**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-704-JHP-TLW |
| | ) | |
| (1) OSAGE WIND, LLC; | ) | |
| (2) ENEL KANSAS, LLC; and | ) | |
| (3) ENEL GREEN POWER NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
<u>MOTION FOR PRELIMINARY INJUNCTION  [Doc. 4]</u>**

NORMAN, WOHLGEMUTH,
CHANDLER, & JETER
Joel L. Wohlgemuth, OBA #9811
Ryan A. Ray, OBA # 22281
401 S. Boston Ave.
Tulsa, Oklahoma 74103
Telephone: (918) 583-7571
Jlw@nwcjlaw.com
RAR@nwcjlaw.com

MODRALL, SPERLING, ROEHL,
HARRIS & SISK, P.A.
Lynn H. Slade
William C. Scott
Post Office Box 2168
Albuquerque, New Mexico 87103
Telephone: (505) 848-1800
Lynn.Slade@modrall.com
Bill.Scott@modrall.com

*Attorneys for Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc.*

## Table of Contents

I.      INTRODUCTION. ....................................................................................................... 1

II.     FACTUAL BACKGROUND. ..................................................................................... 3

   A.     The Osage Wind Project and the Wind Farm Property. .................................... 3

   B.     Communications with the BIA. ......................................................................... 4

   C.     Communications with the Nation. ..................................................................... 6

   D.     The Prior Litigation. ......................................................................................... 7

   E.     Current Construction Activity. .......................................................................... 8

III.    THE UNITED STATES IS NOT ENTITLED TO INJUNCTIVE RELIEF. ................... 10

   A.     The United States seeks a disfavored preliminary injunction. ...................... 10

   B.     The United States Is Unlikely to Succeed on the Merits. .............................. 11

      1.     Osage Wind is not engaged in mining of the Mineral Estate. ................... 11

      2.     The United States is barred by res judicata from raising trespass to the Mineral Estate
      on the Nation's behalf. ................................................................................. 18

   C.     The United States Cannot Demonstrate Irreparable Injury. .......................... 21

   D.     The Balance of Equities Weighs in Osage Wind's Favor. ............................. 23

   E.     An Injunction Would Not Serve the Public Interest. ..................................... 24

IV.     CONCLUSION. ..................................................................................................... 25

## Table of Authorities

**CASES**

*Bursey v. S.C.  Dept. of Health & Envtl. Control*, 600 S.E.2d 80 (S.C. Ct. App. 2004) . . . . 13, 14

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149 (10th Cir. 2001) . . . 11

*E.E.O.C. v. U.S. Steel Corp.*, 921 F.2d 489 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Heideman v. S. Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . .3

*Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324 (10th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . 22

*Koniag, Inc. v. Koncor Forest Res.*, 39 F.3d 991 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . .16

*Millsap v. Andrus*, 717 F.2d 1326 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Montana v. United States*, 450 U.S. 544 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*Nevada v. United States*, 463 U.S. 110 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18, 19

*Nwoson v. Gen. Mills Rests. Inc.*, 124 F.3d 1255 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 20

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) . 10

*Osage Nation v. Irby*, 597 F.3d 1117 (10th Cir. 2010)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Osage Nation v. Wind Capital Group, LLC*, No. 11-CV-00643 GKF-PJC
(N.D. Okla. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..*passim*

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 11, 21, 22

*Saddle Mt. Minerals, L.L.C. v. Joshi*, 95 P.3d 1236 (Wash. 2004) . . . . . . . . . . . . . . . . . . . 16, 23

*Schrier v. Univ. Of Co.*, 427 F.3d 1253 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*Shiver v. United States*, 159 U.S. 491 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Sierra Club, Inc. v. Bostick*, 539 F. App'x 885 (10th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . .23

*Sierra Club v. U.S. Army Corps of Engrs.* 645 F.3d 978 (8th Cir. 2011) . . . . . . . . . . . . . . . . . .24

*St. Louis Typographical Union No. 8, AFL-CIO v. Herald Co.*, 402 F.2d 553 (8th Cir. 1968) .  19

*Taylor v. Sturgell*, 553 U.S. 880 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Tri-State Gen. & Trans. Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346
(10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*United States v. Coleman*, 390 U.S. 599 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*United States v. Hess*, 194 F.3d 1164 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Tohono O'Odham Nation*, ___ U.S. ___, 131 S. Ct. 1723 (2011) . . . . . . . . . . 20

*U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants,
Inc.*, 883 F.2d 886 (10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*Watt v. Western Nuclear, Inc.*, 462 U.S. 36 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*W. Watersheds Project v. Bureau of Land Mgmt.*, 2011 WL 1630789
(D. Nev. Apr. 28, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**STATUTES**

Mining Law of 1872, 30 U.S.C. § 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Stock-Raising Homestead Act, 43 U.S.C.§§ 291-302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Osage Allotment Act of June 28, 1906, ch. 3572, 34 Stat. 539 . . . . . . . . . . . . . . . . . . . . . . . 3, 15

Okla. Stat. Ann. tit. 45, § 723. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Okla. Stat. Ann. tit. 17, § 160.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**REGULATIONS**

25 C.F.R. § 211.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

25 C.F.R. § 211.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 17, 18

25 C.F.R. § 211.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

25 C.F.R. § 211.43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

25 C.F.R. § 211.47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

25 C.F.R. § 214.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

25 C.F.R. § 214.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

43. U.S.C. § 601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

43 C.F.R. § 3601.71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**OTHER AUTHORITIES**

Preamble, 66 Fed. Reg. 58892, 58894 (Nov. 23, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

Restatement (Second) of Judgments § 25 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

Restatement (Second) of Judgments § 41 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Restatement (Second) of Judgments (1982) § 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

53A Am. Jur. 2d *Mines & Minerals* § 14 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Defendants, Osage Wind, LLC ("Osage Wind"), Enel Kansas, LLC, and Enel Green Power North America, Inc. ("Enel") respond to Plaintiff's Motion for Preliminary Injunction [Doc. 4] ("Motion"). Plaintiff, the United States of America, cannot meet the heightened standard to grant a disfavored preliminary injunction that would alter the status quo because Osage Wind is not engaged in "mining" for which a license is necessary and the United States' claims are barred by res judicata. The United States has failed to meet its burden of proof on all of the elements necessary to obtain injunctive relief.

## I.    INTRODUCTION.

Let there be no mistake: the Complaint and Motion urge this Court to become the first court to hold that a mineral estate owner can veto a fee surface owners' reasonable construction on the surface estate solely because subsurface mineral materials must be excavated during surface construction, even when, like here, those materials will remain at precisely the same location from which they were removed. Neither the applicable regulations, nor the Osage Allotment Act, nor the common law support that unprecedented extension of a mineral estate owner's power to extract compensation for, much less veto, construction of a 150 megawatt wind powered generation facility (the "Wind Farm" or "Project") on privately owned surface estate property. The Complaint [Doc. 2] is legally unsupportable and should be dismissed.

Nor do the equities support injunctive relief. The history of communication between the Osage Nation ("Nation") and Osage Wind and prior litigation shows the Nation's unalterable opposition to the Wind Farm, despite full knowledge of the Project. That opposition advanced first through unsuccessful litigation the Nation through the Osage Minerals Council ("OMC") filed in this Court, *see Osage Nation v. Wind Capital Group, LLC*, No. 11-CV-00643 GKF-PJC (N.D. Okla. Oct. 18, 2011)) ("Prior Litigation"), that precludes its benefitting from this action filed at its request by its trustee, and then by challenges to Osage County permits approving the

1

Project and multiple litigations. The Nation seeks to use any means at its disposal to stop the Project. It has enlisted the United States in support of that effort here. The United States' candid disclosure that it seeks at this late date to impose a lease or permit requirement that gives the Nation's or Bureau of Indian Affairs' (the "BIA") the ability to "say 'no'" to the entire Project, Motion at 9, certainly reflects the Nation's, and possibly BIA's, motivation for this filing.

The United States falsely accuses Osage Wind of "conveniently preclud[ing] both the Secretary and the [OMC] from considering" all aspects of the planned construction. *Id.* To the contrary, Osage Wind provided the Nation and the BIA full information, including detailed plans and drawings, of the plans for and scope of the Project and necessary excavations dating back at the latest to 2011, and the planned excavations are described expressly in Chief Judge Frizzell's detailed findings in the Prior Litigation. The BIA waited until excavation was well under way to even mention a "Sandy Soils Permit" may be required of Osage Wind. Then, and at the request of the OMC, *see* Complaint, ¶ 29, the United States filed this suit, over a year after construction began. The regulations give no clue that "mining" includes simply using soil and mineral materials for on-site construction, and the United States, with full knowledge of the proposed scope of the Project and turbine excavations, failed to timely apprise Osage Wind of any contention that a permit or lease was required until excavation were well under way.

Moreover, because Osage Wind has sold no minerals materials, and none could be sold commercially from the isolated holes scattered across over 8,000 acres, the Nation has lost no commercial benefit from its mineral estate. Although the Nation has been deprived of nothing, if a remedy were appropriate, the rock removed is reasonably accounted for. The equities, given the United States' (and the Nation's) unreasonable delay and the absence of irreparable injury, preclude equitable relief on the United States', and its trust beneficiary's, behalf. Far

2

outweighing any prejudice to BIA or the Nation is prejudice to Osage Wind, given its reliance on the United States' acquiescence to the Project's expending or committing almost $300 million dollars to date and the public interest in development of renewable energy. The Court should deny the United States' request for a preliminary injunction.

## II.     FACTUAL BACKGROUND.

### A.     The Osage Wind Project and the Wind Farm Property.

In 2010, Osage Wind, LLC, then an affiliate of Enel's predecessor in interest (Wind Capital Group or "WCG"), secured long term leases of approximately 8,400 acres northeast of the town of Burbank in Osage County, Oklahoma (the "Property"), a small portion of the approximately 1.5 million acre area of Osage County representing the Nation's former reservation. Declaration of Bill Moskaluk, Dec. 9, 2014, ¶ 5 ("Moskaluk Decl."), attached as Ex. 1; Declaration of Joan Heredia, Dec. 9, 2014, ¶ 5 ("Heredia Decl."), attached as Ex. 2.[1] The Property is located entirely on leased surface estate lands owned in fee. Moskaluk Decl. ¶ 5. No portion of the surface estate of the Property is held in trust nor held subject to restriction against alienation. *Id.* ¶¶ 6-8; *see Osage Nation v. Irby*, 597 F.3d 1117, 1127 (10th Cir. 2010) (holding the Osage Reservation was disestablished). The Osage Allotment Act severed the mineral estate of the former reservation from the surface estate and placed it in trust for the Nation. Act of June 28, 1906, ch. 3572, 34 Stat. 539, § 3 ("That the oil, gas, coal, or other minerals covered by the lands . . . are hereby reserved to the Osage tribe . . . .").

Through approvals of the Nation or the OMC, and BIA, the Property is heavily impacted by oil and gas development. A significant number of oil and gas wells have been drilled on the Property, and numerous gravel and dirt oil and gas access roads and pipelines crisscross the

---

[1] The Court may consider evidence in a form that may not be admissible at trial, including hearsay and affidavits. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings.").

central portion of the Property. Heredia Decl. ¶ 6. Many working and abandoned oil and gas wells and related equipment are scattered throughout the area. *Id.*

In contrast, the Wind Farm will have a limited impact on the surface estate. Once fully constructed, the facilities on the Property will consist of 84 turbines, underground collection lines running between turbines and a substation, one overhead transmission line, two permanent meteorological towers, and access roads. Moskaluk Decl. ¶ 9. The surface footprint of the completed facilities, including the surface of the ground above the collection lines, will be approximately 1.5% of the 8,400 acres under lease. *Id.* Given the average size of the foundations, *see infra*, the surface area excavated for the 84 turbine foundations will occupy approximately 0.0649% of the surface of the Property.

**B.     Communications with the BIA.**

Osage Wind fully advised the BIA of its plans for the Wind Farm no later than 2011 (and the Nation beginning in 2008, as discussed below), and has consistently addressed any concerns raised by BIA and the Nation. Over three years before the initiation of this lawsuit, on September 14, 2011, the BIA wrote a letter to WCG, expressing the BIA's concern that the Wind Farm could impact the continued development of oil and gas in the mineral estate and threatened to join with the Nation in litigation to prevent such interference. Heredia Decl. ¶ 12. Nowhere in that correspondence did the BIA state that a permit or lease would be required. On September 19, 2011, WCG representatives met with Charles Head, Acting Regional Director for the BIA's Eastern Oklahoma Regional Office, and Allen Woodcock, Department of the Interior Field Solicitor, with Melissa Currey, BIA Osage Agency Superintendent, and Charles Hulbert, a BIA petroleum engineer, participating by telephone. *Id.* ¶ 13. At the meeting, WCG presented detailed site plans for the Wind Farm. *Id.* WCG stated that it was working with oil and gas

lessees "to ensure that the Project would not interfere with the current and future development plans relating to the mineral estate." *Id.*

On October 7, 2011, WCG provided maps of the proposed Wind Farm and project area to representatives of the BIA, the Nation, and the OMC. *Id.* ¶ 14. Those maps showed turbine locations, foundations, collector systems, existing and proposed access roads, transmission lines, transformers, and the substation; in short, a detailed layout of the entire Project. *Id.* On July 19, 2012, BIA's Acting Regional Director, Eastern Oklahoma Region Karen Ketcher wrote WCG's David Boyce asserting the BIA must ensure that the Project will not affect oil or gas production. *Id.* ¶ 17. On August 12, 2012, Mr. Boyce responded to Acting Director Ketcher, and advised that the Project would not adversely affect the Nation's oil and gas development or engage in sale or removal of minerals that would require "either a mineral lease or any BIA permit . . . ." *Id.* ¶ 18. The BIA did not respond to this letter. *Id.* BIA, however, was copied on Mr. Boyce's October 28, 2013 letter to Andrew Yates of the OMC, responding to the OMC suggestion Osage Wind "may require" a minerals lease or permit, *see* Section II.C, *infra*, and, two weeks later, on November 12, 2013, Chapparal Energy wrote Superintendent Phillips advising that construction of the Project had begun and asserting "it is incumbent upon the BIA . . . to take immediate action . . ." to stop the Project. *See* Letter, Chapparal Energy to Robin Phillips, Acting Supt., Nov. 12, 2013, attached as Ex. 3

Although BIA was then aware that Osage Wind contended its actions did not require a mineral lease and BIA had been asked to take "immediate action," BIA did not communicate with Osage Wind about the Project again until Superintendent Phillips wrote Enel on October 9,

2014, one full year later, and then only claimed need for a "Sandy Soil Permit."[2] *See* Motion, Ex. 3. In response to Superintendent Phillips' letter, Lynn H. Slade, counsel for Osage Wind, sent emails to Field Solicitor Woodcock on October 20, 2014, and Superintendent Phillips on October 21, 2014, attaching a legal memorandum explaining why Osage Wind believes it is not required to have such a permit and stating, "[p]lease advise if I or others at Enel can provide further information or, if you have remaining concerns, we would be happy to meet with your office and any officials of the Osage Nation or Osage Minerals Council who you consider appropriate." *See* Letters, emails, and memorandum attached as Ex. 4. Prior to the filing of this action, neither Enel nor Mr. Slade received any communication advising that BIA disagreed with the conclusion that no lease or permit was needed. On October 20, 2014, Jeff Riles of Enel met with BIA Regional Director Robert Impson, provided further information about excavation activities, and offered to respond to any further questions and schedule a field trip to view operations. *See* Letter from Jeff Riles, attached as Ex. 5.[3]

C.    **Communications with the Nation.**

Beginning in 2008, representatives of Osage Wind and WCG have had numerous meetings with representatives of the Nation and the OMC to discuss the Wind Farm. Heredia Decl. ¶ 9.[4] On April 15, 2011, Osage Wind met with representatives of the OMC and provided

---

[2] Reflecting the ever-evolving positions of the United States and BIA, the Motion makes no mention that Osage Wind should obtain such a permit. Moreover, the BIA's regulations contain no reference to a Sandy Soil Permit, much less any indication about when or how one is to obtain such a permit.

[3] In addition, Osage Wind is consulting with the Nation and other parties regarding the optional U.S. Fish and Wildlife Service ("FWS") Programmatic Take Permit for the Bald Eagle that Osage Wind voluntarily applied for, and the Environmental Assessment ("EA") being prepared with respect to that Permit. Heredia Decl. ¶ 9. FWS is undertaking analysis consistent with the National Environmental Policy Act ("NEPA"), and the BIA is a cooperating agency in that effort.

[4] Osage Wind had comprehensive cultural resources studies prepared with respect to the Project sites, and the Nation's Tribal Historic Preservation Officer indicated no pre-recorded sites

them with copies of the proposed site plan for their review and comment. *Id.* ¶ 11. On that same day, Osage Wind met with Assistant Principal Chief Scott Bighorse and Chris White of the Principal Chief's office. *Id.* On October 7, 2011, WCG's CEO sent a letter to the Nation's Principal Chief and the Chairman of the OMC requesting a meeting. *Id.* ¶ 15. The Nation did not respond to the request for the meeting. *Id.* On October 10, 2013, Andrew Yates of the OMC wrote to WCG stating the Project "may be" subject to "25 C.F.R. §§ 411 and 414 [*sic*]." *Id.* ¶ 19. Mr. Boyce responded to Mr. Yates on October 28, 2013, describing planned excavation and explaining that the Project did not require a minerals lease. *Id.* ¶ 20. Neither Mr. Yates nor the OMC responded to that letter. *Id.*

### D.   The Prior Litigation.

On October 18, 2011, the Nation "through the [OMC]" and represented by Oklahoma, California, and Washington, D.C. counsel, sought an injunction from this Court prohibiting the construction of the Wind Farm, claiming that the placement of the Wind Farm facilities and the "extensive digging to construct deep pits containing concrete foundations" associated with construction would "interfere with the Osage Nation's rights associated with developing its mineral estate." Prior Litigation, Complaint, ¶¶ 17, 40 [Doc. 2] ("Prior Litigation Complaint"). Though the BIA had threatened to join the suit, it did not. *See* Heredia Decl. ¶ 12.

Chief Judge Frizzell denied the Nation's request for injunctive relief, holding that an injunction against Osage Wind's construction would cause "certain harm" to Osage Wind,

---

existed within the Property. Heredia Decl. ¶ 23. Nonetheless, prior to commencing construction, Osage Wind implemented an "inadvertent discoveries" procedure, by which it instructed its employees and contractors that, in the event artifacts, features, burials, or other cultural materials are encountered during construction, all construction within 100 feet of any such location must cease so that any material encountered can be assessed, and the Oklahoma State Archeologist notified, if necessary. Moskaluk Decl. ¶ 13. During the now-complete excavation process on the Property, Osage Wind did not encounter any human remains, artifacts, or other cultural materials. *Id.* ¶ 14.

outweighing the "speculative and hypothetical" injury the Nation claimed, and would adversely affect the public interest. Prior Litigation, Findings of Fact ("FOF") & Conclusions of Law ("COL"), COL Nos. 22-26 [Doc. 36] (Dec. 20, 2011), attached as Ex. 6. Chief Judge Frizzell described the structures and excavations planned for the Project, FOF Nos. 6-9, 22, found the Wind Farm would not interfere with development of the Nation's Mineral Estate oil and gas development, *id.* Nos. 13, 25-31, and that the balance of harms and public interest weighed in favor of not enjoining the Project, *id.* Nos. 32-33. The Nation dismissed its appeal from this ruling. *See* Prior Litigation, Mandate [Doc. 55] (Feb. 23, 2012).

      **E.**    **Current Construction Activity.**

Osage Wind began initial construction work, including clearing, grubbing, and road work, in October 2013. Moskaluk Decl. ¶¶ 11-12. It initiated excavation work on September 10, 2014. *Id.* ¶ 12. As of November 28, 2014, Osage Wind had completed excavation of all 84 foundations. *Id.* ¶ 15(a)(ii). As of December 8, 2014, the soil, rock, with the exception of larger pieces, and crushed rock had been returned to 90% of the foundation holes, *id.* ¶ 15(a)(iv), eight turbines had been fully erected, *id.* ¶ 15(c), and slightly more than 80% of the necessary components for the Project had been delivered and offloaded adjacent to the foundation for each turbine, *id.* ¶ 15(b).

To construct foundations for the turbines, Osage Wind excavates an area approximately 10 feet deep and between 50 and 60 feet in diameter. *Id.* ¶ 15(a)(i). The materials removed include sand, soil, and rock encountered in place. *Id.* Excavated material is placed adjacent to the hole from which it was removed, with rock bigger than 3 feet placed in a separate pile (representing approximately 25% of the material removed, which is not crushed and remains in place as of this date). *Id.* To return the material after a foundation is completed, Osage Wind's contractor has rock crushers at the project site to crush the rock (with the exception of the larger

pieces) to approximately 3 inches in diameter, record the volume crushed, and place the crushed material at the site. *Id.* ¶ 15(a)(ii). This is a customary and standard construction practice, employed around the country and at other projects in Oklahoma. *Id.* After the excavation, mud mats, bases, and pedestals for the foundations are poured using materials brought from offsite. *Id.* ¶ 15(a)(iii). Once a foundation is complete, the sand, soil, and crushed rock from the specific hole is pushed back into the hole. *Id.* ¶ 15(a)(iv).

None of the rock, sand, or soil excavated for any foundation is moved to or used at any other location within or outside of the Property or for any other purpose than to fill the hole from which it came. *Id.* ¶ 15(a)(v). No excavated rock or sand is used in mixing or preparing the concrete for any foundation or sold or used for commercial purpose. *Id.* ¶ 15(a)(v)-(vi). Rather, all sand, aggregate, and concrete needed for construction is purchased from third-party contractors with offsite locations and delivered to the Property. *Id.* ¶¶ 15(a)(vii)-(viii).

The Government, which did not file a motion for preliminary injunction with its Complaint or request expedited hearing, has no basis for contending, *see* Motion at 9-10, that Osage Wind has expedited construction in response to the Government's filing. The Project has proceeded on timelines established some months ago, and in fact stands behind schedule on project construction. *Id.* ¶ 12. In fact, Osage Wind allowed the Project contractor to stop work for four days for the Thanksgiving holiday. *Id.*

Approximately 200 employees of Osage Wind and its contractors are currently constructing and developing the Wind Farm, and that number is planned to increase to approximately 300 in next month. *Id.* ¶¶ 16-17. Once construction is completed, the Wind Farm will have up to twelve full-time employees. *Id.* ¶ 18. Through November 21, 2014, Osage Wind has expended approximately $287,000,000 on the Project. *Id.* ¶ 20. The expected revenue for

local contractors is approximately $2,300,000.00. *Id.* ¶ 19. If the construction is halted, Osage Wind will suffer substantial known losses, including delay costs of approximately $300,000.00 per day, and costs for inability to accept delivery of components of $25,200.00 per day. *Id.* ¶ 22(a)-(c). Upon start of operations, Osage Wind expects approximately $1,000,000 in monthly revenue, which would be lost or delayed if an injunction is granted. *Id.* ¶ 22(d).

## III.   THE UNITED STATES IS NOT ENTITLED TO INJUNCTIVE RELIEF.

### A.   The United States seeks a disfavored preliminary injunction.

A preliminary injunction "is an extraordinary remedy" requiring the moving party to establish a "clear and unequivocal" right to relief. *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quotation marks and citations omitted). "Because it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established." *U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989).

The United States may only obtain its requested injunction if it meets a heightened burden. A "preliminary injunction[] that alter[s] the status quo," as the Motion seeks here, is a "specifically disfavored injunction[] . . . ." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc) (per curiam). Thus the Motion

> must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course. Furthermore, because a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard. Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on our modified-likelihood-of-success-on-the-merits standard.

*Id.* at 975-76. The United States incorrectly asserts that it may rely on a modified standard to meet its burden. *See* Motion at 5.

The primary purpose of a preliminary injunction is to preserve the status quo, the last uncontested status existing before the litigation. *See RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001). The Motion seeks to alter the status quo from the last uncontested status between the parties: that in which Osage Wind was constructing turbine foundations pursuant to its surface leases and County permit. Osage Wind made diligent steps to develop the Project for more than three years, including consultation with the BIA, and began construction of the Wind Farm more than a year ago. *See* Section II.B, E, *supra*. The United States now seeks to alter the status quo by enjoining these construction activities. Motion at 13. The United States must meet the heightened burden.

**B.      The United States Is Unlikely to Succeed on the Merits.**

1.      <u>Osage Wind is not engaged in mining of the Mineral Estate.</u>

The United States is not likely to prevail on the merits because Osage Wind's activities—limited removal and prompt return of the removed soil and rock to its exact prior location, all incident to lawful construction on the surface—are not mining. The United States' argument that Osage Wind is "mining" and thus requires a lease under 25 C.F.R. Parts 211 and 214, *see* Motion at 5-8, fails because neither set of regulations is applicable to construction of the Wind Farm. The United States' Complaint and Motion are premised on a fundamental misconception of the nature of a mineral interest: the mineral estate owner does not have the right to veto a surface use because the surface use involves a reasonable and incidental use of the mineral estate. Rather, it owns the right to commercial development of any such minerals not incidental to reasonable uses of the surface estate. Because Osage Wind only encounters "minerals" incidental to its lawful

11

and reasonable use of the surface, it does not require authorization from Mineral Estate owners.

> a.   25 C.F.R. Parts 211 and 214 do not preclude incidental construction use of the Mineral Estate.

The 25 C.F.R. Parts 211 and 214 regulations do not require Osage Wind to seek either a lease or permit merely to construct the Wind Farm. Parts 211 and 214 apply only to the "business of" developing mineral resources, not to incidental use of minerals in connection with surface construction activities. Part 211 governs "the development of Indian tribal oil and gas, geothermal and solid mineral resources . . . ," 25 C.F.R. § 211.1(a), and defines "mining" as the "science, technique *and business of mineral development* . . . ." *Id*. § 211.3 (emphasis added).

Mining requires placing minerals into the marketplace or to commercial use, as demonstrated in other sections of Part 211. *See id.* § 211.27(a) (limiting leases to the time in which minerals "are produced in paying quantities"); *id.* § 211.43(a)(1) (basing the royalty rate on the "value of the production produced and sold from the lease"); *id.* § 211.47(a) (requiring diligence in mining be exercised "while minerals production can be secured in paying quantities"). Like Part 211, Part 214 imposes an obligation to "exercise diligence in the conduct of prospecting and mining operations" and to "expend annually in development work" a specified sum. 25 C.F.R. § 214.13(a). The plain language of the regulations demonstrate that "mining" is an activity that results in a mineral being marketed, not a temporary and incidental encounter of minerals during surface construction activities. The regulations reflect no intent to convert reasonable excavation for surface construction into "mining."

The requisite nexus between mining and commercial use or marketing is demonstrated by the prudent person rule and the marketability test used to determine whether a subsurface material is a "valuable mineral deposit." Under the prudent person rule, developed under the Mining Law of 1872, 30 U.S.C. § 22, "the discovered deposits must be of such a character that a

person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine." *United States v. Coleman*, 390 U.S. 599, 602 (1968) (quotation marks and citations omitted).[5] Merely because limestone and sand may be minerals useable for commercial purposes, see *Millsap v. Andrus*, 717 F.2d 1326, 1329 (10th Cir. 1983), does not convert construction use of materials to commercial "mining" incompatible with a surface owners' right to use of the surface.

Osage Wind also is not engaged in the "treatment of minerals." Motion at 7-8 (quoting 25 C.F.R. § 211.3). The United States lifts that term from context (the "*business of mineral development including* . . . severance and treatment of minerals . . . ") (emphasis added). Even if crushing part of the rock were "treatment," Osage Wind does not do so in the "business of mineral development." *Bursey v. South Carolina Dept. of Health & Environmental Control*, 600 S.E.2d 80 (S.C. Ct. App. 2004), *aff'd*, 369 S.C. 176, 631 S.E.2d 899 (2006), *overruled on other grounds by Allison v. W.L. Gore & Assoc.*, 714 S.E.2d 547 (S.C. 2011), does not support that Osage Wind is engaged in the treatment of minerals simply because it crushes parts of the materials it removed, before returning it to the hole. *See* Motion at 7-8. In *Bursey*, a company was building a back-up dam while remediating another dam, and used materials from a quarry it developed on the property to make concrete for the dam. 600 S.E.2d at 81-82. *Bursey* held that a mining permit was required, rejecting the argument that the quarry was not mining because it was "excavation . . . conducted solely in aid of on-site construction" of the dam. *Id.* at 87. Relying on the state law defining mining to include "the breaking of the surface soil to facilitate

---

[5] The prudent person rule is complemented by the marketability test, which limits valuable materials to those that can be extracted, processed, transported, and marketed at a profit. *Coleman*, 390 U.S. at 603. "[E]vidence that a mineral deposit is not of economic value and cannot in all likelihood be operated at a profit may well suggest that a claimant seeks the land for other purposes [than mining]." *Id.*.

or accomplish the extraction or removal of ores or mineral solids for sale or processing or consumption in the regular operation of a business[,]" *Bursey* held the company's activities, "go beyond mere 'excavation' as contemplated in the exception [to the mining statute]." *Id.*

Rather than assist the United States, *Bursey* demonstrates a fundamental distinction between mining and the *de minimis* excavation and use of the mineral estate being made by Osage Wind. The Wind Farm turbine foundations consist of 84 holes scattered over 8,400 acres, and the subsurface material is being removed as the holes are dug, and then returned to the exact same hole or stacked on the surface. *See* Section II.A, E, *supra*. In *Bursey*, the surface owners were excavating a 60 acre quarry—the biggest in the state. And while *Bursey* listed "crushing" of rock as a factor in determining whether mining was occurring, the crushed material there was then processed into concrete for use elsewhere on the property. 631 S.E.2d at 82. Here, Osage Wind is crushing some rocks, but it is not processing them for use as concrete, or moving them for use elsewhere on or off the Property; any crushing merely facilitates the process of returning the material to the hole once the foundation has set. The Court should reject the Motion's suggestion that digging and refilling a hole with the same material constitutes "mining" in any sense of the word. Osage Wind is not engaged in the "business of mineral development" and thus no lease or permit is required under either Part 211 or 214.

> b.   Digging foundations that, of necessity, impact "minerals" is not mining.

Citing *Watt v. Western Nuclear, Inc.*, 462 U.S. 36 (1983) ("*Western Nuclear*"), the United States argues, incorrectly, that Osage Wind's digging foundations and refilling them is a use of the Mineral Estate Congress did not intend. Motion at 7. Congress granted full fee title to allottees to support their, and Osage County's, economic development, and did not limit the type of development. Contrary to the Government's vision of allottees as limited to agrarian pursuits,

14

the Osage Allotment Act expresses Congress' intent that the surface estate of the former Osage Reservation be used "for farming, grazing, or *any other purpose not otherwise specifically provided for herein . . . .*" Osage Allotment Act, § 7 (emphasis added). Section 2, Seventh further states that "upon the issuance of such certificate of competency the lands of such member (except his or her homestead) shall become subject to taxation, and such member, except as herein provided, shall have the right to manage, control and dispose of his or her lands the same as any citizen of the United States . . . ." Surface uses directly addressed in the Allotment Act include erection of new buildings, § 2, 11th; a cemetery, § 2, 12th; and construction and improvement of railroads, § 11. There is no reason to accept the United States' strained reading, at odds with the history and current land use of the County, that limits Osage County surface use to agriculture or gives the mineral owner a veto or control over all but the smallest construction projects, and hence all land use, requiring excavation. Congress intended the former Osage Reservation for the full range of types and sizes of land uses, which necessarily requires construction and, accordingly, excavations. Osage Wind's construction of the Wind Farm is consistent with the purpose of the Osage Allotment Act.

The Tenth Circuit has rejected the United States' use of *Western Nuclear* to define surface estate rights under statutes not involved there. Motion at 7. *See United States v. Hess*, 194 F.3d 1164, 1171 (10th Cir. 1999) ("The district court summarily concluded the *Western Nuclear* ruling must extend to this case because the Indian Reorganization Act of 1934 enveloped the same polices as the Stock–Raising Homestead Act of 1916 [43 U.S.C. §§ 291-302]. We disagree."); *see also Koniag, Inc. v. Koncor Forest Res.*, 39 F.3d 991, 1001 (9th Cir. 1994) (considering *Western Nuclear* but concluding it was not controlling because, consistent with the intent of the relevant statute, the surface owner "has a right not to be unreasonably

denied use of rock from [the]subsurface estate"). To the degree *Western Nuclear* is premised on Congress' limiting surface uses of SRHA lands, it is inapplicable here. *Western Nuclear*, in fact recognized the right of even a surface owner of SRHA split-estate lands to use minerals. *See* 462 U.S. at 54 n.14 ("There is force to the argument that this purpose would be defeated if the owner of the surface estate were unable to use reserved minerals even where such use was essential for stock-raising and raising crops."), *citing Shiver v. United States*, 159 U.S. 491, 498 (1895) (homesteader could cut timber to construct a home, "but not to sell the same for money").

The conclusion that the surface owner may incidentally use the Mineral Estate is consistent with Oklahoma law. The Oklahoma Mining Lands Reclamation Act, applicable to Osage Winds lessors' surface estates, provides that surface mining "shall not include excavations or grading conducted for forming, on-site road construction . . . ." Okla. Stat. Ann. tit. 45, § 723. Certainly, the temporary removal and replacement of materials in the hole from which they came is even further removed from mining. *Accord* 53A Am. Jur. 2d *Mines & Minerals* § 14 (2006) ("[T]he simple removal of dirt does not constitute mining."); *Saddle Mt. Minerals, L.L.C. v. Joshi*, 95 P.3d 1236, 1243 (Wash. 2004) (holding surface owner could use sand and gravel in developing a subdivision site, and had to compensate the mineral estate owner only if the developer exported the sand and gravel from the site).

The United States grossly exaggerates in contending that the BIA's "approach here is consistent with the Bureau of Land Management's mineral materials regulation . . . ." Motion at 6 n.2 (citing 43 C.F.R. § 3601.71(b)(1)). That regulation, concerning unauthorized use of mineral materials from public lands, states, [i]f you own the surface estate of lands with reserved Federal minerals, you may use mineral materials within the boundaries of your surface estate without a sales contract or permit only in the following circumstances: (1) You use a minimal amount of

mineral materials for your own personal use . . . ." The final rule issued with respect to this regulation discussed this provision in more detail:

> [W]ithout a contract or permit, or other express authorization, [a] surface estate owner may make only minimal personal use of federally reserved mineral materials within the boundaries of the surface estate. *Minimal use would include, for example, moving mineral materials to dig a personal swimming pool and using those excavated materials for grading or landscaping on the property.* It would not include large-scale use of mineral materials, even within the boundaries of the surface estate.

Preamble, 66 Fed. Reg. 58892, 58894 (Nov. 23, 2001) (emphasis added). This comment provides critical guidance: the BLM regulation contemplates that use of minerals materials incident to construction on the surface estate is not intended to invoke a minerals contract or lease requirement under the federal Materials Act, 43 U.S.C. § 601. The reference to "minimal amount" does not require the surface owner's swimming pool to be small, or the subdivision with numerous residences to forego basements or foundations or septic systems. Here, the use of minerals materials is "minimal" in the sense used in the Preamble, given the relationship of the excavation to the total size of the Property and that it is solely incident to surface construction.

c.   The Wind Farm does not exceed acreage limitations in its incidental use of subsurface materials.

The Motion lifts from context the volume "threshold" in 25 C.F.R. § 211.3 in arguing erroneously that Osage Wind's digging and then replacing over 5,000 cubic yards of subsurface material requires the conclusion that its activities are "mining." Motion at 6-7. Section 211.3 defines "mining" as the "science, technique and *business of mineral development*," *see* Section III.B.1.a, *supra*, but, for sand, gravel, and limestone, "*only if* the extraction of such a mineral exceeds 5,000 cubic yards." (Emphasis added). If that threshold is not met, a permit, and not a lease, is required for such mineral development "business." *See* § 211.3 (defining "permit" as a contract for removal of less than 5,000 cubic yards). The 5,000 cubic yards standard sets a *de*

17

*minimis* amount of mining that can be done by one in the "business of mineral extraction," of certain minerals without a lease. It does not define what constitutes mining.

Nor is Osage Wind violating, "flagrantly" or otherwise, Motion at 8, the acreage limitation in 25 C.F.R. § 214.8, which requires special permission to hold a lease in excess of 960 acres. While the Wind Farm is spread over an area of 8,400 acres, the turbine foundations—the only part of the Project the BIA now claims requires a mineral lease—occupy significantly less acreage, approximately .065%. *See* Section II.A, *supra*. Thus even if a mining lease were required, which it is not, it could pertain only to the limited areas of material removal to build foundations, not the full 8,400 acres, and it would not be one for which special permission was needed. The Motion's intemperate accusations to the contrary are unfounded.

> 2. <u>The United States is barred by res judicata from raising trespass to the Mineral Estate on the Nation's behalf.</u>

The United States will not prevail on the merits for the additional reason that the doctrine of res judicata bars the relief the Complaint and Motion seek because the claims could have and should have been raised in the Prior Litigation by the Nation. Res judicata applies when a party or its privy has already litigated a cause of action to final judgment, and the claim was raised, or could have been raised. *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008); *Nevada v. United States*, 463 U.S. 110, 129-30 (1983). Res judicata either bars the United States from bringing this claim or bars the Nation from gaining benefit from any judgment in this action.

The Prior Litigation, which was dismissed with prejudice and from which the Nation appealed but then dismissed its appeal, is a final judgment on the merits. The United States is in privity with the Nation and is bound by the judgment in the Prior Litigation. In its Complaint, the United States asserts, "[o]n October 29, 2014, the [OMC] . . . request[ed] the assistance of the United States to protect the Osage Mineral Reserve from unauthorized commercial use."

Complaint ¶ 29. The United States' own factual allegations make clear that this case is being brought on behalf of the Nation and at its insistence.

The trust relationship between the United States and a tribe establishes they are privies. *See Nevada*, 463 U.S. at 135 Pyramid Lake Paiute Tribe's water claims barred by res judicata because the United States had litigated the issues and represented the Tribe's interests). The United States is barred from "bring[ing] suit as the designated representative of [the Nation] who was a party to the prior adjudication." *Taylor*, 553 U.S. at 895; *see also* Restatement (Second) of Judgments § 41(1)(a), (d) (1982) (providing that a beneficiary is bound "as though he were a party" when represented by "[t]he trustee of an estate . . . in which the person is a beneficiary" or "an official or agency invested by law with authority to represent" the beneficiary).

The same privity rules apply where the beneficiary represented itself in a prior action. In *St. Louis Typographical Union No. 8, AFL-CIO v. Herald Co.*, 402 F.2d 553, 556 (8th Cir. 1968), after certain union members had sued unsuccessfully for benefits, a subsequent suit by the union on behalf of the members was barred because the union "prosecutes this action solely as the representative of the same employees who were plaintiffs in the state case. In determining whether the parties are the same, substance over form controls." A beneficiary may not have two bites at the apple by getting his trustee to sue: "[I]f a person first litigates in his own behalf, that person may be precluded from claiming any of the benefits of a judgment in a subsequent action that is brought or defended by a party representing him." *E.E.O.C. v. U.S. Steel Corp.*, 921 F.2d 489, 493 (3d Cir. 1990); *see also* Restatement (Second) of Judgments (1982) § 42, cmt. g ("[A] person who appears in his own behalf in litigation has had his day in court and is bound by the judgment and may not relitigate in a subsequent action prosecuted or defended through a representative.").

19

Finally, the cause of action here is the same as that underlying the Prior Litigation. Under the transactional approach, "a cause of action includes all claims or legal theories of recovery that arise from the same transaction, event, or occurrence." *Nwoson v. Gen. Mills Rests. Inc.*, 124 F.3d 1255, 1258 (10th Cir. 1997) (quotation marks and citations omitted). "The now-accepted test . . . for determining whether two suits involve the same claim or cause of action depends on factual overlap, barring 'claims arising from the same transaction.'" *United States v. Tohono O'Odham Nation*, ___ U.S. ___, 131 S. Ct. 1723, 1730 (2011). "Concentrating on operative facts" is required to determine whether the claims arise from the same transaction." *Id.* Under Restatement (Second) of Judgments § 25 (1982), the prior judgment bars the later case, even if the plaintiff in the second case is prepared: "(1) To present evidence or grounds or theories of the case not presented in the first action, or (2) To seek remedies or forms of relief not demanded in the first action."

In both this lawsuit and the Prior Litigation the transaction at issue is the development and construction of the Wind Farm and its alleged interference with the Mineral Estate. Chief Judge Frizzell framed the issue perfectly when he asked, at a hearing: "How exactly does this project result in the inability of the Osage Nation to benefit fully from its mineral estate?" Prior Litigation, Transcript of Proceedings Oct. 26, 2011 [Doc. 18], Pg. 6, Lns. 15-17. In fact, Chief Judge Frizzell made specific findings regarding the size and depth of foundation excavations, and denied the "Nation's request for declaratory relief and a permanent injunction barring Defendants from constructing a wind farm." *See* Section II.D., *supra*. The Prior Litigation and the current lawsuit advance the same res judicata cause of action.

The real party in interest here—the Nation—has litigated the issue of interference with the Mineral Estate and lost. The United States, as its trustee, is bound by the Prior Litigation, and

the Nation cannot circumvent the prior judgment through a proxy. The United States is unlikely to succeed on the merits because its claims are barred by res judicata.

### C.      The United States Cannot Demonstrate Irreparable Injury.

The United States cannot satisfy the irreparable harm requirement because it cannot show "a significant risk that [it or the Nation] will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling*, 552 F.3d at 1210 (quotation marks and citations omitted). The United States claims the Nation and the Mineral Estate will suffer irreparable injury in that Osage Wind's failure to secure a lease from the Nation has injured the ability of the United States and the OMC to say "no" to the Wind Farm, Motion at 9; to address environmental and cultural concerns, *id.* at 9-10; and that monetary damages are insufficient. *Id.* at 10. Each of the United States' asserted injuries fails to satisfy this standard.

The United States argues an irreparable injury occurred because Osage Wind did not seek a lease and "conveniently precluded" input by the BIA and the OMC into the Project design. Motion at 9. That statement is totally false. The BIA, the Nation, and OMC were fully informed about the Project, including planned excavations, from 2011 on, and had ample opportunity to provide input or request modifications to the project. *See* Section II.B, *supra*. The opposite occurred: the BIA simply ignored Osage Wind's October 28, 2013 statements that it did not need a lease and waited silently, for almost a year, until excavation was well underway, to request an uncodified "permit," and *then* completely ignored Osage Wind's October 21, 2014 responsive legal memorandum, standing silent until it filed suit, and never seeking a temporary restraining order or expedited hearing. *See id.*; *RoDa Drilling*, 552 F.3d at 1211 ("[D]elay in seeking preliminary relief cuts against finding irreparable injury.") (quotation marks and citations omitted).  Given Osage Wind's substantial, time-critical investments, this conduct is inexcusable.

The United States falsely accuses Osage Wind of employing a "beat-the-clock" strategy.

Motion at 9-10. By trying to impose ever-changing legal requirements of which they did not timely advise Osage Wind, however, it is the United States that is belatedly trying to find *any* way of stopping a surface estate Project by claiming damage to the mineral estate. The United States is precluded from now arguing an injury, as it waited until excavation was substantially complete before first demanding a lease and seeking temporary relief. *See Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1337-40 (10th Cir. 1982) (laches and unclean hands barred a tribe's claim that the Secretary be ordered to cancel leases, because the tribe unreasonably delayed in bringing suit, the delay resulted in prejudice to the lessees, and the tribe "was not motivated by good faith concerns for the environmental impact" of the lease, but instead wanted to enter into more economically attractive leases).

Nor has any injury occurred because Osage Wind has avoided cultural and environmental consultations. Rather, Osage Wind has voluntarily acted to ensure protection of the Nation's cultural resources and pertinent environmental interests, including hiring consultants, meeting with the Tribal Historic Preservation Officer, requesting an optional Eagle Take Permit and participating in the EA, in which the BIA is a consulting agency. *See* Section II.C n.4, *supra*.

The United States speculates about difficulty in calculating damages. Osage Wind's contractor has records of volumes crushed, and larger pieces of rock remain stacked at the pertinent foundation site. *See* Moskaluk Decl. ¶ 15(a)(ii). But, in any event, thin damages information is insufficient reason to grant an injunction. *See Tri-State Gen. & Trans. Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1362 (10th Cir. 1989) (cited Motion at 9) (stating that, while damages "may appear to be difficult to ascertain . . . we cannot say at this time that the damages . . . cannot be calculated with a reasonable degree of accuracy or that the estimation of damages is so speculative that any award would be inadequate"). The United States states,

"Defendants are crushing the mined resources they find during excavation . . . ." Motion at 10. The United States' Motion belies its argument that damages are impossible to calculate by setting forth calculation of the approximate amount (60,000 cubic yards) of material removed. *Id.* at 7. Were the Court to rule in the United States' favor, a reasonably exact number of cubic yards can be determined, and royalty damages calculated based on current market prices, a proper remedy when a court rules that a surface owner trespassed on a mineral estate. *See Saddle Mt. Minerals*, 95 P.3d at 1243 (remanding for a calculation of the value of sand and gravel removed by the surface owner). BIA and the Nation have adequate remedy at law.

**D.      The Balance of Equities Weighs in Osage Wind's Favor.**

The United States claims Osage Wind's acts are illegal and Osage Wind is responsible for any harm it suffers by the entry of an injunction. Motion at 12. The United States is wrong.

First, the BIA and the Nation, not Osage Wind, is responsible for the harm with which this Motion threatens Osage Wind. For more than three years, Osage Wind communicated about the Wind Farm with the BIA and the Nation, and was never informed a lease may be required. Absent from this case are the concerns of misconduct that animated *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002) (cited Motion at 11). When, as here, actions are taken in good faith compliance with the known regulatory requirements, a party has not inflicted harm on itself. *See Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 893 (10th Cir. 2013) (unpublished) (describing the "self-inflicted" injury in *Davis* as a "knowing[] collaborat[ion] with the federal agency defendant while it improperly 'prejudged the NEPA issues'") (quoting *Davis*, 302 F.3d at 1112). *Sierra Club v. U.S. Army Corps of Engineers* (cited Motion at 11) is also unhelpful here: there, the enjoined party had applied for a permit, but then began the activities that required a permit before that permit had issued. 645 F.3d 978, 997 (8th Cir. 2011). The opposite is true here: Osage Wind had no knowledge that a lease may be required until well *after* it began construction

of the Wind Farm, and the BIA failed to contradict Osage Wind's stated understanding that it was not invading the Mineral Estate.

Second, the harm to Osage Wind if the requested injunctive relief is granted substantially outweighs the United States' speculative and hypothetical claims of threatened injury to the Mineral Estate. As this Court previously found, Osage Wind will face certain economic harm if enjoined. Prior Litigation, COL No. 22. Osage Wind has invested $287 million in the project. *See* Section II.E, *supra*. If the construction is halted, Osage Wind will suffer substantial losses, including delay costs of approximately $300,000.00 per day, and costs for inability to accept delivery of components of $25,200.00 per day. *Id.* Delay of start of operations, costs Osage Wind estimated revenue from generating electricity of approximately $1,000,000 per month, a revenue stream—benefitting the State, County, and local community—which would be lost or delayed if an injunction is granted. *Id.* As any injury to the Nation could be compensated by damages in an amount significantly less than the damages that will be incurred by Osage Wind if the injunction is entered, the balance of equities weighs against granting injunctive relief.

### E. An Injunction Would Not Serve the Public Interest.

The United States argues the public interest would be served by an injunction to permit it to enforce its laws. Motion at 12. The public interest, however, favors continued construction of the Wind Farm and its future operation. *See* Prior Litigation, COL Nos. 23-25. Chief Judge Frizzell concluded that the public policy of the United States and Oklahoma "in support of renewable energy resources" favors ongoing construction of the Wind Farm. *Id.*; COL No. 26; *see also W. Watersheds Project v. Bureau of Land Mgmt.*, 2011 WL 1630789, *6 (D. Nev. Apr. 28, 2011), *aff'd*, 443 Fed. App'x 278 (9th Cir. 2011) ("Congress and the President have clearly articulated that clean energy is a necessary part of America's future and it is important to Nevada's economic and clean energy goals."). Moreover, the Oklahoma Legislature has found

that "[p]romotion of the development of wind energy resources is important to the economic growth of the state," Okla. Stat. Ann. tit. 17, § 160.12(2): applicable public policy (as expressed in statute) favors the exact activities at issue here. If the Wind Farm Project is halted, Oklahoma and Osage County will lose the economic benefit from the temporary and permanent jobs Osage Wind has created, local tax revenue will be eliminated, the surface owners who have leased their lands to Osage Wind will be harmed, and the expected clean energy generation will be lost.

If the Court accepts the United States' position, every proposed construction project in Osage County where excavation is needed, from single family homes, residential subdivisions, multi-family apartments, commercial buildings and their accoutrements, such as septic tanks, water towers, swimming pools, and fencing; to utility lines, oil pipelines, and roads on privately owned land, may be subject to a veto or control by the Nation and land use planning by BIA. *See Montana v. United States*, 450 U.S. 544, 559 n. 9 (1981) ("It defines common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government."). The public interest requires an injunction be denied.

## IV.    CONCLUSION.

Osage Wind respectfully requests the Court deny the United States' Motion.

Respectfully submitted this 10th day of December, 2014,

NORMAN, WOHLGEMUTH, CHANDLER,
& JETER

By:/s/ Ryan A. Ray
        Joel L. Wohlgemuth, OBA # 9811
        Ryan A. Ray, OBA # 22281
        401 S. Boston Ave.
        Tulsa, Oklahoma 74103
        Telephone: (918) 583-7571
        Jlw@nwcjlaw.com
        RAR@nwcjlaw.com

and

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.
Lynn H. Slade, *pro hac vice*
William C. Scott, *pro hac vice*
Post Office Box 2168
500 Fourth Street, N.W., Suite 1000
Albuquerque, New Mexico  87103-2168
Telephone: (505) 848-1800
Lynn.Slade@modrall.com
Bill.Scott@modrall.com

*Attorneys for Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2014, I electronically transmitted the attached Defendants' Response to Plaintiff's Motion for Preliminary Injunction [Doc.4] to the Clerk of the Court using the ECF System for filing. Based on the electronic records currently on file, the Clerk of the Court will transmit a notice of Electronic Filing to the following ECF registrants:

Cathryn D. McClanahan
Assistant United States Attorney
110 West 7th Street, Suite 300
Tulsa, OK  74119
(918) 382-2700
Cathy.mcclanahan@usdoj.ok
*Attorney for the United States of America*

The following non-ECF registrants have been served by First Class United States mail:

Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor Office
7906 East 33rd Street
Tulsa, OK  74145
(918) 669-7730
Charles.babst@sol.doi.gov
*Attorney for the United States of America*

/s/ Ryan A. Ray
**Ryan A. Ray**