**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-704-JHP-TLW |
| | ) | |
| (1) OSAGE WIND, LLC; | ) | |
| (2) ENEL KANSAS, LLC; and | ) | |
| (3) ENEL GREEN POWER | ) | |
| NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AS TO COUNTS I AND II OF THE AMENDED COMPLAINT**
**AND REQUEST FOR EXPEDITED CONSIDERATION**

**TABLE OF CONTENTS**

I.      STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................1

II.     STANDARD .....................................................................................................2

III.    SUMMARY OF ARGUMENT ......................................................................3

IV.    BACKGROUND ............................................................................................4

V.     ARGUMENT ..................................................................................................6

        A.     25 C.F.R. § 214.7, by plain language, encompasses Defendants' invasion of the Osage mineral estate ........................................................................6

        B.     Part 211.3, also by its plain language, makes clear that Defendants are engaged in mining subject to federal regulation ...........................................8

                1.     Defendants engaged in mining, including opencast work, as that term is defined by 25 C.F.R. § 211.3 ................................................................8

                        a)    Defendants are engaged in "the science, technique, and business of mineral development." ......................................................................9

                        b)    Defendants are engaged in "opencast work." ...........................................10

                2.     The de minimis exception for extraction further supports the conclusion that Defendants' activities are encompassed by 25 C.F.R. § 211.3 .....................11

                3.     The lease definition offers further evidence that Defendants' activities are contemplated and covered by the regulations .......................................12

        C.     This Court must defer, as the Tenth Circuit instructs, to the Superintendent's interpretation of the regulations she is charged with administering ...............................................................................13

        D.     The Tenth Circuit has recognized that any "doubtful expression" related to these regulations must be resolved "in favor of the Indians." .....................13

        E.     State law concepts of surface owner and incidental use of a reserved mineral interest have no relevance to the instant inquiry .........................................15

VI.    EXPEDITED CONSIDERATION ................................................................17

VII.   CONCLUSION .............................................................................................18

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Alaska Pacific Fisheries v. United States*, 248 U.S. 78 (1918) ...................................................14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................................2

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ........................13

*Chickasaw Nation v. U.S.*, 208 F.3d 871 (10th Cir. 2000) ........................................................11

*City of Arlington v. FCC*, – U.S. –, 133 S.Ct. 1863 (2013) ......................................................13

*Cooper Distrib. Co. v. Amana Refrig., Inc.*, 63 F.3d 262 (3d Cir. 1995) ...................................9

*Edwards v. Aguillard*, 482 U.S. 578 (1987) ...............................................................................3

*Fed. Express Corp. v. Holowecki*, 552 U.S. 389 (2008)............................................................13

*Kobach v. U.S. Election Assistance Com'n*, - F.3d -, Nos. 14-3062, 14-3072, 2014 WL 6612031

(10th Cir. Nov. 7, 2014)..............................................................................................................13

*Millsap v. Andrus*, 717 F.2d 1326 (10th Cir. 1983).......................................................4,5,11,13,14

*Montana v. Blackfeet Tribe*, 471 U.S. 759 (1985) ....................................................................14

*Osage Nation v. Irby*, 597 F.3d 1117 (10th Cir. 2010)...............................................................4

*Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) ..........................................14

*U. S. v. 162 MegaMania Gambling Devices*, 231 F.3d 713 (10th Cir. 2000)............................14

*U.S. v. West*, 671 F.3d 1195 (10th Cir. 2012) .............................................................................9

*Wildearth Guardians v. Public Service Co. of Colorado*, 853 F.Supp.2d 1086 (D. Colo. 2012)...............3

**Federal Statutes**

25 U.S.C. § 2102................................................................................................................9,10

Act of February 27, 1925, 43 Stat. 1008 ......................................................................................5

Act of March 2, 1929, 45 Stat. 1478............................................................................................5

Act of June 24, 1938, 52 Stat. 1034 .................................................................................5

Act of Oct. 21, 1978 § 2, 92 Stat. 1660 .........................................................................5

Act to regulate the leasing of certain Indian lands for mining purposes, Act of May 11, 1938, 52 Stat. 347 .............................................................................................................8

An Act to Confirm the Great and Little Osage Indians, Act of June 5, 1872, ch. 310, 17 Stat. 228 ..........4

Division of the Lands and Funds of Osage Indians, Oklahoma, S. Rep. No. 59-4210, 59th Congress (1906) ...........................................................................................................4

Osage Allotment Act, Act of June 28, 1906, ch. 3572, 34 Stat. 539 .................................. *passim*

**Federal Rules**

Fed. R. Civ. P. 56 ..........................................................................................................1,2

**Federal Regulations**

25 C.F.R. § 211 ............................................................................................... *passim*

25 C.F.R. § 214 ............................................................................................... *passim*

25 C.F.R. § 226 .............................................................................................2,3,6,8

43 C.F.R. § 3601 .............................................................................................16

**Other Authorities and Sources**

Cambridge Dictionaries Online ........................................................................10

Collins Dictionary ............................................................................................10

Dictionary of Mining, Mineral, and Related Terms .........................................10,11

Federal Register Vol. 61, No. 131 ....................................................................12,16

COMES NOW Plaintiff, the United States of America, by and through Danny C. Williams, Sr., United States Attorney for the Northern District of Oklahoma, and Cathryn D. McClanahan, Assistant United States Attorney, to move for a partial summary judgment in its favor pursuant to Fed. R. Civ. P. 56.  As more fully set forth below, summary judgment is sought as to Counts I and II of the Amended Complaint (Dkt. 20) in this matter on the grounds that there are no material issues of fact and that Plaintiff is entitled to judgment as a matter of law.  For purposes of this motion, a statement of undisputed material facts and a memorandum of points and authorities are submitted herewith.

I.      **STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      Defendant Osage Wind is currently engaged in construction of the Osage Wind Farm Project, a 150 megawatt wind farm being constructed in Osage County, Oklahoma. Dkt. 17 at Exh. 1, Declaration of Bill Moskaluk ("Moskaluk Decl."), at ¶ 3.

2.      Once fully constructed, the Osage Wind Farm Project will consist of 84 turbines, underground collection lines running between turbines and a substation, one overhead transmission line, two permanent meteorological towers, and access roads.  Moskaluk Decl. at ¶ 9.

3.      Excavation for turbine foundations as part of the Osage Wind Farm Project measure approximately 10 feet deep and between 50 and 60 feet in diameter. Moskaluk Decl. at ¶ 15a(i).

4.      Materials extracted for turbine foundations include sand, soil and rock that is excavated in pieces of varying size and shape.  *Id*.

5.      Rock pieces greater than three feet long, which constitute 25% of the excavated materials, are stockpiled next to excavated pits. *Id*.  Excavated soil and rock less than 3 feet long are placed in a separate stockpile. *Id*.

6.      Defendant Osage Wind's contractor utilizes four rock crushers that are moved throughout the site to crush pieces of excavated rock that are less than 3 feet long to a size of roughly 3 inches or less.  Moskaluk Decl. at ¶ 15a(ii).

7.      Following excavation of each pit, concrete foundations, which include concrete mud mats, bases, and pedestals, are poured.  Moskaluk Decl. at ¶ 15a(iii).

8.      Once the concrete foundations are poured and have cured, the crushed rock, sand, and soil are pushed back and compacted into the excavated site.  Moskaluk Decl. at ¶ 15a(iv).

9.      On October 9, 2014, Osage Agency Superintendent Robin Phillips wrote to Defendant Enel Green Power North America, Inc., and demanded that excavation at the wind project site cease until Enel obtained the required authorizations from the BIA.  Dkt. 4 at Exh. 3, Letter from BIA Superintendent Robin Phillips to Mr. Francesco Venturini ("Phillips Letter").

10.     Despite Superintendent Phillip's order, Defendants have continued excavations and construction at the wind project site.  Moskaluk Decl. at ¶ 15.

## II.     STANDARD

Summary judgment is proper if the parties' submissions show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  Partial summary judgments are authorized by Rule 56 to narrow the issues in the case and promote the purpose of the Federal Rules of Civil Procedure, which are "designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1), *cert. denied*, 484 U.S. § 1066 (1988).

Plaintiff filed an amended complaint on December 12, 2014.  Dkt. 20. The Amended Complaint included five separate claims. Count I sought a declaration regarding the applicability of 25 C.F.R. § 211 to the activities undertaken by Defendants. Count II sought a declaration regarding the applicability of 25 C.F.R. § 214 to the activities undertaken by Defendants. In other words, Plaintiff seeks the Court's assistance in resolving a dispute regarding the proper interpretation of the scope and meaning of these sections of the Code of Federal Regulations.[1]

---

[1] It should be noted that these Counts do not involve state law claims or the applicability of 25 C.F.R. § 226.  In an earlier brief, Defendants were apparently confused by a ruling in connection with the Osage Mineral Council's request for injunctive relief under Oklahoma state law or 25 C.F.R. § 226. Dkt. 17 at p. 18. Defendants went so far as to attach Judge Frizzell's findings and conclusions in that case. Dkt. 17 at Exh. 6. But the conclusions of law could not be more explicit as the Court concludes, regarding the merits, "The Wind Farm Does Not Violate 25 CFR § 226.19" and "The Wind Farm Does Not Violate Oklahoma Law." Plaintiff does not agree that

In large part, Defendants detailed and admitted the facts[2] recited in the undisputed material fact section above. Defendants submitted a declaration that set out the excavation processes utilized in the placement of foundations for wind farm operations in Osage County. Dkt. 17 at Exh. 1. With these admitted facts taken as undisputed for purposes of this motion, the case at issue raises a question of law for the Court, and summary judgment is appropriate. In particular, disputes limited to the interpretation of statutes and/or regulations involve pure legal issues which are appropriate for summary judgment. *Edwards v. Aguillard*, 482 U.S. 578 (1987). The resolution of this one central issue is a logical first step that will make the most efficient and effective use of the resources of Plaintiff, Defendants and the Court.

## III.     SUMMARY OF ARGUMENT

The United States respectfully seeks summary judgment on Counts I and II of its Amended Complaint. Specifically, the United States requests that this Court consider the regulations at 25 C.F.R. §§ 211 and 214 and determine whether the activities undertaken by Defendants required leases, permits or approvals.[3]

---

res judicata would apply at all, and it certainly does not apply when the fundamental statutes and regulations underlying the cause of action are completely different.  The United States' instant claims relate to the applicability of 25 C.F.R. §§ 211 or 214 and concerns the impact to the *hard* minerals of the Osage mineral reserve. Part 226, as its title "Leasing of Osage Reservation Lands for Oil and Gas Mining" states, does *not* concern hard minerals that are exclusively addressed at Part 211, which addresses Indian land generally, and Part 214, for Osage minerals (other than oil and gas) specifically.

[2] While the United States accepts the facts surrounding the excavation activities for purposes of this motion only, it should be noted that additional information, opinions or expert opinions are not relevant here and, in fact, should not be considered. *Wildearth Guardians v. Public Service Co. of Colorado*, 853 F.Supp.2d 1086, 1090 (D. Colo. 2012) (for purposes of summary judgment, expert opinion inadmissible as "interpretation of the law is a matter for the Court."). Moreover, should calculation of damages for trespass or conversion become necessary, the United States would be entitled to conduct discovery on these issues.

[3] The United States emphasizes here what is **not** at issue by virtue of this motion for partial summary judgment. Public policy regarding wind (or renewable) energy; speculation about the likelihood of the Defendants securing authorization (if required); and any economic damage suffered by Plaintiff or Defendants are all irrelevant as to the singular legal issue presented in

Osage Wind has extracted and used limestone, dolomite, and other sedimentary minerals from the Osage mineral reserve to facilitate the placement of and to secure wind turbine foundations in the Osage mineral reserve. These activities require approval from the BIA and a lease between Defendant and the Osage Nation that is accepted by the BIA. Osage Wind has ignored the BIA's demand that it obtain the proper approvals and instead proceeded with massive excavation and extraction activities.

IV.       BACKGROUND

The Osage Nation is a federally recognized Indian tribe whose Reservation was established in 1872 comprising what is now Osage County, Oklahoma. Act of June 5, 1872, ch. 310, 17 Stat. 228 ("An Act to Confirm the Great and Little Osage Indians"); *Osage Nation v. Irby*, 597 F.3d 1117, 1120 (10th Cir. 2010), *cert. denied*, 131 S.Ct. 3056 (2011). In 1906, Congress passed the Osage Allotment Act, which allotted most of the surface estate of the reservation, dividing it up among members of the Osage Nation. Act of June 28, 1906, ch. 3572, 34 Stat. 539 at §2; *Osage Nation*, 597 F.3d at 1120-21. That same Act severed the mineral estate from the surface estate and placed it in trust for the Osage Nation. Osage Allotment Act, §3, 34 Stat. at 542; *Osage Nation*, 597 F.3d at 1120.

Congress regarded the surface estate as suitable for farming and grazing.  S. Rep. No. 59-4210, 59th Congress (1906) ("Division of the Lands and Funds of Osage Indians, Oklahoma") at 2.  In allotting the surface estate, Congress provided that each member of the Nation was entitled to three 160 acre tracts, one of which was designated the allottee's homestead tract. Osage Allotment Act at § 2; *Millsap v. Andrus*, 717 F.2d 1326, 1328 (10th Cir. 1983). The allotted lands were subject to leasing for mineral exploitation by the Osage Nation "with the approval of

---

this motion – namely, the proper interpretation of regulations which govern the Osage mineral estate.

the Secretary of the Interior, and under such rules and regulations as he may prescribe," except that no mining or prospecting was permitted on the homestead lands without "the written consent of the Secretary of the Interior." Osage Allotment Act at § 3. Congress has authorized the Department of the Interior ("DOI" or "Department") to promulgate regulations governing the leasing of oil, gas and other minerals on Osage lands. Osage Allotment Act at §3.

The Tenth Circuit, in reviewing the Osage Allotment Act, noted that "[n]othing in the scheme or the legislative history suggests any intent to limit the mineral reservation" and concluded that minerals like limestone and dolomite were reserved along with the oil and gas underlying the surface estate. *Millsap*, 717 F.2d at 1328-1329.

The Osage Allotment Act originally provided for restrictions on the alienation of the allotted surface lands.[4] Much of the surface land in Osage County, however, has been successfully alienated and is no longer subject to restriction. By contrast, the Osage mineral estate remains held in trust by the United States for the benefit of the Osage Nation to this day. Act of Oct. 21, 1978 § 2, 92 Stat. 1660 (amending earlier statute in order to provide that mineral estate is reserved to the Nation "in perpetuity").

As a result of the Osage Allotment Act's severance of the mineral estate from the surface estate, the surface of the project site is privately held and leased to Defendants. All of the minerals underlying the project site, however, are part of the Osage Mineral Reserve. As a general matter, the development of Indian tribal solid mineral resources is governed by federal

---

[4] Restrictions were imposed by Section 2, Act of June 28, 1906, 34 Stat. 539. These restrictions were to run for 25 years or until 1931. Section 3 of the Act of February 27, 1925, 43 Stat. 1008, provided that allotments inherited by Osages were restricted. The Act of March 2, 1929, 45 Stat. 1478, extended restrictions until January 1, 1959. The Act of June 24, 1938, 52 Stat. 1034, extended the restrictions on property until January 1, 1984, or until otherwise provided by Congress. Section 2(b) of the Act of October 21, 1978, 92 Stat. 1660, then struck the phrase "until otherwise provided by Congress" and substituted the phrase "and thereafter until otherwise provided by Congress."

regulations found at 25 C.F.R. § 211, and additional specific regulations applicable to non-oil

and gas mining in the Osage mineral estate are set forth in 25 C.F.R. § 214.

## V.        ARGUMENT

### A.        25 C.F.R. § 214.7, by plain language, encompasses Defendants' invasion of the Osage mineral estate.

Congress has authorized the DOI to promulgate regulations governing the leasing of oil,

gas and other minerals on Osage lands. Osage Allotment Act at §3. Accordingly, the DOI has

promulgated two sets of regulations: one governing oil and gas leasing of Osage lands, 25 C.F.R.

§ 226, and the other, applicable here, governing all non-oil and gas mining on the Osage Mineral

Reserve, 25 C.F.R. § 214. Pursuant to 25 C.F.R. § 214.7, "No mining or work of any nature will

be permitted upon any tract of land until a lease covering such tract shall have been approved by

the Secretary of the Interior and delivered to the lessee." Further, 25 C.F.R. § 214.2 states,

"Leases of minerals other than oil and gas may be negotiated with the tribal council after

permission to do so has been obtained from the officer in charge [the superintendent of the Osage

Indian Agency]."

The regulatory language is expansive and designed to ensure that exploitation of the

mineral estate inures to the benefit of the party for whom Congress reserved it – the Osage

Nation. Part 214.7 states that "no mining or work of any nature" is permitted until a lease is

approved by the Secretary.  The disjunctive "or" is used to establish that neither mining[5] nor

work of "any nature" may properly be conducted without an approved lease in place. Defendants

may not be seeking to sell minerals commercially, but they are "mining" the mineral estate, and,

at a minimum, by excavating thousands of cubic yards, they are performing "work of any nature"

---

[5] Although "mining" is not defined within Part 214, it is defined in Part 211, as discussed more fully below. Defendants are conducting mining and are, in any event, also conducting "work of any nature" as that term applies to Part 214.7.

6

significantly impacting the Osage Mineral Reserve. It is hard to reconcile the expansiveness of Part 214.7's language with Defendants' arguments that no approval, permitting or lease is necessary before unearthing, invading and irreparably altering tens of thousands of cubic yards of minerals in Osage County. The fact that Defendants are not moving the extracted material off-site or selling this material does not cause the Defendants' actions to fall outside of the scope of "mining or other work."

While the precise activity undertaken by Defendants is unprecedented in Osage County, it should be noticed that other similar construction efforts have required leases under the regulatory scheme at 25 C.F.R. § 214. For example, the Oklahoma Department of Transportation ("ODOT"), through its contractor (Sherwood Construction), sought a mining permit when it endeavored to work on a portion of US Highway 60.  Letter from Chris Kinnamon to Osage Indian Agency, dated February 7, 2014, attached hereto as Exhibit 1. The proposed work included limestone, siltstone, sandstone, shale and clay and involved excavation and filling, very similar to Defendants' foundation work. Thereafter a lease was executed to allow payments for removal and use of minerals. Sandy Soil Lease, Contract No. G06-23106, attached hereto as Exhibit 2. ODOT is not a commercial miner and had no interest in commercially marketing the minerals it extracted from the mineral estate. Nevertheless, ODOT, like Defendants here, was engaged in a significant invasion of the mineral estate, excavating large quantities of material and then putting it to use as fill. Unlike Defendants, ODOT complied with the congressionally authorized leasing regulations of Part 214 and thereby ensured that its use of the mineral estate was not in derogation of the Osage Nation's rights to the same. While not at issue in this motion, Plaintiff seeks appropriate damages for Defendants' uncompensated use of the estate here.

**B.     Part 211.3, also by its plain language, makes clear that Defendants are engaged in mining subject to federal regulation.**

There is no definition of mining contained in Part 214, which specifically applies to the Osage mineral estate (except for oil and gas), but such a definition can be found in Part 211 which provides a general regulatory scheme for Indian mineral estates.[6] The purpose and intent of Part 211 are summarized at 211.1(a): "These regulations are intended to ensure that Indian mineral owners desiring to have their resources developed are assured that they will be developed in a manner that maximizes their best economic interests and minimizes any adverse environmental impacts or cultural impacts resulting from such development." In short, the regulations are designed to ensure minerals reserved to Indians are only exploited for purposes benefitting Indians.

    1.    *Defendants engaged in mining, including opencast work, as that term is defined by 25 C.F.R. § 211.3.*

25 C.F.R. § 211.3 contains a broad definition of "mining" and specifically indicates that it is "the science, technique, and business of mineral development, including, but not limited to: *opencast work*, underground work, and in-situ leaching directed to severance and treatment of minerals; Provided, when sand, gravel, pumice, cinders, granite, building stone, limestone, clay or silt is the subject mineral, an enterprise is considered 'mining' only if the *extraction* of such a mineral exceeds 5,000 cubic yards in any given year." (emphasis added).

---

[6] 25 C.F.R. § 211.1(e) excepts leasing and development governed by other parts of the regulations, most notably, 25 C.F.R. § 226.  The regulations at Part 214, which govern Osage minerals other than oil and gas, are not excepted by Part 211.1(e). The Part 211 regulations were promulgated pursuant to the May 11, 1938, "Act to regulate the leasing of certain Indian lands for mining purposes," 52 Stat. 347 at § 4.  The same statute provides that the regulations governing mineral leasing on Indian lands generally will not supersede DOI regulations directed specifically to the Osage lands. *Id.* at § 6 (excepting the Osage Reservation and other enumerated lands from application of §§ 1-4.) Applying the federal definition of mining in Part 211 in the present context simply fleshes out, rather than supersedes, the federal regulations in Part 214.

        a)      Defendants are engaged in "the science, technique, and business of mineral development."

First, under the regulation, mining includes the science, technique and business of mineral development. That definition is followed by a list of exemplar activities that should be encompassed in the definition but should not be confined to those activities.[7]  Consequently, a determination that Defendants are engaged in the science, technique and business of mineral development would be sufficient to demonstrate engagement in mining under the regulations. In this case, Defendants admittedly are performing extensive extraction, handling, sorting, crushing and utilization of minerals. Defendants admit that the ultimate goal of this work is construction of a large-scale wind farm operation. Defendants' business has applied techniques and science to the minerals found in place, albeit to suit Defendants' peculiar purposes. Defendants may not be in the business of marketing minerals, but the definition is not limited to business. The techniques by which they are extracting and using the Osage mineral estate serve their purposes as part of their massive wind farm construction and constitute mineral development.

It should also be noted that, in the area of Indian mineral estates, statutes and regulations have routinely outlined the definition of "development" with a very broad stroke in order to ensure that federal laws and regulations designed to protect Indian interest in the mineral estate are not easily circumvented. In the case of 25 U.S.C. § 2102 ("Indian Mineral Development Act of 1982"), another statute passed for the benefit of Indians and subject to liberal interpretation in their favor, Congress provided that tribes could, subject to the approval of the Secretary, enter

---

[7] The Tenth Circuit recently examined the import of a list of exemplars that follows a specific word. "Since the phrase 'including, but not limited to' plainly expresses a contrary intent, the doctrine of *ejusdem generis* is inapplicable." *U.S. v. West*, 671 F.3d 1195, 1201 (10th Cir. 2012) (quoting *Cooper Distrib. Co. v. Amana Refrig., Inc.*, 63 F.3d 262, 278 (3d Cir. 1995) (Alito, J.)). Ejusdem generis is a principle that would limit the general term ("mining") to only the specific list of items. However, this principle limits general terms that follow specific examples and not, as is the case in Part 211.3, a general term that is followed by examples.

into joint ventures and leases "providing for the exploration for, or extraction, processing, or other development of . . . mineral resources" providing for sale "or other disposition of the production or products of such mineral resources."  In this Act, Congress envisioned that the Secretary's approval authority would not be limited to mining activities associated with the sale of minerals for commercial profit but instead extended it such that Secretarial approval is necessary for leases that explore, extract or process minerals as well as "other development." Congress intended that extraction and processing were part of development, according to a plain reading of this provision. Similarly, the Osage Allotment Act, in reserving the mineral estate as a trust resource, demonstrates Congress's intent that the United States supervises development of the estate to ensure it benefits the trustee, the Osage Nation.

<blockquote>b)      Defendants are engaged in "opencast work."</blockquote>

Second, and in addition to qualification under the broader definition of "mineral development," Defendants are engaged in opencast (or pit) work, specifically identified in Part 211.3 as a type of mining. Collins Dictionary defines opencast as "(of mines and mining) excavated from the surface." Collins Dictionary, http://www.collinsdictionary.com/dictionary/ english/opencast (last visited Dec. 18, 2014). Cambridge Dictionaries Online defines opencast mining as, "the activity of taking minerals, especially coal, from the surface of the ground rather than from passages dug under it." Cambridge Business English Dictionary (Cambridge University Press) *available at* Cambridge Dictionaries Online, http://dictionary.cambridge.org/ dictionary/ business-english/opencast-mining. The DOI defines "opencast work" as "excavation [that] is performed from the surface." Staff of the U.S. Bureau of Mines, Dictionary of Mining,

Mineral, and Related Terms 2170-2171 (U.S. Department of the Interior, 2nd ed. 1996).[8]
According to Part 211.3, opencast "work" is specified as one type of activity that qualifies as
mining and, at the least, Defendants have engaged in opencast "work" impacting the Osage
mineral estate.

The Tenth Circuit, in interpreting the Osage Allotment Act, has liberally construed the
scope of minerals Congress intended to reserve to the Osage Nation in holding the mineral estate
in trust, and it includes limestone and other minerals which Defendants concede they are
excavating and treating. *See Millsap v. Andrus,* 717 F.2d at 1329 (interpreting "other minerals"
in Osage Allotment Act to include "non-hydrocarbon minerals such as limestone and dolomite").
The Tenth Circuit adopted an expansive construction of the statutory phrase, "other minerals."
The Court noted that Congress provided a list of minerals (oil, gas, and coal) but that there was
"no significance" to be assigned to the list and it did not preclude an expansive definition of
"other minerals". *Id.* at n. 5, 6.  The Court categorically rejected the surface owner's complaint
that the "surface owner has virtually nothing left if rock of so common a variety as limestone and
dolomite" is a reserved mineral. *Id.* at n. 6. Accordingly, Defendants opencast work excavating
limestone and other non-hydrocarbon minerals constitutes mining within the meaning of Part 211
and is subject to the leasing requirements of Part 214.

> 2.    *The de minimis exception for extraction further supports the conclusion
>        that Defendants' activities are encompassed by 25 C.F.R. § 211.3.*

There is a final provision in the definition of mining found at Part 211.3 stating that when
sand, limestone or silt (among other minerals) are the subject, an enterprise is only considered to
be "mining" if "extraction" of the mineral exceeds 5,000 cubic yards in a year. Significantly, the
language here turns on the total volume of "extracted" minerals and does not require specific

---

[8] The Tenth Circuit has found "it is helpful to refer to dictionary definitions" in matters of
statutory interpretation. *Chickasaw Nation v. U.S.*, 208 F.3d 871, 876 (10th Cir. 2000).

treatment, commercialization, off-site relocation or even utilization of the mineral at issue.  Here, Defendants have extracted far more than 5,000 cubic yards of sand, gravel, pumice, cinders, granite, building stone, limestone, clay or silt.[9] Because their activities have exceeded, by any measure, the threshold provisions in Part 211.3, Defendants have engaged (and continue to engage) in mining and without authorization.

During rulemaking, in response to comments concerning this de minimis exception (extraction of less than 5,000 cubic yards in a year), the agency noted that "small amounts are excluded from the definition of mining, especially because the purpose of such extraction is often for local and/or tribal use." Federal Register Vol. 61, No. 131 at p. 35640. The plain language of the definitions in this section addresses extraction of minerals above a set threshold - the relocation or subsequent use or sale of the minerals is inconsequential in determining whether "mining" has occurred under the regulations.

> 3.     *The lease definition offers further evidence that Defendants' activities are contemplated and covered by the regulations.*

Again, the Osage mineral specific regulations found at Part 214 do not define lease, but the definition of lease, found at Part 211.3, further supports the Plaintiff's argument. A lease is "any contract approved by the United States . . . that authorizes exploration for, extraction of, or removal of any minerals." Part 211.3. The definition does not align with the Defendants' contentions that mere extraction does not require an approved lease. Extraction or removal of any minerals is specifically contemplated within the regulations without any reference to

---

[9] Because Defendants have consistently denied that the United States has any interest in (or authority related to) the minerals it is excavating, the United States is relying on math principles applied to the dimensions of the excavated pits as admitted to by Defendants (and not precise and verified measurements). Taking the most conservative size of an excavated pit (10 feet by 50 feet), Defendants are likely excavating more than 720 cubic yards per foundation.  That number multiplied by the number of foundations that Defendants have indicated will be developed (84), leads to conclusion that the Defendants have likely excavated more than 60,000 cubic yards.

commercial use or processing or transportation away from the general site of excavation. From a practical standpoint, it makes little difference what use someone ultimately intends to make of the minerals seized, altered or moved; the mineral estate (now irreparably altered) belongs to the Osage tribe and it should be compensated for any extraction or removal.

> **C.      This Court must defer, as the Tenth Circuit instructs, to the Superintendent's interpretation of the regulations she is charged with administering.**

This Court should afford deference to how the BIA interprets the Osage Allotment Act and the federal regulations in Part 214 and 211, which the BIA administers as part of its responsibility to see that congressional purposes for Indian trust resources are fulfilled. Recently, the Tenth Circuit re-affirmed the long-established principle that agency personnel deserve deference when interpreting regulations, including the scope of their own authority. *Kobach v. U.S. Election Assistance Com'n*, - F.3d -, Nos. 14-3062, 14-3072, 2014 WL 6612031, at *3 (10th Cir. Nov. 7, 2014) (citing *City of Arlington v. FCC*, – U.S. –,  133 S.Ct. 1863, 1870–71 (2013) (deference extends to an agency's interpretation of the scope of its own authority under a statute)).  That deference applies with equal force to an agency's interpretation of its regulations. *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 397 (2008) ("agency is entitled to further deference when it adopts a reasonable interpretation of regulations it has put in force."). With that deference, this Court decides "whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

> **D.      The Tenth Circuit has recognized that any "doubtful expression" related to these regulations must be resolved "in favor of the Indians."**

This Court should also construe federal laws and regulations designed to benefit Indians liberally in favor of Indians. As the Tenth Circuit noted in *Millsap v. Andrus,* "we must apply the

general rule that statutes passed for the benefit of dependent Indian tribes are to be liberally construed with doubtful expression being resolved in favor of the Indians." 717 F.2d at 1329 (citing *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89 (1918)). The *Millsap* decision is binding precedent here.

Expanding the reach of this concept, the Tenth Circuit has held that, as a canon of construction, ambiguities should be resolved in favor of the Native American interest. *See Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1461-62 (10th Cir. 1997) (citing *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985)); *U. S. v. 162 MegaMania Gambling Devices*, 231 F.3d 713, 718 (10th Cir. 2000). In fact, the presumption in favor of the Native American interest would control over the more general deference to agency interpretation. *Ramah Navajo Chapter*, 112 F.3d at 1461. Here, the Native American interest and DOI's regulatory interpretation align.

Further, this Court should be guided the by the "Purpose and scope" paragraph of 25 C.F.R. § 211.1:  "These regulations are intended to ensure that Indian mineral owners desiring to have their resources developed are assured that they will be developed in a manner that maximizes their best economic interests and minimizes any adverse environmental impacts or cultural impacts resulting from such development." The first consideration is whether or not the Indian mineral owners even desire to have their resources developed which is why leasing is a federal prerequisite to activities such as those carried out by Defendants. Of course, Defendants bypassed the troublesome scenario that the tribe might rather not disturb or alter the hard mineral estate and simply began excavation. Beyond the above consideration, the purpose of the regulations is to ensure that resources are developed in a manner that maximizes Native Americans' "economic interests." Defendants' course of action certainly does not maximize the

tribe's economic interest in the minerals Defendants admit they are excavating, processing and utilizing, or, in the case of stockpiled minerals, wasting.

> **E.**   **State law concepts of surface owner and incidental use of a reserved mineral interest have no relevance to the instant inquiry.**

The Osage mineral estate is governed by federal law, not state law. Not only has Congress reserved the mineral estate in perpetuity, but the Secretary of the DOI also has been tasked by Congress with responsibility to administer the estate and has promulgated specific regulations in furtherance of that responsibility. The Osage mineral estate, with its unique legislative and regulatory history, the special federal fiduciary responsibilities, and an administrative system for oversight and leasing of Osage minerals in particular, is distinctive. Resort to common law concepts about surface owner rights and traditional mineral reservations is therefore inapt.

Hoping to avoid the expansive language of Parts 211 and 214, Defendants will undoubtedly seek to rely on a wide variety of unrelated mineral and mining or surface owner cases. To be clear, Defendants' use of the mineral estate is not the usual run-of-the-mill activity undertaken by surface owners, ranchers, home builders or farmers. Any attempt to color their usage of the mineral estate as a typical use is simply disingenuous. Defendants are international wind developers on the largest of scales. Defendants proudly proclaim hundreds of millions of dollars invested in this commercial enterprise. Moskaluk Decl. at ¶ 20. The developer has leased more than 8,000 acres of surface and is using mammoth pieces of earth-moving and digging equipment to extract tens of thousands of cubic yards of Osage-owned limestone and other minerals. But most importantly, there are specific federal regulations at issue here, and general state law concepts of surface owner use and enjoyment are either irrelevant or preempted.

No doubt Defendants will also develop alarmist hypotheticals about surface owners unable to conduct day-to-day activities if the United States were to prevail. Of course, surface owners have conducted (and continue to conduct) a full range of activities for decades in Osage County. True incidental use of the mineral estate by a surface owner would not become subject to federal regulation.

As noted above, federal regulations provide for incidental use of the mineral estate in the form of the 5,000 cubic yard de minimis exception in the Part 211 definition of "mining." That exception allows for reasonable use of the sub-surface estate by surface owners for homesteading, ranching, and farming or any other use that does not involve inordinate excavation of the mineral estate. As noted, the Part 211 preamble explained, "Common varieties of mineral resources extracted in small amounts are excluded from the definition of mining, especially because the purpose of such extraction is often for local and/or tribal use." 61 Fed. Reg. at 35640. Plaintiff's approach is consistent with that of the Bureau of Land Management's mineral materials regulations which also provides that a surface owner may use materials within the boundaries of the surface estate without a contract or permit only if the use is of a minimal amount for personal use.  43 C.F.R. § 3601.71(b)(1).  Moreover, to the extent surface owners and lessees contemplate uses that exceed the de minimis exception, they need only secure a lease for their planned activity, as ODOT did for its road project.

When the corporate Defendants leased surface lands that overlie the Osage mineral estate, they did so knowing that they were in a unique area subject to federal regulation. By their own admission, $287,000,000 has been expended on items including surveys, studies, research, regulatory compliance and legal costs. Moskaluk Decl. at ¶ 20. They cannot now claim that the need to secure federal authorizations is tantamount to the United States barring the "reasonable

use" of the surface estate. In any event, the instant motion is not about how a surface owner can or cannot use his lands. The issue here is simply whether or not the surface owner (or his lessee) must obtain authorization to invade the underlying Osage mineral estate.

## VI.        EXPEDITED CONSIDERATION

The United States respectfully requests that this motion be considered on an expedited schedule. As this Court is aware, Plaintiff originally sought a preliminary injunction, only to learn that all excavation work on the wind farm project at hand had been completed within days of the filing of that motion. According to the Defendants, excavation work for 84 foundation sites began last September and was completed by the end of November.  Moskaluk Decl. at ¶ 15.

Defendants, or related entities, are planning another wind farm project in Osage County. 12/04/14 Tulsa World, 2014 WLNR 34394311, "Federal authorities seek immediate halt to Osage County wind development" by Overall, Michael. ("The second project, called Mustang Run, would add 68 more turbines on land adjacent to the wind farm now under construction.") Because Defendants have consistently maintained that no federal approval or permitting is required, Plaintiff does not receive full and timely information about turbine foundation placement. There is no reason for a simple matter of regulatory interpretation to go unaddressed, forcing all parties concerned to operate in a field of uncertainty and protracted litigation. The United States respectfully requests that briefing be timely completed and, if possible, be considered by this Court in an expedited manner.

Further, the United States has received information that, despite Defendants' earlier assurances, rock crushers are still operating and significant excavation activities are continuing, impacting the Osage mineral reserve. See Lease Inspection Forms and accompanying documents, dated December 15, 2014, and attached hereto as Exhibit 3. If rock crushers continue

to process Osage minerals, after the solemn representations contained in the Defendants'
Response to the United States' Motion for Preliminary Injunction, this is inexcusable.

## VII.      CONCLUSION

The United States respectfully requests that the Court consider the regulatory scheme at
25 C.F.R. §§ 211 and 214 and settle the dispute among the parties as to whether the excavation
activities associated with the wind farm require authorization from the United States.


Respectfully submitted,


UNITED STATES OF AMERICA

DANNY C. WILLIAMS, SR.
United States Attorney

s/Cathryn D. McClanahan
CATHRYN D. McCLANAHAN, OBA No. 14853
Assistant United States Attorney
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119
T: 918-382-2700
cathy.mcclanahan@usdoj.gov

Of Counsel:
Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor's Office
7906 East 33rd Street
Tulsa, Oklahoma 74145
T: 918-669-7730
charles.babst@sol.doi.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 19, 2014, I electronically transmitted the foregoing to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Ryan A. Ray
Joel L. Wohlgemuth
rar@nwcjlaw.com
jlw@nwcjlaw.com

-and-

Lynn H. Slade
William C. Scott
Deana M. Bennett
Spencer L. Edelman
lynn.slade@modrall.com
bill.scott@modrall.com
deana.bennett@modrall.com
spencer.edelman@modrall.com
*Counsel for Defendants*

s/Chris Watson
Chris Watson
Legal Assistant