**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-704-JHP-TLW |
| | ) | |
| (1) OSAGE WIND, LLC; | ) | |
| (2) ENEL KANSAS, LLC; and | ) | |
| (3) ENEL GREEN POWER NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT
<u>AND OPENING BRIEF IN SUPPORT</u>**

NORMAN, WOHLGEMUTH,
CHANDLER, & JETER
Joel L. Wohlgemuth, OBA #9811
Ryan A. Ray, OBA # 22281
401 S. Boston Ave. Ste. 2900
Tulsa, Oklahoma 74103
Telephone: (918) 583-7571
JLW@nwcjlaw.com
RAR@nwcjlaw.com

MODRALL, SPERLING, ROEHL,
HARRIS & SISK, P.A.
Lynn H. Slade
William C. Scott
Post Office Box 2168
Albuquerque, New Mexico  87103
Telephone: (505) 848-1800
Lynn.Slade@modrall.com
Bill.Scott@modrall.com

*Attorneys for Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc.*

# Table of Contents

I.      INTRODUCTION……………………………………………………………………...1

II.     STANDARD ON MOTION TO DISMISS AND SUMMARY JUDGMENT…………...2

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS………………………………..3

IV.     ARGUMENT……………………………………………………………………….....6

    A.  Osage Wind's Construction Activities Do Not Constitute "Mining"……………………6
        1.  Neither 25 C.F.R. Part 214 nor Part 211 applies to Osage Wind's activities…………7
        2.  A surface owner has a right to incidental excavation and replacement of mineral
            consistent with the development of the surface………………………………………...14
        3.  The ownership of the Mineral Estate is limited to the ability to commercially develop
            minerals and obtain the proceeds………………………………………………………16

    B.  Res Judicata Bars the United States' Claims Because They Could Have Been Asserted in
        the Prior Litigation……………………………………………………………………18
        1. The United States is in privity with the Nation and is bound by the judgment in the
           Prior Litigation from advancing claims on the Nation's behalf……………………...19
        2. The causes of action are the same in both suits………………………………………22

V.      CONCLUSION………………………………………………………………………..25

# Table of Authorities

**SUPREME COURT CASES**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................ 3

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................ 2

*Corcoran v. Chesapeake & Ohio Canal Co.*,
   94 U.S. 741 (1876) ................................................................................................ 20

*Green v. Mansour*,
   474 U.S. 64 (1985) ................................................................................................ 2

*Montana v. United States*,
   450 U.S. 544 (1981) ................................................................................................ 13

*Nevada v. United States*,
   463 U.S. 110 (1983) ................................................................................................ 18, 21

*Norfolk S. Ry. Co. v. Shanklin*,
   529 U.S. 344 (2000) ................................................................................................ 11

*Sea-Land Servs., Inc. v. Gaudet*,
   414 U.S. 573 (1974) ................................................................................................ 20

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ................................................................................................ 19, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................ 3

*United States v. Coleman*,
   390 U.S. 599 (1968) ................................................................................................ 17

*United States v. Tohono O'Odham Nation*,
   __ U.S. __, 131 S. Ct. 1723, (April 26, 2011) ........................................................ 23

**OTHER FEDERAL CASES**

*Allen v. Town of Colcord*,
   874 F. Supp. 2d 1276 (N.D. Okla. 2012) ................................................................ 3

*E.E.O.C. v. U.S. Steel Corp.*,
   921 F.2d 489 (3d Cir. 1990) .......................................................................... 20

*Edwards v. Kleppe*,
   588 F.2d 671 (9th Cir. 1978) .......................................................................... 17

*Hallenbeck v. Kleppe*,
   590 F.2d 852 (10th Cir. 1979) ........................................................................ 17

*Hatch v. Boulder Town Council*,
   471 F.3d 1142 (10th Cir. 2006) ...................................................................... 23

*Millsap v. Andrus*,
   717 F.2d 1326 (10th Cir. 1983) ...................................................................... 17

*Mullins v. Clinchfield Coal Corp.*,
   128 F. Supp. 437 (W.D. Va. 1953) ................................................................. 15

*Osage Nation v. Irby*,
   597 F.3d 1117 (10th Cir. 2010) ...................................................................... 13

*Pelt v. Utah*,
   539 F.3d 1271 (10th Cir. 2008) ...................................................................... 19

*S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*,
   425 F.3d 735 (10th Cir. 2005) ........................................................................ 15

*St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*,
   605 F.2d 1169 (10th Cir. 1979) .................................................................. 3, 19

*St. Louis Typographical Union No. 8, AFL-CIO v. Herald Co.*,
   402 F.2d 553 (8th Cir. 1968) .......................................................................... 20

*Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards*,
   314 F.3d 501 (10th Cir. 2002) .................................................................. 18, 23

**FEDERAL STATUTES**

42 U.S.C. § 4321 *et seq.* ................................................................................ 13

Act of August 1, 1956, 70 Stat. 774 ................................................................ 10

Act of May 11, 1938, 52 Stat. 347 .................................................................. 10

Mining Law of 1872, 30 U.S.C. § 22 .......................................................... 16, 18

Osage Allotment Act, Act of June 28, 1906, ch. 3572, 34 Stat. 539 .................... 6, 7, 8, 10, 13, 14

**FEDERAL REGULATIONS AND RULES**

25 C.F.R. Part 211 ........................................................................................................ 6, 7, 8, 9

25 C.F.R. § 211.1(a) ................................................................................................................ 8

25 C.F.R. § 211.3 .......................................................................................................... 8, 10, 11, 12

25 C.F.R. § 211.7 ................................................................................................................... 13

25 C.F.R. § 211.27(a) ............................................................................................................... 9

25 C.F.R. § 211.42(a) ............................................................................................................... 9

25 C.F.R. § 211.43(a) ............................................................................................................... 8

25 C.F.R. § 211.47(a) ............................................................................................................... 9

25 C.F.R. § 211.48(a) .......................................................................................................... 10, 11

25 C.F.R. Part 214 .............................................................................................. 6, 7, 8, 9, 11, 22

25 C.F.R. § 214.7 .............................................................................................................. 10, 11

25 C.F.R. § 214.10(d) ............................................................................................................... 8

25 C.F.R. § 214.13(a) ............................................................................................................... 8

25 C.F.R. § 214.14(a) ............................................................................................................... 9

25 C.F.R. Part 226 ................................................................................................................. 22

25 C.F.R. § 226.19(a) ............................................................................................................. 10

Fed. R. Civ. P. 12 ................................................................................................................. 1, 2

Fed. R. Civ. P. 56 ................................................................................................................... 3

**STATE COURT CASES**

*Altman v. Blake*,
    712 S.W.2d 117 (Tex. 1986) ............................................................................................... 17

*Va. Dep't of Mines, Minerals & Energy v. May Bros., Inc.*,
    396 S.E. 2d 695 (Va. Ct. App. 1990) ...................................................................... 15

*Wray v. Goeglein*,
    1998 WL 880582 (Ohio Ct. App. Dec. 2, 1998) ....................................................... 15

**STATE STATUTES**

Alaska Stat. Ann. § 27.08.010 ..................................................................................... 15

Okla. Stat. Ann. tit. 45, § 723 ...................................................................................... 15

Va. Code Ann. § 45.1-180(a) ........................................................................................ 15

**SECONDARY SOURCES**

53A AM. JUR. 2D *Mines and Minerals* § 14 (2006) ..................................................... 15

RESTATEMENT (SECOND) OF JUDGMENTS (1982) .......................................................... 20

U.S. Bureau of Mines, *Dictionary of Mining, Mineral, and Related Terms* (U.S. Dep't of the
    Interior, 2d ed. 1996) ......................................................................................... 11, 12

## I.      INTRODUCTION.

Defendants, Osage Wind, LLC ("Osage Wind"), Enel Kansas, LLC, and Enel Green Power North America, Inc. ("Enel") (collectively, "Defendants"),[1] move this Court for entry of an order dismissing this case with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6) or, alternatively,  Fed. R. Civ. P. 56, because the United States has failed to state a claim upon which relief can be granted and because Defendants are entitled to summary judgment on all claims set forth in the United States' First Amended Complaint for Declaratory Judgment and Damages [Doc. 20] ("Amended Complaint").

Based on the undisputed facts and the applicable law, the United States' claims are legally insufficient for two reasons.  First, Osage Wind is not mining and, consequently, no lease or permit is required under 25 C.F.R. Parts 214 as clarified by Part 211.  The United States' requested relief, that Osage Wind be required to account for material disturbed, pay royalties, cease operations, and remove its existing facilities, is thus meritless. Osage Wind is constructing a wind powered generation facility on privately-owned surface estate property in Osage County, Oklahoma ("Wind Farm" or "Project").  That construction necessarily requires installation of foundations and excavation for footings for wind turbines; a fact well known to the Bureau of Indian Affairs ("BIA") since 2011, at the latest.  Osage Wind's digging to a depth of 10 feet to install the footings and foundations, crushing some of the excavated material, and returning the material into the hole from which it came or leaving it in place—without removing any of that material from the site or using it on a different part of the Project area—is not "mining" of the Osage mineral estate.  *See* Section IV(A), *infra*.

---

[1] Enel Kansas, LLC, is not a proper party in this action because it is a separate entity from Osage Wind, LLC, and has no involvement whatsoever in the Osage Wind Project.  Enel Green Power North America is the parent company of Osage Wind, but is also not a proper party in this action.

Second, the doctrine of res judicata bars the United States' claims brought on behalf of the Osage Nation, because those claims could have and should have been brought by the Osage Nation ("Nation") in its 2011 suit in this Court, seeking to enjoin the construction of the Wind Farm, *Osage Nation v. Wind Capital Group, LLC*, No. 11-CV-00643 GKF-PJC (N.D. Okla. Oct. 18, 2011) ("Prior Litigation"). *See* Section IV(B), *infra*.  The Amended Complaint, brought on behalf of and at the behest of the Nation, seeks the same relief that the Nation has sought, or could have sought, in other fora and is barred. In fact, for over three years, the Nation has attempted to prevent any development of the Osage Wind Project through litigation in this Court and multiple challenges to Osage County approvals of the Project.  Despite the Nation's repeated requests for the United States to take action, and with full knowledge of Osage Wind's escalating investment and proposed excavations, the United States deferred filing this action until excavation was substantially complete.  These equitable factors further support dismissing the Amended Complaint.  *See Green v. Mansour*, 474 U.S. 64, 72 (1985) ("The propriety of issuing a declaratory judgment may depend upon equitable considerations and is also informed by the teachings and experience concerning the functions and extent of federal judicial power.") (citation and quotation marks omitted)).

## II.    STANDARD ON MOTION TO DISMISS AND SUMMARY JUDGMENT.

A motion to dismiss under Rule 12(b)(6) should be granted when, as here, a complaint fails to make allegations sufficient to support a right to relief. "Factual allegations must be enough to raise a right to relief above the speculative level[.]"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief," but a complaint must "contain enough facts to state a claim for relief that is

plausible on its face." *Allen v. Town of Colcord*, 874 F. Supp. 2d 1276, 1282 (N.D. Okla. 2012) (citation and quotation marks omitted). Under Rule 12(b)(6), the Court may consider the documents filed in the Prior Litigation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular . . . matters of which a court may take judicial notice."); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (providing that a court may take judicial notice of its own records and files). Application of the motion to dismiss standard is appropriate if the Court concludes the Amended Complaint fails to state a claim for violation of BIA regulations or rules in favor of the Defendants on res judicata grounds as set forth in Section IV(B).

If the Court instead concludes that facts outside the pleadings must be considered to resolve whether the regulations at issue apply to Osage Wind, the summary judgment standard applies. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, a non-moving party must put forth sufficient evidence, more than a scintilla, such that a reasonable jury could find in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The United States cannot meet that burden here because Osage Wind's activities do not constitute mining.

## III.    STATEMENT OF UNDISPUTED MATERIAL FACTS.

1.    Osage Wind, LLC's activities are undertaken pursuant to leases of approximately 8,400 acres of privately owned fee surface estate lands. *See* Declaration of Bill Moskaluk,

attached as Exhibit 1 to Defendant's Response to Plaintiff's Motion for Preliminary Injunction [Doc. 17] ("Moskaluk Decl."), ¶ 5.

2.      No portion of the Wind Farm Property is held in trust by the United States for the benefit of the Osage Nation.  *Id.* ¶ 6.

3.      No portion of the surface estate of the Wind Farm Property is held in trust by the United States for the benefit of an enrolled member of the Osage Nation.  *Id.*  ¶ 7.

4.      No portion of the surface estate of the Wind Farm Property is held subject to restriction by the United States against alienation.  *Id.* ¶ 8.

5.      The United States acts as a trustee, with fiduciary responsibilities, to protect the mineral estate reserved to the Nation ("Mineral Estate").  Amended Complaint, ¶¶ 4, 14.

6.      On October 18, 2011, the Nation, acting through the Osage Minerals Council ("OMC"), filed a Complaint for Declaratory and Injunctive Relief against Osage Wind's predecessor in interest, Wind Capital Group, LLC. Prior Litigation, Complaint for Declaratory and Injunctive Relief [Doc. 2] ("Prior Litigation Complaint").

7.      In the Prior Litigation Complaint, the Nation alleged that:

a.      Each of the wind turbines to be constructed on the Wind Farm Property "will require extensive digging to construct deep pits containing concrete foundations similar to those required in the construction of tall buildings."  *Id.* ¶ 17.

b.      The Nation "is and will continue to be irreparably harmed if the Defendants are allowed to begin construction and interfere with Osage Nation's rights associated with developing its mineral estate."  *Id.* ¶ 40.

c.      Construction on the Wind Farm Property would interfere with development of oil, gas, coal and/or other minerals.  *Id.* ¶¶ 1, 23.

4

8.      Chief Judge Frizzell dismissed the Prior Litigation Complaint on the merits. Prior Litigation, Judgment [Doc. 37].

9.      Once fully constructed, the facilities on the Wind Farm Property will consist of 84 turbines, underground collection lines running between turbines and a substation, one overhead transmission line, two permanent meteorological towers, and access road, and the total surface footprint will be 1.5% of the 8,400 acres under lease. Moskaluk Decl. ¶ 9; *see also* Prior Litigation, Findings of Fact and Conclusions of Law [Doc. 36] ("Findings of Fact"), ¶ 6.

10.     The turbine foundations are made from reinforced concrete, with each foundation initially being 16 feet in diameter down to four feet below the surface, and measure approximately 10 feet deep and between 50 and 60 feet in diameter. Moskaluk Decl. ¶ (15)(a)(i); Findings of Fact, ¶ 8; Plaintiff's Motion for Partial Summary Judgment [Doc No. 24], ¶ 3 ("U.S. Summary Judgment Motion").

11.     For each turbine, Osage Wind excavated sand, soil, and rock in pieces of various size and shape. Pieces greater than three feet long were stockpiled next to the hole and remains in place.  Moskaluk Decl. ¶ 15(a)(i); U.S. Summary Judgment Motion, ¶ 5.

12.     Excavated rock that was less than three feet long was crushed into a size of roughly three inches or less. Moskaluk Decl. ¶ 15(a)(ii); U.S. Summary Judgment Motion, ¶ 6.

13.     Once a foundation for the turbine was poured and had cured, the crushed rock, sand, and soil from the excavation was pushed back into the excavated site. Moskaluk Decl. ¶ 15(a)(ii); U.S. Motion for Summary Judgment, ¶ 8.

14.     None of the sand, soil, or rock excavated for any foundation or trench is moved to or used at another location within the Wind Farm Property or outside of that property.  Moskaluk Decl. ¶ 15(a)(v).

15.     No sand, soil, or rock from any excavation is used for any purpose other than to return to the hole from which it came.  *Id.* ¶ 15(a)(v).

16.     No excavated sand or rock is used in the mixing or preparing of the concrete for any foundations or other uses, and no excavated rock or sand is sold or used for commercial purposes. *Id.* ¶ 15(a)(v),(vi).

## IV.    ARGUMENT

### A.  Osage Wind's Construction Activities Do Not Constitute "Mining."

The United States' contention that Osage Wind is required to obtain a mining lease or permit to construct turbine foundations fails for three reasons.  First, 25 C.F.R. Parts 214 and 211 must be read in light of the purposes of the Osage Allotment Act, Act of June 28, 1906, ch. 3572, 34 Stat. 539 ("Osage Act"), which is the source of the Secretary of the Interior's ("Secretary") and the BIA's authority.  The Osage Act reserved the Mineral Estate to the Nation, while authorizing the use of the surface estate for any purpose.  Parts 214 and 211 apply only to an entity engaged in the business of developing mineral resources, not an entity that encounters minerals in connection with surface construction activities.  It is undisputed that Osage Wind is not engaging in the business of developing mineral resources.  Undisputed Material Fact ("UMF") Nos. 14-16.  The United States acknowledges that the "crushed rock, sand, and soil are pushed back . . .  into the excavated site."  U.S. Summary Judgment Motion at 2.

Second, neither Part 214 nor Part 211 requires Osage Wind to obtain a lease or permit to engage in activities incident to construction on the surface estate of the Wind Farm Property because an Osage County surface owner has a right to incidental use of material from the Mineral Estate for construction consistent with surface development.  Third, a valid interest in a mineral estate requires a commercially developable mineral, and there are no facts supporting

such a claim here.  Consequently, the Nation has not been deprived of value from its minerals.  While Osage Wind undoubtedly has the right to make minimal and reasonable use of the Mineral Estate incident to its surface construction, it is important to apply common sense to the dispute before the Court.  There are few people in the world who, when digging holes for foundations, would imagine they are mining.  And with good reason: this simply is not mining.

> 1.  Neither 25 C.F.R. Part 214 nor Part 211 applies to Osage Wind's activities.

25 C.F.R. Parts 214 and 211, by their own terms, apply only to entities engaged "mining," defined as the business of developing mineral resources, not to an entity that incidentally encounters minerals in connection with surface construction activities.  The Osage Act defines the United States', and the BIA's, authority because that Act reserved to the Nation the minerals the United States purports to protect and authorized the Secretary to promulgate regulations governing mineral leases with the Nation.  *See* Osage Act, § 3 (providing "leases for all oil, gas, and other minerals, covered by selections and division of land herein provided for, may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary").  The Secretary promulgated 25 C.F.R. Part 214 to implement the Osage Act.  *See* 25 C.F.R. Part 214 (stating that the authority for its promulgation is "Sec. 3, 34 Stat. 543").  The Osage Act allotted the surface estate of the former Osage reservation out of reservation status and expressed Congress' intent that the surface estate be used for "farming, grazing, or *any other purpose not otherwise specifically provided for herein* . . . ." Osage Act, § 7 (emphasis added). Against this backdrop, it is clear that Part 214 does not apply to Osage Wind's activities undertaken pursuant to leases implementing an authorized use of the surface estate.

The regulations at 25 C.F.R. Part 214 addressing "Leasing of Osage Reservation Lands, Oklahoma, For Mining, Except Oil and Gas," are designed only to regulate an entity engaged in

"mining," defined as the business of developing mineral resources, not one that only incidentally encounters minerals during surface construction activities.  Part 214 imposes an obligation to "exercise diligence in the conduct of prospecting and mining operations" and to "expend annually in development work" a specified sum.  25 C.F.R. § 214.13(a).  Section 214.10(d) provides that, for "substances other than gold, silver, copper, lead, zinc, coal, and asphaltum the lessee shall pay quarterly a royalty of *10 percent of the value at the nearest shipping point of all ores, metals or minerals marketed*."  (Emphasis added); *accord* 25 C.F.R. § 211.43(a).

The United States concedes that 25 C.F.R. Part 211 "fleshes out, rather than supersedes" the Part 214 regulations.  Motion at 8 n.6.  Part 211 governs "the development of Indian tribal oil and gas, geothermal and solid mineral resources. . . ."  25 C.F.R. § 211.1(a).  The Part 211 regulations provide the only applicable definition of "mining:" the "science, technique *and business of mineral development* . . . ." *Id*. § 211.3 (emphasis added).  This case requires determination whether this definition can be stretched to require a mining lease or permit with the consent and approval of the Nation and BIA whenever an owner of the surface estate created by the Osage Act seeks to disturb earth for construction necessary to "*any other purpose not otherwise specifically provided for herein* . . . ." Osage Act, § 7 (emphasis added). The correlative determination the U.S. Summary Judgment Motion presents is whether the Nation and BIA may veto any surface construction that disturbs soil, sand or rock notwithstanding that legislative intent.  *See* U.S. Summary Judgment Motion at 4 (contending that Osage Wind's "activities require approval from the BIA and a lease between [Osage Wind] and the Osage Nation that is accepted by the BIA").

The applicable regulations reflect there must be a mineral development purpose to invoke leasing requirements.  Part 211 provides that leases shall be for a term "not to exceed a

primary term of lease duration of 10 years" and "as long thereafter as the minerals specified in the lease *are produced in paying quantities*," *id.* § 211.27(a). The regulations further provide that a party engaged in mining "shall provide for a yearly development expenditure of not less than $20 per acre," *id.* § 211.42(a), and that a party engaged in mining exercise diligence "while minerals production can be secured in paying quantities," *id.* § 211.47(a).

By their own terms, the Part 214 and Part 211 regulations apply to commercial mining, not to a surface owner or lessee of the surface owner, like Osage Wind, that is only engaged in surface construction activities that incidentally impact mineral materials. Osage Wind is simply constructing foundations that are no more than 10 feet deep, much like anyone building a home. UMF No. 10. The material dug out for any foundation or disturbed in trenching[2] is not moved to or used at any other location within the Wind Farm Property or outside of that property. UMF Nos. 14-15. No rock, sand, or soil is used to make concrete or for any purpose; rather, it is placed back in the hole from which it came or is left in place on the surface. UMF Nos. 12-13. Osage Wind is plainly not engaged in the "business of mineral development" and thus no lease or permit is required under either Part 214 or 211.

Indeed, that the regulations do not apply when a surface owner is excavating for purposes consistent with the surface use is supported by reference to the converse: use of the surface by the Mineral Estate owner. 25 C.F.R. § 214.14(a) governs the use of surface lands for development of the leased Osage Mineral Estate:

> Lessees may use so much of the surface of the leased land *as shall be reasonably necessary for the prospecting and mining operations and buildings required by the lease*, and shall also have the *right-of-way* over and across such land to any point of prospecting or mining operations . . . .

---

[2] Contrary to the suggestion of the Amended Complaint, ¶ 2, trenching for underground cables is not complete nor did Osage Wind ever contend that it was completed.

9

(Emphasis added);  *see also id.*  § 226.19(a) (lessees of the Osage Mineral Estate may use the surface "as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, other appliances necessary for operations and marketing, and the right-of-way for ingress and egress to any point of operations").  Osage Wind's excavating, crushing of some materials, and replacing materials removed in the holes or on the surface are a reasonable exercise of the rights of a surface owner or her lessee and do not constitute mining.

Citing 25 C.F.R. § 214.7, the Amended Complaint and the U.S. Summary Judgment Motion make the legally unsustainable allegation that Osage Wind, the surface lessee, must obtain a lease from the Nation, approved by BIA, for "work of any nature" that affects "minerals" or any "work related to minerals."  *See* Amended Complaint, ¶¶ 24, 42, 50.  The legislative enactments under which the regulations are promulgated contain no support for the United States' new interpretation of the regulations.  *See* Section IV(A)(3), *infra* (discussing the Osage Act's purpose); Act of May 11, 1938, 52 Stat. 347; Act of August 1, 1956, 70 Stat. 774. As set forth above, 25 C.F.R. § 211.3 defines "mining" as: "the science, technique, and business of mineral development including, but not limited to: opencast work, underground work, and in-situ leaching directed to severance and treatment of minerals."  25 C.F.R. § 211.48(a) provides: "No exploration, drilling, or mining operations are permitted on any Indian lands before the Secretary has granted written approval of a mineral lease or permit pursuant to the regulations in this part."  The Part 211 regulations are silent as to any requirement for a lease or permit to conduct "work of any nature" or a generalized "work related to minerals" that are not encompassed within the definition of "mining."  The Part 214 Regulations do include the term "work of any nature," but do not require a lease for such a potentially broad category of activity.

25 C.F.R. § 214.7 prohibits "mining or work of any nature" until a mineral lease has been approved, but Part 214 is silent as to any requirement of a lease for any activity *other than mining*.  *See generally* 25 C.F.R. § 214, Title ("Leasing of Osage Reservation Lands, Oklahoma, for Mining, except Oil and Gas").

The theory that "work of any nature" requires a lease or permit must be rejected upon a reading of the relevant regulations under the doctrine of *in pari materia*.  25 C.F.R. § 211.3 defines "mining" by specific acts in "the science, technique, and business of mineral development," and 25 C.F.R. § 211.48(a) prohibits "exploration, drilling, or mining operations" without a lease or permit.  Reading the provisions of Part 211 in conjunction with the Part 214 regulations, it is clear that the types of activities for which a Part 214 lease is required if the activities are defined as "mining" in Part 211, and not for any other potential activity on the surface; "work of any nature" must be read as work of any nature related to the mining activity that requires a lease.  Reading the regulations together compels the conclusion that Part 214 requires a license *only* for the activities defined as "mining" in Part 211.

The United States' proposed interpretation of the applicable regulations conflicts with their express and unambiguous terms, and thus is not entitled to any deference.  *See Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 356 (2000).  The inclusion of the term "opencast" in 25 C.F.R. § 211.3's definition of mining reinforces that the Regulations apply to mining, and *not* to construction.   In the U.S. Summary Judgment Motion, the United States quotes numerous dictionaries but limits its reliance to a snippet in the Bureau of Mine's Dictionary of Mining Terms regarding the term "opencast."  *See* U.S. Bureau of Mines, *Dictionary of Mining, Mineral, and Related Terms* 2170-71 (U.S. Dep't of the Interior, 2d ed. 1996).  The complete Bureau of Mines definition for "opencast" and "opencast method" and "open pit" provide a better

11

understanding of the term.  The concise definition of "opencast method" is: "A mining method consisting of *removing the overlying strata or overburden, extracting the coal, and then replacing the overburden . . . .*"  *Id.* at 2171 (emphasis added).  An "openpit mine" is "[a] mine working or excavation open to the surface.  See:  strip mine." *Id.* at 2174.  "Openpit mining" is similar in definition to the opencast method.  *Id.*  Strip mining is specific to the removal of coal from an opencut mine.  *Id.* at 3142.  These definitions demonstrate that opencast mining is the act of removing a commercially valuable material by removing the overlying strata, extracting the mineral material, and then replacing the overburden with the purpose of using or marketing the material elsewhere.  Osage Wind is not engaged in opencast work; Osage Wind is engaged in construction incident to authorized surface activities.

The United States seeks to minimize the draconian consequences of its present claim by contending that it would only require a lease or permit when quantities of "mineral" extracted are in excess of 5,000 cubic yards.  The regulations, however, do not specify such a limit. Rather, 25 C.F.R. Part 211 requires a permit, including BIA approval, prior to extracting 5,000 cubic yards or less per year of common varieties of minerals.  *See* 25 C.F.R. § 211.3 (defining a "permit" as "any contract issued by the superintendent and/or area director to conduct exploration on or removal of less than 5,000 cubic yards per year of common varieties of minerals from Indian lands").  Contrary to the United States' assertion, its interpretation of Parts 211 and 214 would require a lease or permit for *any* construction that disturbs any quantity of mineral material would give the Nation or BIA a veto over any such construction of any size.

Consequently, if the Court accepts the United States' position, then every proposed construction project in Osage County that requires digging and backfilling, from a small single family home, to multi-family apartments, to commercial buildings, to sports fields, to water

towers, to septic tanks, that require excavation or even preparation of the soil, will be subject both to a veto by the Nation and to lengthy delays and high costs necessitated by compliance with the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq* ("NEPA").  *See* 25 C.F.R. § 211.7.  Such a result conflicts with the Osage Act's legislative intent and would significantly compromise development of Osage County lands, and disrupt long-settled jurisdictional expectations in Osage County.

As the Tenth Circuit concluded in *Osage Nation v. Irby* 597 F.3d 1117 (10th Cir. 2010), the "Osage reservation has been disestablished by Congress" more than a century ago, and the "long-standing assumption of jurisdiction by the State over an area that is [predominantly] non-Indian, both in population and in land use, may create justifiable expectations." *Id.* at 1127-28 (alteration in original; quotation marks and citation omitted). In disestablishing the Osage reservation and making that area a county of Oklahoma, Congress plainly did not intend reserve to the Nation a power to veto substantially all surface development activity in the County.  *See Montana v. United States*, 450 U.S. 544, 559 n. 9 (1981) ("It defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government.").   Nor could Congress have intended to subject virtually every construction project on privately held surface lands in Osage County to the potential cost and delay of pursuing compliance with NEPA and other federal statutory schemes, making the area uncompetitive for economic development.  The Osage Act took the former surface estate out of reservation status and transitioned it to fee ownership to encourage development without undue restriction. Surface uses consistent with Congress' intended uses—here, development, including

building—cannot be forced to comply with statutes Congress did not intend by a strained reading of regulations that apply *only* to the Mineral Estate.

>    2. <u>A surface owner has a right to incidental excavation and replacement of mineral consistent with the development of the surface.</u>

The United States has failed to identify a single precedential case in which the mineral owner was held able to prevent the surface owner from excavating and replacing minerals in the course of conducting construction on the owner's surface estate when all materials excavated would be returned to the same location.

The reasonable uses of the Wind Farm Property are determined by reference to the statute that created the surface estate, the Osage Act.  The Osage Act's primary goal was to assist Osage "allottees" to make beneficial use of their lands, and hence, the development of Osage County. The Osage Act did not impliedly limit the uses of the surface estate; rather it contemplated that the surface estate be used flexibly, "for farming, grazing, or *any other purpose not otherwise specifically provided for herein . . . .*" Osage  Act, § 7 (emphasis added).  Section 2, Seventh reinforced that intent, stating that "upon the issuance of such certificate of competency the lands of such member (except his or her homestead) shall become subject to taxation, and such member . . . shall have the right to manage, control and dispose of his or her lands *the same as any citizen of the United States . . . .*"   (Emphasis added.)  One of the surface uses directly addressed in the Osage Act is the construction and improvement of railroads, § 11.  This intent could only be defeated if construction requiring excavation is subject to a tribal or federal veto whenever mineral materials must be disturbed. Osage Wind's construction of the Wind Farm is consistent with the purpose of the Osage Act.  The United States' narrow vision is not.

The conclusion that the surface owner may incidentally use minerals is consistent with the common law, as the Act indicates an intent to allow landowners the same rights generally

applicable elsewhere.  *See* 53A AM. JUR. 2D *Mines and Minerals* § 14 (2006) ("[T]he simple removal of dirt does not constitute mining."); *see also Wray v. Goeglein*, 1998 WL 880582 *9, n.3 (Ohio Ct. App., Dec. 2, 1998) ("The surface owner has the right to make reasonable use of the surface though this may result incidentally in damage to the mineral owner.") (quotation marks and citation omitted); *Mullins v. Clinchfield Coal Corp.*, 128 F. Supp. 437 (W.D. Va. 1953) (where a surface owner did not sell or otherwise dispose of coal and did not remove it from the subject property, the surface owner's actions did not prevent the mineral owner from exercising her property rights).  This law is persuasive.  *See S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 763 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006) ("When Congress legislates against a backdrop of common law, without any indication of intention to depart from or change common law rules, the statutory terms must be read as embodying their common law meaning.").

Contemporary legislatures recognize a similar balanced that requires a mineral owner to accommodate reasonable surface uses.  The Oklahoma Mining Lands Reclamation Act, applicable to Osage Wind's lessors' surface estates, provides that surface mining "shall not include excavations or grading conducted for forming, on-site road construction or other on-site construction . . . ." Okla. Stat. Ann. tit. 45, § 723.  A similar Virginia statute was considered in *Virginia Department of Mines, Minerals & Energy v. May Brothers, Inc.*, 396 S.E. 2d 695 (Va. Ct. App. 1990), construing Va. Code Ann. § 45.1-180(a), which provides in part that the term "mining" "shall not include excavation or grading when conducted solely in aid of on-site farming or construction."  The court applied that definition to hold that "the simple removal of dirt from a construction site, without more, does not constitute 'mining'" as defined by statute. *Va. Dep't of Mines*, 396 S.E.2d at 697; *see also* Alaska Stat. Ann. § 27.08.010(II)(1) (excluding

from the definition of mining "excavation or grading when conducted solely in aid of on-site farming or construction").  Here, Osage Wind is not removing the dirt from the construction site; it is being excavated and then returned to the same hole or left on site. UMF Nos. 11-15.

Osage Wind has not interfered with the Nation's ability to access valuable minerals. Osage Wind has merely excavated holes to construct foundations and then replaced the minerals or placed the minerals on the surface. This is entirely statutorily consistent with the congressionally contemplated use of the surface estate.  Accordingly, the Court should reject the United States' claims and dismiss the Amended Complaint with prejudice.

   3.   <u>The ownership of the Mineral Estate is limited to the ability to commercially develop minerals and obtain the proceeds.</u>

Nowhere in the Amended Complaint does the United States allege that the soil, sand, and limestone at issue here could be part of a commercially-viable mining operation. This failure is fatal because the ownership of a mineral estate entitles the owner to develop those minerals that are actually valuable; that is, if their price at market exceeds the cost of developing, extracting, and processing the minerals.  In the absence of such a commercially valuable mineral, the incidental excavation of minerals during construction of surface structures does not invade an interest of the mineral estate owner and the mineral estate owner has lost nothing because it never would have yielded value from the minerals excavated and replaced.

An analogy to the developed law under the Mining Law of 1872 is useful.  The Mining Law of 1872 provides: "Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found [open] to occupation and purchase . . . ."  30 U.S.C. § 22.  The Mining Law allows for the development of minerals on public lands; however, the mere discovery of minerals is not sufficient for a miner to perfect a

claim.  The miner must satisfy the "prudent-man" test, often analyzed through a marketability test.

To determine whether valuable mineral deposits under the prudent-man test, "the discovered deposits must be of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine." *United States v. Coleman*, 390 U.S. 599, 602 (1968) (quotation marks and citation omitted).  The marketability test is a refinement of the prudent-man test and requires a claimant to show "that the mineral can be extracted, removed and marketed at a profit."  *Id.* at 600 (quotation marks omitted).  These tests have been applied to hold that a mining claim is not valid where no commercially valuable quantity of mineral existed.  *See Hallenbeck v. Kleppe*, 590 F.2d 852, 856-59 (10th Cir. 1979) (holding that the activity was not mining under the marketability test because there was no evidence of sales of minerals from the claim); *Edwards v. Kleppe*, 588 F.2d 671, 672 (9th Cir. 1978) (holding that mining had not occurred because there was no evidence of value or of marketability of rock, sand, or gravel). This definition is consistent with common law understandings regarding the scope of a reserved mineral estate.  *See Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986) (listing five essential attributes of a severed mineral estate including the right to develop). The right to develop necessarily requires that a mineral be susceptible to being extracted and sold. Although limestone was held to be a reserved mineral of the Mineral Estate in *Millsap v. Andrus*, 717 F.2d 1326 (10th Cir. 1983), in that case a party was excavating limestone for commercial purposes, that is, selling the limestone as road base, *id.* at 1327, n.1, consistent with the scope of a severed mineral estate.  In contrast Osage Wind is merely putting the excavated materials back in the hole they came from or leaving them on the surface.

Although the definitions of the scope of a mining claim from the Mining Law of 1872 and the common law rights of a mineral estate owner do not necessarily control the scope of the minerals reserved to the Nation in the Osage Act, they are instructive.  The United States has failed to allege any facts that would demonstrate that the limestone and other materials contained in the holes excavated by Osage Wind could be developed and sold at a profit. Therefore the Amended Complaint fails to demonstrate that excavating the materials and replacing them at the same location affected any right of, or caused any injury to, the Mineral Estate owner. Because this crucial allegation is missing, the United States fails to state a claim that Osage Wind is in any way interfering with the rights of the Mineral Estate owner.  The United States' ultimate requested relief, removal of the Wind Farm, is particularly unreasonable in light of the United States' failure to demonstrate any interference with the Mineral Estate.

### B. Res Judicata Bars the United States' Claims Because They Could Have Been Asserted in the Prior Litigation.

As a further reason to grant this Motion, the doctrine of res judicata bars the United States' Amended Complaint. "Under res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or *could have been raised* in the prior action." *Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards*, 314 F.3d 501, 503-04 (10th Cir. 2002) (quotation marks and citation omitted).  The doctrine establishes that a final judgment on the merits "is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but *as to any other admissible matter which might have been offered* for that purpose." *Nevada v. United States*, 463 U.S. 110, 129-30 (1983) (quotation marks and citation omitted; emphasis added).  Three elements must be satisfied to apply res judicata: "(1) a final judgment on the merits in an earlier action; (2) identity

of parties or privies in the two suits; and (3) identity of the cause of action in both suits." *Wilkes*, 314 F.3d at 504 (quotation marks, citation, and brackets omitted).

The Prior Litigation was dismissed with prejudice, constituting a final judgment on the merits. *See* Prior Litigation, Judgment [Doc. 37] (Dec. 20, 2011); Mandate from Circuit Court [Doc. 55] (Feb. 23, 2012) (dismissing appeal by agreement of the parties). The other two res judicata elements are satisfied here. Consequently, the claims asserted in this lawsuit are barred because they were not raised by the Nation in the Prior Litigation.

      1.  <u>The United States is in privity with the Nation and is bound by the judgment in the Prior Litigation from advancing claims on the Nation's behalf.</u>

A person, although not a party to an earlier action, is bound by a judgment in the earlier action "when it can be said that there is 'privity' between a party to the second case and one who is bound by an earlier judgment." *Pelt v. Utah*, 539 F.3d 1271, 1281 (10th Cir. 2008). Two of the six categories the Supreme Court has identified establish privity between the United States and the Nation:

> [N]onparty preclusion may be justified based on a variety of pre-existing substantive legal relationships between the person to be bound and a party to the judgment.
>  . . . .
> [A] party bound by a judgment may not avoid its preclusive force by relitigating through a proxy. Preclusion is thus in order when a person who did not participate in a litigation later brings suit as the designated representative of a person who was a party to the prior adjudication.

*Taylor v. Sturgell*, 553 U.S. 880, 894-95 (2008) (quotation marks and citation omitted). "[E]ach case must be carefully examined to determine" whether privity exists. *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1174 (10th Cir. 1979).

The Supreme Court long ago identified the importance of binding a trustee and beneficiary to a prior judgment in subsequent litigation: "It would be a new and very dangerous

doctrine in the equity practice to hold that the *cestui que trust* is not bound by the decree against his trustee in the very matter of the trust for which he was appointed."  *Corcoran v. Chesapeake & Ohio Canal Co.*, 94 U.S. 741, 745 (1876); *see also Sea-Land Servs., Inc. v. Gaudet,* 414 U.S. 573, 593-94 (1974) (beneficiaries are bound by  judgment with respect to the interest which was the subjection of the fiduciary relationship); RESTATEMENT (SECOND) OF JUDGMENTS § 41(1) (1982) (a beneficiary is bound as though a party where the trustee represented the beneficiary or where an official or agency is invested by law with authority to represent the beneficiary).

The same privity rules apply where the beneficiary represented itself in a prior action.  In *St. Louis Typographical Union No. 8, AFL-CIO v. Herald Co.*, 402 F.2d 553 (8th Cir. 1968), union members had sued for benefits and were unsuccessful.  In a subsequent suit by the union on behalf of the members, the Eighth Circuit concluded: "[T]he fact remains that Union concededly has no beneficial interest in any recovery. It prosecutes this action solely as the representative of the same employees who were plaintiffs in the state case. In determining whether the parties are the same, substance over form controls." *Id.* at 556. A beneficiary may not have two bites at the apple:

> [I]f a person first litigates in his own behalf, that person may be precluded from claiming any of the benefits of a judgment in a subsequent action that is brought or defended by a party representing him. . . . In short, the doctrine of claim preclusion applies symmetrically to instances in which litigation by a representative precedes individual litigation and to those instances in which the opposite sequence occurs.

*E.E.O.C. v. U.S. Steel Corp.*, 921 F.2d 489, 493 (3d Cir. 1990) (citations omitted); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 42, cmt. g (providing that a person who appears in his own behalf in litigation has had his day in court and is bound by the judgment and he may not relitigate in a subsequent action prosecuted or defended through a representative).

20

The trust relationship between the United States and a tribe required application of res judicata in *Nevada v. United States*.  In *Nevada*, the United States had represented the Pyramid Lake Paiute Tribe's interests in a prior water rights adjudication.  In a subsequent case, the Tribe sued on a different theory to obtain additional water.  The Supreme Court held that the Tribe should not be permitted to "relitigate the question."   463 U.S. at 135 (quotation marks and citation omitted).  The Supreme Court continued: "There can be no more complete representation than that on the part of the United States in acting on behalf of [the Tribe]."*Id.* at 142 (quotation marks and citation omitted).

Here, there is no question that the United States is acting as the trustee with respect to the Nation and its Mineral Estate, *i.e.*, the trust property, and the Nation is the beneficiary. The trust relationship between the United States and the Nation requires that res judicata bars the Amended Complaint.  The Amended Complaint alleges that "the United States is authorized to bring lawsuits on behalf of trust Indian beneficiaries," that the United States has a "fiduciary responsibility to protect trust Indian resources," and that "the United States is charged with the administration, protection and management of the estate."   Amended Complaint, ¶ 4.  The Amended Complaint further alleges that the United States brought suit "in its capacity as trustee of the Osage minerals estate," *id.*, and that the OMC approved a resolution "requesting the assistance of the United States to protect the Osage Mineral Reserve from unauthorized commercial use."  *Id.* ¶ 29.  The United States has acknowledged that its interests are aligned with those of the Nation.  *See* U.S. Summary Judgment Motion at 14.

The only difference between the present case and *Nevada* is that here the beneficiary—the Nation, acting through the OMC—was the party in the Prior Litigation, not the United States.  A beneficiary that previously lost is not entitled to relitigate an issue through a representative or

to benefit from its representative's later prosecution of the same claim.  In addition, as in *Nevada*, the fact that a different theory is asserted in the second litigation does not bar application of res judicata.  Here, the United States and the Nation have a "pre-existing substantive legal relationship," and the United States seeks now to "bring suit as the designated representative of [the Nation] who was a party to prior adjudication."  *Taylor*, 553 U.S. at 894-95. At issue in the Prior Litigation and this lawsuit is the Mineral Estate, of which the Nation is the beneficiary.  The real party in interest—the Nation—has already litigated the issue of interference with the Mineral Estate to a final judgment.  The BIA, in fact, also considered bringing similar litigation based on the BIA's concern that the turbines and required infrastructure would "unreasonably interfere with the operations of the Osage Mineral Estate." *See* Declaration of Joan Heredia, ¶ 12, attached as Exhibit 2 to Defendants' Response to Plaintiff's Motion for Preliminary Injunction [Doc. No. 17].  The fact that the Prior Litigation was based on 25 C.F.R. Part 226, rather than 25 C.F.R. Part 214, does not immunize the United States' claims from application of res judicata.

       2.   <u>The causes of action are the same in both suits.</u>

The Amended Complaint[3] and the allegations in the Prior Litigation arise out of the same set of facts and seek the same relief—prohibiting Osage Wind from alleged "interference" with the Mineral Estate—by, in the Prior Litigation, preventing installation of the planned Wind

---

[3] The Amended Complaint is one in a series of actions instituted by the Nation or at its behest seeking to halt the construction of the Wind Farm.  Following multiple prior unsuccessful challenges to Osage County land use approvals, in 2014, the Nation brought suit against the Osage County Board of Commissioners, the Board of Adjustment, and Osage Wind, seeking declaratory and injunctive relief to, among other things, enjoin Osage Wind from constructing the Wind Farm, asserting that the Wind Farm would interfere with the Mineral Estate.  *See* Petition for Declaratory Judgment and Petition for Permanent Injunction, Case. No. CV-2014-41 (Okla. Dist. Ct., June 25, 2014). On October 23, 2014, the state district court dismissed the Petition on, among other grounds, the basis of laches and res judicata based on the Prior Litigation, and the Nation has appealed.  The Nation's repeated attempts to litigate the same claims in various fora provide further support for concluding that the United States' current, and similar, claims brought on the Nation's behalf are barred.

Farm, and in this litigation, among other remedies, requiring the removal of the substantially completed turbines for the Wind Farm.   The Tenth Circuit's transactional approach to the concept of "cause of action," *Wilkes*, 314 F.3d at 504, renders these the same "claim." "Under the transactional approach, a cause of action includes all claims or legal theories of recovery that arise from the same transaction, event, or occurrence. All claims arising out of the transaction must therefore be presented in one suit or be barred from subsequent litigation." *Id.* (quotation marks, citation, and alterations omitted).

> What constitutes the same transaction or series of transactions is to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Hatch v. Boulder Town Council*, 471 F.3d 1142, 1149 (10th Cir. 2006) (quotation marks and citation omitted).   "Under the transactional test, a new action will be permitted only where it raises *new and independent* claims, not part of the previous transaction, based on the new facts." *Id.* (emphasis in original); *see also United States v. Tohono O'Odham Nation*, ___ U.S. ___, ___, 131 S. Ct. 1723, 1726 (2011) (barring the Tohono O'Odham Nation from bringing a second suit on different legal grounds but based on the same underlying conduct stating, "[c]oncentrating on operative facts is also consistent with the doctrine of claim preclusion, or res judicata").

The Prior Litigation and the Amended Complaint arise from the same transaction and ask the same question as Chief Judge Frizzell framed: "How exactly does this project result in the inability of the Osage Nation to benefit fully from its mineral estate?" Prior Litigation, Transcript of Proceedings [Doc. 18] (Oct. 26, 2011), Pg. 6, Lns. 15-17. The excavations that are the principal subject of the Amended Complaint were identified by the Nation in the Prior Litigation Complaint, which alleged that turbine construction "will require extensive digging to construct deep pits containing concrete foundations similar to those required in the construction of tall

23

buildings." Prior Litigation Complaint, ¶ 17. The Nation further alleged that it "is and will continue to be irreparably harmed if the Defendants are allowed to begin construction and interfere with Nation's rights associated with developing its mineral estate." *Id*. ¶ 40. In his Findings of Fact, ¶ 8, Chief Judge Frizzell found: "The turbine foundations will be made from reinforced concrete, with each foundation initially being 16 feet in diameter down to four feet below the surface, then expanding in a conical shape with a maximum diameter of 50 feet, to a depth of 10 feet." In the Amended Complaint, ¶ 18, the United States alleges: "The foundations for the wind turbines are made from reinforced concrete, in a conical shape with a base diameter of more than 50 feet, buried to a depth of approximately 10 feet in the subsurface estate." The two cases seek to prevent the same activity affecting the same interest.

While development of the Wind Farm has progressed since the time the Prior Litigation was filed, the *transaction* remains the same. The United States' requested relief in the Amended Complaint is not materially different from the Nation's requested relief in the Prior Litigation, *i.e.*, seeking to halt the Wind Farm. The United States seeks an order from this Court requiring Osage Wind to remove "structures or materials placed . . . in the mineral estate." Amended Complaint, Prayer for Relief, ¶ 5. Accepting the United States' argument would mean granting the relief denied in the Prior Litigation and giving the Nation veto power over the Wind Farm, which the Nation has made clear it intends to exercise. The two cases involve the same cause of action, the other res judicata elements are met, and the United States' claims must be dismissed.

The United States' attempt to distinguish its current action, arising under Parts 214 and 211, from the Nation's claims in the Prior Litigation, based on Part 226, *see* U.S. Motion for Summary Judgment at 2-3, n. 1, fails to appreciate the fact that the Part 226 and Part 214 Regulations implement a single statute—the Osage Act, the sole source of the United States and

BIA's authority to regulate the Mineral Estate, and that Part 211 also applies to Part 226. Contrary to the United States' assertion, the "fundamental statutes and regulations" underlying both the United States' and the Nation's causes of action are not "completely different."   U.S. Summary Judgment Motion at 2-3, n. 1.

## V.       CONCLUSION.

The United States' claims that construction of the Wind Farm requires a permit or a lease under 25 C.F.R. Parts 214 or 211 fails both on the merits and because such a claim must have been brought in the Prior Litigation.   The Court should enter an order of dismissal or an order entering summary judgment in favor of Defendants, dismissing all claims in the Amended Complaint, awarding Osage Wind its costs incurred, and such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

NORMAN, WOHLGEMUTH, CHANDLER, & JETER

By: _s/Ryan A. Ray_ _____
     Joel L. Wohlgemuth, OBA #9811
     Ryan A. Ray, OBA # 22281
     401 S. Boston Ave.
     Tulsa, Oklahoma 74103
     Telephone: (918) 583-7571
     E-mail: RAR@nwcjlaw.com

            and

25

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

Lynn H. Slade
William C. Scott
Post Office Box 2168
500 Fourth Street, N.W., Suite 1000
Albuquerque, New Mexico  87103-2168
Telephone: (505) 848-1800
Lynn.Slade@modrall.com
Bill.Scott@modrall.com

*ATTORNEYS FOR DEFENDANTS OSAGE WIND, LLC, ENEL
KANSAS, LLC and ENEL GREEN POWER NORTH AMERICA,
INC.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 29, 2014, I electronically transmitted the attached Defendants' Motion to Dismiss to the Clerk of the Court using the ECF System for filing. Based on the electronic records currently on file, the Clerk of the Court will transmit a notice of Electronic Filing to the following ECF registrants:

Cathryn D. McClanahan
Assistant United States Attorney
110 West 7th Street, Suite 300
Tulsa, OK  74119
(918) 382-2700
Cathy.mcclanahan@usdoj.ok
*Attorney for the United States of America*

The following non-ECF registrants have been served by First Class United States mail:

Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor Office
7906 East 33rd Street
Tulsa, OK  74145
(918) 669-7730
Charles.babst@sol.doi.gov
*Attorney for the United States of America*

*s/Ryan A. Ray*
Ryan A. Ray

*W2335486.DOC*

27