**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-704-JHP-TLW |
| | ) | |
| (1) OSAGE WIND, LLC; | ) | |
| (2) ENEL KANSAS, LLC; and | ) | |
| (3) ENEL GREEN POWER NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTS I AND II
OF THE AMENDED COMPLAINT [DOC. 24]**

NORMAN, WOHLGEMUTH,
CHANDLER, & JETER
Joel L. Wohlgemuth, OBA #9811
Ryan A. Ray, OBA # 22281
401 S. Boston Ave. Ste. 2900
Tulsa, Oklahoma 74103
Telephone: (918) 583-7571
JLW@nwcjlaw.com
RAR@nwcjlaw.com

MODRALL, SPERLING, ROEHL,
HARRIS & SISK, P.A.
Lynn H. Slade
William C. Scott
Post Office Box 2168
Albuquerque, New Mexico  87103
Telephone: (505) 848-1800
Lynn.Slade@modrall.com
Bill.Scott@modrall.com

*Attorneys for Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc.*

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

I.      INTRODUCTION. ................................................................................................... 1

II.     Response to the Statement of Undisputed Material Facts and Statement of Additional
        Material Facts......................................................................................................... 2

   A.   Response to Statement of Undisputed Material Facts. ...................................... 2

   B.   Statement of Additional Undisputed Material Facts.......................................... 3

III.    RULE 56 REQUIRES DISREGARDING OR STRIKING THE EXHIBITS TO THE
        MOTION.................................................................................................................. 6

IV.     ARGUMENT. ........................................................................................................... 7

   A.   The United States' Overly Broad Interpretation of "Mining" Conflicts with the Language
        and Purpose of the Osage Act............................................................................. 7

   B.   Osage Wind Is Not Engaged in Mining and Does Not Require a Permit or Lease under 25
        C.F.R. Part 214 (or Part 211). ............................................................................ 10

      1.   The United States misinterprets the definition of "mining." ........................... 10

         a.   The Motion ignores the meaning of "the business of mineral development.".......... 10

         b.   The Motion incorrectly equates "mining" with excavation for construction. ......... 11

      2.   The alleged "de minimus exception" does not affect the scope of "mining." ............... 15

   C.   No Deference Is Due the Recent Interpretations of the Regulations to Require a "Sandy
        Soil" Permit or Lease for Construction............................................................... 17

   D.   The Indian Canon Does Not Apply Because the Regulations Are Not Ambiguous. ....... 21

   E.   State Law Is Persuasive Authority Regarding the Definition of "Mining." .................... 23

   F.   Relief Under Counts I and II Is Barred by Laches.............................................. 24

V.      CONCLUSION......................................................................................................... 25

# TABLE OF AUTHORITIES

**Supreme Court Case Law**

*Auer v. Robbins,*
 519 U.S. 452 (1997)................................................................................18

*Bloate v. United States,*
 559 U.S. 196 (2010)................................................................................12

*Burlington Truck Lines, Inc. v. United States,*
 371 U.S. 156 (1962)................................................................................19

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
 467 U.S. 837 (1984)..................................................................................8

*Christopher v. SmithKline Beecham Corp.,*
 ___ U.S. ___, 132 S. Ct. 2156 (2012)...............................................18, 19

*City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y.,*
 544 U.S. 197 (2005) ...............................................................................24

*DeCoteau v. Dist. Cnty. Court for Tenth Judicial Dist.,*
 420 U.S. 425 (1975) ...............................................................................21

*Federal Express Corp. v. Holowecki,*
 552 U.S. 389 (2008)................................................................................19

*Idaho v. Coeur d'Alene Tribe of Idaho,*
 521 U.S. 261 (1997) ...............................................................................21

*Jarecki v. G. D. Searle & Co.,*
 367 U.S. 303 (1961)................................................................................12

*Montana v. United States,*
 450 U.S. 544 (1981)..................................................................................9

*Norfolk S. Ry. Co. v. Shanklin,*
 529 U.S. 344 (2000)................................................................................17

*South Carolina v. Catawba Indian Tribe, Inc.,*
 476 U.S. 498 (1986)................................................................................22

**Other Federal and State Case Law**

*Biodiversity Conservation Alliance v. Jiron*,
  762 F.3d 1036 (10th Cir. 2014) .................................................................25

*Burns v. Holcombe*,
  No. 09-CV-152-JHP, 2010 WL 2756954 (E.D. Okla. July 12, 2010) ..............6

*Cayuga Indian Nation of N.Y. v. Pataki*,
  413 F.3d 266 (2d Cir. 2005) ....................................................................24

*Hook v. Regents of Univ. of Cal.*,
  394 F. App'x 522 (10th Cir. 2010) ...............................................................7

*Law Co. v. Mohawk Const. & Supply Co.*,
  577 F.3d 1164 (10th Cir. 2009) ...................................................................6

*Jicarilla Apache Tribe v. Andrus*,
  687 F.2d 1324 (10th Cir. 1982) ..........................................................24, 25

*Millsap v. Andrus*,
  717 F.2d 1326 (10th Cir. 1983) .................................................................22

*Mt. Emmons Min. Co. v. Babbitt*,
  117 F.3d 1167 (10th Cir. 1997) .................................................................18

*Mullins v. Clinchfield Coal Corp.*,
  128 F. Supp. 437 (W.D. Va. 1953) .............................................................23

*Osage Nation v. Irby*,
  597 F.3d 1117 (10th Cir. 2010) ...................................................................8

*Osage Nation v. Okla. ex rel. Okla. Tax Comm'n*,
  597 F. Supp. 2d 1250 (N.D. Okla. 2009) .......................................................8

*Osage Nation v. Wind Capital Grp., LLC*,
  (N.D. Okla. Dec. 20, 2011) ...................................................................7, 20

*S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*,
  425 F.3d 735 (10th Cir. 2005) ...................................................................23

*United States v. Admin. Enters. Inc.*,
  46 F.3d 670 (7th Cir. 1995) ......................................................................25

*Wilkes v. Wyo. Dept. of Emp't Div. of Labor Standards*,
  314 F.3d 501 (10th Cir. 2002) .....................................................................7

*Wray v. Goeglein*,
       1998 WL 880582 (Ohio Ct. App. Dec. 2, 1998) ...............................................................23

**Federal Statutes**

Act of June 5, 1872, ch. 310, 17 Stat. 228 .....................................................................................8

Osage Allotment Act, Act of June 28, 1906, ch. 3572, 34 Stat. 539 ..................................... passim

Indian Mineral Development Act of 1982, 25 U.S.C. § 2102 ......................................................14

Materials Act of 1947, 30 U.S.C. § 601...........................................................................................16

**Federal Regulations**

25 C.F.R. Part 211.......................................................................................................... passim

25 C.F.R. § 211.1 ...................................................................................................................15

25 C.F.R. § 211.3 .......................................................................................................... passim

25 C.F.R. § 211.48 ..............................................................................................................13, 15

25 C.F.R. Part 214.......................................................................................................... passim

25 C.F.R. § 214.7 .....................................................................................................9, 13, 22

43 C.F.R. § 3601.71 ...............................................................................................................16

**Federal Rules**

Fed. R. Civ. P. 56......................................................................................................................6

Fed. R. Evid. 901 ..................................................................................................................6, 7

**State Statutes**

Okla. Stat. Ann. tit. 45, § 723  ......................................................................................23

Va. Code. Ann. § 45.1-180  ............................................................................................23

**Secondary Sources**

Staff of the U.S. Bureau of Mines, *Dictionary of Mining, Mineral, and Related Terms*
(U.S. Dep't of the Interior, 2d ed. 1996) .......................................................................11

66 Fed. Reg. 58892 (Nov. 23, 2001) ...........................................................................16

53A AM. JUR. 2d *Mines & Minerals* § 14 (2006) .......................................................23

v

## I.     INTRODUCTION.

Defendants, Osage Wind, LLC ("Osage Wind"), Enel Kansas, LLC, and Enel Green Power North America, Inc.[1] (collectively, "Defendants"), respond in opposition to Plaintiff's Motion for Partial Summary Judgment as to Counts I and II of the Amended Complaint [Doc. 24] ("Motion").   The Motion should be denied because the United States' First Amended Complaint [Doc. 20] ("Amended Complaint") and the Motion fail to advance undisputed facts or applicable law which show that the removal and replacement of soil and stone, incident to lawful construction at the site of excavation on fee lands, requires a lease or permit from the Bureau of Indian Affairs ("BIA") or the Osage Nation ("Nation").   The United States seeks the extraordinary relief of removal of Osage Wind's Wind Farm in Osage County, Oklahoma ("Wind Farm" or "Project"), *see* Amended Complaint, Prayer for Relief, ¶ 5, construction of which has been ongoing—with full knowledge of the BIA and the Nation—for over a year.  The applicable law and equities do not support such a result.

The Motion advances an interpretation of 25 C.F.R. Parts 214 and 211 that ignores the purpose of the Osage Allotment Act, Act of June 28, 1906, ch. 3572, 34 Stat. 539 ("Osage Act"), which Congress intended to empower Osage surface allottees to use their lands to promote development in Osage County, Oklahoma.  The United States' overly broad interpretation writes "mining" out of regulations governing "Leasing of Osage Reservation Lands, Oklahoma, for Mining, Except Oil and Gas," 25 C.F.R. Part 214, and writes the "business of mineral development" out of the regulation defining "mining" as the "science, technique and business of mineral development," 25 C.F.R. § 211.3.  The Motion fails to establish (1) an administrative

---

[1] Enel Kansas, LLC, is a separate entity from Osage Wind, LLC, and has no involvement whatsoever in the Osage Wind Project.  Enel Green Power North America is the parent company of Osage Wind.  Neither are proper parties.

interpretation supporting the impractical and unprecedented extension of the regulations to cover Osage Wind's construction of foundations for towers for its Wind Farm, (2) any ambiguity which might require deference to the United States' position, or (3) any principle that limits the extension of its proposed interpretation to all construction requiring excavation in Osage County. Finally, the Motion should be denied because the relief sought is barred by laches. In addition, the Court should grant Defendants' Motion to Dismiss or for Summary Judgment [Doc. 26].

## II.     RESPONSE TO THE STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS.

### A.  Response to Statement of Undisputed Material Facts.

1.      Admitted.[2]

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Osage Wind denies UMF Number 9. BIA Osage Agency Superintendent Robin Phillips' October 9, 2014 letter, attached as Exhibit 3 to Plaintiff's Motion for Preliminary Injunction [Doc. 4] ("October 9, 2014 letter"), did not "demand[] that excavation cease." The letter states: "You are to refrain from any further excavation until such time that you have

---

[2] Undisputed Material Facts ("UMF") Numbers 1-8 rely on the Declaration of Bill Moskaluk, Exhibit 1 to Defendants' Response to Motion for Preliminary Injunction ("Defs. Prelim. Inj. Resp.") [Doc. 17] ("Moskaluk Decl."), made on Mr. Moskaluk's personal knowledge, and, contrary to the United States' implication, Motion at 3 n.2, does not constitute an expert opinion.

obtained a Sandy Soil Permit through the Osage Agency."   A set forth in the Additional Undisputed Material Facts ("AUMF") below, however, Osage Wind and Enel immediately responded to this letter with legal authority establishing that no lease or permit is required. Neither the BIA nor the United States responded to that letter or returned repeated phone calls from Osage Wind before filing this action.  *See* AUMF No. 5.

10.     Osage Wind admits UMF Number 10, but with clarification.  As set forth in the AUMF, Osage Wind continued excavation after October 9, 2014, and completed excavation of turbine foundations on November 18, 2014.  Although the October 9, 2014 letter asserts that failure to obtain a "Sandy Soil Permit . . . may result in this matter being forwarded" to the Solicitor's office for further action, when the BIA did not respond to Osage Wind's letter or other communications, Osage Wind had no reason to believe anything other than that the BIA did not dispute Osage Wind's analysis.

## B.  Statement of Additional Undisputed Material Facts.

1.     Osage Wind, LLC's activities are undertaken pursuant to leases of approximately 8,400 acres of surface estate land owned in fee simple absolute, and the footprint of the Project will be approximately 1.5% of the total acreage.  Moskaluk Decl. ¶¶ 5, 9.

2.     None of the rock, sand, or soil excavated for any foundation of the Project is moved to or used at any other location within or outside of the Property or for any other purpose than to fill the hole from which it came.  Moskaluk Decl. ¶ 15(a)(v).

3.     No excavated rock or sand is used in mixing or preparing the concrete for any foundation or sold or used for commercial purpose.  *Id.* ¶ 15(a)(v)-(vi).

4.     Osage Wind provided the Nation and the BIA full information, including detailed plans and drawings, of the plans for and scope of the Project and necessary excavations dating

3

back at the latest to 2011.  *See* Declaration of Joan Heredia ¶¶ 11-15, Defs. Prelim. Inj. Resp., Ex. 2 ("Heredia Decl.").

5.       In September 2011, the BIA indicated it was considering litigation regarding the impact of the Project on the Nation's mineral estate.  *Id.* ¶ 12.

6.       The BIA was aware in November 2013 that Osage Wind had started Project construction. *See* Supplemental Declaration of Joan Heredia, January 6, 2015, ¶ 5, attached as Exhibit C ("Supp. Heredia Decl.").

7.       BIA was further aware in November 2013 that the Nation contended its excavation "may be subject to" lease or permit requirements, and that Osage Wind had responded that no lease or permit was required because Osage Wind "will not remove or sell any materials from the Project site."  *See* Heredia Decl. ¶¶ 19, 20.

8.       BIA waited until (1) one year after it was aware construction had begun and of Osage Wind's position that no lease or permit was required, and (2) over a month after excavation began, to mention, in the October 9, 2014 letter, that a "Sandy Soils Permit" may be required of Osage Wind.  *See* Moskaluk Decl. ¶¶ 11-12 (stating construction began on October 25, 2013, and foundation excavation work on September 10, 2014).

9.       Superintendent Phillips' October 9, 2014 letter makes no mention of a lease, but instead focuses only on the "Sandy Soils Permit," a term which appears nowhere in Part 211 or 214 or any other published BIA source.

10.       In response to Superintendent Phillips' October 9, 2014 letter, Lynn H. Slade, counsel for Defendants, sent emails to Field Solicitor Woodcock on October 20, 2014, and Superintendent Phillips on October 21, 2014, attaching a legal memorandum explaining why Osage Wind believes it is not required to have a lease or permit.  The October 21 email to the

Superintendent Phillips concluded with the request:  "Please advise if I or others at Enel can provide further information or, if you have remaining concerns, we would be happy to meet with your office and any officials of the Osage Nation or Osage Minerals Council who you consider appropriate."  Declaration of Lynn H. Slade, ¶¶ 2-3, attached as Exhibit A ("Slade Decl.").

11.     On October 20, 2014, Jeff Riles of Enel met with BIA Regional Director Robert Impson, provided further information about excavation activities, and offered to respond to any further questions and schedule a field trip to view operations.  Declaration of Jeff Riles, ¶¶ 3, 5, attached as Exhibit B ("Riles Decl.").  Despite being told of Osage Wind's continuing construction activities, the BIA did not in this conversation, or in response to Mr. Riles' follow-up letter or phone calls, reiterate its request that Osage Wind halt construction.  *Id.* ¶¶ 4, 6-7.

12.     On October 22, 2014, Mr. Slade spoke by telephone with Mr. Woodcock.  As confirmed by his email to Mr. Woodcock of that date, he advised Mr. Woodcock of the status of construction as of that date, confirmed that Osage Wind was continuing construction, and stated that "Osage Wind stands ready to meet to discuss any concerns you, Superintendent Phillips, or the Nation may have."  Slade Decl. ¶ 4.  On October 31, 2014, Mr. Slade made a further request to be advised of "any decisions or concerns that Osage Wind should be aware of in its efforts to address any BIA concerns."  *Id.* ¶ 5.

13.     Prior to the filing of this action, neither Defendants nor Mr. Slade received any communication advising that the BIA disagreed with the conclusion that no lease or permit was needed.  Riles Decl. ¶¶ 6-7; Slade Decl. ¶ 8.

14.     Osage Wind had incurred as of December 10, 2014, approximately $27,944.342.97 in costs for construction work that has been completed.  *See* Moskaluk Decl. ¶

20(d).  It has expended or is committed to expend approximately $287,000,000 as of December 10, 2014 for total project costs.  *Id.* ¶ 20.

15.     The cost to Osage Wind of stopping tower construction activities as of and following October 9, 2014 would have been approximately $300,000 per day in delay costs to the contractor and $25,200 per day in demurrage rates to GE for the inability to accept delivery. *See* Moskaluk Decl. ¶ 22(a), (c).

16.     Tower foundation excavation activities were completed on November 18, 2014. *See* Supplemental Declaration of Bill Moskaluk, ¶ 5, Defendants' Response to the Motion to Expedite [Doc. 27] ("Defs. Mt. Exp. Resp.") (filed contemporaneously), Ex. A.

17.     At the request of the Osage Mineral Council, the United States filed this suit on November 21, 2014, over a year after construction began.  Amended Complaint ¶ 29.

## III.    RULE 56 REQUIRES DISREGARDING OR STRIKING THE EXHIBITS TO THE MOTION.

A summary judgment motion requires the undisputed facts be supported by evidence in the record.  Fed. R. Civ. P. 56(c)(1).  "Documents submitted in support of . . . a motion for summary judgment must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."  *Burns v. Holcombe*, No. 09-CV-152-JHP, 2010 WL 2756954, *4 (E.D. Okla. July 12, 2010) (quotation marks, citations, alterations omitted) (refusing to consider exhibits attached to summary judgment briefing when those exhibits were not authenticated); *see also Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009) (stating that exhibits submitted in a motion for summary judgment are not automatically authenticated, but must be authenticated in accordance with Fed. R. Evid. 901).  Attached to the Motion are three

exhibits that should be disregarded.[3]  Exhibits 1 (correspondence) and 2 (an unsigned lease for a contractor of the Oklahoma Department of Transportation ("ODOT")) are unsupported by declarations establishing their admissibility or authenticity, and are unrelated to the UMF purportedly forming the basis for the Motion.  While Exhibit 1 may satisfy Fed. R. Evid. 901, it lacks foundation showing its materiality and authenticity, and Exhibit 2 is not authenticated and also should be excluded as hearsay.  *Cf. Hook v. Regents of Univ. of Cal.*, 394 F. App'x 522, 531 (10th Cir. 2010) (unpublished) (affirming order striking unauthenticated exhibits).

## IV.    ARGUMENT.

The Motion is without merit.[4]  The UMF and AUMF establish that Osage Wind is not, and has not been, engaged in mining and thus requires no permit, lease, or authorization under any other name, under 25 C.F.R. Parts 214 and 211 (together, the "Regulations").  The United States cannot escape the purpose of the Osage Act or the plain language and structure of the Regulations by appealing to tools for interpretation of ambiguous terms.  There is no ambiguity here:  Osage Wind is not mining, and needs no authorization from the BIA or Nation.

### A.    The United States' Overly Broad Interpretation of "Mining" Conflicts with the Language and Purpose of the Osage Act.

The Motion's reading of the Regulations ignores the organic act for Part 214, which is the Osage Act.  *See* 25 C.F.R. Part 214 (stating authority for promulgation is Sec. 3, 34 Stat. 543).

---

[3] The Court separated the Plaintiff's Request to Expedite Consideration of Motion for Partial Summary Judgment ("Motion to Expedite") [Doc. 25] from the Motion.  Defendants address the Motion to Expedite, and Exhibit 3, in Defendants' Response to the Motion to Expedite.

[4] For the reasons in Defendants' Motion to Dismiss or for Summary Judgment, res judicata bars the Amended Complaint.  It is the United States, not Defendants, that apparently is "confused" by the application of the res judicata doctrine, *see* Motion at 2 n.1, which bars claims that were raised *or that could have been raised* in the prior litigation.  *See Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards*, 314 F.3d 501, 503-04 (10th Cir. 2003).  The present claims could have and should have been raised in *Osage Nation v. Wind Capital Group, LLC*, No. 11-CV-00643-GKF-PJC (N.D. Okla. Oct. 18, 2011) ("Prior Litigation").

The Osage Act's broad purposes of fostering economic independence of Nation members and developing Osage County would be hindered by the United States' requirement of a lease or permit for all projects requiring excavation in Osage County.  In 1872, Congress established a reservation for the Nation in present day Oklahoma. Act of June 5, 1872, ch. 310, 17 Stat. 228. In 1906, Congress enacted the Osage Act, which disestablished the Osage reservation, allotted the Nation's former reservation lands to members of the Nation, and reserved the minerals to the Nation.  Osage Act §§ 2, 7th, 3; *Osage Nation v. Irby*, 597 F.3d 1117, 1125 (10th Cir. 2010). "Although the Osage Nation retained the beneficial interest in the minerals underlying the former Osage reservation area, that interest is contrasted starkly with the pattern divesting the surface, either directly or through authorizations for future sales, of all vestiges of tribal ownership." *Osage Nation v. Okla. ex rel. Okla. Tax Comm'n*, 597 F. Supp. 2d 1250, 1258 (N.D. Okla. 2009), *aff'd sub nom. Osage Nation v. Irby*, 597 F.3d 1117 (10th Cir. 2010).

The Osage Act expressly contemplated allottees would use their surface "for farming, grazing, or *any other purpose not otherwise specifically provided for herein . . . .*"  Osage Act, § 7 (emphasis added).  This statutory language limits the BIA's ability to regulate mineral development in Osage County.  *See* Osage Act § 12; *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.") (citations omitted).  The United States advances snippets of legislative history to support its assertion that the surface allotments were intended only for "farming and grazing," Motion at 4, completely ignoring the unambiguous text of the Osage Act permitting use of the

surface for "any other purpose . . . ."  Osage Act Section 2, Seventh further states that "upon the issuance of such certificate of competency the lands of such member (except his or her homestead) shall become subject to taxation, and such member. . . *shall have the right to manage, control and dispose of his or her lands the same as any citizen of the United States . . . ."*  (Emphasis added.)  Surface uses directly addressed in the Osage Act include the construction and improvement of railroads.  Osage Act, § 11.[5]  The Part 214 regulations must be interpreted and applied in a manner consistent with the Osage Act.

The United States' theory that the BIA and the Nation may require a lease under 25 C.F.R. § 214.7 as a condition of Osage Wind's surface construction, *see* Motion at 6-7, conflicts with the Osage Act.  There is no reason to accept the United States' strained reading, at odds with the Osage Act, that limits Osage County surface use to agriculture or gives the Nation a veto or control over all construction projects, and hence all land use, requiring excavation.  *See Montana v. United States*, 450 U.S. 544, 559 n.9 (1981) ("It defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government.").  Congress intended to enable the owners of Osage County lands to "control and dispose of his or her lands the same as any citizen of the United States."  Osage Act, § 2, 7th.  The Osage Act contemplated the full range of types and sizes of land uses, which necessarily requires construction and, accordingly, incidental excavation, without veto by the

---

[5] The Osage Act provided for the entire 1.47 million acre Osage Reservation, with the exception of approximately 600 acres, to be allotted in three 160 acre parcels to each then-enrolled Osage member, with one selection designated a "homestead," subject to specific restrictions, and the other three "selections" to be freely taxable and amenable to transfer within three years upon demonstration of "competency."  Osage Act, § 2.  The Motion, at 4-5, advances language of the statute concerning "homestead tracts," but the record does not show any "homestead" tracts are involved.  In any event, restrictions on most homestead tracts have been removed.

Nation, which Congress intentionally divested of a wide range of governmental powers over Osage County lands. Osage Wind's construction of the Wind Farm is consistent with the purpose of the Osage Act. A contrary reading would exceed the authority granted to the BIA and the Nation by the Osage Act and cannot be sustained.[6]

> **B. Osage Wind Is Not Engaged in Mining and Does Not Require a Permit or Lease under 25 C.F.R. Part 214 (or Part 211).**
>
> > 1. The United States misinterprets the definition of "mining."
> >
> > > a. *The Motion ignores the meaning of "the business of mineral development."*

Recognizing that Part 214 does not defining mining, the United States acknowledges that Part 211 informs interpretation of Part 214, but fails to provide a reasoned explanation of how the definition of "mining," the "science, technique, and business of mineral development," can be stretched to cover mere excavation needed for authorized surface construction. Motion at 9-10. Instead, the United States advances a superficial attempt to expand the meaning of those terms beyond their plain language. *Id.* The only available definition, in Section 211.3, defines "mining" as "the science, technique, and business of mineral development including, but not limited to: opencast work, underground work, and in-situ leaching directed to severance and treatment of minerals." The "business of mineral development" that is the core of the definition does not contemplate that a surface owner's own construction would constitute "mining" requiring a BIA permit or lease.

The Motion misunderstands why Section 211.3's definition of "mining" references "opencast work." *See* Motion at 10-11. Lifting the term from context, the Motion ignores that the definition employs the term in defining "mineral development, including but not limited to

---

[6] Because Osage Wind does not need a lease or permit to construct the Wind Farm, the Court need not heed the Motion's concerns that Osage Wind is not maximizing the Nation's economic interests by using or wasting minerals. *See* Motion at 14-15.

opencast work, underground work, and in-situ leaching." The term "opencast" and two other terms defining specific mining methods reinforces that Section 211.3's definition of mining does *not* apply to construction. While the cited definitions state that opencast work is "mining" occurring at or near the surface, those definitions do not establish that any digging at or near the surface incident to construction constitutes mining. The United States quotes a fragment of the Bureau of Mine's Dictionary of Mining Terms' definition of "opencast work," but not the full definition. Motion at 10 (citing Staff of the U.S. Bureau of Mines, *Dictionary of Mining, Mineral, and Related Terms* 2170-71 (U.S. Dep't of the Interior, 2d ed. 1996) ("*Dictionary*")). The *Dictionary* defines "opencast method" as "[a] mining method consisting of *removing the overlying strata or overburden, extracting the coal, and then replacing the overburden*. . . . See also: strip mining." *Dictionary* at 2171 (emphasis added). Similarly, an "openpit mine" is "[a] mine working or excavation open to the surface. See: strip mine." *Id.* at 2174. Strip mining is defined with respect to the removal of coal from an opencut mine. *Id.* at 3142. Each of these definitions contemplate that an "opencast method" means mining by removing a commercially valuable material by extraction from the surface with the purpose of using or marketing the material elsewhere. Osage Wind is not engaged in opencast work; Osage Wind is engaged in construction on the surface estate, with incidental excavation and replacement of soil and rock. *See* UMF Nos. 1, 3; AUMF Nos. 1-3.

    *b. The Motion incorrectly equates "mining" with excavation for construction.*

  The United States seeks to stretch the mining-related terminology of the Regulations to cover any excavation and replacement of mineral material for construction, even when minimal in relation to the total project area and exclusively for construction at the specific site of excavation. *See* UMF No. 8 (acknowledging that the material is returned to the same hole);

AUMF Nos. 1-3. But Section 211.3's use of the term "including but not limited to" in its definition of "mining" cannot be used to stretch the definition of "mining" to acts beyond those included or implied by the structure and grammar of the regulation. *See Bloate v. United States*, 559 U.S. 196, 209 (2010) (rejecting a broad reading of "including but not limited to" as "such a reading would violate settled principles of statutory construction because it would ignore the structure and grammar of [the statute], and in so doing render even the clearest of the subparagraphs indeterminate and virtually superfluous"). The key terms in the definition, "the science, techniques *and* business of mineral development," are connected by "including but not limited to" to "*opencast work, underground work, and in-situ leaching directed to severance and treatment of minerals*." Section 211.3 (emphasis added). Each of these terms is related to the word "mineral development," as each is a specific method for extracting minerals for commercial mining. Other terms that would be included within the scope of the definition by the term "including" must be of the same character, that is, must be related to extracting minerals for the business of mineral development. *Cf. Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961) (noting that a word used in a statute is not considered in the abstract, but "gathers meaning from the words around it").

Excavation for construction is not contemplated by the term "mineral development." Ignoring the mining-related terms of Section 211.3, the Motion argues Osage Wind is "handling, sorting, crushing and utilize[ing]" minerals, Motion at 9, terms nowhere mentioned in the Regulations. Surface construction is not "mineral development" as that phrase is used in Section 211.3's definition of mining, even if the builder chooses to use a surface construction technique that may also be used in mining, such as sorting or crushing. Osage Wind is not engaged in opencast work, underground work, or in-situ leaching. Construction activities do not become

"mining" under the Regulations simply because some rocks are crushed to a smaller size before being returned to the hole.  Neither the Regulations nor the Osage Act limit a surface owners' use of the surface to construction that can be completed without sorting, sifting, crushing, or otherwise handling materials removed before returning them to the construction site.

Failing to advance a plausible explanation to extend "mining" as defined by Section 211.3 to surface construction unrelated to mining, the United States returns to Part 214, contending that "mining or work of any nature," as used in Section 214.7, requires a lease for "work" unrelated to "mining,"  because the disjunctive "or" falls between the terms.  *See* Motion at 6-7.  That theory conflicts not only with the Osage Act—which expressly permits broad development of the surface estate—but also with Section 211.3, on which the United States relies for the definition of mining.  The theory that "work of any nature" requires a lease or permit must be rejected under the doctrine of *in pari materia*. Section 211.3 defines "mining" by specific acts in "the science, technique, and business of mineral development," and 25 C.F.R. § 211.48(a) prohibits "exploration, drilling, or mining operations" without a lease or permit. Reading the provisions of Part 211 with Part 214, it is clear that the types of activities for which a Part 214 lease is required are limited to activities defined as "mining" in Part 211, and not for any other potential activity on the surface.  Read in isolation, "work of any nature" could apply to any "work" of any description whether or not related to mineral development; however, to give it a reasonable meaning consistent with the Osage Act, the term must be read as work of any nature related to the mining activity that requires a lease.

The United States' tautological reading of the definition of "lease" does not support that Osage Wind is engaged in "mining."  *See* Motion at 12-13.  Contending that "it makes little

difference what use someone ultimately intends to make of minerals seized,"[7] Motion at 13, the United States argues a lease is required whenever a mineral material is excavated incident to surface construction, because a "lease" is defined as "any contract *approved by the United States* . . . that authorizes" defined activities. By this sleight of hand, the United States seeks to bypass the determination of which "contracts" require approval by the Secretary of the Department of the Interior ("Secretary").  Because no contract requires approval by the United States unless it authorizes "mining," as defined in Section 211.3, the argument has no weight.  Second, reliance on the lease definition of Section 211.3 to define mining disregards the interplay between Parts 211 and 214: a lease is required for *mining* under Part 214 as demonstrated by the title to that part, "Leasing of Osage Reservation Lands, Oklahoma, for Mining, except Oil and Gas."  A mineral lease is *not* required for a surface owner to pursue the broad range of surface uses contemplated by the Osage Act.  Although the United States denies doing so, *see* Motion at 16, the reading it asserts *would* require a lease or permit, and enable a Nation or BIA veto, for every excavation and use of the dirt proposed in Osage County—every basement dug, every septic tank installed, every foundation laid. This was not Congress' intent in promulgating the Osage Act.

The reference to the Indian Mineral Development Act of 1982, 25 U.S.C. § 2102(a) ("IMDA"), Motion at 9-10, does not support the Motion's reading of "mining."  The IMDA authorizes agreement "providing for the exploration for, or extraction, processing, or other development of, oil, gas, uranium, coal, geothermal, or other energy or nonenergy mineral resources[.]"  The IMDA contemplates agreements with tribes for the "development of" mineral

---

[7] Defendants neither "seized" nor "wast[ed]" any minerals, Motion at 13, 15; Osage Wind only excavated and returned sand and rock incident to lawful surface construction.  Osage Wind asserts no claim to the rock that remains on the surface.

resources; it does not reflect that one is *per se* "mining" when one incidentally encounters mineral materials during construction of surface facilities.

2.   The alleged "de minimis exception" does not affect the scope of "mining."

Contrary to the United States' assertion, Part 211 does not exempt those who, in the business of mineral development, "extract" 5,000 cubic yards or less per year of common varieties of minerals from the need to secure approval from the United States and the Nation and a permit to proceed.   *See* Motion at 11-12.   Consequently, the United States' unheralded interpretation of "mining" under Parts 214 and 211 would require a lease or permit for *any* construction that disturbs the Nation's reserved mineral estate and would give the Nation or BIA a veto over any such construction of any size.[8]

25 C.F.R. § 211.1(a) makes clear that the Part 211 regulations "govern leases *and permits* for the development of Indian tribal . . . solid mineral resources[.]"  (Emphasis added).  Section 211.3 defines a "permit" as "any contract issued by the superintendent and/or area director to conduct exploration on or removal of less than 5,000 cubic yards per year of common varieties of minerals from Indian lands."  Section 211.48 directs that "[n]o exploration, drilling or mining operations are permitted on any Indian lands before the Secretary has granted written approval of a mineral lease or permit pursuant to the regulations in this part."  The alleged "de minimis exception" is only an exception to the mining *lease* requirement, but the regulations still require a *permit* granted by the Nation and approved by the Secretary for such volumes.  Consequently,

---

[8] Even under the United States' de minimis argument, Osage Wind would not be required to obtain a permit.  As the United States admits, Osage Wind has not removed any minerals from the Project site, but has either returned the materials back into the hole from which they were taken, or left the material in place.  UMF Nos. 5, 8.  Additionally, the amount of material taken out and replaced from a single foundation does not exceed 5,000 cubic yards, and the United States has failed to present any rationale for aggregating all of the various turbine sites, which are dispersed across 8,400 acres under multiple lease agreements from the surface owners, to support its argument that Osage Wind has exceeded the 5,000 cubic yard trigger.  AUMF No. 1.

the purported 5,000 cubic yard minimum quantity does not limit the activities requiring a lease or permit: instead, the applicable and necessary defining principle allowing construction in Osage County can only lie in the definition of "mining" in Section 211.3: whether the activities represent the "science, technique and business of mineral development . . . ."  Preparing ground for construction on the surface is not the business of developing minerals, but activity necessary to construction of surface facilities.

In contending that the BIA's "approach here is consistent with the Bureau of Land Management's [("BLM")] mineral materials regulation," Motion at 16 (citing 43 C.F.R. § 3601.71(b)(1)), the United States fails to grasp the significant parallel between the activities that the BLM's regulation excepts and Osage Wind's activities here.  The preamble to the final rule discusses the cited provision in more detail:

> [W]ithout a contract or permit, or other express authorization, a surface estate owner may make only minimal personal use of federally reserved mineral materials within the boundaries of the surface estate. *Minimal use would include, for example, moving mineral materials to dig a personal swimming pool and using those excavated materials for grading or landscaping on the property.* It would not include large-scale use of mineral materials, even within the boundaries of the surface estate.

Preamble, 66 Fed. Reg. 58892, 58894 (Nov. 23, 2001) (emphasis added).  This comment provides critical guidance: the BLM regulation contemplates that use of mineral materials incident to construction on the surface estate is not intended to trigger a minerals contract or lease requirement under the Materials Act of 1947, 30 U.S.C. § 601, but removing the mineral materials for large scale uses elsewhere on the surface estate is not "minimal use" by the surface estate owner.  The reference to "minimal amount" does not require the surface owner's swimming pool be small, or the subdivision with numerous residences to forego basements or foundations or septic systems, as these are "minimal uses" of the mineral estate.  The 84

foundations for the Wind Farm displace no more sand, soil, and limestone than does a subdivision with 84 homes, or a street block in a Tulsa suburb, and whereas the BLM regulation permits use of removed material elsewhere "within the boundaries of the surface estate," Osage Wind returned all removed material to the same hole from which it came (or left it in place on the surface). Here, the use of minerals materials is "minimal" in the sense used in the Preamble, given the relationship of the excavation to the total size of the Property, *i.e.*, that the surface footprint will only be approximately 1.5% of the 8,400 acres under lease, *see* AUMF No. 1, and given that the construction of the turbine foundations is solely incident to surface construction.

### C. No Deference Is Due the Recent Interpretations of the Regulations to Require a "Sandy Soil" Permit or Lease for Construction.

The Motion advances the United States' recent theory that the Regulations require Osage Wind to obtain a sandy soil permit, or lease, to conduct excavation incident to its lawful surface construction. The Motion does not establish a prior, much less a consistent, agency position or interpretation of regulations that may be applied by the Court to the Wind Farm. Rather, it shows an ever-evolving attempt by the United States to assert a theory that has no basis in the Regulations and conflicts with the Osage Act.

The United States' argument is not entitled to deference for three reasons. First, the United States has not asserted that the Regulations are ambiguous. An interpretation of the Regulations that would require Osage Wind to obtain a lease or permit for its lawful surface construction is inconsistent with the unambiguous terms of the Regulations and the Osage Act, so is not entitled to deference. *See Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 356 (2000) (holding an agency interpretation of its regulation is afforded no deference where the interpretation is inconsistent with the regulation's text). Here, the United States' interpretation of the Regulations is not entitled to deference because it is contrary to the regulations' definition

of "mining" and contrary to Congress' intent in enacting the Osage Act.  Indeed, the United States requests the Court apply the "plain language" of Parts 214 and 211.  Motion at 8; *cf. Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997) ("If a statute is clear and unambiguous, the court must interpret the statute to effect the unambiguous intent of Congress, regardless of the interpretation given to the statute by an administrative agency with responsibility for enforcement.").  Where no ambiguity exists, no deference is warranted.

Second, even if an ambiguity existed, the United States' interpretation of the Regulations would not be entitled to deference.  When an agency seeks deference to its interpretation of its regulation, deference is warranted unless the interpretation is "plainly erroneous or inconsistent with the regulation."  *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quotation marks, citation omitted).  The "plain language" of the Regulations, however, compels the conclusion that Osage Wind is *not* engaged in mining.  The newly advanced interpretation is not entitled to deference.

Third, and crucially, the United States fails to demonstrate any prior administrative interpretation of Parts 214 or 211 requiring a lease or permit for excavation solely incident to construction on surface estate lands with permission of surface owners.  The United States points to no agency interpretation, guidance, Interior Department Solicitors' Opinion, or administrative decision of the Interior Board of Indian Appeals or the Interior Board of Land Appeals so holding, and Osage Wind's research, as it advised the Office of the Solicitor and Superintendent Phillips on October 20 and 21, 2014, *see* AUMF No. 10, found none.  This is so notwithstanding that Section 211.3 has been in place since at the latest 1996, and Part 214 since 1982.

The Motion's interpretation of Parts 214 and 211 is undeserving of deference because it is a new interpretation presented with "unfair surprise" to Defendants.  *Christopher v. SmithKline Beecham Corp.*, ___ U.S. ___, ___, 132 S. Ct. 2156, 2167 (2012).  Deference is not

warranted when, as here, an agency's interpretation would "impose potentially massive liability on respondent for conduct that occurred well before that interpretation was announced." *Id.* at 2167. In *Christopher*, the Supreme Court refused to accord the Department of Labor's ("DOL") newly announced interpretation of a definition, because industry practice was consistent with the long-standing prior interpretation, and, "[e]ven more important . . . the [agency] never initiated any enforcement actions . . . or otherwise suggested that it thought the industry was acting unlawfully." *Id.* at 2168. When the DOL's sudden change to the definition was challenged, the Supreme Court refused to afford the new definition deference because

> [i]t is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.

*Id.*; *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (rejecting "post hoc rationalizations" for agency action).

Osage Wind is not at fault for not foreseeing that the BIA would announce a new requirement that a sandy soil lease or permit was necessary for disturbing the soil during surface construction activities and taking the steps necessary to return the soil to the exact location from which it was removed. Osage Wind was unable to locate any agency guidance indicating the BIA would take its current position with respect to the Project, and, in numerous meetings and communications between Osage Wind or its predecessor, going back to 2008, and the BIA or the Nation, the BIA did not take the position that a sandy soil permit or lease would be required until after construction was underway. *See* AUMF Nos. 4-13.

Rather than supporting the Motion, *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008), Motion at 13, demonstrates that deference does not apply here because in *Federal*

*Express*, the agency interpretation of its regulation was and had been "applied . . . with consistency."  Here, however, the disputed interpretation of Parts 214 and 211 was announced with the Complaint, and further amended in the Motion, *i.e.* the United States' open cast mining theory, a new addition to the panoply of theories including a sandy soil permit or a sandy soil lease.  It is not a longstanding interpretation that deserves any deference.  The BIA never indicated that a "sandy soil permit" would be required—and does not state it is required in the Motion—until after construction and excavation had begun, three years after the Prior Litigation concluded and Osage Wind had provided BIA and the Nation detailed plans in 2011, and after numerous communications with the BIA and the Nation.  Even after Osage Wind provided detailed legal memorandum articulating why it concluded no lease or permit is required, the BIA declined to provide any guidance, clarification, or rebuttal in response to Osage Wind's clear requests for any such information.  *See* AUMF Nos. 4-13.

Although noting that the Wind Farm is the first to be constructed in Osage County, the United States attempts to analogize the Project to road construction.  Motion at 7.  Exhibits 1 and 2 to the Motion do not support the assertion that "other similar construction efforts have required leases" under Part 214, *see* Motion at 7; they reflect only that a single road contractor agreed to make payment for materials already used as highway fill.  The Exhibits do not indicate any administrative interpretation of Part 214; to the contrary, they reflect only that Sherwood Construction, a road contractor for ODOT, wrote to the BIA on February 7, 2014, Ex. 1, p. 3, did not expressly request permission to proceed with construction, and there was no follow-up until September 16, 2014, when the work was underway and payment had been determined or agreed to.  The Motion, at 7, asserts "*[t]hereafter*, a lease was executed," but it attaches as Exhibit 2 only an unexecuted sandy soil lease, indicating that Sherwood did not obtain any lease, if at all,

until after the construction was underway and the volume of materials excavated and used as fill was determined.  The Motion, at 7, provides no support for the improbable assertion that Sherwood Construction's disturbance of the mineral estate surface in constructing approximately six miles of highway was "very similar to Defendant's foundation work," nor do the Exhibits provide any indication of the status of the surface estate.  These exhibits provide no support for a claimed administrative interpretation, long-standing or otherwise, of Parts 214 and 211 to require a lease or permit for surface construction.[9]

### D.  The Indian Canon Does Not Apply Because the Regulations Are Not Ambiguous.

As the Regulations are not ambiguous, the United States' contention that the Indian canon of construction requires the Court to read Parts 211 and 214 to the Nation's benefit must be rejected.  *See* Motion at 13-14; *DeCoteau v. Dist. Cnty. Court for Tenth Judicial Dist.*, 420 U.S. 425, 447 (1975) ("[L]egal ambiguities are resolved to the benefit of the Indians.").  The

---

[9] Exhibits 1 and 2 demonstrate the fallacy of the United States' argument, Motion at 3, n.3, that the ability of Osage Wind to secure approval of a lease is irrelevant to reviewing the BIA's new interpretation of the Regulations.  If the Court orders Osage Wind to apply for a lease or permit, the Nation's adamant and unwavering opposition to the Project reflects that it will certainly deny any lease or permit.  Thus the order effectively would grant the Nation a veto power over the Project, years into its development.  And this veto would be exercised:  In an "emergency session" on November 24, 2014, the Nation's Congress amended its Judicial Code to authorize, for the first time, Osage Tribal Court jurisdiction over nonmembers, for the purpose of suing Osage Wind in an action for "trespass" and to "tear [the towers] down."  Transcript of Osage Nation Congress, 4th Cong., 5th Special Sess. (Tr. 11/24/14), at 11:1-5 (Statement of Principal Chief Geoffrey Standing Bear); 14:22-25 (Statement of counsel Gene Dennison), attached as Exhibit D.

The United States candidly disclosed in its Motion for Preliminary Injunction, at 9, that it or the Nation could "say 'no'" to the lease or permit, and its Amended Complaint confirms it ultimately wants the Wind Farm to be removed, *see* Amended Complaint, Prayer for Relief, ¶ 5.  There is no authority in the Osage Act, and no regulation under Part 214, that would grant the Nation or the United States a veto over surface construction.  *Cf. Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 282 (1997) ("[T]he declaratory and injunctive relief the Tribe seeks is close to the functional equivalent of quiet title in that substantially all benefits of ownership and control would shift from the State to the Tribe.").

canon is inapplicable where, as here, no ambiguity exists. *Id.* The United States repeatedly asserts that the Regulations' "plain language" supports its argument, and never identifies an ambiguity. *See* Motion at 6, 8. Consequently, by the United States' own acknowledgment, the Indian canon inapplicable because it "does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986).

Contrary to the United States' assertion, *Millsap v. Andrus*, 717 F.2d 1326 (10th Cir. 1983), does not require the canon be applied to expand the Regulations' definition of "mining." Motion at 13-14. In *Millsap*, the Tenth Circuit construed the term "other minerals," and gave it a broad meaning. *Id.* at 1328-29. Here, it is undisputed that the term "mining" is defined in Section 211.3, and the Court should not read it more broadly than written. Nor does the term "work of any nature," Section 214.7, require resort to the canon, as it refers to work related to mining—and not the use of the surface estate. Where no ambiguity exists, the canon does not apply. *See Catawba Indian Tribe, Inc.*, 476 U.S. at 506.

In addition, interpretation "to the benefit of the Indians" does not counsel a decision favoring the United States, which advances interests of the Nation that would contravene a Congressional intent to support Osage members who received surface allotments. Part 214 implements the Osage Act, which intended the allotted surface to be used for "any other purpose not otherwise specifically provided for herein." Osage Act, § 7. To interpret the Regulations to provide rights to the mineral estate owner at the expense of the surface owner would disserve individual Osage members and conflict with the Osage Act.

**E.  State Law Is Persuasive Authority Regarding the Definition of "Mining."**

The United States incorrectly asserts that state law "ha[s] no relevance" to understanding the term "mining" used in the Regulations.  *See* Motion at 15.  Although federal law governs whether Osage Wind must obtain a lease from the Nation and the BIA, the common law can and does inform the analysis of the Regulations, where the common law has persuasive value as to the plain language used in the Regulations.  *See S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 763 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006) ("When Congress legislates against a backdrop of common law, without any indication of intention to depart from or change common law rules, the statutory terms must be read as embodying their common law meaning.").

The conclusion that the surface owner may incidentally use the mineral estate for construction is consistent with common law.  *See Wray v. Goeglein*, 1998 WL 880582, *9, n.3 (Ohio Ct. App. Dec. 2, 1998) ("The surface owner has the right to make reasonable use of the surface though this may result incidentally in damage to the mineral owner.") (quotation marks and citation omitted); *Mullins v. Clinchfield Coal Corp.*, 128 F. Supp. 437, 444 (W.D. Va. 1953) (holding the surface owner's use of mineral materials that did not involve sale or removal from the property did not prevent the mineral owner from exercising his property rights); *accord* 53A Am. Jur. 2d *Mines & Minerals* § 14 (2006) ("[T]he simple removal of dirt does not constitute mining.").  Recognizing this understanding, contemporary legislation reflects the same accommodation between surface and mineral estate interests.  For example, the Oklahoma Mining Lands Reclamation Act, applicable to Osage Winds lessors' surface estates, provides that surface mining "shall not include excavations or grading conducted for . . . on-site construction . . . ." 45 Okla. Stat. Ann., § 723(6); *see also* Va. Code Ann. § 45.1-180(a) (providing that

"mining" "shall not include excavation or grading when conducted solely in aid of on-site farming or construction"). Here, Osage Wind is not removing the dirt and rocks from the construction site; it is being excavated, never leaves the excavation site, and is then returned to the same hole or left on site. AUMF Nos. 2-3.

### F.   Relief Under Counts I and II Is Barred by Laches.

The United States has had knowledge of the Project and planned excavations since at the latest 2011, *see* AUMF Nos. 4-5, and was aware construction began in November 2013, AUMF No. 6-7, but delayed bringing suit until construction and excavation was well underway, and until Osage Wind had expended substantial sums on the Project. Laches bars this suit, as the United States' actions meet both factors for applying the equitable doctrine:  an unreasonable delay in bringing suit, and prejudice to Osage Wind. *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1338 (10th Cir. 1982). Laches is applicable against the United States here, because the United States is asserting the proprietary interests of the Nation in exclusive possession of its alleged mineral estate. *See Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 279 (2d Cir. 2005); *see also City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 218 (2005) (holding laches may be asserted against a tribe).

The United States, the BIA, and the Nation were well aware of Osage Wind's plans for construction and development of the Project, including being provided with maps, and the Nation has litigated its objections to the Project previously. AUMF No. 4. Consequently, the United States "ha[d] knowledge of the relevant facts, [and] acquiesce[d] for an unreasonable length of time in the assertion of a right adverse to [its] own," *Jicarilla Apache*, 687 F.2d at 1338, and its delay in bringing suit was egregious given the United States' awareness of Osage

Wind's substantial investments and commitments.  *See United States v. Admin. Enters. Inc.*, 46 F.3d 670, 673 (7th Cir. 1995).

The second factor of the laches analysis applies because the delay in bringing suit causes great prejudice to Osage Wind, which invested hundreds of millions of dollars in development of the Project before the United States filed suit.  AUMF Nos. 14-15; *see Jicarilla Apache*, 687 F.2d at 1339.  As in *Jicarilla Apache*, Osage Wind had "no notice that anything was amiss" with the construction of the Wind Farm until after it had invested substantial sums in the Project.  *See id.* ("Were they to lose their leases, much of that investment would be lost, not to mention the loss of future profits based on investments already made" (quotation marks and citation omitted)).   "[A] defendant's substantial completion of a challenged project during the delay period can constitute prejudice."  *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1091 (10th Cir. 2014); *id.* at 1095-96 (finding laches applied where the plaintiff had previously litigated—and lost—on related issues, and the agency "has invested significant time and resources, and requiring the [agency] to change its blueprint governing these efforts would compromise work that has already been done").  As both factors are satisfied, the Court should apply laches to bar the requested relief.

## V.    CONCLUSION.

The Court should deny the United States' Motion.  The Undisputed Material Facts, Additional Undisputed Material Facts, and applicable law demonstrate that Osage Wind is not conducting mining or engaged in any other activity for which a lease or permit is required under either Part 214 as informed by Part 211.  Even if the Regulations were held to apply, the doctrine of laches precludes the extraordinary and onerous relief the United States ultimately seeks, *i.e.* the removal of the Wind Farm.

Respectfully Submitted,

NORMAN, WOHLGEMUTH, CHANDLER, &
JETER

By:_____/s/Ryan A. Ray_____
   Joel L. Wohlgemuth, OBA #9811
   Ryan A. Ray, OBA # 22281
   401 S. Boston Ave. Ste. 2900
   Tulsa, Oklahoma 74103
   Telephone: (918) 583-7571
   JLW@nwcjlaw.com
   RAR@nwcjlaw.com

        and

MODRALL, SPERLING, ROEHL, HARRIS
        & SISK, P.A.
   Lynn H. Slade
   William C. Scott
   Post Office Box 2168
   500 Fourth Street, N.W., Suite 1000
   Albuquerque, New Mexico  87103-2168
   Telephone: (505) 848-1800
   Lynn.Slade@modrall.com
   Bill.Scott@modrall.com


*ATTORNEYS FOR DEFENDANTS OSAGE WIND, LLC,
ENEL KANSAS, LLC and ENEL GREEN POWER
NORTH AMERICA, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2015, I electronically transmitted the attached Defendants' Response to Partial Motion for Summary Judgment to the Clerk of the Court using the ECF System for filing. Based on the electronic records currently on file, the Clerk of the Court will transmit a notice of Electronic Filing to the following ECF registrants:

Cathryn D. McClanahan
Assistant United States Attorney
110 West 7th Street, Suite 300
Tulsa, OK  74119
(918) 382-2700
Cathy.mcclanahan@usdoj.ok
*Attorney for the United States of America*

The following non-ECF registrants have been served by First Class United States mail:

Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor Office
7906 East 33rd Street
Tulsa, OK  74145
(918) 669-7730
Charles.babst@sol.doi.gov
*Attorney for the United States of America*

        */s/Ryan A. Ray*
Ryan A. Ray

W2338559.DOCX