# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| (1) OSAGE WIND, LLC; ) | Case No. 14-CV-704-JHP-TLW |
| (2) ENEL KANSAS, LLC; and ) | |
| (3) ENEL GREEN POWER NORTH ) | |
|     AMERICA, INC., ) | |
| ) | |
| Defendants. ) | |

## OPINION & ORDER

Before the Court are Defendants' Motion to Dismiss or for Summary Judgment [Doc. No. 26] and Plaintiff's Motion for Partial Summary Judgment as to Counts I and II of the Amended Complaint [Doc. No. 24]. After consideration of the briefs, and for the reasons stated below, Defendants' Motion is **GRANTED** and Plaintiff's Motion is **DENIED**.

## BACKGROUND

### I.   Factual Background

The material facts are undisputed. Defendant Osage Wind, LLC ("Osage Wind") has engaged in constructing the Osage Wind Farm Project ("the Project), a wind farm constructed in Osage County, Oklahoma. [Doc. No. 17-1, at ¶ 3 (Declaration of Bill Moskaluk)]. The Project is undertaken pursuant to leases of approximately 8,400 acres of privately owned fee surface estate lands. [*Id.* at ¶ 5]. Once completed, the Project will consist of 84 turbines, underground collection lines running between turbines and a substation, one overhead transmission line, two permanent meteorological towers, and access roads, with the total footprint covering approximately 1.5% of the 8,400 acres of leased property. [*Id.* at ¶ 9].

1

The turbine foundations are made from concrete, with each foundation measuring approximately 10 feet deep and between 50 and 60 feet in diameter. [*Id.* at ¶¶ 15(a)(i)-(ii)]. For each turbine foundation, Osage Wind excavated soil, sand, and rock of varying shapes and sizes. [*Id.* at ¶ 15(a)(i)]. Rock pieces that were larger than three feet long were stockpiled beside the hole and remain in place. [*Id.*]. Excavated rock pieces that were less than three feet long were crushed to a size of roughly three inches or smaller. [*Id.* at ¶ 15(a)(ii)]. Once the foundation for a turbine was poured and cured, the crushed rock, sand, and soil excavated from the hole were pushed back into the foundation site from which they came and compacted into the excavated site. [*Id.* at ¶ 15(a)(iv)].

The excavated soil, sand, and rock were not used for any purpose other than to return them to the hole from which they came. [*Id.* at ¶ 15(a)(v)]. None of the excavated soil, sand, or rock was moved to or used at another location, except for backfilling purposes. [*Id.*]. None of the excavated sand, soil, or rock was used to mix or prepare the concrete for any foundation. [*Id.*]. No excavated material was sold or used for any commercial purpose. [*Id.* at ¶ 15(a)(vi)].

## II. Procedural History

In 2011, the Osage Nation, acting through the Osage Minerals Council, filed a Complaint for Declaratory and Injunctive Relief against Osage Wind and other defendants in the Northern District of Oklahoma. [Doc. No. 2 in Case No. 11-CV-643-GKF-PJC] (the "Prior Litigation"). The U.S. Government was not a party to the Prior Litigation. [Doc. No. 37 in Case No. 11-CV-643-GKF-PJC]. In the Prior Litigation, the Osage Nation sought to prevent interference with its oil and gas rights guaranteed by 25 C.F.R. § 226, as a result of digging incident to the defendants' planned wind energy project. On December 20, 2011, Chief Judge Frizzell dismissed the Prior Litigation on the merits. [*Id.*].

Plaintiff, the United States of America ("Plaintiff" or "United States"), filed this action on November 21, 2014. [Doc. No. 2]. In the First Amended Complaint for Declaratory Judgment and Damages, Plaintiff alleges the Defendants' construction activities interfere with the Osage Nation's reserved mineral rights, and Defendants failed to obtain the necessary prior approvals before excavating the turbine foundations for the Project. [Doc. No. 20]. Specifically, Plaintiff asserts Defendants violated 25 C.F.R. § 211.48, which prohibits "exploration, drilling, or mining operations on Indian land" without obtaining permission from the Secretary of the Interior ("Secretary"), and 25 C.F.R. § 214.7, which forbids "mining or work of any nature" on reserved Osage County land unless a mineral lease covering such land is approved by the Secretary. [*Id.*]. Plaintiff alleges "Defendants initiated excavation work and substantial disturbance and invasion of the mineral estate" without obtaining the required prior approvals or appropriate lease. [*Id.*].

The First Amended Complaint alleges five counts, all of which hinge on whether the Defendants violated 25 C.F.R. § 211 and/or 25 C.F.R. § 214. Count I seeks a declaration regarding the applicability and violation of 25 C.F.R. § 211 as to Defendants' construction activities. Count II seeks a declaration regarding the applicability and violation of 25 C.F.R. § 214 as to Defendants' construction activities.

On December 19, 2014, Plaintiff filed a Motion for Partial Summary Judgment as to Counts I and II of the Amended Complaint, along with a Motion for Expedited Consideration. [Doc. Nos. 24, 25]. On December 29, 2014, Defendants filed a Motion to Dismiss or for Summary Judgment. [Doc. No. 26]. On March 27, 2015, Defendants filed a Notice of Supplemental Authority [Doc. No. 38], which Plaintiff moved to strike as improperly filed [Doc. No. 39]. On July 14, 2015, Defendants filed a Notice to the Court, advising construction of the

Osage Wind Farm has been completed and the Wind Farm has commenced commercial operation. [Doc. No. 41]. Plaintiff also moved to strike Defendants' second Notice as improper. [Doc. No. 42]. The pending motions are now fully briefed and ripe for review.

## **DISCUSSION**

To resolve the dispositive motions at issue, the Court must consider facts outside the pleadings, specifically, the documents and affidavits accompanying the parties' briefing.[1] For this reason, the summary judgment standard applies. As a general rule, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The central issues of this case are (1) whether the doctrine of res judicata bars the United States' claims in this matter, and (2) the proper interpretation of the scope and meaning of 25 C.F.R. Parts 211 and 214. With all material facts regarding Defendants' excavation processes being undisputed, this case presents a pure question of law that is appropriately decided on summary judgment. Plaintiff contends Osage Wind's extraction and use of limestone, dolomite,

---

[1] Defendants objected to Plaintiff's submission of Exhibits 1-3 attached to its Motion for Partial Summary Judgment as not properly authenticated. In response, Plaintiff submitted an affidavit from Mary Jeannine Hale verifying the authenticity of Exhibits 1-3. Accordingly, Plaintiff's objection is moot.

4

and other sedimentary minerals from the Osage mineral reserve to facilitate the placement of wind turbine foundations require approval from the Bureau of Indian Affairs ("BIA") and a lease between Defendants and the Osage Nation that is accepted by the BIA. [Doc. No. 24, at 4]. Plaintiff argues Osage Wind's failure to obtain the proper approvals and persistence with its excavation and extraction activities amount to violations of Parts 211 and 214. Defendants contend Osage Wind's construction activities do not constitute "mining" for purposes of the regulations and therefore no lease or permit pursuant to either regulation is required. [Doc. No. 26]. Defendants further contend the final judgment in the Prior Litigation bars the United States' claims in this action under the doctrine of res judicata.

## III. Res Judicata

As a threshold matter, the Court will address Defendants' argument that the doctrine of res judicata bars the United States' First Amended Complaint. "'Under res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or *could have been raised* in the prior action.'" *Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards*, 314 F.3d 501, 503-04 (10th Cir. 2002) (quoting *Satsky v. Paramount Comm., Inc.*, 7 F.3d 1464, 1467-68 (10th Cir. 1993)). To apply res judicata, three elements must be present: "'(1) a final judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits.'" *Id.* at 504 (quoting *King v. Union Oil Co.*, 117 F.3d 444-45 (10th Cir. 1997)) (alterations omitted).

Here, Defendants' argument that res judicata bars the United States' action fails on the second element.[2] Defendants assert the United States is in privity with the plaintiff in the Prior Litigation, the Osage Nation, and is therefore bound by the final judgment on the merits in the Prior Litigation. Preclusion is in order "when a person who did not participate in a litigation

---

[2] It is undisputed the Prior Litigation reached a final judgment on the merits.

5

later brings suit as the designated representative of a person who was a party to the prior adjudication." *Taylor v. Sturgell*, 553 U.S. 880, 894-95 (2008). Here, the United States is acting as the trustee with respect to the Osage Nation and its mineral estate, with the Osage Nation as the beneficiary. [Doc. No. 20, at ¶ 4]. However, it is settled law that when the United States is acting on behalf of an Indian tribe, the United States cannot be bound by a prior action brought by the tribe in which the United States did not participate. This is the case because, when the United States litigates on behalf of Indians, it is both acting formally as a trustee and "asserting its own sovereign interest in the disposition of Indian lands." *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2324 (2011) (citing *Heckman v. United States*, 224 U.S. 413, 445 (1912)). In effect, "the Government assumed a fiduciary role over the Indians not as a common-law trustee but as the governing authority enforcing statutory law." *Id.* Here, the United States is protecting the Osage Nation's interest in the mineral estate while also enforcing the federal Osage Allotment Act and federal regulations that protect Osage mineral rights.

Therefore, the Prior Litigation, which the Osage tribe brought to protect its interest in the land on which Osage Wind built the wind farm, does not bind the United States in protecting its own sovereign interest in such land. *See, e.g., Minnesota v. United States*, 305 U.S. 382, 386 n.1 (1939) ("In the case of patents in fee with restraints on alienation it is established that an alienation of the Indian's interest in the lands by judicial decision in a suit to which the United States is not a party has no binding effect but that the United States may sue to cancel the judgment and set aside the conveyance made pursuant thereto."); *United States v. Candelaria*, 271 U.S. 432, 443-44 (1926) (United States' interest in protecting Indian land rights "cannot be affected by . . . a judgment or decree" "where the United States has not authorized or appeared in the suit"); *Choctaw and Chickasaw Nations v. Seitz*, 193 F.2d 456, 459 (10th Cir. 1952), *cert.*

*denied* 343 U.S. 919 (1952) (noting Supreme Court precedent "clearly recognized the rights of restricted Indians and Indian tribes or pueblos to maintain actions with respect to their lands, although the United States would not be bound by the judgment in such an action, to which it was not a party, brought by the restricted Indian or an Indian tribe or pueblo.").

Although Defendants correctly note that where the United States has litigated an issue affecting an Indian tribe, the *tribe* may not re-litigate the matter, *see Nevada v. United States*, 463 U.S. 110, 135 (1983), the *reverse* is not true. *Bryan County, Oklahoma v. United States*, 123 F.2d 782, 786 (10th Cir. 1941), *cert. denied* 315 U.S. 819 (1942) (concluding that, although a prior judgment "operated to estop the [Indian] allottees from asserting a claim in their own right," "this in nowise affects the right of the United States to maintain this suit" both as "a guardian of the Indians to enforce an agreement creating a vested right in the Indians" and "in its own behalf as a sovereign right.").

Moreover, it is well established the United States "'must have a laboring oar in a controversy'" to be bound by prior litigation in which it was not formally a party. *United States v. Power Eng'g Co.*, 303 F.3d 1232, 1240 (10th Cir. 2002), *cert. denied*, 538 U.S. 1012 (2003) (quoting *Drummond v. United States*, 324 U.S. 316, 318 (1945)). The United States bears the "laboring oar" when it "'assume[s] control over litigation.'" *Id.* (quoting *Montana v. United States*, 440 U.S. 147, 154 (1979)). Here, the United States did not bring the Prior Litigation and there is no evidence the United States "assumed control" over it. *See Montana*, 440 U.S. at 155 (listing seven factors to consider in determining whether the United States assumed control over an action).

Because the United States cannot be bound by the Prior Litigation under the second element of the test for claim preclusion, the Court need not address the third element—whether

7

the same issues in this case were or could have been decided in the Prior Litigation. Accordingly, the Court will proceed to address the merits of the case.

## IV. Osage Mineral Leasing—Statutory and Regulatory Background

In 1906, Congress passed the Osage Allotment Act, which severed the mineral estate from the surface estate in Osage County, Oklahoma, and placed it in trust for the Osage Nation. Osage Allotment Act of 1906 ("Osage Act"), ch. 3572, 34 Stat. 539, § 3; *Osage Nation v. Irby*, 597 F.3d 1117, 1120 (10th Cir. 2010). Under the Osage Act, the affected surface lands could be alienated, subject to restrictions, Osage Act, § 2(7), and owners of such surface land were granted "the right to use and to lease said lands for farming, grazing, or any other purpose not otherwise specifically provided for herein." Osage Act, § 7. The Osage Act further contemplated uses of the surface estate that included "houses, orchards, barns, or plowed land." Osage Act, § 2(2).

Those same lands, however, were also subject to leasing for mineral exploitation by the Osage Nation, with the approval of the Secretary and "under such rules and regulations as he may prescribe." *Id.* at § 3. Although the reservation of the mineral estate to the Osage Nation originally lasted only twenty-five years, the reservation currently runs "in perpetuity." Act of Oct. 21, 1978, Pub. L. No. 95-496, 92 Stat. 1660, § 2. As a result, the surface lands of the Project site may be privately held and properly leased to Defendants, while the underlying mineral estate remains subject to a separate mineral lease secured from the BIA and the Osage Nation.

Pursuant to its rulemaking authority, the Department of Interior ("DOI") promulgated 25 C.F.R. Parts 211 and 214. Part 211 governs the development of reserved Indian tribal solid mineral resources generally, while Part 214 implements the Osage Act and applies specifically to

8

the Osage mineral estate. Plaintiff alleges Defendants' construction activities violated both of these regulations. Specifically, Plaintiff alleges violation of § 211.48(a), which prohibits "exploration, drilling, or mining operations on any Indian lands" without first obtaining a mineral lease or permit, and § 214.7, which prohibits "mining or work of any nature" in affected areas of Osage County without first obtaining a lease from the Secretary.[3] Therefore, Defendants' liability turns on the proper interpretation of these two regulations.

V. **Osage Wind's Construction Activities Do Not Violate 25 C.F.R. § 211**

    A. **"Mining" Is Limited to Commercial Mineral Development**

Plaintiff contends Defendants engaged in "mining" under Part 211, which required Defendants to obtain a mineral lease or permit. Section 211.3 defines "mining" as:

> the science, technique, and business of mineral development including, but not limited to: opencast work, underground work, and in-situ leaching directed to severance and treatment of minerals; Provided, when sand, gravel, pumice, cinders, granite, building stone, limestone, clay or silt is the subject mineral, an enterprise is considered "mining" only if the extraction of such a mineral exceeds 5,000 cubic yards in any given year.

Plaintiff argues Defendants' "extensive extraction, handling, sorting, crushing, and utilization of minerals," which were incident to construction of a large-scale commercial wind farm operation, amounted to the "science, technique, and business of mineral development" under the regulation. [Doc. No. 24, at 9]. However, it is clear to the Court that "mineral development" covers the activities of an entity engaged in the science, technique, and business of *developing minerals*, not those of an entity that incidentally encounters minerals in connection with surface construction

---

[3] 25 C.F.R. § 211.48(a) provides in full: "No exploration, drilling, or mining operations are permitted on any Indian lands before the Secretary has granted written approval of a mineral lease or permit pursuant to the regulations in this part." The first sentence of 25 C.F.R. § 214.7 provides: "No mining or work of any nature will be permitted upon any tract of land until a lease covering such tract shall have been approved by the Secretary of the Interior and delivered to the lessee."

9

activities. In other words, a commercial mineral development purpose is required to invoke the leasing requirements of § 211.48.

The Court reaches this conclusion for several reasons. First, each of the key terms used in § 211.3 under the limitation of "including but not limited to" relates to the phrase "mineral development," and each term refers to a specific method of extracting minerals for commercial purposes—opencast work, underground work, and in-situ leasing directed to severance and treatment of minerals. Other terms that would fall within the scope of "including but not limited to" must be of the same character. *See Bloate. v. United States*, 559 U.S. 196, 209 (2010) (rejecting a broad reading of the phrase "including but not limited to" on the ground that "such a reading would violate settled principles of statutory construction because it would ignore the structure and grammar of [the statute], and in so doing render even the clearest of the subparagraphs indeterminate and virtually superfluous."). Thus, excavating minerals incidentally to construction is not contemplated by the term "mineral development."

Second, contrary to Plaintiff's assertion, the term "opencast work" refers to a method of mining with a purpose of developing the excavated material. The Bureau of Mines defines "opencast method" in relevant part as a "mining method consisting of removing the overlying strata or overburden, extracting the coal, and then replacing the overburden." U.S. Bureau of Mines, *Dictionary of Mining, Mineral, and Related Terms* 2171 (U.S. Dep't of the Interior 2d ed. 1996). "Opencast" is defined as "[a] working in which excavation is performed from the surface. Commonly called open pit." *Id.* These definitions make it plain that opencast mining involves the extraction of mining material for the purpose of using it elsewhere.[4] This activity is fundamentally different from the excavation and backfilling activities in which Osage Wind

---

[4] The Tenth Circuit has found it "helpful to refer to dictionary definitions" in matters of statutory interpretation. *Chickasaw Nation v. United States*, 208 F.3d 871, 876 (10th Cir. 2000).

engaged in constructing the wind farm. Accordingly, Defendants' activities did not constitute "opencast work."

Third, other subsections of Part 211 confirm "mineral development" refers only to mineral development for commercial purposes. For example, § 211.27 provides an initial lease term of ten years which, "absent specific lease provisions to the contrary, *shall continue as long thereafter as the minerals specified in the lease are produced in paying quantities*." (emphasis added). Further, Section 211.47(a) provides the lessee shall "[e]xercise diligence in mining . . . on the leased lands *while mineral production can be secured in paying quantities*." (emphasis added). These provisions presuppose that "mining" subject to a lease under Part 211 results in the commercial development of minerals. Perhaps tellingly, the United States fails to address the meaning of these provisions or how they could be squared with a broader definition of "mining" that would cover excavation incident to construction.

Additionally, the definition of "lease" in § 211.3 does not further Plaintiff's cause. The regulation defines "lease" as "any contract approved by the United States . . . that authorizes exploration for, extraction of, or removal of any minerals." Plaintiff takes this definition to mean that a lease is *required* for any exploration, extraction, or removal of any minerals. However, § 211.48 is the operative provision that states when a lease is required, which is prior to any "exploration, drilling, or mining operations." As discussed above, Defendants' construction activities do not fall within the definition of "mining."

Further, the Indian Mineral Development Act of 1982, 25 U.S.C. § 2102, does not offer support to Plaintiff's argument that mineral "development" encompasses mere extraction and processing. In § 2102, Congress provided that tribes could, subject to the Secretary's approval, enter into joint ventures, leases, or other agreements "providing for the exploration of, or

11

*extraction, processing, or other development of* . . . mineral resources" or "providing for the sale or other disposition of the production or products of such mineral resources." (emphasis added). According to a plain reading, § 2102 refers to agreements with tribes for the "development" of mineral resources. Nowhere does it indicate that incidental excavation and backfilling of minerals amounts to extraction and processing for "development" purposes, as contemplated by § 2102.

Though Plaintiff correctly points out that the regulation should be read broadly in favor of the Osage Nation, Plaintiff's interpretation of "mining" would cover such a broad range of activity as to render the term meaningless. This cannot have been the regulators' intent, and the Court declines to read the regulation as broadly as Plaintiff proposes. Accordingly, the Court concludes Defendants did not engage in "mining" under 25 C.F.R. Part 211.

**B.     The "De Minimus" Exception Does Not Apply to Defendants' Activities**

Nor did Defendants engage in "mining" by virtue of the amount of minerals extracted during Osage Wind's construction activities. Plaintiff argues the final provision in § 211.3's definition of mining applies to Defendants' activities because Defendants' "extraction" of common minerals such as sand, limestone, and silt exceeded 5,000 cubic yards in one year.[5] Plaintiff argues the use of the term "extraction" in § 211.3 means that whether common minerals are being "mined" turns on the total volume of "extracted" minerals, not whether the extraction

---

[5] The Court notes its skepticism with the United States' conclusory assertion that Defendants extracted more than 5,000 cubic yards in a year. While the Court agrees Defendants excavated more than 5,000 cubic yards of minerals across the 84 turbine foundations, the Court is not convinced that the 5,000 cubic yard threshold is meant to apply across *all* excavations done by a single entity. The Project's 84 turbines span across 8,400 acres, and no single foundation hole would satisfy the 5,000 cubic yard threshold. By Plaintiff's own math, Defendants likely excavated only around 720 cubic yards of material per foundation. It strains logic to conclude that the regulators intended the 5,000 cubic yard threshold to apply across *all* holes excavated by one entity, no matter how far apart or how many surface estates are covered. The United States has failed to provide any rationale for aggregating all 84 turbine sites in concluding Defendants' excavations exceeded the 5,000 cubic yard threshold.

is for any a commercial purpose or indeed, any particular purpose. [Dkt. 24, at 11-12; Dkt. 29, at 8].

However, Plaintiff's broad interpretation of the "de minimus" exception does not square with other provisions in the regulation. Specifically, Plaintiff's interpretation does not account for the definition of "permit" in Section 211.3, which states, "Permit means any contract issued by the superintendent and/or area director to conduct exploration on; or removal of *less than 5,000 cubic yards per year* of common varieties of minerals from Indian lands." (emphasis added). By reading the definitions of "mining" and "permit" together, it becomes clear that the 5,000 cubic yard threshold applies only to extraction or removal of common minerals for *development purposes*. A broader reading would mean that any time a surface owner digs a hole on his or her land that would disturb any quantity of common minerals, he or she would have to obtain either a permit or a lease for any digging and backfilling. A broader reading would also mean that every proposed construction project in Osage County that requires digging and backfilling, including building a single-family home, multi-family apartment building, commercial building, or septic tank, would be subject to approval by the Osage Nation. The United States does not allege this is the case in Osage County, and the Court will not impose such a requirement.

The Court's narrower reading of the "de minimus" exception, which requires a mineral development purpose, is bolstered by the agency's statements during rulemaking: "[c]ommon varieties of mineral resources extracted in small amounts are excluded from the definition of mining, especially because *the purpose of such extraction is often for local and/or tribal use*. However, permits for these *small operations* are still reviewed and approved at the superintendent's office." 61 Fed. Reg., 35,634, 35,640 (July 8, 1996) (emphasis added). The

agency's statement focuses on the "purpose" for extracting and using the minerals, and the agency's use of the term "operations" indicates a permit is required only when minerals are being used for some purpose other than extraction and backfilling incident to surface construction. Accordingly, the "de minimus" exception in Part 211 does not apply to Defendants' construction activities. Plaintiff's claim that Defendants violated 25 C.F.R. § 211 fails as a matter of law.

## VI. Osage Wind's Construction Activities Do Not Violate 25 C.F.R. § 214

Plaintiff contends Defendants engaged in "mining or work of any nature" in Osage County without securing a lease from the Secretary of the Interior, in violation of 25 C.F.R. § 214.7. "Mining" is not defined in Part 214. However, as discussed above, under the instructive definition of "mining" found in 25 C.F.R. § 211.3, Defendants' excavation activities do not constitute "mining."

Plaintiff separately asserts Defendants' activities amount to "work of any nature" under § 214.7 because of Defendants' large-scale excavation that "necessarily, purposefully, and repeatedly requires invasion and conversion of the sub-surface minerals." [Doc. No. 29, at 4]. Plaintiff points out that without the limestone and rock materials found in place, "Defendants would have had to purchase backfill materials elsewhere or negotiate a lease with the Osage tribe providing recompense for the backfill materials mined from the mineral estate." [*Id.* at 4-5]. In other words, Plaintiff argues both the large-scale displacement of minerals and the backfilling of minerals amount to "mining or work of any nature," even if Defendants did not move the extracted material offsite or sell this material. [Doc. No. 24, at 6-7]. To bolster its argument, Plaintiff points to negotiations that took place between a contractor for the Oklahoma Department of Transportation ("ODOT") and the DOI for a Sandy Soil Permit or Lease, when

14

the contractor performed roadwork on U.S. Highway 60 that required excavation and backfilling of minerals. [*Id.* at 7; Doc. No. 24-1]. In this regard, Plaintiff attaches an unexecuted "Sandy Soil Lease" between the Osage Nation and ODOT. [Doc. No. 24-2].

Although on its face, the phrase "work of any nature" is not limited to mining work, in context it was plainly intended to mean mining-related exploration and construction. Specifically, applying § 211.3's definition of "mining" to Part 214's regulations using the doctrine of *in pari materia*,[6] the Court concludes the activities requiring a Part 214 lease are those that are defined as "mining" in Part 211, and not "work of any nature" unrelated to mining. As discussed above, § 211.3 defines "mining" by reference to commercial "mineral development." Thus, Part 214 requires a lease only for work related to "mining" as defined in Part 211. "Work of any nature," read in isolation, could describe any kind of "work," but the phrase takes meaning when read as work related to "mineral development."

The Court finds Plaintiff's interpretation of the phrase "work of any nature" to be overly broad and impractical, particularly in light of the permissible uses of the surface estate that may involve disturbing underlying minerals. The 1906 Osage Act contemplated uses of the surface estate that included "houses, orchards, barns, or plowed land," all of which would necessarily involve some incidental digging and backfilling of minerals, but none of which, according to the record before the Court, require a lease or permit from the BIA prior to construction. Osage Act, § 2(2). Further, the United States acknowledges that Part 214 has "not precluded the building of the many houses, ranches, commercial business, water towers and sports fields already existing

---

[6] *In pari materia* is a canon of construction pertaining to related statutes. Statutes that are *in pari materia* "may be construed together, so that inconsistencies in one statute may be resolved by looking to another statute on the same subject. BLACK'S LAW DICTIONARY (10th ed. 2-14). The rule means that "a legislative body generally uses a particular word with a consistent meaning in a given context. Thus, for example, a later act can be regarded as a legislative interpretation of an earlier act in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting and is therefore entitled to great weight in resolving any ambiguities and doubts." *Erlenbaugh v. United States*, 409 U.S. 239, 243-44 (1972) (citation, quotation marks, and alterations omitted).

in Osage County." [Dkt. 29 at 10]. Despite this acknowledgment, the United States fails to offer any practical measure of when a surface use infringes on the mineral rights.

Moreover, Part 214 is silent as to leasing requirements for any activity other than mining, which is reflected in the title of Part 214, "Leasing of Osage Reservation Lands, Oklahoma, for Mining, Except Oil and Gas." *See United States v. Hernandez*, 655 F.3d 1193, 1197 (10th Cir. 2011) (noting that legislative titles may be helpful when interpreting ambiguous statutory language). Further, the title of Part 214.7 itself refers to "operation," which suggests a reference to a mining operation, rather than any surface activity that requires digging and backfilling.

Other sections of Part 214 bolster the Court's conclusion that "mining or work of any nature" is limited to mining operations and mining-related activities. *See* 25 C.F.R. § 214.13 ("Lessees shall exercise diligence in the conduct of prospecting and mining operations"); 25 C.F.R. 214.14(a) ("Lessees may use so much of the surface of the leased land as shall be reasonably necessary *for the prospecting and mining operations and buildings required by the lease*.") (emphasis added); 25 C.F.R. § 214.10(d) (for "substances other than gold, silver, copper, lead, zinc, coal, and asphaltum the lessee shall pay quarterly a royalty of 10 percent of the value at the nearest shipping point of all ores, metals or minerals marketed."). In light of the language of the Osage Act, and as a matter of common sense, the drafters of Part 214 could not have intended to require BIA approval prior to any surface use that requires incidental digging and backfilling.

The Tenth Circuit's decision in *Millsap v. Andrus*, 717 F.2d 1326 (10th Cir. 1983), does not require a different conclusion. In *Millsap*, the Tenth Circuit considered the extent to which the Osage hard mineral estate included common rock, such as limestone or dolomite, and concluded such minerals were indeed reserved to the mineral estate. Importantly, however, the

offending party in *Millsap* was excavating minerals for a *commercial* purpose, namely, selling the limestone as road base. *Id.* at 1327 n.1. By contrast, Osage Wind backfilled the excavated materials into the hole from which they came or left them on the surface beside the hole. The limestone and other excavated materials were not developed, moved offsite for use elsewhere, or sold at a profit. As a result, Osage Wind's excavating and replacing the materials at the same location did not affect any right of the mineral estate owner, which distinguishes it from the commercial activity addressed in *Millsap*.

The Court is also not guided toward a different conclusion by the proffered lease negotiations between ODOT and the DOI in connection with road work. Besides the fact that the attached lease is unsigned, and besides the fact that the attached negotiation letters refer confusingly to both a "permit" and a "lease," [*see* Docs. 24-1, 24-2], these documents do not persuade the Court that a lease is *required* under § 214.7 for mere excavation and backfilling. At best, the evidence merely reflects that a single road contractor agreed to pay for excavation of roadway materials. The United States has failed to identify any prior administrative interpretation of Part 214 (or Part 211) *requiring* a mineral lease or permit for otherwise lawful excavation incident to surface construction. In short, the United States does not suggest that its interpretation of Part 214 is a longstanding one that deserves any deference.

Although the United States denies this consequence, the United States' broad reading of Part 214 would require every proposed excavation in Osage County—including basements, house foundations, septic tanks, and football fields—to secure a mineral lease under Part 214. This was not Congress' intent in enacting the Osage Act. The Osage Act took the former surface estate out of reservation status and transitioned it to fee ownership. The Osage Act contemplated that the surface estate be used for various purposes, "for farming, grazing, or *any other purpose*

17

*not otherwise specifically provided for herein*." Osage Act, § 7 (emphasis added). This intent would be defeated if any construction requiring excavation on privately held surface lands in Osage County were subject to the leasing requirements of Part 214.

Osage Wind excavated holes to build foundations and then replaced the minerals or left them on the surface. Such use is consistent with Congress' contemplated use of the surface estate. Here, the mineral owner has lost nothing because the excavated minerals are replaced and not used for any purpose. Defendants have not marketed or sold minerals or otherwise engaged in mineral development. As a result, they are not required to obtain a lease under Part 214 for their lawful surface construction activities. Plaintiff's claim that Defendants violated 25 C.F.R. § 214 fails as a matter of law.[7]

## VII. No Deference to the United States' Interpretations of Parts 211 and 214 Is Required

In this case, the Court finds no deference to the United States' interpretation of the federal regulations in Parts 211 and 214 is required. Plaintiff is correct that an agency is entitled to deference "when it adopts a reasonable interpretation of regulations it has put in force." *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 397 (2008). In this case, however, Plaintiff's reading of the regulations defies their plain language and is accordingly not a reasonable interpretation or a "permissible construction of the statute" requiring deference. *See id.* ("we accept the agency's position unless it is plainly erroneous or inconsistent with the regulation.") (citation and quotation marks omitted); *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

---

[7] As the Court decides this matter on the merits in Defendants' favor, it need not address Defendants' argument that the doctrine of laches separately bars this suit.

Further, while Plaintiff correctly states this Court is bound to apply the general rule that "statutes passed for the benefit of dependent Indian tribes are to be liberally construed with doubtful expression being resolved in favor of the Indians," the Court does not find any such "doubtful expression" in the regulatory text at issue. *Millsap v. Andrus*, 717 F.2d, 1326, 1329 (10th Cir. 1983) (citing *Alaska Pac. Fisheries v. United States*, 248 U.S. 78, 89 (1918)). Although the United States' reading of the regulations would almost certainly result in a financial boon to the Osage Nation, the Court simply cannot reasonably read the regulatory terms "mining" and "work of any nature" to encompass any activity that disturbs or alters the hard mineral estate.

## CONCLUSION

For the reasons outlined above, the Court concludes that Plaintiff's claims fail as a matter of law. Accordingly, Defendants' Motion for Summary Judgment [Doc. No. 26] is **GRANTED** and Plaintiff's Motion for Partial Summary Judgment [Doc. No. 24] is **DENIED**. Further, Plaintiff's Motion for Expedited Consideration [Doc. No. 25] is **DENIED**, and Plaintiff's Motions to Strike [Doc. Nos. 39, 42] are **DENIED**.

_____
James H. Payne
United States District Judge
Northern District of Oklahoma