1           UNITED STATES DISTRICT COURT FOR THE

2              NORTHERN DISTRICT OF OKLAHOMA

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                   Plaintiff,        )
                                      )
6    vs.                             ) CASE NO. 14-CV-704-GKF-JFJ
                                      )
7    (1) OSAGE WIND, LLC;             )
     (2) ENEL KANSAS, LLC; and        )
8    (3) ENEL GREEN POWER NORTH       )
         AMERICA, INC.,               )
9                                     )
                    Defendants.       )

10

11

12

13

14

15          TRANSCRIPT OF RECORDED PROCEEDINGS
                  FEBRUARY 11, 2020
16       BEFORE THE HONORABLE JODI F. JAYNE,
                MAGISTRATE JUDGE PRESIDING
17
                   **MOTION HEARING**
18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF:            MS. CATHRYN D. McCLANAHAN
                                   MR. NOLAN FIELDS
 3                                 United States Atty's Office
                                   110 W. 7th Street
 4                                 Suite 300
                                   Tulsa, OK 74119
 5
                                   MR. CHARLES R. BABST, JR.
 6                                 U.S. Department of Interior
                                   7906 E. 33rd Street
 7                                 Suite 1000
                                   Tulsa, OK 74145
 8
     FOR THE DEFENDANTS:           MR. RYAN A. RAY
 9                                 Norman Wohlgemuth Chandler
                                   Jeter Barnett & Ray PC
10                                 401 S. Boston Avenue
                                   Suite 2900
11                                 Tulsa, OK 74103

12                                 MS. SARAH M. STEVENSON
                                   Modrall Sperling Roehl
13                                 Harris & Sisk PA
                                   P.O. Box 2168
14                                 Albuquerque, NM 87103

15   FOR DEFENDANT OSAGE MINERALS  MS. MARY KATHRYN NAGLE
     COUNCIL:   (telephonic)       Pipestem Law PC
16                                 320 S. Boston Avenue
                                   Suite 1705
17                                 Tulsa, OK 74103

18                        * * * * * * * * * *

19

20

21

22

23

24

25
```

U.S. District Court
Northern District of Oklahoma

```
 1   PROCEEDINGS:

 2   --------------------------------------------------------------

 3           THE DEPUTY COURT CLERK:   This is United States vs.

 4   Osage Wind, LLC, et al., case number 14-CV-704-GKF-JFJ.

 5       Counsel, please enter your appearances.

 6           MS. McCLANAHAN:   Cathryn McClanahan on behalf of the

 7   United States.

 8           MR. BABST:   Charles Babst, of counsel, and with the

 9   United States Department of the Interior.

10           MR. FIELDS:   Nolan Fields with the United States.

11           MR. RAY:   Your Honor, good morning.   Ryan Ray on

12   behalf of Enel Green Power North America, Enel Kansas, and

13   Osage Wind.

14           MS. STEVENSON:   Your Honor, Sarah Stevenson also on

15   behalf of the defendants.

16           THE COURT:   Good morning.   And I understand there

17   might be some people on the phone?

18           MS. NAGLE:   Yes.   Good morning, Your Honor.   This is

19   Mary Kathryn Nagle of Pipestem Law representing the intervenor

20   plaintiff or seeking to be intervenor plaintiff, Osage Mineral

21   Council.

22           THE COURT:   And if anybody else needs to join later,

23   Ms. Nagle, that's fine, you can just announce that they're on

24   the phone at that time.   I understood maybe --

25           MS. NAGLE:   Thank you.
```

USA v Osage Wind (02-11-2020 Motion Hearing)                    4

1      **THE COURT:**  Yeah, sure.

2      Okay.  This was set for hearing on defendants' motion for

3  quash and/or motion for protective order, which is docket 106.

4  Mr. Ray, I'll recognize you in support of your motion.  At this

5  time, I have, of course, reviewed all your briefs.  I'm not

6  interested in any arguments on standing.  I think the briefs

7  are sufficient on that issue.  As to other issues, I just have

8  a few questions for you and then I'll permit you to make any

9  further argument --

10      **MR. RAY:**  Certainly, Your Honor.

11      **THE COURT:**  -- that you wish to make.

12      **MR. RAY:**  I'll be pleased to -- if the court has

13  questions, I'll be pleased --

14      **THE COURT:**  Yeah, I'd like to start with questions and

15  then I'll let you follow up with any other arguments.

16      **MR. RAY:**  Certainly, Your Honor.  Thank you.

17      **THE COURT:**  Okay.  I've read the transcript of the

18  scheduling conference in front of Judge Frizzell.  My reading

19  of that transcript is that he seems to have permitted the

20  United States fairly broad discovery on these legal remedies

21  and even knowing that there was going to be legal issues

22  presented regarding the proper remedies.  Did you have a

23  different takeaway from that scheduling conference or did

24  defendants have a different takeaway?

25      **MR. RAY:**  I did, Your Honor, and we did.  I don't

1  believe or recall that Judge Frizzell specifically made any

2  findings about the scope of discovery, and I would note, Your

3  Honor, that there are three motions pending in front of Judge

4  Frizzell right now about -- that really go to two issues, which

5  is:  Who is the proper party in this case at this time, and

6  what remedies are they permitted to seek.

7      Now, Your Honor, this case involves a wind energy project

8  in Osage county and there's a very long history of litigation

9  here.  There's been a number of cases, there's a prior case in

10  this court, and there were three or four cases in state court,

11  several of which went to the Oklahoma Supreme Court, that were

12  brought either by or at the behest of the Osage Minerals

13  Council, as this case is.

14      Now, this case, Your Honor, presents a narrow issue which

15  is the Tenth Circuit concluded that because Osage Wind sorted

16  rock, crushed rock, and used rock, that rock that was sorted

17  and crushed in turbine foundations, that that activity and that

18  activity alone required a lease to be granted under some

19  specific provisions in the Code of Federal Regulations.

20      So, when we go, Your Honor, to the question of remedy, we

21  believe that the wrong found by the Tenth Circuit is limited to

22  those minerals that were subject to that operation.  It is not

23  a situation where the Tenth Circuit said this entire project is

24  unlawful.  And we would submit, Your Honor, that there's no

25  fair reading of the Tenth Circuit's opinion consistent with

1   that.

2       After all, we must remember, Your Honor, that the

3   regulation that the Tenth Circuit found applies to the science,

4   technique, and business of mineral development.  Well, this is

5   not a mineral development operation, but the Tenth Circuit said

6   a specific part of the construction constituted mineral

7   development.  And so, to that end, Your Honor, we look,

8   consistent with the -- with another part of the regulations

9   which talks about these leases being done on a royalty-based

10  calculation, based upon the value of minerals, that that is the

11  inquiry that we should be engaged in.

12      Your Honor, we're engaged in responding to discovery

13  consistent with that analysis and we have not opposed other

14  subpoenas that we believe go to that issue, to let's look at

15  what type of materials were subject to the activities that the

16  Tenth Circuit found to be unlawful under the regulations and

17  what is the value of those materials.  That's appropriate

18  discovery and we are willing to participate in that.  But --

19          **THE COURT:**  And you're asking this court to decide

20  today that the subpoenas to Hooper, particularly as to the

21  issue I think you're talking about now, the subpoenas to Hooper

22  are, as a matter of law, outside the scope of whatever the

23  Tenth Circuit has permitted as to legal damages in this case

24  and, therefore, I should find it irrelevant and not permit the

25  subpoenas.  Is that correct?

1          **MR. RAY:**  That, or, Your Honor, at least defer until

2    Judge --

3          **THE COURT:**  Right.  That's your alternative request,

4    is defer?

5          **MR. RAY:**  -- Frizzell makes that determination.

6       And I would note, Your Honor, there are two subpoenas,

7    Hooper Corporation who installed power lines, and we believe

8    the most, based on conferring with our client and conferring

9    with the Hooper Corporation, that they didn't engage in any of

10   this rock sorting, crushing, using for foundations.  They

11   simply dug dirt.  And the Tenth Circuit said if you dig holes

12   in the ground, it's only going further that gives rise to these

13   regulations, it's not that act.

14      Now, there also is --

15         **THE COURT:**  Didn't the United States cite some -- I

16   don't know, maybe it was from their website, something from

17   their website saying what they did on this project, they

18   drilled down beyond industry standards, I think it said?

19         **MR. RAY:**  But what was not there, Your Honor, was any

20   indication that they engaged in sorting, crushing, and using of

21   rock, and it's that activity that the Tenth Circuit found to be

22   unlawful.  Just digging a hole in the ground, the Tenth Circuit

23   very clearly said that is not mining.

24      Now, Your Honor, there's also a second subpoena that's at

25   issue in our motion, and that's to AECI, --

1          **THE COURT:**  Sure.

2          **MR. RAY:**  -- that's Associated Electric Cooperative

3    Incorporated, and --

4          **THE COURT:**  And I want to stop you for just a second,

5    --

6          **MR. RAY:**  Certainly.

7          **THE COURT:**  -- Mr. Ray, because something you said

8    made me -- I want to make sure I have this right.  There's only

9    one subpoena to a Hooper Corporation; right?

10          **MR. RAY:**  That's correct.

11          **THE COURT:**  You weren't trying to tell me there's two

12    separate Hooper entities?  Just the one?

13          **MR. RAY:**  There's one subpoena --

14          **THE COURT:**  Okay.  Yeah.

15          **MR. RAY:**  -- that we know of.

16          **THE COURT:**  Got it.

17          **MR. RAY:**  There's Hooper that did -- that did the --

18          **THE COURT:**  The power lines?

19          **MR. RAY:**  -- installation of these power lines, and

20    then there's AECI which purchases power from -- from the

21    project.  And, Your Honor, the AECI subpoena is, we think, the

22    most clearly outside the scope of discoverable information.

23    Given that the Tenth Circuit tied its finding of wrong to

24    activity that AECI clearly was not involved in in any manner,

25    they were not involved in this project in the construction

1  phase, and we have no objection or producing information about

2  everything that was done in construction, but this subpoena to

3  AECI is expressly targeted at what AECI purchased power for the

4  project on and those -- those type of amounts, payments,

5  records about that.

6       Now, Your Honor, that could only be discoverable under the

7  contention that the project itself is somehow unlawful, which

8  the Tenth Circuit clearly did not permit that.  It clearly only

9  found that a limited aspect of construction required a lease to

10 be had.

11          **THE COURT:**  Now, aren't they seeking that in the event

12 that they -- I think Judge Frizzell called it an election of

13 remedies.  You know, assuming that remedy is permitted to

14 proceed, isn't that information being requested on this

15 disgorgement equitable remedy?  And I understand defendants'

16 argument is that should not be permitted in this case, and that

17 issue is pending before Judge Frizzell, I believe.

18          **MR. RAY:**  That's correct, Your Honor.

19          **THE COURT:**  Is that correct?

20          **MR. RAY:**  It's pending in front of Judge Frizzell.

21 Frankly, it's certainly based on the United States' motion to

22 amend and in the Osage Mineral Council's motion to intervene,

23 we very clearly raised that issue --

24          **THE COURT:**  Right.

25          **MR. RAY:**  -- in both of those, and then we also have a

1  motion for judgment on the pleadings pending as to the United

2  States on the grounds that their failure to appeal bars them

3  from further participation in this case.  Now, clearly, Your

4  Honor, we're not saying no one can participate in this case.

5  We believe that the one and only plaintiff should be --

6          **THE COURT:**  Yeah, I read that footnote.

7          **MR. RAY:**  -- OMC.

8          **THE COURT:**  I was curious what your position was on

9  that.  I was interested to know that you believed somebody

10  should be permitted to prosecute it.

11          **MR. RAY:**  That's right, Your Honor.  Clearly we are

12  not saying that no one should be allowed to proceed.  We're not

13  saying that, Judge.

14          **THE COURT:**  Okay.

15          **MR. RAY:**  There's no way we would say that.  But we

16  believe that the OMC, who is the only party that prosecuted an

17  appeal in this case, --

18          **THE COURT:**  Uh-huh.

19          **MR. RAY:**  -- that they -- they should be allowed to

20  intervene consistent with the Tenth Circuit's opinion.

21          **THE COURT:**  Okay.

22          **MR. RAY:**  And when we look at the wrong that the Tenth

23  Circuit found, it is based upon use of material.

24      And I also believe it important, Your Honor, that prior to

25  the Tenth Circuit's decision, no one had ever adopted the view

1  that was -- that was adopted by the Tenth Circuit that these

2  specific activities would run afoul of these regulations.  It's

3  important, Your Honor, to note that this is not material that's

4  totally unique in the world.  Certainly our clients could have

5  gone and procured other material from another source to conduct

6  this construction activities had there been prior notice that

7  that type of activity required a lease under these

8  circumstances.

9      So, we believe, given the nature of wrong that was found by

10  the Tenth Circuit, which is sorting, crushing, using minerals,

11  that the remedies have to be based on those minerals, they have

12  to be based on the value of those minerals, consistent with --

13  there's a provision in section 214, I believe it's 214.10(d),

14  that talks about how does a lease like this work.  Well, it's a

15  royalty percentage.  I believe that provision contemplates 10

16  percent of the value of the minerals.

17      So, that -- to that end, Your Honor, to determine what

18  amount of minerals were subject to that type of operation,

19  what's their value, we're engaged in that discovery, Your

20  Honor.  We're very well engaged.  We're frankly having much

21  more problems with the U.S. responding to our discovery.  We

22  respectfully submit, Your Honor, that they're trying to

23  foreclose a lot more proper discovery than we are.  We'll

24  probably unfortunately be back in front of the court on some of

25  those issues in the near future.

1     But to the extent it goes to what materials were subject to

2   this -- the activities that the Tenth Circuit said constitute

3   mineral development, we're engaged in that kind of discovery.

4   We haven't opposed subpoenas that relate to that, but frankly

5   these subpoenas will not answer those questions.

6        **THE COURT:**  If disgorgement is permitted as a remedy

7   ultimately or elected as a remedy, do defendants concede that

8   this information would at that time be relevant to that

9   inquiry?

10       **MR. RAY:**  I think if Judge Frizzell says, "I'm going

11  to allow the remedy of discovery of disgorgement as to the

12  entire project," then the AECI subpoena would probably be

13  appropriate at that point.  But as it stands today, Your Honor,

14  with the amended complaint that we have that the United States

15  filed, it does not -- the currently on-file complaint does not

16  mention disgorgement at all.

17       **THE COURT:**  Okay.

18       **MR. RAY:**  And the --

19       **THE COURT:**  Go ahead.  Go ahead.  Sorry.

20       **MR. RAY:**  The accounting that it seeks is an

21  accounting of minerals that were used.  And again, we're about

22  the process of providing that information fully and we have no

23  opposition to discovery that would seek that.  The injunction

24  that that amended complaint seeks is an injunction to prevent

25  the type of activity that the Tenth Circuit found was improper.

1   And again, we're certainly not doing that, Judge.  Any

2   discovery they want to confirm that that's not occurring at the

3   project now nor will it, we're not opposed to that either.  It

4   is these efforts to expand the remedial relief beyond what is

5   set forth in the first amended complaint right now, beyond the

6   scope of that which the Tenth Circuit had before it, and beyond

7   the scope of the proper relief for the wrong that the Tenth

8   Circuit found.  It is those efforts that we believe are not

9   reasonably calculated to lead to the discovery of admissible

10  evidence in this case in its current procedural posture, and at

11  a minimum that discovery should be deferred until we have an

12  answer from Judge Frizzell about whether -- whether these new

13  remedial requests will be allowed and, frankly, who is going to

14  be the plaintiff that will be allowed to pursue them.

15          **THE COURT:**  On this issue of deferral, I have a

16  question, your alternative request.  I'm quoting from Judge

17  Frizzell's hearing.  He said, "We're going to try to hold

18  you" -- you being the United States -- "to that six months.  So

19  be sure to get your experts and proceed apace."  And that was

20  in the context of a discussion about some of these legal issues

21  that you're bringing up in front of this court right now.  So,

22  aren't you asking this court to hinder the United States'

23  ability to do exactly what Judge Frizzell has instructed them

24  to do?

25          **MR. RAY:**  We're asking, Your Honor, that the court not

 1   permit this discovery into the project's revenues, into those

 2   type of inquiries which we believe are not proper given the

 3   nature of harm found by the Tenth Circuit, given the pleadings

 4   as they now exist right now today, and frankly given the

 5   uncertainty about whether the United States is even going to be

 6   allowed to remain a plaintiff when clearly it did not file a

 7   notice of appeal within the confines of Rule 4 and its time

 8   lines.  And we've cited --

 9         **THE COURT:**  All right.  And, Mr. Ray, if you're wrong,

10   if defendants are wrong on this issue, end up being wrong about

11   that, isn't there a chance we're going to be right up at that

12   six-month window and the scheduling order will be closed?

13         **MR. RAY:**  Well, certainly we don't know --

14         **THE COURT:**  I mean, I understand your position, but

15   that's a very real possibility, isn't it?

16         **MR. RAY:**  We certainly don't know when Judge Frizzell

17   will make his rulings or when he will have hearings.

18         **THE COURT:**  And he's very efficient, but these -- I

19   mean, these are big motions, there's three of them and, you

20   know, those things take time for a district court to consider,

21   and it seems to me a very realistic possibility that if I defer

22   this discovery, we could be at five months and --

23   five-and-a-half months, have a ruling, and if defendants'

24   position ends up being rejected, the United States has no time

25   to get this discovery they need.

1      **MR. RAY:**  Could that possibly be an outcome?
2   Certainly it should. [sic]  But again, Your Honor, our position
3   is based on the pleadings as they exist today, is based on the
4   Tenth Circuit's opinion, is based on the type of wrong that was
5   found, which is not the project itself, which is not the mere
6   breaking of the earth; it is this sorting, crushing, using of
7   rock for turbine foundations.  If it relates to that issue in
8   any manner, Your Honor, --
9      **THE COURT:**  Uh-huh.
10      **MR. RAY:**  -- we have provided it or will provide it.
11   We've produced several thousand pages of material.  Even
12   though, Your Honor, our position is the United States shouldn't
13   be in at all, but we recognize someone's going to be, so we're
14   about the the process of providing as much responsive
15   information as we can, Your Honor, working with our client who
16   has people all over the world.  Frankly, some of this
17   information is stored in Italy.  But we're about the process of
18   providing that information and that material that in any
19   reasonable way relates to the rock that was sorted, crushed,
20   and used in turbine foundations.  It is principally, Your
21   Honor, this effort to go beyond and seek the project's revenues
22   writ large.
23      **THE COURT:**  Okay.
24      **MR. RAY:**  That is what we believe to be improper, Your
25   Honor, and especially at this time given this posture we

1  believe that that's improper and at least should be deferred.

2          **THE COURT:**  Is there any reason the AI -- sorry --

3  AECI documents or any other documents revealing your client's

4  confidential pricing or other confidential information couldn't

5  be produced pursuant to the protective order in this case?

6          **MR. RAY:**  Well, if that type of remedial relief is

7  going to be allowed, then the protective order would, I think,

8  afford a level of protection, but we think --

9          **THE COURT:**  What I'm saying is the third parties,

10  there's no reason to think that if you instruct them to or you

11  communicate with them, they're not going to produce these

12  documents pursuant to a protective order?

13          **MR. RAY:**  I certainly think they would, Your Honor.

14          **THE COURT:**  Okay.

15          **MR. RAY:**  I think that would be the case.  But at

16  present, it's just the fundamental legal issues of who is going

17  to be the plaintiff and what remedies are they going to be

18  allowed to pursue.  We believe, consistent with the Tenth

19  Circuit's finding of the narrow class of activity that's

20  wrongful, that these efforts to seek the revenues of the

21  project entirely or discovery aimed at enjoining the project

22  entirely, it's those type of efforts that just cannot be fairly

23  reconciled with the Tenth Circuit's opinion and with the only

24  complaint that is currently on file in this litigation.

25          **THE COURT:**  Okay.

1          **MR. RAY:**  And it's those issues.  That is the reason

2     for our request.

3          **THE COURT:**  Okay.  Thank you very much, sir.

4          **MR. RAY:**  Thank you, Your Honor.

5          **THE COURT:**  Yes.

6          **MS. McCLANAHAN:**  Your Honor, I think that you have a

7     great deal of insight into this case by reading Judge

8     Frizzell's -- the transcript of Judge Frizzell's comments

9     during the scheduling conference.

10         You're correct that the United States is of an opinion that

11    the defendants are hindering our ability to do exactly what we

12    were charged with doing.  A perfect example is that, you know,

13    we issued these subpoenas within 24 hours, 48 hours of leaving

14    that particular hearing before Judge Frizzell, and the

15    defendants waited almost 30 days to enter into this objection.

16    By that time, we had already been in communication with some of

17    the targets of the subpoena.  So, it is putting us somewhat

18    behind the eight ball because at this point the United States

19    is a recognized party, Judge Frizzell has given us this

20    directive to move forward with the discovery, and we're trying.

21         I would also say that while they indicated that they have

22    turned over a great deal of material, there are also a lot of

23    holes where they indicated they no longer had information, that

24    there were no such relevant documents, and some of those

25    documents relate to subcontractors.  Quite frankly, the only

 1  reason I know who to try and subpoena information from at this

 2  point is because of the Internet.  We have not had cooperative

 3  discovery such that I understand fully the operation that was

 4  going on out there.  I have researched it, like I say, on the

 5  Internet and found the kinds of things that you see there from

 6  Hooper Corp.

 7      As to the discussion about the Tenth Circuit opinion, I

 8  think that the argument that is being advanced by the defendant

 9  here is just unbelievably shortsighted in a total reading of

10  what the Tenth Circuit said.

11      The Tenth Circuit --  The Tenth Circuit certainly had

12  before it a question about whether or not what the defendants

13  were doing here was a wrongful activity, but that question was

14  answered at the very end of the opinion by saying, yes, the

15  sorting and the crushing and all those kinds of things meant

16  that under the regulations they were doing mining, and because

17  they were doing mining -- and this is the critical next step --

18  because they were doing mining, we need to remand this because

19  they were required to enter into a lease.  And that's exactly

20  what the remand says.  It doesn't say anything about, "Oh, my,

21  we've got to figure out how much was sorted, how much was

22  crushed."  It says they were required to enter into a lease.

23  They didn't enter into a lease.  What they have done is a

24  trespass, and that's exactly what the first amended complaint,

25  and we can look at the second amended, but let's stay with the

1  first amended since that's the one that is filed right now.

2      The first amended complaint specifically states -- it

3  states five claims.  It states two claims that are for

4  declaratory judgment, which in the United States' opinion have

5  now been decided, but then one for trespass, one for continuing

6  trespass, and one for conversion.  Specifically, we asked for a

7  judgment finding the defendants liable for those

8  things: trespass, continuing, and conversion.  Those things

9  have nothing to do with the kinds of things that they're

10  talking about right now.

11      Trespass damages could very well include what would we have

12  negotiated as a lease.  And the defendants were very proud to

13  state -- in the 2011 lawsuit they stated it and Judge Frizzell

14  made it part of his findings, that some of the surface owners

15  who it could be argued they sold rights to the minerals that

16  they did not own below, but some of the surface owners were

17  taking home $250,000 per year.  And now you can see that

18  defendants are looking to pay for selected amounts of rock and

19  limestone that were crushed out there.

20      There's no reason to think that the Osage Minerals Council,

21  had they been properly approached for a lease, which they were

22  required to do, we now know that, would have negotiated a

23  ridiculously low paying lease when the land -- the surface

24  owners were negotiating those kinds of sums.

25          **THE COURT:**  So, is it the United States' position that

1  the AECI documents are relevant also to a theory of money

2  damages on the trespass claim?

3          **MS. McCLANAHAN:**  Certainly.  Certainly.

4          **THE COURT:**  And also this equitable -- in addition to

5  some sort of equitable disgorgement theory, and I think -- is

6  that governed by the *Davilla* -- is that the *Davilla* case issue?

7          **MS. McCLANAHAN:**  That is the *Davilla* case.  You know,

8  --

9          **THE COURT:**  Okay.  But you're saying, *Davilla* aside,

10  we also think these documents are relevant to trespass money

11  damages?

12          **MS. McCLANAHAN:**  Right, right, because at the heart of

13  the Tenth Circuit's opinion, when you get down to the very

14  bottom of it, sure, they can cherry pick certain words, you

15  know, crushing, sorting, excavating, all kinds of things, but

16  what it led the Tenth Circuit to a conclusion of was that you

17  had to get a lease, you were invading the Osage Minerals

18  mineral estate, you had to go get a lease and you didn't.

19          **THE COURT:**  So, is part of the United States' damages

20  model trying to reconstruct, for lack of a better term, or

21  create this is what a lease may have looked like, this is what

22  our percentage would have been --

23          **MS. McCLANAHAN:**  I think that's --

24          **THE COURT:**  -- from any profits?

25          **MS. McCLANAHAN:**  -- exactly where we're at.  I mean,

1  maybe the more common example would be an oil and gas lease up

2  in the Osage.  It certainly cannot be the case that, you know,

3  a company could come in and pull oil out of the ground and then

4  just say, "We'd like to -- we've denied you payment, we didn't

5  come and negotiate with you, we completely denied your theory

6  that you own those minerals, and now five years later we'd just

7  like to pay you for exactly the oil and gas and nothing

8  more."  I mean, you know, that's not the kind of thing they

9  would have negotiated on the front end.  They would have

10 negotiated something different.

11     And I think, you know, so far as we cited Oklahoma Statutes

12 that would regard landowners, that statute actually does also

13 reference mineral owners and it tells them, you know, to be

14 careful about how you treat the mineral owners, as well.

15     But here, I think what you have are surface owners who are

16 land owners, but mineral estate owners are landowners, as well;

17 they just have a different bundle of rights.  And in this case,

18 the Tenth Circuit found that that bundle of rights, you had to

19 have a lease to touch it.

20     So, with that, I think that this hyper-technical reading

21 and pulling out of a few words, and those aren't necessarily

22 words even out of the statute, those are just words that caught

23 the Tenth Circuit's attention as taking it beyond, you know,

24 just a fair surface use of a minimal amount of top soil

25 basically is what we were talking about.  I just don't think

1  there's a fair reading that would say the Tenth Circuit

2  intended to limit damages.  Damages was never briefed by any

3  party at all.  We never discussed even the issue of trespass.

4      At issue before the Tenth Circuit was simply the regulatory

5  interpretation.  So far as whether or not the United States is

6  a party, I mean, I'm prepared to discuss the line of cases

7  which are completely not applicable to what is happening here.

8  I mean, in this case we have the United States --

9          **THE COURT:**  I don't really need you to go into that

10 procedural --

11         **MS. McCLANAHAN:**  Okay.

12         **THE COURT:**  -- issue.

13         **MS. McCLANAHAN:**  Okay.

14         **THE COURT:**  I know you had that discussion in front of

15 Judge Frizzell, to some extent.  That issue is fully briefed in

16 front of Judge Frizzell.  I am interested in an argument you

17 made in your brief that really defendants are requesting -- I

18 think you used the phrase "an advisory opinion" on the

19 substantive legal issues pending before Judge Frizzell.  I

20 might be mischaracterizing that.  I think I remember the phrase

21 "advisory opinion."  You know, I am obviously concerned about

22 issuing rulings in the context of a relevance determination

23 which has to be made by a magistrate judge.  I'm concerned

24 about any rulings of those interfering or being inconsistent or

25 contradicting rulings that may ultimately be made by Judge

1  Frizzell in this case on motions that are pending before him

2  right now.

3          **MS. McCLANAHAN:**  I understand.  I understand.

4          **THE COURT:**  And I think that's a very real concern in

5  this case.  Would you address that briefly?  I think I know

6  your position, but --

7          **MS. McCLANAHAN:**  Sure.  And insofar as the United

8  States is a party, the defendants have already said they've

9  engaged in discovery with us.  If we were a stranger to this

10  lawsuit, they wouldn't have engaged.  Insofar as the reaches of

11  the Tenth Circuit opinion, I feel like, you know, we need to go

12  back to the basics of Rule 26 which allows --

13          **THE COURT:**  Right.

14          **MS. McCLANAHAN:**  -- pretty broad-brushed discovery,

15  you know, anything that might lead to discoverable evidence,

16  and that taken with just the very final paragraph of the Tenth

17  Circuit's decision which said you had to get a lease, to do

18  whatever it is you were doing, --

19          **THE COURT:**  Uh-huh.

20          **MS. McCLANAHAN:**  -- you had to get a lease.  At the

21  very least, that's what they're opening up and that's what

22  they're telling us we should be doing discovery on.

23          **THE COURT:**  I think you've answered this question,

24  but -- I mean, I think I know the answer to this -- but if

25  Osage Minerals ends up as the only plaintiff in this case, is

1  there any reason to think they would not seek or need this same

2  discovery?

3          **MS. McCLANAHAN:**  Oh, I think they would certainly need

4  the same discovery.

5          **THE COURT:**  Your interests are aligned from everything

6  that I understand, --

7          **MS. McCLANAHAN:**  Right.

8          **THE COURT:**  -- meaning if Osage Minerals ends up as

9  the plaintiff, I have no reason to believe these documents

10 would not be requested or used by them.

11         **MS. McCLANAHAN:**  And to be very clear, I mean, we're

12 not seeking any kind of money damages --

13         **THE COURT:**  Right.

14         **MS. McCLANAHAN:**  -- or any damages on our own behalf.

15         **THE COURT:**  Right.

16         **MS. McCLANAHAN:**  Anything that we receive or any

17 damages that we recover obviously belong to the mineral estate

18 owner which is the Osage Nation.

19         **THE COURT:**  Is AECI the only or primary purchaser of

20 the electricity?

21         **MS. McCLANAHAN:**  We don't know.

22         **THE COURT:**  Okay.

23         **MS. McCLANAHAN:**  We don't know.

24         **THE COURT:**  That's who you know of right now and

25 that's who you've asked?

1          **MS. McCLANAHAN:**  That's what I know of based on press

2    releases that both Osage Wind and AECI published on the

3    Internet.

4          **THE COURT:**  I'm asking to see what can of worms we're

5    opening here and if we know that this is going to lead to 10

6    other, you know, third-party subpoenas to other purchasers if

7    you're trying to get a complete picture or whether you believe

8    this subpoena is probably going to be the extent of it.

9          **MS. McCLANAHAN:**  Based on -- so Mr. Fields and I have

10   done some work to try and just understand the wind industry and

11   the way these kinds of things work, I think that they would

12   only be selling to one entity --

13         **THE COURT:**  Okay.

14         **MS. McCLANAHAN:**  -- and I think it would be this

15   entity for the entire time that we're talking about.

16         **THE COURT:**  I don't have any other questions for you,

17   Ms. McClanahan.

18         **MS. McCLANAHAN:**  Okay.

19         **THE COURT:**  But also feel free to make any other

20   arguments that you wish to make at this time.

21         **MS. McCLANAHAN:**  Okay.  And insofar as I believe

22   Mr. Ray talked about there is something in the regulations

23   about a royalty provision for minerals that are recovered and

24   then sold, that's a minimum, it does set a minimum of 10

25   percent, but the OMC can and frequently does negotiate

 1  something different.  I mean, that's what we're talking about
 2  with the federal government.  We simply approve the lease after
 3  the OMC has negotiated it.  So there's nothing in the
 4  regulations that says the damages would have been limited to or
 5  the lease would have been limited to.  We know exactly what a
 6  lease would have said.  That's just not true.  They could have
 7  negotiated more.
 8      I think, you know, you understand the position that I'm
 9  taking, but with respect to I kept hearing the words, you know,
10  the nature of the wrong, the nature of the wrong.  The nature
11  of the wrong informed their final decision at the Tenth
12  Circuit, but I don't think it at all limited the damages that
13  the plaintiff -- that the minimal estate owner, if you will,
14  could then seek based on the wrong.  It was a trespass and
15  they're not at all limited to the few activities that the Tenth
16  Circuit found so overwhelming that it took it over the line
17  into mining under the definition.  The definition of mining is
18  one question, but trespass and the damages that are allowed
19  under that is a completely different issue, and that's where
20  we're at now.
21          **THE COURT:**  Okay.  Thank you very much.
22      Mr. Ray.
23          **MR. RAY:**  Just briefly, Your Honor, to a few things.
24      I want to be clear about the issue of timing.  That was
25  largely driven by the holidays, Your Honor.  We requested --

1   some members of our team were traveling.  This scheduling

2   conference, that's -- to the extent there was no intentional

3   delay.  We frankly requested an extension of time until the day

4   we filed this motion because, frankly, people were traveling

5   for the holidays, and that really is the issue there, Your

6   Honor.

7        Now, when we talk about the Tenth Circuit opinion, it is --

8   and I'll just read from it because this is important, Your

9   Honor.  The court says, "We agree with Osage Wind, however,

10  that merely encountering or incidentally disrupting mineral

11  materials would not trigger section 211.3's definition.  In

12  other words, 'the simple removal of dirt does not constitute

13  mining.'  There is simply no sense in which the word 'mineral

14  development' means only the removal of dirt without some

15  further manipulation, commercialization, or offsite relocation

16  of it.  The problem here is that Osage Wind did not merely dig

17  holes in the ground - it went further.  It *sorted"* -- and they

18  italicized "sorted" -- "the rocks, *crushed"* -- and they

19  italicized "crushed" -- "the rocks into smaller pieces, and

20  then *exploited* the crushed rocks as structural support for each

21  wind turbine.  The ultimate question is whether this

22  operation" -- in other words, the same thing we said in the

23  prior sentence -- "constitutes 'mineral development' as we have

24  conceptualized the term.  We hold that it does."

25       And then the next heading, Your Honor, is Sorting and

1   Crushing for Backfill Constitutes Mineral Development.  Your

2   Honor, that is the activity that the Tenth Circuit found to be

3   wrong.

4        The Tenth Circuit did not find that the project itself was

5   a trespass.  There is nowhere in that opinion where they said

6   that.  The Tenth Circuit did not say anything about this

7   project generally is an invasion of the mineral estate.  I have

8   just said what they said about that.  It is only because -- the

9   only reason that the requirement for a lease was triggered is

10  because of this sorting, crushing, and exploiting the rocks as

11  structural support for each wind turbine.  That is what the

12  Tenth Circuit said.

13       Now, Your Honor, we heard a little bit about what a lease

14  might have looked like.  Now, the only place in the regulation

15  that talks about this is section 214, 214.10(d).  Now, maybe

16  Ms. McClanahan may be correct, perhaps you could negotiate a

17  higher royalty than 10 percent, but it's still got to be based

18  on the value of the minerals that was subject to this.  In

19  other words, the minerals that were subject to the operation

20  the Tenth Circuit described, 100 percent of that sets the

21  ceiling.  And again, if it relates to those minerals and to

22  that process, we produced it, we will produce it, it's going to

23  be out there.  It is this -- It is this effort to go further,

24  principally as to this AECI subpoena.  And, Your Honor, I would

25  just like to say our understanding, based on conferring with

1  our client, is that's the only purchaser of power for the

2  project.  I believe Ms. McClanahan is correct about that.  But

3  it is this effort to capture any and everything about the

4  project that we submit cannot be squared with the language I

5  just quoted for the court.

6      And this *Davilla* case says nothing about disgorgement.

7  I've read *Davilla*.  *Davilla* is about an injunction and *Davilla*

8  said that the court had not engaged in the proper equitable

9  weighing.  *Davilla* does not say you get disgorgement.

10 *Davilla* -- disgorgement is never there, to the best I can tell,

11 from at least the Tenth Circuit's opinion and the district

12 court in the Western District.  It says absolutely nothing

13 about disgorgement.

14     Your Honor, I just believe, at bottom, the requirement to

15 get a lease was triggered by very specific activities.  It's

16 not just because the project is there.  It's not just because

17 you broke ground.  It's because of very specific activities.

18 Discovery about those activities has been provided and will be

19 provided.  It is this effort to go to the project's revenues

20 more generally that is not proper and we submit that that

21 should at least be deferred until we have an answer from Judge

22 Frizzell to that question.

23          **THE COURT:**  Thank you.

24     Yes, Ms. McClanahan?

25          **MS. McCLANAHAN:**  Your Honor, could I just add one

1    thing?

2            **THE COURT:**  Of course.

3            **MS. McCLANAHAN:**  Regarding, you know, what kind of

4    lease would they have, they most likely, and I don't think it's

5    fair to put this boundary along discovery, to say that they

6    would have only negotiated for the exact rock that was crushed,

7    just like the landowners did not, they're recognizing $250,000

8    per year.  And as Osage Wind, you know, was very proud to tell

9    Judge Frizzell earlier in the case regarding whether or not the

10   balance of harms would allow for an injunction in the oil and

11   gas case, and they were saying, you know, that these landowners

12   have entered into pre-construction during excavation,

13   post-construction leases, and based on the kinds of sales that

14   we are able to make for electricity they may take home $250,000

15   per year.  There's no reason to think that the mineral estate

16   owner would have said, "But I will simply settle for, you know,

17   some 10 percent or even 100 percent of exactly the minerals

18   that you take, I'm not interested in any of this royalty type

19   provision that the surface owners are apparently selling to

20   you."

21       I would also say that, on remand, *Davilla* certainly did

22   consider disgorgement, and there's quite a bit of activity in

23   the case after that.  It appears to me, I'm just looking at the

24   docket, that it did settle, but there was discovery regarding

25   disgorgement and that was an open avenue of redress for the

1   harms that were had there.

2       And, of course, in *Davilla*, we actually had a lease, so

3   they had done the right thing, the company had done the right

4   thing with getting a lease, and then it stayed over after the

5   lease for quite a period of time.  Here, there never was a

6   lease.  We don't have any basis to think, well, this is what

7   they probably would have settled for, that this is the way they

8   previously had negotiate these types of things.

9       Those were the only two points that I had to add.

10          **THE COURT:**  Thank you.

11          **MR. RAY:**  Judge, just very briefly.  I would just say

12   that this regulation contem- -- this is the guidance in the

13   very chapter of the Code of Federal Regulations that the Tenth

14   Circuit was considering that talks about what a lease looks

15   like.  It says it's royalty-based, based on the minerals that

16   were subject to these activities.  The Tenth Circuit defined

17   what those activities are in a very specific way when it said,

18   "The only reason you had to get a lease here is because you

19   sorted, crushed, and used."  So, our discovery should be based

20   on that set of conduct, and if it relates to that, Judge, we

21   have provided it and we will provide it.

22          **THE COURT:**  Thank you.

23       Okay.  I'm going to give the parties an oral ruling today.

24   I don't intend to issue a follow-up written order.  If you want

25   this legal ruling, of course, you can order a transcript, but I

 1   like to warn people in advance that this is what you're going

 2   to get.

 3       The motion to quash and alternative motion for protective

 4   order, docket 106, are both denied.

 5       As to both subpoenas, defendants moved to quash on grounds

 6   that the United States is not a proper party to the case.  As

 7   to the Hooper subpoena, defendants moved to quash on grounds of

 8   irrelevance because Hooper did not sort, crush, or exploit the

 9   minerals and, therefore, does not possess any relevant

10   information as to damages.

11       As to the AECI subpoena, defendants moved to quash on

12   grounds of irrelevance because equitable relief is not legally

13   available and is not adequately pled.  Alternatively,

14   defendants seek a protective order delaying production until

15   the district court rules on the above issues which are both

16   presented and currently pending motions.  Plaintiffs contend

17   that defendants lack standing to object to these subpoenas and

18   that all information is relevant to theories that are live and

19   remain part of this lawsuit.

20       First, the court finds defendants do have personal standing

21   to object to the extent the third parties are being asked to

22   produce documents containing defendants' proprietary or

23   confidential information.  However, with respect to any

24   confidentiality objections, the court finds the protective

25   order entered sufficient to protect defendants' confidential

1   contracts or pricing information.  Plaintiff does not object to

2   defendants' contacting third parties and discussing any

3   information that this should be produced pursuant to the terms

4   of the protective order.

5       With respect to the relevance objection and timing issues,

6   I find no need to reach plaintiff's standing objection.  This

7   court has the power on my own motion to quash or modify a

8   third-party subpoena that seeks wholly irrelevant information,

9   which is defendants' primary argument in this case.  I also

10  have authority to control the timing of discovery and entertain

11  any arguments about delaying production pending rulings by the

12  district judge.  So, I really don't think the standing argument

13  is relevant as to those because I have authority to reach both

14  of those issues on my own motion in relation to a third-party

15  subpoena.

16      So, with that, reaching the substance, the court first

17  rejects the argument seeking to quash or delay the subpoenas

18  based on the United States not being a proper party in the

19  case.  The United States is currently the party prosecuting

20  this case on remand and it has not been dismissed.  That issue

21  will be decided in due course.

22      For purposes of discovery, I find it wholly permissible for

23  the United States to continue issuing discovery in the case

24  while that issue is pending.  Further, that is clearly what was

25  contemplated by Judge Frizzell at the scheduling conference.

1  He stated, "If there's a motion to excise them, we'll take that

2  up.  But I'm going to proceed here and set a discovery cutoff

3  date."  As a practical matter, some entity is going to have to

4  prosecute this case on remand and this information is going to

5  be requested by the Osage if not by the United States.  I find

6  no cause for quashing or modifying the subpoena based on the

7  United States' lack of status as a party.

8      As to defendants' relevance argument related to the Hooper

9  subpoena, the court finds the request relevant to the issue of

10 damages.  It is a completely open question in this litigation

11 whether Hooper's construction of the power lines resulted in

12 mining of the minerals under the Tenth Circuit's definition.

13 In my view, this is an entirely proper subject of discovery and

14 the United States is entitled to determine whether these

15 activities increased the amount of damages.

16     Contrary to defendants' argument, I find the Tenth Circuit

17 opinion not so clear that plaintiff should be entirely

18 foreclosed from any discovery on this topic and this is better

19 decided at later stages of the proceedings by Judge Frizzell.

20     As to the AECI subpoena, the court finds that Judge

21 Frizzell gave every indication that the United States was

22 entitled to discovery on this lost profits issue, even knowing

23 at the time that this was going to be an open legal question,

24 both as to whether the remedy was properly pled and whether the

25 remedy is available at all.  Further, as argued by the United

1  States, the court finds this information could be relevant to

2  trespass money damages, as well.

3      The United States indicated its concern at the sched- --

4  I'm sorry -- at the scheduling conference, the United States

5  indicated its concern that defendants' position on lost profits

6  would slow down discovery.  This exact issue was discussed and

7  Judge Frizzell stated, "It's not my intention that this case

8  slow down," and indicated his view that the United States would

9  be entitled to elect remedies after discovery on both issues.

10      So, reading that scheduling conference transcript, and

11  consistent with that intent, I find the request proper and

12  relevant to live issues in the case at this time.

13      Further, as admitted, there is no question the AECI

14  documents are relevant to any lost profits or disgorgement

15  equitable remedy that the United States constructs in the event

16  that it is permitted by the district judge.

17      So, those are the substantive reasons that those motions to

18  quash or somehow limit them are going to be denied.  I want to

19  be clear that I'm not making legal rulings or substantive legal

20  rulings on these questions.  I just find that they are live

21  issues in the case and that the requested discovery is relevant

22  to those live issues in the case.  I don't find any reason to

23  circumvent the discovery at this point in time.  The worst

24  thing that can happen is that the documents are produced and

25  then down the road the district court indicates that certain

1 remedy wasn't available.

2     Given the tight schedule that you've been given, that the

3 United States has been given, the six-month deadline, and given

4 Judge Frizzell's indication that he intends to keep that

5 deadline, I think a better outcome is to permit the discovery

6 at this time and let the United States have the information,

7 even knowing there's a chance it may not end up being used.

8 The bottom line is it's relevant because the issues are still

9 in the case.

10     Again, I find that any delay with respect to the

11 alternative request to delay production, the court finds delay

12 is not warranted and is, in fact, contrary to the scheduling

13 order's intent.  In setting the six-month discovery schedule,

14 Judge Frizzell was well aware there were unresolved legal

15 questions and he nonetheless told the United States, "We're

16 going to try to hold you to that six months" and "be sure to

17 get your experts and proceed apace."  So, I think any contrary

18 ruling by me at this juncture is very likely to hinder that, to

19 cause unnecessary delay, and I'm going to permit this discovery

20 to proceed at this time.

21     Is there anything further from the United States?

22         **MS. McCLANAHAN:**  No, Your Honor.

23         **THE COURT:**  Is there anything further, Mr. Ray?

24         **MR. RAY:**  The only thing potentially I can think of,

25 Your Honor, is what's the timing for production --

1          **THE COURT:**  Production?

2          **MR. RAY:**  -- of documents to occur?

3          **THE COURT:**  Let's discuss that.  Have the third

4   parties indicated when they might be able to produce these

5   documents?  Is that what you're getting at, Mr. Ray?

6          **MR. RAY:**  That is.

7          **THE COURT:**  A deadline, do you want this court to set

8   a deadline for the third parties?

9          **MR. RAY:**  I just raise that as a potential issue that

10  we may encounter.

11         **THE COURT:**  Well, sure.  Given everything I expressed

12  about my concerns about timing, --

13         **MR. RAY:**  Certainly.

14         **THE COURT:**  -- that seems legitimate.

15         **MS. McCLANAHAN:**  I believe all of the subpoena targets

16  that are at issue here had actually contacted us and they were

17  willing to turn over the documents.  They received phone calls

18  from defendants' counsel telling them not to do so.  They

19  received a copy of the motion that's currently --

20         **THE COURT:**  Sure.

21         **MS. McCLANAHAN:**  -- in front of you and discussed that

22  with me.  I have no reason to think that the documents -- AECI

23  has already produced some, and I believe it was Hooper's

24  counsel that said, "I'll have to find whatever I can find," and

25  they intended to comply with the subpoena, I believe, except

1   for the fact that defendants' counsel had instructed them not

2   to.

3            THE COURT:  What time do you think?  Seven days?

4            MS. McCLANAHAN:  I think seven days is reasonable,

5   yes.

6            THE COURT:  Okay.  I'm going to enter minutes that say

7   the motion to quash or motion for protective order is denied

8   for the reasons stated at the hearing, and then I'll set the

9   deadline for the third parties in that minute so that they

10  know.

11     Mr. Ray, does that -- do you have any other concerns about

12  that?

13           MR. RAY:  I think that's adequate, Judge.

14           THE COURT:  Okay.  All right.  Thank you.  Court's

15  adjourned.

16           THE DEPUTY COURT CLERK:  All rise.

17     (PROCEEDINGS CLOSED)

18                      **REPORTER'S CERTIFICATION**

19      WHILE NOT PRESENT IN PERSON TO STENOGRAPHICALLY REPORT THE

20  FOREGOING PROCEEDINGS, I CERTIFY THAT IT WAS TRANSCRIBED TO THE

21  BEST OF MY ABILITY FROM A DIGITAL AUDIO RECORDING.

22

                         CERTIFIED:   *s/Greg Bloxom*
23                                    Greg Bloxom, RMR, CRR
                                      United States Court Reporter
24                                    333 W. 4th Street, RM 411
                                      Tulsa, OK 74103
25                                    (918)699-4878
                                      greg_bloxom@oknd.uscourts.gov