**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| (2) Osage Minerals Council | ) | Case No. 14-CV-704-GKF-JFJ |
| | ) | |
| Intervenor-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1) OSAGE WIND, LLC; | ) | |
| (2) ENEL KANSAS, LLC; and | ) | |
| (3) ENEL GREEN POWER | ) | |
| NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**OSAGE MINERALS COUNCIL COMPLAINT IN INTERVENTION**

Intervenor-Plaintiff Osage Minerals Council seeks relief against Defendants and, in support thereof, states as follows:

**NATURE OF THE ACTION**

1.      The Osage Minerals Council ("OMC") is an independent agency within Osage Nation government created "for the sole purpose of continuing its previous duties to administer and develop the Osage Minerals Estate in accordance with the Osage Allotment Act of June 28, 1906, as amended." Osage Nation Const. art. XV, § 4.

2.      In this civil action, the OMC seeks declaratory judgment that the excavation activities of Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc. (collectively "Defendants") on the Osage Reservation were unlawful because Defendants failed to obtain all requisite OMC leases and permits, and federal regulatory approvals.

3.    Defendants conducted unauthorized mineral excavation activities in connection with the construction of industrial wind energy facilities on the Osage Reservation. As a part of this project, Defendants dug into and took minerals from the Osage Mineral Estate.

4.    The project consists of 84 wind turbines and associated infrastructure. Defendants excavated and constructed foundations for the wind turbines, as well as trenches for underground electrical lines. Defendants excavated numerous pits measuring approximately 60 feet in diameter and 10 feet deep. As part of this process, Defendants excavated soil, sand, and rock of varying sizes encountered during Defendants' excavation. Defendants crushed some of these extracted materials and used them to reinforce the concrete turbine foundations and for associated infrastructure. Decision from Circuit Court, Dkt. # 78.

5.    The OMC seeks a declaratory judgment that the activities of Defendants on the Osage Reservation were unlawful, and that Defendants were obligated to obtain the requisite OMC and federal regulatory approvals and to enter into appropriate leases and permits approved by the Secretary.

6.    As the Tenth Circuit concluded, the OMC possesses a "unique" interest that "is particularized and significant because the Osage Nation *owns* the beneficial interest in the mineral estate at issue." Decision from Circuit Court, Dkt. # 78 (emphasis in original).

7.    The United States Court of Appeals for the Tenth Circuit has agreed with the interpretation as set forth by the United States and the Intervenor-Plaintiff. Decision from Circuit Court, Dkt # 78.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction under 28 U.S.C. § 1345, which provides that the district courts shall have original jurisdiction in all civil actions commenced by the United States

or any agency thereof. *McCarty v. Hollis*, 120 F. 2d 540 (10th Cir. 1941). Defendants have admitted jurisdiction in this matter. Joint Status Report, Dkt. # 34.

9.      Venue is proper in this district under 28 U.S.C. § 1391(b), inasmuch as the property at issue is located on the Osage Reservation, which is contiguous with Osage County, Oklahoma. Defendants have admitted venue in this matter. Joint Status Report, Dkt. # 34.

## PARTIES

10.      Plaintiff United States is authorized to litigate this case in order to fulfill its fiduciary responsibility to protect tribal trust assets. *See United States v. Colvard*, 89 F. 2d 312 (4th Cir. 1937). The Osage Nation ("Osage Nation") is a federally recognized Indian Tribe. Thus, as trustee, the United States is charged with the administration, protection, and management of the Osage Mineral Estate, at issue in this action. *See* Act of June 28, 1906 ch. 3572, § 3, 34 Stat. 539, 543-44, amended in relevant part by Act of Mar. 2, 1929, ch. 493, 45 Stat. 1478 (extending restricted trust status of mineral estate to 1959); Act of June 24, 1938, ch. 645, 52 Stat. 1034 (extending restricted trust status of the mineral estate to 1983); Act of Oct. 21, 1978, Pub. L. 95–496, 92 Stat. 1660 (extending restricted trust status of minerals estate in perpetuity). In furtherance of those trust responsibilities, the Bureau of Indian Affairs ("BIA") has promulgated and administers regulations governing activities affecting the Osage Minerals Estate. The United States brings this lawsuit in its capacity as trustee of the Osage Mineral Estate, as well as to enforce compliance with federal law.

11.      The Osage Minerals Council ("OMC") is an independent agency within the Osage Nation established to administer and develop the Osage Mineral Estate. Osage Nation Const. art. XV, § 4.

12. The Osage Nation Constitution empowers the OMC with primary authority to preserve and protect the Osage Mineral Estate, including the initiation and prosecution of claims for damage caused to the Osage Mineral Estate. Specifically, the Osage Nation Constitution, art. XV, §3, establishes the OMC's authority to litigate on behalf of the Osage Mineral Estate, stating that: "The right to income from mineral royalties shall be respected and protected by the Osage Nation through the Osage Minerals Council . . . ." *Id.* at § 3; *see also* Osage Nation Congress, Resolution 11-22 at ¶ 4 (Sept. 26, 2011) ("The Osage Minerals Council has the authority to act for, to protect the interests of [the Osage Nation] with respect to matters relating to the Osage Mineral Estate, including the initiation, prosecution and settlement of claims relating to the Osage Mineral Estate. . .").

13. Defendant Osage Wind, LLC, is a Delaware limited liability company and has its headquarters at 717 Kihekah Avenue, Pawhuska, Oklahoma 74056. It is a wholly-owned subsidiary of Tradewind Energy, Inc., an Enel Green Power Company. Until March 2019, when Enel Green Power North America acquired Tradewind Energy, Inc., Osage Wind, LLC was a wholly-owned subsidiary of Enel Kansas, LLC. Corporate Disclosure Statement, Dkt. # 7.

14. Tradewind Energy, Inc., is incorporated in Kansas and is headquartered at Southlake Technology Park, 16105 West 113th Street, Suite 105, Lenexa, Kansas 66219. In 2013, Tradewind Energy purchased Wind Capital Group, LLC's 100% ownership interests in Osage Wind, LLC.

15. Enel Green Power and Tradewind Energy have been strategic partners since 2006. Since March 2019, Tradewind Energy, Inc. has been 100% owned by Enel Kansas, LLC.

16. Defendant Enel Kansas, LLC, is a Delaware limited liability company and has its headquarters at Southlake Technology Park, 16105 West 113th Street, Suite 105, Lenexa, Kansas

66219. It is a wholly-owned subsidiary of Enel Green Power North America, Inc. Corporate Disclosure Statement, Dkt. # 7.

17.     Defendant Enel Green Power North America, Inc. is a wholly-owned subsidiary of Enel Green Power International, BV, a Netherlands corporation. It is incorporated under the laws of Delaware and has its headquarters at One Tech Drive, Suite 220, Andover, Massachusetts 01810. Corporate Disclosure Statement, Dkt. # 7.

18.     Enel Green Power North America, Inc. has been intricately involved in the development of the Osage Wind Project from the beginning, including conversations with the BIA about the legality of Defendants' excavation of the Osage Mineral Estate without the requisite permit—or lack thereof. For instance, on October 20, 2014—after receiving BIA's October 9, 2014 letter demanding that Defendants' excavation activities cease—Jeff Riles, then Manager of Regulatory Affairs for Enel Green Power North America, Inc., met with the BIA Regional Director to discuss Defendants' excavation activities. Mr. Riles offered to respond to the BIA's questions and also offered to schedule a field trip for the BIA to view Defendants' operations.

19.     Enel Green Power International, BV is a wholly-owned subsidiary of Enel Green Power, SpA, a publicly-traded Italian corporation. Corporate Disclosure Statement, Dkt, # 7.

20.     Enel Green Power SpA is 69% owned by Enel SpA, a publicly-traded Italian corporation, and 31% openly traded public markets. Corporate Disclosure Statement, Dkt, # 7.

21.     Enel Green Power SpA, Enel Green Power International, BVA, and their subsidiaries in other countries have exhibited a pattern of extracting resources from Indigenous communities without their consent, especially in Central and South America. Indigenous communities affected by Enel's wind development in their regions—such as the Isthmus of

Tehuantepec—have raised complaints similar to those raised by the OMC and BIA in the current action. Specifically, international Indigenous communities have issued complaints against Defendants Enel Green Power SpA, Enel Green Power International, BVA, and their subsidiaries, concerning their lack of formal consultation processes, illegal land leasing contracts, and environmental impacts on construction and operation phases.

## FACTS

### The Osage Nation

22.     The Osage Nation is a federally-recognized Indian Tribe with a long history of treaty and trust relations with the United States.

23.     After conflict with white settlers on the former Osage Reservation in Kansas, the Osage Nation agreed to move from Kansas to the Indian Territory in 1870.

24.     The leadership of the Osage Nation at that time sent Wa-ti-an-ka and other men to what is now the Osage Reservation to look at this land. When they returned, Wa-ti-an-ka advised the Tribe that "the Osages should move to this place . . . because he believed that there was something in this land that would take care of the Osage people in the future. Our children would never starve, and our elders could live without fear." *Legislative Field Hearing on H.R. 2912, To Reaffirm the Inherent Sovereign Rights of the Osage Tribe to Determine Its Membership and Form of Government Before H. Comm. on Resources*, 108th Cong. 14-15 (2004) (statement of Jim Gray, Principal Chief, Osage Tribe).

25.     Based on this advice, the Osage Nation purchased the current Osage Reservation in fee simple from the Cherokee Nation. Act of July 15, 1870, ch. 296, 16 Stat. 362-63 (1879).

26.     In 1872, the United States Congress established the purchased lands as the Osage Reservation. An Act to Confirm to the Great and Little Osage Indians a Reservation in Indian Territory, Act of June 5, 1872, ch. 10, 17 Stat. 228.

27.     The Osage Reservation is contiguous with Osage County, Oklahoma.

28.     After over a century of governance prescribed by federal law, the Osage Nation is now governed in accordance with the Constitution of the Osage Nation, which provides for a three-branch government—Congress (legislative), Chiefs (executive), and Judicial.

29.     In addition to the three-branch government, the Constitution of the Osage Nation also establishes an independent agency, the Osage Minerals Council, responsible for the administration and development of the Osage Mineral Estate.

**The 1906 Osage Allotment Act and the Osage Mineral Estate**

30.     In 1906, Congress enacted the Osage Allotment Act, which separated the mineral estate (subsurface) from the approximate 1.47-million-acre surface estate of the Osage Reservation and placed the mineral estate in trust for the Tribe (the "Osage Mineral Estate"). *See* Act of June 28, 1906, ch. 3572, 34 Stat. 539. The surface estate was allotted to individual members of the Osage Nation for the purpose of homesteading. *Id.* at §2. Congress regarded the surface estate as suitable for farming and grazing. S. Rep. No. 59-4210, 59th Congress (1906) (Division of the Lands and Funds of Osage Indians, Oklahoma) at 2.

31.     Congress, in the Osage Allotment Act and its subsequent amendments, specifically reserved "oil, gas, coal, or other minerals covered by the lands" to the Osage Tribe. Act of June 28, 1906, ch. 3572, § 3, 34 Stat. 539. In severing the mineral estate from the surface estate, Congress did not contemplate uses of the surface estate which would interfere with the mineral estate beyond those normally associated with homesteading, farming, and grazing.

32.     In 1921, Congress "authorized and directed" the Secretary of the Interior and the Osage Nation to offer for lease any unleased Osage land for oil and gas exploration purposes "as long thereafter as oil or gas is to offer for lease "as long thereafter as oil or gas is found in paying quantities . . . ."  Act of March 3, 1921, ch. 120, 41 Stat. 1249.

33.     In 1929, Congress authorized and directed that "not less than twenty five thousand acres" of Osage land must "be offered for lease for oil and gas mining purposes during any one year . . . ." Act of March 2, 1929, ch. 493, 45 Stat. 1478, 1479.

34.     In 1978, Congress authorized the Secretary to establish regulations that allow for unitization of Osage oil and gas leases—or merger of leases producing from a common source of supply without regard to surface boundary issues—to "provide for the greatest ultimate recovery of oil and gas under lying the Osage mineral estate . . . ."  An Act to amend certain laws relating to the Osage Tribe of Oklahoma, and for other purposes, Pub. L. 95–496, § 4, 92 Stat. 1660 (1978).

35.     The surface estate of the Osage Reservation is subservient to the Osage Mineral Estate.

36.     The provisions of the Osage Allotment Act and its subsequent amendments addressing leasing and mining of the Osage Mineral Estate are implemented through regulations promulgated by the Department of the Interior. *See id.* ("[L]eases for all oil, gas, and other minerals, covered by selections and division of land herein provided for, may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe . . . ."). The regulations governing leases for the purpose of mining the Osage Mineral Estate, excluding oil and gas, are outlined at 25 C.F.R. Part 214.

37.     Part 214 provides that "[n]o mining or work of any nature will be permitted upon any tract of land until a lease covering such tract shall have been approved by the Secretary of the Interior and delivered to the lessee." 25 C.F.R. § 214.7.

38.     Part 214 also provides that "[l]eases of minerals other than oil and gas may be negotiated with the tribal council after permission to do so has been obtained from the officer in charge [the superintendent of the Osage Indian Agency." 25 C.F.R. § 214.2.

39.     Mining is defined in 25 C.F.R. § 211.3—which governs the development of Indian mineral resources generally—as:

> the science, technique, and business of mineral development including, but not limited to: opencast work, underground work, and in-situ leaching directed to severance and treatment of minerals; Provided, when sand, gravel, pumice, cinders, granite, building stone, limestone, clay or silt is the subject mineral, an enterprise is considered 'mining' only if the extraction of such a mineral exceeds 5,000 cubic yards in any given year.

25 C.F.R. § 211.3.

**Administration and Management of the Osage Mineral Estate: Osage Minerals Council and Bureau of Indian Affairs**

40.     The OMC was established by the Osage Nation Constitution for the purpose of "administer[ing] and develop[ing] the Osage Mineral Estate in accordance with the Osage Allotment Act of June 28, 1906, as amended." Osage Nation Const. art. XV, § 4. In administering and developing the Osage Mineral Estate, the OMC is "obligat[ed] to ensure the preservation of the Osage Mineral Estate . . . ." *Id.*

41.     As the administrator and developer of the Osage Mineral Estate, the OMC has "the power to consider and approve leases and to propose other forms of development of the Osage Mineral Estate" in compliance "with applicable federal law and all laws and regulations of the Osage Nation." *Id.*

42.     Once the OMC enters into a lease for the Osage Mineral Estate, the Department of the Interior, through the Superintendent of the Osage Agency, must approve the lease in order for it be legally binding. *See* Act of June 28, 1906, ch. 3572, § 3, 34 Stat. 539 ("leases for all oil, gas, and other minerals, covered by selections and division of land herein provided for, may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe . . . .").

**Defendants Willfully Avoided Obtaining a Lease for Mining Activities**

43.     In 2010, the Defendants leased surface rights to approximately 8,400 acres of lands in Osage County, Oklahoma, for the purpose of constructing industrial wind energy facilities.

44.     In 2011, prior to Defendants' construction of the eighty-four planned wind turbines, the United States and the Osage Nation expressed concern about the wind facilities, and possible interference the facilities might have with the Osage Mineral Estate. At this time, the United States, the Osage Nation, and the Osage Minerals Council were not aware of the scope of the Defendants project—specifically, that Defendants' excavation of the Osage Mineral Estate would exceed 5,000 cubic yards such that Defendants' excavation activities would trigger the mining regulations in Part 214. But at this same time, however, Defendants were aware that "[p]ursuant to the Osage Allotment Act of 1906, the Osage Nation owns and has the authority to lease all of the Mineral Estate located under its former reservation." *See Osage Nation v. Wind Capital Group, LLC et al*., Case No. 11-CV-643-GKF-PJC, Pl.'s Tr. Br. 3 (N.D. Okla. Dec. 12, 2011).

45.     In October 2013, the Defendants initiated site preparation and new road construction, and by September 2014, began excavation work for the 84 wind turbines,

underground collection lines, an overhead transmission line, two permanent meteorological towers, and a network of access roads.

46.     On October 9, 2014, the Superintendent of the Osage Agency, Robin Phillips, wrote to Defendant Enel Green Power North America, Inc., and demanded that the subject activities cease until an appropriate permit or lease for the excavation and use of minerals from the Osage Mineral Estate was approved by the Osage Minerals Council and the BIA.

47.     On October 29, 2014, three weeks after Superintendent Phillips issued her demand letter to Defendants, the Osage Minerals Council approved Resolution 3-25, requesting the assistance of the United States to protect the Osage Mineral Estate.

48.     Despite previous dealings with the Osage Minerals Council and the United States, and despite their knowledge of the Osage Nation's ownership over the Osage Mineral Estate, Defendants never took any action to obtain a lease for mining the Osage Mineral Estate from the OMC.

49.     Defendants willfully and intentionally, and in bad faith, entered and disrupted the Osage Mineral Estate and unlawfully excavated minerals therefrom. Instead of abiding the BIA Superintendent's instructions in the October 9, 2014 letter and obtaining a lease, Defendants rushed to commence and complete their construction and excavation. By November 21, 2014— just six weeks after the BIA Superintendent told Defendants their actions were unlawful— Defendants had completed their excavation of the Osage Mineral Estate.

50.     Defendants willfully and intentionally, and in bad faith, entered and disrupted the Osage Mineral Estate, despite clear orders to cease activities until an appropriate permit or lease was approved by the OMC and BIA, and accordingly, the balance of equities tip in the OMC's favor and warrant the provision of injunctive relief.

51.     In November 2014, the United States, as trustee for the Osage Nation, filed this lawsuit to halt Defendants' excavation work on the basis that such sand, soil, and rock extraction by Osage Wind was 'mining' under 25 C.F.R. § 211.3 and thus required a mineral lease under 25 C.F.R. § 214.7.

**Defendants' Mining Activities Violated Federal Law and the Sovereign Authority of the Osage Nation**

52.     Since the beginning stages of their industrial wind energy project, Defendants have rejected the demands of the United States to comply with federal law, electing to complete massive excavations without an adequate lease, despite having notice of the lease requirement.

53.     In the course of constructing the 84 wind turbines, Defendants constructed large, concrete foundations that required large areas of the Osage Mineral Estate—measuring approximately 10 feet deep and 60 feet in diameter—to be excavated.

54.     For each concrete foundation, Defendants excavated approximately 19,440 cubic feet (720 cubic yards) of dirt, sand, gravel, limestone, and other common minerals—excavating a total of 1,632,959 cubic feet (60,480 cubic yards) of the minerals owned by the Osage Nation, an amount 12 times more than the 5,000 cubic yards excepted from leasing requirements under 25 C.F.R. § 211.3.

55.     For each of the turbines, Defendants dug pits measuring more than 60 feet wide and 30 feet deep and excavating limestone, sandy soil and other minerals from the subsurface estate. Rock from the excavations came out in pieces of varying size and shape.

56.     During the excavation, rocks larger than three feet long were removed from the subsurface and placed on the surface near the foundation hole. Minerals smaller than three feet were crushed to less than three inches. After each foundation was poured and cured, Defendants

used the minerals they had excavated and crushed, which were approximately 75% of the materials excavated—or 45,630 cubic yards—for backfill and compacting.

57.     Because Defendants used the minerals they excavated from the Osage Mineral Estate as backfill for their wind turbine foundations, Defendants did not have to purchase backfill elsewhere.

58.     In late November 2014, the United States discovered that the Defendants had completed their excavation of the Osage Mineral Estate. Accordingly, the United States withdrew its request for an injunction and filed an amended complaint.

59.     In their exploitation of the subsurface Osage Mineral Estate, Defendants exercised and maintained control and/or possession of portions of the rightful property of the OMC and the Osage Nation: the Osage Mineral Estate.

60.     The continued operations of the Osage Wind Project wind turbines threatens irreparable harm to the Osage Mineral Estate, as continued operations without the requisite lease, permit, or approval required by federal law eliminates the ability of the OMC to exercise its inherent sovereign authority over the Osage Mineral Estate, a harm that cannot be compensated adequately by monetary damages. Defendants' elimination of the OMC's ability to exercise its sovereign authority and determine the fate of the Osage Mineral Estate in this matter is a harm that will continue to give rise to irreparable harm until Defendants' operations are enjoined and the OMC's inherent and statutory authority to govern the Osage Mineral Estate is restored.

61.     The public interest will be served by a permanent injunction that prohibits Defendants' continued trespass because compliance with federal laws serves a significant public interest. Defendants failed to comply with federal law when they refused to follow the BIA's instructions and obtain the requisite permit, and instead entered and disrupted the Osage Mineral

Estate and unlawfully excavated minerals therefrom in direct violation of 25 C.F.R. § 211 and/or 25 C.F.R. § 214.

62.     Compliance with federal laws serves the public interest by protecting the public from serious harm, both known and unknown, associated with wind energy generation and the electronic field created around wind farms which may produce enough transient voltages to sufficiently increase rates of cancer, diabetes, heart disease, and attention-deficit disorder.

63.     On September 30, 2015, this Court awarded summary judgment to Defendants, concluding that their excavation work did not constitute "mining" under § 211.3, and thus, did not trigger the leasing required of § 214.7.

64.     Following this Court's decision, the OMC moved to intervene in this proceeding for the purpose of filing an appeal, but this Court denied the OMC's motion for "lack of jurisdiction due to the pending appeal."

65.     Upon this Court's denial of the OMC's motion to intervene, the OMC appealed the denial to the Tenth Circuit.

66.     On appeal, the Tenth Circuit determined that the OMC was an appropriate party to the merits appeal, and further concluded that Defendants' excavation of the Osage Mineral Estate constituted mining under 25 C.F.R. § 211.3, and thus, required a lease pursuant to 25 C.F.R. § 214.7.

67.     Defendants' excavation continued in earnest until completed, according to Defendant, on December 15, 2014. Resp. in Supp. of Mot., Dkt. # 27 at Exhibit A.

68.     In August 2011, Shidler Public Schools Superintendent John Herzig anticipated an infusion of about $1.5 million a year into the Shidler School District from property taxes collected on Osage Wind's turbines.

14

69.     In 2015, the Wind Energy Industry Impacts in Oklahoma Report completed by the State Chamber of Oklahoma Research Foundation projected the revenue from the Osage Wind Project to be $62,273,489.

70.     In June 2017, Shidler Public Schools received $285,000 in combined tax revenue from the Osage Wind Project and the Mustang Run Wind Project, both of which are 100% held by Tradewind Energy, Inc as of 2019.

71.     In 2017, Enel Green Power North America recognized the release of 170 million EU in deferred taxes in response to U.S. tax reform.

72.     In 2018, Enel Green Power North America was ranked the largest wind operator in Oklahoma with more than 1,700 MW of managed capacity across 10 wind farms and had an overall investment of 2.7 billion U.S. dollars in the state since 2012.

73.     In the first half of 2019, The Enel Group received a 51.9% revenue increase from its United States and Canada geographical areas, which it attributed to an increase in wind generation in the United States and Canada.

## COUNT I

### DECLARATION REGARDING THE APPLICABILITY AND VIOLATION OF 25 C.F.R. § 211

74.     The OMC realleges and incorporates the preceding paragraphs.

75.     The Defendants have engaged in unauthorized mining and excavation in the subsurface lands of the Osage Mineral Estate without first obtaining a lease and permit approved by the OMC and Secretary.

76.     25 C.F.R. § 211 sets forth the regulations that are generally applicable to the leasing of tribal lands for mineral development. Although these regulations specifically carve out from their coverage certain sets of regulations for specified Indian Tribes (*see* 25 C.F.R. §

211.1(e)), no such carve out is made for the Osage Nation. Thus, by their terms, the regulations in § 211 are applicable to the mining and extraction of solid minerals from the subsurface lands of the Osage Mineral Estate.

77.     25 C.F.R. § 211.48 explicitly prohibits "exploration, drilling, or mining operations" on Indian land without obtaining from the Secretary (a) "written approval of a mineral lease or permit" and (b) "[a]fter a lease or permit is approved, written permission…before any operations are started on the leased premises."

78.     25 C.F.R. § 211.3 defines "Indian Land" as "any lands owned by any individual Indian . . . . or other tribal group which owns land or interests in the land, the title to which is held in trust by the United States or is subject to a restriction against alienation imposed by the United States." In the case of the Osage Nation, the Indian lands are the subsurface Osage Mineral Estate which was reserved by Congress for the benefit of the Tribe.

79.     25 C.F.R. § 211.3 defines "mining" as "the science, technique, and business of mineral development." Further, that section provides that "mining" includes, but is not limited to, "opencast work, underground work, and in-situ leaching." When the subject mineral is sand, gravel, pumice, cinders, granite, building stone, limestone, clay or silt, extraction is only "mining" if it exceeds "5,000 cubic yards in any given year."

80.     Defendants have extracted significantly more than 5,000 cubic yards of sand, gravel, pumice, cinders, granite, building stone, limestone, clay or silt since commencing construction in 2014; Defendants, however, never obtained the requisite permits required under 25 C.F.R. § 211. Defendants, therefore, wrongfully engaged in "mining" under the definition set forth in the Code of Federal Regulations, as interpreted by the U. S. Court of Appeals. Decision from Circuit Court, Dkt. # 78.

81.     According to the U. S. Court of Appeals (Dkt. # 78), Defendants have exploited the subsurface Osage Mineral Estate by excavating, extracting, severing, converting, and crushing minerals without obtaining a proper lease, permit, or approval as required by federal law.

82.     By reason of the U. S. Court of Appeals decision in this matter (Dkt. # 78) and now as law of the case, this Court should declare judgment that Defendants' activities required compliance with 25 C.F.R. § 211 and that the express terms of that section have been violated by Defendants.

83.     Defendants are jointly and severally liable for all damages that resulted from their violations of 25 C.F.R. § 211.

### COUNT II

### DECLARATION REGARDING THE APPLICABILITY
### AND VIOLATION OF 25 C.F.R. § 214

84.     The OMC realleges and incorporates by reference the preceding paragraphs.

85.     The regulations applicable to mining on Osage Reservation lands provide that "[n]o mining or work of any nature will be permitted upon any tract of land until a lease covering such tract shall have been approved by the Secretary of the Interior and delivered to the lessee." 25 C.F.R. § 214.7. Here, according to the Tenth Circuit, the Defendants have violated the regulations because they engaged in mining or other work without having first obtained an appropriate lease and prior approvals. Decision from Circuit Court, Dkt. # 78 at p. 26.

86.     "Leases of minerals other than oil and gas may be negotiated with the tribal council after permission to do so has been obtained from the officer in charge [the Superintendent of the Osage Agency]." 25 C.F.R. § 214.2. Defendants, however, failed to obtain

an approved lease from the OMC regarding the mining or other work Defendants performed on the Osage Mineral Estate.

87.     By reason of the U. S. Court of Appeals decision in this matter (Dkt. # 78) and now as law of the case, this Court should declare that Defendants' activities required compliance with 25 C.F.R. § 214 and that the express terms of that section have been violated by Defendants.

88.     Defendants are jointly and severally liable for all damages that resulted from their violations of 25 C.F.R. § 214.

## COUNT III

### TRESPASS

89.     The OMC realleges and incorporates by reference the preceding paragraphs.

90.     Defendants were never authorized to extract minerals from the Osage Mineral Estate. Defendants never entered into a lease or had a lease approved by the Secretary to extract, excavate or make use of minerals.

91.     Defendants were prohibited from extracting and excavating minerals pursuant to 25 C.F.R. § 211 and/or pursuant to 25 C.F.R. § 214. Decision from Circuit Court, Dkt. # 78.

92.     Defendants willfully and intentionally, and in bad faith, entered and disrupted the Osage Mineral Estate and unlawfully excavated minerals therefrom. On October 9, 2014, Superintendent Phillips sent a letter to Defendant Enel Green Power North America, Inc., informing Defendants that they could not lawfully excavate minerals from the Osage Wind Project without obtaining a lease.

93.     Instead of abiding the BIA Superintendent's instructions and obtaining a lease, Defendants rushed to commence and complete their construction and excavation. By November

21, 2014—just six weeks after the BIA Superintendent told Defendants their actions were unlawful, Defendants had completed their excavation of the Osage Mineral Estate.

94.     By willfully and intentionally, and in bad faith, entering and disrupting the Osage Mineral Estate, despite clear orders to cease activities until an appropriate permit or lease was approved by the OMC and BIA, Defendants have tipped the balance of equities tip in the OMC's favor, and accordingly, Defendants' conduct warrants the provision of injunctive relief.

95.     Defendants knew or should have known that they were required to comply with the express provisions of 25 C.F.R. § 211 or 25 C.F.R. § 214.

96.     By conducting unauthorized and unapproved mining or work related to minerals, as contemplated by 25 C.F.R. § 211 or 25 C.F.R. § 214, Defendants trespassed on the Osage Mineral Estate, in violation of law and, in doing so, caused damages.

97.     Defendants are co-trespassers and are jointly and severally liable for all damages that resulted from the trespass.

## COUNT IV

### CONTINUING TRESPASS

98.     The OMC realleges and incorporates by reference the preceding paragraphs.

99.     Defendants were never authorized to extract minerals from the Osage Mineral Estate. Defendants did not enter into a lease or have a lease approved by the Secretary to extract, excavate or make use of minerals.

100.     Defendants were prohibited from invading, extracting and excavating minerals pursuant to 25 C.F.R. § 211 and/or 25 C.F.R. § 214. Decision from Circuit Court, Dkt. # 78.

101.     Defendants entered and disrupted the Osage Mineral Estate and unlawfully excavated minerals therefrom, in a manner constituting continuing trespass.

102.    Defendants knew or should have known that they were required to comply with the express provisions of 25 C.F.R. § 211 or 25 C.F.R. § 214.

103.    By placement of the turbine foundation and other materials, Defendants trespassed on the Osage Mineral Estate, in violation of law and, in doing so, caused damage to the Estate. The insertion and placement of materials or structures in the Osage Mineral Estate is a continuing trespass and diminishes the Estate or diminishes the use and enjoyment of the Osage Mineral Estate for the OMC.

104.    The public interest will be served by a permanent injunction that prohibits Defendants' continued trespass because compliance with federal laws serves a significant public interest. Defendants failed to comply with federal law when they refused to follow the BIA's instructions and obtain the requisite permit, and they failed to comply with federal law when they instead entered and disrupted the Osage Mineral Estate and unlawfully excavated minerals therefrom in direct violation of 25 C.F.R. § 211 and/or 25 C.F.R. § 214.

105.    Compliance with federal laws serves the public interest by protecting the public from serious harm, both known and unknown, associated with wind energy generation and the electronic field created around wind farms which may produce enough transient voltages to sufficiently increase rates of cancer, diabetes, heart disease, and attention-deficit disorder.

106.    Defendants are co-trespassers and are jointly and severally liable for all damages that resulted from the continuing trespass.

## COUNT V

### CONVERSION

107.    The OMC realleges and incorporates by reference the preceding paragraphs.

108.     The Osage Allotment Act severed the mineral estate from the surface estate of the Osage Reservation and placed the mineral estate in trust for the Tribe. As trustee, the United States is charged with the administration, protection, and management of the estate.

109.     According to the U. S. Court of Appeals, Defendants were prohibited from extracting and excavating minerals pursuant to 25 C.F.R. § 211 or pursuant to 25 C.F.R. § 214 until or unless they obtained the requisite permits authorizing them to do so. Decision from Circuit Court, Dkt. # 78.

110.     Defendants willfully and intentionally, and in bad faith, entered and disrupted the Osage Mineral Estate and unlawfully excavated minerals therefrom. On October 9, 2014, Superintendent Phillips' October 9, 2014 sent a letter to Defendant Enel Green Power North America, Inc., informing Defendants that they could not lawfully excavate minerals from the Osage Wind Project without obtaining a lease.

111.     Instead of abiding by the BIA Superintendent's instructions and obtaining a lease, Defendants rushed to commence and complete their construction and excavation. By November 21, 2014—just six weeks after the BIA Superintendent told Defendants their actions were unlawful, Defendants had completed their excavation of the Osage Mineral Estate.

112.     By willfully and intentionally, and in bad faith, entering and disrupting the Osage Mineral Estate, despite clear orders to cease activities until an appropriate permit or lease was approved by the OMC and BIA, Defendants have tipped the balance of equities in the OMC's favor, and accordingly, Defendants' conduct warrants the provision of injunctive relief.

113.     Defendants knew or should have known that they were required to comply with the express provisions of 25 C.F.R. § 211 or 25 C.F.R. § 214.

114. By conducting unauthorized and unapproved mining or work related to minerals, as contemplated by 25 C.F.R. § 211 or 25 C.F.R. § 214, Defendants converted, and had control and possession over, property belonging to the Osage Mineral Estate and, in doing so, caused damage to the Estate. So long as the Osage Wind Projects continue in operation, Defendants will continue their unlawful use and possession of excavated minerals from the Osage Mineral Estate. Defendants' continued unlawful use and possession of excavated minerals from the Osage Mineral Estate creates a harm that cannot remedied by monetary damages and, therefore, necessitates the imposition of injunctive relief.

115. Defendants are jointly and severally liable for all damages that resulted from the conversion.

## **PRAYER FOR RELIEF**

WHEREFORE, the OMC respectfully requests that this Court:

116. Enter a declaratory judgment under 25 U.S.C. § 2218 (confirming the law of the case established by the U. S. Court of Appeals) that Defendants are in violation of 25 C.F.R. § 211 and that mining and excavation activities undertaken by Defendants were and are subject to the regulations set out at 25 C.F.R. § 211. Decision from Circuit Court, Dkt. # 78.

117. Enter a declaratory judgment under 25 U.S.C. § 2218 (confirming the law of the case established by the U. S. Court of Appeals) that Defendants are in violation of 25 C.F.R. § 214 and that the mining and excavation activities and work of any nature undertaken by Defendants were and are subject to the regulations set out at 25 C.F.R. § 214. Decision from Circuit Court, Dkt. # 78.

118. Enter a judgment assessing damages or providing any appropriate remedy— whether monetary or sounding in equity, including disgorgement of profits—as determined, to

the Osage Mineral Estate for unlawful or unauthorized mining, excavation or other work, as set out in the federal regulations.

119.    Enter a judgment finding Defendants jointly and severally liable for any remedy, including monetary damages in an amount to be proven, ejectment or any other equitable remedy this Court finds appropriate, resulting from the trespass, continuing trespass, and conversion.

120.    Enter a judgment requiring Defendants to account or provide accounting for any and all excavation as well as all revenue attributable to the Osage Wind wind farm operation, mining and other work, as set out in governing federal regulations.

121.    Upon accounting (as sought above), enter a judgment in favor of Intervenor-Plaintiff disgorging all revenues resulting from the unlawful wind farm operation.

122.    Upon accounting (as sought above), enter a judgment in favor of Intervenor-Plaintiff to address the unjust enrichment resulting from the unlawful wind farm operation.

123.    Enter a judgment awarding damages, with interest, to the Intervenor-Plaintiff for trespass, conversion, and bad faith trespass and conversion to the extent allowed under the law, plus any applicable multipliers, additions, penalties and accruals to date of judgment.

124.    Enter appropriate permanent injunctive relief, enjoining Defendants from any further excavation, mining, continuing trespass, or other work that concerns the Osage Mineral Estate, including but not limited to ejectment—until or unless the requisite leases are approved the Secretary and the OMC.

125.    Award such other and further relief, including all legal remedies and all equitable remedies which may be available to the Intervenor-Plaintiff, as the Court determines to be just and proper.

Respectfully submitted,

s/ Wilson Pipestem
Wilson Pipestem, OBA No. 16877
Mary Kathryn Nagle, OBA No. 33712
Abi Fain, OBA No. 31370
Pipestem Law, P.C.
320 S. Boston Ave., #1705
Tulsa, Oklahoma 74103
918-936-4705 (Office)
wkpipestem@pipestemlaw.com
mknagle@pipestemlaw.com
afain@pipestemlaw.com
*Counsel for Intervenor-Plaintiff*
*Osage Minerals Council*

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that on April 15, 2020, I electronically transmitted the foregoing to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Ryan A. Ray
Joel L. Wohlgemuth
rar@nwcjlaw.com
jlw@nwcjlaw.com

-and-

Lynn H. Slade
Sarah S. Stevenson
Deana M. Bennett
Spencer L. Edelman
lynn.slade@modrall.com
sarah.stevenson@modrall.com
deana.bennett@modrall.com
spencer.edelman@modrall.com
*Counsel for Defendants*

Cathryn Dawn McClanahan
cathy.mcclanahan@usdoj.gov
*Counsel for Plaintiff, United States*

David McCullough
dmccullough@dsda.com

Jeffrey S. Rasmussen
jrasmussen@ndnlaw.com

-and-

Wilson Pipestem
Mary Kathryn Nagle
Abi L. Fain
afain@pipestemlaw.com
mknagle@pipestemlaw.com
wkpipestem@pipestemlaw.com
*Counsel for Intervenor-Plaintiff, Osage Minerals Council*

     s/ Wilson Pipestem