# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, and THE OSAGE MINERALS COUNCIL, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) Case No. 14-CV-704-GKF-JFJ ) |
| OSAGE WIND, LLC; ENEL KANSAS, LLC; and ENEL GREEN POWER NORTH AMERICA, INC., | ) ) ) ) ) |
| Defendants. | ) |

## DEFENDANTS OSAGE WIND, LLC, ENEL KANSAS, LLC, AND ENEL GREEN POWER NORTH AMERICA, INC.'S REPLY BRIEF IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS THE OSAGE MINERALS COUNCIL'S COMPLAINT IN INTERVENTION

| | |
|---|---|
| Ryan A. Ray, OBA #22281<br>NORMAN WOHLGEMUTH CHANDLER<br>JETER BARNETT & RAY, P.C.<br>2900 Mid-Continent Tower<br>401 South Boston Avenue<br>Tulsa, OK 74103<br>918-583-7571<br>918-584-7846 (facsimile) | Lynn H. Slade, *admitted pro hac vice*<br>Sarah M. Stevenson, *admitted pro hac vice*<br>MODRALL, SPERLING, ROEHL,<br>HARRIS & SISK, P.A.<br>Post Office Box 2168<br>Albuquerque, NM 87103-2168<br>505-848-1800<br>505-848-9710 (facsimile) |

**ATTORNEYS FOR DEFENDANTS, OSAGE WIND, LLC, ENEL KANSAS, LLC AND ENEL GREEN POWER NORTH AMERICA, INC.**

**Dated: June 10, 2020**

**I.     OKLAHOMA LAW IS ADOPTED INTO FEDERAL LAW AS RELEVANT, BUT EVEN IF IT WERE NOT, THERE IS NO MATERIAL CONFLICT.**

The OMC contends that Oklahoma law applies only to its trespass claim, and not to any issue of remedy. (Dkt. # 158, at 7–8 & n.2).[1] On the question of remedies globally there is a "'presumption that state law should be incorporated into federal common law.'" *United States v. Turley*, 878 F.3d 953, 956 (10th Cir. 2017) (quoting *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 98 (1991)). "Displacement [of state law] will occur only where . . . a significant conflict exists between an identifiable federal policy or interest and the operation of state law or the application of state law would frustrate specific objectives of federal legislation." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988). Here, no federal statute gives the OMC the right to, for example, disgorgement, an accounting,[2] or an injunction.[3] Thus, there is no legislative objective to frustrate.

The OMC claims that there is purportedly an identifiable federal policy or interest— apparently applicable only in the Tribal context—allowing the "award[] [of] both monetary damages *and* equitable relief for trespass to Indian lands in order to 'reimburse the Tribe for the most profitable use of its land.'" (Dkt. # 158, at 8, quoting *United States v. Pend Oreille Pub. Util.*

---

[1] At the outset, this is not entirely correct. For just as the Tenth Circuit noted that it "lack[ed] a federal body of trespass law to protect the Allottees' federal property interests," *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 965 (10th Cir. 2019), there is similarly a lack of federal law on conversion, and the OMC has identified no such law. Without such law before the Court, the same principle must apply to conversion as it does to trespass *a fortiori*.

[2] The OMC Response claims that a "confidential relationship" can exist in many situations. (Dkt. # 158, at 18). While that may be true, "a confidential relationship cannot be unilateral . . . [and] it arises only if both parties understand that a special trust or confidence has been reposed." *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 107 F. Supp. 2d 841, 863 (W.D. Mich. 2000).

[3] This is not supported by the cases the OMC relies upon. For example, the Lanham Act—at issue in *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 475 (1962)—expressly confers the right to "recover . . . defendant's profits." 15 U.S.C. § 1117(a). The same is true of the Resource Conservation and Recovery Act—at issue in *United States v. Torlaw Realty, Inc.*, 483 F. Supp. 2d 967, 974 (C.D. Cal. 2007)—where 42 U.S.C. § 6928 expressly allows for the recovery of monetary penalties *and* injunctive relief.

*Dist. No. 1*, 28 F.3d 1544, 1551 (9th Cir. 1994)). But in *Pend Oreille*, unlike here, prospective injunctive relief was awarded to stop further, *future* flooding, while monetary damages for trespass were awarded to remedy the *past* flooding. In other words, there were two distinct "injuries" to be remedied, warranting distinct remedies. Here, there is no dispute that Osage Wind is not engaged in the activities which the Tenth Circuit found were "mining," and there is no plausible allegation that such activity continues. No cited or located authority awards an Indian Tribe—or any other party for that matter—both money damages and equitable relief for the same exact wrong, at least without specific, statutory authorization to do so, which is not present here.

In any event, on the key issues as to equitable relief, federal common law and Oklahoma law are not in conflict. "[I]n the federal courts equity has always acted only when legal remedies were inadequate." *SFF-TIR, LLC v. Stephenson*, 262 F. Supp. 3d 1165, 1200-01 (N.D. Okla. 2017). "[M]oney damages are an adequate remedy at law." *Tilton v. Capital Cities/ABC*, 827 F. Supp. 674, 682 (N.D. Okla. 1993). And proof of irreparable harm is a necessary element (which must also be pleaded) to obtain permanent injunctive relief under federal law. *Sw. Stainless, Ltd. P'ship v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009). Since the OMC cannot show—and has not plausibly pleaded—either irreparable injury or lack of an adequate remedy at law in this case, it cannot pursue equitable relief for each of these independent reasons.

II.     **THE WRONG FOUND BY THE TENTH CIRCUIT CANNOT SUPPORT EQUITABLE RELIEF.**

To properly consider the question of remedy, one must first remember what is and is not at issue in this case, and what the Tenth Circuit actually found. The Tenth Circuit was considering a regulation that prohibits mining without a lease—there is no provision of law in this case that prohibits, even arguably, a wind-energy project from operating. Thus, the Tenth Circuit cannot be said to have actually found, or even had a legal basis to have possibly found, that Osage Wind is operating an "illegal wind farm."

Originally in this Court, the United States had espoused that Defendants' activities amounted to "performing 'work of any nature' significantly impacting the Osage Mineral Reserve," which the United States apparently contended violated Part 214 irrespective of whether the activities amounted to "mining." (Dkt. # 24, at 6-7). The Tenth Circuit noted the OMC did not raise that argument on appeal. *United States v. Osage Wind, LLC*, 871 F.3d 1078, 1082 n.2 (10th Cir. 2017). Thus, given the United States' inaction and the OMC's waiver, the prohibition of "mining" was the only alleged wrong before the Tenth Circuit (and thus before this Court now).[4]

At its most basic level, the issue can be summarized as: no one can legitimately say that operating a wind energy project is "mining." Indeed, the Tenth Circuit rejected the assertion that merely breaking the ground or the Project's presence subsurface was unlawful:

> **We agree with Osage Wind, however, that merely encountering or incidentally disrupting mineral materials would not trigger § 211.3's definition.** In other words, "the simple removal of dirt does not constitute mining." 53A Am. Jur. 2d Mines and Minerals § 14. **There is simply no sense in which the word "mineral development" means only the removal of dirt** without some further manipulation, commercialization, or offsite relocation of it. The problem here is that Osage Wind did not merely dig holes in the ground—it went further. It *sorted* the rocks, *crushed* the rocks into smaller pieces, and then *exploited* the crushed rocks as structural support for each wind turbine. The ultimate question is whether *this operation* constitutes "mineral development" as we have conceptualized the term. We hold that it does.

*Id.* at 1091 (bolding added, italics in original). The Tenth Circuit's analysis means that Osage Wind did not need a lease for the Project more generally, but only in order to sort rocks, crush rocks, and exploit the crushed rock for foundations.

---

[4] The Tenth Circuit also rejected the OMC's contention that the *de minimis* exception of 25 C.F.R. § 211.3 "establishes a separate definition" of mining, apparently premised upon the size of the Project, a contention that continues to lurk in the OMC's Response. Instead, the Tenth Circuit found that "[t]he inclusion of the de minimis exception does not negate the need initially to satisfy the threshold definition of mining." *Osage Wind*, 871 F.3d at 1089. This furthers the conclusion that *only* the specific activity found to constitute "mining" under the regulations is remediable by this Court.

3

Accordingly, when one properly considers that the *only* wrong found by the Tenth Circuit was Osage Wind's "sort[ing] and then crush[ing] the minerals and us[ing] them as backfill to support its wind turbine structures," *id.* at 1090, it becomes clear that (i) there is nothing to enjoin (because that conduct is not plausibly alleged to be ongoing (and is neither, in fact, ongoing nor intended in future)); (ii) Osage Wind was entirely within its legal rights to "encounter[] or incidentally disrupt[] mineral materials," including in constructing a wind energy project, and (iii) the fact that the Project's foundations exist subsurface is not illegal or unlawful under any theory. With those indisputable matters in mind, the unavailability of equitable relief is clear.

"[F]or every right, there is a remedy." *Marbury v. Madison*, 5 U.S. 137, 162-63 (1803). But it is not true that the violation of every right entitles a party to every remedy. It has always been the rule that "suits in equity shall not be sustained in the courts of the United States 'in any case where plain, adequate and complete remedy may be had at law.'" *Matthews v. Rodgers*, 284 U.S. 521, 525 (1932). As discussed in Part III.C *infra*, the OMC has an adequate remedy at law— monetary damages measured either by royalty value or the value of the minerals less the cost of producing them. Consequently, equitable relief is unavailable to the OMC under the "traditional notion that equity should not intervene where legal remedies (i.e., damages) are adequate, either in practice or even just in theory." *Kramer v. Thompson*, 947 F.2d 666, 679 (3d Cir. 1991).

### III. THE OMC RESPONSE FAILS TO SUPPORT THAT AN ALLEGED INJURY TO "SOVEREIGNTY," WITHOUT MORE, ESTABLISHES IRREPARABLE INJURY.

The OMC Response relies exclusively on the OMC's asserted "sovereign right to say no," contending "'significant interference with [a Tribe's] self-government' constitutes irreparable harm warranting the imposition of injunctive relief" in an attempt to defeat Defendants' showing that the OMC has failed to demonstrate irreparable injury warranting injunctive relief. (Dkt. # 158, at 15 (citing *Seneca-Cayuga Tribe of Oklahoma v. Oklahoma,* 874 F.2d 709 (10th Cir. 1989),

4

and cases quoting it)). The Response identifies no other irreparable injury beyond alleged injury to "sovereignty." The OMC Response fails: first, because no case it cites or that Defendants' research disclosed holds an injury to sovereignty, standing alone, absent any other irreparable injury to tribal interests, supported equitable remedies. Second, under the Tenth Circuit Opinion, the OMC had no power to say "no" to the Project itself, because, had Osage Wind been aware, or even on notice, of the Tenth Circuit's Opinion,[5] it could have simply acquired the materials it crushed and used as fill material from another source (they are not unique), and no OMC or BIA approval would have been required for any of Osage Wind's activities.

### A.  *No Case Holds Injury to Sovereignty, Without More, Is Irreparable in Itself.*

The OMC relies exclusively on three cases to relieve it of the duty to allege facts establishing irreparable injury. (Dkt. # 158, at 15-16). Significantly, however, all three cases involved substantial tribal interests not compensable by money damages the state actions involved would impair, in addition to injury to sovereignty. In *Seneca-Cayuga Tribe,* the Tribes filed suit to enjoin a pending state court suit in which the State of Oklahoma sought to enjoin operation of the Tribes' high stakes bingo games. 874 F.2d 709. Noting Oklahoma did not deny the conditions for a preliminary injunction were satisfied, Judge Seymour's opinion detailed the Tribes' injuries: "[t]hey would lose income used to support social services for which federal funds have been reduced or are non-existent, and lose jobs employing Indians . . . . The Tribes would also be forced to expend time and effort on litigation in a court that does not have jurisdiction over them, and risk

---

[5] Contrary to its suggestion, the OMC is not the arbiter of whether the regulations apply to a specific situation. Instead, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177.  Until the Tenth Circuit ruled in this case, no court had adopted the construction of the regulations ultimately reached, and in fact the Honorable James H. Payne rejected it.

5

inconsistent binding judgments from state and federal courts." *Id.* at 716;[6] *see also Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1251 (10th Cir. 2001) (in a case involving state refusal to recognize tribal vehicle registration, explaining that "the injury to the tribe was irreparable because it could not be adequately compensated for in the form of monetary damages. but . . . *perhaps more important, monetary relief might not be available to the tribe because of the state's sovereign immunity*." (emphasis added)); *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1251-52, 1256 (10th Cir. 2006) (concluding that "[a] failure to grant the injunction would cause the Wyandotte serious harm" because its facilities were being raided, its property being seized, and its officers being arrested).

*Cayuga Indian Nation of New York v. Vill. of Union Springs*, 293 F. Supp. 2d 183, 196-98 (N.D.N.Y. 2003), illustrates that, to be irreparable, an injury to sovereignty must exist along with other irreparable injuries. In *Cayuga*, the court distinguished *Pierce*, and similar authority, as "the infringement of tribal sovereignty [in those cases] was either much larger in scope than that which is at issue here, or was accompanied by other harm which could not be valued in dollars." *Id.* at 197. The same is true in this case, and money damages *are* available.

The Response fails to show a plausible irreparable injury because OMC does not advance any injury to sovereignty comparable to that discussed in the cases OMC cites. Rather, the OMC's injury, which is limited to damages arising from Osage Wind's "sort[ing]," "crush[ing]," and "exploiting" rock for the tower foundations, is readily remedied by money damages.[7]

---

[6] This, in and of itself, *is* irreparable harm, *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011); but *is not* presented here.

[7] Nor does the Response identify injuries it asserts are irreparable in addressing specific remedies, beyond that to its asserted "sovereign' right to say "no." (*See* Dkt. # 158, at 17-18 (accounting); *id.* at 19-20 (disgorgement); *id.* at 20-23 (continuing trespass)).

6

### B. *There is No Injury to Sovereignty of any Sort Because the OMC Could Not Say "No."*

The Response, relying solely on injury to sovereignty, gains no support from the *Seneca-Cayuga* line of cases because the OMC's only injury was loss of the regulatorily prescribed value for rock Osage Wind "sorted," "crushed," and "exploited" in tower foundations. *Osage Wind*, 871 F.3d at 1091. The Tenth Circuit made clear Osage Wind could have excavated and reused materials in foundations without running afoul of the Part 211 and 214 regulations, so long as Osage Wind did not crush and reuse the crushed materials: in fact, had Osage Wind been on notice that the Tenth Circuit's conclusion was, in fact, the law, it could simply have purchased needed materials at the nearby quarry and left on site rocks of a size not suitable for foundation support, which the OMC itself acknowledges. (*See* Dkt. # 140, at ¶ 57). Hence, the OMC had no sovereign authority to say "no" to the Project entirely. Consequently, the mere continuous, post-construction presence of the Project foundations is not material to any injury arising from the absence of a lease, and the only injury the OMC sustained is readily remedied in damages measured by the cost Osage Wind would have incurred had it acquired the foundation materials elsewhere.

### C. *The OMC Fails to Refute Defendants' Showing that the OMC Has an Adequate Remedy at Law—Monetary Damages for Conversion and/or Trespass.*

Contrary to OMC's Response, an adequate remedy at law exists—the readily calculable monetary damages measured by the market value of the rock that was "sorted," "crushed" and "exploited." (*See* Dkt. # 150, at 19).[8] As Defendants' Motion established, when, as here, mining occurs without a lease, the measure of damage is the market value of the extracted mineral less the expenses of severing the minerals. *See* Dkt. # 150, at 20 n.9 (citing *Dilworth v. Fortier*, 1964 OK

---

[8] The OMC's assertion that the market value will be "arbitrarily assigned" has no basis in law or fact (*See* Dkt. # 158, at 19 n.7). The regulations at issue in the Tenth Circuit's Opinion include measures by which the value can be calculated. *See, e.g.*, 25 C.F.R. § 214.10 (royalty rates); 25 C.F.R. § 211.43 (same).

7

112, ¶ 27, 405 P.2d 38, 45; *Edwards v. Lachman*, 1974 OK 58, ¶ 17, 534 P.2d 670, 674); *see also Am. Mining Ins. Co. v. Peters Farms, LLC*, 557 S.W.3d 293, 294 (Ky. 2018); *Pan Coal Co. v. Garland Pocahontas Coal Co.*, 125 S.E. 226, 227 (W. Va. 1924).[9] The Interior Board of Land Appeals ("IBLA") has identified the same measure of damages for trespasses to federal minerals. *See, e.g.*, *Harney Rock and Paving Co.*, 91 IBLA 278, 289 (1986) ("Accordingly, we hold that absent a clear expression to the contrary in [relevant state law], damages for an unintentional trespass involving crushed rock may consist of either (1) the royalty value of the mineral or (2) the market value of the severed and crushed rock less the expenses of severing and crushing it, whichever is greater.").[10] In other words, monetary damages, measured by either the royalty value of the minerals or by their fair market value less the expense of extracting them, is the remedy for trespass to minerals, even for trespass against the Osage mineral estate, and negates the OMC's right to injunctive relief.[11]

---

[9] *Schafer v. Centerpoint Energy Okla. Gas*, No. 17-CV-365-GKF-FHM, 2018 WL 1014017 (N.D. Okla. May 21, 2018) is far more significant than the OMC wishes. It holds trespass damages are an adequate remedy precluding disgorgement, even for periods prior to issuance of the fee patent, when the allotted lands remained restricted. *Id.* at *5. In any event, Oklahoma law is adopted and borrowed, and federal law is identical as to Oklahoma's adequate-remedy-at-law doctrine.

[10] *Harney* confirms, even assuming the OMC had a right to say "no" to a lease with Osage Wind, the measure of damages is limited to the market value of the minerals less the expenses of severing them. *See* 91 IBLA at 287-289 (discussing a prior IBLA decision applying that damages measure to the United States under a similar theory to the OMC's). *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 40-41, & n.2 (1983), is also instructive because, as here, prior to the Supreme Court's decision, whether gravel was reserved to the United States had been unresolved; the Bureau of Land Management ("BLM") determined the trespasser committed an unintentional trespass, and the IBLA affirmed BLM's assessment of damages, based on royalty rates ascertained from appraisals of other sites.

[11] The OMC's Response provides no authority supporting that the presence of the tower foundations in subsurface is a "continuing trespass." To the contrary, both cases it cites address continued mining over a period of months or years, compensable by money damages for minerals removed, and neither supports the prospective, "post-mining" remedies challenged by this Partial Motion to Dismiss. (*See* Dkt. # 158, at 13, citing *United States v. Hess*, 194 F.3d 1164, 1169 (10th Cir. 1999); *Thompson v. United States*, 308 F.2d 628, 633 (9th Cir. 1962)).

**IV.  THE ISSUE OF WHETHER THE OMC IS ENTITLED TO ANY RELIEF PREMISED UPON THE PROJECT'S PRESENCE IN THE GROUND (EXPRESSLY INCLUDING AN INJUNCTION REQUIRING REMOVAL OF THE PROJECT) WAS DECIDED IN THE STATE CASE.**

The OMC Response on the issue of the preclusive effect of *Osage Nation and Osage Minerals Council v. Osage County Board of County Commissioners, et al.*, District Court of Osage County Case No. CV-2014-41 (the "State Case") is riddled with factual and legal errors.

- The Tenth Circuit's Opinion cannot be res judicata, which applies in a "second lawsuit" and it requires that "the first suit must have proceeded to a final judgment on the merits." *Clark v. Haas Grp., Inc.*, 953 F.2d 1235, 1236 (10th Cir. 1992). The Tenth Circuit did not render a final judgment on the merits. The most the Tenth Circuit's Opinion could be is law of the case, and "the law of the case doctrine applies only to issues actually decided." *Cleary v. Wind Quarry Operations, LLC*, No. 15-CV-189-R, 2017 WL 5172426, at *3 (D. Wyo. Jan. 4, 2017).

- The Tenth Circuit found that the 2011 Federal Litigation in ***this Court*** was not res judicata of the claim that Osage Wind had violated 25 C.F.R. Part 211 and 214. The Tenth Circuit said literally nothing about the State Case. The Tenth Circuit's res judicata decision makes sense inasmuch as one can reasonably conclude that the rock sorting, crushing, and use was not known in 2011 and "if OMC had sought relief under 25 C.F.R. § 214.7, Osage Wind might have rejoined that it had ample time to secure the approved lease . . . ." *Osage Wind*, 871 F.3d at 1087. But the Project's subsurface presence clearly was known no later than in this Court's earlier case, *Osage Mineral Council v. Wind Capital Group*, No. 4:11-cv-00643-GFK-PJC, Dkt. # 36 at 3, Findings of Fact, ¶¶ 6, 8, and the OMC alleged it in the State Case as a basis for injunctive relief *after* Project construction had commenced, when a lease allegedly should have been in place or in process.

9

- Defendants did not invoke the State Case in support of res judicata, but laches. (*See* May 5, 2017 FED. R. APP. P. 28(j) letter, copy sans exhibit thereto attached as Exhibit A).

- The OMC makes much of the fact that the State Case and this case involve "distinct cause[s] of action." (Dkt. # 158, at 13). But "while res judicata requires mutuality of causes of action collateral estoppel does not. Instead, collateral estoppel applies to identical issues raised in successive suits, whether they be addressed in the same claims or not." *Gass v. United States*, Case No. 99-B-966, 2000 WL 506960, at *2 (D. Colo. Mar. 1, 2000). The issue of whether the OMC was entitled to enjoin the Project's operations and existence was litigated at a time when it knew construction had commenced and knew the Project would purportedly be "invading" the Osage Mineral Estate. Collateral estoppel prevents that relief here.

- The relevant time for the applicability of res judicata and collateral estoppel is "when a final judgment is rendered." *Knox v. Lederle Labs.*, 4 F.3d 875, 880 (10th Cir. 1993); *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir. 2000) (collateral estoppel does not apply unless "the prior action has been finally adjudicated on the merits"). Assuming, without conceding, that the date when "turbine excavation work began" is the relevant temporal metric for purposes of the preclusion doctrines, that occurred in September of 2014 (Dkt. # 140, at ¶ 45), which is *prior* to the entry of final judgment in the State Case.[12] Thus, the remedies now sought could have been sought by the OMC in the State Case even under its own theory of timing.

## CONCLUSION

The Defendants' Partial Motion to Dismiss (Dkt. # 150) should be **granted**, as the OMC may not pursue any equitable relief or claims for continuing trespass or accounting.

---

[12] And the record in this case clearly demonstrates that the OMC was routinely monitoring the Project site and photographing activity there. Dkt. # 24-3.

10

Respectfully submitted,

/s/ Ryan A. Ray
**Ryan A. Ray**, OBA # 22281
**NORMAN WOHLGEMUTH CHANDLER JETER BARNETT & RAY, P.C.**
2900 Mid-Continent Tower
401 South Boston Avenue
Tulsa, OK 74103
918-583-7571
918-584-7846 (facsimile)

-and-

**Lynn H. Slade** (admitted *pro hac vice*)
**Sarah M. Stevenson** (admitted *pro hac vice*)
MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
Post Office Box 2168
Albuquerque, NM 87103-2168
505-848-1800
505-848-9710 (facsimile)

**ATTORNEYS FOR DEFENDANTS, OSAGE WIND, LLC, ENEL KANSAS, LLC AND ENEL GREEN POWER NORTH AMERICA, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2020, I electronically transmitted the attached Document to the Clerk of the Court using the ECF System for filing. Based on the electronic records currently on file, the Clerk of the Court will transmit a notice of Electronic Filing to the following ECF registrants:

Cathryn D. McClanahan
Abi Laura Fain
David McCullough
Jeffrey S. Rasmussen
Mary Kathryn Nagle
Wilson Kirk Pipestem

The following non-ECF registrants have been served by First Class United States mail:

11

Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor Office
7906 East 33rd Street
Tulsa, OK 74145
(918) 669-7730
Charles.babst@sol.doi.gov
*Attorney for the United States of America*

/s/ Ryan A. Ray
**Ryan A. Ray**