**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1)  UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| (2) OSAGE MINERALS COUNCIL, | ) | Case No. l4-CV-704-GKF-JFJ |
| | ) | |
| Intervenor-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1) OSAGE WIND, LLC; | ) | |
| (2) ENEL KANSAS, LLC; and | ) | |
| (3) ENEL GREEN POWER | ) | |
| NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**INTERVENOR PLAINTIFF OSAGE MINERALS COUNCIL'S MOTION TO COMPEL**
**PRODUCTION OF DOCUMENTS AND BRIEF IN SUPPORT THEREOF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii-iii

ARGUMENT ....................................................................................................................... 1

I.     INTRODUCTION ....................................................................................................... 1

II.    STATEMENT OF FACTS ........................................................................................ 2

     1.  Enel Kansas and EGPNA's Productions and documents related to TradeWind ......... 3

     2.  Defendants' Privilege Logs ...................................................................... 8

     3.  Defendants' Communications and Work Product Related to Their "Detailed Legal Analysis" ...................................................................................... 10

III.   ARGUMENT ......................................................................................................... 15

     a.  Enel Kansas and EGPNA must produce documents and a privilege log responsive to OMC's Requests for Production as well as documents related to TradeWind ................ 15

     b.  Defendants must remedy deficiencies within their privilege log ...................................... 18

     c.  Defendants must produce documents and communications related to their attorneys' "detailed legal analysis" that a permit was not required to excavate on the Osage Mineral Estate ........................................................................................................... 20

IV.   CONCLUSION ..................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*
    199 F.R.D. 677 (N.D. Okla. 2001) .......................................................................... 14

*Continental III. Nat'l Bank & Trust Co. of Chicago v. Caton*
    136 F.R.D. 682 (D. Kan. 1991) .............................................................................. 15

*Dilworth v. Fortier*
    405 P.2d 38, 1964 OK 112 (Okla. 1964)................................................................. 18

*Fed. Deposit Ins. Corp. v. Renda*
    126 F.R.D. 70 (D. Kan. 1989),
    *aff'd sub nom. F.D.I.C. v. Daily*, 973 F.2d 1525 (10th Cir. 1992) ..................................15

*Frontier Refining, Inc. v. Gorman- Rupp Co.*
    136 F.3d 695 (10th Cir. 1998) .............................................................................. 22

*Hearn v. Rhay*
    68 F.R.D. 574 (E.D. Wash. 1975) .......................................................................... 20

*Motley v. Marathon Oil Co.*
    71 F.3d 1547 (10th Cir. 1995) .............................................................................. 20

*Seneca Ins. Co., Inc. v. Western Claims, Inc.*
    774 F.3d 1272 (10th Cir. 2014)............................................................... 14, 20, 21, 23

*United States v. Osage Wind, LLC*
    871 F.3d 1078 (10th Cir. 2017) ............................................................................. 3

**Statutes**

Del. Code Ann. tit. 6 § 18-303 ...............................................................................4, 16

Okla. Stat. Ann. tit. 18 § 2022 ........................................................................... 3, 4, 16

**Regulations**

25 C.F.R. § 214.7 ................................................................................................. 2

**Court Rules**

Fed. R. Civ. P. 26(b)(5) ........................................................................................ 18

Fed. R. Civ. P. 34(b)(2)(B)-(C) ...............................................................................15

Fed. R. Civ. P. 37 ................................................................................................................ 2

Local Rule 37.1 ................................................................................................................ n.1

Intervenor-Plaintiff Osage Minerals Council ("the OMC"), by its undersigned counsel of record, submits this motion in accordance with Rule 37 of the Federal Rules of Civil Procedure ("FRCP"), to compel Defendants Osage Wind, LLC, Enel Green Power North America, Inc., and Enel Kansas, LLC ("Defendants") to produce documents responsive to the OMC's First Set of Interrogatories and Requests for Inspection and Production to each of the Defendants, respectively. For the reasons set forth below, the OMC respectfully requests that the Court (1) compel all three Defendants to provide documents responsive to the OMC's Requests for Production, (2) compel Defendants to provide separate privilege logs or provide information sufficient to determine which defendant is asserting the privilege, and (3) compel Defendants to produce documents improperly withheld on the basis of privilege.[1]

---

[1] As required Local Rule 37.1, attorneys for the OMC conferred in good faith with attorneys for the Defendants on July 29, 2020, but were unable to reach an accord with respect to the discovery disputes set forth in this motion.

## I.      INTRODUCTION

The Osage Minerals Council ("OMC") brings this Motion to Compel Defendants Osage Wind, LLC ("Osage Wind"), Enel Kansas, LLC ("Enel Kansas") and Enel Green Power North America, Inc. ("EGPNA") to remedy the significant deficiencies in their document productions to date. Enel Kansas and EGPNA have produced next to nothing, while Osage Wind has produced nearly everything Defendants have provided to the OMC. Instead of agreeing to conduct a reasonable search and produce the responsive documents located within Enel Kansas's and EGPNA's possession, Defendants have objected to the OMC's discovery requests on the grounds that (1) these two defendants are not liable for the actions of Osage Wind; and (2) somehow Enel Kansas and EGPNA do not maintain their own, separate documents apart from Osage Wind. Defendants' flawed assertions of corporate separateness is erroneous under the law, and certainly does not shield Enel Kansas and EGPNA from fulfilling their discovery obligations in this litigation.

Furthermore, and in addition to deficiencies identified in Defendants' privilege logs, the OMC moves to compel the production of all documents related to the legal analysis of Defendants' counsel related to whether or not a permit was required for Defendants to excavate the Osage Mineral Estate. In numerous filings over the last five and a half years, Defendants have repeatedly raised the issue of their "good faith" belief, based on their attorneys' analysis, that a permit was not required as a basis for proceeding without a permit. Having put their attorneys' analysis directly at issue in this litigation, applicable Tenth Circuit precedent precludes Defendants from maintaining an assertion of privilege over documents that relate to the analysis. If these documents are not produced, the OMC—and this Court—will be unable to ascertain the veracity of Defendants' assertions that they relied, in "good faith," on their

attorneys' analysis when they decided to proceed with mining on the Osage Mineral Estate without a permit.

Therefore, and in accordance with Rule 37 of the FRCP, the OMC moves to compel (1) Osage Wind, LLC ("Osage Wind"), Enel Kansas, LLC ("Enel Kansas") and Enel Green Power North America, Inc. ("EGPNA") to produce documents responsive to OMC's First Set of Interrogatories and Requests for Inspection and Production of Documents to Defendant Osage Wind, First Set of Interrogatories and Requests for Inspection and Production of Documents to Defendant Enel Kansas, and OMC's First Set of Interrogatories and Requests for Inspection and Production of Documents to Defendant EPGNA served on April 23, 2020 pursuant to Rules 33 and 34, including but not limited to Requests for Production to Osage Wind Nos., 10, 31, 34, 36, 38, 40, and 50,  Requests for Production to Enel Kansas Nos. 10, 29, 31, 32, 34, 36, 38, 40, and 48-51 and Requests for Production to EGPNA Nos. 28, 31, 33, 35, 37, and 47, respectively, (2) Defendants to provide separate privilege logs or provide information sufficient to determine which Defendant is asserting which privilege, and (3) Defendants to produce documents and correspondence in their possession related to the genesis of their "detailed legal analysis" that Defendants have affirmatively relied on to assert their conduct was carried out in "good faith." *See, e.g.*, ECF No. 150, 10-11 (Defendants asserting they concluded that a federal lease or permit was not required before proceeding to construct the Osage Wind project "based upon a detailed legal analysis" that was, at one point, shared in an October 20, 2014 Memorandum to Alan Woodcock, General Attorney at the Office of the Solicitor (Department of the Interior)).

## II.    STATEMENT OF FACTS

The instant litigation concerns damages and appropriate remedies for Defendants' failure to secure a federally approved lease from the OMC under 25 C.F.R. § 214.7. *See United States v.*

*Osage Wind, LLC*, 871 F.3d 1078, 1084 (10th Cir. 2017). The OMC intervened on April 13, 2020 (Dkt. 135) and on April 23, 2020 served its First Set of Interrogatories and Requests for Inspection and Production of Documents to Osage Wind, LLC ("Osage Wind") (Ex. A), First Set of Interrogatories and Requests for Inspection and Production of Documents to Enel Kansas ("OMC's Requests to Enel Kansas," Ex. B), and First Set of Interrogatories and Requests for Inspection and Production of Documents to EGPNA ("OMC's Requests to EGPNA," Ex. C).

      1.   *Enel Kansas and EGPNA's Productions and documents related to TradeWind*

In response, Defendants' productions are overwhelmingly comprised of documents from Osage Wind, with very little to no documents produced by Enel Kansas or EGPNA. To date, EGPNA has only produced 92 pages of documents to the OMC. Nagle Decl. at ¶ 7. Enel Kansas has produced no documents to the OMC, although Enel Kansas cites documents produced by Osage Wind in its First Supplemental Responses and Objections to the OMC's Requests to Enel Kansas. *See* Ex. D.

On July 16, 2020, counsel for the OMC sent counsel for EGPNA and Enel Kansas a letter highlighting the absence of produced documents from EGPNA and Enel Kansas. Ex. E at 9 ("To date, EGPNA has produced ninety-two (92) pages of documents devoid of communications in any form, and Enel Kansas has produced nothing."). In response, Enel Kansas and EGPNA did not produce responsive documents; instead, they asserted that "Enel Kansas and EGPNA . . . are among parent entities of Osage Wind, LLC, and do not separately maintain documents . . .". July 22, 2020 Letter from Lynn Slade to Mary Kathryn Nagle, Ex. F at 7-8. EGPNA also objected to the OMC's discovery requests to EGPNA, asserting that EGPNA was under no obligation to produce responsive documents because "EGPNA is not liable for any alleged acts or wrongs of Osage Wind, LLC, of which it is manager." Ex. G (citing Okla. Stat. Ann. tit. 18, § 2022; Del.

Code Ann. tit. 6, § 18-303).[2] Enel Kansas stated it would not produce responsive documents on the same basis. *See* Exs. D, H (citing Okla. Stat. Ann. Tit. 18 § 2022.).[3]

However, documents produced by Defendant Osage Wind reveal that, contrary to EGPNA and Enel Kansas's representations and objections, EGPNA at least is more than just an indirect parent of Osage Wind. EGPNA entered both a Management Services Agreement (the "Management Agreement," EGPNA-000056-92, Ex. I) and a Construction Management Agreement (the "Construction Agreement," EGPNA-000025-55, Ex. J) with Osage Wind on October 1, 2014 making EGPNA responsible for the day-to-day administrative and financial operations of Osage Wind, including supervising and monitoring compliance with third-party contracts (Ex. I, Section 2.5(a)), hiring and dismissing subcontractors (Ex. I, Section 2.5(a)), communicating with Osage Wind's members and Enel Kansas (e.g., Ex. I, Sections 3.1(h)-(k)(m) and 3.2), as well as the supervision of construction and construction subcontractors (Ex. J, Section 2.2). Notices sent to Osage Wind under the agreements are instructed to be addressed to "Osage Wind, LLC c/o Enel Green Power North America, Inc." Ex. I, Section 7; Ex. J, Section 10.1. EGPNA was directly involved in, and managing, the construction and excavation of the Osage Wind farm project at issue in this case.

Furthermore, Defendant Osage Wind's produced documents reveal that EGPNA employees and executives communicated directly with the Bureau of Indian Affairs concerning Defendants' decision to push forward with mining without a permit, despite the United States' instruction that they must first obtain the permit required by law. For example, in a set of emails titled "Bureau of Indian Affairs," Bill Price, identified by the email as "EGP North America,"

---

[2] EGPNA raised this objection with respect to Request for Production Nos. 29-30, and 32. Ex. G.
[3] Enel Kansas specifically objected to Request for Production Nos. 28-31, 33, 35, 37, 47, 48, 49 and 51 and objected by incorporation to Request for Production Nos. 32, 34, 36, 38, 39, 41-43 and 63 on the basis that Enel Kansas is not liable for the wrongs of Osage Wind or TradeWind Energy, Inc. Ex. H.

discusses with subcontractor Infrastructure & Energy Alternatives LLC ("IEA") the response to Bureau of Indian Affairs inquiries as to whether they have filed for a permit and directs IEA to let "Enel/Tradewinds" "make all the future communication with Mr. Whiteshield on this issue." OSAGE WIND-018672-73, Ex. K. Bill Moskaluk and Giuseppe DiMarzio, also identified as "EGP North America," are copied in this communication. *Id.*

Bill Price, Bill Moskaluk, and Giuseppe DiMarzio are involved in another episode regarding approval of a Change Order Request to compensate IEA for additional blasting at the construction site of the Osage Wind farm project. In one set of emails titled "Osage: Drilling, blasting, and Crushing Change order," Giuseppe DiMarzio and Bill Moskaluk discuss with IEA a Change Order to approve additional foundations for blasting and copy Bill Price. OSAGE WIND-018730-31, Ex. L; OSAGE WIND-018734-35, Ex. M. In these emails, Project Manager Bill Moskaluk's signature block identifies him as "Construction North & Latin America, Enel Green Power, Osage Wind Project."[4] Ex. M at OSAGE WIND-018734.  In another set of emails, "Blasting at Osage," Stephen Lajoie, Director of Procurement, Enel Green Power North America, Inc., provides updates on the approval for IEA's blasting to Giuseppe DiMarzio, Giovanni Nicoletti, and Bill Price, all identified as "EGP North America." OSAGE WIND-018805-06, Ex. N. In yet another set of emails, "Osage Backfill," Giuseppe DiMarzio directs IEA to continue rock crushing while Bill Price works on getting the Change Order Request approved by Maria Galainena de Carlos, Head of Wind Design, Engineering and Construction, Enel Green Power España. OSAGE WIND 018808-13, Ex. O. The other non-IEA individuals in those emails are an IEA-hired consultant and Bill Moskaluk, Stephen Lajoie, Jan Sugarman, Eva-Elena Bruno, Gregory Kochmann, Ryan Adams, Giovanni Nicoletti, and Salvatore Sciuto.

---

[4] The inclusion of "Osage Wind Project" is notable because the vast majority of signature blocks in the produced emails do not mention Osage Wind at all.

All are identified as "EGP North America" except Sciuto, whose label "REN-E&C" appears to refer to another Enel department. *Id.*

Thus, although Defendants have objected to the notion that EGPNA and Enel Kansas must conduct a reasonable search for and produce responsive documents within their own possession (and not just Osage Wind's), Osage Wind's own document production reveals that Enel Kansas and EGPNA were not passive bystanders, but instead, were actively engaged—and indeed were managing—the actions relevant to this litigation. For example, Enel Green Power's Engineering & Construction Department ("EGP E&C") states that it was EGPNA who must give approval prior to blasting at the Osage Wind farm project site. A "Technical Report for Blasting at Osage WindTurbine Sites" dated November 18, 2014 (OSAGE WIND-018685-721, Ex. P) purports to summarize the "Contractual agreements between EGP and IEA." *Id.* at OSAGE WIND-018688. However, "snapshots" of the contracts in the "Contract Agreement between EGP and IEA" section clarify that EGP E&C is referring to versions of the Amended and Restated Balance of Plant and Engineering, Procurement and Construction Contract between Osage Wind and IEA (the "Osage Wind and IEA Contract"). *Id.* at OSAGE WIND-018690. Throughout the technical report are references to IEA not getting "EGP" approval before blasting. *See, e.g., id.* at OSAGE WIND-018692. "EGP Engineering" further provides blasting recommendations for 89 locations on the Osage Mineral Estate. *Id.* at OSAGE WIND-018699-703.

EGPNA's full control of the project is again on display in the Change Orders required under the Osage Wind and IEA Contract. Of the twenty-nine Change Orders that the OMC located in Osage Wind's document production identifying the signatories' affiliations, only three were signed on behalf of Osage Wind. *See* Change Order No: 001 signed by Matt Gilhousen, V.P., OSAGE WIND-001944-45, Ex. Q; Change Order Nos: 036 and 037 signed by Rafael

Gonzalez, President and CEO, OSAGE WIND-001328-332, Ex. R. The remainder were signed

on behalf of EGPNA by Francesco Venturini, Chief Executive Officer, Rafael Gonzalez,

President and CEO, and Brayten McGee, Project Manager. Change Order Nos: 002, 004-008,

010, 012-026, 030-031, 033-034, Ex. S. All of these Change Orders are on Enel Green Power

Letterhead. Exs. Q, R, S. Further, there are numerous examples in Osage Wind's production of

Derek D. DeBlois, comptroller, EGPNA, sending notices to leaseholders regarding quarterly

payments under their Wind Energy Lease Agreements, sometimes with Osage Wind included on

the letterhead and other times without. *See, e.g*., OSAGE WIND-019906-23, Ex. T.

Given all the functions EGPNA was providing for its subsidiary, it is perhaps

understandable that both the Management Agreement and the Construction Agreement contain

indemnity clauses whereby EGPNA agrees to indemnify Osage Wind for "all claims, demands,

actions, suits, or proceedings . . . resulting from . . . Loss of or damage to any property to the

extent caused be the negligence or willful misconduct of [EGPNA]." Ex. I, Section 8; Ex. J,

Section 6.1.

Finally, in the first privilege log provided by EGPNA and Enel Kansas (Defendants' First

Amended and Supplemental Privilege Log, Ex. U), discussed in further detail below, Defendants

identified no documents from EGPNA or Enel Kansas despite eighteen of the thirty-one

documents Defendants logged including at least one individual identified in Osage Wind

produced communications as "EGP North America," *e.g*., Stephen Lajoie, Bill Price, Bill

Moskaluk, Giuseppe DiMarzio.[5] *See id.*

---

[5] As discussed more fully below, Defendants' have failed to provide the job titles or employment capacities of individuals appearing in their privilege log who are not attorneys. The OMC has thus been forced to comb Osage Wind's productions for such information.

Defendant Osage Wind's document production, therefore, directly undermines Defendants' contention that EGPNA and Enel Kansas do not have responsive documents within their possession, or, as Defendants also contend, that these two Defendants are "not liable for any alleged acts or wrongs" at issue in this litigation. *See, e.g.,* Ex. G at 20, 21; Ex. H at 17, 19, 20-21.

Defendants have also withheld responsive documents relating to TradeWind Energy, Inc. ("TradeWind"). In response to requests relating to TradeWind, counsel for Defendants objected in their July 22 letter that TradeWind's relationship "has no materiality to the value of minerals 'mined' . . . or to whether Osage Wind 'mined' . . . with knowledge a lease was required." Ex. F at 5, 9. Counsel for the OMC responded on July 28, stating: "[g]iven that it appears Tradewind still owned Osage Wind after construction began, 'documents, records, contracts, and agreements' Tradewind entered into regarding Osage Wind and documents related to Tradewind's acquisition of Osage Wind and representations about the project, are certainly relevant to OMC's claims as are Tradewind's financial documents." Ex. V at 4. The parties were not able to reach agreement on this point during the July 29 meet and confer, and thus, Defendants continue to withhold responsive documents related to Tradewind's acquisition of Osage Wind. Nagle Decl. at ¶ 6.

## 2.  *Defendants' Privilege Logs*

Osage Wind provided its privilege log on June 2, 2020. Ex. W. Neither EGPNA nor Enel Kansas have provided a privilege log to identify the responsive, privileged documents they are withholding in response to the discovery requests that the OMC has served on them.

In a July 16 letter, counsel for the OMC identified a number of deficiencies with Osage Wind's privilege log. Ex. E. For example, Osage Wind failed to identify attorneys and employment capacities for senders and recipients despite asserting attorney-client privilege for

all thirty entries and failed to provide adequate information for some entries, including dates, sender and recipient lists, and/or sufficient descriptions.  Ex. E at 1-5. Counsel for the OMC further noted that communications produced by Osage Wind tagged most of the non-attorney recipients and senders listed in the privilege log as "EGP North America" and/or listed their "@enel.com" email addresses. *Id.* at 3. The OMC thus reiterated its request for confirmation that EGPNA and Enel Kansas would produce responsive documents and their own privilege logs. *Id.* at 6.

Osage Wind, Enel Kansas, and EGPNA responded on July 22, 2020 with their combined First Amended and Supplemental Privilege Log. Ex. U. This time Defendants identified attorneys and provided additional sender and recipient names, dates, and updated descriptions. However, rather than satisfy Enel Kansas and EGPNA's discovery obligations, Defendants' combined privilege log added confusion by failing to indicate which Defendant was asserting which privilege or identify any Enel Kansas or EGPNA documents. *Id*. Moreover, the combined privilege log again failed to provide additional information for non-attorney senders and recipients. *Id.* In the accompanying letter, counsel for Defendants asserted that business advice provided by in-house counsel was "inextricably intertwined with legal advice." Ex. F at 2.

In a July 28 letter, Counsel for the OMC reiterated the need for Enel Kansas and EGPNA to provide separate privilege logs and emphasized the increased importance of labels, job titles, or employment capacities for non-attorney senders and recipients in deciphering Defendants' combined privilege log. Ex. V.[6]

---

[6] Counsel for the OMC also identified two documents with descriptions insufficient for claiming attorney client privilege and three previously listed documents that had not been produced. *Id.* To date, the removed documents still have not been produced. *See* July 28 Letter from Nagle to Slade, Ex. V at 2-3 (listing OSAGE WIND PRIV-00085-86, OSAGE WIND PRIV-00087, and OSAGE WIND PRIV 00088 as having been removed from Defendants' privilege log but not produced). These documents should be produced.

Defendants provided their Second Amended and Supplemental Privilege Log ("Second Amended Privilege Log," Ex. X) on July 28, the day before the parties held a meet and confer. The Second Amended Privilege Log addressed none of the OMC's concerns, merely adding three documents and supplementing identification of attorneys. At the July 29 meet and confer among the United States, Defendants, and the OMC, the parties discussed the overall deficiencies in Defendants' privilege logs, Enel Kansas and EGPNA's failure to produce their own privilege logs (or identify which documents within Osage Wind's privilege log are in their possession), and assertions of privilege over advice from in-house counsel. Nagle Decl. at ¶ 4. The parties were unable to come to a resolution on any of these topics. *Id.*

The United States' Exhibit 11 to their Motion to Compel (Dkt. 177-1) is a comprehensive accounting of the deficiencies in the Defendants' Third Amended and Supplemental Privilege Log to the United States which is identical to the Defendants' Second Amended Privilege Log to the OMC and does not require reproduction. The OMC supports and joins the reasoning set forth therein.

### 3. Defendants' Communications and Work Product Related to Their "Detailed Legal Analysis"

Defendants have repeatedly, over the course of this litigation, and affirmatively argued that their decision to move forward with excavating the Osage Mineral Estate was done in good faith because of a "detailed legal analysis" performed and undertaken by their attorneys. Defendants first resorted to this argument back in December of 2014, when, in opposition to the United States' Motion for Preliminary Injunction, Defendants asserted that "[t]he United States falsely accuses Osage Wind of 'conveniently preclud[ing] both the Secretary and the [OMC] from considering' all aspects of the planned construction" (Dkt. 17 at 2), in part because:

> Lynn H. Slade, counsel for Osage Wind, sent emails to Field Solicitor Woodcock on October 20, 2014, and Superintendent Phillips on October 21, 2014, attaching

a legal memorandum explaining why Osage Wind believes it is not required to
have such a permit and stating, "[p]lease advise if I or others at Enel can provide
further information or, if you have remaining concerns, we would be happy to
meet with your office and any officials of the Osage Nation or Osage Minerals
Council who you consider appropriate."

Dkt. 17 at 6. Defendants attached one version of this legal memorandum to their opposition to

the United States' Motion for Preliminary Injunction. *See* Dkt. 17-4. The Court did not respond

to or adjudicate Defendants' arguments with regards to their attorneys' legal analysis because the

United States withdrew its request for a preliminary injunction. Dkt. 23.

Defendants once again, in January of 2015, relied on their attorneys' legal analysis in

their Response in Opposition to the United States' Motion for Partial Summary Judgement. *See*

Dkt. 28 at 20. Defendants urged the Court to deny the United States' Motion, asserting that

"Osage Wind is not at fault," in part, because "Osage Wind [had] provided [a] detailed legal

memorandum articulating why it concluded no lease or permit is required . . ." Dkt. 28 at 19-20.

Five years later, after having lost on the law in the Tenth Circuit, Defendants maintained

their affirmative reliance on their attorneys' legal analysis in defending against the United States'

claims. In their Response in Opposition to the United States' Motion to File a Second Amended

Complaint, Defendants explained they opposed the United States' Motion because the United

States' Second Amended Complaint asserts that "Osage Wind's activities were done '"willfully

and intentionally and in bad faith."'" Dkt. 101 at 11. According to Defendants, "[t]here are no

factual allegations that would support this conclusory statement, which is not true, as

demonstrated above [because] Osage Wind believed, in good faith, ***based upon a detailed legal***

***analysis***, that a lease or permit were not required" for excavation. *Id.* (emphasis added).

Just a few weeks later, Defendants once again relied on their attorneys' legal analysis to,

again, argue that the United States should be not be permitted to allege that "Osage Wind's

activities were done 'willfully and intentionally and in bad faith' [since] [t]here are no factual allegations that would support this conclusory statement, which is not true." Dkt. 116 at 11. Defendants once again bolstered this conclusion by stating that "Osage Wind believed, in good faith, ***based upon a detailed legal analysis***, that neither a lease nor permit were required. . . ." *Id.* (emphasis added).

Defendants again relied on their attorneys' "detailed legal analysis" in their Motion to Dismiss the OMC's Complaint in Intervention. *See* Dkt. 150 at 10-11. In their Motion to Dismiss, Defendants urged that the OMC's Complaint in Intervention should be dismissed, in part, because it erroneously asserted that "Osage Wind's activities were done 'willfully and intentionally and in bad faith.'" Dkt. 150 at 10. Again, Defendants argued that Intervenor-Plaintiff should be precluded from making such assertions *because* "Osage Wind believed, in good faith, ***based upon a detailed legal analysis***, that neither a lease nor a permit were required." *Id.* at 11 (emphasis added).

Finally, Defendants have incorporated their good faith reliance on the detailed legal analysis into their Answers to the United States' First Amended Complaint (Dkt. 99 at 12) and the OMC's First Amended Complaint (Dkt. 174 at 14). They have also included it as an affirmative defense in their Answer to the OMC's First Amended Complaint in Intervention. *See* Dkt. 174, Defenses and Affirmative Defenses ¶ 17 ("Part or all of the OMC's claims are barred because any Defendant found to have engaged in unlawful conduct ***believed in good faith that its conduct was not illegal and there was not clear law to the contrary*** prior to the Tenth Circuit's decision in this case.") (emphasis added).

Not only have the Defendants put their good faith reliance on the advice of their counsel directly at issue, but it has now become *the* issue in this case. On July 15, 2020, the Court

clarified that determining whether Defendants' unlawful mining was truly carried out in "good faith" is now the central issue to be litigated in this case, on remand from the Tenth Circuit. Dkt. 173 at 15:7-9 ("But the issue that's really before the court, or will be before the court, is whether or not the trespasser here is innocent or is not, or is a bad faith trespasser . . .").

Despite Defendants' repeated reference to, and reliance on, their counsel's "detailed legal analysis" to assert they acted in "good faith" when they excavated the Osage Mineral Estate, Defendants have refused to produce the relevant communications and documents that relate to the creation of, and research behind, the "detailed legal analysis" they continue to affirmatively rely on. In its July 16 letter, the OMC asserted that Defendants must produce these documents since "[h]aving used this legal analysis as an exhibit to support their opposition to Plaintiff's requested relief, Defendants cannot now claim that the analysis itself, or any of the communications leading up to its creation, remain cloaked in attorney-client or attorney-work product privilege." Ex. E at 2.

Counsel for the Defendants responded on July 22 claiming that they had "not pleaded such an affirmative defense." Ex. F at 2. It is unclear what Defendants mean by this, however, since their Answer to the OMC's First Amended Complaint in Intervention still states that "part or all of the OMC's claims are barred because any Defendant found to have engaged in unlawful conduct *believed in good faith that its conduct was not illegal and there was not clear law to the contrary* prior to the Tenth Circuit's decision in this case." Dkt. 174, Defenses and Affirmative Defenses ¶ 17 (emphasis added).

Defendants also asserted that they are not obligated to produce documents and communications related to the "detailed legal analysis" they repeatedly rely on in their filings since "providing that memorandum, in no sense waived attorney-client privilege or work product

protection of all communications pertaining to the same general subject matter." July 22 Letter

from Slade to Nagle, Ex. F at 2 (citing *Cardtoons, L.C. v. Major League Baseball Players Ass'n,*

199 F.R.D. 677, 682-683 (N.D. Okla. 2001)).

Counsel for the OMC responded on July 28, noting that Defendants' reliance on

*Cardtoons* was misplaced because Defendants' repeated raising the issue of their good faith

belief distinguishes them from the Defendant in *Cardtoons*, who did not repeatedly raise the

subject matter at issue over which privilege is waived. Ex. V at 3. The OMC once again pointed

out that "Defendants cannot justify their actions as reasonable based on [their attorneys'] legal

advice and then decline to provide that advice based on a claim of privilege." *Id.* at 3. (citing

*Seneca Insurance Company, Inc. v. Western Claims, Inc.*, 774 F.3d 1272, 1276-1278 (10th Cir.

2014)). At the July 29 meet and confer, the parties discussed the Defendants' continued

withholding and assertion of privilege over documents related to the "detailed legal analysis"

Defendants rely on in asserting their good faith defense, but were unable to reach resolution of

the issue. Nagle Decl. at ¶ 5.

In Appendix A, filed concurrently with this Motion and Brief in Support, Intervenor-

Plaintiff provides a list of all entries on Defendants' privilege log/s where Defendants have

withheld relevant information and documents that will elucidate whether or not Defendants'

assertion of good faith are in fact true. Examples of documents from Defendants' privilege log

that would help establish whether in fact Defendant's relied in good faith on the advice of

counsel include:

- OSAGE WIND PRIV-000078-81: "E-mails containing advice of counsel

  regarding legal research on Sandy Soil Permit." 10/11/14

- OSAGE WIND PRIV-000214-21: "Memorandum regarding whether use of soil by surface owners required mining permit." 5/19/14

- OSAGE WIND PRIV-005906-5912: "Counsel's advice to clients regarding call with Alan Woodcock regarding whether permit or mineral lease is required." 10/17/14

### III.     ARGUMENT

#### A.   Enel Kansas and EGPNA must produce documents and a privilege log responsive to OMC's Requests for Production, as well as documents related to TradeWind.

The Federal Rules of Civil Procedure require Enel Kansas and EGPNA to produce responsive documents in their possession, custody, or control. *See* Fed. R. Civ. P. 34(b)(2)(B)-(C). There is no suggestion in the Rules that one party's discovery obligations can be satisfied by another party in the litigation. Indeed, courts have found that responding parties are obligated to produce documents in their own control, even when those documents may already be in the possession of the requesting party. *See Fed. Deposit Ins. Corp. v. Renda*, 126 F.R.D. 70, 72 (D. Kan. 1989), *aff'd sub nom. F.D.I.C. v. Daily*, 973 F.2d 1525 (10th Cir. 1992). That is, "[u]nless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden." *Continental Ill. Nat'l Bank & Trust Co. of Chicago v. Caton,* 136 F.R.D. 682, 685 (D. Kan. 1991).

EGPNA and Enel Kansas cannot hide behind Osage Wind's productions. To date, EGPNA has produced 92 pages of documents, and Enel Kansas none. Nagle Decl. at ¶ 7. Their justification that they have "relatively few separately responsive documents" due to the indirect nature of their ownership interests, and lack of corporate liability for the conduct at issue in the litigation, is incredible for a few reasons. *See* Ex. F at 7-8.

15

First, Enel Kansas and EGPNA's objections to OMC's Requests for Production on the basis that they are not liable for the wrongs of Osage Wind lack merit under the law. *See* Exs. D, G. As an initial matter, Okla. Stat. Ann. Tit. 18 § 2022 provides that "a member . . . of a limited liability company is not liable for the obligations of a limited liability company *solely* by reason of being such member." Okla. Stat. Ann. Tit. 18 § 2022 (emphasis added). Similarly, Del. Code Ann. Tit. 6 § 18-303 provides "no member . . . of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company *solely* by reason of being a member . . . of the limited liability company." Del. Code Ann. Tit. 6 § 18-303 (emphasis added). It is not the OMC's position that Enel Kansas and EGPNA are implicated in the trespass on the Osage Mineral Estate *solely* because they are parents of Osage Wind.

Instead, the OMC maintains that Enel Kansas and EGPNA were involved in the decision-making process that led up to Defendants' trespass, a position that is supported by Osage Wind and EGPNA's  Construction Management and Management Services Agreements and their indemnity clauses and examples throughout Osage Wind's production of EGPNA and other Enel Kansas division employees who clearly made decisions regarding Defendants' excavation of the Osage Mineral Estate.  Moreover, it is hard to imagine how Enel Kansas and EGPNA can argue that they are immune from corporate liability at the same time that their employees are running Osage Wind, and perhaps even more ironically, in the same breath that they claim EGPNA and Enel Kansas do not maintain separate documents from Osage Wind (or, apparently, legal representation). This all points to a lack of corporate separation sufficient to eliminate such separation as a legitimate basis to fail to undertake a search for and production of documents responsive to the OMC's discovery requests.

There can be no doubt that Osage Wind is not the lone actor in all of this—even if they are the only Defendant to produce documents and a privilege log.[7] As discussed and highlighted in great detail above, EGPNA managed and oversaw the excavation and construction contracts for the Osage Wind farm project, and furthermore, the Management Agreement and Construction Agreement required EGPNA to communicate with Enel Kansas. *E.g.*, Ex. I, Section 3.2. It is hard to believe that there would be no record of business conducted with "@enel.com" email addresses and often on Enel letterhead by EGPNA employees at EGPNA or Enel Kansas. At this point, however, EGPNA and Enel Kansas have not even agreed to undertake a reasonable search.

Moreover, both the Management Agreement and the Construction Agreement contain indemnity clauses whereby EGPNA agrees to indemnify Osage Wind for "all claims, demands, actions, suits, or proceedings . . . resulting from . . . Loss of or damage to any property to the extend caused be the negligence or willful misconduct of [EGPNA]." Ex. I, Section 8; Ex. J, Section 6.1. Defendants' statements that neither EGPNA nor Enel Kansas are "liable" for the unlawful mining of the Osage Mineral Estate do not justify Defendants' failure to search for, and produce, responsive documents.

Finally, Defendants' objections to the OMC's requests relating to TradeWind on the basis that TradeWind's relationship to Osage Wind "has no materiality to the value of minerals 'mined' . . . or to whether Osage Wind 'mined' . . . with knowledge a lease was required" or "relationship to the excavation, crushing and re-use of minerals," respectively, are not only incorrect, they improperly narrow the scope of discovery to which the OMC is entitled to under

---

[7] It is clear from the Defendants' combined privilege log that EGPNA possesses relevant, and/or privileged documents. For example, OSAGE WIND-PRIV-000108-10 is an email to counsel regarding cost construction information from in-house counsel to EGPNA employees and additional counsel. Ex. X at 6. Similarly, OSAGE WIND PRIV-000089 is an email from an EGPNA employee to other EGPNA employees and in-house counsel regarding "use of soil from Project site." *Id.* at 4.

the law. *See* Ex. F at 5, 9. Continuing trespass, ejectment, res judicata, and the willfulness of Defendants' trespass are all live issues in this case. *See* Dkt. 173 at 6:6-8 and 15:7-12. Among other things, communications between Enel Kansas and Osage Wind, EGPNA and/or TradeWind regarding the project are relevant to Defendants' continuing trespass, especially representations that may have been made about the project during the course of transferring ownership. *See, e.g., Dilworth v. Fortier*, 405 P.2d 38, 1964 OK 112 (Okla. 1964) (no good faith where failed to make a reasonable investigation into rights to enter property). As of Defendants' last Corporate Disclosure Statement, Enel Kansas was a wholly-owned subsidiary of EGPNA. Dkt. 126. And according to Enel's publicly available June 30, 2020 Half-Year Financial Report, TradeWind is the wholly-owned subsidiary of Enel Kansas. Ex. Y at 230. Thus, while it's possible that TradeWind documents are not in EGPNA's possession or control for purposes of production, they certainly are within the possession of Enel Kansas.

The Court should grant the OMC's Motion to Compel and order both EGPNA and Enel Kansas to search for and produce all documents responsive to the OMC's Requests for Production served on each Defendant separately; EGPNA and Enel Kansas cannot rely on Osage Wind to fulfill their own discovery obligations in this litigation.

### B. Defendants must remedy deficiencies within their privilege log.

Defendants' privilege log falls far short of compliance with the governing standards set forth in the governing Federal Rules of Civil Procedure. When a party withholds information based on privilege, the party must describe the nature of the withheld documents or communications in a manner that will enable other parties to assess the claim. Fed. R. Civ. P. 26(b)(5). As described above and detailed more fully in the United States' Motion to Compel (Dkt. 175), Defendants' privilege log continues to be deficient in many aspects despite weeks of correspondence and a meet and confer. Those deficiencies include inadequate identification of

recipients on distribution lists, failure to identify individuals by employment capacity, failure to provide adequate descriptions, and assertion of privilege over business advice provided by in-house attorneys.

Those deficiencies are intensified by Defendants' decision to combine their privilege logs. For example, OSAGE WIND PRIV-0001455-9 is described as "Email to counsel and others regarding timeline of communication regarding whether permit required for project and summarizing advice of counsel." Ex. X at 7-8. Based off of documents produced by Osage Wind, the sender of this email appears to be an EGPNA employee. When it comes to the recipients list, Defendants' Addendum to their privilege log is helpful for identifying the attorneys on the recipients list, but the OMC is again left to dig through Osage Wind productions to guess as to which entities, if any, the other individuals belong to. Even more perplexing is that the recipients list ends with the words "and others." *Id.* at 8. While the OMC might have a chance at identifying named individuals with some sleuthing, no amount of ingenuity can turn up the identity of "others" or shed light into whether communications including them are privileged. Again, that is just one example.

 Because the United States' Motion to Compel analyzes in detail the deficiencies with each entry on Defendants' privilege log (Dkt. 177-1),[8] there is no need for the OMC to replicate that work here. Instead, the OMC supports and joins with the United States in its arguments and reasserts its request that Defendants remedy the deficiencies in their current privilege log, as well

---

[8] The United States' Exhibit 11 annotates the Defendants' Third Amended and Supplemental Privilege Log to the United States which is identical to the Defendants Second Amended and Supplemental Privilege Log to OMC.

as submit separate logs for each of the Defendants, including Osage Wind, Enel Kansas and

EGPNA.[9]

### C. Defendants must produce documents and communications related to their attorneys' "detailed legal analysis" that a permit was not required to excavate on the Osage Mineral Estate.

Having repeatedly relied on their attorneys' legal analysis that a permit to excavate was

not required to assert that Defendants acted in "good faith" and, therefore, are not "bad faith"

trespassers under the law, Defendants cannot shield the documents and communications related

to this legal analysis from discovery. Under applicable Tenth Circuit precedent, allowing

Defendants to withhold these documents under an assertion of privilege would "violate the well-

established principle that 'attorney-client communications cannot be used both as a sword and a

shield.'" *Seneca Ins. Co. v. W. Claims, Inc.*, 774 F.3d 1272, 1278 (10th Cir. 2014) (quoting

*Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1552 (10th Cir.1995)).

In *Seneca Ins. Co. v. W. Claims, Inc.*, 774 F.3d 1272, the Tenth Circuit considered "the

contours of the attorney-client privilege" under Oklahoma law. In settling on the test developed

in *Hearn v. Rhay*, 68 F.R.D. 574 (E.D.Wash.1975), the Court recognized that "at-issue" waiver

applies where the:

---

[9] OMC notes that OSAGE WIND PRIV-00085-86, OSAGE WIND PRIV-00087, and OSAGE WIND PRIV 00088 are no longer included on Defendants' Second Amended and Supplemental Privilege Log, and thus the Court should compel their production. *See*, Ex. X.

(1)     assertion of the privilege was the result of some affirmative act by the asserting party;

(2)     through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and

(3)     application of the privilege would deny the opposing party access to information vital to its defense.

*Seneca Ins. Co.*, 774 F.3d at 1276.[10]

The first element of the *Seneca* at-issue test is easily satisfied. Just like the plaintiffs in *Seneca,* Defendants here have affirmatively put at issue their attorneys' legal analysis and advice by pointing to their good faith reliance on counsel's "detailed legal analysis" repeatedly throughout the last five and a half years of litigation. *See, e.g.,* Dkt. 17 at 2, 6; Dkt. 28 at 19-20; Dkt. 99 at 12; Dkt. 101 at 11 ("Osage Wind believed, ***in good faith***, ***based upon a detailed legal analysis***, that a lease or permit were not required") (emphasis added); Dkt. 116 at 11 ("Osage Wind believed, ***in good faith***, ***based upon a detailed legal analysis***, that a lease or permit were not required") (emphasis added); Dkt. 150 at 10-11 ("Osage Wind believed, ***in good faith, based upon a detailed legal analysis***, that neither a lease nor a permit was required.") (emphasis added); Dkt. 174, Defenses and Affirmative Defenses ¶ 17. The legal analysis of Defendants' counsel would not be at issue but for Defendants' repeated affirmative acts.

Second, by asserting that this legal analysis demonstrates the "good faith" nature of their unlawful conduct, Defendants have "put the protected information at issue by making it relevant to the case." *Seneca Ins. Co.*, 774 F.3d at 1276. Because Defendants are relying on their attorneys' legal analysis to claim their conduct was carried out in "good faith," it is clear that Defendants have rendered the information they claim is privileged relevant to the case.

---

[10] The *Seneca* Court also held that this analysis applies to waiver of privilege over related work product. *Seneca Ins. Co.*, 774 F.3d at 1278 (holding that the plaintiff also waived work product protection by putting attorney correspondence and analysis at issue).

As for the third element, the Tenth Circuit has concluded that "the information must [] be 'vital,' which necessarily implies the information is available from no other source." *Frontier Refining, Inc. v. Gorman–Rupp Co.*, 136 F.3d 695, 701 (10th Cir.1998). Here, this is precisely the case. Defendants assert they truly relied on their attorneys' analysis that a permit was not required, but whether or not they truly did rely on this legal advice in good faith can only be determined by an analysis that considers whether:

(1) They *first* requested their attorneys to work on this legal analysis before or after the United States informed Defendants that federal law required them to get a permit;

(2) Whether other attorneys working for Defendants disagreed with Lynn Slade's final conclusion in the "detailed legal analysis" he sent to Alan Woodcock on October 14, 2014 (Dkt. 17-4), and whether Defendants chose to ignore this disagreement amongst their counsel; or, equally relevant, whether Defendants' attorneys' legal analysis changed over time, in relation to the economic impact of that analysis as construction continued to progress;

(3) Whether the legal analysis they claim to rely on was outcome determinative—a determination that can only be made by reviewing the instructions Defendants' counsel received when they began preparing the "detailed legal analysis" they now claim to have relied upon;

(4) And many other considerations related to whether Defendants themselves actually, and in good faith, relied on their attorneys' conclusion that a permit was not required by law—or whether their internal communications demonstrate otherwise.

Because Defendants assert their trespass was carried out in "good faith," in reliance on their attorneys' legal analysis that a permit was not required under the law, the "application of the

privilege" here, in this instance, "would deny the [OMC] access to information vital to its

defense" against Defendants' good faith assertions. *Seneca Ins. Co.*, 774 F.3d at 1276. The

OMC's Motion, therefore, satisfies all three of the requisite elements the Tenth Circuit set out in

*Seneca*.

Defendants, accordingly, cannot rely on their advice of counsel as foundational evidence

of their status as a "good faith" trespasser and refuse to produce documents that would

substantiate, or undermine, the veracity of their assertions; Defendants have put the

reasonableness of their decision to trespass at issue, and thus cannot rely on the assertion of

privilege to prevent discovery of the facts related to that decision. *See Seneca Ins. Co.*, 774 F.3d

at 1277-78; EDWARD J. IMWINKELRIED, THE NEW WIGMORE: EVIDENTIARY

PRIVILEGES, § 6.12.4 (2014) (the "in issue" doctrine prevents assertion of privilege as both

shield and sword). Without access to work product and communications relating to the origins

and various iterations of the "detailed legal analysis," including the documents and

correspondence identified in Defendants' privilege log and listed in the attached Appendix A, the

OMC cannot evaluate whether Defendants actually believed the position set forth in the now

public legal memorandum or whether they were merely using it as a justification to cover up

their willful misconduct and bad faith.

The OMC's Motion to Compel these relevant documents and communications should be

granted.

## IV.   CONCLUSION

For the reasons stated above, the OMC respectfully requests the Court (1) compel Osage

Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America. Inc. to provide

documents responsive to Intervenor Plaintiff's Requests for Production, as well as compel

Defendants to provide separate privilege logs or provide information sufficient to determine

which defendant is asserting the privilege, (2) compel Defendants to address the deficiencies in their privilege logs, and (3) compel Defendants to produce any and all documents, communications, and attorney-work product related to the detailed legal analysis they claim substantiates their good faith affirmative defense in this litigation.

Respectfully submitted,

s/ Mary Kathryn Nagle
Mary Kathryn Nagle, OBA No. 33712
Wilson Pipestem, OBA No. 16877
Abi Fain, OBA No. 31370
Pipestem Law, P.C.
320 S. Boston Ave., #1705
Tulsa, Oklahoma 74103
918-936-4705 (Office)
wkpipestem@pipestemlaw.com
mknagle@pipestemlaw.com
afain@pipestemlaw.com
*Counsel for Intervenor-Plaintiff*
*Osage Minerals Council*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 20, 2020, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Ryan A. Ray                              Cathryn Dawn McClanahan
Joel L. Wohlgemuth                       cathy.mcclanahan@usdoj.gov
rar@nwcjlaw.com                          *Counsel for Plaintiff, United States*
jlw@nwcjlaw.com

-and-

Lynn H. Slade
Sarah S. Stevenson
lynn.slade@modrall.com
sarah.stevenson@modrall.com
*Counsel for Defendants*



 /s/ Mary Kathryn Nagle