# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and | ) | |
| THE OSAGE MINERALS COUNCIL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-704-GKF-JFJ |
| | ) | |
| OSAGE WIND, LLC; | ) | |
| ENEL KANSAS, LLC; and | ) | |
| ENEL GREEN POWER NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF MEGAN J. BEAUREGARD

Megan J. Beauregard, after first being duly sown, hereby depose and state:

1.      I am the General Counsel and Vice President of Legal and Corporate Affairs for Enel North America, Inc. (f/k/a Enel Green Power North America, Inc.) ("EGPNA") and all of its United States-based subsidiaries and affiliates, including Enel Kansas, LLC and Osage Wind, LLC.  I have been a member of the bar of the State of New Hampshire since 2004, and I have been a member of the bar of the State of Massachusetts since 2010.

2.      I have been employed by EGPNA since 2008, and I have always worked in the office of the General Counsel, which employs, and employed during 2013 and 2014, a number of lawyers and support staff (the "Enel Legal Department").

3.      From the time of the commencement of my employment with EGPNA through 2017, the General Counsel was Stephen C. Champagne.  Initially, I was employed as an Associate General Counsel for several years, and from approximately 2015 – 2016, I was a Senior Associate

General Counsel.  Also, during the period of 2013 and 2014, Mike Tierney and Jinjue Allen, among others, were employed as Counsel in the Enel Legal Department.

4.      The principal functions of the Enel Legal Department are to support litigation (or other forms of dispute resolution, such as mediation and arbitration) to which either EGPNA or one of its United States-based subsidiaries is a party and to advise business persons of the companies on legal issues pertinent to their work or as specifically requested.  The Enel Legal Department does not make general business decisions for EGPNA or one of its United States-based subsidiaries.  Indeed, Mr. Champagne's strongly held personal philosophy was that the General Counsel, in particular, and the Enel Legal Department more generally, was there to provide legal advice, and it was up to the business decision makers to make the actual decisions.  That was the manner in which the Enel Legal Department functioned in 2013 and 2014 (and continues to be the case today), and it particularly applied to all issues associated with the Osage Wind wind-energy project located in Osage County, Oklahoma (the "Project").

5.      In my capacity as General Counsel, I have access to the legal records maintained by the Enel Legal Department and supervise their maintenance.  That includes records related to Osage Wind, LLC ("Osage Wind"), including records provided by the prior owners of Osage Wind—Wind Capital Group, LLC ("WCG") and TradeWind Energy, Inc. ("TradeWind").  The exhibits to this Declaration are maintained in such records (which are maintained in the ordinary course of the Enel Legal Department's business), and I have personally reviewed such records.

6.      Osage Wind was an entity formed in 2008.  Prior to August of 2013, its membership interests were wholly owned by WCG.

7.      As of August 22, 2013, TradeWind acquired WCG's interest in Osage Wind, and as of that date wholly owned Osage Wind's membership interests.

2

8.      As of September 17, 2014, Enel Kansas, LLC ("Enel Kansas") acquired
TradeWind's interest in Osage Wind, and as of that date wholly owned Osage Wind's membership
interests.

9.      Enel Kansas was and is a holding company.  Enel Kansas does not have separate
employees.  Rather, employees of Enel Green Power North America, Inc. ("EGPNA") provide
services for Enel Kansas, as is customary for the United States-based subsidiary companies of
EGPNA (such as Enel Kansas and Osage Wind).  And like all other United States-based
subsidiaries and affiliates of EGPNA, the Enel Legal Department has provided legal services and
legal advice for Enel Kansas and Osage Wind, and did so as to the Project in particular.

10.     EGPNA was also a party to the Purchase Agreement whereby Enel Kansas acquired
TradeWind's interest in Osage Wind.

11.     Enel Kansas and TradeWind had a business relationship centered in the
development of wind energy projects for several years prior to September of 2014, and the
transaction whereby Enel Kansas acquired TradeWind's membership interests in Osage Wind (to
which EGPNA was also a party) had been under discussion for some time prior to its formal
consummation in September of 2014, including throughout 2013.

12.     Under the operative agreements, both WCG and TradeWind had duties to work
with the new owner(s) of Osage Wind to provide necessary information and cooperate to facilitate
the Project.

13.     Part of that cooperation involved the provision of legal information and legal advice
from outside counsel to TradeWind and Osage Wind, Steve Willman and Darren Neil, and the

3

General Counsel to WCG and Osage Wind, George Knapp.[1]  That information was shared with EGPNA and Enel Kansas with the understanding and expectation that it remained privileged and confidential.

14.    Thus, WCG, TradeWind, Osage Wind, Enel Kansas, and EGPNA had an identical interest in at least 2013 and 2014 in ensuring that the Project complied with all applicable and potentially applicable legal requirements.

15.    In 2008 and 2009, representatives of Osage Wind met with representatives of the Osage Minerals Council (the "OMC").  OMC representatives stated at that time that, unless Osage Wind was willing to pay the OMC monetary payments that exceeded the amounts the OMC received from oil and gas production, the OMC and the Osage Nation (the "Nation") would be opposed to the Project.

16.    Despite that, WCG and Osage Wind have engaged and attempted to engage in communications with the OMC, the Nation, the United States Bureau of Indian Affairs (the "BIA"), and the United States Department of the Interior ("Interior") regarding all issues associated with the Project. (*See* Dkt. # 17-2, at 3-4, 21-25).

17.    On October 18, 2011, the Nation, acting through the OMC, filed a Complaint for Declaratory and Injunctive Relief against WCG *Osage Nation v. Wind Capital Group, LLC*, No. 11-CV-00643 GKF-PJC (N.D. Okla. Oct. 18, 2011) ("Prior Federal Litigation") (Dkt. # 2, copy attached as Exhibit 1).

18.    In the Prior Federal Litigation Complaint, the OMC alleged that:

_____

[1] The Enel Legal Department also received a detailed memorandum prepared for TradeWind and Osage Wind from Barbara Craig, Greg Corbin, Sarah Curtiss, and Robin Seifried of the Stoel Rives, LLP law firm regarding numerous matters associated with the Project, including potential theories of litigation against the Project and those lawyers' opinions regarding potential responses thereto.

    a.  Each of the wind turbines to be constructed on the Project site "will require extensive digging to construct deep pits containing concrete foundations similar to those required in the construction of tall buildings." *Id.* ¶ 17.

    b.  The OMC "is and will continue to be irreparably harmed if the Defendants are allowed to begin construction and interfere with Osage Nation's rights associated with developing its mineral estate." *Id.* ¶ 40.

    c.  Construction on the Project site would interfere with development of oil, gas, coal and/or other minerals. *Id.* ¶¶ 1, 23.

19.    On October 10, 2013, Andrew Yates, Chairman of the OMC, sent a letter to the Chief Executive Officers of WCG and TradeWind, which stated, in part:

> Activities occurring within or affecting the Osage Mineral Estate may be subject to a range of federal regulatory requirements, including the need to secure a federal permit or lease to undertake such activities, pursuant to 25 C.F.R. §§ 411 and 414.

(October 10, 2013 Letter from Andrew Yates, at 1, copy attached hereto as Exhibit 2).

20.    On November 11, 2013, three members of senior management (including the CEO and General Counsel) of Chaparral Energy, LLC ("Chaparral") sent a letter to Osage Agency, BIA Acting Superintendent Robin Phillips, which was carbon copied to the CEOs of WCG and TradeWind, as well as BIA Field Solicitor Alan Woodcock and the Chairman of the OMC. In the letter, Chaparral, which described itself as having a "mineral lease with the Osage Nation," stated that:

> Chaparral believes it is incumbent upon the BIA, as trustee and regulator of the Osage Mineral Estate, to take immediate action to protect both the Osage and the significant investments of Chaparral and other affected lessees whose leases will be impaired by the wind project.

(November 11, 2013 Letter from Mark Fischer, et al., at 3, copy attached hereto as Exhibit 3).

21.     On April 25, 2014, the Osage Nation and the OMC filed a "Petition to the [Osage County] Board of Adjustment to Rescind Wind Capital Energy Project Variance and Prohibit Construction at the Project Site until the Board Properly Authorizes the Project." (Copy attached as Exhibit 4). On May 8, 2014, the Osage County Board of Adjustment denied this Petition at a public hearing.

22.     The Nation and the OMC thereafter appealed that denial to the District Court of Osage County in May 2014 in *In the Matter of the Osage Nation and the Osage Minerals Council*, District Court of Osage County Case No. CV-2014-36 (the "Zoning Appeal"). A copy of the OMC's Petition in the Zoning Appeal is attached as Exhibit 5.

23.     During the pendency of the Zoning Appeal, the Nation and the OMC commenced *separate* litigation in the District Court of Osage County, styled *Osage Nation and Osage Minerals Council v. Osage County Board of County Commissioners, et al.*, District Court of Osage County Case No. CV-2014-41 (the "State Declaratory Case"). The OMC's Petition in the State Declaratory Case was filed on June 25, 2014 (copy attached as Exhibit 6).

24.     Moreover, throughout 2013 and 2014, Osage Wind was about the process of obtaining other permits and regulatory approvals related to the Project, including from the Army Corps of Engineers and the United States Forest Service. The OMC opposed Osage Wind's efforts to obtain approvals from the United States Forest Service through counsel, Ian Shavitz, and Osage Wind reasonably anticipated continuing opposition from the OMC and the Nation based upon their history of litigation opposition as detailed in Paragraphs 15 – 23 above.

25.     Based upon the matters described in Paragraphs 15 – 24 above, WCG, TradeWind, Osage Wind, and the Enel Legal Department anticipated the potential of numerous pieces of litigation challenging the Project, and were in fact involved in defending litigation challenging the

6

Project, brought by or at the behest of the OMC and/or the Nation throughout 2013 and 2014.  This specifically included, but was not limited to, the issues presented by the Andrew Yates letter of October 10, 2013 and the Chaparral letter of November 11, 2013.

26.     Further, in evaluating whether to, in fact, proceed with the transaction described in Paragraphs 9 – 11 above, decisionmakers at EGPNA were interested in, and in fact sought, legal advice from the Enel Legal Department (including, principally, General Counsel Champagne) regarding counsel's views about pending, threatened, and anticipated potential litigation surrounding the Project.  During the course of such discussions, there were numerous complex issues of state and federal law that were beyond the scope of the particular legal expertise of Mr. Champagne or any other member of the Enel Legal Department.  Accordingly, outside counsel was involved, including outside counsel that had previously been advising WCG, TradeWind, and Osage Wind on similar issues.  Further, business records of the Enel Legal Department, maintained in the ordinary course of its business, indicate that TradeWind underwent a similar process, consulting with its counsel, in deciding whether and on what terms to acquire WCG's interest in Osage Wind.

27.     In particular, outside counsel for Osage Wind and TradeWind, including Steve Willman and Darren Neil (of the Douthit Frets Rouse Gentile & Rhodes, LLC firm in Leawood, Kansas), and Lynn Slade, Bill Scott, Walter Stern, and Sarah Stevenson (of the Modrall Sperling Roehl Harris & Sisk, P.A. law firm in New Mexico) were frequently consulted throughout 2013 and 2014 to provide legal advice and actual and potential litigation strategy regarding all matters associated with the Project.[2]

---

[2] Ryan Ray of the Norman Wohlgemuth Chandler Jeter Barnett & Ray, P.C. law firm in Tulsa, Oklahoma was also included on certain communications, as he and his law firm were lead counsel for Osage Wind in the Zoning Appeal and the State Declaratory Case (as well as the underlying

28.     Further, members of the Enel Legal Department, including then-General Counsel Stephen Champagne, Deputy General Counsel Mike Tierney, and Assistant General Counsel Jinjue Allen, were involved in communications throughout 2014 related to the Project for the purposes of providing legal advice and actual and potential litigation strategy themselves regarding all matters associated with the Project, and to coordinate and interface with outside counsel regarding legal advice and actual and potential litigation strategy of outside counsel regarding issues associated with the Project.

29.     Such legal advice required review and comment upon forms of engineering, procurement, and construction ("EPC") contracts through a designated team of counsel and business people necessary to decide terms to be included in the numerous complex agreements for the Project and how to apply and implement those terms once agreed upon.  To facilitate that advice, the Enel Legal Department reviewed and commented on such items through a spreadsheet, maintained electronically.  Such a method of analysis and compilation of input from counsel and others was commonplace during this time period.  Spreadsheets prepared and circulated for that purpose are identified on Defendants' Fourth Amended Privilege Log as Osage Wind Priv 00001-000025 and 000026-000044. The attorneys providing input and advice through this medium included Steve Champagne, the General Counsel, and Mike Tierney, whose particular expertise was construction law and contracts.  It was understood by all reviewers and commenters the information exchanged was to remain strictly confidential within the company, as it included

---

proceedings at the Osage County Board of Adjustment), as well as for Mustang Run Wind Energy Project, LLC, which was owned by TradeWind, in the case *Mustang Run Wind Project, LLC v. Osage County Board of Adjustment*, District Court of Osage County Case No. CV-2014-34 ("*Mustang Run*"), which was assigned to the same state District Judge and presented overlapping issues. The Osage Nation and the OMC were permitted to intervene in *Mustang Run* and presented many similar challenges in that proceeding as they had presented in the Zoning Appeal and the State Declaratory Case.

recommendations to counsel as to terms for inclusion in pertinent agreements, and the spreadsheets were not shared outside the company (and were specifically not shared with the counterparties to the various agreements).

30.     Steve Champagne had advised business people who rendered services for EGPNA, Enel Kansas, and Osage Wind to include members of the Enel Legal Department on communications regarding the Project for the express purpose of providing legal advice and actual and potential litigation strategy regarding all matters associated with the Project.  Due to the various matters and challenges that had been presented, and were continuing to be presented, regarding the Project, counsel's involvement was required to ensure that the numerous pending legal issues were being fully analyzed and analyzed based upon a complete understanding of the relevant facts.  The business people who rendered services for EGPNA, Enel Kansas, and Osage Wind copied or addressed communications regarding the Project to members of the Enel Legal Department on communications in 2014 in particular due to the numerous pending legal challenges and actual lawsuits challenging the Project.  Obtaining legal advice and legal strategy opinions was important in this environment, which included numerous pieces of actual, threatened, and anticipated potential litigation.

31.     Multiple business people with specific responsibilities for the many functions required to implement the Project, which was complex in many ways, were involved in providing input to counsel to advise legal decisions or in effectuating legal decisions pertaining to the development of the Project, including EGPNA employees Joan Heredia, Jennifer Dean, Bill Price, Bill Moskaluk, Giuseppe DiMarzio, Nick Lincon, Christopher Hickey, Mike Welch, Chris Hanson, Giuseppe DiMarzo, Francesco Venturini, Rafael Gonzalez, Christian Missaglia, Mike Storch.  Also involved were business people Daren Daters, Matt Gilhousen, Aaron Weigel, Rob

Freeman, and Geoff Coventry of TradeWind, which had owned Osage Wind's membership interests until September 17, 2014.  David Boyce, the Chief Executive Officer of WCG, the prior owner of Osage Wind, was also involved for similar reasons.  Further, as a matter of company policy, all employees of EGPNA, Enel Kansas, and Osage Wind were required to maintain such communications as strictly confidential, not be disclosed to persons outside the management teams responsible for the project.  It is my understanding that TradeWind had a similar requirement in 2013 and 2014.

32.     In addition to the cooperation required by the operative agreements described in Paragraphs 12 and 13 above, Osage Wind and TradeWind were pursuing joint defense efforts in the Zoning Appeal, the State Declaratory Case,[3] and *Mustang Run*, and were also pursuing a joint legal strategy on permitting and compliance issues associated with wind-energy projects in Osage County more generally.

33.     Indeed, as to the issues presented in this litigation, the United States filed a substantively identical lawsuit in this Court, styled *United States of America v. Mustang Run Wind Energy Project, LLC, et. al*, United States District Court for the Northern District of Oklahoma Case No. 15-cv-TCK-FHM (the "Mustang Run Federal Litigation").  As copy of the Complaint in the Mustang Run Federal Litigation is attached as Exhibit 7.  Named as Defendants in the Mustang Run Federal Litigation were (i) Mustang Run Wind Energy Project, LLC, (ii) TradeWind, (iii) EGPNA, and (iv) Enel Kansas.  All of the Defendants pursued a joint defense in the Mustang Run

---

[3] Though it was not named as a defendant, the Osage Nation and the OMC's Petition in the State Declaratory Case included a multiple-paragraphs section asserting challenges to the Mustang Run Project, which were also included in the substantive claims for relief.  (*See* Exh. 6, at 9-11, 15, ¶¶ 26-30, 35, 45).

Federal Litigation and were represented by common counsel in that case. This was consistent with the parties' approach to the issue at prior times, including in 2013 and 2014.

34.     When EGPNA received Robin Phillips' October 9, 2014 letter to Francesco Venturini (which was carbon copied to the BIA Field Solicitor's Office, which EGPNA's inside and outside counsel understood to be the attorneys responsible for representing the BIA in litigation), the Enel Legal Department decided that outside counsel, Lynn H. Slade and William C. Scott of the Modrall Sperling firm, would communicate with the Field Solicitor's Office in response to the letter. Mr. Slade and Mr. Scott prepared a written memorandum to be submitted to the Field Solicitor, Alan Woodcock, detailing the position of Osage Wind on why it believed a permit was not required to continue with Project construction. That writing was always intended to be shared with Mr. Woodcock, and it was in fact so shared.

35.     There were, however, communications with Osage Wind personnel and the Enel Legal Department to provide Mr. Slade and Mr. Scott with the necessary factual background, and to give the Enel Legal Department the opportunity to review and approve the submission to Mr. Woodcock. Those communications were always intended to be privileged, whereas the submission to Mr. Woodcock was not.

36.     The Enel Legal Department has been closely involved with the document production efforts of all three named Defendants in this litigation—EGPNA, Enel Kansas, and Osage Wind. Working with outside counsel, the Enel Legal Department has identified the persons involved with the Project most likely to have responsive documents, as well as other locations in which responsive documents related to the Project would likely be found. The persons so identified and the locations so searched have been identified without regard to whether the persons

11

are employed formally by EGPNA or Osage Wind (as noted above, Enel Kansas has no separate employees).

I declare under penalty of perjury in accordance with the laws of the United States that the foregoing is true and correct in accordance with 28 U.S.C. § 1746.

Executed this 1st day of September, 2020.

**Megan J. Beauregard**

# EXHIBIT 1

Roger Wiley (OK Bar No. 11568)
**ROSETTE, LLP**
P.O. Box 1667
McAlester, OK 74502
Tel: (480) 242-4570
Fax: (480) 889-8997
Email: rwiley@rosettelaw.com

*Attorney for Plaintiff*
*THE OSAGE NATION*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. **THE OSAGE NATION** acting through the **OSAGE MINERALS COUNCIL,**<br><br>Plaintiff,<br><br>vs.<br><br>1. **WIND CAPITAL GROUP, LLC,** a Delaware limited liability company;<br>2. **OSAGE WIND, LLC,** a Delaware limited liability company; and<br>3. **WC INVESTMENT MANAGEMENT, LLC,** fka **WIND CAPITAL INVESTMENT MANAGEMENT, LLC,** aka/fka **WIND CAPITAL INVESTMENT GROUP, LLC,** a Missouri limited liability company,<br><br>Defendants. | Case No. 11-CV-643-GKF-PJC<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1    Plaintiff, the Osage Nation, acting through the Osage Minerals Council, for its

2    claims and causes of action against the Wind Capital Group, LLC, Osage Wind, LLC

3    and Wind Capital Investment Management, LLC, alleges and states as follows:

4

5                    **THE PARTIES, JURISDICTION, AND VENUE**

6    1.    Plaintiff the Osage Nation is a federally-recognized Indian tribe located in

7    north central Oklahoma, with its principal place of business located in Osage County,

8    Oklahoma.  The Osage Nation has approximately 15,600 members.  The government of

9    the Osage Nation is obligated to ensure the preservation of the oil, gas, coal and/or other

10   minerals within the boundaries of the Osage Reservation as well as to protect the rights

11   of its tribal members to income derived from these minerals (the "Minerals

12   Obligations").  To that end, the Osage Nation is acting through the Osage Minerals

13   Council, a minerals management agency created under Article XV, section 4 of the

14   Constitution of the Osage Nation to discharge the Minerals Obligations, including those

15   related and necessary to mineral estate lessees.  The Osage Nation, together with the

16   Osage Minerals Council, will hereinafter be referred to collectively as the "Osage

17   Nation" or "Plaintiff."

18   2.    Defendant Wind Capital Group ("WCG") is a limited liability company

19   organized under the laws of Delaware.  WCG maintains its principal place of business in

20   St. Louis, Missouri with additional offices located in Chicago, Illinois and Madison,

21   Wisconsin.

22
                    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1        3.     Defendant Osage Wind, LLC ("Osage Wind") is a limited liability

2    company organized under the laws of Delaware.  Upon information and belief, Osage

3    Wind is the owner and developer of the Osage County Wind Project, as described more

4    fully below, and is also owned and/or controlled by one or more of the other defendants

5    named herein.

6        4.     Defendant WC Investment Management, LLC ("WCIM") is a limited

7    liability company organized under the laws of Missouri.  Upon information and belief,

8    WCIM was formed in Missouri in 2005 under the name Wind Capital Group, LLC.

9    Subsequently through filings with the Missouri Secretary of State's Office, Wind Capital

10   Group, LLC changed its name to Wind Capital Investment Management, LLC, and

11   finally to WC Investment Management, LLC.  Also upon information and belief, WCIM

12   continues to be known as or referred to as Wind Capital Group, LLC.

13       5.     At all relevant times hereto, WCG and WCIM have shared one or more

14   members and/or organizers, including Thomas S. Carnahan.  It is unknown to Plaintiff at

15   this time whether WCG and/or WCIM share one or more members and/or organizers

16   with Osage Wind.  WCG, together with WCIM and Osage Wind, will be collectively

17   referred to as the "Defendants," and are responsible for the unlawful acts described in

18   this Complaint.

19       6.     This Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1362, and

20   28 U.S.C. § 1367(a).

21

22

1    7.    Osage Nation's request for declaratory and injunctive relief is authorized

2    by 28 U.S.C. §§ 2201, 2202.

3    8.    Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a

4    substantial part of the events giving rise to this action occurred in this federal judicial

5    district and the real property that is the subject of this dispute is located in this federal

6    judicial district.

7    **FACTUAL BACKGROUND**

8    9.    Osage Nation repeats and re-alleges each of the foregoing allegations in

9    this Complaint as though fully set forth herein.

10    10.    Osage Nation and its citizens are the beneficial owners of a mineral estate

11    comprised of 100% of the minerals located in and under Osage County, Oklahoma.

12    11.    As the owner of all the minerals located in and under Osage County,

13    Oklahoma, Osage Nation has the right to explore, develop, remove, operate, and

14    transport the minerals within the Osage Nation mineral estate.

15    12.    The revenues generated from the Osage Nation mineral estate are allocated

16    to the State, County, and members of the Nation.

17    13.    The revenues generated from the Osage Nation mineral estate that are

18    distributed to members of the Nation provide essential income for Osage citizens who

19    share in the mineral revenue distributions, comprising the sole source of income for

20    some citizens of the Osage Nation.

21

22

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

4

1    14.    Several million dollars in annual revenues generated from the Osage

2  Nation mineral estate are paid to the Osage County and State of Oklahoma for roads and

3  schools.

4    15.    Osage Nation has entered into lease agreements with certain energy

5  companies for the purpose of exploring and developing the Osage Nation mineral estate

6  and in accordance with 25 C.F.R. § 226.19, the Osage Nation acting through the Osage

7  Minerals Council has certain Minerals Obligations and as such has the right to use so

8  much of the surface estate as may be reasonable for the exploration, development,

9  removal, operation, transportation, and marketing of the mineral estate.

10    16.    The Defendants are proposing to construct, and have already taken

11  significant and affirmative steps toward constructing, a massive industrial network of

12  wind turbines, high voltage underground electric transmission lines, met towers, a

13  substation, roads, and storage yards (hereinafter referred to as "Osage County Wind

14  Project") over and upon the Osage Nation mineral estate.

15    17.    The Defendants' Osage County Wind Project will place 94 wind turbines,

16  each approximately 400 feet in height, over and upon the surface above the Osage

17  Nation mineral estate.  Each of the 94 wind turbines will require extensive digging to

18  construct deep pits containing concrete foundations similar to those required in the

19  construction of tall buildings.

20

21

22

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

18.     The Defendants' Osage County Wind Project will place two separate "met towers," each approximately 200 feet in height, over and upon the surface above the Osage Nation mineral estate.

19.     As part of Defendants' Osage County Wind Project, an extensive network of high voltage electric underground transmission lines, a substation, storage yards, outbuildings, and roads over and upon the surface above the Osage Nation mineral estate will be constructed.

20.     The Defendants' Osage County Wind Project will implement and mobilize a large work force requiring the use of numerous pieces of heavy equipment including cranes, scrapers, road graders, backhoes, and tractor trailers as well as other heavy equipment over and upon the surface above the Osage Nation mineral estate.

21.     Osage Nation is in the process of exploring and developing Osage Nation's mineral estate in the area where the Defendants propose to construct their Osage County Wind Project.

22.     During the process of exploring and developing its mineral estate, Osage Nation has discovered marketable amounts of oil and natural gas within the Osage Nation mineral estate.   Developing and marketing the natural gas will require the construction of flow lines and transmission lines within the Osage Nation mineral estate. The Defendants' construction and operation of the Osage County Wind Project will illegally interfere with the construction, operation and maintenance of the flow lines and transmission lines to the detriment of the Osage mineral estate and Osage Nation.

Case 4:11-cv-00643-GKF-PJC   Document 2 Filed in USDC ND/OK on 10/18/11   Page 7 of 11
Case 4:14-cv-00704-GKF-JFJ   Document 186-1 Filed in USDC ND/OK on 09/01/20   Page 21 of
110

1    23.    The Defendants' Osage County Wind Project will interfere with Osage

2   Nation's rights to the surface necessary for the exploration, development, removal,

3   operation, transportation, and marketing of the Osage Nation mineral estate.

4                        **FIRST CLAIM FOR RELIEF**

5   **OSAGE NATION REQUESTS THIS COURT TO DECLARE THAT THE OSAGE
    COUNTY WIND PROJECT VIOLATES FEDERAL LAW, GUARANTEEING
6   OSAGE NATION'S ACCESS TO THE MINERAL ESTATE AND ISSUE A
    PRELIMINARY AND PERMANENT INJUNCTION ENJOINING THE
7   DEFENDANTS FROM COMMENCING THE OSAGE COUNTY WIND
                              PROJECT
8                      (28 U.S.C. §§ 2201, 2202)

9    24.    Osage Nation repeats and re-alleges each of the foregoing allegations in

10   this Complaint as though fully set forth herein.

11   25.    An actual controversy exists between Osage Nation and the Defendants in

12   that the Defendants plan to construct a massive industrial wind farm on the surface

13   above Osage Nation's mineral estate in violation of federal law.

14   26.    Federal regulations governing the leasing of Osage Nation's mineral estate

15   guarantee the right to use so much of the surface above the mineral estate as may be

16   reasonable for operations and marketing. *See* 25 C.F.R. § 226.19.

17   27.    The Defendants' Osage County Wind Project will interfere with the right

18   of surface access, which will in turn cause serious and immediate harm to the Osage

19   Nation, including cancelled leases, inability to attract future lessees, and the inability to

20   benefit fully from the mineral estate through the use of new technologies.

21

22

1     28.     Absent judicial intervention, Osage Nation will suffer imminent,

2     permanent, and irreparable harm for which there is no adequate remedy at law.

3     29.     This Court may grant and Osage Nation is entitled to declaratory and

4     injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202.

5     30.     Because the construction of a massive industrial wind farm on the land

6     above Osage Nation's mineral estate will interfere with access to the mineral estate, this

7     Court should declare that the Osage County Wind Project on the surface above Osage

8     Nation's mineral estate violates federal law.

9     31.     If the Defendants are permitted to construct and operate the Osage County

10    Wind Project on the land above Osage Nation's mineral estate, Osage Nation will suffer

11    great harm.   In order to prevent irreparable injury, this Court should issue both

12    preliminary and permanent injunctions prohibiting the Defendants from moving forward

13    with the Osage County Wind Project.

14                          **SECOND CLAIM FOR RELIEF**

15    **OSAGE NATION REQUESTS THIS COURT TO ISSUE INJUNCTIVE RELIEF
      AGAINST DEFENDANTS' OSAGE COUNTY WIND PROJECT AS IT**
16    **ILLEGALLY INTERFERES WITH OSAGE NATION'S RIGHT TO DEVELOP
      AND OPERATE ITS MINERAL ESTATE**
17

18    32.     Osage Nation repeats and re-alleges each of the foregoing allegations in

19    this Complaint as though fully set forth herein.

20    33.     The right to enter land to explore for and develop minerals is an ownership

21    right.  Under Oklahoma law, the surface estate is servient to the dominant mineral estate

22

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

8

1    for the purpose of oil and gas development. *DuLaney v. Okla. State Dep't of Health,*

2    868 P.2d 676, 680 (Okla. 1993).

3        34.    Recent advances in technology have led to the discovery of previously

4    undetected marketable amounts of oil and natural gas within the Osage Nation mineral

5    estate. Access to the surface above the mineral estate is vital to Osage Nation's ability

6    to develop and market the newly discovered oil and natural gas.

7        35.    Developing and marketing the natural gas will require the construction of

8    flow lines and transmission lines within the Osage Nation mineral estate.

9        36.    The Defendants' Osage County Wind Project is located on the land by

10   which the mineral estate is accessed.

11       37.    The construction and placement of 94 wind turbines, met towers, high

12   voltage electric underground transmission lines, power substations, storage yards,

13   outbuildings, and roads will significantly interfere with Osage Nation's, the dominant

14   estate holders', right of access.

15       38.    The Defendants' construction and operation of the Osage County Wind

16   Project will illegally interfere with the construction, operation and maintenance of the

17   flow lines and transmission lines to the detriment of the Osage mineral estate and Osage

18   Nation.

19       39.    The construction and operation of the Defendants' Osage County Wind

20   Project will cause Osage Nation to suffer significant money damages in an amount so

21   substantial that Osage Nation's damages would far exceed any amount that the

22

1   Defendants would be capable of paying in a suit for money damages and Osage Nation

2   is therefore without an adequate remedy at law.

3       40.    Osage Nation is and will continue to be irreparably harmed if the

4   Defendants are allowed to begin construction and interfere with Osage Nation's rights

5   associated with developing its mineral estate.

6       41.    Accordingly, Osage Nation requests entry of injunctive relief maintaining

7   the status quo as to Osage Nation's right to continue the exploration and development of

8   its mineral estate without interference from the Defendants.

9       WHEREFORE, Plaintiff Osage Nation requests judgment for declaratory and

10  injunctive relief in its favor as follows:

11      A.    A judgment declaring that the Osage County Wind Project violates 25

12  C.F.R. § 226.19, guaranteeing Osage Nation access to the mineral estate;

13      B.    Directing that the Defendants not proceed with the Osage County Wind

14  Project due to the unreasonable interference with Osage Nation's right to develop and

15  operate its mineral estate;

16      C.    Enjoining the Defendants from taking any actions designed to construct or

17  operate the Osage County Wind Project or engage in any surface activities that interfere

18  with Osage Nation's dominant mineral rights;

19      D.    Declaring that the construction and operation of the Defendants' Osage

20  County Wind Project on the land above Osage Nation's mineral estate will interfere with

21

22

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

10

1   Osage Nation's access to the mineral estate and that the Osage County Wind Project

2   violates federal law;

3       E.      Awarding Osage Nation its reasonable attorney fees and costs; and

4       F.      Awarding all other relief as this Court deems just and equitable.

5                                   Respectfully Submitted,

6                                   ROSETTE, LLP

7

8                                   By /s/ Roger Wiley
                                        Roger Wiley (OK Bar No. 11568)
9                                       14 Crooked Oak Lane
                                        McAlester, OK 74501
10                                      (480) 242-4570
                                        (480) 889-8997
11                                      rwiley@rosettelaw.com

12                                      *Attorney for Plaintiff*
                                        *THE OSAGE NATION*

13

14

15

16

17

18

19

20

21

22

                            COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# EXHIBIT 2

# Osage Minerals Council
## Osage Nation



Joseph B. "Sonny" Abbott
Curtis O. Bear
Cynthia J. Boone
Melvin Core

Galen Crum - Chairman
Myron F. Red Eagle
Dudley P. Whitehorn
Andrew Yates

David Boyce
Chief Executive Officer
Wind Capital Group
1 South Dearborn Street, Suite 2100
Chicago, Illinois 60603

Robert H. Freeman
Chief Executive Officer
TradeWind Energy, Inc.
Southlake Technology Park
16105 West 113th Street, Suite 105
Lenexa, Kansas 66219

Dear Messrs. Boyce and Freeman:

The Osage Minerals Council is writing to request information from Wind Capital Group and TradeWind Energy[1] to allow the Minerals Council and the Bureau of Indian Affairs (BIA) to determine the federal permitting, leasing and other regulatory requirements that could apply to the Osage Wind Project (the Project).

The Project, to be located within Osage County, will overlie the mineral estate of the Osage Nation, which the United States holds in trust for the Osage Nation. In addition to oil and gas, the Osage Mineral Estate consists of solid materials, including limestone, dolomite, sandstone, sand, gravel, clay and shale. Activities occurring within or affecting the Osage Mineral Estate may be subject to a range of federal regulatory requirements, including the need to secure a federal permit or lease to undertake such activities, pursuant to 25 C.F.R. §§ 411 and 414.

To the extent that the Project requires a lease or permit, Wind Capital Group or TradeWind Energy will be required to negotiate lease or permit terms and conditions with the Osage Minerals Council, including bond requirements, royalty payments, duration and fees. In

---

[1] The Osage Mineral Council understands that Wind Capital Group has signed an agreement to sell the Project to TradeWind Energy. For this reason, this letter is being sent to both companies.

addition, BIA must complete required federal environmental reviews before issuing a permit or lease (*i.e.*, compliance with the National Environmental Policy Act (NEPA); the National Historic Preservation Act; the American Indian Religious Freedom Act; and Executive Order 11593, Protection and Enhancement of the Cultural Environment). Activities within the Osage Mineral Estate cannot begin until the BIA has issued the necessary permit or lease, and the failure to secure a federally-required lease or permit could result in fines or other legal action by the Osage Nation or BIA.

The initial information that the Osage Minerals Council requires to make the necessary regulatory determinations includes the following:

1. Types of solid materials located below areas of excavation at the Project site;

2. Types of turbines (manufacturer/model) that will be used for the Project;

3. Dimensions of the foundations (height/width/depth) to be excavated for: (a) the construction of each turbine; and (b) the construction of any other Project features, including but not limited to, roads, transmission line poles/towers; buildings; meteorological towers (collectively, "ancillary Project features");

4. Amount (in cubic yards) of solid materials that will be excavated for the construction of: (a) each turbine; and (b) ancillary Project features;

5. Method(s) of excavating solid materials;

6. Manner in which turbines will be secured/affixed in the sub-surface;

7. Location/placement of solid materials following excavation for turbines and ancillary Project features (*i.e.*, stockpile on site, utilize in the development of the wind farm, haul off-site for sale; etc.); and

8. Any on-site or off-site treatment of excavated solid materials (*e.g.*, crushing of sandstone).

Because we understand that construction is scheduled to commence this calendar year, the Osage Minerals Council recommends that you provide the requested information as quickly as possible to avoid construction delays. The Osage Minerals Council also understands that BIA has requested that Wind Capital provide BIA and the Minerals Council with information concerning the Project to allow for a determination regarding federal regulatory requirements.[2] To the extent that information was submitted to BIA, the Osage Minerals Council requests that you provide this information as well.

---

[2] BIA's July 19, 2012 letter noted that the agency had "previously recommended that any wind power proposals or agreements be submitted to the [BIA] for review prior to construction so as to allow the BIA to assess potential impacts to the Osage Nation's mineral interests." This letter also indicated that information should be provided "early in the planning process" in order allow BIA and the Osage Minerals Council adequate "lead time" to review the Project to avoid construction delays and setbacks that could result from the need to secure a permit or lease.

If you have any questions, please call,  (918)-287-5433 .

Osage Minerals Council Chairman, Andrew Yates

# EXHIBIT 3



November 12, 2013

**VIA: E-Mail and U.S. Mail**

Robin Phillips, Acting Superintendent
Osage Agency, Bureau of Indian Affairs
P.O. Box 1539
Pawhuska, OK 74056

Dear Superintendent Phillips:

I am writing to request your assistance in protecting Chaparral Energy L.L.C.'s ("Chaparral") mineral lease with the Osage Nation, and the revenue generated for the Osage Mineral Estate. Wind Capital Group (Osage Wind, LLC) has begun constructing a complex 94-turbine wind power generation project on 8,500 acres in Osage County. The wind project is located on surface lands above, and in the subsurface within, the North Burbank Unit ("Unit") of the Osage Mineral Estate. As an Osage lessee, Chaparral has the right to explore and the duty to produce oil and gas in the Unit. Chaparral has made significant investments to produce the Unit pursuant to its legal obligations. The proposed wind project's elaborate web of 94 turbines, underground collection lines, overhead lines, and network of access roads will directly interfere and conflict with Chaparral's ability to safely and efficiently develop oil and gas minerals under its lease(s).

It is hard to overstate the importance of oil production from the almost 100 year-old Burbank Field. The Burbank Field has historically been the single largest generator of income for the Osage Mineral Estate. To date, it is estimated that the North Burbank Unit alone has generated $900 million (2013 dollars) in royalties to the Osage Nation. Chaparral purchased the rights to the Unit from the prior operator in 2006, with the intent of implementing enhanced oil recovery ("EOR") operations. (EOR involves flooding a mature oil field with $CO_2$ in order to release and access stranded oil.) The planned EOR operations are expected to generate approximately $1.1 billion in additional royalty payments to the Osage Nation over the remaining life of the project. However, over 1,840 acres of Chaparral's leasehold rights overlap with the proposed wind project footprint.

Chaparral executed a long-term carbon dioxide ($CO_2$) purchase and sale agreement for the capture of $CO_2$ from a Kansas nitrogen fertilizer plant to allow Chaparral to initiate EOR operations in the Unit. To facilitate these operations, Chaparral constructed a $CO_2$ compression facility ($61 million) at the Kansas plant site and installed approximately 68 miles of pipeline ($60 million) to deliver the $CO_2$. Chaparral began $CO_2$ injection in June of 2013, and the new EOR operations are expected to recover 77 million barrels of oil, upon which the Osage will receive royalty revenue. The 77 million barrels of oil could not have been recovered with traditional production operations.

Robin Phillips
November 11, 2013
Page 2 of 4

Inclusive of the $CO_2$ capture facility and pipeline, Chaparral has invested approximately $250 million in its Burbank EOR project. We intend to invest a total of $1.8 billion over a number of years to fully implement the $CO_2$-EOR project. Chaparral made this significant investment in the development of the Osage Mineral Estate with the full and reasonable expectation that its legal rights to develop the dominant mineral estate would be protected against conflicting uses of the subservient surface estate. Locating the wind project on the surface lands overlying the Burbank Field and placing turbine foundations and collection lines in the mineral estate will create serious safety issues generally unfamiliar to the wind energy industry. Because the Burbank Field is developed on 10-Acre well spacing, wells, pipelines, and other facilities are closer together than in many other producing regions. The oil and gas industry imposes set off distances as safety measures for remedial activities on existing wells, drilling operations on new sites, and work space extending on either side of pipelines. The masts of pulling units and drilling rigs vary in heights, but typical set off distances range from 110 to 130 feet. However, the height and constant motion of the proposed turbines create a much greater radius of influence, and safety considerations would therefore dictate even greater set off distances from oil and gas operations. Without such distances, the radius of influence associated with the rotating blades will inhibit safely intervening on existing wells and drilling of proposed new sites.

Development of the reservoir may be jeopardized, depending upon the proposed footprint of the wind project. The relocation of drilling sites from the symmetrical development of the EOR flood patterns will reduce the ultimate recovery of oil reserves, leading to a permanent loss of revenue to Chaparral and the Osage Mineral Estate. Directional drilling of future wells to reach the desired bottom-hole location and avoid surface obstructions (windmills) may be cost prohibitive at the shallow depth that exists in the Burbank Field.

In addition, the wind project will hamper, obstruct, and may even prevent Chaparral's oil and gas production over thousands of acres covered by its lease, as follows:

- The existing road network is limited in an effort to protect the prairie and improve the prairie visual aesthetics. The roads are maintained by Chaparral. Over-use by the wind project operations and resulting traffic will increase cost of maintenance, and will likely require constructing additional roads, and therefore causing additional destruction to the prairie.

- The wind turbines will require installation of significant surface and underground power gathering systems. These systems will add to the cost of oil and gas operations, and in some cases may prevent access to new or existing well or facility locations. Surface power lines will create further set off requirements as described above. Buried high voltage lines will create additional safety issues when oil and gas operators install or maintain existing lines.

Robin Phillips
November 11, 2013
Page 3 of 4

- One of Chaparral's values is to support and improve the communities in which we operate, and as a result Chaparral is a member of the Oklahoma One-Call System, commonly known as Call Okie. The extensive excavation expected to result from turbine and power line installation will create an incredible burden for our employees responding to "One Call" requests. "One Calls" associated with the wind power generation facility installations, including turbines, roads, and electric lines, will create a need to hire additional personnel to locate existing infrastructure installed by Chaparral and prior operators in the oil field over the past 100 years. This is an additional safety concern, to ensure that the power generation complex does not encounter high pressure fluid lines or hydrocarbon-bearing pipelines and other oilfield infrastructure.

- Power lines associated with an extensive wind power development are known to create electric currents that cause corrosion in steel piping and structures. When leaks occur in oilfield operations we have environmental incidents. While mitigation efforts can be made to reduce this potential, it will increase maintenance costs of the existing lines.

Beyond the safety concerns of developing a complex of wind turbines and associated infrastructure among oilfield operations, and given the above limitations, Chaparral estimates that the proposed wind project would cause it to incur many millions of dollars in damages from lost production and associated revenue, and increased exploration and production costs. This will severely harm Chaparral's ability to recover its $250 million investment in the Burbank Field, and will force Chaparral to re-evaluate its planned future investments in the field, which would otherwise likely approach $1.8 billion. Consequently, increased costs to Chaparral automatically results in diminished economic returns from the oil field production. This directly causes a decrease in oil production, which will be a detrimental impact on the management and production of oil on behalf of the Osage Mineral Estate. In short, the proposed wind project will conflict with Chaparral's operations and unlawfully interfere with its legal right to develop the Osage Mineral Estate, to the detriment of both Chaparral and the Osage.

Chaparral understands that Wind Capital Group has recently commenced construction without any authorization from the BIA. Chaparral believes it is incumbent upon the BIA, as trustee and regulator of the Osage Mineral Estate, to take immediate action to protect both the Osage and the significant investments of Chaparral and other affected lessees whose leases will be impaired by the wind project. Chaparral has invested significant capital and made a long-term commitment to develop the Osage Mineral Estate, in reliance upon the United States' compliance with its duties as trustee and regulator to protect against surface uses that impair lessees' development of the mineral estate. Failure to act will result in significant harm to Chaparral, and will result in long-term negative consequences for leasing and production in Osage County. It would set a dangerous precedent in light of the multiple other wind projects proposed for Osage County, and send a chilling message to those who make or are considering making investments in Indian Country that the United States will not protect against the impairment of leases by third parties.

Robin Phillips
November 11, 2013
Page 4 of 4


Chaparral looks forward to your prompt response to our concerns in light of the on-going wind project construction that has just initiated within our Unit.

Sincerely,

Mark Fischer, CEO


David Ketelsleger, General Council

Scott Wehner, Sr. Vice President — EOR Operations


cc:     Andrew Yates, Chairman, Osage Minerals Council
        Kevin Washburn, Assistant Secretary, Indian Affairs
        Robert Impson, Regional Director
        Eddie Streater, BIA Regional Office
        Alan Woodcock, Solicitor
        David Boyce, CEO, Wind Capital Group
        Robert Freeman, CEO, TradeWind Energy
        George M. Knapp, Vice President, Osage Wind, LLC

# EXHIBIT 4



**Akin Gump**
STRAUSS HAUER & FELD LLP

IAN A. SHAVITZ
+1 202.887.4590/fax: +1 202.887.4288
ishavitz@akingump.com

April 25, 2014

Mandy Laird, Clerk
Pawhuska-Osage County Board of Adjustment
628 Kihekah Ave.
Pawhuska, OK  74056

Ms. Laird,

I am writing on behalf of my clients, the Osage Nation and Osage Minerals Council (collectively, the "Osage Nation"), to submit the enclosed "*Petition to the Board of Adjustment to rescind the Wind Capital Energy Project Variance and Prohibit Construction at the Project Site until the Board Properly Authorizes the Project*" to the Pawhuska-Osage County Board of Adjustment.

The Osage Nation requests that the enclosed Petition be added to the agenda of the May 8, 2014 Board of Adjustment meeting, and that a representative of the Osage Nation be provided the opportunity to address the Board in support of the enclosed Petition.

Thank you and please feel free to call me with any questions.

Sincerely

Ian A. Shavitz



# Akin Gump

STRAUSS HAUER & FELD LLP

## Petition to the Board of Adjustment to Rescind the Wind Capital Energy Project Variance and Prohibit Construction at the Project Site until the Board Properly Authorizes the Project

*April 25, 2014*

The Osage Nation, a federally-recognized Indian tribe, and the Osage Minerals Council petition the Pawhuska-Osage County Board of Adjustment to rescind Osage Wind, LLC's (Wind Capital)[1] variance granted by the Board on August 11, 2011 for the Osage Wind Energy Facility Project.

### SUMMARY OF THE PETITION

The Pawhuska-Osage County Board of Adjustment (Board) should rescind Wind Capital's variance and prohibit construction at the Project site until the Board properly authorizes the Osage Wind Energy Facility Project (Project). Action by the Board of Adjustment is necessary for several reasons.

First, the Board of Adjustment failed to issue Wind Capital the proper type of approval required to develop a wind energy facility in Osage County. The Osage County Wind Energy Ordinance expressly requires a developer to secure a "conditional use permit" before constructing a wind energy project. The Board of Adjustment, however, issued Wind Capital a "variance" for its project. Conditional use permits and variances are two completely different land use authorizations—each serves a different purpose; each has its own distinct set of procedures; and each has different criteria that a project must meet before the Board may grant the authorization.

Second, the Board lacks authority to issue a conditional use permit for a wind energy facility in Osage County, despite what is stated in the Wind Ordinance. The Pawhuska-Osage County Zoning Ordinance, which governs land uses within Osage County, does not identify a wind energy facility as a permissible use in Osage County. The Zoning Ordinance prohibits the Board from issuing a conditional use permit for a use that is not otherwise permissible in Osage County.

Third, Osage County's Wind Energy Ordinance does not provide the Board with authority to issue a conditional use permit; in fact, the Wind Ordinance expressly recognizes that a conditional use permit is a *prerequisite to* developing a Wind Energy Facility in Osage County, confirming that the Wind Ordinance is *not* a *source of authority for* issuing a conditional use permit.

---

[1] The Application was submitted by Wind Capital Group, the parent corporation of Wind Capital LLC. This petition will refer to Wind Capital as the developer.

1



Fourth, the Project's variance cannot properly authorize development of the Project. As stated, the Wind Ordinance identifies a conditional use permit – rather than a variance – as the prerequisite for the Project. Further, even if a variance were the proper Board approval, the Board lacks authority to issue a variance for a wind energy project, as this land use is not permissible under the Zoning Ordinance. Finally, even if the Board had authority to issue a variance here, the variance would be improper because the Project site fails to meet the Zoning Ordinance's strict variance standards and the Board failed to make the findings required by the Zoning Ordinance.

Given that the Board issued an incorrect and flawed approval for the Project, and that Osage County law fails to provide the Board with authority to issue a conditional use permit for a wind energy facility, Petitioners requests that the Board rescind Wind Capital's variance and prohibit construction at the Project site until the Board properly authorizes the Project in accordance with County law.

## I.    BACKGROUND

### a.  Factual Background

On July 7, 2011, Wind Capital submitted its "Application for Conditional Use or Variance" to allow for the construction of the Wind Capital Energy Project (Application). The Application was assigned "Conditional Use Application Number 2012-1", and was noticed for a public hearing on August 11, 2011. Wind Capital placed public hearing notices in the Pawhuska Journal-Capital, on signs at the Project site, and in mailings sent to landowners. Each notice stated that Wind Capital had applied for a conditional use permit.

The Board held its public hearing on Wind Capital's Application at the Board's August 11, 2011 meeting. At the outset of the meeting, Board member Mike Render identified the hearing as a "hearing on the conditional use permit, 2012-01, related to Wind Capital LLC."[2] Immediately following the public hearing portion of the meeting, the Board voted unanimously to grant Wind Capital a variance based upon Wind Capital's Application for a Conditional Use Permit.[3] The Board failed to explain why it issued a variance, rather than the conditional use permit for which Wind Capital had applied.

### b.  Legal Background

The development of a Wind Energy Facility in Osage County is governed by two separate and distinct Osage County ordinances: (i) the Osage County Wind Energy Ordinance (Wind Ordinance) and (ii) the Pawhuska-Osage County Planning Area Zoning Ordinance (Zoning Ordinance).

---

[2] August 2011 Hearing Tr., p. 3, lns. 23-25.

[3] *Id.* at 50, ln.4.



**Akin Gump**
STRAUSS HAUER & FELD LLP

### i. *Wind Ordinance*

The Wind Ordinance establishes "minimum requirements and regulations for the *placement, construction, and modification of Wind Energy Facilities and related equipment*" in Osage County.[4]   Accordingly, the Wind Ordinance dictates design standards, sighting conditions, property maintenance, and roadway-related issues associated with wind energy facilities.  In this respect, the Wind Ordinance is analogous to a Building Code in that it dictates the standards required when constructing a wind energy facility; it does not authorize the construction of a wind energy facility in a specific location.

Section 3.4 of the Wind Ordinance identifies the land use "permit" a developer is required to obtain before constructing a wind project, stating:

> A Wind energy facility may be constructed as provided in this ordinance after first obtaining a permit from the Pawhuska-Osage County Board of Adjustment. Conditional Use Permit Applications for wind energy facilities shall be based on anticipated total rated nameplate capacity of the proposed project.  A permit fee ("Conditional Use Permit Fee") shall be due upon approval of the Conditional Use Permit.

Thus, Section 3.4 does not authorize the Board to issue a conditional use permit for a proposed project, but instead, requires an applicant to secure a conditional use permit as a *prerequisite to* proceeding with a project according to the design requirements included in the Wind Ordinance.

### ii. *Zoning Ordinance*

The Zoning Ordinance governs permitted land uses within Osage County.  Section 1.4 of the Zoning Ordinance states that "no land shall be used and no building, structure, or improvement shall be made, erected, [or] constructed . . . for any purpose or in any manner except in conformity with the regulations contained herein."  In other words, if a specific land use is not expressly authorized as a permitted use in the Zoning Ordinance, then that land use is not permitted in Osage County.

If the Zoning Ordinance does not permit a project's proposed land use "as a use of right" in a district, a project may only proceed if the project qualifies for either a conditional use permit or a variance.  These are two very different approvals, each with its own distinct substantive standards and procedural requirements, and each listed separately in the Zoning Ordinance:[5]

- <u>Conditional Use Permit</u>.  Before a project qualifies for a conditional use permit within a given zoning district, the Zoning Ordinance must expressly identify the project's

---

[4] Wind Ordinance, § 1.0 (emphasis added).

[5] *Compare* Zoning Ordinance, § 6.5.2 *with id.* § 6.5.3.



proposed land use as a permitted land use subject to conditions, and the Board must impose the conditions included in the Zoning Ordinance as part of the approval.

- Variance. A project qualifies for a variance, on the other hand, not because the Zoning Ordinance identifies the project's land use as permissible subject to certain conditions, but because the land itself has certain extraordinary features and characteristics such that strict application of the Zoning Ordinance upon the land would place an extreme hardship on the property owner.

Regardless of whether the Board issues a conditional use permit or variance, however, the intended land use for which an authorization is sought must be a permitted use in the Zoning Ordinance.[6]

## II.   THE BOARD FAILED TO ISSUE A CONDITIONAL USE PERMIT FOR THE PROJECT

As noted above, the Wind Ordinance requires the Board of Adjustment to issue a conditional use permit before a Wind Energy Facility may be built in Osage County.[7] The Board, however, has never issued a conditional use permit for the Project, either at or following the August 11, 2011 meeting. Rather, the Board issued a variance at the August 11, 2011 meeting. For this reason alone, the Board must prohibit construction activities at the project site, as the Project has not been authorized under the Zoning Ordinance and fails to meet the prerequisite for development included in Section 3.4 of the Wind Ordinance.

The Board cannot simply "fix" this situation by allowing the Project to proceed with the variance or simply re-labeling the variance it granted as a conditional use permit. First, as noted above, conditional use permits and variances are two completely different land use authorizations—each serves a different purpose; each has its own distinct set of procedures; and each has different criteria that a project must meet before the Board may grant the authorization. Second, the plain language of the Wind Ordinance expressly requires a conditional use permit, and not a variance, as a prerequisite to developing a wind energy project.

## III.   THE BOARD LACKS AUTHORITY TO ISSUE A CONDITIONAL USE PERMIT OR VARIANCE FOR A WIND ENERGY PROJECT IN OSAGE COUNTY

a.   The Board Lacks Authority to Issue a Conditional Use Permit for a Wind Energy Project in Osage County.

The Board also lacks authority to issue a conditional use permit for a Wind Energy Facility in Osage County. The Project is to be located in an Agricultural District. Article 2 of the Zoning Ordinance contains a Permitted Use Table that identifies the land uses that are

---

[6] *See* Zoning Ordinance, §§ 6.5.2 & 6.5.3.

[7] Wind Ordinance § 3.4.



permitted "as a use of right" within an Agricultural District and those for which the Board can issue a conditional use permit. The Board may only issue a conditional use permit for a proposed use within a zoning district if the permitted use table for that District identifies the use as one that is "permitted subject to the granting of a conditional use permit."[8] The Agricultural District Permitted Use Table neither lists a Wind Energy Facility as an allowable use in an Agricultural District nor includes a use category broad enough to encompass a Wind Energy Facility. Thus, developing a Wind Energy Facility is not permitted subject to the granting of a conditional use permit in an Agricultural District.

Article 3 of the Zoning Ordinance confirms that a conditional use permit was not available for the Project. Article 3, titled "Use Conditions," identifies the categories of uses that the Board may authorize with a conditional use permit and the specific conditions that the Board must impose in connection with each such use.[9] A Wind Energy Facility is not a use listed in Article 3, thus confirming that a conditional use permit was not available for the Project.

    b.   <u>The Wind Energy Ordinance does not Provide the Board with Authority to Issue a Conditional Use Permit</u>.

The Board seemingly attempted to rely upon Wind Ordinance Section 3.4 as the source for the Board's authority to issue a conditional use permit or variance for the Project. As stated above, however, Section 3.4 does *not authorize* the Board to issue a conditional use permit for a proposed project. Instead, Section 3.4 *requires* an applicant to secure a conditional use permit *as a prerequisite* to proceeding with a project according to the design requirements included in the Wind Ordinance. Only the Zoning Ordinance can authorize the Board to issue a conditional use permit for certain land uses.

The Wind Ordinance fails to provide the Board with authority to issue a conditional use permit here, in no small part, because the Wind Ordinance does not amend the Zoning Ordinance to add wind energy facilities as a permitted land use in Osage County. This is crucial given that the Zoning Ordinance trumps all other "regulations, ordinances, orders, resolutions, or parts thereof in conflict with" the Zoning Ordinance, insofar as those other laws purport to authorize or regulate permitted land uses.[10] Thus, even if the intention of the Wind Ordinance was to authorize a wind energy facility as a permitted land use, the Wind Ordinance failed to do this, and the Zoning Ordinance prohibits this. Accordingly, the Board had no authority to issue a conditional use permit for the Project.

---

   [8] Zoning Ordinance, § 1.7.1.

   [9] *See generally*, Zoning Ordinance, Article 3. The uses identified in Article 3 include: Accessory Buildings; Bed and Breakfast Inns; Accessory Commercial Uses in Multi-Family Residential and Office Districts; Animals; Dwelling Groups; Home Occupations; Mining Activities and Related Services; Mobile Home Parks; Non-Residential Uses in Residential Districts; Off-Street Loading; Off-Street Parking; Scrap Metal Facilities; Solid Waste Disposal; Signs; Advertising Signs; Townhouse Development; and Sexually Oriented Businesses.

   [10] Zoning Ordinance, § 9.2.



**Akin Gump**

STRAUSS HAUER & FELD LLP

    c.    <u>The Board Lacked Authority to Issue a Variance for the Wind Capital Project.</u>

As stated above, a conditional use permit – rather than a variance – is required before a wind energy facility can be developed. But even if a variance could be used to authorize a wind energy facility, the Board lacked authority to issue a variance to Wind Capital as well. The Zoning Ordinance defines a variance as:

> An adjustment in the application of the specific provisions of [the Zoning Ordinance] to a particular piece of property which property, because of special circumstances applicable to it, is deprived of privileges commonly enjoyed by other properties in the same vicinity and zoning district and which adjustment remedies disparity in privileges.[11]

The Board's authority to "adjust the application of the specific provisions" of the Zoning Ordinance through a variance is not without limits. Section 6.5.3 of the Zoning Ordinance states "[u]nder no circumstances shall the Board grant a variance to allow a use not permissible under the terms of these regulations in the district involved . . . ." Similarly, Section 1.4 of the Zoning Ordinance states that "no land shall be used and no building, structure, or improvement shall be made, erected, [or] constructed . . . for any purpose or in any manner *except in conformity with the regulations contained herein.*"[12] Thus, a use must be permitted under the Zoning Ordinance before the Board has authority to issue a variance for such use. Again, the Zoning Ordinance does not include a Wind Energy Facility as a permissible use, and thus does not provide the Board with the requisite authority.

    (i)    <u>The Wind Capital Project fails to meet the strict requirements for a variance.</u>

Even if the Wind Ordinance identified a variance as a prerequisite for developing wind energy projects, and if the Board had authority to grant a variance for such a project, the Board must find that the project meets very strict requirements in order to issue a variance. These requirements are set forth as follows in Zoning Ordinance Section 6.5.3(1):

- <u>Site Characteristics</u>. The project site must exhibit "special conditions and circumstances," including "exceptional narrowness, shallowness, shape, topography, or other extraordinary or exceptional situation or condition of a specific piece of property," which are "peculiar to the land involved."[13]

- <u>No Fault of Applicant</u>. The project site's "special conditions and circumstances," cannot result from an applicant's actions.

---

[11] Zoning Ordinance, § 8.2.

[12] Zoning Ordinance, § 1.4 (emphasis added).

[13] Zoning Ordinance, § 6.5.3.



- <u>Deprivation of Rights</u>. The Zoning Ordinance "deprive[s] that applicant of rights commonly enjoyed by other properties in the same district . . . ."

- <u>Special Privileges</u>.  Applicant cannot receive any "special privilege that is denied by the [Zoning Ordinance] to other lands . . . in the same district."

Wind Capital fails to meet each of these strict requirements.

First, the Application did not address, much less demonstrate, any of the above requirements.  The Board should have denied the Application for this reason alone.

Second, the Project site does not contain any of the <u>site characteristics</u> that the Zoning Ordinance requires for a variance. The Project site is precisely the same as the tens of thousands of acres of agricultural and ranching lands surrounding it.  Without such site characteristics, there are no characteristics that could be the <u>fault of the applicant.</u>

Third, the Zoning Ordinance does not <u>deprive the Applicant of rights</u> commonly enjoyed by other properties in the same district.  Other properties in the same district -- and the properties that make up the Project site -- can be used (and are used) for agriculture and ranching, which are allowable uses in Agricultural Districts.

Fourth, by granting a variance, the Board essentially gave Wind Capital a <u>special privilege that is denied by the Zoning Ordinance to other lands</u> in the same district.     Wind Capital simply wants to develop leased land in a manner that is not otherwise allowed by local zoning laws.  This falls far short of the very high bar that the Zoning Ordinance sets for the Board to properly issue a variance, and, accordingly, gave Wind Capital an unjust privilege.

(ii)   <u>The Board failed to make the findings required by the Zoning Ordinance for a variance</u>.

The Zoning Ordinance prohibits the Board from issuing a variance unless and until it makes the following findings: (i) that the representations in the application responding to the requirements of Paragraph 6.5.3 are valid (which include the requirements in Part III.c.(i) above); (ii) that the reasons set forth in the Application justify the granting of the variance, and that the variance is the minimum variance that will make possible the reasonable use of the land, building, or structure; and (iii) that granting the variance "will be in harmony with the general purpose and intent of [the Zoning Ordinance], and will not be injurious to the neighborhood, or otherwise detrimental to the public welfare."[14]

The Board, however, made none of these findings, either on the record at the August 11, 2011 hearing or in any subsequent decision document.  This is not surprising given that Wind Capital's Application failed to address, much less demonstrate, any of the requirements of

---

[14] *Id.*



**Akin Gump**

STRAUSS HAUER & FELD LLP

section 6.5.3. In the absence of such information in the Application, the Board could not have made any such findings.

Of note, the Board completely failed to make findings regarding the most significant requirement from an environmental and adjacent landowner perspective; namely, whether granting a variance "will be in harmony with the general purpose and intent of [the Zoning Ordinance], and will not be injurious to the neighborhood, or otherwise detrimental to the public welfare." Numerous speakers at the Public Hearing commented on these issues. For example:

- Mr. Ford Drummond commented on the drop in property values due to the turbines' adverse effects on Osage County's viewshed.

- Mr. Mike Fuhr, State Director for the Oklahoma Nature Conservancy, noted the potential adverse effects on both the Tallgrass Prairie and the greater prairie chicken.

- Mr. Chris White, Executive Director for Governmental Affairs for the Osage Nation, mentioned the adverse effects that placement of the wind energy facility would have on the Osage Nation's mineral estate, including oil and gas resources.

Locating a massive wind project on thousands of acres of land in Osage County, within unfragmented prairie, within the habitat and range of protected species, and in a location that would impact tribal cultural resources and existing oil and gas operations, clearly falls short of the Zoning Ordinance standards.

## REQUESTED RELIEF

As demonstrated in this Petition, the Board of Adjustment failed to issue the required conditional use permit for the Project, and lacked the authority to issue a variance for the Project. In these circumstances where such good cause exists, the Board has the authority and the obligation to reconsider its Osage Wind Project decision, rescind Wind Capital's variance and prohibit construction at the Project site until the Board properly authorizes the Project.[15]

Respectfully Submitted:

Ian Shavitz
Counsel to the Osage Nation

---

[15] *See* Rathkopf's *The Law of Zoning and Planning, at* § 32:5; 101A *Corpus Juris Secundum, Zoning and Land Planning* § 249.

# EXHIBIT 5

RECEIVED
MAY 19 2014
By _____ _____

## IN THE BOARD OF ADJUSTMENT OF THE COUNTY OF OSAGE, OKLAHOMA

CV- 2014-36

APPEAL OF THE OSAGE NATION AND THE OSAGE MINERALS COUNCIL FROM
A DECISION OF THE BOARD OF ADJUSTMENT OF THE COUNTY OF OSAGE,
OKLAHOMA, IN RE BOARD OF ADJUSTMENT CASE NUMBER  CUP-2012-01

District Court, Osage County, Okla.

MAY 2 8 2014

ANGIE BRUCE, Court Clerk
By_____ _____ Deputy

### NOTICE OF APPEAL

The Osage Nation, a Federally recognized Indian tribe, and the Osage Minerals Council,

the governing body of the Osage Minerals Estate ("Appellants"), do hereby appeal the decision

of the Board of Adjustment of the County of Osage, Oklahoma, rendered on May 8, 2014,

denying *Appellant's Petition to the Board of Adjustment to Rescind the Wind Capital Energy*

*Project Variance rendered in Case No. CUP-2012-01 and Prohibit Construction at the Project*

*Site Until the Board Properly Authorizes the Project* (the "Petition") to the District Court of

Osage County, State of Oklahoma.  The grounds for the appeal are:

1.      The Board of Adjustment (hereinafter referred to as the "Board") acted arbitrarily,

capriciously and unreasonably when it denied the Petition.

2.      The decision of the Board to deny the Petition and refuse to take affirmative

action to rescind the Osage Wind Energy Project's variance or otherwise prohibit construction of

the Project was arbitrary, capricious and unreasonable because TradeWind Energy LLC is

constructing a massive wind energy project on over 8,000 acres of land in Osage County,

Oklahoma, without the proper authorization required by Osage County law, including the

Pawhuska Osage County Planning Area Zoning Ordinance and the Osage County Wind Energy

Ordinance.

3.      The decision of the Board denied the Applicants of the equal protection of the

1

laws of Osage County and the State of Oklahoma.

WHEREFORE, the Appellants request that the original or certified copies of all papers constituting the record of the proceedings in Osage County Board of Adjustment Case No. CUP-2014-01, together with the order, decision, or ruling of the Board, be transmitted to the Court Clerk of the District Court of Osage County, Oklahoma and that this appeal be heard by the Court *de novo*, and that Appellant have such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

Gene P. Denison, OBA #2308
1437 S. Boulder Ave. Suite 170
Tulsa, Oklahoma 74119
(918)-396-4600
(918)-582-9940

And

John W. Moody, OBA #6321
6004 South Marion Ave.
Tulsa, Oklahoma 74135
(918) 742-7528
Fax (918) 742-7528
E-Mail: johnw.moody@gmail.com

**Attorneys for Appellant**

2

RECEIVED by the Clerk of the Board of Adjustment of the County of Osage, Oklahoma, this 19th day of May, 2014.

Clerk of the Board of Adjustment of the County of Osage, Oklahoma

By: _Mandy Laird_____

# EXHIBIT 6

## IN THE DISTRICT COURT OF OSAGE COUNTY
## STATE OF OKLAHOMA

THE OSAGE NATION, a sovereign Indian Nation;  )
and the OSAGE MINERALS COUNCIL, an  )
independent agency of the Osage Nation  )
                                                  )
     Plaintiffs,  )
                                                  )
     vs.  )     Case No. C V- 2014-41
                                                  )
BOARD OF COMMISIONERS OF OSAGE COUNTY,  )
OKLAHOMA; BOARD OF ADJUSTMENT OF OSAGE  )
COUNTY, OKLAHOMA; and OSAGE WIND, L.L.C., a  )
Delaware limited liability company,  )
                                                  )
     Defendants.  )

District Court, Osage County, Okla.
FILED

JUN 2 5 2014

ANGIE BRUCE, Court Clerk
By_____ Deputy

## PETITION FOR DECLARATORY JUDGMENT
## AND PETITION FOR PERMANENT INJUNCTION

Plaintiffs, the OSAGE NATION, a sovereign Indian Nation ("Osage Nation") headquartered in Pawhuska, and the OSAGE MINERALS COUNCIL, an independent agency of the Osage Nation ("Minerals Council"), seek declaratory and injunctive relief against the Defendants, BOARD OF COMMISSIONERS OF OSAGE COUNTY, OKLAHOMA ("Commissioners"), the BOARD OF ADJUSTMENT OF OSAGE COUNTY, OKLAHOMA (the "Board of Adjustment") and OSAGE WIND, L.L.C., a Delaware limited liability company ("Osage Wind"), for unlawful authorization of wind energy facilities in Osage County.  Plaintiffs allege and state:

### JURISDICTION AND VENUE

1.    Plaintiff Osage Nation is a sovereign Indian Nation headquartered in Pawhuska whose status as a sovereign is formally acknowledged by the United States.

2. Plaintiff Minerals Council is an independent agency of the Osage Nation, created under Article XV, Section 4, of the Constitution of the Osage Nation, to manage, administer and develop the Osage Mineral Estate located within the boundaries of the Osage Reservation reserved to the Osage Nation pursuant to the Act of June 5, 1906, Chapter 3572 (34 Stat. 539), in accordance with the Osage Allotment Act of June 28, 1906, as amended.

3. Osage County is a body corporate and politic.  The powers of Osage County are exercised by the Board of County Commissioners of Osage County, as provided by 19 Okla. Stat. § 3.

4. The Board of Adjustment of Osage County, Oklahoma (the "Board of Adjustment") is a board established by the Board of County Commissioners of Osage County, Oklahoma in Sections 6.1 through 6.6 of the Osage County Area Zoning Ordinance (hereinafter referred to as the "Zoning Ordinance") passed and adopted by resolution of the Board of Commissioners on December 20, 1993, effective March 1, 1994, as amended. The Zoning Ordinance was adopted and the Board of Adjustment was created pursuant to the authority granted by the Legislature of the State of Oklahoma, in Title 19 Oklahoma Statutes, Chapter 19A County Planning and Zoning, Sections 866.1 through 866.36, hereinafter referred to as the "Zoning Enabling Act".

3. Osage Wind, L.L.C., is a Delaware limited liability company, registered as a foreign limited liability company in the State of Oklahoma and is authorized to conduct business in the State of Oklahoma.

2

4.     The events giving rise to Plaintiffs' claims occurred in Osage County, Oklahoma, and involve the use of land and the subsurface of such land located in Osage County

5.     This is an action brought pursuant to Title 12, Okla. Stat., Sections 1651 through 1657 (the "Declaratory Judgment Act") to (a) determine the rights and status of Plaintiffs and Defendants; (b) to determine the validity and constitutionality of Section 6.5.2 of the Zoning Ordinance of Osage County and the authority of the Board of Adjustment to approve or grant a "Conditional Use Permit" ("CUP") pursuant to said Section 6.5.2 to authorize construction and operation of a wind energy facility in Osage County; (c) to determine and declare that the action by the Board of Adjustment authorizing construction and operation of a wind energy facility in Osage County based upon the application for approval of CUP 2012-1 filed by Osage Wind was without authority, and as a result, the action of the Board of Adjustment approving CUP 2012-1 is void and of no force and effect; (d) to enjoin and restrain the Defendant Board of Adjustment from granting a CUP for a wind energy facility in Osage County; (e) to enjoin and restrain the Defendant Board of Commissioners, its agents, officers and employees and the Board of Adjustment from issuing permits or authorizations to Osage Wind for a CUP and for any improvements and use of land that do not conform to the regulations and uses permitted by the Zoning Ordinance in the zoning district in which a CUP is to be located; and (f) to enjoin and restrain Osage Wind from constructing a wind energy facility on the land based on the approval of CUP 2012-1 by the Board of Adjustment.

3

6.     There is an actual controversy regarding the rights and status of Plaintiff and Defendants and the validity and constitutionality of a governmental ordinance or regulation.

7.     This Court has jurisdiction over this civil action and venue is proper in this District.

## FACTUAL BACKGROUND

8.     This action involves the improper and unauthorized practice by the Osage County Board of Adjustment to consider and grant conditional use permits to Osage Wind LLC to develop land located in Osage County for a utility-scale wind energy project.

### Zoning Authority in Osage County

9.     The Zoning Ordinance was passed and adopted by the Commissioners on December 20, 1993. Section 1.1 of the Zoning Ordinance states that the ordinance was adopted in pursuance of the authority granted by the Legislature of the State of Oklahoma in the Zoning Enabling Act.  Section 1.2 of the Zoning Ordinance states the purpose and necessity of the Zoning Ordinance and Regulations.  A true and correct copy of Sections 1.1 and 1.2 is attached hereto as Exhibit 1 and incorporated herein by reference.

10.    Pursuant to the Enabling Act and the Zoning Ordinance, the Board of Commissioners divided the unincorporated areas of Osage County into zoning districts, being generally agricultural, residential, commercial and industrial, regulating the use, height and number of stories of structures, the coverage of the land by buildings, the size of yards and open spaces, the location of buildings, and the density of populations.

4

11.     Section 1.7.1 of the Zoning Ordinance states that the uses permitted in the several agricultural, residential, commercial and industrial districts are set forth in Tables 1-1, 2-1, 5-1 and 8-1 of the Zoning Ordinance.  Section 1.7.1 of the Zoning Ordinance further states that a use is either permitted "by right" in a district or is only permitted subject to the granting of a conditional use permit ("CUP") by the Board of Adjustment, in accordance with the provisions of Article 6 of the Zoning Ordinance.  Uses permitted by right in a district are designated in the Tables by an "X".  Uses that may be permitted by a conditional use permit in a district are designated in the Tables by a "P".     A wind energy facility is not listed as a use permitted as of right or by a conditional use permit in the Zoning Ordinance.  A true and correct copy of Section 1.7.1 is attached hereto as Exhibit 2 and incorporated herein by reference.

12.     Article 6 of the Zoning Ordinance states the Powers and Duties of the Board of Adjustment.     Section 6.5.2 of Article 6 provides that the Board of Adjustment shall have the power to hear and decide applications for conditional use permits for only such uses for which the zoning regulations require such a permit. Section 6.5.2 further provides that where a conditional use permit is required and granted by the Board of Adjustment, it shall be issued subject to the specific conditions upon which the Board has determined to grant the permit and that the Board shall make written findings of fact that the application complies with the pertinent individual conditions of use as set forth in Article 3 of the Zoning Ordinance.  A true and correct copy of Section 6.5.2 is attached hereto as Exhibit 3 and incorporated herein by reference.

5

13. Within an agricultural district, the uses permitted by right and by a conditional use permit are set forth in Table 1.1 of Section 2.1.2 of the Zoning Ordinance. A true and correct copy of Section 2.1.2 and Table 1.1 is attached hereto as Exhibit 4 and incorporated herein by reference.

**Osage County Wind Energy Ordinance**

14. On information and belief, in response to proposals to develop wind energy facilities in Osage County, on April 4, 2011, the Board of Commissioners by resolution adopted and passed the "Osage County Wind Energy Ordinance" (the "Wind Energy Ordinance"). A true and correct copy of the Wind Energy Ordinance is attached hereto as Exhibit 5 and incorporated herein by reference. On information and belief, one or more wind energy companies, played a substantial role in drafting the Osage County Wind Energy Ordinance.

**Osage Wind Energy Facility**

15. On or about July 8, 2011, Osage Wind submitted an application numbered 2012-1 (the "Osage Wind Application") to the Board of Adjustment for a conditional use permit or variance for a wind energy facility (the "Osage Wind Energy Facility") to be located on thirty-one (31) tracts of land in Sections 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 32, 33, 34, 35 and 36 in Township 26 North, Range 6 East of the Indian Meridian in Osage County, containing a total of approximately 8,000 acres. A true and correct copy of the Osage Wind Application is attached hereto as Exhibit 6 and incorporated herein by reference.

16. Located below the entirety of the proposed Osage Wind Energy site lies the Osage Mineral Estate. The Osage Mineral Estate consists of oil and gas and solid minerals, including, but not limited to, sand, gravel, limestone and other solid

minerals.  The United States holds the Osage Mineral Estate in trust for the benefit of the Osage Nation.

18.    The Board of Adjustment held a public hearing on the Osage Wind Application on August 11, 2011, at which the Plaintiffs testified against the Board of Adjustment granting an approval for the Osage Wind Energy Project.    Despite Plaintiffs' and other opposition, the Board of Adjustment approved the Application of Osage Wind at the conclusion of the public hearing, by voting to approve a variance for the Osage Wind Energy Facility

19.    The Osage Wind Energy Facility approval by the Board of Adjustment authorizes Osage Wind to construct and operate ninety four (94) 1.62 Megawatt wind turbines as well as many miles of underground collection lines, roadways, and other infrastructure and facilities to support the generation of electricity.    The turbines hub on the tower will be 80 meters (262 feet) high.    The blades on the turbines are 48.7 meters (159.77 feet) long.    The total height of the turbines, including blades will be approximately 422 feet (128.6 meters). To construct the turbines, Osage Wind will be required to enter (and has already entered) the Osage Mineral Estate for each turbine foundation and for the miles of underground collection lines, which will require the excavation of significant amounts of Osage minerals.  On information and belief, each foundation will be buried as deep as 10 feet within the Osage Mineral Estate and will be as wide as 50 feet underground and 70 feet at the surface.

20.    Once constructed and operational, the Osage Wind Energy Facility is projected to kill bald eagles due to bald eagles colliding into the massive turbine blades.    Osage Wind has sought, but not secured, a permit pursuant to the Bald

and Golden Eagle Protection Act from the United States Fish and Wildlife Service ("USFWS") to allow the Wind Energy Facility to kill bald eagles.

21.    Bald eagles are the most sacred religious and cultural species to the Osage Nation.  The Plaintiffs have strongly opposed USFWS issuing a permit to Osage Wind to authorize the killing of eagles, through meetings and written correspondence with Osage Wind and USFWS.

22.    The Osage Wind Energy Facility site is also located on lands that contain numerous Osage Nation cultural resources and likely contain Osage ancestor burials.  On information and belief, constructing the Osage Wind Energy Facility will adversely impact and destroy Osage Nation cultural resources.  The Osage Nation has raised its concerns regarding impacts to cultural resources and burials to Osage Wind, USFWS, the State Historic Preservation Office and the United States Advisory Council on Historic Preservation.

23.    Through direct correspondence with Osage Wind and the Bureau of Indian Affairs, Plaintiffs raised concerns about the Wind Energy Facility's unauthorized access in, and damages to, the Osage Mineral Estate.

24.    Immediately after learning that Osage Wind had begun construction of the Wind Energy Facility by conducting excavation activities at the site, Plaintiffs filed a Petition with the Osage County Board of Adjustment requesting that the Board of Adjustment vacate or rescind the granting of the CUP, in part, for lack of authority to grant or approve a conditional use permit for the Wind Energy Facility. On May 5, 2014, the Board of Adjustment denied Plaintiffs petition.

8

25.    The Osage Wind Energy Facility restricts or prevents the full access to and use of the Osage Minerals Estate, which affects existing leases of the mineral estate and reduces revenue generated from the Osage Mineral Estate.

**The Mustang Run Wind Energy Facility**

26.    On or about March 7, 2014, Mustang Run Wind Project LLC ("Mustang Run") submitted an application (the "Mustang Run Application") to the Board of Adjustment for a conditional use permit or variance for a wind energy facility (the "Mustang Run Wind Energy Facility") to be located on fifty-eight (58) tracts of land in Sections 4, 5, 6, 8, 10, 15, 16, 17, 21, 22, 23, 24, 27 and 28, in Township 26 North, Range 6 East, Sections 3, 4, 5, 6, 7, 8, 9, 10, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 and 28 in Township 26 North, Range 7 East, Sections 32 and 33 in Township 27 North, Range 6 East and Sections 31 and 32, in Township 27, Range 7 East, all in Osage County, containing a total of approximately 9,400 acres.   A true and correct copy of Pages 1 through 19 of the Mustang Run Application is attached hereto as Exhibit 7 and incorporated herein by reference.   Pages 20 through 220 of the Mustang Run Application are not attached hereto as said pages consisted of copies of the various leases and easements, the "green cards" showing mailing of notices, affidavit of mailing and other items that are not relevant and that do not describe the Application.

27.    Located below the entirety of the proposed Mustang Run Wind Energy site lies the Osage Mineral Estate.

28.    On April 10, 2014, the Osage Nation filed a Petition Objecting to Mustang Run Wind Energy Project, LLC's "Application for Conditional Use or Variance," on the grounds that, *inter alia*, the Board of Adjustment lacked authority

to issue a conditional use permit for a wind energy facility in Osage County.  The Petition also outlined reasons why the Mustang Run Wind Energy Project failed to meet the criteria necessary for issuance of a conditional use permit, based upon the impacts that the Mustang Run Wind Energy Facility would have on the tall grass prairie, the Osage Nation Heritage Trail, bald eagles, Osage Nation Cultural resources, the Greater Prairie Chicken, exiting oil and gas leases, and the Osage Nation Mineral Estate.

29.    The Board of Adjustment held a public hearing on the Mustang Run Wind Energy Facility Application on April 10, 2014, at which the Plaintiffs testified against the Board of Adjustment granting an approval for the Mustang Run Wind Energy Facility.

30.  On May 8, 2014, the Board of Adjustment voted to deny Mustang Run's Application for Conditional Use or Variance.

#### FIRST CAUSE OF ACTION FOR DECLARATORY JUDGMENT

Plaintiffs, for their First Cause of Action against the Defendants, allege and state:

31.    Plaintiffs allege and incorporate Paragraphs 1 through 30 of this Petition in their First Cause of Action as if fully set forth herein.

32.    A "wind energy facility" is not listed as a use permitted by right or by a conditional use permit in Table 1.1 of the Zoning Ordinance titled "Uses Permitted in Agricultural Districts", attached hereto as Exhibit 4.

33.    The Board of Adjustment has no power or authority under the Zoning Ordinance to hear, decide and approve a conditional use permit for a wind energy facility.

34.     The approval of a wind energy facility, including the Osage Wind
Energy Facility and CUP 2012-1, by the Board of Adjustment as a conditional use
permit is not authorized by the Zoning Ordinance and is void and of no force and
effect.

35.     The properties listed in the Applications for a conditional use permit by
Osage Wind and Mustang Run for a wind energy facility are zoned "AG" Agricultural
General District.  A wind energy facility is not a permitted use by right or by a
conditional use permit in the AG District and violates the Zoning Regulations.

36.     Section 1.4 of the Zoning Ordinance provides that no land shall be
used and no building, structure, or improvement shall be used for or be made,
erected, nor be constructed to be used or maintained for any purpose or in any
manner except in conformity with the regulations in the Zoning Ordinance.  The
improvements being constructed on the land subject to CUP 2012-1 to be used by
Osage Wind and the intended use of the land for a wind energy facility by Osage
Wind do not conform to the Zoning Regulations.  A true and correct copy of Section
1.4 is attached hereto as Exhibit 8 and incorporated by reference.

**WHEREFORE**, premises considered, Plaintiffs respectfully demand judgment
against each of the Defendants declaring (*i*) a "wind energy facility" is not listed as a
use permitted by right or by a conditional use permit in Table 1.1 of the Zoning
Ordinance titled "Uses Permitted in Agricultural Districts"; (*ii*) the Board of
Adjustment had no power or authority under the Zoning Ordinance to hear, decide
and approve a conditional use permit for a wind energy facility in Osage County;
(*iii*) the approval of the Osage Wind Energy Facility and CUP 2012-1 by the Board of
Adjustment as a conditional use permit is not authorized by the Zoning Ordinance

11

and is void and of no force and effect; (*iv*) a wind energy facility is not a permitted use by right or by a conditional use permit in the AG District and violates the Zoning Regulations; and (*v*) the improvements being constructed on the land subject to CUP 2012-1 to be used by Osage Wind and the intended use of the land for a wind energy facility by Osage Wind do not conform to the Zoning Regulations and are in violation thereof.

## SECOND CAUSE OF ACTION FOR DECLARATORY JUDGMENT

Plaintiffs, for their Second Cause of Action against the Defendants, allege and state:

37.     Plaintiffs allege and incorporate Paragraphs 1 through 36 of this Petition in their Second Cause of Action as if fully set forth herein.

38.     Osage County is subdivision of the State of Oklahoma and has only such powers and authority as are delegated to and authorized by law of the State of Oklahoma in 19 Okla. Stat. § 1, to-wit:

"Each organized county within the state shall be a body corporate and politic and as such shall be empowered for the following purposes:

1. To sue and be sued;

2. To purchase and hold real and personal estate for the use of the county, and lands sold for taxes as provided by law;

3. To sell and convey any real or personal estate owned by the county, and make such order respecting the same as may be deemed conducive to the interests of the inhabitants;

4. To execute leases of real property owned by the county to nonprofit corporations organized for the general purpose of historical preservation;

5. To make all contracts and do all other acts in relation to the property and concerns of the county necessary to the exercise of corporate or administrative power; and

6. To exercise such other and further powers as may be especially provided for by law."

39.     The power of the Board of Commissioners to zone property and the power to create a board of adjustment are especially provided for by the Legislature in the Zoning Enabling Act (19 O. S. §§ 866.1 *et seq.*).   Section 866.22 of the Zoning Enabling Act provides that the Board of County Commissioners of any county exercising the power to zone property shall appoint a Board of Adjustment. The powers delegated by the legislature to a county board of adjustment are stated in 19 Okla. Stat. § 866.23 as follows:

"The county board of adjustment shall have the following powers and it shall be its duty:

1. To hear and decide appeals where it is alleged that there is error of law in any order, requirement, decision or determination made by the county inspecting officer in the enforcement of the county zoning regulations.

2. To hear and decide requests for map interpretations or for decisions on other special questions upon which it is authorized to pass by the regulations adopted by the board.

3. Where, by reason of exceptional narrowness, shallowness, shape, topography or other extraordinary or exceptional situation or condition of a specific piece of property, the strict application of any regulation adopted under this act would result in peculiar and exceptional difficulties to, or exceptional and demonstrable undue hardship upon, the owner of such property, to authorize, upon an appeal relating to such property, a variance from such strict application so as to relieve such demonstrable difficulties or hardships, provided such relief can be granted without substantially impairing the intent, purpose, and integrity of the zone plan or other element of the comprehensive plan as embodied in the zoning regulations and map.

In exercising the above powers, such board of adjustment may, in conformity with the provisions of this act, reverse or affirm wholly or partly, or may modify the order, requirement, decision or determination appealed from and may make such order, requirement, decision or determination as ought to be made, and to that end shall have all the powers of the officer from whom the appeal is taken.

> In acting upon any appeal, such board of adjustment shall, in its consideration of and decision thereon, apply the principles, standards and objectives set forth and contained in all applicable regulations, ordinances and resolutions and in the comprehensive plan."

No other powers of a Board of Adjustment are granted to, delegated to or authorized by the Legislature in the Zoning Enabling Act.

40.    Section 6.5.2 of the Osage County Zoning Ordinance is an unauthorized delegation of power and authority by the Board of Commissioners to the County Board of Adjustment to hear, decide and approve applications for a conditional use permit for a wind energy facility.

41.    The Board of Adjustment has no power or authority under the Statutes of the State of Oklahoma to hear, decide and approve a conditional use permit for a wind energy facility.

42.    The approval of the Osage Wind Energy Facility and CUP 2012-1 by the Board of Adjustment as a conditional use permit is not authorized by the State of Oklahoma and is void.

**WHEREFORE**, premises considered, Plaintiffs respectfully demand judgment against each of the Defendants declaring (*i*) Section 6.5.2 of the Osage County Zoning Ordinance is an unauthorized delegation of power and authority by the Board of Commissioners to the County Board of Adjustment to hear, decide and approve applications for a conditional use permit for a wind energy facility; (*ii*) the Board of Adjustment had no power or authority under the Statutes of the State of Oklahoma to hear, decide and approve the Application of Osage Wind for a conditional use permit for a wind energy facility; and (*iii*) the approval of CUP 2012-1 is void and of no force and effect.

## THIRD CAUSE OF ACTION FOR DECLARATORY JUDGMENT

43.    Plaintiffs allege and incorporate Paragraphs 1 through 42 of this Petition in their Third Cause of Action as if fully set forth herein.

44.    The Application for a wind energy facility filed by Osage Wind states that the "Code Section Conditional Use/Variance is sought" is "Osage County Wind Energy ordinance, Section 3.4".

45.    The Application for a wind energy facility filed by Mustang Run states that the "Code Section Conditional Use/Variance is sought" is "Osage County Wind Energy ordinance, Section 3.4".

46.    The Osage County Wind Ordinance states its purpose is to establish minimum requirements and regulations for the placement, construction and modification of Wind Energy Facilities while promoting the safe, effective and efficient use of such systems.  It is in the nature of a building code for construction and is not a zoning ordinance or regulation, either expressly or implicitly.

47.    Section 3.4 of the Osage County Wind Energy Ordinance does not authorize or grant the power to the Board of Adjustment to hear and decide an application for a conditional use permit or a variance of the terms of the Zoning Ordinance for a wind energy facility.

48.    Title 19, Okla. Stat., § 866.23 and Section 6.5.3 of the Zoning Ordinance state the power and authority of the Board of Adjustment to grant a variance.  Osage Wind did not demonstrate any hardship by reason of exceptional narrowness, shallowness, shape, topography, or other extraordinary or exceptional situation or condition of a specific piece of property, in which the strict application of the zoning regulations would result in peculiar and exceptional difficulties to, or

exceptionable demonstrable undue hardship upon the owner of such property in the Osage Wind Application or to the Board of Adjustment.

49.     The Board of Adjustment had no jurisdiction, power or authority under Section 3.4 of the Wind Energy Ordinance to hear, decide or approve a conditional use permit or variance of the terms of the Zoning Ordinance for a wind energy facility.

50.     Any approval of a variance for a wind energy facility by the Board of Adjustment or a conditional use permit pursuant to Section 3.4 of the Wind Energy Ordinance for a wind energy facility, including the Osage Wind Energy Facility, is void and of no force and effect.

**WHEREFORE**, premises considered, Plaintiffs respectfully demand judgment against each of the Defendants declaring (*i*) Section 3.4 of the Wind Energy Ordinance does not authorize or grant the power to the Board of Adjustment to hear and decide an application for a conditional use permit or a variance of the terms of the Zoning Ordinance for a wind energy facility; (*ii*) the Board of Adjustment had no jurisdiction, power or authority under Section 3.4 of the Wind Energy Ordinance to hear, decide or approve a conditional use permit or variance of the terms of the Zoning Ordinance; and (*iii*) approval of a variance for the Application of Osage Wind for a wind energy facility by the Board of Adjustment or a conditional use permit pursuant to Section 3.4 of the Wind Energy Ordinance is void and of no force and effect.

### FOURTH CAUSE OF ACTION FOR PERMANENT INJUNCTION

51.     Plaintiffs allege and incorporate Paragraphs 1 through 50 of this Petition in their Fourth Cause of Action as if fully set forth herein.

52.    The County has improperly issued permits and/or authorizations to Osage Wind for the construction of the Wind Energy Facility approved by the Board of Adjustment.

53.    Osage Wind is in the process of constructing the Wind Energy Facility on the property subject to CUP 2012-1 and Plaintiffs will be irreparably harmed by the construction of the Wind Energy Facility and the use of the property and the subsurface mineral estate for the Wind Energy Facility.

54.    The construction of the Osage Wind Energy Facility violates the Zoning Ordinance of Osage County and should be enjoined.

55.    Plaintiffs do not have an adequate remedy at law and should be granted a permanent injunction against the Defendants, enjoining and restraining the Defendants from permitting, authorizing, constructing and using the property and the subsurface mineral estate for a Wind Energy Facility based upon the approval of CUP 2012-1 by the Board of Adjustment that is void by law and that is in violation of the Zoning Ordinance of Osage County.

56.    Plaintiffs are entitled to be awarded their reasonable attorneys' fees and the costs of this action.

**WHEREFORE**, premises considered, Plaintiffs respectfully demand judgment against each of the Defendants permanently enjoining and restraining them from permitting, authorizing, constructing and using a Wind Energy Facility on the property listed in the Application of Osage Wind based upon the approval of CUP 2012-1, that is void and is in violation of the Zoning Ordinance of Osage County.

## **PRAYER FOR RELIEF**

17

**WHEREFORE,** Plaintiffs, Osage Nation and Osage Minerals Council, pray that they be granted judgment against Defendants as follows:

a.      That the Court enter judgment on Plaintiffs' First Cause of Action in favor of Plaintiff against Defendants, the Board of Commissioners of Osage County, Oklahoma, the Board of Adjustment of Osage County, Oklahoma, and Osage Wind, L.L.C., a Delaware limited liability company, declaring (*i*) a "wind energy facility" is not listed as a use permitted by right or by a conditional use permit in Table 1.1 of the Zoning Ordinance titled "Uses Permitted in Agricultural Districts"; (*ii*) the Board of Adjustment had no power or authority under the Zoning Ordinance to hear, decide and approve a conditional use permit for a wind energy facility in Osage County; (*iii*) the approval of the Osage Wind Energy Facility and CUP 2012-1 by the Board of Adjustment as a conditional use permit is not authorized by the Zoning Ordinance and is void and of no force and effect; (*iv*) a wind energy facility is not a permitted use by right or by a conditional use permit in the AG District and violates the Zoning Regulations; (*v*) the improvements being constructed on the land subject to CUP 2012-1 to be used by Osage Wind and the intended use of the land for a wind energy facility by Osage Wind do not conform to the Zoning Regulations and are in violation thereof.

b.      That the Court enter judgment on Plaintiffs' Second Cause of Action in favor of Plaintiffs against the Defendants declaring (*i*) Section 6.5.2 of the Osage County Zoning Ordinance is an

unauthorized delegation of power and authority by the Board of
Commissioners to the County Board of Adjustment to hear, decide and
approve applications for a conditional use permit for a wind energy
facility; (*ii*) the Board of Adjustment had no power or authority under
the Statutes of the State of Oklahoma to hear, decide and approve the
Application of Osage Wind for a conditional use permit for a wind
energy facility; and (*iii*) the approval of CUP 2012-1 is void and of no
force and effect.

    c.    That the Court enter judgment on Plaintiffs' Third Cause
of Action in favor of Plaintiffs against Defendants declaring (*i*) Section
3.4 of the Wind Energy Ordinance does not authorize or grant the
power to the Board of Adjustment to hear and decide an application for
a conditional use permit or a variance of the terms of the Zoning
Ordinance for a wind energy facility; (*ii*) the Board of Adjustment had
no jurisdiction, power or authority under Section 3.4 of the Wind
Energy Ordinance to hear, decide or approve a conditional use permit
or variance of the terms of the Zoning Ordinance; and (*iii*) approval of
a variance for the Application of Osage Wind for a wind energy facility
by the Board of Adjustment or a conditional use permit pursuant to
Section 3.4 of the Wind Energy Ordinance is void and of no force and
effect;

    d.    That the Court enter judgment on Plaintiffs Fourth Cause
of Action in favor of Plaintiffs against the Defendants, permanently
enjoining and restraining the Defendants from permitting, authorizing,

19

constructing and using the property listed in the Application for a Wind Energy Facility based upon the approval of CUP 2012-1 by the Board of Adjustment that is void by law and that is in violation of the Zoning Ordinance of Osage County.

e.      That the Court enter judgment against the Defendants for Plaintiffs' reasonable attorneys' fees and the costs of this action; and

f.      That the Court grants such other and further relief as allowed by law or as the Court may deem to be just and proper.

Respectively Submitted,

Gene P. Dennison, OBA No. 2308
1437 S. Boulder, Suite 170
Tulsa, Oklahoma 74119
Telephone (918) 396-4600
Facsimile (918) 582-9940


John W. Moody, OBA No. 6321
6004 South Marion Avenue
Tulsa, Oklahoma 74135
Telephone (918) 728-7528
Facsimile  (918) 728-7528

**ATTORNEYS FOR PLAINTIFFS**

## VERIFICATION

STATE OF OKLAHOMA          )
                           ) ss.
COUNTY OF OSAGE            )

Scott Bighorse, being first duly sworn, upon oath, deposes and says that he is the Chief of the Osage Nation, has read the foregoing Petition, knows the contents thereof, and to the best of his knowledge and belief, the matters and things set forth therein are true and correct.

*Scott N. BigHorse*

Scott Bighorse

SUBSCRIBED AND SWORN to before me this 25th day of June, 2014.

*Carrie L Rogers*

NOTARY PUBLIC

Notary No. _____

My Commission Expires:

_____

OFFICIAL SEAL
**CARRIE L. ROGERS**
NOTARY PUBLIC OKLAHOMA
OSAGE COUNTY
COMM. EXP. 06-24-2016
COMM. NO. 08006524

ARTICLE 1

INTRODUCTORY PROVISIONS

## Section 1.1   Adoption and Citation

This ordinance, in pursuance of the authority granted by the Legislature of the State of Oklahoma in Title 11, Chapter 43. Section 101-109 of the Oklahoma Statutes and in Title 19, Oklahoma Statutes, Annotated, Sections 866.1 to 866.36, shall be known as the Osage County Area Zoning Ordinance and may be cited as such and is referred to herein as "these zoning regulations" or "these regulations".

## 1.2   Purpose and Necessity

The regulations contained herein are necessary and are established for the purposes of promoting the public health, safety, peace, morals, comforts. convenience, prosperity, order, and general welfare; lessening danger and congestion of public transportation and travel; securing safety from fire and other dangers; preventing overcrowding of land; avoiding undue concentration of population; providing adequate police protection, transportation, water, sewage, schools, parks, forests, recreational facilities, military and naval facilities, and other public requirements and preventing undue encroachment thereon; creating a stable pattern of land uses upon which to plan for such services and facilities; encouraging the most appropriate uses of land, maintaining and stabilizing the value of property; and carrying out the Comprehensive Plan.

## 1.3   Nature and Application

### 1.3.1   Nature

These regulations classify and regulate the use of land, buildings, and structures within the unincorporated areas of Osage County.  The regulations contained herein are necessary to promote the health, safety, convenience, and welfare of the inhabitants by dividing the territorial jurisdiction into zoning districts and regulating therein the use of the land and the use and size of buildings as to height and number of stories, and coverage of the land by buildings, the size of yards and open spaces, the location of buildings. and the density of population.

### 1.3.2   Exemption of Uses

Other provisions of these regulations to the contrary notwithstanding, these regulations shall not apply to:

Transportation, communication, and utility facilities which utilize public rights-of-way or easements customarily provided in subdivision plats, or

The following uses, exempt under the provisions of 19 O.S. Sections 866.16 and 866.30:*

* Unincorporated area only

1.1

**EXHIBIT 1**

1.7 Interpretation of Permitted Uses

1.7.1  Identification of Permitted Uses

Uses permitted in the several agricultural, residential, commercial and industrial districts are as set forth in Tables 1-1, 2-1, 5-1 and 8-1, respectively.  Where an "X" appears in the column of a district in such table, the use set off opposite the "X" is permitted as a use of right in that district.  Where a "P" appears, the use is permitted subject to the granting of a conditional use permit by the Board of Adjustment, in accordance with the provisions of Article 6.

Uses permitted in the parking, office, mining and flood districts are set forth in the text of the respective district provisions.

1.7.2  Reference for Interpretation of Permitted Uses

In the event of questions as to the meaning of permitted uses, reference shall be made to the Standard Land Use Classification Manual, January, 1965 edition, published by the Urban Renewal Administration of the U.S. Housing and Home Finance Agency and the Bureau of Public Roads of the U.S. Department of Commerce

For those uses not listed or clearly listed, the matter of interpretation of uses and classifications shall be submitted to the Osage County Board of Adjustment as set out in Section 6.4 of these regulations for interpretation and assignment of use and classification.

1.7.3  Miscellaneous Provisions

(a) In the event an unlisted use area can be interpreted as being in two or more listed areas, the most restrictive interpretation shall apply.

(b) Uses set forth in the tables of permitted uses are principal uses, unless they are identified as accessory uses.

(c) No zoning of restricted Indian Land as define by Federal Status CRF 25 however, compliance under this ordinance is requested.

1.4

Exhibit 2

of Adjustment a written notice of appeal specifying the grounds thereof. The inspecting officer shall forthwith transmit to the Board of Adjustment the papers constituting the record upon which the action appealed from was taken.

The Board of Adjustment shall fix a reasonable time for the hearing of the appeal and give written notice to the Planning Commission and the parties in interest and public notice, all at least fifteen days in advance of such hearing. In all cases of applications for conditional use permits, variances, or other appeals affecting a particular lot or particular lots, rather than a zoning district as a whole or the territorial jurisdiction as a whole, notice shall also include the posting on the property of a sign whose dimensions, design, content, and location shall conform with specifications established by the Board of Adjustment. At the hearing, any party may appeal in person or by agent or by attorney. The Board shall decide the appeal in a reasonable time.

An appeal stays all proceedings in furtherance of the action appealed from, unless the officer from whom the appeal is taken certified to the Board of Adjustment, after the notice of appeal shall have been filed with him, that by reason of facts stated in the certificate a stay, in his opinion, would cause imminent peril to life or property. In such cases, proceedings shall not be stayed otherwise than by a restraining order which may be granted by the Board of Adjustment or by a court of record on application and notice to the officer from whom the appeal is taken and on due cause shown.

### Section 6.5   Powers and Duties of the Board

6.5.1   Administrative Review Power of the Board

The Board shall have the power to hear and decide appeals where it is alleged there is error in any order, requirement, decision, or determination made by the inspecting officer in the enforcement of these regulations, subject to the provisions of Section 6.4.

6.5.2   Power of the Board to Grant Conditional Use Permits

The Board shall have the power to hear and decide applications for conditional use permits for only such uses for which these regulations require such a permit. Where a conditional use permit is required and granted, it shall be issued subject to the specific conditions upon which the Board has determined to grant the permit.

The applicant shall submit a written application for a conditional use permit indicating the section of these regulations under which the permit is sought, stating the grounds on which a permit is requested, and submitting a site plan showing the proposed development. The Board shall hold a public hearing as provided in paragraph 6.4.

The Board shall make written findings certifying that the application complies with the pertinent individual conditions of use as set forth in Article 3. That any additional conditions of use specified in the granting of the permit are compatible with the general provisions of these regulations, as well as the provisions for the district in which such use is permitted, and that satisfactory provisions and arrangements have been made concerning the following where applicable:

6.2

**EXHIBIT 3- P. 1**

(1) Safety of the motoring public and of pedestrians using the facility and the area immediately surrounding the site.

(2) Safety from fire hazard and measures for fire control.

(3) Protection of adjacent property from flood or water damage.

(4) Noise producing elements and glare of vehicular and stationary lights and effects of such lights on the established character of the neighborhood.

(5) Location, lighting, and types of signs and relation of signs to traffic control and adverse effects on adjacent properties.

(6) Street size and adequacy of pavement width for traffic reasonably expected to be generated by the proposed use around the site and in the immediate neighborhood.

(7) Adequacy of parking as determined by requirements of these regulations for off-street parking facilities in the use district in which the site is located; location of ingress and egress points for parking and off-street loading spaces, and protection of public health by surfacing an all parking areas to control dust.

(8) Such other measures as will secure and protect public health, safety, morals, and general welfare.

The Board shall consider the application and site plan and shall grant or deny the application.  In granting an application, the Board shall impose such requirements and conditions, in addition to those expressly stipulated in these regulations for the particular use, as the Board may deem necessary for the protection of adjacent properties and the public interest.

Authority to issue building or occupancy permits pursuant to the granting of a conditional use permit shall expire two years after the granting of the conditional use permit, except when the following conditions have been met:

(1) Building permits have been issued, materials have been acquired, and the foundation of at least one building has been placed on the site, or

(2) Where no construction is required, an occupancy permit has been issued, and actual operation of the use has been started.

After authority for issuance of a building or occupancy permit, pursuant to the granting of a conditional use permit, has expired by default, no building or occupancy permit shall be issued except under a conditional use permit grant pursuant to a new application.

6.5.3  Power of the Board to Authorize Variances

6.3

**EXHIBIT 3-P. 2**

ARTICLE 2

DISTRICT PROVISIONS

## Section 2.1  Agriculture District Provisions

2.1.1  Description of Agriculture Districts

The agriculture districts are intended to provide areas primarily for
agricultural and related uses.  The AG Agriculture General District is
intended primarily for areas designated as agricultural on the
Comprehensive Plan and which are likely to remain in agricultural use for
the foreseeable future.  The AI Agriculture Industrial District is
intended primarily for areas designated as industrial on the Comprehensive
Plan but which are not yet ready for industrial development.  The AR
Agriculture Residence District is intended for areas designated as
residential or commercial development.  It is the purpose of these districts
to protect the agricultural and other permitted uses from unplanned and
premature, scattered, urban type development, pending proper public or
quasi-public facilities.  The AO Agriculture Open Space District is
intended primarily for areas where continuation of open space is desired.

2.1.2  Uses permitted in Agricultural Districts

Uses permitted in the various agriculture districts are as set forth in
Table 1.1.  Where an "X" appears in the column of a district the use set
off opposite the "X" is permitted as a use of right in that district.
Where a "P" appears, the use is permitted subject to the granting of a
Conditional Use Permit by the Board of Adjustment in accordance with the
provisions of Article 6.

Table 1.1  Uses Permitted in Agricultural Districts *

---------------------------------------------------------------------

| District | | | | Uses Permitted in the Indicated Districts |
|---|---|---|---|---|
| AO | AG | AI | AR | |
| | | | | ACCESSORY STRUCTURES AND USES |
| X | X | X | X | 002 Accessory buildings, subject to Section 3.2 |
| X | X | X | X | 004 Customary home occupations, subject to Sec. 3.6 |
| X | X | X | X | 010 Accessory living quarters |
| X | X | X | X | 046 Accessory off-street loading and parking facilities, subject to Sec. 3.10 and 3.11 |
| X | X | X | | 054 Accessory retail sales: farm products raised on the premises |
| X | X | X | X | 063 Accessory signs, subject to Section 3.14 |
| X | X | X | X | 066 Temporary accessory facilities of the construction industry which are incidental to the construction of a building permitted in the district, and which shall be removed when construction work is completed. |

*NEC means "not elsewhere classified" in this table.
For meaning of P and X, see paragraph preceding this table.

2.1

EXHIBIT 4-P. 1

Table 1.1 (continued)
```
--------------------------------------------------------------
     District          Uses Permitted in the Indicated Districts

AO  AG  AI  AR    ACCESSORY STRUCTURES AND USES
--------------------------------------------------------------
X   X   X   X     009 Accessory uses, NEC.

                  RESIDENTIAL USES

                   11 Household units
    X   X   X      111 Detached single-family dwellings
    X*  X*  X*     116 Individual mobile home

                  MANUFACTURING USES

                   40 Transportation, Communication and
                      Utilities, General
X   X   X   X      401 Facilities of electric cooperatives of public
                      utilities subject to the jurisdiction of the
                      Corporation Commission of the State of Okla.
                      subject to Section 1.3.2
X   X   X   X      402 Transportation, communication, and utility
                      facilities which utilize public rights-of-way
                      or easements customarily provided in
                      subdivision plats, subject to Section 1.3.2

                  UTILITIES

P   P   P   P      484 Sewage disposal
P   P   P   P      485 Solid waste disposal, subject to Sec. 3.13

                  TRADE

                   51 Wholesale Trade
    X             515 Farm products (raw materials) - wholesale

                  SERVICES

                   62 Personal services
                  624 Funeral and crematory services; cemeteries
    X             6242 Cemeteries
                   65 Professional services
                  651 Medical and other health services
        P         6513 Hospital services
        P         6516 Sanitarium, convalescent, and rest
                      home services
```

*Allowed in unincorporated area only.


2.2


**EXHIBIT 4-P. 2**

Table 1.1 (continued)

| AO | AG | AI | AR | | Uses Permitted in the Indicated Districts |
|----|----|----|----|------|-------------------------------------------|
| | | | | | District |
| P | P | P | | 658 | Medical, dental, and other patient services |
| | P* | P* | P | 659 | Other professional services, NEC |
| | | | | 67 | Governmental services |
| P | X | X | P | 672 | Protective functions and their related activities |
| X | X | X | | 675 | Military bases and reservations |
| | | | | 68 | Educational services |
| | P | | P | 681 | Schools: nursery, primary and secondary |
| | P | | P | 682 | University, college, junior college and professional school education, not including flight schools |
| | | | | 69 | Miscellaneous services |
| | | | | 691 | Religious activities |
| | X | | | 6911 | Churches, synagogues, and temples |
| | | | X | 6912 | Same, subject to Section 3.9 |
| | | | X | 6912 | Parish houses and rectories |
| | P | | P | 692 | Welfare and charitable services |
| | P | | P | 699 | Other miscellaneous services |
| | P | | P | 6994 | Civic and fraternal organizations |
| | | | | | CULTURAL, ENTERTAINMENT, AND RECREATIONAL |
| | X | X | P | 71 | Cultural activities and nature exhibitions |
| | | | | 72 | Public assembly |
| | | | | 721 | Entertainment assembly |
| | P | P | P | 7211 | Amphitheaters |
| | P | P | P | 7214 | Legitimate theaters |
| | | | | 73 | Amusements |
| | | | | 731 | Fairgrounds and amusement parks |
| | P | P | P | 7311 | Fairgrounds |
| | | | | 739 | Other amusements NEC |
| | X | X | | 7392 | Miniature golf |
| X | X | X | | 7393 | Golf driving ranges |
| P | P | P | P | 7395 | Shooting ranges |
| | | | | 74 | Recreational activities |
| | | | | 741 | Sports activities |
| X | X | X | P | 7412 | Golf courses |
| X | X | X | P | 7413 | Tennis courts |
| | X | X | | 7416 | Riding stables |

*Allowed in unincorporated area only.

2.3

**EXHIBIT 4-P. 3**

Table 1.1 (continued)

| District | | | | Uses Permitted in the Indicated Districts |
|---|---|---|---|---|
| AO | AG | AI | AR | |
| X | X | X | P | 742 Playgrounds and athletic areas |
| X | X | X | P | 743 Swimming areas |
| | | | | 7431 Swimming beaches |
| | X | X | P | 744 Marinas |
| | | | | 749 Other recreation NEC |
| P | P | P | P | 7491 Camping and picnicking areas |
| | P | P | P | 75 Resorts and group camps (not including halfway houses or drug rehabilitation centers) |
| P | P | P | P | 76 Parks |

RESOURCE PRODUCTION AND EXTRACTION

| | | | | 81 Agriculture, subject to Section 3.4 |
|---|---|---|---|---|
| X | X | X | X | 810 The erection or use of the usual farm buildings for agricultural purposes*, subject to Sec. 1.3.2 |
| X | X | X | X | 811 The planting of agricultural crops, subject to Section 1.3.2 |
| X | X | X | X | 815 Farms; dairy |
| | X | | | 816 Farms and ranches: livestock other than dairy |
| | X | | | 8161 Farms and ranches: cattle |
| X | X | X | X | 8161.9 Farms and ranches: cattle NEC |
| X | X | X | | 8162 Farms and ranches: hogs |
| X | X | X | X | 8169 Farms and ranches: other livestock NEC |
| X | X | X | X | Other agriculture and related activities NEC subject to Section 3.4 |
| X | X | X | | 82 Agricultural related activities other than cotton ginning |
| X | X | X | X | 83 Forestry activities and related services |
| X | X | X | | 84 Fishing activities and related services |
| | | | | 85 Mining activities and related services |
| X | X | X | X* | 853 Extraction of oil or natural gas subject to Section 1.3.2 |

*Allowed in unincorporated areas only.

2.1.3  Bulk and Area Regulations for Residential Uses in Agricultural Districts

Every residential use in Agricultural Districts shall be subject to the regulations set forth in Table 1.2 and 1.3 and to the modifications thereof set forth in Article 4.

2.4

**EXHIBIT 4-P. 4**

R E S O L U T I O N

BY

THE BOARD OF COUNTY COMMISSIONERS OF OSAGE COUNTY
OF THE STATE OF OKLAHOMA

**WHEREAS,** THE BOARD OF COUNTY COMMISSIONERS OF OSAGE COUNTY, WITHIN AND FOR THE STATE OF OKLAHOMA, BEING IN SESSION ON THIS 4TH DAY OF APRIL, 2011; AND,

**WHEREAS,** THERE BEING A QUORUM OF THE BOARD PRESENT THE FOLLOWING MOTION WAS MADE BY_____Bob Jackson_____ AND SECONDED BY _____Scott Hilton_____, AFFIRMATIVE VOTE BY ALL.

**THEREFORE,** BE IT RESOLVED THAT THE BOARD OF COUNTY COMMISSIONERS OF OSAGE COUNTY, OKLAHOMA DOES APPROVE THE ATTACHED WIND ENERGY ORDINANCE AS APPROVED BY THE OSAGE COUNTY PLANNING COMMISSION.

**SIGNED** THIS THE 4TH DAY OF APRIL, 2011—

BOARD OF COUNTY COMMISSIONERS
OSAGE COUNTY, OKLAHOMA

_____ CHAIRMAN

_____ MEMBER

_____ MEMBER

DENNY HUTSON, OSAGE COUNTY CLERK

**EXHIBIT 5**

# OSAGE COUNTY WIND ENERGY ORDINANCE

## 1.0 Purpose

The purpose of this ordinance is to establish minimum requirements and regulations for the placement, construction, and modification of Wind Energy Facilities and related equipment, while promoting the safe, effective, and efficient use of such systems.  This ordinance does not address small wind energy facilities with a rated nameplate capacity of 50 kilowatts (kW) or less.

## 2.0 Definitions

**Abandoned:**  A Wind Energy Facility or project shall be considered abandoned when, once installed, it fails to generate electricity from commercial wind energy equipment for a period of twenty-four (24) consecutive months for reasons other than curtailment, repowering, a valid judicial order or other governmental regulatory action, with no pending negotiations for purchase.  A Wind Energy Facility shall not be considered abandoned following a natural disaster or other force majeure if it is put in proper working order and capable of generating electricity within 36 months after the occurrence of the natural disaster or other force majeure.

**Rated Nameplate Capacity:** The maximum rated output of electric power production equipment. Due to the nature of wind energy facilities, watts or kilowatts (kw) will be used as the standard rating unit in this ordinance.

**Turbine Height:** The height of a wind turbine measured from prevailing grade level at the support base to the tip of the turbine blade when it reaches its highest elevation.

**Wind Energy Facility:** An electrical generation facility consisting of one or more wind turbines under common ownership or operating control and with a collective rated nameplate capacity greater than 50kw, including substations, meteorological data towers, aboveground and underground electrical transmission and collection lines, transformers, control systems, and other buildings or facilities used to support the installation, maintenance, and operation of the facility, and whose primary purpose is to supply electricity for commercial use.

**Wind turbine:** A wind energy conversion system which converts wind energy into electricity through the use of a wind powered turbine supplying mechanical energy to an electric power generator. The wind energy conversion system includes but is not limited to the turbine assembly including the blades and connection to the generator, tower, tower foundation, and transformer if used.

## General Requirements – Wind Energy Facilities and Projects

### 3.1 Design Standards

#### 3.1.2 Setbacks:
Wind turbines shall be set back a minimum of 1000 ft. from all inhabited structures. The setback from all 50kv or greater transmission lines or public roads existing at the time the Conditional Use Permit is issued, shall be a minimum of 125% of the turbine height. The setback distance shall be measured from the center of the wind turbine base to the nearest point of the applicable inhabited structure, the nearest point of a 50kw or greater transmission line, or the centerline of a public road. Hunting cabins, storage buildings, barns or other temporary, moveable, or agricultural structures are not considered inhabited structures.

Wind turbines are NOT eligible for later height modifications if the modified height fails to meet the setback limits.

#### 3.1.3 Setback waivers:
The Pawhuska – Osage County Board of Adjustment (the agency designated to approve the Conditional Use Permit) shall consider an exception to the minimum setbacks required if a signed agreement of consent is obtained from the owner of the structures nearer to the Wind Turbines than the required setback distance.

#### 3.1.4 Minimum blade height:
The minimum blade height of the lowest extent of a turbine blade shall be 50 feet above ground.

#### 3.1.5 Color and finish:
Wind Turbines shall be a neutral or non-obtrusive color that complies with applicable Federal Aviation Administration (FAA) requirements.   Gray, beige, white, or off-white are recommended. Wind Turbine blades may be black.

#### 3.1.6 Lighting:
Wind energy facility lighting shall comply with FAA requirements. In addition, during construction, all wind energy towers shall have sufficient aircraft warning lights to alert helicopter traffic. Lighting of Wind energy facilities beyond FAA standards shall be directed downward and limited to that required for safety and operational purposes.

#### 3.1.7 Signage and advertising:
Signs and advertising shall be restricted to safety signs and reasonable identification of the manufacturer, operator of the wind energy facility, and utility (if any).

#### 3.1.8 Access:
All access doors, climbing apparatuses, or access ways to Wind Turbines, towers, and electrical equipment shall remain locked and inaccessible by the public.  Access roads will be private roads and gated at the edge of the public right of way, with appropriate no trespassing signage.

### 3.2 Siting Conditions and Property Maintenance:

**3.2.1 Land clearing:**
Except as otherwise agreed in writing between a landowner and owner of the wind energy facility, clearing of natural vegetation shall be limited to that which is necessary for the safe construction, operation, and maintenance of the wind energy facility.

**3.2.2 Soil erosion:**
Soil erosion is to be mitigated by the use of silt fencing and any accumulated product which can be used in the site reclamation.

**3.2.3 System conditions:**
The wind energy facility shall be maintained in a good condition acceptable to the Osage County Commission. Maintenance shall include, but not be limited to, painting, structural repairs, and security measures.

**3.2.4 Removal and decommissioning requirements:**
The wind energy facility shall be properly decommissioned in accordance with the rules and requirements in effect under 17 O.S. Sections 160.13, 160.14, and 160.15 (The Oklahoma Wind Energy Development Act).

### 3.3 Roads

**3.3.1 Inspection:**
Prior to beginning construction the permit applicant will identify all public roads potentially impacted by the construction and maintenance of a wind energy facility. The applicant shall notify the Osage County Commission of the need for an inspection of public roads so identified.

**3.3.2 Maintenance and repair:**
The applicant and the Osage County Commission shall enter into an agreement for maintenance and repair of roads subject to the additional wear and tear of construction and maintenance activity of a wind energy facility. Applicant shall not be held responsible for maintaining or repairing a road to a condition better than what existed at the time of inspection by the county.

### 3.4 Permits:

A Wind energy facility may be constructed as provided in this ordinance after first obtaining a permit from the Pawhuska – Osage County Board of Adjustment. Conditional Use Permit applications for wind energy facilities shall be based on anticipated total rated nameplate capacity of the proposed project. A permit fee ("Conditional Use Permit Fee") shall be due upon approval of the Conditional Use Permit. The permit fee shall be $1,100.00 per megawatt of rated capacity.



**OSAGE COUNTY WIND**
• Osage County, OK •
a Wind Capital Group project

July 7, 2011

Mr. Jake Bruno
Osage County Planning & Zoning
628 Kihekah
Pawhuska, OK  74056

RE:  Application for Conditional Use or Variance Osage Wind, LLC

Dear Mr. Bruno:

Osage Wind, LLC hereby submits its application for conditional use or variance for a wind energy facility to be located in Osage County, Oklahoma.  Please find enclosed a completed copy of the application form and a check in the amount of $60.00.  We have also enclosed the following exhibits describing the proposed facility:

      Exhibit A:  Site map and turbine locations

      Exhibit B:  Project area Platt map and land parcel identification

If you have questions or would like any additional information, please do not hesitate to contact us.  Thank you very much for your assistance with this application.

Very truly yours,

Tom Green
Senior Manager, Project Development
(608) 370-2426

**EXHIBIT 6**

JUL-07-2011  11:21      GABLE GOTWALS                 918 595 4990     P.003/014
JUL-07-2011 10:37 From:                        To:918 595 4990      P.3/14

RECEIVED
JUL 0 8 2011
OSAGE CO. PROGRAMS

PAWHUSKA-OSAGE COUNTY PLANNING COMMISSION
OSAGE COUNTY BOARD OF ADJUSTMENT
628 KIHEKAH – PAWHUSKA, OKLAHOMA 74056
PHONE: 918-287-3980 OR 800-672-4326
FAX: 918-287-0031

## APPLICATION FOR CONDITIONAL USE OR VARIANCE

DATE July 7, 2011   FEE: $60.00   *Conditional Use* APPLICATION NO. 2013-01

APPLICANT'S NAME  Osage Wind, LLC

LOT SIZE (SQ. FT. OR ACRES) _____ WIDTH(FT) _____ DEPTH(FT) See Attached

LEGAL DESCRIPTION  See Attached

## CONDITIONAL USE PERMIT OR VARIANCE:

PRESENT ZONING  See Attached

PRESENT USE OF LAND  See Attached

CODE SECTION CONDITIONAL USE/ VARIANCE IS SOUGHT Osage County Wind Energy

CONDITIONAL USE/ VARIANCE IS REQUESTED FOR _____ ordinance, Section 3.4
Wind Energy Facility

APPLICANT'S SIGNATURE            314-685-3000
George Knapp, Vice President      PHONE NUMBER

1430 Washington Ave., Suite 3000, St. Louis, MO  63103
MAILING ADDRESS  CITY        STATE        ZIP

APPROVED ___✓___            DATE  8-11-11

DISAPPROVED _____        DATE _____

BY:

OSAGE COUNTY BOARD OF ADJUSTMENTS  ___✓___

**EXHIBIT**
**ZONING PACKET**

**LEGAL DESCRIPTIONS**

| Parcel Key | Land Description | Present Zoning | Present Use |
|---|---|---|---|
| 1 | SOUTH HALF OF SECTION 24 AND SOUTH HALF OF THE NORTHWEST QUARTER AND SOUTH HALF OF THE NORTHEAST QUARTER SECTION 24. CONTAINING APPROXIMATELY 470.94 ACRES; ALL IN SECTION 24 TOWNSHIP TWENTYSIX (26) NORTH, RANGE FIVE (5), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 2 | NORTH HALF OF THE NORTHEAST QUARTER SECTION 24. CONTAINING APPROXIMATELY 78.59 ACRES; ALL IN SECTION 24 TOWNSHIP TWENTYSIX (26) NORTH, RANGE FIVE (5), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 3 | NORTH HALF OF NORTH HALF OF AND SOUTH HALF OF NORTHEAST QUARTER LYING  NORTH OF THE ROAD IN SECTION 25. CONTAINING APPROXIMATELY 231.95 ACRES; ALL IN SECTION 25 TOWNSHIP TWENTYSIX (26) NORTH, RANGE FIVE (5), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 4 | SOUTH HALF OF SOUTHWEST QUARTER SECTION 14. CONTAINING APPROXIMATELY 80 ACRES; ALL IN SECTION 14 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 5 | SOUTHWEST QUARTER SECTION 19.  CONTAINING APPROXIMATELY 161.8 ACRES; ALL IN SECTION 19 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 6 | SOUTHEAST QUARTER SECTION 19.  CONTAINING APPROXIMATELY 162.08 ACRES; ALL IN SECTION 19 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 7 | SOUTHWEST QUARTER .  CONTAINING APPROXIMATELY 160 ACRES; ALL IN SECTION 20 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 8 | ALL SECTION 21 EXCEPT 1.52A ROAD EASEMENT. CONTAINING APPROXIMATELY 639 ACRES; ALL IN SECTION 21 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |

| Parcel Key | Land Description | Present Zoning | Present Use |
|---|---|---|---|
| 9 | NORTHEAST QUARTER SECTION 22. CONTAINING APPROXIMATELY 160 ACRES; ALL IN SECTION 22 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 10 | WEST HALF OF OF SECTION 22 EXCEPT 3.76A ROAD EASEMENT AND SOUTHEAST QUARTER OF SECTION 22. CONTAINING APPROXIMATELY 478 ACRES; ALL IN SECTION 22 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 11 | NORTH HALF OF SECTION 23 AND WEST HALF OF SOUTHEAST QUARTER. CONTAINING APPROXIMATELY 408.6 ACRES; ALL IN SECTION 23 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 12 | NORTHEAST QUARTER SOUTHEAST QUARTER. CONTAINING APPROXIMATELY 40 ACRES; ALL IN SECTION 23 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 13 | SOUTHEAST QUARTER SOUTHEAST QUARTER. CONTAINING APPROXIMATELY 40 ACRES; ALL IN SECTION 23 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 14 | SOUTHWEST QUARTER SOUTHWEST QUARTER . CONTAINING APPROXIMATELY 40 ACRES; ALL IN SECTION 24 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 15 | NORTHWEST QUARTER,  NORTHEAST QUARTER, NORTH HALF OF SOUTHWEST QUARTER , NORTH HALF OF SOUTHEAST QUARTER, SOUTHEAST QUARTER SOUTHWEST QUARTER AND SOUTHWEST QUARTER SOUTHEAST QUARTER.  CONTAINING APPROXIMATELY 560 ACRES; ALL IN SECTION 24 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 16 | WEST HALF OF SECTION 25. CONTAINING APPROXIMATELY 320 ACRES; ALL IN SECTION 25 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 17 | NORTHEAST QUARTER.  CONTAINING APPROXIMATELY 160 ACRES; ALL IN SECTION 26 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |

| Parcel Key | Land Description | Present Zoning | Present Use |
|---|---|---|---|
| 18 | NORTH HALF OF SOUTHEAST QUARTER SECTION 26. CONTAINING APPROXIMATELY 80 ACRES; ALL IN SECTION 26 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 19 | NORTHWEST QUARTER,  NORTHEAST QUARTER and SOUTHWEST QUARTER of SECTION 27.  CONTAINING APPROXIMATELY 480 ACRES; ALL IN SECTION 27 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 20 | NORTHEAST QUARTER, SOUTHWEST QUARTER , SOUTHEAST QUARTER SECTION 28.  CONTAINING APPROXIMATELY 480 ACRES; ALL IN SECTION 28 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 21 | NORTHWEST QUARTER SECTION 28.  CONTAINING APPROXIMATELY 160 ACRES; ALL IN SECTION 28 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 22 | NORTHEAST QUARTER (EXCEPT 5.05A ROAD EASE) & WEST HALF OF (EXCEPT 10.36 ROAD EASE).  CONTAINING APPROXIMATELY 625 ACRES; ALL IN SECTION 29 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 23 | NORTH HALF OF SECTION 30 LYING  NORTH OF RD. CONTAINING APPROXIMATELY 202.58 ACRES; ALL IN SECTION 30 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 24 | ALL THAT PRT OF SECTION 32 LYING SOUTH OF HWY 60. CONTAINING APPROXIMATELY 320 ACRES; ALL IN SECTION 32 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 25 | ALL SECTION 32 LYING  NORTH HWY 60 (EXCEPT 7A POB BEG W SECTION LN 368' S NORTHWEST CORNER OF THE S1258' TH E71' TO W BNDRY LN ST HWY 18 A DIST OF 1293' TH W395.2' TO POB).  CONTAINING APPROXIMATELY 320 ACRES; ALL IN SECTION 32 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 26 | NORTH HALF OF SOUTHWEST QUARTER LYING SOUTH OF HWY 60.  CONTAINING APPROXIMATELY 65.16 ACRES; ALL IN SECTION 33 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |

| Parcel Key | Land Description | Present Zoning | Present Use |
|---|---|---|---|
| 27 | ALL THAT PART OF SECTION 33 LYING NORTH OF HWY 60. CONTAINING APPROXIMATELY 328 ACRES; ALL IN SECTION 33 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 28 | ALL THAT PART OF SECTION 34 LYING NORTH OF HWY 60. CONTAINING APPROXIMATELY 446 ACRES; ALL IN SECTION 34 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 29 | SOUTHEAST QUARTER LYING NORTH OF HWY 60 SECTION 35.  CONTAINING APPROXIMATELY 134.05 ACRES; ALL IN SECTION 35 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 30 | WEST HALF OF SECTION 35 LYING NORTH OF HWY 60. CONTAINING APPROXIMATELY 264 ACRES; ALL IN SECTION 35 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |
| 31 | SOUTHWEST QUARTER & E/2 SOUTHEAST QUARTER. CONTAINING APPROXIMATELY 222 ACRES; ALL IN SECTION 36 TOWNSHIP TWENTYSIX (26) NORTH, RANGE SIX (6), EAST IN INDIAN MERIDIAN TOWNSHIP IN OSAGE COUNTY, OKLAHOMA. | Agricultural | Agricultural Ranching |





LEGEND
Proposed Turbine Location
Alternate Turbune Location
Access Road
Alternate Access Road
Collector System
Proposed Substation
Proposed Generator Radial
O&M Building
Project Boundary
Landowner Parcel
60m Met Tower
SODAR Unit
Substation
Transmission Line
Improved Roads
Dirt - Gravel Roads
Communication Tower
NHD Streams
NHD Waterbody
Elevation (Feet)
High : 1301
Low : 891
NOTES
CONFIDENTIAL AND PROPRIETARY
PROJ NO. 620
OSAGE COUNTY, OKLAHOMA
OSAGE WIND PROJECT
PROJECT SITE PLAN-
152 MW GE 1.6-100
SCALE AS SHOWN
DWG. NAME
SHEET 1 OF 1
REV
Wind Capital Group
Bringing Wind Energy Home
TURBINE ARRAY
ISSUED FOR DESIGN
DATE 07/06/11
CHECKED CDZ
APPROVED EDB
Page Size: 22"x34"
1 inch = 1,500 feet
1:18,000
Page Size: 11"x17"
1 inch = 3,000 feet
1:36,000
0 0.125 0.25 0.5 Miles
N
W
E
S
NO
DATE
REVISION
BY
CKD
APV
T:\PROJECTS\Osage-620 GIS\MXD\Osage IFD V18_0 INF_CTY 070611.mxd

**Mustang Run Wind Project, LLC**

**Conditional Use Permit Application**

**Submitted for Consideration on March 31, 2014**





TRADEWIND ENERGY

Exhibit 7

## Table of Contents

| | |
|---|---|
| Application Submitted 3/7/2014 | 1 |
| Written Project Description | 2 |
| Site Plan Map | 3 |
| Zoning Packet | 4 |
| Ownership from Abstract Company | 5 |
| Proof of Publication | 6 |
| Picture of Posted Sign | 7 |
| Affidavit of Notification | 8 |
| Green Cards | 9 |
| Recorded Agreements and Memorandums | 10 |

*1*

PAWHUSKA-OSAGE COUNTY PLANNING COMMISSION
OSAGE COUNTY BOARD OF ADJUSTMENT
628 KIHEKAH – PAWHUSKA, OKLAHOMA  74056
PHONE:  918-287-3980 OR 800-672-4326
FAX:  918-287-0031

## APPLICATION FOR CONDITIONAL USE OR VARIANCE

DATE _3/7/2014_____     FEE:  $60.00     APPLICATION NO. _____

APPLICANT'S NAME  _Mustang Run Wind Project, LLC_____

LOT SIZE (SQ. FT. OR ACRES) _9,453 acres or 9406 acres_____ WIDTH(FT) _____ DEPTH(FT)_____

LEGAL DESCRIPTION ___See Attached_____      _____

## CONDITIONAL USE PERMIT OR VARIANCE:

PRESENT ZONING_____Agricultural_____

PRESENT USE OF LAND _Agricultural/Ranching_____

CODE SECTION CONDITIONAL USE/ VARIANCE IS SOUGHT _Osage County Wind Ordinance Sec. 3.4_

CONDITIONAL USE/ VARIANCE IS REQUESTED FOR _Wind Energy Facility_____

_____     _913-888-9463 / 913-956-4079_
APPLICANT'S SIGNATURE                        PHONE NUMBER

_16105 W. 113th Street, Suite 105_      _Lenexa, KS_      _66219_
MAILING ADDRESS  CITY            STATE            ZIP

APPROVED_____        DATE_____

DISAPPROVED_____        DATE_____

BY:

OSAGE COUNTY BOARD OF ADJUSTMENTS  _____

*2*

## Mustang Run Project Summary

The Mustang Run Wind Project (Mustang Run) is located in Osage County, Oklahoma approximately 10 miles West of Pawhuska and 45 miles West of Bartlesville. The Project's southern border is Highway 60, and Highway 18/11 runs west of the Project site. Access within the site will be via new gravel roads to be constructed on private property and the upgrading of Foraker Road. The project consists of approximately 9500 acres, but the actual footprint (including turbine locations, access roads, underground collector systems, transmission pole locations, substation and switchyard) will be less than 375 acres.

- Mustang Run has entered into a Power Purchase Agreement (PPA) with Grand River Dam Authority (GRDA) for a 136 MW Project planned to start producing power in Q3 2015.

- The facility will consist of approximately sixty-eight (68) Vestas Turbines with 80 meter hub height towers and either 100m or 110m blade diameters. Turbine technology is in constant evolution, and while the brand and hub height will not change, adjustments to power output ratings and software configurations between approval and completion of construction are possible.

- Electrical infrastructure will include a 34.5/138 kV project substation (including station power service and system protection), a 34.5 kV underground collector system, and a 138 kV project transmission line.

- Civil infrastructure will include: upgrades to existing county roads (per a Road Maintenance Agreement currently being negotiated with Osage County), new gravel access roads within the project area, temporary crane paths, laydown yard and staging areas, an Operations and Maintenance building and related infrastructure, as well as turbine foundations. All of the aforementioned civil infrastructure will be at Mustang Run's expense, including restoration of temporary disturbances and infrastructure.

- The design and construction of necessary interconnection facilities will be performed by the utility. The point of interconnection (POI) to the regional transmission system will be the Shidler substation owned by Public Service of Oklahoma.

- The Project includes an approximately 10 mile overhead power line to connect to the POI. The design as proposed includes two alternative routes (Primary and Alternate). The Primary route will consist entirely of private easements. The Alternate route, which for a portion of the route approaching the POI follows state highway 18/11, will consist of State right of way easement rights in addition to private easements. The Alternate route is subject to State approval. In advance of commencement of construction, the Project will submit notice to the County of final route selection.

- The Project will be in full compliance with the Osage County Wind Ordinance.

- All construction and related electrical activities will be in full compliance with applicable State and Federal engineering and building regulations.

- A full archeological survey has commenced and will be completed on the proposed areas of disturbance in advance of construction activities.

- The project will be in full compliance with all applicable Federal and State environmental regulations.

- The submitted design should be considered final, subject to influences outside of the control of the Project which may require minor micro-siting revisions. Such influences may include constructability concerns, environmental constraints, avoidance of existing and planned oil and gas facilities, or any other constraints as discovered in pre-construction surveys.

Environmental Reports Completed:

- Initial Environmental and Permitting Review for the Mustang Run Wind Project – May 19, 2008
- 2009 Greater Prairie Chicken Survey and Habitat Assessment Report – August 25, 2009
- 2010 Greater Prairie Chicken Lek Study Report for the Mustang Run Wind Project, LLC – September 9, 2010
- 2011 Greater Prairie-Chicken Lek Study Report for the Mustang Run Wind Project, LLC- September 2, 2011
- 2013 Greater Prairie-Chicken Habitat Quality Assessment Report for the Mustang Run Wind Project, LLC-December 10, 2013
- Spring Raptor Migration Study and Raptor Nest Survey – September 24, 2009
- 2009 Spring and Fall Raptor Migration Study and Raptor Nest Survey – March, 2010
- 2010 Spring Raptor Migration Study for the Mustang Run Wind Project, LLC – October 14, 2010
- Spring and Fall 2010 Raptor Migration Study and Raptor Nest Survey for the Mustang Run Wind Project, LLC – January 2011
- 2010 Breeding Birds Survey for the Proposed Mustang Run Wind Project, LLC – December 2010
- 2011 Breeding Bird Study for Proposed Mustang Run Wind Project, LLC-September 2011
- 2013 Bald Eagle Nest Survey Report – May 2013
- 2013 American Burying Beetle Desktop Report – August 4, 2013
- 2013 American Burying Beetle Presence/Absence Survey Report – October 4, 2013

Remaining Environmental work to be completed for Project includes the following:

- American Burying Beetle Survey (2014)
- Bald Eagle Nest Surveys (2014)
- Bald Eagle Point-Count Surveys (present – July, 2014)
- Bird & Bat Risk Assessment
- Bird & Bat Conservation Strategy
- Wetland Delineations
- Consultation with Oklahoma SHPO
- Completion of a Desktop and Field Cultural Resources Survey

3

# EXHIBIT 7

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-CV-453-JED-FHM |
| | ) | |
| (1) MUSTANG RUN WIND PROJECT, | ) | (Related: *U.S. v. Osage Wind, LLC, et al.*; |
| LLC; | ) | NDOK Case No. 14-CV-704-JHP-TLW) |
| (2) TRADEWIND ENERGY, INC.; | ) | |
| (3) ENEL KANSAS, LLC; and | ) | |
| (4) ENEL GREEN POWER NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT FOR DECLARATORY JUDGMENT AND
### PRELIMINARY AND PERMANENT INJUNCTION

Plaintiff, the United States of America, by and through Danny C. Williams, Sr., United States Attorney for the Northern District of Oklahoma, and Cathryn D. McClanahan, Assistant United States Attorney, for its Complaint against the above-named defendants, alleges as follows:

### NATURE OF THE ACTION

1.     In this civil action, the United States seeks a preliminary and a permanent injunction and a declaratory judgment that the ongoing excavation activities of Mustang Run Wind Project, LLC, Tradewind Energy, Inc., Enel Kansas, LLC, and Enel Green Power North America, Inc. (collectively "Defendants") in Osage County, Oklahoma, are unlawful and must be suspended until Defendants have obtained all requisite federal regulatory approvals and have entered into appropriate leases approved by the Secretary of the Interior ("the Secretary").

2.     Defendants have announced their intention to, and may already be conducting, unauthorized mineral excavation activities in connection with the construction of a wind energy

project on 9,500 acres in Osage County, Oklahoma. The project consists of approximately 68 wind turbines and associated infrastructure. Defendants propose to dig numerous pits measuring more than 50 feet wide and more than 10 feet deep. As part of this process, Defendants propose to excavate sand, soil of various types, and rock encountered in place. Defendants propose to crush some of these extracted materials and use them to reinforce the concrete turbine foundations.

3.      The activities that Defendants may engage in are substantially similar to the activities of another project in Osage County (Osage Wind, LLC), which is already the subject of litigation in this court. *United States v. Osage Wind, LLC, et al.*; NDOK Case No. 14-CV-704-JHP-TLW. Osage Wind is also associated with Enel Kansas, LLC, and Enel Green Power North America, Inc., defendants in both matters.

4.      The United States seeks, on an expedited basis, preliminary and permanent injunctions, and a declaratory judgment that the anticipated or ongoing activities of Defendants in Osage County, Oklahoma, are unlawful and must be suspended immediately and until they have obtained the requisite federal regulatory approvals and have entered into appropriate leases approved by the Secretary.

## PARTIES

5.      The Osage Nation ("Osage Nation") is a federally recognized Indian tribe. The United States is authorized to bring lawsuits on behalf of trust Indian beneficiaries pursuant to 25 U.S.C. § 175. The United States is further authorized to litigate this case in order to fulfill its fiduciary responsibility to protect trust Indian resources. *See United States v. Colvard*, 89 F. 2d 312 (4th Cir. 1937). Further, as trustee, the United States is charged with the administration, protection, and management of the estate. *See* Act of June 28, 1906 § 3, 34 Stat. 539, 543-44,

amended in relevant part by Act of Mar. 2, 1929, 45 Stat. 1478 (extending restricted trust status of minerals estate to 1959); Act of June 24, 1938, 52 Stat. 1034 (extending restricted trust status of the minerals estate to 1983); Act of Oct. 21, 1978, 92 Stat. 1660 (extending restricted trust status of minerals estate in perpetuity). In furtherance of those trust responsibilities, the Bureau of Indian Affairs ("BIA") has promulgated and does administer regulations governing activities affecting the Osage minerals estate. The United States brings this lawsuit in its capacity as trustee of the Osage minerals estate, as well as to enforce compliance with federal law.

6.   Upon information and belief, Defendant Mustang Run Wind Project, LLC is an Oklahoma limited liability company and a wholly owned subsidiary of Enel Kansas, LLC.

7.   Upon information and belief, Defendant Tradewind Energy, Inc. is a Kansas for-profit corporation, the developer of the Mustang Run Wind Project, and a subsidiary of Enel Kansas, LLC.

8.   Upon information and belief, Defendant Enel Kansas, LLC, a Delaware limited liability company, is a wholly owned subsidiary of Enel Green Power North America, Inc.

9.   Upon information and belief, Defendant Enel Green Power North America, Inc. is a Delaware corporation.

## JURISDICTION AND VENUE

10.   This Court has jurisdiction under 28 U.S.C. § 1345, which provides that the district courts shall have original jurisdiction in all civil actions commenced by the United States or any agency thereof. *McCarty v. Hollis*, 120 F. 2d 540 (10th Cir. 1941).

11.   Venue is proper in this district under 28 U.S.C. § 1391(b), inasmuch as the property at issue is located in Osage County, Oklahoma. 28 U.S.C. § 1661(b).

## FACTS

### The Osage Nation and the Osage Minerals Estate

12.     The Osage Nation is a federally recognized Indian tribe. The Osage Reservation was originally established through the Act of June 5, 1872, ch. 310, 17 Stat. 228 (An Act to Confirm to the Great and Little Osage Indians a Reservation in Indian Territory).

13.     In 1906, Congress enacted the Osage Allotment Act, which severed the minerals estate from the surface estate of Osage Reservation and placed the minerals estate in trust for the tribe. *See* Act of June 28, 1906, ch. 3572, 34 Stat. 539. The surface estate was allotted to individual members of the Osage Nation for the purpose of homesteading. *Id.* at § 2. The Congress regarded the surface estate as suitable for farming and grazing. S. Rep. No. 59-4210, 59th Congress (1906) (Division of the Lands and Funds of Osage Indians, Oklahoma) at 2.

14.     The Congress, in the Osage Allotment Act, specifically reserved "oil, gas, coal, or other minerals covered by the lands" to the United States in trust for the Osage Tribe. Osage Allotment Act at § 3. In severing the minerals estate from the surface estate, the Congress did not contemplate uses of the surface estate which would interfere with the minerals estate beyond those normally associated with homesteading, farming, and grazing.

15.     The Osage Minerals Council is an independent political entity within the Osage Nation established by Article XV of the Osage Nation Constitution. Among the responsibilities of the Osage Minerals Council is the negotiation of leases for the development and extraction of minerals from the Osage minerals estate.

16.     The BIA and its Osage Agency in Pawhuska, Oklahoma, administers many of the United States' trust duties related to the Osage minerals estate.

### Defendants' Mining Activities

17.    Defendants are constructing a wind energy project consisting of approximately 68 turbines, underground collection lines, overhead transmission line, and a network of access roads.

18.    Immediately below the surface, the minerals estate contains limestone, sandy soil (sand and gravel), and other minerals belonging to the United States in trust for the Osage Nation.

19.    The installation of the wind energy project's turbines and foundations requires substantial excavation of the subsurface estate belonging to the Osage Nation, which is held in trust by the United States and regulated by the BIA.

20.    The massive excavation activities necessary to place the wind turbines are expected to be substantially similar to the excavation already accomplished by Osage Wind, LLC and discussed at length in *United States v. Osage Wind, LLC, et al.*; NDOK Case No. 14-CV-704-JHP-TLW, Declaration of Bill Moskaluk, Dkt. 17-1 at 5.

21.    The foundations for the wind turbines are made from reinforced concrete, in a conical shape with a base diameter of 50 to 60 feet, buried to a depth of approximately 10 feet in the subsurface estate. These activities include the excavation of limestone, sandy soil and other minerals from the subsurface estate. Rock from the excavations comes out in pieces of varying size and shape.

22.    Defendants utilize rock crushers to crush the limestone, and the crushed rock is placed next to the site from which it was excavated.

23.    Once a foundation for the turbine is poured and has cured, the crushed rock, sand and soil from the excavation are pushed back into the excavated site as backfill.

24.     Upon information and belief, unless Defendants are restrained, the erection of all the planned turbines will involve excavation and use by Defendants of well over 40,000 cubic yards of minerals.

**The Defendants' Activities Require Prior Approvals**

25.     Generally, the development of Indian tribal solid mineral resources is governed by federal regulations found at 25 C.F.R. § 211. There are specific regulations applicable to non-oil and gas mining on the Osage Mineral Reserve set forth in 25 C.F.R. § 214.

26.     Pursuant to 25 C.F.R. § 214.7, "No mining or work of any nature will be permitted upon any tract of land until a lease covering such tract shall have been approved by the Secretary of the Interior and delivered to the lessee."

27.     Additionally, "Leases of minerals other than oil and gas may be negotiated with the tribal council after permission to do so has been obtained from the officer in charge [the superintendent of the Osage Indian Agency]." 25 C.F.R. § 214.2.

28.     According to 25 C.F.R. § 211.3, "mining" is "the science, technique, and business of mineral development including, but not limited to: opencast work, underground work, and in-situ leaching directed to severance and treatment of minerals; Provided, when sand, gravel, pumice, cinders, granite, building stone, limestone, clay or silt is the subject mineral, an enterprise is considered 'mining' only if the extraction of such mineral exceeds 5,000 cubic yards in any given year."

**Notice to the Defendants Regarding Unauthorized Activities**

29.     On information and belief, Defendant Enel Kansas, LLC and/or Defendant Enel Green Power North America, Inc. participated in the Osage Wind, LLC project  described in detail in *United States v. Osage Wind, LLC, et al.*; NDOK Case No. 14-CV-704-JHP-TLW.

There, excavation and earth movement activities began on or around September 2014. On September 29, 2014, the BIA first learned of Defendants' unlawful activities when an employee of the BIA Osage Agency observed employees and agents of Osage Wind performing excavation activities as detailed above.

30.     With respect to Osage Wind, Osage Agency Superintendent Robin Phillips wrote to Defendant Enel Green Power North America, Inc. on October 9, 2014, and demanded that the subject activities cease until an appropriate permit or lease for the excavation and use of minerals from the Osage minerals estate was approved.

31.     On October 29, 2014, the Osage Mineral Council approved Resolution 3-25, requesting the assistance of the United States to protect the Osage minerals estate from unauthorized commercial use.

32.     On July 31, 2015, Osage Agency Superintendent Robin Phillips wrote to Defendant Tradewind Energy advising that an approved mineral lease pursuant to federal regulations was required prior to the contemplated invasion and use of the Osage minerals estate.

33.     Despite these notices, Defendants have not sought but rather have expressly refused to seek appropriate authorization.

34.     Mustang Run Wind Project, LLC, applied for a conditional use permit to construct and operate wind turbines with the Osage County Board of Adjustment. When the application was denied, Mustang Run filed a Petition for review with the District Court for Osage County (Case No. CV-2014-34), and the matter is currently pending before Oklahoma's Supreme Court. *Mustang Run Wind Project, LLC, v. Osage County Board of Adjustment*, Case No. 113463 (Okla. S. Ct.). Therein, Mustang Run pled with the court for expedited consideration because it is a "multi-million dollar wind energy facility." Motion for Expedited Appeal and/or for Accelerated

Appeal, *Mustang Run Wind Project LLC, v. Osage County Board of Adjustment*, No. 113463

(Okla. S. Ct.), filed January 27, 2015. Indeed, Mustang Run alleged that "every minute" that the

turbines are not operational in Osage County, some parties will be "deprived" of "revenue

stream". *Id.* Nonetheless, the Oklahoma Supreme Court denied Mustang Run's motion.

## COUNT I

### DECLARATION REGARDING THE DEFENDANTS' ACTIVITIES
### AND THE APPLICABILITY OF 25 C.F.R. § 211

35.     The United States realleges and incorporates the preceding paragraphs.

36.     The Defendants are engaged in unauthorized mining and excavation in the

subsurface lands of the Osage minerals estate without first obtaining a lease approved by the

Secretary.

37.     25 C.F.R. § 211 sets forth the regulations that are generally applicable to the

leasing of tribal lands for mineral development. Although these regulations specifically carve out

from their coverage certain sets of regulations for specified Indian tribes (*see* 25 C.F.R. §

211.1(e)), no separate provision is made for the Osage Nation. Thus, by their terms, the

regulations in § 211 are applicable to the mining and extraction of solid minerals from the

subsurface lands of the Osage minerals estate.

38.     25 C.F.R. § 211.48 explicitly prohibits "exploration, drilling, or mining operations

on Indian land" without obtaining from the Secretary (a) "written approval of a mineral lease or

permit" and (b) "after a lease or permit is approved, written permission before any operations are

started on the leased premises."

39.     25 C.F.R. § 211.3 defines "Indian Land" as "any lands owned by any individual

Indian . . . or other tribal group which owns land or interests in the land, the title to which is held

in trust by the United States or is subject to a restriction against alienation imposed by the United

8

States." In the case of the Osage Nation, the Indian lands are the subsurface minerals estate which was reserved by the Congress for the benefit of the Tribe.

40.     Upon information and belief, Defendants have or will extract and use more than 5,000 cubic yards of sand, gravel, pumice, cinders, granite, building stone, limestone, clay or silt this year. In fact, upon information and belief, Defendants contemplate extracting and using over 40,000 cubic yards of minerals from the subsurface estate in the Mustang Run Wind Project. Therefore, they are engaged in "mining" under the definition set forth in the Code of Federal Regulations.

41.     The Defendants will or already are excavating, extracting, severing, converting, and crushing minerals from the subsurface Osage minerals estate for a commercial purpose without obtaining a proper lease, permit or approval as required by federal law.

42.     By reason of the foregoing, an actual and justiciable controversy exists. The United States therefore seeks a declaratory judgment that Defendants must cease their current activities in the Osage minerals estate until they obtain proper federal authorization to conduct such activities.

## COUNT II

### DECLARATION REGARDING THE DEFENDANTS' ACTIVITIES AND THE APPLICABILITY OF 25 C.F.R. § 214

43.     The United States realleges and incorporates the preceding paragraphs.

44.     The regulations applicable to mining on Osage reservation lands provide that "[n]o mining or work of any nature will be permitted upon any tract of land until a lease covering such tract shall have been approved by the Secretary of the Interior and delivered to the lessee." 25 C.F.R. § 214.7. Here, Enel Kansas, LLC and Enel Green Power North America, Inc. have already violated the regulations with impunity with respect to the Osage Wind sister operation.

*See United States. v. Osage Wind, LLC, et al.*; NDOK Case No. 14-CV-704-JHP-TLW. Mustang Run Wind Project, LLC, and Tradewind Energy, Inc., now also unashamedly plan to engage in mining or other work without having first obtained an appropriate lease and prior approvals and despite the clear instructions of Osage Agency Superintendent Phillips.

45.     "Leases of minerals other than oil and gas may be negotiated with the tribal council after permission to do so has been obtained from the officer in charge [the Superintendent of the Osage Agency]." 25 C.F.R. § 214.2.

46.     The United States therefore seeks a declaratory judgment that Defendants must cease all mining excavation activities in the Osage minerals estate until they obtain the authorizations required under 25 C.F.R. § 214.

## COUNT III

### PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF TO HALT EXCAVATION, DIGGING AND EARTH MOVING ACTIVITIES

47.     The United States realleges and incorporates the preceding paragraphs.

48.     The United States is entitled to a preliminary injunction and permanent injunction from this Court to preserve the status quo and to prevent immediate and further irreparable harm to the United States and the Osage minerals estate. The United States will shortly present a Motion for Preliminary Injunction.

### PRAYER FOR RELIEF

**WHEREFORE**, the United States respectfully requests that this Court:

1.     Enter a declaratory judgment under 25 U.S.C. § 2218 that Defendants are in violation of 25 C.F.R. § 214 and must refrain from engaging in mining and excavation activities in the Osage minerals estate until they obtain proper federal authorizations allowing such activities.

2.     Enter a declaratory judgment under 25 U.S.C. § 2218 that Defendants are in violation of 25 C.F.R. § 211 and must refrain from engaging in mining and excavation activities in the Osage minerals estate until they obtain proper federal authorizations allowing such activities.

3.     Enter a judgment assessing damages, as determined, to the Osage minerals estate for unlawful or unauthorized mining and excavation.

4.     Enter a preliminary injunction to halt all mining and excavation activities within the area of the Osage Mineral Council's jurisdiction and a permanent injunction ordering the Defendants to refrain from engaging in those activities until proper federal authorizations have been obtained.

5.     Award such other and further relief as the Court determines to be just and proper.

Respectfully submitted,

UNITED STATES OF AMERICA

DANNY C. WILLIAMS, SR.
United States Attorney

s/Cathryn D. McClanahan
CATHRYN D. McCLANAHAN, OBA No. 14853
Assistant United States Attorney
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119
T: 918-382-2700
cathy.mcclanahan@usdoj.gov

Of Counsel:
Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor's Office
7906 East 33rd Street
Tulsa, Oklahoma 74145
T: 918-669-7730
charles.babst@sol.doi.gov

11