**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| OSAGE MINERALS COUNCIL, | ) | |
| | ) | |
| Intervenor Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-704-GKF-JFJ |
| | ) | |
| OSAGE WIND, LLC; | ) | |
| ENEL KANSAS, LLC; and | ) | |
| ENEL GREEN POWER NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**THE UNITED STATES' RESPONSE IN OPPOSITION**
**TO DEFENDANT OSAGE WIND, LLC'S FIRST MOTION TO COMPEL**
**AGAINST THE UNITED STATES (Dkt. 177)**

TABLE OF CONTENTS

**INTRODUCTION**…………………………………………………………………………1

**EXAMINATION OF DEFENDANT'S BACKGROUND & PROCEDURAL HISTORY**…2

**DISPUTED DISCOVERY ISSUES**………………………………………………………5

**ARGUMENT AND AUTHORITIES**…………………………………………………12

**I.    While the six items at issue are facially overbroad, the United States still affirmatively objected in detail to their burdensome and overly broad nature.  Furthermore, Defendant asks this court to sanction its fishing expedition to acquire these otherwise irrelevant subject communications**……………………………………………………12

   **1.    By Defendant's own definition, these six discovery items are overly broad on their face, particularly due to Defendant's continued failure to limit their over-inclusive scope, contrasted against the United States' continued, detailed objections**……………………………………………………………………..12

   **2.    Defendant casts a broad net in a fishing expedition that may have been relevant were the United States and the Osage Nation on trial; however, these communications have no relevance to the stage of litigation at hand**…………15

**II.   The court has confirmed that affirmative defenses related to the applicable federal lease regulations will not be entertained**…………………………………………………19

**III.  Despite Defendant's self-serving omissions in its Motion of the various objections repeatedly asserted and supplemented throughout the course of discovery, the United States never waived any objections to relevance**………………………………………20

**IV.   Despite Defendant's alternative version of the facts, the United States has repeatedly, and in increasing detail, laid out the burden of the subject discovery items**………....21

**V.    Defendant's demand for these communications is vexatious and contrary to the orderly conclusion of this litigation; Defendant's sole aim is to distract from the real issue in this case – *Defendants'* intent that predicated their subsequent acts of trespass, continuing trespass and conversion**…………………………………………24

**CONCLUSION**………………………………………………………………………....25

TABLE OF AUTHORITIES

## Cases

*Aikens v. Deluxe Fin. Svcs.*
    217 F.R.D. 533 (D. Kan. 2003)…………………………………………………..………13

*Angier v. Mathews Exploration Corp.*
    905 P.2d 826 (OK CIV APP 1995)………………………………….…………..………...4

*Armstrong v. Conseco Senior Health Ins. Co.*
    No. 07-CV-659-JHP-PJC, 2009 WL 10728160 (N.D. Okla. Feb. 24, 2009)………...22-23

*Barton v. Tomacek*
    No. 11-CV-0619-CVE-TLW, 2012 WL 4735927 (N.D. Okla. Oct. 3, 2012)………..15-16

*Cohlmia v. Ardent Health Servs., LLC*
    No. 05-CV-384-GKF-PJC, 2008 WL 4925764 (N.D. Okla. Nov. 14, 2008)………...12-14

*Doricent v. American Airlines, Inc.*
    1993 WL 437670 (D. Mass. 1993)………………………………………….......…13

*Exxon Shipping Co. v. Baker*
    554 U.S. 471 (2008)………………………………………………………………..…24

*Fairlawn Cemetery Ass'n v. First Presbyterian Church, U.S.A. of Okla. City*
    496 P.2d 1185 (Okla. 1972)……………………………………………………...….4

*FragranceNet.Com, Inc. v. FrangranceX.Com, Inc.*
    No. CV-06-2225-JFB-AKT, 2007 WL 9710244 (E.D.N.Y. Aug. 28, 2007)………...20-21

*Johnson v. Kraft Foods*
    238 F.R.D. 648 (D. Kan. 2006)……………………………………………………..…13

*Koch v. Koch Indus., Inc.*
    203 F.3d 1202 (10th Cir. 2000)………………………………………………......…16

*Leisure Hospitality, Inc. v. Hunt Properties, Inc.*
    No. 09-CV-272-GKF-PJC, 2010 WL 3522444 (N.D. Okla. Sept. 8, 2010)…………12-13

*McCoo v. Denny's, Inc.*
    192 F.R.D. 675 (D. Kan. 2000)……………………………………………….......…12

*Reibert v. CSAA Fire & Cas. Ins. Co.*
    No. 17-CV-350-CVE-JFJ, 2018 WL 279348 at *3 (N.D. Okla. Jan. 3, 2018)……....15-16

TABLE OF AUTHORITIES (CONTINUED)

**Cases (continued)**

*St. John Med. Ctr., Inc. v. Hodges*
No. 12-CV-523-GKF-PJC, 2013 WL 12145962 (N.D. Okla. May 10, 2013)………...12-13

*Steenbergen v. First Fed. Sav. & Loan of Chickasha*
753 P.2d 1330 (Okla. 1987)……………………………………………………………..4

*Welty v. Martinaire of Oklahoma, Inc.*
867 P.2d 1273 (Okla. 1994)……………………………………………………………..4

*Wyatt v. ADT Sec. Servs., Inc.*
No. 10-CV-383-GKF-FHM, 2011 WL 1990473 (N.D. Okla. May 23, 2011)……….12-13

**Federal Regulations**

25 C.F.R. § 211………………………………………………………………...12, 18-19

25 C.F.R. § 211.1……………………………………………………………………..17

25 C.F.R. § 214………………………………………………………………...12, 18-19

25 C.F.R. § 214.7………………………………………………………….......1, 4, 19, 24

**Court Rules**

Fed. R. Civ. P. 26…………………………………………………………..12-13, 15-16

Fed. R. Civ. P. 34…………………………………………………………………...14

Fed. R. Civ. P. 37…………………………………………………………………...11

Local Civil Court Rule 7.2……………………………………………….....................1

Local Civil Court Rule 37.1………………………………………………...................11

**Other Authorities**

Fed. R Civ. P. 26, advisory committee's notes………………………………………..15

58 Am.Jur. Nuisances § 2………………….........................................................4

Restatement (Second) of Torts, § 161……………….........................................4

COMES NOW Plaintiff, the United States of America, by and through R. Trent Shores, United States Attorney for the Northern District of Oklahoma, and Cathryn McClanahan and Nolan Fields, Assistant United States Attorneys, and for its Response and Objection to Defendant's[1] First Motion to Compel Against the United States ("Motion") (Dkt. 177), alleges as follows:

## INTRODUCTION

The United States brought this action to address Defendants' unlawful mining in Osage County (First Amended Complaint, Dkt. 20), concerning the Osage Wind wind-energy project ("Project"). In remanding this case back to the District Court, the Tenth Circuit concluded that "because Osage Wind was required to procure a lease under 25 C.F.R. § 214.7, we REVERSE the district court's order granting summary judgment [] and REMAND for further proceedings consistent with this opinion." Dkt. 78 at 26-27. Defendant now seeks an order from this court compelling the United States to turn over communications that occurred among three parties and nonparties to this action: (1) various, unidentified departments, agencies or offices of the United States; (2) the Bureau of Indian Affairs; and (3) the Osage Minerals Council or the Osage Nation. Defendant attempts to support its motion by cherry-picking correspondence between the parties regarding the communications or correspondence they seek. However, Defendants' actions belie their own arguments in support of Osage Wind's Motion.[2]

---

[1] Defendant Osage Wind, LLC ("Defendant" or "Osage Wind") is the lone Defendant having issued discovery to the United States to date. Interestingly, all three Defendants jointly issued discovery to Intervenor-Plaintiff Osage Minerals Council ("OMC") on May 1, 2020.

[2] The United States cannot know if Defendants genuinely need or want the items they seek, or if they filed this Motion to covertly supplement their subsequently filed First Motion to Compel Against the Osage Minerals Council (Dkt. 179) without seeking leave to surpass the page limitation. *See* LCvR 7.2(c) ("**Length and Format of Briefs.** No brief shall be submitted that is longer than twenty-five (25) typewritten pages without leave of Court.") (emphasis in original); *see also* Defendants' First Motion to Compel Against the Osage Minerals Council, Dkt. 179 at 8 ("The essential background of this matter is summarized in the Osage Wind's pending First Motion to Compel Against the United States, and the Defendants respectfully invite the Court to examine

Osage Wind has not articulated the relevance of the subject communications – involving Plaintiff, Intervenor-Plaintiff and nonparties – or even the bearing such communications can have on the damages phase of the litigation, wherein the parties are *supposed* to be determining the damages owed and remedies available to the Osage Minerals Council for *Defendants'* illegal conversion, trespass and continuing trespass into the Osage mineral estate.  Given that the United States repeatedly lodged several timely, valid objections to the communications Defendant seeks, the court should reject this Motion and not be distracted from the meritorious motions to compel contemporaneously pending before it.

## <u>EXAMINATION OF DEFENDANT'S BACKGROUND & PROCEDURAL HISTORY</u>

Defendant spends the first five pages of its Motion leading the reader through a detailed, and biased procedural history of how the parties have arrived at this point. Dkt. 177 at 6-10.  The next five pages concern what Defendant describes as the "Procedural Issues in the Case." *Id.* at 10-15.  Defendant seems to consider this litigation's procedural history – initially receiving a favorable ruling by the District Court in summary judgment, only to be reversed and remanded by the Tenth Circuit – as live "issues."  However, it is important to address a few aspects of this procedural section, so that the "issues" are properly framed.

First, Defendant still resists accepting that the Tenth Circuit found its activities on the Project to be mining and continues to argue that it was reasonable to rely upon "detailed legal analysis" that allegedly allowed them to disregard the federal lease requirement.  For example, Defendant finds it necessary to point out that:

> The Tenth Circuit also noted that "*[i]t might be reasonable* to adopt the construction favored by Osage Wind, which sets as the definitional boundary the commercialization of the minerals." *Id.* (emphasis added).  After all, Judge Payne agreed with Defendants' position.  But the Tenth Circuit rejected it, based upon the

that brief to the extent such background is need to adjudicate this Motion.").

> Indian canon of construction, which provides that "ambiguity in laws designed to favor the Indians ought 'to be liberally construed' in the Indians' favor." *Id*. at 1090. Any suggestion that Osage Wind's activities constituted some sort of willful bad faith cannot be squared with the Tenth Circuit's Opinion, which was expressly answering a previously unanswered question and one it found to have an ambiguous answer based upon then-existing law.

Dkt. 177 at 12, ¶ 18 (citing Dkt. 78).  Osage Wind then concludes that the mere suggestion that Defendants' acts were based on willful bad faith is out of step with the Tenth Circuit's opinion. *Id.* However, the Tenth Circuit did <u>not</u> find Defendants' interpretation of the regulations reasonable, <u>nor</u> did it find the District Court's initial ruling correct.  Defendant concedes that the Tenth Circuit *rejected* these positions yet seeks to detour around them.  Throughout this case, Defendants – three companies (related, nested subsidiaries) with international roots and private equity investors – have blatantly disregard the sovereignty of the Osage mineral estate, flouting federal regulations, and even now maintain their efforts to avoid any liability for their continuing trespass and for the minerals they converted.

Second, Osage Wind touts the affirmative defenses it has asserted, noting that Defendants filed their Answer 20 days after the Status and Scheduling Conference on December 11, 2019. *Id.* at 13, ¶ 23.  However, considering the Tenth Circuit entered its mandate on April 29, 2019 (Dkt. 88), Defendants cannot gloss over the fact that they filed their Answer to the United States' First Amended Complaint eight months later on December 31, 2019. *See* Dkt. 177 at 13, ¶¶ 21, 23.

Third, Osage Wind seeks to turn the tables and present itself as the victim, implying that the OMC and the Osage Nation did not have a right to deny Defendants mining access to the Osage mineral estate – that the tribe did not have the right to say no. *Id.* at 13, ¶ 24.  Looking to point the finger at anyone besides themselves, Defendants also seek to blame the "United States (including, but not limited to, the BIA and [Dept. of ]Interior [which ]failed to clearly and timely articulate

the theories now at issue despite numerous attempts to do so over many years." *Id.*  Again, blame the victim, or failing that, blame the victim's trustee.

Fourth, and finally, while the Tenth Circuit explicitly found that "Osage Wind was required to procure a lease under 25 C.F.R. § 214.7" (Dkt. 78 at 26), Osage Wind underlines that the Tenth Circuit did not decide that Defendants committed a trespass, a continuing trespass or conversion. Dkt. 177 at 14, ¶ 25.  A trespass is defined as "an actual physical invasion of the property of another." *Fairlawn Cemetery Ass'n v. First Presbyterian Church, U.S.A. of Okla. City*, 496 P.2d 1185, 1187 (Okla. 1972) (citing 58 Am.Jur. Nuisances § 2). A continuing trespass will be found from "the continued presence on the land of a structure, chattel, or other thing which [an] actor has tortiously placed there, whether or not the actor has the ability to remove it." *Angier v. Mathews Exploration Corp*., 905 P.2d 826, 830 (OK CIV APP 1995) (citing Restatement (Second) of Torts, § 161).  Conversion is established by the wrongful use of the personal property of another. *See Welty v. Martinaire of Oklahoma, Inc.*, 867 P.2d 1273, 1275 (Okla. 1994) ("Black defines conversion as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels of another.'"); *Steenbergen v. First Fed. Sav. & Loan of Chickasha*, 753 P.2d 1330, 1332 (Okla. 1987) ("Conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.").  Considering the elements of trespass, continuing trespass and conversion, and the Tenth Circuit's confirmation that a violation of the federal regulations occurred, it is disingenuous for Defendant to seek to relitigate the law-of-the-case and imply that the damages owed and remedies available to the OMC and the Osage Nation are not the focus of this stage of the litigation.[3]

---

[3] Damages and remedies were the focus of the Status Conference held December 11, 2019, Dkt. 100. The court subsequently implied that Defendants' status as trespassers had been established:

## DISPUTED DISCOVERY ISSUES

Ten pages into its Motion, Defendant finally turns to the particular discovery items in dispute.  Yet again, Defendant omits critical points that provide necessary context to the disputed items. Dkt. 177 at 15-19.

1.      Defendant outlined the three interrogatories and three related requests for production at issue.[4] *Id.* at 15, ¶ 33 (quoting Dkt. 177-5 at 5-6, 12-13).  While Defendant did provide the particular interrogatories and answers along with the particular requests and responses at issue, it omitted particular germane objections by the United States:

> 4.      Plaintiff objects to any interrogatory to the extent that it seeks information neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.
>
> * * *
>
> 6.      Plaintiff objects to the definition of "You" and "Your," or any variation thereof, on the ground that it is unduly burdensome, over inclusive, and not reasonably calculated to lead to the discovery of admissible evidence. The definition, which instructs the Plaintiff to consider "You" to mean "the United States of America and, where the context permits, your counsel and any consultants, experts, investigators, agents, attorneys, or other persons acting on your behalf" renders many of the discovery requests circular, confusing or unanswerable. In addition, the provided definition could conceivably require searches of every agency, employee, consultant or expert of the federal government or, perhaps, of the entire "United States of America[.]" There are more than 450 federal agencies and, in the Executive Branch alone, there are well over two million employees. There are many instances, noted with particularity below, where this drafting error results in a failure of the "reasonable particularity" standard set out in Fed.R.Civ.P. 34(b)(l). Consequently, as noted and discussed below, some discovery was

---

But the issue that's really before the court, or will be before the court, is whether or not the trespasser here is innocent or is not, or is a bad faith trespasser, and whether the trespasser is entitled to his mining costs. I think it's just part and parcel of a trespass claim in this context.

Transcript of Telephonic Status Conference held July 15, 2020, Dkt. 173 at 15:7-11.

[4] The interrogatories at issue focus on "communications" and the requests for production on "correspondence." As Defendant's definition of "communications" includes "correspondence" (with each term defined in a similar fashion), they will be hereinafter collectively referred to in this Response as "communications." *See* Dkt. 177-4 at 3.

fantastically over-inclusive, vague and improper, rendering Plaintiff incapable of answering.

* * *

8.      Plaintiff hereby incorporates its General Objections into each and every response herein. Any further, more specific objection asserted within a particular response is made in addition to and without waiving any General Objection. Each response is made subject to and without waiving any of Plaintiff s objections.

Dkt. 177-5 at 3-4.  Importantly, Defendant included the following instruction and definition in its

First Set of Interrogatories and Requests for Production:

"You" or "your," whether capitalized or not, shall mean the United States of America and, where the context permits, your counsel and any consultants, experts, investigators, agents, attorneys, or other persons acting on your behalf.

Dkt. 177-4 at 5.

2.      Further, Defendant paints itself in a positive light, explaining that in its February 26, 2020, letter it took issue with the United States' interpretation of the foregoing discovery requests. *See* Dkt. 177 at 17, ¶ 34.  Defendant conveniently omits the fact that it did <u>not</u> stand on its original interrogatories and requests at issue but actually revised all six of the items at issue in that very letter:

[W]e now request the United States respond to each as asking:

<u>**Interrogatory No. 5:**</u> Describe all communications between you and/or the Bureau of Indian Affairs, on the one hand, and the Osage Minerals Council, on the other, the subject of which communications regards in any way the wind farm described in paragraph 2 of your First Amended Complaint from January 1, 2010, to the present.

<u>**Interrogatory No. 6:**</u> Describe all communications between you and/or the Bureau of Indian Affairs, on the one hand, and the Osage Nation, on the other, the subject of which communications regards in any way the wind farm described in paragraph 2 of your First Amended Complaint from January 1, 2010, to the present.

<u>**Interrogatory No. 7:**</u> Describe all communications between you and/or the Bureau of Indian Affairs, on the one hand, and any agency of the United States of America, on the other, the subject of which communications regards in any way the wind farm described in paragraph 2 of your First Amended Complaint from January 1, 2010, to the present.

* * *

For the same reasons stated in our response to your objections to those interrogatories, please advise if you will produce responsive documents if the Requests are revised as follow[s]:

**Request for Production No. 4:** Provide copies of all correspondence between you and/or the Bureau of Indian Affairs, on the one hand, and the Osage Minerals Council, on the other, the subject of which communications regards in any way the wind farm described in paragraph 2 of your First Amended Complaint from January 1, 2010, to the present.

**Request for Production No. 5:** Provide copies of all correspondence between you and/or the Bureau of Indian Affairs, on the one hand, and the Osage Nation, on the other, the subject of which communications regards in any way the wind faun described in paragraph 2 of your First Amended Complaint from January 1, 2010, to the present[.]

**Request for Production No. 6:** Provide copies of all correspondence between you and/or the Bureau of Indian Affairs, on the one hand, and any agency of the United States of America, on the other, the subject of which communications regards in any way the wind farm described in paragraph 2 of your First Amended Complaint from January 1, 2010, to the present.

Dkt. 177-6 at 3-5.  Based on Defendant's apparently good faith effort, revising these six items in its February 26th letter, the United States responded in kind by letter on March 6, 2020. *See* Dkt. 177 at 17, ¶ 35 (referencing Dkt. 177-7).  However, Defendant again conveniently leaves out an important caveat from the United States that *immediately preceded* its supplemental response to the six revised items.  While Defendant calls the court's attention to pages two to three of the United States' March 6th letter (*Id.*), at the bottom of page one, the United States made it clear it was <u>not</u> waiving any of its previous objections to these particular items, notwithstanding Defendant's revisions:

As a general point, **the United States does not waive any of its previously lodged objections**, but seeks to respond to the various issues addressed in your Letter in the spirit of cooperation.  In response to the interrogatories and requests to production identified in your [February 26th letter], please see as follows:

Dkt. 177-7 at 1 (emphasis added).

7

3.  On April 14, 2020, the United States was "barred from proceeding further in this case." Dkt. 139 at 1.  On May 7, 2020, the court reconsidered its previous action and "restored [the United States] as plaintiff, in its role as trustee of the Osage Mineral Estate …." Dkt. 153 at 3.

4.  Two weeks later, on May 21, 2020, Osage Wind inquired by letter concerning the six discovery items at issue. *See* Dkt. 177 at 18, ¶ 36.  Defendant then, again, shares a selective portion of the United States' responsive letter dated May 29, 2020. *See* Dkt. 177 at 18, ¶ 37 (citing Dkt. 177-9).  Defendant conveniently leaves out the *same* important caveat from the United States that *immediately preceded* its supplemental response and objection to the six revised items.  While Defendant calls the court's attention to page two of the United States' May 29th letter (*Id.*), at the bottom of page one the United States, again, made it clear it was <u>not</u> waiving any of its previous objections to these particular items, notwithstanding Defendant's revisions:

> As a general point, **the United States does not waive any of its previously lodged objections**.  Through this letter, and in the spirit of cooperation, the United States herein provides an update on the status of its supplementation for the specific Interrogatories and Requests (modified in your February 26th Letter) and identified in the final paragraph of your May 21st Letter:

Dkt. 177-9 at 2 (emphasis added).

5.  On June 10, 2020, Defendant sent another letter to the United States, continuing to take issue with the objections to the subject six discovery items. *See* Dkt. 177 at 18, ¶ 38 (citing Dkt. 177-10).  The United States responded to Defendant with a letter on June 18, 2020, of which Defendant, again, provides only curated selections in its Motion. *See* Dkt. 177 at 18, ¶ 39 (citing 177-11).  It is noteworthy that the United States included a nearly page-long timeline[5] in its June

---

[5] Defendant's affinity for correspondence, coupled with the COVID-19 outbreak and the United States being first barred and then restored to the case collectively induced the United States to include a timeline in this letter, as such a timeline would be instructive should the discovery dispute produce a motion to compel.  The timeline contains 16 entries ranging from January 3, 2020 through June 11, 2020.

18th letter to Defendant, attempting to provide some clarity and context to the ongoing discovery dispute. Dkt. 177-11 at 3.

6.      Following up on its June 10th letter, the next day Defendant e-mailed the United States complaining about the lack of conventional responses to discovery and requesting same. The United States also responded to this request in its June 18th letter, agreeing to supplement its discovery responses in a conventional format, despite the fact that it had provided responses, objections and specific bates-ranges that correlated to specific interrogatories and requests:

> While Mr. Slade now specifically requests a conventional supplemental response to discovery, the United States points out that **it was Mr. Slade in his Feb. 26th letter wherein he chose that medium to modify the particular seven interrogatories and requests for production in question, as opposed to re-issuing those particular discovery items in a conventional format (a separate document)**. As requested, and in the spirit of cooperation, please see the attached conventional supplemental responses to the seven discovery items in question.

Dkt. 177-11 at 4 (emphasis added). [6]  The United States never complained about the format or issuance of the six revised discovery items at issue, which Defendant only disseminated in an e-mailed letter. [7]

7.      Defendant also omits in its Motion that the United States provided the requested conventional supplemental responses to discovery on June 18, 2020. *See* Plaintiff United States of America's Second Supplemental Responses to Defendant, Osage Wind, LLC's First Set of Interrogatories and Requests for Production and Second Supplemental Responses to Defendant Osage Wind, LLC's Second Requests for Production, attached as Exhibit 1.  By intentionally

---

[6] Defendant seems to have grown tired of the incessant correspondence they generated.

[7] Defendant frustrates the orderly progression of discovery by returning to the original requests and responses of the subject discovery items.  Defendants revised their requests and insisted on formal, revised responses.  The five months of discovery negotiation (from March through July) and the manner in which these discovery items were finally presented to the court should bear on the weight this court evaluates the relief Defendant seeks.

omitting any reference to these responses, Defendant again ignores the particular, germane objections consistently lodged by the United States from the outset. *Supra,*[8] at ¶ 1 (nos. 4, 6, 8); Exh. 1 at 2-3. Failing to reference the United States' Second Supplemental Responses, Defendant avoids the necessary evolution of the six subject discovery items.[9] *See* Exh. 1 at 4-11.

8.     After reviewing the United States' Second Supplemental Responses to Defendant's First Set of Interrogatories and Requests for Production served June 18, 2020, five days later Defendant requested clarification by e-mail as to whether or not the United States was committed to producing the responsive communications. *See* Dkt. 177 at 19, ¶ 40 (citing Dkt. 177-12). The United States responded the same day, but Defendant only provided a portion of the United States' responsive email (Dkt. 177 at 19, ¶ 41) – again omitting any reference to the United States' Second Supplemental Responses to Defendant's First Set of Interrogatories and Requests for Production:[10]

> **As outlined in its most recent supplemental answers to modified interrogatories (nos. 5-7) and supplemental responses to modified requests (nos. 4-6, and 15), served June 18, 2020**, the United States did not identify or

---

[8] *Supra* signals are provided for ease of reference/citation to the numbered paragraphs herein.

[9] While the detail below was provided in response to another discovery request that concerned production of nonparty discovery, the explanation of off-site processing and delays also applies to the communications concerning the six discovery items at issue here:

> The documents produced by Hooper and IEA were not completely Bates-stamped when provided to Plaintiff. **Further, such documents were of a volume and in formats that surpassed the capabilities and systems available to Plaintiff's counsel. Accordingly, the production from Hooper and IEA have been forwarded to a Department of Justice facility in South Carolina where they are being processed and will be made accessible to the parties upon the completion of their processing.** Plaintiff will provide an update to Defense counsel as soon as it receives one from the off-site facility. As mentioned above, considering the nearly four weeks where Plaintiff was barred from this proceeding, coupled with implications of the COVID-19 pandemic, the processing of this information subpoenaed from third parties has been delayed.

Exh. 1 at 18 (emphasis added).

[10] Unsure why Defendant again failed to reference its Second Supplemental Responses, the United States highlights them here as an example of how it has exercised good faith throughout discovery, in the spirit of cooperation, even when disagreements have arisen.

produce any responsive documents. As noted in my June 18th letter, the United States' duty to supplement regarding these seven particular discovery items was relieved by the Court's Minute Order issued April 13, 2020 (Dkt. 135). Commensurate with the Court's Order, the United States is not presently reviewing or identifying documents responsive to the above discovery items.

Dkt. 177-13 at 2 (emphasis added).

9.      On July 1, 2020, the court issued an Opinion and Order denying the United States leave to file a Second Amended Complaint, based largely on the court's view that "the requested amendments will require expensive and extensive additional discovery, resulting in further delay of what has already been protracted litigation." Dkt. 161 at 12.

10.     Finally, Defendant made much ado in further correspondence, requesting that the United States and the OMC identify or narrow the issues that would be discussed during the meet and confer that was scheduled for July 29, 2020.  The United States and OMC obliged, providing Defendant with the information requested.[11]  Even though the OMC and the United States initiated the meet and confer, it was not surprising that during the resulting teleconference Defendant asked whether the United States was going to supplement its discovery production.  At most, only a couple minutes of the thirty-plus minute teleconference concerned this inquiry, with Defendant advising they would "take it up later."[12]

---

[11] *See* July 28, 2020 e-mail (and preceding chain) from Lynn Slade to Nolan Fields, attached as Exhibit 2; July 28, 2020 e-mail from (and preceding chain) from Slade to Mary Kathryn Nagle, attached as Exhibit 3.

[12] While Defendant seems to have "take[n] it up later" via this Motion, the United States expected a separate meet and confer. With this Motion, along with the other three pending motions to compel scheduled for the October 7, 2020 teleconference hearing, in the interests of judicial economy and the orderly progression of discovery, the United States does not object to Defendant's certification of conference pursuant to Fed. R. Civ. P. 37(a)(2)(A) and LCvR 37.1. *See* Dkt. 177 at 19.

## ARGUMENT AND AUTHORITIES

I.     **While the six items at issue are facially overbroad, the United States still affirmatively objected in detail to their burdensome and overly broad nature.   Furthermore, Defendant asks this court to sanction its fishing expedition to acquire these otherwise irrelevant subject communications.**

Continuing its omissions, Defendant leaves out important aspects of the rule addressing discovery scope and limits:

> parties may obtain discovery regarding an nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, **the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit**.

Fed. R. Civ. P. 26(b)(1) (emphasis added).   Defendant emphasized "or defense" when selectively citing to this rule in its Motion, and then left out everything following "needs of the case" (Dkt. 177 at 19), Defendant argues the communications at issue may be relevant to its various defenses. Specifically, Defendant argues that if production is ordered, these communications will not be used to argue against the applicability of 25 C.F.R. §§ 211 and 214, but are necessary to defend against remedies including ejection and injunction. *See* Dkt. 177 at 23.

1.     *By Defendant's own definition, these six discovery items are overly broad on their face, particularly due to Defendant's continued failure to limit their over-inclusive scope, contrasted against the United States' continued, detailed objections.*

"A party resisting discovery on the ground that the requests are overly broad has the burden of supporting its objection, unless the request is overly broad on its face." *Cohlmia v. Ardent Health Servs., LLC*, No. 05-CV-384-GKF-PJC, 2008 WL 4925764, at *2 (N.D. Okla. Nov. 14, 2008); (quoting *McCoo v. Denny's, Inc.*, 192 F.R.D. 675, 686 (D. Kan. 2000)).   In the context of objections, they "must be stated with specificity. Mere boilerplate objections or the familiar litany of overly broad, vague or burdensome, without more, is not sufficient." *St. John Med. Ctr., Inc. v. Hodges*, No. 12–CV–523 GKF–PJC, 2013 WL 12145962, at *2 (N.D. Okla. May 10, 2013) (citing

*Leisure Hospitality, Inc. v. Hunt Properties, Inc.*, No. 09–CV–272–GKF–PJC, 2010 WL 3522444, at \*3 (N.D. Okla. Sept. 8, 2010); *Wyatt v. ADT Sec. Servs., Inc.*, No. 10–CV–383–GKF–FHM, 2011 WL 1990473, at \*2 n.1 (N.D. Okla. May 23, 2011)).

Further, "requested discovery must pass the Rule 26(b)(1) relevance test and - perhaps as important - the provisions of Rule 26(b)(2)(c) pertaining to burdensomeness, expense, and likely value." *Cohlmia*, 2008 WL 4925764 at \*4.  In a specific instance, the court in *Cohlmia* found a request over-broad, vague and burdensome that sought every document for a 10-year period. *Id.* at \*6.  Discovery requests containing "omnibus terms" can signal discovery requests that are facially overbroad. *Id.* at fn. 11 (courts have held a request to be unduly burdensome on its face if, as here, it uses the "omnibus term 'relating to' or 'regarding' with respect to a general category or group of documents.") (citing *Aikens v. Deluxe Fin. Svcs.*, 217 F.R.D. 533, 538 (D. Kan. 2003); *Johnson v. Kraft Foods*, 238 F.R.D. 648, 658–59 (D. Kan. 2006); *Doricent v. American Airlines, Inc.*, 1993 WL 437670, at \*10 (D. Mass. 1993) (such a request "does not apprise the recipient of the scope of the documents sought")).

Here, Defendant's own definition and drafting of the six discovery items in question make them facially overbroad.  Defendant's own definition of "you" and "your" (*supra,* at ¶ 1) is fatal, as all six of the discovery items contain the same phrase seeking:

> communications[/correspondence] between **you and/or** the Bureau of Indian Affairs, on the one hand, and the Osage Minerals Council[/the Osage Nation/any agency of the United States], on the other, the subject of which communications **regards in any way** the wind farm described in paragraph 2 of your First Amended Complaint from January 1, 2010, to the present.

*Supra,* at ¶ 2 (emphasis added).  As outlined above, numerous courts (in this District, Circuit and elsewhere) have explained that omnibus terms just like Defendant's "regards in any way" result in discovery items being ruled facially overbroad and not discoverable.  Like the requesting party in

*Cohlmia*, Defendant also seeks records going back ten years.  As the Court found in *Cohlmia*, these six discovery items should be deemed facially overbroad and Defendant's Motion to Compel denied.

Even were these six discovery items not overly broad on their face, *from the outset* the United States affirmatively objected to these items as being burdensome, over-inclusive, circular, confusing, unanswerable, fantastically over-inclusive, vague and improper. *Supra*, at ¶ 1(no. 6). Despite Defendant's failure to acknowledge this critical objection in its Motion, from the very beginning, the United States did not merely throw out boilerplate terms.  It went further, explaining how Defendant's definition was overbroad and the burden it created:

> In addition, the provided definition could conceivably require searches of every agency, employee, consultant or expert of the federal government or, perhaps, of the entire "United States of America[.]" There are more than 450 federal agencies and, in the Executive Branch alone, there are well over two million employees. There are many instances, noted with particularity below, where this drafting error results in a failure of the "reasonable particularity" standard set out in Fed.R.Civ.P. 34(b)(l).

*Supra*, at ¶ 1(no. 6).  Further, not only have these detailed objections been repeatedly asserted from the outset by the United States' throughout its responses, there was extensive correspondence between the parties before their meet and confer. *Supra,* at fns. 5-7. While there was a list of objections, they were not boilerplate and should have made Defendant well aware of, among other issues, the burdensome nature of the requests.

Despite glossing over it in its Motion, Defendant revised these six discovery items once, but specifically failed to address the unworkable scope it created by its definition of "you" in all six items. Further, all six items also contain the Bureau of Indian Affairs ("BIA") as the lone agency of the United States for which Defendant chose to not narrow the scope.  If Defendant was solely interested in communications from the BIA or the Dept. of Interior with the OMC or the

14

Osage Nation, it had ample opportunities over the past eight months to alert the United States regarding any interest in further revising and narrowing the scope of these items in an attempt to make them workable.[13]   Now in its Motion, for the first time, Defendant subtly tries to paint itself in a more reasonable light and act as if it has somehow further narrowed the scope of what federal agencies or departments it wants communications from regarding the Project. *See* Dkt. 177 at 6, ¶ 3; 13, ¶ 24 and 23; *contra, supra,* at ¶ 1(no. 6).  Muddying the waters now does not change what Defendant has been unwilling to do for eight months.

   2.   *Defendant casts a broad net in a fishing expedition that may have been relevant were the United States and the Osage Nation on trial; however, these communications have no relevance to the stage of litigation at hand.*

Defendant urges the court to view its six discovery items liberally, noting that relevance should be construed broadly to potentially arrive at information that may bear on a party's defense. *Reibert v. CSAA Fire & Cas. Ins. Co.*, No. 17-CV-350-CVE-JFJ, 2018 WL 279348 at *3 (N.D. Okla. Jan. 3, 2018) (citation omitted).  Importantly, the court further explained that "[t]he 2015 Amendment also *deleted* language that permitted discovery '**of any matter relevant to the subject matter involved in the action**' upon a showing of good cause. This language was removed because it was 'rarely invoked' and redundant with language permitting discovery relevant to a claim or defense …." *Id.* (citing Fed. R Civ. P. 26 advisory committee's notes to the 2015 amendment) (emphases added).  Even after the 2015 Amendment, Rule 26(b)(1) "does not authorize unlimited discovery." *Id.* at *4 (quoting *Barton v. Tomacek*, No. 11-CV-0619-CVE-

---

[13] However, if Defendant wished to salvage Interrogatory No. 7 and Request No. 6, it would have to narrow "any agency of the United States of America" to be  more specific, i.e., a particular agency, a particular department, etc. (the United States of America comprises 450 agencies and two million employees).  Even still, these two items, along with the other four subject discovery items, remain overly broad if "you" is not addressed, and the law-of-the-case would still preclude their scope as related to the applicable federal lease regulations.

TLW, 2012 WL 4735927, at *4 (N.D. Okla. Oct. 3, 2012)).  A party simply pursuing a "'broad theory of the case' does not automatically justify broad discovery." *Id.*

As addressed above, Defendant bases all six of its discovery items on "the subject of which communications regards in any way the wind farm." *Supra* at ¶ 2.  Not only is this an unmitigated, overly broad fishing expedition, its over-inclusiveness causes a direct, irreconcilable conflict with the law-of-the-case.  *See* Section II, further addressed below.  Information like the subject communications may have previously had some arguable relevance, but those prospects diminished considerably after July 1, 2020, when the court denied entry of the broader Second Amended Complaint, opting for the narrower, less discovery-intensive First Amended Complaint. *See* Dkt. 161 at 12 (the court seeks to avoid expensive and extensive additional discovery, contributing to further protracted litigation).

Importantly, the *Reibert* court specifically cautioned against unchecked, overly broad discovery:

> Courts should prevent speculative "fishing expeditions," whereby a party "pleads its allegations in entirely indefinite terms, **without in fact knowing of any specific wrongdoing by the defendant**, and then bases massive discovery requests upon those nebulous allegations, in the hope of finding particular evidence of wrongdoing." [] This type of fishing expedition is an abuse of the judicial process.

*Reibert*, 2018 WL 279348 at *4 (quoting *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1238 (10th Cir. 2000)).

Defendant *needs* the court to view its six discovery items liberally because they are the precisely the type of unfounded requests the *Reibert* court decried as a fishing expedition. Defendant would have this court switch the parties' roles, but the United States and the OMC are not on trial, nor are they the parties accused of wrongdoing. *See* Dkt. 177 at 13, ¶ 24.  The diligent, but unsuccessful, efforts of the OMC and Osage Nation to prevent Defendants' trespassing into,

and conversion of, the Osage mineral estate were not wrongdoing, but rather the acts of a sovereign resisting an unlawful invasion of its mineral estate.  Defendant would have the court believe the OMC and Osage Nation did not have any right to say no to Defendants and their Project, despite the extensive regulatory scheme and federal policy dictating otherwise.[14]

Saddled with the Tenth Circuit's ruling that a federal lease was required, Defendants are backed into a corner as having violated federal regulations.  Desperate to get off the hook and shift the blame - and the liability - elsewhere, they need the court to indulge this illogical premise: somehow, the communications between the United States and the OMC floated from these parties to the Defendants, corrupting their states of mind and causing their innocent trespass into, and conversion of, the Osage mineral estate.  This Motion removes any doubt Defendants are attempting to swap the parties' positions by asking the court to sanction this fishing expedition.

The reality is that the communications sought do not bear on *any* claim in the case, which Defendant concedes.  However, Defendant alleges that these communications relate to their affirmative defenses. *See* Dkt. 177 at 23.  To the extent any of the subject communications concern Defendants' need for a lease, they are barred by the law-of-the-case pursuant to the Tenth Circuit's opinion and order. *See* Dkt. 171 at 2 (the court prohibited affirmative defenses relating "direct[ly] to the applicability of 25 C.F.R. §§ 211, 214").  However, despite this prohibition, Defendant has made no attempt (and is not interested in making any attempts) to adjust the scope of these six

---

[14] The "Purpose and scope" paragraph of 25 C.F.R. § 211.1 explains: "These regulations are intended to ensure that Indian mineral owners **desiring to have their resources developed** are assured that they will be developed in a manner that maximizes their best economic interests and minimizes any adverse environmental impacts or cultural impacts resulting from such development." (emphasis added).  The first consideration is whether the Indian mineral owners *even desire* to have their resources developed, which is why leasing is a federal prerequisite to the mining activities such as those carried out here by Defendants.

discovery items to comply with the court's order.[15]  Furthermore, the subject communications are irrelevant to whether Defendants were and remain innocent trespassers of the Osage mineral estate.

Defendant confirms that these are the *precise* type of communications it seeks to further its defenses. *See* Dkt. 177 at 13, ¶ 24 ("[T]he United States . . . failed to clearly and timely articulate **the theories now at issue** despite numerous attempts to do so over many years.") (emphasis added).  Defendant continues to develop their "blame the victim" defense.  This approach to discovery requires Defendant to cast the widest net to catch *any* communications that may tenuously cast blame on someone, anyone, else.  Defendant wants the court to take the bait in order to distract from the cost-benefit analysis that ultimately forced them to rely on a "detailed legal analysis" cover story for arguing the federal lease regulations did not apply to them. *See* The United States' Motion to Compel Discovery, Dkt. 175 at 15-18, 26-30.[16]

Defendant concludes its first argument section by asserting that the United States'

---

[15] Defendant is not interested in limiting its discovery requests to the law-of-the-case because Defendants will <u>not</u> commit to is applicability.  Defendants' penchant for relitigating the Tenth Circuit's decision  remains on display:

> None of the Defendants' affirmative defenses – such as waiver, estoppel, laches, or preclusion (res judicata and collateral estoppel) are asserted **at the present time** to claim that Parts 211 or 214 of Title 25 of the CFRs do not apply in this case.
>
> * * *
>
> Communications between and among the United States (and various agencies and representatives thereof) and the OMC and/or the Nation about the Project are accordingly relevant to numerous still-pending issues in the litigation … This is particularly the case so that it can be discovered **whether the theory adopted by the Tenth Circuit was the theory on which the United States' and the OMC's pre-suit communications were based – or whether they were based upon a broader theory that was specifically rejected by the Tenth Circuit**.

Dkt. 177, at 23-24 (emphasis added).

[16] *See also* Dkt. 175-1 at 99, OSAGE WIND PRIV-000157, Oct. 22, 2014 E-mail from Slade to many, Exh. 12 ("I advised that we are continuing operations notwithstanding the Superintendent's letter **due to extreme economic costs**, that we did so with respect for the Superintendent and the Nation, **but the client has relied on the conclusion in our memo that no lease or permit is required**.").

responses to these six discovery items are clearly deficient.   By only making a selective presentation of the objections the United States repeatedly submitted throughout discovery (*supra,* at ¶¶ 1-2, 4, 6-7), Defendant attempts to limit this court's examination by only presenting the objections that suit its narrative.   However, the United States repeatedly asserted objections based on relevance (*supra,* at ¶ 1(no. 4)), which became more specific once the court confirmed the law-of-the-case handed down by the Tenth Circuit. *See* Dkt. 171 at 2 (the court prohibited affirmative defenses relating "direct[ly] to the applicability of 25 C.F.R. §§ 211, 214").   As stated above, the United States further objected from the outset, going well beyond anything resembling boilerplate, detailing how Defendant crafted its own definition that made these six discovery items burdensome, over-inclusive, circular, confusing, unanswerable, fantastically over-inclusive, vague and improper. *Supra,* at ¶ 1(no. 6).   Defendant's omission of these objections in its Motion signals how fatal they are to Defendant's argument.

## II.   The court has confirmed that affirmative defenses related to the applicable federal lease regulations will not be entertained.

The court confirmed "that it would apply the law-of-the-case as articulated by the Tenth Circuit, and not revisit issues determine by the Circuit.   [Further, the court explained it] did not intend to limit the assertion of affirmative defenses beyond those direct to the applicability of 25 C.F.R. §§ 211, 214." Dkt. 171 at 2.   However, the communications Defendant seeks through the subject discovery directly relate to the applicability of Sections 211 and 214, which require a lease to mine. *See* Dkt. 78 at 26 (the Tenth Circuit found that "Osage Wind was required to procure a lease under 25 C.F.R. § 214.7").   These communications go directly to, or are inextricably intertwined with, the requirement that Defendants should have obtained a lease before they invaded, trespassed and converted the Osage mineral estate.

Defendant inexplicably omits that it revised these six discovery items in its February 26, 2020 letter, which demonstrates Defendant's tacit admission that the original items, as-issued, were overly broad. *Supra,* at *¶* 2.  Although Defendant did not stand on its original interrogatories and requests at issue, it remained obstinate in failing to further define or narrow the "you" definition. *Id.; supra*, at ¶ 1(no. 6).  That same obstreperous attitude is what placed Defendants into this litigation in the first place.  By taking the position that the federal regulations requiring a lease did not apply to them, Defendants have dug a hole[17] from which they cannot escape.

### III.   Despite Defendant's self-serving omissions in its Motion of the various objections repeatedly asserted and supplemented throughout the course of discovery, the United States never waived any objections to relevance.

Despite Defendant's portrayal to the contrary, as addressed above, the United States made numerous, timely relevance objections that Defendant inexplicably omitted from its Motion. S*upra,* at 16-20.  Despite this omission and leaving out the fact that it revised the six discovery items at issue (*supra,* at ¶¶ 2, 4, 7), Defendant makes much about the supplementary responses made by the United States in its March 6th letter.  While specifically <u>not</u> waiving its objections, the United States stated that it *expected* to supplement its production, but, importantly, counsel noted that it had <u>not</u> yet received <u>nor</u> reviewed any responsive communications.  Defendant ignores the near month in which the United States was barred from the case and during which (and even after the United States was restored) Defendant delayed its own responses and production on the outstanding discovery it owed to the United States.[18]  Defendant glibly notes "discovery is a two-way street," implying that the United States has not participated in discovery within the Federal

---

[17] Or in this case, literally, 84 of them – one for each of the turbines they illegally mined for the Project. *See* Dkts. 17-1 at 3, ¶ 9 ("the facilities on the Wind Farm Property will consist of 84 turbines"); 78 at 26 ("Osage Wind was required to procure a lease").

[18] The third set of discovery issued to Defendant Osage Wind and second sets issued to Co-Defendants, each on March 6, 2020, were not responded to until May 21, 2020.

Rules. *FragranceNet.com, Inc. v. FrangranceX.com, Inc.,* No. CV-06-2225, 2007 WL 9710244, at *3 (E.D.N.Y. Aug. 28, 2007).

Finally, as stated above, the court reeled in the scope of discovery in its July 1, 2020 Opinion and Order, in order to prevent further delay. Dkt. 161 at 12. The court took more expansive remedies - including an accounting of revenues, disgorgement of profits and unjust enrichment - off the table. Accordingly, the more expansive affirmative defenses Defendant tenuously links to the subject communications it seeks are now outside the scope of discovery and no longer relevant to the claims and defenses at issue (if they ever were).

**IV.     Despite Defendant's alternative version of the facts, the United States has repeatedly, and in increasing detail, laid out the burden of the subject discovery items.**

Defendant feigns surprise, pointing to the recent Joint Status Report (Dkt. 166, filed July 13, 2020) and recent correspondence that leads it "to believe that the United States *may claim* that providing responsive information and documents will be burdensome." Dkt. 177 at 26 (emphasis added). Defendant further alleges that a burden objection has been waived "since burden has *never* been raised, except perhaps in the most oblique and nebulous way." *Id.* (emphasis in original). Contrary to Defendant's unfounded representations, the United States has *repeatedly* objected of the burdens created by Defendant's overly broad discovery items. As early as February 3, 2020, the United States alerted Defendant to the burden its discovery items, as drafted, posed. *Supra*, at ¶ 1 (no. 6). As noted, the United States specifically renewed and preserved its detailed objections outlined in ¶ 1 (no. 6) above on March 6th, May 29th, and June 18th. *Supra,* at ¶¶ 2, 4, 7.

As recently as July 15, 2020, counsel for the United States confirmed the hardship the subject discovery items were occasioning:

So kind of like the good faith/bad faith, this has given us some heartburn as we try and work our way through discovery issues. The defendants have asked for literally tens of thousands of pages of e-mails **and communications about things like the United States or the Solicitor's Office or the local installation up in Pawhuska talking to the OMC about things as far back as 2010 and 2011**, I assume, to try to shore up some kind of an equitable defense.

**That has presented an incredible hardship for us so far as to trying just to get those documents processed, culled out, and things like that.** We've objected to that discovery based on the language of docket 135 and to a lesser extent, I guess, the docket 138 language, understanding that affirmative defenses are not being -- or are not allowed at this point in the litigation and that we are moving to the relief due to the Osage Mineral Estate.

Transcript of Telephonic Status Conference held July 15, 2020, Dkt. 173 at 9:5-20 (emphasis added).  To put a finer point on it, the Department of Interior has flagged approximately 266,969 pages of communications and documents potentially responsive to subject discovery items.  The record is what it is: Defendant asserts that an objection to "burden has *never* been raised, except perhaps in the most oblique and nebulous way[,]" but the paper trail detailed by the United States of its repeated, detailed burden (and other related) objections goes back seven months.

Defendant then alternatively argues that even if burden *has* been timely asserted by the United States, it must show that the hardship is undue and disproportionate compared to the benefits the requesting party may gain from production. Dkt. 177 at 26 (citing *Armstrong v. Conseco Senior Health Ins. Co.,* No. 07-CV-659-JHP-PJC, 2009 WL 10728160, at *3 (N.D. Okla. Feb. 24, 2009) (citation omitted)).  Interestingly, defense counsel represented Conseco, the defendant in that litigation, and attempted to defend its client against a bad faith breach of contract and fraud. *Id.* at *1.  Defense counsel resisted an interrogatory and request for production seeking a sampling of 100 claim files going back five years, objecting based on excessive cost and an undue burden. *Id.* at *1, 4.  Conseco premised its burdensomeness argument on 100 claims files, presuming each file to be 410 pages long, which among other considerations constituted an undue

22

burden. *Id.* at \*4.  The court did not find this argument persuasive, in light of plaintiff volunteering to accept half, only 50 of the 100 claim files sought. *Id.*

Turning to the instant case and the discovery items at issue, defense counsel finds itself on the other side of a motion to compel, fantastically claiming that the United States has made no burden objection, but if it has, that any hardship pales in comparison to the parade of horribles Defendants may endure if these communications are not produced.[19]  It is no surprise Defendant fails to identify *any* benefits that production of the subject communications may provide, because, as discussed above, Defendant is grasping at straws, hoping that the court will sanction this fishing expedition.

Finally, it is important to view Defendant's continued pursuit of the subject communications against the backdrop of the court's July 1, 2020 Order.  By narrowing the scope of the case, the court limited the claims and remedies thought viable for the six months preceding its July 1st Order.  Following that Order, the dividing line of what the court ruled is relevant and what is a fishing expedition, shifted a considerable degree.  Defendants fail to acknowledge this seismic shift and still want the broad and unreasonable slog of discovery they sought from the outset.  Defendants could barely bring themselves to acknowledge the Tenth Circuit's Order, so it is no surprise they are unwilling to acknowledge the impact of this court's July 1st Order.

---

[19] In *Armstrong,* defense counsel argued 41,000 pages was an undue burden.  In comparison, here the United States is arguing that 266,969 pages (650% more) is an undue burden, not to mention that any communications involving the United States (without any more specificity), the OMC and the Osage Nation are wholly irrelevant to whatever intent Defendants maintained (in good or bad faith) when trespassing and converting the Osage mineral estate.

**V.   Defendant's demand for these communications is vexatious and contrary to the orderly conclusion of this litigation; Defendant's sole aim is to distract from the real issue in this case – *Defendants'* intent that predicated their subsequent acts of trespass, continuing trespass and conversion.**

Ultimately, the Tenth Circuit decided the regulatory definition of "mining" and recognized the need for Defendants to obtain a federally approved lease under federal regulation.  Dkt. 78. The merits are determined and both parties agree that the Tenth Circuit has set the law of the case. The parties should be about the business of determining the damages owed and evaluating the remedies available to the Osage mineral estate.

The Supreme Court has emphasized "the value of waiver and forfeiture rules, which ensure that parties can determine when an issue is out of the case, and that litigation remains, to the extent possible, an orderly progression." *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 n. 6 (2008). "The reason for the rules is not that litigation is a game, like golf, with arbitrary rules to test the skill of the players." *Id*. (internal citations and quotation marks omitted).  "Rather, litigation is a winnowing process, and the procedures for preserving or waiving issues are part of the machinery by which courts narrow what remains to be decided." *Id*.   If Defendants had some legitimate defense to avoiding the federally required lease for this wind project, that ship has sailed.  By now, this case has been considered and decided by the Tenth Circuit and elevated to the Supreme Court, returning to this court with a remand "because Osage Wind was required to procure a lease under 25 C.F.R. section 214.7[.]"  Dkt. 78 at p. 26.

The parties are at the phase of this litigation where Defendants' actions, specifically, *Defendants'* intent predicating *Defendants'* subsequent trespass, continuing trespass and conversion of the Osage mineral estate are under scrutiny.  Any other party's (or nonparty's) communications about the Project had no bearing on whether or not *Defendants* willfully committed these acts.  Defendants' purported interest in these communications comprise a futile

attempt to demonstrate the comparative negligence, contributory negligence or unclean hands of others – hoping to muddy the waters and paint United States, the Osage Minerals Council and the Osage Nation as bad actors.  Seeking these communications is vexatious and contrary to the orderly conclusion of this litigation.

Moreover, any communications between any other parties and nonparties concerning the Project fail to justify the Defendants knowingly ignoring the requirement that they must secure a federally required lease before mining the Osage mineral estate.  After performing a cost-benefit analysis that indicated "extreme economic costs" of compliance with the federal lease requirement, Defendants chose to argue that the federal regulations (conveniently) did not apply to them. Defendants could have secured the federally required lease and treated the Osage tribal members fairly, compensating them in a fashion similar to the surface owners whose land is also burdened by the Project.  Confronted by the Tenth Circuit's confirmation that they violated federal regulations, Defendants remain entrenched in their unwillingness to answer for their wrongful acts, and remain incapable of admitting that they needed permission to mine the Osage mineral estate in the first place.

## <u>CONCLUSION</u>

Defendant Osage Wind's First Motion to Compel Against the United States should be denied.

Respectfully submitted,

UNITED STATES OF AMERICA

R. TRENT SHORES
United States Attorney

*Nolan M. Fields IV*

Cathryn D. McClanahan, OBA No. 14853
Nolan M. Fields IV, OBA No. 31550
Assistant United States Attorneys
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119
T: 918-382-2700
cathy.mcclanahan@usdoj.gov
nolan.fields@usdoj.gov

Of Counsel:
Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor's Office
7906 East 33rd Street
Tulsa, Oklahoma 74145
T: 918-669-7902
charles.babst@sol.doi.gov