**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

(1) UNITED STATES OF AMERICA, et al. )
                                          )
                  Plaintiffs,          )
                                          )
                                          )     Case No. 14-CV-704-GKF-JFJ
v.                                        )
                                          )
(1) OSAGE WIND, LLC, et al.         )
                                          )
                  Defendants.      )

**OSAGE MINERALS COUNCIL'S BRIEF IN OPPOSITION TO DEFENDANTS'
FIRST MOTION TO COMPEL THE OSAGE MINERALS COUNCIL**

TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND ......................................................2

III.    ARGUMENT......................................................................................................6

        a.    The OMC's Initial Disclosures Satisfy the Federal Rules of Civil Procedure ..........6

        b.    The OMC's Responses to Defendants' Interrogatories
              Satisfy the Federal Rules of Civil Procedure............................................10

        c.    The OMC is Not Precluded from Seeking Lost Oil and Gas Revenue
              in This Litigation ..................................................................................11

        d.    The OMC's Communications with the Executive Branch of the Osage
              Nation are Protected by the Executive Privilege ......................................17

              1.   Defendants Erroneously Claim the Executive Privilege is Unavailable to
                   the OMC Under Osage Nation and Federal Common Law................................18

              2.   Federal Common Law Permits Use of the Executive Privilege
                   in this Case ....................................................................................20

              3.   The Osage Nation Properly Invoked the Executive Privilege............................23

IV.     CONCLUSION ................................................................................................24

<div align="center">

T<small>ABLE OF</small> A<small>UTHORITIES</small>

</div>

**Cases**

*Am. Commerce Ins. Co. v. Harris*
    No. CIV-07-423-SPS, 2008 WL 3456848 (E.D. Okla. Aug. 8, 2008)..............................18

*B. Braun Med. Inc. v. Abbott Labs.*
    155 F.R.D. 525 (E.D. Pa. 1994) .................................................................................11

*Barr v. Matteo*
    360 U.S. 564 (1959) ..................................................................................................22

*Campbell v. CSAA Fire & Cas. Ins. Co.*
    No. CV-19-739-R, 2020 WL 3244010 (W.D. Okla. June 15, 2020) ............................7, 8

*Channer v. Dep't of Homeland Sec.*
    527 F.3d 275, (2d Cir. 2008) .....................................................................................13

*Davis v. Littell*
    398 F.2d 83 (9th Cir. 1968) ............................................................................19, 21, 22

*Hancock v. Greystar Mgmt. Servs., L.P.*
    No. CIV-15-1095-R, 2016 WL 2889084 (W.D. Okla. May 17, 2016) .........................7, 8

*Marmon Coal Co. v. Dir., Office of Workers' Comp. Programs*
    726 F.3d 387 (3d Cir. 2013) ................................................................................12, 13

*McKinney v. Reassure Am. Life Ins. Co.*
    No. 06-CIV-271-RAW, 2006 WL 3228791 (E.D. Okla. Nov. 2, 2006) ...........................8

*Miccosukee Tribe of Indians of Florida*
    No. 12-CV-22638-UU, 2013 WL 7728831 (S.D. Fla. Feb. 11, 2013)............................22

*Osage Nation v. Wind Capital Grp., Ltd. Liab. Co.*
    No. 11-CV-643-GKF-PJC, 2011 WL 6371384 (N.D. Okla. Dec. 20, 2011) .............12, 13

*Poitra v. Sch. Dist. No. 1 in the Cty. of Denver*
    311 F.R.D. 659 (D. Colo. 2015) ............................................................................6, 7, 8

*Smash Tech., LLC v. Smash Sols., LLC*
    No. 2:19-CV-00105-TC-JCB, 2020 WL 3546254 (D. Utah June 30, 2020) ...................11

*Spalding v. Vilas*
    181 U.S. 483 (1896) ..................................................................................................22

*Stout v. Long*
No CV 14-427 WPJ, 2018 WL 1322051 (W.D. Okla. March 14, 2018) ........................11

*Strate v. A-1 Contractors*
520 U.S. 438 (1997) ....................................................................................................19

*United States ex rel. Tyson v. Amerigroup Ill, Inc.*
230 F.R.D. 538 (N.D. Ill. 2005) .................................................................................10

*United States v. Osage Wind, LLC*
871 F.3d 1078 (10th Cir. 2017) ...........................................................3, 5, 12, 13, 16, 17

*United States v. Pend Oreille Pub. Util. Dist. No. 1*
28 F.3d 1544 (9th Cir. 1994) ...............................................................................14, 15

*United States v. Reynolds*
345 U.S. 1 (1953) .................................................................................................23. 24

*United States v. Wheeler*
435 U.S. 313 (1978) ....................................................................................................23

*US Bank Nat'l Ass'n v. PHL Variable Ins. Co.*
No, 12 CIV. 6811 CM JCF, 2013 WL 5495542 (S.D.N.Y. Oct. 3, 2013) ........................9

*Williams v. Lee*
358 U.S. 217 (1959) ...............................................................................................19, 24

*Windom v. FM Indus., Inc.,*)
No. 8:00CV580, 2003 WL 21939033, at *1 (D. Neb. Aug. 12, 2003) ............................7

*Worcester v. Georgia*
31 U.S. 515 (1832) .....................................................................................................19

## Statutes

Osage Nation Code, tit. 15, ch. 8, § 8-104(A)(5) ...............................................18, 20
Osage Nation Code, tit. 15, ch. 8, § 8-104(A)(11) .............................................18, 20
Navajo Tribal Code, tit. 7, ch.3, § 34(C) ...............................................................19

## Court Rules

Fed. R. Civ. P. 26(a)(1) ...................................................................6, 7, 8, 9, 10
Fed. R. Civ. P. 26(a)(1)(E) ..............................................................................9
Fed. R. Civ. P. 33 .........................................................................................11
Fed. R. Civ. P. 33(a)(2) ..................................................................................11
Fed. R. Civ. P. 37(c)(1) ..............................................................................9, 10
Fed. R. Evid. 501 ..........................................................................................19

Intervenor-Plaintiff Osage Minerals Council ("OMC") hereby responds to Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc.'s (collectively, "Defendants") Motion to Compel the Osage Mineral Council, Dkt. 179.

## I.   INTRODUCTION

Defendants' Motion to Compel is as wasteful as it is useless. Defendants' chief complaint is that the OMC has not yet provided Defendants with a precise computation of damages. And yet by the time this Court holds a hearing on Defendants' Motion on October 7, Defendants will have had five days to receive and review the computation of damages in the OMC's expert reports (which they will receive on October 2). As described below, applicable law and precedent demonstrates that the OMC has not violated its discovery obligations.

Defendants fare no better in their attempt to preclude the OMC from obtaining recovery for Defendants' unlawful conduct under the guise of a "res judicata" argument. In 2017, the Tenth Circuit concluded there is no way the OMC could have predicted the massive extent of Defendants' mining activities before turbine excavation began in the fall of 2014. Accordingly, as the Tenth Circuit concluded, the OMC is *not* precluded from seeking relief under a new cause of action for failure to obtain the required lease for mining, because when the OMC filed its claims in 2011, it could not have known the wind farm would entail such an extensive mining effort on the Osage Mineral Estate. To be sure, the fact that the OMC has been consistent in terms of how it describes the harm or damages to the Osage Mineral Estate caused by Defendants' unlawful conduct in no way precludes them from seeking recovery now, under a cause of action the OMC could not have filed in 2011.

Finally, Defendants' challenge to the documents the OMC has withheld under the executive privilege is lacking in both legal support and relevance. The requested documents will

in no way inform this Court's consideration of the proper award of damages for Defendants' unlawful conduct and continuing trespass on the Osage Mineral Estate. The OMC has not abused or overly applied this privilege; in fact, the OMC has applied it to a mere five documents—all communications between the Executive Branch of the Osage Nation government and the OMC, shielded and protected under Osage Nation law. Defendants' challenge to these five documents is also a waste of time.

Ultimately, Defendants seek to misconstrue the OMC's production as insufficient based on page count. The fact that the OMC has produced fewer documents than Defendants, however, is not surprising. The majority of documents regarding Defendants' unlawful conduct and continuing trespass on the Osage Mineral Estate are exclusively within the possession and control of Defendants, not the OMC. The OMC did not commit a trespass, and it would be absurd to expect the OMC to have more documents regarding Defendants' unlawful conduct than Defendants themselves. The OMC has thoroughly searched for and produced all non-privileged documents responsive to Defendants' discovery requests.

For the reasons described in greater detail below, Defendants' Motion to Compel should be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

A brief review of the factual and procedural background of this case, as it now stands, reveals that the OMC's ability to recover monetary damages for Defendants' unlawful continuing trespass on the Osage Mineral Estate is not nearly as limited as Defendants would have it. It is true that this Court, as Defendants note in their motion, previously stated the OMC's "intervention is restricted to seek only those remedies sought by the United States in the First Amended Complaint." Defs.' Mot. 2 (quoting *United States v. Osage Wind, LLC*, No. 14-CV-

704-GKF-JFJ, 2020 WL 3578351, at *8 (N.D. Okla. July 1, 2020)). That decision, however, was issued in the context of dismissing certain equitable forms of relief the OMC included in its first Complaint in Intervention that the United States had not, as requested in Defendants' Motion to Dismiss the OMC's Complaint in Intervention. *See Osage Wind*, 2020 WL 3578351. In granting Defendants' Motion to Dismiss the OMC's claims for an accounting, disgorgement of profits, and unjust enrichment, this Court did not limit the ability of the OMC to seek monetary damages for Defendants' continuing trespass on the Osage Mineral Estate.

All in all, the landscape of this litigation has shifted significantly over the last six months, and a review of the recent filings and adjustments to the Court's Scheduling Orders reveals that the OMC has not withheld or unreasonably delayed the provision of responsive, relevant information to Defendants' discovery requests.

First, the OMC filed its motion to intervene nine months ago, on January 10, 2020, following remand from a favorable decision on the merits in the Tenth Circuit, wherein the Court determined Defendants had undertaken "mineral development" without acquiring the requisite federally-approved lease. *See United States v. Osage Wind, LLC*, 871. F.3d 1078, 1081 (10th Cir. 2017). The OMC's motion to intervene, however, was not granted until April 13, 2020. Dkt. 136.

In the approximately three months that passed between the time the OMC filed its motion to intervene until the time its motion was granted, the United States and Defendants commenced discovery pursuant to the Scheduling Order issued on December 12, 2019, which identified June 12, 2020, as the cutoff for all discovery—with final requests due by May 13, 2020. Dkt. 97. On March 20, 2020, discovery cutoff was extended to August 12, 2020. Dkt. 131.

On April 14, 2020—one day after the OMC was made an intervening party—the United States was barred from proceeding further in the case. Dkt. 139. And while the decision to bar

the United States from participating in the case was set aside on May 7, 2020, Dkt. 153, the OMC used its first month as an intervening party to support the United States in its request to the court to reconsider the order barring its participation, especially considering the United States had already conducted a significant amount of discovery prior to the OMC being granted intervention. Dkt. 147. During this first month, the OMC also worked to complete its initial Rule 26 Disclosures—served on Defendants on May 12, 2020—and the OMC began identifying documents responsive to the discovery requests Defendants served on the OMC on April 23, 2020.

Anticipating the need to supplement information on a rolling basis, based within the timeframe provided in applicable Scheduling Orders, the OMC explained in its initial Rule 26 Disclosures that because intervention was granted on April 13, 2020, "the OMC is in the initial stages of computing each category of remedies, and the documents or other evidentiary material on which each computation is based . . . . [and] the OMC will supplement this disclosure with computations of damages, along with documents and/or evidentiary support for these computations, as they become available." OMC Rule 26(a)(1) Disclosures 2–3, Ex. 2. Since December 2019, the Scheduling Order has been twice amended, extending the dates for identifying experts and their reports, as well as discovery cutoff. The December 2019 Scheduling Order required the United States to identify experts and reports by April 24, 2020, and provided a discovery cutoff of June 12, 2020. Dkt. 100. The First Amended Scheduling Order extended the date for the United States to identify experts and reports to June 23, 2020, and extended the date for discovery cutoff to August 12, 2020. Dkt. 131. The Second Amended Scheduling Order—now in effect—extended the deadline for identifying experts and serving expert reports to October 2, 2020, and extended the date for discovery cutoff to December 18, 2020. Dkt. 172.

Since having been granted the right to intervene in this action, the OMC has complied with the relevant Scheduling Orders and has actively provided responses and produced documents responsive to Defendants' discovery requests, supplementing responses and documents as additional information becomes available. On June 2, 2020, the OMC served on Defendants' its Responses to Defendants' First Set of Interrogatories and Requests for Production, as well as its first privilege log (Dkt. 179-3), again reserving the right to supplement the responses as necessary or appropriate. On July 9, 2020, the OMC provided its first supplemental production and second privilege log in response to Defendants' First Set of Interrogatories and Requests for Production. Int.-Pl.'s Second Privilege Log, 07-09-2020 Ex. 1.

With discovery still ongoing, Defendants, the United States and the OMC met and conferred on July 29, 2020, to determine what discovery-related disagreements could be resolved and what issues each party would need to address through motions to compel. During the meet and confer and now in their motion to compel, Defendants expressed dissatisfaction with the OMC's disclosures and responses related to damages. Despite operating within a truncated timeframe—further complicated by the onset of COVID-19 and the necessary closure of the OMC's offices due to infections—the OMC has repeatedly identified its theory of damages based on the Tenth Circuit's ruling that Defendants violated federal law and "a right unique to OMC established by 25 C.F.R. § 214.7." *U.S. v. Osage Wind, LLC*, 871 F.3d at 1086. As described in the OMC's First Amended Complaint, Dkt. 164, filed pursuant to this Court's order limiting the OMC's relief to that which was requested in the United States' First Amended Complaint, Dkt. 161, the OMC's theory of damages includes monetary and/or equitable relief for Defendants' unlawful or unauthorized mining, excavation or other work, monetary damages in an amount to be proven, ejectment or any other equitable remedy this Court finds appropriate,

and damages for Defendants' continuing trespass to the extent allowed under the law. OMC's

First Am. Compl. ¶¶ 98-100.

Calculations of these damages rely, in part, on documents produced by Defendants in

response to the OMC's discovery requests related to Defendants' knowing and intentional

conduct, as well as expert reports. Currently, Defendants continue to illegitimately withhold a

significant collection of responsive documents that will substantively inform the calculus of

damages that the OMC may recover for Defendants' bad faith in perpetrating their unlawful and

continuing trespass on the Osage Mineral Estate; these missing documents are the subject of the

OMC's Motion to Compel, filed on August 20, 2020. Dkt. 183.

After this Court dismissed the OMC's claims for unjust enrichment, an accounting, and

disgorgement of profits, the OMC described its claim for monetary damages as follows in the

Joint Status Report filed on July 13, 2020:

> In addition to equitable relief in the form of a permanent injunction
> and ejectment/removal, the OMC is also entitled to compensation
> for damages in an amount that will cover the financial harm to the
> Osage Mineral Estate, and Osage headright holders, from the
> obstruction to oil and gas drilling on the Estate caused by
> Defendants' ongoing trespass.

See Joint Status Report 3, Dkt. 166.

### III.   ARGUMENT

#### a. The OMC's Initial Disclosures Satisfy the Federal Rules of Civil Procedure.

The OMC's Initial Disclosures do not violate Federal Rule of Civil Procedure 26. "Rule

26(a)(1) disclosures are designed to accelerate the exchange of basic information and help focus

the discovery that is needed, and facilitate preparation for trial or settlement." *Poitra v. Sch. Dist.*

*No. 1 in the Cty. of Denver*, 311 F.R.D. 659, 663 (D. Colo. 2015) (internal quotation marks

omitted). "To that end, initial disclosures should provide an opposing party 'with information

essential to the proper litigation of all relevant facts, to eliminate surprise, and to promote settlement.'" *Id.* (quoting *Windom v. FM Indus., Inc.*, No. 8:00CV580, 2003 WL 21939033, at *1 (D. Neb. Aug. 12, 2003) (brackets omitted). To be sure, "[t]he goal of the federal discovery rules is to prevent a trial by ambush." *Hancock v. Greystar Mgmt. Servs., L.P.,* No. CIV-15-1095-R, 2016 WL 2889084, at *1 (W.D. Okla. May 17, 2016) (denying defendant's motion to compel under Rule 26(a)(1)).

There certainly is no risk of a "trial by ambush" in this instance since the OMC has made it abundantly clear to Defendants that first and foremost, the OMC is entitled to equitable relief in the form of ejectment, and in the alternative, the OMC is entitled to the lost oil and gas revenue resulting from the obstruction caused by Defendants' unlawful, continuing trespass. *See* Joint Status Report 3, Dkt. 166 ("In addition to equitable relief in the form of a permanent injunction and ejectment/removal, the OMC is also entitled to compensation for damages in an amount that will cover the financial harm to the Osage Mineral Estate, and Osage headright holders, from the obstruction to oil and gas drilling on the Estate caused by Defendants' ongoing trespass."). Here, there is no surprise as to what theory of damages the OMC will claim or assert at trial, as this information has already been disclosed and discussed, and ultimately, will be fully developed in expert reports shared on October 2, 2020, and briefed in summary judgment motions long before the parties present argument at trial.

In this regard, Defendants' reliance on a subset of cases where the plaintiff *was* required to disclose a precise dollar amount in damages is entirely misplaced. *See, e.g.,* Defs.' Mot. 8–9 (asserting that the plaintiff must "provide 'the categories of damages he seeks with corresponding dollar figures . . . .'") (quoting *Campbell v. CSAA Fire & Cas. Ins. Co.,* No. CV-19-739-R, 2020 WL 3244010, at *1 (W.D. Okla. June 15, 2020)). In *Campbell*, for instance, the

plaintiff alleged the defendant had breached an insurance contract and failed to pay the full cost of repairs on plaintiff's residence; accordingly, the court ordered plaintiff to provide the documentation for the repairs he claimed the defendant insurance company should cover. *Campbell*, 2020 WL 3244010, at *1.

Here, in contrast to *Campbell*, there is no bill for repairs that the OMC can simply hand over to Defendants for their review. The valuation of the impact that Defendants' continuing trespass has had on oil and gas revenues to the OMC and Osage headright holders will vary greatly based on expert testimony concerning the extent to which the unlawful wind farm impeded oil and gas development on the Osage Mineral Estate, as well as a thorough review of documents produced by Defendants disclosing the good faith/bad faith nature of the legal analysis they assert justifies their refusal to comply with federal law. Accordingly, it is more than reasonable that the OMC did not provide an exact dollar mount in its Initial Disclosures. *See Hancock v. Greystar Mgmt. Servs., L.P.,* 2016 WL 2889084 (denying defendant's motion to compel an exact computation of damages because the value of the claim was not known at the time of plaintiff's Rule 26 Initial Disclosures).

This is precisely why courts have concluded that "Rule 26(a)(1) disclosure requirements should be applied with common sense in light of the principles of Rule 1, keeping in mind the salutary purposes that the rule is intended to accomplish." *Poitra v. Sch. Dist. No. 1 in the Cty. of Denver*, 311 F.R.D. at 664 (internal quotation marks omitted). Accordingly, federal courts have concluded that "[i]t is simply unfair for any defendant to remain in forced ignorance regarding th[e dollar amount of plaintiff's damages] until the rebuttal portion of a plaintiff's closing argument." *McKinney v. Reassure Am. Life Ins. Co*., No. 06-CIV-271-RAW, 2006 WL 3228791, at *2 (E.D. Okla. Nov. 2, 2006).

But there is *no* possibility of that happening here. Defendants will not wait until the rebuttal portion of the OMC's argument at trial to discover the exact dollar amount in damages the OMC claims. Instead, Defendants will wait twenty-four days from now, until October 2, when the OMC will share its expert reports with Defendants in compliance with this Court's Scheduling Order. *See* Second Am. Sched. Order 3, Dkt. 172. Defendants' Motion is a supreme waste of time since the OMC's expert reports, revealing the precise calculations of damages, will be served on Defendants on October 2, five days before this Court's scheduled hearing on Defendant's motion to compel on October 7.[1]

Rule 26 simply requires disclosure of information that is "reasonably available" at the time of the disclosure. Fed. R. Civ. P. 26(a)(1)(E). To be clear, the analysis required here is not ordinary nor is it routine. The Osage Mineral Estate has never been invaded at the level of Defendants' illegal conduct; the OMC has no precedent or data on which it could instantaneously base damage calculations without expert analysis. Any attempt by Defendants to force the OMC to assign monetary value to the OMC's damages before Defendants complete their document production and before expert evaluation is essentially an attempt to force the OMC to speculate on the scope of Defendants' wrongdoing.[2]

---

[1] Defendants quote *US Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, No. 12 CIV. 6811 CM JCF, 2013 WL 5495542, at *3 (S.D.N.Y. Oct. 3, 2013) for the proposition that "there is no 'exception to Rule 26(a)(1) in cases in which damages will be proved by experts . . . .'" Defs.' Mot. 16. The *US Bank* Court, however, merely states the same standard that the OMC has articulated above, namely that Rule 26 requires the disclosing party must make its disclosure based on information "it has at the time, and to supplement those disclosures as more information is gained." *Id.* This is exactly what the OMC has done and plans to continue to do, as it gains more information through expert analysis and review of the documents produced by Defendants. The OMC is not seeking an exemption from Rule 26; the OMC simply asserts its right to ascertain the information necessary to compute the monetary value of its damages before being forced to settle on an arbitrary number. Rule 26 requires nothing more, and nothing less.

[2] Defendants' attempt to assert Federal Rule of Civil Procedure 37(c) also fails, as Rule 37 only applies upon a violation of Rule 26. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to

By the time this motion is heard on October 7, it will be clear that Defendants' motion to compel has accomplished nothing more than wasting the parties', as well as the Court's, valuable time and resources.

### b. The OMC's Responses to Defendants' Interrogatories Satisfy the Federal Rules of Civil Procedure.

Likewise, the OMC's responses to Defendants' interrogatories satisfy the Federal Rules of Civil Procedure. Defendants do not seem to agree, and quote the Northern District of Illinois's decision in *United States ex rel. Tyson v. Amerigroup Ill, Inc.*, 230 F.R.D. 538, 544 (N.D. Ill. 2005), for the argument that "[c]ontention interrogatories that seek damage theory and methodology information from a plaintiff almost invariably will comport with the requirements of Rules 26(b)(1) and 33(c) of the Federal Rules of Civil Procedure. . . . ." *See* Defs.' Mot. 12. *Tyson*, however, ultimately supports the OMC's position, not Defendants.

In *Tyson*, the District Court denied plaintiff's motion to compel a computation of damages *before* the sharing of defendant's expert report since requiring the parties to do so "before expert discovery began . . . would serve no useful purpose, for within a matter of weeks or days, the plaintiffs will be provided with the defendants' expert report which would be fully revelatory of the theory or theories actually to be relied on and would render the plaintiffs' discovery efforts exercises in futility." *Tyson*, 230 F.R.D. at 541-42. For the same reasons here, Defendants' motion is futile.

To be sure, the nature of Defendants' interrogatory also counsels against granting their motion to compel. Here, Defendants seek their information through the use of a premature

---

provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information . . . at a hearing, or at a trial."). As discussed above, the OMC's answers do not violate Fed. R. Civ. P. 26, therefore Fed. R. Civ. P. 37 does not apply.

contention interrogatory. A contention interrogatory "ask[s] a party: to state what it contends, . . . [or] to state all the facts upon which it bases a contention." *Smash Tech., LLC v. Smash Sols., LLC*, No. 2:19-CV-00105-TC-JCB, 2020 WL 3546254 at \*6 (D. Utah June 30, 2020). Though such interrogatories are allowable, they "warrant special treatment" under Fed. R. Civ. P. 33. *Id.*; *see also id.*, 33(a)(2) ("An [contention] interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact . . . but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time."). As the United States District Court for the Western District of Oklahoma has noted, "[t]he Court has the power to delay answers to contention interrogatories until after designated discovery is complete." *Stout v. Long*, No. CV 14-427 WPJ, 2018 WL 1322051, at \*3 (W.D. Okla. Mar. 14, 2018); *see also B. Braun Med. Inc. v. Abbott Labs.*, 155 F.R.D. 525, 527 (E.D. Pa. 1994) ("there is considerable support for deferring contention interrogatories until the end of the discovery period."). Here, the discovery period does not end until December 18, 2020. *See* Second Am. Sched. Order. Dkt. 172.

Accordingly, Defendants' have incorrectly characterized the OMC's obligations to respond to their contention interrogatories under Fed R. Civ P. 33(b) prior to the disclosure of expert reports, and prior to the expiration of the discovery period, as ordered by this Court. The OMC has more than satisfied the applicable Civil Rules of Procedure and will provide a more detailed and specific statement of damages when Defendants complete their document production and the OMC's expert evaluation is concluded.

### c. The OMC is Not Precluded from Seeking Lost Oil and Gas Revenue in This Litigation.

In addition to demanding that the OMC immediately produce the calculation of damages it will ultimately include in its expert reports, Defendants also seek to preclude the OMC from

recovering damages for the harm Defendants have caused to the Osage Mineral Estate. Notably, Defendants "assert that [the findings in the 2011 Case] are preclusive of the [OMC's] ability to pursue damages in this action for alleged 'obstruction to oil and gas drilling.'" Defs.' Mot. 15 (citing *Osage Nation v. Wind Capital Grp., Ltd. Liab. Co*., No. 11-CV-643-GKF-PJC, 2011 WL 6371384, at *4–5 (N.D. Okla. Dec. 20, 2011) ("2011 Case")). This is not so.

The Tenth Circuit has already considered, and rejected, Defendants' res judicata argument. In 2017, the Tenth Circuit found that this Court's decision in the 2011 Case does *not* preclude the OMC from pursuing remedies for its claims in this litigation, brought under 25 C.F.R. § 214.7. *See United States v. Osage Wind, LLC*, 871. F.3d 1078, 1087 (10th Cir. 2017) (concluding the 2011 Case does not preclude the OMC's current claims because Osage Wind cannot demonstrate "the instant claim [under 25 C.F.R. § 214.7] would have been ripe … *before turbine excavation work began*" when the 2011 Case was brought.) (emphasis added). Again, turbine excavation work did not begin until 2014, and thus the OMC could not have brought its current claims under 25 C.F.R. § 214.7 in 2011.

Furthermore, the fact that the OMC pursued a similar theory of damages in the 2011 Case in no way precludes the OMC from pursuing the same theory of damages now, in 2020, under a new and separate cause of action under 25 C.F.R. § 214.7, as claims under § 214.7 could not have been brought in 2011. *See, e.g., Marmon Coal Co. v. Dir., Office of Workers' Comp. Programs*, 726 F.3d 387, 395 (3d Cir. 2013) (concluding that in conducting a res judicata analysis, "an identical sought-after remedy for each of the claims is not dispositive for purposes of determining whether the second claim involves a new cause of action"). In *Marmon Coal*, the Third Circuit concluded that res judicata did not preclude the plaintiff from pursuing the same remedy for the same injury a second time when the second action "involve[d] a different cause of

action" than the first claim, and the new cause of action could not have been brought in the prior action. *Id.*; *see also Channer v. Dep't of Homeland Sec.,* 527 F.3d 275, 281 (2d Cir. 2008) (concluding that res judicata does not apply where the prior claim and subsequent claim rely on "distinct" causes of action, even when "the remedy for each claim is identical").

Undeterred by the Tenth Circuit's dismissal of their res judicata argument, Defendants further argue that the conclusions and findings made by the District Court in the 2011 Case preclude the OMC from seeking a calculation of damages based on the unlawful wind farm's interference with oil and gas revenues from the Osage Mineral Estate. Defs.' Mot. 15. Specifically, Defendants note that this Court, in the 2011 Case, dismissed the idea that the wind farm would interfere with oil and gas, stating: "[t]he court finds no evidence that the Wind Farm's surface use would prevent reasonable access to, and use of, the surface estate by oil and gas lessees." *Id.* (quoting *Wind Capital Grp.*, 2011 WL 6371384, at *4–5).

Of course, as the Tenth Circuit noted, in 2011 no one (other than Defendants themselves) knew that the excavation and footprint of the wind farm across the Osage Mineral Estate would be as extensive as it eventually was by the time Defendants completed their work in December of 2014. *See Osage Wind, LLC*, 871. F.3d at 1087 ("At that early stage, the magnitude of the planned excavation work was not known to OMC or the United States, so it was not apparent that Osage Wind's proposed wind farm would violate 25 C.F.R. § 214.7."). Thus in 2011, there was no way for this Court to truly know the extent to which Defendants would mine and interfere with the Osage Mineral Estate, and as the Tenth Circuit concluded, conclusions based on what was known in 2011 do not preclude the OMC from seeking relief now based on what has been learned regarding Defendants' unlawful conduct. *See id.* At a bare minimum, expert

discovery is necessary to determine the extent of the impairment before any dismissal of this theory of damages could or should be dismissed.

Defendants also misleadingly assert that when this Court dismissed the OMC's claims for disgorgement of profits, the Court concluded that the OMC could not pursue recovery for lost oil and gas revenue on the Osage Mineral Estate. *See* Defs.' Mot. 16 ("First, the theory was espoused by the OMC as a basis for it to pursue claims for accounting and disgorgement, which Judge Frizzell has found that it may not do."). The OMC's claim for disgorgement of profits, however, was *not* based on the payments that Osage headright holders lost; instead, the OMC's claim for disgorgement of profits was based on an equitable theory of recovery that because Defendants have and continue to unlawfully trespass on the Osage Mineral Estate, the OMC is entitled to the profits the Defendants have glommed as a result of their unlawful conduct. The dismissal of this form of equitable relief in no way precludes the OMC from seeking recovery for the monetary damages that Defendants' conduct has caused directly to the Osage Mineral Estate itself by preventing the OMC from exercising its sovereign judgment in order to put the Estate to the most profitable use that will benefit all Osage headright holders.

For this same reason, Defendants' statement that the Ninth Circuit's decision in *United States v. Pend Oreille Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1548 (9th Cir. 1994), "is inapplicable" to the current litigation is nothing more than a misleading conflation of claims that have been dismissed with theories of damages that are now properly the subject of expert discovery. *See* Defs.' Mot. 16. Defendants' ambiguous wording implies this Court has specifically held that the OMC cannot use the *Pend Oreille* standard to calculate damages. This is absolutely not the case. In its Response to the Defendants' Motion to Dismiss, Dkt. 158, the

14

OMC cited to *Pend Oreille* primarily to rebut Defendants' assertion that the OMC was precluded from seeking equitable remedies because legal remedies may be available. *Id.* at 8.

To be sure, *Pend Oreille* specifically provides guidance for calculating damages where a trespass to tribal trust property arises from a failure to obtain the requisite license or, in the instant case, permit. In *Pend Oreille*, a utility company flooded reservation land as part of a power project without obtaining the requisite license. *See* 28 F.3d at 1548. After finding that the utility had trespassed, the Ninth Circuit further held that the standard for determining damages should be calculated using the most profitable "use of the value of the tribal lands" as part of the project rather than the rental value of the land for grazing as the utility argued. *Id.* at 1549–51. The Ninth Circuit reasoned that "[r]equiring the Utility to reimburse the Tribe for the most profitable use of its land will encourage future applicants for licenses to fully disclose the effects of their projects on Indian reservation lands and current licensees to seek approval to use such lands." *Id.* at 1551.

The parallels between *Pend Oreille* and the instant case are numerous, given that in this case, Defendants have calculated they would prefer to spend money litigating in defense of their unlawful conduct rather than pay the requisite fee for a lawful permit in the first place. Thus, discovery related to the damages done to the Osage Mineral Estate in light of its "most profitable use" is proper and necessary, and, in keeping with the OMC's arguments above specifically addressing lost oil and gas revenues, will be properly addressed in expert reports.

Defendants also misapprehend the reach of the Court's holding that the OMC's remedies are limited to those sought in the United States' First Amended Complaint, primarily because they have mischaracterized the representations made in the United States' First Amended Complaint, Dkt. 20, and the OMC's Reply to Defendants' Opposition to the OMC's Motion to

Intervene, Dkt. 127. When read in context and in full, it is obvious the footnote in the United States' First Amended Complaint that Defendants' contend disclaims any remedies related to oil and gas revenues does nothing of the kind. *See* Defs.' Mot. 14 n.6. Rather, it clarifies that the United States is alleging only that Defendants engaged in unlawful mining, not unlawful oil and gas exploration and development, and that oil and gas development is "specifically excepted" from 25 C.F.R. § 214. *See* United States Am. Compl. 5 n.1, Dkt. 20.  Nowhere does the First Amended Complaint state that the United States, or now the OMC, decline to seek damages for the Defendants' interference with the OMC's ability to develop its oil and gas interests as a result of Defendants' trespass. Nor, as Defendants claim, did the OMC represent that it would not pursue damages for oil and gas operations in its Response to Defendants' Motion to Dismiss. Defs.' Mot. 14 n.6. Much as it is now, the OMC has been addressing the Defendants' penchant for pressing res judicata at every turn, even where there was no conceivable application. *See, e.g.,* OMC's Reply in Supp. of Mot. to Intervene 9 n.4, Dkt. 127 ("[I]t is unclear which allegations . . . Defendants are referring to as 'relating to the OMC's oil and gas interest in its mineral estate.' The paragraphs Defendants reference . . . contain a historical account of the purchase and establishment of the Osage Reservation . . . .")

Furthermore, Defendants continue to peddle the myth that the Tenth Circuit somehow concluded that "the measure of damages must be tied to the value of the rock that was 'sorted,' 'crushed,' and 'exploited . . . as structural support for each wind turbine." Defs.' Mot. 17–18 (quoting *United States v. Osage Wind, LLC*, 871 F.3d at 1091). Defendants take this language from the Tenth Circuit's discussion about what constitutes "mineral development" under 25 C.F.R. § 211.3, not from any discussion of damages under 25 C.F.R. § 214 or even from any

discussion of damages for trespass generally. Indeed, the Tenth Circuit never considered the proper measure of damages and left that issue to the District Court on remand.

Defendants have provided no rationale or lawful reason why the OMC should be precluded from pursuing its theory of damages related to the extent that Defendants' continuing trespass has interfered with the revenues the OMC would have otherwise received from the Osage Mineral Estate and distributed to Osage headright holders. At this point, the parties should proceed pursuant to the Court's Scheduling Order without the hindrance of motions, disguised as "discovery" in nature, but filed with the goal of dismissing theories of recovery before they can be fully fleshed out and supported through expert discovery.

### d. The OMC's Communications with the Executive Branch of the Osage Nation are Protected by the Executive Privilege.

As discussed in greater detail below, the OMC's communications with the Executive Branch of the Osage Nation are protected by executive privilege, under both Osage Nation law, as well as federal common law. But first and foremost, it bears noting that accepting Defendants' statements on how and why these documents might be relevant to the current litigation would require erroneously circumventing the clear findings of the Tenth Circuit in this matter. Defendants assert that these documents are key to demonstrating "that the arguments advanced in this litigation were advanced too late in time. . . ." Defs.' Mot. 18, but the Tenth Circuit has already considered, and rejected, this argument from Defendants.

In November 2017, the Tenth Circuit considered whether the OMC and the United States could have or should have brought its current claims earlier than 2014, and determined it could not. Specifically, the Tenth Circuit found that Defendants have failed to demonstrate that "the instant claim [under 25 C.F.R. § 214.7] would have been ripe … *before turbine excavation work began*," which was in the latter half of 2014. *Osage Wind, LLC*, 871 F.3d at 1087 (emphasis

17

added). The Tenth Circuit has already concluded that Plaintiff's claims were not "advanced too late in time," and Defendants' attempt to overcome the application of the executive privilege on this basis fails on its face.

To be sure, the OMC has not abused or applied the privilege excessively, having only applied the executive privilege to a small subset of communications to or from Osage Nation Chief Standing Bear and/or his staff concerning leases on the Osage Nation Reservation— communications that are protected under Osage Nation law. *See* Dkt. 179-3; Int.-Pl.'s Second Privilege Log, 07-09-2020, Ex. 1. All in all, the OMC has only claimed this privilege over five documents in total. *See id.* The executive privilege applies to these communications with the Executive Branch of the Osage Nation government.

> ### 1. Defendant's Erroneously Claim the Executive Privilege is Unavailable to the OMC Under Osage Nation and Federal Common Law.

In their Motion, Defendants erroneously challenge that the "Osage Nation Code, tit. 15 ch. 8 § 8–104 (a)(5, 11) does not, in any event, provide a privilege from discovery or testimony." Defs.' Mot. 19. Defendants offer no authority or precedent to assert that the Osage Nation Code does not give rise to the privilege itself. There are none.

Instead, Defendants cite one case from the Eastern District of Oklahoma that discusses and interprets an *Oklahoma* law, specifically the Oklahoma Open Records Act. *See id.* (citing *Am. Commerce Ins. Co. v. Harris*, No. CIV-07-423-SPS, 2008 WL 3456848 (E.D. Okla. Aug. 8, 2008)). Authorities discussing the assertion of the executive privilege under Oklahoma law, however, in no way preclude the ability of a sovereign Tribal Nation, the Osage Nation, to assert the executive privilege under its own laws, as well as federal common law.

Instead, Tribes, including the Osage Nation, have the ability as sovereign nations to pass internal laws upholding the executive privilege for their respective officers and entities, and tribal law governs the scope of a sovereign Tribal Nation's ability to invoke the executive privilege on behalf of tribal executive officials. *See Davis v. Littell*, 398 F.2d 83, 84 (9th Cir. 1968) (holding that Tribal Nations "enjo[y] sufficient independent status and control over [their] own laws and internal relationships to be able to accord absolute privilege to [their] officers within the areas of tribal control.").[3] It is Osage Nation law, rather than Oklahoma law, which governs the privilege at issue.

Furthermore, in their Motion, Defendants incorrectly interpret Fed. R. Evid. 501 to erroneously claim that no "rule prescribed by the Supreme Court provides executive privilege to the OMC and/or the Nation." Defs.' Mot. 20. The existence of the executive privilege Under Osage Nation law, however, is not contingent on recognition in the Federal Rules of Evidence. Instead, the Supreme Court has long held that sovereign nations, including the Osage Nation, have the right "to make their own laws and be ruled by them" with respect to internal affairs. *Strate v. A-1 Contractors*, 520 U.S. 438, 459 (1997) (quoting *Williams v. Lee*, 358 U.S. 217, 220 (1959)); *see also Worcester v. Georgia*, 31 U.S. 515, 559 (1832) (explaining that the Tribes are

---

[3] In *Davis*, the Ninth Circuit distinctly acknowledged the ability of the Navajo Nation to acknowledge the executive privilege in its Tribal Code. 398 F.2d at 84. The Navajo Nation, unlike the Osage Nation in this instance, did not address the executive privilege in its code at the time the claim was brought. *Id*. As such, only after finding neither the Navajo Code nor any decision of the Navajo Tribal Court "bestowed absolute privilege on its executive officers," did the court look at a separate provision in the Navajo Code which allowed for Arizona state law or federal law to supplement the privileges available under Navajo Nation law. *Id*. (citing Navajo Tribal Code, tit. 7, ch.3, § 34(C)). Bottom line: federal courts have already affirmed the sovereignty authority of Tribal Nations to acknowledge the executive privilege under their Nation's laws.

"distinct independent political communities, retaining their original natural rights" and not dependent on federal law for their powers of self-government).

The Osage Nation Code makes clear that an executive privilege is available to all communications containing the "negotiating position of the Osage Nation, including all boards, committees, commissions, departments, *agencies or other Osage government entity*, before a contract, lease or other agreement is entered into" as well as records with "[i]nformation contained within or related to a contract, lease or other agreement which is confidential and/or proprietary in nature" are "private or otherwise protected *and shall not be considered public for purposes of required disclosure*." Osage Nation Code, tit. 15, ch. 8, §§ 8-104(A)(5), (11) (emphasis added). In this instance, a lease has yet to be entered into; that however, is the exclusive result of Defendants' willful violation of federal law. Defendant's unlawful conduct does nothing to diminish the privilege afforded, under Osage Nation law, to communications concerning the lease that Defendants should have secured under 25 C.F.R. § 214.7 before mining the Osage Mineral Estate.

To be sure, the five privileged communications that Defendants seek to support their previously disposed theories of defense are protected by Osage Nation law and are not to "be considered public for *purposes of required disclosure*." Osage Nation Code, tit. 15, ch. 8, §§ 8-104(A)(5), (11) (emphasis added). Accordingly, under Osage Nation law, communications to and from the Executive Branch of government regarding leases are protected from disclosure under the executive privilege.

## 2. Federal Common Law Permits Use of the Executive Privilege in this Case

Though this Court need look no further than the Osage Nation Code to find the OMC's legal basis for asserting an executive privilege, federal common law also shields the

communications to and from the Osage Nation's Executive Branch of government under the executive privilege.

Defendants recognize that "[f]ederal common law does recognize an executive privilege," Defs.' Mot. 12, but misleadingly assert that this privilege "does not extend beyond communications by, with, or at the direction of the President of the United States" because, for instance, federal courts have refused to extend the privilege to "presidents-elect." Defs.' Mot. 21 (quoting *Fish v. Kobach*, No. 16-2105-JAR-JPO, 2017 WL 1929010, at *5 (D. Kan. May 10, 2017)). The OMC, however, is not attempting to extend the privilege to the Chief-elect of the Osage Nation. Instead, the OMC has only asserted the privilege over communications to and from individuals who, at the time the communication was made, lawfully held office in the Executive Branch of the Osage Nation government. *See, e.g., Letter from Osage Nation Executive Director of Government Affairs to Osage Minerals Council*, 4/19/11, OMC-000249 – OMC-000255, Int.-Pl.'s First Privilege Log, 06-02-2020, Dkt. 179-3.

Although Defendants attempt to limit the Ninth Circuit's decision in *Davis v. Littell* to nothing more than a decision that acknowledged "a privilege from liability for defamation," and did not address "an evidentiary privilege" Defs.' Mot. 21, a cursory reading of the Ninth Circuit's decision reveals more was truly at issue. *See* 398 F.2d at 84. While the *Davis* Court did address, narrowly, a privilege from liability for defamation, it also broadly affirmed the Navajo Nation's ability "to accord absolute privilege to its officers within the areas of tribal control" under Navajo Nation law, even though Navajo Nation law did not explicitly do so. *Id*. In *Davis*, the District Court for the District of Arizona entered summary judgment in favor of the Navajo Nation's General Counsel, who invoked the executive privilege, on the basis that "[t]he Navajo Tribe is a sovereign entity within the United States" and the General Counsel's position is

"comparable to the Chief Legal Officer of the United States, any state thereof, or any political subdivision . . . ," and therefore the position was in the scope of the executive privilege. *Id*. at 83. The Ninth Circuit found, on principles of federal common law governing tribal sovereignty, that the District Court's decision was "rationally" supported. *Id*.

Similarly, the OMC is a government entity of the Osage Nation, and the OMC's communications with the executive branch of the Osage Nation should be afforded the same "absolute executive privilege" that "has long been established by court decision" which protects communications of federal officers. *Id*. (citing *Barr v. Matteo*, 360 U.S. 564 (1959); *Spalding v. Vilas*, 181 U.S. 483 (1896)). The Osage Nation's position as "a sovereign entity within the United States" supports the Nation's ability to pass laws which affirm an executive privilege for communications between Osage Nation executive officers and the OMC. *Id*.

Finally, Defendants mistakenly rely on the District Court's decision in *Miccosukee Tribe of Indians of Florida v. U.S.,* to assert that the executive privilege does not apply "to a Native American tribe." Defs.' Mot. 21 (citing *Miccosukee Tribe of Indians of Florida v. U.S.*, No. 12-cv-22638-UU, 2013 WL 7728831, at *9 (S.D. Fla. Feb. 11, 2013)). That decision, however, is wholly inapplicable to the present case. In that case, the Miccosukee Tribe attempted to invoke the executive privilege to protect documents from the *federal government* (specifically, the Internal Revenue Service), and not a private corporate entity who unlawfully trespassed on tribal trust property. *See Miccosukee Tribe of Indians of Florida*, 2013 WL 7728831, at *9. In that case, the Court held that "tribal sovereignty does not extend to prevent the *federal government* from exercising its superior sovereign powers." *Id*. at *8. (emphasis added).

In this instance, the OMC has not invoked the executive privilege against an agency of the federal government exercising its own sovereign powers, but rather, the OMC has asserted

this privilege against private corporations, who by no means enjoy "superior sovereign powers" to the Osage Nation. Whereas the Miccosukee Tribe "cited the Tribe's newly-passed resolution as a reason for not producing the requested documents," Defs.' Mot. 22 (citations omitted), the OMC is not citing a newly passed law engendered for the sole purpose of evading a federal investigation. Instead, the relevant Code at issue and cited above has been on the books since 2009. There is no abuse of power here. The OMC, an agency of a sovereign government, has asserted the executive privilege over a mere five documents, and the fact that the OMC is invoking the executive privilege created by Osage Nation law is in line with the Supreme Court's clear precedent that "Indian tribes have not given up their full sovereignty." *U.S. v. Wheeler*, 435 U.S. 313, 323 (1978).

### 3.   The Osage Nation Properly Invoked the Executive Privilege

In their determined effort to circumvent the application of a customary privilege afforded under Osage Nation law, Defendants further assert that "even if the executive privilege applied, the OMC has not properly invoked it," quoting a single case from the United States District Court, District of Delaware, which in turn cites *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953). *See* Defs.' Mot. 23. The Supreme Court's conclusion in *Reynolds*, however, in no way prohibits the OMC from asserting an executive privilege, grounded in Osage Nation law, over communications to and from the Executive Branch of the Osage Nation government.

To be sure, in *Reynolds*, the Supreme Court did not consider the narrow issue before this Court, specifically the Osage Nation's right to invoke the executive privilege for communications between its executive officers and the OMC as a sovereign nation. Instead, the Supreme Court considered the Air Force's ability to invoke a formal claim of privilege where the aircraft and personnel at issue were engaged in a highly secret mission; ultimately, the Court

found the Air Force properly invoked a privilege over "material touching upon military secrets." 345 U.S. at 11.

The *Reynolds* holding, and its unique factual background, by no means gives rise to a standard governing the Osage Nation's right to invoke the executive privilege as a protection concomitant to its right to "make [its] own laws and be ruled by them" with respect to Executive Branch communications concerning leases and related activity on the Osage Reservation. *Williams*, 358 U.S. at 220. There are no principles of federal common law which directly prevent the OMC and the Osage Nation from asserting its claim through counsel, who necessarily represent the OMC in this litigation. As such, the OMC has properly invoked the executive privilege.

## IV.   CONCLUSION

For the aforementioned reasons, the OMC requests that the Court deny Defendants' Motion to Compel the Osage Minerals Council.

<div style="margin-left:40%">

Respectfully submitted,

s/ Mary Kathryn Nagle
Mary Kathryn Nagle, OBA No. 33712
Wilson Pipestem, OBA No. 16877
Abi Fain, OBA No. 31370
Pipestem Law, P.C.
320 S. Boston Ave., #1705
Tulsa, Oklahoma 74103
918-936-4705 (Office)
wkpipestem@pipestemlaw.com
mknagle@pipestemlaw.com
afain@pipestemlaw.com

*Counsel for Intervenor-Plaintiff*
*Osage Minerals Council*

</div>

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2020, I electronically transmitted the foregoing to

the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic

Filing to the following ECF registrants:


Ryan A. Ray
Joel L. Wohlgemuth
rar@nwcjlaw.com
jlw@nwcjlaw.com

-and-

Lynn H. Slade
Sarah S. Stevenson
lynn.slade@modrall.com
sarah.stevenson@modrall.com
*Counsel for Defendants*

Cathryn Dawn McClanahan
cathy.mcclanahan@usdoj.gov
*Counsel for Plaintiff, United States*


                                    /s/ Mary Kathryn Nagle
                                    _____