## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| OSAGE MINERALS COUNCIL, | ) | |
| | ) | |
| Intervenor-Plaintiff, | ) | Case No. 14-CV-704-GKF-JFJ |
| | ) | |
| v. | ) | |
| | ) | |
| OSAGE WIND, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court are the following discovery motions: (1) Defendant Osage Wind, L.L.C.'s First Motion to Compel against the United States (ECF No. 177); (2) the United States' Motion to Compel Discovery (ECF No. 175); (3) Intervenor Plaintiff Osage Minerals Council's Motion to Compel Production of Documents (ECF No. 183); and (4) Defendants' First Motion to Compel against the Osage Minerals Council (ECF No. 179).

**I.       Procedural History**

This case involves a large-scale excavation project ("Project") undertaken by Defendant Osage Wind, LLC ("Osage Wind") on private fee land in Osage County, Oklahoma, for the purpose of installing eighty-four (84) wind turbines and creating a wind farm. Osage Wind is wholly owned by Defendant Enel Kansas, LLC, which is wholly owned by Defendant Enel Green Power North America, Inc. ("EGPNA"). Before excavation work began, the Project was the subject of litigation and regulatory challenges.

In October 2013, Osage Wind initiated site preparation and road construction. In September 2014, Osage Wind began excavation work, which was completed in November 2014.

On November 21, 2014, the United States filed this lawsuit, arguing that the excavation work constituted "mining" under regulations governing development of minerals in the Osage Mineral Estate and therefore required a lease approved by the Secretary of Interior.  The United States also asserted supplemental state law claims for trespass and conversion.  After learning Osage Wind had already completed the excavation work, the United States withdrew its request for an injunction and filed an amended complaint for damages based on the unauthorized extraction of reserved minerals.

On September 30, 2015, U.S. District Judge James Payne held the work did not constitute mining, did not require a lease, and entered judgment in favor of Osage Wind.  The United States, as trustee of the Osage Mineral Estate, did not appeal the district court's judgment, but the Osage Mineral Council ("OMC"), acting on behalf of the Osage Nation, appealed.  The Tenth Circuit reversed the district court, and held that, pursuant to 25 C.F.R. § 214, Osage Wind's "extraction, sorting, crushing, and use of minerals as part of its excavation work constituted 'mineral development,' thereby requiring a federally approved lease which Osage Wind failed to obtain." *United States v. Osage Wind, LLC*, 871 F.3d 1078, 1081-82 (10th Cir. 2017).  The circuit remanded the case to the district court for further proceedings consistent with the decision.

On October 24, 2019, the Court Clerk randomly reassigned the case to U.S. District Judge Gregory Frizzell.  The United States, as Plaintiff, and OMC, as Intervening Plaintiff, are prosecuting the case on remand.  The district judge has resolved several disputes regarding the scope and nature of pleadings and what issues remain to be litigated on remand.  *See*, *e.g.*, ECF Nos. 135, 138, 153, 161, 162, 171, 207.  Plaintiffs seek damages on their claim for regulatory violations and state-law claims for trespass and conversion.  Plaintiffs contend Osage Wind was a

bad-faith trespasser.[1]  Plaintiffs also seek equitable remedies, including disgorgement of profits, ejectment, and a permanent injunction enjoining Defendants from "any further excavation, mining, continuing trespass, or other work that concerns the Osage Mineral Estate," without obtaining the required leases.  *See* ECF No. 140 (Intervenor Complaint).  *See also* ECF No. 20 (United States' Complaint).  Defendants raised numerous affirmative defenses, including an affirmative good-faith defense premised on the legality of their conduct, discussed in detail below.  *See* ECF Nos. 99, 174.

The parties conducted discovery and filed four motions to compel seeking resolution of discovery disputes.  The Court conducted a hearing and took the motions under advisement.  While the discovery motions were pending, the district judge granted judgment in favor of OMC on Defendants' affirmative equitable defenses of estoppel, laches, waiver, unclean hands, and *in pari delicto*, as discussed in detail below.  ECF No. 207.  The Court's discovery rulings reflect the district judge's recent preclusion of these defenses.

The specific issues addressed in this Order are: (1) whether Defendants waived privilege for the challenged privileged materials based on "at-issue" waiver;[2] (2) whether Defendants EGPNA and Enel Kansas have further discovery obligations; (3) whether the United States must produce internal communications and/or communications with OMC, Osage Nation, and other agencies regarding the Project dating back to 2010; and (4) whether OMC must produce two communications involving Osage Nation executive officials.

---

[1] The district judge clarified that his prior orders did not preclude the United States from arguing Osage Wind was a bad-faith trespasser for the purpose of calculating damages for the mineral trespass under Oklahoma law.  ECF No. 171 at 3.  OMC expressly pled bad-faith trespass in its Intervenor Complaint.

[2] The United States and OMC also argue the documents they seek are not privileged.  This will be addressed by separate Order following *in camera* review of certain documents.

II.     **Plaintiffs' Motions to Compel Privileged Materials on Grounds of "At Issue" Waiver (ECF Nos. 175, 183)**

As reflected in their Fifth Amended Privilege Log ("FAPL"), Defendants withheld draft legal memoranda, email communications, and other documents created during 2013-2014, on the basis of attorney-client and/or work product privilege.  ECF No. 195 at Ex. 2 (FAPL).  The United States and OMC seek to compel a limited number of these documents on the grounds that, assuming they are privileged, Defendants impliedly waived any attorney-client or work product protection by placing the materials at issue in the litigation.  Specifically, Plaintiffs seek to compel 94 entries on grounds of waiver.  *See* ECF No. 175-1 at Ex. 11 (challenging 29 entries from Third Amended Privilege Log);[3] ECF No. 195 at Ex. 5 (Correlation Table prepared by United States, adopted by OMC, challenging 65 additional entries from FAPL, which was produced after motion was filed).  *See also* ECF No. 183-2 (OMC's appendix challenging 23 entries from Osage Wind's Second Amended Privilege Log, which overlaps with United States' challenges).

A.     **Relevant Facts and Parties' Arguments**

Additional background facts are relevant to the Court's waiver analysis.  According to the first Declaration of Megan Beauregard ("Beauregard"), General Counsel for EGPNA, the following events were occurring during 2013-2014, which is the period covering the challenged entries on the FAPL.  The EGPNA legal department provided legal advice regarding the Project to Osage Wind and Enel Kansas, which is a holding company without separate employees.  ECF No. 186-1 at ¶ 9.  The EGPNA legal department hired outside counsel and consulted with outside counsel "throughout 2013 and 2014 to provide legal advice and actual and potential litigation strategy regarding all matters associated with the Project."  *Id.* at ¶ 27.  *See also id.* at ¶¶ 17, 21,

---

[3] Exhibit 11 contains a total of 31 entries.  The first two entries are spreadsheets seeking advice of counsel regarding contracts between Osage Wind and a third party, and the United States does not appear to assert these are covered by any at-issue waiver.

23, 24 (describing other lawsuits and regulatory proceedings during this time frame).  Those outside lawyers included Lynn Slade ("Slade") and William Scott ("Scott"), of Modrall Sperling law firm.  *Id.* at ¶ 27.  Slade is named trial counsel of record in the case.

On October 10, 2013, the same month Osage Wind initiated site preparation and road construction on the Project, Andrew Yates, Chairman of OMC, sent a letter to World Capital Group ("WCG") and TradeWind, which are prior owners of Osage Wind, requesting eight specific types of information "to allow the [OMC] and the Bureau of Indian Affairs (BIA) to determine the federal permitting, leasing and other regulatory requirements that could apply to the Osage Wind Project (Project)."  ECF No. 186-1 at Ex. 2.  This letter stated that, if a lease was indeed required, "the failure to secure a federal-required lease or permit could result in fines or other legal action by the Osage Nation or BIA."  *Id.*  On November 11, 2013, Chapparel Energy, LLC sent a letter to Osage Agency, BIA Acting Superintendent Robin Phillips ("Phillips"), stating that it was incumbent upon BIA to protect the Osage and the investments of Chapparel Energy and "other affected leases whose leases would be impaired by the wind project."  ECF No. 186-1 at Ex. 3.  BIA Field Solicitor Alan Woodcock ("Woodcock") and the CEOs of WCG and TradeWind were carbon copied on the letter from Chapparel Energy.

Almost a year later, on October 9, 2014, Phillips sent a letter to Francesco Venturini, which was received by EGPNA and the BIA Field Solicitor's Office.  ECF No. 186-1 at ¶ 34.[4]  EGPNA in-house and outside counsel understood the BIA Field Solicitor's Office to be the attorneys responsible for representing the BIA.  *Id.*  According to Beauregard, EGPNA's legal department "decided that outside counsel . . . would communicate with the Field Solicitor's Office in response

---

[4] This letter is not part of the record.  Privilege log entries indicate Francesco Venturini is an employee of one or more Defendants.

to the letter" and inform the BIA Field Solicitor "why it believed a permit was not required to continue with Project construction." *Id.*

On October 20, 2014, at the clients' direction, Slade and Scott sent a memorandum to BIA Field Solicitor Woodcock ("Slade Memo"). According to the Slade Memo, it responds to Woodcock's ***"request for factual and legal support for Osage Wind's belief that a Sandy Soil and Rock Mining Permit is not required."*** ECF No. 175-1 at Ex. 10. The Slade Memo is presented in a classic legal memo format, with a "question presented," a "short answer," an extensive discussion of the facts and case law, and a conclusion. *See* ECF No. 175-1 at Ex. 10. The Slade Memo concludes that that the excavation ***"does not constitute mining which would require a lease or permit from the Osage Nation or BIA"*** and asks to "advise if you require any additional information." *Id.* According to Beauregard, the Slade Memo was always "intended to be shared with Mr. Woodcock, and it was in fact so shared." ECF No. 186-1 at ¶ 34. The communications between Defendants and outside counsel and drafts leading to the Slade Memo were, however, "always intended to be privileged." *Id.* at ¶ 35. Soon after the Slade Memo was sent, on November 21, 2014, the United States filed this lawsuit.

Also relevant to implied waiver are Defendants' pleadings. In their Answer to OMC's First Complaint in Intervention, Defendants asserted the following affirmative defense: "Part or all of the OMC's claims are barred because any Defendant found to have engaged in unlawful conduct ***believed in good faith that its conduct was not illegal*** and there was not clear law to the contrary prior to the Tenth Circuit's decision in this case." ECF No. 174 at ¶ 17 (emphasis added). In briefs filed with the Court in support of dispositive and other motions, Defendants have repeatedly argued that any conduct deemed illegal was taken in good faith based on a "detailed legal analysis." *See, e.g.,* ECF No. 150 at 10-11 ("Osage Wind ***believed, in good faith, based upon a detailed legal analysis,*** that neither a lease nor a permit was required.").

Plaintiffs argue that, assuming the challenged entries are privileged attorney-client communications and/or work product, Defendants impliedly waived privilege by asserting a good-faith defense premised on the "legality" of their conduct and relying on a "detailed legal analysis" as proof.  During the hearing, counsel for OMC explained that its position

> is not that if you say you have a good faith belief you've waived privilege over everything.  That's not at all the issue here. . . . The issue is they are saying that the evidence of their good faith belief is the detailed legal analysis and they said that again repeatedly and we cited all the times they said that in our brief.  So, if they're not going to produce the detailed legal analysis and the documents that prove this, I mean, we need to see the communication from their clients where their clients requested, asked questions about it, to ascertain whether or not their clients actually relied on that and actually believed it.  And if we can't get that, I think both the OMC and the United States will be seriously impaired because what will happen at a trial where they can say, "Well, we had a good faith belief based on this evidence," you can't look at that evidence, you can't review it, and the fact-finder here can't look at that either because the evidence we're relying on happens to be privileged, and that's why the at-issue waiver exists.

ECF No. 198 at 13-14.

Conversely, Defendants argue no waiver has occurred, because: (1) they have not expressly asserted an "advice of counsel" affirmative defense; and (2) they will rely exclusively on the non-privileged Slade Memo.  During the hearing, Defendants' counsel explained:

> We're different here, Your Honor, in that we're not relying on a privileged and confidential discussion.  It is more so, Your Honor, that we articulated a position in this memorandum that was shared and has been in the court record for a number of years and that there wasn't – that that was the only document prior to the suit being filed that set out a [sic] analysis of the issues that – and it wasn't timely responded to.  It's that situation, Your Honor, that forms the basis of our good faith defense and not, "My lawyer told me in confidence that I could do this."  That's a distinction and an important one.

*Id.* at 10-11.

### B.     General Legal Standards

Under Rule 26 of the Federal Rules of Civil Procedure, parties may obtain discovery "regarding any *nonprivileged* matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1) (emphasis added).  Discoverable

information need not be admissible at trial.  *Id.*  The parties do not dispute relevance, and the issue

is whether the challenged documents are non-privileged.

Federal privilege law applies because the Court's jurisdiction is grounded in federal

question jurisdiction.  *See In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1184 (10th Cir. 2006)

("[P]rivileges in federal-question cases generally are 'governed by the principles of the common

law as they may be interpreted by the courts of the United States in the light of reason and

experience.'").[5]  The parties do not appear to dispute that federal common law, and not Oklahoma

law, governs the privilege issues presented.

With respect to the burden of proving waiver of privilege, there exists conflicting authority

within the circuit.  *Compare Truman v. City of Orem*, 362 F. Supp. 3d 1121, 1132 (D. Utah 2019)

(explaining that Tenth Circuit law is "silent" and holding that privilege holder bears burden of

proving absence of waiver as element of privilege assertion), *with Lindley v. Life Inv'rs Ins. Co.*

*of Am.*, No. 08-CV-0379-CVE-PJC, 2010 WL 1741407, at *7 (N.D. Okla. Apr. 28, 2010) (after

privilege holder establishes elements of privilege, "the party seeking to overcome the assertion of

a valid privilege bears the burden to show that the privilege has been waived").  The Court follows

*Lindley* and holds that the party seeking to overcome the assertion of a valid privilege bears the

burden to show that the privilege has been waived.  *See id.  See also United States v. Newell*, 315

F.3d 510, 525 (5th Cir. 2002) ("The burden to establish at-issue waiver of a privilege is upon the

---

[5] Despite language in Federal Rule of Evidence 501 stating that "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision," courts have held that, where jurisdiction is based on a federal question and a court has supplemental jurisdiction over state-law claims, practical considerations mandate application of federal privilege rules in the entire case.  *See Vondrak v. City of Las Cruces*, 760 F. Supp. 2d 1170, 1177 (D.N.M. 2009) (explaining that, where primary source of jurisdiction is the federal claim, the federal evidentiary interest should be primary as well); *United States v. Copar Pumice Co., Inc.*, No. CV 09-1201 JAP/KBM, 2012 WL 12898786, at *4 (D.N.M. Apr. 23, 2012) (explaining that advisory committee notes resolve conflict between House and Senate versions of the rule by providing that "[i]n nondiversity jurisdiction civil cases, federal privilege law will generally apply").

party who asserts waiver[.]").  The Court's outcome would be the same regardless of which party bears the burden of proof.

### C.    Defendants Waived Privilege Under "At Issue" Waiver Doctrine[6]

The Tenth Circuit has explained three approaches to an "at issue" waiver of attorney-client privilege: (1) automatic waiver approach, whereby the privilege holder waives privilege simply by raising a claim or defense to which the privileged material is relevant; (2) an intermediate approach, whereby the privilege is "waived only when the material . . . is both relevant to the issues raised on the case and either vital or necessary to the opposing party's defense of the case"; and (3) a restrictive approach, whereby "a litigant waives privilege if, and only if, the litigant directly puts the attorney's advice at issue in the litigation."  *Seneca Ins. Co. v. Western Claims, Inc.*, 774 F.3d 1272, 1275-76 (10th Cir. 2014) (quoting *Frontier Refining, Inc. v. Gorman-Rupp Co.*, 136 F.3d 695 (10th Cir. 1998)).

The Tenth Circuit has not selected an approach for purposes of federal law.  In *Seneca*, the Tenth Circuit was applying Oklahoma privilege law.  Based on agreement of the parties, the court applied a "version of the second approach" known as the *Hearn* test, which derives from *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975).  District courts are split in predicting whether the Tenth Circuit would follow the *Hearn* test or a more restrictive approach.  *Compare Anchondo v. Anderson, Crenshaw, & Assocs.*, 256 F.R.D. 661, 670 (D.N.M. 2009) (predicting Tenth Circuit would adopt *Hearn* test); *Williams v. Sprint/United Mgmt. Co.*, 464 F. Supp. 2d 1100, 1104 (D. Kan. 2006) (same); *with Truman v. City of Orem*, 362 F. Supp. 3d 1121, 1132 (D. Utah 2019) (predicting Tenth Circuit would adopt the third approach finding waiver only when the "client puts the advice squarely at issue").

---

[6] For purposes of this Order, the Court assumes the challenged entries are privileged and determines whether Plaintiffs have shown an implied waiver of privileged materials.

Because Tenth Circuit law is unsettled, the Court analyzes both potential tests.  Under the *Hearn* test, at-issue waiver requires: "(1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to [its] defense."  *Seneca*, 774 F.3d at 1276.  Thus, if a privilege holder takes an action making the privileged materials relevant, the court may then balance the need for disclosure and determine whether the material is vital to the opponent's case.

Under the more restrictive test, a litigant waives privilege "if, and only if, the litigant *directly* puts the attorney's advice at issue in the litigation."  *Seneca*, 774 F.3d at 1276 (emphasis added).  In *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994), the case cited by the Tenth Circuit for the restrictive test, the court explained that legal advice is not placed in issue "merely because it is relevant, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner."  32 F.3d at 863.  Instead, the advice of counsel is placed in issue "where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication."  *Id.*  The Third Circuit cautioned that *Hearn* and similar cases rest merely on a conclusion that the "information sought is relevant and should be disclosed" and fail to create a predictable standard for litigants.  *Id.* at 863-65 (explaining that courts should "work to apply the privilege in ways that are predictable and certain" and avoid finding waiving simply because "a client's state of mind is at issue").

The Court concludes Defendants waived privilege under either the more restrictive test described in *Rhone-Poulenc Rorer Inc.* or the more lenient *Hearn* test, because Defendants placed their counsel's advice directly at issue by relying on a "detailed legal analysis" of outside counsel

to prove their subjective good faith belief in the legality of their conduct. Assuming the Tenth Circuit would apply the more restrictive approach, Defendants' assertions and method of proof result in a waiver of privilege. First, Defendants pled an affirmative good-faith defense premised entirely on their subjective belief in the "legality" of their conduct. Second, they seek to prove their subjective good-faith defense by reliance on a "detailed legal analysis" of whether a lease was required for the Project, and they cite to the Slade Memo. The Slade Memo presents a legal analysis and conclusion of outside counsel of whether the excavation required a lease, which was sent to BIA before suit. The FAPL reveals that the "detailed legal analysis" in the Slade Memo was: (1) solicited by clients, see OSAGE WIND PRIV 112-113 (email dated 10/16/14 seeking legal advice regarding letter from BIA concerning construction pending further information on permit); (2) described as advice of counsel, OSAGE WIND PRIV 48-53 (describing draft of Slade Memo as "containing advice of counsel regarding rights of surface owners" in Osage County); and (3) the subject of communications with clients, OSAGE WIND PRIV 5906-5912 (describing "[c]ounsel's advice to clients regarding call with Alan Woodcock regarding whether permit or mineral lease is required," dated 10/17/14).

Defendants seek to establish their subjective good faith in the legality of their conduct by presenting a "detailed legal analysis," *i.e.*, the legal advice, of their outside counsel. Defendants' litigation conduct of relying on the legal analysis in the Slade Memo to prove their subjective good-faith belief is akin to reliance on an "advice of counsel" defense, which is a quintessential type of "at issue" waiver. Defendants are not proving their subjective good-faith belief in the legality of their conduct with an internal business analysis or other non-legal advice; they are proving their subjective good faith with their lawyers' analysis of whether a lease was required for the Project. The analysis is offered to support a subjective good-faith belief in legality of conduct, meaning it was necessarily communicated to the client. This results in at-issue waiver for

privileged advice on the same subject matter, to avoid selective use of otherwise privileged legal advice. *See Seneca*, 774 F.3d at 1277-78 (finding privilege waived where corporate officers "generally did not rely on their own reasons for settling with Route 66 for $1 million" but instead "chose to rely on 'advice of counsel' to justify the reasonableness of the settlement"); *Rhone-Poulenc Rorer Inc.*, 32 F.3d at 863 (explaining that, "[i]n an action for patent infringement, where a party is accused of acting willfully, and where that party asserts as an essential element of its defense that it relied upon the advice of counsel, the party waives the privilege regarding communications pertaining to that advice"); *United States v. Copar Pumice Co., Inc.*, No. CV 09-1201 JAP/KBM, 2012 WL 12903727, at *5 (D.N.M. June 18, 2012) (affirming magistrate judge's conclusion that Defendants "placed the privileged materials directly at issue by asserting that their actions were legal under the federal mining laws and that they acted in good faith based" on this legal advice) (reaching same conclusion under *Hearn* test or more restrictive test requiring reliance). *Cf. Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1552 (10th Cir. 1995) (finding no waiver where defendant "did not attempt to justify its termination of [plaintiff] on the basis of advice of counsel" but instead "defended its decision, which was part of a company-wide reduction in force, based on a lack of sufficient work to justify the position [plaintiff] held"); *Cudd Pressure Control, Inc. v. New Hampshire Ins. Co.*, 297 F.R.D. 495, 499 (W.D. Okla. 2014) (finding no waiver where Defendants took no affirmative step in litigation that would make the substance of its attorney's privileged opinion letter relevant to the case).

Defendants argue privilege was not waived because: (1) they did not expressly plead an "advice of counsel" defense; and (2) they are not relying on any *privileged* advice, because the Slade Memo was sent to the BIA prior to litigation. These arguments are unavailing under the specific facts presented. First, the Court sees no meaningful difference between asserting an "advice of counsel" defense, which is consistently found to waive privilege, and asserting a

"subjective good-faith belief in the legality of conduct based on a lawyers' detailed legal analysis" defense.  Defendants support their subjective good-faith defense with "a detailed legal analysis" by their hired lawyers, and the FAPL describes the Slade Memo as "advice of counsel."  In short, the Court agrees with Plaintiffs that Defendants' protests of any reliance on advice of counsel to prove their subjective good faith belief in the legality of their conduct are belied by the realities of their litigation position.  *See* ECF No. 194 at 6 (describing Defendants' argument they are not relying on advice of counsel as a "red herring"); ECF No. 190 at 6 (describing Defendants' denial of reliance on advice of counsel as "linguistic gymnastics").

Second, Defendants cannot avoid waiver by exclusive reliance on the non-privileged Slade Memo.  Defendants have injected the "detailed legal analysis," as a whole, into the litigation for the factfinder's consideration by relying on the attorneys' conclusions and analysis to prove an innocent state of mind.  Some of the legal advice injected into the lawsuit was voluntarily disclosed in the form of the Slade Memo before litigation, but some remains shielded by privilege.  Naturally, Defendants are willing to exclusively rely on the polished-up version of its "detailed legal analysis" in the form they chose to reveal, just as if Defendants' executives took the stand and testified as to the legal advice in their chosen form or testified that they relied on a legal analysis by counsel without explaining the advice at all.  This results in a selective disclosure of otherwise privileged legal advice.  If no waiver is found, Defendants will assert they formed a subjective, good-faith belief their conduct was legal based on the "detailed legal analysis" of their outside counsel (*see* Slade Memo), while depriving Plaintiffs of the opportunity to explore the totality of that "detailed legal analysis," when it was received, and the clients' communications with counsel regarding that advice (*see* withheld drafts and communications leading to Slade Memo and other prior legal advice regarding whether a lease was required).  Defendants' defenses and methods of

proof are the type of acts that expose otherwise privileged materials on the same subject.[7]  Another

result would work an end-run around the underlying purposes of the waiver doctrine.

The *Hearn* test was applied by the Tenth Circuit in *Seneca*, represents Oklahoma law, and

has been repeatedly followed in the Northern District of Oklahoma.  *See, e.g., Lindley v. Life Inv'rs*

*Ins. Co. of Am.*, 267 F.R.D. 382, 393 (N.D. Okla. 2010); *Cardtoons, L.C. v. Major League Baseball*

*Players Association*, 199 F.R.D. 677, 681 (N.D. Okla. 2001).  Application of the more lenient

*Hearn* test even more clearly results in waiver.  For the same reasons explained in more detail

above, the Court finds: (1) assertion of the privilege was the result of Defendants' asserting a good-

faith affirmative defense premised on the "legality" of their actions; (2) Defendants placed the

protected information at issue by making it relevant to the case; and (3) application of the privilege

would deny Plaintiffs access to privileged materials that are "vital" to countering a good-faith

defense premised on a detailed legal analysis by outside opinion counsel.  Prior versions of the

"detailed legal analysis" in the Slade Memo, communications regarding the Slade Memo, timing

of the Slade Memo, and prior advice on the same subject matter are all "vital" to a central issue in

the case – namely, whether Defendants can prove their subjective good-faith belief in the legality

of proceeding with the Project without a lease because they believed in the correctness of opinion

counsel's detailed legal analysis, as set forth in the Slade Memo.  The *Hearn* test even more clearly

supports a finding of waiver, because it focuses exclusively on whether Defendants pled a good-

faith affirmative defense, and whether the privileged materials are vital to Plaintiffs' ability to

meaningfully counter the assertion.

---

[7] Reliance on advice of counsel can waive privilege under federal common law even "where no disclosure has been made."  *See* Fed. R. Evid. 502(a) advisory committee's note (explaining that Rule 502(a) "governs only certain waivers *by disclosure*" and does not intend to displace or modify federal common law concerning waiver based on reliance of advice of counsel, which can apply even "where no disclosure has been made").

The Court has considered the principal cases relied upon by Defendants in briefs and during the hearing.  They are distinguishable and help illustrate why "at issue" waiver occurred here.  In *John Doe Co. v. United States*, 350 F.3d 299, 300-01 (2d Cir. 2003), the United States had issued a grand jury subpoena for privileged notes underlying a 46-page position letter sent by the target's counsel to the U.S. Attorney during a grand-jury investigation.  The district court granted the motion based on "at issue" waiver.  *Id.* at 302-03.  The circuit court reversed, reasoning that the present case was "completely lacking that element of unfairness," because "the U.S. Attorney's office in its sole discretion decides what evidence will be placed before the grand jury."  *Id.* at 303.  "Doe's letter, in which it made claims about the advice it had received from ATF and about its innocent state of mind, was delivered only to the U.S. Attorney" and "was not seen by the grand jury, much less by a petit jury or court adjudicating Doe's claims of innocent state of mind."  *Id.* at 303-04.  Under these factual circumstances, the court found it "impossible to see how the U.S. Attorney is subjected to any unfairness as the result of its own receipt of the Letter."  *Id.*  The *John Doe* case is distinguishable based on the stage of litigation.  Here, Defendants seek to use advice of counsel disclosed in a pre-suit memo for a purpose other than avoiding litigation or assuaging the BIA.  They now seek to use it to persuade a court they acted in good faith when they proceeded with the Project without a lease.  This creates the element of unfairness that was lacking in *John Doe*.

In *Cardtoons, L.C. v. Major League Baseball Players Association*, 199 F.R.D. 677, 682 (N.D. Okla. 2001), the court correctly held that a defendant's assertion that it acted in good faith when it sent cease-and-desist letters did not, standing alone, waive privilege as to an underlying legal memorandum supporting the client's letters.  When the adversary sought to compel the legal memorandum, the client had merely responded to questions in a deposition from defendant's counsel about the client's reliance on the memo.  The court found those actions insufficient to

conclude defendants had taken any affirmative acts to place the attorney advice at issue. *Id.* at 683. The court cautioned that, if the *defendants* asked the client at trial whether she acted in accordance with legal advice when sending the cease-and-desist letters, defendants would waive the privilege. *Id.* Here, Defendants have crossed that barrier by asserting they acted in good faith based on the legality of their conduct based on a "detailed legal analysis" of outside counsel.

*AIU Insurance Company v. Tig Insurance Company*, No. 07-752, 2008 WL 5062030, Nov. 25, 2008 (S.D.N.Y. 2008), raised during the hearing, also supports a finding of at-issue waiver. In stating the law, the court explained that the "contents of an attorney-client communication are most frequently found to be at issue when a party asserts an advice-of-counsel argument in support of a claim or defense." *Id.* at *5. The court cited a case explaining that waiver commonly occurs when a defendant asserts an advice-of-counsel defense or good-faith defense which places in issue whether his attorney made him aware his acts were illegal or otherwise improper. *Id.* at *5. In that case, unlike here, the privilege-holder did not intend to use any advice of counsel to prove a breach of contract claim and had not asserted "a good faith or advice-of-counsel defense." *Id.* at *15.

In sum, considering the Tenth Circuit's possible tests and case law cited by the parties, Plaintiffs have shown that Defendants waived privilege for certain challenged documents by placing their attorneys' legal advice directly at issue in the litigation and relying on it to prove an affirmative good-faith defense.

### D. Scope of Waiver Extends to Challenged Entries On Subject Matter of "Detailed Legal Analysis" of Whether Mining Lease/Permit Was Required for the Project

The scope of an at-issue waiver premised on reliance on legal advice generally extends to privileged materials on the same subject matter as the advice. *See Seneca*, 774 F.3d at 1278 (finding privilege waived as to privileged correspondence regarding legal advice party relied on

for settling a lawsuit); *Copar Pumice Co., Inc.*, 2012 WL 12898786, at *4 (holding that assertion of advice of counsel defense waived the attorney-client privilege concerning "all legal advice provided to the defendants regarding the legality of the mining, transportation, processing, marketing, trade, gift or sale of pumice").[8]

The Court finds the waiver extends to challenged entries concerning the limited subject matter of the "at issue" detailed legal analysis and advice relied on by Defendants - namely, analysis and advice regarding whether excavation for the Project constitutes mining and therefore required a lease or permit under the relevant regulations.  This includes drafts of the Slade Memo, communications regarding the Slade Memo, and prior advice and communications on the same subject matter dating back to 2013.  The Court's ruling applies to entries on this specific subject matter, regardless of whether Defendants have asserted attorney-client privilege, work-product privilege, or both.[9]   This ruling results in a limited subject matter waiver of privileged materials during the one-year period preceding the litigation.  The scope of the waiver does not extend to all privileged entries that may be relevant to subjective good faith; the waiver extends to the legal analysis and advice placed at issue.

---

[8] According to the Tenth Circuit, at-issue waivers based on reliance of advice of counsel may extend to both attorney-client communications and work-product directly placed at issue by the privilege holder.  *See Seneca*, 774 F.3d at 1278.  *See also Feld v. Fireman's Fund Ins. Co.*, 991 F. Supp. 2d 242, 255 (D.D.C. 2013) (finding both "attorney-client privilege and the attorney work-product privilege" waived with respect to two key subjects placed at issue by indemnity suit).  As in *Seneca*, the parties have not made meaningful distinctions between the privileges for purposes of at-issue waiver.

[9] This is consistent with the general approach of Federal Rule of Evidence 502(a), which extends waiver, if certain requirements are met, to attorney-client communications and work product placed at issue by a litigant.  *See* Fed. R. Evid. 502(a).

**E.      Some Challenged Entries Clearly Fall Under Court's Defined Subject Matter Waiver Based on Their Dates/Descriptions**[10]

The Court has reviewed the dates and subject matter descriptions in the FAPL and finds that the following entries **are included** within the subject matter waiver explained above.  For these documents, the Court does not require *in-camera* examination or further review.

1.    Drafts of the Slade Memo and communications related to subject matter of Slade Memo in August-November of 2014: OSAGE WIND PRIV 48-53; 59-65; 78-81; 82-84; 5906-5912; 90-91; 92-93; 94-95; 112-113; 114-115; 122-123; 128-144; 145-149; 150-153; 157-164; 165-167; 222-229; 214-221; 230-355; 427-432; 613-614; 586-590; 423-426; 598-602; 697; 437-452; 613-614; 586-590; 423-426; 697; 437-452; 613-614; 586-590; 423-426; 598-602; 591-597; 461-462; 668-671; 366; 394-399; 380-381; 606-607; 603-605; 617-631; 632-649; 356; 400-410; 657-660; 650-656; 608-609; 610-612; 681; 460; 698-700.

2.    Earlier materials related to use of soil at Project site and whether mining lease/permit was required under federal regulations: OSAGE WIND PRIV 45-47; 214-221; 421-422; 672-673; 615-616; 679-680; 362; 411-420; 357-361; 576-584.

The Court finds the remaining entries on the FAPL present a closer question and require *in-camera* examination to determine: (1) whether they are covered by the subject-matter waiver outlined above; or, alternatively, if they are not covered by the waiver, (2) whether they constitute privileged materials entitled to an attorney-client or work-product privilege in the first instance. Defendants are ordered to produce the remaining challenged entries for *in-camera* review, unless Defendants can make a good-faith determination that entries are covered by the Court's waiver or the parties reach another agreement.  The parties may not file further briefs on either issue, unless

---

[10] As explained above, the Court assumes without deciding Defendants could prove these entries qualify as privileged.

permitted by the Court.  The documents shall be submitted in a three-ring binder in the order they are listed on the FAPL.  Following *in-camera* examination of the remaining documents, the Court will enter one order regarding production of all challenged entries and setting one deadline for compliance.  Any production compelled by this Order is stayed pending a final ruling as to all challenged entries.

### III.    OMC's Motion to Compel Discovery from EGPNA and Enel Kansas (ECF No. 183)

OMC raises issues related to the discovery compliance of Defendants EGPNA and Enel Kansas.  In their motion, OMC requests that the Court: (1) overrule any objection of Enel Kansas and EGPNA based on their lack of liability or "corporate separateness" from Osage Wind; (2) compel production of documents related to these Defendants' good faith and the decision-making process, rather than merely related to "excavation"; (3) require Defendants to prepare individual privilege logs; and (4) compel production of global financial information of Enel Kansas, EGPNA, and TradeWind Energy for 2014-2019, which were withheld on grounds of relevance.

The first two issues are no longer disputed, at least for purpose of discovery.  Originally, Enel Kansas and EGPNA objected to producing documents on the basis that "EGPNA is not liable for any alleged acts or wrongs of Osage Wind, LLC, of which it is a manager" and that Plaintiffs had failed to plead any claim to "pierce the corporate veil."  ECF No. 183-3 at 101-02 & 79.  But in their response brief and during the hearing, Enel Kansas and EGPNA represented to the Court that they did not withhold documents based on this objection.  ECF No. 189 at 10-11 (response brief); *see also* ECF No. 198 at 67 (hearing argument).  Instead, Beauregard explained that EGPNA legal department coordinated production efforts by identifying all persons most likely to have responsive documents, "without regard to whether the persons are employed formally by EGPNA or Osage Wind (as noted above, Enel Kansas has no separate employees)."  Second Declaration of Beauregard, ECF No. 189-2 ¶ 12.  During the hearing, Slade further represented that Enel

Kansas and EGPNA did not limit their production to excavation or operations but also searched for and identified documents related to their good-faith knowledge and decision-making process, although all such documents were withheld on the basis of privilege.  ECF No. 198 at 75-76.  For clarity in the record, the Court overrules Enel Kansas and EGPNA's "corporate separateness" objection to discovery and compels them to search for and produce responsive documents.  For clarity in the record, the Court compels these Defendants to produce information relevant to the decision-making process, rather than merely operations.  If any documents have been withheld on "corporate separateness" grounds, they shall be produced.

OMC also objects to Defendants' submission of a joint privilege log.  Generally, Federal Rule of Civil Procedure 26(b)(5)(A) requires a "party" to create the privilege log for that party's privileged documents.  Beauregard explained that the EGPNA legal department coordinated production efforts of all parties by identifying all persons most likely to have responsive documents from all Defendants.  All counsel were employed as a common legal team, under the management of EGPNA legal department, and all privileged communications were logged in a single privilege log.  Based on this description of how documents were gathered, kept, and produced, and that all personnel involved in development of the Project functioned as a unit, the Court will permit the joint privilege log at this time.  In the event the Court needs to rule on a privilege issue, and the joint nature of the privilege log makes a ruling difficult, the Court will consider whether further information and description is necessary for a particular entry.[11]

Finally, with respect to financial information of Defendants Enel Kansas, EGPNA, and TradeWind withheld on grounds of relevance, the Court inquired during the hearing whether OMC

---

[11] Defendants refused to concede their "corporate separateness" defense, except for purposes of discovery.  ECF No. 198 at 74-75.  While the Court need not reach this issue to resolve discovery issues, Defendants' description of the team nature of the Project, the method of document production, and the submission of a joint privilege log would not seem to support Defendants' position of "corporate separateness."

still needed a ruling on that issue.  OMC responded that "we will seek an order from the court saying that that's not a legitimate basis to withhold responsive documents so that when we get to depositions or trial and we're having to litigate these issues that Mr. Slade has said, we actually have discovery and have, you know, witnesses that we can talk to and we can actually defend against those affirmative defenses that they plan to raise."  ECF No. 198 at 2.  The Court emphasizes that Defendants may not raise any "corporate separateness" objection to discovery.  If Defendants determine they have a further need for global financial information of Defendants or TradeWind to defend against the "corporate separateness" defense or other reasons, they may renew their motion to compel.

## IV.     Osage Wind's Motion to Compel Against the United States (ECF No. 177)

Osage Wind seeks to compel the United States to respond to three interrogatories (Interrogatories 5, 6, and 7) and three requests for production (Requests for Production 4, 5, and 6) regarding communications between and among the United States and OMC and/or the Osage Nation related to the Project.  *See* ECF No. 187-1.  Osage Wind argues the challenged requests are relevant to: (1) the United States' requested potential remedies of injunction/ejectment, and (2) Osage Wind's affirmative defenses of waiver, estoppel, and laches.  Osage Wind further argues that the United States waived its relevance objections by failing to raise them in a timely manner, and that the United States failed to engage in good-faith discussions attempting to narrow the scope of the requests.  The United States responds that the challenged requests are irrelevant, as the Tenth Circuit has already determined Osage Wind is liable for engaging in unpermitted mining and the United States' knowledge of Osage Wind's activities is not relevant to their requested remedies. The United States further responds that the challenged requests are facially overbroad and unduly burdensome, and that it has not waived any relevance objections.

In his recent order ruling on OMC's motion for judgment on the pleadings, the district judge precluded Osage Wind from asserting its affirmative defenses of estoppel, laches, waiver, unclean hands, and *in pari delicto*.  ECF No. 207.  Regarding the affirmative defenses of laches and unreasonable delay, the district judge found they were precluded based on law of the case doctrine.  *Id.* at 4-5, 8 n.4.  Regarding the state-law affirmative defenses of estoppel, waiver, unclean hands, and *in pari delicto*, the district judge explained that, "[p]ermitting third-parties to avoid the[ir] stringent leasing requirements by pointing to the *Nation's own conduct* would frustrate federal Indian land policy." *Id.* at 8 (emphasis added) (citing *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 967-68 (10th Cir. 2019)).  The district judge further found that Osage Wind's state-law affirmative defenses may not apply to bar or limit the available remedies, noting that the Tenth Circuit has endorsed a uniform federal standard for determining whether a permanent injunction is an appropriate remedy, when trespass involving Indian lands is at issue. *Id.* at 8-9 (citing *Davilla*, 913 F.3d at 972-73).  The district court further indicated that "incorporation of state law remedies would frustrate federal Indian policy." *Id.* at 8.

In light of the district judge's preclusion of equitable defenses, the only remaining question presented by the United States' motion to compel is whether the requested discovery is relevant to the potential remedies of ejectment of, and a permanent injunction against, the existence and operation of the Project.  Osage Wind argues the requested discovery remains relevant to the overall "balancing of equities" under the *Davilla* test.  Osage Wind also argues that the district judge might apply the Restatement (Second) of Torts § 936 in its analysis, which would render the requests relevant.

The Court concludes that the requested discovery of the United States and OMC's communications is not relevant to the remaining issues.  The district judge indicated his intent to apply the *Davilla* test to Plaintiffs' claims for permanent injunction and ejectment.  Under that test,

in order for the court to grant an injunction requiring removal of property from federally protected Native American land interests, a district court must engage in "a full weighing of the equities." *Davilla*, 913 F.3d at 971. *Davilla* articulated three factors for a district court to consider in deciding whether to permanently enjoin a continuing trespass on tribal land: (1) whether an injunction is necessary to prevent "irreparable harm," (2) whether "the threatened injury outweighs the harm that the injunction may cause" to the enjoined party, and (3) whether the injunction would "adversely affect the public interest." *Id.* at 973 (quotation omitted). *See also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (explaining that, among other factors, a court must "consider[] the balance of hardships between the plaintiff and defendant, [in order to determine that] a remedy in equity is warranted"); *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 976 (N.D. Iowa 2006) (explaining that "the balance of harm analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public.").

The "balancing of equities" under *Davilla* does not include any backward-looking considerations of past conduct or knowledge. Rather, the *Davilla* test focuses on the present balance of harms to the parties and the public. Given this standard, the requested discovery into communications involving the United States and OMC is not relevant to potential injunctive relief. The requested communications relate to the United States' and OMC's past knowledge (or lack thereof) regarding Osage Wind's activities prior to the litigation and the theory of harm the United States and OMC may have espoused prior to this litigation. Osage Wind does not attempt to link their discovery requests to any present equitable concerns related to the balance of harms from granting or denying an injunction, and the Court can identify no relevant concerns at this stage of litigation.

Osage Wind also argues there remains a possibility the district judge will consider the Restatement (Second) Of Torts § 936(1) governing the appropriateness of the remedy of injunction against a tort, which includes factors of unreasonable delay in bringing suit and related misconduct on the part of the plaintiff.  *See* ECF No. 209 n.2.  The Court also rejects this relevance argument. The district judge endorsed *Davilla* for the proposition that federal law governs matters of remedy even where state law governs matters of right, such as where a trespass occurred.  ECF No. 207 at 8.  In applying federal law, he expressly declined to apply the equitable factors in § 936 to determine the appropriateness of an injunction against trespass.  *Id.* at 8-9.  Applying *Davilla*, he reasoned that any equitable considerations premised on the delay or misconduct of the Osage Nation would frustrate federal Indian land policy.  *See Davilla*, 913 F.3d at 967-68 (declining to incorporate state trespass law where doing so would "frustrate federal Indian land policy" by "effectively robbing Indian allottees and the government of meaningful control over alienation"). Regardless of what test the district judge applies, he indicated that delay or misconduct of the Osage Nation**,** including the United States as trustee for the Osage minerals estate**,** will play no role in the equitable analysis.  Based on *Davilla* and the January 11 order, the requested discovery items are not relevant to remaining issues in the case.[12]

Finally, the Court finds that Osage Wind's argument that the United States waived any relevance objection by failing to raise them in a timely manner (*see* ECF No. 177 at 19-21) is moot. The district judge's order, which narrowed the scope of relevance, was filed only on January 11, 2021.  The United States did not have an opportunity to object to the relevance of the requested communications based on this recent order until this week.  In that vein, the United States filed a Notice on January 13, 2021, contending that Osage Wind's Motion to Compel was moot in light

---

[12] Because the requests are not relevant, the Court does not reach the overbreadth and burden objections.

of the January 11 order precluding five of Osage Wind's affirmative defenses. *See* ECF No. 208. While the Court does not find that Osage Wind's Motion to Compel is moot, the Court does find that any waiver arguments contained within Osage Wind's motion are moot.

## V.      Defendants' Motion to Compel Against OMC (ECF No. 179)

The only remaining issue presented by Defendants' Motion to Compel against OMC is whether to compel two documents withheld by OMC on grounds of relevance and executive privilege.[13]  These two challenged documents are set forth on Intervenor-Plaintiff's Privilege Log, which was submitted to the Court following the hearing.  They consist of an email from Osage Nation Executive Director of Government Affairs to OMC, dated April 19, 2011, and an email from Osage Nation Tribal Historic Preservation Officer to Osage Nation Executive Director of Government Affairs, dated September 7, 2011.

For reasons explained above in Part IV regarding the elimination of Defendants' equitable defenses and lack of relevance to any remaining issues in the case, the Court finds these communications from 2011 are also not relevant.  Due to the lack of relevance, the Court does not reach the issue of whether the communications are protected by an executive privilege created by the Osage Nation Code.  Although Defendants contend executive privilege issues are also likely to arise in relation to testimonial evidence, the Court will address that issue if and when presented by a motion expressly directed to testimonial evidence.

## VI.     Conclusion

The Court Orders as follows:

1. Defendant Osage Wind, L.L.C.'s First Motion to Compel against the United States (ECF No. 177) is DENIED.

---

[13] The Court resolved the issues related to Defendants' motion to compel OMC's financial disclosures during the hearing.

2. Defendants' First Motion to Compel against the Osage Minerals Council (ECF No. 179) is DENIED.

3. United States' Motion to Compel Discovery (ECF No. 175) is GRANTED in part and HELD IN ABEYANCE in part pending *in camera* review of documents.

4. Intervenor Plaintiff Osage Minerals Council's Motion to Compel Production of Documents (ECF No. 183) is GRANTED in part, DENIED in part, and HELD IN ABEYANCE in part pending *in camera* review of documents.

5. Documents shall be submitted no later than Monday, January 25, 2021.

6. The Court STAYS production of the documents compelled by this Order.  The Court will issue a second order ruling on remaining privilege issues that sets a deadline for production.  The time for objecting to this Opinion and Order is TOLLED pending this Court's final ruling on the remaining withheld documents.

**SO ORDERED** this 16th day of January, 2021.

**JODI F. JAYNE, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**