# EXHIBIT I

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                       NORTHERNDISTRICT OF OKLAHOMA
 2

 3   UNITED STATES OF AMERICA,

 4        Plaintiff,

 5   and

 6   OSAGE MINERALS COUNCIL,

 7        Intervenor-Plaintiff,

 8   vs.                            Case No. 14-CV-704-GFK-JFJ

 9   OSAGE WIND, LLC;
     ENEL KANSAS, LLC; and
10   ENEL GREEN POWER NORTH
     AMERICA, INC.,
11
          Defendants.
12

13          VIDEO ZOOM DEPOSITION OF JOHN H. PFAHL
                TAKEN ON BEHALF OF THE PLAINTIFF
14         ON MARCH 10, 2021, BEGINNING AT 10:01 A.M.
                       IN TULSA, OKLAHOMA
15

16

17                         APPEARANCES

18   On behalf of the PLAINTIFF:

19   Cathryn D. McClanahan
     Assistant United States Attorneys
20   UNITED STATES ATTORNEY'S OFFICE
     Northern District of Oklahoma
21   110 W. 7th St., Suite 300
     Tulsa, OK   74119
22   (918) 382-2700
     cathy.mcclanahan@usdoj.gov
23
     Christina Watson, Paralegal
24   Michelle Hammock, Paralegal

25   REPORTED BY:   SUSAN K. McGUIRE, CSR, RPR
```

Page 2

Of counsel for the Plaintiff:

Charles R. Babst, Jr.
Senior Attorney
Tulsa Field Solicitor's Office
U.S. Department of the Interior
7096 East 33rd Street
Tulsa, OK  74145
(918) 669-7902

On behalf of the DEFENDANTS:

Ryan A. Ray
NORMAN, WOHLGEMUTH, CHANDLER
JETER, BARNETT & RAY, P.C.
401 S. Boston Ave.
2900 Mid-Continent Tower
Tulsa, OK  74103
(918) 583-7571
rar@nwcjlaw.com

Sarah M. Stevenson
Dominic A. Martinez
MODRALL, SPERLING, ROEHL,
HARRIS & SISK, P.A.
500 Fourth St. NW, Suite 1000
Albuquerque, New Mexico 87103
(505) 848-1800
sarah.stevenson@modrall.com
dam@modrall.com

On behalf of the INTERVENOR-PLAINTIFF:

Mary Kathryn Nagle
Wilson K. Pipestem
Jennifer Baker
PIPESTEM & NAGLE, P.C.
401 S. Boston Ave., Suite 2200
Tulsa, OK  74103
(918) 936-4705
mknagle@pipestemlaw.com
wkpipestem@pipestemlaw.com
jbaker@pipestemlaw.com

Megan Beauregard
Associate General Counsel
Enel Green Power North America

ALSO PRESENT:  Gabe Pack, Videographer

Page 3

CONTENTS

|  | Page |
|---|---|
| DIRECT EXAMINATION BY MS. McCLANAHAN | 5 |
| CROSS EXAMINATION BY MS. NAGLE | 129 |

EXHIBITS

| Exhibit | | Page |
|---|---|---|
| 1 | SRK Consulting Report | 12 |
| 2 | 2011 RMT Report | 25 |
| 3 | Tribal Resolution | 28 |
| 4 | Westlaw 25 CFR 214.10 | 32 |
| 5 | Osage Wind 12246 Purchase Order | 39 |
| 6 | Change Order | 59 |
| 7 | Tenth Circuit Opinion | 60 |
| 8 | Email 5-15-14 | 156 |
| 9 | Article | 202 |
| 10 | Geological Survey | 211 |

STIPULATIONS

It is stipulated that the deposition of JOHN H. PFAHL may be taken on MARCH 10, 2021, pursuant to agreement and in accordance with the Federal Rules of Civil Procedure before Susan K. McGuire, CSR, RPR.

Page 4

1  VIDEOGRAPHER:  This is a videotaped
2  deposition of John Pfahl, in the matter of the United
3  States and Osage Minerals Council versus Osage Wind,
4  on March 10th, 2021.  We are on the record at 10:01
5  a.m.
6      Will Counsel please state your appearances
7  for the record.
8      MS. McCLANAHAN:  I'll start.  I'm Cathy
9  McClanahan for the United States.  I have Charles
10 Babst here, as well, of counsel.  He's with the
11 Department of Interior.
12     MS. NAGLE:  Mary Kathryn Nagle for the Osage
13 Minerals Council, Intervenor-Plaintiff.  With me I
14 also have my partner, Wilson Pipestem, from Pipestem
15 Law, as well as Jennifer Baker from Pipestem Law.
16     MR. RAY:  Good morning.  Ryan Ray for all
17 defendants, Osage Wind, LLC; Enel Green Power, North
18 America, Incorporated; and Enel Kansas, LLC.
19     THE COURT REPORTER:  Mr. Pfahl --
20     MS. STEVENSON:  This is Sarah Stevenson, I'm
21 also here for defendants, along with my colleague,
22 Dominic Martinez.
23     VIDEOGRAPHER:  The court reporter will now
24 swear in the witness.
25          * * * * * *

Page 5

WHEREUPON,

JOHN H. PFAHL

after having been first duly sworn, deposes and says in reply to the questions propounded as follows, to-wit:

DIRECT EXAMINATION
BY MS. McCLANAHAN:

Q.  All right.  I'll ask the witness to state his name and spell it for the court reporter.

A.  Sure.  My name is John Holland Pfahl. That's J-O-H-N, H-O-L-L-A-N-D, P-F-A-H-L.

THE COURT REPORTER:  I need him to speak up.

Q.  (BY MS. McCLANAHAN)  And if you could possibly either turn your microphone up, or you speak up.  It's just a little difficult for us to hear when you are talking.

A.  Yeah.  Give me one second.  I -- we're using the conference room audio system, so I've got to go over there to turn the settings on the microphone.

Q.  Okay.  Okay.  Sure.

VIDEOGRAPHER:  Do you want to take a break?

MS. McCLANAHAN:  No.

VIDEOGRAPHER:  Okay.

THE WITNESS:  Okay.  It looks like the microphone in the room is maxed out, so I'll just try

Page 26

1  A.  Yes, that is correct.
2  Q.  And you think that's a fair estimate of the
3  density of limestone in this area, generally; is that
4  correct?
5  A.  Yes, I do.
6  Q.  Does density have anything to do with the
7  decision to blast or not blast in order to excavate?
8  A.  No, it does not.
9  Q.  To convert 63,180 cubic yards to tons, you
10 first multiplied 155 pounds per cubic foot by 27; is
11 that right?
12 A.  No.  You would have divided it by 27.  Or,
13 sorry, pounds per -- sorry.  So, you first divide
14 it -- I would have to actually write this out, this
15 equation, to go from a pounds per cubic foot to tons
16 per cubic yard.  My apologies there.  If you'd like, I
17 can think about it for a second and give you the full
18 way of approaching it.
19 Q.  Okay.  So, did you conclude that there were
20 264,000 -- or, I'm sorry, 264 million pounds of
21 limestone?
22 A.  I don't have the value or the volume --
23 sorry, the mass in pounds.  I have it in tons.  So I
24 converted the 155 pounds per cubic feet to 2.1 tons
25 per cubic yard, and applying that against the 63,180

Page 27

1  cubic yards, came up with a paid value of 132,678 tons
2  of limestone.
3  Q.  Okay.  Okay.  I think -- we both got there.
4  My 264 million were divided then by 2,000 to get to
5  tons, and that's the same answer that you have,
6  132,678 tons; correct?
7  A.  Yeah, I'll have to take your word on that.
8  Again, I don't have the calculation and all the
9  interim steps in front of me, but if we're getting to
10 the same point, that sounds like the right answer.
11 Q.  Okay.  And it's your opinion that the total
12 value of the 132,678 tons of limestone that was
13 excavated would be $68,993.  And I'm excluding
14 interest right now.
15 A.  So, yes, $68,993, valued at the time that it
16 was mined.
17 Q.  And you base this value off the royalty rate
18 that's contained in a limestone lease to APAC Central
19 Quarry; is that right?
20 A.  That's right.  I checked the leases on a
21 couple of the quarries on the OMC's mineral estate,
22 and they were consistent with that value.  So that was
23 the value at the time for limestone being mined within
24 the county based on those leases.
25 Q.  Okay.  I think attached to your report as

Page 28

1  Exhibit 21 is a tribal resolution regarding the APAC
2  lease.  I'm going to ask that that be marked and
3  entered as Exhibit -- Plaintiff's Exhibit 3 here.
4      Do you have that document in front of you?
5  A.  Exhibit 21?
6  Q.  It's attached to your report as Exhibit 21,
7  yes.
8  A.  Yes, I do have it.
9  Q.  And is this one of the documents you relied
10 upon to establish that .50 cents per ton of limestone
11 in 2012?
12 A.  Yes, that is correct.
13 Q.  Okay.  So given that the limestone in
14 question that we're talking about in this case was
15 excavated in 2014, it's your opinion that the value of
16 the limestone that was taken by Osage Wind from the
17 estate during construction was .52 cents a ton; is
18 that correct?
19      MR. RAY:  Object to the form.  You can
20 answer.
21      THE WITNESS:  Yeah, that is correct.  So the
22 royalties were escalated at that time.  Again, I
23 looked at other leases as well, and they had a .1 cent
24 per year escalation.  So the .50 cents in 2012
25 escalated to .52 cents in 2014.

Page 29

1  Q.  (BY MS. McCLANAHAN)  So, in this regard, you
2  believe that the value of a lease from the OMC, as
3  contemplated by the Tenth Circuit, would have been
4  $68,993, and, again, we're not talking about interest
5  right now; is that correct?
6      MR. RAY:  Object to the form.
7      THE WITNESS:  So, yeah.  My opinion, the
8  value of the mineral mined to the OMC would have been
9  $68,993 at the time.
10 Q.  (BY MS. McCLANAHAN)  Okay.  So limestone was
11 not the only mineral that was excavated during the
12 construction; is that right?
13 A.  That is correct.
14 Q.  Do you agree that other minerals were
15 excavated?
16 A.  I agree that other minerals were excavated.
17 Q.  Clay and shale were also excavated during
18 the construction; is that correct?
19 A.  Yes, that is correct.
20 Q.  And do you agree that clay and shale are
21 considered mineral resources?
22 A.  I do not believe that clay and shale meet
23 the definition of being mined.  It was outlaid by the
24 Tenth Circuit court.
25 Q.  Okay.  But that wasn't my question.  Do you

Page 34

1 copper, lead, zinc, coal, and asphaltum, the lessee
2 shall pay quarterly a royalty of 10 percent of the
3 value at the nearest shipping point of all ores,
4 metals, or minerals marketed.
5      Did I read that correctly?
6    A.  Yes, I believe so.
7    Q.  So could clay and shale be considered
8 minerals, other than gold, silver, copper, lead, zinc,
9 coal and asphaltum?
10   A.  Yes.
11      MR. RAY:  Object to the form.
12   Q.  (BY MS. McCLANAHAN)  Do you know if -- when
13 someone enters a lease with the Osage Minerals Council
14 to mine clay or shale from the mineral estate, do you
15 know whether or not this regulation applies?
16      MR. RAY:  Object to the form.
17      THE WITNESS:  I do not know how the OMC
18 takes into account this regulation when they set their
19 leases.  It's clear that they didn't follow it 100
20 percent, because the limestone leases that they set at
21 the time do not use the 10 percent royalty.  So I
22 don't know where else they diverge from this.
23   Q.  (BY MS. McCLANAHAN)  So we're -- again,
24 we're having a little bit of trouble understanding
25 you, if you could, maybe, put your hands down and just

Page 35

1 speak as loud as you can.
2      I believe the upshot of what you just said
3 was that you don't believe that they followed this
4 regulation?
5    A.  What I said is that it's -- the limestone
6 leases -- I'm sorry, I'm going to scoot over one
7 chair.
8    Q.  Okay.
9    A.  Just so that I'm closer to the microphone.
10 Maybe that will make a difference.
11   Q.  Okay.
12   A.  So what I just said is that the limestone
13 leases that I reviewed that I have formed the basis of
14 my .52 cents per ton to set the value of the limestone
15 were not a 10 percent of value type lease.  So I do
16 not know what else the OMC does that diverges or is
17 not consistent with this regulation.
18   Q.  Do you have any reason to disagree that
19 214.10(d) would apply if someone sought to mine clay
20 and shale from the mineral estate here?
21      MR. RAY:  Object to the form.
22      THE WITNESS:  As noted, the OMC did not
23 appear to follow it, so there probably was good reason
24 for that.
25   Q.  (BY MS. McCLANAHAN)  Do you think it would

Page 36

1 have been important for your opinion, in forming an
2 opinion in this case, to know whether or not this
3 regulation applies?
4      MR. RAY:  Object to the form.
5      THE WITNESS:  I think what is most important
6 is what the actual market rates were at the time, and
7 what was established.  Those seem to divert from this.
8 So, I defer to what was actually being done instead of
9 this regulation.  I'm sorry, just to --
10   Q.  (BY MS. McCLANAHAN)  And if I understand --
11 I'm sorry, go ahead.
12   A.  Is the SOUND any better now?
13   Q.  It's a little better.  Our --
14      MS. McCLANAHAN:  Let me just ask, are we
15 completely turned up so far as volume?
16      MS. HAMMOCK:  Yes.
17   Q.  (BY MS. McCLANAHAN)  Okay.  We're as far up
18 as we can get, so I appreciate you speaking loudly, I
19 guess.
20      So it's your opinion that clay and shale
21 that was excavated from the Osage mineral estate by
22 Osage Wind had no value because there was no
23 processing facility to make them valuable; is that
24 right?
25      MR. RAY:  Object to the form.

Page 37

1      THE WITNESS:  So the value of a mineral is
2 only when you can sell it.  And if they were able to
3 sell the clay or shale for other purposes, then it
4 could have had value.  But from the standpoint of a
5 material amount of volume, in my opinion there is not
6 a market for clay and shale that is extensive enough
7 to drive those as an important point of value.
8    Q.  (BY MS. McCLANAHAN)  But you understand, as
9 you read 214.10(d), that that regulation does not
10 value minerals according to whether there is nearby
11 demand or nearby processing; correct?
12      MR. RAY:  Object to the form.
13      THE WITNESS:  No, you're actually incorrect.
14 That regulation values minerals when they're sold.  If
15 there is no nearby processing, or there is no nearby
16 marketing and they are not sold, then they carry zero
17 value.
18   Q.  (BY MS. McCLANAHAN)  Well, you would agree
19 that the operative word, I guess, that we're both
20 looking at is the word "nearest"?
21   A.  No.  The operative word here is "market."
22 So the mineral is only worth what you can sell it for.
23 If you cannot sell that mineral, then it's worth zero.
24   Q.  Well, the regulation reads, For substances
25 other than, gold, silver, copper, lead, zinc, coal,