# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
    UNITED STATES OF AMERICA,
 3
             Plaintiff,
 4

 5  OSAGE MINERALS COUNCIL,

 6           Intervenor-Plaintiff

 7  vs.                No. 14-CV-704-GFK-JFJ

 8  OSAGE WIND, LLC; ENEL KANSAS, LLC; and ENEL GREEN POWER
    NORTH AMERICA, INC.,
 9
             Defendants.
10

11  _____
```

```
12          REMOTE VIDEO DEPOSITION OF EVERETT WALLER
              TAKEN ON BEHALF OF THE DEFENDANTS
13      ON AUGUST 5, 2021, BEGINNING AT 10:07 A.M.
                   TAKEN VIA ZOOM
14          REPORTED BY MIKE WASHKOWIAK, CCR

15                   APPEARANCES:

16  Via Zoom on behalf of the PLAINTIFF

17          Stuart Ashworth
            UNITED STATES ATTORNEY'S OFFICE
18          110 West 7th Street, Suite 300
            Tulsa, Oklahoma 74119
19          918-382-2700
            stuart.ashworth@usdoj.gov
20

21  Via Zoom on behalf of the INTERVENOR-PLAINTIFF

22          Wilson Pipestem
            PIPESTEM & NAGLE, P.C.
23          401 South Boston Avenue, Suite 2200
            Tulsa, Oklahoma 74103
24          918-936-4705
            wkpipestem@pipestemlaw.com
25
```

```
 1
    Via Zoom On behalf of the INTERVENOR-PLAINTIFF
 2
            Abi Fain
 3          PIPESTEM & NAGLE, P.C.
            401 South Boston Avenue, Suite 2200
 4          Tulsa, Oklahoma 74103
            918-936-4705
 5          afain@pipestemlaw.com

 6  Via Zoom on behalf of the DEFENDANTS

 7          Thomas J. McCormack
            NORTON ROSE FULBRIGHT
 8          1301 Avenue of the Americas
            New York, New York 10019
 9          212-318-3000
            thomas.mccormack@nortonrosefulbright.com
10
    Via Zoom on behalf of the DEFENDANTS
11
            Robert Kirby
12          NORTON ROSE FULBRIGHT
            1301 Avenue of the Americas
13          New York, New York 10019
            212-318-3000
14          robert.kirby@nortonrosefulbright.com

15
    Also present: (all via Zoom) Cathryn McClanahan, US
16  Attorney's Office; Charles Babst, US Attorney's Office;
    Michelle Hammock, Christina Watson
17
    Virtual Videographer: Gabe Pack
18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2                                                   Page

 3   Direct Examination by MR. McCORMACK                 5

 4

 5                            EXHIBITS

 6   Number     Description                        Page

 7   155        Testimony of OMC - Waller             21

 8   156        Interview with Chairman Waller        37

 9   157        news article from July 2014           40

10   158        OMC candidate interview, Waller       61

11   159        Constitution of the Osage Nation      99

12   160        First Amended Complaint              117

13   161        Osage Nation letter to Enel          146

14   162        Enel letter to Standing Bear,        159

15              Redcorn and Waller

16   163        OMC response letter to Enel          160

17   164        OMC minutes from November 2015       174

18   165        OMC minutes from August 2015         175

19

20                          STIPULATIONS

21        It is stipulated that the deposition of EVERETT

22   WALLER may be taken pursuant to agreement and in

23   accordance with the Federal Rules of Civil  Procedure on

24   AUGUST 5, 2021, before Mike Washkowiak, CCR.

25
```

1        Q     All right.  So is it fair to say that at least

2     in this article you're saying you don't have a generalized

3     opposition to alternate energy or anything of the fact; is

4     that fair?

5        A     And I don't.

6        Q     All right.  But what you say is the site is the

7     problem.  What do you mean by the site in this time frame

8     July of 2014?

9        A     If we had had consideration --

10             MR. PIPESTEM:  Objection.  I'm going to direct

11     the witness not to answer the question as it releases

12     specific facts of this case.  That was a time before this

13     litigation was initiated, and the Court has ruled that

14     testimony irrelevant.  So I'm instructing the witness not

15     to answer that question.

16        Q     (BY MR. McCORMACK)  All right.  Let me ask this

17     question, which is I think you just said you don't have a

18     problem with alternate energy; is that fair?

19        A     Yes.

20        Q     All right.  But what you have, at least

21     theoretically then and today, is a problem with the

22     location of alternate energy; is that fair?

23             MR. PIPESTEM:  Objection.  To the extent that

24     question involves a statement of facts related to the time

25     period before this litigation was initiated, which that

```
1    being paid to the Osage Nation; is that fair?

2              MR. PIPESTEM:  Objection.  Compound question.

3    Please answer if you know.

4         A    It would only be at the request to the Bureau of

5    Indian Affairs that would deliver us that exact number.

6         Q    (BY MR. McCORMACK)  Well, do you know if any

7    proposed oil drilling or exploration on the 8400 acres is

8    not proceeding because of the existence of the wind farm

9    on the property?

10        A    I do not.

11        Q    You recognize that, and I know that we walked

12   through this earlier today, and I was appreciative of your

13   patience with me, that your knowledge of what's been going

14   on at the OMC really goes back to 2010 before you were

15   actually on the council, and you know there was a lawsuit

16   brought by the OMC to try to stop the development of the

17   wind farm on the theory that it would interfere with the

18   development of oil and gas, right?

19             MR. PIPESTEM:  Objection.  I'm instructing the

20   witness not to answer.  This involves facts pre-existing

21   the filing of this lawsuit, so I'm instructing the witness

22   not to answer.

23        Q    (BY MR. McCORMACK)  You understand that the

24   District Court, federal court here in this case, ruled

25   that in fact the wind farm did not interfere in the
```

1            THE VIDEOGRAPHER:  We're back on the record at

2     12:30 p.m.

3            MR. McCORMACK:  Do me a favor, and I apologize

4     to everybody, could you read me back the last Q & A?

5            (Last question and answer read back)

6       Q    (BY MR. McCORMACK)  So you have, obviously the

7     lawsuit was filed in November 2014.  There were efforts

8     made at that time for an injunction.  All of those

9     pleadings postdated the filing by physical mean, and

10    you've read those.  You've read those materials,

11    Mr. Waller?

12      A    Yes.

13      Q    All right.  And you saw the decision of the

14    Court that came in the early part of this case that

15    precluded any injunctive -- withdrawn.

16            You've seen the history of the case since that

17    time?

18      A    To date, yes.

19      Q    Yes, sir.  And I know we'll get into the minutes

20    in a while here, and that comes up periodically at the

21    Osage Minerals Council's meetings; is that fair?

22      A    It should.

23      Q    Yes, indeed.  Let me ask you, going back to what

24    I think was marked as 158, which is your candidate

25    interview in 2018, we talked about what you meant by the

1    best oilfield, and I think we've walked through that

2    pretty comprehensively.  I asked you -- I know I asked you

3    previously whether you personally opposed the development

4    of renewable energy projects such as wind farms in Osage

5    County, and I think we have the answer to that question on

6    the record.

7              My question is have you spoken to others in the

8    Osage Minerals Council on that subject matter, that is,

9    whether they generally oppose the development of renewable

10   energy projects such as wind farms anywhere in Osage

11   County?

12             MR. PIPESTEM:  Objection.  To the extent that

13   requires answers that occurred prior to the filing of this

14   lawsuit, I'm instructing the witness not to answer.

15        Q    (BY MR. McCORMACK)  That was seven years ago, so

16   I'm assuming there must be some conversations in that time

17   frame, but I'll leave it to you, Mr. Waller?

18        A    There was a council directive.

19        Q    There was a council directive?

20        A    Yes, a consensus.

21        Q    What was the council directive and consensus?

22        A    To find some relief.

23        Q    To find some relief from what?

24             MR. PIPESTEM:  Objection.  We're getting into

25   privileged communications regarding this lawsuit, so I'm

1    instructing the witness not to answer.

2            MR. McCORMACK:  You didn't even get close to

3    establishing that.  I was talking about his communications

4    with other Osage Council -- Osage Minerals Council members

5    about their generalized approach to renewable energy in

6    Osage County.  I don't see where that gets into privilege.

7    So if you're going to instruct him not to answer that, go

8    ahead and do it, but I'm going to keep asking questions on

9    that until we can get established some of that is somehow

10   privileged.

11       Q    (BY MR. McCORMACK)  Let me ask this question.

12   You said that you were -- you had a directive.  What was

13   the directive that you discussed with members of the Osage

14   Minerals Council?

15            MR. PIPESTEM:  Objection.  To the extent that

16   involves privileged communications between Minerals

17   Council members, possibly and likely with legal counsel

18   present, I'm instructing the witness not to answer the

19   question.

20       Q    (BY MR. McCORMACK)  I'm not asking about any

21   communications you may have had with your counsel present.

22   I'm extremely mindful of attorney-client privilege.  I

23   believe in it very much.  I'm asking about you about

24   communications that you had with members of the Osage

25   Minerals Council independent of and without your counsel

**Professional Reporters**
800.376.1006
www.proreporters.com

1    witness not to answer.  To the extent that calls for

2    questions that preexist the filing of this lawsuit, then

3    the witness should not answer this question.

4            MR. McCORMACK:  I'm going to break it in two,

5    then, because I want that instruction on the record.

6        Q   (BY MR. McCORMACK)  So to the extent you've had

7    conversations with the Osage Minerals Council prior to the

8    filing of this lawsuit on the subject of whether or not

9    the Osage Minerals Council should generally oppose the

10   development of renewable energy projects such as wind

11   farms anywhere in Osage County, please tell me what those

12   communications are?

13           MR. PIPESTEM:  Objection.  For the reasons I

14   stated earlier, the Court has ruled that that information

15   regarding communications prior to the filing of this

16   lawsuit are irrelevant and, therefore, based on that court

17   order, I'm instructing the witness not to answer.

18       Q   (BY MR. McCORMACK)  All right, now let me take

19   the next piece of that.  Please tell me any communications

20   you've had with Osage Minerals Council members without

21   counsel present after December 1, 2014 in which the

22   subject matter is whether the Osage Minerals Council

23   should oppose the development of renewable energy projects

24   such as wind farms anywhere in Osage County?

25           MR. ASHWORTH:  Object to the form.

```
 1   Chief Standing Bear.  There's no lawyers.  I'm not talking

 2   about lawyers.

 3            MR. PIPESTEM:  You did not -- first of all, if

 4   you're asking me the question, then I'll answer it.  You

 5   did not limit the question to whether counsel was not

 6   there.  There's also the question of executive privilege

 7   that we've raised repeatedly in this case.  So you can set

 8   aside your -- you can ask the question about the time

 9   after the lawsuit, but it doesn't mean there aren't other

10   privileges or other limitations of what he can answer.

11            MR. McCORMACK:  Okay.  Let me try this.

12       Q    (BY MR. McCORMACK)  Have you ever had any

13   conversation about the future of renewable energy and wind

14   farms in Osage County, Oklahoma after December 1, 2014

15   with any person where your lawyers were not present?  All

16   you've got to answer that question is yes or no.

17       A    Yes, I have.

18       Q    All right.  Now answer the question of who did

19   you have those conversations with, and no other question?

20       A    I have referred back to my chief.

21       Q    All right.  Did you have any conversations with

22   other members of the Osage Minerals Council on that

23   subject matter after December 1, 2014?

24       A    Not without being our --

25            MR. PIPESTEM:  Objection.  I'm instructing the
```

1     witness not to answer that question to the extent that

2     legal counsel may have been present or there may have been

3     discussion of legal strategy in that conversation between

4     Minerals Counsel.  So on that basis, I'm instructing the

5     witness not to answer to preserve privilege.

6          MR. McCORMACK:  Yeah, well, I would disagree

7     with you on that.  You've got to establish that there was

8     actually privileged communication that took place first.

9     I was very careful what I asked.  I asked him whether he'd

10    had a conversation.  I didn't ask him -- and who he had it

11    with.  I didn't ask him what it was.  You get to assert

12    privilege once you identify the basis of the privilege.

13    You've got to have a person and persons and you have a

14    legal issue.  I'm not going to fight you --

15          MR. PIPESTEM:  Counsel, if you leave the door

16    open to the communication with whoever might be there,

17    that could include attorneys, and so I'm going to instruct

18    the witness not to violate the privilege in that

19    circumstance.

20          MR. McCORMACK:  You have to identify the

21    attorney to establish the privilege.  I'm not asking what

22    he said.  This is identifying the communication.  I

23    haven't asked substantively anything about what was said.

24    You can't assert a privilege unless you establish the

25    elements of privilege.  You've got to have a lawyer,

1    subject to in terms of possible objection by the Office of

2    the Principal Chief.  I'm just trying to find out if that

3    as a practical matter is something that is understood by

4    the Osage Minerals Council and the Office of Principal

5    Chief based upon your observations and knowledge?

6         A    Speaking on behalf as the chairman, yes, I'm

7    aware of it.

8         Q    Right.  That's all I was trying to find out.  So

9    as a practical matter, look, organizations have rules, and

10   I'm just trying to figure -- and practicalities.  So what

11   I'm trying to figure out, and maybe you answered the

12   question, Mr. Waller, from what you told me earlier today,

13   which is from 2010 you were really the representative, if

14   you will, of the chief at that time to the Osage Minerals

15   Council.  I presume because the chief understands that it

16   does have this objection right, is that one of the reasons

17   why you understood you were you doing that job for the

18   prior chief?

19              MR. PIPESTEM:  Objection.  I'm instructing the

20   witness not to answer on any matter prior to the filing of

21   this litigation, including at the time from 2010 until the

22   time this case was filed.

23              MR. McCORMACK:  I can't stop you from doing

24   that, but you are overreading the judge's orders.  You

25   seem to think that anything that happened before the date

1      of this Complaint is off-limits, and the issue is whether

2      or not the bad faith of the Osage Nation and Osage

3      Minerals Council, I understand that that's what the Court

4      dealt with.  But out of good faith, and it's certainly not

5      off the table and these questions have been asked of

6      multiple witnesses, our witnesses and other witnesses, and

7      no one has instructed that the date of the Complaint is

8      some wall that nobody can go past.  I really disagree with

9      that.  If you're going to continue to instruct to do it,

10     there's nothing I can do about that, but you do so at your

11     own peril.

12          Q    (BY MR. McCORMACK)  I'm going to ask the

13     question again.  Did you understand in 2010 when you were

14     working on behalf of the chief at that time that one of

15     your jobs was to inform the chief so that he could

16     properly exercise his authority constitutionally under

17     Article 15?

18               MR. PIPESTEM:  Objection.  I'm instructing the

19     witness not to answer the question for the reasons I've

20     given before.

21               MR. McCORMACK:  Okay, I want to get that on the

22     record.  Is your view that anything that happened before

23     the date of this Complaint is off-limits for this witness?

24               MR. PIPESTEM:  I'll let you interpret the

25     Court's order any way you want to.  I think your

1    interpretation is wrong.

2              MR. McCORMACK:  I'm not asking that.  I'm asking

3    what your instruction is so that I don't waste a lot of

4    time in this deposition.  If your view is that anything

5    that happened prior to the date of the lawsuit,

6    November 2014, is not something I can ask about, then

7    please state that on the record so I understand exactly

8    where you're coming from.

9              MR. PIPESTEM:  I have restated it over and over

10   and over again.  I don't know how much more clear I can be

11   about it.  I have stated that over and over again.

12             MR. McCORMACK:  Okay, I got it.  So you're

13   saying that this witness will not be allowed to answer any

14   questions having to do with any subject matter prior to

15   the date of this lawsuit in November of 2014?

16             MR. PIPESTEM:  Related to this lawsuit, that's

17   right.  You asked him questions about -- a number of

18   questions about his educational background, his employment

19   history.  Of course I allowed those questions.  But

20   consistent with the Court's orders, you are not permitted

21   to ask irrelevant questions when there is a court order

22   that has determined that that's the case.

23             MR. McCORMACK:  The power of the Constitution of

24   the Osage Minerals Council and the Office of the Principal

25   Chief is in and of itself distinct from anything going on

1      Q     All right, okay.  I know I was going to ask you

2  this question, too, which is on the remedy side of this.

3      A     Yes.

4      Q     I know we've talked about and we saw it earlier

5  in some of the interviews that you gave, and I know that

6  the judge in this case when he issued the order denying

7  the injunction relative to the original lawsuit mentioned

8  both federal and Oklahoma state public policies in favor

9  of renewables.  How do those public policies, that of the

10  federal government and the state of Oklahoma, factor into

11  your thinking about remedies in this case, if they do?

12      A     If I had a company who came to me and asked me

13  to go to my federal team to develop some project in my

14  Osage Reservation that I felt comfortable with and

15  directed by my council, I think it would be a great

16  partnership.  I'm going to be dealing with them anyway.

17      Q     Well, let me ask you this.  I know, and again,

18  we can walk through all these minutes because I've seen

19  them, but we know that in 2013 when the first

20  communications were made with my client about --

21      A     Yes.

22      Q     -- whether or not there was a mineral element to

23  this, that the BIA struggled with whether there actually

24  was and said that they were struggling with whether there

25  was.  Do you remember that part of this?

**Professional Reporters**
800.376.1006
www.proreporters.com

1          MR. PIPESTEM:  Objection.  I'm instructing the

2    witness not to answer the question.  It involves a -- you

3    cited something in 2013 prior to bringing this litigation.

4    I'm instructing the witness not to answer.

5          MR. McCORMACK:  Well, this, I think, goes to my

6    client's good faith, not the Osage Nation's purported bad

7    faith.

8      Q     (BY MR. McCORMACK)  And that is in 2013 you

9    understood that the BIA wasn't sure whether or not there

10   was a minerals component to what the wind farm was doing.

11   Is that fair from your observations of what was going on

12   at that time?

13         MR. PIPESTEM:  Again, I'm going to instruct the

14   witness not to answer.  I'm objecting not only on the

15   basis of -- well, the Court has ordered that that

16   information is not relevant to this case.  So again, I'm

17   instructing Chairman Waller not to answer the question.

18         MR. McCORMACK:  And I'm going to make my record

19   clear, too.  I'm talking about my client's good faith, and

20   you have been doing an immense amount of discovery on that

21   subject matter.  That goes -- and our regulatory person

22   was inquired about everything that went back to 2011

23   because that goes to my client's good faith, and I'm

24   entitled to inquire about my client's good faith.  I'm not

25   doing anything about any alleged bad faith.  I'm asking

1    Mr. Waller, who was familiar with all the issues at the

2    time, whether or not there was a struggle even within the

3    BIA in 2013 as to whether or not mineral rights would be

4    implicated by this wind farm.  Is that a fair question?

5              MR. PIPESTEM:  Objection.  I'm instructing the

6    witness not to answer for the reasons of irrelevance based

7    on the Court's order.

8              MR. McCORMACK:  All right, and I'm going to keep

9    asking the questions because I find that instruction

10   inappropriate.

11       Q    (BY MR. McCORMACK)  I know that there are --

12   there are minutes in which the BIA Superintendent Phillips

13   comes and discusses these issues.  Do you remember that

14   issue, that is, whether or not the BIA was having

15   difficulty deciding whether or not there was a mineral

16   element to this wind farm?

17             MR. PIPESTEM:  Objection.  For the reasons

18   stated before, I'm instructing the witness not to answer

19   the question.

20       Q    (BY MR. McCORMACK)  Do you understand why my

21   client might have in good faith concluded that there was

22   not a mineral element to the building of this facility?

23             MR. PIPESTEM:  Objection.  For the same reasons

24   stated, I'm instructing the witness not to answer.

25             MR. McCORMACK:  I find that incredible, but I'm

```
 1   going to keep asking the question and we'll let the Court

 2   decide.

 3           MR. PIPESTEM:  Absolutely.

 4       Q    (BY MR. McCORMACK)  Do you understand why it is

 5   my client might have in good faith believed that there was

 6   not a mineral consequence to the development of the wind

 7   farm on the 8400 acres?

 8           MR. PIPESTEM:  Objection.  For the reasons

 9   stated repeatedly in this deposition, I'm instructing the

10   witness not to answer the question.

11       Q    (BY MR. McCORMACK)  Was there a doubt in your

12   mind, Mr. Waller, at any time in the 2013-2014 period as

13   to whether or not there was a mineral aspect to the

14   project that my client was engaged in on the 8400 acres?

15           MR. PIPESTEM:  Objection.  For the reasons

16   stated, I'm instructing the witness not to answer the

17   question.

18       Q    (BY MR. McCORMACK)  Did you have discussions

19   with other members of the Osage Minerals Council in the

20   2013-2014 period as to whether or not there was indeed a

21   minerals element to the construction project that Osage

22   Wind was building on the 8400 acres?

23           MR. PIPESTEM:  Objection.  I'm instructing the

24   witness not to answer the question on the basis of

25   relevance as determined by the Court and because of
```

1    privilege.

2        Q    (BY MR. McCORMACK)   Well, it's now 2021 and

3    we're here talking about this lawsuit, and on any basis

4    between 2014, the date that the lawsuit began, and today,

5    have you at least considered the prospect that my client

6    was acting in good faith when it concluded it did not have

7    a mineral element to the construction of the wind farm on

8    the 8400 acres?

9             MR. PIPESTEM:   For the reasons stated, I'm

10   objecting on the basis of relevance as determined by the

11   Court.   I'm instructing the witness not to answer.

12             MR. McCORMACK:   I made that question from the

13   period, although I disagree 100 percent with what you're

14   doing here --

15             MR. PIPESTEM:   That's okay.   You can do that all

16   day.   We're going to go through this process.   That's

17   what --

18             MR. McCORMACK:   I understand.

19             MR. PIPESTEM:   So your commentary is unwelcome.

20   If you want me to answer a question, I will.

21             MR. McCORMACK:   I was just going to say that

22   that last question was couched in the way that your

23   objection would not be applicable, which was from two

24   thousand -- from December of 2014 to today.   So now you're

25   going to instruct him not to answer in that period too?

```
 1    don't mind.  I'm going to switch to another subject

 2    matter.  Is that good?

 3              MR. PIPESTEM:  Chairman Waller, would a break

 4    okay with you?

 5              THE WITNESS:  How long?

 6              THE VIDEOGRAPHER:  We're off the record at

 7    2:42 p.m.

 8              (BREAK FROM 2:42 TO 2:54)

 9              THE VIDEOGRAPHER:  Back on the record at

10    2:54 p.m.

11         Q    (BY MR. McCORMACK)  Welcome back, Mr. Waller.

12    Just quickly, and I have spoken to counsel for the OMC in

13    the break, and the next section of this deposition was

14    intending to walk through relevant OMC minutes and events

15    that led up to the dispute and then ultimately resulted in

16    a lawsuit filed on November 21, 2014, which is the lawsuit

17    that we're in currently.  In light of the -- in light of

18    the position taken by counsel for the OMC that he is not

19    going to allow any questions on these subject matters to

20    be answered in the timeframe prior to November 21, 2014, I

21    said that I would simply preserve my objection to that

22    instruction and pick up on November 21, 2014, with a full

23    reservation of rights, so that's what I'm going to do.

24              MR. McCORMACK:  Counsel, I'm happy to have any

25    additional statements you may wish to make on the record
```

1    at this point.

2            MR. PIPESTEM:   Okay.   Yes, I'm going to instruct

3    the witness not to answer on any matters deemed irrelevant

4    by the Court.   I'm also going to instruct the witness not

5    to answer any questions that would violate the

6    attorney-client privilege or any other privilege,

7    including the common interest privilege with the United

8    States.

9            What I would recommend is that if you want to

10   ask each question because I may have objections to the

11   question based on form, the government may have objections

12   based on the question for other reasons.   But if we need

13   to get that on the record and you want do that, certainly

14   we're glad to do that.

15           MR. McCORMACK:   Okay, thank you, Counsel.   To me

16   I think it was just important to understand that I had

17   intended to ask this witness as the chairman of the Osage

18   Minerals Council and as someone who this morning I was

19   able to demonstrate was familiar with the processes of the

20   Osage Minerals Council from 2010 forward, I was planned

21   ask him a series of questions relevant to that timeframe,

22   but we've all agreed that I'm not going to get any answers

23   today.

24           And so I appreciate, Counsel, your statement,

25   and I understand that if you have additional objections

1    you'll make them.  But again I'll just say for the record

2    I reserve my rights relative to all the instructions that

3    stopped my inquiry from anything that happened prior to

4    November 21, 2014.  With that, let's set sail on this next

5    section.

6        Q    (BY MR. McCORMACK)  Let me ask you quickly to

7    look at what I have marked as or I will mark as

8    Exhibit 161, which is, for the concierge, under tab 75.

9    It is a letter dated, ironically, November 21, 2014 from

10   the Osage Nation to Enel Green Power North America.  Let

11   me ask you, Mr. Waller, have you seen this letter before?

12            (WHEREUPON, Exhibit 161 was marked for

13   identification.)

14       A    Yes.

15       Q    Did you have any role in preparing the letter?

16       A    No.

17       Q    All right.  By this time, I believe you were

18   chair of the OMC, correct, November of 2014?

19       A    Yes.

20       Q    This was one of those issues I talked to you

21   about previously when I was looking at the Osage Nation

22   Constitution, which was where did the authority of the

23   Osage Minerals Council stop and where did the authority of

24   the principal chief begin.  And I think you told me that

25   the principal chief did have the right to speak on behalf

**Professional Reporters**
800.376.1006
www.ProReporters.com

1   on issues that implicate the Osage Minerals Council

2   without the chairman of the Osage Minerals Council knowing

3   about it?

4        A    This is a letter from the assistant chief.  I

5   cannot deliver the answer to that.

6        Q    Well, he saying he's acting principal chief.

7   That's how he signed it.  So would that -- would that help

8   you answer the prior question?

9        A    I did not direct the executive side.

10       Q    All right.  I think what I've learned is that

11   you learned about this letter probably about the same time

12   my client did, when you received a copy of it; is that

13   fair?

14       A    Yes.

15       Q    Did you have a conversation with Raymond Redcorn

16   or anybody else from the principal chief's office about

17   this letter?

18            MR. PIPESTEM:  Objection.  I'm going to instruct

19   the witness not to answer on the basis of privilege,

20   relevance.

21            MR. McCORMACK:  I don't get the privilege

22   question.  Well, it doesn't matter what I think.  I'm

23   asking -- in privilege you have to set up a basis for

24   privilege before you just assert the privilege.

25       Q    (BY MR. McCORMACK)  Well, let me ask you this.

1    preferred to resolve it through litigation?

2        A    We were already in litigation.

3        Q    Understood.  And this is a letter seeking to

4    maybe have a dialogue, and your response to it was no, or

5    not interested at this time, or let's see where the

6    litigation goes?  What was your reaction to this opening,

7    if you will?

8        A    As chairman I was in litigation.  I cannot speak

9    on behalf of the chief or assistant.

10       Q    All right.  Let me show you the next item, which

11   I'll mark as, I think, 163 which is under tab 29.  This is

12   a letter from you dated May 26, 2015.

13            (WHEREUPON, Exhibit 163 was marked for

14   identification.)

15       A    Yes.

16       Q    To Enel Green Power.  You've seen this letter

17   before, right?

18       A    Yes.

19       Q    All right.  You see you write back and you say

20   we received your letter, and then you say "The Osage

21   Minerals Council is not interested in meeting with

22   representatives of Enel at this time."  Do you see that?

23       A    Yes.

24       Q    Why not?

25       A    I take direction --

1          MR. PIPESTEM:  Objection.  The basis for that is

2     subject to attorney-client privilege.  Communications

3     between attorney and the client, the Minerals Council at

4     the time, went into litigation strategy.  So I'm

5     instructing the witness not to answer the question.

6          MR. McCORMACK:  That's a bold move, Counsel.

7     You just took over the question and decided it was

8     privileged, so let me --

9          MR. PIPESTEM:  This is in the middle of

10    litigation, as you recall, Counsel.  That's not that bold.

11    That's sort of, as you described earlier, sort of a

12    rational, easy response to this when you're asking about

13    what they're thinking about in the middle of litigation

14    when it mentions -- the letter mentions litigation on its

15    face.

16         MR. McCORMACK:  When counsel appears on the

17    scene, I will stand back to privilege, but we haven't

18    established that yet.  The question I asked Mr. Waller

19    is -- maybe in fairness to your objection, I'll try that.

20    Q    (BY MR. McCORMACK)  Which is prior to responding

21    to this letter -- excuse me.  Prior to responding to the

22    Enel letter, did you have communications with your

23    counsel?  You can answer that question yes or no.

24    A    Yes.

25    Q    All right.  And after those communications with

1    counsel this letter came, is that a fair description?

2         A    Yes.

3         Q    All right.  Independent of your counsel without

4    regard to anything your counsel may have said to you, if

5    that's possible, did you personally decide that this was

6    not a good time to have a conversation with the folks at

7    Enel?

8              MR. PIPESTEM:  Objection.  That is a -- the

9    Chairman Everett Waller serves as the chairman of the

10   Osage Minerals Council, so his thoughts and deliberations

11   are subject to -- this is all in preparation for

12   litigation, so I'm instructing the witness not to answer.

13             MR. McCORMACK:  I asked -- I asked him

14   specifically whether or not he had a thought independent

15   of his counsel and in his personal capacity, which none of

16   those would implicate the privilege.  I'm going to stand

17   with that question.

18        Q    (BY MR. McCORMACK)  Independent of your counsel

19   and in your personal capacity, did you have a reaction to

20   whether or not this was a good time to be speaking to

21   Enel?

22             MR. PIPESTEM:  Objection.  For the reasons I

23   stated before, this is subject to privilege, and so I'm

24   instructing the witness not to answer the question.

25        Q    (BY MR. McCORMACK)  Did you have any thoughts

1    **independent of your counsel?**

2              MR. PIPESTEM:  Objection for the same reasons I

3    stated.

4              MR. McCORMACK:  How can you possibly say that

5    that's privileged, whether he had thoughts independent of

6    his counsel and you're saying that's privilege?

7              MR. PIPESTEM:  Chairman Waller serves as the

8    chairman of the Osage Minerals Council.

9              MR. McCORMACK:  Who cares?  I'm asking him his

10   personal opinion without any lawyers.

11             MR. PIPESTEM:  I care.  I care.

12             MR. McCORMACK:  I understand that.

13             MR. PIPESTEM:  I care.

14             MR. McCORMACK:  But I'm talking about the

15   technical point.  Of course you care.  My point is how can

16   you instruct a witness not to answer a question when I've

17   asked him independent of the advice he was getting from

18   counsel in his own personal opinion if he had a view?

19   What's privileged about that?

20             MR. PIPESTEM:  It's related to litigation

21   involving the Osage Minerals Council where he's an

22   official, so that is a part of the deliberation they have,

23   each one of them, and then as a body, so that is

24   privileged.  And so I'm instructing him not to answer the

25   question.  Furthermore, I'm objecting on the basis of

1    relevance as instructed by the Court.

2            MR. McCORMACK:  I've stumbled into a funny place

3    with you guys.

4            MR. PIPESTEM:  I don't know -- well, I don't

5    want to argue with you, but I suggest you read not only

6    the court orders but your own filings here.

7            MR. McCORMACK:  I understand.  I understand all

8    that.  My point is I know privilege quite well, and you're

9    instructing to answer things that I'm not asking about

10   privilege, and you're doing it promiscuously, but I can't

11   stop you from doing it.

12           MR. PIPESTEM:  I respectfully disagree with you,

13   Counsel.

14           MR. McCORMACK:  I understand.  I understand.  We

15   both have jobs to do.

16       Q    (BY MR. McCORMACK)  Anyway, since I can't ask

17   you about your personal opinions that you derived from

18   your own thinking and not your lawyer's, let me move on to

19   something else.

20           You say in the next sentence, "In addition, your

21   letter was addressed to Chief Geoffrey Standing Bear and

22   Assistant Chief Raymond Redcorn.  Any future

23   correspondence regarding proposed wind energy projects in

24   Osage County should be directed to Osage Minerals Council

25   only."  Why did you tell them that?

1        A     I'm in --

2              MR. PIPESTEM:   Objection.   I'm instructing the

3       witness not to answer the question.   This document was

4       written and signed by Chairman Waller in his capacity as

5       chairman of the Osage Minerals Council.   The basis for

6       this communication is subject to a deliberative privilege

7       and the discussion among Minerals Council members, so I'm

8       instructing him not to answer question.

9              MR. McCORMACK:   You know this letter was sent to

10      my client.   You understand that, right?   There's no

11      confidentiality associated with the statements in the

12      letter.   You understand that, don't you?

13             MR. PIPESTEM:   I understand exactly what the

14      document is.

15             MR. McCORMACK:   Okay.   But I've now asked him

16      what he meant by something he said in a letter to my

17      client, and you're saying he can't answer that question

18      because it's privileged?   Is that what your point is?

19             MR. PIPESTEM:   You're asking him to expound on a

20      letter that was written in the context of litigation, so

21      that is right.

22             MR. McCORMACK:   I'm asking him what he meant

23      when he sent my client, clearly not within the privilege,

24      a statement.   I'm asking him what he meant, and you're

25      saying he can't answer it because even though he made the

 1    for asking questions that are inappropriate.

 2            MR. McCORMACK:  Okay.  Let me ask more questions

 3    that you apparently think are inappropriate about what he

 4    meant when he sent something my client, so let me keep

 5    going and I'm going to draw as many instructions as you

 6    decide are appropriate.

 7        Q    (BY MR. McCORMACK) I asked you pretty simply,

 8    Mr. Waller, why you had told him that any future

 9    correspondence regarding the proposed wind energy projects

10    in Osage County should be directed to the Osage Minerals

11    Council only, asking why you told them that.  I'm going to

12    ask you that again, except I think I'm going to draw an

13    objection you're not allowed to answer that question.

14            MR. McCORMACK:  Is that right, Counsel?

15            MR. PIPESTEM:  That's correct, for the reasons I

16    stated before.

17            MR. McCORMACK:  And that reason is because you

18    think that's privileged, correct?

19            MR. PIPESTEM:  Yes, the deliberation that went

20    into this letter, it's privileged.  Yes, it is.

21        Q    (BY MR. McCORMACK)  And then, "The Osage

22    Minerals Council is an independent agency charged with

23    preserving the Osage Mineral Estate and protecting the

24    income derived from the minerals estate.  In administering

25    and developing the Osage Mineral Estate, the Osage

1    Minerals Council is responsible considering and approving

2    mineral leases and proposing other forms of development

3    within the minerals estate.  Because wind energy projects

4    directly implicate and affect the minerals estate, wind

5    project-related correspondence should be directed to the

6    Osage Minerals Council only."  Do you see that?

7        A    Yes.

8        Q    All right.  So you're instructing my -- you're

9    telling my client that they should only deal with the

10   Osage Minerals Council, not -- not the Office of the

11   Principal Chief, correct?

12       A    We're litigants at the time, so it's a directive

13   back to us.

14       Q    I don't know what that means.  You're telling my

15   client that they should deal with the Osage Minerals

16   Council and not with the office of the chief, correct?

17   That's what you were telling them?

18            MR. PIPESTEM:  Objection.  Asked and answered.

19       Q    (BY MR. McCORMACK)  You can answer the question.

20   Mr. Waller, you can answer the question.

21       A    We are in a federal case with our trustee is why

22   I needed it directed back to us.

23       Q    Well, at this time the Osage Minerals Council

24   was not in the case, correct?

25            MR. PIPESTEM:  Objection.  Calls for a legal

**Professional Reporters**
800.376.1006
www.ProReporters.com

1    conclusion.   And I'm going to instruct the witness not to

2    answer the question.   Relations between the United States

3    as trustee and the Minerals Council as the trust

4    beneficiary of the Osage Nation when it comes to the Osage

5    Mineral Estate are privileged.   So the state of the Osage

6    Minerals Council's place in this is --

7           MR. McCORMACK:  Just let me get it straight,

8    Counsel.  I asked him the question of whether at this time

9    the Osage Minerals Council was a party to this lawsuit,

10   and you've just instructed him not to answer that question

11   on privilege?

12          MR. PIPESTEM:  That's not the question you

13   asked, Counsel.

14          MR. McCORMACK:  Well, then, let me ask that

15   question.

16      Q    (BY MR. McCORMACK)  At this time was Osage

17   Minerals Council a party to this lawsuit?

18      A    No.

19      Q    All right.   Why did you advise Enel that they

20   should only deal with the Osage Minerals Council relative

21   to the subject matter on a go-forward basis?

22          MR. PIPESTEM:  Objection.  I'm instructing the

23   witness not to answer because that question gets to

24   matters of privilege as counsel -- as attorney-client and

25   deliberative privilege.  I'm instructing him not to

1    answer.

2         Q    (BY MR. McCORMACK)  Did you speak to your

3    counsel, yes or no, on the subject matter of whether or

4    not Enel should communicate only with the Osage Minerals

5    Council on a go-forward basis relative to the wind farm?

6              MR. PIPESTEM:  Objection.  You're asking him

7    specifically a question about what he communicated with

8    legal counsel, so I'm instructing him not to answer the

9    question.

10             MR. McCORMACK:  Well, here's how privilege

11   works, at least in my world.  You have the person who

12   communicated, the lawyer who was involved, and the general

13   subject matter of the communication, which is maintained

14   in confidence, and that makes it privileged so long as it

15   was of a legal nature.  I asked him whether or not he had

16   spoken on the general subject matter of whether or not the

17   Osage Minerals Council should be the only party

18   communicating with Enel on a go-forward basis at this

19   time.  That's what I asked.

20             MR. PIPESTEM:  And that same question I would

21   instruct him not to answer because that would violate the

22   attorney-client privilege.

23             MR. McCORMACK:  So although Mr. Waller informed

24   my client to communicate only with the Osage Minerals

25   Council, you're not going to let him answer the question

```
 1      Q     In 2018?

 2      A     Yes.

 3      Q     Did he run for reelection or no?

 4      A     Yes.

 5      Q     Okay.  And he didn't win, I take it?

 6      A     Correct.

 7      Q     All right.  And what do you recall

 8   Mr. Cheshewalla saying to you either at this Osage

 9   Minerals Council meeting or at any other time with regard

10   to the prospect of potentially addressing the consequence

11   of wind farms being here to stay?

12            MR. PIPESTEM:  Objection.  Those communications

13   were part of deliberation between Minerals Council and

14   legal counsel in the midst of litigation in federal court.

15   I'm instructing the witness not to answer.

16            MR. McCORMACK:  He just said -- we've just

17   testified and established that at this meeting there were

18   no lawyers that were representing Osage Minerals Council

19   in this litigation present.

20      A     No, that's not the question you asked.

21      Q     (BY MR. McCORMACK)  What did Mr. Cheshewalla say

22   at this meeting with regard to any aspect of wind power?

23      A     Just exactly what the minutes say he said.

24      Q     And how long did he speak?

25      A     Very short.
```

1     Q    Do you read that and do you recall that to be a

2  follow-up to issues that Mr. Cheshewalla was raising?

3     A    Yes, I believe it complemented it.

4     Q    All right.  Do you recall whether or not

5  Mr. Redcorn made any particular suggestions or had any

6  particular ideas about how to keep options open in the

7  renewables space on a go-forward basis?

8     A    No specifics.

9     Q    Okay.  At any time after this, do you recall

10  having a conversation with Mr. Cheshewalla or Mr. Redcorn

11  on the issue of whether or not the Osage Minerals Council

12  should consider options for renewable energy on a

13  go-forward basis?

14          MR. PIPESTEM:  Objection.  That question calls

15  for discussions that happened in the context of

16  litigation, including the attorney-client privilege.  I'm

17  instructing the witness not to answer the question.

18     Q    (BY MR. McCORMACK)  I'm not talking about

19  anything having to do with the Enel case.  I'm talking

20  specifically about whether at any point in time,

21  Mr. Waller, you recall having a conversation with

22  Mr. Cheshewalla or Mr. Redcorn with regard to the

23  generalized topic of whether or not renewable energy

24  should be something that the Osage Minerals Council should

25  look into as a prospect for future consideration or

1     **development?**

2              MR. PIPESTEM:  Objection.  I'm instructing the

3     witness not to answer that question.  It calls for issues

4     associated directly with this litigation, so that's

5     covered by attorney-client privilege and deliberation of

6     an elected body called the Osage Minerals Council.

7              MR. McCORMACK:  Let me get your most recent

8     instruction understood.  If Mr. Cheshewalla and Mr. Waller

9     had a conversation generally about the prospect of wind

10    development or renewable development in Osage County for

11    the future, your view, even though lawyers weren't present

12    for the conversation, is it would be privileged because of

13    litigation between Enel and Osage Minerals Council; is

14    that right?

15             MR. PIPESTEM:  No, that's not my position.

16             MR. McCORMACK:  Okay.  That's the question I

17    asked, so why are you instructing him not to answer?

18             MR. PIPESTEM:  You asked a question.  I'm

19    telling you I object for different reasons.

20             MR. McCORMACK:  No, you instructed him not to

21    answer my question.

22             MR. PIPESTEM:  That's correct, that's correct.

23             MR. McCORMACK:  If you had -- if you had an

24    objection about whether or not I strayed into privilege,

25    you could've inquired into that, but instead you

```
1    instructed him not to answer my question, and I want to
2    know on what basis did you do that?
3            MR. PIPESTEM:  On the basis of attorney-client
4    privilege.  If you want me to explain.
5            MR. McCORMACK:  No, I don't, because your theory
6    is if you talk about wind power it's privileged, which is
7    beyond my comprehension.  But let me ask a different
8    question, and let's see if I draw another one of these
9    objections and instructions not to answer on things that I
10   don't think are even remotely privileged, but let's see.
11       Q    (BY MR. McCORMACK)  Did you have a conversation
12   at any time with Mr. Cheshewalla or Mr. Redcorn in this
13   timeframe, 2015 or anytime thereafter, on the general
14   subject matter of whether or not it made sense for the
15   Osage Minerals Council to look into the prospect of
16   renewable energy taking place somewhere on the Osage
17   Mineral Estate?
18       A    For any company, not just yours?
19       Q    Yes, sir, especially not mine.
20       A    Well, I don't know.  You're the one we were
21   having to deal with thinking.
22       Q    Understand, but the answer is yes, any company.
23            MR. PIPESTEM:  I'm instructing the witness not
24   the answer to the extent that any answer involves
25   communications related to Enel or any affiliated
```

 1   companies.

 2       Q    (BY MR. McCORMACK)  Mr. Waller, you're up.

 3       A    In executive.

 4       Q    Okay.  So you had conversations about the

 5   prospect of renewable energy in Osage County in executive

 6   session; is that right?

 7       A    I said that when I started talking.

 8       Q    What was the nature of those conversations?

 9            MR. PIPESTEM:  Objection.  That is a -- I'm

10   instructing the witness not to answer about the

11   deliberations with legal counsel.

12            MR. McCORMACK:  Fair point.

13       Q    (BY MR. McCORMACK)  In the conversations that

14   you -- well.

15            MR. McCORMACK:  You have a very broad net,

16   Counsel.

17            MR. PIPESTEM:  Counsel, you continue to ask

18   questions that are clearly within the privilege.  I mean,

19   some of these aren't hard.  I understand we may disagree

20   on the margins here, but this is right at the heart of

21   their communications.

22            MR. McCORMACK:  I asked only about

23   communications with people other than Enel, and the answer

24   was yes, that there were communications with others other

25   than Enel in executive session.  Then I asked what was the

```
1          MR. PIPESTEM:  I agree.

2          MR. McCORMACK:  Let me ask this question.

3      Q    (BY MR. McCORMACK)  You said -- I asked you

4  about Mr. Cheshewalla and I asked you about Mr. Redcorn,

5  and there are obvious statements about wind power in this

6  2015 Osage Minerals Council meeting, yes?  I've asked you

7  about that.  Fair enough so far?

8      A    The answer is yes.

9      Q    You've told me what you could about those

10 discussions, which is what you've already testified to.

11 And then I asked if you ever had any further conversation

12 not involving Enel about the development about renewable

13 power, generally, in the Osage Mineral Estate.  And you

14 said yes, you had that conversation at executive council.

15 Am I right so far?

16     A    With my councilmen.  I didn't talk to a company.

17     Q    Okay, with your councilmen.  In the

18 conversations that you had with Mr. Cheshewalla and

19 Mr. Redcorn, did those take place after this meeting of

20 2015 or at any other time beyond this 2015 meeting?

21     A    Executive session.

22     Q    Okay.  So the answer to that question, I guess,

23 is yes, that it did occur but it occurred in executive

24 session; is that right?

25     A    Yes.
```

1     Q    What was the context of those discussions?  Did

2   it involve litigation with my client Enel?

3              MR. PIPESTEM:  Objection.  You're asking him to

4   make statements about conversations that he just said were

5   privileged and as a part of an executive session of the

6   Osage Minerals Council.

7              MR. McCORMACK:  Okay, you're saying that if they

8   had a conversation about the future of renewable power in

9   Osage County in an executive session you're going to

10   instruct him not to answer whether it involved litigation

11   or not, correct?

12              MR. PIPESTEM:  In this circumstance that

13   involves litigation, the future of wind energy, yes, is

14   related to this lawsuit.

15              MR. McCORMACK:  I don't know if you were at that

16   meeting or not, but it's really not for you to say whether

17   they involved it.  This is really for this witness to say,

18   so let's ask that question.

19     Q    (BY MR. McCORMACK)  In this executive session in

20   which you had conversations with either Mr. Cheshewalla or

21   Mr. Redcorn about the future of potential renewable energy

22   in Osage County, was litigation counsel present for those

23   meetings?

24     A    Yes.

25     Q    Okay.  Did the subject matter of those

Chairman Everett Waller    Document 263-1 Filed in USDC ND/OK on 08/19/21    Page 42 of
Case 4:17-cv-00606-GKF-JFJ    Document 263-1 Filed in USDC ND/OK on 08/19/21    Page 42 of
48    189

1    instruct if need be, but you've never had a conversation

2    with Mr. Cheshewalla or with mister -- excuse me.

3         MR. McCORMACK:  Put my document back up,

4    Mr. Concierge.

5         Q    (BY MR. McCORMACK)  You've never had a

6    conversation with Mr. Cheshewalla or Mr. Redcorn on the

7    issue of the renewable prospects for Osage County and

8    Osage Mineral Estate other than in executive session and

9    other than when your counsel was present for this case; is

10   that right?

11        A    That's correct.  I had to be in front of my full

12   Council or whoever is present for the quorum.

13        Q    Okay.  Do you know if anybody in the audience or

14   anyone else commented in this 2015 meeting on the

15   statements that were made by Mr. Cheshewalla and

16   Mr. Redcorn with regard to the options for renewable power

17   in the future in Osage County?

18        A    The minutes reflect they did.

19        Q    And that would be Mr. Connor.  Anyone else?

20        A    The minutes reflect what happened.

21        Q    All right.  "Councilman Yates states that he is

22   firmly against the wind industry and he is against any

23   kind of negotiating with them."  Do you see that?

24        A    Yes, I did.

25        Q    And that was a position he consistently held?

1        MR. PIPESTEM:  Objection.  Calls for

2    communications that were part of this litigation, and so

3    I'm instructing the witness not to answer the question.

4            MR. McCORMACK:  You're instructing the witness

5    not to answer the question of whether Councilman Yates

6    consistently took the position that he was firmly against

7    the wind industry and against any kind of negotiating with

8    the wind industry?

9            MR. PIPESTEM:  That's not the question that you

10   asked.

11           MR. McCORMACK:  I thought it was.

12   Q    (BY MR. McCORMACK)  In any event, this position

13   that Mr. Yates took at this meeting that he is firmly

14   against the wind industry and is against any kind of

15   negotiating with them, was that a position that was his

16   consistent position, from your observations and

17   understandings, in connection with your dealings with the

18   Osage Minerals Council?

19           MR. PIPESTEM:  Objection.  I'm instructing the

20   witness not to answer the question.  Communications

21   between Councilman Yates and Councilman now Chairman

22   Waller involving litigation and any kind of negotiations

23   with other parties, particularly Enel, was a part of an

24   attorney-client communication and deliberation among the

25   Tribal Council -- pardon me, the Minerals Council, so

1    ten minutes from now?

2              THE WITNESS:  Thank you.

3              THE VIDEOGRAPHER:  Off the record at 4:22 p.m.

4              (BREAK FROM 4:22 TO 4:33)

5              THE VIDEOGRAPHER:  Back on the record at

6    4:33 p.m.

7        Q    (BY MR. McCORMACK)  Welcome back, Mr. Waller.

8        A    Thank you.

9              MR. McCORMACK:  One thing I wanted to say before

10   we proceeded to this section is that I have spoken to

11   Mr. Pipestem about an issue that he and I have been

12   talking about throughout the day, which is I have a series

13   of questions that relate to leases and sandy soil permits

14   and waivers that cover a variety of periods of time,

15   including a period of time before November 21, 2014.

16   Mr. Pipestem has advised me that if I were to ask any

17   questions about those subject matters prior to

18   November 21, 2014, he would instruct the witness not to

19   answer those questions for the reasons that he has stated

20   previously on the record today.  I have told him that I

21   don't agree with that, that I object to it, and I reserve

22   my rights relative to it.

23              But to save us the gymnastics of having that

24   fight on the record, I will agree to proceed on a period

25   of time that is post November 21, 2014 so as to avoid a

1    case-by-case instruction while reserving all my rights.

2            Mr. Pipestem, anything you want to add to that?

3            MR. PIPESTEM:  No.

4        Q    (BY MR. McCORMACK)  All right, so let me show

5    you what has been marked as, it's tab 30, I believe we're

6    already marked it as plaintiff's 165, so let's go back to

7    that one for a second.  This is the August 19, 2015 OMC

8    minutes.  On page four under the item ODOT, maybe you want

9    to blow that one up.

10            You'll see it says here that someone is at the

11    Osage Minerals Council's meeting on August 19, 2015 from

12    the ODOT, which I read to mean the Department of

13    Transportation in Oklahoma.  Is that a fair presumption on

14    my part, Mr. Waller?

15        A    Yes.

16        Q    All right.  And he talks that the department has

17    a lot of work in Osage County over the next several years.

18    I know that historically there had been arranged between

19    OMC and the DOT, but here he states that there is

20    $42 million in bridgework and some road work underway.  He

21    proposes a memorandum of understanding to provide the

22    Minerals Counsel with the projects they have coming up.

23    Do you see that?

24        A    Yes.

25        Q    Was this the first time that you understand that

```
1                        ERRATA SHEET

2        USA and Osage Minerals Council vs. Osage Wind, et al.

3                 DEPOSITION OF EVERETT WALLER

4              REPORTED BY: MIKE WASHKOWIAK, CCR

5            DATE DEPOSITION TAKEN: AUGUST 5, 2021

6                      JOB NO. 151610

7    PAGE  LINE  IS                   SHOULD BE

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

```
1                          JURAT

2       USA and Osage Minerals Council vs. Osage Wind, et al.

3             I, EVERETT WALLER, do hereby state under oath

4    that I have read the above and foregoing deposition in its

5    entirety and that the same is a full, true and correct

6    transcription of my testimony so given at said time and

7    place.

8

9

10           _____

11           Signature of Witness

12

13

14           Subscribed and sworn to before me, the

15    undersigned Notary Public in and for the State of Arkansas

16    by said witness, EVERETT WALLER, on this _____day

17    of_____, 2021.

18

19

20

21           _____

22           NOTARY PUBLIC

23           MY COMMISSION EXPIRES:_____

24           JOB NO. 151610

25
```

```
 1                  C E R T I F I C A T E

 2    STATE OF ARKANSAS    )

 3                         )  SS:

 4    COUNTY OF WASHINGTON)

 5              I, Mike Washkowiak, Certified Court Reporter

 6    within and for the State of Arkansas, do hereby certify

 7    that the above-named EVERETT WALLER was by me first duly

 8    sworn to testify the truth, the whole truth, and nothing

 9    but the truth, in the case aforesaid; that the above and

10    foregoing deposition was by me taken and transcribed

11    pursuant to agreement, and under the stipulations

12    hereinbefore set out; and that I am not an attorney for

13    nor relative of any of said parties or otherwise

14    interested in the event of said action.

15              IN WITNESS WHEREOF, I have hereunto set my hand

16    and official seal this 11th day of August, 2021.

17

18

19                    MIKE WASHKOWIAK, CCR

20

21                    State of Arkansas, No. 654

22

23

24

25
```