# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
     UNITED STATES OF AMERICA,
 3

 4            Plaintiff,

 5   and

 6   OSAGE MINERALS COUNCIL,

 7            Intervenor-Plaintiff,
     vs.                          No. 14-CV-704-GFK-JFJ
 8
     OSAGE WIND, LLC; ENEL KANSAS,
 9   LLC; and ENEL GREEN POWER
     NORTH AMERICA,
10

11            Defendants.

12   VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF BILL MOSKALUK
                TAKEN ON BEHALF OF THE PLAINTIFF
13                 ON JUNE 16, 2021 AT 10:00 A.M.

14                         APPEARANCES

15   On behalf of the PLAINTIFF:
     Stuart Ashworth
16   Cathryn D. McClanahan
     Nolan Fields
17   UNITED STATES ATTORNEY'S OFFICE
     Northern District of Oklahoma
18   110 West 7th Street, Suite 300
     Tulsa, Oklahoma  74119
19   918.382.2700
     stuart.ashworth@sol.doi.gov
20

21   (Appearances continued on the following page)

22   ALSO PRESENT:  Megan Beauregard, Michelle Hammock, &

23   Christina Watson

24   VIDEOTAPED BY:  Megan Smith

25   REPORTED BY:   Abby Rhodes, CSR, RPR
```

Page 2

APPEARANCES CONTINUED

On behalf of the INTERVENOR-PLAINTIFF:
Mary Katherine Nagle
Shoney Blake
PIPESTEM & NAGLE
401 South Boston Avenue, Suite 2200
Tulsa, Oklahoma  74103
918.936.4705
mknagle@pipestemlaw.com

On behalf of the DEFENDANT:
Ryan Ray
NORMAN, WOHLGEMUTH, CHANDLER, JETERN, BARNETT & RAY
401 South Boston Avenue
2900 Mid-Continent Tower
Tulsa, Oklahoma  74103
918.583.7571

Sarah M. Stevenson
Lynn Slade
MODRALL, SPERLING, ROEHL, HARRIS & SISK
500 Fourth Street NW, Suite 1000
Albuquerque, New Mexico  87103
505.848.1800
sarah.stevenson@modrall.com

Page 3

INDEX

| | Page |
|---|---|
| BILL MOSKALUK | 6 |
| Direct Examination by Mr. Ashworth | 6 |
| Cross Examination by Ms. Nagle | 127 |
| Redirect Examination by Mr. Ashworth | 179 |

EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 8 | 5/15/14 E-mail | 144 |
| 37 | 5/22/14 E-mail Chain | 140 |
| 38 | 10/9/14 Letter from the Bureau of Indian Affairs | 114 |
| 46 | Exhibit B(i) Scope of Work | 75 |
| 48 | Organizational Procedure No. 80 | 98 |
| 52 | Contract Between Osage Wind LLC & IEA Renewable Energy Inc. | 177 |
| 53 | 7/9/14 Email Chain | 147 |
| 55 | September 2014 E-mail Chain | 156 |
| 56 | September 2014 E-mail chain | 159 |
| 59 | Bill Moskaluk's LinkedIn Page | 17 |
| 60 | Defendants' Response to Plaintiff's Motion for Preliminary Injunction | 24 |
| 61 | Osage Wind Project Alignment Meeting Agenda 9/9/14 | 37 |

EXHIBITS (Continued)

Page 4

| Exhibit | Description | Page |
|---|---|---|
| 62 | Project Option/Change Order | 89 |
| 63 | 5/22/15 E-mail Chain | 99 |
| 64 | October 2014 E-mail Chain | 106 |
| 65 | 10/14/14 E-mail Chain | 113 |
| 66 | 6/26/14 Meeting Notes | 150 |
| 67 | September 2014 E-mail Chain | 162 |
| 68 | September 2014 E-mail Chain | 164 |
| 69 | Defendants' Fifth Amended and Supplemental Privilege Log | 171 |
| 70 | Project Short Views Update 10/17/14 | 174 |

STIPULATIONS

It is stipulated that the deposition of BILL MOSKALUK may be taken pursuant to agreement and Federal Rules of Civil Procedure on June 16, 2021, before Abby Rhodes, CSR, RPR.

Page 5

VIDEOGRAPHER:  This is the videotape deposition of Bill Moskaluk in the matter of the United States of America and Osage Minerals Council versus Osage Wind, et al., filed in the United States District Court for the Northern District of Oklahoma, Case No. 14-CV-704-GFK-JFJ.  We're on the record at 10:00 a.m. on June 16, 2021.  Will counsel please state their names for the record.

THE WITNESS:  William Moskaluk.

MR. ASHWORTH:  Stuart Ashworth with the U.S. Attorney's Office.  I also have Cathy McClanahan and Nolan Fields, attorneys in the case, as well as Michelle Hammock and Christina Watson who are paralegals with the U.S. Attorney's Office.  And we represent the U.S.

MS. NAGLE:  Mary Katherine Nagle with Pipestem & Nagle.  I represent the intervener-plaintiff, the Osage Minerals Council, and with me today is my colleague Shoney Blake.

MR. RAY:  Ryan Ray for the defendants.  I believe also on call for the defendants is Lynn Slade and Sarah Stevenson.  Counsel Megan Beauregard is observing.

VIDEOGRAPHER:  Okay.  Will the reporter now swear in the witness.

Page 154

1 agreement with what your understanding was at the
2 time, in the summer of 2014?
3   A   Yes, I agree with it.
4   Q   Okay.  And -- okay.  Great.
5       Do you -- do you know whether the original
6 scope was for the IEA team to be allowed to mine on
7 site as -- as Ron states here?
8   A   No, I don't.
9   Q   Okay.  But it is your understanding that
10 originally the plan was for them to fill the -- the
11 back -- use backfill from the construction site on the
12 wind farm; is that correct?
13   A   Yes.
14   Q   Do you recall at any point in time, was
15 there a decision ever made to start importing the
16 backfill instead and purchasing those materials off
17 site?
18   A   I don't recall that.
19   Q   Okay.
20   A   No, wait a second.  I think there was the
21 opportunity for everybody to put together a cost
22 estimate, but to my knowledge, it didn't go any
23 further.
24   Q   Okay.  Do you recall reviewing the cost
25 estimate?

Page 155

1   A   No, I don't.
2   Q   Okay.  Did anyone ask you to assist in
3 preparing the cost estimate?
4   A   Yes, Giuseppe had asked me.  Hold on now.
5 I'm not sure what it was, what estimate I did.  I
6 think it was on manhours or something of that nature,
7 not -- not materials.
8   Q   Okay.  And would that have been -- well, let
9 me -- let me actually ask this way:
10       If you -- if -- if EGPNA and IEA had had to
11 import backfill for the wind farm off site onto the
12 site, would that have increased the number of hours
13 of -- in terms of just manpower and labor to do that?
14   A   I'm not really sure.  If it was -- if it was
15 in the contract originally, there wouldn't be any
16 additional cost factors in it so...
17   Q   Mmm-hmm.
18   A   I'm unsure.
19   Q   Okay.  All right.  Let me move on to another
20 exhibit, and this was previously entered as Exhibit 55
21 in another deposition, and -- and so -- okay.  Here we
22 go.  So let's see here, this looks like it is dated --
23 well, first of all, I will say this is -- this is
24 Exhibit 55.  It's Bates stamped Osage Wind-019901 and
25 it looks like at the bottom here we've got an e-mail

Page 156

1 from Craig Mazurowski to you, CCing Chris Hanson and
2 Ron Ritter, dated September 2, 2014, Craig writes
3 "Bill, in the past we have had a couple conversations
4 regarding crushing rock on site.  It is my
5 understanding that Enel/Tradewinds does not want any
6 crushing on site due to mineral right issues.  Please
7 confirm.  Thanks."
8       And you write back "Craig, let's discuss
9 this a.m.  Bill."
10       Do you recall this e-mail exchange in
11 September of 2014 with Craig Mazurowski?
12       (Exhibit 55 Marked for Identification)
13   A   Vaguely, but I do remember -- whatever the
14 outcome was, I -- I can't really remember, but I
15 vaguely remember this e-mail, yes.
16   Q   Okay.  Do you recall much -- well, do you
17 know first -- did you end up having this conversation
18 with Craig?
19   A   I'm not even certain about that either.
20   Q   Okay.  That's fine.  I -- I know it was a
21 long time ago.
22       When he writes "In the past we've had a
23 couple conversations regarding crushing rock on site,"
24 do you -- do you recall what those conversations were
25 about specifically?

Page 157

1   A   No.
2   Q   Okay.  He also writes "It is my
3 understanding that Enel/Tradewinds does not want any
4 crushing on site due to mineral -- mineral right
5 issues."
6       Do you recall anyone from Enel or Tradewind
7 saying something to you along those lines?
8   A   They might have said something to Craig.
9 That -- that, I don't know.
10   Q   Okay.  Do you recall anyone like Bill Price
11 or Steve Champagne ever mentioning to you that there
12 should not be crushing on site due to mineral right
13 issues?
14   A   No.
15   Q   Okay.  So you -- you really don't recall
16 ever kind of hearing any messaging around we need to
17 stop crushing due to mineral right issues?
18   A   No.
19   Q   And it is true that actually crushing
20 continued after September 3, 2014, on the Osage Wind
21 farm; is that correct?
22   A   Yes.
23   Q   Okay.  Do you recall whether the Bureau of
24 Indian Affairs ever communicated to EGPNA that
25 crushing minerals on the Osage Wind farm would require

Page 158

1  a lease or permit?
2    A   In that letter that was presented to me, I
3  believe that's when they told Enel or whomever and
4  that was a sandy soil permit.
5    Q   Okay.  And do you recall reviewing that
6  letter when -- when it was received by EGPNA?
7    A   No, I -- I read it briefly and passed it on
8  to Giuseppe DiMarzio and also Bill Price.
9    Q   Okay.  And did they, after that, ask you to
10 tell IEA to cease construction while they reviewed the
11 letter or considered the legal issues, or were you
12 ever asked to even pause on construction?
13   A   No.
14   Q   Did they inform you at that time that there
15 would be no need to pause on construction because they
16 had a legal memorandum that -- that explained that the
17 BIA was wrong?
18   A   No.
19   Q   Okay.  So let's -- I'm going to -- we
20 don't -- I don't think we need to look at this
21 document anymore.  I'm actually going to show you
22 another document.  Here we go.  Okay.  And this one
23 was previously entered as Exhibit 56.  Here's its
24 stamp and it's -- it's Bates stamped Osage
25 Wind-018666.  And this looks like an e-mail to -- from

Page 159

1  you to Giuseppe, dated September 16, 2014.
2        Do you happen to recall this e-mail?  I'll
3  give you a chance to look at it.
4        (Exhibit 56 Marked for Identification)
5    A   It's basically giving Giuseppe an update on
6  where we were at.  It was like a daily report.
7  Report.
8    Q   And was Giuseppe your direct supervisor or
9  would that be more Bill Price or was it a combo of
10 both?
11   A   More of a Bill Price.
12   Q   Okay.  So I note here that you write
13 "Running into rock conditions affecting the
14 operation."
15       What exactly did you mean by that?
16   A   Means I couldn't dig the hole.
17   Q   Okay.  And so I note that sort of in this --
18 this e-mail you mention having to -- let me see if
19 I -- you know, those areas will be charged and shot.
20       What -- what does it mean to -- and I may
21 not get the lingo right, to -- to charge those areas
22 or to shoot them, what is that referring to?
23   A   It's referring to the dyn -- dynamite charge
24 that you put in the drilled hole and then you
25 basically set it off.

Page 160

1    Q   Mmm-hmm.
2    A   And you shoot your foundations so it's just
3  a construction term that we use.
4    Q   Mmm-hmm.  Mmm-hmm.  Mmm-hmm.
5        I note here that -- and -- and -- and so was
6  some of that not a part of the initial plan or design
7  or it wasn't fully anticipated when you commenced
8  construction?
9    A   Yeah, it was -- it was not -- it was not
10 part of the plan initially and, like I said, all of us
11 were under the impression that the geotech report was
12 true in its findings of the types of soil, but it
13 wasn't -- it didn't even reflect the correct soils
14 that were in there so somebody got mixed up.
15   Q   I see.
16       And you write here as of September 16
17 "Falling behind with excavations due to rock."
18   A   Yes.
19   Q   At current -- do you know how far behind you
20 would have been from the projected schedule at that
21 time?
22   A   One or two of the foundations, I believe,
23 were at -- at risk.  We had to complete them at a
24 certain time for GE to bring their turbines in, and
25 that's what we based -- that's what they based the

Page 161

1  initial schedule on, was the delivery of turbines.  I
2  had to have some place to put them.
3    Q   Mmm-hmm.
4    A   Without any -- you know, without any
5  construction activity going around.
6    Q   Right.  Okay.
7        And you write here "At current rate, I don't
8  know if they can meet GE delivery time frames."
9        So is it correct to say that at that point
10 in time, in mid September, if there were any further
11 delays or pauses on construction, Enel would not be
12 able to meet GE's delivery time frame?  Is that
13 correct?
14   A   Yeah, they couldn't figure out what we were
15 going to do at the time, and that was just a little
16 nudge on my part to have them make a decision on which
17 way to go.
18   Q   Did they ever get back to you in response to
19 this with a decision?
20   A   I'm not really sure.
21   Q   Okay.  All right.  I think -- I think that
22 is enough with this document and so I am going to now
23 move on to another document.  Here we go.  And I
24 believe this one has not yet been introduced so this
25 is going to be Exhibit 67 and it is Bates stamped