**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| (2) OSAGE MINERALS COUNCIL, | ) | Case No. l4-CV-704-GKF-JFJ |
| | ) | |
| Intervenor-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1) OSAGE WIND, LLC; | ) | |
| (2) ENEL KANSAS, LLC; and | ) | |
| (3) ENEL GREEN POWER | ) | |
| NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**INTERVENOR-PLAINTIFF OSAGE MINERALS COUNCIL'S**
**BRIEF IN OPPOSITION TO DEFENDANTS' THIRD MOTION TO COMPEL**
**AGAINST THE OSAGE MINERALS COUNCIL**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ...........................................................................................................1

PROCEDURAL AND FACTUAL BACKGROUND ...........................................................1

    a.  The Court's January 11, 2021 Opinion And Order ("Affirmative Defenses Order")........1

    b.  The Court's May 21, 2021 Opinion And Order ("Objections Order") ...............................2

    c.  Defendants' Motion For Reconsideration And The Court's August 25, 2021 Opinion And Order....................................................................................................5

STANDARD OF REVIEW ..............................................................................................6

ARGUMENT..................................................................................................................7

    a.  The OMC Was Correct To Object On Grounds Of Relevance ...........................................7

        i.  This Court's Orders Clearly State Defendants Are Not Entitled To Backward-Looking Evidence Related To The OMC's Past Conduct Or Knowledge Under A *Davilla* Analysis ........................................................................8

        ii.  The Backward-Looking Testimony Defendants Seek Is Not Relevant To This Court's Consideration Of Defendants' Status As A "Good Faith" Or Innocent Trespasser ....................................................................10

    b.  It Is Not "Unfair" That OMC Witnesses Do Not Have Relevant Knowledge Regarding Whether Defendants Honestly Believed That They Did Not Need A Permit ..................16

    c.  The OMC Properly Objected On Attorney-Client Privilege Grounds ..............................18

    d.  The OMC Properly Objected on Deliberative Process And Executive Privilege Grounds ........................................................................................................23

CONCLUSION ..............................................................................................................26

TABLE OF AUTHORITIES

<u>**Cases**</u>

*Alaska Place Co. v. Lee*
    553 P.2d 54 (Alaska 1976) ...................................................................................13, 16

*Bailey v. Texas Pacific Coal & Oil Co.*
    32 P.2d 709 (Okla. 1934)....................................................................................................12

*Barlow v. United States*
    32 U.S. 404 (1833) ...........................................................................................................15

*Champlin Refining Co. v. Aladdin Petroleum Corp.*
    238 P.2d 827 (Okla. 1951)..................................................................................................12

*CGC Holding Co. LLC v. Hutchens*
    No. 11-CV-01012-RBJ-KLM, 2016 WL 11691829 (D. Colo. Apr. 28, 2016)................18

*City of Sherrill v. Oneida Nation*
    544 U.S. 197 (2005) .........................................................................................................6

*Davilla v. Enable Midstream Partners L.P.*
    913 F.3d 959 (10th Cir. 2017) ..........................................................................2, 4, 9, 12

*Delta Drilling Co. v. Arnett*
    186 F.2d 481 (6th Cir. 1950) ...........................................................................................13, 16

*Dilworth v. Fortier*
    405 P.2d 38 (Okla. 1964)....................................................................................................11, 12

*eBay Inc. v. MercExchange, L.L.C.*
    547 U.S. 388 (2006) .........................................................................................................4, 5

*Edwards v. Lachman*
    534 P.2d 670 (Okla. 1974).................................................................................................12

*FragranceNet.com, Inc. v. FragranceX.com, Inc.*
    No. CV-062225 (JFB) (AKT), 2007 WL 9710244 (E.D.N.Y. Aug. 28, 2007)................17

*Gordon v. T.G.R. Logistics, Inc.*
    321 F.R.D. 401 (D. Wyo. 2017) ......................................................................................6

*Hinsdale v. City of Liberal, Kansas*
    961 F. Supp. 1490 (D. Kan. 1997).....................................................................................21

*In re Grand Jury Proceedings*
    616 F.3d 1172 (10th Cir. 2010) ........................................................................18, 20

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*
    559 U.S. 573 (2010) ...........................................................................................15

*Jicarilla Apache Tribe v. Andrus*
    687 F.2d 1324 (10th Cir. 1982) .............................................................................2

*Miller v. Tidal Oil Co.*
    17 P.2d 967 (Okla. 1933)....................................................................................12

*Oneida Indian Nation of N.Y. v. New York*
    691 F.2d 1070 (2d Cir. 1982) ................................................................................2

*Perez v. El Tequila LLC*
    No. 12-CV-588-JED-PJC, 2014 WL 5341766 (N.D. Okla. Oct. 20, 2014)...............23, 24

*Reibert v. CSAA Fire & Cas. Ins. Co*
    No. 17-CV-350-CVE-JFJ, 2018 WL 279348 (N.D. Okla. Jan. 3, 2018) ..........................6

*Ridenour v. Kaiser-Hill Co.*
    397 F.3d 925 (10th Cir. 2005) .........................................................................24, 25

*Sapulpa Petroleum Co. v. McCray*
    277 P. 589 (Okla. 1929)..................................................................................12, 14

*SEC v. Melchior*
    No. 90–C–1024J, 1993 WL 89141 (D. Utah Jan. 14, 1993) ...........................................13

*Senate of Puerto Rico v. U.S. Dept. of Justice*
    823 F.2d 574 (D.C. Cir. 1987).............................................................................24

*Sinclair Oil Corp. v. Texaco, Inc.*
    208 F.R.D. 329 (N.D. Okla. 2002) ........................................................................21

*Smith v. St. Paul Fire and Marine Ins. Co.*
    905 F. Supp. 909 (D. Kan. 1995)..........................................................................13

*United States v. Gentry*
    119 F. 70 (8th Cir. 1902) ...................................................................................16

*United States v. Gonzalez*
    58 F.3d 506 (10th Cir. 1995) ..............................................................................13

*United States v. Scott*
    37 F.3d 1564 (10th Cir. 1994) ............................................................................17

*U.S. Fire Ins. Co. v. Bunge N. Am., Inc.*
    No. 05-2192-JWL-DJW, 2007 WL 1531846 (D. Kan. 2007) ...........................17

*United States v. Trujillo,*
    853 F.2d 800, 804 (10th Cir. 1988) .................................................................12

*White v. Conoco, Inc.*
    710 F.2d 1442 (10th Cir. 1983) ......................................................................12

## **Court Rules**

Fed. R. Civ. P. 26(b)(1) .............................................................................................6

Fed. R. Civ. P. 30(c)(2) .......................................................................................7, 18

## I.    INTRODUCTION

Intervenor-Plaintiff Osage Minerals Council ("OMC") files this brief in opposition to Defendants Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc.'s (collectively, "Defendants") Third Motion to Compel Against the Osage Minerals Council, Dkt. 263. Despite Defendants' assertions otherwise, all of the objections the OMC's counsel made during the course of Osage Minerals Council Chairman Everett Waller's ("Chairman Waller") deposition were appropriate and proper. The OMC's counsel properly invoked the attorney-client, executive, and deliberative process privileges. Furthermore, counsel's objections on relevance grounds were more than reasonable since the deposition testimony Defendants seek to compel relates only to affirmative defenses this Court has dismissed and will not be probative of whether Defendants constitute a "good faith" or innocent trespasser on the Osage Mineral Estate. Defendants' Motion to Compel, therefore, should be denied, and Chairman Waller's deposition should not be re-opened.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

### a.  The Court's January 11, 2021 Opinion And Order ("Affirmative Defenses Order")

On January 11, 2021, this Court granted the OMC's Motion for Judgment on the Pleadings. *See* Dkt. 219. In granting the OMC's Motion, the Court ruled that, as a matter of law, Defendants could not raise certain affirmative defenses against Plaintiffs' claims that Defendants trespassed on the Osage Mineral Estate when they illegally mined the Estate without the required lease. *See generally* Dkt. 219. As a result, Defendants' affirmative defenses of estoppel, laches, waiver, unclean hands, and *in pari delicto* have been dismissed, as a matter of law. *See id.* at 11.

In granting the OMC's Motion for Judgment on the Pleadings, the Court's Affirmative Defenses Order held the "OMC [was] entitled to judgement on the pleadings *as to laches*,"

1

adopting the Tenth Circuit's view "that the United States commenced this action within a reasonable time and therefore declined to dispose of this action based on laches." *Id.* at 4-5. With regards to the remaining affirmative defenses of estoppel, waiver, unclean hands, and *in pari delicto*, the Court looked to the Tenth Circuit's decision in *Davilla v. Enable Midstream Partners L.P.*, and held that "[p]ermitting third-parties to avoid [] stringent leasing requirements by pointing to the Nation's own conduct would frustrate federal Indian land policy," since it was "Congress [that] dictated the prerequisites" for mining the Osage Mineral Estate. *Id.* at 7–8; *see Davilla*, 913 F.3d 959, 967-68 (10th Cir. 2019). Accordingly, under the Tenth Circuit's analysis in *Davilla*, Defendants' delay-based affirmative defenses could not be asserted against the OMC's claims that Defendants trespassed on the Osage Mineral Estate. *See id*; *see also, id.* at 5 (noting that "courts have consistently recognized that tribes, as well as the United States while acting as a trustee on behalf of Indian tribes, are not subject to 'state delay-based defenses.'") (quoting *Oneida Indian Nation of N.Y. v. New York*, 691 F.2d 1070, 1084 (2d Cir. 1982)).

Finally, this Court rejected Defendants' argument that their state-based affirmative defenses were also viable under federal law, specifically, pursuant to the Tenth Circuit's decision in *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324 (10th Cir. 1982). Dkt. 219, 10. This Court determined that the facts and applicable laws in *Andrus*, namely, compliance with the National Environmental Policy Act—a law that "do[es] not relate to rights of Indians per se, . . . [but] instead advances substantive goals for the nation as a whole"—were distinguishable from the present case dealing with federal law specific to the Osage Nation. *Id.* at 11 (quoting *Andrus*, 687 F.2d at 1340, n.11).

### b. The Court's May 21, 2021 Opinion And Order ("Objections Order")

Following this Court's January 11, 2021 decision, the Magistrate Judge issued rulings on four separate motions to compel. *See* Dkt. 210. On January 16, 2021, the Magistrate Judge issued

an Order granting Plaintiffs' motions to compel Defendants' production of documents related to

the "detailed legal analysis" that Defendants had put at issue by arguing that Defendants'

trespass on the Osage Mineral Estate was committed in good faith reliance on a particular

"detailed legal analysis" generated by Defendants' counsel. *See* Dkt. 175; Dkt. 183. The

Magistrate Judge concluded that "Defendants have injected the 'detailed legal analysis,' as a

whole, into the litigation for the factfinder's consideration by relying on the attorneys'

conclusions and analysis to prove an innocent state of mind," Dkt. 210, 13, and as a result, the

Magistrate Judge ordered production of documents concerning the same. *See id.* at 25–26.

In the same Order, the Magistrate Judge denied Defendants' motions to compel

Plaintiffs' production of documents that Defendants claimed were relevant to their affirmative

defenses of estoppel, laches, waiver, etc. *See* Dkt. 177; Dkt. 179. Specifically, Defendants sought

the production of internal communications from the OMC and United States from 2011 to 2014,

for the purpose of arguing that both had failed to timely notify Defendants of the legal

requirement to obtain a lease. *See* Dkt 177, ¶¶ 23–24; Dkt. 179, 18. Defendants noted they had

"asserted the following defenses . . .  [e]stoppel; [l]aches; and [w]aiver" against the United

States, *id.* at ¶ 23 (citing Dkt. 99, 12), and explained that "[t]he essential factual basis of these

defenses is that . . . . the United States (including, but not limited to, the BIA and Interior) failed

to clearly and timely articulate the theories now at issue." *Id.* at ¶ 24.

To analyze Defendants' motions to compel, the Magistrate Judge considered "whether

the requested discovery is relevant to the potential remedies of ejectment of, and a permanent

injunction against, the existence and operation of the Project" under the three-factor *Davilla* test

that this Court has indicated governs claims for equitable relief in this case. Dkt. 210, 22. The

Magistrate Judge concluded that the requested discovery concerning the United States' and the

3

OMC's past conduct was *not* relevant to the *Davilla* factors, as those factors "focus[] on the present balance of harms to the parties and the public." *Id.* at 23. Moreover, "Osage Wind [did] not attempt to link their discovery requests to any present equitable concerns related to the balance of harms from granting or denying an injunction." *Id*. Accordingly, the Magistrate Judge determined that the backward-looking communications Defendants sought were irrelevant to the issues remaining in the litigation.

On March 8, Defendants filed their Partial Objection to the Magistrate Judge's Discovery Order—not this Court's January 11, 2021 Affirmative Defenses Order—challenging the portions of the Magistrate Judge's Order that denied discovery of "backward-looking" evidence under the balancing of equities articulated in *Davilla*. Dkt. 218 ("Partial Objection"). The OMC filed a brief in opposition. Dkt. 223.

On May 21, 2021, this Court issued its Opinion and Order rejecting the arguments Defendants asserted in their Partial Objection to the Magistrate Judge's Discovery Order. Dkt. 226 (the "Objections Order"). First, this Court clarified that Defendants' analysis of *Davilla* mischaracterized the holding in the case. Dkt. 226, 7. Instead, this Court noted that:

> [T]he Tenth Circuit explicitly required consideration of the following factors in cases of continuing trespass to Indian land: (1) whether an injunction is necessary to prevent "irreparable harm," (2) whether "the threatened injury outweighs the harm that the injunction may cause" to the enjoined party, and (3) whether the injunction would "adversely affect the public interest."

*Id.* at 8 (quoting *Davilla,* 913 F.3d at 973). This Court further found that these "factors reflect the prospective nature of injunctive relief." *Id*. at 8 (citations omitted).

This Court also rejected Defendants' contention that the Magistrate Judge had erred when she failed to interpret *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), as supporting Defendants' argument that backward-looking evidence regarding the OMC's and the United

4

States' alleged delay would be relevant to the balancing of the equities test under *Davilla*.[1] Referencing the Affirmative Defenses Order, this Court stated that "recitations of the general principles of equity—that do not contend with the strong federal policy in favor of vindicating Indian law claims—do not persuade the court that it must consider the United States and OMC's past conduct to determine the propriety of equitable relief." *Id.* at 10.[2]

### c. Defendants' Motion For Reconsideration And The Court's August 25, 2021, Opinion And Order

On June 14, 2021, Defendants requested this Court reconsider the Affirmative Defenses Order and the Objections Order. Dkt. 229. The OMC and the United States filed motions in opposition. Dkt. 234; Dkt. 235. Defendants then filed replies to both the OMC and the United States. Dkt. 244; Dkt 245.

On August 25, 2021, this Court denied reconsideration, finding Defendants' "motion is little more than a rehash of arguments raised and rejected in prior briefing." Dkt. 264, 12. First, the Court declined Defendants' request to reverse its decision denying Defendants' affirmative defense of laches, reasoning that the "application of the law of the case doctrine as to the Tenth Circuit's resolution of laches was neither clear error nor manifest injustice."[3] *Id*. at 17. Second, the Court considered Defendants' argument that the Court had misinterpreted the Tenth Circuit's decision in *Davilla* and concluded that "the court's application of *Davilla* was not a misapprehension of controlling law sufficient to rise to the level of clear error." *Id*. at 21. Third,

---

[1]  This Court noted that Defendants' reliance on *eBay* and other patent law cases was misplaced, "as they do not relate to Indian land claims." *Id.* at 10.

[2]  This Court also concluded that "Osage Wind fails to demonstrate the relevance of the requested discovery to its res judicata/claim preclusion affirmative defense." Dkt. 226, 12.

[3]  The Court went even further, noting that "although Osage Wind contends that the Tenth Circuit erred in consider[ing] the beginning of turbine excavation as the relevant timeframe for laches, rather than judging the defense from when OMC learned of plans detailing the excavation, defendants raised this issue in their petition for rehearing to the Circuit, which was denied." Dkt. 226, 14.

5

the Court affirmed its Affirmative Defense Order dismissing Defendants' delay-based affirmative defenses, concluding that "the Affirmative Defense Order did not err or misconstrue the law in concluding that the affirmative defenses were not properly asserted under the federal courts' traditional equity jurisprudence." *Id*. at 24. Fourth, the Court held Defendants failed to "tie" the "requested discovery…to other remedies, apart from the equitable remedies of injunction and ejectment," including "damages and an accounting," before this Court and the Magistrate Judge. *Id*. at 25.[4] And finally, the Court disposed of Defendants' arguments that the Supreme Court's decision in *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), somehow requires this Court to re-instate Defendants' dismissed delay-based defenses, noting that "the Osage Nation has consistently exercised sovereignty over the Osage Mineral Estate having never lost possession of it." *Id.* at 23-24.

### III.   STANDARD OF REVIEW

Under Rule 26 of the Federal Rules of Civil Procedure, parties may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). When considering a motion to compel, reviewing courts must inquire: "(1) is the information privileged; (2) is it relevant to a claim or defense; and (3) is it proportional to the needs of the case." *Reibert v. CSAA Fire & Cas. Ins. Co.*, 17-CV-350-CVE-JFJ, 2018 WL 279348, at *2 (N.D. Okla. Jan. 3, 2018) (citing *Gordon v. T.G.R. Logistics, Inc.*, 321 F.R.D. 401, 402 (D. Wyo. 2017)). Although the concept of relevance remains fairly broad, courts should prevent speculative "fishing expeditions." *Id.* at *4. To inquire whether requested discovery is sufficiently "proportional" to the needs of the case,

---

[4] Importantly, the Court found "[t]he United States and OMC have reasonably relied upon the Affirmative Defense Order and Objection Order" and "[r]econsideration would necessarily require the court to extend the discovery deadline and further delay this seven-year-old case." Dkt. 226, 12.

courts consider "(1) the importance of the issues at stake in the action, (2) the amount in controversy, (3) the parties' relative access to relevant information, (4) the parties' resources, (5) the importance of the discovery in resolving the issues, and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

Defendants' Motion to Compel not only seeks privileged information, it is a fishing expedition for previously dismissed, irrelevant information not proportional to the needs of this case. For these reasons, and the reasons described in greater detail below, Defendants' Motion should be dismissed.

## IV.   ARGUMENT

### a.   The OMC Was Correct To Object On Grounds of Relevance

The relevancy objections asserted by the OMC's counsel, along with his subsequent instructions not to answer the same, were made in accordance with this Court's prior orders specifically addressing relevancy, or more appropriately, lack thereof. Thus, counsel's objections and instructions fall within the "narrow set of circumstances"—as Defendants acknowledged but did not fully discuss—that do not require a party to provide testimony subject to an objection on the record. *See* Defs.' Mot. 11-12. Specifically, the "narrow set of circumstances" that Defendants reference in passing is described in the last sentence of Rule 30(c)(2), which states: "A person may instruct a deponent not to answer only when necessary . . . *to enforce a limitation ordered by the court* . . . ." Fed. R. Civ. P. 30(c)(2) (emphasis added).

Indeed, all of the relevancy objections Defendants now challenge in their Motion relate to testimony designed to shift the blame from Defendants for their own conduct in illegally mining the Osage Mineral Estate to the OMC, in violation of this Court's clear edict that "[p]ermitting third-parties to avoid [] stringent leasing requirements by pointing to the Nation's own conduct

would frustrate federal Indian land policy," and thus, is impermissible in this litigation. Dkt. 219, 8. As this Court previously concluded, such discovery is impermissible because "Congress [] dictated the prerequisites" for mining the Osage Mineral Estate (an Indian trust asset), and these prerequisites do *not* hinge the Estate's protection on an evaluation of whether the *OMC* acted in any specific manner to somehow prevent Defendants from illegally mining the Estate. *Id.* at 7. Accordingly, the objections offered by the OMC's counsel were proper, appropriate, and necessary to prevent Defendants from questioning Chairman Waller concerning issues and topics this Court has deemed irrelevant to the only remaining issue in this case: "the relief due to the Osage Mineral Estate." Dkt. 171, 2 (quoting Dkt. 138).

> ### i. *This Court's Orders Clearly State Defendants Are Not Entitled To Backward-Looking Evidence Related To The OMC's Past Conduct Or Knowledge Under A Davilla Analysis*

Since January 16, 2021, this Court has repeatedly upheld its determination that "[t]he 'balancing of equities' under *Davilla does not include any backward-looking* considerations of [the OMC's] past conduct or knowledge." Dkt. 210, 23 (emphasis added); *see also* Dkt. 226, 11 ("For the same reasons, the court is not persuaded that . . . backward looking variants of the affirmative defense of unclean hands are relevant to determine the availability of equitable relief here, in the context of a tribal land claim."); Dkt. 264, 20-21 (rejecting Defendants' argument "that backward-looking evidence is relevant to the 'public interest' consideration of the preliminary injunction analysis," and noting that *Davilla's* public interest inquiry is "forward-looking as to the 'the relative costs and benefits of defendant removing the pipeline. . . .'").

Despite this Court now having affirmed its interpretation and application of *Davilla* to the present case no fewer than three times, Defendants still argue that backward-looking evidence—this time as is relates to "understanding what remedies the OMC has sought in other

cases where alleged mining occurred without first obtaining a lease pursuant to 25 C.F.R. § 214, and the circumstances in which the OMC has granted waivers concerning that lease requirement"—is an "important consideration[] in any equitable analysis." Defs.' Mot. 15. Defendants, however, have offered no explanation for how actions the OMC has taken to curb the hypothetical, illegal actions of others is at all probative of the public interest in an injunctive relief analysis, or any factor the *Davilla* Court has deemed relevant to this Court's consideration of equitable relief. At this point, Defendants have had every opportunity to provide an explanation as to *how* evidence of other parties' hypothetical illegal mining—and/or the OMC's response to such hypothetical illegal mining—might shed light on this Court's consideration of the weighing of the equities, and Defendants have offered nothing more than a blanket statement that these "are important considerations in any equitable analysis." Defs.' Mot. 15.

Such blanket statements do not suffice. Without any further explanation or reason, it appears that this line of inquiry—targeted to what hypothetical actions the OMC may or may not have taken in the past—is nothing more than an attempt to repackage Defendants' delay-based affirmative defenses and transform this Court's "public interest" analysis into a question of whether the OMC did enough to prevent Defendants from illegally mining the Osage Mineral Estate. But nothing in 25 C.F.R. § 211 or 25 C.F.R. § 214, or the Osage Allotment Act as passed by Congress, supports such an interpretation. Quite the opposite, because it was "Congress [that] dictated the prerequisites" for mining the Osage Mineral Estate, nothing in *Davilla* supports the incorporation of considerations that would allow "third-parties to avoid [] stringent leasing requirements by pointing to the Nation's own conduct. . . ." Dkt. 219, 7-8 (citing *Davilla*, 913 F.3d at 967-68). Doing so would "would frustrate federal Indian land policy." *Id.* The deposition

testimony Defendants seek, therefore, is not relevant to this Court's weighing of the equities and consideration of equitable relief.

> ## ii. The Backward-Looking Testimony Defendants Seek Is Not Relevant To This Court's Consideration Of Defendants' Status As A "Good Faith" Or Innocent Trespasser

Not to be deterred by several Court orders deeming this testimony irrelevant, Defendants now claim, in a motion filed eleven days before the close of discovery, that backward-looking evidence concerning what the OMC was doing before the United States filed the instant litigation is relevant to this Court's consideration of Defendants' status as a "good faith" or innocent trespasser (which goes to the calculation of monetary damages and not equitable relief). *See* Defs.' Mot. 14. Defendants claim Chairman Waller's challenged testimony is necessary to determine "whether '[d]efendants knew or should have known that they were required to comply with the express provisions of 25 C.F.R. § 211 or 25 C.F.R. § 214.'" *Id.* at 13 (quoting Dkt. 171, the "July 15, 2020 Order," in turn quoting Dkt. 20, the United States First Amended Complaint). This presentation, however, is misleading and quotes the Court's July 15, 2020 Order entirely out of context.

The fact that this Court's three-page July 15, 2020 Order quoted the United States First Amended Complaint ("United States FAC") as having alleged that "[d]efendants knew or should have known that they were required to comply with the express provisions of 25 C.F.R. § 211 or 25 C.F.R. § 214," *see* Dkt. 20, ¶¶ 49, 56, 63, in no way constitutes a holding that this allegation in the United States FAC is somehow the governing precedent that will determine whether Defendants constitute an innocent trespasser. Instead, the Court's July 15, 2020 Order was responding to Defendants' argument that "the court's July 1 Orders [] dispos[ed] of the issue of whether Osage Wind constituted an 'innocent trespasser' for the purpose of calculating damages

10

for the mineral trespass under Oklahoma law." Dkt. 171, 3. That is, in July 2020, Defendants were arguing that the question of whether they constitute an "innocent trespasser" had been dismissed entirely from this case, and in response, the Court noted it had *not* been dismissed because "[t]he court's July 1 Orders were intended to frame the claims and relief at issue by limiting the United States and the OMC to the allegations and demands of the First Amended Complaint." *Id.* The Court then quoted the "[d]efendants knew or should have known" language from the United States FAC *not* to espouse the standard of law governing the Court's adjudication of Defendants' status as an innocent trespasser, but rather, the Court quoted the United States FAC to note that "the United States preserved the issue of whether Osage Wind qualified as an 'innocent trespasser,'" and consequently, Defendants were wrong to claim the issue had been dismissed from the case. *Id.*

And to be sure, a review of the actual law does not support Defendants' mischaracterization of the governing standard. Instead, Oklahoma law makes clear that the question before the Court is *not* whether "the OMC's views and understanding of the scope of mining—generally and as specifically applied to the Project" (Defs.' Mot. 13) are sufficient to demonstrate whether Defendants "knew" or "should have known" they had to comply with the law. Contrary to Defendants' framing of the law—a framing that noticeably lacks citations to a *single* court precedent—the Oklahoma Supreme Court has concluded that:

> Good faith, as the term is used in the rule of law that a trespasser on the land of another who takes property therefrom shall be liable only for the actual damages if the property taken was taken in good faith, means that the taking is without culpable negligence or a willful disregard of the rights of others and *in the honest and reasonable belief that it was rightful*. The term has been employed in the authorities on this subject to characterize the acts of one who, while legally a wrongdoer, *acted in the honest belief that his conduct was lawful*.

11

*Dilworth v. Fortier*, 405 P.2d 38, 46 (Okla. 1964) (emphasis added); *see also White v. Conoco, Inc.*, 710 F.2d 1442, 1448-49 (10th Cir. 1983) (concluding that under Oklahoma law, a good faith trespasser is "one who acts without culpable negligence or willful disregard of the rights of others and in an honest, reasonable belief that his action is proper.").[5] Thus, the factual inquiry the factfinder in this case must undertake is whether Defendants had a "reasonable" belief that their mining of the Osage Mineral Estate without a permit was lawful, and, ultimately, whether Defendants had an "honest" belief that their conduct was lawful. *See id.*

Furthermore, Defendants have repeatedly claimed that their honest, "good faith" belief is based on the advice they received from their counsel (not anyone else, and certainly not the OMC); that is, Defendants have asserted that they "believed, in good faith, *based upon a detailed legal analysis*, that a lease or permit were not required." Dkt. 101, 11 (emphasis added); *see also* Dkt. 116, 11 (Defendants, again, claiming that Defendants "believed, in good faith, based upon a

---

[5] Defendants' assertion that they constitute a good faith/innocent trespasser is not a defense to liability. Instead, the general rule is that if a defendant acted in good faith, that defendant is entitled to a reduction of damages in an amount equal to the defendant's expenditures in producing the mineral. *See, e.g., Champlin Refining Co. v. Aladdin Petroleum Corp.*, 238 P.2d 827 (Okla. 1951); *Bailey v. Texas Pacific Coal & Oil Co.*, 32 P.2d 709 (Okla. 1934); *Miller v. Tidal Oil Co.*, 17 P.2d 967 (Okla. 1933); *Sapulpa Petroleum Co. v. McCray*, 277 P. 589 (Okla. 1929). The OMC maintains, however, that even if the factfinder were to conclude that Defendants act in good faith—it is clear they did not, but even then—Defendants are not entitled to a reduction in damages because the OMC and Osage headright holders have not received any benefit or gain from Defendants' trespass. *Edwards v. Lachman*, 534 P.2d 670, 673 (Okla. 1974) (concluding defendants are not entitled to a reduction in damages where the trespass committed "by defendants conferred no benefits upon plaintiffs or their property."). The OMC also reserves its right to challenge Defendants' reliance on this "good faith" argument to the extent the Oklahoma "good faith" trespasser exception violates *Davilla's* proscription that state law cannot be incorporated into federal law claims where doing so would violate Congress's policy mandates for the management of the Osage Mineral Estate as an Indian trust asset. *See Davilla*, 913 F.3d at 967 (opining that "even if Oklahoma would say that this evidence could defeat any trespass claim, we would not incorporate such a rule into the Allottees' federal right of action. As we explained above, federal courts should only incorporate state rules of decision into federal claims to the extent those rules are consistent with federal law and policy."); *see also* Dkt. 219, 8 ("Permitting third-parties to avoid these stringent leasing requirements by pointing to the Nation's own conduct would frustrate federal Indian land policy."); *United States v. Trujillo,* 853 F.2d 800, 804 (10th Cir. 1988) (affirming the district court's order that innocent trespassers must vacate and restore the land and pay nominal damages because "it is the result required by the Pueblo Lands Act and the policy underlying it.").

detailed legal analysis, that neither a lease nor permit were required."); Dkt. 150, 10-11 (Defendants, again, claiming that Defendants are not liable for their unlawful mining because they "believed, in good faith, based upon a detailed legal analysis, that neither a lease nor permit were required."). Thus, based on Defendants' repeated iterations of their own affirmative defense, it is clear that Defendants' "good faith" defense is, first and foremost, predicated on the allegation that they relied, in good faith, on the advice of their counsel. *See* Dkt. 17, ¶ 17 (asserting an advice of counsel affirmative defense); *see also* Dkt. 210, 10-11 (concluding that "Defendants placed their counsel's advice directly at issue by relying on a 'detailed legal analysis' of outside counsel to prove their subjective good faith belief in the legality of their conduct.").

Because Defendants themselves predicate their reasonable "good faith" belief on their own reliance on their counsel's advice, the relevant question before the Court, ultimately, is not whether Defendants' "should have known" but rather, is whether their reliance on counsel was itself, in fact, undertaken in "good faith." To reach such a determination, courts will consider and determine the following:

- Whether all of the relevant facts underlying the legal analysis were "fairly submitted to their attorneys" and "completely disclosed." *See, e.g., Delta Drilling Co. v. Arnett*, 186 F.2d 481, 486 (6th Cir. 1950); *United States v. Gonzalez*, 58 F.3d 506, 512 (10th Cir. 1995); *SEC v. Melchior*, No. 90–C–1024J, 1993 WL 89141, at *20 (D. Utah 1993); *Smith v. St. Paul Fire and Marine Ins. Co.*, 905 F. Supp. 909, 920 (D. Kan. 1995).
- Whether the defendant requested advice of counsel on the legality of its proposed action. *Melchior*, 1993 WL 89141 at *20.
- Whether the defendant received "advice from counsel that the action to be taken will be legal." *Id*.
- "[W]hether advice of counsel is being furnished for tactical reasons and whether there has been a good faith reliance on the advice." *Alaska Place Co. v. Lee*, 553 P.2d 54, 60 (Alaska 1976).
- Whether the defendant "had reason to believe [its counsel] was capable of giving competent advice about the case." *Smith,* 905 F. Supp. 909, 920.
- Whether the defendant "honestly pursued" its counsel's advice. *Id*.

13

None of the deposition testimony that Defendants seek to compel from Chairman Waller bears any relation to any of these considerations. This is because "[g]ood faith consists in an *honest intention* to abstain from taking any unconscientious advantage of another, even though forms or technicalities of the law, together with an absence of all information or belief of facts which would render the transaction unconscientious." *Sapulpa Petroleum Co. v. McCray*, 277 P. 589, 590 (Okla. 1929) (emphasis added) (citation omitted). Any determination of good faith, or innocent trespasser status, must consider *Defendants'* intent and knowledge at the time the decision was made to engage in their unlawful conduct—not Plaintiffs'. What Chairman Waller thought, believed, or did in the past is simply not probative of whether Defendants honestly believed the attorney analysis that they have consistently claimed to have relied on.

A review of the objections Defendants challenge reveals that they all properly challenge questions asked of Chairman Waller that have no bearing on Defendants' intent or knowledge at the time Defendants elected to move forward with mining the Osage Mineral Estate without a permit. For instance, Defendants claim that they should be allowed to ask Chairman Waller:

> And that is in 2013 you understood that the BIA wasn't sure whether or not there was a minerals component to what the wind farm was doing. Is that fair from your observations of what was going on at that time?

Defs.' Mot. 14 (quoting Waller Tr. 138:8-139:7). Putting aside the incorrect characterization of Chairman Waller's understanding of BIA's understanding of the law, this question does not even begin to approach any relevant topic related to whether Defendants held an honest belief in 2013 or 2014 that they could mine the Osage Mineral Estate without a permit because of an analysis their attorneys undertook. Nothing in this question inquires as to whether Defendants fully disclosed the facts to their attorneys regarding their plans for construction, nor does this question

focus at all on Defendants' sincere beliefs. What Chairman Waller believed about BIA's understanding of the law in 2013 is entirely irrelevant to any issue remaining in the case.

And to the extent Defendants seek testimony regarding whether the OMC sufficiently informed Defendants *why* they must comply with the law, no such requirement exists. *See* Defs.' Mot. 13 (asserting that why and how the OMC "understand[s] the scope of mining—generally and as specifically applied to the Project," is relevant to Defendants' alleged good faith reliance on the advice of their counsel). Indeed, such discovery would not only go against this Court's prior holdings and Indian law policy, *see* Dkt. 219, 7-8, it would also conflict with the Supreme Court's longstanding recognition that ignorance of the law does not excuse violations of the law:

> We have long recognized the "common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally." *Barlow v. United States,* 7 Pet. 404, 411, 8 L.Ed. 728 (1833) (opinion for the Court by Story, J.) . . . . Our law is therefore no stranger to the possibility that an act may be "intentional" for purposes of civil liability, even if the actor lacked actual knowledge that her conduct violated the law. . . . [W]hen Congress has intended to provide a mistake-of-law defense to civil liability, it has often done so more explicitly than here.

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581–83 (2010). Congress did not provide a "mistake-of-law" defense for illegally mining the Osage Mineral Estate. Nor did Congress provide a "the OMC failed to sufficiently notify you not to break the law" defense either. All of Chairman Waller's testimony that Defendants seek in this regard is entirely irrelevant to the question of what remedy this Court should impose for Defendants' illegal mining of the Osage Mineral Estate.[6]

---

[6] Defendants contend that "testimony concerning the royalty rates and other terms under which the OMC has entered into such leases is relevant to the calculation of damages . . . ." Defs.' Mot. 16. The OMC certainly objects to this contention, as the royalty rates the BIA and the OMC have historically offered to mine the Osage Mineral Estate contemplate the existence of a party that lawfully obtained a lease from the OMC. To date, Defendants have never sought a lease from the OMC, and instead, have forced the OMC to litigate. Defendants' circumvention of the OMC's sovereignty precludes the calculation of damages in this litigation based on rates negotiated with entities who obtained a lease to mine the Osage Mineral Estate *before* engaging in mining. That objection aside, and without waiving the

    **b.   It Is Not "Unfair" That OMC Witnesses Do Not Have Relevant Knowledge Regarding Whether Defendants Honestly Believed That They Did Not Need A Permit**

Next, Defendants argue that the OMC unfairly takes the position that "that it can ask questions about whether Defendants acted in bad faith, but it is improper for Defendants to gather any rebuttal evidence." Defs.' Mot. 17. The OMC, however, has done nothing to prevent Defendants from gathering rebuttal evidence. For instance, Defendants could gather evidence to demonstrate that Defendants took care to ensure that all relevant facts regarding their methodologies for construction were "fairly submitted to their attorneys" who undertook the legal analysis. *Delta Drilling Co. v. Arnett*, 186 F.2d at 486. Or, Defendants could gather evidence to demonstrate that the Modrall Sperling memo was *not* "being furnished for tactical reasons" or that "there has been a good faith reliance on the advice." *Alaska Place Co. v. Lee*, 553 P.2d at 60. It is not, however, the OMC's fault that "when the good faith or the intent of a party in a given affair is in issue, [that party's] acts and sayings in relation to it at about the time of the transaction generally constitute the best evidence of the fact." *United States v. Gentry*, 119 F. 70, 73 (8th Cir. 1902).

Nonetheless, Defendants cite to several unpublished opinions in an attempt to show that "basic principles governing discovery" indicate that Defendants should be allowed to ask

---

OMC's objection to the relevance of this discovery, Plaintiffs have provided Defendants with more than enough information and responsive documents to calculate the royalty rates that the OMC has previously negotiated with lawful actors. *See, e.g.,* Dkt. 271-2 (OMC's Objections and Responses to EGNPA's First Interrogatories and Requests for Production) 14, 20 (producing OMC-000736-741); Dkt. 271-3 (United States First Supplemental Responses to Defendant, Osage Wind, LLC's First Set of Interrogatories and Requests for Production), Response to Interrogatory No. 8, 3-4 (identifying Osage Wind-1793-1795, 1799, 1921-1929, 1933-1934, 1937, 1980-1984, 1986, 1990, 1995-1999, 2020-2024, 2027-2030, 2034-2037, 2126-2129, 2134-2137, 2139-2140, 2142-2143, 2179).

16

questions about the OMC's pre-suit conduct because discovery is a "two-way street."[7] Defs.'

Mot. 17. None of the cases Defendants cite support the proposition that Defendants should be

permitted to obtain deposition testimony from the OMC to substantiate Defendants' "good

faith"/innocent trespasser deduction from monetary damages. For instance, Defendants cite a

District Court in Kansas for the proposition that "[b]y raising a defense, a party opens the door to

the discovery concerning that defense." Defs.' Mot. 17 (quoting *U.S. Fire Ins. Co. v. Bunge N.*

*Am., Inc.*, No. 05-2192-JWL-DJW, 2007 WL 1531846, at \*5 (D. Kan. May 25, 2007))

(quotations omitted). The OMC, however, has not raised any defense in relation to Defendants'

"good faith" reliance on the advice of counsel and their alleged status as an innocent trespasser.

Instead, Defendants have repeatedly raised the argument that they relied on their attorneys'

advice in good faith. *See* Dkt. 210, 10 (concluding that "Defendants placed their counsel's advice

directly at issue by relying on a 'detailed legal analysis' of outside counsel to prove their

subjective good faith belief in the legality of their conduct."); *see also United States v. Scott*, 37

F.3d 1564, 1583 (10th Cir. 1994) ("[R]eliance upon advice of counsel is a defense that the

defendant must establish.") (citations omitted).[8]

---

[7] As noted by this Court in this Court's August 25, 2020 Order, "[u]npublished decisions are not precedential, but they may be cited for their persuasive value." Dkt. 264, n.4 (citations and quotations omitted).

[8] Defendants also reference *FragranceNet.com, Inc. v. FragranceX.com, Inc.* for the proposition that "[d]iscovery is a two-way street." Defs.' Mot. 17 (quoting *FragranceNet.com*, No. CV 06-2225 (JFB) (AKT), 2007 WL 9710244, at \*3 (E.D.N.Y. Aug. 28, 2007) (quotations omitted); *see also FragranceNet.Com, Inc.*, 2007 WL 9710244, at \*3. While it is true that the *FragranceNet.com* Court concluded that it was fair to require both parties to produce their corporate books and record, the Court reached that conclusion based on a determination that each party's corporate books and records were relevant to the issues remaining in the case, thus "[t]o rule otherwise would severely prejudice Plaintiff's ability to prosecute this action." *FragranceNet.Com, Inc.*, 2007 WL 9710244, at \*3. Here, to the contrary, Defendants' ability to prosecute their innocent trespasser defense is not at all prejudiced by the inability of Defendants to ask Chairman Waller what he did or did not do in the past, since what Chairman Waller did or did not do in the past is in no way probative of whether Defendants held an honest belief that they did not need a lease to mine the Osage Mineral Estate.

Finally, Defendants argue the OMC "unilateral[ly] determin[ed]" that the pre-suit discovery sought by Defendants in the deposition of Chairman Waller was not relevant absent "any Court order limiting deposition testimony . . . ." Defs.' Mot. 18. The Court's previous orders, however, clearly preclude the testimony that Defendants now seek. *See, e.g.,* Dkt. 226, 10 (concluding that Defendants have failed to "persuade the court that it must consider the United States and OMC's past conduct to determine the propriety of equitable relief."); *see also* Dkt. 210, 24 (noting that discovery related to the "delay or misconduct of the Osage Nation" is foreclosed for lack of relevance to the remaining issues in the case.).[9]

### c.   The OMC Properly Objected On Attorney-Client Privilege Grounds

Furthermore, contrary to Defendants' assertions otherwise, counsel's objections based on the attorney-client privileges were entirely appropriate and proper. Under Fed. R. Civ. P. 30(c)(2), an attorney can instruct a deponent not to answer "when necessary to preserve a privilege." The attorney-client privilege protects "confidential communications by a client to an attorney made in order to obtain legal assistance from the attorney in his capacity as a legal advisor." *In re Grand Jury Proceedings*, 616 F.3d 1172, 1182 (10th Cir. 2010) (citation omitted). The attorney-client privilege also protects "those attorney to client communications which would have a tendency to reveal the confidences of the client." *Id.*

---

[9] Defendants cite *CGC Holding Co. LLC v. Hutchens* as "instructive" to their claim, stating "it has long been established that instructing a witness not to answer a deposition question on the grounds of relevance is simply not permitted." Defs.' Mot. 18 (quoting *CGC Holding*, No. 11-cv-01012-RBJ-KLM, 2016 WL 11691829 (D. Colo. Apr. 28, 2016) (quotations omitted). While it is easy to make a sentence taken out of context appear "instructive," a closer look at the law discussed in *CGC Holding*—depositions by oral examination under Fed. R. Civ. P. 30—shows that counsel for the OMC's objections fall squarely within Rule 30's constraints. Fed. R. Civ. P. 30(c)(2) clearly states "a person may instruct a deponent not to answer . . . to enforce a limitation ordered by the court . . . ." Here, the Court has limited discovery concerning the OMC's pre-litigation conduct. *See* Dkt. 264, 20-21, 26.

Defendants attempt to circumvent this privilege by cherry-picking multiple excerpts from Chairman Waller's deposition transcript without providing the full context necessary to understand the question posed and the objection stated. For example, Defendants cite to a mere four lines in Chairman Waller's 217-page transcript to argue that the privilege was improperly invoked. *See* Defs.' Mot. 19 (quoting Waller Tr. 88:15-19). Defendants' omission provides the foundation they claim is lacking. Just three pages in the transcript before, Defendants' counsel asked Chairman Waller about this litigation, specifically stating "obviously the lawsuit was filed in November 2014. There were efforts made at that time for an injunction." Ex. 1 (Waller Tr.), 86:06-08. Then Defendants' counsel asked a question that relates directly to the OMC's decision to intervene in this litigation, asking "My question is have you spoken to others in the Osage Minerals Council on that subject matter, that is, whether they generally oppose the development of renewable energy projects such as wind farms anywhere in Osage County?" *Id.* at 87:07-11. From there, the questioning quickly devolved into the OMC's communications with OMC counsel and deliberations concerning the instant litigation, as the exchange (which Defendants omitted from their motion) went as follows:

> **Q: There was a council directive?**
> A: Yes, a consensus.
> **Q: What was the council directive and consensus?**
>  A: To find some relief.
> **Q: To find some relief from what?**
>
> MR. PIPESTEM: Objection. *We're getting into privileged communications regarding this lawsuit,* so I'm instructing the witness not to answer . . . .
>
> **Q: (BY MR. McCORMACK) Let me ask this question. You said that you were -- you had a directive. What was the directive that you discussed with members of the Osage Minerals Council?**
> MR. PIPESTEM: Objection. To the extent that

> involves privileged communications between Minerals Council members,
> possibly and likely with legal counsel present, I'm instructing the witness
> not to answer the question.

*Id.* at 87:18-19 (emphasis added). As shown above, Defendants' counsel asked a question about

the OMC's directive regarding this litigation, and the OMC's counsel objected, and then gave a

reason, the reason being that the questions were touching on "privileged communications

regarding this lawsuit." *Id.* at 87-24-88:1. Conversations related to the OMC's decision to

intervene in this lawsuit were either with the OMC's counsel, or specifically discussed advice

received from the OMC's counsel, and thus they clearly fit within the protected category of

"confidential communications by a client to an attorney made in order to obtain legal assistance

from the attorney in his capacity as a legal advisor." *In re Grand Jury Proceedings*, 616 F.3d at

1182. Ultimately, in this exchange, counsel for Defendants narrowed his questioning to make

clear he did not intend to ask about communications with counsel, and because he made clear he

was not asking about privileged communications, he got an answer to his question:

> **Q: Please tell me any communications**
> **You've had with Osage Minerals Council members without**
> **counsel present after December 1, 2014 in which the**
> **subject matter is whether the Osage Minerals Council**
> **should oppose the development of renewable energy projects**
> **such as wind farms anywhere in Osage County?**
> A: Not without my counsel I haven't.

Ex. 1 (Waller Tr.), 90:19-91:02. Reading the five pages together clearly demonstrates that

Defendants are wrong to state that the OMC's counsel "instructed Chairman Waller not to

answer questions in the absence of any foundation showing that the answers to those questions

implicated that privilege." Defs.' Mot. 19. In this instance, the four lines Defendants selected for

inclusion in their motion omitted Chairman Waller's testimony that he did not have

conversations concerning the OMC's opposition to the development of renewable energy

projects after the filing of this lawsuit without counsel present. This is more than enough to

establish the foundation necessary for the privilege. *See Hinsdale v. City of Liberal*, 961 F. Supp.

1490, 1494 (D. Kan. 1997) (concluding that the privilege covers communications "relate[d] to

the business or transaction for which the attorney has been retained or consulted.").

Defendants also claim that the OMC's counsel made an inappropriate objection based on

attorney-client privilege at 92:25-93:5, *see* Defs.' Mot. 19, when the OMC's counsel stated:

"Objection. I'm instructing the witness not to answer that question to the extent that legal

counsel *may have been present* or there *may have been discussion of legal strategy* in that

conversation between Minerals Counsel. So on that basis, I'm instructing the witness not to

answer to preserve privilege." Ex. 1 (Waller Tr.), 92:25-93:05. Again, Defendants omit

Chairman Waller's statement just one page before that, after the United States filed this litigation

in 2014, Chairman Waller did not have any conversations about the wind farm at issue in this

case, or wind energy in general, without the presence of counsel. *See* Ex. 1 (Waller Tr.) at 91:02.

It is more than reasonable for OMC's counsel to object and instruct the witness not to answer a

question about discussions following the filing of this lawsuit "to the extent that legal counsel

may have been present or there may have been discussion of legal strategy." *Id.* at 93:01-03.

Defendants also argue that the OMC's counsel "instructed Chairman Waller not to

answer questions that only sought underlying facts, which are not protected by attorney-client

privilege." Defs.' Mot. 20. First and foremost, while underlying facts are not protected by the

attorney-client privilege, "communications between the attorney and the client, even when the

parties are discussing factual information, are protected by the attorney client privilege." *Sinclair

Oil Corp. v. Texaco, Inc*., 208 F.R.D. 329, 332 (N.D. Okla. 2002). A simple review of the

excerpts Defendants rely upon in their motion reveals that the OMC's counsel in no way

21

prevented Defendants' counsel from asking questions related to facts not protected by the
attorney-client privilege. First, Defendants cite to their counsel's question at 92:21-23, where Mr.
McCormack asked Chairman Waller "All right. Did you have any conversations with other
members of the [OMC] on that subject matter after December 1, 2014?" Defs.' Mot. 21 (quoting
Waller Tr. 92:21-23). Defendants again omit a key portion of Chairman Waller's testimony. Just
one page before, Chairman Waller informed Mr. McCormack that, after the United States filed
this lawsuit in 2014, all of his conversations on that subject matter involved counsel. *See* Ex. 1
(Waller Tr.) at 91:02. Once again, the invocation of the attorney-client privilege to prevent
disclosure of communications with counsel is more than appropriate.

Second, Defendants offer up 181:9-13 as grounds for concluding that the OMC's counsel
improperly objected. *See* Defs.' Mot. 21. Again, a review of the transcript reveals that the
OMC's counsel did not prevent Defendants' counsel from asking questions concerning non-
privileged facts. Mr. McCormack asked whether, in 2015 (after this litigation had been filed), the
OMC had conversations concerning "the issue of whether or not the Osage Minerals Council
should consider options for renewable energy on a go-forward basis." Ex. 1 (Waller Tr.), 181:09-
13. Mr. McCormack and Mr. Pipestem then engaged in a back and forth regarding Mr.
Pipestem's objection, and Mr. Pipestem explained that Mr. McCormack's question "calls for
issues associated directly with this litigation, so that's covered by attorney-client privilege and
deliberation of an elected body called the Osage Minerals Council." *Id.* at 182:03-06. Following
this proper objection, Mr. McCormack rephrased his question, and the exchange went as follows:

> **Q: (BY MR. McCORMACK) Did you have a conversation at any time
> with Mr. Cheshewalla or Mr. Redcorn in this timeframe, 2015 or
> anytime thereafter, on the general subject matter of whether or not it
> made sense for the Osage Minerals Council to look into the prospect
> of renewable energy taking place somewhere on the Osage Mineral
> Estate?**

> A: For any company, not just yours?
> **Q: Yes, sir, especially not mine.**
> A: Well, I don't know. You're the one we were having to deal with thinking.

*Id.* at 183:11-21. It is hard to understand what facts Defendants think they are missing. Mr. McCormack spent a good deal of time asking Chairman Waller what conversations he had about wind energy after the United States filed this lawsuit in 2014, and it is quite clear from Chairman Waller's testimony that the only conversations he recalls took place in the presence of counsel and concerned Defendants and the wind farm at issue in this litigation. OMC's counsel, therefore, properly invoked the attorney-client privilege during Chairman Waller's deposition to prevent the disclosure of discussions the OMC had in 2015 and thereafter with counsel concerning issues related to this litigation.

### d. The OMC Properly Objected On Deliberative Process And Executive Privilege Grounds

OMC's counsel also properly evoked the deliberative process privilege. Defendants claim that "[t]he OMC's counsel repeatedly instructed Chairman Waller not to answer questions on deliberative process grounds[,]" Defs.' Mot. 22, but only cite to two examples where Chairman Waller was instructed not to answer based on an assertion of this privilege. Two times hardly justifies the use of the word "repeatedly," but putting Defendants' hyperbolic rhetoric aside, the record is clear that these two objections were reasonable and appropriate.

"The purpose of the deliberative process privilege is to protect, in limited circumstances, communications of the governmental executive, 'where disclosure would harm the lawful exercise of executive authority or adversely affect the quality of advice the executive received from subordinates.'" *Perez v. El Tequila LLC*, No. 12-CV-588-JED-PJC, 2014 WL 5341766, at *6 (N.D. Okla. Oct. 20, 2014), *objections overruled*, No. 12-CV-588-JED-PJC, 2014 WL

12652310 (N.D. Okla. Nov. 18, 2014) (citation omitted). As the Tenth Circuit has noted, the deliberative process privilege:

> [R]ests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.

*Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 939 (10th Cir. 2005) (quotations and citations omitted). There are two essential elements of the deliberative process privilege. First, the privilege applies to *pre-decisional* communications, and thus courts consider "whether [the communication] was generated before the adoption of an agency policy." *Senate of Puerto Rico v. U.S. Dept. of Justice,* 823 F.2d 574, 585 (D.C. Cir. 1987) (quotation marks and citation omitted). Second, the privilege applies to *deliberative* communications, such as advisory opinions and recommendations. *See Perez*, 2014 WL 5341766, at *7. Further, the *Perez* Court underscored that the privilege may extend to a government's "deliberations leading to a decision whether or not to sue." *Id.*

The two objections that Defendants challenge both fall within the scope of the deliberative process privilege because they both concern pre-decisional communications that are deliberative, formed within a governmental agency (the OMC), regarding the OMC's policies and recommendations in relation to not only this current litigation, but also to wind development broadly. For instance, in the first example cited by Defendants, Defs.' Mot. 23 (quoting Waller Tr. 179:7-15), Defendants' counsel asked Chairman Waller what he recalled concerning internal conversations the OMC had in 2015 "with regard to the prospect of potentially addressing the consequence of wind farms[,]" Ex. 1 (Waller Tr. ), 179:09-11, and although Councilman Cheshewalla had, during the course of the meeting being discussed in the deposition, read out loud a letter stating his opinions of Defendants and wind farm development generally, the

24

conversation Defendants' counsel asked about and the conversation that took place after Councilman Cheshewalla read his letter out loud took place in executive session, outside of the publicly-available, recorded meeting, when the OMC was engaged in internal governmental deliberation. *See id.* at 184:04-07. Furthermore, this timeframe immediately preceded the OMC's ultimate decision to intervene in this case for the purpose of appealing after the United States declined to do so. Accordingly, the information sought from Defendants' line of inquiry was both pre-decisional and deliberative, and thus, falls within the scope of the privilege.

Indeed, the questioning Defendants point to in their Motion reveals that Defendants' counsel wanted Chairman Waller to testify as to the motivations of individual members of the OMC with regards to the decisions the OMC has made as a governmental agency concerning wind development. Such "subjective motivations" fall clearly within the scope of the privilege, and therefore, are not discoverable. *Ridenour*, 397 F.3d at 939 (concluding that the privilege precludes "inquiries into the Government's subjective motivation for a decision."). Defendants' second challenge, therefore, fails as it inquires into the subjective motivations as evidenced by deliberative communications that elected members of the OMC had with regards to wind farm development. *See* Defs.' Mot. 24 (quoting Waller Tr. at 181:18-182:6).[10]

---

[10] The OMC likewise properly invoked the executive privilege. *See, e.g.,* Ex. 1 (Waller Tr.), 92:6-7 (asserting the "executive privilege that we've raised repeatedly in this case."); *id.* at 152:14-21. The OMC incorporates its prior position stated in its Opposition to Defendants' First Motion to Compel, Dkt. 188, at 17-23, regarding the applicability of executive privilege to the OMC—specifically, that the OMC is protected by executive privilege under both Osage Nation law and federal common law. During Chairman Waller's deposition, Defendants' counsel exclaimed that the "executive privilege does not apply to commercial events and commercial matters. It doesn't. I've litigated it many times." Ex. 1 (Waller Tr.), 185:14-17. The OMC, however, is not a commercial entity. The OMC is a governmental agency within a sovereign Nation. *See* Dkt. 264, 23-24 (noting that "the Osage Nation has consistently exercised sovereignty over the Osage Mineral Estate having never lost possession of it.").

## V.   CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny

Defendants' Third Motion to Compel Against the OMC.

> Respectfully submitted,
>
> s/ Mary Kathryn Nagle
> _____
> Mary Kathryn Nagle, OBA No. 33712
> Wilson Pipestem, OBA No. 16877
> Abi Fain, OBA No. 31370
> Jennifer Baker, OBA No. 21938
> Shoney Blake, Cal. Bar No. 264981
> Pipestem and Nagle Law, P.C.
> 401 S. Boston Ave., #2200
> Tulsa, Oklahoma 74103
> 918-936-4705 (Office)
> mknagle@pipestemlaw.com
> wkpipestem@pipestemlaw.com
> afain@pipestemlaw.com
> jbaker@pipestemlaw.com
> sblake@pipestemlaw.com
> *Counsel for Intervenor-Plaintiff*
> *Osage Minerals Council*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 9, 2021, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Ryan A. Ray
Joel L. Wohlgemuth
rar@nwcjlaw.com
jlw@nwcjlaw.com

-and-

Lynn H. Slade
Sarah S. Stevenson
Deana M. Bennett
Spencer L. Edelman
lynn.slade@modrall.com
sarah.stevenson@modrall.com
deana.bennett@modrall.com
spencer.edelman@modrall.com
*Counsel for Defendants*

David McCullough
dmccullough@dsda.com

Jeffrey S. Rasmussen
jrasmussen@ndnlaw.com

-and-

Wilson Pipestem
Mary Kathryn Nagle
Abi L. Fain
Jennifer Baker
Shoney Blake
mknagle@pipestemlaw.com
wkpipestem@pipestemlaw.com
afain@pipestemlaw.com
jbaker@pipestemlaw.com
sblake@pipestemlaw.com
*Counsel for Intervenor-Plaintiff,*
*Osage Minerals Council*

-and-

Thomas J. McCormack
Robin D. Ball
Robert Comer
Robert Kirby thomas.mccormack@nortonrosefullbright.com
robin.ball@nortonrosefullbright.com bob.comer@nortonrosefullbright.com
robert.kirby@nortonrosefullbright.com
*Counsel for Defendants*

Cathryn Dawn McClanahan
cathy.mcclanahan@usdoj.gov

*Counsel for Plaintiff, United States*

<u>/s/ Mary Kathryn Nagle</u>