# EXHIBIT 1

Case No. l4-CV-704-GKF-JFJ

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
      UNITED STATES OF AMERICA,
 3
                Plaintiff,
 4

 5    OSAGE MINERALS COUNCIL,

 6              Intervenor-Plaintiff

 7    vs.                   No. 14-CV-704-GFK-JFJ

 8    OSAGE WIND, LLC; ENEL KANSAS, LLC; and ENEL GREEN POWER
      NORTH AMERICA, INC.,
 9
                Defendants.
10

11    _____

12           REMOTE VIDEO DEPOSITION OF EVERETT WALLER
               TAKEN ON BEHALF OF THE DEFENDANTS
13          ON AUGUST 5, 2021, BEGINNING AT 10:07 A.M.
                     TAKEN VIA ZOOM
14             REPORTED BY MIKE WASHKOWIAK, CCR

15                     APPEARANCES:

16    Via Zoom on behalf of the PLAINTIFF

17           Stuart Ashworth
             UNITED STATES ATTORNEY'S OFFICE
18           110 West 7th Street, Suite 300
             Tulsa, Oklahoma 74119
19           918-382-2700
             stuart.ashworth@usdoj.gov
20

21    Via Zoom on behalf of the INTERVENOR-PLAINTIFF

22           Wilson Pipestem
             PIPESTEM & NAGLE, P.C.
23           401 South Boston Avenue, Suite 2200
             Tulsa, Oklahoma 74103
24           918-936-4705
             wkpipestem@pipestemlaw.com
25
```

Page 2

1
2    Via Zoom On behalf of the INTERVENOR-PLAINTIFF
3        Abi Fain
         PIPESTEM & NAGLE, P.C.
4        401 South Boston Avenue, Suite 2200
         Tulsa, Oklahoma 74103
5        918-936-4705
         afain@pipestemlaw.com
6    Via Zoom on behalf of the DEFENDANTS
7        Thomas J. McCormack
         NORTON ROSE FULBRIGHT
8        1301 Avenue of the Americas
         New York, New York 10019
9        212-318-3000
         thomas.mccormack@nortonrosefulbright.com
10
11   Via Zoom on behalf of the DEFENDANTS
12       Robert Kirby
         NORTON ROSE FULBRIGHT
13       1301 Avenue of the Americas
         New York, New York 10019
14       212-318-3000
         robert.kirby@nortonrosefulbright.com
15
16   Also present: (all via Zoom) Cathryn McClanahan, US
     Attorney's Office; Charles Babst, US Attorney's Office;
17   Michelle Hammock, Christina Watson
18   Virtual Videographer: Gabe Pack
19
20
21
22
23
24
25

Page 3

1                    INDEX
2                                            Page
3    Direct Examination by MR. McCORMACK          5
4
5                   EXHIBITS
6    Number   Description              Page
7    155   Testimony of OMC - Waller       21
8    156   Interview with Chairman Waller      37
9    157   news article from July 2014      40
10   158   OMC candidate interview, Waller    61
11   159   Constitution of the Osage Nation    99
12   160   First Amended Complaint        117
13   161   Osage Nation letter to Enel     146
14   162   Enel letter to Standing Bear,     159
15       Redcorn and Waller
16   163   OMC response letter to Enel      160
17   164   OMC minutes from November 2015    174
18   165   OMC minutes from August 2015     175
19
20               STIPULATIONS
21       It is stipulated that the deposition of EVERETT
22   WALLER may be taken pursuant to agreement and in
23   accordance with the Federal Rules of Civil Procedure on
24   AUGUST 5, 2021, before Mike Washkowiak, CCR.
25

Page 4

1            THE VIDEOGRAPHER:  This is the videotaped
2    deposition of Chairman Everett Waller in the matter of the
3    United States and Osage Minerals Counsel versus Osage Wind
4    on August 5, 2021.  We're on the record at 10:07 a.m.
5    Will counsel please state your appearances for the record?
6            MR. McCORMACK:  Yes.  I'm Tom McCormack.  I'm
7    with Norton Rose Fulbright, and we are counsel to the
8    defendants in this action.
9            MR. KIRBY:  This is Robert Kirby, also from
10   Norton Rose Fulbright.
11           THE COURT REPORTER:  Counsel for plaintiff?
12           MR. PIPESTEM:  Wilson Pipestem, Pipestem and
13   Nagle, on behalf of the Osage Minerals Council.
14           MS. FAIN:  This is Abi Fain, counsel from
15   Pipestem and Nagle also on behalf of the intervening
16   plaintiff Osage Minerals Council.
17           MR. ASHWORTH:  Stuart Ashworth on behalf of the
18   US.  I also have Cathy McClanahan and Nolan Fields with
19   the U.S. Attorney's Office, Charles Babst with the
20   Department of the Interior, and then I have Michelle
21   Hammock and Christina Watson, paralegals with the US
22   Attorney's Office.
23           THE VIDEOGRAPHER:  The court reporter will now
24   swear in the witness.
25           EVERETT WALLER,

Page 5

1    after having been first duly sworn, deposes and says in
2    reply to the questions propounded as follows, to-wit:
3            DIRECT EXAMINATION
4    BY MR. MCCORMACK:
5        Q   Good morning, Mr. Waller.
6            MR. McCORMACK:  Before we begin, may I ask one
7    quick question?  Who is going to be defending Mr. Waller's
8    deposition today?  I heard a lot of defense counsel, but I
9    wasn't sure of that.
10           MR. PIPESTEM:  Well, there's just two of us, and
11   it will be me, Wilson Pipestem.
12           MR. McCORMACK:  Thank you, Mr. Pipestem.
13       Q   (BY MR. McCORMACK)  All right, Mr. Waller, will
14   you please state your full name for the record?
15       A   Everett Mayton Waller.
16       Q   How old a man are you as you sit here today?
17       A   I am 62 years old.
18       Q   Where do you live?
19       A   I reside in the Hominy Indian Village, Hominy,
20   Oklahoma.
21       Q   Could you please give us a brief description of
22   your educational background?
23       A   Yes, sir.  I was -- went to school here in
24   Hominy, graduated, attended the University of Oklahoma.
25   Then I went on to the Bureau of Indian Affairs and went to

Page 6

1  OSU Extensions and took my certifications to the federal
2  side.
3      Q   When you say OSU Extensions, could you give us a
4  brief description of what you mean by that statement?
5      A   Yes, sir.  They have a program for which they
6  train you on different developments in the fossil fuels
7  industry.
8      Q   Understood.  Now, as I understand your resume,
9  and I've seen information online with regard to it, you
10 have worked in some capacity in the Osage area or in Osage
11 County since you got out of college?
12     A   Yes, sir.
13     Q   And that included a stent with the BIA?
14     A   Yes, sir.
15     Q   And what were the jobs that you were doing in
16 that period of time leading up to the time that is most
17 relevant here, which is your time on the OMC, and we'll
18 get to that, but what were you doing in that time frame
19 between the time you got out of the University of Oklahoma
20 and you ended up on the OMC?
21     A   I went right to work in the Bureau of Indian
22 Affairs, the Branch of Minerals.  I was hired as a gauger,
23 one of the first to go out in the field and gauge our
24 tanks for sale.  Then I went on to become a petroleum
25 engineer technician in the same branch, and I ended my

Page 7

1  tenure as a field supervisor for the whole reservation.
2      Q   During that period of time, did you ever work on
3  oil wells in the field and act in any capacity relative to
4  the drilling of oil on the Osage Estate?
5      A   Sir, that was before I started for the Bureau of
6  Indian Affairs, and yes, I have.
7      Q   I see.  I'm from Texas originally.  I'm familiar
8  with the oil and gas business.  I've been on oil wells, so
9  I was just curious if you had that same experience?
10     A   Yes, I do.
11     Q   All right.  Did you work as a roustabout, or
12 were you working in some supervisory capacity?
13     A   No, sir, I was on the rig floor and roustabout.
14     Q   All right, and how long did you do that?
15     A   I actually had summer jobs for three years, and
16 then I worked with the private sector on the pulling
17 units.
18     Q   Was that all in Osage County, or was that in
19 different parts of either Oklahoma or other states?
20     A   I was on drilling rigs for Kurt Brown and Hughes
21 Drilling on the scoop and stack, and the rest of all my
22 commitments were here in the Osage.
23     Q   All right.  I know from looking at your resume
24 that from 1994 to '96 you were a councilman of the Osage
25 National Council.  Can you tell me briefly what that work

Page 8

1  entailed?
2      A   Yes, sir.  It was the Osage National Council
3  through a referendum government was brought in, and that
4  it established itself as a criteria under our
5  Constitution.
6      Q   And then you also served as president of the
7  Intertribal Transportation Association from 1996 to 1998?
8      A   That's correct.  And I also sat as the area
9  representative preceding that.
10     Q   What did you -- what were your duties, if you
11 will, as the president of the Intertribal Transportation
12 Association?
13     A   To help establish the development of roads,
14 bridges, and byways in the reservations and Indian lands
15 across the nation.
16     Q   And that involved activities beyond Osage County
17 in Oklahoma?
18     A   Yes, sir, it did.
19     Q   That was more national in scope?
20     A   Yes, sir.
21     Q   And then after that, you served as a board
22 member of the State of Oklahoma Tribal Advisory Committee?
23     A   That's correct.
24     Q   What were your duties in connection with that
25 work, Mr. Waller?

Page 9

1      A   We developed and maintained the connection
2  between the State of Oklahoma and tribal transportation
3  improvement programs.
4      Q   You mentioned transportation.  Was that
5  primarily focused on issues of transportation within Osage
6  County or other counties in Oklahoma?
7      A   Yes, sir.
8      Q   What was the purpose and scope of that work, if
9  I may ask?
10     A   A better connection between the communications
11 of the tribes and their programs through the federal
12 government, IC legislation, Next T, T21 of those areas
13 through federal highways.
14     Q   All right.  And then from -- I know, and let's
15 kind of move up to the Osage Minerals Counsel.  I know
16 that you have been on the Osage Minerals Council since
17 2014; is that right?
18     A   Correct.
19     Q   And you obviously have a great deal of
20 experience and history in the Osage County and Osage
21 Nation.  Were you a formal or informal advisor to the
22 Osage Minerals Council before you became a formal member
23 in 2014?
24     A   That's correct.
25     Q   And you obviously have a significant background

Page 10

1  in oil and gas.  What was the nature of the counsel or
2  advice that people sought from you prior to your being on
3  the Osage Minerals Council that might be helpful to the
4  Osage Minerals Council?
5      A  Sir, I worked for Chief John D Red Eagle as
6  council liaison directly to the chief's office.
7      Q  How long -- how long were you working for that
8  individual?
9      A  For approximately four years.
10     Q  All right.  So prior to 2014, would it be fair
11 to say you that were familiar with activities and events
12 that were taking place within the Osage Minerals Council?
13     A  Yes, sir.
14     Q  Who at that time prior to you becoming on the
15 Osage Minerals Council -- well, let me step back.  I
16 withdraw that question.
17        How did it come about that you were asked to be
18 on the Osage Minerals Council in 2014?
19     A  Through the participants of the shareholders
20 requesting that I run for this seat.
21     Q  All right.  I apologize, I missed a little bit
22 of it in my own head.  Prior to 2014 you served in the
23 capacity as an advisor to whom again?
24     A  Chief John D Red Eagle.
25     Q  Chief John D Red Eagle was chief of the Osage

Page 11

1  Nation at that time?
2      A  That's correct.
3      Q  How long did you serve as an advisor to Chief
4  John D Red Eagle?
5      A  From 2010 to 2014, July.
6      Q  And was there, and I'm trying to get the sense
7  of it, and I've done my homework on the Osage Nation as
8  best I could and on the Osage Minerals Council as best I
9  could, can you give me a sense of in that time frame
10 between 2010 and 2014 what was the nature of the
11 communications between the office of Chief Red Eagle and
12 the Osage Minerals Council relative to issues that would
13 be of interest to both the Osage Nation and the Osage
14 Minerals Council?
15        MR. PIPESTEM:  Objection.  I'm going to -- this
16 is irrelevant to this case to the extent this question
17 gets into matters before this litigation was filed.  To
18 the extent that the witness's answers involve information
19 before this case was initiated, the Court has ruled that
20 that information is not relevant.  So I'm instructing the
21 witness not to answer any questions related to
22 communications related to this issue before that time.
23        MR. McCORMACK:  When you say "this issue," what
24 issue are you talking about?
25        MR. PIPESTEM:  The issue of this litigation.

Page 12

1      MR. McCORMACK:  Okay.  I'm going to ask my
2  questions.  If you're going to instruct the witness not to
3  answer, I can't stop there.
4      Q  (BY MR. McCORMACK) Prior to two thousand --
5  prior to 2014 when you were on the Minerals Counsel, were
6  there interactions between the Osage Nation and the Office
7  of the Chief John Red Eagle and the Osage Minerals Council
8  regarding issues of mutual concern concerning the Osage
9  Mineral Estate?
10     A  Yes.
11     Q  In your experience how would that -- how would
12 that come about?  Was that a regular communication?  Did
13 they share the same offices?  Did sometimes the members of
14 the Osage Minerals Council approach the chief and his
15 staff prior to meetings?  You were there.  What was the
16 practical sense of how that worked?
17     A  The council handled its tribal business, and I
18 reported directly to the chief immediately afterwards.
19     Q  Would you attend the meetings, Mr. Waller, on
20 behalf of the Osage Nation?
21     A  Yes.
22     Q  All right.  So that's important for me to know,
23 thank you.  So in the period 2010 when you were working
24 for Chief John Red Eagle and prior to becoming a member of
25 the Osage Minerals Council in 2014, did you regularly

Page 13

1  attend Osage Minerals Council's meetings?
2      A  Yes.
3      Q  Was one of your billets, if you will, one of
4  your duties relatives to your work for Chief Red Eagle to
5  report on what was taking place at the Osage Minerals
6  Council in that time frame, 2010 to 2014?
7      A  Yes.
8      Q  Okay.  So this was one of the things that you
9  were personally responsible for, if you will, in terms of
10 keeping the chief advised as to what was taking place
11 during the Osage Minerals Council's meetings?
12     A  At all times.
13     Q  All right.  Did you have any formal title that
14 was relevant to the Osage Minerals Council prior to
15 becoming a member of the Osage Minerals Council in 2014?
16     A  No.
17     Q  Were you ever asked to serve on any ad hoc
18 committees or to work with any members of the Osage
19 Minerals Council on particular subject matters prior to
20 becoming a member of the Osage Minerals Council in 2014?
21     A  I offered my assistance, but I wasn't sitting on
22 committees.
23     Q  Understood.  Just as a sense of how it worked,
24 would the Osage Minerals Council sometimes approach you,
25 Mr. Waller, and say look, we'd like your advice and



Page 14

1 thoughts on this subject matter in that time frame, 2010
2 to 2014?
3    A   Yes.
4    Q   Did Chief Red Eagle sometimes attend Osage
5 Mineral Council's meetings in the period of time when you
6 were working for him in the period 2010 and 2014?
7    A   Yes.
8    Q   What might be a reason why, in your experience
9 and observations, that Chief Red Eagle would attend Osage
10 Minerals Council meetings in that time frame, 2010 to
11 2014?
12    A   The council was working on some federal efforts
13 through EPA, for an example, and other federal entities.
14    Q   That was a significant enough event that the
15 members of the Osage Minerals Council or yourself felt it
16 was important for the chief to be present?
17    A   Yes.
18    Q   All right.  Do you remember any particular
19 subject matter that came up in that time frame relative to
20 the Osage Minerals Council's responsibilities that Chief
21 Red Eagle actively participated in in that time frame 2010
22 to 2014?
23    A   Yes.
24    Q   Can you give me a brief description of what that
25 is?

Page 15

1    A   As I just stated, we were working through the
2 EPA program, they had some other situations whichever the
3 council felt necessary that we stayed as a unit, the
4 Nation.
5    Q   Understood.  When did Chief John D Red Eagle
6 stop being the principal chief of the Osage Nation?
7    A   At the end of '14.
8    Q   End of '14.  Is that when Standing Bear became
9 the principal chief?
10    A   No, sir.
11    Q   I'm sorry, I missed someone.  Who came after
12 Chief Red Eagle?
13    A   Scott BigHorse.
14    Q   That was the end of 2014, did you say?
15    A   Yes.
16    Q   I apologize if I asked for this previously, but
17 can you give me the exact date when you became a member of
18 the Osage Minerals Council?
19    A   July 18, 2014 at the first regular meeting.
20    Q   Prior to July 18, 2014, Mr. Waller, what would
21 you say was the percentage of Osage Minerals Council
22 meetings you had attended during the period 2010 to 2014
23 when you were working with Chief John D Red Eagle?
24    A   Almost every one of them.
25    Q   All right, so you were familiar with activities

Page 16

1 of the OMC by virtue of your participation in those
2 meetings?
3    A   To what information I was privy to, yes.
4    Q   All right.  In addition to meeting with the
5 Osage Minerals Council in that timeframe, 2010 to
6 July 2014 when you became a formal member, did you also
7 meet with members of the Osage Minerals Council informally
8 in that time frame on issues of mutual concern between the
9 Osage Minerals Council and the Osage Nation?
10    A   If requested.
11    Q   All right.  Who would typically make that
12 request?
13    A   It'd be the chairman.
14    Q   Chairman.  And at that time who was the chairman
15 of the Osage Minerals Council?
16    A   Mr. Yates.
17    Q   Mr. Yates.  In what time frame was Mr. Yates the
18 chairman of the Osage Minerals Council, if you recollect,
19 sir?
20    A   I can only tell you that he replaced Mr. Crum.
21 I don't have the dates, sir.
22    Q   All right.  But Mr. Crum, was he the chairman of
23 the Osage Minerals Council when you first started
24 attending meetings on behalf of Chief John D Red Eagle in
25 2010?

Page 17

1    A   Mr. Widehorn.
2    Q   I'm sorry, say that again?
3    A   Mr. Dudley Widehorn.
4    Q   Widehorn, all right.  So Mr. Widehorn was the
5 chairman of the OMC in 2010, and then Mr. Crum replaced
6 him and then Mr. Yates replaced him?
7    A   That's correct, to the best of my recollection.
8    Q   Thank you.  Is that all in the period between
9 2010 and July of 2014?
10    A   Yes, sir.
11    Q   All right.  And then in 2014 did you become the
12 chairman of the OMC?
13    A   Yes, I did.
14    Q   All right.  And you replaced Mr. Yates?
15    A   Yes.
16    Q   All right, I mentioned a moment ago that prior
17 to you becoming chairman of the OMC in July 2014 you had
18 periodically been asked by the chairman to participate in
19 discussions involving the business of the OMC and
20 potentially the Osage Nation, and then you mentioned
21 Mr. Crum.  Had Mr. Widehorn or Mr. Yates also periodically
22 approached you in the period between 2010 and 2014 to
23 discuss OMC business?
24    A   Yes.
25    Q   All right.  Was that on a regular basis, or was

Page 18

1  that out of the ordinary?  Was that something that was a
2  normal part of your daily routine?  How would you describe
3  that as the person who was there?
4      A   It was regular.
5      Q   And again, I apologize for not knowing, but does
6  the Osage Nation and the OMC share a certain office space
7  or building in which you would be in the same location on
8  a daily basis?
9      A   I would be in their offices and chambers, but I
10 actually had an office in the executive side.
11     Q   All right.  What is the distance between the OMC
12 Business Office and the Osage Nation Business Office, if I
13 can ask that question?
14     A   About a football field's length away.
15     Q   All right.  So did you often find yourself in
16 the Osage Minerals Council's facilities in the period
17 between 2010 and July of 2014 dealing with either any of
18 the chairmen or others with regard to OMC business?
19     A   Yes, unless directed elsewhere by the chief.
20     Q   All right.  Who first approached you,
21 Mr. Waller, with the idea of you becoming the chairman of
22 the Osage Minerals Council?
23     A   The council just made that decision.  It wasn't
24 a -- I was just voted in.
25     Q   All right.  Was there -- I apologize.  Let me go

Page 19

1  back and get a couple of other points I wasn't sure of.  I
2  know that Chief John Red Eagle was chief from 2010 forward
3  and then he was replaced by Scott BigHorse?
4      A   That's correct.
5      Q   And that happened at the end of 2014?
6      A   Yes.
7      Q   And then who came after Chief Scott Bighorse?
8      A   Chief Standing Bear won the election when I won
9  my council election.
10     Q   All right.  And you do have to stand for
11 election by members who have rights, headrights, if you
12 will, to be on the OMC; is that right?
13     A   Yes.
14     Q   Did a chairman also have to be elected, or could
15 a chairman be selected by the elected members of the OMC?
16     A   That's how the position is filled, by elected
17 members of the council.
18     Q   And then do you have to stand for election as
19 chairman, or are you elected as the OMC chair by the
20 elected members of the OMC?
21     A   I'm elected by the sitting members.
22     Q   All right.  So you don't stand for general
23 election of the headright owners; is that right?
24     A   Just for the position of council.
25     Q   Oh, I see.  And did you do that before you were

Page 20

1  elected as the chairman?
2      A   Yes.
3      Q   All right.  So you were elected by the headright
4  members in the same time frame, July of 2014?
5      A   Yes.
6      Q   All right.  Then the council itself made you the
7  chair in that time frame, fair enough?
8      A   Thank you.
9      Q   Let me ask you, the court reporter, to tag as an
10 Exhibit, I believe we're up to 155 now.  It's at tab B of
11 the materials.  It's called Testimony of Osage Minerals
12 Council Chairman Everett Waller from July 2019.
13         MR. PIPESTEM:  Counsel, this document, it may
14 just be me, but it's difficult to read on my screen.  Am I
15 the only one with that concern or issue?
16         MR. McCORMACK:  No, I have the same issue.
17 Let's see if they can't improve it some.
18         MR. PIPESTEM:  Okay.
19         MR. McCORMACK:  Mr. Concierge, maybe even better
20 than that.  Mr. Waller is 62, I'm 65; it would be nice if
21 we could see the document.
22         THE WITNESS:  Thank you.
23         THE VIDEOGRAPHER:  Is there a particular section
24 you would like me to zoom in?
25         MR. McCORMACK:  Why don't we start with the

Page 21

1  first paragraph?
2          THE VIDEOGRAPHER:  Okay.
3          MR. McCORMACK:  Maybe you can blow that up.
4  There you go.  Is that better?  I think that works.
5      Q   (BY MR. McCORMACK)  Just looking at the second
6  sentence, Mr. Waller, it says, "I have the honor of
7  serving as a chairman of the Osage Minerals Council, an
8  independent agency within the Osage Nation government that
9  is constitutionally empowered to administer and develop
10 the Osage Mineral Estate."  Let me ask you, first of all,
11 this is a statement that you made in around July 11, 2019?
12         (WHEREUPON, Exhibit 155 was marked for
13 identification.)
14     A   Yes.
15     Q   And what is your understanding of the Minerals
16 Council's constitutional authority to administer and
17 develop the Osage Mineral Estate?
18     A   Under the Constitution of the Osage Nation, the
19 OMC under Article 15 is given this as we were given the
20 same empowerment as the tribal council that I had sat on.
21     Q   Let me ask you to now go to paragraph three of
22 the document.  Looking at Exhibit 155 paragraph three, it
23 states something I don't think there's a dispute about,
24 which is that the Osage Reservation spans an area of
25 approximately 1.47 million acres and is contiguous with

Page 22

1   Osage County, Oklahoma.  Do you see that?
2       A   Yes.
3       Q   And that's an accurate statement, that Osage
4   County is essentially 1.47 million acres, and that is the
5   mineral estate that the Osage Nation owns, correct?
6       A   The reservation is, yes.
7       Q   All right.  Let me ask you to turn to page two
8   and to look at the third paragraph on page two.  I want to
9   look in particular at that last sentence that says,
10  "In 2014 the Osage Agency estimated that in fiscal years
11  2012 through 2027, the Osage Mineral Reservation would
12  generate $13.6 billion in royalties for our Osage
13  headright holders."  Do you see that?
14      A   Yes.
15      Q   And that was -- that was -- how did it come
16  about that the Osage Agency was estimating the potential
17  generation of royalties in 2014?  Was that something that
18  the Osage Minerals Council asked them to do, or did they
19  do that of their own accord?
20      A   It is recorded and then brought to the council
21  monthly.
22      Q   All right.  Do they make an estimate -- let me
23  stand back for a second.
24          Do they monthly estimate what the potential
25  generation of royalties will be for 15 years, or do they

Page 23

1   do that only on a periodic basis?
2       A   I actually receive what has been sold.
3       Q   You receive the actual sales figures and then
4   report them to the headright owners, yes?
5       A   That's correct.
6       Q   But how did it come about that this is a
7   particular estimate for a 15-year period where it was
8   estimated that just under $1 billion, if you will, on an
9   annualized basis would be generated by the estate.  I'm
10  curious as to how it came about that that estimate was
11  done, if you know?
12      A   It's from the information that the agency has
13  delivered to the council.
14      Q   All right.  And we're now seven years into that
15  15-year period.  Do you know whether or not the estimates
16  that were provided in 2014 of this type of royalty revenue
17  have been met or not met?
18      A   To date?
19      Q   Yes, sir.
20      A   The pandemic and prices have changed that
21  somewhat.
22      Q   All right.  I'm just trying to determine whether
23  the Osage Minerals Council is keeping tabs of this
24  estimate against actual performance.  That's what I'm
25  trying to find out.

Page 24

1       A   Yes.
2       Q   All right, have they -- what percentage are they
3   off from the estimated $13.6 billion in royalties for this
4   time frame?
5       A   That would only be under the production data.
6       Q   Do you have a generalized sense of it as the
7   chairman as to where we are in terms of the OMC against this
8   estimate?
9       A   I couldn't give that number correctly.
10      Q   All right.  Do you also know, of the
11  $13.6 billion number that was estimated for this time
12  frame 2014 to 2027 what part of that or what percentage of
13  the $13.6 billion was estimated to be from hard minerals?
14      A   A minimal amount of that.
15      Q   I mean, would you say, I'm guessing as someone
16  who did oil and gas that oil and gas is probably
17  99 percent of that number?  Is that reasonable or not
18  reasonable?
19      A   I'm a little more conservative.  I think it's
20  probably 97.
21      Q   All right, fair enough.  If you look at the next
22  paragraph on what we've marked as Exhibit 155, it starts
23  with the words "as a result."  This document was prepared,
24  I think it was established, in July 2019 pre-pandemic?  It
25  says, "In recent years Osage minerals production has

Page 25

1   dramatically slowed."  Do you see that?
2       A   Yes.
3       Q   Then it goes on to say in the last sentence
4   there, "This decline in revenue is in part the result of
5   systems and decisions related to administration of the
6   Osage Mineral Estate."  Do you see that?
7       A   My highlight is not that.  Mine is showing a
8   TERA question.
9       Q   That's weird.  I'm sorry, it's the last -- oh
10  yeah.  Yes, it's the fourth paragraph down.  Thank you,
11  Mr. Waller.
12          MR. McCORMACK:  The fourth paragraph down, Mr.
13  Concierge.  There you go.
14      Q   (BY MR. McCORMACK)  Okay, I'm sorry Mr. Waller,
15  this is now the correct item.
16      A   Thank you.
17      Q   I think we talked about the first sentence says
18  in recent years Osage minerals production has dramatically
19  slowed.  And then the next sentence says, "This lack of
20  production results in a human cost to our Osage headright
21  holders, including elders who rely on income from Osage
22  minerals."  And then it says, "This decline in revenue is
23  in part the result of systems and decisions related to
24  administration of the Osage Mineral Estate."  Do you see
25  that?

Page 26

1    A   Yes.

2    Q   I know I have the headright information, which

3  is publicly available, and I recognize that it has dropped

4  meaningfully over the last several years.  Again, this is

5  in July 2019 pre-pandemic.  I was curious as to what you

6  meant in that last sentence, "This decline in revenues is

7  in part the result of systems and decisions related to

8  administration of the Osage Mineral Estate."  What did you

9  mean by that?

10   A   There's many things that envelop what we get

11 paid today.  Today we got paid 64.43 on the price of a

12 barrel.  There was other issues included in this;

13 regulatory, the global market, and of course the pandemic.

14   Q   The pandemic has had an additional negative

15 impact on the production of oil and gas out of the Osage

16 fields?

17   A   Yes.

18   Q   Is that a demand issue, or is that a personnel

19 issue, or is that an equipment issue?  From your

20 perspective as chairman of the council, what is your view

21 of that issue relative to the pandemic?

22   A   We were asked by the United States government to

23 allow some of the larger production elements to have to

24 shut in for bid because they could operate it.  Personnel

25 is part of that answer.

Page 27

1    Q   Has that improved any with -- well, I guess with

2  the current circumstance it's hard to say, but with

3  vaccinations and whatnot has that improved any in terms of

4  personnel available to work the field?

5    A   Yes, sir, and the price I just quoted you.

6    Q   Okay.  I know I've read some statements here and

7  there of Chief Standing Bear, and I think he's referred to

8  the BIA's management of the Osage Estate as "a disaster."

9  Have you ever heard Chief Standing Bear say that?

10       MR. PIPESTEM:  Objection.  Assuming facts not in

11 evidence.

12   Q   (BY MR. McCORMACK)  You can answer.  I don't

13 think it's a secret, but have you ever heard Chief

14 Standing Bear refer to BIA's management of the Estate as

15 "a disaster"?

16       MR. PIPESTEM:  Same objection.

17   Q   (BY MR. McCORMACK)  You can answer.  Perhaps

18 Mr. Waller's camera has frozen up?

19   A   No.

20   Q   Sorry.  You're thinking.  My apologies.

21   A   I don't have that document in front of me.

22   Q   How often do you see Chief Standing Bear?

23   A   As much as he lets me.

24   Q   Would that be weekly?

25   A   No, sir.

Page 28

1    Q   Would that be monthly?

2    A   At best.

3    Q   All right.  Have you ever heard him in a public

4  forum or otherwise refer to the BIA's stewardship of the

5  estate as "a disaster?"  For instance, in the state of the

6  nation address that he gave in March of this year?

7    A   Yes.

8    Q   All right.  Have you spoken to him about that

9  subject matter?

10   A   Yes.

11   Q   Do you share his view that the BIA's stewardship

12 of the estate has been a disaster?

13   A   I am in a different position to be stating

14 things like that.

15   Q   Understood.  But this is a deposition, I do have

16 the right to ask.  So do you share that, let's just keep

17 you away from the OMC, personally do you share that view

18 of Chief Standing Bear relative to the stewardship of the

19 BIA, personally?

20   A   I feel like I've been working a situation that

21 shows where they're understaffed, underpaid.  I agree that

22 that has been their problem, and that part I do agree

23 with.  And then we have been looking as a council of the

24 options, which the chief has directed also, of a TERA

25 possibility.  I as Tribal Council used to have direct

Page 29

1  service elements brought to my tribe, so that's what I

2  think personally.

3    Q   Well, you've been involved at least in OMC

4  matters since 2010, and as we've discussed you've been

5  involved in oil and gas related exploration on the Osage

6  Reservation for your entire career.  Did you have that

7  view only recently of the BIA, or is that an historical

8  view as well, your personal view?

9    A   They can always do a better job.

10   Q   All right.  And I'm asking because that sentence

11 that we went over that was in Exhibit 155, and it says

12 "This decline in revenue is in part a result of systems

13 and decisions related to administration of the Osage

14 Mineral Estate," and you didn't mention the BIA, but I

15 certainly understand Chief Standing Bear's view of that.

16 I've gotten your personal view of that.  Was that an

17 element of what you intended to get across in that

18 statement that you made in July of 2019, which is the

19 BIA's role in this?

20   A   Among other items that I feel like we have to

21 look at all options available to the council to protect

22 and increase our production in the laws that we live by.

23   Q   Has the council made suggestions and proposed

24 changes to the BIA that might address some of the issues

25 that you identified in your previous answers concerning

Page 30

1 some of the issues that are present at the BIA and its

2 management of the Osage Estate?

3    A    We are waiting on to receive the CFR codes and

4 see if those updates will give us the relief we are

5 looking for.

6    Q    Have you had, have you personally, Mr. Waller,

7 had conversations with BIA representatives on these

8 subject matters, that is, ways in which the BIA can

9 improve its performance in your view relative to the

10 estate?

11    A    Yes.

12    Q    What suggestions have you presented to the BIA

13 in that regard?

14    A    That we need to be a competitive element in

15 production and development without having the impasses in

16 which we had because we are a reservation; permits,

17 leasing, things next door under Corporation Commission in

18 the State of Oklahoma will take you days, whereas

19 possibilities it could take you weeks to months on the

20 federal side.

21    Q    Would you put that in the realm of bureaucratic

22 red tape that needs to be cut through to be more

23 competitive?

24    A    Oh, we agree on that.

25    Q    All right.  And you mentioned permits and

Page 31

1 leasing.  When did you first have conversations that you

2 can recall with the BIA with regard to permits and

3 leasing?

4    A    2000.

5    Q    2000?

6    A    While I was on Tribal Council.  But if you want

7 to talk Minerals Counsel, as soon as I took office.

8    Q    All right.  And what was the thrust, if you

9 will, of your conversations with the BIA about permitting

10 and leases?

11    A    Expedite all efforts.

12    Q    All right.  Is that, as a technical matter,

13 that's because requests for leases and permits have to go

14 to the BIA first before the OMC has an opportunity to

15 approve?

16        MR. PIPESTEM:  Objection.  I'm going to direct

17 the witness not to answer to the extent that question

18 leads to information that's prohibited by court order in

19 this case where the Court has determined that matters

20 before the filing of this case are irrelevant.  Those

21 communications are not properly before the Court.

22        MR. McCORMACK:  Mr. Court Reporter, could you

23 read back my question, please?

24        THE COURT REPORTER:  Is that, as a technical

25 matter, that's because requests for leases and permits

Page 32

1 have to go to the BIA first before the OMC has an

2 opportunity to approve?

3        MR. McCORMACK:  Counsel, I wasn't sure.  Did you

4 instruct this witness not to answer, or did you simply

5 object to the question?

6        MR. PIPESTEM:  I objected, and I also instructed

7 the witness not the answer to the extent that information,

8 the answer to that question involves answers related to

9 the scope of this litigation before the Complaint in this

10 lawsuit was filed.

11        MR. McCORMACK:  Again, I'll ask the questions.

12 If you wish to instruct him not to answer, there's nothing

13 I can do about that.

14    Q    (BY MR. McCORMACK)  With regard to the answer

15 that you gave to me concerning leases and permits, were

16 you referring to what we'll call Section 226 oil and gas

17 leases and permits, or were you referring to something

18 else?

19    A    Was that directed to me?

20    Q    Yes, sir.

21    A    All the above.

22    Q    So oil and gas, so the 226, if you will, but

23 also 214 and 211, if I may use that terminology?

24        MR. PIPESTEM:  Objection.  For the reason as I

25 stated before, I'm instructing the witness not to answer

Page 33

1 questions related to communications that occurred before

2 the filing of this lawsuit related to the scope of this

3 case.

4    Q    (BY MR. McCORMACK)  Well, let me ask you this.

5 I guess I'm just trying to find out if they occurred, not

6 necessarily what the subject matter of them was.  I think

7 what you said, Mr. Waller, was that as soon as you got

8 onto the Council in July of 2014 you were interacting with

9 the BIA with regard to leases and permits.  Is that fair?

10    A    Yes.

11    Q    And then I asked you whether we were talking

12 about 226 leases and permits or something else, and you

13 said, I think, all of the above.  But let me understand

14 exactly what that means.  So those communications involved

15 226 leases and permits, if you will; is that fair?

16    A    Yes.

17    Q    Did they also involve 211 and 214 permits and

18 leases respectively?  Is that fair?

19    A    Yes.

20    Q    And since you've been on the council in July of

21 2014, have the number of 214 and 211 leases and permits

22 and their consideration by the BIA and the OMC increased?

23        MR. PIPESTEM:  Objection.  I'm instructing the

24 witness not to answer the question as it relates to the

25 time between when he was elected on July 18, 2014 and the

1 filing of this lawsuit on November 21, 2014.

2      If you know the answer to the question after

3 that time, Chairman Waller, you may answer.

4      A.  Yes.

5      Q.  (BY MR. McCORMACK)  So I'll ask the question

6 again, but I think I at least have the answer for the

7 period November forward.  That from the period of

8 November 2014 forward there has been an increase in the

9 number of 2011 permits and 2014 leases that have been

10 considered by the BIA and thus considered by the OMC; is

11 that fair?

12      MR. PIPESTEM:  Objection.  Assumes facts not in

13 evidence.

14      MR. McCORMACK:  That's why I'm asking this

15 witness.

16      Q.  (BY MR. McCORMACK)  You can answer the question.

17 That was a form objection.

18      A.  I don't have those numbers in front of me.

19      Q.  Well, but what's your recollection and

20 understanding?  I'm going to walk through all of them a

21 little later, and I know there's a lot more of them now

22 than there used to be, so my sense is that there's a lot

23 more.  Did I get that wrong?

24      A.  No.

25      MR. PIPESTEM:  Objection.  Assuming facts not in

1 evidence.

2      Q.  (BY MR. McCORMACK)  Your answer was no, I didn't

3 get it wrong?  I think I'll try it again.  Which is

4 after -- well, let me put it this way.

5      Was one of the things that you focused on after

6 you got on the Minerals Council in July 2014 paying closer

7 attention to 2014 -- excuse me, to two thousand -- my

8 apologies, Mr. Waller.

9      After you got on the Minerals Council in July of

10 2014, is it fair to say that one of the things that you

11 focused on was 2014 leases and 2011 permits on a

12 go-forward basis at the BIA at the OMC for the Osage

13 Mineral Estate?

14      A.  One of many.

15      Q.  All right.  And again, from your observations

16 and from the leadership that you brought to the OMC, is it

17 your view that that has now happened, that there has been

18 more of a focus on two thousand -- excuse me, on 214 and

19 211 leases and permits on the Osage Mineral Estate?

20      A.  The focus is the same.

21      Q.  Understood.  Do you understand that there have

22 been more of them since you have been on the OMC than

23 before you were on the OMC?

24      A.  I just don't have that number.  I can only

25 answer for what I have.

1      Q.  Okay.  What's your sense of it?  You're there

2 every day.

3      A.  Yes.

4      Q.  All right.  And has that -- that has been a

5 subject matter of discussions between you personally and

6 the BIA in the period July 2014 forward, that is, paying

7 closer attention to the 214 and 211 leases and permits?

8      A.  It's been the same process.

9      Q.  So it's -- well, did you have -- you had

10 conversations with them prior to being on the OMC on that

11 subject matter?

12      A.  No.

13      Q.  All right.  So since you've been on the OMC,

14 that has been a subject of conversations between you and

15 the BIA, which is closer attention to 214 and 211 leases

16 and permits, yes?

17      A.  After directed by my council.

18      Q.  Right.

19      MR. McCORMACK:  Let me ask the court reporter to

20 turn to tab E, which is a March 16, 2021 interview of

21 Mr. Waller.  I'll mark this as 156.

22      If you'll turn to the second page,

23 Mr. Concierge, it's going to be -- and blow up the section

24 of this interview that begins with Ms. Herrera's

25 statements, that's why there is concern here.  It's the

1 first time Herrera's name shows up.  Keep that going all

2 the way down -- sorry, go back.  Just want to take that

3 middle section from Herrera all the way down to the second

4 time, down to the Herrera, Waller, Herrera, Waller and

5 then Herrera, put all that up.  If I've confused you, let

6 me know.

7      THE VIDEOGRAPHER:  One second.  I'm trying to

8 get this figured out here.

9      Q.  (BY MR. McCORMACK)  There you go.  Mr. Waller,

10 do you remember having an interview with Allison Herrera?

11      (WHEREUPON, Exhibit 156 was marked for

12 identification.)

13      A.  Yes.

14      Q.  And this was -- you've seen this report before

15 of the interview?

16      A.  Yes.

17      Q.  Among other things, she was talking to you about

18 Deb Haaland's appointment as the Interior secretary and

19 her record opposing the fossil fuel industry.  Do you

20 remember that?

21      A.  Yes.

22      Q.  Then she goes on to ask the question, and you

23 see the first one there it says, referring to Deb Haaland,

24 "She did make a point at her confirmation hearing that the

25 ban on oil and gas leases doesn't extend to tribal lands."

Case 4:11-cv-00636-GKF-JFJ    Document 272-14 Filed in USDC ND/OK on 09/09/21    Page 12 of 57

Page 38

1  Did you see that?
2      A   Yes.
3      Q   Did the OMC reach out to the Interior secretary
4  to reinforce the notion that the Osage Nation was opposed
5  to any ban on oil and gas exploration on tribal lands?
6      A   We did reach out.
7      Q   All right.  And did either the secretary or
8  people working with her confirm for you that she does not
9  believe that any ban on oil and gas would extend to tribal
10 lands?
11     A   To the reservation, yes.
12     Q   All right.  Go down to the next question.  It
13 says, Ms. Herrera says, "Waller is responsible for
14 maximizing profits for Osage Nation shareholders, so he
15 needs to get oil companies to come in and lease their
16 land."  Do you agree with that?
17     A   Yes.
18     Q   You also, she says about you, that you think
19 that "Haaland will be good because she understands tribal
20 sovereignty."  Do you see that?
21     A   Yes.
22     Q   And that's a fair statement?  She said fairly
23 what you had said to her?
24     A   Yes.
25     Q   And then you said, "I think that she will

Page 39

1  identify that I speak on behalf of the fossil fuel tribe,
2  the oldest."  Do you see that?
3      A   I am.
4      Q   So you referred to the Osage Nation as the
5  fossil fuel tribe; is that right?
6      A   Tribe, yes.
7      Q   Why did you use that nomenclature?
8      A   Because in 1896 we developed the fossil fuel for
9  the Allotment Act.
10     Q   Meaning you have the oldest mineral rights of
11 any tribe?  Is that what you mean by that?
12     A   And even more.  We had to buy our reservation.
13     Q   Right.  By fossil fuel tribe, I think you're
14 trying to get across that it's very important that oil and
15 gas exploration for the tribe is quite important, yes?
16     A   For the shareholder it's everything.
17     Q   For the headright holders, correct?
18     A   That I represent, yes, sir.  This is the
19 chairman talking.
20     Q   Right.  Do you often refer to the Osage
21 headright holders or the Osage Nation as the fossil fuel
22 tribe?
23     A   My representation is, yes.
24         MR. McCORMACK:  Let me ask the court reporter to
25 mark as the next exhibit in order, which I believe is 157.

Page 40

1  If I ever get that wrong, correct me.  I think we're at
2  157.  Let me have him turn to tab 64.  Tab 64 is a
3  July 24, 2014 article entitled "Why Oklahoma's Wind Energy
4  Future Could be Shaped by Osage County."  Let me ask you
5  to go to the second page.
6      Q   (BY MR. McCORMACK)  Mr. Waller, have you seen
7  this article before?  I know you're in it, but I was
8  curious if you'd seen it before?
9          (WHEREUPON, Exhibit 157 was marked for
10 identification.)
11     A   Yes.
12     Q   All right.  And this article came out within a
13 week of you becoming the Osage Minerals Council's
14 chairman, yes?
15     A   Yes.
16     Q   All right.  And let me -- do you remember
17 speaking to the reporter with regard to this particular
18 subject matter and what was on that reporter's mind?
19     A   Yes.
20     Q   What were you being asked, and what was your
21 point in the conversations that you had with the reporter?
22     A   On the consideration.
23     Q   I'm sorry, I didn't understand that.
24     A   Just on the consideration of what are our
25 options in our reservation.

Page 41

1      Q   All right.  Let's go to the second page of this
2  document which has been marked as 157, which is -- and
3  let's go to the third paragraph starting with the words
4  "wind energy" and let's blow that up so all of us with
5  aged eyes can see it.
6      A   Thank you.  My age is sneaking up on me here.
7      Q   Gentlemen of a certain age.  And it says, "Wind
8  energy is becoming a big deal in Oklahoma.  Last year,
9  this state was the country's fourth largest wind power
10 producer, data from the US Energy Information Agency show,
11 and while many Oklahomans are excited about the promises
12 of wind energy, fewer carbon emissions and regular royalty
13 checks for leased land, to name a few, the industry is
14 facing entrenched resistance."  Do you remember having
15 conversations of that nature or being mindful of those
16 themes in this time frame, July of 2014, when you spoke to
17 the reporter that wrote this article?
18     A   Yes.
19     Q   Do you understand today what role Oklahoma plays
20 in wind energy in terms of the production of wind power in
21 Oklahoma relative to the rest of the country?
22     A   Yes.
23     Q   Do you understand that that's a growing industry
24 in the country, in Oklahoma in particular?
25     A   I'm only worried about my reservation.

Page 42

1    Q   Of course, and I understand that.  But my
2  question is do you understand that it's a growing sector
3  in the United States generally and in Oklahoma
4  specifically, that is, the wind generation and renewables
5  generation?
6         MR. PIPESTEM:  Objection.  Compound question.
7    Q   (BY MR. McCORMACK)  You can answer.
8    A   Yes.
9         MR. McCORMACK:  All right.  Let me now go two
10  pages forward, and there's a nice picture of you there,
11  and we can find that picture.  Next page.  That's not him.
12  There he is.  If you'll blow up the three paragraphs
13  underneath the picture of Mr. Waller.
14    Q   (BY MR. McCORMACK)  You were a little younger
15  then, Mr. Waller.
16    A   You don't know how bad you hurt me then.
17    Q   The picture on my website is probably just as
18  old, but anyway.  Okay.  Now, the first paragraph says
19  "The Osage Nation has objected to wind energy projects on
20  the grounds that construction could unearth and disturb
21  native remains and artifacts and that spinning turbine
22  blades could kill bald eagles."  Do you see that?
23    A   Yes.
24    Q   We'll get into that later because we've seen
25  that's actually been pressed by the Osage Minerals Council

Page 43

1  and the Nation.  But let me get to the next sentence.
2  "But there's another element at work here:  Oil."  Do you
3  see that?
4    A   Yes, our oil.
5    Q   This is now 2014.  It says, "Members of the
6  Osage Nation own most of the mineral rights in Osage
7  County."  I would say they own all the mineral rights, but
8  be that as it may.  "The council that represents those
9  interests is worried that wind farms, their large
10  footprints as well as their powerlines and associated
11  electrical equipment, could interfere with oil and gas
12  development."  Do you see that?
13    A   Yes.
14    Q   Is that what you told this reporter at this
15  time, that you were concerned about wind farms conceivably
16  interfering with oil and gas development?
17    A   Yes.
18    Q   Then they have a quote here.  It says, "The site
19  is the problem," says Everett Waller, "it's not the
20  alternate energy or the wind energy, anything of the fact.
21  I have a job as chairman of the Minerals Council to
22  protect my shareholders.  This is a business.  We're in
23  the oil business."  Do you remember saying that at about
24  this time, July 2014?
25    A   Yes.

Page 44

1    Q   All right.  So is it fair to say that at least
2  in this article you're saying you don't have a generalized
3  opposition to alternate energy or anything of the fact; is
4  that fair?
5    A   And I don't.
6    Q   All right.  But what you say is the site is the
7  problem.  What do you mean by the site in this time frame
8  July of 2014?
9    A   If we had had consideration --
10         MR. PIPESTEM:  Objection.  I'm going to direct
11  the witness not to answer the question as it releases
12  specific facts of this case.  That was a time before this
13  litigation was initiated, and the Court has ruled that
14  testimony irrelevant.  So I'm instructing the witness not
15  to answer that question.
16    Q   (BY MR. McCORMACK)  All right.  Let me ask this
17  question, which is I think you just said you don't have a
18  problem with alternate energy; is that fair?
19    A   Yes.
20    Q   All right.  But what you have, at least
21  theoretically then and today, is a problem with the
22  location of alternate energy; is that fair?
23         MR. PIPESTEM:  Objection.  To the extent that
24  question involves a statement of facts related to the time
25  period before this litigation was initiated, which that

Page 45

1  question did, I'm instructing the witness not to answer
2  the question.
3         MR. McCORMACK:  That question involved more than
4  the time frame that you're referring to, Counsel.
5         MR. PIPESTEM:  That's exactly right.
6         MR. McCORMACK:  Well, I'm going to ask it
7  anyway, and you can instruct away.
8    Q   (BY MR. McCORMACK)  But when you said the site
9  is the problem in this 2014 article, what were you
10  referring to?  Do you mean Osage County, or do you mean
11  the 8400-acre wind farm project that was underway at the
12  time?
13         MR. PIPESTEM:  Objection.  I'm instructing the
14  witness not to answer.  The Court has ruled that before
15  the initiation of this litigation that those
16  communications and matters are irrelevant to this case.
17         MR. McCORMACK:  I may have missed that, Counsel.
18  Did you instruct him not to answer?
19         MR. PIPESTEM:  I'm instructing the witness not
20  to answer it again.
21         MR. McCORMACK:  Okay.
22    Q   (BY MR. McCORMACK)  At the time of this
23  interview in 2014, you were aware that there was already a
24  significant wind farm being built in Osage County,
25  correct?

Page 46

1    A   Yes.

2    Q   That wind farm was the one that was built by my

3    clients, essentially, yes?

4        MR. PIPESTEM:  Objection.  The same objection.

5    The date of this article, I believe, is -- Counsel, it

6    looks like the date is 7/24/2014?

7        MR. McCORMACK:  I think that's right.

8        MR. PIPESTEM:  Which is before the time this

9    litigation was initiated.  I'm instructing the witness not

10   to answer that question for the reasons stated before.

11   Q   (BY MR. McCORMACK)  Well, let's move forward in

12   time to November 2014.  Did your opinion about, that you

13   expressed in July of 2014 about not having a problem with

14   alternate energy or wind energy or anything to the fact,

15   did that opinion continue into late 2014?

16       MR. PIPESTEM:  Objection.  For the reasons I

17   stated before, I'm instructing the witness not to answer

18   to the extent that question refers to opinions and beliefs

19   prior to the initiation of this litigation that's specific

20   to this litigation.

21       MR. McCORMACK:  I thought I had avoided that

22   problem.

23   Q   (BY MR. McCORMACK)  So let's say as of

24   December 1, 2014, had your view as expressed in this

25   July 2014 article that alternate energy and wind energy

Page 47

1    was not something you opposed generally, but rather it was

2    the siting of it that was the issue, did that opinion

3    continue into December of 2014?

4        MR. PIPESTEM:  Objection.  I'm instructing the

5    witness not to answer for the same reasons.  Counsel, to

6    the extent you're -- I'll just leave it to that.

7    Q   (BY MR. McCORMACK)  Well, in December of 2014

8    did your opinion with regard -- has your opinion with

9    regard to alternate energy or wind energy, did that shift

10   from an opinion that you had held previously in 2014?

11       MR. PIPESTEM:  Objection.  For the reasons I

12   stated before, I'm instructing the witness not to answer

13   that question.

14   Q   (BY MR. McCORMACK)  Well, what's your view

15   today?  Do you have a problem with alternate energy or

16   wind energy today, Mr. Waller?

17   A   No.

18   Q   All right.  Has your opinion on that subject

19   matter changed at any time between December 2014 and

20   today?

21   A   No.

22   Q   All right.  And is it your view that the issue

23   that you have with wind power is the location of wind

24   power, today or at anytime between December of 2014 and

25   today?

Page 48

1    A   Yes.

2    Q   How has it changed?

3    A   No, it has not changed.

4    Q   Oh, it has not changed, all right.

5    A   I'm just trying to hear exactly how you're

6    wording the question.

7    Q   Fair enough, and if I confused you, my

8    apologies.

9        Have you -- you haven't had a significant change

10   in opinion about the potential use or value of renewable

11   wind energy.  Your issue is where it's going to be put; is

12   that fair?

13   A   One of my issues, yes.

14   Q   Okay, what's the other issues?

15   A   That it has to be vetted through my Osage

16   Minerals Council.

17   Q   All right.  And that is -- okay, we'll get to

18   that issue later in the day, but your point being that

19   anybody that wishes to develop a wind farm anywhere in

20   Osage County, your view is that that needs to be vetted

21   through the Osage Minerals Council; is that right?

22   A   Yes, sir.

23   Q   All right.  When did that -- you said you

24   changed your view.  When did that view become part of the

25   landscape, if you will?

Page 49

1        MR. PIPESTEM:  Objection.  Mischaracterization

2    of his answer.

3    Q   (BY MR. McCORMACK)  Okay, correct me.  I'm

4    asking a question.  You can correct me if I got it wrong,

5    meaning you, Mr. Waller.

6    A   Repeat the question for me, please.

7    Q   Yes.  I don't have the luxury of having the

8    transcript here in front of me.

9        MR. McCORMACK:  It's fair enough, Counsel.  If I

10   got that wrong, let me fix it.

11   Q   (BY MR. McCORMACK)  When did you develop the

12   view that no wind farm can be built in Osage County

13   without the vetting of the Osage Minerals Council?

14       MR. PIPESTEM:  Objection.  To the extent that

15   question requires the witness to discuss beliefs prior to

16   the filing of this litigation, I'm instructing the witness

17   not to answer.  To the extent it's after the time of

18   litigation in November 2014, witness, you may answer the

19   question.

20   Q   (BY MR. McCORMACK)  It's up to you, Mr. Waller.

21   A   I have the response of this quote that you're

22   bringing up has not changed.  If I had the opportunity to

23   visit before this was handed to me as chairman, I think I

24   could have gave my concerns better then than trying to

25   answer it now.

Page 50

1  Q  I guess the question was you've now testified
2  that one of the issues that you view with regard to the
3  development of any wind farm in Osage County, Oklahoma
4  requires the vetting of the Osage Minerals Council, to use
5  your term.  When did you first develop that view?
6      MR. PIPESTEM:  Objection.  To the extent that it
7  requires the deponent to provide facts that preexist the
8  filing of this Complaint, I'm instructing the witness not
9  to answer the question.
10  Q  (BY MR. McCORMACK)  Back to you, Mr. Waller.
11      MR. PIPESTEM:  I'm instructing him not to answer
12  the question.
13  Q  (BY MR. McCORMACK)  Let me ask you another
14  question.  You've now told me at least your current view,
15  and Counsel has not allowed me to ask you when you
16  developed it, but your current view is that no wind farm
17  can be built in Osage County without vetting of the Osage
18  Minerals Council.  I think I got that right; is that
19  correct?
20  A  Yes.
21  Q  Why is that?
22  A  That's how we do business.
23  Q  But what is the -- what is the -- you understand
24  that there's surface right holders and then there's
25  mineral right holders.  What is your view as to why it is

Page 51

1  that the construction of a wind farm, for example, as
2  opposed to a convenience store or a school or something
3  else would necessarily require vetting by the Osage
4  Minerals Council?
5  A  When it has an impact.
6  Q  By impact, what do you mean?
7  A  On the location.
8  Q  An impact on the mineral rights?
9  A  On the estate I'm here to protect.
10  Q  All right.  But exactly what impact do you mean?
11  Do you mean on the mineral rights or on some other issue?
12  A  The one I was here for today is over the
13  shareholders' rights.
14  Q  Well, we just established, I think, that your
15  view as the chairman of the Osage Minerals Council is that
16  any wind farm in Osage County requires vetting by the
17  Osage Minerals Council, and then I asked you why that was
18  and is it different for a wind farm than it might be for
19  the construction of a convenience store or a gas station
20  or an office building or a school?  That was my question.
21  A  If fits different criteria.
22  Q  Okay.  Tell me what those criteria are that it
23  fits such that you would have that view towards the
24  development of wind farms in Osage County?
25  A  Because you're not established in a

Page 52

1  municipality, you're not established in the state of
2  Oklahoma.  The situation here is that this is out on a
3  field in which I'm here to discuss its options, its
4  exploitation, and its leasing and permitting.
5  Q  Let me unpack that if I can.  What are the
6  reasons -- let me try it differently.
7      Does someone who wants to build a gas station in
8  Osage County, does that person have to have that project
9  vetted by the Osage Minerals Council, in your view, before
10  they can build a gas station?
11  A  It's according to the easement.  Are they in a
12  town location?  Those are set aside by federal law.  I
13  don't think it's necessary.  But where it's not set aside
14  by federal law, you're in the reservation; you're going to
15  have to act like it.
16  Q  I appreciate that clarification.  So if someone
17  wants to build a gas station in the reservation anywhere
18  in Osage County, would, in your view, the Osage Minerals
19  Council need to vet the construction of that gas station?
20  A  We have before.
21  Q  Okay.  Are there records of that?
22  A  Skiatook Casino.
23  Q  All right.  But the Skiatook Casino is owned by
24  the Osage Nation, yes?
25  A  Very happily say yes.

Page 53

1  Q  Yes, I'd imagine.  But the question I'm asking
2  for you is, is it your view that any construction project
3  that would take place on the reservation would require the
4  vetting of the Osage Minerals Council, any construction
5  project?
6  A  I'd have to see what kind of footprint we're
7  talking about, what is the structure, what is going to be
8  the regulatory items which has to be brought in.
9  Q  How would someone who wants to build that
10  construction project know what to look at to be able to
11  determine whether or not you believed or the Osage
12  Minerals Council believed that it would require the
13  vetting of the OMC to proceed?
14      MR. PIPESTEM:  Objection.  Compound.  Please
15  answer.
16  A  Yes, it falls under requirements of the Bureau
17  of Indian Affairs, Department of Interior.
18  Q  (BY MR. McCORMACK) Well my question is --
19  A  The code.
20  Q  Okay.  What code are you referring to,
21  Mr. Waller?
22  A  The 214 in this case.
23  Q  All right.  I guess I'm just trying to gauge
24  what your view of that is, which is, does it depend on how
25  big of a hole is being dug whether or not a person who

Page 54

1  wants to build any construction project on the surface
2  land of Osage -- of the Osage Nation needs to come to the
3  Osage Minerals Council, in your view, to be vetted?
4         MR. PIPESTEM:  Objection.  Compound question.
5     Q  (BY MR. McCORMACK)  You can answer.  There's a
6  question pending, Mr. Waller.  You can answer it.
7     A  If it's on the reservation, it needs to follow
8  the federal criteria to proceed.
9     Q  I'm trying to find out, as the chairman of the
10  OMC who's charged with the mineral estate, what is that
11  criteria for someone who wants to build on Osage
12  reservation a construction project, what is the criteria
13  for deciding whether or not the Osage Minerals Council
14  must vet that construction project?
15     A  If it's brought to our attention, then it falls
16  under criteria of the 5000 square cubic yards.  Once it
17  encompasses more than that, the council cannot waive it.
18  That has to go on to the permitting and leasing process by
19  the federal government that represents us.
20     Q  So it depends on the size of the excavation
21  that's being done, is that what you're --
22     A  Among other items.
23     Q  What are the other items?
24     A  Where is it located at?
25     Q  Osage Reservation.

Page 55

1     A  Is it going to be setting on top of a trunk
2  line?  Is going to be setting on part of a Corps of
3  Engineers process?  Does it set in any kind of County
4  Commissioners water flood, water plain, floodplain?  Those
5  kinds of issues.  I have to -- I have to look at each one
6  specifically.
7     Q  What I'm trying to find out, if somebody wants
8  to build a gas station on the Osage Reservation, what do
9  they go look at to find out whether they have to come and
10  be vetted by the OMC?  That's what I'm trying to find out.
11     A  We would have to have that in request to the
12  council to answer that.
13     Q  Does that mean anybody who's considering
14  building a construction project on the Osage Reservation,
15  is it your view that every single one of them has to come
16  to the OMC to be vetted, or is there some subset that
17  don't have to be vetted?
18     A  I think the criteria has already been set.  The
19  reservation has specified certain acreage, and the
20  townships, right-of-ways that I give to ODOT, things of
21  that nature, and that all has to fall in compliance.
22  You're going to have to have an eight second review before
23  you build this gas station on your turnouts, whatever
24  those issues are.  But mine is on the front end; it's how
25  much are you going to use of my property.

Page 56

1     Q  When you say how much you're going to use of my
2  property, can you tell me what you mean by that?
3     A  Borrowed material, rock, water.
4     Q  By use, what do you mean by use those materials?
5     A  The usage, we are looking at any possible sale
6  effort.  Once that triggers, the permit itself to give you
7  the parameters of the lease itself on this sale through
8  the Bureau of Indian Affairs.
9     Q  Do you know -- I mean, are you familiar with any
10  ongoing construction projects in the Mineral Estate
11  currently where a party who is constructing any building
12  or any facility has not come to the OMC to be vetted?
13     A  It's not been brought to my attention, no.
14     Q  Do you assume that there are such projects?
15     A  I would be guessing at best.
16     Q  All right.  But you live in Osage County, and
17  you drive around in Osage County.  You have a position --
18     A  Not much.  I'm the chairman.  You don't get to
19  go to Walmart, you don't get to go get your gas.
20     Q  Yes, I've heard there's no Walmart in Osage
21  County.  But we know there are schools there.  We know
22  that there's buildings there, et cetera.  Do you know --
23  you don't know currently --
24     A  Yes, my shareholders helped build them.
25     Q  All right.  Is there construction going on now

Page 57

1  that you're aware of in Osage County where the OMC has not
2  vetted that construction?
3         MR. PIPESTEM:  Objection.  Asked and answered.
4     Q  (BY MR. McCORMACK)  I was hoping I might have
5  refreshed your recollection, Mr. Waller.  You can answer.
6     A  I don't know that answer.
7     Q  All right.  Again, for someone who wants to
8  build on -- withdrawn.
9         I think the surface land ownership in Osage
10  County is over 99 percent non-Osage Nation members.  Is
11  that an accurate statement?
12     A  No.
13     Q  No, all right, my apologies.  Do you know what
14  the percentage of ownership of the members of the Osage
15  Nation are?
16     A  You'll have to ask Chief Standing Bear.
17     Q  All right.  Any guesstimate that you have, a
18  running tab?
19     A  I will not guess.
20     Q  All right.  Is it -- but it could be 99 percent
21  non-Osage Nation members, or you don't know?  You don't
22  know?
23     A  It's less.
24     Q  Okay.  Is it your view that any surface
25  landowner in Osage County if they want to construct a

Page 58

1  project on their land must come to the Osage Minerals
2  Council to have that project vetted?
3      A  No.
4      Q  All right.  I didn't think that would be your
5  view, but I wanted to know.  So I wanted to know what is
6  the criteria that someone who wants to build needs to be
7  aware of so as not to run afoul of the Osage Minerals
8  Council's view of its right to vet?
9      A  They should know that they run afoul when they
10 start selling it.
11     Q  When they sell soil or minerals from the Estate?
12     A  Correct.
13     Q  I know, we'll go through them later, but I know
14 that the Department of Transportation and then various
15 companies that do gravel pit and dirt pit and mining in
16 than manner have received various permits and leasing over
17 the years.  Are you familiar with any other criteria that
18 would be needed for a potential construction project to be
19 vetted by the OMC?
20     A  Do I have the ODOT MOUs in place that help set
21 criteria?  If I have that position on these other items
22 when you're asking about homeowners and things of that
23 nature, it's not leaving their property.
24     Q  All right.
25     A  And they're not generating profitability there.

Page 59

1  They're trying to live and survive, just like my Osage
2  are, which is hard to do sometimes.
3      Q  Understood.  Let's go back to what I've marked
4  as Exhibit 157, which is the July 2014 interview that
5  we've been talking about.  We've talked about this a
6  little bit.
7      MR. McCORMACK:  Let's go back to the same
8  section, Mr. Concierge, that we talked about previously,
9  which is -- let's start with the section that begins with
10 "the site is the problem."  It's on the page with the
11 picture of Mr. Waller.  No, that's not it.  There you go;
12 that's the one.  The bottom paragraph on that page.
13     Q  (BY MR. McCORMACK)  Okay.  We talked about the
14 first part of that, and I've drawn a lot of instructions
15 from your counsel for you not to answer questions, but let
16 me look at the last two sentences there.  It says, "This
17 is this is a business.  We're the oil business."  Do you
18 see that?
19     A  Yes.
20     Q  Can you live with wind farms in Osage County so
21 long as those wind farms don't interfere with your ability
22 to drill for oil and gas in Osage County in your capacity
23 as chairman of the OMC?
24     A  That's too broad.  How many wind farms,
25 turbines?

Page 60

1      Q  Well, that's a good question.  What is your --
2  let me ask -- let me try to do it incrementally.
3      I may have asked this, and if I did I apologize,
4  Mr. Waller, sometimes I forget what I've asked.  Are you
5  generally opposed to any wind project in Osage County
6  today?
7      A  I think the task at hand is the 87 I have now.
8  I can't project on what the future entails.
9      Q  Understood.  But I think your -- we're going to
10 get into the minutes in a moment.  A lot of people
11 expressed issues about wind farms, et cetera, and I'm
12 going to ask you your views of that, obviously.  So I'm
13 asking them like as a precursor, if you will, what is your
14 generalized view about whether wind farms are welcome in
15 Osage County from your perspective?
16     MR. PIPESTEM:  Objection.  Asked and answered.
17     Q  (BY MR. McCORMACK)  You can answer it.
18     A  I'd have to review the project before I'd ever
19 give that kind of answer.
20     Q  Well --
21     MR. ASHWORTH:  We've been going -- sorry.
22 We've been going for over an hour and a half.  Is this an
23 okay time for a break, or whenever you get to a stopping
24 point?
25     MR. McCORMACK:  This is fine.  This is good.  I

Page 61

1  appreciate your patience, Mr. Waller.  What time you want
2  to come back?
3      THE WITNESS:  I would enjoy just to move for
4  about five minutes.
5      MR. McCORMACK:  Sure.
6      THE VIDEOGRAPHER:  We're off the record at
7  11:38 a.m.
8      (BREAK FROM 11:38 TO 11:52.
9      THE VIDEOGRAPHER:  Back on the record at
10 11:52 a.m.
11     Q  (BY MR. McCORMACK)  Thank you, Mr. Waller.  Let
12 me ask you to look, I believe now we're at tab 158,
13 Exhibit 158.
14     MR. McCORMACK:  I'd ask the concierge to go to
15 tab 86.  This is a 2018 Osage Minerals Council candidate
16 interview for Mr. Waller.  Let me have the concierge blow
17 up that last question and answer on Exhibit 158.  Add the
18 question as well, which comes right before that paragraph.
19     Q  (BY MR. McCORMACK)  Okay, Mr. Waller, I know
20 that we have talked about you being elected to the Osage
21 Minerals Council in 2014, being selected as the chair of
22 the OMC in 2014, and this document suggests that you had
23 to run for reelection at some point in time.  Is that a
24 fair conclusion on my part?
25     (WHEREUPON, Exhibit 158 was marked for



Page 62

1  identification.)

2     A   It is.

3     Q   All right.  What is the term of an OMC member?

4  Is it two years?  Four years?  What is the term?

5     A   Four years, sir.

6     Q   So you had to re-run in 2018.  I assume you got

7  elected again?

8     A   Yes, I did.

9     Q   All right.  Did you also, then, get selected as

10 the chairman of the OMC at that time in 2018?

11    A   No.

12    Q   Okay.  So you're now a member, but you're not

13 the chairman starting in 2018?

14    A   July, yes.

15    Q   All right.  Who is now the chairman of the OMC?

16    A   I am.

17    Q   Okay, so when did you get elected?  There's

18 something I missed.  When did you get elected chairman

19 again after the election in 2018?

20    A   After I buried my brother-in-law, Andrew Yates.

21    Q   I see.  And when was that?  My condolences.

22 When was that?

23    A   In February.

24    Q   Of this year?

25    A   Correct.

Page 63

1     Q   All right.  So -- and that was a question on my

2  mind.  I didn't know he was your brother-in-law.  My

3  condolences, as I said.  I know that you were the chairman

4  from July of 2014 until, apparently, July of 2018, and

5  then Mr. Yates was the chairman from 2018 to earlier this

6  year, February of 2021, and now you've returned as the

7  chairman of the OMC.  Do I have that chronology right?

8     A   No.

9     Q   Okay, then I won't even try.  Why don't you give

10 me the chronology?

11    A   2018?

12    Q   Well, you were chairman --

13    A   Councilwoman Harlan was selected, then I was

14 brought in, don't have the data in front of me, to be

15 re-seated as chairman, and then we had a vote, and then

16 until February Councilman Yates was chairman.

17    Q   Okay, I apologize.  I'm going to do this a

18 little more methodical.  You were originally elected in

19 July 2014 to the council and then became chairman at that

20 time.  I think I've got that right so far, yes?

21    A   Yes.

22    Q   And then you remained on the council and were

23 chair until when?

24    A   Until we took office OMC 4.

25    Q   I'm sorry, I didn't understand that.  You became

Page 64

1  chairman of the OMC in July 2014 and you're chairman

2  today.  When did you stop being chairman, and what

3  happened in the interval?

4     A   2018 Councilwoman Harlan was voted in as

5  chairman.

6     Q   How long did she serve in that capacity?

7     A   I don't remember.

8     Q   Did Mr. Yates replace Councilwoman Harlan?

9     A   I did.

10    Q   When did Mr. Yates serve as chairman of the

11 Osage Minerals Council?

12    A   I would have to go back in my records, but last

13 year before his demise.

14    Q   All right.  So it was Harlan, you, Yates, and

15 then you again?

16    A   Yes.

17    Q   That all happened in the period after 2018?

18    A   Correct.  To date.

19    Q   A generalized sense of how long Councilwoman

20 Harlan was the OMC chair?  Was it a year?

21    A   A year.

22    Q   A year.  Do you know why she stepped down?

23    A   Personal reasons.

24    Q   All right.  And then you were elected at that

25 time, so that would've been maybe 2019?

Page 65

1     A   Probably.

2     Q   And you stayed in that role until Mr. Yates took

3  over, and I apologize if I asked, but when did he take

4  over that role?

5     A   I believe in 2019 was his electoral.  I can't

6  tell you which month.  We handle a lot of stuff.  He

7  served until February, and then I was elected to fill the

8  position.

9     Q   All right.  And now you've been in the role

10 since -- well, we talked about when you were in it before,

11 but you're currently the chairman of the Osage Minerals

12 Council, and that's been the case since the time of the

13 demise of your relation, and that was in February of this

14 year?

15    A   Correct.

16    Q   All right, thank you for the chronology.  I was

17 trying to figure that out from the minutes and couldn't

18 get it, so I appreciate that.

19        Let me turn back to now what I've marked, I

20 believe, as Exhibit 158, and this was an Osage Minerals

21 Council candidate interview.  Do you remember giving that

22 interview?

23    A   I sure do.

24    Q   All right.  Let me ask you to go to the last

25 paragraph here, starting with the line that says, it's

Page 66

1  like, I think, three or four sentences into the last
2  paragraph.  It says, "I have not spent a day without being
3  in federal court, and as you know well the federal court
4  case that we have now is in the Supreme Court of the
5  United States stating that you cannot come to our
6  reservation without dealing with us, and a foreign country
7  can go to the White House and get a category exclusions,
8  and then we get the capital gains process going to the
9  buyback on this energy."  That case that you're referring
10 to is this case, is the Enel Green Power case and the
11 Osage Minerals Council and US Government case, as far as I
12 understand; is that right?
13     A  The case, yes, I was in.
14     Q  All right.  When you're saying you have not
15 spent a day without being in federal court, you're talking
16 about relative to this case that while you've been on the
17 OMC there has been litigation pending between the OMC, the
18 government, and Enel Power?  Is that what you were
19 intending to say there?
20     A  And others.
21     Q  And others, all right, all right.  It goes on to
22 say, "And I'm okay with nonrenewable, because that's what
23 I do.  But on the renewable, I'm okay with that too, but
24 just don't put it in my best oilfield."  Do you see that?
25     A  Well, I stick by that.

Page 67

1      Q  All right.  When you say "just don't put it in
2  my best oilfield," what are you referring to?
3      A  Location.
4      Q  But where is the best oilfield in Osage County?
5      A  Anywhere that I act as representative of the
6  shareholder.
7      Q  When you say just don't put it in my best
8  oilfield, do you mean just don't put it anywhere in Osage
9  County?
10     A  No, sir.
11     Q  Okay, so what do you mean by my best oilfield?
12     A  You're sitting next to the largest reservoir in
13 the nation.
14     Q  When you say "you're sitting next to the largest
15 reservoir in the Nation," who is your and where are we
16 sitting?
17     A  We are sitting on the Osage Reservation.
18 Specifically your turbines are sitting right next to the
19 most prolific field that we've had in our history.
20     Q  Okay.  Is that the Burbank Field?
21     A  Correct.
22     Q  Where is the Burbank Field relative to the
23 8400 acres that are part of the lease hold that the wind
24 farm is operating on?
25     A  Northwest of you, sir.

Page 68

1      Q  All right.  So it's not in the 8400 acres?
2      A  It's not in the North Burbank, no, sir.
3      Q  All right.  So the best oilfield is not on the
4  8400 acres, right?
5      A  I don't know that yet.  I haven't drilled all of
6  it.
7      Q  Well --
8      A  I answered it's not on the Burbank Unit.
9      Q  Right.  Well, the reason you say just don't put
10 it on my best oilfield is because you don't want the wind
11 farm to be interfering with potential oil and gas
12 exploration and development on 8400 acres where it does
13 sit?
14     A  Along with the process of development of the
15 oilfield, my location, the lease, things of that nature.
16     Q  Okay.  Let me pull that apart a little bit.  The
17 best oilfield is the Burbank Oilfield, and that is not, at
18 least traditionally, on the 8400 acres; is that fair?
19     A  Correct.
20     Q  And the Burbank Oilfield is northeast of the
21 8400 acres.  Do you know how far?
22     A  Northwest.  It adjoins your next lessee.
23     Q  All right.  Is the Burbank Field, if you will,
24 the one where the most oil wells have been drilled in the
25 Osage Mineral Estate historically?

Page 69

1      A  Yes, sir, every 330 feet, unless designated by
2  superintendent of the Osage.
3      Q  All right.  That remains today the most prolific
4  of the oil fields in the Osage Nation, if you will?
5      A  Yes.
6      Q  And do you know how many wells are currently
7  operating on the 8400 acres that is the subject of the
8  lease for this wind farm?
9      A  It's only under the (unintelligible) and it's
10 not numbered or drilled to near that extent.
11     Q  Well, is there any new drilling going on on the
12 8400 acres?
13     A  Not at this time.
14     Q  Is there any new drilling taking place in the
15 Burbank Field northeast of the 8400 acres?
16     A  All of the Burbank, or the adjoining acreage?
17     Q  All the Burbank.
18     A  Yes.
19     Q  All right.  Is there any in the adjoining
20 acreage?
21     A  Yes.
22     Q  All right.  So is that the most active area, the
23 Burbank Field, if you will?
24     A  Yes.
25     Q  What percentage of the revenue generated by oil



Page 70

1  and gas in Osage County for the Osage Nation is generated
2  by the Burbank Field, to your understanding?
3      A   Close to 40 percent and improving.
4      Q   Okay.  There's active exploration going on on
5  that site today, yes?
6      A   They are completing their CO2 units, so yes,
7  they are plugging and they've added new compressors to
8  take care of their flood.  They'll probably reopen some
9  old holes as criteria allows.
10     Q   And so I think you said there's a well every
11 300 feet in the Burbank Field.  What is the acreage, best
12 guesstimate, of the Burbank Field, if you will, that is
13 being developed as you described?
14     A   I don't know the exact number at this time.  I'd
15 have to look it up.
16     Q   Is it bigger than 8400 acres, less than 8400
17 acres, or you don't have any idea?
18     A   It's less.
19     Q   Less.  Meaningfully less, or not so much?
20     A   I'll just stay with it's less.
21         MR. PIPESTEM:  Objection.  Compound.
22     Q   (BY MR. McCORMACK)  Okay.  Is there any
23 commercial development or any buildings on the property
24 that you've described that constitutes the Burbank Field
25 other than oil and gas wells?

Page 71

1          MR. PIPESTEM:  Objection.  Compound question.
2      Q   (BY MR. McCORMACK) You can answer.
3      A   Not to my knowledge.
4      Q   Have you been out to the Burbank Field?
5      A   Yes.
6      Q   Have you been to the 8400 acres that's the
7  subject of the wind farm?
8      A   I drove by it, yes.
9      Q   Have you -- you drove by it.  Have you ever been
10 on the actual property itself, the 8400 acres?
11     A   No, that would be trespassing without having the
12 authority of the landowner.
13     Q   Understood.  You envisioned my next question.
14 Have you ever spoken to any of the landowners who own the
15 8400 acres relative to the wind farm?
16     A   I have not.
17     Q   Do you know who they are?
18     A   I don't have the list, no.
19     Q   Do you know --
20     A   You can tell me.
21     Q   Well, we'll get to that, but do you have -- do
22 you have any knowledge as to whether or not the
23 landholders are members of the Osage Nation?
24     A   Not at this time.  I wasn't permitting the
25 event.  I don't have that.  If the project had been

Page 72

1  brought to the council, we would've had that information
2  to make our decision.
3      Q   The land ownership, you mean?
4      A   Yes.
5      Q   All right.  Are you familiar with the history of
6  oil production on the 8400 acres generally?
7      A   As a commoner, yes.  I don't have an engineering
8  degree.
9      Q   I apologize, I'm trying to be thorough.  I may
10 have asked you this, but there are no current -- let me
11 pull back.
12         On the Burbank Oilfield that we're talking
13 about, are they doing traditional drilling and then also
14 fracking, or are they doing something else?
15     A   It's all under the traditional vertical element.
16     Q   Right.  Are there plans to do fracking in that
17 field or any other field that you know of?
18     A   They have not given me their program to answer
19 that.
20     Q   All right.  In the Burbank Field who are the
21 primary lessees who are bringing up the oil and the gas
22 for the Osage Nation?
23     A   Perdure.
24     Q   So there's one, Perdure?
25     A   Yes, the field itself.

Page 73

1      Q   All right.  You had talked about the Burbank
2  Field as being one that could be responsible for as much
3  as 40 percent of the Osage mineral royalties.  Do you know
4  what percentage of the mineral royalties for Osage Nation
5  come out of the 8400 acres that are subject to the land
6  for the wind farm?
7      A   No, I've not looked that up.
8      Q   All right.  And I think you said there's no
9  current exploration going on on that 8400 acres; is that
10 right?
11     A   To the best of my knowledge.  I have not seen
12 the drilling permit request.
13     Q   Do you know whether there are operating rigs on
14 the property itself, the 8400 acres, as we sit here today?
15     A   As a drilling unit or a workover?
16     Q   Well, as any production of oil on the property
17 from prior wells?
18     A   Not to my knowledge.
19     Q   All right.  So does that mean there's no
20 royalties from oil and gas currently coming from the
21 8400 acres that serves as the location of this wind farm
22 that we're litigating about?
23     A   It would be under the leases held by production.
24     Q   I'm sorry, I don't know what that means.
25     A   That you have oil wells that are going up and

Page 74

1  now that have been leased and permitted.  Those are the
2  only ones that we will receive royalty through the bureau
3  trust fund administration.
4      Q   Okay.  Again, just so I can understand it,
5  there's no current drilling going on on the 8400 acres
6  today, and I think you told me that you were unaware of
7  whether or not any oil is actually being produced from the
8  8400 acres.  Did I get that right?
9      A   No.
10      Q   Okay, so maybe I got the second piece wrong.
11  There is no drilling going on there now; that's right,
12  isn't it?
13      A   Yes.
14      Q   And then my question was what production is
15  coming off the 8400 acres now, to your understanding?
16      A   The leases that are held by production, those
17  are the ones that we are receiving the royalty through.
18      Q   Okay.  What would I look at to see what
19  percentage of the Osage Nation's collective royalty is
20  coming out of that 8400 acres?
21      A   I'm not for sure you'll be privy to that
22  information from my shareholders.
23      Q   Understood.  I don't have it currently.  I may
24  or may not have the right to it.  I think I might have the
25  right to it, but I needn't quarrel with you on that

Page 75

1  subject matter.
2      A   Oh, we can visit any time.
3      Q   Okay.  The question I guess I'm asking, and
4  maybe I misunderstood it, do you know what production is
5  coming out of the 8400 acres currently and what percentage
6  of total production from the Osage Fields is coming from
7  the 8400 acres?
8      A   No, I do not have that number.
9      Q   All right.  What is your -- do you have any idea
10  what role the 8400 acres plays in the current royalties
11  for the Osage Nation?  Is it de minimus?  Is it
12  meaningful?  Is it somewhere in between?  Do you know?
13          MR. PIPESTEM:  Compound question.
14      Q   (BY MR. McCORMACK)  You can answer, Mr. Waller.
15      A   Every barrel is important to my Osage
16  shareholder.
17      Q   I understand that.
18      A   Just like your shareholders.
19      Q   No, I get it.  I mean, you're in the oil
20  business, I get it.  But I'm just trying to find out if
21  you know on this 8400 acres, you don't -- let's just maybe
22  say it that way.
23          You don't know whether this 8400 acres is
24  contributing one half of one percent or one percent or
25  something more than that relative to the total royalties

Page 76

1  being paid to the Osage Nation; is that fair?
2          MR. PIPESTEM:  Objection.  Compound question.
3  Please answer if you know.
4      A   It would only be at the request to the Bureau of
5  Indian Affairs that would deliver us that exact number.
6      Q   (BY MR. McCORMACK)  Well, do you know if any
7  proposed oil drilling or exploration on the 8400 acres is
8  not proceeding because of the existence of the wind farm
9  on the property?
10      A   I do not.
11      Q   You recognize that, and I know that we walked
12  through this earlier today, and I was appreciative of your
13  patience with me, that your knowledge of what's been going
14  on at the OMC really goes back to 2010 before you were
15  actually on the council, and you know there was a lawsuit
16  brought by the OMC to try to stop the development of the
17  wind farm on the theory that it would interfere with the
18  development of oil and gas, right?
19          MR. PIPESTEM:  Objection.  I'm instructing the
20  witness not to answer.  This involves facts pre-existing
21  the filing of this lawsuit, so I'm instructing the witness
22  not to answer.
23      Q   (BY MR. McCORMACK)  You understand that the
24  District Court, federal court here in this case, ruled
25  that in fact the wind farm did not interfere in the

Page 77

1  potential for drilling for oil and gas on the 8400 acres,
2  correct?
3          MR. ASHWORTH:  Object to the form.
4      Q   (BY MR. McCORMACK)  You can answer.
5      A   The directive was already there when I took the
6  position as chairman in '14.
7      Q   Understood.  But as we discussed this morning,
8  you were attending the OMC meetings regularly from 2010
9  on.  You had regular interactions with people on the OMC
10  when you were serving as someone who worked with --
11      A   Liaison.
12      Q   -- Chief Red Eagle.  Right.  So you knew there
13  was a lawsuit filed, and you knew that the Court said that
14  the development of the wind farm would not interfere with
15  the oil and gas development on the 8400 acres.  Is that
16  fair?
17          MR. PIPESTEM:  Objection.  Objection.  I'm
18  instructing the witness not to answer questions related to
19  facts that are irrelevant to this case as decided by the
20  Court prior to the filing of this lawsuit.  I'm
21  instructing the witness not to answer.
22          MR. McCORMACK:  I'm not going to fight with you.
23      Q   (BY MR. McCORMACK)  It's not a fact in dispute.
24  It's in the federal law books that there was a decision
25  reached where the Court said that the development of this

Page 78

1  wind farm would not interfere with the oil and gas
2  development on the 8400 acres.  Are you aware of that fact
3  today as you sit here now?
4      A.  Yes.
5      Q.  All right.  And so -- in fact, I know that at
6  some point in time, we'll get to it, but the Chaparral Oil
7  Company was involved in some efforts to consider drilling
8  on this 8400 acres in the last decade or so.  Does that
9  refresh your recollection?
10      MR. PIPESTEM:  Objection.  I'm instructing the
11  witness not to answer.  That question involves facts prior
12  to the filing of this litigation, so again I'm instructing
13  the witness not to answer.
14      Q.  (BY MR. McCORMACK)  Well, let's talk about
15  something that you do know that's reality and that you
16  know today.  Chaparral went bankrupt; is that right?
17      MR. McCORMACK:  We seem to have lost Mr. Waller.
18      THE VIDEOGRAPHER:  Want to go off the record?
19      MR. McCORMACK:  No, he's back.
20      THE WITNESS:  No, sir.  I've got a lot of calls
21  hitting me.
22      Q.  (BY MR. McCORMACK)  Sorry about that.
23      A.  Well, my wife's ill in the other room, so that's
24  only thing that matters, actually.
25      Q.  I have a wife too.  I know exactly what that

Page 79

1  means.
2      Anyway, getting back to that, Chaparral Oil was
3  involved in potential efforts to develop on this
4  8400 acres historically; is that right?
5      MR. PIPESTEM:  Objection.  I'm instructing the
6  witness not to answer for the reasons previously stated.
7      Q.  (BY MR. McCORMACK)  And Chaparral, are you aware
8  today as we sit here today, that Chaparral Oil went
9  bankrupt?
10      A.  No, I wasn't.
11      Q.  All right.  But be that as it may, is Chaparral
12  currently doing anything on the 8400 acres?
13      A.  I can't answer that.
14      Q.  Because you don't know, or --
15      A.  I have not requested that information from my
16  trustee.
17      Q.  Okay.  Are you in contact today with Chaparral
18  for any reason?
19      A.  No.
20      Q.  When was the last time -- when was the last
21  time, if you recall, that the OMC was in contact with
22  Chaparral with regard to any issues concerning potential
23  oil exploration on the 8400 acres?
24      MR. PIPESTEM:  Objection.  I'm instructing the
25  witness not to answer for the reasons stated before.

Page 80

1  That's irrelevant.  Based on the question you asked could
2  be an answer prior to the filing of this litigation.
3      MR. McCORMACK:  I find all those instructions
4  odd, but that's okay.  But if you instruct, I can't do
5  anything about it, at least not now.
6      Q.  (BY MR. McCORMACK)  My question is, let's pick a
7  date.  Let's say December 1, 2014, are you aware of any
8  communication between the OMC and Chaparral in that time
9  frame having to do with potential development of oil and
10  gas assets on the 8400 acres which is the subject of this
11  lawsuit?
12      A.  I do not know that.
13      Q.  All right.  I guess I'll ask that question more
14  generally as well.  From December 1, 2014 until today, are
15  you aware of any other oil and gas entity that is
16  potentially involved in the development of oil and gas
17  production on the 8400 acres which is the subject of this
18  lawsuit?
19      A.  I do not know that.
20      Q.  I apologize again, Mr. Waller, if I asked this.
21  I know you told me earlier that you did not know what
22  actual royalties may have been paid by the production of
23  oil on the 8400 acres.  My question is, do you know one
24  way or the other if there is any royalties coming from
25  that 8400 acres as you sit here today?

Page 81

1      A.  Yes, if the wells are producing, yes, they are.
2      Q.  All right.  And do you know if the wells are
3  producing?
4      A.  Yes.
5      Q.  Okay.  What you don't know is what percentage of
6  production from that location as a percentage of the total
7  production, if you will, for the Osage Nation; is that
8  fair?
9      A.  I have not had that information or requested it,
10  but I can.
11      Q.  All right.  Where would that information come
12  from?  Would it come from the OMC and assets at its
13  disposal, or would that be something that would come from
14  the BIA, or would that come from interacting with your
15  lesses under their relevant statute?  How would that
16  information get to you if you wanted to pick up your phone
17  and call?
18      MR. PIPESTEM:  Objection.  Compound.
19      A.  That would be the Bureau of Indian Affairs.
20      Q.  (BY MR. McCORMACK)  The Bureau of Indian
21  affairs?  Yes, the Bureau of Indian Affairs would have
22  that information?
23      A.  The Department of Interior, yes.
24      Q.  All right.  I know we talked briefly about the
25  Burbank Field, and you mentioned it was northeast, it was



Page 82

1  at least portions --

2     A   Northwest.

3     Q   Sorry, my apologies, northwest, okay.  I got it;

4  I can see it.  So northwest of the 8400 acres, do you know

5  how close to the 8400 acres the first well in the Burbank

6  Field is located?

7     A   Within a few miles.

8     Q   All right.  Is that the closest one of the

9  Burbank Field, within a few miles of the 8400 acres?

10    A   Until you get to the South Burbank Unit.

11    Q   And then the South Burbank Unit is located where

12 relative to the 8400 acres?

13    A   It's also to the northwest.  It's actually a

14 little closer on the border.

15    Q   Is that also within a few miles of the

16 8400 acres?

17    A   Yes, sir.

18    Q   When you say within a few miles, are we talking

19 one mile?  Five miles?  Seven miles?

20    A   No, sir, under five.

21    Q   Under five.  More than one, under five?

22    A   I'd have to look at my map.

23    Q   But you've been on the field.  What's your

24 guess?

25    A   I'm guessing under five.

Page 83

1     Q   All right, fair enough.  Going -- well, prior

2  to -- I think we've discussed that you've never been on

3  the 8400 acres.  Prior to the efforts of my client to put

4  a wind farm on that property, were you aware what the

5  status of the 8400 acres was prior to the wind farm, in

6  terms of what it was being used for, what was happening on

7  the property, that sort of thing?

8        MR. PIPESTEM:  Objection.  I'm instructing the

9  witness not to answer the question as to the facts that

10 predate the filing of this lawsuit.  The Court has ruled

11 that irrelevant.  So again, I'm instructing the witness

12 not to answer the question.

13    Q   (BY MR. McCORMACK) Well, do you know, for

14 example, whether or not any of the consequence of the oil

15 and gas production on this 8400 acres had created

16 pollution or environmental problems of any sort prior to

17 the wind farm's efforts to build the wind farm?

18       MR. PIPESTEM:  Objection.  For the reasons I've

19 stated, I'm instructing the witness not to answer.

20    Q   (BY MR. McCORMACK) Have you ever seen any

21 information that would indicate to you what the

22 environmental circumstances were on this 8400 acres prior

23 to the wind farm appearing at the scene?

24       MR. PIPESTEM:  Objection.  For the reasons I've

25 stated, I'm instructing the witness not to answer the

Page 84

1  question.

2     Q   (BY MR. McCORMACK)  Do you know whether there

3  had been any environmental work done or any work to ensure

4  that historical artifacts were not disturbed on this

5  property prior to the development of the wind farm in

6  2011?

7        MR. PIPESTEM:  Objection.  For the reason I

8  stated earlier, I'm instructing the witness not to answer

9  the question.

10    Q   (BY MR. McCORMACK)  Have you read the Court

11 filings that have been made by the various parties in

12 their litigation that has been occurring since 2014,

13 Mr. Waller?

14    A   To the best of my abilities.

15    Q   And have you read information concerning efforts

16 to get injunctions to stop the wind farm from proceeding?

17       MR. PIPESTEM:  Objection.  To the extent that

18 question leads to or suggests facts or could be answered

19 in a way that involves facts that preexist the filing of

20 this lawsuit, I'm instructing the witness not to answer

21 the question.

22       MR. McCORMACK:  Well, certainly filings that

23 were made in a case after it was filed in November of 2014

24 would not be the subject of your ongoing instruction for

25 him not to answer questions which I think are relevant,

Page 85

1  but that's not really pertinent.

2     Q   (BY MR. McCORMACK)  I asked you whether or not

3  you had read the filings that occurred in the lawsuit that

4  seems to be the go-off point for Counsel, whether you've

5  read those pleadings.  They all got filed after the

6  lawsuit was filed, right?  Have you read them?

7        (Unintelligible talking)

8        MR. McCORMACK:  I apologize, whoever just spoke,

9  that was pretty garbled.  I don't think we got it.

10       THE WITNESS:  Tom, they're saying that they

11 can't hear you and I, which is -- that's terrible.

12       MR. McCORMACK:  I'm looking.  I've got -- my

13 mute is not on, my stop video is not on.  I can hear you,

14 Mr. Waller.  You can hear me?

15       THE WITNESS:  Yes.

16       MR. McCORMACK:  So it's Stuart, I'm getting,

17 there may be a weak connection.

18       THE WITNESS:  It's all of them.

19       THE VIDEOGRAPHER:  Do we want to go off the

20 record.

21       MR. McCORMACK:  I guess you've got to solve that

22 problem.

23       THE VIDEOGRAPHER:  We're off the record at

24 12:29.

25       (BREAK FROM 12:29 TO 12:30)

Page 86

1    THE VIDEOGRAPHER:  We're back on the record at
2    12:30 p.m.
3        MR. McCORMACK:  Do me a favor, and I apologize
4    to everybody, could you read me back the last Q & A?
5        (Last question and answer read back)
6    Q    (BY MR. McCORMACK)  So you have, obviously the
7    lawsuit was filed in November 2014.  There were efforts
8    made at that time for an injunction.  All of those
9    pleadings postdated the filing by physical mean, and
10   you've read those.  You've read those materials,
11   Mr. Waller?
12   A    Yes.
13   Q    All right.  And you saw the decision of the
14   Court that came in the early part of this case that
15   precluded any injunctive -- withdrawn.
16        You've seen the history of the case since that
17   time?
18   A    To date, yes.
19   Q    Yes, sir.  And I know we'll get into the minutes
20   in a while here, and that comes up periodically at the
21   Osage Minerals Council's meetings; is that fair?
22   A    It should.
23   Q    Yes, indeed.  Let me ask you, going back to what
24   I think was marked as 158, which is your candidate
25   interview in 2018, we talked about what you meant by the

Page 87

1    best oilfield, and I think we've walked through that
2    pretty comprehensively.  I asked you -- I know I asked you
3    previously whether you personally opposed the development
4    of renewable energy projects such as wind farms in Osage
5    County, and I think we have the answer to that question on
6    the record.
7        My question is have you spoken to others in the
8    Osage Minerals Council on that subject matter, that is,
9    whether they generally oppose the development of renewable
10   energy projects such as wind farms anywhere in Osage
11   County?
12       MR. PIPESTEM:  Objection.  To the extent that
13   requires answers that occurred prior to the filing of this
14   lawsuit, I'm instructing the witness not to answer.
15   Q    (BY MR. McCORMACK)  That was seven years ago, so
16   I'm assuming there must be some conversations in that time
17   frame, but I'll leave it to you, Mr. Waller?
18   A    There was a council directive.
19   Q    There was a council directive?
20   A    Yes, a consensus.
21   Q    What was the council directive and consensus?
22   A    To find some relief.
23   Q    To find some relief from what?
24       MR. PIPESTEM:  Objection.  We're getting into
25   privileged communications regarding this lawsuit, so I'm

Page 88

1    instructing the witness not to answer.
2        MR. McCORMACK:  You didn't even get close to
3    establishing that.  I was talking about his communications
4    with other Osage Council -- Osage Minerals Council members
5    about their generalized approach to renewable energy in
6    Osage County.  I don't see where that gets into privilege.
7    So if you're going to instruct him not to answer that, go
8    ahead and do it, but I'm going to keep asking questions on
9    that until we can get established some of that is somehow
10   privileged.
11   Q    (BY MR. McCORMACK)  Let me ask this question.
12   You said that you were -- you had a directive.  What was
13   the directive that you discussed with members of the Osage
14   Minerals Council?
15       MR. PIPESTEM:  Objection.  To the extent that
16   involves privileged communications between Minerals
17   Council members, possibly and likely with legal counsel
18   present, I'm instructing the witness not to answer the
19   question.
20   Q    (BY MR. McCORMACK)  I'm not asking about any
21   communications you may have had with your counsel present.
22   I'm extremely mindful of attorney-client privilege.  I
23   believe in it very much.  I'm asking about you about
24   communications that you had with members of the Osage
25   Minerals Council independent of and without your counsel

Page 89

1    present relative to this directive?
2        MR. ASHWORTH:  I'm going to also throw an
3    objection in there to the extent that the Court has
4    already ruled that internal communications are outside the
5    scope of discovery.
6        MR. PIPESTEM:  I'll also say I will instruct the
7    witness not to answer to the extent it involves other
8    privileges, including the common interest privilege we
9    have with the United States.  So those communications, the
10   answers you have -- or the question you asked could
11   involve other people that could invoke a privilege.  On
12   that basis, I'm instructing the witness not to answer the
13   question.
14       MR. McCORMACK:  I find it all highly irregular
15   to have not even the remotest sense that there's been a
16   privileged communication, and yet drawing an objection not
17   to answer because of privileged communications.  Let me
18   walk through it because I need to make my record.
19   Q    (BY MR. McCORMACK)  Have you had conversations
20   with members of the Osage Minerals Council without lawyers
21   present on the issue of whether or not the development of
22   renewable energy would be something that the Osage Council
23   should support or not support in Osage County?  Let's try
24   that one.
25       MR. PIPESTEM:  Objection.  I'm instructing the

Page 90

1 witness not to answer. To the extent that calls for
2 questions that preexist the filing of this lawsuit, then
3 the witness should not answer this question.
4      MR. McCORMACK: I'm going to break it in two,
5 then, because I want that instruction on the record.
6      **Q   (BY MR. McCORMACK) So to the extent you've had**
7 **conversations with the Osage Minerals Council prior to the**
8 **filing of this lawsuit on the subject of whether or not**
9 **the Osage Minerals Council should generally oppose the**
10 **development of renewable energy projects such as wind**
11 **farms anywhere in Osage County, please tell me what those**
12 **communications are?**
13      MR. PIPESTEM: Objection. For the reasons I
14 stated earlier, the Court has ruled that that information
15 regarding communications prior to the filing of this
16 lawsuit are irrelevant and, therefore, based on that court
17 order, I'm instructing the witness not to answer.
18      **Q   (BY MR. McCORMACK) All right, now let me take**
19 **the next piece of that. Please tell me any communications**
20 **you've had with Osage Minerals Council members without**
21 **counsel present after December 1, 2014 in which the**
22 **subject matter is whether the Osage Minerals Council**
23 **should oppose the development of renewable energy projects**
24 **such as wind farms anywhere in Osage County?**
25      MR. ASHWORTH: Object to the form.

Page 91

1      **Q   (BY MR. McCORMACK) You can answer.**
2      A   Not without my counsel I haven't.
3      **Q   Okay. You've never spoken to -- have you ever**
4 **spoken to Chief Standing Bear about the future of**
5 **renewable power in Osage County in the period December 1,**
6 **2014 forward?**
7      MR. ASHWORTH: Object to the form.
8      MR. PIPESTEM: Objection based upon privilege as
9 well, privileged conversations as well.
10      **Q   (BY MR. McCORMACK) Okay. What was the setting**
11 **in which you had one or more conversations with Chief**
12 **Standing Bear about the future of renewable energy**
13 **projects in Osage County after December 1, 2014?**
14      A   Just to give him an update.
15      **Q   An update on what?**
16      A   This case.
17      **Q   All right. Have you ever had any conversations**
18 **with Chief Standing Bear in the period December 1, 2014**
19 **forward in which you and he discussed whether or not**
20 **renewable energy projects should be proceeding in Osage**
21 **County generally?**
22      MR. PIPESTEM: Objection. I'm instructing the
23 witness not to answer on the basis of privilege.
24      MR. McCORMACK: What the heck is the basis for
25 that? I asked him whether he had a conversation with

Page 92

1 Chief Standing Bear. There's no lawyers. I'm not talking
2 about lawyers.
3      MR. PIPESTEM: You did not -- first of all, if
4 you're asking me the question, then I'll answer it. You
5 did not limit the question to whether counsel was not
6 there. There's also the question of executive privilege
7 that we've raised repeatedly in this case. So you can set
8 aside your -- you can ask the question about the time
9 after the lawsuit, but it doesn't mean there aren't other
10 privileges or other limitations of what he can answer.
11      MR. McCORMACK: Okay. Let me try this.
12      **Q   (BY MR. McCORMACK) Have you ever had any**
13 **conversation about the future of renewable energy and wind**
14 **farms in Osage County, Oklahoma after December 1, 2014**
15 **with any person where your lawyers were not present? All**
16 **you've got to answer that question is yes or no.**
17      A   Yes, I have.
18      **Q   All right. Now answer the question of who did**
19 **you have those conversations with, and no other question?**
20      A   I have referred back to my chief.
21      **Q   All right. Did you have any conversations with**
22 **other members of the Osage Minerals Council on that**
23 **subject matter after December 1, 2014?**
24      A   Not without being our --
25      MR. PIPESTEM: Objection. I'm instructing the

Page 93

1 witness not to answer that question to the extent that
2 legal counsel may have been present or there may have been
3 discussion of legal strategy in that conversation between
4 Minerals Counsel. So on that basis, I'm instructing the
5 witness not to answer to preserve privilege.
6      MR. McCORMACK: Yeah, well, I would disagree
7 with you on that. You've got to establish that there was
8 actually privileged communication that took place first.
9 I was very careful what I asked. I asked him whether he'd
10 had a conversation. I didn't ask him -- and who he had it
11 with. I didn't ask him what it was. You get to assert
12 privilege once you identify the basis of the privilege.
13 You've got to have a person and persons and you have a
14 legal issue. I'm not going to fight you --
15      MR. PIPESTEM: Counsel, if you leave the door
16 open to the communication with whoever might be there,
17 that could include attorneys, and so I'm going to instruct
18 the witness not to violate the privilege in that
19 circumstance.
20      MR. McCORMACK: You have to identify the
21 attorney to establish the privilege. I'm not asking what
22 he said. This is identifying the communication. I
23 haven't asked substantively anything about what was said.
24 You can't assert a privilege unless you establish the
25 elements of privilege. You've got to have a lawyer,

Page 94

1  you've got to have legal advice, and it's got to be
2  confidential.
3        MR. PIPESTEM:  I understand the elements of
4  privilege.  You're asking such a broad question about
5  communications with council members without limiting that
6  to with other people being present, like legal counsel.
7  You're asking a question that could lead to a disclosure
8  of privilege conversations, and so I'm going to instruct
9  the witness consistently not to answer that question.
10        MR. McCORMACK:  Yeah, and now you're coaching
11  the witness, and I don't appreciate that.
12        MR. PIPESTEM:  No, I'm not either.  You asked me
13  a question.  Now, in this deposition under the Federal
14  Rules, I can respond to your question.  I'm addressing
15  you, and I am not coaching this witness.
16        MR. ASHWORTH:  I'm going to interject also.  I'm
17  going to interject also.  Regardless of privilege, the
18  Court has already specifically ruled in this matter that
19  any internal communications, as well as communications
20  with third parties, regardless of privilege, is irrelevant
21  and outside the scope of discovery, and the defendants are
22  not entitled to discover that information, whether the
23  conversation has happened or not.
24        MR. McCORMACK:  Okay.  Are you taking the
25  position that we are not allowed to inquire of any

Page 95

1  communications of the members of the Osage Minerals
2  Council concerning the subject matter of this lawsuit at
3  any time?  Is that your position?
4        MR. ASHWORTH:  First off, that's what the Court
5  said.  Second --
6        MR. McCORMACK:  No, I'm not asking you -- I can
7  read the Court's decision.  I'm asking your position.  If
8  you're going to instruct this witness not to answer any of
9  those questions, I find that -- nothing shocks me, but I
10  find that quite interesting.  Is that your position, that
11  if I'm going to ask him what he spoke to another council
12  member about, you're going to say he can't answer the
13  question?
14        MR. ASHWORTH:  Did I ever say he couldn't answer
15  the question?
16        MR. McCORMACK:  I think that's what you said.
17        MR. ASHWORTH:  No, I did not.  I raised an
18  objection.
19        MR. McCORMACK:  I understand.  We're all doing
20  our job.  Let's take a step back.  I didn't mean to get
21  everybody hot and bothered.  Let's go back to my question.
22  Look, I'm a -- nobody believes more in the privilege than
23  me.  I completely get it.  I have no interest in asking
24  for privileged communications.  I would not ask for
25  privileged communications.  I recognize and adhere to it,

Page 96

1  and I think it's one of the great privileges of law in
2  this country.  You don't have a problem with me on that.
3        My question is whether there are communications
4  that took place that aren't privileged, and I'm entitled
5  to find out about that.  I respect your desire to make
6  sure I don't step into privileged areas, so let me try to
7  do a better job of it.
8    Q   (BY MR. McCORMACK)  Mr. Waller, thank you for
9  your patience.  We have talked about your communications
10  after December 1, 2014 with Chief Standing Bear about the
11  potential future of renewable energy in Osage County, and
12  you said you had such conversations.  And then I asked you
13  what was the nature of those conversations, and then you
14  said you reported to him.  Then I said what were you
15  reporting to him, and you said the progress of the case, I
16  think is what you said.  If I got any of that wrong,
17  please correct me now.
18    A   Yes, it was on the case.
19    Q   All right.  And did you have any communications
20  with him after December 1, 2014 about the future of
21  renewable energy in Osage County that was not connected to
22  the case?
23        MR. ASHWORTH:  Object to form.
24    A   No.
25    Q   (BY MR. McCORMACK)  You did not, okay.  Did you

Page 97

1  have any communications after December 1, 2014 with
2  members of the Osage Minerals Council with regard to the
3  future of renewable energy, including wind projects in
4  Osage County, that did not involve your lawyers?  You can
5  answer that question yes or no.
6        MR. ASHWORTH:  Object to the form.
7    Q   (BY MR. McCORMACK)  You can answer.
8    A   No.  I've never had that without my counsel
9  being present.
10    Q   All right.  Have you had conversations with
11  anyone else on God's beautiful planet, did you have
12  conversations with anyone else on the subject matter of
13  the future of wind farms in Osage County in the period
14  December 1, 2014 onward that did not involve discussing
15  this case?
16    A   No.
17    Q   All right.  So you never discussed that with
18  Chief Standing Bear other than about the case, you never
19  had a conversation like that with any members the Osage
20  Minerals Council without your counsel present, and you
21  never spoke about it to any other person on God's
22  beautiful planet, yes?
23    A   Without counsel, that's correct.
24    Q   All right.  Let me ask you --
25        MR. PIPESTEM:  Counsel, is now a good time for a

Page 98

1 break?
2      MR. McCORMACK: All of our hollering at each
3 other burned up that 15 minutes. It's fine with me. Tell
4 me when you want to come back. How about 1:30?
5      MR. PIPESTEM: That's fine.
6      MR. McCORMACK: 1:30 Central time?
7      MR. PIPESTEM: Chairman Waller, is that okay
8 with you, 1:30?
9      THE WITNESS: Yes.
10      THE VIDEOGRAPHER: We're off the record at
11 12:48 p.m.
12      (BREAK FROM 12:48 TO 1:32)
13      THE VIDEOGRAPHER: We're on the record at
14 1:32 p.m.
15      Q   (BY MR. McCORMACK) Let me ask you a quick
16 question as a follow-up from our discussions earlier
17 today. What is publicly available from the OMC for a
18 person who was considering a commercial project in Osage
19 County to review to see if a lease or permit is required
20 under 214 or 211?
21      A   They would be sent to the Bureau of Indian
22 Affairs website.
23      Q   Okay. The OMC doesn't have any information on
24 that subject matter independent of what the BIA might
25 have?

Page 99

1      A   No, that's federal law. That's what we follow.
2      Q   All right. Let me ask you, and have the court
3 reporter mark, I believe we're at 159, and this is tab 84.
4 This is the Constitution of the Osage Nation. Are you
5 familiar with this document, Mr. Waller?
6      (WHEREUPON, Exhibit 159 was marked for
7 identification.)
8      A   Very familiar.
9      Q   Let me ask you to look at a couple sections, if
10 you will. If you'll look at Article 10 of the
11 Constitution of the Osage Nation, it's on page 16.
12      MR. McCORMACK: Maybe I can have the court
13 reporter go to page 16 and blow it up. Let's look at
14 Article 10, section one. It's the prior page, I think.
15 No, it's page 16 on the document, and it's Article 10.
16 Page 16, do you see the number on the lower right? You've
17 got 11; 16 is the one I'm looking for.
18      THE VIDEOGRAPHER: That is page 16.
19      MR. McCORMACK: I'm seeing 17 on the bottom of
20 the page. Okay. We're going to have to do it the hard
21 way. Blow it back down to where it was, and let's go back
22 page by page.
23      THE VIDEOGRAPHER: Okay.
24      MR. McCORMACK: Looking for Article 10. You're
25 in sections still. Keep going, keep going. You see

Page 100

1 you're at Article 8? You need to move forward. I don't
2 know what to say. Mine has 16 at the bottom. What's that
3 number down here on the right?
4      THE VIDEOGRAPHER: That's ten.
5      MR. McCORMACK: Ten?
6      THE VIDEOGRAPHER: Yeah.
7      MR. McCORMACK: Yeah, so go to page 16, the one
8 that says 16 on the bottom right.
9      THE VIDEOGRAPHER: That is 16.
10      MR. McCORMACK: There you go, section one
11 Article 10, Code of Ethics. Do you see that? Just blow
12 it up. No, Article X. Right there in the middle. There
13 you go.
14      Q   (BY MR. McCORMACK) Anyway, we got there
15 finally. Mr. Waller, have you seen Article 10 of the code
16 of ethics -- excuse me, Article X of the Osage Nation
17 Constitution previously?
18      A   Yes.
19      Q   All right. And I just want to ask a couple of
20 questions about this section. It says purpose,
21 recognizing the desire of the Osage people to establish a
22 government that is fair and equitable to all people. Who
23 is that all people? Who does that refer to?
24      A   The citizens of the Osage Nation.
25      Q   All right. And so -- and then it goes on to

Page 101

1 say, the Osage people is a term in the first sentence. Is
2 all people only Osage people, or is it all people?
3      A   All people Osage.
4      Q   Okay. So I would ask you, "Elected or appointed
5 tribal officials and employees of the Osage Nation,
6 putting aside their personal and private interests, shall
7 strive for the common good of the Osage people and shall
8 administrate fair and equal treatment of all persons,
9 claims, and transaction petitioning before the Osage
10 Nation government." Do you see that?
11      A   Yes.
12      Q   That phrase "all persons" in that section, who
13 does that refer to?
14      A   Anyone under the Osage Nation.
15      Q   All right. So my understanding of your reading
16 of the Code of Ethics is that any reference to people or
17 persons within this section relates only to the Osage
18 people or Osage persons; is that right?
19      A   That is identified, yes.
20      Q   All right. Now, let me ask you to go to page 21
21 of this document, and it's Article 15, Natural Resources
22 and Mineral Management. You understand that is the
23 section of the Constitution that deals with the mineral
24 rights of the Osage Nation. Is that a fair description?
25      A   For the Nation it is.

1    Q   And let me -- let me go over to section four
2   onto the next page.  Well, let's see section four
3   management of the Osage Mineral Estate.  This is on page
4   21.
5        THE VIDEOGRAPHER: It skips from 20 to 22.
6        MR. McCORMACK: That's highly unfortunate.  Your
7   copy doesn't have page 21 in it?
8        THE VIDEOGRAPHER: Let me look.  One second,
9   please.
10       MR. McCORMACK: Actually, I think that is the
11  document.  Yeah, there is no 22 for some reason, although
12  the sections continue.  So go to page 21, and go to
13  section four.  Go to section four.  Blow up section four.
14   Q   (BY MR. McCORMACK) All right.  This section
15  four says Management of the Osage Mineral Estate, and the
16  first sentence says "The Mineral Estate of the Osage
17  Reservation is reserved to the Osage Nation."  Do you see
18  that?
19   A   Yes.
20   Q   All right.  Then let's go over to the next page,
21  the second paragraph of the next page.
22       THE VIDEOGRAPHER: That's page 23?
23       MR. McCORMACK: Yes.
24   Q   (BY MR. McCORMACK) It says, "The Osage Minerals
25  Council is recognized by the Osage Nation government as an

1   independent agency within the Osage Nation established for
2   the sole purpose of continuing its previous duties to
3   administer and develop the Osage Mineral Estate in
4   accordance with the Osage Allotment Act of June 28, 1906,
5   as amended, with no legislative authority for the Osage
6   Nation government."  Do you see that?
7    A   Yes.
8    Q   All right.  Is it your understanding that this
9   constitutional provision is the one that vests the Osage
10  Minerals Council as the independent agency within the
11  Osage Nation to manage the Osage Mineral Estate; is that
12  fair?
13   A   I only read Article 15.
14   Q   I'm sorry, I didn't understand that answer.
15   A   Article 15 allows the element in which I run
16  under, the Osage Minerals Council directive.
17   Q   All right.  Let me go to the next paragraph.
18   A   Yes.
19   Q   Let me blow that up as well, or have the
20  concierge do so.
21       In here it says, "The Osage Minerals Council
22  shall have the power to consider and approve leases and to
23  propose other forms of development of the Osage Mineral
24  Estate."  Do you see that?
25   A   Yes, sir.

1    Q   All right.  And do you have a sense, is that --
2   is that constitutionally set as the authority and power of
3   the Osage Minerals Council, in your understanding?
4    A   Yes.
5    Q   All right.  And other than that power, is there
6   another power the Osage Minerals Council has that is not
7   set forth in this Constitution?
8    A   Under Article 15, I say no.
9    Q   All right.  That suggests that maybe you believe
10  there's another provision that could add to the power
11  authority of the Osage Minerals Council beyond Article 15,
12  or no?
13   A   No.
14       MR. PIPESTEM: Objection.  Calls for a legal
15  conclusion.
16   Q   (BY MR. McCORMACK) All right.  So Article 15 is
17  the section from which the Osage Minerals Council derives
18  its power, at least constitutionally, for the Osage
19  Nation; is that fair?
20       MR. PIPESTEM: Objection.  Calls for a legal
21  conclusion.  Please answer if you know.
22   A   Article 15 encompasses all of that effort and
23  provisions that is allowed, and the Osage Minerals Council
24  is the Osage Nation.  We're not a separated element.
25   Q   (BY MR. McCORMACK) Well, that was actually kind

1   of my question, which is the Osage Constitution gives the
2   Osage Minerals Council "the power to consider and approve
3   leases and propose other forms of development of the Osage
4   Mineral Estate."  That's what this document says, yes?
5    A   Yes, sir.
6    Q   All right.  And then -- and then the next
7   section was interesting to me.  It says, "Mineral leases
8   approved and executed by the Council shall be deemed
9   approved by the Osage Nation unless within five working
10  days, written objection is received from the Office of the
11  Principal Chief that the executed lease or other
12  development activity violates Osage law or regulation."
13  Do you see that?
14   A   Yes.
15   Q   And then constitutionally it creates the
16  provision that any dispute that might arise through that
17  process would be heard before the Supreme Court of the
18  Osage Nation Judiciary.  Do you see that?
19   A   Yes.
20   Q   So is it your understanding that the Osage
21  Minerals Council has the power to consider and approve
22  leases and to propose other forms of development of the
23  Osage Mineral Estate, but that the Office of the Principal
24  Chief has five days to either approve or not approve of
25  the action by the Osage Minerals Council?

Page 106

1    A   That's correct.
2    Q   All right.  Has that been your operating
3    assumption the entire time that you've been associated
4    with the Osage Minerals Council in the period --
5    A   I'm not assuming.  That is the operation under
6    the Constitution that I have (inaudible).
7    Q   Understood.  The question I guess I have is
8    has -- was there ever a time that you can recall when you
9    were affiliated with the Osage Minerals Council when a
10   lease or a proposal to develop the Osage Minerals Council
11   was overruled by the Office of the Principal Chief?
12   A   No.
13   Q   All right.  Because of this, is there a
14   methodology in place where any decision made by the Osage
15   Minerals Council must be provided to the Office of the
16   Principal Chief immediately after it makes the
17   determination to see whether or not the Office of
18   Principal Chief objects to any of the actions of the Osage
19   Minerals Council?
20   A   Yes.
21       MR. PIPESTEM:  Objection.  Mischaracterizes this
22   provision of the Osage Constitution.
23   Q   (BY MR. McCORMACK)  I'm sorry, you said yes.
24   What would that process be?
25   A   We use the Osage Nation website to download

Page 107

1    immediately to it for availability, and the chief is sent
2    any effort that includes something he needs to look over
3    for us.
4    Q   I see.  As a result of the fact that the Office
5    of the Principal Chief has oversight, if you will,
6    constitutionally on decisions made by the Osage Minerals
7    Council relative to approving leases and proposing other
8    forms of development of the Osage Mineral Estate, does
9    that mean that often in practice the Osage Minerals
10   Council works in conjunction with the Principal Chief's
11   Office to make sure that it doesn't get out in front of
12   the chief if he's opposed to an action, that sort of
13   thing?
14       MR. PIPESTEM:  Objection.  Mischaracterization
15   of the law.
16       MR. McCORMACK:  I don't think so, but that's an
17   objection.
18   Q   (BY MR. McCORMACK)  You can answer the question,
19   Mr. Waller.
20   A   Repeat it for me, please.
21   Q   Sure.  This provision here suggests that
22   whatever the Osage Minerals Council does in approving
23   leases or proposing other forms of development on the
24   Osage Mineral Estate is subject to objection by the Office
25   of the Principal Chief within five days.  Is that a fair

Page 108

1    reading of it?
2        MR. PIPESTEM:  Objection.  Mischaracterizes the
3    law in the Osage Constitution.
4    Q   (BY MR. McCORMACK)  You can answer.
5    A   As it is written.
6    Q   All right.  That's what I was trying to get to.
7    In practice is it different, or is there a system built, I
8    think you said so, that the Office of the Principal Chief
9    gets all the decisions of the Osage Minerals Council
10   relative to the subject matter set forth in this provision
11   and then has the right to react or object to that?  Is
12   that as a practical matter how it works?
13       MR. PIPESTEM:  Objection.  Mischaracterization
14   of Osage Constitutional law.
15   Q   (BY MR. McCORMACK)  I'm not sure what your
16   counsel is objecting about, but that's okay.  He has the
17   right to do it, but you've still got to answer the
18   question.
19   A   And I go back to Article 15, that it encompasses
20   this also out of the Constitution.
21   Q   I understand Article 15 deals with the Osage
22   Minerals Council and its right relative to the Mineral
23   Estate.  What I'm trying to do is understand
24   constitutionally what the process is for the Osage
25   Minerals Council exercising its authority and what it is

Page 109

1    subject to in terms of possible objection by the Office of
2    the Principal Chief.  I'm just trying to find out if that
3    as a practical matter is something that is understood by
4    the Osage Minerals Council and the Office of Principal
5    Chief based upon your observations and knowledge?
6    A   Speaking on behalf as the chairman, yes, I'm
7    aware of it.
8    Q   Right.  That's all I was trying to find out.  So
9    as a practical matter, look, organizations have rules, and
10   I'm just trying to figure -- and practicalities.  So what
11   I'm trying to figure out, and maybe you answered the
12   question, Mr. Waller, from what you told me earlier today,
13   which is from 2010 you were really the representative, if
14   you will, of the chief at that time to the Osage Minerals
15   Council.  I presume because the chief understands that it
16   does have this objection right, is that one of the reasons
17   why you understood you were you doing that job for the
18   prior chief?
19       MR. PIPESTEM:  Objection.  I'm instructing the
20   witness not to answer on any matter prior to the filing of
21   this litigation, including at the time from 2010 until the
22   time this case was filed.
23       MR. McCORMACK:  I can't stop you from doing
24   that, but you are overreading the judge's orders.  You
25   seem to think that anything that happened before the date

Page 110

1  of this Complaint is off-limits, and the issue is whether
2  or not the bad faith of the Osage Nation and Osage
3  Minerals Council, I understand that that's what the Court
4  dealt with.  But out of good faith, and it's certainly not
5  off the table and these questions have been asked of
6  multiple witnesses, our witnesses and other witnesses, and
7  no one has instructed that the date of the Complaint is
8  some wall that nobody can go past.  I really disagree with
9  that.  If you're going to continue to instruct to do it,
10 there's nothing I can do about that, but you do so at your
11 own peril.
12    **Q   (BY MR. McCORMACK)  I'm going to ask the**
13 **question again.  Did you understand in 2010 when you were**
14 **working on behalf of the chief at that time that one of**
15 **your jobs was to inform the chief so that he could**
16 **properly exercise his authority constitutionally under**
17 **Article 15?**
18    MR. PIPESTEM:  Objection.  I'm instructing the
19 witness not to answer the question for the reasons I've
20 given before.
21    MR. McCORMACK:  Okay, I want to get that on the
22 record.  Is your view that anything that happened before
23 the date of this Complaint is off-limits for this witness?
24    MR. PIPESTEM:  I'll let you interpret the
25 Court's order any way you want to.  I think your

Page 111

1  interpretation is wrong.
2     MR. McCORMACK:  I'm not asking that.  I'm asking
3  what your instruction is so that I don't waste a lot of
4  time in this deposition.  If your view is that anything
5  that happened prior to the date of the lawsuit,
6  November 2014, is not something I can ask about, then
7  please state that on the record so I understand exactly
8  where you're coming from.
9     MR. PIPESTEM:  I have restated it over and over
10 and over again.  I don't know how much more clear I can be
11 about it.  I have stated that over and over again.
12    MR. McCORMACK:  Okay, I got it.  So you're
13 saying that this witness will not be allowed to answer any
14 questions having to do with any subject matter prior to
15 the date of this lawsuit in November of 2014?
16    MR. PIPESTEM:  Related to this lawsuit, that's
17 right.  You asked him questions about -- a number of
18 questions about his educational background, his employment
19 history.  Of course I allowed those questions.  But
20 consistent with the Court's orders, you are not permitted
21 to ask irrelevant questions when there is a court order
22 that has determined that that's the case.
23    MR. McCORMACK:  The power of the Constitution of
24 the Osage Minerals Council and the Office of the Principal
25 Chief is in and of itself distinct from anything going on

Page 112

1  in our lawsuit.  I guess this falls under the category,
2  however, that historically this comes before November of
3  2014 so you're going to instruct him not to answer these
4  questions.
5     MR. PIPESTEM:  As I have -- since you're asking
6  me, you have mischaracterized what this Constitution says
7  repeatedly, and so I've objected to it.
8     MR. McCORMACK:  I didn't ask you that question.
9  I'm not asking for your interpretation of this
10 Constitution so you can feed an answer to your client.
11 I'm asking you very specifically if I'm asking about how
12 this Constitution works, your point is that the order that
13 the judge has issued precludes me from asking the question
14 because this Constitution, what, existed before 2014?
15 That's my question.
16    MR. PIPESTEM:  I stated my objection.  I made my
17 directive to the client not to answer the question for the
18 reasons I stated, and that's a part of this record.  I'm
19 not instructing the witness in any way, shape, or form
20 about that.  I'm directing him not to answer the question
21 that you asked.
22    MR. McCORMACK:  Okay.  Do you believe that I'm
23 allowed to ask any questions prior to November of 2014 of
24 this witness that might bear on the good faith of my
25 client?

Page 113

1     MR. PIPESTEM:  No, I don't.
2     MR. McCORMACK:  Okay.  I clearly understand your
3  position now.  I appreciate it.
4     MR. PIPESTEM:  Among a host of other questions
5  you can't ask.
6     MR. McCORMACK:  Well, it may make this
7  deposition go a lot faster since I now know that there's a
8  bright line in your mind and you're going to enforce it,
9  so I've got that.
10    **Q   (BY MR. McCORMACK)  Let me ask more questions,**
11 **and if I draw the instruction, so be it.**
12    **In your time on the Osage Minerals Council and**
13 **in your time working for the principal chief prior to**
14 **being on the Osage Minerals Council, perhaps you've**
15 **answered this question, I apologize, Mr. Waller, if you**
16 **have, but you don't ever remember there being an objection**
17 **by the Office of the Principal Chief to any action taken**
18 **by the Osage Minerals Council exercising its**
19 **constitutional rights under Article 15; is that right?**
20    **A   I've not had that happen.**
21    **Q   All right.  You mentioned earlier that you had**
22 **spoken to Chief Standing Bear on several subject matters**
23 **that related to the lawsuit, and because it was privileged**
24 **you drew the instruction not to answer.  Do you**
25 **communicate regularly in the time that you've been on the**



1 Osage Minerals Council, both as a member and then as a
2 chairman, with the chief, now Standing Bear, before that
3 whoever may have been chief at the time, with regard to
4 matters that the Osage Minerals Council will consider at
5 its hearings and its proceedings?
6     A   We take everything to executive and invite them
7 in.
8     Q   I was going to ask you about executive session.
9 So what triggers executive session?  What does it relate
10 to?  How do you -- how do you go into executive session?
11    A   It is requested and put on the agenda, and then
12 we vote to go in executive session and take care of our
13 business there.  In this case you're asking specifically
14 about the chief, and in those situations which he needs
15 that, he is brought in.
16    Q   And again, I don't know as a practical matter,
17 but in your experience on the Osage Minerals Council how
18 often does the principal chief attended the meetings?  Is
19 that a common event or is that a periodic event or what is
20 your sense of that issue?
21    A   However his schedule works out.
22    Q   Would he typically come if he were available and
23 participate, or is it out of the ordinary to have the
24 chief come to an Osage Minerals Council meeting?
25        MR. PIPESTEM:  Objection.  Compound question.

1    Q   (BY MR. McCORMACK)  You can answer.
2    A   He has always come when we request, and then
3 also if it's something that he needs to speak with us
4 about.
5    Q   Can the chief speak on behalf of the Osage
6 Minerals Council?
7    A   Unless he designates it to me, which he did
8 under the ICEWIG, the federal entity of Indian Country
9 Energy Infrastructure Working Group, and then as is done
10 through his office as designee.  But yes, unless he
11 chooses someone else.
12    Q   And that's important for me to know, and I
13 appreciate that.  When did that designation take place, if
14 I may ask?
15    A   During my tenure on OMC 3.
16    Q   So after 2018?
17    A   After '14.
18    Q   After '14.
19    A   '16, '17, sir.  I don't have the dates in front
20 of me, but I still sit on said committee.
21    Q   Well, and just as a practical matter, prior to
22 that time could the principal chief speak on behalf of the
23 Osage Minerals Council without concern that the Osage
24 Minerals Council's independence was somehow implicated by
25 that?

1    A   The chief can say anything he wants.
2    Q   All right, that's what I'm trying to get to.
3 Your understanding on a practical basis is that the chief
4 could, in fact, speak on behalf of the Osage Minerals
5 Council?
6    A   And has many times upon our request.
7    Q   Okay, all right.
8    A   He's a big hitter in Washington if you didn't
9 know that.
10    Q   No, he's a very impressive guy.
11    A   Yes, sir, he is, and his wife is my relative.
12    Q   Okay, that's good to know.  I looked up -- I've
13 certainly done a lot of work with Chief Standing Bear too,
14 and I've seen exactly what you're saying.
15    A   Thank you.
16    Q   Very impressive man.  Let me turn to something
17 else now.  I want to go --
18    A   Thank you.
19    Q   You're welcome.  I want to go to tab 81 for the
20 court reporter, and I think we're --
21        MR. McCORMACK:  What's our tab now, are we at
22 159 or 160?
23        THE COURT REPORTER:  This will be 160.
24        MR. McCORMACK:  Say that again.
25        THE COURT REPORTER:  This will be 160.

1        MR. McCORMACK:  I can't hear you.
2        THE COURT REPORTER:  160.
3        MR. McCORMACK:  160, oh sorry.
4        THE COURT REPORTER:  No problem.
5        MR. McCORMACK:  Thank you.
6    Q   (BY MR. McCORMACK)  I'm going to mark this as
7 Exhibit 160.  This is Osage Minerals Council's First
8 Amended Complaint in Intervention which was filed in this
9 case in July of 2020 and ask you whether you've seen this
10 document before.
11        (WHEREUPON, Exhibit 160 was marked for
12 identification.)
13    A   Yes.
14    Q   Did you read this document prior to its being
15 filed?
16    A   Yes.
17    Q   All right.  And you approved its filing, I'm
18 assuming, as a representative of the Osage Minerals
19 Council?
20    A   As a directive from the Osage Minerals Council.
21    Q   Okay.  Let me ask you if I can --
22    A   Sure.
23    Q   -- to turn to page 19 of the document, which is
24 the section entitled Prayer for Relief.  All right, now, I
25 think I've learned from today, and I appreciate the

Page 118

1  testimony, that as you sit here today you are the chairman
2  of the Osage Minerals Council, yes?
3      A    Correct.
4      Q    All right.  And obviously the Osage Minerals
5  Council is suing my clients, yes?
6      A    Yes.
7      Q    And as the chairman of the Osage Minerals
8  Council, I wanted to ask you, what remedies is the Osage
9  Minerals Council seeking here against my clients?
10     A    As requested in this document, removal.
11     Q    All right.  So the remedies you're seeking for,
12  there's actually several of them, we can go over it, but
13  one of them is so-called ejectment.  Is that what you were
14  referring to when you were talking about removal?
15     A    That's correct.
16     Q    All right.  Do you understand that there were
17  other remedies being sought by the Osage Minerals Council
18  in this lawsuit?
19     A    Yes.
20     Q    What do you understand those remedies to be?
21     A    I think I have to know the answer to the first
22  one first before I answer too much of that.
23     Q    All right, how can I help?
24     A    Just go ahead and give me my other options as
25  you see.

Page 119

1      Q    Okay.
2      A    I can't read it.
3      Q    No, I understand.  I'm a lawyer, and I got that.
4  The first two, 96 and 97, seek a declaratory judgment
5  relative to certain subject matters; is that fair?
6      A    Yes.
7      Q    And then paragraph 98 says, "Enter a judgment
8  assessing damages or providing any appropriate remedy,
9  whether monetary or sounding in equity, as determined to
10  the Osage Mineral Estate for unlawful or unauthorized
11  mining, excavation, or other work as set out in the
12  Federal Regulations."  Did I read that right?
13     A    Yes.
14     Q    What did you understand that to mean?
15     A    Following the -- following the Code of Federal
16  Regulations that protect my reservation.
17     Q    All right.  They talked about assessing damages
18  or providing any appropriate remedy, whether monetary or
19  sounding in equity.  Do you see that?
20     A    Yes.
21     Q    And do you understand the difference between a
22  monetary remedy and one sounding in equity?
23     A    Of course.
24     Q    All right.  And what is the monetary remedy that
25  the Osage Nation is seeking here?

Page 120

1      A    As much as you can give on this environment.  We
2  believe that Chairman Yates had sent a letter to you, and
3  the United States government had sent a letter to you.
4      Q    And what would the -- and I understand those
5  letters may have been relative to the issue of the mining
6  which is at the core of this lawsuit, but you understand
7  that there was a monetary demand connected to those?
8      A    Yes.
9      Q    What was that monetary demand?
10     A    The lack of being able to produce our field.
11     Q    I'm sorry, I didn't hear that.
12     A    The production that we are unable to take care
13  of at this time.
14     Q    So is that a monetary damage that flows from
15  alleged loss of oil and gas production on the 8400 acres
16  which is the subject of the wind farm?
17     A    I can only speak about the wind farm footprint,
18  yes.
19     Q    All right.  So do you know what the monetary
20  value is of this alleged loss of oil and gas production on
21  the 8400 acres?
22     A    Yes.
23     Q    What is it?
24     A    I will ask you to refer to the DEMD information
25  that was sent to us, Department of Energy Management and

Page 121

1  Development.
2      Q    Okay, I apologize.  What did the DEMD say on the
3  subject matter that would be relevant to my inquiry?
4      A    It talked about the production availability as
5  they see it.
6      Q    All right.  As I said earlier, though, there is
7  no production taking place on the 8400 acres, correct, new
8  production?
9      A    If you say so, yes.
10     Q    Well, I thought we agreed on the earlier.  Did I
11  get that wrong?
12     A    Well, I haven't been up there, so I can't even
13  answer that.  I would feel like it is not.  You asked
14  about the production that's already there and are we
15  receiving royalties, and that's correct.  DEMD looked at
16  it from a different side as being experts in the field.
17     Q    Okay.  Do you seek monetary damages for the
18  value of the minerals that were used in the construction
19  of the wind farm?
20     A    Yes.
21     Q    All right, do you know the value of that?
22     A    I won't guess those exact numbers.
23     Q    All right.  Do you know what the Osage Minerals
24  Council typically charges for, say, a ton of material that
25  might be removed from the Osage Estate?

Page 122

1    A    Under a permit?

2    Q    Yes, sir.

3    A    Ten percent as federal law dictates.

4    Q    Ten percent of the sale value?

5    A    Yes.

6    Q    What if it isn't sold?

7    A    What was the use of it?  If it wasn't sold, why

8    were they mining it?

9    Q    Okay.  All right.  We talked about two forms of

10   potential monetary damages, one being, I'll say it my way,

11   and if I get it wrong, please correct me, the impact of

12   the wind farm development as you described, and then

13   potentially the value of minerals.  Any other economic or

14   monetary damages that you can think of, Mr. Waller?

15   A    Not at this time.

16   Q    All right.  And then we talked about matters

17   sounding in equity.  What do you understand matters

18   sounding in equity to be in terms of the remedies that the

19   Osage Minerals Council is seeking in this case?

20   A    I have many options.  You would have to tell me

21   what is the value for us.

22   Q    Well, we talked earlier, and I think you

23   indicated that you were familiar with the distinction

24   between monetary remedies and equitable remedies.

25   A    Yes, sir.

Page 123

1    Q    And we've talked about the monetary remedies,

2    and now I'm into the equitable remedies.  I'm asking you,

3    what is your understanding what the OMC is seeking in

4    terms of equitable remedies?

5    A    The loss of our production.

6    Q    The loss of the potential oil and gas

7    production?

8    A    Yes.

9    Q    All right.  That sounds monetary to me, so an

10   equitable remedy, I'm trying to determine how an equitable

11   remedy would necessarily implicate the loss of that oil in

12   production, but I'm all ears if you can answer that

13   question?

14   A    I can't give you a dollar amount at this time.

15   Q    Well, an equitable remedy also, let's go to the

16   next section of the Complaint, which is paragraph 99.

17   A    Yes.

18   Q    And it says, "Enter a judgment finding

19   defendants jointly and severally liable for any remedy,

20   including monetary damages in an amount to be proven,

21   ejectment, or any other equitable remedy this Court finds

22   appropriate resulting from the trespass and continued

23   trespass."  Do you see that?

24   A    Yes.

25   Q    All right.  So we're back again on this section

Page 124

1    talking about monetary damages and then also ejectment or

2    any other equitable remedy.  Do you see that?

3    A    Yes.

4    Q    We've kind of walked through the monetary

5    damages piece of this.  Is there anything that you want to

6    add to that beyond what we've talked about, primarily the

7    oil and gas issues and the value of the minerals?

8    Anything else you want to add in terms of the monetary

9    piece of that?

10   A    Besides my court costs?

11   Q    Okay.  Court costs, that's another.  All right,

12   anything else?

13   A    Not at this time.

14   Q    Okay.  Now, let's talk about ejectment or any

15   other equitable remedy this Court finds appropriate.  What

16   does the Osage Minerals Council have in mind for that?

17   A    Since I've never had the opportunity to visit

18   with you, I don't know how to fill in the last sentence

19   you gave me.  Usually something that's this large would've

20   been brought to my attention, and someone would have come

21   and saw us.

22   Q    You're referring to the fact that my clients had

23   not come to the Osage Minerals Council prior to the

24   commencement of the building of the structures out there

25   on the 8400 acres?

Page 125

1    A    I'm talking while I've been chairman, sir.

2    Q    Okay.  All right.  Well, really the question I'm

3    asking is in this damages section the claim for relief.

4    We know we have a lawsuit.  What would satisfy the Osage

5    Minerals Council?

6    A    I could give you some options.

7    Q    I'm all ears.

8    A    Take it away, the first one; that's why we're

9    here.  The second one looks at the loss of value of my

10   production, and the third is something I think we should

11   have been talking about and it'd have made this call a lot

12   quicker is I think we're looking at permitting two

13   different issues.  One is a position without the Osage

14   Minerals Council on my reservation.  The other one is a

15   position with my Osage Minerals Council on my reservation.

16        There's many items I think we could have looked

17   at, power grid.  As you know I sit on federal White House

18   committees.  I understand the involvement there.  My gas

19   is taking care of Arizona as we speak, so things of that

20   nature.  And I believe you're a company that could even

21   bring new elements to my reservation.  You have the

22   wherewithal.

23        MR. ASHWORTH:  Object to the form of that

24   question.

25   Q    (BY MR. McCORMACK)  I want to walk back through

Page 126

1  those, and I appreciate very much, Mr. Waller, your
2  answer.  One of the things we're looking at here is we've
3  talked about monetary issues, and then we've talked about
4  ejectment and other equitable remedies.  Mostly what I'm
5  trying to find out is what is it that the Osage Minerals
6  Council would want to satisfy it as a matter of damages.
7  We've talked about the monetary piece, which is the
8  purported diminishment in oil and gas production, and
9  we've talked about the value of the minerals, and then on
10 the other piece I want to talk about ejectment for a
11 moment.  Are you taking the position that this wind farm
12 should be ejected from the 8400 acres?
13      A  As one of my options, yes.
14      Q  All right.  And in connection with that, have
15 you -- have you as the chairman of the Osage Minerals
16 Council or anyone at your direction sought to evaluate the
17 consequences of the ejectment option here relative to
18 people not only like my own clients but to other people
19 within the larger community in Oklahoma?
20      MR. ASHWORTH:  Object to the form.
21      Q  Sir?
22      Q  (BY MR. McCORMACK)  You can answer.  He objected
23 to the form.
24      A  I just look at what happens on my reservation.
25 I can't compare the other elements to what is my situation

Page 127

1  here.  We're the only ones in the world held under these
2  CFR codes.
3      Q  Right.  Well, and we've covered several subject
4  matters already on this front, and I can get back to the
5  question that you raised with me, which I very much
6  appreciate.
7      A  Yes, sir.
8      Q  Which is how Enel might be able to be of more
9  value to a larger set of issues than the one that we're
10 fighting about, but I want to -- I still have to deal with
11 the ones that are before me, Mr. Waller.
12      A  I understand.
13      Q  So I've got to ask.  The ejectment issue,
14 obviously the removal of the wind farm would be a major
15 event.  Would you agree with that?
16      A  For all parties concerned.
17      Q  Yes.  And the question I'm asking you is whether
18 the Osage Minerals Council, for example, has spoken to the
19 landowners about that option and what consequences might
20 befall them if that were to happen?
21      A  I have not talked to them.
22      Q  All right.  Have you directed anyone to talk to
23 them?
24      A  No, I have not.
25      Q  Have you directed anyone to evaluate what the

Page 128

1  economic and logistical consequences would be to the
2  landowners of the property?
3      A  I would only know that information from,
4  actually, you.
5      Q  Okay.  But my point is that is not something
6  that you have looked into as a potential consequence of
7  the equitable remedy of ejectment that the OMC at least
8  technically is seeking in the Complaint that we're walking
9  through?
10     A  No, you would have to show me what contracts
11 we're talking about.  I don't know that number.
12     Q  All right.  And again, whether yourself or
13 anyone else from the Osage Minerals Council has looked
14 into the consequences to the owner of the project, my
15 clients, in the event of an ejectment, the economic and
16 other logistical consequences to my client if that were to
17 occur?
18     A  I have not.
19     Q  All right.  And you have not directed anyone at
20 the OMC to look into that question?
21     A  For the third time, I have not.
22     Q  All right, all right.  Has anyone from the OMC
23 looked into the question of what the removal of the wind
24 farm would mean to the delivery of electricity in the
25 larger community?

Page 129

1      A  Is some of the electricity used in Osage County?
2      Q  Well, I'll ask that question, and then I'll go
3  back to the other question.  But yes, is some of the
4  electricity used in Osage County?
5      A  Okay.  No, I haven't looked into that.
6      Q  All right.  Do you know, for example, I know
7  this because I'm a power lawyer, but whether or not the
8  loss of that electricity would impact the ability of the
9  local community to have power during peak periods of time
10 of electricity demand?
11     A  If I knew where it hit the grid, I would know
12 that answer better.
13     Q  All right.  And I have to walk through these
14 questions, Mr. Waller.  I hope you understand that.  But
15 you personally have not and you have not asked anyone from
16 the Osage Minerals Council to look into that question,
17 correct?
18     MR. PIPESTEM:  Objection.  Asked and answered.
19     Q  (BY MR. McCORMACK)  I don't think I have on this
20 issue, but go ahead.  You can answer.
21     A  I have not.
22     Q  All right.  Do you know what tax revenues the
23 wind farm generates for the local school district and the
24 local county?
25     A  I don't have that number in front of me.



Page 130

1    Q   Well, looking at this Complaint, if you look at
2  page 13 of the Complaint, paragraph 63.
3    A   Please pull that up for me.
4    Q   Do you see here it says that in August --
5    A   Yes, sir.
6    Q   -- 2011 Shidler Public School Superintendent
7  John Hertzig anticipated an infusion of about $1.5 million
8  a year into the Shidler School District from property
9  taxes collected on Osage Wind's turbines.  Do you see
10 that?
11   A   Is that what they're getting today?
12   Q   Well, I'm just asking whether you've seen -- I'm
13 asking you currently whether you've seen this paragraph in
14 the Complaint that Osage Minerals Council filed?
15   A   Yes, I have.
16   Q   This is an allegation that Osage Minerals
17 Council made.  This is your allegation.
18   A   I knew that.
19   Q   Do you know today what type of tax revenue, if
20 any, the Shidler School District is receiving from
21 property taxes collected on the Osage Wind's turbines?
22   A   No, and it's called Shidler.
23   Q   Thank you, Shidler.  I was wondering about that.
24 Shidler, thank you.  Do you know the answer to that
25 question?

Page 131

1    A   No, I do not.
2    Q   Does that matter to the Osage Minerals Council
3  relative to the equitable remedy that it's seeking in this
4  case?
5    A   Yes, because we pay all the schools in our
6  county through our gross production tax.  I'm very aware
7  of it.  I'm paying four school districts being a
8  restricted landowner.
9    Q   Understood.  In other words the Osage Minerals
10 Council does care whether or not the removal of this wind
11 farm might cost the Shidler School District as much as
12 $1.5 million a year in lost taxes; is that right?
13   A   I do.
14   Q   All right.  And the same thing, do you know what
15 kind of taxes that the Osage Wind wind farm is paying to
16 the County of Osage in Oklahoma?
17   A   I do not.
18   Q   All right.  Is that something that you as the
19 chairman of the Osage Minerals Council cares about
20 relative to the equitable remedies that it's seeking in
21 this case?
22   A   Very interested.
23   Q   All right.  You understand that if this wind
24 farm were removed, those tax revenues would be gone, yes?
25   A   Yes.

Page 132

1    Q   And that's not a matter of indifference to you,
2  is it?
3        MR. PIPESTEM:  Objection.  Asked and answered.
4    Q   (BY MR. McCORMACK)  You can answer it.
5    A   I'm asked to give presentations at Shidler
6  school for a coach.  I care about every child I've got
7  there because you've got Osages there too.  So that's my
8  answer.
9    Q   All right.  Do you know how many people are
10 permanently employed at the Osage Wind wind farm in the
11 8400 acres?
12   A   No, I am not.
13   Q   Do you care about those potential lost jobs if
14 this wind farm were removed?
15   A   Among other things.
16   Q   All right.
17   A   How many Osages are those working employees?
18   Q   I was going to ask you that, actually.  It was
19 on my mind as well.  Do you know whether or not Osage
20 Nation members are in fact employed by the wind farm?
21   A   You can only answer that.
22   Q   All right.
23   A   I'd like to say a lot.  I direct every program.
24 I'm not only in the oil business.  I have my scholarships.
25 I have my school funding by my shareholder.  I do

Page 133

1  presentations at all these schools.  I have been for
2  years.
3        I've got to be at a football lifting here at
4  seven, folks, for my grandson.
5    Q   It's that time of year.
6        Mr. Waller, do you know, I know there's been in
7  the record in connection with this case evidence that
8  between 200 and 250 people were employed as construction
9  personnel during the construction of the wind farm.  Do
10 you know whether or not any of the members of the Osage
11 Nation were among that 200-250 employees?
12   A   I do not.
13   Q   We've walked through a number of items that
14 would be impacted by the removal of this wind farm, and I
15 know that technically you're asking for the removal of the
16 wind farm.  But your answers suggest to me that you're not
17 indifferent to the consequences of the removal of the wind
18 farm to a number of constituencies, both the taxing
19 authorities, the schools, private landowners, others.  Is
20 that a fair summary of your testimony?
21   A   I'm the chairman of the Osage Minerals Council.
22 I'm not going to cut my children's future off.  I sit on
23 White House calls every month of what are we going to do
24 to save ourselves.  Actually, I've been promoting every
25 kind of development across the nation on Indian country;

Page 134

1  solar, turbine, everything. I've just got to have a
2  better fit here where I'm located and elected to take care
3  of this reservation.
4      Q   Understood. And this has been very helpful to
5  me, and I appreciate it. I guess the question is there's
6  a -- the remedy section here is a bit wide open. It talks
7  about monetary remedies, and then it talks about equitable
8  remedies, which basically are fair remedies. I guess
9  we've talked about the monetary, and you've said
10 technically you've asked for ejectment, but you understand
11 the consequence of that. What else -- what else would you
12 like Enel to do to make this right?
13     A   Build my hospital. I don't even have a hospital
14 here. I've had every large corporation come through, take
15 the billions, then what do I have left? You might be
16 coming in to something that I've got to have. I've got to
17 have this power to bring to my people on the reservation.
18 Do you think that powerline is going to help in California
19 out there on those 217 tribes that are burned to the
20 ground? You and I have got to look at working and taking
21 care of my homeland. I mean that. I'm serious about all
22 of what I say.
23     Q   I understand, and I appreciate and respect it.
24 All right, I still have my job to do, though. I'm asking
25 about remedies, and we've seen the monitary issue.

Page 135

1      A   Yes.
2      Q   We've seen the nuclear option of the ejectment,
3  and I was curious about other equitable remedies that
4  might be appropriate to the particular circumstances out
5  there at that 8400 acres from your perspective as the
6  chairman of the party that sued my client.
7      A   Yes.
8      Q   Anything else on your list of economic or
9  equitable remedies that the Osage Minerals Council is
10 seeking from my client as a result of this lawsuit?
11     A   On behalf of my shareholder?
12     Q   Yes, sir.
13     A   Education. We have many mutual help housing.
14 Maybe we can help them somewhere on that grid. The future
15 is going to have to have us.
16     Q   Well, and I appreciate these conversations,
17 first of all. I very much appreciate the conversation
18 with you. As I was getting ready for the deposition, I
19 was thinking in a larger sense that the Osage Minerals
20 Council, and we can go over it, I've seen that there were
21 people at the Osage Minerals Council who talked about,
22 wait a minute, what might be the future, we probably have
23 to do something about wind. I can ask you about that when
24 we get to it, but this is sometimes more effective. I
25 thought to myself, I'm from Texas, I'm from an oil and gas

Page 136

1  state, and I know my children are always yelling at me
2  about renewables and about what the future's going to look
3  like, et cetera.
4          And I wondered when I was reading all these
5  Osage Minerals Council's minutes and there were people
6  talking about wind and what does that mean for the future,
7  and I am curious. That's why I asked these questions,
8  maybe not as artfully, when we were talking about the
9  future of wind in Osage County. As I understand it, Osage
10 County has got really good wind. So I guess the question
11 is, does the Osage Minerals Council see wind or renewables
12 as one of the elements in its future relative to the
13 management of the Osage Estate?
14     A   I'll have to get done with this before I say
15 that.
16     Q   That's fair, that's fair, okay. All right, I
17 think we've covered, then, the equitable and monetary
18 issues. Well, let me ask you, going back to my job here.
19 We've talked about equitable remedies, we've talked about
20 ejectment. Were there other equitable remedies that you
21 had in mind in terms of future activities on the site or
22 anything along those lines in terms of the damages that
23 you've sought in this case, the Osage Minerals Council?
24     A   I can only say it would only be through our
25 involvement.

Page 137

1      Q   All right, okay. I know I was going to ask you
2  this question, too, which is on the remedy side of this.
3      A   Yes.
4      Q   I know we've talked about and we saw it earlier
5  in some of the interviews that you gave, and I know that
6  the judge in this case when he issued the order denying
7  the injunction relative to the original lawsuit mentioned
8  both federal and Oklahoma state public policies in favor
9  of renewables. How do those public policies, that of the
10 federal government and the state of Oklahoma, factor into
11 your thinking about remedies in this case, if they do?
12     A   If I had a company who came to me and asked me
13 to go to my federal team to develop some project in my
14 Osage Reservation that I felt comfortable with and
15 directed by my council, I think it would be a great
16 partnership. I'm going to be dealing with them anyway.
17     Q   Well, let me ask you this. I know, and again,
18 we can walk through all these minutes because I've seen
19 them, but we know that in 2013 when the first
20 communications were made with my client about --
21     A   Yes.
22     Q   -- whether or not there was a mineral element to
23 this, that the BIA struggled with whether there actually
24 was and said that they were struggling with whether there
25 was. Do you remember that part of this?

Page 138

1    MR. PIPESTEM: Objection. I'm instructing the
2 witness not to answer the question. It involves a -- you
3 cited something in 2013 prior to bringing this litigation.
4 I'm instructing the witness not to answer.
5    MR. McCORMACK: Well, this, I think, goes to my
6 client's good faith, not the Osage Nation's purported bad
7 faith.
8    Q    (BY MR. McCORMACK) And that is in 2013 you
9 understood that the BIA wasn't sure whether or not there
10 was a minerals component to what the wind farm was doing.
11 Is that fair from your observations of what was going on
12 at that time?
13    MR. PIPESTEM: Again, I'm going to instruct the
14 witness not to answer. I'm objecting not only on the
15 basis of -- well, the Court has ordered that that
16 information is not relevant to this case. So again, I'm
17 instructing Chairman Waller not to answer the question.
18    MR. McCORMACK: And I'm going to make my record
19 clear, too. I'm talking about my client's good faith, and
20 you have been doing an immense amount of discovery on that
21 subject matter. That goes -- and our regulatory person
22 was inquired about everything that went back to 2011
23 because that goes to my client's good faith, and I'm
24 entitled to inquire about my client's good faith. I'm not
25 doing anything about any alleged bad faith. I'm asking

Page 139

1 Mr. Waller, who was familiar with all the issues at the
2 time, whether or not there was a struggle even within the
3 BIA in 2013 as to whether or not mineral rights would be
4 implicated by this wind farm. Is that a fair question?
5    MR. PIPESTEM: Objection. I'm instructing the
6 witness not to answer for the reasons of irrelevance based
7 on the Court's order.
8    MR. McCORMACK: All right, and I'm going to keep
9 asking the questions because I find that instruction
10 inappropriate.
11    Q    (BY MR. McCORMACK) I know that there are --
12 there are minutes in which the BIA Superintendent Phillips
13 comes and discusses these issues. Do you remember that
14 issue, that is, whether or not the BIA was having
15 difficulty deciding whether or not there was a mineral
16 element to this wind farm?
17    MR. PIPESTEM: Objection. For the reasons
18 stated before, I'm instructing the witness not to answer
19 the question.
20    Q    (BY MR. McCORMACK) Do you understand why my
21 client might have in good faith concluded that there was
22 not a mineral element to the building of this facility?
23    MR. PIPESTEM: Objection. For the same reasons
24 stated, I'm instructing the witness not to answer.
25    MR. McCORMACK: I find that incredible, but I'm

Page 140

1 going to keep asking the question and we'll let the Court
2 decide.
3    MR. PIPESTEM: Absolutely.
4    Q    (BY MR. McCORMACK) Do you understand why it is
5 my client might have in good faith believed that there was
6 not a mineral consequence to the development of the wind
7 farm on the 8400 acres?
8    MR. PIPESTEM: Objection. For the reasons
9 stated repeatedly in this deposition, I'm instructing the
10 witness not to answer the question.
11    Q    (BY MR. McCORMACK) Was there a doubt in your
12 mind, Mr. Waller, at any time in the 2013-2014 period as
13 to whether or not there was a mineral aspect to the
14 project that my client was engaged in on the 8400 acres?
15    MR. PIPESTEM: Objection. For the reasons
16 stated, I'm instructing the witness not to answer the
17 question.
18    Q    (BY MR. McCORMACK) Did you have discussions
19 with other members of the Osage Minerals Council in the
20 2013-2014 period as to whether or not there was indeed a
21 minerals element to the construction project that Osage
22 Wind was building on the 8400 acres?
23    MR. PIPESTEM: Objection. I'm instructing the
24 witness not to answer the question on the basis of
25 relevance as determined by the Court and because of

Page 141

1 privilege.
2    Q    (BY MR. McCORMACK) Well, it's now 2021 and
3 we're here talking about this lawsuit, and on any basis
4 between 2014, the date that the lawsuit began, and today,
5 have you at least considered the prospect that my client
6 was acting in good faith when it concluded it did not have
7 a mineral element to the construction of the wind farm on
8 the 8400 acres?
9    MR. PIPESTEM: For the reasons stated, I'm
10 objecting on the basis of relevance as determined by the
11 Court. I'm instructing the witness not to answer.
12    MR. McCORMACK: I made that question from the
13 period, although I disagree 100 percent with what you're
14 doing here --
15    MR. PIPESTEM: That's okay. You can do that all
16 day. We're going to go through this process. That's
17 what --
18    MR. McCORMACK: I understand.
19    MR. PIPESTEM: So your commentary is unwelcome.
20 If you want me to answer a question, I will.
21    MR. McCORMACK: I was just going to say that
22 that last question was couched in the way that your
23 objection would not be applicable, which was from two
24 thousand -- from December of 2014 to today. So now you're
25 going to instruct him not to answer in that period too?

Page 142

1  MR. PIPESTEM: I am. Not only because of the
2  time because of relevance of the question as determined by
3  the Court.
4      MR. McCORMACK: The good faith of my client is
5  not relevant to the equitable remedies you seek in this
6  case. That's interesting. Is that your position?
7      MR. PIPESTEM: Are you asking that question --
8  if you're asking -- let me clarify.
9      Objection. I'm directing the witness not to
10 answer the question on the basis of relevance as
11 determined by the Court.
12     MR. McCORMACK: So my client's good faith is not
13 relevant to the equitable remedies that's being sought?
14 That's what I'm asking you, Counsel?
15     MR. PIPESTEM: I'm not here to answer your
16 questions in a deposition. I'm a lawyer for the Osage
17 Minerals Council. So if you want to subpoena me and get
18 questions for me, then you can do that.
19     MR. McCORMACK: I'm more interested in your
20 position so that I can present it to the Court.
21     MR. PIPESTEM: You've got my position on the
22 record.
23     MR. McCORMACK: You instructed him not to
24 answer, but you didn't answer my question. I'm just
25 trying to find out what your position is. You're saying

Page 143

1  that my client's good faith is in your view irrelevant to
2  the equitable remedies that are being sought by the Osage
3  Minerals Council in this case?
4      MR. PIPESTEM: I have made objections. I've
5  instructed the witness not to answer for the reasons that
6  I stated, and I'm not going to say anything more about it.
7  If you want to seek the Court's intervention, that's
8  certainly your right.
9      MR. McCORMACK: Counsel, I think I'm entitled to
10 know what your position is. If your position is that my
11 client's good faith is irrelevant to the equitable
12 remedies being sought by the Osage Minerals Council and
13 that is the reason why you're instructing this witness not
14 to answer, I think I'm entitled to know that.
15     MR. PIPESTEM: I have provided the basis for my
16 objection, and I'm not going to say anything more about
17 it. Again, if you think that's insufficient, we can bring
18 the matter before the judge.
19     MR. McCORMACK: Okay. I think whatever your
20 position is, and you haven't told me necessarily what it
21 is on that particular question, the effect is the same,
22 which is you're not allowing me to inquire about my
23 client's good faith in a case where equitable remedies are
24 being sought.
25     All right, why don't we take a break, if you

Page 144

1  don't mind. I'm going to switch to another subject
2  matter. Is that good?
3      MR. PIPESTEM: Chairman Waller, would a break
4  okay with you?
5      THE WITNESS: How long?
6      THE VIDEOGRAPHER: We're off the record at
7  2:42 p.m.
8      (BREAK FROM 2:42 TO 2:54)
9      THE VIDEOGRAPHER: Back on the record at
10 2:54 p.m.
11 Q   (BY MR. McCORMACK) Welcome back, Mr. Waller.
12 Just quickly, and I have spoken to counsel for the OMC in
13 the break, and the next section of this deposition was
14 intending to walk through relevant OMC minutes and events
15 that led up to the dispute and then ultimately resulted in
16 a lawsuit filed on November 21, 2014, which is the lawsuit
17 that we're in currently. In light of the -- in light of
18 the position taken by counsel for the OMC that he is not
19 going to allow any questions on these subject matters to
20 be answered in the timeframe prior to November 21, 2014, I
21 said that I would simply preserve my objection to that
22 instruction and pick up on November 21, 2014, with a full
23 reservation of rights, so that's what I'm going to do.
24     MR. McCORMACK: Counsel, I'm happy to have any
25 additional statements you may wish to make on the record

Page 145

1  at this point.
2      MR. PIPESTEM: Okay. Yes, I'm going to instruct
3  the witness not to answer on any matters deemed irrelevant
4  by the Court. I'm also going to instruct the witness not
5  to answer any questions that would violate the
6  attorney-client privilege or any other privilege,
7  including the common interest privilege with the United
8  States.
9      What I would recommend is that if you want to
10 ask each question because I may have objections to the
11 question based on form, the government may have objections
12 based on the question for other reasons. But if we need
13 to get that on the record and you want do that, certainly
14 we're glad to do that.
15     MR. McCORMACK: Okay, thank you, Counsel. To me
16 I think it was just important to understand that I had
17 intended to ask this witness as the chairman of the Osage
18 Minerals Council and as someone who this morning I was
19 able to demonstrate was familiar with the processes of the
20 Osage Minerals Council from 2010 forward, I was planned
21 ask him a series of questions relevant to that timeframe,
22 but we've all agreed that I'm not going to get any answers
23 today.
24     And so I appreciate, Counsel, your statement,
25 and I understand that if you have additional objections

Page 146

1  you'll make them.  But again I'll just say for the record
2  I reserve my rights relative to all the instructions that
3  stopped my inquiry from anything that happened prior to
4  November 21, 2014.  With that, let's set sail on this next
5  section.
6    Q    (BY MR. McCORMACK)  Let me ask you quickly to
7  look at what I have marked as or I will mark as
8  Exhibit 161, which is, for the concierge, under tab 75.
9  It is a letter dated, ironically, November 21, 2014 from
10  the Osage Nation to Enel Green Power North America.  Let
11  me ask you, Mr. Waller, have you seen this letter before?
12      (WHEREUPON, Exhibit 161 was marked for
13  identification.)
14    A    Yes.
15    Q    Did you have any role in preparing the letter?
16    A    No.
17    Q    All right.  By this time, I believe you were
18  chair of the OMC, correct, November of 2014?
19    A    Yes.
20    Q    This was one of those issues I talked to you
21  about previously when I was looking at the Osage Nation
22  Constitution, which was where did the authority of the
23  Osage Minerals Council stop and where did the authority of
24  the principal chief begin.  And I think you told me that
25  the principal chief did have the right to speak on behalf

Page 147

1  of the Osage Nation, and I think Exhibit 161 is a
2  reflection of that.  So you understood that this was
3  someone from the Office of the Principal Chief writing
4  directly to my client about the status of this issue in
5  November of 2014, yes?
6      MR. PIPESTEM:  Objection.  Mischaracterization
7  or Chairman Waller's former testimony.
8    Q    (BY MR. McCORMACK) You can answer the question.
9  Mr. Waller, you're up.
10    A    Repeat my question.
11    Q    Let me just start over.
12    A    Thank you.
13    Q    From your testimony earlier, I understood that
14  even though issues might be within the purview of the
15  Osage Minerals Council, the Office of the Principal Chief
16  still had the right to act on behalf of the Osage Minerals
17  Council when the chief felt that was appropriate; is that
18  fair?
19      MR. PIPESTEM:  Objection.  Mischaracterization
20  of Chairman Waller's former testimony earlier in this
21  deposition.
22    Q    (BY MR. McCORMACK) You can answer the question.
23  Let me try again.  This is not complicated.  This is a
24  situation where the acting Principal Chief Raymond Redcorn
25  is writing to my client dealing with issues that implement

Page 148

1  or implicate the Osage Minerals Council and the Mineral
2  Estate at the property, yes?
3    A    Yes.
4    Q    All right.  And you didn't have any problem with
5  that because you told me earlier that the -- that the
6  principal chief had the right to do that.  That was all I
7  was trying to get to; is that fair?
8      MR. PIPESTEM:  Objection.  Mischaracterization
9  of Chairman Waller's earlier testimony in his deposition.
10      MR. McCORMACK:  Okay, tell me how
11  mischaracterizes his earlier testimony.
12      MR. PIPESTEM:  Is that is question to me?
13      MR. McCORMACK:  Yes.
14      MR. PIPESTEM:  Chairman Waller testified that
15  the chief has authority when the Minerals Council
16  authorizes him to speak.  He also testified that he agreed
17  with Osage Constitution when it says the chief has a right
18  to object to a lease if it's inconsistent with Osage law,
19  not for any reason.  So it's a very limited basis whereby
20  the chief or the Office of Principal Chief has a role over
21  Osage mineral production.  You also read from a part or
22  the Constitution, and Chairman Waller did as well, about
23  the independence of the Osage Minerals Council.  That's
24  the basis.
25      MR. McCORMACK:  I appreciate that clarification.

Page 149

1  I'll take it.
2    Q    (BY MR. McCORMACK)  One of the items that your
3  counsel mentioned is when the Osage Minerals Council asks
4  the principal.  (inaudible) the Osage Minerals Council ask
5  the principal chief have the Principal Chief Raymond
6  Redcorn to send this letter on November 21, 2014?
7      MR. PIPESTEM:  Counsel, I don't know.  I
8  apologize, but I think there was some technological
9  problem with your question.  I couldn't hear part of it.
10  I don't know if I'm the only one or whether others on the
11  Zoom --
12      MR. McCORMACK:  I'm happy to repeat it.
13      MR. PIPESTEM:  I apologize for that.
14      MR. McCORMACK:  Not at all.  One thing lawyers
15  aren't responsible for is technology.  I'll start the
16  question over.
17    Q    (BY MR. McCORMACK)  Your counsel gave me a
18  clarification from his perspective of some of the history
19  here in the prior testimony, and one of those was that the
20  principal chief might become involved in Osage Minerals
21  Council's matters when the Osage Minerals Council asks him
22  to.  And then my question is is this letter that was sent
23  on November 21, 2014 by acting Principal Chief Raymond
24  Redcorn done as a result of a request from the Osage
25  Minerals Council?



Chairman Everett Waller                                    8/5/2021

Page 150

1    A  No.

2    Q  All right.  And so do you know on what basis,

3  then, that acting Principal Chief Raymond Redcorn sent

4  this letter?

5    A  You said he was acting chief, didn't you?

6    Q  Yes, sir.

7    A  There's your answer.

8    Q  All right.  And so was it your understanding

9  that if the principal chief decided to communicate on a

10  subject matter involving Osage Minerals Council and issues

11  subject to Osage Minerals Council's purview that that was

12  an appropriate exercise of the principal chief's

13  authority?

14    A  We were CCed on this letter.

15    Q  I'm sorry, I didn't hear that answer.  We were?

16    A  CCed on this letter.

17    Q  Understood.

18    A  That's where we got it.

19    Q  I don't want to spend a lot of time

20  unnecessarily.  I'm just trying to find out, did you know

21  about this letter before it went out?  How about that?

22    A  Not until it was delivered.

23    Q  All right.  And was that -- was that, and I'm

24  trying to find this out too, was that a normal practice

25  that the Office of the Principal Chief might send a letter

Page 151

1  on issues that implicate the Osage Minerals Council

2  without the chairman of the Osage Minerals Council knowing

3  about it?

4    A  This is a letter from the assistant chief.  I

5  cannot deliver the answer to that.

6    Q  Well, he saying he's acting principal chief.

7  That's how he signed it.  So would that -- would that help

8  you answer the prior question?

9    A  I did not direct the executive side.

10    Q  All right.  I think what I've learned is that

11  you learned about this letter probably about the same time

12  my client did, when you received a copy of it; is that

13  fair?

14    A  Yes.

15    Q  Did you have a conversation with Raymond Redcorn

16  or anybody else from the principal chief's office about

17  this letter?

18    MR. PIPESTEM:  Objection.  I'm going to instruct

19  the witness not to answer on the basis of privilege,

20  relevance.

21    MR. McCORMACK:  I don't get the privilege

22  question.  Well, it doesn't matter what I think.  I'm

23  asking -- in privilege you have to set up a basis for

24  privilege before you just assert the privilege.

25    Q  (BY MR. McCORMACK)  Well, let me ask you this.

Page 152

1  Is Raymond Redcorn a lawyer?

2    MR. PIPESTEM:  Are you asking me, Counsel?

3    MR. McCORMACK:  No, I'm asking Mr. Waller.

4    MR. PIPESTEM:  Okay.

5    A  Not to my knowledge.  I don't know.

6    Q  (BY MR. McCORMACK)  And you're not a lawyer, are

7  you?

8    A  No.

9    Q  All right.  And did you have a conversation with

10  Mr. Redcorn, you can answer this question yes or no, did

11  you have a conversation with Mr. Redcorn on or about

12  November 21, 2014 after you received a copy of this

13  letter?

14    MR. PIPESTEM:  Objection.  I'm instructing the

15  witness not to answer for reasons of executive privilege

16  between leaders of the Osage Nation, and also there may

17  have been legal counsel present at that conversation.  So

18  the witness should not be answering questions related to

19  conversations that would have -- that might have occurred

20  with legal counsel present, if so.  That's my objection

21  and my instruction.

22    MR. McCORMACK:  Well, your instruction is based

23  upon the theory that maybe there was a lawyer involved

24  with absolutely no factual predicate for that; is that

25  right?

Page 153

1    MR. PIPESTEM:  Well, I'm not building the

2  factual predicate here, Counsel, you are.

3    MR. McCORMACK:  And I didn't ask a question that

4  was privileged.  I asked him whether he had a conversation

5  with Mr. Redcorn, period.  That's what I asked him.

6  There's no privilege implicated by that whatsoever.

7    MR. PIPESTEM:  Certainly there are.  If counsel

8  was present when the chairman of the Minerals Council and

9  the assistant chief, or acting principal chief in this

10  circumstance, had a conversation, that's a privileged

11  conversation.

12    MR. McCORMACK:  No, the fact of whether or not

13  he had the conversation, even if it were a privileged

14  conversation, the fact that the conversation occurred is

15  not privileged.  Do you think it is?

16    MR. PIPESTEM:  I will say you can ask that

17  question on whether or not a conversation occurred or not.

18    MR. McCORMACK:  That's the question I asked.

19    Q  (BY MR. McCORMACK)  Did a conversation occur

20  with Mr. Redcorn between you, Mr. Waller, and Mr. Redcorn

21  as an outgrowth of this letter that Mr. Redcorn sent on

22  November 21, 2014, yes or no?

23    A  No.

24    Q  Okay.  Now I will ask you why?  I mean, the way

25  my brain works, logically I would pick up the phone and

Page 154

1  ask someone who was speaking on behalf of Osage
2  Council why they sent the letter.  You didn't do that?
3      MR. PIPESTEM:  Objection.  Asked and answered.
4      Q   (BY MR. McCORMACK)  You can answer.
5      A   It would only be in executive session.
6      Q   Okay.  So you're saying maybe you did have a
7  conversation with him, but it would've been in executive
8  session?
9      A   No, I'm saying that if it had it would be in
10  executive.  We don't -- we do not open that discussion
11  between the chief and ourselves unless it is warranted.
12      Q   Okay, I'm a little confused.  Are you now saying
13  this conversation -- well, that there may have been a
14  conversation or there may not have been a conversation,
15  but if there were a conversation it would be subject to
16  executive privilege?  Is that what you're saying?
17      A   If requested by the chairman.
18      Q   But you don't remember one way or the other
19  whether you had -- withdrawn.  I think you said --
20      A   Thank you.
21      Q   I think you said you do not remember having a
22  conversation with Mr. Redcorn about this letter.  Maybe
23  this is the easiest way to deal with this; is that right?
24      A   Yes.
25      Q   All right.

Page 155

1      MR. McCORMACK:  Let me ask to show you on the
2  second paragraph there, if you'll go to the second
3  paragraph of this letter.  If the concierge will put the
4  second paragraph of the letter up.
5      THE WITNESS:  Please.
6      Q   (BY MR. McCORMACK)  Okay.  And it says, "As a
7  show of good faith, we respectfully request that you
8  suspend construction of the wind energy facilities in our
9  homeland."  So on November 21, 2014, acting Principal
10  Chief Raymond Redcorn asked Enel to suspend construction
11  of the wind energy facilities in the Osage homeland.  Do
12  you see that?
13      A   Yes.
14      Q   Do you remember having a conversation on that
15  subject matter at any time with the folks from the
16  principal chief's office, or they were doing this all on
17  their own?
18      MR. PIPESTEM:  Objection.  Compound question.
19      Q   (BY MR. McCORMACK)  You can answer.
20      A   No.
21      Q   You don't remember having a conversation on that
22  subject matter on November 21 or any other time, that is,
23  that the Office of the Principal Chief had advised Enel to
24  stop working on the project?
25      MR. PIPESTEM:  Objection.  Asked and answered.

Page 156

1      Q   (BY MR. McCORMACK)  You can answer it.
2      A   No, I do not.
3      Q   Okay.  And then the next sentence says, "As you
4  know, we believe that Enel Green Power NA may have already
5  destroyed Osage cultural resources, including the remains
6  of our ancestors."  Do you see that?
7      A   Yes.
8      Q   Do you have any evidence of that?
9      A   I did not write that letter.
10      Q   Understood.  I'm asking you whether you are
11  aware of any evidence that Enel Green Power may have
12  destroyed Osage cultural resources including the remains
13  of ancestors?
14      A   Did you have any inadvertent finds under section
15  106?  I don't know of any is what my answer is.
16      Q   And again, I know that there was a -- affidavits
17  filed in connection with this lawsuit in which issues of
18  this nature were address.  Do you remember -- you told me
19  you had read as much of the legal record as you could
20  tolerate.  Do you remember seeing affidavits from my
21  client which provided significant reports on whether or
22  not there were sites of cultural significance on the
23  8400 acres?
24      A   Not verbatim, but yes, I've seen them.
25      Q   All right.  And that in fact a consultant that

Page 157

1  Enel had retained had spoken with and communicated with
2  the persons in the Osage Nation who were responsible for
3  such things.  Do you recall that?
4      A   Dr. Hunter's office, Tribal Historic
5  Preservation Office.
6      Q   That's correct.
7      A   I wasn't privy to that.
8      Q   All right.  And so did you know that her office
9  had been spoken with and inquired about relative to any
10  issues of whether or not there were cultural -- areas of
11  cultural significance on the 8400 acres?
12      A   I wasn't sent the information.
13      Q   All right.  Anyway, getting back to the bottom
14  line here, you're not aware of any evidence that Enel
15  Green Power may have destroyed Osage cultural resources,
16  including the remains of ancestors; is that a fair
17  statement?
18      A   I do not.
19      Q   All right.  After this letter of November 21,
20  2014 was sent to Enel, do you recall in the chronology
21  what occurred next in terms of whether or not Enel
22  responded to this letter and interacted with the Office of
23  the Principal Chief as a result of the letter?
24      A   I don't remember.
25      Q   All right.  We now know and we know from the

Page 158

1  instructions today too that the lawsuit was filed on
2  November 21, 2014. What role did you play in managing the
3  litigation once the lawsuit was filed, if any?
4      A  Directed it to my legal counsel.
5      Q  Would that be the counsel that is representing
6  you today?
7      A  That's not who started the case.
8      Q  Okay. Let me show you what has been previously
9  marked. I don't know if it's been previously marked or
10  not, but let me see. No, it hasn't been.
11      Let me show you a document. I believe we're at
12  Exhibit 162 now. This is a letter dated May 13, 2015 from
13  Enel Green Power to the Honorable Geoffrey Standing Bear,
14  the Honorable Raymond Redcorn and the Honorable Everett
15  Waller. We'll mark that.
16      MR. McCORMACK: Mr. Concierge, we're at 162; is
17  that right?
18      THE COURT REPORTER: That's right.
19      (Whereupon a discussion was held that was not
20  reported)
21      MR. McCORMACK: Why don't you put the body of
22  the letter up so that we all can read it.
23      Q  (BY MR. McCORMACK) This letter was written on
24  May 13, 2015 and was sent to, as we said, to Principal
25  Chief Standing Bear, Raymond Redcorn and yourself. Do you

Page 159

1  remember receiving this letter?
2      (WHEREUPON, Exhibit 162 was marked for
3  identification.)
4      A  Just give me one moment. I want to check
5  something.
6      Q  Of course.
7      A  Yes.
8      Q  And you saw that Enel wrote in an attempt to
9  begin a dialogue as a possible way to resolve differences.
10  Do you remember that?
11      A  That stayed over in executive to who the letter
12  was written. I take direction from my council's
13  consensus.
14      Q  Understood. My simple question was you remember
15  that at this time, May of 2015, Enel had sent a letter to
16  Chief Standing Bear, to assistant Chief Raymond Redcorn
17  and to Chairman Waller?
18      A  Yes.
19      Q  An opening, if you will, to a potential
20  accommodation. Do you remember that?
21      A  Yes.
22      Q  What was your reaction to the letter?
23      A  That all would have went to the case that was
24  filed.
25      Q  Meaning that you, at this time at least,

Page 160

1  preferred to resolve it through litigation?
2      A  We were already in litigation.
3      Q  Understood. And this is a letter seeking to
4  maybe have a dialogue, and your response to it was no, or
5  not interested at this time, or let's see where the
6  litigation goes? What was your reaction to this opening,
7  if you will?
8      A  As chairman I was in litigation. I cannot speak
9  on behalf of the chief or assistant.
10      Q  All right. Let me show you the next item, which
11  I'll mark as, I think, 163 which is under tab 29. This is
12  a letter from you dated May 26, 2015.
13      (WHEREUPON, Exhibit 163 was marked for
14  identification.)
15      A  Yes.
16      Q  To Enel Green Power. You've seen this letter
17  before, right?
18      A  Yes.
19      Q  All right. You see you write back and you say
20  we received your letter, and then you say "The Osage
21  Minerals Council is not interested in meeting with
22  representatives of Enel at this time." Do you see that?
23      A  Yes.
24      Q  Why not?
25      A  I take direction --

Page 161

1      MR. PIPESTEM: Objection. The basis for that is
2  subject to attorney-client privilege. Communications
3  between attorney and the client, the Minerals Council at
4  the time, went into litigation strategy. So I'm
5  instructing the witness not to answer the question.
6      MR. McCORMACK: That's a bold move, Counsel.
7  You just took over the question and decided it was
8  privileged, so let me --
9      MR. PIPESTEM: This is in the middle of
10  litigation, as you recall, Counsel. That's not that bold.
11  That's sort of, as you described earlier, sort of a
12  rational, easy response to this when you're asking about
13  what they're thinking about in the middle of litigation
14  when it mentions -- the letter mentions litigation on its
15  face.
16      MR. McCORMACK: When counsel appears on the
17  scene, I will stand back to privilege, but we haven't
18  established that yet. The question I asked Mr. Waller
19  is -- maybe in fairness to your objection, I'll try that.
20      Q  (BY MR. McCORMACK) Which is prior to responding
21  to this letter -- excuse me. Prior to responding to the
22  Enel letter, did you have communications with your
23  counsel? You can answer that question yes or no.
24      A  Yes.
25      Q  All right. And after those communications with

Page 162

1    counsel this letter came, is that a fair description?
2      A   Yes.
3      Q   All right.  Independent of your counsel without
4    regard to anything your counsel may have said to you, if
5    that's possible, did you personally decide that this was
6    not a good time to have a conversation with the folks at
7    Enel?
8          MR. PIPESTEM:  Objection.  That is a -- the
9    Chairman Everett Waller serves as the chairman of the
10   Osage Minerals Council, so his thoughts and deliberations
11   are subject to -- this is all in preparation for
12   litigation, so I'm instructing the witness not to answer.
13         MR. McCORMACK:  I asked -- I asked him
14   specifically whether or not he had a thought independent
15   of his counsel and in his personal capacity, which none of
16   those would implicate the privilege.  I'm going to stand
17   with that question.
18     Q   (BY MR. McCORMACK)  Independent of your counsel
19   and in your personal capacity, did you have a reaction to
20   whether or not this was a good time to be speaking to
21   Enel?
22         MR. PIPESTEM:  Objection.  For the reasons I
23   stated before, this is subject to privilege, and so I'm
24   instructing the witness not to answer the question.
25     Q   (BY MR. McCORMACK)  Did you have any thoughts

Page 163

1    independent of your counsel?
2          MR. PIPESTEM:  Objection for the same reasons I
3    stated.
4          MR. McCORMACK:  How can you possibly say that
5    that's privileged, whether he had thoughts independent of
6    his counsel are you saying that's privilege?
7          MR. PIPESTEM:  Chairman Waller serves as the
8    chairman of the Osage Minerals Council.
9          MR. McCORMACK:  Who cares?  I'm asking him his
10   personal opinion without any lawyers.
11         MR. PIPESTEM:  I care.  I care.
12         MR. McCORMACK:  I understand that.
13         MR. PIPESTEM:  I care.
14         MR. McCORMACK:  But I'm talking about the
15   technical point.  Of course you care.  My point is how can
16   you instruct a witness not to answer a question when I've
17   asked him independent of the advice he was getting from
18   counsel in his own personal opinion if he had a view?
19   What's privileged about that?
20         MR. PIPESTEM:  It's related to litigation
21   involving the Osage Minerals Council where he's an
22   official, so that is a part of the deliberation they have,
23   each one of them, and then as a body, so that is
24   privileged.  And so I'm instructing him not to answer the
25   question.  Furthermore, I'm objecting on the basis of

Page 164

1    relevance as instructed by the Court.
2          MR. McCORMACK:  I've stumbled into a funny place
3    with you guys.
4          MR. PIPESTEM:  I don't know -- well, I don't
5    want to argue with you, but I suggest you read not only
6    the court orders but your own filings here.
7          MR. McCORMACK:  I understand.  I understand all
8    that.  My point is I know privilege quite well, and you're
9    instructing to answer things that I'm not asking about
10   privilege, and you're doing it promiscuously, but I can't
11   stop you from doing it.
12         MR. PIPESTEM:  I respectfully disagree with you,
13   Counsel.
14         MR. McCORMACK:  I understand.  I understand.  We
15   both have jobs to do.
16     Q   (BY MR. McCORMACK)  Anyway, since I can't ask
17   you about your personal opinions that you derived from
18   your own thinking and not your lawyer's, let me move on to
19   something else.
20         You say in the next sentence, "In addition, your
21   letter was addressed to Chief Geoffrey Standing Bear and
22   Assistant Chief Raymond Redcorn.  Any future
23   correspondence regarding proposed wind energy projects in
24   Osage County should be directed to Osage Minerals Council
25   only."  Why did you tell them that?

Page 165

1      A   I'm in --
2          MR. PIPESTEM:  Objection.  I'm instructing the
3    witness not to answer the question.  This document was
4    written and signed by Chairman Waller in his capacity as
5    chairman of the Osage Minerals Council.  The basis for
6    this communication is subject to a deliberative privilege
7    and the discussion among Minerals Council members, so I'm
8    instructing him not to answer question.
9          MR. McCORMACK:  You know this letter was sent to
10   my client.  You understand that, right?  There's no
11   confidentiality associated with the statements in the
12   letter.  You understand that, don't you?
13         MR. PIPESTEM:  I understand exactly what the
14   document is.
15         MR. McCORMACK:  Okay.  But I've now asked him
16   what he meant by something he said in a letter to my
17   client, and you're saying he can't answer that question
18   because it's privileged?  Is that what your point is?
19         MR. PIPESTEM:  You're asking him to expound on a
20   letter that was written in the context of litigation, so
21   that is right.
22         MR. McCORMACK:  I'm asking him what he meant
23   when he sent my client, clearly not within the privilege,
24   a statement.  I'm asking him what he meant, and you're
25   saying he can't answer it because even though he made the

Page 166

1 statement was privileged; that's what you're saying?

2 the statement was privileged; that's what you're saying?

3     MR. PIPESTEM: Yes, that's what I'm advising,

4 yes. That in the context of this litigation when the

5 chairman of the Minerals Council writes a letter to a

6 defendant party who is -- who is a party to this lawsuit

7 and has been, with a lot of history here, this sort of

8 letter is subject to conversations between council and

9 their attorneys, and you cannot try to cordon off the

10 chairman of the Minerals Council by asking his thoughts in

11 personal capacity because but for the fact that he's a

12 part of the Osage Minerals Council he would not be part of

13 the conversation.

14     MR. McCORMACK: My problem, Counsel, is not with

15 that issue at this point because I'm asking his personal

16 opinion. He sent a letter to my client. I'm asking what

17 he meant and you won't let him answer the question.

18 Clearly the letter is not privileged.

19     MR. PIPESTEM: And clearly the letter speaks for

20 itself.

21     MR. McCORMACK: No, it doesn't. That's what

22 discovery is all about. Okay, you just keep instructing

23 away. I think you set a world record for instructions not

24 to answer in a deposition.

25     MR. PIPESTEM: And you're setting a world record

Page 167

1 for asking questions that are inappropriate.

2     MR. McCORMACK: Okay. Let me ask more questions

3 that you apparently think are inappropriate about what he

4 meant when he sent something my client, so let me keep

5 going and I'm going to draw as many instructions as you

6 decide are appropriate.

7     **Q**   **(BY MR. McCORMACK) I asked you pretty simply,**

8 **Mr. Waller, why you had told him that any future**

9 **correspondence regarding the proposed wind energy projects**

10 **in Osage County should be directed to the Osage Minerals**

11 **Council only, asking why you told them that. I'm going to**

12 **ask that again, except I think I'm going to draw an**

13 **objection you're not allowed to answer that question.**

14     MR. McCORMACK: Is that right, Counsel?

15     MR. PIPESTEM: That's correct, for the reasons I

16 stated before.

17     MR. McCORMACK: And that reason is because you

18 think that's privileged, correct?

19     MR. PIPESTEM: Yes, the deliberation that went

20 into this letter, it's privileged. Yes, it is.

21     **Q**   **(BY MR. McCORMACK) And then, "The Osage**

22 **Minerals Council is an independent agency charged with**

23 **preserving the Osage Mineral Estate and protecting the**

24 **income derived from the minerals estate. In administering**

25 **and developing the Osage Mineral Estate, the Osage**

Page 168

1 **Minerals Council is responsible considering and approving**

2 **mineral leases and proposing other forms of development**

3 **within the minerals estate. Because wind energy projects**

4 **directly implicate and affect the minerals estate, wind**

5 **project-related correspondence should be directed to the**

6 **Osage Minerals Council only." Do you see that?**

7     A   Yes.

8     **Q**   **All right. So you're instructing my -- you're**

9 **telling my client that they should only deal with the**

10 **Osage Minerals Council, not -- not the Office of the**

11 **Principal Chief, correct?**

12     A   We're litigants at the time, so it's a directive

13 back to us.

14     **Q**   **I don't know what that means. You're telling my**

15 **client that they should deal with the Osage Minerals**

16 **Council and not with the office of the chief, correct?**

17 **That's what you were telling them?**

18     MR. PIPESTEM: Objection. Asked and answered.

19     **Q**   **(BY MR. McCORMACK) You can answer the question.**

20 **Mr. Waller, you can answer the question.**

21     A   We are in a federal case with our trustee is why

22 I needed it directed back to us.

23     **Q**   **Well, at this time the Osage Minerals Council**

24 **was not in the case, correct?**

25     MR. PIPESTEM: Objection. Calls for a legal

Page 169

1 conclusion. And I'm going to instruct the witness not to

2 answer the question. Relations between the United States

3 as trustee and the Minerals Council as the trust

4 beneficiary of the Osage Nation when it comes to the Osage

5 Mineral Estate are privileged. So the state of the Osage

6 Minerals Council's place in this is --

7     MR. McCORMACK: Just let me get it straight,

8 Counsel. I asked him the question of whether at this time

9 the Osage Minerals Council was a party to this lawsuit,

10 and you've just instructed him not to answer that question

11 on privilege?

12     MR. PIPESTEM: That's not the question you

13 asked, Counsel.

14     MR. McCORMACK: Well, then, let me ask that

15 question.

16     **Q**   **(BY MR. McCORMACK) At this time was Osage**

17 **Minerals Council a party to this lawsuit?**

18     A   No.

19     **Q**   **All right. Why did you advise Enel that they**

20 **should only deal with the Osage Minerals Council relative**

21 **to the subject matter on a go-forward basis?**

22     MR. PIPESTEM: Objection. I'm instructing the

23 witness not to answer because that question gets to

24 matters of privilege as counsel -- as attorney-client and

25 deliberative privilege. I'm instructing him not to

Page 170

1 answer.
2    Q   (BY MR. McCORMACK) Did you speak to your
3 counsel, yes or no, on the subject matter of whether or
4 not Enel should communicate only with the Osage Minerals
5 Council on a go-forward basis relative to the wind farm?
6        MR. PIPESTEM: Objection. You're asking him
7 specifically a question about what he communicated with
8 legal counsel, so I'm instructing him not to answer the
9 question.
10        MR. McCORMACK: Well, here's how privilege
11 works, at least in my world. You have the person who
12 communicated, the lawyer who was involved, and the general
13 subject matter of the communication, which is maintained
14 in confidence, and that makes it privileged so long as it
15 was of a legal nature. I asked him whether or not he had
16 spoken on the general subject matter of whether or not the
17 Osage Minerals Council should be the only party
18 communicating with Enel on a go-forward basis at this
19 time. That's what I asked.
20        MR. PIPESTEM: And that same question I would
21 instruct him not to answer because that would violate the
22 attorney-client privilege.
23        MR. McCORMACK: So although Mr. Waller informed
24 my client to communicate only with the Osage Minerals
25 Council, you're not going to let him answer the question

Page 171

1 why did he tell that to my client, right?
2        MR. PIPESTEM: You've asked several questions.
3 You have asked the question of what he communicated with
4 legal counsel, which certainly is privileged, and then
5 also the deliberation with legal counsel because as
6 Chairman Waller testified that this -- the Minerals
7 Council was represented by legal counsel at the time. And
8 so yes, I'm instructing him not to answer the question
9 you're asking.
10    Q   (BY MR. McCORMACK) Mr. Waller, who wrote this
11 letter?
12    A   The Osage Minerals Council.
13    Q   Okay. Did that involve you? Did you
14 participate in drafting the letter?
15    A   I read it, approve it, and then sign it.
16    Q   All right. Do you know who on the Osage
17 Minerals Council drafted the letter?
18    A   Yes.
19    Q   Who?
20    A   My attorneys.
21    Q   Okay, fair enough. But they're not on the Osage
22 Minerals Council, are they?
23    A   No, they were under litigation and hired by us
24 to assist us in going through this endeavor.
25    Q   All right. Perhaps that would've saved a lot of

Page 172

1 headaches if I had said that early on. So this letter, as
2 your recollection, was drafted by your legal counsel; is
3 that fair?
4    A   After meeting with the council.
5    Q   Okay. At the meeting of the council, was your
6 counsel present at that meeting, or was that meeting of
7 the council without your counsel present?
8    A   With them present.
9    Q   Okay. Let's go to the third paragraph. It
10 says, "Finally, we have recently learned that the
11 representatives of Osage Wind met with the assistant
12 secretary of Indian Affairs, Chairman Washburn, and sought
13 to discuss the pending federal court litigation and the
14 potential for settlement. It was highly inappropriate for
15 Osage Wind, LLC/Enel to request and attend such a meeting
16 given the pending federal litigation and even more so
17 given that Osage Minerals Council was not provided with
18 notice of the meeting or invited to attend." Do you see
19 that?
20    A   Yes.
21    Q   Do you know whether the Osage Minerals Council
22 ever met with the assistant secretary of Indian Affairs or
23 anyone else from the Indian Affairs Office in DC with
24 regard to the subject matter of the dispute with Osage
25 Wind without Osage Wind present?

Page 173

1    A   Like in this meeting where we weren't present, I
2 have not.
3    Q   Do you know whether or not the Osage -- whether
4 or not members of the Osage Minerals Council met with
5 anybody at the Secretary of Indian Affairs Office about
6 this subject matter when Enel was not present at any time?
7    A   I have not.
8    Q   At the end of letter you say, "In closing if in
9 the future the Osage Minerals Council would like to
10 discuss wind project related issues, we will contact you
11 directly." Do you see that?
12    A   Yes.
13    Q   Have you ever contacted Enel in the time frame
14 from May 26, 2015 until today on wind project related
15 issues?
16    A   No.
17    Q   Why not?
18    A   I think the initiative has lost its value
19 because we're in litigation.
20    Q   Okay. So litigation changed the dynamics some?
21    A   Didn't it for you?
22    Q   Yes, I suppose that's fair.
23        Let's go to the next exhibit, which is under tab
24 33, to my concierge.
25        MR. McCORMACK: I believe this is 163, Mr. Court

Page 174

1  Reporter?

2      THE COURT REPORTER:  This will be 164.

3      MR. McCORMACK:  Sorry, 164.

4      Q   (BY MR. McCORMACK)  These are minutes from an

5  Osage Minerals Council meeting of November 13, 2005.

6      (WHEREUPON, Exhibit 164 was marked for

7  identification.)

8      A   You're a day early.

9      Q   Actually, let me mark as 165 a set of minutes

10  dated August 19, 2015 of the Osage Minerals Council, and

11  that will be 165.  So 164 is the November 13, 2015

12  meeting, and 165 is the August 19, 2015 meeting.

13     THE VIDEOGRAPHER:  What tab is that?

14     MR. McCORMACK:  I'm sorry, my apologies.  Tab

15  30, Osage Minerals Council regular meeting August 19,

16  2015.  My apologies for doing those slightly out of order,

17  but let's turn to 165 first, if you don't mind.  Mr.

18  Concierge, if you would put 165 up on the screen.

19     THE VIDEOGRAPHER:  Which one was that?  I

20  apologize.

21     MR. McCORMACK:  Not at all.  That's the one

22  behind tab 30, and it's dated Wednesday August 19, 2015.

23     THE VIDEOGRAPHER:  Okay, I see Tab 31 as being

24  September 16.

25     MR. McCORMACK:  Tab 30.  Tab 30 is August 19.

Page 175

1      THE VIDEOGRAPHER:  Okay.

2      MR. McCORMACK:  You got it?

3      THE VIDEOGRAPHER:  Yes.

4      Q   (BY MR. McCORMACK)  All right, so let me proceed

5  with what has been marked as Exhibit 165, which as I said

6  for the record is minutes from August 19, 2015.  You'll

7  see that at this time you know that you're the chairman

8  and you called the meeting to order at 10:04 a.m.  Do you

9  see that?

10     (WHEREUPON, Exhibit 165 was marked for

11  identification.)

12     A   Yes.

13     Q   At this time the Osage Minerals Council members

14  were Cynthia Boone, Joseph Cheshewalla.  Did I get it

15  right?

16     A   You're close.  You didn't get it right.

17     Q   Okay, how do you say it?

18     A   Cheshewalla.

19     Q   Cheshewalla, thank you.  Joseph Cheshewalla,

20  Galen Crum, Stephanie Irwin, Talee Redcorn, yourself, and

21  Andrew Yates.  Is that fair?

22     A   Yes.

23     Q   And then the guests in attendance, do you see

24  that list there?

25     A   Yes.

Page 176

1      Q   Are any of those lawyers?

2      A   Yes.

3      Q   Okay, who are the lawyers there?

4      A   Practicing or not practicing?

5      Q   Practicing at that time, 2015.

6      A   Sicking, Dowd, I don't think that Dennison was

7  practicing at the time, Mr. Kane.  That's the best I can

8  give you.

9      Q   Were any of those lawyers representing the Osage

10  Minerals Council in the lawsuit against my client?

11     A   No, they were not.

12     Q   All right.  I noticed also at this meeting, if

13  you go to the next page, Chief Standing Bear came to this

14  meeting.  As you said, that's not an uncommon event.  Is

15  that fair?

16     A   Thank you.

17     MR. PIPESTEM:  Objection.  It mischaracterizes

18  his testimony from earlier in his deposition.

19     Q   (BY MR. McCORMACK)  Okay, you can answer the

20  question.

21     A   Yes, he was there.

22     Q   Let me ask you to go to the top of page five of

23  the meeting.

24     MR. McCORMACK:  For the concierge, just blow up

25  that top paragraph.

Page 177

1      THE WITNESS:  Thank you.  I can't read it.

2      MR. McCORMACK:  Me neither.

3      Q   (BY MR. McCORMACK)  Okay.  The heading here is

4  "wind farms."  Do you see that?

5      A   Yes.

6      Q   And then it says "Joseph Cheshewalla reads a

7  letter he wrote concerning the wind turbines."  Do you see

8  that?

9      A   Yes.

10     Q   Do you recall what Mr. Cheshewalla, who was on

11  the Osage Minerals Council at the time, what he said in

12  his letter?

13     A   Yes.

14     Q   It goes on to say in the next sentence, "The

15  letter concerns some options that we could have in case

16  the wind farms are here to stay."  Do you see that?

17     A   I remember it.

18     Q   Where would I get my hands on a copy of that

19  letter?

20     A   Joe Cheshewalla.

21     Q   All right.  Is that not something that the Osage

22  Minerals Council would keep in its formal minutes or

23  records?

24     A   He brought it to us in executive.

25     Q   Okay.  Now to my question, would there be a copy

Page 178

1   of that somewhere in the formal records or files of the
2   Osage Minerals Council, that is, Mr. Cheshewalla's letter
3   at this time?
4        A   I would have to check.
5        Q   Okay.
6            MR. McCORMACK:  Counsel, I would make a request
7   for that letter in the event that it does appear somewhere
8   in the OMC's council, of council's files.
9        Q   (BY MR. McCORMACK)  You say you remember the
10  letter.  What do you recall that Mr. Cheshewalla was
11  saying with regard to options in the event that wind farms
12  were here to stay?
13       A   He really didn't have any.
14       Q   So is this -- the minutes are wrong about the
15  options that --
16       A   No, he didn't have any specifics.  He just said
17  that we need to see what they are.
18       Q   Did people ask him questions with regard to his
19  letter?
20       A   No.
21       Q   How well do you know Mr. Cheshewalla?
22       A   I served with him and worked with him.  I know
23  him.
24       Q   When did he leave the Osage Minerals Council?
25       A   If that was '15, in '18.

Page 179

1        Q   In 2018?
2        A   Yes.
3        Q   Did he run for reelection or no?
4        A   Yes.
5        Q   Okay.  And he didn't win, I take it?
6        A   Correct.
7        Q   All right.  And what do you recall
8   Mr. Cheshewalla saying to you either at this Osage
9   Minerals Council meeting or at any other time with regard
10  to the prospect of potentially addressing the consequence
11  of wind farms being here to stay?
12           MR. PIPESTEM:  Objection.  Those communications
13  were part of deliberation between Minerals Council and
14  legal counsel in the midst of litigation in federal court.
15  I'm instructing the witness not to answer.
16           MR. McCORMACK:  He just said -- we've just
17  testified and established that at this meeting there were
18  no lawyers that were representing Osage Minerals Council
19  in this litigation present.
20       A   No, that's not the question you asked.
21       Q   (BY MR. McCORMACK)  What did Mr. Cheshewalla say
22  at this meeting with regard to any aspect of wind power?
23       A   Just exactly what the minutes say he said.
24       Q   And how long did he speak?
25       A   Very short.

Page 180

1        Q   How long was his letter?
2        A   One page.
3        Q   And do you recall generally what the thrust of
4   his conversations were or his letter was?
5        A   Just as it said here.
6        Q   Did he speak about the dispute with Enel?
7        A   I can't remember.
8        Q   How old man is Mr. Cheshewalla?
9        A   He's younger than me.
10       Q   Is he in his 50s?  His 40s?
11       A   Later 50s.
12       Q   Later 50s.  In any event, you testified
13  everything you can remember about what it is that
14  Mr. Cheshewalla may have said in his letter?
15       A   Yes, sir.
16       Q   Also in anything he may have said at this
17  meeting in 2015?
18       A   Yes, sir.
19       Q   And then it goes on to say, "Councilman Redcorn
20  states that we are in the energy business.  He is not
21  saying he is for wind energy, but we should keep the
22  options open if there is energy development out there and
23  we should be on the lookout for the benefit of the
24  shareholders."  Do you see that?
25       A   Yes.

Page 181

1        Q   Do you read that and do you recall that to be a
2   follow-up to issues that Mr. Cheshewalla was raising?
3        A   Yes, I believe it complemented it.
4        Q   All right.  Do you recall whether or not
5   Mr. Redcorn made any particular suggestions or had any
6   particular ideas about how to keep options open in the
7   renewables space on a go-forward basis?
8        A   No specifics.
9        Q   Okay.  At any time after this, do you recall
10  having a conversation with Mr. Cheshewalla or Mr. Redcorn
11  on the issue of whether or not the Osage Minerals Council
12  should consider options for renewable energy on a
13  go-forward basis?
14           MR. PIPESTEM:  Objection.  That question calls
15  for discussions that happened in the context of
16  litigation, including the attorney-client privilege.  I'm
17  instructing the witness not to answer the question.
18       Q   (BY MR. McCORMACK)  I'm not talking about
19  anything having to do with the Enel case.  I'm talking
20  specifically about whether at any point in time,
21  Mr. Waller, you recall having a conversation with
22  Mr. Cheshewalla or Mr. Redcorn with regard to the
23  generalized topic of whether or not renewable energy
24  should be something that the Osage Minerals Council should
25  look into as a prospect for future consideration or

Page 182

1   development?

2       MR. PIPESTEM: Objection. I'm instructing the

3   witness not to answer that question. It calls for issues

4   associated directly with this litigation, so that's

5   covered by attorney-client privilege and deliberation of

6   an elected body called the Osage Minerals Council.

7       MR. McCORMACK: Let me get your most recent

8   instruction understood. If Mr. Cheshewalla and Mr. Waller

9   had a conversation generally about the prospect of wind

10  development or renewable development in Osage County for

11  the future, your view, even though lawyers weren't present

12  for the conversation, is it would be privileged because of

13  litigation between Enel and Osage Minerals Council; is

14  that right?

15      MR. PIPESTEM: No, that's not my position.

16      MR. McCORMACK: Okay. That's the question I

17  asked, so why are you instructing him not to answer?

18      MR. PIPESTEM: You asked a question. I'm

19  telling you I object for different reasons.

20      MR. McCORMACK: No, you instructed him not to

21  answer my question.

22      MR. PIPESTEM: That's correct, that's correct.

23      MR. McCORMACK: If you had -- if you had an

24  objection about whether or not I strayed into privilege,

25  you could've inquired into that, but instead you

Page 183

1   instructed him not to answer my question, and I want to

2   know on what basis did you do that?

3       MR. PIPESTEM: On the basis of attorney-client

4   privilege. If you want me to explain.

5       MR. McCORMACK: No, I don't, because your theory

6   is if you talk about wind power it's privileged, which is

7   beyond my comprehension. But let me ask a different

8   question, and let's see if I draw another one of these

9   objections and instructions not to answer on things that I

10  don't think are even remotely privileged, but let's see.

11      Q   (BY MR. McCORMACK) Did you have a conversation

12  at any time with Mr. Cheshewalla or Mr. Redcorn in this

13  timeframe, 2015 or anytime thereafter, on the general

14  subject matter of whether or not it made sense for the

15  Osage Minerals Council to look into the prospect of

16  renewable energy taking place somewhere on the Osage

17  Mineral Estate?

18      A   For any company, not just yours?

19      Q   Yes, sir, especially not mine.

20      A   Well, I don't know. You're the one we were

21  having to deal with thinking.

22      Q   Understand, but the answer is yes, any company.

23      MR. PIPESTEM: I'm instructing the witness not

24  the answer to the extent that any answer involves

25  communications related to Enel or any affiliated

Page 184

1   companies.

2       Q   (BY MR. McCORMACK) Mr. Waller, you're up.

3       A   In executive.

4       Q   Okay. So you had conversations about the

5   prospect of renewable energy in Osage County in executive

6   session; is that right?

7       A   I said that when I started talking.

8       Q   What was the nature of those conversations?

9       MR. PIPESTEM: Objection. That is a -- I'm

10  instructing the witness not to answer about the

11  deliberations with legal counsel.

12      MR. McCORMACK: Fair point.

13      Q   (BY MR. McCORMACK) In the conversations that

14  you -- well.

15      MR. McCORMACK: You have a very broad net,

16  Counsel.

17      MR. PIPESTEM: Counsel, you continue to ask

18  questions that are clearly within the privilege. I mean,

19  some of these aren't hard. I understand we may disagree

20  on the margins here, but this is right at the heart of

21  their communications.

22      MR. McCORMACK: I asked only about

23  communications with people other than Enel, and the answer

24  was yes, that there were communications with others other

25  than Enel in executive session. Then I asked what was the

Page 185

1   nature of those communications.

2       THE WITNESS: You asked specifically about

3   Councilman Redcorn and Councilman Cheshewalla.

4       MR. McCORMACK: Yes, I did.

5       MR. PIPESTEM: Let me answer the question

6   related to these.

7       MR. McCORMACK: Mr. Waller, you may be late for

8   your events if we continue to have these kinds of problems

9   all through the afternoon.

10      MR. PIPESTEM: You're going to run out of time

11  anyway. He's going to be on time. You're asking about

12  communications that occurred in executive session, which

13  are by definition privileged.

14      MR. McCORMACK: Executive session and executive

15  privilege does not apply to commercial events and

16  commercial matters. It doesn't. I've litigated it many

17  times.

18      THE WITNESS: On a reservation?

19      MR. McCORMACK: If it's a commercial matter,

20  executive privilege doesn't -- it can't be used.

21      MR. PIPESTEM: In the middle of litigation

22  regarding wind energy companies, conversations in

23  executive session often in this circumstance are going to

24  involve legal counsel or deliberation about litigation.

25      MR. McCORMACK: We needn't lecture each other.

1    MR. PIPESTEM:  I agree.

2    MR. McCORMACK:  Let me ask this question.

3    **Q   (BY MR. McCORMACK)  You said -- I asked you**

4    **about Mr. Cheshewalla and I asked you about Mr. Redcorn,**

5    **and there are obvious statements about wind power in this**

6    **2015 Osage Minerals Council meeting, yes?  I've asked you**

7    **about that.  Fair enough so far?**

8    A    The answer is yes.

9    **Q    You've told me what you could about those**

10   **discussions, which is what you've already testified to.**

11   **And then I asked if you ever had any further conversation**

12   **not involving Enel about the development about renewable**

13   **power, generally, in the Osage Mineral Estate.  And you**

14   **said yes, you had that conversation at executive council.**

15   **Am I right so far?**

16   A    With my councilmen.  I didn't talk to a company.

17   **Q    Okay, with your councilmen.  In the**

18   **conversations that you had with Mr. Cheshewalla and**

19   **Mr. Redcorn, did those take place after this meeting of**

20   **2015 or at any other time beyond this 2015 meeting?**

21   A    Executive session.

22   **Q    Okay.  So the answer to that question, I guess,**

23   **is yes, that it did occur but it occurred in executive**

24   **session; is that right?**

25   A    Yes.

1    **Q    What was the context of those discussions?  Did**

2    **it involve litigation with my client Enel?**

3    MR. PIPESTEM:  Objection.  You're asking him to

4    make statements about conversations that he just said were

5    privileged and as a part of an executive session of the

6    Osage Minerals Council.

7    MR. McCORMACK:  Okay, you're saying that if they

8    had a conversation about the future of renewable power in

9    Osage County in an executive session you're going to

10   instruct him not to answer whether it involved litigation

11   or not, correct?

12   MR. PIPESTEM:  In this circumstance that

13   involves litigation, the future of wind energy, yes, is

14   related to this lawsuit.

15   MR. McCORMACK:  I don't know if you were at that

16   meeting or not, but it's really not for you to say whether

17   they involved it.  This is really for this witness to say,

18   so let's ask that question.

19   **Q    (BY MR. McCORMACK)  In this executive session in**

20   **which you had conversations with either Mr. Cheshewalla or**

21   **Mr. Redcorn about the future of potential renewable energy**

22   **in Osage County, was litigation counsel present for those**

23   **meetings?**

24   A    Yes.

25   **Q    Okay.  Did the subject matter of those**

1    **communications with mister -- well, who was present, which**

2    **counsel?**

3    A    It's in executive session of the council

4    meeting.

5    **Q    Which counsel was present?  Which lawyers were**

6    **present for that meeting that you just referred to?**

7    A    That would have been a representative from

8    Fredericks Spiegel (phonetic) and Morgan.

9    **Q    Okay.  That was your lawyers at the time for the**

10   **case, for the litigation?**

11   A    Tom Fredericks was our representative.

12   **Q    So the only time you ever talked about renewable**

13   **power in Osage County with Mr. Cheshewalla or Mr. Redcorn**

14   **was in executive session when there was litigation counsel**

15   **present on the Enel case; is that right?**

16   MR. PIPESTEM:  Objection.  Asked and answered.

17   **Q    (BY MR. McCORMACK)  You can answer.  Waiting on**

18   **you, Mr. Waller.**

19   A    Executive session, because of the litigation I

20   have not been able to take care of all the items I would

21   like to do.  This is taking a huge amount of my time

22   trying to take care of my shareholders.  I handle all of

23   my business with my council.  In cases like this,

24   litigation, it's all held in executive.  That's my answer.

25   **Q    I understand.  And again maybe Counsel will**

1    instruct if need be, but you've never had a conversation

2    with Mr. Cheshewalla or with mister -- excuse me.

3    MR. McCORMACK:  Put my document back up,

4    Mr. Concierge.

5    **Q    (BY MR. McCORMACK)  You've never had a**

6    **conversation with Mr. Cheshewalla or Mr. Redcorn on the**

7    **issue of the renewable prospects for Osage County and**

8    **Osage Mineral Estate other than in executive session and**

9    **other than when your counsel was present for this case; is**

10   **that right?**

11   A    That's correct.  I had to be in front of my full

12   Council or whoever is present for the quorum.

13   **Q    Okay.  Do you know if anybody in the audience or**

14   **anyone else commented in this 2015 meeting on the**

15   **statements that were made by Mr. Cheshewalla and**

16   **Mr. Redcorn with regard to the options for renewable power**

17   **in the future in Osage County?**

18   A    The minutes reflect they did.

19   **Q    And that would be Mr. Connor.  Anyone else?**

20   A    The minutes reflect what happened.

21   **Q    All right.  "Councilman Yates states that he is**

22   **firmly against the wind industry and he is against any**

23   **kind of negotiating with them."  Do you see that?**

24   A    Yes, I did.

25   **Q    And that was a position he consistently held?**

Page 190

1    MR. PIPESTEM: Objection. Calls for
2  communications that were part of this litigation, and so
3  I'm instructing the witness not to answer the question.
4    MR. McCORMACK: You're instructing the witness
5  not to answer the question of whether Councilman Yates
6  consistently took the position that he was firmly against
7  the wind industry and against any kind of negotiating with
8  the wind industry?
9    MR. PIPESTEM: That's not the question that you
10 asked.
11    MR. McCORMACK: I thought it was.
12    Q   (BY MR. McCORMACK) In any event, this position
13 that Mr. Yates took at this meeting that he is firmly
14 against the wind industry and is against any kind of
15 negotiating with them, was that a position that was his
16 consistent position, from your observations and
17 understandings, in connection with your dealings with the
18 Osage Minerals Council?
19    MR. PIPESTEM: Objection. I'm instructing the
20 witness not to answer the question. Communications
21 between Councilman Yates and Councilman now Chairman
22 Waller involving litigation and any kind of negotiations
23 with other parties, particularly Enel, was a part of an
24 attorney-client communication and deliberation among the
25 Tribal Council -- pardon me, the Minerals Council, so

Page 191

1  therefore it is privileged and is not -- the witness, I'm
2  instructing him not to respond.
3    Q   (BY MR. McCORMACK) "Councilman Yates stated at
4  this meeting he was firmly against the wind industry." Is
5  that a position that he took with you in other
6  circumstances not involving your counsel? What a joke.
7    MR. PIPESTEM: Objection. I'm instructing the
8  witness not to answer the question for the basis of
9  violating attorney-client privilege. I'd like to make
10 sure that the record says or states that counsel for
11 defendants referred to our objection as a joke. I want to
12 make sure that that's on the record.
13    MR. McCORMACK: Well, my view is that you've
14 instructed him not to answer an immense number of
15 questions that don't implicate the privilege.
16    MR. PIPESTEM: I disagree with you.
17    MR. McCORMACK: Okay, let's not fight. You can
18 see I feel that you have overused your instruction, but I
19 can't stop you from doing it. You have your own client to
20 take care of. I've got that.
21    Q   (BY MR. McCORMACK) So let me ask this question.
22 Did you ever speak with Councilman Yates about his
23 position that he is firmly against the wind industry at
24 any time other than when you heard him say this in front
25 of this meeting in 2015 where lawyers were not present?

Page 192

1    A   I have not.
2    Q   Okay. Let's look at tab 33, which has been
3  marked as Exhibit 164. This is a November 13, 2015 set of
4  minutes. I wanted to ask you, do you recall this meeting,
5  Mr. Waller? You were the chairman at this time
6  November 13, 2015?
7    A   Yes.
8    Q   If you go to the second page --
9    MR. McCORMACK: Concierge, go to the second
10 page. It's the first full paragraph, the section windmill
11 cases. Do you see that.
12    Q   (BY MR. PIPESTEM) Okay. And it says,
13 "Stephanie Irwin states the Osage Wind, we lost that
14 part." Do you know what she was referring to when she
15 says that?
16    A   I do not.
17    Q   All right. And it says, "When Mustang Run
18 started we asked for an injunction until the Osage Wind
19 part was settled." Do you know what she -- what that
20 sentence refers to?
21    A   It's a directive by a councilwoman.
22    Q   I'm sorry, I didn't hear that.
23    A   It's a directive that is by Councilwoman Irwin.
24    Q   Well, let's talk about that.
25    (Whereupon a discussion was held that was not

Page 193

1  reported due to interference)
2    Q   (BY MR. McCORMACK) Do you recognize the name
3  Mustang Run?
4    A   Yes.
5    Q   You understand Mustang Run to be another wind
6  farm that was attempting to build out in Osage County?
7    A   Yes.
8    Q   Do you recall whether the Osage Minerals Council
9  took a position relative to whether or not the Mustang Run
10 wind farm should proceed in Osage County?
11    A   Yes.
12    Q   The position Osage Minerals Council took was
13 that the Mustang Run wind farm should not proceed; is that
14 fair?
15    A   Repeat that.
16    Q   Yes. The position that the Osage Minerals
17 Council took was that the Mustang Run wind farm should not
18 proceed in Osage County, correct?
19    A   At that time.
20    Q   All right. Has that changed since then?
21    A   You and I aren't done yet.
22    Q   Understood. But in terms of Mustang Run, has
23 the Osage Minerals Council's position that Mustang Run
24 should not be able to build a wind farm in Osage County,
25 has that position changed?

Chairman Everett Waller    8/5/2021

1    A  I can't answer that until I get done with this
2   case.
3    Q   Okay, and maybe I can understand this better.
4   Is your view that this case will help set policy on an
5   ongoing basis for the Osage Minerals Council which then it
6   would use to deal with potential additional wind or
7   renewable farm projects in Osage County?
8    A  That is one of my options.
9    Q   Okay.  What about this case do you think needs
10  to be resolved before you can seriously consider other
11  wind farms or renewable energy projects in Osage County?
12   A  The reflection of our sovereignty and the
13  commitment to be in concert with us on projects that
14  develop the future for this reservation.
15   Q  I understand.  You're hoping that perhaps this
16  case will create a template for that future?
17   A  I can dream, can't I?
18   Q  Yes, and can't we all?  But that was -- that's
19  my question.  Do you think that perhaps a resolution of
20  this dispute, however it may turn out, will have a major
21  impact on how the Osage Minerals Council views renewable
22  projects, including wind projects, in the future for Osage
23  County?
24   A  Not just wind, but other projects in general,
25  green energy.

1    Q  All right.
2    A  But you are the first element that we have to
3   deal with.
4    Q   Have there been other green projects that have
5   approached the Osage Minerals Council in the last several
6   years with the desire to perhaps develop a green project
7   in Osage County that are on hold, if you will, until
8   resolution of the disputes between the Osage Minerals
9   Council and the Osage Nation -- excuse me, and Enel?
10   A  I cannot entertain other projects until you and
11  I take care of this one.
12   Q  Okay, I got it.  That's an incentive for both of
13  us it seems like?
14   A  It is to me.
15   Q  I understand, I understand.  I mean, it's an
16  important issue, renewable power.  You know, I asked a lot
17  of questions earlier today about whether renewable power
18  was going to be in the future of the Osage Mineral Estate,
19  and I think what you're telling me is maybe, but we've got
20  to get this problem resolved first.  Is that a fair
21  summary of all that?
22   A  I concur.
23   Q  All right, okay.  It goes on in this section.
24  It says, "She would like a resolution today because the
25  solicitors will have to appeal it.  She states we have

1   spent over $1 million on the wind farm that is our
2   responsibility because of our inherent sovereignty."  Do
3   you see that?
4    A  Yes.
5    Q  Do you recall this discussion and what may have
6   been said in the open meeting with the public about the
7   importance of spending the money because of the inherent
8   sovereignty?
9    A  The sovereign is the issue.
10   Q  At this time it goes on to say, "This is what
11  she's asking today, for a resolution to direct
12  Mr. Fredericks to ask the solicitor's office to move
13  forward on the appeal."  Do you see that?
14   A  Yes.
15   Q  This is the appeal of this case, the one
16  involving the determination by the lower court that there
17  had not been a use of the mineral estate?
18   A  Are you representing Osage Wind?
19   Q  Yes, in this case, yes.
20   A  Then the answer is yes.
21   Q  All right.
22      MR. McCORMACK:  Can the concierge go to the next
23  part of this document under what it says there?  It says,
24  I think, motion to enter executive was made by Councilman
25  Yates and by Councilman Irwin.

1    A  Yes.
2    Q  (BY MR. McCORMACK)  And then if you look at
3   the -- it goes into executive session, and then if you
4   look at the very bottom on the page --
5      MR. McCORMACK:  And let's ask our concierge to
6   do that.  It just says the last two motion passes down
7   there.  Do you see those two at the bottom, motion passes
8   and motion passes?  Put them both up.  Okay.
9    Q  (BY MR. McCORMACK)  And it says, Motion is made
10  by Councilwoman Irwin to accept and ask Mr. Fredericks to
11  send his letter to the US Solicitor's Office to do the
12  appeal process and ask him to do the appeal on the
13  windmill and is seconded by Councilwoman Boone.  Do you
14  see that?
15   A  Yes.
16   Q  Do you know at this time whether or not anyone
17  from the Osage Minerals Council had been in contact with
18  the Department of Interior on this issue as to whether or
19  not to appeal?
20   A  No.
21   Q  Do you know whether anyone from the Osage
22  Minerals Council had been in touch with anyone at the
23  Department of Justice with regard to the question of
24  whether to appeal?
25   A  No.  I was the chairman.



Page 198

1 Q  Do you know whether or not a resolution was ever

2 formally adopted authorizing the OMC to intervene in the

3 lawsuit to allow the appeal?

4 A  Yes.

5 Q  And was it?

6 A  In '14.

7 Q  I'm sorry, I missed that.

8 A  On the appeal itself?

9 Q  Yes, sir.

10 A  Was that on 8/15/15?

11 Q  I'm not a hundred percent sure of that date.  I

12 know it was in 2015.

13 MR. McCORMACK:  Counsel, do you know, Mr.

14 Pipestem?

15 MR. PIPESTEM:  I do not know.

16 MR. McCORMACK:  I'm sorry, I don't either.

17 A  It was taken care of that week on the appeal.

18 MR. McCORMACK:  I've think this is good time to

19 break.

20 Mr. Pipestem, I apologize for my

21 under-the-breath statement.  I was a little frustrated.  I

22 hope you'll forgive me for my momentary lack of

23 professionalism.  I apologize for that.

24 MR. PIPESTEM:  Apology accepted.

25 MR. McCORMACK:  Thank you.  All right, how about

Page 199

1 ten minutes from now?

2 THE WITNESS:  Thank you.

3 THE VIDEOGRAPHER:  Off the record at 4:22 p.m.

4 (BREAK FROM 4:22 TO 4:33)

5 THE VIDEOGRAPHER:  Back on the record at

6 4:33 p.m.

7 Q  (BY MR. McCORMACK)  Welcome back, Mr. Waller.

8 A  Thank you.

9 MR. McCORMACK:  One thing I wanted to say before

10 we proceeded to this section is that I have spoken to

11 Mr. Pipestem about an issue that he and I have been

12 talking about throughout the day, which is I have a series

13 of questions that relate to leases and sandy soil permits

14 and waivers that cover a variety of periods of time,

15 including a period of time before November 21, 2014.

16 Mr. Pipestem has advised me that if I were to ask any

17 questions about those subject matters prior to

18 November 21, 2014, he would instruct the witness not to

19 answer those questions for the reasons that he has stated

20 previously on the record today.  I have told him that I

21 don't agree with that, that I object to it, and I reserve

22 my rights relative to it.

23 But to save us the gymnastics of having that

24 fight on the record, I will agree to proceed on a period

25 of time that is post November 21, 2014 so as to avoid a

Page 200

1 case-by-case instruction while reserving all my rights.

2 Mr. Pipestem, anything you want to add to that?

3 MR. PIPESTEM:  No.

4 Q  (BY MR. McCORMACK)  All right, so let me show

5 you what has been marked as, it's tab 30, I believe we're

6 already marked it as plaintiff's 165, so let's go back to

7 that one for a second.  This is the August 19, 2015 OMC

8 minutes.  On page four under the item ODOT, maybe you want

9 to blow that one up.

10 You'll see it says here that someone is at the

11 Osage Minerals Council's meeting on August 19, 2015 from

12 the ODOT, which I read to mean the Department of

13 Transportation in Oklahoma.  Is that a fair presumption on

14 my part, Mr. Waller?

15 A  Yes.

16 Q  All right.  And he talks that the department has

17 a lot of work in Osage County over the next several years.

18 I know that historically there had been arranged between

19 OMC and the DOT, but here he states that there is

20 $42 million in bridgework and some road work underway.  He

21 proposes a memorandum of understanding to provide the

22 Minerals Counsel with the projects they have coming up.

23 Do you see that?

24 A  Yes.

25 Q  Was this the first time that you understand that

Page 201

1 there might have been a memorandum of understanding

2 reached between the DOT and Osage Minerals Council with

3 regard to work that the DOT might have been doing out on

4 the mineral reserve, Mineral Estate, rather?

5 A  On the reservation this has been a product

6 through our transportation improvement program.

7 Q  Do you know if prior to this time that the

8 interactions with the DOT had been on a piecemeal basis

9 and that it led to the decision to go ahead and do a

10 memorandum of understanding for a larger project?  Is that

11 what happened here, or have I misread that?

12 A  It was to update the MOU to fall under the

13 requirements of the federal regulations.

14 Q  I'm sorry, I didn't mean to step on your answer.

15 So prior to this time, that is, in August of

16 2015, there had been memorandums of understanding between

17 the DOT and the Osage Minerals Council?

18 A  And the Osage Nation.  Those funds are declared

19 through the product that used to be straight to the Tribal

20 Council that I sat on.  But after 2006 it's endeavored

21 through the Nation.  They have the program, but I

22 represent the shareholders who put the funds in it to the

23 State of Oklahoma through a gross production tax.

24 Q  Okay.  Do you know whether or not the memorandum

25 of understanding that was referenced here in this

Page 202

1  August 2015 meeting has periodically been updated between
2  the Osage Minerals Council, the Osage Nation, and the DOT?
3     A   Yes, sir.
4     Q   So that happens on a periodic basis and that
5  gets in front of the Osage Minerals Council for its
6  approval?
7     A   Correct.
8     Q   In those agreements, is a royalty agreed to
9  between the Osage Minerals Council on behalf of the estate
10  and the DOT for any materials that might be used by the
11  DOT in its construction activities?
12     A   Yes, sir.
13     Q   Has that changed over time, that is, in this
14  period 2015 forward?
15     A   Yes.
16     Q   What is the current royalty rate, if you will,
17  for the DOT, if you know?
18     A   I know.  I wrote the law.  Ten percent.
19     Q   That's -- in addition to that, they also pay a
20  flat royalty fee?
21     A   In certain cases that we're not also in on the
22  project.  Some of the projects are for the tribe, the
23  Nation, and then are some ODOT specific that we're not
24  included in but we have some participation due to oil
25  wells in the right-of-ways, things of that nature, the

Page 203

1  moving of utilities, anything that falls under that.
2     Q   Okay.  Going back, because you said you helped
3  write the law --
4     A   Yes.
5     Q   -- the current arrangement with the DOT is a
6  ten percent royalty?
7     A   That's the update that the Bureau had, but I sat
8  on the ITA, as you mentioned, and I was on the Federal
9  Highways Administration writing the policies and
10  guidelines for all expenditures in Indian country.
11     Q   Okay, thank you for that.  That's significant.
12  The question I have is the current arrangement with the
13  DOT is a ten percent royalty.  How is that calculated?
14     A   Sir, it goes under the leasing through the
15  Bureau of Indian Affairs, and it's calculated through the
16  scales.  We basically have stayed with that, bring them
17  the receipts.  They show the sales and it's calculated
18  from those.
19     Q   Well, and that's what I'm trying to get my
20  fingers around.  Excuse me if I don't know this as well as
21  you do, but the DOT, I understand historically what they
22  might do is they might go onto the Osage Reservation, they
23  might dig up soil or dirt or rock, and they might use it
24  in the building of roads or the maintenance of roads and
25  things of that nature.  Is that a reasonably good

Page 204

1  description of what they have historically done, the DOT,
2  out there?
3     A   In some cases.
4     Q   All right.  And does that ten percent apply to
5  that scenario as well?
6     A   Yes.
7     Q   Okay.  And so since they're using the soil
8  and/or the rock in their construction of roads or
9  maintenance of roads, what is the ten percent royalty
10  derived from?  It's not a sale, so what's it derived from?
11     A   The contract that was let by the ODOT shows the
12  capacity of area they're using, if it's a borrow pit,
13  things of that nature.
14     Q   So it's a volume issue, ten percent?  Is that --
15  a borrow pit, and I assume you mean the term to mean a
16  hole dug in the ground that the soil is used for a variety
17  of purposes?  Is that a fair description of a borrow pit?
18     A   Yes, sir.  The project, if they can't hold the
19  compaction of the road due through the dirt they have, we
20  have to bring in another element that will allow
21  compaction.
22     Q   So and then -- so let's say they take out a
23  certain amount of dirt from the borrow pit on the estate
24  and they use it to build the road.  Is ten percent royalty
25  derived against some set price for a cubic foot of dirt or

Page 205

1  a cubic foot rock?  How is that set?  I'm trying to figure
2  it's percent of what number, and where do you get the
3  number from?
4     A   The number is from the receipt, and it's either
5  done over running over the scale or the Bureau of Indian
6  Affairs will send out their inspectors and they'll
7  calculate the volume of the linear square yards that are
8  being used.
9     Q   Okay.  I apologize for being a little slow.
10  Something I can understand is I saw a number of documents
11  that reflected that the rate often paid was 52 cents a
12  ton, for instance.  That's easy for me to understand.
13  Somebody takes out 100 tons, they pay a hundred tons times
14  52.  But now that the calculation is ten percent, I keep
15  trying to figure out ten percent of what?  Of the value of
16  the materials removed, and then how do you come to that
17  value?
18     A   Because it's written in the building of the
19  road, the construction of the usage of said material.
20     Q   So someone might say look, I'm going to --
21     A   It's a product.
22     Q   So somewhere in the contract it would say I'm
23  going to need a million dollars worth of dirt or fill, and
24  you would get ten percent of that?  Is that how that would
25  work?

Page 206

1    A   In most cases.

2    Q   I see, okay.  So that's the point.  So somewhere

3  in the contract there is an estimation of the volume of

4  dirt or fill that might be needed.  If that's taken from

5  the reservation -- excuse me, from the estate, then you

6  would get ten percent of that as a royalty payment?

7    A   Yes, on the permitting of it.

8    Q   Okay.  So that's based upon the value of the

9  contract, and then is it a bid process?  How does -- who's

10 the one who sets the value, I used a million dollars as an

11 example, who's the one that sets the value of the amount

12 that would be spent on fill in the contract?  Is that --

13 is that something that you're involved with as a

14 counter-party, or is that just something that the DOT sets

15 as what they're going to pay for these materials or what

16 they're going to spend on these materials?

17    A   It is brought to the council, falls under the

18 permitting and then it goes through the Bureau of Indian

19 Affairs for calculation and payment.

20    Q   I see, okay.  So did that shift, Mr. Waller, at

21 least in the materials that I looked at, it looked it

22 might've been 52 cents a ton pricing, and then that

23 shifted to this ten percent model.  Is that generally how

24 it's done now for pricing the value of these soil and rock

25 excavation removables?

Page 207

1    A   Yes, sir, all new permitting would fall under

2  that requirement.

3    Q   Okay, all right, okay.  That's as of when?

4    A   2019, but the actual project was done before

5  then, and I don't have a specific date in which the Bureau

6  of Indian Affairs -- we were negotiating that 51 per cent

7  per ton was a low number, so I know you're looking at an

8  ancient contract.  The contract actually added dollars to

9  it, cents in this words, and it every year would increase

10 as the lease stated.

11    Q   Okay.  We talked earlier today about what

12 percentage of the amount of money that comes into the

13 Osage Nation for the mineral rights in the estate, and we

14 talked about what percentage of it was oil and gas, what

15 percentage of it was mineral.  I think we settled on the

16 number 97 percent oil and gas and the remaining mineral.

17 What kind of money does the DOT pay for the Mineral Estate

18 usage that it has, if you know?

19    A   That's a great question.  They pay the -- number

20 one, they come to us and our representative at Bureau of

21 Indian Affairs, and it's negotiated through ODOT and our

22 trustee, and then it is derived on the payment for said

23 well because if it's in the right-of-way we're getting

24 ready to plug it.

25    Q   Do you have a ballpark figure of how much the

Page 208

1  Oklahoma DOT pays for use of the mineral side from the

2  estate on a yearly basis, give or take?  Half a million?

3  A million?

4    A   I would have to go back to my records.

5    Q   Any wild guess?

6    A   I won't make a wild guess.

7    Q   It doesn't have to be wild.

8    A   Well, thank you.  Now that you've said that, I

9  feel better.  No, I don't have that number in front of me.

10    Q   Well, let me ask you this.  Is it in the order

11 of hundreds of thousands of dollars or in the order of

12 millions of dollars?  Do you know that?

13    A   We do not run into that many wells that are

14 archaic (phonetic) and in the right-of-way.

15    Q   Okay, so it's not a meaningful -- well,

16 meaningful is the wrong word.  It's not a huge number,

17 let's put it that way?

18    A   Yes, sir.

19    Q   But is the DOT your biggest customer that way,

20 and are they the ones who spend the most on those types of

21 royalties for the use of the soil and the rock and other

22 materials in that manner?

23    A   It has many options.  It's also ODOT, and then

24 we go to the Osage County.  Any projects that we have, we

25 might be fully funding them into the millions.  This

Page 209

1  Transportation Improvement Program, I allocated over

2  7 million of our funds in one year to keep the county

3  going.

4    Q   When you say you allocated 7 million of your

5  money to keep the county going, I'm not 100 percent sure

6  what that means in terms of royalty in a mineral estate.

7  Could you help me understand that?

8    A   These are two different identities you're

9  asking.  One's a royalty payment; the other is the

10 obligation of taking care of our dollars on the

11 transportation side.

12    Q   I see.

13    A   We separate it.

14    Q   I got it.  One is revenue, the other is expense;

15 is that fair?

16    A   That's close enough.

17    Q   Yes, okay, I've got it.  On the revenue side,

18 the DOT or other governmental entities in or around Osage

19 County, would you say that is the lion's share of the

20 money that the OMC collects as royalties for the use of

21 soil, dirt, and gravel pits and things of that nature?

22    A   Yes.

23    Q   More than 50 percent?  More than 75 percent?

24    MR. PIPESTEM:  Objection.  Compound question.

25    Q   (BY MR. McCORMACK)  Okay.  More than 50 percent?

Page 210

1    A   It's according to how many projects I have.  I
2    can't answer that unless I have the shorter-term or
3    long-range plan that has already been vetted through ODOT.
4    Q   I understand, but you're the chairman of the
5    Osage Minerals Council.  You probably have some sense of
6    where your revenues come from?
7    A   Yes, I do.
8    Q   Generally speaking, would you say that more than
9    half of the money that you derive from the use of gravel
10   or dirt or things of that nature comes from the DOT and
11   the Osage County governmental-related entities?
12   A   Now the answer is yes.  You added them in.
13   Q   Okay, fair enough.  Is it meaningfully beyond
14   50 percent, or is it closer to 50 percent?
15   A   I would say 50 percent because I can't obligate
16   how much other that the royalty is coming from through the
17   private sector or taken outside of the county.
18   Q   All right, so let's just use that number, then,
19   give or take 50 percent from the DOT and the Osage County
20   governmental entities.  Who pays you the other give or
21   take 50 percent for these mineral rights, if you will, to
22   dirt and soil and gravel, that sort of thing?
23   A   Whoever buys it from the quarry.
24   Q   Okay.  Is the quarry run by the Osage Minerals
25   Council, or is it run by a private enterprise in

Page 211

1    conjunction with the Osage Minerals Council?
2    A   It's private sector, and it is under the leasing
3    that it is -- those are specifically done by weight
4    tickets.
5    Q   Okay, what is -- so for the quarry, I guess you
6    called it the quarry, is that the right term?
7    A   Yes.
8    Q   Is there more than one private enterprise out
9    there working on the quarry where they sell rock and fill
10   and other items from the estate, or is there just one?
11   A   The question is that there's more than one,
12   yes.
13   Q   Okay.  And we've walked through, as best I could
14   pull it off, the conversations about the DOT and what they
15   currently pay, and you mentioned a moment ago, I think,
16   that for these private enterprises that are using these
17   quarry pits that they pay by weight; is that right?
18   A   Yes, sir.
19   Q   What is their current freight, if you will?
20   What do they pay -- what do they pay per, say, ton, if
21   that's how it's done?
22   A   At the sale of the tonnage on the ticket.
23   Q   Yes, sir.
24   A   Ten percent of it.
25   Q   So in other words, if they dig out four

Page 212

1    truckloads of soil and they sell it for $10,000, I don't
2    know, 5000?  I don't know what -- I apologize, I don't
3    know the pricing.
4    A   That's a little high.
5    Q   A little high, okay.  You would get ten percent
6    of that retail sale, if you will?
7    A   Yes.
8    Q   Okay.  Okay, was that also changed in the last
9    several years from a particular -- we talked about 51, 52
10   cents a ton?
11   A   Yes.
12   Q   That changed also to just 10 percent of the
13   ultimate sale?
14   A   Yes, as the Code of Federal Regulations
15   required.
16   Q   Okay.  How did that -- were you part of that,
17   you personally, part of the effort to change the Code of
18   Federal Regulations to allow that ten percent?
19   A   No.
20   Q   No, okay.  But that's -- that's the operative
21   CFR provision at this point?
22   A   That we live by, yes.
23   Q   And that's been in -- I think you said that
24   started in 2019?
25   A   That's the last updated ODOT MOU I have.  The

Page 213

1    amount came to us before then through our superintendent.
2    Q   Okay.  And prior to that change in 2019 and in
3    these privately run quarries on the reservation, the
4    pricing was per ton, and that was in the vicinity of 50,
5    60 cents per ton?
6    A   Just like the contract you picked the 51 off of.
7    That's how it was done.
8    Q   Sure.  Do you know, was that, in other words on
9    the several private quarries that exist out there on the
10   reservation, would they have the similar pricing on the
11   same pricing, 51, 52, whatever it might've been per ton,
12   in that time frame?
13   A   At that point in time, yes.
14   Q   Okay.  In other words, you weren't charging one
15   80 cents and another one 30 cents; you were charging them
16   in the vicinity of 50, 60 cents per ton?
17   A   Until the ten percent came in, yes.
18   Q   Okay.  And that was -- that ten percent came in
19   in 2019, and prior to that time it always been on a
20   per-ton basis?
21   A   Yes, and that probably preceded '19.
22   Q   Okay.  Do you know what the price per ton was in
23   the period right before the regulations changed to make it
24   a ten percent royalty?
25   A   We had in some cases over 57 and 59.

Chairman Everett Waller    8/5/2021

Page 214

1    Q   Okay. So somewhere between 50 and 60 cents in
2   the period prior to 2019?
3    A   Until the increase of ten percent become
4   established.
5    Q   Let me ask you as someone who basically runs a
6   huge business. What has the difference in that royalty
7   meant? Has it increased your revenue from that point of
8   your operations five percent? Ten percent?
9   Fifteen percent?
10    A   I think over that.
11    Q   Over that, okay. All right, that's good.
12    A   Not much, though.
13    Q   Not much. So somewhere ten, 15 percent give or
14   take?
15    A   Yes, there was an increase.
16    Q   How about the volume? Has the volume stayed
17   essentially the same for many years, or has it gone up or
18   gone down in this period, say, 2015 to today?
19    A   It's stayed basically the same.
20    Q   Let me show you what has been -- it's under tab
21   50 for the concierge. I'll mark this as the exhibit next
22   in order. Perhaps you can tell me what that is. I know
23   we're around 164, is that right, 165?
24    MR. PIPESTEM:   Counsel, before we get to that
25   question, I'm showing it's three minutes till 5 p.m.

Page 215

1   Under the federal and the local rule, we have reached the
2   end of the deposition at 5 p.m. Central, so I encourage
3   you to wrap up any questions that you have.
4    MR. McCORMACK:   A couple of questions. My
5   understanding of that rule is similar to many other
6   jurisdictions that it doesn't count break time, so I
7   think -- or lunchtime. I think that would probably give
8   me at least an hour. I have no desire to keep the
9   deposition going unnecessarily, but let me check and see
10   if we have an agreement on that point or whether I'm a
11   cult of one on that.
12    MR. ASHWORTH:   I would note that I think the
13   local rules are clear that it's seven hours or it has to
14   end at five. Regardless of whether you start at 4:00, it
15   still has to end at five unless there's an agreement of
16   the parties.
17    MR. McCORMACK:   Okay. That suggests you're
18   being kind to me, Counsel, and I should try to wrap up.
19   Is that -- listen, I apologize, I'm not an Oklahoma
20   lawyer, but some of the Oklahoma lawyers on the call, we
21   started at -- I see what you're saying. We started at ten
22   local time; it's now five local time. Is it true you
23   don't count -- I know in many districts you don't count
24   break time for that seven hours.
25    MR. ASHWORTH:   I would agree with that, but it's

Page 216

1   seven hours or it has to end at five, so no later than
2   five. So if you had started earlier than 10 a.m. we'd
3   still be going. But if you start the deposition late, you
4   still have to end by five.
5    MR. McCORMACK:   You guys are tough out there in
6   Oklahoma. Mr. Pipestem, are you going to give me a little
7   bit more time, or are you going --
8    MR. PIPESTEM:   I don't think so. Tell me how
9   many more questions you have.
10    MR. McCORMACK:   Well, just let me quickly look
11   at my outline here. Hold on. Well, there's no chance I'm
12   going to get my questions done in 15 minutes, so I'm not
13   sure doing 15 minutes is going to do us much good. I may
14   end up having to 30(b)(6) some of these questions, so what
15   are you going to do?
16    Anyway, I haven't heard from anybody on my side
17   of the aisle, so tell me for the future so I know. You're
18   telling me no matter what time someone starts a deposition
19   in the Northern District of Oklahoma that at 5:00
20   everybody knocks off? That's the way the rule is?
21    MR. PIPESTEM:   Under the local rule, yes.
22    MR. ASHWORTH:   Unless there's an agreement of
23   the parties.
24    MR. McCORMACK:   That would been good for me to
25   know.

Page 217

1    MR. PIPESTEM:   It's in the local rule.
2    MR. McCORMACK:   No, I understand, I understand.
3   What I had been advised was I had seven hours not
4   including breaks, so I didn't get the information I
5   needed. I guess, Mr. Pipestem, that suggests that I'm
6   going to say, thank you, Mr. Waller for attending today.
7   I appreciate it very much, and I guess have no choice but
8   to stop at 5:00. I'm assuming my colleagues in Oklahoma
9   are giving the straight dope, and I'll accept it, so there
10   you go.
11    THE WITNESS:   Thank you, Tom.
12    MR. McCORMACK:   You bet.
13    THE VIDEOGRAPHER:   We're now off the videotape
14   record. The time is 5:01 p.m.
15    (DEPOSITION CONCLUDED AT 5:01 P.M.)
16
17
18
19
20
21
22
23
24
25

Page 218

1    ERRATA SHEET
2    USA and Osage Minerals Council vs. Osage Wind, et al.
3    DEPOSITION OF EVERETT WALLER
4    REPORTED BY: MIKE WASHKOWIAK, CCR
5    DATE DEPOSITION TAKEN: AUGUST 5, 2021
6    JOB NO. 151610
7 PAGE  LINE  IS          SHOULD BE
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

Page 219

1    JURAT
2    USA and Osage Minerals Council vs. Osage Wind, et al.
3        I, EVERETT WALLER, do hereby state under oath
4    that I have read the above and foregoing deposition in its
5    entirety and that the same is a full, true and correct
6    transcription of my testimony so given at said time and
7    place.
8
9
10   _____
11   Signature of Witness
12
13
14       Subscribed and sworn to before me, the
15   undersigned Notary Public in and for the State of Arkansas
16   by said witness, EVERETT WALLER, on this _____day
17   of_____, 2021.
18
19
20
21   _____
22   NOTARY PUBLIC
23   MY COMMISSION EXPIRES:_____
24   JOB NO. 151610
25

Page 220

1    C E R T I F I C A T E
2    STATE OF ARKANSAS  )
3                )  SS:
4    COUNTY OF WASHINGTON)
5        I, Mike Washkowiak, Certified Court Reporter
6    within and for the State of Arkansas, do hereby certify
7    that the above-named EVERETT WALLER was by me first duly
8    sworn to testify the truth, the whole truth, and nothing
9    but the truth, in the case aforesaid; that the above and
10   foregoing deposition was by me taken and transcribed
11   pursuant to agreement, and under the stipulations
12   hereinbefore set out; and that I am not an attorney for
13   nor relative of any of said parties or otherwise
14   interested in the event of said action.
15       IN WITNESS WHEREOF, I have hereunto set my hand
16   and official seal this 11th day of August, 2021.
17
18
19       MIKE WASHKOWIAK, CCR
20
21       State of Arkansas, No. 654
22
23
24
25