**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| (2) OSAGE MINERALS COUNCIL, | ) | Case No. l4-CV-704-GKF-JFJ |
| | ) | |
| Intervenor-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1) OSAGE WIND, LLC; | ) | |
| (2) ENEL KANSAS, LLC; and | ) | |
| (3) ENEL GREEN POWER | ) | |
| NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**INTERVENOR-PLAINTIFF OSAGE MINERALS COUNCIL'S
MOTION TO COMPEL DEFENDANT ENEL GREEN POWER NORTH AMERICA,
INC. TO RESPOND TO THE OMC'S THIRD SET OF DISCOVERY REQUESTS,
INCLUDING INTERROGATORIES AND REQUESTS FOR PRODUCTION OF
DOCUMENTS**

TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

I.   Introduction ............................................................................................................1

II.  Procedural and Factual Background .......................................................................2

    A.  OMC Served Discovery Requests on May 28, 2021 and Agreed that EGPNA
       Would have an Extension to Respond ............................................................2

    B.  EGPNA's July 26, 2021 Responses and Objections and August 30, 2021
       Supplemental Production Were Inadequate ...................................................3

    C.  The Parties Met and Conferred on August 31, 2021 ......................................5

    D.  Defendants' August 30 and September 14 Productions Did Not Include
       Information Responsive to ROG Nos. 6 and 14 .............................................6

III. Standard of Review .................................................................................................9

IV.  Argument ...............................................................................................................10

    A.  Enel KS's and EGPNA's Profits from the Wind Farm Are Relevant to a
       Weighing of the Equities under Davilla ......................................................10

    B.  EGPNA Cannot Satisfy Its Own Discovery Obligations By Pointing To Discovery
       Concerning Osage Wind's Profits ...............................................................13

       1.  EGPNA's and Enel KS's Involvement in and Direction of the Project
          Pre-dates Enel KS's Ownership of the Project. ...........................................16

       2.  EGPNA Made the Decisions to Commence Dynamite Blasting and Rock
          Crushing of the Osage Mineral Estate and to Continue after Receiving
          Superintendent Phillips's Letter ..................................................................20

    C.  Defendants' Objections Based on Dkt. Nos. 161 and 162 are Meritless ...........23

V.   Conclusion .............................................................................................................24

i

TABLE OF AUTHORITIES

Cases

*Callaway Golf Co. v. Acushnet Co.*,

  576 F.3d 1331 (Fed. Cir. 2009) ...............................................................13

*Callaway Golf Co. v. Acushnet Co.*,

  585 F. Supp. 2d 600 (D. Del. 2008) .........................................................13

*Commonwealth Scientific and Industrial Research Organisation v. Buffalo Technology*, Inc.,

  492 F.Supp.2d 600 (E.D. Tex. 2007).....................................................5, 13

*Davilla v. Enable Midstream Partners, L.P.*,

  913 F.3d 959 (10th Cir. 2019) ............................................................11, 25

*Gavlik v. Am. Family Home Ins. Co.*,

  No. 07-CV-336-TCK-PJC, 2008 WL 11509963 (N.D. Okla. Jan. 11, 2008) ...........................10

*Gen. Elec. Cap. Corp. v. Lear Corp.*,

  215 F.R.D. 637 (D. Kan. 2003) ...............................................................10

*Idaho Conservation League v. Magar*,

  No. 3:12-CV-00337-CWD, 2015 WL 632367 (D. Idaho Feb. 13, 2015) ................................13

*Owens v. Sprint/United Mgmt. Co.*,

  221 F.R.D. 649 (D. Kan. 2004) ...............................................................10

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,

  784 F. App'x 786 (Fed. Cir. 2019) ...........................................................14

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,

  No. 14-CV-02061-H-BGS, 2018 WL 9903323 (S.D. Cal. Aug. 13, 2018) .............................14

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,

No. 14-CV-02061-H-BGS, 2020 WL 6561431 (S.D. Cal. Nov. 9, 2020) ...............................14

*United States v. Ameren Missouri*,

421 F.Supp.3d 729 (E.D. Mo. 2019) .............................................................................5, 12, 13

*United States v. Ameren Missouri*,

9 F.4th 989 (8th Cir. 2021) ...............................................................................................12

<u>Rules</u>

Fed. R. Civ. P. 26(b)......................................................................................................10, 11

Fed. R. Civ. P. 34(a)..............................................................................................................9

Fed. R. Civ. P. 34(b)..............................................................................................................9

Fed. R. Civ. P. 37(a)..............................................................................................................9

## I.    INTRODUCTION

Intervenor-Plaintiff Osage Minerals Council ("OMC") files this brief in support of the OMC's Motion to Compel Defendant Enel Green Power North America, Inc. ("EGPNA") to respond to the OMC's Third Set of Discovery Requests to Defendant Enel Green Power North America, Inc., Including Interrogatories and Requests for Production of Documents ("OMC Requests"), specifically Interrogatory Nos. 6 and 14 ("ROG Nos. 6 and 14"). Ex. 1. Notably, Defendants have already claimed that the OMC's request for permanent injunctive relief, if ordered by this Court, will cost Defendants as much as $300,000,000. *See* Defs.' Partial Objs. to Mag. J.'s Ops. and Orders 12 n.9, Dkt. 218, (asserting that the OMC's request for ejectment/removal "must be considered in light of the fact that the equitable remedy of removal would cost the Defendants nearly $300,000,000.00.").

However, as discussed in greater detail below, federal courts considering whether to award permanent injunctive relief cannot consider such a dramatic figure in isolation. Instead, if this Court is to truly consider Defendants' allegation that permanent injunctive relief will cost Defendants three hundred million dollars, then the Court must also be able to consider this alleged amount with regards to the amount that each of the three Defendants has invested in the Osage Wind Farm Project (the "Project") to date, as well as how much each defendant has earned in income or profits from the Project—individually, and up until today, since as this Court has repeatedly concluded, the weighing of the equities under *Davilla* requires full consideration of the consequences going forward. *See* Aug. 25, 2021 Order 20, Dkt. 264.

Defendants, however, have insisted that the OMC is only entitled to documents and information identifying how much Defendant Osage Wind, LLC ("Osage Wind") has earned from or invested in the Project. EGPNA, specifically, has refused to produce any information or documents responsive to ROG Nos. 6 and 14. But this Court will not be able to fully weigh the

equities under *Davilla* without this information. Osage Wind is one of three Defendants in this case, and there is no reason why the Court's consideration of permanent injunctive relief should be evaluated based on one defendant's profits alone.

Defendants' attempt to hide how profitable the Osage Wind Farm is behind Osage Wind is as transparent as it is baseless. Osage Wind is a corporate shell. Osage Wind has no employees. Osage Wind did not control or direct any of the illegal conduct that led to Defendants' trespass on the Osage Mineral Estate. Instead, EGPNA and Enel Kansas, LLC ("Enel KS") have controlled every aspect of the Osage Wind Farm's construction, including the decision to not obtain the lease that the Tenth Circuit has concluded is required. Osage Wind did not fund the construction of the Osage Wind Farm Project. Instead, all funding was contributed by Enel KS and EGPNA, or investors that EGPNA specifically sought out.[1] There is no rational reason to assume that this Court can accurately assess what kind of a financial impact permanent injunctive relief would have on the Osage Wind Farm's profitability by looking at the financials of Osage Wind alone.

Accordingly, the OMC moves the Court and respectfully requests that EGPNA be compelled to produce all information and documents responsive to ROG Nos. 6 and 14.

## II.   PROCEDURAL AND FACTUAL BACKGROUND

### A.   OMC Served Discovery Requests On May 28, 2021 and Agreed that EGPNA Would have an Extension to Respond

On May 28, 2021, the OMC served the OMC Requests on Defendants. *See* Ex. 1; May 28, 2021 Email from Mary Kathryn Nagle Ex. 3. Among these Requests, the OMC asked for the following responses to interrogatories ("ROGs") and documents:

---

[1] General Electric also contributed to the Project via its capital contribution to Osage Wind after becoming a member on October 1, 2014. *See* Fourth Amended and Restated Osage Wind LLC Agreement Ex. 2, at ), OSAGE WIND-041312.

> **Interrogatory No. 6:** For each year the Project has been in operation, state the profits you have earned from the Project in absolute dollar amounts and as a percentage of Enel Green Power North America, Inc.'s total profits.

> **Interrogatory No. 14:** Please state the total dollar amount Enel Green Power North America, Inc. has invested in the Project to date.

OMC Requests Ex. 1, at 5–6.[2]

On June 21, 2021, Defendant EGPNA's counsel wrote to the OMC stating, "Defendant EGPNA request[s] a two-week extension to respond to the OMC's third set of discovery requests. Please advise if the OMC agrees to this request for extension." June 21 Email from Sarah Stevenson Ex. 4. The OMC responded that it would be "happy to accommodate that request if Defendants [would] agree to a two-week extension for the OMC's objections and responses to Defendants' latest discovery requests." June 21 Email from Mary Kathryn Nagle, *id.* The parties then mutually agreed to a two-week extension for the OMC in response to Defendants' latest discovery requests in addition to a two-week extension for Defendants to respond to the OMC's Third Set of Discovery Requests to EGPNA. *Id.*

### B. EGPNA's July 26, 2021 Responses and Objections and August 30, 2021 Supplemental Production Were Inadequate

---

[2] Although the ROGs themselves were served on EGPNA and refer to EGPNA, the OMC has continuously asked Defendants for the profits made from the Project and investments made into the Project by Enel KS, out of recognition that the OMC's Third Set of Discovery Requests to EGPNA defines "you" to include all Defendants. *See* OMC Requests, Ex. 1, at 5. The OMC also previously asked Enel KS directly for this information in its Request for Production No. 42 to Enel KS. *See* Intv. Pl.'s First Set of Interrogs. and Requests for Inspection and Produc. to Def. Enel KS 11, Dkt. 183-3, at 30. Furthermore, Enel KS is a holding company, wholly-owned and controlled by EGPNA. *See* Second Decl. of Megan J. Beauregard ¶ 9, Dkt. 189-2. Accordingly, any profits that Enel KS makes from the Project, as well as any investments made by Enel KS, are directed by EGPNA and EGPNA's executives and/or employees. Documents and information related to Enel KS's profits from the Project, or investments made to the Project, are therefore relevant and responsive. Also, although the OMC is only moving to compel ROG Nos. 6 and 14, the OMC notes that if the OMC is successful in this Motion, Defendants will be required to produce any and all documents related to ROG Nos. 6 and 14, as Request for Production No. 62 required Defendants to "produce all documents supporting, pertaining to, and/or relied upon in your responses to the above Interrogatories." OMC Requests, Ex. 1, at 8.

On July 26, 2021, Defendant EGPNA served its Responses and Objections to the OMC's

Third Set of Interrogatories and Requests for Production of Documents on EGPNA ("EGPNA

Responses"). *See* Ex. 5. In response to ROG No. 6, EGPNA stated:

> EGPNA objects to this Interrogatory as seeking information that is not relevant to
> the claims in this case and not reasonably calculated to lead to the discovery of
> admissible evidence. The Interrogatory seeks information beyond the scope of, and
> not relevant to, the remedies sought in the OMC's First Amended Complaint in
> Intervention, Dkt. # 164. *See* Order denying United States Motion for Leave to File
> a Second Amended Complaint and granting in part and denying in part Defendants'
> Partial Motion to Dismiss the Osage Minerals Council's Complaint in Intervention,
> dkt. # 161, and Order granting Defendants' Motion to Strike Allegations in OMC's
> Complaint in Intervention, dkt. #162.

EGPNA Resp. Ex. 5, at 3. And in response to ROG No. 14, EGPNA stated:

> EGPNA objects to this interrogatory as seeking information beyond the scope of,
> and not relevant to, the remedies sought in the OMC's First Amended Complaint
> in Intervention, Dkt. # 164. *See* Order denying United States Motion for Leave to
> File a Second Amended Complaint and granting in part and denying in part
> Defendants' Partial Motion to Dismiss the Osage Minerals Council's Complaint in
> Intervention, dkt. # 161, and Order granting Defendants' Motion to Strike
> Allegations in OMC's Complaint in Intervention, dkt. #162.

*Id.* at 10–11.

Counsel for the OMC reviewed EGPNA's Responses, as well as the entirety of all

Defendants' productions, and deemed them to be deficient. On August 26, 2021, counsel for the

OMC sent Defendant EGPNA a deficiency letter regarding its Responses and Supplemental

Responses. Aug. 26, 2021 Deficiency Letter Ex. 6. In this letter, the OMC pointed out that

"[b]ecause EGPNA refers generally to the two orders[, Dkt. Nos. 161 and 162,] in the Objections

and because the subject Interrogatories and Requests for production span a number of topics,

[including RFP's Nos. 83 and 84,] the OMC is unable to determine the specific grounds on

which EGPNA believes the requests are objectionable." *Id.* at 1–2. OMC's counsel further

stated:

4

As EGPNA is also aware, Defendants have represented to the Court and to Plaintiffs through discovery that decommissioning the project will cost Defendants upwards of $300,000,000. Dkt. 218, 12 n.9; *e.g.*, Osage Wind, LLC's Answer to Interrogatory No. 10 from the United States. With respect to Interrogatory Nos. 6 and 14, the extent of the potential harm to Defendants cannot be adequately determined absent information that can put Defendants' costs into proper context. *See, e.g., United States v. Ameren Missouri*, 421 F.Supp.3d 729, 816 (E.D. Mo. 2019) (noting defendant will still be profitable after complying with injunctive relief); *Commonwealth Scientific and Industrial Research Organisation v. Buffalo Technology*, Inc., 492 F.Supp.2d 600, 606 (E.D. Tex. 2007) (recognizing that permanent injunction will only affect 11% of defendant's business).

*Id.* at 2.

Four days later, on August 30, 2021, Defendant EGPNA served its First Supplemental Responses and Objections to Plaintiff in Intervention Osage Minerals Council's Third Set of Interrogatories and Requests for Production of Documents on the OMC ("EGPNA Supplemental Responses"). Ex. 7. Both the EGPNA Responses and the EGPNA Supplemental Responses were inadequate and failed to satisfy the OMC's requests in ROG Nos. 6 and 14 and RFP Nos. 83 and 84. Sept. 28, 2021 Declaration of Mary Kathryn Nagle ("Nagle Decl.") Ex. 8, ¶ 3.

Also on August 30, 2021, Defendants sent a response to the OMC's August 26 Deficiency Letter. Defs.' Aug. 30, 2021 Letter Ex. 9. In this letter, Defendants raised several relevance objections based on the Court's orders at Dkt. 161 and Dkt. 162 and stated that "[s]everal of the discovery requests in the OMC's [Requests to EGPNA] seek irrelevant information and documents, thereby imposing the prejudice on Defendants that the Court intended to preclude." *Id.* at 2. Further, Defendants stated that Interrogatories No. 6 and 14 seek financial information from EGPNA which is "beyond the scope of the Project" and Defendants have already produced "exhaustive information regarding Osage Wind, LLC's" financial information." *Id.*

C.     The Parties Met and Conferred on August 31, 2021

5

On August 31, 2021, the OMC and Defendants engaged in a Meet and Confer regarding the issues raised in the OMC's August 26 Deficiency Letter. Nagle Decl. ¶ 5. During the Meet and Confer, counsel for the OMC stated its position that the financial information for EGPNA and Enel KS is relevant to the extent that Defendants might seek to argue that, under a *Davilla* weighing of the equities analysis, there would be financial harm in decommissioning and/or removing the Osage Wind Farm Project. *Id.* ¶¶ 6-7. In response, counsel for Defendants stated that the OMC has received a lot of financial information from Osage Wind, LLC on the Project's construction and money made from the project. *Id.* ¶ 8. Therefore, Defendants did not see how the additional information requested in ROG Nos. 6 and 14 is necessary beyond what was already in the OMC's possession from Osage Wind, LLC. *Id.* ¶ 8. When asked whether Defendants were taking the position that Enel KS's and EGPNA's profits and investments were not at all relevant to a weighing of the equities analysis under *Davilla*, counsel for Defendants stated they were not taking position. *Id.* ¶¶ 9-10. Defendants would likewise not confirm that they would *not* be relying on this type of evidence or argument in summary judgment briefing or at trial. *Id.* ¶ 10. At the end of the meet and confer, Defendants stated they would be supplementing their production, and the OMC agreed to look further at this supplemental production, as well as past productions, to determine whether the requested financial information for EGPNA and Enel KS could be ascertained from the financial documents of Osage Wind, LLC. *Id.* ¶¶ 12-13.

### D.   Defendants' August 30 and September 14 Productions Did Not Include Information Responsive to ROG Nos. 6 and 14

Following the August 31 meet and confer, the OMC reviewed Defendants' entire production and noted, in a second deficiency letter to Defendants sent September 8, 2021, that Defendants' production was not sufficient as to ROG Nos. 6 and 14, as well as Request for

Production ("RFP") Nos. 83 and 84. Nagle Decl. ¶ 14; Intv. Pl.'s Sept. 8, 2021 Deficiency Letter Ex. 10. On September 9, 2021, Defendants' counsel stated that in response to the OMC's September 8 letter, Defendants "are preparing supplemental responses to RFPs 65, 83, 84, and 77[,]" but Defendants did not address the outstanding information requested in ROG Nos. 6 and No. 14. Sept. 9, 2021 Email from Sarah Stevenson Ex. 11; Nagle Decl. ¶ 15.

OMC's counsel responded to Defendants' September 9 email the same day, asking for an update on Defendants' supplemental production and clarity on what Defendants intended to provide therein. *See* Sept. 9, 2021 Email from Mary Kathryn Nagle Ex. 12. Further the OMC asked Defendants "to confirm with respect to Interrogatories 6 and 14, [if] Defendants [were] maintaining the position that Enel Kansas and EGPNA financials are not relevant to this litigation[.]" *Id.*

Without responding to counsel's question, on September 14, 2021, Defendants served Supplemental Responses. *See* EPGNA Second Suppl. Resp. Ex. 13. Counsel for the OMC reviewed this production and determined that it lacked any documents responsive to ROG Nos. 6 and 14 because it did not contain information specific to the profits made from or investments made to the Osage Wind Farm from either EGPNA or Enel KS. Nagle Decl. ¶ 18. Because the September 14 production did not contain information responsive to ROG Nos. 6 and 14, counsel for the OMC followed up on her September 9 email (to which there had been no response) and, on September 20, 2021, asked of Defendants' counsel: "Can you please clarify whether Defendants will be producing the requested documents related to EGPNA and Enel KS's profits/financials from the Osage Wind Farm Project (specifically what we discussed, and what the OMC wrote about in its August 26 letter)." Sept. 20, 2021 Email from Mary Kathryn Nagle Ex. 14.

In response, Defendants' counsel, on September 20, 2021, stated: "At this time, Defendants do not intend to supplement any responses to discovery requests that seek any financial information from EGPNA or Enel Kansas." Sept. 20, 2021 Email from Sarah Stevenson Ex. 15. In response, the OMC's counsel replied on September 21, 2021 stating:

> Just so we are clear on why Defendants are withholding the requested information (specifically Enel KS and EGPNA's profits from owning and operating the Osage Wind Farm, ROG No. 6, and the amount that EGPNA has invested in the Project, ROG No. 14), is it your position that this information is irrelevant? During our August 31 Meet and Confer, Defendants did concede the relevance of this information to a weighing of the equities under *Davilla*. If I recall correctly, Defendants took the position that information related to Enel KS and EGPNA's profits/financials/etc could be discovered through looking at the documents produced that show income to Osage Wind, LLC. We then went and looked at that information and could not deduce the actual amount in profits that Enel KS and EGPNA have accumulated from the Osage Wind Farm, nor can we say with certainty how much EGPNA has invested in the Osage Wind Farm Project to date.

Sept. 21, 2021 Email from Mary Kathryn Nagle Ex. 16. Further, the OMC asked Defendants to clarify whether they were changing their position from the August 31 Meet and Confer as to the relevance of EGPNA and Enel Kansas's financial information to the *Davilla* weighing of the equities. *Id.* Defendants' counsel responded by stating:

> We did not concede any type of document or information, specifically profit or investment information for EGPNA and/or Enel Kansas, is relevant (or not) to the *Davilla* analysis. We did agree to consider your request to supplement discovery responses further, and noted that you may have some of the requested information in your possession already. We have not changed the position stated in the meet and confer, and we did supplement our responses to Interrogatories 6 and 14 in the supplemental responses served last week.

Sept. 22, 2021 Email from Sarah Stevenson Ex. 17.

Although Defendants' counsel stated that Defendants "did supplement [their] responses to Interrogatories 6 and 14 in the supplemental responses served last week," *id.*, those supplemental responses (served on September 14) do not contain information that identifies an

8

absolute dollar amount of profits by year and Project profits as a percentage of EGPNA's total profits. Nagle Decl. ¶ 18. Nor do these supplemental responses identify the total amount that EGPNA has invested in the Project. *Id.* ¶ 18. Instead, Defendants continue to point only toward previous productions referencing Osage Wind, LLC's profits and investments in the Project. *Id.* ¶¶ 10, 18. Moreover, the OMC was unable to locate the information requested regarding EGPNA's financials (*i.e.,* EGPNA's profits and/or investments related to the Osage Wind Farm Project) within any of the documents Defendants produced responsive to Requests for Production Nos. 83 and 84. *Id.* ¶ 18.

Accordingly, the OMC has used more than reasonable efforts to meet and confer with Defendants, but the parties have been unable to resolve the dispute related to ROG Nos. 6 and 14, necessitating this Motion to Compel.

### III.    STANDARD OF REVIEW

"A party seeking discovery may move for an order compelling an answer, designation, [or] production" if "a party fails to produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iv). Rule 34 permits a party to serve a request within the scope of Rule 26(b) to produce designated documents and requires that the request "describe with reasonable particularity each item or category of items to be inspected" and "specify a reasonable time, place, and manner for the inspection and for performing the related acts." Fed. R. Civ. P. 34(a)(1)(A), (b)(1)(A)–(B). Rule 26(b) permits a party to seek and obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1).

"At the discovery phase of litigation 'relevancy' is broadly construed and a request for discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party." *Gavlik v. Am. Family Home Ins. Co.*, No.

07-CV-336-TCK-PJC, 2008 WL 11509963, at *1 (N.D. Okla. Jan. 11, 2008) (citing *Owens v. Sprint/United Mgmt. Co.*, 221 F.R.D. 649, 652 (D. Kan. 2004)). "When the requested discovery appears relevant, the party opposing discovery has the burden of establishing the lack of relevance by demonstrating that the requested discovery . . . does not come within the scope of relevance set forth in Fed. R. Civ. P. 26(b)(1), or that it is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Id.* (citing *Gen. Elec. Cap. Corp. v. Lear Corp.*, 215 F.R.D. 637, 640 (D. Kan. 2003)). A motion to compel in the face of a relevancy objection must, therefore, be granted if a party fails to produce documents, unless the objecting party proves there is no possibility that the information may be relevant to a claim or defense. Here, Defendants are unable to demonstrate that the requested documentation regarding Enel KS's and EGPNA's profits is not relevant under a *Davilla* weighing of the equities analysis, and consequently, the OMC's Motion to Compel should be granted, and Defendants should be ordered to produce the requested documents as soon as is practicable.

## IV. ARGUMENT

### A. Enel KS's and EGPNA's Profits from the Wind Farm Are Relevant to a Weighing of the Equities under Davilla

This Court has held that the standard for determining injunctive relief in this case will be the "balancing of the equities" standard articulated by the Tenth Circuit in *Davilla v. Enable Midstream Partners, L.P.*, 913 F.3d 959 (10th Cir. 2019). *E.g.*, Aug. 25, 2021 Order 20, Dkt. 264. Thus the Court's inquiry will consider:

(1) whether an injunction is necessary to prevent irreparable harm,
(2) whether the threatened injury outweighs the harm that the injunction may cause to the enjoined party, and
(3) whether the injunction would adversely affect the public interest.

10

*Davilla*, 913 F.3d at 973. Any information relevant to that three-factor inquiry is discoverable. *See* Fed. R. Civ. P. 26(b)(1).

In making their case against injunctive relief under the second *Davilla* factor, it is hard to imagine that Defendants will not invoke the nearly $300,000,000 in costs they claim they would incur should the "equitable remedy of removal" be granted. Defs.' Partial Objs. to Mag. J.'s Ops. and Orders 12 n.9, Dkt. 218. And to be sure $300,000,000 sounds like an enormous sum, as does $290,229,611.70, which is the figure Osage Wind provided in its discovery responses to the United States. *See* Osage Wind's Resp. and Obj. to Pl.'s Fourth Set of Interrogs. and Requests for Prod. Ex. 18, at 6. However, without the financial information requested in ROG Nos. 6 and 14, there is no way to begin to understand what that number actually means for all three Defendants.

As an initial matter, it appears that about $223,000,000 of what removal would purportedly "cost the Defendants" consists of payouts to Osage Wind's investors. *See Id.* (listing "Free cash flow to equity" as $133,074,142.7, "Cash out to Tax partner" as $90,000,000.0, and "Cash out to Equity partner" as $31,500,000.0). Given Osage Wind is a wholly-owned subsidiary of Osage Wind Holding, which is a subsidiary of holding company Enel KS, which in turn is a wholly-owned subsidiary of EGPNA, it stands to reason that at least some of that $223,000,000 would find its way to Enel KS and EGPNA. *See* Defs.' Suppl. Corporate Disclosure Statement, Dkt. 126.

More to the point, the Court cannot evaluate the potential harm caused by the costs Defendants have identified without also knowing the numbers on the other side of the ledger. Other courts have recognized the importance of providing the Court with this exact context. For example, in *United States v. Ameren Missouri*, the Eastern District of Missouri found that the

11

balance of harms favored the party seeking the injunction despite the hefty price tag of compliance with the proposed injunctive relief. *See United States v. Ameren Missouri*, 421 F.Supp.3d 729, 815–16, 820 (E.D. Mo. 2019), *aff'd in part*, 9 F.4th 989 (8th Cir. 2021). In its analysis, the District Court considered the fact that both Ameren Missouri and its sole owner, Ameren Corporation, were "financially strong," further noting that although the price tag to install certain pollution reduction technology at Ameren Missouri's Rush Island plant would result in "about $200 million per year in capital costs over the four-year construction period plus an estimated $27 to $38 million in operating and maintenance costs," this was "only about half as large as Ameren's average annual dividend in recent years." 421 F.Supp. 3d at 798–99. Similarly with its Labadie plant, the District Court found that Ameren could "readily finance" the $55 million in capital investment and $53 million per year in operating costs with a fraction of the annual dividends it has issued in recent years." *Id.* at 816.

Other courts have recognized similar analyses are relevant when balancing the harms to the parties in considering whether to award permanent, injunctive relief. *See, e.g.*, *Commonwealth Sci. & Indus. Rsch. Organisation v. Buffalo Tech., Inc.*, 492 F.Supp.2d 600, 606 (E.D. Tex. 2007) (recognizing that permanent injunction will only affect 11% of defendant's business); *Idaho Conservation League v. Magar*, No. 3:12-CV-00337-CWD, 2015 WL 632367, at *8 (D. Idaho Feb. 13, 2015) (Court finding balance of harms favored issuance of an injunction against defendant for defendant's failure to get necessary permit under the Clean Water Act where the Court was "unpersuaded" there would be a financial hardship on defendant after reviewing defendant's "substantial" unencumbered assets and monthly income); *Callaway Golf Co. v. Acushnet Co.*, 585 F. Supp. 2d 600, 622 (D. Del. 2008), *aff'd in part, vacated in part*, 576 F.3d 1331 (Fed. Cir. 2009) (noting permanent injunctive relief would be a "subtle" harm on

12

defendant where "defendant's corporate parent…is a multi-billion dollar conglomerate.");

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 14-CV-02061-H-BGS, 2018 WL

9903323, at *10 (S.D. Cal. Aug. 13, 2018), *aff'd*, 784 F. App'x 786 (Fed. Cir. 2019), and *order*

*dissolved*, No. 14-CV-02061-H-BGS, 2020 WL 6561431 (S.D. Cal. Nov. 9, 2020) (finding

balance of hardships weighed against defendant and permanent injunction was necessary where

defendant "and its parent company [ ] have tens of millions of dollars in cash and a total market

cap exceeding two billion…").

There can be no doubt that the information requested in ROG Nos. 6 and 14 will be

relevant to the Court's consideration of the weighing of the equities under *Davilla*, as the Court

works to put Defendants' claims that removal will cost them $300,000,000 in the proper context,

and ultimately, determine whether the financial consequence of removal (or decommissioning)

will be as devastating as Defendants would like the Court to believe.

**B.      EGPNA Cannot Satisfy Its Own Discovery Obligations By Pointing To Discovery Concerning Osage Wind's Profits**

In Defendants' August 30 Letter, Defendants claim that there is no duty to produce

information responsive to ROG Nos. 6 and 14 because information related to Osage Wind's

profits has been produced and that satisfies Defendants' duty to respond to the OMC's discovery

requests. Defs.' Aug. 30, 2021 Letter Ex. 9, at 2. Specifically, during the parties' August 31 Meet

and Confer, Defendants' counsel informed the OMC that documents produced documenting

Osage Wind's profits would demonstrate the amount in profits EGPNA and Enel KS have made

from the Osage Wind Farm Project, and this would satisfy Defendants' obligations under ROG

Nos. 6 and 14. Nagle Decl. ¶¶ 8–10. As described in greater detail above, the documents

produced by Defendants relating to Osage Wind's profits do not identify how much EGPNA

(and by extension, Enel KS) have made in profits from the Osage Wind Farm, much less allow a

factfinder to understand what financial impact certain remedies (such as ejectment) may have on all three Defendants—information that is essential for a proper weighing of the equities.

Next, Defendants further claimed that they "have already produced exhaustive information regarding Osage Wind, LLC's investments in constructing the project through the construction contract and investment in wind tower turbines, and financial information from defendant Osage Wind, LLC." Defs.' Aug. 30, 2021 Letter Ex. 9, at 2. These documents, alone, do not satisfy Defendants' obligation to produce information and documents that demonstrate the amount in profits that EGPNA (and Enel KS) have received from the ongoing operations of the Wind Farm Project, or the monies these two entities have invested.

First and foremost, the August 30 Letter's vague references to "the construction contract and investment in wind tower turbines" only *supports* the OMC's position that EGPNA's and Enel KS's profits and investments are relevant in this litigation, above and beyond what Osage Wind may have invested or received in profits. Defendants deflect to the "construction contract," but the Construction Management Agreement signed between EGPNA and Osage Wind merely demonstrates that Osage Wind contractually transferred all authority and control over the Osage Wind Farm to EGPNA. *See* Construction Management Agreement dated as of Aug. 19, 2014 between EGPNA and Osage Wind ("CMA") Ex. 19. Nothing in the CMA supports Defendants' assertion that producing documents related to Osage Wind absolves them of any duty to produce documents related to EGPNA and/or Enel KS.

Osage Wind and EGPNA entered into the CMA on August 19, 2014—just before construction and excavation for the wind tower turbines began on the Osage Mineral Estate. Sept. 16, 2014 Email from EGPNA Project Coordinator Ex. 20, at OSAGE WIND-018666 (reporting on that "areas will be charged and shot, hopefully by the end of the week"). Under

14

CMA § 2.2, titled Construction Management, Defendants agreed that "the Construction Manager [EGPNA] is hereby authorized and obligated to perform, the following services on behalf of the Company [Osage Wind] . . . ." CMA § 2.2 Ex. 19, at EGPNA-000009. One of the "following services" that both Osage Wind and EGPNA agreed EGPNA would undertake includes "*obtaining*, maintaining, administering and preserving in full force and effect and performing any obligations of the Company [Osage Wind] under, *all necessary Permits*, in connection with the construction of the Project . . . ." *Id.* § 2.2(i) at EGPNA-000011 (emphasis added). Thus, the CMA establishes that obtaining permits, or a lease, for the construction of the Osage Wind Project was EGPNA's obligation, not Osage Wind's.

It is hard to imagine why Defendants believe that producing the CMA absolves them of their duty to produce documents showing EGPNA's and Enel KS's profits and/or investments in the Osage Wind Farm. Nothing in the CMA refers to any information related to profits, profit sharing, or how profits would be funneled from Osage Wind to EGPNA and/or Enel KS. *See* CMA Ex. 19. Nothing in the CMA refers to investments EGPNA and/or Enel KS made to fund the construction of the Osage Wind Farm. It is clear that the "construction contract" does not contain information responsive to ROG Nos. 6 and 14.

The CMA does, however, demonstrate that Defendants' attempt to hide the profits of EGPNA and Enel KS behind Osage Wind is absurd, nonsensical, and baseless. As the CMA demonstrates, if the profits of any of these three entities are to be considered relevant under a *Davilla* weighing of the equities analysis, it would be the profits of Enel KS and EGPNA, since they are the entities that actually carried out the trespass. Time and time again, documents produced in this case, as well as deposition testimony, confirm that Osage Wind was nothing more than a corporate shell. It was EGPNA and Enel KS—*not* Osage Wind—that invested the

15

funds necessary to construct the Osage Wind Farm Project, decided whether or not the Osage

Wind Farm Project would obtain a lease from the OMC, and ultimately, decided to continue with

excavation and rock crushing of Osage Minerals in October 2014, despite the fact that the United

States Department of the Interior instructed EGPNA to stop. The profits that EGPNA and Enel

KS made from their illegal wind farm are relevant to a weighing of the equities analysis under

*Davilla*.

Indeed, a simple review of the discovery to date underscores the reality that there is no

rational reason to permit Defendants to withhold documents and information related to EGPNA

and Enel KS on the basis that documents related to Osage Wind, alone, suffice.

1.    **EGPNA's and Enel KS's Involvement in and Direction of the Project Pre-dates Enel KS's Ownership of the Project.**

EGPNA and Enel KS's early involvement in the Project supports the OMC's assertion

that evidence related to how permanent equitable relief may or may not impact EGPNA and Enel

KS remains relevant under a weighing of the equities *Davilla* analysis. As early as 2006,

EGPNA and Enel KS partnered with TradeWind to develop wind farm projects. *See* Freeman Tr.

Ex. 21, at 18:17-19:1; Gilhousen Tr. Ex. 22, at 15:4-17; Heredia Tr. Ex. 23. at 88:18-20

("TradeWind and Enel Green Power were, to use the term loosely, partners in the

development."); Enel Kansas LLC Limited Liability Company Agreement Ex. 24, at OSAGE

WIND-041255-57. At that time, EGPNA negotiated an agreement with TradeWind by which

Enel agreed to fund TradeWind's project development of wind farms. Freeman Tr. Ex. 21, at

106:16-23 ("[A]ll of TradeWind's capital funding for development came . . . from Enel or -- and

or/revenue from sales of projects."); Gilhousen Tr. Ex. 22, at 15:8-17 ("[W]e needed an

institutional investor that could really fund the business appropriately relative to what we were

trying to accomplish in the business we were in. Wind projects are very capitally intensive.");

16

Champagne Tr. Ex. 25, at 222:13-14 ("Well, Enel Green Power essentially provided funding to Trade Wind to do a lot of what they do."). In return, Enel had the first right of refusal to purchase, construct, and own projects that TradeWind had developed. Freeman Tr. Ex. 21, at 19:6-21:1 ("As it happened on the wind side, we sold the vast majority of our projects to Enel, which is, you know, probably not surprising."); Gilhousen Tr. Ex. 22, at 17:24-18:4.

The Osage Wind Farm Project followed this same structure. Indeed, TradeWind's purchase of the Project on Aug. 22, 2013, was guaranteed by EGPNA and approved by EGPNA's board of directors. *See* Aug. 22, 2013 Membership Interest Purchase Agreement ("2013 MIPA") Ex. 26, at OSAGE WIND-021250, 021258. The purchase was also approved by TradeWind's board of directors, which at the time included EGPNA's then Chief Commercial Officer Mike Storch and at least one other Enel executive.[3] *See id.*; Storch Tr. Ex. 27, at 49:25-50:11.

Enel KS provided funding to TradeWind for the Osage Wind Farm Project as early as November 21, 2013, in the Osage Project Loan Agreement ("OPLA"), which explicitly recognized the "expectation that [Enel KS] or its designee will subsequently acquire the Project from [TradeWind]." Apr. 14, 2014 Letter Agreement between EGPNA, Enel KS, TradeWind and Osage Wind ("Letter Agreement") Ex. 28, at OSAGE WIND-021240 (quoting OPLA § 3.5).[4] Under the OPLA, EGPNA was "jointly and severally liable . . . for the full and timely payment of and performance of [Enel KS's] obligations." Apr. 14, 2014 Amended and Restated Osage Project Loan Agreement ("April 2014 Am. OPLA") Ex. 29, at OSAGE WIND-040158,.

---

[3] When EGPNA became a minority owner in TradeWind, "part of what was agreed to is a board that Enel would have board seats on." Freeman Tr. Ex. 21, at) 83:25-84:2.

[4] Because Defendants have not produced the November 21, 2013 Osage Project Loan Agreement, the OMC cites to the recitation of the November 2013 provision in the April 14, 2014 Letter Agreement among EGPNA, Enel Kansas, TradeWind, and Osage Wind.

In recognition of TradeWind's intended role as nothing more than the Project developer, the OPLA *prohibited* TradeWind from "allow[ing] Osage [Wind] to undertake . . . [certain] actions relating to the Osage Project without the prior written approval of [Enel KS]," including "finalizing any material permit," "submitting comments with respect to any permit or environment assessment," "issuing any press releases with respect to Osage [Wind], the [] Project, or related permitting process or with respect to the Osage Nation," and "issuing any limited or full notice(s) to proceed under any construction contract."[5] *Id.* at OSAGE WIND-040162–63. Under this OPLA that both TradeWind and Enel KS signed, TradeWind could *not* get a permit or lease from the OMC for the Osage Wind Farm without Enel KS's written consent. *See id.*; Dean Tr. Ex. 30, at 99:16-21 (testifying that a permit from the OMC would qualify as a "material" permit). Notably, none of TradeWind's witnesses could identify a time when Enel KS ever gave its written consent for TradeWind to obtain a mining lease from the OMC. *See, e.g.*, Venturini Tr. Ex. 31, at 69:13-17.

Under the OPLA, TradeWind would either have to seek such approval from its own board (which included EGPNA executives) or "directly" from Enel KS staff. Gilhousen Tr. Ex. 22, at 56:21-57:3 ("Enel was on the board, so the board could provide that authorization."). Because Enel Kansas did not and does not have its own employees, this meant that TradeWind sought the required written approvals under the OPLA from EGPNA employees. *See* Decl. of EGPNA General Counsel and Vice President of Legal and Corporate Affairs Megan Beauregard

---

[5] A limited notice to proceed "giv[es] a contractor some limited notice to move forward with a particular phase of a construction project or actions associated with a construction project." Such actions could include "purchasing a piece of equipment," "starting more detailed engineering," or "moving some dirt." Gilhousen Tr. Ex. 22, at 53:22-54:12. It's a way "of making sure the future buyer, i.e., Enel is comfortable with the decisions that Trade[W]ind is making with its money in the form of a loan." Freeman Tr. Ex. 21, at 117:6–9.

¶ 9, Dkt. 186-1, ("Enel Kansas was and is a holding company. Enel Kansas does not have separate employees. Rather, employees of [EGPNA] provide services for Enel Kansas . . . .").

The Letter Agreement—signed by TradeWind, Enel KS, and EGPNA executives on April 14, 2014—added further requirements that TradeWind grant control over construction of the Project to EGPNA. Letter Agreement Ex. 28, at OSAGE WIND-021240. After acquiring Osage Wind, TradeWind would "cause Osage [Wind] to appoint EGPNA . . . as project representative with respect to finalizing the Project design and engineering" and "agree to the role of EGPNA . . . in managing any construction-related activities and matters concerning the Project" until September 30, 2014. *Id.* at OSAGE WIND-021241. However, TradeWind and Osage Wind would still be "invited to attend" meetings with the construction general contractor and "kept advised" of the construction contract negotiations. *Id.* Finally, the Letter Agreement required Osage Wind to give "due regard to the recommendations of EGPNA as the anticipated construction manager for the Project . . . and the role of Enel Kansas as both lender and anticipated Project owner." *Id.*

TradeWind giving EGPNA control over the design and construction of the Project made sense because "Tradewind was never in the business of constructing projects or operating projects" and was "always completely out [following the] preconstruction phase." Freeman Tr. Ex. 21, at 21:4-7; *id.* at 118:23-24 ("Tradewind was not involved in construction, to be clear."); Gilhousen Tr. Ex. 22, at 130:3-4 ("[O]ur job was to develop projects, not to engineer and construct and operate."). And, in fact, TradeWind "didn't have any people . . . that knew anything about construction, they never did construction." Freeman Tr. Ex. 21, at 119:10-13.

Thus, EGPNA exerted control over finalizing the design of the Osage Wind Farm Project, including making all final determinations as to construction plans, after EGPNA signed

the Letter Agreement in April 2014. *See, e.g.*, Sept. 20, 2014 Email titled "Osage Wind Farm: Conventional vs. Special Foundation - Accounting Ex. 32, at OSAGE WIND-021426 ("ENEL requested that we eliminate the borrow pits that were part of the original design."); June 24, 2014 Email titled "RE: Osage: LNTP 14" Ex. 33, at OSAGE WIND-18399-403 (discussion of foundation re-design to comply with EGPNA specifications); July 9, 2014 Email titled "Osage: Fill Material" Ex. 34, at IEA-00227119-21 (EGPNA requesting commitment from contractor regarding cost impact of importing backfill); May 16, 2014 Email titled "Osage Wind Farm" Ex. 35, at HOOPER-0005202 ("Enel has purchased the project and is changing a lot of the design that we had previously done."); Sept. 2, 2014 Email titled "Osage: Rock crushing" Ex. 36, at OSAGE WIND-019901 ("It is my understanding that Enel/Tradewinds does not want any crushing due to mineral right issues."). And, as discussed above, "obtaining . . . and performing any obligations of the Company under all necessary Permits, in connection with construction of the Project" explicitly became EGPNA's responsibility when it signed the CMA with Osage Wind on August 19, 2014.[6] CMA Ex. 19, at EGPNA-000011.

## 2. EGPNA Made the Decisions to Commence Dynamite Blasting and Rock Crushing of the Osage Mineral Estate and to Continue After Receiving Superintendent Phillips's Letter

Enel KS purchased the Osage Wind Farm Project on September 17, 2014. *See* Enel Kansas Membership Interest Purchase Agreement ("2014 MIPA") Ex. 37, at OSAGE WIND-021123. Concurrently with the purchase, all of Osage Wind's officerships were filled by EGPNA employees: Francesco Venturini, Rafael Gonzalez, Mike Storch, Steve Champagne, Gianfranco Butera, Bill Price, Stephen Pike, and David Post. *See* Third Amended and Restated Limited

---

[6] The OMC discussed EGPNA's control over the Project as evidenced by the Construction Management Agreements and Management Services Agreement in its First Motion to Compel Defendants. *See* Defs.' Resp. to the Osage Minerals Council's Mot. to Compel 4–7, Dkt. 189.

Liability Company Operating Agreement of Osage Wind, LLC ("Osage Wind Operating Agreement") Ex. 38, at OSAGE WIND-041272. Osage Wind had no employees at that time or any relevant time after. 2014 MIPA Ex. 37, at OSAGE WIND-021140,; Storch Tr. Ex. 27, at 70:20-22; Heredia Tr. Ex. 23, at 38:18-21 (stating "there weren't specific Osage Wind, LLC employees."); Venturini Tr. Ex. 31, at 25:11-19 ("I would say 100 percent of employees were at the Enel Green Power North America level.").

Blasting in preparation for pouring the turbine foundations began shortly after the purchase. Sept. 16, 2014 Email from EGPNA Project Coordinator Ex. 20, at OSAGE WIND-018666 (reporting that "areas will be charged and shot, hopefully by the end of the week"). Rock crushing to develop backfill suitable for stabilizing the turbines was underway by September 25, 2014. Sept. 29, 2014 Email titled "Bureau of Indian Affairs" Ex. 39, at OSAGE WIND-019900.2 (contractor reporting to EGPNA Project Coordinator that BIA had inquired as to whether EGPNA "filed for a permit with the minerals council for our crushing operation that took place on 9-25-2014").

Notably, EGPNA employees made all strategy decisions with respect to the response to BIA's inquiries regarding the excavation process. *See, e.g.*, Oct. 16, 2014 Email Ex. 40, at OSAGE WIND PRIV-000114-15 (exchange among EPGNA employees and legal counsel regarding response to letter from BIA Superintendent Robin Phillips). In particular, Bill Price, EGPNA Vice President of Engineering & Construction, has been identified as the person who approved continuing excavation in defiance of Superintendent Phillips's October 9, 2014 demand to EGPNA that it "refrain from any further excavation of minerals until such time that you have obtained a Sandy Soil Permit through the Osage Agency." Letter from Superintendent

21

Phillips Ex. 41, at OSAGE WIND PRIV-000243; Champagne Tr. Ex. 25, at 181:8-15. EGPNA, and not Osage Wind, made the decision to continue with excavation and rock crushing.

EGPNA's Mr. Price also authorized the change order approving the cost of blasting the Osage Mineral Estate with dynamite in "82 locations" and crushing the minerals so removed for use as backfill to stabilize the turbines. Dec. 1, 2014 EGPNA Change Order Request Ex. 42, at OSAGE WIND-019012. The change order that Mr. Price approved states that EGPNA decided to utilize rock crushing, as opposed to importing minerals from offsite, because "[i]mporting material was also not advised by EGP NA Legal Dep[artment]" out of concern that doing so "would have given credit to the Osage Nation's theory on the commercial use of soil[,]" a theory that EGPNA stringently opposed (and one that the Tenth Circuit ultimately endorsed). *Id*. at OSAGE WIND-019013; *see also* Heredia Tr. Ex. 23, at 100:2-7 (excavated rock was used "so that we didn't potentially trigger any sort of permits with the BIA").

All of this points to the fact that Enel KS's and EGPNA's profits are not just relevant but crucial to the weighing of the equities under *Davilla* because they were the companies actually engaged in the conduct necessitating injunctive relief. Notably, Enel KS owned the Osage Wind Farm Project at the time that the United States instructed Defendants to cease their excavation activities on the Osage Mineral Estate and EGPNA made the decision to proceed with construction—in defiance of the United States' instructions. Osage Wind had little to no involvement in these decisions and activities—and with no employees, how could it? The idea, then, that only the profits of Osage Wind are relevant to a weighing of the equities under *Davilla* is absurd, if not irrational. As discussed above, a full weighing of the equities requires financial information from all three Defendants in this litigation, specifically with regards to what they invested in the Osage Wind Farm Project, any profits received, as well as the profits they

continue to receive—so that the Court can fairly compare them to the costs Defendants have identified related to removal or decommissioning.

Then, and only then, will the Court have a full picture of the potential impacts from the provision of permanent injunctive relief. Defendants have offered no legitimate basis to claim that this information, from Enel KS and EGPNA, is not relevant, nor have they demonstrated that it can be gleaned from documents relating to Osage Wind alone. Accordingly, EGPNA should be compelled to produce all information and documents responsive to ROG Nos. 6 and 14.

### C.      Defendants' Objections Based on Dkt. Nos. 161 and 162 are Meritless

Defendants also objected to ROG Nos. 6 and 14 on the basis that these two ROGs seek "information and documents that were beyond the scope of, and not relevant to, the remedies sought in the OMC's First Amended Complaint." Defs.' Aug. 30, 2021 Letter Ex. 9, at 1. Specifically, Defendants claim that ROG Nos. 6 and 14 "seek information beyond the Project" because they are designed "to re-litigate issues previously resolved by the Court in Dkt. # 161 and #162." *Id.* at 1-2 (citing Dkt Nos. 161, 162). The OMC however, is not seeking to re-litigate its previously dismissed claims such as disgorgement of profits or an accounting. Instead, the OMC is seeking this information because it is relevant to the OMC's claim for permanent injunctive relief (*i.e.*, ejectment, decommissioning, removal, *etc.*). And the very same orders that Defendants cite in opposition to this discovery also make clear that the OMC's request for permanent injunctive relief is very much alive and well in the OMC's First Amended Complaint. *See* July 1, 2020 Op. and Order Den. Pl.'s Mot. for Leave to File a Second Am. Compl. 15, Dkt. 161 (declining to dismiss the United States/OMC's claims seeking the removal of the wind farm structures and directing the parties to brief the "request for removal of materials and structures placed at a later date"); *id.* at 8 ("With respect to whether the Tenth Circuit decision [*United*

*States v. Osage Wind, LLC*, 871 F.3d 1078 (10th Cir. 2017)] limits the United States's/OMC to monetary damages, the court concludes that it does not.").

Indeed, there can be no question that the OMC's First Amended Complaint contains a request for permanent injunctive relief—including but not limited to ejectment, Intv. Pl. First Am. Compl. ¶ 101, Dkt. 164—and furthermore, as this Court has repeatedly concluded, this Court will apply the weighing of the equities analysis as articulated in the Tenth Circuit's decision in *Davilla*. *See, e.g.*, Aug. 25, 2021 Order 20, Dkt. 264 (citing *Davilla v. Enable Midstream Partners, L.P.*). And, as discussed in greater detail above, federal courts have concluded that total investments made and profits rendered from a project are relevant to a full consideration of a weighing of the equities, especially where Defendants have made assertions that permanent injunctive relief could cost as much as $300,000,000. *See* Defs.' Partial Objs. to Mag. J.'s Ops. and Orders 12 n.9, Dkt. 218. The statement that the requested discovery is "beyond the scope of, and not relevant to, the remedies sought in the OMC's First Amended Complaint" is patently false.

## V.   CONCLUSION

For the reasons stated above, the OMC respectfully requests that the Court grant the OMC's Motion to Compel.

Respectfully submitted,

s/ Mary Kathryn Nagle
Mary Kathryn Nagle, OBA No. 33712
Wilson Pipestem, OBA No. 16877
Abi Fain, OBA No. 31370
Jennifer S. Baker, OBA No. 21938
Shoney Blake, Cal. Bar No. 264981
Pipestem and Nagle Law, P.C.
401 S. Boston Ave., #2200
Tulsa, Oklahoma 74103
918-936-4705 (Office)
mknagle@pipestemlaw.com

24

wkpipestem@pipestemlaw.com
afain@pipestemlaw.com
jbaker@pipestemlaw.com
sblake@pipestemlaw.com
*Counsel for Intervenor-Plaintiff*
*Osage Minerals Council*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 29, 2021, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:


Ryan A. Ray
Joel L. Wohlgemuth
rar@nwcjlaw.com
jlw@nwcjlaw.com

-and-

Lynn H. Slade
Sarah S. Stevenson
Deana M. Bennett
Spencer L. Edelman
lynn.slade@modrall.com
sarah.stevenson@modrall.com
deana.bennett@modrall.com
spencer.edelman@modrall.com
*Counsel for Defendants*

David McCullough
dmccullough@dsda.com

Jeffrey S. Rasmussen
jrasmussen@ndnlaw.com

-and-

Wilson Pipestem
Mary Kathryn Nagle
Abi L. Fain
Jennifer S. Baker
Shoney Blake
mknagle@pipestemlaw.com
wkpipestem@pipestemlaw.com
afain@pipestemlaw.com
jbaker@pipestemlaw.com
sblake@pipestemlaw.com
*Counsel for Intervenor-Plaintiff,
Osage Minerals Council*

-and-

Thomas J. McCormack
Robin D. Ball
Robert Comer
Robert Kirby thomas.mccormack@nortonrosefullbright.com
robin.ball@nortonrosefullbright.com bob.comer@nortonrosefullbright.com
robert.kirby@nortonrosefullbright.com
*Counsel for Defendants*


Cathryn Dawn McClanahan
cathy.mcclanahan@usdoj.gov

*Counsel for Plaintiff, United States*

26

/s/ Mary Kathryn Nagle