## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    **And**

**OSAGE MINERALS COUNCIL,**

    **Intervenor-Plaintiff,**

**v.**

**OSAGE WIND, LLC;**
**ENEL KANSAS, LLC; and**
**ENEL GREEN POWER NORTH**
**AMERICA, INC.,**

    **Defendants.**

**Case No. 14-CV-704-GKF-JFJ**

### Plaintiff the United States' Motion to
### Determine Sanctions for Spoliation of Evidence

Plaintiff, the United States of America, moves the Court as follows to determine appropriate sanctions for Defendants' failure to keep critical measurements and records regarding their mining activities, as promised by them to the Court.

The Court well-knows the general history of this case. *See* Dkt. 264 at 1-5 ("Background and Procedural History"). Specifically relevant to this motion, in 2013, the Osage Minerals Council (OMC) wrote to the Osage Wind Project developer regarding the need for a "federal permit or lease" to undertake activities affecting the Osage Mineral Estate (OME). Exhibit 1 at 1. Therein, the OMC asked for specific information "to make the necessary regulatory determinations." *Id*. at 2.

That information included the types of solid materials at the Project site, the dimensions of excavation for turbines and ancillary Project features, the amount (in cubic yards) of solid materials excavated and any "on-site or off-site treatment of excavated" minerals (specifically including crushing). *Id*. These items were crucial for an accurate and prompt determination of the need for the "permit or lease." *Id*.[1]

When this litigation began in 2014, Defendants were actively engaged in blasting, excavating and destructing portions of the OME. In a December 2, 2014, filing (Dkt. 4 at 10), the United States specifically noted:

> [A]fter-the-fact calculation of monetary damages is made impossible here by the actions of the Defendants. Defendants are crushing the mined resources that they find during excavation and reusing them for other purposes to advance their commercial interests . . . . While they are relieving themselves of the burden of purchasing necessary materials on the open market, they are also eliminating the possibility of a fair measure of the quality and quantity of materials encountered and used.

Defendants acknowledged this concern that monetary damages would become increasingly difficult to calculate as they continued to ravage the OME. Dkt. 17 at 27 ("[t]he United States speculates about difficulty in calculating damages."). However, Defendants hastened to assure the Court that "Osage Wind's contractor has records of volumes crushed, and larger pieces of rock remain stacked at the pertinent

---

[1] Rather than respond with data, the developers responded that the OMC likely had a great deal of information already. Dkt. 17-2 at 42, Wind Capital Group, LLC CEO Boyce's Oct. 28, 2013 letter. This immediate, uncooperative and dismissive response is less important here than the notice given by the OMC of the specific types of information and records that would be critical. Moreover, Defendants' General Counsel confirms they anticipated litigation regarding the Project "specifically including, but was not limited to, the issues presented by the Andrew Yates letter of October 10, 2013." Dkt. 186-1 at 8, ¶ 25.

foundation site." *Id.* Indeed, Defendants' Site Coordinator Bill Moskaluk submitted a Declaration to verify that such records were being kept contemporaneous with construction.[2]

In the usual course of construction, "as built" drawings or surveys are separate and apart from the planning phase. Precise construction activities, including any changes from the blueprint or plans, are recorded.[3] As Mr. Moskaluk testified:

> Q: Okay. Would as-builts be kept for all aspects of the construction process for a wind project, based on your experience?
>
> A: Yes.
>
> . . .
>
> Q: But if there was a deviation in the amount of what was actually excavated versus what the plans called for, you believe it should be documented?
>
> A: Yes.

Exhibit 3, Moskaluk Deposition Transcript at 31 (118:17-20 and 121:2-5). In fact, he testified it is "a customary practice to have as-builts or to have as-builts for the construction process." *Id.* at 31 (118:13-16). As to the Osage Wind site, he agreed he told the Court the volume of crushed rock would be recorded, as is industry standard. *Id.* at 13 (47 - 49).

---

[2] "An individual crusher is deployed to a specific excavation site to crush the pieces of rock less than 3 feet long to a size of roughly 3 inches or less. The contractor records the volume of rock crushed and the rock is then stored at the site." Dkt. 17-1 at 5, ¶15(a)(ii)].

[3] In this case, all parties know there were massive changes from planning through implementation. For example, plans originally calling for blasting to prepare 27 turbines expanded to 55 foundation locations in a December 9, 2014, Change Order. Exhibit 2.

Rock blasting expanded beyond its anticipated scope because, as Mr. Moskaluk admitted, the soils report prepared before excavation began "didn't reflect actual conditions." Exh. 3 at 33 (126:14-15). In fact, when they put "the first bucket down to dig our hole," the project had to "stop and regroup" because of the rock encountered. *Id.* at 11 (41:4-6). It could not be excavated "normally." *Id.* at 11 (41:11). Defendants were caught "by surprise" that the pre-excavation report being used "was not reflective of the actual materials" encountered. *Id.* at 34 (131:10-12).

This unexpected switch from traditional excavation methods to blasting most of the sites is important. Mr. Mazurowski, contractor IEA's on-site project manager, testified "all rocks that are blasted" must "be crushed" for "re-use." Exhibit 4 at 12 (42:12-16), Mazurowski Deposition Transcript. Traditional excavation methods would not have called for such processing of the mineral estate. *Id.* at 12 (42-43).

Sadly, it is now apparent no records of the volume of crushed rock were kept. The United States' expert and Defendants' own expert searched high and low for some record that reflected the actual excavation performed at Defendants' direction. In his report, Defense expert Mr. Pfahl candidly admits no as built surveys are available. And so, he notes, "[t]he size and associated volume of each excavation remains uncertain." Exhibit 5 at ¶ 47, Expert Opinion Report of John Pfahl. Despite earlier representation to the Court that records were being kept and despite Defendants' clear understanding of the importance of keeping records, any hope of a completely accurate account of what materials they excavated is gone.

4

As for Mr. Moskaluk, he now testifies the Declaration he submitted to the Court was prepared by others; he is unfamiliar with terms used in the document; and, information contained in it were held by upper management and never "on the site level." Exh. 3 at 7(23) to 9(33). The document was put in front of him to sign when he was a new employee. *Id.* at 15(54). Having thought the volume of rock crushed "would probably be in the as-built drawings someplace," he was surprised that no as-built or records of mineral volume and manipulation are available. *Id.* at 15 (56:22-23), 31 (121:8-13).

Mr. Mazurowksi, as project manager and most senior on-site employee for the general contractor performing much of the excavation (Exh. 4 at 6 (18-20), testified no one from Osage Wind or Enel asked him to prepare "as-builts as it relates to the material that was excavated" or "measurements" of excavation (*Id.* at 15 (57:4-14)). Unhesitatingly, he admitted that if the specifications for material excavation changed and additional material was excavated, "there would be no documentation" of the deviation. *Id.* at 16 (58:18 to 59:5). "No one ever told [him] that records regarding the amount of materials to be excavated should be documented." *Id.* at 23(88:25 to 89:3). Importantly, Mr. Mazurowski agreed that had Defendants told him to document the amount of materials excavated, he would have. *Id.* at 23 (89:4-8).

The opportunity to preserve definitive measures and critical evidence in this case has passed. As Mr. Mazurowski testified, the backfill (consisting of the OME) used is critical to the structural integrity of the wind turbines:

Q: And would you agree that for the life of the wind farm, once that backfill's placed in there to support the turbine, the wind farm cannot continue to operate if that backfill were to be removed?

A: Yes. It would make it unsafe.

*Id.* at 25 (97:5-9).

As Defendants' Rule 30(b)(6) representative, Mr. Pike acknowledged the failure to record the volume of minerals excavated during the construction of the wind farm:

Q: Did the defendants record the actual volume of minerals excavated during the Osage wind project?

A: To my knowledge, no.

Exhibit 6, Pike Deposition Transcript at 30 (116:18-21). When questioned regarding Mr. Moskaluk's Declaration to the Court – promising volumes were being recorded – Mr. Pike, for Defendants, casually admitted Mr. Moskaluk was mistaken:

Q: My question is what is the defendants' belief or do the defendants know why Bill Moskaluk told the Court in December 2014 that rocks were being crushed when, in fact, the volume was not being recorded? I'm not asking for you to speculate. I'm asking is do the defendants know why this was said?

MR. BALL: I'm going to object that that's outside the scope of the witness' designation. He can say if he knows, but it's outside the scope of the witness' designation.

A: I don't -- I don't know. It may have been his belief that that was needed and being performed. Again, it wasn't.

*Id.* at 31 (120:10-23). This answer is particularly troublesome, given that Mr. Moskaluk expressly testified the Declaration was put in front of him for signature, and he trusted others had done the research. Defense Counsel also expressly directed

the Court to Mr. Moskaluk's Declaration to assure the Court the evidence of volumes of materials being crushed was being carefully recorded. Dkt. 17 at 27.

Finally, the following colloquy with Mr. Pike, as Defendants' corporate representative, shows that "typically" when someone is to be paid for volumes of excavated materials, such records would be kept:

> Q: So if minerals, the minerals that were to be excavated on a project, if reimbursements or payments would have to be made based on those minerals extracted, either the defendants or its subcontractors or contractors would record those volumes; is that correct?

> MR. BALL: Objection; mischaracterizes the witness' prior testimony. You can respond.

> A: Yeah. If a contract was such that they were being paid for volume, typically someone would make a calculation of the volumes that were excavated and to be paid.

Exh. 6 at 29 (113:6-17). Here, Defendants had no doubt but that the OMC claimed ownership of the minerals. Defendants knew the volume of excavation was at issue in this litigation – otherwise, they would not have asked Mr. Moskaluk to make the representation in his Declaration. They also full-well knew that in certain cases "typically someone would make a calculation of the volumes that were excavated and to be paid." Excavation was going on in real time as they made these representations to the Court. They chose to mislead the Court, let critical – and easily recordable - evidence become inaccessible and difficult (and costly) to recreate.

Defendants had notice and a clear chance to keep such accurate records, and, according to well-established caselaw and precedent, should now be foreclosed from

speculating to calculate damages. Defendants should not be allowed to speculate – at all – regarding the extent of excavation or the materials encountered.

Moreover, Defendants should bear the costs incurred by the United States in its endeavor to provide the Court with a professional estimate of what, and how much, materials were likely excavated. These costs could have been avoided had Defendants but taken the steps to keep careful measurements – as they promised, and were required by law, to do. [4]

## A.   The United States is entitled to an inference that its calculations related to excavation activities are correct.

Spoliation occurs when evidence relevant to litigation is destroyed, adversely impacting a litigant's ability to prove a portion of its claim. *See Patel v. OMH Medical Center*, 987 P.2d 1185, 1202 (Okla. 1999). *See also U.S. ex rel Koch v. Koch Industrial, Inc.*, 197 F.R.D. 463, 482 (N.D. Okla. 1998) (spoliation includes the intentional or negligent destruction or loss of tangible and relevant evidence, which impairs a party's ability to prove or defend a claim); *Manpower, Inc. v. Brawdy*, 62 P.3d 391, 392 (Okla.Civ.App. 2002) (spoliation occurs when relevant evidence is destroyed and affects litigant's ability to prove case). Generally, a litigant has a duty to "preserve evidence that it knows or should know is relevant to imminent or ongoing

---

[4] The United States is not seeking harsh sanctions, such as an instruction before a jury of an adverse inference (e.g. consciousness of guilt). *See, e.g., Chapman v. BOK Financial Corp.*, No. 12-CV-613-GKF-PJC, 2014 WL 3548844 (N.D. Okla. July 17, 2014). The United States is simply asking for a halt of the use of resources directed toward recreating measurements Defendants wantonly chose to not record, making them inaccessible to all parties. Allowing Mr. Pfhal's speculative testimony only helps Defendants fill a void of evidence they knowingly created.

litigation." *Koch*, 197 F.R.D. at 482. *See also Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991) (litigant must preserve what it knows or reasonably should know is relevant evidence). Here, there is no question Defendants knew about and expected the litigation, were in the process of excavating and promised the parties and the Court that careful records were created. Nonetheless, Defendants (and the contractor under their direct control) now admit no records were kept.[5]

When spoliation has occurred, the Court has the "inherent power to impose evidentiary and monetary sanctions as a means of controlling and supervising the litigation before them so as to achieve an orderly and expeditious disposition of the litigation." *Koch*, 197 F.R.D. at 482. One such evidentiary sanction is a negative inference against the party who committed the act of spoliation. Oklahoma law has long recognized the existence of an "adverse presumption that follows 'the destruction or spoliation' of evidence." *Beverly v. Wal-Mart Stores, Inc.*, 3 P.3d 163, 165 (Okla.Civ.App. 1999) (quoting *Harrill v. Penn*, 273 P. 235, 237 (Okla. 1929));

---

[5] The circumstances of this case are also akin to destructive testing cases. Here, Defendants engaged a contractor at the very time litigation was commenced (and ongoing), processing the OME and then rendering it inaccessible.

> When an expert employed by a party or his attorney conducts an examination reasonably foreseeably destructive without notice to opposing counsel and such examination results in either negligent or intentional destruction of evidence, thereby rendering it impossible for an opposing party to obtain a fair trial, it appears that the Court would be not only empowered, but required to take appropriate action, either to dismiss the suit altogether or to ameliorate the ill-gotten advantage.

*Barker v. Bledsoe*, 85 F.R.D. 545, 547-48 (W.D. Okla. 1979).

*Manpower*, 62 P.3d at 392 (destruction of evidence with no satisfactory explanation results in an inference unfavorable to the spoliator).

The nature of the conduct complained of and the importance of the evidence in question are used in determining the severity of the sanction. *See Koch*, 197 F.R.D. at 483 ("severity of the sanction selected should be a function of and correspond to the willfulness of the spoliator's destructive act and the prejudice suffered by the non-spoliating party"). Here, Defendants had been on notice for more than a year, before excavation, that the OMC contended mining regulations compelled Defendants to secure the permission of the OMC to massively excavate the OME. Osage Agency Superintendent Robin Phillips specifically directed Defendants to stop excavation on October 9, 2014. Dkt. 270-6. Despite the express language of the letter, Defendants continued their activities and failed to make any careful record of the minerals at issue. Defendants' destruction of this evidence is not only questionable, but it substantially impairs the plaintiffs' ability to prove the amount and character of minerals Defendants mined. Without relief, the United States is made to bear the burden of proving what the absent evidence would have shown. This burden is rightfully cast on Defendants, the party responsible for the loss of the evidence. Defendants have never produced records to contradict the reasoned opinion of the United States' eminently qualified geologic expert, and an inference as to the correctness of his reconstruction of the excavation activities should not be questioned by Defendants, the clear wrong-doers here.

10

**B.   Defendants should not be allowed to speculate regarding the excavation of the OME.**

The United States was forced to hire an expert to try to reconstruct what types of materials were encountered, mined, processed or replaced in each of 84 foundation sites. Mr. Freas, a geologist with over 40 years of experience, visited the site, and pored over the plans and documents Defendants *did* decide to keep. Still, no records expressly documented the amount of material excavated, crushed or used to repack and support each of the 84 turbine sites and ancillary Project infrastructure. Defendants also hired an expert, John Pfahl, who speculated regarding the amount of materials encountered during excavation and the type of materials Defendants used as backfill in the foundation sites. Mr. Pfhal could not help but make note of Defendants' astonishing lack of records and testified to the resultant and abiding uncertainty. Exh. 5 at ¶ 47 ("The size and associated volume of each excavation remains uncertain."); Exhibit 7, Pfahl Deposition Transcript at 13 (49), 15 (54). Nonetheless (and unsurprisingly), Mr. Pfhal, takes issues with some calculations and assumptions made by the United States' expert and seeks to revise Mr. Freas' calculations downward, to Defendants' benefit. Defendants should not benefit from the vacuum of information they purposefully and knowingly created.

Both experts must now resort to educated speculation thanks to Defendants' broken promises. Defendants cavalierly promised this Court to keep records, but discovery has confirmed they did not. Defendants should be prohibited from providing any testimony or argument on this issue, because, while anticipating

litigation, they utterly and without explanation failed to keep records they admit would be critical to any future damage calculation.

**C.     Had Defendants behaved lawfully, they would have had a regulatory obligation to maintain proper records. They should enjoy no benefit from their illegal behavior.**

"Sanctions for spoliation are also proper where a duty to retain records was mandated by law." *Hunter v. Big Rock Transportation, Inc.*, No. 08-CV-116, 2009 WL 10698513, at *7 (D. Wyoming Feb. 25, 2009). Clear regulations were in place that would have required Defendants to keep detailed records of their excavation activities:

> Lessee shall keep upon the leased premises accurate records of the drilling, redrilling, or deepening of all holes showing the formations, and upon the completion of such holes, copies of such records shall be transmitted to the superintendent by the lessee after the first completion and of any further drilling thereafter, and a failure to so furnish report within the time prescribed shall be considered a violation of the regulations. Lessee shall, before commencing operations, file with the superintendent a plat and preliminary statement of how the openings are to be made and the property developed.

25 C.F.R. § 214.13(b). By ignoring the Superintendent's pleas to obtain permission before the excavation and mining, Defendants also granted themselves relief from keeping "accurate records" or filing a "plat and preliminary statement."

**D.     The United States has suffered prejudice due to Defendants' treatment of critical evidence.**

Time and money have been wasted with two experts wrangling over an educated estimate of the type of minerals encountered and even the extent of the excavation. As Defendants' own expert candidly stated: "[E]xtrapolating a blast pattern to an

excavated volume includes significant uncertainty." Exh. 5 at ¶ 50. Mr. Moskaluk originally told this Court that excavation of the holes measured 10 feet deep and between 50 and 60 feet in diameter. Dkt. 17-1 at 5. Defense expert, Mr. Pfahl (who never visited the site), used a measurement of "70 feet in diameter by 10 feet in depth." Exh. 5 at ¶ 51. And, despite a considerable amount of testimony in this case calling into question the geotechnical report prepared pre-excavation, Mr. Pfhal relied on that report to determine the quality of mineral excavated. *Id*. at ¶ 52.

Mr. Freas, the United States' expert, shared some commonalities with Defendants' counterpart, Mr. Pfahl. Both agree on and employed the same valuation methodology, despite differences in their respective calculations. *Id*. at ¶¶ 96, 103; Exh. 7 at 43 (166:15-167:1) (Mr. Pfahl noting he and Mr. Freas used "the exact same methodology" regarding comparable transactions). However, after digging into their respective opinions, Mr. Freas' analysis was the more detailed and complete.

First, Freas identified three types of minerals that were excavated and used as support for the installed structures, while Mr. Pfahl only identified one type and attempted to distinguish the other two minerals. Exh. 5 at ¶ 99. Capturing Defendants' manipulation and use of all three minerals is warranted, as the Tenth Circuit determined "'mineral development' includes acting upon the minerals to exploit the minerals themselves" - precisely what Defendants did here to support their infrastructure. Dkt. 78 at 23. Second, Mr. Freas visited the site and estimated particularized excavation volumes for each of the 84 turbine towers, while Mr. Pfahl made a general estimate and only applied it to 82 towers. *Id.* at ¶¶ 100-01; *see also*

Exhibit 8, Freas Deposition Transcript at 16 (58:16-59:10). Third, beyond all 84 turbine towers, Mr. Freas included transmission lines, collector systems, and substations in his calculations, compared to Mr. Pfahl selectively capturing 82 towers. Exh. 5 at ¶ 101. Yet again, Mr. Freas' analysis was demonstrably more comprehensive in considering each of the turbine locations individually and assessing the mineral development related to the ancillary infrastructure. Finally, Mr. Pfahl criticizes Mr. Freas' use of the current royalty rate (*Id.* at ¶ 102); however, such approach is specifically authorized by statute. *See* 23 O.S. § 64(2); *see also* Appellate Decision, Dkt. 78 at 19-20. In sum, Freas' particularized approach is more reasonable and better aligned with the law of the case defining mining.

If Defendants had simply lived up to their promise to the Court and the parties in 2014, no speculation or controversy would exist. There should be records that a certain amount of limestone, of shale and of clay was encountered – all relating to turbine and ancillary infrastructure excavations that resulted in such minerals' exploitation and manipulation. There should also be records about what became of the minerals, including precise volumes of minerals crushed.

A recently decided case involved an injury and critical evidence of an outlet's threaded fitting. Defendant EOG had the fitting but then could not find it during litigation. The Court noted the prejudice emanating from the loss of evidence:

> Without examining the actual threaded fitting used in this case, the parties are unable to say what type the fitting was, and therefore whether Defendants were negligent or whether they acted with willful and wanton disregard. The missing evidence does not touch on a tangential issue - it touches on *the* issues in this case. Defendants characterize this prejudice

14

as minimal, but the Court disagrees. Because the Court finds Plaintiff is
prejudiced by EOG's spoliation of the threaded fitting, spoliation
sanctions are appropriate.

*Johnson v. EOG Resources, Inc.,* No. 18-CV-123, 2020 WL 10356190, at *7 (D.

Wyoming Jan. 27, 2020) (italics in original). Similarly, here, *the* issue remaining

centers on the damage done (i.e. the extent of excavation) by Defendants. The

*Johnson* Court imposed limitations of testimony and payment of fees but declined to

completely disallow the expert testimony proffered by EOG because such a ruling

would have been "dispositive-like." *Id.* at *8. Here, of course, neither Mr. Pfhal nor

Mr. Freas give testimony that eliminates (or establishes) liability, but their testimony

is critical to determine the extent to which the OME was excavated. The requested

remedy – eliminating the speculative testimony of Defendants' expert – is reasonable.

### E. The Court should remedy Defendants' wanton spoliation of critical evidence.

Spoliation sanctions are proper when "(1) a party has a duty to preserve evidence

because it knew, or should have known, that litigation was imminent, and (2) the

adverse party was prejudiced by the destruction of the evidence." *Burlington N. &

Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007) (citation omitted). As

set out above, both conditions exist in the instant matter.

If the offending party were "mere[ly] negligen[t]" in losing or destroying

evidence, the ultimate sanction of an adverse instruction regarding consciousness of

a weak case may not be applicable. *Henning v. Union Pac. R. Co.*, 530 F.3d 1206, 1220

(10th Cir. 2008). Here, it would be difficult to categorize Defendants' conduct as

merely negligent, given the explicit report to the Court that records would be kept on the very issue Defendants' expert now acknowledges is difficult to estimate with accuracy. However, even if Defendants' conduct does not rise to a level of "bad faith," a spectrum of remedies is available to the Court:

> Court-fashioned spoliation sanctions include, for example: an award of attorney fees; an order that the culpable party produce related documents regardless of any claims of privilege or immunity []; excluding evidence or striking part of a party's proof; allowing the aggrieved party to question a witness in front of the jury about the missing evidence []; and imposing costs for creating a substitute for spoliated data []. Such sanctions may be imposed even where evidence was lost or destroyed due to negligence, so long as the party seeking sanctions can show it suffered prejudice and the other side was on notice that the evidence should be preserved.

*Browder v. City of Albuquerque*, 187 F. Supp. 3rd 1288, 1295-96 (D.N.M. 2016) (citations omitted).

The Tenth Circuit has specifically held that a showing of bad faith was not necessary for exclusion of evidence:

> Defendant was not required to show that plaintiff acted in bad faith in destroying the evidence in order to prevail on its request for spoliation sanctions. The district court found that plaintiff had a duty to preserve the evidence because it knew or should have known that litigation was imminent, and defendant was prejudiced by the destruction of the evidence because there was no substitute for a direct visual examination of the busway. The district court also imposed the least severe sanction that would be appropriate to balance out the prejudice to the defendant.

*103 Investors I, L. P. v. Square D Co.*, 470 F.3d 985, 989 (10th Cir. 2006). Defendants concede they anticipated litigation on this particular issue. *See* Dkt. 186-1 at 8, ¶ 25. There will be no opportunity to examine the excavated materials and the mining pits Defendants' dug to place the turbine foundations and related ancillary Project

16

infrastructure. There are not even any careful records regarding the excavated material. The Court should exclude the speculation of Defendants' expert, who attempted to mend the uncertainty Defendants themselves created; order Defendants to bear the costs incurred by the United States' retention of expert Mr. Freas; and order whatever additional remedies the Court may find just and appropriate.

Respectfully submitted,

United States of America

Clinton J. Johnson
Acting United States Attorney

s/Cathryn D. McClanahan
Cathryn D. McClanahan, OBA No. 14853
Nolan M. Fields IV, OBA No. 31550
Assistant United States Attorneys
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119
T: 918-382-2700
cathy.mcclanahan@usdoj.gov
nolan.fields@usdoj.gov

Stuart P. Ashworth, OBA #31468
Special Assistant United States Attorney
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor's Office
7906 East 33rd Street, Suite 100
Tulsa, Oklahoma 74145
T: 918-669-7905
stuart.ashworth@sol.doi.gov

Of Counsel:
Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor's Office
7906 East 33rd Street
Tulsa, Oklahoma 74145
T: 918-669-7902
charles.babst@sol.doi.gov