**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| (2) OSAGE MINERALS COUNCIL, | ) | Case No. l4-CV-704-GKF-JFJ |
| | ) | |
| Intervenor-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1) OSAGE WIND, LLC; | ) | |
| (2) ENEL KANSAS, LLC; and | ) | |
| (3) ENEL GREEN POWER | ) | |
| NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**INTERVENOR-PLAINTIFF OSAGE MINERALS COUNCIL'S**
**BRIEF IN SUPPORT OF THE OSAGE MINERAL COUNCIL'S MOTION FOR**
**SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

I.   INTRODUCTION ..........................................................................................................1

II.  STATEMENT OF UNDISPUTED FACTS .........................................................................1

III. STANDARD OF REVIEW ............................................................................................10

IV.  ARGUMENT...............................................................................................................11

    A.  The OMC is Entitled to Judgment on Counts One and Two ..............................11

    B.  The OMC is Entitled to Judgment on Counts Three and Four...........................12

    C.  Permanent Injunctive Relief is Warranted........................................................13

        i.   An Injunction is Necessary to Prevent Irreparable Harm..............................13

        ii.  The Threatened Injury Outweighs the Harm that an Injunction May Cause.................16

        iii. An Injunction Would Serve, Not Adversely Affect, the Public Interest .......................17

    D.  Defendants Are Jointly and Severally Liable ....................................................19

    E.  Alternatively, if the Court Deems Permanent Injunctive Relief is Not Warranted, Hazel's Report Contains the Proper Calculation of Monetary Damages .......................................21

    F.  Defendants Did Not Reasonably Rely on the Advice of Their Counsel in Good Faith to Mitigate Damages...........................................................................................22

    G.  The OMC is Entitled to Attorney Fees ..............................................................25

V.   CONCLUSION. ...........................................................................................................25

## TABLE OF AUTHORITIES

### Cases

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) .......................................................................................... 19

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
    480 U.S. 531 (1987) ........................................................................................................ 19

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................................ 11

*Callaway Golf Co. v. Acushnet Co.*,
    585 F. Supp. 2d 600 (D. Del. 2008) ............................................................................... 17

*Cayuga Indian Nation of New York v. Pataki*,
    79 F. Supp. 2d 66 (N.D.N.Y. 1999) ............................................................................... 21

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................................................................ 11

*Commonwealth Scientific and Industrial Research Organisation v. Buffalo Tech., Inc.*,
    492 F. Supp. 2d 600 (E.D. Tex. 2007) ........................................................................... 17

*Davilla v. Enable Midstream Partners L.P.*,
    913 F.3d 959 (10th Cir. 2019) ............................................................................ 12, 13, 18

*Equifax Servs., Inc. v. Hitz*,
    905 F.2d 1355 (10th Cir. 1990) ...................................................................................... 14

*F.D.I.C. v. Moll*,
    848 F. Supp. 145 (D. Colo. 1993) .................................................................................. 20

*Hall v. Cole*,
    412 U.S. 1 (1973) ............................................................................................................ 25

*Idaho Conservation League v. Magar*,
    No. 3:12-cv-00337-CWD, 2015 WL 632367 (D. Idaho Feb. 13, 2015) ......................... 17

*Kiowa Indian Tribe of Okla. v. Hoover*,
    150 F.3d 1163 (10th Cir. 1998) ...................................................................................... 15

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................................................................ 11

*Oneida Cnty. v. Oneida Indian Nation of N.Y.*,
  470 U.S. 226 (1985) ...................................................................................12

*P.J.E.S. by & through Escobar Francisco v. Wolf*,
  502 F. Supp. 3d 492 (D.D.C. 2020) ...............................................................19

*Pacific Gas & Elec. v. State Energy Resources Conservation & Dev. Comm'n*,
  461 U.S. 190 (1983) ...................................................................................20

*Prairie Band of Potawatomi Indians v. Pierce*,
  253 F.3d 1234 (10th Cir. 2001) ......................................................................13

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  No. 14-cv-02061-H-BGS, 2018 WL 9903323 (S.D. Cal. Aug. 13, 2018) .....................17

*Project Hope v. M/V Ibn Sina*,
  250 F.3d 67 (2d Cir. 2001) .............................................................19, 20, 21

*Ravo v. Rogatnick*,
  70 N.Y.2d 305 (1987) ..................................................................................21

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*,
  32 F.3d 851 (10th Cir. 1994) .........................................................................24

*RoDa Drilling Co. v. Siegal*,
  552 F.3d 1203 (10th Cir 2009) .......................................................................14

*S.E.C. v. Melchior*,
  No. 90-C-1024J, 1993 WL 89141 (D. Utah Jan. 14, 1993) ...................................23

*Sac & Fox Nation v. LaFaver*,
  905 F. Supp. 904 (D. Kan. 1995) ...................................................................18

*Samgamo Biosciences, Inc. v. Cargolux Airlines Int'l, S.A.*,
  No. C-04-0672, 2005 WL 8177572 (N.D. Cal. Dec. 21, 2005) ..............................20

*Seneca-Cayuga Tribe of Oklahoma v. State of Oklahoma*,
  874 F.2d 709 (10th Cir. 1989) ..................................................................15, 18

*Shaw v. Cherokee Meadows, LP*,
  431 F. Supp. 3d 1336 (N.D. Okla. 2019) ..........................................................10

*Sw. Stainless, LP v. Sappington*,
  582 F.3d 1176 (10th Cir. 2009) .....................................................................14

iv

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
    805 F.2d 351 (10th Cir. 1986)................................................................................16

*United States v. Ameren Missouri*,
    421 F. Supp. 3d 729 (E.D. Mo. 2019)...................................................................17

*United States v. Gonzalez*,
    58 F.3d 506 (10th Cir. 1995)................................................................................24

*United States v. Osage Wind, LLC*,
    871 F.3d 1078 (10th Cir. 2017)........................................................2, 10, 11, 12

*United States v. Polytarides*,
    584 F.2d 1350 (4th Cir. 1978)..............................................................................24

*United States v. Torlaw Realty, Inc.*,
    483 F. Supp. 2d 967 (C.D. Cal. 2007), *aff'd,* 348 F. App'x 213 (9th Cir. 2009) ............22

*United States v. Van Allen*,
    524 F.3d 814 (7th Cir. 2008)................................................................................24

*United States v. Wenger*,
    427 F.3d 840 (10th Cir. 2005) .............................................................................22

*Universal City Studios, Inc. v. Nintendo Co. Ltd.*,
    615 F. Supp. 838 (S.D.N.Y. 1985)......................................................................24

*Winnebago Tribe of Nebraska v. Stovall*,
    216 F. Supp. 2d 1226 (D. Kan. 2002), *aff'd,* 341 F.3d 1202 (10th Cir. 2003)....15, 16, 18

*Wyandotte Nation v. Sebelius*,
    443 F.3d 1247 (10th Cir. 2006)...........................................................................15

## **Statutes**

Act of June 24, 1938, ch. 654, § 3, 52 Stat. 1035...........................................................15

Osage Allotment Act of June 28, 1906, 34 Stat. 539  ....................................................1

Osage Allotment Act of June 28, 1906 § 3, 34 Stat. 539, 543-44.................................1

## **Court Rules**

Fed. R. Civ. P. 56...........................................................................................................1, 10

Fed. R. Civ. P. 56(c) ...................................................................................................10

**Federal Regulations**

25 C.F.R. § 214 .........................................................................................................11

25 C.F.R. § 214.7 ...............................................................................................2, 11, 19

25 C.F.R. § 211 .........................................................................................................11

25 C.F.R. §166.812(c) ................................................................................................25

**Treatises**

Restatement (Second) of Torts § 879 (1979).................................................19, 20, 21

**Osage Law**

Osage Nation Const. art. XV, § 4 ..................................................................................1

## I.     INTRODUCTION

Intervenor-Plaintiff Osage Minerals Council ("OMC") files this brief in support of the

OMC's Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56. As described in greater

detail below, the OMC is entitled to judgment as a matter of law because no dispute of material

fact exists, and the undisputed facts demonstrate that Defendants are jointly and severally liable

for their continuing trespass on the Osage Mineral Estate. Defendants' attempt to circumvent

Osage laws and the authority of the OMC threatens to irreparably harm the Osage Nation's

sovereignty. Because the harm to Osage Nation's sovereignty greatly outweighs any financial

harm that could come to Defendants as a result of ejectment or removal, permanent injunctive

relief is the appropriate remedy to be issued in this case.

## II.     STATEMENT OF UNDISPUTED FACTS

1.  The Osage Nation is a federally recognized Tribal Nation whose sovereign existence pre-

dates both the United States and the State of Oklahoma. October 12, 2021 Declaration of Everett

Waller, Chairman of the OMC ("Waller Decl."), Ex. 1, ¶ 2.

2.  The OMC is an independent agency within the Osage Nation government created "for the

sole purpose of continuing its previous duties to administer and develop the Osage Mineral

Estate in accordance with the Osage Allotment Act of June 28, 1906, as amended." Osage Nation

Const. art. XV, § 4; Waller Decl., Ex. 1, ¶¶ 37-43.

3.  The United States, as Trustee, is charged with the administration, protection, and

management of the Osage Mineral Estate, the Indian trust asset at issue in this litigation. Act of

June 28, 1906 § 3, 34 Stat. 539, 543-44.

4.  Despite a history full of seemingly insurmountable atrocities over hundreds of years, the

Osage Nation has fought to preserve its sovereignty and has consistently exercise sovereignty

over the Osage Mineral Estate. Dkt. 264, 23-24 ("the Osage Nation has consistently exercised

sovereignty over the Osage Mineral Estate having never lost possession of it."); Waller Decl., Ex. 1, ¶¶ 3-27, 47, 49-50.

5.   Defendants in this case mined the Osage Mineral Estate without the lease that is required under federal law, specifically the regulation found at 25 C.F.R. § 214.7. *United States v. Osage Wind, LLC*, 871 F.3d 1078, 1092 (10th Cir. 2017).

6.   Despite receiving instruction from the Tenth Circuit in September of 2017 that Defendants were "required to procure a lease under 25 C.F.R. § 214.7," *id.* at 1093, Defendants have taken *no* steps to obtain the mining lease required under federal law. Heredia Tr., Dkt. 285-20, at 181:14-18; Price Tr., Ex. 2, 242:18-25; Gilhousen Tr., Ex. 3, 102:16-20.

7.   The Executives who exercised leadership and had decision-making authority over whether or not to obtain the lease pursuant to 25 C.F.R. § 214.7 continue to disagree with the Tenth Circuit's decision and continue to question the Bureau of Indian Affairs's ("BIA") jurisdiction. Weigel Tr., Ex. 4, 42:12-13 ("I still hold the position that no minerals were taken."), 133:5-6 ("I felt then and still feel strongly what we were doing was not mining"); Storch Tr., Dkt. 285-21, at 108:14-15, 19-21 ("[M]y opinion was and remains that we weren't mining. . . . I understand [the BIA] is a federal agency and so forth, but that doesn't mean they have jurisdiction.").

8.   Defendants claim that their decision to excavate and use Osage minerals without obtaining a lease from the OMC was made in good faith reliance on their attorneys, who undertook a "detailed legal analysis" at the time and informed Defendants that they believed no lease would be required. Dkt. 28, 19-20; Dkt. 116, 11; Dkt. 150, 10-11.

9.   The first draft of this "detailed legal analysis" is a memorandum dated October 31, 2013, and is authored by Sarah Stevenson, of the Modrall Sperling law firm. Ex. 5, OSAGE WIND

PRIV-000414 (hereinafter "OWP-").

10. No one at EGPNA, Enel Kansas ("Enel KS"), Osage Wind, or TradeWind Energy ("TradeWind") is aware of a single individual from any of these companies who ever asked the attorneys at Modrall Sperling to undertake this analysis, and many do not recall ever actually seeing the legal memorandum. Heredia Tr., Dkt. 285-20, at 59:18 ("I'm not sure specifically why [the 'detailed legal analysis'] was requested"); *Id*. at 107:21; Gilhousen Tr., Ex. 3, 96:9-10; Storch Tr., Dkt. 285-21, at 96:14 ("No. I don't remember who requested [the legal memorandum]."); Moskaluk Tr., Ex. 6, 146:3-19; Price Tr., Ex. 2, 33:13; Champagne Tr., Ex. 7, 131:3 (responding "I don't recall . . ." when asked who raised the permit issues with Modrall Sperling); Venturini Tr., Ex. 8, 71:21-72:15; Freeman Tr., Ex. 9, 164:18-20 ("I don't remember exactly how that decision was made [to seek outside counsel]"); Dean Tr., Ex. 10, 77:4-79:10.

11. Instead of Defendants, Darren Neil, a lawyer at Polsinelli, PC, retained the attorneys at Modrall Sperling for the purpose of undertaking the "detailed legal analysis." Ex. 11, OSAGE WIND-034644 (hereinafter "OW-"); *see also* Dean Tr., Ex. 10, 25:1-7.

12. By October of 2013, "[t]he Osage Tribe ha[d] indicated that it will assert Trade Winds Energy must receive a mining permit from the Osage Minerals Council in order to construct and operate the wind farm . . . ." Ex. 5, OWP-000415.

13. The October 31, 2013 version of the "detailed legal analysis" concluded that "construction of the wind farm does not require a permit from the BIA or the Osage Nation," while also noting that "there is no controlling authority on this point." *Id*.

14. The October 31, 2013 version of the "detailed legal analysis" described Defendants' methods of construction and excavation as follows: "To the extent any soil or other subsurface material is (touched) by Trade Winds, it is *merely incidental* to Trade Winds' construction of its

approved wind farm." *Id*. (emphasis added).

15. Enel KS and EGPNA employees and executives decided how the Osage Wind Farm would be constructed—not TradeWind and certainly not Osage Wind. Dkt. 285, 19-20.

16. As early as 2006, EGPNA negotiated an agreement with TradeWind by which Enel agreed to fund TradeWind's project development of wind farms, and in return, EGPNA had the first right of refusal to purchase, construct, and own projects that TradeWind had developed. Dkt. 285, 16-17.

17. When TradeWind purchased the membership interests in Osage Wind, LLC, in August of 2013 (thereby effectively purchasing the Wind Farm Project itself), the plan at the time was for Enel KS to purchase the Wind Farm after TradeWind finished developing and "de-risking" it. Freeman Tr., Ex. 9, 46:16-48:8 ("we were perfecting development, derisking . . ."); Dean Tr., Ex. 10, 17:16-20; Venturini Tr., Ex. 8, 68:19-69:05.

18. TradeWind Energy had no expertise in construction at the time it financed, owned, and developed the Osage Wind Farm. Freeman Tr., Ex. 9, 119:11-13 ("[W]e didn't have any people at Tradewind that knew anything about construction, they never did construction."); Gilhousen Tr., Ex. 3, 130:3-8.

19. Enel KS is a holding company, wholly-owned and controlled by EGPNA. Dkt. 189-2, ¶ 9

20. EGPNA and Enel KS effectively operate as the same entity, as Enel KS has no employees of its own, Enel KS is funded fully by EGPNA, and EGPNA Executives hold all officer positions for Enel KS and make all business decisions for Enel KS. Dkt. 189-2, ¶ 9.

21. In 2013 and 2014, Osage Wind owned the assets that constituted the Osage Wind Farm, but Osage Wind itself is just a corporate shell used by EGPNA and Enel KS to own and construct the wind farm, as Osage Wind has no employees of its own and makes no business

decisions separate and apart from those made by Executives at EGPNA and/or Enel KS. Dkt. 285, 21; Dkt. 189-2, ¶ 9.

22. EGPNA fully funded TradeWind's purchase of the Osage Wind Farm through the purchase of all of the membership interests in Osage Wind, LLC, and without EGPNA's funding, TradeWind would not have been able to make this purchase. Dkt. 285, 16-17.

23. Pursuant to the contracts Enel KS and EGPNA signed with TradeWind, TradeWind and Osage Wind could not get a permit from the OMC or the BIA for the Osage Wind Farm without first receiving written consent from Enel KS. Dkt. 285, 18 (citing Ex. 12, OW-040156 at 0162-0163).

24. None of Defendants' witnesses recall EGPNA or Enel KS ever giving written consent to TradeWind to obtain a lease from the OMC and/or the BIA. Dkt. 285, 18; *see, e.g.,* Venturini Tr., Ex. 8, 69:13-17.

25. Enel KS purchased the Osage Wind Farm in September 2014 by purchasing all of TradeWind's membership interests in Osage Wind, LLC. Dkt. 285-21; Dkt. 189-2, ¶ 8.

26. EGPNA became the formal construction manager for the Osage Wind Farm as of August 19, 2014, through a Construction Management Agreement that made EGPNA responsible for "obtaining . . . all necessary Permits in connection with the construction of the Project." Ex. 13, EGPNA-000025 at 0036.

27. EGPNA exercised control over construction of the Osage Wind Farm prior to August 19, 2014 through financing agreements. *E.g.,* Ex. 14, OW-014867, ¶¶ 2-4, Ex. 12 at 040163.

28. On October 9, 2014, the Superintendent of the Osage Agency, Robin Phillips, wrote to EGPNA and demanded that Defendants cease all excavation and rock crushing until an appropriate permit or lease for the excavation and use of minerals from the Osage Mineral Estate

was approved by the OMC and the BIA. Ex. 15, OWP-000243.

29. Enel KS was the legal owner of the Osage Wind Farm when the BIA instructed

Defendants to stop all construction activities and get a lease from the OMC. Ex. 16, OW-021119;

Ex. 15, OWP-000243.

30. EGPNA and Enel KS (and not Osage Wind) elected to continue with construction

without a lease after receiving the United States' instruction to stop. Champagne Tr., Ex. 7,

146:04-08 (stating it was EGPNA's Bill Price who elected to continue with construction); Price

Tr., Ex. 2, 153:20-154:06 (stating that EGPNA executives, including Francesco Venturini, made

the decision to continue construction).

31. The 2013 Membership Interest Purchase Agreement ("2013 MIPA") that allowed

TradeWind to purchase the Osage Wind Farm Project contained an atypical provision

that explicitly excluded all "Native American Tribes" from the definition of "Governmental

Authority" in the agreement. Ex. 17, OW-021248 at 021251[1]; Dean Tr., Ex. 10, 89:8

(TradeWind permit specialist stating it is not typical in her experience for the definition of

"Governmental Authority" to exclude Tribal Nations).

32. The categorical exclusion of "Native American tribe" from the 2013 MIPA served to

exclude a permit from the OMC from the list of "Permits" that the parties would obtain before

constructing and/or operating the Osage Wind Farm. Ex. 17, OW-021251, 021253; Storch Tr.,

Dkt. 285-21, at 40-41:25-7; Freeman Tr., Ex. 9, 68-69:17-8; Gilhousen Tr., Ex. 3, 42-43:25-6.

33. EGPNA's Board of Directors conducted due diligence on and approved the 2013 MIPA.

---

[1] Section 1.1 of the 2013 MIPA states that, "for the avoidance of doubt, no Native American tribe, nation, entity, body, organization, governmental or other authority, or any agency, division, ministry, instrumentality or authority thereof, shall be considered a 'Governmental Authority' for any purpose hereunder." *Id*. at 021251. Just four months earlier, in April 2013, Osage Wind contractually agreed that the Osage Wind Farm would not obtain a permit from the Osage Nation. *See* Dkt. 239-8, at 035627 ("the definition of 'Governmental Authority' shall not include the Osage Nation . . .").

Ex. 17, OW-021248, § 2.4(h), at 21258 ("The Board of Directors of . . .EGP[NA] shall have

approved this transaction in all respects . . . ."); Storch Tr., Dkt. 285-21, 49:14-17 (confirming

EGPNA Board approval); Champagne Tr., Ex. 7, 226-27 (describing EGPNA's due diligence).

34. EGPNA's Board of Directors approved and funded a transaction that explicitly excluded

a permit from the OMC from the list of permits that the Osage Wind Farm Project would obtain.

Ex. 17, OW-021248, § 2.4(h), at 021258 (showing EGPNA's Board of Directors approved the

agreement); *id.* § 1.1, at 21251 (excluding "Native American tribes" from the definition of

"Governmental Authority"); *id.* § 1.1, at 021253 (defining "Permit" as a "license  . . . by any

*Governmental Authority*.") (emphasis added); Champagne Tr., Ex. 7, 219: 13-18 (agreeing that

"that because tribes were omitted from the definition of Governmental Authority, this definition

of permit would not include permits from the Osage Nation . . . .").

35. EGPNA's Board of Directors made the decision to contractually exclude an Osage

Nation permit from the list of permits the Osage Wind Farm would acquire two months *before*

Modrall Sperling concluded its "detailed legal analysis" stating that no permit from the Osage

Nation would be necessary. *Compare* Ex. 5, OWP-000414 (demonstrating that Defendants'

attorneys did not conclude their original analysis until October 31, 2013), *with* Ex. 17, OW-

021248 (EGPNA's Board of Directors approved of the 2013 MIPA—and the categorial

exclusion of Native American tribes—in August of 2013).

36. Initially, EGPNA's plans for constructing the Osage Wind Farm did not involve blasting

or rock crushing, as the March 2013 Scope of Work for construction indicated that no blasting

would be used. Dkt. 247-1, at 3779 (noting that "rock blasting . . . has not been included."); Ex.

18, OW-019901 (noting that initially, "Enel/Tradewinds [did] not want any crushing onsite due

to mineral right issues.").

37. The plans for construction, however, eventually changed, and by June of 2014, the Scope of Work for construction indicated that rock crushing and rock blasting would be used. Ex. 19, OWP-024565, at 024575 ("Rock blasting or removal has been included for 27 turbine locations."); Price Tr., Ex. 2, 56:19-57:03 (testifying that plans for construction, as of March 2013, did not include rock blasting and that this changed by the summer of 2014, when the plans were updated to include rock blasting).

38. None of Defendants' employees or executives, however, ever asked the Modrall Sperling attorneys to update their "detailed legal analysis" to take into account this change in the plans for construction. Price Tr., Ex. 2, 108-109:24-7; Dean Tr., Ex. 10, 77:4-79:10; Heredia Tr., Dkt. 285-20, 107:19-21, 217:9-16; Champagne Tr., Ex. 7, 130:25-131:3; *cf.* Ex. 20, OWP-000578 (showing that the analysis, as of May 2014, continued to state: "[t]o the extent any soil or other subsurface material would be moved by TradeWind, it would be *merely incidental* to TradeWind's construction of its approved wind farm.") (emphasis added); Ex. 21, OWP-000446 (the August 25, 2014 analysis omits the "merely incidental" language but does not include any language indicating the attorneys considered whether rock blasting and/or rock crushing would constitute mining and therefore require a permit).

39. Defendants had begun rock crushing, rock blasting, and using dynamite on the Osage Mineral Estate by September 25, 2014. Dkt. 285, 21 (citing Dkt. 285-39).

40. Although the version of the "detailed legal analysis" that Defendants sent to the United States on October 21, 2014 *did* mention rock crushing as the method of excavation and construction, none of the various versions of the memo that Defendants claim to have relied on prior to October 2014 make any mention of rock crushing or rock blasting. *Compare* Dkt. 17-4 *with* Ex. 5, OWP-000414; Ex. 20, OWP-000577; Ex. 21, OWP-000446, Ex. 22, OW-041648

(September 3, 2014 Memo).

41. EGPNA elected to use rock crushing and dynamite blasting when constructing the Osage Wind Farm based on advice from EGPNA's Legal Department that the alternative, *i.e.* importing backfill, "would have given credit to Osage Nation's theory on the commercial use of soil" and would have supported the conclusion that Defendants must obtain a permit to mine the Osage Mineral Estate.  Ex. 23, OW-019012 at 9013.

42. One of the reasons EGPNA decided to continue with excavation of the Osage Mineral Estate following receipt of Superintendent Phillips' letter was that stopping would be expensive and time-consuming. Ex. 24, OWP-000129 ("The alternative digging up the material not using it and bringing in fill, very expensive."); Ex. 25, OWP-000165 at 0165 (as of September 30, 2014, EGPNA's Bill Price reported "We are expecting to be a week delayed on GE WTG deliveries and any further stoppages will……..you get the picture" and "this is not a good time to stop excavation works unless we absolutely have too."); Ex. 26, OWP-000119 (showing Defendants ran the numbers and stopping excavation would have cost Defendants "$220,064.00 per week, on the crushing alone.").

43. One of the reasons EGPNA decided to continue with its construction and excavation was that stopping would jeopardize EGPNA's contract with the entity that had agreed to purchase the electricity generated by the Osage Wind Farm. Storch Tr., Dkt. 285-21, 117:15-118:4; Price Tr., Ex. 2, 27:7-28:3.

44. To date, Defendants have refused to produce any information or documentation demonstrating the profits EGPNA and/or Enel KS have made from owning and operating the Osage Wind Farm Project, and consequently, that information is the subject of a currently pending Motion to Compel. Dkt. 285.

45. Defendants claim that permanent injunctive relief will cost them as much as $300,000,000. Dkt. 218, 12 n.9.

46. EGPNA and its corporate parents in the Enel corporate family continue to own and operate a lucrative international corporation with hundreds of projects worldwide. Venturini Tr., Ex. 8, 16:5-11, 98:5-6.

47. Defendants used the minerals they took from the Osage Mineral Estate for structural support at the base of the wind tower turbines. *Osage Wind, LLC*, 871 F.3d at 1092 ("Osage Wind needed to stabilize these tall wind turbines, and 'develop[ed]' the removed rock in such a way that would accomplish that goal.").

48. Defendants continue to use these minerals from the Osage Mineral Estate as support for the Osage Wind Farm wind tower turbines because if they were removed and returned to the Osage Mineral Estate, the wind tower turbines would fall over and cease to operate. Moskaluk Tr., Ex. 6, 137:10-22; 179:4-17; Weigel Tr., Ex. 4, 28:4-23; Price Tr., Ex. 2, 151:19-152:6; Centera Tr., Ex. 27, 69:13-20.

49. Mr. Stephen Hazel's expert report does not assume that Defendants' trespass and use of Osage minerals constitutes a routine, arms-length market transaction with two willing parties who both had the option to negotiate. Hazel Tr., Ex. 28, 153:12-16, 169:22-23.

50. The Osage Mineral Estate is more valuable than the surface estate. *Osage Wind, LLC*, 871 F.3d at 1092; Hazel Tr., Ex. 28, 153:22-23.

### III.   STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56, summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Shaw v. Cherokee Meadows, LP*, 431 F. Supp. 3d 1336, 1340 (N.D. Okla. 2019) ("A fact is 'material' if it 'might affect the outcome of the suit under the governing law.") (citations

omitted). Notably, Fed. R. Civ. P. 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). And when the moving party has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In opposing a motion for summary judgment, the adverse party "may not rest upon the mere allegations or denials of [the adverse party's] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV.   ARGUMENT

### A.  The OMC is Entitled to Judgment on Counts One and Two

The OMC is entitled to judgment on its declaratory judgment claims, specifically Counts One and Two of the OMC's First Amended Complaint ("FAC"), Dkt. 164. As the Tenth Circuit concluded, Defendants have violated both 25 C.F.R. § 211 and § 214. *Osage Wind, LLC*, 871 F.3d at 1092. First, the Tenth Circuit noted that "if Osage Wind engaged in 'mining' (as defined in § 211.3) of the Osage mineral estate, then it was required to secure a lease from Osage Nation with approval from the United States." *Id.* at 1082. The Tenth Circuit then considered the definition of "mining" and "determine[d] that Osage Wind's excavation activities constituted 'mining' under § 211.3, [and consequently,] a federally approved lease was required under § 214.7." *Id.* at 1084.

Defendants, however, did not obtain a lease under § 214.7 prior to commencing their excavation of Osage minerals, nor have they sought to obtain a lease under § 214.7 since the Tenth Circuit instructed them to do so in 2017. SUF ¶¶ 5-6. Accordingly, Defendants have

violated federal law and the OMC is entitled to judgment as a matter of law on Count One

(Violation of 25 C.F.R. § 211) and Count Two (Violation of 25 C.F.R. § 214).

## B.  The OMC is Entitled to Judgment on Counts Three and Four

The OMC is likewise entitled to summary judgment on its trespass and continuing

trespass claims because the material facts substantiating these claims are not in dispute.[2] In

*Davilla*, the Tenth Circuit identified three elements a plaintiff must prove to prevail on a

continuing trespass to Indian trust property in Oklahoma[3]: 1) that the plaintiff has a right to

possession of the property at issue; 2) that the defendant physically entered or remained on the

property; and 3) that the defendant had no legal right to enter or remain on the property. *Davilla*

*v. Enable Midstream Partners L.P.*, 913 F.3d 959, 966 (10th Cir. 2019).[4]

As to the first element, there can be no dispute that the OMC has a right to possession of

the property at issue which is held in trust by the United States for the benefit of the Osage

Nation. SUF ¶¶ 1-3; *Osage Wind*, 871 F.3d at 1082. Second, undisputedly, Defendants

physically entered the property when they unlawfully mined and made use of the Osage Mineral

Estate. SUF ¶ 5; *Osage Wind*, 871 F.3d at 1083. Furthermore, there can be no dispute that

Defendants have remained as the wind tower turbines remain in operation and Defendants have

---

[2] Federal law governs the OMC's claims because they pertain to trespass on Indian trust property. *See* Dkt. 219, 7 ("Indian land claims [are] exclusively a matter of federal law.") (quoting *Oneida Cnty. v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 241 (1985)). However, as the Tenth Circuit has noted, "[b]ecause we lack a federal body of trespass law to protect [Plaintiffs'] federal property interests, we must borrow state law *to the extent it comports with federal policy*." *Davilla*, 913 F.3d at 965 (emphasis added). Incorporating Oklahoma's law governing continuing trespass does not conflict with federal policy concerning Indian trust property, and therefore, should be incorporated. *Davilla*, 913 F.3d at 964.

[3] Proving a continuing trespass necessarily proves a trespass as they share the same elements. *See Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 971 n.8. (10th Cir. 2019).

[4] Although the Tenth Circuit periodically referred to the defendants' tort in *Davilla* as simply a "trespass," both the District Court order and the Tenth Circuit opinion make clear that the defendants in *Davilla* were liable for a "continuing trespass." *See, e.g., Davilla*, 913 F.3d at 973 (affirming the "federal district court's decision to permanently enjoin a *continuing* trespass . . . .") (emphasis added).

made no efforts to obtain a lease for their continued use of Osage minerals from the Osage Mineral Estate. SUF ¶¶ 6, 47-48.

As to the third element, there is no question that Defendants had no right to enter the property because they failed to procure the necessary lease prior to entry. SUF ¶ 5. And Defendants have no right to remain on the property because, following the Tenth Circuit's decision, they have not procured a lease or even attempted to comply with the lease requirement. SUF ¶ 6; *see also Davilla*, 913 F.3d at 967 (concluding that defendants had "no legal right to keep a structure on the [the Indian trust property] unless and until [they] secure[d] a right-of-way for that purpose from the Secretary of the Interior."). All of the elements for a trespass and a continuing trespass are met by the undisputed facts in this case, and therefore the OMC is entitled to judgment on Counts Three and Four of the OMC's FAC, Dkt. 164.

### C. Permanent Injunctive Relief is Warranted

The OMC seeks permanent equitable relief in the form of ejectment. Dkt. 164, ¶¶ 99, 101. The Tenth Circuit Court of Appeals has concluded that courts considering permanent injunctive relief to remedy trespass on Indian trust property must consider three factors:

(1) whether an injunction is necessary to prevent irreparable harm,
(2) whether the threatened injury outweighs the harm that the injunction may cause to the enjoined party, and
(3) whether the injunction would adversely affect the public interest.

*Davilla*, 913 F.3d at 973. In this instance, all three factors warrant permanent injunctive relief.

### i. An Injunction is Necessary to Prevent Irreparable Harm

First, the OMC will suffer irreparable harm absent injunctive relief because Defendants' ongoing trespass and open defiance of the OMC's authority over the Osage Mineral Estate threatens to undermine and diminish the sovereignty of the Osage Nation—a harm that cannot be adequately atoned for in money. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d

1234, 1250 (10th Cir. 2001) (concluding that irreparable harm "does not readily lend itself to definition" but "is often suffered when the injury cannot be adequately atoned for in money.") (citations omitted); *See also Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (a court may find irreparable harm "based upon evidence suggesting that it is impossible to precisely calculate the amount of damage [a] plaintiff will suffer.") (quoting *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990).[5]

Here, simply paying the OMC what Defendants' experts opine to be the "market value" for the minerals taken wrongfully assumes there was some sort of arms-length commercial transaction between two willing negotiators and the dispute solely relates to the worth of the minerals exchanged.[6] This dispute, however, does not. The OMC and the Osage Nation are not commercial entities. They are not peddling products. The OMC is a governmental agency within the Osage Nation, and the Osage Nation is a sovereign nation that pre-dates both Oklahoma and the United States. SUF ¶¶ 1-2; Waller Decl., Ex. 1, ¶¶ 2, 37-43. As a sovereign entity within a sovereign nation, the OMC is not bound by any "market" price. The OMC does not have to participate in the market at all. Defendants' unlawful mining of the Osage Mineral Estate threatens to obliterate the OMC's sovereign right to determine how, when, and *if* an entity mines the Estate at all.

More specifically, the OMC has sufficiently demonstrated irreparable harm because Defendants' unlawful trespass on the Osage Mineral Estate undermines and significantly

---

[5] This includes, for example, cases where the party requesting the injunction is "deprived of control of its real property[,]" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210-11 (10th Cir 2009) (affirming district court's finding of irreparable harm), which is precisely the case here. Defendants took the OMC's property without the OMC's consent, in violation of federal and Osage law, and they have continued to use the OMC's property without obtaining the required lease. SUF ¶¶ 5-6, 47-48.

[6] Ms. Centera testified that she would expect "market conditions." Centera Tr., Ex. 27, 44:19-21. Mr. Pfahl based his calculations on "the actual market rates were at the time." Pfahl Tr., Ex. 29, 36:5-6.

14

interferes with the self-government of the OMC and, ultimately, the Osage Nation. The Tenth Circuit Court of Appeals has concluded that "significant interference with [the] self-government" of a Tribal Nation constitutes irreparable harm. *Seneca-Cayuga Tribe of Oklahoma v. State of Oklahoma*, 874 F.2d 709, 716 (10th Cir. 1989); *see also Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (affirming the District Court's finding of "significant interference with tribal self-government" where "more than economic damages were at stake."); *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006) ("an invasion of tribal sovereignty can constitute irreparable injury."). Here, Defendants' attempt to reduce the OMC to a commercial entity forced to sell its Indian trust property at a "market rate" significantly interferes with the Osage Nation's self-government and invades Osage sovereignty.

To be sure, by severing the Osage Mineral Estate from the surface estate, and by placing it in trust for the Osage Nation, Congress sought to ensure that the Mineral Estate would be leased "in such quantities and at such times as may be deemed for the best interest of the Osage Tribe of Indians." Act of June 24, 1938, ch. 654, § 3, 52 Stat. 1035; *see also* Waller Decl., Ex. 1, ¶¶ 28-29, 32. The decision to allow, or to forbid, mining on the Osage Mineral Estate, therefore, is a sovereign function of the Osage Nation's self-government, one that the Osage Constitution assigns to the OMC. SUF ¶ 2; Waller Decl., Ex. 1, ¶¶ 37-43. Defendants' trespass not only unlawfully seizes tribal assets, it threatens the ability of the OMC to function as a government and enforce Osage laws. *See Kiowa Indian Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1171-72 (10th Cir. 1998) (concluding that a Tribal Nation has demonstrated irreparable harm where there has been a "seizure of tribal assets, . . . and [a] concomitant prohibition against full enforcement of tribal laws [that] significantly interferes with the Tribe's self-government.").

That is, absent the issuance of injunctive relief, the OMC's inherent right to self-govern

and administer the Osage Mineral Estate will be reduced to nothing more than a right to recover nominal damages in federal court, *after* companies have taken and used Osage minerals in defiance of Osage law. The Osage Nation has fought for hundreds of years to preserve the sovereignty of the Osage Nation, as well as the Nation's right to administer and govern the Osage Mineral Estate. SUF ¶ 4; Waller Decl., Ex. 1, ¶¶ 3-27, 47, 49-50. Truly "this is not a matter of how much capital will be lost if the injunction is not imposed. Instead, the issues concern the scope of tribal sovereignty, an issue that can not be measured in dollars." *Winnebago Tribe of Nebraska v. Stovall*, 216 F. Supp. 2d 1226, 1233 (D. Kan. 2002), *aff'd*, 341 F.3d 1202 (10th Cir. 2003).

### ii. The Threatened Injury Outweighs the Harm that an Injunction May Cause

Here, the threatened injury to the sovereignty of the Osage Nation outweighs any harm to Defendants, as Defendants have only identified monetary damages, and monetary damages, alone, do not tip the scales against permanent injunctive relief. To preclude the issuance of injunctive relief, Defendants must show that the injunction will threaten the very "viability" of their overall business, leading to its "destruction," and even then an injunction is not necessarily off the table. *See Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) ("A threat to trade or business viability may constitute irreparable harm.").

Here, there is no evidence in the record to demonstrate that permanent injunctive relief would lead to the destruction of EGPNA's renewable energy business. Although $300,000,000 sounds like a large number, it is clear that EGPNA and the Enel corporate family operate a worldwide renewable energy portfolio that is expansive and highly liquid. SUF ¶ 46. Furthermore, EGPNA and Enel KS have refused to produce any documents that would put this

$300,000,000 figure into context, and thus there is nothing in the record to support the notion that permanent injunctive relief would threaten EGPNA's viability as a going concern.[7]

 Federal courts routinely conclude that injunctions are proper against a company if the company and/or corporate parent remains profitable or viable after the injunction is issued. *See, e.g., United States v. Ameren Missouri*, 421 F. Supp. 3d 729, 816 (E.D. Mo. 2019) (noting defendant will still be profitable after complying with injunctive relief); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 14-cv-02061-H-BGS, 2018 WL 9903323, at *10 (S.D. Cal. Aug. 13, 2018) (finding balance of hardships weighed against defendant and permanent injunction was necessary where defendant "and its parent company [ ] have tens of millions of dollars in cash and a total market cap exceeding two billion . . . ."); *Idaho Conservation League v. Magar*, No. 3:12-cv-00337-CWD, 2015 WL 632367, at *8 (D. Idaho Feb. 13, 2015) (finding balance of harms favored issuance of an injunction after reviewing defendant's "substantial" unencumbered assets and monthly income); *Callaway Golf Co. v. Acushnet Co.*, 585 F. Supp. 2d 600, 622 (D. Del. 2008) (noting permanent injunctive relief would be a "subtle" harm on defendant where "defendant's corporate parent . . . is a multi-billion dollar conglomerate."); *Commonwealth Scientific and Industrial Research Organisation v. Buffalo Tech., Inc.*, 492 F. Supp. 2d 600, 606 (E.D. Tex. 2007) (recognizing that permanent injunction will only affect 11% of defendant's business).

 Defendants cannot establish that the Enel corporate family's renewable energy business will be destroyed by the issuance of a permanent injunction *vis à vis* the Osage Wind Farm, and accordingly, the threatened injury to the OMC outweighs any harms Defendants could claim.

   **iii.  An Injunction Would Serve, Not Adversely Affect, the Public Interest**

---

[7] The OMC has repeatedly requested EPGNA to produce documents and information related to EGPNA's and Enel KS's profits, and they have refused; this evidence is currently the subject of a pending Motion to Compel. *See* Dkt. 285.

The public interest factor of *Davilla's* permanent injunction analysis also weighs heavily in favor of the OMC. Here, ejectment would best serve the public interest by "helping to assure Tribal self-government, self-sufficiency and self-determination" of the Osage Nation in administering the Mineral Estate. *Sac & Fox Nation v. LaFaver*, 905 F. Supp. 904, 907-08 (D. Kan. 1995). As discussed above, absent injunctive relief, Defendants' unlawful trespass and circumvention of Osage law will significantly interfere with and diminish the Osage Nation's sovereignty. And the Tenth Circuit has recognized that the issuance of an injunction will not run against the public interest where an injunction "promotes the paramount federal policy that Indians develop independent sources of income and strong self-government." *Seneca-Cayuga*, 874 F.2d at 716. The Osage Nation established the OMC with this exact purpose in mind—to "administer and develop the Osage Mineral Estate" as an act of self-governance to ensure the highest profitability from the Estate for the benefit of Osage citizens. SUF ¶ 2; Waller Decl., Ex. 1, ¶ 37-43. Succinctly put, "[t]his case is not only about economics, it is about sovereignty." *Winnebago Tribe*, 216 F. Supp. 2d at 1234.

Preserving the Osage Nation's sovereignty, alone, would suffice to demonstrate that the public interest will be served by the issuance of permanent injunctive relief. But as this Court has already determined, "Congress has dictated the prerequisites of a right to enter [for mining work] by statute." Dkt. 219, 7 (quoting *Davilla*, 913 F.3d at 967). And so here, the issuance of permanent injunctive relief is the only remedy that will preserve the manner in which Congress intended for its own statute to work—by preserving the OMC's exclusive jurisdiction and authority over the Osage Mineral Estate, as well as the United States Department of the Interior's role as Trustee in protecting and preserving the Indian trust asset Congress set aside for the Osage Nation. Adhering to Congress's purpose behind the Osage Act serves the public interest.

18

*See, e.g., Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 544 (1987) (courts will look to the "underlying substantive policy the [statutory] process was designed to effect."); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("Congress specifically identified the process through which it wanted the [federal agency] to make project decisions such as this one. It comports with the public interest for the [federal agency] to comply faithfully with those procedures."); *P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 546 (D.D.C. 2020) (citation omitted) ("There is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate.").

Despite a decision from the Tenth Circuit instructing Defendants that they cannot use Osage minerals without obtaining a lease under 25 CFR § 214.7, Defendants have failed to take any steps to obtain the required lease, and many of Defendants' employees still, to this day, believe the Tenth Circuit got it wrong. SUF ¶¶ 6-7. Undeniably, "[t]he public's interest is not served by continued acts violative of the law." 502 F. Supp. 3d at 546 (internal quotation omitted). The public interest warrants the imposition of permanent, injunctive relief to ensure compliance with both Osage and federal law.

### D.  Defendants Are Jointly and Severally Liable

Under federal common law, Defendants are jointly and severally liable for their tortious trespass, continuing trespass, and unlawful mining of the Osage Mineral Estate. Federal common law permits this Court to impose joint and several liability on multiple defendants where, as here, "a fair allocation of liability cannot be made among multiple tortfeasors" as a matter of fact. *Project Hope v. M/V Ibn Sina*, 250 F.3d 67, 76 (2d Cir. 2001); *see also id.* (quoting Restatement (Second) of Torts § 879 (1979) ("If the tortious conduct of each of two or more persons is a legal cause of harm that cannot be apportioned, each is subject to liability for the entire harm,

irrespective of whether their conduct is concurring or consecutive.")).[8]

Here, there can be no question that the "tortious conduct" of each of the Defendants in this case is the "legal cause of harm that cannot be apportioned." *Project Hope*, 259 F.3d at 76 (quoting Restatement (Second) of Torts § 879 (1979)). For instance, when the trespass began, Osage Wind owned the assets comprising the Osage Wind Farm, SUF ¶ 21, but Osage Wind made no decisions as to how the Osage Mineral Estate would be mined, if, when, or where. *See id.* Instead, Enel KS and EGPNA made those decisions. SUF ¶¶ 21-27. After purchasing the Osage Wind Farm in September of 2014, Enel KS did not allow Osage Wind to obtain a lease to mine the Osage Mineral Estate without Enel KS's written consent, SUF ¶ 23, and there is no evidence in the record to demonstrate that Enel KS ever gave Osage Wind its consent to obtain a lease from the OMC. SUF ¶ 24. Moreover, EGPNA executives made *all* of the decisions regarding how the Osage Wind Farm would be constructed, including the decision to use rock blasting, dynamite, and rock crushing, based on advice received from EGPNA's Legal Department. SUF ¶¶ 27, 30, 36-37, 41-43. When the United States instructed Defendants to cease construction unless and until they obtain a lease to mine the Osage Mineral Estate, EGPNA executives made the decision to continue with excavation and construction without obtaining the

---

[8] Although Oklahoma has abolished joint and several liability, federal courts have recognized that a federal common law of joint and several liability may be imposed where a State's abolishment "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives to Congress,'" in which case, "federal law preempts state law." *F.D.I.C. v. Moll*, 848 F. Supp. 145, 149 (D. Colo. 1993) (quoting *Pacific Gas & Elec. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983)). As this Court has repeatedly stated, there is a "specific federal interest in Indian land claims and maximizing Indians' economic interest," Dkt. 264, 20 n.8, and because it is "Congress [that] dictated the prerequisites" for mining the Osage Mineral Estate, Dkt. 219, 7-8, Oklahoma law cannot be incorporated in a manner that would stand as an obstacle to the accomplishment and execution to the Congress's purposes and objectives in ensuring the Osage Mineral Estate's protection. *See Moll*, 848 F. Supp. at 149. Other federal courts have recognized a federal common law joint and several liability in circumstances where a state rule of liability would be inappropriate given a unique federal interest. *See, e.g., Samgamo Biosciences, Inc. v. Cargolux Airlines Int'l, S.A.*, No. C-04-0672 JSW (EMC), 2005 WL 8177572, at *4 (N.D. Cal. Dec. 21, 2005) (recognizing a "federal common law" joint and several liability in the airway common carrier context).

required lease. SUF ¶ 30.

The continued unlawful mining of the Osage Mineral Estate would not be possible without the actions or participation of each of these three Defendants. All three Defendants, therefore, have engaged in "joint enterprise and a mutual agency" such that divisibility of causation is not possible. *Cayuga Indian Nation of New York v. Pataki*, 79 F. Supp. 2d 66, 73 (N.D.N.Y. 1999) (quoting *Ravo v. Rogatnick*, 70 N.Y.2d 305, 308 (1987)); *see* SUF ¶¶ 10, 15-17, 19-27, 29-37, 39, 41-43, 47-48 (establishing that Defendants acted as one in their tortious conduct and therefore causation cannot be apportioned). Because Defendants' conduct has met the standard for the Court to impose joint and several liability under federal common law, "each is subject to liability for the entire harm" they have collectively caused to the OMC. *Project Hope*, 259 F.3d at 76 (quoting Restatement (Second) of Torts § 879 (1979)).

### E. Alternatively, if the Court Deems Permanent Injunctive Relief is Not Warranted, Hazel's Report Contains the Proper Calculation of Monetary Damages

If the Court determines that permanent injunctive relief is not warranted, the FTI Consulting Report, authored by Mr. Steven Hazel (the "Hazel Report"), contains the proper calculation of monetary damages for Defendants' illegal and ongoing trespass on the Osage Mineral Estate. *See* Ex. 30. In contrast to Mr. Pfahl and Ms. Centera (the experts whose reports Defendants have proffered), Mr. Hazel's calculations do not wrongfully assume that Defendants' trespass and use of Osage minerals constitutes a routine, arms-length market transaction with two willing parties who both had the option to negotiate. SUF ¶ 49. As Mr. Hazel noted in his deposition, "[y]ou have to negotiate with the mineral estate owners to get th[e] right" to mine the Mineral Estate. Hazel Tr., Ex. 28, 169:22-23; *see also id.* at 153:12-16 (stating his Report and conclusions are based on the reality that "the Osage Nation has to have some say into whether or not there is a lease at all").

21

Accordingly, if the Court determines that monetary damages is the only proper form of remedy, then there must be some assessment of what the parties most likely would have paid in an actual arms-length transaction and negotiation. In determining what Defendants would be willing to pay, Mr. Hazel observed that "the surface leases represent a directly comparable proxy for amounts that Osage Wind itself was willing and able to pay" to be able to construct the Osage Wind Farm on the Osage Mineral Estate. Hazel Rpt., Ex. 30, 7. As for what OMC would most likely be willing to pay, Mr. Hazel concluded it would not be reasonable to assume that the OMC "would [] negotiate something less than what the surface owners got . . . ." Hazel Tr., Ex. 28, 153: 12-16; SUF ¶ 49. This is more than reasonable since, "[i]n general, the mineral estate is more valuable than the surface estate." Hazel Tr., Ex. 28, 153:22-23; SUF ¶ 50. Thus, the Hazel Report concludes that the total damages the OMC is entitled to in order to remedy Defendants' ongoing, illegal trespass amounts to $25,969,607.00. Hazel Rpt., Ex. 30, 8. If the Court determines that permanent injunctive relief is not warranted, the monetary damages as calculated in the Hazel Report should be granted to Plaintiffs.[9]

### F. Defendants Did Not Reasonably Rely on the Advice of Their Counsel in Good Faith to Mitigate Damages

Although the Tenth Circuit recognizes a good faith reliance on counsel defense, it does not operate as "a complete defense, but is merely one factor a jury may consider when determining whether a defendant acted willfully." *United States v. Wenger*, 427 F.3d 840, 853 (10th Cir. 2005) (citation omitted). The Tenth Circuit requires a party alleging this defense to establish "(1) a request for advice of counsel on the legality of a proposed action, (2) full disclosure of the relevant facts to counsel, (3) receipt of advice from counsel that the action to be

---

[9] The Court may grant injunctive relief *and* damages. *See United States v. Torlaw Realty, Inc.*, 483 F. Supp. 2d 967, 973 (C.D. Cal. 2007), *aff'd,* 348 F. App'x 213 (9th Cir. 2009) (in response to trespass on tribal lands, the United States "can recover damages and obtain a permanent injunction . . . .").

taken will be legal, and (4) reliance in good faith on counsel's advice." *Id.* (citations omitted). Defendants fail to establish all four.

First, Defendants fail to demonstrate that they actually requested the legal advice they now claim to have relied on. Over the course of 13 depositions of individuals employed by Defendants or hired to construct the Osage Wind Farm, not one deponent could recall *who* requested the advice from legal counsel pertaining to Osage Mineral Estate permits, when the request was made, why the request was made, or if the request was made at all. SUF ¶ 10. And although TradeWind's attorney hired Modrall Sperling in August 2013, SUF ¶ 11, this does not establish that Defendants themselves requested the legal advice they now claim to have relied on. *See S.E.C. v. Melchior*, No. 90-C-1024J, 1993 WL 89141, at *21 (D. Utah Jan. 14, 1993) ("defendant[] could not reasonably rely in good faith on the advice of an attorney who merely adopted the legal conclusions reached by a prior attorney".).

Second, the record is clear that Defendants did not fully disclose the relevant facts to their counsel. When the analysis was performed for the October 2013 memorandum, EGPNA's plans for constructing the Osage Wind Farm did *not* include the use of dynamite, rock blasting, or rock crushers. SUF ¶¶ 9, 36. Rather, this plan was introduced early in the summer of 2014, when it was determined that it may become necessary to use dynamite, rock blasting, and rock crushing. SUF ¶ 37. None of Defendants' employees or executives, however, provided this updated information to Defendants' attorneys, and thus prior to the commencement of construction in September 2014, *none* of the memos Defendants relied on actually considered the fact that they would be using rock crushing and dynamite blasting on the Osage Mineral Estate.[10] SUF ¶ 38.

---

[10] The *only* version of the "detailed legal analysis" that discusses rock crushing is the October 2014 version. *See* Dkt. 17-4. The Tenth Circuit has held that *when* the advice was given is a key factor in determining whether that advice was actually relied on, *see Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (10th Cir. 1994), as courts have repeatedly imposed the common-sense requirement

Defendants' failure to disclose this change in plans is fatal to their claim they relied in good faith on the advice of counsel. *See United States v. Gonzalez*, 58 F.3d 506, 512 (10th Cir. 1995).

Third, the advice Defendants received from their attorneys was not that their actions would be legal, but rather, that "there is no controlling authority on point." SUF ¶ 13; *see also* Ex. 20, OWP-000577, 000578 (as May of 2014, the "detailed legal analysis" noted that "[w]hile some weak authority was found on this point, the question appears largely unaddressed."). This is hardly the kind of robust legal analysis one would expect to find supporting an entity's decision to defy instructions from a United States federal agency.

Fourth and finally, Defendants cannot establish that they actually relied in good faith on their attorneys' advice. The decision to categorically exclude permits from the Osage Nation from the list of permits the Wind Farm would acquire was made *more than two months before* Defendants' attorneys concluded their "detailed legal analysis on October 31, 2013. SUF ¶¶ 31-35. Defendants cannot claim to have actually relied on their attorneys' advice when Defendants made the decision to *not* obtain a permit from the Osage Nation two months before receiving, reviewing, or even knowing what their attorneys had concluded.

Finally, requesting advice of counsel for purely tactical reasons is evidence that the advice was not requested with honest intent. *See Universal City Studios, Inc. v. Nintendo Co. Ltd.*, 615 F. Supp. 838, 862 (SDNY 1985) (finding that Universal's "limited investigation" of the merits of its claim was intentional and that advice was requested to improve bargaining position). That is precisely what Defendants did here. As explained above, Defendants initially sought and received their attorneys' advice *after* they had already made the decision not to seek

---

that the advice must have been given *prior to* the defendant's action. *See, e.g., United States v. Van Allen*, 524 F.3d 814, 823 (7th Cir. 2008); *United States v. Polytarides*, 584 F.2d 1350, 1352-53 (4th Cir. 1978). Here, because Defendants commenced with rock crushing before the October 2014 version of the memorandum, they cannot claim to have relied on that particular memo as legal advice.

a permit from the OMC. SUF ¶¶ 31-35. Further, the facts of the excavation—namely, that there would be rock crushing—did not appear in the "detailed legal analysis" until it was shared with the United States—as a strategic response to the United States' instruction that they could not continue excavation without a lease from the OMC. SUF ¶ 40. It is clear, therefore, that the "detailed legal analysis" shared with the BIA on October 20, 2014 was crafted, not to provide legal advice to Defendants, but to persuade BIA officials that Defendants' rock crushing without a lease was lawful. It was not, and the undisputed facts of the case demonstrate that Defendants did not rely on the advice of their counsel in good faith.

### G.  The OMC is Entitled to Attorney Fees

The OMC is entitled to attorney fees. In instances where there has been a trespass on Indian trust property, federal regulations provide the BIA with authority to recover, among other things, "[t]he costs associated with enforcement of the regulations,  . . . and *attorney fees . . .*" 25 C.F.R. §166.812(c). The award of attorney fees is likewise appropriate here since the undisputed facts demonstrate that Defendants did not act in good faith. *Hall v. Cole*, 412 U.S. 1, 5 (1973) ("a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons." (internal citations omitted).

### V.  CONCLUSION

For the reasons stated above, the OMC respectfully requests that the Court grant the OMC's Motion for Summary Judgment.

Respectfully submitted,

s/ Mary Kathryn Nagle
Mary Kathryn Nagle, OBA No. 33712
Wilson Pipestem, OBA No. 16877
Abi Fain, OBA No. 31370
Jennifer S. Baker, OBA No. 21938
Shoney Blake, Cal. Bar No. 264981
Pipestem and Nagle Law, P.C.

25

401 S. Boston Ave., #2200
Tulsa, Oklahoma 74103
918-936-4705 (Office)
mknagle@pipestemlaw.com
wkpipestem@pipestemlaw.com
afain@pipestemlaw.com
jbaker@pipestemlaw.com
sblake@pipestemlaw.com
*Counsel for Intervenor-Plaintiff
Osage Minerals Council*

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2021, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Ryan A. Ray
Joel L. Wohlgemuth
rar@nwcjlaw.com
jlw@nwcjlaw.com

-and-

Lynn H. Slade
Sarah S. Stevenson
Deana M. Bennett
Spencer L. Edelman
lynn.slade@modrall.com
sarah.stevenson@modrall.com
deana.bennett@modrall.com
spencer.edelman@modrall.com
*Counsel for Defendants*

David McCullough
dmccullough@dsda.com

Jeffrey S. Rasmussen
jrasmussen@ndnlaw.com

-and-

Wilson Pipestem
Mary Kathryn Nagle
Abi L. Fain
Jennifer S. Baker
Shoney Blake
mknagle@pipestemlaw.com
wkpipestem@pipestemlaw.com
afain@pipestemlaw.com
jbaker@pipestemlaw.com
sblake@pipestemlaw.com
*Counsel for Intervenor-Plaintiff,
Osage Minerals Council*

-and-

Thomas J. McCormack
Robin D. Ball
Robert Comer
Robert Kirby thomas.mccormack@nortonrosefullbright.com
robin.ball@nortonrosefullbright.com bob.comer@nortonrosefullbright.com
robert.kirby@nortonrosefullbright.com
*Counsel for Defendants*


Cathryn Dawn McClanahan
cathy.mcclanahan@usdoj.gov

*Counsel for Plaintiff, United States*

27

/s/ Mary Kathryn Nagle