# EXHIBIT 1

Case No. l4-CV-704-GKF-JFJ

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| (2) OSAGE MINERALS COUNCIL, | ) | Case No. l4-CV-704-GKF-JFJ |
| Intervenor-Plaintiff, | ) | |
| v. | ) | |
| (1) OSAGE WIND, LLC;<br>(2) ENEL KANSAS, LLC; and<br>(3) ENEL GREEN POWER<br>NORTH AMERICA, INC., | ) | |
| Defendants. | ) | |

## DECLARATION OF EVERETT WALLER, CHAIRMAN OF THE OSAGE MINERALS COUNCIL

In accordance with 28 U.S.C. § 1746, I, Everett Waller, declare:

1. I submit this Declaration in support of the Osage Minerals Council's ("OMC") Motion for Summary Judgment, and this Declaration is based on my personal knowledge. If called as a witness, I could and would testify competently to such facts under oath.

2. The Osage Nation is a federally recognized Tribal Nation whose sovereign existence pre-dates both the United States and the State of Oklahoma.

3. Our ancestors fought hard and made many sacrifices so that we would still have the Osage Mineral Estate today.

4. Prior to 1808, Osage lands primarily encompassed parts of states that now include Missouri, Arkansas, Kansas, and Oklahoma.

5. The Osage Nation was forced to make major land cessions to the United States in a series of treaties signed between 1808 and 1870.

6. The Osage Treaty of 1808 marked the first treaty between the Osage Nation and the

United States. In this treaty, the Osage Nation was required to cede millions of acres of land in Missouri and Arkansas in exchange for $1,200 in cash and an annual delivery of $1,500-worth of merchandise. And the United States promised the Osage Nation "friendship" and "protection." *See* Treaty with the Osage, Nov. 10, 1808, 7 Stat. 107.

7. The Osage Treaty of 1818 resulted in the Osage Nation ceding approximately 1.8 million acres of our land in Arkansas and Oklahoma for no compensation. *See* Treaty with the Osage, Sept. 25, 1818, 7 Stat. 183.

8. The Osage Treaty of 1825 resulted in the Osage Nation ceding all of our remaining land in exchange for a reservation in Kansas, a sum of $140,000 to be paid over 20 years in cash, merchandise, provisions or domestic animals, along with an initial supply of animals and materials to "aid the[ Osage] in their agricultural pursuits." And the United States promised the Osage Nation "friendship" and "protection." *See* Treaty with the Osage, June 2, 1825, 7 Stat. 240.

9. The Osage Treaty of 1865 resulted in the Osage Nation ceding approximately 3.2 million acres of our Kansas reservation, which was to be sold at $1.25 per acre, with proceeds credited to the Osages and bearing a five percent interest. This treaty also provided an avenue for the Osage to cede what remained of our Kansas reservation after the 1865 Treaty—approximately 4.8 million acres—at our discretion. *See* Treaty with the Osage, Sept. 29, 1865, 14 Stat. 687.

10. The 1865 Treaty, however, was almost abrogated. In 1868, the Osage Nation was induced to sign a new treaty that would have sold all the Osage lands in Kansas to a railroad company for 20 cents per acre. That is, for the total 8 million acres constituting the Osage Reservation in Kansas, the United States would have paid the Osage $2.4 million less that it was required to pay the Osage for only 3.2 million acres under the terms of the 1865 Treaty. The

1868 Treaty initially received approval from the Executive Branch of the United States federal government, as well as the Indian Committee to the Senate. *See* H.R. Rep. No. 44-186 (1877).

11. Because the 1868 Treaty drastically changed the terms of the 1865 Treaty—to the detriment of the Osage Nation—the Osage Nation employed attorneys to prevent the ratification of the 1868 Treaty. *See id.*

12. The attorneys for the Osage Nation were successful in having the 1868 Treaty withdrawn prior to its ratification by the U.S. Senate. But because the Osage attorneys were successful in preventing the 1868 Treaty from becoming law, bills were subsequently introduced in the U.S. Senate and House of Representatives that would have had nearly the same effect. One bill before the Senate would have authorized the United States to take the 8 million acres of the Osage Reservation in Kansas at a price of twenty cents per acre; meanwhile, a bill before the House of Representatives would have authorized the United States to take the same 8 million acres at a price less than 12.5 cents per acre. *See id.*

13.  Again, the attorneys for the Osage Nation argued against provisions in any bill that would change the agreed terms of the 1865 Treaty, and again, the attorneys succeeded in defeating proposals that the Osage Nation deemed offensive to the 1865 Treaty. *See id.*

14. In 1870, Congress agreed to pay $1.25 per acre for all 8 million acres of Osage land in Kansas, but also provided that such sale would occur only when the Osage Nation agreed to move to Indian Territory. *See* Act of July 15, 1870, 16 Stat. 335, 362.

15. Under the terms of removal, however, the Osage Nation was required to pay for the new Osage Reservation in Indian Territory.

16. At the time Congress passed the Act of July 15, 1870, Osage leaders had identified land in Indian Territory they wanted for the Osage Reservation.

17. Both the federal government and Osage leaders were aware that the land the Osage Nation chose for the Osage Reservation in Indian Territory was unfit for cultivation. *See* S. Exec. Doc. No. 41-39, *Message of the President of the United States, Communication the Second Annual Report of the Board of Indian Commissioners*, App. 14 at 81 (Feb. 10, 1871) (statement of Little Clymore's Councilor made Aug. 12, 1870) ("We live on what the ground produces. . . . The land out on the plains is not good for cultivation—you can't raise anything on it. I think we ought to have all of it to hunt on as long as the buffalo continues plenty and we want to hunt.").

18. The geographic features of the Osage land selection west of the ninety-sixth meridian was described by the United States Indian Agent in 1871 as being " broken, rocky, sterile, and utterly unfit for cultivation." Rep. of the Comm'r of Indian Affairs to the Sec'y of the Interior for the Year of 1871, No.73, Neosho Agency, Indian Territory 490 (Oct. 1, 1871).

19. But even though the land was not considered good for cultivation, it was of the utmost importance to the Osage Nation. *See* S. Exec. Doc. No. 41-39, *Message of the President of the United States, Communication the Second Annual Report of the Board of Indian Commissioners*, App. 14 at 81 (Feb. 10, 1871) (statement of Wau-Tan-Ka [sic] made Aug, 12, 1870) ("Nothing is more dear than land. Off the land we get our living. We can't eat money. . . . I want you to tell the President that we want the land west of the ninety-sixth parallel. That is the mark I have laid down. I feel myself as a human being, and am able to study for myself.").

20. The Osage Nation's removal to Indian Territory, however, did not end the Osage Nation's struggle to protect Osage land and resources.

21. Our Nation's leaders routinely called on the United States to exercise its treaty and trust duty obligation to protect our land and our Reservation from trespassers. *See* Rep. of the Comm'r of Indian Affairs to the Sec'y of the Interior for the Year of 1871, at 492 ("I now

entreat those whose duty it is to establish the boundaries of this reservation, and to remove trespassers therefrom, and to provide for enforcement of the laws in the Indian country, not to neglect longer the sacred obligations the Government owes to these Osages.").

22. In 1872, Congress determined that a "recent survey" established that the meridian that was supposed to be the eastern boundary of the Osage Reservation was further west than estimated in 1870 and "the most valuable portion of [the 1870][] Osage reservation, and upon which all their improvements [we]re situtated" was beyond what was determined to be the eastern boundary, and Congress again resettled the Osage Nation to land that it deemed to be lesser in value. Act of June 5, 1872, ch. 310, 17 Stat. 228.

23. According to Census numbers, the Osage population decreased from nearly 5,000 people in 1870 to 1,500 in 1890.

24. In 1875, the Osage Nation asserted objections to the establishment of a territorial government over Indian Territory, noting that do so would violate the treaties with Tribes forced to relocate there. *See* S. Mis. Doc. No. 43-72 , *Protest of the Osage Nation of Indians Against the Establishment by Congress of a Territorial Government of the United States Over the Indian Nations* 1–2, 4(Feb. 9, 1875) ("[O]ur people, the Osages, were driven away from our home in Kansas, some of our people being dreadfully abused . . . and in some cases actually murdered. But we were all promised protection in our new home in the Indian Territory. The country that we now live in is our own. We have bought it and paid the money for it, according to a law you passed yourselves, and at a priced fixed by your Government. . . . A territorial government would open our doors . . . and would soon break up our nations and tribes and destroy our people, and our lands would go to squatters and railroads, and our moneys would be absorbed and squandered by those who have no right to them.").

25. Thirty-one years later, in 1906, Congress enacted the Osage Allotment Act, which effectively severed the mineral estate (subsurface) from the approximate 1.47-million-acre surface estate of the Osage Reservation and placed the mineral estate in trust for the Tribe (the "Osage Mineral Estate"). *See* Act of June 28, 1906, ch. 3572, 34 Stat. 539.

26. In the 1920s, the Federal Bureau of Investigation undertook the investigation of several Osage murders committed by "organized criminals[] who have engaged in schemes to enrich them selves [sic] at the expense of the Indians." Annual Rep. of the Attorney Gen. of the United States 102 (1926).

27. In fact, these Osage murders were committed by non-Indians who stood to inherit Osage Headrights—the right of certain Osages to an interest in revenues from the Osage Mineral Estate—and Congress took up the matter of appropriating Osage trust funds to prosecute those involved. *See Hearing Before the Subcomm. of H. Comm. on Appropriations, Second Deficiency Appropriation Bill, 1928*, 70th Cong. 308 (1928); *Hearing Before Subcomm. of H. Comm. on Appropriations, Dep't of Justice, 1928*, 69th Cong. 52 (1927).

28. Congress, in the Osage Allotment Act and its subsequent amendments, not only specifically reserved "oil, gas, coal, or other minerals covered by the lands" to the Osage Tribe, it stated the leases for the same "may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as [the Secretary] may prescribe." Act of June 28, 1906, ch. 3572, § 3, 34 Stat. 539.

29. Indeed, from the time Congress passed the Osage Allotment Act in 1906 until the time Congress reaffirmed certain sovereign rights of the Osage Tribe in 2004, *see* Act of December 3, 2004, 118 Stat. 2609, Congress passed no fewer than 15 laws over the course of eight

consecutive decades to extend protections for the Osage Mineral Estate and reaffirm the Osage Tribe's ownership and governance over the Osage Mineral Estate.

30. From 1906 to 2004 membership in the Osage Tribe was wholly contingent upon an Osage's right to share in revenues from the Osage Mineral Estate. *See* Act of Dec. 3, 2004, Pub. L. No. 108-431, § 1(a)(3), 118 Stat. 2609 (2004).

31. Prior to 2004, the Osage Allotment Act, as amended, governed the structure and election of the Osage Tribal Council.

32. In 2004, Congress reaffirmed "the inherent sovereign right of the Osage Tribe to determine its own form of government." *Id.* at § 1(b)(2).

33. In 2006, the present-day Osage Nation Constitution was ratified by a majority vote of the qualified voters of the Osage Nation.

34. The Osage Nation Constitution established three separate branches of government, generally: the Legislative, the Executive, and the Judicial. Osage Nation Const. art. V, § 1.

35. The legislative branch, known as the Osage Nation Congress, is responsible for making the laws of the Osage Nation, and the executive branch is responsible for ensuring "that the laws are faithfully executed, and ministered and enforced. *Osage Nation Const*. arts. VI-VII.

36. But, the legislative and executive branches are both prohibited from "creat[ing[ any law or ordinance pertaining to the mineral royalties from the Osage Mineral Estate that acts in conflict with federal law and regulations." Osage Nation Const. art. IV, § 5. Similarly, the Osage Nation government is prohibited from exercising legislative authority in the place of the responsibilities reserved for the Osage Minerals Council. Osage Nation Const. art. XV, § 4.

37. Accordingly, the Osage Nation Constitution created an independent agency within the

Osage Nation known as the Osage Minerals Council—the successor to the Osage Tribal Council established by Congress in the 1906 Act—responsible for ensuring "[t]he right to income from mineral royalties shall be respected and protected." Osage Nation Const. art. XV, §§ 3–4.

38. Additionally, the Osage Minerals Council serves to fulfill the Osage Nation's "perpetual obligation to ensure the preservation of the Osage Mineral Estate." Osage Nation Const. art. XV, § 4.

39. In this role, the Osage Minerals Council is tasked with "continuing its previous duties [as outlined in the 1906 Act in relation to the Tribal Council] to administer and develop the Osage Mineral Estate in accordance with the Osage Allotment Act of June 28, 1906." *Id.*

40. "As an independent agency within the Osage Nation, the Osage Minerals Council may promulgate its own rules and regulations as long as such rules and regulations are not inconsistent with the laws neither of the Osage Nation nor with the rules and regulations established by the United States Congress in the 1906 Allotment Act." *Id.*

41. The authority of the Osage Minerals Council includes "the power to consider and approve leases and to propose other forms of development of the Osage Mineral Estate." *Id.*

42. The authority of the Osage Minerals Council to consider and approve leases or other forms of agreement for development of the Osage Mineral Estate must, however, "comply with applicable federal law and all laws and regulations of the Osage Nation." *Id.*

43. In deciding whether to approve a minerals lease, the Osage Minerals Council must balance various interests, including whether a lease for one mineral, such as rock, can impact access to other minerals, such as oil and gas.

44. To my knowledge, Defendants have never submitted an application for a lease under 25 C.F.R. § 214.7 for the use of Osage minerals at the Osage Wind Farm Project.

45. To my knowledge, Defendants have never returned the Osage minerals that they took in 2014 and continue to use today.

46. To my knowledge, even if Defendants sought to return the Osage minerals they took, they cannot return the minerals in the form in which they existed prior to Defendants' crushing and blasting.

47. Historically, the Osage Nation has had to expend significant efforts and resources to protect and preserve our inherent sovereignty as a Nation, including our right to govern over the Osage Mineral Estate.

48. Requiring the OMC to litigate against an entity who insists on taking Osage minerals without the required lease costs the OMC significant time and resources that could and should be spent elsewhere to assist the OMC in effectively governing and protecting the Osage Mineral Estate.

49. Although many have attempted to eradicate the sovereignty of the Osage Nation, we are still here.

50. Although there have been many attempts to sever the Osage Nation's ownership of the Osage Mineral Estate, these attempts have failed; the Osage Nation—through the OMC—continues to govern and protect the Osage Mineral Estate.

I have personal knowledge of the facts stated herein, and, if called to do so, I would competently testify to these facts. I declare under penalty of perjury that the foregoing is true and correct. Executed on October 12, 2021.

*Everett Waller*
Everett Waller