# EXHIBIT 2

Case No. l4-CV-704-GKF-JFJ

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
      UNITED STATES OF AMERICA,
 3
                   Plaintiff,
 4
      and
 5
      OSAGE MINERALS COUNCIL,
 6
                   Intervenor-Plaintiff,
 7
      vs                           No. 14-CV-704-GKF-JFJ
 8
      OSAGE WIND, LLC,
 9    ENEL KANSAS, LLC;
      and ENEL GREEN POWER
10    NORTH AMERICA, INC.,
11            Defendants.
12         VIDEOTAPED DEPOSITION OF BILL PRICE
          Taken on Behalf of the Intervenor-Plaintiff
13         On July 21, 2021, beginning at 5:03 a.m.
          All Parties Appearing Via Webconference
14
                      APPEARANCES
15    Appearing on behalf of the PLAINTIFF:
      Cathryn D. McClanahan
16    Nolan Fields
      UNITED STATES ATTORNEY'S OFFICE
17    NORTHERN DISTRICT OF OKLAHOMA
      110 West Seventh Street, Suite 300
18    Tulsa, Oklahoma 74119
      918-382-2772
19    cathy.mcclanahan@usdoj.gov
      nolan.fields@usdoj.gov
20    and
      Charles R. Babst, Jr.
21    UNITED STATES DEPARTMENT OF THE INTERIOR
      OFFICE OF THE SOLICITOR
22    7906 East 33rd Street
      Tulsa, Oklahoma 74145
23    918-669-7730
      charles.babst@sol.doi.gov
24         Appearances Continued on Next Page
      VIDEOTAPED BY:  Megan Smith
25    REPORTED BY:  MARY K. BECKHAM, CSR, RPR
```

Page 2

```
1        APPEARANCES Continued
2    Appearing on behalf of the INTERVENOR-PLAINTIFF,
     OSAGE MINERALS COUNCIL:
3    Mary Kathryn Nagle
     Shoney Blake
4    PIPESTEM & NAGLE
     1333 New Hampshire Avenue
5    N.W. Washington, D.C. 20036
     202-407-0591
6    mknagle@pipestemlaw.com
7    Appearing on behalf of the WITNESS, BILL PRICE,
     INTERVENOR-PLAINTIFF and DEFENDANT, OSAGE WIND, LLC,
8    ENEL KANSAS, LLC and DEFENDANT, ENEL GREEN POWER
     NORTH AMERICA, INC.:
9    Thomas J. McCormack
     Robert Kirby
10   NORTON ROSE FULBRIGHT US LLP
     1301 Avenue of the Americas
11   New York, New York 10019-6022
     212-408-5182
12   thomas.mccormack@nortonrosefulbright.com
     robert.kirby@nortonrosefulbright.com
13   and
     Sarah M. Stevenson
14   MODRALL, SPERLING, ROEHL, HARRIS & SISKA, P.A.
     Post Office Box 2168
15   Albuquerque, New Mexico 87103-2168
     505-848-1800
16   sarah.stevenson@modrall.com
17
18
19   Also present:  Christina Watson, Michelle Hammock
20
21
22
23
24
25
```

Page 3

INDEX

```
1                    INDEX
2                                    Page
3   DIRECT EXAMINATION BY MS. NAGLE          8
4   DIRECT EXAMINATION BY MS. McCLANAHAN     174
5
6
7              EXHIBITS
8   Exhibit              Page
9   8    Email Dated May 15, 2014 Bates     142
10       Stamp Osage Wind PRIV-000089
11  36   Memo Dated October 31, 2013 Bates  88
12       Stamp Osage Wind PRIV-000414
13  38   Letter Dated October 9, 2014 Bates 157
14       Stamp Osage Wind PRIV-000243
15  46   Scope of Work Contract Bates Stamp  77
16       Osage Wind-000381
17  68   Email Dated September 30, 2014     144
18       Bates Stamp Osage Wind PRIV-000165
19  78   Membership Interest Purchase       37
20       Agreement between TradeWind and
21       Wind Capital
22  79   Membership Interest Purchase       43
23       Agreement between Enel Kansas and
24       TradeWind
25  81   Email - Lynn Slade to Robin Phillips 127
```

Page 4

EXHIBITS continued

```
1           EXHIBITS continued
2   Exhibit                  Page
3   84   Email Bates Stamp Osage Wind-000114 212
4   85   Email to Francesco Venturini        221
5        Bates Stamp Osage Wind PRIV-000112
6   98   Email Bates Stamp Osage Wind        238
7        PRIV-000128
8   102  Exhibit B(i) Bates Stamp Osage      48
9        Wind-003768
10  103  Scope of Work Agreement Bates Stamp 62
11       Osage Wind-024565
12  104  Construction Management Agreement   82
13       between EGPNA and Osage Wind
14       Bates Stamp EGPNA-000001
15  105  Email Bates Stamp Osage Wind-018680 106
16  106  Email Bates Stamp Osage Wind-018808 109
17  107  Memo Dated May 19, 2014 Bates Stamp 116
18       Osage Wind PRIV-000577
19  108  Memo Dated August 25, 2014 Bates    124
20       Stamp Osage Wind PRIV-000446
21  109  Email Dated October 20, 2014 Bates  160
22       Stamp Osage Wind-019010
23  110  Email Dated November 22, 2014 Bates 169
24       Stamp Osage Wind-038347
25
```

Page 5

EXHIBITS CONTINUED

```
1           EXHIBITS CONTINUED
2   Exhibit                  Page
3   111  Change Order Form Dated             170
4        December 9, 2014 Bates Stamp
5        Osage Wind-019012
6   112  Email from Steve Champagne Bates    206
7        Stamp Osage Wind PRIV-000698
8   113  Email Bates Stamp Osage Wind        207
9        PRIV-000700
10  114  Email Bates Stamp Osage Wind        211
11       PRIV-000157
12  115  Email Bates Stamp Osage Wind        217
13       PRIV-000311
14  116  Email Bates Stamp Osage Wind        226
15       PRIV-000306
16  117  Email Bates Stamp Osage Wind        231
17       PRIV-000606
18  118  Email Bates Stamp Osage Wind        254
19       PRIV-000258
20
21
22
23
24
25
```

Page 6

1 STIPULATIONS
2 It is hereby stipulated and agreed by and between
3 the parties hereto, through their respective
4 attorneys, that the deposition of BILL PRICE may be
5 taken pursuant to notice and in accordance with the
6 Federal Rules of Civil Procedure on July 21, 2021,
7 before Mary K. Beckham, CSR RPR.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1       THE VIDEOGRAPHER:  This is the videotaped
2 deposition of Bill Price in the matter of United
3 States, Osage Minerals Council vs Osage Wind in the
4 Northern District of Oklahoma, Case Number
5 14-CV-704-GKF-JFJ.  We are now on the record at
6 5:03 a.m. central time on July 21st, 2021.  Will
7 counsel please state their appearances for the
8 record?
9       MS. NAGLE:  Yes.  This is Mary Kathryn
10 Nagle from Pipestem & Nagle Law representing the
11 intervenor plaintiff, the Osage Minerals Council,
12 and with me here today is my colleague Shoney Blake.
13       MS. McCLANAHAN:  This is Kathy McClanahan.
14 I'm with the United States Attorney's Office here in
15 Tulsa, representing the United States.  I have with
16 me Nolan Fields, Charles Babst, and paralegals,
17 Michelle Hammock and Christina Watson.
18       MR. McCORMACK:  And this is Tom McCormack
19 with Norton Rose Fulbright on behalf of the witness,
20 Bill Price, and with me today are my colleagues,
21 Sarah Stevenson from Modrall Sperling and Bob Kirby,
22 also from Norton Rose Fulbright.
23       THE VIDEOGRAPHER:  Okay.  Will the
24 reporter now swear in the witness?
25 WHEREUPON,

Page 8

1                    BILL PRICE,
2 after having been first duly sworn, deposed and
3 says in reply to the questions propounded as
4 follows, to-wit:
5             DIRECT EXAMINATION
6 BY MS. NAGLE:
7       Q   So thank you so much, Mr. Price.  Good
8 morning -- or good afternoon as it may be --
9       A   Good afternoon.
10      Q   -- depending on where you are.
11      A   I'm in South Africa.  Yes, Johannesburg,
12 South Africa.
13      Q   Wonderful.  Thank you so much for taking
14 the time to join us today.  My name is Mary Kathryn.
15 I will be asking some questions on behalf of the
16 intervenor plaintiff in this case, the Osage
17 Minerals Council.  Just before we get started, have
18 you ever testified in a deposition before?
19      A   I have.
20      Q   Okay.  So --
21      A   Yeah.
22      Q   You probably know how it goes, but, you
23 know, I'll be asking some questions.  Your attorney,
24 Mr. McCormack, will be defending, and he may object.
25 I just ask that you answer my question unless he

Page 9

1 instructs you not to, and if you have any questions,
2 you know, feel free to ask me to clarify or, you
3 know, I certainly don't want you to have to guess or
4 assume anything, so please feel free to ask
5 clarifying questions if you need them, and, you
6 know, we can take breaks at any time.  So I will try
7 to watch the clock and take breaks, you know, on a
8 somewhat regular basis.  But if you ever need a
9 break at some time, please feel free to let me know
10 or let your counsel know, and he can ask and we can
11 certainly take a break.  Does that sound good to
12 you?
13      A   Yes, I understand.
14      Q   Okay.  Thanks so much.  Now --
15      MR. McCORMACK:  Ms. Nagle, can I ask a
16 quick question?  I know this is a little out of the
17 ordinary having to do this by Zoom.  One of the
18 things that I have suggested to my witness is I have
19 a phone here.  Obviously, I wouldn't do it in the
20 middle of a question unless there were a privilege
21 involved, but it may be that here and there the
22 client and I may wish to speak.  I would -- if I do
23 that, I would probably call him on the phone, mute
24 this out, and just -- I just want to let you know
25 that if I do that, maybe won't have to, I just

Page 10

1  wanted to let you know what our protocol is going to
2  be for that.
3        MS. NAGLE:  Okay.  Thank you.  I
4  appreciate that, and I appreciate -- you know,
5  obviously, we can't all be in the same room during a
6  Zoom deposition, so if you do need an opportunity to
7  speak to the witness, you know, certainly one of you
8  two can let me know and we can take a break --
9        MR. McCORMACK:  Okay.
10       MS. NAGLE:  -- to facilitate that phone
11 call.  Okay.  Thank you.
12       Q   (By Ms. Nagle)  So other than -- so it
13 sounds like, Mr. Price, you will have a phone
14 present with you during the deposition; is that
15 correct?
16       A   Yes.
17       Q   Will you be communicating with anyone else
18 other than -- other than your counsel during this
19 deposition?
20       A   I don't anticipate.  I have a clear
21 calendar, so I have a lot of responsibilities, so I
22 can't say that someone else wouldn't call, because I
23 do have it on, to be able to communicate.  It is on
24 the vibrate mode so to not cause an interruption to
25 this process.

Page 11

1        Q   Okay.  Great.
2        A   If others were to call me in my ordinary
3  course of business, and I haven't had that -- since
4  I have the phone on, others could call as well.
5        Q   Sure, sure.  Okay.  Thank you.  What did
6  you do to review or prepare for your deposition
7  today?
8        A   I have recently looked at some documents,
9  I've talked with the company's legal support staff
10 just to get some review and recollection of some of
11 the documents that took place, you know, six, seven
12 years ago.  It's been a while, so to try to refresh
13 my memory.
14       Q   Did you have any meetings with counsel to
15 prepare for the deposition?
16       A   Yeah, I had three meetings, three
17 discussions to just go over material.
18       Q   And --
19       A   I'm (inaudible) --
20       Q   And besides counsel, have you spoken to
21 anyone else today about your deposition?
22       A   Today, no.
23       Q   Prior to today have you spoken to anyone
24 about your deposition besides counsel?
25       A   Not the actual content.  I've spoken to my

Page 12

1  staff.  I've spoken to a few people to clear
2  schedule, to let them know that I wasn't available
3  during this period of time, so to generally try not
4  to disturb me while I go through this process, but
5  from a content perspective, no.
6        Q   Okay.  All right.  So in terms of your
7  employment with Enel, when did you first become
8  employed with an Enel entity?
9        A   I joined Enel through an acquisition.
10 Enel Green Power North America acquired a company
11 called AMP Resources that I was vice president of
12 operations with, and during that acquisition I was
13 asked to continue working for the company that was
14 acquired by Enel North America, and that's how I
15 joined them, through an acquisition.
16       Q   And do you recall roughly what time period
17 or year that would have been?
18       A   2005, 2006.
19       Q   Okay.  And so were you then, after that
20 acquisition, employed by Enel Green Power North
21 America?
22       A   Yes.
23       Q   And what was your job title after that
24 acquisition?
25       A   I was the vice president of geothermal

Page 13

1  operations, geothermal assets, and I had significant
2  experience in -- broad, general experience in
3  geothermal, so both development, construction and
4  operations.
5        Q   Okay.
6        A   So the acquisition that Enel did with AMP
7  Resources, there were four distinct geothermal
8  projects, and I was interested in acquiring those
9  projects and further developing them.
10       Q   And are you still employed with Enel
11 today?
12       A   Yes.
13       Q   And which Enel entity are you currently
14 employed by?
15       A   The same.
16       Q   Okay.
17       A   So while I'm in South Africa I'm here as
18 an expat.
19       Q   Okay.  What is your current job title
20 today?
21       A   I'm the country manager of Southern
22 Africa, CO and the managing director.
23       Q   Okay.  And have you, during the course of
24 your time with Enel, been employed by any other Enel
25 entities, or has it been EGPNA the whole time?

Page 14

1    A   So mine is all Enel Green Power North
2  America, so it changed some business entities, but
3  it's the same -- same core company.
4    Q   Okay.  And has your job title -- have you
5  held any other job titles besides vice president of
6  geothermal ops and country manager?
7    A   Yes.
8    Q   And what were the other job titles that
9  you've held?
10   A   The other job title was we started doing
11 geothermal construction works.  I went from just
12 this operational function to construction, so I
13 became the vice president of engineering
14 construction for Enel Green Power North America and
15 started with constructing geothermal projects and
16 then after that extended to constructing solar
17 projects for the vo-tech and then wind projects,
18 hydro projects, and then my area of responsibility
19 expanded beyond North America to Central and South
20 America.  So I was responsible for building projects
21 in Chile, Canada, North America -- of course that's
22 North America, but beyond the United States, and a
23 project in Panama, Costa Rica, Guatemala, a bunch of
24 projects in Mexico until about 2016 where I was
25 assigned and asked to come to South Africa to be the

Page 15

1  country manager position that I just referenced.
2    Q   And when did you work on the Osage Wind
3  Farm project?
4    A   2014, 2015 for sure, '14, yes, is my
5  recollection.
6    Q   And so would your title at that time have
7  been vice president of engineering and construction?
8    A   Correct.
9    Q   Okay.  So during that time period in 2014
10 to 2015 then, who did you report to?
11   A   I had a dual report.  We have a matrix
12 organization, so I reported to the CO, which it
13 was -- at the time was Francesco Venturini, and I
14 also reported to the head of engineering
15 construction for the -- all of Enel, which is a
16 position in Italy, a gentleman named Vagliasindi --
17 what was his first name -- so Mr. Vagliasindi, so
18 interesting as it's -- the spelling, Vittorio,
19 Vittorio Vagliasindi with Enel.  He has since
20 retired.
21   Q   Okay.  And was there anyone that reported
22 directly to you?
23   A   The project management staff -- are
24 you referring to the Osage project or other?
25   Q   Correct, just for the Osage Wind Farm

Page 16

1  project, who were the folks that reported directly
2  to you?
3    A   Primarily project management team, project
4  management includes some logistical staff.  At the
5  time we had, again, a matrix organization, so we're
6  not really hierarchal per se, when you say
7  reporting, because we have multiple business lines.
8  So the project management was the -- had the -- I
9  would say for my responsibility, to make it clear, I
10 had the overall execution responsibility for this
11 project, to ensure it was constructed and executed.
12   Q   And with that responsibility were you
13 there on the site for the wind farm project during
14 construction?
15   A   I mean, not full time.  I visited the site
16 from time to times, because I had multiple projects
17 under my responsibilities, so I visited various
18 projects in different countries.
19   Q   Who or was there someone who was there on
20 site on a daily basis that reported to you that you
21 relied on for updates about what was happening on
22 the ground at the site?
23   A   We had a site manager, a gentleman named
24 Bill Moskaluk, the site manager, and then from time
25 to time we had a project manager named Giuseppe

Page 17

1  DiMarzio.
2    Q   Okay.  And did you have any direct
3  communication with any of the subcontractors working
4  on the construction process?
5    A   I'm not too sure or recollect much
6  subcontractors.  I mean, I did have some discussion
7  of subcontractors.  If I can rephrase your question,
8  did I have -- of course, did I have discussions with
9  contractors or subcontractors?
10   Q   Sorry.  Did you have conversations or did
11 you communicate directly with subcontractors working
12 on the project?
13   A   Not too much subs, here and there doing
14 safety inspections, so not much of the
15 subcontractors, per se.  It's normally not something
16 that we would do.  Contractors, yeah, of course the
17 main contractors, you know, a lot.
18   Q   Were there -- were there contractors that
19 you had communications with?
20   A   All of our major equipment suppliers, of
21 course, the main contractor who did the turn key
22 aspect or balance of plant of the project, IEA.
23 Their vice president was a gentleman named Chris
24 Hanson.
25   Q   Okay.

Page 18

1    A   I've had a lot of discussions with him.
2    Q   Okay.  Great.  Now, were you involved at
3  all with the change order request process?
4    A   Yes.
5    Q   And what was your role with the change
6  order process?
7    A   The change order process is -- if we had
8  some work activities that were outside of the scope
9  of our contract, that a change order would be
10  created on the behalf of project management.  So
11  project management would put together through the
12  contractor and say, okay, there's something that was
13  outside of the work specification.  We would need
14  this additional work that would -- that a request be
15  done, and then my role would, one would be to review
16  it, understand it, have some discussions with the
17  contractor, understand some pricing, and then would
18  endorse it and then submit it for approval to --
19  to -- I believe through -- I've done a lot of
20  different projects with the change order processes
21  and procedures, but it would go to a level of
22  signature requirement for the company to acknowledge
23  the change order.  Depending on the cost of the
24  change order, it would have an impact on the time.
25  Can you hold on just a minute?

Page 19

1    Q   Sure.
2        (Discussion held off the record)
3    A   Okay.
4    Q   (By Ms. Nagle)  Okay.  So just to be
5  clear, was that a phone call from your counsel, from
6  Mr. McCormack?
7        MR. McCORMACK:  It was.
8    A   Yes.
9    Q   (By Ms. Nagle)  Are we okay to proceed?
10  Do you want me to --
11        MR. McCORMACK:  Yes.
12        MS. NAGLE:  Okay.
13        MR. McCORMACK:  No.  That's the functional
14  equivalent of reaching over and whispering in my
15  witness's ear.
16        MS. NAGLE:  Gotcha.
17    Q   (By Ms. Nagle)  So in terms of the change
18  order request process, who would submit a change
19  order request?
20    A   Who would submit?  It would be submitted
21  on behalf of project management, so -- so I'm going
22  to clear who -- what do you mean who?  As an entity,
23  as an individual?
24    Q   Would it have been, for instance, Bill
25  Moskaluk, or who would have in this process been

Page 20

1  responsible for submitting the change order request?
2    A   The initial change order request would be
3  submitted by project management, which would be
4  Giuseppe DiMarzio.
5    Q   Okay.  And how many -- roughly how many
6  change order requests were there during the process
7  of construction for the Osage Wind Farm?
8    A   I don't recall how many.  Typically we
9  don't want to have too many of these things, but I
10  don't remember the exact number.
11    Q   Okay.  And do you recall what sort of
12  frequency there were with them?  I mean, was it
13  common to have a change order request submitted on
14  this project, or were they rather infrequent?
15    A   I guess it depends on your interpretation
16  of infrequent.  From my personal experience with
17  building projects, the number of change orders on
18  this particular project was -- from the contractor
19  IEA there was more than we typically have, but other
20  works, not as much, so I would say less than
21  standard from my experience with the construction
22  renewal plans.
23    Q   Do you recall how many change order
24  requests were submitted for this project?
25    A   No.

Page 21

1    Q   Were you personally in charge of approving
2  or denying a change order request, or would that
3  have been someone else above you?
4    A   I would approve a change order request
5  that was submitted by Giuseppe DiMarzio, so in some
6  cases he would help prepare them, so I would approve
7  it at my level, and then for -- again, depending on
8  the amount, the cost and the certain topic, then it
9  would be escalated for final approval.
10    Q   Uh-huh.
11    A   Which usually in our procedures, there's a
12  signature on the bottom of them, so I would initiate
13  the process and go through a formal approval.
14    Q   What criteria did you use to decide
15  whether or not to approve a change order request?
16    A   A change order is -- the criteria was if
17  it was work scope outside of contract.
18    Q   Was there any work that was outside the
19  scope of the contract that should not be approved?
20        MR. McCORMACK:  Object to the form of the
21  question.  If you understand it, you can answer.
22    A   Can you rephrase?
23    Q   (By Ms. Nagle)  Sure.  So in terms of
24  deciding whether or not to approve a change order
25  request that came across your desk, how would you

Page 22

1 evaluate whether or not to approve such a request?
2      A   Whether it was not defined in the
3 contract.  So again, a change order is just
4 something that's outside the scope of work.  So you
5 have a contract, and if you have work that is not
6 scriptive, then it needs a change order.  Where I'm
7 a little bit struggling on your answer, it's not so
8 black and white, because there could be something in
9 the contract where it would be not precisely clear.
10 So there would be some situations where a contractor
11 and an owner would be at dispute of what that
12 language is, so parties would come together and come
13 to an agreement, and sometimes that would involve a
14 change order and sometimes not.
15      Q   Okay.  Did you ever deny a change order
16 request during your work on the Osage Wind Farm
17 project?
18      A   Yes.
19      Q   Do you recall what the basis was for
20 denying that change order request that you denied?
21      A   We -- I believed it was -- it was included
22 in the scope of work of the contract.
23      Q   So it was not necessary to approve the
24 change order request because the request already
25 covered work that was in the scope of the contract;

Page 23

1 is that correct?
2      A   Yes.
3      Q   Okay.  Did you ever need to elevate a
4 decision on a change order request for the Osage
5 Wind Farm project?
6      A   Yeah, as -- I think I've already explained
7 that, that our decision-making process on a change
8 order goes through multiple oversights, through a
9 procedure.
10      Q   So who above you would you elevate it to
11 for that oversight?
12      A   It went to our project management team and
13 its legal, and to Vittorio Vagliasindi, so multiple
14 signature checks, so we had various layers.  If we
15 had an engineering issue, there was an engineering
16 assessment done that says, yeah, we agree that this
17 additional work is necessary, so there's multiple
18 oversights.  Typically, again, in this particular
19 project at this phase of the change order procedure,
20 there's usually a signature on the bottom that
21 defines who is responsible to review that change
22 order and to approve it.
23      Q   Okay.  And what other projects did you
24 work on prior to Osage Wind?
25      MR. McCORMACK:  You mean at any time?

Page 24

1 Sorry.  You mean at any time, Ms. Nagle?
2      MS. NAGLE:  Sure.
3      Q   (By Ms. Nagle)  Any time before Osage
4 Wind, yes.
5      MR. McCORMACK:  Okay.
6      A   Referring to with Enel, another company?
7      Q   (By Ms. Nagle)  Yeah.  With Enel, what
8 projects did you work on prior to Osage Wind?
9      MR. McCORMACK:  I'm just going to ask,
10 Sarah, I don't know whether some or part of that
11 question implicates some of the issues that are off
12 the table now in this case.  Not that I care that
13 much, but I guess we should at least be mindful of
14 that issue.
15      MS. STEVENSON:  Thanks, Tom.  I'll keep
16 listening, and I think it's probably a fair
17 question.
18      MR. McCORMACK:  Okay.  All right.  Thank
19 you.
20      A   From the amounts of projects, I would say
21 I think -- I don't know how many, because I did a
22 lot.  I would say by the time I did Osage I had done
23 a few wind projects, I had done a few geothermal
24 projects, I did photovoltaic projects.  So by the
25 time I had done Osage, I actually did -- built a

Page 25

1 project, which was called Chisholm, which was
2 actually in Oklahoma as well.
3      Q   Okay.  Was Chisholm a wind farm project?
4      A   Yes.
5      Q   And was your job title with respect to
6 those other wind farm projects that you worked on
7 also vice president of engineering and construction?
8      A   Yes.
9      Q   So would your job responsibilities for
10 these other wind farm projects, including Chisholm,
11 have also included what you referred to as execution
12 of the project?
13      A   Yes.
14      Q   Okay.  Did any of those projects involve
15 Indian trust property?
16      A   Not that I'm aware of, no.
17      Q   Okay.  Did you work on any other projects
18 simultaneously with Osage Wind from 2014 to 2015?
19      A   Yes.
20      Q   Okay.  And what were those other projects?
21      A   Like I said, there were projects -- this
22 period of time is South America, Central America, a
23 variety of different projects.  I'd have to look at
24 the time.  So at any time I would have had about
25 five to ten projects, something of this nature, in

Page 26

1 execution that I would be responsible for.

2 **Q   Okay.  And were you involved at all in**
3 **structuring financing or ownership transactions**
4 **related to the Osage Wind Farm project?**

5 A   My involvements with -- there was a
6 transition period -- was more the technical
7 evaluation of the projects, so when there was a
8 desire by Enel to acquire the project, I was
9 involved in certain technical assessments of it.

10 **Q   Okay.  And so would that have been when**
11 **Enel Kansas acquired the project from -- would that**
12 **have been when Enel Kansas acquired the project?**

13 A   Yes, that was part of that process, so
14 part of the fork, so I would say part of the due
15 diligence --

16 **Q   Uh-huh.**

17 A   -- of the acquisition.

18 **Q   In terms of undertaking due diligence,**
19 **what were your responsibilities with regards to that**
20 **transaction?**

21 A   Reviewing the current state of the
22 project, the project had some existing agreements
23 relating to fact, had some -- for example, the IEA
24 agreement was an existing contract, turbine supply
25 agreements, power purchase agreements,

Page 27

1 interconnection agreements, just the -- those type
2 of aspects that would have an impact on the
3 execution of the project, and so I would get -- I
4 gave my comments or inputs on whether we can
5 complete the project or execute the project in the
6 time needed to meet the obligations of the contract.

7 **Q   What were the time obligations under the**
8 **contract that you all were required to meet with the**
9 **Osage Wind Farm project?**

10 A   The project in general has one main
11 customer and one main -- which is an offtake
12 agreement, which was through a power purchase
13 agreement.  I don't remember the name of the entity.
14 It was a utility, but Associated Electric or
15 something of this nature.  So we had a power
16 purchase agreement, and it had certain requirements
17 for us to produce and be online for, and then
18 other -- other aspects, we had interconnection
19 agreements to interconnect the facility into the
20 transmission grid and testing requirements to
21 demonstrate the project met its requirements to
22 declare commercial, so all those requirements, so
23 that when we put the project online we had enough
24 time to meet the contractual --

25 **Q   Uh-huh.**

Page 28

1 A   So that was my -- so that's the -- as I
2 said, the project has one main customer, which was
3 the -- this particular offtake.

4 **Q   And with regards to the power purchase**
5 **agreement with Associated Electric, did you all end**
6 **up meeting the contractual dates?**

7 A   Yes.

8 **Q   Do you recall what that date was?**

9 A   It was later 2015 -- or, excuse me, yeah,
10 '15, it was later 2015.  The project, yeah, met its
11 requirements.

12 **Q   Okay.  Did you ever communicate with**
13 **anyone from General Electric regarding the Osage**
14 **Wind Farm project?**

15 A   General Electric.  Well, there's two --
16 two business entities with this project with General
17 Electric.  One was the Turbine Supply Agreement,
18 called TSA, where they supplied the actual wind
19 turbines, the components of the wind turbines.  Then
20 we -- GE was also the production tax credit -- I
21 believe the partner for the project, so they had an
22 investment aspect, so we had -- through GE there was
23 a former -- a technical advisor and GE's technical
24 team to -- we would -- they would be part of our
25 project review meetings, they would be part of

Page 29

1 our -- the technical team to make sure the project
2 was built how we were supposed to build it, as you
3 would expect for a partner to -- for them to assess
4 that the project was being built the way it was
5 supposed to be built.

6 **Q   Uh-huh.  And in terms of GE's assessment,**
7 **were they assessing this during the phase of**
8 **construction, or would they have assessed that after**
9 **the completion of the construction?**

10 A   Both, during and upon completion.

11 **Q   And who at Enel would have been primarily**
12 **responsible for communication with GE?**

13 A   Well, again, it depends on what part --
14 are you talking about GE finance or GE turbine
15 supply agreement?

16 **Q   I see.  How about GE finance?**

17 A   GE finance would -- the technical team
18 would be -- would be me, but it also could have been
19 the project manager.  They could request certain
20 documents, and we would provide them.  They could
21 ask technical requirements to our engineering team
22 if they wanted to see some aspects, we would
23 submit -- they could provide documents.  So my
24 interface with GE finance group was primarily the
25 technical team.

Page 30

1    Q  Okay.  Do you recall any names of any
2  individuals at GE that you communicated with
3  directly about the Osage Wind Farm project?
4    A  Not off the top of my head.
5    Q  Okay.  Now, prior to Enel's acquisition of
6  the wind farm project, did you have any involvement
7  in Tradewind's purchase of the wind farm project
8  from Wind Capital Group in 2013?
9    A  Not much.
10    Q  Okay.
11    A  But I think I -- when I say that is, I
12  knew about it, I knew there was a desire to acquire
13  it, I knew -- from our standard company meetings, I
14  knew it was on our pipeline.  I knew it was
15  something that the company was interested in doing.
16  Once a project -- these type of activities are ran
17  through the business development team, and then once
18  they hit a certain maturity with the business
19  development team, then I get involved, because the
20  business development team does a lot projects, and
21  there's certain points where they would need my
22  input as we get closer to the project meeting a
23  certain maturity level.
24    Q  Do you know if it was the plan at that
25  time in 2013 for Enel to eventually acquire the

Page 31

1  project?
2    A  Say again?
3    Q  So do you know whether it was the plan at
4  that time in 2013 when Tradewind purchased Osage
5  Wind from Wind Capital Group, was it the plan then
6  for Enel to eventually acquire the project?
7    A  Again, I wasn't -- I wasn't part of the
8  decision-making process for that.  I was part of
9  meetings, staff meetings, so I was aware of the
10  aspects of it, but it would not be normally
11  customary in my responsibilities to be part of
12  that -- that activity.  So, yeah, I was aware that
13  Tradewinds was interested in -- which was our
14  development partner, to acquire this project, and
15  then, of course, we would then -- we would acquire
16  the project from Tradewinds, we provided some
17  monetary support from Tradewinds, and the details of
18  the transactions, how much we paid, all that stuff,
19  it was not -- I wasn't part of that.
20    Q  Okay.  Do you recall who from Tradewind
21  was involved in the transaction?
22    A  No.
23    Q  Okay.  Do you recall who from Wind Capital
24  Group was involved in the transaction?
25    A  No.

Page 32

1    Q  Do you recall who was Enel's legal
2  representation in the transaction?
3    A  Well, I think Enel had both internal and
4  external counsel that supported the transaction, but
5  did I have direct -- are you talking 2013 or what
6  period?
7    Q  That is correct.
8    A  2013?
9    Q  Yeah, 2013.
10    A  I wasn't involved in that at all.
11    Q  Okay.  Are you familiar with the detailed
12  legal analysis that defendants' attorneys undertook
13  in this case to determine whether or not the Osage
14  Wind Farm project would require a mining permit from
15  the Osage Nation?
16    A  Are you referring to the 2013 opinion or
17  the one in '14?
18    Q  Either one.  But, yes, are you familiar
19  with either one of those legal opinions?
20    A  I'm somewhat familiar, and I read them at
21  the time.  The 2013 document I read when we were in
22  construction mode, so I wasn't aware of its -- at
23  the time of starting construction, and then I became
24  aware of it, and then, of course, the 2014 opinion,
25  I was there at the project, so much more aware of

Page 33

1  it.
2    Q  When did you first read the 2013 opinion?
3    A  September, October, I believe, of 2014.
4    Q  Okay.  And who decided this analysis was
5  necessary from Enel or any of the Enel affiliated
6  entities?
7    A  Which one?
8    Q  Well, I guess let me ask it this way.  Who
9  requested Modrall Sperling to undertake this
10  analysis?
11    A  Which analysis, 2013 or 2014?
12    Q  How about the 2013 legal opinion?
13    A  I have no idea.  I wasn't part of the
14  project --
15    Q  Okay.
16    A  -- at that time.
17    Q  For 2014, do you have any knowledge of who
18  asked Modrall Sperling to undertake that legal
19  analysis?
20    A  I suspect it would be part of our legal
21  team, because we were assessing it.  I also think
22  that Tradewinds, they did a permitting assessment.
23  We asked Tradewinds, you know, what's up with this
24  permit requirement, can you give some insight over
25  it, and then so Tradewinds would be involved and our

1  legal and executive staff team.
2  Q   Okay.
3  A   And this is speculation.
4      MR. McCORMACK:  And I would jump in on
5  that and say, if you know the answer, answer it.  If
6  you don't know the answer, don't speculate.
7  Q   (By Ms. Nagle)  So just to be clear, do
8  you know when the decision was made in 2013 to ask
9  Modrall Sperling to undertake their legal analysis?
10 A   I don't know anything about the 2013 --
11 the decision process, who -- I read the document
12 after the fact in 2014.
13 Q   Okay.  Then 2014, do you know when Modrall
14 Sperling was asked to undertake craft -- drafting
15 that legal analysis?
16 A   I don't have any direct knowledge of the
17 time, but I did read the analysis after it was
18 drafted.
19 Q   Do you know at that time in 2014 who at
20 Enel was responsible for providing Modrall Sperling
21 with the facts that they relied on in writing this
22 legal analysis?
23 A   I don't understand what you mean, facts.
24 Could you explain what exactly, what facts you are
25 referring to?

1  Q   So in terms of the method of construction,
2  what was being mined, what was being taken, the
3  methodology of taking the minerals from the ground,
4  how they were being used, any of that information
5  relevant to the actual construction of the wind farm
6  project, do you know, was there someone at Enel who
7  was responsible for providing those facts to the
8  attorneys at Modrall who were performing this legal
9  analysis?
10     MR. McCORMACK:  Hold on one second.  I'm
11 going to object to the form of the question for a
12 variety of reasons, including inserting facts not
13 established and also compound, but if you understand
14 the question, you can answer it.
15 A   Well, I recall us -- us as in Enel, the
16 execution team, as well as myself, explaining to the
17 group what -- the process that we were doing at the
18 site, so this included a team that included legal
19 counsel, it included permits.  So when we -- when we
20 were trying to understand what the situation was, we
21 got together as a group, so I provided the technical
22 explanation of what was occurring on site.
23 Q   Uh-huh.
24 A   So if those are the facts you are
25 referring to, yes.

1  Q   Okay.  Would anyone else have provided
2  facts related to what was occurring on site in
3  addition to you, or would it have just been you?
4  A   It could have been -- these teams, we have
5  various meetings, we had numerous meetings.  So if
6  it was a high level meeting, it would have just been
7  me.  If we had various support group meetings, it
8  could have been, of course, Bill Moskaluk, our
9  engineering team, our environmental team, Giuseppe
10 DiMarzio, the project manager.
11 Q   Okay.  In terms of the 2014 memo, when did
12 the Modrall Sperling attorneys conclude their --
13 finish their analysis for purposes of drafting the
14 2014 memo?
15 A   October or November of 2013.
16 Q   Okay.  So for purposes of --
17 A   I don't know when they draft -- that's
18 when I read it, so...
19 Q   Okay.  Do you know whether they updated
20 their analysis between 2013 and 2014?
21 A   They updated -- I read both.  The
22 conclusions were the same.  So I don't know what you
23 mean by update.
24 Q   Well, I'm just asking whether you know of
25 any updates that were made based on changes on site,

1  changes in the construction plan.  Do you know of
2  any updates that were made to the memo to account for
3  changes from 2013 to 2014?
4  A   I don't recall.
5  Q   Okay.  So I am now going to introduce an
6  exhibit, which has actually previously been
7  introduced.  I'm going to share my screen.
8  Hopefully it will be visible.  So this has
9  previously been entered as Exhibit 78 in this
10 litigation.  It is Bates stamped Osage Wind-021248,
11 and I'll represent that it is the Membership
12 Interest Purchase Agreement between TradeWind Energy
13 and Wind Capital Group.  Mr. Price, are you familiar
14 with this document?
15     (Exhibit 78 previously marked for
16 identification.)
17 A   I might have read it, but since I wasn't
18 part of the purchase, it wouldn't be something that
19 I spent a lot of time with.
20 Q   (By Ms. Nagle)  Okay.  I note here that it
21 states that -- on this page that Wind Capital Group
22 is the seller and TradeWind Energy is the purchaser.
23 What is your understanding of the purpose of this
24 agreement?
25 A   Well, it seems pretty clear.  So it says,

Page 38

1  you know, TradeWinds was buying the project from the
2  Wind Capital Group.
3  **Q   Okay.  And if we look at the page ending**
4  **in Bates stamp 50 here, I see that EGP is defined as**
5  **Enel Green Power North America, Inc.  Was that your**
6  **employer at the time of this agreement in 2013?**
7  A   I believe so, yes.
8  **Q   Okay.  If we look at the page ending in**
9  **Bates stamp 58, let's get there, here, if you look**
10 **on Section 2.4h, it states, "The board of directors**
11 **of purchaser and EGP shall have approved this**
12 **transaction in all respects."  Do you know who was**
13 **on the board of directors at EPGNA at the time of**
14 **this agreement?**
15 A   No.
16 **Q   Do you have any knowledge of whether or**
17 **not the board of directors at EGPNA reviewed the**
18 **transaction and approved it?**
19 A   No.
20 **Q   Okay.  Do you know who was on the board of**
21 **directors at TradeWind Energy at this time?**
22 A   No.
23 **Q   I'm sorry.  I didn't hear that.  Did**
24 **you --**
25 A   No.  It was not normally my

Page 39

1  responsibility.  I wasn't personally on the board of
2  either company.
3  **Q   Okay.  Do you know who was responsible for**
4  **drafting this agreement?**
5  A   No.
6  **Q   Okay.  Would Enel have been involved at**
7  **all in the drafting of this agreement?**
8  A   It's speculation on my part, so, no, I
9  wouldn't.  Obviously, if Enel had some -- would
10 have had an interest in the project they would
11 have -- I would suspect they would have an interest
12 in this agreement, but I have no direct knowledge of
13 such.
14 **Q   Okay.  If we look at the page ending in**
15 **Bates stamp 21251, just scroll up here really quick,**
16 **we're in the definition section, I see here in**
17 **governmental authority, it is defined as meaning,**
18 **"any United States, federal, state, local or other**
19 **governmental authority," and then it goes on to say,**
20 **"provided, however, that for the avoidance of doubt,**
21 **no Native American Tribe, nation, entity, body,**
22 **organization, governmental or other authority or any**
23 **agency, division, ministry, instrumentality or**
24 **authority thereof shall be considered a governmental**
25 **authority for any purpose hereunder."  What is your**

Page 40

1  **understanding for why Native American tribes were**
2  **excluded from the definition of governmental**
3  **authority in this agreement?**
4  A   I don't know.  I wasn't a party to this.
5  I wasn't -- I didn't draft it.  I didn't, you know,
6  review this particular aspect.  I didn't opine on
7  this.  So as I said, when I read the document, it
8  was more -- it was after the fact, so this was a
9  decision that was done well before my involvement
10 with it.
11 **Q   Okay.  Let's look at -- do you know**
12 **whether it would be typical in an agreement of this**
13 **nature to exclude Native American tribes from the**
14 **definition of governmental authority?**
15 A   I have no opinion on that.  This is the
16 first project that I recall that I'd done, I'd built
17 that was part of a Native American tribe, and so I
18 would not have any idea whether it would be normal
19 or not.
20 **Q   Okay.  Fair enough.  Moving on to page**
21 **Bates stamp 21293, so here we have the Guaranty**
22 **Agreement, and it looks like Enel Green Power North**
23 **America is the guarantor.  Do you see that?**
24 A   Yes.
25 **Q   What was EGPNA's interest in serving as**

Page 41

1  **the guarantor here?**
2  MR. McCORMACK:  Object to the form of the
3  question, assumes facts, but if you know the answer,
4  you can answer.
5  A   I don't.  You are asking me about an
6  agreement that I've continued to represent I don't
7  have a lot of knowledge about.  So it's not an
8  engineering and construction agreement.  It's an
9  execution agreement to purchase the project, and
10 it's not something that I had any involvement with.
11 **Q   So you don't have any understanding as to**
12 **why EGPNA would want to serve as the guarantor in**
13 **terms of this acquisition?**
14 A   I have some speculation, but since I
15 wasn't part of the agreement, it's really -- nor did
16 I have any decision-making process on it.
17 **Q   Okay.  In terms of Enel Kansas's purchase**
18 **of the Osage Wind Farm project from TradeWind in**
19 **2014, do you recall who from TradeWind was involved**
20 **in that acquisition?**
21 A   No.  I spoke to a lot of people at
22 TradeWinds.  I don't remember the names.  If I
23 looked at a list of names, I would probably recall.
24 It was a long time ago, but I had a lot of
25 discussions with the Tradewinds team, and I did work

Page 42

1  with Tradewind's group on a variety of activities.
2  We did a lot of projects with Tradewind as a
3  developer partner.
4      Q    Would it have been Rob Freeman?
5      A    The name sounds familiar.
6      Q    Okay.  But you don't know for sure?
7      A    No.
8      Q    Who from Enel Kansas was involved in that
9  transaction between Enel Kansas and TradeWind in
10 2014?
11     A    Enel Kansas was the entity that, you know,
12 acquired the project, so it would have been Enel
13 staff, it would have been our legal staff, a lot of
14 business development staff, executive staff, finance
15 staff, pretty much a lot of the team within the
16 company.
17     Q    Do you know who Enel Kansas's legal
18 representation was in this transaction?
19     A    No.
20     Q    Okay.  Did your responsibilities with
21 respect to Osage Wind, the wind farm project, change
22 at all as a result of this transaction in 2014?
23     A    No.
24     Q    Okay.  So I am now going to show what has
25 previously been entered as Exhibit 79 in this

Page 43

1  litigation, and that is Bates stamped Osage
2  Wind-021119.  Let me see if I can enlarge it just a
3  little bit here.  There we go.  That's maybe a
4  little bit easier to see.
5          This is a Membership Interest Purchase
6  Agreement between Enel Kansas and TradeWind Energy,
7  dated September 17th, 2014.  Have you seen this
8  agreement before, Mr. Price?
9          (Exhibit 79 previously marked for
10 identification.)
11     A    I believe I have.  Again, not -- I knew we
12 purchased it, I knew there was an agreement here,
13 but I have not spent a lot of time on it, so...
14     Q    (By Ms. Nagle)  Do you --
15     A    I'm aware of it, but -- I've read it a
16 time or two, and since it's not something that has
17 much to do with the execution of the project, it
18 wouldn't have been something that I spent a lot of
19 time on.
20     Q    Do you know the purpose of this agreement?
21     A    Sure.  It's to purchase the project from
22 TradeWinds.
23     Q    Okay.  Great.  If we look at page ending
24 in Bates stamp 23, it looks like it states here that
25 Enel Kansas, LLC, is the buyer and TradeWind Energy

Page 44

1  is the seller; is that correct?
2      A    Yes.
3      Q    Okay.  And if we look at the page ending
4  in Bates stamp 21127, we're in the definitions -- in
5  Article 2 definitions.  Governmental authority here
6  states that it means "any national, tribal, state or
7  local government."  So I note that it looks like
8  this definition of governmental authority includes
9  tribal, whereas the last one we looked at excluded
10 tribal government.  Do you have an understanding of
11 why the decision was made to include tribal
12 documents within the definition of governmental
13 authority in this 2014 agreement?
14         MR. McCORMACK:  Hold on one second.
15 Object to the form of the question, assumes facts
16 not in evidence.  But you may answer the question if
17 you understand.
18     A    I don't, no.
19     Q    (By Ms. Nagle)  Do you know which entity,
20 whether it was Enel Kansas or TradeWind Energy that
21 would have requested to include tribal in this
22 definition of governmental authority?
23     A    No.
24     Q    Do you know who at Enel would know the
25 answer to that question?

Page 45

1      A    Again, I could speculate, but I don't have
2  direct knowledge of who would have.  I'm sure I
3  had -- we have a leadership team who had an impact,
4  but I have no -- no direct knowledge to be able to
5  address your question.
6      Q    Do you know who for Enel Kansas worked on
7  drafting this agreement?
8      A    I, again, being part of our staff meetings
9  and being familiar with the agreement being
10 discussed, our business development team, our legal
11 team, obviously our CEO, those are the teams that I
12 recall in our staff meetings that referenced the
13 agreements and the progress of such.
14     Q    Okay.  And so by reference to your CEO,
15 are you referring to Francesco Venturini?
16     A    Yes.
17     Q    Okay.  When you reference the legal team,
18 would that be Mike Tierney or someone else at Enel?
19     A    Who was head at the time was Steve
20 Champagne, so it's that legal team and support.
21 Mike Tierney was a legal support under the team of
22 Steve Champagne.  The business development team,
23 which was David Post, head of commercial office, and
24 a person that did a lot of work with TradeWinds
25 which was Mike Storch, were the individuals

Page 46

1  primarily were the individuals responsible for the
2  execution of this particular document.
3      Q   Okay.  And do you have an understanding
4  whether under this definition of governmental
5  authority here, would this definition have included
6  the Osage Minerals Council as a governmental
7  authority?
8      MR. McCORMACK:  If you know.
9      A   I don't understand your question.
10     Q   (By Ms. Nagle)  Okay.  Do you understand
11 whether for purposes of this agreement here, that
12 we're looking at in Exhibit 79, whether under this
13 definition the Osage Minerals Council would have
14 been a governmental authority?
15     MR. McCORMACK:  Same objection, lack of
16 foundation, assumes facts.  But if you know the
17 answer, you can give it.
18     A   I see the definition here, but, you know,
19 I don't know exactly Bureau of Indian Affairs, if
20 it's included in this, if it's considered a
21 government authority.
22     Q   (By Ms. Nagle)  Okay.
23     A   I'm unsure.  I'm not sure.
24     Q   Fair enough.  Do you know whether or not
25 Steve Champagne, who worked on this agreement, or

Page 47

1  any of the other drafters who worked on this
2  agreement relied on Modrall Sperling's legal opinion
3  that you mentioned before in drafting this
4  definition of governmental authority?
5      A   No, I'm not aware.
6      Q   Okay.  If we look at the page ending in
7  Bates stamp 21126, it defines affiliate here on this
8  page, means, "with respect to any Person, any other
9  Person controlling, controlled or under common
10 control of such first Person.  For purposes of this
11 definition, the term control means, (1), the
12 ownership of 50 percent or more of the equity
13 interest in a Person, or (2) the power whether by
14 contract, equity ownership or otherwise, to direct
15 or cause the direction of the policies or management
16 of a Person."  Do you know whether for purposes of
17 this definition whether EGPNA would have been an
18 affiliate of Enel Kansas under this definition?
19     MR. McCORMACK:  Excuse me, I'm going to
20 object to the form of the question, lacking
21 foundation and -- but, nonetheless, if you have an
22 answer to that, go ahead.
23     A   Look, for me, my understanding -- my
24 understanding is Enel Green Power had greater than
25 50 percent ownership in the Enel Kansas project, so

Page 48

1  I would -- so knowing that, it would be the
2  controlling entity.
3      Q   (By Ms. Nagle)  Okay.  Fair enough.  Let
4  me just open up my next exhibit.  So, let's see
5  here, I'm now going to introduce a new exhibit, and
6  I believe that we are at Exhibit 102, but someone
7  please correct me if I'm wrong about that, but
8  unless someone corrects me, this will be Exhibit 102
9  in this litigation, and it is Bates stamped Osage
10 Wind-003768, and I will note for the record that it
11 looks to be Exhibit B(i), "To balance of plant
12 engineering, procurement and construction contract
13 by and between Osage Wind, LLC, and RMT, Inc, scope
14 of work."  Mr. Price, are you familiar with this
15 agreement?
16     (Exhibit 102 marked for identification.)
17     A   Yes.
18     Q   (By Ms. Nagle)  What is this agreement or
19 document?
20     A   What is the date of it?
21     Q   Well, I will actually state that based on
22 where this falls in defendants' production, we think
23 it's March 25th, 2013, but that date does not appear
24 anywhere that we've been able to see on this actual
25 document.  We're just looking at the Bates stamp in

Page 49

1  relation to other documents in the chronology.  So
2  my guess to you is that it would have been
3  March 25th, 2013.
4      A   So it would make sense.  So my
5  recollection is there was an existing construction
6  contract that exists with the project, and the
7  construction company was RMT.  RMT was acquired in
8  some manner by IEA, and so this construction
9  contract is not something we viewed as an asset of
10 the project, primarily because it had an existing
11 agreement to execute the construction of the
12 project.
13     So, yeah, I was familiar with it.  It was
14 also interesting from my side is the Wind Capital
15 Group was, I would say, a competitor of sorts, so
16 they also built projects, so we -- we were able to
17 get -- this was an existing turn key contract that
18 was used within the industry, so that's my
19 recollection of this particular contract.
20     Q   Okay.  And let's see, if we look at page
21 10, which is ending in Bates stamp 3778, let me see
22 here for a second, okay.  This page here.  I will
23 note that paragraph E, note under here General Civil
24 Infrastructure Services - Clarifications and
25 Exclusions, paragraph E here states, "Contractor

**Bill Price**

**7/21/2021**

**14 (50 - 53)**

1 will not be restricted regarding movement or
2 transport of soil materials, nor will contractor be
3 responsible for fees or delays associated with
4 mineral rights issues."  Mineral rights does not, by
5 what I've reviewed of this document, appear to be
6 defined within the document.  Do you have an
7 understanding of what is meant by mineral rights
8 issues?
9     A   Well, if it's not defined, then it's
10 speculation.  Since it's capitalized, it should have
11 been defined.  So this agreement -- mineral rights,
12 we have rights to minerals.
13     Q   So for the purposes of the Osage Wind Farm
14 project, would that be in reference to the minerals
15 of the Osage Mineral Estate?
16     A   Sure.  I think that, you know, mineral
17 rights would be -- it could be a lot of entities.
18     THE REPORTER:  I'm sorry.  Could you
19 repeat your answer?
20     A   It could be a lot of entities, mineral
21 rights, the way I associate it.  So if you had a
22 quarry of such and you became an entity where you
23 are getting minerals for certain aspects and there
24 was -- you know, it's who your purchase team --
25 minerals or rock or material from, who owned that

1 rock and whether it's -- I think that would make
2 common sense in this particular paragraph or
3 sentence.
4     Q   Do you have an understanding of what soil
5 materials refers to right here (indicating)?
6     A   I think soil materials could be anything
7 as far as soil.
8     Q   Would it be the materials excavated during
9 construction of the Osage Wind Farm project site?
10     A   (Inaudible.)
11     THE REPORTER:  Okay.  I didn't hear the --
12 could you repeat your answer?
13     A   I said it could.
14     Q   (By Ms. Nagle)  Okay.  Now, is it your
15 understanding that this communication related to
16 how -- regarding the movement or transport of soil
17 materials, was this consistent with what Enel
18 communicated to IEA during the construction phase of
19 the project?
20     A   No, we -- no, there was a limitation to
21 moving of rocks, and there's also some common sense
22 of when you transport, some economic decisions that
23 -- dealing with soil materials, so they are usually
24 defined within the agreement, because there's a cost
25 impact associated with it.

1     Q   So if I'm correct, did you just say there
2 was a limitation imposed in terms of the movement of
3 rock on the Osage Wind Farm project?
4     A   I believe so, yes.
5     Q   And would that be in contradiction to the
6 statement here where it states that "Contractor will
7 not be restricted regarding movement or transport of
8 soil materials"?
9     MR. McCORMACK:  Object to the form of the
10 question.
11     A   Yeah, I --
12     MR. McCORMACK:  Assumes facts.
13     A   Sorry.  Sorry.  I interrupted you, Mr.
14 McCormack.
15     MR. McCORMACK:  No.  I was just saying,
16 object to the form of the question.  It assumes
17 facts about what the circumstances were relative to
18 this provision and the activities on the site.
19     Q   (By Ms. Nagle)  So, Mr. Price, going back
20 to my question, it states here that "Contractor will
21 not be restricted regarding movement or transport of
22 soil materials," but is it your testimony today that
23 there was actually a limitation in place regarding
24 how IEA could move or transport soil materials
25 within the project?

1     A   Yes.
2     Q   Do you know when that limitation was put
3 in place?
4     A   Well, this contract was replaced.  This
5 wasn't -- as far as I understand, this is the RMC
6 contract, this is the contract that was used to
7 execute the project, so you are asking me the
8 question, and I'm lost to the contract.
9     Q   Okay.  Look at the next paragraph, F, it
10 states, "The contract price includes the following
11 quantities of materials for excavation."  Then it
12 lists a lot of materials here.  If you look at the
13 top of the next page it says, "Contractor will be
14 responsible to track excavation volumes periodically
15 throughout the project."  What is your understanding
16 of what is meant by "track excavation volumes
17 periodically throughout the project"?
18     A   I think it's self-explanatory.  So
19 contractors -- that they would track the excavated
20 volumes, how much material was removed from the --
21     Q   And I --
22     A   -- in the excavation process.
23     Q   And do you know whose job that was
24 primarily, like what individual at IEA was
25 responsible for tracking excavation problems -- or

1  volumes, excuse me.
2      A   No.
3      Q   Okay.
4      A   It says here the contractors.  The
5  contractors are defined in the terms as contractor.
6  And this particular agreement says that would be the
7  case now.
8      Q   Okay.  If you look at paragraph F -- I'm
9  sorry, paragraph G here, it says, "Rock blasting or
10 removal has not been included."  What does that
11 mean?
12     A   Well, the rock blasting, when you are
13 doing an excavation, if the rock material is too
14 hard, it requires blasting, so, therefore, this is a
15 commercial agreement between two parties.  So what
16 it's reflecting here is if -- if blasting is
17 required, the contract is explaining that it's not
18 part of the scope of work.  So if you have to blast
19 the rock, then it would be -- this would be an
20 example of what you would require a change order.
21     Q   So why wasn't rock blasting initially
22 included in this scope of work?
23     A   Again, I wasn't part of this contract.
24     Q   Do you know why it wasn't included in the
25 contract?

1      A   I just explained I didn't know why -- I
2  didn't have anything to do with this contract.  It
3  was negotiated before -- this is something that
4  existed before the project.
5      Q   Was rock blasting eventually used at the
6  Osage Wind Farm project site?
7      A   Yes.
8      Q   Do you know who made the decision to
9  utilize rock blasting?
10     A   Well, it was a combination -- yeah, I do
11 know.
12     Q   Who would that have been?
13     A   Well, it was the contractor, site manager
14 or even project management and myself.
15     Q   And when was that decision to use rock
16 blasting made?
17     A   Well, there was some decision to blast a
18 certain amount of foundations based on some
19 geotechnical assessments that was done at the time
20 of the updated agreement.  So there was some
21 assessment where rock blasting was expected to be
22 needed because of the hardness of the rock, and then
23 throughout the execution of the project, there was
24 additional rock blasting that was performed by the
25 contractor, IEA.

1      Q   And when you mentioned that it was based
2  on the geotechnical assessment, do you recall
3  roughly the month or year when it was determined
4  that rock blasting would be necessary?
5      A   I don't.  What I recall is when we
6  acquired the project we did a technical assessment,
7  and we thought there was some foundations that was
8  required, and we put a stop or put a figure in the
9  contract, which was 27 -- 27 excavation sites that
10 would need to be potentially blasted, so that -- and
11 the primary reason is that when you do a
12 geotechnical investigation, you just do a sampling
13 of the subsurface situation, so our assessment of
14 the subsurface conditions had some question marks,
15 whether it needed -- it could be excavated through
16 normal -- an excavation process, so you would put a
17 provision in the contract to allow the subsurface
18 blasting if it was necessary, up to 27 foundations.
19     Q   So the determination to blast these 27
20 foundations, would that have been made after -- this
21 draft agreement that we're looking at now was
22 drafted in March of 2013?
23     A   Yes.
24     Q   Would it -- would that determination to
25 blast those 27 sites have been made in 2014?

1      A   I don't know exact date, but it was
2  certainly in 2014, the summer of 2014 when we were
3  negotiating the new contract that it was included.
4      Q   Okay.  And so for purposes of the 2013
5  legal opinion that Modrall Sperling undertook, would
6  the attorneys who worked on that legal opinion,
7  would they have been informed at that time in 2013
8  that rock blasting or removal was not being used at
9  the Osage Wind farm site?
10         MR. McCORMACK:  Hold on.  Object to the
11 form of the question, lack of foundation, but if you
12 know the answer, you may --
13     A   I don't know the answer.  I wasn't
14 involved.
15     Q   (By Ms. Nagle)  Okay.  And in 2014 when
16 the determination was made to use rock blasting of
17 the 27 excavation sites, who at Enel informed
18 Modrall Sperling of this change in construction?
19         MR. McCORMACK:  Object to the form of the
20 question, assumes facts.  If you know the answer,
21 you can answer.
22     A   First of all, I don't know if it was a
23 change.  I don't know what the legal team knew
24 before, other than what was written in the legal
25 opinion.  So I didn't know if they knew -- if they

Page 58

1 didn't know about blasting or not, because I wasn't
2 there, I didn't know.  In the 2014 opinion, there
3 was explanation given that rock blasting was done,
4 so I know that it was part of the input factor of
5 which you referred to earlier as facts of the
6 process of excavation.  2013, I don't know.
7    Q   (By Ms. Nagle)  Okay.  So you're not sure
8 who at Enel informed Modrall Sperling in the summer
9 of 2014 that rock blasting would occur; is that
10 correct?
11        MR. McCORMACK:  Object to the form of the
12 question, inconsistent with his answer, but you can
13 answer it again.
14    A   I believe I've already discussed that.  So
15 we, as a group, got together as a team, especially
16 when we received this notification from the Bureau
17 of Indian Affairs, and we, like I said, asked to --
18 the activity of mining, so we got together to
19 describe what activity we were doing on site so it
20 could be assessed on -- you know, is that considered
21 mining.  So myself, from the technical team, as well
22 as my support staff, described the process that was
23 being taken place at the site.
24    Q   And who else would have been in these
25 discussions that you've just referred to besides

Page 59

1 yourself?
2    A   I believe you already asked that question,
3 and I've already answered it.
4    Q   Okay.  I'm not sure that I understand that
5 you've answered specifically as to the conversations
6 you were just describing.  So who else would have
7 been involved in these discussions with you that you
8 just referred to in the summer of 2014?
9    A   It's the question where you asked me about
10 the facts, and I asked you -- I returned, I said,
11 what facts, and you asked me facts associated with
12 the excavation and the process of the plant, and I
13 explained to you how we got together and presented
14 the information and who I thought was on those
15 calls.
16    Q   Okay.  So in terms of the other
17 individuals, who would have been on those calls?
18 Would it have been Joan Heredia?
19    A   Yes, for sure.
20    Q   Okay.  What about Francesco Venturini?
21    A   He's a CO, he could have been, but -- and
22 we had multiple calls, as I believe I explained to
23 you.  So you want me to explain it again.  We had,
24 you know, high level, executive level, what I call
25 high level discussions, and then various group level

Page 60

1 discussions.
2    Q   Okay.
3    A   So -- of the activities that we were doing
4 at the sites.  We had multiple meetings with
5 multiple entities to describe, your term, facts upon
6 excavation of what was going on at the site.
7    Q   Would Giuseppe DiMarzio have been in these
8 meetings?
9    A   In some of them, yes.
10    Q   Okay.  What about Matt Gillhousen?
11    A   Matt, I think, was TradeWinds, so I
12 believe so, yes.
13    Q   Okay.  What about Jennifer Dean?
14    A   I'm not sure.
15    Q   Okay.  What about Jacob Valentine?
16    A   Not sure.
17    Q   Okay.  Jeff Riles?
18    A   Jeff Riles.  Jeff Riles was a
19 communication person who helped with our
20 communications on site, so he would be on some of
21 them.
22    Q   Okay.  What about Mike Storch?
23    A   Mike Storch was on some, as well as the
24 high level discussions with -- he's the chief
25 operating officer and had a big input on the

Page 61

1 business transaction of the project.
2    Q   Okay.  And what about Aaron Weigel?
3    A   I believe so.
4    Q   Okay.  Thank you.  All right.  So just one
5 last thing with this document.  If you look here on
6 page ending in Bates stamp 3779, under WTG
7 Foundations, it looks like it says, "Construct 94
8 Turbine Foundations in the locations provided by
9 owner and achieve foundation completion."  Is it
10 your understanding that the initial plan was to
11 construct 94 separate wind turbines?
12    A   Again, this is -- this is what the
13 agreement says.  So I'm unclear why you are asking.
14 So it's -- the intention of this particular
15 agreement reflects 94 foundations, yes.
16    Q   Thank you.  So I'm now going to introduce
17 another exhibit.  So this -- let's see, let me pull
18 it up.  So I believe this will be -- I believe this
19 will be Exhibit 103 that we are now looking at.  And
20 Exhibit 103 is Bates stamped Osage Wind-024565, and
21 it is another scope of work agreement similar to the
22 one we just looked at.  I will represent to you that
23 based on its location within defendants' production
24 and the Bates stamping of it, it appears to be the
25 June 2014 version.  Are you familiar with this

Page 62

1 document, Mr. Price?
2          (Exhibit 103 marked for identification.)
3     A   When was it executed, when was this
4 signed?
5     Q   (By Ms. Nagle)  You know what, I am not
6 actually certain, but let me see if there's anything
7 at the end that would indicate, and I don't know --
8 do you know whether there were various versions that
9 were worked on before it was actually, finally
10 executed?
11    A   See, my recollection is there was an
12 existing agreement, and then we transitioned to RMT
13 when RMT was purchased by IEA.  So I'm trying to --
14 at some point RMT became IEA, so that's why I'm kind
15 of wondering here, is -- with the agreement, the
16 execution version should have been perhaps between
17 Osage Wind and IEA, or it could have been RMT, and
18 then -- and then at the execution of the project,
19 RMT was finally acquired by IEA, so that's why I'm
20 -- that's why I asked you about the timing --
21    Q   Okay.
22    A   -- because if you told me the timing, then
23 I can give you more of a clarity on the history and
24 my involvement with this agreement.
25    Q   Do you recall exactly when IEA purchased

Page 63

1 RMT?
2     A   I thought it was -- again, it was a while
3 ago, so I thought it was relative -- my recollection
4 is IEA was from the start -- I thought our contract
5 was with IEA, but, again, I'm -- it's been a long
6 time ago, so --
7     Q   Sure.
8     A   -- IEA was the entity that executed the
9 project.
10    Q   Sure.  If we look at the page ending in
11 Bates stamp 24575, let's see here, here under WTG
12 Foundations, it says, "Construct 84 Turbine
13 Foundations in the locations provided by owner and
14 achieve foundation completion."  Do you recall that
15 at one point the number of wind turbines changed to
16 84?
17    A   Yes.
18    Q   Do you recall when that change was made?
19    A   Well, it's actually quite simple.  If you
20 look at the last sentence, it says, "The foundations
21 will be designed to accommodate GE 1.79-100
22 turbines."  If you looked at the other agreement it
23 would be 1.7, so to meet the general output power
24 the name plate ratings of turbines is higher, so,
25 therefore, you need less foundations, so if you go

Page 64

1 back to the other agreement, you'll understand.
2     Q   Okay.
3     A   Because it was a smaller wind turbine;
4 therefore, it required less foundations to meet the
5 output of the facility.
6     Q   So like I said, based on where this is
7 placed in defendants' production, we're thinking
8 this is the June 2014 version of the scope of work.
9 Does that sound right to you, or would you assume
10 that this decision to move to 84 turbines would have
11 happened at a different time?
12    A   Well, I think it happened in 2014 for
13 sure.  It's -- the new turbines, the GE 1.79, was
14 something that we were looking at through Enel.  The
15 previous entity was the lesser rated machine.  So it
16 would be at one point where Enel was involved in the
17 project.  I'm still unsure, provided this is the
18 execution version.  I -- You know, my feeling is it
19 not, but, you know, I would prefer to have -- you
20 know, for you to present a document that had -- that
21 said either execution version or signed version, and
22 then I would know for sure, for certain.
23         MR. McCORMACK:  And just for the record, I
24 recognize we're in a tough spot here, because we're
25 doing this all through remote efforts, but I have

Page 65

1 the same reaction, which is I don't know what the
2 documents are necessarily.  We're only looking at
3 one provision in them, but I'd just note that for
4 the record for whatever it's worth.  Sorry, Ms.
5 Nagle.  Go ahead.
6         MS. NAGLE:  Okay.  Thank you.
7     Q   (By Ms. Nagle)  So Mr. Price, do you know
8 whether or not this scope of work would have been in
9 effect at the time that you were vice president of
10 engineering and construction, in charge of the
11 project?
12    A   Eighty-four turbines, 84 turbine sites was
13 what we -- what we had planned to do.  I believe we
14 had the 89 potential sites, but 84 excavations.
15    Q   Okay.
16    A   We had some alternate sites in the design
17 to -- in the event we encountered some difficult
18 sites or there's some cavern or some geotechnical
19 feature, maybe some oil and gas interference or
20 something, so we had a -- in the design work, we had
21 some surplus sites planned for.  So in some
22 documents you might see 89, but the actual
23 foundations that were planned to be excavated was
24 84.
25    Q   Okay.  And if you look up just a little

1  bit above here under F, it says, "Rock blasting or
2  removal has been included for 27 turbine locations."
3  Is this the decision you referred to when we were
4  looking at the earlier agreement where you stated
5  that at some point the decision was made for rock
6  blasting to be used at 27 turbine locations?
7      A   Yes.
8      Q   Okay.  And I note, too, that previously
9  there was language here that we looked at that was
10  actually paragraph F that stated -- that referred to
11  the contractor tracking the excavation volumes
12  periodically through the project.  I note that
13  that's -- that's not here.  Do you know why that
14  language regarding tracking the excavation volumes
15  was removed?
16      A   No.
17      Q   Okay.  So if we go up a little bit further
18  under E, it still says, "Contractor will not be
19  restricted regarding movement or transport of soil
20  materials, nor will contractor be responsible for
21  fees or delays associated with mineral rights
22  issues."  So is it your understanding that as of
23  June 2014 the limitation on movement of soil
24  materials had not yet been communicated to IEA?
25      A   I don't understand your question.  Are

1  you --
2      Q   So -- no, go ahead.
3      A   Go ahead.  Well, look, this -- again, this
4  was -- as I explained before, this was a contract
5  that was a standard contract from another entity, so
6  I don't know the -- a lot of contract terms that you
7  see in contracts are standard contract terms that I
8  would say are boilerplate.  This was not an Enel
9  contract, so we inherited this project, and when we
10  inherited this contract, we decided rather than
11  taking the time to negotiate a completely new
12  agreement, that it was better to take the existing
13  agreement and try to work with it and -- for the
14  purpose of expedience.
15         So when we had these type of contract
16  terms -- you know, if it was an Enel contract I
17  could generally tell you, yeah, that's been in, you
18  know, 20 of our contracts, so it's not specific to
19  this Osage project.  So there is typical language in
20  most contracts that have something similar to this,
21  so it's -- you know, it's generally boilerplate type
22  language and not necessarily any correlation to the
23  existing situation that exists with Osage.
24      Q   Okay.  Do you have an understanding of who
25  at Enel would have been responsible for informing

1  IEA that paragraph E is not correct and that
2  actually IEA is restricted in terms of movement of
3  soil on the Osage Wind farm project?
4         MR. McCORMACK:  Hold on.  Object to the
5  form of the question -- hold on.  Object to the form
6  of the question as assuming facts, but you can
7  answer if you have an answer.
8      A   Look, as I said before, I would be much
9  more comfortable to address this question, is this
10  the execution version of the contract between us and
11  IEA?
12      Q   We don't have in our production from
13  defendants any version of this that's actually
14  signed.  My understanding is that this is an exhibit
15  to a different contract, and so we have not -- if
16  there is an executed version where there are
17  signatories to this, it has not been produced to us.
18         MS. NAGLE:  So maybe I put that back on
19  Mr. McCormack and ask that, are you aware of an
20  executed version in your production?
21         MR. McCORMACK:  I'm not, but we can
22  certainly take that request under advisement.
23         MS. NAGLE:  Okay.  Well, we'll just
24  reserve the right to keep this deposition open
25  until -- since you are objecting to the questions

1  and the witness is unable to answer, based on those
2  objections and the fact that you are waiting for us
3  to show him an executed version.  So we'll keep the
4  deposition open until you all are able to provide us
5  with that executed version.
6         MR. McCORMACK:  Well, a couple of things.
7  Number 1, I haven't stopped this witness from
8  answering any questions, and, number 2, I'm not -- I
9  don't know if there is an executed version, so I
10  understand you've got your position, and I just told
11  you mine.
12         MS. NAGLE:  Okay.  Thank you.  We'll await
13  the receipt of the executed version.  Thank you so
14  much.
15      Q   (By Ms. Nagle)  Okay.  So going back to my
16  question, Mr. Price, what is your understanding of
17  when and how Enel communicated to IEA that they
18  actually were restricted in terms of moving soil on
19  the Osage Wind Farm project site?
20         MR. McCORMACK:  Again, object to the form
21  of the question to the extent that it assumes facts,
22  but if the question makes sense to you, you may
23  answer.
24      A   Well, you know, I recall certainly within
25  the aspect of the project when we had this

Page 70

1  discussion with IEA concerning the BIA question of
2  permit.  Typically, on projects of this nature, I
3  think this provision agrees, and it's -- because of
4  the sensitivities with the Osage mineral rights, you
5  know, I have the sense that since this is more of a
6  boilerplate type sentence, that this doesn't have
7  the sensitivities that you are addressing, that had
8  some sensitivities within rights, because we, at the
9  time, didn't feel we had this as an issue.  So it
10  wasn't in any of our permits, it wasn't in any of
11  our requirements.  So it wasn't, you know, as
12  sensitive as you are suggesting.
13       I do not know if this is, in essence, the
14  execution version.  Typically, what we do to -- in
15  projects, this would have been attached, a scope of
16  work or a technical specification, there would have
17  been an Enel specification.  The Enel specification
18  would have delineated exactly how the contractor
19  would be to execute the project, and in there it
20  would say how to do.  Typically, contracts of this
21  nature, when you have the -- this is a form of a
22  commercial agreement, which has a lot to do with the
23  commercial terms or fees associated.  So this
24  language would be more into protection or risk
25  management of the contract.  The technical

Page 71

1  specifications will delineate how the project is
2  executed.  So I think if you are looking at that
3  language that describes this type of thing and then
4  limitations, I think the more appropriate document
5  you should be referring to is the technical
6  specifications.
7    Q   Okay.  And whose responsibility would it
8  have been at this time at Enel to communicate to IEA
9  that they were restricted in terms of moving soil at
10  the wind farm project?
11       MR. McCORMACK:  I'm going to object to the
12  form of the question.  It's asked and answered and
13  also assumes facts, but you can answer the question
14  if you have an answer.
15    A   The restricted -- the restricted of moving
16  materials was presented at the -- at the time we got
17  the BIA.  We also had a technical specifications
18  document where the contractor was to comply with the
19  execution of the project, and if the contractor
20  wanted to do something different than what the
21  technical specification describes, they would have
22  to go through an RFI process.  RFI stands for
23  request for information, request for a deviation of
24  spec, and even, potentially, a change order request
25  if there's a cost associated with doing it different

Page 72

1  than the technical specification.
2    Q   (By Ms. Nagle)  So I understand you're
3  saying that the time frame was when the
4  conversations were happening with the BIA, but my
5  question was who, and so I'll just repeat my
6  question.  Who at Enel was responsible for
7  communicating this limitation in terms of movement
8  of soil on the Osage Wind Farm project to IEA?
9       MR. McCORMACK:  Same objection.  You can
10  answer.
11    A   Who was responsible?  I was responsible
12  for the execution of the contract, so, you know,
13  ultimately it was me, but we have different people
14  that communicate with the project, so Bill Moskaluk
15  would have, Giuseppe DiMarzio.  The ultimate
16  responsibility to execute this project would have
17  been myself.  Did I have specific conversations with
18  IEA, I did, yeah, with Chris Hanson.
19    Q   (By Ms. Nagle)  Okay.
20    A   And --
21    Q   Go ahead.
22    A   But the site team would have been Bill
23  Moskaluk, et cetera.
24    Q   Okay.  Thank you.  All right.  Let's look
25  at another --

Page 73

1       MR. McCORMACK:  Ms. Nagle, is this a good
2  time to take our morning break --
3       MS. NAGLE:  Sure.
4       MR. McCORMACK:  -- our early morning
5  break?
6       MS. NAGLE:  Sure.  Absolutely.  How long
7  would we like to take a break for?
8       MR. McCORMACK:  How about 15 minutes, so
9  6:55?
10       MS. NAGLE:  Okay.  So 6:55 --
11       MR. McCORMACK:  Your time.
12       MS. NAGLE:  -- Central Oklahoma time.
13       MR. McCORMACK:  Yes.
14       MS. NAGLE:  Does that work for the United
15  States?
16       MS. McCLANAHAN:  Yes.
17       MS. NAGLE:  Okay.  Great.  Let's go off
18  the record and come back at 6:55.
19       MR. McCORMACK:  Great.  Thank you so much.
20       THE VIDEOGRAPHER:  We are off the record
21  at 6:39 a.m. central time.
22       (Recess was had.)
23       THE VIDEOGRAPHER:  We are back on the
24  record at 6:55 a.m. central time.
25       MS. NAGLE:  Okay.  Just to be clear, is

Page 74

1  the United States attorney's office here as well?

2         MS. McCLANAHAN:  Yes, we are.

3         MS. NAGLE:  Okay.  Fantastic.  Thanks so

4  much.

5     **Q    (By Ms. Nagle)  All right.  So moving**

6  **along, I am now going to show an exhibit that has**

7  **previously been marked in this litigation as Exhibit**

8  **46.  And it is a document Bates stamped on Osage**

9  **Wind-000381.  And it is yet another scope of work**

10 **contract.  I will note that based on where it falls**

11 **in within defendants' production, it appears to be**

12 **the August 11th, 2014, version of the scope of work.**

13        (Exhibit 46 previously marked for

14 identification.)

15    **Q    (By Ms. Nagle)  Mr. Price, are you**

16 **familiar with this document?**

17    A   I believe so, yes.

18    **Q    Do you know who from Enel in August of**

19 **2014 would have been negotiating this scope of work?**

20    A   It would have been the -- for Enel it

21 would have been our procurement team that was

22 supported by myself and staff.

23    **Q    Great.  So if we look at page 11, which is**

24 **ending in Bates stamp 391 --**

25    A   As an observation, going back.

Page 75

1    **Q    Uh-huh.**

2    A   If you look at the title of the document.

3    **Q    Uh-huh.**

4    A   It's the execution version that's part of

5  the scope.  It has a different title than the

6  document we referred to before, so this means the

7  document we referred to before was an obsolete

8  document that you asked me questions on.

9    **Q    Okay.**

10   A   This exhibit is part of a contract, so the

11 exhibit which is the balance of plant, so you'll

12 notice that this definition -- or this title is

13 different from the other, so the other was indeed an

14 -- obsolete.

15   **Q    Okay.  So is it your testimony that this**

16 **version here that we're looking at, Exhibit 46,**

17 **would have been the executed version?**

18   A   I don't know if it's the executed version,

19 but it's certainly more -- more in scope with what

20 activities were had, as well as the -- it is more

21 dated within the activities that were about ready to

22 start.  Construction started real soon after this

23 agreement, after this date in August.

24   **Q    When exactly did construction start; do**

25 **you recall?**

Page 76

1    A   We started mobing into the sites in

2  August.  I recall we started doing some construction

3  activities in September, so we started some

4  mobilizations in August.  That's my recollection.

5    **Q    Uh-huh.  Okay.  If we look at the page**

6  **ending in Bates stamp 391.  Whoops, here we go.  I**

7  **note here paragraph F still seems to be the same,**

8  **"Rock blasting or removal has been included for 27**

9  **turbine locations."  Is that your recollection that**

10 **that was the plan when construction commenced, was**

11 **to use rock blasting at 27 wind turbine locations?**

12   A   So it's -- rock blasting or removal has

13 been included for 27 locations.  So it's included,

14 it doesn't necessarily mean that you would need to

15 do 27, so -- but I think 27 was -- was approved or

16 commercially accepted as part of the contract.

17   **Q    Do --**

18   A   So in other words, if you did 20

19 foundations, it had a provision to do up to 27.

20 Anything over 27, then perhaps the contractor could

21 consider this change order.

22   **Q    Do you know if a change order request was**

23 **ever submitted to blast more than 27 locations?**

24   A   Yes.

25   **Q    Do you know when that change order would**

Page 77

1  have been submitted?

2    A   Change order, there was a lot of

3  discussions in the change order in the -- 2014.  I

4  think the final submittal of the change order

5  occurred or agreement to the cost was the following

6  year.  There was a dispute between both parties

7  whether the blasting was necessary or not.

8    **Q    Okay.  And so in terms of that dispute,**

9  **who took the position that blasting was not**

10 **necessary?**

11   A   The view is when you do rock blasting,

12 it's such that when you do standard excavation work

13 that the standard excavation, which is through

14 either some manual means with -- you know, from a

15 hydraulic or pneumatic type jackhammer to an

16 excavator, which is a tractor that has tracks and

17 has a big, large bucket on the end, and it's trying

18 to rip soil and grind it up as it's doing its

19 foundation.  Sometimes this is very time and labor

20 intensive, and it's simpler -- could be envisioned

21 simpler if the contractor was allowed to blast.  And

22 so the contractor represented they were taking too

23 long to do this standard excavation process and then

24 decided to do more blasting to keep the project on

25 schedule.  Also, our concern was, as Enel, is it

Page 78

1  became -- I think it's a commercial consideration,
2  since it is an opportunity for the contractor to --
3  to get paid for something more than 27 locations.
4  So there's somewhat of a conflict there.
5      Q   Okay.  If you look above at paragraph E,
6  here it states, "Other than balancing material where
7  is presently existing, contractor will be restricted
8  regarding movement or transport of soil materials,
9  nor will contractor be responsible for fees or
10 delays associated with mineral rights issues."  What
11 is your understanding of what is meant here by the
12 phrase, "other than balancing material where is
13 presently existing"?
14     A   Balancing material is just -- well,
15 balancing of material -- it's the balancing that you
16 would have -- my read on that is it's just that,
17 where you -- if -- present conditions, you know, you
18 could move soil around within that present
19 condition.  So if you are moving a hole, you are not
20 putting it precisely back in that hole as it came
21 out, it's balancing and moving things around.
22     Q   And what is your understanding by the
23 phrase, "contractor will be restricted regarding
24 movement or transport of soil materials"?
25     A   That they can't move soil materials.

Page 79

1      Q   And do you know who made the decision at
2  Enel to include this language in this scope of work?
3      A   I believe it was -- it was discussions
4  that we had during the contract execution that was
5  consistent with the scope of work document.  The
6  scope of work document had clarity on what -- on how
7  to do the -- the excavation works and how to execute
8  the projects, so the contract was suggested to be
9  consistent with that.
10     Q   And so if you'll recall, the last version
11 of the document that we looked at, Exhibit 46 from
12 the previous version that we looked at -- or sorry,
13 this is -- sorry, not Exhibit 46, but the June 2014
14 version that we looked at did not include this
15 limitation.  Do you have an understanding of why the
16 decision was made to add this limitation to this
17 version, this August 2014 version?
18     A   I believe I just answered that question,
19 to be consistent with the scope of work documents
20 from the technical specifications.
21     Q   And so are there scope -- is it your
22 testimony that there are scope of work documents
23 with technical specifications that included this
24 limitation?
25     A   I believe so.

Page 80

1      Q   Okay.  And was that -- was that limitation
2  regarding the movement of soil materials that's
3  included in the technical specifications that are
4  referring to, is that limitation a limitation that
5  Enel decided upon in reliance on Modrall Sperling's
6  legal analysis?
7      A   Well, obviously, the -- I'm not sure if
8  the technical specifications included that
9  assessment.  Clearly, the 2014 -- the letter wasn't
10 because it was a date done that was subsequent to
11 this negotiation, so I'm uncertain.  What I do
12 recall is we had -- there was a purpose or reason
13 why we wanted to do it, and many times it's not
14 consideration of mining, it's a consideration of
15 availability of fill, it's -- there's a technical
16 reason why we would want to do that.  And so there
17 was an engineering assessment done for prior
18 reasons, and then the assessment was, this is how we
19 want IEA to construct the project, and, again,
20 that's -- so the commercial terms or commercial part
21 of the agreement should be consistent with the
22 execution -- or the technical specs.
23     Q   Okay.  Thank you for that.  Let's move to
24 our next exhibit.  Just to be clear, I know I just
25 took that exhibit down, but what we were just

Page 81

1  looking at, would that have been the scope of work
2  that you would have operated under for the rest of
3  the construction of the Osage Wind Farm, or do you
4  think there's a separate scope of work out there
5  that would have covered the construction?
6      A   It should be initialed.  It should be
7  signed.  So, normally, when we enter into
8  agreements, there's the -- you know, each page,
9  because it's a record.  So I didn't see any
10 initials, I didn't see the document.  I didn't see
11 if it was signed.  So from the date you've
12 represented, it's certainly very close to the
13 execution time frame.
14     Q   Okay.
15     A   It's not typical to -- an execution
16 version is just that, it has signatures, and it has
17 initials at the bottom of each page.
18     Q   Okay.  All right.  Thank you.  I am going
19 to introduce our next exhibit, which is Exhibit 104,
20 and it is Bates stamped EGPNA-000001, and the title
21 of the document is Construction Management
22 Agreement, dated August 19th, 2014, between Enel
23 Green Power North America as the construction
24 manager and Osage Wind, LLC as the company.
25 Mr. Price, are you familiar with this document?

Page 82

        (Exhibit 104 marked for identification.)
1
2    A   Yes.
3    Q   (By Ms. Nagle)  Were you involved at all
4  in the negotiation of this document?
5    A   It's an internal document that describes
6  the scopes and responsibilities of the respective
7  entities, so, yeah, I was part of this agreement
8  from a contribution perspective, yeah, I was.  This
9  is also a standard agreement that we do between
10  projects and execution that Enel does.
11    Q   Okay.  If we look at the page ending in
12  Bates stamp 06, we have here a definition of
13  governmental or regulatory authority that refers to
14  meaning "any court, tribunal, authority, agency,
15  commission, official, administrative body or other
16  instrumentality of the United States or any state,
17  county, city or other political subdivision
18  arbitrator or any judicial or quasi-judicial
19  tribunal of competent jurisdiction."  Do you have an
20  understanding of whether or not this definition
21  includes the Osage Minerals Council as a
22  governmental authority?
23    A   From the definition it would seem to
24  include that.
25    Q   Do you recall any discussions -- when you

Page 83

1  working on the drafting of this document with your
2  team at Enel, do you recall any discussions
3  specifically related to the drafting as this term,
4  as it is defined here in the agreement?
5    A   No.
6    Q   Okay.
7    A   I think most of these construction
8  agreements are very common between projects and what
9  they are as construction management agreements.
10  It's a way of Enel to do -- to assign the -- who is
11  responsible to execute the project on behalf of the
12  company, so it defines work such that we can get --
13  Enel can be compensated for the work it does in this
14  execution activity.  So this -- the majority of
15  these documents are typically internal documents
16  that are between projects, the projects are
17  consistent.  So this language is likely very, very
18  similar to all projects we do.
19    Q   Okay.  If we look at page 7, the
20  definition of permits means, "The permission granted
21  by any governmental or regulatory authority to do an
22  act that would otherwise be impermissible, including
23  all licenses, permits, consents, authorizations,
24  approvals, ratifications, certifications,
25  registration, exemptions, variances, exceptions and

Page 84

1  other similar consent granted or issued by any
2  governmental or regulatory authority."  Would this
3  definition -- is it your understanding that this
4  definition of permits would include a permit from
5  the Osage Minerals Council?
6        MR. McCORMACK:  Object to the form of the
7  question.  May be requiring a legal conclusion, but
8  you can answer the question, if you are able.
9    A   Well, I -- which particular permit are you
10  referring to?
11    Q   (By Ms. Nagle)  Any permit from the Osage
12  Minerals Council.  Is it your understanding that
13  that would be included under the definition of
14  permits here in this agreement?
15        MR. McCORMACK:  Same objection.
16    A   I think it depends on what the permit is
17  for.
18    Q   (By Ms. Nagle)  How about a permit for
19  mining?
20        MR. McCORMACK:  Same objection.
21    A   I think if there was -- was mining
22  activity and if the permits would be under that, it
23  would be under this definition.
24    Q   (By Ms. Nagle)  Okay.  If we look on page
25  ending in Bates stamp 09 here, Section 2.2, which is

Page 85

1  titled, Construction Manager Obligations, it states
2  that "The Construction Manager, EGPNA, is hereby
3  authorized and obligated to perform the following
4  services on behalf" -- and this is sort of done here
5  at the bottom.  "Construction manager is hereby
6  authorized and obligated to perform the following
7  services on behalf of the company."  And then if
8  we -- well, actually, first, just one question, do
9  you have an understanding whether under Section 2.2,
10  whether or not the construction manager was
11  authorized and obligated to perform the function of
12  obtaining a permit from any applicable governmental
13  agencies or authorities?
14    A   It could.  I think it potentially could,
15  but in this project with the permits, the permits
16  for the project to begin construction were obtained
17  prior to this agreement going into effect.  So all
18  the construction permits were identified and
19  obtained before construction activities were
20  started.
21    Q   And when you referred to those
22  construction permits, which entity obtained those
23  permits?
24    A   Some -- some of them were from the
25  previous owner.  Some of them were for TradeWinds.

Page 86

```
 1     Q   And were there permits that EGPNA or Enel
 2   obtained that TradeWind did not?
 3     A   I would have been responsible for some
 4   permits, some construction permits, submit some
 5   documents.  There are some permits that -- my
 6   recollection is when we started construction, all
 7   the permits were provided.  There was some -- like
 8   building permits, like a permit that you would
 9   build, like, a control room in the substation, you
10   need a building permit, like, you would build a home
11   of sorts.  So those permits would be done through
12   the course of the construction of the project and
13   performed by the contractor.  So yeah.  Does that
14   address your question?
15     Q   Yes.  Thank you.  Okay.  Looking at the
16   page ending in Bates stamp 16, I note here Section
17   5.5 says, Key Personnel.  And it says, "The
18   construction manager shall identify at least one
19   person to be the point of contact with
20   representatives of the company with respect to
21   matters arising under this agreement.  Such person
22   shall be reasonably acceptable to the company.
23   Initially, William Price shall be the point of
24   contact on behalf of the construction manager, which
25   is acceptable to the company."  What were some of
```

Page 87

```
 1   your duties and responsibilities as the point of
 2   contact on behalf of the construction manager in
 3   this -- in terms of this agreement?
 4     A   I think the agreement defines what my
 5   responsibilities are.
 6     Q   And what is your understanding of how the
 7   agreement frames those?
 8     A   The execution responsibility of the
 9   project.
10     Q   Okay.  And what is your understanding of
11   the phrase, point of contact?  What do you take that
12   to mean?
13     A   That if there's an issue or aspects of the
14   project, that I would be the one that was contacted
15   to address it.
16     Q   And it says here, "shall be reasonably
17   acceptable to the company."  Do you understand that
18   the company refers to Osage Wind?
19     A   Yes.
20     Q   Did Osage Wind have any say in your
21   election?
22     A   (Inaudible.)
23     Q   I'm sorry.  I didn't hear if you answered.
24     A   I'm trying to -- these are standard
25   agreements.  I mean, I'm not aware if they had a yes
```

Page 88

```
 1   or no or had some consternation of me being the
 2   acceptable person or the -- so -- or the point of
 3   contact.
 4     Q   Okay.  Do you know if there was ever
 5   another point of contact that was appointed on
 6   behalf of EGPNA under this agreement?
 7     A   No.
 8     Q   Okay.  All right.  Those are all of my
 9   questions in relation to that document.
10         So now we are going to look at a document
11   that has previously been entered in this litigation
12   as Exhibit 36, and this document is Bates stamped
13   Osage Wind PRIV-000414.  I will note that it is a
14   memo from Modrall Sperling to -- it's to Bill Scott
15   from Sarah Stevenson, dated October 31st, 2013,
16   regarding the rights of surface owners to use soil.
17         (Exhibit 36 previously marked for
18   identification.)
19     Q   (By Ms. Nagle)  Mr. Price, are you
20   familiar with this document?
21     A   Yes.
22     Q   And is this the legal opinion from 2013
23   that you referred to earlier?
24     A   Yes.
25     Q   Do you know who Bill Scott is?
```

Page 89

```
 1     A   No.
 2     Q   Okay.  Do you know who Sarah Stevenson is?
 3     A   Yes.
 4     Q   Who is Sarah Stevenson?
 5     A   She's with us now.
 6     Q   Okay.
 7     A   She's the representative for the
 8   reference -- or legal firm.
 9     Q   And did she represent -- I guess, who did
10   she represent when she drafted this memo in October
11   of 2013?
12     A   The legal firm referenced at the heading
13   of the document.
14     Q   Was this work performed on behalf of Enel?
15     A   I don't know.  I wasn't part of this
16   agreement.
17     Q   Okay.
18     A   I wasn't part of the -- I wasn't engaged
19   in the project --
20     Q   Okay.
21     A   -- to any significant extent at this time.
22     Q   Okay.  So if we look here at the question
23   presented, it states, "whether a surface owner who
24   excavates land for the purpose of construction
25   consistent with its surface rights, and does not
```

Page 90

1  remove the land excavated from the property, is
2  engaged in mining of the mineral estate and requires
3  a permit." What is your understanding of why the
4  phrase, "and does not remove the land excavated from
5  the property" was included here in the question
6  presented?
7      A   My understanding is if you actually remove
8  the land and it's used for an alternative purpose
9  and there's a -- perhaps a commercial benefit of
10  such, then that would be a form of mining, so it
11  does not remove the land, how -- so this legal
12  opinion says that that would be mining.
13     Q   Okay.  And is that an understanding that
14  you have based on the advice you received from your
15  legal counsel?
16     A   Yes.
17     Q   Okay.  If we look at page 2 of this memo
18  ending in Bates stamp 415, it states here under
19  analysis, "The Osage Tribe has indicated that it
20  will assert TradeWinds Energy must receive a mining
21  permit from the Osage Minerals Council in order to
22  construct and operate the wind farm."  Is it your
23  understanding that this memo was drafted after
24  defendants received communication from the Osage
25  Tribe that their position was that a mining permit

Page 91

1  was required?
2          MR. McCORMACK:  Hold on just one second.
3  objection, foundation.  But you can answer if you --
4  if you know the answer.
5      A   Well, I don't know the answer, because --
6  and, again, I wasn't part of this document.  I read
7  it later, later after it was -- in 2014.  It is
8  interesting to note that -- that I can't imagine why
9  a mining permit would be required to operate the
10  facility, because operations of the facility is just
11  wind turbines spinning, so no -- so it seems to me
12  that in this first page there is a complete
13  misunderstanding of what was actually happening on
14  the site and what some -- what the Osage Tribe had
15  thought to -- whether a permit was required.  So why
16  would you need a mining permit to operate the
17  facility?  That's a good question, because no
18  minerals are being moved.  Construction, yeah,
19  there's minerals that are disturbed, but, you know,
20  the question is why would it include the operation
21  of the wind farm.
22     Q   Okay.  I will note that I don't see the
23  word, operation, here in this paragraph.  It does
24  seem to say that, at least as Sarah Stevenson and
25  Bill Scott -- or Sarah Stevenson, who drafted the

Page 92

1  memo, put it, that when the Osage Tribe indicated it
2  will assert that a mining permit is necessary, the
3  phrase that Ms. Stevenson used was "on the grounds
4  that the excavation and construction, and permanent
5  placement of the towers constitutes mining of the
6  Osage's mineral estate."  Do you have an
7  understanding of what is meant here by excavation in
8  addition to construction?
9          MR. McCORMACK:  Object to the form.
10         A   I --
11         MR. McCORMACK:  Wait, wait, wait.  Object
12  to the form of the question, foundation, but you can
13  answer it if you can.
14     A   So I'd like to clarify something.  I
15  disagree with you in your point that it doesn't
16  include operate, because it does include that in the
17  sentence.  It says, The Osage Tribe has indicated
18  that it will assert TradeWinds Energy -- has
19  asserted to TradeWind Energy must receive a mining
20  permit from the Osage Minerals Council in order to
21  construct and -- and operate the wind farm.  So
22  there is a "and" there, "and operate the wind farm,"
23  there's nothing done.  So I don't understand why
24  you'd come back and suggest that that does not --
25  operate the wind farm is not in this paragraph when

Page 93

1  it clearly is.
2      Q   (By Ms. Nagle)  Okay.  Duly noted.  What
3  is your understanding of what is meant by the word,
4  excavation, in this paragraph?
5          MR. McCORMACK:  Again, we object to the
6  form, foundation, but you can answer.
7      A   I have my understanding of what excavation
8  is, and excavation is removal of material or -- you
9  know, standard definition is not capitalized, but
10  excavation is movement of rock in preparation for
11  construction or build a structure.
12     Q   (By Ms. Nagle)  And are you familiar with
13  the Tenth Circuit's opinion in this litigation?
14     A   I'm somewhat familiar.  It's been
15  explained to me.
16     Q   Do you have --
17     A   (Inaudible.)
18     Q   I'm sorry, I interrupted you.  What did
19  you say?
20     A   I have not read it in full.
21     Q   Are you aware that the Tenth Circuit has
22  concluded that defendants excavation on the Osage
23  Mineral Estate constitutes mining under the law?
24     A   I --
25         MR. McCORMACK:  Whoa, whoa, whoa.  Object

Page 94

1  to the form of the question as calling for a legal
2  conclusion.  You can answer if you can, although I
3  would advise you also, Mr. Price, that if you are
4  required to answer that question based upon
5  attorney/client communications that you may have
6  received from us or other attorneys, you should be
7  very mindful about that and not answer in a way that
8  would violate the attorney/client privilege.  Is
9  that confusing enough for you?
10     A   It is.  I'm not understanding what you are
11  saying.  So I wouldn't mind a break and have a
12  discussion with you, Mr. McCormack.
13         MR. McCORMACK:  I can do it, which is if
14  you -- if you have learned what you know about that
15  Tenth Circuit case from speaking to your attorneys,
16  you have no obligation to tell this lawyer that.  If
17  you've learned what you know from speaking to
18  non-attorneys, you do have an obligation to tell
19  this attorney that.
20     A   I can give you my understanding, my brief
21  understanding.  Is that appropriate or not
22  appropriate?
23         MR. McCORMACK:  If it is not derived from
24  attorney/client communications, then you can answer
25  that question, but if it is, you should not, because

Page 95

1  everybody understands it is a privilege, and we
2  honor it in this country.  So you have to make -- if
3  you need to talk to me to make that call, I'm happy
4  to have that discussion with you offline.
5     Q   (By Ms. Nagle)  So just to be clear, I'm
6  not asking you about any conversations you've had
7  with attorneys, but you have testified here today
8  that in your opinion this was not mining and that
9  there was not a need to get a permit from the Osage
10  Nation.  And so there is a Tenth Circuit case on
11  point, and if you -- you either have an
12  understanding of that or you don't.  So, certainly,
13  I'm not asking about any conversations you've had
14  with your attorneys about the legal significance of
15  that opinion, but do you have an understanding of
16  what the Tenth Circuit decided in this case?
17     A   I haven't read the opinion, so I believe I
18  have an understanding of what it says, but it was
19  explained to me from a third party.  Since I haven't
20  read it, so I'm relying on what's been expressed to
21  me, what it means.
22     Q   Okay.  When you say, third party, would
23  the third party communications have been with your
24  attorneys or non-attorneys?
25     A   With attorneys.

Page 96

1     Q   Okay.  Do you have an understanding
2  sitting here today of -- as to whether or not
3  defendants were required to get a permit for the
4  mining they undertook on the Osage Mineral Estate?
5     A   I understood that the Tenth Circuit
6  suggested that there was a requirement to get a
7  permit, there was a decision made that it said for
8  -- as I understood, for rock crushing.
9     Q   And did you say you read the Tenth
10  Circuit's opinion in this case?
11     A   I haven't.
12     Q   Okay.  All right.  I know -- well, okay,
13  let me just keep going with this memo.
14     A   Can you bring up the -- I guess I can't
15  ask that.
16         MR. McCORMACK:  No.
17     A   Bring up the Tenth Circuit Court's -- I
18  guess that's --
19         MR. McCORMACK:  I don't see any value in
20  that, so let her do what she needs to do.
21     A   I understand.  Sorry.
22     Q   (By Ms. Nagle)  I'm happy to show it to
23  you, if you would like to see it, but I really -- I
24  think you've answered my questions with regards to
25  your understanding and knowledge of the Tenth

Page 97

1  Circuit's decision, so -- but if you feel --
2     A   Very well.
3     Q   Yeah, but always happy to show you a
4  document if need be.  Okay.  So if we look further
5  down in this memo, it also says here, "TradeWinds
6  does not dispute that the lease does not provide it
7  with a right to conduct mining or other mineral
8  extraction.  TradeWinds, however, is not conducting
9  mining to the extent any soil or other subsurface
10  material is touched by TradeWinds, it is merely
11  incidental to TradeWinds' construction of its
12  approved wind farm."  What is your understanding of
13  what is meant here by the phrase "merely
14  incidental"?
15         MR. McCORMACK:  Hold on.  Object to the
16  form of the question, foundation, but you can answer
17  if you know the answer.
18     A   Well, when a subsurface is touched -- so
19  when you are excavating, you are moving the
20  material.  It's incidental because you don't really
21  plan on where the bucket goes.  So you are moving
22  soil for the construction of the project.
23  Incidental, I would look at that as it's not a
24  planned location other than the excavation site.
25     Q   And based on your experience as vice

Page 98

1  president of engineering and construction, would
2  using a rock crusher and dynamite for blasting be
3  merely incidental touching of the minerals?
4      A   I'm not sure.
5      Q   Fair enough.  On pages 3 to 4 of this memo
6  I see there's -- there's quite a few cases that are
7  cited here in the memo.  We have got the Supreme
8  Court -- United States Supreme Court's decision in
9  Watt v Western Nuclear on page 3.  We've also got
10 Rosette on page 4.  Do you -- did you review any of
11 these cases yourself when you reviewed a version of
12 this memo?
13     A   I just glassed over it.
14     Q   Uh-huh.  I note that the Watt v Western
15 Nuclear case states here that -- at the top of page
16 4 of the memo, "One of the overriding purposes of
17 the Act," referring to the SRHA, which is the Stock
18 Raising Homestead Act, "one of the overriding
19 purposes of the Act was to permit settlers to
20 establish and maintain successful homesteads.  There
21 is force to the argument that this purpose would be
22 defeated if the owner of the surface estate were
23 unable to use reserved minerals, even where such use
24 was essential for stock raising and raising crops."
25 Do you recall having any conversations with your

Page 99

1  attorneys with regards to this legal opinion or any
2  later versions about what the actual purpose of the
3  Stock Raising Homestead Act was?
4      A   No.
5      Q   Okay.  Do you recall having any
6  discussions with your attorneys regarding this legal
7  opinion or any other versions of it regarding what
8  the purpose was behind Congress's Act in 1906 when
9  Congress put the Osage Mineral Estate in trust?
10     A   No.
11     Q   Okay.  Did you ever have any conversations
12 with your attorneys regarding whether or not
13 construction of a wind farm would be "essential for
14 stock raising and raising crops"?
15     A   No.
16     Q   If we look at the block quote from
17 Rosette, if we see here, it says, "While Rosette
18 might be able to use the heated water from
19 geothermal resources under its property for use in
20 watering livestock or irrigating forage crops and
21 remain within the patent, the commercial activity of
22 heating greenhouses to produce roses for sale falls
23 outside the patent."  Did you ever have any
24 conversations with your attorneys in relying on
25 this -- on their legal opinions with regards to what

Page 100

1  the decision -- this court's decision in Rosette
2  means when it refers to commercial activity?
3      A   No.
4      Q   Okay.  Do you have an understanding of
5  whether or not the Osage Wind Farm was producing
6  anything to sell commercially?
7      A   To sell commercially, they were selling
8  electricity.
9      Q   Okay.  And did you know in this time frame
10 from 2013 to 2015 that the Osage Allotment Act
11 separated the mineral estate and the -- from the
12 surface estate within Osage County?
13     A   No.
14     Q   Okay.
15     A   Say that again, the question, if I
16 understood it correct.
17     Q   Sure.
18     A   Because I didn't hear that there was -- so
19 go ahead.
20     Q   Were you aware in this time frame from
21 2013 to 2015 that the Osage Allotment Act separated
22 the mineral estate from the surface estate in Osage
23 County?
24     A   I'm not exactly sure what that means, but
25 I was aware that the Osage had subsurface rights,

Page 101

1  and -- but what I understood was that the oil and
2  gas rights from that of the landowner on the
3  surface, so there are some surface rights that
4  belong to the Osage Tribe.
5      Q   Okay.  If you look here at the bottom of
6  page 4 of the memo it states, "The mineral rights
7  reserved under the Stock Raising Homestead Act are
8  done so in language similar to that of the Osage
9  Allotment Act."  Did you ever have any conversations
10 with your attorneys regarding this legal analysis or
11 the one in October of 2014 regarding the similarity
12 in the language between the Stock Raising Homestead
13 Act and the Osage Allotment Act?
14     A   No.
15     Q   Okay.  Do you have any understanding -- do
16 you have an understanding of why this language was
17 included in this memo?
18     A   No.
19     Q   Okay.  If you look a little bit further
20 down here, it says at the bottom of page 4, "The
21 cases interpreting and applying the Stock Raising
22 Homestead Act, therefore, are persuasive with
23 respect to the interpretation of the Osage Allotment
24 Act, and the same holding should result."  Do you
25 have an understanding of why this language is

Case 4:14-cv-00704-GKF-JFJ   Document 294-3 Filed in USDC ND/OK on 10/11/21   Page 28 of 71

1 included in the memo?

2    A   No.

3    Q   Okay.  On page 6 there are quotes here

4 from a Fourth Circuit decision in Mullins v

5 Clinchfield Coal Corporation, and it states,

6 essentially, that, you know, "The reasonable

7 exercise of surface or residual rights does not

8 constitute a trespass, although the mineral owner is

9 entitled to compensation based upon the value in

10 situ of the coal displaced."  Did you have any

11 conversations with your attorneys regarding this

12 memo or any future versions of it with regards to

13 this language about, entitled to compensation based

14 upon the value of what was taken?

15    A   No.

16    Q   Do you know -- to your knowledge to this

17 day, has the Osage Minerals Council been compensated

18 by Enel for the value of the minerals that Enel

19 took?

20    A   I don't believe so.

21    Q   To this day has Enel taken any steps to

22 obtain the lease that the Tenth Circuit stated

23 Enel's required to obtain?

24       MR. McCORMACK:  Whoa, whoa, whoa.  Object

25 to the form of the question as assumes facts, but

1 you can answer it if you know the answer.

2    A   Yeah, I'm not sure.  Subsequent activities

3 after the construction of the project was built and

4 any of the last things that happened in the last few

5 years, at the time of the project are to be -- we

6 didn't conclude that the activity we were doing was

7 mining.  So this judgment that you are referring to

8 was done much later, so at the time we were under

9 the clear understanding the activities we were doing

10 was not mining.

11    Q   Are you aware of -- sorry.  Go ahead.

12    A   So at the time of my involvement in the

13 project, at no time were we mining.

14    Q   Okay.  You continue to hold that belief

15 today, that at no time you all were engaged in

16 mining?

17    A   Well, I'm unclear what the Tenth Circuit's

18 decision describes, because to me it's quite fuzzy,

19 but -- at least the way it was explained to me, but,

20 you know, there's been some judgment later in fact,

21 but not at the time of the construction of the

22 project.

23    Q   Okay.  Are you aware of any actions that

24 defendants have undertaken to obtain a lease for the

25 mining the Tenth Circuit has claimed occurred?

1       MR. McCORMACK:  Object, asked and

2 answered, but you can answer it again.

3    A   Say again?

4    Q   (By Ms. Nagle)  I'm just trying to

5 ascertain whether or not you are aware of any

6 actions that may or may not have been undertaken by

7 Enel to obtain a lease following the Tenth Circuit's

8 decision?

9    A   Obtain a lease or a permit?

10    Q   Either one from the Osage Minerals

11 Council.

12    A   There was some discussion at the time of

13 construction when we literally received this

14 instruction.  We approached and tried to have a

15 discussion, a dialogue with the Osage Tribe and the

16 Bureau of Indian Affairs to have some consideration.

17 So we looked at it to see what exactly -- why do you

18 think this is mining, and we responded to that.  So

19 there was an attempt to try to have some form of

20 agreement, and it was not successful.

21    Q   Do you recall when that attempt was made?

22    A   October of 2014.

23    Q   Okay.  In looking at this legal analysis

24 here from October of 2013, what is your

25 understanding of how this legal analysis impacted

1 the plans for construction of the Osage Wind farm?

2       MR. McCORMACK:  Object to the form of the

3 question, foundation, but you can answer it.

4    A   Well, as I understand it, we weren't --

5 because of sensitivities of this requirement, we

6 weren't allowed to remove excavated materials from

7 the project, or as we excavated materials, we

8 weren't allowed to relocate them.

9    Q   (By Ms. Nagle)  And what do you mean by

10 relocate?

11    A   Well, remove them from site, use them for

12 any other purpose, so we were to -- anything that we

13 excavated, we had to put it right back.

14    Q   And was it your understanding at this time

15 that it would have been -- well, scratch that.  No,

16 that's fine.  All right.

17       Let's move on to the next exhibit.  All

18 right.  So this will be Exhibit 105, I believe.

19 This is a document Bates stamped -- sorry, let me

20 just go to the first page here -- Bates stamped

21 Osage Wind-018680.  At the top we have an email from

22 you, Bill Price, to Maria -- and I'm probably going

23 to mispronounce her name -- Galainena De Carlos,

24 dated December 2nd, 2014, and the subject reads,

25 Osage backfill.

Page 106

1    (Exhibit 105 marked for identification.)
2    **Q   (By Ms. Nagle)  Are you familiar with this**
3    **email exchange, Mr. Price?**
4    A   I believe so, if you don't mind me quickly
5    reading it.
6    **Q   Yes, yeah, please go ahead.**
7    A   So this is December 2nd.  Yes, I'm aware
8    of it.
9    **Q   Okay.  And I will note here that on the**
10   **second page there's an email from Giuseppe DiMarzio**
11   **where he writes, "Steve, as you may recall, the**
12   **contract with IEA has 27 special excavations**
13   **included in the price.  In reality, the site**
14   **conditions found have shown more competent, not**
15   **rippable rocks, so we had to blast 55 beyond the**
16   **contract and rock crush 54 beyond the contract."  Is**
17   **that -- does that -- is that what you remember**
18   **happening with regard to the rock blasting at this**
19   **time?**
20   A   Yes.
21   **Q   Okay.  Do you recall -- this email is**
22   **dated December -- sorry, Giuseppe's email is dated**
23   **November 28th, 2014.  Do you recall when Enel**
24   **discovered that there would need to be blasting**
25   **based on the site conditions found, beyond the 27**

Page 107

1    **wind turbine sites?**
2    A   Well, this was done in October or
3    November, because that's when it was completed by.
4    **Q   Okay.  Who is Steven Lajoie?**
5    A   I believe he had -- Steven Lajoie.  I
6    think it's -- Steven Lajoie was a procurement
7    representative, so we were -- that's my
8    recollection, so we were looking at the commercial
9    aspect, because when we were looking at a change
10   order, you also can get procurement involved to
11   negotiate costs.  So Steven Lajoie was -- from my
12   recollection, was a procurement representative.
13   **Q   Okay.  And what do you understand to be**
14   **meant by the phrase Giuseppe used here, "rippable**
15   **rocks"?**
16   A   So what he represented is we -- the
17   contractor, IEA, had attempted to go to the
18   foundation, and they attempted to use the means that
19   were specified in the contract to excavate the
20   foundations.  And the contractor made some decisions
21   that the standard method that was contained in the
22   contract was -- in their version was not rippable
23   rock.  So in other words, an excavator couldn't
24   break through -- a bucket, you can imagine an
25   excavator -- do you know what a -- I'm asking you a

Page 108

1    question.  An excavator is this machine that I
2    described earlier, and it would not have the
3    capability to normally break apart the rock as it's
4    building the foundation or excavating the
5    foundation.  So, therefore, their blasting of
6    this -- it's more structural, more competent
7    rocks --
8    **Q   Okay.**
9    A   -- that required some other special -- as
10   they say here, special excavations.
11   **Q   And at this time when this -- these**
12   **additional excavations were required and it was**
13   **discovered that they were not rippable rocks, was**
14   **that information provided to your attorneys at**
15   **Modrall Sperling?**
16   A   I don't know to the extent of how many,
17   but the fact that the project was doing some
18   blasting was -- my understanding was provided.  The
19   explanation of the activities that I referenced
20   earlier that -- as we referred to, the definition of
21   facts, what was occurring at the site, discussion of
22   blasting was included.  To the extent of blasting,
23   because we weren't completed yet, was not.
24   **Q   Okay.  At any point in time did anyone**
25   **from Enel ask Modrall Sperling to update their legal**

Page 109

1    **analysis based on the additional blasting that was**
2    **taking place?**
3    A   I'm not aware nor I expect it would have
4    any merit, because if you are blasting 27
5    foundations or 55 more foundations, you are still
6    blasting, so it would have been covered in the
7    original assessment.
8    **Q   Okay.  Let's see, looking at our next**
9    **exhibit, so this document I am showing you now will**
10   **be marked as Exhibit 106, and it is a document Bates**
11   **stamped Osage Wind-018808.**
12      (Exhibit 106 marked for identification.)
13   **Q   (By Ms. Nagle)  At the very top is an**
14   **email from you, Bill Price, to Bill Moskaluk, dated**
15   **December 3rd, 2014, subject matter, Osage backfill.**
16   **It looks like it's a forward of -- it's a different**
17   **version or an updated version of the email chain we**
18   **were looking at earlier, and it now has this**
19   **December 2nd response from you as well.  Are you**
20   **familiar with this email?**
21   A   Yes.
22   **Q   Who is Maria here that you are writing to?**
23   A   She's the head of engineering, wind
24   engineering.
25   **Q   Okay.**

1  A   Or she could have been the head of civil,
2  so she was -- she was either civil engineering or
3  head of wind.  She's done both -- both positions, so
4  I don't know what she was at this time.
5  **Q   Would she have been with EGPNA?**
6  A   Yes, she was an engineering reference.
7  **Q   Who is Salvatore Sciuto?**
8  A   Sciuto, Salvatore Sciuto.  He was the
9  overall head of engineering.  So Maria reported to
10 Salvatore Sciuto.  Both of these employees are in
11 Italy.
12 **Q   Okay.  Was Salvatore also employed by**
13 **EGPNA?**
14 A   Yes.
15 **Q   Okay.  You write here in this sentence,**
16 **"Overall, the reality is the report and its**
17 **conclusions did not represent the actual conditions**
18 **observed at the site."  What report are you**
19 **referring to?**
20 A   There's an engineering report that the
21 engineering team did, actually at my request,
22 because of -- to understand why the contractor had
23 made some assertions that more -- that the site
24 conditions required blasting.  And we were -- and
25 from my perspective, as the head of construction in

1  managing costs, we have a site assessment or
2  geotechnical report that suggested a lesser number
3  of foundations needed more working than what the
4  contractor found, so the contractor had -- because
5  they are entitled to a change order, the contractor
6  had made some representations that the rock,
7  subsurface conditions were harder; therefore, it
8  must have required the additional special handling,
9  which meant a change order, additional fee.
10        So I was asking our engineering team, how
11 could we be so wrong from 27 to these 84
12 foundations.  So I was questioning why we didn't
13 pick it up so I can utilize -- so I can assess
14 why -- how to address this with the contractor
15 through a change order.
16 **Q   In undertaking this exercise, did you ever**
17 **find out what the cause of this discrepancy was**
18 **between the actual conditions in the report?**
19 A   Well, once I got the report, clearly the
20 report shows that that -- in most cases there was
21 some additional, but even less than 27.  The report
22 shows that the rock should have been able to be --
23 gone through a standard excavation process, it just
24 would have took more time to do it.  So the report
25 demonstrated that it was -- clearly, it was a

1  commercial aspect of IEA.  IEA represented the rock
2  was harder than perhaps it was, because it achieved
3  a commercial benefit of such.  So the report is very
4  clear that if you look at the rippability of the
5  rock, as described before, that it should have been
6  able to be -- gone through a standard excavation
7  unless blasting should have occurred.
8        So once we received the report, which, of
9  course, was after the fact, then we -- you know,
10 then as you see here, that IEA had represented
11 something different, it became clear that it was a
12 commercial -- it was a commercial consideration of
13 that by IEA to blast the rock if -- what IEA -- IEA
14 had two considerations from a commercial
15 perspective.  One is they had -- they had the
16 opportunity to earn more of a fee in a change order,
17 because anything over 27 they could get additional
18 fees; secondly, they -- if they excavated the
19 foundations through standard means due to an
20 excavator or hydraulic or pneumatic type tools to
21 break apart the rock, it would have taken more time
22 and more labor expense, and, therefore, more cost to
23 the contractor.  So it was more of a simpler
24 commercial decision of the excavation contractor to
25 represent that it's harder than actual, so,

1  therefore, it was a necessity to blast.
2  **Q   I see.  You also write here in this email,**
3  **"However, the contractual agreement clearly**
4  **identifies the subsoil situation and the price in**
5  **which it was based upon."  What contractual**
6  **agreement are you referring to?**
7  A   The agreement between the project and IEA
8  that we referred to earlier that comes --
9  **Q   Okay.**
10 A   -- to 27 foundations.
11 **Q   Okay.  So you also write here, "The site**
12 **team determined that 81 of the 84 foundations needed**
13 **blasting.  Further, there are many other factors,**
14 **such as the disputed mining activity and associated**
15 **mineral rights with the Osage Nation, which lead us**
16 **into making the necessary decisions to move forward**
17 **with the project."  So do you recall exactly when**
18 **the number jumped from 27 wind turbines that we**
19 **looked at before that needed blasting to 81?**
20 A   Well, it was October or November, so we
21 started -- excavation started in September, and we
22 finished end of November, something like this.
23 **Q   Okay.  Do you know if anyone at Enel ever**
24 **asked Modrall Sperling to update their legal**
25 **analysis, based on the fact that there would be**

Page 114

1 blasting at 81 of the 84 foundations?

2      MR. McCORMACK:  Objection, asked and

3 answered.  You can answer it again.

4      A    Okay.  Yeah, it's really irrelevant.  At

5 the time the report was generated or asked, we

6 described the activities that was going on, so

7 whether you're -- if mining was in 27 foundations or

8 84 foundations, it would have been assessed in the

9 report or the document.

10     Q    (By Ms. Nagle)  So it's true that Enel did

11 not request an update to the legal memo after

12 October 2014; is that correct?

13     A    Yes.

14     Q    Okay.  With regards to where you say,

15 "into making the necessary decisions to move forward

16 with the project," what did you mean by "necessary

17 decisions"?

18     A    At the time what we were trying to do is

19 assess how to continue with the project.  So we

20 were -- when we did this -- the interesting fact is

21 if we -- if you excavated the project, if you are

22 able to break apart the rock, then maybe this

23 rock -- less rock crushing would have been

24 necessary.  So because of this -- if you excavated a

25 foundation and you chipped it away, then the size of

Page 115

1 the rock that would have been removed from the

2 foundation would be much less size, so an excavator

3 would have ripped the rock.

4      So if you had -- since we blasted it -- or

5 we blasted more than actually necessary, as it turns

6 out from the engineering report, because of a

7 commercial benefit to the contractor, the rocks

8 coming out of the foundation were larger.  They

9 weren't broken in pieces.  So, therefore, for us to

10 use them for fill required additional work to those

11 rocks, which was crushing.  So because of the

12 additional blasting, led to more crushing, that the

13 report -- the engineering report shows that it was

14 actually unnecessary to do.  So if we had stuck to

15 it and required the contractor to use

16 extraordinaries and continue in its excavation and

17 other methods, the engineering report shows that it

18 should have been able to be broken apart through

19 other forms other than blasting.

20     Q    In terms of the other -- many other

21 factors that you are referring to here, you write,

22 "Such as the disputed mining activity and associated

23 mineral rights with the Osage Nation."  How did that

24 factor into the decision-making process at this

25 time?

Page 116

1      A    Well, again, I don't recall exactly the

2 exact activity.  I think about at the time, but a

3 little bit clearer, is when we excavated, as I

4 explained earlier, if by doing this rock crushing,

5 which was the concern of the parties.  So while we

6 suggest the rock crushing wasn't mining, it was a

7 disputed fact that the rock crushing may have been

8 considered mining.  So if we never had to do it in

9 the first place, then you wouldn't have a dispute.

10 So if we were able to excavate the foundations,

11 which the engineering report shows that we could

12 have excavated, you know, 60, 70 of the foundations

13 without doing this blasting, then this disputed

14 activity would have been just a few -- few

15 foundations.

16     Q    Okay.  I am going to take that exhibit

17 down.  Okay.  So the next exhibit -- so I think we

18 are on -- I believe we are on Exhibit 107.  So this

19 will be Exhibit 107.  It is Bates stamped Osage Wind

20 PRIV-000577, and this looks to be an updated version

21 of Exhibit 36.  This one is dated May 19th, 2014.

22 It's from Steve Willman at TradeWind Energy from Lynn

23 Slade, Bill Scott and Sarah Stevenson.

24     (Exhibit 107 marked for identification.)

25     Q    (By Ms. Nagle)  Are you familiar with this

Page 117

1 memo, Mr. Price?

2      A    Yes.

3      Q    Would you have read this May 19th, 2014,

4 version?

5      A    Yes.

6      Q    Do you have an understanding of why

7 Mr. Willman needed an updated version of this memo

8 on May 19th, 2014?

9      A    I understood it to be to get clarity

10 from -- as it says, to -- you know, "whether the

11 surface owner who excavates land for the purpose of

12 constructing consistent with its surface rights, and

13 it does not remove the land excavated from the

14 property, is engaged in mining."  So it's an

15 assessment.  It's a request to -- just as the

16 question presented.

17     Q    Do you have an understanding of why

18 changes were made between the October 2013 version

19 and this May 2014 version?

20     A    No.

21     Q    Okay.  Were there -- do you have an

22 understanding of whether there were any inadequacies

23 that needed to be addressed in the May 2013 version

24 that were addressed in this version?

25     A    No.

Page 118

1     MR. McCORMACK:  Whoa, whoa, whoa, whoa,
2  whoa.  Object to the form of the question, asked and
3  answered, but I think you just answered it again, so
4  go ahead.
5     Q   (By Ms. Nagle)  Do you know if any changes
6  were made to Enel's construction plans for the Osage
7  Wind Farm based on the assessments made in this
8  May 2014 version of the memo?
9     A   Yeah, I think it changes technical
10  specifications to -- to not remove the rock
11  foundations -- or not remove the rocks excavated
12  from the foundations, to not -- to put it back in as
13  fill.
14     Q   Okay.  If we look at the page ending in
15  Bates 578 here, we still have this language about
16  the "Osage Tribe has indicated that it will assert,"
17  that seems to be the same as we saw before.  Let's
18  see, so I see here -- this paragraph right here,
19  this sentence, "TradeWinds' construction of the wind
20  farm, as we understand its plans, will not require a
21  permit from the BIA or the Osage Nation."  What is
22  your understanding of what is meant by this language
23  here, "as we understand its plans"?
24     A   Well, as we understand how the project was
25  going to be constructed.

Page 119

1     Q   Did you have an understanding at this time
2  that your attorneys at Modrall Sperling were relying
3  on folks at Enel to give them updated information
4  about the plans for construction?
5     MR. McCORMACK:  Object to the form of the
6  question.  Whoa, whoa, whoa.  Object to the form
7  of -- object to the form of the question,
8  foundation, but you can answer it.
9     A   Can you rephrase, because I'm trying to
10  understand what you are asking me because I -- okay.
11  Go ahead.
12     Q   (By Ms. Nagle)  Did you have an
13  understanding at this time in May of 2014 that the
14  attorneys at Modrall Sperling were relying on folks
15  at Enel for updated information about the
16  construction plans for the Osage Wind Farm?
17     MR. McCORMACK:  Object to the form of the
18  question, foundation, but you can answer.
19     A   This particular document, while I read it,
20  it was after the May.  I don't recall reading it
21  before.  Our engineering team may have read it.  I
22  was not as aware of the sensitivities with this
23  permit until September, and then I, you know, read
24  all of these documents.  So there was an assessment
25  made in May that added how we were going to do --

Page 120

1  how we were going to execute the project.  In this
2  case, it said TradeWinds, but Enel was riding
3  parallel or working on the execution, preparing for
4  the execution of the project on the behalf of
5  TradeWinds until Enel actually acquired the project
6  from TradeWinds.
7     So when we had the issue with the -- or
8  the question with the Bureau of Indian Affairs about
9  mining, a lot of these documents became more
10  available to us to assess, you know, what's the --
11  what is the reason why this -- we were getting this
12  letter from the BIA, and we understood that there's
13  no mining -- there's hidden -- hidden requirement,
14  so my response is to go back to others with
15  TradeWinds and our permit team and said, you know,
16  what is this about.  So -- and that's when I started
17  reading more in detail these documents.  So prior to
18  May -- prior to this particular document and the
19  documents in 2013, I wasn't involved with that.
20     Q   (By Ms. Nagle)  Okay.  And I see that the
21  phrase, "it would -- to the extent any soil or other
22  subsurface material would be moved by TradeWind, it
23  would be merely incidental to TradeWinds'
24  construction of its approved wind farm."  I see that
25  language is still in this version.  Then I also note

Page 121

1  that if we look at page ending in Bates stamp 581,
2  that we still see a discussion of Rosette -- sorry,
3  let me find -- there's discussion of Rosette here.
4  And do you have an understanding of why the Rosette
5  case was included in this memo?
6     MR. McCORMACK:  Wait.  Object to the form
7  of the question, compound, but you can answer it.
8     A   Sorry, I'm answering too fast.  No, I
9  wasn't involved in this document or its preparation
10  until after the fact.  So I believe all the
11  questions you asked me about this document, at least
12  these type of comparisons, the answer would be no.
13     Q   (By Ms. Nagle)  Okay.  And further on
14  down, this memo states, on page 5, "The reservation
15  of the mineral rights reserved under the Stock
16  Raising Homestead Act is similar to that of the
17  Osage Allotment Act."  Do you have an understanding
18  of why this phrase was included in this memo?
19     MR. McCORMACK:  Objection, foundation.
20  You can answer it, if you know the answer.
21     A   No.
22     Q   (By Ms. Nagle)  In the first paragraph on
23  page 582, the authors of this memo write, "The
24  surface owner may use the mineral estate
25  incidentally, but it may not use it for commercial

Page 122

1  extraction of minerals or other related purposes."
2  Did you have any conversations with your attorneys
3  at Modrall Sperling about what "other related
4  purposes" could mean in this context?
5      A.  No.
6      Q.  Okay.  The page ending in 583, I see here
7  that we still have the citation to Mullins and
8  Saddle Mountain.  Do you have an understanding of
9  why these two cases were included in this memo?
10     A.  No.
11         MR. McCORMACK:  Object to the form of the
12 question, foundation.  You can answer, if you know
13 the answer.
14     A   Sorry.  No.
15     Q.  (By Ms. Nagle)  Okay.  Did defendants rely
16 on this particular memo from May 2014 to determine
17 that a mining permit from the Osage Nation was not
18 necessary?
19     A   Say again?
20     Q.  Did Enel rely on this legal memo from Lynn
21 Slade, Bill Scott and Sarah Stevenson in May of 2014
22 to determine that a mining permit from the Osage
23 Nation was not necessary?
24     A.  Yes.
25     Q.  Okay.  And is it your understanding that

Page 123

1  this detailed legal analysis was contingent upon a
2  backfill versus aggregate distinction?
3         MR. McCORMACK:  Object to the form of the
4  question, confusing, but if you understand the
5  question, you can answer.
6      A   I understood it to be that the -- that the
7  mining was extraction of minerals and then being
8  used for a different purpose, for commercial use,
9  being used for -- I mean, being spread out on roads,
10 being removed from sites and being, say, disposed
11 of, but if we removed -- my understanding was that
12 if we removed the rock and we had to crush the rock
13 for it to be used as backfill, we're basically
14 putting it back in the hole just in a form that
15 allowed compaction for structural support for the
16 foundation, that that was allowed and it was not
17 considered mining.
18     Q.  Okay.  I'm going to move on to the next
19 exhibit, which this will be Exhibit 108, and it is
20 Bates stamped Osage Wind PRIV-000446.  And I will
21 note that it is an August 25th, 2014, version of
22 this memo to Steven C. Willman from TradeWind Energy
23 from Lynn Slade, Bill Scott and Sarah Stevenson,
24 subject matter, rights of surface owners or their
25 lessees in Osage County, Oklahoma, to excavate or

Page 124

1  utilize soil.
2         (Exhibit 108 marked for identification.)
3      Q.  (By Ms. Nagle)  Do you know why
4  Mr. Willman would have needed an updated or new
5  version of this memo in August of 2014?
6      A.  No.
7      Q.  Do you know -- have you reviewed this
8  version of the memo?
9      A.  Yes.
10     Q.  Do you know if any changes were made to
11 Enel's construction plans as a result of the
12 revisions made to this memo?
13     A.  No.
14     Q.  Were there any changes made --
15     A   I --
16     Q.  I'm sorry, go ahead.
17     A   Let me make it clear.  When I said no,
18 means no changes were made, not that I wasn't aware.
19     Q.  Okay.  Thank you.
20     A   So no changes were made to the execution
21 on behalf -- so we believed that we still -- we
22 didn't adopt any new changes based on this memo.
23     Q.  Okay.  Thank you.  Were any changes
24 made -- oh, sorry.  So I do note that in this
25 question presented there's new language that was not

Page 125

1  in any of the previous versions, and -- where it
2  refers to here, it says, "whether a surface owner
3  who excavates soil and related materials from land
4  for the purpose of construction consistent with its
5  surface rights, and does not remove the materials
6  excavated from the property, subject to a mineral
7  reservation."  Do you have an understanding of why
8  the phrase, "property subject to a mineral
9  reservation" was added to this version of the memo?
10        MR. McCORMACK:  Wait.  Objection, form of
11 the question.  Object to the form of the question,
12 foundation, but you can answer the question.
13     A   I do not.
14     Q.  (By Ms. Nagle)  Okay.  Do you know what is
15 meant by the phrase, "property subject to a mineral
16 reservation"?
17        MR. McCORMACK:  Same objection.
18     A   Well, I would -- to me what it means is
19 that subject to some type of mineral, as you say,
20 reservation or permit or some acknowledgment to have
21 permission or -- for that mineral.
22     Q.  (By Ms. Nagle)  Okay.  Looking through
23 this version of the memo, I note that there's no
24 language referring to the fact that the Osage Tribe
25 has indicated that a permit is necessary.  That

Page 126

1 language, of course, was in the May 2014 and the
2 October 2013 versions. Do you have an understanding
3 of why that language was deleted?
4     A   No.
5     Q   Okay. I note we still have Watt v.
6 Western Nuclear cited here on page 3. It looks like
7 Rosette is still cited here on page 4. Do you have
8 an understanding of why Rosette was still included
9 in this version of the memo?
10    A   No.
11    Q   Okay. I see here on page 5, we still have
12 this language, "The reservation of the mineral
13 rights reserved under the SRHA is similar to that of
14 the Osage Allotment Act." Do you have an
15 understanding as to why this language was included
16 in the memo?
17    A   No.
18    Q   At the bottom of this paragraph -- same
19 paragraph it says, "The cases interpreting and
20 applying the Stock Raising Homestead Act, therefore,
21 should be persuasive with respect to the
22 interpretation of the Osage Allotment Act, and the
23 same holding should result." Do you have an
24 understanding of why this language was included in
25 the memo?

Page 127

1     A   No.
2     Q   Did the defendants rely on this version of
3 the memo to determine that obtaining a mining permit
4 from the Osage Nation was not necessary?
5     A   Yes.
6     Q   Okay. Moving along, I'm going to show an
7 exhibit that has previously been entered as Exhibit
8 81. And let's see here, this is a document that's
9 not Bates stamped, it's not in the production, but
10 it was attached by defendants to their response to
11 the United States' motion for preliminary injunction
12 back on December 10th, 2014, but if you look down
13 here, there's a cover email from Lynn Slade to Robin
14 Phillips.
15        (Exhibit 81 previous marked for
16 identification.)
17    Q   (By Ms. Nagle) Do you know who Robin
18 Phillips is?
19    A   Well, it says here BIA. So Bureau of
20 Indian Affairs.
21    Q   Okay.
22    A   Do I recall who this person is? Not
23 directly.
24    Q   Okay. Do you know who Alan Woodcock is?
25    A   I recall, but I don't exactly recall his

Page 128

1 duty or responsibility. I recall the name, but...
2     Q   Okay.
3     A   So my answer is no.
4     Q   Okay. Here it looks like Lynn Slade is
5 sharing, he says, "We believe you should be apprised
6 of the information contained in the October 17,
7 2014, memorandum to Mr. Alan Woodcock in the
8 Regional Solicitor's Office attached." And if we
9 scroll down here, we see that it is, in fact,
10 attached as a part of this exhibit the defendants
11 submitted in the federal court in December of 2014.
12 This version is dated October 20th, 2014, to Alan
13 Woodcock from Lynn Slade and William Scott. Did
14 you -- are you familiar with this version of the
15 memo?
16    A   Yes.
17    Q   Was this version shared with anyone at
18 Enel?
19    A   Yes.
20    Q   And do you recall anyone at Enel asking
21 the attorneys at Modrall Sperling why they made
22 changes in this version from the previous versions?
23    A   I don't know why anybody asked other than
24 to -- to define more precisely the activities that
25 was going on with the project. There seemed to be

Page 129

1 some gray area from the Bureau of Indian Affairs,
2 and I believe that this -- the intention here was to
3 more -- it's more detailed in its response, because
4 we were trying -- we as Enel was trying to assess
5 whether this mining permit was required or not.
6     Q   Do you recall any discussion -- or do you
7 have an understanding as to why the previous
8 versions of this memo were not shared with Alan
9 Woodcock?
10    A   I would have no idea whether they were
11 shared or not.
12    Q   Okay. Was there anyone at Enel who was
13 responsible for ensuring that when Modrall Sperling
14 sent this October 2014 version to Alan Woodcock that
15 it had the most accurate understanding of the facts
16 contemporaneous to October 2014?
17    A   I'm not sure. So ask again, the question.
18 So I understand, it was someone -- was someone
19 within Enel responsible to get this to Mr. Woodcock?
20    Q   Was there anyone at Enel responsible for
21 ensuring that the facts that Modrall Sperling put
22 into this legal memorandum and then shared with Alan
23 Woodcock were correct and accurate and up-to-date as
24 of October 2014?
25    A   That would be either -- would anybody from

Page 130

1 Enel assess this, would anybody assess the legal
2 opinion, is that how I -- if I can rephrase your
3 question?
4     Q   So the question is whether or not anyone
5 at Enel would have fact checked it.  Was it anyone's
6 job at Enel to assess whether the facts used in this
7 memo were accurate or not?
8     A   So fact -- which part of the memo?  I
9 mean, the memo has consistent to what activities are
10 going on, so what particular facts?
11    Q   Well, let's see, we can certainly go
12 through here and -- factual background.  So, I mean,
13 each of these is a fact, right?  Osage Wind, an
14 indirect, wholly-owned subsidiary of EGPNA.  I mean,
15 I don't think -- holds leases of non-Indian owned
16 fee estate, I don't think anyone is going to dispute
17 that, but is there -- I mean, that's a fact.
18        And my question is -- and there's numerous
19 facts here, the excavations for the turbine
20 foundations are the largest excavations and measure
21 approximately 10 feet deep and between 50 and
22 60 feet in diameter.  My assumption, I could be
23 wrong, is that Modrall Sperling didn't -- weren't
24 experts at turbine excavation foundation creation
25 and that they relied on Enel for these facts that

Page 131

1 they put in this memo, but if I'm wrong I'd love to
2 know that.  So really my question is just, was there
3 someone at Enel whose job it was or whose
4 responsibility it was to ensure that these facts in
5 this memo are accurate?
6     A   Can you scroll through the rest of the
7 memo?
8     Q   Sure.
9     A   So these particular facts are correct,
10 yes.  We provided this information on actual
11 activities.  The background on the Osage Mineral
12 Estate, I believe we've covered that in great
13 detail, but I don't know.  So the factual aspects of
14 the -- so some parts of this document, the answer is
15 yes, and some parts of the document, no.
16    Q   Okay.
17    A   When it comes to these -- the historical
18 legal cases, I'm not sure who checked them, but as
19 far as the factual background and what was actually
20 done at the site, yes.
21    Q   Okay.  And you said "we" when you were
22 referring to who --
23    A   Enel.
24    Q   -- provided the facts for factual
25 background.  Would that -- you, would that have been

Page 132

1 you?
2     A   I certainly recall this language, so at
3 one time I reviewed whether it was actually in this
4 document or a subsequent document that was cut and
5 paste into this document.  I'll -- verifying that
6 this was actual activity that was actually
7 describing the activities that's begun on site.
8     Q   Okay.  And so if we look up here a little
9 bit further, if we're looking at this first page and
10 the second page, nowhere do I see anything in the
11 factual background or the first two pages that
12 refers to the touching of the soil materials as
13 merely incidental, which is language we looked at in
14 previous versions of this memo.  Do you have an
15 understanding of why the merely incidental language
16 was deleted from this October 2014 version of the
17 memo?
18    A   No.  I think it's clear what the intent
19 here was, to try to more accurately -- when you say,
20 incidentally touching, it's perhaps not a clarified
21 term, so let's clarify exactly what was going down,
22 what was happening at the site, and this document
23 more properly reflects what was being done so that
24 it can be -- so everybody is clear on the activities
25 so we can get a -- you know, this assessment.

Page 133

1     Q   Okay.  Do you have an understanding of who
2 removed the merely incidental language from the
3 memo?
4     A   I don't.
5     Q   Okay.  It also looks like some new
6 language was added to this memo that was not in any
7 of the previous versions.  For instance, it says
8 here, "Although there have been repeated efforts by
9 the Osage Nation to prevent implementation of the
10 project, the issue regarding the sandy soil mining
11 permit may also reflect a misunderstanding of Osage
12 Wind's activities or the applicable law."  Do you
13 know who added this language to the memo?
14    A   No.
15    Q   What is your understanding of who had the
16 misunderstanding of Osage Wind's activities?
17    A   Well, I think the -- when we received the
18 message and what activities we were doing at site,
19 even the BIA initial letter had some mis- -- had
20 some inaccuracies in it that need to be clarified
21 and activities that were going on and clarities of
22 whether it was considered mining or not.
23    Q   Okay.  What information were the BIA or
24 the Osage Nation lacking at that time in terms of
25 understanding Osage Wind's activities?

Page 134

```
 1        MR. McCORMACK:  Object to the form of the
 2  question, confusing, speculative, but if you know
 3  the answer, you can answer.
 4     A  Well, we -- of what exactly was happening
 5  at the site when it first was mining, so it seemed
 6  that the Bureau of Indian Affairs, when they wrote
 7  their letter, they had some inaccuracies, such as
 8  the size, and there's exaggerated language.  There
 9  was a pit that was 30 feet deep; so there's nowhere
10  in the project that there's a pit that's 30 feet
11  deep.  So it gives the appearance from the Bureau of
12  Indian Affairs that they were trying to exaggerate
13  the actual activities that was going on for other
14  purposes.  So the letter says 30 feet, nowhere is
15  there 30 feet.  Why would they put such -- so this
16  type of misunderstanding from the BIA.  So why would
17  they put that in the document, so that that's --
18  that was, you know, a clear misunderstanding and
19  then how that -- so when people -- when others read
20  this information, it would give you -- if you had
21  the viewpoint that a pit that existed 30 feet,
22  that's a pretty large excavation, and that perhaps
23  you could come to the conclusion that maybe some
24  mining activity could happen with such a large
25  excavation, but this didn't occur.  So people were
```

Page 135

```
 1  making up -- making their minds up based on false
 2  information.
 3     Q  Okay.  If we look at this -- let's see,
 4  I'm going, scrolling down here to the case law
 5  that's mentioned, and I see here we're talking about
 6  different statutes, and I see here mention of Watt v
 7  Western Nuclear on page 4, but scrolling down to
 8  page 5, I don't see any mention of the Rosette
 9  decision, which has been in all the previous drafts
10  of the memo that we've looked at until now.  Do you
11  have an understanding of why the citation to Rosette
12  was deleted from this version of the memo?
13     A  No.
14     Q  Do you know who deleted it?
15     A  No.
16     Q  Okay.  Likewise, if we scroll down to page
17  7, I see there's some additional authorities here,
18  but there's no discussion -- there's discussion of
19  Saddle Mountain, but no discussion of Mullins, which
20  was that Fourth Circuit case about compensation that
21  we looked at earlier, that's in the previous
22  versions of the draft.  Do you know who decided to
23  remove the citation to Mullins?
24     A  No.
25     Q  Okay.  If you look on page 5, we have this
```

Page 136

```
 1  language here, "The reservation of the mineral
 2  rights reserves under the SRHA is similar to that of
 3  the Osage Allotment Act," which is language we've
 4  seen in all the other versions, but then it says,
 5  "Although the contemplated surface uses under the
 6  SRHA are perhaps narrower than the general grant of
 7  surface rights for patentees under the Osage
 8  Allotment Act."  Do you have an understanding about
 9  why this qualification here was added in this
10  October 2014 version of the memo?
11     A  No.
12     Q  Do you know if legal research was
13  performed to reach this conclusion here made in this
14  last part of the sentence?
15     A  Legal research?
16     Q  Yeah.
17     A  No.  We relied on the entity that provided
18  the document.  Legal research seems to refer to the
19  -- in these points, so legal research --
20     Q  Okay.
21     A  -- I don't think that that's what's
22  contained in this document, so -- and we're getting
23  a specific legal opinion, so...
24     Q  Okay.  So who at Osage Wind, EGPNA or Enel
25  Kansas relied on this memo to determine that a
```

Page 137

```
 1  mining permit from the Osage Nation was not
 2  necessary?
 3     A  I don't know.  Enel was the executer of
 4  the project, and so Enel relied on this.
 5     Q  Okay.  Was there --
 6     A  If --
 7     Q  I'm sorry.  Go ahead.
 8     A  If there are other entities, it's
 9  immaterial at this point, because we were the
10  responsible party and the owner of the project and
11  building it.
12     Q  Was there ever a time when you were
13  uncertain, you, yourself personally, as to whether
14  or not a permit or lease from the Osage Nation would
15  be required?
16     A  Yes.
17     Q  And when was that time period?
18     A  When we -- when we received this letter
19  from the BIA that said, hey, stop mining.  We were
20  not mining, so we took a pause.  So why would a
21  representative come on site and suggest we were
22  doing something we weren't, so we took a pause and
23  we asked, is this considered mining?  And this
24  additional document that you see was a result of
25  others that questioned why are we receiving this
```

Page 138

1  letter from the BIA to stop mining. So we -- so at
2  that time we revisited some of these, and that's
3  where I see a lot of this old background, the
4  history of the challenges associated with this
5  mining permit, whether it was required or not, and
6  then the subsequent conclusions made that the
7  activity we were doing is not mining, so we
8  continued to excavate the project accordingly.
9      Q   Okay. I'm now going to introduce Exhibit
10  109.
11      MR. McCORMACK: Do you mind actually if we
12  take our next break? It's been an hour and a half.
13      MS. NAGLE: Sure. I am fine with that.
14  How long do we need for a break?
15      MR. McCORMACK: Come back at 8:45.
16      MS. NAGLE: I'm fine with that. Does that
17  work for the United States?
18      MS. McCLANAHAN: Yes, ma'am.
19      MS. NAGLE: Okay. Great. Let's go off
20  the record.
21      MR. McCORMACK: Thanks so much.
22      THE VIDEOGRAPHER: We are off the record
23  at 8:28 central time.
24      (A recess was had.)
25      THE VIDEOGRAPHER: We are back on the

Page 139

1  record at 8:47 a.m. central time.
2      Q   (By Ms. Nagle) Okay. Thanks so much. So
3  I am going to try to wrap up my questioning in this
4  next session so that the United States has some time
5  to ask some questions as well. So thank you so much
6  for bearing with me through all of this.
7      I'd like to now just ask some general
8  questions about some of the terminology that relates
9  to excavation and mining and construction of wind
10  farms. So what exactly is a borrow pit?
11      A   Typically, a borrow pit could be like a
12  pit used for material, like a quarry.
13      Q   Okay.
14      A   So if you need material such that there's
15  nothing there, that you could get it from that pit.
16      Q   Okay. And how do you create a borrow pit?
17      A   Usually, it's just that. You identify --
18  in the quarry you identify the rights to that, you
19  get in some discussions with whoever owns that,
20  whether it's a lease, there's some identified quarry
21  pits where you get material, some landowners have
22  access to material, and you can get material from
23  soil or rock or other aggregate from -- through
24  those type of negotiations or agreements to acquire
25  that material. So you get it by digging it.

Page 140

1      Q   Right. Okay. Is it typical to use a
2  borrow pit on a wind farm construction site?
3      A   It's typical to bring in -- yeah, to have
4  a quarry or bring in fill material, yes.
5      Q   Okay. And what exactly is aggregate?
6      A   Aggregate is rock.
7      Q   Okay.
8      A   It's usually defined to a certain size,
9  rock -- irregular rock piece.
10      Q   Okay. How is that distinguished from
11  backfill?
12      A   Backfill includes other -- you know,
13  aggregate is just like rock-rock, backfill is a
14  combination of material.
15      Q   Okay. And where does backfill come from
16  usually?
17      A   Usually it comes from the turbine
18  foundation that you remove --
19      Q   Okay.
20      A   -- in most all cases.
21      Q   Okay. And what does it mean to balance a
22  construction site?
23      A   I would like to see this worded in context
24  of a sentence, but I think if you are balancing a
25  construction site, and we're looking at it from a

Page 141

1  perspective of material, it would be moving material
2  from one place to another as necessary needs to
3  shore up, so where that rock would go. So that
4  would be just as a term refers to it as a balancing,
5  equalizing, moving more on site to the other where
6  it's needed.
7      Q   Okay. Great. And when you first started
8  working on the Osage Wind Farm project, do you
9  recall what the plans were specifically for sourcing
10  the backfill that would be used for the Osage Wind
11  Farm?
12      A   The backfill was the turbines themselves,
13  which, again, is almost -- all turbines, the
14  backfill comes from excavated rock.
15      Q   Okay.
16      A   The only challenge with this particular
17  project, it had, you know, hard rock.
18      Q   Sure.
19      A   Almost always, because it's -- you have
20  to -- the commercial requirement is to bring in
21  rock, it really doesn't make sense, so you take the
22  material you excavate, and you sift it and use it
23  for backfill.
24      Q   Okay. I'd like to show you an exhibit
25  that's previously been entered in this litigation as

1 **Exhibit 8, and it's a document Bates stamped Osage**
2 **Wind PRIV-000089, and it looks to be a May 15th,**
3 **2014, email from Joan Heredia to Daren Daters, and**
4 **subject matter says, Osage use of soil materials.**
5      (Exhibit 8 previously marked for
6 identification.)
7   **Q   (By Ms. Nagle)  Have you seen this**
8 **document?**
9   A   Yes.
10   **Q   Ms. Heredia writes, "It is very important**
11 **that we not remove any soil from the project site or**
12 **use site materials in lieu of materials we would**
13 **typically buy off site in developing a wind project.**
14 **Osage Nation has mineral rights for the project**
15 **lands, and removal of soil, especially for**
16 **commercial gain, could constitute mining."  Looking**
17 **back at these sentences that Ms. Heredia wrote, does**
18 **her understanding of what is permissible without a**
19 **permit and what is not permissible without a permit,**
20 **is that correct based on your understanding?**
21   A   From back in 2014, yes.
22   **Q   Okay.  And when Ms. Heredia writes this,**
23 **is that -- is her understanding of that based on her**
24 **reliance on the detailed legal analysis that Modrall**
25 **Sperling undertook?**

1   A   I'm not sure how she came to the
2 conclusion, but Joan Heredia is the head of
3 permitting or regulatory compliance, so her
4 responsibility is to ensure we have all adequate
5 permits, and if there's any sensitivities to certain
6 permits or aspects of executing the project, she's
7 to inform or make the project team aware of the
8 sensitivities and that's simply what she's doing
9 here.
10   **Q   Okay.  It states here, "Please make sure**
11 **this is announced broadly to all subcontractors."**
12 **Do you know what processes Enel had in place to make**
13 **sure that that announcement would go to all**
14 **subcontractors?**
15   A   Yes.  It's part of our technical
16 specifications.
17   **Q   Was there an individual whose job it was**
18 **primarily to communicate this to subcontractors?**
19   A   Well, to subcontractors, it would be the
20 responsibility of the contractor, so I think
21 she's -- she's -- should have -- it's probably a
22 typo there -- she should make sure this announces
23 broadly to all contractors.  The contractors is who
24 we have agreements with.  Subcontractors are
25 contractors, sub of our main contractor, if you

1 understand, so misunder -- misprint there.  So the
2 answer is make sure it's broadly announced or it's
3 part of our contract that we have with our
4 contractors and it's included in our technical
5 specifications.
6   **Q   Okay.  I'm going to stop looking at that**
7 **document, and I'm now going to pull up a document**
8 **that's previously been entered as Exhibit 68 in this**
9 **litigation, and let me just share my screen.  So**
10 **this is Exhibit 68, and it's a document Bates**
11 **stamped Osage Wind PRIV-000165.  At the top there's**
12 **an email to you from Steve Champagne, dated**
13 **September 30th, 2014.**
14      (Exhibit 68 previously marked for
15 identification.)
16   **Q   (By Ms. Nagle)  Have you seen this email**
17 **exchange before?**
18   A   I believe so.  It looks familiar, yeah.
19 Can you scroll down?
20   Q   Yes.
21   A   Okay.
22   **Q   If you look just below here, this email**
23 **from Giuseppe DiMarzio, dated September 30th, 2014,**
24 **he writes -- he lists an agenda here, and he writes,**
25 **"Do we need a rock crushing permit with the Mineral**

1 **Council for backfill of foundations?  2. If so, can**
2 **we get it?  3. If not, we should prepare anyway the**
3 **strategy for the response.  4. Who in EGP is going**
4 **to call the BOI?"  So is it true that at this point**
5 **in time, as of September 30th, that defendants, Enel**
6 **specifically, was still considering whether or not**
7 **it would need to get a rock crushing permit from the**
8 **Osage Minerals Council?**
9   A   Well, again, let's -- let's clarify what
10 this says.  So what we received is a -- this
11 document from the Bureau of Indian Affairs, as I
12 recall it, and it had on there that we needed to --
13 because of the rock crushing, we needed to get a
14 mining permit.  So when we -- we were -- we
15 established the project, we as Enel, through all of
16 these various different correspondence we've
17 addressed here, said that our activity wasn't
18 mining.
19      So in the BIA letter to us it referenced
20 rock crushing.  So none of these documents that
21 we've discussed or had some activities talk about
22 the actual activity of rock crushing, so we wanted
23 to say, hey, look, this rock crushing, is it mining,
24 and so --
25   **Q   Okay.**

**Page 146**

1    A    -- so we took a pause, and -- you know,
2  when we get a letter or such, we want to understand,
3  you know, what it meant.  So that's -- so the first
4  agenda -- here we got this letter, you know.  Do we
5  have a situation here?  If we do need this permit,
6  this is the -- then it's to head to Joan.  So Joan
7  is the head of environmental, our regulatory
8  affairs, Daren was assigned to the project, and then
9  you have some business development guys, myself,
10  Bill Moskaluk is the site, Steve Champagne is the
11  legal, Aaron, I believe, was TradeWinds' permitting
12  person, but Lincon is the -- is business
13  development, so -- then it says, "if so, can we get
14  it?"  I'm looking at the bullet points again.  If
15  not, we should prepare the strategy for the
16  response, and who in EGP is going to call the -- I
17  think that's probably BIA, Bureau of Indian Affairs,
18  BIA.
19    Q    Yeah, yeah.
20    A    So -- okay?
21    Q    Okay.  Okay.  Thank you.  Then Joan
22  responds here to Giuseppe's email on September 29th,
23  2014, and she writes, "Giuseppe, we need to act with
24  an abundance of caution.  We should not be using
25  materials at the site that would be otherwise

**Page 147**

1  commercially available.  I understand backfill -- I
2  understood backfill would come from an off-site
3  quarry."  Is Ms. Heredia's understanding of the
4  plans for the sourcing of the backfill correct?
5    A    No, it was not correct.
6    Q    Do you have any idea why she had this
7  misunderstanding?
8    A    I'm not Joan Heredia, I don't know why.  I
9  do know that we do a lot of projects.  We were doing
10  a lot of projects at the same time.  Some projects
11  you would -- you could use material for backfill.
12  If you had a sandy -- like sand situation, where the
13  sand wasn't a good source for structural support,
14  you could use -- you might have to use off-site
15  material, but in this particular project, the
16  foundation, the material there was certainly
17  suitable for backfill.
18    Q    Was Ms. Heredia's statement here in this
19  email based on her review of Modrall Sperling's
20  legal analysis provided to Enel?
21        MR. McCORMACK:  Hold on, hold on.  Object
22  to the form of the question, foundation, but you can
23  answer it if you know.
24    A    I wouldn't know what was in Joan's mind.
25  I mean, this is on the 29th of September, so it

**Page 148**

1  was -- you know, from a historical perspective, it
2  wasn't -- from the various documents we had, it
3  wasn't certainly the last one.  Joan was involved
4  with the permits, and she had access to some of this
5  correspondence that took place earlier, so -- so I
6  think that in this particular case she's just, hey,
7  let's look at this, and it was, we got this thing
8  from BIA, so we all said -- we all said, hey, let's
9  pause, let's take a look at this.  We got this
10  letter, and, you know, are we doing something wrong,
11  which was prudent to do.  So I think that her
12  message here is, you know, if she -- whether she had
13  this misunderstanding or not, she said, hey, look,
14  let's take a pause so we all get on the same page,
15  and that's what took place.
16    Q    Okay.  If you look above here, Aaron
17  Weigel responds on September 29th stating, "It is my
18  understanding that the rock crushing is not a
19  commercial use."  Did you have the same
20  understanding as Mr. Weigel, that rock crushing was
21  not a commercial use?
22    A    Yes.
23    Q    Did you ever have any conversations with
24  any of the Modrall Sperling attorneys regarding what
25  would constitute a commercial use of the minerals

**Page 149**

1  taken from the mineral estate?
2    A    Direct discussions, no.
3    Q    Okay.  Is your understanding in line with
4  Mr. Weigel's here that rock crushing is not a
5  commercial use, is that based on the detailed legal
6  analysis that Modrall Sperling undertook?
7        MR. McCORMACK:  Object to form,
8  foundation.  You can answer it if you know.
9    A    I don't know, but I -- you know, rock
10  crushing, there's no commercial value of rock
11  crushing.  In fact, it's almost the other way
12  around.  It costs you money to crush rock, so you
13  don't get any value.  There's no commercial value
14  for crushing the rock.
15    Q    (By Ms. Nagle)  And Aaron Weigel also
16  writes here, "Instead, it is a symptom of simply
17  having rocks too big to neatly put back into the
18  holes from which they came."  Is that -- in your
19  view, is that a correct understanding of why rock
20  crushing was necessary?
21    A    Yes.
22    Q    Okay.  If we move up to your email from
23  September 30th, you state here -- let me see, right
24  here at the top, "Because of the more than expected
25  hard rock that we are encountering with the

Page 150

1  **foundations excavations, we are having to blast more**
2  **than expected."  Is it correct that you ended up**
3  **having to blast more at the construction site than**
4  **you initially expected?**
5      A   Yes.  You've asked that before, and I've
6  answered it already.
7      Q   Okay.  Let's see here, you write, "The
8  **large rocks removed from the excavation works is**
9  **being crushed and reused for backfill.  This is**
10 **normal, as we do not want to dispose of the large**
11 **excavated rocks.  Possibly would then be considered**
12 **mining and cannot use large rocks for backfill."**
13 **What did you mean by "possibly would then be**
14 **considered mining"?**
15     A   Well, we have to dispose of the rocks, and
16 usually -- then you're actually removing the rocks,
17 you are putting them somewhere else, they are being
18 used for another purpose than -- especially if
19 there's a commercial fact -- than -- yeah, we --
20 then we didn't want any -- from the advice we had,
21 is if we didn't remove them and we could excavate
22 and put them right back where they were, then it
23 wasn't mining, so we didn't want to take any risk to
24 give anybody some consternation of -- that this rock
25 was being used for another purpose than going back

Page 151

1  in the hole in which it came.
2      Q   And so is this statement here a statement
3  **you are making in reliance on the detailed legal**
4  **analysis that your attorneys performed?**
5      A   At the time and at the time of this
6  message, the subsequent memo wasn't written, so
7  we -- I was in fact finding, so at this time when
8  I was reviewing all the various, previous
9  correspondence, the correspondence that was sent in
10 2013 and 2014, getting more familiar with the
11 different activities in more detail.  So we -- so
12 that's why we said, let's pause for a minute, and
13 let's -- because we can.  We don't have to do rock
14 crushing.  So let's pause until we have a clear
15 understanding if there's something that we're doing
16 inappropriately.  So the detailed legal analysis
17 was -- especially the one that was done in October
18 or November was -- came later.
19     Q   Okay.  And you say here, "Cannot use large
20 **rocks for backfill."  Why was it that you were**
21 **unable to use the large rocks for backfill?**
22     A   Well, they don't provide structural
23 support.  So rocks -- large back -- large rocks, you
24 can't compress them.  So when you -- so you have
25 to -- when we crush them, you make them to a size,

Page 152

1  and then you compact the soil on top of the
2  foundation, and it provides some structural strength
3  per the engineering design.  So when we -- when
4  you -- if it was just big rocks, it's not
5  compressible per se for the, you know, proper
6  backfill compaction.
7      Q   Okay.  You also write here, "This is
8  **causing additional time, and we are slipping on**
9  **foundation schedule.  Thus, this is not a good time**
10 **to stop excavation works unless we absolutely have**
11 **to."  What did you mean by "absolutely have to"?**
12     A   Well, we're in a construction schedule, so
13 things are -- so in a construction schedule, things
14 are very in sync.  So equipment was already ordered,
15 equipment was going to arrive.  There's a certain
16 execution of the project that it's a big master
17 plan, so if we stop the excavation works, it creates
18 a huge domino effect in the construction of the
19 projects.  In this case, you know, the excavation
20 works was not the issue.  What the issue was the
21 rock crushing, so we didn't have to stop the
22 excavation, so what we just did is we piled -- we
23 continued with the excavations, and then we crushed
24 the rock once we had some clarity on whether we
25 could do it or not without this permit, so the

Page 153

1  excavation work continued.
2      Q   So is it true that after receiving -- or
3  **after this visit from the BIA in late September that**
4  **Enel stopped crushing rock temporarily at the**
5  **construction site?**
6      A   Yes.
7      Q   For how long --
8      A   (Inaudible.)
9      Q   For how long did you stop?
10     A   I'm not, you know, exactly sure.  I
11 would -- approximately a couple of weeks, something
12 like this, but we did stop for a period of time for
13 us to take a breather to see if this was something
14 that was -- to understand what the situation was.
15 So we did stop crushing rock, we did, yeah, but,
16 again, the excavation works to building -- doing the
17 pits continued, because --
18     Q   Uh-huh.
19     A   -- that wasn't under dispute.
20     Q   And who made the decision at Enel to pause
21 **on the rock crushing?**
22     A   Well, primarily I did, but also supported
23 by the executive team.
24     Q   And would the executive team include
25 **Francesco Venturini?**

1    A   Yes.

2    Q   Okay.  Who made the decision to resume

3 rock crushing?

4    A   Same -- the same executive team, primarily

5 supported by me, and it was my recommendation to

6 continue and -- based on the information we had.

7    Q   Okay.  And at that time did you ask the

8 attorneys at Modrall Sperling to specifically

9 analyze whether rock crushing would constitute

10 mining?

11    A   I believe so, yes.  That's part of the --

12 that's part of the description of activities.

13    Q   Okay.  And you state here, "We are

14 expecting to be a week delayed on GE, WTG

15 deliveries, and any further stoppages will...."  You

16 get the picture.  What did you mean by -- well,

17 actually let me back up.  At that point why were you

18 expecting to be a full week delayed?

19    A   Well, what we did -- what that meant, this

20 bullet point, it goes in a little bit more detail,

21 but what happens is when wind turbines are

22 delivered -- so they come in sections.  You have

23 power sections, you have the Nacelle, you have

24 blades, you have different components that come to

25 the site.  So you don't want to -- there's very

1 limited areas of storage, of actually stacking these

2 components on site.  There's no place to put them,

3 so the components are going to come on site, and the

4 intention is we have equipment available, cranes,

5 components, so that these tower sections, the first

6 sections to arrive are to be installed.  So if we

7 delay the foundations -- we can excavate the

8 foundations, we can actually pour the mud mats,

9 which is a cement base, we can do the -- erect the

10 foundation, which is the rebar and the cement

11 foundation, but you can't install the tower sections

12 until the units are backfilled, and the backfill

13 required a competent fill material to do, which is

14 where the rock crushing came in.

15         So there's a natural delay that we could

16 have experienced with the rock crushing, but then --

17 because we could do other activities, but when these

18 components come, and most of these foundations are

19 available, there's no way to install these tower

20 sections as they are being delivered in consecutive

21 points, so if -- so what it would do is it would be

22 equivalent to backing up traffic on a freeway.

23    Q   Okay.  And if you don't have the storage

24 on site, would you have to, like, send them back, or

25 what would happen if they arrived before you were

1 able to complete that?

2    A   There's a few things you can do.  You can

3 put them on standby which then you incur what they

4 refer to as demurrage cost, where you -- the trucks

5 just hold onto them for a while, and then you start

6 incurring these large fees.  You can tell the

7 manufacturer to slow down in delivery, which is not

8 a good thing, because then these components go

9 somewhere else.  There's also the challenge that you

10 have a crane or equipment and manpower to install

11 these, so if you delay that, that equipment and

12 manpower is assigned to somebody else.

13         So you have a certain window to execute

14 the installation of this equipment.  If you miss

15 that window, that equipment and that crew might go

16 somewhere else and -- or it's been allocated

17 somewhere else.  This is at a time of -- of a

18 project where you had this -- production tax

19 credits, concerns for the production tax credits

20 were going to expire; therefore, there was a lot of

21 demand for equipment to assemble wind turbine

22 projects, and that includes cranes and construction

23 material and resources.  So if we didn't meet

24 schedule, those resources went to another project,

25 and then we took a huge risk of not being able to

1 complete and execute the project on time.  I see.

2 Okay.  I'm going to stop with this exhibit, and I'm

3 now going to bring up Exhibit 38, which has been

4 previously -- a document that's previously been

5 entered as Exhibit 38 in this litigation.  I'll

6 share my screen.  So this is a document Bates

7 stamped Osage Wind PRIV-000243, and it's an

8 October 9th, 2014, letter from Superintendent Robin

9 Phillips of the BIA to Francesco Venturini.

10         (Exhibit 38 previously marked for

11 identification.)

12    Q   (By Ms. Nagle)  Are you familiar with this

13 document, Mr. Price?

14    A   Yes.

15    Q   If you read here, it says, "You are to

16 refrain from any further excavation of minerals

17 until such time that you have obtained a sandy soil

18 permit through the Osage Agency."  After receiving

19 this letter, was excavation of the minerals halted

20 at the Osage Wind Farm project?

21    A   Again, we took a little pause, but then we

22 continued with the excavations.

23    Q   And is it true that that pause, as you

24 mentioned before, only involved a pause on rock

25 crushing, but not on the actual excavation itself?

Page 158

1    A   We paused some of the excavation for a
2  shorter period of time than we did rock crushing, so
3  the excavations -- because I believe there was --
4  there was additional discussions between Joan and
5  the BIA and the concerns they had, and the concern
6  was rock crushing.  So there was additional
7  discussion, and the permit was involved, primarily
8  around the crushing.  That was the concern.
9        So, you know, how things evolved, it
10  wasn't so much -- the excavation was always expected
11  to occur.  What the concern was -- is the -- is this
12  had been crushed into small rocks and piled around
13  the turbine foundation, was the concern.  So that's
14  why we made the decision, you know, this is -- the
15  excavation was always a normal aspect of the project
16  execution, it was in the special use permit,
17  everybody knew that this was what we were going to
18  do.  The Osage Tribe knew that excavation was
19  required.
20        This rock crushing was now into question,
21  and, again, I point out here that this -- we got
22  this letter inadvertently, so we -- so although it
23  says this is October 9th, we received it, you know,
24  from secondhand.  So I recall that, and that created
25  some problems, because we didn't get it directly.

Page 159

1  So there seemed to be some sensationalism with the
2  letter, that it was being used for an alternative
3  fact, because it didn't go to us, it went to
4  somebody else, or it was posted before we received
5  it.  And then, as I mentioned, I recall, because I
6  was not really thrilled because Mr. Whiteshield,
7  this inspector, found a pit approximately 60 foot
8  wide and 30 feet deep.  There's no pit, there's no
9  foundation that's 30 feet deep, so it's a gross
10  exaggeration.  And this leads people, if they read
11  this, to say, 30 foot deep, my goodness, maybe
12  there's mining activity going on.
13        So this activity, because it was 30 foot
14  deep, this misinformation put a lot of people on
15  notice, like, well, what the heck is Enel doing
16  there.  So that's why we took a pause and went and
17  said, okay, let's try to get some clarification here
18  on what the concern is.
19    **Q   Okay.  Okay.  Thank you for that.  Let's
20  see, just a little bit more here.  I'd like to
21  introduce another exhibit.  Okay.  So I believe this
22  will be Exhibit 109.  Let me share my screen.  So
23  this is a document Bates stamped Osage Wind-019010.
24  And it is an email to Vittori Vaglisindi.  I'm
25  totally mispronouncing --**

Page 160

1    A   Don't worry about it.
2    **Q   Thank you.  From you, dated October 20th,
3  2014.**
4        (Exhibit 109 marked for identification.)
5    **Q   (By Ms. Nagle)  Are you familiar with this
6  email?**
7    A   Yes.
8    **Q   Who is Vittorio, whose name I cannot
9  pronounce, Vaglisindi?**
10    A   Vaglisindi.
11    **Q   Yeah.**
12    A   He's the head of engineering construction,
13  who I referenced at the beginning of this
14  deposition.
15    **Q   Okay.  Who is Luca Rossini?**
16    A   Luca Rossini was the head of construction
17  at the time.
18    **Q   Okay.  At --**
19    A   Luca Rossini was the head of engineering.
20    **Q   At EPGNA or at Enel?  Okay.**
21    A   Luigi Lapegna was the head of project
22  management.
23    **Q   Okay.  And who is Magrini Umberto?**
24    A   Umberto Magrini is -- was the head of
25  engineering.

Page 161

1    **Q   Also for Enel?**
2    A   Head of engineering -- he was the head of
3  engineering, yeah.  And then -- yeah, right now he's
4  the head of -- again, these individuals change, so
5  Vittorio retires, and then these positions back in
6  2013, they -- you know, people get promoted and move
7  around.
8    **Q   Uh-huh.**
9    A   So excuse me if I get -- what their job
10  positions were in 2013 and 2014, 2015 would have
11  transitioned.
12    **Q   Sure.  Sure.  So under engineering and
13  construction you write, "It seems the primary
14  concern is associated with the rock crushing."  What
15  made you say that?**
16    A   Because that was the basis of the
17  correspondence we had with the BIA, Joan's
18  discussion.  The excavation was always a defined
19  activity the project was going to undergo.  So where
20  the concern was, was that -- again, our special use
21  permit, all these things defined the excavation and
22  all the activities that we're doing.  So we -- there
23  seemed to be some concern that, you know, why were
24  we crushing rock.  To me it's -- when you are
25  excavating, you build in a road, you are doing any

Page 162

1   type of construction activity, you are crushing
2   rock, so it's --
3       Q   Uh-huh.
4       A   You know, I'm perplexed by some of the
5   decisions that were made by the Tenth Circuit, but,
6   regardless, you know, crushing rock is in some form,
7   when you grade a road you could crush rock, so
8   that -- but actually we had rock crushing machines,
9   and that was the concern.  When you are doing
10  excavation material, when you are digging a hole,
11  you crush rock, right, so construction practice you
12  crush rock.  So the concern was that we thought,
13  okay, this is what the -- what people are being
14  worried about, so maybe it's a form of education and
15  clarity, so that's what we were trying to do.
16      Q   Okay.  You also write, "If this is a
17  long-term stoppage, we can then bring in other
18  material for backfill.  This will add cost to the
19  project, but we think it can be managed."  Did Enel
20  ever decide to bring in other material for backfill?
21      A   No.  We decided not to do that.
22      Q   Why was that decision made?
23      A   Primarily because the activity that we
24  were doing, there's a cost impact, and because the
25  advice from legal -- from our legal consultants that

Page 163

1   the activity of crushing and our activity wasn't
2   considered mining, so why would we incur another
3   cost for this.
4       THE WITNESS:  Can we take a quick pause
5   for a second?
6       MS. NAGLE:  Sure.  How long of a break do
7   we need?
8       THE WITNESS:  Just a minute.  I have --
9   you know, I'm getting a call from counsel.
10      MS. NAGLE:  Okay.
11      THE VIDEOGRAPHER:  We are off the record
12  at 9:21 a.m. central.
13      (A recess was had.)
14      THE VIDEOGRAPHER:  We are back on the
15  record at 9:23 a.m. central time.
16      MS. NAGLE:  Okay.  So I will just state
17  for the record that we're having a lot of
18  interruptions and coaching of the witness, so I'm
19  not sure what the basis for this last call was, but
20  it's happened numerous times now, so I would just
21  ask counsel going forward that if you do have an
22  issue, if it's based on privilege or whatever it is,
23  that you make it clear for the record and that you
24  actually permit the questioning of the witness
25  without interruption.  It's not usual or certainly

Page 164

1   considered by Rule 30 that there will be these kinds
2   of interruptions to questioning of the witness.
3       MR. McCORMACK:  Well, just let me say for
4   the record, I'm not sure what you are talking about.
5   We haven't interfered in this examination at all.  I
6   am 5,000 miles from my witness, and I've had two --
7   one, two -- conversations with my client during the
8   deposition.  I don't find that out of the ordinary
9   at all.  So I disagree entirely with your idea that
10  we're interfering in any way.  We've been extremely
11  professional with you.  I think you've been
12  professional with me.  But I don't think that having
13  a sidebar with my client after a question ends is
14  inappropriate in any way, especially when he's
15  5,000 miles away and I've done it twice.  So I
16  disagree entirely with any suggestion that we're
17  doing anything inappropriate here.
18      MS. NAGLE:  I just -- I don't think we --
19  go ahead, Kathy.
20      MS. McCLANAHAN:  I'm sorry.  This is Kathy
21  McClanahan with the United States Attorney's Office.
22  I've simply never witnessed anything like it in 27
23  years of practicing law.  It is, at least in this
24  district, and I'm sure you became familiar with our
25  case law and our rules when you were admitted pro

Page 165

1   hac vice, it is not allowed.  After the witness is
2   sworn in, we are entitled to a candid discussion
3   between the questioner and the witness, and there
4   are cases out there that, if you care to look, in
5   the Northern District where magistrates have said
6   that this kind of -- you called them whispering into
7   your client's ear.  That's expressly forbidden.  So
8   I just make my record that I will be prepared to
9   call Judge Jayne.  I hate to bother her at 9:30 in
10  the morning, but I will do that if we continue to
11  have these interruptions.
12      MR. McCORMACK:  I could not disagree with
13  you more.  I'm not doing anything wrong, and I'd be
14  very curious to see if when we're taking the
15  examination of your witnesses you think you are not
16  allowed to speak to your client at any time during
17  the deposition.  I would find that quite surprising,
18  but let's not --
19      MS. McCLANAHAN:  Please do -- please do
20  take a note of that, because --
21      MR. McCORMACK:  Let's not waste any
22  further time on this.  Can we just get back to the
23  job at hand?
24      Q   (By Ms. Nagle)  Okay.  So we were just
25  interrupted by a call that you got from your

Page 166

1 counsel. I'm not sure what the nature of that call
2 was or the purpose that call, but before your
3 counsel took you away from this deposition, we were
4 discussing this document here, and at the bottom of
5 this email chain where you referred to, "If there is
6 a long-term stoppage, we can then bring in other
7 material for backfill. This will add cost to the
8 project, but we think it can be managed."
9        And so I believe you were discussing an
10 answer before, which I think is finished, so we'll
11 move on to the next question. And you say here on
12 the next page, "Best case scenario is the BIA
13 assesses the situation and determines our activities
14 are not mining and conclude the permit is not
15 applicable for the project." If that is the best
16 case scenario -- well, first of all, did that
17 happen?
18    A   No.
19    Q   So what was the alternative to your best
20 case scenario in event that the BIA did not agree
21 and determine and remain steadfast that your
22 activities did constitute mining?
23    A   Well, we just had a -- we had a
24 disagreement. We couldn't get -- both parties
25 couldn't agree on the activities that we were doing

Page 167

1 were mining, so we sought to try to get clarity to
2 try to get some concurrence, agreement of why
3 either side -- why the BIA -- let's -- why the BIA
4 considered rock crushing mining, and the
5 explanation -- we didn't get an explanation. So
6 basically, you know, it was to submit the permit,
7 and let's see what happens. So it wasn't clear to
8 us, there was no explanation that -- you know, when
9 we asked questions why was it considered mining. So
10 it wasn't addressed.
11        We had legal assessments done that
12 supported that what we were doing was not mining,
13 and we had a history of the Osage -- Osage Nation
14 trying to stop the project. So that was -- this was
15 another attempt to stop the project, so we continued
16 on our activity.
17    Q   So was the plan at this time to continue
18 with construction and excavation if the BIA wasn't
19 convinced that you were right?
20    A   I think that's adding more to it than
21 what -- it's one particular input, so all the other
22 inputs that I just described earlier were -- led to
23 the decision to continue it. So it wasn't just
24 because the BIA said, no, we don't agree. Let's
25 continue. No. We tried multiple different ways to

Page 168

1 try to work with the parties to understand what the
2 objections are, alternatives. We didn't get this
3 clarity from the Bureau of Internal -- Indian
4 Affairs.
5    Q   Would you say that you got the clarity you
6 needed from the Tenth Circuit's decision in this
7 case?
8    A   I think that this is not -- not fair to
9 say, because this is well beyond, and at the time of
10 the project, this decision wasn't there.
11    Q   If the decision had been there, would that
12 have been sufficient to convince you or anyone at
13 Enel that a mining permit is necessary?
14        MR. McCORMACK: Object to the form of the
15 question, calls for speculation, argumentative. You
16 can answer.
17    A   As I represented earlier, I would have to
18 look at the Tenth Court's decision, but as I
19 understand it, it was a rock crushing activity. So
20 if we had a concern that rock crushing was the area
21 of concern and we couldn't -- and it was necessary
22 to permit, then we would look at other means.
23    Q   (By Ms. Nagle) Okay.
24    A   So with the latest information, you take a
25 different decision.

Page 169

1    Q   I am now going to show you what will be
2 Exhibit 110, and this is a document that is Bates
3 stamped Osage Wind-038347, and at the top it's an
4 email to you from Bill Moskaluk, dated
5 November 22nd, 2014, with a subject line, Osage
6 standby cost estimate only.
7        (Exhibit 110 marked for identification.)
8    Q   (By Ms. Nagle) Are you familiar with this
9 email exchange?
10    A   Well, I received it. If you scroll down,
11 I'll get more familiar.
12    Q   Sure.
13    A   Okay.
14    Q   So at the bottom of the first page is a
15 November 22nd, 2014, e-mail from Craig Mazurowksi to
16 Bill Moskaluk and Giuseppe DiMarzio, providing what
17 looks to be numbers of costs of how much it would
18 cost to halt construction; is that correct?
19    A   Yes.
20    Q   Okay. Okay. And was this the first time
21 that IEA had been asked to provide these cost
22 calculations?
23    A   I'm not sure if we asked them verbally
24 before or took into consideration something sooner.
25    Q   Do you know how -- at this time do you

1  know how many of the 84 excavations were complete?

2     A   By the end of November quite a bit, the

3  excavations; rock crushing, less.

4     Q   Who asked that these calculations be done?

5     A   Who asked the -- I did.

6     Q   You did?  And why did you ask for these

7  numbers?

8     A   Because I wanted to assess what the impact

9  of the costs were, if we had to -- if we couldn't

10  continue on.  So it was part of the decision-making

11  process to look at all considerations, all factors

12  and to understand the situation that we were in, to,

13  you know, assess how to proceed, how long we

14  could -- how long we could withhold while we took a

15  look at the situation and what the financial impact

16  of it was.

17     Q   Okay.  All right.  So let me take this

18  document down, and we are now -- so this will be

19  Exhibit 111, and it's document Bates stamped Osage

20  Wind-019012.  I note here at the bottom it's got

21  your signature for approval, dated December 9th,

22  '14, and it looks like it's a change order form.

23        (Exhibit 111 marked for identification.)

24     Q   (By Ms. Nagle)  Do you recognize this

25  document?

1     A   Yes.

2     Q   Okay.  And if you look -- if we look at

3  the page ending in 13, there's some sort of

4  explanatory notes here.  There's the section called,

5  Decision Process for Rock Crushing.  Do you see that

6  here?

7     A   Yes.

8     Q   And it explains that, let's see here, it

9  says, "Given the issue with Osage Nation, the

10  disposal of excavated rocks and import of

11  backfilling material from outside the county was a

12  more expensive solution."  How was importing

13  backfill material from outside the county a more

14  expensive solution?

15     A   We had to -- again, I have to remember

16  from the time that -- when the assessment was done,

17  it's like where was suitable backfill, where could

18  we -- where could we get the material, and it has to

19  be trucked in.  So there's various permits to truck

20  it in, there's potential damage to the roads,

21  especially on site, so we would have to do the

22  potential construction for the roads, and then

23  there's a cost impact of what do we do with the

24  material we pull out.  So all the different cost

25  impacts from doing something else, because there's

1  more activities that need to be done, so it added

2  additional cost to the project.

3     Q   Okay.

4     A   It would have added additional cost to the

5  project.

6     Q   And here it says, "Importing material was

7  also not advised by EGPNA legal department, because

8  it would have given credit to Osage Nation's theory

9  on the commercial use of soil and therefore

10  abandoned."  Who in EGPNA legal department told you

11  not to consider importing material because it would

12  give credibility to the Osage Nation's legal theory?

13     A   This is more of a misunderstanding on my

14  part.  So when we imported material, at no time

15  would that be mining, but it would have -- so it

16  was -- I think this is -- it's a misunderstanding.

17     Q   So I understand you are saying you had a

18  misunderstanding about it, but who did you speak to

19  about this from the EGPNA legal department?

20     A   Well, it was the same legal assessment

21  from the -- that we did for whether we needed to get

22  the permit or not, so the fact that we -- so that

23  discussion of whether we need to stop doing the

24  excavation works or the rock crushing, it's all part

25  of that discussion, so -- as an alternative.  So at

1  the time I was writing this, I was trying to -- you

2  know, to give the bullet points to the different

3  issues.  There would be no benefit, there's no -- no

4  -- the commercial use of the soil therefore

5  abandoned, so there was a misstatement on my part.

6     Q   Okay.  So the mis-- let me try to

7  understand.  Why was it important to not give credit

8  to the Osage Nation's theory on the commercial use

9  of the soil?

10     A   Well, again, as I stated, this is a

11  misunderstanding.  So the commercial use -- when you

12  mine, the commercial use would be if we took the

13  existing rock and sold it to -- and it went

14  somewhere else, so we didn't want to have a

15  commercial use of the existing.  Bringing in rock

16  from another entity for backfill didn't -- didn't

17  provide any -- there was no -- there was no debate

18  on that, whether that was a concern by the Osage

19  Nation, to bring in external sourced material for

20  backfill.

21     Q   When did you come to realize that your

22  statement here was a misunderstanding?

23     A   Well, reading it now, as well as at the

24  time.  I think during the time in 2015, I was

25  actually, you know, asked about it.  It was a minor

1 point on the -- when we submitted this change order
2 cost, when it was actually approved, you were asking
3 questions, and I thought, well, that's not exactly
4 correct here.
5    Q   Did you ever take any steps to correct it?
6    A   No. It's an internal document, and the
7 point of the document was to describe why we needed
8 to justify the change order.
9    Q   Okay.
10       MS. NAGLE: Well, those are all of my
11 questions that I have for now. Thank you so much
12 for taking all this time to answer them.
13       Kathy, I will turn the witness over to the
14 United States now for questioning.
15       MS. McCLANAHAN: Very good.
16          DIRECT EXAMINATION
17 BY MS. MCCLANAHAN:
18    Q   I'll start with actually the exhibit that
19 you just had up.
20       MS. McCLANAHAN: I think you marked it
21 Exhibit 111?
22       MS. NAGLE: Yes.
23       MS. McCLANAHAN: The change order?
24       MS. NAGLE: Yes. Do you want me to --
25       MS. McCLANAHAN: Pull that up. We've got

1 it. I think we've got it. I think we might have
2 located it somewhere different in the documents.
3 What I have is Osage Wind-35491.
4       MS. NAGLE: So that might be a different
5 version.
6       MS. McCLANAHAN: I think it is.
7       MS. NAGLE: So up to you if you want to
8 enter it as a new exhibit or --
9       MS. McCLANAHAN: If you don't mind, would
10 you just put up your 111.
11       MS. NAGLE: Yeah, I'm happy to.
12       MS. McCLANAHAN: At about the same spot
13 you were about before.
14       MS. NAGLE: So I was at down here, and if
15 you need me to move it, just let me know.
16       MS. McCLANAHAN: Excellent, very good.
17    Q   (By Ms. McClanahan) So Mr. Price, under
18 the Decision Process for Rock Crushing, you
19 indicated that there was an issue with Osage Nation,
20 and now you realize that the statement that you made
21 was the result of a misunderstanding. Was that your
22 testimony?
23    A   That wasn't a result of mis- -- no. I
24 misrepresented the bullet point.
25    Q   You misrepresented the bullet point?

1    A   Yeah.
2    Q   I'm having trouble understanding that.
3 Was there an issue with the Osage Nation?
4    A   Yes.
5    Q   And was the disposal of excavated rocks
6 and the import of backfilling material from outside
7 more expensive?
8    A   That was -- that was our understanding,
9 yes, at the time.
10    Q   Do you have reason to believe --
11    A   That was correct.
12    Q   -- that's not true?
13    A   Say again?
14    Q   Do you have reason to believe that that's
15 not true, that those things would not have been a
16 more expensive solution now?
17    A   It would have been a more expensive
18 solution, so that is correct.
19    Q   Okay. So I don't understand what the
20 misunderstanding that you had, both of these things
21 are true. What's the misunderstanding?
22    A   The fourth bullet point.
23    Q   I'm sorry?
24    A   The fourth bullet point. Importing
25 material was also not advised by EPG legal

1 department, because it would have given credit to
2 the Osage Nation's theory on the commercial use of
3 soil and, therefore, abandoned.
4    Q   So your testimony is today that it was
5 advised?
6    A   I mis- -- so the legal department -- so
7 the importing of the material, it was more the
8 exporting of material, so it's not import. Exchange
9 that word for export.
10    Q   Exporting material was not advised,
11 because that would have given credit to the Osage
12 Nation's theory. Is that what you intended to say?
13    A   It certainly wasn't importing material, so
14 it was a mistake.
15    Q   Okay. And exporting material was
16 definitely not advised by the legal department; is
17 that correct?
18    A   Correct.
19    Q   I'm sorry. Did you say yes?
20    A   Yes. Correct.
21    Q   Okay. The next bullet point -- actually,
22 let me skip to the one right after that that says,
23 "Finally, the crusher was ready to leave the project
24 after Thanksgiving." So was there one crusher on
25 site, or how many were there on site?

Page 178

1    A   We had up to three.

2    Q   Okay.  So were all three crushers going to
3    leave the project right after Thanksgiving?

4    A   I'm not sure.  I don't remember.

5    Q   Okay.  And so by authorizing a change
6    order, you ensured that the crusher stayed after
7    Thanksgiving?

8    A   Again, I'm not sure of the timing of the
9    project.  It happened seven years ago when we had
10   rock crushers there and how long they stayed.

11   Q   Okay.  But you were under a duty to your
12   employer, I mean, you made sure that these facts
13   that justified spending an additional $2 million,
14   you made sure they were correct at the time, didn't
15   you?

16   A   Yes.

17   Q   Okay.  How long did you pause the rock
18   crushing?

19   A   Again, I don't know the exact time, but I
20   know we paused for a short period of time.  You
21   know, I test -- stated earlier approximately two
22   weeks, so I'm not sure --

23   Q   Could have been two weeks?

24   A   You know, that's -- I know we paused a
25   little bit while -- because when we got this BIA --

Page 179

1    that's right when we paused for a little bit of time
2    to understand what...

3        MS. McCLANAHAN:  Okay.  Mary Kathryn, you
4    can take down your screen.  Thank you so much.

5    Q   (By Ms. McClanahan)  So for those two
6    weeks, do I understand your testimony to be that you
7    continued to excavate, but paused rock crushing?

8    A   Well, we definitely continued to excavate.
9    When we first got the notice, we looked at the
10   construction schedule, but we certainly took a stop
11   on all works, and then once we understood that the
12   issue of rock crushing was the concern, then
13   excavations tech works continued, and --

14   Q   And how did you -- I'm sorry.  I'm sorry.
15   I cut you off.  Go ahead.

16   A   No, I think I was done.

17   Q   Okay.  And how did you come to the
18   conclusion that rock crushing was the primary issue,
19   but excavation could continue?

20   A   Well, I recall this was discussions that
21   Joan had with the BIA, the concerns with -- the
22   excavation was a clearly defined activity.  For
23   example, I understood it was a special use permit.
24   All parties knew we were doing excavations or
25   removing of pits.  There was some -- so we -- so all

Page 180

1    parties knew that this was a standard activity in
2    building a wind farm.  The issue that surprised
3    people was this rock crushing.  They felt that the
4    feedback we got was -- through verbal discussions
5    was that the rock crushing was not something that
6    they were aware of or these rock crushing machines.

7    Q   So I'm confused.  Are you saying then that
8    because the BIA knew that excavation was going on,
9    that couldn't have been the subject of the request
10   to stop work?

11   A   That was -- and my understanding of my
12   recollection is the issue that was the concern
13   between the BIA and the activity we were doing was
14   rock crushing, not excavation.  Excavation --

15   Q   But you --

16   A   -- is a standard process.  It's a standard
17   process.  It's known -- Osage Nation knew about it,
18   the Bureau of Indian Affairs knew about it, it was
19   in our permits, everybody knew that the -- the
20   activity associated with excavation.  What was
21   concerning or what was new to folks was this rock
22   crushing machine, and it was the source of the
23   consternation.  That's what I'm explaining.

24   Q   Okay.  So in your mind the difference was
25   what the BIA knew was going on and then the new

Page 181

1    thing, the surprise element of rock crushing?

2    A   Yes.  That was the -- that was what their
3    concern was.  That was the added --

4        (Simultaneous speakers.)

5    Q   (By Ms. McClanahan)  How do you know that?

6    A   -- that was not known.

7    Q   How do you know that?

8    A   You've asked.  That's my recollection of
9    the discussions that was had with Joan and others
10   and correspondence.  It was the rock crushing
11   concern.

12   Q   Did you ever talk to the BIA?  Did you
13   ever talk to anybody who was with the BIA or
14   employed by the BIA?

15   A   I did not personally, no.

16   Q   Okay.  So your understanding of what was
17   the primary issue comes from your discussions
18   internally?

19   A   Yes, and all the different, various
20   aspects of the documents, the availability of
21   documents, looking over the requirements of what
22   people knew and what people didn't know.

23   Q   Did you have an understanding of who Robin
24   Phillips was?

25   A   I don't recall.

1    Q   Do you understand she's the one who signed
2  the stop work order?
3    A   I talked to many people many years, and I
4  don't remember everybody's name, especially on a
5  project that happened seven years ago.  So I'm sorry
6  if I don't recognize this name and it becomes a
7  question for you.
8    Q   We have it.  Could you pull it up?  I
9  think it's Exhibit 38 previously marked, and I
10  believe Ms. Nagle showed this document to you, I'm
11  going to show it to you again.  It's Exhibit 38, and
12  it's a letter from Robin Phillips.  Okay.  If you
13  could stop right there.
14        It says, "You are to refrain from any
15  further excavation of minerals until such time," but
16  you're indicating to me that when she says, "you are
17  to refrain from any further excavation of minerals,"
18  she didn't mean what she clearly said there?
19        MR. McCORMACK:  Object to the form of the
20  question, argumentative.  You can answer it.
21    A   I can't see all the document.  Can you
22  reduce it, please, because half of it is --
23    Q   (By Ms. McClanahan)  Surely.
24    A   Can you go larger?  Okay.  That's fine.  I
25  can see it.  So as I explained before in this

1  document, in the previous testimony, we received
2  this document secondhand.  We received it from other
3  people prior.  It has some inaccuracies in the
4  document, gross inaccuracies, and so it led us to --
5  to ask clarity, since it had these gross
6  inaccuracies in it, what was the concern?  And the
7  concern we got wasn't the excavation, it was the
8  crushing the rocks.
9    Q   So, again, my question was, when Robin
10  Phillips says, "You are to refrain from any further
11  excavation of minerals," you believe she did not
12  mean what she said there?
13        MR. McCORMACK:  Object to the form of the
14  question, asked and answered, and --
15        MS. McCLANAHAN:  I haven't had an answer.
16        MR. McCORMACK:  -- and argumentative.  But
17  you can answer the question.
18    A   So like on the body, it does have
19  inaccuracies, as I've explained.  We took this
20  document, we paused, we asked, we inquired about
21  what is -- what is the concern here, and the concern
22  was rock crushing.  It wasn't the excavation,
23  because the parties knew excavation works were going
24  to continue.  The pit, approximately 60 foot wide
25  and 30 foot deep, 30 foot deep is an extreme gross

1  exaggeration, a huge exaggeration of what was going
2  on, so clearly --
3    Q   I full well understand --
4    A   We should --
5    Q   I full well understand that you take
6  issue --
7    A   May I finish, please?
8        MR. McCORMACK:  Hold on.
9        MS. McCLANAHAN:  No, no.  I'm going to ask
10  that we strike it as nonresponsive.
11    Q   (By Ms. McClanahan)  I full well
12  understand, sir, that you take issue with the fact
13  that you had to find this document online when it
14  was posted for the public.  I also understand you
15  take issue with the 30 feet as being a gross
16  representation.  But if I'm not asking any question
17  about those, please do not continue to give me
18  nonresponsive answers.
19        So your testimony today is that you
20  understood, through further discussions, that when
21  Robin Phillips said, "You are to refrain from
22  further excavation of minerals," that she didn't
23  mean what she said?
24        MR. McCORMACK:  Object to the form of the
25  question, argumentative.  You can answer the

1  question.
2    A   So when we got the document in the way we
3  had, we questioned the document, as I've described,
4  because it had these issues with it.  So the
5  conclusions that you will refrain from these
6  activities were based on gross inaccuracies that
7  took place in the document, so we asked for an
8  explanation of what the concern was, and the concern
9  was -- is the rock crushing.  It wasn't the
10  excavation.  And that is my testimony or my
11  deposition point.
12    Q   (By Ms. McClanahan)  Do you have to
13  excavate rock before you crush rock?
14    A   Yes.
15    Q   But it's your understanding then that
16  because Ms. Phillips knew that excavation was
17  ongoing, that that couldn't have been the issue that
18  she had with your operation?
19        MR. McCORMACK:  Object to the form of the
20  question, argumentative.  You can answer the
21  question.
22    A   What's the question?  I don't understand
23  your question.
24    Q   (By Ms. McClanahan)  It's your
25  understanding that because Ms. Phillips had to have

Page 186

1  -- and you keep using the word, she knew about it,
2  she knew about excavation, that she couldn't have
3  meant for you to refrain from any further
4  excavation?
5      MR. McCORMACK:  Object to the form of the
6  question, assumes facts and argumentative.  You can
7  answer.
8      A   The excavation as part of the project was
9  a permitted activity, it was allowed, so it was a
10 special use permit.  The activities that we did
11 associated with the project, excavation was a known
12 activity.  So you have to excavate to build the
13 turbine foundations, so it was a described event, so
14 we had the rights to do it.  So the concern was,
15 when we got this letter, what is -- what is the
16 concern?  The concern was crushing rock, not
17 excavation.
18     Q   (By Ms. McClanahan)  So you indicated that
19 excavation was a permitted activity.  Did I hear
20 that correctly?
21     A   It was an activity -- in my understanding
22 was listed -- my recollection, it was listed in the
23 activity that was associated with building the
24 project, yes.
25     Q   Listed where?

Page 187

1      A   In the special use permit, amongst others.
2      Q   Which is issued by what -- I'm sorry.  Go
3  ahead.  Were you finished?
4      A   Yes.
5      Q   Which is issued by who?
6      A   It's -- I don't recall the entity that
7  issued the permit.  It was a known activity that was
8  associated with construction on the project, and
9  there was no objections to this time.
10     Q   There were no objections --
11         (Simultaneous speakers.)
12     A   (Inaudible.)
13     Q   -- to the special use permit?
14     A   There was no --
15     Q   There were no objections?
16     A   There was no objections to excavation that
17 I'm aware of, no.
18     Q   Okay.  And a special use permit, you are
19 not aware of what governmental body issued that?
20     A   Well, I don't remember the actual entity
21 that issued the special use permit.
22     Q   And you understand that there are
23 different bodies that govern the use and the
24 permitting of different things?
25     A   Yes.

Page 188

1      Q   So, like, for instance, are you familiar
2  with the wild eagle take permit?
3      A   I'm vaguely familiar that we had a -- this
4  permit requirement.
5      Q   Okay.  You don't think that just because
6  there's a special use permit that you could do away
7  with asking the United States Fish and Wildlife
8  Service for an incidental take of wild eagles, do
9  you?
10     A   No.
11     Q   In other words, the special use permit
12 didn't usurp every other permit that might be
13 required; is that right?
14         MR. McCORMACK:  Object to the form of the
15 question, argumentative.  You can answer it.
16     A   My point is the special use permit
17 provides clarity of what the activities of the
18 project would be.  If the Osage Nation had issues
19 with certain activities of the project, that would
20 be for them to -- that would be for them to issue
21 the concern of how the project was constructed.  The
22 Osage Nation knew about the permit, they knew how
23 the project was to be constructed, they knew
24 excavation work was going to be done, and they never
25 questioned the excavation works.

Page 189

1      Q   (By Ms. McClanahan)  They never raised an
2  objection to the special use permit?
3      A   To the excavation works, so you are
4  putting words in my mouth.
5      Q   Do you know who owns the minerals that sit
6  beneath the surface in Osage County?
7      A   My understanding, the subsurface minerals
8  were Osage -- the Osage Nation, oil and gas, these
9  were from the Osage Nation.
10     Q   Do you understand that all the minerals
11 that underlie the surface in Osage County belong to
12 the Osage Nation?
13     A   Yes.
14         MS. McCLANAHAN:  You can take that exhibit
15 down.  Could we look at what's previously been
16 marked as Exhibit 68?  It is labeled Osage Wind-
17 PRIV-000165.
18     Q   (By Ms. McClanahan)  I understand that you
19 looked at this document with Ms. Nagle, so my
20 questions here will be brief.  If you take a look at
21 the bullet point that reads, "The large rocks
22 removed from the excavation works is being crushed
23 and reused for backfill."  The next sentence says,
24 "This is normal, as we do not want to dispose of the
25 large excavated rocks," and then in parentheses it

Page 190

1  says, "possibly would then be considered mining."
2  How did you reach the conclusion that that might be
3  considered mining?
4      A   Because we would be using or putting these
5  rocks to another -- use them for another intended
6  purpose; therefore, they're a potential of
7  commercial use.  With the -- this was a discussion
8  within the team, it was a discussion within our
9  environmental group, as well as the -- Joan Heredia,
10  as well as the legal team that suggested that if we
11  disposed of this rock or did something else with it,
12  other than putting it as backfill that it might be
13  considered as mining; therefore, we didn't want to
14  have any potential or any concerns that the activity
15  we were doing would be considered that, so we didn't
16  do it.
17      Q   Okay.  So I'll just ask you, who gave you
18  your working definition of the word mining?
19      A   Well, this is -- we got this from our
20  legal consultant, what mining is, got that also from
21  internal staff, so -- of that activity that we're
22  doing is not mining.
23          MR. McCORMACK:  Bill, could you speak up?
24  I'm having a hard time hearing you.
25          THE WITNESS:  Sorry.

Page 191

1          THE REPORTER:  Could you repeat your
2  answer?
3      A   I said I got this from the -- from our
4  legal staff and from third party consultant legal
5  that assess the activity we're doing, how it's
6  mining, and that -- and then we had some internal
7  discussions about the activities that -- to not
8  cause or not create any additional issues by doing
9  activities that would be considered a commercial
10  activity, I mean, a commercial gain.  If we removed
11  the rocks and they went somewhere else, the
12  perception is that there would be considered some
13  commercial value to that.
14      Q   (By Ms. McClanahan)  So you specifically
15  had legal advice that pertained to large rocks being
16  removed and being crushed and reused for backfill,
17  or were you applying a working definition of mining
18  to what you knew to be the situation on the ground?
19      A   My recollection is that was the advice we
20  received from legal counsel, that the activity we
21  were doing by crushing rock and using it as backfill
22  was not mining, in multiple documents.
23      Q   Okay.  The next bullet point, it says,
24  "Because Enel is to operate the facility on a
25  long-term basis," so it was always the understanding

Page 192

1  that Enel would be operating the facility; is that
2  correct?
3      A   Yes.
4      Q   Have you ever heard the term "as-built"?
5      A   Yes.
6      Q   Can you tell me what that means to you?
7      A   As-built is usually -- it's referred to as
8  a drawing or document that describes how the project
9  was actually built.  So you have design
10  specifications, so as-builts would be something that
11  if there was a deviation from what the design
12  drawings showed that you would reflect it in
13  as-built documents.  Sometimes as-built drawings are
14  exactly as designed, would have some indication
15  of changes made along the way through to the
16  construction of the project.
17      Q   Okay.  And we looked at a change order; do
18  you recall that in this case?
19      A   Yes.
20      Q   So is it fair to say that there was
21  significant differences in the way the project was
22  designed and the way it was -- we thought it was
23  going to be built and then the conditions that you
24  encountered once you got there?
25      A   I don't think that that's completely

Page 193

1  correct.  I think in this particular project, when
2  it came to the foundation pieces, as I expressed
3  before, general subsurface conditions are always a
4  tricky thing.  Why is because no one absolutely
5  knows what you are going to encounter, so you do
6  geotechnical investigations, you drill bore holes,
7  if you think about that the documents that we
8  chatted about before, the engineering documents --
9  so just because you drill a bore hole does not mean
10  that the conditions --
11      Q   Are you receiving a call from your
12  counsel?  Are you receiving a call from your
13  counsel?
14      A   No, I'm not.
15          MR. McCORMACK:  He's not receiving a call
16  from his counsel, Counselor.
17          MS. McCLANAHAN:  Thank you.
18      Q   (By Ms. McClanahan)  Go ahead.  I'm sorry.
19  I didn't want to interrupt you, but I heard a phone
20  buzzing.
21      A   I'm not going --
22          MR. McCORMACK:  Wait until the question is
23  over.
24      A   You're not supposed to say -- yeah.  So
25  that when it comes to the foundations, when it comes

Page 194

1 to geotechnical, when you do a bore hole to
2 understand what's underneath the ground, it's not
3 always representative of what's five feet next to
4 it. So you try to do investigations of subsurface.
5 No one really knows. You don't know if there's a
6 cavern. You don't know if there's a huge boulder.
7 You get a general clue of subsurface conditions. So
8 you do that, and you base your construction contract
9 on that. That protects both parties.
10        If you don't do that, then what would
11 occur is the contractor would make some presumption
12 that the rock conditions would be quite severe and
13 the cost would be high, especially on an EPC
14 contract. An EPC contractor balanced by a contract,
15 in this particular case, is -- that we used on this
16 project, is a -- is a term contract. It doesn't
17 have variable costs unless it's a change order. So
18 if the contractor says, I will do this complete job
19 under this complete scope for this exact price,
20 except if there's different subsurface conditions
21 than reflected in the geotechnical investigations.
22        So here we had a situation where we -- as
23 I described before, where the contractor had
24 represented that the subsurface conditions were
25 different and that the rocks --

Page 195

1   Q   And that --
2   A   -- were harder than had thought.
3   Q   Which resulted in you blasting a dozen
4 more sites than you had anticipated?
5   A   Than we anticipated, but, then again,
6 after we -- when you're doing these things, you are
7 doing them on a realtime basis, and you are going
8 along. It's hard to stop and say, look, no, no, no,
9 that -- that rock is rippable, you know, continue
10 working on it, continue jackhammering, continuing
11 excavation, so the contractor made representations,
12 they are the experts, and we were -- we were given
13 representations by the contractor it was too
14 difficult and we needed to do blasting.
15        I've also given in my deposition that we
16 subsequently did the engineering report, that many
17 of those foundations that we blasted were not
18 necessary. So it was a representation of the
19 contractor, and it was primarily for a couple of
20 things; for commercial benefits, because they got
21 paid more after the 27th, as well as they were able
22 to do it more quickly, because the blasting was
23 quicker than the continuing to hammer to do the
24 excavation site.
25   Q   And you needed it to go faster?

Page 196

1   A   We needed -- we needed to do it -- we
2 needed it to be done on time, so that the
3 contractor, whether -- for whatever reason, labor
4 force wasn't making progress, unskilled excavator,
5 whatever -- whatever reasons could happen, less,
6 less manpower on the job than the contractor had
7 thought, maybe underestimated the activity.
8 Regardless, the contractor was slipping on schedule
9 to complete the excavations, that's correct.
10   Q   And back to my question about as-builts,
11 are you aware of any as-builts that were rendered at
12 the conclusion of this project?
13   A   Am I aware of any? Yeah, I believe we did
14 receive as-builts for the project. It's a standard
15 activity.
16   Q   So it's a standard activity to have an
17 as-built?
18   A   At the completion of a project, yes.
19   Q   Would it surprise you if there were no
20 as-builts in this project?
21   A   It would, yeah. Unless --
22   Q   Were as -- I'm sorry. Go ahead.
23   A   -- the project was built to complete
24 specifications, so it was built as the drawings
25 said. So these are as-builts. It was built exactly

Page 197

1 like this.
2   Q   So at the time that at least some of the
3 excavation was going on, were you on site?
4   A   Yes.
5   Q   Did you see the explosion, some of the
6 blasting occurring?
7   A   No, nobody -- nobody sees that, even --
8 people are evacuated.
9   Q   Did you see the excavation that took place
10 after the blasting?
11   A   Yes.
12   Q   Did you see rocks piled up alongside of
13 the holes?
14   A   I saw larger than normal rocks. Blasting
15 would do that, yes, versus doing standard
16 excavation. So, yes -- because it would break apart
17 the rock in bigger chunks. So when you excavate it,
18 it would be bigger chunks, yes.
19   Q   And you saw those up alongside the holes
20 that were being dug for the turbine bases?
21   A   Yes, I saw a couple of examples.
22   Q   Okay. Did you or did anyone on your staff
23 keep measurements or keep records about what kind of
24 rocks you were encountering and how much material
25 was excavated?

Page 198

1    A  I'm not aware.

2    Q  I'm sorry, you are not --

3    A  I'm not aware of what records -- I

4 think -- of what was excavated. I think,

5 mathematically, there's the hole, and the size of

6 hole was done, and the amount of material from that

7 hole should be able to be calculated.

8    Q  Did you encounter -- do you know if the

9 excavation encountered limestone?

10    A  I recall in the geotechnical

11 investigations there's some materials in the rock

12 included limestone, amongst others.

13    Q  What -- yeah. What others do you recall?

14    A  Clay, just other forms of rock structures.

15 I mean, the reason why I pick up clay, clay is

16 usually good for compactible soil, so -- it helps

17 with compaction, but -- so I pick up on that, but

18 the type of material that's under the ground were

19 identified in the geotechnical reports, so --

20    Q  So clay -- I'm sorry. Go ahead.

21    A  So there's documents that show, based on

22 the core samples taken and for the geotechnical

23 investigation that took place, that the cores give

24 the rock formations that were encountered.

25    Q  Okay. But at the time when excavation

Page 199

1 actually took place, you are not aware of any

2 records being kept to say, we encountered this much

3 limestone, this much clay, this much of that material?

4    A  Correct, not that I'm aware of.

5    Q  And you indicated that clay would be

6 useful for compacting?

7    A  In some cases, yeah. I just -- in my

8 many, many, many, many projects I've built, I mean,

9 some projects I have clay in there, but, again, I'm

10 not a structural engineer, I'm not a civil engineer,

11 so it's not my form of expertise. So it's just

12 something that I've come across in my years of

13 experience that leads me to think about it.

14    Q  Okay. I wonder if you could help me find

15 the right term for something. Once in place, do

16 these wind turbines need -- I've heard it referred

17 to as a setback around a turbine base where certain

18 activities just can't be carried on?

19    A  Where certain activities -- setback. I

20 mean, I'm not sure. I'm not sure what you are

21 referring to.

22    Q  Do you know what a setback is?

23    A  Yeah, but it's not --

24    Q  What does that mean to you?

25    A  Well, it's not --

Page 200

1    Q  I'm sorry. What does that mean to you?

2    A  Just the distance from the wind turbine.

3 There are certain activities that need to take

4 place. So when you compact the ground and compact

5 the soil, you have heavy lifting equipment that's

6 there, such as the crane, because the crane has to

7 have competent soil and competent material

8 underneath it to be able to properly lift these

9 large tower sections and then have the lifting

10 that's in the air. So usually the pads from the

11 wind turbine generator pads are built, they are

12 built for what they call these crane pads, and they

13 are built for --

14    Q  Okay.

15    A  -- a certain storage, they are built for a

16 certain lay-down of components, they're built for

17 certain maneuvering, so it's all part of the

18 engineered documents.

19    Q  Okay. Talk to me about after the wind

20 turbine is in place. Does there need to be a

21 setback where certain activities -- like, if a

22 landowner decided they wanted to drill a water well

23 or build a house, you wouldn't expect them, or maybe

24 you -- you can't have them building that, you know,

25 three feet away from your turbine base, can you?

Page 201

1    A  I wouldn't -- no. Sure, you wouldn't

2 want -- well, you have the wind turbine, so there's

3 a certain activity because the wind turbine is

4 spinning and it's 360 degrees, so it can go all the

5 way around.

6    Q  Okay.

7    A  So you have this diameter of the blade, so

8 there's a certain requirement there, yeah.

9    Q  And insofar as subsurface, you dig a hole

10 that's bigger than is necessary for the actual

11 turbine base; is that correct?

12    A  A little bit, yeah.

13    Q  And then -- I'm putting this in very

14 simple terms, because I'm certainly not a wind

15 turbine expert, but you place the wind turbine base

16 in the hole, and you put this compaction material

17 around it, backfill, right?

18    A  Sure. And to be more -- to be simple, I

19 mean, it's -- you do the excavation, which is

20 basically you're pulling the material, excavation is

21 that. You are pulling the material out of a hole,

22 you create a hole. The hole is a design, the size

23 of the hole, the physical location, the depth, the

24 diameter is all -- it's engineering defined, and

25 then you -- we place a mud mat, which is like a

Page 202

1  formal foundation on the base.  It's just a simple
2  concrete, non-finished pad, and then you -- we build
3  a rebar cage, which is the structural support of the
4  wind turbine.  It is what they call a base and
5  pedestal.  The pedestal is where the wind turbine
6  connects to.  We pour the concrete, so you -- you
7  pour the concrete on the base.  It cures for a
8  period of time.  You pour the concrete all at once.
9  You have to, because if you don't, it's in various
10  different -- it has to be continued concrete --
11  where the concrete is poured all at the same time --
12  not all at the same time, but you can't let it cure
13  for a period of time between different concrete
14  batches.  And then it cures for a period of time.
15       You do a test, and then you do the
16  backfill.  So the backfill comes last, and the
17  backfill provides the surrounding structural part.
18  So if you think about it, a simpler thing is if you
19  look at a bridge post, so then it holds up a bridge.
20  So you've got the pillar that would also provide
21  structural support, the soil and the structural
22  support underneath the ground for that pillar.  A
23  wind turbine is similar to that.
24      Q   Okay.  So -- and I understand that it's
25  much more technical than what you've just laid out

Page 203

1  for me, there are specific kinds of backfill,
2  there's specific amounts of backfill, and the
3  quality of the rock has to be crushed down to two
4  inches or whatever is called for; is that correct?
5      A   Yeah, it's from the civil engineering.
6  The civil engineering, we have a specification on
7  the material for backfill, so it's -- and it has to
8  be a certain type of structural rock.  Sometimes
9  when you do excavations of some project the -- where
10  the rock -- or where you are doing excavations it's
11  not suited for backfill.  Most cases it is, almost
12  all cases it is.  I mean, you use the rock you pull
13  out, you sift it, which is a screen of sorts, and
14  then -- to separate the different sizes of rock, and
15  then you use it for backfill and compaction.
16      Q   So you would certainly need to prevent
17  anybody from coming in and disrupting this backfill
18  that you've placed, the compaction that you've done,
19  all the kind of lateral support that you've provided
20  for this turbine, you would need to prevent somebody
21  from coming in and disrupting that; is that correct?
22      A   I'm not sure what you mean by disrupt, but
23  would they -- would they dig anything close to the
24  wind turbine foundation?
25      Q   Exactly.

Page 204

1      A   I'm not a civil engineer, but I would say
2  that's -- that is correct.  There's a certain
3  distance with -- you wouldn't want activity because
4  the surrounding rock is providing that support.  To
5  the extent --
6      Q   Even the rock -- I'm sorry, go ahead.
7      A   To the extent of the distance, I don't
8  know.  I mean, I'm not a civil engineer.
9      Q   So even the rock that is surrounding what
10  you've placed, as you've constructed the turbine
11  base, is necessary to provide lateral support; is
12  that correct?
13      A   Yes.
14      Q   And you are just not aware of the
15  distance -- I'm almost thinking of it like a ring
16  around the turbine base.
17      A   I think that's -- to the extent of the
18  size of that ring, I'm not sure.
19      Q   Okay.  And do you know usually how a wind
20  farm operator keeps folks from coming a drilling a water -- a
21  water well or doing something three feet to the side
22  of the wind turbine?
23      A   Well, the wind turbine -- all wind
24  turbines have pads, so there's actual -- a physical
25  pad where the turbine is on, so to drill a well --

Page 205

1  you know, you can't drill a well, because it
2  requires a derrick, and you would hit the blades.
3  So you can't have anything close to the turbine, you
4  know, you couldn't have anything high, so the -- but
5  the wind turbine -- all the pads for the wind
6  turbines are areas that are -- that are part of the
7  construction and part of the allotted use with the
8  landowner.
9      Q   So you obtain a lease from the landowner,
10  and in that lease it would say, I get to use the
11  area around the wind turbine?
12      A   I don't understand.  Who gets to use?
13      Q   That you as the wind farm company, you get
14  to use all the area that's around there that's
15  necessary for that lateral support.
16      A   Yes, it's lateral support, it's also used
17  for potential maintenance.  Say, if one of the
18  blades fails or gets hit by lightning or you have to
19  do maintenance on the Nacelle, you have to bring a
20  crane in to do corrective or preventative
21  maintenance.  So you have to bring heavy equipment,
22  so the pad needs to be -- needs to continue to stay
23  there until -- for the project, for servicing the
24  wind turbines.
25      Q   And you just put all that in a lease?



Page 206

1    A   Yes.

2         MS. McCLANAHAN:  Could we look at a

3  document that is labeled, and I do not think that is

4  an exhibit, so this may be a new one, Osage Wind

5  PRIV-000698.  I think we're at 112, so we'll label

6  that as 112.

7         (Exhibit 112 marked for identification.)

8    Q   (By Ms. McClanahan)  All right, Mr. Price,

9  do you see that document?

10   A   Yes.

11   Q   Does it appear to be an email from Steve

12 Champagne?

13   A   Yes.

14   Q   And you are the first person there listed

15 in just a number of recipients; do you see that?

16   A   Yes.

17   Q   And the subject matter is, in all caps,

18 Urgent, Confidential Osage Litigation.  Do you see

19 that?

20   A   Yes.

21   Q   So Mr. Champagne indicates that they are

22 anticipating that either the Osage Nation or the BIA

23 may file stop work orders as soon as this coming

24 Monday.  Do you recall receiving this email?

25   A   Yes.

Page 207

1    Q   Do you recall that Mr. Champagne asked

2  everybody to kind of fan out and get information

3  that would be needed to shore up a defense against

4  either the Nation or the BIA?

5    A   Yes.

6    Q   Do you remember exactly what information

7  you were tasked with getting?

8    A   No, I don't remember all the information

9  that he asked us to provide, but for my -- for me it

10 would be based on the -- certainly execution aspects

11 of the project, we're doing -- how we're doing it,

12 where the project status is, where the construction

13 activities to date are, how we're progressing.

14        MS. McCLANAHAN:  So I believe attached to

15 this email -- and we may have to go down, down --

16 okay.  The next document is Osage Wind PRIV-000700.

17 I guess we'll mark that as 113.

18        (Exhibit 113 marked for identification.)

19   Q   (By Ms. McClanahan)  Does that list look

20 familiar to you?

21   A   Sure, yes.

22   Q   So do you recall that you set about to get

23 the items that are listed there under number 2c?

24   A   Yes.

25   Q   Specifically, it just has -- and I'm just

Page 208

1  assuming, because it has, in red, Bill, and you are

2  also a recipient on the email.  So you set out to

3  get that information that is listed there?

4    A   Yes.

5    Q   The first thing it says is, "Declarations

6  and exhibits establishing economic damage/hardship

7  to Osage Wind and to the public."  Did you get a

8  declaration?

9    A   I don't recall what kind of declaration we

10 got, but we did have subcontractors that said if we

11 stopped work or some support contractors, would

12 there be an impact to their business if we stopped

13 works, and I recall us seeking that and providing

14 some.

15   Q   Do you recall if you asked Mr. Moskaluk to

16 prepare a declaration?

17   A   Yes.

18   Q   And did you ask Mr. Moskaluk to

19 prepare the -- or I'm sorry, to prepare a statement,

20 or did you, as this seems to indicate, get the

21 information to Modrall, the law firm?

22   A   I don't remember the exact instructions to

23 Bill, but most of these questions are -- as a site

24 manager would be responsible to get, he's working

25 with the subcontractors.  I'm not there 100 percent

Page 209

1  of the time, so he would be working with these

2  contractors.  So what form of response he would be

3  used to provide, you know, I don't recall, but as a

4  site manager, he would -- a lot of these things he

5  would be more best suited to take.

6    Q   So are these items that are listed in 2c,

7  are they items that would have been -- the

8  information to answer those questions, it would have

9  been available to you?

10   A   Would I have seen -- I'm sorry, I don't

11 understand your question.

12   Q   So 2c there seems to ask for total costs

13 incurred to date, delayed damages, costs to idle

14 equipment and just a laundry list of items.  Is that

15 the kind of information that you would have had

16 access to?

17   A   I would state -- based on this, there's a

18 list of things that Steve Champagne is asking for.

19 So he's created a list that he needs to support any

20 potential litigation, and lists -- what he's done is

21 he's gone through and said, okay, here who is going

22 to do what, and under 2c my name is listed, and

23 said, Bill, you are to lead the effort to obtain

24 this information.  So it would have been my

25 responsibility to do this, supported by my staff.

Page 210

```
1      So I would, basically, in some of these
2  cases, some of these things, would delegate it to
3  staff and say, would you obtain this information,
4  and some stuff I would perhaps look at myself.
5      Q   Okay.  But all of this information would
6  have been available to you, either through your
7  staff or just directly?
8      A   Some of it is not normal for us to achieve
9  or look at, because we don't normally -- we're busy
10 working on and executing the project, not defending
11 a type of, you know, legal position.  Our job is to
12 execute the project.  So we had a challenge here
13 being brought on by an external entity, so we had to
14 defend our rights.  So our legal team is asking us
15 for information, so we -- so some of this stuff is
16 not something that we normally keep track of on a
17 daily basis, so we would -- we would pause and go
18 try to seek this information as we were requested by
19 legal counsel.
20      MR. KIRBY:  Excuse me, excuse me, Counsel,
21 sorry to interrupt.  This is Bob Kirby from Norton,
22 Rose.  I just -- Tom let me know he's been locked
23 out of the deposition room, so if we can just take a
24 short break, and we can see if we can figure that
25 out, that would be appreciated.
```

Page 211

```
1      THE VIDEOGRAPHER:  We're off the record at
2  10:33 a.m.
3      (A recess was had.)
4      THE VIDEOGRAPHER:  We are back on the
5  record at 10:50 a.m. central.
6      MR. McCORMACK:  I just want to apologize.
7  I do have people in my home here, and one of them
8  managed to kick the router out of the -- router plug
9  out of the wall about five or seven minutes before I
10 was aware of what was going on, so I actually missed
11 about five or seven minutes of Bill's testimony, and
12 then I had to reboot and all this other business, so
13 my apologies for causing that kind of logistical
14 headache, and I'm ready to proceed.
15      MS. McCLANAHAN:  Okay.  I'd like to pull
16 up -- I don't think this has been marked previously,
17 but it's Osage Wind PRIV-000157.  Go down just a
18 little bit so we can see Lynn Slade's, October 22nd,
19 2014, email.
20      (Exhibit 114 marked for identification.)
21      Q   (By Ms. McClanahan)  I don't believe you
22 were copied on this; is that correct?
23      A   It doesn't appear from the email
24 addresses.
25      MS. McCLANAHAN:  Okay.  Then I'm sorry.
```

Page 212

```
1  If you could scroll up now.
2      Q   (By Ms. McClanahan)  Do you see that you
3  are looped in, I suppose, with a later copy or
4  forward of the email chain to you on October 22nd at
5  about 2:45?
6      A   Yes.
7      Q   Okay.  And again, back down to Lynn
8  Slade's email where he is conveying that he had
9  talked to Alan Woodcock of the Interior Department
10 here in Tulsa.  He said they had a brief meeting,
11 which included other subjects, at which no decisions
12 were reached.  There will be a larger meeting in
13 Pawhuska.  The next sentence says, "He asked only
14 one question.  Are we currently pouring foundations
15 or replacing material?"  And then the next sentence
16 says, "I advised we were not to my knowledge."  At
17 the time, October 22nd, you were actually pouring
18 foundations and replacing materials; is that
19 correct?
20      A   I believe so.
21      MS. McCLANAHAN:  And now if we could look
22 at Exhibit 84.  I believe it's been previously
23 marked, and it's the Bates number Osage Wind-000114.
24 We'll scroll down a little bit.
25      (Exhibit 84 previously marked for
```

Page 213

```
1  identification.)
2      Q   (By Ms. McClanahan)  I want to draw your
3  attention to the lengthy email there from Joan
4  Heredia to a number of people and then carbon
5  copying a number of people, and you are included in
6  that; do you see that?
7      A   Yes.
8      Q   In the second paragraph do you see a
9  sentence that says, "They indicated to me that a
10 sandy soil mining permit is required pursuant to 25
11 C.F.R. 214."  Do you see that sentence?
12      A   Yes.
13      Q   So that's something different than the
14 conditional use permit that you spoke of earlier; is
15 that right?
16      A   The sandy soil mining permit and the
17 special use permit are different permits, yes.
18      Q   And the BIA is a different agency than the
19 entity that issues the conditional use permits; is
20 that right?
21      A   Yes.
22      Q   Okay.  Then if we could scroll down a
23 little bit further, I think it's the last paragraph
24 we see on this page, and, of course, you are welcome
25 to read as much as you need for context, but that
```

1  paragraph states, "She stated that our use of the
2  material would require a permit."  Do you see that?
3     A   The starting paragraph, yes.
4     Q   So it's not the crushing or refinement of
5  rocks that would require a permit; is that right?
6        MR. McCORMACK:  Object to the form of the
7  question, speculative and assumes facts, foundation,
8  but you can answer the question.
9     A   Well, actually if you look at the rest of
10 the paragraph it kind of does say that, so I'm not
11 sure where your point is.  She questioned the use of
12 the rock crushers, that we were using the material
13 in question, that if we normally would bring in
14 material and that would be purchased to go to the
15 activity.  So this was more of the issue.
16       I replied, no, we were crushing the rock,
17 because the rock varied in size from 3 inches to a
18 couple of feet, and we had to crush it to put it
19 back in the hole.  I explained that it seemed she
20 was referring to what we call engineered fill, and
21 rock was not engineered fill.  So the concern here
22 was, as I understood this document, it was the fact
23 that we were doing this rock crushing.  That is my
24 interpretation of the --
25       (Simultaneous speakers.)

1     Q   Okay.  In the --
2     A   -- not the excavation.
3     Q   So as you read that paragraph, you are
4  under the impression then that the two parties to
5  this conversation, whoever it is, is informing the
6  BIA about the kinds of activities they are
7  undertaking, varied in sizes from 3 inches to a
8  couple of feet, we crushed it, we put it back in the
9  hole, so there's some explanation of the rock
10 crushing going on?
11    A   Yes.
12       MS. McCLANAHAN:  Okay.  If you could go
13 just to the very next -- stop right there.
14    Q   (By Ms. McClanahan)  So after all that
15 explanation, she stated that the "BIA wanted us to
16 stop work until we got a permit."  Do you read that?
17    A   Yes.
18    Q   It doesn't say stop crushing, correct?
19    A   Yes.
20    Q   And then a little further down in that
21 paragraph it says, "She again reiterated that we
22 need to stop work," and, again, this is a direction
23 from a federal official to stop work; is that right?
24    A   Wait a minute.  Where are you referring to
25 this at?

1     Q   Well, yeah, the same paragraph, so the
2  paragraph at the first sentence says, "She specified
3  the letter stated BIA wanted us to stop work until
4  we got a permit."  And then a couple of sentences
5  later it says, "She again reiterated that we need to
6  stop work."  Do you understand that to be a
7  direction from a federal official to stop work?
8        MR. McCORMACK:  Object to the form of the
9  question, argumentative.  You can answer.
10    A   I understood that this individual wanted
11 us to stop activity.  What's -- there's -- what
12 actual activity she wanted to stop.
13    Q   (By Ms. McClanahan)  So you are unclear
14 when she says, "stop work" what she means?
15    A   Correct.  Is work a defined term?  What
16 exactly is she asking us to do?  All construction?
17 You can't move -- we can't build roads?  We can't
18 stop work on foundation?  What exactly is she asking
19 us to stop doing?  It doesn't specify.
20    Q   So the defendants were unclear what was
21 meant when the letter asked for a stop work and then
22 this discussion mentions stopping work and then,
23 again, reiterate -- reiterates the need to stop
24 work?
25    A   This was, again, an internal document, but

1  the discussion -- we had some subsequent discussion
2  on the interpretation, but there was no clarity from
3  the BIA and what actually we were supposed to stop.
4  The concern was the rock crushing, not the
5  excavation.  So while I understand --
6     Q   So when she said --
7     A   -- there are different permits, excavation
8  work is in -- is in -- is in the special issue
9  permit.  All parties knew we were doing it.
10    Q   Again, you never spoke to anybody at BIA?
11    A   No.
12    Q   So you left it --
13    A   Which is normal.
14    Q   And you left it to Joan Heredia to do that
15 outreach?
16    A   Joan Heredia was the head of regulatory
17 compliance and permits.  Since this was a permit
18 related issue, she was the appropriate person to
19 make contact in this regard.
20    Q   Okay.
21       MS. McCLANAHAN:  If we could -- I think
22 this is another new one, Osage Wind PRIV-000311.  I
23 think we're on Exhibit 114 -- 115.
24       (Exhibit 115 marked for identification.)
25    Q   (By Ms. McClanahan)  I direct your

Page 218

1   attention to the first line there.  It says, to Bill
2   Price, and it includes a link to a flickr account.
3   Are you familiar with what this link might have
4   represented?
5       A   I don't know.  Let me look at the
6   document.  I can get -- already get a better idea of
7   what it might include.
8       Q   Okay.  Do you recall looking at any photos
9   of the site that were published in the Osage News?
10      A   I don't recall.
11      Q   Right under that one that is to you is one
12  from you.  Do you see that?  It's from you to kind
13  of a list of people there, dated October 14th, 2014.
14      A   Sure, yes.
15      Q   In the first paragraph you are
16  discussing -- so your name is Bill, you are
17  discussing Bill Moskaluk.  The second paragraph
18  says, "I sent a message to Bill on lockdown on all
19  communication at the site."  So is this you
20  directing Bill to lock down communication at the
21  site?
22      A   Yes.
23      Q   Why would you do that?
24      A   Well, because we were under, seemed like,
25  media attack, seems like the -- there was a direct

Page 219

1   media engagement to -- in our view to exacerbate or
2   to create a situation that perhaps wasn't there.  So
3   if our staff had provided some information that
4   might be misconstrued, we wouldn't want that to
5   happen.  So site staff are trained to build
6   projects, not to be media relations experts.  So if
7   media were to ask a question to site staff, should
8   they respond?  No, they shouldn't.  They are not
9   trained, they are not prepared, and it would likely
10  be used for a purpose not -- not intended, at least
11  on our part.  So the answer is, if we were to have
12  any inquiries, you direct it to the appropriate
13  individual.
14      Q   So when you say, "lockdown on all
15  communication at the site," you are only referring
16  to the press?
17      A   Or external -- external sources, yeah.
18      Q   I'm sorry.  I don't know what that means,
19  external.  So anybody outside of the company?
20      A   Yes.  So if there was a question or
21  inquiry on the project, it should be addressed to
22  the appropriate person.  Why?  Because there's some
23  extreme exaggeration going on and misrepresentation
24  on behalf of the Osage Nation to elicit what we
25  viewed as a public relations attack.

Page 220

1       Q   When it says that, "I reminded them that
2   everything needs to be directed to Bill, and then he
3   is to defer to external communications," first of
4   all, this is you speaking, so I guess what you are
5   saying is that you reminded them that everything
6   needs to go through Mr. Moskaluk?
7       A   Correct.
8       Q   Is that correct?
9       A   Yes.  Bill is the most senior
10  representative on site.  I wasn't always at the
11  project, so we had to have a local representative if
12  anything were to be asked.  So it would be asked to
13  him, and he would respond such that I understand
14  your question, I'll defer to the appropriate party.
15  That was the instruction --
16      Q   Then he --
17      A   -- correct.
18      Q   Then he was to defer to External
19  Communications, and I see that external
20  communications is capitalized, is that a department
21  within Enel?
22      A   It was probably a misprint, but it should
23  have been deferred to internal, not external.
24      Q   Oh, okay.
25          MS. McCLANAHAN:  Switching gears here a

Page 221

1   little bit, can we look at Exhibit 85 that's been
2   previously marked.  It's marked Osage Wind
3   PRIV-000112.  I'm going to go down towards -- well,
4   let's look at the top so that we're clear on who is
5   talking and everything.
6          So this is to Mr. Francesco, with a bunch
7   of folks copied, and then it's from David Post.
8          (Exhibit 85 previously marked for
9   identification.)
10      Q   (By Ms. McClanahan)  Can you tell me who
11  is David Post?
12      A   He's the head of business development.
13      Q   Okay.  And what was his role --
14      A   (Inaudible.)
15      Q   -- at this time, at the time?
16      A   Yes.
17      Q   What was his role in the Osage Wind
18  project?
19      A   He was the business development, the
20  entity that developed the project until it was
21  handed over to ENC.  So Enel has a distinct three
22  department within the company of business
23  development, engineering construction, operations.
24  They're our three main business lines.  So David
25  Post was responsible for the business development

Page 222

1 activities of the project until it hit a certain
2 maturity and was handed over to engineering
3 construction. So David Post generally handed the
4 project over to me, so he was responsible to get the
5 project to the state of construction. So this tends
6 to -- whether it's purchasing the project, and then
7 it's doing the financial close, the permitting --
8 Q Okay.
9 A -- entity, Joan Heredia was a function of
10 business development, and then -- so he was the head
11 of that department.
12 Q Okay. The first sentence says, "We've
13 just received a letter from the Bureau of Indian
14 Affairs addressed to you, in which we are being
15 asked to stop the construction of the Osage project
16 until we have a so-called sandy soil permit." So
17 was it your understanding they were referring to
18 that same letter that we looked at earlier that was
19 signed by the superintendent of the Osage Agency?
20 A Yes.
21 Q Okay. And then it specifically says, "We
22 are being asked to stop construction." Do you see
23 that?
24 A Yes.
25 Q And it doesn't make a distinction about

Page 223

1 excavating versus rock crushing, correct?
2 A Correct.
3 Q And then if we could go down to the bottom
4 of that email, there are some bullet points, and I
5 want to draw your attention specifically to the last
6 bullet point. It says, "The stop work letter only
7 pertains to excavating activities." Isn't that
8 contrary to what you just testified to, that you
9 thought the letter did not apply to excavation
10 activities?
11 A David Post is the head of business
12 development. He doesn't know anything about
13 engineering construction. He's not --
14 Q Okay.
15 A He's not an expert on these activities.
16 So it's his interpretation.
17 Q Okay.
18 A You know, when we say, stop construction
19 work, he doesn't know if a foundation is the only
20 thing that's going on. He's not aware of every
21 aspect of the engineering construction. So this is
22 a high level communication between David Post and
23 our CEO that says, hey, look, this is his view of
24 the situation, and he's getting him up to date. So
25 it's a very high level, it's not a -- it's not to

Page 224

1 be, you know, broken down -- it wasn't intended to
2 be broken down the way you are, and it's just to
3 give an update to our CEO of the situation. So when
4 we stay, stop construction, it's a business
5 development perspective of what we were being asked
6 to do. Temporarily stop excavation activities.
7 David Post doesn't know -- didn't know certain
8 aspects and the details of what excavation is and
9 what the subsequent activities were. So his -- his
10 understanding of this is -- it's not his area of
11 expertise.
12 Q So right before the bullet points do you
13 see the language that says, "This matter is being
14 treated with the utmost priority and urgency, and
15 the team is currently proceeding under the following
16 plan." So does that give some implication that
17 perhaps there's a team that has developed a plan
18 which is set out in this email?
19 A Yes. The team is Enel, and we're -- these
20 are activities, so he's giving an update to the CEO
21 of Enel North America that we have a problem at one
22 of our projects, and here's a letter that we
23 received, and here's certain activities that we're
24 doing that addresses this activity. So it's an
25 update. It's considered a high level update, not a

Page 225

1 detailed update, not a precise update, an update to
2 let the CEO of our company know that we have a
3 problem.
4 Q So why do you think he used the words, the
5 stop work letter only pertains to excavating
6 activities? Why did he emphasize and use the word
7 "only"?
8 MR. McCORMACK: Object to the form of the
9 question, requires speculation, but you can answer
10 the question.
11 A Because that was the basis of the letter
12 received from the BIA. It's work associated with
13 the excavation, this mining permit. Joan reports to
14 him, so I'm speculating that Joan gave him an update
15 that said, hey, look, they are not happy with how we
16 are crushing rock. So, you know, to David, crushing
17 rock is excavation. I mean, again, it's a
18 speculation on my part. So he's asking us to stop
19 this activity.
20 Q (By Ms. McClanahan) So you think when he
21 used the word "excavation," he intended to say,
22 "rock crushing"?
23 MR. McCORMACK: Object to the form of the
24 question.
25 A I think he --

Page 226

1   MR. McCORMACK:  Wait, wait, wait.  Object
2 to the form of the question, foundation,
3 argumentative.  You can answer.
4   A   I think that he used excavation as a
5 catch-all phrase, yes, I do.  Catch-all phrase
6 with -- I don't think David Post -- he's never built
7 a project.  He's not an engineer.  It's not his area
8 of responsibility, and when he represents
9 excavation, I think it's a very limited knowledge of
10 what that means.  Again, this memo is a letter to
11 our CEO.  It's a high level, so I think in this case
12 he's suggesting that it affects one certain aspect
13 of the construction project, certain other aspects
14 could continue, so I think that's his intent of this
15 high level correspondence.
16   Q   Let me show you another document.  This
17 one is -- this one is, I think, new, Osage Wind
18 PRIV-000306, and I want to skip down to the third
19 page, which is labeled 308, and a little further
20 down.
21      (Exhibit 116 marked for identification.)
22   Q   (By Ms. McClanahan)  This is -- I'll just
23 represent to you that this is kind of a complicated
24 chain to follow, but I want us to focus in on the
25 October 11th, 2014, email at 2:46 from

Page 227

1 Mr. Champagne, and it says, "Joan, do you know
2 anything about this permit?  I'm copying Bill P and
3 ask him to find out if the contractor got it,
4 assuming we do, in fact, need it.  Until we confirm
5 one way or the other, we need to comply with the
6 letter."  Do you recall Mr. Champagne asking you to
7 find out if the contractor had got the permit?
8   A   I don't recall, but if he did ask, I would
9 say -- I would have told him, this is not a
10 contractor permit, it's not in the scope of work
11 document that we have -- or contract or agreement we
12 have with the contractor, and no -- no place is it
13 listed that the contractor's responsibility is this
14 particular permit.
15   Q   So if it wasn't listed as his
16 responsibility, the contractor's responsibility, it
17 was nobody's responsibility, or whose responsibility
18 was it?
19   A   Well, if the permit -- the sandy soil
20 permit, because I've seen the document, it was --
21 the permit would have been from the entity that
22 seeks to mine the rock, so the -- it would have been
23 the responsibility of the owner --
24   Q   Which in the case of the --
25   A   -- of the project.

Page 228

1   Q   -- Osage Wind project would have been who?
2   A   Enel, Osage or whatever the business
3 entity, I don't remember, that owned the project.
4   Q   Okay.  Then the second sentence there from
5 Steve says, "Until we confirm one way or the other,
6 we need to comply with the letter.  Steve."  Do you
7 recall Mr. Champagne saying that we actually need to
8 comply with the letter?
9   A   Yes.
10   Q   So excavation work was stopped?
11   A   Well, there was, as I expressed before,
12 certain -- we did do a pause.  So when Steve wrote
13 this, if I don't -- you know, on October 11th, I
14 would have had a discussion with Steve and said,
15 hey, Steve, this is -- this is the discussion, this
16 is what's happening, and then we would get further
17 clarification, you know, on what his -- his -- so
18 that he's up-to-date on what the concern is.  The
19 concern on our view, that we talked about in staff,
20 was the fact of the rock crushing.  Excavation
21 wasn't at the time -- during this time wasn't the
22 big issue, and, again, it's -- excavation seems to
23 be a catch-all phrase here with many different
24 entities.  The excavation or the digging of a hole
25 wasn't the problem.  It was the crushing of the

Page 229

1 rock, which was considered mining, that was the
2 issue.
3   Q   So despite what -- and I forget his name
4 now that we were just looking at.  Despite what
5 Mr. Champagne said and what Mr. Post said, you do
6 not believe the stop work order related to
7 excavation?
8   A   I'm not sure what Mr. Storch said, but
9 Mr. Port -- David Post, we just looked at it.  I'm
10 familiar with that particular document, the summary
11 he gave to Francesco Venturini, and I don't think
12 David Post understands what excavation is.  It was
13 definitely -- he was using a catch-all phrase, that
14 is my belief, yes.  And Steve, he didn't --
15 obviously doesn't want -- didn't want the conflict
16 or to create a conflict, so he suggested we stop
17 activities until you get this mining permit.  The
18 act of excavation was never considered mining.
19 Excavation -- even in the courts don't -- don't
20 suggest that excavation is a form of mining.  So the
21 mining -- the concern was when we were crushing
22 rock.  So we were asked to -- is -- is, in fact, this
23 is where we
24 focused our attention to, is -- is, in fact, this
25 crushing rock, because it's not something that
25 people were -- generally felt that they weren't

Page 230

1  aware that we were doing.  The excavation of
2  foundations, everybody knew, Osage Nation knew, it
3  was part of the construction of the wind farm.  It
4  wasn't a secret that you build a hole to install a
5  wind turbine.  So the concern wasn't excavation, the
6  concern was what we were doing with the material
7  that we excavated.
8      Q   So if the Nation knows that someone
9  intends to go out and dig a hole, then they can't be
10  concerned that that might be mining?
11      MR. McCORMACK:  Object to the form of the
12  question, argumentative.  You can answer.
13      A   Yeah, I -- whether they're -- what the
14  Osage Nation concerned or not, they knew about
15  it, they never had any objection to us excavating a
16  hole.  It's what we did with the minerals that they
17  were concerned with.
18      Q   And you said even the courts didn't focus
19  on excavation.  Did I hear that correctly?
20      A   That's my interpretation.  If it's
21  wrong -- I mean, my understanding is the Tenth
22  Circuit was -- the concern was what made it mining
23  was rock crushing and not the actual excavation.
24      Q   Who told you that?
25      A   My understanding was it was discussion

Page 231

1  with legal counsel.
2      Q   And have you ever read the Tenth Circuit
3  decision?
4      A   No.
5      Q   Do you know how many times they use the
6  word "excavation"?
7      A   No.
8      MR. McCORMACK:  Objection, argumentative.
9      Q   (By Ms. McClanahan)  I'm sorry, what was
10  your answer?
11      A   Well, if I said I didn't read it, then how
12  would I know how many times they used excavation, so
13  the answer is no.
14      Q   That's a good point.
15      MS. McCLANAHAN:  All right.  If we could
16  look at Osage Wind PRIV-000606.
17      (Exhibit 117 marked for identification.)
18      Q   (By Ms. McClanahan)  Do you see that?  I
19  think this is a new one.  It will be, what are we --
20  117.  This appears to be an email to -- you are one
21  of the recipients.  It's from Giuseppe -- Giuseppe
22  DiMarzio, if I'm saying that correctly.  At the top
23  it says "Mike, the WTG foundation details are
24  correct."  Then it says, "I would mention that we
25  might need to crush rocks for cable trenching

Page 232

1  backfilling and O&M building foundations."  What are
2  O&M?
3      A   It's the operations and maintenance
4  building, so it's like a site, it's like a facility
5  building.  So your O&M staff would occupy this
6  building.  It also could be some control equipment,
7  switch gear in this building.
8      Q   Okay.  Giuseppe is saying we might be
9  crushing rocks for both cable trenching, to use as
10  backfill, and O&M building foundations.  Do you know
11  if rock was crushed for those two things?
12      A   I don't know.  The difference with an O&M
13  building is the foundation.  You don't go very far
14  down.  So you build a concrete slab on top of the
15  surface.  You do some -- maybe a foot or two, I
16  don't know the depth, it depends on the engineering
17  drawings, so you don't go down 10 feet.  So this 60
18  foot by 90 foot is a two-dimensional footprint, a
19  rectangle on surface.  It doesn't describe the depth
20  of the foundation, so Giuseppe is just saying it
21  might, so I don't know if we -- I don't recall any
22  rock crushing that we did for the cable trenching.
23      Q   How far down would the cable trenching go,
24  if you recall?
25      A   Cable trenching, typically, goes down

Page 233

1  approximately three feet.  So, basically, if you
2  think of a backhoe, a bucket, and so you dig a
3  trench, a narrow trench with a narrow bucket.  They
4  also have a -- you have a trenching machine.  It
5  basically looks like a circular device with a bunch
6  of buckets that just turns, and you've seen
7  something like this, and it just makes a trench,
8  narrow for cable.  In some cases -- in this
9  particular project we also used boring, where we
10  bored into the ground from one end to the other and
11  ran conduit and cable within that conduit.
12      MS. McCLANAHAN:  If we could go down a
13  little bit, Michelle, to the October 17 at 1:47
14  e-mail from Mr. Scott to Mike Tierney.
15      Q   (By Ms. McClanahan)  Do you see that?
16      A   Yes.
17      Q   Let's look -- do you see the yellow
18  part -- and I think this is how it was produced, so
19  we didn't make that alteration to the document.  But
20  right before there it says, "Bill & Giuseppe, unless
21  the original language is true, I suggest modifying
22  this sentence as follows, in case the station and/or
23  O&M building foundations are larger."  And then the
24  sentence in yellow says, "The excavation for the
25  foundations for the turbine measure approximately

1 10 feet deep and between 50 and 60 feet in
2 diameter."  Do you see that?
3     A   Yes.
4     Q   And if there appear -- there appears to be
5 struck-out language, language that was struck out,
6 that says, "are the largest excavations"?
7     A   Yes.
8     Q   Do you see that?
9     A   Yes.
10    Q   So the sentence seemed to formerly say
11 that the excavations for the foundations are the
12 largest excavations, but then, according to the
13 note, we need to take that out, and the explanation
14 is because, "in case the station and/or O&M building
15 foundation is larger."  Do you see that?
16    A   Yes.
17    Q   So excavated backfill was used beyond just
18 the WTG foundations; is that correct?
19    A   Estimate -- yeah, when we -- yeah, the
20 cable was a couple of feet.
21    Q   So you used it for both -- I'm sorry, go
22 ahead.
23    A   Excavated backfill, so when you -- yeah,
24 you dig a hole, or you dig a trench, you put a
25 cable on it -- or actually, you dig a trench, you

1 put some sand -- a layer on the bottom, you put a
2 sand layer on top, it's to allow the cable to expand
3 and contract, and then you put the material that you
4 dug a hole, and you put it back.
5     Q   Okay.
6     A   The difference with the -- with the cable
7 is it's not a structural support rock, so crushing
8 of it is less necessary or very less unlikely,
9 because it's not -- the crushing of rock is not --
10 and a cable trench is not structural.  In the case
11 of the O&M building, same thing.  Not using the --
12 whatever you remove for backfill, because not
13 providing structural support for a tower section.
14 So then, again, the O&M building might have gone
15 down a foot.  It's just a concrete slab.  You build
16 a building on top of a concrete slab, so it's a
17 completely different aspect.
18        You have an individual, Mike Tierney, or
19 even what, from Bill Scott, these individuals are
20 legal persons, so they are -- they are into writing
21 language that's -- you know, let's make it more
22 clear.  So if it's not an unknown or if it's not
23 clear at the time, let's remove this ambiguous
24 language, but I can say, at the end, the rock
25 crushing wasn't necessary, to my knowledge, for the

1 cables nor the O&M building.
2     Q   Are you saying it wasn't necessary or
3 there was no rock crushing activity for either the
4 cables or the building?
5     A   Not to my knowledge, because it wouldn't
6 be necessary.  There's no -- it's quite a different
7 purpose.  You crush the rock for structural content,
8 to get it to a size so that it can be used for a
9 structural backfill.  The cable trenches nor the O&M
10 building require that.
11    Q   So you used it for backfill, you just
12 didn't have to process it through a crusher; is that
13 what you are saying?
14    A   You dig a hole, and you put the rock back
15 in the hole, yes.
16    Q   Okay.  If we go up a little further, you
17 did point out that this first email that we were
18 looking at, first in time I'll say, email was
19 between Bill Scott, Mike Tierney and Lynn Slade, and
20 then it looks as though you don't get looped in
21 until 2:30 in the afternoon when Mike Tierney says
22 to both you and Giuseppe, "Please review it as soon
23 as possible and provide your comments to me."  So
24 you were asked to review the construction related
25 facts that were going to be included in the

1 Modrall's memo to Alan Woodcock; is that correct?
2     A   We were asked to review this particular
3 information, where it was used for and how it was
4 used.  You know, we were just asked to review this
5 statement, and that's what we did.
6     Q   Well, let's look at the first sentence of
7 Bill Scott's email.  It says, "We are adding a
8 statement of facts to the memo that will go to Alan
9 Woodcock."  Do you see that?
10    A   Yes.
11    Q   So maybe at the time you got this email
12 you did understand that you were being asked to
13 review a statement of facts in a memo that would
14 ultimately go to Alan Woodcock, whoever that is?
15    A   Yes.
16    Q   Okay.  Then we're going to jump up in the
17 email chain a little bit there.  Do you see the
18 email from Mike and it was to you, it's the 2:27
19 email and it says, "Forgot to replace one of the
20 Enel's with Osage Wind's.  Please do so throughout."
21 Do you know why Tierney was intent on replacing all
22 of the Osage -- all of the Enel's with Osage Wind's?
23    A   If I understood, Osage Wind was the name
24 of the entity of the project.
25    Q   Okay.

Page 238

1    A   I think it's more of a legal -- to
2   properly name the entity and wasn't to -- it wasn't
3   Enel, it wasn't the business entity of Enel, so he
4   was properly reflecting who was the owner of the
5   project.
6    Q   Okay.  And I think this next exhibit has
7   been marked previously as number 98.  It's Osage
8   Wind PRIV-000128.
9        (Exhibit 98 previously marked for
10  identification.)
11   Q   (By Ms. McClanahan)  Do you see that as
12  previously marked?  Okay.
13   A   Not yet.  Still waiting.  Okay.  Coming
14  up.
15   Q   Sir, I will just let you know this is a
16  very long and convoluted chain of emails, but
17  happily, we're going to just look at the first two
18  pages of it here.  I'll draw your attention to the
19  October 13th, 2014, at 9:32 where it's Bill Price at
20  Enel wrote, "If we look at this from another
21  view...if we filled out an application for whatever
22  permit, what would we be applying for?  What would
23  we say in the application?"  Is it true that you
24  were not certain that you never needed a permit?
25   A   Yeah, it's completely true.  I mean, I

Page 239

1   didn't think we needed a permit.  I wasn't aware of
2   the permit when we got this question from the BIA,
3   this concern.  We said, okay, what's the concern?
4   We had a concern from an entity that was very
5   unhappy with the project and didn't want the project
6   built, so we took a look at what the concern was,
7   and said, do we need this permit.  So, yeah, I
8   looked at it seriously.
9        Then I looked at the application that it
10  asked us to fill out and said, look, submit the
11  sandy soil permit, and I said, what do I fill out?
12  We're not mining.  We're not doing this.  How do I
13  even fill this thing out?  So it's a completely --
14  the email is, like, well, I don't know what to put
15  in this permit, because we're not doing what it asks
16  us to do.  So am I supposed to make something up?
17  So, you know, we were informed we weren't mining.
18  What is -- so the permit asks this certain
19  information that we weren't doing, so what am I
20  supposed to put in a permit?  So in order to get the
21  permit you have to fill it out and put information
22  in, since the information -- so, yeah, I struggled
23  with that, so...
24   Q   And I'm sorry --
25   A   Go ahead.

Page 240

1    Q   I was just going to ask.  Did you just say
2   you did have the application in front of you?
3    A   At the time I received an application of
4   what the permit requirements were, yeah.
5    Q   Okay.
6    A   And I read the requirements and asked the
7   information that the permit was asking for.  I said,
8   what this is -- what I'm saying here is, we were
9   being asked to submit a permit, and the permit asks
10  certain information that I'm, like, well, how do we
11  fill this out?  I said, we're not doing any of this
12  stuff.  So I struggled to figure out how to apply
13  for a permit that it was asking for information that
14  we weren't doing.  So that -- so we were -- in other
15  words, we were asked to submit a sandy soil permit,
16  but the conditions in the permit that it asked us to
17  enter, to be clear, we weren't doing.  So what I was
18  asking here is, how do I fill out this permit?
19   Q   So what specifically --
20   A   Okay.
21   Q   I'm sorry, were you finished?
22   A   Yes, ma'am.
23   Q   What specifically -- what was the first
24  question that hung you up, that you were unable to
25  answer?

Page 241

1    A   Well, I'd have to look at it again.  One
2   of them was -- it was, like, you know, describe the
3   mining activity you're doing.  We weren't doing any
4   mining activity.
5    Q   And at that juncture you kind of threw up
6   your hands and said, this permit application --
7    A   Well, what am I -- if I have a permit
8   application and we're not doing mining, how do I
9   submit an application for what activity is expected?
10  We asked the BIA, can you please describe, you know,
11  what is it you want the permit -- what is it you
12  want us -- what is the concern?  The BIA didn't
13  respond.  They just said, submit the permit, and
14  we'll tell you.  So we never got clarification from
15  the Bureau of Indian Affairs what to do in this
16  regard.
17       So I asked Joan, how do we submit -- what
18  are we to do?  How do we submit this permit?  So to
19  me it was more of a -- it was -- we knew that the
20  Osage wasn't happy with the project.  They asked us
21  to submit a permit that wasn't applicable.  They
22  didn't even give us instructions how to fill it out.
23  So if they were really serious about a permit that
24  was really necessary, do you think -- wouldn't they
25  give us instructions or help us, you know,

Page 242

1  understand what exactly we were supposed to put in
2  the permit?  Didn't happen.
3      Q   So who did you call to find out how to
4  fill out this application?
5      A   I talked with Joan.  Who did I call in
6  particular, is I asked Joan, I said, well, how do we
7  fill this thing out?  And Joan asked, she was the
8  point of contact, asked the BIA specifically about
9  it, and they said, just fill it out, and we'll let
10  you know.  I go, well, Joan, how do we fill it out?
11      Q   So somebody at the BIA told Joan, fill it
12  out, and we'll let you know?
13      A   Yeah, submit the permit, and we'll let you
14  know.
15      Q   And then she relayed that information to
16  you?
17      A   Yeah.
18      Q   Did you ever fill out the application?
19      A   No.  We had no instructions, and we had no
20  description of what mining was.  We had no
21  description even from the BIA what was mining.  They
22  said, fill out the permit, what you are doing, and
23  then we'll get back to you.  So I said, what do I
24  put in here, so that was part of one of the
25  challenges that we had.

Page 243

1      Q   And then on the second page of this
2  exhibit, so that would be page 129 Bates stamped, a
3  little more, I suppose, than halfway down it says,
4  "We knew Osage would be a challenging asset, and it
5  is proving itself as such."  And I think you can see
6  down a little bit below that, it says, "Take care,
7  Joan Heredia," so I think this is Joan Heredia
8  saying, "We knew Osage would be a challenging
9  asset."  Can you tell me, to your understanding, did
10  you know that Osage would be a challenging asset?
11      A   We knew -- look, what I knew about the
12  project is the Osage Nation had objections to the
13  project, and they tried to stop the project in many,
14  many cases.  They actually gave the previous owner a
15  lot of concerns on whether it wanted to continue
16  with the project.  When we acquired the project, in
17  our due diligence process we looked at the -- what
18  were the different aspects of the project.  Of
19  course, I looked primarily, as I testified before in
20  my deposition, is that I looked at the technical
21  aspect, but I was part of the support team and
22  listened to the discussions on all the different
23  activities that the Osage Nation tried to do to stop
24  the project.  They didn't like the project.  They
25  didn't want the project, and seemed to use, you

Page 244

1  know, extreme measures to try to stop it.
2      So we knew that Osage Nation, because they
3  didn't like it, that it would be -- that they would
4  continue to challenge us along the way.  So we knew
5  going into the project that we had a party, a party
6  that didn't think kindly, so this was clear.
7      Q   And the stop work order, to the best of
8  your understanding, who was that from?  What entity
9  was that from?
10      A   Bureau of Indian Affairs.
11      Q   You understand that the Bureau of Indian
12  Affairs is a federal agency?
13      A   I said earlier, I didn't really think much
14  of it.  They asked us to stop work.  What work did
15  they ask us to stop doing?
16      Q   I'm sorry.  I just asked, do you
17  understand that the Bureau of Indian Affairs is a
18  federal agency?  That's all I asked.
19      A   I'm uncertain, you know, what --
20      Q   You are not familiar --
21      A   I'm not familiar with the Bureau of Indian
22  Affairs, especially in the specific -- with the
23  authority over this project, so -- and are they an
24  agency, are they part of the Osage Nation, or if
25  it's a federal agency, I wasn't aware.

Page 245

1      Q   My goodness.  Did you do anything to try
2  and clarify that understanding?
3      A   As far as my responsibility and aspect of
4  the project was to build the project.  Joan Heredia
5  was the environmental person that talked with the
6  Bureau of Indian Affairs.  So for my purposes, I
7  took direction from our, you know, head of
8  regulatory compliance on the aspect of this permit.
9      Q   Did you ever ask Ms. Heredia if the Bureau
10  of Indian Affairs and the Osage Nation are one in
11  the same?
12      A   No.
13      Q   Did you think it was important to know who
14  the letter was coming from when you received it?
15      MR. McCORMACK:  Object to the form of the
16  question.
17      A   It came from the Bureau of Indian Affairs.
18      MR. McCORMACK:  Wait, wait, wait.  Object
19  to the form of the question, argumentative.  You can
20  answer.
21      Q   (By Ms. McClanahan)  I'm sorry, did you
22  answer?
23      A   Yes.
24      Q   And what was your response?
25      A   It came from the Bureau of Indian Affairs,

Page 246

1  so if that's a federal government agency or entity,
2  it was an entity that gave us instruction, and I
3  asked our regulatory compliance entity to say, what
4  is -- what is this -- what is this instruction, what
5  is going on with this -- is this an authoritative
6  agency that has any authority over our project?
7  What are they asking us to do?  And she was the
8  person who made contact with the BIA to get clarity
9  on this.  So from my aspect, you know, I've
10  testified early of my interpretation of what the
11  requirements were.
12  **Q  But you just testified a moment ago that**
13  **it was your understanding that the Osage Nation had**
14  **done a lot of things to try and stop the project**
15  **over the course of a long period of time; is that**
16  **correct?**
17  A  Yes.
18  **Q  Do you understand that the United States**
19  **government or any agency thereof had done anything**
20  **to stop the project before the letter was received?**
21  A  I'm not aware.  Again, the fact that I've
22  testified earlier is that the letter was submitted
23  to a PR agency or some agency that was posted on
24  media before I received it, as well as it had gross
25  issues with it, so it was an exaggeration.  So what

Page 247

1  was the purpose or reason of doing that?  Why didn't
2  we receive the letter?  So the purpose, in our view,
3  was to harm the project or stop the project.
4  **Q  Did you ever ask why you didn't receive**
5  **the letter?**
6  A  I didn't personally ask, no.
7  **Q  Were there other people carbon copied on**
8  **the letter?**
9  A  I don't recall.
10  **Q  Okay.  Let's take a look at that letter**
11  **again, just so we can kind of clarify on this issue.**
12  MS. McCLANAHAN:  Do you know the exhibit
13  number?
14  PARALEGAL:  Yes, it's 38.
15  **Q  (By Ms. McClanahan)  Is this the letter**
16  **that we are talking about when we refer to the**
17  **letter?**
18  A  Yes.
19  **Q  Okay.  And at the bottom of it, let's take**
20  **a look and see who was carbon copied on it.  Do you**
21  **see there that the Tulsa Field Solicitor, that's**
22  **one; eastern Oklahoma Regional Director, that's**
23  **another one; the Chief of the Osage Nation, and the**
24  **Chairman of the Osage Minerals Council; all of those**
25  **folks were copied, correct?**

Page 248

1  A  The letter represents that.  I have no
2  direct knowledge if they were given the letter or
3  not.
4  **Q  Do you have some reason to dispute that**
5  **the United States government copied the Chief of the**
6  **Osage Nation on this letter?**
7  A  It says CC on there.  I don't know
8  exactly -- if these people received it.  It's
9  addressed to Mr. Venturini, so it should have gone
10  to Mr. Venturini, and -- at least that's who it was
11  addressed to, but it certainly didn't make a direct
12  path to Mr. Venturini.
13  **Q  Was this letter mailed to Mr. Venturini?**
14  **Did he receive it in standard U.S. mail?**
15  A  I don't know how he received it.
16  **Q  Do you know when he received it?**
17  A  No.  The exact date that --
18  **Q  When --**
19  A  -- he received it, I don't recall.
20  **Q  Are you generally familiar that in**
21  **business correspondence the CC means that those**
22  **people are also copied with a copy of the letter?**
23  A  Yes, I'm aware of this.
24  **Q  Okay.  So if the Chief of the Osage Nation**
25  **received a copy of the letter that was**

Page 249

1  **simultaneously mailed to Mr. Venturini, is it**
2  **possible that the Chief of the Osage Nation posted**
3  **the letter before it reached Mr. Venturini?**
4  A  I suppose it's possible.
5  **Q  Is that the fault of the United States**
6  **government?**
7  A  Is it the fault of the United States
8  government?  What would be the purpose, the reason
9  to post it in such a way --
10  **Q  Excuse me.  I didn't say the United States**
11  **government posted it.  Are you aware the United**
12  **States government has ever posted this letter?**
13  A  I don't know who posted it, but it was
14  posted prior to when we received it.
15  **Q  You don't recall?**
16  A  I didn't say that.  I said, I don't know
17  who posted it or who gave this information to
18  outlets and that they required a problem with it,
19  other than it wasn't -- it certainly wasn't us, and
20  it was before we had received it.
21  **Q  So how do you know that this was posted**
22  **online?  Who told you that?**
23  A  Six, seven years ago I remember that we
24  got second -- hey, this was posted, and we were
25  getting, you know, inquiries about it.  So -- we

Page 250

1 said, well, we haven't even received the letter yet.
2 So it was generally distributed without -- before we
3 had received it. So that's how I recall.
4    Q  Well --
5    A  The specifics of where it went seven years
6 ago, I can't remember.
7    **Q  Do you have any information that it was**
8 **generally distributed before it was also posted to**
9 **Mr. Venturini?**
10    A  I don't -- as I said before, I wasn't the
11 author of this letter. What I'm testifying is, we
12 didn't receive the letter before it was -- before
13 others found out about it. I don't know if these
14 people on CC, if they got it or not. I didn't mail
15 it to them. I wasn't responsible to mail it to
16 them, and I have no idea if they received it. What
17 I do know is that it was widely posted before we had
18 received it, so we were caught off guard because we
19 didn't receive this letter before it was out to
20 media.
21    Q  Does the fact that --
22    A  (Inaudible.)
23    **Q  -- that you were caught off guard -- and I**
24 **take it you think that seems very unfair?**
25    A  That is --

Page 251

1    Q  Am I correct in that assumption?
2    A  No, I don't think it's unfair. I think
3 it's -- it's a -- because it has inaccuracies, it
4 didn't give us the opportunity to explain, to
5 address it before it was posted to outlets. So it's
6 more of a PR campaign to discredit the project,
7 because it has in here things that are not correct.
8 So do I think that that's -- that's -- do I think
9 that's not good? Yes. I think if the Bureau of
10 Indian Affairs is going to write a letter and submit
11 something, they should verify that the content in it
12 is correct, and somehow it didn't happen. And then
13 it was distributed and got into PR, and we didn't
14 receive it. So we were being asked information that
15 was not correct. Do I think that --
16    (Simultaneous speakers.)
17    **Q  (By Ms. McClanahan) Are you saying you**
18 **never --**
19    A  -- no, I don't.
20    Q  Are you saying you --
21    A  (Inaudible.)
22    Q  -- never received the lever?
23    A  No, we received the letter. We just
24 received the letter --
25    Q  Do you know when you received the letter?

Page 252

1    A  I don't know the exact date of when we
2 received the letter, no. I just know that it was
3 afterwards, that it was distributed with other
4 parties including media.
5    **Q  Are you aware that mail reaches recipients**
6 **at different times?**
7    MR. McCORMACK: Object to the form of the
8 question, argumentative. You can answer.
9    A  Am I aware that mail gets to people at
10 different times?
11    Q  (By Ms. McClanahan) Yes.
12    A  Yes.
13    **Q  Do you think that a letter that's sent**
14 **from Tulsa, Oklahoma, might reach the Osage Nation**
15 **in Osage County, Oklahoma, a day or two quicker than**
16 **it would reach Mr. Venturini in Andover,**
17 **Massachusetts?**
18    MR. McCORMACK: Object to the form of the
19 question, speculative, argumentative. You can
20 answer.
21    A  I have no idea if it's one or two days.
22 My understanding, it was greater than a week, so it
23 wasn't one or two days. It was a long period of
24 time before we actually received this letter and
25 before it was broadcast to the whole community, so,

Page 253

1 yeah, that's -- so it wasn't a one/two day event.
2    **Q  (By Ms. McClanahan) So that series of**
3 **events, where you feel like it was unfairly**
4 **broadcast, did that cause you to take the letter**
5 **less seriously than you might have?**
6    A  I wouldn't say -- again, you are putting
7 words in my mouth. Did I say it's unfairly
8 broadcast? I said it was inappropriate -- or not
9 proper protocol to broadcast or submit a letter that
10 would have been addressed to us, that has
11 inaccuracies, so that it would be cleaned up or at
12 least clarified before it got distributed to the
13 public. And it should have been the responsibility
14 of the Bureau of Indian Affairs to properly
15 represent the activities that were going on at the
16 project. The Bureau of Indian Affairs didn't do
17 that. So --
18    **Q  But you don't know --**
19    (Simultaneous speakers.)
20    A  (Inaudible.)
21    **Q  -- who posted this letter, do you?**
22    A  I do not.
23    **Q  Did you ever see it online?**
24    A  I recall, yeah, I did. I was able to --
25 but I don't remember the -- because I was told about

Page 254

1  it, and I'm like, yeah, that's -- so, yeah, I saw.
2  That's when we said, well, we haven't received this
3  yet, we are going to receive it, so while we receive
4  it, you know, let's address it.
5      Q   All right.  I have one final exhibit, and
6  I do not think this is already an exhibit.  So let's
7  take a look at Osage Wind PRIV-000258.  We're going
8  to move down a little more than halfway on that
9  first page.
10     (Exhibit 118 marked for identification.)
11     Q   (By Ms. McClanahan)  Do you see the email
12 there from Joan Heredia to you?
13     A   Yes.
14     Q   Okay.
15     MS. McCLANAHAN:  And then actually just a
16 little bit onto the next page, because that email
17 continues.  There we go.  That's fine.  That will
18 do.
19     Q   (By Ms. McClanahan)  So this appears to be
20 an email to you with a bunch of people carbon
21 copied, and it's from Joan Heredia.  Do you see the
22 sentence there on the start of the second page there
23 that says, "We need to work our way through this --
24 or through it and keep record of our compliance and
25 legal evaluation."  So were records kept of Enel's

Page 255

1  compliance?
2      A   I'm just reading the paragraphs if you
3  don't mind.
4      MR. McCORMACK:  I thought my router had
5  gone out again.  Sorry.
6      A   So it's a message from Joan to me.  "We
7  need to keep records of our compliance and legal
8  evaluation."  Sure.  I mean, I think when it says,
9  We need to work through this, which we did work
10 through it, we need to keep record -- keep records
11 of the activities we're doing, the excavation, the
12 activities we're doing, of our compliance,
13 compliance to our permit obligations that we thought
14 that at the time were necessary, and legal
15 evaluation, which we attended to -- which we
16 eventually did give, so, yes.
17     Q   And was it your understanding also that
18 IEA would be keeping records of compliance?
19     A   Well, keeping record of compliance is a
20 very broad definition -- or broad aspect, so you
21 have the head of environmental compliance, so
22 keeping compliance would be more a compliance with
23 permits.  So I don't think it's the intention here
24 for Joan to say, hey, we need to keep -- IEA needs
25 to be keeping records of compliance, because

Page 256

1  she's -- if it was specific for our construction
2  contractor, I believe she would have said it.  I
3  think her point here is, being the head of permits,
4  is to keep records of requirements that we have in
5  our permit, which we did.
6      Q   Okay.  And you're right, reading this
7  alone is maybe a little broad, so let's look at the
8  context of this email.  We can go -- I don't know
9  how that very bottom page actually looks, but if you
10 go all the way down -- and this is how it was
11 produced to us, so there are a few blank boxes and
12 things like that.
13     So at the beginning of the email chain
14 there is a copy of the letter, again, the one that
15 we've been talking about, and that letter is dated
16 October 9th, 2014; is that right?
17     A   That's what it says, yes.
18     Q   Okay.  And do you see on that particular
19 copy, if you go down --
20     MS. McCLANAHAN:  I'm sorry, Michelle.  Go
21 down a little bit there.
22     Q   (By Ms. McClanahan)  Do you see the carbon
23 copy list there as well?
24     A   Yes.
25     Q   Do you see the little checkmark next to

Page 257

1  the Chief, Osage Nation?
2      A   Yes.
3      Q   Okay.  And then we're going to just move
4  up a little bit.  There is a redacted, I guess, I
5  don't really know, box there, signature block, we
6  can move up past that, and it's --
7      MS. McCLANAHAN:  I apologize.  We have our
8  Wednesday tornado.  If that's troublesome to the
9  court reporter, I can wait.  It will go off in a
10 minute.
11     Q   (By Ms. McClanahan)  Do you see the part
12 that says, "Rob, Matt and Geoff, below is a letter
13 that Ryan Ray provided me from the Tribe website.
14 Someone should pass this along to EGP."  So in
15 particular, this trail of emails is related to that
16 letter from Robin Phillips of the BIA to ENGPA
17 (sic), asking them to stop work.  Now, if you move,
18 you know, further up the chain and you said you see
19 Joan Heredia's comment, does that impact your
20 understanding of what she means when she said, "We
21 just need to work our way through this -- through it
22 and keep record of our compliance and legal
23 evaluation"?
24     A   I still believe that that's -- in context
25 is compliance of our permit obligations.

Page 258

```
 1    Q   Your permit obligations?
 2    A   Yes.  Joan is the head of environmental
 3  compliance, so she's said, we need to work, we need
 4  to understand -- so we have an entity that wrote
 5  this letter that says, hey, we -- you know, we need
 6  to address this issue.  This is her as a permitting
 7  agency, would be her responsibility to assess the
 8  situation.  She is, again, the head of environmental
 9  compliance.  So she said, okay.  She's looked at it
10  and says, we need to figure out what this is about,
11  we need to keep a record of all the different things
12  we're doing and complying -- my interpretation
13  certainly from -- getting from Joan would be
14  compliance of permits, that we're doing certain
15  things, and we need to get a legal evaluation of the
16  situation.  Again, which we did.  So, no, no concern
17  here in what this sentence says.
18    Q   So no concern here -- I'm sorry, what was
19  the end of that sentence?
20    A   No concern of what this sentence says or
21  did we do -- yes, we worked on it as a team, we --
22  records of our compliance with permits, that's my
23  interpretation, and we did a legal evaluation.  We
24  did all of those things.
25    Q   So where it says, "keep record of our
```

Page 259

```
 1  compliance," where would I go if I wanted to see
 2  records of compliance that she might have been
 3  referring to?
 4    A   The activities associated with this, which
 5  was the excavation, you know, the activities of the
 6  schedule, what we were doing, compliance with
 7  existing permits, special use permits, all of the
 8  permits, and then we, of course, got into the
 9  discussion of whether this is mining or not, so
10  customary with mining, were we moving rock, were we
11  taking rock off site, were we selling this rock
12  commercially, so compliance with those type of
13  things, yes.  So do we need to keep records?  Yes.
14    Q   So you were keeping good records about the
15  kinds of rocks that you were encountering?
16    A   I didn't say that.  That wasn't required.
17    Q   Were you keeping good records about what
18  happened to the excavated material?
19    A   When you say -- let's see, were we keeping
20  records of excavated material.  As far as my
21  knowledge, we kept records that we were required to
22  keep, records of -- that, you know, permits and
23  activities that we were required to do in reference
24  to our permits, do we keep records of such?  Yes, to
25  my knowledge.  Do we keep --
```

Page 260

```
 1    Q   Did you --
 2    A   -- record of every little detail, it's --
 3  we kept records to meet the compliance of the
 4  project.
 5    Q   Did you keep records of the excavated
 6  material?
 7    A   That's a broad question.  Do you have a
 8  specific record that you're chatting about?  Did we
 9  excavate a certain foundation?  Yes.  Do we keep
10  records?  What exact records would you be concerned
11  with?
12    Q   Did you keep records that would reflect
13  the volume of material excavated at a particular
14  site?
15    A   I'm not sure if we kept records of a
16  volume of a particular site, nor do I really
17  believe -- I'm not sure how necessary it would be.
18  Why?  Because you have a site, an excavation, you
19  have a size of the area that was excavated, so it
20  can be simply calculated of the volume excavated
21  from that site.  So in that regard, as far as I
22  understand, the excavation sites were excavated per
23  drawing and per -- and then from there it's --
24    Q   So you did not keep records of the
25  excavation site, but would rely upon the hole size
```

Page 261

```
 1  that was in the plan; is that correct?
 2    A   I'm not sure what you mean by keeping
 3  records of an excavated site.  It's not --
 4    Q   Well, let me ask this --
 5    A   -- necessary to -- what exact records --
 6  I'm not referring -- I don't understand what you are
 7  referring to, records we would normally keep, that
 8  would be customary of a project.
 9    Q   Well, and I'm not talking about normal or
10  customary records.  I'm talking about records on the
11  Osage and in response to this letter that you
12  received.  So were you keeping records about the
13  volume of materials excavated and the type of
14  materials excavated?
15        MR. McCORMACK:  Object to the form, asked
16  and answered, actually on several occasions today,
17  but you can answer it again.
18    A   No, we didn't keep volumes of material
19  excavated.  We did geotechnical investigations that
20  showed the rock subsurface conditions that we would
21  expect to encounter.  We excavated the foundations
22  per the engineering drawings, so we generally had
23  the rock conditions we knew we were going to
24  encounter or we did encounter, and the volume that
25  we excavated were consistent to the requirement of
```

Page 262

1  the construction contract and the engineering
2  requirements.
3      Q   (By Ms. McClanahan)  But as I recall,
4  correct me if I'm wrong on this account, I mean, you
5  originally planned to blast 27 sites and not the 82
6  that you wound up blasting, so those geotechnical
7  records that you're referring to might not be the
8  most accurate?
9      A   I was expecting Mr. McCormack to say
10  something.
11     Q   Is that correct?
12     A   I've already addressed this, clearly.  So,
13  no, it's not correct.  So the -- just because the
14  site, we had to blast more rocks, the geotechnical
15  investigation report clearly identifies that the
16  rock blasting was -- was not necessary from a
17  geotechnical perspective.  The contractor had
18  challenges with keeping on schedule and was
19  struggling breaking the rock apart through the
20  excavations.  So the contractor suggested to us, in
21  real time that we're trying to keep the project
22  schedule, hey, these things have to be blasted.
23         We subsequently looked at the data and
24  found out that actually it didn't need to be.  So
25  the contractor did search and works that, after the

Page 263

1  fact, we found out that wasn't necessary.  That's
2  what the engineering documents supported.  That's
3  engineering documents supported that our data was
4  correct, and there was commercial reasons for the
5  contractor to blast more than necessary.  That's
6  what I testified on.
7      MS. McCLANAHAN:  I'm sorry.  Could we pull
8  up Exhibit 106, please?  I think we've already
9  looked at this exhibit.
10     A   There's still nothing on my end.
11     Q   (By Ms. McClanahan)  We're working on it.
12  We're going to go down a little ways.  Do you recall
13  looking at this exhibit?  I think you looked at it
14  with both me and with Ms. Nagle.
15     A   Yes.
16     Q   Okay.  Do you see the sentence -- it
17  says -- well, it starts off, "I am aware of the
18  report and have reviewed it," and then you say, "I
19  was -- also attended the November 11th project
20  review meeting and personally inspected many of the
21  foundations and saw the material that was removed
22  from the excavations.  Overall, the reality is the
23  report and its conclusions did not represent the
24  actual conditions observed at the site."  Did you
25  write that?

Page 264

1      A   Yes.
2      Q   And so you reported to Maria and Salvatore
3  that you've actually walked the site and that the
4  report -- the geotechnical report did not represent
5  the actual conditions observed at the site, correct?
6      A   Yes.
7      Q   But you did not keep records of the
8  geotechnical conditions that did exist?
9      A   The core samples were taken, so you have
10  two different situations here.  You have -- for me
11  representing project management and the actual
12  aspect of execution of project.  You've got Maria,
13  who is heading the engineering, so you have -- I
14  have looked at a couple of projects or a couple of
15  sites, and I saw that the rock formation that
16  existed there and the need to -- to break it apart,
17  but what I saw was, of course, the material after
18  it's been blasted.
19         So, you know, there's this balance
20  between, you know, engineering of record and actual
21  sites, and then you have the contractor's commercial
22  aspect with the aspect -- commercial aspect with the
23  project and wanting to, one, create a commercial
24  opportunity to get paid more, as well as increase
25  the schedule.

Page 265

1         So the ones that I looked at, I thought it
2  was quite -- I thought it was quite rocky, but based
3  on the professional expertise that we have, who --
4  the engineering team who are engineers, I'm not a
5  civil engineer.  I'm not a rock expert.  So I'm a
6  project manager that questioned it, but from the
7  experts who analyzed it and wrote a report on it and
8  a substantive report on it, their conclusions was --
9  who are the experts, that it wasn't necessary to
10  blast all of these foundations.  To our -- again, it
11  was relatively -- it was, as they say, Monday
12  morning quarterbacking, because a lot of these
13  things we had to do anyway, because we've already
14  done it.
15         MS. McCLANAHAN:  Could I ask the court
16  reporter to read back the actual question that I
17  asked?
18         (The requested portion was read back.)
19     Q   (By Ms. McClanahan)  Did you keep records
20  regarding what you observed at the site or not?
21     A   We kept records of the core samples that
22  were taken from the sites that were excavated, were
23  kept, yes.
24     Q   Did you keep any other records as you
25  walked along the site there?

Page 266

1    A   Not that I'm aware of.

2    Q   You personally inspected the site. You
3  said you personally inspected many of them, but you
4  kept no records?

5        MR. McCORMACK:  Object to the form of the
6  question, argumentative, inconsistent with prior
7  testimony, but go ahead.  You can answer.

8    A   Yeah, I inspected a few of the sites.  I'm
9  not a civil expert.

10    Q   (By Ms. McClanahan)  Did you inspect a
11  few, or did you inspect many?

12    A   I think few and many are just one and the
13  same.

14    Q   They are the same to you?

15    A   Yes.

16    Q   And what was the purpose for this email to
17  these two folks on December 2nd, 2014?

18    A   It's an internal document.  There's always
19  the struggle, especially when you have a change
20  order.  We had a cost -- we had a cost component of
21  $2 million being requested of the contractor, so we
22  had the request, a commercial aspect of the
23  contractor doing the work, and we had the engineering
24  entity that stated this is the conditions of record.
25  So me, as a project manager, I'm trying to

Page 267

1  ascertain, here's the existing conditions, here's
2  what the geotechnical report says.  So why is there
3  this difference in cost -- or why is there a
4  difference in activity that led to this difference
5  in cost?  So it was an internal document debating
6  between project management and engineering, how did
7  we get to this discrepancy between these two
8  activities.

9    Q   And one point that you made in this
10  conversation, and you actually underlined it, it's
11  the only part of your email that I see underlined is
12  that the report that was created before "did not
13  represent the actual conditions observed at the
14  site."  Correct?

15    A   That's -- that's -- that was the
16  representation from the contractor.

17    Q   That was a representation from the
18  contractor?

19    A   The contractor was the one doing the work.

20    Q   But the sentence right before it, you say,
21  I personally inspected, I saw the material removed.
22  "The reality is that the report and its conclusions
23  did not represent the actual observed -- conditions
24  observed at the site."  That's not the contractor.
25  That's you saying that I've been there, correct?

Page 268

1    A   I've been there.  Again, I'm not an
2  expert.  I visited a couple of sites, but I didn't
3  look at all of the sites that were excavated.  The
4  contractor represented it required much more work
5  than necessary to excavate the foundations.

6    Q   But even though the conditions were
7  different than the -- the reality was different than
8  the conditions that were in this report, nobody kept
9  any records about how they were different?

10        MR. McCORMACK:  Object to the form of the
11  question, argumentative and inconsistent with prior
12  testimony, but you can answer again.

13    A   I think it's -- again, what was the -- I
14  think I've made it really clear, part of the report
15  date was December, the activity date of the
16  excavation was September, October, November, so, you
17  know, knowing we had a discrepancy in report, this
18  was after the fact, so I was trying to understand
19  why we had this cost discrepancy.  The report came
20  after it was already done.  So since the report came
21  after it was done, it's information I got later.  So
22  why would I have kept records of that activity when
23  the report came later?  So, no, it wasn't -- it
24  wasn't an issue until like, well, how did we get
25  this wrong.

Page 269

1    Q   Did you start keeping records after
2  receiving the Bureau of Indian Affairs' letter to
3  stop work?

4    A   What records would you -- are you
5  referring to?

6    Q   About your excavation and/or crushing
7  operations.

8    A   We kept records of the activities that we
9  did, the foundations that we dug, the foundations
10  that need to be blasted.

11    Q   Did you keep records about how much
12  material was crushed or processed through a crusher?

13    A   I expected Mr. McCormack -- I've already
14  addressed this question.

15    Q   You've addressed the question of asking
16  whether or not you kept records of the amounts
17  crushed after you received the letter from the
18  Bureau of Indian Affairs?  I guess I don't recall
19  that answer.  Can you tell me again?  Did you
20  keep --

21    A   We did not keep records --

22    Q   Okay.

23    A   -- of how much rock we crushed.  It's not
24  ordinarily customary to do.  There was a request to
25  do it.  In my multiple wind turbine projects that

Page 270

1  I've built all over North America, Oklahoma, all
2  over the world, have I kept any records of
3  foundation rock material?  No.  Have I ever required
4  to get a construction permit for the excavation of
5  rock or crushing rock at any project that I've ever
6  built?  No.  Is it a customary practice --
7      Q   Have you ever --
8      A   -- practice to keep records?  No.
9      Q   Have you ever received a stop work order
10 from a federal agency on one of your sites?
11     A   No.
12     Q   So this --
13     A   (Inaudible.)
14     Q   -- project seems to be different.  Did you
15 know when the United States filed a lawsuit against
16 the wind developer?
17     A   No.
18     Q   You have no idea when that occurred?
19     A   My responsibility, like I said, I built
20 the project, and my understanding of the lawsuit
21 that was filed was after some time, and then I
22 had -- actually had moved and moved my
23 responsibility to South Africa.
24     Q   So it's your understanding that the
25 lawsuit was filed after you had already moved away

Page 271

1  from Osage Wind project?
2      A   I was doing other projects, and it was
3  handed over to operations, so the activities of
4  whatever activity -- the legal aspects, I wasn't
5  directly involved with.
6      Q   But you were involved in November of 2014,
7  weren't you?
8      A   Yes.
9      Q   Well, that's when the lawsuit was filed.
10 Did nobody make you aware there was a lawsuit?
11     A   I don't know if it was filed back then.  I
12 knew if there was information they were asked, I
13 provided it, but, again, it wasn't my aspect -- my
14 responsibility was the building of the project, and
15 when a lawsuit was filed, I don't remember.  A lot
16 of things have happened in the last seven years.
17     Q   So you were in charge of the execution of
18 the contract, isn't that right?
19     A   Yes.
20     Q   And nobody made you aware that a lawsuit
21 was filed regarding the project in November of 2014?
22     A   I don't recall.
23     MS. McCLANAHAN:  That's all I have.
24     MR. McCORMACK:  Okay.  Thank you.  I will
25 say this, we will reserve all of our questions for

Page 272

1  Mr. Price for trial, so I have no questions now.
2  But you know what that means, Mr. Price, it means
3  you are free to go.
4      THE WITNESS:  It's dark time.  Thank you.
5      THE VIDEOGRAPHER:  We are off the record
6  at 12:24 p.m. central time.
7      (DEPOSITION CONCLUDED AT 12:24 P.M.)

Page 273

1                    JURAT
2  UNITED STATES/OSAGE MINERALS COUNCIL VS OSAGE WIND
3       JOB FILE NO. 151737
4  STATE OF OKLAHOMA
5  SS
6  COUNTY OF TULSA
7      I, BILL PRICE, do hereby state under oath
8  that I have read the above and foregoing deposition
9  in its entirety and that the same is a full, true
10 and correct transcription of my testimony so given
11 at said time and place, except for the corrections
12 noted.
13
14 _____
15 Signature of Witness
16
17
18     Subscribed and sworn to before me, the
19 undersigned Notary Public in and for the State of
20 Oklahoma by said witness, BILL PRICE, on this
21 _____day of_____, 2021.
22
23 _____
24 NOTARY PUBLIC
25 MY COMMISSION EXPIRES:_____

Page 274

```
1        ERRATA SHEET
2  UNITED STATES/OSAGE MINERALS COUNCIL VS OSAGE WIND
3        DEPOSITION OF BILL PRICE
4    REPORTED BY: MARY K. BECKHAM, CSR RPR
5   DATE DEPOSITION TAKEN: JULY 21, 2021
6        JOB FILE NO. 151737
7  PAGE  LINE  IS            SHOULD BE
8  ____ ____ _____ _____
9  ____ ____ _____ _____
10 ____ ____ _____ _____
11 ____ ____ _____ _____
12 ____ ____ _____ _____
13 ____ ____ _____ _____
14 ____ ____ _____ _____
15 ____ ____ _____ _____
16 ____ ____ _____ _____
17 ____ ____ _____ _____
18 ____ ____ _____ _____
19 ____ ____ _____ _____
20 ____ ____ _____ _____
21 ____ ____ _____ _____
22 ____ ____ _____ _____
23 ____ ____ _____ _____
24 ____ ____ _____ _____
25 ____ ____ _____ _____
```

Page 275

```
1        CERTIFICATE
2  STATE OF OKLAHOMA
3  SS
4  COUNTY OF TULSA
5        I, Mary K. Beckham, Certified Shorthand
6  Reporter within and for the State of Oklahoma, do
7  hereby certify that the above-named BILL PRICE was
8  by me first duly sworn to testify the truth, the
9  whole truth, and nothing but the truth, in the case
10 aforesaid; that the above and foregoing videotaped
11 deposition was by me taken in shorthand and
12 thereafter transcribed; that the same was taken,
13 pursuant to stipulations hereinbefore set out; and
14 that I am not an attorney for nor relative of any of
15 said parties or otherwise interested in the event of
16 said action.
17
18       IN WITNESS WHEREOF, I have hereunto set my
19 hand and official seal this 21st day of July, 2021.
20
21
22        Mary K. Beckham
23 _____
24       Mary K. Beckham, CSR, RPR
25       CSR No. 01053
```