# EXHIBIT 4

Case No. l4-CV-704-GKF-JFJ

```
 1                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
      UNITED STATES OF AMERICA,
 3
                  Plaintiff,
 4
      and
 5
      OSAGE MINERAL COUNCIL,
 6
          Intervenor-Plaintiff,
 7
      vs.                              Case No. 14-CV-704-GFK-JFJ
 8
      OSAGE WIND, LLC;
 9    ENEL KANSAS, LLC; and
      ENEL GREEN POWER NORTH
10    AMERICA, INC.,
11                  Defendants.
12    _____
13                    DEPOSITION OF AARON WEIGEL
              TAKEN ON BEHALF OF THE INTERVENOR-PLAINTIFF
14                ON JUNE 29, 2021, BEGINNING AT 9:07 A.M.
                  ALL PRESENT ATTENDED REMOTELY VIA ZOOM
15            REPORTED BY KARLI DANIELS, CSR, RPR, CCR
16                          APPEARANCES:
17    On behalf of the Plaintiff:
18            Nolan Fields
              Catherine McClanahan
19            UNITED STATES ATTORNEY'S OFFICE
              110 West 7th Street, Suite 300
20            Tulsa, Oklahoma 74119
              (918)382-2700
21            nolan.fields@usdoj.gov
              cathy.mcclanahan@usdoj.gov
22
23
24
25
```

Page 2

```
1              APPEARANCES CONTINUED:
2   On behalf of the Intervenor-Plaintiff:
3       Mary Katherine Nagle
        Shoney Blake
4       PIPESTEM & NAGLE, P.C.
        401 South Boston Avenue, Suite 2200
5       Tulsa, Oklahoma 74103
        mknagle@pipestemlaw.com
6
7   On behalf of the Defendants:
8       Ryan Ray
        NORMAN, WOHLGEMUTH, CHANDLER, JETER, BARNETT &
9       RAY, P.C.
        401 South Boston Avenue, Suite 2900
10      Tulsa, Oklahoma 74103
        (918)583-7571
11      rar@nwcjlaw.com
12      Lynn Slade
        Sarah Stevenson
13      MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
        500 Fourth Street NW, Suite 1000
14      Albuquerque, New Mexico 87103
        (505) 848-1800
15      lynn.slade@modrall.com
16      Bob Comer
        NORTON, ROSE, FULBRIGHT, LLP
17      1225 17th Street, Suite 3050
        Denver, Colorado 80202
18      (303)801-2728
        bob.comer@nortonrosefulbright.com
19
20  Also present:  Michelle Hammock, Christina Watson
21  Videographers: Gabe Pack, CJ Shelton
22
23
24
25
```

Page 3

```
1                    INDEX
2                                    Page
3   Direct Examination by Ms. Nagle            4
4   Cross-Examination by Mr. Fields           111
5                  EXHIBITS
6   Number  Description                Page
7   89   Osage Wind Priv 000299-000302      21
8   90   Osage Wind Priv 000427-000429      56
9   91   Osage Wind Priv 000357-000358      70
10  92   Osage Wind Priv 000359-0003660     74
11  93   Osage Wind Priv 000361        75
12  94   Osage Wind Priv 000165-000167      79
13  95   IEA 00226838             80
14  96   IEA 00239657-00239658         98
15  97   Osage Wind 019006-019009     103
16  98   Osage Wind Priv 000128-000144     142
17  99   Osage Wind Priv 000092-000093     152
18  100  Osage Wind Priv 000090-000091     152
19  101  Osage Wind Priv 000233-000238     180
20               STIPULATIONS
21      It is stipulated that the deposition of Aaron
22  Weigel may be taken pursuant to agreement and in
23  accordance with the Federal Rules of Civil Procedure on
24  June 29, 2021, before Karli Daniels, CSR, RPR, CCR.
25
```

Page 4

```
1        THE VIDEOGRAPHER:  This is the videotaped
2   deposition of Aaron Weigel, in the matter of United States
3   and Osage Minerals Council versus Osage Wind, on June 29,
4   2021.  We are on the record at 9:07 a.m.
5        Will counsel please state your appearances for
6   the record.
7        MS. NAGLE:  Good morning.  Mary Katherine Nagle
8   of Pipestem & Nagle Law representing the
9   Intervenor-Plaintiff, the Osage Minerals Council.  With me
10  here today I have my colleague, Shoney Blake.
11       MR. FIELDS:  United States of America,
12  Plaintiff.  My name's Nolan Fields, and I have Cathy
13  McClanahan, Charles Babst with the Department of Interior
14  Solicitors Office, Michelle Hammock and Chris Watson with
15  our office.
16       MR. RAY:  Ryan Ray for the Defendants.
17  Co-counsel Lynn Slade is also on the remote line.  We are
18  here for all defendants.
19       THE VIDEOGRAPHER:  The court reporter will now
20  swear in the witness.
21  WHEREUPON,
22            AARON WEIGEL,
23  after having been first duly sworn, deposes and says in
24  reply to the questions propounded as follows, to-wit:
25            DIRECT EXAMINATION
```

Page 5

```
1   BY MS. NAGLE:
2        Q   Great.  Good morning.  My name is Mary
3   Katherine, and I'm a partner at Pipestem & Nagle Law, and
4   we represent the Osage Minerals Council, and so I will be
5   asking you some questions here at the front end.  I will
6   try to make it as efficient as possible because I know my
7   colleague, Nolan, over at the United States Attorney's
8   Office is going to have questions as well.
9        Just so I -- just so I know, is it -- your last
10  name, is it Weigel?  Is that how you pronounce it?
11       A   That's correct.
12       Q   Okay.  Thank you.  So, Mr. Weigel, good morning.
13       MS. NAGLE:  I'm sorry, did you say something,
14  Nolan?
15       MR. FIELDS:  Yeah.  I'm sorry for the feedback.
16  I think that there's another attorney on the call, but he
17  didn't announce himself for the record.  I think that
18  might want to happen, especially because he hasn't
19  formally entered on behalf of the case yet.
20       MS. NAGLE:  Yes.  I see -- and I think he was
21  here with us yesterday.
22       Ryan, is that one of --
23       MR. RAY:  Yes.  I believe that's probably Bob
24  Comer that's joined, and he will be appearing in short
25  order for the defendants.  That process is underway.
```

Page 6

1    MS. NAGLE: Okay.

2    MR. RAY: Sorry, Mary Katherine. Thank you.

3    MS. NAGLE: No worries. No worries. Thank you.

4    Q   (BY MS. NAGLE) So, Mr. Weigel, just before we

5  get started, have you had your deposition taken before?

6    A   I have not.

7    Q   You have not. Okay. So just so you know how

8  things will go today, I will be asking you some questions,

9  showing you some documents. You know, it's -- it's a

10  formal process, you're under oath, but, of course, if you

11  need to take a break at any time, I just ask that you

12  answer the question that's put before you, then you can

13  say, you know what, I need a break. I will watch the

14  clock and try to take breaks every hour and a half for

15  everyone's benefit, but, you know, this isn't -- you know,

16  it's not a test of willpower. If anyone needs to go to

17  the bathroom or get some food or water, that's always

18  understandable, so please, please do not hesitate to let

19  me know if you need a break.

20    And your attorney, Mr. Ray, will likely object

21  to some different things, and that's completely fine. I

22  just ask that you ask my questions unless he instructs you

23  not to, in which case that's something we have to work out

24  between us attorneys.

25    What did you do to prepare for your deposition

Page 7

1  today?

2    A   I had a single preparatory call.

3    Q   Okay. Did you look at some documents?

4    A   I did review some communications, yes.

5    Q   Okay. And were those communications back from

6  the 2013, 2014 time period?

7    A   Yeah. I believe they were understood to be

8  relevant documents that might be worth looking at.

9    Q   Okay. And did you speak with anyone else

10  besides your counsel regarding today's deposition?

11    A   I did not.

12    Q   Okay. Fair enough. So in terms of your

13  educational background, do you hold any degrees?

14    A   I do have a degree in mechanical engineering,

15  yes.

16    Q   Okay. And from what school?

17    A   University of Kansas.

18    Q   Jayhawks. All right. My mom was a professor

19  there for many years, so I grew up watching Kansas

20  basketball. Yes.

21    Okay. So in terms of mechanical engineering, do

22  you hold any licenses or certificates?

23    A   I did not.

24    Q   Okay. I just don't understand how that works,

25  so -- and have you received any formal training in

Page 8

1  construction?

2    A   No.

3    Q   Okay. And let's see here. When did you start

4  working for Tradewind Energy?

5    A   Hired in the spring of 2008 for Tradewind

6  Energy.

7    Q   Okay.

8    A   Although, technically, I was an intern about

9  four years before that, if you count that, but not

10  officially an employee until 2008.

11    Q   Okay. And what was your job title at that time

12  in 2008?

13    A   I was hired as what they call a developer, which

14  in renewables tends to mean a project manager.

15    Q   And so what were -- how would you describe your

16  responsibilities at that time?

17    A   The way we typically described it was you are

18  responsible as kind of the CEO of a project, meaning that

19  you were responsible for coordinating all activities

20  necessary to get the project to the point where it was

21  ready to be handed off to someone to own and operate it.

22  So prior to construction, including everything from real

23  estate to permitting to environmental, all the -- all the

24  basic categories of development.

25    Q   Okay. And at that time, who was your

Page 9

1  supervisor?

2    A   I worked, I believe, directly for Matt

3  Gilhousen.

4    Q   Now, did -- now, that was in 2008. Did your job

5  title ever change after that?

6    A   Yes, it did.

7    Q   Do you recall when?

8    A   I do not recall.

9    Q   Okay.

10    A   I suspect prior to that 2014, '15 era, but its

11  been some time since then.

12    Q   Okay. So would you say sometime before you

13  begin your work on the Osage Wind project, your job title

14  changed? Is that correct?

15    A   I guess not technically before, because my

16  initial -- one of any initial projects included the area

17  that ultimately became Osage Wind.

18    Q   Okay.

19    A   Which Tradewind was developing separately at the

20  time.

21    Q   Okay.

22    A   So the timeline's a little confusing there.

23    Q   Sure.

24    A   So I would say my title did change at the point

25  prior to 2013.

Aaron Weigel                                                                          6/29/2021

**Page 10**

1    Q   Okay.  And when your title did change, what did
2    your new title become?
3    A   It was probably portfolio management of some --
4    some vein.
5    Q   Okay.  And would that --
6    A   Director of portfolio management or something.
7    Q   Okay.  And would that have still been for
8    Tradewind?
9    A   Yes.
10   Q   Okay.
11   A   Yes.
12   Q   And you did say that one of your initial
13   projects was the area that became Osage Wind.  Do you
14   recall roughly when you would have started working on that
15   area?
16   A   Yeah.  Almost immediately.  So summer or fall of
17   2008.
18   Q   Okay.  And what were some of the initial
19   responsibilities you had with regards to that?  I mean,
20   was it sort of scoping out the land?  Or maybe if you
21   could describe it in your own words.
22   A   Yeah.  The initial stages of all developments
23   are the same, which is trying to understand who the owners
24   of the property are, so the land owners typically, and
25   then meeting with any involved local government agencies.

**Page 11**

1    And so that included meetings with the mayor and the
2    county, and, in fact, a meeting with the Osage Minerals
3    Council sometime late 2008, early 2009 I would have also
4    attended.
5    Q   And when you met with the Osage Minerals Council
6    in late 2008 or 2009, what was the extent of that
7    communication?  Did you inform them of the intent to build
8    a wind farm?  Or maybe you could describe that in your own
9    words.
10   A   Yes.  We intended to inform them of our plans
11   and to open negotiation around what we would normally call
12   a pilot agreement, an agreement you would do with a party
13   like a county.  Normally in Kansas where we had been
14   developing until that point, counties didn't have any
15   permitting process, so what you would do is go in ahead of
16   time, you'd negotiate an agreement, so say here's what
17   we're planning on doing, you know, we'd like to sign an
18   agreement with you that says the parties agree to this
19   type of behavior, and normally there was payment
20   associated with that.  So this meeting was to open that
21   conversation.
22   Q   Okay.  Was there anything that was decided in
23   that meeting?
24   A   I would say there were no -- there were no
25   outcomes that were official from that meeting.

**Page 12**

1    Q   Was this your first meeting with an entity or a
2    governmental body within a tribal nation?
3    A   It would have been close, if not the first.
4    Q   Sure.  And prior to working on the Osage Wind
5    Farm project, had you had any training with regards to
6    Indian trust property?
7    A   No.
8    Q   Okay.  Okay.  So we -- so we decided or we
9    learned that you became in charge of portfolio management
10   sometime in 2013 or 2014, we're not sure exactly when.
11   Did your job title with Tradewind ever change after that?
12   A   My final job title was a vice president of
13   portfolio management, and that would have been prior to
14   the sale to Enel --
15   Q   Okay.
16   A   -- which occurred in I believe it was March of
17   2019.
18   Q   Okay.
19   A   So I'm now currently an Enel employee with that
20   same title, vice president of portfolio management, soon
21   to be changed once it integrates with whatever their
22   system is because it's different.
23   Q   Okay.  Okay.  And how did your job
24   responsibilities change when you became vice president of
25   portfolio management?

**Page 13**

1    A   Yeah.  I focused more on the tools and systems
2    necessary to manage primarily the cost and risk of
3    projects across the portfolio.  So databases,
4    spreadsheets, web-based tools.  The company was obviously
5    developing more than just one project, so the intent was
6    to consolidate that information.  I will add that my
7    project responsibility never handed to someone else, so I
8    remained still responsible for that kind of Osage Wind
9    area, which Tradewind called Mustang Run at the time,
10   which is a corollary project.
11   Q   Okay.  Were you also director of project
12   development for Mustang Run?
13   A   I was the project manager, the developer for
14   Mustang Run, yes.
15   Q   Okay.  When did you begin your work on Mustang
16   Run?
17   A   That was that 2008 date I told you earlier.
18   Just for clarity, I suppose, Mustang Run was originally
19   supposed to be a 300-ish megawatt project that encompassed
20   the area to the east of Osage Wind as well as the area
21   that's now Osage Wind.  Ultimately, Wind Capital, an
22   entirely separate entity at the time, secured the land
23   rights for the western half and Tradewind secured the land
24   rights for the eastern half, and so they became two half
25   as big projects, a single 150 megawatt Mustang and a

**Professional Reporters**
800.376.1006
www.proreporters.com

Page 14

1  single 150 megawatt Osage.

2  Q  I see.  Okay.  And while you were working on

3  Mustang Run and Osage Wind, were you working on any other

4  projects at that time?

5  A  I did have a handful of projects primarily in

6  Arkansas I was working on.

7  Q  What were your responsibilities with regards to

8  those projects?

9  A  Exact same.

10  Q  Okay.  Did you interface with any tribal

11  governments for any of those projects in Arkansas?

12  A  I did not.

13  Q  Okay.  Did any of those projects involve Indian

14  trust property?

15  A  They did not.

16  Q  Okay.  So while you were working at Tradewind on

17  the Osage Wind Farm project, did you have any other job

18  titles besides director of project development or

19  portfolio management?

20  A  I don't recall anything different than those two

21  categories, no.

22  Q  Okay.  And in terms of your role as, you know,

23  director of project development or portfolio management,

24  did you ever have any direct communications with any of

25  the subcontractors?

Page 15

1  A  Direct communications with subcontractors, yes.

2  Q  And what sorts of communications would you have

3  with them?

4  A  Can you clarify what subcontractors you're

5  speaking of?  There obviously are many entities that the

6  company would hire to do work.

7  Q  Sure.  How about IEA?

8  A  Yes.

9  Q  Yes.  Okay.

10  A  I did communicate with IEA rather, you know,

11  consistently throughout that time period.

12  Q  Okay.  And what about Cooper?

13  A  I don't recognize Cooper.

14  Q  Okay.  Sanderfoot?

15  A  Don't recognize Sanderfoot.

16  Q  Okay.  Dykon Blasting?

17  A  No.

18  Q  Okay.  So did you have any involvement in

19  securing the financing for the Osage Wind Farm project?

20  A  No.

21  Q  Okay.  Were you involved in structuring -- I

22  know there were some corporate transactions between some

23  of the various related corporate entities in the Enel

24  family related to the Osage Wind Farm.  Were you involved

25  in any of those transactions?

Page 16

1  A  My involvement was that of a typical developer

2  role which might be to prepare schedules that would

3  ultimately become part of those documents.  The language

4  for those documents was ultimately outside of my

5  responsibility.

6  Q  Okay.  And so did your responsibilities for the

7  Osage Wind Farm project change at all after Tradewind

8  purchased the wind farm from Wind Capital Group in 2013?

9  A  My responsibilities changed.  I guess could you

10  clarify that a little bit?  Because if Tradewind didn't

11  own it, I was not necessarily responsible for making any

12  decisions relative.  So during the period in which Osage

13  was owned by Wind Capital Group, there was a transitionary

14  period when we were attempting to purchase it, although it

15  was outside the control entirely of Tradewinds, so I would

16  have been incapable of making any decisions of

17  representing anything for Osage Winds until the time of

18  which Tradewind did own it.

19  Q  Okay.

20  A  After that exact purchase, then, you know, my

21  responsibility would have ended at the time that Enel took

22  ultimate ownership, and I would have taken a more advisory

23  role in the project at that point.

24  Q  Okay.  And so you're just -- when you say when

25  Enel took ownership, are you referring to when Enel Kansas

Page 17

1  bought Osage Wind from Tradewind in 2014?

2  MR. RAY:  Object to form.

3  A  I don't know which entity within Enel purchased

4  it.  I know that Tradewind sold it to an Enel entity.

5  Q  (BY MS. NAGLE) Okay.  Fair enough.  Who was your

6  direct supervisor when you were working on Osage Wind?

7  A  It would have been Matt Gilhousen.

8  Q  Okay.  Was he your direct supervisor on other

9  projects as well or just Osage Wind?

10  A  All projects.

11  Q  Okay.  And who was he employed by at that time?

12  A  He was a founding member of Tradewind Energy.

13  Q  And while you were working on Osage Wind, did

14  you work with a team?

15  A  All projects of Tradewind were developed using

16  subject matter experts from many departments, so I guess

17  the answer to that would be yes.

18  Q  Okay.  And do you recall the names of the

19  individuals that you worked most closely with on Osage

20  Wind?

21  A  Is there a specific area you're interested in?

22  The company was 50 to 60 people, all of which had a --

23  Q  You know, anyone that you interfaced with with

24  regards to permitting regulations, you know, the sort of

25  governmental relations prior -- you know, prior to and

Page 18

1 during construction.
2    A   I would say probably Jennifer Dean is the
3 permitting subject matter expert at Tradewind at the time,
4 still -- still has a role similar to that.  Many
5 conversations with Matt Gilhousen, previously mentioned,
6 Rob Freeman and Geoff Coventry, who were the other
7 partners of Tradewind at the time.  That's probably the
8 extent of the Tradewind team that was closely involved.
9    Q   Okay.  And these were all folks employed by
10 Tradewind.  Is that correct?
11    A   Correct.
12    Q   Did you ever communicate regularly with anyone
13 at Enel at this time?
14    A   As you're aware, there's a partnership that was
15 existing at the time, and so communication about the
16 portfolio and about, you know, conceptually what projects
17 might be coming was common, so, yes.
18    Q   Okay.  And who at Enel would you speak with most
19 often about the project?
20    A   For Osage Winds, given the advanced nature of
21 the project, meaning it was close to construction, it
22 probably would have been Nick Lincoln, Mike Storage was on
23 a handful of those discussions because it was
24 transactional at the time and that was his expertise, as
25 well as Amber Zuhlke -- not Amber, sorry, she was with

Page 19

1 Wind Capital Group my apologies.  Joan Heredia would have
2 been the Enel counterpart to Jennifer Dean.
3    Q   Okay.
4    A   And that's probably it.
5    Q   Okay.  And were you ever involved in the change
6 order request process for the project?
7    A   Change order request process.  Maybe, I guess is
8 the answer to that.
9    Q   Okay.
10    A   I don't recall specifically a change order
11 request.
12    Q   Fair enough.  That is a fine answer.  It's
13 totally fine to not recall.  Okay.  Let's see.  Did you
14 ever communicate with anyone outside of Tradewind, Osage
15 Wind Capital, or any of the Enel entities about the
16 project?
17    A   Well, obviously there was legal counsel
18 involved, as you're aware.  With that single addition I
19 would say that that represented who I'm aware of.
20    Q   Okay.  And we did discuss earlier that you did
21 communicate with IEA.  Is that correct?
22    A   (Nods head.)
23    Q   And it sounds like you may have also had some
24 communications with the mayor, county, and the Osage
25 Minerals Council.  Is that correct?

Page 20

1    A   That's correct.
2    Q   In addition to those outside entities, did you
3 ever communicate with anyone from General Electric
4 regarding the project?
5    A   I did not.
6    Q   Okay.  What about JPM Capital Corporation, did
7 you ever communicate with anyone there about the project?
8    A   Sounds like that was related to financing.  I
9 would not have been involved in that, don't recall that.
10    Q   Okay.  All right.  So I'm going to go ahead and
11 enter -- actually, this is a really great moment because I
12 need to actually verify what the last exhibit number was
13 here yesterday just to make sure I got it.
14    MS. NAGLE:  Nolan, I don't know if you recall
15 off the top of your head.  I meant to check this morning.
16    MR. FIELDS:  Yes.  I think we're at 89 now.
17 This would be 89.
18    MS. NAGLE:  Thank you so much.  That was on my
19 to do list this morning, and I forgot to check.
20    Q   (BY MS. NAGLE) Okay.  So I'm going to enter what
21 will be Exhibit 89 into the record, and I am going to
22 share my screen.  And for the record I will note that this
23 is a document Bates stamped Osage Wind Priv 000299, I'm
24 marking it as Exhibit 89, and it's an email exchange with
25 the subject BIA.  I'll give you a second to look at it

Page 21

1 here, Mr. Weigel, and I can certainly scroll down if you
2 want to read more of the email chain.  It looks like it's
3 an email from you dated October 11, 2014.
4    (WHEREUPON, Exhibit 89 was marked for
5 identification.)
6    A   Yeah.  Let me see the start of the chain, if
7 possible.
8    Q   Sure.  Absolutely.  So it starts -- well,
9 that's -- okay.  So it looks like it starts here with an
10 email from Steve Willman, then it goes up to this from
11 what looks to be Matt Gilhousen, and then Steve Champagne,
12 and then a very length email from William Scott, it seems,
13 and Matt Gilhousen.  Joan Heredia has a response, and then
14 your response is here at the top.
15    So I will just note here I'm interested in, you
16 write, "Our research showed this permit isn't applicable,"
17 and my question to you is what research are you referring
18 to here?
19    A   There was a memo from Modrall Sperling that was
20 relied upon throughout this process, stating, I believe,
21 the activity of installing wind facilities was not mining.
22    Q   And do you have an understanding of who did that
23 research?  I mean, you said Modrall, but individual names
24 of folks who did that research?
25    A   Yeah.  We interacted primarily with Lynn Slade.

Page 22

1  Q.  Okay.  Do you know if anyone else on his team
2  worked on that research?
3  A.  I believe I saw other names that were involved
4  in preparing it, but you'd have to ask him.
5  Q.  Sure.  And how was the research communicated to
6  you?
7  A.  The PDF would have been delivered by email and
8  we would have had follow-up phone calls to discuss.
9  Q.  Okay.  And who asked Lynn Slade or Modrall
10  Sperling to undertake this research?
11  A.  As I recall, this would have been the very first
12  point that the idea that mining may even remotely be an
13  issue, which we were unaware of.  Despite me meeting with
14  the tribe in -- I'm sorry, the Mineral Council, in 2008 or
15  '9, the first time we learned about this was in 2013
16  sometime, at which point we reached out to our lawyers
17  which would have been Rouse Frets or maybe DFRG at the
18  time.  They've changed names a couple of times.  And they
19  went out and found an expert, as they normally would in
20  something that they weren't experts at, and that's when
21  Lynn Slade, I guess he prepared this, this memo for us.
22  Q.  And so you said it was in response to something
23  in 2013 from the tribe.  What did the tribe communicate to
24  Tradewind in 2013 in relation to mining or the need for a
25  permit?

Page 23

1  A.  I believe there was a letter that was sent.  I
2  want to say it was from the Minerals Council asking about
3  what types of digging that we may need a permit for
4  digging.  It wasn't actually addressed to Tradewind at the
5  time.  I think it was to Wind Capital Group, who owned the
6  project, and then we were cc'ed, Tradewind was cc'ed on
7  that communication, and that was the first time we were
8  learning there's a consideration for mining.
9  Q.  And you said Tradewind was cc'ed on that
10  communication.  Did Wind Capital Group ask for the same
11  legal research or was it just Tradewind who asked for the
12  research?
13  A.  I do not know the answer to that.
14  Q.  Okay.  Were you involved in the communication
15  directly to the attorneys at Modrall Sperling when
16  Tradewind asked for this research or was it someone else
17  who actually maybe asked?
18  A.  I suspect it would have been Matt, but I -- I
19  don't think it was me.
20  Q.  Okay.  Okay.  All right.  And do you recall what
21  the findings were of this research?
22  A.  The findings of the Modrall Sperling memo?
23  Q.  Uh-huh.
24  A.  Yeah.  I firmly recall it saying our activities
25  would not represent mining.

Page 24

1  Q.  And do you recall what the basis was for those
2  findings?
3  A.  The memo itself referenced many other, you know,
4  case law, but, you know, as a -- as a -- not a lawyer
5  myself, as an engineer, we were focused on, you know,
6  whatever the definition of mining that was proposed in the
7  C.F.R. was, and then, you know, the results that was
8  explained to us by the lawyers, which, again, was relied
9  on.
10  Q.  Sure.  Absolutely.  Did anyone that was in-house
11  counsel to Tradewind work, you know, with the attorneys at
12  Modrall Sperling on the research?
13  MR. RAY:  Object to form.
14  A.  I wouldn't know that.
15  Q.  (BY MS. NAGLE) Okay.
16  A.  But I find it unlikely.  Also, we don't have in
17  house.  Tradewind never had in-house counsel, of course.
18  Q.  Oh, okay.  All right.  So let's see.  Let
19  me pull up the next one.  Sorry.  Just one moment.  Let me
20  find my next document, which for some reason is not where
21  I thought it was.
22  Okay.  All right.  So I'm now going to show you
23  what has been previously marked in a prior deposition as
24  Exhibit 36.  We've got the court reporter's stamp right
25  here.  And this document Exhibit 36 is Osage Wind Priv

Page 25

1  000414.  Is this the memo that you were just talking
2  about, Mr. Weigel?
3  A.  Without reviewing it closely, it does look to be
4  similar in form.
5  Q.  Sure.  Sure.  And I will note that it's dated
6  October 31, 2013, on Modrall Sperling letterhead.  Does
7  that seem like the right timeline in terms of what we were
8  just talking about?
9  A.  Yes.
10  Q.  Okay.  I'm happy to scroll down.  It's a
11  seven-page memo.  So to the extent you would like to see
12  any page here, please feel free to direct me, and I'll go
13  there.  I'm just going to ask a few questions about
14  different aspects of the memo.
15  First off, do you know who Bill Scott is?
16  A.  I know he's an associate with Lynn, but I do not
17  have any direct communications or -- with him, I believe.
18  Q.  Sure.  Okay.  And do you know who Sarah
19  Stevenson is?
20  A.  I do not know where she fits in the Modrall
21  Sperling firm.
22  Q.  Okay.  So you never had any direct conversations
23  with either Bill Scott or Sarah Stevenson.  Is that
24  correct?
25  A.  That's correct.  This was always through Lynn

Page 26

1  Slade that these conversations occurred --
2   Q.  Okay.
3   A   -- when I was ever involved.
4   Q.  Okay.  Do you recall roughly during that time
5  period how many conversations you would have had with Lynn
6  Slade about these legal questions?
7   A   This particular issue was somewhat common to
8  have discussions about and I think through the following
9  year would have been common to have discussions about.
10  Enel is a 70,000 person company, and so as -- as this
11  project advanced, there were always additional people
12  getting involved whom had questions about the specific
13  issue, and so we would tend to come back to this with some
14  regularity to review.
15   Q.  Sure.  Now, in terms of -- I understand this is
16  a legal memo and so the lawyers have to do their lawyer
17  thing, but in terms of giving the lawyers the facts they
18  would need to understand the scope of excavation, the form
19  or method of excavation, who as Tradewind was responsible
20  for providing the information in terms of what would
21  actually be happening, you know, in the excavation phase
22  of Osage Wind Farm project?
23   A   Yeah.  I do recall discussions around the memo
24  about what -- verbally what we had planned to do.  It's
25  not terribly difficult to describe the scope of digging

Page 27

1  for a foundation.  Typically about 10 feet deep, typically
2  about 50 feet wide; dig the dirt out, put the concrete in,
3  put the dirt back on top.  The construction of, you know,
4  small-scale field roads wasn't also very difficult to
5  describe, so I recall those being described verbally.  I
6  do not recall, you know, an engineering drawing of any
7  kind being sent, although it possibly could have been.
8   Q.  Okay.  And in terms of those verbal
9  conversations about the scope of excavation and
10  construction, you said 10 feet deep, 50 feet -- 50 feet
11  wide.  At that time in those conversations, was the plan
12  to purchase materials off site for backfill or was the
13  plan to use the excavated material on site for backfill?
14  Do you recall?
15   A   Yeah.
16   MR. RAY:  Object to form.
17   A   Yeah.  There was never a plan as it related to
18  turbine foundations to buy material and fill those holes
19  back up with material from off site.  The reason was an
20  engineering reason, it's that there's no -- it doesn't
21  matter what comes out of the hole.  If you were digging
22  out a hole of cotton candy or pudding, the engineering
23  value is the same, it just has to be on top of the
24  concrete.  So whether it's dirt, whether it's sand,
25  whether it's limestone, there's no need to purchase any

Page 28

1  specific material.  All that matters is the volume and
2  mass of what you removed and the volume and mass of what
3  goes back in the hole.
4   Q.  (BY MS. NAGLE) And in terms of volume and mass,
5  is another -- and I know nothing about engineering, but is
6  another factor that engineers would take into
7  consideration the size of the materials themselves?
8   A   There are, you know, civil engineering standards
9  that say, you know, very large particles if you try and
10  stack them together have very big air gaps and they tend
11  to settle, and so as you can see, as the process went
12  along, you know, the reason for the correction that
13  eventually happened was that it would be dangerous and
14  risky, the turbines can fall over if you didn't, you know,
15  make the materials stable before putting them back into
16  the ground.  So that discussion definitely happens.
17   Along that vein there were discussions about you
18  can build foundations without digging a hole, you can put
19  them on top of the surface.  You can build foundations in
20  all kinds of different shapes and manners and ways that
21  were all discussed.  Ultimately, we did it in the
22  traditional way because we thought that it conformed to
23  the law for the memo we were provided.
24   Q.  And I'm familiar with some of those
25  communications, and we'll get to that a little bit later.

Page 29

1  So for purposes of this memo, was it ever communicated to
2  Lynn Slade and this team that there would be rock crushers
3  on site crushing the limestone to a specific size?
4   MR. RAY:  Object to form.
5   A   The discussion of rock crushing happened on
6  phone calls that I suspect Lynn Slade was on.  It would
7  have been difficult for him to have not been on those, so
8  I suspect the answer to that is yes.
9   Q.  (BY MS. NAGLE) Do you recall when those phone
10  calls regarding rock crushing would have been happening?
11   A   It would have been closer to the start of
12  construction, which would have been early or, you know,
13  mid 2014 time frame.
14   Q.  And would there have been conversations
15  concerning rock crushing -- rock crush -- sorry -- rock
16  crushing before mid 2014?
17   A   I don't know.
18   Q.  Okay.  Do you recall any conversations with
19  anyone at Modrall Sperling about rock crushing before
20  May 2014?
21   A   I recall the discussion about mining starting
22  very general about does removing soil and putting it back
23  count, and then getting more specific the closer to
24  construction we got in terms of what about roads, what
25  about borrow pits, what about crushing, and we formed a

Page 30

1   opinion on those as they arose.

2       Q   Okay.  So would you say this memo is sort of

3   still at the more generic phase and doesn't -- doesn't

4   actually get to directly, you know, borrow pits or, you

5   know, roads or anything like that?  Would you agree with

6   that?

7       MR. RAY:  Object to form.

8       A   Yeah.  I mean, I guess this memo would have been

9   earlier and I would have suspected it to be refined over

10  time.

11      Q   (BY MS. NAGLE) So if we go here to the question

12  presented, it states "whether a surface owner who

13  excavates land for the purpose of construction consistent

14  with its surface rights and does not remove the land

15  excavated from the property is engaged in mining of the

16  mineral state and requires a mining permit," so I'm

17  curious whether this language here "does not remove the

18  land excavated from the property," is that a detail that

19  you or someone else at Tradewind told the folks at Modrall

20  Sperling?  Is that information that you said, that, you

21  know, the plan was not to remove what was excavated from

22  the property?

23      A   I recall early on reviewing a definition of

24  mining, and it may have been the one that was in the

25  Indian-specific C.F.R. language about what mining was and

Page 31

1   that if you asked any person off the street, any normal

2   human being what mining is, I think they would tell you

3   it's, you know, taking materials and taking them

4   somewhere, right?  So I think this was an attempt to

5   rectify whatever we had seen about mining in other

6   definitions at the time, but by no means did we have a

7   clear understanding of all of the nuance at the time this

8   question was posed.

9       Q   Uh-huh.  Fair enough.  In terms of consistent

10  with its surface rights, what kind of information did

11  Tradewind give to the attorneys at Modrall Sperling

12  regarding what surface rights the company may have

13  acquired for the project?

14      MR. RAY:  Object to form.

15      A   I don't believe we sent them wind energy leases.

16  Certainly leases were in place.  They may have had access

17  to them through a data room.  I recall discussions around

18  wind being a surface right generally in Oklahoma.  Since

19  DFRG was involved, we had done much research.  You know,

20  there's oil and gas activity all around here, and

21  there's -- you know, much research was conducted between

22  Tradewind and DFRG specific to surface rights.

23      Q   (BY MS. NAGLE) Do you recall what the status of

24  the surface rights were at the time of the writing of this

25  memo?

Page 32

1       A   I believe that Wind Capital Group had secured

2   wind energy leases that were in full force and effect for

3   the entirety of the construction area.

4       Q   Do you know exactly when those were acquired?

5       A   As I recall, around the 2011 era.

6       Q   Okay.  And at this time in 2013, did you have an

7   understanding of whether the subsurface estate or the

8   surface estate there in Osage County -- well, let me --

9   let me back that up.

10          Did you have an understanding at the time that

11  the Osage mineral state had been severed from the surface

12  estate?

13      A   That was one of the first things the land owners

14  told me, and, in fact, in 2008, the Minerals Council said

15  it as well, although it felt more in context with oil and

16  gas at the time.

17      Q   Uh-huh.  And did you have an understanding at

18  that time in 2013 that the surface estate was subservient

19  to the Osage mineral estate?

20      MR. RAY:  Object to form.

21      A   I understand subservient to mean that the

22  mineral state has the right to use whatever, the surface,

23  to get to its stuff, and the surface also has its own

24  rights.

25      Q   (BY MS. NAGLE) Okay.  Looking on page two of the

Page 33

1   memo which is Bates stamped 415, here under the heading

2   analysis, it states, "The Osage Tribe has indicated that

3   it will assert Tradewinds Energy must receive a mining

4   permit from the Osage Minerals Council in order to

5   construct and operate the wind farm on the grounds that

6   the excavation and construction and permanent placement of

7   the towers constitutes mining of the Osage minerals

8   estate."

9           Is this -- earlier we discussed that Tradewind

10  was copied on a communication from the Osage Minerals

11  Council to Wind Capital Group stating that a permit would

12  be necessary.  Is this a reference to that communication

13  you mentioned earlier?

14      MR. RAY:  Object to form.

15      A   I believe that answer to be yes.

16      Q   (BY MS. NAGLE) Okay.  And do you recall roughly

17  when that communication would have been received?

18  Obviously sometime before October 31, 2013.  Do you recall

19  exactly when?

20      A   I do not.  Not much longer before that.  Not

21  within six months.

22      Q   Okay.  And just a little bit below that, it

23  says, "Tradewinds does not dispute that The Lease does not

24  provide it with the right to conduct mining or other

25  mineral extraction."  When it says "The Lease", and "The

Page 34

1 Lease" is capitalized, do you understand that to be a

2 lease with surface land owners?

3    A  Yes.

4    Q  Okay. It says here, "Tradewinds, however, is

5 not conducting mining. To the extent any soil or other

6 subsurface material is touched by Tradewinds, it is merely

7 incidental to Tradewind's construction of its approved

8 wind farm." What is your understanding of "merely

9 incidental" as it relates to the subsurface material and

10 use of it?

11    A  We thought about it much like building a

12 basement for a house which is you have to move dirt out of

13 the way to build a basement into the ground but you pile

14 it back up on the sides, and that -- yeah. You have --

15 you couldn't not touch it in order to do the thing you

16 wanted to do, but, in fact, you still had to buy the

17 concrete for your basement foundation, you still had to do

18 the excavation, and, yeah, that was the concept.

19    Q  Okay. And in that concept of the touching the

20 subsurface material being merely incidental, at that time

21 in October 2013, was it envisioned that using a rock

22 crusher would also be merely incidental?

23    A  I do not recall conversations about rock

24 crushers at this stage.

25    Q  Okay. So at the very end of this third

Page 35

1 paragraph here, let's see -- okay. Sorry. Let me --

2 okay. So looking back up here, there's a reference to 25

3 C.F.R. part 226 and 25 C.F.R. part 214, and then the memo

4 states, "No provisions of either of these sections provide

5 information on whether surface use consistent with a

6 surface lease or license is considered mining such that a

7 permit or lease is necessary." What was your

8 understanding of what "consistent with a surface lease or

9 license" meant for purposes of this memo?

10    A  Yeah. I mean, my understanding of what this

11 means is that the language in those sections of C.F.R.

12 was -- didn't tell us exactly whether or not what we were

13 doing, you know, was, you know, correct.

14    Q  Okay. Looking at pages 3 to 4, I see here that

15 there is a citation to -- I'm sorry. My apologies. Back

16 up to 3, Bates stamp 416, in reference to the Supreme

17 Court's decision in Watt v. Western Nuclear. Do you see

18 that at the bottom of page 3?

19    A  I do.

20    Q  And it's referencing the Stock-Raising Homestead

21 Act. Do you recall any discussions around the

22 Stock-Raising Homestead Act at this time?

23    A  I do not.

24    Q  Okay. I know you said that these two provisions

25 that we were talking about earlier, specifically 25 C.F.R.

Page 36

1 part 246 and 25 CFR part 224 weren't incredibly clear with

2 regards to what exactly what would constitute mining. Do

3 you recall if there were any analogous statutes or

4 regulations that you all looked at with Modrall Sperling

5 at that time that you thought might inform your

6 interpretation of these two regulations?

7    A  I mean, that -- yes. That's what the memo is,

8 right, and ultimately the conclusion is what we at

9 Tradewind cared about and what we relied on.

10    Q  Sure. So going back down here to this case,

11 Watt v. Western Nuclear, which is discussing the

12 Stock-Raising Homestead Act, there's a quote here from the

13 Supreme Court that notes -- I'm starting at kind of the

14 top of page 4 -- that "one of the overriding purposes of

15 the act was to permit settlers to establish and maintain

16 successful homesteads. There is force to the argument

17 that this purpose would be defeated if the owner of the

18 surface estate were unable to use reserved minerals, even

19 where such use was essential for stock raising and raising

20 crops."

21     Did you have an understanding in reading this

22 memo from Modrall Sperling what the purpose of the

23 Stock-Raising Homestead Act was?

24    MR. RAY: Object to form.

25    A  I did not.

Page 37

1    Q  (BY MS. NAGLE) Okay. Did you or your attorneys

2 ever undertake to discern the congressional purpose behind

3 the Osage Allotment Act which placed the mineral estate in

4 trust for the Osage Nation?

5    MR. RAY: Object to form.

6    A  I personally did not. You'd have to ask the

7 lawyers what their thought process was.

8    Q  (BY MS. NAGLE) Okay. Do you know if any -- you

9 said I'd have to ask the attorneys. You don't know

10 whether or not Lynn Slade or Bill Scott or Sarah Stevenson

11 who wrote this memo ever undertook to understand the

12 overriding purpose of the Osage Allotment Act. Is that

13 correct?

14    MR. RAY: Object to form.

15    A  That's correct.

16    Q  (BY MS. NAGLE) Okay. I see here, you know, it's

17 talking about the purpose of the Stock Head -- sorry --

18 Stock-Raising Homestead Act, and then it notes that in

19 this particular example of mining in a Supreme Court case,

20 the court found, quote, you know, "The purpose would be

21 defeated if the owner of the surface estate were unable to

22 use reserved minerals, even where such use was essential

23 for stock raising and raising crops." Did you ever

24 understand stock raising or raising crops to be a use for

25 the minerals that were taken in this case from the Osage

1  mineral estate?
2      A   We --
3          MR. RAY:  Object to form.
4      A   Our opinion was we weren't taking minerals.
5  This portion of research, as I recall it, was tangential,
6  one data point, and that we were not stock raising, as you
7  said, but we were also not taking minerals.
8      Q   (BY MS. NAGLE)  Okay.  If you were not taking the
9  minerals, and this is, of course, the Watt v. Western
10 Nuclear case about what minerals were taken, do you have
11 an understanding of why this particular Supreme Court case
12 was included here in this memo?
13     A   I would go back to my prior comment that the
14 definition in the specific references was unclear and that
15 you can see many of these are tangential in the way that a
16 lawyer would typically go and find anything that might
17 possibly apply for discussion purposes.
18     Q   Okay.  So what I see here, the next case that's
19 discussed is Rosette, which is a district court case from
20 the District of New Mexico, and this case, of course,
21 refers back to the Supreme Court case we were just
22 discussing, Watt v. Western Nuclear, and says, "Thus,
23 while Rosette might be able to use the heated water from
24 geothermal resources under its property for use in
25 watering livestock or irrigating forage crops and remain

1  within the patent, the commercial activity of heating
2  ground greenhouses to produce roses for sale falls outside
3  the patent.  Therefore, Rosette, by virtue of being the
4  surface water, does not acquire the right to use the
5  geothermal resources in well 55-7 for use in providing
6  heat for its commercial greenhouse operation.  The right
7  to the resources remains in the federal government."
8          Do you have an understanding for purposes of
9  this memo what the distinction is between the use of the
10 resources for stock raising -- you know, stock raising and
11 raising crops versus the operation of a commercial
12 enterprise like a greenhouse?  Do you have an
13 understanding of that distinction?
14         MR. RAY:  Form.
15     A   I recall both of these being -- trying to
16 discover the nuance of what counts as a resource.
17 Geothermal, in your example here, something we obviously
18 weren't relying on or weren't using.  So I think there were
19 helpful to color what our activities were and how they
20 might relate to things that had already been done.
21     Q   (BY MS. NAGLE) Uh-huh.  Did you see this case,
22 Rosette, as related for opining at all on the nature of
23 the operation, the fact that the operation was commercial
24 in nature?
25         MR. RAY:  Object to form.

1      A   Yeah.  We didn't discuss that as a key point.
2      Q   (BY MS. NAGLE) Okay.  And when you say "we
3  didn't discuss that", do you -- are you saying you didn't
4  discuss it with the attorneys who worked on this memo?
5      A   I'm saying that the memo discussions we had
6  afterwards, the idea that because one thing was commercial
7  and what we were doing was commercial is -- we didn't see
8  as a point of discussion, yes.
9      Q   Okay.
10     A   It was around what was the mineral interaction
11 was most of the discussion.
12     Q   Okay.  Lower on page 4, it states here, "The
13 mineral rights reserved under the Stock-Raising Homestead
14 Act are done so in language similar to that of the Osage
15 Allotment Act."  Do you have an understanding of what that
16 sentence signifies for purposes of this memorandum?
17         MR. RAY:  Object to form.
18     A   I have to again say that it was in the effort to
19 find things that were close to try and understand better
20 what the rules might be and what the law might be.
21     Q   (BY MS. NAGLE) Okay.  If I moved on to page 6,
22 down here this is Bates stamped 419, I notice there's a
23 reference to Mullins, a circuit case, and also a reference
24 to the Supreme Court of Washington, Saddle Mountain
25 Minerals.  Here, let's see.  Mullins is concluding in the

1  forth circuit case that, "The mineral owner is entitled to
2  compensation based upon the value of" -- sorry -- "the
3  value in situ" -- S-I-T-U -- "of the coal displaced."  Do
4  you see that?
5      A   I do.
6      Q   And I see that Saddle Mountain says, "However,
7  even if a surface owner can burden a mineral owner's
8  right, it does not mean the surface owner can export
9  minerals without any compensation to the mineral owner."
10 to your knowledge, has the Osage Minerals Council ever
11 been compensated for the minerals that were taken from the
12 Osage Minerals Estate to construct the Osage Wind Farm?
13         MR. RAY:  Object to form.
14     A   To my knowledge, no compensation has been paid,
15 but also no materials were taken.
16     Q   (BY MS. NAGLE) And so to this day, your
17 understanding is still that no materials were taken at the
18 Osage Wind Farm.  Is that correct?
19     A   To our understanding of what mining was, we had
20 not removed viable materials and commercialized them in
21 any way.  We still believe that to be true.
22     Q   And is that understanding based on this memo?
23     A   Yes.
24     Q   Are you aware that in 2017, the tenth circuit
25 concluded that both federal law and Osage law required

Page 42

1  Defendants Enel and everyone else to get a permit for the
2  mining activities that took place at the Osage Wind Farm?
3       MR. RAY:  Object to form.
4    A   At that point, the project wasn't within my
5  purview, but I am aware that happened, yes.
6    Q   (BY MS. NAGLE) Does that decision from the tenth
7  circuit change your viewpoint at all on whether or not
8  some sort of compensation is due to the Osage Minerals
9  Council for the minerals taken, or do you still hold the
10 same position that no minerals were taken?
11      MR. RAY:  Object to form.
12   A   I still hold the position that no minerals were
13 taken.
14   Q   (BY MS. NAGLE) Okay.  Let's see.  Moving along.
15 So I think we discussed this a little bit earlier.  You
16 said you -- so I asked you if you had any responsibilities
17 with regards to the transaction where Tradewind purchased
18 the Wind Farm project from Osage Wind Capital Group, and
19 you said you helped prepare schedules.  Is that correct?
20   A   That is correct.
21   Q   Do you recall who in 2013 on the Tradewind side
22 would have been involved in that transaction?
23   A   It would have been Rob Freeman, Matt Gilhousen,
24 and Geoff Coventry.
25   Q   Okay.  And do you recall on the Wind Capital

Page 43

1  Group side who would have been involved in that
2  transaction?
3    A   I don't remember all the names.  I know David
4  Boyce was the CEO and was certainly involved, and they had
5  their general counsel, had a general counsel that would
6  have been involved.
7    Q   Okay.  Great.  So I am -- I am now going to show
8  you what was actually entered yesterday as Exhibit 78.  So
9  for the court report's information, it doesn't have -- we
10 don't have the stamp yet, but this is Exhibit 78.  It's
11 Bates stamped Osage Wind 021248, and I will represent that
12 it is the membership interest purchase agreement between
13 Tradewind Energy, who is the purchaser, and that Wind
14 Capital Group, who is the seller.  Mr. Weigel, are you
15 familiar with this document at all?
16   A   I am aware that it existed.  I was not part of
17 the preparation or execution of this document.
18   Q   Okay.
19   A   So I wouldn't be familiar with the specific
20 language and terms.
21   Q   Okay.  Fair enough.  So you had no role in
22 shaping or in forming the creation of this document?
23   A   I had no role.
24   Q   Fair enough.  I am going to look at one page in
25 here, and that's the page that ends in Bates stamp 21251.

Page 44

1  And I see here there's a definition of governmental
2  authority, meaning any United States federal, state,
3  local, or governmental authority, regulatory body,
4  political subdivision, et cetera, et cetera.  I'll give
5  you a second to read that definition.
6    A   Okay.
7    Q   Under this definition, I know you said you met
8  with the mayor, would the local city there -- actually, to
9  back up for a second, was that the mayor of Pawhuska?
10   A   The mayor of Pawhuska, and then the -- there's a
11 governing body, I can't recall the name of it, but the
12 county has conditional use permit process.  That would
13 have been the primary local authority.
14   Q   Okay.  So in terms of the city government of
15 Pawhuska, would you understand that government to fall
16 under this definition of governmental authority here?
17      MR. RAY:  Object to form.
18   A   Having not written it, my understanding, it
19 looks to me like it would.
20   Q   (BY MS. NAGLE) Okay.  What about the county that
21 you -- you know, like the county officials that you met
22 with?  Would the county government fit underneath this
23 definition of governmental authority?
24      MR. RAY:  Object to form.
25   A   Same answer.  It looks like it would.

Page 45

1    Q   (BY MS. NAGLE) Okay.  I note that at the end of
2  it, this says, "provided, however, that for the avoidance
3  of doubt, no Native American tribe, nation, entity, body,
4  organization, governmental or other authority or any
5  agency, division, ministry, instrumentality, or authority
6  thereof shall be considered a governmental authority for
7  any purpose here under."  With that language here in this
8  definition, would you understand the Osage Minerals
9  Council to be a governmental authority?
10   A   They appear to be exclusively removed from this
11 definition, although I recognize, you know, they clearly
12 are the normal human definition.  Per the document --
13   Q   Sure.
14   A   -- they're excluded from this definition.
15   Q   Did -- and you stated before, did anyone working
16 on this transaction or this document ever discuss with you
17 this decision to exclude Native American tribes from the
18 definition of governmental authority?
19   A   Not at all.
20   Q   I'm sorry.  Did you -- I didn't hear it.
21   A   No was the answer.
22   Q   No.  Thank you.  So with that my guess is the
23 answer might be no, but I'll ask you none the less.  So do
24 you have any understanding of the purpose of this
25 exclusion here in this definition of governmental

Page 46

```
1    authority?
2         MR. RAY:  Object to form.
3    A   I do not, and I don't want to guess.
4    Q   (BY MS. NAGLE) Fair enough.  I don't want you to
5    guess either, so I don't know is a very fair answer.
6         So I will next show you what has already
7    previously in this litigation been entered as Exhibit 52.
8    This does actually have the benefit of a court reporter's
9    stamp on it from a prior deposition, and it is Bates
10   stamped Osage Wind-035610, and this is the Osage Wind
11   project amended and restated balance of plant engineering
12   procurement and construction contract by and between Osage
13   Wind, LLC, and IEA Renewable Energy, dated April 11, 2013.
14   Have you seen this document, Mr. Weigel?
15   A   I would not have been involved in preparing
16   this. I don't believe I have seen it before in its
17   entirety.
18   Q   Okay.  Do you have an understanding -- and this
19   is dated April 11, 2013.  Do you have an understanding of
20   when Osage Wind, LLC, decided to engage with IEA for
21   purposes of construction of the wind farm?
22   A   That is a good question. It was involved in
23   early discussions with IEA specific to this project, as is
24   typical for a project near construction.  Trying to sign
25   this contract that, you know, forms the basis of what's
```

Page 47

```
1    going to be developed, how's it going to be done, who's
2    going to do it, it would have been normal to be involved
3    in that as the project developer to make sure the scope
4    was right, and so I was certainly at meetings with IEA
5    prior to this.  I would guess it was within a few months,
6    though.  I mean, within 2013.
7    Q   Okay.  So if we look at the page ending in
8    5620 -- oh, wow.  There we go.  5620, it notes that Osage
9    Wind is the owner and IEA is the contractor.  Do you -- do
10   you see that there?
11   A   Yes.
12   Q   Okay.  And then on Bates stamp ending -- hold
13   on.  Let me get to this page.  Okay.  So on this page --
14   so with the understanding that Osage Wind is the owner,
15   I'm on page Bates stamp 35672, it states that the owner's
16   manager -- "The owner shall appoint a representative to
17   act as the manager and coordinator of this contract on
18   owner's behalf."  Do you know who Osage Wind appointed to
19   be the manager of this contract?
20        MR. RAY:  Object to form.
21   A   I do not.
22   Q   (BY MS. NAGLE) Okay.
23   A   Typically, that would have been outside of the
24   scope of Tradewind.
25   Q   Okay.
```

Page 48

```
1    A   It would have been after a project goes into
2    construction.  It would have been the ultimate
3    owner-operator, which would have been Enel.
4    Q   Okay.  Okay.  So now I will go to Bates stamp
5    627.  And here we have -- again on Bates stamp 35627 we
6    have another definition of governmental authority here,
7    and this one is a bit shorter than the last one we saw in
8    the membership interest purchase agreement.  This one says
9    governmental authority means, "Any court, tribunal,
10   arbiter, authority, agency, commission, council, official,
11   or other instrumentality of the United States, or any
12   foreign country, or any domestic or foreign state, county,
13   city, school district, or other political subdivision.
14   For avoidance of doubt, the definition of governmental
15   authority shall not include the Osage Nation or any court,
16   tribunal, arbiter, agency, commission, council, official,
17   or other instrumentality thereof."  Do you -- were you
18   involved in the drafting of this definition of
19   governmental authority?
20   A   I was not.
21   Q   Did anyone from Osage Wind or any of the
22   affiliated entities, whether that's the Tradewind or EGPNA
23   or Enel Kansas, did anyone from any of those entities ever
24   consult with you regarding whether or not to exclude Osage
25   Nation from the definition of governmental authority?
```

Page 49

```
1    A   They did not.
2    Q   Do you have any idea which attorneys would have
3    advised Osage Wind on the decision to exclude Osage Nation
4    from the definition of governmental authority?
5         MR. RAY:  Object to form.
6    A   If this was executed by Tradewind, which I
7    believe it was, then it would have been our -- DFRG, which
8    would have been Steve Willman at the time.
9    Q   (BY MS. NAGLE) Okay.  And -- all right.  So let
10   me just see here.  All right.  Let's see.  I'm just seeing
11   if I have any more questions about this document, and I
12   think that I do not.  All right.  So I think we can -- we
13   can stop looking at that document.
14        And now I am going to show you what was
15   yesterday entered as Exhibit 79.  And hold on just a
16   second.  Let me share my screen.  So this document here
17   yesterday was entered as Exhibit 79.  We don't have the
18   court reporter's stamp just yet.  It is Bates stamped
19   Osage Wind-021119, and I will represent to you that it is
20   the membership interest purchase agreement between Enel
21   Kansas and Tradewind Energy dated September 17, 2014.  Are
22   you familiar with this document, Mr. Weigel?
23   A   Similar to the others, I would not have been
24   involved in the direct preparation of the language that is
25   contained in it.
```

Page 50

1  Q  Do you have an understanding of this document's

2  purpose?

3      A  Yes.  At this point in time, Tradewind and Enel

4  had a relationship that required membership and purchase

5  agreements at the time projects went into construction,

6  prior to construction, and that would have happened eight

7  to ten times by this time.

8      Q  Okay.  Moving down to what is ending in Bates

9  stamp 21127.  Let me see if I can -- there we go.  That's

10 better.  Here we have yet another definition of

11 governmental authority.  This time it is defined as

12 meaning, "Any national, tribal, state, or local

13 government," and I will represent to you that I don't see

14 any language here that excludes the Osage Nation or Native

15 American tribes.  Would you agree that this definition --

16 in your -- let me scratch that.

17         Is it your understanding that the Osage Nation

18 and the Osage Minerals Council under this definition would

19 constitute a governmental authority?

20         MR. RAY:  Object to form.

21     A  I was not involved in the preparation of this

22 language.  My non-lawyer read of this is that the tribe is

23 not excluded.

24     Q  (BY MS. NAGLE) Okay.  And what is your

25 understanding of why the contracts that Tradewind and

Page 51

1  Osage Wind and Enel were working on in 2013 excluded Osage

2  Nation as a governmental authority and then in 2014

3  included Osage Nation as a governmental authority?

4          MR. RAY:  Object to form.

5      A  I do not know.

6      Q  (BY MS. NAGLE) Do you have any idea who would

7  know the reason for this change in language?

8      A  Given this contract was directly between Enel

9  and Tradewinds, it would have been head counsel for the

10 Enel side, as well as on the Tradewind side, three

11 original partners, as I mentioned.  I would suspect that

12 Matt Gilhousen would have some input, and then, again, our

13 direct lawyers, Steve Willman and DFRG Law Firm.

14     Q  Okay.  And is there anyone specifically at DFRG

15 that -- a name of someone that would have, you think,

16 worked on this sort of language?

17     A  The memos were usually in the purview of Steve

18 Willman.

19     Q  Okay.  And do you know -- so to the best of your

20 knowledge, Steve Willman would have worked on this

21 contractual language.  Is that correct?

22         MR. RAY:  Object to form.

23     A  I -- I expect he would have.

24     Q  (BY MS. NAGLE) Do you know if Steve Willman ever

25 had any conversations with the team at Modrall Sperling

Page 52

1  about the legal research they were conducting with regards

2  to whether or not a mining permit was necessary?

3          MR. RAY:  Object to form.

4      A  I was party to conversations where both of those

5  individuals were on the phone discussing said minerals.

6      Q  (BY MS. NAGLE) And would those discussions have

7  taken place in 2013?

8      A  Yes.  Directly after the receipt of the memo,

9  there would have been calls including Steve and Modrall

10 Sperling.

11     Q  So I -- just to check in, I'm probably -- well,

12 it seems like I'm about halfway through some of the

13 questions I have, but I don't know exactly how much longer

14 it will take.  We've been going for an hour and 20

15 minutes.  I can keep going, or does anyone need a break at

16 this point?

17         MR. RAY:  Let's take a break --

18         MR. FIELDS:  We'll take a break.

19         MR. RAY:  -- for the record, if you don't mind.

20         MS. NAGLE:  Yeah.  Does -- do we want five or

21 ten?

22         MR. FIELDS:  Ten.

23         MR. RAY:  Ten.

24         MS. NAGLE:  All right.  I hear some votes for

25 ten.  All right.  Ten minutes.  Let's go off the record,

Page 53

1  please.

2          THE VIDEOGRAPHER:  We are off the record at

3  10:19.

4          (Break taken.)

5          THE VIDEOGRAPHER:  We are back on the record at

6  10:33.

7          MR. RAY:  I'll just note that co-counsel Sarah

8  Stevenson has joined the deposition.  Please proceed.

9      Q  (BY MS. NAGLE) Okay.  Thank you.  So jumping

10 right back into it.  So Mr. Weigel, earlier we -- we've

11 talked about a lot of different terms today related to

12 wind farms, and I just wanted to back up for a second and

13 ask, in terms of laying foundation for a wind turbine,

14 what -- what is a barrow pit?

15     A  As a mechanical engineer, I think you probably

16 should ask a civil engineer that question --

17     Q  Okay.

18     A  But since as a developer, a lot of your role as

19 a developer is to explain to the land owners what

20 construction's going to be like on their property, so I'm

21 reasonably qualified to answer that question.  A barrow

22 pit would be a time when either because the -- mostly

23 because the slope is too steep, you might need to move

24 some dirt from one place to another place in order to

25 level things out, essentially.

Page 54

1    Q   Okay.  And is that also what is referred to
2   sometimes when folks say they need to balance the site or
3   is that different?
4    A   No.  I think balance a site would normally refer
5   to the remaining steps of construction.  So it's -- I
6   think it's part of the terms of the OP contract, I would
7   expect -- EPC contract.
8    Q   And what is the EPC contract?
9    A   Oh, engineer, procure, construct.
10   Q   Okay.  And in terms of a contract, who is that
11  between?
12   A   It would be similar in form to the IEA contract
13  that you had put up there.
14   Q   I see.  So is the IEA contract we looked at an
15  example of an EPC contract?
16   A   Yeah.  I think it's maybe just a different label
17  for slightly different responsibilities, depending on, you
18  know, what it is that they're doing at the site.
19   Q   Okay.  And how would you define backfill?
20   A   Backfill is the replacement of materials from --
21  the turbine foundation is the only place on site that we
22  would use that term backfill.
23   Q   Okay.  And typically on a wind farm project,
24  where does backfill come from?
25   A   Backfill is always the dirt that came out of the

Page 55

1   hole.
2    Q   Always?
3    A   The material that came out of the hole.
4    Q   Okay.
5    A   I've never at any site we've worked on purchased
6   materials to backfill for turbines.
7    Q   Okay.  So you personally have never worked on a
8   project where backfill is purchased off site.  Is that
9   correct?
10   A   That's correct.
11   Q   Was that option here ever contemplated?
12   A   We did contemplate it as part of the -- you
13  know, starting from the original memo and moving forward,
14  as an option.  We thought that the -- A, it wasn't
15  necessary; B, the environmental impacts of piles of dirt
16  laying around would put us out of compliance for other
17  runoff and, you know, environmental compliance type
18  issues.
19   Q   And in terms of that runoff and other
20  environmental compliance issues that would have occurred
21  from purchasing off site backfill material, who was
22  responsible for that analysis?  Would that have been Joan
23  Heredia or someone else?
24   A   I would guess, if we're talking about the time,
25  those conversations were likely to have happened during

Page 56

1   the Tradewind ownership period of Osage Winds, and it
2   would have been myself, Matt Gilhousen, and Jennifer Dean,
3   the permitting specialist at Tradewind, who would have
4   initiated those conversations.  I would have expected Joan
5   to be involved.
6    Q   Yeah.  Okay.  All right.  So now I am going to
7   introduce what should be Exhibit 90 in this litigation.
8   So Exhibit 90, Bates stamped Osage Wind Priv-000427, and I
9   can -- at the top, this is an email from Darren Neil to
10  Lynn Slade, and, actually -- and your copied.  You're
11  copied.  But I can start at the bottom, too, if you'd like
12  to see all the way.
13      (WHEREUPON, Exhibit 90 was marked for
14  identification.)
15   A   Yeah.  That would be helpful to review them, the
16  chain.
17   Q   Yeah.  So it looks like it starts here from an
18  email from Ian Shavitz, and this is from October 2013.
19  And are you -- have you seen this email from Ian Shavitz
20  before?
21   A   I don't recall it directly.
22   Q   But this is in October of 2013.  Would -- could
23  this have been the instance in which you mentioned a
24  letter from the Osage Minerals Council to Tradewind and
25  Wind Capital Group?  Could this have been this letter?

Page 57

1    A   It could have been.  I would have to look at it.
2    Q   Okay.  Sure.  And then who's -- who's David
3   Boyce?
4    A   I believe he was the CEO of Wind Capital Group.
5    Q   Okay.  And who's George Knapp?
6    A   George Knapp was their head of internal counsel.
7    Q   Oh, it says right here.  Okay.  And move up
8   here, it looks like you respond on October 10, 2013, "I
9   suppose I shouldn't let things like this surprise me."
10  What did you mean by, you know, "I suppose I shouldn't let
11  things like this surprise me"?
12   A   Yeah.  The environment at the Mustang Run and
13  Osage Wind project was contentious on many fronts, and
14  this was one of the later instances where we felt the
15  Minerals Council or the tribe was attempting to make a new
16  claim for another -- yet another thing; previously it had
17  been burying beetles, previously the conditional use
18  permitting process, previously bald eagles.  Really, from
19  the initial time that I met with the Minerals Council, it
20  felt like -- it felt like to me it was attempted --
21  attempts to block the project from every possible way.
22   Q   Did -- did that make it hard to take their
23  statement that a permit was necessary seriously?
24      MR. RAY:  Object to form.
25   A   No.  Not at all.

Page 58

1    Q   (BY MS. NAGLE) You took it seriously?

2    A   I did.

3        MR. RAY:  Object to form.

4    Q   (BY MS. NAGLE) But you -- and you were not

5    surprised by it?

6    A   Can you restate that?  Sorry.

7    Q   So I'm just trying to understand, you say -- we

8    looked at this communication from Ian Shavitz, the

9    attorney for the Osage Minerals Council, in October of

10   2013 with regards to mining on the Osage mineral estate,

11   and your response is, "I suppose I shouldn't let things

12   like this surprise me."  So I guess really I should ask

13   are you saying that you were surprised at this time or you

14   were not surprised to get this communication from the

15   Osage Minerals Council?

16   A   I was not surprised.  It meant the pattern of

17   I'll call them "legal attacks" that we had been

18   experiencing for years.

19   Q   Okay.  Let's move to our next exhibit.  Just

20   give me one moment, and we'll pull that up.  This exhibit

21   yesterday was entered as Exhibit 81, and I can represent

22   to you that this was filed by defendants in this

23   litigation.  Exhibit 81 here was actually Exhibit 4 to

24   defendant's response to plaintiff's, the United States

25   Plaintiff's motion for preliminary injunction.  It is on

Page 59

1    the docket, publicly on the court's docket as 17-4, and

2    I'm just going to move it down a little bit so you can see

3    this is the cover email that accompanies what is the

4    attachment.  It's an email to Lynn Slade to Superintendent

5    Robin Phillips at the BIA dated October 21, 2014.  I'll

6    give you a moment to look at that.

7    A   Okay.

8    Q   All right.  And then the attachment here is this

9    version of a Modrall Sperling memorandum, and I will note

10   that it is to Alan Woodcock from Lynn Slade and William

11   Scott.  Do you know who Alan Woodcock is?

12   A   I do not.

13   Q   Okay.  And I think you mentioned before, Lynn

14   Slade is an attorney that represents Enel Kansas, EGPNA,

15   and Osage Wind at Modrall Sperling.  Is that correct?

16   A   I believe he was hired under Tradewind Energy,

17   but he --

18   Q   Okay.

19   A   -- I think also represented those entities you

20   had said.

21   Q   Okay.  And William Scott.  Do you know who

22   William Scott is?

23   A   I presume him to be the same Bill Scott that was

24   prior on this.

25   Q   And this is dated October 20, 2014, and here's

Page 60

1    the body of the email -- or sorry -- the memo.  Now, it

2    does look to me that there are some differences between

3    this memo and the prior version that we've looked at in

4    October -- that was dated October 2013, Exhibit 36.  Do

5    you understand the reasoning behind the difference -- the

6    differences or the changes that were made?

7    A   I was uninvolved in the changes or any changes

8    that were made.  As I said earlier, I suspect these

9    things, as you learn more, continued to be improved.  I

10   would have that expectation, but I couldn't tell you the

11   differences off the top of my head.

12   Q   Did -- between October 2013 and October 2014,

13   did anyone at any of the Enel companies or Tradewind ask

14   the attorneys at Modrall Sperling to update their legal

15   analysis?

16       MR. RAY:  Object to form.

17   A   I personally did not.  I cannot tell you if

18   anyone else did.

19   Q   (BY MS. NAGLE) So you're unaware?

20   A   Yeah.

21   Q   You're unaware if anyone asked the attorneys at

22   Modrall Sperling to update their legal analysis?

23   A   That's correct.

24   Q   Okay.  I will note for just a second, if I --

25   okay.  Exhibit 36.  Okay.  So if we look back at

Page 61

1    Exhibit 36, right, there's this language here in

2    Exhibit 36 that says, "The Osage tribe has indicated that

3    it will assert Tradewinds Energy must receive a mining

4    permit from the Osage Minerals Council in order to

5    construct and operate the wind farm."  I have searched

6    high and low in this version of the memo, Exhibit 81, and

7    I cannot find that language regarding the Osage Tribe has

8    indicated, you know, that it will assert Tradewinds Energy

9    must receive a mining permit.  Do you know if that

10   language is in here in this October 2014 version of the

11   email?

12       MR. RAY:  Object to form.

13   A   I do not know.

14   Q   (BY MS. NAGLE) Okay.  Do you know if it was

15   taken out?

16       MR. RAY:  Object to form.

17   A   I don't know.

18   Q   (BY MS. NAGLE) Okay.  Do you have any idea who

19   would know the answer to that?

20   A   I would say someone higher than me in the

21   organization that would have been involved in those

22   discussions.  It's possible Matt Gilhousen would have been

23   involved in that transaction or that transfer of

24   information.  I was not.

25   Q   Okay.  All right.  Then I also -- we also

Page 62

1  discussed, you know, here at the bottom of page 2 of
2  Exhibit 36, the October 2013 memo, the statement here, "To
3  the extent any soil or other subsurface material is
4  touched by Tradewinds, it is nearly incidental to
5  Tradewinds' construction of its approved wind farm." I
6  will represent to you in the later version, Exhibit 81, I
7  will searched for the phrase "merely incidental" and
8  cannot find it here in this later version of the memo. Do
9  you know if that language was removed?
10      MR. RAY: Object to form.
11  A  I do not.
12  Q  (BY MS. NAGLE) Okay. Do you know why anyone
13  would have wanted to remove that language from the memo?
14  A  You would have to ask the person who prepared
15  it. I do not know.
16  Q  Okay. I also note that it states here, "The
17  issue regarding the sandy soil mining permit may also
18  reflect a misunderstanding of Osage Winds' activities or
19  the applicable law." What is your understanding of what
20  is meant by "may also reflect a misunderstanding of Osage
21  Winds' activities"? What's the misunderstanding there?
22      MR. RAY: Object to form.
23  A  My interpretation of that goes back to the
24  question you asked me about backfill, where people tend to
25  think that backfill's something that has to be bought, and

Page 63

1  that there's -- I personally always felt there's some
2  confusion around those activities and the engineering
3  value of those activities which I believe is what this is
4  supposed to touch on.
5  Q  (BY MS. NAGLE) Okay. So this is a
6  misunderstanding of did you say the engineering value of
7  Osage Winds' activities in relation to the backfill?
8  A  In relation to the backfill, it's a
9  misunderstanding of the activities that we're taking
10  and -- let me try and back that up, I guess. So it's
11  difficult for someone who doesn't design turbine
12  foundations to understand that the dirt itself, when you
13  take it out and put it back in, could be anything, and
14  that it feels like to some people construction materials
15  are being used, and this is intended to capture that
16  nuance that putting the dirt backfill in a hole is
17  different than buying construction materials.
18  Q  Okay. And when you say that the backfill "could
19  be anything", what do you mean by that?
20  A  What I mean by that is that whenever we go to
21  build or are about to build a wind project, we will hire a
22  company to take soil samples to do geo tech, which
23  essentially is the same thing you do for an oil well. You
24  drill a hole, determine what kind of materials are there
25  already, and then you design your concrete foundation with

Page 64

1  reference to the materials that are in place because the
2  presumption is those materials will be put back in the
3  hole, and there are differences if the soil is clay, if
4  the soil is sand, if the soil has rock. You would have an
5  engineer tell you exactly how big your foundation has to
6  be, and the type of material that comes out and goes back
7  in changes the design you would need.
8  Q  I see. Who was the engineer that would have
9  done that study on the Osage Wind Farm project?
10      MR. RAY: Object to form.
11  A  I don't know off the top of my head.
12  Q  (BY MS. NAGLE) Okay. Was that kind of a study
13  done for this project?
14      MR. RAY: Object to form.
15  A  It must always be done, so I would -- I believe
16  it to exist.
17  Q  (BY MS. NAGLE) Okay. So scrolling down in our
18  2014 version of this memo, I will note that when we get to
19  the -- you know, the -- sort of the discussion of the case
20  law, I see we have Watt v. Western Nuclear, which if we go
21  back to Exhibit 36, if you recall, here's Watt v. Western
22  Nuclear in the 2013 version of the memo, but then the 2013
23  version on page four includes this quote from Rosette that
24  we previously discussed, and when I go here past -- I'm
25  now back on the 2014 version, and I go on from Watt v.

Page 65

1  Western Nuclear, the discussion of Rosette has been
2  deleted. Do you have an understanding of why the
3  discussion of the District Court of New Mexico's decision
4  in Rosette was removed?
5  A  I was not directly involved in the preparation
6  of this memo, so I do not have any -- any input as to why
7  that might have been removed.
8  Q  Do you know who removed it?
9  A  I would suspect the person who prepared the
10  document, but I do not know.
11  Q  Fair enough. So if we continue our movement
12  through this memo, if we recall, I'm back now on
13  Exhibit 36, and we're -- we're looking at page 6, and we
14  earlier discussed the circuit court decision in Mullins,
15  which, of course, mentions compensation based upon the
16  value of what's taken. I will note that over here in
17  our -- in our Exhibit 81, the 2014 version, there's no
18  discussion of Mullins if you look through this. Its just
19  been completely -- completely taken out. Do you
20  understand why the court's decision in Mullins was removed
21  from this memo?
22      MR. RAY: Object to form.
23  A  I do not.
24  Q  (BY MS. NAGLE) Do you know who removed that
25  language?



Page 66

1    A   I do not.

2    Q   Okay.  So another interesting issue, if we look
3  at Saddle Mountain Minerals, the Washington Supreme Court
4  case, there's this block quote here over the second part,
5  beginning with "however", as we discussed before, here in
6  Exhibit 36, it mentions, "Even if a surface owner can
7  burden a mineral owner's right, it does not mean the
8  surface owner can export minerals without the compensation
9  to the mineral owner."  I will note for the record that in
10 Exhibit 81, the 2014 version, that "however" language here
11 has been deleted.  It's just -- it's just gone.  Do you
12 know why that -- that part of the quote from Saddle
13 Mountain Minerals was deleted?

14      MR. RAY:  Object to form.

15      A   I do not.  I will say, by 2014, we had
16 determined there was no materials to be exported.

17      Q   (BY MS. NAGLE) So that may have been the reason,
18 just because the minerals were not being exported off the
19 wind farm?

20      A   It's purely speculative because I did not
21 prepare it, so --

22      Q   Well, I hate for you to speculate.  So do you
23 have any idea who would know why that language was
24 deleted?

25      A   The person who prepared the memo would be the

Page 67

1  person to ask.

2    Q   Fair enough.  On page 5, going back up just a
3  little bit here, I will note, you know, this language here
4  says "the reservation of the mineral rights reserved under
5  the SRHA", which I think we looked earlier was the
6  Stock-Raising Homestead Act, I might be getting that
7  wrong, but that act that we were talking about, SRHA, is
8  similar to that of the Osage Allotment Act, "although the
9  contemplated surface uses under the SRHA are perhaps
10 narrower than the general grant of surface rights for
11 patentees under the Osage Allotment Act."  Do you have an
12 understanding of what that sentence means?

13      A   I do not.

14      Q   I'm sorry.  What was your answer?

15      A   You're asking me to describe SRHA and how it's
16 different from the Osage Allotment Act?

17      Q   Or do you have an understanding of what the
18 significance is of the fact that here the attorneys are
19 saying that the contemplated surface uses under the SRHA
20 are narrower than the Osage Allotment Act?  Do you have
21 any understanding of what the significance of that is?

22      A   Yeah.  I take that to mean that you shouldn't --
23 you should not assume it's directly applicable.

24      Q   But the SRHA is directly applicable?

25      A   Not assume that it's directly applicable because

Page 68

1  it's a different scope.

2    Q   Okay.  Let's see here.  And so, you know, at
3  this point, we're looking at this memo being sent to -- of
4  course, first of all, the memo, this is dated October 20,
5  2014.  At that point do you recall whether or not the
6  United States had asked or had demanded that Enel and
7  EGPNA stop construction at the Osage Wind Farm?

8    A   I do not recall if at this point that had
9  happened.  I know that did happen around this time.

10      Q   Okay.  And when that did happen, whether it was
11 before or after this memo was sent, did defendants in this
12 case, Osage Wind, EGPNA, Enel Kansas, did defendants stop
13 construction at the Osage Wind Farm?

14      A   My job was in Kansas City in an office, and so I
15 can't tell you if the field crew did or did not actively
16 stop, but I assume there's someone else who you can talk
17 to who did.

18      Q   Do you know who at Enel or EGPNA would have been
19 in charge and made the decision to not stop construction
20 in October of 2014?

21      A   I don't know.  It could have been possibly maybe
22 Nick Lincon would be someone who may know that answer.

23      Q   Okay.  Do you know whether or not the memo that
24 we just reviewed, Exhibit 81, the October 2014 version of
25 the memo, was that relied on in making the determination

Page 69

1  to not stop construction?

2      MR. RAY:  Object to form.

3      A   My recollection is that memo was relied on from
4  the beginning as the de facto evidence that what we were
5  doing was not mining.  Anything to the contrary was a
6  misunderstanding.

7      Q   (BY MS. NAGLE) And before you -- let me rephrase
8  that.

9      So -- okay.  Okay.  When did you personally
10 reach the conclusion that the construction activities and
11 excavation at the Osage Mineral -- of the Osage mineral
12 estate did not constitute mining?

13      MR. RAY:  Object to form.

14      A   I think the solicitation of expert input was the
15 correct action, and so in late 2013, going to our direct
16 law representatives and having them find an expert, which
17 was Modrall Sperling, who had experience with, you know,
18 tribal interaction such as this, after reviewing that
19 information, I felt confident that the answer we had
20 received and the answer we had discussed was the correct
21 one.

22      Q   (BY MS. NAGLE) Was there ever a time when you
23 were uncertain as to whether or not a permit would be
24 required from Osage Nation?

25      A   I have never been uncertain that a permit was

Page 70

1 required.
2    Q  Fair enough.  Let's move on to our next exhibit.
3 If you'll give me just a moment to pull it up.  I'm a
4 one-man shop over here today.  Okay.  So I'm going to
5 share my screen.  This will be Exhibit 91, and it is Bates
6 stamped Osage Wind Priv-000357.  I will note at the top
7 you are copied on an email from Steve Willman to Lynn
8 Slade, dated April 25, 2014.
9       (WHEREUPON, Exhibit 91 was marked for
10 identification.)
11      Let's see.  Would you like for me to start at
12 the bottom?  I can.
13    A  That would be great, actually, if you could.
14    Q  Okay.  So that's -- so here's Justin Larson
15 emailing John Blickensderfer -- sorry, I butchered that
16 name -- February 27, 2014.  Justin writes John, "Do you
17 have any experience with this?  What type of work have you
18 seen performed where the entity had to actually acquire
19 this permit?  Curious to what extent this is a risk for
20 turbine excavations as well as roadwork or even water
21 wells for domestic usage."  Who is Justin Larson?
22    A  Justin would have been the head of the
23 engineering department and Tradewind.
24    Q  Okay.  And would he have been responsible for
25 that analysis you mentioned earlier in terms of studying

Page 71

1 the soil type to determine the design structure for the
2 wind turbines?
3       MR. RAY:  Object to form.
4    A  He would have initiated a third-party to do that
5 survey likely at this time, depending on if the ownership
6 had changed to Enel yet, but I suspect he was involved.
7    Q  (BY MS. NAGLE) Okay.  And who's John
8 Blickensderfer?
9    A  I believe he was a consultant who had worked in
10 Osage County prior, and I believe it's Guy Engineering
11 Services, which it says above that, which actually may
12 have been the one who did the foundation design.  But they
13 had been doing work for us, design work for us at other
14 projects, if not this one.
15    Q  Okay.  I note here the subject of this is "Osage
16 Mining Permit".  Do you know what prompted Justin Larson
17 in February of 2014 to ask this question about an Osage
18 mining permit?
19    A  I don't have an exact recollection of the
20 meeting in which Justin was tasked to ask this question,
21 but I believe it to be after an external communication
22 came in that says you need this.  I think it was the --
23 maybe it was the BIA letter that was around that same
24 time.  But one of those communications triggered an
25 internal discussion in which Justin was asked to reach out

Page 72

1 to someone who may have some other information that we
2 hadn't thought about or considered.
3    Q  Okay.  So you believe there was an external
4 communication from the BIA at this time, but you're not
5 sure exactly what that communication was?
6       MR. RAY:  Object to form.
7    A  I see February.  I mean, its been seven years.
8 I mean, I can't remember the exact communication that came
9 in, but at this point, certainly in late 2013 we were
10 aware of this possible accusation, you know, per the OMC
11 letter, Osage Minerals Council letter, so it wouldn't have
12 been abnormal to continue to investigate.
13    Q  (BY MS. NAGLE) Uh-huh.  Do you know if Justin
14 Larson ever received a copy of the memo that we looked at
15 from October 2013 saying that no permit was required,
16 Exhibit 36?
17       MR. RAY:  Object to form.
18    A  I do not know.
19    Q  (BY MS. NAGLE) You do not know.  So is it true
20 that perhaps some of the individuals working at Tradewind
21 or other Enel affiliates were not -- were not aware of the
22 legal analysis saying that a permit was not required?
23       MR. RAY:  Object to form.
24    A  Anyone directly involved in the Osage Wind
25 project was aware of this concept, and everyone who I was

Page 73

1 working with had the same opinion I gave you that what we
2 were doing was not mining per our understanding per the
3 memo.
4    Q  (BY MS. NAGLE) So if we go forward here, Justin
5 sends this to you on February 28, 2014.  "This is the
6 special provision that is associated with all projects let
7 in Osage County.  The contractors are responsible for
8 obtaining this permit and paying the associated fees.
9 ODOT and City of Tulsa do not pay this as a separate pay
10 item.  The contractor includes this cost in other items of
11 work."  And then it looks like you forward this email to
12 Darren B. Neil, Steve Willman, and Matt Gilhousen.  Who is
13 Darren Neil?
14    A  Darren Neil is an associate of Steve Willman.
15    Q  Okay.  And why did you forward this email to
16 Darren, Steve, and Matt?
17    A  Matt, my direct boss, was -- obviously needed to
18 know.  Steve and Darren worked closely together on all
19 things Tradewind at the time.
20    Q  Okay.  Okay.  Okay.  Just a moment.  Let me pull
21 up the next exhibit.  And so I'm now going to introduce
22 this document as Exhibit 92, and I will note for the
23 record that it is Bates stamped Osage Wind Priv-000359,
24 and this document is entitled Oklahoma Department of
25 Transportation Special Provision for Osage Nation Mineral

Page 74

1    Reservation Sandy Soil Permit -- Sandy Soil Mining Permit.
2    Excuse me.
3         Have you seen this document before, Mr. Weigel?
4         (WHEREUPON, Exhibit 92 was marked for
5    identification.)
6    A   I have not. I have seen summaries.
7    Q   Okay. So going back to Exhibit 91, it looks
8    like there were some -- what it looks like to me is that
9    there were some attachments to this email because this is
10   Bates stamped Osage Wind Priv 000357. This is right after
11   that. 000359. Do you recall whether or not -- I'm sorry.
12   Let me back up.
13        Let's go back to Exhibit 91 here where we
14   actually see Steve Willman send, "Attached are documents
15   received from Guy Engineering regarding BIA permitting.
16   It appears that the special provision applies to
17   specifications for highway construction. Please let us
18   know your thoughts." And so -- so these are attachments
19   to Steve Willman's cover email which I neglected to show
20   you. My apologies for that. And you'll see here, it says
21   "Osage Mineral Permit.pdf" and "Transportation Improvement
22   Program". There's another PDF here. And I note that you
23   are copied up here.
24        So with that in mind, going to the attachment
25   now that has been entered as Exhibit 92, do you recall

Page 75

1    receiving this as an attachment to Steve William --
2    Willman's February 2014 email to you?
3         MR. RAY: Object to form.
4    A   I do not recall reading this document that came
5    through. I do recall the summary, as I mentioned, that it
6    was provided from Modrall Sperling had kind of digested
7    this document, as the email traffic showed.
8    Q   (BY MS. NAGLE) Uh-huh. And what was your
9    understanding at that time of the significance of this
10   document?
11   A   That it pertained to the construction of
12   highways, which was, from an engineering perspective, very
13   different than what we were talking about doing in terms
14   of just backfill.
15   Q   Uh-huh. Okay. And then I'm also now going to
16   introduce Exhibit, I believe, 93. And so this will be
17   Exhibit 93, and it is Bates stamped Osage Wind
18   Priv-000361, which, in terms of the way in which
19   defendants produced this, seems to be the second
20   attachment here, I would believe. At least one of these
21   two attachments here referenced in Steve Willman's cover
22   email. Are you familiar with this document labeled
23   Procedures for Obtaining Sandy Soil and Rock Mining
24   Permits, Osage County, Oklahoma?
25        (WHEREUPON, Exhibit 93 was marked for

Page 76

1    identification.
2    A   I don't recall reviewing it closely. Again, I
3    kind of let it go through the legal process.
4    Q   And so when you say you "let it go through the
5    legal process", who in terms of the team of attorneys that
6    you relied on would have reviewed this document?
7         MR. RAY: Object to form.
8    A   Yeah. It would have been primarily interacting
9    with Lynn or Steve interacting with Lynn.
10   Q   (BY MS. NAGLE) Do you know whether they took
11   this into consideration in terms of forming the legal
12   analysis that you relied on either in October 2013 or
13   October 2014?
14   A   Yeah, I don't know.
15   Q   You don't know. Okay. Did -- going back to
16   Exhibit 91, did anyone here ever follow up with John, the
17   vice president of engineering here from Guy Engineering,
18   with regards to the attachments or their legal
19   significance in terms of a mining permit?
20        MR. RAY: Object to form.
21   A   I believe, based on this context, there wouldn't
22   have been any reason to reach back out to John.
23   Q   (BY MS. NAGLE) And why do you say that? Why
24   would there be no reason to reach back out to him?
25   A   John, the consultant from Guy Engineering, was

Page 77

1    not, I think, part of the IEA subcontractor responsible
2    for construction or any decision making relative to the
3    project going forward. I recall this to be an exploration
4    for more -- more information, which we received the
5    documents and then digested those documents into
6    ultimately what became the memo into what ultimately
7    formed our opinion.
8    Q   Okay. So I think earlier you stated you weren't
9    sure if these documents, specifically Exhibit 93 here and
10   Exhibit 92, were considered for purposes of formation of
11   the October 2013 legal analysis or the October 2014 legal
12   analysis. Is that correct?
13   A   I said I cannot tell you that they specifically
14   incorporated these documents into their analysis, but we
15   did -- they were received by them, I would expect. It
16   would be reasonable for the law firm to review documents
17   that were sent from the client saying, you know, consider
18   these documents. It's a reasonable expectation, but I
19   can't say without a doubt they did because I didn't
20   prepare them.
21   Q   Did you or Matt Gilhousen or anyone else at
22   Tradewind or Enel ever follow up with your attorneys,
23   Steve Willman or Modrall Sperling, to find out whether
24   they considered these particular documents, Exhibits 92
25   and 93, in the formation of their legal analysis?

Page 78

1   MR. RAY:  Object to form.

2   A   I can't recall that exact question being asked.

3   Q   (BY MS. NAGLE)  Okay.  Fair enough.  So now let's

4   see here.  I'm going to introduce another exhibit.  Oh,

5   here we go.

6       Okay.  My apologies for the delay.  So this will

7   be Exhibit 94, and Exhibit 94 is Bates stamped Osage Wind

8   Priv-000615.  I will note that at the top here, the very

9   top email is from Lynn Slade to Matt Gilhousen,

10  copying Bill Scott, Steve Willman, Rob Freeman, and

11  yourself, with a copy to Bill Scott dated October 25,

12  2014.  Let me actually see if there's a bottom.  Okay.  So

13  that's just a signature.  Well, wait a second.  No.  The

14  bottom email is from Matt Gilhousen to yourself, Lynn

15  Slade, Bill Scott, and Steve Willman and Rob Freeman,

16  October 25, 2013, mineral stat -- I'm assuming that's a

17  typo and he means statutes.  Matt writes, "Can one of you

18  send out the specific language from the statute that

19  describes what mineral-related activity does require a

20  permit from the BIA?"

21      And Lynn responds to that here with his email

22  from -- dated October 25, 2013, "Matt, although there are

23  specific regulations governing leasing of minerals other

24  than oil and gas on other such lands, they likely are also

25  subject to the regulations under the Indian Mineral

Page 79

1   Leasing Act in 25 C.F.R. part 211 which are referenced in

2   my earlier email.  Here are quotations from key provisions

3   of both sets of regulations," et cetera, et cetera.

4       What is your understanding of why in October of

5   2013 Matt Gilhousen is asking for this analysis at this

6   point in time?

7       (WHEREUPON, Exhibit 94 was marked for

8   identification.)

9   A   I don't know what his intent was when sending --

10  was sending that email.  As I said earlier, the Enel team

11  is 70,000 people, and this is a conversation we had,

12  I would say, with somewhat regular recurrence between that

13  2013 date and, you know, the end of construction.  So

14  typically it was to include additional parties that were

15  getting involved at the different stages.

16  Q   Okay.

17  A   But that is -- again, you'd have to ask Matt

18  what prompted that email.

19  Q   Uh-huh.  And it looks like this pre dates the

20  October 31, 2013 memo that we looked at in Exhibit 36.

21  Down here at the bottom it says no mining or work of any

22  nature will be permitted upon any tract of land until a

23  lease covering such tract shall have been approved by the

24  BIA.  This is coming from 25 C.F.R. 214.7.

25      What was your understanding of these regulations

Page 80

1   when you read this email from Lynn Slade?

2   A   I guess this was still early enough that

3   information was being collected and more information was

4   needed to formulate an opinion at this point, based on

5   what I read.

6   Q   So this was the stage when the legal research

7   for the legal analysis was being done.  Is that correct?

8       MR. RAY:  Object to form.

9   A   Yeah.  I can't recall the exact dates of when

10  that memo was actually received.  It was around this time,

11  right, October of 2013?

12  Q   (BY MS. NAGLE)  Fair enough.  So let me go to my

13  next exhibit.  So -- okay.  All right.  So the next

14  exhibit I will show you we will mark as Exhibit 95, and I

15  will note for the record this document is Bates stamped --

16  sorry -- IEA 00226838, and at the top it says "Meeting

17  Notes", dated June 5, 2014, Osage Wind project, Osage

18  County, Oklahoma.  Topic, "Osage Daily C&G Update".

19  Participants are listed as Ron Ritter, Andrew Landoll,

20  Aaron Weigel, Justin Larson (notes), Khawar Hameed, Craig

21  Mazurowski, Jared Linden, and Randy Gardner.  So I note

22  you are listed here as a participant.

23      What does the C&G update -- what does C&G stand

24  for?

25      (WHEREUPON, Exhibit 95 was marked for

Page 81

1   identification.)

2   A   I actually don't know that.

3   Q   Okay.  Fair enough.  What was your role in these

4   meetings?

5   A   I would have been playing the developer role,

6   which, again, is just coordinating activities across

7   different departments.  Justin is obviously an engineer in

8   this case.

9   Q   Okay.  Justin Larson, the engineer?

10  A   Yeah.

11  Q   Okay.  And who's Ron Ritter?

12  A   Ron was a representative from IEA.

13  Q   And what was his role in the project?

14  A   I don't know his specific title.  I know he was

15  involved in contractual and oversight activities.

16  Q   Okay.  Who's Andrew Landoll?

17  A   Andrew Landoll was a Tradewind employee in the

18  field services department who supported for a short time

19  activities in the field at the Osage Wind project.

20  Q   What sorts of activities?  Like the excavation

21  activities or something else?

22  A   No.  I mean, it wasn't specific at all to -- to

23  any one piece.  At this time, and really, I guess,

24  throughout all time, after a project transitions from

25  ownership of Tradewind into Enel, Tradewind would take a

Page 82

1  role that is advisory, and it's always our need to protect
2  some of the obligations we had made to land owners. For
3  example, sometimes you make specific obligations and you
4  say, well, you can't construct here or you shouldn't cut
5  that tree down or very specific things that were in our
6  interest to make sure we kept those promises, and so we
7  tended to have someone there during, you know, certain
8  activities to make sure those obligations were met, so
9  that would have been his role during this time.
10      Q   Okay. And we discussed Justin Larson. Who is
11  Khawar Hameed?
12      A   I do not recognize that name.
13      Q   Who is Craig Mazurowski?
14      A   His role is with IEA I do remember, but I don't
15  know what his title was.
16      Q   Okay. And who was Jared Linden?
17      A   I don't know Jared Linden.
18      Q   Okay. What about Randy Gardener?
19      A   I'm pretty sure that was an IEA person, but --
20      Q   Okay. Fair enough. I understand it's seven
21  years ago, so. Item number four under discussion here
22  states, "Ron reviewing the need for borrow pit depicted on
23  plan set. Will review in field and report back to group."
24      What was the outcome of that review?
25      A   It's entirely likely I wasn't included, but --

Page 83

1  so I don't know, I guess.
2      Q   Okay. Do you know whether a borrow pit was ever
3  a part of the plan for the Osage Wind Farm?
4      A   I recall discussions about whether a borrow pit
5  would be needed, and oftentimes it comes down to the
6  design you choose and where you pick the roads and the way
7  you construct those roads. I know that there are
8  oftentimes dozens of iterations of designs for projects
9  and the goal is to optimize to the most affordable
10  construction type, and to the extent you can use dirt
11  that's already there, it's often cheaper than going and
12  borrowing dirt from other places. So this would have been
13  part of the design optimization process, which would have
14  fallen under Justin at the Tradewind level to make sure he
15  was managing, and then I suspect IEA and a third-party
16  engineer would have been working on the iterations of that
17  design.
18      Q   Okay. Fair enough. Let's move on to my next
19  exhibit. So just a second. So this is a document that
20  was previously entered in a prior deposition as
21  Exhibit 53, and I will note that it is Bates stamped
22  IEA-00227119. And if we go down to the bottom, the very
23  bottom email here is from Brian Jensen dated July 9, 2014
24  to Randy Gardner, Ron Ritter, Jacob Valentine and some
25  other folks, subject matter "Osage Fill Material". I will

Page 84

1  note you are copied. I believe you're copied here. There
2  we go. Yeah. So you are copied up here at the very top
3  in this top email from Ron Ritter to Giuseppe DiMarzio,
4  dated July 9, 2014.
5      But to go step by step, this bottom email
6  here -- let's see. First of all, who is Brian Jensen?
7      A   Brian would have been a project engineer working
8  underneath Justin Larson.
9      Q   Okay. And he writes, "As we discussed in the
10  past, we will not be able to transport fill from one part
11  of the project to another due to Osage mining laws." What
12  is your understanding of what Brian is referring to here
13  when he refers to the Osage mining laws?
14      A   Brian, being in a relatively distant location
15  from the discussions around the project, is, I think,
16  attempting to comment on the contents of what the memo is
17  which is what are the rules that guide the need for a
18  sandy soil permit.
19      Q   How were the contents of that October 13 --
20  sorry -- October 31, 2013 email that we looked at,
21  Exhibit 36, how were the contents of that email
22  communicated to other folks like Brian Jensen or others at
23  Tradewind?
24      A   I would suspect -- not suspect. It was
25  certainly discussed with heads of departments. So Justin,

Page 85

1  being Brian's boss, would have been responsible for
2  comprehending what that memo and that specific content was
3  and directing his employees to work in a way that was
4  planned.
5      Q   Uh-huh. Do you agree that he has correctly
6  interpreted the memo here where he writes, "We will not be
7  able to transport fill from one part of the project to
8  another due to Osage mining laws"?
9      MR. RAY:  Object to form.
10      A   No. What he's -- what he's attempting to do --
11  you'd have to ask him what his intent was from those
12  words, I suppose. My interpretation is that he's
13  referencing a topic that he didn't well understand as well
14  as Justin or I would have.
15      Q   (BY MS. NAGLE)  I see. Okay. And so Justin, his
16  supervisor, is the individual who would have been educated
17  on the contents of the October 2013 legal analysis. Is
18  that correct?
19      A   I believe he would understand it, yes.
20      Q   Okay. And a little further on he writes, "How
21  much fill are you anticipating hauling into the site?
22  Will this be a change order as construction plans
23  initially had a borrow-on-project site which is no longer
24  a viable method." Do you have an understanding of why the
25  borrow pit was no longer a viable method?



Aaron Weigel    6/29/2021    23 (86 - 89)

Page 86

1 A  I can answer that throughout the design
2 optimization process, as I mentioned -- there was an email
3 of me being frustrated earlier about the litigation that
4 had happened so far.  Not a surprise comment.  The way we
5 optimize the project was with the intent that a lawsuit
6 may in fact happen and that we wanted to build the site in
7 as minimal impact as possible so as to, you know, minimize
8 the likelihood of a -- of a lawsuit.
9 Q  So --
10 A  Despite us believing that it was not mining.
11 Q  I see.  So really what Brian is communicating
12 here is less -- less adherent to the actual detailed legal
13 analysis we looked at in Exhibit 36 and more of the
14 instructions he received to sort of be very conservative
15 and create the best record possible should litigation
16 arise.  Is that correct?
17 MR. RAY:  Object to form.
18 A  I believe he was instructed that way from
19 Justin.
20 Q  (BY MS. NAGLE) Going up here, on July 9th, Ron
21 Ritter responds, and he says, "We intend to balance the
22 site."  What is your understanding -- I know we discussed
23 this a little bit earlier.  But here, what is younger of
24 what Ron is referring to by saying, "We intend to balance
25 the site"?

Page 87

1 A  My knowledge of balance is that in lieu of
2 borrowing from somewhere else to fill, you would take an
3 area that's not level and you would dig from the high
4 side, move it to the low side in order to make something
5 level.
6 Q  Okay.  So he says, "That process, along with the
7 excavation of the foundation itself, will develop the vast
8 majority of materials we need for fill and for associated
9 sloping.  However, should we need to import fill, the
10 quarry in Burbank from which we are deriving our access
11 road aggregate can supply us off site material."  Do you
12 know if there were any further conversations at Enel or
13 Tradewind about importing off site fill materials from
14 Burbank?
15 MR. RAY:  Object to form.
16 A  Well, the term aggregate and fill are different
17 in this sentence.  And I -- aggregate was certainly
18 purchased off site, as was always the intent.  I don't
19 know if fill ultimately was ever needed, and therefore I
20 was not part of conversations to purchase any.
21 Q  (BY MS. NAGLE) Okay.  And so then --
22 unfortunately our stamp here is right over Giuseppe's
23 email, but Ron has another email up here to Giuseppe, and
24 he writes -- he writes, "It would not be practical for us
25 to perform this work with imported fill at no extra cost

Page 88

1 if the original scope was for us to be allowed to mine on
2 site fill."  What does Ron mean by "mine on site fill"?
3 MR. RAY:  Object to form.
4 A  You'd have to ask him.  My understanding is he's
5 talking about borrow pits.
6 Q  (BY MS. NAGLE) Okay.  All right.  Let's move on
7 to our next document that we have here.  Okay.  So this is
8 a document that has previously been entered as Exhibit 37,
9 and it is Bates stamped Osage Wind-024749, and up here at
10 the top, it's an email from Joan Heredia to Aaron Landoll
11 and you, copying a lot of folks, I won't read all their
12 names, dated May 22, 2014.  Do you remember this email?
13 A  I'd have to look through it from the bottom, if
14 we could.
15 Q  No problem.  We will do that.  So at the bottom,
16 it looks like here we have an email from Khawar Hameed.  I
17 know earlier you stated you weren't sure who he is.  It
18 does look like he's from EGPNA here.  He writes on
19 Thursday May 22, 2014, "Attached please find the POD from
20 today."  What is the "POD from today"?  Do you know?
21 A  Plan of the day.
22 Q  Okay.  I see.  All right.  And then up above
23 that, Joan Heredia responds.  You're, you know, one of the
24 recipients.  She says, "Aaron," presumably to you, "I note
25 in the attached POD sieve analysis being performed for

Page 89

1 road aggregate.  In an abundance of caution that we do not
2 want to trigger a minerals permit, will you please look
3 into this and report back to this group on what the plans
4 are.  I know it is common to try to use on site material
5 when possible, but as you know, Osage is special."
6 You then write back on May 22nd to Ron, Mike,
7 Craig -- or I guess you were forwarding, I suppose.  It's
8 actually hard to see because it doesn't say that here.
9 "It is my understanding that the sieve analysis is on
10 aggregate that is coming from the quarry, but as Joan
11 suggests below, please confirm that's the case.  It's very
12 important that we not remove ANY," in all caps, "soil from
13 the project site or use site materials in lieu of
14 materials we would typically buy off site in developing a
15 wind project."
16 Why did you tell Ron, Mike, and -- Ron, Mike,
17 and Craig that it would be important to not use site
18 materials in lieu of materials we would typically buy off
19 site in developing a wind project?
20 A  It's in an incredibly important distinction
21 between backfill and aggregate, and this email is about
22 aggregate, which would typically be purchased off site.
23 As -- I'm not a civil engineer, but a sieve analysis would
24 be a measurement around aggregate, and this communication
25 is to confirm, because at this point Joan saw something in

Page 90

1   the plan of the day, alerted me, I'm confirming the
2   understanding with the field people that when we are using
3   aggregate, it's coming from off site.
4        Q    And so that distinction you've made between
5   backfill and aggregate, is that a distinction you made
6   based on the legal analysis performed by Modrall Sperling?
7        MR. RAY:  Object to form.
8        A    That legal analysis, I think, had commentary
9   about making commercial use of materials, and while it was
10  not ultimately determined that you were not allowed to do
11  that, we, out of abundance of caution, said, to be very
12  clear, if it's something we normally buy, we will continue
13  to buy it, and so not replacing any material for something
14  you would commercially otherwise have to buy; therefore,
15  putting a turbine foundation in, we would never buy
16  materials for there, dig it out, put it in, but for roads
17  and for aggregate specifically, we normally would buy rock
18  for the roads, so let's go buy rock from the quarry, as we
19  did at this site.
20       Q    (BY MS. NAGLE) So I understand that distinction
21  that you're making here in now in terms of the aggregate
22  for the roads and backfill for a turbine and what you all,
23  you know, would normally do in the ordinary course of
24  business, but do you -- I guess, could you help me
25  understand how did the legal analysis that we looked at in

Page 91

1   Exhibit 36 explain or justify that distinction between
2   backfill versus aggregate, or did the attorneys not
3   consider that at all?
4        MR. RAY:  Object to form.
5        A    I would have to go back and reread all the
6   recommendations --
7        Q    (BY MS. NAGLE) Sure.
8        A    -- that were in that memo to determine, you
9   know, how that relates.  Like I can tell you that after
10  receiving the memo and between this time, start of
11  construction, as I said, we had conversations to try and
12  take the absolute safest, most clear course of action, and
13  that included that distinction of aggregate being
14  purchased outside or not based on conversations with
15  lawyers.
16       Q    Okay.  I will note looking back at Exhibit 36
17  right now, the question's presented whether "a surface
18  owner who excavates land for the purpose of construction
19  consistent with its surface rights and does not remove the
20  land excavated from the property is engaged in mining of
21  the mineral state and requires a mining permit".  I don't
22  see anything in here in relation as to whether it's for
23  backfill or aggregate purposes, but is that your
24  understanding that that was part of this legal analysis?
25       MR. RAY:  Object to form.

Page 92

1        A    I can't tell you if that specific information
2   was considered in drafting this document.  I can tell you
3   it was discussed at Tradewinds in response to this.
4        Q    (BY MS. NAGLE) And who would have been a part of
5   these conversations at Tradewind with regards to the legal
6   distinction between backfill and aggregate?
7        A    I suspect Matt Gilhousen would have been
8   involved.
9        Q    Uh-huh.
10       A    His background is civil engineering, so --
11       Q    And would any of the attorneys who were involved
12  in creating this legal analysis here in Exhibit 36, would
13  they have been involved in those conversations?
14       A    There were numerous times when they were
15  involved in discussions about this memo.  Whether that
16  specific topic was raised, I can't tell you exactly that
17  it was.
18       Q    Okay.  Do you know whether Bill Scott and Sarah
19  Stevenson, when they undertook the effort to write this
20  email, were they aware of the distinction that you and the
21  others at Tradewind were making for backfill and aggregate
22  for legal purposes?
23       MR. RAY:  Object to form.
24       A    I do not know if they were aware of that.
25       Q    (BY MS. NAGLE) Okay.  Do you know if Lynn Slade

Page 93

1   was aware of that distinction you were making between
2   backfill and aggregate for legal purposes?
3        A    I do not know if they were aware of that.
4        Q    Okay.  So going back to Exhibit 37 here, you
5   continue after that sentence to state, "Osage Nation has
6   mineral rights for the project lands, and removal of soil,
7   especially for commercial gain, could constitute mining."
8   You state later on, "Please make sure this message is
9   widely communicated to any subcontractors working on the
10  project."  What steps were taken by Tradewind or Enel to
11  ensure that this message was widely communicated to the
12  subcontractors working on the project?
13       MR. RAY:  Object to form.
14       A    This communication is an example.  The person I
15  would have been responsible with communicating with would
16  have been Ron Ritter, as we previously discussed, as the
17  primary IEA contact.  It would have been in a, you know,
18  supervisory managerial role and expected to accomplish
19  that from his side. I don't know what record he may or
20  may not have of that that occurred below him.
21       Q    (BY MS. NAGLE) Okay.  So you would have looked
22  to Ron to communicate the messaging you gave here in this
23  email about what is permissible and what's not permissible
24  under Osage mining laws, he would have been tasked with
25  communicating that to the subcontractors?

Page 94

```
1        MR. RAY:  Object to form.
2    A  He along with the others in this email who
3  generally represented management the on site.
4    Q   (BY MS. NAGLE)  Okay.  And did Ron, Mike, or
5  Craig ever get to actually review the contents of what we
6  just looked at, Exhibit 36, the October 2013 email from
7  Modrall Sperling?
8    A  I don't know.
9    Q  Okay.  Okay.  So where Joan writes, "As you
10 know, Osage is special," what did she mean?  What was your
11 understanding of what she meant by that?
12   A  You'd have to ask her --
13   Q  Okay.
14   A  -- what she meant by special.
15   Q  Fair enough.  Let me move on to our next
16 exhibit.  So let's see here.  Okay.  This has previously
17 been entered as Exhibit 8 in this litigation, and it is
18 Bates stamped -- oh, and, unfortunately, we don't have the
19 court reporter's stamp on this, and I'm not sure why
20 that's the case.  But I can represent to you this is
21 Exhibit 8.  It's Bates stamped Osage Wind Priv-000089, and
22 it is an email from Joan Heredia to Daren Daters and
23 Giuseppe DiMarzio.  Let's see here.  Have you seen this
24 email exchange before?
25   A  I believe I have seen this before, yes.
```

Page 95

```
1    Q  Okay.  So she writes, "It is very important that
2  we not remove any soil from the project site or use site
3  materials in lieu of materials we would typically buy off
4  site in developing a wind project.  Osage Nation has
5  mineral rights for the project lands, and removal of the
6  soil, especially for commercial gain, could constitute
7  mining."  This appears to me, I'll represent to you, to be
8  an exact word for words copy and paste of what you said in
9  the exhibit we just looked at.  Would you agree with that?
10       MR. RAY:  Object to form.
11   A  I would agree.
12   Q   (BY MS. NAGLE)  Was -- do you recall whether or
13 not that was purposeful for you and Joan to be copying and
14 pasting the news in the exact same language?
15       MR. RAY:  Object to form.
16   A  Joan and I and others were continuously in
17 communication around this time, and it would not be
18 uncommon for us to be, you know, collaborating or
19 communicating the same -- the same thing and making sure
20 the messaging was consistent.
21   Q   (BY MS. NAGLE)  So I note her email's dated
22 May 15th and yours is dated May 22nd.  How would you have
23 gotten the quote you used in your email from her to use in
24 your May 22nd email?
25   A  Yeah, I don't know.
```

Page 96

```
1    Q  Okay.
2    A  There -- I don't know.
3    Q  Was Joan given a copy of the October 2013
4  memorandum from Modrall Sperling that we looked at in
5  Exhibit 36?
6        MR. RAY:  Object to form.
7    A  I believe Joan to have been provided a copy of
8  that memo, but I don't have a record of it in front of me
9  to confirm, but --
10   Q   (BY MS. NAGLE)  Okay.
11   A  -- she certainly should have.
12   Q  Okay.  Did you -- in terms of deciding how to
13 communicate what is permissible and not permissible under
14 Osage Nation mineral laws, mining laws to the team, did
15 you take your orders from Joan or did Joan tell you how to
16 communicate these things?  Who was in charge with regards
17 to those instructions?
18       MR. RAY:  Object to form.
19   A  Neither of us would directly report to each
20 other.
21   Q   (BY MS. NAGLE)  Okay.  Do you have an
22 understanding of why this language that you and Joan are
23 using in May of 2014 to communicate to others working on
24 the Osage Wind Farm, why this particular language was not
25 included in the October 2014 version of the memo,
```

Page 97

```
1  Exhibit 81 that was sent to Alan Woodcock?
2    A  I, you know, would not expect a lawyer to grab
3  email language and put it in an memo, I guess.
4    Q   (BY MS. NAGLE)  Okay.  But beyond that
5  expectation, you don't have an understanding of why this
6  language didn't end up in the version of the memo that was
7  sent to Alan Woodcock?
8    A  This would have been written by either Joan or
9  I.  I can't tell you which one or if there's other email
10 traffic.  So I can't tell you why it didn't make it into
11 the memo, no.
12   Q  Was this language that you or Joan wrote based
13 on your reading of the detailed legal analysis that
14 Modrall Sperling provided to you?
15       MR. RAY:  Object to form.
16   A  This does not look like language that was in the
17 memos, and it looks like something that was written by
18 someone in the company.
19   Q   (BY MS. NAGLE)  Would it have been written based
20 on the detailed legal analysis that your attorneys
21 provided?
22       MR. RAY:  Object to form.
23   A  I would say anything I wrote that was around
24 this mining issue was very well informed by that memo.
```

Page 98

1    Q   (BY MS. NAGLE) Would you have run this language
2    by the attorneys who wrote that memo before disseminating
3    it to the team?
4    A   No.
5    Q   No.  Okay.  In your view, is this language in
6    agreement with or in accordance with the legal analysis in
7    the memo?
8        MR. RAY:  Object to form.
9    A   I'm not sure I can make that assessment.
10   Q   (BY MS. NAGLE) Would you have made that
11   assessment before sending this language in 2014?
12   A   I would have sent direction I thought was
13   appropriate, so.
14   Q   And in determining what's appropriate to tell
15   the team, would you have relied on the legal analysis that
16   you got from Modrall Sperling regarding Osage mining laws?
17   A   Yes.
18   Q   Let's move on to the next exhibit.  Let's see
19   here.  Okay.  This will be Exhibit 96, and I will note
20   that it is Bates stamped IEA 00239657, and it looks like
21   another set of meeting notes.  This one is dated June 30,
22   2014, participants are Ron Ritter, Craig Mazurowski, Mike
23   Welch, Randy Gardner, Bill Maluska, Brian Jensen, Rod
24   Northway, Aaron Weigel.  We discussed -- who's Mike well?
25       (WHEREUPON, Exhibit 96 was marked for

Page 99

1    identification.)
2    A   I believe he was an IEA employee.
3    Q   Okay.  Do you remember what his roles or
4    responsibilities were with regards to this project?
5    A   I recall him being on site.  I don't know what
6    his responsibilities were.
7    Q   Okay.  Who is Bill Maluska?
8    A   A employee who, again, was, I think, tasked with
9    on site management of some level.
10   Q   Okay.  Who's Rod Northway?
11   A   Rod Northway was an additional developer like
12   me.
13   Q   Okay.  Did you interface in any kind of regular
14   manner with Rod Northway?
15   A   We work in the same office.  Rod came in
16   somewhat late in this process to help support making sure
17   all the development activities were covered.
18   Q   Okay.  Under the action items here on page two
19   in this document, we see here "earthwork balance
20   confirmation for mitigation of Osage mining permit risk"
21   is assigned to Jacob.  Does "Jacob" here refer to Jacob
22   Valentine?
23   A   That's a good question.  Was there a Jacob
24   Valentine there, like -- I don't know what Jacob it is, I
25   guess.

Page 100

1    Q   Okay.  So we're not sure who Jacob is.  What is
2    your understanding of what is meant by "Osage mining
3    permit risk"?
4    A   I would describe that as the same litigation
5    risk we discussed previously, which is that, per the memo,
6    we thought we weren't mining, but that we could take steps
7    to make sure that we were constructing in the safest way
8    possible to prevent unnecessary litigation.
9    Q   And was that understanding that you just
10   described as the Osage mining permit risk, was that
11   understanding informed by the legal analysis performed by
12   Modrall Sperling?
13   A   Yes.
14   Q   Okay.  It says -- what -- how would the
15   earthwork balance mitigate the Osage mining permit risk?
16       MR. RAY:  Object to form.
17   A   Yeah.  Earthwork is moving dirt, so I would
18   interpret this as the -- you know, the movement of dirt
19   across the site.
20   Q   (BY MS. NAGLE) Okay.  Who --
21   A   As we discussed earlier, there was an -- there
22   was an attempt earlier to minimize that, right, so I would
23   read this comment as that.
24   Q   And who would determine what sort of earthwork
25   balance would need to be performed to mitigate the Osage

Page 101

1    mining permit risk?
2        MR. RAY:  Object to form.
3    A   Yeah, I don't -- I don't know who would
4    ultimately sign off on that.
5    Q   (BY MS. NAGLE) What is your understanding of why
6    the earthwork balance that was undertaken to mitigate the
7    Osage mining permit risk, those steps and those plans with
8    earthwork balance were not discussed in the October 2013
9    version of the memo we looked at in Exhibit 36?  What is
10   your understanding by why these sort of mitigation efforts
11   were not discussed there?
12       MR. RAY:  Object to form.
13   A   Yeah.  I can't tell you, I guess, why things
14   were or were not included.  I can tell you that the
15   Tradewind team was acting, I believe, in good faith to
16   minimize impacts.
17   Q   (BY MS. NAGLE) And the efforts you undertook to
18   act in good faith to minimize those impacts, for instance,
19   what we're looking at here in this document, were those
20   informed by conversations you had with the attorneys who
21   drafted the detailed legal analysis?
22   A   Certainly the initial starting point was the
23   memo.  Other legal advice, verbal, I can't -- I can't
24   recall whether we specifically talked about minimization
25   efforts.

Page 102

1  Q  Okay. I do know we looked at Exhibit 36, the
2  October 2018 memo, and it referred to the interaction with
3  the subsurface materials as touching the soil and it
4  being, quote, "nearly incidental." Is it your
5  understanding that this earthwork balance confirmation
6  here is within the scope of merely incidental touching of
7  the subsurface soil?
8      MR. RAY: Object to form.
9  A  I personally thought that to be the case that
10 moving dirt for a road was merely incidental.
11 Q  (BY MS. NAGLE) Okay. All right. Let's stop
12 that for just a second. Okay. In your -- in your mind,
13 was -- well, first of all, do you have an understanding of
14 what it refers to when someone at the wind farm does shot
15 and charging or shoot and charging?
16 A  I would need more information to know what that
17 is.
18 Q  Okay. All right. I'm trying to find my next
19 piece of evidence. I've got a lot of things here. Where
20 is it at. That is not -- okay. Okay. Okay. So let's
21 see here. Okay. So moving on to the next exhibit, this
22 will be Exhibit 97. Let me grab it really quick. Here we
23 go.
24     Okay. So this will be Exhibit 97, and this
25 document is Bates stamped Osage Wind-019006, and it looks

Page 103

1  like it's an email from Bill Price to Giuseppe DiMarzio
2  and Bill Maluska called Osage backfill. Have you seen
3  this email exchange before?
4     (WHEREUPON, Exhibit 97 was marked for
5  identification.)
6  A  I don't recall it.
7  Q  Okay. Let's go down to the bottom. It looks
8  like it starts with an email from Matt Johnson to Chris
9  Hanson dated November 4, 2014. There's quite a bit here.
10 I'll let you review it.
11 A  Okay.
12 Q  Okay. Above that, Chris Hanson writes to Craig
13 Mazurowski, Bill Moskaluk and Giuseppe. Giuseppe reached
14 out, "BARR Engineering over the weekend has agreed and
15 inquired as to what variance the project can receive for
16 eliminating the crushing costs." Who is BARR Engineering?
17 A  They provide foundation designs. I suspect they
18 did on this project.
19 Q  Okay. Chris writes, "BARR has recommended
20 nothing larger than 6 inches minus in the 67-foot
21 footprint of the foundation." What does that mean?
22     MR. RAY: Object to form.
23 A  This is a reference to the backfill in that, if
24 you're going put stuff back in the hole, you have to be
25 smaller than 6 inches, each individual piece.

Page 104

1  place in order to ensure that the pieces were smaller than
2  6 inches?
3      Q  (BY MS. NAGLE) Okay. So what would need to take
4      MR. RAY: Object to form.
5  A  I don't know what activities could possibly be
6  taken to make sure that happens. I know crushing could be
7  one of them.
8  Q  (BY MS. NAGLE) Okay. And what is your
9  understanding then of -- with these specifications in
10 place, would it have been possible for Osage Wind or
11 Tradewind or Enel to simply dig up all of the materials
12 there at the Osage Wind Farm and put it all back in the
13 ground as they originally found it? Would that have been
14 possible?
15     MR. RAY: Object to form.
16 A  We know that pieces came out that were bigger
17 than 6 inches, so it would not have met the design for the
18 foundation to put those back in the hole.
19 Q  (BY MS. NAGLE) Okay. Let's -- I've got next --
20 hold on one moment. Let me -- oh, okay. Great. Okay. I
21 see it. Okay. I'm going to move on to another document.
22 Okay. And this document has previously been entered as
23 Exhibit 84. We don't have a court reporter stamp just yet
24 because it was used in yesterday's deposition, but I will
25 let you all know that Exhibit 84 is Bates stamped Osage

Page 105

1  Wind-000114. I note at the top here it's an email from
2  Nick Lincon to David Post and several others. Have you
3  seen this email? It's dated October 16, 2014. Have you
4  seen this email before, Mr. Weigel?
5  A  Don't recall the contents of it, but --
6  Q  Okay.
7  A  I don't recall.
8  Q  So you may or may not have seen this email
9  before. I will say on the earlier version, you are copied
10 here, October 16, 2014 from Joan Heredia to Mike Tierney
11 and Bill Scott and Lynn Slade. Who's Mike Tierney?
12 A  I don't know Mike Tierney's role.
13 Q  I'm sorry. You're saying you don't recall his
14 role?
15 A  Yeah. I don't recall his role. Sorry.
16 Q  Okay. And it looks like Joan Heredia writes --
17 let me make sure I find the exact spot. Oh, I see. Okay.
18 Hold on. Sorry. So she states here in reference to her
19 conversation with the superintendent, "She stated our use
20 of the material would require a permit and that she would
21 send me a form. I indicated we were not using material,
22 rather we were digging a hole and filling back in a hole."
23 Do you see that there?
24 A  Yes.
25 Q  And is your understanding of what Joan is

Page 106

1  stating here -- is your understanding that that's
2  accurate?
3     A   Her opinion would have been formulated per the
4  memo that we were backfilling material that came out of
5  the hole.  That looks accurate to me.
6     Q   Okay.  And she writes, "I replied, no, we were
7  crushing the rock because it varied in size from 3 inches
8  to a couple feet and we had to crush it to put it back
9  into the hole."  Is it correct that you had to crush it to
10 put it back into the hole?
11        MR. RAY:  Object to form.
12     A   Yeah.  You'd have to ask a structural engineer
13 whether it would have been okay to put it back in the
14 multiple feet size.
15     Q   (BY MS. NAGLE) Uh-huh.  She writes here, Joan
16 writes, "I told her I do not have the authority to stop
17 work but stated I would make sure to speak to management
18 tomorrow morning and promised to get back to her with how
19 we intended to proceed."  Were you a part of any of those
20 conversations with management with regards to how to
21 proceed?
22     A   I believe at this point the project had
23 transferred to fully within Enel's control, and my
24 influence was, you know, minimal at this point.  So I
25 don't recall being on those conversations with management.

Page 107

1  It may have not been -- it may not have been appropriate
2  for me to be there either at that time.
3        MS. NAGLE:  Okay.  We'll stop looking at this
4  document and -- just a second.  Okay.  So I'm going to
5  introduce another exhibit.  I also seem to not have this
6  document which is very -- oh, no, maybe I do.  No.  Oh,
7  sorry.  Well, no.  Oh, okay.  No.
8        You know what, I think that I just have a couple
9  more questions, and so what might be helpful is if we just
10 took like a five minute break, and that way I can sort of
11 find out what my final few questions are, and then we can
12 come back and do those and then break for lunch.  Would
13 that work?
14        MR. RAY:  That's fine.
15        MS. NAGLE:  Okay.  So we'll take a five.  Okay?
16 Thanks so much.
17        THE VIDEOGRAPHER:  We are off the record at
18 12:03.
19        (Break taken.)
20        THE VIDEOGRAPHER:  We are back on the record at
21 12:09.
22     Q   (BY MS. NAGLE) All right.  So I have just one
23 last exhibit that I would like to show before I conclude
24 my questioning, so I will be referring to here Exhibit 70.
25 Its previously been entered as Exhibit 70, and it is Bates

Page 108

1  stamped Osage Wind-036433.
2        Have you -- are you familiar with this document?
3  It's titled Project Short Views Update October 17, 2014.
4  Have you seen this before?
5     A   I have not or don't recall.
6     Q   Okay.  All right.  You were still the Osage Wind
7  site coordinator in October 2014.  Is that correct?
8        MR. RAY:  Object to form.
9     A   The Osage Wind site coordinator?  If that's an
10 official definition of something, I'm not aware of it, I
11 guess.
12     Q   (BY MR. RAY) What was your official designation
13 at that time?
14     A   I mean, I still would have been the Tradewind
15 developer of record for the project, but depending on when
16 the actual MIPA happened, when it got sold to Enel, I
17 wouldn't have any official capacity for Osage Winds.
18     Q   Okay.  Let's see here.  So looking all the way
19 down, this is quite a lengthy document here, on page 90 to
20 91 where it says "staff", it lists quite a few folks here.
21 Some of these are some names I know we've mentioned
22 before.  It appears to me these are folks from IEA.  I
23 don't know if would you agree with that.  Chris Hanson,
24 Craig Mazurowski, Mike Welch?
25     A   I recognize those first three names as IEA

Page 109

1  employees.
2     Q   Okay.  Did you ever communicate regularly with
3  any of these individuals regarding the construction and
4  excavation of the Osage Wind Farm?
5     A   Craig and Mike I had at least some interaction
6  with.  Chris I had met a couple times but was not directly
7  involved with my interactions with the sub.
8     Q   Okay.  Up above here we've got issues and
9  concerns on the page ending in Bates stamp 490, and letter
10 "I" here says, "Cut fills are not balancing due to mineral
11 rights issues and land owners."  What is your
12 understanding of -- or were you aware at that time that
13 cut fills were not balancing because of mineral rights
14 issues?
15        MR. RAY:  Object to form.
16     A   Yeah, I would not have been involved in the on
17 site construction that would have led to this.  I
18 described my understand earlier of cut and fill being
19 taking it from where it's high and moving it to where it's
20 low to make flat roads.  I can't tell you what was meant
21 by the person who wrote this comment.
22     Q   (BY MS. NAGLE) It says here "having to
23 import fill from the quarry in some areas".  Were you
24 aware that IEA, for purposes of this construction, was
25 importing fill?



Page 110

1    MR. RAY: Object to form.

2    A    I was not aware.

3    Q    (BY MS. NAGLE) Okay.  It says here under "P",

4    project pressure -- "Project getting pressure from the

5    Osage BIA for a sandy soils permit.  They have issued a

6    request to stop.  Work is proceeding forward via request

7    of EGP."  Do you understand EGP to be a reference to Enel

8    Green Power North America here?

9    A    That's how I would interpret EGP, yes.

10   Q    (BY MS. NAGLE) Okay.

11   A    And how was the determination to not stop

12   construction and excavation communicated to the folks at

13   IEA at that time?

14       MR. RAY: Object to form.

15   A    I would not have been involved in that, so I

16   don't know the answer.

17   Q    (BY MS. NAGLE) Who would have -- who would have

18   been involved in communicating that to IEA?

19       MR. RAY: Object to form.

20   A    I don't know exactly who would have been the

21   person.  It's possible maybe Nick Lincon or someone in his

22   type of capacity would have better knowledge of who would

23   have given a direction.

24       MS. NAGLE: Okay.  All right.  I think -- with

25   that, I think I have concluded all the questioning that I

Page 111

1    have.  Thank you so much, Mr. Weigel, for your time and

2    your patience.  And I would assume that we want to break

3    for lunch before turning to the United States.

4        MR. FIELDS: Yes.  That would be our request.

5        MS. NAGLE: Okay.  So I think we can go off the

6    record.

7        THE VIDEOGRAPHER: We are off the record at

8    12:14.

9        (Break taken.)

10       THE VIDEOGRAPHER: We are back on the record at

11   1:01.

12       CROSS-EXAMINATION

13   BY MR. FIELDS:

14   Q    Hi, Mr. Weigel.  My name's Nolan Fields.  I'm an

15   assistant U.S. attorney here in Tulsa.  I'm going to

16   follow up on some of the things that Mary Katherine

17   already asked you, and then I might go into a couple new

18   areas as well, but I'll try to be respectful of your time,

19   as I'm sure we all want to get this through as quickly as

20   possible.

21   A    Okay.

22   Q    I want to remind you that you're still under

23   oath with the court reporter.

24       When we started out, Ms. Nagle asked you a

25   couple of questions about your background and experience,

Page 112

1    and I can't remember if she asked you if you had taken

2    depositions in the past.  Have you?

3    A    I have not.  She did ask me, I think.

4    Q    Okay.  So maybe looking through my notes I

5    missed it.  And currently your employer is Enel Green

6    Power North America, correct?

7    A    That is correct.

8    Q    And -- because they purchased part -- consumed

9    Tradewinds Energy a couple years ago, correct?

10       MR. RAY: Object to form.

11   A    Early 2019, they purchased a portion of

12   Tradewind Energy and sold another portion, and I went

13   along with the transaction.

14       MS. NAGLE: Okay.  I'd like to bring up

15   Exhibit 90 which has previously been entered today.  I

16   think it's Osage Wind Priv 427.  Do you mind pulling that

17   up on the screen?

18   Q    (BY MR. FIELDS) Mr. Weigel, this is one of the

19   email chains that we looked at earlier this morning.  I

20   just have a couple follow-up questions.

21   A    Okay.

22   Q    Okay.  I'll scroll to the end.

23       MR. FIELDS: Or if, Michelle, you don't mind

24   scrolling to the end, just to give Mr. Weigel a taste

25   again of where it starts, and we can kind of work our way

Page 113

1    up.

2        The beginning, so I think it starts out with an

3    email from Ian Shavitz, an attorney who represented an

4    Osage Minerals Council.  You can start scrolling the other

5    way.  And he sent an email on approximately -- scroll up

6    so we can see the -- when he sent it.

7    Q    (BY MR. FIELDS) On October 10, 2013 to

8    Mr. Freeman.  I think he was the CEO of Tradewinds Energy

9    at the time, and Mr. Boyce of Wind Capital Group and cc'ed

10   these additional people.  This is that letter from the

11   Osage Minerals Council where they raise the issue of the

12   minerals permit potentially being needed.  Do you kind of

13   remember talking about that this morning?

14   A    I do.  Remind me, the attachment is the one that

15   asks the details --

16   Q    Yes.

17   A    -- of how big and how wide and stuff?

18   Q    Yes.  Based on the date, I believe it's the

19   October 10, 2013 letter from Chairman Yates to those CEOs.

20   A    I do recall that.

21   Q    Okay.

22       MR. FIELDS: Keep scrolling, Michelle, back up

23   so we can kind of work our way back up the email chain.

24   Q    (BY MR. FIELDS) And then it looks like

25   Mr. Freeman forwards it to Mr. -- or -- yeah, forwards it,

Aaron Weigel                                                                6/29/2021

Page 114

1   asking Rob -- just kind of review that, the body of that
2   next email right there, it looks like they're trying to
3   figure out which counsel they're going to kind of refer
4   this to.  Would you agree with that?
5       A   So to clarify, the email's from George Knapp who
6   it says is signed at the bottom, and they're asking
7   Tradewinds who we should be referred to.
8       Q   Yes, sir.
9       A   Yeah.  That -- I agree with that.
10      Q   That sounds accurate.  Okay.
11          MR. FIELDS:  Keep scrolling up.  And then it
12  looks like -- scroll back down.
13      Q   (BY MR. FIELDS) There's another little email in
14  the chain there.  I just want to work through it so
15  there's no surprises, we're all on the same page.  Then it
16  looks like on October 10, 2013, later in the day at
17  5:27 p.m., Mr. Knapp forwards to you the conversation
18  below and just -- he's trying to just bring you into this
19  email chain, correct?
20          MR. FIELDS:  Scroll back up so we can see what
21  he's receiving.
22      Q   (BY MR. FIELDS) Would you agree?
23      A   I would agree with that.
24      Q   Okay.
25          MR. FIELDS:  Keep scrolling up, please.  Okay.

Page 115

1       Q   (BY MR. FIELDS) And then it looks like you
2   forward --
3           MR. FIELDS:  Okay.  Scroll back down.
4       Q   (BY MR. FIELDS) It looks like you forward what
5   you received to a larger group including Mr. Neil,
6   Mr. Willman, ccing Mr. Freeman and I guess you said at the
7   time your boss, Matt Gilhousen, correct?
8       A   Yes.
9       Q   And then I'm just looking at the body of that
10  email.  Give me one second.  I think Ms. Nagle already
11  asked you why this surprised you, and I believe you said
12  it kind of -- you said that it surprised you because -- it
13  shouldn't surprise you because it was just another attempt
14  by the -- you thought, by the Osage Nation to be a
15  roadblock to this project.  I might be mischaracterizing
16  you, but is that a fair statement?
17          MR. RAY:  Object to form.
18      A   I might just say it as this was not surprising
19  because it was the latest in a series of attempts to stop
20  the project.
21      Q   (BY MR. FIELDS) And I think some of the other
22  attempts you mentioned in the time were, in your testimony
23  previously, burying beetles, correct?
24      A   American Bury Beetle.
25      Q   Yes.  And another attempt that you perceived to

Page 116

1   stop the project involved bald eagle permits, correct?
2       A   That's correct.
3       Q   And so this third iteration at least in these
4   examples we're talking about right now would have been
5   this mining permit, correct?
6           MR. RAY:  Object to form.
7       A   I believe I also mentioned the conditional use
8   permit process and hearings.  But you're correct, this was
9   the next.
10      Q   (BY MR. FIELDS) Thank you for correcting me.  I
11  think you're right, you did bring that up.  So four
12  discrete legal attempts or avenues to potentially sideline
13  this project.  Is that a fair assessment?
14          MR. RAY:  Object to form.
15      A   That would be my reason for writing that I was
16  not surprised is that I was characterizing it that way in
17  this email.
18      Q   (BY MR. FIELDS) And I believe you also stated in
19  your previous testimony, you said, quote "It's hard to
20  take the Osage Nation seriously," close quote, involving
21  all these attempts to stop the Osage Wind project,
22  correct?
23          MR. RAY:  Object to form.
24      A   I don't remember saying it that way, but --
25      Q   (BY MR. FIELDS) But thinking back on when you

Page 117

1   crafted this email, how would you describe your state of
2   mind?  Would you -- were you frustrated with the Osage
3   Nation or were you frustrated with the federal government?
4           MR. RAY:  Object to form.
5       A   As the project developer, it's -- part of my
6   role, like I said first on, was, you know, discover the
7   permitting needs, work through the land, real estate
8   rights, work through the permitting process, and my job
9   function was to accomplish those things, so roadblocks in
10  that process would frustrating, and so I would say it's
11  not necessarily with either of those parties so much as
12  the accomplishment of my role.
13      Q   (BY MR. FIELDS) Fair enough.  But I think that
14  you said earlier that it was hard to take the Osage Nation
15  seriously, but considering all the things you mentioned or
16  at least the burying beetle, the bald eagles, and this
17  potential application of a mining permit, do you recognize
18  that all of those are federal requirements and not Osage
19  Nation sovereign requirements?
20      A   The burying beetle's federally protected.  The
21  eagle is the Migratory Bird Treaty Act, which is federal.
22  And what was the last one you said?
23      Q   The mining permit at issue in this litigation,
24  federal in nature, not something delineated from the Osage
25  Nation's own sovereignty?

Page 118

1 MR. RAY: Object to form.

2 A Yeah. I'm not -- I'm not sure I quite

3 understand.

4 Q (BY MR. FIELDS) Let me put it -- I guess the --

5 let me make it a little clearer. The burying beetles were

6 required by the -- or were covered under a federal

7 regulation, the bald eagles permit was controlled by a

8 federal regulation, and this Osage minerals mining permit

9 that is at issue in this litigation was controlled by

10 federal -- a federal regulation?

11 MR. RAY: Object to form.

12 A I think that's correct.

13 Q (BY MR. FIELDS) Okay. So going back to the

14 email, there in the next sentence, you say, "Let's confer

15 about whether or not PS needs support on this." You --

16 who are you -- is it a person or a company you were

17 referring to? What's "PS"?

18 A PS is short for Polsinelli, which would have

19 been the law firm that Darren and Steve work for.

20 Q Okay. Thank you. Can you hear me still?

21 A Yes.

22 Q Okay. Perfect. We thought we lost connection.

23 I appreciate your patience.

24 Okay. So going to the next -- or continuing on.

25 So PS is the name of the law firm. Could you read that

Page 119

1 whole -- the entirety of that sentence that begins "let's

2 confer about" out loud?

3 A "Let's confer about whether or not PS needs

4 support on this."

5 Q So you can still see the exhibit right now?

6 A I can, yes.

7 Q Okay. We were having technical issues on our

8 side, so as long as you can see it, that's all I care

9 about.

10 A Yes. I can.

11 Q So what did you mean when you said "whether or

12 not PS needs support on this"? What does that mean?

13 A As with all issues that are legal in nature at

14 these projects, Polsinelli was our general support for

15 real estate and commercial reasons, but it was not

16 uncommon to have them bring in experts where needed and

17 kind of help us find the right representation or support,

18 which I believe was my question relative to this inquiry

19 was whether or not Polsinelli would have the correct level

20 of experience to handle this or if they needed external

21 support.

22 Q And so who or what firm came in as that expert

23 support that was ultimately brought in?

24 A Yeah, I don't know all the discussions that the

25 owners Matt and Rob had with Polsinelli with Darren and

Page 120

1 Steve, but this question ultimately resulted in Modrall

2 Sperling and the memo that we were talking about earlier

3 today.

4 Q Okay. Perfect. Thank you so much. So the

5 date --

6 MR. FIELDS: Scroll up a little, Michelle. Keep

7 scrolling up.

8 Q (BY MR. FIELDS) So to -- to kind of tie a bow on

9 what you just said, so it looks like Darren Neil forwarded

10 the substance of the emails below, including an

11 attachment, to Lynn Slade at the Modrall Sperling firm,

12 correct?

13 A Yes.

14 Q And so this was on October 11, 2013, and the

15 previous testimony this morning you gave was that the memo

16 that Modrall Sperling drafted that provided legal advice

17 to you on October -- dated October 21, 2013 was the

18 primary and legal analysis that you used to feel

19 comfortable that a permit was not required, correct?

20 A That is, yes, correct.

21 Q So this -- if we get the timing right, Modrall

22 would have potentially been brought in, based on this

23 email chain, somewhere around October 11, 2013 regarding

24 this particular issue, and then around 20 days later, they

25 would have cranked out the memo that then you relied upon?

Page 121

1 MR. RAY: Object to form.

2 A Yeah. The dates are in the record. That's my

3 recollection of how it went.

4 MR. RAY: We can hear you.

5 MS. NAGLE: Okay. Good. For some reason, we

6 weren't getting the feedback. Sorry. I don't know why

7 our connection is having issues. I'd love to blame the

8 federal government, but I don't want to do that.

9 Okay. So as a follow up, I guess since you took

10 that exhibit down, would you pull up Exhibit 94, which is

11 Osage Wind Priv 615.

12 Q (BY MR. FIELDS) While she's pulling that up,

13 Mr. Weigel, this is another email that we reviewed this

14 morning. I just have a couple follow-up questions.

15 MR. FIELDS: Okay. Okay. Scroll down a little

16 bit so he can kind of just get a general idea of -- I

17 think this is only a one -- or I guess it's a two page

18 exhibit. On the second page, the original email that was

19 sent, that was from Matt Gilhousen on October 25, 2013.

20 Scroll back up so he can see that's the end of

21 it. Perfect.

22 Q (BY MR. FIELDS) Matt Gilhousen to Lynn Slade,

23 Bill Scott, Willman, Freeman, and you, on October 25,

24 2013, and Mr. Gilhousen is asking for specific language of

25 the statutes that apply to this mineral permit. Is that a

Page 122

1  fair summary of what he's asking?
2      A.  Yes.
3      Q.  Okay.
4          MR. FIELDS:  Scroll up so they can see the rest,
5  if you don't mind, please.
6      Q.  (BY MR. FIELDS) And then the same date, it looks
7  like Mr. Slade responds with, as requested, a summary of
8  the language in the statutes.  Scroll up a little more so
9  you can see it's the same day.
10         Okay.  So they're working hard for you, and at
11 5:00, whatever time this email comes through, the language
12 for the applicable statutes in their mind comes through.
13 And if you scroll down a little bit, would you say that's
14 a fair assessment of what Mr. Slade provided, a summary of
15 the language of the statutes they believe were applicable?
16         MR. RAY:  Object to form.
17     A.  Yeah.  I can't comport to understand what this
18 is going to be used for.  Matt sent the email.  You can
19 ask him what he needed this information for.  I certainly
20 don't recall this specific language existing for any
21 longer than as you have it here on the screen.  The memo
22 became kind of the main -- the main source of this
23 information, which was not, you know, that many days
24 later.
25     Q.  (BY MR. FIELDS) Yes, sir.  I would not disagree

Page 123

1  with you.  So this -- these statutes were provided on
2  October 25th, and they looked to be just a summary of the
3  statutes.  There's no analysis that you relied upon in
4  this particular email, correct?
5      A.  Yeah.  This email was not what the company
6  relied on or what I relied on to form opinion.
7      Q.  So what you or the company relied on was the
8  subsequent memo that was dated October 31, 2013, correct?
9      A.  I think when I say memo, I mean the memo that
10 started in 2013 and, of course, I see that kind of -- the
11 ultimate memo as being one thing, despite there being some
12 technical difficulties or technical differences as were
13 presented this morning.  But that memo in its general
14 sense was what we relied upon.
15     Q.  Yes, sir.  Thank you.  So speaking of -- to kind
16 of expand on that, it's your position then that the memo
17 dated October 31, 2013 was not the only document that you
18 relied upon.  What you're saying is that as that memo
19 evolved over the next year or so to have another
20 iteration, you were reviewing whatever legal counsel was
21 providing you, correct?
22     A.  I think it's safe to say all information that we
23 received was taken into account.
24     Q.  I guess maybe a better way to ask it is was your
25 reliance static based on the October 31, 2013 memo or did

Page 124

1  it evolve with additional legal analysis you received from
2  counsel on the topic?
3          MR. RAY:  Object to form.
4      A.  Yeah.  I think -- I think the research evolved.
5  The opinion that was at the end of the memo was relied
6  upon throughout the process.
7      Q.  (BY MR. FIELDS) Do you recall reviewing drafts
8  of the October 31, 2013 memo before it was finalized with
9  that date?
10     A.  I do not, and that wouldn't have been typical to
11 have at Tradewind or at least in my role.
12     Q.  Are you aware if Tradewind Energy ever
13 considered a legal malpractice claim against Modrall
14 Sperling?
15         MR. RAY:  Object to form.
16     A.  I am not aware of that, no.
17     Q.  (BY MR. FIELDS) Are you aware if Enel Green
18 Power North America ever considered a legal malpractice
19 claim against Modrall Sperling?
20         MR. RAY:  Object to form.
21     A.  I am not aware.
22     Q.  (BY MR. FIELDS) Okay.  Thank you.  Okay.  I'm
23 going to pull up another email chain.
24         MR. FIELDS:  Michelle, could you pull up Osage
25 Wind Priv 000128.

Page 125

1      Q.  (BY MR. FIELDS) We're putting this one up,
2  Aaron.  Thanks for being patient.
3      A.  Yeah.  Sure.  No worries.
4      Q.  Okay.  This is a rather long email chain.  I
5  think it goes back maybe like 16 pages, and so I'm going
6  to do my best.  If it's okay with you, I'm going to have
7  Michelle scroll down all the way to the bottom so that you
8  can see what the context is so that you're not surprised.
9  Okay?
10         So it looks like at least the most recent one at
11 the top was dated October 14, 2014, but as she scrolls
12 down to the very bottom, we'll just kind of work our way
13 through it from the bottom.  I believe it starts -- it
14 starts about a week earlier around October 7, 2014.  You
15 can just zoom all the way down there and then we'll work
16 our way back up.
17         Okay.  So there's some legal disclaimers at the
18 bottom of the emails, and then it looks like this is the
19 first email in the chain.
20         MR. FIELDS:  Scroll up a little more.  Go up
21 above the next page break.  Okay.  This is kind of where
22 it starts.
23     Q.  (BY MR. FIELDS) On October 7, 2014, a man by the
24 name of George Merritt, at an email address at
25 harriscommunications.com sends and email to some guys.

Page 126

1  I'm not sure who they are.  I guess we'll -- and then
2  let's read a little bit of the content.  Let's scroll down
3  a little.  Okay.  Perfect.
4       Take a look at this, the subject -- or the body
5  of this email real quick.  I'll give you a chance to read
6  it, and then I'll ask you a quick question, Mr. Weigel.
7  Okay?
8     A   Okay.  I think I got it.
9     Q   Okay.  So it looks like someone from the Tulsa
10 World was looking to speak with you about the wind farm
11 under construction in Osage County, correct?
12    A   That looks correct, yes.
13    Q   Okay.  And who is George Merritt?
14    A   George Merritt would have been an employee at a
15 company hired by Tradewind to help us with public
16 relations, essentially.
17    Q   And would that have been normal pattern and
18 practice for a wind project that you all were in business
19 development for?
20    A   Absolutely.
21    Q   And had you worked with this company before in
22 the past on other projects?
23    A   We had a relationship with Harris previously.  I
24 don't know if I specifically had worked with them, but
25 they helped us in Oklahoma throughout this entire time

Page 127

1  frame and I think probably, you know, some time before.
2     Q   So when you say they helped you in Oklahoma, was
3  that based on your recollection on this, the Osage Wind
4  project and the Mustang Run project?
5     A   No.  And I guess its -- its been some time, so
6  my recollection is that we, you know, at the time, were
7  working on many projects in Oklahoma, including some that
8  are not in Osage County, other counties throughout the
9  state, and I believe at this time, Harris Communications
10 was supporting more than just this one project in just
11 this one county, but others instead, also.
12    Q   Thank you so much.  I appreciate that.
13        MR. FIELDS:  Okay.  Could you scroll up,
14 Michelle, maybe a whole page to Osage Wind Privilege 141.
15 Keep scrolling up, I think.  Yeah.  Keep scrolling up.
16    Q   (BY MR. FIELDS) So I'm not going through every
17 single email and the chain.  I'm just kind of focusing on
18 the ones where I have questions, if that's okay with you.
19 So at the top of this next page, it looks like Mr.
20 Merritt, on October 8, 2014 at 4:44 p.m., sends an email
21 to -- is it Mr. DeGennaro or Ms. DeGennaro?  I'm not sure
22 which one.  Maybe you know.
23    A   Michaela DeGennaro.
24    Q   Oh, Michaela.  Perfect.  Thank you so much.
25 Sends this email and you're cc'd on this, and it looks

Page 128

1  like they're continuing a discussion about this Tulsa
2  World reporter, and maybe the question got more specific.
3  Do you mind kind of reading over that part that you can
4  see that email right there?  And I'll just leave it there
5  for a second.  Tell me when you're -- you've kind of
6  skimmed through it.
7     A   Okay.
8     Q   So initially in the email chain at the
9  beginning, Mr. Merritt contacted you and was saying, hey,
10 there's this question from the Tulsa World, they're
11 working on this article, and then as the email chain
12 progresses here, he got a little more specific, and the
13 reporter asks if they're aware of the complaints and
14 whether we had a reaction, I guess "we" being the
15 defendants or Enel Green Power North America, correct?
16    A   I understand it to mean the Osage project had a
17 reaction.
18    Q   Yes, sir.  Okay.  Let me keep scrolling up.
19        MR. FIELDS:  Would you scroll up another page,
20 Michelle, all the way up to 139, two pages up.  This is
21 it.  Yeah.
22    Q   (BY MR. FIELDS) So I'm going to ask you a quick
23 question about this part.  So still on October 8, 2014,
24 still from Michaela DeGennaro, now an expanded group
25 including Mr. Champagne, Ms. Heredia, and you're still

Page 129

1  cc'd on this, so you're still in the loop, still talking
2  about the Tulsa World article.  I'm going to let you kind
3  of skim over that real quick.
4        MR. FIELDS:  Thank you, Michelle.
5     Q   (BY MR. FIELDS) I'll leave it there real quick.
6  Let me know when you're ready.
7     A   Okay.  I'm ready.
8     Q   Do you -- do you happen to know why EGPNA was
9  trying to not be visible to the media at this time?
10    A   Yeah.  I can't speak specifically to in this
11 context what Michaela was implying here.  I will say
12 her -- her role as the head of communications and in all
13 prior projects we had done they tend to want to announce
14 it before answering questions about it as a matter of Enel
15 process as I had seen other projects go.
16    Q   Okay.  And then I guess the rest of that email,
17 the second paragraph --
18        MR. FIELDS:  You can leave it there.
19    Q   (BY MR. FIELDS) -- says, "So this would be
20 another reason to keep the answer general and maybe just
21 reword Steve's reply to say the project is being
22 constructed in compliance with all permits and
23 requirements of law and without mentioning EGPNA."  So if
24 I understand that correctly, did you -- would you think
25 that to be Michaela's -- her draft of what the response to

1  the reporter should be?

2  A  You'd have to ask her what she meant by her own

3  email. Sorry.

4  Q  What did you -- what did you understand it to

5  mean since you were cc'ed on the email then?

6  A  Yeah. Again, that was the response that was

7  suggested by Steve. She's seems agreeing.

8  Q  Okay.

9  MR. FIELDS: So scroll down a little bit,

10  Michelle. I guess I should go the other way, actually.

11  Q  (BY MR. FIELDS) So I guess Steve's contribution

12  just before that -- so Steve Champagne, October 8, 2014,

13  at 5:43 just before that to the same group had said, "I

14  think replying with more detail than I suggested implies

15  we're giving some credibility to their assertions. I'd

16  rather not, but this is Michaela's call." So would you

17  say that Mr. Champagne was deferring to Michaela?

18  MR. RAY: Object to form.

19  A  Michaela's job is the head of communications,

20  so, I think.

21  Q  (BY MR. FIELDS) And what was Steve's job? He's

22  the legal counsel internally for Tradewind -- or for

23  EGPNA? One of the attorneys, right?

24  A  I don't know what his specific title was. If he

25  was the legal department, I don't know.

1  Q  Okay.

2  MR. FIELDS: Keep scrolling. I guess at the top

3  of whatever that direction is -- okay. On this 138, I

4  think I'm going to have some questions here.

5  Q  (BY MR. FIELDS) Okay. I'll try to take this

6  piece by piece. So there's a snippet of an email at the

7  bottom. We can ignore that. But I want the email that

8  you sent right here, so this is perfect.

9  So still going up in this email chain, October

10  8, 2014, now at 6:23 p.m., you compose this email with

11  these two paragraphs. I'll let you look at that for a

12  second before I ask you a couple questions.

13  A  Okay.

14  Q  Okay. So in that second paragraph that begins

15  Tradewind Energy, it says, "Tradewind Energy and the

16  Bureau of Indian Affairs have been in direct

17  communication. We described the mechanics of the process

18  which is still currently underway to install wind

19  turbine -- install turbine foundations, and both parties

20  reached an agreement that those actions as described do

21  not require a permit from the BIA. This project is being

22  constructed in compliance with all permits and

23  requirements of law." So is it your suggestion -- your

24  suggestion was to state that Tradewind Energy and BIA were

25  in an agreement that no mining permit was required,

1  correct?

2  A  That was what I was suggesting.

3  Q  Did you believe that to be true at the time?

4  A  We had communicated to the BIA by a letter the

5  plans and had not been told one was required, despite it

6  being arisen, you know, a year prior to this. My belief

7  was that if it was an issue, we would know about it by

8  know. If it was their opinion, we would have known about

9  it by now.

10  Q  So if I understand this correctly, it was -- the

11  lack of communication was acquiescence in your mind that

12  BIA did not have a problem with the project?

13  MR. RAY: Object to form.

14  A  The fact that they had been -- the communication

15  had happened and the intent was clear should have been, in

16  my mind, expectant of a response if one was deserved, yes.

17  Q  (BY MR. FIELDS) So when you say "the intent was

18  clear", well, the intent on your end, but how could you

19  possibly know the intent of the BIA if there was silence?

20  A  Yeah. That is a fair statement that I, in this

21  case, should not be representing the BIA's opinion

22  publicly, and so ultimately this wasn't printed.

23  Q  Right. This is the intermittent process on how

24  to respond to a potential Tulsa World article, correct?

25  A  That's what's happening in the email chain, yes.

1  Q  So in -- so in other words, you perceived the

2  BIA's silence to be the BIA's agreement that a permit was

3  not required?

4  A  My frame of mind was that we had researched this

5  extensively, we had a memo, and I felt then and still feel

6  strongly what we were doing was not mining and that the

7  BIA had an opportunity to weigh in and had not told us

8  not to a year prior.

9  Q  But a year prior you hadn't started excavation,

10  construction, because that didn't start until September of

11  2014, correct?

12  A  Yeah. I can't recall the exact date that

13  foundations started being dug.

14  Q  Okay. Fair enough.

15  A  It would have been around that time, fall of

16  2014.

17  Q  Right. So the paragraph right above that, we

18  can respond to this, after -- I guess in the second

19  sentence, it kind of -- the second line from the top, it

20  continues on, "Steve's response sounds like we have

21  something to hide. We don't. Your average reader is

22  likely to think we dodged the question, and that's not

23  good local PR for us. I suggest something like this," and

24  then you gave your recommendation. So is it fair to say

25  that Mr. Champagne's proposal to not respond, as it would

Page 134

1  give credit to the Osage's assertions, meant that you felt
2  it would be perceived that the defendants had something to
3  hide?
4        MR. RAY:  Object to form.
5     A   My personal opinion on the phrase "no comment"
6  is that it's a weak PR response in this situation and
7  others.
8     Q   (BY MR. FIELDS) Fair enough.  Scrolling up above
9  to the next proceeding email.
10        MR. FIELDS:  Keep going up a little more.  Keep
11  going.  Right there.  Perfect.
12     Q   (BY MR. FIELDS) So Mr. Merritt responds a couple
13  minutes later, five minutes later, just to you, and then
14  he -- or, sorry, to you and then he ccs the group, and
15  then he says, "By any chance, Aaron, do you think the BIA
16  would -- do you think the BIA would give that response?
17  If it's that simple, it would be great to have the agency
18  stop this issue cold."  So would you say it's a fair
19  representation that Mr. Merritt did not think that your
20  suggested statement that both parties reached an agreement
21  on those actions as described does not require a permit
22  from the BIA was not a good way to go forward?
23        MR. RAY:  Object to form.
24     A   You'd have to ask him what his email meant.
25  He's recommending a different path.  He's recommending we

Page 135

1  would need the BIA to say that, not for me to say that,
2  for us to say that, which is a fair response, I believe.
3     Q   (BY MR. FIELDS) And what's your recollection of
4  how the BIA responded?
5     A   You'll have to ask a more specific question than
6  that.  I'm not sure what you're talking about.
7     Q   Well, this is on October 8th.  On October 9th, I
8  believe that the BIA sent a letter to the CEO of Enel
9  saying that there's a cease and desist that was being
10  ordered.  So I think it's fair that Mr. Merritt was
11  correct and that your statement would have been dead in
12  the water, don't you think?
13        MR. RAY:  Object to form.
14     A   Yeah.  I'm aware the BIA sent that letter.
15  Whether it was related to this, I can't tell you.
16     Q   (BY MR. FIELDS) Okay.  Thank you.  All right.
17  Let's move on.
18        MR. FIELDS:  Can you scroll up to page 136,
19  about two pages up.  So I'm skipping some emails in
20  progression of what the comment would look like, so --
21  okay.  This is perfect.
22     Q   (BY MR. FIELDS) So on October 10, 2014, I guess
23  we're two days later now, at 1:41 in the afternoon, you
24  write this email.  Can you kind of review this real quick,
25  and then I'll ask you a question about it.

Page 136

1     A   Okay.
2     Q   Okay.  So in the first paragraph, you start it
3  off with, "Let's get this language ready to send..." and
4  I'll skip down to the one, two, three, fourth line, "but
5  also one that doesn't presume to answer the question for
6  BIA."  So at this point, two days later after
7  Mr. Merritt's suggestion and maybe receipt or knowledge of
8  the October 9th cease and desist letter, you've now
9  removed your language from the draft asserting that TWE
10  and BIA agreed that a permit was not needed, correct?
11        MR. RAY:  Object to form.
12     A   The fact that its been removed from the
13  suggestion is true in my email here.  Whether it's related
14  to the receipt of that email, I can't tell you.  I don't
15  know about the timing of that.  I believe there was some
16  delay in the date of the letter and the date of me
17  personally seeing it.
18     Q   (BY MR. FIELDS) Fair enough.  But at the same
19  time, one way or another, that language got pulled out,
20  and now your suggestion edits are in blue below.  Even
21  though they're not in blue, that second paragraph is now
22  your proposed more refined statement?
23     A   Yes.
24     Q   Okay.  And in summary, it basically just says
25  that TWE and BIA had been in direct communication about

Page 137

1  the process including those involved to install the
2  foundations.  Based on those communications, the project
3  is not -- the project is not seeking a permit.  So we've
4  gone from agreement with BIA and Tradewind Energy to just
5  Tradewind Energy's not seeking a permit, correct?
6        MR. RAY:  Object to form.
7     A   The language has removed the agreement statement
8  and it now says only what we intend to do.
9        MR. FIELDS:  Okay.  Michelle, you can scroll up,
10  please, to 135, the next page up.
11        Okay.  This is a little funky because the email
12  gets carried from one page to another, so can you scroll
13  up a little bit to the previous page to see the date and
14  time and then we'll scroll back down.
15        So this is October 13th from Ms. Heredia, 1:27
16  in the afternoon someone's time.  Scroll down a little so
17  we can see.
18     Q   (BY MR. FIELDS) It looks like it's going to
19  Merritt, you, and Mr. Weigel.  And that's perfect.  Do you
20  mind just kind of looking the body of that email over real
21  quick, and then I'll ask you a quick question?
22     A   Okay.
23     Q   Okay.  So based on the second to last sentence
24  of the first paragraph, this news broke over the weekend
25  via a BIA letter dated September 9th and posted on the

Page 138

1  Osage website. "We've yet to receive the BIA letter from
2  EGPNA." A do you think that's some of the delay that we were
3  talking about in getting the cease and desist letter?
4      MR. RAY: Object to form.
5      A  I think it's pretty clear that she says they
6  have yet to receive it.
7      Q  (BY MR. FIELDS) Yes, sir. Thank you. And so
8  Ms. Heredia's kind of qualifying the fact that it's pretty
9  likely that the BIA thinks that a sandy soil mining permit
10  is going to be required and legal counsel is saying that
11  it's not necessary, correct?
12      MR. RAY: Object to form.
13      A  Yeah. I don't want to try to interpret her
14  email, but, yes.
15      Q  (BY MR. FIELDS) Okay. Then what did it mean to
16  you?
17      A  Sorry. Can you say that one more time, the
18  question?
19      Q  If you don't want to interpret her email,
20  what -- what do you think it -- you were copied, it was
21  sent to you from Ms. Heredia, so what did it mean to you
22  at the time?
23      A  Okay. This says we shouldn't make a statement,
24  so she's telling me that this is unfolding and the
25  conversation below should be paused until more information

Page 139

1  is received, the letter being one of those things.
2      Q  And it's not just a letter, it's a letter saying
3  that the BIA thinks you need a sandy soil mining permit.
4  So that's a pretty stark event, wouldn't you say?
5      A  Yeah. I mean, it changes the situation is what
6  I would say.
7      Q  Okay. Fair enough. Thank you.
8      MR. FIELDS: Would you scroll up to page 131.
9      Okay. So I apologize in general for the way
10  this is formated, but this is the way we received it from
11  defense counsel, so we've got to work with what we've got.
12  So, actually, could you scroll up to page 129, and it will
13  catch the beginning of the email. Keep going. Thank you,
14  ma'am. Keep on going. Okay. Perfect right there.
15      Q  (BY MR. FIELDS) So, again, I might butcher this
16  guy's name, but Jack Thirolf sends an email on October 13,
17  2014, 3:51 in the afternoon, to you and a group of other
18  individuals who are co-defendants. So we're going to
19  scroll through those names, and then we'll get to a --
20  this is a -- it looks to be a couple of different news
21  articles that were describing what was going on with the
22  Osage Wind project, and this first one that you see right here
23  being from what looks to be the Barnsdall Times. But
24  we're going to scroll down because I don't really care
25  about that right now.

Page 140

1      Then the next one looks like a -- maybe a Tulsa
2  World article.
3      We'll keep scrolling down. Again, I apologize.
4  That's just the way it's formated. Stop right there one
5  second.
6      So what I care about is you were quoted, I
7  think, in this article or you were at least attributed
8  right there, so do you mind looking at that paragraph that
9  starts "Aaron Weigel, the head of project development"
10  real quick. Look at that, and then I'll ask you a
11  question.
12      A  Okay. I've read it.
13      Q  Okay. Thank you. Thank you, Mr. Weigel. And
14  so in the second line, you said Tuesday that "questions
15  about the project need to be post to Enel North America,
16  the subsidiary of an Italian utility giant that's now
17  building the project. However, he said that, generally
18  speaking, it's industry practice for the rock excavated
19  during construction in wind turbine foundation." So I
20  imagine that were you given the direction that were you
21  allowed to refer the questions to Enel North America at
22  this point because you did so in the article, correct?
23      MR. RAY: Object to form.
24      A  Yeah. I with this response would have been
25  directed to say this, right, yes. So we would have had a

Page 141

1  conversation that said please tell the reporter to talk to
2  Enel North America, which I did.
3      Q  (BY MR. FIELDS) Okay. And in the earlier
4  portion of the same email chain, I think it was Michaela,
5  as you pronounced, DeGennaro, correct, who was the
6  communications head at Enel Green Power North America who
7  was saying hold off, correct? Two days earlier she was
8  saying hold off?
9      A  I believe she was saying it had not been
10  announced yet.
11      Q  Right.
12      A  But I'd have to go back and review that to
13  specifically see her recommendation.
14      Q  Yes, sir. But either way, a couple days later
15  after saying hold off, don't release it, you got the green
16  light, and so you did here at least in this article,
17  correct?
18      A  I did release that Enel North America was the
19  owner now.
20      Q  Do you think that they were willing -- was it
21  your understanding that Enel Green Power at that point was
22  willing to allow their name to be floated so they could
23  better control the spin now that the cease and desist
24  letter had been filed and made public?
25      A  I was not in the conversations to determine

Page 142

1 that, nor would I have any idea what their communications
2 department had suggested was the right course of action.
3     Q   But in some way did you feel like the
4 responsibility was being taken away from you with
5 Tradewind and being -- and moved over to Enel?
6     A   In my personal view, the signing of the MIPA is
7 when that happens.  PR is an entirely different thing,
8 which is Michaela's realm.
9     Q   Okay.  Thank you.  So this whole document chain
10 beginning with Osage Wind Priv 128 through what we
11 reviewed, I'll submit it as Exhibit 98 just to keep our
12 numbers right.  I think that's where we're at everybody.
13     I think I only have two more email chains -- or
14 it's two groups, but I'll do my best to work through them.
15 Thank you so much, Mr. Weigel.
16     (WHEREUPON, Exhibit 98 was marked for
17 identification.)
18     MR. FIELDS:  Okay.  Michelle, the next one I'd
19 like to pull up, it's of course not an exhibit yet, but
20 it's Osage Wind Priv 000092.
21     Q   (BY MR. FIELDS) This is another email chain,
22 Mr. Weigel.  I'm going to have Michelle scroll all the way
23 to the bottom.  I think there's maybe four emails on this
24 chain, but we'll work through them pretty quickly.
25     Okay.  This is where it starts.  Mr. Welch with

Page 143

1 IEA sends this email to Chris.  If you scroll up a little,
2 Michelle, I think we'll see from the header, it looks like
3 it was Chris Hanson -- to Chris Hanson at IEA and
4 Mr. Moskaluk who was, I think, the site coordinator at
5 Enel for the project.  So there's the substance of that
6 email, if you don't mind taking a quick look at that.
7     A   Okay.  Yes.
8     Q   So to give some context, it looks likes
9 Mr. Whiteshield with the BIA was either on site or
10 contacted Mr. Welch or someone with IEA and raised the
11 issue that a permit was required for crushing operations
12 that took place on 9/25/14.  Is that a fair summary?
13     A   That's a fair summary, yes.
14     Q   Okay.
15     MR. FIELDS:  So then scroll up to the next email
16 where he responds.  Thank you, Michelle.
17     Q   (BY MR. FIELDS) So then this next -- whether
18 it's -- I guess it's an email.  So I guess it's maybe a
19 meeting event.  It looks like an appointment, yes, sir,
20 and it looks like embedded.  It was going from Giuseppe
21 DiMarzio to yourself, other Enel Green Power individuals,
22 and the topic was Osage Bureau of Indian Affairs, and it
23 was set to have the meeting on Tuesday, September 30,
24 2014, at 11:30 in the morning, with the agenda to include
25 the four items that Mr. DiMarzio had laid out.  Is that a

Page 144

1 fair summary of what it looks to be?
2     A   Yes.
3     Q   And, again, so many different names.  I know you
4 said it earlier.  With a company this big, it's swimming
5 with people in different positions.  Mr. DiMarzio, do you
6 recall what his position was at that time?
7     A   I do not.  I know he was on site at the --
8     Q   Okay.
9     A   -- facility during construction --
10     Q   Okay.
11     A   -- but I don't know what his responsibilities
12 were there.
13     Q   Okay.  That's fine.  That's helpful.  So someone
14 on site, Mr. DiMarzio potentially, sets the agenda for
15 this meeting, and he reviewed those four agenda items?
16     A   Yeah.
17     Q   Can I ask you a question about them?  Have you
18 had a chance to look at them?
19     A   Yes.
20     Q   So this first question is, "Do we need a rock
21 crushing permit with the mineral counsel for backfill
22 foundations?"  That's his first item on the agenda,
23 correct?
24     A   Yes.
25     Q   And second item is, "If so, can we get it?"  Do

Page 145

1 you think he was implying the rock crushing permit?  Is
2 that what you thought he meant?
3     A   "Do we need a rock crushing permit," I think the
4 issue is in response to the inspection that happened where
5 he was told by a BIA representative that a permit was
6 needed for rock crushing.  He's asking the question, and
7 so let's have a meeting to talk about that particular
8 issue.
9     Q   So is it fair to say number one was do we need
10 this rock crushing permit, and then number two, if so, can
11 we get it?  That's a follow up to number one, correct?
12     MR. RAY:  Object to form.
13     A   You'd have to ask him.
14     Q   (BY MR. FIELDS) Well, what did it mean to you?
15 I assume you attended the call or the meeting, so what did
16 those agenda items mean to you?  Do you think that number
17 two was talking about a rock crushing permit, getting it,
18 if it was possible?
19     A   I expected to talk about the sandy soils and
20 mining permit on this call --
21     Q   Okay.
22     A   -- and the memo we had relative to it.
23     Q   Well, based on the agenda item for one,
24 Mr. DiMarzio's asking if the permit's needed, correct?
25     A   I don't see a question, but you'd have to ask --

Aaron Weigel   6/29/2021

Page 146

1    Q   Right.

2    A   -- him.

3    Q   You're right.  He didn't have a question mark on

4    there, but the way he phrased it "do we need", I assume it

5    was a pull out, but I can move on.

6        Number three, "If not, should we prepare anyway

7    for the strategy for the response."  By "if not", do you

8    think he's implying if we don't get or need a rock

9    crushing permit?  Is that what it meant to you?

10   A   It looks like badly translated Italian which is

11   not uncommon for the site guys on the Enel side.  He -- I

12   would interpret this to be a response to the BIA person

13   below who had said something was needed.

14   Q   Okay.

15   A   What do we say back.

16   Q   So staying on number three, "Should we prepare

17   anyway for the strategy for the response," so do you

18   recall what that strategy was you discussed in the call?

19   A   I do not.  I'm sorry.

20   Q   Okay.  That's fair.

21   A   Yeah.

22   Q   Because, I mean, you stated earlier in the

23   deposition testimony today that, quote, "you've never been

24   uncertain a permit was not required," correct?  That's

25   your testimony?

Page 147

1    A   Yeah.

2    Q   Okay.  So let's scroll up more.  So there was

3    this call that was scheduled for September 30, 2014, 11:30

4    in the morning, and then the next item that's up is an

5    email that looks to be from Ms. Heredia from Mr. Giuseppe.

6    I guess that's Mr. DiMarzio.  I'll let you look at

7    that for a second, and then I'll ask you the next

8    question.

9    A   Okay.  Go ahead.

10   Q   Okay.  So, "We need to act with an abundance of

11   caution.  We should not be using materials at the site

12   that would otherwise be commercially available.  I

13   understood backfill would come from an off site quarry.

14   We need to discuss with Steve Champagne before proceeding.

15   Please do not crush rock further until we have had a

16   chance to discuss."  So if I understand correctly, "We

17   need to discuss with Steve Champagne before proceeding,"

18   did you interpret that to mean Joan was saying we're going

19   to -- we can't do anything until we talk to Steve before

20   we go forward?

21       MR. RAY:  Object to form.

22   A   Yeah.  She was recommending a discussion with

23   Steve.

24   Q   (BY MR. FIELDS) Okay.  And then the last

25   sentence, "Please do not crush rock further until we

Page 148

1    had a chance to discuss."  So under no uncertain terms

2    Mr. Heredia is saying don't crush any more rock until

3    we've had this discussion, correct?

4        MR. RAY:  Object to the form.

5    A   She's telling Giuseppe.

6    Q   (BY MR. FIELDS) Right.  And that's on

7    September 29, 2014 at 9:38, correct?  At least when the

8    email was sent.  Who knows the time zones, right?

9    A   I would agree that was the time it was sent.

10   Q   So is it fair to say Joan was ordering a stop to

11   rock crushing?

12   A   No.  I can't speak to the chain of command on

13   who actually has the authority to do so, whether Giuseppe

14   would be the person to stop that.

15   Q   That's not my question.  I appreciate what

16   you're -- what you're sharing, but I'm saying it says

17   "please do not crush rock", so she's asking him to stop

18   crushing rock, at least until the conversation's been had,

19   correct?

20       MR. RAY:  Object to form.

21   A   That's how I would interpret what she's said.

22   Q   (BY MR. FIELDS) Okay.  Okay.  Thank you.

23       MR. FIELDS:  Then scroll up, Michelle, to the

24   next email, which I think is the last one in this chain,

25   thankfully.  All right.  Thank you, ma'am.

Page 149

1    Q   (BY MR. FIELDS) So here is the following email

2    from Ms. Heredia to a number of people -- or from you to

3    Mr. Heredia and a number of people, it looks like the next

4    day September 30, 2014, at 2:45 a.m.  That's pretty early

5    in the morning.  Do you mind taking a look at that real

6    quick, and then I'll ask you a quick question.

7    A   Okay.

8    Q   All right.  Perfect.  So third line, third

9    sentence.  "I agree we should hit pause until we explain

10   that to the BIA."  I mean, effectively you're agreeing

11   with Ms. Heredia who just said the day earlier to not

12   crush rock further until you've had a chance to discuss

13   with Steve.  Isn't that fair to say?

14       MR. RAY:  Object to form.

15   A   The point of this email is not to say rock

16   crushing was wrong.  In fact, the first three sentences

17   are the opposite of that where I just say that we aren't

18   in the wrong, but relationships, especially with people

19   like the BIA, matter, and I expected that we would

20   communicate it in a -- you know, a fair and congenial way

21   and make sure we have the conversation.

22   Q   (BY MR. FIELDS) Well, I appreciate you for

23   summarizing that the email did not mean to say rock

24   crushing was wrong.  I never said that.  You said that.

25   What I'm asking is if your words were "I agree we should

Aaron Weigel                                          6/29/2021                                          39 / 150 · 153

Page 150

1    hit pause until we explain that to the BIA," so regardless
2    of why you were saying that it was your recommendation
3    that the project should hit pause, what did that mean?
4         MR. RAY:  Object to form.
5    A    My email with my words here saying that I agreed
6    to hit pause is saying that we are going to have to
7    restart crushing, but let's stop because the BIA came out
8    and said stop, and let's communicate about what we believe
9    to be the facts of the case.
10        Q    (BY MR. FIELDS) So you're saying that you should
11   restart crushing, so that means you had stopped crushing
12   at some point, correct?
13   A    What I'm saying is that we should hit pause.  I
14   don't -- I don't know if they -- at this point I suspect
15   they had not stopped, but I don't if they did stop
16   crushing rock.
17        Q    So you don't know if they listened, but you're
18   saying, from your perspective, you should at least hit
19   pause right now until -- until otherwise decided?
20   A    Yes.  I'm suggesting we stop crushing rock.
21        Q    Okay.  Thank you so much.  So let me ask you
22   this.  Why would you recommend hitting pause when you
23   previously stated that you were never uncertain a permit
24   was not required?  How do you reconcile those two
25   statements?

Page 151

1    A    I think that the entire content in context to
2    this email is quite clear.  So I appreciate the specific
3    line being called out.  I will say pausing to communicate
4    is almost never a bad idea despite if what you believe
5    you're doing is right or not, and especially in my
6    business, relationships, you know, are important to
7    maintain.
8         Q    But in this instance, the project excavations
9    and rock crushing did not stop, and despite the cease and
10   desist letter, business as usual continued, didn't it?
11        MR. RAY:  Object to form.
12   A    That, I don't know.  I was not on site.
13        Q    (BY MR. FIELDS) So you're not aware if the work
14   stopped.  You're saying it could have stopped, you just
15   don't know?
16   A    I don't know if it did or did not.
17        Q    Okay.  Thank you.  So this -- this was Osage
18   Wind Priv 000092 and 93.  I'll submit that as Exhibit 99
19   so I can keep the exhibits accurate in the record.  I
20   apologize to counsel for not doing that on the front end.
21   All right.  So we can take that one down.
22        And let's pull up Osage Wind Privilege 000090.
23   All right.  And this is going to be Exhibit 100, and I do
24   not believe its been previously admitted.  If it has and I
25   missed it in the list, I apologize.

Page 152

1         (WHEREUPON, Exhibits 99 and 100 were marked for
2    identification.)
3         MR. FIELDS:  Can you scroll down to the very
4    bottom?  Keep on going.
5         Q    (BY MR. FIELDS) So, again, some emails and
6    appointments, Mr. Weigel.  This looks to be an original
7    appointment that initiated this email chain around Monday,
8    September 29, 2014, at 11:03 p.m., from Mr. Lincon to --
9    and it could be Lincon, I don't know, I want to be
10   respectful -- to a group including yourself, and the
11   subject was Osage Mineral Rights, to be held the next day,
12   September 30, 2014, at 11:00 a.m. Eastern, correct?
13   A    Yeah.  That looks right.
14        Q    And then you forwarded that above from -- I
15   guess to Nick and some other people.  I don't know how all
16   that works.  That's technical stuff.  We'll scroll up a
17   little more and then we'll get into an actual email that
18   has text, not an appointment.
19        Then it looks like an email from Mr. Heredia
20   that's on this email chain, and it's an email that she is
21   sending to you and another group of similar individuals,
22   whether Tradewind or Enel, and it's dated Wednesday,
23   October 21, 2014, at 12:40 a.m., talking about Osage
24   mineral rights.  So do you mind looking that over,
25   Mr. Weigel, and then I'll ask you a couple questions.

Page 153

1    A    Okay.
2         Q    Okay.  So I guess Ms. Heredia spoke with
3    Mr. Whiteshield at the BIA, and she gave a summary of her
4    conversation with him.  Is that a fair summary of kind of
5    generally what's happening in the introduction of the
6    paragraph?
7    A    I agree with that.
8         Q    About in the middle one, two, three, four, five
9    lines in, the sentence begins "I did explain briefly".
10   Could you read that sentence, please?
11   A    "I did explain briefly that the Osage is very
12   protective of their oil and gas operations, but that wind
13   and oil and gas can co-exist as we do at many of our
14   sites."
15        Q    Thank you.  So do you think it's odd that
16   Ms. Heredia, working for Enel, like the -- whatever, the
17   sixth largest public utility in the country or the world
18   or whatever, is describing how she's explaining to this
19   BIA field tech how the Osage is very protective of their
20   oil and gas operations when that's his job?
21        MR. RAY:  Object to form.
22   A    I can tell you that in Oklahoma, this was not
23   the first site that Tradewind had developed and oil and
24   gas operations are quite heavy down here and that the
25   discussion of the interaction of building a wind farm with

Page 154

1 an oil and gas facility is relatively new for a lot of
2 people, so I -- that explanation I have heard and/or given
3 hundreds of times about how you can build a wind farm
4 around active oil and gas operations, and we had done that
5 at this point at other sites already.
6 Q   (BY MR. FIELDS) But had you ever built another
7 wind farm in Osage County, Oklahoma up until this point,
8 or would this have been the first one?
9 A   This was the first one in Osage County,
10 Oklahoma.
11 Q   And to your knowledge, would you have ever dealt
12 with the Osage Nation Native American tribe in any of your
13 wind projects throughout the U.S.?
14 A   We had not, to my knowledge.
15 Q   And so would you imagine that the federal
16 regulations that were specific to the Osage Nation would
17 have applied here in Osage County, Oklahoma, and maybe not
18 have applied in the other counties across the U.S. where
19 you had other projects?  Is that correct?
20      MR. RAY:  Object to form.
21 A   I think it's typical for us to review the
22 obligations and requirements of law in every location we
23 attempt to build in as a separate and independent thing.
24 They vary county to county, state to state, city to city.
25 Q   (BY MR. FIELDS) But do you find it interesting

Page 155

1 that Mr. Heredia is lecturing the Osage -- or the BIA
2 Osage Agency field tech, petroleum field tech, on how oil
3 and gas is something very important to the Osage when his
4 complaint had been about rock crushing a different type of
5 mineral that had nothing to do with oil and gas?
6      MR. RAY:  Object to form.
7 A   I can't speak to the intent or your
8 representation of the tone of the discussion as you just
9 represented it.  I don't know.
10 Q   (BY MR. FIELDS) Well, what did that mean to you?
11 You were on the email.  You received it.  How did you
12 interpret it at the time or now?
13      MR. RAY:  Object to form.
14 A   I read what she said when she talked with
15 Mr. Whiteshield and absorbed that information as an
16 accurate representation of the call.
17 Q   (BY MR. FIELDS) Did representatives from Enel
18 regularly lecture local federal representatives about
19 their operations?
20      MR. RAY:  Object to form.
21 A   I can't think of a single time I experienced
22 that in person.
23 Q   (BY MR. FIELDS) Okay.  Go to the last sentence
24 of the last paragraph.  It says, "My suggestion is that
25 the site can carry on, but we should try to get the letter

Page 156

1 to Robin as soon as possible."  So if I understand that
2 correctly, is that Ms. Heredia saying that the work is
3 going to continue?  Is that a fair summary?
4      MR. RAY:  Object to form.
5 A   It's -- it's unclear to me what she meant by
6 "carry on".  That could have many definitions.
7 Q   (BY MR. FIELDS) So what did it mean to you at
8 the time?
9 A   You'd have to ask her.  I'm sorry.
10 Q   I'm asking what -- what -- what did it mean to
11 you at the time, since you were one of the recipients on
12 the email?  What did you think Ms. Heredia saying "my
13 suggestion is that the site can carry on" -- I'm just
14 asking for your opinion.
15      MR. RAY:  Object to form.
16 A   Yeah.  I don't know.  Sorry.
17 Q   (BY MR. FIELDS) Okay.  Sounds good.  So two days
18 earlier, Ms. Heredia had recommended stopping rock
19 crushing.  Now she's saying she suggests the site can
20 carry on.  You don't think that she was still talking
21 about rock crushing, do you?
22 A   I think it's fair to assume that.
23 Q   Do you know what changed in those two days?
24 A   If I'm recalling the email chain we just went
25 through, Mr. Whiteshield reached out to construction, it

Page 157

1 went up the chain, Joan was identified to take the call,
2 Joan took the call, the summary here, she felt
3 comfortable based on that summary, carry on was her
4 recommendation.
5 Q   But two days earlier when she sent an email to
6 Giuseppe, she said, "Please do not crush rock further
7 until we've have a chance to discuss".  So you think it's
8 fair they had a chance to discuss and someone made the
9 decision to carry on?
10      MR. RAY:  Object to form.
11 A   Yes.
12 Q   (BY MR. FIELDS) At the time, did you -- okay.
13 Sorry.  I didn't mean to interrupt you.  Continue.
14 A   Yeah.  Can you focus on what -- I mean, what do
15 you need me to agree to or what do you need me to tell you
16 that happened that I was involved in the situations?  I
17 attended those calls.  I can tell you that I remember Joan
18 being asked to make the call to reach out to Ray
19 Whiteshield.  That was part of those discussions.  You can
20 see the evidence of that here.  So time to discuss, I --
21 my understanding of that based on those calls was this
22 discussion which Joan has provided the summary.
23 Q   Okay.  So did you agree with Mr. Heredia's
24 assessment that the site can carry on?
25 A   You know, me personally, I had recommended prior



Page 158

1  that what we were doing was not wrong and that we should
2  pause and reach out.  I would maintain that was still my
3  position, and if the reach out had gone well, that's her
4  decision as to move forward or not.  I had provided my
5  recommendation previously.
6      Q.  Okay.  Thank you so much.  All right.  We can
7  take that one down.  Thank you so much, Mr. Weigel.  And I
8  hope you realize I don't know you, and if my tone starts
9  to get snarky or you think I'm upset, go right ahead.  I
10 promise I am -- I appreciate your candor, and you have
11 been so patient.  I'm on the last set of emails and we can
12 get out of here.  I just need to get the ones entered that
13 we haven't entered.  It's one out of three, but I think
14 we'll be at the end of this tunnel.
15     MR. FIELDS:  So could you pull up Osage Wind
16 Privilege 357.  I think it was previously admitted as
17 Exhibit 91.
18     Q.  (BY MR. FIELDS) And, of course, it's more
19 emails.  This one you've already seen.
20     A.  Yes.
21     Q.  Okay.  So I think you recognize it.
22     MR. FIELDS:  Scroll down to the bottom, if you
23 don't mind, Michelle.
24     Q.  (BY MR. FIELDS) Initially, the email that kicked
25 it off was from Mr. Blickensderfer at Guy Engineering to

Page 159

1  Justin Larson at Tradewind Energy.  And I think you said
2  Mr. Larson was like an engineer at Tradewind?
3      A.  Yes.
4      Q.  Okay.  And then Mr. Larson forwarded it to you
5  on April 25, 2014, and I guess Mr. Larson had received the
6  initial email from Mr. Blickensderfer about a month and a
7  half earlier on February 27th -- excuse me, two months
8  earlier.  And so if we look at the subject generally just
9  to refresh your recollection, the subject is about an
10 Osage mining permit.  It looks like Mr. Blickensderfer had
11 found some that had been involved with ODOT or the City of
12 Tulsa and he was passing it along, correct?
13     A.  He was passing along the documentation, yes,
14 that he was aware of.
15     Q.  Okay.  And then you took that documentation in
16 the next email up above and you forwarded that to Darren
17 Neil, Steve Willman, and Matt Gilhousen three minutes
18 later, correct?  At least that's what the email seems to
19 report.
20     A.  Yes.
21     Q.  And so based on what's in the email from
22 Mr. Larson to you, he's saying at least ODOT and the City
23 of Tulsa have complied with this permit in the past and
24 he's going to provide information, correct?
25     MR. RAY:  Object to form.

Page 160

1      A.  I don't know that it's -- you know, it's saying
2  that he has had -- this engineer has had experience with
3  this permit previously, this type of permit previously.
4      Q.  (BY MR. FIELDS) I mean, would you think it's
5  fair to say at least one of those was on an ODOT project
6  since they were listed in the email?  Do you think that's
7  fair?
8      A.  Yeah.  There's not a lot of details.  You could
9  assume ODOT would be included.
10     Q.  And would you also assume it's fair to say that
11 the City of Tulsa might have been another entity that
12 would have complied or had something to do with this
13 mining permit in the past, similar to ODOT?
14     A.  That's a safe assumption based on the email.
15     Q.  Yes, sir.  Scroll up.  So you forward it to Mr.
16 Neil, Willman, and Gilhousen, and then it looks like
17 Mr. Willman, the top email, sends it over to Mr. Slade and
18 Mr. Scott at Modrall, cc you to keep you in the loop on
19 Friday, April 25, 2014, and it looks like there's two
20 attachments.  Both of those have been admitted as
21 exhibits.  One is listed "Osage Wind Mineral Permit," a
22 PDF, and the other one is
23 "TransportationImprovementProgram@osagetribe.org", some
24 kind of numbers, another PDF, correct?
25     A.  Yes.

Page 161

1      Q.  Those are the blue underlined things.  I assume
2  those are attachments.  Is that a fair assessment, you
3  think?
4      A.  Seems fair to me.
5      Q.  And then the subject of the -- or the body of
6  the email, just kind of look it over real quick and we'll
7  get out of here.  Let me know when you've looked it over.
8      A.  Okay.
9      Q.  So the first line, "Attached are the documents
10 received from Guy Engineering regarding the BIA
11 permitting.  It appears," and then Mr. Willman continues,
12 and then he says, "I do not believe this information
13 changes our prior conclusions, but I would appreciate your
14 input."  So what did that email Mr. Willman forwarded on
15 in that information to Modrall Sperling mean to you?
16     A.  My recollection of this effort overall starting
17 with Justin Larson and moving forward was to continuously
18 try and improve our understanding of what does and doesn't
19 apply relative to the sandy soils permit process.  This
20 would have been simply the collection of that information
21 and sending it to what we saw as the experts of
22 interpreting that which would have been the Modrall
23 Sperling Law Firm.
24     Q.  So you were gathering up information to
25 continuously improve, and you were sending it on to the

Page 162

1   attorney since they were the experts, right?
2       A   Yes.
3       Q   Okay.  Okay.
4           MR. FIELDS:  Michelle, can you take that one
5   down and bring up Exhibit 93?  Oh.  Hold on one second.
6       Q   (BY MR. FIELDS) Mr. Weigel, could you give me
7   about one minute?  I just need to make sure I'm pulling up
8   the right exhibit.  Hold on one second.
9       A   Sure thing.
10      Q   So let me ask you one more follow-up question
11  before I pull up.  I want to pull up one of the
12  attachments to that email, but before we move away from
13  the email, let me ask you, in the second sentence, it
14  says, "It appears that the special provision applies to
15  specifications for highway construction.  Please let us
16  know your thoughts."  So considering you were -- you were
17  getting this information from and these permits and this
18  information from an engineering company that had done
19  highway construction work in the past, how does that fit
20  with wind turbine excavations?
21      A   That is the reason to include it, I believe, as
22  part of the analysis, to determine whether it is or is not
23  the same.  Ultimately, we determined it's not the same and
24  that the memo says wind turbine foundation excavation is
25  not the same as building a highway.  A highway isn't just

Page 163

1   digging up a hole and putting it back.  It's more
2   equivalent to a house foundation or something similar.
3       Q   Okay.  Well, what about the construction aspect
4   of it specifically?
5       A   You know -- you mean the construction aspects of
6   highways?
7       Q   Absolutely.
8       A   I'm certainly not an expert in constructing a
9   highway, but it -- it is relatively -- relatively easy to
10  determine that highway construction, building a base,
11  building a foundation, adding certain types of rock on top
12  of it, putting concrete and asphalt down, that all of that
13  is pretty different than digging a hole and putting the
14  dirt back in the hole.
15      Q   But at the end of the day, construction is
16  construction regardless if it's a highway or a wind
17  turbine.  So what did you mean that to mean coming in this
18  email chain when you reviewed it?
19          MR. RAY:  Object to form.
20      A   That the entire effort was to determine what
21  types of construction.  Construction is not construction
22  when it comes to the law in this case.
23      Q   (BY MR. FIELDS) Okay.  But you're not an
24  attorney, right, so you're not providing legal analysis?
25  You're a business development expert, and that's your job

Page 164

1   capacity, correct?
2           MR. RAY:  Object to form.
3       A   That's correct.
4       Q   (BY MR. FIELDS) And so this is April 25, 2014,
5   about, I don't know, six months following the October 31,
6   2013 memo that you said made you never be uncertain a
7   permit was not required, however you're still trying to
8   improve and collect information just to make sure you're
9   right, correct?
10          MR. RAY:  Object to form.
11      A   The intent for improving and collecting was
12  almost never to almost make sure we were correct.  It was
13  the pattern of legal activity and lawsuits that we were
14  expecting that caused us to continue that effort for all
15  through construction.
16      Q   (BY MR. FIELDS) So while you were confident in
17  your position, you thought you might want a CYA or to
18  protect the company just to make sure if lawsuits ensued
19  that you all were in a safer position, correct?
20          MR. RAY:  Object to form.
21      A   No.  I wouldn't describe it that way, no.
22          MR. FIELDS:  Okay.  Let's look at the
23  attachment.  So can you take that down, Michelle?  This
24  was Exhibit 91.  Its already been entered.  Let's look at
25  Exhibit 93, which is Osage Wind Priv 361.

Page 165

1       Q   (BY MR. FIELDS) And, again, Mr. Weigel, I
2   appreciate you.  I know we're -- we're almost there.  This
3   really is the last little group of questions I have,
4   especially since you've already seen this document.
5           Do you recall earlier from this morning the
6   procedures for obtaining a sandy soil and rock mining
7   permit in Osage County, Oklahoma?  Do you remember looking
8   at this attachment briefly?
9       A   I do, yes.
10          MR. FIELDS:  Michelle, do you mind just
11  scrolling down to show that it's just this one page?
12  Okay.  Perfect.  That's it.  Scroll back up to the top, if
13  you don't mind.
14      Q   (BY MR. FIELDS) So some of the applicable
15  C.F.R.s that we've previously mentioned is listed right
16  there in the second line of the second sentence.  "These
17  will be subject to the code of federal regulations under
18  25 C.F.R. part 214."  That was one of the C.F.R. parts
19  that was listed in the memo and in the October 21, 2013
20  memo, correct?
21      A   I'm going to have to look at it, but I believe
22  so.
23      Q   And it was also one of the C.F.R. statutes that
24  was listed after Matt Gilhousen requested Lynn Slade
25  provide him with the language of the pertinent statutes,

Page 166

1   correct?

2        MR. RAY:  Object to form.

3    A   I'd have to put it back on the screen to

4   confirm, but --

5    Q   (BY MR. FIELDS) Yeah.  I appreciate you.  And

6   just so we're keeping the time date, this was an

7   attachment to the email that Mr. Willman sent to Mr. Slade

8   and Mr. Scott on April 25, 2014.  Just keep that in mind

9   because we're going to look through some more emails.  I

10  just want to keep April 25, 2014 kind of in your mind.

11       MR. FIELDS:  All right.  You can take that down,

12  Michelle.  Thank you.

13       All right.  Then can you pull up Exhibit 89,

14  which is Osage Wind Priv 299.

15   Q   (BY MR. FIELDS) And, again, this is about,

16  shoot, four pages of emails.  I'm going to skip through

17  the first two pages and focus on the latter two.  But for

18  the sake of this, since you've already seen some parts of

19  it, I'm going to let Michelle scroll all the way down and

20  we'll work back in reverse chronological order just to

21  kind of give you an idea of what's going on for some

22  context, okay, Mr. Weigel?

23   A   Okay.

24   Q   All right.  So page 302 is just some email

25  confidentiality stuff at the bottom of the emails from the

Page 167

1   attorneys.  Mr. Ray is sending an email to himself, I

2   guess, from a personal account to his work account.  He's

3   found something, I think it's the letter on October 9th,

4   then you scroll up and it looks like he sends it to

5   Mr. Willman.

6        MR. FIELDS:  Stop right there.  Scroll down a

7   little because we never really got into it.  So stop.

8    Q   (BY MR. FIELDS) So it looks like Mr. Ray found a

9   letter on the tribe's website, it's totally inconsistent

10  with the conversations with BIA, and so this is just

11  getting forwarded from person to person, and it looks like

12  this email chain.  So this really doesn't matter.  I just

13  want to give you some context for what we're going to look

14  at.

15       So on Osage Wind 300, let's look at -- okay.

16  Right here.  At the bottom of 300, there's an email from

17  October 11, 2014, 2:46 p.m.  Mr. Champagne's emailing, I

18  guess, Joan.  "Joan, do you know anything about this

19  permit?  I'm coping Bill P. to ask him to find out more."

20  I'm assuming Bill P.'s probably Bill Price, wouldn't you

21  imagine?

22   A   I don't know.  Probably.

23   Q   Do you know any other Bill P.'s who worked with

24  you on this project?

25   A   It's plausible that it's Bill Price.

Page 168

1    Q   Okay.  "To find out if contractor got it,

2   assuming we do in fact need it.  Until we confirm one way

3   or the other, we need to comply with the letter.  Steve."

4   So at this point, Mr. Champagne says "assuming we do in

5   fact need it".  They're talking about the permit, right?

6        MR. RAY:  Object to form.

7    A   "Do you know anything about this permit?"  You'd

8   have to see the letter to see what the letter was

9   referencing.  Can you remind me which letter this was that

10  was forwarded?

11   Q   (BY MR. FIELDS) Yes.  This is the October 9,

12  2014 letter, the cease and desist letter from the BIA.

13  There was a delay.  It didn't get sent to you guys real

14  quick, so Ryan Ray reportedly went on the Osage Nation's

15  website, pulled up the letter, got it to the defendants,

16  and then you all were discussing it before it actually was

17  formally received by Mr -- I guess.  That's the letter

18  we're talking about.  I apologize.  Sometimes even trying

19  to give the context doesn't make it real clear.

20   A   Yeah.  Understood.

21   Q   Okay.  Let's -- let's keep moving on.  So

22  Mr. Champagne is asking Mr. Heredia if we need this

23  permit.  Is that fair?  At least that's what it looks

24  like, correct?

25       MR. RAY:  Object to form.

Page 169

1    A   Yeah.  I mean, executives at Steve's level,

2   having not thought about this for a year, is sending it to

3   the person who's responsible for permitting and saying

4   help me interpret this --

5    Q   (BY MR. FIELDS) There you go.

6    A   -- is how I interpret it.

7    Q   Okay.  So the next email that we're going to

8   scroll up and look at is, unfortunately, a beast and takes

9   up more than a page.  So even though it's mainly on Osage

10  Wind Priv 300 --

11       MR. FIELDS:  Can you scroll up to 299?  Perfect.

12  Show him the top.

13   Q   (BY MR. FIELDS) This looks like an email from

14  Bill Scott to Mr. Willman and Mr. Slade regarding the BIA,

15  and Steve starts it right there.  "Thanks for forwarding

16  this.  Curious that, to my knowledge, this is the first

17  time the BIA or the Osage have made any mention of a sandy

18  soil mining permit."

19       And the just kind of look at this right at the

20  top.  Yeah.  Take a look at those first four paragraphs.

21  And that -- that will get most of it.  Once you've had a

22  chance to kind of glance over it, I'll ask you to look at

23  a couple specific sentences.

24   A   Okay.

25   Q   Okay.  Perfect.  So right out of the box, I have

Page 170

1 on the first line of the first paragraph, "I have tried to
2 find a copy of an application for a sandy soil mining
3 permit, a copy of such permit, or a regulation or pamphlet
4 describing the permit or the application process." So
5 because this email was coming from Bill Scott, one of your
6 experts at Modrall, did you find it was funny that he
7 couldn't find the permit that had been forwarded to him as
8 an attachment back on April 25th of 2014?
9     A    "Funny" is an interesting choice.  I would have
10 preferred better communication.
11    Q    Okay.  Well, how about the fact that six months
12 after receiving a permit he had been looking for for
13 continuous improvement purposes, as you described it,
14 seemingly, Mr. Scott still can't find a copy of the sandy
15 soil mining permit, even though he had received it as an
16 attachment on April 25, 2014, correct?
17        MR. RAY:  Object to form.
18    A    I can say he should have received it by this
19 point.  He did.
20    Q    (BY MR. FIELDS) Okay.  If you look at the second
21 to last line of this paragraph, the line -- there's a
22 reference to ODOT.  I guess the sentence from the -- above
23 says, "The only references I can find to such a permit are
24 in some Oklahoma Department of Transportation (ODOT)
25 materials."  So did you understand that to mean Mr. Scott

Page 171

1 was -- couldn't find his permit but he could find
2 references to the permit in ODOT materials?  Is that fair?
3        MR. RAY:  Object to form.
4     A    Yeah.  I don't know what research he underwent
5 to respond to this email that he got at this time.
6     Q    (BY MR. FIELDS) Yeah.  Fair enough.  He must
7 have not looked in his email.  But looking at the next
8 paragraph, "The most informative item located thus far is
9 an ODOT draft of a special provision for Osage Nation
10 mineral reservation sandy soil permit."  So, again, he's
11 not -- he needs the actual sandy soil permit, but he can
12 only find this ODOT special provision, correct?
13        MR. RAY:  Object to form.
14    A    Yeah.
15    Q    (BY MR. FIELDS) And then the next paragraph, it
16 begins, "first, the ODOT document says," so, again, he's
17 referencing the ODOT document, correct?
18        MR. RAY:  Object to form.
19    A    He appears to be referencing the special
20 provisions for Osage Nation's mineral reservations sandy
21 soil permit document that he has discovered.
22    Q    (BY MR. FIELDS) Correct.  And then even in the
23 next paragraph that begins "second, the ODOT document
24 indicates," again, it looks like he's focusing on the ODOT
25 document, correct?

Page 172

1     A    I would agree.
2     Q    Let me know when you're -- when you're done with
3 the paragraph that begins "second, the ODOT document".
4     A    Okay.  Go ahead.
5     Q    Perfect.  So would you agree that the
6 paragraph that begins "second, the ODOT document",
7 Mr. Scott seems to be referencing the ODOT document,
8 correct?
9        MR. RAY:  Object to form.
10    A    I believe so.
11    Q    (BY MR. FIELDS) Okay.  The next paragraph,
12 "third, the ODOT document indicates", again, this seems
13 that Mr. Scott is referencing the ODOT document, correct?
14    A    I would agree.
15    Q    Okay.  Then the next paragraph, "Without seeing
16 either the application form or the actual permit, we can't
17 say whether the ODOT document accurately describes the
18 circumstances under which the permit may be required.
19 I'll keep searching, and I will check with Lynn, and we'll
20 get back to you."  So is it safe to say, at least at this
21 time on October 11, 2014, Mr. Scott is looking for the
22 permit and instead he's only referencing the ODOT
23 document?
24        MR. RAY:  Object to form.
25    A    He says he's searching, so I believe that his

Page 173

1 words were he's searching.
2     Q    (BY MR. FIELDS) But we already looked at the
3 email from April 24, 2014 where you all forwarded that
4 attachment to him, correct?
5        MR. RAY:  Object to form.
6     A    I didn't see that to him specifically, but --
7     Q    (BY MR. FIELDS) Okay.  Yes, sir.
8        MR. FIELDS:  Scroll up, if you don't mind,
9 Michelle.
10    Q    (BY MR. FIELDS) So this is another additional
11 email that's on the same chain after Mr. Scott's email
12 about referencing the ODOT document a number of times.  It
13 looks like Matt Gilhousen on October 11, 2014.  So this is
14 the same day, maybe 45 minutes later throughout the same
15 time zone.  It says, "Seems like we're jumping the gun by
16 stopping work."  So would you believe that there was
17 actually a work stoppage?
18        MR. RAY:  Object to form.
19    A    I don't know if there was or not.
20    Q    (BY MR. FIELDS) I guess that's what we're trying
21 to figure out.  It seems like nobody seems to remember,
22 but he did say someone was jumping the gun by stopping
23 work.  Do you think that was related to the Osage Wind
24 construction activities that were happening on October 11,
25 2014?

Page 174

1       MR. RAY:  Object to form.

2    A  This is specific to the Osage project in

3 response to the letter that requested work stoppage,

4 so that would be the topic, yes.

5    Q  (BY MR. FIELDS) Okay.  So it looks like even

6 Matt recognizes that he's seen this before.  In the next

7 paragraph, "See the email below from Bill at Modrall.

8 Read his research.  I believe this was looked at some time

9 ago along with the overall mineral permit, and it

10 determined to not be applicable."  So wouldn't you agree

11 that even Matt agrees at this point that, hey, we've

12 looked at this before and thought it didn't apply?  Isn't

13 that fair?

14       MR. RAY:  Object to form.

15    A  That was my opinion, and I understood that to be

16 the opinion of my coworkers at Tradewind.

17    Q  (BY MR. FIELDS) Okay.  Two paragraphs down

18 Mr. Gilhousen continues, "I wouldn't stop anything until

19 someone shows up with a TRO, as we've done nothing wrong.

20 I suggest we reach out to BIA ASAP and figure out what the

21 hell they are thinking."  What did that mean to you when

22 you received this forwarded chain of emails?

23       MR. RAY:  Object to form.

24    A  TRO is a legal term, right, for --

25    Q  (BY MR. FIELDS) Yes.

Page 175

1    A  -- a judge ordering them to stop.  So he's

2 referencing that he expects the judge to make the

3 statement.

4    Q  Yeah.  I believe it means temporary restraining

5 order, but, heck, I could be wrong.  But you're right.

6 The next line, "It's Steve's call, but that's my opinion

7 for what it's worth."  By "Steve" do you think Matt

8 Gilhousen was referring to Steve Champagne, one of the

9 attorneys for the defendants?

10       MR. RAY:  Object to form.

11    A  It would be -- I don't know which Steve he

12 meant, I guess.  There were multiple Steves involved.

13 There were multiple Steves involved in this process, so I

14 can't guess at what he meant.

15    Q  (BY MR. FIELDS) What other Steves can you recall

16 besides Champagne that you worked with on this project?

17    A  There was also Steve Willman.

18    Q  Okay.  That's a good point.  How about we scroll

19 up and look at the email chain and see if -- I guess there

20 is a Willman on there.  You're right.  We've got Steve

21 Willman and we've got Steve Champagne, so I guess

22 theoretically either one could be referring to either one of

23 them that it should be their call, correct?

24       MR. RAY:  Object to form.

25    A  I don't know what his intent was.  I'm just

Page 176

1 trying to, you know, help.

2    Q  (BY MR. FIELDS) So what was -- refresh my

3 memory.  What was Steve Willman's position at that time in

4 October of 2014?  Wasn't he the general counsel for

5 Tradewind Energy?

6    A  He would have been external counsel --

7    Q  Oh, that's right.

8    A  -- for Tradewind Energy.

9    Q  That's right.

10    A  I don't know if he was or was not retained by

11 Enel, but --

12    Q  So he would have been the general counsel,

13 outside counsel for Tradewind, because I guess his email

14 is "DFRGlaw".  I guess that's that law firm you referred

15 to earlier that I butchered the name on that starts with a

16 D.

17    A  Yeah.  Rouse something.

18    Q  All right.  So if it wasn't outside counsel's

19 call, it could have been Steve Champagne's call, and

20 he's -- he works for Enel in their legal department,

21 right, at the time, in 2014 in October?

22       MR. RAY:  Object to form.

23    A  Steve Champagne was an employee at Enel and was

24 in the legal department.

25    Q  (BY MR. FIELDS) Thank you so much.  Let's scroll

Page 177

1 up, and we'll hopefully finish up with this exhibit and

2 this email.  So this is a -- this is the last email in the

3 chain.  It's an email from Ms. Heredia to a large group

4 that Steve Champagne's included, Steve Willman's included,

5 and I guess you're sending it to them.  You're sending it

6 to Joan and ccing this group to -- in this chain on

7 October 11, 2014, at 9:33 in the evening.  Take a look at

8 that short email you sent from your iPhone, and then I'll

9 ask you a quick question when you're ready.

10    A  Okay.  Go ahead.

11    Q  "Our research showed this permit isn't

12 applicable, so I think we should require more than just a

13 letter stating we should get one before altering course."

14 So what did you mean by that?

15    A  I'm referring to the memo we had relied on.

16    Q  You think you -- it says, "I think we should

17 require more than just a letter stating we should get one

18 before altering course."  Don't you mean the letter as in

19 the cease and desist letter from the Bureau of Indian

20 Affairs?

21       MR. RAY:  Object to form.

22    A  I don't recall if I had read the letter at this

23 point, but I am recommending that we need to rectify our

24 research against what the letter says.

25    Q  (BY MR. FIELDS) I mean, your first line of that

Page 178

1    sentence says, this email says, "This is hugely
2    frustrating given the timeline here," so don't you think
3    you were being frustrated by the cease and desist letter
4    that was dated October 9, 2014?
5         MR. RAY:  Object to form.
6      A   My frustration I'm expressing in this email is
7    that we had researched this in 2013 for the memo, we had
8    had the -- I believe it was Minerals Council and
9    Mr. Whiteshield -- maybe not Whiteshield, you can check
10   that name -- but with the inspector we had a phone call.
11   This issue should not have been a surprise to anyone.  My
12   frustration was I think about that this was an
13   inappropriate way to raise this issue, I felt, based on
14   the pattern of experience.
15     Q   (BY MR. FIELDS) So you said it shouldn't have
16   been a surprise, but it sounds like it was a surprise to
17   your expert counsel because he couldn't even find the
18   mining permit that had been sent to him on April 25th of
19   2014.  So are you saying it shouldn't have been a surprise
20   to your own retained counsel, or do you mean it shouldn't
21   have been a surprise the BIA was only bringing it up now,
22   what seemed to be in the 11th hour, and that you were
23   frustrated with the BIA?  Which one were you frustrated
24   with?
25     A   My frustration was this issue was not new.  It

Page 179

1    was an old issue.  Certainly I was aware of it.  Certainly
2    Matt Gilhousen recalled it.  Many of us were involved in
3    these discussions, so --
4      Q   So to confirm, you were frustrated with the
5    issue.  You weren't necessarily frustrated with your
6    counsel or the BIA, correct?
7         MR. RAY:  Object to form.
8      A   My frustration was I had, as a developer, my
9    responsibility to work through these issues.  I thought
10   this one was resolved and for it to show up in this manner
11   was frustrating to me.
12     Q   (BY MR. FIELDS) Fair enough.  But at the same
13   time, you were also frustrated with the Osage Nation
14   because all the different stumbling blocks happening from
15   that project, correct?
16        MR. RAY:  Object to form.
17     A   I don't think I quite said it that way.
18     Q   (BY MR. FIELDS) I don't think it was in the
19   email.  That was just generally what you mentioned
20   earlier.  Okay.  Let's take that exhibit down.  Let me
21   move to the last exhibit that I had.  Of course it's going
22   to be another set of emails.  It's Osage Wind Priv 233.  I
23   don't believe that this one has been admitted yet, and so
24   I guess we're up to 98?  No.  Oh, yeah.  We're over 100.
25   So 101.

Page 180

1         (WHEREUPON, Exhibit 101 was marked for
2    identification.)
3         MS. NAGLE:  I think you're at 100.
4      Q   (BY MR. FIELDS) So Mr. Weigel, I'll try to go
5    through the same rubric of showing you everything that's
6    in this, and we'll work back to the most current email
7    chain.  Okay?
8      A   Okay.
9      Q   Again, if you scroll all the way to the bottom,
10   there's a whole lot of confidentiality disclaimers that we
11   don't care anything about at this time, but attorneys like
12   to include them in their email.  So we'll scroll up from
13   that, then we'll get to an email that Mr. Willman
14   emailed -- right there.
15        MR. FIELDS:  Scroll down a little bit so they
16   can see it.
17     Q   (BY MR. FIELDS) It looks like an email from
18   Mr. Willman to Mr. Gilhousen and the rest of the team
19   about forward BIA, October 11, 2014.  Then the next email
20   is -- so, "This is the letter Ryan Ray provided me from
21   the tribe's website.  Someone should probably pass it
22   along to EGP.  Should I advise them I forwarded it to Lynn
23   and Bill?"  Okay.  So it looks like Mr. Willman's passing
24   it on.  Okay.  I'm going to keep moving on.  Do you agree
25   with that, generally?

Page 181

1      A   I do.
2      Q   Okay.  So Michelle's going to keep scrolling.
3    She's going to get to the next email chain.  Yeah.  We can
4    just skip that one.  Let's keep going up in the chain.  It
5    looks likes there's a large email from Ms. Heredia that is
6    unfortunately forwarded in a real weird, wacky way with
7    all kinds of carrots that make it hard to read, but it has
8    lots of paragraphs broken out.
9         MR. FIELDS:  Keep scrolling up to the top of 244
10   where it -- I think you got it.  There, perfect.
11     Q   (BY MR. FIELDS) So Ms. Heredia is sending this
12   email forwarding a summary of events that have attached
13   correspondence for your reference.  So it looks like she's
14   walking through a timeline with her numbered sequence.
15   Just take a look at that real quick.  Again, that's not
16   the questions I had that I will pose to you, I just want
17   you to know the context from where all this email chain is
18   coming from.  Let me know when you've had a chance to
19   glance over it.
20     A   Okay.
21     Q   Okay.  Okay.  So in paragraph seven, it starts,
22   "October 11th, Modrall does a quick assessment on the
23   sandy soil mining permit.  They could not find anything on
24   the BIA or Osage websites, although they observed mention
25   of this permit from an ODOT site and it appeared to mainly

Page 182

1  apply to road activities, or maybe this was all ODOT was
2  concerned with."  So would you take that to mean
3  Ms. Heredia was unsure what the permit was applicable to?
4        MR. RAY:  Object to form.
5     A  I can't answer to her intent.  I can only
6  say that --
7     Q  (BY MR. FIELDS)  Okay.  Well, you were a
8  recipient on this email in this email chain, so what was
9  your opinion of it at the time when you read paragraph
10  seven?
11    A  I had had conversations prior to this with Joan
12  where we had discussed the sandy soils permit, so her
13  representation here I would expect to include the analysis
14  we had done in 2013 as that had been discussed.
15    Q  But, again, don't you find it odd that on
16  October 11th Modrall was doing a quick assessment of a
17  sandy soil mining permit that they had received six months
18  earlier on October -- or April 25, 2014, that somehow just
19  got lost in the shuffle?
20        MR. RAY:  Object to the form.
21    A  I would much prefer a perfect law firm, but I'm
22  not sure I would say it was odd, but certainly the
23  information was available.
24    Q  (BY MR. FIELDS)  Okay.  To kind of change gears,
25  in referencing ODOT, don't you think it would make sense

Page 183

1  that ODOT would be concerned about roads since it's the
2  Oklahoma Department of Transportation?  Wouldn't their
3  construction activities be focused on road construction?
4     A  Yeah.  I don't know everything that ODOT does.
5  I assume there's road improvements and ditches and all
6  kinds of activities that they're responsible for.
7     Q  I don't know about you in Kansas, but I wish
8  they would do a better job.  The potholes we have are
9  terrible.
10        MR. FIELDS:  Okay.  You can scroll up, Michelle,
11  to -- I guess to see where this email chain continued on.
12    Q  (BY MR. FIELDS)  So it looks like at the top of
13  this page, original message, Steve Champagne is sending an
14  email to Ms. Heredia, including you, Aaron Weigel, in the
15  cc line.  In the second line, it says, "My inclination is
16  to do nothing until we actually receive the letter."  So
17  did you take that to mean Mr. Champagne was saying let's
18  hold off until we actually receive the letter on October
19  12, 2014, because there was that delay you were describing
20  between pulling to off the Osage website and formally
21  receiving it?  Do you think that's fair?
22        MR. RAY:  Object to form.
23    A  Yeah.  I -- it's tough to tell.  I assume he was
24  waiting for a communication.
25    Q  (BY MR. FIELDS)  So it's possible.  And then the

Page 184

1  last paragraph even -- or second to last paragraph that
2  begins with a carrot.  "Meanwhile, if Modrall can see what
3  more they can learn about what facts actually result in
4  the need for a permit and what the actual requirements are
5  for getting a permit, that will be helpful when preparing
6  for the calls with Ray and Phillip."  So did that at the
7  time mean to you that Steve Champagne wanted Modrall to
8  learn more about the permit's requirements to see if they
9  needed to get it before they have the conversations with
10  the BIA representatives?
11        MR. RAY:  Object to form.
12    A  My interpretation is him asking for more
13  information.
14    Q  (BY MR. FIELDS)  Okay.  But, again, you had said
15  multiple times that you had never been uncertain that a
16  permit was not required for this project, correct?
17        MR. RAY:  Object to form.
18    A  I, Aaron Weigel, have never been uncertain that
19  a permit was not required.
20    Q  (BY MR. FIELDS)  Absolutely.  That's your
21  personal opinion.  Thank you.  Okay.
22        MR. FIELDS:  Let's scroll up, Michelle, and go
23  to the last page of this email chain.
24    Q  (BY MR. FIELDS)  Okay.  So here's another email
25  from Mr. Scott at Modrall, and he is sending someone

Page 185

1  something, October 13, 2014, at 7:24 in the morning.
2  Second line, "We will see what more we can learn about the
3  sandy soil permit and will report back."  Do you think at
4  this point Mr. Scott had received a copy of the permit yet
5  or do you think he was still looking for it, if you know?
6        MR. RAY:  Object to form.
7     A  I have no idea.
8     Q  (BY MR. FIELDS)  Okay.  Let's scroll up to the
9  next email on the chain.  Mr. Champagne emailing Mr. Scott
10  and including you in the cc line.  "Thanks.  Ideally, if
11  we can get ourselves comfortable that we do not need this
12  permit, it may be good to go through the solicitor's
13  office to resolve this."  So Mr. Champagne is saying,
14  ideally, if we can get ourselves comfortable, that we do
15  not need the permit on October 14, 2014.  It sounds like
16  that he might not have been as confident as you were that
17  the permit was not required, correct?
18        MR. RAY:  Object to form.
19    A  Nothing about what he said looks like he was
20  un-confident.  It seems like he's asking my opinion.
21    Q  (BY MR. FIELDS)  He says "if we can get ourselves
22  comfortable".  Is that a question, or do you think that
23  he's -- you're saying that it's your opinion that he was
24  exuding confidence at this point that a permit was not
25  required?

Page 186

1    MR. RAY: Object to form.

2    A  I can't, you know, read the tone of his email.

3    Q  (BY MR. FIELDS) But in your opinion, was he
4    confident the permit was not required or not confident?

5    MR. RAY: Object to form.

6    A  He was asking for more information in this email
7    chain, so I suspect that he needed more information.

8    Q  (BY MR. FIELDS) Okay. But why would you need
9    more information if you were confident a permit wasn't
10   required?

11   MR. RAY: Object to form.

12   A  I can't tell you. You'd have to ask him whether
13   he was --

14   Q  (BY MR. FIELDS) Okay.

15   A  -- familiar with the issue at that point or not
16   or if he was as closely engrained in it as I was or if he
17   needed a refresher course as executives sometimes do.

18   Q  I would definitely like to ask him, we just
19   haven't got it him yet. But I appreciate your time.

20   Okay. Next email, the last one in this chain.
21   Let's scroll up so you can see it all. So it's from
22   Champagne again to -- or from Scott at Modrall to
23   Mr. Champagne, ccing a number of people in the group,
24   including yourself in the fourth cc line, Monday,
25   October 13, 2014, subject, BIA sandy soil permit. I'll

Page 187

1    give you a second to look it over.

2    A  Okay. Got it.

3    Q  All right. So it looks like Mr. Scott is
4    describing a conversation he had with Mr. Dotson at the
5    Oklahoma Department of Transportation in the first line.

6    Does that seem like a fair summary of the introduction of
7    this paragraph?

8    A  I would agree.

9    Q  And in the third line, "Mr. Dotson advised that
10   the ODOT special standard specification was updated March
11   of this year to track the requirements and conditions of
12   the sandy soil permit." So doesn't it seem pretty clear
13   that Mr. Dotson is describing ODOT's standards and
14   specifications, not necessarily the BIA's sandy soil
15   permit specifications, correct?

16   MR. RAY: Object to the form.

17   A  Yeah. I -- it looks like Bill had reached out,
18   Bill Price, and --

19   Q  (BY MR. FIELDS) Yes, sir.

20   A  -- this was -- this was the summary of his
21   conversation.

22   Q  Yes, sir. I appreciate that.

23   A  There was more information available.

24   Q  Okay. Then moving on to the last few lines of
25   the paragraph, "Mr. Dotson said he did not have a copy of

Page 188

1    the BIA form permit handy. I am still trying to attain a
2    copy of that permit as well as the application form
3    without contacting the BIA directly." So, again,
4    October 13, 2014, Mr. Scott with Modrall Sperling still
5    does not have a copy of the sandy soil permit application
6    form, correct?

7    A  I think he's clear about what he has.

8    Q  Well, if he has it, he doesn't know he has it,
9    right, otherwise, he wouldn't be asking for it?

10   A  Yeah.

11   Q  Do you have any opinion on why he wouldn't want
12   to contact the BIA directly?

13   MR. RAY: Object to form.

14   A  I do not know. Yeah.

15   Q  (BY MR. FIELDS) I guess in your position,
16   though, you were on the business development side and
17   were -- you mentioned earlier in your deposition that it
18   was important to keep good relations with the constituents
19   and like the project people that were involved, but in
20   this instance, it looks like the open lines of
21   communication might not have been so open, at least
22   regarding the BIA after the cease and desist letter was
23   sent on October 9th. Is that fair to say?

24   MR. RAY: Object to form.

25   A  At this point, the project had continued to

Page 189

1    transition into the hands of Enel's control and less into
2    the hands of Tradewind being responsible for those direct
3    communications. In my experience, when people send cease
4    and desist letters, conversations tend to move more
5    towards letters.

6    Q  (BY MR. FIELDS) So is it fair to say if you --
7    if Enel -- or if Enel wasn't -- wouldn't have been in
8    control and it still would have been under Tradewind's
9    purview, would you have recommended reaching out to the
10   BIA directly, as you had previously?

11   MR. RAY: Object to the form. Calls for
12   speculation.

13   MR. FIELDS: What was the additional -- sorry.
14   What did you say, Ryan? I couldn't get the rest of that
15   objection. I heard the form part. What was the rest?

16   MR. RAY: Object to form. Calls for
17   speculation.

18   Q  (BY MR. FIELDS) Okay. I was asking for your
19   opinion, whatever you think.

20   A  Yeah. I honestly don't know. It wouldn't have
21   been -- it wouldn't have been my call. It would have been
22   the owner's.

23   Q  (BY MR. FIELDS) But you earlier testified that
24   you would have been in favor of a pause to crushing in
25   favor of potentially working out an amicable solution?

Page 190

1     MR. RAY:  Object to form.

2     A   I can tell you if I had been in the boardroom

3   with my boss and Matt, that we would have absolutely

4   considered picking up the phone and trying to have a

5   conversation.

6     Q   (BY MR. FIELDS) Okay.  I appreciate that.

7         Let me just look and see if I have any other

8   questions or documents.  I think we already admitted this

9   one as Exhibit 101.  Anything else?

10        All right.  The United States passes the

11  witness.  Thank you so much, Mr. Weigel.

12    MR. RAY:  We'll just take a short break, a ten

13  minute break.

14    THE VIDEOGRAPHER:  We are off the record at

15  2:58.

16    (Break taken.)

17    THE VIDEOGRAPHER:  We are back on the record at

18  3:05.

19    MR. RAY:  The Defendant will reserve their

20  questions of Mr. Weigel for the time of trial, and he will

21  exercise his right to read and sign.

22    THE VIDEOGRAPHER:  We are off the record at

23  3:05.

24      (DEPOSITION CONCLUDED AT 3:05 P.M.)

25

Page 191

1           ERRATA SHEET

2   UNITED STATES OF AMERICA and OSAGE MINERALS COUNCIL v.

3         OSAGE WIND, LLC, et al.

4         DEPOSITION OF AARON WEIGEL

5     REPORTED BY: KARLI DANIELS, CSR, RPR, CCR

6     DATE DEPOSITION TAKEN: JUNE 29, 2021

7         JOB NO. 151413

8   PAGE  LINE  IS          SHOULD BE

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Page 192

1            JURAT

2   UNITED STATES OF AMERICA and OSAGE MINERALS COUNCIL v.

3       OSAGE WIND, LLC, et al.

4     I, Aaron Weigel, do hereby state under oath that

5   I have read the above and foregoing deposition in its

6   entirety and that the same is a full, true and correct

7   transcription of my testimony so given at said time and

8   place.

9

10

11  _____

12  Signature of Witness

13

14

15    Subscribed and sworn to before me, the

16  undersigned Notary Public in and for the State of Arkansas

17  by said witness, Aaron Weigel, on this _____day

18  of_____, 2021.

19

20

21

22  _____

23  NOTARY PUBLIC

24  MY COMMISSION EXPIRES:_____

25  JOB NO. 151413

Page 193

1        C E R T I F I C A T E

2     I, Karli Daniels, Certified Shorthand Reporter,

3   Registered Professional Reporter, Certified Court

4   Reporter, do hereby certify that the above-named Aaron

5   Weigel was by me first duly sworn to testify the truth,

6   the whole truth, and nothing but the truth, in the case

7   aforesaid; that the above and foregoing deposition was by

8   me taken and transcribed pursuant to agreement, and under

9   the stipulations hereinbefore set out; and that I am not

10  an attorney for nor relative of any of said parties or

11  otherwise interested in the event of said action.

12    IN WITNESS WHEREOF, I have hereunto set my hand

13  and official seal this 8th day of July, 2021.

14

15

16    KARLI DANIELS, CSR, RPR, CCR

17

18

19

20

21

22

23

24

25