# EXHIBIT 5

Case No. l4-CV-704-GKF-JFJ



**Memorandum**

| | | |
|---|---|---|
| To: | Bill Scott | |
| From: | Sarah Stevenson | |
| Date: | October 31, 2013 | |
| Re: | Rights of surface owners to use soil | |

Modrall Sperling
Roehl Harris & Sisk, P.A.

Bank of America Centre
500 Fourth Street NW
Suite 1000
Albuquerque,
New Mexico 87102

PO Box 2168
Albuquerque,
New Mexico 87103-2168

Tel: 505.848.1800
www.modrall.com
Fax: 505.848.9710
www.modrall.com

Question Presented

Whether a surface owner who excavates land for the purpose of construction consistent with its surface rights—and does not remove the land excavated from the property—is engaged in "mining" of the mineral estate and requires a mining permit.

The Osage mineral estate

In *Osage Nation v. Irby*, 597 F.3d 1117, 1120-21 (10th Cir. 2010), the Tenth Circuit set forth the following relevant history of the Osage Nation:

In 1872, Congress established a reservation for the Osage Nation in present day Oklahoma. *See* Act of June 5, 1872, ch. 310, 17 Stat. 228 (An Act to Confirm to the Great and Little Osage Indians a Reservation in the Indian Territory). In 1887, due to increased demand for land by white settlers and a desire to assimilate tribal nations, Congress passed the Indian General Allotment Act. *See* Act of February 8, 1887, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. §§ 331–334, 339, 341–342, 348–349, 354, 381). The Osage reservation was expressly exempted from this Act. 25 U.S.C. § 339. In 1907, Oklahoma became a state, and the Osage reservation was incorporated into the new state as Osage County as provided for in the Oklahoma Enabling Act. *See* Act of June 16, 1906, ch. 3335, 34 Stat. 267, §§ 2, 21; *see also* Okla. Const., art. XVII, § 8 ( "The Osage Indian Reservation with its present boundaries is hereby constituted one county to be know as Osage County."). Osage County, the largest county in Oklahoma, covers about 2,250 square miles (about 3% of Oklahoma's total land area).

Contemporaneous to passing the Oklahoma Enabling Act, Congress enacted the Osage Allotment Act. *See* Act of June 28, 1906, ch. 3572, 34 Stat. 539. The 1906 Osage Allotment Act severed the mineral estate from the surface estate of the reservation and placed it in trust for the tribe. *Id.* at §§ 2–3. . . . The Act also allotted most of the Osage surface land in severalty to tribal members. Osage Allotment Act at § 2.

The Act of June 5, 1872, ch. 310, 17 Stat. 228 (An Act to Confirm to the Great and Little Osage Indians a Reservation in the Indian Territory) does not mention the mineral estate.

EXHIBIT 36

OSAGE WIND PRIV-000414

The Osage Allotment Act, Sec. 2, Seventh, Act of June 28, 1906, ch. 3572, 34 Stat. 539, provides that "nothing herein shall authorize the sale of the oil, gas, coal, or other minerals covered by said lands, said minerals being reserved to the use of the tribe for a period of twenty-five years, and the royalty to be paid to said tribe as hereinafter provided; *And provided further*, That the oil, gas, cola, and other minerals upon said allotted lands shall become the property of the individual owner of said land at the expiration of said twenty-five years, unless otherwise provided for by Act of Congress."  Section 3 of the Osage Allotment Act further provides that "the oil, gas, coal or other minerals covered by the lands for the selection and division of which provision is herein made are hereby reserved to the Osage tribe for a period of twenty-five years from and after the eighth day of April [1906]; and leases for all oil, gas, and other minerals, covered by selections and division of land herein provided for, may be made by the Osage tribe of Indians, through its tribal council, and with the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe . . . . *And Provided further*, That no mining of or prospecting for any of said mineral or minerals shall be permitted on the homestead selections herein provided for without the written consent of the Secretary of the Interior . . . ."  Section 11 of the Osage Allotment Act provides for lands for railroad purposes, "*Provided*, That such railroad companies shall not take or acquire hereby any right or title to any oil, gas, or other mineral in any of said lands."

The Osage Nation's Constitution declares authority over the Osage Mineral Estate, defined as the "oil, gas, coal, and/or other minerals within the boundaries of the Osage Reservation . . . reserved to the Osage Nation pursuant to the Act of June 28, 1906 (34 Stat. 539), as amended."  Art. XV, Sec. 2.

25 C.F.R. Part 226 contains regulations for the "Leasing of Osage Reservation lands for oil and gas mining."  25 C.F.R. Part 214 contains the regulations for the "Leasing of Osage Reservations Lands, Oklahoma, for mining, except oil and gas."  No provisions of either of these sections provide information on whether surface use, consistent with a surface lease or license, is considered mining such that a permit or lease is needed.

Analysis

The Osage Tribe has indicated that it will assert Trade Winds Energy must receive a mining permit from the Osage Minerals Council in order to construct and operate the wind farm, on the grounds that the excavation and construction, and permanent placement, of the towers constitutes "mining" of the Osage's mineral estate.

Trade Winds' construction of the wind farm does not require a permit from the BIA or the Osage Nation.  While there is no controlling authority on this point, the Tribe's argument should be rejected because Trade Winds is not engaging in mining or other use of the mineral estate, but is taking actions consistent *only* with its lease.

Trade Winds does not dispute that the Lease does not provide it with a right to conduct mining or other mineral extraction. Trade Winds, however, is not conducting mining.  To the extent any soil or other subsurface material is (touched) by Trade Winds, it is merely incidental to Trade Winds' construction of its approved wind farm.  No soil is removed from the site, or processed on site for a commercial use.

The Federal Regulations implementing the Indian Mineral Lands Act **CITE** governing the leasing of Tribal lands for mineral development defining "mining" as follows:

OSAGE WIND PRIV-000415

the science, technique, and business of mineral development including, but not limited to: opencast work, underground work, and in-situ leaching directed to severance and treatment of minerals;[1] Provided, when sand, gravel, pumice, cinders, granite, building stone, limestone, clay or silt is the subject mineral, *an enterprise is considered "mining" only if the <u>extraction</u> of such a mineral exceeds 5,000 cubic yards in any given year.*

25 C.F.R. § 211.3 (emphasis added). In mining terminology, "extraction" means "the process of mining and removal of coal or ore from a mine" and "the separation of a metal of valuable mineral from an ore, or concentrate." Paul W. Thrush, ed., A Dictionary of Mining, Mineral, and Related Terms 404 (U.S. Dept. of Interior 1968).

Although no federal cases interpreting this regulatory definition of "mining" were located, or the rights of mineral estate owners in Osage County, federal courts have considered the interaction between surface rights and mineral rights under other federal statutes.

The Stock Raising Homestead Act, 39 Stat. 862 (1916), codified at 43 U.S.C. §§ 291-302, Section 9, states "That all entries made and patents issued under the provisions of this Act shall be subject to and contain a reservation to the United States of all the coal and other minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same. The coal and other mineral deposits in such lands shall be subject to disposal by the United States in accordance with the provisions of the coal and mineral land laws in forces at the time of such disposal." The subsequent sentences provide for right of entry of the mineral estate owner or lessee, and the payment of damages to the surface owner for crops or tangible improvements. The section concludes by stating "that all patents issued for the coal or other mineral deposits herein reserved shall contain appropriate notations declaring them to be subject to the provisions of this Act with reference to the disposition, occupancy, and use of the land as permitted to an entryman under this Act." Section 3 of the Act requires "improvements" to be placed upon the land.

The Agricultural Entry Act, 38 Stat. 509 (July 17, 1914), codified at 30 U.S.C. § 121-___, (also sometimes referred to as the Mineral Reservation Act) Section 1, states "That lands withdrawn or classified as phosphate, nitrate, potash, oil, gas, or asphaltic minerals, or which are valuable for those deposits, shall be subject to appropriate location, selection, entry, or purchase, if otherwise available, under the nonmineral land laws of the United States, whenever such location, selection, entry, or purchase shall be made with a view of obtaining or passing title with a reservation to the United States of the deposits on account of which the lands were withdrawn or classified or reported as valuable, together with the right to prospect for, mine, and remove the same . . . ."

The United States Supreme Court in *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 53 (1983), interpreted "mineral" as used in the Stock-Raising Homestead Act "to include substances that are mineral in character (*i.e.,* that are inorganic), that can be removed from the soil, that can be used for commercial purposes, and that there is no reason to suppose were intended to be included in the surface estate." *Watt*, considering whether the surface owner could sell gravel for commercial purposes, noted

> this case does not raise the question whether the owner of the surface estate may use a reserved mineral to the extent necessary to carry out ranching and farming activities successfully. Although a literal reading of the SRHA would suggest that any use of a

---

[1] Minerals is defined by the same regulation as "both metalliferous and non-metalliferous minerals; all hydrocarbons, including oil and gas, coal and lignite of all ranks; geothermal resources; and includes but is not limited to, sand, gravel, pumice, cinders, granite, building stone, limestone, clay, silt, or any other energy or non-energy mineral."

3

> reserved mineral is a trespass against the United States, one of the overriding purposes of the Act was to permit settlers to establish and maintain successful homesteads. There is force to the argument that this purpose would be defeated if the owner of the surface estate were unable to use reserved minerals even where such use was essential for stock-raising and raising crops.

*Id.* at 54 n.14 (discussing *Shiver v. United States*, 159 U.S. 491 (1895), which held that a homesteader could cut timber on land where it was otherwise prohibited for the purpose of constructing a homestead, as otherwise the right to homestead would lose meaning, so long as the timber was for use, *not* for sale).

*Watt* has not been construed by an Oklahoma court.

The District of New Mexico considered it in *Rosette, Inc. v. United States*, 64 F. Supp. 2d 1116, 1118 (D.N.M. 1999), *aff'd*, 277 F.3d 1222 (10th Cir. 2002), in which the surface owner was using geothermal resources deeper than 1000 feet to power their commercial greenhouses. *Rosette* rejected the arguments that (1) geothermal resources were not minerals under the Stock-Raising Homestead Act, and New Mexico statutory law defined the water as a geothermal resource, and (2) that use of geothermally warmed water is distinct from using water for agriculture, which would be a permitted surface use. *See id.* at 1125 ("Finally, the lease provision permitting the lessee to use wells for potable water for lease related purposes cannot fairly be read to include free use of the heat from geothermal wells. Once again, the distinction between potable water and the heat it transports is critical."). On appeal, the Tenth Circuit affirmed, holding

> Any right that can be inferred from the footnote in *Western Nuclear* and the opinion in *Shiver* would extend only to the use of resources essential for stockraising and the raising of crops. *See Western Nuclear*, 462 U.S. at 54 n.14. Thus, while Rosette might be able to use the heated water from geothermal resources under its property for use in watering livestock or irrigating forage crops and remain within the patent, the commercial activity of heating greenhouses to produce roses for sale falls outside the patent. Therefore, Rosette, by virtue of being the surfaceholder, does not acquire the right to use the geothermal resources in Well 55–7 for use in providing heat for its commercial greenhouse operation. The right to the resources remains in the federal government.

*Rosette Inc. v. United States*, 277 F.3d 1222, 1234-35 (10th Cir. 2002).

Considering *Watt*, the Ninth Circuit held that the surface owner had the right to use rock from the mineral state. "Apart from Koniag's rock, there are no practical sources of rock for development of Koncor's surface estate, consistent with the intent of ANCSA. Therefore, Koncor, as surface owner, has a right not to be unreasonably denied use of rock from Koniag's subsurface estate. The benefits and burdens of this servitude run with the respective estates." *Koniag, Inc. v. Koncor Forest Res.*, 39 F.3d 991, 1001 (9th Cir. 1994).

The mineral rights reserved under the Stock Raising Homestead Act are done so in language similar to that of the Osage Allotment Act. The Stock Raising Homestead Act states that surface patents "contain a reservation to the United States of all the coal and other minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same." Section 3 of the Osage Allotment Act states that "the oil, gas, coal, or other minerals covered by the lands [allotted or sold under the Act] are hereby reserved to the Osage tribe . . . ." Both Acts reserve generally the "minerals" to one other than the surface owner, and neither Act contains specific language prohibiting use by the surface owner of any soil for personal use. The cases interpreting and applying the Stock Raising Homestead

OSAGE WIND PRIV-000417

Act, therefore, are persuasive with respect to the interpretation of the Osage Allotment Act, and the same holding should result.

These cases demonstrate that a surface owner has a right to use material from the mineral estate for purposes consistent with the surface use, without being considered to have engaged in mining. The surface owner may use the mineral estate incidentally; but it may not use it for commercial or other purposes. Applied to the case at bar, Trade Wind is authorized under its lease to use or move the soil so long as it does not gain any commercial benefit from that soil.

This concept is supported by state law. "[T]he simple removal of dirt does not constitute mining." 53A Am. Jur. 2d Mines and Minerals § 14 (citing *Com., Dep't of Mines, Minerals & Energy v. May Bros., Inc.*, 396 S.E.2d 695, 697 (Va. 1990)). *May Brothers* applied the Virginia definition of "mining" ("the breaking or disturbing of the surface soil or rock in order to facilitate or accomplish the extraction or removal of minerals; any activity constituting all or part of a process for the extraction or removal of minerals so as to make them suitable for commercial, industrial, or construction use; but . . . *shall not include excavation or grading when conducted solely in aid of on-site farming or construction*") (emphasis added) to hold that dirt removed from a construction site "was not thereafter 'processed' in any manner, but was simply transported to the Virginia Baptist Hospital construction site. . . . We hold that the simple removal of dirt from a construction site, without more, does not constitute 'mining'" as defined by statute. *See also Bursey v. S. Carolina Dep't of Health & Envtl. Control*, 600 S.E.2d 80, 81-82 (S.C. Ct. App. 2004) *aff'd,* 631 S.E.2d 899 (S.C. 2006) *overruled on other grounds by Allison v. W.L. Gore & Associates*, 714 S.E.2d 547 (S.C. 2011) (construing a state statute definition of "mining" exception for "excavation or grading when conducted solely in aid of on-site farming or of on-site construction" as not including a dam construction project where the minerals removed in excavation were used to build the dam); *Linde Enterprises, Inc. v. Pennsylvania Dep't of Envtl. Prot.*, 692 A.2d 645, 649 (Pa. Commw. Ct. 1997) (concluding excavation for construction, where the dirt was then transported and used elsewhere, was commercial). *Cf.* 30 U.S.C. § 1278 (stating that surfacing mining regulations do not apply to "the extraction of coal as an incidental part of Federal, State or local government-financed highway or other construction under regulations established by the regulatory authority").

Oklahoma's Wind Energy Development Act ("WEDA") demonstrates that a wind energy facility includes both above and below ground components. *See* Okla. Stat. Ann. tit. 17, § 160.13(9) ("'Wind energy facility' means an electrical generation facility consisting of one or more wind turbines under common ownership or operating control, *and includes substations, meteorological data towers, aboveground and underground electrical transmission lines, transformers, control systems, and other buildings or facilities used to support the operation of the facility*, and whose primary purpose is to supply electricity to an off-site customer or customers.") (emphasis added). The same statute defines "wind turbine" as "a wind energy conversion system which converts wind energy into electricity through the use of a wind turbine generator and includes the turbine, blade, tower, base and pad transformer, if any." *Id.* (8). The purpose of the WEDA is to address the relationship between wind energy developers and mineral estate owners, recognizing that they both have rights to the property. 17 Okl.St.Ann. § 160.12(3); *see Osage Nation ex rel. Osage Minerals Council v. Wind Capital Grp., LLC*, 11-CV-643-GKF-PJC, 2011 WL 6371384 (N.D. Okla. Dec. 20, 2011), appeal dismissed (Feb. 23, 2012) ("The Oklahoma Legislature recently issued the . . . findings in support of wind energy development, but striking a balance between the development of wind energy resources and the right of mineral estate owners to make reasonable use of the surface estate . . . .").

5

OSAGE WIND PRIV-000418

Federal and state law relating to resource development, therefore, provides no support for the Tribe's argument that a mining permit is needed to construct a wind turbine.

Additionally, principles of property law permit surface owners to make use of the soil in a manner consistent with their ownership rights. *See Mullins v. Clinchfield Coal Corp.*, 128 F. Supp. 437, 442 (W.D. Va. 1953) *aff'd*, 227 F.2d 881 (4th Cir. 1955) (concluding surface owners do not owe damages to the mineral owners when construction on the surface of a railroad, including changing the course of a creek and a road). On appeal, the Fourth Circuit held "a displacement of outcrop or other coal in the reasonable exercise of surface or residual rights does not constitute a trespass, although the mineral owner is entitled to compensation based upon the value in situ of the coal displaced." *Mullins v. Clinchfield Coal Corp.*, 227 F.2d 881, 884 (4th Cir. 1955).

In a recent case from the Supreme Court of Washington, the surface owner had to grade, cut, and fill the property in order to construct a residential subdivision. *Saddle Mountain Minerals, L.L.C. v. Joshi*, 95 P.3d 1236, 1238 (Wash. 2004).

> A surface owner can burden a mineral owner's right. In *Pyramid Coal Corp. v. Pratt*, the owner of land—who did not own the coal lying beneath the land—drilled a well to supply water for his house. 229 Ind. 648, 650, 99 N.E.2d 427 (1951). The well passed through a seam of coal. The mining company, owner of the coal, removed a part of the well passing through the seam of coal while excavating coal. As a result, the surface owner was deprived of his water supply and the water was allegedly contaminated. The surface owner sued the mining company for damages caused by loss of water supply and possible contamination of the water. *Id.* The court ruled in favor of the surface owner and held that he was entitled to drill a well to obtain water because the severance of surface ownership and mineral ownership created an easement in favor of the surface owner which burdened the mining company's right to coal. *Id.* at 651–54, 99 N.E.2d 427.
>
> However, even if a surface owner can burden a mineral owner's right, it does not mean that the surface owner can export minerals without any compensation to the mineral owner. . . . Here, as in *Pyramid Coal Corp.*, the Joshis were entitled to utilize the surface soil in developing the Gage Galaxy site. However, under *Mullins,* the Joshis must compensate Saddle Mountain if they export sand and gravel from the Gage Galaxy site.

*Id.* at 1243. *See also Wray v. Goeglein*, 1998 WL 880582 n.9 (Ohio Ct. App. Dec. 2, 1998) (quoting Thompson's real property treatise, 1A Thompson 73-75, § 164, "The surface owner has the right to make reasonable use of the surface though this may result incidentally in damage to the mineral owner."); *Weathers v. M.C. Lininger & Sons, Inc.*, 682 P.2d 770, 774 (Or. 1984) (quoting Healy, *Rights of Mineral Owners in Surface,* 1 Rocky Mtn. Mining L Inst 85, 92 (1955), "*the surface owner has the right to use the surface for all other purposes not inconsistent with or interfering with the mineral owner's use.*").

A California case held, "The right given is limited to the use of the land for the purpose of producing the minerals. Any use by the owner, or others operating under him, which does not affect the search for and production of the minerals, is lawful, and the defendants have no right to interfere with such use, except when in the actual exercise of the lessees' rights under the lease, the other occupation or use shall be found adverse, injurious, or conflicting." *Brookshire Oil Co. v. Casmalia Ranch Oil & Dev. Co.*, 156 Cal. 211, 217, 103 P. 927, 929 (1909) overruled on other grounds *Callahan v. Martin*, 43 P.2d

788 (Cal. 1935). The Court held a pipeline installed under right granted by the surface owner did not interfere with the rights of the mineral estate lessee. *Id.*

Research Conducted

I reviewed manuals available on the Department of Interior's website and did not find any information discussing our factual situation. Nor did I locate any relevant opinions of the Solicitor of the Interior. The Indian Tribal Energy Development and Self-Determination Act of 2005, 25 U.S.C. §§ 3501-06, and relevant regulations, 25 C.F.R. Part 224, did not shed light on the issue.

I initially focused on searching for regulations, cases, agency decisions, and secondary sources defining "mining" or "minerals" to demonstrate that excavation incident to construction on the surface was not "mining." While some weak authority was found on this point, the question appears largely unaddressed. I then turned to the question, in property law, of the rights of surface owners to use the soil to conduct activities related to their surface use. The caselaw of various states supports that surface owners may use soil, even when there are minerals present in the soil, for construction or otherwise, but cannot sell the minerals without being liable to the owner of the mineral estate. While the cases do not say so explicitly, this appears to be because construction is not "mining" but is a surface use.

I did not find any Oklahoma cases addressing this issue.

Y:\dox\client\85910\0001\RESEARCH\W2011397.DOCX

OSAGE WIND PRIV-000420