# EXHIBIT 6

Case No. l4-CV-704-GKF-JFJ

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
    UNITED STATES OF AMERICA,
 3

 4              Plaintiff,

 5   and

 6   OSAGE MINERALS COUNCIL,

 7              Intervenor-Plaintiff,
    vs.                          No. 14-CV-704-GFK-JFJ
 8
    OSAGE WIND, LLC; ENEL KANSAS,
 9   LLC; and ENEL GREEN POWER
    NORTH AMERICA,
10

11              Defendants.

12   VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF BILL MOSKALUK
                 TAKEN ON BEHALF OF THE PLAINTIFF
13               ON JUNE 16, 2021 AT 10:00 A.M.

14                          APPEARANCES

15   On behalf of the PLAINTIFF:
    Stuart Ashworth
16   Cathryn D. McClanahan
    Nolan Fields
17   UNITED STATES ATTORNEY'S OFFICE
    Northern District of Oklahoma
18   110 West 7th Street, Suite 300
    Tulsa, Oklahoma  74119
19   918.382.2700
    stuart.ashworth@sol.doi.gov
20

21   (Appearances continued on the following page)

22   ALSO PRESENT:  Megan Beauregard, Michelle Hammock, &

23   Christina Watson

24   VIDEOTAPED BY:  Megan Smith

25   REPORTED BY:   Abby Rhodes, CSR, RPR
```

**Page 2**

1              APPEARANCES CONTINUED

2  On behalf of the INTERVENOR-PLAINTIFF:
   Mary Katherine Nagle
3  Shoney Blake
   PIPESTEM & NAGLE
4  401 South Boston Avenue, Suite 2200
   Tulsa, Oklahoma  74103
5  918.936.4705
   mknagle@pipestemlaw.com

6  On behalf of the DEFENDANT:
7  Ryan Ray
   NORMAN, WOHLGEMUTH, CHANDLER, JETERN, BARNETT & RAY
8  401 South Boston Avenue
   2900 Mid-Continent Tower
9  Tulsa, Oklahoma  74103
   918.583.7571

10
   Sarah M. Stevenson
11 Lynn Slade
   MODRALL, SPERLING, ROEHL, HARRIS & SISK
12 500 Fourth Street NW, Suite 1000
   Albuquerque, New Mexico  87103
13 505.848.1800
   sarah.stevenson@modrall.com

14

15

16

17

18

19

20

21

22

23

24

25

**Page 3**

INDEX

2                                    Page

3  BILL MOSKALUK                      6
4  Direct Examination by Mr. Ashworth        6
5  Cross Examination by Ms. Nagle         127
6  Redirect Examination by Mr. Ashworth    179

7              EXHIBITS

8  Exhibit       Description
9  8      5/15/14 E-mail             144
10 37     5/22/14 E-mail Chain       140
11 38     10/9/14 Letter from the Bureau of   114
12         Indian Affairs
13 46     Exhibit B(i) Scope of Work       75
14 48     Organizational Procedure No. 80     98
15 52     Contract Between Osage Wind LLC &   177
16         IEA Renewable Energy Inc.
17 53     7/9/14 Email Chain         147
18 55     September 2014 E-mail Chain     156
19 56     September 2014 E-mail chain     159
20 59     Bill Moskaluk's LinkedIn Page      17
21 60     Defendants' Response to Plaintiff's   24
22         Motion for Preliminary Injunction
23 61     Osage Wind Project Alignment Meeting  37
24         Agenda 9/9/14
25         EXHIBITS (Continued)

**Page 4**

1  Exhibit    Description              Page
2  62    Project Option/Change Order       89
3  63    5/22/15 E-mail Chain          99
4  64    October 2014 E-mail Chain        106
5  65    10/14/14 E-mail Chain          113
6  66    6/26/14 Meeting Notes          150
7  67    September 2014 E-mail Chain      162
8  68    September 2014 E-mail Chain      164
9  69    Defendants' Fifth Amended and     171
10        Supplemental Privilege Log
11 70    Project Short Views Update 10/17/14   174
12
13
14
15           STIPULATIONS
16        It is stipulated that the deposition of BILL
17 MOSKALUK may be taken pursuant to agreement and
18 Federal Rules of Civil Procedure on June 16, 2021,
19 before Abby Rhodes, CSR, RPR.
20
21
22
23
24
25

**Page 5**

1   VIDEOGRAPHER:  This is the videotape
2  deposition of Bill Moskaluk in the matter of the
3  United States of America and Osage Minerals Council
4  versus Osage Wind, et al., filed in the United States
5  District Court for the Northern District of Oklahoma,
6  Case No. 14-CV-704-GFK-JFJ.  We're on the record at
7  10:00 a.m. on June 16, 2021.  Will counsel please
8  state their names for the record.

9   THE WITNESS:  William Moskaluk.
10   MR. ASHWORTH:  Stuart Ashworth with the U.S.
11  Attorney's Office.  I also have Cathy McClanahan and
12  Nolan Fields, attorneys in the case, as well as
13  Michelle Hammock and Christina Watson who are
14  paralegals with the U.S. Attorney's Office.  And we
15  represent the U.S.

16   MS. NAGLE:  Mary Katherine Nagle with
17  Pipestem & Nagle.  I represent the
18  intervener-plaintiff, the Osage Minerals Council, and
19  with me today is my colleague Shoney Blake.

20   MR. RAY:  Ryan Ray for the defendants.  I
21  believe also on call for the defendants is Lynn Slade
22  and Sarah Stevenson.  Counsel Megan Beauregard is
23  observing.

24   VIDEOGRAPHER:  Okay.  Will the reporter now
25  swear in the witness.

Page 6

1     (Witness continued)
2          BILL MOSKALUK,
3  being first duly sworn, was examined and testified as
4  follows, to wit:
5          DIRECT EXAMINATION
6  BY MR. STUART ASHWORTH:
7     Q    Sir, my name is Stuart Ashworth and I'm with
8  the U.S. Attorneys Office and I represent the United
9  States in this lawsuit.
10         Can I get your full name for the record.
11    A    William Moskaluk.
12    Q    What is your middle name?
13    A    Alexander.
14    Q    And do you -- and you go by Bill?  I think
15  he froze or he's thinking.  I'm sorry, we -- I think
16  there was technical difficulties there.
17         Before our screen froze, I had asked you go
18  by Bill; is that correct?
19    A    Correct.
20    Q    Okay.  Have you gone by any other names
21  other than Bill or William Alexander Moskaluk?
22    A    I had a nickname many years ago when I was
23  about three or four.  It was Buddy, but I don't go by
24  that now.
25    Q    Okay.  Have you ever given a deposition

Page 7

1  before?
2     A    Yes.
3     Q    How many depositions have you given?
4     A    I believe it's been one, possibly two.
5     Q    Okay.  How long ago were they, those?
6     A    Gosh, I couldn't tell you in a matter of
7  years.  It was a while ago.
8     Q    Within -- since 2000?
9     A    I'm not sure.
10    Q    Okay.  What did those depositions relate to?
11    A    One was a lawsuit down in Orlando, Florida,
12  a person had tripped over a bumper block at the
13  parking garage at Orlando International Airport.
14    Q    And were you a witness or was it related to
15  construction?
16    A    It was related to construction.
17    Q    What was the other deposition that you think
18  you may have been involved with?
19    A    Oh, gosh.  I don't remember what it was for
20  right offhand, but that was several years ago as well.
21    Q    Okay.  Have you ever testified at trial
22  before?
23    A    No, sir.
24    Q    Okay.  I'm going to go over some -- some
25  deposition ground rules just -- you know, since it

Page 8

1  seems like it's been a while.  You know, today, I'm
2  just going to be -- you know, it's just a
3  conversation.  I'm going to be asking you some
4  questions and you can -- I'll give you the opportunity
5  to respond.  The difference there is that we have a
6  court reporter, a stenographer who is writing
7  everything that you say and I say down so that we have
8  a clear record for the Court.
9          So because of that, I just kindly ask that
10  you let me answer my -- or ask my questions before you
11  respond and I'll do my best also to let you finish
12  your questions -- I'm sorry, finish your answer before
13  I ask my next question.  Okay?
14    A    Okay.
15    Q    Part of that to make a clear record, if I
16  ask you a yes-or-no question and you can answer it yes
17  or no, I ask that you do that.  And you can add
18  whatever you -- caveat you want to.  I just would ask
19  that you not say uh-huh or huh-uh just because those
20  words are written very similarly and I'd hate for you
21  to get one answer and it gets accidentally typed up as
22  a different answer by the court reporter.
23         Is that okay?
24    A    Yes.
25    Q    And if for any reason you -- you start

Page 9

1  saying uh-huh or huh-uh during your deposition, if I
2  correct you, I hope that you understand that I'm not
3  trying to be mean; I'm just trying to make sure that
4  the record is clear.
5          Is that okay?
6     A    Yes.
7     Q    Your deposition is not -- not intended to be
8  a marathon.  I don't think that it's going to go super
9  long, but I do anticipate going on breaks every hour,
10  just a five-minute or however long break we'll --
11  we'll take.  At any point before those breaks, those
12  scheduled breaks you can ask for a break, just let me
13  know.  My only question or my only caveat is that I
14  ask -- if I ask you a question, that you finish
15  responding to the question before we take a break.
16         Is that fair?
17    A    Yes.
18    Q    Okay.  If for any reason I ask you a
19  question that you don't hear any part of that question
20  or you don't understand any part of that question, let
21  me know.  Just say, hey, Stuart, I didn't catch that,
22  I don't understand, can you rephrase or re-ask and
23  I'll be more than happy to do that.  Okay?
24    A    Okay.
25    Q    And the purpose of that is because I want to

Page 10

1 have a clear record and I would hate for you to
2 respond to a question that you didn't hear or didn't
3 understand before you answer.  So if I do ask you a
4 question and you respond, would it be fair for me to
5 assume that you heard the question and you understood
6 it before you responded?
7     MR. RAY:  Object to form.
8     You can answer.
9     THE WITNESS:  Yes.
10   Q  (By Mr. Ashworth) Okay.  And during your
11 deposition, your attorney or the attorneys here can
12 object, object to the form of the question.  That's
13 just their way of preserving an objection for the
14 Court.  Unless you're instructed not to answer, you
15 can go ahead and answer.  Okay?
16   A  Yes.
17   Q  Okay.  What did you do to prepare yourself
18 for today's deposition?  Did I cut out, Bill?
19   A  I didn't hear anything you said.  I'm sorry.
20   Q  Okay.  It just seems like we may be having
21 some -- some slight connection issues.
22       What did you do to prepare for your
23 deposition?
24   A  Would you repeat that, please?  I didn't
25 quite hear you.

Page 11

1   Q  No -- no problem.
2       What did you do to prepare for your
3 deposition?
4   A  I met with Ryan Ray and Megan Beauregard
5 yesterday and went over a couple of things.
6   Q  So I'll just stop you there.  I don't want
7 to know anything that you spoke with -- with your
8 counsel because that's attorney-client privilege for
9 your -- for you deposition prep, but any -- what --
10 other than speaking with counsel, what else did you
11 do?
12   A  Nothing.
13   Q  Did you review any documents?
14   A  I did.
15   Q  Okay.  What documents did you review?
16   A  It was some e-mails, past e-mails, a
17 declaration, things of that nature.
18   Q  Do you know about how many e-mails you
19 reviewed?
20   A  No, I don't.
21   Q  Okay.  With the e-mails that you reviewed,
22 were those your e-mails or e-mails from other people?
23   A  A little bit of both.  The majority of them
24 were e-mails by other people.
25   Q  Okay.

Page 12

1   A  And I did -- I did have some of my own that
2 I responded to as well.
3   Q  Were there anything contained in those
4 e-mails that you disagreed with?
5   A  No.
6   Q  Okay.  Everything in those e-mails kind of
7 go along with your recollection of the events at the
8 time of the construction?
9     MR. RAY:  Object to form.
10    THE WITNESS:  Basically, those -- those
11 other e-mails from other people, they were just
12 commenting on this and that.  I don't really know what
13 their background was with the information, but
14 ultimately, those people are responsible for saying
15 what they said so it would have to go back to them if
16 you wanted to contact them.
17   Q  (By Mr. Ashworth) Sure.
18     And I don't know what they wrote so I
19 wouldn't know how to contact them or who they were,
20 but my question would be is the information that is
21 contained in the e-mails that you reviewed, was there
22 anything inconsistent in those e-mails, inconsistent
23 with your memory of the construction project?
24    MR. RAY:  Object to form.
25    THE WITNESS:  Basically, that -- that

Page 13

1 project was seven years ago, going on eight, and for
2 me to really remember everything that happened on that
3 project site is kind of hard to do.  I was 62 at the
4 time, I'm 70 years old now.  I've been through a
5 cancerous situation.  I just don't remember all of it
6 so I can't really, really comment on it.
7    MR. ASHWORTH:  Sure.
8    I'm going to ask the court reporter, Abby,
9 if you could reread my question to Bill.
10   COURT REPORTER:  Sure.
11   (Court reporter read back requested portion
12 of transcript)
13   MR. RAY:  I renew the objection.
14   Q  (By Mr. Ashworth) Bill, I just wanted to get
15 a response to that -- that question.
16   MR. RAY:  Object to form.  Asked and
17 answered.
18   Q  (By Mr. Ashworth) Is there anything in those
19 e-mails that you -- that were inconsistent with your
20 memory?
21   A  No.
22   Q  Okay.  What about the declaration, do you --
23 did you review the declaration?
24   A  Yes.
25   Q  First off -- scratch that question.

Page 14

1    The declaration you're referring to, that's
2  the declaration that you submitted in response to a
3  motion for injunction, I believe, as far as a lawsuit;
4  is that correct?
5    A  Yes.
6    Q  And did you review that declaration in
7  preparation for your deposition in its entirety?
8    A  We briefly touched base on it, yes.
9    Q  Okay.  Did you review your declaration --
10  did you read your declaration?  Let me ask that.
11    A  Yes.
12    Q  Okay.  Was there anything in the declaration
13  that you believe was incorrect?
14    A  No.
15    Q  Okay.  To the best of your memory,
16  everything contained in your declaration was accurate?
17  Bill, I may have cut out.  Did you -- did you respond
18  to that?
19    A  I didn't hear the whole question.  I'm
20  sorry.
21    Q  Sure.  Was there -- scratch that.
22    It's your testimony that the declaration
23  that you prepared, both the -- let me back up first.
24    There's two declarations that you submitted
25  relative to a lawsuit; is that correct?

Page 15

1    A  Yes.
2    Q  And did you review both declarations?
3    A  Yes.
4    Q  Okay.  Is it -- would it be your testimony
5  that both of the declarations that you reviewed were
6  truthful?
7    A  Yes.
8    Q  Other than the e-mails and declarations,
9  were there any other documents that you reviewed to
10  prepare for your deposition?
11    A  Like I said earlier, the -- the e-mails that
12  I -- I was looking at, other than that, there was no
13  other documents.
14    Q  Okay.  Did you speak with anyone other than
15  your counsel to prepare for your deposition?
16    A  No.
17    Q  Is anyone aware of your deposition other
18  than counsel?
19    A  My wife.
20    Q  Okay.  Other than your wife?
21    A  No.
22    Q  Did you do anything other than speak with
23  counsel and review documents that you already
24  discussed that could help -- that helped prepare you
25  or helped your memory of the case?

Page 16

1    A  No, they were the only ones.
2    Q  Okay.  What is your current residential
3  address?
4    A  105 North 4th Street, Rio Vista, California
5  94571.
6    Q  How long have you lived there?
7    A  Oh, gosh.  Twelve years.
8    Q  Okay.  What is your highest level of
9  education that you completed?
10    A  Thirteen, 14 years.
11    Q  When you say 13, 14 years, are we talking
12  about high school?
13    A  No, 12 years all together with elementary
14  school, junior high school, and -- and high school and
15  there was a couple years in there for college.
16    Q  Okay.  Your -- you graduated high school; is
17  that correct?
18    A  Yes.
19    Q  Okay.  Did you get any degrees in college?
20    A  There was a two-year AS degree in
21  architecture years ago.
22    Q  Where was that from?
23    A  Valencia Community College, Orlando,
24  Florida.
25    Q  Okay.  Who are you currently employed by?

Page 17

1    A  I'm not.  I'm retired.
2    Q  When did you retire?
3    A  September of '17.
4    Q  I'm going to introduce an exhibit to your
5  deposition that I'm going to mark as Exhibit No. 59.
6  It's going to be a LinkedIn page.  We'll get that
7  pulled up.  Scroll down a little bit.  This appears to
8  be a LinkedIn page or at least your LinkedIn page,
9  have to go to the next page -- does that -- does this
10  look like it could be yours?
11    (Exhibit 59 Marked for Identification)
12    A  I don't even remember that document.  I'm
13  sorry.
14    Q  Sure.  Do you know if you have a LinkedIn
15  page?
16    A  I don't know.  I think that account ran out
17  a long time ago.
18    Q  Okay.  But at one point you would have had a
19  LinkedIn page?
20    A  Yes.
21    Q  Okay.  Here it says that prior to
22  retirement, or at least it seems like you retired from
23  Enel Green Power North America.
24    Is that -- is that about accurate?  Bill,
25  did you -- did -- did I cut out?

Page 18

1    A   Yes, you did.

2    Q   Okay.  It -- here it indicates that you

3  retired from Enel Green Power North America; is that

4  correct?

5    A   Yes.

6    Q   And it says that you worked there beginning

7  in May 2014 to May 2017; is that -- is that correct?

8    A   Yes.  Well, actually, it was -- actually, it

9  was September of 2017.

10   Q   Okay.  And it says that you -- during your

11 time at Enel Green, that you were the site manager; is

12 that correct?

13   A   Yes.

14   Q   Okay.  When you -- were you the site manager

15 for Enel Green the entire time while working for Enel

16 Green?

17   A   Yes.

18   Q   Okay.  How long -- scratch that.

19       When you began work at Enel Green, you were

20 hired as a site manager; is that correct?

21   A   I was -- I was hired as a site

22 coordinator --

23   Q   Okay.

24   A   -- initially.

25   Q   When did you switch over?

Page 19

1    A   It was towards the end of my tenure with

2  Enel Green Power.

3    Q   Okay.  So during your tenure at Enel Green,

4  you were not, in fact, site manager the entire time;

5  correct?

6    A   Correct.

7    Q   Okay.  In your role as site coordinator,

8  what would have been your job responsibilities?

9    A   Basically to report site conditions and site

10 project to my superiors, to oversee the construction

11 activities.

12   Q   Okay.  Would you have been on site on a

13 project generally the entire time?

14   A   Yes.

15   Q   Okay.  Would your superior that you would

16 have reported to also have been on site?

17   A   They were on site occasionally and also once

18 a month at our construction meetings.

19   Q   Okay.  But in general, you would have been

20 the boots-on-the-ground person for Enel Green for a

21 particular project that you were assigned to; is that

22 correct?

23       MR. RAY:  Object to form.

24       You can answer.

25       THE WITNESS:  Yes.

Page 20

1    Q   (By Mr. Ashworth)  Okay.  What would a --

2  what's the difference between a site manager and a

3  site coordinator?

4    A   A site manager has responsibility to make

5  pertinent decisions for a site coordinator does not

6  have that ability, and he relies on his superiors in

7  order to direct him on his daily activities.

8    Q   What was -- when you -- scratch that.

9        When you started for Enel Green, what was

10 the first project that you were assigned to?

11   A   Osage Wind's prod -- project.

12   Q   Okay.  How long were you assigned to the

13 Osage Wind project?

14   A   Gosh, I can't really remember offhand the

15 exact time I was there.  Probably about six to eight

16 months.

17   Q   Were you there when the project finished?

18   A   Yes.

19   Q   Okay.  So you saw the project to completion?

20   A   Yes.

21   Q   After the Osage Wind project, what project

22 did you get assigned to for Enel?

23   A   I believe it was one in Weatherford,

24 Oklahoma.  I'm -- I can't remember the name of that

25 one.  Little Elk.

Page 21

1    Q   Do you recall who was the site manager on

2  the Osage Wind project?

3    A   The project manager was Giuseppe DiMarzio.

4    Q   Okay.  And while you were on the Osage Wind

5  project, Giuseppe was always your superior; is that --

6  is that correct?

7    A   Yes, there was him and there was also a

8  fellow by the name of Bill Price.

9    Q   Okay.  And at all times while working on the

10 Osage Wind project, you were the site coordinator and

11 never the site manager; is that right?

12   A   That is correct.

13   Q   Okay.  Is there a chain of command that you

14 are aware of for issues or problems to be brought to

15 Enel Green management on site?

16       MR. RAY:  Object to form.

17       You can answer.

18       THE WITNESS:  There is a chain of command.

19 There's multiple people involved.  How many people,

20 I'm really not privy to that because half of them are

21 in Italy and half of them are in the United States

22 so...

23   Q   (By Mr. Ashworth)  If -- if there was an

24 issue or a problem on any given project that you were

25 assigned to with Enel Green, as site coordinator, how

Page 22

1  would you bring that, you know, to someone's attention
2  in the higher-ups of Enel Green?
3      A   Sometimes it was a phone call, a simple
4  phone call.  Sometimes it was an e-mail perhaps, just
5  normal lines of communication.
6      Q   Okay.  Would you have spoken with someone
7  who is off site with Enel Green management?
8      A   It would be with Enel management, yes.
9      Q   And I assume if Enel Green management had an
10 issue or a problem relating to the project that you
11 were assigned to and they wanted to address it with
12 you, they would contact you or would they have to
13 contact someone else to get that information to you?
14     A   No, they'd contact myself.
15     Q   Okay.  Who is Joan Heredia?
16     A   She was our environmentalist and regulatory
17 affairs person.  I don't know if I've ever -- I don't
18 know if I have her title correct or not.
19     Q   Okay.  When you say "our," are you referring
20 to Enel Green?
21         MR. RAY:  Object to form.
22         You can answer.
23         THE WITNESS:  I'm sorry, I didn't hear the
24 question.
25     Q   (By Mr. Ashworth) Sure.

Page 23

1         Was Joan Heredia an Enel Green employee?
2      A   Yes.
3      Q   Okay.  What was Joan Heridia's role in
4  relation to the Osage Wind project?
5         MR. RAY:  Object to form.
6         THE WITNESS:  She was basically my go-to
7  person for any environmental concerns that I had on
8  the project.
9      Q   (By Mr. Ashworth) Do you know if you had any
10 environmental concerns relating to the Osage Wind
11 project?
12     A   No, I did not have any.  I -- I had concerns
13 myself about run-offs and facilitation leading to the
14 job site, but once we got it corrected, it was fine.
15     Q   Do you know if Joan Heredia had much
16 involvement with the Osage Wind project?
17     A   That, I don't know.
18     Q   I'm going to pull up your declaration that
19 I'm going to mark as an Exhibit No. 60.  This is going
20 to be the first declaration that you entered.  Maybe
21 make that just a little bit smaller.
22         Sir, I marked this declaration, it's
23 entitled Declaration of Bill Moskaluk as Exhibit
24 No. 60.
25         Is this the -- does this appear to be the

Page 24

1  declaration, one of the declarations that you reviewed
2  to prepare for your deposition?
3         (Exhibit 60 Marked for Identification)
4      A   What you need to do is enlarge that so I can
5  see it.  I -- I can't even read it.
6      Q   Sorry.  We can definitely do that.
7      A   All right.
8      Q   Sorry about that.
9      A   All right.
10     Q   And we can scroll through it if you want to
11 verify that this is the document you reviewed.
12     A   Yes, I believe so.
13     Q   When was the last time that you read this
14 document?
15     A   Yesterday.
16     Q   Okay.  We're going to go to the last page of
17 this declaration, which I believe is page No. 9 of the
18 declaration, ten on the PDF.
19         Right here, it says executed this ninth day
20 of December 2014 in Burbank, Oklahoma, and then it has
21 a signature there.
22         Is -- is -- is that your signature?
23     A   Yes.
24     Q   Okay.  And do you recall signing that,
25 signing this document?

Page 25

1      A   I must have because that's my signature so
2  yes, I did.
3      Q   Okay.  We'll scroll to the page above that
4  just towards the bottom.  Right there.  It says
5  "Pursuant to 28 USC, Section 1746, I declare under
6  penalty of perjury that the foregoing is true and
7  accurate to the best of my knowledge."
8      A   To the best of my --
9      Q   Did I read that correctly?  Did I read that
10 correctly?
11     A   I'm sorry, repeat that.
12     Q   Sure.
13         Did I read that sentence correctly?  I can
14 read -- reread it if you want me to.
15     A   No, I can -- I can read it just fine, and at
16 the time that this was happening, it was true and to
17 the best of my knowledge.
18     Q   Okay.  I believe you testified earlier that
19 you have reviewed this declaration and that there was
20 nothing in there that you believe was not true or
21 correct; is that right?
22     A   Yes, it was.  You've got to remember also
23 that this was a prepared document and basically we --
24 I reviewed it and put my signature on it as well.
25     Q   Sure.

Page 26

1    Here in this sentence it says "Pursuant to
2  28 USC, Section 1746, I declare under penalty of
3  perjury that the foregoing is true and accurate to the
4  best of my knowledge," and then on the next page you
5  signed it.
6    Is it your testimony that you would have
7  signed this document even though you declared under
8  penalty of perjury not knowing that the -- what was in
9  the document, not true or -- or -- or accurate?
10    MR. RAY:  Object to form.  Misstates prior
11 testimony.
12    THE WITNESS:  First of all, I don't know
13 what that 28 USC 1746 is.  And everything at that time
14 I believe was true and correct.  I can't really
15 remember all the details, but I believe it was.
16    Q    (By Mr. Ashworth) Sure.
17    Would it be your testimony that after
18 reviewing this section, this citation to a statute,
19 that you would have signed this document not knowing
20 what the statute said?
21    MR. RAY:  Object to form.
22    THE WITNESS:  I knew what the document had
23 said after reviewing it at the time I signed it.  Like
24 I said, that was -- that was a long time ago as well.
25    Q    (By Mr. Ashworth) Sure.

Page 27

1    Would it be your testimony that in seeing a
2  citation to a statute, that you would have signed this
3  document not knowing what the requirements of the
4  statute required?
5    MR. RAY:  Object to form.
6    THE WITNESS:  I -- I don't know what you're
7  alluding to, but like I said, the document was signed
8  back the -- on the date shown.  Other than that, I
9  can't elaborate one way or another.  At the time I
10 signed it I, believe that it was true and correct.
11    Q    (By Mr. Ashworth) Okay.  Why was the purpose
12 for which you signed this declaration?
13    A    I think it had to do with our first case
14 against the Osage or they had up against Enel back
15 then.
16    Q    Okay.  And this was to -- this declaration
17 was to support Enel's case?
18    A    It was to support what?  I'm sorry?
19    Q    I'm sorry.
20    Was this declaration in support of Enel
21 Green's case?
22    MR. RAY:  Object to form.
23    THE WITNESS:  Yes.
24    Q    (By Mr. Ashworth) Okay.  And by submitting
25 this document, which was to be in support of Enel

Page 28

1  Green's case, would it be your testimony that you
2  would have made sure that the information contained in
3  it was -- was accurate and truthful?
4    A    Yes.
5    Q    Okay.  We'll go to the top of this document,
6  which is the PDF pages two, it's the first page of the
7  declaration.
8    Sir, before I get into this, I know earlier
9  you testified that you did not prepare this document,
10 but when this document was presented to you, do you
11 recall if you made any changes?
12    A    I -- I can't remember that at all.
13    Q    Okay.
14    A    I'm not sure.
15    Q    If there was something in this document that
16 was incorrect, would you have made a change to it
17 before you would have signed it under penalty of
18 perjury?
19    MR. RAY:  Object to form.
20    THE WITNESS:  I probably would have changed
21 it, but I don't know if I had or not.
22    Q    (By Mr. Ashworth) We're going to have to go
23 to the paragraph five.  Actually, we're actually going
24 to stay right there on paragraph four.  I'll -- I'll
25 read this first part under paragraph four.  It says "I

Page 29

1  am familiar with and in connection with the
2  preparation of this declaration, have reviewed the
3  business records of both Enel and Osage Wind, LLC
4  associated with the Osage," and then we'll scroll down
5  to the next page.
6    Then it goes on, it says "Wind project
7  concerning the development and construction of that
8  project.  Those records were contemporaneously made
9  by, or with information from, people with knowledge of
10 the information reported and kept in the course of
11 Enel's and Osage Wind, LLC's regularly conducted
12 business activities.  It is the regular practice of
13 both Enel and Osage Wind to prepare and maintain such
14 records."
15    It appears to me that -- well, first off,
16 did I read that correctly?
17    A    Yes.
18    Q    It seems that you made the statements in
19 this declaration based on your review of the documents
20 in the possession of Enel and Osage Wind.
21    Does that seem about right?
22    A    Yes.
23    Q    Okay.  Starting on page -- I'm sorry, on the
24 same page, paragraph five, it says "In 2010, Osage
25 Wind, LLC began to secure leases to approximately

Page 30

1  840 acres -- I'm sorry, 8,400 acres of privately-owned
2  fee surface estate lands from the owners of those
3  lands in an area northeast of the town of Burbank in
4  Osage County, Oklahoma," and then it refers that to
5  the Osage Wind project, I'm sorry, Osage -- scratch
6  that. I'm sorry, wind farm property.
7      A   That's just history that was written into
8  this declaration by others and for what -- what their
9  reasoning was, I'm not really sure.
10     Q   Sure.
11         Just to be clear, you were hired by Enel
12  Green in May 2014; is that right?
13     A   Yes.
14     Q   Okay. And you're making this declaration to
15  the Court under your name about the history of Osage
16  Wind beginning in 2010; is that right?
17     A   It -- it was prepared by others -- others
18  other than myself and it was just -- a little bit of
19  history about the project is the best I can -- I can
20  tell you.
21     Q   Sure.
22         This -- this declaration before your
23  your deposition? Does anywhere in this -- this
24  declaration indicate to the Court that this was
25  prepared by someone other than you?

Page 31

1      MR. RAY: Object to form.
2      THE WITNESS: Yes.
3      Q   (By Mr. Ashworth) Somewhere in this
4  declaration indicates that it was prepared and sent by
5  someone other than you?
6      A   Yes, it was.
7      Q   Where do you recall seeing that?
8      A   I'm sorry?
9      Q   Where do you recall seeing that reference in
10 this declaration?
11     A   Are we talking about the 2010?
12     Q   No, I'm talking about your declaration.
13         Is there anywhere in this current
14 declaration that I marked as Exhibit No. 60 that
15 indicates to the Court that you did not prepare the
16 words on this declaration?
17     MR. RAY: Object to form.
18     THE WITNESS: No, I did not.
19     Q   (By Mr. Ashworth) Okay. And there's nothing
20 in this declaration that indicates to the Court that
21 these are not your words; is that correct?
22     MR. RAY: Object to form.
23     THE WITNESS: Yes.
24     Q   (By Mr. Ashworth) Okay. And, in fact, this
25 declaration tells the Court that this is being

Page 32

1  presented to the Court under your name?
2      A   Yes.
3      Q   Is that right? Okay.
4         Paragraph six says "No portion of the wind
5  farm property is held in trust by the United States
6  for the benefit of the Osage Nation."
7         My question is, is what does "held in trust"
8  mean?
9      A   I don't know.
10     Q   Okay. As a site coordinator on a wind
11 project, would -- would this have been something you
12 should have known about, whether the land was held in
13 trust or not?
14     MR. RAY: Object to form.
15     THE WITNESS: No. No, that was, like I
16 said, above my pay grade. It was in the upper
17 management hands and the legal departments as well.
18     Q   (By Mr. Ashworth) If you didn't know what
19 "held in trust" means, why did you indicate this in
20 your declaration under penalty of perjury to the
21 Court?
22     MR. RAY: Object to form.
23     THE WITNESS: I don't know.
24     Q   (By Mr. Ashworth) Okay. Do you think it
25 would have been appropriate for you to tell the Court

Page 33

1  something, to make a statement to the Court that you
2  didn't know what it meant?
3      MR. RAY: Object to the form.
4      THE WITNESS: I don't know. I don't recall.
5      Q   (By Mr. Ashworth) I'm sorry, you don't
6  recall or you don't know? Those are different --
7  those are different answers.
8      A   Yes, I do not know.
9      Q   Okay. Paragraph eight, it says "No portion
10 of the surface estate" -- "no portion of surface
11 estate of the wind farm property is held subject to
12 restrictions by the United States against alienation."
13         My question is, is what is "held subject to
14 restrictions by the United States against alienation"
15 mean?
16     A   I don't know.
17     Q   As a site coordinator on a wind project, is
18 this something that you would have -- you should have
19 known about?
20     MR. RAY: Object to form.
21     THE WITNESS: No, because, like I said, all
22 the matters pertaining to the case were -- were within
23 our management, upper management people, and that
24 information was never held down on the site level.
25     Q   (By Mr. Ashworth) Okay. And just to be

Page 34

1 clear, when you made this statement to the Court, you
2 had no clue what it meant?
3      MR. RAY:  Object to form.
4      THE WITNESS:  No.
5    Q   (By Mr. Ashworth)  Okay.  We'll do paragraph
6 11.  It says "Construction of the Osage Wind project
7 commenced on October 25, 2014.  Sorry, "2013."
8      You would have been the on-site -- you would
9 not have been on site when construction commenced; is
10 that correct?
11    A   Correct.
12    Q   Okay.  Do you know what kind of construction
13 started, what activity started in October 2013?
14    A   The construction that started, I'm assuming,
15 was the roadways for the project.
16    Q   Is that typical on a wind project based on
17 your experience in the industry?
18    A   That would be your first activity, yes.
19    Q   By the way, I skipped this part, how much
20 experience do you have or had working in the renewable
21 energy industry?
22      MR. RAY:  Object to form.
23      THE WITNESS:  Approximately 12 years.
24    Q   (By Mr. Ashworth)  Okay.  Paragraph 12, it
25 says -- going to the second sentence of paragraph 12,

Page 35

1 in October '13, "Clearing and grubbing and initial
2 road construction began on the wind farm property.
3 That work continued through roughly the end of January
4 2014.  From roughly late March through June 2014
5 further road construction and site preparation work
6 was ongoing at the wind farm property."
7      Did I read that correctly?
8    A   I believe you did, yes.
9    Q   Okay.  It appears, based on this statement,
10 that work stopped sometime between late January and
11 early March 2014.
12      Do you know why construction activities
13 stopped during that period?
14    A   I really can't remember that.  I don't
15 recall.
16    Q   Based on your experience in the industry, is
17 it normal to see a project have a work stoppage during
18 the early stages of construction?
19    A   Not necessarily, no.
20    Q   Okay.  For there to be a work stoppage in
21 excess of a month, would that generally be caused
22 because there's some type of issue on the project,
23 based on your experience?
24      MR. RAY:  Object to form.
25      THE WITNESS:  Yes.

Page 36

1    Q   (By Mr. Ashworth)  And again, you don't know
2 what issue, if any, there was for the work stoppage
3 here; is that correct?
4    A   I just don't recall it.  I'm sorry.
5    Q   Sure.
6      In the middle of this paragraph, it begins
7 with "excavation work."  It says "Excavation work for
8 foundations then began on September 10, 2014."
9      My question is:  Did excavation work begin
10 on schedule, if you recall?
11    A   Please -- please repeat that.
12    Q   Sure.
13      You would have been the site coordinator at
14 the time or at least during September 2014; that's
15 correct?
16    A   Yes.
17    Q   Do you recall if excavation work began on
18 schedule in September 2014?
19    A   I'm not really sure about the dates.  I'm --
20 I'm sorry.
21    Q   Sure.  I'm going to pull up another exhibit.
22 It's a meeting agenda exhibit that I'm going to mark
23 as Exhibit No. 61.  We'll scroll through this and let
24 you get a chance to -- to look at it.  Scroll back up.
25      Sir, do you know what this document is?

Page 37

1      (Exhibit 61 Marked for Identification)
2    A   It's an agenda for our monthly meeting.
3    Q   Okay.  It says "Alignment Meeting Agenda."
4      Is that the same as a monthly meeting?
5    A   Yes.
6    Q   Okay.  And it appears to be an all-day
7 meeting that starts with breakfast at 7:00 I believe
8 a.m. and then it goes down to -- if we scroll down a
9 bit, it seems to me it ends at 5:30 p.m.
10      Are these monthly meetings generally a
11 full-day meeting?
12    A   Yes.
13    Q   Okay.  And it appears since this is dated
14 September 9, 2014, that this would have been the day
15 before excavation started?
16    A   I really don't recall.
17    Q   Okay.  Would you have been at this meeting?
18    A   Say that again.  I'm sorry.
19    Q   As site coordinator, do you know if you
20 would have been at this full-day meeting --
21    A   Yes.
22    Q   -- on the project?
23    A   Yes.
24    Q   Okay.  It says towards the top, it says at
25 6:30 a.m. to -- to 8:00 a.m. it says a welcome by Bill

Page 38

1  Price.
2      Who is Bill Price?
3      A   He, at that time, was the vice president for
4  engineering and construction with Enel.
5      Q   Okay.  And it appears that he was there in
6  person based on this agenda.
7      A   Yes.
8      Q   Do you have any recollection of him showing
9  up to the monthly meetings?
10     A   Yes, he normally was on every -- every
11 monthly meeting.  He -- he would come to site.
12     Q   Okay.  The entry at 11:30 a.m., it says --
13 it states "Issue escalation matrix."
14     Do you know what that means?
15     A   No.
16     Q   I can't tell if the word "issue" is being
17 used as a verb or a noun here, if this is an issue as
18 in a problem or are they issuing an escalation matrix.
19     Do you -- does that ring a bell?
20     MR. RAY:  Object to form.
21     THE WITNESS:  No.  No, sir.
22     Q   (By Mr. Ashworth) Okay.  Towards the bottom
23 of the day at 3:00, it says "Project issues."
24     Do you know what issues were discussed
25 during this meeting?

Page 39

1      A   At that time, probably so, yes.
2      Q   Okay.  Do you -- do you know now, right now
3  as we speak?
4      A   I don't recall what the issues were but...
5      Q   Okay.  And again, it seems like this is the
6  day before excavation work would have started, and you
7  don't know what the issues -- issues that would have
8  been discussed here?
9      A   No, I really don't recall.
10     Q   Okay.  We're going to go back to your
11 declaration and we're going to go to paragraph 15
12 under A, little i, I'm going to actually let you read
13 this to yourself and let me know when you're done.
14     A   Okay.
15     Q   You're making this, the declaration, the
16 statement in this section because you wanted the Court
17 to know about the excavation process in the case; is
18 that correct?
19     A   Yes.
20     Q   Okay.  In fact, you believe that by telling
21 the Court about the excavation process, you were
22 somehow trying to be helpful to defeat the U.S.'s
23 request for injunction in the case; is that right?
24     MR. RAY:  Object to form.
25     THE WITNESS:  Now, say that again.

Page 40

1      Q   (By Mr. Ashworth) Sure.
2      By -- by making your statement here, by
3  informing the Court about the excavation process,
4  you're trying to be helpful to -- you know, in
5  opposition to the U.S.'s request for injunction; is
6  that right?
7      MR. RAY:  Same objection.
8      THE WITNESS:  I'm not sure.  At that time, I
9  think I was just basically explaining the excavation
10 process on foundations, nothing to do with anything
11 else.
12     Q   (By Mr. Ashworth) Sure.
13     Do you believe that everything within this
14 section is accurate, an accurate -- accurately
15 reflects the excavation for foundation in the case,
16 for the foundation in the case?
17     A   To the best of my knowledge, yes.
18     Q   Okay.  Nowhere in this section did you
19 inform about the significant amount of blasting that
20 was taking place at the time; is that correct?
21     A   This was prior to the blasting.
22     Q   I'm sorry, when did the blasting take place?
23     A   I'm not sure of the specific date, but
24 everybody that was involved with the blasting of these
25 excavations were relying on a document that was put

Page 41

1  together by one of our engineering firms and they give
2  a soils analysis and they drill holes and we should
3  have just been able to dig those holes conventionally,
4  but when we first put the first bucket down to dig our
5  hole, we ran into rock and there was rock all the way
6  down, which basically we had to stop and regroup, and
7  that's when it was decided to go ahead and drill,
8  charge it, and then shoot the foundation.
9      Q   Okay.  Let me -- go ahead.  Sorry.
10     A   We couldn't -- we couldn't excavate it
11 normally.
12     Q   Okay.  Just -- just based on your testimony,
13 it seems to me that you're indicating that part of the
14 excavation process required blasting; is that correct?
15     A   Yes.
16     Q   Okay.  And in this section of your
17 declaration, you're saying the excavation for the
18 foundation began in September 2014.
19     My question to you would be:  There's
20 nowhere in this section did you tell the Court that
21 blasting was taking place as part of the excavation
22 work that you detailed; is that correct?
23     A   Yes.
24     Q   And, in fact, it was -- it was your intent
25 to mislead the Court about the excavation process; is

Page 42

1  that correct?
2      MR. RAY:  Object to form.
3      THE WITNESS:  Repeat that again.  I'm sorry.
4  Q   (By Mr. Ashworth) Sure.
5      It was your intent to mislead the Court
6  about the excavation process to get the Court to deny
7  the U.S.'s request for injunction?
8      MR. RAY:  Object to form.
9      THE WITNESS:  No, that was not the intent,
10 sir.
11 Q   (By Mr. Ashworth) Okay.  And why did you
12 detail the excavation process you -- it seems like you
13 went into detail, but you fail to mention to the Court
14 about the blasting.
15 A   It -- I'm going to say it was an oversight
16 on my part.  I'm not really sure why I phrased it this
17 way.
18 Q   We're going to look at the next section
19 under, it's called two little I.  There's two parts to
20 this first page and when you're done with that, we'll
21 switch to the second page.
22 A   Mmm-hmm.  Okay.
23 Q   It's on the next page, just two lines.  When
24 you're done with that, let me know.
25 A   Yes.

Page 43

1  Q   Did you indicate to the Court anywhere in
2  this section the purpose for the crushing -- the
3  crushing of larger rocks into smaller rocks?
4  A   No.
5  Q   Okay.  Did crushing the larger rocks into
6  smaller rocks fulfill any purpose?
7  A   Say that again.
8  Q   Sure.
9      Did the crushing of the larger rocks into
10 smaller rocks, did that serve any purpose?
11 A   Yes, it was used for backfill material in
12 the foundation itself.  And we can't have anything 6
13 inches or greater in the foundation.
14 Q   Okay.  That was a requirement that you
15 couldn't have anything larger than 6 inches; is that
16 right, as backfill?
17 A   Yes.
18 Q   And do you know why that is so?
19 A   It's a requirement by Barr Engineering who
20 designed the foundation themselves.
21 Q   Do you know what purpose it served to have
22 rocks smaller than 6 inches as backfill?
23 A   Yes, it's compaction issues.  If you put the
24 larger rock in the hole, your smaller aggregates fall
25 through and create a void on top and you won't get

Page 44

1  100 percent compacted areas around -- around your
2  foundation so you had to follow --
3  Q   Why would -- I'm sorry, I cut you off there.
4      You had to follow what?
5  A   You had to follow the design engineer's
6  recommendations.
7  Q   Okay.  And why would it have been important
8  that you would have voided those voids through
9  compaction?
10 A   I'm not sure if I understand your question.
11 It has to deal with compaction efforts on their --
12 Q   Okay.
13 A   And you wouldn't want to use a large rock in
14 that because you can compact over it, but underneath
15 it, you wouldn't have any compaction at all.
16 Q   Okay.  Let me re-ask the question this way:
17 What was the purpose for compaction of backfill?
18 A   To stabilize your foundation and also the
19 turbine on top of your foundation.
20 Q   To stabilize the foundation.
21      We're talking about the wind tower
22 foundation; is that right?
23 A   That is correct.
24 Q   And to stabilize it, does that -- is that in
25 reference to providing structural support for the wind

Page 45

1  tower?
2  A   Yes.
3  Q   Okay.  So then you would agree that by
4  crushing the rock into smaller pieces, the purpose of
5  that would be for structural support for use of
6  backfill for structural support for the wind towers?
7      MR. RAY:  Object to form.
8      THE WITNESS:  Yes.
9  Q   (By Mr. Ashworth) Is that correct?
10 A   Yes.
11 Q   You would agree that by crushing the rock
12 into smaller pieces, Enel Green derived some use out
13 of the rocks; is that correct?
14     MR. RAY:  Object to form.
15     THE WITNESS:  I think that we're restricted.
16 Once again, I don't really recall the whole situation
17 on why we did that.  I know we couldn't move the rock
18 from one site to another and that's why we elected
19 to -- to crush the rock, to leave it in place.
20     MR. ASHWORTH:  Okay.  I'm going to have
21 Abby, the court reporter, reread my question.
22     COURT REPORTER:  You bet.
23     (Court reporter read back requested portion
24 of transcript)
25     THE WITNESS:  Yes.

Page 46

1  Q  (By Mr. Ashworth) Okay.  In the middle of
2  this section, it says "The contractor records the
3  volume of rock crushed and rock is then stored at the
4  site."
5      Did I read that correctly?
6  A  Yes.
7  Q  Which contractor were you referring to here?
8  A  The general contractor, which was IEA, had a
9  subcontractor.  I can't remember what their
10 organization's name was, but he was responsible for
11 the volume of rock quantities.
12 Q  Was -- I'm sorry, was the contractor or the
13 subcontractor required?
14 A  The subcontractor was required under IEA to
15 track that.
16 Q  Okay.  Here you say contractor and not
17 subcontractor.
18     Is there a reason why you didn't tell the
19 Court that the responsibility referred to here was a
20 subcontractor?
21     MR. RAY:  Object to form.
22     THE WITNESS:  I don't have a contract --
23 Enel Green Power did not have a contract with the
24 subcontractor.  We only have a contract with the
25 general contractor themselves.  That's why I

Page 47

1  referenced it the way I did.
2  Q  (By Mr. Ashworth) Okay.  So are you
3  telling -- did you tell the Court -- scratch that.
4      You're representing to the Court that IEA
5  had the responsibility to record the volume of crushed
6  rock --
7  A  Ultimately --
8  Q  -- is that what you're saying?
9  A  Ultimately, they do have the responsibility.
10 Q  Okay.  Here you say -- let me kind of re --
11 re -- redo this sentence.
12     It says the contractor records the volume of
13 rock, but it's your testimony today that the
14 contractor did not record the rock, it would have been
15 the subcontractor?
16     MR. RAY:  Object to form.
17     THE WITNESS:  Right.  It -- they had given
18 that responsibility themselves, and I can't really
19 speak to them why they did that, but that's the way I
20 understand that it went down.
21 Q  (By Mr. Ashworth) Sure.
22     And I -- and I understand you could not
23 represent why IEA delegated this duty to a
24 subcontractor, but I'd like for you to speak as to why
25 you told the Court that the contractor recorded the

Page 48

1  volume of rocks when, in fact, you tell me today the
2  contractor did not do it.
3      MR. RAY:  Object to form.
4      THE WITNESS:  The -- the contractor is
5  ultimately responsible for their subcontractors' work
6  in its entirety.  They are the people, they are the
7  ones that answer to Enel Green Power and provide that
8  information.  If they fail to do so, I don't...
9  Q  (By Mr. Ashworth) Okay.  How -- go ahead,
10 I'm sorry if I interrupted you.
11 A  No, that's okay.
12 Q  How did you know that the contractor was
13 recording the volume of rock that was crushed?
14 A  I believe Mr. Price had made that agreement
15 with a Chris Hanson, which was a vice president of
16 construction for IEA.
17 Q  So it's your understanding that Chris Hanson
18 or someone else at Enel Green would have told Enel --
19 I'm sorry, would have told IEA that they were required
20 to record the volume of rock that was being crushed?
21 A  Yes.
22 Q  Okay.  Is it customary based on your
23 experience in the industry that whenever rock is
24 crushed during the excavation and backfill process,
25 that the volume of the rock that is being crushed is

Page 49

1  recorded?
2  A  I don't think in most cases that it is.
3  This was just a special condition that we had gotten
4  into, and for some reason, they wanted them to keep
5  track of the -- the quantities.
6  Q  So based on your experience in the industry,
7  your 12 years of experience in the industry, the
8  recording of the volume of crushed rock is not a
9  customary and standard construction process?
10 A  A lot of times we don't have the rock
11 encountered on several projects; however, there --
12 there's different projects throughout the industry
13 that have dealt with rocky conditions elsewhere.
14 Q  Okay.  My question is:  Based on your
15 experience in the industry, whenever rock is crushed,
16 is it customary in a standard construction practice to
17 record the volume of rock?
18     MR. RAY:  Object to form.
19     THE WITNESS:  Yes.
20 Q  (By Mr. Ashworth) Okay.  In preparing this
21 declaration under oath, would you have spoken with IEA
22 or its subcontractor to verify that the volume of
23 rocks were indeed being recorded?
24     MR. RAY:  Object to form.
25     THE WITNESS:  I'm not -- I'm not sure if I

Page 50

1  did or not. I just don't recall that.

2      Q  (By Mr. Ashworth) Okay.  If Chris Hanson or

3  someone else from Enel Green higher up would have

4  instructed IEA to record the volume of rock that was

5  being crushed, would it have been your responsibility

6  to follow up with IEA or its subcontractor to verify

7  that indeed they were doing that?

8      MR. RAY:  Object to form.

9      THE WITNESS:  That, I -- I don't recall me

10  doing that but...

11      Q  (By Mr. Ashworth) Okay.  Would it be

12  necessary to record the volume of rock that is crushed

13  for any other purpose other than there was an issue

14  that you alluded to earlier?

15      MR. RAY:  Object to form.

16      THE WITNESS:  No.

17      Q  (By Mr. Ashworth) Have you -- scratch that.

18      As site coordinator, would you have reviewed

19  the scope of work that would have been drafted by Enel

20  Green for IEA for this particular project?

21      A  No, I did not.

22      Q  Let me re-ask that question.

23      As a site coordinator, would it have been

24  your responsibility to have reviewed scope of work for

25  a -- for a contractor so that you knew exactly what

Page 51

1  work the contractor was supposed to do on a project?

2      MR. RAY:  Object to form.

3      THE WITNESS:  Yes.

4      Q  (By Mr. Ashworth) Okay.  While you may not

5  have a recollection of what the scope of work stated,

6  you would at the time have known or been familiar with

7  the scope of work for IEA; correct?

8      A  Yes.

9      Q  Okay.  If there was a requirement for IEA to

10  record the volume of rocks that were being crushed, is

11  that something you would have anticipated that would

12  have been in the scope of work?

13      MR. RAY:  Object to form.

14      THE WITNESS:  No, I don't believe it was in

15  the scope of work.

16      Q  (By Mr. Ashworth) Are you aware that Craig

17  Mazurowski gave a deposition in this case?

18      MR. RAY:  Object to form.

19      THE WITNESS:  Am I aware of it?

20      Q  (By Mr. Ashworth) Yes.

21      A  Yes.

22      Q  Did you speak with him prior to your

23  deposition today?

24      A  No.

25      Q  Okay.  I'm terrible with his last name.  I

Page 52

1  don't, you know, want to get caught up, but I'll just

2  call him -- refer to him as Craig in your deposition.

3      Do you know who Craig is?

4      A  Do I know who he is?

5      Q  Yes.

6      A  Yes.

7      Q  Who is Craig?

8      A  He was project manager for IEA.

9      Q  Okay.  Would it surprise you if I were to

10  tell you that Craig testified that IEA did not record

11  the volume of rocks that were being crushed on site?

12      MR. RAY:  Object to form.

13      THE WITNESS:  No, it wouldn't surprise me.

14      Q  (By Mr. Ashworth) Would it surprise you if I

15  were to tell you that Craig testified that no one told

16  him that he needed to have the volume of rocks that

17  were crushed to be recorded?

18      MR. RAY:  Object to form.

19      THE WITNESS:  Like I said earlier, that --

20  that decision was made by two vice presidents, one for

21  Enel and one for IEA, and whatever the agreement was

22  or who would take care of the volume counts or

23  whatever was between them and their subcontractor so I

24  can't answer that truthfully.

25      Q  (By Mr. Ashworth) Okay.  My question would

Page 53

1  be:  Again, would it surprise you that Craig testified

2  that no one told him that the rocks, the volume of

3  rocks needed to be recorded?

4      MR. RAY:  Object to form.

5      THE WITNESS:  No, it doesn't surprise me.

6      Q  (By Mr. Ashworth) But yet you made in your

7  declaration to the Court under oath, under penalty of

8  perjury, that the contractor recorded the volume of

9  rocks crushed.

10      MR. RAY:  Object to form.

11      Q  (By Mr. Ashworth) Is that not correct?

12      A  Yes, that was the agreement.

13      Q  Okay.  Sorry, that was the agreement?

14      A  Between those two parties I had mentioned

15  earlier, yes.

16      Q  Okay.  So then it would surprise you if

17  Craig testified that no one told him that the rocks

18  needed to be -- the volume needed to be recorded?

19      MR. RAY:  Object to form.

20      THE WITNESS:  I can't really recall, but it

21  would be surprising.

22      Q  (By Mr. Ashworth) Okay.  Why did you think

23  to include in your declaration to the Court anything

24  about the volume of rocks being recorded?

25      MR. RAY:  Object to form.

Page 54

1    THE WITNESS: As I stated, the -- the
2 declaration was not prepared by me. It was prepared
3 by others, and me being new with the company, I
4 thought it was standard procedure to do so. Give a
5 little bit of history on the declaration and
6 everything so that was my only response.
7    Q    (By Mr. Ashworth) Sure.
8        The -- what was the issue that was at
9 dispute during construction?
10   A    What was the issue with what? I'm sorry.
11   Q    Sure.
12       What was -- what was that issue in -- well,
13 let me kind of back this, make this question a little
14 bit more simpler.
15       The lawsuit that was filed by the United
16 States and Osage Minerals Council against Enel Green
17 and Osage Wind, do you know what the allegations were?
18   A    No.
19       MR. RAY: Object to form.
20   Q    (By Mr. Ashworth) Okay. Do you know that
21 there was a dispute during the excavation process with
22 Enel Green? That's right; correct?
23   A    Yes.
24   Q    What was the dispute about?
25   A    The aggregates themselves.

Page 55

1    Q    Okay. The -- the aggregates, we're talking
2 about the rocks and the soil?
3    A    Yes.
4    Q    Okay. And you had indicated just a few
5 minutes ago that you said that you believe with this
6 declaration that you were just providing background
7 information about the process; is that right?
8    A    Yes.
9    Q    But this -- this statement directly relates
10 to rocks that were at issue in the proceeding being
11 brought against Enel Green; is that right?
12       MR. RAY: Object to form.
13       THE WITNESS: That, I'm not sure of. Like I
14 said, I wasn't involved in any of the disputes or
15 handlings of that at all. It was -- it was -- I was
16 never involved.
17   Q    (By Mr. Ashworth) Okay. As site coordinator
18 on the Osage Wind project, you were aware at the time
19 that there was an allegation made that Osage Wind and
20 Enel Green was using rocks without permission;
21 correct?
22       MR. RAY: Object to form.
23       THE WITNESS: I'm not sure if it was without
24 permission or not. Like I said, I -- that would be up
25 to somebody other than myself, but the way it trickled

Page 56

1 down, you know, I guess it -- it was a conflict
2 between the two parties.
3    Q    (By Mr. Ashworth) You were aware that
4 there -- that the rock and materials that were
5 excavated needed special handling?
6        MR. RAY: Object to form.
7        THE WITNESS: I don't know what you mean by
8 "special handling."
9    Q    (By Mr. Ashworth) Well, here you tell the
10 Court that the volume of rocks being crushed were
11 recorded, and so my question is, is why would you have
12 told the -- the Court this unless there was some type
13 of issue going on?
14       MR. RAY: Object to form.
15   Q    (By Mr. Ashworth) Relating to the rock.
16       MR. RAY: Same objection.
17       THE WITNESS: If it was a requirement, which
18 I believe it was, I believe it was a directive that
19 came from Enel to the subcontractor to go ahead and
20 keep track of the volume. Now, whether or not that
21 subcontractor or contractor had not done that, I think
22 would be -- I think that information would probably be
23 in the as-built drawings someplace.
24   Q    (By Mr. Ashworth) Okay. We'll talk about
25 the as-builts later, but we're -- we're just past an

Page 57

1 hour. I would like to take a quick break if you're
2 okay with that. Take about a ten-minute break.
3        MR. RAY: Sure. That would be good.
4        VIDEOGRAPHER: We're off the record at
5 11:14 a.m.
6        (A recess was taken from 11:14-11:28 a.m.)
7        VIDEOGRAPHER: We're back on the record at
8 11:28 a.m.
9    Q    (By Mr. Ashworth) Sir, we're -- we're back
10 on the record, and before we get any further, I just
11 want to let you know that you are under oath, that you
12 swore to it during your deposition to give truthful
13 answers to the best of your ability. That being said,
14 I just want to reiterate that at all points in your
15 deposition that oath will -- will, you know, still
16 apply.
17       Prior to -- now that we're back on the
18 record, is there anything about your prior test- --
19 I'm sorry, your previous testimony before the break
20 that you'd like to change?
21   A    No.
22   Q    Okay. About this declaration, you don't
23 have to pull it up just yet, the declaration that we
24 discussed earlier which is marked as Exhibit No. 60,
25 did anyone from Enel Green management or any Enel

Page 58

1  Green employee tell you that you needed to sign the
2  declaration?
3     A   It was presented to me for signature, yes.
4     Q   Who presented it to you for signature?
5     A   I -- I just don't recall.
6     Q   Would it have been presented to you via
7  e-mail or in person?
8     A   I'm -- I'm guessing here, but I'm thinking
9  that it was an e-mail that I received.
10    Q   Okay.  Do you know who prepared it?
11    A   I believe it was our legal department along
12 with outside attorneys as well.
13    Q   Okay.  When it was given to you, do you know
14 if you were allowed to review it before you signed it?
15    A   Yes, I was -- basically said if I had any
16 changes, go ahead and make the corrections and send it
17 back or whatever.
18    Q   Were there any drafts of this declaration
19 that you are aware of that were made before you signed
20 it?
21    A   I don't really recall that.
22    Q   Did anyone from Enel Green speak with you to
23 go over the process before this declaration was
24 drafted?
25    A   I don't recall, but I don't think so.

Page 59

1     Q   Okay.  Would you -- this had been the very
2  first time that you would have seen the information or
3  knew about the information that was presented in the
4  declaration?
5        MR. RAY:  Object to form.
6        THE WITNESS:  Yes.
7     Q   (By Mr. Ashworth) Okay.  When the
8  declaration was given to you, were you able to ask any
9  questions, if you had them?
10    A   If I had them, yes.
11    Q   Do you know if you had any questions when
12 you -- before signing the declaration?
13    A   I -- I really can't recall.
14    Q   Okay.  Did you make any changes to the
15 declaration before you may -- before you signed it?
16    A   I -- I don't recall if I did or not.
17    Q   We'll go back to the declaration, the same
18 section on -- under paragraph or subparagraph two
19 little I in paragraph 15 on -- there we go.  Right
20 there.  A little bit down.  All the way down so we can
21 see subparagraph two little I.  Two little I.
22        It says "After the foundations are built and
23 cured, the crushed rock and soil is returned to the
24 hole from which it came."
25    A   True.

Page 60

1     Q   Is there anywhere -- okay.  Is there
2  anywhere in -- in this section that indicates to the
3  Court the reason why the crushed rock and soil is
4  returned to the hole from which it came from?
5        MR. RAY:  Object to form.
6        THE WITNESS:  I really don't know the full
7  history behind it, but I know that we weren't allowed
8  to use the material anywhere else on site.  It had to
9  remain on that specific turbine site.
10    Q   (By Mr. Ashworth) Okay.  The next sentence,
11 it says "The crusher is then moved to a new excavation
12 location.  This is a customary and standard
13 construction process including in wind projects and
14 has been employed around the" -- on the next page --
15 "country and at other projects in Oklahoma."
16        This language that you include, this is a
17 customary and standard construction process, are you
18 referring to the part that the crusher is moved to a
19 new excavation location or are you referring to this
20 entire section that you're telling the Court that this
21 entire process is customary and standard construction
22 practice?
23    A   The -- the crusher was moved to another
24 foundation location.  That -- we're just following the
25 sequence of turbines that --

Page 61

1     Q   Okay.
2     A   -- we did.
3     Q   Well, let me -- sure.  Let me ask it this
4  way:
5        In -- after foundations are built and cured,
6  is it a customary and standard construction practice
7  within the industry that the crushed rock and soil is
8  returned to the hole from which it came from?
9     A   Yes.
10    Q   Okay.  So it would be your testimony that it
11 would not be a customary or standard construction
12 process to use the crushed rock and soil for any
13 purpose other than to return it to the hole from which
14 it came from?
15        MR. RAY:  Object to form.
16        THE WITNESS:  That's what we normally do,
17 yes, is replace that material that we excavated back
18 into the same hole and use it for compaction
19 requirements.  Any of the other soils that remain, we
20 build the site up to ensure proper drainage around the
21 turbines -- away from the turbines, I'm sorry.
22    Q   (By Mr. Ashworth) Sure.
23        So my question would be:  It would not be a
24 customary or standard construction process to use the
25 excavated material for anything other than backfill

Page 62

1 into the exact same hole from which it was -- it came
2 from?
3        MR. RAY: Object to form.
4        THE WITNESS: On this site, we had to use
5 all the material on that particular site. We used it
6 for backfill material and also the pad around the --
7 the access pad around the turbines itself as well
8 and...
9    Q   (By Mr. Ashworth) Okay. So I'm just kind of
10 using logic here, you -- you just testified that it is
11 a customary and standard construction process in the
12 industry to return excavated material back to the hole
13 from which it came from, that that is the standard and
14 customary practice within the industry, is when you
15 excavate material and it's been crushed, you return it
16 back to that same hole; is that right?
17   A   The majority -- yes.
18   Q   Okay. Since that is the customary and
19 standard process, it would be -- logic to me would say
20 it's not -- would not be a customary process or
21 standard construction practice to use the excavated
22 soil for any other purpose?
23       MR. RAY: Object to form.
24       THE WITNESS: You would still use the
25 material on that specific site. Anything remaining,

Page 63

1 you could probably use it elsewhere. However, the
2 restrictions on this project didn't allow us to do so.
3    Q   (By Mr. Ashworth) Then why did you tell the
4 Court that it is a customary and standard construction
5 process that crushed rock and soil is returned to
6 the -- that same hole from which it came from when
7 you're telling me today that that's not the customary
8 and standard construction process?
9    A   It is -- it is the construction process
10 that -- that you do. Anything that is left over and
11 excess on other projects, you know, you can use in the
12 shallow area and build it up or you try to use a
13 majority of it around the location itself. This
14 particular project we had to leave everything within,
15 I can't remember the dimensions of the footprint, but
16 we had to leave everything on that particular site,
17 the backfill material, road, you know, the access road
18 leading up to it, et cetera.
19   Q   Okay. Well, that's not what you're telling
20 the Court here in your declaration to the Court under
21 oath. You're telling the Court here that the reason
22 why you crushed -- why the crushed rock and soil was
23 returned in the hole from which it came from is
24 because it's a customary and standard construction
25 process, but now you're telling me that the reason why

Page 64

1 it was done that way was because this was a unique
2 situation.
3        MR. RAY: Object to form.
4        THE WITNESS: No, it -- it -- it's still
5 customary practice. This job didn't allow us to do
6 the -- we were restricted in a sense. I'm just
7 basically giving you a little bit of stuff, what we do
8 in construction. It has nothing to do with anything
9 so...
10   Q   (By Mr. Ashworth) Sure.
11       Why did you mislead the Court here with your
12 statement under oath?
13       MR. RAY: Object to form.
14       THE WITNESS: I didn't intentionally do
15 that. That -- at that time, when I -- when this was
16 written, it was to the best of my knowledge.
17   Q   (By Mr. Ashworth) Okay. But you knew the
18 process at the time when it was written; correct?
19   A   I do know of a process -- of the process,
20 yes.
21   Q   Okay. And, in fact, you signed this
22 declaration to the Court on behalf of your employer in
23 order to defeat the plaintiffs' request for
24 injunction; is that not correct?
25       MR. RAY: Object to form.

Page 65

1        THE WITNESS: That was not the intent. That
2 was not my intent, no, sir.
3    Q   (By Mr. Ashworth) Okay. It was not your
4 intent that the request for injunction be defeated on
5 behalf of your employer?
6        MR. RAY: Object to form.
7        THE WITNESS: I don't -- I don't get
8 involved in any of the legal decisions that were there
9 or any of the lawsuit. I simply provided information
10 to the parties that put this document out.
11   Q   (By Mr. Ashworth) Okay. You provided
12 information for this document; that information was
13 misleading.
14       MR. RAY: Object to form.
15   Q   (By Mr. Ashworth) True?
16       MR. RAY: Object to form.
17       THE WITNESS: I don't know.
18   Q   (By Mr. Ashworth) Okay. The information did
19 not accurately reflect the process that you oversaw
20 during the construction process.
21       MR. RAY: Object to form.
22   Q   (By Mr. Ashworth) That's true; correct?
23       MR. RAY: Object to form.
24       THE WITNESS: Say that again, I'm sorry.
25   Q   (By Mr. Ashworth) Sure.

Page 66

```
 1        The information here -- I'll scratch that.
 2        We'll go to -- we'll pull up a different
 3   exhibit.  We'll go to the scope of work and we're
 4   going to go to page 12.  We're going to look at -- on
 5   page 12 of the document, it's paragraph five, what is
 6   it, beginning here in the middle of the -- middle of
 7   the page it says "Excess excavated material from the
 8   foundation, if suitable, may be used to backfill --
 9   sorry, to balance backfill excavations, construct
10   roadways, construct crane pads, and may be spread
11   around the foundation pads."  Then it goes on to the
12   last sentence, it says "Contractor shall not haul
13   material outside of the project boundaries nor use
14   native material for any construction purpose other
15   than noted above."
16        So under the scope of work that was drafted
17   by Enel or Osage Wind, it was indicated to IEA that
18   they could use the excavated material in addition to
19   using as backfill, they could use it for other
20   projects within the project area.
21        MR. RAY:  Object to form.
22        THE WITNESS:  I -- I think that --
23   Q    (By Mr. Ashworth) Is that correct?
24   A    I think this document -- I'm not sure if
25   it's -- of its date that it was written.  I really
```

Page 67

```
 1   don't know.
 2        As I stated before, you can use this
 3   material if we didn't have the restrictions in place.
 4   This is just a -- like a boilerplate type requirement
 5   on the project.
 6   Q    Okay.  So when you say this is a boilerplate
 7   requirement for the project, are you indicating that
 8   it's kind of a loose requirement that doesn't have to
 9   be filled -- followed?
10        MR. RAY:  Object to form.
11        THE WITNESS:  I don't think it was intended
12   to be followed, actually, because of the restrictions
13   that we had.  Other than that, I -- I don't really
14   know.
15   Q    (By Mr. Ashworth) Okay.  But nowhere in your
16   declaration did you indicate that there was a scope of
17   work that would have allowed the crushed rock to be
18   used for something other than backfill?
19        MR. RAY:  Object to form.
20        THE WITNESS:  Yes.
21   Q    (By Mr. Ashworth) Okay.  We're going to go
22   to subparagraph, it's little numeral -- numeral
23   number -- or I'm sorry, numeral five which is on page
24   5.  Oh, I'm sorry, it's declaration.  Page 5, little
25   numeral five.  One page down.  In this section, I'm
```

Page 68

```
 1   going to look at the -- the second sentence, it says
 2   "No sand, soil, or rock from any excavation is used
 3   for any purpose other than to return to the hole from
 4   which it came."
 5        What does that sentence mean to you?
 6   A    Exactly that, that it was to remain there.
 7   Q    That the sand, soil, and rock that was
 8   excavated, so the excavated material, the only purpose
 9   for the excavated material was to be used as backfill
10   to the hole from which it came from; is that right?
11   A    Yes, that's my interpretation, yes.
12   Q    Okay.  So you're telling the Court that the
13   excavated material was only going to be used for
14   backfill or for no other purposes?
15   A    As long as the material stayed on that
16   designated site, yes.
17   Q    Okay.  But, in fact, this excavated material
18   was used for some -- for a purpose other than
19   backfill; is that correct?
20        MR. RAY:  Object to form.
21        THE WITNESS:  In some cases it was spread
22   around the turbine site itself, yes.
23   Q    (By Mr. Ashworth) When it was -- so when it
24   was used as backfill, it was also being used for
25   structural support for the wind tower; is that
```

Page 69

```
 1   correct?
 2   A    The backfill material was for the structural
 3   support.  The other area was for drainage that we
 4   built up draining it away from the turbine itself, and
 5   a portion of that in that little access road and apron
 6   around the terminal -- around the turbine, but it
 7   didn't leave that particular site, to my knowledge.
 8   Q    Did you tell the Court that the material is
 9   being used for structural support in your declaration?
10        MR. RAY:  Object to form.
11        THE WITNESS:  I don't think so, no.
12   Q    (By Mr. Ashworth) Do you think it would have
13   been important for the Court to know that Enel Green
14   and Osage Wind was using the backfill material for
15   structural support?
16        MR. RAY:  Object to form.
17        THE WITNESS:  I -- I don't know the answer
18   to that.
19   Q    (By Mr. Ashworth) Okay.  Let me re-ask it
20   this way:  Do you know if it would have been important
21   for the Court to know that the materials that were
22   excavated on site was being used for structural
23   support for the wind tower?
24        MR. RAY:  Object to form.
25        THE WITNESS:  I -- I don't -- I don't know
```

Page 70

1  that answer.
2      Q   (By Mr. Ashworth) Okay.  Is the reason why
3  you failed to tell the Court in your declaration that
4  the purpose for the excavated material to be used was
5  for structural support?  Is that reason -- scratch
6  that.
7          Is the reason why you said that -- did not
8  say that was to help Enel Green defeat the request for
9  injunction?
10     A   I don't --
11         MR. RAY:  Object to form.
12         THE WITNESS:  I don't think that was the
13  intent, no.
14     Q   (By Mr. Ashworth) Okay.  Under the --
15  paragraph underneath there, right under the page, it
16  says "No excavated rock or sand is sold or used for
17  commercial purposes."
18         Is that -- was that a correct statement?
19     A   Yes.
20     Q   Okay.  You separate sold and commercial
21  purposes.
22         When you're saying not used for commercial
23  purposes, are you meaning that the rock and sand were
24  not being used to advance any economic purpose of Enel
25  Green?

Page 71

1      A   No, not -- not to my knowledge anyway.  I
2  know we didn't sell anything away from the job site.
3      Q   Sure.
4          You -- you didn't -- I know that you didn't
5  sell any excavated rock and sand that was excavated.
6  I -- you know, I get that.
7      A   Okay.
8      Q   And -- and but you're also saying none of
9  the excavated rock or sand was used for commercial
10  purposes, and I just want to know what you're
11  referring to here.
12         Are you saying that Enel Green did not use
13  the rock or sand for any economic purposes?  Is that
14  what you're saying?
15         MR. RAY:  Object to form.
16         THE WITNESS:  Yes, that's exactly what I'm
17  saying.
18     Q   (By Mr. Ashworth) Let me just make sure I --
19  that question -- my question -- the setup to that
20  question was not phrased very well.
21         When you say here no excavated rock or sand
22  was used for commercial purposes, you're indicating to
23  the Court that Enel Green did not use any of the
24  excavated rock or sand to advance any economic
25  interests of Enel Green?

Page 72

1          MR. RAY:  Object to form.
2          THE WITNESS:  That's my interpretation, yes.
3  And you -- you keep mentioning commercial.  I'm unsure
4  what that would do to benefit Enel.  I was not -- I'll
5  state it again.  Whatever the issues were between Enel
6  and also the Osage, I had nothing to do with that.  I
7  had no knowledge of what they were doing on a
8  day-to-day basis on -- on that case at all so this, to
9  the best of my knowledge, is -- is what we basically
10  did.
11     Q   (By Mr. Ashworth) Well, I don't know what
12  you mean by commercial or not used for commercial
13  purposes here because these aren't my words, and
14  that's why I'm asking you what did you mean by -- by
15  this.  You said that you interpret that to mean that
16  you were saying to the Court that Enel Green was not
17  using any of the excavated rock or sand to advance any
18  economic interests.
19     A   No, they did not.
20     Q   Okay.  We're going to look at paragraph 12,
21  page 3, paragraph -- I'm sorry, of the document,
22  towards the bottom it says -- it begins with, it says
23  "Osage Wind has not engaged in a beat-the-clock
24  strategy and has not accelerated construction work on
25  the project.  Though it has taken reasonable steps to

Page 73

1  stay on schedule."
2          Then it goes on and says, it says "In fact,
3  contrary to the usual practice for a project at this
4  stage of development, all construction work was shut
5  down for four days for the Thanksgiving weekend."
6          Did I read that correct?
7      A   Yes.
8      Q   It seems to me that you're telling the Court
9  here that you're not trying to increase work to get it
10  done as soon as possible -- well, scratch that.
11         It seems to me that you're trying to tell
12  the Court that you weren't in a hurry and as evidence
13  of that, you took four days -- you-all took four days
14  off during Thanksgiving weekend.
15         Is that -- am I reading that correctly?
16     A   Yes.
17     Q   And you're -- you're telling the Court that
18  taking off for Thanksgiving weekend is not a usual
19  practice in the industry?
20     A   Normally, we work through the holidays, yes.
21     Q   Okay.  And that's based on your experience
22  in the industry?
23     A   Yes.
24     Q   Okay.  I'm going to pull back up the
25  exhibit, the scope of work.

Page 74

1    Did I mark that as an exhibit?  I think it
2  already is.
3        MS. McCLANAHAN:  It's already been marked as
4  an exhibit.
5        MR. ASHWORTH:  Okay.  I will double check on
6  the scope of work, the number of that.
7    Q   (By Mr. Ashworth) As we pull that up, I'm
8  going to look at page 8 at the top of the page.  Right
9  here.  This is the scope of work between Osage Wind
10 and IEA.  It says "The intent of contract is for
11 Saturdays and Sundays to be utilized as make-up days,
12 contractor will notify owner if the work for schedule
13 varies significantly from this plan.  No work will be
14 performed on the following holidays without written
15 approval from owner."  It says Thanksgiving day, day
16 after Thanksgiving day, and based on the first
17 sentence, it seems that weekends as well would not be
18 anticipated to be worked on.
19       You've just testified earlier that it's
20 based on your experience and practice, and also as you
21 told the Court that you would work through
22 Thanksgiving, the day after Thanksgiving and the
23 weekend thereafter, but yet this scope of contract
24 seems to show that Enel had already decided that that
25 wasn't going to happen.

Page 75

1    A   That, I don't --
2    Q   Am I missing --
3    A   That, I don't recollect, but it's normal
4  that -- I normally used to work through the holiday
5  seasons themselves.  This was a part of the contract
6  that was written, I'm not sure by who or who
7  interjected this.  That's maybe their regular holidays
8  that they get, but I do know that they -- they did
9  take off for Thanksgiving and I believe it was also
10 Christmas Eve and Christmas day.
11   Q   Okay.  I also want to note for the record
12 that this scope of work that I'm referring to was
13 previously admitted in a previous deposition as
14 Exhibit No. 46.
15       So going back to that, in your declaration,
16 if we could go back, you told the Court under oath, in
17 fact, contrary to the usual practice for a project at
18 this stage of development, all construction was shut
19 down for four days for the Thanksgiving weekend.
20       While it may be your experience, you did not
21 tell the Court that that decision was already made
22 prior to this point by Enel Green.
23       (Exhibit 46 Marked for Identification)
24       MR. RAY:  Object to form.
25       THE WITNESS:  I'm --

Page 76

1    Q   (By Mr. Ashworth) Is that not correct?
2    A   I'm not sure who made the decision at -- at
3  all.  I'm sorry, I just don't recall every little bit
4  of it.
5    Q   Sure.
6        It -- if you say that the higher-ups in Enel
7  Green, whether it's legal department or whatever, may
8  have drafted or had a hand in drafting this, were they
9  trying to set you up to tell mistruths to the Court?
10       MR. RAY:  Object to form.
11       THE WITNESS:  I -- I don't think so.
12   Q   (By Mr. Ashworth) Okay.  But the purpose of
13 this declaration was to get the Court to deny the
14 plaintiffs' request for injunction; correct?
15       MR. RAY:  Object to form.
16       THE WITNESS:  I -- I don't know the answer
17 to that question.  I'm sorry.
18   Q   (By Mr. Ashworth) Okay.  In paragraph 16 of
19 your declaration, you wrote that "Currently there are
20 approximately 200 people on site and involved in the
21 construction of the Osage Wind project.  This includes
22 employees of Osage Wind, Enel, IEA RE Inc., referring
23 to the general contractor, and several" -- I'm sorry,
24 "several contractors."
25       Was that a correct statement when you made

Page 77

1  that?
2    A   Osage Wind... I really don't recall this,
3  but yes, I guess, yes.
4    Q   Okay.  How many Osage Wind employees were
5  there versus Enel Green employees on site?
6        MR. RAY:  Object to form.
7        THE WITNESS:  I believe there was one and
8  possibly another at our monthly meetings initially.
9    Q   (By Mr. Ashworth) When you say "one," are
10 you referring to Osage Wind employees?
11   A   Yes.
12   Q   Okay.  Do you know who that one Osage Wind
13 employee would have been?
14   A   No, sir, I just don't recall.
15   Q   What was Osage Wind's involvement in the
16 construction of the project, that you were aware of?
17       MR. RAY:  Object to form.
18       THE WITNESS:  The project was theirs and
19 Enel had bought the project from them.
20   Q   (By Mr. Ashworth) Okay.
21   A   Other than that, I -- I don't know.
22   Q   But the -- Enel Green was the company that
23 was directing the construction process; correct?
24       MR. RAY:  Object to form.
25       THE WITNESS:  Yes.

Page 78

1    Q   (By Mr. Ashworth) Okay. Going back up to --
2  you don't have to go, scroll up.
3       Going back to the part where we talked about
4  Thanksgiving day weekend in your declaration where you
5  inform the Court under oath that that was a usual --
6  contrary to the usual and customary process where
7  construction would be stopped during that four-day
8  weekend --
9    A   Like I said --
10   Q   -- why did --
11   A   Go ahead.
12   Q   Yes. Yeah. The question is why, why did
13 you say that?
14   A   Repeat that again. I'm getting a lot of hum
15 on this end.
16   Q   I'm sorry, that's on our end. That's the
17 tornado siren in Tulsa. It's every Wednesday.
18   A   Hmm. Could you repeat your last question,
19 please.
20   Q   Sure. Let me say the -- the statement that
21 you'd made in paragraph 12 said "In fact, contrary to
22 the usual practice for a project at this stage of
23 development, all construction work was shut down for
24 the four days of Thanksgiving weekend."
25       My question is: Why do you think the

Page 79

1  purpose was for saying that statement to the Court?
2       MR. RAY: Object to form.
3       THE WITNESS: I -- I don't really know.
4    Q   (By Mr. Ashworth) Okay. We're going to go
5  down to paragraph -- we're jumping around. We're
6  going to go to paragraph 20.
7       Actually, this is a good stopping point for
8  a break. We can do -- we can break for lunch, or if
9  we take a small break, sir, that's up to you and then
10 we -- you know, of course the other parties as well.
11      Do you have a preference, sir?
12   A   No, I don't.
13      MR. ASHWORTH: Mary Katherine?
14      MS. NAGLE: We're certainly fine to keep
15 going at this point. I don't know. Yeah, we're fine.
16 We're fine either way.
17      MR. ASHWORTH: Ryan?
18      MR. RAY: I think, I mean, we'd like a lunch
19 break at some point. It doesn't necessarily have to
20 be now.
21      MR. ASHWORTH: Let's continue then, sir,
22 unless you want to take a five-minute break. Bill, do
23 you have a preference?
24      THE WITNESS: No, I don't.
25      MR. ASHWORTH: Great. Let's continue.

Page 80

1    Q   (By Mr. Ashworth) Paragraph 20 of your
2  declaration, it says "As of November 21, 2014, the
3  total amount expended on the project including
4  contracts that's been executed is 200" --
5       VIDEOGRAPHER: Excuse me, sorry to interrupt
6  but we need to go off the record. The reporter got
7  kicked off of the call so --
8       MR. ASHWORTH: Okay.
9       VIDEOGRAPHER: -- we are off the record at
10 12:03 p.m.
11      (A recess was taken from 12:03-1:12 p.m.)
12      VIDEOGRAPHER: It is 1:12 p.m. and we are
13 back on the record.
14   Q   (By Mr. Ashworth) Sir, we're back on -- on
15 the record. I just want to remind you that you're
16 still under oath. The rules of perjury still apply.
17      Coming back from the break, is there
18 anything that you would like to change about your
19 previous testimony?
20   A   No.
21   Q   Anything you want to add to your previous
22 testimony?
23   A   No, thank you.
24   Q   Who else is in the room with you other than
25 Ryan Ray and Megan Beauregard? Is there anyone else?

Page 81

1    A   No.
2    Q   Okay. You understand that the minerals that
3  were under the Osage Wind projects were owned by the
4  Osage Nation; is that correct?
5       MR. RAY: Object to the form.
6       THE WITNESS: I was -- I was told that, yes.
7    Q   (By Mr. Ashworth) Okay. And -- and -- and
8  based on that, you -- you understood that the rocks
9  and soil underneath the project was owned by the
10 tribe; is that right?
11      MR. RAY: Object to form. And we -- we lost
12 you a little bit there, Stuart. Can you re-ask that
13 question, please.
14      MR. ASHWORTH: Sure.
15   Q   (By Mr. Ashworth) Sir, and based on -- based
16 on that, you understood at the time that the rocks and
17 soil underneath the wind project was owned by the
18 tribe?
19      MR. RAY: Object to form.
20      THE WITNESS: Yes.
21   Q   (By Mr. Ashworth) Okay. We're going to go
22 to your declaration, page 20. I'm sorry, paragraph
23 20. I don't have a page number.
24      MS. McCLANAHAN: That's okay. I got it.
25   Q   (By Mr. Ashworth) This says "As of

Page 82

1  November 20 -- 21, 2014, the total amount expended on
2  the project including contracts that have been
3  executed is $287 million."
4       Is that correct?
5       A   You know, I -- I can't -- I can't comment on
6  that because I don't -- that number was provided and I
7  don't know who provided it. I just simply don't
8  remember that number.
9       Q   You can't comment on the words that you told
10 the Court in opposition to a request for injunction;
11 is -- is that your testimony right now?
12      MR. RAY: Object to form.
13      THE WITNESS: That was seven years ago, once
14 again, that I did that. I don't remember all the
15 details with it at all at this present time.
16      Q   (By Mr. Ashworth) Sure.
17      You know even though it's seven years ago
18 when you make a statement to the Court under oath, I
19 mean, I think we can all agree that we can do our best
20 to understand your statement.
21      You previously indicated that the
22 declaration that you made to the Court under oath was
23 based on your review of business records of Enel Green
24 and Osage Wind.
25      Was that a correct statement?

Page 83

1       A   Well, there were a lot of records that I did
2  review and stuff like that, but like I said, even
3  today, I -- I don't remember all of the things, if
4  any. I mean, I haven't been affiliated with this for
5  seven years, eight years, whatever the number is, but
6  I can't -- I can't remember everything, and as a
7  matter of fact, I don't.
8       Q   Okay. Well, what -- if you indicated that
9  the declaration, the words that you told the Court
10 were based on your review of business records of Enel
11 Green and Osage Wind, I want to know is if you made
12 this statement regarding this number to the Court, you
13 would have made that statement based on something that
14 you saw in the business records of Enel Green or Osage
15 Wind; is that correct?
16      A   Yes and no. I mean, I don't know how to
17 answer that question. The numbers were probably
18 provided by somebody else, maybe in our finance
19 department. They weren't provided by myself. The
20 numbers were just there due to the -- the records that
21 I -- or that I reviewed on this at that time.
22      Q   Okay. As you --
23      A   I -- I really can't remember where the
24 $287 million came from.
25      Q   So as you sit here today, you don't know if

Page 84

1  this $287 million number is accurate or not?
2       MR. RAY: Object to form.
3       THE WITNESS: I'm -- I'm not sure.
4       Q   (By Mr. Ashworth) Okay. And, in fact, when
5  you made this declaration to the Court, at that time,
6  you didn't know if that number was correct?
7       MR. RAY: Object to form.
8       THE WITNESS: No, I think --
9       Q   (By Mr. Ashworth) Is that true?
10      A   At -- at the time I reviewed the document,
11 the documents and everything else like that, the
12 number might have been -- you know, that number
13 probably is correct, but I -- like I said, it was
14 provided by someone else and I assumed it was a
15 correct number. Other than that, I just don't
16 remember where the number came from.
17      Q   Okay. Are you saying that you assumed at
18 the time that the number was correct before you told
19 that number to the Court?
20      A   Yes.
21      Q   Okay. And, in fact, you did not do anything
22 to verify that that number was accurate?
23      MR. RAY: Object to form.
24      THE WITNESS: I'm not sure what -- what I
25 did. I can't recall what my actions were at that

Page 85

1  time.
2       Q   (By Mr. Ashworth) Okay. Would it surprise
3  you that you would have made this statement to the
4  Court under oath without knowing or verifying that it
5  was a true and accurate statement?
6       MR. RAY: Object to form.
7       THE WITNESS: At the time when I signed
8  this, the number -- I probably verified the number,
9  but I'm not sure if I had or not. I can't give you
10 the particulars because I -- I have not remembered.
11 I've forgot or whatever.
12      Q   (By Mr. Ashworth) Okay. If you did not --
13 scratch that.
14      Would you agree that if you made a statement
15 under oath to the Court, that you would not make that
16 statement unless you know it's true?
17      A   As I said, at the time when I -- when this
18 happened, I probably did verify that number, but
19 today, I just don't -- I don't even remember the
20 document today.
21      Q   Sure.
22      Sir, you're going to have to listen to my
23 question. My question is: If you make a statement to
24 the Court under oath, under penalty of perjury, that
25 statement that you make, you would have made sure that

Page 86

1    that was an accurate statement; is that -- is that
2    true?
3        MR. RAY:  Object to form.
4        THE WITNESS:  I'll clarify, the -- the
5    287 million probably was a correct number.  I did not
6    at the present time have anything untruthful that I
7    reported back then on this document.  I -- I did not
8    lie or anything else of that nature.
9        Q    (By Mr. Ashworth) Okay.  You're saying that
10   you didn't lie, and I'm not saying -- you know, make
11   any representations, what I am saying is, is if you
12   make a statement to the Court, would you not agree
13   that you had a duty to verify that that statement is
14   true?
15       MR. RAY:  Object to form.
16       THE WITNESS:  Yes.
17       Q    (By Mr. Ashworth) Okay.  This number,
18   $287 million, that figure doesn't include any payments
19   to the Osage Nation, does it?
20       MR. RAY:  Object to form.
21       THE WITNESS:  Not -- not to my knowledge.
22       Q    (By Mr. Ashworth) Okay.  And -- and that's
23   because Enel Green never intended to pay for their
24   rocks and soil that they used to support their wind
25   towers; is that correct?

Page 87

1        MR. RAY:  Object to form.
2        THE WITNESS:  I do not know that.
3        Q    (By Mr. Ashworth) Okay.  Well, just to be
4    clear, what I'm talking about, which -- which rock and
5    soil I'm talking about, I'm talking about the rocks
6    and soil that Enel Green took from the Osage Minerals
7    without first obtaining permission or permit from the
8    Osage Minerals Council.
9        MR. RAY:  Object to form.
10       Q    (By Mr. Ashworth) Do we have the same
11   understanding of what rocks and minerals I'm talking
12   about?
13       MR. RAY:  Object to form.
14       THE WITNESS:  No.
15       Q    (By Mr. Ashworth) I'm sorry, you don't know
16   what minerals I'm referring to?
17       A    I'm assuming that it is the limestone.
18       Q    Okay.  We'll just say the -- we'll call it
19   the excavated material.
20       A    Okay.
21       Q    The $287 million that was paid by Enel Green
22   for the project didn't include any type of payments
23   for the excavated materials; is that correct?
24       MR. RAY:  Object to form.
25       THE WITNESS:  Yes.

Page 88

1        Q    (By Mr. Ashworth) I'm sorry, yes, it did
2    include payment to --
3        A    No.  No, it did not.  That -- that payment
4    was probably to the contractor themselves, IEA.
5        Q    Okay.  In this -- sorry, in this same
6    paragraph, I'm just going to reread it, it says "As of
7    November 21, 2014, the total amount expended on the
8    project including contracts that have been executed is
9    287 million.  These expenditures consist of the
10   following," and then if we go down, we can look at, it
11   says "D, cost of construction, the original contract
12   price between Osage Wind, LLC and IEA RE Inc. for the
13   project construction is approximately $54 million.  To
14   date, Osage Wind has incurred approximately round up
15   to 80 -- I'm sorry, 28 million in costs for work that
16   had been completed."
17       Why did you talk about the original contract
18   price between Osage Wind and IEA under the section
19   Cost of Construction?
20       MR. RAY:  Object to form.
21       THE WITNESS:  I'm not sure at this time.
22       Q    (By Mr. Ashworth) Okay.  Is it because you
23   think you believed it was important to the Court to
24   know what the contract price was?
25       MR. RAY:  Object to form.

Page 89

1        THE WITNESS:  No, like I said earlier, I
2    didn't -- I provided some input to this declaration,
3    but as far as the numbers and everything else are --
4    that concern, everybody else added to it and the
5    numbers seem to jibe on this declaration at that time.
6        Q    (By Mr. Ashworth) Okay.  As -- as we sit
7    here today, do you believe that it is relevant to
8    know -- for the Court to know what the original
9    contract price was in relations to the cost of
10   construction?
11       MR. RAY:  Object to form.
12       THE WITNESS:  I do not know what that number
13   was on that contract at all.  Even at this time, I
14   don't simply remember.
15       Q    (By Mr. Ashworth) I'm going to pull up an
16   exhibit that is a change order dated December 1, and
17   I'm going to mark it as Exhibit No. 62.
18       (Exhibit 62 Marked for Identification)
19       MR. RAY:  Is there a Bates number on that,
20   Stuart, that you can give us?
21       MR. ASHWORTH:  I don't know yet.  We'll have
22   to -- as it gets pulled up.
23       It's -- it's -- is it already made an
24   exhibit?
25       MS. McCLANAHAN:  No.

Page 90

1  MR. ASHWORTH: It's not Bates stamped. This
2  was provided by IEA in response to a subpoena, it's
3  my -- if I can recall. We'll go kind of towards the
4  beginning.
5      Q   (By Mr. Ashworth) Sir, I -- first off, have
6  you seen any of the change orders that were entered
7  relative to the Osage Wind project?
8      A   That was not part of my responsibilities.
9  Those were handled by upper folks within the company.
10 I never got to see the -- the total numbers of the
11 change order. That was --
12     Q   Okay.
13     A   -- apparently none of -- none of my
14 business.
15     Q   Oh, okay. Okay. None of your business.
16         Well, this -- this change order --
17     A   I said apparently it was none of my
18 business.
19     Q   I'm sorry, what? I didn't catch that.
20     A   I said apparently it was -- it was none of
21 my business or it didn't fall within my
22 responsibility.
23     Q   Perhaps higher-ups at Enel Green did not
24 believe it was your pay grade?
25     A   No, they let me know what it was about, but

Page 91

1  they never showed me the numbers. If I did get it, it
2  was always redacted.
3      Q   Okay. Well, this change order is dated
4  December 1, 2014, around the same time as your
5  declaration. If we scroll down a little bit, in the
6  middle of this page, keep going down, right here, it
7  indicates this is a change order with IEA. It
8  indicates that the original contract price was
9  approximately $51 million. With -- we're having a bit
10 of feedback over here.
11         With change orders, previous change orders,
12 it made the revised contract of IEA approximately
13 34 million.
14         Did I read -- am I summarizing that
15 correctly?
16     MR. RAY: Object to form.
17     THE WITNESS: I'm sure you are, but, you
18 know, once again, I had nothing to do with the
19 numbers.
20     Q   (By Mr. Ashworth) Sure.
21         Maybe -- and I understand that you had
22 nothing to do with the numbers, but in the
23 declaration, if we go back to the declaration, you
24 told the Court about the numbers even though you had
25 no involvement with the numbers.

Page 92

1      A   And that's -- that is correct, and I didn't
2  know who entered -- entered these numbers in that
3  agreement to begin with or that declaration to begin
4  with. I have no knowledge of that and, like I said, I
5  basically don't remember the entirety of this
6  declaration in -- in itself.
7      Q   Do you think it would have been appropriate
8  for the Court to have relied upon your declaration in
9  ruling on the plaintiffs' requests for injunction, to
10 rely on the statements and numbers that you provided
11 even though the numbers were not, you know, within
12 your duties with IEA?
13     MR. RAY: Object to form.
14     THE WITNESS: That, I -- I don't know.
15     Q   (By Mr. Ashworth) You don't know if it would
16 be appropriate for the Court to rely on the numbers
17 that you presented?
18     MR. RAY: Object to form.
19     THE WITNESS: I think at the time that this
20 was written, I think that it -- they were true
21 numbers. However, I can't verify that now. I can't
22 really remember what -- what happened back then with
23 this declaration. I have no idea.
24     Q   (By Mr. Ashworth) Okay. Let me re-ask it
25 this way:

Page 93

1          If you were not the numbers person at -- at
2  Enel Green, you would agree that the Court shouldn't
3  rely on the numbers that you gave to the Court because
4  you were not privy to the numbers?
5      MR. RAY: Object to form.
6      THE WITNESS: Oh, I'm sure that the numbers
7  that were provided were correct. I just don't have
8  any way of verifying it now. I -- I really don't.
9  That was a financial department decision to come up
10 with these numbers and that was not part of my job
11 description at that time.
12     Q   (By Mr. Ashworth) Is there anywhere here
13 that you indicate to the Court that you don't know
14 exactly what the numbers are but that you're relying
15 on someone else to -- for that?
16     MR. RAY: Object to form.
17     THE WITNESS: The numbers that were there, I
18 trusted the -- the people that provided the numbers,
19 that they were accurate.
20     Q   (By Mr. Ashworth) Well, under the Cost of
21 Construction section here in your declaration to the
22 Court, why did you tell the Court about the original
23 contract price even though at the time of this
24 declaration, that original contract price had already
25 been revised many times and at the time it was around

1  $34 million?  Why did you tell --
2        MR. RAY:  Object to form.
3        THE WITNESS:  I'm not sure why they did it.
4  You would have to ask the people that wrote the change
5  orders or put these numbers in here.  I don't have any
6  information on that.
7        Q    (By Mr. Ashworth) Sir, you know, I'm not
8  wanting to know why they gave those numbers.  I want
9  to know, is why did you tell the Court this?
10       MR. RAY:  Object to form.
11       THE WITNESS:  I seriously can't remember.
12       Q    (By Mr. Ashworth) Okay.  You don't know why
13 you misled the Court -- scratch that.
14       Do you think you did this, you made this
15 statement because you wanted to mislead the Court into
16 thinking that Enel Green's contract expenses were more
17 than what they actually were?
18       MR. RAY:  Object to form.
19       THE WITNESS:  No, I didn't intentionally do
20 anything of that nature at all, not to try to fool --
21       Q    (By Mr. Ashworth) Do you --
22       A    -- anybody.  I didn't realize that it was
23 going to have an effect on the tribe or, now, I had no
24 idea, you know, nothing.
25       Q    Do you think the person that provided you

1  this did so in an effort to mislead the Court into
2  thinking that Enel -- Enel Green's contract expenses
3  were more than what they actually were?
4        MR. RAY:  Object to form.  Calls for
5  speculation.
6        THE WITNESS:  I'm not sure.  I would have to
7  refer you to that person what the -- the thought
8  process was, but I don't --
9        Q    (By Mr. Ashworth) I'm not asking -- sure.
10 Sorry to interrupt you.  I'm not asking about their
11 thought process.  What I am asking is, is what your
12 current thought process is.
13       Do you think that the individuals who gave
14 you this number did so to mislead the Court?
15       MR. RAY:  Object to form.
16       THE WITNESS:  I don't think so.
17       Q    (By Mr. Ashworth) Do you think it was
18 truthful to tell the Court -- scratch that.
19       Do you think that you were being truthful to
20 the Court when you failed to tell the Court that the
21 contract price as of the time of your declaration was
22 $20 million less than the original contract --
23 contract price called for?
24       MR. RAY:  Object to form.  Lack of
25 foundation.

1        THE WITNESS:  I'm not sure.
2        Q    (By Mr. Ashworth) You're not sure if you're
3  being truthful?
4        MR. RAY:  Object to form.
5        THE WITNESS:  No, I was truthful at the time
6  that this was presented, you know.  Other than that, I
7  really don't remember who provided all this
8  information, who developed this report on the
9  statements or anything else like that.  I really can't
10 remember the majority of the details.
11       Q    (By Mr. Ashworth) And do you know who I
12 could ask to find out who did this declaration for
13 you?
14       A    I'm not sure.  I don't know.  Like I said,
15 there was a -- we had a legal department and I believe
16 they had outside legal as well working on this.  Other
17 than that, I don't -- I don't know for sure.
18       Q    Have you ever signed a declaration before a
19 Court before?
20       A    I'm not sure if it was a declaration or not.
21 I really don't know.
22       Q    Have you ever signed an affidavit before?
23       A    I can't remember if I did but...
24       Q    Do you -- at the time that you signed this
25 declaration, did you know that by making the

1  statements, you were indicating that the statements
2  were true and accurate?  Did you at least know that?
3        A    Yes.
4        Q    Okay.  Is -- would it be fair for me to --
5  to believe that the reason why you did not tell the
6  Court in the declaration here that the contract price,
7  the revised contract price was 20,000 -- 20 million
8  less than what the original price was because you
9  didn't want the Court to -- to believe that Enel Green
10 was trying to cut costs on the project?
11       MR. RAY:  Object to form.
12       THE WITNESS:  No.
13       Q    (By Mr. Ashworth) Was Enel Green trying to
14 cut costs or save money on the project?
15       A    I think as an owner, they probably would
16 have liked to have saved some money, yes, but I'm not
17 even sure what the final numbers were on that project
18 so I don't think they -- everybody, every company
19 wants to save a little bit of money, but I don't know
20 what their actions were.
21       Q    In your position as site coordinator on the
22 Osage Wind project, was it your understanding that
23 Enel Green was trying to cut costs in relations to the
24 excavation process?
25       A    Not to my knowledge, no.

Case 4:14-cv-00704-GKF-JFJ   Document 59-16 Filed in USDC ND/OK on 10/26/21   Page 27 of 48

1    Q.  Okay.  I'm going to pull up an exhibit that
2  was previously marked as Exhibit 48 and it's a change
3  order for blasting and we're going to go to page 4.
4  It's the middle of the page on page 4.  Right there.
5  Second-to-last bullet point there, this is a change
6  order, which is I guess somewhat -- I don't -- I'll
7  say this, I do not see your name on it, but I just
8  want to bring this to your attention, it's from Enel
9  Green.
10        It says "In an attempt to limit the cost
11  impact of rock crushing, EP" -- sorry, "EGP E&C has
12  also inquired IEA/Barr to pursue" -- I assume that's
13  supposed to be "lighter crushing procedure.  The
14  response was that the material larger than 3 inches
15  would not have been suitable to meet compaction
16  requirements."
17        Were you aware at the time that Enel Green
18  tried to pursue other options for crushing the rock to
19  save money.
20        (Exhibit 48 Marked for Identification)
21        MR. RAY:  Object to form.
22        THE WITNESS:  No, all I know is we couldn't
23  use anything larger than that in order to achieve our
24  compaction results.
25    Q.  (By Mr. Ashworth) Okay.  And just to be

1  clear of what -- the number that you believe is the
2  total on the project was $287 million.
3        At least the number that you present to the
4  Court; is that correct?
5    A.  Yes.
6    Q.  Okay.  I'm going to pull up another exhibit
7  that I'm going to mark as Exhibit No. 63.  It is going
8  to be e-mails regarding material costs.  Right there
9  is perfect.
10        So this is an e-mail --
11        (Exhibit 63 Marked for Identification)
12        MR. RAY:  Is there a Bates range on this --
13  is there a Bates number on this document?
14        MR. ASHWORTH:  I don't believe there is, but
15  let's scroll down.  There's not.  I guess when IEA was
16  coordinating with counsel during the production, they
17  did not -- they failed to Bates stamp the production.
18    Q.  (By Mr. Ashworth) Sir, this is an e-mail
19  from Craig Mazurowski and yourself, looks like May 22,
20  2015.
21        Do you recall seeing this e-mail?
22    A.  No, I don't recall.
23    Q.  Okay.  It indicates -- well, first off, do
24  you have any idea how much money Enel Green saved by
25  using the Osage minerals without permission?

1        MR. RAY:  Object to form.
2        THE WITNESS:  No, I don't.
3    Q.  (By Mr. Ashworth) Well, here, it says --
4  these are calculations it seems like that Craig had
5  provided to you.  It indicates 1200 cubic feet of
6  excavation, but I'd represent to you just based on the
7  numbers that perhaps it could be referred to cubic
8  yards, but it says 12 -- 1200 cubic feet of
9  excavation, please note the foundations were mixed
10  soil and not all limestone.  We did not import any
11  backfill material.  It was crushed on site.  It goes
12  on to say "Assumptions that 60 percent was limestone,
13  40 percent was soil, based on those assumptions here
14  is what I figured what it would have cost to backfill
15  with imports.  480 cubic yards of soil at a cost of
16  $7,488."  Then it says "720 cubic yards of limestone
17  at a cost of 15,660."
18        If you add 1566 -- I'm sorry, 660 to 7,488,
19  I'll, you know, I'm terrible at math, but I'll
20  represent that based on my numbers and -- and checking
21  and rechecking, that's $23,184 per foundation.
22        Sir, how many foundations were done on the
23  project?
24    A.  There was a total of 84 foundations.
25    Q.  Okay.  If you times $23,184 per foundation,

1  that's 84 foundations, that comes out to be a savings
2  that Enel Green realized of $1,944,432.
3        How much -- that's how much they saved by
4  using the Osage minerals without a permit.  Were you
5  aware of that at the time?
6        MR. RAY:  Object to form.
7        THE WITNESS:  No.
8    Q.  (By Mr. Ashworth) You had no understanding
9  that Enel Green, had they chosen -- had they not used
10  the minerals, this is the amount of money they would
11  have had to have spent to use substitute backfill?
12        MR. RAY:  Object to form.
13        THE WITNESS:  I -- I don't know that.  This
14  e-mail that I got, I more than likely had forwarded on
15  either to Giuseppe or Bill Price.
16    Q.  (By Mr. Ashworth) Okay.
17    A.  I don't deal with it.
18    Q.  You would understand just based on this --
19  well, scratch that.
20        It's your understanding that Enel Green did
21  not pay for any of the materials that were excavated;
22  correct?
23        MR. RAY:  Object to form.
24        THE WITNESS:  I did not -- I did not know
25  what they paid for, what they haven't paid for.  That

Page 102

1  was none of my -- it wasn't my business.  It just
2  didn't fall in my realm of activities.
3      Q   (By Mr. Ashworth) Okay.  It's -- it's -- as
4  site coordinator -- scratch that.
5      What is your realm of activities as site
6  coordinator for the Osage Wind project?
7      A   Oversee the construction that's happening
8  around the job site.
9      Q   Okay.  Well, we're going to go back to your
10  declaration, first page.  The bottom, I'm looking at
11  page -- paragraph three, the last thing it says "My
12  duty as site coordinator include, among other things,
13  the overall management and supervision of construction
14  of the project including timing and schedule of work
15  to ensure the project proceeds on schedule and on
16  budget."
17      And you're just telling me now that the
18  numbers were not within your bailiwick even though in
19  your declaration to the Court, it seems to me that
20  you're telling the Court that budgeting was within
21  your responsibility as site coordinator?
22      MR. RAY:  Object to form.
23      THE WITNESS:  The budget was handled by our
24  project manager Giuseppe DiMarzio.  He would let me
25  know where we were on budget and if I was going over

Page 103

1  or whatever.  Other than that, I mean, I just don't
2  remember and I don't recall what the whole thing was.
3      Q   (By Mr. Ashworth) So you didn't write this
4  part about your responsibilities; is that what you're
5  telling me?
6      A   That's exactly what I'm telling you.
7      Q   Okay.  So when this was presented to you to
8  sign, knowing that this was not your job
9  responsibilities, you signed it anyways?
10      MR. RAY:  Object to form.
11      THE WITNESS:  At that time, I believe I was
12  signing in good faith that it was true and correct.
13      Q   (By Mr. Ashworth) So at the time in good
14  faith, you thought those were your job
15  responsibilities; is that what you're saying?
16      A   No, I'm not saying that.  My God, I can't
17  remember the entire document from seven years ago to
18  today.  I -- I really can't.  I don't know what answer
19  you want me to give you, but I can't give you a lot of
20  the answers because I simply don't remember.
21      Q   Sure, sir.  The answers that I want is the
22  truth.  I expect the truth from you just as I would
23  expect you to tell the Court the truth with your
24  declaration.
25      A   At the time that that declaration was

Page 104

1  signed, it was the truth.  I -- I don't think that it
2  wasn't.
3      Q   So at the time of the declaration, you
4  believed your job responsibilities, as you told to the
5  Court, was the truth?
6      A   At the time --
7      MR. RAY:  Object to form.
8      THE WITNESS:  -- at the time of signing
9  this, yes.
10      Q   (By Mr. Ashworth) Okay.  We're going to go
11  back to -- we're actually going to go to a new
12  exhibit, change order for blasting.  It may already
13  be...
14      MS. McCLANAHAN:  It's already an exhibit.
15      MR. ASHWORTH:  It's going to be Exhibit 48,
16  page 4.  Middle of the page.  Down, right there.
17      Q   (By Mr. Ashworth) So this section it says at
18  the very top, it says "The decision process for rock
19  crushing was" -- I assume it's supposed to mean
20  derived -- "was derived by the following conditions,"
21  and then it goes on, which is the fourth bullet point
22  from the top, it says "Given the issues with the Osage
23  Nation, the disposal of excavated rock -- rocks and
24  imported backfill material from outside the county was
25  a more expensive solution."

Page 105

1      Did I read that correctly?
2      A   Yes.
3      Q   It seems to me that Enel Green was making a
4  conscious decision that instead of not using the
5  excavated rocks, that they would save money by using
6  the rock -- scratch that.
7      It seems to me that Osage Nation -- sorry,
8  I'm getting a little flustered there.
9      Seems to me that Enel Green is making the
10  conscious decision here that it would be much cheaper
11  to use the excavated material versus using material
12  from off site.
13      Is that how you read this bullet point?
14      MR. RAY:  Object to the form.
15      THE WITNESS:  Yes.
16      Q   (By Mr. Ashworth) Okay.  And -- and based on
17  the e-mail, it seems that the savings would have been
18  about $1.9 million that Enel Green -- based on the
19  estimate provided by Craig Mazurowski?
20      MR. RAY:  Object to form.
21      Q   (By Mr. Ashworth) Is that correct?
22      A   Yes.
23      Q   We're going to pull up an exhibit that I'm
24  going to mark as Exhibit No. 64.  It's an e-mail dated
25  October 29.  So at the top it says -- where it says

Page 106

1 **thank you, it seems that this is coming from Barbara**
2 **Matula to Chris Hanson.**
3      **Do you know who Barbara Matula is?**
4      (Exhibit 64 Marked for Identification)
5      A   No.
6      **Q   Okay.  We're going to go down to the second**
7 **page at the very bottom.**
8      MR. RAY:  Does this one also not have Bates
9 numbers?
10      MR. ASHWORTH:  That's correct.
11      **Q   (By Mr. Ashworth) First off, who is Chris**
12 **Hanson -- I'm sorry, Chris Hanson, I think you -- you**
13 **told -- talked about him earlier.**
14      **What was his position and relations to the**
15 **Osage Wind project?**
16      A   He was a general contractor with IEA.  He
17 represented them.  He was vice president of
18 construction for them, for IEA.
19      **Q   Okay.  Here at the bottom, the second page,**
20 **this first bullet point it says "Osage Nation has**
21 **asserted mineral rights permit is required to break**
22 **the surface of the ground," and then it says "Enel**
23 **directed" -- or sorry, "Enel directs IEA to continue**
24 **without permit."**
25      **Did I read that correctly?**

Page 107

1      A   Yes.
2      **Q   And just to confirm, it was indeed Enel**
3 **Green who directed IEA to continue to work without**
4 **first obtaining a minerals permit from the Osage**
5 **tribe; is that correct?**
6      MR. RAY:  Object to form.
7      THE WITNESS:  I'm sure they did, but I
8 thought that the permit was in process, is the only
9 reason why they would have made that statement I'm
10 sure.
11      **Q   (By Mr. Ashworth) So you believed under this**
12 **statement where it says Enel directs IEA to continue**
13 **without permit, it's your understanding that Enel was**
14 **trying to get a permit even though they're directing**
15 **IEA not to get a permit or to continue without a**
16 **permit?**
17      MR. RAY:  Object to form.
18      THE WITNESS:  I'm not really sure.
19      **Q   (By Mr. Ashworth) You're not sure about**
20 **what?**
21      A   I'm not sure of that, if they directed IEA
22 to continue without a permit.
23      **Q   Okay.  It says it --**
24      A   Go ahead.
25      **Q   No, I'm sorry, I -- I interrupted you.**

Page 108

1      A   No, I don't even recall this, this e-mail
2 that you're showing me now.  I don't even know where
3 it came from or anything.  I just don't remember.
4      **Q   We'll -- sure.  We'll scroll up to the**
5 **bottom of the first page.**
6      A   Okay.
7      **Q   Right here.  We'll stop here.  It's an**
8 **e-mail from Chris Hanson, and you said that Chris**
9 **Hanson was the vice president or one of the vice**
10 **presidents at IEA.**
11      A   Correct.
12      **Q   Is that right?**
13      A   Yes.
14      **Q   And if he's making this statement, Enel**
15 **directs IEA to continue without permit, in relations**
16 **to Osage Nation has asserted mineral rights permit is**
17 **required.**
18      A   Okay.
19      **Q   Is it your testimony that -- you know, that**
20 **IEA was trying to get a permit?**
21      MR. RAY:  Object to form.
22      THE WITNESS:  I'm not sure.  I'm not sure at
23 all.
24      **Q   (By Mr. Ashworth) Okay.  Is there anything**
25 **in here that would indicate to you that IEA was trying**

Page 109

1 to get a permit?
2      A   No.
3      **Q   Okay.  If Enel Green had stopped work so**
4 **that it could obtain a minerals permit, that would**
5 **have delayed the project; is that correct?**
6      A   That, I'm not sure of.
7      **Q   Okay.  Well, it says Enel here or at least**
8 **in the e-mail that Chris is referencing it says "Enel**
9 **directs IEA to continue without permit."**
10      **You don't know if getting the permit would**
11 **have caused any delay?**
12      MR. RAY:  Objection.  Asked and answered.
13      THE WITNESS:  I'm not -- I'm not sure if it
14 would or not.  I think that possibly they did proceed
15 without the permit until we got the permit.  I'm not
16 really sure.
17      **Q   (By Mr. Ashworth) Okay.  By proceeding**
18 **without a permit, Enel Green stood to gain both time**
19 **and money on the project; would you not agree with**
20 **that?**
21      MR. RAY:  Object to form.
22      THE WITNESS:  I'm not -- I'm not sure how
23 much money they saved on the project.  Like I said, I
24 was never involved in any of that.
25      **Q   (By Mr. Ashworth) Sure.**

Bill Moskaluk   6/16/2021

**Page 110**

1  Do you know how much time they would have
2  saved?
3      MR. RAY:  Object to form.
4      THE WITNESS:  No, I really don't.
5  Q   (By Mr. Ashworth) During the project, did
6  any government employee or government official show up
7  to the project and direct that the project stop until
8  a permit could be obtained?
9  A   There was one fellow from the Osage tribe
10 that came to a site and he handed me a letter which I
11 in turn I forwarded it on to Giuseppe and Bill Price
12 that were handling the contract issues.
13 Q   Do you know who that individual was?
14 A   I know he was tall.  It was either, oh, oh,
15 Mr. Whitehead or a Frank Weir.  I'm not really sure
16 which, which one.
17 Q   Would an individual with the last name of
18 Whiteshield, does that sound familiar?
19 A   Yes.
20 Q   I'm sorry, who was the first person that
21 you -- the first name you said?
22 A   I'm not sure which one it was.  There were a
23 couple of gentlemen out there, plus I think several
24 more that they -- they drove on the site, but it was
25 either Frank Weir I believe is his last name or

**Page 111**

1  Whiteshield guy or whatever.
2  Q   Would you have spoken with this Weir or --
3  or -- or Whiteshield individual outside of the letter
4  being handed to you?
5  A   I'm not sure.  I don't remember.  I know we
6  took them on a quick job site tour and showed them
7  exactly what was happening on site.  I do know that,
8  but other than that, I don't recall anything else.
9  Q   Did that occur at the same time that the
10 rock excavation and crushing was taking place?
11 A   Yes, I believe so.
12 Q   Okay.  Do you recall anyone showing up to
13 the project other than these two individuals that you
14 just mentioned, that were either from the government
15 or from the tribe?
16 A   I know there were other visitors that came
17 out there, but it was reported to me that they were
18 back kind of site -- who those individuals were, I
19 really don't know.  Normally, we have a protocol set
20 up, any visitors to the site must come to the main
21 office and check in with us and they would be escorted
22 out, but apparently that didn't happen on a few -- on
23 a few visits.
24 Q   And it's your understanding that when these
25 two individuals that you mentioned were on site, there

**Page 112**

1  was a concern about the use of the excavated material;
2  is that -- is that right?
3      MR. RAY:  Object to form.
4      THE WITNESS:  That -- I can't answer that
5  because I don't know if there was a concern with that
6  or not.
7  Q   (By Mr. Ashworth) Okay.
8  A   They just wanted to see what the site was
9  all about so...
10 Q   And did any of these two individuals direct
11 you or anyone on site to stop construction?
12 A   The fellow that handed me the -- the letter,
13 it said that he wanted me to stop and I said I'll
14 forward it on to my superiors and they'll make that
15 decision.
16 Q   Okay.  I'm going to pull up another exhibit
17 that's an e-mail dated October 14, and I don't know if
18 it's Bates stamped.  We'll see.  I'm going to mark it
19 as Exhibit No. 65, I believe, yeah, 65.  It's not
20 Bates stamped.  At the bottom of the page, we're going
21 to go actually all the way to the bottom of the
22 document.
23     Sir, this is an e-mail from Louise Red Corn
24 and it's directed to it seems at EGPNA PR.
25     Do you know who that to line is, EGPNA PR?

**Page 113**

1  Is that the PR department of Enel Green?
2      (Exhibit 65 Marked for Identification)
3      MR. RAY:  Object to form.
4      THE WITNESS:  Okay.
5  Q   (By Mr. Ashworth) Oh, I'm asking you.
6  Do you know what that is?
7  A   Public relations, maybe.  I don't know.
8  Q   Okay.  It says "To whom it may concern, I'm
9  inquiring regarding a letter sent by the Bureau of
10 Indian Affairs, Osage agency, in Oklahoma regarding an
11 un-permitted quarry operation at Enel's Osage Wind
12 project."  It goes on "My question, what is Enel doing
13 to respond to this letter?  Has the company ceased
14 quarrying -- quarrying rock?  Why did it not obtain a
15 permit before commencing such operations?  The letter
16 sent by BI -- by the BIA to Enel NA to Francesco
17 Venturini is attached."
18     Do you recall reading this e-mail?
19 A   No.
20 Q   Do you know what letter is being referenced
21 here, the letter by the BIA to Francesco Venturini?
22 A   I believe it was the same letter that was
23 hand delivered to myself.
24 Q   Okay.
25     Can you pull up that letter?  The letter

Page 114

1  from Robin Phillips.
2      Pull up a letter that was previously marked
3  as Exhibit No. 38. It's my understanding, this is a
4  letter that was attached, I'll give you an opportunity
5  to look at this.
6      (Exhibit 38 Marked for Identification)
7  A   That was the letter that was submitted to me
8  by one of those two individuals.
9  Q   Okay. And if we scroll at the top, it's
10 dated October 9, 2014.
11 A   Okay.
12 Q   And towards the bottom -- actually the
13 middle, if you go down a little bit, it says "You are
14 to refrain from any further excavation of minerals
15 until such time you have obtained a sandy soil permit
16 through the Osage agency."
17     Did I read that correctly?
18 A   Yes.
19 Q   Okay. We're going to go back to the
20 previous exhibit, Exhibit 65, the e-mail. We're going
21 to go to the bottom of the second page. It seems that
22 it was forwarded to Steve Champagne.
23     Who -- first of all, who is Steve Champagne?
24 A   He was one of our legal counsel with Enel at
25 that time.

Page 115

1  Q   Okay. It says, he writes "My inclination
2  would be to say we have not received a letter and
3  would not respond to it until we do. We are not
4  quarrying rock and we have all permits required for
5  the work we are doing."
6      Do you recall reading that, this e-mail?
7  MR. RAY: Object to form.
8  THE WITNESS: No.
9  Q   (By Mr. Ashworth) Okay. Let's go to the
10 very top of this document, page one. It's an e-mail
11 from Bill Price to Giuseppe DiMarzio and yourself, and
12 it says "Gents, please review the e-mail chain. This
13 issue seems to be growing and we need to have a lock
14 down on all communications at the site. At the site,
15 everything needs to be directed to Bill and then
16 deferred to internal communications, Michaela. Bill,
17 I am trying to get you some talking points, but for
18 now, if asked, one, we have all permits required to
19 build the facility, and, two, please direct any
20 further communications to Michaela."
21     Do you recall reading this e-mail now?
22 A   No.
23 Q   Okay. Would it be safe for me to assume
24 that none of the talking points that Bill Price is --
25 gave you would have indicated that Enel Green was

Page 116

1  using Osage minerals without permission so that it
2  could have a substantial savings of money on the
3  project? Is that -- is that correct?
4      MR. RAY: Object to form.
5      THE WITNESS: I'm not -- I'm not sure. I
6  didn't understand all of that. I'm sorry.
7  Q   (By Mr. Ashworth) Sure. No problem.
8      Is it safe for me to assume that none of the
9  talking points that Bill Price gave you would have
10 been a talking point that said that Enel Green was
11 using the minerals in order to save money and time?
12     MR. RAY: Object to form.
13     THE WITNESS: That, I'm not sure of. I
14 don't think that was referring to me. I think that
15 was Michaela writing back to Bill Price.
16 Q   (By Mr. Ashworth) Okay. Do you know what
17 any of the talking points eventually ended up being?
18 A   No.
19 Q   Okay. Do you recall you being told talking
20 points to give relative to this project?
21 A   I -- I don't remember.
22 Q   Okay. Sir, earlier you referenced
23 as-builts.
24     What -- first off, what are as-builts?
25 A   A record of the construction activities on

Page 117

1  site, what other kind of changes were made, like if we
2  relocated a road, you know, we would have to show that
3  on the as-built drawings.
4  Q   It's my understanding that you have 12 years
5  of experience in the wind industry; is that correct?
6  A   Yes.
7  Q   And you have more experience than that in
8  the construction industry; is that correct?
9  A   Yes.
10 Q   About how much experience do you have in
11 construction industry in general?
12 A   Thirty-five plus or minus years.
13 Q   And you would be -- scratch that.
14     Would it be safe for me to assume that you
15 were very familiar with as-builts during your 35 years
16 of construction?
17 A   Yes.
18 Q   Okay. And just so that I can understand the
19 as-builts a little bit better, based on your
20 explanation, is that an as-built, you have your
21 original kind of blueprints or plans and that if
22 anything deviates from that as they're built, you have
23 the redlined version and that's what we're looking at
24 as as-builts.
25     Is that -- is that my -- is my understanding

1  correct?
2        MR. RAY:  Object to form.
3        THE WITNESS:  Yes.
4    Q   (By Mr. Ashworth)  Okay.  So if the project
5  said that a tower was supposed to be at X site but
6  then eventually ended up being at a different site,
7  that would be in the as-built?
8    A   Yes, it would be.
9    Q   Okay.  And did Enel Green or IEA keep
10 as-builts for the projects?
11   A   I believe they did, yes.
12   Q   Okay.  Is that based on your experience in
13 the wind industry, is it a customary practice to have
14 as-builts or to have as-builts for the construction
15 process?
16   A   Yes.
17   Q   Okay.  Would as-builts be kept for all
18 aspects of the construction process for a wind
19 project, based on your experience?
20   A   Yes.
21   Q   Okay.  Would that include as-builts for
22 transmission lines?
23   A   Yes.
24   Q   Would that include as-builts for any type of
25 buildings that were constructed?

1    A   Yes, it would.
2    Q   Would that include as-builts for excavation
3  work?
4    A   I believe there was already contract
5  drawings in regards to the foundations on -- it was
6  one from Barr Engineering, any changes in that would
7  have had to have been reflected on the -- on the
8  drawings itself but I don't believe any of them were.
9    Q   Okay.  And that's for the foundation, is
10 that for the actual concrete foundation, or are we
11 talking about --
12   A   Yes, that was the -- I'm sorry.
13   Q   Were -- no, I'm sorry to interrupt there.
14       As -- sorry, there's a bit of delay so I'm
15 sorry for the interruption.  What were you going to
16 say?
17   A   That was for the foundations, yes.
18   Q   Okay.
19   A   Not -- not for the excavated material.
20   Q   Based on your experience, if -- if -- if
21 there was a drawing or plan that indicated that X
22 amount of material was to be excavated and a different
23 amount was excavated, based on your experience in the
24 wind industry, would that have been documented in an
25 as-built or documented, yeah, in general?

1        MR. RAY:  Object to form.
2        THE WITNESS:  Yes, it would have been
3  reflected.
4    Q   (By Mr. Ashworth)  Okay.  And that's just --
5  and that's based on your belief that's customary and
6  standard practice in the industry, to reflect changes
7  from any deviation in excavation plans?
8    A   Yeah, it would have been reflected on your
9  quantity sheets that are part of the package, drawing
10 package.
11   Q   Who would have been responsible for that?
12   A   That was the contractor's responsibility.
13   Q   Do you know if anyone directed the
14 contractor to do as-builts for the entire project
15 except for excavation work?
16   A   No, I don't.
17   Q   Okay.  You never directed IEA to do
18 as-builts on the entire project except for the sole
19 aspect of excavation?
20   A   No, that was -- that was a contractual
21 requirement, that they provided as-builts once the
22 project was completed.
23   Q   Okay.
24   A   I don't believe that it -- it's -- had
25 anything to do with excavated materials in specific to

1  that.
2    Q   But if there was a deviation in the amount
3  of what was actually excavated versus what the plans
4  called for, you believe it should be documented?
5    A   Yes.
6    Q   By the contractor?
7    A   Yes.
8    Q   Okay.  And if Craig Mazurowski testified in
9  his deposition that they were never told to keep or
10 document changes in excavation material, would that
11 surprise you?
12       MR. RAY:  Object to form.
13       THE WITNESS:  Yes.
14   Q   (By Mr. Ashworth) That would be against your
15 experience in the industry; correct?
16   A   I'm -- I'm not sure what the question was.
17   Q   You didn't hear the question or would you
18 like me to re -- rephrase the question?
19   A   Rephrase the question.
20   Q   Sure.
21       If Mr. -- I'm sorry, if Craig Mazurowski
22 testified during his deposition that they did not
23 document the deviations between the plans and what was
24 actually excavated, if he testified that that wasn't
25 documented, that would be contrary to your experience

Page 122

1 in the industry?

2       MR. RAY:  Object to form.

3       THE WITNESS:  I'm sorry, I still don't

4 understand your last portion of that question.

5       Q   (By Mr. Ashworth) Sure.  Let me just back it

6 back up.

7           In your experience in the industry, your 12

8 years of experience, when drawings say that a certain

9 amount of material is supposed to be excavated --

10      A   Mmm-hmm.

11      Q   -- if the amount -- if there was a deviation

12 of those plans, based on your experience, they should

13 be reported, that information should be reported?

14      A   Yes.

15      Q   And if that didn't happen here with the

16 Osage Wind project, that would be in contradictory --

17 in contradiction to your experience within the

18 industry?

19      A   Yes.

20      Q   Okay.  Have you ever lived in Oklahoma

21 outside of working on the Woodward project and the

22 Osage project?

23      A   Have I ever lived?

24      Q   Yes, like resided in Oklahoma.

25      A   I lived in Ponca City, I lived in

Page 123

1 Weatherford, and I lived in Rush Springs.

2      Q   When did you live in Rush Springs?

3      A   What's that?

4      Q   Let me ask this:  Was Rush Springs part of a

5 wind project?

6      A   Yes.

7      Q   Okay.  Do you have any family members in

8 Oklahoma?

9      A   In Oklahoma?  I don't know --

10      Q   Yeah.

11      A   -- but my wife does.

12      Q   Do you know where they live?

13      A   Maysville.

14      Q   Okay.  Sir, you were the site coordinator on

15 the project and you previously indicated that the site

16 manager, which was your supervisor, was Giuseppe

17 DiMarzio.

18          Do you know why you were asked to provide

19 the declaration to the Court instead of the site

20 manager Giuseppe DiMarzio?

21      MR. RAY:  Object to form.

22      THE WITNESS:  I'm not sure.

23      Q   (By Mr. Ashworth) Okay.  When you were asked

24 to do this declaration, you had only worked with Enel

25 Green for less than a year; is that correct?

Page 124

1      A   That is correct.

2      Q   Do you think that they gave or do you think

3 Enel Green had you sign the declaration to the Court

4 because you do not have as much experience or

5 knowledge of Enel Green at that time?

6      MR. RAY:  Object to form.

7      THE WITNESS:  No, I don't think that was the

8 case.

9      Q   (By Mr. Ashworth) Okay.  Then why -- why do

10 you think Enel Green chose you to make the statements

11 that you did to the Court?

12      MR. RAY:  Object to form.

13      THE WITNESS:  I don't know.

14      Q   (By Mr. Ashworth) Okay.  Based on what you

15 know today, do you wish someone would have signed the

16 declaration at Enel Green instead of you?

17      MR. RAY:  Object to form.

18      THE WITNESS:  That would have been nice, I

19 guess.  Other than that, I did sign it.

20      Q   (By Mr. Ashworth) Okay.  Do you think there

21 was anyone -- scratch that.

22          Would there have been anyone at Enel Green

23 that would have been a better person to have signed a

24 declaration to the Court with the information that you

25 had -- had provided?

Page 125

1      MR. RAY:  Object to form.

2      THE WITNESS:  I'm not sure.  A lot of things

3 come into play, maybe it was a language barrier from

4 Giuseppe.  He was Italian and maybe he didn't

5 understand everything.  I'm really not sure how they

6 came about that decision.

7      Q   (By Mr. Ashworth) Okay.  My question -- let

8 me re-ask the question this way:

9          Do you think there would have been anyone at

10 Enel Green that would have been more qualified or

11 had -- be in a better position to sign the declaration

12 before in opposition to the plaintiffs' request for

13 injunction?

14      MR. RAY:  Object to form.

15      THE WITNESS:  Probably Bill Price.

16      Q   (By Mr. Ashworth) And do you believe that

17 Bill Price would have been a better person to sign the

18 declaration because he would have had more knowledge

19 of the statements that were in your declaration?

20      MR. RAY:  Object to form.

21      THE WITNESS:  Yes.

22      Q   (By Mr. Ashworth) Sir, why did you leave

23 Enel Green?

24      A   I was in North Dakota and the project was

25 finishing up and I was sick at the time so I went

Page 126

1  ahead and retired.  And then I was diagnosed with
2  cancer at the time.
3      Q   Sir, it's my understanding that at the
4  beginning of the project, the project called for only
5  27 of the foundation areas to be blasted but then
6  later on that number had to change.
7      Do you recall that part?
8      A   Yes.
9      Q   And I understand that IEA indicated to Enel
10  Green that the additional blasting was required
11  because of more rock that was encountered?
12      A   That's true.  They base their -- their
13  contractual amount off of the soils report that we had
14  gotten on the project and it didn't reflect actual
15  conditions.
16      Q   Okay.  Do you agree with IEA?
17      A   Yes.
18      Q   Okay.  Do you believe that additional
19  blasting was -- was necessary?
20      A   Yes.
21      MR. ASHWORTH:  Okay.  Let's take a
22  ten-minute break.  I am pretty sure I'm almost done.
23  Let me just take a quick break so I can gather
24  everything so I can end this quickly.  Okay, sir?
25      THE WITNESS:  Okay.

Page 127

1      VIDEOGRAPHER:  We are off the record at
2  2:22 p.m.
3      (A recess was taken from 2:22-2:35 p.m.)
4      VIDEOGRAPHER:  We are back on the record at
5  2:35 p.m.
6      Q   (By Mr. Ashworth) Sir, we're back on the
7  record and I just want to remind you that you're still
8  under oath.  The rules of perjury still apply.
9      Is there anything that you wanted to change
10  about your previous testimony today?
11      A   No.
12      Q   Okay.  Is there anything that you would like
13  to add to your previous testimony today?
14      A   No.
15      MR. ASHWORTH:  Okay.  I have nothing,
16  nothing further, and I will pass the witness.
17      MS. NAGLE:  Great.
18      MR. ASHWORTH:  Thank you for your time.
19      THE WITNESS:  Okay.  Thank you.
20      CROSS EXAMINATION
21  BY MS. NAGLE:
22      Q   Good afternoon, Mr. Moskaluk.  My name is
23  Mary Katherine Nagle and I'm a partner here at
24  Pipestem & Nagle and I represent the Osage Minerals
25  Council.  And so I will be following up to Mr.

Page 128

1  Ashworth's questions and asking a few -- a few of our
2  own, and I hope to not be repetitive and not repeat
3  questions he asked and hopefully not take too much
4  more of your time.
5      A   Okay.
6      Q   So thank you for indulging me and I know
7  you've -- I know you've already discussed things quite
8  at length so, you know, just -- just jumping right in,
9  and I can pull up the exhibits if we want to look at
10  them again, but earlier, you know, I know Mr. Ashworth
11  showed you Exhibit 48 which was a change order.
12      Just kind of stepping back more broadly,
13  what was your role in the change order process?
14      A   I would take the change orders that came in
15  and I would pass them on to Giuseppe which he in turn
16  would pass it on to Bill Price.  Both of them would
17  review it and then they would get back to me, telling
18  me, yes, this is -- this is good or whatever.  That
19  was the extent of it.  They were the ones that
20  approved the change orders.
21      Q   Okay.  So really you just passed it along
22  but you didn't personally have any decision-making
23  authority over whether they were approved or denied?
24      A   No decision making at all.
25      Q   Would that have been Bill Price or Giuseppe,

Page 129

1  do you know?
2      A   It would have been them if not more people.
3      Q   And did you receive -- when you would
4  receive the change orders, were they coming from Craig
5  Mazurowski?
6      A   Most of them, I believe, they did.  He was
7  responsible for writing the change orders and, like I
8  said, they would come to me and then I would forward
9  them on.
10      Q   Mmm-hmm.
11      And do you remember if you ever got any
12  change orders from anyone else other than Craig
13  Mazurowski?
14      A   I don't recall.
15      Q   Okay.  Do you remember EGPNA ever denying a
16  change order request?
17      A   I don't recall that either.  It's possible
18  they might have, but for sure, I don't know.
19      Q   And was it your understanding when you would
20  submit these change order requests to Giuseppe
21  DiMarzio, was he employed by Enel Green Power North
22  America?
23      A   Yes, he was.
24      Q   Okay.  I know earlier we were looking at the
25  dollar amounts.

Page 130

1   Was it your general impression that overall
2   the change order requests were decreasing the cost of
3   the contract to EGPNA?
4       A   No, I didn't -- I didn't think that way.
5       Q   Do you recall what most of the change orders
6   related to?
7       A   The only thing -- the only thing I can think
8   of is -- is the -- the blasting --
9       Q   Mmm-hmm.
10      A   -- and excavation.  I really don't know.
11      Q   Mmm-hmm.
12          And I know -- I know earlier we discussed
13  the fact that there was a little bit more blasting
14  than was -- was originally inspected simply because of
15  the amount of rock under the surface.
16          Do you recall when you joined the project
17  and -- and was hired -- when you were hired by EGPNA
18  in May of 2014, what was your understanding of what
19  the construction plan was for the foundations of the
20  turbines?
21      A   Only what was shown to me on -- on a
22  drawing, that that's what they had planned to build on
23  it.
24      Q   At that time in -- in May of 2014, was the
25  plan to use rock crushers?

Page 131

1       A   To use rock crushers?
2       Q   Mmm-hmm.
3       A   No.
4       Q   Was it at that time to use imported backfill
5   material purchased from off site?
6       A   No, normally they use the material that they
7   excavated from the foundation.  However, we could not
8   break through that foundation with a conventional
9   operation, and that's mainly -- excuse me, mainly the
10  geotech report that all parties were using was not
11  reflective of the actual materials that were on site.
12  So it caught us all by surprise --
13      Q   Mmm-hmm.
14      A   -- that we couldn't dig these foundations
15  without drilling and shooting.
16      Q   I see.
17          Do you recall when that realization
18  occurred?  I know it must have been after May 2014
19  but --
20      A   Yeah, I'm -- I'm not really sure.
21      Q   Okay.  Let's see.  Did you yourself while
22  you were working on the Osage Wind farm ever
23  communicate directly with anyone from the Tradewind
24  Energy company?
25      A   Excuse me?  Say that one more time.

Page 132

1       Q   While you worked on the Osage Wind farm, did
2   you yourself ever have any communications with anyone
3   from Tradewind?
4       A   Yes.  Yes.
5       Q   Okay.  And do you recall any names of anyone
6   that you communicated with at Tradewind?
7       A   Actually, no, because they were only on the
8   project for short periods of time.  There was one
9   fellow there and probably another guy from their
10  office every once in a while, like on the monthly
11  meetings, but once -- once Enel had solidified the
12  contracts with Tradewinds on the purchase of that
13  project, they -- they disappeared.
14      Q   Okay.  And you were employed by EGPNA; is
15  that correct?
16      A   Yes, ma'am.
17      Q   While working on the Osage Wind farm, did
18  you ever communicate with anyone from Enel Kansas?
19      A   Enel Kansas?
20      Q   Yes.
21      A   I don't -- I don't remember if I did.
22      Q   Okay.  Fair enough.
23          Are you -- are you familiar with the
24  corporate entity Enel Kansas?
25      A   No.

Page 133

1       Q   Okay.  Did you, while working on the Osage
2   Wind farm project, ever communicate with anyone who
3   was an employee of Osage Wind, LLC?
4       A   That was the same people I just finished
5   talking about.  There's one representative on site and
6   I thought they were Tradewinds, not Osage Wind.
7       Q   Okay.  So -- so you may have communicated
8   with people from Osage Wind, LLC, but you thought they
9   were folks from Tradewind; is that correct?
10      A   Correct.
11      Q   Okay.  And -- and during your work on the
12  Osage Wind farm, did you ever communicate with anyone
13  from General Electric?
14      A   Yes, their project manager with GE --
15      Q   Mmm-hmm.
16      A   -- was on the -- on the project site, along
17  with one of his helpers that he had.
18      Q   And do you recall his name, the project
19  manager's name?
20      A   We called him Gunny.
21      Q   Okay.
22      A   Because he was an ex-marine.
23      Q   Okay.  And do -- you don't remember Gunny's
24  last name by any chance, do you?
25      A   I actually don't.

Page 134

1   Q   Okay.  No worries.
2        What about Gunny's -- you mentioned he had a
3   helper or an assistant.
4        Do you, by any chance, recall that person's
5   name?
6   A   Yeah, it was his right -- it was his
7   right-hand man, Mark.
8   Q   Mmm-hmm.
9   A   I can't remember.  I -- I think he's an
10  employ -- employee with Enel at this time.
11  Q   Okay.  And -- okay.
12       Do you recall, you know, at that time, would
13  Gunny have been at the project site once a week or
14  more often than that or less often, do you recall?
15  A   He was there full time.
16  Q   Full time.  Okay.
17       Did he ever express any -- any stress or
18  anxiety over project construction delays that were
19  occurring?
20  A   I believe he might have mentioned that, but
21  when he did it, I'm not really sure.
22  Q   Did you have an understanding that if
23  construction on the wind turbines was delayed past a
24  certain amount of time, that there could be issues
25  with the contract between EGPNA and General Electric?

Page 135

1        MR. RAY:  Object to form.
2        THE WITNESS:  Yes, there -- there were some
3   penalty clauses in there.
4   Q   (By Ms. Nagle) And do you recall discussions
5   about those penalty clauses?
6   A   No.
7   Q   Okay.  How -- do you recall how were you
8   aware that there were penalty clauses in the contract
9   with GE?
10  A   I -- I had asked Giuseppe and Bill Price
11  about that and they -- they sent me some information,
12  that it -- it was so much per day, I believe it was,
13  but I -- I can't recall exactly what it was.
14  Q   Mmm-hmm.  Do you -- did you know or did you
15  have an understanding -- do you know today or did you
16  have an understanding at that time that -- that if
17  project construction on the wind farm wasn't finished
18  by a certain date, that Enel could lose entire --
19  entirely lose its contract with GE?
20  A   No, I did not know that.
21  Q   Okay.  Did you, while working on the Osage
22  Wind farm, communicate directly with anyone from
23  JP -- JPM Capital Corporation?
24  A   I'm not sure who they are.
25  Q   Okay.  And while working on the Osage Wind

Page 136

1   farm, did you ever communicate with anyone from
2   Northwestern Mutual Life Insurance Company regarding
3   the project?
4   A   That, I'm unsure of as well.
5   Q   Fair enough.
6        And while working on the Osage Wind farm
7   project, did you ever communicate with anyone from
8   State Street Bank & Trust Company?
9   A   Not that I -- I recall, no.
10  Q   Okay.  And I understand seven years ago is a
11  long time.
12  A   Yes.
13  Q   I'd have a hard time remembering myself so
14  I -- believe me, I understand.
15  A   I couldn't even -- I couldn't even tell you
16  what I had for dinner last night so how about that.
17  Q   I'm with you.
18       So now I just -- I have some questions I'd
19  like to ask you sort of about industry standards and
20  some definitions and words that have been thrown
21  around in the documents in this case.
22       What is your understanding of what is -- how
23  is it different to lay the foundation for a wind
24  turbine versus the foundation for just a building?
25  A   They're a lot different.  To support that

Page 137

1   tower, it's almost in a conical shape, if you will,
2   like so, and it's -- in its circumference it's about
3   60 to 80 feet in width all the way around and it comes
4   up and it's got the pedestal that comes up with the
5   bolt hole sticking through the top of your foundation
6   which are in sync and in line with the flange plate
7   that fits over it and that's in the base of your
8   turbine, but it's nothing like a foundation for a
9   building or anything like that.
10  Q   And is it the case that, I think what we're
11  referring to or I guess how -- how would you describe
12  or define backfill?
13  A   It's material that we use to backfill the --
14  the foundation, to get the correct compaction around
15  it for the structural integrity of that foundation as
16  well, stops your movement this way and this way
17  (indicating).
18  Q   I see.
19       And so in terms of structural integrity, is
20  it true that without the backfill, the wind turbine
21  would not be able to remain standing upright?
22  A   Right.  Exactly.  I wouldn't want to try it.
23  Q   Yeah.
24       And -- and what is a borrow pit?
25  A   I'm sorry, I didn't catch all that.

Page 138

```
 1    Q   No worries.
 2        I said how would you define a borrow pit?
 3    A   Material where I could take material out of
 4 and use for around the project.
 5    Q   And is it typical to have a borrow pit on
 6 site during the construction of a wind farm?
 7    A   It's always a nicety.  It --
 8    Q   Do you -- oh, go ahead.
 9    A   It will save you a lot of costs in trucking
10 if it -- if it was right there on site.
11    Q   Is that something that you would normally
12 expect the -- the subcontractor, for instance in this
13 case IEA, to create as a part of their work in -- in
14 constructing the wind farm?
15    A   No.  I think it has to be designated ahead
16 of time, the borrow areas on the project site.
17    Q   Do you know, were there borrow pits used or
18 created for -- for this construction, for the
19 construction of the Osage Wind farm?
20    A   No.
21    Q   Do you --
22    A   I --
23    Q   Go ahead.
24    A   -- I don't think we had one.
25    Q   Was that a decision -- was the decision to
```

Page 139

```
 1 not have one a decision that you participated in or
 2 was that made by other folks?
 3    A   That was made by others in 2013 or 2010, I
 4 have no idea.
 5    Q   Do you know who at -- at EGPNA would have
 6 made that decision to not have a borrow pit?
 7    A   No, I don't.
 8    Q   Do you know whether (audio glitch-inaudible)
 9 a plan -- a construction plan is to have a borrow pit
10 on site?
11    A   I caught half of that.  The first half broke
12 up.
13    Q   Sorry.
14    A   That's okay.
15    Q   Yeah, it's telling me my internet is
16 unstable for some reason.
17        Do you -- do you know whether initially the
18 plan was for there to be a borrow pit on site at the
19 Osage Wind farm?
20    A   No, I don't.
21    Q   Okay.  And what does it mean to balance a
22 construction site?
23    A   It's your cut and fill areas.  You want to
24 make sure that you balance the site in that regard so
25 you have enough material to fill the voids to lower
```

Page 140

```
 1 depressed areas so you fill them up, so it's more or
 2 less a -- a suitable roadway, et cetera, that you can
 3 use in cut and filling your material.
 4    Q   Okay.  So let's see.  I'm going to go ahead
 5 and show you an exhibit.  Let's see if I can share my
 6 screen.  And so this has already been entered into the
 7 record as Exhibit 37.  I will note that it's Bates
 8 stamped Osage Wind-024749, and this is an e-mail from
 9 Joan Heredia on May 22, 2014, and I will note that it
10 looks like -- let's see here.  I'm actually not sure
11 if you were copied on this.
12        (Exhibit 37 Marked for Identification)
13    A   Doesn't look like it.
14    Q   Doesn't look like it.  Okay.
15        In any event, I'm going to read to you a
16 couple lines from this May -- this earlier e-mail from
17 May 22, 2014, from Aaron Weigel to Ron, Mike, and
18 Craig, which I -- I would assume is Craig Mazurowski
19 and Ron Ritter, but I'm -- I'm -- you know, I'm not
20 sure.
21    A   Mmm-hmm.
22    Q   He writes "It is my understanding that the
23 sieve analysis is on aggregate that's coming from the
24 quarry, but as Joan suggests below, please confirm
25 that's the case.  It is very important that we not
```

Page 141

```
 1 remove ANY soil from the project site or use site
 2 materials in lieu of materials we would typically buy
 3 off site in developing a wind project.  Osage Nation
 4 has mineral rights for the project lands and removal
 5 of soil especially for commercial gain could
 6 constitute mining."
 7        Is that -- so I'm just reading there from
 8 Aaron's e-mail.  Is that -- does Aaron's statement
 9 here, is that in accordance or does that agree with
10 your understanding of what the restrictions were at
11 the time of construction of the Osage Wind farm?
12        MR. RAY:  Object to form.
13        THE WITNESS:  Yes.
14    Q   (By Ms. Nagle)  And I know you're not copied
15 on this e-mail, but did -- did anyone ever communicate
16 that to you?
17    A   Communicated it, yes.  Yes, they have.
18    Q   Do you remember -- oh, sorry.  Go ahead.
19    A   Yeah, it -- it was Bill Price who -- who
20 told me that.  He wanted to make sure that I knew that
21 I was not to remove any materials from site in any
22 manner or form.  I knew that.
23    Q   And did Bill Price tell you that we -- that
24 you were also not to use site materials in lieu of
25 materials that could be bought or purchased off site?
```

Page 142

1    A   No, he did not.

2    Q   He did not tell you that.  Okay.

3        Now, further on down in this e-mail from

4    Aaron Weigel, he writes "Please make sure this message

5    is widely communicated to any subcontractors working

6    on the project."

7        Do you recall anyone at EGPNA asking you to

8    communicate, make sure that the folks at IEA

9    understood the message that Aaron Weigel is sharing

10   here in this e-mail?

11   A   No.

12   Q   Okay.  Do you have any memory of anyone at

13   EGPNA, other than Bill Price, communicating to you

14   that it was important to not use the site materials in

15   lieu of materials that could be purchased off site?

16   A   No.

17   Q   Okay.  Now, I think earlier you did mention

18   that one of the restrictions you understood at the

19   time was that you were not allowed to take site

20   materials and -- and move them across the wind farm

21   and use them elsewhere.

22       Can you explain to me -- is that -- is that

23   a correct understanding of what you understood to be

24   the limitation at the time?

25   A   Yes, it -- all the material that we, say,

Page 143

1    excavated from the turbine site or that particular

2    turbine site had to remain right there.  I couldn't

3    use that material any place on the job site other than

4    that hole.

5    Q   So your understanding was you -- you -- you

6    could take the minerals out of the ground, but you had

7    to put them right back where you got them; is that

8    correct?

9    A   Correct.

10   Q   Was your understanding that it was

11   permissible for EGPNA to -- to do that and crush the

12   materials before putting them back in the ground?

13   A   I caught a little bit of that but I didn't

14   really understand --

15   Q   Sure.

16   A   -- the last part.

17   Q   So I guess let me rephrase and ask a better

18   question.

19       Did anyone ever express to you, anyone from

20   EGPNA ever express to you any limitations on rock

21   crushing?

22   A   No.

23   Q   Okay.  Let's see here.  Okay.  So I'm now

24   going to show you a different document so if you'll

25   give me just a second to pull that up.  I'm going to

Page 144

1    look at what has been previously marked as Exhibit 8

2    in this litigation, and this is Osage -- oh, I'm

3    sorry, yeah, no, this is -- it just doesn't -- for

4    some reason this version doesn't seem to have the

5    reporter's stamp on it, but I can represent to you

6    this is Exhibit 8 from the fall deposition and it's

7    Bates stamped Osage Wind Priv-000089, and this is a

8    May 15th e-mail from Joan Heredia.

9        Now, do you -- and I -- I see that it

10   doesn't look like you're copied on this e-mail either.

11       (Exhibit 8 Marked for Identification)

12   A   Mmm-hmm.

13   Q   Do you know who Daren Daters is,

14   D-A-T-E-R-S?

15   A   Yes, he's -- he's another environmentalist

16   that works along with Joe -- Joan Heredia.

17   Q   Okay.  And do you have an understanding of

18   what his job duties and responsibilities were in

19   relation to the Osage Wind farm?

20   A   He was -- he was there to ensure that we had

21   our silt control all in place throughout the job site

22   and that it was done properly.

23   Q   Okay.  And so I note for you here that --

24   that Joan also writes "...it is very important that we

25   not remove ANY soil from the project site or use site

Page 145

1    materials in lieu of materials we would typically buy

2    off site in developing a wind project.  Osage Nation

3    has mineral rights for the project lands and removal

4    of soil especially for commercial gain could

5    constitute mining."

6        Does it -- does this sound familiar to you,

7    this -- this statement and this understanding of what

8    was permissible and what was not?

9        MR. RAY:  Object to form.

10       THE WITNESS:  Partially, yes, but, like I

11   said, I'm not familiar with this one, with all... any

12   soils from the site and I never heard of using the

13   materials in lieu of materials from -- we had

14   typically bought off site.  I've -- I've never heard

15   that before.

16   Q   (By Ms. Nagle)  Okay.  And did you -- did

17   Joan Heredia ever communicate directly with you about

18   any limitations in constructing the Osage Wind farm?

19   A   She visited the job site I believe once and

20   we had a conversation basically in regards to this.

21   She asked me if I was removing any of the material off

22   site and I said no.  She basically said, well, good.

23   A   Mmm-hmm.

24       Do you -- do you recall when that visit was,

25   what month it would have been?

Page 146

1    A   No, ma'am, I don't.

2    Q   Okay.  That's fine.

3        Did Joan, Bill Price, or anyone else at

4    EGPNA ever inform you that they had a legal memorandum

5    from their attorneys telling them that it was fine

6    to -- to -- to use these materials on site as backfill

7    for the wind turbines --

8        MR. RAY:  Object.

9    Q   (By Ms. Nagle) -- without getting a permit

10   from Osage Nation?

11   A   I'm not -- I'm not sure.

12   Q   Okay.

13   A   I don't recall anything like that.

14   Q   So you don't ever recall hearing about a

15   legal memorandum that stated that EGPNA's construction

16   at the Osage Wind farm was perfectly legal and did not

17   trigger the need for a mining permit; is that correct?

18       MR. RAY:  Object to form.

19       THE WITNESS:  Yes, that's correct.

20   Q   (By Ms. Nagle) Did you ever have any

21   conversations with anyone at EGPNA about getting a --

22   a mining permit or lease from the Osage Nation?

23   A   Yes, I did, and that was with Steve

24   Champagne, and basically I was told that it was -- the

25   site didn't require one.

Page 147

1    Q   And what -- what explanation did Steve

2    Champagne give you for that determination, that one

3    was not needed?

4    A   Yeah, he didn't -- he didn't elaborate on

5    it.  He was just very short and to the point and that

6    was that.

7    Q   Okay.  Do you recall when he communicated

8    that there would be no need for a permit to you?

9    A   No, I really don't.

10   Q   Okay.  Do you recall if -- like, did -- did

11   anyone from EGPNA ever inform you that Osage Nation

12   had taken the position that a permit was required?

13   A   No.

14   Q   Okay.  So I am going to show you another

15   document, and let me just pull that up and this one

16   has also previously been entered as an exhibit in a

17   previous deposition, so this is Exhibit 53 and it is

18   Bates stamped IEA-00227119, and see here, it does look

19   like you -- you are a recipient of this e-mail.  The

20   e-mail is dated July 9, 2014, and it's from Ron

21   Ritter.

22       Do you recall who Ron Ritter was?

23       (Exhibit 53 Marked for Identification)

24   A   He -- he started out the project prior to

25   Craig Mazurowski coming on site.

Page 148

1    Q   And was he with IEA?

2    A   Yes, he was.

3    Q   Okay.  And it looks like below, we've got

4    this -- at the very bottom we've got this e-mail here

5    from Brian Jensen.

6        Do you recall who Brian Jensen was?

7    A   Yes, he worked for Tradewinds.  In what

8    capacity, I'm -- I'm not really sure.

9    Q   Okay.  Did you ever interact with him while

10   working on the Osage Wind farm?

11   A   I might have talked to him a couple of

12   times.  Nothing pertinent but...

13   Q   Sure.  He writes here in his July 9, 2014,

14   e-mail, that "And as we have discussed in the past, we

15   will not be able to transport fill from one part of

16   the project to another due to Osage Nation mining

17   laws."

18   A   Right.

19   Q   Does that conform with your understanding of

20   what some of the limitations were at the time of

21   construction?

22   A   Yes.

23   Q   Okay.  And let's see here.  Let me keep

24   going.  What was your understanding, though -- you

25   told me that Steve Champagne had -- had told you that

Page 149

1    there would not be any need for a permit.

2        Was it your understanding that that was a

3    determination made by EGPNA as opposed to IEA?

4    A   Say that one more time.

5    Q   Sure.  So I guess let me ask a better

6    question.

7        Do you recall whether IEA had -- had the

8    authority to determine whether or not a mining permit

9    was necessary for this project, or was that a decision

10   made by EGPNA?

11       MR. RAY:  Object to form.

12       THE WITNESS:  I -- I think it was Steve

13   Champagne that -- Champagne that made that

14   determination.

15   Q   (By Ms. Nagle) Okay.  And so let's see.  So

16   let's see.  Still looking at this document, going back

17   down here, so if we're looking at this July 9, 2014,

18   e-mail again from Brian, he says "How much fill are

19   you anticipating hauling into the site?  Will this be

20   a change order as the construction plans initially had

21   a borrow on project site which is no longer a viable

22   method?"

23       I know I asked you earlier and you said you

24   did not recall whether or not the construction plans

25   initially entertained the idea or planned for having a

1 borrow pit on site.

2     Does this help jog your memory at all or do

3 you still not recall?

4     A   No, I don't recall that.

5     Q   Okay.  And do you recall any conversations

6 around the fact that a borrow pit was no longer a

7 viable method?

8     A   Not really, no.

9     Q   Okay.  All right.  So let's see.  I'm going

10 to take a look at a different document now so give me

11 just a second to find this.  I'm trying to do this all

12 digitally is a -- is a new -- a new thing here.  Okay.

13 So I think I've pulled it up.  So I -- I believe that

14 we are on Exhibit 66 now, if I look at my notes real

15 quick.  Yeah, I think that Mr. Ashworth ended on 65 so

16 I'll introduce this document as Exhibit 66, and I will

17 note for the record this says here these are meeting

18 And it looks like this says here these are meeting

19 notes, excuse me, from June 26, 2014.

20     It states here that participants include

21 Bill Maluska.

22     Do you -- do you think that is supposed to

23 refer to you and that it might be a typo?

24     (Exhibit 66 Marked for Identification)

25     A   Yes.

1     Q   Okay.  That was my thought too.  And it

2 lists the other folks here.

3     Do you recall this meeting on or around

4 June 26, 2014?

5     A   No, ma'am.

6     Q   Okay.  Is this group here of folks that are

7 listed, Ron Ritter, Andrew Landoll, Justin Larson,

8 Craig Mazurowski, Mike Welch, Randy Gardner, Giovanni

9 Nicoletti, Giuseppe DiMarzio, Bill Moskaluk, and Brian

10 Jensen, is that a group -- would you all meet

11 routinely or was this more of just a spontaneous not

12 recurring meeting that took place?

13     A   Actually, I think this has to pertain to a

14 daily report and it was just informing everybody where

15 they were, "No safety issues and no rain today,"

16 just -- just an informative document.

17     Q   Okay.  Okay.  And if we look down a little

18 further, we see on this page it lists action items.

19     A   Mmm-hmm.

20     Q   And some things are crossed out, but I see

21 here it refers to earthwork balance confirmation for

22 mitigation of Osage mining permit risk, and then in

23 parenthesis it says Jacob.

24     Do you -- do you know whether Jacob refers

25 to Jacob Valentine?

1     A   I have no idea who Jacob --

2     Q   No idea.  Okay.

3     A   No.

4     Q   So you're not sure sitting -- and I realize

5 this was seven years ago, so sitting here today,

6 you're not sure who Jacob was?

7     A   Correct.

8     Q   Okay.  What was your understanding at the

9 time in June of 2014 of what -- what -- what was meant

10 by Osage mining permit risk?

11     A   I'm not really sure.

12     Q   Okay.  Do you -- do you recall anyone ever

13 discussing the Osage mining permit risk?

14     A   No, just -- just what I was told, that the

15 permit was not necessary by Steve Champagne was the

16 only...

17     Q   Okay.

18     A   I think there were other conversations after

19 that.  I think I might have placed a call in to

20 Giuseppe and also Bill Price on that matter as well.

21     Q   Did -- after having that conversation with

22 Steve Champagne about how a permit would not be

23 necessary, did anyone ever give you instructions on

24 how to continue with the project and avoid the risk of

25 having to get a permit?

1     A   I know I was told to continue on with what I

2 was doing.

3     Q   Okay.  And was -- were those instructions

4 coming from your supervisors at Enel as opposed to

5 IEA?

6     A   No, that was coming from Steve Champagne.

7     Q   Okay.  So -- so this is -- so let me

8 actually go back just for a moment here to Exhibit 53,

9 which we were looking at just a few moments ago, so

10 I've already shown you this document; I'm just going

11 back to it.

12     Here, if we look at Ron Ritter's e-mail,

13 kind of here to -- to Brian Jensen, Randy Gardner, and

14 to Jacob Valentine, Ron writes -- let's see if I can

15 find where I am.  Okay.  Now of course I've -- I'm

16 lost.  Oh, sorry.  I need to go all the way to the

17 top.  Here we go.  Okay.  My apologies.  I want to

18 look at this e-mail from Ron Ritter.  July 9, 2014,

19 and you are -- you are a recipient I see here.

20     A   Yes.

21     Q   Ron -- Ron writes "It would not be practical

22 for us to perform this work with imported fill at no

23 extra cost if the original scope was for us to be

24 allowed to mine onsite fill."

25     Does that statement from Ron, is that in

Page 154

1  agreement with what your understanding was at the
2  time, in the summer of 2014?
3       A   Yes, I agree with it.
4       Q   Okay.  And -- okay.  Great.
5           Do you -- do you know whether the original
6  scope was for the IEA team to be allowed to mine on
7  site as -- as Ron states here?
8       A   No, I don't.
9       Q   Okay.  But it is your understanding that
10 originally the plan was for them to fill the --
11 back -- use backfill from the construction site on the
12 wind farm; is that correct?
13      A   Yes.
14      Q   Do you recall at any point in time, was
15 there a decision ever made to start importing the
16 backfill instead and purchasing those materials off
17 site?
18      A   I don't recall that.
19      Q   Okay.
20      A   No, wait a second.  I think there was the
21 opportunity for everybody to put together a cost
22 estimate, but to my knowledge, it didn't go any
23 further.
24      Q   Okay.  Do you recall reviewing the cost
25 estimate?

Page 155

1       A   No, I don't.
2       Q   Okay.  Did anyone ask you to assist in
3  preparing the cost estimate?
4       A   Yes, Giuseppe had asked me.  Hold on now.
5  I'm not sure what it was, what estimate I did.  I
6  think it was on manhours or something of that nature,
7  not -- not materials.
8       Q   Okay.  And would that have been -- well, let
9  me -- let me actually ask this way:
10          If you -- if -- if EGPNA and IEA had to
11 import backfill for the wind farm off site onto the
12 site, would that have increased the number of hours
13 of -- in terms of just manpower and labor to do that?
14      A   I'm not really sure.  If it was -- if it was
15 in the contract originally, there wouldn't be any
16 additional cost factors in it so...
17      Q   Mmm-hmm.
18      A   I'm unsure.
19      Q   Okay.  All right.  Let me move on to another
20 exhibit, and this was previously entered as Exhibit 55
21 in another deposition, and -- and so -- okay.  Here we
22 go.  So let's see here, this looks like it is dated --
23 well, first of all, I will say this is -- this is
24 Exhibit 55.  It's Bates stamped Osage Wind-019901 and
25 it looks like at the bottom here we've got an e-mail

Page 156

1  from Craig Mazurowski to you, CCing Chris Hanson and
2  Ron Ritter, dated September 2, 2014, Craig writes
3  "Bill, in the past we have had a couple conversations
4  regarding crushing rock on site.  It is my
5  understanding that Enel/Tradewinds does not want any
6  crushing on site due to mineral right issues.  Please
7  confirm.  Thanks."
8           And you write back "Craig, let's discuss
9  this a.m.  Bill."
10          Do you recall this e-mail exchange in
11 September of 2014 with Craig Mazurowski?
12          (Exhibit 55 Marked for Identification)
13      A   Vaguely, but I do remember -- whatever the
14 outcome was, I -- I can't really remember, but I
15 vaguely remember this e-mail, yes.
16      Q   Okay.  Do you recall much -- well, do you
17 know first -- did you end up having this conversation
18 with Craig?
19      A   I'm not even certain about that either.
20      Q   Okay.  That's fine.  I -- I know it was a
21 long time ago.
22          When he writes "In the past we've had a
23 couple conversations regarding crushing rock on site,"
24 do you -- do you recall what those conversations were
25 about specifically?

Page 157

1       A   No.
2       Q   Okay.  He also writes "It is my
3  understanding that Enel/Tradewinds does not want any
4  crushing on site due to mineral -- mineral right
5  issues."
6           Do you recall anyone from Enel or Tradewind
7  saying something to you along those lines?
8       A   They might have said something to Craig.
9  That -- that, I don't know.
10      Q   Okay.  Do you recall anyone like Bill Price
11 or Steve Champagne ever mentioning to you that there
12 should not be crushing on site due to mineral right
13 issues?
14      A   No.
15      Q   Okay.  So you -- you really don't recall
16 ever kind of hearing any messaging around we need to
17 stop crushing due to mineral right issues?
18      A   No.
19      Q   And it is true that actually crushing
20 continued after September 3, 2014, on the Osage Wind
21 farm; is that correct?
22      A   Yes.
23      Q   Okay.  Do you recall whether the Bureau of
24 Indian Affairs ever communicated to EGPNA that
25 crushing minerals on the Osage Wind farm would require

Page 158

1  a lease or permit?
2      A   In that letter that was presented to me, I
3  believe that's when they told Enel or whomever and
4  that was a sandy soil permit.
5      Q   Okay.  And do you recall reviewing that
6  letter when -- when it was received by EGPNA?
7      A   No, I -- I read it briefly and passed it on
8  to Giuseppe DiMarzio and also Bill Price.
9      Q   Okay.  And did they, after that, ask you to
10 tell IEA to cease construction while they reviewed the
11 letter or considered the legal issues, or were you
12 ever asked to even pause on construction?
13     A   No.
14     Q   Did they inform you at that time that there
15 would be no need to pause on construction because they
16 had a legal memorandum that -- that explained that the
17 BIA was wrong?
18     A   No.
19     Q   Okay.  So let's -- I'm going to -- we
20 don't -- I don't think we need to look at this
21 document anymore.  I'm actually going to show you
22 another document.  Here we go.  Okay.  And this one
23 was previously entered as Exhibit 56.  Here's its
24 stamp and it's -- it's Bates stamped Osage
25 Wind-018666.  And this looks like an e-mail to -- from

Page 159

1  you to Giuseppe, dated September 16, 2014.
2          Do you happen to recall this e-mail?  I'll
3  give you a chance to look at it.
4          (Exhibit 56 Marked for Identification)
5      A   It's basically giving Giuseppe an update on
6  where we were at.  It was like a daily report.
7  Report.
8      Q   And was Giuseppe your direct supervisor or
9  would that be more Bill Price or was it a combo of
10 both?
11     A   More of a Bill Price.
12     Q   Okay.  So I note here that you write
13 "Running into rock conditions affecting the
14 operation."
15         What exactly did you mean by that?
16     A   Means I couldn't dig the hole.
17     Q   Okay.  And so I note that sort of in this --
18 this e-mail you mention having to -- let me see if
19 I -- you know, those areas will be charged and shot.
20         What -- what does it mean to -- and I may
21 not get the lingo right, to -- to charge those areas
22 or to shoot them, what is that referring to?
23     A   It's referring to the dyn -- dynamite charge
24 that you put in the drilled hole and then you
25 basically set it off.

Page 160

1      Q   Mmm-hmm.
2      A   And you shoot your foundations so it's just
3  a construction term that we use.
4      Q   Mmm-hmm.  Mmm-hmm.  Mmm-hmm.
5          I note here that -- and -- and -- and so was
6  some of that not a part of the initial plan or design
7  or it wasn't fully anticipated when you commenced
8  construction?
9      A   Yeah, it was -- it was not -- it was not
10 part of the plan initially and, like I said, all of us
11 were under the impression that the geotech report was
12 true in its findings of the types of soil, but it
13 wasn't -- it didn't even reflect the correct soils
14 that were in there so somebody got mixed up.
15     Q   I see.
16         And you write here as of September 16
17 "Falling behind with excavations due to rock."
18     A   Yes.
19     Q   At current -- do you know how far behind you
20 would have been from the projected schedule at that
21 time?
22     A   One or two of the foundations, I believe,
23 were at -- at risk.  We had to complete them at a
24 certain time for GE to bring their turbines in, and
25 that's what we based -- that's what they based the

Page 161

1  initial schedule on, was the delivery of turbines.  I
2  had to have some place to put them.
3      Q   Mmm-hmm.
4      A   Without any -- you know, without any
5  construction activity going around.
6      Q   Right.  Okay.
7          And you write here "At current rate, I don't
8  know if they can meet GE delivery time frames."
9          So is it correct to say that at that point
10 in time, in mid September, if there were any further
11 delays or pauses on construction, Enel would not be
12 able to meet GE's delivery time frame?  Is that
13 correct?
14     A   Yeah, they couldn't figure out what we were
15 going to do at the time, and that was just a little
16 nudge on my part to have them make a decision on which
17 way to go.
18     Q   Did they ever get back to you in response to
19 this with a decision?
20     A   I'm not really sure.
21     Q   Okay.  All right.  I think -- I think that
22 is enough with this document and so I am going to now
23 move on to another document.  Here we go.  And I
24 believe this one has not yet been introduced so this
25 is going to be Exhibit 67 and it is Bates stamped

Page 162

1  Osage Wind Priv-000094.
2      And I will note that this is an e-mail from
3  Joan Heredia to -- to many folks, including yourself,
4  dated September 30, 2014.
5      I'll give you a chance to look at it.
6      Do you recall this e-mail at all?
7      (Exhibit 67 Marked for Identification)
8  A  No.
9  Q  Okay.  I see in this -- in the very top line
10  e-mail to Giuseppe, Joan writes on September 30,
11  "Giuseppe, we need to act with an abundance of
12  caution.  We should not be using materials at the site
13  that would be otherwise commercially available.  I
14  understood backfill would come from an offsite
15  quarry."
16      Was your understanding, while working on the
17  Osage Wind farm, the same as Joan's here in this
18  e-mail?
19  A  No, it was not.  I didn't know that
20  initially it was set up for backfill to come from an
21  offsite quarry.  I did not know that.  I -- I think
22  all that changed.  I -- that's -- I'm not really sure.
23  Q  Okay.  So -- so -- okay.
24  A  Maybe Joan had some other information that I
25  didn't have but...

Page 163

1  Q  Mmm-hmm.
2  A  I don't know.
3  Q  Okay.  So this -- so this e-mail from Joan
4  would be in conflict with -- with the instructions you
5  received in -- in doing your work on this site?
6  A  Yes.
7      MR. RAY:  Object to form.
8  Q  (By Ms. Nagle) Okay.  She also writes
9  "Please do not crush rock further until we have had a
10  chance to discuss."
11      Do you recall after this e-mail was sent on
12  September 30th whether you-all stopped crushing rock
13  on -- on the site for any period of time?
14  A  I don't believe we did, no.
15  Q  Okay.  Do you recall, were you a part of any
16  discussions in response to this e-mail from Joan,
17  discussions that may have taken place about whether or
18  not to stop crushing rock?
19  A  No.
20  Q  Okay.  Were you aware of any conversations
21  of that nature taking place?
22  A  Yeah, they were going back and forth on it
23  and basically it was -- that's -- that's a management
24  decision up there and I didn't have any input on it.
25  Q  Was that something that Steve Champagne

Page 164

1  would have been involved in?
2  A  Yes.
3  Q  And -- and did Steve Champagne ever explain
4  to you Enel's reasoning or rationale behind his
5  decision to not stop crushing rock?
6  A  No.
7  Q  Okay.  All right.  Let's -- I think we're
8  finished with this document.  Moving right on, so this
9  will be, I believe, Exhibit 68 and I note for the
10  record that Exhibit 68 is Bates stamped Osage Wind
11  Priv-000165.  It's an e-mail with the subject line
12  "Osage - Bureau of Indian Affairs."
13      And have you seen this e-mail exchange
14  before?  I will note it looks like you're copied here
15  at the top.
16      (Exhibit 68 Marked for Identification)
17  A  Vaguely I remember it, yes.
18  Q  Okay.  It looks like it's dated
19  September 30, 2014, and Bill Price writes -- I'm
20  sorry, Steve Champagne writes "Agree with Bill that
21  it's okay to continue excavating but hold off on the
22  crushing for now."
23      Does this refresh your memory, do you recall
24  ever being instructed to stop the crushing on site?
25  A  No.

Page 165

1  Q  Okay.  And I -- I think just a little bit
2  further down on September 30th, Bill Price writes here
3  "The large rocks removed from the excavation works is
4  being crushed and reused for backfill.  This is normal
5  as we do not want to dispose of the large excavated
6  rocks (possibly then be considered mining) and
7  cannot use large rocks for backfill.  We are basically
8  putting them back where we removed them - just in
9  smaller pieces."
10  A  Yes.
11  Q  Does that -- is that -- does that sound like
12  what your -- your understanding of what the
13  construction process was at the time?
14  A  Yes.
15  Q  Okay.  Did you at the time or do you now
16  have an understanding of why disposal of large
17  excavated rocks would be considered mining?
18  A  No, I don't.
19  Q  Okay.  That's fine.
20      Bill also writes "We are expecting to be a
21  week delayed on GE WTG deliveries and any further
22  stoppages will...... you get the picture."
23      Do you know what WT -- I know what GE -- I
24  would assume GE means General Electric.
25      Do you know what WTG stands for?

Page 166

1    A  Wind turbines themself.

2    Q  Okay.  And does this align with your

3 understanding at the time that there could be

4 significant consequences to Enel if they were to delay

5 construction of the wind turbines any further?

6    A  Yes.

7    Q  Okay.  Let's see here.

8    A  Could we take a break -- could we take a

9 break for about five minutes?

10    MS. NAGLE:  Absolutely.  Absolutely.  And

11 just so everyone knows, I'm getting a lot closer to

12 the end but not -- not -- I still have a little bit

13 more to go, but I know it's been a long day so let's

14 take five and then I'm hoping, like, 30 minutes more

15 and I'm done so...

16    VIDEOGRAPHER:  We are off the record at

17 3:29 p.m.

18    (A recess was taken from 3:29-3:34 p.m.)

19    VIDEOGRAPHER:  We are back on the record at

20 3:34 p.m.

21    Q  (By Ms. Nagle) Okay.  So let's see.  We were

22 looking at Exhibit 68 and I think that -- I think that

23 I don't -- do not have any more questions for Exhibit

24 68 at this time so let me look through my notes here.

25    I think -- so I think earlier we -- we

Page 167

1 did -- we -- we looked at some e-mails about possibly

2 bringing in fill from off site to use as backfill for

3 the wind turbines.

4    Do you recall why that option was not

5 pursued?

6    A  No, I don't.

7    Q  Okay.  Do you recall any discussions with

8 anyone at EGPNA about the option of purchasing

9 backfill off site?

10    A  I do, but I'm not sure what the final

11 outcome was.  I don't think we ever bought any

12 material off site to bring to site, and that's what I

13 know.

14    Q  Okay.  Okay.  And let's see here.  Do you --

15 all right.  I'm going to now show you what has

16 previously been marked as Exhibit 38 in this

17 litigation, and this is Bates stamped Osage Wind

18 Priv-000243, and it is a October 9, 2014, letter from

19 superintendent Robin Phillips to Francesco Venturini

20 and, Mr. Moskaluk, do you recall ever having reviewed

21 this letter or seen it in the past?

22    A  Yes, this is -- this is the letter that,

23 like -- like I said earlier, I can't remember the

24 gentleman's name that actually handed it to me.  It

25 was either Frank Weir or White himself.  I'm not --

Page 168

1 I'm not really sure, but I took this letter and passed

2 it on to both Giuseppe and Bill Price at the time.

3    Q  Okay.  So you were the person actually on

4 site at the wind farm when the letter was hand

5 delivered?

6    A  Yes.

7    Q  Was that the first time that you were on

8 site at the wind farm when someone from the Bureau of

9 Indian Affairs showed up?

10    A  No, they showed up once before as well.

11    Q  Do you remember when that time before was?

12    A  No, ma'am, I sure don't.

13    Q  Okay.  Did you speak with that person from

14 the BIA when they showed up the previous time?

15    A  Yes.

16    Q  And do you recall what -- what that

17 conversation was about or what you-all discussed?

18    A  I was basically taking them for a tour to

19 show them the job site and what we were doing, and if

20 he asked me any questions, I really don't remember,

21 but I'm sure -- I'm sure he did and I sure I gave

22 him some answers, but what those answers were, I -- I

23 really don't remember.

24    Q  Okay.  Fair enough.

25    And here it says that "You are to refrain

Page 169

1 from any further excavation of minerals until such

2 time that you have obtained a Sandy Soil permit

3 through the Osage Agency."

4    Do you recall after this letter any steps

5 being taken by you or anyone else at EGPNA to obtain a

6 sandy soil permit?

7    A  I believe that they had, and I'm not sure

8 who was responsible for obtaining that permit, but

9 I -- I --

10    Q  Mmm-hmm.

11    A  -- I was led to believe that they were

12 trying to obtain it, yes.

13    Q  And what -- do you understand what steps

14 were being taken to obtain that permit?

15    A  No, I don't.

16    Q  Did anyone communicate to you that -- that

17 excavation would be stopped to comply with this demand

18 from the BIA?

19    A  No.

20    Q  Okay.  Do you know ultimately whether or not

21 EGPNA obtained the correct permit through the Osage

22 agency?

23    MR. RAY:  Object to form.

24    THE WITNESS:  I'm not sure if they -- they

25 had.

1  Q  (By Ms. Nagle) Okay.  So you just don't know
2  either way whether someone followed through on that or
3  not?
4  A  No.
5  Q  Did you have an understanding at the time of
6  whose job at EGPNA it would have been to get this
7  permit?
8  A  Not really.  Being new to the company, I
9  really didn't know all the players and what their
10  specific roles were.  I -- I could assume that it
11  would -- would have fallen underneath -- no, I -- I
12  don't know who -- who handled it for Enel.
13  Q  Okay.  And that's fine.
14      Okay.  And I am going to move on to our next
15  exhibit.  And that is going to be, I believe, Exhibit
16  69, if that is where we are in the process, and this
17  Exhibit 69 is Defendants' Fifth Amended and
18  Supplemental Privilege Log, so actually what I'm
19  going to be asking us to take a look at is on page 8,
20  one of the entries in defendants' privilege log in
21  this litigation specifically Osage Wind Priv-000111 is
22  an undated entry, but it lists you here as the author
23  and states that "Bill Moskaluk handwritten notes
24  regarding the costs associated with halting excavation
25  at Project site as requested by Bill Scott, Esquire."

1      Do you know who Bill Scott is?
2      (Exhibit 69 Marked for Identification)
3  A  No.
4  Q  Do you have any memory of -- of ever
5  communicating with him?
6  A  Not -- not really, I don't, no.
7  Q  Okay.  Do you -- oh, sorry, go ahead.
8  A  Was he an Enel person?
9  Q  I actually don't know.  So there we go.
10  A  Okay.
11  Q  But and -- and I of course don't want you to
12  share any kind of privileged information that may have
13  come from an attorney to you, but in terms of just a
14  business reason, do you -- do you recall what your
15  understanding was at the time of why you were being
16  asked to create notes, you know, about what the cost
17  would be for halting the excavation at the project
18  site?
19      MR. RAY:  Object to form.
20      THE WITNESS:  I -- I believe what this is
21  pertaining to, I think I was given the man-hours, the
22  rock crushers possibly, if we had halted the rental
23  and all that stuff from... I believe that's what it
24  was, but I'm not actually sure.
25  Q  (By Ms. Nagle) Okay.  And so you do at least

1  have some recollection of undertaking an analysis of
2  how much it would cost to stop construction; is that
3  correct?
4  A  Yeah, I gave them some -- I gave them some
5  preliminary numbers, and I'm sure they discussed it
6  and added some numbers as well.  I'm not really
7  100 percent sure.
8  Q  And you wouldn't happen to recall those
9  numbers sitting here today, would you?
10  A  No, ma'am, I don't.
11  Q  Is it your recollection that at -- at this
12  time when you were preparing these notes, that -- that
13  Enel was at least considering halting construction,
14  that was, like, an option on the table?
15  A  I was not aware of that.
16  Q  Okay.  Do you recall who else may have been
17  asked to prepare these kinds of numbers or financial
18  data on the costs of halting construction?
19  A  I believe Giuseppe was asked as well.
20  Q  Okay.  And were the numbers that you were
21  crunching, was that really just in relation to
22  man-hours or were you looking at other things like the
23  cost of losing the contract with GE or anything else
24  like that?
25  A  No, I just had to pertain to man-hours and

1  rental costs on the -- on the equipment being used.
2  Q  Okay.  And this looks like October 17, 2014,
3  I'm looking at Osage Wind Priv-108 to 110, it looks
4  like this is e-mail to counsel and others forwarding
5  Bill Moskaluk construction cost information.
6      Does that -- does that refresh your memory
7  that you were asked to prepare these numbers sometime
8  after October 9, 2014?
9  A  I'm not really sure of the dates, but it
10  was -- the requests came from Giuseppe to me.
11  Q  Mmm-hmm.
12  A  Right.
13  Q  And -- and was the request after EGPNA
14  received the cease and desist letter from
15  superintendent Phillips?
16  A  Oh, I couldn't -- I couldn't tell you that.
17  Q  You're not sure.  Okay.
18  A  I am not sure.
19  Q  Okay.
20      Did you have any understanding whether or
21  not EGPNA was asking for these numbers because they
22  had received this letter from superintendent Phillips?
23  A  No, not to my knowledge, no.
24  Q  Did you see them -- did you see this
25  number-crunching exercise at all -- as being at all

Page 174

1  related to that letter from superintendent Phillips?

2      A   You broke up on that last one.

3      Q   Sure.

4          I was just wondering if you thought this

5  might at all be related -- at the time, did you have

6  an understanding that the number crunching you were

7  being asked to do was at all related to the

8  September 9 letter from superintendent Phillips?

9          MR. RAY:  Object to form.

10         THE WITNESS:  I'm not really sure at the

11  time.  I don't think I did think that it was in

12  relationship to that letter.  I'm not really sure.

13     Q   (By Ms. Nagle)  Okay.  That's fine.

14         All right.  So I'm going to stop sharing

15  that, my screen on that document and move on to the

16  next document, and this document that I am introducing

17  will be Exhibit 70, and it's Bates stamped Osage

18  Wind-036433 and it's a document titled "Project Short

19  Views Update," looks like it's dated October 17, 2014.

20         Are you at all familiar with this document

21  or does this -- do you remember documents that looked

22  like this?

23         (Exhibit 70 Marked for Identification)

24     A   I'm not familiar with this document at all,

25  but I -- I think it was a monthly report that went to

Page 175

1  Italy management in Rome.

2      Q   And at this point in October of 2014, you

3  would have still been the site coordinator; is that

4  correct?

5      A   Yes.

6      Q   If we look at page, let's go down to page,

7  let's see, 58 here.  So -- so if we go to page ending

8  in Bates stamp 36490 -- hold on.  It might not be --

9  here we go.  I'm looking, actually, sorry, page 36491,

10  it looks like there's a list of different folks from

11  IEA who were involved in the project.

12         Did you have any direct communications with

13  any of these folks during the course of your work on

14  the Osage Wind farm?

15     A   Yes.

16     Q   What about Chris Hanson, were you in contact

17  with him?

18     A   Yes.

19     Q   And Craig Mazurowski?

20     A   Yes.

21     Q   Is there anyone else on this list that --

22  that you would have been routinely in contract[sic]

23  with that we haven't previously discussed?

24     A   I was in contact with Mike Welch, Kenny

25  Reck, Scott Beach, Robbie Lloyd, and Jerry Klemesten.

Page 176

1      Q   Okay.  And what was Mike Welch's role on the

2  Osage Wind farm project?

3      A   Mike Welch?

4      Q   Yes.

5      A   I believe he was like the erection

6  superintendent.

7      Q   And so what were his sort of

8  responsibilities on the site?

9      A   Putting the towers, stacking the towers up

10  with his --

11     Q   Okay.  Okay.  And was Mike Welch with IEA?

12     A   Yes.

13     Q   Okay.  What about Pat Ringler, do you know

14  who Pat Ringler was?

15     A   He's, like, the office manager.

16     Q   Okay.  And with IEA?

17     A   Yeah, I'm not really sure what his role was.

18     Q   Okay.  Fair enough.

19         Let's see here.  I'm just seeing if I

20  really -- okay.  I think that I have one last document

21  I would like to show you --

22     A   Okay.

23     Q   -- and then I will be finished with my

24  questioning.  So let me just pull up that document.

25  And this is a document that was previously entered as

Page 177

1  an exhibit in Craig Mazurowski's deposition and it is

2  Exhibit 52, and for the record, I'll note it's Bates

3  stamped Osage Wind-035610.

4          Mr. Moskaluk, are you familiar with this,

5  what looks to be a contract between Osage Wind and

6  IEA, dated April 11, 2013?

7          (Exhibit 52 Marked for Identification)

8      A   No.

9      Q   Okay.  Do you recall ever receiving a copy

10  of this when you were working on the Osage Wind farm?

11     A   I know I had requested but it was several

12  months before I had received it.

13     Q   Okay.  So you -- do you recall if you ever

14  actually received a copy of this contract while you

15  were working on the wind farm?

16     A   I was -- the contract itself with the

17  numbers in it and everything else like that was

18  reda -- redacted so I didn't really get to see the

19  numbers of the contract, et cetera, but as far as

20  scopes of work were concerned, I believe I had those,

21  yes.

22     Q   Okay.  It looks like the -- this contract

23  was signed by David Bostwick for IEA and Rob Freeman

24  for Osage Wind.

25         Do you know who Rob Freeman is?

Page 178

1    A    No, ma'am.

2    Q    Okay.  Do you have any understanding of who

3 at Osage Wind or at EGPNA worked on negotiating the

4 different provisions of this contract?

5    A    No, ma'am.

6         MS. NAGLE:  Okay.  Would you have -- okay.

7 Well, actually, I think -- you know what?  I think

8 those -- I think those are all the questions that I

9 have and I thank you for your time and for -- and for

10 sitting through this with us today and I -- I am ready

11 to pass the witness so thank you, sir.

12        THE WITNESS:  Thank you, ma'am.

13        MR. RAY:  We're -- we're going to take a

14 short break.  We'll be back in ten minutes.

15        MS. NAGLE:  Okay.

16        VIDEOGRAPHER:  We are off the record at

17 3:50 p.m.

18    (A recess was taken from 3:50-4:01 p.m.)

19        VIDEOGRAPHER:  We are back on the record at

20 4:01 p.m.

21        MR. RAY:  The defendants will reserve

22 questioning for Mr. Moskaluk to the time of trial and

23 he will read and sign.

24        MR. ASHWORTH:  I will say I have one, two,

25 two follow-up questions to M.K.'s, though.  Sorry,

Page 179

1 Mary Katherine's questions.

2        REDIRECT EXAMINATION

3 BY MR. ASHWORTH:

4    Q    Sir, I just have two quick questions.  The

5 first question is:  Earlier you had indicated in

6 reference to the use of backfill and -- and -- and why

7 it was helpful for structural support, and you

8 indicated that it prevents the tower from doing -- you

9 said this and this.

10        Just for the record, you're refer -- just

11 for the record, to clarify, the backfill structural

12 support prevents the tower to go -- from going side to

13 side; is that right?

14    A    Yeah.  It --

15    Q    Or wobbling?

16    A    -- it's to prevent the -- the tipping of the

17 tower in either direction.

18    Q    Okay.  I just wanted to make sure because

19 when we read the transcript, I just want to make sure

20 it's clear.

21        And then also, you had indicated that Enel

22 Green provided to you with documents that were -- that

23 they redacted, that you reviewed, and perhaps, how I

24 define redacted and how you may define redaction or

25 redacted may be different so what do you mean by

Page 180

1 "redacted"?

2    A    It was blacked out.

3    Q    Blacked out?

4    A    Yes.

5    Q    So when Enel Green gave you certain

6 documents, they made the conscious decision to black

7 out something before they gave it to you, another Enel

8 Green employee?

9        MR. RAY:  Object to form.

10        THE WITNESS:  Somebody did, yes.

11        MR. ASHWORTH:  Okay.  I have nothing

12 further.

13        MR. RAY:  We'll reserve our questions for

14 the time of trial.  Mr. Moskaluk will read and sign.

15        VIDEOGRAPHER:  Okay.  We are off the record

16 at 4:03 p.m.

17    (The deposition of BILL MOSKALUK was

18 concluded at 4:03 p.m.)

19

20

21

22

23

24

25

Page 181

1            JURAT

2 USA & Osage Minerals Council vs. Osage Wind LLC, et

3         al.

4        JOB No. 151136

5        I, BILL MOSKALUK, do hereby state under oath

6 that I have read the above and foregoing deposition in

7 its entirety and that the same is a full, true and

8 correct transcription of my testimony so given at said

9 time and place.

10

11    _____

12    BILL MOSKALUK

13

14

15    Subscribed and sworn to before me, the

16 undersigned Notary Public in and for the State of

17 Oklahoma by said witness, BILL MOSKALUK, on this

18 _____ day of _____, 2021.

19

20

21

22    _____

23    NOTARY PUBLIC, STATE OF OKLAHOMA

24        MY COMMISSION EXPIRES:_____

25        (AER)

Page 182

1        ERRATA SHEET

2  USA & Osage Minerals Council vs. Osage Wind LLC, et

3        al.

4        DEPOSITION OF:  BILL MOSKALUK

5        REPORTER:  Abby Rhodes, CSR, RPR

6        TAKEN ON: JUNE 16, 2021

7        JOB NO.: 151136

8  PAGE   LINE   IS        SHOULD BE

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

Page 183

1        CERTIFICATE

2  STATE OF OKLAHOMA     )

3                        ) SS:

4  COUNTY OF OKLAHOMA     )

5

6        I, Abby Rhodes, CSR, RPR, do hereby certify

7  that on June 16  2021 at the offices, via Zoom, there

8  came before me BILL MOSKALUK who was duly sworn to

9  testify the truth, the whole truth, and nothing but

10 the truth; and that the foregoing pages constitute a

11 full, true, and correct transcript of the deposition

12 of said witness on the date as indicated.

13       I do further certify that I am not counsel,

14 attorney, or relative of either party, or otherwise

15 interested in the event of this suit.

16       IN WITNESS WHEREOF, I have hereunto set my

17 hand and affixed my seal at my office in Oklahoma City

18 Oklahoma County, Oklahoma, this 23rd day of June,

19 2021.

20

21 _____,

22 Abby Rhodes, CSR, RPR

23 CSR No. 1939.

24

25