**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and | ) | |
| THE OSAGE MINERALS COUNCIL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-704-GKF-JFJ |
| | ) | |
| OSAGE WIND, LLC; | ) | |
| ENEL KANSAS, LLC; and | ) | |
| ENEL GREEN POWER NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AND OPENING BRIEF IN SUPPORT**

# EXHIBIT 3

CONFIDENTIAL

## AMENDED AND RESTATED LEASE AND EASEMENT
## FOR A WIND ENERGY PROJECT

This Amended and Restated Lease and Easement for a Wind Energy Project ("Agreement") is made, dated and effective this 9th day of December, 2011 (the "Effective Date"), between **CAROLYN KANE-SNIVELY and JAMES W. SNIVELY, JR.**, wife and husband ("OWNER"), and **OSAGE WIND, LLC**, a Delaware limited liability company (successor by merger with Osage Wind, LLC, an Oklahoma limited liability company), and its assigns (herein collectively "COMPANY").

This Agreement amends and restates in its entirety that certain Lease and Easement For A Wind Energy Project made, dated and effective February 11, 2010 (the "Existing Lease"), between OWNER and COMPANY, a memorandum of which was recorded April 5, 2010 (the "Existing Memorandum of Lease"), as Document #002121, in Book 1415, at Page 479, in the County Clerk's Office of Osage County, Oklahoma, according to the terms and conditions set forth below.

### ARTICLE I
### DEVELOPMENT PERIOD

1.     **Development Period**.  During the Development Period (as defined in Article I, Section 2 below), OWNER hereby grants to COMPANY an exclusive option to lease solely for Wind Energy Purposes (as defined in Article II, Section 2) the real property of OWNER located in the County of Osage, State of Oklahoma as more particularly described on Exhibit A attached hereto and incorporated herein by this reference (the "Property").  During the Development Period, COMPANY shall also have the exclusive right to study the feasibility of wind energy conversion on the Property.  Such study rights shall include studies of wind speed, wind direction and other meteorological data and the extraction of soil samples using a drilling rig or otherwise, together with a reasonable right of access to, from and across the Property in connection therewith.

1.1     **Development Period Activities.** COMPANY agrees that in conducting its feasibility studies during the Development Period, it will: (i) indemnify, defend and hold Landowner harmless from all claims, liens and costs arising or resulting from such feasibility studies; and (ii) promptly repair any physical damage caused by the feasibility studies and related inspections and tests and restore the Property as nearly as practical to the condition existing immediately prior to COMPANY's entry on the Property.

2.     **Term**.  The "Development Period" shall be for a term commencing on the Effective Date and continuing for (i) the remainder of the calendar month in which the Effective Date occurs, and (ii) the next succeeding twelve (12) consecutive calendar months, subject to extension for up to three (3) additional one-year terms as provided in Article I, Section 3, below.

3.     **Development Period Consideration**.   COMPANY shall pay to OWNER the following amounts:

1

**EXHIBIT**

**28**

   3.1 **Signing Bonus**.  As initial consideration for the execution of the Existing Lease, COMPANY paid to OWNER the sum of Seven Thousand Three Hundred Thirty-Three Dollars ($7,333) in certified funds as required under the Existing Lease.  Said signing bonus was based on a calculation of Eight and Five/100 Dollars ($8.05) per acre within the Property.  The parties stipulate and agree that the initial acreage within the Property for purposes of computing such bonus was 911 acres.

   3.2 **Development Period Rent.**  Within forty-five (45) days of the Effective Date, COMPANY shall pay to OWNER an amount equal to Five Dollars ($5.00) per acre of the Property, which will be full payment for the next succeeding twelve (12) consecutive calendar months.  COMPANY may extend the Development Period for up to three (3) additional one-year terms by paying to OWNER, within thirty (30) days prior to the end of the then-current Development Period, an amount equal to Five Dollars ($5.00) per acre of the Property, for each additional one-year term; and upon making such payment the Development Period shall automatically be deemed so extended as if the same had been continuously in effect.  The Development Period will terminate on the earlier of the Lease Effective Date (as defined in Article I, Section 5) or the termination of this Agreement.  COMPANY, at its sole option, may terminate this Agreement at any time during the Development Period upon thirty (30) days' written notice to OWNER.  On termination of the Development Period, without an exercise of the Lease option, except as otherwise set forth herein, neither party shall have any further obligation or liability to the other.

   4. **Memorandum of Agreement**.  OWNER agrees to execute and deliver to COMPANY the Amended and Restated Memorandum of Lease and Easement for a Wind Energy Project attached to this Agreement as <u>Exhibit B</u> (the "Memorandum of Lease"), and COMPANY shall, at its expense, cause the same to be recorded with the recorder of deeds for the county in which the Property is located.  OWNER hereby expressly consents and agrees that, in the event COMPANY exercises its option to lease the Property as herein provided, COMPANY shall execute and record the Notice of Commencement of Lease attached to the Memorandum of Lease, without further authorization or other action on the part of OWNER.

   5. **Exercise of Option**.  COMPANY may exercise its option to lease the Property by giving written notice to OWNER at any time prior to the termination of the Development Period, and the term of the Lease (as defined in Article II, Section 1 below) shall commence on the date such notice is given, or such other date within the then-current Development Period as COMPANY may specify in such notice (the "Lease Effective Date").

**ARTICLE II**
**LEASE**

   1. **Lease**.  In the event COMPANY exercises its option to lease the Property, and commencing on the Lease Effective Date, OWNER hereby leases to COMPANY and COMPANY hereby leases from OWNER the Property (the "Lease") on the terms herein provided.

   2. **Purpose of Lease**.  The Lease shall be for Wind Energy Purposes and COMPANY shall have the exclusive right to use the Property solely for Wind Energy Purposes.  For purposes of

2

CONFIDENTIAL

collecting and transmitting the electrical energy so converted, with any and all activities reasonably related thereto, including, without limitation,

(a)    determining the feasibility of wind energy conversion and other power generation on the Property, including studies of wind speed, wind direction and other meteorological data and extracting soil samples;

(b)    erecting, constructing, reconstructing, installing, using, replacing, relocating and removing from time to time, and maintaining and operating, wind turbines, overhead and underground electrical cables, overhead and underground communications lines, electric transformers, energy storage facilities, telecommunications equipment, roads, fences, meteorological towers and wind measurement equipment, and other facilities and equipment associated with or operated in conjunction with large wind turbine installations (collectively the "Windpower Facilities") on the Property; provided that the Windpower Facilities shall specifically exclude any substation(s) or operation and maintenance building(s);

(c)    undertaking any other activities, whether by COMPANY or a third party authorized by COMPANY, that COMPANY reasonably determines are necessary, and appropriate to accomplish any of the foregoing, including, without limitation:

(i)    the right of ingress to and egress from the Windpower Facilities (whether located on the Property, or on adjacent property or elsewhere) over and across the Property by means of roads and lanes thereon if existing, or otherwise by such route or routes as COMPANY may construct from time to time ("Access Rights"); and,

(ii)    the right to erect, construct, reconstruct, replace, relocate, remove, maintain and use the following from time to time in connection with the Windpower Facilities:  (a) a line or lines of poles, with such wires and cables as from time to time are suspended therefrom, and (b) all necessary and proper foundations, footings, cross arms and other appliances and fixtures for use in connection with said towers, wires and cables on, along and in the Property; and

COMPANY's right to construct and operate the Windpower Facilities shall be subject to the provisions hereof and COMPANY's obligation to maintain such Windpower Facilities during the term hereof and to remove the same upon the expiration of this Agreement.

(d)    Without limiting any of the foregoing, OWNER hereby grants to COMPANY the following easements (collectively, the "Easements"):

(i)    an exclusive easement to use, convert, maintain and capture the free and unobstructed flow of the wind currents and wind resources over and across the Property;

3

OSAGE WIND-013674

**CONFIDENTIAL**

(ii)     an exclusive easement to permit the rotors or other components of any Windpower Facilities located on adjacent properties to overhang the Property, if applicable;

(iii)     the right to utilize at COMPANY's sole cost and expense, on a non-exclusive basis, any access, utility, transmission or other easements, rights of way or licenses held by OWNER over lands in the general vicinity of the Property that COMPANY determines could be used for the benefit of the Windpower Facilities; and

(iv)     the right (on a non-exclusive basis) to install, maintain, operate and repair those parts of the Windpower Facilities consisting of power lines and access roads on, over, across or beneath the Property.

Notwithstanding anything herein to the contrary, the parties acknowledge and agree that (a) the Easements are subject to existing matters filed of record, including without limitation, ownership of the mineral estate, existing oil and gas leases; and (b) in the event that OWNER receives a notice of an intent to drill or other notice indicating a desire to use any portion of the surface of the Property for any activity related to the exploration or production of oil, gas or other mineral interests, then OWNER will provide a copy of such notice to COMPANY and allow COMPANY to participate, at its sole cost, in any negotiations or proceedings involving such activities.

3.     **Term of Lease**.  The initial term of the Lease shall be twenty-five (25) years from the Lease Effective Date (the "Initial Term"), subject to extension as provided in Article II, Section 4 below.

4.     **Option to Renew Lease**.  COMPANY shall have the right to extend the term of the Lease by written notice to OWNER no later than one hundred twenty (120) days prior to the expiration of the Initial Term, for an additional twenty (20) year period commencing upon the expiration of the Initial Term (the "Renewal Term"), and on the same terms and conditions as in effect during the Initial Term.

4.1     **Holdover**.  If COMPANY holds over and continues in possession of the Property after the 12-month period allowed for the removal of the Windpower Facilities, as defined in Article II, Section 14.6, following (i) the expiration or (ii) earlier termination of the Lease, COMPANY will be deemed to be occupying the Property on the basis of a month-to-month tenancy subject to all of the terms and conditions of the Lease, except that as liquidated damages by reason of such holding over, the amounts payable by COMPANY under the Lease shall be increased such that the consideration payable under this Article of the Lease and any other sums payable hereunder shall be one hundred twenty-five percent (125%) of the amount payable to OWNER by COMPANY for the applicable period immediately preceding the first day of the holdover period. COMPANY acknowledges that in the event it holds over, OWNER's actual damages will be difficult, if not impossible, to ascertain, and the liquidated damages herein agreed to be paid are reasonable in amount and are payable in lieu of actual damages and are not a penalty.  COMPANY further acknowledges that acceptance of hold over consideration does not imply OWNER's consent to hold over.

4

CONFIDENTIAL

5.    **Payments**.  COMPANY shall pay to OWNER the following:

5.1    **Exercise of Option Payment**.  In consideration of COMPANY exercising the Lease option, COMPANY shall pay to OWNER a one-time payment equal to  Five Dollars ($5.00) per acre of the Property.  COMPANY shall make this payment within forty-five (45) days after the Lease Effective Date.

5.2    **Fees During Construction Period.**  For the period commencing on the Lease Effective Date and continuing until the Operations Date (as defined below), COMPANY shall pay OWNER an annual fee equal to Five Dollars ($5.00) per acre of the Property, which shall be due within forty-five (45) days after the first anniversary of the Lease Effective Date and each anniversary of the Lease Effective Date until the earlier of the Operations Date or the termination of this Lease.  Any such payment for partial years shall be prorated.  For purposes hereof, "Operations Date" shall mean the date that COMPANY's wind turbines commence "Commercial Operations" as that term (or any similar term used in its place) is defined in COMPANY's power purchase agreement for the wind project of which the Property is a part (the "Project"). [COMPANY shall provide OWNER with a copy of COMPANY's power purchase agreement ("PPA") for the Project within thirty (30) days of the execution date of the PPA. Within thirty (30) days after the execution of any amendment or modification to the PPA, COMPANY shall provide OWNER with a copy of that amendment or modification.]

5.3    **Turbine Operating Fees**.   COMPANY shall pay OWNER an annual "Turbine Operating Fee", for the period commencing on the Operations Date and ending on the later of (a) the expiration of the Initial Term or the Renewal Term; or (b) the date all such Windpower Facilities are removed from the Property (the "Removal Date") equal to the greater of the following:

(i)  the actual nameplate wind turbine capacity installed on the Property multiplied by the per megawatt amount listed in  Table 5.3 (a) below.  Any mid-year change in the nameplate capacity shall be prorated; or

(ii)  an amount calculated by taking the annual Gross Revenue (as defined in Article II, Section 5.4 below) actually received by COMPANY, multiplied by Owner's Pro Rata Share (defined below) multiplied by the applicable royalty percentage listed in Table 5.3 (b) below; "Owners Pro Rata Share" shall be a fraction, the numerator of which is equal to the nameplate capacity (as rated by the manufacturer) of the wind turbines installed on the Property and the denominator of which is equal to the nameplate capacity (as rated by the manufacturer) of all wind turbines installed within the Project; or

(iii)  an amount equal to the Participation Fee Rate.  The Participation Fee Rate shall be equal to the total number of acres included in the Property multiplied by the per acre amount listed in Table 5.3 (c) below.

The nameplate wind turbine capacity multiplied by the per-megawatt amount set forth in Table 5.3 (a) and the Participation Fee Rate set forth in Article II, Section 5.3 (iii) shall be calculated and the greater thereof paid in four (4) equal quarterly payments within forty-five (45) days after the first day

5

CONFIDENTIAL

of the applicable calendar quarter (such four (4) quarterly payments, the "Initial Annual Operating Fee"). Within forty-five (45) days after the first anniversary of the Lease Effective Date occurring after the Operations Date, and annually thereafter within forty-five (45) days after each successive anniversary of the Lease Effective Date, until the Removal Date; COMPANY shall determine the amount (if any) by which the sum calculated under Article II, Section 5.3 (ii), for the preceding calendar year, exceeds the sum paid to OWNER as the Initial Annual Operating Fee, the "TRUE UP AMOUNT", and COMPANY shall deliver to OWNER a statement reasonably identifying the computation of the TRUE UP AMOUNT.    If the TRUE UP AMOUNT is positive then COMPANY shall pay the TRUE UP AMOUNT to OWNER within such forty-five (45) day period.

Turbine Operating Fees for any partial year shall be prorated.

### Table 5.3 (a)

| Lease Year | Per Megawatt |
|------------|--------------|
| 1-10 | $7,500 |
| 11-20 | $8,500 |
| 21-30 | $9,500 |
| 31+ | $10,500 |

### Table 5.3 (b)

| Lease Year | Royalty Percentage |
|------------|--------------------|
| 1-10 | Four Percent (4%) |
| 11-20 | Four and One-Half Percent (4.5%) |
| 21-30 | Five Percent (5.0%) |
| 31+ | Five and One-Half Percent (5.5%) |

### Table 5.3(c)

| Lease Year | Per Acre |
|------------|----------|
| 1-10 | $20 |
| 11-20 | $25 |
| 21-30 | $30 |
| 31+ | $35 |

6

OSAGE WIND-013677

CONFIDENTIAL

OWNER shall have the right to audit the books and records of COMPANY pertaining to the Property and Windpower Facilities on the Property, specifically those calculations related to Gross Revenue, and to inspect the Windpower Facilities on the Property for compliance with the terms of the Lease, upon reasonable written notice to COMPANY requesting such audit or inspection, such company performing audit to be reasonably approved in advance by COMPANY. COMPANY and OWNER shall agree upon the time and place of such inspection or audit within thirty (30) days of such written request. OWNER may audit the books and records no more than once per calendar year and may inspect the Windpower Facilities more than once per year as reasonably determined by the company performing the audit to be reasonably necessary to support any audit. In the event OWNER's audit reveals that COMPANY underpaid OWNER, then within thirty (30) days of COMPANY's receipt of evidence of such underpayment, COMPANY shall pay to OWNER such shortfall so that the correct amount is paid in full. Further, in the event OWNER's audit reveals that COMPANY underpaid OWNER by more than 5% of the correct amount of any payment, then COMPANY will pay for OWNER's costs and expenses of the audit within thirty (30) days after receipt of an invoice for such costs and expenses. If Oklahoma Laws impose additional requirements regarding COMPANY's books and records beyond those specified in this Agreement, COMPANY shall comply with such additional requirements.

     5.4    **Gross Revenue:**  For the purposes hereof, the term "**Gross Revenue**" means the Aggregate Total Revenue, less Transmission and Interconnection Expenses.

     (a) For purposes hereof, the term "Aggregate Total Revenue" shall mean (i) the payments actually received by COMPANY or any "Affiliated Party", as hereinafter defined, during the applicable period of time, from the sale by COMPANY or any Affiliated Party to the purchaser of electricity or of electrical energy generated and sold from the Project plus (ii) any payments received (A) from the renewable energy credits, carbon credits, greenhouse gas credits, pollution credits or any similar environmental attributes that directly result from the operation of Project; plus (B) pursuant to a business interruption insurance policy or from the manufacturer of any wind turbine unit under the provisions of its warranty therefor, in each case if made specifically in lieu of revenues from the normal operation of such wind turbines; and plus (C) from damages, bonus, termination or other lump sums received under power purchase agreements. For the purposes hereof, "Affiliated Party" shall be any entity or person which COMPANY directly or indirectly controls, is controlled by or is under common control with. "Control" shall mean (i) the power to direct or cause the direction of the management and policies of the entity, whether through ownership of voting securities, by contract or otherwise, or (ii) a direct or indirect equity interest of fifty percent (50%) or more in the entity.

     (b) [Intentionally omitted].

     (c) For avoidance of doubt, the term "Aggregate Total Revenue" shall exclude, without limitation, revenues received: (i) from the sale, assignment, transfer or other disposition of Windpower Facilities or any other of COMPANY's improvements (and any interest therein); (ii) from sales of electrical energy produced from any wind turbines not associated with the Project; (iii) from any rental or other payment received by COMPANY in exchange for COMPANY's assigning, mortgaging or otherwise transferring all or any interest of COMPANY in this Agreement; (iv) from

7

CONFIDENTIAL

parasitic or other loss incurred in the ordinary course of business and not the result of the acts or omissions of COMPANY (i.e. electrical energy used to power Windpower Facilities or development activities or lost in the course of transforming, shaping, transporting or delivering the electricity); (v) from sales of electrical energy for which payment is not received (including because of default by the purchaser thereof); (vi) or from any production tax credits, investment tax credits, grants in lieu of investment tax credits or other tax benefits and credits, or any reimbursement thereof, received by COMPANY in connection with any wind project, except only for the credits specified in Article II, Section 5.4(a)(ii)(A) above.

(d)   For purposes hereof, the term "Transmission and Interconnection Expenses" shall mean payments actually made by COMPANY for electricity transmission, interconnection, delivery or distribution services during the applicable period of time, for the electrical energy generated and sold from the Project.   In the event Transmission and Interconnection Expenses exceed twenty percent (20%) of Aggregate Total Revenue, the Transmission and Interconnection Expenses for purposes hereof shall be treated as twenty percent (20%) of Aggregate Total Revenue, unless otherwise agreed to by OWNER. Any such expenses shall not be paid to an Affiliated Party unless the dealings with the Affiliated Party are at arm's length and disclosed to OWNER.

(e)   In the event that electrical energy produced from the Project is commingled with electrical energy produced from wind turbines located in other projects, COMPANY shall, using such methods, calculations, procedures and formulae as COMPANY shall in good faith adopt, allocate the Project a portion of the Gross Revenues received from such commingled electrical energy.

(f)   In the event that electrical energy produced from the Project is sold to an Affiliated Party by COMPANY, then the Gross Revenue from the sale of electricity under such contract shall be determined based upon the then current market values.

5.5   **Guaranteed Minimum Per-Megawatt Rent.**   Notwithstanding anything else contained in this Agreement, if COMPANY exercises its option to lease the Property as defined in Article I, Section 5 of this Agreement and begins construction of the Project, then commencing on the Operations Date, for purposes of calculating the amount under Section 5.3(i), the nameplate wind turbine capacity under Section 5.3(i) shall be calculated using a figure of not less than .015 megawatts of nameplate capacity (as rated by the manufacturer)  per leased acre of the Property regardless of whether such nameplate capacity is actually installed or not on the Property ("Guaranteed Minimum Per-Megawatt Rent"). If the actual nameplate wind turbine capacity installed on the Property is greater than .015 megawatts of nameplate capacity (as rated by the manufacturer) per leased acre, then the actual nameplate wind turbine capacity installed on the Property shall be used in calculating the amount under 5.3(i).

Notwithstanding anything herein, COMPANY shall not be required to include acreage in the calculation of the Guaranteed Minimum Per-Megawatt Rent that has Material Defects (as defined below) or that is included in the "No Turbine" area on Exhibit D.   For illustrative purposes only, if a Material Defect causes 100 acres to be unusable for wind turbine placement that

8

OSAGE WIND-013679

CONFIDENTIAL

100 acres would be subtracted from the total leased acreage; the sum of which would be multiplied by .015 to determine the nameplate wind turbine capacity number to be used in Section 5.3(i).

Material Defects are those defects that (i) COMPANY has identified in writing to OWNER prior to the Operations Date relating to any portion of the Property for which OWNER fails to cure within one hundred eighty (180) days after receipt of such written notice; or (ii) any local, state or federal laws or regulations affecting any portion of the Property that would adversely affect the installation, construction, permitting or financing of at least .015 megawatts of nameplate capacity (as rated by the manufacturer) per leased acre from being installed on the Property (collectively "Material Defects"). Material Defects include but are not limited to: (i) defects on title identified in writing by COMPANY prior to the expiration of the Development Period or inability to obtain non-disturbance and subordination agreements as further addressed in Section 15.2, (ii) Hazardous Materials, defined as the presence of any substance, material or waste which is now or hereafter classified as hazardous or toxic, or which is regulated under current or future federal, state or local laws or regulations, on or under the Property, (iii) complications of environmental laws, (iv) failure, after COMPANY's exercise of diligent efforts, to obtain any approval with respect to zoning, permitting or other siting laws, ordinances, or regulations required for the installation of wind turbine generators on the Property, or (v) any other factor beyond COMPANY's reasonable control that prevents COMPANY from installing, constructing or financing a total of at least .015 megawatts of nameplate capacity (as rated by the manufacturer) per leased acre on the Property. Nothing stated herein shall constitute or be interpreted to require a requirement of COMPANY to install .015 megawatts of nameplate capacity per leased acre on the Property.

5.6 **Construction Payment**. In the event one or more wind turbines are installed on the Property, COMPANY shall pay OWNER a one-time "Construction Payment" in the amount equal to Seven Thousand Dollars ($7,000) per megawatt of nameplate wind turbine capacity to be installed on the Property. The Construction Payment shall be paid to OWNER within forty-five (45) days after the date that the first section of any wind turbine(s) is erected on the Property. No additional Construction Payment shall be due in connection with any replacement or repowering of wind turbines on the Property.

5.7 **Participation Fee**. In the event COMPANY does not install a wind turbine on the Property, then COMPANY shall pay to OWNER a "Participation Fee" in an amount equal to the Participation Fee Rate, as defined in Article II, Section 5.3(iii). At such time, if any, as COMPANY has installed one or more wind turbines on the Property, the obligation to pay the Participation Fee shall terminate and the Turbine Operating Fee shall be payable pursuant to Article II, Section 5.3. The Participation Fee shall be paid within forty-five (45) days after the first anniversary of the Lease Effective Date occurring after the Operations Date, and annually thereafter within forty-five (45) days after each successive anniversary of the Lease Effective Date. Participation Fees for partial years shall be prorated.

5.8 **Construction Delay**. If COMPANY has not commenced construction of Windpower Facilities on any of the land which is part of the land for the Project by the date which is thirty (30) days prior to the fourth anniversary of the Lease Effective Date, then the Lease shall

9

automatically terminate upon such fourth anniversary, unless extended by written agreement between COMPANY and OWNER.

5.9    **Other Payments**.  If COMPANY desires to use the Property for any use other than the installation of the Windpower Facilities, COMPANY shall negotiate a separate agreement with OWNER.

5.10    **Late Charges.**  In the event COMPANY fails to timely pay any amount due hereunder and such amount remains unpaid for a period of thirty (30) days after OWNER has provided COMPANY written notice of the delinquency, (i) COMPANY shall pay a one-time penalty per occurrence equal to five percent (5%) of the amount due and (ii) OWNER may collect from COMPANY interest on such entire unpaid amount of 18% per annum, until paid in full.

6.    **Ownership of the Windpower Facilities**.  OWNER shall have no ownership or other interest in any of the Windpower Facilities installed on the Property, and COMPANY may remove any or all of the Windpower Facilities at any time.  OWNER disclaims, waives and releases any claim that the Windpower Facilities constitute fixtures, regardless of how the Windpower Facilities are affixed to the Property.

7.    **Taxes**

(a)    OWNER shall pay, when due, all real property taxes and assessments levied against the Property (subject to Article II, Section 7(b)) and all personal property taxes and assessments levied against any property and improvements owned by OWNER and located on the Property.  Subject to Article II, Section 7(c), if OWNER shall fail to pay any such taxes or assessments when due, COMPANY may, at its option, pay those taxes and assessments and any accrued interest and penalties, and deduct the amount of its payment from any payment otherwise due to OWNER from COMPANY.  In the event such taxes and assessments are greater than any payment due to OWNER, in addition to deducting the payment from any payment due, COMPANY may pursue legal options for the difference.

(b)    COMPANY shall pay all personal property taxes and assessments levied against the Windpower Facilities when due, including any production tax imposed on the electricity produced by the Windpower Facilities.  In addition, COMPANY agrees to pay to the relevant taxing authority, on behalf of OWNER, or reimburse OWNER for (as the case may be), any increase in the real property taxes levied against the Property as a result of the installation and operation of the Windpower Facilities on the Property by COMPANY, including any reclassification of the Property as a result of the Windpower Facilities or this Lease.  COMPANY shall not be liable for taxes attributable to facilities installed by OWNER or others (except any Affiliated Party) on the Property, or for any increase in the underlying value of the Property itself.  It is a condition precedent to OWNER's right to make payment directly to the taxing authority or for any reimbursement of any such increased taxes hereunder that OWNER submit the real property tax bill to COMPANY within six (6) months after OWNER receives the bill from the taxing authority.  Each party shall, if requested by the other, cooperate in effecting a tax division of the Property or in protesting any such increased taxes.

10

**CONFIDENTIAL**

(c)     Either party may contest the validity or amount of any levied taxes, assessments or other charges for which each is responsible under the Lease as long as such contest is pursued in good faith and with due diligence and the party contesting the tax, assessment or charge has paid the obligation in question or posted bond to pay the obligation in the event of an adverse determination. Both parties shall cooperate in pursuit of any such appeal.

8.     **Utilities**. COMPANY shall pay for all electrical and telephone/communication and other utility facilities furnished to the Windpower Facilities. OWNER may request the placement of a security surveillance system on COMPANY's physical structures, for purposes, including but not limited to, of monitoring roads and gates for trespassers, all at OWNER's expense. The devices may not interfere with the rights of COMPANY granted hereunder, and such placement shall be subject to COMPANY's written consent which shall not be unreasonably withheld.

9.     **Termination**.

9.1     **COMPANY's Right to Terminate**. COMPANY shall have the right to terminate the Lease as to all or any part of the Property at any time, effective upon thirty (30) days' written notice to OWNER during the Development Period and upon one hundred eighty (180) days' written notice to OWNER during the Initial Term or any Renewal Term, provided however that COMPANY may not exercise this right to terminate if COMPANY is in default of any material provision herein. If COMPANY terminates the Lease as to all of the Property after the fifth (5th) anniversary of the Lease Effective Date but prior to the twentieth (20th) anniversary of the Lease Effective Date, then COMPANY shall pay to OWNER a one-time payment of Ten Thousand Dollars ($10,000.00). If such termination is as to only part of the Property, the Lease shall remain in effect as to the remainder of the Property. In the event of a partial termination, COMPANY and OWNER shall execute an amendment to this Agreement and a new memorandum of lease in recordable form evidencing the change in Property subject to the Lease.

9.2     **OWNER's Right to Request Release of Property**. At any point following the Operations Date, as defined above, but not more than once annually, unless otherwise agreed to by the parties, OWNER shall have the right to request by written notice to COMPANY the release of any portion of the Property. COMPANY shall have sixty (60) days in which to study the effect on the Project of any such release and shall not unreasonably deny any such request for release, provided however the determination of the effect such release shall have on the Project shall be in COMPANY's sole discretion. Any negative impact on the Project shall be deemed reasonable to deny the request. If OWNER requests a release and COMPANY grants such request, the Lease shall remain in effect as to the remainder of the Property. In the event of the exclusion of any acreage from the Property, then the Lease will terminate as to such excluded portion of the Property and COMPANY and OWNER shall execute an amendment to this Agreement and a new memorandum of lease in recordable form evidencing the change in Property subject to the Lease.

9.3     **OWNER's Right to Terminate**. OWNER shall have the right to terminate the Lease only if a material default in the performance of COMPANY's obligations under this Agreement shall have occurred and remains uncured by the end of the applicable period set forth in this Article II, Section 9.3, and subject also to the terms of Article II, Sections 18 and 20 of this Agreement. OWNER shall simultaneously notify COMPANY and all Leasehold Mortgagees (as

11

OSAGE WIND-013682

**CONFIDENTIAL**

defined in Article II, Section 18.2) of the default, which notice shall set forth in reasonable detail the facts pertaining to the default and specify the method of cure. COMPANY shall have the right to remedy (a) a monetary default within thirty (30) days; and (b) a non-monetary default within ninety (90) days, with each curative period commencing as of the date of COMPANY's receipt of notice of default from OWNER, or, if cure of a non-monetary default will take longer than ninety (90) days, COMPANY shall have such additional period of time as is necessary to complete such cure, provided that COMPANY must promptly undertake the cure within the relevant time period and thereafter diligently prosecute the cure to completion, which shall be completed within a reasonable time.

9.4 **Effect of Termination**. Upon termination of the Lease, COMPANY shall, upon written request by OWNER and at OWNER's sole cost and expense, execute and record such documents as may be reasonably requested by OWNER to evidence the termination, including without limitation, a quitclaim deed to OWNER of all of COMPANY's right, title and interest in and to the Property. If COMPANY fails to execute and record any requested documents or a quitclaim deed, OWNER may, in addition to exercising any right and remedies that OWNER may have hereunder or in accordance with law or equity, record with the county recorder of deeds of the county in which the Property is located an OWNER's affidavit stating that the Lease has been terminated together with proof of service of a copy of the affidavit on COMPANY and all Leasehold Mortgagees according to the notice procedures provided in Article II, Section 18, provided OWNER shall not have any right to file this Agreement as part of such affidavit. Unless COMPANY or a Leasehold Mortgagee records with the applicable county recorder of deeds a written objection or denial of termination within thirty (30) days after service on it of the affidavit, the affidavit shall have the same effect as COMPANY's quitclaim deed.

10. **Changes**. If, at any time during the term of this Agreement, to meet legal or regulatory requirements it becomes reasonably necessary, COMPANY may request that OWNER (at COMPANY's sole cost and expense) amend this Agreement or re-execute a new lease substantially in the form of this Agreement with a term equal to the term of the Lease remaining as of the date of execution of the new lease, and OWNER shall execute and enter into the new lease with COMPANY or its designee; provided, however, that no such amendment or new lease will impair any of OWNER's rights under this Agreement or increase the burdens or obligations of OWNER hereunder or change any payments required to be made hereunder.

11. **Cooperation Regarding Utility Easements**. OWNER understands and acknowledges that the Windpower Facilities must be interconnected to the network or grid of the local or regional electrical public utility, and that such interconnection may require easements from OWNER to the utility for access, transmission, facilities, or the like. OWNER agrees to negotiate in good faith with such utility and reasonably cooperate for the purpose of effecting such interconnection, at COMPANY's sole cost and expense.

12. **Requirements of Governmental Agencies**. COMPANY shall have the right, in its sole discretion, to apply for such permits, variances, conditional use permits, zoning modifications or other governmental approvals as COMPANY considers necessary or appropriate for its use of the Property as permitted by this Agreement and/or for the installation, operation and use of the Windpower Facilities, and shall have the right to seek such amendments or revisions to applicable

12

**CONFIDENTIAL**

zoning and wind use ordinances, statutes and regulations, and to contest by appropriate legal proceedings, brought in the name of COMPANY, OWNER, or in the names of both COMPANY and OWNER where appropriate or required, the validity or applicability to the Property or the Windpower Facilities of any law, ordinance, statute, order, regulation, property assessment or the like now or hereafter made or issued by any federal, state, county, local or other governmental agency or entity. OWNER shall cooperate with COMPANY in every reasonable way with respect to the foregoing, at no out-of-pocket expense to OWNER. Any such contest or proceeding, including any maintained in the name of OWNER, shall be controlled and directed by COMPANY, provided that COMPANY shall indemnify and defend OWNER from any liability arising due to COMPANY's contest or proceeding, including without limitation, the failure to observe or comply during any such contest or proceeding with the contested law, ordinance, statute, order, regulation or property assessment.

13. **Location of Windpower Facilities**. COMPANY may change the proposed location(s) of any of the Windpower Facilities from the initially proposed location(s) in connection with the initial installation of the Windpower Facilities. Notwithstanding the foregoing, an example of a possible turbine layout for the Property is attached as Exhibit D. Once the Project is completely constructed, COMPANY shall not be entitled to place any additional turbine locations upon the Property without the prior written consent of OWNER (which such consent shall not be unreasonably conditioned, delayed, or withheld); provided that the foregoing shall not preclude any replacement of any of the then-existing turbines or repowering of any of the then-existing turbine locations. COMPANY shall bury all transmission lines between wind turbines where practicable at a depth that is consistent with soil conditions and industry standards.

14. **Company Covenants**.

14.1 **OWNER Activities**. COMPANY shall make reasonable efforts not to disturb OWNER's activities on the Property (provided that OWNER's activities are not inconsistent with COMPANY's rights under the Lease). COMPANY recognizes and agrees that OWNER retains and reserves full right to use the Property for any and all purposes except for those uses granted to COMPANY herein and which do not materially interfere with COMPANY's operations. COMPANY shall not place turbines in the areas marked "No Turbines" on the map(s) attached as Exhibit D, if any, without the prior written consent of OWNER. COMPANY shall share with OWNER its site development plan prior to construction, showing OWNER the proposed location of wind turbines, roads and electric power lines, before making its final decisions as to location of turbines, roads and power lines on the Property. OWNER shall provide COMPANY with information regarding OWNER's land use patterns for use in the design and construction of the Wind Facilities. The location and dimensions of any access roads shall be made by COMPANY in its sole discretion, except that: COMPANY agrees to use commercially reasonable efforts to:  i) minimize the interruption of OWNER's operations on the Property by such access roads, and (ii) install such access roads perpendicular to public roads or parallel to crop rows, existing fence lines, waterways or other natural contours. Upon request of OWNER, COMPANY shall post the access roads it constructs to the Windpower Facilities as being private roads only for use by personnel in connection with the Windpower Facilities. OWNER, or any person granted the right by OWNER for access and use of the Property, may use or cross such roads provided that the same shall not

13

**CONFIDENTIAL**

interfere with COMPANY's rights under the Lease. Any fencing, roads or gates constructed or installed by COMPANY shall be at least the same quality of construction and materials as then currently used by OWNER.

14.2   **Insurance**.   Commencing on the Lease Effective Date and continuing through the Removal Date, COMPANY shall, at its expense, maintain a broad form comprehensive coverage policy of public liability insurance insuring COMPANY against loss or liability caused by the Windpower Facilities and COMPANY's use of the Property under the Lease, in an amount not less than Two Million Dollars ($2,000,000) of combined single limit coverage per occurrence, accident or incident, which has a commercially reasonable deductible.  Certificates of such insurance shall be provided to OWNER at the Lease Effective Date and thereafter at OWNER's written request. COMPANY shall have OWNER added as an additional insured on such policy.  At least every five (5) years COMPANY shall, with their insurance carrier, re-evaluate the coverage amount for adequacy of protection and provide a statement of the insurance carrier's determination of adequacy to OWNER.  OWNER shall have the right to consent to the sufficiency of the coverage, such consent not to be unreasonably withheld.  If Oklahoma Laws impose additional requirements regarding insurance beyond those specified in this Agreement, COMPANY shall comply with such additional requirements.

14.3   **Safety**.  COMPANY shall construct such fencing around the perimeter of the Windpower Facilities as COMPANY may deem necessary or appropriate to secure or enclose the same and take other security precautions if it is determined by COMPANY, in its sole discretion, that such fencing and/or security measures will reduce such risks of damage, death or injury without unduly burdening OWNER's use of the Property.  The expense for any and all fencing constructed by COMPANY, or other security measures taken by COMPANY, shall be borne solely by COMPANY.   COMPANY shall take such additional reasonable safety measures as deemed appropriate by COMPANY to reduce the risk of damage to the Windpower Facilities or the risk that the Windpower Facilities will cause damage, injury or death to people, livestock, other animals and property.

14.4   **Construction Liens**.  COMPANY shall keep the Property free and clear of all liens and claims of liens for labor and services performed on, and materials, supplies or equipment furnished to, the Property in connection with the installation and operation of Windpower Facilities on the Property pursuant to the Lease; provided, however, that COMPANY may contest any such lien by appropriate proceedings.  COMPANY shall satisfy such lien in full within thirty (30) days after such proceeding has become final and unappealable.  COMPANY shall promptly bond around any lien placed on the Property as a result of COMPANY's activities on the Property.  Without limiting the foregoing, COMPANY may settle any such lien on terms it deems satisfactory in its sole discretion so long as such settlement results in the removal of such lien from the Property pursuant to applicable law.

14.5   **Hazardous Materials**.  COMPANY shall not violate, and shall defend, indemnify and hold harmless OWNER for, from and against any violation by COMPANY or COMPANY's agents, contractors or subcontractors of, any federal, state or local law, ordinance or regulation relating to the generation, manufacture, production, use, storage, release or threatened release, discharge, disposal, transportation or presence of any substance, material or waste which is

14

**CONFIDENTIAL**

now or hereafter classified as hazardous or toxic, or which is regulated under current or future federal, state or local laws or regulations, on or under the Property.  In addition, COMPANY shall protect, defend, indemnify and hold harmless OWNER with respect to any fines, penalties, losses, costs and expenses (including reasonable attorneys fees) with respect to any such violations described herein, and COMPANY agrees to cleanup and remove from the Property any such hazardous or toxic substance, material or waste caused by COMPANY, its agents, or contractors and subcontractors.

14.6    **Removal of Facilities.**

(a)    Within twelve (12) months from the expiration or termination of all rights under the Lease, COMPANY, at its sole expense, shall remove all Windpower Facilities, including foundations, to a depth of forty-two (42) inches below grade, and restore the surface to a condition similar to the surrounding land, and COMPANY's Access Rights shall continue for such period. Should COMPANY fail to remove all Windpower Facilities within the twelve (12) month period, OWNER shall simultaneously notify COMPANY and all Leasehold Mortgagees (as hereinafter defined), in writing, of the default, and if such removal is not begun within sixty (60) days of such notice and diligently pursued to its conclusion, OWNER shall have the right to seek specific performance as a remedy, in addition to all other rights and remedies herein or allowed by law or equity.

(b)    **Security for COMPANY's Removal Obligations**.  Beginning on the fifteenth (15th) anniversary of the Lease Effective Date and every third year thereafter, COMPANY shall, at its sole cost and expense, obtain security for COMPANY's removal obligations described above in Article II, Section 14.6(a), in the form of a bond from an investment grade company or issuer, not to be rated less that AA- in accordance with Standard and Poor's rating system or a letter of credit, which will cover the removal cost of removing said Windpower Facilities from the Property at the end of the term of the Lease ("Decommissioning Security").  The form and content of any such letter of credit shall be subject to the reasonable approval of OWNER.  Failure to provide protection of OWNER's interest in the event of COMPANY's insolvency, bankruptcy, receivership, or rights of any other third parties shall be deemed reasonable grounds to deny approval by OWNER.  COMPANY shall retain an independent, certified professional engineer reasonably approved by OWNER to estimate the total cost incurred by an unrelated third party of decommissioning the Windpower Facilities ("Decommissioning Costs").  Should the Decommissioning Costs be equal to or less than one dollar ($1.00), then the Decommissioning Security value shall be zero dollars ($0.00) and the Decommissioning Security shall not be required to be established or maintained by COMPANY.   Each estimate shall (i) be in writing, (ii) be provided to OWNER on or before forty-five (45) days after the fifteenth (15th) anniversary of the Lease Effective Date and forty-five (45) days after every third (3rd) anniversary thereafter, and (iii) shall itemize the amounts included in the Decommissioning Costs.  If Oklahoma Laws impose additional requirements regarding decommissioning beyond those specified in this Agreement, COMPANY shall comply with such additional requirements.

15

**CONFIDENTIAL**

### 14.7    Damages.

(a)    **Pasture Damage**. The parties acknowledge that OWNER may suffer damage to pastures/forage grasses on the Property during COMPANY's construction, installation, operation, maintenance and removal of Windpower Facilities on the Property.  Any pasture/forage grass loss compensation shall be based upon actual pasture/forage grass that was destroyed on the Property that occurred as a direct result of COMPANY's construction, installation and maintenance of Windpower Facilities on the Property.   Between the Effective Date and December 31, 2015, COMPANY shall pay OWNER a total of twenty-eight dollars ($28) per acre per year of pasture/forage grass actually destroyed or damaged. The damage payment shall be made for each occurrence of damage, however, the damage claim can only be made once in a twelve (12) month period for each specific area of damage.  For the remainder of the Lease COMPANY shall pay OWNER fair market value for any pasture/forage grass actually destroyed.  The parties hereto shall try in good faith to agree to the acreage affected.  If the parties hereto cannot agree, they shall have the area measured by an impartial party such as a crop insurance adjuster or extension agent.  Payment of pasture damages shall be made within thirty (30) days after determining the extent of damage.

After construction is complete, COMPANY shall not be responsible to pay OWNER any losses of income, rent, business opportunities, profits or other losses arising out of OWNER's inability to grow grasses or crops or use any area occupied by any wind turbine, including gravel, steps/ladder and transformer located at base of wind turbine tower, and turbine access road, or otherwise use the Property.

(b)    **Fences/Other Fixtures**. The parties acknowledge that OWNER may suffer damage to fences or other fixtures on the Property during COMPANY's construction, installation and maintenance of Windpower Facilities on the Property.  COMPANY shall promptly repair or replace such fences or other fixtures, or pay to OWNER fair compensation for such losses or damage.  Fair compensation shall mean actual cost to repair at the point of damage and to return the fence or fixture to its pre-damage condition.  If the parties cannot reach agreement as to amount which would constitute fair compensation, the issue shall be submitted to arbitration before the American Arbitration Association or any arbitrator mutually agreed to by the parties.   Should COMPANY require the relocation or removal of any fence line on the Property, COMPANY shall obtain OWNER's prior written consent for any such relocation or removal.  The previous sentence shall not be deemed to require OWNER's consent for the addition of access roads, additional gates in existing fence lines, and/or additional improvements that do not involve relocating or removing OWNER's existing improvements.

(c)    **Livestock Damage**. If OWNER suffers any destruction of, or damage to, or loss of livestock on the Property as a result of the actions or inactions of COMPANY, then COMPANY shall pay OWNER fair compensation equal to the revenue that OWNER or any other owner of such livestock would have received on the open market for such destroyed or damaged or loss to livestock as set forth herein during the growing season in which such livestock were destroyed or damaged or incurred loss.  The amount of revenue that OWNER would have received on the open market for such destroyed or damaged or loss to livestock shall be determined by OWNER based upon (a) the number of livestock damaged or destroyed or which incurred loss and (b) the average market price received for such live livestock in the week in which such livestock were

16

**CONFIDENTIAL**

destroyed or damaged or incurred loss.  It is expressly agreed that after entering or exiting any locked gate providing access to the Property, COMPANY and its agents or contractors shall lock the same, or if during construction, shall monitor any open gate so that livestock is not lost or stolen.

14.8    **Conservation Programs**.   To the extent COMPANY's installation or construction of the Windpower Facilities requires the removal of any of the Property from participation in the Farm Service Agency's Conservation Reserve Program or similar program in which it was enrolled and qualified at the time COMPANY's applicable installation or construction began at such site, and, as a result, OWNER incurs any penalties or reimbursement obligations to the government agency administering the program related to the period after disqualification, COMPANY agrees to reimburse OWNER the amount of such penalties and obligations or pay the amounts on behalf of OWNER within thirty (30) days of written notification by OWNER to COMPANY and verification by COMPANY.  OWNER shall notify COMPANY of any new areas of the Property that become eligible to be enrolled in any such program(s) after the Effective Date promptly upon such eligibility and shall also notify COMPANY of any such penalties or reimbursement for which COMPANY would be responsible under this Section should such areas be enrolled, together with an accounting and copies of the underlying documentation and billing and receipts.  For avoidance of doubt, OWNER shall not qualify and enroll any new areas of the Property without COMPANY's prior written consent, which consent shall not be unreasonably conditioned, delayed, or withheld.

14.9    **Care and Appearance**.  To the extent commercially practicable COMPANY shall:  (i) maintain all roads used for ingress and egress and any other portion of the Property used by COMPANY, and shall maintain the Windpower Facilities in good condition and repair, ordinary wear and tear excepted, all at COMPANY's sole expense, (ii) keep the Windpower Facilities and all of the Property free of debris caused by COMPANY, (iii) be responsible for weed and erosion control on the portions of the Property occupied by the Windpower Facilities, (iv) not use the Property for storage except for materials, construction equipment and vehicles directly associated with construction or maintenance of the Windpower Facilities, (v) repair any wind turbine producing sound in excess of 85 decibels measured at any point 2000 feet from such wind turbine in order to reduce the sound caused to at or below this specified level, and (vi) keep the Windpower Facilities in good working order and repair, consistent with industry standards.

14.10   **Setback from Residence**.  COMPANY shall not, without the prior written consent of OWNER, erect any Wind Facility within one-eighth (1/8) mile of any occupied residential structure located on the Property or any adjacent land as of the Lease Effective Date.

14.11   **Remediation of Glare and Shadow Flicker**.  COMPANY agrees that, should OWNER experience problems or complaints by others with glare or shadow flicker associated with the presence of the Wind Facilities on the Property or adjacent properties within the Project, COMPANY will promptly investigate the nature and extent of the problem and the best methods of correcting any problems found to exist.  COMPANY, at its expense, with agreement of OWNER, will then promptly undertake measures reasonable necessary and consistent with industry standards to mitigate the offending glare or shadow.

17

OSAGE WIND-013688

**CONFIDENTIAL**

14.12  **Supervision of Employees/Agents**.   COMPANY shall prohibit its employees, agents, affiliates, contractors and subcontractors from engaging in any unauthorized activity on the Property, including, but not limited to hunting, fishing, or engaging in other recreational activities on the Property or bringing firearms or alcohol to the Property or driving at excessive speeds or in a reckless manner.

14.13  **Condition of Property**. COMPANY has inspected the physical and topographic condition of the Property and accepts the same "AS IS" in their existing physical and topographic condition. COMPANY further acknowledges that it is not relying upon any representation or warranty by OWNER regarding any physical aspect of the Property. OWNER disclaims any and all warranties of merchantability, suitability, or fitness for any purpose, and any other warranty whatsoever not expressly set forth in this Agreement. OWNER and COMPANY hereby agree and acknowledge that the use of the terms "grant" or "convey" in no way implies the Property is free of liens, encumbrances, or prior rights, except for Wind Energy Purposes. COMPANY is hereby put on notice that any prior grant or encumbrance is of record and COMPANY is advised to examine all public records regarding the Property. COMPANY agrees to do all things necessary to be appraised of any other interests shown by any other recording authority prior to the Lease Effective Date. COMPANY acknowledges and agrees that all subsurface mineral rights to the Property are owned by the Osage Indian Nation. The provisions of this section shall survive the expiration or earlier termination of this Agreement. *, or amendment thereto,*

14.14  **Equitable Payment Terms**.  If COMPANY signs a lease agreement *with* with any landowner that is a part of the Project containing more favorable payment terms, COMPANY shall execute an amendment to this Agreement giving OWNER the same more favorable payment terms.  In the event any such landowner is given greater payment terms, COMPANY shall grant those same favorable greater payment terms within forty-five (45) calendar days from the date of the option or lease containing the more favorable terms. The granting of these additional terms to OWNER, if any, shall be deemed an amendment to the Lease.  OWNER agrees that a breach of this Subsection 14.14 shall not be a material default in the performance of COMPANY's obligations constituting grounds for terminating the Lease under Article II, Section 9.3. 

*, or amendment thereto,*

Notwithstanding anything herein, OWNER acknowledges that (i) COMPANY has guaranteed to another landowner in the Project that the Turbine Operating Fees under Article II, Section 5.3(i) will be based on a minimum number of megawatts that may be greater than the minimum number of megawatts guaranteed to OWNER under Article II, Section 5.5 and (ii) that another landowner in the Project received $5.00/acre for the Development Period Rent under Article I, Section 3.2 for a period of six (6) months versus twelve (12) months; OWNER expressly agrees that such provisions, although arguably more favorable, will not be deemed to violate this Article II, Section 14.14 and OWNER waives the right to assert any claims under this Article II, Section 14.14 in relation to such more favorable payment terms, while retaining all other rights to seek amendment for all other causes and reasons hereafter as to all other payment terms.

18

OSAGE WIND-013689

**CONFIDENTIAL**

15.    **OWNER Covenants.**

15.1    **No Interference**.  OWNER's activities and any grant of rights OWNER makes to any person or entity other than COMPANY, whether located on the Property or elsewhere, shall not, currently or prospectively, interfere with:  the construction, installation, maintenance or operation of COMPANY's Windpower Facilities or any of COMPANY's affiliates' windpower facilities, whether located on the Property or elsewhere; access over the Property to such Windpower Facilities; or the undertaking of any other activities permitted hereunder.  Without limiting the generality of the foregoing, OWNER agrees that any obstruction to the free flow of the wind is prohibited throughout the entire area of the Property.  Trees, structures and improvements located on the Property as of the date of the Lease shall be allowed to remain and COMPANY may not require their removal.  OWNER may not place or plant, or authorize the placement or planting by any other party of, any trees, structures or improvements on the Property after the Lease Effective Date or within five hundred (500) feet of a wind generation turbine, which may, in COMPANY's sole judgment, impede or interfere with the flow of wind to any Windpower Facility, unless OWNER has received prior written approval from COMPANY, such approval not to be unreasonably withheld for any such trees, structure or improvement.  Notwithstanding anything contained in this Article II, Section 15.1 to the contrary, (i) OWNER shall have the right to plant trees or place or build structures and improvements on the Property up to fifty (50) feet in overall height and maintaining a seven hundred fifty (750) foot setback from current or planned turbine locations, and (ii) OWNER shall have the right to construct not more than one (1) Small Turbine on the Property for OWNER's personal use, so long as such Small Turbine is located within two hundred fifty (250) feet of OWNER's existing residential building.  A "Small Turbine" shall mean a wind turbine for residential farm use by OWNER with a nameplate capacity of forty (40) kilowatts or less and a hub height of twenty (20) meters or less.

15.2    **Title Review; Cooperation and No Encumbrances**.  OWNER shall cooperate with COMPANY and use commercially reasonable efforts to obtain non-disturbance, subordination and attornment agreements from any person with a lien, encumbrance, mortgage, lease or other exception to OWNER's fee title to the Property to the extent necessary to eliminate any actual or potential interference by any such person with any rights granted to COMPANY under the Lease.  OWNER shall also provide COMPANY with any further assurances and shall execute any estoppel certificates, consents to assignments, or additional documents which may be reasonably necessary for recording purposes or otherwise reasonably requested by COMPANY.  To the best of OWNER's knowledge, there are no encumbrances or liens against the Property, except as set forth in Exhibit "C" attached hereto.

15.3    **Negative Covenant**.  During the term of this Agreement, OWNER agrees not to grant or convey to any third party any rights in or to the Property relating to developing, constructing, installing, operating, maintaining, replacing and repairing wind energy generation turbine(s), supporting structures, foundations and pads, footings, electrical transformers, fixtures, electric distribution and transmission lines, cables, power poles, access roads, and any other related facilities and equipment, or undertaking any and all activities related thereto (including without limitation, the evaluation of wind energy resources).

19

OSAGE WIND-013690

**CONFIDENTIAL**

15.4   **Requirements of Governmental Agencies/Lenders**.   OWNER shall assist and fully cooperate with COMPANY, at no out-of-pocket expense to OWNER, in complying with or obtaining any land use permits and approvals, tax-incentive or tax-abatement program approvals, building permits, environmental impact reviews and clearances or any other approvals required or deemed desirable by COMPANY in connection with the financing, construction, installation, replacement, relocation, maintenance, operation or removal of the Windpower Facilities, including execution of applications for such approvals and delivery of information and documentation related thereto.

15.5   **Hazardous Materials**.   OWNER shall not violate, and shall defend, indemnify and hold harmless COMPANY for, from and against any violation by OWNER or OWNER's agents or contractors of any federal, state or local law, ordinance or regulation relating to the generation, manufacture, production, use, storage, release or threatened release, discharge, disposal, transportation or presence of any substance, material or waste which is now or hereafter classified as hazardous or toxic, or which is regulated under current or future federal, state or local laws or regulations, on or under the Property.   OWNER shall defend, indemnify and hold harmless COMPANY for, from and against any environmental condition existing on the Property prior to the Effective Date or caused by OWNER or OWNER's agents or contractors.

15.6   **Quiet Enjoyment**.   OWNER covenants and warrants that COMPANY shall peacefully hold and enjoy all of the rights granted by the Lease for its entire term without hindrance or interruption by OWNER or any person lawfully or equitably claiming by, through or under or superior to OWNER subject to the terms of the Lease and the rights with respect to the mineral estate.   OWNER and its activities on the Property and any grant of rights OWNER makes to any other person shall not interfere with any of COMPANY's activities pursuant to the Lease, and OWNER shall not interfere with or allow interference with the wind speed or wind direction over the Property or otherwise engage in activities which might impede or decrease the output or efficiency of the Windpower Facilities.   COMPANY covenants and warrants that it will not materially interfere with OWNER's use of the Property, except as is authorized by this Agreement.

15.7   **Surface Damages Caused by Mineral Estate**

(a)   OWNER will notify promptly COMPANY of any written notices of any proposed oil, gas or mineral operations ("Proposed Operations") on the Property that are received by OWNER pursuant to any laws or regulations relating to the protection of the rights of a surface landowner, specifically including, without limitation, the Oklahoma Seismic Exploration Regulation Act, 52 Okla. Stat. § 318.21, *et seq.*, and the Leasing of Osage Reservation Lands for Oil and Gas Mining 25 CFR 226 (collectively, the "Surface Rights Acts"), together with a copy of any such notice received.

(b)   OWNER shall provide COMPANY with reasonable advance notice of any impending proceeding or meeting related to any Proposed Operations.

(c)   In the event of any negotiations by OWNER for any claim for surface damages relating to Proposed Operations ("Owner's Surface Damages"), OWNER agrees to include COMPANY's claim for surface damages as a consequence of the Proposed Operations if

20

**CONFIDENTIAL**

COMPANY is not permitted to independently submit its claim for surface damages, which may include the cost of relocating the Windpower Facilities in the portions of the Property subject to the Proposed Operations caused to be relocated as a result of the Proposed Operations ("Company's Surface Damages").

(d)  COMPANY shall have the right, in its sole discretion and at COMPANY's expense, to contest by legal proceedings (which may be brought in the name(s) of OWNER and/or COMPANY where appropriate or required), the Proposed Operations or the amount of any Company Surface Damages relating to such Proposed Operations. OWNER shall in all respects cooperate with COMPANY in any such contest. *[at no cost to OWNER,]*

16.  **Indemnification**.  COMPANY, for itself and its contractors, subcontractors, employees and agents (the "Indemnifying Party") agrees to defend, indemnify and hold harmless OWNER and its employees, representatives, mortgagees and agents (collectively the "Indemnified Party") against losses, damages, claims, expenses and liabilities for physical damage to property and for physical injury to any person, to the extent resulting from or arising out of (i) any operations or activities of the Indemnifying Party on the Property; (ii) any negligent or intentional act or omission on the part of the Indemnifying Party; or (iii) any breach of the Lease by the Indemnifying Party. This indemnification shall not apply to losses, damages, claims, expenses and liabilities to the extent caused by any negligent or intentional act or omission on the part of the Indemnified Party. COMPANY's obligations regarding pasture/forage, tile lines and/or livestock damage are specified in Article II, Section 14.7 of this Agreement and are not covered under this indemnification. This indemnification shall survive the termination of this Agreement.  Except for (1) recovery under this indemnity clause, or (2) gross negligence or willful misconduct, neither OWNER nor COMPANY shall be liable to the other for incidental, consequential, special, punitive or indirect damages, including, without limitation, loss of use, loss of profits, costs of capital or increased operating costs, arising out of this Lease, whether by reason of contract, indemnity, strict liability, negligence, intentional conduct, breach of warranty, or otherwise.  Provided however, that if at any time OWNER leases or otherwise puts control of all or a portion of the Property in a third party, this indemnity shall immediately become mutual as between OWNER and COMPANY.

17.  **Assignment; Subleases**

COMPANY may assign the Lease or sublet all or any part of the Property or the Windpower Facilities without obtaining the consent of OWNER provided that (i) any such assignment or sublease shall not be for a period beyond the term of the Lease and (ii) the assignee or sublessee shall be subject to all of the obligations, covenants and conditions applicable to COMPANY.  Without limiting generality of the foregoing, a foreclosure and sale by a Leasehold Mortgagee pursuant to Article II, Section 18 shall be a permitted assignment.  In the event of an assignment of COMPANY's entire interest in the Lease, COMPANY shall be released of all further liability under the Lease following assumption by an assignee of all obligations hereunder if such assignee has the financial ability and industry expertise reasonably necessary to perform all the obligations of COMPANY hereunder.  OWNER may assign the Lease to any party in connection with the sale or other transfer of the Property by OWNER, which assignment shall release OWNER of all further liability under the Lease; provided, however, that any such sale shall be subject to the

21

Lease and OWNER must notify COMPANY, in writing, of the transfer of the property within thirty (30) days of the closing date.

18. **Leasehold Mortgage.**

    18.1   **Mortgage by COMPANY**. COMPANY may, from time to time, mortgage, pledge, hypothecate or otherwise encumber (any of the foregoing, a "Mortgage"), the Windpower Facilities and/or the Easements and/or the rights granted to COMPANY under the Lease (such rights, collectively, the "Leasehold Estate"). Nothing herein shall be deemed to permit the Leasehold Mortgagee to take title to, or otherwise encumber, OWNER's fee title to the Property.

    18.2   **Mortgagee Protection**. COMPANY shall provide to OWNER the relevant contact information for each holder of any such Mortgage (a "Leasehold Mortgagee"), and such Leasehold Mortgagee shall, for so long as its Mortgage is in existence and until the lien thereof has been extinguished, be entitled to the following protections:

    18.2.1   **Leasehold Mortgagee's Right to Possession, Right to Acquire and Right to Assign**. A Leasehold Mortgagee shall have the absolute right: (a) to assign its security interest; (b) to enforce its lien and acquire title to the Leasehold Estate by any lawful means (subject to the provisions hereof); (c) to take possession of and operate the Windpower Facilities or any portion thereof and to perform all obligations to be performed by COMPANY hereunder, pursuant to its agreements with COMPANY, applicable law, or both; and (d) to acquire the Leasehold Estate by foreclosure or other legal proceedings or remedy (whether judicial or non-judicial) and thereafter to assign or transfer the Leasehold Estate to a third party. OWNER's consent shall not be required for any such acquisition of COMPANY's Leasehold Estate by a third party.

    18.2.2   **Notice of Default; Opportunity to Cure**. As a condition to exercising any rights or remedies as a result of any alleged default by COMPANY, OWNER shall give written notice of the default to each Leasehold Mortgagee for whom COMPANY has provided contact information, as provided above, concurrently with delivery of such notice to COMPANY, specifying in detail the alleged event of default and the required remedy. In the event OWNER gives such written notice of default, the following provisions shall apply:

    (a)   A "monetary default" means failure to pay when due any rent, real property taxes, insurance premiums or other monetary obligation of COMPANY under the Lease; any other event of default is a "non-monetary default."

    (b)   The Leasehold Mortgagee shall have the same period after receipt of notice of default to remedy the default, or cause the same to be remedied, as is given to COMPANY and any of its successors and assigns after COMPANY's receipt of notice of default, plus, in each instance, the following additional time periods: (i) thirty (30) days in the event of any monetary default; and (ii) thirty (30) days in the event of any non-monetary default, provided that such thirty (30) day period shall be extended for the time reasonably required to complete such cure, including the time required for the Leasehold Mortgagee to perfect its right to cure such non-monetary default by obtaining possession of the Windpower Facilities (including possession by a receiver) or by

22

**CONFIDENTIAL**

instituting foreclosure proceedings, provided the Leasehold Mortgagee acts with reasonable and continuous diligence and in compliance with the terms hereof. The Leasehold Mortgagee shall have the absolute right to substitute itself for COMPANY and perform the duties of COMPANY hereunder for purposes of curing such defaults. OWNER expressly consents to such substitution, agrees to accept such performance, and authorizes the Leasehold Mortgagee (or its employees, agents, representatives or contractors) to enter upon the Property to complete such performance with all the rights, privileges and obligations of COMPANY hereunder. OWNER shall not terminate the Lease prior to expiration of the cure periods available to a Leasehold Mortgagee as set forth above.

(c)     During any period of possession of the Windpower Facilities or Leasehold Estate by a Leasehold Mortgagee (or a receiver requested by such Leasehold Mortgagee), the Leasehold Mortgagee shall pay or cause to be paid the rent and all other monetary charges payable by COMPANY hereunder which have accrued and are unpaid at the commencement of said period and those which accrue thereafter during said period. Following acquisition of the Leasehold Estate by the Leasehold Mortgagee or its assignee or designee as a result of either foreclosure, deed-in-lieu of foreclosure or other remedy, or by a purchaser at a foreclosure sale, the Lease shall continue in full force and effect and the Leasehold Mortgagee or party acquiring title to the leasehold estate shall assume the Lease and, as promptly as reasonably possible, commence the cure of all defaults hereunder and thereafter diligently process such cure to completion within the time frames set forth hereinabove, whereupon OWNER's right to terminate the Lease based upon such defaults shall be deemed waived; provided, however, the Leasehold Mortgagee or party acquiring title to the leasehold estate shall not be required to cure those defaults which are not reasonably susceptible of being cured or performed by such party ("non-curable defaults"), e.g. untimely performance of an obligation. Non-curable defaults shall be deemed waived by OWNER upon completion of foreclosure proceedings or acquisition of the Leasehold Estate by such party and after the cure of all monetary defaults and other defaults capable of being cured.

(d)     Any Leasehold Mortgagee or other party who acquires the Leasehold Estate pursuant to foreclosure, deed-in-lieu of foreclosure or other remedy shall not be liable to perform the obligations imposed on COMPANY by the Lease incurred or accruing after such party no longer has ownership of the Leasehold Estate.

(e)     Neither bankruptcy nor insolvency shall be grounds for terminating the Lease as long as the rent and all other monetary charges payable to OWNER hereunder are paid by the Leasehold Mortgagee in accordance with the terms of the Lease.

(f)     Nothing herein shall be construed to extend the Lease beyond the Lease term or to require a Leasehold Mortgagee to continue foreclosure proceedings after the default has been cured. If the default is completely cured and the Leasehold Mortgagee discontinues foreclosure proceedings, the Lease shall continue in full force and effect.

18.2.3  **New Lease to Mortgagee**. If the Lease terminates because of COMPANY's default or if the Leasehold Estate is foreclosed, or if the Lease is rejected or disaffirmed pursuant to bankruptcy law or other law affecting creditors' rights, OWNER shall, upon

23

**CONFIDENTIAL**

written request from any Leasehold Mortgagee within ninety (90) days after any such event, enter into a new agreement concerning the Property, on the following terms and conditions:

(a)     The terms of the new agreement shall commence on the date of termination, foreclosure, rejection or disaffirmance and shall continue for the remainder of the term of the Lease, at the same rent and subject to the same terms and conditions set forth in the Lease. Such new agreement shall be subject to all existing subleases, provided the subtenants are not then in default.

(b)     The new agreement shall be executed within thirty (30) days after receipt by OWNER of written notice of the Leasehold Mortgagee's election to enter a new agreement, provided said Leasehold Mortgagee: (i) pays to OWNER all rent and other monetary charges payable by COMPANY its successors or assigns, as applicable, under the terms of the Lease up to the date of execution of the new agreement, as if the Lease had not been terminated, foreclosed, rejected or disaffirmed, less the rent and other income actually collected by OWNER from subtenants or other occupants of the Property; and (ii) performs all other obligations of COMPANY under the terms of the Lease, to the extent performance is then due and susceptible of being cured and performed by the Leasehold Mortgagee; and (iii) agrees in writing to perform, or cause to be performed, all non-monetary obligations which have not been performed by COMPANY and would have accrued under the Lease up to the date of commencement of the new agreement, except those obligations which constitute non-curable defaults. To the extent allowed by law, any new agreement with the Leasehold Mortgagee shall enjoy the same priority as the Lease over any lien, encumbrance or other interest created by OWNER.

(c)     At the option of the Leasehold Mortgagee, the new agreement may be executed by a designee of such Leasehold Mortgagee.

(d)     After the termination, rejection or disaffirmance of the Lease and during the period thereafter during which any Leasehold Mortgagee shall be entitled to enter into a new agreement concerning the Property, OWNER will not terminate any sublease or the rights of any sublessee thereunder unless such sublessee shall be in default under such sublease. During such period, if OWNER shall receive any rent and other payments due from sublessees, including sublessees whose attornment it shall have agreed to accept, it will do so as agent of such Leasehold Mortgagee and shall deposit such rents and payments in a separate and segregated account in trust subject to a right of setoff against amounts due to OWNER; and, upon the execution and delivery of such new agreement, shall account to the tenant under said new agreement for the rent and other payments made under said subleases; and the tenant shall thereupon assign the rent and other payments due under said subleases to any Leasehold Mortgagees under the Lease. The collection of rent by OWNER acting as an agent pursuant to this Section shall not be deemed an acceptance by OWNER for its own account of the attornment of any sublessee unless OWNER shall have agreed in writing with such sublessee that its tenancy shall be continued following the expiration of any period during which a Leasehold Mortgagee may be granted a new agreement, in which case such attornment shall take place upon such expiration but not before. OWNER shall not be under any obligation to enforce any sublease.

24

(e)     If more than one Leasehold Mortgagee makes a written request for a new agreement pursuant hereto, the new agreement shall be delivered to the Leasehold Mortgagee requesting such new agreement whose Mortgage is prior in lien, and the written request of any other Mortgagee whose lien is subordinate shall be void and of no further force and effect.  At no expense to OWNER, a Leasehold Mortgagee shall provide a current title report on the Property to OWNER reflecting the priority of the lien of such Leasehold Mortgagee.

(f)     The provisions of this Article II, Section 18 shall survive the termination, rejection or disaffirmance of the Lease and shall continue in full force and effect thereafter to the same extent as if this Section were a separate and independent contract made by OWNER, COMPANY and such Leasehold Mortgagee, and, from the effective date of such termination, rejection or disaffirmance of the Lease to the date of execution and delivery of such new agreement, such Leasehold Mortgagee may use and enjoy said Property without hindrance by OWNER or any person claiming by, through or under OWNER; provided that all of the conditions for a new agreement as set forth herein are timely complied with.

18.3     **Leasehold Mortgagee's Consent to Amendment, Termination or Surrender**.  Notwithstanding any provision of the Lease to the contrary, the parties agree that so long as there exists a Leasehold Mortgagee, the Lease shall not be modified or amended and OWNER shall not accept a surrender of the Property or any part thereof or a cancellation or release of the Lease from COMPANY prior to expiration of the term without the prior written consent of the Leasehold Mortgagee.  This provision is for the express benefit of and shall be enforceable by such Leasehold Mortgagee.

18.4     **No Waiver**.  No payment made to OWNER by a Leasehold Mortgagee shall constitute an agreement that such payment was, in fact, due under the terms of the Lease; and a Leasehold Mortgagee having made any payment to OWNER pursuant to OWNER's wrongful, improper or mistaken notice or demand shall be entitled to the return of any such payment, provided however that the Leasehold Mortgagee must identify any such payments as being made under protest.

18.5     **No Merger**.  There shall be no merger of the Lease with the fee estate in the Property by reason of the fact that the Lease or any interest therein may be held, directly or indirectly, by or for the account of any person or persons who shall own the fee estate or any interest therein, and no such merger shall occur unless and until all persons at the time having an interest in the fee estate in the Property and all persons (including Leasehold Mortgagee) having an interest in the Lease or in the estate of OWNER and COMPANY shall join in a written instrument effecting such merger and shall duly record the same.

18.6     **Further Amendments**.  At COMPANY's request, OWNER shall amend the Lease to include any provision which may reasonably be requested by a current or proposed Leasehold Mortgagee; provided, however, that such amendment does not impair any of OWNER's rights or payments under the Lease or substantially increase the burdens or obligations of OWNER hereunder.  Upon the request of any Leasehold Mortgagee, OWNER shall execute any additional instruments reasonably required to evidence such Leasehold Mortgagee's rights under the Lease.

25

OSAGE WIND-013696

**CONFIDENTIAL**

18.7   **Third Party Beneficiary**.  Leasehold Mortgagee shall be an express third party beneficiary hereof and shall be entitled to rely on and enforce the provisions of this Article II, Section 18 and Article II, Section 6.

18.8   **Notices to Leasehold Mortgagee**.  OWNER shall provide Leasehold Mortgagee copies of all notices of default provided to COMPANY following any written request by Leasehold Mortgagee to receive such notices.

19.   **Estoppel Certificate.**  Within ten (10) days after written request by either party (the "Requesting Party"), the other Party agrees to deliver to any proposed mortgagee, purchaser or transferee or to the Requesting Party, a certificate, certifying, if such be the case, that this Agreement is in full force and effect and that there are no defenses or offsets thereto, or stating specifically those that are then claimed by such other party and such other matters as may be reasonably requested by the Requesting Party, its lender or a purchaser or transferee of or any portion thereof including the Property.  OWNER and COMPANY agree to work together in fulfilling any such requests and will not unreasonably deny any such request.

20.   **Force Majeure**.  If performance of the Lease or of any obligation hereunder is prevented or substantially restricted or interfered with by reason of an event of Force Majeure (defined below), the affected party, upon giving notice to the other party, shall be excused from such performance to the extent of and for the duration of such prevention, restriction or interference. The affected party shall use its reasonable efforts to avoid or remove such causes of nonperformance and continue performance hereunder whenever such causes are removed.  "Force Majeure" means fire, earthquake, flood or other casualty or accident; strikes or labor disputes; war, terrorism, civil strife or other violence; any law, order, proclamation, regulation, ordinance, action, demand or requirements of any government agency or utility; or any other act or condition beyond the reasonable control of a party hereto.

21.   **Tax Credits**.  If under applicable law the holder of a leasehold interest in the nature of that held by COMPANY, or any successor or assign, under the Lease becomes ineligible for any tax credit, benefit or incentive for alternative energy expenditure established by any local, state or federal government, then, at COMPANY's option, OWNER and COMPANY shall amend this Agreement or replace it with a different instrument so as to convert COMPANY's interest in the Property to a substantially similar interest that makes COMPANY eligible for such tax credit, benefit or incentive; provided, however, that no such amendment or replacement will impair any of OWNER's rights under the Lease increase the burdens or obligations of OWNER hereunder or reduce any payments required to be made hereunder.

## ARTICLE III
## MISCELLANEOUS

1.   **Confidentiality**.  OWNER shall maintain in the strictest confidence, for the benefit of COMPANY and any of its successors and assigns, all information pertaining to the financial terms of this Agreement, COMPANY's site or product design, methods of operation, methods of construction, power production or availability of the Windpower Facilities, and the like, whether

26

CONFIDENTIAL

disclosed by COMPANY or any of its successors and assigns, or discovered by OWNER, unless such information either (i) is in the public domain by reason of prior publication through no act or omission of OWNER or its employees or agents; (ii) was already known to OWNER at the time of disclosure and which OWNER is free to use or disclose without breach of any obligation to any person or entity; or (iii) is necessary for disclosure of the obligations of this Agreement to any subsequent OWNER or prospective purchaser of the Property.   OWNER shall not publish or otherwise disclose it to others, or permit its use by others for their benefit or to the detriment of COMPANY or any of its successors and assigns.   Notwithstanding the foregoing, OWNER may disclose such information to OWNER's lenders, attorneys, accountants and other personal financial advisors solely for use in connection with their representation of OWNER regarding this Agreement and in making such disclosure advises the party receiving the information of the confidentiality of the information and obtains the written agreement of said party not to disclose the information, which agreement shall run to the benefit of and be enforceable by COMPANY. OWNER may also disclose such information pursuant to lawful process, subpoena or court order requiring such disclosure; provided OWNER shall, as soon as reasonably possible, notify COMPANY of the receipt of such lawful process, subpoena or court order and cooperate with COMPANY, at COMPANY's sole expense, to maintain the confidentiality of the disclosed information. OWNER may discuss the existence and terms of this Agreement with any other party with land leased or offered to be leased within the Project.   Notwithstanding the foregoing, this confidentiality provision shall not apply to the contents of the Memorandum of Lease once the same is filed of record.

2.     **Authority**.  OWNER represents it is the sole owner of the Property and each party represents it has the unrestricted right and authority to execute this Agreement and to grant to the other the rights and interests and to enter into the Lease as contemplated hereunder.  Each person signing this Agreement on behalf of a party represents it is authorized to do so, and all persons having any ownership interest in the Property (including spouses) are signing this Agreement as OWNER.  When signed by both parties, this Agreement constitutes a valid and binding agreement enforceable against each party in accordance with its terms.

3.     **Copy of Title Information/Abstract**.  Within thirty (30) days of the Effective Date, OWNER agrees to provide COMPANY with a copy of any existing title reports, title abstracts, title commitments, deeds and other title information with respect to the Property in OWNER's possession or control.  COMPANY shall be responsible for the return of any title reports, title abstracts, title commitments, deeds or other title information in the same condition as it was delivered by OWNER.

4.     **Covenants Running with the Land**.  OWNER and COMPANY agree that all of the covenants and agreements contained in this Agreement touch and concern the Property and are expressly intended to, and shall, be covenants running with the land and shall be binding upon the Property and each party's present and future estate or interest therein and upon each of the parties, their respective heirs, administrators, executors, legal representatives, successors and assigns.

5.     **Notices**.  All notices or other communications required or permitted by this Agreement, including payments to OWNER, shall be in writing and shall be deemed given when personally delivered to OWNER, COMPANY or COMPANY's successors and assigns, or in lieu of

27

**CONFIDENTIAL**

such personal service, five (5) days after deposit in the United States mail, first class, postage prepaid, certified; or the next business day if sent by reputable overnight courier, provided receipt is obtained and charges prepaid by the delivering party or the next business date if sent by confirmed facsimile.  Any notice shall be addressed as follows:

|  |  |
|---|---|
| If to OWNER: | Carolyn Kane Snively<br>16071 N. 88th Place W<br>Skiatook, OK  74070 |
|  | M. John Kane IV<br>1515 Prudom Avenue<br>Pawhuska, OK  74056 |
|  | Paul A. Kane<br>1214 E. 17th Place<br>Tulsa, OK  74120 |
| With copy to: | Phillips Murrah, PC<br>Corporate Tower, 13th Floor<br>101 N. Robinson<br>Oklahoma City, OK  73102<br>Attn:  Sally A. Hasenfratz<br>Fax:  405-235-4431 |
| If to COMPANY: | Osage Wind, LLC<br>c/o Wind Capital Group, LLC<br>Attn: Real Estate Department<br>1430 Washington Avenue, Suite 300<br>St. Louis, MO 63103<br>Fax:  314-685-3001 |

Any party may change its address for purposes of this paragraph by giving written notice of such change to the other parties in the manner provided in this paragraph. COMPANY shall provide the notice address for any Leasehold Mortgagee.

     6.   **Cooperation**.  Each of the parties, without further consideration, agrees to execute and deliver such additional documents and take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement and to fulfill the obligations of the respective parties.

     7.   **Entire Agreement; Amendments**.   This Agreement constitutes the entire agreement between OWNER and COMPANY respecting its subject matter.  Any agreement, understanding or representation respecting the Property, this Agreement, the Lease, or any other matter referenced herein not expressly set forth in this Agreement or a subsequent writing signed by both parties is null and void.  This Agreement shall not be modified or amended except in a writing signed by both parties.  No purported modifications or amendments, including without limitation

28

OSAGE WIND-013699

**CONFIDENTIAL**

any oral agreement (even if supported by new consideration), course of conduct or absence of a response to a unilateral communication, shall be binding on either party.

8.   **Governing Law; Dispute Resolution**.  This Agreement shall be governed by and interpreted in accordance with the laws of the state of Oklahoma. All claims, disputes and other matters in question arising out of or relating to this Lease or any breach thereof, will be decided exclusively by proceedings instituted in the State District Courts of Oklahoma, or the United States District Court for the Northern District of Oklahoma.

9.   **Partial Invalidity**.  Should any provision of this Agreement be held, in a final and unappealable decision by a court of competent jurisdiction, to be either invalid, void or unenforceable, the remaining provisions hereof shall remain in full force and effect, unimpaired by the holding.

10.   **Section Headings**.  The Article and Section headings herein are inserted only for the convenience of reference and shall in no way define, limit or describe the sole scope or intent of any provision of this Agreement.

11.   **Counterparts**.  This Agreement may be executed with counterpart signature pages and in duplicate originals, each of which shall be deemed an original, and all of which together shall constitute a single instrument.

12.   **Acknowledgement**.  OWNER has been informed by COMPANY and understands that the presence and operations of the Windpower Facilities on the Property and on adjacent property potentially will result in some nuisance to OWNER, and OWNER hereby accepts such nuisance and waives any right that OWNER may have to object to such nuisance (and OWNER releases COMPANY from any claims OWNER may have with respect to any such nuisance, save and except for any nuisance resulting from a breach of this Agreement and/or arising from any condition inconsistent with the reasonable business practices for a company engaged in wind energy production).

13.   **Amendment and Restatement**.  This Agreement amends and restates in its entirety the Existing Lease according to the terms and conditions more fully set forth herein.

IN WITNESS WHEREOF, OWNER and COMPANY have caused this Lease to be executed and delivered by their duly authorized representatives as of the Effective Date.

(Signatures on the following page)

29

**CONFIDENTIAL**

COMPANY

**OSAGE WIND, LLC**

By:  George M. Knapp, Vice President

Dated:_____ _12-30-11_____

OWNER

**CAROLYN KANE-SNIVELY**

Carolyn Kane-Snively

Dated:_____ _12.9.11_____

**JAMES W. SNIVELY, JR.**

James W. Snively, Jr.

Dated_2-9-11_____

30

**CONFIDENTIAL**

OSAGE WIND-013701

**CONFIDENTIAL**

EXHIBIT A
**TO AMENDED AND RESTATED LEASE AND EASEMENT**
**FOR A WIND ENERGY PROJECT**

LEGAL DESCRIPTION OF PROPERTY

**Tract 1:**
The S/2 SW/4 Section 14, Township 26 North, Range 6 East of the Indian Meridian, Osage County, Oklahoma.

**Tract 2:**
NE/4 Section 22, Township 26 North, Range 6 East of the Indian Meridian, Osage County, Oklahoma.

**Tract 3:**
W/2 SE/4 and N/2 Section 23, Township 26 North, Range 6 East of the Indian Meridian, Osage County, Oklahoma.

**Tract 4:**
All that part of Section 32 and the N/2 SW/4 of Section 33 in Township 26 North, Range 6 East lying South of New U.S. Highway No. 60, Osage County, Oklahoma.

**Tract 5:**
All that part of the SE/4 lying North of US Highway #60 in Section 35, Township 26 North, Range 6 East of the Indian Meridian, Osage County, Oklahoma.

Excepting out the Recognized Environmental Contamination Area (REC) more particularly described as:

**REC AREA:** BEING THE CENTER OF A 100 FOOT DIAMETER RECOGNIZED ENVIRONMENTAL CONTAMINATION AREA OUT OF THE NE/4 OF SECTION 22, TOWNSHIP 26 NORTH, RANGE 6 EAST OF THE INDIAN MERIDIAN, OSAGE COUNTY, OKLAHOMA, SAID NE/4 OF SECTION 22, TOWNSHIP 26 NORTH, RANGE 6 EAST CONVEYED TO CAROLYN C. KANE BY DEED RECORDED IN VOLUME 1040, PAGE 129, OFFICIAL PUBLIC RECORDS OF OSAGE COUNTY, OKLAHOMA, SAID CENTER POINT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS AND AS SURVEYED UNDER THE SUPERVISION OF JOHN F. WATSON & COMPANY FROM APRIL, 2010 THROUGH OCTOBER 2011:

**COMMENCING** at a 1" iron pipe with brass cap found at the northeast corner of said Section 22; Thence crossing said Section 22, South 45°38'19" West a distance of 1353.44 feet to an existing Well (Fronkier #5) for the **CENTER** of said 100 foot diameter Recognized Environmental Contamination Area #7 and containing 0.180 acre of land, more or less.

Note: Bearings, distances and acreage stated herein are Grid, NAD83, Oklahoma North Zone.

A-1

**CONFIDENTIAL**

**EXHIBIT B**
**TO AMENDED AND RESTATED LEASE AND EASEMENT**
**FOR A WIND ENERGY PROJECT**

When recorded return to:

_____

_____

_____

_____

**AMENDED AND RESTATED MEMORANDUM OF LEASE AND EASEMENT**
**FOR A WIND ENERGY PROJECT**

**THIS AMENDED AND RESTATED MEMORANDUM OF LEASE AND EASEMENT FOR A WIND ENERGY PROJECT** (the "Memorandum") is made and entered into as of the ____ day of _____, 2011by and between _____ (hereinafter called "Owner"), and OSAGE WIND, LLC, a Delaware limited liability company, and its assigns (hereinafter called "Company").

RECITALS

WHEREAS, reference is made to that certain Amended and Restated Lease and Easement for a Wind Energy Project dated as of the _____ day of _____, _____, by and between Owner and Company (the "Lease"), whereby Owner has granted to Company the right and option to lease certain real property owned by Owner in Osage County, Oklahoma, and as more particularly described on Schedule "1" attached hereto and incorporated herein by reference (the "Property"), which amends and restates that certain Lease and Easement for a Wind Energy Project dated as of [_ _____, 2010] (the "Existing Lease"), by and between Owner and Company, a memorandum of which was recorded _____, 2010 (the "Existing Memorandum of Lease"), as Document #_____, in Book _____, at Page _____, in the County Clerk's Office of Osage County, Oklahoma; and

WHEREAS, the parties wish to amend and restate the Existing Memorandum of Lease and give notice of the amendment and restatement of the Existing Lease and the right and option granted to Company to lease the Property and the other rights and interest of Company.

NOW THEREFORE, in consideration of $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of

B-1

**CONFIDENTIAL**

OSAGE WIND-013703

**CONFIDENTIAL**

the mutual covenants, agreements and conditions contained herein and contained in the Lease, the parties hereto agree as follows:

1.  **Definitions**.  Capitalized terms used but not otherwise defined in this Memorandum shall have the same meaning ascribed to such terms in the Lease.

2.  **Option to Lease**.  During the Development Period, Owner hereby grants to Company an exclusive option to lease for wind energy purposes (as described in the Lease) the Property.  The "Development Period" shall be for a term commencing on the Effective Date and continuing for (i) the remainder of the calendar month in which the Effective Date occurs, and (ii) the next succeeding twelve (12) calendar months, subject to Company's right to extend the Development Period for three (3) additional one-year terms.  Company may exercise its option to lease the Property by giving written notice of such election to Owner at any time prior to the termination of the Development Period, and the term of the Lease will commence on the date such notice is given, or such other date within the term of the Development Period as Company may specify in such notice (the "Lease Effective Date").

3.  **Lease**.  In the event Company exercises its option to lease the Property, Owner hereby leases to Company and Company hereby leases from Owner, the Property.  The term of Lease shall be twenty-five (25) years from the Lease Effective Date.  Company has the right to extend the term of the Lease for an additional twenty (20) year period.

4.  **Notice of Commencement of Lease**.  In the event Company exercises its option to lease the Property, Owner hereby irrevocably and unconditionally authorizes Company to execute the Notice of Commencement of Lease and Easement for a Wind Energy Project (the "Notice of Commencement") attached to this Memorandum as <u>Schedule "2"</u>, and to record the same in the real property records for the county in which the Property is located, all without further authorization or action on the part of Owner.  The Notice of Commencement, when so executed and recorded, shall confirm and provide record notice of the exercise of the option to lease by Company, the commencement of the Lease, and of the Lease Effective Date.

5.  **Covenants Running with the Land**.  Owner and Company agree that all of the covenants and agreements contained in the Lease touch and concern the Property and are expressly intended to, and shall, be covenants running with the land and shall be binding upon the Property and each party's present and future estate or interest therein and upon each of the parties, their respective heirs, administrators, executors, legal representatives, successors and assigns.

6.  **Notice and Binding Effect**.  It is understood that the purpose of this Memorandum is to give notice of the Lease.  The Lease contains other terms and conditions set forth more fully therein.  All such terms and conditions of the Lease are incorporated herein by this reference.  The parties hereby ratify and confirm the Lease as if the Lease were being re-executed by them and recorded.  This Memorandum shall bind and inure to the benefit of Owner and Company and their respective successors and assigns, and shall encumber the Property and shall be binding on Owner's successors-in-interest thereto and all persons claiming by, through or under Owner, subject to the express provisions of the Lease.  In the event of any inconsistency between the provisions of this Memorandum and the Lease, the provisions of the Lease shall control.

B-2

**CONFIDENTIAL**

7.      **Confidentiality of Lease**.  The Lease is subject to a confidentiality clause in which the parties have covenanted to keep certain information about the Lease confidential.

8.      **Counterpart Execution**.  This Memorandum may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same instrument.

(Signatures on the following page)

B-3

**CONFIDENTIAL**

OSAGE WIND-013705

**CONFIDENTIAL**

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Memorandum of Lease and Easement for a Wind Energy Project as of the day and year first above written.

Owner:

By: _____

Print Name: _____

STATE OF _____ )
                              ) SS:
COUNTY OF _____ )

This instrument was acknowledged before me this _____ day of _____, 2011 by _____.

_____

Name(print):_____

Notary Public

| My Commission No. _____ |
| Expires: |
| |
| |
| |
| PLEASE AFFIX SEAL FIRMLY AND CLEARLY IN THIS BOX. |

B-4

**CONFIDENTIAL**

**CONFIDENTIAL**

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Memorandum of Lease and Easement for a Wind Energy Project as of the day and year first above written.

COMPANY:

OSAGE WIND, LLC,
a Delaware limited liability company

By: _____
Print Name: _____
Title: _____

STATE OF _____   )
                              )   SS:
COUNTY OF _____     )

This instrument was acknowledged before me this _____ day of _____, 2011 by _____ as _____ on behalf of Osage Wind, LLC, a Delaware limited liability company.

_____
Name(print):_____
              Notary Public

My Commission No. _____
Expires:

PLEASE AFFIX SEAL FIRMLY AND CLEARLY IN THIS BOX.

B-5

**CONFIDENTIAL**

OSAGE WIND-013707

CONFIDENTIAL

### SCHEDULE "1"
## TO AMENDED AND RESTATED MEMORANDUM OF LEASE AND EASEMENT
## <u>FOR A WIND ENERGY PROJECT</u>

LEGAL DESCRIPTION OF PROPERTY

**[to be provided]**

B-6

OSAGE WIND-013708

**CONFIDENTIAL**

## SCHEDULE "2"
## TO AMENDED AND RESTATED MEMORANDUM OF LEASE AND EASEMENT
## FOR A WIND ENERGY PROJECT

When recorded return to:

Osage Wind, LLC
c/o Wind Capital Group, LLC
Attn.: Real Estate Department
1430 Washington Avenue, Suite 300
St. Louis, MO 63103


STATE OF _____ )
                                 )
COUNTY OF _____     )


### NOTICE OF COMMENCEMENT OF LEASE

**THIS NOTICE OF COMMENCEMENT OF LEASE** ("Notice of Commencement") is made and executed as of the _____ day of _____, _____, by Osage Wind, LLC, a Delaware limited liability company ("Company"), for itself and on behalf of _____ ("Owner").

RECITALS

WHEREAS, reference is made to that certain Amended and Restated Lease and Easement for a Wind Energy Project dated as of the _____ day of _____, _____ (the "Lease"), by and between Owner and Company, whereby Owner granted to Company the right and option to lease certain real property located in Osage County, Oklahoma, and being more particularly described in Exhibit A attached hereto (the "Property"), which Lease is evidenced by a certain Amended and Restated Memorandum of Lease and Easement for a Wind Energy Project executed by Owner and Company, dated as of the _____ day of _____, _____, and recorded on the _____ day of _____, _____ as Document No. _____ in the real property records of Osage County, Oklahoma (the "Memorandum").

WHEREAS, pursuant to the terms of the Lease and Memorandum, in the event Company exercises its right and option under the Lease to lease the property from Owner, Company is authorized to execute and record this Notice of Commencement for the purpose of confirming and providing record notice of the exercise by Company of such right and option, the commencement of the Lease and the Lease Effective Date.


B-7


**CONFIDENTIAL**                                              OSAGE WIND-013709

**CONFIDENTIAL**

WHEREAS, pursuant to a letter dated as of the _____th day of _____, 2011, from Company to Owner, Company has exercised its right and option to lease the Property, on and subject to the terms of the Lease.

NOW THEREFORE, in consideration of $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants, agreements and conditions contained herein and contained in the Lease, Company and Owner agree as follows:

1.    **Definitions**.  Capitalized terms used but not otherwise defined in this Notice of Commencement shall have the same meaning ascribed to such terms in the Lease.

2.    **Lease**.  Owner hereby leases to Company, and Company hereby leases from Owner, the Property, on and subject to the terms of the Lease.  The term of Lease shall be twenty-five (25) years from the Lease Effective Date.  The Lease Effective Date is the _____th day of _____, 2011. Company has the right to extend the term of the Lease for an additional twenty (20) year period.

3.    **Covenants Running with the Land**.  Owner and Company agree that all of the covenants and agreements contained in the Lease touch and concern the Property and are expressly intended to, and shall, be covenants running with the land and shall be binding upon the Property and each party's present and future estate or interest therein and upon each of the parties, their respective heirs, administrators, executors, legal representatives, successors and assigns.

4.    **Notice and Binding Effect**.  It is understood that the purpose of this Notice of Commencement is to give notice of the Lease, the exercise of the option to lease by Company and the Lease Effective Date.  The Lease contains other terms and conditions set forth more fully therein.  All such terms and conditions of the Lease are incorporated herein by this reference.  The Lease is hereby ratified and confirmed as if the Lease were being re-executed by Company and Owner and recorded.  This Notice of Commencement shall bind and inure to the benefit of Owner and Company and their respective successors and assigns, and shall encumber the Property and shall be binding on Owner's successors-in-interest thereto and all persons claiming by, through or under Owner, subject to the express provisions of the Lease.  In the event of any inconsistency between the provisions of this Notice of Commencement and the Lease, the provisions of the Lease shall control.

[Signature page follows]

B-8

**CONFIDENTIAL**

IN WITNESS WHEREOF, Company has executed this Notice of Commencement of Lease and Easement for a Wind Energy Project as of the date and year first written above.

COMPANY:

OSAGE WIND, LLC,
a Delaware limited liability company

By: _____
Print Name: _____
Title: _____

STATE OF _____     )
                             )     SS:
COUNTY OF _____       )

   This instrument was acknowledged before me this ____ day of _____, _____ by _____ as _____ on behalf of Osage Wind, LLC, a Delaware limited liability company.

_____
Name(print):_____
     Notary Public

My Commission No. _____
Expires:




PLEASE AFFIX SEAL FIRMLY AND CLEARLY IN THIS BOX.

B-9

**CONFIDENTIAL**

CONFIDENTIAL

**EXHIBIT A**
**TO NOTICE OF COMMENCEMENT**
**OF AMENDED AND RESTATED LEASE AND EASEMENT**
**FOR A WIND ENERGY PROJECT**

LEGAL DESCRIPTION OF PROPERTY

CONFIDENTIAL

OSAGE WIND-013712