**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and | ) | |
| THE OSAGE MINERALS COUNCIL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-704-GKF-JFJ |
| | ) | |
| OSAGE WIND, LLC; | ) | |
| ENEL KANSAS, LLC; and | ) | |
| ENEL GREEN POWER NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY**
**JUDGMENT AND OPENING BRIEF IN SUPPORT**

# EXHIBIT 4

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3    UNITED STATES OF AMERICA,

 4         Plaintiff,
      and
 5
      OSAGE MINERALS COUNCIL,
 6         Intervenor-Plaintiff,
      vs.                               No. 14-cv-704-GKF-JFJ
 7
      OSAGE WIND, LLC,
 8    ENEL KANSAS, LLC;
      and ENEL GREEN POWER
 9    NORTH AMERICA, INC.,

10         Defendants.

11

12     ZOOM/VIDEOTAPED DEPOSITION OF 30(b)(6) WITNESS
                      STEPHEN PIKE
13          TAKEN ON BEHALF OF THE PLAINTIFF
       ON SEPTEMBER 30, 2021, BEGINNING AT 10:02 A.M.
14           ALL PARTIES APPEARING VIA ZOOM

15

16    APPEARANCES

17    On behalf of the PLAINTIFF:

18    Stuart Ashworth
      Cathryn McClanahan
19    UNITED STATES ATTORNEY'S OFFICE
      NORTHERN DISTRICT OF OKLAHOMA
20    110 West Seventh Street, Suite 300
      Tulsa, Oklahoma 74119
21    (918) 382-2772
      stuart.ashworth@sol.doi.gov
22    cathryn.mcclanahan@sol.doi.gov

23    (Appearances continued on next page.)

24    VIDEOTAPED BY:  Greg Brown

25    REPORTED BY:  Jane McConnell, CSR RPR RMR CRR
```

1   that summary and the specifics on those topics.  So,

2   yes, and I did speak with Mirko.

3        Q    Anyone other than Mirko and counsel that

4   you would have spoke to to prepare for this topic?

5        A    I'll think of the individual items.

6   Mirko on the modeling.

7             I had asked the question of our head of

8   engineering, Douglas Meneghel that I mentioned at

9   the beginning of this day, if he was involved in a

10  calculation for the removal cost.  He wasn't.

11            And I talked to Tom Leboutillier who did

12  perform the summary calculations for the removal of

13  the structures.

14       Q    I'm going to pull up what I've marked --

15  we're going to mark as Exhibit 209.

16            (Exhibit 209 marked for identification.)

17       Q    (BY MR. ASHWORTH)  This is the document

18  that we received at midnight last night or this

19  morning.  Please bear with me.  We'll zoom in.

20            Sir, have you seen this document before

21  on the screen?

22       A    I have.

23       Q    Do you know what this is?

24       A    This is a summary of an estimate of impact

25  if we were to remove the project.



1    Q    When did you first review this?

2         MR. BALL:  Objection to form.

3    A    So this table, the first time I reviewed

4    this table was during my preparation.

5    Q    (BY MR. ASHWORTH)  And when was that?

6    A    That was over the past few days as it

7    relates to this table.

8    Q    And over the past few days is the very

9    first time you would have reviewed this document;

10   is that correct?

11        MR. BALL:  Objection to form.  You can

12   answer.

13   A    Yes.  As it relates to this document, yes.

14   Q    (BY MR. ASHWORTH)  Was there any drafts

15   of this document that you would have reviewed?

16   A    There was a summary of these items in

17   one of our responses which is where this had come

18   from, but this draft was developed over the past

19   few days.

20   Q    Okay.  Who developed or created this

21   document?

22   A    I created -- I created this document from

23   the information that we had in -- that we had in a

24   response, the earlier response, interrogatory

25   response.

1      Q    Okay.  I just want to get some

2  explanations about this.  What is this first entry,

3  "free cash flow to equity"?  What does that mean?

4      A    So free cash flow to equity is the -- it

5  would be after the cash flow available to the equity

6  partners of the project.

7           So for every year, starting the year that

8  we take the facility down, that is the sum of the

9  cash flow payments that were assumed in what we call

10  our tax partner model for those years.  In this case

11  it was 2021 through the end of the life of the

12  project.

13      Q    This is the payment of money to the equity

14  owners of the project?

15      A    That is the estimated, the estimated

16  payments from the original model that we expect to

17  see in those years as cash flow to the equity

18  partners.

19      Q    And who are the equity partners?

20      A    So the partners for the -- the equity

21  partners for the project are two companies.  There's

22  the -- it's an Enel subsidiary, so I think it's

23  Osage Wind Holding is the holding company, and it

24  is made up of an Enel entity.

25           And then there was a GE entity.  I think

```
 1   it was EFS Osage Wind which had been bought out by a

 2   company called Apollo.  So today it's Apollo.

 3        Q    Okay.  I was kind of confused by that

 4   response.  This is all new to me.  So one of them

 5   would have been Osage Wind Holding.  Did you say

 6   Osage Wind Holding is comprised of Apollo or is

 7   Apollo --

 8             MR. BALL:  Objection; asking for a legal

 9   conclusion, but you can answer.

10        A    I'll try and clarify.  So Osage Wind

11   Holdings is the holding company of Osage Wind, the

12   project.  The Osage Wind Holdings is made up of two

13   entities.  One is an Enel entity and the correct

14   term is Enel Kansas, LLC.

15             And then the other entity is or was at

16   the beginning when they executed the agreement a GE

17   company.  It was called EFS Osage Wind, and their

18   interest has since been bought out by a company

19   called Apollo.

20        Q    (BY MR. ASHWORTH)  Okay.  So when you said

21   partner, equity partners, it's not two, it's one,

22   which is Osage Wind Holding, but then Osage Wind

23   Holding is owned by or was owned by two additional,

24   two other.  Is that --

25        A    Osage Wind Holding is made up of two
```



1    entities.  It's made up of --

2        Q    Is there any other equity partner other

3    than Osage Wind Holding?

4        A    Other than the two entities that I

5    mentioned, no.

6        Q    Okay.  And is Osage Wind Holding a

7    partnership or is it an LLC?

8            MR. BALL:  Objection to the extent it

9    calls for a legal conclusion.  You can answer.

10       A    To my knowledge, it's an LLC.

11       Q    (BY MR. ASHWORTH)  So here in this graph

12   you're representing that if the projects were to

13   be -- the wind farm to be removed, it would result

14   in roughly 133 million as I guess a write-down to

15   Osage Wind Holding, LLC?

16           MR. BALL:  Object to the form.

17       Q    (BY MR. ASHWORTH)  Is that what this is

18   explaining?

19       A    What this is explaining is that would be

20   the loss of the free cash flow revenue stream that

21   the equity partners expected to get that they would

22   not get coming from the generation of electricity,

23   salable electricity at the site.

24       Q    So this is a hypothetical number that is

25   not guaranteed; correct?



1              MR. BALL:  Objection to form.

2        A     It is not a guaranteed number.  It is an

3   estimate that is based on the average wind

4   generation for the facility.  So the generation

5   varies slightly from year to year, but this would be

6   based on the estimated energy, again, verified by an

7   independent engineer, and then the power purchase

8   rate that would be part of our power purchase

9   contract.

10             So the sum of those would be the revenue

11  stream and then minus the expenses which would be

12  the operation and maintenance of the facility.

13       **Q     (BY MR. ASHWORTH)  So this number, this**

14  **approximately 133 million, that is not an expense**

15  **for something that the defendants would have to pay;**

16  **correct?  It's just a loss, a potential loss of**

17  **future income?**

18             MR. BALL:  Objection to form and objection

19  to the extent it calls for a legal conclusion.  You

20  can answer.

21       **Q     (BY MR. ASHWORTH)  Is that correct?**

22       A     It is both.  So it is a portion of that.

23  Again, it's based on the free cash flow.  There

24  will be a payment or there would be a specific

25  payment to the preferred equity holder if the



```
 1   project did not continue to exist.  So the GE
 2   entity has a preferred right, and I think that
 3   that is I'll call it roughly 31, 32 million of
 4   that 133,000 -- or 133 million.
 5        Q    So the GE part of their equity I guess
 6   is -- is that like a loan that they're expecting or
 7   they're required to pay a certain amount?
 8             MR. BALL:  Objection to form.
 9        A    I think the best way to look at it is
10   like a loan.  There would be a requirement for us
11   to reimburse GE for the $31 million or $32 million
12   amount if we were to stop operating the project.
13   I agree the best way to look at it is like a loan.
14   So it's a preferred -- it's a preferred equity
15   interest, but you can look at it as a loan.
16        Q    (BY MR. ASHWORTH)  If the wind project
17   or the wind farm were to cease operations, the
18   defendants would only be required to pay this
19   approximately $31, $32 million to this GE entity;
20   correct?
21             MR. BALL:  Objection to form.
22        A    It's a lot more that would have to be
23   paid if we cease to operate, but as specific to the
24   133 million?
25        Q    (BY MR. ASHWORTH)  Yes.
```



1      A      That is the makeup of the revenue stream,

2   and if that revenue stream didn't exist, we would

3   have to reimburse GE the 31, 32 million.

4      **Q      The defendants would not be paying the**

5   **remaining approximately $100 million, that's not an**

6   **expense they'd have to pay relative to this entry?**

7      A      It would not be a payment we would have to

8   make.  It would be a loss of the revenue that the

9   project was intended to provide based on the

10  investment.  So it would be a loss of revenue.

11     **Q      It would be a loss to some third party**

12  **and not to the defendants?**

13           MR. BALL:  Objection; mischaracterizes the

14  witness' testimony.

15     A      The loss comes to Enel Kansas which I

16  think is a defendant.

17     **Q      (BY MR. ASHWORTH)  The last line it says**

18  **"cash out to tax partner (JPM)."  What does that**

19  **mean?  Is JPM JP Morgan?**

20     A      Yes.  You are correct.  JPM is JP Morgan.

21     **Q      What does "cash out to tax partner" mean?**

22     A      So with a wind farm, there are typically

23  tax partnerships that are entered into that monetize

24  the revenue stream from the production tax credits.

25  So there is a federal production tax credit that a



1  wind farm is eligible to receive based on the amount

2  of energy it produces.

3          So we would do a tax partnership with an

4  entity that could use the tax credits, and it's

5  structured in a way where they enter into the

6  agreement for an amount and then receive the

7  benefits back over time through the credits and

8  then through a residual interest in the project.

9      **Q    So did JP Morgan pay for or provide money**

10  **to the defendants in order to become their tax**

11  **partner?**

12      A    Yes.  JP Morgan would have as part of the

13  entering in as a tax partner made a payment to

14  become part of the project, yes, to receive the --

15      **Q    How much did they make?**

16          MR. BALL:  How much did they pay?  Is that

17  the question?

18          MR. ASHWORTH:  Sorry.  That's correct.

19      **Q    (BY MR. ASHWORTH)  How much did they pay?**

20      A    I am not aware of the amount, amount paid.

21  I'm only aware of the amount we would have to pay if

22  we ceased to operate the project.

23      **Q    So if the operation is -- if the wind farm**

24  **is ceased, the defendants would be required to pay**

25  **$90 million to JP Morgan to reimburse JP Morgan as**



1   **lack of receiving the tax credit; is that your**

2   **testimony?**

3       A    Yes.  So my testimony is that we would

4   have to pay JP Morgan for breaking the agreement to

5   provide the tax credits and residual interest in the

6   project.  So the model calculates that.

7            So there would be -- from the beginning

8   of the project we started generating credits, they

9   got some benefit.  This is a calculation based on

10  stopping 2001 for the remainder of what they're

11  entitled to for revenues coming from the project,

12  and the tax partner is structured in a way the

13  agreement requires us to pay them for that future

14  benefit if we break the agreement.

15      **Q    And what document did you review to**

16  **determine this amount, this $90 million amount?**

17      A    I reviewed the document that we provided

18  which is a part of what we call our tax partner

19  model which shows -- the revenue stream shows the

20  tax distributions, and it shows a calculation of

21  what the balance that JP Morgan would be entitled to

22  which I think in the model shows to be 95 million,

23  but there was an estimate that we could negotiate

24  and close it at probably an amount slightly lower

25  than that.  So we used an estimate of 90 million.



Stephen Pitre                                                                          13

1       Q    Did you review the actual agreement

2   between JP Morgan and the defendants relative to

3   this tax partner agreement?

4       A    I did a cursory overview of the LLC

5   agreement that forms the tax partnership but relied

6   on Mirko Lapenta that I mentioned earlier who's an

7   expert in this agreement to summarize what the

8   damage approach would be.

9       Q    And this contractual agreement to that

10  contract, it's called an LLC agreement?  What

11  agreement is this called?

12      A    So the agreement, the agreement would be

13  the LLC, Osage Wind, LLC agreement which is how they

14  enter into the project.

15      Q    And that was between Osage -- who were the

16  parties to that agreement?

17      A    So I guess I would have to -- I would have

18  to look.  I do have that available.  I could look at

19  the parties if necessary, but my recollection is the

20  holding company and then JP Morgan.

21      Q    So if the wind projects were to have to

22  be -- if the wind farm were to be removed, who would

23  actually be responsible for paying this?  Would it

24  be Osage Wind Holding or Enel Green Power North

25  America, Enel Kansas, Osage Wind, LLC?



```
 1        A     So it would be the project that would be

 2   obligated to pay it which would be Osage Wind, LLC.

 3        Q     Okay.  The next line, "PPA liquidated

 4   damages, AECI," what is this line?

 5        A     So we have a power purchase agreement with

 6   AECI where we sell our power and obligates us to

 7   sell power to them.  There is a clause in there that

 8   if we terminate, we need to reimburse them for

 9   damages.  There -- in that agreement there is a

10   clause relative to availability, guaranteed

11   availability damages.  So we guarantee that we're

12   going to be generating a certain portion of the

13   time, calculated on a percentage.  And if the

14   project was removed, we would not be able to honor

15   and fulfill that part of our agreement.

16             There is a clause in there that says the

17   liquidated damages are $2 million a year and then --

18   up until year 12, then after year 12 the damage and

19   damage cap no longer apply.  So that would be the

20   last.  So that would be three years at $2 million.

21             The other damage that we could owe on that

22   but we have determined is not going to be owed is if

23   for some reason they had to replace the power that

24   they were expecting to get from us, they would --

25   they would be entitled to a difference between our
```

1    power purchase price and what they would have to

2    buy it back for, and that was determined to be

3    negligible based on today's power prices.

4        Q    Is there any force majeure clause in the

5    agreement that you reviewed which provides for these

6    liquidated damages?

7             MR. BALL:  Objection to form.

8        A    So there is a force majeure clause in the

9    agreement.  I don't believe it would relate to these

10   damages.

11       Q    (BY MR. ASHWORTH)  Okay.  Is there a force

12   majeure clause in the agreement between JP Morgan

13   and Osage Wind Holding relative to the $90 million

14   payment?

15       A    I am not aware of any force majeure clause

16   relative to the 90 million.

17       Q    Is there a force majeure clause in the LLC

18   agreement in general with JP Morgan?

19       A    I would have to look at the agreement.

20   A force majeure clause is a typical part of the

21   agreement.  I can look at the agreement if

22   necessary, but a force majeure clause is a typical

23   clause.

24       Q    The next line is "GIA liquidated damages"

25   for approximately 19 million.  What's that?



Stephen Pike

1      A     So we have a generator interconnection

2   agreement.  That's what GIA stands for which allows

3   us to connect to the local grid.  In connecting to

4   the local grid, before the project is built there's

5   an assessment done of what network upgrades there

6   would need to be for the project to be built.  So

7   there was an assessment done, and in this case that

8   amount of network upgrades that we had to perform

9   was 22,500,000.

10           Then the partner, the counterparty to the

11   interconnection agreement, reimburses that and then

12   gets the value of that back over the life of the

13   project.  So it gets that spread out in equal

14   payments over the life of the project, over the

15   life of the interconnection agreement.

16           So this 19 million is made up of two

17   pieces.  One is called the undepreciated portion of

18   that 22 1/2 million that the interconnection party

19   AECI had paid for the network upgrades that will no

20   longer get value for them.  So that is close to 17

21   million of that.

22           Then the balance is just an estimated cost

23   to remove the facilities that we would need to do if

24   we -- if we remove the project, we would need to

25   remove the improvements that were done on the system

1    as well.

2         Q    So the improvements to the system is

3    separate from -- scratch that.

4              What agreement/contract provides for these

5    damages?  What's the name of the contract?

6         A    So the contract is large generator

7    interconnection agreement.  It would be between

8    Osage Wind and AECI.

9              I believe it had Bates stamped.  I looked

10   at it, and I believe it had Bates stamped on it and

11   was submitted.

12        Q    And there's a provision in there that

13   indicates that if you were to cease operations, that

14   you would be required to remove the infrastructure?

15        A    There are two provisions in there.  One,

16   that we would have to make the counterparty whole

17   on the undepreciated portion of the improvement,

18   and we would have to disconnect -- disconnect our

19   facilities which would be disconnecting and removal

20   of the specific improvements related to our

21   facility.

22        Q    Let's say that removal, you all did not

23   remove by court order, but in year 2040 the wind

24   farm comes to its natural conclusion, you'll be

25   removing these improvements on your all's side



1    regardless; is that correct?

2          MR. BALL:  Objection to form; assumes

3    facts not in evidence.  You can answer.

4      A    Yeah.  What is more typical is at that

5    point in time all the improvements would be fully

6    depreciated, fully written off.

7          Unless required, we probably would not

8    remove -- or we would disconnect still, we would

9    have an obligation to disconnect.  We would remove

10   what was required or necessary.

11         Again, that's a small portion of the

12   19.3 million.  I think it's 2 or 2.4 of that.

13     Q    (BY MR. ASHWORTH)  So are you saying

14   that you would -- you would have to remove those

15   improvements now if the project would be

16   disconnected, but in the future you wouldn't have

17   to remove it because the items were already

18   depreciated?

19         MR. BALL:  Objection to form.  You can

20   answer.

21     A    Yeah.  It's an assumption that we made

22   since they have the right to ask us to disconnect

23   our facilities, and those were part of our

24   facilities that they would make us remove them.

25         So of that 19, again, roughly 2 million



 1    is that cost and the assumption that we believe they

 2    would exercise their right to have us remove those

 3    improvements.

 4         Q    (BY MR. ASHWORTH)  So thank you.  That's

 5    speculation, the numbers and costs are speculative;

 6    is that correct?

 7              MR. BALL:  Objection to form.  It

 8    mischaracterizes the witness' testimony.  You can

 9    answer.

10         A    We made an assumption since they have the

11    right, they would exercise the right, and that was

12    the estimated cost for the removal.

13         Q    (BY MR. ASHWORTH)  So you're speculating

14    that they would require you to remove?

15              MR. BALL:  Objection to form and

16    argumentative.  Sorry.  Go ahead.

17         Q    (BY MR. ASHWORTH)  Is that yes?

18              MR. BALL:  And asked and answered.

19         A    I am speculating that they would exercise

20    their rights in the contract to have us disconnect

21    and remove those facilities.

22         Q    (BY MR. ASHWORTH)  What about this next

23    line, "leases LD and other commitments"?

24         A    So we have six leases on the project with

25    landowners that allow us to have the facilities



1    there.  In that lease there is a termination amount

2    of $10,000 for each of the leases.  So it's the six

3    leases times $10,000 per lease.

4        Q    And is there a force majeure clause in

5    those leases?

6        A    I don't recall if there is.  I would have

7    to look at the leases.

8        Q    Okay.  Is there any insurance that may be

9    applicable to pay for any of these damages if the

10   wind project would have to cease operations?

11       A    I'm not aware of any insurance that would

12   cover the voluntary removal of the wind project.

13       Q    We're not talking about voluntary removal.

14   We're talking about court ordered.  Is there any

15   insurance that would pay for any of these alleged

16   expenses if the wind farm were forced to close?

17       A    Again, I'm not aware of any insurance

18   policy that we would have that would pay for the

19   court-ordered removal of this facility.

20       Q    Okay.  Next line, "cash out dismantling

21   in 2021."  I think that's a -- refers to a different

22   document that I'll refer to later.

23            The bottom line says, "net financial

24   impact (cash)" of approximately $258 million.  Is it

25   your testimony that this is the impact for the total



1   **expense minus the approximate 100 million to the**

2   **equity partners, this is what the amount the**

3   **defendants would have to pay if the wind project**

4   **were ordered to be removed?**

5          MR. BALL:  Objection to form, and you can

6   answer if you understand the question.

7     A    Yeah.  What the $258 million represents is

8   the financial impact to Osage Wind if the project

9   had to be removed.

10    **Q    (BY MR. ASHWORTH)  And that impact would**

11  **be as to which of the defendants?  All of the**

12  **defendants or just some of them?**

13         MR. BALL:  Objection to form.

14    A    Could you refresh me on -- you had

15  mentioned three entities as the defendants.  Can you

16  just refresh me so I'm sure I answer your question

17  correctly?

18    **Q    (BY MR. ASHWORTH)  Sure.  Enel Kansas,**

19  **Osage Wind, LLC, and Enel Green Power North America.**

20    A    So all of the defendants would be impacted

21  by the removal of the facility, all three of those

22  entities.

23    **Q    Well, my question is as to this number,**

24  **this bottom line number of approximately 258 million**

25  **minus the 100 million that we discussed going to the**

