**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, and THE OSAGE MINERALS COUNCIL, ) ) ) | |
| Plaintiffs, ) ) | |
| vs. ) ) | Case No. 14-CV-704-GKF-JFJ |
| OSAGE WIND, LLC; ENEL KANSAS, LLC; and ENEL GREEN POWER NORTH AMERICA, INC., ) ) ) ) ) | |
| Defendants. ) | |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AND OPENING BRIEF IN SUPPORT**

# EXHIBIT 9

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
     UNITED STATES OF AMERICA,
 3

 4              Plaintiff,

 5   and

 6   OSAGE MINERALS COUNCIL,

 7              Intervenor-Plaintiff,
     vs.                              No. 14-CV-704-GFK-JFJ
 8
     OSAGE WIND, LLC; ENEL KANSAS,
 9   LLC; and ENEL GREEN POWER
     NORTH AMERICA,
10

11              Defendants.

12   VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF BILL MOSKALUK
                TAKEN ON BEHALF OF THE PLAINTIFF
13                ON JUNE 16, 2021 AT 10:00 A.M.

14                       APPEARANCES

15   On behalf of the PLAINTIFF:
     Stuart Ashworth
16   Cathryn D. McClanahan
     Nolan Fields
17   UNITED STATES ATTORNEY'S OFFICE
     Northern District of Oklahoma
18   110 West 7th Street, Suite 300
     Tulsa, Oklahoma  74119
19   918.382.2700
     stuart.ashworth@sol.doi.gov
20

21   (Appearances continued on the following page)

22   ALSO PRESENT:  Megan Beauregard, Michelle Hammock, &

23   Christina Watson

24   VIDEOTAPED BY:  Megan Smith

25   REPORTED BY:   Abby Rhodes, CSR, RPR
```

```
 1        Q    Okay.  Would you -- this had been the very
 2   first time that you would have seen the information or
 3   knew about the information that was presented in the
 4   declaration?
 5             MR. RAY:  Object to form.
 6             THE WITNESS:  Yes.
 7        Q    (By Mr. Ashworth) Okay.  When the
 8   declaration was given to you, were you able to ask any
 9   questions, if you had them?
10        A    If I had them, yes.
11        Q    Do you know if you had any questions when
12   you -- before signing the declaration?
13        A    I -- I really can't recall.
14        Q    Okay.  Did you make any changes to the
15   declaration before you may -- before you signed it?
16        A    I -- I don't recall if I did or not.
17        Q    We'll go back to the declaration, the same
18   section on -- under paragraph or subparagraph two
19   little I in paragraph 15 on -- there we go.  Right
20   there.  A little bit down.  All the way down so we can
21   see subparagraph two little I.  Two little I.
22             It says "After the foundations are built and
23   cured, the crushed rock and soil is returned to the
24   hole from which it came."
25        A    True.
```

```
 1   don't know.
 2          As I stated before, you can use this
 3   material if we didn't have the restrictions in place.
 4   This is just a -- like a boilerplate type requirement
 5   on the project.
 6       Q   Okay.  So when you say this is a boilerplate
 7   requirement for the project, are you indicating that
 8   it's kind of a loose requirement that doesn't have to
 9   be filled -- followed?
10          MR. RAY:  Object to form.
11          THE WITNESS:  I don't think it was intended
12   to be followed, actually, because of the restrictions
13   that we had.  Other than that, I -- I don't really
14   know.
15       Q   (By Mr. Ashworth) Okay.  But nowhere in your
16   declaration did you indicate that there was a scope of
17   work that would have allowed the crushed rock to be
18   used for something other than backfill?
19          MR. RAY:  Object to form.
20          THE WITNESS:  Yes.
21       Q   (By Mr. Ashworth) Okay.  We're going to go
22   to subparagraph, it's little numeral -- numeral
23   number -- or I'm sorry, numeral five which is on page
24   5.  Oh, I'm sorry, it's declaration.  Page 5, little
25   numeral five.  One page down.  In this section, I'm
```



```
 1   going to look at the -- the second sentence, it says
 2   "No sand, soil, or rock from any excavation is used
 3   for any purpose other than to return to the hole from
 4   which it came."
 5            What does that sentence mean to you?
 6   A      Exactly that, that it was to remain there.
 7   Q      That the sand, soil, and rock that was
 8   excavated, so the excavated material, the only purpose
 9   for the excavated material was to be used as backfill
10   to the hole from which it came from; is that right?
11   A      Yes, that's my interpretation, yes.
12   Q      Okay.  So you're telling the Court that the
13   excavated material was only going to be used for
14   backfill or for no other purposes?
15   A      As long as the material stayed on that
16   designated site, yes.
17   Q      Okay.  But, in fact, this excavated material
18   was used for some -- for a purpose other than
19   backfill; is that correct?
20            MR. RAY:  Object to form.
21            THE WITNESS:  In some cases it was spread
22   around the turbine site itself, yes.
23   Q      (By Mr. Ashworth) When it was -- so when it
24   was used as backfill, it was also being used for
25   structural support for the wind tower; is that
```



```
 1   correct?
 2       A    The backfill material was for the structural
 3   support.  The other area was for drainage that we
 4   built up draining it away from the turbine itself, and
 5   a portion of that in that little access road and apron
 6   around the terminal -- around the turbine, but it
 7   didn't leave that particular site, to my knowledge.
 8       Q    Did you tell the Court that the material is
 9   being used for structural support in your declaration?
10            MR. RAY:  Object to form.
11            THE WITNESS:  I don't think so, no.
12       Q    (By Mr. Ashworth) Do you think it would have
13   been important for the Court to know that Enel Green
14   and Osage Wind was using the backfill material for
15   structural support?
16            MR. RAY:  Object to form.
17            THE WITNESS:  I -- I don't know the answer
18   to that.
19       Q    (By Mr. Ashworth) Okay.  Let me re-ask it
20   this way:  Do you know if it would have been important
21   for the Court to know that the materials that were
22   excavated on site was being used for structural
23   support for the wind tower?
24            MR. RAY:  Object to form.
25            THE WITNESS:  I -- I don't -- I don't know
```

```
 1   that answer.
 2        Q    (By Mr. Ashworth) Okay.  Is the reason why
 3   you failed to tell the Court in your declaration that
 4   the purpose for the excavated material to be used was
 5   for structural support?  Is that reason -- scratch
 6   that.
 7             Is the reason why you said that -- did not
 8   say that was to help Enel Green defeat the request for
 9   injunction?
10        A    I don't --
11             MR. RAY:  Object to form.
12             THE WITNESS:  I don't think that was the
13   intent, no.
14        Q    (By Mr. Ashworth) Okay.  Under the --
15   paragraph underneath there, right under the page, it
16   says "No excavated rock or sand is sold or used for
17   commercial purposes."
18             Is that -- was that a correct statement?
19        A    Yes.
20        Q    Okay.  You separate sold and commercial
21   purposes.
22             When you're saying not used for commercial
23   purposes, are you meaning that the rock and sand were
24   not being used to advance any economic purpose of Enel
25   Green?
```

```
 1        Q    No worries.
 2             I said how would you define a borrow pit?
 3        A    Material where I could take material out of
 4   and use for around the project.
 5        Q    And is it typical to have a borrow pit on
 6   site during the construction of a wind farm?
 7        A    It's always a nicety.  It --
 8        Q    Do you -- oh, go ahead.
 9        A    It will save you a lot of costs in trucking
10   if it -- if it was right there on site.
11        Q    Is that something that you would normally
12   expect the -- the subcontractor, for instance in this
13   case IEA, to create as a part of their work in -- in
14   constructing the wind farm?
15        A    No.  I think it has to be designated ahead
16   of time, the borrow areas on the project site.
17        Q    Do you know, were there borrow pits used or
18   created for -- for this construction, for the
19   construction of the Osage Wind farm?
20        A    No.
21        Q    Do you --
22        A    I --
23        Q    Go ahead.
24        A    -- I don't think we had one.
25        Q    Was that a decision -- was the decision to
```

1  remove ANY soil from the project site or use site
2  materials in lieu of materials we would typically buy
3  off site in developing a wind project.  Osage Nation
4  has mineral rights for the project lands and removal
5  of soil especially for commercial gain could
6  constitute mining."
7          Is that -- so I'm just reading there from
8  Aaron's e-mail.  Is that -- does Aaron's statement
9  here, is that in accordance or does that agree with
10 your understanding of what the restrictions were at
11 the time of construction of the Osage Wind farm?
12         MR. RAY:  Object to form.
13         THE WITNESS:  Yes.
14    Q    (By Ms. Nagle) And I know you're not copied
15 on this e-mail, but did -- did anyone ever communicate
16 that to you?
17    A    Communicated it, yes.  Yes, they have.
18    Q    Do you remember -- oh, sorry.  Go ahead.
19    A    Yeah, it -- it was Bill Price who -- who
20 told me that.  He wanted to make sure that I knew that
21 I was not to remove any materials from site in any
22 manner or form.  I knew that.
23    Q    And did Bill Price tell you that we -- that
24 you were also not to use site materials in lieu of
25 materials that could be bought or purchased off site?



1      A    No, he did not.

2      Q    He did not tell you that.  Okay.

3           Now, further on down in this e-mail from

4  Aaron Weigel, he writes "Please make sure this message

5  is widely communicated to any subcontractors working

6  on the project."

7           Do you recall anyone at EGPNA asking you to

8  communicate, make sure that the folks at IEA

9  understood the message that Aaron Weigel is sharing

10 here in this e-mail?

11     A    No.

12     Q    Okay.  Do you have any memory of anyone at

13 EGPNA, other than Bill Price, communicating to you

14 that it was important to not use the site materials in

15 lieu of materials that could be purchased off site?

16     A    No.

17     Q    Okay.  Now, I think earlier you did mention

18 that one of the restrictions you understood at the

19 time was that you were not allowed to take site

20 materials and -- and move them across the wind farm

21 and use them elsewhere.

22          Can you explain to me -- is that -- is that

23 a correct understanding of what you understood to be

24 the limitation at the time?

25     A    Yes, it -- all the material that we, say,



```
 1   excavated from the turbine site or that particular
 2   turbine site had to remain right there.  I couldn't
 3   use that material any place on the job site other than
 4   that hole.
 5        Q    So your understanding was you -- you -- you
 6   could take the minerals out of the ground, but you had
 7   to put them right back where you got them; is that
 8   correct?
 9        A    Correct.
10        Q    Was your understanding that it was
11   permissible for EGPNA to -- to do that and crush the
12   materials before putting them back in the ground?
13        A    I caught a little bit of that but I didn't
14   really understand --
15        Q    Sure.
16        A    -- the last part.
17        Q    So I guess let me rephrase and ask a better
18   question.
19             Did anyone ever express to you, anyone from
20   EGPNA ever express to you any limitations on rock
21   crushing?
22        A    No.
23        Q    Okay.  Let's see here.  Okay.  So I'm now
24   going to show you a different document so if you'll
25   give me just a second to pull that up.  I'm going to
```



```
 1   materials in lieu of materials we would typically buy
 2   off site in developing a wind project.  Osage Nation
 3   has mineral rights for the project lands and removal
 4   of soil especially for commercial gain could
 5   constitute mining."
 6            Does it -- does this sound familiar to you,
 7   this -- this statement and this understanding of what
 8   was permissible and what was not?
 9            MR. RAY:  Object to form.
10            THE WITNESS:  Partially, yes, but, like I
11   said, I'm not familiar with this one, with all... any
12   soils from the site and I never heard of using the
13   materials in lieu of materials from -- we had
14   typically bought off site.  I've -- I've never heard
15   that before.
16       Q    (By Ms. Nagle) Okay.  And did you -- did
17   Joan Heredia ever communicate directly with you about
18   any limitations in constructing the Osage Wind farm?
19       A    She visited the job site I believe once and
20   we had a conversation basically in regards to this.
21   She asked me if I was removing any of the material off
22   site and I said no.  She basically said, well, good.
23       Q    Mmm-hmm.
24            Do you -- do you recall when that visit was,
25   what month it would have been?
```



```
 1        Q    And was he with IEA?
 2        A    Yes, he was.
 3        Q    Okay.  And it looks like below, we've got
 4   this -- at the very bottom we've got this e-mail here
 5   from Brian Jensen.
 6             Do you recall who Brian Jensen was?
 7        A    Yes, he worked for Tradewinds.  In what
 8   capacity, I'm -- I'm not really sure.
 9        Q    Okay.  Did you ever interact with him while
10   working on the Osage Wind farm?
11        A    I might have talked to him a couple of
12   times.  Nothing pertinent but...
13        Q    Sure.  He writes here in his July 9, 2014,
14   e-mail, that "And as we have discussed in the past, we
15   will not be able to transport fill from one part of
16   the project to another due to Osage Nation mining
17   laws."
18        A    Right.
19        Q    Does that conform with your understanding of
20   what some of the limitations were at the time of
21   construction?
22        A    Yes.
23        Q    Okay.  And let's see here.  Let me keep
24   going.  What was your understanding, though -- you
25   told me that Steve Champagne had -- had told you that
```

```
 1        Q    Okay.  And I -- I think just a little bit
 2   further down on September 30th, Bill Price writes here
 3   "The large rocks removed from the excavation works is
 4   being crushed and reused for backfill.  This is normal
 5   as we do not want to dispose of the large excavated
 6   rocks (possibly would then be considered mining) and
 7   cannot use large rocks for backfill.  We are basically
 8   putting them back where we removed them - just in
 9   smaller pieces."
10        A    Yes.
11        Q    Does that -- is that -- does that sound like
12   what your -- your understanding of what the
13   construction process was at the time?
14        A    Yes.
15        Q    Okay.  Did you at the time or do you now
16   have an understanding of why disposal of large
17   excavated rocks would be considered mining?
18        A    No, I don't.
19        Q    Okay.  That's fine.
20             Bill also writes "We are expecting to be a
21   week delayed on GE WTG deliveries and any further
22   stoppages will...... you get the picture."
23             Do you know what WT -- I know what GE -- I
24   would assume GE means General Electric.
25             Do you know what WTG stands for?
```