IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, and THE OSAGE MINERALS COUNCIL, <br><br> Plaintiffs, <br><br> vs. <br><br> OSAGE WIND, LLC; ENEL KANSAS, LLC; and ENEL GREEN POWER NORTH AMERICA, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 14-CV-704-GKF-JFJ

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AND OPENING BRIEF IN SUPPORT**

# EXHIBIT 11

```
         IN THE UNITED STATES DISTRICT COURT FOR THE
                  NORTHERN DISTRICT OF OKLAHOMA




UNITED STATES OF AMERICA,

         Plaintiff,

and

OSAGE MINERALS COUNCIL,

         Intervenor-Plaintiff,


-vs-                              Case No. 14-CV-704-GFK-JFJ

OSAGE WIND, LLC; ENEL KANSAS,
LLC; and ENEL GREEN POWER
NORTH AMERICA, INC.,

         Defendants.




         VIDEOTAPED DEPOSITION OF ROBERT C. FREAS

            TAKEN ON BEHALF OF THE DEFENDANTS

        ON APRIL 19, 2021, BEGINNING AT 10:04 A.M.

                         VIA ZOOM




REPORTED BY:  Shannon S. Harwood, CSR, RPR, CRR
```

Professional Reporters
800.376.1006

         nearby and you could -- if you had rail available, you
         could ship it quite a long distance for railroad
         ballasts or -- or more durable kind of rocks, but no,
         there's -- there -- otherwise, there's a fairly local
         business.
             Q.    Okay.  And are there any rocks or -- or
         materials at the Burbank Quarry?
             A.    No, it's limestone, shale and clay.
             Q.    Okay.  And is there any rail available?
             A.    No.
             Q.    We're going to turn now just to a -- a brief
         discussion of the RMT report.  I know you relied on this
         extensively.  Do you agree with RMT's discussion of the
         geologic setting?
             A.    Yes.
                   MR. ASHWORTH:  Object to form.
             Q.    (By Ms. Stevenson)  Did you have any
         objections or -- or corrections that you may make to how
         RMT described the geologic setting of the wind project?
             A.    No, not particularly.
             Q.    Okay.  Did you review other geologic studies
         that were conducted by Osage Wind?
             A.    No, RMT was the only report I looked at.
             Q.    Okay.  So you did not review the 2014 Terracon
         report?

1   aware if the contractors crushed any of the limestone
2   that they excavated?
3        A.   The only place that I'm aware that they
4   absolutely did was on the wind towers, the wind tower
5   foundations.
6        Q.   And are you aware with respect to the towers,
7   the collector -- collector system, the substation, the
8   transmission line, if materials that were excavated were
9   returned to the excavated hole?
10       A.   I am not.  I'm making the assumption at least
11  some of the material was used, because when I was on
12  site, there was no -- there were no stock piles anywhere
13  of unused material.  It didn't appear that material had
14  been stockpiled or stored and there was no reference in
15  any of the construction documents that I saw of excess
16  material being hauled away.
17       Q.   I'd like to turn now to your expert -- back to
18  your expert report and I'd like to discuss the -- how
19  you calculated the volume of materials that were
20  excavated.  So what -- what was the total volume of
21  materials excavated that you determined?
22       A.   I have to look at my report and I believe on
23  page 7, at -- at the bottom of the page, second
24  paragraph from the bottom, it says, "Combining all of
25  this data, it was determined that the excavation of 84

1  wind turbine tower foundations," and I'm just talking
2  about the tower foundations, "comprised a total of
3  4,343,587 cubic feet which is equivalent to 160,874
4  cubic yards of material, which includes a total of
5  94,670 cubic feet (3,506 cubic yards) of material
6  excavated to accommodate a place with a structural
7  fill."
8      Q.   And can you walk us through, please, what
9  documents you reviewed and relied upon to reach this
10 total amount of material for the foundation?
11     A.   I reviewed the turbine foundation drawings and
12 specifications that I'd referenced earlier.  I believe
13 it's Drawing 488 S1, 2 and 3, as well as the RMT report
14 and their references in there to how material was to be
15 placed back into the foundation -- over the foundations
16 and I believe that's -- most of that is in Section 4 of
17 that report, if I remember.
18     Q.   Okay.  And I -- I guess I -- I -- I need a
19 little bit more -- more help on that.
20     A.   Okay.
21     Q.   How do we take this -- how do we take this
22 information and what did you pull from it to get this
23 4,600,000-some cubic feet of material that was removed
24 for the wind turbine towers?
25     A.   The base part of it starts with the fact that

1   both Mr. Pfahl and I used similar calculations.  I
2   believe he used a 70-foot diameter.  I took the 52-foot
3   ring, there was a 52-foot ring, which was used for the
4   base of the thing -- of the foundations.  That was in
5   one of the purchase orders.  The 52-foot ring and then
6   from all the pictures that I had, it was obvious that
7   they had a work area that extended beyond the ring all
8   the way around.
9            In one picture, there were a few men that were
10  in there.  I did my level best to scale off based on
11  the -- the anticipated height of a man, what that was
12  and I determined that it was probably about eight feet,
13  which made the total width or the total diameter of the
14  -- of the circle around the foundation 68 feet.  As I
15  said, Mr. Pfahl I believe used 70 feet.
16           So I had 52, feet plus eight foot on either
17  side, and that gave you a base unit of -- times 10-foot
18  height and you calculate that, set that number aside.
19  And then I did -- if you look back at the report and you
20  look at the drawings, most of the drawings -- the
21  drawings indicate a one-to-one compaction limit on the
22  sides for the material being placed back in the hole.
23  You'll notice in the drawings, there's a -- a line that
24  goes at a slight angle away from the foundations and in
25  the RMT report, they set a two-to-one excavation for the

1  un -- the -- the material that was not limestone or
2  wouldn't stand at a one-to-one angle.
3              I went through each of the drill holes for
4  each of the foundations and determined that there were
5  approximately 15, there could have been more, could have
6  been less, but I determined 15 based on my own
7  experience that would have been used at a two-to-one
8  slope rather than a one-to-one slope.
9              Again, looking at the Dykon drill pattern that
10 they laid out for their blasting, it -- it was all
11 consistent with that, and so I used a one-to-one side
12 slope from the ring out, as well as a two-to-one slope
13 on 15.  So taking that's, what, 15 from -- from 84,
14 what, 59 holes, something -- 69 -- 70 -- 69 holes,
15 whatever it was.  At any rate, use 15 holes that I had
16 two to one, the rest of them were one-to-one slope.
17             Well, you calculate that and add it to the
18 base, and then the last thing I did was, again, look at
19 each individual foundation and using, again, my
20 engineering geology background and experience in -- in
21 -- in mining determined that there was -- there were
22 areas where they would have had to put structural fill.
23             I went back and looked at the Sanderfoot
24 volumes of concrete placed and -- and -- and gravel used
25 and tried to confirm that there was more material used

1  in some holes than others, and based on that, came up
2  with the 3,506 cubic yards of additional excavation over
3  and above the drawings for structural fill.
4          Putting those three -- three numbers together,
5  I came up, then, with the 160,874 cubic feet -- or cubic
6  yards or 4,343,587 cubic feet.
7     Q.   Okay.  Thank you.  And you have to remember,
8  you're -- you're working with a lawyer here, so I -- I
9  have some questions that may seem very basic to you.
10    A.   That's fine.
11    Q.   You said -- you said based -- based on your
12 experience, approximately 15 of the foundation sites
13 were compacted at a two-to-one level rather than a
14 one-to-one.  Can you -- what experience is that based
15 on?
16    A.   Let -- let me correct your observation first.
17 I'm looking at how it was excavated to --
18    Q.   Okay.
19    A.   -- a two to one, because the side slopes on
20 the -- on the holes where you have material that's not
21 -- not limestone all the way to the top, you have to lay
22 them back at an angle of repose or a side slope that
23 will be appropriate for the work environment.  So that
24 -- whether you're looking at OSHA specifications or --
25 or general health and safety, you don't want material

1  screening, they didn't just screen limestone.  They
2  screened shale.  They screened clay.  They screened
3  everything that came out of that hole in order that
4  there was no oversight, so yes, they -- they screened,
5  they may not have crushed, but they screened shale.
6       Q.   And did they also screen clay?
7       A.   They had to.
8       Q.   Did you find any note that there was crushing
9  done of clay or shale?
10      A.   No.
11      Q.   You said you reviewed Mr. Pfahl's report; is
12 that correct?
13      A.   Yes, I did.
14      Q.   And if I'm correct, I believe you came up with
15 different total numbers for the amount of material that
16 was excavated for the foundation; is that correct?
17      A.   That is correct.
18      Q.   And are you going to offer any opinions on
19 Mr. Pfahl's conclusions or methodologies with respect to
20 the quantity of material excavated for the foundation?
21      A.   Mr. Pfahl's -- Mr. Pfahl appears, from what I
22 saw, to be a well-qualified individual for -- for what
23 he was retained for.  I disagree with Mr. Pfahl in -- in
24 a couple of areas, one of which is that I believe that I
25 was more detailed than he was when it came to looking at

1  the excavation of the side slope material beyond the
2  vertical cone, if you will, that was -- was done, but
3  more importantly, I disagreed with Mr. Pfahl in terms of
4  the definition of mining.
5           I don't -- I do not agree with the definition
6  of mining being restricted to material that is only
7  crushed.  There are any number of instances that I have
8  been in mine properties where no material was crushed,
9  but the material was still mined.
10          When you look at the definition in the Tenth
11 Circuit ruling, they weren't trying to identify -- in my
12 opinion, they were not trying to identify individual
13 items that had to be performed on the rock material, but
14 they were looking at the -- the process, and the process
15 is excavating and making the material ready and/or using
16 it.
17          And they specifically noted in the report,
18 there are times when common materials such as limestone,
19 sandstone, shale, sand and gravel, do not have to have
20 any kind of treatment, but can still be used.  And, in
21 fact, the RMT report said, We think these materials can
22 be used for this kind of fill.
23          So to me, the mining that took place included
24 all of the materials that was -- were excavated.  To me,
25 the issue is excavated and used, and as a consequence, I

1    MS. STEVENSON:  Okay.

2    MS. NAGLE:  Thank you.

3    MS. STEVENSON:  We'll -- we'll plan on doing
4    that.  Thank you.

5    Q.  (By Ms. Stevenson)  So the next section of
6    your report starting on page -- page 10 goes to the
7    valuation of the mineral material.

8    A.  That's correct.

9    Q.  So when you were looking at the valuation of
10   the material, was this a market value you were looking
11   at?

12   A.  I looked at the -- again, went back to the
13   Tenth Circuit ruling and the Tenth Circuit made it very
14   clear that it was -- the value of the minerals was to be
15   10 percent of the market price of -- of material at the
16   closest point to the project.  Given the fact that IEA
17   exercised a purchase order with Burbank Materials, which
18   was essentially next door, for limestone, shale and
19   clay, it was simply a matter of looking at 10 percent of
20   the purchase price and moving from there.

21   Q.  So to determine the -- the market price, you
22   relied on that Burbank invoice; is that correct?

23   A.  I actually looked at the purchase order that
24   was made by IEA and then used the Burbank to confirm
25   that, in fact, the material was actually sold at the

1  price that was in the purchase order.
2      Q.  Okay.  And did you rely on any other documents
3  or types of information to determine the market price
4  for limestone, shale or clay in 2014?
5      A.  No, because as far as I was concerned, the
6  price paid for that particular project, each project
7  stands on its own.  That was the price that was paid.
8  That was the price that -- that was established.
9      Q.  How would you define a market price?
10     A.  A market price is the price that a willing
11 buyer and a willing seller agree to exchange materials.
12     Q.  And I'd like to explore some -- before I come
13 back to that, I'd like to explore some -- the 10 percent
14 royalty rate.
15     A.  Uh-huh.
16     Q.  And you -- you mentioned the Tenth Circuit
17 opinion.  What else did you rely on to determine the
18 appropriate royalty rate?
19     A.  I didn't.  Tenth Circuit had settled it as far
20 as I was concerned.
21     Q.  Did you -- when -- when you were visiting
22 Burbank and you spoke with them there, did you ask them
23 about the royalty rates that they paid to the OMC?
24     A.  No.
25     Q.  Okay.  Did you do any research into the

1    A.   The shipping point would be the source point
2    for material being shipped to the buyer.
3    Q.   And why is Burbank the -- the shipping point?
4    A.   From -- there were no other quarries closer to
5    the wind farm that could have provided material other
6    than Burbank Materials.  Pawhuska Quarry is quite a ways
7    further as is the -- I wish I could remember what was in
8    the other -- in Mr. Pfahl's report, the Atlas Quarry or
9    whatever it was that was also -- APAC, the APAC --
10   Q.   APAC.
11   A.   -- Quarry that was -- was referenced, but
12   again, that is further away than Burbank Materials.
13   Q.   Are you aware if these -- these other quarries
14   if their -- the rates they charge for limestone, clay or
15   shale were different than that charged at Burbank?
16   A.   I never looked at price lists from any of
17   those properties.
18   Q.   And so on -- on page 11, your total value of
19   royalties that should be paid you have as $247,979.42;
20   is that correct?
21   A.   That's correct.
22   Q.   And you state that's the value of mineral
23   materials for the 84 wind turbine towers and associated
24   equipment can you just lay out for me what that
25   associated equipment is?

1  Q.  (By Ms. Stevenson)  And when we're talking
2  about all of the materials that were excavated and then
3  subsequently returned to the -- to the excavated hole,
4  was everything that was put back in the hole, was it all
5  available for purchase elsewhere?
6  A.  If it was anything other than -- yeah, the
7  limestone, shale and clay were specified in the purchase
8  order.  Limestone, shale and clay was what was dug up.
9  Limestone, shale and clay is what is available from
10 Burbank Materials.
11 Q.  Okay.  Thank you.  I have a couple of
12 questions for you now about Mr. Pfahl's report, and you
13 said you reviewed that; is that correct?
14 A.  Yes, I did.
15 Q.  Do you intend to offer any opinions at trial
16 on Mr. Pfahl's report?
17 A.  I don't anticipate that.  However, one of the
18 lawyers may ask me a question or whatever, but I don't
19 anticipate specifically saying anything about
20 Mr. Pfahl's report.
21 Q.  So do you -- you don't intend to put any
22 opinion you may have about Mr. Pfahl's report in writing
23 as either an update or an addendum to your report?
24 A.  No, I do not.
25 Q.  And did you review Mr. Pfahl's deposition

1  referenced in the Tenth Circuit.  Then from -- when you
2  get to the value, you then take 10 percent of that and
3  that's the royalty.
4            Is that correct?
5       A.   I took 10 percent of what the purchase price
6  was at the nearest shipping point, which is the Tenth
7  Circuit ruling, and took 10 percent of that, yes.
8       Q.   What would be -- to get that purchase price or
9  -- or the price, so let's say -- we'll start with clay.
10 It would be $6 times 71,082 tons; is that correct?
11      A.   That -- that would be the shale.  The clay
12 would be 61,082 and that would be times $6.  The shale
13 would be 72,404 tons time $6, and the limestone 188,638
14 times $8.90.
15      Q.   Would you mind just quickly just doing the
16 math and then telling me what --
17      A.   It would --
18      Q.   -- it adds all up?
19      A.   Yeah, it would simply be a matter of
20 multiplying the numbers that are there on page 11 by 10,
21 so that the total would be 2,479,794.20.
22      Q.   Okay.  Earlier, Ms. Stevenson asked about any
23 criticisms that you intend or -- or -- or presently
24 intend to -- to offer about John Pfahl's report at
25 trial.  And I just want to clarify or -- for the record

1  at least for me that you have no intentions outside of
2  what you've already discussed today; is that correct?
3       A.   That's correct.  I -- I think Mr. Pfahl's a --
4  a professional man and -- and I am -- I'm not one who
5  wants to particularly engage in an argument with him or
6  -- or -- or a discussion of methodology.  I mean, we
7  simply -- we disagreed in -- in how we approached it and
8  I think that was based upon, as much as anything, his
9  view of -- of restricted into crushed material versus
10 mine of using all of the materials that were there.
11            MR. ASHWORTH:  Okay.  I have no further
12 questions for the witness, but I would, before I pass to
13 Sarah -- back to Sarah, Ms. Stevenson, to see if she
14 would be willing to accept service of the subpoena of --
15 of John Pfahl just so we can have that on the record?
16            MS. STEVENSON:  Mr. Ashworth, of we can
17 just -- I'd like to consult with my co-counsel on that
18 question as well as just to make sure we don't have any
19 followup.  So if we could take maybe five minutes and
20 then I will get back to you on -- with an answer to that
21 question when we come back.
22            MR. ASHWORTH:  No problem.
23            MS. STEVENSON:  Okay.  So if we can just go
24 off the record until 1:10.
25            THE VIDEOGRAPHER:  We're off the record at