IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and THE OSAGE MINERALS COUNCIL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 14-CV-704-GKF-JFJ |
| OSAGE WIND, LLC; ENEL KANSAS, LLC; and ENEL GREEN POWER NORTH AMERICA, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPENING BRIEF IN SUPPORT**

# EXHIBIT 12

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                       NORTHERNDISTRICT OF OKLAHOMA
 2

 3    UNITED STATES OF AMERICA,

 4         Plaintiff,

 5    and

 6    OSAGE MINERALS COUNCIL,

 7         Intervenor-Plaintiff,

 8    vs.                            Case No. 14-CV-704-GFK-JFJ

 9    OSAGE WIND, LLC;
      ENEL KANSAS, LLC; and
10    ENEL GREEN POWER NORTH
      AMERICA, INC.,
11
           Defendants.
12

13            VIDEO ZOOM DEPOSITION OF JOHN H. PFAHL
                 TAKEN ON BEHALF OF THE PLAINTIFF
14         ON MARCH 10, 2021, BEGINNING AT 10:01 A.M.
                       IN TULSA, OKLAHOMA
15

16

17                           APPEARANCES

18   On behalf of the PLAINTIFF:

19   Cathryn D. McClanahan
     Assistant United States Attorneys
20   UNITED STATES ATTORNEY'S OFFICE
     Northern District of Oklahoma
21   110 W. 7th St., Suite 300
     Tulsa, OK    74119
22   (918) 382-2700
     cathy.mcclanahan@usdoj.gov
23
     Christina Watson, Paralegal
24   Michelle Hammock, Paralegal

25   REPORTED BY:  SUSAN K. McGUIRE, CSR, RPR
```

```
 1    I would have requested a site visit for myself.  But
 2    given that he was very comfortable with what he saw
 3    and how it went, I did not feel the need to attend
 4    myself.
 5         Q.   (BY MS. McCLANAHAN)  So you've read Steven
 6    Hazel's report; is that correct?
 7         A.   Yes, that's correct.
 8         Q.   Do you have any criticism of him if he did
 9    not do a site inspection?
10         A.   I think that there's plenty of criticism of
11    his report.  I don't think it has anything to do with
12    whether he attended the site visit or not.
13         Q.   Okay.  Paragraph 15 of your report on -- I
14    believe it's Page 3, or maybe it starts on Page 3, you
15    summarize your findings and opinions.  Do you see
16    that, or have that in front of you?
17         A.   Yes.
18         Q.   Okay.  As part of your calculations, you
19    make the assumption that 132,678 tons of limestone was
20    mined; is that correct?
21         A.   Yes, that is correct.
22         Q.   To calculate this number, you used an
23    average diameter of 70 feet for excavated holes,
24    cylinders, as it were, with an average depth of ten
25    feet; is that right?
```



```
 1         A.    Yes, that is correct.  I think that I've got
 2   quite a bit of detail on that a little bit later in my
 3   report.
 4         Q.    Right.  And we're looking at the front of
 5   the report, which is more of a summary; is that right?
 6         A.    Yes, that is correct.
 7         Q.    Okay.  It resulted in an average volume of
 8   1,423 cubic yards; is that correct?
 9         A.    That does not show up in the summary, but I
10   do believe that that shows up later on in Paragraph --
11         Q.    Maybe, Paragraph 56, or close to there?
12         A.    It looks like Paragraph 51 --
13         Q.    51.
14         A.    -- I make that reference.  That was the
15   number that I relied upon to form the basis for the
16   excavation volume, correct.
17         Q.    Okay.  And then you multiplied that, the
18   1,425 cubic yards, by 82 tower sites; is that right?
19         A.    Yes.
20         Q.    So you indicate that this totals
21   approximately 117,000 cubic yards of total materials
22   excavated; is that right?  And I'm looking at
23   Paragraph 56 on Page 30.
24         A.    Yes, that's correct.
25         Q.    You take the position that 54 percent of
```



```
 1   those materials excavated were limestone; is that
 2   right?
 3        A.   Yes.  And I believe that that actually is
 4   consistent with what Mr. Freeze estimated, as well.
 5        Q.   Okay.  Based on this 54 percent, you
 6   indicate that, finally, 63,180 cubic yards of
 7   limestone was excavated from the mineral estate during
 8   the construction; is that right?
 9        A.   Yes, for those towers.  I believe the 82
10   towers, specifically.
11        Q.   Okay.  Did you review the 2011 RMT Report to
12   form your --
13        A.   Yes, I did.
14        Q.   I'm sorry.  You did?
15        A.   Sorry.  I thought you were finished with the
16   question there.
17        Q.   So you did review the 2011 RMT Report to
18   form your opinion?
19        A.   Yes, I did.
20        Q.   And I think it's attached as Exhibit 5 to
21   your report, and I'm going to ask that we mark that as
22   Plaintiff's Exhibit 2 for this deposition.
23             According to that report that you reviewed,
24   the density for the limestone was approximately 155
25   pounds per cubic foot; is that correct?
```



```
 1        A.    Yes, that is correct.
 2        Q.    And you think that's a fair estimate of the
 3   density of limestone in this area, generally; is that
 4   correct?
 5        A.    Yes, I do.
 6        Q.    Does density have anything to do with the
 7   decision to blast or not blast in order to excavate?
 8        A.    No, it does not.
 9        Q.    To convert 63,180 cubic yards to tons, you
10   first multiplied 155 pounds per cubic foot by 27; is
11   that right?
12        A.    No.  You would have divided it by 27.  Or,
13   sorry, pounds per -- sorry.  So, you first divide
14   it -- I would have to actually write this out, this
15   equation, to go from a pounds per cubic foot to tons
16   per cubic yard.  My apologies there.  If you'd like, I
17   can think about it for a second and give you the full
18   way of approaching it.
19        Q.    Okay.  So, did you conclude that there were
20   264,000 -- or, I'm sorry, 264 million pounds of
21   limestone?
22        A.    I don't have the value or the volume --
23   sorry, the mass in pounds.  I have it in tons.  So I
24   converted the 155 pounds per cubic feet to 2.1 tons
25   per cubic yard, and applying that against the 63,180
```



1    cubic yards, came up with a paid value of 132,678 tons
2    of limestone.
3         Q.   Okay.  Okay.  I think -- we both got there.
4    My 264 million were divided then by 2,000 to get to
5    tons, and that's the same answer that you have,
6    132,678 tons; correct?
7         A.   Yeah, I'll have to take your word on that.
8    Again, I don't have the calculation and all the
9    interim steps in front of me, but if we're getting to
10   the same point, that sounds like the right answer.
11        Q.   Okay.  And it's your opinion that the total
12   value of the 132,678 tons of limestone that was
13   excavated would be $68,993.  And I'm excluding
14   interest right now.
15        A.   So, yes, $68,993, valued at the time that it
16   was mined.
17        Q.   And you base this value off the royalty rate
18   that's contained in a limestone lease to APAC Central
19   Quarry; is that right?
20        A.   That's right.  I checked the leases on a
21   couple of the quarries on the OMC's mineral estate,
22   and they were consistent with that value.  So that was
23   the value at the time for limestone being mined within
24   the county based on those leases.
25        Q.   Okay.  I think attached to your report as



```
 1    Exhibit 21 is a tribal resolution regarding the APAC
 2    lease.  I'm going to ask that that be marked and
 3    entered as Exhibit -- Plaintiff's Exhibit 3 here.
 4              Do you have that document in front of you?
 5       A.   Exhibit 21?
 6       Q.   It's attached to your report as Exhibit 21,
 7    yes.
 8       A.   Yes, I do have it.
 9       Q.   And is this one of the documents you relied
10    upon to establish that .50 cents per ton of limestone
11    in 2012?
12       A.   Yes, that is correct.
13       Q.   Okay.  So given that the limestone in
14    question that we're talking about in this case was
15    excavated in 2014, it's your opinion that the value of
16    the limestone that was taken by Osage Wind from the
17    estate during construction was .52 cents a ton; is
18    that correct?
19              MR. RAY:  Object to the form.  You can
20    answer.
21              THE WITNESS:  Yeah, that is correct.  So the
22    royalties were escalated at that time.  Again, I
23    looked at other leases as well, and they had a .1 cent
24    per year escalation.  So the .50 cents in 2012
25    escalated to .52 cents in 2014.
```



1          Q.   (BY MS. McCLANAHAN)  So, in this regard, you
2    believe that the value of a lease from the OMC, as
3    contemplated by the Tenth Circuit, would have been
4    $68,993, and, again, we're not talking about interest
5    right now; is that correct?
6               MR. RAY:  Object to the form.
7               THE WITNESS:  So, yeah.  My opinion, the
8    value of the mineral mined to the OMC would have been
9    $68,993 at the time.
10         Q.   (BY MS. McCLANAHAN)  Okay.  So limestone was
11   not the only mineral that was excavated during the
12   construction; is that right?
13         A.   That is correct.
14         Q.   Do you agree that other minerals were
15   excavated?
16         A.   I agree that other minerals were excavated.
17         Q.   Clay and shale were also excavated during
18   the construction; is that correct?
19         A.   Yes, that is correct.
20         Q.   And do you agree that clay and shale are
21   considered mineral resources?
22         A.   I do not believe that clay and shale meet
23   the definition of being mined.  It was outlaid by the
24   Tenth Circuit court.
25         Q.   Okay.  But that wasn't my question.  Do you



```
 1        A.   So, I do not believe that the reasonable
 2   prospect for economic extraction is met for the clay
 3   and the shale present at the project site.
 4        Q.   Okay.  Would you agree, more generally, and
 5   we're not talking about the construction site now, are
 6   clay and shale mineral resources?
 7             MR. RAY:  Object to the form.
 8             THE WITNESS:  In certain locations, and in
 9   certain situations, they can be mineral resources, but
10   they are not uniformly.  And that is no different than
11   diamonds, or anything else.  You can actually have a
12   quite large diamond deposit, which is a mineral, which
13   can be a very valuable mineral, but which does not
14   meet the standard of a mineral resource, and clay and
15   shale in this instance is no different.
16        Q.   (BY MS. McCLANAHAN)  Would you agree that
17   clay and shale can have value as construction fill or
18   a low permeable liner?
19        A.   Yes.
20        Q.   Is it your opinion that the court should
21   find that the clay and shale that was excavated from
22   the mineral estate here and used as backfill during
23   the construction had no value?
24             MR. RAY:  Object to the form.
25             THE WITNESS:  It's my opinion that the clay
```



```
 1   and shale that was excavated do not meet the standard
 2   of mining that was defined by the Tenth Circuit Court.
 3        Q.   (BY MS. McCLANAHAN)  So your decision to
 4   exclude clay and shale was based solely on your
 5   interpretation of the Tenth Circuit decision?
 6             MR. RAY:  Object to the form.
 7             THE WITNESS:  Yes, that is correct.
 8        Q.   (BY MS. McCLANAHAN)  And if at trial the
 9   judge determines that the excavated clay and shale
10   indeed falls under the definition of minerals mined,
11   will it be your opinion that they do have value?
12             MR. RAY:  Object to the form.
13             THE WITNESS:  Yes, if they were mined, there
14   would potentially be value associated with them.
15             MS. McCLANAHAN:  Okay.  Could I go ahead and
16   introduce Plaintiff's Exhibit 4?  And this particular
17   exhibit was not attached to your report.
18             Counsel, I'm more than happy to ask
19   Ms. Hammock to E-mail this out.  I'm going to put it
20   on the screen.  It's really a one-page document.  So
21   if anybody needs it E-mailed out, we can do that.  It
22   is simply a Westlaw copy of 25 CFR 214.10.
23             Ryan, would you like a copy E-mailed, or
24   we're going to share our screen?
25             MR. RAY:  I mean, at this point, if it's not
```



1  something that I've looked at differently.  So, I
2  don't have any opinions right now to give you, but it
3  certainly doesn't mean that that can't change.
4       Q.   (BY MS. McCLANAHAN)  Do you have any
5  additional criticisms of Mr. Freas and the opinion
6  that he's expressed in this case?
7       A.   I assume beyond what is stated in my report
8  is what you're asking?
9       Q.   Exactly, yes.
10      A.   Yeah.  So, again, my report, I believe,
11 addresses the major items that I felt like I had a
12 different opinion from Mr. Freas.  It doesn't mean
13 that if we went down a different path, or looked at
14 things in a different way, I wouldn't have other
15 critiques.
16      Q.   Okay.  And were there other opinions that
17 you formed that you plan on giving at trial that you
18 have not discussed with us here today?
19      A.   Again, my opinions as presented in my expert
20 report reflects today.  There certainly could be
21 changes to that, depending upon new information that
22 might be received, different questions, different
23 approaches, but that expert report reflects my current
24 opinions.
25           MS. McCLANAHAN:  Okay.  If it's okay with



```
 1    concluding as to what value this lease would have had
 2    for the mineral -- the mining that Osage Wind
 3    undertook, and in ascertaining what that value would
 4    be to the OMC, if there was a category that you
 5    certainly didn't have any expertise in valuing you
 6    just excluded it from your evaluation; is that
 7    correct?
 8         A.   Yes.  As far as something like oil and gas
 9    goes, and if there was something else that was outside
10    of my expertise.  But I am not aware of anything else
11    that was excluded, just the oil and gas.
12         Q.   Okay.  And so I know -- I know we talked
13    earlier with Ms. McClanahan about this valuation of
14    $73,962, which I get from Paragraph 4(D) of your
15    report, and I understand that's what you consider to
16    be the value, plus an interest that you've attached on
17    top of that; is that correct?
18         A.   Yes, that's correct.
19         Q.   Now, for purposes of calculating this
20    number, what value did you attribute to the Osage
21    Nation's sovereignty?
22         A.   So I only valued the minerals, themselves.
23    So I took into account what the Osage Nation -- or,
24    I'm sorry, the Osage Minerals Council, I guess is
25    probably a better term, typically charges as a royalty
```



```
 1        Q.   (BY MS. NAGLE)  For purposes of your report,
 2   if the Osage Nation or the OMC was a for-profit
 3   corporation, would your valuation of the minerals
 4   mined be higher or lower?
 5        A.   It would really depend on how the OMC
 6   administered the leases.  So if they were a for-profit
 7   corporation, and they charged a different lease rate,
 8   I would have used that different lease rate, but I
 9   simply used the lease rate that they established as to
10   market price at the time.
11        Q.   So you -- your -- this is what you were
12   talking about earlier at looking at comparable
13   transactions; is that correct?
14        A.   That is correct.
15        Q.   So, in terms of comparable transactions, you
16   relied on comparable transactions to evaluate what the
17   value of the minerals taken here in this instance
18   would be; is that correct?
19        A.   So, I relied on comparable transactions to
20   establish market price for the minerals that were
21   mined.  You know, I think that that's the same
22   approach that Mr. Robert Freas also took when he did
23   his expert report, or, I believe he actually with the
24   U.S. government, and correct me if I'm wrong, but
25   Mr. Freas and I both used the exact same methodology
```



```
 1   there.
 2       Q.   I appreciate that.  But I'm not asking about
 3   Mr. Freas, I'm asking about your report.  So for
 4   purposes of your report, did you assume that the lease
 5   is acquired under 214.7 before or after the mining
 6   takes place?
 7            MR. RAY:  Object to the form.
 8            THE WITNESS:  Yeah, what I considered was
 9   that the Tenth Circuit court ruled that mining
10   occurred.  And so I looked at the value of the
11   minerals that were mined and established at the time
12   that the market value for those minerals would have
13   been.
14       Q.   (BY MS. NAGLE)  So, in this instance, all of
15   the comparable transactions you looked at, how many of
16   them were transactions where the lease was obtained
17   after years of litigation by the OMC?
18            MR. RAY:  Object to the form.
19            THE WITNESS:  Yeah, I don't know the legal
20   history on any of those leases, so I can't comment on
21   that.  But, again, it wouldn't have changed the value
22   of the minerals themselves.  The value of the mineral
23   is set by the sale price of the royalty.  So --
24       Q.   (BY MS. NAGLE)  So the value -- I'm sorry.
25   I'm sorry.  I didn't mean to interrupt you.  Keep
```



1     this.  Okay, here we go.  So I am highlighting the
2     quote from you.  It says here, if I can show you,
3     "John," right here it says you, and then in this --
4     you know, it kind of continues down here and up to
5     here.
6              And, so, this is still your quote here.  And
7     if I can quote you, it says, "Every mining project is
8     unique, and must be evaluated appropriately given
9     those unique conditions."
10             What did you mean by that?
11   A.   Yeah.  So, typically in the industry, you
12   know, you get one gold deposit and it is completely
13   different than another gold deposit, even if it's a
14   mile away.  So, you know, geology is not 100 percent
15   consistent between projects, and that changes the
16   nature of the project.
17             But, you know, this one was actually one of
18   the best ones that I've ever worked on from the
19   standpoint of having comparables because, for once, we
20   have a very similar geology across the entire county,
21   we have established lease royalties.
22             So, you know, normally my job is actually a
23   lot more difficult, I don't have good comparables like
24   this one to rely upon.  And there's a lot more
25   interpretation that has to go into it; whereas, for



```
 1   this one, it was very straightforward, lots of good
 2   information.
 3            And, again, you know, like Mr. Freas, I
 4   found that that was a very good comparable.
 5       Q.   Okay.  And you also write that -- hold on,
 6   let me see if -- I'm trying to just get us there
 7   quickly.  Oops.  Okay.
 8            So this is another quote from you in the
 9   same article here, and the question is, "Moreover, how
10   have environmental concerns affected your line of
11   work?  Have these changes affected the types of cases
12   that could be taken to court?"
13            And here's your response, and I'm
14   particularly interested in this sentence here that I'm
15   going to highlight where you write, "In addition,
16   missing something major on the environmental liability
17   or permitting side that can take an asset's value to
18   zero can also result in immediate write-downs and
19   associated lawsuits."
20            And so my question is to you, in terms of
21   valuing, would you agree that the value can be
22   affected by lawsuits that are brought about from a
23   failure to get a permit?
24       A.   At the project level, I think that is
25   appropriate.  At the level of the value of the
```

