**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OSAGE MINERALS COUNCIL, | ) | |
| | ) | |
| Intervenor-Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-704-GKF-JFJ |
| | ) | |
| OSAGE WIND, LLC; | ) | |
| ENEL KANSAS, LLC; and | ) | |
| ENEL GREEN POWER NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**The United States' Motion for Summary Judgment**

**Table of Contents**

I.      **Statement of the Case**………………………………………………….......... 1

II.     **Statement of Undisputed Facts**…..…………………………………………... 1

III.    **Standard for Summary Judgment**…………………………………..…………… 3

IV.     **Arguments and Authorities**…………………………………………..…........ 3

    A.  Plaintiff is entitled to judgment as a matter of law on the issue of conversion…........ 3

    B.  Plaintiff is entitled to judgment as a matter of law on the issue of trespass.................. 5

    C.  Plaintiff is entitled to judgment as a matter of law on the issue of continuing trespass.6

    D.  Plaintiff is entitled to relief as it relates to Defendants' trespass of the OME………. 9

        i.    Plaintiff is entitled to monetary damages for Defendants' trespass………….. 9

        ii.   Plaintiff is entitled to an accounting for Defendants' trespass………..…….. 13

        iii.  Plaintiff is entitled to the legal remedy of ejectment because of Defendants' trespass……………………………………………………………….…….. 14

    E.  Defendants cannot establish sufficient facts to offset the damages caused by their willful behavior and ignorance of the law…………………………………..…... 15

        i.    Reliance on counsel defense does not operate to bar such recovery………... 15

        ii.   Defendants are not innocent trespassers as a matter of law……….……….. 19

    F.  Plaintiff is entitled to equitable remedies as a matter of law.… …………………… 19

        i.    Irreparable Harm……………………………………………………..…….. 20

        ii.   Balancing of Potential Harm……………………………………………….. 22

        iii.  Public Interest……………………………………………………….......... 23

V.      **Prayer for Relief**……………………………………………………………... 24

## Table of Authorities

<u>**Cases**</u>

*Angier v. Mathews Exploration Corp.*
905 P.2d 826, (Okla. Civ. App. 1995)……………………………………………………………6

*Baltimore City. v. AT&T Corp.*
735 F. Supp. 2d 1063 (S.D. Ind. 2010)………………………………………...............7

*Beck v. Northern Natural Gas Co.*
170 F.3d 1018 (10th Cir. 1999)…………………………………………………...11

*C.E. Carlson, Inc. v. SEC*
859 F.2d 1429 (10th Cir. 1988)…………………………………………………...17

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986)…………………………………………………… ……………………3

*Chase v. United States*
272 F. 684 (8th Cir. 1921)…………………………………………………………...15

*Chaparral Energy v. Pioneer Exploration*
241 P.3d 1161 (Okla. Civ. App. 2010)…………………………………………………..4

*Davilla v. Enable Midstream Partners L.P.*
913 F.3d 959 (10th Cir. 2019)……………………………………………6, 19-20, 22-23

*Dilworth v. Fortier*
405 P.2d 38 (Okla. 1964)………………………………………………….…………16, 19

*Equifax Servs., Inc. v. Hitz*
905 F.2d 1355 (10th Cir. 1990)…………………………………………………...20

*Fairlawn Cemetery Ass'n v. First Presbyterian Church, U.S.A.*
496 P.2d 1185 (Okla. 1972)…………………………………………………..6

*Finnell v. Jebco Seismic*
67 P.3d 339 (Okla. 2003)………………………………………………………………10

*First National Bank v. Melton & Holmes*
9 P.2d 703 (Okla. 1932)…………………………………………………………….4

*Fish v. Kobach*
840 F.3d 710 (10th Cir. 2016)……………………………………………………….24

*Foltz v. Columbia Cas. Co.*
    No. CIV-15-1144, 2016 WL 4402056 (W.D. Okla. Aug. 18, 2016)………………………24

*Frank v. Mayberry*
    985 P.2d 773 (Okla. 1999)……………………………………….... ……………...…….6

*Greyhound Lines, Inc. v. Peter Pan Bus Lines, Inc.*
    845 F.Supp. 295 (E.D. PA 1994)………………………………………………………22

*Central Valley Chrysler-Jeep, Inc. v. Golstene*
    563 F.Supp.2d 1158 (E.D. Cal. 2008)…………………………………………………23

*Heideman v. S. Salt Lake City*
    348 F.3d 1182 (10th Cir. 2003)………………………………………………………...24

*Hines v. Indep. Sch. Dist. No. 50*
    380 P.2d 943 (Okla. 1963)……………………………………………………………...20

*Jicarilla Apache Tribe v. Andrus*
    687 F.2d 1324 (10th Cir. 1982)………………………………………………………...14

*Kitchen v. Herbert*
    755 F.3d 1193 (10th Cir. 2014)……………………………………………….…22-23

*Marsh v. Brooks*
    49 U.S. 223 (1850)…………………………………………………………………15

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
    475 U.S. 574 (1986)………………………………………………………………............3

*McDermott v. City of Albany*
    309 A.D.2d 1004 (2003)……………………………………………………….............12

*Oneida Cty., N.Y. v. Oneida Indian Nation*
    470 U.S. 226 (1985)…………………………………………………………….9-10, 12

*Owner-Operator Independent Drivers Ass'n, Inc. v. Ledar Transport*
    No. 00-258, 2000 WL 33711271 (W.D. Mo. Nov. 3, 2000)……………………….…20

*Prairie Band of Potawatomi Indians v. Pierce*
    253 F.3d 1234 (10th Cir. 2001)………………………………………………………...24

*Quarles v. United States*
    139 S. Ct. 1872 (2019)…………………………………………………………….......6-7

*Rose Brothers, Inc. v. City of Alva*
      356 P.22d 1083 (Okla. 1960)……………………………………………………3

*Seneca-Cayuga Tribe of Oklahoma v. State of Oklahoma*
      874 F.2d 709 (10th Cir. 1989)……………………………………………...21, 24

*Stack v. Gudgel*
      158 P. 1144 (Okla. 1916)……………………………………………………..4

*Steenbergen v. First Federal Savings and Loan of Chickasaw*
      753 P.2d 1330 (Okla. 1987)………….......................................................3-4

*Sw. Stainless, LP v. Sappington*
      582 F.3d 1176 (10th Cir. 2009)……………………………………………20, 22-23

*U.S. Zinc Co. v. Colburn*
      255 P. 688 (Okla. 1927)…………………………………….........................4

*United States v. Custer Channel Wing Corp.*
      376 F.2d 675 (4th Cir. 1967)………………………………………………...17

*United States v. Osage Wind*
      871 F.3d 1078 (10th Cir. 2017)……………………………………1, 3, 6, 11-14

*United States v. Pend Oreille Publ. Utility Dist. No. 1*
      28 F.3d 1544 (9th Cir. 1994)………………………………………………….9

*United States v. Santa Fe Pac. R. Co.*
      314 U.S. 339 (1941)………………………………………………………..13-14

*United States v. Southern Pacific Transp. Co.*
      543 F.2d 676 (9th Cir. 1976)………………………………………………...9-10

*United States v. State of Wyo.*
      331 U.S. 440 (1947)………………………………………………………...19

*United States v. Wenger*
      427 F.3d 840 (10th Cir. 2005)………………………………………………17

*Vertex Holdings v. Cranke*
      217 P.3d 120 (Okla. Civ App. 2009)………….......................................5-6

*Weinberger v. Romero-Barcelo*
      456 U.S. 305 (1982)………………………………………………………...24

*Williams v. Garnett*
608 S.W.2d 794 (Tex. Civ. App. Waco 1980)…………………………………………12

*Woodford v. Ngo*
548 U.S. 81 (2006)…………………………………………………………………………10

**Statutes**

Act of June 28, 1906, ch. 3572, 34 Stat. 539 (Osage Allotment Act)……………….................1

Trade and Intercourse Act of 1793 (Nonintercourse Act), 1 Stat. 329…………………………..12

**Federal Regulations**

25 C.F.R. § 162(B)……………………………………………………………………………10

25 C.F.R. § 162.106……………………………………………………………………………10, 15

25 C.F.R. §166.812……………………………………………………………………………10

25 C.F.R. § 214……………………………………………………………………………....10

25 C.F.R. § 214.7……………………………………………………………………….6, 12, 25

49 C.F.R. § 376.12……………………………………………………………………………..20

**Court Rules**

Fed.R.Civ.P. 56………………………………………………………………………...1, 3, 24

**State Authorities**

23 O.S. § 61……………………………………………………………………………………10

**Other Authorities**

1 Dan B. Dobbs, *Law of Remedies* § 4.3(5), at 608 (2d ed. 1993)………………………….....13

42 C.J.S. Indians § 55……………………………………………………………………………21

89 C.J.S. Trover and Conversion § 1………………………………………………………………3

Black's Law Dictionary (11th ed. 2019)……………………………………………...13-14

Restatement (Second) of Torts § 158…………………………………………………………….7

Restatement (Second) of Torts § 161……………………….........................................................6

Plaintiff, the United States of America, moves for summary judgment pursuant to Fed. R. Civ. P. 56. Summary judgment is appropriate in this case because there are no genuine disputes as to any material fact. Accordingly, Plaintiff is entitled to judgment as a matter of law.

## I.       Statement of the Case

Defendants engaged in a large-scale excavation project developing the wind farm at issue, during which they mined minerals owned by the Osage Nation, controlled by the Osage Minerals Council ("OMC"), and held in trust by the United States. Defendants failed to obtain a federally approved lease prior to engaging in mining. Accordingly, Plaintiff, as trustee, is entitled to legal damages and/or an injunction including but not limited to removal of the wind farm.

## II.      Statement of Undisputed Facts

1.    The United States holds the mineral rights in Osage County, Oklahoma ("Osage Mineral Estate" or "OME") in trust for the benefit of the Osage Nation of Oklahoma, which is administered by the OMC. Act of June 28, 1906, 34 Stat. 539; *United States v. Osage Wind,* 871 F.3d 1078, 1081-82 (10th Cir. 2017).

2.    In 2010, Osage Wind, LLC leased only surface rights to build a commercial wind farm. *Osage Wind,* 871 F.3d at 1081-82.[1]

3.    In September 2014, excavation work began for the wind farm, which involved the excavation of minerals (limestone, clay and shale) from the OME. *Id*. Defendants excavated minerals in order to construct the wind towers, transmission lines and collector system. *Id*.; Exhibit 1, Mazurowski Depo. Tr., 35:14-21; 46:3-17.

---

[1] Although the wind turbines would eventually occupy approximately 1.5% of the total acreage of the surface, the entire 8,400 acre parcel of surface land was leased. *Id*.

4.   Once the cement foundation was complete for each wind tower, the excavated minerals were used as backfill to provide structural support and foundation stabilization for each wind tower. Exhibit 2, Moskaluk Depo. Tr., 68:23-69:7; 44:16-45:2; Exh. 1 at 97:2-9. Excavated minerals were also used to construct the access pads, roads and aprons around each wind tower. Exh. 2 at 62:4-8; 63:3-18; 68:23-69:7. Further, the excavated minerals were used to provide built up drainage to allow rain to drain away from each wind tower. *Id*. at 68:23-69:7; 61:10-21.

5.   As it relates to transmission lines, wooden poles were placed into holes that had been excavated in the ground. Exh. 1 at 46:14-17. Excavated minerals were then used as backfill to provide structural support for the wooden pole transmission lines. *Id*. at 46:18-21.

6.   As it relates to the collector system, cables were laid into trenches that had been excavated in the ground. *Id*. at 35:13-21. Excavated minerals were then used as backfill to provide thermal insulation for the underground cables. Exhibit 3, Pike 30(b)(6) Depo. Tr. Pt. 1, 145:23-146:8; 146:20-147:11.

7.   Defendants could have used substitute minerals purchased offsite in lieu of using the minerals that were excavated onsite. Defendants made the conscious decision to use the excavated minerals in order to save money. *See* Exh. 2 at 105:9-15; Exhibit 4, Enel Change Order at 4 ("[T]he disposal of excavated rocks and import of back filling material from outside the County was a more expensive solution."); Exhibit 5, E-mail of 10/16/14 from Price to Moskaluk. Defendants estimated that using excavated minerals in lieu of purchasing substitute minerals from offsite saved them $1,944,432 as to the wind towers alone. *See* Exhibit 6, Email of 5/22/15 re Material Estimates.[2]

---

[2] The estimated savings per wind tower were $23,148 ($7,488 for soil and $15,660 for limestone) for a total of $1,944,432 for all 84 wind towers.

8. "Osage Wind's extraction, sorting, crushing, and use of minerals as part of its excavation work constituted 'mineral development,' thereby requiring a federally approved lease which Osage Wind failed to obtain." *Osage Wind*, 871 F.3d at 1081-82.

## III.    Standard for Summary Judgment

Summary judgment is required where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted). Here, there is no viable conflict as to whether Defendants violated federal law or committed conversion, trespass and continuing trespass. *Osage Wind,* 871 F.3d at 1081-82. Plaintiff is therefore entitled to judgment as a matter of law.

## IV.    Arguments and Authorities

### A.    **Plaintiff is entitled to judgment as a matter of law on the issue of conversion.**

It is undisputed Defendants illegally and wrongfully assumed the rights of ownership of the OME without permission during the construction of the Osage Wind project. Accordingly, the Court should find as a matter of law that Defendants committed the tort of conversion. "'Conversion is an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" *Rose Brothers, Inc. v. City of Alva*, 356 P.22d 1083, 1085 (Okla. 1960) quoting 89 C.J.S. Trover and Conversion § 1; *see also, e.g.*, *Steenbergen v. First Federal Savings and Loan of Chickasaw*, 753 P.2d 1330, 1332 (Okla. 1987) ("Conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights

therein."). "The mere illegal taking or wrongful assuming of a right to personal property constitutes a conversion, and no further step is necessary to perfect the right of action therefor." *First National Bank v. Melton & Holmes*, 9 P.2d 703 (Okla. 1932). It is not necessary that the alleged converter apply the property to his own use or be in bad faith. *Steenbergen*, 753 P.2d at 1332 citing *U.S. Zinc Co. v. Colburn*, 255 P. 688 (Okla. 1927); *Stack v. Gudgel*, 158 P. 1144 (Okla. 1916). **While the mere unauthorized excavation of minerals may not constitute conversion, once *minerals are excavated*, the unauthorized use of those excavated minerals constitutes conversion**. *See Chaparral Energy v. Pioneer Exploration*, 241 P.3d 1161, 1164 (Okla. Civ. App. 2010) ("After oil or gas is produced, it is tangible personal property and is subject to conversion."). The Osage Wind project involved the excavation of minerals, which included clay, shale and limestone, during the construction of the wind towers, transmission lines and collector system. *See* Fact No. 3. Once the minerals in question were excavated and set aside, title to the excavated minerals remained with the Osage Nation as held in trust by Plaintiff. While on the surface, the excavated minerals were then subject to conversion when used without permission by Defendants. *See Chaparral Energy,* 241 P.3d at 1164.

As it relates to the 84 wind towers sites, Defendants exerted dominion over the excavated minerals when they used them as backfill material and to construct the access road and apron around each wind tower. *See* Fact No. 4. By using the excavated minerals as backfill material, Defendants were using them to provide the wind towers with structural support and to stabilize the cement foundations. *Id.* The excavated minerals were also used to provide built up drainage to allow rain to drain away from each wind tower, which helped preserve the integrity of each wind tower foundation. *Id.* Defendants could have used substitute minerals purchased offsite in lieu of using the excavated minerals. *See* Fact No. 7. However, they made the conscious decision

to use the excavated minerals to save money. *Id.* In an internal document, Defendants explained they would save an estimated **$1,944,432** by using the excavated minerals in lieu of purchasing and importing minerals from offsite. *Id.*

Similar to the wind towers, Defendants excavated minerals during the construction of transmission lines. *See* Fact No. 5. Defendants then exerted dominion over these excavated minerals when they used them as backfill material to provide structural support for the wooden transmission line poles. *Id*. Likewise, Defendants excavated minerals during the construction of the collector system. *See* Fact No. 6. Defendants then exerted dominion over these excavated minerals when they used them as backfill material to provide thermal insulation for the collector system cables. *Id*.

When Defendants used the excavated minerals as backfill for structural support, thermal insulation and/or for use in constructing wind tower access roads and aprons, they exerted dominion over the excavated minerals and assumed the rights of ownership to them inconsistent with the rights of ownership by the Osage Nation as held in trust by Plaintiff. It is undisputed that Defendants' exertion of dominion and assumption of the rights of ownership to the excavated minerals was wrongful and without the consent of the OMC and Plaintiff. Accordingly, the Court should find as a matter of law that Defendants committed the tort of conversion as to the excavated minerals that they *used* during the construction of the wind towers, transmission lines and collector system.

> **B.     Plaintiff is entitled to judgment as a matter of law on the issue of trespass.**

It is undisputed Defendants physically invaded the OME without the permission of the OMC and Plaintiff during the construction of the Osage Wind project. Accordingly, the Court should find as a matter of law that Defendants committed the tort of trespass. **Oklahoma defines trespass as "the actual physical invasion of the property of another without permission**."

*Vertex Holdings v. Cranke*, 217 P.3d 120, 123 (Okla. Civ App. 2009) (emphasis added); *Frank v. Mayberry*, 985 P.2d 773 (Okla. 1999); *Fairlawn Cemetery Ass'n v. First Presbyterian Church, U.S.A.*, 496 P.2d 1185, 1187 (Okla. 1972). As the Tenth Circuit previously found in this case, to receive permission to invade the OME, Defendants were required to obtain to a lease. *Osage Wind*, 871 F.3d at 1081-82. Failure to obtain a lease *ipso facto* results in a trespass to the OME. *See 25 C.F.R. § 214.7* ("[n]o mining or work of any nature will be permitted upon any tract of land until a lease covering such tract shall have been approved by the Secretary of the Interior.").

It is undisputed Defendants invaded the OME without first obtaining a lease from the OMC. Therefore, Defendants' invasion of the OME was done without permission. Accordingly, the Court should find as a matter of law that Defendants committed the tort of trespass during the construction of the Osage Wind project.

### C.   Plaintiff is entitled to judgment as a matter of law on the issue of continuing trespass.

It is undisputed that the presence of the wind towers, transmission lines and collector system in question, without the permission of the OMC constitutes a continuing trespass of the OME by Defendants. Accordingly, the Court should find as a matter of law that the presence of Defendants' wind towers and ancillary infrastructure constitute a continuing trespass. Under Oklahoma law an invasion of real property by a permanent structure constitutes a continuing trespass. *See Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 971 n.8 (10th Cir. 2019) (citing *Fairlawn Cemetery Ass'n*, 496 P.2d at 1187); *see also Angier v. Mathews Exploration Corp.*, 905 P.2d 826, 830 (Okla. Civ. App. 1995) (quoting Restatement (Second) of Torts § 161) (A continuing trespass may be found "by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it."); *Quarles v. United States*, 139 S. Ct. 1872, 1877 (2019) (quoting

Restatement (Second) of Torts § 158, Comment m, p. 280) ("[t]he law of trespass likewise proscribes remaining on the land of another without permission. In that context, the term 'remain' refers to 'a continuing trespass for the entire time during which the actor wrongfully remains.")"; *Baltimore City. v. AT&T Corp.*, 735 F. Supp. 2d 1063, 1080-81 (S.D. Ind. 2010) (continuing trespass where the ongoing use of an underground cable "would almost certainly involve additional entries to repair, replace, and maintain the cable.") (Internal citations omitted).

Defendants' abovementioned trespass remains ongoing as the presence of Defendants' wind towers continue to permanently invade and exploit the OME. While the total area of Defendants' continuing trespass is in dispute, it is undisputed that at the very least the presence of each wind tower physically prevents the OMC from accessing, leasing, mining and otherwise developing its mineral resources within a 500-foot radius of each wind tower. According to Defendants' engineers, it would be unsafe for mining operations to take place within a 500-foot radius of each wind tower. *See* Pfahl Report, Dkt. 292 at 39 (¶ 75). John Pfahl, Defendants' purported mining and minerals expert, opined in his expert report that:

> **I relied upon the engineers from OW to provide their recommended set-back for a safe mining distance. The distance provided by OW is a 500-foot radius from the wind tower. In my opinion, this distance is reasonable and likely conservative.** I am aware of instances of quarries operating at significantly smaller distance (e.g. <300 feet) to residential areas, which I would expect to have similar (if not more stringent) restrictions on blasting. **Kimberlee Centera of TerraPro Solutions[3] confirmed a 500-foot setback is reasonable and typical in the wind energy business. Therefore, I am comfortable in the reliance upon the OW estimate in this analysis.**

*Id*. (emphasis added) (footnote added). The 500-foot radius, or buffer zone, around each wind tower wherein the OMC is unable to safely access and develop the OME constitutes a continuing

---

[3] Kimberlee Centera is Defendants' purported expert.

invasion of the OME without permission. Accordingly, the Court should find as a matter of law that the presence of Defendants' wind towers is a continuing trespass.

In addition to the 500-foot radius wherein the OMC is physically prevented from accessing and developing due to physical safety concerns, each wind tower uses the OME in the area surrounding each wind tower for structural support without permission of the OMC. While the total area of use is in dispute, it is undisputed that at the very least each wind tower uses the underlying minerals within a 90-foot radius of the same for structural support. *See* Exhibit 7, Enel Safety Radius Memo. "Enel Engineering and Construction's conservative recommendation is to have a 90 ft radius from the turbine center pin as a 'no excavation' zone. Any excavation within this radius may reduce the stabilizing load provided by the terrains weight, reducing the overturning safety factor." *Id*. This is to say that if the OMC were to excavate any of the minerals within a 90-foot radius of a wind tower, the wind tower would lose its structural stability, thus potentially placing it as risk for catastrophic failure. Exh. 3 at 48:20-49:1.

The undisputed 90-foot radius is distinguished from the 500-foot radius in that the 90-foot radius encompasses the area in which a wind tower ***uses*** the underlining minerals for structural support whereas the 500-foot radius area encompasses the area in which it would be ***unsafe*** for individuals to operate a quarry or otherwise engage in mineral development. *See* Exh. 7*; see also* Exh. 3 at 100:3-9 ("Q. This buffer zone relates to structural integrity and not safety of actual individuals? A. These calculations are relative to the structural stability of the wind turbine, correct.") (objection omitted); *Id*. at 25:16-24 ("Q. What would be some of the reasons why it would be unsafe to put structures close to a wind tower? A. The reason that it would be important is a function of the operation of the wind turbine during all conditions and a function of the structural stability of the wind turbine.") (objection omitted); *Id*. at 39:12-16 ("We base [the 90-

foot radius] off of an assessment of the structural stability of the wind turbine."); *Id*. at 43:7-15

("Q. Okay. What is your understanding of what this document [referring to Exh. 7] is or what it's

saying? A. My understanding of what this document is saying is explaining a calculation that

analyzes and then calculates what a conservative safe zone around the turbine would be in order

to perform mining activities or excavation activities without impacting the structural stability of

the turbine itself.").

It is undisputed that the presence of each wind turbine tower at Defendants' wind farm relies

upon and uses the OME within a 90-foot radius for structural support. Therefore, Defendants'

continuing reliance on and use of these minerals without the OMC's permission constitutes a

continuing invasion of the OME. Accordingly, the Court should find as a matter of law that the

presence of Defendants' wind towers is a continuing trespass.

### D.      Plaintiff is entitled to relief as it relates to Defendants' trespass of the OME.

As shown above, it is undisputed that Defendants' invasion of the OME without permission

constitutes trespass as a matter of law. Accordingly, Plaintiff is entitled to remedies resulting

from Defendants' trespass. In *United States v. Pend Oreille Publ. Utility Dist. No. 1*, 28 F.3d

1544, 1549 n.8 (9th Cir. 1994), it is noted that the "Supreme Court has recognized a variety of

federal common law causes of action to protect Indian lands from trespass, including actions for

**ejectment, accounting of profits, and damages**." (emphasis added); *Oneida Cty., N.Y. v.*

*Oneida Indian Nation*, 470 U.S. 226, 233-36 (1985) (action for damages); *United States v.*

*Southern Pacific Transp. Co.,* 543 F.2d 676, 682–84 (9th Cir. 1976) (action for damages).

### i.      Plaintiff is entitled to monetary damages for Defendants' trespass.

Though the regulations pertaining to leasing the OME do not specifically identify what

damages are appropriate for failure to obtain a lease and then mining the OME anyway[4], as noted above, federal courts do recognize a remedy sounding in damages for trespass. *County of Oneida,* 470 U.S. at 233–36; *Southern Pacific Transp. Co.,* 543 F.2d at 682–84. Although 25 C.F.R. § 162(B) deals with agricultural leases relating to Indian trust property, it may provide guidance to the Court on the issue of trespass damages. Part 162(B) specifically provides that where a lease is required, and possession is taken without procuring a lease, the Bureau of Indian Affairs ("BIA") "will take action to recover possession on behalf of the Indian landowners and pursue any additional remedies available under applicable law." *25 C.F.R. § 162.106.* The damages than an Indian landowner are entitled to from trespassers on Indian agricultural land are detailed in 25 C.F.R. §166.812, which includes the collection of the value of the products illegally used or removed plus a penalty of double their values. *See* 25 C.F.R. § 162.106(B). Though there is not a specific formula for calculating damages for mining the OME without a lease, guidance (not strict adherence) should be taken from statutory regulations concerning the failure to obtain a lease as to other categories of Indian property rights.[5]

Oklahoma law provides further guidance on measure of damages for trespass, noting that "[f]or the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate for all detriment proximately caused thereby, whether it could have been anticipated or not." *23 O.S. § 61. See Finnell v. Jebco Seismic*, 67 P.3d 339, n.29 (Okla. 2003). As noted above, Plaintiff is entitled to pursue monetary damages for Defendants' trespass. To support this claim, Plaintiff

---

[4] *See* 25 C.F.R. § 214, generally. It appears the regulations' drafters did not contemplate anyone would mine minerals from the OME without having first obtained a valid lease.
[5] In *Woodford v. Ngo*, 548 U.S. 81, 81 (2006), the Supreme Court acknowledged that guidance from bodies of law with similar rules but different terminology is appropriate for purposes of interpretation.

retained Steven Hazel, consulting and financial advisor with FTI Consulting, Inc., as an expert witness as to Plaintiff's monetary damages. Exhibit 8, Expert Report of Steven Hazel. Mr. Hazel identifies the lease valuation for Defendants' unapproved mining of the OME at $20,206,286, if the turbines operate through 2036 (completing their initial 25-year term)[6], or including an additional $5,763,321, if the turbines operate through 2056 (completing the additional 20-year renewal term).[7] *Id.* at 24.

In reaching this number, Mr. Hazel compares the surface leases executed by Defendants to identify a reasonable amount for leasing the OME. *Id.* at 4-8, *see also* Exhibit 9, Hazel Depo. Tr., 163:14-21; 164:1. In other words, Mr. Hazel utilizes an impressed lease approach, finding the fair rental value as the measure of damages sustained by Defendants' failure to obtain a lease. In so doing, he applies the amount Defendants paid to lease the entire surface[8] and opines that amount should be held as to the lease value for the entire mineral estate.[9] Thus, the proper measure of damages for Defendants' trespass to the OME is the lost rental value for the entire mineral estate, just as Defendants paid to lease the entire surface estate.

This calculation of damages, based on fair rental value, is supported in *Beck v. Northern Natural Gas Co*., 170 F.3d 1018 (10th Cir. 1999). In *Beck*, the defendant was authorized, and negotiated leases, to store gas underlying 23,000 acres of property. *Id*. at 1021. However, after the gas was stored, it migrated to an unapproved and unleased area. The landowners sued the defendant, and a jury awarded landowners the fair rental value of the property as damages for

---

[6] *Id.* at 14 n.69, 19, and 24.
[7] *Id.* at 14 n.70, 19, and 24.
[8] Though only 1.5% of the surface was actually used.
[9] In fact, the surface leases are useless unless Defendants also acquire a federally approved lease. Surface owners are limited in what they may do with their surface interests, as they do not have the ability to authorize the interference of the OME. *Osage Wind,* 871 F.3d at 1092.

trespass. The award was upheld on appeal. *See also Oneida Cty., N.Y.*, 470 U.S. at 230 (upholding damages in the amount of fair rental value plus interest for two years for land occupied by counties who utilized land conveyed to New York in violation of the Trade and Intercourse Act of 1793 (Nonintercourse Act), 1 Stat. 329); *McDermott v. City of Albany*, 309 A.D.2d 1004 (2003) (diminution in rental value can be appropriate measure of damages for trespass, though plaintiff failed to seek such damages); *Williams v. Garnett*, 608 S.W.2d 794 (Tex. Civ. App. Waco 1980) (loss of rentals appropriate in trespass action). Notably, Congress specifically (and only) allowed the Osage Nation to alienate the OME via a lease. Accordingly, it is no surprise that is the precise form of relief the Tenth Circuit has reversed and remanded this Court to address: "because Osage Wind was required to procure a lease under 25 C.F.R. § 214.7, we REVERSE the district court's order granting summary judgment . . . and REMAND for further proceedings consistent with this opinion." *Osage Wind,* 871 F.3d at 1093. Consistent with fashioning the fair rental value owed to the Osage Nation in the form of a lease, the Court necessarily needs to define the term (period of time) where Defendants use the surrounding minerals **plus** the minerals they process to support their turbines and related wind farm infrastructure. Wind turbines have a life expectancy, and, consequently, Defendants have secured a specific lease term from the surface owners. To implement the Tenth Circuit's finding, Defendants need a lease from the mineral owners. Thus, Mr. Hazel's calculation as to the loss of the rental value of the mineral estate is reasonable.

In discussing all factors at play in how he reached his damages calculation, Mr. Hazel also points out that not only did Defendants mine the OME without a lease, but that the structural support of the OME is necessary to anchor the wind turbines that encompass the surface portion of the OME. Exh. 9 at 145:11-18. *See also*, Exhibit 10, Price Individual Capacity Depo. Tr.,

176:5-18 (identifying that it would have been more expensive to bring in outside materials for backfill than to utilize the OME). Finally, Mr. Hazel notes the OME is being damaged every day that the wind farm is present without a lease. Exh. 9 at 167:19-25, 168:1-6. Together, these factors establish that Mr. Hazel's calculation of damages is reasonable, appropriate, and supported by case law. It is undisputed Plaintiff is entitled to damages for Defendants' trespass. Mr. Hazel's expert report and analysis should guide this Court's decision in this regard.

### ii.  Plaintiff is entitled to an accounting for Defendants' trespass.

Not only have courts found that monetary damages are appropriate in a trespass action, but it is also recognized that Indian owners, or the United States acting for them, are within their rights to request an accounting. *See United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339 (1941) (finding that the United States as guardian of the Walapai (Hualpai) Tribe in Arizona was entitled to an accounting "for all rents, issues and profits derived from the leasing, renting or use of the lands[.]"). Accordingly, Plaintiff is entitled to an accounting from Defendants for the profits derived from Defendants' trespass into the OME.

"The term accounting, or accounting for profits, is used in several ways. In its most important meaning, it is a restitutionary remedy based upon avoiding unjust enrichment…the plaintiff may recover a judgment for the profits due from use of his property." ACCOUNTING FOR PROFITS, Black's Law Dictionary (11th ed. 2019) citing 1 Dan B. Dobbs, *Law of Remedies* § 4.3(5), at 608 (2d ed. 1993). Defendants utilized the OME as structural support for wind turbines. Though Defendants attempt to downplay the necessity of the use of the OME [10], the fact is that Defendants did mine and utilize the OME without a lease[11], admitted it would be more expensive

---

[10] Rock and minerals were "incidental." Exhibit 11, Storch Depo. Tr., 124:1-126:10.
[11] *Osage Wind,* 871 F.3d at 1084, 1091-93.

to bring in outside materials for the backfill than to use the OME minerals[12], and ignored the

BIA's requests[13] to cease mining while refusing to meet with the Osage Nation[14]. Furthermore,

the consensus from Defendants is that the project needed to be completed on time.[15]

Defendants previously argued that the United States is not entitled to an equitable accounting

because it does not meet the factors required.[16] However, as trespassers, Defendants are subject

to an accounting of the profits they received from the unlawful and unauthorized use of the

OME. *See United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339 (1941). It is undisputed that

Defendants used the OME but did not procure a federally required lease. Moreover, Defendants'

wind turbines are actively being stabilized by the ongoing use of the OME. *See Osage Wind,* 871

F.3d at 1091-92. Thus, all profits derived from the wind project must be subject to accounting as

a part of the damages award for Defendants' trespass.

> iii.   **Plaintiff is entitled to the legal remedy of ejectment because of Defendants' trespass.**

An equitable remedy is defined as "[a] remedy, usu. a nonmonetary one such as an injunction

or specific performance, obtained when available legal remedies, usu. monetary damages, cannot

adequately redress the injury." REMEDY, Black's Law Dictionary (11th ed. 2019). In *Jicarilla*

*Apache Tribe v. Andrus*, the Petition requested cancellation of leases that had been approved by

the Secretary of the Interior. 687 F.2d 1324, 1332-33 (10th Cir. 1982). The Court found that the

request for an equitable remedy (cancellation) to be of paramount importance in establishing the

equitable nature of the case. *Id*. This, of course, differs greatly from the case at bar. Here, the

---

[12] Exh. 10 at 176:5-18

[13] Exh. 11 at 180:6-182:14.

[14] *Id*. at 138:8-139:6 (objecting to meeting with Chief Standing Bear: "I am not convinced we want to do this, in fact consider this a formal objection. He has not proven to be honorable in our past dealings[.]").

[15] Exh. 10 at 195:15-196:9; Exh. 11 at 139:7-140:5.

[16] Dkt. 150 at 31-32.

United States seeks damages or ejectment due to Defendants' trespass resulting from their willful failure to obtain a lease prior to mining the OME.

In *Chase v. United States*, 272 F. 684, 685 (8th Cir. 1921), the Court recognized that the United States, in exercise of its trust powers, "in respect of the approval of leases during the restricted period against obstruction and trespass… is not remitted to the **ordinary legal remedies of ejectment** and wrongful detainer." (emphasis added). Further, 25 C.F.R. § 162.106, though it discusses possession taken without an approved lease as to agricultural lands, explicitly states that the BIA "will take action to recover possession on behalf of the Indian landowners, and pursue any additional remedies available under applicable law." While these authorities may not be controlling here, they do provide justification for the conclusion that the United States' remedy of ejectment is not automatically an equitable remedy but could be considered a legal remedy. *See also Marsh v. Brooks,* 49 U.S. 223, 232 (1850) ("an action of ejectment could be maintained on an Indian right to occupancy and use, is not open to question.").

Thus, Plaintiff is not limited to arguing for an equitable remedy of ejectment. Instead, Plaintiff is entitled to the legal remedy of ejectment due to Defendants' trespass in the OME. The Osage Nation, through the OMC, maintains the sole right to the occupancy and use of the OME that Defendants currently possess. As Defendants ignored requests to cease their mining and show no intent to voluntarily remove themselves from the OME, Plaintiff is entitled to ejectment.

### E. Defendants cannot establish sufficient facts to offset the damages caused by their willful behavior and ignorance of the law.

#### i. Reliance on counsel defense does not operate to bar such recovery.

Plaintiff anticipates Defendants will assert they relied on the advice of counsel to push forward with their illegal, unlicensed mining of the OME. Specifically, Defendants previously argued "any Defendant found to have engaged in unlawful conduct believed in good faith that its

conduct was not illegal," could not be held liable for damages. Dkt. 174 at 16. Defendants therefore continued to assert their reliance on counsel resulted in advice that no lease was required[17], despite contrary assertions by the other parties in this matter. During depositions, Defendants continue to utilize an opinion from their counsel to shield their misconduct, despite the fact that Defendants' counsel did not state with all certainty that Defendants' actions were legal.[18] Further, the Magistrate Judge in this matter concluded that "Defendants have injected the 'detailed legal analysis,' as a whole, into the litigation for the factfinder's consideration by relying on the attorneys' conclusions and analysis to prove an innocent state of mind."[19]

This Court has not sanctioned any sort of "defense" based on the parties' relative good or bad faith. Such a defense would flagrantly interfere with the express intent of Congress and its regulations setting forth the **sole** avenue for the OMC to alienate its minerals – a lease. This Court has cited the inquiry relevant to the so-called innocent trespasser (Dkt. 171 at 3):

> Good faith, as the term is used in the rule of law that a trespasser on the land of another who takes property therefrom shall be liable only for the actual damages if the property taken was taken in good faith, means that the taking is without culpable negligence or a willful disregard of the rights of others and in the honest and reasonable belief that it was rightful.

*Dilworth v. Fortier*, 405 P.2d 38, 46 (Okla. 1964). Good faith is only relevant to determine if the trespasser may deduct certain costs. Good faith, in this context, is no defense to trespass.

While the Tenth Circuit recognizes a good faith reliance on counsel defense, it does not operate as "a complete bar to recovery… but is merely one factor a jury may consider when

---

[17] Dkt. 101 at 18; Dkt. 116 at 19; Dkt. 150 at 19-20.

[18] *See* Exhibit 12, Email of 8/25/14 from Slade to Willman ("This memo, as did our prior memo, references cases at pages 5 and 6 recognizing limitations on the surface owners' rights, including that the surface owner may be obligated to reimburse the mineral estate owner for the value of minerals rendered inaccessible to the mineral owner.").

[19] Dkt. 175 at 13-15; Dkt. 183 at 15-20; Dkt. 210 at 9-16.

determining whether a defendant acted willfully." *United States v. Wenger*, 427 F.3d 840, 853 (10th Cir. 2005), citing *United States v. Custer Channel Wing Corp.*, 376 F.2d 675, 683 (4th Cir. 1967). The Tenth Circuit requires a party alleging this defense to establish "(1) a request for advice of counsel on the legality of a proposed action, (2) full disclosure of the relevant facts to counsel, (3) receipt of advice from counsel that the action to be taken will be legal, and (4) reliance in good faith on counsel's advice." *Id.*, citing *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429 (10th Cir. 1988).

Even if this limited defense was available to Defendants (and it is not), Defendants fall far short of the Tenth Circuit's standard. First, there simply is no evidence that Defendants requested legal advice on the full course of proposed action of developing the OME. The memorandum initially prepared by the Modrall law firm cites the issue as: "Whether a surface owner who excavates land for the purpose of construction consistent with its surface rights-and does not remove the land excavated from the property-is engaged in "mining" of the mineral estate and requires a mining permit." Exhibit 13, Modrall 10/31/13 Memo; Exh. 11 at 157-58 (only had benefit of the 2013 memo when excavation began). Of course, by focusing on the "purpose of construction" of the excavation, counsel (and clients) failed to account for the nature and scale of excavation. There is no discussion of the massive amount of materials to be excavated, the planned size of the excavation for each site, or the proposed use to backfill with Osage Minerals and to rely upon them for structural support. The conclusion reached within the memo is that the wind farm "is authorized under its lease [with the landowner] to use or move the soil so long as it does not gain any commercial benefit from that soil." Exh. 13. Even Defendants' executives recognize the commercial benefits to the wind turbines courtesy of the OME. *See* Exh. 3 at 145-46; Exh. 1 at 86; Exhibit 14, Price 30(b)(6) Depo. Tr. at 103-104 (even the material sorted, but

not crushed nor compacted, was used to provide erosion control benefitting the Project). It is strikingly apparent that the memo missed the mark by not evidencing any understanding of the nature and extent of Defendants' excavation and usage of the minerals. Defendants were well-aware the memo missed the mark but "relied" on it anyway.

Additionally, Defendants cannot meet the second requirement to utilize the defense of counsel in an attempt to circumvent the federal leasing requirements and resulting damages here. Although Defendants point to an October 31, 2013, memo as a base document for support of their actions, the plans *at that time* for constructing the Wind Farm did not include the use of dynamite, rock blasting, or rock crushers.[20] Further, While the "detailed legal analysis" Defendants eventually sent to the United States on October 21, 2014, mentioned rock crushing as a method of excavation, all of the versions of the memo Defendants claim to have relied on prior to October 2014 are devoid of any mention of rock blasting or rock crushing. Cf. Dkt. 17-4 with Exh. 13; Exhibit 15, Modrall 5/19/14 Memo; Exhibit 16, Modrall 8/25/14 Memo; Exhibit 17, Modrall 9/3/14 Memo.

Furthermore, Defendants did not receive advice from counsel that their actions were, or would be, legal. First, the attorneys did not have information as to the full extent of the excavation occurring, as noted. The memo author states that "no federal cases" interpreting the regulatory definition of mining or "the rights of mineral estates owners in Osage County," were located. Exh 13. at 3. The author conceded that the surface owner "may not use [the mineral estate] for commercial or other purposes." *Id*. at 5. Finally, the author concedes that the question

---

[20] EGPNA's initial plans for constructing the wind farm specifically excluded blasting or rock crushing, as noted by the March 2013 Scope of Work for construction. *See* Exhibit 18 at 12 ("Rock blasting . . . has not been included.") and 13 ("Rock blasting . . . is not included."); Exhibit 19, Email of 9/2/2014 from Mazurowski to Moskaluk (initially, "Enel/Tradewinds [did] not want any crushing onsite due to mineral right issues.").

of whether excavation incident to construction was mining or not "appears largely unaddressed" in the regulations, cases, decisions and secondary sources reviewed. She then posits that where courts have held a "surface owner may use soil," it "appears to be because construction is not 'mining,'" although no courts held so "explicitly." *Id*. at 7. The memo contains no discussion of excavation volumes, crushing, or plans to make use of the rock and require a 500-foot setback.

### ii.     Defendants are not innocent trespassers as a matter of law.

The Oklahoma Supreme Court holds that in evaluating whether a trespasser who unlawfully removes minerals from another's property, "good faith" must be "established by proof . . . the taking is without culpable negligence or a willful disregard of the rights of others and in the honest and reasonable belief that it was rightful." *Dilworth*, 405 P.2d at 46. Good faith is only relevant to determine whether, ultimately, the trespasser may deduct certain costs. Conversely, if bad faith is found, damages are subjected to multiples based on various Oklahoma statutory authorities. Importantly, good faith, in these contexts, is no defense to trespass. This Court has repeatedly reminded the parties of the "strong interest in the vindication of Indian land claims." Dkt. 264 at 20.[21] *See also United States v. State of Wyo.*, 331 U.S. 440, 458 (1947) (holding "the burden of pleading and proving good faith is on the defendant. The 'good faith' … is something more than the trespasser's assertion of a colorable claim to the converted minerals.").

### F.     Plaintiff is entitled to equitable remedies as a matter of law.

If the Court concludes that ejectment is not a viable legal remedy, Plaintiff remains entitled to assert ejectment as an equitable remedy. Even under the equitable remedy analysis, Plaintiff remains entitled to judgment as a matter of law. Alternatively, another form of injunction

---

[21] It is not certain, however, that Defendants are entitled to assert this state law defense, which solely serves to offset conversion costs by allowing them to deduct their costs of extraction, to the trespass to Indian trust property claim in this matter. *See Davilla*, 913 F.3d at 967.

available to the Court, shy of removing the entire wind farm, is temporarily ordering Defendants to shut down the turbines and stop electricity generation until they secure the federally required lease as the Tenth Circuit directed. *See Owner-Operator Independent Drivers Ass'n, Inc. v. Ledar Transport*, No. 00-258, 2000 WL 33711271 (W.D. Mo. Nov. 3, 2000) (enjoining the defendant motor carrier from operating certain motor vehicles that it did not own, until it executed written lease agreements with the owner-operators in accordance with 49 C.F.R. § 3 76.12).

*Davilla* is the instructive case for weighing a request for injunction on tribal land. *Davilla* articulates three factors to consider in weighing a request for trespass and injunction on tribal land; all of which require the Court to ascertain what effect an injunction, or ejectment in this case, would have on the parties.

### i.       Irreparable Harm

The first factor identified in *Davilla* is a consideration of whether an injunction is necessary to prevent irreparable harm. 913 F.3d at 973. "A district court may find irreparable harm 'based upon evidence suggesting that it is impossible to precisely calculate the amount of damage plaintiff will suffer.'" *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009), citing *Equifax Servs., Inc. v. Hitz,* 905 F.2d 1355, 1361 (10th Cir. 1990) (quotation and alterations omitted). An injury may be classified as "'irreparable when it is incapable of being fully compensated for in damages or where the measure of damages is so speculative that it would be difficult if not impossible to correctly arrive at the amount of the damages.'" *Id.*, quoting *Hines v. Indep. Sch. Dist. No. 50,* 380 P.2d 943, 946 (Okla. 1963).

Defendants herein developed the minerals from the OME, ignoring letters requiring them to cease operations, doubting the BIA was a government agency, and refusing to meet with the

20

Osage Nation/OMC.[22] However, it is undisputed Defendants' actions constitute a trespass, and such trespass not only caused money damages but continues to utilize the OME minerals without a lease **to this day**. Defendants' trespass interferes with the self-governance of the Osage Nation through the OMC. Defendants' trespass bypassed and ignored the requirement to obtain a lease from the OMC yet developed the minerals owned in trust for the Osage Nation. Inherent to tribal self-governance is the ability to make laws and regulations for the protection of tribal property.[23] In *Seneca-Cayuga Tribe of Oklahoma v. State of Oklahoma*, 874 F.2d 709, 716 (10th Cir. 1989), the Tenth Circuit Court of Appeals concluded that "significant interference with [the] self-government" of a Tribal Nation constitutes irreparable harm.

Defendants were aware of the parties' position yet proceeded to irreparably and irrefutably mine the OME. Though damages can compensate in part for their willful, arrogant actions, the fact remains that the OME can never be restored, and Defendants' actions overtly ignoring the Osage Nation[24] renders irreparable harm evident. The OME that Defendants intentionally mined without ever attempting to obtain a lease can never be replaced. The injury to the Osage Nation

---

[22] Exhibit 20, Phillips' 10/9/14 letter, Exhibit 21, Yates' 10/10/13 letter, and Exhibit 22, Ketcher's 7/19/12 letter.

[23] *See* 42 C.J.S. Indians § 55: "A tribe has the power to make its own substantive law in internal matters and retains its original natural rights in matters of local self-government. The tribes' rights include the right to make all laws and regulations for the government **and protection of tribal** persons and **property** consistent with the Constitution and laws of the United States." (emphasis added).

[24] Exhibit 23, 8/22/13 MIPA at 4 ("for the avoidance of doubt, no Native American tribe, nation, entity, body, organization, governmental or other authority, or agency, division, ministry, instrumentality or authority thereof, shall be considered a 'Governmental Authority' for any purpose hereunder."). Beyond the definition itself, Defendants' irreparable damage has been consistently demonstrated in their cavalier approach to the Project. With warning aplenty, Defendants went ahead with their plans, mined the OME, fought this litigation tooth and nail (sparing no expense regarding attorneys' fees), and now expect the Court to award a pittance – if anything – for their transgressions. If successful, their actions embolden other bad actors to emulate their systematic avoidance of negotiating with the Osage Nation and disincentivize recognition of applicable federal regulations.

and the OMC, through Defendants' actions and attitude, irreparably injured the sovereignty and standing of the Indian owners of the OME.

### ii.     Balancing of Potential Harm

The second factor identified in *Davila* is whether "'the threatened injury outweighs the harm that the injunction may cause' to the enjoined party." 913 F.3d at 973 (citing *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014) (quoting *Sw. Stainless, LP*, 582 F.3d at 1191). Defendants have no injury; they built and operated their wind farm while permanently damaging the OME. Defendants did not ask permission but instead now ask forgiveness and assert it is too costly to remove the wind farm, citing their self-calculated costs of removal as their harm. Chiefly, a trespasser "has no right to benefit from [its] illegal trespass." *Greyhound Lines, Inc. v. Peter Pan Bus Lines, Inc.,* 845 F. Supp. 295, 302 (E.D. PA 1994) (injunction entered against competing bus line that had no right to send "hawkers" onto competitor's property to solicit business).

Fully aware the United States sought a preliminary injunction at the onset of this suit to bring the wind farm into compliance, Defendants failed to secure an expert to testify on the potential harm that could be imposed on them. Instead, they opted to create their own figures for their expected harm. *See* Dkt. 17-1 at 8-9; Exhibits 24 and 25, Cost Estimates of Removal and Decommissioning; Exhibit 26, Pike 30(b)(6) Depo. Tr. Pt. 2 at 47:14-50:3. A year after Defendants first provided their in-house potential harm calculations, Mr. Pike presented revised figures, explaining he had discovered a $30,000,000 error in Defendants' earlier calculation. *Id.* at Exh. 26. An engineer by education, Mr. Pike found this calculation error that eluded Defendants' finance professionals. This sort of slapdash, back-of-the-envelope calculation, mixing real expenses that may be paid with softer, lost profit calculations for individual partners, is wholly insufficient to demonstrate undue hardship or burden in the balancing of equities.

It is clear Defendants simply made a business decision, after receiving communications from the United States and the Osage Nation. It was, literally, calculated risk because Defendants had all the information related to potential costs and losses. However, such decisions about the applicability and enforcement of regulations are a "constantly evolving part of the normal business landscape" and "provide no basis for the notion courts should insulate business from the consequences of business decisions." *Central Valley Chrysler-Jeep, Inc. v. Golstene*, 563 F.Supp.2d 1158, 1169 (E.D. Cal. 2008). In *Golstene*, the court found that an automaker failed to show how issues of equity would be implicated, even if they had been forced to make a business decision about applicable regulations and enforcement. Of course, Defendants were aware of a legal issue flagged by both the United States and the Osage Nation and chose to proceed with expensive investments of capital, equipment, personnel, and contractual obligations extending for decades. As the *Golstene* court concluded, "the choice to proceed [] is fundamentally just a business decision that, like any other, may have negative consequences if wrongly made. **It is not up to the courts to deflect the burden of such business decisions**." *Id*. (emphasis added).

The harm to the OME is Defendants' trampling of Congressional intent. The OME under the wind farm remains inaccessible for the duration of the wind farm's presence. In weighing the harm, Defendants' actions set a dangerous precedent of act first, ask later. Not only is the OME permanently and irreparably damaged at the wind farm location, made inaccessible for mining, but the future harm remains at issue as economic return to OME owners cannot be maximized.

### iii.    Public Interest

The third factor identified in *Davilla* is if the injunction would "'adversely affect the public interest.'" *Davilla,* 913 F.3d at 973 (citing *Kitchen*, 755 F.3d at 1208) (quoting *Sappington*, 582 F.3d at 1191)). The OME, as a form of tribal self-government and an independent source of

23

income, should be viewed as matter of public interest. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1253 (10th Cir. 2001) ("[T]his court's case law suggests that tribal self-government may be a matter of public interest."), citing *Seneca-Cayuga*, 874 F.2d at 716 ("injunction promotes the paramount federal policy that Indians develop independent sources of income and strong self-government."). Conversely, Defendants are a private company with no identifiable public interest sufficient to tip the scales in a weighing of public interest. *See Foltz v. Columbia Cas. Co.*, No. CIV-15-1144, 2016 WL 4402056, at *2 (W.D. Okla. Aug. 18, 2016) (public interest not adversely impacted where the conflict is "a private dispute between private parties[.]").

As discussed in Statement of Undisputed Facts 1-5, Congress has enacted law and directed that enforcing regulations be made to preserve the OME and to allow alienation in a specific manner. When considering public interest as part of an equitable balancing test, the Tenth Circuit has confirmed that "democratically elected representatives . . . are in a better position than this Court to determine the public interest[;]. . . [t]he courts' peculiar function is to say what the law is, not to second-guess democratic determinations of the public interest." *Fish v. Kobach*, 840 F.3d 710,755 (10th Cir. 2016) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1191 (10th Cir. 2003). As a matter of fact, in *Fish*, the Tenth Circuit acknowledged that "the Supreme Court noted that although courts should exercise their traditional equitable practices in evaluating requests for injunctive relief for violation of a federal statute, those practices are 'conditioned by the necessities of the public interest which Congress has sought to protect.'" *Id.*, quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## V.    Prayer for Relief

In accordance with Fed. R. Civ. P. 56, the United States is entitled to judgment as a matter of law on the issues of conversion, trespass, and continuing trespass. Specifically, the United States

24

requests the Court award relief stemming from Defendants' trespass of the OME in the form of monetary damages for fair rental value, an accounting, and the legal remedy of ejectment.

Additionally, the United States also requests a finding that Defendants invaded the OME as willful violators of federal mining regulations, not as innocent trespassers. Finally, the United States requests it be awarded all forms of equitable relief including, at minimum, an order enjoining Defendants continued electricity generation at the Osage Wind Project until they secure the federal mining lease compliant with Part 214.7 and approved by the Court. Should the Court not award fair rental value for a future period when Defendants lack the federally required mining lease, and if the Court fails to award the legal remedy of ejectment, the United States alternatively requests the Court award equitable ejectment at such time.

<div style="margin-left: 40%;">

Respectfully submitted,

UNITED STATES OF AMERICA
United States Attorney

s/ Cathryn D. McClanahan
Cathryn D. McClanahan, OBA No. 14853
Nolan M. Fields IV, OBA No. 31550
Assistant United States Attorneys
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119
T: 918-382-2700
cathy.mcclanahan@usdoj.gov
nolan.fields@usdoj.gov

Stuart P. Ashworth, OBA No. 31468
Special Assistant United States Attorney
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor's Office
P.O. Box 470330
Tulsa, Oklahoma 74147
T: 918-669-7905
stuart.ashworth@sol.dog.gov

</div>

Of Counsel:
Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor's Office
P.O. Box 470330
Tulsa, Oklahoma 74147
T: 918-669-7902
charles.babst@sol.doi.gov