IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, and THE OSAGE MINERALS COUNCIL,<br><br>Plaintiffs,<br><br>vs.<br><br>OSAGE WIND, LLC;<br>ENEL KANSAS, LLC; and<br>ENEL GREEN POWER NORTH AMERICA, INC.,<br><br>Defendants. | Case No. 14-CV-704-GKF-JFJ |

**DEFENDANTS' RESPONSE TO PLAINTIFF THE UNITED STATES' MOTION TO DETERMINE SANCTIONS FOR SPOLIATION OF EVIDENCE [Dkt. # 293]**

Defendants Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc. ("EGPNA" and together, "Defendants") respond in opposition to Plaintiff the United States' Motion to Determine Sanctions for Spoliation of Evidence [Dkt. # 293] (the "Motion"). The United States' request for sanctions is baseless, because the United States cannot satisfy the threshold requirement that such evidence alleged to have been spoliated *actually existed* in the first place. Here, the subject "measurements and records regarding [Defendants'] mining activities" were never created or kept by the Project's general contractor. Motion at 1. Defendants cannot be sanctioned for destroying documents that never existed. Further, the United States is not prejudiced by the absence of records of volumes of minerals excavated by the general contractor, because record drawings confirming the size of the excavated area for each turbine foundation exist and the United States' and Defendants' expert witnesses have been able to calculate the volumes of

minerals excavated. As fully explained herein, the United States' request for sanctions is unsupported by case law, and the Motion should be denied in its entirety.

I.  **BACKGROUND**

The United States' Motion is premised on the absence of contemporaneous records showing the volume of various minerals (limestone, clay, shale) excavated by IEA, or any subcontractors it may have engaged, during the construction of the Osage Wind wind energy project (the "Project"). Craig Mazurowski, Project Manager for the general contractor, IEA Renewable Energy, Inc. ("IEA"), testified that his company did not record volumes of minerals crushed on site. *See* Deposition of Craig Mazurowski, relevant portions attached hereto as **Exhibit 1**, at 153:11-13. The United States served subpoenas for documents related to the Project on IEA and a number of IEA's subcontractors, obtaining thousands of documents. Records showing the volume of minerals crushed at the Project site were not contained among the documents produced. The United States does not appear to dispute that records showing the volume of minerals excavated at the Project site were never created by IEA. *See* Motion at 4 ("Sadly, it is now apparent no records of the volume of crushed rock were kept."). That concession dooms this Motion.

Typically, records of volumes excavated are only created where the construction contract provides the contractor will be paid based on volume excavated. Declaration of Stephen D. Pike ¶ 4, attached as Exhibit 8 to Defendants' Motion for Partial Summary Judgment (Dkt. # 297). *Id.* Even then, the contractor calculates the volume based on the size of the excavated area. *Id.*

Here, while an earlier version of the contract provided for payment of the contractor based on volumes excavated, *see* Statement of Work, Exhibit B(i) to Balance of Plant Engineering, Procurement and Construction Contract by and between Osage Wind, LLC and RMT, Inc., pp. 10-11, attached hereto as **Exhibit 2**; Deposition of William Price (July 21, 2021) 48:21-49:12,

excerpts attached hereto as **Exhibit 3**, the contract was revised so that it did not provide for payment on this basis. Pike Decl. ¶ 4; Statement of Work, Exhibit B(i) to Balance of Plant Engineering, Procurement and Construction Contract by and between Osage Wind, LLC and IEA Renewable Energy, Inc (fkw RMT, Inc.), pp. 12, attached hereto as **Exhibit 4.** Consequently, there was no requirement that the contractor contemporaneously calculate or record the volumes at issue.

Nonetheless, the volume of material excavated still can be calculated in the same way the contractor would have calculated it at the time. Record, or "as-built," drawings are created to provide an accurate representation of a completed construction project. Pike Decl. ¶ 2. Following construction of the Project, IEA, its subcontractor, and the engineering company concluded IEA had not deviated from the construction plans for the turbine foundations, and proceeded to issue record drawings. *Id.* ¶ 3 & Ex. A thereto. Those record drawings demonstrate the size of each turbine excavation and the size of the holes excavated, allowing for the volume excavated to be calculated. *Id.* ¶ 4; *see also* Pfahl Report at 24-25 & n.22 (noting there were no changes between the foundation plans and record drawings).

The United States repeatedly points to a December 9, 2014 Declaration by Bill Moskaluk [Dkt. # 17-1], in which he stated that Osage Wind's contractor "records the volume of rock crushed[.]". At most, this declaration indicates Mr. Moskaluk understood or expected such records would be prepared and kept by the contractor. Mr. Moskaluk testified he understood the contract between Osage Wind and IEA required IEA to record such volumes, *see* Deposition of Bill Moskaluk, relevant portions attached hereto as **Exhibit 5**, at 46:1-48:19, and would expect to find them in "as-built drawings". *Id.* at 56: 17-23, 119: 20-121:7. As noted, the contract with IEA had been modified to remove any such requirement, and the record drawings were retained, allowing for such calculation. In any event, Mr. Moskaluk did not declare that Defendants, or any of them,

3

were keeping the documents, or that he had seen or reviewed the documents he believed IEA was keeping. The "records" at issue in the United States' Motion for spoliation sanctions never existed.

Further, the absence of contemporaneous volume calculations is no impediment here; the same calculation that the contractor would have performed to create such records can be performed today. Indeed, the United States and Defendants have retained expert witnesses who have used documents created during and at the conclusion of Project construction to calculate the amounts and types of minerals excavated. Defendants retained John Pfahl, a mining engineer with over 20 years of experience in the mining and minerals industry. *See* Rule 26(a)(2) Expert Report of John Pfahl, relevant portions attached hereto as **Exhibit 6** ("Pfahl Report"). The United States retained geologist Robert Freas, who also has experience in the minerals industry. *See* Rule 26(a)(2) Expert Report of Robert Freas, relevant portions attached hereto as **Exhibit 7** ("Freas Report"). To determine the volume of minerals excavated, Mr. Pfahl and Mr. Freas both relied on record drawings of the excavations prepared for the Project, geological studies conducted of the Project site, and general geological information. While their approaches differed somewhat, and they did not agree on what Project infrastructure should be included when calculating the total volume of minerals excavated, or the royalty rate to determine the value of minerals "mined," the differences in methodology were minimal. Indeed, the United States' expert testified he "has no real argument" with the methodology employed or calculations of Defendants' expert. *See* Deposition of Robert Freas, relevant portions attached hereto as **Exhibit 8**, at 57:25-58:13. As relevant to the United States' Motion for spoliation sanctions, both Mr. Pfahl and Mr. Freas had sufficient information to calculate (i) the volume of minerals "mined" to the cubic yard, and (ii) the value of such minerals. *See* Pfahl Report at 4; Freas Report at 11.

4

The Court should deny the Motion because (i) parties cannot be sanctioned for destroying evidence that never existed, and (ii) the United States has suffered no prejudice because the parties' experts have calculated the volume (and value) of minerals mined at the Project site.

I.     **ARGUMENT**

**A. FEDERAL LAW GOVERNS THE UNITED STATES' MOTION FOR SANCTIONS.**

The United States relies on Oklahoma state law in its Motion, but federal courts apply federal law to resolve motions for sanctions based on spoliation of evidence. *See Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1226 n.6 (10th Cir. 2017); *Cox. v. Trans. Co. of Ariz., LLC*, No. 18-CV-117-CVE-JFJ, 2019 WL 3573668, at *2 (N.D. Okla. Aug. 6, 2019); *Peshlakai v. Ruiz*, No. CIV 13-0752 JB/ACT, 2014 WL 1947680, at *1 (D.N.M. Apr. 28, 2014). Applying federal law, as opposed to Oklahoma state law, is proper because "'the authority to impose sanctions for spoliated evidence arises not from substantive law, but rather from the court's inherent power to control the judicial process,'" and "'a spoliation ruling is evidentiary in nature and federal courts generally apply their own evidentiary rules in both federal question and diversity matters.'" *Peshlakai*, 2014 WL 1947680, at *1 (quoting *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009)). Accordingly, this Court should disregard the United States' citation to presumptions and standards for spoliation of evidence under Oklahoma law, *see, e.g.*, Motion at 9 ("Oklahoma law has long recognized the existence of an 'adverse presumption that follows the destruction or spoliation of evidence'"), and apply the standards imposed by federal law, which are set out below.[1]

---

[1] Even if Oklahoma state law applied, the United States' Motion should still be denied because Oklahoma law does not permit sanctions for spoliation of evidence when the evidence at issue never existed. *See Patel v. OMH Medical Center*, 987 P.2d 1185, 1202 (Okla. 1999) (affirming dismissal of a claim for spoliation of evidence where "[n]o destruction or alteration of a document or instrument took place").

### B. SANCTIONS FOR SPOLIATION OF EVIDENCE ARE INAPPROPRIATE WHERE THE EVIDENCE AT ISSUE NEVER EXISTED.

The United States, as the party alleging spoliation of evidence, "must establish: (1) that the party having control over the evidence had an obligation to preserve it; (2) that records were destroyed with a 'culpable' state of mind; and (3) that the destroyed evidence was relevant to the movant's claims or defenses." *Aircraft Fueling Systems, Inc. v. Southwest Airlines Co.*, No. 08-CV-414-GKF-FHM, 2011 WL 4954250, at *2 (N.D. Okla. Oct. 18, 2011). In addition, "there is the obvious requirement that the evidence must have existed," which courts have identified as "[t]he threshold issue in any motion for spoliation[.]" *CCA Recordings 225 Litigation v. United States*, No. 19-cv-2491-JAR-JPO, 2021 WL 2212758, at *8 (D. Kan. June 1, 2021). A party cannot "prevail on a spoliation motion unless he can produce some evidence that documents containing relevant information actually existed and were destroyed." *Kincaid v. Wells Fargo Securities LLC*, No. 10-CV-808-JHP-PJC, 2012 WL 162349, at *2 (N.D. Okla. Jan. 19, 2012); *Huckels v. Safeway, Inc.*, No. 16-cv-00595-MJW, 2018 WL 6243317, at *2 (D. Colo. Apr. 17, 2018) ("It is axiomatic that a spoliation sanction is only warranted in instances where the moving party can show that the evidence alleged to have been destroyed actually existed[.]").

Numerous courts within the Tenth Circuit have declined to impose sanctions for spoliation of evidence where such evidence never existed. For example, in *Schreiber v. Fed. Express Corp.*, No. 09-CV-128-JHP-PJC, 2010 WL 1078463, at *5 (N.D. Okla. Mar. 18, 2010), the employment discrimination plaintiff sought a spoliation jury instruction because an IT employee of the defendant stated that he was asked to erase e-mails on the plaintiff's computer. Because the plaintiff could not conclusively show that his computer actually contained relevant e-mails, *Schreiber* concluded the plaintiff could not satisfy the requirement that he was prejudiced by the alleged evidence destruction, and declined to impose a spoliation sanction. *Id*. Similarly, in

6

*Oldenkamp v. United American Insurance Co.*, No. 07-CV-601-TCK-PJC, 2008 WL 46682226, at *2-3 (N.D. Okla. Oct. 21, 2008), the plaintiff alleged the defendant destroyed relevant e-mails, pursuant to its company policy directing that sensitive messages be deleted as soon as possible. *Oldenkamp* rejected the plaintiff's request for sanctions because the plaintiff "offered no evidence that any relevant e-mails existed, nor that any were destroyed." *Id*.

The Motion does not advance any case law in which a court sanctioned a party for spoliation of evidence where such evidence never existed. *See* Motion at 8-9 (citing *Patel v. OMH Medical Center*, 987 P.2d 1185, 1202 (Okla. 1999) (affirming dismissal of a claim for spoliation of evidence where "[n]o destruction or alteration of a document or instrument took place"); *U.S. v. Koch Indus., Inc.*, 197 F.R.D. 463, 486 (N.D. Okla. 1998) (concluding that spoliation sanctions were appropriate where a party's conduct "resulted in the destruction of computer files containing information relevant to the issues in this litigation"); *Manpower, Inc. v. Brawdy*, 62 P.3d 391, 392-93 (Okla. Civ. App. 2002) (rejecting defendant's argument that plaintiff's obtaining medical treatment for back injury attributed to defendant constituted spoliation of evidence); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 73-74 (S.D.N.Y. 1991) (concluding that a party spoliated evidence by destroying relevant maintenance records)). In *Johnson v. EOG Resources, Inc.*, No. 18-CV-123, 2020 WL 10356190, at *6-7 (D. Wyo. Jan. 27, 2020), the primary case on which the United States relies, it was "undisputed" the defendant "had control over" a critical piece of evidence (a threaded fitting that had "separated and exploded," injuring the plaintiff at an oil wellsite), but the defendant "lost or destroyed" the fitting. *Johnson*, where relevant evidence existed and was lost or destroyed, does not support that Defendants here should be sanctioned because the Project's general contractor did not create records of minerals mined at the Project site.

The United States repeatedly points to the Declaration of Bill Moskaluk, which stated that "Osage Wind's contractor has records of volumes crushed," Motion at 2, 5-7, but courts have concluded that inaccurate statements about the existence of evidence do not give rise to spoliation sanctions. For example, in *Willis v. Cost Plus, Inc.,* No. 16-639, 2018 WL 1319194, at *4–5 (W.D. La. Mar. 12, 2018), an employee of the defendant mistakenly noted on an incident report that the plaintiff's fall was captured by surveillance cameras, and the plaintiff asserted a spoliation claim because no surveillance footage was produced. *Id*. After the defendant's employee testified that she "mistakenly checked the 'yes' box" on the incident report, the court granted summary judgment on the spoliation claim because the plaintiff had no evidence showing the defendant "actually did capture the incident on its surveillance video." *Id*. In *Putscher v. Smith's Food & Drug Centers, Inc.,* 2014 WL 2835315, at *6–7 (D. Nev. June 20, 2014), another slip-and-fall case, the defendants' written discovery responses left open the possibility that surveillance footage of the plaintiff's fall existed, and an employee of the defendant testified that she "believe[d]" surveillance cameras captured the area where the plaintiff fell. However, in light of other, more conclusive evidence that no "surveillance footage of [the plaintiff's] slip and fall ever existed," the court denied the plaintiff's request for spoliation sanctions based on the missing surveillance footage. *Id*.; *see also Huckels*, 2018 WL 6243317, at *2 (employee's deposition testimony that he "believe[d]" he took notes was insufficient grounds for spoliation claim based on absence of notes).

The United States' Motion does not cite any case law holding that a mistaken statement about the existence of records can give rise to sanctions for spoliation of evidence. *See generally* Motion. In lieu of case law, the United States relies on false and overblown descriptions about the effect of the contractor's not recording volumes excavated. *See* Motion at 11 ("Both experts must

now resort to educated speculation thanks to Defendants' broken promises."); *id*. at 2 ("Defendants acknowledged this concern that monetary damages would become increasingly difficult to calculate as they continued to ravage the OME."). Mr. Moskaluk's understanding or expectation that Osage Wind's contractor created and kept records of volumes of minerals crushed at the Project site was inaccurate. *See* Mazurowski Dep. 153:11-13; Pike Decl. ¶ 4. Nevertheless, the volumes of minerals crushed can still be calculated in the same manner that Osage Wind's contractor would have calculated them at the time of Project excavation. Mr. Pfahl and Mr. Freas have done so. *See* Pfahl Report at 4; Freas Report at 11. The United States has not advanced any authority suggesting that it is entitled to the host of remedies for alleged spoliation of evidence it requests in its Motion. As explained above, applicable case law suggests otherwise, and the Motion should be denied.

### C. THE UNITED STATES HAS SUFFERED NO PREJUDICE DUE TO DEFENDANTS' ALLEGED SPOLIATION OF EVIDENCE.

To succeed on a motion for spoliation sanctions, in addition to showing the evidence actually existed at one point in time, a party must establish that it was prejudiced by the destruction of evidence. *Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1149 (10th Cir. 2009). Here, the United States not only fails to establish that evidence was destroyed (because the subject records never existed), but it also fails to establish that it suffered prejudice from the lack of records of volumes of minerals mined at the Project site. Again, the same calculation that the contractor would have performed in 2014 to create such records can be performed today. Both Defendants' expert, Mr. Pfahl, and the United States' expert, Mr. Freas, used existing documentation to calculate the volumes of minerals excavated for turbine foundations at the Project site to the cubic yard. *See* Pfahl Report at 59-60 (Mr. Pfahl calculated 1,425 cubic yards per turbine foundation and Mr. Freas calculated 1,915 cubic yards per turbine foundation). And although they apply different

9

royalty rates (Mr. Pfahl applying the rate used on leases in effect in the 2014 timeframe, and Mr. Freas a ten-percent royalty rate), both experts were able to calculate the amount of royalties due the OMC. *See* Pfahl Report at 4 ($68,993); Freas Report at 11 ($247,979.42). The United States decries the absence of a "completely accurate account of what materials" were excavated at the Project site, Motion at 4, but the absence of a "completely accurate account" of specific materials excavated does not mean that the United States is "actually, rather than merely theoretically" prejudiced. *Turner*, 563 F.3d at 1150.

To the contrary, Mr. Pfahl's expert report explains how he deliberately formed a conservative calculation of the minerals excavated at the Project site. *See* Pfahl Report at 29-30. An example of Mr. Pfahl's conservative approach is that the construction plans for excavations for turbine foundations "outline a structural excavation of approximately 7-foot depth and average diameter of 59.5 feet . . . which results in a total excavation of approximately 720 cubic yards" per turbine foundation. *See id*. at 59-60. While the construction plans would allow for calculation of the volume of minerals excavated, Mr. Pfahl took a conservative approach and assumed a larger structural excavation of 10-foot depth and average diameter of 70 feet, for a total excavation of 1,425 cubic yards per turbine foundation. *See id*. The United States strains to establish prejudice arising from the lack of "completely accurate" records, but given the conservative calculations by Mr. Pfahl and Mr. Freas,[2] the lack of records of contemporaneous calculations might actually benefit the Plaintiffs by yielding a greater volume of minerals mined. *See* Deposition of John Pfahl, relevant portions attached hereto as **Exhibit 9**, at 57:11-20 ("I was asked to value the minerals

---

[2] As noted herein, the construction plans for the turbine foundations outline an excavation of 720 cubic yards per foundation. Taking a conservative approach, Mr. Pfahl calculated excavations per foundation at 1,425 cubic yards. *See* Pfahl Report at 59-60. Mr. Freas assumes that excavations per foundation were 1,915 cubic yards, without explaining how he arrived at this figure. *See* Freas report at 7.

10

that were excavated, and I found a reasonable approach of calculation. If anything, a close accounting probably would have resulted in a smaller value than I estimated."). In any event, the United States fails to advance any *evidence* it was prejudiced by the absence of the records it claims existed.

The United States asks this Court to exclude Mr. Pfahl's calculation of minerals mined at the Project site in favor of Freas's estimate, in order to "mend the uncertainty Defendants themselves created." Motion at 17. However, the difference between Mr. Pfahl's and Mr. Freas's calculations primarily is due to the experts' methodologies, rather than any conduct by Defendants (or the Project's general contractor, IEA, or its subcontractors). In calculating the volume of minerals mined, Mr. Pfahl correctly relied on the Tenth Circuit's opinion in this case, which limited "mining" to those minerals that were crushed and sorted and taken advantage of for a structural purpose. *See* Pfahl Report at 21 (citing *United States v. Osage Wind*, 871 F.3d 1078 (10th Cir. 2017)). Mr. Pfahl's reliance on the Tenth Circuit opinion eliminated clays, shales, and topsoil from his calculation of minerals "mined," *id*., which yielded a lower calculation than Mr. Freas, who included clay and shale as minerals "mined" by Defendants, *see* Freas Report at 11. Mr. Freas' calculation is also higher than Mr. Pfahl's because Mr. Freas included excavations at all 84 turbine foundations (including two foundations where no crushing occurred), as well as excavations for the Project's collector system, transmission system, substation, and O&M Building, where no crushing occurred.[3] *See* Pfahl Report at 60. The experts also differed on the appropriate royalty

---

[3] The United States characterizes Mr. Freas' analysis as "more detailed and complete," because it accounts for more minerals in more locations than Mr. Pfahl's analysis. As Defendants have repeatedly stated, *see, e.g.*, Defendants' Motion for Partial Summary Judgment and Opening Brief in Support [Dkt. # 297], at 7-8, Plaintiffs' overly broad interpretation of the Tenth Circuit's definitions of "mining" and "mineral development" are unsupported by the Tenth Circuit's opinion. This appears to be the basis of Mr. Freas's overestimate of minerals "mined."

11

rate for the minerals mined. *Id*. at 60-61. Despite their methodological differences, Mr. Freas testified that he has "no real argument with [Mr. Pfahl's] methodology" or "how he calculated" volumes of minerals excavated. Freas Dep. at 57:25-58:13. The United States' request for this Court effectively to conclude that Mr. Freas' methodology is preferable to Mr. Pfahl's is completely unwarranted. No spoliation of evidence has occurred, and the Court should have the opportunity at trial[4] to hear testimony from the two experts and make a decision about their competing methodologies.

Further, the United States asks the Court to order Defendants to "bear the costs incurred by the United States' retention of expert Mr. Freas," Motion at 17, despite the fact that Freas would almost certainly have been retained regardless of the alleged spoliation of evidence. As the Plaintiff in this case, the United States has the burden of proving its damages arising from Defendants' conduct. It is unclear how the United States believes it could prove its damages arising from "mining," as defined by the Tenth Circuit, without retaining an expert in geology and mining like Mr. Freas—even if Osage Wind's contractor had kept the type of records the United States now claims to need. The United States is not prejudiced by retaining a necessary expert to prove up its case. The request for payment of Mr. Freas's fees is unjustified and should be denied.

## II.   CONCLUSION

For the reasons explained herein, Defendants respectfully request that the Court deny the United States' Motion in its entirety.

---

[4] If the United States believes that Mr. Pfahl's approach is unreliable, then it should file a *Daubert* motion to exclude his testimony, rather than seeking a backdoor exclusion based on a flawed spoliation theory.

Respectfully submitted,

/s/ Ryan A. Ray_____
**Ryan A. Ray**, OBA # 22281
**NORMAN WOHLGEMUTH, LLP**
3200 Mid-Continent Tower
401 South Boston Avenue
Tulsa, OK 74103
918-583-7571
918-584-7846 (facsimile)

-and-

**Lynn H. Slade**, *pro hac vice*
**Sarah M. Stevenson**, *pro hac vice*
**Dominic A. Martinez**, *pro hac vice*
**MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.**
Post Office Box 2168
Albuquerque, NM 87103-2168
505-848-1800
505-848-9710 (facsimile)

-and-

**Thomas J. McCormack**, *pro hac vice*
**Robert Kirby**, *pro hac vice*
**NORTON ROSE FULBRIGHT US LLP**
1301 Avenue of the Americas
New York, NY 10019
212-318-3000
212-318-3400 (facsimile)

*Of Counsel:*
**Robin D. Ball** (Los Angeles Office), *pro hac vice*
**Robert D. Comer** (Denver Office), *pro hac vice*
**NORTON ROSE FULBRIGHT US LLP**

**ATTORNEYS FOR DEFENDANTS
OSAGE WIND, LLC, ENEL KANSAS, LLC
AND ENEL GREEN POWER NORTH
AMERICA, INC.**

**CERTIFICATE OF SERVICE**

      I hereby certify that on November 1, 2021, I electronically transmitted the attached Document to the Clerk of the Court using the ECF System for filing. Based on the electronic records currently on file, the Clerk of the Court will transmit a notice of Electronic Filing to the following ECF registrants:

Cathryn D. McClanahan
Nolan Fields IV
Stuart P. Ashworth
Mary Kathryn Nagle
Wilson Kirk Pipestem
Abi Laura Fain
David McCullough
Jeffrey S. Rasmussen
The following non-ECF registrants have been served by email:

Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor Office
7906 East 33rd Street
Tulsa, OK 74145
(918) 669-7730
Charles.babst@sol.doi.gov
*Attorney for the United States of America*


/s/ Ryan A. Ray
Ryan A. Ray