**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| (2) OSAGE MINERALS COUNCIL, | ) | Case No. l4-CV-704-GKF-JFJ |
| | ) | |
| Intervenor-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1) OSAGE WIND, LLC; | ) | |
| (2) ENEL KANSAS, LLC; and | ) | |
| (3) ENEL GREEN POWER | ) | |
| NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**INTERVENOR-PLAINTIFF OSAGE MINERALS COUNCIL'S
RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

i

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

I.    INTRODUCTION ................................................................................................... 1

II.   PROCEDURAL BACKGROUND ............................................................................. 1

III.  RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ...................... 3

IV.   STANDARD OF REVIEW ...................................................................................... 7

V.    ARGUMENT ......................................................................................................... 8

      A.   Defendants Are Not Entitled to Judgment on the OMC's Claims for Trespass and
           Continuing Trespass ................................................................................... 8

           i.   Defendants Trespassed on the Osage Mineral Estate ........................ 8

           ii.  Defendants' Continued Unauthorized Use of Osage Minerals Constitutes a Continuing
                Trespass ........................................................................................ 12

           iii. Defendants' Trespass is Abatable .................................................. 15

           iv.  The Fact that Rock Was Crushed Does Not Preclude the OMC's Claim for Continuing
                Trespass ........................................................................................ 16

      B.   The OMC is Entitled to Permanent Injunctive Relief ............................... 17

           i.   The OMC Will be Irreparably Harmed Absent the Provision of Injunctive Relief ....... 17

           ii.  Removal of the Wind Farm Will Remedy the Harm Caused by Defendants'
                Trespass ........................................................................................ 21

      C.   The OMC's FAC Did Not Limit Injunctive Relief to Ejectment ................ 22

VI.   CONCLUSION ...................................................................................................... 25

TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................. 8

*B. Willis, C.P.A., Inc. v. BNSF Railway Co.*,
No. 04-CV-163-TCK-TLW, 2009 WL 10727998 (N.D. Okla. May 26, 2009) ............. 14

*Bradley v. Renfrow*,
84 P.2d 460 (Okla. 1938) ........................................................................ 14

*Davilla v. Enable Midstream Partners, L.P.*,
913 F.3d 959 (10th Cir. 2019) .......................................................... *passim*

*Ellis v. Ark La. Gas Co.*,
450 F. Supp 412 (E.D. Okla. 1978) ........................................................... 12

*Fairlawn Cemetery Ass'n v. First Presbyterian Church*,
496 P.2d 1185 (Okla. 1972) .................................................................... 13

*Frank v. Mayberry*,
985 P.2d 773 (Okla. 1999) ...................................................................... 17

*Hughes v. Harden*,
151 P.2d 425 (Okla. 1944) ...................................................................... 15

*Jaquez v. Lawton Corr. Facility*,
No. CIV-11-1066-F, 2013 WL 2645589 (W.D. Okla. June 12, 2013) ...................... 22

*Kansas v. Nebraska*,
574 U.S. 445 (2015) .............................................................................. 25

*Kiowa Indian Tribe of Okla. v. Hoover*,
150 F.3d 1163 (10th Cir. 1998) ............................................................ 20, 21

*Max Oil Co. Inc. v. Range Prod. Co. LLC*,
681 Fed. App'x 710 (10th Cir. 2017) ..................................................... 15, 16

*Nichols v. Mid-Continent Pipe Line Co.*,
933 P.2d 272 (Okla. 1996) ...................................................................... 17

*Prairie Band of Potawatomi Indians v. Pierce*,
253 F.3d 1234 (10th Cir. 2001) ................................................................ 20

*Reorganized FLI, Inc. v. Williams Companies, Inc.*,
    1 F.4th 1214 (10th Cir. 2021) ...................................................................... 25

*Rocky Mountain Christian Church v. Bd. of Cty. Comm'rs*,
    613 F.3d 1229 (10th Cir. 2010) .................................................................... 22

*Russell v. Williams*,
    964 P.2d 231 (Okla. Civ. App. 1998) ........................................................... 17

*Seneca-Cayuga Tribe of Okla. v. State of Okla. ex rel. Thompson*,
    874 F.2d 709 (10th Cir. 1989) ...................................................................... 20

*SFF-TIR, LLC v. Stephenson*,
    250 F. Supp. 3d 856 (N.D. Okla. 2017) .......................................................... 8

*Sunray Oil Co. v. Cortez Oil Co.*,
    112 P.2d 792 (Okla. 1941) ..................................................................... 11, 12

*Taylor v. Gilmartin* ,
    434 F. Supp. 909 (W.D. Okla. 1977) ............................................................ 22

*Tenn. Valley Auth. v. Jones*,
    199 F. Supp. 3d 1198 (E.D. Tenn. 2016) .............................. 16, 18, 19, 21, 22

*Thournir v. Buchanan*,
    710 F.2d 1461 (10th Cir. 1983) .................................................................... 22

*United States v. Hess*,
    194 F.3d 1164 (10th Cir. 1999) .................................................................... 15

*United States v. Osage Wind, LLC*,
    871 F.3d 1078 (10th Cir. 2017) ........................................................... *passim*

*United States v. Sturdevant*,
    No. 07-2233-KHV, 2009 WL 10689852 (D. Kan. Dec. 11, 2009) ............... 22

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
    300 U.S. 515 (1937) ..................................................................................... 25

*Winnebago Tribe of Nebraska v. Stovall*,
    216 F. Supp. 2d 1226 (D. Kan. 2002), *aff'd*, 341 F.3d 1202 (10th Cir. 2003) ......... 18, 19

*Wyandotte Nation v. Sebelius*,
    443 F.3d 1247 (10th Cir. 2006) .................................................................... 20

**Statutes**

Act of June 24, 1938, ch. 654, § 3, 52 Stat. 1035 .......................................................... 21

**Court Rules**

Fed. R. Civ. P. 54(c) ................................................................................................ 25

Fed. R. Civ. P. 56(a) ................................................................................................. 8

**Federal Regulations**

25 C.F.R. § 211 .................................................................................................. 9, 23

25 C.F.R. § 211.3 ....................................................................................... 1, 2, 5, 11

25 C.F.R. § 214 .................................................................................................. 9, 23

25 C.F.R. § 214.7 .................................................................................................... 3

**Treatises**

Restatement (Second) of Torts § 162, cmt. (e) .................................................... 16, 17

## I.     INTRODUCTION

Intervenor-Plaintiff Osage Minerals Council ("OMC") files this brief in opposition to

Defendants' Osage Wind, LLC ("Osage Wind"), Enel Kansas, LLC ("Enel KS"), and Enel

Green Power North America, Inc. ("EGNPA" and collectively, "Defendants") Motion for

Summary Judgment, Dkt. 297. For the reasons described in greater detail below, Defendants'

Motion should be denied.

## II.     PROCEDURAL BACKGROUND

According to Defendants, the Tenth Circuit ruled that "placement of turbine foundation

into holes from which rock and soil had been removed . . . *was never a trespass of any kind*, let

alone a continuing trespass." Defs.' Mot. 3 (emphasis added). Although the OMC agrees that the

Tenth Circuit's ruling in this case controls, the OMC must correct Defendants' blatantly

fictitious claim that the Tenth Circuit concluded that Defendants' mining of the Osage Mineral

Estate was never a trespass or does not now constitute a continuing trespass. In fact, the word

trespass literally appears nowhere in the Court's opinion. *See United States v. Osage Wind, LLC*,

871 F.3d 1078 (10th Cir. 2017). Contrary to Defendants' assertions, the Tenth Circuit reached *no*

conclusion as to whether Defendants' mining of the Osage Mineral Estate constitutes a trespass.

In fact, a close reading of the Tenth Circuit's decision significantly undermines

Defendants' overall characterization of it. Ultimately, the Tenth Circuit concluded that "Osage

Wind's excavation work here constituted 'mining' under § 211.3." *Id.* at 1092. This conclusion,

however, was not limited to the act of "crushing of minerals," alone, as Defendants would have

it, *see* Defs.' Mot. 8, but rather, the Tenth Circuit's conclusions were clearly focused on

Defendants' *use*, or *exploitation*, of the minerals. *See, e.g., id.* at 1090 (noting Defendants

engaged in mining because they "sorted and then crushed the minerals and *used them* as backfill

*to support its wind turbine structures*.") (emphasis added). Rock crushing, therefore, is just one

1

component of the activity the Tenth Circuit found to constitute mining: the *use* of Osage minerals to support the wind tower turbines. *See id.* at 1081 (stating that Defendants engaged in mining because they "extracted minerals for the purpose of exploiting the minerals themselves on site."); *see also id.* at 1091 (concluding Defendants engaged in mining because they "*act[ed] upon the minerals in order to exploit the minerals themselves*.") (emphasis in original).

In fact, the Tenth Circuit was acutely focused on the fact that Defendants altered the Osage minerals deliberately so they would serve as structural support for Defendants' wind turbines. First, the Court noted that Defendants "sorted the extracted rock material into small and large pieces, and then crushed the smaller pieces so they would be the proper size for backfilling the holes." *Id.* at 1087. Next, the Court recounted that Defendants "positioned the bigger rock pieces adjacent to the backfilled excavation sites." *Id.* These actions were significant because, as the Court concluded, "[a]ll of this was done to add structural support to the large wind turbines installed deep in the ground." *Id.* Ultimately, Defendants were found to have engaged in mining, unlawfully, without a lease under § 214.7 because Defendants took "*advantage* of [the minerals] for a structural purpose." *Id.* at 1092 (emphasis added). That is, Defendants "needed to stabilize these tall wind turbines, and 'develop[ed]' the removed rock in such a way that would accomplish that goal." *Id.* According to the Tenth Circuit, "[t]his constitutes 'mining' as defined by § 211.3." *Id.* There can be no question that the Tenth Circuit's analysis hinged on Defendants' *use* of Osage minerals to structurally support their wind turbines.

Finally, although the Tenth Circuit did not reach a decision with regards to whether Defendants' unlawful use of Osage minerals constitutes a trespass, the Court made several findings that, as described in greater detail below, support the inevitable conclusion that Defendants did trespass, and continue to do so today. First, the Tenth Circuit acknowledged that

"the Osage Nation *owns* the beneficial interest in the mineral estate at issue." *Id.* at 1086

(emphasis in original). And ultimately, the Court concluded Defendants violated § 214.7 because

Defendants *exploited* the OMC's property for a specific purpose, without obtaining the lease that

§ 214.7 requires in order to use that property. Specifically, the Tenth Circuit noted:

> The problem here is that Osage Wind did not merely dig holes in the ground—it
> went further. It *sorted* the rocks, *crushed* the rocks into smaller pieces, and then
> *exploited* the crushed rocks as structural support for each wind turbine.

*Id.* at 1091 (emphasis in original). To put it simply, without the use of Osage minerals to provide

structural support for the wind turbines, the turbines could not stand. True, Defendants could

have had purchased backfill materials to structurally support their wind turbines from elsewhere,

but they chose to take advantage of Osage minerals instead.

Nothing in the Tenth Circuit's decision supports Defendants' notion that the Tenth

Circuit somehow concluded there "was never a trespass of any kind." Defs.' Mot. 3. Instead, it is

clear that the Tenth Circuit concluded Defendants violated § 214.7 because Defendants took

"advantage of [Osage minerals] for a structural purpose." *Id.* 1092. As described in greater detail

below, Defendants have not sought a lease from the OMC and continue to utilize the Osage

minerals they took from the Osage Mineral Estate as structural support for their wind tower

turbines, and this continued—unauthorized—use of Osage minerals constitutes a continuing

trespass.

## III.   RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1.   Disputed in part. The lease Defendants cite as Exhibit 3 is not for "privately owned

fee surface estate lands," but rather, for "the real property of OWNER located in the County of

Osage . . . ." Defs.' Ex. 3 at Art. 1, § 1. The legal description of Property makes no reference to

surface or subsurface rights, nor does the lease define the scope of these terms. Defs.' Ex. 3.

Finally, Defendants' statement concerning the 8,400 acres of privately owned fee surface estate

lands does not reflect the additional surface use agreements Defendants entered with existing mineral production entities that hold dominant easements over the surface of the land purportedly leased by private owners to Defendants. *See* Joint Surface Use Agreement By and Between Linn Operating, Inc., as Special Agent and Attorney-in-Fact for Linn Energy Holdings, LLC and Osage Wind, LLC, OSAGE WIND-007851, Ex. 1.

2. Disputed. Defendants did not *place* 84 wind turbines on the 8,400 acres of land, but instead they used dynamite to blast and excavate deep holes that extend well beneath the surface, and into the Osage Mineral Estate, in order to anchor the 84 turbines beneath the surface estate. OMC's First Am. Compl. ("OMC's FAC"), Dkt. 164, ¶¶ 4, 50. Constructing the wind turbines within the excavated holes and compacting the excavated minerals on top of the turbine foundations provides the structural support the wind turbines required. *Osage Wind, LLC*, 871 F.3d at 1092 (noting that Defendants used Osage minerals "to stabilize these tall wind turbines. . . ."); Dkt. 297-5 (Price Tr.) at 201:18-202:23; Dkt. 297-4 (Pike Tr.) at 45:1-6.

3. Disputed. Defendants kept no records of the amount of minerals they excavated and/or continue to use from the Osage Mineral Estate. Ex. 2 (Expert Opinion of John Pfahl) ¶ 47. Because there is no record to substantiate Defendants' claims, the actual amount remains in dispute. *See* Dkt. 293, 4.

4. Undisputed.

5. Disputed in part. Defendants' statement is not complete, as prior to pouring the concrete, Defendants created the specific holes pursuant to engineered designs, placed mud mats within the holes—which serve as a "formal foundation on the base"—and then "pour[ed] the concrete on the base in the excavated hole." Dkt. 294-3 (Price Dep. Tr.) at 201:13-202:14; Dkt. 294-4 (Weigel Dep. Tr.) at 63:23-64:7. Also, "[a]fter each foundation was poured and cured,

4

Defendants used the minerals they had excavated and crushed, which were approximately 75%

of the materials excavated—or 45,630 cubic yards—for backfill and compacting." OMC's FAC,

¶ 53; *Osage Wind, LLC*, 871 F.3d at 1087 (concluding that Defendants "sorted the extracted rock

material into small and large pieces, and then crushed the smaller pieces so they would be the

proper size for backfilling the holes.").

    6.   Undisputed.

    7.   Undisputed.

    8.   Disputed in part. The excavated minerals were not used simply to fill holes, but

instead, they were used specifically as structural support. *Osage Wind, LLC*, 871 F.3d at 1090,

(finding that Osage Wind "used [the minerals] as backfill to support its wind turbine structures");

*see also* Dkt. 294-6 (Moskaluk Tr.) 68:23-69:7 (noting that Osage minerals were used to improve

drainage).

    9.   Undisputed and not material. The Tenth Circuit has concluded that whether

Defendants sold or did not sell the materials is irrelevant to the present action. *Osage Wind, LLC*,

871 F.3d at 1090 (rejecting Defendants' "proposed commercialization requirement" because the

Osage Act's reference to the word sale "does not mean that 'mining' only occurs when the

extracted minerals are being sold. Rather it means simply that surface estate owners cannot sell

what does not belong to them."). The Tenth Circuit squarely rejected Defendants' "view that the

minerals must be sold or marketed in order to trigger the defining of 'mining' under 25 C.F.R. §

211.3." *Id.*

    10.  Disputed and not material to the relief sought in Defendants' Motion, Dkt. 297.

Whether Defendants moved or used minerals at any location other than the turbine site is not at

issue here. *Osage Wind, LLC*, 871 F.3d at 1081 (concluding that "relocations" of Osage minerals

"are not at issue here," because Defendants "act[ed] upon the extracted minerals for the purpose of exploiting the minerals themselves on site."). Furthermore, although witnesses testified during depositions that such a limitation was communicated, the Osage Wind Farm Project's initial Scope of Work construction plans explicitly stated that the construction contractor "will not be restricted regarding movement or transport of soil materials . . . ." Ex. 3, OSAGE WIND-003778; *see also* Dkt. 293, 4  (noting that no records were kept of how many minerals were extracted and from where within the Project's footprint).

11.  Undisputed and not material to the relief sought in Defendants' Motion, Dkt. 297. The Tenth Circuit concluded Defendants "crushed the smaller pieces so they would be the proper size for backfilling the holes[,]" and furthermore, that this crushing "was done to add structural support to the large wind turbines installed deep in the ground." *Osage Wind, LLC*, 871 F.3d at 1087. Defendants continue to use the crushed Osage minerals for structural support to keep their wind turbines standing and in operation. Defs.' Ex. 6 (Mazurowski Dep. Tr.) at 80:9-13; Defs.' Ex. 9 (Moskaluk Dep. Tr.) at 137:10-22; 179:4-17; Dkt. 294-4 (Weigel Tr.) 28:4-23; Dkt. 294-3 (Price Tr.) 151:19-152:6;  Dkt. 294-19 (Centera Tr.) 69:13-20.

12.  Undisputed and not material. Regardless of whether the project was completed in 2015, Defendants continue to exploit the extracted minerals on site for the turbines' structural support. *See* OMC's Response to Paragraph 11, which is adopted and incorporated by reference. Further, Defendants' operation of wind turbines effectively blocks access to Osage minerals within a defined radius of the turbines. Dkt. 293-5 (Pike Tr.) at 49:2-8.

13.  Undisputed.

14.  Disputed and not material in part. Mr. Freas acknowledged that his valuation assumes a willing seller and a willing buyer, and furthermore, that he knew of no evidence to

indicate that his valuation was the price the OMC would have, or is willing now, to receive in exchange for the minerals the Osage Nation owns. Dkt. 293-7 (Freas Tr.) at 95:02-97:20.

15.   Disputed and not material. Mr. Pfahl's valuation is immaterial because, in calculating his valuation for the minerals Defendants unlawfully took, he "did not specifically contemplate [] the sovereign status of the OMC," Dkt. 293-6 (Pfahl Tr.) at 153:7-17, and furthermore, he does not know whether the OMC actually owns the Osage Mineral Estate. *Id.* at 117:9-10. As a result of his ignorance, Mr. Pfahl erroneously assumed that the OMC was nothing more than a willing seller in a commercial market. *Id.* at 153:14-17; *see also id.* at 132:03-08 (he has no awareness "of the sovereignty of the OMC as its own regulatory body"). Of course, the OMC is an independent agency of the Osage Nation that must balance interests in a lease negotiation, including the impact of a lease on access to other minerals (such as oil and gas) and the impacts on other minerals lessees. Dkt. 294-2 (Declaration of Chairman Everett Waller ("Waller Decl.")) ¶¶ 3-43. Mr. Pfahl's valuation is further immaterial because he interpreted the Tenth Circuit's decision as concluding that Defendants' conduct does not constitute "mining" unless it involves rock crushing. *Id.* at 61:05-21, 75:10-21, 199:13-200:14. The Tenth Circuit's conclusion, however, focused on the fact that Defendants "exploited the crushed rocks as structural support for each wind turbine." *Osage Wind, LLC*, 871 F.3d at 1091. Thus, even if the OMC could be considered a non-sovereign, willing, commercial seller out on the market—the OMC of course is not—but even if it were, Mr. Pfahl's valuation would be immaterial to this case as his valuation explicitly excludes the valuation of minerals the Tenth Circuit concluded Defendants unlawfully mined.

## IV.   STANDARD OF REVIEW

In ruling on a motion for summary judgment, Rule 56(a) of the Federal Rules of Civil Procedure permits a court to grant summary judgment "if the movant shows there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). Under Rule 56, a material fact is one which "might affect the outcome of the suit

under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And

whether or not a fact will affect the outcome of the suit is governed by the substantive law that

applies to the plaintiff's claims. *See id.* Accordingly, "[f]actual disputes that are irrelevant or

unnecessary will not be counted" in a court's consideration of summary judgment. *Id.* Thus, to

the extent that Defendants raise irrelevant facts—either in their motion (Dkt. 297) or in response

to the OMC's (Dkt. 294)—those facts will not and cannot affect this Court's consideration of

whether to grant summary judgment. And ultimately, under Rule 56, "the court must resolve all

reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in

the light most favorable to the nonmoving party." *SFF-TIR, LLC v. Stephenson*, 250 F. Supp. 3d

856, 975 (N.D. Okla. 2017) (citations omitted). Under these standards, Defendants' Motion

should be denied.

## V.   ARGUMENT

### A.   Defendants Are Not Entitled to Judgment on the OMC's Claims for Trespass and Continuing Trespass

#### i.   Defendants Trespassed on the Osage Mineral Estate

Defendants attempt to sidetrack the Court by stating that "[p]lacement of the wind turbine

foundations was not a trespass." Defs.' Mot. 12. The OMC's claim for trespass, however, is not

predicated solely on Defendants' placement of wind turbines. Instead, a review of the OMC's

FAC reveals that the OMC's claim for trespass stems from allegations that:

- "Defendants excavated soil, sand, and rock of varying sizes encountered during Defendants' excavation. Defendants crushed some of these extracted materials and *used* them to reinforce the concrete turbine foundations and for associated infrastructure." OMC's FAC ¶ 4 (emphasis added).
- "Defendants never took any action to obtain a lease for mining the Osage Mineral Estate from the OMC." OMC's FAC ¶ 45.

8

- "Defendants willfully and intentionally entered and disrupted the Osage Mineral Estate and unlawfully excavated minerals therefrom." OMC's FAC ¶ 46.
- "Defendants willfully and intentionally entered and disrupted the Osage Mineral Estate, despite clear orders to cease activities until an appropriate permit or lease was approved by the OMC and BIA." OMC's FAC ¶ 47.
- "In the course of constructing the 84 wind turbines, Defendants constructed large, concrete foundations that required large areas of the Osage Mineral Estate—measuring approximately 10 feet deep and 60 feet in diameter—to be excavated." OMC's FAC ¶ 50.
- "After each foundation was poured and cured, Defendants *used* the minerals they had excavated and crushed, which were approximately 75% of the materials excavated—or 45,630 cubic yards—for backfill and compacting." OMC's FAC ¶ 53 (emphasis added).
- "Defendants *used* the minerals they excavated from the Osage Mineral Estate as backfill for their wind turbine foundations." OMC's FAC ¶ 54 (emphasis added).
- "In their exploitation of the subsurface Osage Mineral Estate, Defendants exercised and maintained control and/or possession of portions of the rightful property of the OMC and the Osage Nation: the Osage Mineral Estate." OMC's FAC ¶ 56.
- "Defendants were never authorized to extract minerals from the Osage Mineral Estate." OMC's FAC ¶ 80.
- "By conducting unauthorized and unapproved mining or work related to minerals, as contemplated by 25 C.F.R. § 211 or 25 C.F.R. § 214, Defendants trespassed on the Osage Mineral Estate, in violation of law and, in doing so, caused damages." OMC's FAC ¶ 86.

These are just a few of the many paragraphs in the OMC's FAC that substantiate the OMC's claim for trespass. Defendants' suggestion that somehow this is a case about whether the wind turbines—and not Defendants themselves—trespassed on the Osage Mineral Estate is as erroneous as it is absurd.

As discussed in greater detail above, the Tenth Circuit did *not* consider whether Defendants' conduct gives rise to a trespass under the law, and the Tenth Circuit certainly did *not* opine that "the turbine foundations did not 'physically invade' the mineral estate" or "that their placement was not a trespass." Defs.' Mot. 12. As is clear from reading the Tenth Circuit's decision itself, the Tenth Circuit did not consider whether the placement of turbines constitutes "mining," but instead, the Court concluded Defendants engaged in mining because they "sorted

and then crushed the minerals and *used them* as backfill *to support [their] wind turbine structures*." *Osage Wind*, 871 F.3d at 1090 (emphasis added); *see also id.* at 1081 (concluding Defendants engaged in mining because they "act[ed] upon the extracted minerals for the purpose of exploiting the minerals themselves on site."). A review of the OMC's FAC reveals that the OMC's allegations mirror the conduct the Tenth Circuit concluded constitutes "mining." *See, e.g.,* OMC's FAC ¶¶ 4, 46-47, 50, 53-54, 56, 86. Defendants' attempt to shift the blame from themselves to their wind turbines fails miserably.

Furthermore, the undisputed evidence in the record demonstrates that Defendants *did* commit a trespass. Defendants assert that "[a]ny claim of trespass requires that 'one person actually physically invades the real estate of another without the permission of the person lawfully entitled to possession.'" Defs.' Mot. 12 (quoting *Davilla*, 913 F.3d at 966) (internal quotations and citations omitted). But this is precisely what happened here. First, there is no question that the OMC owns the property at issue in this litigation, that is, minerals from the Osage Mineral Estate. *Osage Wind*, 871 F.3d at 1086 ("the Osage Nation owns the beneficial interest in the mineral estate at issue."). Second, it is clear that Defendants physically invaded the Osage Mineral Estate, including by using dynamite to blast the Estate and by crushing the minerals they extracted from the Estate. Intervenor Plaintiff's Statement of Undisputed Facts, Dkt. 294-1 ("OMC SUF") ¶¶ 39, 41; *see also Osage Wind, LLC*, 871 F.3d at 1090. Finally, Defendants invaded the Osage Mineral Estate "without the permission of the person lawfully entitled to permission" because they never did, and never have, attempted to obtain permission from the OMC to use the Osage minerals they took from the Osage Mineral Estate. OMC SUF ¶¶ 5-6. Defendants committed a trespass.[1]

---

[1] Defendants take care to note that the Tenth Circuit has concluded "that 'surface construction activities' such as 'building a basement or swimming pool' do not require a lease merely because they

In a last ditch effort to obfuscate the OMC's clear claim for trespass, Defendants assert that "Plaintiffs do not allege that any excavated sand or rock was used to mix or prepare the concrete for the wind turbine foundations[,]" Defs.' Mot. 13, and therefore, according to Defendants, "[i]t simply cannot be said that excavated minerals were acted upon for the purpose of exploiting the minerals themselves to place the foundations." *Id.* (quotation omitted). Unfortunately for Defendants, the Tenth Circuit analyzed the activities Defendants admit they undertook, *i.e.*, sorting and crushing minerals and using them as backfill for the foundations, and concluded that Defendants' "excavation work [] constituted mining under § 211.3." *Osage Wind, LLC*, 871 F.3d at 1092. As a result, it is Defendants' development and use of Osage minerals as structural support for the turbine foundations that is at issue here, *not* what materials they used to mix their concrete. *See id.* at 1092. The OMC's allegations reflect the actions the Tenth Circuit concluded constitute mining, as the OMC alleged that "Defendants used the minerals they excavated from the Osage Mineral Estate *as backfill for their wind turbine foundations*." OMC's FAC ¶ 54 (emphasis added).

Finally, none of the authorities Defendants cite support the conclusion that a trespass did not take place on the Osage Mineral Estate. For instance, Defendants cite the Oklahoma Supreme Court's decision in *Sunray Oil Co. v. Cortez Oil Co.* for the proposition that a surface owner has "the right to so use the surface" lands of a mineral estate for "the disposal of salt water." Defs.' Mot. 14 (quoting 112 P.2d 792, 793 (Okla. 1941)). Nowhere in *Sunray Oil, Co.*, however, does the Oklahoma Supreme Court discuss, mention, or even consider the word "trespass." *See*

---

'involve[] digging a hole in the ground, displacing rock and soil in the process." Defs.' Mot. 13 (quoting *Osage Wind, LLC*, 871 F.3d at 1092). Defendants, however, did not merely dig a hole and displace soil and rock in the process, instead they "*exploited* the crushed rocks as structural support for each wind turbine." *Id.* at 1091 (emphasis in original). It is unclear why Defendants waste space in their Motion discussing construction activities that the Tenth Circuit has explicitly concluded did not take place in this case.

*Sunray Oil Co.*, 112 P.2d 792. This decision, moreover, is beside the point, as the Tenth Circuit has already concluded that Defendants' leases with surface landowners do not give Defendants the legal right to excavate and use Osage minerals without the lease required under federal law. *Osage Wind, LLC,* 871 F.3d at 1087-93.[2]

Not only do the legal issues in *Sunray Oil Co.* and this case differ, but applicable policy considerations differ such that the state law applied in *Sunray Oil Co.* cannot be applied to the instant case. *See Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 969 (10th Cir. 2019). Simply put, the "same result" does *not* "obtain[] here," Defs.' Mot. 14, and *Sunray Oil Co.* provides no guidance to this Court.

### ii.   Defendants' Continued Unauthorized Use of Osage Minerals Constitutes a Continuing Trespass

Defendants contend the OMC cannot substantiate its claim for continuing trespass because "the crushing of rock for backfill was completed once and for all in 2014[,]" and accordingly, Defendants' trespass on the Osage Mineral Estate is not "ongoing." Defs.' Mot. 15. While Defendants are correct that a trespass must be ongoing to be a "continuing trespass," Defendants' argument fails because they improperly predicate the OMC's claim on the crushing of rock, instead of on the continued *use* and *exploitation* of the rock. As discussed in greater detail above, rock crushing is just one component of Defendants' *use* of Osage minerals, and it

---

[2] Defendants' reliance on *Ellis v. Ark La. Gas Co.* is so inapposite it hardly warrants discussion. *See* Defs.' Mot. 13-14 (citing 450 F. Supp 412 (E.D. Okla. 1978)). Defendants appear to claim that this decision permits Defendants to dynamite and blast their way into the Osage Mineral Estate because, once they dig deep enough to create a "cavern," the OMC no longer owns it. Even if this was a correct interpretation of *Ellis* (it is not, since the cavern in *Ellis* was naturally occurring and not manmade), this decision—applying Oklahoma law—would have no application because "Congress has dictated the prerequisites" for mining the Osage Mineral Estate, Dkt. 219, 7 (citation omitted), and accordingly, state law related to ownership of caverns has no application in the present case. *See Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 967 (10th Cir. 2019).

was Defendants' development and use of the minerals—specifically to support the wind tower turbines—that the Tenth Circuit concluded constitutes "mining." *See id.* at 1081 (stating that Defendants engaged in mining because they "extracted minerals for the purpose of exploiting the minerals themselves on site."); *see also id.* at 1091 (concluding Defendants engaged in mining because they "*act[ed] upon the minerals in order to exploit the minerals themselves.*") (emphasis in original). Defendants' use and exploitation of the Osage minerals they extracted continues unabated, and thus the trespass remains ongoing.[3]

It is undisputed that Defendants' use of Osage minerals continues. The crushed minerals are still, seven years later, being used as structural support to stabilize the wind turbines. *See* Response to Statement of Undisputed Facts ("RSUF") ¶¶ 11-12; OMC SUF ¶¶ 6, 47-48. And despite the Tenth Circuit's decision in this case, Defendants have not attempted to obtain a lease for the minerals they continue to use. OMC SUF ¶ 6; *see also* Dkt. 285-20 (Heredia Tr.) at 181:14-18 (acknowledging that no entity involved with the Osage Wind Project ever applied for a lease); Dkt. 294-3 (Price Tr.) at 102:16-103:10; Ex. 4 (Venturini Tr.) at 108:11-16. Thus, Defendants' trespass remains ongoing because, after taking the minerals and crushing them,

---

[3] Count IV of the OMC's FAC is concise and brief, but ¶ 88 specifically "realleges and incorporates by reference the preceding paragraphs." Dkt. 164, ¶ 88. Thus, the OMC's claim for continuing trespass includes allegations that Defendants "*used* [Osage minerals] to reinforce the concrete turbine foundations and for associated infrastructure" throughout the Osage Wind Farm. OMC's FAC ¶ 4 (emphasis added); *see also, e.g.,* OMC's FAC ¶ 54 ("Defendants *used* the minerals they excavated from the Osage Mineral Estate as backfill for their wind turbine foundations." (emphasis added). And to be sure, Defendants' use of the minerals they extracted continues and remains ongoing. RSUF ¶¶ 11-12; OMC SUF ¶¶ 6, 47-48. Of course, the OMC is not divorcing itself from the allegations contained in ¶ 93, namely, that the ongoing placement of Defendants' structures *inside* the Osage Mineral Estate constitutes a continuing trespass because Defendants do not have a lease for their occupation of the Mineral Estate, and their ongoing use prevents the OMC from fully accessing portions of the OMC's own property. RSUF ¶ 12. In *Davilla*, the Tenth Circuit found "[w]here a refusal to remove a permanent structure effects the invasion of real property, it constitutes a 'continuing trespass' under Oklahoma law." 913 F.3d at 971, n.8 (citing *Fairlawn Cemetery Ass'n v. First Presbyterian Church*, 496 P.2d 1185, 1187 (Okla. 1972)). Thus, the reason the OMC is going to great lengths to discuss the other allegations (beyond placement of the turbines) in the OMC's FAC is simply in response to Defendants' attempt to pretend they do not exist.

Defendants continue to use them as structural support in order to keep their wind turbines standing and in operation. RSUF ¶¶ 11-12. When asked whether the Osage Wind Farm's wind tower turbines could remain standing *without* the Osage minerals that Defendants continue to use as backfill and for structural support, Mr. Moskaluk, EGPNA's on-site Construction Manager, answered: "I wouldn't want to try it." Dkt. 294-6 (Moskaluk Tr.) at 137:19-23. And Defendants have not.[4] In the seven years since they first entered and disrupted the Osage Mineral Estate, they have never attempted to stop using the Osage Minerals they unlawfully took and crushed.

To be sure, Defendants cite only to authorities that support the conclusion that Defendants' trespass remains ongoing.[5] Defendants cite to *Bradley v. Renfrow*, wherein the Oklahoma Supreme Court found a continuing trespass because the defendant repeatedly intruded on the plaintiffs' property "'for a period of more than a year,'" was "'continuing to do so,'" and "'will continue unless restrained.'" Defs.' Mot. 15 (quoting 84 P.2d 460, 431 (Okla. 1938)). Here, Defendants' trespass extends far beyond a "period of more than a year" (seven, to be exact), and there is no evidence or indication that Defendants will cease unlawfully using Osage minerals as structural support for their wind turbines unless they are compelled to do so by this

---

[4] Defendants have not stopped using the Osage minerals they extracted and crushed because, without the structural support provided by the Osage Nation's minerals, the wind turbines would be unable to remain standing and in operation. *See* Dkt. 294-6 (Moskaluk Tr.) at 179:10-17 (explaining that backfill is "to prevent – the tipping of the tower in either direction."); Dkt. 294-3 (Price Tr.) at 151:19-152:6 (stating the crushed minerals provide "structural strength per the engineering design" to the turbine foundations); Dkt. 294-4 (Weigel Tr.) at 28:4-23 (stating that Defendants use Osage minerals to stabilize their wind power turbines because "the turbines can fall over if you didn't, you know, make the materials stable before putting them back into the ground.").

[5] Defendants cite to *B. Willis, C.P.A., Inc. v. BNSF Railway Co.*, noting that this Court concluded the trespass claim was "barred by [the] 2-year statute of limitations" and therefore could not constitute a continuing trespass. *See* Defs.' Mot. 15 (quoting 2009 WL 10727998, at *14 (N.D. Okla. May 26, 2009)). Defendants do not contend—nor could they—that any statute of limitations precludes the OMC's claim for continuing trespass in this action, and thus this Court's decision in *BNSF Railway Co.* is of no relevance to the Court's consideration of Defendants' Motion.

Court.[6] RSUF ¶¶ 11-12; OMC SUF ¶¶ 6, 47-48. Accordingly, it is clear that Defendants' trespass "will continue unless restrained." Defendants' continued *use* of the Osage minerals they unlawfully extracted and crushed—without the requisite lease the Tenth Circuit has concluded is required—constitutes a continuing trespass.

### iii. Defendants' Trespass is Abatable

Next, Defendants argue that "crushing rock for backfill is not a continuing trespass" because a continuing trespass "must be abatable." Defs.' Mot. 17. Putting aside, again, the reality that Defendants' trespass did not begin and end with rock crushing, Defendants' reliance on nuisance case law in no way undermines the OMC's claim for continuing trespass. Defendants cite *Hughes v. Harden* for the proposition that the Oklahoma Supreme Court has held that demonstrating that a trespass is "abatable" constitutes a necessary element to establish a claim for continuing trespass under Oklahoma law. Defs.' Mot. 17 (citing 151 P.2d 425, 426 (Okla. 1944)). The *Hughes* Court, however, did not find "abatement" to be a necessary element of continuing trespass, but instead found that successive actions for damages are permissible when the "cause of injury is abated by the expenditure of labor or money." 151 P.2d 425, 426 (Okla. 1944) (citation omitted).[7] This holding in no way repudiates the OMC's claim for continuing trespass.

---

[6] Likewise, Defendants' use of *United States v. Hess* is immaterial. *See* Defs.' Mot. 16 (citing 194 F. 3d 1164 (10th Cir. 1999)). As an initial matter, the OMC referenced *Hess* one time, *see* Dkt. 158, 23, and this was only in response to Defendants' use of *Hess*. *See* Dkt. 150, 24. Nonetheless, the crucial component from *Hess* is the Tenth Circuit's decision that "if the gravel is titled in the government, the Hess family's gravel extractions over the years constitute a continuing trespass." *Hess*, 194 F.3d at 1176. While the Tenth Circuit left the question of who held title to the gravel to be decided on remand, the Court explicitly found that, if held by the government, the extractions constitute a continuing trespass. *Id.* As it pertains to this case, there is no question that the minerals Defendants continue to use for structural support are titled to the Osage Nation, a sovereign Tribal Nation, and are held in trust by the United States. Thus, as thoroughly explained above, Defendants' continued use of the minerals constitutes a continuing trespass.

[7] Defendants' citation to *Max Oil Co. Inc. v. Range Prod. Co. LLC*, is even less helpful. Defs.' Mot. 17 (citing 681 Fed. App'x 710, 715 (10th Cir. 2017)). The phrase "continuing trespass" is used one

Defendants also assert "there is no rational sense in which removal of wind turbine foundations . . . could abate the crushing of rock." Defs.' Mot. 17. This is, of course, beside the point. Defendants continue to use Osage minerals without the lease required by Osage and federal law, and a permanent injunction of ejectment will abate "Defendants['] disregard [for the OMC's] statutory authority," and furthermore, without ejectment, others will try to "mimic Defendants' disrespect, [and] then [the OMC's] regulatory scheme would be thoroughly compromised." *Tenn. Valley Auth.*, 199 F. Supp. 3d at 1205.[8] There can be no question that injunctive relief will remedy the harm caused by Defendants' continuing trespass. *See id.* (concluding that "remedies at law are not sufficient to compensate for this injury.").

### iv. The Fact that Rock Was Crushed Does Not Preclude the OMC's Claim for Continuing Trespass

Defendants next cite to a comment made in the Restatement (Second) of Torts ("Restatement") to argue that the OMC's claim for continuing trespass fails because Defendants "caused a permanent physical change to the rock. . . ." Defs.' Mot. 17-18 (citing Restatement § 162 cmt. e). First, this Court has already determined that *Davilla* sets the governing standard of law in this case, and not the Restatement. *See* Dkt. 264, 25 (declining to apply the Restatement "to determine the ejectment and permanent injunction remedy" because the Court will instead apply "the *Davilla* factors."). Even if Defendants are correct that the Restatement is persuasive

---

time in *Max Oil*, and only in reference to an issue that was not before the Court. *See Max Oil*, 681 Fed. App'x 710, 715 (10th Cir. 2017). In discussing temporary versus permanent nuisance damages, the Tenth Circuit explained that temporary nuisance damages are those "reasonably capable of abatement." *See id.* at 716 (citation omitted). The OMC's FAC contains no claims for nuisance, and *Max Oil Co. Inc.* is simply irrelevant.

[8] Moreover, the Tenth Circuit's decision in *Davilla* establishes that the elements for trespass and continuing trespass are the same, because under Oklahoma law, a continuing trespass "is not a distinct legal wrong" from a trespass. *See Davilla*, 913 F.3d at 971 n.8. Defendants' argument fails on this alone, as there is no "abatable" requirement needed to establish a trespass. *See id*. at 966 (listing the three elements required to show trespass and continuing trespass).

authority and could somehow displace *Davilla*,[9] the comment Defendants cite does not preclude a finding of continuing trespass here. By Defendants' flawed logic, an otherwise undeniable claim of continuing trespass could easily be defeated purposefully by a trespasser if he broke up some rocks at the outset of his trespass. Altering the physical condition of the land does not *negate* a continuing trespass, it merely *fails, in and of itself, to comprise* a continuing trespass. But the OMC is not, and never has, claimed that Defendants' continuing trespass begins and ends with the crushing of rock. While Defendants are no longer engaged in the act of crushing Osage minerals, they are still using the Osage minerals they extracted—rendering Restatement § 162 comment (e) inapplicable to this case.

### B.  The OMC is Entitled to Permanent Injunctive Relief

#### i.   The OMC Will be Irreparably Harmed Absent the Provision of Injunctive Relief

The OMC has demonstrated that it will suffer irreparable harm absent injunctive relief, and further, that monetary damages are not adequate to compensate for the harm that Defendants' unlawful actions have inflicted, and continue to inflict, upon the OMC. In their Motion for Summary Judgment, Defendants assert that the OMC cannot demonstrate the requisite irreparable harm because "Plaintiffs cannot show **any** harm . . . from the wind turbine themselves." Defs.' Mot.  24 (emphasis added). The OMC and the United States, however, did not sue the wind turbines. The OMC brought suit against Defendants—Osage Wind, Enel KS, and EGPNA—because (1) Defendants entered and disrupted the Osage Mineral Estate, (2)

---

[9] Defendants make no claim that the Oklahoma Supreme Court has adopted Section 162 of the Restatement. *See* Defs.' Mot. 18. As Defendants point out, the Oklahoma Court of Civil Appeals merely cited to a comment following Restatement § 162 in *Russell v. Williams*, 964 P.2d 231 (Okla. Civ. App. 1998). *See id.* The two Oklahoma Supreme Court cases Defendants reference, *Frank v. Mayberry,* 985 P.2d 773 (Okla. 1999), and *Nichols v. Mid-Continent Pipe Line Co.*, 933 P.2d 272 (Okla. 1996), quote language from the Restatement that pertains to liability of infliction of emotional distress and nuisance, respectively—not continuing trespass.

Defendants unlawfully extracted and significantly altered Osage minerals without the lease required by law, and finally, because (3) Defendants continue to unlawfully possess and use Osage minerals for structural support to keep their wind turbines in operation.

The OMC, therefore, has sufficiently demonstrated irreparable harm because Defendants' unlawful trespass on the Osage Mineral Estate undermines and significantly interferes with the self-government of the OMC and, ultimately, the Osage Nation.[10] The Tenth Circuit Court of Appeals has concluded that "significant interference with [the] tribal self-government" of a Tribal Nation constitutes irreparable harm. *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (affirming the District Court's finding of "significant interference with tribal self-government" where "more than economic damages were at stake."). Here, Defendants' attempt to reduce the OMC to a commercial entity forced to sell its Indian trust property at a "market rate" significantly interferes with the Osage Nation's regulatory authority and invades Osage Nation's sovereignty, giving rise to irreparable harm.[11] *See TVA*, 199 F. Supp. 3d at 1205 ("allowing parties like Defendants to disregard [plaintiff's] authority . . . would result in irreparable harm.").

Defendants, however, assert that the OMC cannot "demonstrate . . . that 'Defendants' invasion of the OMC's sovereignty and right to self-govern the Osage Mineral Estate constitutes

---

[10] Defendants' failure to negotiate a lease with the OMC undermines the rights of the OMC to balance the interests of various interests at the site of the lease, including Osage Nation citizens, Osage headright holders, other mineral lessees in the area, and nearby mineral development opportunities. Dkt. 294-2 (Waller Decl.) ¶ 43.

[11] In asserting that the OMC cannot demonstrate irreparable harm, Defendants choose to quibble with the Tenth Circuit's conclusion that Defendants engaged in mining because they "sorted and then crushed the minerals and *used them* as backfill *to support its wind turbine structures*." *Osage Wind, LLC*, 871 F. 3d at 1090 (emphasis added); Defs.' Mot. 19-20 (claiming they did not engage in "mining" simply because "some of the rock removed from holes was then crushed for backfill adjacent to the turbine foundations."). As discussed *ad nauseam* in this Response, Defendants did not just "remove" rock or "dig" holes—they *used* (and continue to use) Osage minerals as structural support for their wind turbines, without the lease required by law. *See Osage Wind*, LLC, 871 F.3d at 1091 ("Osage Wind did not merely dig holes in the ground . . . .").

an irreparable harm.'" Defs.' Mot. 22 (quoting Dkt. 158, 17). Defendants hinge this argument on the fact that rock crushing has "long-since ended[,]" and thus, according to Defendants, they are not "interfering on an ongoing basis with the force and effect of laws passed by Indian tribal governments." *Id.* Again, Defendants' unlawful interference with the Osage Nation's laws and sovereignty did not begin and end with rock crushing. As the Tenth Circuit concluded, Defendants violated federal and Osage laws because they used Osage minerals, without a lease, to "add structural support to the large wind turbines installed deep in the ground." *Osage Wind, LLC,* 871 F.3d at 1087.

To date, Defendants have made *no* attempts to secure the lease the Tenth Circuit concluded Defendants' exploitation of Osage minerals requires. OMC SUF ¶ 6. Furthermore, Defendants continue to use the Osage minerals they extracted as structural support for their wind turbines. RSUF ¶¶ 11-12; OMC SUF ¶¶ 47-48. There can be no question, therefore, that Defendants' ongoing use of Osage minerals, without a lease from the OMC, constitutes a circumvention of the OMC's sovereignty that, if allowed to continue unabated, would diminish the OMC's sovereignty to nothing more than a right to recover nominal damages in federal court, *after* companies have taken and used Osage minerals in defiance of Osage law. There is no dollar amount that will adequately compensate the OMC for Defendants' infringement on the sovereignty of the Osage Nation.[12] *See TVA*, 199 F. Supp. 3d at 1205-06 (concluding that

---

[12] Defendants' observation that both the United States and Defendants have submitted expert reports containing valuations for the amount of Osage minerals mined in no way undermines the reality that monetary damages are not an adequate remedy for the harm Defendants have caused, and continue to cause, to the OMC. In undertaking their valuations, both experts assumed a transaction with a willing buyer and a willing seller, and neither considered the fact that the OMC constitutes a regulatory agency within a sovereign Tribal Nation, or that the minerals unlawfully taken are held in trust by the United States. RSUF ¶¶ 14-15; Dkt. 293-7 (Freas Tr.) at 96:01-97:20. Accordingly, the experts' disparate valuations do not change the fact that "the issues [in this case] concern the scope of tribal sovereignty," and that is "an issue that can not be measured in dollars." *Winnebago Tribe of Nebraska v. Stovall*, 216 F. Supp. 2d 1226, 1233 (D. Kan. 2002), *aff'd*, 341 F.3d 1202 (10th Cir. 2003).

"[a]warding legal damages instead of an injunction [] would be tantamount to a forced sale of [plaintiff's] statutory permitting discretion.").

Defendants also, unsuccessfully, attempt to distinguish several relevant authorities from the present case.[13] For instance, Defendants claim that the OMC cannot rely on the Tenth Circuit's decision in *Prairie Band of Potawatomi Indians v. Pierce* because, in that decision, the Tenth Circuit concluded that the State of Kansas' refusal to recognize the sovereign right of the Tribe to issue vehicle registrations for tribal citizens "'created the *prospect* of significant interference with tribal self-government."' Defs.' Mot. 22 (quoting 253 F.3d 1234, 1250 (10th Cir. 2001)) (emphasis added). Of course, in this case, the Court need not consider a "prospect" of "significant interference with tribal self-government" that might occur again sometime in the future—the significant interference is already taking place, right now. As this Court has previously concluded, "Congress has dictated the prerequisites" for mining the Osage Mineral Estate, Dkt. 219, 7(citation omitted), and those prerequisites require entities, such as Defendants, to obtain permission from the OMC *before* taking and using minerals from the Osage Mineral Estate, in order to ensure that the Mineral Estate is leased "in such quantities and at such times as

---

[13] In a cursory footnote, Defendants claim that the OMC cannot rely on the Tenth Circuit's decisions in *Wyandotte Nation v. Sebelius* and *Seneca-Cayuga Tribe of Okla. v. State of Oklahoma ex rel. Thompson* because those cases deal with "state interference" and there is "[n]o ongoing state interference" in the present case. Defs.' Mot. 22 (citing 443 F.3d 1247, 1248 (10th Cir. 2006); 874 F.2d 709, 711 (10th Cir. 1989)). The governing standard established by the Tenth Circuit, however, does not limit the imposition of injunctive relief to those instances where a Tribal Nation's sovereignty is infringed upon by a State government. *See, e.g., Kiowa Indian Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1171–72 (10th Cir. 1998) (reversing the district court's denial of the Kiowa Tribe's request for injunctive relief "to restrain Mr. Hoover [a non-Indian individual] and Aircraft Equipment [a private corporation]" in their actions against the Tribe). The fact that Defendants in this case are corporations and not state governments, plainly, does not grant Defendants a free pass to infringe on the sovereignty of the Osage Nation without the imposition of injunctive relief. Defendants' argument that the OMC cannot demonstrate that Defendants are entitled to sovereign immunity is likewise irrelevant. *See* Defs.' Mot. 23. The Tenth Circuit's guiding precedent inquires as to whether the defendant's unlawful conduct "significantly interferes with the Tribe's self-government"—and *not* whether the defendant can demonstrate it is a corporation entitled to sovereign immunity. *See, e.g., Kiowa Indian Tribe of Okla.*, 150 F.3d at 1171–72.

may be deemed for the best interest of the Osage Tribe of Indians." Act of June 24, 1938, ch. 654, § 3, 52 Stat. 1035. And failure to comply with Congress's dictates for the Osage Mineral Estate constitutes grounds sufficient to impose permanent, injunctive relief. *See, e.g., Tenn. Valley Auth. v. Jones,* 199 F. Supp. 3d at 1206 (entering "a permanent injunction requiring Defendants to remove the[ir] structures" because "Defendants have not complied with the obligation Congress imposes" and "[t]his omission alone is sufficient to grant [plaintiff] the relief it seeks" to remedy Defendants' trespass).

Defendants' distractions do not, and cannot, change the fact that the decision to allow, or to forbid, mining on the Osage Mineral Estate constitutes a sovereign function of the Osage Nation's self-government, one that the Osage Constitution assigns to the OMC. OMC SUF ¶ 2; Dkt. 294-2 (Waller Decl.) ¶¶ 37-43. Defendants' trespass not only unlawfully seizes tribal assets, it threatens the ability of the OMC to function as a government and enforce Osage laws. *See Kiowa Indian Tribe of Okla.*, 150 F.3d at 1171–72 (concluding that a Tribal Nation has demonstrated irreparable harm where there has been a "seizure of tribal assets, . . . and [a] concomitant prohibition against full enforcement of tribal laws [that] significantly interferes with the Tribe's self-government."). Accordingly, the OMC has established it will suffer irreparable harm absent the imposition of permanent, injunctive relief.

> ### ii.     Removal of the Wind Farm Will Remedy the Harm Caused by Defendants' Trespass

Although the OMC agrees with Defendants that an injunction "must be narrowly tailored to remedy the harm shown," Defs.' Mot. 24 (citations omitted), Defendants are wrong that ejectment will not remedy the harm caused by Defendants' continuing trespass. As federal courts have noted, "remedies at law are not sufficient to compensate for" injuries resulting from the disregard of a sovereign agency's authority to regulate, but a permanent injunction certainly is.

*Tenn. Valley Auth.*, 199 F. Supp. 3d at 1205. In *Tennessee Valley Authority*, the United States

District Court, Eastern District of Tennessee noted that the defendants' placement of structures

on the Hiwassee River violated "Congress's clear statutory directive" that no party be permitted

to place such structures on the River absent permission from the Tennessee Valley Authority

("TVA"). *Id.* at 1199. In considering the defendants' disregard for the authority Congress

bestowed upon the TVA, the District Court concluded that "allowing parties like Defendants to

disregard TVA's statutory authority . . . would result in irreparable harm." *Id.* at 1205. In that

case, "[a]warding legal damages instead of an injunction [] would be tantamount to a forced sale

of TVA's statutory permitting discretion." *Id.* at 1205-06. The same is true here. Awarding legal

damages instead of an injunction would be tantamount to a forced sale of the OMC's permitting

discretion, and accordingly, an injunction is the *only* relief that will remedy Defendants' refusal

to comply with Osage and federal law.[14]

### C.  The OMC's FAC Did Not Limit Injunctive Relief to Ejectment

Defendants contend that that this Court has concluded that the OMC's request for an

injunction is "'explicitly limited' [to] an injunction against 'excavation mining and other work."

*See* Defs.' Mot. 25 (quoting Dkt. 161, 12 n.4). And therefore, according to Defendants, "[a]ny

---

[14] Defendants cite multiple cases which have nothing to do in the slightest with tribal sovereignty or violations of a federal leasing statute. *See* Defs.' Mot. 24. Such cases involve situations where: an Oklahoma City monk's parents could not be enjoined from threatening him into leaving his monastery when they had not contacted him in ten months, *Taylor v. Gilmartin* , 434 F. Supp. 909, 910 (W.D. Okla. 1977); a court could not order an injunction that a plaintiff's name be placed on a ballot where the election had "come and gone," *Thournir v. Buchanan*, 710 F.2d 1461, 1462 (10th Cir. 1983); an inmate plaintiff's "vague demands" for exams, and a special investigative order, diet, and outside recreation plan were not sufficient remedies for defendant private prison's alleged constitutional violations, *Jaquez v. Lawton Corr. Facility*, No. CIV-11-1066-F, 2013 WL 2645589, at *19 (W.D. Okla. June 12, 2013); and an injunction against a defendant property management group who no longer owned the properties where the alleged violations occurred would not remedy alleged violations of the Fair Housing Act, *United States v. Sturdevant*, No. 07-2233-KHV, 2009 WL 10689852, at *4 (D. Kan. Dec. 11, 2009). Indeed, it is unsurprising that in each of these totally unrelated situations, an injunction was not "narrowly tailored to remedy the harm shown." *Rocky Mountain Christian Church v. Bd. of Cty. Comm'rs*, 613 F.3d 1229, 1240 (10th Cir. 2010).

[o]ther [d]emand for a [p]ermanent [i]njunction [a]gainst the Project [s]hould be [d]ismissed [b]ecause [n]o such [d]emand [w]as [p]leaded in the Complaint." *Id.* at 24. The OMC's FAC, however, is nowhere near as limited as Defendants would have it. Rather, the OMC predicated its request for injunctive relief on, for example, the following:

- "Defendants willfully and intentionally entered and disrupted the Osage Mineral Estate, despite clear orders to cease activities until an appropriate permit or lease was approved by the OMC and BIA, and accordingly, the balance of equities tip in the OMC's favor and warrant the provision of injunctive relief." OMC's FAC, ¶ 47; *see also id.*, ¶ 84 (same).
- "The public interest will be served by a permanent injunction that prohibits Defendants' continued trespass because compliance with federal laws serves a significant public interest. Defendants failed to comply with federal law when they refused to follow the BIA's instructions and obtain the requisite permit, and they failed to comply with federal law when they instead entered and disrupted the Osage Mineral Estate and unlawfully excavated minerals therefrom in direct violation of 25 C.F.R. § 211 and/or 25 C.F.R. § 214." *Id.* ¶ 94.

The OMC's request for injunctive relief, therefore, is in no way limited to stopping excavation work that took place in the past, but rather, was clearly pled in a manner that asks this Court to enjoin the operations of the Osage Wind Farm "until or unless the requisite leases are approved by the Secretary and the OMC." *Id.* ¶ 101.

In addition to overlooking the clear language in the OMC's FAC, Defendants also misconstrue the Court's July 1 Order granting in part their motion to dismiss. Boldly, Defendants claim that the Court limited the OMC's request for injunctive relief to "an injunction against 'excavation mining and other work'" based on a footnote, specifically footnote four of the Court's July 1 Order. *See* Defs.' Mot. 25 (citing Dkt. 161, 12 n.4). A simple reading of footnote four, however, demonstrates that Defendants' characterization of the Court's July 1 Order is mistakenly erroneous, at best, and possibly purposefully misleading, at worst. In footnote four, the Court explained why both the United States and the OMC must strike the claims for an accounting, disgorgement, and unjust enrichment from their respective complaints. *See* Dkt. 161,

23

12 n.4. In doing so, the Court noted that the United States' inclusion of the words "permanent injunctive relief" in its first complaint did not adequately preserve the aforementioned claims because "[t]he First Amended Complaint includes nothing from which the court, or Osage Wind, could reasonably infer that the United States sought an *accounting, disgorgement, or unjust enrichment related to revenues generated by the wind farm operation*." *Id.* (emphasis added). Footnote four clearly precludes Plaintiffs from seeking relief in the form of an accounting, disgorgement, and/or unjust enrichment. Not any or all injunctive relief.[15]

Furthermore, Defendants also, in a separate argument, asked the Court to dismiss Plaintiffs' claims for injunctive relief, and the Court refused to. Defendants argued "that any remedy other than money damages for the rock that was 'sorted,' 'crushed,' and 'exploited . . . as structural support' is barred by the law of the case doctrine." Dkt. 161, 8 (citation omitted). The Court, however, found that "the law of the case doctrine does not limit the United States/OMC to money damages," and accordingly, Plaintiffs were entitled to continue to seek permanent injunctive relief. Dkt. 161, 9. The notion that the Court's July 1 Order somehow limits the OMC's request for permanent injunctive relief is unsubstantiated and entirely erroneous.[16]

Finally, even if the OMC somehow had failed to adequately plead its request for permanent injunctive relief, it is clear that this Court, sitting in equity, has sufficient authority to

---

[15] It is notable that in denying the United States' request to amend its complaint and add claims for an accounting, disgorgement, and unjust enrichment, the Court was primarily concerned with the undue prejudice Defendants would suffer from the burden of additional discovery. *See* Dkt. 161, 12 ("Moreover, the requested amendments will require expensive and extensive additional discovery, resulting in further delay of what has already been protracted litigation."). The Court did not express this concern in relation to Plaintiffs' request for ejectment or other forms of injunctive relief.

[16] The Court's discussion of the OMC's FAC further clarifies that the Court was only dismissing "*certain* equitable relief" as specified, and the forms of equitable relief that were dismissed include, "specifically[,] disgorgement of profits, an accounting of 'all revenue attributable to the Osage Wind farm operation,' and unjust Enrichment." Dkt. 161, 15 (emphasis added). The OMC is entitled to seek all other forms of permanent injunctive relief.

grant the equitable relief that the OMC now requests.[17] *Kansas v. Nebraska*, 574 U.S. 445, 456 (2015) ("When federal law is at issue and 'the public interest is involved,' a federal court's 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.'"); *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) ("Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."). This Court is not limited to the equitable remedy of ejectment and can issue any form of equitable relief to which the Court determines the OMC is entitled.

## VI.   CONCLUSION

For the reasons stated above, the OMC respectfully requests that the Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

s/ Mary Kathryn Nagle
Mary Kathryn Nagle, OBA No. 33712
Wilson Pipestem, OBA No. 16877
Abi Fain, OBA No. 31370
Jennifer S. Baker, OBA No. 21938
Shoney Blake, Cal. Bar No. 264981
Pipestem and Nagle Law, P.C.
401 S. Boston Ave., #2200
Tulsa, Oklahoma 74103
918-936-4705 (Office)
mknagle@pipestemlaw.com
wkpipestem@pipestemlaw.com
afain@pipestemlaw.com
jbaker@pipestemlaw.com

---

[17] Federal Rule of Civil Procedure 54(c) makes clear that the Plaintiffs should be granted the relief they are *entitled to* even if the Plaintiffs failed to demand this relief in their pleadings. *See* Fed. R. Civ. P. 54(c) ("Every other final judgment should grant the relief to which each party is entitled, *even if the party has not demanded that relief in its pleadings*.") (emphasis added); *see also Reorganized FLI, Inc. v. Williams Companies, Inc.*, 1 F.4th 1214, 1226-27 (10th Cir. 2021) (finding that a party preserved a remedy by asking for "such other and further relief as the Court may deem appropriate" because "Rule 54 of the Federal Rules of Civil Procedure does not require any greater specificity than this to preserve a remedy.").

sblake@pipestemlaw.com
*Counsel for Intervenor-Plaintiff*
*Osage Minerals Council*

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2021, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Ryan A. Ray
Joel L. Wohlgemuth
rar@nwcjlaw.com
jlw@nwcjlaw.com

-and-

Lynn H. Slade
Sarah S. Stevenson
Deana M. Bennett
Spencer L. Edelman
lynn.slade@modrall.com
sarah.stevenson@modrall.com
deana.bennett@modrall.com
spencer.edelman@modrall.com
*Counsel for Defendants*

David McCullough
dmccullough@dsda.com

Jeffrey S. Rasmussen
jrasmussen@ndnlaw.com

-and-

Wilson Pipestem
Mary Kathryn Nagle
Abi L. Fain
Jennifer S. Baker
Shoney Blake
mknagle@pipestemlaw.com
wkpipestem@pipestemlaw.com
afain@pipestemlaw.com
jbaker@pipestemlaw.com
sblake@pipestemlaw.com
*Counsel for Intervenor-Plaintiff, Osage Minerals Council*

-and-

Thomas J. McCormack
Robin D. Ball
Robert Comer
Robert Kirby thomas.mccormack@nortonrosefullbright.com
robin.ball@nortonrosefullbright.com bob.comer@nortonrosefullbright.com
robert.kirby@nortonrosefullbright.com
*Counsel for Defendants*

Cathryn Dawn McClanahan
cathy.mcclanahan@usdoj.gov

*Counsel for Plaintiff, United States*

/s/ Mary Kathryn Nagle