# EXHIBIT 4

Case No. l4-CV-704-GKF-JFJ

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
     UNITED STATES OF AMERICA,
 3
          Plaintiff,
 4
     and
 5
     OSAGE MINERALS COUNCIL,
 6
          Intervenor-Plaintiff,
 7
     vs.                              No. 14-CV-GFK-JFJ
 8
     OSAGE WIND, LLC;
 9   ENEL KANSAS, LLC;
     and ENEL GREEN POWER
10   NORTH AMERICA, INC.
11        Defendants.

12   _____

13      ZOOM/VIDEOTAPED DEPOSITION OF FRANCESCO VENTURINI
            TAKEN ON BEHALF OF THE INTERVENOR-PLAINTIFF
14       ON SEPTEMBER 13, 2021, BEGINNING AT 7:04 A.M.
                ALL PARTIES APPEARING VIA ZOOM
15          REPORTED BY KARLI DANIELS, CSR, RPR, CCR

16                     APPEARANCES:

17   On behalf of the PLAINTIFF:

18        Stuart Ashworth
          Nolan Fields
19        Cathryn McClanahan
          UNITED STATES ATTORNEY'S OFFICE
20        NORTHERN DISTRICT OF OKLAHOMA
          110 West Seventh Street, Suite 300
21        Tulsa, Oklahoma 74119
          (918)382-2772
22        stuart.ashworth@sol.doi.gov
          nolan.fields@sol.doi.gov
23        cathryn.mcclanahan@sol.doi.gov

24

25   (Appearances continued on next page.)
```

Page 2

1   (Appearances continued.)

2   On behalf of the INTERVENOR-PLAINTIFF:

3       Abi Fain
        Mary Katherine Nagle
4       PIPESTEM & NAGLE
        401 South Boston Avenue, Suite 2200
5       Tulsa, Oklahoma 74103
        (918)936-4705
6       mknagle@pipestemlaw.com

7
    On behalf of the DEFENDANTS:
8
        Thomas J. McCormack
9       Robert Kirby
        NORTON ROSE, FULBRIGHT
10      1301 6th Avenue
        New York, New York 10019
11      (212)318-3000
        thomas.mccormack@nortonrosefulbright.com
12      robert.kirby@nortonrosefulbright.com

13  ALSO PRESENT: Christina Watson; Michelle Hammock; Julie
    Combs; Megan Beauregard, Enel in-house counsel; Beatrice
14  Saiz, Enel in-house counsel

15  VIDEOGRAPHER: Sean Shell

16

17

18

19

20

21

22

23

24

25

Page 3

1                    INDEX

2                            Page

3   Direct Examination by Mr. Fain          5

4   Cross-Examination by Mr. Ashworth       99

5               STIPULATIONS

6       It is stipulated that the deposition of

7   Francesco Venturini may be taken pursuant to agreement and

8   in accordance with the Federal Rules of Civil Procedure on

9   September 13, 2021, before Karli Daniels, CSR, RPR, CCR.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1           THE VIDEOGRAPHER:  This is the videotaped

2   deposition of Francesco Venturini, taken on behalf of the

3   Intervenor-Plaintiff, in the matter of the United States

4   of America, Plaintiff, Osage Mineral Council,

5   Intervenor-Plaintiff, versus Osage Wind, LLC, et al.,

6   filed in the United States District Court for the Northern

7   District of Oklahoma, Case Number 14CV-704-GFK-JFJ.

8           This deposition is being held via web conference

9   on Monday, September 13, 2021.  We're on the record at

10  7:04 a.m.

11          Will counsel please state their appearances for

12  the record.

13          MR. McCORMACK:  Yes.  This is Tom McCormack with

14  Norton Rose Fulbright on behalf of the witness, and with

15  me is my colleague, Bob Kirby, also from Norton Rose

16  Fulbright, and Megan Beauregard from Enel, also a lawyer

17  in-house.

18          MS. FAIN:  This is Abi Fain from Pipestem and

19  Nagel on behalf of the Osage Minerals Council as the

20  Intervenor-Plaintiff, and with me I have Mary Katherine

21  Nagel and Julie Combs.

22          MR. ASHWORTH:  Stuart Ashworth, on behalf of the

23  United States.  With me are attorneys Nolan Fields and

24  Cathy McClanahan.  I also have paralegals Christiana

25  Watson and Michelle Hammock.

Page 5

1           MR. McCORMACK:  Okay.  Let's go.

2           THE VIDEOGRAPHER:  The court reporter will now

3   please swear in the witness.

4   WHEREUPON,

5               FRANCESCO VENTURINI,

6   after having been first duly sworn, deposes and says in

7   reply to the questions propounded as follows, to-wit:

8           DIRECT EXAMINATION

9   BY MS. FAIN:

10      Q    Okay.  Thank you, Mr. Venturini, for joining us

11  this morning here and this afternoon where you are.  We'll

12  start off with some general questions, but I just want to

13  make sure that you know we'll hopefully proceed in a

14  conversational manner, and -- but if a time comes up where

15  you'd like to take a break or need to stop for a moment,

16  we are free to do that.

17          First off, have -- or --

18          MS. FAIN:  And, I'm sorry.  I just want to

19  clarify.  There is somebody on named Beatrice Saiz.

20          MS. SAIZ:  (Nods head.)

21          MS. FAIN:  Oh, and can you identify who you're

22  with?

23          MS. SAIZ:  Yes.  I'm Enel in-house as well.

24          MS. FAIN:  Okay.  Thank you.

25          MR. McCORMACK:  My apologies.  I forgot to

Page 6

1  mention Beatrice. She's also on for Enel.
2       MS. FAIN: Okay. Thank you so much.
3       Q   (BY MS. FAIN) Mr. Venturini, have you ever
4  testified in a deposition before today?
5       A   Nope.
6       Q   Have you -- can you tell us if you've done
7  anything to prepare for today's deposition?
8       A   Yes. I met with my lawyers.
9       Q   Okay. And besides your attorneys, have you
10  spoken with anybody else in preparation for the
11  deposition?
12      A   Other than my wife, no.
13      Q   Okay. Do you hold any degrees, any college
14  degrees?
15      A   Yes, I do. I have a bachelor's degree in
16  economics, and then I have a master's degree in the school
17  of management at Sloan MIT.
18      Q   Okay. And have you ever received any kind of
19  formal training in construction matters?
20      A   No. I'm not an engineer by background.
21      Q   Have you ever received any formal training with
22  respect to Indian Trust property?
23      A   No, I haven't.
24      Q   And what experience do you have with
25  interpreting United States federal statutes and

Page 7

1  regulations?
2       A   I would say general management classes, yeah.
3       Q   I'm going to go ahead and ask some general
4  questions about your involvement and history on wind
5  energy projects. Have you been involved with any wind
6  energy entities besides Enel?
7       A   As -- I just -- I mean, my job has been Enel for
8  the past 22 years. So when you're talking about
9  "entities", obviously you use SPB's at different projects,
10  different Enel entities, but always owned by Enel.
11      Q   Okay. And let's see. Can you provide the names
12  of any wind-energy-related entities where you have served
13  as a board member?
14      A   I don't recall any of them, honestly. I have,
15  but I have no idea.
16      Q   Can you -- do you have like a ballpark idea of
17  how many --
18      A   No.
19      Q   -- or has it been less than ten?
20      A   I honestly don't know. I mean, the SPB's are
21  built for -- as you know, they're risking the general
22  structure of the government, so around many. You do them
23  to develop a project. You do some of them to build the
24  project. You do some others to finance the project. I
25  have no idea, to be honest with you.

Page 8

1       Q   What about non-Enel entities, have you served on
2  boards for any companies that are not -- were not owned by
3  Enel at the time you served on their board?
4       A   If -- sorry. I'm not sure I understand the
5  question.
6       Q   Sure. Sure. Are there -- are there any
7  companies where -- that you have served as a board member
8  for, that during the time you served as -- on the board,
9  that company was not owned by Enel?
10      A   If I have served as a board member in other
11  companies not owned by Enel during the past 20 years?
12      Q   Even the past ten years.
13      A   Oh, yes. I did, and I still do.
14      Q   Can you -- do you have the names of what those
15  companies are?
16      MR. McCORMACK: Counsel, can you -- can you tell
17  me why we're getting into this? I mean, the Court has
18  ordered that the only entities that are relevant are the
19  three entities that are defendants in this lawsuit.
20  There's been specific Court orders on that subject matter.
21  Why are we talking about entities that are unrelated to
22  Enel and asking questions about those? I'm kind of
23  curious as to your thinking on that.
24      MS. FAIN: Well, I think that, you know, as the
25  questions will begin to play out, that there have been

Page 9

1  times, like here, where, you know, the final agreement
2  between Enel and Tradewind were not closed, but
3  Mr. Venturini was on the board for Enel but he was also
4  serving on the board at Tradewind at the time of the
5  transaction.
6       MR. McCORMACK: Okay. I'm happy to let you ask
7  the questions. I just -- I -- just be mindful of the fact
8  that we fought about what he's entitled to be asked about
9  or discovered, generally, and the Court was very clear
10  that he's talking about these three Enel entities. So I'm
11  an accommodating guy, I'll let you ask some questions, but
12  just be mindful that that's really what the Court is
13  dictating in some of the prior decision-making, which I
14  read over the weekend.
15      But go ahead.
16      MS. FAIN: Okay.
17      MR. ASHWORTH: I would just interject real
18  quick. I'm having just a slight difficulty hearing Mr.
19  Venturini. I just want to verify that the court
20  reporter's hearing the answers of Mr. Venturini or having
21  any issues.
22      THE REPORTER: I am hearing him. He's coming
23  through a little bit lightly.
24      So if you could speak up a little bit, that
25  would be good, or move a little closer to the mic.

Page 10

1    THE WITNESS: I can put headphones on, if
2 necessary, but otherwise, if you --
3    MR. ASHWORTH: I'm having --
4    THE WITNESS: Can you hear me now?
5    THE REPORTER: Yes.
6    MR. McCORMACK: And one thing I'll also suggest,
7 and I recognize these are kind of odd scenarios that we
8 are typically not in by doing this by video, but it would
9 be good for both the questioner and Mr. Venturini to allow
10 each other to finish speaking before either one of us
11 starts talking again, because I noticed that a couple
12 times. So let's try to maintain that as well.
13    Sorry, Counsel. Go ahead.
14    Q   (BY MS. FAIN) Okay. Mr. Venturini, can you name
15 some of the entities that you served on their board, and
16 we'll make it in the past ten years, that when you served
17 on the board, they were not owned by Enel?
18    A   I cannot recall all of them. I can tell you
19 that today I'm in the board of a company called CESI,
20 which is a company making - how shall I say -
21 certification for analytical machinery. I'm in the board
22 of several associations of -- regarding specialty
23 electro-mobility. I was in the board of a company in the
24 United States called Sentient Science until six months
25 ago. I was in the board of a couple startups of -- in the

Page 11

1 past. And as you mentioned, to be honest with you, I
2 didn't even recall, but probably I was also on the board
3 of Tradewind at the time.
4    Q   With respect to Tradewind, do you recall what
5 years you served on the board?
6    A   No. What I'm imagining is that, when I arrived
7 in the United States, probably 2012, 2011, up to when I
8 left in 2015.
9    Q   And on that same line of questioning with regard
10 to the Tradewind board, how is it that you became a member
11 of that board? Were you invited by somebody at Tradewind?
12    A   It was -- Tradewind is a company developing wind
13 projects. We had -- we used them to develop several wind
14 projects in the United States. We had a -- we owned a
15 share of Tradewind at the time, and we had a very complex
16 agreement in terms of development of new projects. And
17 because we own part of Tradewind, I would guess I was
18 invited to join the board, yes.
19    Q   Do you -- you mentioned a complex agreement with
20 Tradewind. Do you know the ballpark date of when that
21 agreement was entered regarding development projects
22 between the two?
23    A   Excuse me. What did -- what did -- what did you
24 say? What kind of data?
25    Q   You had -- you had mentioned that Tradewind and

Page 12

1 Enel had some type of complex agreement around development
2 opportunities. Do you have a general idea of when that
3 agreement was entered?
4    A   Not really. I mean, when I arrived in the
5 United States, it was 2010, 2011. Tradewind was having
6 some financial issues, so -- and we just restructured the
7 deal at the time. And I think we restructured the deal
8 more than once, so -- during the past -- during the past
9 years. They're very, very quick developers, and we wanted
10 to make sure that we could use their services, so we
11 helped them every time that they had financial trouble.
12 They were not just developing for Enel, but they were a
13 very important developer to us.
14    Q   At the time you were serving on Tradewind's
15 board, do you recall how many members were on the board
16 with you?
17    A   No. I think -- I'm assuming, because I don't
18 remember exactly names. I'm assuming on our side it was
19 me and probably Mike Storch, and on their side, I'm sure
20 it was Rob Freeman. The three shareholders, so -- main
21 shareholders. So Rob Freeman; Matt. I don't even recall
22 the names of the other two guys. Forgive me, but I don't
23 recall their names.
24    Q   Sorry. So is it your recollection that there
25 were five members on the board or --

Page 13

1    A   Five or more. I mean, I -- my recollection was
2 that there were the three of them and some others on our
3 side, but I don't remember recall their names.
4    Q   Okay. Thank you. And let's see. I think
5 when -- you mentioned that you came to the United States
6 around 2010 or so, but when did you become an Enel
7 employee in the first instance? When were you first hired
8 by Enel?
9    A   December 15, 1997.
10    Q   And which Enel entity was it that employed you
11 at that time?
12    A   It was the Enel SPA. At the time there only --
13 it was essentially only one big Enel. It was before the
14 impounding process when it was split in different
15 companies, in different entities. I think it was year
16 2000 or 1999.
17    Q   And since -- since 1997, since you first joined
18 Enel, what positions have you held at Enel?
19    A   I was hired, as I said, 15th December 1997, so I
20 would say early 1998, as a controller, financial
21 controller. Then I moved into the position -- and I was
22 hired because, at the time, Enel was going through the
23 impounding and they had the idea of going public and I had
24 some experience with public companies. Financial
25 controller, Enel SPA, then I became the CFO of the holding

Page 14

1  company. Then I moved to be internal auditor for the
2  distribution company, and then I became the CFO of the gas
3  division, natural gas division. And then I came back and
4  I was the head of the back office for the retail division,
5  and then I was the head of finance for Enel Green Power.
6  Then I became the BD, head of BD for North America, then
7  CEO, president CEO of Enel Green Power North America, and
8  then president and CEO of Enel Green Power. And then
9  today, I'm the CEO of Enel X.
10    **Q  Okay. And when was it that you became president**
11  **of Enel Green Power North America?**
12    A  I think it was 2011, but I cannot recall the
13  exact month.
14    **Q  And what year did that title change or what year**
15  **did your position change after 2011?**
16    A  May 2014, my -- the CEO of Enel Green Power was
17  appointed the CEO of the whole Enel group, and I became
18  the CEO of Enel Green Power. So between May 2014 and
19  September, October of that year, I essentially went back
20  and forth, but I was mostly in Italy, and for several
21  reasons. I was very, very busy in figuring out what the
22  new job was all about. I mean, Enel Green Power is a very
23  big company working all over the world. Then I had to
24  move back my family from the United States to Rome, and
25  then at the time I was also going to school. I was going

Page 15

1  to MIT, so I had to do -- it was a crazy life back and
2  forth for several months until the new CEO, president CEO
3  of Enel Green Power North America was appointed. Then
4  once again in 2000 -- May 2017, from being the president
5  CEO of Enel Green Power, I was appointed as the CEO of
6  Enel X, a completely different division, different company
7  of Enel.
8      MR. McCORMACK: Madam Court Reporter, would you
9  please read back the question that was just asked to Mr.
10  Venturini.
11      THE REPORTER: Yes.
12      (The requested portion is read back by the
13  reporter.)
14      MR. McCORMACK: Okay. Thank you.
15      THE REPORTER: You're welcome.
16    **Q  (BY MS. FAIN) Can you describe how your**
17  **responsibilities changed when your position changed from**
18  **2011 to 2014?**
19    A  From 2011 to 2014?
20    **Q  When -- sorry. When you had your position as**
21  **president of Enel Green Power North America in 2011 and**
22  **then in May 2014 you became CEO, how did your**
23  **responsibilities with that -- what did -- what changed**
24  **with your responsibilities?**
25    A  Responsibilities changed completely. I mean, I

Page 16

1  was now the president CEO of a -- what I would call a
2  division of Enel Green Power. So the entity was Enel
3  Green Power North America, but, I mean, we were
4  essentially taking care of the business in the United
5  States and Canada, then I became the CEO of public company
6  with about 30 percent of the stock traded in Milan and in
7  London and did business worldwide.
8      So from having, you know, four or five different
9  projects in North America in construction, I became the
10  CEO of a big group with tens, probably hundreds of
11  projects in construction at the same time. So it was
12  completely a different beast, a completely different
13  animal.
14    **Q  In that time, before 2014 and after 2014, what**
15  **was your -- what was your relationship with Enel Kansas?**
16    A  I'm not even sure what Enel Kansas is. I'm
17  assuming it's an SPB controlled by Enel Green Power North
18  America, but I have no information regarding Enel Kansas
19  as it is. I have no idea.
20    **Q  When was it that you left EGP North America?**
21    A  In -- what do you mean? What sense?
22    **Q  After -- you've stated that you're now at Enel**
23  **X. Were you -- was there -- did you leave Enel Green**
24  **Power North America and go directly to Enel X or was there**
25  **something in there?**

Page 17

1    A  There was a project in there. In May 2014, from
2  being the head of Enel Green Power North America, I became
3  the head of Enel Green Power. So we're talking about,
4  again, a big company with several thousand employees all
5  over the world. And then in 2017, I left Enel Green Power
6  and I became the CEO of Enel X. So this is the jump from
7  a company owned by Enel Green Power, Enel Green Power
8  North America, into a completely different division in
9  2017 doing completely different stuff. My business today
10  is mostly software and other digital tools.
11    **Q  Thank you. That clarification was very helpful.**
12  **I think I was stuck on Enel Green Power North America a**
13  **little longer than I realized, so thank you for clarifying**
14  **that.**
15      **Let's see. When you were at EGPNA, did you**
16  **have -- did you have authority to approve or deny any**
17  **actions related to wind projects within -- that were under**
18  **your scope of review or management?**
19    A  I had a lot of power, but I'm not sure that I
20  had the power of stopping everything at that time. I was
21  appointed to a CEO of Enel Green Power. I had to justify
22  any of such big decisions I was going to make. So I
23  love -- would love to feel like I was fully independent,
24  but I had a boss like everybody else, and I had to respond
25  to my boss.

Page 18

1   Q   What -- who was your boss?  Who did you answer
2   to when it came to those decisions?
3       A   My boss was and still is Francesco Starace.
4   Francesco Starace was at the time the CEO of Enel Green
5   Power, and today, he is the CEO of Enel.
6       Q   In that time when you were making decisions
7   at -- you know, for Enel Green Power North America, you
8   said you had to -- there were several considerations
9   that -- you know, that were part of justification for any
10  decision that you made in your role.  What types of
11  considerations played into how you justified certain
12  decisions you made?
13      A   I had -- I don't know what you mean with
14  "consideration".  I mean, I obviously had business
15  reviews.  I had phone calls with my boss to educate him on
16  different subjects.  There was an investment -- there were
17  and there are still investment committees I have to bring
18  a project to for approval.  So I guess I had many
19  different interactions.  So if I had to, you know, make an
20  important decision, I had to share it with the rest of the
21  management team.
22      Q   Who else was on the management team that you
23  would communicate with?
24          MR. McCORMACK:  Counsel, can you give us a time
25  frame?

Page 19

1          MS. FAIN:  Sure.
2       Q   (BY MS. FAIN) In the time that you were head of
3   Enel Green Power North America, what -- what -- who was on
4   the management team that you would work with, especially
5   related to the Osage Wind project?
6       A   Well, it depends very much on the kind of
7   decision that I was supposed to make.  The entity is a
8   very big company.  It's very complex.  So if I had to
9   discuss about procuring wind mills, I was going to talk to
10  the head of procurement in Rome if I had any problem.  If
11  we are talking about construction of the wind mill, I had
12  to talk to the head of engineering and construction in
13  Rome because all the different projects around the world
14  reported directly to them.
15          So the project manager sitting on site and
16  making sure that the project was built, the direct line of
17  report is to me and at the same time to the head of
18  engineering and construction in Rome.  If I had to discuss
19  the fact that, I don't know, the project was not as
20  economically sustainable as we thought it was, I had to go
21  back to investment committee and discuss with the
22  committee to -- how to manage it.
23          I mean, it's -- there are very many people who I
24  could have talked to about it depending on the subject
25  matter and depending on so -- on how important the matter

Page 20

1   was.
2       Q   In the case of the Osage Wind project, who would
3   you have spoken to regarding permitting issues and
4   relations with the federal government?
5       A   I would have spoken -- it depends on the
6   importance of the information.  I had -- I mean, it's very
7   difficult to give you a straight answer.  If it was
8   something about the development of the project, I was
9   going to discuss it with my head of development in the
10  United States and maybe even with the head of development
11  in Rome, maybe with the legal counsel.
12          I -- actually, I mean, if we're talking about
13  legal issues, 100 percent with the legal counsel, local
14  and maybe in Rome even.  It depends very much on the
15  matter.
16      Q   Do you recall at that time who the individuals
17  were for -- on the legal team that you would have spoken
18  with or anybody else who you would have spoken to about
19  the permitting requirements for the Osage Wind project?
20      A   First of all, it's very difficult that I was
21  going to get to that level of detail about discussing
22  about permits for a specific project.  Usually that was
23  directly handled by the team in charge of that project.
24  If the issue was extremely relevant, it maybe would have
25  come to me.  In that case, I would have spoken to the

Page 21

1   legal counsel, who at that time was Steve Champagne.
2       Q   In your time at EGPNA, when the North America
3   entity that you are over was considering undertaking a new
4   wind project or acquiring an existing wind project or
5   development, what kind of due diligence was typically
6   performed?
7       A   The due diligence was performed directly by the
8   business development team together with all the different
9   people from different -- from different departments.  So
10  the BD team was in charge of the due diligence, and then
11  legal, engineering, anybody who had -- safety, anybody who
12  had any interest in the project in terms of development
13  would have made his/her part into it.
14          I mean, it was -- it was -- it -- a wind project
15  is an extremely complex project to handle, so you need a
16  lot of different people from -- with different expertise,
17  and you mix them up and you put them in a group, and then
18  they spend days going through all different papers and
19  making sure that everything's okay.
20          I'm not a technician.  I am -- I am a general
21  manager, and to be honest with you, I never got into the
22  due diligence of a wind project, and I would not be able
23  to describe to you exactly in detail what the project --
24  what the process would entail.
25      Q   Okay.  When -- do you recall when you first

Page 22

1  became aware of the Osage Wind project?
2      A   I'm sure there was a list of many projects that
3  were in the course of development by the developer.  You
4  mentioned TradeWind, so I'm assuming that it was developed
5  by Tradewind at the time.  But to be honest with you, I
6  mean, if you had mentioned a different developer, it could
7  have been a different developer.
8          And when the project is developed, the project
9  goes through -- when it's ready to go, goes through the
10  due diligence, and then from the due diligence goes to
11  investment committee.  And in investment committee, there
12  is the people responsible for development of the project,
13  in this case, the North American team and the CEO, the CFO
14  of Enel Green Power, and then the the -- all the direct
15  reports, and they analyze the project and they see if it
16  meets the proper rate, the level of return that are
17  required by the company if it's developed properly.
18  Obviously, I mean, it's a presentation of slides.  They
19  don't go in detail.  They trust the people who put
20  together the information.
21      Q   Do you recall or do you have an idea of when
22  EGPNA first considered acquiring the Osage Wind project?
23      A   No, I have no idea.
24      Q   When you -- when you first became involved in
25  any capacity with the Osage Wind project, was this -- was

Page 23

1  this before EGPNA entered a loan agreement with Tradewind
2  for the project, for the Osage Wind project?
3      A   I have no idea.
4      Q   Okay.  Can you describe the scope of work you
5  were involved with on the Osage Wind project, generally?
6      A   I mean, no.  I mean, I was managing a portfolio
7  of projects.  So when projects were in development, my
8  biggest concern was to put all the team, the whole team
9  together and make sure that the job was properly done.
10  Everybody had to pitch its own knowledge in making sure
11  that the project was valuable.
12          Once we were ready to go, I mean -- and, again,
13  I wasn't -- I do not have the kind of know-how to get into
14  all the different engineer and legal details.  I trust my
15  team.  I mean, it's a very -- it was, still is, a very
16  senior team with a humongous experience in this sector.
17  At that time, Mike Storch was -- together with David Post,
18  they were the head developers on Enel Green Power North
19  America side, and they're people with decades of
20  experience in this business.
21      Q   Do you -- so if I heard right, on the Osage Wind
22  project, the people on the team from the EGPNA were you
23  had Mike Storch and Dave Post.  Do you recall any of the
24  other team members for the Osage Wind project?
25      A   From what I can remember, it was Bill Price as

Page 24

1  general manager.  He used to be the general manager for
2  80, 90 percent of the projects built in the United States,
3  so I would be surprised if Bill was not part of it.  Legal
4  side, Steve Champagne.  Enel side, Steve Pike.  I mean, my
5  management team was fully involved on, you know, the
6  different projects in the United States, and obviously
7  they had to delegate to other members of the team because
8  we were growing at the time quite fast.  There were many
9  projects in our portfolio.
10      Q   With that team set, what -- is it -- is it
11  accurate to say they handled day-to-day decisions on the
12  project?
13      A   Absolutely, yes.
14      Q   At what point would issues on the project rise
15  to your level?
16      A   Usually where -- situations where there was the
17  potential for not moving forward or there were extra costs
18  to take care of.  Everything that I would say had an
19  impact on the construction of the project more than
20  anything else, the economic viability of the project
21  itself.  We had to -- we had -- if the project was in
22  construction, we had to go to the investment committee,
23  which means that we were given the rate that we needed to
24  make sure that the project was economically viable.
25  Anything that had impact, both problems in construction or

Page 25

1  an economics impact on the project, I would have been
2  involved.
3      Q   The same team that you mentioned, were they
4  employed by Enel Green Power North America?
5      A   I'm assuming so.  I mean, honestly, there were
6  different entities, but I'm assuming all the people I
7  mentioned were employed by Enel Green Power North America
8  at the time, yes.
9      Q   Were they employed by -- were they employees of
10  any other Enel entities at the same time?
11      A   Not that I remember.  I mean, usually SPB's are
12  empty boxes, so I would say 100 percent of employees were
13  at the Enel Green Power North America level.  But during
14  those times, we made different, let's call them
15  "brownfield" positions.  Like for example, the joint
16  venture with General Electric.  In this case, I cannot
17  swear that there were not Enel employees in -- being part
18  of the JV, but my assumption's 100 percent of employees
19  were Enel North America level.
20      Q   Okay.  Thank you.  Was there -- do you recall
21  any times where you decided to override a decision made by
22  the team working on the Osage Wind project?
23      A   Regarding no such -- no.  Absolutely I have no
24  recollection, and to be honest with you, I don't have a
25  recollection of me overriding any important decision



Page 26

1  regarding any other project.  I mean, Enel Green Power, by
2  definition, is a company structured throughout by teams.
3  Being a team member is extremely important, so most of the
4  official decisions are made, you know, at the team level.
5  **Q   Okay.  And in this -- in the time that you were**
6  **CEO of Enel Green Power North America, were you -- would**
7  **you have been involved on some of the financing agreements**
8  **related to the Osage Wind project?**
9  A   No.  I, in that case, still were a very strong
10 team working with banks.  Actually, there was a direct
11 line also in that case with the finance department in
12 Rome.  Usually, there are two parallel paths; on one side
13 you develop and build the project, and on the other side,
14 as we know, there are very important incentives in the
15 United States.  In this case, we are talking about the
16 so-called "PTC's" and there is a completely different
17 parallel path working on financing the project which
18 essentially means selling the PTC's to a bank.
19 **Q   Okay.  Were you -- were you involved with any**
20 **financing agreements in your -- in your role as a board**
21 **member of Tradewind?**
22 A   Financing agreements for what?
23 **Q   Well, in particular, the Osage Wind project.**
24 **Would you have weighed in on any financing agreements on**
25 **Tradewind's side?**

Page 27

1  A   No.  I mean, just it would be -- Tradewind was
2  an independent company.  I mean, we funded part of the
3  development, but I would have never gotten involved in
4  anything specific regarding the project.  They were
5  completely independent in developing the project, and when
6  it was ready to go, which means it was ready for due
7  diligence and ready for construction, they would have
8  brought it to us.  Again, investment committee, due
9  diligence, and then go through the process as I described
10 earlier.
11 **Q   So to clarify, when you said they would have**
12 **"brought it to us", are you saying they would have brought**
13 **it to Enel or they would have brought it to their own**
14 **Tradewind board for --**
15 A   They would have brought it -- they would have
16 brought it to Enel Green Power.  Most of the board -- most
17 of the -- what the board would have done at the time was
18 mostly looking at the financing of this -- of the company,
19 making sure that they had funding to keep developing
20 projects.  Extremely expensive to develop a wind project,
21 and you develop many, but only, you know, a few are
22 successful, so you need to keep funding development
23 activities, and that's what we were discussing about.
24 **Q   So did the Tradewind board, when you were a**
25 **member of the board, discuss the Osage Wind project?**

Page 28

1  A   I'm sure we did, but, I mean, honestly, what we
2  discussed about, I have no idea.  The way it worked is
3  that they brought in -- whenever the board -- and as far
4  as I remember, it was, you know, probably three or four
5  times a year, they brought a few slides describing, you
6  know, the different projects; what they thought was going
7  to be the size; what they thought it was going to be, too
8  much or enough for -- to be safe to us.  It was general
9  information.  They were taking care of all the development
10 activities.  They were very involved, and rightfully so.
11 I mean, it was their job and they were paid to develop a
12 project.
13 **Q   So even though the Tradewind had its own -- you**
14 **know, it's own team responsible for day to day, when there**
15 **were issues that rose to the level of the board, was there**
16 **a majority of Tradewind people on the board, was there --**
17 **or a majority of Enel people on the board, or was it**
18 **equal?**
19 A   I don't remember how many members there were on
20 the board, so I cannot tell you, to be honest.  I -- we
21 were not controlling the company.  I don't think that we
22 were equal members of the board.  But in any case, this
23 kind of issues regarding the development of projects were
24 not brought to the board.  We were not interested in
25 understanding how they were developing a single project

Page 29

1  because it was their responsibility and they were
2  compensating -- they were compensated for that.
3      So it was their job to initiate the development
4  and building the development up to a certain point when
5  the project was ready for construction.  At that point,
6  they would have brought it to our attention.  We would
7  have started our due diligence, and if the due diligence
8  was positive and we believed that the project was at the
9  level of maturity where construction could have started,
10 then we would have packaged the whole thing and gone to
11 the Enel Green Power investment committee for approval.
12 Because every project needs funding, and that's the reason
13 why investment committee exists, right?  I mean, you go to
14 the investment committee and ask for funding to build a
15 project.
16 **Q   Who would have been on the investment committee**
17 **at Enel Green Power?**
18 A   As I said, the CEO or the CFO and all the CEO's
19 direct reports.
20 **Q   So, and you would have been on -- is it accurate**
21 **to say you would have been on the investment committee?**
22 A   Yeah.  In this case, I mean, if you are talking
23 about the North American project, I would have been the
24 one bringing the project to the committee, and CEO and CFO
25 mostly, but everyone analyzing the project with the detail

Page 30

1  that was provided to them, and then the committee would
2  have made a decision.  I had no -- I mean, I was not
3  going -- I could not approve my own project.  So in this
4  case, I was the one bringing the project to the committee.
5       If one of my colleagues from Brazil was going to
6  bring a Brazilian project to the committee, I would have
7  been the one -- the one giving my opinion regarding a
8  specific project.  But when you are bringing your own,
9  you're just, you know, explaining what the situation is
10 and the decision is made by the rest of the committee.
11      Q   Okay.  So were there any -- between Enel and
12 Tradewind, were there any understandings with regard to
13 conflicts of interest?  Considering that you did serve on
14 the board of Tradewind and you were head of EGP's North
15 America operation, were there any terms that would have
16 protected against conflicts that might come up with
17 filling two different roles?
18      MR. McCORMACK:  Hold on.  Object to the form of
19 the question.  Vague and ambiguous.
20      You can answer the question.
21      A   Well, I'm not sure I understand the question
22 because I don't see any conflict of interest.  I mean,
23 that's how the wind industry really works in the United
24 States.  You have hundreds of different developers and
25 that's their job.  I mean, they develop projects.  And

Page 31

1  they usually make money -- they don't have money to build
2  the project, so they need to develop it up to the point
3  where it can be constructed, and usually, at that point,
4  they sell it to a third party.
5       So Tradewind was one of the many developers we
6  used in the United States.  The fact that we were -- you
7  know, we were helping them in finding the money to develop
8  a big portfolio, I don't see any conflict, to be honest.
9  I mean, it's a very common thing in the industry.  You
10 have a foot in the door, and you -- more than anything
11 else, you provide finance that is needed so that these
12 guys can go out and do their job.  It's very expensive to
13 develop a -- I mean, renewal projects in general, and
14 specifically in this case, wind projects in the United
15 States.
16      Q   Were you -- in your time in the North America
17 position, were you involved with any management agreements
18 related to the Osage Wind project?
19      A   Management agreement.  What do you mean?
20      Q   So the -- for instance, Enel's, EGP's role as
21 managing construction of the Osage Wind project.
22      A   Forgive me.  I still am not sure I understand
23 what you mean.
24      Q   So prior to Enel purchasing the membership
25 interest in the Osage Wind project, there was an agreement

Page 32

1  for construction management wherein Osage -- or Enel would
2  also serve as the construction management team for the
3  project.  Would you have been involved in this?
4       MR. McCORMACK:  Wait.  Object.  Oh, wait, wait.
5  Object to the form of the question.  Assumes facts not in
6  evidence.  Vague and ambiguous.
7       But you can answer it.
8       A   I have no idea.  I mean, there were several
9  agreements fairly often that we build with the developers
10 to help them out.  I mean, I don't know if there is one
11 here or not.  I have no recollection.  We're talking about
12 something -- I mean, it was seven years ago, almost eight.
13      Q   (BY MR. McCORMACK) Okay.  Let's see.  Were
14 you -- would you have been involved -- and maybe this
15 would have been on the investment side as well.  But
16 during your time in the North America office, were you
17 involved with any service agreements related to the Osage
18 Wind project?
19      A   Again, I have no recollection.  But I
20 wouldn't -- I wouldn't probably be directly involved with
21 this kind of stuff.  I mean, there were several agreements
22 for all the different projects.  Maybe I would have signed
23 an agreement as president and CEO, but that doesn't mean I
24 had any, you know, idea of the details in that -- in the
25 agreement.  So I'm not sure exactly what you're referring

Page 33

1  to.
2       Q   Do you know who would have likely been involved
3  on behalf of Enel in that -- in a service agreement?
4       A   If there is an agreement of some sort which
5  means that there is a legal binding contract in some form,
6  definitely the legal counsel at the time, Steve Champagne,
7  or some member of his team.
8       Q   Did you ever communicate with anyone from
9  General Electric regarding the Osage Wind project?
10      A   No.  The General Electric deal was a package
11 deal, and by the time it was closed, I was well gone.
12      Q   Do you recall when it was closed?
13      A   No.
14      Q   Did you ever communicate with anyone from
15 Northwestern Mutual Life Insurance regarding the Osage
16 Wind project?
17      A   No.  I had no direct contact with the banks
18 other than for the dinner for celebrating the closing of
19 the deal.  Other than that, I mean, there were teams of
20 both sides super specialized in this kind of financing
21 that were taking care of everything.
22      Q   Do you recall who would have been on the Enel
23 team for financing?
24      MR. McCORMACK:  I'm sorry.  For what time?  For
25 what issue?  Sorry.



Page 34

1  MS. FAIN:  Still the time frame in which
2  Mr. Venturini was over the North America operations.
3      MR. McCORMACK:  Okay.  And involved in what
4  subject matter?
5      MS. FAIN:  We're talking about the financing.
6  A   The answer would have been the CFO.  To be
7  honest, I'm -- well, I changed so many times, I'm not even
8  sure who it would have been.  But on the finances -- on
9  the financing side, it was and still is a brilliant guy
10 called Marc Rizzo, and Marc was the guy in charge of all
11 the funding, actually, still is in charge of all the
12 funding for Enel Green Power North America today, which is
13 a much, much bigger company.
14 Q   (BY MS. FAIN)  Okay.  So when you were over the
15 North America operation, do you have -- do you recall just
16 kind of a general number of how many other projects you
17 were responsible for in some capacity during that time?
18 A   I'm not exactly sure what you're referring to
19 because there are different phases for the different
20 projects.  So you're talking about development, you're
21 talking construction, you're talking about maintenance,
22 you're talking about selling the projects, you're talking
23 about buying the projects.  The business is -- the value
24 chain within the business is quite broad.
25 Q   I think in relation to projects that were also

Page 35

1  being -- in the process of being developed at the same
2  time as the Osage Wind project.
3  A   I cannot tell you how many, but the pipeline of
4  projects was a long one because we -- we operate -- we
5  were one -- we were, still are one of the very few
6  operators in North America building solar, wind, hydro,
7  and geothermal projects.  So we had -- we had a long
8  pipeline of all the different technologies.  You know, I
9  can't tell you how many.
10     Tradewind was not developing solar at the time,
11 actually, so we had relationship with other players.
12 Geothermal was mostly done in-house.  Either is very
13 complicated, and it takes decades to develop a project.
14 So there were a few ones that we handled before, volume,
15 but mostly it's you go out and you buy projects from third
16 parties.  So it's very difficult for me to answer your
17 question.
18 Q   I think -- okay.  Given the -- given the broad
19 range of work that the North America operation did at the
20 time that you were over it, do you recall if any of those
21 projects besides Osage Wind involved Indian Trust
22 property?
23 A   No, I don't recall if we had any other project
24 on -- in such a situation.  But I cannot exclude it, to be
25 honest.

Page 36

1  Q   Okay.
2  A   We definitely have projects on federal ground
3  because federal government is such a big land owner in the
4  United States, but every project has a completely
5  different situation from the others.  That's why you need
6  developers.  That's why it's so expensive, because you're
7  dealing with hundreds, sometimes thousands of land owners.
8  Q   In the projects that -- where the property has
9  some connection to the federal government, whether it's
10 public lands or tribal lands, are -- is there -- does Enel
11 have a special team for those specific matters or --
12 A   There is no special team.  I mean, at the end,
13 to make this business work, you need to be clean and
14 efficient.  There was a BD team.  At the time, I can't
15 remember if they were organized by technology or
16 geographical area, but then at the end, they were doing
17 most of the work.  Remember, a lot of this work is done by
18 external developers, and they know exactly when a project
19 is ready to be -- to be analyzed, to be analyzed by us.
20 They know when a project is mature enough to go to
21 investment community.  I mean, everybody knows.  It's
22 industry.
23 Q   And I apologize if this question is repetitive,
24 but when you say you have the developer and then, you
25 know, they're getting it into a package that will then be

Page 37

1  analyzed by Enel, what does that analysis look like?
2  A   It's the due diligence that you were referring
3  to before.
4  Q   Okay.  And are there -- what are risks that you
5  would typically review during the analysis or look for
6  during an analysis?
7  A   I am not the person in charge.  I was not in
8  charge of the due diligence.  But I'm assuming that they
9  were going through every conceivable risk for every
10 project, from environmental risk, financial risk,
11 procurement risk, legal risk.  I mean, usually the first
12 thing that was analyzed, the biggest one, wind risk.  If
13 you have wind in a specific area, and can you use it to
14 generate.  And that risk, very often, a lot of developers,
15 they were developing projects for years, and coming was
16 fantastic wind projections, but then we reanalyzed and
17 were not very convinced that they were real.  So, I mean,
18 there is tons of stuff that needs to go -- that needs to
19 be analyzed, but I wasn't in charge of -- never have been
20 really in charge of that level of detail, so I don't know.
21 Q   So would that -- would that type of analysis
22 be -- show up in a report anywhere?  Was it normally just
23 discussed during a meeting?  What is the genesis of that
24 analysis?  How does it --
25 A   Usually -- forgive me if I interrupt you.  I



Page 38

1  shouldn't do that.  Usually, it's through the due
2  diligence report.  The due diligence report is then
3  packaged in those 10, 15 slides that I was describing to
4  you that go to the investment company.
5      Q  Okay.  Thank you.  Have you --
6      A  I'm sure there's more reports, but I don't know.
7  I have no idea.
8      Q  Have you ever worked on a project where a
9  governmental authority has notified the project proponent
10 that a license or permit was required?
11     A  (Inaudible.)
12     Q  I'm sorry.  What?  Did you --
13     A  No.  I don't remember.
14     MR. McCORMACK:  He said -- he said, "Not that I
15 recall."
16     MS. FAIN:  Thank you.
17     Q  (BY MS. FAIN)  Have you -- do you know of any
18 projects that Enel has worked on where the project
19 proponent has refused to seek or obtain a license or
20 permit that -- after they've been notified one is
21 necessary?
22     A  It would not have come to my desk because it
23 would have been stopped by the BD team if that was the
24 case.  I wouldn't know because I -- it's -- again, all the
25 development process was handled directly by a specific

Page 39

1  team that was using all the different team members within
2  the company to try to bring a project to the level of
3  maturity that you need to construct it.  But, I mean, I
4  wouldn't have gone into that level of detail.  I mean, I
5  would have done business reviews with my BD team and they
6  would have described what was in the pipeline, but I
7  sincerely doubt that they would have told me that that
8  specific project had that specific legal issue.  It
9  wasn't -- it wasn't relevant to me.  I was managing the
10 portfolio on this business project.
11     Q  Okay.  That's helpful.  And when you -- when you
12 represent the "BD team", for the Osage Wind project, is
13 that the individuals you mentioned earlier, Mike Storch,
14 Bill Price, Steve Champagne, or were there others on the
15 team that --
16     A  There was also another guy.  His name is David
17 Post.  David Post, who is Spanish, was the head of the
18 business development team.
19     Q  Okay.  Let's see.  Is it -- to your knowledge,
20 is it typically the -- the -- Enel's responsibility to
21 determine what laws and regulations applied to the
22 projects they're interested in?
23     A  Absolutely.  I mean, there is -- we are very
24 extremely careful with the local laws all over the world.
25 We cannot risk to build a project and then find out that

Page 40

1  we were not, you know, supposed to.  As we -- we -- it's a
2  big investment.  There are tons of lawyers making sure
3  that we do the proper thing.
4      Q  Okay.  I think I'd like to go into some
5  questions about industry standards and terms that we'll be
6  discussing a little bit further.  Can you describe -- and
7  we --
8      MR. McCORMACK:  Counsel, if you're going to
9  take -- if you're going to move subject matters, I
10 wouldn't mind having an opportunity to use the restroom,
11 quite frankly.  So can we take our first morning break?
12     MS. FAIN:  Absolutely.  Do you want to -- do you
13 want five minutes?  Ten minutes?  What --
14     MR. McCORMACK:  Why don't we take ten minutes.
15     MS. FAIN:  Okay.  Great.
16     THE VIDEOGRAPHER:  We're off the record at
17 8:11 a.m.
18     (Break taken.)
19     THE VIDEOGRAPHER:  We are back on record at
20 8:23 a.m.
21     Q  (BY MS. FAIN)  Okay.  We'll jump into this next
22 section about industry standards.  And so, first, can you
23 tell us a little bit about or describe what a membership
24 interest purchase agreement is.
25     A  In general?

Page 41

1      Q  Yes.
2      A  I'm assuming you're referring to a contract
3  between two parties where a company or a subject buys
4  quotas of another company or entity.
5      Q  Generally, who are the parties to this type of
6  agreement for a wind project?
7      A  I'm not sure what you're referring to.  It
8  depends what the agreement is about.  What are you
9  referring to?  The SPB that has the project?  I'm not
10 sure.
11     Q  Sure.  We'll first look at or talk about the
12 MIPA, the membership interest purchase agreement between
13 Tradewind and the Osage Wind project -- or Tradewind and
14 Wind Capital.  During this time when Tradewind entered a
15 membership interest purchase agreement with Wind Capital,
16 were you -- do you recall if you were on the board for
17 Tradewind?
18     A  No.  And I don't know what Wind Capital is.
19     Q  Okay.  So in this case, there was a membership
20 interest purchase agreement entered on August 22, 2013
21 between Tradewind and Wind Capital Group where EGPNA was
22 the guarantor.  Does this -- does this agreement sound
23 familiar to you?
24     MR. McCORMACK:  Hold on.  Just object to the
25 form of the question.  Assumes facts not in evidence.

Page 42

1    But you can answer the question.

2    A   No, I don't recall.

3    Q   (BY MS. FAIN)  Okay.  I'll go ahead and have

4    Julie from our team show you a document that is marked

5    Exhibit Number 78.  It's the membership interest purchase

6    agreement that I just mentioned between Tradewind Energy

7    and Wind Capital Group, and it includes the guarantee

8    agreement with EGPNA serving as the guarantor.

9        Have you seen this document?

10       MR. McCORMACK:  Wait.  Object to the form of the

11   question.  Assumes facts not in evidence.

12       But you can answer the question.

13   A   I don't know.

14   Q   (BY MS. FAIN)  Based off the page that we have on

15   the screen, does it -- it looks like Tradewind and Wind

16   Capital Group are the parties to the agreement.  Would you

17   say that's accurate?

18   A   What I read, yes, Tradewind Energy and Wind

19   Capital Group.

20   Q   And in this case, it indicates that Tradewind

21   was the purchaser and Wind Capital was the seller.  Is

22   that accurate?

23   A   From what I can read from this document, yes.

24   Q   Okay.  And below that initial introduction, it

25   goes on to say that the seller, in this case, Wind Capital

Page 43

1    Group, owns 100 percent of the membership interest in

2    Osage Wind, LLC, and the purchaser, in this case,

3    Tradewind, desires to purchase from the seller the

4    membership interest in Osage Wind, LLC.

5        In August -- at the time of this agreement,

6    August 22, 2013, would you have been on Tradewind's board?

7    A   (Inaudible.)

8    Q   Okay.

9        THE REPORTER:  Can you repeat that answer,

10   please.

11   A   I don't know.

12       THE REPORTER:  Okay.  Thank you.

13   Q   (BY MS. FAIN)  So later on in this agreement, in

14   Section 1.1, there is a definition for, I believe it's

15   EGP, and in this case, "EGP" means Enel Green Power North

16   America, Inc.  Does that look accurate?

17   A   From what I read, yes.

18   Q   Okay.  And "EGP guarantee" means, "The guarantee

19   to be delivered by EGP at closing in the form of Exhibit A

20   attached hereto."

21       To your knowledge, the -- did EGP deliver the

22   guarantee at the closing of this transaction?

23   A   I'm sorry.  I don't -- I -- I don't know.

24   Q   Okay.  Is it typical for EGP to serve as

25   guarantor for Tradewind on wind projects?

Page 44

1    A   It was not typical, but it could have happened.

2    Q   Okay.  In the same exhibit at -- it's page 46 or

3    Bates stamp 21293, the agreement states that -- the

4    guarantee agreement states that EGPNA will, "guarantee the

5    duties, performance, and obligations of the buyer,

6    Tradewind, under the membership interest purchase

7    agreement."

8        Do you see where it says this?

9    A   Yes.

10   Q   Okay.  And do you know what Tradewind's duties

11   would have been in this agreement?

12   A   No.  I said no.

13   Q   Oh, okay.  Sorry.  Do you know what the purpose

14   of the guarantee agreement would be in this instance, why

15   EGP would agree to be the guarantor?

16   A   No.  It would be just assumptions.

17   Q   Okay.  Okay.  On -- on -- in this same

18   agreement, we have the Bates stamped page 21251.  This

19   agreement also defines the term "governmental authority".

20   And I'm going to read part of this defined term for you

21   once we get there so you can see it as well.

22       Okay.  So the part I'm going to read starts

23   with, "For the avoidance of doubt, no Native American

24   tribe, nation, entity, body, organization, governmental or

25   other authority, or any agency, division, ministry,

Page 45

1    instrumentality, or authority thereof shall be considered

2    a governmental authority for any purpose whatsoever."

3        What is your understanding of why, under this

4    agreement, no Native American tribe was to be considered a

5    governmental authority?

6    A   I have no idea.

7    Q   And did EGPNA ever undertake an independent

8    inquiry and determination as to the rights of a Native

9    American tribe, or more specifically, the Osage Nation in

10   relation to the Osage Wind project?

11   A   I don't know.  I'm assuming that maybe the BD

12   unit would have done it, but I don't know.

13   Q   Okay.  And they -- if it was the BD unit,

14   would -- do they fall under your direction?

15   A   Yeah.

16   Q   Okay.  And are -- were you ever made aware of

17   any conclusions that that unit reached regarding --

18   regarding the Osage Nation's rights in relation to the

19   Osage Wind project?

20   A   No, I don't recall.

21   Q   Okay.  And let's see.  As a -- as a board member

22   of Tradewind, did you ever undertake any inquiry to

23   ascertain whether it was in Tradewind's interest to agree

24   it exclude Native American tribes from the definition of

25   governmental authority?

Page 46

1    A   Not that I recall.

2    Q   Okay.  If no one undertook this inquiry, do you

3    recall what representations were made to EGPNA about the

4    rights of a Native American tribe in relation to the Osage

5    Wind project?

6    A   It was not my responsibility to get into that

7    level of detail as it were.

8    Q   Okay.  Would -- is this something -- you

9    mentioned the B -- the BD team.  In your role as an

10   executive of EGPNA or as a board member of Tradewind,

11   would you ever review this type of agreement, a membership

12   interest purchase agreement?

13   A   No.

14   Q   Okay.  Okay.  Then in the same agreement, we're

15   going to go down to Bates stamped page 21257, and it's the

16   section is "delay and interim payment," which states that

17   Tradewind may, "delay payment of an interim payment until

18   after all pending or threatened claims, litigation,

19   arbitration, administrative proceedings, or any dispute

20   initiated, brought, or asserted by the United States as

21   trustee for the Osage Nation or by the Osage Nation have

22   been finally resolved including all appeals and reviews

23   thereof."

24       Do you see where it says that?

25   A   Yeah, in the last part of the paragraph.

Page 47

1    Q   Yes.  That's correct.

2    A   Uh-huh.

3    Q   What was your understanding or do you have an

4    understanding of why this would have been included in an

5    agreement between Tradewind when it purchased the Osage

6    Wind project?

7    A   I have no understanding.

8    Q   Okay.  And do you -- do you recall if there

9    was -- if Tradewind had any expectation in 2013 that the

10   United States, as trustee for the Osage Nation, would

11   bring a lawsuit related to the Osage Wind project?

12   A   I don't know.

13   Q   Okay.  Is it safe to say or accurate to say that

14   the board, the Tradewind board, did not discuss this as a

15   possibility in 2013?

16   A   I cannot exclude it.  I cannot even tell you if

17   I was in that board meeting or not.

18   Q   Okay.  And do you have any idea of when an

19   agreement such as this -- what entities are involved in

20   drafting the agreement?

21   A   "Entities", meaning what exactly?

22   Q   What -- who drafted -- who would typically be

23   responsible for drafting this type of agreement?

24   A   Lawyers.  We -- our legal counsel would have

25   been involved, assuming that this is Enel Green Power

Page 48

1    stuff, and then probably a lot of external advice.

2    Q   Okay.  And we're going to stay on this same

3    document and now go to Bates stamp page 21258.  And this

4    is Section 2.4H.  It says, "The Board of Directors of

5    Purchaser EGP shall have approved this transaction in all

6    respects, it being understood that such approval is in

7    absolute discretion of such Board of Directors without any

8    duty of good faith."

9        To your -- do you see where it says this?

10   A   Yeah.

11   Q   To your knowledge, who would have been involved

12   in advising the Board of Directors of EGPNA in relation to

13   this agreement?

14   A   It would have been the legal counsel at the

15   time.

16   Q   Okay.  And are you aware of the advice that was

17   given to the -- to EGP's Board of Directors?

18   A   No, not that I recall.

19   Q   Okay.  And at this time, would you have been on

20   EGP's Board, Board of Directors?

21   A   I'm assuming so.

22   Q   Okay.  Do you -- can you tell us around this

23   time how many members sat on EGP's Board of Directors?

24   A   No, I cannot remember.

25   Q   Okay.  And did -- let's see.  We'll go ahead and

Page 49

1    move to Bates stamped page 21268, and it's Article 3 of

2    this agreement.  And specifically, I believe it's Section

3    3.1, "Representations and warranties of Seller Wind

4    Capital Group," and then under 3.1Y, "Project approval's

5    compliance with law".  Do you see that section?

6    A   Yes.

7    Q   Okay.  It says that -- bullet point -- at bullet

8    point 2, the second paragraph reads in part, "Neither

9    seller nor the company has received any notice, formal or

10   informal, of any material issues raised by any

11   governmental authority with respect to the project,

12   including those related to bird migration and other

13   environmental matters, which such issues the seller or

14   company expects could have a material adverse effect on

15   the future development or construction of the project."

16       Do you know what would be meant by "material

17   adverse effect" in relation to the future development of

18   or construction of the Osage Wind project?

19   A   I would say -- I mean, I would say it's

20   something that has the effect of stopping development.

21   That's an assumption.

22   Q   Would -- is -- do you think that this could be

23   the reason why Native American tribes were exempted from

24   the definition of governmental authority?

25       MR. McCORMACK:  Object to the form of the



Page 50

1 question.  Calls for speculation.  Also involves a legal
2 conclusion.
3       But you can answer.
4    A  I have no idea.
5    Q   (BY MS. FAIN) Why do you think that Native
6 American tribes were excluded from the definition of
7 applicable permits in connection with the Osage Wind Farm
8 project before Modrall Sperling concluded their analysis
9 concerning whether a permit from the Osage Nation would be
10 required?
11       MR. McCORMACK:  Wait.  Object to the form of the
12 question.  Assumes facts not in evidence.  Asked and
13 answered.
14       But if you can answer the question --
15    A  I cannot answer the question.  I have no -- I
16 have no idea.  I was not at that level of detail.  I'm
17 sorry.
18    Q   (BY MS. FAIN) And just to -- to revisit the
19 people involved, this -- is it your understanding that
20 this -- these provisions would have been reviewed by
21 Enel's BD team that you have referenced?
22    A  I would expect the business development team in
23 the due diligence.
24    Q  Okay.  All right.  Well, I will move on to a
25 different membership interest purchase agreement, but this

Page 51

1 one is different in that it is between Tradewind Energy
2 and Enel Kansas, and it was entered on September 17, 2014.
3 So we'll go ahead.  This document, this agreement was
4 previously introduced, and it's marked as Exhibit 79.  So
5 we'll have -- Julie will help us get that document pulled
6 up.
7       And it says -- so as you can see on the page
8 that is on the screen, it says the agreement is between
9 Enel Kansas, LLC, and Tradewind Energy, Inc.  Do you
10 recall this agreement?
11    A  No.  It's dated September 17, 2014.  That was
12 already the time when I was CEO of Enel.  So, I mean,
13 if -- I mean, if before that I was not in the level of
14 detail, at the time, I was definitely very far from this
15 level of detail.
16    Q  Who was -- who was over the North American
17 operation at that -- as of September 17, 2014?
18    A  As far as I remember - I could be wrong -
19 formally, it was still myself because my replacement had
20 not been appointed yet formally.  Informally -- I mean,
21 not informally.  In practice, the senior team in the
22 United States was managing all the day-to-day business
23 activities.
24    Q  Okay.
25    A  So it was the same people I mentioned before.

Page 52

1    Q  Okay.  And let's see.  So is this an agreement
2 that you typically would have signed off on?
3    A  Possibly.
4    Q  Okay.  Are -- is it -- is it --
5       MS. FAIN:  Julie, if you could, go ahead and
6 scroll down to Bates stamp number 021156.
7    Q   (BY MS. FAIN) She's there.  Let's see.  And on
8 this page it says chief executive officer of Enel Kansas,
9 LLC.  Do you recognize the signature on the by line?
10    A  Yeah.  It looks my sign there.
11    Q  And what about the -- is that the same signature
12 as the by line for Enel Green Power North America?
13    A  Yeah.
14    Q  And does this -- do you have any recollection
15 now of Enel Kansas, LLC?
16    A  No.
17    Q  Okay.
18    A  I think that this was signed digitally from what
19 I can tell, so I could have been anywhere around the
20 world.
21    Q  Okay.  So it's not -- is this something you
22 would have read before signing?
23    A  Oh, I would probably have received some sign
24 of -- some sort of note of what the whole thing was about,
25 and then I would have signed it.

Page 53

1    Q  And who would have provided you with that note
2 about what this was?
3    A  The legal counsel together with the management
4 team.
5    Q  Okay.  At this time, how would you -- you've
6 indicated that you're not familiar with Enel Kansas.  Is
7 that correct?
8    A  I do not -- I didn't -- I didn't remember the
9 name.  So I don't know what "familiar" means for you.  I
10 am -- from what I see -- from what I can tell from this
11 document, it's probably an SPB that was dedicated to a
12 specific project.
13    Q  Can you -- in that respect, what you just
14 mentioned, how -- what does that relationship look like
15 between Enel Green Power North America and an entity like
16 Enel Kansas?  What is the -- what is the relationship?
17    A  Usually, Enel Green Power North America
18 controlled different SPB's, which are the companies that
19 then owned the project.
20    Q  Okay.  So in this case, Enel Green Power, is it
21 accurate to say it controlled -- it would have controlled
22 Enel Kansas at the time of this agreement?
23       MR. McCORMACK:  Wait, wait, wait, wait.  Object
24 to the form of the question.  Calls for a legal
25 conclusion.  Assumes facts not in evidence.

Page 54

1    You can answer.
2    A   I have no idea.  I mean, it could have been
3  controlled partially, in total; it depends very much on
4  the financials.  Usually, it depends on the financial
5  structure that you are trying to put together.  But
6  probably, yes.  Probably it was controlling the company.
7    Q   (BY MS. FAIN) For -- oh, sorry.  Go ahead.
8    A   No, I don't know.  I cannot tell you.  I have no
9  idea.
10   Q   All right.  For an entity like Enel Kansas,
11 under the SPB structure, are there ever employees?  Or let
12 me reframe that.
13       Would Enel Kansas have employed anybody
14 separately from Enel Green Power?
15   A   I'm not sure I understand the question.
16   Q   So you -- in this -- on this page, it reflects
17 that you signed as the CEO of Enel Kansas and CEO as Enel
18 Green Power North America.
19   A   Uh-huh.
20   Q   The people working on the Enel Kansas side, were
21 they all Enel Green Power employees or were they
22 specifically employed by Enel Kansas?
23   A   It's -- again, I'm going to repeat the same
24 answer I gave you before.  Most of the cases I would say
25 close to 100 percent all the employees were employees of

Page 55

1  Enel Green Power North America.  If there were exceptions,
2  they were extraordinary exceptions.  And, again, I don't
3  recall even one.
4        What I was thinking about, as I said before, was
5  the JV with General Electric.  I'm not sure if some
6  employees were borrowed by the JV from Enel Green Power
7  North America, to be honest.  I cannot tell you.  Usually,
8  100 percent of the employees are Enel Green Power North
9  America.  The SPB's are empty boxes.
10   Q   Okay.  Thank you.  And so is it -- when it came
11 to drafting this agreement, who would you say would have
12 been involved on the Enel side in drafting this agreement?
13   A   As I said, these kind of agreements were usually
14 managed by our BD department together with the support of
15 the legal counsel.
16   Q   Okay.  And do you know if, as far as the legal
17 counsel goes, would they have been involved in
18 representing or advising any other entities besides EGP
19 concerning the Osage Wind project?
20   A   I'm not sure I understand your question.
21   Q   Were there -- were there any attorneys involved
22 in drafting on EGP's side that were also responsible for
23 giving advice to any other entities on this project?
24   A   Again, I'm sorry, but I don't understand.  There
25 is one legal counsel, and the legal counsel had, I think,

Page 56

1  probably two or three internal lawyers, and then they were
2  working with a lot of external advisers.
3    Q   Are the -- are the external advisers, are they
4  private firms or outside counsel?
5    A   Private firms.  Outside counsels, yes.
6    Q   Okay.  And do you recall who the outside counsel
7  was at this time?
8    A   No.
9    Q   Okay.  Were you ever in communication with the
10 attorneys that were involved in drafting this?
11   A   Internal or external?
12   Q   Both.  Either.  Well, we'll start with internal.
13   A   I was, I think -- I was in contact with them.
14 They were my legal team, but did we ever talk specifically
15 about this agreement, I have no idea.
16   Q   How often would you -- do you -- would you say
17 or estimate that you would speak to your legal counsel
18 about the Osage Wind project?
19       MR. McCORMACK:  Just for clarification, I just
20 want to be sure that we don't get into the substance of
21 those conversations because that would be attorney-client
22 privilege.  So she's only asking the question of how often
23 do you speak, and that's the question you should answer
24 without risk of giving away priveledged information.
25       THE WITNESS:  Thank you.

Page 57

1    A   What's the date of this agreement again?
2    Q   (BY MS. FAIN) This agreement, I believe, is
3  September 17, 2014.
4    A   I would say extremely rarely.
5    Q   Extremely rarely?
6    A   I don't know.  Maybe once a month.
7    Q   Okay.
8    A   I was BD on my other job.  Again, I was not
9  involved in the day-to-day activities of Enel Green Power
10 North America at the time.  I was signing these documents
11 because formally I was still the chief executive officer,
12 but the team had all the experience, capabilities, and
13 know-how to keep Enel going without having my guidance on
14 a daily basis.
15   Q   Did you ever direct anyone to communicate with
16 the other attorneys on this case, or would it -- or,
17 rather, anybody in addition to Steve?
18   A   What do you mean?
19       MR. McCORMACK:  Yeah.  Sorry.  Go ahead.
20   Q   (BY MS. FAIN) Was there -- did you -- did you
21 ever direct others on the Osage Wind project to
22 communicate with any of the attorneys involved with
23 drafting this agreement besides Steve Champagne?
24   A   Are you talking about external counsel?
25   Q   Including external counsel as well.



Page 58

1    A   I'm not sure I understand your question.  Steve
2  Champagne was the legal counsel, so I would have talked to
3  him.  Why would I have gone to external counsel and talked
4  to them?  It doesn't make -- I didn't -- I would have
5  barely found the time to talk to Steve.  There was
6  absolutely no reason for me to go out -- to go and talk to
7  the rest of the legal team.  I don't exclude it, but, I
8  mean, I am very -- I have no idea why I would have done
9  that.
10    Q   So if that's the case, is it accurate to say
11  that communication with external counsel would have been
12  through Steve Champagne?
13    A   Absolutely.
14    Q   Okay.  And would it have been Steve Champagne
15  who gave directions to external counsel?
16    MR. McCORMACK:  Counsel, are you referring to
17  this document or are you now referring to larger issues
18  beyond this document?
19    MS. FAIN:  Well, I think specific to this
20  document, and then we will eventually turn to some of the
21  larger issues.
22    MR. McCORMACK:  Okay.  Thank you for that
23  clarification.
24    A   What's the question again?
25    Q   (BY MS. FAIN) If there were matters that related

Page 59

1  to this agreement that external counsel was working on,
2  would they have received their direction for work to be
3  completed from Steve Champagne?
4    A   I'm assuming so, yeah.
5    Q   Okay.  Okay.  We'll move to the -- another
6  portion of this agreement, Section 1.2, which is Bates
7  stamp 021125.  Okay.  And do you see that section?
8    A   Section 1.2?
9    Q   Yes.  That's right.  Okay.  It says that -- in
10  part, the provision states "EGPNA will be jointly and
11  separately liable to Tradewind for the full and timely
12  payment and performance of Enel Kansas' obligations
13  pursuant to Sections 1.1, 3.9, and 8.4, hereunder EGPNA's
14  obligations, and agrees to pay the amounts due thereunder
15  and/or perform EGPNA's obligations within ten business
16  days after the date of the written notice from Tradewind
17  to EGPNA that such obligations were not paid and/or
18  performed when due."
19       Is this consistent with your understanding of
20  this agreement?
21    A   That's impossible to answer.  First of all, I
22  don't know what Sections 1.1, 3.9, 8.4 are about, so -- so
23  I don't know what we're reading.
24    Q   Okay.
25    A   It's --

Page 60

1    Q   We will -- oh, sorry.  Go ahead.
2    MR. McCORMACK:  Counsel, just for my
3  clarification, is this still the guarantee agreement or
4  the other agreement?  It doesn't show on my screen.
5    MS. FAIN:  This is the membership interest
6  purchase agreement.
7    MR. McCORMACK:  Oh, okay.
8    MS. FAIN:  Between Enel Kansas and Tradewind.
9    MR. McCORMACK:  All right.  Thank you.
10    Q   (BY MS. FAIN) Okay.  Well, we'll move on to
11  another provision that hopefully will describe some of
12  that, some of the sections that it referenced.  So let's
13  see.  We'll go Bates stamp 21150, and one of the sections
14  is 8.4 B, and 8.4 is one of the sections that was
15  mentioned above.  And it's buyer's indemnity, and this
16  provision reads -- or do you see where it says "buyer's
17  indemnity"?
18    A   Uh-huh.
19    Q   And Subsection B, specifically?
20    A   Yeah.
21    Q   Okay.  It says, "The buyer and EGPNA hereby
22  agree to indemnify and hold harmless seller against and in
23  respect to any act or omissions of buyer, its agents,
24  representatives, employees, or affiliated entities,
25  including without limitation any and all activities

Page 61

1  related to the design, construction, and operation of the
2  project, whether arising before or after the closing,
3  except those, one, caused by the actions or failures to
4  act by seller at any time, or, two, caused by the actions
5  or failures to act by Osage before the closing, provided
6  that indemnification is agreed to hereunder for those acts
7  or failures to act and are taken at the written direction
8  of buyer or its affiliate."
9       What is your understanding for why EGPNA, not
10  just Enel Kansas, would have agreed to indemnify
11  Tradewind?
12    A   I'm not sure I understand what you're trying to
13  get to.  I'm not sure I understand the question.  This
14  is -- seems like, to me, a general indemnity on the
15  project, so if there is something that doesn't go down the
16  right path, there is some kind of indemnification, but I
17  cannot be more specific.  I would have to have much more
18  knowledge on this specific project, which I don't have,
19  unfortunately.
20    Q   Okay.  Okay.  We'll move along to the page
21  that's Bates stamped 21133, and it's going to be -- we're
22  in the same agreement, and it's section 3.5, "Sharing
23  information after closing".  Do you see that section?
24    A   3.5, yes.
25    Q   Okay.  And this section specifically notes that

Francesco Venturini   9/13/2021   17 (62 - 65)

Page 62

1 the parties shall agree on -- and it's about close to the
2 middle of the paragraph where this starts.  "The parties
3 shall agree on an acceptable manner for communication,
4 which may include the creation of a committee consisting
5 of representatives designated by EGPNA in order to allow
6 respectfully in order to allow seller to provide input as
7 to," and if we go to number eight, "communications with
8 the Osage Nation."
9        Do you see this?
10    A   Yeah.
11    Q   And what would the purpose of this provision be,
12 do you think?
13    A   I would -- they would just be assumptions, but
14 if you want, I can assume.
15    Q   Who would -- who from the EGP team would have
16 been responsible for any committee that was created under
17 this provision?
18    A   There was no committee from what I can tell, so
19 I don't know.  I can assume who could have been a member,
20 but I don't even know if the committee was ever put in
21 place.
22    Q   Okay.
23    A   Again, it was always the same people.  Mike,
24 Steve, Bill, David, me.  At the time, me, no, because at
25 the time, I was well gone.  It was September of 2014, so I

Page 63

1 wasn't -- I wasn't -- I was in the U.S. extremely
2 sporadically and mostly on the weekends because I was
3 going to school.
4    Q   Okay.  Let's see.  We will move along to a
5 different document.  And I believe it is still at the time
6 before your role had changed but by one month.
7        MS. FAIN:  So, Julie, if you could go ahead and
8 pull up a document that has previously been introduced as
9 Exhibit 80.
10    Q   (BY MS. FAIN) Okay.  And it says Amended and
11 Restated Osage Project Loan Agreement.  Are you -- do you
12 recognize this agreement?
13    A   No.
14    Q   Okay.  And let's see.  Now, this agreement, like
15 the previous one, has a space for signature.
16        MS. FAIN:  Julie, can you go ahead and scroll
17 down to Bates stamp page 14735.
18    Q   (BY MS. FAIN) Now, here we have the by line
19 indicating that you are the CEO of Enel Kansas, LLC.  Is
20 that correct?
21    A   I can't tell you, but I can probably -- I assume
22 so.
23    Q   Okay.  And, also, the by line for EGPNA also
24 reflects that you're CEO and president at the time.
25    A   That is my signature on there.

Page 64

1    Q   And generally speaking, what would the purpose
2 of this type of loan agreement be?
3    A   What agreement?  This one?
4    Q   Yes.
5        MS. FAIN:  Julie, can you scroll up to the first
6 page, please.
7    A   I cannot tell you.  I mean, I would have to read
8 the agreement.  I have no idea.
9    Q   (BY MS. FAIN) Okay.
10    A   I don't know.  Probably what we are doing here
11 is -- it's very difficult to tell.  I mean, it's -- I just
12 see the first page, but I'm assuming -- again, it's an
13 assumption, it's financing Tradewind.
14    Q   Okay.
15    A   For the development of the project.  But I'm --
16 we can read the agreement if you want to.
17    Q   I'll move along to hopefully a section that will
18 help us work through this.  Let's see.  So in 1.1 E of
19 this agreement, it states that -- oh, right there.  At the
20 end of the third line, it states that in the event --
21 let's see.  "The parties contemplated that subject to
22 certain conditions lender or affiliate thereof will
23 purchase the equity of Osage from borrower on or before
24 September 30, 2014, or such later date as elected by
25 lender."

Page 65

1        Do you know what conditions would have been
2 contemplated?
3    A   (Shakes head in disaffirmation.)
4    Q   Okay.
5        MR. McCORMACK:  I didn't see that.  I think, for
6 the record, if he shook his head no, we should probably
7 indicate that.
8        MS. FAIN:  Oh, yes.  Thank you, Mr. McCormack.
9    Q   (BY MS. FAIN) Can you go ahead and say whether
10 you know what those -- what conditions were contemplated?
11    A   No.
12    Q   Okay.  You -- and you said "no".  Is that
13 correct?
14    A   Yes.
15    Q   Okay.  And so continuing on from the same
16 section, the -- it states in part, "In the event that such
17 purchase is not concluded on or about September 30, 2014
18 and the funds available under the Osage loan are not
19 sufficient to keep the Osage project construction on
20 schedule and current with respect to its related payment
21 obligations."
22        What is your understanding of what "on schedule"
23 and "current with respect to its related payment
24 obligations" means?
25    A   I don't know what the "related payment

Page 66

1  obligations" are about, so I have no idea.  It looks like
2  at that line that needed to be met to make the Osage
3  project viable.
4      Q   Okay.
5      A   I need to read the document to have more
6  knowledge about it.  To be honest, I mean, looking at just
7  pieces and parts, I have no idea what we're talking about.
8      Q   Okay.  Okay.  We'll move on to Section 3.2 at
9  Bates stamp page 14729.  And do you see where we're at,
10  3.2?
11     A   Yeah.
12     Q   Their approval rights?
13     A   Yeah.
14     Q   It says that, "Notwithstanding the foregoing,
15  borrower shall not, on behalf of Osage or otherwise, allow
16  Osage to undertake any of the following actions relating
17  to the Osage project without the prior written approval of
18  lender, such approval not to be unreasonably withheld,
19  conditioned, or delayed."
20         Do you see where it says this?
21     A   Yes.
22     Q   Okay.  And I'm going to go ahead and read a few
23  bullet points or subsections and start with Subsection J.
24         MS. FAIN:  And, Julie, if you could, scroll down
25  just a bit.

Page 67

1      Q   (BY MS. FAIN) And it says, "Finalizing any
2  material permit except where not practicable, as for
3  example, may be the case for permit for which the
4  applications have already been submitted as of the date
5  hereof and for which the issuance is automatic."
6      A   Uh-huh.
7      Q   And then below that at L, we have hiring of any
8  employees.
9      A   Uh-huh.
10     Q   And Subsection N, we have, "Issuing any press
11  releases with respect to Osage, the Osage project, or
12  related permitting process, or with respect to the Osage
13  Nation."
14     A   I cannot read that.  I don't see it.
15         MR. McCORMACK:  Yeah.  That's not showing up on
16  the -- on the screen.
17         MS. FAIN:  Sorry.
18     Q   (BY MS. FAIN) That is Subsection N.
19     A   N.  "Issuing any press releases with respect to
20  Osage, the Osage project, or related permitting process,
21  or with respect to the Osage Nation."  Okay.
22     Q   And then we have Subsection O, "Submitting
23  comments with respect to any permit or environmental
24  assessment."  And, finally, Subsection P, "Issuing any
25  limited or full notices to proceed under any construction

Page 68

1  contract.
2         So under the -- under this agreement, is it
3  accurate to say that Tradewind, based on these provisions,
4  was contractually bound to prevent Osage Wind from
5  obtaining a mining permit from the Osage Nation unless
6  Tradewind got prior written approval from Enel Kansas?
7         MR. McCORMACK:  Wait.  Object to the form of the
8  question.  Calls for a legal conclusion.  Assumes facts
9  not in evidence.  It's speculative.
10        But you can answer the question.
11     A   I don't know.  We need to scroll up and read
12  the -- the -- every single letter again.  Can you go up
13  once again, please, where it talks about the permits?
14        MS. FAIN:  Julie, can you go ahead and scroll up
15  to the opening that really describes what -- that
16  introduction for 3.2.
17        THE WITNESS:  Oh, I see it.  Okay.  Please go
18  down one more.  Oh, too much.  Okay.
19     A   I don't know.  I mean, I -- it looks to me like
20  many other conditions we see in many other wind projects.
21  You're are substantially funding the project.  You're
22  asking the developer to behave in the proper -- in the
23  proper way, trying to reduce the risk on the project.
24  Other than the risk in the project goes through these
25  actions, I cannot speculate anything more.

Page 69

1         If you take any wind agreement, you will see
2  it's, you know, I mean, at least from my experience, full
3  of ways trying to de-risk the project, trying to make the
4  developer following the right path.  It looks to me like
5  this is what we're trying to do with that.
6      Q   Okay.  So that's -- I think that's helpful in
7  just knowing that it's -- is it accurate to say your
8  understanding or your representation is that this type of
9  provision is aimed at de-risking the project?
10     A   I'm assuming so, yeah.
11     Q   Okay.
12     A   You're lending money.  You want to de-risk.
13     Q   Do you know if anyone at Enel ever gave
14  Tradewind written approval to obtain a permit from the
15  Osage Nation and the Bureau of Indian Affairs to mine the
16  Osage Mineral Estate?
17     A   I have no idea.
18     Q   Okay.  Do you know if the construction of the
19  Osage Wind Farm would have been possible without this loan
20  from Enel?
21     A   I have no idea.  I mean, we were lending money
22  to Tradewind at the time.  As I told you earlier, they are
23  very good developers, and we were keeping them alive, if
24  you will.  I mean, it's a business way to fix up a job, it
25  sounds, in a way to make sure if there is a down, they can

Page 70

1  keep working.

2  Q   In your -- in these types of agreements that

3  you've had with Tradewind, did you have -- did Enel have a

4  right, like a first right of -- or an option to purchase

5  developments or a right of first refusal of Tradewind

6  projects, development projects?

7  A  I cannot remember the details, but I remember

8  that we had some kind of right to buy the project that

9  we're -- at least on this specific instance, yes.

10  Q   Okay.  And do you know or have an idea of when

11  Enel would have notified Tradewind that they intended to

12  exercise their option on the Osage Wind project?

13  A  (Shakes head in disaffirmation.)

14  MR. McCORMACK:  Again, for the record, he shook

15  his head no.

16  THE WITNESS:  Sorry.

17  Q   (BY MS. FAIN) I'll ask it again, and if you

18  could say what your response is, that will help our court

19  reporter immensely.

20  Do you -- do you recall when Enel would have

21  notified Tradewind that they intended to exercise their

22  option on the Osage Wind project?

23  A  No.

24  MS. FAIN:  Okay.  And we're going to be getting

25  into another section.  Is this a good time for a quick

Page 71

1  break, or do folks on the Zoom want to keep going?

2  MR. McCORMACK:  I like breaks.  I'm happy to

3  take a break.  So I'll see you back in ten minutes?

4  MS. FAIN:  That would be great.

5  And does that work for the U.S.?

6  MR. ASHWORTH:  Yes.

7  THE VIDEOGRAPHER:  We're off the record at

8  9:16 a.m.

9  (Break taken.)

10  THE VIDEOGRAPHER:  We are back on the record at

11  9:26 a.m.

12  Q   (BY MS. FAIN) Okay.  We'll move along on our

13  topics, and we're going to move on to a document that was

14  previously introduced as Exhibit 36.  And Julie will have

15  that pulled up.

16  This document is a memorandum from Sarah

17  Stevenson to Bill Scott titled Rights of Surface Owners to

18  Use Oil, dated October 31, 2013.  I'm going to refer to

19  the various versions of this memo as "the Modrall Sperling

20  memo".

21  Do you recall ever having seen this memo?

22  A  No, I do not.  And to be honest with you, I

23  don't know who Sarah Stevenson or Bill Scott are.

24  Q   Okay.  Did you -- let's see.  So you don't

25  recall that you've ever received this?

Page 72

1  A  (Shakes head in disaffirmation.)

2  Q   Okay.

3  MR. McCORMACK:  He shook his head.  He shook his

4  head no.

5  I'm sure I didn't.

6  Q   (BY MS. FAIN) You're sure you didn't receive

7  this?

8  A  Yeah.

9  Q   Okay.  And do you know if -- are you aware if

10  anybody at Enel Green Power spoke to external counsel

11  about issues related to the Osage Nation's rights as they

12  affect the Osage Wind project?

13  A  I don't know.

14  Q   Okay.

15  A  It would be speculation.

16  Q   And shifting gears to your role as a board

17  member of Tradewind.  Did you have -- did the Tradewind

18  board ever have any interaction with Tradewind's

19  attorneys?

20  A  No, I'm assuming.

21  Q   Okay.  Well, we'll go ahead and read a section

22  of this just to get a better idea of what it covers, and

23  we'll go on to talk about how that's relevant here.  But

24  the question presented in this memo is whether, "A surface

25  owner who excavates land for the purpose of construction

Page 73

1  consistent with its surface rights and does not remove the

2  land excavated from the property is engaged in mining of

3  the mineral state and requires a mining permit".

4  Do you have any understanding of why the

5  condition "does not remove the land excavated from the

6  property" would have been included in this memo about the

7  Osage Wind project?

8  MR. McCORMACK:  Object to the form of the

9  question.  Lacks foundation.  Assumes facts not in

10  evidence.

11  But you can answer the question.

12  A  It would be just assume -- an assumption.  I

13  mean, my assumption is that they are -- whoever's caught

14  trying to -- what -- sorry, trying to figure out if --

15  excavation, and then whether without taking anything out

16  or away is considered mining.  I'm reading with you so

17  I've -- I mean, I cannot say.

18  Q   Sure.  And at this time and -- that this memo

19  was drafted --

20  MS. FAIN:  Julie, can you scroll down just a

21  bit?

22  MR. McCORMACK:  Other way.

23  MS. FAIN:  Or up.

24  MR. McCORMACK:  Yeah.

25  Q   (BY MS. FAIN) The time of this memo, the time of

Page 74

1  its drafting was October 31, 2013. Were you made aware
2  either -- well, first, in your role at Enel, were you ever
3  made aware of issues regarding the Osage Nation?
4       MR. McCORMACK: Do you mean at this time,
5  Counsel, or some other time, or ever?
6       MS. FAIN: At this point, ever.
7    Q   (BY MS. FAIN) At any time when you were at Enel
8  Green Power North America, were you made aware of any
9  issues with regard to Osage Nation?
10     A   If I remember, there were several different
11 issues with the project, as in any other project we build.
12 I cannot remember specifically what we're talking about.
13 I remember there was something with oil and gas, but,
14 again, we're in Oklahoma if I'm not mistaken, and that
15 kind of problem was extremely frequent. So I cannot say
16 that there were -- let me rephrase it. I am sure that
17 there were several issues with the project, as in many,
18 many other projects, because they're extremely complex
19 things. I honestly don't recall anything specifically to
20 the -- regarding the Osage Nation.
21     Q   Okay. Do you have an understanding of what
22 rights tribes have in Oklahoma?
23     A   No.
24     Q   Do you have an understanding that federally
25 recognized tribes are governments?

Page 75

1       MR. McCORMACK: Object. Wait. Object to the
2  form of the question. Assumes facts not in evidence and
3  seeks legal conclusion.
4       But you can answer the question.
5     A   Can you repeat the question?
6     Q   (BY MS. FAIN) Do you have -- what is your -- let
7  me rephrase it. What is your understanding of what a
8  tribe is?
9       MR. McCORMACK: Object to the form of the
10 question. Vague and ambiguous.
11      But you can answer the question, if you can.
12     A   Well, I mean, getting into my knowledge about
13 Indian tribes in the United States, I'm assuming, again,
14 that they're people who were there before people from
15 Europe showed up. They were divided in tribes. They were
16 in the -- in the -- in what's the United States today much
17 before the Europeans arrived.
18      Is that enough of a description? I don't know.
19 I'm not sure exactly what you're wanting me to describe.
20     Q   (BY MS. FAIN) No, that's fine, and hopefully I
21 can narrow it even further. Are you aware that the Osage
22 Nation has its own elected government?
23     A   No, I don't.
24     Q   Okay. And are you aware that the Osage Nation
25 has its own citizens?

Page 76

1     A   Well --
2       MR. McCORMACK: Object to the form. Wait.
3  Object to the form of the question. Calls for legal
4  conclusion.
5       But you can answer.
6     A   I'm assuming. I mean, if you call it a
7  "nation", I'm assuming it has its own citizens. But
8  what's the -- what are the rules around it, what's -- how
9  it works, that's as far as my knowledge.
10     Q   (BY MS. FAIN) Are you aware that at any time
11 during the Osage Wind project, during the leading up to
12 the agreement between Enel Kansas and Tradewind and then
13 the construction of the project, whether Enel considered
14 the Osage Nation as a government with some scope of
15 jurisdictional authority in Osage County?
16     A   You're asking if Enel ever considered?
17     Q   Yes.
18     A   I -- I really hope so. I mean, we were
19 supported by tons of advisers, and that's their role. So
20 that's why developing a project's so expensive. I mean,
21 you try to be a good neighbor and try to understand all
22 the different intricacies that are effecting that specific
23 land. I mean, you're talking about hectares and hectares
24 or acres and acres of land, as I said, with different
25 owners. So I really hope that Enel Green Power took care

Page 77

1  of all these issues. And, again, we rely, on one side, a
2  very senior and strong team, and on the other side, a very
3  large number of advisers, especially on these kind of
4  topics.
5     Q   On this memo that's on the screen, if we can go
6  to the second page, Bates stamped number 415, there is a
7  paragraph. It's right under the "analysis" section. It's
8  that first paragraph under "analysis" that says, "The
9  Osage Tribe has indicated that it will assert Tradewind
10 Energy must receive a mining permit from the Osage
11 Minerals Council in order to construct and operate the
12 wind farm on the grounds that the excavation and
13 construction and permanent placement of the towers
14 constitutes mining of the Osage's Mineral Estate."
15      Do you see where it says that?
16     A   Yeah.
17     Q   Have you -- have you been advised at any point
18 as to the Osage Tribe's intent to assert this right or
19 this require -- this permit requirement?
20     A   If I've been -- forgive me. I'm not sure I
21 understand the question. If I've been advised that
22 they -- can you rephrase it in such a way that I
23 understand what kind of answer to give?
24     Q   Sure. Sure. Were you ever advised as to the
25 Osage Nation saying that they required a permit for the

Francesco Venturini                    9/13/2021                    78 - 81

Page 78

1  wind turbines for the Osage Wind project?

2        MR. McCORMACK:  Object to the form.

3        Sorry.  Go ahead.

4        Object to the form of the question.  Vague and

5  ambiguous.

6        But you can answer it.

7     A   I think you need to specify exactly what you

8  mean with "advise".  Because was I told at the time that

9  they required the permit?  I'm sure that I was told.  I

10  was told in probably different forms.  If I was advised,

11  it seems like, you know, some legal counsel came to me

12  saying, hey, look, there is something that -- it's --

13  I'm not sure exactly what you mean by "advise".

14     Q   I guess, earlier we spoke about how an issue

15  might rise to your desk --

16     A   Yes.

17     Q   -- instead of just the BD team.

18     A   Yes.

19     Q   Was the issue of the Osage Nation ever raised to

20  your level with regard to the permitting requirement that

21  the Osage Nation was asserting?

22     A   You're talking about this specific permit

23  requirement or some other stuff?  Because the project was

24  extremely complex, so I'm sure that there were, you know,

25  several bumps.  Like every time, it happens, you know.  I

Page 79

1  mean, I'm 99 percent sure that stuff came up and the team

2  discussed it.  But if you're talking about this specific

3  permit, I mean, I'm sure that at a certain point somehow

4  it came up, but I cannot be more specific.

5     Q   Okay.  I would clarify that I am talking

6  specifically about the permitting requirement around what

7  constitutes mining and the Osage Minerals Council's right

8  to issue permits in relation to mining of the Osage

9  Mineral Estate.

10        MR. McCORMACK:  I'm not sure there's a question

11  there, but I object to the form of the question as

12  mischaracterizing facts.

13        But if there is a question there, you can answer

14  it.

15     A   I'm not sure I understand the question.

16     Q   (BY MS. FAIN) Did you --

17     A   What --

18     Q   I guess I understand that you say that there

19  were many complex components to this project, and, you

20  know, not -- usually the BD team would take care of the

21  day-to-day issues.

22     A   Yes.

23     Q   Did this issue, the Osage Minerals Council

24  permitting, ever arise to or was it ever elevated to you

25  to make a decision on?

Page 80

1     A   The issue was elevated to -- thank you for the

2  clarification.  It was definitely -- it definitely came to

3  my attention.  I cannot tell you how the decision was

4  made.  I'm assuming, again, as usual in these cases, that

5  was the collective decision made by the management team at

6  the time with tons, tons of support from legal advisers.

7  I mean, that's how we operate.  We want to be obeying the

8  law in every single occasion we have, which is hopefully

9  always.  But I cannot be more specific than this.

10     Q   Okay.  So in this -- in this case of this permit

11  that the Osage Minerals Council was asserting that was

12  required, you talk about how you assume that the team

13  would have considered it.  And is this something that you

14  would have weighed in on the team or were you

15  comfortable with whatever decision the team handling this

16  matter determined was the right way to proceed?

17        MR. McCORMACK:  Well, first of all, let me

18  object to the form of question as assuming facts not in

19  evidence and also as asked and answered.

20        But with those provisors, you can answer the

21  question.

22     A   Here we're talking about permitting, which is an

23  essential component of every energy project in general.  I

24  was going say wind project, but it's every project that

25  you build.  So it seems to me like, you know, it's, again,

Page 81

1  another permit, and you need to figure out how to handle

2  it.  I -- there is not much to add other than that.

3        Was I part of the decision about doing what?

4  Because if you're -- if we're talking about the asking for

5  figuring out what kind of permit we're talking about, if

6  it was legally required or not and so on, that's usually

7  something that was managed, as hundreds of different

8  permits that you need when you build a project like this

9  one, directly by BD/legal level.

10     Q   Okay.  So their decision -- a decision against

11  seeking a permit from the Osage Minerals Council, is that

12  something you were comfortable with based on the team that

13  would have handled it?

14     A   I'm not sure I understand the question again.  I

15  mean, it depends on how the team felt regarding the -- how

16  should I say, the importance, the gravity of the specific

17  situation.  I mean, can you imagine, I mean, the team

18  coming to me for every permit that they need for every

19  single tower that needs to be installed?  What we have

20  here, it seems like, again, they're trying to figure out

21  what kind of permit is needed and to keep going with the

22  project.

23     Q   Okay.  Give me just one moment.  So you have --

24  as you mentioned earlier, you are not familiar with the

25  firm Modrall Sperling.  Is that accurate?

Page 82

1   A  With the firm that --

2   Q  The firm -- I'm sorry.  The firm that drafted

3 this memo, Modrall Sperling.

4   A  Not specifically, no.

5   Q  So you do not know why this memo was even

6 drafted.  Is that accurate?

7   A  I believe they name the question presented.  I'm

8 assuming they had a question regarding the mining permit

9 at the site, and they asked these lawyers, who are

10 probably experts in this field, about it; how do you --

11 how do we get a permit, how do you -- how can you get a

12 permit, is the permit required?  But these are all

13 assumptions.  I have no idea.  This is October 31, 2013.

14 They are developing the project, so they are talking with

15 different parties to figure it out.

16   Q  Would you be surprised if they were talking to

17 attorneys for Enel?

18   A  No.

19   Q  Okay.  So I'm going to move on to another

20 exhibit that's -- that was previously introduced, and it

21 was -- it's Exhibit 183.  And it's an email from

22 Tradewind's attorney, Steve Willman, to one of the

23 attorneys for Modrall Sperling, and it's dated August 19,

24 2014.

25      And do you -- do you see this email on the

Page 83

1 screen?

2   A  Uh-huh.

3   Q  And it's to Lynn Slade, one of the Modrall

4 Sperling attorneys, from Steve Willman from a firm that

5 represented Tradewind.  And he said, "Lynn, are you

6 available for a call tomorrow regarding the Osage Mineral

7 memo?  EGP has asked to have it scaled back (without

8 conclusions).  Thanks, Steve."

9      And on -- do you have any idea who at EGP would

10 have made this request to have the memo "scaled back"?

11   A  For one, I had -- I would have no idea.  But I

12 would say, number two, I'm not even sure that EGP asked to

13 have it scaled back.  I mean, this is some guy writing to

14 another guy, but there's no EGP people in the memo.  I

15 mean, this could be just a developer trying to do

16 something with the project.  I mean, this doesn't imply

17 any involvement why EGP.

18   Q  Are you -- are you aware that defendants in --

19 here in this case have asserted that they relied in good

20 faith on this memo by Modrall Sperling for not getting a

21 permit from the Osage Minerals Council?

22   A  That would be us, Enel Green Power?

23   Q  I'm sorry.  What?

24   A  Defendant would be us, Enel?

25   Q  That's correct.

Page 84

1   A  I mean, I don't know because I am -- I was not

2 there when they declared it.  But, I mean, if they used

3 the memo, it's -- it's -- I mean, we collect all the

4 different documentation, and then we read it and we try to

5 figure out what to do next, so I'm not surprised.

6   Q  Okay.  And so -- but you don't know who from

7 Enel Green Power would have communicated with Tradewind's

8 attorney?

9     MR. McCORMACK:  On this subject matter or on

10 some subject matter?

11     MS. FAIN:  On this subject matter specifically.

12   A  No.  I mean, if -- at this stage, usually the

13 team involved is mostly business development.  But, again,

14 I -- the fact that EGP has asked to have it scaled back is

15 an assumption based on an email between people that are

16 not EGP.

17   Q  (BY MS. FAIN) Okay.  I'm going to go ahead and

18 show you.  We're going to show you another exhibit that

19 has previously been introduced as Exhibit 81, and it's

20 another version of the memo from Modrall Sperling.  And

21 this specific memo is the one that was sent to the Bureau

22 of Indian Affairs' superintendent of the Osage Nation

23 along with the U.S. Solicitor Alan Woodcock on October 20,

24 2014, and it was also filed with -- in the federal court

25 case to support their response to the United States'

Page 85

1 original motion for preliminary injunction.

2     So it's -- is it correct to say you -- or I

3 guess I'm asking, can you confirm that I'm understanding

4 what you said earlier, that you were not aware that this

5 memo has been relied upon to show defendants acted in good

6 faith?

7     MR. McCORMACK:  Wait.  Object to the form of the

8 question.  Assumes facts not in evidence.

9 Mischaracterizes his prior testimony.

10     But you can answer the question.

11   A  I didn't -- I don't recall this specific memo,

12 so I don't know if it was utilized or not to move ahead

13 with the project or not.  So I -- I cannot -- to the

14 specific question, the answer is no.

15   Q  (BY MS. FAIN) Okay.  Just one moment, please.

16 So did you, to your knowledge or your recollection, ever

17 rely on a memo that stated a permit wasn't required from

18 the Osage Minerals Council?

19     MR. McCORMACK:  Object to the form of the

20 question.  Vague and ambiguous.  Asked and answered.

21     But you can answer the question.

22   A  Relied to do what?  Revise it so I can -- it's

23 very generic.  Relied to do what?  I mean, what am I --

24 it's October 20th of 2014.  I'm probably sitting in Rome.

25   Q  (BY MS. FAIN) Okay.

Page 86

1    A   Help me.  I mean, if I understand the question,
2    I'll try to answer it, but I'm honestly -- I'm not sure
3    exactly what you want from me.
4    Q   In terms of reliance, it's that, did you rely on
5    the memo for any reason related to the rights of the Osage
6    Nation?
7         MR. McCORMACK:  Are you speaking about
8    Mr. Venturini in his personal capacity or are you speaking
9    some other capacity?
10        MS. FAIN:  As the person who was still signing
11   off on things on behalf of Enel Green Power North America
12   and Enel Kansas.
13        MR. McCORMACK:  All right.  Then I will object
14   to the form of the question as vague and ambiguous and as
15   asked and answered.
16        But you can answer the question.
17   A   Unfortunately, I have to assume, which I don't
18   know if it's the proper thing to do.  At the time, I'm
19   sure the management team had to make a decision, and as
20   usual, I'm sure that we discussed about everything related
21   to whatever project, and the management team tried to get
22   to the best possible conclusion.
23        Unfortunately, I have to say, and I am ashamed
24   of this, at this time I was not very present in the United
25   States because I had to deal with 100 million other things

Page 87

1    around the globe.  So I do not recall exactly the
2    situation.  It's my fault.  I mean, I'm ashamed of it.  It
3    was a very complex time of my life.
4    Q   Okay.  Well, we will -- we will move along
5    and -- to another -- to another topic.  Let's see.  Let's
6    see.
7         MS. FAIN:  Do you mind if I take a quick five
8    minute break?
9         MR. McCORMACK:  Not at all.
10        MS. FAIN:  Okay.  Thank you.
11        THE VIDEOGRAPHER:  We're off the record at
12   9:56 a.m.
13        (Break taken.)
14        THE VIDEOGRAPHER:  We are back on record at
15   10:05 a.m.
16   Q   (BY MS. FAIN) Okay.  So we're going to move on
17   to another document, and it's one that's been previously
18   entered into during a deposition.  It's Exhibit 38, and
19   it's Bates stamped Osage Wind Priv 000243, and we have it
20   up on the screen now.  And this letter is addressed to
21   you, and it's from Robin Phillips, who is the
22   superintendent of the Bureau of Indian Affairs Osage
23   Agency.
24        Are you familiar with this letter?
25   A   I don't know what you mean with "familiar", but

Page 88

1    I've seen the letter before, yes.
2    Q   Okay.  And when did you -- do you recall when
3    you received the letter?
4    A   No.
5    Q   Okay.
6    A   I would say probably I never received it.
7    Q   Okay.  And --
8    A   I wasn't -- I wasn't there, so my -- most of the
9    correspondence was -- work-related was opened directly by
10   the office in the United States and then managed by that
11   office.
12   Q   So in that case, how would you have received the
13   letter?  Who would have made you aware of this letter?
14   A   I have seen it.  I have definitely seen it a
15   couple days ago when my legal counsel described to me what
16   the case was all about.
17   Q   Okay.  Did you -- do you know if you saw this
18   letter back in 2014 when it was initially sent?
19   A   As I said, very likely that I didn't see it.  I
20   cannot swear on it because I honestly -- I mean, it could
21   have been scanned and sent to me, but that's unlikely.
22   Most of the work-related correspondence was, as I said,
23   opened at the office in the United States and then sent to
24   the proper person to be -- to be handled.
25   Q   Okay.  And so were you -- were you ever in

Page 89

1    communication with anyone at the Bureau of Indian Affairs
2    or the Department of Interior prior to receiving this
3    letter about rock crushing at the Osage Wind project site?
4    A   Me, Francesco Venturini?
5    Q   Yes.
6    A   No.
7    Q   Okay.  Do you -- are you aware of anyone from
8    Enel who would have been in communication with the Bureau
9    of Indian Affairs or the Department of Interior prior to
10   receiving this letter on October 9, 2014?
11   A   My assumption is the BD team and the legal
12   counsel.
13   Q   Okay.  And do you ever recall receiving another
14   letter from a United States federal agency involving a
15   wind farm Enel owned or operated or was constructing
16   beyond -- besides the Osage Wind project?
17   A   No.
18   Q   Okay.  How common is it for Enel to receive, or
19   more specifically, how common is it for you to receive
20   this type of letter from a federal agency in the United
21   States?
22   A   I would say quite uncommon, but I wouldn't be
23   able to, you know, tell exactly the importance of the
24   letter.  As I said, I was not at the office in the United
25   States at the time, so it -- it -- my assumption is that

Francesco Venturini   9/13/2021   24 (90 - 93)

Page 90

1 the people in the office are a very senior and competent
2 team, handled problems directly, so they received the
3 letter and then they decided what to do.
4 **Q   Okay.**
5 A   Mail was not opened and then scanned to me, and
6 then me, from wherever I was, trying to redirect it to the
7 right people in the office.  It was handled directly at
8 the office when received.
9 **Q   Did anyone from your team ever discuss with you**
10 **the need to meet with somebody from the Bureau of Indian**
11 **Affairs?**
12 A   Meaning me meeting somebody?
13 **Q   Meaning anyone from Enel Green Power.**
14 A   Not that I recollect, but I cannot discount it.
15 I mean, who knows.  I'm sure that there were contacts.  I
16 have no idea.  I cannot tell you.
17 **Q   Okay.  So in this letter, in the first**
18 **paragraph, it says that, "Mr. Whiteshield found a pit**
19 **approximately 60 feet wide and 30 feet deep.  Limestone**
20 **had been crushed into small rocks and piled around the**
21 **wind turbine foundation."**
22 **Do you roughly recall any issues related to rock**
23 **crushing at the Osage Wind project?**
24 A   No.
25 **Q   Okay.**

Page 91

1 A   It's common practice, just to let you know how
2 the industry works, to try to use as much as possible
3 whatever you can find at the site.  So I cannot discount
4 it because those are normal practices.  But I'm not an
5 engineer.  I'm not an expect in construction, so --
6 **Q   So were you ever made aware that the United**
7 **States -- like, in October 2014, did anyone from your team**
8 **make you aware that the United States, through one of its**
9 **agencies, had requested that excavations at the Osage Wind**
10 **project cease until the permitting issue could be**
11 **resolved?**
12 A   I'm assuming that you're referring to the email
13 from Mr. Post.
14 **Q   I am first referencing the last paragraph of**
15 **this letter where the United States specifically directs**
16 **you to refrain from any further excavation of minerals**
17 **until a permit has been obtained.**
18 A   You're referring to this paragraph, but what's
19 the question?
20 **Q   Were you -- were you made aware of this**
21 **directive, this position of the United States in the --**
22 **around October 2014?**
23 A   Again, I'm sure that there was some form of
24 communication.  We know there was an email from David Post
25 regarding the project, so --

Page 92

1 **Q   Did you have -- let's see.  So did this**
2 **communication from the United States result in Enel**
3 **refraining from any further excavation?**
4 A   Not that I know of.  I think the project
5 continued, but, again, exactly how that -- how that
6 happened, it's -- I don't know the details.  The United
7 States had, still has, one of the strongest and most
8 senior teams in Enel Green Power worldwide.  I have, you
9 know, full trust in the fact that they were doing the
10 right thing, plus I know that they were using tons of
11 external advice to move in the right direction.
12 **Q   Okay.  Let's see.  We're going to move along to**
13 **one final document, and then I'll be wrapping up and we**
14 **can move along to the United States.  And this document**
15 **is -- it's been previously introduced as Exhibit 111.**
16 **It's Bates stamped Osage Wind 19012, and it's regarding a**
17 **change order from December 2014.**
18 **In your position at Enel, specifically when you**
19 **were at Enel Green Power North America but more generally**
20 **until somebody was named to replace your position there,**
21 **were you involved with or did you have the authority to**
22 **approve change order requests?**
23 A   Yeah.
24 **Q   Let's see.  Was there anyone at EGPNA besides**
25 **you who had authority to approve or deny a change order**

Page 93

1 **request?**
2 A   I cannot recall exactly, but, again, I was the
3 country manager, and the engineering and construction unit
4 was reporting directly to Rome, was not under my direct
5 management in the United States, and this is because the
6 engineering and construction is essentially managed
7 globally, again, by a central unit to create synergies and
8 reduce cost.  So I had the power to sign a change order,
9 but engineering and construction as a unit, the project
10 managers had the full right to sign it without my
11 approval.  Eventually, they asked for approval to --
12 **Q   Okay.**
13 A   In this case, I'm not sure if this change order
14 was signed by the country manager or engineering and
15 construction.  Probably directly by engineering and
16 construction, but, again, it depended.  It depended very
17 much on the specifics, what the transition was.
18 **Q   I believe --**
19 MS. FAIN:  Julie, can you scroll down.
20 **Q   (BY MS. FAIN) I believe -- let's see.  I**
21 **believe -- here we go.  It was --**
22 A   Engineering and construction directly.  All the
23 names here, Price, Rossini, Magrini, they're all people
24 working in engineering and construction.  Magrini actually
25 is the head of engineering and construction worldwide for

Page 94

1   Enel.
2       Q   Okay.  And can you talk to us or describe to us
3   what the change order request process is or how it works?
4       A   Specifically, there are different change orders,
5   so I would have to try to figure out which one is the
6   procedure they're referring to.  Most of the time it's
7   when you have a change in the quantity of a specific task
8   that was budgeted in a project.  But that's very much on
9   the situation.
10          So there are tons of different change order
11  requests that can be managed.  It's usually a process that
12  is managed between engineering and procurement.  So I
13  cannot help you very much in the -- in the details.
14      Q   No, that's helpful, and that was what we were,
15  you know, trying to better understand.  Do you -- is there
16  ever a time that you recall denying or directing someone
17  else to deny a change order request that you received on
18  this project?
19      A   No.  No.
20      Q   Okay.  Let's see.  So in the -- in this
21  document, in the explanatory note that's on the Bates
22  stamped page 19013, there's a section that says, "The
23  decision process for rock crushing was driven by the
24  following conditions."  It's at the top of this page.
25          Do you see that?

Page 95

1       A   Uh-huh.
2       Q   Okay.  And the change order states, "Given the
3   issue with the Osage Nation, the disposal of excavated
4   rocks and import of backfilling materials from outside the
5   county was a more expensive solution."
6           Do you see that?
7       A   No.
8       Q   Let's see.  It's the middle of the page.  It's
9   the third bullet point under -- under "decision process
10  for rock crushing".
11      A   Okay.
12          (The witness reads to himself.)
13          Okay.
14      Q   Okay.  And then right above that, the sentence
15  right above that, it says "given the issue with the Osage
16  Nation".
17      A   Uh-huh.
18      Q   Did you -- at this time, is it accurate to say
19  you were there, that you would have been aware of an issue
20  with the Osage Nation?
21      A   I'm not sure I understand the question.  You're
22  telling me -- you're asking me if I was aware about an
23  issue with the Osage Nation in
24  December 2000-and-whatever-it-was?
25      Q   2014.

Page 96

1       A   2014.  I don't know.  I could.
2       Q   Okay.
3       A   I mean, I -- I -- I knew, generally speaking,
4   that would -- that would not be correct, no.  I didn't
5   know generally speaking of all the projects that were
6   under construction, no.  I -- with the Osage -- with this
7   project, there's been decently long history, so I cannot
8   discount the fact that probably I was aware of the fact
9   that there was an issue.
10      Q   Okay.  And in the fifth bullet point, so a
11  couple down from where we were, it talks about
12  importing -- it states that, "Importing material was also
13  not advised by EGPNA legal department because it would
14  have given credit to Osage Nation's theory on the
15  commercial use of soil and, therefore, abandoned."
16          Do you see that?
17      A   Yeah.  I thought that's the one we were reading.
18      Q   Yeah.  It's right under the initial given --
19      A   I was reading that one.  You were reading the
20  one up above.
21      Q   Well, we'll meet in the middle.
22      A   Okay.
23      Q   Okay.  So it's -- do you know who from the EGPNA
24  legal department would have been likely to communicate
25  that message?

Page 97

1       A   Steve Champagne would be the one to blame,
2   but -- he was -- he's the head of the legal department,
3   but I couldn't know who the legal counsel at the time was
4   really dealing specifically with this issue.
5       Q   Did you share the view that importing material
6   was not advisable because it would, quote, unquote,
7   "credit the Osage Nation's theory"?
8       A   What do you mean "share the view"?
9       Q   Did you agree with that position that the --
10  that was provided by the Enel Green Power legal
11  department?
12      A   I don't agree.  I don't know enough to give you
13  an opinion.  I mean, the only thing I know is that we're
14  very -- I mean, essentially, we try to do our best to be
15  the best neighbors to whoever is in the projects that we
16  develop.  I mean, we need to stay there for 20 years,
17  sometimes even 30.  It's our objective to be as, you know,
18  obeying to the law and good neighbors as much as we
19  possibly can.  So my assumption is that here the legal
20  department did, as usual, the best they could to obey the
21  law.
22      Q   At the time that this order was approved by Bill
23  Price, and I understand that your role had changed, but
24  around December 9, 2014, were you still receiving updates
25  on the status of issues with the Osage Nation?

| | |
|---|---|
| Page 98 | Page 100 |

Page 98

1    A   No.  We -- sorry.  No.  It just -- the month of
2  December is a very peculiar month because a lot of -- you
3  know, you're getting to the end of the year, and a lot of
4  projects need to be finished.  So the way you follow all
5  of this - I'm talking about hundreds of projects around
6  the world - is you have an engineering and construction
7  meeting where you go through the list and you try to
8  understand how much they're costing as far as a delay,
9  what can be done to expedite.
10       But it's -- I mean, at that point, it's very
11  difficult that you get into the level of detail that's
12  going to tell you what the specific problem is and how to
13  solve it.  It's a, you know, 5,000 people organization.
14  It would be impossible to do that for this many projects.
15       MS. FAIN:  Okay.  Well, I -- that -- that wraps
16  up the questions that I have planned right now.  So we can
17  either take a quick break, or I don't know if the U.S.
18  is -- is -- wants to dive in.  But whatever the -- however
19  the group would prefer would be just fine.
20       MR. ASHWORTH:  We would divert to Mr. Venturini.
21  If you'd like to move forward, I can start my questions
22  and we can take a break later, or we can take a break now
23  and I'll ask my questions and probably break later as
24  well.  So I don't think I -- go ahead.
25       THE WITNESS:  Sorry.  Forgive me.  We took a

Page 99

1  break 20 minutes ago, so I think that we can move on, if
2  you guys are --
3       MR. McCORMACK:  That's fine with me, too.
4       MR. ASHWORTH:  And I don't think I have too much
5  questions to ask, but we'll go ahead and get started.
6            CROSS-EXAMINATION
7  BY MR. ASHWORTH:
8    Q   Sir, my name is Stuart Ashworth, and I'm with
9  the U.S.  And earlier in your deposition -- well, first
10  off, is there anyone in the room with you currently?
11    A   Yeah.
12    Q   Who?
13       MS. SAIZ:  I'm here.  Can you hear me?
14       MR. McCORMACK:  That's Beatrice, the one we
15  identified as we started the deposition.
16       MR. ASHWORTH:  Okay.
17       MR. McCORMACK:  She's a lawyer from Enel.
18    Q   (BY MR. ASHWORTH) Sir, has there been anyone
19  other than Beatrice in your room?
20    A   No.  I can turn the computer around to show you.
21  I mean, I'm in the main meeting room in Enel X, and it's
22  just me and her.
23    Q   Okay.  And when you say the -- when you say the
24  --
25    A   I can turn it -- I can turn it around if you

Page 100

1  want me to.
2    Q   No, that's fine.
3       MR. McCORMACK:  We don't -- we don't need to see
4  that.
5       THE WITNESS:  I don't know.
6       MR. McCORMACK:  But appreciate it.
7    Q   (BY MS. FAIN) Sir, when you said that you were
8  in the main meeting room for Enel X, is that -- where is
9  that located at?  Is that in Rome?
10    A   Yes, it's in Rome.
11    Q   Okay.  During your deposition, have you had any
12  access to any documents that you, you know, have pulled up
13  or been reviewing?
14    A   No.
15    Q   Okay.  Have you had access to any messaging -
16  emails, text messages - during your deposition so far?
17    A   No, except one from my mother.
18    Q   Okay.  Sir, earlier you testified, you said it
19  was -- I believe you said it was a common practice to use
20  minerals that were on site for construction projects.  Is
21  that correct?
22    A   Can you repeat that?
23       MR. McCORMACK:  What -- what -- I'm going to
24  object to the --
25    Q   (BY MR. ASHWORTH) Sure.  I believe --

Page 101

1       MR. McCORMACK:  Go ahead.  Sorry.  Go ahead.
2    Q   (BY MR. ASHWORTH) Sure.  I believe, sir, you
3  testified that it was a common practice to use minerals or
4  materials that are on site during construction projects.
5  Is that correct?
6       MR. McCORMACK:  I'm going to object to the form
7  of the question as assuming facts not in evidence,
8  mischaracterizing the testimony, and as having legal
9  conclusions involved.
10       But you can answer the question.
11    A   Okay.  First of all, sorry, but there is a
12  little echo, so I will have to ask you to repeat the
13  question probably several times.
14       What I meant was since there was a reference to
15  try to reduce cost, it was not -- it's common practice
16  that when you have a project, that you try to use as much
17  as you can whenever it's available.  I'll give you an
18  example.  If there is a village close by, you try to --
19  since you're talking about very often thousands of people,
20  you try to use whatever is available at the village to
21  support those thousands of people.  If there is no
22  village, then you need to try to pose a deal with the land
23  owners to have, you know, support during the construction
24  and so on.
25       So the -- what I meant was trying to optimize

Page 102

1 whatever is around, especially when you're talking about
2 projects that are - forgive me for the expression - in the
3 middle of nowhere, essentially.
4    Q   (BY MR. ASHWORTH) Okay.  Sir, in that desire to
5 use materials that are nearby, is that driven by the
6 desire to save money?
7    A   No.  First of all, if we use something where the
8 project is, you need to have the permits to do it, and
9 this is true for everything that you do.  So cost is a
10 driver always with -- always, but, I mean, for us, cost
11 was with permitting.  If you don't have the permit, you
12 cannot use whatever is available.
13    Q   Okay.  So is it your belief that in order to use
14 materials on site, you would need permission or a permit
15 to use those materials?  Is that correct?
16       MR. McCORMACK:  Wait a minute.  Wait, wait,
17 wait.  Object to the form of the question.  Argumentative.
18 Assumes facts not in evidence.  Seeks a legal conclusion.
19       But you can answer the question.
20    A   Can you repeat the question at this point?
21 Because I forgot the question.
22       MR. ASHWORTH:  Sure.
23       Court reporter, could you please reask that
24 question for me?
25       THE REPORTER:  Yes.

Page 103

1       (The requested portion is read back by the
2 reporter.)
3       MR. McCORMACK:  And I would repeat -- I would
4 repeat my objections.  Argumentative.  Seeks a legal
5 conclusion.  Assumes facts not in evidence.
6       But you can answer the question.
7    A   I would assume that there is an assessment about
8 what material we're talking about, and if it says that a
9 permit is required, then we would acquire the permit.
10    Q   (BY MR. ASHWORTH)  So my question, or at
11 least your previous testimony, is that if there's
12 materials on site, you would use those if you had
13 permission or a permit.  I believe that was your
14 testimony.  Is that not your testimony?
15    A   I'm not sure I understand your question.  I
16 mean, you're asking me --
17    Q   Okay.
18    A   All right.
19    Q   Sure.  Would it be kind of -- I guess I'll start
20 back to the beginning of my -- this line of questioning.
21 Would it be -- would it be common for Enel Green Power
22 North America to use materials on site?  By "materials",
23 I'm referring to minerals.
24       MR. McCORMACK:  Whoa, whoa, whoa, whoa, whoa.
25 Object to the form of the question.  Assumes facts not in

Page 104

1 evidence.  Calls for a legal conclusion.  And
2 mischaracterizes prior testimony.
3       But you can answer the question.
4    A   You are -- I think that you are asking the wrong
5 person.  I mean, you should ask the engineering and
6 construction team because I'm not an expert in
7 construction.  What I meant during the testimony was we
8 are trying to optimize a big -- whatever is done to build
9 a wind project.  I was specifically referring, for
10 example, to food, entertainment for the people, lodging
11 for the people and all this kind of stuff.  But I cannot
12 discount that in specific parts of the world, material
13 present, material on site is also utilized.
14       But, again, you're asking the wrong person.  I'm
15 not expert in the engineering and construction.  I've been
16 on --
17    Q   (BY MR. ASHWORTH) Okay.
18    A   -- the site three, four times in my life.
19    Q   Sure.  You under -- scratch that.
20       Would you agree that if you were to not use
21 materials that came from the site, you had to obtain
22 materials off site, that you would pay for those
23 materials?  Is that correct?
24    A   It depends on the material.  I mean, some
25 materials --

Page 105

1    Q   Okay.
2    A   Some materials you just pay for transport
3 because some people just want to get rid of it.
4    Q   Okay.  Are you aware that Bill Moskaluk, who was
5 the site manager for Enel-EGPNA on the Osage Wind project,
6 testified during his deposition that Enel saved
7 approximately $1.7 million by using the materials that
8 they excavated from the site instead of purchasing those
9 materials from off site?  Are you aware that he testified
10 about that?
11       MR. McCORMACK:  Wait, wait, wait.  Object to the
12 form of the question.  Assumes facts not in evidence.
13       But you can answer the question.
14    A   No.  I have no idea because I have no idea what
15 the other people from Enel testified.
16    Q   (BY MR. ASHWORTH) Would that surprise you that
17 using products -- I'm sorry, using minerals on site would
18 realize a cost savings into the millions of dollars for
19 Enel on a particular -- on any given wind construction
20 project?
21       MR. McCORMACK:  Wait.  Object to the form of the
22 question.  Mischaracterizes the evidence.  Misstates prior
23 testimony.
24       But you can answer the question.
25    A   I don't understand why it would surprise me.

Page 106

1    Q   (BY MR. ASHWORTH) And as CEO of EGPNA, it would
2  be your goal, at least to the stakeholders, that cost
3  savings would be a top priority for wind project
4  constructions.  Is that correct?
5    A   One of the top priorities, or the top priority?
6  They're different.
7    Q   A priority.
8    A   A priority.  It's a priority.
9    Q   I'm sorry.  Did you say yes?
10   A   Yes.  It's a priority together with others, yes.
11  I'm sorry.
12   Q   Okay.  Are you aware that the minerals that were
13  excavated and used in the project, one of the reasons why
14  they were used in the project, the Osage Wind project, was
15  for use of structural support of the wind towers?
16       MR. McCORMACK:  Wait, wait.  Object to the form
17  of the question.  Mischaracterizes the facts.
18       But you can answer the question.
19   A   I am aware today, because talking to my legal
20  counsel --
21       MR. McCORMACK:  Don't talk about what you talked
22  to me about.
23       THE WITNESS:  All right.
24   A   So I was made aware of the fact that we used
25  them, but honestly speaking, until a few days back, I had

Page 107

1  no recollection of was done with those - how should I call
2  them - stones, mineral stones.
3    Q   (BY MR. ASHWORTH) Okay.  Are you aware that an
4  appellate court in the U.S. held specifically that Enel
5  was required to obtain a permit to use materials that were
6  excavated during the Osage Wind project?
7    A   No.
8       MR. McCORMACK:  So, wait.  Actually, I think the
9  court held about a mining license, a mining lease, but be
10  that as it may.  So I'm going to object to the form of the
11  question as being inaccurate facts.
12       But go ahead.
13   A   No.
14   Q   (BY MR. ASHWORTH) As you sit here today, you're
15  unaware that an appellate court, specifically the Tenth
16  Circuit Court of Appeals, held that Enel Green Power North
17  America illegally used minerals that were excavated
18  without prior permission?
19   A   I was not aware of it.
20   Q   Okay.  Does that surprise you?
21   A   It does a bit.
22   Q   Okay.  Why does that surprise you?
23   A   Because we are very careful in the way we build
24  our projects, so I'm surprised that, if there was a
25  mistake -- well, I mean, mistakes are made, so -- but we

Page 108

1  are extremely careful when we build projects.  We need to
2  stay there for 20, 30 years, so we try to make sure that
3  everyone is happy with what we are doing.  It's extremely
4  painful to stay in 20, 30 years in a place where people
5  don't like you.  So we, generally speaking, try to avoid
6  it.
7    Q   Do you know of any efforts that Enel did to
8  obtain permission to use the minerals that were excavated
9  during the Osage Wind project?
10   A   What do you mean?
11   Q   Well, we know that they -- we know that Enel did
12  not obtain permission to use the minerals.  My question to
13  you would be are you aware of any efforts that anyone at
14  Enel Green Power North America did to obtain permission to
15  use those minerals?
16   A   No.
17   Q   You're unaware of any efforts undertaken to
18  obtain permission?
19   A   I'm assuming the people tried, I -- but I'm --
20  honestly speaking, don't know whom and how they did it and
21  even if they did it.
22   Q   Okay.  Do you believe that someone at Enel
23  should have attempted to obtain permission to use minerals
24  that were excavated during the Osage Wind project?
25       MR. McCORMACK:  Wait.  Object to the form of the

Page 109

1  question.  Argumentative.  Assumes legal conclusions.
2       But you can answer the question.
3       THE WITNESS:  Okay.  Forgive me.  Every time
4  that you go with that sentence, then I forget exactly what
5  the words of the questions are.  Can you --
6       MR. ASHWORTH:  Court Reporter, do you mind
7  restating my question?
8       THE REPORTER:  Sure.
9       (The requested portion was is back by the
10  reporter.)
11       MR. McCORMACK:  And I would repeat the
12  objections as well for this question.
13   A   I do not have enough information to give you a
14  straight answer.  I mean, again, when you're talking about
15  project like this one, you're talking about a lot of
16  complexity, and there are tons of people involved and
17  legal advisers.  Nobody wants to be fired for, you know, a
18  project that didn't go right, so everyone is trying to do
19  their best.  My assumption, especially in this case with a
20  senior team in charge of portfolio projects in the United
21  States and me being God only knows where at the time, I'm
22  assuming that they made any possible effort to do it
23  right.
24   Q   (BY MR. ASHWORTH) So, I'm sorry.  It's your
25  testimony that you're unaware if anyone made efforts to

Francesco Venturini    9/13/2021

Page 110

1  obtain permission, but you assume someone did make

2  efforts.  Is that correct?

3       MR. McCORMACK:  Wait.  Object to the form of the

4  question.  Mischaracterizes his testimony.  Assumes facts

5  not in evidence.

6       But you can answer the question.

7    A  No, I said something different.  I have not

8  enough information about the situation of the project at

9  the time to tell you if it's yes or no.  So I can only

10 assume that, again, if they thought is was something that

11 was supposed to be done, they did it.  We are talking

12 about people with 30 years of experience in these fields.

13   Q  (BY MR. ASHWORTH) Sorry.  Go ahead.  I'm sorry

14 if I cut you off.

15   A  No, I'm -- I'm -- they have 30 years of

16 experience.  We're talking about people who were the ones

17 really starting the renewable air in the United States.

18 So people with, you know, a level of seniority that I

19 cannot even think about doubting.  I don't have anything

20 else to add.  I mean, I'm sure that they tried, and

21 hopefully they did the right thing.

22   Q  Okay.  Whose responsibility would it be at Enel

23 Green Power North America to make sure that the entity had

24 permission to use minerals during a construction project?

25      MR. McCORMACK:  I'm sorry.  In 2014 or 2013,

Page 111

1  some other time?

2       MR. ASHWORTH:  No.  I stand on my question.

3    A  So I'm assuming that you're talking about

4  related to this project?

5    Q  (BY MR. ASHWORTH) Yes.

6    A  Because this project is a very peculiar one and

7  it is in a time when, again, my presence in the United

8  States was extremely limited, so the -- the management

9  team.  We're talking about people, as I said, 30-plus

10 years of experience focused on their specific targets.

11 They were -- I would say I'm 99.9 percent sure that they

12 were making collective decisions because I know them very

13 well.  At the end, usually when you are on the verge of

14 construction - because my understanding is that this was

15 the situation - or during construction, at that point, the

16 project manager and actually the head of engineering and

17 construction in the United States would have been the one

18 mostly calling the shots.  So they would be the one trying

19 to figure out putting all the pieces together, if it was

20 the time to -- a good time to -- if it was right or wrong

21 to move ahead.

22   Q  Okay.  Let me reask it this way.  Who would

23 ultimately be responsible for ensuring that permission was

24 obtained to use minerals during the Osage Wind project?

25   A  I don't know what the transition was at the

Page 112

1  time.  It's -- it was a team of four or five people.  We

2  named them more than once over the past three hours.  I

3  can repeat the names.  Steve Champagne was the legal

4  counsel, so he was definitely the one providing advice

5  about if the permit was needed or not.  Mike Storch and

6  David Post were the people having done the development of

7  the project, so all the due diligence and probably having

8  dealt with all the issues happening until then.  And then

9  once the project goes on to the investment community, it

10 was a matter of handing over the project to engineering

11 and construction.  I don't know exactly when the project

12 was handed over to engineering and construction.  At that

13 point, engineering and construction would have had the

14 last word.  But knowing these guys and knowing how much

15 they liked to work together, I'm sure that they, you know,

16 together made the decision, and I'm sure that it was the

17 decision that they thought was right at the moment.

18   Q  Okay.  Would you have any duty to make sure that

19 either Steve Champagne, Mike Storch, anyone at -- or

20 everyone at -- underneath you were acting in accordance

21 with all applicable federal regulations relative to the

22 Osage Wind project?

23   A  As the CEO of this company -- sorry.  As the CEO

24 of that company, in the end, it was my responsibility.

25 But the transition is such where you have, again -- Enel

Page 113

1  Green Power is the -- in my opinion, one of the best

2  energy companies out there, and because of its people,

3  because of the fact of how we operate and how we are

4  building long-term relationships with land owners and all

5  the different stakeholders.  So in the end, it's always

6  the CEO's fault.  However, specifically, in this

7  case, I'm sure those guys in the United States decided

8  based on facts, based on what they had, that that was the

9  right decision to make to build the project.

10   Q  Okay.  If -- going back to the Tenth Circuit

11 Court of Appeals' opinion finding that EGPNA was required

12 to get permission to use the minerals, if the Court had

13 found EGPNA had done something wrong, would you expect to

14 be informed about that decision?

15      MR. McCORMACK:  Object to the form of the

16 question.  It assumes facts not in evidence.  It also is

17 argumentative and is speculative.

18      You can answer the question.

19      MR. ASHWORTH:  Yeah.  I'm going to -- hold on.

20 Listen.  Listen, McCormack.  You know that we reserve

21 objections.  I'm sorry.  Objections in our circuit, as

22 well as our district court, is object to the form of the

23 question.  Only when I ask you what that form objection is

24 are you able then to tell me so that I can correct that

25 for trial.



Page 114

1    I'm going to ask you to refrain from inserting
2  your speaking objections over form objections.  If I ask
3  you specifically what your form objections are, you can go
4  ahead and tell me, but otherwise, keep that to yourself.
5        MR. McCORMACK:  I appreciate your advice.  I've
6  read my --
7        MS. FAIN:  It's not advice.  I'm telling you
8  that, this right now.  I know that you have been pro hoc'd
9  into this case.  I know that you're not familiar with the
10  Tenth Circuit, the Northern District of Oklahoma's local
11  rules, but I would expect that you'd get familiar with
12  those and then govern yourself accordingly.
13        MR. McCORMACK:  I am governing myself completely
14  appropriately.  I don't appreciate being called by my last
15  name.  I find that disrespectful, but I've suffered worse.
16        I've read the cases in the Northern District of
17  Oklahoma, and objecting to form and stating what the basis
18  of the objection is appropriate, and that's what I'm
19  going to continue to do so.  I appreciate your advice, and
20  I'll follow my own counsel.
21        MS. FAIN:  It's only appropriate when I ask you
22  what those form objections are.
23        MR. McCORMACK:  Okay.  So --
24        MS. FAIN:  I assume that you're asking about the
25  State Farm case.

Page 115

1        MR. McCORMACK:  I'm not going to argue with you,
2  Counsel.  You're familiar with that I do.  I'm going to
3  continue to do it.  If you think I've done it wrong,
4  then -- then okay.  Then we have a good faith
5  disagreement.
6        So where were we?
7        MR. ASHWORTH:  Court Reporter, can you please
8  reread -- reask my question?  I had one pending.
9        THE REPORTER:  Yes.  One second.  Okay.
10        (The requested portion is read back by the
11  reporter.)
12        MR. McCORMACK:  Would you also please read by
13  objections.
14        MR. ASHWORTH:  No.  I'm going to say that the
15  court reporter -- that's not necessary.  Don't do it.  I'm
16  the one asking questions.  The objections stand.
17        You assert your objections for the purposes of
18  preserving the record.  There's no need to reask it or
19  restate it other than to somehow communicate something to
20  the witness.  Just completely inappropriate.
21        MR. McCORMACK:  Ms. Court Reporter, you're going
22  to follow the statements of the counsel for the U.S., or
23  are you going to do what I've asked you to do and read
24  back my objection?
25        MR. ASHWORTH:  I'm going to say, if that's how

Page 116

1  you're going to stand, we're going to stop.  We're going
2  to call the judge right now.
3        MR. McCORMACK:  Okay.  Call the judge.
4        MR. ASHWORTH:  Okay.  Let's -- let's go off the
5  record.
6        THE VIDEOGRAPHER:  We're off the record at
7  10:50 a.m.
8        (Break taken.)
9        THE VIDEOGRAPHER:  We are back on the record at
10  11:51 a.m.
11    Q   (BY MS. FAIN) Sir, let me reask the question or
12  rephrase the question that was pending before we went on
13  our break.  If the Tenth Circuit Court of Appeals found
14  that EGPNA violated federal regulations by using minerals
15  without permission, would you have wanted to have known
16  about that?
17    A   I'm thinking.  I mean, is that a -- I would not
18  know the importance of the issue, honestly.  So to try to
19  understand what you want to know and what you don't want
20  to know, you also need to understand the weight of
21  information that you need to receive.  My -- that's why
22  you can trust your legal counsels to decide what's the
23  information that you are supposed to be knowing.  So I --
24  how can you even -- how can I give you an answer not
25  knowing the importance of the decision that is to be made,

Page 117

1  and honestly speaking, at the time, I have no idea.
2    Q   Okay.  So as CEO of EGPNA, you have no opinion
3  as to whether you would want to have known that the
4  company you're the CEO of violated federal regulations as
5  determined by the Tenth Circuit Court of Appeals in the
6  United States?
7        MR. McCORMACK:  Objection to the form of the
8  question.  It's inconsistent with his prior testimony.
9        But you can answer the question.
10    A   I would have to -- again, I had a very strong
11  team of people trying to decide what was important for me
12  to know in regard of the specific project.  It's not a
13  matter of me wanting to know or not.  I cannot in this
14  circumstance today try to, you know, understand if that
15  information would have been important to me to make a
16  decision.
17        I entrusted the team.  They -- they -- they were
18  the ones evaluating what was important for me to know and
19  what not.  Evidently, they thought it was not important or
20  was not that relevant that they could decide it
21  themselves.
22    Q   As you sit here today, do you believe that you
23  would have known about this Tenth Circuit Court opinion
24  finding that EGPNA violated federal regulations?
25    A   You're asking me if I think today if it was

Page 118

1  relevant information for me to know?
2    Q.  No.  My question is, as you sit here today, do
3  you believe you should have known?
4      MR. McCORMACK:  Object to the form of the
5  question.  Calls for speculation.
6    A  I think it's a little speculative to try to
7  judge it now, I mean, looking at where we are.  But I
8  don't think that I would have made a better decision than
9  was made at the time.  I mean, there were tons of people
10  looking at this and they collectively decided to proceed,
11  which means they really believed in the fact that they
12  were on the right side of the fence.
13    Q  (BY MR. ASHWORTH) I'm asking -- the question I
14  asked was, as you sit here today, do you now believe that
15  you should have known about the Tenth Circuit opinion?
16    A  No.  It doesn't matter because I would not have
17  been able to provide a knowledgeable input into what was
18  going on.  That's why you have management with you,
19  because they're supposed to, you know, understand what's
20  going on and make the right decision.  What kind of input
21  I would have given to them?  I mean, they would have been
22  the ones knowing exactly what was going on and deciding.
23  It's not that the CEO knows everything.  He knows very
24  little very often, unfortunately.
25    Q  Okay.  As CEO of a company, do you believe that

Page 119

1  that's not important that you know if your company you're
2  CEO of is violating federal regulations?
3      MR. McCORMACK:  I'm going to object to that
4  question as being argumentative and inconsistent with the
5  prior testimony about when he was CEO.
6      But with those provisors, go ahead.
7    A  I don't think anybody thought there was a
8  federal violation.  I mean, do you see somebody coming to
9  me and saying, hey, we are violating the federal
10  regulation, what do you think, we should go ahead or stop?
11  I mean, that's not what happens, right?  I mean, people
12  are thinking they're on the right path and doing the right
13  thing.  I'm not sure exactly what -- what answer to your
14  question.
15    Q  Fair enough.  Well, the Tenth Circuit has
16  already found that EGPNA has violated federal regulations.
17  My question would be, as CEO, is that something you would
18  want to be apprised of or to be made aware of, and it
19  seems to me that your testimony is, as CEO, you don't
20  think it's something that you should have been made aware
21  of.  Is that correct?
22      MR. McCORMACK:  Wait.  Let me -- object to the
23  form of the question.  It's inconsistent with his prior
24  testimony about when he was CEO and assumes facts not in
25  evidence.

Page 120

1      But you can proceed.
2    A  I -- it -- the -- you're in a -- when you're in
3  a big company, you have, again, a management team deciding
4  how to handle different things.  Probably at the time they
5  thought that there was not something relevant for me to
6  know because they were handling the issue on a project
7  level.  Should I have been told that there was something
8  going on with the project?  Probably, actually.  I don't
9  know.  Maybe they even told me, but they probably also
10  told me that they were handling it.  I cannot recall
11  exactly the situation.
12      Hundreds of projects around the world.  I don't
13  want to dismiss this one as not important, but a lot of
14  decisions are made at project level.
15    Q  Okay.  As CEO of a company, would you care
16  whether or not federal regulations are being violated by
17  the company?
18    A  I feel like it's the same question.  Obviously,
19  I want to make sure that we are not violating the law.  I
20  mean, I said it more than once.  Our objective is to stay
21  in a place for several decades.  We don't want to violate
22  the law.  It doesn't make any sense to do it.  So, yes, I
23  did, but at the same time, I have an international legal
24  team taking care of these things.  And, again, if they
25  thought it was not important, it was not relevant, or even

Page 121

1  they informed me, they informed me but not making me aware
2  of the fact that I had to worry about it, I mean, that was
3  up to them.  Again, project team; legal team on project
4  level.
5    Q  If EGPNA was found to have violated federal
6  regulations, is that something that would have been
7  addressed with the Board of Directors for EGPNA?
8    A  I don't know.  It depends on the kind of
9  violation.  It depends how the legal team would have
10  assessed the kind of violation.
11    Q  Do you know if the Tenth Circuit Court of
12  opinion regarding the Osage Wind project was brought up
13  with the Board of Directors for EGPNA?
14    A  When was the -- when did this happen?  Because
15  I'm not even sure about the date.  When was the decision
16  made?
17    Q  One second.  2017.
18      MR. McCORMACK:  I think September of 2017, if
19  I'm not mistaken, Counsel.
20    A  I wasn't even in EGP anymore.  I had left, as I
21  said in the very beginning.  May 2017, I moved in to be
22  the CEO of Enel X, so there was a completely different
23  management team at the time.  So, no, I'm not aware of
24  anything because it was not, if you will, my problem at
25  that point.

Page 122

1    Q   (BY MR. ASHWORTH) Okay.  Whose problem would it
2    have been?
3    A   It depends on how you think that the issue was
4    relevant.  It would have been a problem of the legal
5    department in Enel.  Having -- the project had been built
6    at that point, so it was a matter of -- it was a legal
7    issue more than anything else.  So I'm assuming that it
8    was managed directly by the legal department.
9    Q   Okay.  I'm going to pull up an exhibit that was
10   previously marked in this case as Exhibit Number 85.  As
11   we're getting this pulled up, earlier in the deposition, I
12   believe you indicated to Ms. Fain that the letter
13   addressed by Robin Phillips, that you don't
14   recall -- that you don't believe it was forwarded to you.
15       I would indicate -- so this is a -- can you see
16   this letter, this email in front of you --
17   A   Yeah.
18   Q   -- on the screen?
19       (Off-the-record discussion.)
20   Q   (BY MR. ASHWORTH) This is a letter from David
21   Post to you, and this was October 16, 2014, and there's an
22   enclosure here.  And I'll represent to you that this
23   enclosure is the letter that Ms. Fain had previously
24   entered into -- or showed you from Robin Phillips.
25   A   Okay.

Page 123

1    Q   Do you recall seeing this email?
2        MR. McCORMACK: Counsel, could you -- could you
3    -- excuse me, Counsel, could you make that larger?  I
4    can't see it.
5        MR. ASHWORTH:  Is that good?
6        MR. McCORMACK:  Yeah.  That's better.  Thank
7    you.
8    A   I couldn't recall the email, obviously, until a
9    few days back, then it was given to me to look at by my
10   legal counsel, yes.
11   Q   (BY MR. ASHWORTH) Okay.  What documents have you
12   reviewed to prepare for your deposition?
13   A   Actually, this email and the letter that you're
14   talking about.
15   Q   The letter and this email.  Is that correct?
16   A   Yes, correct.
17   Q   What other documents have you reviewed to
18   prepare for your deposition?
19   A   I said it.  The letter.  The letter attached to
20   this email, and this email.
21   Q   And no other documents.  Is that correct?
22   A   No other documents, no.
23   Q   Okay.  So you would have been aware of the
24   letter from Robin Phillips at the BIA, Bureau of Indian
25   Affairs, to Enel asking or directing Enel to stop work on

Page 124

1    the project pending Enel getting a permit for the
2    minerals.  You would have been aware of that letter in
3    October 2014.  Is that correct?
4    A   I'm assuming so.  This is what the email is
5    talking about, yes.
6    Q   Okay.  Have you ever been aware of an instance
7    during a wind project where a government entity directed
8    Enel to stop construction?
9    A   Not that I recall, but, I mean, I cannot
10   discount the fact that probably there was, there were
11   cases in the past.  I have no idea.  I'm talking about
12   worldwide.  I mean, the situation is very much depending
13   on the country.
14   Q   Are you aware of any instances where there was a
15   letter from a government entity directing Enel to stop
16   construction but Enel refused to stop and continued
17   construction?  Are you ever aware of a situation like
18   that?
19   A   Again, not that I remember.
20   Q   Okay.  In this letter -- well, first off, was
21   there anything in this letter that you disagreed with that
22   was different from your -- any memory that you may have
23   had regarding the project?
24       MR. McCORMACK:  Counsel, I'm sorry.  For
25   clarification, are you referring to the letter that is an

Page 125

1    attachment to this email or are you referring to the
2    email?
3        MR. ASHWORTH:  I'm sorry.  The letter.  Sorry.
4    I'm sorry.  This exhibit, excluding the letter.
5        MR. McCORMACK:  So the email.
6    A   So I'm not sure I understand the question.  You
7    are asking me again if I remember this email or not?  I
8    mean, can you repeat?
9    Q   (BY MR. ASHWORTH) Sure.  When you reviewed this
10   email, this exhibit to prepare for your deposition, was
11   there anything in this exhibit that you disagreed with?
12   A   If I disagreed about something that was written
13   in this email?
14   Q   That's correct.
15   A   What do you mean by disagreeing?
16   Q   That you believe was incorrect.
17   A   I have no idea.  I mean, first of all, it's very
18   difficult to remember what I thought at the time.  As I
19   said, I was miles away.  I -- it's very difficult for me
20   to disagree about something that is very -- that is just
21   informative.  They're telling me that there is a -- we can
22   read it together, a sandy soil permit issue that nobody
23   was aware of until last week and that they're trying to
24   figure out what this whole thing is about.  This is what
25   I -- how -- the way I interpret the email.

Page 126

1    Q.  Okay.

2    A.  But I don't know.  What can I agree or disagree

3  about?  It's just information.

4    Q.  You had testified, I believe, earlier that you

5  would have relied upon the research or the opinions of

6  your in-house counsel regarding whether a permit was

7  needed or not for a particular project.  Is that correct?

8    A.  I would say -- more than the legal counsel, I

9  would say the team working on the project, yes.

10  Obviously, the legal counsel is an important piece of it.

11    Q.  Okay.  Are you aware whether or not either

12  in-house counsel or your Enel team that you referred to

13  did any independent research as to whether a permit was

14  necessary to use minerals during the Osage Wind project?

15    A.  I have no idea.

16    Q.  I'm sorry.  You have no idea.  Was that your --

17  was that your answer?

18    A.  Yeah.  I can assume that they did everything the

19  way they wanted, that they needed to, but, I mean, if they

20  specifically looked for a sandy soil permit at the time, I

21  have no idea.

22        MR. ASHWORTH:  Okay.  Let's take a five minute

23  break.  I'm almost done with my questions.  I'm going do

24  go over my notes real quick.

25        MR. McCORMACK:  Sure.

Page 127

1        THE VIDEOGRAPHER:  We're off the record at

2  12:09 p.m.

3        (Break taken.)

4        THE VIDEOGRAPHER:  We're back on the record at

5  12:14 p.m.

6        MR. ASHWORTH:  We pass the witness.  We have no

7  further questions.

8        MR. McCORMACK:  I have no further questions for

9  this witness.  We reserve them all for trial.

10        Thanks very much, everyone.

11        THE VIDEOGRAPHER:  This concludes the videotaped

12  deposition of Francesco Venturini.  We're off the record

13  at 12:14 p.m.

14        (DEPOSITION CONCLUDED AT 12:14 P.M.)

15

16

17

18

19

20

21

22

23

24

25

Page 128

1        ERRATA SHEET

2  THE UNITED STATES OF AMERICA, et al. v. OSAGE WIND, LLC,

3        et al.

4        DEPOSITION OF FRANCESCO VENTURINI

5  REPORTED BY: KARLI DANIELS, CSR, RPR, CCR

6  DATE DEPOSITION TAKEN: SEPTEMBER 13, 2021

7        JOB NO. 152609

8  PAGE  LINE  IS        SHOULD BE

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Page 129

1        JURAT

2  THE UNITED STATES OF AMERICA, et al. v. OSAGE WIND, LLC,

3        et al.

4        I, Francesco Venturini, do hereby state under

5  oath that I have read the above and foregoing deposition

6  in its entirety and that the same is a full, true and

7  correct transcription of my testimony so given at said

8  time and place.

9

10

11        _____

12  Signature of Witness

13

14

15        Subscribed and sworn to before me, the

16  undersigned Notary Public by said witness, Francesco

17  Venturini, on this _____day of_____, 2021.

18

19

20

21        _____

22  NOTARY PUBLIC

23  MY COMMISSION EXPIRES:_____

24  JOB NO. 152609

25

1      C E R T I F I C A T E

2

3      I, Karli Daniels, Certified Shorthand Reporter,

4  Registered Professional Reporter, Certified Court

5  Reporter, do hereby certify that the above-named Francesco

6  Venturini was by me first duly sworn to testify the truth,

7  the whole truth, and nothing but the truth, in the case

8  aforesaid; that the above and foregoing deposition was by

9  me taken and transcribed pursuant to agreement, and under

10  the stipulations hereinbefore set out; and that I am not

11  an attorney for nor relative of any of said parties or

12  otherwise interested in the event of said action.

13      IN WITNESS WHEREOF, I have hereunto set my hand

14  and official seal this 18th day of September, 2021.

15

16

17

18      _Karli Daniels_

19      KARLI DANIELS, CSR, RPR, CCR

20

21

22

23

24

25

26