## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

      Plaintiff,

      And

OSAGE MINERALS COUNCIL,

      Intervenor-Plaintiff,

v.

OSAGE WIND, LLC;
ENEL KANSAS, LLC; and
ENEL GREEN POWER NORTH
AMERICA, INC.,

      Defendants.

Case No. 14-CV-704-GKF-JFJ

**Plaintiff United States of America's Response in Opposition to Defendants' Motion for Partial Summary Judgment (Dkt. 297)**

# Table of Contents

I.     Response to Defendants' Statement of Undisputed Facts............................ 1

II.     United States' Additional Undisputed Facts............................................. 4

III.     Summary Judgment Standard.................................................................. 6

IV.     Arguments and Authorities...................................................................... 6

     A.  Defendants committed a trespass against the OME by conducting mining *and* other work without first obtaining a federally approved mineral lease.................................................................................................... 6

     B.  The Court should not dismiss the United States' continuing trespass claim................................................................................................. 11

           1.  Defendants' continuing trespass against the OME is ongoing.................................................................................16

           2.  Defendants' continuing trespass against the OME is abatable.................................................................................18

           3.  Defendants' current use of the *in situ* minerals is not a permanent change to the physical condition of the OME.................................................................................18

     C.  The ownership interest to empty holes and surfaces exposed by Defendants' unauthorized excavation work is irrelevant to the United States' trespass and continuing trespass claims.............................................................19

     D.  Defendants' unauthorized, ongoing use and exploitation of the *in situ* minerals within the OME can only be remedied through injunctive relief, if a Part 214.7 lease is not executed.................................................................... 21

V.     Conclusion........................................................................................ 23

# Table of Authorities

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)……………………………………….......6

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)……………………… ……………………6

*City of Herriman v. Bell,* 590 F.3d 1176 (10th Cir. 2010)………………………………..…6

*City of Kenai v. Cook Inlet Nat. Gas Storage Alaska, LLC,* 373 P.3d 473 (Alaska 2016)………..20

*Davilla v. Enable Midstream Partners L.P.,* 913 F.3d 959 (10th Cir. 2019)…………………8, 18

*Ellis v. Ark. La. Gas Co.,* 450 F. Supp. 412 (E.D. Okla. 1978)………………………………19-20

*Lone Wolf v. Hitchcock,* 187 U.S. 553 (1903) ……………………………………………...21

*Millsap v. Andrus,* 717 F.2d 1326 (10th Cir. 1983) ……………………………………20, 22-23

*O'Brien Oil, LLC v. Norman,* 233 P.3d 413 (Okla. Civ. App. 2010)………………………...19

*Oneida Cty., N.Y. v. Oneida Indian Nation,* 470 U.S. 226 (1985)………………………………21

*Solem v. Bartlett,* 465 U.S. 463 (1984)………………………… …………………………22

*United States v. Osage* Wind, 871 F.3d 1078 (10th Cir. 2017)………………………2-8, 10, 12-13

*Williamson v. Fowler Toyota, Inc.,* 956 P.2d 858 (Okla. 1998)…………………………..………8

*Winton v. Amos,* 255 U.S. 373 (1921)…………………………………………………………21

**Statutes**

Act of June 28, 1906, § 3, 34 Stat. 539 (Osage Allotment Act)……......................................22

**Federal Regulations**

25 C.F.R. § 1.2………………………………………………………………………………5

25 C.F.R. § 211………………………………………………………………………………12

25 C.F.R. § 211.3………………………………………………………………………8, 10-11

25 C.F.R. § 214………………………………………………………………….....................7, 12

25 C.F.R. § 214.7…………………………………………………..………5-8, 10, 12, 20-21, 23-24

25 C.F.R. § 214.10(d)…………………………………………………..…………………………..4

**Court Rules**

Fed.R.Civ.P. 12……………………………………………….………………………...13

Fed.R.Civ.P. 30(b)(6)…………………………………………………………..………...17

Fed.R.Civ.P. 56……………………………………………………………………..6, 13

**Other Authorities**

Osage Nation Constitution, Art. I……………………………………………………..21

Restatement (Second) of Torts…………………………………………………………18

Restatement (Second) of Torts § 162 ………………………….........................................18

Plaintiff, the United States of America, responds in opposition to Defendants' Motion for Partial Summary Judgment and Brief in Support (Dkt. 297) as follows:

## I.     Response to Defendants' Statement of Undisputed Facts

1.  *Disputed in part*. Defendants leased privately owned fee surface estate lands consisting of *8,190 acres* in Osage County, Oklahoma. *See* Steven Hazel's Expert Report, Dkt. 300 at Exh. 8, p. 4, as filed under seal at Dkt. 299.

2.  *Disputed*. Defendants' attempt to minimize the significance and extent of their actions to develop the Osage Mineral Estate (OME) by characterizing wind turbines as being "placed" on the leased *8,190* acres is trite. Defendants not only employed special excavation activities – e.g. blasting with explosives and rock crushing for at least 82 of its 84 turbine locations - they specifically opted to ignore the option of building turbine foundations on the surface without digging holes. *See* Exhibit 1 (EGPNA Change Order Approval Authorization dated 12/9/2014) (Failure to approve the $2M change order would have resulted in temporary storage costs, construction cost delays, and cold weather works resulting in costs "much higher than the overall cost of the Change Order.") [1]; Exhibit 2 (Weigel Dep. Tr.) at 28:17-19.

---

[1] The decision process for rock crushing was driven by the following conditions:

. . .

• Big rocks and boulders could not be displaced with imported material from outside the project. Given the issue with Osage Nation the disposal of excavated rocks and import of backfilling material from outside the County was a more expensive solution.

• Importing material was also not advised by EGPNA Legal Dep. because it would have given credit to Osage Nation's theory on the commercial use of soil and therefore abandoned.

. . .

*Id.* at 2.

1

3.   *Disputed*. The extent of Defendants' illegal excavations and mining cannot be precisely known because they failed to keep such records in the face of anticipated litigation on the subject. *See* United States' Motion to Determine Sanctions for Spoliation of Evidence, Dkt. 293. Although the original Barr Engineering Foundation Drawings indicated the excavation area for each wind turbine foundation was to measure 10 feet deep and 60 feet in diameter, *see* Exhibit 3 (Barr Drawing), Exhibit 4 (photographs taken by Defendants), as well as an eye-witness account, Exhibit 5 (Whiteshield Depo. Tr. 112:15-113:1),[2] indicate that the excavation areas were larger than 10 feet deep and 60 feet in diameter. *See also* Exhibit 6 (Whiteshield Complaint Form); Exhibit 7 (Letter of 10/9/2014 to F. Venturini: "In performing an inspection, Mr. Whiteshield found a pit approximately 60 feet wide and 30 feet deep.").

4.   *Undisputed*.[3]

5.   *Disputed*. As with Fact No. 2, Defendants again try to minimize the significance and extent of their actions taken to develop the OME by simply characterizing such as the wind turbines having concrete turbine foundations "poured" into each such hole. The Tenth Circuit has already found Defendants' mineral development of the OME encompassed "sort[ing] the extracted rock material into small and large pieces, and then crush[ing] the smaller pieces so they would be the proper size for backfilling the holes.") *United States v. Osage Wind, LLC*, 871 F.3d 1078, 1087 (10th Cir. 2017).

---

[2] "On my visit on September 29, 2014, I witnessed several pits that were 60 foot wide, 30 foot deep." Exh. 5, Whiteshield Depo. Tr. 112:15-113:1.
[3] The rock that was excavated consisted of limestone, shale and clay. *See* Exhibit 8 (Freas Expert Report, VI(b) at 3). Clay is a component of sedimentary rock.

6. *Disputed*. The extent of Defendants' illegal excavations and mining cannot be precisely known because they failed to keep such records in the face of anticipated litigation on the subject. *See* Dkt. 293.

7. *Undisputed*.

8. *Disputed in part*. As in Fact Nos. 2 and 5, Defendants again try to minimize the significance and extent of their actions to develop the OME by simply characterizing their "push[ing] back" excavated OME materials into the turbine holes as backfill. The Tenth Circuit found Defendants' use of the excavated material for "backfill[] and stabilization" constituted "mining" and required a lease. *Osage Wind, LLC*, 871 F.3d at 1091-92.

9. *Undisputed and immaterial*. The Tenth Circuit rejected Defendants' previous "proposed commercialization requirement" argument, finding that confining "mining" to sales and offsite relocations of extracted minerals was "overly restrictive." *Id.* at 1089-90.

10. *Disputed. See* United States' response to Disputed Fact No. 6 above.

11. *Undisputed and immaterial*. The Project would be inoperable but for the ongoing use of the stolen OME Defendants excavated and continue to use as backfill (providing ongoing stabilization for the turbines and related infrastructure) - not to mention the area immediately surrounding the turbines, which remains off limits for mining, making those minerals inaccessible.

12. *Undisputed and immaterial. See* United States' response to Undisputed and Immaterial Fact No. 11 above.

13. *Undisputed and immaterial. See* United States' response to Undisputed and Immaterial Fact No. 11 above.

14. *Disputed*. It is Robert Freas's opinion that $247,979.42 is the *royalty amount under 25 C.F.R. § 214.10(d)* for the minerals mined, with the total value of minerals mined at the nearest shipping point being $2,479,794.20. *See* Exh. 8 at 11. This does not take into account the total value of minerals mined at the excavation site, which would include the cost of shipping (representing the value conferred to Defendants for using the minerals mined).

15. *Disputed*. John Pfahl testified the $68,993 figure was for limestone only. *See* Exhibit 9, Pfahl Depo Tr. 29:20-30:8, 32:3-7. Mr. Pfahl did not take into consideration that *clay and shale* were minerals "mined" by Defendants. *Id*. Mr. Freas's opinion is that $247,979.42 is the royalty amount under 25 C.F.R. § 214.10(d) for the minerals mined, with the total value of minerals mined at the nearest shipping point being $2,479,794.20. *See* Exh. 8 at 11. This is not the total value of minerals mined at the excavation site, which would include the cost of shipping (representing the value conferred to Defendants for using these minerals). Further, this figure is separate from the lost rental value of the lease not entered into, which robbed the OMC of its opportunity to negotiate as addressed in Mr. Hazel's expert report.

## II.    United States' Additional Undisputed Facts

1.    Defendants' extraction, sorting, crushing and use of minerals as part of its construction efforts constituted "mining." Dkt. 99, Defendants' Answer at ¶ 2; *Osage Wind, LLC*, 871 F.3d at 1081-82.

2.    Defendants were required to obtain a federally approved lease prior to their excavation work, mining and construction activities. Dkt. 99 at ¶¶ 2, 24.

4

3.   Defendants did not obtain a federally approved lease prior to their excavation work, mining and construction activities, and so were not authorized to begin excavation work, mining or construction activities. *Id.* at ¶ 2; 25 C.F.R. § 214.7.[4]

4.   Defendants excavated OME minerals so that wind turbines, transmission lines and an underground collector system could be installed within the OME. *Osage Wind,* 871 F.3d at 1081-82; Exhibit 10 (Mazurowski Depo. Tr., 35:14-21; 46:3-17).

5.   After the turbine foundations, transmission lines and collector system were installed, Defendants purposefully used and exploited the excavated minerals as: (1) backfill to structurally support and stabilize the turbine foundations, Exhibit 11 (Moskaluk Depo. Tr., 68:23-69:7); Exh. 10 at 97:2-9; (2) backfill to structurally support and stabilize the transmission line poles, *Id.* at 46:18-21; (3) thermal insulation to insulate and protect the cables for the collector system, Exhibit 12 (Pike Depo. Tr., 145:23-146:8, 146:20-147:11; (4) material to construct the access pads, roads and aprons around each wind tower, Exh. 11 at 62:4-8, 63:3-18, 68:23-69:7; and (5) material to provide built up drainage to allow rain to drain away from each wind turbine, *Id.* at 68:23-69:7, 61:10-21.

6.   Defendants are actively using and exploiting the OME excavated minerals to provide structural support and stabilization for the turbine foundations. Exh. 10 at 97:2-9; Exh. 12 at 45:1-6.

7.   Defendants are actively using and exploiting the *in situ* minerals of the OME within a 90-foot radius of each wind turbine to provide structural support for them. *See* Enel Safety

---

[4] Although this section includes a 160-acre maximum for a single lease, 25 C.F.R. § 1.2 provides the Secretary with authority to waive or make exceptions to the regulations in Chapter 25 (including Part 214) where it is in the best interests of the Osage Nation.

Radius Memo, Dkt. 300 at Exh. 7, as filed under seal at Dkt. 299; Exh. 12 at 39:12-16, 48:20-49:1, 100:3-9.

## III.    Summary Judgment Standard

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When applying this standard, "[w]e examine the factual record and draw all reasonable inferences in the light most favorable to the nonmoving party." *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

A material fact is one which may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Defendants cite a number of facts immaterial to the summary judgment requested and refuse to acknowledge the Tenth Circuit's decision as setting out critical, material facts.

## IV.    Arguments and Authorities

### A.    Defendants committed a trespass against the OME by conducting mining *and* other work without first obtaining a federally approved mineral lease.

Although the Tenth Circuit specifically found Defendants were required to procure a lease under 25 C.F.R. § 214.7 to exploit the OME, *Osage Wind, LLC*, 871 F.3d at 1093, Defendants urge the Court to dismiss the United States' continuing trespass claim because Defendants still believe they never trespassed against the OME in the first place. This position shows no regard for the fact that they were never authorized to begin excavation work at all, let alone to act upon the minerals to exploit them for Defendants' benefit.

As noted by the Tenth Circuit, 25 C.F.R. § 214.7 specifically provides, "*[n]o mining or work of any nature will be permitted upon any tract of land until a lease covering such tract shall have been approved by the Secretary of the Interior* and delivered to the lessee." *Osage Wind,* 871 F.3d

at 1082 (emphasis in original), *citing* 25 C.F.R. § 214.7. It is undisputed that Defendants'
extraction, sorting, crushing and use of minerals in their construction efforts constituted
"mining." *Osage Wind*, 871 F.3d at 1081-82; *see also* Additional Undisputed Fact No. 1.
Under § 214.7, Defendants were not permitted to engage in "mining" on the 8,190-acre tract
of land ***until*** a minerals lease covering this area was obtained from the Osage Minerals
Council (OMC) and approved by the Secretary of the Interior. Because Defendants engaged
in "mining" before obtaining an approved minerals lease, Defendants *ipso facto* trespassed
against the OME. Any argument of Defendants against this would be meritless. In lieu of
arguing that their unauthorized mining did not constitute a trespass, Defendants focus their
attention on the placement of their wind turbines.

Defendants would have the Court believe the mere "placement of wind turbine
foundations did not require a lease under 25 C.F.R. Part 214 and was not a trespass of any
kind, let alone a continuing trespass." Dkt. 297 at 16-17. This hubris is breathtaking. To
advance this false narrative, Defendants want the Court to overlook the plain, unambiguous
language of 25 C.F.R. § 214.7, "[n]o mining ***or work of any nature will be permitted*** upon any
tract of land ***until a lease*** covering such tract shall have been approved by the Secretary of the
Interior and delivered to the lessee."

Two distinct events in 25 C.F.R. § 214.7 are prohibited from taking place *until* a
federally approved lease is obtained. The first is "mining," which the Tenth Circuit found
Defendants conducted, thereby needing a lease. The second is "work of any nature."
Defendants' pouring of the concrete turbine foundations, installation of transmission poles,
and laying of underground collector system cables in excavated holes and trenches
constituted "work of any nature," which Defendants were not permitted to do *until* a

federally approved lease was obtained. The fact that Defendants engaged in these activities without permission is dispositive on the issue of Defendants' trespass per 25 C.F.R. § 214.7.

Defendants further argue that "the turbine foundations did not 'physically invade' the mineral estate and their placement was not a trespass," by noting that the Tenth Circuit previously opined, "digging a hole in the ground, displacing rock and soil in the process," or otherwise "merely encountering or disrupting the mineral estate," was not "mining" under 25 C.F.R. § 211.3 and did not require a lease. Dkt. 297 at 17, *citing Osage Wind*, 871 F.3d at 1092 (emphasis added). Defendants' fundamental misunderstanding of the Tenth Circuit's opinion is apparent. Just because the pouring of concrete, installation of transmission lines and laying of underground collector system cables does not appear neatly within the § 211.3 definition of "mining," does not mean Defendants were permitted to carry out these activities within the OME without first obtaining a federally approved lease. Defendants were required to obtain such a lease before taking these actions because the acts of <u>pouring concrete foundations, installing transmission poles and laying underground collector system cables</u> within the OME falls well within the second category of "**work of any nature**" provided under 25 C.F.R. § 214.7. Defendants' failure to obtain the required lease before it conducted this work necessarily means Defendants committed trespass against the OME.

As Defendants point out, a claim of trespass requires that "one person 'actually physically invades the real estate of another without the permission of the person lawfully entitled to possession.'" Dkt. 297 at 17, citing *Davilla v. Enable Midstream Partners, L.P.*, 913 F.3d 959, 966 (10th Cir. 2019) (quoting with alterations *Williamson v. Fowler Toyota, Inc.*, 956 P.2d 858, 862 (Okla. 1998)). Here, Defendants did not have the requisite OMC permission to pour concrete foundations, install transmission poles or lay underground collector system

cables within the OME. Therefore, Defendants actually and physically invaded the OME without permission and so committed trespass against it.

Defendants go on to argue that - notwithstanding the issue of turbine foundations and transmission lines - the physical excavation work they conducted was not "mining" and did not require a lease. Of note, this new contention directly contradicts admissions made in Defendants' Answer no less than fifteen times: "The *Defendants admit* that the Tenth Circuit Court of Appeals determined *certain actions of Osage Wind constituted "mineral development"* for which a *federally approved lease was required*, and no such lease was issued prior to the excavation and construction activities." Dkt. 99 at ¶¶ 24, 25, 33, 39, 42, 43, 46, 47, 48, 50, 53, 54, 61, 62 and 64. Moreover, in open court during a motion hearing, Defendants' counsel admitted: "Now, this case, Your Honor, presents a narrow issue which is the Tenth Circuit concluded that *because Osage Wind sorted rock, crushed rock, and used rock*, that rock that was sorted and crushed in turbine foundations, that that activity and *that activity alone required a lease to be granted* under some specific provisions in the Code of Federal Regulations." Dkt. 125 at 5 (emphasis added). Counsel then admitted "the Tenth Circuit said a specific part of the construction constituted mineral development." *Id*. at 6. Further, counsel admitted: "Your Honor, I just believe, at bottom, the requirement to get a lease was triggered by very specific activities." *Id*. at 29. Clearly, in their earlier, more candid moments, Defendants fully understood a lease was required because the regulations had been "triggered."[5] In fact, Defendant squarely admitted that, "Osage Wind's activities constituted mining in violation of federal law." Dkt. 177 at 11-12.

---

[5] Judge Jayne dismissed Defendants' specious argument that discovery could only take place on crushing and sorting activity, finding that "[c]ontrary to defendants' argument," "the Tenth Circuit opinion [is] not so clear that plaintiff should be entirely foreclosed from any

Aside from Defendants' complete about face, mining is not the only category of activity they were prohibited from doing without first obtaining permission. Defendants were also prohibited from conducting "work of any nature" without permission. 25 C.F.R. § 214.7. Excavation work clearly falls within the category of "work of any nature." Indeed, the Secretary of the Interior adopted a carveout to § 214.7 allowing excavation work to take place without prior permission when the extraction of minerals involves 5,000 cubic yards or less in a given year. 25 C.F.R. § 211.3. "Thus, in practice, owners of the surface estate retain virtually uninhibited use of their lands, unless of course they seek to develop more than 5,000 cubic yards of common-variety minerals." *Osage Wind*, 871 F.3d at 1092. Here, Defendants excavated well over 5,000 cubic yards of minerals from the OME in 2014 during the construction of the Project. Therefore, pursuant to 25 C.F.R. § 214.7, Defendants were required to obtain a federally approved lease before they conducted *excavation work*. Because Defendants conducted excavation work without first obtaining the required lease, they irrefutably committed trespass against the OME.[6]

Defendants suggest "[n]o principled distinction can be made between pouring concrete into an empty hole for a swimming pool or the basement of a building, which the Tenth Circuit recognized did not require a lease, and pouring concrete into an empty hole for a wind turbine foundation." Dkt. 297 at 18. (One could be forgiven for mistaking Defendants' current motion as another request to reconsider the Tenth Circuit decision, as many of the issues raised were squarely addressed by the Circuit.) To repeat, where the work to be

---

discovery" on topics beyond sorting and crushing and at sites beyond the turbine sites. Dkt. 125 at 34.
[6] Had Defendants excavated 5,000 cubic yards or less of minerals in 2014, they would not have needed a federally approved lease before conducting this work and so would not have committed a trespass against the OME.

performed involves the excavation of Osage minerals in excess of 5,000 cubic yards in a given year, permission from the OMC is a prerequisite. 25 C.F.R. § 211.3. It is incredible that someone would seek to build a swimming pool or basement in Osage County that would exceed this 5,000 cubic yard exception, as <u>5,000 cubic yards represents more than one and a half Olympic size swimming pools</u>.[7] The construction of the average swimming pool or basement in rural Osage County bears no comparison to the construction of the Osage Wind Project, which resulted in the excavation of approximately 171,022.8 cubic yards of minerals. Exh. 8 at 3 (4,617,603.5 cubic feet ÷ 27 = 171,022.8 cubic yards). For Defendants to argue they did not need permission to begin such massive excavation work based on an understanding that permission unnecessary to begin excavation work for the construction of an average-size backyard swimming pool is disingenuous and unreasonable. The Court should not be persuaded by Defendants' irrational attempt to veil their deliberate trespass against the OME. The *de minimis* 5,000 cubic yard exception does not extend to Defendants' construction activities, as the Tenth Circuit has already so plainly ruled.

### B.   The Court should not dismiss the United States' continuing trespass claim.

Defendants ask the Court to dismiss the United States' continuing trespass claim. Defendants advance their boldest argument with their weakest support. They argue none of the "excavated minerals were 'acted upon for the purpose of exploiting the minerals themselves' to place the foundations" and that the "placement of the turbine foundations"

---

[7] Per the Fédération Internationale de Natation, an Olympic swimming pool measures 50 by 25 meters, with a depth of at least two meters, for a total of 3,300 cubic yards. https://www.themeasureofthings.com/results.php?comp=volume&unit=cy&amt=599&sort=pr&p=1.

was the sole basis for a judgment of continuing trespass. Dkt. 297 at 18, citing *Osage Wind, LLC*, 871 F.3d at 1092. Defendants' contentions are demonstrably wrong.

*First*, Defendants' assertion that the "placement of the turbine foundations" is the only basis for a judgment of continuing trespass completely ignores the text of the United States' First Amended Complaint, which provides:

COUNT IV
CONTINUING TRESPASS

. . .

53.  Defendants were never authorized to extract minerals from the Osage mineral reserve. **Defendants did not enter into a lease or have a lease approved by the Secretary to extract, excavate *or make use of minerals*.**

54.  **Defendants were prohibited from invading, extracting and excavating minerals pursuant to 25 C.F.R. § 211 or pursuant to 25 C.F.R. § 214.**

55.  **Defendants <u>entered</u> and <u>disrupted</u> the Osage mineral estate and excavated minerals therefrom, in a manner <u>constituting continuing trespass</u>.**

56.  Defendants knew or should have known that they were required to comply with the express provisions of 25 C.F.R. § 211 or 25 C.F.R. § 214.

57.  **By placement of the turbine foundation and other materials, Defendants trespassed on the Osage mineral estate, in violation of law and, in doing so, caused damage to the estate. The insertion and placement of materials or structures in the mineral estate is a continuing trespass and diminishes the estate or diminishes the use and enjoyment of the mineral estate.**

Dkt. 20 at 10-11 (emphasis added). The "placement of the turbine foundations" is not the only basis the United States plead to support the continuing trespass claim. Defendants were not allowed to begin excavation work, or work of any other nature, without first obtaining permission through a federally approved lease. 25 C.F.R. § 214.7. Defendants committed a trespass against the OME when they began excavation work and mined without permission.

Further, Defendants' unsanctioned ongoing and active use and exploitation of the excavated minerals and *in situ* minerals for their continued benefit constitutes a continuing trespass against the OME. To the extent Defendants are trying to argue the United States did not plead enough facts to state a claim for continuing trespass, such an argument should have been raised in a Rule 12 motion. Concealing Defendants' argument within a Rule 56 motion should not grant them a ticket to a ship that has sailed. The Court should not dismiss the United States' well plead continuing trespass claim.

*Second*, the minerals Defendants excavated (without permission) were indeed "acted upon for the purpose of exploiting the minerals themselves" to place the turbine foundations. *Osage Wind, LLC*, 871 F.3d at 1092. Defendants acted upon (*i.e.*, sorted and crushed) the excavated rocks to exploit them as backfill to construct the wind turbines. *Id.* at 1087 ("[Defendants] sorted the extracted rock material into small and large pieces, and then crushed the smaller pieces so they would be the proper size for backfilling the holes. [Defendants] positioned the bigger rock pieces adjacent to the backfilled excavation sites. All of this was done to add structural support to the large wind turbines installed deep in the ground."). To exploit the excavated rocks as backfill, Defendants were first required to crush them. Defendants' Site Coordinator, Bill Moskaluk, testified:

> Q.  Did the crushing of the larger rocks into smaller rocks, did that serve any purpose?
>
> A.  Yes, it was used for backfill material in the foundation itself. And we can't have anything 6 inches or greater in the foundation.
>
> Q.  Okay. That was a requirement that you couldn't have anything larger than 6 inches; is that right, as backfill?
>
> A.  Yes.
>
> Q.  And do you know why that is so?

13

> A.     It's a requirement by Barr Engineering who designed the foundation themselves.

Exh. 11 at 43:9-20. Along with sorting and crushing the excavation material, Defendants also conducted certain tests and analysis before exploiting the excavated material as backfill. Exhibit 13, Technical Specifications at Sec. 7.18 ("Soils used as fill material shall be tested for grain size analysis, moisture content, Atterberg limits on fines content, and proctor tests (standard dry maximum density).").

In addition to acting on (*i.e.*, testing, sorting and crushing) the excavated rock to exploit it as backfill, Defendants acted on all excavated minerals (not just the limestone and shale) to exploit them during the construction of the turbine foundations, transmission lines and collector system. Defendants used the excavated minerals (crushed limestone, shale and clay) as backfill for the excavated holes and then acted on the backfill material by compacting it to provide further structural support. As Mr. Moskaluk testified:

> Q.     What was the purpose for compaction of backfill?
>
> A.     To stabilize your foundation and also the turbine on top of your foundation.

Exh. 11 at 44:17-19. Defendants' Project Manager with IEA Construction, Craig Mazurowski, testified:

> Q.     It is your testimony that, based upon your experience, when clay and limestone is used as backfill, is it being used as a means of achieving the purpose of structural support?
>
> A.     Yes.
>
> . . .
>
> Q.     What would be the need for compaction of backfill in regards to wind tower foundations?
>
> A.     Structural support.
>
> Q.     Okay. And that's important?
>
> A.     Yes.

. . .

> Q.     It's your understanding, sir, that all of the excavated material that was used as backfill was used for the purpose of structural support for the wind towers; is that correct?
>
> A.     Correct.

Exh. 10 at 31:17-21; 84:23-85:3; and 80:9-13. In addition to being exploited as backfill, the

excavated materials were also used to achieve positive drainage away from the turbine

foundations:

> Q.     Okay. But, in fact, this excavated material was used for some -- for a purpose other than backfill; is that correct?
>
> Mr. Ray: Object to form.
>
> A.     In some cases it was spread around the turbine site itself, yes.
>
> Q.     When it was -- so when it was used as backfill, it was also being used for structural support for the wind tower; is that correct?
>
> A.     The backfill material was for the structural support. The other area was for drainage that we built up draining it away from the turbine itself, and a portion of that in that little access road and apron around the terminal -- around the turbine, but it didn't leave that particular site, to my knowledge.

Exh. 11 at 68:17-69:7. Defendants' exploitation of the excavated material to achieve positive

drainage was premeditated in their Technical Specifications for the Project:

> If adequate for backfilling, excess excavation material will be distributed and compacted around the foundation and graded to establish positive drainage away from the foundation . . . Ponding of water near the foundation elements from improper drainage shall not be permitted . . . Final site grading shall ensure no ponding occurs directly over foundation excavation.

Exh. 13 at 8.2.

Defendants' assertion that none of the "excavated minerals were 'acted upon for the

purpose of exploiting the minerals themselves' to place the foundations" (Dkt. 297 at 18) is

audacious in the face of the Technical Specifications they drafted for the Project and the

testimony of their construction team. There is no basis for the Court to dismiss the United

States' continuing trespass claim, as Defendants request. Rather, the Court should find that

Defendants' ongoing use and exploitation of the excavated materials without permission

constitutes a continuing trespass against the OME as a matter of law.

Defendants further argue the United States' continuing trespass claim should be

dismissed because the rock crushing activity is "(1) not ongoing, (2) not abatable, and (3) a

permanent physical change to land." Dkt. 297 at 20. Defendants' argument ignores that the

United States' continued trespass claim is not predicated on the prior crushing of rock, but

rather is centered around Defendants' *ongoing* invasion, disruption, diminishment, use, and

exploitation of the OME (both excavated minerals and *in situ* minerals).

### 1.   Defendants' continuing trespass against the OME is ongoing.

Defendants' exploitation of the minerals they excavated was not a one-off. Defendants

continue to exploit the excavated materials without permission.

> Q.   When you're constructing a wind farm, what purpose does backfill serve?
>
> A.   Structural integrity of the wind turbines.
>
> Q.   And would you agree that for the life of the wind farm, once that backfill's placed in there to support the turbine, the wind farm cannot continue to operate if that backfill were to be removed?
>
> A.   Yes. It would make it unsafe.

Exh. 10 at 97:2-9; *see also* Exh. 13 at 8.2 ("When turbine is fully erected and operational, the

backfill material directly over the foundation footprint should be undisturbed at all times.");

Exh. 12 at 45:1-6 ("So the structural stability of the wind turbine relies on the stability of the

foundation and the foundation and the weight of the materials above the footing of the

foundation. So to keep the stability of the turbine, you need to keep the soils above the

foundation of the wind turbine."). Defendants are also exploiting *in situ* minerals that were not excavated.

In an internal memo, Defendants admit that - not only are they continuing to exploit the excavated materials for structural support - they are also continuing to exploit the *in situ* minerals within a 90-foot radius of each wind turbine. Dkt. 300 at Exh. 7, as filed under seal at Dkt. 299 ("Enel Engineering and Construction's conservative recommendation is to have a 90 ft radius from the turbine center pin as a 'no excavation' zone. Any excavation within this radius may reduce the stabilizing load provided by the terrains weight, reducing the overturning safety factor."). Defendants' Rule 30(b)(6) Witness, Stephen Pike, testified:

> Q. Okay. So by removing the materials or minerals that's in this zone between 26 feet and 90-feet radius outside of the wind tower, by removing those it has the potential to affect the stability of the wind tower; is that correct?
>
> A. I think that is a fair statement, correct.
>
> Q. Okay. So it is the defendants' position that the Osage Minerals Council cannot develop the minerals within this no excavation zone because if they do, it has the potential of harming the stability or affecting the stability of these wind towers; is that correct?
>
> A. That is correct.
>
> Q. And it's the defendants' position that the Osage Minerals Council is not able to mine minerals from within this no excavation zone; is that correct?
>
> A. That is correct.
>
> Q. [] Is it the defendants' position that the minerals within this 90-foot radius are inaccessible to the Osage Minerals Council?
>
> A. That is correct.

Exh. 12 at 48:20-49:19. Defendants' <u>active and ongoing</u> use, exploitation and invasion of the OME within a 90-foot radius of their wind turbines without permission is, by any

account, a continuing trespass against the OME. In an internal e-mail mere months before

this litigation's commencement, Defendants' lead counsel warned of the same liability:

> This memo, *as; [sic] did our prior memo*, references cases at pages 5 and 6
> recognizing limitations on the surface owners' rights, including that the surface
> owner may be obligated to reimburse the mineral estate owner for the *value of
> minerals rendered inaccessible* to the mineral owner."

Exhibit 14, Email of 8/25/2014 from Slade to Willman (emphasis added).

### 2. Defendants' continuing trespass against the OME is abatable.

Contrary to Defendants' suggestion, their continuing trespass is abatable. Removal of

their wind turbines and ancillary structures would abate their continuing trespass. As noted,

Defendants' turbines are actively using, without permission, the *in situ* OME minerals

within a 90-foot radius of each turbine for structural support. By removing the turbines,

Defendants would no longer be using and exploiting the *in situ* OME minerals for structural

support. Defendants' continuing trespass against the *in situ* minerals is clearly abatable.

### 3. Defendants' current use of the *in situ* minerals is not a permanent change to the physical condition of the OME.

Defendants argue the Court should dismiss the United States' continuing trespass claim,

because the prior rock crushing activity constituted a permanent change to the physical

condition of the OME. Dkt. 297 at 22-23. Defendants argue that where there is a permanent

wrongful change to the physical condition of land, the Restatement (Second) of Torts limits

redress to an action for trespass alone. *Id.* citing Restatement (Second) of Torts, § 162.

This Court previously held that it will not apply the Restatement (Second) of Torts to

determine the United States' ejectment and permanent injunction remedies. Dkt. 264 at 25

("The court will not apply the RESTATEMENT factors in this case in favor of the *Davilla*

factors.") (footnote omitted).

Even were the Court to apply the Restatement, Defendants' arguments would still fail. The United States' continuing trespass claim is not predicated upon Defendants' rock crushing activities, but, rather, upon Defendants' ongoing invasion, disruption, diminishment and exploitation of the OME without permission through their unauthorized appropriation and ongoing use of excavated minerals as structural backfill material to support the turbine foundations, as well as, Defendants' unauthorized use and ongoing exploitation of the *in situ* minerals surrounding the wind turbines. While the changes to the physical characteristics of some excavated minerals may have been permanent, Defendants' unauthorized invasion, disruption, diminishment, and exploitation of the OME is not.

### C.   The ownership interest to empty holes and surfaces exposed by Defendants' unauthorized excavation work is irrelevant to the United States' trespass and continuing trespass claims.

Defendants argue the presence of the turbine foundations within the OME without permission is not a trespass or continuing trespass to the OME, because the surface owner owns the "empty holes and surfaces exposed by excavation." Dkt. 297 at 18, citing *Ellis v. Ark. La. Gas Co.*, 450 F. Supp. 412, 421 (E.D. Okla. 1978); *O'Brien Oil, LLC v. Norman*, 233 P.3d 413, 417 (Okla. Civ. App. 2010). However, Defendants' citation to *Ellis* and *O'Brien* is misplaced. The case at hand does not involve the construction of turbine foundations and ancillary structures within existing earthen pits or depleted natural gas reservoirs. Instead, the case involves Defendants' unauthorized creation of earthen pits within the OME and the subsequent unsanctioned development and exploitation of the excavated minerals to support installation of the turbine foundations and ancillary structures. Even if the surface owners own the surface interest of any newly created earthen pit in Osage County, this ownership interest does not grant the surface owners, or their lessees – here Defendants, the

right to use the excavated minerals as structural backfill, nor does it grant the right to use the *in situ* minerals adjacent to the earthen pits for structural support of the structures installed therein. Regardless of who owns the surface, Defendants' unauthorized excavation, mining, and ongoing use and exploitation of the OME constitutes a trespass and continuing trespass.

Moreover, Defendants fail to acknowledge later caselaw, expressly addressing the *Ellis* holding, calling into question the applicability of the general rule in certain circumstances that exist in this case. In *City of Kenai v. Cook Inlet Nat. Gas Storage Alaska, LLC*, the Court specifically examined the *Ellis* holding and agreed with the general principle of the "American rule" regarding natural gas storage rights. 373 P.3d 473, 483 (Alaska 2016). However, the Court cautioned that the American rule was only applicable when "no statutory reservation [is] at issue," and that the *Ellis* Court attempted to discern the "intent of the private parties" where there was no "language of the severing deed dictating a different construction." *Id.* The Court went on to reject any argument that the American rule applied where there was a "reservation of rights" under statute. *Id.* at 484. The Court determined, "the rights at issue are governed by the terms of the statutory reservation." *Id.* The American rule does not apply in the context of the Osage Mineral reservations because the Tenth Circuit has held that the Court "must apply the general rule that statutes passed for the benefit of dependent Indian tribes are to be liberally construed with doubtful expression being resolved in favor of the Indians." *Millsap v. Andrus*, 717 F.2d 1326, 1329 (10th Cir. 1983). In short, Defendants' arguments concerning natural caverns and the American Rule does not apply, where Congress has statutorily reserved a mineral estate.

**D.** **Defendants' unauthorized, ongoing use and exploitation of the *in situ* minerals within the OME can only be remedied through injunctive relief, if a Part 214.7 lease is not executed**.

Defendants argue the United States' demand for removal of the wind turbines should be dismissed, because the harm caused by Defendants' ongoing use and exploitation of the *in situ* minerals around the turbines is compensable by monetary damages. However, this argument assumes the Court has the authority to award monetary damages in lieu of a lease. Defendants are mistaken. Without a valid Part 214.7 lease, the only remedy the Court has in its quiver - with respect to Defendants' continuing trespass against the *in situ* minerals in question - is injunctive relief.

It is generally accepted that when the U.S. Constitution reserves a power to Congress, the other branches of government are prohibited from exercising such power absent an express Congressional delegation of authority. In the context of federal Indian law, it has long been recognized that the Constitution reserves exclusive authority to Congress. *See Oneida County, N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 234 (1985) ("With the adoption of the Constitution, Indian relations became the exclusive province of federal law."). "Plenary authority over tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government." *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566 (1903). This "plenary authority" includes "full power to legislate concerning [] tribal property." *Winton v. Amos*, 255 U.S. 373, 391 (1921).

Acting within its plenary power, Congress set aside and reserved the *in situ* minerals in the area now known as Osage County, Oklahoma to the Osage Nation.[8] *See* Act of June 28, 1906, § 3, 34 Stat. 539. It is well-understood that once these minerals were set aside and reserved to the Osage Nation, they were reserved for the Osage Nation until such time Congress explicitly indicates otherwise. *Solem v. Bartlett*, 465 U.S. 463, 470 (1984) ("[O]nly Congress can divest a reservation of its land and diminish its boundaries."). The Tenth Circuit long ago held that "The Act [of 1906] also evidences **a congressional intent to maintain control** over the more valuable resources to prevent their improvident depletion by individual tribe members." *Millsap*, 717 F.2d at 1328 (emphasis added). Congress acted specifically to "insur[e] to **tribal management** the valuable economic base in the mineral resources[.]" *Id.* (emphasis added).

Congress did not grant the Court authority to award monetary damages as compensation for continuing trespass. Doing so may in essence grant Defendants title to the *in situ* minerals in question. The Court cannot re-title property lawfully reserved to the Osage Nation by Congress, as this would infringe upon Congress' plenary power to legislate matters concerning Indian property. Neither can the Court remove the *in situ* minerals in question from the Osage Nation's mineral reservation, as the Court has no authority to diminish, or otherwise disestablish, the reserved characteristics of the *in situ* minerals.

Even if title to the *in situ* minerals is not changed as part of a Court ordered remuneration, the conveyance of an exclusive right to use and possess in the future, without a lease, would be inherent with respect to monetary compensation for Defendants'

---

[8] Previously known as the Osage Tribe of Indians. *See* Act of June 28, 1906, § 3, 34 Stat. 539; *see also*, Osage Nation Constitution, Art. I.

continuing trespass. The Court cannot grant Defendants the right to use or possess the Osage Nation's *in situ* minerals, because the Court cannot alienate the Osage Nation's rights to the *in situ* minerals. Only Congress is allowed to do this. Defendants' call for the Court to undo that which has been lawfully done by Congress invites the obliteration of our Country's founding principles. It further invites the reduction of the Osage Nation's rights to its mineral reservation, which would be a punishment against the tribe, not a remedy for it.

Congress contemplated its own intent to maintain "control" and allow for "tribal management" of the valuable mineral estate. *Millsap*, 717 F.2d at 1328. Therefore, the harm caused by Defendants' continuing trespass against the *in situ* minerals is irreparable absent removal of the wind turbines and ancillary structures – unless a Part 214.7 lease is executed by the parties (satisfying Congressional intent and tribal sovereignty) and subsequently entered by the Court, resolving the claims at issue. *See* Dkt. 300 at 32. Regardless of any alleged injury to Defendants or public interest, the Court's lack of authority to allow Defendants to continue to use the Osage Nation's *in situ* minerals without a lease necessitates that Defendants be enjoined.

## V. Conclusion

Defendants committed a trespass against the OME when they mined without obtaining a federally approved lease. Defendants further committed a trespass against the OME when they engaged in excavation work and the pouring of concrete foundations, installation of transmission line poles and laying of underground collector system cables within the OME without obtaining a federally approved lease. Moreover, Defendants committed a trespass against the *in situ* minerals located within a 90-foot radius of Defendants' wind turbines,

when Defendants used and exploited these minerals to provide structural support for the turbines without permission.

Defendants' ongoing use of the excavated minerals - as: 1) backfill to support the turbine foundations and transmission line poles; 2) thermal insulation for the collector system cables; 3) construction material for access pads, roads and aprons around each wind turbine; and; 4) build up material for positive drainage - without permission constitutes a continuing trespass. Defendants' ongoing use of the *in situ* minerals - as structural support for the wind turbines - without permission constitutes a continuing trespass as well.

Without a valid Part 214.7 lease, Defendants' continuing trespass against the *in situ* minerals must be enjoined, because the Court has no authority to give Defendants the right to prospectively use and possess the *in situ* minerals set aside and reserved to the Osage Nation by Congress. Removal of Defendants' wind turbines and ancillary structures - not the diminishment of the Osage Nation's mineral reservation - is the proper remedy for Defendants' willful, continued wrongdoing in the absence of a lease.

For the foregoing reasons, the United States respectfully requests the Court deny Defendants' Motion for Partial Summary Judgment (Dkt. 297) in its entirety and grant the United States such other and further relief the Court may deem just and proper.

Respectfully submitted,

United States of America

Clinton J. Johnson
Acting United States Attorney

s/Cathryn D. McClanahan
Cathryn D. McClanahan, OBA No. 14853
Nolan M. Fields IV, OBA No. 31550
Assistant United States Attorneys
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119
T: 918-382-2700
cathy.mcclanahan@usdoj.gov
nolan.fields@usdoj.gov

Stuart P. Ashworth, OBA #31468
Special Assistant United States Attorney
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor's Office
7906 East 33rd Street, Suite 100
Tulsa, Oklahoma 74145
T: 918-669-7905
stuart.ashworth@sol.doi.gov

Of Counsel:
Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor's Office
7906 East 33rd Street
Tulsa, Oklahoma 74145
T: 918-669-7902
charles.babst@sol.doi.gov