# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, and )
THE OSAGE MINERALS COUNCIL, )
                                )
           Plaintiffs, )
                                )
vs. )    Case No. 14-CV-704-GKF-JFJ
                                )
OSAGE WIND, LLC; )
ENEL KANSAS, LLC; and )
ENEL GREEN POWER NORTH )
AMERICA, INC., )
                                )
          Defendants. )

---

## DEFENDANTS' RESPONSE TO PLAINTIFF THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT [Dkt. # 300]

---

Ryan A. Ray, OBA #22281
NORMAN WOHLGEMUTH, LLP
3200 Mid-Continent Tower
401 South Boston Avenue
Tulsa, OK 74103
918-583-7571
918-584-7846 (facsimile)

Thomas J. McCormack, *pro hac vice*
Robert Kirby, *pro hac vice*
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
212-318-3000
212-318-3400 (facsimile)

Lynn H. Slade, *pro hac vice*
Sarah M. Stevenson, *pro hac vice*
Dominic A. Martinez, *pro hac vice*
MODRALL, SPERLING, ROEHL,
HARRIS & SISK, P.A.
Post Office Box 2168
Albuquerque, NM 87103-2168
505-848-1800
505-848-9710 (facsimile)

*Of Counsel:*
Robin D. Ball (Los Angeles Office), *pro hac vice*
Robert D. Comer (Denver Office), *pro hac vice*
NORTON ROSE FULBRIGHT US LLP

**ATTORNEYS FOR DEFENDANTS OSAGE WIND, LLC, ENEL KANSAS, LLC AND ENEL GREEN POWER NORTH AMERICA, INC.**

**Dated: November 2, 2021**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................ 1

RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS .......... 2

DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS
THAT PRECLUDE SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF ............................ 4

ARGUMENT AND AUTHORITIES ..................................................................................... 6

I.      Defendants—Not Plaintiff—Are Entitled to Summary Judgment on
Plaintiff's "Continuing Trespass" Claim. ........................................................... 6

      A.     The "Presence" of the Project Is Not and Never Has Been a Trespass .................. 7

      B.     "Support" the Surface Receives from the Mineral Estate Does
Not Render the Project a Trespass. ...................................................................... 9

      C.     The Alleged "Buffer Zone" Around the Wind Turbines Is Not a Trespass. ......... 11

II.     Defendants—Not Plaintiff—Are Entitled to Summary Judgment on Plaintiff's
Demand for Removal of the Project. ................................................................... 13

      A.     Plaintiff Cannot Satisfy the Requirements for a Permanent Injunction. ............... 13

            1.     No Irreparable Harm Will be Suffered Absent an Injunction. .................. 14

            2.     The One-Sided Balance of Harms Precludes an Injunction ..................... 15

            3.     Compelling Public Interests Preclude an Injunction. ............................... 17

      B.     Plaintiff Cannot Evade the Requirements for a Permanent Injunction
with its Purported "Legal Remedy of Ejectment." ................................................ 20

III.    The Calculation of Damages Must Await a Trial ................................................. 21

      A.     Plaintiff's Demand for "Lost Rental Value for the Entire Mineral Estate"
Has No Basis in Law or Fact and, at Most, Presents Factual Disputes. ............... 21

      B.     The Measure of Damages that Should Be Applied at Trial is the Royalty
Value to the OMC of the Volume of Rock Crushed by Defendants. .................... 24

      C.     At Most, Plaintiff's Unfounded Attacks on Defendants' Good Faith
Present Factual Disputes Not Suitable for Summary Judgment ........................... 24

CONCLUSION AND REQUESTED RELIEF ....................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abilene Retail # 30, Inc. v. Bd. of Comm'rs,*
492 F.3d 1164 (10th Cir. 2007).................................................................23

*Angier v. Mathews Exploration Corp.*, 905 P.2d 826 (Okla. Ct. App. 1995) ...............................9

*Beal v. Western Farmers Elec. Coop.*, 228 P.3d 538 (Okla. Civ. App. 2009)............................12

*Beck v. Northern Natural Gas Company*, 170 F.3d 1018 (10th Cir. 1999) ..................................21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)........................................23

*Davilla v. Enable Midstream Partners L.P.,*
913 F.3d 959 (10th Cir. 2019) ................................................8, 10, 13, 14, 17, 20

*Dilworth v. Fortier*, 405 P.2d 38 (Okla. 1964)...........................................................24

*Edwards v. Lachman*, 534 P.2d 670 (Okla. 1974) .......................................................24

*Ellis v. Ark. La. Gas Co.*, 450 F. Supp. 412 (E.D. Okla. 1978)...................................8

*Fairlawn Cemetery Ass'n v. First Presbyterian Church,*
496 P.2d 1185 (Okla. 1972).........................................................8, 14, 20

*First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136 (10th Cir. 2017)......................................19

*Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312 (8th Cir. 2009) ................................18

*Goodly v. Check-6 Inc.*, 2018 WL 4092015 (N.D. Okla. Aug. 1, 2018) .......................................2

*Greyhound Lines, Inc. v. Peter Pan Bus Lines, Inc.,*
845 F. Supp. 295 (E.D. Pa. 1994) .......................................................17

*Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.,*
573 F.3d 947 (10th Cir. 2009) ...........................................................21

*Kobach v. Fish*, 840 F.3d 710 (10th Cir. 2016).........................................................19

*Lapham v. Watts Regulator Co.*, 2016 WL 248471 (D. Kan. Jan. 21, 2016)..............................23

*Lawrence v. City of Owasso*, 2014 WL 693443 (N.D. Okla. Feb. 21, 2014)................................2

*Malloy v. Monahan*, 73 F.3d 1012 (10th Cir. 1996) ..................................................16

*Marsh v. Brooks*, 49 U.S. 223 (1850) ...................................................................20

Page(s)

*Millsap v. Andrus*, 717 F.2d 1326 (10th Cir. 1983) ....................................................11

*Muscogee (Creek) Nation v. Henry*,
2010 WL 1078438 (E.D. Okla. Mar. 18, 2010) ....................................................18

*O'Brien Oil, LLC v. Norman*, 233 P.3d 413 (Okla. Civ. App. 2010) ..........................8

*Osage Nation ex rel. Osage Mins. Council v. Wind Cap. Grp., LLC*,
2011 WL 6371384 (N.D. Okla. Dec. 20, 2011) ..................................... 12, 13, 16, 18

*Schrier v. Univ. of Colo.*, 427 F.3d 1253 (10th Cir. 2005) ..........................................14

*Seneca-Cayuga Tribe of Oklahoma v. State of Oklahoma ex rel. Thompson*,
874 F.2d 709 (10th Cir. 1989) ..............................................................15

*Sierra Club, Inc. v. Bostick*, 539 Fed. App'x 885 (10th Cir. 2013) ............................16

*Sunray Oil Co. v. Cortez Oil Co.*, 112 P.2d 792 (Okla. 1941) ....................................8

*United States v. Osage Wind, LLC*, 871 F.3d 1078 (10th Cir. 2017) ..................*passim*

*W. Watersheds Project v. Salazar*, 692 F.3d 921 (9th Cir. 2012) ................................18

*Walker v. Apex Wind Constr., LLC*,
2015 WL 3686729 (W.D. Okla. June 12, 2015) ....................................................12

*Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256 (10th Cir. 2007) ..................................24

*Williamson v. Fowler Toyota, Inc.*, 956 P.2d 858 (Okla. 1998) ..................................11

**Rules, Statutes, Regulations, and Other Authorities**

60 Okla. Stat. Ann. § 66 ..............................................................................................11

Fed. R. Civ. P. 56(c)(1)(a) ............................................................................................2

Federal Rule of Evidence 702 ......................................................................................23

LCvR56 ....................................................................................................................2, 24

25 C.F.R. Part 214 ..................................................................................... 9, 11, 19, 22

25 C.F.R. Part 226 ........................................................................................................19

25 C.F.R. § 211.3 ......................................................................................................7, 8

25 C.F.R. § 214.4 ..........................................................................................................11

                                                                        **Page(s)**

25 C.F.R. § 214.7 ...........................................................................................2, 3

25 C.F.R. § 214.14 ........................................................................................ 11, 12

25 C.F.R. § 226.19 ............................................................................................ 12

25 C.F.R. § 226.43(a) ........................................................................................ 19

Restatement (Second) of Torts §§ 819, 821 ................................................10-11

Defendants Osage Wind, LLC ("Osage Wind"), Enel Kansas, LLC ("Enel KS"), and Enel Green Power North America, Inc. ("EGPNA" and, together, "Defendants") respond in opposition to plaintiff the United States' ("Plaintiff") summary judgment motion (Dkt. # 300) (the "Motion" or "Pl.'s Br.").

## INTRODUCTION

Plaintiff moves for summary judgment on continuing trespass, trespass, and conversion, and requests this Court, without trial, order removal of Osage Wind's 84-turbine, 150 MW wind generation facility (the "Project") and also award nearly $26 million in damages. Defendants, not Plaintiff, are entitled to summary judgment on Plaintiff's demand for removal of the Project and continuing trespass claim. The Tenth Circuit's ruling settled that the presence of the Project requires no "mining" lease and is not a trespass of any kind. Nor has Plaintiff provided any evidence of any harm that would be prevented by the extraordinary order they seek. And Plaintiff has no answer for the nearly $260 million in harm that would befall Osage Wind, or for the school superintendents, county treasurer, and local landowners who now attest to the public harms that forced removal of the Project would wreak. Plaintiff's damages demand for "lost rental value for the entire mineral estate" calculated over a 45-year period has no basis in law or fact, and relies on misreading the Tenth Circuit's opinion and testimony of a purported "expert" whose speculative opinions should be excluded. At minimum, this damages demand presents factual disputes.

Insofar as the Tenth Circuit held crushing rock for backfill required a mining lease, Osage Wind and EGPNA do not oppose summary judgment as to liability (only) on Plaintiff's trespass and conversion claims. As to Enel KS, a separate holding company that neither owned nor constructed the Project, Plaintiff proffers no evidence of liability and the Motion should be denied

in its entirety.[1]  This case should proceed to trial for a determination of damages equal to the royalty value of the rock crushed for backfill, which, according to the parties' respective mining engineering experts, totals no more than $247,979.42 nor less than $68,993.

### RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS[2]

1.      Not disputed.

2.      Not disputed that Osage Wind entered into leases with surface estate owners, and did not enter into a mining lease under 25 C.F.R. § 214.7.

3.      Objection; violates Fed. R. Civ. P. 56(c)(1)(a) as the evidence cited does not support the facts asserted.  Not material because "digging a hole in the ground, displacing rock and soil in the process," and then "building" in the hole, did not require a lease under 25 C.F.R. § 214.7.  *See United States v. Osage Wind, LLC*, 871 F.3d 1078, 1092 (10th Cir. 2017).  Further disputed to the extent Plaintiff's use of the term "Defendants" falsely implies that Enel KS engaged in or was otherwise responsible for any "mining."

4.      Disputed.  Approximately 25% of the material excavated for each foundation was not used as backfill, and was instead left on the surface.  Ex. 1 (Moskaluk Tr.) at 39:10-40:17; Dkt.

---

[1] Defendants incorporate by reference Part V of their response to the OMC's summary judgment motion ("Opp. to OMC"), to further explain why the Motion should be denied as to Enel KS.

[2] The majority of the purported facts and exhibits referenced in the Motion do not appear in Plaintiff's Statement of Undisputed Facts ("SUF" and, Defendants' responses, "RSUF"), and are not "set forth in concise, numbered paragraphs" therein as required by LCvR56(b).  For that reason, Defendants request the Court strike Pl.'s Ex. 7 through 26, and all factual assertions relying thereon. *See Goodly v. Check-6 Inc.*, 2018 WL 4092015, at *1 (N.D. Okla. Aug. 1, 2018) (Frizzell, J.).  Defendants further request the Court strike Pl.'s Ex. 8, the Expert Report of Steven Hazel, as "[u]nsworn expert reports are not competent to be considered on a motion for summary judgment." *Lawrence v. City of Owasso*, 2014 WL 693443, at *5 (N.D. Okla. Feb. 21, 2014) (Frizzell, J.).

# 17-1 at ¶ 15(a)(i); Ex. 2 (Oct. 5 Price Tr.) at 96:12-16.[3]  Mr. Mazurowski, Project Manager for construction contractor IEA Renewable Energy, Inc. ("IEA"), testified the material was not used for purposes other than backfill or foundational support.  Ex. 3 (Mazurowski Tr.) at 35:2-12.  He further testified that the excavated material was not used for road construction purposes, for crane pads, or for drainage.  *Id.* at 45:12-19, 80:15-81:4 (APAC invoice was for road construction), 138:10-15; Ex. 4 (APAC P/O).  Further disputed to the extent Plaintiff implies that "excavation" without crushing rock for backfill constitutes "mining," which it does not.  Further disputed that the evidence cited concerns Enel KS.

5.      Disputed.  Mr. Mazurowski of IEA, whose testimony is the sole support SUF ¶ 5 cites, testified he assumed but did not recall that poles had been erected, did not recall excavated material being used for backfill, and instead expects "they would have likely used the quarry" located nearby for fill material.  Ex. 3 (Mazurowski Tr.) at 46:7-47:24.  Further disputed to the extent Plaintiff implies that "excavation" without crushing rock for backfill constitutes "mining."

6.      Disputed to the extent Plaintiff implies rock was crushed for the collector system; no such crushing occurred and Plaintiff cites no evidence showing otherwise.  Ex. 5 (July 21 Price Tr.) at 235:24-236:15; Ex. 6 (Sept. 30 Pike Tr.) at 125:17-127:14; 130:7-23, 132:7-133:10. Further disputed to the extent Plaintiff implies excavation of the collector system and replacement of excavated materials into holes from which it was removed without crushing rock was mining.

7.      Defendants do not dispute that minerals purchased offsite could have been used in lieu of crushing excavated rock.  The remainder of SUF ¶ 7 is disputed to the extent it suggests Defendants believed they had any obligation to obtain a mining lease under 25 C.F.R. § 214.7 for

---

[3] Unless otherwise indicated, all "Ex." cites refer to exhibits filed herewith.  For convenience, Defendants use the same exhibit numbering here as they do in their Opp. to OMC.  Certain exhibits have been authenticated in the accompanying Beauregard Declaration (Ex. 53).

any of their activities; excavated materials were used for backfill in the good faith belief, and based on the advice of counsel, that no such lease was required. Ex. 5 (July 21 Price Tr.) at 154:2-12; *id.* at 46:24-47:5, 136:12-137:11, 137:12-138:8, 190:17-191:22; Ex. 7 (Champagne Tr.) at 181:8-15.[4] The citation to Pl.'s Ex. 4 is inapposite because it refers to importing "material from outside the County," when such material was available from nearby quarries. Ex. 3 (Mazurowski Tr.) at 82:10-83:1; Ex. 4. The final sentence of SUF ¶ 7 is further disputed. The evidence cited is an email containing an estimate of cost*, not* savings (as Plaintiff incorrectly claims). *See* Pl.'s Ex. 6 (estimating "what it would have cost to backfill with imports" at a total of $23,148/turbine foundation). The email then reports the cost of "[e]ach site crushed" at $25,863, indicating that crushing was more than $1,500/foundation more expensive than importing backfill. *Id.* Further, the estimate was provided by an IEA employee, Mr. Mazurowski, not by any of the Defendants as SUF ¶ 7 asserts. *Id.* Further disputed that the evidence cited concerns Enel KS.

8.     Not disputed that SUF ¶ 8 quotes part of one sentence from the Tenth Circuit's decision containing a legal conclusion. Disputed that it constitutes a full statement of that decision.

## DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF

1.     No excavated sand, soil, or rock was sold. Ex. 1 (Moskaluk Tr.) at 70:14-19.

---

[4] That Defendants acted in good faith and on the advice of counsel is further demonstrated by the following evidence (further discussed in Opp. to OMC, Part II.B): Ex. 8; Ex. 9; Ex. 10 (Lucero Dec.) at Ex. 1 (Nov. 15, 2013 OMC minutes); Ex. 11 (Nov. 19, 2013 email); Ex. 12 (Oct. 22, 2014 email); Ex. 13 (Oct. 9, 2014 email); Ex. 14 (Oct. 10, 2014 letter); Ex. 15 (Oct. 11, 2014 emails); Ex. 16 (Oct. 12, 2014 email); Ex. 17 (re: Oct. 15, 2014 call); Ex. 18 (Oct. 17, 2014 email); Ex. 19 (Oct. 17, 2014 emails); Ex. 20 (Oct 1, 2014 email); Ex. 2 (Oct. 5 Price Tr.) at 25:22-25, 44:2-45:7, 46:20-48:18; Ex. 5 (July 21 Price Tr.) at 33:4-34:1, 46:24-48:2, 127:2-5, 136:12-137:4, 137:12-138:8, 154:7-12, 190:17-191:22; Ex. 7 (Champagne Tr.) at 21:2-14, 129:13-130:24, 134:17-135:7, 164:2-165:5, 166:6-167:5, 204:23-205:14; Ex. 21 (Hale Tr.) at 23:9-24:9; Ex. 22 (Freeman Tr.) at 166:14-22; 168:6-169:4; Ex. 23 (Phillips Tr.) at 94:9-99:10.

2.      No excavated sand, soil, or rock was moved to, or used in any way at, any location other than the site at which it had been excavated.  Dkt. # 29 at 3; Ex. 1 (Moskaluk Tr.) at 67:21-69:7, 138:17-24, 141:18-22, 142:17-143:9, 145:16-22, 148:13-22.

3.      All crushing of excavated rock was completed in 2014.  Ex. 24 (Herfurth Dec.) at ¶¶ 6-7 & Ex. B at 1-2.

4.      The Project entered commercial operation in 2015.  Ex. 25 (Price Dec.) ¶ 3; Ex. 5 (July 21 Price Tr.) at 27:7-28:11.  The Project generates 150.4 MW of energy, sufficient to meet the energy consumption needs of over 50,000 households.  Ex. 26 (Pike Dec.) ¶ 7.

5.      Robert C. Freas, an expert witness for the United States, testified that the total value to the OMC of the minerals "mined" was $247,979.42.  Ex. 27 (Freas Tr.) at 71:18-21.

6.      John Pfahl, an expert witness for Defendants, testified that the total value to the OMC of the minerals "mined" was $68,993.  Ex. 28 (Pfahl Tr.) at 27:11-16.

7.      The OMC has not and will not suffer any lost revenue due to the presence of the Project rendering some minerals temporarily inaccessible.  Ex. 29 (Pfahl Dec.) at Ex. 1 ¶¶ 93-95.

8.      There is no 500-foot safety setback from the wind turbines.  Rather, the surface leases for the Project provide that the lessors may erect buildings or other improvements on their land within 500 feet of the turbines, unless those improvements would interfere with wind flow to a given turbine.  Ex. 26 (Pike Dec.) ¶¶ 4-5; Ex. 26-1 at Att. F § 15.1; Ex. 29 (Pfahl Dec.) ¶¶ 4-9.

9.      If the Court were to order the Project removed, the net adverse economic impact on Osage Wind would be $258,729,611.70.  That total is comprised of the loss of projected free cash flow (after expenses), liquidated damages and other payments that would be due under Osage Wind's tax equity agreement, power purchase agreement, interconnection agreement, and surface

leases, and the costs of dismantling and removing the Project (net of salvage value). Ex. 26 (Pike Dec.) at ¶ 2 & Att. A-C; Ex. 26-1 at Att. D-G; Ex. 6 (Sept. 30 Pike Tr.) at 151:14-169:9.

10. The Shidler Public Schools and the Woodland Public Schools receive annual payments attributable to taxes paid by Osage Wind. In 2021, the Shidler Public Schools and the Woodland Public Schools received approximately $1,683,000 and $500,000, respectively. Osage Wind bears 60% of the tax burden for the Shidler Public Schools. Ex. 30 (Rogers Dec.) ¶¶ 3, 5; Ex. 31 (Wilson Dec.) ¶ 3; Ex. 32 (Hulse Dec.) ¶ 6; Ex. 34 (Waller Tr.) at 129:22-132:8.

11. Ten people are employed full-time at the Project site as technicians and managers, who would lose their jobs if the Project were removed. Ex. 26 (Pike Dec.) at ¶ 3.

12. Pursuant to six leases, the surface estate owners of 8,400 acres in Osage County receive periodic payments from Osage Wind for an initial term of 25 years (with a 20-year Osage Wind renewal option), subject to termination if the Project were ordered removed. Ex. 33 (Smith Dec.) at ¶¶ 2-4, 6; Ex. 26 (Pike Dec.) at ¶ 2(e).

## ARGUMENT AND AUTHORITIES

## I. Defendants—Not Plaintiff—Are Entitled to Summary Judgment on Plaintiff's "Continuing Trespass" Claim.

The conduct the Tenth Circuit ruled required a mining lease was the crushing of rock excavated from each turbine site, because "it acted upon the minerals by altering their natural size and shape in order to take advantage of them for a structural purpose." *See Osage Wind*, 871 F.3d at 1091-92. As Defendants explain in their motion for partial summary judgment (Dkt. # 297 at 15-18), and Plaintiff effectively concedes, that conduct ended nearly seven years ago and is not a continuing trespass. Nonetheless, Plaintiff now asserts three theories of continuing trespass. Pl.'s Br. 6-8. Only the first of those theories is (in part) pleaded in the Complaint and properly before the Court; all three fail on their merits as a matter of law.

**A.      The "Presence" of the Project Is Not and Never Has Been a Trespass.**

Plaintiff's theory that the "presence of wind towers . . . without the permission of the OMC constitutes a continuing trespass" fails because the "presence" of the Project never required a mining lease. Pl.'s Br. 6. To the contrary, the Tenth Circuit held that Osage Wind, as the surface owners' lessee, possessed "expansive authority granted to [them under the Osage Act] to use and develop their land," including "digging a hole in the ground, displacing rock and soil in the process," and "building" in the empty hole. *See Osage Wind*, 871 F.3d at 1092.

Plaintiff's attempt to read a single introductory sentence in the second paragraph of the Tenth Circuit's opinion as condemning the entire Project as unauthorized "mining" cannot be reconciled with the body of the Tenth Circuit's opinion. Pl.'s Br. 3 ("Osage Wind's extraction, sorting, crushing, and use of minerals as part of its excavation work constituted 'mineral development,' thereby requiring a federally approved lease") (quoting *Osage Wind*, 871 F.3d at 1081). The Tenth Circuit proceeded to carefully explain what "part of [Defendants'] excavation work constituted 'mineral development,'" *Osage Wind, LLC*, 871 F.3d at 1081, and what did not. In particular, the Tenth Circuit held "mineral development" occurs when minerals are "acted upon for the purpose of exploiting the minerals themselves." *Id*. at 1091-92. Crushing rock for backfill met this definition because "it acted upon the minerals by altering their natural size and shape in order to take advantage of them for a structural purpose." *Id*. Excavating "a hole in the ground, displacing rock and soil in the process," and then "building" in the empty hole, did not. *Id*. at 1092.

Indeed, the Tenth Circuit repeatedly rejected Plaintiff's theory that Osage Wind was required to obtain a mining lease to displace rock and soil in connection with turbine foundation construction. *See id*. ("[M]erely encountering or disrupting the mineral estate does not trigger the definition of 'mining' under 25 C.F.R. § 211.3."); *see also id*. at 1089 (rejecting as "plainly wrong"

contention that "any extraction of such minerals exceeding 5,000 cubic yards constitutes mining"), 1091 ("We agree with Osage Wind, however, that merely encountering or incidentally disrupting mineral materials would not trigger § 211.3's definition.").  That some of the rock removed was then crushed for backfill adjacent to the turbine foundations does not transform the presence of those foundations into unauthorized "mining" or continuing trespass.

The Tenth Circuit's holding is consistent with the common law rule that the surface owner, not the mineral estate, owns and has the right to use empty holes and surfaces exposed by excavation.  *See Ellis v. Ark. La. Gas Co.*, 450 F. Supp. 412, 421 (E.D. Okla. 1978) (holding that surface owner owns "depleted gas storage reservoir"); *Sunray Oil Co. v. Cortez Oil Co.*, 112 P.2d 792, 793 (Okla. 1941) (surface owner entitled to use "for the disposal of salt water" of dry well drilled for oil exploration); *O'Brien Oil, LLC v. Norman*, 233 P.3d 413, 417 (Okla. Civ. App. 2010) (holding that surface owners "own the plugged and abandoned wellbore").  The Project's surface lessors owned each hole left behind by excavation, and it was no trespass for Osage Wind, their lessee, to pour a foundation onto the exposed surface of such holes.

The decisions on which Plaintiff relies for the proposition that "[u]nder Oklahoma law an invasion of real property by a permanent structure constitutes a continuing trespass" (Pl.'s Br. 6), are not to the contrary, and each is distinguishable because there it was the ***surface rights holder*** who objected to a continued unauthorized presence on its real property.  *See Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 962 (10th Cir. 2019) ("individual Native American Allottees—who hold equitable title in the allotted land" brought trespass claim against defendant who "failed to remove" pipeline after "[a] twenty-year easement . . . expired"); *Fairlawn Cemetery Ass'n v. First Presbyterian Church*, 496 P.2d 1185, 1187 (Okla. 1972) (defendant church was "encroaching upon the land of the adjoining Cemetery" by "continuing the dirt fill on Cemetery's

property"); *Angier v. Mathews Exploration Corp.*, 905 P.2d 826, 828 (Okla. Ct. App. 1995) ("surface owner" brought trespass claim for "locating the entry way for the access road at the [incorrect] southeast corner of [plaintiff's] lands"). By contrast, the OMC had no right to prevent the surface owners, or Osage Wind their lessee, from excavating and then building a foundation in the resulting surface holes. *See Osage Wind*, 871 F.3d at 1091-92.

Plaintiff's assertion that "the presence of the . . . transmission lines and collector system" and other "ancillary infrastructure" also constitute "continuing trespass" fares no better. Pl.'s Br. 6. As with the wind turbine foundations, excavation of a surface hole and the placement of the Project's transmission lines, collector system, or any other "ancillary infrastructure" into that hole does not require a mining lease under 25 C.F.R. Part 214 or constitute a "trespass" on the mineral estate. *See Osage Wind*, 871 F.3d at 1091-92. And Plaintiff presents no evidence that excavated rock was crushed for backfill in connection with any such "ancillary infrastructure." It was not. RSUF ¶¶ 5-6. In any event, Plaintiff may not pursue a continuing trespass (or any other) claim with respect to "ancillary infrastructure," because no such claim was pleaded in the Complaint. The only "structures or materials" alleged in the Complaint to constitute a "continuing trespass" were the turbine foundations. Dkt. # 20 ("FAC" or "Complaint") at ¶¶ 2, 18, 57. If Plaintiff possessed any viable claims relating to transmission lines, the collector system, or other "ancillary infrastructure"—it does not—they should have been pleaded in the Complaint.

B.    **"Support" the Surface Receives from the Mineral Estate Does Not Render the Project a Trespass.**

Plaintiff's theory of "continuing invasion" of the mineral estate because "each wind tower uses the underlying minerals . . . for structural support" also fails. Pl.'s Br. at 8-9. No such theory was pleaded in the Complaint, which instead alleges that the "placement of materials or structures in the mineral estate is a continuing trespass." FAC ¶ 57. Even had this theory been properly

preserved in the Complaint, it would fail as a matter of law because it is inconsistent with the Tenth Circuit's ruling in this case and other pertinent law, and would produce absurd results.

The Tenth Circuit held it was when Osage Wind crushed rock for backfill that it "acted upon the minerals by altering their natural size and shape in order to take advantage of them for a structural purpose." *See Osage Wind*, 871 F.3d at 1091-92. Nowhere did the Tenth Circuit hold, as Plaintiff now suggests, that because this crushing of rock served a "structural purpose," the passive support the underlying mineral estate provides to the wind turbines requires a mining lease. *See id.* To the contrary, the Tenth Circuit repeatedly stressed that no lease is required when surface structures or activities "encounter," "implicate," "disrupt," or "displace" minerals. *See id.* at 1091-92. By the laws of physics, the wind turbines and their foundations—like every other surface structure—receive "support" from rock and soil beneath the surface. That is, at most, passive "encountering" of the mineral estate that neither requires a mining lease nor constitutes trespass. *See id.*; *see also Davilla*, 913 F.3d at 966 (trespass requires that "one person actually physically invades the real estate of another"). Were the rule otherwise, then every home, swimming pool, housing subdivision, apartment building, ranch, office building, shopping center, and courthouse in Osage County would, at this moment, be guilty of continuing trespass on the Osage mineral estate. Not so. The Tenth Circuit emphasized that "building a basement or swimming pool" does not require a mining lease, and recognized surface owners' "expansive authority . . . to use and develop their land." *See Osage Wind*, 871 F.3d at 1092.

Plaintiff's theory that a surface owner trespasses when it relies on the mineral estate for support is also inconsistent with common law, statutes, and regulations providing that the surface owner has a ***right*** to such support, and imposing liability on mineral lessees who cause damage by removing that support. For example, the Restatement (Second) of Torts provides that "[o]ne who

negligently withdraws subjacent support of land in another's possession or of artificial additions on it is subject to liability for harm resulting." § 821; *see also id.* § 819 (regarding "lateral support"). Similarly, an Oklahoma statute provides that a surface owner is "entitled to the lateral and subjacent support which his land receives." 60 Okla. Stat. Ann. § 66. As a result, an adjoining landowner must take "reasonable precautions to sustain the land of the other." *Id.* If anything, 25 C.F.R. Part 214 even more broadly protects the surface estate from injury from "mining operations" by a mineral lessee. *See* 25 C.F.R. § 214.14. Under those regulations, mineral lessees may only "use so much of the surface of the leased land as shall be reasonably necessary," and even then "only under condition of least injury and inconvenience to the . . . owner of the land." *Id.* And mineral lessees "shall pay all reasonable damages . . . to improvements on said land, or any damage that during the life of the lease may be occasioned in any manner whatsoever by the use of the surface." *Id.*; *see also Millsap v. Andrus*, 717 F.2d 1326, 1329 (10th Cir. 1983) (25 C.F.R. § 214.4 "grant[s] the land surface owner a right to damages from the licensee"). Plaintiff has it backwards: Surface structures do not "trespass" on underlying rock and soil from which they receive support, but a mineral lessee has a duty to avoid unnecessary interference with that support and is liable for any resulting damage.

### C. The Alleged "Buffer Zone" Around the Wind Turbines Is Not a Trespass.

Plaintiff's theory that there exists a "500-foot radius, or buffer zone, around each wind tower wherein the OMC is unable to safely access and develop the OME," fails as "continuing trespass." Pl.'s Br. 7-8. Neither Count IV nor anywhere else in the Complaint mentions this alleged "buffer zone." Even were it properly before the Court, such a "buffer zone" is not a trespass because it does not constitute an "actual physical invasion" of real estate. *Williamson v. Fowler Toyota, Inc.*, 956 P.2d 858, 862 (Okla. 1998). For this reason, the U.S. District Court of

the Western District of Oklahoma dismissed an almost identical trespass claim "premised on a '*de facto* 'no-build' zone in a fifteen hundred foot (1500) radius surrounding the Turbine.'" *Walker v. Apex Wind Constr., LLC*, 2015 WL 3686729, at *2 n.3 (W.D. Okla. June 12, 2015). The court "underscore[d]" that "a claim for trespass requires an actual physical invasion of the real property of another." *Id.*; *see also Beal v. Western Farmers Elec. Coop.*, 228 P.3d 538, 541 (Okla. Civ. App. 2009) ("[T]he emission of an [electromagnetic field] or stray electricity from an electrical transmission line is insufficient to support a claim of trespass."). If an alleged 1,500-foot "buffer zone" surrounding a wind turbine fails as a matter of law to state a trespass claim, then an alleged 500-foot "buffer zone" cannot be a trespass, either.

Plaintiff's "buffer zone" theory is a transparent attempt to revive in modified form the OMC's failed action to enjoin the Project on the basis that "the Wind Farm will violate 25 C.F.R. § 226.19" because it "will interfere with the Tribe's right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for oil and gas development." *Osage Nation ex rel. Osage Mins. Council v. Wind Cap. Grp., LLC*, 2011 WL 6371384, at *2, 7 (N.D. Okla. Dec. 20, 2011) (Frizzell, J.). This Court dismissed that claim on the merits, finding in part:

> Plaintiff did not present evidence of legally cognizable conflict between any mineral lessee's planned surface use and the Wind Farm's planned facilities. Plaintiff presented one mineral lessees' plans for future drillsites and construction of related infrastructure that may occur within the boundaries of the Wind Farm. The Court concludes that if any actual and/or legally cognizable conflict should arise, and if the conflict cannot be resolved by reasonable accommodations, the mineral lessee may file suit in a court of appropriate jurisdiction.

*Id.* at *8. Here the Complaint expressly disclaims "any allegations that concern oil and gas development" (FAC at 5 n.1), and pleads no claim under 25 C.F.R. § 226.19 or 25 C.F.R. § 214.14, i.e., the analogous regulation governing "reasonably necessary" use of surface lands by the OMC's lessees when mining hard minerals. Nor does the Complaint allege the Project prevented or will prevent any mineral lessee from engaging in mining operations.

Regardless, the Motion presents no evidence that, at any time in the eight years that have passed since construction of the Project began, any putative lessee of the OMC has been prevented from mining anywhere in the 8,400 acres that Osage Wind leases from the surface owners. Nor is there any evidence that such a lessee plans to engage in mining on that acreage were the Project ordered removed. Unlike the (inadequate) showing this Court rejected in 2011, here Plaintiff fails even to prove "one mineral lessees' plans . . . within the boundaries of the Wind Farm." *See Osage Nation ex rel. Osage Mins. Council*, 2011 WL 6371384, at *8. The testimony of Defendants' expert witness in mining engineering, John Pfahl, further demonstrates the OMC has not and will not lose any revenue due to the presence of the Project. AMF ¶ 7. Tellingly, Plaintiff declined to offer rebuttal expert testimony on these points. Ex. 27 (Freas Tr.) at 89:11-91:10, 101:22-102:10. Plaintiff's attempt to repackage a claim dismissed a decade ago should be rejected.

Last, Plaintiff also misstates the facts when it asserts it would be "unsafe for mining operations to take place within a 500-foot radius of each wind tower." Pl.'s Br. 7. To the contrary, there is no 500-foot safety setback from the wind turbines. AMF ¶ 8.

## II. Defendants—Not Plaintiff—Are Entitled to Summary Judgment on Plaintiff's Demand for Removal of the Project.

The sole basis pleaded by Plaintiff for "an order that structures or materials placed . . . be removed" is "continuing trespass." FAC at 12 & ¶ 57. Thus, Plaintiff's demand for removal of the Project should be dismissed with its continuing trespass claim. Any demand for an injunction against the Project also fails as a matter of law to satisfy the *Davilla* test. Plaintiff's purported "legal remedy of ejectment" is no answer to those defects.

### A. Plaintiff Cannot Satisfy the Requirements for a Permanent Injunction.

The Tenth Circuit reversed as an abuse of discretion the entry of a permanent injunction "ordering [defendant] to remove the pipeline on the basis of [continuing trespass] liability alone."

*Davilla*, 913 F.3d at 973. Plaintiff must satisfy three elements: (1) "an injunction is necessary to prevent 'irreparable harm,'" (2) "the threatened injury outweighs the harm that the injunction may cause," and (3) the injunction would not "adversely affect the public interest." *Id*. It satisfies none.

### 1. No Irreparable Harm Will be Suffered Absent an Injunction.

It is Plaintiff's burden to show that absent an injunction it will suffer injury not "merely serious or substantial," but "certain, great, actual and not theoretical," and not "compensable by monetary damages." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005). The only injury to Plaintiff when Osage Wind crushed excavated rock for backfill was the loss of royalties the OMC would have received had Osage Wind instead purchased backfill from one of the local quarries operating under lease from the OMC. As Defendants explain in their motion for partial summary judgment, that injury is compensable in money damages and Plaintiff's own expert calculated such damages down to the penny. Dkt. # 297 at 20-22; AMF ¶¶ 5-6. Neither of Plaintiff's two theories of irreparable harm succeeds.

***First***, Plaintiff invokes continuing trespass when it asserts that "such trespass . . . continues to utilize the OME minerals without a lease." Pl.'s Br. 21. The Tenth Circuit rejected the theory that the mere assertion of continuing trespass relieves the plaintiff of its burden to prove it will suffer irreparable harm absent an injunction. *See Davilla*, 913 F.3d at 974 (rejecting request to affirm permanent injunction on "the sheer right to exclude," where "the Allottees do not explain how the pipeline's presence works 'irreparable harm' otherwise"). Regardless, Plaintiff's claim for continuing trespass fails as a matter of law and cannot support an injunction. *See* Part I, *supra*.

***Second***, Plaintiff asserts "Defendants' trespass interferes with the self-governance of the Osage Nation." Pl.'s Br. 21. Beyond rote recitation of the words "self-governance" and "sovereignty," however, Plaintiff fails to offer any evidence of such injury, or demonstrate that

cases enjoining ongoing interference by state governments with laws passed by Indian tribal governments apply to long-since-ended rock crushing by a private company. A review of those decisions confirms they do not. In *Seneca-Cayuga Tribe of Oklahoma v. State of Oklahoma ex rel. Thompson*, the only decision Plaintiff cites for this theory, plaintiff Indian tribes obtained an injunction against Oklahoma and state and local officials, including county district attorneys and sheriffs and a state judge, that "enjoined Judge Douthitt from proceeding with the state court suit between the State and the Tribes, and enjoined the State from interfering with the operation of the bingo games." 874 F.2d 709, 710-11 (10th Cir. 1989). As the Tenth Circuit explained, "the State seeks here to assert the authority to regulate activities established by Indians under tribal ordinances and operating in Indian Country." *Id*. at 713. And given the Indian tribes' "sovereign immunity," the state-court action "forced [the tribes] to expend time and effort on litigation in a court that does not have jurisdiction over them." *Id*. at 716. The Tenth Circuit affirmed the injunction in part because in these circumstances "the Tribes would face the prospect of significant interference with their self-government." *Id*. By contrast, no ongoing state interference with Indian tribal self-government exists here. Plaintiff cites no decision holding that the mere fact that real property is owned by an Indian tribe makes every ordinary private trespass on such property an irreparable injury to "self-government." We are aware of none. *See* Dkt. # 297 at 22-23.[5]

### 2. The One-Sided Balance of Harms Precludes an Injunction.

As Plaintiff fails to demonstrate any harm (let alone irreparable harm) would be prevented by an injunction ordering the removal of the Project, it cannot demonstrate that such harm

---

[5] Nor have Plaintiff or the OMC otherwise treated unauthorized mining as "irreparable" harm only remedied by removal: In 2014, the OMC's lessee Burbank Materials mined in areas for which it had no lease and, rather than seeking ejectment, the OMC accepted payment of royalties and granted an expanded lease covering the additional areas. Ex. 23 (Phillips Tr.) at 151:8-153:13.

outweighs hundreds of millions of dollars in inevitable injury Osage Wind would suffer. *See Sierra Club, Inc. v. Bostick*, 539 Fed. App'x 885, 889-90 (10th Cir. 2013) (affirming denial of injunction against pipeline where TransCanada Corporation and its project company would lose "hundreds of thousands of dollars each day," which "outweigh[ed]" plaintiff's "threatened environmental injuries"). Plaintiff's assertion that "Defendants have no injury" (Pl.'s Br. 22) if ordered to remove the Project ignores this Court previously found, even before construction had begun, that Osage Wind would suffer hundreds of millions of dollars in "certain harm" from an injunction, comprised of lost "estimated future profits," "expenses paid to date," and payments to counterparties for which it would "remain contractually obligated." *Osage Nation ex rel. Osage Mins. Council*, 2011 WL 6371384 at *2, 11. It is just as "certain" now that Osage Wind, as owner and operator of the Project, would suffer serious harm from the forced removal of a 150 MW wind generation facility, and that such harm would include not only the costs of dismantling the Project's 84 wind turbines and associated infrastructure, but also costs from Osage Wind's resulting inability to satisfy obligations to counterparties, and loss of the cash flow the Project otherwise would have generated over its intended life. Indeed, Stephen Pike, a Senior Vice President of Osage Wind responsible for the operations and maintenance of the Project from the completion of construction in 2015 through 2020, testified that Osage Wind would suffer such harms together totaling over $258.7 million were it ordered to remove the Project. AMF ¶ 9.

While Plaintiff derides this evidence as "insufficient," it proffers no contrary evidence Osage Wind would suffer less than $258.7 million in harm from the removal of the Project—let alone "no injury." Pl.'s Br. 22. And there is no requirement that Osage Wind retain an expert to testify that Osage Wind itself would suffer harm from the forced removal of the Project it owns and operates. *See Malloy v. Monahan*, 73 F.3d 1012, 1015-16 (10th Cir. 1996) (holding testimony

of plaintiff "involved in the purchase, rehabilitation, and sale of distressed residential properties" as to "lost future profits of his own real estate ventures" was admissible).

Plaintiff's suggestion that courts may ignore the harm an injunction would cause the defendant in trespass cases is unfounded. Pl.'s Br. 22. Unlike the bus line in *Greyhound Lines, Inc. v. Peter Pan Bus Lines, Inc.*, enjoined from "continuing trespass" by sending paid "hawkers" with bullhorns into a competitor's bus terminal on an ongoing basis, here crushing rock for backfill ended nearly seven years ago. 845 F. Supp. 295, 302 (E.D. Pa. 1994). And the hundreds of millions of dollars in harm Osage Wind would suffer from the forced removal of the Project is orders of magnitude greater than whatever harm could befall a bus line from an order that its "hawkers" remain "outside the Greyhound terminal" rather than inside of it. *Id.* at 296. Indeed, in *Greyhound* there was "no contention by the defendant, nor could there be, that the defendant would be harmed by an injunction to a greater extent than the plaintiff would be were the injunction not issued." *Id.* at 302. Not true here. Likewise, Plaintiff's assertion that Defendants "chose to proceed with expensive investments of capital, equipment, personnel, and contractual obligations" is not a license to ignore the extreme injury that would result from the forced removal of the Project now. Pl.'s Br. 23. *Davilla* is controlling that "the sheer right to exclude simply cannot begin and end the equitable analysis" even in cases of "continuing trespass on allotted land," which this case is not. *Davilla*, 913 F.3d at 973-74. It remains Plaintiff's burden to prove "the threatened injury outweighs the harm that the injunction may cause to the enjoined party." *Id.* at 973.

### 3. Compelling Public Interests Preclude an Injunction.

Plaintiff's blithe assertion that there is "no identifiable public interest" (Pl.'s Br. 24) that would be harmed by the forced removal of the Project is remarkable, not least given that this Court previously "conclude[d] that an injunction against the Wind Farm would adversely affect the

public interest." *Osage Nation ex rel. Osage Mins. Council*, 2011 WL 6371384 at *11. This Court found the Project was expected to provide numerous public benefits, including that it would "generate $20 million dollars in local tax revenues over 20 years, including $1.5 million for Shidler schools during the first few years," "employ . . . 10–12 permanent employees," provide local surface owners with "lease payments over the 20-year life of the Wind Farm," offer a "renewable, relatively stable energy source," and "power 50,000 homes." *Id.* at *6. Each of those expected benefits has been realized but would be lost were the Project removed. AMF ¶¶ 4, 10-12.

Loss of tax revenues for Osage County and two local school districts would harm the public interest. *Muscogee (Creek) Nation v. Henry*, 2010 WL 1078438, at *6 (E.D. Okla. Mar. 18, 2010) (denying injunction where resulting "loss of tax revenue . . . damages the public interest"). Loss of jobs for Oklahoma residents and lease payments for Osage County landowners would harm the public interest. *See Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009) (holding that "public interest in maintaining nineteen jobs . . . weighed against an injunction"). And loss of clean, renewable energy for over 50,000 homes would harm the public interest. *See W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (affirming denial of injunction against solar project given "possible damage to . . . state and national renewable energy goals"). Even OMC Chairman Everett Waller acknowledged the forced removal of the Project would be a "major event" for "[a]ll parties concerned." Ex. 34 (Waller Tr.) at 127:13-16. Chairman Waller testified he "care[s] whether or not the removal of this wind farm might cost the Shidler School District as much as $1.5 million a year in lost taxes," acknowledging "you've got Osages there too." *Id.* at 129:22-132:8. He further testified he "care[s] about those potential lost jobs if this wind farm were removed." *Id.* at 132:9-15. Plaintiff's (and the OMC's) demand for the forced removal of the Project, however, dismisses those concerns.

Plaintiff's suggestion that the Court overlook such harms because these "regulations . . . allow alienation in a specific manner" is unpersuasive. Pl.'s Br. 24. This is not a case where a federal statute "mandates injunctive relief as remedy for a violation" and thus "constrained the courts' traditional discretion to determine whether such relief is warranted." *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017). 25 C.F.R. Part 214 does not authorize (let alone mandate) injunctive relief or even impose fines for "mining" without a lease. Plaintiff's speculation that "the regulations' drafters did not contemplate anyone would mine . . . without having first obtained a valid lease" (Pl.'s Br. 10 n.4) overlooks that the "drafters" provided for such fines in 25 C.F.R. Part 226 governing oil and gas leasing. *See* 25 C.F.R. § 226.43(a).[6]

Plaintiff also fails to demonstrate that an order that the Project be removed would serve the public interest in "tribal self-government and an independent source of income." Pl.'s Br. 23-24. Crushing rock for backfill was at most an ordinary private trespass for which Plaintiff may seek to prove actual damages, and did not interfere with "tribal self-government." Part II.A.1, *supra*. Plaintiff makes no attempt to explain (much less demonstrate) how demolishing the Project would strengthen "self-government" or any "source of income." Any suggestion by Plaintiff that the OMC would collect additional mining royalties upon removal of the Project is speculation unsupported by any admissible evidence. AMF ¶ 7.[7]

---

[6] The decisions cited by Plaintiff (and the OMC) concern the public interest in government officials complying with federal statutes, which is not at issue here. *See, e.g.*, *Kobach v. Fish*, 840 F.3d 710, 755-56 (10th Cir. 2016) (Kansas officials enjoined from violation of federal election law).

[7] Plaintiff's "alternative[]" request for "another form of injunction" ordering Osage Wind "to shut down the turbines" unless it obtains a mining lease fares no better. Pl.'s Br. 19-20. No such "form of injunction" (*id.*) was pleaded and it is too late for new theories of relief. Opinion and Order, Dkt. # 161 at 12-13. It would be senseless to order Osage Wind to obtain a mining lease when the only "mining" ended years ago and the presence of the Project requires no lease. Plaintiff remains unable to demonstrate any harm that would be prevented by such injunction. And given the OMC's implacable opposition to the Project and demand for "hold up" value damages in this

**B.    Plaintiff Cannot Evade the Requirements for a Permanent Injunction with its Purported "Legal Remedy of Ejectment."**

Plaintiff's demand for a "legal remedy of ejectment" should be dismissed for three reasons. Pl.'s Br. 14-15. *First*, this Court ruled that last year was too late for Plaintiff to "make its 'prayer for relief' a 'moving target' by adding a litany of additional forms of relief." Dkt. # 161 at 13. A demand for "injunctive relief . . . *including ejectment*" was among the proposed "additional forms of relief" this Court rejected. *Id*. at 6. And, until now, it "appear[ed] to be uncontested that, in the context of an alleged trespass on Indian land, ejectment is a form of injunctive relief," rather than a freestanding legal remedy allegedly unconstrained by equitable concerns. *See* Opinion and Order, Dkt. # 264 at 24 n.10; *see also* Dkt. # 103 (proposed Second Amended Complaint) at 13-14 (seeking "ejectment" as "injunctive relief"). *Second*, the Tenth Circuit has rejected Plaintiff's theory that "the sheer right to exclude" a trespasser alone is sufficient to order the removal of energy infrastructure "with no further weighing of the equities." *Davilla*, 913 F.3d at 973-74. Instead, a district court must follow the "well-developed federal common law standard for issuing a permanent injunction." *Id*. at 973. *Davilla* controls and this Court should apply the three-part test for injunctive relief to Plaintiff's demand for removal of the Project, however styled. Dkt. # 264 at 25 (explaining the Court would apply "the *Davilla* factors" to "remedies of injunction and ejectment").[8] *Third*, a demand for ejectment fails on its merits because Defendants do not "currently possess" the "occupancy and use of the OME." Pl.'s Br. 15. The rock crushed for backfill in 2014 remains in the ground at the sites from which it was excavated. AMF ¶¶ 1-2. And

litigation, there is no reason to believe a "shut down" would be "temporar[y]" (Pl.'s Br. 20), or save Osage Wind or the public from the severe harms catalogued above.

[8] Plaintiff's citation to *dicta* in centuries-old decisions does not change this result. *See, e.g.*, *Marsh v. Brooks*, 49 U.S. 223, 232 (1850) (holding Iowa court erred when it "decided that the patent obtained . . . by Reddick's heirs was a better title than the reservation," and noting in *dicta* that "an action of ejectment could be maintained on an Indian right to occupancy and use").

the continued presence of the Project on the surface and in holes from which rock and soil were excavated years ago requires no mining lease and is not a trespass of any kind. Part I.A, *supra*. Simply put: Plaintiff cannot "eject" Defendants from the mineral estate because Defendants are not occupying the mineral estate.[9]

## III. The Calculation of Damages Must Await a Trial.

### A. Plaintiff's Demand for "Lost Rental Value for the Entire Mineral Estate" Has No Basis in Law or Fact and, at Most, Presents Factual Disputes.

Plaintiff asserts its demand for $25,969,607 in trespass damages represents "lost rental value for the entire mineral estate" calculated as "the amount Defendants paid to lease the entire surface" for a 45-year term. Pl.'s Br. 11. Among many other errors, Plaintiff grossly overstates the property subjected to trespass (only the volume of rock crushed for backfill) and the duration of that trespass (hours or days at a given turbine site, completed at all sites over a few months). Plaintiff cites no precedent—let alone Oklahoma precedent, to which this Court should look for "guidance on measure of damages" (Pl.'s Br. 10)—for trespass damages that include "rental value" of property that was not subjected to trespass, extending for decades after any trespass ended. The cases it cites are to the contrary. In *Beck v. Northern Natural Gas Company*, for example, each of the plaintiff landowners whose property was used by the defendant to store natural gas for a period of 17 years was awarded "fair rental value of the property for the period in question" on a "per acre" basis. 170 F.3d 1018, 1021 (10th Cir. 1999) (applying Kansas law).

---

[9] Plaintiff's demand for an "accounting" of "all profits derived from the wind project" should be rejected for similar reasons. Pl.'s Br. 14. This Court denied Plaintiff leave to assert a demand for "an accounting of revenue attributable to the wind farm." Dkt. # 161 at 12. Nor has plaintiff demonstrated it lacks an adequate remedy in damages. *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 964 (10th Cir. 2009) ("[A]n equitable remedy—such as an accounting—is not proper if there is an adequate remedy at law.").

Nor is Plaintiff's damages demand supported by its suggestion the Court take "guidance" from regulations regarding grazing permits on Indian agricultural land. Pl.'s Br. 10. Those regulations have no application here and 25 C.F.R. Part 214 contains no comparable provisions. And Plaintiff mischaracterizes the conclusion of the Tenth Circuit's opinion as somehow directing this Court to impose "fair rental value . . . in the form of a lease." Pl.'s Br. 12. It did no such thing, instead briefly summarizing the holding and remanding "for further proceedings consistent with this opinion." *See Osage Wind*, 871 F.3d at 1093.

Plaintiff's misreading of the Tenth Circuit's ruling also underlies the false assumption that Defendants would have had no choice but to pay whatever "hold up" price the OMC might demand because the Project supposedly could not lawfully exist without a mining lease. This assumption is how Plaintiff (incorrectly) concludes "the surface leases are useless unless Defendants also acquire a federally approved lease" (Pl.'s Br. 11 n.9), and Plaintiff's purported valuation "expert" Steven Hazel speculates damages should be at least equal to "the amounts paid, or willing to be paid by Osage Wind to the Surface Owners." Pl.'s Ex. 8 (Hazel Report) at 7; Ex. 35 (Hazel Tr.) at 155:4-157:12, 159:5-16. Even had the Tenth Circuit's opinion been available then, however, Osage Wind never would have paid a "hold up" price to the OMC but instead "could have used substitute materials purchased offsite" (SUF ¶ 7) for backfill around the turbine foundations, with no rock crushing or mining lease required. *See Osage Wind*, 871 F.3d at 1091-92. The Project's presence has never required a mining lease. *See id.*; Part I, *supra*.

If such offsite backfill had been purchased from a quarry in Osage County, the OMC would have received royalties equal to the price per ton provided in the OMC's leases with that quarry. Using that contemporaneous royalty price, Defendants' expert witness in mining engineering, John Pfahl, testified that the total value to the OMC of the volume of minerals "mined" was $68,993.

AMF ¶ 6. Plaintiff's assertion that Defendants would have paid the OMC nearly $26 million for a lease equates to **more than 376 time**s Mr. Pfahl's estimate of the royalty value of all the rock crushed for backfill. Plaintiff's expert witness in mining engineering, Robert C. Freas, testified that the total royalty value to the OMC of the volume of minerals "mined" was $247,979.42. AMF ¶ 5. Thus, Plaintiff's damages demand equates to **more than 104 times** the (itself exaggerated) estimate by Plaintiff's own expert of the royalty value of all of the minerals excavated for the entire Project.[10] It defies reason that the OMC would ever be entitled to "lost rental value" damages hundreds of times greater than the royalties the OMC would have received had Osage Wind instead purchased the same volume of crushed rock from a local quarry.

For these and other reasons, Defendants soon will file a motion to strike Mr. Hazel's testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), on grounds that he is unqualified on these subject matters and his opinions are not the product of reliable methods. If Mr. Hazel's testimony were excluded, Plaintiff's motion for summary judgment as to damages would be wholly unsupported by any admissible evidence. Even if Mr. Hazel's testimony were deemed admissible, Mr. Pfahl and Defendants' wind energy development expert Kimberlee Centera offer expert testimony rebutting Mr. Hazel's opinions. Ex. 29 (Pfahl Dec.) at Ex. 1, ¶¶ 104-110; Ex. 36 (Centera Dec.) at Ex. 1, pp. 2-4. Such a "battle of the experts" presents "a credibility determination" that "requires a trial." *Abilene Retail # 30, Inc. v. Bd. of Comm'rs*, 492 F.3d 1164, 1188 (10th Cir. 2007) (Ebel, J., concurring); *see also Lapham v. Watts Regulator Co.*, 2016 WL 248471, at *6 (D. Kan. Jan. 21, 2016) (denying summary judgment where "conflicting opinions . . . create genuine issues of

---

[10] Mr. Freas's estimate overstates both the quantity of minerals "mined" and the value of those minerals (among other errors). Ex. 28 (Pfahl Tr.) at 23:18-29:9, 31:20-32:2, 127:4-15, 166:15-167:1, 203:6-204:4; Ex. 29 (Pfahl Dec.) at Ex. 1, ¶¶ 96-103. These are issues for trial.

material fact"). In no event has Plaintiff demonstrated an entitlement as a matter of law to $25,969,607 in trespass damages.

**B.** **The Measure of Damages That Should Be Applied at Trial is the Royalty Value to the OMC of the Volume of Rock Crushed by Defendants.**

At trial, Defendants will ask this Court to award no greater than $68,993 in damages to Plaintiff. That amount equals royalties lost to the OMC when Defendants crushed rock for backfill at the turbine sites rather than purchasing the same volume of crushed rock from an OMC lessee at a local quarry. *See Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1268 (10th Cir. 2007) (affirming award of "$10,000 in damages for lost timber profits" where trespass prevented use of property as tree farm) (applying Oklahoma law). At most, this Court should apply the measure of damages in Oklahoma when minerals have been produced and sold without authorization: market value of the minerals at the surface less cost. *See Dilworth v. Fortier*, 405 P.2d 38, 39-40 (Okla. 1964); *Edwards v. Lachman*, 534 P.2d 670, 674 (Okla. 1974). Although well-established under Oklahoma law (unlike Plaintiff's demand for "lost rental value for the entire mineral estate"), it is not wholly apt here because this is not a case where minerals have been sold. AMF ¶¶ 1-2. Such an award could result in an unwarranted windfall to the OMC, therefore, if it were to receive damages derived from the full market value of the crushed rock while that same rock remains on the land. Determining damages under either measure, however, must await trial.

**C.** **At Most, Plaintiff's Unfounded Attacks on Defendants' Good Faith Present Factual Disputes Not Suitable for Summary Judgment.**

In an attempt to preclude deduction of costs at trial and thereby impose exemplary damages under *Dilworth*, the United States requests summary judgment that Defendants did not act in good faith. Pl.'s Br. 15-19. That request should be denied as unsupported by admissible evidence; nearly all of the factual assertions and exhibits on which it depends should be stricken for noncompliance with LCvR56(b). *See* p. 2 n.2, *supra*. Further, Defendants incorporate by

24

reference their Opp. to OMC, Part II.B, which explains that, contrary to Plaintiff's accusations, the record amply demonstrates Defendants' good-faith efforts to understand and comply with mining lease regulations, and their reliance on the advice of outside counsel that no mining lease or permit was required to crush rock for backfill, or otherwise. RSUF ¶ 7 & n.4. At minimum, there are genuine issues of material fact as to Plaintiff's and the OMC's accusations of bad faith.

While Plaintiff's and the OMC's arguments are nearly identical, Plaintiff further asserts Defendants "ignored the BIA's requests to cease mining" and "refuse[d] to meet with the Osage Nation." Pl.'s Br. 14. Not true. Defendants extensively consulted with the BIA and explained that Defendants' outside counsel had advised that their activities, including rock crushing, did not constitute mining or require a lease. Ex. 17 (re: Oct. 15, 2014 call); Ex. 37 (Oct. 21, 2014 email); Ex. 51 (Oct. 21, 2014 email); Ex. 52 (re: Nov. 11, 2014 call); Ex. 23 (Phillips Tr.) at 112:19-115:2 (re: Oct. 15, 2014 call). There is no evidence the BIA responded with an explanation of why it believed Defendants were incorrect before it filed suit. Ex. 7 (Champagne Tr.) at 91:17-21; Ex. 51; Ex. 52. Defendants repeatedly sought to meet with the Osage Nation, but were rebuffed. Ex. 38 (Nov. 19, 2014 letter); Ex. 39 (Nov. 21, 2014 letter); Ex. 40 (May 13, 2015 letter); Ex. 41 (May 26, 2015 letter).

## CONCLUSION AND REQUESTED RELIEF

For the foregoing reasons, Defendants respectfully request the Court deny the Motion in its entirety, except as to liability on Count III (Trespass) and Count V (Conversion) as against Osage Wind and EGPNA (only), with damages to be awarded in an amount determined at trial.[11]

---

[11] For purposes of appeal, Defendants maintain they should be permitted to present their affirmative defenses of estoppel, laches, waiver, unclean hands, and *in pari delicto*, as to which this Court previously granted a judgment on the pleadings. Dkt. # 99 at 12-13, # 174 at 15-16.

Respectfully submitted,

*/s/ Ryan A. Ray*
**Ryan A. Ray**, OBA # 22281
**NORMAN WOHLGEMUTH, LLP**
3200 Mid-Continent Tower
401 South Boston Avenue
Tulsa, OK 74103
918-583-7571
918-584-7846 (facsimile)

-and-

**Lynn H. Slade**, *pro hac vice*
**Sarah M. Stevenson**, *pro hac vice*
**Dominic A. Martinez**, *pro hac vice*
**MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.**
Post Office Box 2168
Albuquerque, NM 87103-2168
505-848-1800
505-848-9710 (facsimile)

-and-

**Thomas J. McCormack**, *pro hac vice*
**Robert Kirby**, *pro hac vice*
**NORTON ROSE FULBRIGHT US LLP**
1301 Avenue of the Americas
New York, NY 10019
212-318-3000
212-318-3400 (facsimile)

*Of Counsel:*
**Robin D. Ball** (Los Angeles Office), *pro hac vice*
**Robert D. Comer** (Denver Office), *pro hac vice*
**NORTON ROSE FULBRIGHT US LLP**

**ATTORNEYS FOR DEFENDANTS OSAGE WIND, LLC, ENEL KANSAS, LLC AND ENEL GREEN POWER NORTH AMERICA, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2021, I electronically transmitted the attached Document to the Clerk of the Court using the ECF System for filing. Based on the electronic records currently on file, the Clerk of the Court will transmit a notice of Electronic Filing to the following ECF registrants:

Cathryn D. McClanahan
Nolan Fields IV
Stuart P. Ashworth
Mary Kathryn Nagle
Wilson Kirk Pipestem
Abi Laura Fain
David McCullough
Jeffrey S. Rasmussen
The following non-ECF registrants have been served by email:

Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor Office
7906 East 33rd Street
Tulsa, OK 74145
(918) 669-7730
Charles.babst@sol.doi.gov
*Attorney for the United States of America*

*/s/ Ryan A. Ray*
Ryan A. Ray