**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and | ) | |
| THE OSAGE MINERALS COUNCIL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-704-GKF-JFJ |
| | ) | |
| OSAGE WIND, LLC; | ) | |
| ENEL KANSAS, LLC; and | ) | |
| ENEL GREEN POWER NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO INTERVENOR-PLAINTIFF THE OSAGE
MINERALS COUNCIL'S MOTION FOR SUMMARY JUDGMENT [Dkt. # 294]**

Ryan A. Ray, OBA #22281
NORMAN WOHLGEMUTH, LLP
3200 Mid-Continent Tower
401 South Boston Avenue
Tulsa, OK 74103
918-583-7571
918-584-7846 (facsimile)

Lynn H. Slade, *pro hac vice*
Sarah M. Stevenson, *pro hac vice*
Dominic A. Martinez, *pro hac vice*
MODRALL, SPERLING, ROEHL,
HARRIS & SISK, P.A.
Post Office Box 2168
Albuquerque, NM 87103-2168
505-848-1800
505-848-9710 (facsimile)

Thomas J. McCormack, *pro hac vice*
Robert Kirby, *pro hac vice*
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
212-318-3000
212-318-3400 (facsimile)

*Of Counsel:*
Robin D. Ball (Los Angeles Office), *pro hac vice*
Robert D. Comer (Denver Office), *pro hac vice*
NORTON ROSE FULBRIGHT US LLP

**ATTORNEYS FOR DEFENDANTS
OSAGE WIND, LLC, ENEL KANSAS,
LLC AND ENEL GREEN POWER
NORTH AMERICA, INC.**

**Dated: November 2, 2021**

# TABLE OF CONTENTS

<b>Page</b>

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION .......................................................................................................... 1

RESPONSE TO THE OMC'S STATEMENT OF UNDISPUTED MATERIAL FACTS ............ 2

DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS THAT
PRECLUDE SUMMARY JUDGMENT IN FAVOR OF THE OMC ...................................... 13

ARGUMENT AND AUTHORITIES .................................................................................. 13

I.   Defendants—Not the OMC—Are Entitled to Summary Judgment on the OMC's
     "Continuing Trespass" Claim and Demand for Removal of the Project. ........................ 14

     A.   No Irreparable Harm Will be Suffered Absent an Injunction. ............................. 15

     B.   The One-Sided Balance of Harms Precludes an Injunction. ................................ 16

     C.   Compelling Public Interests Preclude an Injunction. .......................................... 17

II.  The Calculation of Damages Must Await a Trial. ........................................................ 18

     A.   The OMC's Demand for $26 Million in "Hold Up" Value Damages Has
          No Basis in Law or Fact and, at Most, Presents Factual Disputes. ...................... 18

     B.   At Most, the OMC's Unfounded Attacks on Defendants' Good Faith
          Present Factual Disputes Not Suitable for Summary Judgment ........................... 19

III. The OMC Fails to Demonstrate Entitlement to Declaratory Relief ............................... 24

IV.  The OMC Fails to Demonstrate Entitlement to Attorney's Fees .................................... 24

V.   At Most, Factual Disputes Preclude Summary Judgment Against Enel KS .................... 25

CONCLUSION AND REQUESTED RELIEF ...................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998)....................................24

*Callaway Gold Co. v. Acushnet Co.*, 585 F. Supp. 2d 600 (D. Del. 2008) ..................17

*Casa Blanca de Punta Mita v. Rayment*,
   2020 WL 4208055 (N.D. Okla. July 22, 2020) .....................................................24

*Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959 (10th Cir. 2019)..................11, 15, 16

*Dilworth v. Fortier*, 405 P.2d 38 (Okla. 1964)...............................................19, 21, 22

*Edwards v. Lachman*, 534 P.2d 670 (Okla. 1974) ........................................................19

*Kiowa Tribe of Okla. v. Hoover*, 150 F.3d 1163 (10th Cir. 1998)................................15

*Lawrence v. City of Owasso*, 2014 WL 693443 (N.D. Okla. Feb. 21, 2014).............................18

*Mountain v. Nordwall*, 2005 WL 8175877 (D. Utah Jan. 6, 2005). ............................................25

*Osage Nation ex rel. Osage Mins. Council v. Wind Cap. Grp., LLC*,
   2011 WL 6371384 (N.D. Okla. Dec. 20, 2011)...............................................16, 17

*Schafer v. Centerpoint Energy Okla. Gas*,
   2018 WL 10140171 (N.D. Okla May 21, 2018)....................................................19

*Schell v. OXY USA Inc.*, 814 F.3d 1107 (10th Cir. 2016) ...........................................24

*Sierra Club, Inc. v. Bostick*, 539 Fed. App'x 885 (10th Cir. 2013)........................16, 17

*Slocum v. Phillips Petroleum Co.*, 678 P.2d 716 (Okla. 1984) ....................................19

*Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758,765 (10 Cir. 1997) ........................24, 25

*Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
   805 F.2d 351 (10th Cir. 1986) ............................................................................16

*United States v. Osage Wind, LLC*, 871 F.3d 1078 (10th Cir. 2017) ..................................*passim*

*United States v. Sneed*, 34 F.3d 1570 (10th Cir. 1994)..................................................6

*United States v. Wenger*, 427 F.3d 840 (10th Cir. 2005) .............................................21

*Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202 (10th Cir. 2003) .........................15

**Page(s)**

**Statutes, Rules, Regulations, and Other Authorities**

25 C.F.R. Part 211 ................................................................................................. 24

25 C.F.R. Part 214 ....................................................................................... 7, 24, 25

25 C.F.R. § 166.812 ...................................................................................... 24, 25

25 C.F.R. § 211.3 ................................................................................................... 5

25 C.F.R. § 214.7 .............................................................................................. 2, 20

Defendants Osage Wind, LLC ("Osage Wind"), Enel Kansas, LLC ("Enel KS"), and Enel Green Power North America, Inc. ("EGPNA" and, together, "Defendants") respond in opposition to intervenor-plaintiff the Osage Minerals Council's (the "OMC") summary judgment motion (Dkt. # 294) (the "Motion" or "OMC's Br.").

## INTRODUCTION

Relying on the same arguments and assertions as the United States, the OMC moves for summary judgment on trespass and continuing trespass and demands the forced removal of Osage Wind's 84-turbine, 150 MW wind generation facility (the "Project"), and nearly $26 million in damages.  Defendants incorporate by reference all the arguments set forth in their opposition to the United States' motion for summary judgment, filed herewith (the "Opp. to US").  Defendants, not the OMC, are entitled to summary judgment on the OMC's demand for removal of the Project and continuing trespass claim.  Nor is the OMC entitled without trial (or ever) to speculative "hold up" value damages resting on the false premise that the Project's existence requires a mining lease.

Instead, damages should be determined at trial equal to the royalty value of the rock crushed for backfill or, at most, the market value of that rock at the surface less production costs.  In an attempt to preclude deduction of costs and thereby impose exemplary damages, the OMC seeks a judgment that "Defendants did not rely on the advice of their counsel in good faith."  The record shows precisely the opposite; at most, factual disputes preclude summary judgment.  Declaratory relief as to 25 C.F.R. Parts 211 and 214 should be denied as moot and purposeless, as the Tenth Circuit settled their interpretation years ago, and the conduct it held required a mining lease (crushing rock for backfill) ended years before that.  In light of the Tenth Circuit holding, Osage Wind and EGPNA do not oppose summary judgment as to liability (only) on the OMC's trespass claim.  As to Enel KS, a separate holding company that neither owned nor constructed the Project, the Motion should be denied in its entirety.

## RESPONSE TO THE OMC'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Not disputed.

2.      Not disputed.

3.      Not disputed.

4.      Not material.

5.      Disputed to the extent the OMC suggests that activity other than crushing rock for backfill constituted "mining" without a required lease under 25 C.F.R. § 214.7.  *See United States v. Osage Wind, LLC*, 871 F.3d 1078, 1091-92 (10th Cir. 2017).

6.      Disputed; not material.  The Tenth Circuit did not "instruct" Defendants to obtain a lease; it held that crushing of rock for backfill completed years earlier was "mining" that had required a lease.  *Osage Wind,* 873 F.3d at 1091-93.  Further, the evidence cited concerns periods before the Tenth Circuit's ruling, or testimony of a witness who was then employed by Tradewinds Energy ("TWE," which sold its Osage Wind membership interests to Enel KS in 2014).  Ex. 42 (Heredia Tr.) at 180:7-181:18, 221:9-222:12; Ex. 5 (July 21 Price Tr.) at 238:15-242:25; Ex. 43 (Gilhousen Tr.) at 11:1-13:4, 100:7-103:2.[1]

7.      Disputed; not material.  Mr. Weigel was an employee of TWE, not any Defendant, at the time at issue.  Ex. 44 (Weigel Tr.) at 16:6-17:4.  Mr. Storch left EGPNA before the Tenth Circuit issued its decision.  Ex. 45 (Storch Tr.) at 107:7-21, 115:7-16, 176:8-9.  Defendants accept the Tenth Circuit's decision.

8.      Defendants agree the decision not to apply for a lease under 25 C.F.R. § 214.7 was made in good faith, including in reliance on advice of counsel that no lease was required.

---

[1] Unless otherwise indicated, all "Ex." cites refer to exhibits filed herewith.  For convenience, Defendants use the same exhibit numbering here as they do in their Opp. to US.  Certain exhibits have been authenticated in the accompanying Beauregard Declaration (Ex. 53).

9.     Disputed.   Advice of counsel was provided not just in an October 31, 2013 memorandum, and later memoranda, but also in emails and calls.  Ex. 2 (Oct. 5 Price Tr.) at 25:1-26:25, 37:14-21, 44:2-45:18; Ex. 5 (July 21 Price Tr.) at 35:1-22, 46:24-48:2, 136:12-138:8, 154:2-12, 190:17-191:22; Ex. 7 (Champagne Tr.) at 44:23-48:19, 164:12-165-5; Ex. 46 (Willman Tr.) at 40:23-41:25; Ex. 22 (Freeman Tr. ) at 70:11-72:5; Ex. 47 (Oct. 11, 2010 email); Ex. 48 (Oct. 25, 2013 email) at 000672; Ex. 20 (Oct 1, 2014 email); Ex. 13 (Oct 9, 2014 email); Ex. 14 (Oct. 10, 2014 letter); Ex. 15 (Oct. 11, 2014 emails) at 000309; Ex. 16 (Oct. 12, 2014 email) at 000286; Ex. 17 (re: Oct. 15, 2014 call); Ex. 18 (Oct. 17, 2014 email); Ex. 19 (Oct. 17, 2014 emails).

10.     Disputed; not material.   Steve Willman, a Polsinelli LLP lawyer and TWE's "outside general counsel," identified Modrall, Sperling, Roehl, Harris & Sisk, P.A. ("Modrall") as experts on Indian law matters in 2013, and arranged for their retention to advise TWE (and, after its acquisition by TWE, Osage Wind) concerning Indian law matters, including mining lease issues.  Ex. 46 (Willman Tr.) at 54:6-23, 67:9-17, 69:6-18; Ex. 22 (Freeman Tr.) at 99:24-100:24, 164:2-10.  Following receipt of an October 10, 2013 OMC letter suggesting the Project "may" require a mining lease (US Ex. 21), TWE and Polsinelli lawyers consulted with Modrall regarding mining lease issues.  Ex. 47 (Oct. 11, 2013 email); Ex. 48 (Oct. 25, 2013 email) at 000672.

11.     Disputed to the extent the OMC suggests Modrall did not provide legal advice and services to Defendants.  *See* ¶ 10, *supra*.  Mr. Neil, Mr. Willman's colleague at Polsinelli LLP, executed the retention agreement.  OMC's Ex. 11.  EGPNA also retained Modrall.  Ex. 7 (Champagne Tr.) at 21:2-14, 204:23-205:14; Ex. 5 (July 21 Price Tr.) at 33:4-34:1, 154:7-12; Ex. 2 (Oct. 5 Price Tr.) at 44:2-45:7.  EGPNA personnel consulted with Modrall before Enel KS's acquisition.  Ex. 22 (Freeman Tr.) at 166:14-22; 168:6-169:4; Ex. 7 (Champagne Tr.) at 129:13-130:24.  Following Enel KS's acquisition of Osage Wind, Defendants consulted with

Modrall, including about mining lease issues, and Modrall performed work on their behalf, including written and oral advice on mining lease issues, written and oral communications with the BIA and the DOI Solicitor's office, and preparation and submission to the Solicitor of a memorandum on mining lease issues.  Ex. 5 (July 21 Price Tr.) at 46:24-48:2, 136:12-137:4, 154:7-13, 190:17-191:22; Ex. 7 (Champagne Tr.) at 130:4-12, 134:17-135:7, 164:2-165:5, 166:6-167:5; Ex. 20 (Oct 1, 2014 email); Ex. 13 (Oct 9, 2014 email); Ex. 14 (Oct. 10, 2014 letter drafted by Modrall); Ex. 15 (Oct 11, 2014 emails) at 000309; Ex. 16 (Oct. 12, 2014 email) at 000286; Ex. 17 (re: Oct. 15, 2014 call); Ex. 18 (Oct. 17, 2014 email); Ex. 19 (Oct. 17, 2014 emails).

12.     Objection; disputed.  The cited statement is second-hand hearsay and inadmissible for the purpose for which it is cited.  Rather than asserting TWE "must receive a mining permit," the OMC's October 28, 2013 letter to Wind Capital Group ("WCG") and TWE requested information concerning the Project, stating only that Project activities "*may* be subject to . . . the need to secure a federal permit or lease to undertake such activities, pursuant to 25 C.F.R. §§ 411 [sic] and 414 [sic]."  Ex. 8 at p. 1 (emphasis added).  WCG responded in an October 28, 2013 letter (copying BIA Superintendent Phillips), stating that "[n]either a mineral lease nor any BIA permit is required."  Ex. 9.  There is no evidence the OMC or BIA ever responded.  Two weeks later, Superintendent Phillips advised the OMC that the BIA was "looking at what the Osage Agency can possibly do as far as permits under 25 C.F.R. 2-14" and could not say how the BIA would proceed.  Ex. 10 (Lucero Dec.) at Ex. 1 (Nov. 15, 2013 OMC minutes), p. 3, ¶ 5, ll 107-114; *see also* Ex. 11 (Nov. 19, 2013 email); Ex. 21 (Hale Tr.) at 23:9-24:9.

13.     Disputed that ¶ 13 provides a full or accurate statement of the October 31, 2013 memorandum, in which Modrall concludes that the argument that a mining lease is required "should be rejected because Trade Winds is not engaging in mining."  OMC's Ex. 5 at p. 2; *see id.*

at pp. 2-6 (analyzing 25 C.F.R. § 211.3 definition of "mining" and statutes and case law defining mining in other contexts).

14.     Not material.   Disputed that ¶ 14 provides a full or accurate statement of the October 31, 2013 memorandum.

15.     Disputed.   Objection; rather than admissible evidence, the OMC cites its own statements in a prior brief.  Neither the referenced portions of the OMC's brief nor anything cited therein supports OMC's assertion that Enel KS decided how the Project would be constructed, or that Osage Wind had no role in such decisions.  *See* Dkt. 285 at 19-20.

16.     Objection; not material; disputed.  Rather than admissible evidence, the OMC cites statements in its own brief.  Further disputed as unsupported by evidence to the extent the OMC asserts EGPNA agreed to fund all TWE wind farm development, or had a right of first refusal to purchase all TWE development, or that the EGPNA/TWE arrangement encompassed a right to "construct" projects, or contemplated EGPNA would "own" projects.

17.     Disputed.  The Membership Interest Purchase Agreement ("MIPA") entered into by TWE and WCG as of August 13, 2013, provided for purchase of WCG's membership interests in Osage Wind, not of the Project itself, and the transaction contemplated by the MIPA did not close before April 14, 2014.  Further disputed that it was contemplated that Enel KS would "purchase the Wind Farm," rather than Osage Wind membership interests.  OMC Ex. 12 at OW-040156; OMC Ex. 17 at 021248, 021256; Statement of Undisputed Facts ("SUF") at ¶ 21.

18.     Disputed; not material.  Osage Wind, not TWE, owned the Project.  OMC Ex. 17; SUF ¶ 21.

19.     Not disputed.

5

20.    Disputed.  The evidence cited shows only that Enel KS has no employees.  *See* Dkt. 189-2 at ¶ 9.  The assertion that EGPNA and Enel KS "operate as the same legal entity" is a legal conclusion that the two entities are alter egos.  No such claim was pled.  Nor has the OMC adduced evidence necessary to support any such claim.  *See* Dkt. # 306 at 10-12.

21.    Disputed; objection.  Osage Wind owns and operates the Project and owned the assets that constitute the Project in 2013 and 2014.  It is not a "shell" company, which is a company without assets or operations.  *See United States v. Sneed*, 34 F.3d 1570, 1574 n.2 (10th Cir. 1994).  The OMC's statements in a prior brief are not admissible evidence and nothing cited by the OMC supports the assertion that Osage Wind "makes no business decisions."

22.    Disputed; objection.  TWE did not purchase the Project, but instead purchased WCG's membership interests in Osage Wind.  OMC Ex. 17; SUF ¶ 21.  Further, Enel KS, not EGPNA, lent TWE money to assist with that purchase.  OMC Ex. 12.  The OMC cites no evidence that Enel KS (much less EGPNA) "fully" funded purchase of the Osage Wind membership interests.  Ex. 22 (Freeman Tr.) at 161:6-162:11; Ex. 46 (Willman Tr.) at 138:22-139:2.  The OMC improperly cites its own statements in a prior brief.

23.    Not material.  There is no evidence TWE or Osage Wind ever believed a mining lease was required, much less requested approval from Enel KS to obtain a lease; rather, TWE and Osage Wind believed no lease was required.  Ex. 46 (Willman Tr.) at 121:1-5; Ex. 22 (Freeman Tr.) at 77:20-78:19; Ex. 43 (Gilhousen Tr.) at 43:23-44:5; Ex. 44 (Weigel Tr.) at 34:25-35:13.

24.    Not material.  There is no evidence TWE or Osage Wind ever requested approval from Enel KS or EGPNA to obtain a lease from the OMC and/or the BIA; on the contrary, TWE believed no mining lease was required.  *See* ¶ 23, *supra*.  Further, the agreement cited by the OMC does not require EGPNA approval.  OMC Ex. 12 at 040162-63.

6

25.      Disputed.  Enel KS purchased TWE's membership interests in Osage Wind, not the Project.  OMC Ex. 16.  The evidence cited by the OMC does not show otherwise.

26.      Objection; the evidence cited does not support the facts asserted as the document cited is a Construction Management Agreement dated October 1, 2014, not August 19, 2014.

27.      Disputed.   The cited loan agreement provides Enel KS, not EGPNA, certain approval rights regarding construction-related matters.  OMC Ex. 12 at 014867.  The OMC cites no evidence Enel KS was ever called upon to exercise those rights.  The other document cited, an April 14, 2014 letter agreement, contemplated the appointment of EGPNA as construction manager, but that appointment did not occur until months later.  OMC Ex. 14 at 014868; SUF ¶ 26. The OMC cites no evidence EGPNA "exercised control over construction" before the Construction Management Agreement became effective.

28.      Disputed.   Superintendent Phillips' letter dated October 9, 2014 referenced "a Sandy Soil Permit," not a lease.  OMC Ex. 15.  There is no provision in 25 C.F.R. Part 214 for any form of "permit," and no reference to "Sandy Soil."   Ex. 23 (Phillips Tr.) at 97:6-99:10. Superintendent Phillips agreed her October 9, 2014 letter requested Defendants obtain a permit that does not exist under 25 C.F.R. Part 214.  Ex. 23 (Phillips Tr.) at 94:9-99:10.

29.      Disputed.  Enel KS has never owned the Project.  Enel KS purchased and owns membership interests in Osage Wind, which in turn owns the Project.  OMC Ex. 16 at 021123-24; SUF ¶ 21.  Further, Superintendent Phillips' letter did not "instruct" Defendants to "get a lease," but instead to obtain a "Sandy Soil Permit."  *See* ¶ 28, *supra*.

30.      Disputed.  There is no evidence Enel KS played any role in a decision to continue with construction after receipt of Superintendent Phillips' letter dated October 9, 2014; the exhibits OMC cites reference only EGPNA.  Further disputed to the extent the OMC implies Defendants

did not respond to that letter.  Defendants thereafter responded to the BIA both directly and through Modrall, and explained that Modrall had advised that their activities did not constitute mining or require a lease.  Ex. 17 (re: Oct. 15, 2014 call); Ex. 37 (Oct. 21, 2014 email); Ex. 51 (Oct. 21, 2014 email); Ex. 52 (re: Nov. 11, 2014 call); Ex. 23 (Phillips Tr.) at 112:19-115:2 (re: Oct. 15, 2014 call).  There is no evidence the BIA responded with any explanation of why it believed Defendants were incorrect before it filed suit.  Ex. 7 (Champagne Tr.) at 91:17-21; Ex. 51 (Oct. 21, 2014 email); Ex. 52 (re: Nov. 11, 2014 call).

31.      Disputed; not material.  TWE purchased membership interests in Osage Wind from WCG, not the Project.  OMC Ex. 17 (2013 MIPA).  The definition of "Governmental Authority" in the 2013 MIPA is not material and was drafted by WCG.  Ex. 49 (Dean Tr.) at 111:7-14; Ex. 46 (Willman Tr.) at 106:9-107:2; Ex. 22 (Freeman Tr.) at 128:23-129:17.[2]

32.      Disputed; not material.  The OMC's assertion that the exclusion of "Native American tribe" from the definition of "Governmental Authority" in the 2013 MIPA (between TWE and WCG) "served to exclude a permit from the OMC from the list of 'Permits' that the parties would obtain" is false.  There is no provision that the parties will not obtain required permits (or leases) unless they are issued by a "Governmental Authority"; instead, the definition served only to limit the representations and warranties the parties provided to each other.  *See, e.g.,* OMC Ex. 17 (2013 MIPA) at 6021260, -02128 (§ 3.1(y)(iii)) (WCG representation that Osage Wind "is

---

[2] The second sentence of footnote 1 to SUF ¶ 31 is disputed.  Nothing in the cited contract between Osage Wind and IEA provided or "agreed that the Osage Wind Farm would not obtain a permit from the Osage Nation."  Dkt. # 239-8.  While the definition of "Governmental Authority" and "Permit" limited the permits *IEA* would be responsible for incurring the expense to obtain, nothing in that contract provided that Osage Wind would not obtain any other permits (or leases) that might be required from entities that did not qualify as "Governmental Authorities."  Dkt. # 239-8 at 035655 (§ 4.14).  Further, there is no evidence anyone at that time (including the BIA) believed a mining lease was required.  *See* ¶¶ 12, 23, *supra*.

in compliance" with Permits "to the extent obtained"); *see also* Ex. 7 (Champagne Tr.) at 217:10-220:10; Ex. 46 (Willman Tr.) at 107:16-22; Ex. 45 (Storch Tr.) at 41:8-42:3.

33.     Disputed; not material.  EGPNA's Board of Directors approved the 2013 MIPA between TWE and WCG (OMC Ex. 17), but the OMC cites no evidence EGPNA's Board of Directors "conducted due diligence" on that (or any) agreement.  The cited testimony references diligence on a different agreement, and does not reference diligence undertaken by the Board of Directors.  Ex. 7 (Champagne Tr.) at 224:2-227:1.

34.     Disputed; not material.  The 2013 MIPA did not "exclude an Osage Nation permit from the list of permits the Osage Wind Farm would acquire."  *See ¶* 32, *supra*.

35.     Disputed.  The 2013 MIPA did not "exclude an Osage Nation permit from the list of permits the Osage Wind Farm would acquire."  *See ¶* 32, *supra*.  Further disputed to the extent it suggests Modrall's advice consisted only of a single memorandum.  *See ¶* 9, *supra*.

36.     Disputed.  The March 2013 Scope of Work (the "2013 SOW") did contemplate rock crushing.  It stated that, while some sites could be excavated with a "conventional tracked excavator," "more competent rock" at 30 locations would require "special excavation equipment such as a hoe ram or equivalent" and "additional special handling of the excavated rock."  Dkt. # 247-1 at 3779.  As the Project general contractor IEA acknowledged, the term "special handling of the excavated rock" referenced "rock crushing" for excavated rock.  Dkt. 285-22 at 021426.

37.     Disputed.  While the June 2014 Scope of Work changed to provide that "more competent rock" at 27 locations might require "special excavation equipment such as a hoe ram or equivalent, *or rock blasting,*" it continued to provide for "additional special handling of the excavated rock," as did the 2013 SOW.  *Compare* Dkt. 247-1 at 3779 *with* OMC Ex. 19 at 024576.

The provision for "additional special handling"—rock crushing—was not a change.  Dkt. 285-22 at 021426; Ex. 3 (Mazurowski Tr.) at 42:8-11; ¶ 36, *supra*.

38.    Disputed.  The plans did not change with respect to the inclusion of rock crushing.  *See* ¶¶ 36-37, *supra*.  Defendants consulted with Modrall concerning rock crushing and Modrall continued to advise that no mining lease was required.  Ex. 5 (July 21 Price Tr.) at 127:2-5, 136:12-137:11, 137:12-138:8, 154:7-12, 190:17-191:22; Ex. 2 (Oct. 5 Price Tr.) at 25:22-25, 46:20-48:18; Ex. 7 (Champagne Tr.) at 166:6-167:5; Ex. 20 (Oct 1, 2014 email); Ex. 13 (Oct. 9, 2014 email); Ex. 14 (Oct. 10, 2014 letter); Ex. 15 at 000309 (Oct 11, 2014 emails); Ex. 16 at 000286 (Oct. 12, 2014 email); Ex. 17 (re: Oct. 15, 2014 call); Ex. 18 (Oct. 17, 2014 email); Ex. 19 (Oct. 17, 2014 emails).

39.    Objection; OMC cites its own statements in a prior brief, which are not admissible evidence.  Dkt. # 285-39 references only rock crushing.

40.    Disputed to the extent the OMC suggests Modrall's advice consisted only of these written memoranda, or that Modrall did not also advise orally and in emails that no lease was required despite the crushing of rock for backfill.  *See* ¶ 9, *supra*.  Also disputed to the extent the OMC suggests Defendants did not consult with Modrall concerning rock crushing, or that Modrall did not continue to advise that Defendants did not require a mining lease.  *See* ¶ 38, *supra*.

41.    Not disputed that "importing backfill" was an available "alternative" to crushing excavated rock for backfill adjacent to the turbine foundations.  Disputed to the extent the OMC suggests EGPNA believed it required a mining permit, which it did not.  Ex. 5 (July 21 Price Tr.) at 136:12-137:11, 154:7-12, 167:11-16, 190:17-191:22; Ex. 7 (Champagne Tr.) at 130:13-19, 134:17-135:12, 164:12-165:5, 166:6-167:5.

42.     Disputed.  The OMC cites no evidence showing these considerations were the reasons EGPNA determined to continue with excavation.  Further disputed because it ignores that following receipt of Superintendent Phillips' October 9, 2014 letter, excavation was paused for approximately one day and rock crushing was paused for approximately seven days, during which EGPNA sought Modrall's advice.  Ex. 2 (Oct. 5 Price Tr.) at 15:12-18:22, 25:22-25.  William Price of EGPNA made the decision to resume those activities following that pause based on the advice of counsel that no mining lease was required.  Ex. 5 (July 21 Price Tr.) at 154:2-12; *id.* at 46:24-47:5, 136:12-137:11, 137:12-138:8, 190:17-191:22; Ex. 7 (Champagne Tr.) at 181:8-15.  Cost was considered only in evaluating whether, even though no permit for rock crushing was required, to bring in offsite material for backfill.  Ex. 5 (July 21 Price Tr.) at 162:22-163:3; Ex. 7 (Champagne Tr.) at 150:13-18.

43.     Disputed.  The OMC cites no evidence that stopping excavation activities would have jeopardized EGPNA's contract with the energy purchaser, or that this was the reason EGPNA determined to resume excavation activities.  Instead, the evidence shows Mr. Price made the decision to resume those activities on advice of counsel.  *See* ¶ 42, *supra*.

44.     Not material.  Disputed that EGPNA and Enel KS own the Project; Enel KS owns membership interests in Osage Wind.  SUF ¶ 21; OMC Ex. 16.  Disputed that profits EGPNA and/or Enel KS have made are relevant, particularly when documentation of the total economic impact on Osage Wind, the Project owner, including cash distributed and projected to be distributed by Osage Wind to its owners, has been produced, and Defendants do not assert any additional impact on EGPNA and/or Enel KS as an additional harm to Defendants under *Davilla*.  Ex. 6 (Pike Tr.) at 168:23-169:9; Ex. 26 (Pike Dec.) at ¶ 2 & Att. A.  *See* Dkt. # 161 at 11-12 (denying leave to amend to seek "an accounting of revenue attributable to the wind farm"); Dkt.

# 162 at 5 (striking allegations as to "investment by [EGPNA] in Oklahoma wind farms" and "revenue increases received by the Enel Group"); Dkt. # 306 (opposition to motion to compel).

45.     Disputed.   As the OMC is aware, Defendants corrected their analysis, which demonstrates that the negative economic impact on Osage Wind of the removal of the Project would be $258,729,611.70.  Ex. 6 (Sept. 30 Pike Tr.) at 161:21-162:2; Ex. 50 (Oct. 6 Pike Tr.) at 72:9-13, 74:6-11; Ex. 26 (Pike Dec.) at ¶ 2 & Att. A.

46.     Disputed; not material.  *See* ¶ 44, *supra*.  The testimony cited does not state that EGPNA owns or operates an "international corporation with hundreds of projects worldwide."

47.     Disputed.  Approximately 25% of the material excavated was left on the surface. Ex. 1 (Moskaluk Tr.) at 39:10-40:17; Dkt. # 17-1 at ¶ 15(a)(i); Ex. 2 (Oct. 5 Price Tr.) at 96:12-16.

48.     Not material.  Disputed that "support" wind turbines receive from underlying rock and soil means "Defendants continue to use these minerals," and further disputed that such "support" constitutes trespass or requires a mining lease.  *See* Opp. to US, Part I.B.  Nor do the operative complaints plead any claim concerning such "support."

49.     Not material; objection.  Mr. Hazel's purported "expert" opinion as to damages is inadmissible including in that it is premised on speculative "hold up" value and the false assumption that the presence of the Project requires a mining lease.  *See* Opp. to US, Part I.A.  The testimony cited does not support the asserted statement.  In addition, Mr. Hazel's unsworn expert report is hearsay not competent as summary judgment evidence.

50.     Disputed; not material.  The relative value of the "Osage Mineral Estate" and the "surface estate" is not relevant as Osage Wind required a mining lease only as to the volume of rock crushed for backfill.  *Osage Wind*, 871 F.3d at 1091-92.  The Tenth Circuit's decision does not state the Osage mineral estate is more valuable than the surface estate.  Mr. Hazel's cited

testimony is in reference to "coal mines" and purported to speak "in generalities," and he did not purport to have valued the Osage mineral estate or the combined value of the rights of the owners of the surface rights overlying the mineral estate.  Ex. 35 (Hazel Tr.) at 153:17-23.

## DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS
## THAT PRECLUDE SUMMARY JUDGMENT IN FAVOR OF THE OMC

1.      No excavated sand, soil, or rock was sold.  Ex. 1 (Moskaluk Tr.) at 70:14-19.

2.      No excavated sand, soil, or rock was moved to, or used in any way at, any location other than the site at which it had been excavated.  Dkt. # 29 at 3; Ex. 1 (Moskaluk Tr.) at 67:21-69:7, 138:17-24, 141:18-22, 142:17-143:9, 145:16-22, 148:13-22.

3.      All crushing of excavated rock was completed in 2014.  Ex. 24 (Herfurth Dec.) at ¶¶ 6-7 & Ex. B at 1-2.

4.      The Project entered commercial operation in 2015.  Ex. 25 (Price Dec.) ¶ 3; Ex. 5 (July 21 Price Tr.) at 27:7-28:11.  The Project generates 150.4 MW of energy, sufficient to meet the energy consumption needs of over 50,000 households.  Ex. 26 (Pike Dec.) ¶ 7.

5.      Robert C. Freas, an expert witness for the United States, testified that the total value to the OMC of the minerals "mined" was $247,979.42.  Ex. 27 (Freas Tr.) at 71:18-21.

6.      John Pfahl, an expert witness for Defendants, testified that the total value to the OMC of the minerals "mined" was $68,993.  Ex. 28 (Pfahl Tr.) at 27:11-16.

7.      The OMC has not and will not suffer any lost revenue due to the presence of the Project rendering some minerals temporarily inaccessible.  Ex. 29 (Pfahl Dec.) at Ex. 1 ¶¶ 93-95.

8.      There is no 500-foot safety setback from the wind turbines.  Rather, the surface leases for the Project provide that the lessors may erect buildings or other improvements on their land within 500 feet of the turbines, unless those improvements would interfere with wind flow to a given turbine.  Ex. 26 (Pike Dec.) ¶¶ 4-5; Ex. 26-1 at Att. F § 15.1; Ex. 29 (Pfahl Dec.) ¶¶ 4-9.

9.      If the Court were to order the Project removed, the net adverse economic impact on Osage Wind would be $258,729,611.70.  That total is comprised of the loss of projected free cash flow (after expenses), liquidated damages and other payments that would be due under Osage Wind's tax equity agreement, power purchase agreement, interconnection agreement, and surface leases, and the costs of dismantling and removing the Project (net of salvage value).  Ex. 26 (Pike Dec.) at ¶ 2 & Att. A-C; Ex. 26-1 at Att. D-G; Ex. 6 (Sept. 30 Pike Tr.) at 151:14-169:9.

10.      The Shidler Public Schools and the Woodland Public Schools receive annual payments attributable to taxes paid by Osage Wind.  In 2021, the Shidler Public Schools and the Woodland Public Schools received approximately $1,683,000 and $500,000, respectively.  Osage Wind bears 60% of the tax burden for the Shidler Public Schools.  Ex. 30 (Rogers Dec.) ¶¶ 3, 5; Ex. 31 (Wilson Dec.) ¶ 3; Ex. 32 (Hulse Dec.) ¶ 6; Ex. 34 (Waller Tr.) at 129:22-132:8.

11.      Ten people are employed full-time at the Project site as technicians and managers, who would lose their jobs if the Project were removed.  Ex. 26 (Pike Dec.) at ¶ 3.

12.      Pursuant to six leases, the surface estate owners of 8,400 acres in Osage County receive periodic payments from Osage Wind for an initial term of 25 years (with a 20-year Osage Wind renewal option ), subject to termination if the Project were ordered removed.  Ex. 33 (Smith Dec.) at ¶¶ 2-4, 6; Ex. 26 (Pike Dec.) at ¶ 2(e).

## ARGUMENT AND AUTHORITIES

### I.      Defendants—Not the OMC—Are Entitled to Summary Judgment on the OMC's "Continuing Trespass" Claim and Demand for Removal of the Project.

The OMC asserts two continuing trespass theories: (1) Defendants "remain on the property" because the "turbines remain in operation"; and (2) "Defendants continue to use these minerals . . . as support for the . . . turbines."  OMC's Br. 10, 12-13.  Only the first theory was pleaded in the Intervenor Complaint and is properly before this Court.  *See* Dkt. # 164 ("OMC

Compl.") ¶ 93 (pleading "insertion and placement of materials or structures" as "continuing trespass"). Both theories fail as a matter of law. *See* Opp. to US, Part I. The presence of the Project has never been a trespass. Nor do wind turbines trespass on the mineral estate by virtue of passive "support" they—like every building in Osage County—receive from underlying rock and soil. Regardless, the OMC fails as a matter of law to satisfy any of the three mandatory elements for a permanent injunction. *See* Opp. to US, Part II. Defendants further respond below to certain additional arguments made by the OMC as to those elements:

### A. No Irreparable Harm Will be Suffered Absent an Injunction.

The OMC remains unable to cite any authority holding that the mere fact that real property is owned by a Tribe makes every ordinary private trespass on such property an irreparable injury to "self-government." OMC's Br. 15. To the contrary, each of the decisions on which the OMC relies involved an injunction against ongoing interference by state governments with laws passed by Tribal governments.[3] The OMC's overheated assertion that Defendants "threaten[] to obliterate the OMC's sovereign right to determine how, when, and *if* an entity mines the Estate" (OMC's Br. 15), is another version of its shopworn theory that it suffered irreparable harm when deprived of the asserted right to "say no." Dkt. # 158 at 1, 15, 17. But, by definition, every plaintiff with a trespass claim must have been deprived of the right to "say no" to that offense. *See Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 967 (10th Cir. 2019) (explaining that "the

---

[3] *See*, *e.g.*, *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1204 (10th Cir. 2003) (injunction issued against Kansas officials when "the state began seizing tribal property without notice and initiated criminal proceedings"); *Kiowa Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1165 (10th Cir. 1998) (denial of injunction reversed in Tribe's action against Oklahoma, state judges, and state-court judgment creditors where "the Tribe sought a preliminary injunction barring further prosecution of state contract claims against the Tribe and use of certain post-judgment remedies directed against the Tribe, including seizure of a variety of tribal assets, on the basis that these procedures violated the Tribe's sovereign immunity").

defendant's *lack of a right to enter* is an *element of the claim*").  The OMC protests too much when it complains "[t]he OMC and the Osage Nation are not commercial entities" and "do[] not have to participate in the market at all."  OMC's Br. 14.  OMC Chairman Everett Waller considers the Osage Nation "the fossil fuel tribe," adding:  "This is a business.  We're in the oil business."  Ex. 34 (Waller Tr.) at 38:12-17, 39:4-23, 43:18-25.  He views himself as "responsible for maximizing profits for the Osage Nation shareholders."  *Id*.  Regardless, money damages can compensate for the past crushing of rock.

### B.   The One-Sided Balance of Harms Precludes an Injunction.

When the OMC demands Defendants prove the "Enel corporate family's renewable energy business will be destroyed" (OMC's Br. 17), it improperly turns on its head the OMC's burden to prove "'the threatened injury outweighs the harm that the injunction may cause' to the enjoined party."  *Davilla*, 913 F.3d at 973.  The OMC misconstrues the authority it cites when it asserts that, to prevail on the balance of harms, "Defendants must show that the injunction will threaten the very 'viability' of their overall business, leading to its 'destruction.'"  OMC's Br. 16 (quoting *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986)).  The discussion the OMC quotes concerns a ***plaintiff's*** burden to "show irreparable injury," not the balance of harms.  *See Tri-State*, 805 F.2d at 356.  The nearly $260 million in injury Osage Wind would suffer from forced removal of the project more than suffices to preclude an injunction.  *See Sierra Club, Inc. v. Bostick*, 539 Fed. App'x 885, 890 (10th Cir. 2013) (affirming denial of preliminary injunction against pipeline where TransCanada Corporation and its affiliated project company would lose "hundreds of thousands of dollars each day"); *Osage Nation ex rel. Osage Mins. Council v. Wind Cap. Grp., LLC*, 2011 WL 6371384, at *2, 11 (N.D. Okla. Dec. 20, 2011) (Frizzell, J.) ("certain harm" to Osage Wind outweighed "speculative and hypothetical" harm alleged by the OMC).

The OMC's insistence the Court analyze the finances of the purported "Enel corporate family" as "context" (OMC's Br. 17) is contrary to *Sierra Club, Inc.*, which required no such context to affirm the denial of an injunction against multinational conglomerate TransCanada Corporation and its project company. *See* 539 Fed. App'x at 889. The assorted out-of-Circuit decisions on which the OMC relies do not hold that weighing the harm an injunction would prevent against the injury to the defendant requires an analysis of the finances of its affiliates. *See*, *e.g.*, *Callaway Gold Co. v. Acushnet Co.*, 585 F. Supp. 2d 600, 622 (D. Del. 2008) (injunction against patent infringement where "harm that defendant would suffer is admittedly subtle" and equated to "$0.005-$0.006 per dozen" golf balls sold, while "not[ing]" defendant's parent company in passing); *see also* Dkt. # 306 at 8-9. Nonetheless, no amount of "context" changes that the OMC has not shown removal of the Project would prevent ***any*** injury, let alone injury sufficient to justify imposing nearly $260 million in harm on Osage Wind.

### C.    Compelling Public Interests Preclude an Injunction.

Like the United States, the OMC does not mention this Court has already "conclude[d] that an injunction against the Wind Farm would adversely affect the public interest." *Osage Nation ex rel. Osage Mins. Council*, 2011 WL 6371384 at *11. Nor does the OMC say a word about the loss of jobs, tax revenues for Osage County and two local school districts, income for local landowners, and clean, renewable energy for over 50,000 homes, that would follow the forced removal of the Project. AMF ¶¶ 4, 10-12. This silence is astonishing; even OMC Chairman Waller acknowledged the harms that would befall local schoolchildren and employees of the Project in the event of its removal. Ex. 34 (Waller Tr.) at 127:13-16, 129:22-132:15. On the other side of the scale, the OMC offers generalized assertions regarding "sovereignty," "self-governance," and "Congress's purpose behind the Osage Act." OMC's Br. 18. But the OMC does not explain—let alone submit evidence to prove—how removing the Project would tangibly serve any of those

17

interests. It would not. The suggestion that such an order would "ensure the highest profitability for the Estate" (*id.*) is pure speculation divorced from any evidence. AMF ¶ 7. Further, removing the Project would not prevent "continued acts violative of the law" (OMC's Br. 19), because the activity that required a lease—crushing rock for backfill—ended years ago. AMF ¶ 3.

## II.    The Calculation of Damages Must Await a Trial.

### A.    The OMC's Demand for $26 Million in "Hold Up" Value Damages Has No Basis in Law or Fact and, at Most, Presents Factual Disputes.

As set forth in the Opp. to US, Part III, the OMC's Motion should be denied as to its "alternative" demand for $25,969,607 in "damages as calculated in the Hazel Report." OMC's Br. 21-22. The premise for the OMC's outsized demand is speculative "hold up" value on the misguided view that the Project could not lawfully exist without a mining lease. But the Tenth Circuit's decision settled that the presence of the Project required no mining lease. *See Osage Wind*, 871 F.3d at 1091-92. While crushing rock for backfill required a mining lease, *id.*, there was an "alternative, *i.e.*, importing backfill" from an offsite quarry (SUF ¶ 41), that would have obviated any need for such a lease. No damages can arise from the irrational premise that Defendants would have agreed to pay $26 million to crush excavated rock for backfill.

Defendants will soon file a motion to strike Mr. Hazel's purported "expert" testimony. The OMC also may not rely on Mr. Hazel's expert report because "[u]nsworn expert reports are not competent to be considered on a motion for summary judgment." *Lawrence v. City of Owasso*, 2014 WL 693443, at *5 (N.D. Okla. Feb. 21, 2014) (Frizzell, J.). At most, the OMC's damages demand is a matter for trial, including because Defendants' mining engineering expert Mr. Pfahl and wind energy development expert Ms. Centera offer expert testimony rebutting Mr. Hazel's opinions. Ex. 29 (Pfahl Dec.) at Ex. 1, ¶¶ 104-110; Ex. 36 (Centera Dec.) at Ex. 1, pp. 2-4.

**B.      At Most, the OMC's Unfounded Attacks on Defendants' Good Faith Present Factual Disputes Not Suitable for Summary Judgment**

As set forth in the Opp. to US, Part III.B, at trial the OMC may recover damages equal to the royalty value of the rock crushed for backfill or, at most, the market value of that rock at the surface less costs of production pursuant to the measure of damages in *Dilworth v. Fortier*, 405 P.2d 38 (Okla. 1964).   The Oklahoma Supreme Court there held that awarding the value of minerals produced *without* deduction of costs "would be analogous to permitting the recovery of exemplary damages." *Id*. at 40.   As the Oklahoma Supreme Court subsequently reaffirmed:

> [T]o prove that a trespasser has acted in 'bad faith' the proof must show some element of fraud, malice or oppression, or the trespasser's actions must be shown to be actuated by or accompanied with some evil intent, or must be the result of gross negligence—such disregard of another's rights—as is deemed equivalent of such intent.

*Edwards v. Lachman*, 534 P.2d 670, 673 (Okla. 1974); *see also Slocum v. Phillips Petroleum Co.*, 678 P.2d 716, 719 (Okla. 1984) ("Exemplary damages are highly penal and . . . should not be lightly imposed.").   This Court dismissed an exemplary damages demand where the plaintiff "failed to show genuine issues of material facts exist for the proposition that the trespass contained some element of fraud, malice, or oppression," "evil intent," or "gross negligence." *Schafer v. Centerpoint Energy Okla. Gas*, 2018 WL 10140171, at *6 (N.D. Okla May 21, 2018) (Frizzell, J.).

This will be an impossible burden for the OMC to meet at trial.   The record shows Defendants made diligent efforts to understand and comply with applicable law, including engaging outside counsel (Modrall) expert in Indian law to provide legal advice regarding mining lease issues.   Response to SUF ("RSUF") at ¶¶ 9-11.   Modrall advised Defendants that no mining lease was required if excavated materials were not sold or removed from the Project site.   RSUF ¶¶ 9, 11.   Accordingly, Defendants ensured no excavated rock or soil was sold or removed from the Project site.   SAF ¶¶ 1-2.   In the fall of 2014, after Osage Wind commenced turbine foundation

excavations, it received a site visit from a BIA inspector and a letter from the BIA Superintendent stating that "excavation of minerals" should cease until "you have a obtained a Sandy Soil Permit," and noting that the inspector "found a pit" and "[l]imestone . . . crushed into small rocks around the wind turbine foundation."  OMC Ex. 38; *see also* RSUF ¶ 28.

In an exercise of caution, and despite the potential cost of delay, Defendants paused rock crushing for one week and excavation for one day while they conferred with Modrall and the BIA. RSUF ¶¶ 38, 42.  Consistent with its prior analysis, Modrall advised that no mining lease or permit was required for rock crushing for backfill in connection with surface construction activities.  *Id*. Mr. Price, then the Vice President of Engineering and Construction for EGPNA with overall responsibility within EGPNA for the construction of the Project, in consultation with EGPNA's General Counsel and other colleagues, made the decision to resume rock crushing in reliance on Modrall's legal advice.  *Id*.; Ex. 25 (Price Dec.) ¶¶ 1-2.  Defendants directed Modrall to continue to confer with the BIA including by submitting a legal memorandum explaining their conclusion that no mining lease was required.  RSUF ¶¶ 30, 38, 42; Ex. 12.  The BIA did not provide any opposing legal analysis to Defendants, instead commencing this action.  RSUF ¶ 30.

This action presented a question of first impression as to the applicability of a mining lease under 25 C.F.R. § 214.7 to surface construction activities the Tenth Circuit aptly described as "a far cry from a typical mining operation."  *Osage Wind*, 871 F.3d at 1092.  There existed "no agency interpretation, informal guidance document, adjudicatory decision, or anything else" issued by the BIA to provide further guidance.  *Id*. at 1088.  Judge Payne held as a matter of law it was "clear" no mining lease was required for any aspect of Osage Wind's "extraction, handling, sorting, crushing and utilization of minerals."  Dkt. # 44 at 9-10.  The United States declined even to appeal that ruling.  When the Tenth Circuit reversed on appeal from the OMC, it expressly rejected the

OMC's position that a mining lease had been required to displace or disturb rock and soil in connection with construction of the Project. *Osage Wind*, 871 F.3d at 1089, 1091-92. For example, the Tenth Circuit rejected as "plainly wrong" the OMC's contention that "any extraction of such minerals exceeding 5,000 cubic yards constitutes mining." *Id*. at 1089. The Tenth Circuit further acknowledged that "sorting and crushing of rocks to provide structural support does not fit nicely with traditional notions of 'mining,'" and that "[i]t might be reasonable to adopt the construction favored by Osage Wind, which sets as the definitional boundary the commercialization of the minerals." *Id*. at 1091-92.

Indeed, the OMC cannot possibly prove, as a matter of law and without a trial, that Defendants acted with fraud, malice, oppression, evil intent, or gross negligence, as the OMC must to show the "bad faith" necessary for exemplary damages. *See Dilworth*, 405 P.2d at 40. Seemingly recognizing this, the OMC attempts to move the goal posts, asserting Defendants must prove the elements of a "good faith reliance on counsel defense." OMC's Br. 22 (citing *United States v. Wenger*, 427 F.3d 840 (10th Cir. 2005)). But Defendants are not asserting "[g]ood faith reliance on counsel [as] a defense to the mens rea element of a criminal prosecution." *Wenger*, 427 F.3d at 853. Rather, they are defending against exemplary trespass damages under Oklahoma law. *Dilworth* and its progeny, not federal criminal cases, set the relevant standard.[4]

*Dilworth* is itself instructive, in that it reversed a trial award of exemplary damages against defendants who produced oil and gas pursuant to a lease later "declared void," and argued on appeal "they were entitled to rely upon the opinion of their title attorney." *Dilworth*, 405 P.2d at

---

[4] The United States misconstrues Defendants' answer to the Intervenor Complaint as asserting an advice of counsel defense. Dkt. # 300 at 15-16. Not so. Defendants, without mentioning advice of counsel, were, in an abundance of caution, preserving their right to present evidence of their good faith. Dkt. # 174 at 16.

39, 44.  Rather than apply a rigid test for good faith reliance on counsel, as the OMC proposes, the court concluded it must consider "the circumstances in each case" and proceed by "examining the entire record."  *Id.* at 47.  While "[w]ithout question" the title attorney should have conducted further factual investigation "instead of rendering an opinion based upon an assumption," the court explained, this did not "show some element of fraud, malice or oppression," "evil intent," or "gross negligence," on defendants' part.  *Id.* at 47-48.  Accordingly, the court held it could "not conclude that the facts in this case justify an award of exemplary damages."  *Id.* at 48.

Compared to *Dilworth*, lack of evidence of bad faith is even more apparent here. Defendants relied upon Modrall's analysis of mining regulations and its legal conclusion that no lease was required for excavation or rock crushing in connection with surface construction activities.  RSUF ¶¶ 9-11, 38, 42.  After the fact, Judge Payne considered it "clear" Modrall was correct.  Dkt. # 44 at 9.  The Tenth Circuit agreed that "digging a hole in the ground, displacing rock and soil in the process," and then "building" in the empty hole, required no mining lease.  *See Osage Wind*, 871 F.3d at 1092.  It disagreed only as to crushing rock for backfill, while acknowledging Modrall's interpretation "might be reasonable."  *Id.* at 1091-92.  There is nothing here to show it was "bad faith" for Defendants to follow this legal advice three years before the Tenth Circuit resolved these questions of first impression.  It was not.

Regardless, even under its preferred legal standard, the OMC fails to demonstrate an entitlement to judgment as matter of law.  ***First***, that TWE originally retained Modrall in August 2013 does not show that somehow Defendants did not "actually request[] the legal advice they now claim to have relied on."  OMC's Br. 23.  The OMC ignores everything that occurred after, including Osage Wind's acquisition by TWE and subsequent acquisition of interests in Osage Wind by Enel KS, and the extensive record of Modrall providing legal advice to Defendants

22

on these very mining lease issues.  RSUF ¶¶ 9-11, 38, 42.  **Second**, the OMC asserts Defendants

must have "fail[ed] to disclose" to Modrall that they "would be using rock crushing and dynamite

blasting" because those activities were not specifically mentioned in written memoranda prepared

by Modrall prior to October 2014.[5]  OMC's Br. 23.  Not so.  Defendants received legal advice

from Modrall in formal memoranda and also by email and phone.  RSUF ¶ 9.  Defendants

specifically consulted with Modrall concerning rock crushing when the BIA asserted that rock

crushing required a "Sandy Soils Permit," and Modrall's conclusion that no mining lease or permit

was required did not change.  RSUF ¶¶ 38, 42.  **Third**, it is not true that Defendants never received

"advice . . . their actions would be legal."  OMC's Br. 24.  Both in formal written memoranda, and

by email and phone, Modrall's consistent advice was that no mining lease was required.  RSUF

¶¶ 9, 13, 38, 42.  **Fourth**, the accusation that, before receiving legal advice, Defendants made a

"decision to categorically exclude permits from the Osage Nation from the list of permits the Wind

Farm would acquire" (OMC's Br. 24), is entirely invented from the misreading of ordinary

commercial contracts.  RSUF ¶¶ 31-35.  The contract between Osage Wind and IEA used the term

"Governmental Authority" to define permits the **contractor** would be responsible for incurring the

expense to obtain, **not** to somehow "categorically exclude" Osage Wind from obtaining other

permits.  RSUF ¶ 31.  And the accusation that, before consulting with Modrall, Defendants had

made their minds up to not obtain a mining lease cannot be reconciled with the record of careful

consultation between Modrall and Defendants concerning that same subject matter.  RSUF ¶¶ 9,

38, 42.  At the very least, "view[ing] the factual record and draw[ing] all reasonable inferences

---

[5] The OMC's fixation on blasting is irrelevant, as blasting is just another method of excavating "more competent rock."  RSUF ¶ 37.  The Tenth Circuit ruled that such "displacing" or "disrupt[ing] the mineral estate" in connection with "surface construction activities" does not constitute "mining."  *See Osage Wind*, 871 F.3d at 1092.

therefrom most favorably to the nonmovant," there are "genuine issue[s] of material fact" as to the OMC's accusations and whether Defendants acted with the bad faith necessary for exemplary damages. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).[6]

## III.   The OMC Fails to Demonstrate Entitlement to Declaratory Relief.

The OMC moves for summary judgment on its declaratory judgment claims regarding "the applicability and violation" of 25 C.F.R. Parts 211 and 214.  OMC Compl. ¶¶ 64-78.  But the Tenth Circuit settled those questions in 2017 and the conduct it held required a mining lease under Part 214 (but not Part 211) had ended years earlier.  SAF ¶ 3.  As a result, Count I and Count II are moot because such declarations would have "no real-world impact on [Defendants'] conduct." *Schell v. OXY USA Inc.*, 814 F.3d 1107, 1116 (10th Cir. 2016).  Nor would they "settle the controversy" or "serve a useful purpose." *Casa Blanca de Punta Mita v. Rayment*, 2020 WL 4208055, at *9 (N.D. Okla. July 22, 2020) (Frizzell, J.).  The OMC effectively concedes this when it requests "declaratory judgment . . . confirming the law of the case established by the U.S. Court of Appeals."  OMC Compl. ¶¶ 96-97.  The Tenth Circuit's ruling need not be "confirm[ed]."

## IV.   The OMC Fails to Demonstrate Entitlement to Attorney's Fees.

"[T]he longstanding 'American Rule,' . . . generally bars prevailing parties from recovering attorneys' fees in the absence of a statute or enforceable contract providing for such an award." *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758,765 (10 Cir. 1997).  The OMC's reliance on 25 C.F.R. § 166.812(c) is misplaced, as that regulation applies only to "[t]respassers on Indian

---

[6] As is the subject of several pending motions to compel, the OMC and the United States refused to comply with Defendants' requests for discovery regarding, among other things, other instances of mining leases or permits being requested, required, or waived for comparable surface construction activities, and what information, if any, was made available to the public regarding the procedures for obtaining such leases or permits. *See* Dkt. # 261-263, 266.  Defendants expect such discovery will further bolster at trial the reasonableness and credibility of Defendants' testimony that they acted in good faith when deciding that no mining lease or permit was required.

agricultural land." *Id.*; *see also Mountain v. Nordwall*, 2005 WL 8175877 at *6 (D. Utah Jan. 6, 2005) (rejecting application of Part 166 to "non-grazing permit context"). 25 C.F.R. Part 214, by contrast, does not impose attorney's fees or penalties of any kind for mining without a lease. The OMC's demand for attorney's fees because "undisputed facts demonstrate that Defendants did not act in good faith" fares no better. OMC's Br. 25. It is far from "undisputed" that Defendants "did not act in good faith." *See* Part II.B, *supra*. Moreover, the "bad-faith exception to the American Rule" concerns "abuses [of] judicial process," not "bad faith in the acts giving rise to the substantive claim." *Towerridge, Inc.*, 111 F.3d at 765, 768.

## V.    At Most, Factual Disputes Preclude Summary Judgment Against Enel KS.

The OMC fails to prove as a matter of law that Enel KS is liable for trespass. Enel KS is a holding company owned by EGPNA with no employees of its own. SUF ¶¶ 19-20. Osage Wind, not Enel KS, was the owner of the Project assets and contracted with IEA who, through subcontractors, crushed rocked for backfill adjacent to the turbine foundations. RUSF ¶¶ 29, 31. EGPNA's Mr. Price made the decision to resume rock crushing based on the advice of counsel. RUSF ¶ 42. The assertion that "Enel KS . . . made those decisions" is contrary to the record. RSUF ¶¶ 21-27. And it is of no moment that, during the period TWE owned Osage Wind, Enel KS had certain approval rights as lender to TWE regarding finalization of permits. RUSF ¶¶ 23-24, 27. There is no evidence Enel KS was ever called upon to exercise such rights as to any mining lease or permit. *Id.* Instead, it was believed no such lease or permit was required. *Id.*

## CONCLUSION AND REQUESTED RELIEF

For the foregoing reasons, Defendants respectfully request the Court deny the Motion in its entirety, except as to liability on Count III (Trespass) as against Osage Wind and EGPNA (only), with damages to be awarded in an amount to be determined at trial.

Respectfully submitted,

*/s/ Ryan A. Ray*

**Ryan A. Ray**, OBA # 22281
**NORMAN WOHLGEMUTH, LLP**
3200 Mid-Continent Tower
401 South Boston Avenue
Tulsa, OK 74103
918-583-7571
918-584-7846 (facsimile)

-and-

**Lynn H. Slade**, *pro hac vice*
**Sarah M. Stevenson**, *pro hac vice*
**Dominic A. Martinez**, *pro hac vice*
**MODRALL, SPERLING, ROEHL, HARRIS**
**& SISK, P.A.**
Post Office Box 2168
Albuquerque, NM 87103-2168
505-848-1800
505-848-9710 (facsimile)

-and-

**Thomas J. McCormack**, *pro hac vice*
**Robert Kirby**, *pro hac vice*
**NORTON ROSE FULBRIGHT US LLP**
1301 Avenue of the Americas
New York, NY 10019
212-318-3000
212-318-3400 (facsimile)

*Of Counsel:*
**Robin D. Ball** (Los Angeles Office), *pro hac vice*
**Robert D. Comer** (Denver Office), *pro hac vice*
**NORTON ROSE FULBRIGHT US LLP**

**ATTORNEYS FOR DEFENDANTS**
**OSAGE WIND, LLC, ENEL KANSAS, LLC**
**AND ENEL GREEN POWER NORTH**
**AMERICA, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2021, I electronically transmitted the attached Document to the Clerk of the Court using the ECF System for filing.  Based on the electronic records currently on file, the Clerk of the Court will transmit a notice of Electronic Filing to the following ECF registrants:

Cathryn D. McClanahan
Nolan Fields IV
Stuart P. Ashworth
Mary Kathryn Nagle
Wilson Kirk Pipestem
Abi Laura Fain
David McCullough
Jeffrey S. Rasmussen
The following non-ECF registrants have been served by email:

Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor Office
7906 East 33rd Street
Tulsa, OK 74145
(918) 669-7730
Charles.babst@sol.doi.gov
*Attorney for the United States of America*


*/s/ Ryan A. Ray*
Ryan A. Ray