**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA, and    )
THE OSAGE MINERALS COUNCIL,    )
                                     )
        Plaintiffs,    )
                                     )
vs.                             )    Case No. 14-CV-704-GKF-JFJ
                                   )
OSAGE WIND, LLC;    )
ENEL KANSAS, LLC; and    )
ENEL GREEN POWER NORTH    )
AMERICA, INC.,    )
                                   )
        Defendants.    )

---

**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY
OF PLAINTIFF THE UNITED STATES' EXPERT WITNESS
STEVEN J. HAZEL AND OPENING BRIEF IN SUPPORT**

---

Ryan A. Ray, OBA #22281
NORMAN WOHLGEMUTH, LLP
3200 Mid-Continent Tower
401 South Boston Avenue
Tulsa, OK 74103
918-583-7571
918-584-7846 (facsimile)


Thomas J. McCormack, *pro hac vice*
Robert Kirby, *pro hac vice*
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
212-318-3000
212-318-3400 (facsimile)

Lynn H. Slade, *pro hac vice*
Sarah M. Stevenson, *pro hac vice*
Dominic A. Martinez, *pro hac vice*
MODRALL, SPERLING, ROEHL,
HARRIS & SISK, P.A.
Post Office Box 2168
Albuquerque, NM 87103-2168
505-848-1800
505-848-9710 (facsimile)
*Of Counsel:*
Robin D. Ball (Los Angeles Office), *pro hac vice*
Robert D. Comer (Denver Office), *pro hac vice*
NORTON ROSE FULBRIGHT US LLP


**ATTORNEYS FOR DEFENDANTS
OSAGE WIND, LLC, ENEL KANSAS,
LLC AND ENEL GREEN POWER
NORTH AMERICA, INC.**

**Dated: November 9, 2021**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ................................................................................................ 1

SUMMARY OF MR. HAZEL'S OPINIONS ............................................................ 3

APPLICABLE LEGAL STANDARDS .................................................................... 5

ARGUMENT ....................................................................................................... 7

I.  Mr. Hazel's Opinions as to the "Hold Up" Value Osage Wind Allegedly Would
    Have Paid the OMC for a Mining Lease Are Neither Relevant Nor Reliable ................... 7

    A.  Mr. Hazel's Testimony is Irrelevant .................................................... 7

    B.  Mr. Hazel's Testimony is Unreliable .................................................... 9

II. Mr. Hazel is Not Qualified to Opine as to the "Hold Up" Value Osage Wind
    Allegedly Would Have Paid the OMC for a Mining Lease ............................................. 14

CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138 (10th Cir. 2000) ..................13

*Bright v. Ohio Nat'l Life Assur. Corp.*,
2012 WL 12888316 (N.D. Okla. Nov. 29, 2012) ..................................................9

*Center City Periodontists, P.C. v. Dentsply International, Inc.*,
321 F.R.D. 193 204 (E.D. Pa. 2017) ...........................................................8, 9, 13

*City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576 (10th Cir. 1998) ....................................14

*Conroy v. Vilsack*, 707 F.3d 1163 (10th Cir. 2013).....................................................................6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).....................................1, 6

*Dean v. Thermwood Corp.*, 2012 WL 90442 (N.D. Okla. Jan. 11, 2012) ..................................10

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997).......................................................................9

*Graves v. Mazda Motor Corp.*, 405 Fed. App'x 296 (10th Cir. 2010) ...................................6, 14

*Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082 (W.D. Okla. 2009) ...................................7

*Hellard v. Mid Century Ins. Co.*, 2021 WL 429917 (N.D. Okla. Feb. 8, 2021).......................6, 10

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ..................................................................6

*Mooring Cap. Fund, LLC v. Knight*, 388 Fed. App'x 814 (10th Cir. 2010) ................................9

*Palmer v. Asarco Inc.*, 510 F. Supp. 2d 519 (N.D. Okla. 2007).....................................................9

*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2001) ...............................14

*S. Star Central Gas Pipeline, Inc. v. 120 Acres Located in Rice Co., Kan.*,
2012 WL 984271 (D. Kan. Mar. 22, 2012) .......................................................11

*Schulze v. United States*, 2019 WL 1440306 (N.D. Okla. Apr. 1, 2019)....................................10

*United States v. Osage Wind, LLC*, 871 F.3d 1078 (10th Cir. 2017) ......................................1, 7

*United States v. Rodriguez-Felix*, 450 F.3d 1117 (10th Cir. 2006) ..............................................7

**Rules and Statutes**

Fed. R. Evid. 702 ........................................................................................... 1, 5, 6, 9

Defendants Osage Wind, LLC ("Osage Wind"), Enel Kansas, LLC, and Enel Green Power North America, Inc. (collectively, "Defendants"), move the Court pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for an Order excluding the testimony of Steven J. Hazel whom plaintiff the United States ("Plaintiff") designated as an expert on damages in this action.

## INTRODUCTION

Mr. Hazel's opinions are the product of a thought exercise in which he imagines a hypothetical scenario wherein Osage Wind could neither construct nor operate its 84-turbine, 150 MW wind generation facility (the "Project") without entering into a mining lease with intervenor-plaintiff Osage Minerals Council (the "OMC").  In that scenario, Mr. Hazel speculates, Osage Wind would have no choice but to pay whatever hold up value the OMC might demand.  Positing the OMC would not "accept anything less than what the surface owners got," he opines the OMC's damages should be "at least equal" to the present value of all of the "income streams" that Osage Wind could owe the surface land owners through the year 2056.  This damages amount, Mr. Hazel claims, is "$25,651,701, excluding prejudgment interest," and "probably should be more" but for his own "conservative" approach.

Mr. Hazel's testimony is inadmissible as it is neither relevant nor reliable.  His thought exercise is a fantasy and ignores the Tenth Circuit has ruled it was crushing rock for backfill, not construction or operation of the Project, that required a mining lease.  *United States v. Osage Wind, LLC*, 871 F.3d 1078, 1091-92 (10th Cir. 2017).  He also overlooks that it is "undisputed" Osage Wind "could have used substitute minerals purchased offsite in lieu of using the minerals that were excavated onsite" for backfill.  Dkt. # 300 at p. 2.  Mr. Hazel's speculation as to the outcome of hypothetical lease negotiations in which Osage Wind had no choice but to accede to the OMC's

demands, therefore, is of no relevance to this case. Osage Wind instead could have purchased crushed rock from a quarry, with no crushing of excavated rock or mining lease required.

Mr. Hazel's testimony also lacks reliability because it is not based on sufficient facts or reliable methods. His thought exercise was dreamed up solely for purposes of this litigation and bears no rational relationship to any recognized methodology or scholarly literature. His purported reliance on the terms of the surface leases as the "most directly comparable proxy" for what the OMC allegedly would have negotiated with Osage Wind falls apart on first inspection. Mr. Hazel acknowledges he is unaware of any wind energy project anywhere in the United States where a mineral rights owner received the same payment terms as the surface estate owners. Nor is there any rational basis to expect they would: A wind energy project exists to convert surface wind resources to electricity, not to produce minerals. And the use of the surface leases as a "proxy" leads Mr. Hazel to absurd results like his opinions that the OMC should be paid tens of millions of dollars for megawatts of wind energy to be generated by the Project in future decades, plus more for damage to the OMC's non-existent "pasture/forage grass." At bottom, the amount of damages Mr. Hazel claims is arbitrary and rests on nothing but his "say so." More is required before a purported "expert" may testify to his opinions.

Nor is Mr. Hazel qualified to speculate on the terms Osage Wind and the OMC allegedly would have negotiated in his hypothetical scenario. He is an accountant with no training, education, or meaningful experience in wind energy development, and his one-time retention as a testifying expert as to construction cost overruns for a wind project does not cure that deficiency. The parties have retained mining engineering experts who will assist the Court in determining damages from the crushing of rock for backfill without a mining lease. Mr. Hazel's testimony should be excluded as it will not assist the finder of fact in that determination, or otherwise.

## SUMMARY OF MR. HAZEL'S OPINIONS

Mr. Hazel states he was retained "to assess damages" as to "Defendants' failure to obtain the requisite federal regulatory approvals and appropriate leases . . . to conduct extraction sorting, crushing and the use of minerals . . . as part of its excavation work." Ex. 1 (Report) at 1.  He opines the "Total Damages suffered by the Osage Nation" is "$25,651,701, excluding prejudgment interest."  *Id.* at 8.  According to Mr. Hazel, that total is "the present value of cash flows from all Income Streams contained in the Six Surface Leases" entered into by Osage Wind and the surface estate owners for the acreage on which the Project is located.  *Id.* at 7.

Those "Income Streams" include a one-time signing bonus, development period rent, one-time exercise of option payment, construction period fees, one-time construction payment, pasture damages, and turbine operating fees.  *Id.* at 5-6.  Mr. Hazel groups the first six of those seven "Income Streams" together as "Development Period Damages" totaling $1,404,252 attributable to the period from execution of the surface leases until "construction of the wind turbines was completed."  *Id.* at 7-8.  Mr. Hazel's final "Income Stream," i.e., turbine operating fees attributable to the period "commencing on the Commercial Operations date through the expiration of the lease," comprises $24,247,449 of total damages.  *Id.*  He calculates those fees by what he calls the "Megawatt Method," meaning an annual per-megawatt fee corresponding to the electricity generating capacity of the Project.  *Id.* at 15-17, 19.  His calculation includes the present value of such fees over the "initial term of 25 years," plus "an additional 20 years" for which "Osage Wind has the option to renew the Surface Lease."  *Id.* at 14.[1]

---

[1] At his deposition, Mr. Hazel testified his claimed damages "do not include the renewal time frame" because he was "being conservative." Ex. 2 (Hazel Tr.) at 127:5-20.  When shown that his expert report claimed over $5 million in damages for the optional renewal term, Mr. Hazel acknowledged "[w]e did include the 20 years at the discounted amount," adding "it is what it is" and "[w]e've already risk adjusted, so it's still a fair calculation."  *Id.* at 201:21-203:3.

Mr. Hazel's report provides the following explanation of why he determined damages in this manner:

> Based on the above descriptions of the Defendants' excavation activities [paraphrased from certain cited paragraphs of the complaint], it is clearly evident that the Mineral Estate is **at least as integral** as the Surface Estate to the construction of the Wind Farm by Osage Wind.  FTI has therefore determined that damages suffered by the Osage Nation due to the Defendants' failure to enter into the appropriate leases are **at least equal** to the present value of the amounts paid by, or willing to be paid by the Defendants to the owners of the Surface Estate, as evidenced by the Six Surface Leases . . . .

Ex. 1 (Report) at 6 (emphases in original).  His report asserts this "is a reasonable measure of damages and it is consistent with . . . the Osage Nation's best economic interests."  *Id.* at 7.  It further asserts the "Six Surface Leases represent a reasonable determination of the agreement that the Osage Nation would have negotiated with Osage Wind, and the most directly comparable proxy for amounts that Osage Wind was willing and able to pay."  *Id.*

At his deposition, Mr. Hazel testified that his opinion that "the mineral estate is at least as integral as the surface estate to the construction of the wind farm," and his measure of damages, were premised on the assumption the Project could not have lawfully been constructed or operated without a mining lease:  "The bottom line here is, if you can't anchor down that wind turbine, it's worthless."  Ex. 2 (Hazel Tr.) at 145:7-18.[2]  As a result, in Mr. Hazel's view, the OMC could have demanded, and Osage Wind would have had no choice but to pay, an amount at least equal to the present value of all payments under the surface leases:

> They have to get a lease.  So they have to negotiate the lease with the Osage Nation to basically get this wind farm in place.  My understanding, the Osage Nation would have said no.  Absolutely no is what they would have said.  So now you're in a dynamic where you have to negotiate a lease with somebody that doesn't even want

---

[2] *See also id.* at 159:13-15 ("They're required to get a lease to do those activities.  If they can't do those activities, they can't have a wind farm."); 166:22-23 ("Again, you have to get a lease to basically build the wind farm."); 167:15 ("[T]hey can't build it until they get the lease."); 171:17-20 ("[T]hey would need to have that lease to basically do the complete project.").

to do what you want them to do.  So again, it's a very reasonable proxy to the damages in this particular case.

*Id*. at 214:16-25.[3]  Indeed, according to Mr. Hazel, the amount Osage Wind would have agreed to pay the OMC for a mining lease "probably is more" than the nearly $26 million in damages set forth in his report, but he is being "conservative."  *Id*. at 215:1-5.[4]

Mr. Hazel's damages opinions do not consider the value of the rock crushed for backfill by Osage Wind at the turbine sites, or the fact that such activity ended years ago.  *Id*. at 83:12-15 (damages estimate "doesn't have anything to do in my mind about what that particular mineral may be worth"); 155:4-11 ("I already told you a bunch of times [that the fact mining ended during the construction period is] not relevant to me.  That's not the calculation we made.").  Similarly, Mr. Hazel's report states he "refrained from using . . . as a proxy" the contemporaneous mining leases entered into by the OMC and various "entities involved in the business of mineral excavation" that "typically contained royalty agreements."  Ex. 1 (Report) at 21.  Among other asserted reasons, Mr. Hazel states "the Osage Nation willingly entered into these Mineral Leases," while it is "generally opposed" to "wind energy projects."  *Id*. at 22.

## APPLICABLE LEGAL STANDARDS

Rule 702 provides that opinion testimony of a qualified expert witness is admissible if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

---

[3] *See also id*. at 95:11-14 ("[T]hey don't want this development, so if you're trying to say that you have to charge us royalty in every single possible situation, that doesn't make sense to me."); 152:21-22 ("[W]hy would they [the OMC] accept anything less than what the surface owners got?"); 220:10-23 (Mr. Hazel's belief "the Osage Nation was opposed to the project" is "a big reason" why he contends "surface leases are a better proxy than actual mineral production").

[4] *See also id*. at 194:16-18 ("[T]hey should get a similar amount to the surface owners and actually probably get more."); 219:15-16 ("I've already said it probably should be more . . . .").

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Thus, "Rule 702 imposes on the trial court an important gate-keeping obligation, to ensure that any and all expert testimony is not only relevant, but reliable." *Hellard v. Mid Century Ins. Co.*, 2021 WL 429917, at *2 (N.D. Okla. Feb. 8, 2021) (Frizzell, J.). "A two-part test applies to determine admissibility. First, the district court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion. Second, the court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact . . . ." *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013) (internal citations and quotation marks omitted). "The proponent of expert testimony bears the burden of showing that the testimony is admissible." *Id.*

"In assessing whether an expert's opinion is reliable enough to be admitted, a district court may consider whether (1) the opinion at issue can be and has been tested, (2) the theory or technique has been subjected to peer review and publication, (3) there is a known or potential rate of error, and (4) the technique has general acceptance in the relevant discipline." *Graves v. Mazda Motor Corp.*, 405 Fed. App'x 296, 298 (10th Cir. 2010) (Gorsuch, J.) (citing *Daubert*, 509 U.S. at 593-94); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). These factors are "nonexclusive" and "additional factors which may be relevant depending on the circumstances include":

(1) whether the expert proposes to testify about matters growing naturally and directly out of his research, independent of the litigation, or whether he has developed his opinion expressly for the purpose of testifying, (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, (3) whether the expert has adequately accounted for obvious alternative explanations, (4) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting, and (5) whether the field

6

of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1094-95 (W.D. Okla. 2009), *aff'd*, 405 Fed. App'x 296 (10th Cir. 2010).  These standards warrant the exclusion of Mr. Hazel's testimony.

**ARGUMENT**

**I.      Mr. Hazel's Opinions as to the "Hold Up" Value Osage Wind Allegedly Would Have Paid the OMC for a Mining Lease Are Neither Relevant Nor Reliable**

**A.      Mr. Hazel's Testimony is Irrelevant**

Plaintiff bears the burden to show that Mr. Hazel's "testimony is relevant." *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006).  "In essence, the question is whether the reasoning or methodology properly can be applied to the facts in issue." *Id.*  Plaintiff cannot meet this burden as Mr. Hazel's testimony is contrary to the Tenth Circuit's determination of what activity required a mining lease (and what did not), and is not the appropriate measure of damages.

Mr. Hazel's damages opinions purport to reflect a "determination of the agreement that the Osage Nation would have negotiated with Osage Wind" (Ex. 1 (Report) at 7), in a hypothetical scenario where Osage Wind was "required to get a lease" before it could "have a wind farm." Ex. 2 (Hazel Tr.) at 159:13-15; s*ee also id.* at 145:7-18, 166:22-23, 167:15, 171:17-20.  Such testimony is not relevant to Plaintiff's damages, however, because constructing and operating a "wind farm" does ***not*** require a mining lease.  The Tenth Circuit settled that surface owners possess "expansive authority granted to [them under the Osage Act] to use and develop their land," including "digging a hole in the ground, displacing rock and soil in the process," and "building" in the empty hole. *Osage Wind*, 871 F.3d at 1092.  It was the crushing of excavated rock for use as backfill at the turbine sites that required a mining lease, because that activity "acted upon the minerals by altering their natural size and shape in order to take advantage of them for a structural purpose." *Id.* at 1091-92.

7

Thus, the price Mr. Hazel speculates Osage Wind would have paid the OMC to "have a wind farm" is immaterial when Osage Wind instead could have purchased crushed rock from a quarry, with no crushing of excavated rock or mining lease required.   Ex. 2 (Hazel Tr.) at 159:13-15.   As Plaintiff acknowledges in its pending motion for summary judgment, it is "undisputed" Osage Wind "could have used substitute minerals purchased offsite in lieu of using the minerals that were excavated onsite."  Dkt. # 300 at 2.  Mr. Hazel agrees.  Ex. 2 (Hazel Tr.) at 52:1-3 (agreeing it is "fair" that "aggregate is pretty generally available in many locations"), 139:1-140:5, 161:9-15 ("They have access to [aggregate].").[5]  If such offsite backfill had been purchased from a quarry in Osage County, the OMC would have received royalties equal to the price per ton provided in the OMC's lease with that quarry.  Both Plaintiff and Defendants have proffered expert witnesses in mining engineering who testified to the royalty value to the OMC of the volume of minerals "mined."  Plaintiff's expert, Robert C. Freas, testified that this value totaled $247,979.42.  Ex. 3 (Freas Tr.) at 71:18-21.  Defendants' expert, John Pfahl, testified that this value totaled $68,993.  Ex. 4 (Pfahl Tr.) at 27:11-16.  Under either estimate, Mr. Hazel's claim that Osage Wind would have paid the OMC nearly $26 million for a mining lease is hundreds of times the royalties the OMC would have received had Osage Wind instead purchased the same volume of crushed rock from a local quarry.  Mr. Hazel's testimony has no possible bearing on actual damages in this case and should be excluded.

This would not be the first time a U.S. District Court has excluded Mr. Hazel's testimony as irrelevant.  In *Center City Periodontists, P.C. v. Dentsply International, Inc.*, the court agreed

---

[5] The OMC also agrees.  Dkt. # 294-1 at 9 ("importing backfill" was "the alternative" to "rock crushing"); Dkt. # 316 at 3 ("True, Defendants could have . . . purchased backfill materials to structurally support their wind turbines from elsewhere, but they chose to take advantage of Osage minerals instead.").

that Mr. Hazel's purported expert testimony should be excluded because "his 'analysis does not fit this case,'" among other reasons. 321 F.R.D. 193, 204 (E.D. Pa. 2017). There Mr. Hazel had testified to "procedures for calculating potential damages" in a breach of warranty action. *Id.* at 203. But the court found "his model does not distinguish between damages attributable to the specific breach alleged in this case or 'something else,'" and thus his methodology was "undifferentiated" and "irrelevant for purposes of determining damages." *Id.* at 204. The same is true here: Mr. Hazel's "hold up" value testimony is not relevant to determining the damages from crushing rock for backfill.

### B.    Mr. Hazel's Testimony is Unreliable

"Fed. R. Evid. 702 requires an expert's testimony to be 'based upon sufficient facts or data' and to be 'the product of reliable principles and methods' which have been 'applied reliably to the facts of the case.'" *Mooring Cap. Fund, LLC v. Knight*, 388 Fed. App'x 814, 820 (10th Cir. 2010). "An expert's testimony may be excluded where it is based on subjective beliefs or unsupported speculation which is no more than *ipse dixit* guesswork." *Bright v. Ohio Nat'l Life Assur. Corp.*, 2012 WL 12888316, at *2 (N.D. Okla. Nov. 29, 2012) (Frizzell, J.). In such cases, "there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Mr. Hazel's testimony fails this test. His opinions that "the Mineral Estate is **at least as integral** as the Surface Estate," and that therefore the OMC's damages "are **at least equal**" to the present value of all payments under the "Six Surface Leases," which he deems "the most directly comparable proxy," are divorced from any methodology or supporting facts or data. Ex. 1 (Report) at 6-7. In other words, his testimony is "classic *ipse dixit*" and should be excluded. *See Palmer v. Asarco Inc.*, 510 F. Supp. 2d 519, 531 (N.D. Okla. 2007).

Mr. Hazel's report does not identify any methodology or scholarly literature he relied upon to determine how allegedly "integral" the mineral estate was "to construction of the Wind Farm,"

or how allegedly "comparable [a] proxy" were the "Six Surface Leases." Ex. 1 (Report) at 6-7. At his deposition, Mr. Hazel disclaimed relying on any specific methodology or literature, and instead asserted his opinions were "[b]ased on all my years of training, based on every single textbook and treatise I've looked at, based on everything I've done in my whole career." Ex. 2 (Hazel Tr.) at 219:19-25.[6] This is not enough: "Experience may provide the basis for qualification as an expert, but experience is not a methodology." *Dean v. Thermwood Corp.*, 2012 WL 90442, at *7 (N.D. Okla. Jan. 11, 2012). Neither Mr. Hazel's report nor his deposition testimony adequately "explain how his experience informed his analysis and produced the conclusions he seeks to sponsor." *Id.*; *see also Hellard*, 2021 WL 429917 at *5 (purported expert opinions were "based only on the *ipse dixit* of Mr. Cary and are therefore inadmissible" where he "fails to explain how his experience is reliably applied to the facts"); *Schulze v. United States*, 2019 WL 1440306, at *3 (N.D. Okla. Apr. 1, 2019) (Frizzell, J.) (excluding testimony where "Dr. Rouse fails to explain how his experience led to his conclusions" and "the court is without the means to test Dr. Rouse's assumptions or evaluate the basis of Dr. Rouse's opinions"). To the contrary, Mr. Hazel's testimony showed his opinions to be nothing more than subjective beliefs premised on misreading the Tenth Circuit's ruling to mandate a mining lease to construct and operate the Project. *See* Ex. 2 (Hazel Tr.) at 145:7-18, 159:13-15, 166:22-23, 167:15, 171:17-20.

When Mr. Hazel was asked to explain "the basis for [his] conclusion that the amounts paid to the surface owners are a directly comparable proxy to what should have been paid to the Osage Nation," he answered:

---

[6] *See also id.* at 166:6-17 (asserting he was following "standard damage theory" found in "any treatise"), 215:22-217:25, 218:15-23 (asserting "any damage treatise or textbook or whatever would talk about the comparable analysis we did").

> This negotiated deal between the various parties is exactly the same land in question.  One is the subsurface, one is the surface, so they're very close in proximity to each other.  It's all the dynamics to make it the best approximation of the minimum amount that the mineral estate owner should receive.

*Id.* at 179:5-16; *see also id.* at 218:24-219:4 ("We have a comparable for the same property, for the same time period, for the same project.  All those different things are the same.").  Mr. Hazel fails to identify any principle by which he concludes "close proximity" makes the mineral estate "directly comparable" to the surface estate for purposes of a wind energy project or otherwise.  There is none.  While a single family home and the car in its driveway are in "close proximity," for example, it cannot be said that such proximity makes the terms of a sale of the home a "comparable" for the car.  The same is true here:  Surface estate owners possess property rights to the surface and its wind resources that the mineral estate does not.  Courts exclude the testimony of purported experts who, like Mr. Hazel, rely on ill-fitting "comparable" transactions to justify their damages opinions.  *See S. Star Central Gas Pipeline, Inc. v. 120 Acres Located in Rice Co., Kan.*, 2012 WL 984271, at *4 (D. Kan. Mar. 22, 2012) (excluding damages testimony in condemnation action where the "only basis" for the expert's "$150 per acre lease estimate" was "an Alaska lease, which is too remote to be relevant").

Mr. Hazel admits he is unaware of "any other instance in which mineral owners were paid the same as surface owners in a wind energy project."  Ex. 2 (Hazel Tr.) at 101:16-25; *see also id.* at 178:20-24.  This is no surprise:  A wind energy project exists to convert wind resources to electricity, not to produce minerals.  Here the surface leases provide "the Lease shall be for Wind Energy Purposes," and grant Osage Wind "the exclusive right to use the Property" for "collecting and transmitting the electrical energy so converted."  Ex. 5 (Lease) at Art. II § 2.  The "Income Streams" Mr. Hazel opines the OMC is entitled to receive as damages likewise have nothing to do with mineral production.  In one telling example, Mr. Hazel asserts the OMC should receive

$16,363 in "Pasture Damages" paid by Osage Wind for "pasture/forage grass actually destroyed or damaged." Ex. 1 (Report) at 11. While Mr. Hazel acknowledges the OMC did not "have any rights in pasture or forage grass," he suggests this is just "semantics" and the OMC should be paid for damage to pasture or forage grass because "there would be similar dynamics to the subsurface of this that were affected." Ex. 2 (Hazel Tr.) at 182:17-25. When asked to identify "the similar subsurface comparable, if you will, to the pasture," Mr. Hazel admitted: "I haven't thought about that. I don't know. I would have to think about that." *Id*. at 183:17-20.

As with "Pasture Damages," Mr. Hazel's report halfheartedly attempts to connect the other "Income Streams" during the "Development Period" to hypothetical "mining." *See* Ex. 1 (Report) at 8-12 (e.g., asserting that per-acre "Development Period Rent" payments "potentially relate to mining" insofar as Osage Wind had "the right to extract soil samples"). But Mr. Hazel's report makes no such attempt as to the $24,247,449 in "Turbine Operating Fees" he estimates will be paid to surface estate owners from the commencement of commercial operation in 2015 through 2056, which comprise more than 94% of Mr. Hazel's claimed damages. *Id*. at 12-19. He calculates those fees using the "Megawatt Method," i.e., an annual per-megawatt fee corresponding to the electricity generating capacity of the Project. *Id*. at 15-17, 19; *see also* Ex. 5 (Lease) at § 5.3(ii). Mr. Hazel's report is silent, however, as to any reason why the mineral estate owner would ever receive payments calculated from the megawatts of electricity generated by converting wind resources into electricity, much less for decades into the future. During his deposition, Mr. Hazel conceded this conclusion is nothing more than his subjective opinion of "hold up" value: "[W]hy would they accept anything less than what the surface owners got?" Ex. 2 (Hazel Tr.) at 152:21-22. This is not reliable expert opinion.

12

Mr. Hazel's choice to disregard the contemporaneous mining leases entered into by the OMC is further evidence his opinions are litigation-driven and based on nothing more than his "say so." *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1166 (10th Cir. 2000) (affirming exclusion of expert valuation testimony where district court had "concluded that Smith's analysis disregarded or failed to account for . . . prices actually received by $CO^2$ suppliers in comparable markets"); *Ctr. City Periodontists, P.C.*, 321 F.R.D. at 204 (excluding Mr. Hazel's testimony as "unreliable" where he "fails to account for any revenue generated" from allegedly nonconforming dental device). As Mr. Hazel acknowledges, those mining leases "typically contained royalty agreements whereby the Osage Nation would receive payments based on a royalty rate that was applied to . . . minerals extracted over the term of the lease." *See* Ex. 1 (Report) at 21; *see also* Ex. 2 (Hazel Tr.) at 89:18-93:9.

Mr. Hazel's stated reasons why he "refrained from using [the mining leases] as a proxy" for damages from Osage Wind's mining without a lease are wholly contrived. Ex. 1 (Report) at 21. For example, Mr. Hazel complains the mining leases are not "related to wind farm projects" and are "based on minerals extracted for sale." *Id.* But these complaints assume the very conclusion they are intended to show: That the OMC's damages cannot be straightforwardly calculated from the royalty value of the minerals "mined," which the parties' respective mining engineering experts have already done. *Id.* His assertion that the "duration" and "size of the properties involved" in the mining leases are different from the duration and acreage of the "Six Surface Leases" is a restatement of his unfounded assumption that the OMC should receive payments to lease thousands of acres on which no "mining" occurred for a period spanning decades after any "mining" was completed. *Id.* at 22. And his assertion that "the Osage Nation willingly entered into these Mineral Leases," while it is "generally opposed" to "wind energy projects," is

13

yet another variation on the false notion that Osage Wind had no choice but to pay "hold up" value to the OMC. *Id.* at 22; *see also* Ex. 2 (Hazel Tr.) at 220:10-23. In the end, Mr. Hazel's testimony "rests on no more than his say so—and that isn't good enough to require its admission." *Graves*, 405 Fed. App'x at 299.

## II.   Mr. Hazel is Not Qualified to Opine as to the "Hold Up" Value Osage Wind Allegedly Would Have Paid the OMC for a Mining Lease

Even were Mr. Hazel's testimony relevant (it is not), he is not qualified to provide expert testimony on this subject matter. Courts routinely exclude experts whose proffered testimony falls outside the bounds of their expertise. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969-70 & n.4 (10th Cir. 2001) (orthopedic surgeon not qualified to testify about surgical technique she did not research or perform); *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998) (affirming exclusion of expert who lacked state-specific knowledge of insurance claims handling).

Mr. Hazel describes himself as "a forensic accountant," and acknowledges "probably 75%" of his time is devoted to work as a testifying or consulting expert in various litigations. Ex. 2 (Hazel Tr.) at 18:11-19:12. While Mr. Hazel may be qualified to calculate the present value of future payments due under the "Six Surface Leases," he is not qualified to opine on what agreement a wind energy developer would have entered into with a mineral rights holder were such an agreement (as Mr. Hazel wrongly assumes) necessary to "have a wind farm." Ex. 2 (Hazel Tr.) at 159:13-15. The sum total of Mr. Hazel's experience with wind energy development is a single prior litigation where he was engaged to testify as to "potential cost overruns" in a construction dispute, plus "a couple of [other] cases that had wind farms on them" where "it was more of a peripheral aspect." *Id.* at 19:25-25:13. Mr. Hazel admits he has never before opined on lease terms a wind energy developer would enter into with a mineral rights holder. *Id.* at 23:20-24:4,

24:25-25:13, 99:4-23. This lack of relevant expertise is even more problematic given Mr. Hazel's sole reliance on his own experience, rather than on any recognized methodology or scholarly literature, as the basis for his speculative opinion that Osage Wind would have agreed to pay the OMC nearly $26 million for a mining lease. *Id.* at 219:19-25. Mr. Hazel's testimony is beyond the limits of his accounting expertise.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court grant the instant motion and enter an Order excluding Mr. Hazel from testifying in this action and granting Defendants such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Ryan A. Ray*
**Ryan A. Ray**, OBA # 22281
**NORMAN WOHLGEMUTH, LLP**
3200 Mid-Continent Tower
401 South Boston Avenue
Tulsa, OK 74103
918-583-7571
918-584-7846 (facsimile)

-and-

**Lynn H. Slade**, *pro hac vice*
**Sarah M. Stevenson**, *pro hac vice*
**Dominic A. Martinez**, *pro hac vice*
**MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.**
Post Office Box 2168
Albuquerque, NM 87103-2168
505-848-1800
505-848-9710 (facsimile)

-and-

**Thomas J. McCormack**, *pro hac vice*
**Robert Kirby**, *pro hac vice*
**NORTON ROSE FULBRIGHT US LLP**
1301 Avenue of the Americas
New York, NY 10019
212-318-3000
212-318-3400 (facsimile)

*Of Counsel:*
**Robin D. Ball** (Los Angeles Office), *pro hac vice*
**Robert D. Comer** (Denver Office), *pro hac vice*
**NORTON ROSE FULBRIGHT US LLP**

**ATTORNEYS FOR DEFENDANTS
OSAGE WIND, LLC, ENEL KANSAS, LLC
AND ENEL GREEN POWER NORTH
AMERICA, INC.**

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 9, 2021, I electronically transmitted the attached Document to the Clerk of the Court using the ECF System for filing. Based on the electronic records currently on file, the Clerk of the Court will transmit a notice of Electronic Filing to the following ECF registrants:

Cathryn D. McClanahan
Nolan Fields IV
Stuart P. Ashworth
Mary Kathryn Nagle
Wilson Kirk Pipestem
Abi Laura Fain
David McCullough
Jeffrey S. Rasmussen
The following non-ECF registrants have been served by email:

Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor Office
7906 East 33rd Street
Tulsa, OK 74145
(918) 669-7730
Charles.babst@sol.doi.gov
*Attorney for the United States of America*


*/s/ Ryan A. Ray*
Ryan A. Ray