**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and | ) | |
| THE OSAGE MINERALS COUNCIL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-704-GKF-JFJ |
| | ) | |
| OSAGE WIND, LLC; | ) | |
| ENEL KANSAS, LLC; and | ) | |
| ENEL GREEN POWER NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY
OF PLAINTIFF THE UNITED STATES' EXPERT WITNESS
STEVEN J. HAZEL AND OPENING BRIEF IN SUPPORT**

# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
    UNITED STATES OF AMERICA,
 3
                  Plaintiff,
 4
    and
 5
    OSAGE MINERALS COUNCIL,
 6
                  Intervenor-Plaintiff,
 7
    vs                          No. 14-CV-704-GKF-JFJ
 8
    OSAGE WIND, LLC,
 9  ENEL KANSAS, LLC;
    and ENEL GREEN POWER
10  NORTH AMERICA, INC.,

11              Defendants.

12        VIDEOTAPED DEPOSITION OF STEVEN HAZEL
             Taken on Behalf of the Defendants
13        On April 29, 2021, beginning at 10:05 a.m.
          All Parties Appearing Via Webconference
14
                      APPEARANCES
15  Appearing on behalf of the PLAINTIFF:
    Stuart Ashworth
16  Cathryn McClanahan
    UNITED STATES ATTORNEY'S OFFICE
17  NORTHERN DISTRICT OF OKLAHOMA
    110 West Seventh Street, Suite 300
18  Tulsa, Oklahoma 74119
    918-382-2772
19  stuart.ashworth@sol.doi.gov
    and
20  Charles R. Babst, Jr.
    UNITED STATES DEPARTMENT OF THE INTERIOR
21  OFFICE OF THE SOLICITOR
    7906 East 33rd Street
22  Tulsa, Oklahoma 74145
    918-669-7730
23  charles.babst@sol.doi.gov

24          Appearances Continued on Next Page
    VIDEOTAPED BY:  STESHA SNOW
25  REPORTED BY:  MARY K. BECKHAM, CSR, RPR
```

1    Q    All right.  And tell us what you do in

2  that role.

3    A    Well, broadly, I guess I'm responsible, is

4  the word I would use, for various different people

5  directly, work in broader teams on other different

6  matters, but, generally, I'm the person responsible

7  for the final product and, potentially, testifying.

8    Q    Is testifying as an expert witness your

9  primary work?

10   A    No.

11   Q    What is your primary work?

12   A    I mean, most people would consider me a

13  forensic accountant.  So I do, you know, various

14  different things in the capacity as a forensic

15  accountant.

16   Q    Testifying as an expert is one of them,

17  correct?

18   A    True.

19   Q    What percentage of your time would you

20  estimate you devote to testifying as an expert

21  witness?

22   A    Well, I mean, I guess it depends on how

23  you define that, but if you're talking about

24  specifically in a testifying capacity, it's

25  probably, I don't know, ten hours a month.



```
 1        Q    And what about preparing expert reports?
 2   By way of example, how often do you do that?
 3        A    Are you talking about expert reports in
 4   the capacity of litigation, or are you talking about
 5   expert reports generally?
 6        Q    We'll first start with litigation.
 7        A    I mean, it changes over time.  I would say
 8   it's probably 75 percent is in the form of
 9   litigation at this point.
10        Q    And do you also do work on occasion as a
11   non-testifying expert?
12        A    Yes.
13        Q    And tell us broadly what that usually
14   entails.
15        A    Well, first of all, there could be a
16   consulting role, which I was actually including kind
17   of within the litigation environment, but then
18   there's also roles where we're just doing either
19   valuation work, for example, or tax analysis,
20   something like that.  That would be outside of the
21   litigation environment, either prior to any
22   litigation commencing or some type of traditional
23   purpose, like financial reporting or a tax related
24   valuation, something like that.
25        Q    Have you ever prior to this case been
```



```
 1    involved in a litigation matter involving wind
 2    energy?
 3         A    I believe there was -- yes.
 4         Q    All right.  When was that, sir?
 5         A    It's been a while ago.  It's been -- I
 6    would guess it's probably around 15 years ago.
 7         Q    Do you recall the court in which that was
 8    pending?
 9         A    No.
10         Q    Do you recall the state it was in?
11         A    I don't remember where the court state
12    was, but the project was in Wyoming.
13         Q    And what was the litigation about, if you
14    recall?
15         A    It was about some construction cost
16    overruns.
17         Q    All right.  And do you recall any of the
18    parties to the case?
19         A    No.
20         Q    Do you recall any of the lawyers?
21         A    I can't think of who was involved with
22    that case.  It's been a long time ago.
23         Q    And what subject matter were you
24    testifying on in that case?
25         A    Related to the potential cost overruns of
```

**Professional Reporters**

800.376.1006
www.ProReporters.com

```
 1  the project.  And I didn't testify, just so we're

 2  clear, but it was related to the overall

 3  construction costs of the project.

 4       Q    All right.  Were you retained as an expert

 5  witness for one of the parties?

 6       A    Yes.

 7       Q    All right.  Were you estimating the cost

 8  overruns for which party, if you recall?

 9       A    My remembrance is we were working for the

10  owner.

11       Q    The owner of the project?

12       A    Correct.  Sorry, my phone rang on my other

13  line.  I apologize.

14       Q    No, that's okay.  All right.  And it was a

15  dispute with whom?  Was it the contractor or --

16       A    Correct.

17       Q    Okay.  So were you attempting to value

18  the -- what these construction cost overruns would

19  cost?  Was that your role?

20       A    No, I wouldn't phrase it that way.  I

21  mean, I'm not an engineer, so I'm not going to be

22  doing that.

23       Q    Well, how would you phrase it?  What were

24  you doing in that case?

25       A    So I would be looking at the accumulation
```



```
 1   of the costs related to the overall costs expended

 2   by the general contractor, various different

 3   approved or unapproved change orders, to look at the

 4   potential cost overrun of the project.

 5        Q    And what kinds of overruns were these, if

 6   you recall?

 7        A    I don't remember.  I don't remember what

 8   they specifically were in that case.

 9        Q    Do you remember generally what they were,

10   any sense at all?

11        A    I mean, I could speculate, based on what

12   generally these type of cases have, but I don't

13   remember anything specific to this case.

14        Q    Do you remember anything at all about the

15   nature of the overruns?

16        A    Well, there was some, but I don't remember

17   specifically how much or what the reasons were, the

18   purposes were.

19        Q    And did you give -- you said you did not

20   give any testimony in that case; is that right?

21        A    That's my remembrance.  I don't remember

22   giving any testimony.

23        Q    Did you draft a report in that case?

24        A    I don't even remember that for sure.  I'm

25   sure we were in the process of it, but I just don't
```



1    remember when it settled.

2        Q    **You do recall that it did settle, though,**

3    **correct?**

4        A    I mean, obviously, it settled in some way.

5    I don't remember exactly how, but I don't believe I

6    ever was deposed.  I don't believe I ever testified.

7        Q    **Do you think you actually formed any**

8    **opinions in that case?**

9        A    I mean, probably, but I don't remember

10   exactly how those would be memorialized.

11       Q    **Did that case involve mineral interests in**

12   **any way?**

13       A    I mean, I guess, yes, because there's

14   obviously something that has to be done when you

15   construct the site, but, again, I guess some people

16   would argue whether there's mineral interests or

17   not, but, it's -- you know, there's a subsurface

18   aspect to any type of wind farm.  Let's just put it

19   that way.

20       Q    **But were you opining on anything related**

21   **to mineral interests in that case?**

22       A    I mean, no, not the way you phrased it.

23   Obviously, there would be costs related to that

24   particular activity, but I wouldn't be opining on

25   the actual mining itself.



```
 1        Q    And were you aware of any payments being
 2   made to the mineral interest owner in that case?  Do
 3   you recall anything about that?
 4        A    I do not.
 5        Q    All right.  Have you had any other
 6   experience with litigation matters involving the
 7   wind energy industry?
 8        A    I can't think of one.
 9        Q    Do you have any experience in the wind
10   industry in non- -- in a non-litigation context?
11        A    It seems like there have been a couple of
12   cases that had wind farms on them, but nothing that
13   I can think of off the top of my head.
14        Q    It wasn't anything you were looking at
15   specifically as to your engagement; is that fair?
16        A    I mean, I would consider it was more of a
17   peripheral aspect.  It wasn't the main aspect of the
18   case.
19        Q    And it wasn't anything you were
20   specifically asked to form views on in those
21   matters; is that true?
22        A    Yeah, that I don't remember.  I don't
23   remember what the attorneys may have asked me to
24   look at in that way.  I don't remember.
25        Q    Do you recall in any of those matters
```

1   being asked to opine on payments that might be due

2   to mineral owners?

3        A    No, I don't remember that aspect coming

4   up.

5        Q    This is the first case in which you've

6   rendered that type of opinion; is that correct?

7        A    No.

8        Q    What other case have you rendered an

9   opinion about payments due to mineral owners in a

10  wind energy project?

11       A    Okay.  So if we're talking about specific

12  to wind projects, which was not your last question,

13  I can't think of one off the top of my head.

14       Q    All right, sir.  So we've looked at

15  Appendix A that listed the documents that you've

16  relied on after -- as of September 18th of 2020;

17  true?

18       A    It's not on the screen anymore, but, yes,

19  that's what that document represents.  There you go.

20  Thank you.  Yes.

21       Q    All right.  Now, you said you've looked at

22  the three expert reports after that, correct?

23       A    Yes.

24       Q    All right.  And you also said you believe

25  you've received some other information that you



1    Q    I mean, you're aware that aggregate is

2    pretty generally available in many locations, true?

3    A    That's fair.

4         MR. ASHWORTH:  Hey, Ryan?

5         MR. RAY:  Yes.

6         MR. ASHWORTH:  Do you mind if we take a

7    quick break?  I need to use the rest room.  We've

8    been at it for about an hour now.

9         MR. RAY:  No, let's take a few minutes.

10        THE WITNESS:  Okay.  Five minutes, is

11   that what we're saying?

12        MR. ASHWORTH:  That works.

13        MR. RAY:  Five, ten, something like that,

14   yeah.

15        THE WITNESS:  Okay.

16        THE VIDEOGRAPHER:  We're off the record at

17   11:02 a.m.

18        (A recess was had.)

19        THE VIDEOGRAPHER:  We're back on the

20   record at 11:12 a.m.

21   Q    (By Mr. Ashworth)  All right, sir.  Before

22   we left, we were talking about some of your work at

23   the -- I believe we were talking about Classick and

24   Music.  What did you do in the CPA side, what was

25   your role there?

 1    the criticisms.

 2        Q    Do you have any that generally come to

 3    your mind, as we sit here right now?

 4        A    I would rather have the report in front of

 5    me to give you all of them.  I don't want to start

 6    giving you a partial laundry list.

 7        Q    Can you think of one example as you sit

 8    here right now, without even looking at the report

 9    in front of you?

10        A    Well, I think broadly he misses the point.

11    The point here in this particular situation is

12    negotiation of a lease.  It doesn't have anything to

13    do in my mind about what that particular mineral may

14    be worth right there at that particular moment in

15    time.  We're talking about damages related to this

16    case and what the mineral right owners should

17    receive as damages.  That's what we're talking about

18    in this case.  So he just totally misses the point.

19        Q    Damages for what?

20        A    For the failure to get a lease for the

21    mining activities that the Tenth Circuit determined

22    was going on.

23             MR. RAY:  All right.  Do we have up

24    Mr. Hazel's report, Exhibit 18?  Is that the exhibit

25    that we have here?



1    full sentence from which that's quoted.  It

2    starts -- do you see where it says, "These

3    regulations are intended to ensure that Indian

4    mineral owners desiring to have their resources

5    developed are assured that they will be developed in

6    a manner that," as they said, "maximizes their best

7    economic interests."  Do you see that?

8         A    Honestly, I can't see it because the

9    screen is cut off a little bit, but I think you read

10   it properly.

11        Q    All right.  Do you also have an

12   understanding that part 214 of these regulations

13   actually specifically applies in Osage County?  You

14   looked at some of those, did you not?

15        A    You'll have to refresh my memory, but that

16   sounds right.

17             (Exhibit 20 marked for identification.)

18        Q    (By Mr. Ray)  All right.  Well, let's take

19   a look at Exhibit Number 20, and if we could, let's

20   go to page 32.  And do you see there, sir, where

21   "Leases, among other things, must be on forms

22   prepared by the department, and the superintendent

23   of the Osage Indian School, Pawhuska, Oklahoma, will

24   furnish prospective lessees with such forms at the

25   cost of $1 per set."  Do you see that?



Steven J. Hazel                                        4/29/2021        80

```
 1              MR. ASHWORTH:  Object to the form.  Ryan,
 2    I can't see where you're -- what you're referring
 3    to.  Could you enlarge it so I can see where you're
 4    reading from?
 5              MR. RAY:  Yeah, it's from the first
 6    sentence there.
 7        A    I mean, I think you read it properly, if
 8    that's what you're asking, yes.
 9        Q    (By Mr. Ray)  All right.  And one of the
10    things there is a form N, which would be a lease,
11    except for lead and zinc, right?
12        A    True.
13        Q    Are you aware of any forms prepared by the
14    Department of the Interior that would have terms
15    like those you are proposing?
16        A    I have no idea what you're talking about
17    there.
18        Q    Have you seen a form lease that would have
19    payment terms like what you've proposed in your
20    report?
21        A    Are you talking about our damage
22    calculation in our report?
23        Q    Yes, sir, that's basically based on the
24    terms of the surface leases that the surface owners
25    got in this case, right?
```



```
 1        A     True.

 2        Q     Have you seen forms prepared by the

 3   Department of the Interior that have terms like

 4   that?

 5              MR. ASHWORTH:  Object to the form.

 6        A     I don't know why they would prepare those,

 7   first of all, so I don't understand your question,

 8   but I guess, no, I haven't seen something specific

 9   like that.

10              (Exhibit 23 marked for identification.)

11        Q     (By Mr. Ray)  All right.  Let's take a

12   look at Exhibit 23.  Have you ever seen this

13   document, sir?

14        A     This one does look familiar.  I definitely

15   have some similar to this, but I can't remember if

16   it was Candy Creek or not.

17        Q     All right.  This would appear to be a

18   lease that was in effect in 2013 and 2014, true?

19        A     A negotiated lease between the two parties

20   at that time period, yes.

21        Q     Right.  It's on a form prepared by the

22   Department of the Interior, is it not?

23        A     That's what it appears.

24        Q     All right.  And it has -- in paragraph

25   2(a) it actually has a royalty rate, correct?
```



```
 1        A     It does.

 2        Q     And that's 51 cents per ton for all

 3   limestone and Dolomite received; is it not?

 4        A     It technically says removed, but, yes.

 5        Q     Removed -- "removed from the premises" is

 6   what it says, right?

 7        A     Yes.

 8        Q     That's what triggers payment of the

 9   royalty under this document?

10        A     We would have to look at the whole

11   document, but that's what this line says, yes.

12        Q     All right.  Well, please take a look, and

13   tell us if you -- I believe it's a two-page

14   document, sir.  If you need to look at the entire

15   thing to tell us if you see any other payment terms

16   that are set out, please take a look and let us know

17   what they are.  And I apologize.  It's actually four

18   pages, maybe it's five.

19        A     I'm not sure I really understand the

20   question.  Are you trying to say what is the trigger

21   event for a payment --

22        Q     Yes, sir.

23        A     Is that what your question is?

24        Q     I'm trying to ask you if there's anything

25   other than the removal of limestone or Dolomite?
```

1     A     That would cause a payment?

2     **Q     Yes, sir.**

3     A     Okay.  Can you go to the next page?  Okay.

4  Keep going.  Keep going.  So I think your question

5  is, is the removal of the limestone and Dolomite the

6  triggering for the royalty?  I agree with you.

7     **Q     Nothing else that triggers a payment in**

8  **this form prepared by the Department of Interior?**

9     A     I think that's fair.

10    **Q     All right.  Let's go back to Exhibit 20,**

11 **and we'll take a look at page 12.  Now, do you see**

12 **subsection (d), sir?**

13    A     You said B as in boy or D as in dog?  Oh,

14 D?  Okay.

15    **Q     D as in, yeah, Delta.**

16    A     Okay.

17    **Q     All right.  Are you -- there was no gold,**

18 **silver, copper, lead, zinc, coal or asphaltum at**

19 **issue in this case, true?**

20    A     Correct.

21    **Q     All right.  So this provision actually**

22 **requires a royalty rate for those substances for**

23 **"10 percent of the value at the nearest shipping**

24 **point of all ores, metals or minerals marketed,"**

25 **correct?**



1    **required in subsection (d) for these materials?**

2         A    You'll have to do that one again.  Can you

3    say that one again?

4         **Q    Is there anything else in this regulation**

5    **that would contemplate any different kind of royalty**

6    **for the substances at issue in this case, other than**

7    **that in subsection (d)?**

8         A    Well, sure.  I mean, again, the Indian

9    Nation didn't want the development at all, so we're

10   talking about leases that the Nation wants.  Well,

11   they don't want this development, so if you're

12   trying to say that you have to charge us royalty in

13   every single possible situation, that doesn't make

14   sense to me.

15        **Q    My question, sir, is specific to**

16   **subsection 210 of the Code of Federal Regulations,**

17   **and my question is whether anything in this**

18   **regulation contemplates a royalty for the substances**

19   **at issue here, other than that set forth in**

20   **subsection (d)?**

21             MR. ASHWORTH:  Object to the form.

22        A    Well, first of all, this is 214.10(d), not

23   what you said, but second of all, if there's a

24   negotiated lease for these, is this royalty

25   required, the answer is yes.



```
 1        Q    And are you highly qualified in all of
 2   those areas?
 3        A    Yes.
 4        Q    All right.  As it relates to wind, I
 5   believe I understood you earlier that you've been
 6   involved in one case involving wind energy that
 7   involved construction overruns, correct?
 8        A    No, that's not what I said.
 9        Q    All right.  What other wind energy
10   projects have you been involved in?
11        A    Again, as we talked about previously,
12   there was the one case we talked about in detail.  I
13   believe there was other cases where there was wind
14   farms as part of the development, but was not the
15   focal aspect of that particular case.
16        Q    You certainly didn't analyze anything
17   about mineral leases in those cases specific to wind
18   farms, true?
19        A    I don't remember that being a dynamic in
20   those cases, correct.
21        Q    And you've never actually done that at all
22   before this case, true?
23        A    Sure.
24        Q    All right, sir.  Let's take a look at the
25   third page of Exhibit Number 24.  Is this a budget
```

1    **research; can you describe for us what kind of**

2    **industry research was done?**

3         A    Trying to think of an example, just bear

4    with me a second here.  I guess a good example would

5    be that we did some research related to the life

6    cycle of a wind turbine.

7         Q    Okay.  Any other examples that you can

8    think of?

9         A    Off the top of my head, I think we did

10   some analysis related to wind projects related to

11   their cost structure.  I think we did some research

12   related to the discount rates, to their rates of

13   return, to their revenue sources, to their

14   agreements with electrical providers, those types of

15   things.

16        Q    And did your research reveal any other

17   instance in which mineral owners were paid the same

18   as surface owners in a wind energy project?

19        A    I don't think the research spoke to that,

20   no.

21        Q    Are you aware of that occurring anywhere

22   else in the United States of America?

23        A    Again, that's not what we're doing here,

24   so I'm not sure why you're saying that, but I'm not

25   aware of that specific dynamic happening.



1      A    Well, first of all, there's historical

2 amounts that would not have a present value, so it's

3 looking at the overall amounts that would be

4 received by the six surface owners.

5      Q    **Over the entire life of the project?**

6      A    Well, not technically over the entire life

7 of the project, over the initial period.  It does

8 not include the renewal time frame.

9      Q    **Your calculations do not include the**

10 **renewal time frame?**

11      A    Correct.

12      Q    **Because it wouldn't be appropriate to**

13 **include those, because we don't know if the renewal**

14 **is going to happen or not, right?**

15      A    I would disagree with that.  We were just

16 being conservative by just using the additional time

17 frame.  Technically, you would add the probability

18 of the lease being extended, which is pretty likely,

19 but we're talking about out in the future, so it

20 would be present valued back.

21      Q    **And how do you know it is likely that the**

22 **lease will be extended?**

23      A    Based on any renewable project, they want

24 the project as long as possible.  Now, obviously,

25 things can change in the industry at that time,



```
 1        Q    (By Mr. Ray)  All right.  Let's take a
 2   look at Exhibit 26, if we could.  Have you seen this
 3   document before?
 4        A    It does look familiar.  I don't remember
 5   what context I saw this in, but it does look
 6   familiar.
 7        Q    And did you understand that IEA Renewable
 8   Energy was the contractor that constructed this
 9   project?
10        A    I actually thought it was a different name
11   that was spelled out, but I'm not trying to disagree
12   with you.  They could be the same entity.
13        Q    Well, whoever they are, it clearly appears
14   that they purchased some aggregate from Dewey,
15   Oklahoma, correct?
16        A    That's what it appears, yes.
17        Q    This was ordered on December 16th, 2014,
18   right?
19        A    Yes.
20        Q    That's during the construction period;
21   yes?
22        A    Sounds right, yes.
23        Q    All right.  And it says, if we look in the
24   bottom sort of left hand there, it says, "Delivered
25   to Osage Wind project," right?
```



```
 1        A    It does.

 2        Q    So it certainly appears that aggregate

 3   was, in fact, purchased for this project from

 4   another source; yes?

 5        A    That's what it appears.

 6             (Exhibit 27 marked for identification.)

 7        Q    (By Mr. Ray)  Let's take a look at Exhibit

 8   27, if we could.  Have you seen this document

 9   before, sir?

10        A    This one does not look familiar, but,

11   again, it's a similar purchase order to the previous

12   one.

13        Q    And it certainly indicates a number of

14   hard mineral type materials were purchased for the

15   Osage Wind farm; do you see that?

16        A    Yeah.  I mean, I guess we should be

17   careful about using the word, hard, in that

18   particular context, but there are various different

19   materials purchased here, yes.

20        Q    Which one of them do you not define as

21   hard, if any?

22        A    Well, I mean, again, I'm not trying to be,

23   you know, argumentative, but most people would

24   consider clay and fill, they wouldn't necessarily

25   consider that a hard mineral.
```



1    we're on the right page.

2        A    Oh, yeah, you're on page 10 still, sorry.

3    "Based on the above descriptions," that's the one

4    you talked about?

5        Q    **Yes, sir.**

6        A    I see that.

7        Q    **How is it the case, sir, that the mineral**

8    **estate is at least as integral as the surface estate**

9    **to the construction of the wind farm?**

10       A    Yes.

11       Q    **Explain how that is so.**

12       A    Well, I mean, we've already talked about

13   that many times today, that their damages are

14   probably at least what the surface estate -- I

15   believe you even agreed with me a couple of times

16   that the mineral estate is typically more valuable.

17   The bottom line here is, if you can't anchor down

18   that wind turbine, it's worthless.

19       Q    **So is that -- so is it the anchoring of it**

20   **in the subsurface that is the basis of your**

21   **conclusion there?**

22       A    No.  I'm just giving you an example of

23   something that has to have all the different aspects

24   of the equation.  You can't just set it on top of

25   the surface.



Steven J. Hazel   4/29/2021   152

1   **right, right?  And you've seen that before, haven't**

2   **you?**

3        A    I don't think I necessarily -- again, I

4   shouldn't be making legal conclusions like this or

5   interpretations.  I don't read that that way, but if

6   a judge or another lawyer says that's the

7   interpretation of that language, that's fine.  I'm

8   not interpreting it one way or the other.

9        **Q    So it is your conclusion, sir, that the**

10   **mineral owners should receive a lease on these --**

11   **the terms, the same as Exhibit 28; is that correct?**

12             MR. ASHWORTH:  Object to the form.

13        A    I mean, no, that's not what my report

14   says.  I mean, first of all, they may not want it at

15   all, so there should be no wind farm there.  So

16   that's the first option.  So, basically, now that

17   there is a wind farm there, do they have to tear it

18   up?  Let somebody else decide that.  But at this

19   point they have to have approval, being Osage Wind

20   has to have the approval of the mineral estate

21   owners, so why would they accept anything less than

22   what the surface owners got?  It doesn't make any

23   sense.  They would want at least that amount, if not

24   more, because, again, as you've agreed with me a

25   couple of different times, the mineral estate is



Steven J. Hazel                                                                    4/29/2021                                                                    155

```
 1  being damaged the whole time frame when the wind

 2  farm is there.  That's the damages component.

 3           MR. RAY:  Move to strike as nonresponsive.

 4      Q    (By Mr. Ray)  My question again, sir, is,

 5  do you have any evidence that mining occurred after

 6  the construction period ended?

 7      A    Again, you've asked me that question

 8  multiple times.  I've told you that I don't have any

 9  specific information, because I haven't looked into

10  that.  I already told you a bunch of times it's not

11  relevant to me.  That's not the calculation we made.

12      Q    Are you aware, sir, of any other instance

13  in which a mineral owner is paid other than for the

14  production of minerals from the mineral estate?

15           MR. ASHWORTH:  Object to the form.

16      A    I mean, there are situations, especially

17  in the oil and gas, where people are paid for other

18  than the extraction itself, because they need other

19  types of either pipelines or houses or whatever they

20  need to basically do the overall production of that

21  mineral, which is not specific to the mineral

22  itself.

23      Q    (By Mr. Ray)  So in the oil and gas

24  context, there often are payments to hold it for

25  future production, right?
```



1    Q    The regulations you reviewed in this case,

2    that were at issue in the Tenth Circuit --

3    A    I guess I'm not following the question.

4    what do you mean?

5    Q    The regulations that were at issue in the

6    Tenth Circuit opinion; you understand that, right?

7    A    They mention certain particular statutes,

8    yes, but, again, they defined what they considered

9    mining in this particular context.

10    Q    And it was that activity that required a

11    lease, right?

12    MR. ASHWORTH:  Object to the form.

13    A    They're required to get a lease to do

14    those activities.  If they can't do those

15    activities, they can't have a wind farm.  That's

16    what they're basically saying.

17    Q    (By Mr. Ray)  And what do you base that

18    conclusion on, that they -- if they can't do those

19    activities they can't have a wind farm?

20    A    Well, because they constructed it that

21    way, so they must have felt it necessary to do it.

22    Q    Well, we've already seen, sir, in Exhibits

23    26 and 27 that these materials were available for

24    purchase from other locations, right?

25    A    Then they should have done that broadly.



1   that.  That's not my place.

2       **Q    But they certainly would have been --**

3   **wouldn't have been extracting rock, sorting rock,**

4   **crushing rock, and reusing rock from this area,**

5   **true?**

6           MR. ASHWORTH:  Object to the form.

7       A    Again, I don't know what they exactly

8   would have done, because that didn't occur.

9       **Q    (By Mr. Ray)  But you know and understand**

10  **that aggregate is readily available for commercial**

11  **purpose -- purchase, do you not?**

12      A    You had to have asked that question at

13  least 10 times now, so we're not disagreeing on

14  that.  They have access to it.  They just didn't do

15  it that way.

16          MR. RAY:  We've been going about an hour.

17  I'd like to take a rest room break, unless anyone

18  has an objection.

19          Is that okay with you, sir?

20          THE WITNESS:  Sure.  You're the boss.

21          THE VIDEOGRAPHER:  We're off the record at

22  2:11 p.m.

23          (A recess was had.)

24          THE VIDEOGRAPHER:  We're back on the

25  record at 2:27 p.m.



1  would be, of course, on the same terms, but if

2  you're asking whether they had been bifurcated or

3  separated, which is relatively unique, I can't think

4  of one specifically where they would have the exact

5  same terms.

6       Q    Is there any scholarly literature or

7  anything like that that you reviewed that indicated

8  that was an appropriate way of determining payments

9  to mineral owners when a wind farm is constructed?

10      A    I mean, it's just standard damage theory,

11  so I would think any treatise or document related to

12  damages would look at it that way.

13      Q    Specific to wind energy?

14      A    Specific to wind energy.  No, they don't

15  get specifically, typically, to a specific industry.

16  I haven't seen any type of treatise that gets that

17  specific.

18      Q    And have you read any literature that

19  indicates that a mineral owner should be paid for

20  mining, other than based on the minerals mined?

21      A    Well, I mean, that's not the dynamic here.

22  Again, you have to get a lease to basically build

23  the wind farm.  It's not a matter of paying for the

24  minerals.  You're building a wind farm, so I don't

25  understand your question.



1    Q    Well, we looked, sir, already at the Tenth

2    Circuit opinion that clearly said it was the

3    extraction, sorting, crushing, use of minerals that

4    required a lease, right?  We looked at that?

5              MR. ASHWORTH:  Object to the form.

6    A    I agree.

7    Q    (By Mr. Ray)  And there was nothing in the

8    opinion that just said generally to construct a wind

9    farm, you have to have a lease, true?

10             MR. ASHWORTH:  Object to the form.

11   A    I don't understand that question.  I mean,

12   we're talking about this specific case.  They had

13   mining activities, so, therefore, they're required

14   to have a federally recognized lease, so, therefore,

15   they can't build it until they get the lease.

16   Q    (By Mr. Ray)  Right, but there's no mining

17   going on out there right now?

18             MR. ASHWORTH:  Object to the form.

19   A    Yeah, we've covered that ground at least

20   ten times, so I don't know why it matters.  It

21   doesn't matter.  They're still being damaged every

22   day the wind farm is there.

23   Q    (By Mr. Ray)  And how is that?

24   A    How is what?

25   Q    How are they being damaged every day that

Steven J. Hazel   4/29/2021   17

```
 1   conclusion, so I would not make that opinion.
 2        Q    (By Mr. Ray)  So you're not rendering that
 3   opinion in this case, true?
 4        A    If you're asking about the legal opinion,
 5   absolutely not.  I'm not a lawyer.  That's not my
 6   place.
 7        Q    Let's go back to your report, sir, page 7.
 8   I believe that's Exhibit 18.  And you reference, as
 9   we've seen, sir, that "the surface leases represent
10   a directly comparable proxy for amounts that Osage
11   Wind itself was willing and able to pay."  Do you
12   see that?
13        A    Yes.
14        Q    And what would they have been paying for?
15        A    The right to obtain that lease.
16        Q    And they needed the lease to do what?
17        A    To construct -- ultimately, to construct
18   the wind farm because, again, the way they did it,
19   they would need to have that lease to basically do
20   the complete project.
21        Q    Did any of the regulations you looked at,
22   sir, make reference to constructing a wind energy
23   project?
24             MR. ASHWORTH:  Objection to form.
25        A    I mean, I don't remember a specific one
```



 1   suggest they were different from others that were

 2   constructed on land?

 3        A    I mean, again, if you have a construction

 4   on a hilly side versus a mountain versus a flat

 5   land, of course, it's going to be different.  The

 6   construction aspects are going to be different.  So

 7   it is what it is.  You do the construction based on

 8   the specific topography of the land that you have.

 9        Q    And did you, sir, see any sources of

10   material or have any knowledge, other than your

11   opinion in this case, of surface owners and mineral

12   owners being paid the same amounts for a wind

13   project?  Is there any other project you can

14   identify for us like that?

15        A    Again, that's not my opinion in this case.

16   We're talking about it's similar to that, and we're

17   being conservative, but I have not seen that

18   specific dynamic, because, again, generally the

19   mineral estate gets more than the surface estate.

20        Q    Are you aware of any wind energy project

21   where the mineral owner has received more than the

22   surface owner?

23        A    I'm not aware of that, because, typically,

24   they're the same people.

25        Q    Let me ask you this, sir, are you aware of



Steven J. Hazel                                    4/29/2021                              179

1    a coal mine where the surface owner gets paid more

2    than the mineral owner?

3         A    I'm not aware of that.  Is it possible

4    that occurs, it's possible.

5         Q    And, sir, what is the basis for your

6    conclusion that the amounts paid to the surface

7    owners are a directly comparable proxy to what

8    should have been paid to the Osage Nation here?

9              MR. ASHWORTH:  Object to the form.

10        A    This negotiated deal between the various

11   parties is exactly the same land in question.  One

12   is the subsurface, one is the surface, so they're

13   very close in proximity to each other.  It's all the

14   dynamics to make it the best approximation of the

15   minimum amount that the mineral estate owner should

16   receive.

17        Q    (By Mr. Ray)  You understand that in most

18   cases the mineral owner and the surface owner are

19   paid differing amounts based on what's occurring,

20   are you not?

21             MR. ASHWORTH:  Object to the form.

22        A    Well, that question makes no sense, so, I

23   mean, do you want me to try to answer that?

24        Q    (By Mr. Ray)  Well, let me start with an

25   example, sir.  So how about oil and gas, if we have



Steven J. Hazel    4/29/2021    182

```
 1   who has the rights to grab those or not, no.
 2       Q    Let's look, sir, at one specific category
 3   of your report, and that will be on page 11 of your
 4   report.
 5       A    Okay.
 6       Q    And that is pasture damages; do you see
 7   that?
 8       A    I do.
 9       Q    And you state there that that is a payment
10   equal to $28 per acre related to pasture/forage
11   grass actually destroyed or damaged; do you see
12   that?
13       A    Yes.
14       Q    All right.  Now, did the mineral estate
15   owner have any rights in pasture or forage grass?
16       A    No.
17       Q    So how is it that they should receive a
18   payment that is for only forage grass actually -- or
19   pasture grass actually destroyed?
20       A    Because we're looking at the overall
21   equation, first of all, and there would be similar
22   dynamics to the subsurface of things that were
23   affected.  They would just use different semantics,
24   a different way of calling it, but it would have the
25   same type of category of damages.
```

1    Q    Do you know the circumstance under

2  which -- do you know the circumstances under which

3  pasture or forage grass was actually destroyed in

4  this situation?

5    A    Oh, I think there was some information

6  about that, but I don't remember the specifics.

7    Q    So do you know for a fact that that

8  implicated any right of the mineral owner?

9    A    Again, it's not -- I'm not trying to get

10  that precise.  The situation here is we have a

11  proxy.  So they would use different semantics, and

12  we fully agree with you, it's for -- basically,

13  that's more appropriate to subsurface, but they're

14  going to negotiate similar types of payments over

15  time for the dynamics that are specific to

16  subsurface.

17    Q    And what would you use as the similar

18  subsurface comparable, if you will, to the pasture?

19    A    I haven't thought about that.  I don't

20  know.  I would have to think about that.

21    Q    Yet, you, in fact, have concluded that

22  those payments are due as a part of your analysis,

23  true?

24    A    I've already explained to you why we did

25  that.



1  able to pay the surface owners?

2       Q    Well, do you know whether that -- that

3  additional amount would make the project

4  economically viable or not?  Do you know that, for

5  example?

6       A    They would have to decide that and decide

7  if they want to produce the property at all and not

8  put a wind farm here at all, but they should have

9  determined that on the front end, not the back end.

10       Q    But is there anything, sir, other than the

11  fact that payments like that were made to the

12  surface owners that you base that conclusion on?

13       A    I think it's all the facts and

14  circumstances in this case.  It's based on the

15  financial performance, it's based on all of the

16  documentation in the record, that they should get a

17  similar amount to the surface owners and actually

18  probably get more.

19       Q    But you're not aware of any other wind

20  energy project in the United States where a separate

21  mineral owner has even been paid anything, are you?

22            MR. ASHWORTH:  Object to the form.

23       A    Again, this is a little bit different

24  dynamic in that case.  So Osage Wind, it's their

25  requirement to understand all the things they have

Steven J. Hazel   4/29/2021   2037

 1   clearly.  I don't think it's clearly at all.  It has

 2   ten years in there, so it clearly says 10 years, but

 3   it talks about absent specific lease provisions.  In

 4   the next sentence it talks absent specific lease

 5   provisions to the contrary.  I mean, it has all

 6   sorts of different caveats just in that first

 7   paragraph alone.

 8       **Q    (By Mr. Ray)  Sir, does the absent**

 9   **specific lease provisions to the contrary relate to**

10   **the term?**

11           MR. ASHWORTH:  Object to the form.

12       A    You tell me.  You're the lawyer.  I don't

13   know.  I'm not making legal conclusions.

14       **Q    (By Mr. Ray)  You just don't -- you don't**

15   **know how long that a term of a lease can be**

16   **permitted to be under these regulations?**

17           MR. ASHWORTH:  Object to the form.

18       A    I honestly don't care, because I'm talking

19   about the damages, so you can interpret it any way

20   you want.  It's not going to change my conclusion.

21       **Q    (By Mr. Ray)  I believe you said earlier,**

22   **sir, that you do not ascribe any damages to the**

23   **renewal term.  Did I understand you correctly there?**

24       A    We didn't specifically calculate the

25   renewal term, correct.



```
 1              MR. RAY:  All right.  Let's go back to

 2    Mr. Hazel's report, if we could, and if we could go

 3    to page 19.  That's Exhibit 18.

 4              THE VIDEOGRAPHER:  You did say Mr. Hazel's

 5    report?

 6              MR. RAY:  I did.  Exhibit 18, please.

 7              THE VIDEOGRAPHER:  One moment.  I've got a

 8    technical issue here.  For some reason it is not

 9    displaying.  Could we go off the record for a

10    moment, please?

11              MR. RAY:  Certainly.

12              THE VIDEOGRAPHER:  We're off the record at

13    3:30 p.m.

14              (A recess was had)

15              THE VIDEOGRAPHER:  We're back on the

16    record at 3:30 p.m.

17        Q    (By Mr. Ray) All right, sir.  This is on

18    page 19 of your report.  It certainly appears to me

19    that you have calculated, about halfway through

20    table 7, future operating fees for the renewal term

21    period.  Do you see that?

22        A    Yeah, I stand corrected, you're right.  We

23    did include the 20 years at the discounted amount,

24    you're right.

25        Q    So should that be removed?
```



1      A     No, I mean, it is what it is.  It's based

2   on the time period of 2036 to 2056.  We've already

3   risk adjusted, so it's still a fair calculation.

4      Q     And how is it risk adjusted?  Explain that

5   to me, sir.

6      A     Okay.  Sorry, because we didn't just use a

7   pure time value money, we used a risk adjusted rate.

8      Q     And what was the -- what was the risk

9   adjustment?

10     A     I don't know what you're asking there.

11     Q     You said you used a risk adjusted rate;

12  yes?

13     A     Yes.

14     Q     How did you determine the risk adjusted

15  rate?

16     A     The same way we considered the discount

17  rate in the other future operating fees, based on a

18  proxy of ocean, winds, cost of capital, plus an

19  add-on.

20     Q     And did you take into account if these

21  additional amounts were owed how that would affect

22  the calculation?

23     A     Sorry, you cut out on me again.

24     Q     I'm sorry.  Did you take into account if

25  these additional amounts were owed how that would



1  asked to look into.  So, I mean, again, she says

2  what she says, and it is what it is.  I don't agree

3  it's an inaccurate valuation.  I don't agree it's an

4  inaccurate calculation of damages basis situation.

5  I don't agree that it's a disproportionate windfall.

6  How can it be a windfall?  It's exactly the same

7  thing as the surface owners got.  How could it be

8  possibly a windfall?  That makes no sense

9  whatsoever.  So all of those dynamics, I just

10  disagree, because I stand by my report.

11      Q    But you can't name for us, sir, any other

12  instance in which any other mineral owner has

13  received a penny for a mineral -- for a wind farm,

14  can you?

15      A    But again, in this case, they have to get

16  a lease, so that's irrelevant.  They have to get a

17  lease.  So they have to negotiate the lease with the

18  Osage Nation to basically get this wind farm in

19  place.  My understanding, the Osage Nation would

20  have said no.  Absolutely no is what they would have

21  said.  So now you're in a dynamic where you have to

22  negotiate a lease with somebody that doesn't even

23  want to do what you want them to do.  So again, it's

24  a very reasonable proxy to the damages in this

25  particular case.



1    Q    So why couldn't it be more?

2    A    I've already said it probably is more, but

3    I'm trying to get to the best, conservative proxy of

4    the damages for this particular case.

5    Q    But you're not aware of any other mineral

6    owner being paid in this way, correct?

7    A    Again, it doesn't matter.  This particular

8    case is somewhat unique.  They don't want a wind

9    farm there.  I don't know how I can get that through

10   to you.  They do not want a wind farm there.  So now

11   you're negotiating with a party that doesn't want to

12   do what you're doing.  How do you think that

13   negotiation is going to go?

14   Q    The question, sir, is not about relevance.

15   The question is whether you are aware of any other

16   mineral owner that has been paid in this way?

17   A    Again --

18        MR. ASHWORTH:  Object to the form.

19   A    -- I have not looked into that fully.  It

20   doesn't matter to me.  I'm looking at the facts and

21   circumstances of this case.

22   Q    (By Mr. Ray)  Are you aware of anyone

23   other than you in a published article, a court case,

24   anywhere else that advocates for paying a mineral

25   owner for a wind energy project in the way you do?



```
 1        A    Again, I don't think I published anywhere,
 2   so I don't know what you're asking there.  So do I
 3   have a specific case with exactly these same facts
 4   and circumstances, no.  Are there similar cases that
 5   speak to this, yes.  So again, the judge or jury is
 6   going to have to decide that.
 7        Q    What similar case speaks to this, in your
 8   opinion?
 9        A    I didn't say there's a similar case.  I
10   said there's other cases that speak to this.  I'm
11   not a lawyer.  I haven't investigated all the cases.
12        Q    Are you aware of even one?
13        A    There was a couple of cases that were
14   talked about, trying to remember the names.  I think
15   one was Millsap that was part of the -- because I
16   don't know if it's specific to this dynamic we're
17   talking about.  I think there's one called like
18   DeVilla is another case.  There was various
19   different cases that the counsel had referenced and
20   kind of told me how the cases came out to basically
21   inform that opinion where it's a reasonable
22   calculation of the damages.
23        Q    Did Millsap versus Andrews involve a wind
24   energy project?
25        A    Again, I don't remember the specific of
```



```
 1    the case, so I can't answer that.

 2        Q    Did the DeVilla case involve a wind energy

 3    project?

 4        A    Again, I'm not sure how that's relevant,

 5    but I don't remember one way or the other.

 6        Q    It was a case you said informed your

 7    conclusion in that regard; yes?

 8        A    I didn't say that.

 9        Q    All right.  Did you rely on Millsap versus

10    Andrews in any manner?

11        A    I'm just answering your questions.  I

12    don't think I would say I relied upon them, because,

13    again, I'm not a lawyer.  You asked if there's other

14    similar cases that might have formed your opinion

15    about damage calculations.  I gave you the best

16    answer I could.  I don't remember the specific of

17    those cases.

18        Q    Can you tell us anything about the

19    specifics of those cases?

20        A    You could pull them up, and we could read

21    them together.  I've read them before.

22        Q    No.  My question is your recollection as

23    we sit here right now?

24        A    I've tried to give you my best remembrance

25    of what I read.
```



1     Q    Can you tell us anything at all about the

2  DeVilla case?

3     A    Again, you keep asking me the same

4  question over and over and over again.  I've already

5  tried to answer that.  I don't remember any

6  specifics about the case.  I was trying to answer

7  your other question.  I tried to give you examples.

8     Q    Did you say, sir, awhile ago that you have

9  not been published anywhere?

10    A    In this --

11         MR. ASHWORTH:  Object to the form.

12    A    -- particular case, I haven't been

13 published anywhere, because, of course, I haven't

14 testified in this matter.

15    Q    (By Mr. Ray)  And can you identify any

16 source, other than you, that would say the mineral

17 owners and the surface owners should be paid in the

18 same way if mining occurs contrary to these

19 regulations?

20    A    Again, any damage treatise or textbook or

21 whatever would talk about the comparable analysis we

22 did.  So all of those treatises and textbooks would

23 be similar to this dynamic.

24    Q    And they would say you would need some

25 kind of a comparable, correct?



Steven J. Hazel                                                4/29/2021                                          319

```
 1         A     Which we have here.  We have a comparable

 2    for the same property, for the same time period, for

 3    the same project.  All those different things are

 4    the same.

 5         Q     It's just a payment that's not based upon

 6    mining production in any way?

 7         A     Okay.  I understand your position there,

 8    but again, that's not what I calculated.

 9         Q     And what are you calculating?

10         A     If you don't have that figured out by now,

11    we're going to be here a while.  I've calculated the

12    damages to the mineral estate, based on the surface

13    owners as a proxy for the damages to the mineral

14    estate owner.  I've already said it's kind of a

15    conservative.  I've already said it probably should

16    be more, but I've tried to make a reasonable and

17    credible calculation based on the facts and

18    circumstances of this case.

19         Q     And by what methodology, sir, do you

20    conclude that that is an appropriate proxy in this

21    type of circumstance?

22         A     Based on all my years of training, based

23    on every single textbook and treatise I've looked

24    at, based on everything I've done in my whole

25    career.
```



1      Q     But you can't point out a single one of

2    those that says that mineral owners and surface

3    owners are paid the same in wind energy development;

4    true?

5      A     I don't believe any textbook would be that

6    specific to the industry.  Plus the other dynamic;

7    it's not done that way.  We're damage experts.

8    We're not -- there's not going to be a book that

9    says blank like that.  It's not going to happen.

10      Q     Is the only reason, sir, that you contend

11    that the surface leases are a better proxy than

12    actual mineral production in this county because you

13    believe the Osage Nation was opposed to the project?

14      A     Is that the only reason?

15      Q     Yes.

16      A     Is that what you asked?

17      Q     Yes, sir, that's what I'm asking.

18      A     I don't think it's the only reason.  I

19    think it's a big reason, but again, they went about

20    doing their construction regardless of what the

21    Osage Nation wanted or didn't want and, basically,

22    created it, so now they have to compensate them for

23    their damages.

24      Q     Are there any other reasons that you

25    believe the surface payments are an appropriate