# EXHIBIT 2

Case No. l4-CV-704-GKF-JFJ

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2

 3   UNITED STATES OF AMERICA,

 4            Plaintiff,

 5   and

 6   OSAGE MINERALS COUNCIL,

 7            Intervenor-Plaintiff,

 8   vs                         No. 14-CV-704-GKF-JFJ

 9   OSAGE WIND, LLC, ENEL KANSAS,
     LLC; and ENEL GREEN POWER
10   NORTH AMERICA, INC.,

11            Defendants.

12
          VIDEOTAPED DEPOSITION OF ROBERT FREEMAN
13       Taken on Behalf of the Intervenor Plaintiff
         On September 7, 2021, beginning at 9:04 a.m.
14         All Parties Appearing Via Webconference

15
                        APPEARANCES
16
     Appearing on behalf of the PLAINTIFF:
17   Stuart Ashworth
     Cathryn D. McClanahan
18   Nolan Fields
     UNITED STATES ATTORNEY'S OFFICE
19   NORTHERN DISTRICT OF OKLAHOMA
     110 West Seventh Street, Suite 300
20   Tulsa, Oklahoma 74119
     918-382-2772
21   stuart.ashworth@usdoj.gov
     cathy.mcclanahan@usdoj.gov
22   nolan.fields@usdoj.gov

23          Appearances Continued on Next Page

24   ALSO PRESENT:  Christina Watson, Michelle Hammock
     VIDEOTAPED BY:  Sean Shell
25   REPORTED BY:  Mary K. Beckham, CSR, RPR
```

**Page 2**

1    APPEARANCES Continued

2    Appearing on behalf of the INTERVENOR-PLAINTIFF,
     OSAGE MINERALS COUNCIL:
3    Jennifer Baker
     Mary Kathryn Nagle
4    Ridge Howell
     PIPESTEM & NAGLE
5    1333 New Hampshire Avenue
     N.W. Washington, D.C. 20036
6    202-407-0591
     jbaker@pipestemlaw.com
7    mknagle@pipestemlaw.com

8    Appearing on behalf of the INTERVENOR-PLAINTIFF and
     DEFENDANT, OSAGE WIND, LLC, ENEL KANSAS, LLC and
9    ENEL GREEN POWER NORTH AMERICA, INC.:
     Robin Ball
10   NORTON ROSE FULBRIGHT US LLP
     555 South Flower Street, 41st Floor
11   Los Angeles, California 90071
     213-892-9200
12   robin.ball@nortonrosefulbright.com
     and
13   Lynn Slade
     MODRALL, SPERLING, ROEHL, HARRIS & SISKA, P.A.
14   Post Office Box 2168
     Albuquerque, New Mexico 87103-2168
15   505-848-1800
     lynn.slade@modrall.com

16   Appearing on behalf of the WITNESS, ROBERT FREEMAN:
17   Kirk T. May
     GM LAW, PC
18   1201 Walnut, 20th Floor
     Kansas City, Missouri 64106
19   816-471-7700
     kirkm@gmlawpc.com

20

21

22

23

24

25

**Page 3**

1                  INDEX

2                         Page

3    DIRECT EXAMINATION BY MS. BAKER        5

4    DIRECT EXAMINATION BY MR. FIELDS       135

5

6

7

8          PREVIOUSLY MARKED EXHIBITS

9    Exhibit                  Page

10   36    Memorandum from Sarah Stevenson to Bill

11         Scott, Osage Wind Priv-000414-000420  125

12   60    Declaration of Bill Moskaluk, filed

13         12/10/14                143

14   78    Membership Interest Purchase Agreement

15         Osage Wind 021248-021320       54

16   79    Membership Interest Purchase Agreement

17         Osage Wind 02119-021222        89

18   81    Email String            133

19   183   Email from Steve Willman to Lynn Slade

20         dated 8/19/14, Osage Wind Priv 000697  170

21   194   Amended and Restated Osage Project Loan

22         Agreement, Osage Wind 040156-040170  105

23

24

25

**Page 4**

1                  EXHIBITS

2    Exhibit                  Page

3    199   Bates stamped Osage Wind 040139     124

4    200   Email exchange between Robert Freeman

5         and Lynn Slade, dated 10/25/13, Osage

6         Wind Priv-000672               128

7

8                  STIPULATIONS

9    It is hereby stipulated and agreed by and between

10   the parties hereto, through their respective

11   attorneys, that the deposition of ROBERT FREEMAN may

12   be taken pursuant to notice and in accordance with

13   the Federal Rules of Civil Procedure on September 7,

14   2021, before Mary K. Beckham, CSR RPR.

15

16

17

18

19

20

21

22

23

24

25

**Page 5**

1         THE VIDEOGRAPHER:  This is the videotaped

2    deposition of Robert Freeman taken on behalf of the

3    intervenor plaintiff in the matter of United States

4    of America, plaintiff, Osage Minerals Council,

5    intervenor plaintiff, versus Osage Wind, LLC, et

6    al., filed in the United States District Court for

7    the Northern District of Oklahoma, Case Number

8    14-CV-704-GKF-JFJ.  This deposition is being held

9    via webconference on Tuesday, September 7th, 2021.

10   We're on the record at 9:04 a.m.

11         Will counsel please state their

12   appearances for the record?

13        MS. BAKER:  This is Jennifer Baker,

14   counsel for intervenor plaintiff, The Osage Minerals

15   Council.  With me today are my colleagues, Mary

16   Kathryn Nagle and Ridge Howell.

17        MR. ASHWORTH:  This is Stuart Ashworth

18   representing the United States.  With me are Cathy

19   McClanahan and Nolan Fields -- Nolan Field --

20   Fields, sorry, Assistant U.S. Attorneys.  I also

21   have Christina Watson and Michelle Hammond, our

22   paralegals with the U.S. Attorney's Office.

23        MR. BALL:  Good morning, this is Robin

24   Ball, Norton Rose Fulbright, for the defendants, and

25   also along today is Lynn Slade of the Modrall

Page 6

1  Sperling firm.

2       MR. MAY:  Kirk May is here today on behalf

3  of the witness, Mr. Freeman.

4       THE VIDEOGRAPHER:  The court reporter will

5  now please swear in the witness.

6  WHEREUPON,

7            ROBERT FREEMAN,

8  after having been first duly sworn, deposes and

9  says in reply to the questions propounded as

10  follows, to-wit:

11            DIRECT EXAMINATION

12  BY MS. BAKER:

13  **Q   Good morning, Mr. Freeman.  My name is**

14  **Jennifer Baker.  I'm the attorney for the Osage**

15  **Minerals Council in this case.  I'll be asking you a**

16  **series of questions today.  I want to make sure that**

17  **you are comfortable, so if at any point you need a**

18  **break for water, rest room, any reason like that,**

19  **please feel free to just let me know, and we can**

20  **take a break.  If you have any difficulty hearing or**

21  **understanding me, please let me know that as well.**

22  **I'm happy to reask any questions.  Tell me, do you**

23  **have a smart phone with you today?**

24  A  I do.

25  **Q   Okay.  Is it turned on?**

Page 7

1  A  Yes.

2  **Q   Okay.  I would ask that you turn the**

3  **ringer off and have it face down, please.**

4  A  Ringer is off, face down.

5  **Q   Great.  Thank you.  Do you have any other**

6  **electronic devices besides your smart phone and the**

7  **computer that you are talking on?**

8  A  No.

9  **Q   Okay.  And do you agree not to text or use**

10  **any messaging system while we're on the record**

11  **during this deposition?**

12  A  Yes.

13  **Q   Great.  Do you have anyone in the room**

14  **with you?**

15  A  Just my attorney, Kirk May.

16  **Q   Okay.  Do you have any printed documents**

17  **with you?**

18  A  No.

19  **Q   Okay.  Can you tell me, have you given a**

20  **deposition before today?**

21  A  No.

22  **Q   Okay.  Have you ever testified in court?**

23  A  No.

24  **Q   Okay.  Do you have an understanding of**

25  **what the process will look like today, has your**

Page 8

1  **counsel kind of explained how the deposition is**

2  **going to work?**

3  A  Yeah, I think -- yeah, generally, yes.

4  **Q   Okay.  Great.  If your counsel does have**

5  **an objection, please go ahead and answer his (sic)**

6  **question unless he specifically instructs you not to**

7  **answer.**

8  A  Okay.

9  **Q   What have you done to prepare for your**

10  **deposition today?**

11  A  The only thing I've done is speak with

12  Kirk -- Kirk May.

13  **Q   Okay.**

14  A  I had a brief conversation with Robin and

15  Lynn Slade.

16  **Q   Okay.  Did you review any --**

17  A  That wasn't all preparation.  I would call

18  it more just here's what's coming kind of thing.

19  You are going to be deposed.

20  **Q   Okay.  You didn't review any facts or any**

21  **events specific to the case.  It was more just**

22  **preparation for how this process will work today?**

23  A  Correct.

24  **Q   Okay.  Great.  Do you hold any degrees?**

25  A  I do.

Page 9

1  **Q   Okay.  Could you tell me what those are,**

2  **please?**

3  A  Yeah, I have a Bachelor's Degree in

4  geology and a law degree.

5  **Q   Okay.  What institution did you obtain**

6  **those degrees from?**

7  A  University of Missouri, Columbia for the

8  geology degree, and the University of Arkansas for

9  the law degree.

10  **Q   Okay.  Are you currently licensed to**

11  **practice law?**

12  A  I am.

13  **Q   Are you currently practicing?**

14  A  No.

15  **Q   Okay.  Can you tell me which jurisdictions**

16  **you are a member of the bar?**

17  A  Well, so, I think technically I'm still

18  Arkansas and Missouri.  I've actually been going

19  through the process to give up my license in

20  Arkansas.  I think, technically, it's pending before

21  the Arkansas Supreme Court right now, so I probably

22  still show as having a license there.

23  **Q   Okay.  You'll stay licensed in Missouri,**

24  **but you are not currently practicing?**

25  A  That's the plan, yes.

Page 10

1   Q   Okay.

2   A   I have not practiced law since 1991.

3   Q   Okay.  And who is your current employer?

4   A   Well, so I have a board seat and an

5   advisory role with Savion, that's spelled

6   S-A-V-I-O-N, LLC.  I was the CEO of Savion until

7   the -- December of this -- or this past year, 2020,

8   and have stayed on in just a board and advisory

9   role.  So that's my only -- I don't have any other

10  employment.

11  Q   Okay.  Have you ever worked for Tradewind

12  Energy?

13  A   Yes.

14  Q   Okay.  Can you tell me when that company

15  was established?

16  A   So the predecessor to Tradewind was known

17  as Kansas Wind Power, and it was formed before I got

18  there, but I think it was actually, technically,

19  formed in 2002 would be my guess.  So I started

20  consulting to Kansas Wind Power in July of 2003 and

21  was formerly hired -- formally hired as the CEO of

22  Kansas Wind Power in March of 2004.  I think I have

23  that right.  Yeah.  And then we -- shortly after I

24  was hired as CEO of Kansas Wind Power, we changed

25  the name to Tradewind, Tradewind Energy.

Page 11

1   Q   Okay.  You said that you were not with

2   Tradewind when they started, correct?

3   A   Correct.

4   Q   Okay.  Do you know who started the

5   company?

6   A   I think it was originally started by a guy

7   named Troy Helming.

8   Q   Okay.  And -- go ahead.

9   A   Then there were -- I mean, Troy hired and

10  brought in a few people after he formed it, which

11  included Matt Gilhousen and Geoff Coventry, and I

12  mention them because Troy ended up leading the

13  business and was bought out by the then existing

14  shareholders of the business in the 2004 time frame

15  after I came in, and then as CEO at that point, I

16  kept Matt, Matt Gilhousen and Geoff Coventry on.

17  And then there's -- you know, their positions kind

18  of grew, and their -- you know, their equity stake

19  in the business, you know, also increased over time,

20  which I was involved with.

21  Q   Okay.  And you said you believe Tradewind

22  was established in 2002.  Would that be when the

23  name changed from Kansas Wind Power, or would that

24  be when Kansas Wind Power was started?

25  A   I think that's when it was founded.  I'm

Page 12

1   not sure what that would be.  I'm guessing a little

2   on the '02.  I don't think it was earlier than that.

3   The name change occurred -- my recollection would

4   probably be around May of -- around May of 2004, I

5   would think.

6   Q   When the name changed, was it strictly a

7   name change, did any of the projects change, the

8   scope of the work, anything about the company

9   besides the name?

10  A   No.

11  Q   Okay.

12  A   No, I don't -- no, I think it was just --

13  it was just a name change.  That was it, yeah.

14  Q   Okay.  Do you know why the company was

15  started, why it was founded?

16  A   Well, I wasn't there at the time, but,

17  yeah, all I can tell you is that when I came in, it

18  was focused on developing wind energy, large scale

19  wind energy projects, and, you know, I believe that

20  that was -- that was always the business plan before

21  I got there.

22  Q   Okay.  Do you know whether the company was

23  aware of the Osage Wind project when the name change

24  took place, when it became Tradewind Energy?

25  A   Well, no, I don't -- I don't have any

Page 13

1   recollection of the Osage Wind project around that

2   time frame.

3   Q   Okay.

4   A   I believe that came much -- many, many

5   years later.

6   Q   Could you take your best recollection of

7   when that did occur, when Tradewind did become aware

8   of the Osage Wind project?

9   A   Yeah.  Well, so, I guess about the only

10  thing that I've looked at, knowing that I was going

11  to be deposed today, is the transaction between

12  Tradewind and Enel on the sale of the Osage Wind

13  project, so that was after Tradewind acquired it and

14  then we sold it to Enel, and I believe that was in

15  the 2014 time frame.  I'm -- I guess I -- you know,

16  I would say that we must have probably started to

17  become aware of it in, say, a year prior to that,

18  give or take.

19      (Simultaneous speakers.)

20  Q   (By Ms. Baker)  Okay.

21  A   Probably, yeah.

22  Q   And that's when you --

23  A   We -- sorry.  Go ahead.

24  Q   Go ahead.

25  A   Well, so I was just going to make a point

Page 14

1 to your earlier question that we -- Tradewind was --
2 became Tradewind -- or known as Tradewind in '04.
3 As I said, so what would that be, nine years or
4 something, so...
5      Q    Okay.  And you believe that around 2013 is
6 when Tradewind became aware of the Osage Wind
7 project?
8      A    I think so, yeah.  And actually, I
9 don't -- coming into this, I didn't even remember
10 really the years specifically.  I just knew it was a
11 long time ago.  I think the only reason that I'm
12 able to really call up the 2014 date is because I
13 looked at the date on the membership interest
14 purchase agreement between Tradewind and Enel just
15 to get my head around what -- when that transaction
16 occurred.
17      Q    Okay.  Did you become aware of the Osage
18 Wind project through Tradewind?
19      A    Yeah.  I mean, yes, it would have been
20 through Tradewind.  We didn't have any other -- any
21 other companies.
22      Q    Okay.  And you wouldn't have separately
23 discussed the project with anyone outside of
24 Tradewind?
25      A    No, it would have been in our just -- our

Page 15

1 official roles as employees of Tradewind.
2      Q    Okay.
3      A    We didn't -- I guess I'm not sure I'm
4 understanding the question.  We weren't -- if you
5 are asking if any -- if any of us, including myself,
6 had business dealings around wind projects outside
7 of Tradewind, the answer is no.
8      Q    You dealt only with Tradewind as far as
9 wind projects?
10      A    Correct.
11      Q    Okay.  Do you recall when Tradewind was
12 considering acquiring Osage Wind, what were the pros
13 and cons, what were the considerations in whether or
14 not to make that purchase?
15      A    So the project -- I guess all I can say
16 about that is as far as the pros go, it was -- we
17 were one of the most active developers in the state
18 of Oklahoma.  As -- you know, as Tradewind we were
19 kind of one of the big dogs in the state of
20 Oklahoma.  That was a primary market for us, and so
21 we were -- and we had -- we had ongoing sort of
22 continued growth plans for that market.  We saw it
23 as a key market, and it was a market that we felt
24 like we understood really well.  So we were looking
25 for ways to grow in Oklahoma, which included our

Page 16

1 development efforts, and then we would have
2 opportunities from time to time, you know, come
3 across our desks, as far as projects to acquire.
4 And we did acquire a number of projects in Oklahoma.
5 So I would say -- and then as developers, our job
6 was to -- was to be able to formulate basically an
7 expert view or opinion on what were good locations
8 in the state for building large scale wind projects,
9 and that included an analysis of -- well, all the
10 things we did, including offtake, you know, power
11 sales opportunities, permitting, transmission
12 interconnect, land acquisition, all those kinds of
13 things.  So that was certainly a project -- as
14 evidenced by the fact that we bought it, that was a
15 project that checked all the boxes for us.
16          In terms of what cons may have been, the
17 only -- I guess the only thing that I would say is I
18 think we were aware that there had been -- or we
19 became aware, I guess, that there had been some
20 history of issues between the Wind Capital Group
21 that we bought the project from and -- frankly, I
22 don't recall -- I don't recall the name of -- you
23 know, or probably correct way of describing the
24 governing body associated with the Osage Indian
25 tribe there.  Whatever that governing body was, we

Page 17

1 became aware that there had been some dispute there,
2 and so I'm sure that we -- you know, we looked at
3 that and considered that and would have discussed
4 that with our board on a project acquisition and,
5 ultimately, got comfortable with how it was resolved
6 and moved forward with the acquisition.
7      Q    How did you become aware of that dispute,
8 as you called it?
9      A    We would do -- on any projects -- on any
10 project that we would buy, we would do -- I guess as
11 you would expect, we would do very thorough due
12 diligence.  So every part of our team at Tradewind
13 would dig into a project to make sure that there
14 weren't any, you know, sort of show stoppers or
15 things that would ultimately keep the project from
16 getting built where we would acquire it, pretty
17 normal stuff.  So somewhere in that due diligence
18 process, we would have become aware of it.
19      Q    Do you recall specifically how?  Were you
20 speaking to someone they mentioned it, did you
21 receive correspondence, was it something else?
22      A    No, I don't.  I don't remember.
23      Q    Okay.
24      A    I would imagine that kind of thing would
25 come up pretty quickly, but I would -- you know, I

Page 18

1 would kind of -- honestly, I would just be
2 speculating. You know, again, we would -- we would
3 be extremely thorough on that kind of stuff,
4 including, you know, we would have attorneys, our
5 lawyers would be probably looking for any history --
6 you know, any history of litigation involving the
7 name of the company or, you know, the project
8 company we were buying. We would be interviewing
9 the management team, of, you know, the selling
10 company, asking lots of questions, so it could have
11 come up in multiple, probably different ways.
12 **Q   Okay. When Tradewind was started, was it**
13 **part of the Enel corporate family, was it considered**
14 **an affiliate or subsidiary or anything like that of**
15 **Enel?**
16     A   No.
17 **Q   Okay. Did it ever become part of Enel?**
18     A   No, not part of Enel in the sense of being
19 a controlled -- you know -- or a wholly owned, that
20 kind of thing, if that's the question. So the
21 relationship between Tradewind and Enel, it did --
22 it was a little bit fluid over the years. That --
23 so to get the chronology on the table, so we talked
24 about the origins of Kansas Wind Power and Tradewind
25 in that time frame, so then we formed the

Page 19

1 partnership with Enel in September of 2006.
2 **Q   Could you repeat that? You formed the**
3 **partnership with Enel?**
4     A   In September of 2006.
5 **Q   Okay.**
6     A   And at the time that we formed the
7 partnership, we both sold a minority equity stake in
8 the company to Enel, and we also signed a separate
9 partnership agreement, pursuant to which we would --
10 we would have a partnership around the development
11 and then -- well, around the development of
12 projects.
13         And I guess -- so there was a pretty
14 significant -- there may have been some relatively
15 minor changes in how that relationship was
16 constructed. There was a pretty big transaction in
17 2012 that involved a -- sort of a cashing out of
18 the -- well, the very first shareholders in the
19 company, the original shareholders. I want to say
20 there were probably around 20. So in 20 -- in 2012
21 those 20 shareholders were cashed out, and in the
22 context of that transaction Enel still only owned a
23 minority stake. In fact, their stake went down, so
24 it was -- it was originally around 40 or 45 percent
25 of the company, and in 2012 it dropped to around

Page 20

1 19 percent.
2         The other thing that's, I think,
3 probably -- for a complete answer to your question
4 is worth sort of describing is the way that the
5 partnership worked is Tradewind was exclusively a
6 developer, so we would do all -- and let me know if
7 you need me to explain how this -- you know, what we
8 were involved in. We would do all of the work on a
9 project, beginning with site identification and then
10 complete development of the project, leading up to
11 the beginning of construction or what in industry
12 jargon we would call financial close, that would
13 allow for the funding of construction. So
14 everything preceding that was Tradewind's --
15 generally Tradewind's responsibility, and then we
16 felt -- we would always sell projects
17 preconstruction.
18         So pursuant to the partnership Enel had,
19 essentially, a right of first refusal on Tradewind
20 projects, and then in concept if they exercised
21 their right, we would sell the project to Enel. If
22 they didn't, we would sell to someone else.
23         As it happened, on the wind side, we sold
24 the vast majority of our projects to Enel, which is,
25 you know, probably not surprising. That's why they

Page 21

1 were in the partnership with us. We did have -- we
2 did have at least one project that we sold to
3 someone other than Enel, so, yeah, go put a fine
4 point on it, we -- Tradewind was never in the
5 business of constructing projects or operating
6 projects. We were always completely out at a
7 preconstruction phase. I'll stop there and see if
8 you have any more questions about that.
9 **Q   You mentioned that Enel had a right of**
10 **first refusal for projects that Tradewind was**
11 **selling, right?**
12     A   Correct.
13 **Q   Okay. Was that memorialized in some kind**
14 **of agreement or a contract between Tradewind and**
15 **Enel?**
16     A   Yes.
17 **Q   Do you know what the date was of that**
18 **agreement?**
19     A   Well, the very first one would have been
20 in September of 2006. To what extent that document
21 was amended over time, I don't recall.
22 **Q   Do you remember the title of the document?**
23     A   No.
24 **Q   Okay. And you mentioned that Enel's**
25 **ownership interest in Tradewind kind of fluctuated.**

Page 22

1  When did Enel first obtain or acquire any ownership
2  interest in Tradewind?
3     A   September of 2006.
4     Q   Okay.
5     A   I think I've got the month right.  I
6  don't -- yeah, I don't recall the day, but I think
7  it was September of '06, yeah.
8     Q   Okay.  So Tradewind has never been a
9  subsidiary of Enel or any other Enel related entity;
10  is that right?
11    A   When you say "subsidiary," I assume you
12  mean as in a controlled -- that they would have a --
13  more than a 50 percent ownership, so a control --
14  control of the company?
15    Q   Yes.
16    A   No.  They never -- no, they never owned
17  anything other than a minority stake in the company
18  until the company was essentially split up and sold
19  in 2019.
20    Q   Okay.  You mentioned you were the CEO at
21  Tradewind, right?
22    A   Correct.
23    Q   What were your job responsibilities as
24  CEO?
25    A   Pretty -- pretty standard CEO

Page 23

1  responsibilities.  So, I mean, I -- I guess, I
2  reported to the board of directors, and all of the
3  employees of the company ultimately, you know,
4  reported up to me.  I don't remember how many direct
5  reports I had.  That changed over time, but at times
6  probably -- you know, at most I would probably have
7  eight or ten direct reports, and the rest of the
8  company would then report up through those people to
9  me.
10         And I was -- yeah, I was just responsible
11  for strategy, personnel, culture.  I was involved in
12  all the day-to-day, made major decisions, you know,
13  that would need to be made.  I would at least be
14  making recommendations, you know, and discussing
15  major decisions with the board.  Things that didn't
16  require board approval, usually, I mean, you know, I
17  guess -- I guess in concept -- I guess the buck
18  stopped with me, so to speak.  We had -- I had a
19  very -- I had a lot of what -- I guess a high trust
20  relationship with Matt Gilhousen and Geoff Coventry,
21  who were also equity owners in the business and, for
22  that matter, our senior managers in the business.
23  So I would -- you know, I would certainly -- they
24  were involved in decision-making with me.  That was
25  the basic construct.

Page 24

1     Q   Who were those senior managers?
2     A   Well, that would have changed over time,
3  too.  I mean, considering the business was around
4  for 16 -- 16 years or whatever.  So that would have
5  changed quite a bit, but we -- I guess, certainly,
6  Matt Gilhousen was the kind of long-term chief
7  development officer, Geoff Coventry was the
8  long-term chief operating officer, and then we had
9  various and sundry people under those two guys that
10  ran the different divisions of the business.
11        So, yeah, it's a little tough to say who
12  those people were, just because I would kind of need
13  a snapshot in time, and I'm not sure I would be able
14  to remember, you know, exactly, depending on what
15  the time frame was, but, certainly, I guess once the
16  company hit full stride we got to about 145
17  employees.  We became one of the -- one of the
18  largest developers in the U.S., and I guess when
19  that team was fully built out, you know, we probably
20  had eight or ten departments, and, I mean, I can
21  name some names of people that ultimately were
22  heading those departments, but I don't know if that
23  would sync up with whatever time frame you are
24  looking for, so...
25    Q   Okay.  So you couldn't tell me who the

Page 25

1  head of the departments were in 2012 -- in 2012?
2     A   In 2012 -- I mean, there's a few that I
3  could speak to pretty confidently, I think, because
4  they were people that were certainly with the
5  company at that point and were in a leadership role,
6  you know, going back pretty far.  So, Jennie Dean
7  comes to mind, Jennifer Dean, and she most likely
8  would -- what I can't recall is whether she had
9  staff under her at that point, which she would have
10  either been the only in-house biologist and person
11  responsible for environmental and permitting, or if
12  we had additional staff, she would have been the
13  head of that group, I would say pretty confidently.
14        What else?  On transmission, the
15  transmission team, I'd be pretty confident in saying
16  that would have been Derrick Sunderman.  Again, he
17  would have either been the only transmission person
18  or heading a staff, if we had a staff at that point.
19        What other departments?  I mean, we had a
20  business development group.  That one would be a
21  little tougher -- well, that would have been Frank
22  Castanza in 2012.  That was kind of the sales arm
23  that would have been responsible for long-term power
24  sales off of our projects.
25        Kevin Walters, for sure, would have been



Page 26

1  there, so he was our head meteorologist and would
2  have been the guy that would have been heading up
3  design -- well, I'm sorry, let me rephrase.  That's
4  probably not the right term.  Not designed from an
5  engineering perspective, but he would have been the
6  guy responsible for laying out the site and where
7  the wind turbines would go.
8          Are there other departments that come to
9  mind?  I mean, I guess real estate.  Honestly, I
10 don't -- I don't recall who was heading up real
11 estate at that time.  So I shouldn't say on that.  I
12 just don't remember for sure.  I was thinking about
13 engineering, and I'm having a hard time.  You know,
14 we had a very small -- we always had a very small
15 engineering staff.  I don't think it was ever more
16 than a few people.  At some point Justin Larson
17 became the head of that group, but I don't recall if
18 we had hired Justin yet in 2012.  I have a feeling
19 we had not hired him yet.
20         And again, keeping in mind what I was
21 explaining earlier, which is that we would do
22 preliminary -- we would do preliminary engineering
23 and design kind of layouts and -- type layouts,
24 preconstruction, but then, ultimately, when we would
25 sell the project as a development stage asset to

Page 27

1  Enel, then Enel would do the final -- they would do
2  all the final engineering, site layout, stuff like
3  that, unless it was completely locked in by a
4  permit, I guess thinking out loud a little bit, but,
5  you know, I would think the one exception is, you
6  know, you could get -- I think -- I think to some
7  degree sites may have been locked in by permits, and
8  so they would probably have to apply for an amended
9  permit if they were going to change a site layout,
10 but they would certainly do all the kind of final
11 design engineering work on projects associated with
12 the construction phase.
13 Q   What kind of permits might lock you into a
14 site or into a specific design?
15 A   This is not my area of expertise, but I
16 would -- I would say that county -- county --
17 some -- not all, but some counties that we were in
18 would require that you have a building permit, and I
19 would imagine that the site layout would be with the
20 building permit context.
21 Q   Okay.  At any time at all did you ever
22 work for Enel or any Enel company, EGPNA, for
23 example?
24 A   No.
25 Q   Do you recall when you started working on

Page 28

1  the Osage Wind project?
2  A   No.  Like I said, I really couldn't even
3  remember what year we were talking when I first got
4  the subpoena, and so my answer to that would just be
5  based on my seeing -- having seen the date on the
6  MIPA, as we call them, the membership interest
7  purchase agreement, between Tradewind and Enel being
8  dated, I believe, in September of 2014.
9          So, yeah, you know, just back up -- you
10 know, just be back up a year, you know, a year plus
11 would be my answer, I guess, for the amount of time
12 that we would need to spend looking at a project,
13 doing due diligence and then an acquisition.
14 Q   I'm sorry, I think I might have gotten a
15 little bit confused about that last part.  About a
16 year and a half from when you would learn about a
17 project to when you would sell the project, or what
18 was that time frame?
19 A   Yeah, no, sorry.  So if we sold the
20 project to Enel in 2014, and in this case it was a
21 project we acquired, I don't remember exactly when
22 we started working on that acquisition.  So I don't
23 have a date -- I don't have a good date for you on
24 that, but I guess my understanding coming into this
25 is that I believe -- and I'm not even positive of

Page 29

1  this, but I believe that Tradewind, apparently,
2  bought the project from the Wind Capital group in
3  2013, and so there would have been some amount of
4  time leading up to that acquisition, some number of
5  months, not years.  I would -- you know, I would
6  imagine it would be some number of months that we
7  had our team, you know, doing due diligence on the
8  project and, you know, just going back to the
9  question you asked earlier on what kinds of things
10 we would be looking at before we would buy
11 something.
12         That was the only project that -- as best
13 I can recall, that's the only project we ever bought
14 from Wind Capital Group.  So we did acquire, you
15 know, a fair number of other projects from other
16 companies, but that was the only one that I recall
17 that we ever acquired from Wind Capital Group.
18 Q   Do you recall what your specific job
19 duties were or what your responsibilities were with
20 respect specifically to the Osage Wind project?
21 A   I guess generally I would -- on an
22 acquisition I would typically review the legal
23 documents around an acquisition, either buying a
24 project or selling a project.  We always had an
25 outside general counsel.  We didn't have any

Page 30

1 in-house attorneys at Tradewind. I might have been
2 the only one there that actually had -- that had a
3 law degree, you know. Honestly, I don't remember if
4 anybody else there had a law degree or not, but we
5 didn't have any functioning attorneys inside
6 Tradewind, so we always had outside counsel. But I
7 would -- you know, just as my job, I guess, as CEO,
8 just to try to make sure that things were getting
9 done right, and certainly it was -- it was a
10 decently natural fit for me to read a legal document
11 since I had a law degree.
12        So anyway, I would have presumably read
13 through the acquisition documents, and then as far
14 as the due diligence process, I would not personally
15 conduct due diligence. That would be up to the
16 team, and then I would typically only get involved
17 in discussion around those kinds of things to the
18 extent that issues would surface that would, I
19 guess, be deemed by somebody to be worthy of
20 discussion, you know, among the management team or,
21 you know, making the board aware of a situation,
22 that kind of thing.
23   Q   And you mentioned that the team would be
24 involved in due diligence. Do you recall the titles
25 and names of the folks who were specifically doing

Page 31

1 the due diligence for the Osage Wind project?
2   A   No, I don't. It's like I said, I don't --
3 quite honestly, I don't even remember how big our
4 staff was at that time. We hired a lot of people,
5 and I would say after that -- whatever time frame
6 we're talking here, 2012, 2013, 2014 -- so I think
7 the company was quite a bit smaller than the 145
8 that I mentioned to you at that time, and I really
9 don't recall who all would have -- would have been
10 kind of running that.
11        The one thing that I can say, you know,
12 with confidence is that Matt Gilhousen, as the chief
13 development officer, would have been, no doubt, very
14 involved with, you know, any issues that were coming
15 up in the due diligence process, and whoever was
16 working on that would have been, ultimately,
17 reporting up to Matt.
18   Q   While you were at Tradewind, did you hold
19 any positions or titles other than CEO?
20   A   No.
21   Q   Okay. And did you personally work on any
22 kind of a team during your time at Tradewind?
23   A   I'm not sure I -- I don't think I
24 understand the question.
25   Q   Well, you mentioned that there was a team

Page 32

1 who would do due diligence, and then you were the
2 CEO. So were you involved in any teams, or were you
3 kind of separate and apart?
4   A   I was -- was I part of the team? Let's
5 see, if you go back -- so if you go back to the very
6 early days back when I first joined as CEO, we only
7 had four or five employees, including myself, so in
8 the very early days we kind of all did everything.
9 Now, in my case there was some -- well, we all did
10 everything.
11        There was some division of responsibility.
12 So Matt Gilhousen was always on development, which
13 is not something that I had any background in, and I
14 didn't have any real expertise in, but, you know,
15 the hats that I was wearing when it was just -- it
16 was just us four or five people, was -- you know, I
17 was mostly at that time focused on power sales and
18 relationships with utility companies that would
19 ultimately be buyers of our -- of the power coming
20 off of our wind projects. So I was doing -- so, you
21 know, I guess, yes, in the very early days I was
22 directly -- you know, I was not, you know, the CEO
23 sitting in the ivory tower waiting for issues to
24 bubble up. I was doing -- I was down in the
25 trenches doing work, and that was -- yeah, that was

Page 33

1 power sales stuff. I was involved in lobbying,
2 hiring lobbyists and lobbying state and federal
3 government officials around, you know, the coming
4 wind industry, because that was the very early days
5 of the industry at that time.
6        Certainly a lot of strategy stuff,
7 business planning, capital -- I was always very
8 involved in capital formation, so I would have been
9 the lead person -- this was true throughout the
10 entire history -- or the entire -- the entire
11 lifespan of the company was -- I was always the lead
12 person on raising money to fund the business. I was
13 very involved with hiring people, bringing in new
14 employees. Probably would have been reviewing
15 legal -- any and all legal stuff that was coming
16 through and managing our outside general counsel.
17 So that's kind of -- I think that's the bulk of the
18 things I was doing.
19        Now, as the company grew, as these things
20 typically go, as the company got bigger and bigger,
21 then we had people to do the in-the-trench work, so
22 we would have full-time market development, business
23 development people that were calling on utilities,
24 and so less and less, you know, would I find myself
25 walking into a meeting and talking to a utility



Page 34

1  company, et cetera.  I was not involved with
2  landowner meetings.  I was not -- I was never -- I
3  was really never involved with anything around pure
4  development, so landowner meetings, permitting
5  meetings, those kinds of things, transmission
6  related meetings, I was really never involved in any
7  of that.
8        I don't want to keep going and lose track
9  of your question.  Is that helpful?
10   **Q   Yes.  I think that's covered it.  To**
11 **switch gears just a little bit, did you ever**
12 **communicate with anyone from EGPNA regarding the**
13 **Osage Wind project?**
14   A   Yes, certainly, I would have -- I would
15 have been -- I would have had conversations with
16 EGP, and it would have presumably been the board --
17 board members.  Probably most of my interactions --
18 in fact, I don't even recall for sure how many board
19 seats we had then, and I was -- I guess I had a --
20 technically had a board seat.
21       I'm not even sure I recall for sure, but
22 most of my interactions in that time frame would
23 have been with Mike Storch, who was an executive
24 with EGPNA, and then I would -- I'm guessing it was
25 probably Francesco Venturini, who was the CEO then.

Page 35

1  His predecessor was Toni Volpe, and, frankly, I
2  don't recall when there was a handoff when Toni
3  stepped down and Francesco took over, but I think it
4  was Venturini in that time frame.  So most of my
5  communications as CEO were with those guys on
6  everything, and board meetings were sort of a
7  formality, so we were in discussions all the time.
8        You know, I was on the phone with, you
9  know, one of those -- probably more, but at least
10 one of those guys, if not both of those guys, you
11 know, whoever the top executives were in Boston, on
12 a -- certainly a weekly basis, sometimes daily
13 basis.
14   **Q   Okay.  Do you recall what you discussed,**
15 **what the topics of conversation were, what you**
16 **talked about?**
17   A   I don't -- I don't remember any specifics
18 other than, you know, just to say what would have
19 been a normal discussion around any acquisition that
20 we did, which, again, we did -- we did a fair number
21 of those, would have just been generally what the
22 team was finding with the project, why our team
23 would think it's a good project and we should go
24 forward with the acquisition, the terms of the
25 transaction that are being discussed.  It would not

Page 36

1  have been, you know, unusual at all for Enel to
2  weigh in on, you know, if not direct, just how the
3  project was structured, how much are we paying for a
4  project, is there cash up front or an earn-out, what
5  are the terms of the earn-out, what kind of reps are
6  we getting from the seller, those kinds of things.
7        I'm gonna -- I mean, I'm gonna -- I mean,
8  keeping in mind that this was -- what are we talking
9  here?  We're talking eight years ago.  So I don't
10 remember any specifics or details around any
11 conversations, but I'm quite sure that the previous
12 history of litigation between the Wind Capital Group
13 and the Osage would have no doubt come up in those
14 conversations, and being -- making sure that we were
15 all confident or comfortable that -- that that
16 situation had been resolved, it was sort of
17 dispositive of the matter and that we were -- you
18 know, the project was basically free and clear.
19       That -- I can't, you know, recall any
20 other -- any other specifics, and on that one I
21 don't remember specifics.  I just know that there's
22 no way that that would not have come up.
23   **Q   Okay.  Do you recall any conversations**
24 **with Wind Capital Group about the Osage Wind**
25 **project?**

Page 37

1  A   It would be basically the same answer.  I
2  do recall that I was on the phone.  I was on a
3  couple of calls, I think, with David Boyce, I think
4  is the guy's name, and then a couple of calls -- I
5  don't remember how many, but maybe a couple of calls
6  with the CEO of the company that owned the Wind
7  Capital Group out of Ireland, and I think her name
8  was Rosheen.  I think everybody -- everybody called
9  her Rosh and, quite honestly, I don't even remember
10 her last name now.
11       So I was on a few calls with her and David
12 Boyce, presumably around the transaction, because,
13 again, I would -- I would tend to get more directly
14 involved in my role around deal terms and
15 documenting deals, and so I would presume that that
16 would have been my involvement, would have been with
17 those folks and Rosheen, would have been around deal
18 terms and, you know, documenting the deal, you know,
19 risk allocations.  You know, there's always a lot of
20 negotiating in those -- any of those kind of
21 transactions around who is taking what risks, and
22 that would show up in the form of how and when
23 people paid contingent payments on projects and that
24 kind of stuff.
25       So that, and then -- so your question was

Page 38

1  specific to conversations with Wind Capital Group
2  people; is that right?
3      Q   Yes.
4      A   Yeah, so I had a few conversations over
5  the years with Tom Carnahan, and I don't -- I don't
6  remember whether Tom was still with Wind Capital
7  Group or not at that time, so I don't recall
8  anything specific about talking to him necessarily
9  about the transaction, because I just don't remember
10  if he was still there.
11      We were competitors and, you know, had
12  some -- you know, some healthy -- healthy
13  competition going in our markets and butted heads a
14  few times over that kind of stuff, but then we also,
15  I think, you know, probably tried to work -- there
16  were always -- there were always some amount of
17  collaboration between industry competitors around
18  state legislation and those kinds of things that
19  were in all of our interests, and I probably talked
20  to him about those kind of things.  But I can't say
21  that I remember any other specifics about my
22  conversation with Wind Capital Group.
23      Q   Do you know who Tom -- you said Carnahan
24  -- went to work for after that?
25      A   All I recall is -- I feel like it was a

Page 39

1  private equity -- some kind of private equity group.
2  I don't -- I don't remember any of the details
3  around that.
4      Q   Okay.  Did you work on any other projects
5  simultaneously with the Osage Wind project?
6      A   Yeah, we had Tradewind -- you mean me
7  personally or Tradewind?
8      Q   You personally.
9      A   Well, so the company had -- well, I don't
10  know how big we were then, but over time, you know,
11  dozens -- we had done dozens of wind projects, and
12  at some point that number would have been over 100
13  wind projects.  And my -- my -- so I would have
14  had -- you know, my role would have been, as I
15  described it, for all of that, with the emphasis on
16  the bigger we got, the more projects, the more
17  people, the more I -- the less I was involved in
18  details and the more I was involved with really just
19  managing up to the board and raising capital and
20  just dealing with whatever the biggest and brightest
21  fires that were burning day to day.
22      Q   Okay.  Do you recall if any of the
23  projects that you or the company worked on involved
24  Indian trust property?
25      A   So Indian trust property, so the -- the

Page 40

1  only -- the only projects that I recall that
2  involved the Indians would have been the Osage
3  project and the Mustang Run --
4      Q   Okay.
5      A   -- are the only two that come to mind, and
6  I don't recall the timing of -- I don't recall the
7  timing of Mustang Run particularly.  And the other
8  thing that I will mention is when you say "Indian
9  trust property," I don't know exactly what that term
10  means, whatever technical meaning there is with
11  that, but we -- as relates to those two projects,
12  you know, what I do recall is that I think we were
13  probably dealing with the same Osage Indian people,
14  and, again, whatever that governing body was on both
15  projects in Osage County.
16      And as best I can recall, it would have
17  been in relation to mineral interests that they may
18  have had, meaning we -- we leased surface ground for
19  wind projects, and I don't recall if we -- I don't
20  recall that we ever leased surface ground from an
21  Indian group.
22      Q   Okay.  Do you recall if any of the
23  projects were on lands where the subsurface was
24  owned by a tribe or, as you called it, an Indian
25  group?

Page 41

1      A   Yeah, I think that was probably the
2  situation with both Osage and Mustang.
3      Q   Okay.  Any others?
4      A   Not that I remember.
5      Q   Okay.  You mentioned a MIPA before, a
6  membership interest purchase agreement, so if I say
7  MIPA or MIPA, will you understand that that's what
8  I'm referring to?
9      A   Yes.
10      Q   Great.  I want to ask you just a couple of
11  questions to make sure we're on the same page about
12  that.  Can you describe in general what a MIPA is?
13      A   Yeah, it's a -- so the project company --
14  each project had its own company that owned it, and
15  each -- the legal entity for each of those project
16  companies was an LLC, a limited liability company or
17  corporation, and the ownership units of the LLC for
18  each project were membership interests.
19      And so Tradewind would wholly own the
20  membership interests of each project company.  We
21  would usually establish those early, very early in
22  the process.  I mean, right -- as soon as we would
23  identify a project, a site where we would want to
24  establish a project, before we would basically do
25  anything, we would typically set up an LLC.

Page 42

1  Tradewind would own it, and then over time
2  the assets that would relate to that project would
3  be all under the LLC.  And then, ultimately, as I
4  described, when we would sell the project before
5  construction start, we would sell -- we would be
6  selling the membership interests in that LLC to
7  another party, and, again, in most cases -- on wind
8  projects in most cases to Enel Green Power North
9  America.
10  Q.  Okay.  Who were the parties in general to
11  a membership interest purchase agreement?
12  A.  So it would have been Tradewind --
13  Tradewind Energy, as the owner of the LLC, would be
14  the seller, and then the buyer, again it would
15  depend on who the buyer was, but if it was -- if it
16  was an Enel purchased project, then the buyer would
17  have been, I think -- I think Enel -- well, let's
18  see, so Enel Green Power North America -- I don't
19  recall the specifics of this, but I think they did
20  have a subsidiary that they set up, one or more
21  subsidiaries that they set up that would acquire the
22  projects from Tradewind.  So there may have been one
23  or more intermediate companies between the project
24  LLC and Enel Green Power.  I don't recall the name
25  of that entity.

Page 43

1  Q.  Okay.  So you mentioned that under the
2  MIPA there is a lender -- I'm sorry, there's a buyer
3  and a seller.  Is there a lender?
4  A.  No.
5  Q.  Okay.  Is there a guarantor?
6  A.  Guarantor?
7  MR. BALL:  Objection, vague.
8  Q.  (By Ms. Baker)  Go ahead and please
9  answer.
10  A.  So the only time that I recall guaranties
11  coming up would have been -- let's see, if there was
12  a future obligation to Tradewind, it's possible that
13  we would have required a parent company guaranty
14  from Enel, and when I say Enel, I mean up the chain,
15  either EGPNA or its parent company.  Frankly, I
16  don't -- they didn't like to give those, and I
17  frankly don't recall -- that was very -- if that --
18  if that happened, it would have been very few times.
19  I think we probably asked for it more than once, but
20  it was a hard thing to get, so that's the only --
21  that's the only context I can really think of that a
22  guaranty might have -- might have come into play,
23  but as relates to -- as relates to -- let's see --
24  well, let's see, okay, so as relates to transactions
25  between Tradewind and Enel Green Power North America

Page 44

1  as the buyer, here's the part I'm a little hazy on,
2  so -- and this may be what you are asking about.
3  If they -- to the extent that they had an
4  intermediate subsidiary that was actually the buyer,
5  then we may have had EGPNA as a limited guarantor on
6  certain things, maybe specific provisions in a
7  contract.  When you asked the question, I was
8  thinking more up the chain all the way to Enel --
9  Enel SPA, which is the owner of Enel Green Power,
10  which is the owner, I guess, of Enel Green Power
11  North America, so the Enel SPA stuff was very hard
12  to get, and I'm not sure we ever got that.
13  We may have had EGPNA limited guaranties
14  on specific provisions in our MIPAs, but, yeah, I
15  don't -- there's nothing specific on that that I
16  recall beyond that.
17  Q.  Okay.  What's the role or purpose of a
18  guarantor in one of these agreements?
19  MR. BALL:  Objection.
20  A.  It would be if for some reason -- and it
21  could be for a host of reasons, but if for some
22  reason we wanted the backing of a bigger company
23  than the buyer of the project LLC, then we would
24  have asked for a guaranty of the bigger company.
25  That could be financial.  It could also be -- it

Page 45

1  could be performance, more likely, though,
2  financial, I would say.
3  Q.  (By Ms. Baker)  And with respect to the
4  Osage Wind project, is there a reason you would want
5  the backing of a larger company there?
6  MR. BALL:  Objection to form.
7  Q.  (By Ms. Baker)  Please go ahead.
8  A.  I don't -- I don't recall any specifics
9  about -- I don't recall any specifics about a
10  guaranty on that particular project.
11  Q.  And you don't recall whether there would
12  have been a reason to have one or to seek one?
13  A.  I mean, all I would be doing is just sort
14  of speculating out loud.
15  Q.  Okay.
16  A.  I honestly don't remember, which I don't
17  think is probably a good idea, so, no, I just don't
18  -- I don't recall anything on that specifically.
19  Q.  Okay.  Did Tradewind ever own Osage Wind,
20  LLC?
21  A.  Sorry, say that again.
22  Q.  Did Tradewind Energy ever own Osage Wind,
23  LLC?
24  A.  Yes, I believe we did.  So the -- frankly,
25  I was a little hazy on this, too, until looking back

Page 46

1    at the MIPA, but the way that we apparently
2    structured that transaction is that Tradewind bought
3    the project and then turned around and sold the
4    project to Enel.
5        Q   Do you recall why Tradewind purchased the
6    project from Wind Capital Group?
7        A   I should be -- sorry, I should be probably
8    a little more pointed with that.  So, presumably,
9    that was not Tradewind -- that was not Tradewind
10   Energy that actually acquired it, but rather --
11   well, let's see, I guess the project subsidiary was
12   probably already established, and that's what we
13   were buying, so, yeah, it was probably Tradewind
14   Energy.  I'm sorry, go ahead, say that again,
15   please.
16       Q   Yes.  Did -- do you recall why Tradewind
17   purchased Osage Wind from Wind Capital?
18       A   Yeah, so -- well, I take it you are asking
19   why did Enel not just buy the project directly as
20   opposed to having it go through Tradewind?  Is
21   that --
22       Q   Sure.
23       A   -- what you are asking?  So, yeah, so Enel
24   was -- this came up in other contexts, other
25   projects that we acquired, but they were -- they

Page 47

1    had -- they had pretty rigid views on how they
2    wanted these transaction structures as relates to
3    Tradewind's expertise and job, and so we were the
4    developers, we were the constructors and
5    operators, and we had -- we had the team that knew
6    how to do due diligence on a development asset.
7    They didn't.  Frankly, they would have -- they would
8    have really struggled with that.
9        So what made sense was for Tradewind --
10   and we did this time and time again -- Tradewind to
11   onboard projects, be completely responsible for all
12   of the -- all of the due diligence on projects, and
13   then hold the projects during the period of time
14   that we were perfecting development, derisking, as
15   we would call it, and then ultimately sell to Enel,
16   you know, when Enel was comfortable that we had put
17   the project through its paces, and either they --
18   you know, either they could take a clean handoff and
19   manage risk from there going into construction, or
20   in some -- that was always true, but in some cases
21   we would -- we would have some lingering development
22   responsibilities that would usually just be land --
23   landowner relations would kind of be the stuff that
24   we would -- because we had all those relationships.
25       We would -- we would be involved in some

Page 48

1    of that kind of stuff on -- you know, beyond a sale
2    of the project to Enel, but anyway, that was the
3    structure, and like I say, we -- I don't remember
4    how many, but we bought a fair number of the
5    projects over time, many or all which got built, and
6    that was always how we did it.  Tradewind would buy,
7    Tradewind would perfect the projects, and then
8    Tradewind would sell to Enel.
9        Q   Okay.  Do you know who came up with the
10   concept for the Osage Wind project, whose idea that
11   was?
12       A   No, I don't know any of the history of it,
13   particularly in the context of an acquisition.  I
14   think -- you know, frankly, I'm speculating a bit
15   here, but I guess my assumption is that we got a
16   phone call from somebody at Wind Capital Group
17   asking us if we'd be interested in buying the
18   project.  But I don't know who made that call and
19   who received that call, but I think that's probably
20   where the whole thing probably would have started.
21       Q   Okay.  So you don't know whose idea the
22   project itself was, you know, how it was originally
23   conceived?
24       A   No, we weren't -- Tradewind had no -- we
25   had no involvement in it.  That was a Wind Capital

Page 49

1    Group project.  It was a competitor of ours, so we
2    wouldn't -- yeah, we wouldn't have had any
3    involvement before the time that we bought it.
4        Q   Okay.  Do you know if Osage County was the
5    original location where the project was planned?
6        A   I don't -- I don't know anything about
7    that, no.  The only thing -- all I can say is I
8    think the project was in -- probably entirely in
9    Osage County.  What I'm a little hazy on is whether
10   any of the project crossed a county boundary, and,
11   frankly, I don't remember whether that would have
12   been the Osage project or Mustang Run.  But, yeah,
13   again, certainly any history preceding when
14   Tradewind bought the project, we wouldn't have been
15   involved with.  I don't know why anybody would know
16   the answer to that.  I don't know the answer to
17   that.
18       Q   Okay.  Were you involved in membership
19   interest purchase agreements for the Osage Wind
20   project or related to the Osage Wind project?
21       A   Yeah, as previously stated.  I would
22   have -- I would have reviewed those documents.
23       Q   Okay.  Did you have any specific
24   responsibilities under those documents?
25       MR. BALL:  Objection, vague.

Page 50

1  A   So you are asking if the documents called
2  me out as a person that had responsibilities?
3  Q   (By Ms. Baker)  Yes, or if the company put
4  any responsibilities on you pertaining to that
5  agreement.
6  A   Well, no, I don't -- I don't know why --
7  the only -- I mean, I don't know why -- I don't know
8  that I was named in that document or any document.
9  Occasionally when we would sell projects and we
10 would be negotiating reps and war- --
11 representations and warranties in documents, we
12 would restrict -- we would restrict a breach of a
13 rep as being specific to individuals named in the
14 document.  I don't recall whether that was at all
15 the case in these documents, whether the individuals
16 were named.  Sometimes, I mean, that was -- I would
17 say that was more the exception than the rule.  If
18 the individuals were named, I probably would show up
19 in those, or I might occasionally, but I would say
20 usually not.
21      Then as far as -- if you are asking what
22 the expectations were of me, I don't think there was
23 anything -- there was nothing written in stone.
24 There was nothing written down anywhere that said
25 Rob Freeman will review legal agreements.  Now, as a

Page 51

1  matter of practice, I would always -- I would always
2  review legal agreements, and, like I said, have a
3  close connection, if not, you know, basically
4  oversight or management over outside counsel.  Why,
5  because I knew my way around legal documents, and I
6  wanted to make sure things didn't get messed up as
7  much as I could.
8  Q   Okay.
9  A   No, I don't -- there was no -- as far
10 as -- sorry -- the Enel team at all, they don't --
11 you know, they didn't -- I think they were used to
12 seeing me in and around legal agreements, but that
13 was not like in a job description per se.
14 Q   Okay.  Do you know if anyone from EGPNA
15 was involved in the transaction where Tradewind sold
16 Osage Wind to Enel Kansas?
17 A   So, yeah, there would have been -- so
18 there was always Enel people on the other side of
19 the table.  Most of the -- so in that time frame I
20 think I'd be correct in saying that the two primary
21 architects of sales transactions between Tradewind
22 and Enel and sort of, you know, down into kind of
23 negotiating the finer points of the deal terms would
24 have been me and Mike Storch.
25 Q   And --

Page 52

1  A   And then Enel would have been represented
2  by -- well, they would have been represented -- they
3  always had counsel, outside counsel involved.  Steve
4  Champagne, I think, was around in those days, he was
5  their in-house general counsel.  So Steve would kind
6  of pop in and out and stuff.  I have no idea -- I
7  just don't recall how much involvement, you know,
8  Steve would have on any particular transaction but
9  he was around for sure.
10      And then as far as I can remember, they
11 always had an outside firm involved as well, and
12 then -- so that would have been, you know, Rob, Mike
13 Storch, their outside counsel, and then, you know,
14 Mike would -- the same thing I would do, Mike would
15 bring in members of his team as needed to just check
16 boxes on things that they would be concerned with
17 before they would close a transaction with us, and
18 then I would do the same thing.
19      I would always have Matt Gilhousen as the
20 CEO, I would always have Matt and Geoff both, would
21 review those transactions, those documents.  I would
22 always ask those guys to review them, and then Matt
23 and I, with really Matt taking more of the lead, we
24 would always have -- we would always have the
25 developer that was responsible for a project or

Page 53

1  onboarding a project review the document.  Every
2  head of every department would review a document,
3  but, again, keeping in mind all of these people were
4  responsible for due diligence before a document
5  would get signed, but they would also be reviewing
6  the legal agreement, with particular attention being
7  paid for reps, warranties and covenants.
8  Q   When you say reps, what are you referring
9  to there?
10 A   Representations, warranties and covenants.
11 Standard -- very standard stuff in any project sale
12 agreement where the seller is making
13 representations, warranties and covenants to the
14 buyer about -- you know, just conceptually about the
15 status and condition of the project.
16 Q   Okay.  I believe you mentioned that
17 Tradewind entered into a MIPA to purchase Osage Wind
18 from Wind Capital Group in 2013; is that right?
19 A   Yeah, I think that's right.  I have not
20 looked at that document, so I've heard that date
21 come up in just my conversations with Kirk, my
22 attorney, but I have not gone back and looked at the
23 document.  But that was the date that I understood
24 that it was executed.
25 Q   Okay.  Have you ever seen that document?

Page 54

1    A    I would have seen it at that time.
2    Q    Okay.
3    A    I've not looked at it since then.
4        (Exhibit 78 marked for identification.)
5    Q    (By Ms. Baker)  Okay.  Let's go ahead and
6    take a look at Exhibit 78.  This document was
7    previously marked as 78, and the Bates stamp is
8    Osage Wind 021248 to 320.
9        MR. MAY:  Excuse me.  Could we take a
10   short break before we jump into this at this time?
11       MS. BAKER:  Absolutely, sure.
12       THE VIDEOGRAPHER:  We're off the record at
13   10:17 a.m.
14       (A recess was had.)
15       THE VIDEOGRAPHER:  We are back on the
16   record at 10:33 a.m.
17   Q    (By Ms. Baker)  Mr. Freeman, I'd like to
18   ask quickly, did you speak with anyone on the break?
19       MR. MAY:  Yes, he spoke to me.
20   Q    (By Ms. Baker)  Okay.
21   A    Okay.  Yes.
22   Q    Did you speak with anyone else?
23   A    No.
24   Q    Okay.  Let's go ahead and take a look now,
25   if my colleague, Ridge, could pull up Exhibit 78.

Page 55

1        MR. HOWELL:  Jenn, could you give me the
2    ability to share my screen?
3        MS. BAKER:  Oh, I apologize, I didn't know
4    that needed to happen, and I'm sorry, if everyone
5    will give me just a second.  Do you know how to do
6    that, Ridge?
7        MR. HOWELL:  I don't know for sure.
8        MS. BAKER:  Perhaps the videographer
9    knows, because we didn't set up this Zoom.  Is that
10   something I have control over?
11       Why don't we go off the record and resolve
12   this and then come back on the record.
13       THE VIDEOGRAPHER:  We're off the record at
14   10:34 p.m.
15       (Discussion held off the record)
16       THE VIDEOGRAPHER:  We are back on the
17   record at 10:35 a.m.
18   Q    (By Ms. Baker)  So this is a document that
19   has been previously marked as Exhibit 78, Bates
20   stamped Osage Wind 021248.  Mr. Freeman, do you
21   recognize this document?
22   A    We can't -- can you see the whole page?  I
23   can't see.
24       MR. MAY:  It's cropped off at the top --
25   the bottom part of the window.

Page 56

1        MS. BAKER:  Okay.  Ridge, would you mind,
2    please, scrolling slowly through the agreement so he
3    can see what it is?
4    Q    (By Ms. Baker)  Mr. Freeman, if you'd like
5    him to slow down at all, please just let us know.
6    There are 73 pages to this document.  Would you be
7    comfortable if we scroll to the signature page?
8    A    Sure.  I think -- yeah.  There's my
9    signature, yeah.
10   Q    Okay.  So do you recognize this document?
11   A    Yeah, it appears to be the purchase
12   agreement between Tradewind and Wind Capital Group
13   of the Osage Wind project.
14   Q    Would that be from August 22nd, 2013?
15   A    That's the date I saw.
16   Q    Okay.  Do you know if this agreement
17   includes a form guaranty agreement with EGPNA
18   serving as the guarantor?
19   A    Well, like I said, I don't know that, but
20   I just saw a reference to a guaranty, as he was
21   scrolling through the top of it.
22       MS. BAKER:  Ridge, could you show us that
23   first page of the guaranty just below this, please?
24   Go ahead and keep going.  Okay.  Right here is
25   great.

Page 57

1    Q    (By Ms. Baker)  So now that you see this,
2    does this refresh your memory, does this agreement
3    include a guaranty in which EGPNA is the guarantor?
4        MR. MAY:  Could you scroll to the bottom
5    of the guaranty, please?
6    A    It appears to me it's a form of agreement
7    attached to the exhibit.
8    Q    (By Ms. Baker)  Okay.
9    A    I don't know if it was executed or not
10   executed.
11   Q    Okay.  You don't recall?
12   A    No, I don't, I don't remember the specific
13   about what this was about.
14   Q    Okay.  Do you have any idea what reason
15   EGPNA would have for serving as a guarantor?
16       MR. BALL:  Objection to form.
17   A    No, I don't recall.
18   Q    (By Ms. Baker)  Do you recall ever
19   asking -- as Tradewind Energy, asking EGPNA to serve
20   as a guarantor?
21   A    No, not on this transaction.
22   Q    Okay.  Let's turn to the page that's Bates
23   stamped 21293, which is the guaranty agreement.  It
24   states that "EGPNA will guaranty the duties,
25   performance and obligations of the buyer, which is

Page 58

1 Tradewind, under the MIPA."  Do you see this
2 language?
3       MS. BAKER:  Ridge, are you able to
4 highlight this language?
5       MR. HOWELL:  Yes.  Can you repeat that?
6       MS. BAKER:  It's in the third whereas
7 paragraph, the last one, "Guarantor will guaranty
8 the duties, performance and obligations."
9    Q   (By Ms. Baker)  Okay.  Do you see this
10 language, Mr. Freeman?
11    A   Yes.
12    Q   Do you know what the duties of Tradewind
13 would have been under the agreement?
14    A   Not -- not from memory, just whatever is
15 contained in the document.  I mean, I haven't seen
16 these documents in seven, eight, whatever it is,
17 eight years.  So, no, I don't recall the specifics.
18    Q   Okay.  And I understand that you don't
19 recall the specifics here, but do you know generally
20 what's the purpose of a guaranty of this nature?
21    A   I think I mentioned that earlier.  Just
22 conceptually, the guaranty would presumably be to
23 backstop obligations of -- in this case Tradewind,
24 of -- you know, it's to reduce risk for the seller,
25 right, that they get paid and the performance

Page 59

1 occurs, so they are presumably going after a
2 bigger -- a bigger company with a bigger balance
3 sheet.
4    Q   Okay.  When you say "backstop," what do
5 you mean by that term?
6    A   Normally, you would ask for a guaranty if
7 you don't have confidence in the financial
8 wherewithal or performance and/or performance
9 capabilities of the entity you are dealing with.
10    Q   Okay.  So if -- if, for instance, EGPNA
11 was the guarantor in this agreement, then EGPNA
12 would backstop, which means, basically, they would
13 guaranty or assure Tradewind that they would cover
14 any of these duties or financial responsibilities if
15 the buyers -- I'm sorry, yes, if the buyer were to
16 breach any of those duties?
17       MR. BALL:  Object to the form.
18    Q   (By Ms. Baker)  Go ahead, please, and
19 answer if you can.
20    A   I'm sorry, could you rephrase the
21 question?  I'm not sure I understand the question.
22    Q   Okay.  Sure.  I'm still kind of trying to
23 get to the meaning of this word, backstop, that you
24 have used.  So if EGPNA was the guarantor, what
25 would they be backstopping?  What does that mean?

Page 60

1    A   Well, it depends on what the guaranty
2 says.  It would be -- you know, the guaranty should
3 be specific as to what the obligations are that it's
4 guarantying, but the idea would be -- the idea would
5 be that if Tradewind doesn't perform something
6 that's covered by the guaranty, then the guarantor
7 would cover that obligation.
8    Q   Okay.  Let's go ahead and turn to the page
9 that is Bates stamped 21248.  You'll see under the
10 defined terms here, affiliate is that first
11 definition.  It's defined as, "With respect to any
12 person, any other person controlling, controlled by,
13 or under common control with such person.  For
14 purposes of this definition, the term, control --
15 excuse me, the term, control, and correlative terms
16 means A, the ownership of 50 percent or more of the
17 equity interests in a person or, B, the power,
18 whether by contract, equity ownership or otherwise,
19 to direct or cause the direction of the policies or
20 management of a person.  For the avoidance of doubt,
21 the company shall be deemed to be an affiliate of
22 seller, prior to the closing, but shall not be
23 deemed to be an affiliate of seller from and after
24 the closing."  So based on this definition, were
25 there affiliates under this agreement?

Page 61

1       MR. BALL:  Objection to form.
2    Q   (By Ms. Baker)  Please keep in mind that
3 if your attorney objects, do go ahead and answer,
4 unless he instructs you specifically not to answer.
5    A   Well, I don't recall -- I don't recall how
6 the term, affiliate, is used in the agreement.  I
7 don't know how -- I mean, I see the definition of
8 affiliate, but I don't -- I don't know how it came
9 up.  The only parties that I've seen identified at
10 this point are the project company, Tradewind
11 Energy, Inc. and Wind Capital Group, and then EGPNA
12 as the guarantor.  That's what I've seen identified
13 so far.  So what is the question?
14    Q   Whether there were any affiliates under
15 this agreement?
16    A   Do you mean were any of the parties to
17 this agreement affiliated with each other?
18    Q   Were any of them meeting the definition of
19 affiliates that's defined right here in this MIPA?
20    A   On the sell side -- seller's side or the
21 buyer's side?
22    Q   Either side.
23    A   Well, presumably -- my understanding of
24 this would be that the seller as the -- would be the
25 affiliate of the subsidiary company of selling,

Page 62

1  Tradewind, right?
2      Q   Okay.  Any other --
3      A   The --
4      Q   Go ahead, please.
5      A   So, then on the buyer's side, the buyer is
6  Tradewind Energy, Inc.  There's no -- there's no
7  affiliate -- so you have the buyer -- but the buyer
8  is not affiliated with the seller or the project
9  company before it acquires it under this agreement
10 or the guarantor.
11     Q   Okay.  Let's go ahead --
12     A   Is that what you are asking, is that it?
13     Q   Yes.  So there's just the parties that you
14 see listed and there's no other affiliates involved;
15 is that what you are saying?
16         MR. BALL:  Objection to form.
17     Q   (By Ms. Baker)  Please go ahead.  Is that
18 what you are saying, that there's no affiliates
19 involved, only the named parties?
20         MR. BALL:  Objection to form.
21     A   No, I'm not saying -- not that I can think
22 of, no.
23     Q   (By Ms. Baker)  Okay.  Let's go ahead and
24 turn to page 21251.  You'll see here there's a term,
25 governmental authority, that's defined, and I'm

Page 63

1  going to read part of the definition to you here.
2  It says, "For the avoidance of doubt, no Native
3  American tribe, Nation, entity, body, organization,
4  governmental or other authority or any agency,
5  division, ministry, instrumentality or authority
6  thereof shall be considered a governmental authority
7  for any purpose hereunder."  What's your
8  understanding of why no Native American tribe was to
9  be considered a governmental authority for this
10 agreement?
11     A   I don't know the answer to that.
12     Q   Okay.  Did Tradewind ever make its own
13 independent inquiry into what rights a Native
14 American tribe might have in relation to the
15 project?
16         MR. BALL:  Objection to form.
17     A   Ask the question again.
18     Q   (By Ms. Baker)  Sure.  Did Tradewind ever
19 do its own independent inquiry to try and find out
20 whether any Native American tribe had rights related
21 to the Osage Wind project?
22     A   Rights related to the project?
23     Q   Yes, any rights that might be affected.
24         MR. BALL:  Objection to form.
25     A   Certainly, as a part of our due diligence,

Page 64

1  as I already mentioned, we would have been looking
2  at any issues that could affect the project at all,
3  whatever that might be, including -- including
4  mineral interests.  Oil and gas interests would fall
5  under that, permits.  All those are things that our
6  team would have looked at.
7      Q   (By Ms. Baker)  Okay.  And which tribes
8  were you considering during this review?
9      A   The only tribe that I recall would have
10 been the Osage.
11     Q   Okay.  Who would have -- who would have
12 looked into that at Tradewind?
13     A   I don't -- I can't name names.  We did
14 have -- we would have had our team at Tradewind
15 looking into permitting issues so -- well, so Aaron
16 Weigel was the project development lead, so he would
17 have been directly involved in project review.  We
18 did hire -- we hired outside counsel, so we had
19 our -- we had our usual outside counsel for the
20 transaction, and then at some point we hired Lynn
21 Slade's firm to advise us specifically on issues
22 around tribal rights on the project.  I don't -- I
23 can't tell you exactly when we hired him, but we did
24 definitely retain them, and they were our advisers.
25 That's probably the best answer I can give.

Page 65

1      Q   Okay.  You mentioned that you had usual
2  outside counsel besides Lynn Slade.  Who was that
3  usual outside counsel?
4      A   Normally Steve Willman was our attorney
5  that worked on our transactions.
6      Q   And he was affiliated with a separate law
7  firm?
8      A   Yes.
9      Q   Okay.  And so did he make any conclusions
10 as to whether Osage rights would be impacted here by
11 development of the project?
12     A   That wouldn't have been his call.
13     Q   Okay.  Whose call would that have been?
14     A   That's why we hired Lynn Slade and his
15 firm.  Yeah, they were the -- I don't recall how we
16 found them exactly, but they came billed as one of
17 the -- sort of the best firms in the country on --
18 specifically on dealing with Indian tribe
19 matters.  So that's who we hired.
20     Q   Okay.  And how did you become aware of
21 their representation or of them, as you described
22 it, you know, being involved or focusing on Native
23 American matters?
24     A   I don't recall specifics about how we were
25 introduced to them.

Page 66

1   Q   Okay.  And do you recall what
2   representations Tradewind made to EGPNA or any other
3   Enel subsidiary about the rights of Osage regarding
4   the wind project?
5   A   I can't -- I can't quote reps, no, on a
6   transaction from seven years ago, eight years ago.
7   Q   Okay.  Regarding specifically this term
8   that we were discussing, governmental authority, do
9   you have any knowledge as to which entity wanted
10  this term included in the agreement?
11  A   No.
12  Q   Do you know who was responsible for
13  drafting this term in the agreement?
14  A   I don't even remember who originated the
15  original draft of the agreement.  I don't know
16  whether it came -- the original draft came from Wind
17  Capital Group or if it came from Tradewind, so, no,
18  I don't recall.
19  Q   Okay.  So you don't know what attorney
20  drafted the whole agreement?
21  A   No.  I mean, it would -- somebody would
22  have created a first draft, and then it would have
23  been negotiated from there, and I don't recall who
24  created the first draft, no.
25  Q   Okay.  Who was involved in the different

Page 67

1   iterations and revisions to the agreement?
2   A   I don't -- I don't -- I don't have
3   specific recall on that, other than what I've
4   already said, which is, typically, Steve Willman and
5   I would have been working on a document with the
6   support of my team, and then at some point -- I
7   mean, I can't -- I can't even -- well, I guess
8   presumably Enel -- somebody at Enel would do this as
9   well, but I don't recall who was involved on their
10  side.
11  Q   Were you personally involved in the
12  creation of this agreement or providing advice about
13  this agreement?
14  A   I would have reviewed the agreement, yeah,
15  for sure.
16  Q   Did you have any input into the terms?
17  A   Yeah.  I mean, I certainly would have
18  had -- yeah, I would have had input.
19  Q   And do you recall this specific term, this
20  definition, governmental authority?
21  A   No, I don't.
22  Q   Okay.  Let's go ahead and turn in this
23  same exhibit to page 21253, scroll down just a bit.
24  We're looking for the definition of permit here.
25  And so permit is defined as "Any license, permit,

Page 68

1   certificate, order, consent, registration,
2   exemption, consultation, variance, filing or other
3   form, permission or review required under or issued
4   pursuant to any environmental law or by any
5   governmental authority."  Do you see that
6   definition?
7   A   Yes.
8   Q   And now, do you agree that this definition
9   of the term, permit, excludes permits from the Osage
10  Minerals Council, since governmental authority is
11  defined explicitly to exclude Native American
12  tribes?
13      MR. BALL:  Objection to form.
14  A   Yeah, I don't -- I guess I don't feel like
15  I can sit here on the fly and make an assessment of
16  what the legal interpretation of this would be.
17  Q   (By Ms. Baker)  Well, as a layperson and
18  as a CEO who was involved in this transaction and
19  even in the specific agreement, you saw that the
20  governmental authority provision excludes Native
21  American tribes from being governmental authorities,
22  so if a tribe was not a governmental authority, does
23  that mean a tribe, such as Osage, could not have
24  issued a permit based on this definition?
25      MR. BALL:  Objection, form.

Page 69

1   A   Yeah, I guess all I can do is read these
2   two paragraphs that you are reciting, and, yeah, it
3   appears as though -- it appears as though it is, I
4   guess, as you described it, that permit -- permit
5   references governmental authority, and you are
6   saying governmental authority under the prior
7   definition excludes stuff related to the Indian
8   Affairs, so I don't know what else to add to that.
9   Q   (By Ms. Baker)  Okay.  And operating under
10  the assumption that tribal permits are excluded from
11  the definition of permit here, who would have made
12  the decision to exclude tribal permits?
13  A   I don't -- I just simply don't -- I just
14  don't recall any -- I don't recall any -- any debate
15  or discussions negotiating around these terms, so I
16  can't -- it's just not ringing a bell with me.  So I
17  can't tell you who -- you know, who would have --
18  who would have pulled -- you know, I guess made a
19  decision, which I think is kind of what you are
20  driving at.  I mean, again, all I can tell you is
21  that the team -- the team involved in it would have
22  been Steve Willman, myself, Matt Gilhousen, some of
23  the guys and gals at Tradewind that were looking at
24  reps and warranties, et cetera, Lynn Slade, if we
25  had hired him at that point.  So I don't know what

Page 70

1  else -- I can't tell you -- are you asking for a
2  name of a person or what?  What are you asking for?
3      **Q   Or even which entity might have wanted**
4  **permits to exclude tribal permits?**
5          MR. BALL:  Objection to form.
6      A   Yeah, I just don't -- I mean, I can't -- I
7  don't recall any discussion around this specific
8  language or these definitions, so --
9      **Q   (By Ms. Baker)  Okay.**
10     A   -- I can't really go further than that.
11     **Q   Okay.  At the point in time when this**
12 **agreement was drafted and entered into, had a**
13 **determination been made yet that the project did not**
14 **need a permit from the Osage Nation or the Osage**
15 **Minerals Council?**
16     A   I don't recall the specific timing of
17 conclusions that we -- that we reached with the
18 advice of Lynn Slade.  I can say that I don't recall
19 our advisers ever concluding or, you know,
20 suggesting to us that we needed a permit from the
21 Osage, and my presumption would be that we reached
22 that conclusion or we got comfortable with that
23 issue before we bought the project.  So we -- yeah,
24 so we -- yeah, we were -- that was definitely not
25 identified as a permit that we would need, and to

Page 71

1  the contrary, we were advised that we did not need
2  anything.
3      **Q   Okay.  Were you advised to that effect at**
4  **the time this agreement was entered into?**
5      A   Again, I can't -- I just can't -- I
6  don't -- I can't give you the days and months, but
7  my -- my assumption would be -- there's no question
8  that we got comfortable with this issue before we
9  bought the project, or we wouldn't have bought it.
10 We didn't -- our job was to buy projects that we
11 knew -- that we knew exactly what we needed and we
12 would be confident that we could complete.  So that
13 was not an issue that was raised as a problem or,
14 you know, something that we needed in addition to
15 the project at the time we bought it.
16     **Q   So at the time you bought the project, you**
17 **would not have done that unless you were comfortable**
18 **regarding the permit question, and did you rely on**
19 **Mr. Slade's advice or any other counsel's advice to**
20 **become that comfortable?**
21     A   For sure, yeah, and by virtue of the fact
22 that, no doubt, we were aware that there had been
23 litigation prior to the time that we bought the
24 project and that that suit had been -- had concluded
25 in favor of the project, and so --

Page 72

1      **Q   Okay.  So --**
2      A   -- I think as far as we knew, it was a
3  settled matter, and we were getting the advice of
4  Lynn Slade and his team that we didn't need
5  anything.
6      **Q   Okay.  So you got that advice from**
7  **Mr. Slade prior to entering into this agreement to**
8  **purchase the project?**
9          MR. BALL:  Objection to form.
10     A   Yeah.  Okay.  Well, so I'll just repeat
11 what I already said, which is, I really can't recall
12 the specific dates of conversations, but I would
13 feel pretty confident that we got the advice before
14 we bought the project, or we wouldn't have bought
15 it.  The only -- the only thing that I can say that
16 would have been a way to manage through that, if
17 those conversations don't line up exactly that way,
18 is essentially we would not take risk, i.e., pay a
19 bunch of money for a project that we -- we aren't
20 highly confident that we are going to be able to
21 sell and make money on.  That was our business.
22         So we would not have stepped into a -- you
23 know, sort of a fully exposed risk position in the
24 project, not knowing the answer to that question.
25 Our job was to, as Tradewind -- I said this earlier

Page 73

1  on, but our job as developers was to acquire permits
2  that we needed to have for a project, and to the
3  extent that -- to the extent that permits weren't
4  yet required, but that they would be required in the
5  context of construction and operations, we would --
6  we would identify those typically.  So we were
7  all -- we were all over -- we were all over that
8  kind of stuff in the development phase.
9      **Q   (By Ms. Baker)  Okay.  Do you recall**
10 **whether Mr. Slade continued to advise Tradewind**
11 **regarding the need for a permit after the purchase**
12 **took place?**
13         MR. BALL:  Objection to form, assumes
14 facts not in evidence.
15     **Q   (By Ms. Baker)  And Mr. Freeman, let me**
16 **back that up for a second.  Did Mr. Slade continue**
17 **to provide advice regarding the need for a permit**
18 **after Tradewind purchased the project?**
19         MR. BALL:  Objection to form, assumes
20 facts not in evidence.
21         THE WITNESS:  Should I still answer that?
22         MR. MAY:  Yes.
23     A   So I'll just repeat myself.  I don't
24 recall specific dates and chronology here, but Lynn
25 Slade was an ongoing adviser to Tradewind,

Page 74

1  specifically on the tribal issues, and I would say
2  that he advised us all the way up to the moment of
3  selling the project.
4      Q   (By Ms. Baker)  And what did he advise you
5  regarding, in light of the fact that you were
6  already comfortable that no permit was necessary?
7      A   We would have had him -- we would have had
8  him looking -- we were relying on him to tell us
9  what we needed.  Now, typically, when -- at
10 Tradewind when we talk mineral interest, we're --
11 we're thinking oil and gas, and we would encounter
12 that all the time.  We have lots and lots of
13 projects that are built on surface estates that have
14 oil and gas, active oil and gas operations ongoing.
15 So permitting with respect to mineral interest
16 owners would in all cases -- we would be thinking
17 about oil and gas, as Tradewind, to be clear, our
18 team.
19         With that being said, again, we hired Lynn
20 Slade to tell us or to identify what we need to know
21 as relates to the Indian tribe as we were in the
22 process of acquiring and selling the project.
23     Q   Okay.  Let's go ahead and take a look at
24 page Bates stamped 21268 of this document.  A
25 representation is made here that "The company is in

Page 75

1  compliance in all material respects with all permits
2  of the extent -- excuse me, to the extent obtained,
3  and has paid all amounts currently due under all
4  obtained permits."  Do you see this line?
5      A   Yes.
6      Q   Okay.  Did anyone at Tradewind or on the
7  Tradewind board of directors, prior to approving
8  this agreement, undertake any analysis to determine
9  whether this statement was true?
10     A   Sure.  We wouldn't have made -- what --
11 sorry, what section are we in here in this document?
12 What's the -- what's the heading of this section?
13        MS. BAKER:  Ridge, would you mind
14 scrolling up.
15     A   Keep going higher, because you said we're
16 in the rep section, but I want to understand, is
17 this the buyer -- seller reps or buyer reps?
18     Q   (By Ms. Baker)  So we have representations
19 and warranties of seller.
20     A   So we're talking about Wind Capital Group
21 here?
22     Q   Yes.
23     A   Okay.  So this is Wind Capital Group's
24 reps?
25     Q   Yes.

Page 76

1      A   Okay.
2      Q   So the question is whether anyone at
3  Tradewind took steps to determine whether the
4  statement we're discussing is true?  And we're going
5  to scroll back down, and, again, that's 21268, right
6  here.  So did Tradewind take any steps to determine
7  whether this statement was accurate?
8      A   Well, we would do due diligence on a
9  project to -- as best we can to try to make sure
10 that we're comfortable with what we're buying, but
11 we're relying -- when the other party makes a rep,
12 we're relying on the other party from a legal
13 perspective, right?
14     Q   Do you make that reliance without
15 undertaking any analysis or investigation of your
16 own?
17     A   Ultimately I would say the answer, yes, we
18 do due diligence on projects, but when you're
19 talking reps, I would say that we're relying on the
20 entity making the rep that they did -- they are not
21 committing fraud, that they are being truthful and
22 that they have the -- they have the resources to
23 back up -- back up the rep they are making.
24     Q   Okay.  When this agreement was signed,
25 August 2013, is it true that neither Tradewind nor

Page 77

1  Osage Wind nor EGPNA had a permit from the Osage
2  Nation to mine the Osage Mineral Estate?
3      A   Well, we didn't -- to my recollection we
4  didn't -- we were advised that we didn't need a
5  permit, and we didn't have -- we didn't have a
6  permit, regardless of what it was.  And I do know
7  that there were ongoing conversations between the
8  Tradewind team and the Osage, and the Osage had not
9  identified a permit.  No one had identified a
10 permit.
11     Q   Who was having conversations with Osage on
12 Tradewind's side?
13     A   I don't recall the specific people.
14     Q   Do you recall who they spoke with at
15 Osage?
16     A   That -- yeah, that I don't know.  I was
17 never in those meetings.  I was never in those
18 meetings, so, yeah, since I wasn't in them, I
19 can't -- I can't tell you who was there.
20     Q   Okay.  So to be clear, Tradewind did
21 conduct due diligence for this agreement, but not
22 specifically with respect to this provision that's
23 highlighted?
24        MR. BALL:  Object to the form.
25     A   No, that's not -- I don't think that's

Page 78

1  what I said.
2      Q   (By Ms. Baker)  Okay.
3      A   So we would do due diligence on all
4  aspects of a project, which would certainly include
5  permitting for sure.  My point simply is that we --
6  we would -- we would, nonetheless, be relying on the
7  seller in this case, we would be relying on their --
8  when they make a rep that they are being truthful
9  about their rep, but, yeah, our team would have been
10 conducting due diligence and identifying all the
11 permits that the project has, the permits that it
12 needs that it doesn't have, ultimately in building a
13 picture on what the risk profile of the project is.
14     **Q   You mentioned that Tradewind did become**
15 **comfortable with the idea that a permit wasn't**
16 **necessary.  Did you personally reach that**
17 **conclusion?  Did you become comfortable that no**
18 **permit was necessary?**
19     A   Yes.
20     **Q   Okay.  And what caused you to be**
21 **comfortable with that?**
22     A   Well, the advice of our counsel and -- and
23 the due diligence that the team was working on, the
24 conversations that were happening with the Osage,
25 yeah, all of that, all of that, ultimately, you

Page 79

1  know, comes together, in the form of, you know, a
2  conversation between me and the team on, again, what
3  we're buying and what we're selling.
4      **Q   Okay.  I know you mentioned you don't**
5  **recall the specifics of the conversations with the**
6  **Osage Nation.  Were you aware of the specifics at**
7  **the time of this agreement?**
8      A   No, I don't -- I wasn't getting detailed
9  descriptions of conversations that were happening in
10 meetings that I was in, other than very -- just very
11 high level kind of stuff.  I think we -- I think --
12 you know, we, as Tradewind -- we were aware, and I
13 was involved in conversations along these lines with
14 my team, is we were aware of the litigation history
15 and how that was resolved, and we were -- we were
16 communicating -- we were basically communicating
17 with the Osage, like we did with all constituents
18 around projects, and just, again, making sure
19 that -- that we were checking all the boxes, and
20 that would have been the extent of my personal sort
21 of involvement or understanding.
22     **Q   You mentioned the word, constituents, just**
23 **now.  What does that term mean?**
24     A   Constituents would be basically anyone
25 that would have any kind of an interest or a stake

Page 80

1  in a project or that could even -- I guess that
2  could raise issues.  So just to give you a few
3  examples, as a developer, you know, we would be
4  talking, obviously, to the landowners, both the
5  surface estate, mineral interest owners, which, as I
6  mentioned, typically would be oil and gas owners,
7  local officials, county, planning and zoning.
8          One thing that we have to do, and I would
9  include this in the definition of constituent, is if
10 there are sort of community activist types that want
11 to stop a project, even if they have no -- they have
12 no standing, we would have -- we would have public
13 meetings, invite everyone, including people who were
14 opposed to projects, and we would have conversations
15 with all of these people, regulators, state, local,
16 federal regulators, the people that were -- you
17 know, that were regulating or overseeing
18 environmental matters, like -- well, threatening
19 endangered species and cultural resources.
20         So we would talk to everybody around
21 projects, and so our -- our meetings and discussions
22 with the Osage would have been very consistent with
23 that approach.
24         MR. BALL:  Counsel, I'm seeing a message
25 that the U.S. is disconnected.

Page 81

1          THE VIDEOGRAPHER:  Do we want to go off
2  the record?
3          MS. BAKER:  Yes, please.
4          THE VIDEOGRAPHER:  We're off the record at
5  11:18 a.m.
6          (A recess was had.)
7          THE VIDEOGRAPHER:  We are back on the
8  record at 11:20 a.m.
9          MS. BAKER:  Okay.  Let's go ahead and
10 turn, Ridge, to page 21257.
11     **Q   (By Ms. Baker)  Where it says, "delay in**
12 **interim payment" up there towards the top, it states**
13 **that "Tradewind may delay payment of an interim**
14 **payment until after all pending or threatened**
15 **claims, litigation, arbitration, administrative**
16 **proceedings or any dispute initiated, brought or**
17 **asserted by the United States, as trustee for the**
18 **Osage Nation, or by the Osage Nation have been**
19 **finally resolved, including all appeals and reviews**
20 **thereof."  Do you know why this was included in the**
21 **agreement?**
22     A   Just from reading this paragraph, it looks
23 like it was designed to protect Tradewind as buyer
24 from paying -- paying additional monies until
25 certain risks were dealt with or issues were

Page 82

1   handled.

2   Q   Okay.  As far as those risks or issues, in

3   2013 was there an expectation that there would be a

4   lawsuit related to this wind farm project?

5   A   As in a new lawsuit?

6   Q   Yes.

7   A   Something --

8   Q   Or any lawsuit, yes, anything that hadn't

9   taken place.

10   MR. BALL:  Objection to form.

11   A   I don't recall an expect- -- ask the

12   question one more time.

13   Q   (By Ms. Baker)  Sure.  In 2013 was there

14   an expectation that there might be a lawsuit related

15   to the project?

16   A   I don't know.  I don't think I would say

17   there was an expectation of litigation.

18   Q   Okay.  Were you involved in advising the

19   Tradewind board of directors regarding this

20   agreement?

21   A   Well, I didn't really advise the board,

22   but -- in that sense, but I would have been working,

23   presumably, directly with Mike Storch on this

24   agreement, so, I think that's -- Mike, again,

25   working for EGPNA.

Page 83

1   Q   Okay.  Do you recall who was on the board

2   of directors for Tradewind at the time of this

3   transaction?

4   A   Not specifically.  Mike -- I mean, I don't

5   know that the whole board for sure, because I said

6   this earlier in my testimony, but Mike Storch would

7   have been on the board, and I -- I don't recall for

8   sure from there.

9   Q   Do you recall whether any of the other

10   board members were affiliated with Enel?

11   A   Yeah -- well, I don't -- I just don't

12   recall the board composition at that time.  As I

13   explained earlier, it wasn't the same over the

14   course of -- that partnership lasted for -- what was

15   that -- 13 years, and the board composition changed

16   over time, and I just don't -- I don't recall what

17   it was at that time.

18   Q   Okay.  Do you know why there would have

19   been Enel folks on the board?

20   A   On the Tradewind board?

21   Q   Yes.

22   A   Yeah, I mean, sure, because they -- they

23   owned a minority stake in the business, and that --

24   that was part of the -- part of what was agreed to.

25   When we brought them in as minority owners into the

Page 84

1   business, that was part of what was agreed to is a

2   board that Enel would have board seats on.

3   Q   Okay.  So that was a term that Enel

4   wanted, was to make sure that they had some folks on

5   Tradewind's board?

6   A   Correct.

7   Q   Do you happen to know who was on the EGPNA

8   board of directors at that time?

9   A   No.

10   Q   Do you recall if you advised the board of

11   directors for EGPNA regarding the agreement?

12   A   My dealings were with the Tradewind board

13   people, and then other -- other managers, senior,

14   you know, managers or executives at EGPNA, I don't

15   know whether they were on the EGPNA board or not.

16   Q   I'm sorry, did you say you did provide

17   advice to those people?

18   A   Well, for example, I would have phone

19   conversations with Steve Champagne from time to

20   time.  I have no idea whether Steve Champagne was a

21   board member of EGPNA, as an example.  Or Francesco

22   Venturini or Toni Volpe, those kind of people.

23   Q   Okay.  Do you know who was advising the

24   EGPNA board?

25   A   I didn't have any dealings -- I didn't

Page 85

1   have any dealings with the EGPNA board.  Again, all

2   my dealings were with the guys on the -- my official

3   dealings were with people on the -- were with the

4   Tradewind board, and then I would have conversations

5   from time to time with other people in the EGPNA

6   organization that were not necessarily on the

7   Tradewind board.

8   Q   Okay.  And on page Bates stamped 21260

9   under Article 3, Representations and Warranties,

10   under 3.1(y), bullet point 2 reads, "Neither seller

11   nor company has received notice, formal or informal,

12   of any material issues raised by any governmental

13   authority with respect to the project."

14   A   Sorry, where are you again?

15   Q   I'm sorry, 3.1(y), this should be, I

16   believe, on 26 -- 21260, it might be on 268.  Okay.

17   So this bullet where it says, essentially, that

18   neither party has received notice of any material

19   issues raised by a governmental authority with

20   respect to the project.

21   MR. BALL:  Counsel, can I ask where you

22   are reading from?

23   Q   (By Ms. Baker)  I'm sorry, I'm looking

24   right now to -- it's little -- yes, it's highlighted

25   right there.

1    A   Little Roman iii?

2        MR. BALL:  Little Roman iii?

3    Q   (By Ms. Baker)  I apologize, that's

4    actually not the -- we don't really need to find the

5    specific definition, but let me ask you this.  Would

6    you consider a permit needed for construction of the

7    wind towers to be material to the purchase of the

8    project?

9        MR. BALL:  Object to the form.

10   A   Is a permit required for construction

11   material to the decision to buy the project?

12   Q   (By Ms. Baker)  Yes.

13   A   Is that your question?

14   Q   Yes.

15   A   Yes.  Yeah, that would be considered

16   material.

17   Q   Okay.  On this page that we're still

18   looking at here, the first highlighted paragraph

19   there, it talks about material adverse effects on

20   future development.  Were there any discussions

21   about issues that could have material adverse

22   effects as that's used here, either before or after

23   negotiation of the agreement?

24       MR. BALL:  Objection to form.

25   A   I just don't -- I don't recall any -- ask

1    me the question one more time.

2    Q   (By Ms. Baker)  Sure.  Do you recall any

3    communications about issues that could have a

4    material adverse effect on future development?

5        MR. BALL:  Objection, form.

6        MR. MAY:  Do you need to see what that

7    term means, material adverse effect (inaudible) --

8    A   Yeah, I mean, I understand what the

9    concept is.  Certainly the way we would define that

10   would be different in every agreement, but I

11   don't -- I don't -- no, I don't -- I mean, I come

12   back to what I said earlier, which is we didn't

13   identify any show stopper issues in the process of

14   doing our due diligence on the project, and that

15   included -- while you're raising issues about the

16   tribe and the status of discussions with the tribe,

17   again, I would just come back to the same point,

18   here, which is we did not identify any permit that we

19   required to have by the tribe.

20   Q   (By Ms. Baker)  Okay.  Let's --

21   A   I mean, as you can imagine, if we

22   identified any permit and there was concern over

23   whether we could or couldn't get it, that's -- in

24   our business, that's -- that's a deal killer, and we

25   deal with that all the time.  So most projects, the

1    vast majority don't have tribal -- don't have tribal

2    interests, but we're dealing with state -- state

3    permits all the time and county permits, those kind

4    of things, and they will literally kill a project.

5    So we would never buy a project that we didn't have

6    a permit on it and we had concerns about whether we

7    could get the permit.  That would be -- we have to

8    have some ability to determine that we know what we

9    need and that we have confidence that we can get

10   there.  That's what we do.

11   Q   Okay.  Let's move forward to 2014.  Did

12   Tradewind enter into a MIPA to sell Osage Wind to

13   Enel Kansas in 2014?

14   A   Yes.

15   Q   Okay.  As Tradewind's president or CEO,

16   why did you want to sell the wind farm to Enel?

17   A   So we sold -- I described our business

18   model earlier, we sold all projects that were

19   "buildable."

20   Q   Okay.

21   A   We sold all projects that were buildable

22   or became buildable to somebody, and in our wind

23   business, it was almost -- almost all those projects

24   were sold to Enel.

25   Q   Okay.

1    A   That's how we -- that's how we generated

2    revenue.

3        (Exhibit 79 marked for identification.)

4    Q   (By Ms. Baker)  Okay.  Got it.  Let's go

5    ahead and take a look at the document that's been

6    previously marked Exhibit 79.  That is Bates stamped

7    Osage Wind 021119.  Do you recognize this document?

8    A   Just seeing the title, but, yes, it looks

9    like it's the document governing Enel buying the

10   project -- or documenting Enel buying the project

11   from Tradewind.

12   Q   Okay.

13   A   I mean, you'd have to scroll down to see

14   the name of the project, it looks like.

15   Q   Let's go ahead and take a quick look at

16   the --

17   A   It says something about the Osage project

18   here.

19   Q   Okay.  Here we go.  Okay.  So this looks

20   familiar?

21   A   Yes.

22   Q   Okay.  Based on your knowledge of this

23   agreement, would you consider this to be an arm's

24   length transaction between Tradewind and Enel

25   Kansas?

Page 90

1    A   Yes.
2    Q   Okay.  What is your understanding of what
3 an arm's length transaction is?
4    A   Well, not with an affiliate.
5    Q   So arm's length transaction to you just
6 means an affiliate was not the purchaser or the
7 sell- -- or the seller?
8    A   In lay terms, yes.
9    Q   Okay.
10    A   Two unaffiliated, unrelated parties.
11    Q   Okay.  On page 21123 -- Bates stamped
12 21123 here, the preamble says that the 2013 MIPA,
13 which we just looked at, was amended October 25,
14 2013, November 2, 2013, March 14, 2014, and
15 April 15, 2014.  So we're saying here -- the
16 preamble says that the 2013 MIPA was amended four
17 times.  Do you know why these amendments were made?
18    A   I don't recall any specifics around the
19 amendments, no.
20    Q   Okay.  None of them?
21    A   No.
22    Q   Okay.  And on page 4 of the MIPA, Bates
23 stamped 21126, it says that closing will take place
24 on or before September 18.  We'll look at the
25 definition of closing here.  So did closing actually

Page 91

1 take place on September 18, 2014?
2    A   I actually don't remember the day that it
3 closed on, so, you know, all I can do is look at the
4 date, but, yeah, I don't -- I don't recall.
5    Q   Do you recall who drafted this agreement?
6    A   This would have been Steve Willman, Rob
7 Freeman, Mike Storch on the EGPNA side, and we -- I
8 mean, we did these transactions many times, so...
9    Q   Okay.  The attorneys that you just listed,
10 did they represent or advise any other entities that
11 were involved in the project?
12       MR. BALL:  Objection, form.
13    A   Steve Willman was counsel for Tradewind,
14 and that was it.  So he was never -- he was never
15 counsel to Enel.  He would have been conflicted on
16 that.  And then I don't know who -- I don't know --
17 I don't know what firm was representing Enel on
18 this, you know, if they even had an outside firm
19 involved.  I don't recall that on the transaction.
20    Q   (By Ms. Baker)  Okay.  Do you recall
21 whether the attorneys who worked on this 2014 MIPA
22 were the same attorneys who worked on the previous
23 one?
24       MR. BALL:  Objection to form.
25    A   The previous one being --

Page 92

1    Q   (By Ms. Baker)  Being the MIPA by which
2 Tradewind purchased the project from Wind Capital
3 Group.
4    A   Steve Willman would have been Tradewind's
5 lawyer on the transaction document.  Again, I've
6 already mentioned that we had -- we had other firms,
7 including Lynn Slade, advising Tradewind.
8    Q   So did any of these attorneys work on both
9 documents, both MIPAs?
10    A   Yes, Steve Willman for sure --
11    Q   Okay.
12    A   -- would have been involved, and I don't
13 recall -- I don't recall on Lynn Slade.  He wouldn't
14 have been responsible for the entire document, per
15 se.  You know, we had him specifically working,
16 advising us on, you know, Indian issues, permitting
17 issues and that kind of thing.  He may have reviewed
18 provisions in the document or documents.  He may
19 have done that, but I don't recall that
20 specifically.
21    Q   Okay.  So besides the attorneys that are
22 entities to this agreement, was there anybody else
23 involved in drafting the agreement?
24    A   Drafting the agreement?  Well, again, I
25 said, I don't really recall who was -- who was

Page 93

1 involved on the EGPNA side, other than I'm confident
2 in saying that Mike Storch would have been involved.
3 I guess lawyers-wise, I don't know.  So I'm -- I'm
4 interpreting your question as you are saying a
5 drafting question.  We had a lot of reviewers.
6 Drafting was, you know, a different matter.  So
7 drafting would have been more, you know, myself,
8 Steve Willman, attorneys.  If Lynn Slade was
9 involved in any drafting, I don't recall.  So that
10 would have been the drafting team.
11       Then we had a lot of reviewers.  So the
12 reviewers would have been, again, Matt Gilhousen,
13 Geoff Coventry, some of the Tradewind team.  There
14 would have been a lot of people who looked at this
15 document.
16    Q   Okay.  Can you tell me why EGPNA was a
17 party to this agreement?
18    A   No, I don't know.  You would have to show
19 me.
20    Q   Okay.  So --
21    A   Just tell me again, you would have to go
22 back to the top.  Who was the buyer, the entity?
23       MS. BAKER:  Could we go ahead and scroll
24 up here.
25    A   Yeah, so EGPNA joins -- so they are only

Page 94

1  joining the agreement as relates to Section 1.2, and
2  the buyer is Enel Kansas, LLC. So your question was
3  again?
4      Q   (By Ms. Baker) Was whether or not EPGNA
5  was a party to this agreement?
6      A   It looks like they were for a limited
7  purpose.
8      Q   Okay. So --
9      A   Section 1.2, and I don't recall what 1.2
10 says, so I would have to look at it.
11     Q   Okay. Let's go ahead and take a look at
12 that. It's on page 21125, Section 1.2 here. Go
13 ahead and take a second, please, to read that, if it
14 refreshes your memory.
15     A   Well, I don't recall what the other
16 sections say in reference to 1.1, 3.9 and 8.4. It
17 looks like it pertains to payment, Tradewind getting
18 paid, but I would have to see those provisions to be
19 sure.
20     Q   Is it fair to say that EGPNA was the
21 guarantor for this contract?
22         MR. BALL: Objection to form.
23     A   Yeah, no, I mean, from what I'm seeing and
24 my memory of how we would do these, they would not
25 be a guarantor -- they are not a guarantor of the

Page 95

1  entire agreement. They are -- it looks like they
2  are a guarantor of very specific obligations under
3  the agreement, so we would have to look at what
4  those specific obligations were.
5      Q   (By Ms. Baker) Okay. Let's turn to page
6  21124, Section 1.1(b)i regarding development costs
7  through the date hereof; transition. So this
8  provision reads in part, "Seller has paid all
9  invoices received to date and agrees it shall not
10 pay any more invoices, but rather will provide the
11 invoices to the accounts payable department at
12 EGPNA." Do you see this language in here?
13     A   Yes, I spotted it.
14     Q   Okay. Great. So is seller Tradewind?
15     A   I think that's who was named up above.
16     Q   Okay.
17     A   I think that's what I saw, yeah.
18     Q   So why would invoices be sent from
19 Tradewind to EGPNA?
20     A   Because once they buy the project, they
21 are responsible for making -- paying all the
22 expenses, and we're out at that point. So,
23 typically, the way these things work, we sell the
24 project, and we get paid, we get reimbursed for
25 costs, reasonable -- reasonable costs, whatever, et

Page 96

1  cetera, we get reimbursed for costs, and then we
2  would get paid a fee, and the fee would be our
3  profit in the deal basically, and then after the
4  moment in time at which Enel buys the project, then
5  they start picking up all the costs. To the extent
6  that invoices continue to come to Tradewind, we
7  would have to send the invoices to Enel to pay in,
8  you know, whatever interim period it takes to get --
9  to notify people of the new owner to send their
10 invoices to and that kind of thing.
11     Q   Okay. So who would be responsible for
12 payment of the invoices?
13     A   At Tradewind or at Enel?
14     Q   Well, that's the question. Would Enel be
15 responsible for paying invoices, would Tradewind?
16         MR. BALL: Objection to form.
17     A   That's kind of an accounting department
18 question, which is definitely not my -- my thing.
19 All I can tell you is that if Tradewind paid the
20 invoice after closing, after we sold it, it would be
21 preapproved by Enel, and we would be reimbursed for
22 it. But the -- the preference, the desire would be
23 -- where possible, would be for Enel to be paying
24 invoices.
25         I think the one -- probably the one area

Page 97

1  that that would really come up in the accounting
2  world there would be on the leases, the real estate
3  stuff. That was a fairly complicated thing to
4  manage, because on any given site we would often
5  have a substantial number of landowners, and we
6  would have a history of sending out lease payments,
7  you know, sometimes for years. Not on this project,
8  because we hadn't owned it that long, but -- sorry,
9  ignore what I just said.
10         We would be sending out payments to the
11 landowners, and I do think -- my memory is that it
12 would oftentimes be difficult for Enel to just
13 completely step straight in to sending out payments
14 to landowners and not sort of messing that up, so
15 there might have been a period of time where we
16 continued to do that and they would reimburse us.
17     Q   Okay. To your knowledge was EPGNA's
18 accounts payable department generally responsible
19 for Enel entities outside of EGPNA?
20         MR. BALL: Objection to form.
21     A   I have no idea on that.
22     Q   (By Ms. Baker) Okay. Let's look at page
23 Bates stamped 021153. In Section 9.5 here it
24 designates persons for the seller and buyer to whom
25 notices and communications should be sent. Can you

Page 98

1  tell me why the -- I'm sorry?
2     A   I'm agreeing, yeah, okay.
3     Q   Okay.  And then for notice to the buyer,
4  it looks like Michael Storch at EGPNA is listed; do
5  you see that?
6     A   You'll have to scroll down a little
7  further.
8     Q   Oh, yes.
9     A   Yes, I see it.
10    Q   Okay.  Why wasn't someone from Enel Kansas
11  listed here?
12    A   I don't know what the -- I mean -- well,
13  all I can tell you is how we handle our project
14  subsidiaries, but I was not -- I don't have any
15  direct knowledge around how Enel staffed, so to
16  speak, its subsidiary companies.  Did they have any
17  employees or not, did they second people to
18  subsidiaries, et cetera, so Mike Storch was the
19  EGPNA guy that I dealt with, which is what this is
20  indicating, and I mentioned that earlier, but you
21  are asking about the subsidiary that bought the
22  project; is that right?
23    Q   Yes.
24    A   I don't -- I don't know what -- that was
25  sort of an internal EGPNA thing.  I wasn't involved

Page 99

1  with that.
2     Q   Okay.  Do you --
3     A   I can say -- well, sorry, go ahead.
4     Q   Go ahead and finish your thought.
5     A   I was just going to say that Tradewind, we
6  set up project subsidiaries for our projects, but
7  the project companies didn't hire people.
8     Q   That actually kind of leads to my next
9  question.  Did Osage Wind have employees?
10    A   Not that I recall.  As Tradewind, we
11  would -- we would -- I think we did paper -- you
12  know, paper that kind of thing, so we had some kind
13  of a secondment or, in kind of lay terms, loaning --
14  you know, loaning people to project companies to
15  work on projects, but our project companies did not
16  hire people per se in general.
17    Q   Okay.  You say "in general."  Do you not
18  recall specifically with respect to Osage Wind?
19        MR. BALL:  Objection to form.
20    A   I don't have -- I don't recall any project
21  companies that ever hired -- had employees, so
22  that's all I can say.  I don't have any reason to
23  think that Osage could have been different.
24    Q   (By Ms. Baker)  Okay.  For purposes of
25  developing this agreement, who would have

Page 100

1  represented the interest of Osage Wind?  Who would
2  have spoken for Osage Wind?
3     A   The project company?
4     Q   Yes.
5     A   Well, you are talking legal counsel?
6     Q   Legal or generally advocating for their
7  interests, so even one of the companies.
8     A   After Tradewind Energy acquired Osage,
9  then Steve Willman -- Steve Willman was counsel to
10  Tradewind and, in effect, counsel to the project
11  company, and the advocates are pretty much as I've
12  described them.  So it would have been Steve
13  Willman, myself, as sellers, and then the other
14  members of the team as involved.  And I've said this
15  also, but also we -- we had also retained Lynn Slade
16  and his firm, so they would have been involved on
17  behalf of Tradewind and the project company.
18        We would hire consulting firms as well,
19  but I don't recall whether we had -- I'm sure we had
20  consulting firms involved in something on the
21  project.  We always did have third party consultants
22  involved, but I don't recall any specifics about
23  this project on any -- you know, any of the
24  consultants, any consultants per se.
25    Q   Okay.  Do you know who would have hired

Page 101

1  those consultants?
2     A   Well, the answer is no in the sense of was
3  it Tradewind Energy, Inc. or Osage Wind Power, LLC
4  or whatever the name of the company was, because it
5  would take both forms on different projects.  So
6  from a legal entity perspective, I'm not sure,
7  because sometimes we would use Tradewind Energy,
8  Inc., and sometimes we would use the project
9  company.
10    Q   Okay.  Let's look at page 021142, Section
11  4.14(b).  It states to the seller's actual
12  knowledge, all governmental approvals, permits,
13  licenses or exemptions from licensing for commercial
14  operation and maintenance are listed in Schedule
15  4.14(b) and, further, that the project is in
16  compliance in all material respects with all
17  permits.  Do you see this language?  Mr. Freeman, do
18  you see the language I'm referring to?
19    A   Well, I see the whole paragraph.  I'm
20  trying to pick up on exactly the part you were
21  reading.
22    Q   So all governmental approvals, permits,
23  licenses or exemptions for commercial operation, and
24  maintenance of the project are listed in Schedule
25  4.14(b).

Page 102

1   A   Yes.
2   Q   It also states that the project is in
3   compliance in all material respects with all
4   permits. Do you know why this provision was
5   included in the agreement?
6   A   Yeah. Tradewind would, typically -- on
7   all of our projects that we were selling, we would
8   typically have some kind of a rep -- is this in the
9   rep section? I assume it is. We would have some
10  kind of a rep on permits, the status of permits for
11  the project, and so it looks like that is what this
12  is pertaining to.
13  Q   So do you know who asked for this
14  provision to be included in the agreement?
15  A   It was very standard -- it was just
16  standard.
17  Q   Standard? Okay.
18  A   Yeah. I mean, they -- so I've kind of
19  described already what the job of Tradewind was,
20  but -- so Enel, as buyer, or any buyer, when they
21  are getting ready -- when they are buying a project
22  and they are planning on constructing a project,
23  they want to be sure that it either has all the
24  permits it needs or it can get permits that it
25  doesn't -- that the project doesn't yet have, it can

Page 103

1   get them. So they were -- they were very much, you
2   know, I guess, at that point kind of relying on us
3   to say, here's -- here's -- here's the permit
4   situation.
5   Q   Okay. So do you understand the statement
6   to release EGPNA from liability in the event
7   Tradewind failed to get a necessary permit?
8   A   I can't --
9       MR. MAY: Would you repeat that question,
10  please?
11      MS. BAKER: Sure.
12  Q   (By Ms. Baker) Is it your understanding
13  that this statement releases EGPNA from liability in
14  the event Tradewind fails to obtain a necessary
15  permit?
16      MR. BALL: Objection to form.
17  A   Releases Enel. This is -- this is a
18  representation from seller, qualified by actual
19  knowledge of what the project needs, right? So
20  that -- I think you asked if it releases. I don't
21  think it has the effect of releasing anyone. Is
22  that a -- I guess is that what you are asking, is,
23  does suddenly the need for a permit go away?
24  Q   (By Ms. Baker) No. Is EGPNA no longer on
25  the hook?

Page 104

1   Q   Under the agreement?
2       MR. BALL: Object to the form.
3   Q   (By Ms. Baker) Yes.
4   A   Well, that's -- I mean, I wouldn't say --
5   I wouldn't say yes to that question, no. I mean, I
6   think, for one thing, it's qualified by what
7   seller's actual knowledge is, but I think we're
8   getting into kind of legal interpretations of the
9   agreement, which I'm not very comfortable with.
10  Q   And I know we touched on the board of
11  directors in 2013. I don't believe we talked about
12  2014. Do you recall who was on the Tradewind board
13  of directors in 2014?
14  A   No.
15  Q   Do you recall whether any of them happened
16  to be affiliated with Enel?
17  A   We always had Enel affiliated board
18  members.
19  Q   So how can this be an arm's length
20  transaction if the board of directors signing off on
21  the agreement includes Enel employees?
22  A   It's very common for minority shareholders
23  to have board seats. I mean, I have one right now.
24  I'm on a board of Savion, LLC. It's a development
25  company, and I'm on the board, and actually I don't

Page 105

1   own -- I don't own anything, so yes, that's standard
2   stuff.
3   Q   Okay. So do you think Enel employees were
4   able to fairly represent Tradewind's interests?
5       MR. BALL: Objection to form.
6   A   Enel didn't -- Enel didn't -- well, I
7   mean, I guess the point is that there -- it was a
8   bigger board. I mean, as board -- as directors,
9   they had legal responsibilities to meet, as
10  directors, yes, for sure. But they weren't the only
11  members of the board, and, certainly, Matt and Geoff
12  and I were all -- we all had -- I mean, basically,
13  we had the controlling interest, so I don't know how
14  else to answer that.
15  Q   (By Ms. Baker) Okay. That's fine. Do
16  you recall an amended and restated Osage project
17  loan agreement related to the project?
18  A   That term rings a bell, but I don't
19  remember -- I don't really remember any specifics on
20  it right off.
21      (Exhibit 194 marked for identification.)
22  Q   (By Ms. Baker) Okay. Let's go ahead and
23  take a look at Exhibit 194. This document was
24  previously marked 194 and is Bates stamped Osage
25  Wind 040156. Do you recognize this document?

Page 106

1    A    It sounds familiar.  I would have to dig
2    through it some more to speak -- yeah, to really
3    speak to it.
4    Q    Okay.  Let's scroll through quickly and
5    get to the end and take a look at the signature page
6    as well.
7    A    Go back to the first -- sorry, I want to
8    see who the parties are to it.  Okay.
9    Q    So under this agreement Tradewind was the
10   borrower, correct?
11   A    Looks like it.
12   Q    Then Enel Kansas was the lender?
13   A    Yeah, I guess so, yeah.
14   Q    Can you explain the general purpose of
15   this loan agreement?
16   A    Yeah, Enel funded -- Enel funded
17   development of Tradewind's -- all of Tradewind's
18   capital funding for development came -- well, one of
19   two ways, either from Enel or -- and/or revenue from
20   sales of projects.  And the funding -- by and large
21   the funding was typically loans, and it could be
22   loans to Tradewind -- well, loans to Tradewind
23   Energy I think and/or loans to project subsidiaries.
24   Q    Okay.  Let's take a look at the page Bates
25   stamped 040158.  Under Section 1.1(f), EGPNA

Page 107

1    obligations, it states that EGPNA shall be jointly
2    and severally liable with lender to the borrower for
3    a full and timely payment of and performance of
4    lender's obligations to make advances to the
5    borrower when required hereunder, subject to other
6    terms and conditions hereof, and agrees to pay the
7    borrower the amounts due hereunder within 10
8    business days after the date of written notice from
9    the borrower to EGPNA if such obligations were not
10   paid when due.  So aside from this obligation for
11   EGPNA to pay Tradewind upon 10 business days'
12   notice, do you know of any other obligations EGPNA
13   had under this agreement?
14   A    I don't recall the specifics.
15   Q    Let's take a look at page --
16   A    I mean --
17   Q    Go ahead.
18   A    All I can react to is just what I'm seeing
19   in that paragraph.
20   Q    Okay.  Let's look at pages Bates stamped
21   040158, that's the same page, under 1.1(e) it states
22   that "The parties contemplate that, subject to
23   certain conditions, lender or an affiliate thereof
24   will purchase the equity of Osage from borrower on
25   or before September 30th, 2014 or such later date as

Page 108

1    elected by lender."  So it looks like this is
2    placing conditions that would need to be met for the
3    lender or the affiliate to purchase Osage Wind's
4    equity.  Do you know what those conditions are?
5        MR. BALL:  Objection to form.
6        A    Okay.  Sorry, I was trying to read all
7    this.  Can you ask me the question again?
8        Q    (By Ms. Baker)  Sure.  So it says subject
9    to certain conditions the lender or affiliate will
10   purchase the equity of Osage from borrower.  What
11   were those conditions?
12   A    Yeah, I don't know.  Yeah, I don't have --
13   I don't remember such an agreement.
14   Q    Do you know who the term, affiliate, would
15   refer to in this circumstance, lender or an
16   affiliate?
17   A    See it's capitalized, is it defined?
18   Q    It is, but do you have an understanding
19   just based on your familiarity with the document of
20   what that would mean?
21   A    I'm not that familiar with the document at
22   this point.  My understanding of the definition of
23   affiliate would be along the lines of the definition
24   you read earlier from the prior document, which
25   would be a controlling -- a controlling concept.

Page 109

1        MS. BAKER:  Okay.  Let's scroll up to
2    definitions real quick and take a look at the
3    definition of affiliate here.  Do we have the
4    definitions section in this document?
5        Q    (By Ms. Baker)  It looks like the term may
6    not actually be defined in this particular
7    agreement.  Given your experience and your
8    familiarity with these projects and these companies,
9    do you believe that EGPNA would be considered an
10   affiliate for this purpose?
11   A    EGPNA would be considered an affiliate of
12   who?
13       MR. BALL:  Object to the form.  There's a
14   definition of affiliate in the agreement.
15   A    It's capitalized, so I would assume it
16   shows up somewhere in here.
17   Q    (By Ms. Baker)  We can actually -- let's
18   go ahead and move on.  Were there any payment
19   obligations between the parties to this loan
20   agreement, outside of what's described in the loan
21   agreement?
22   A    Payment obligations between who?
23   Q    The parties to this agreement, so that
24   would be -- I believe EGPNA, Enel Kansas and
25   Tradewind?

MR. BALL: Object to the form.

**Q (By Ms. Baker) We'll scroll up to the top to verify that.**

A So I don't recall any specifics to this -- this contract. We did have -- and I mentioned this earlier, but we had a -- we had a partnership agreement between Enel and Tradewind that generally governed or provided for their right of first refusal to buy projects and then how projects would be paid for, and it was formulaic. I mean, it was pretty formulaic, I guess you could say.

So I'm not exactly sure how broadly to interpret your question there, but I guess there may have been payment obligation type things in the partnership agreement that would relate to this, this transaction. Having said that, I mean, generally, we -- once we're down to the point of doing a contract like this, this set of contracts, everything governing the obligations of both parties should be covered here.

**Q Okay. Is there a reason that September 30th, 2014, would be the date chosen for the purchase to be concluded?**

A I have no idea where -- I don't remember anything about that date, any magic to that date.

**Q Okay.**

A It was probably something that was just negotiated. I guess -- let me say that differently. I don't think there was any magic to that date, no.

**Q Okay. Do you recall who drafted this loan agreement?**

A This would have been the same -- the same people involved on our side would have been myself, Steve Willman, maybe some additional reviewers, and then on the Enel side, Mike Storch would have been involved again, and I don't know others on his side.

**Q Let's turn to the page Bates stamped 040163, Section 4.2. This provision designates the persons for the borrowers and lenders to whom all notices, requests and demands to or upon the respective parties should be sent. So it looks like for notices to be sent to the borrow -- borrower, you and Steve Willman are listed.**

A Okay.

MS. BAKER: Let's scroll down a little bit and see that.

A Yeah.

**Q (By Ms. Baker) Why wasn't anyone from the lender and Enel Kansas listed?**

A Don't know other than -- well, I'd be

speculating. I mean, I don't know the answer. I gave you my answer on the Tradewind side. We didn't -- our subsidiaries didn't hire employees.

**Q Okay. What were your responsibilities related to this loan agreement?**

A I would have -- I would have presumably reviewed it.

**Q Anything else?**

A I didn't usually draft per se, Steve Willman was really the drafter. Then I would review -- I would review Steve's drafting and on the Enel side, Mike -- Mike Storch. I don't know whether -- I don't know beyond Mike Storch who would have. I mean, they may have had, you know, finance -- a finance group or something like that that may have been involved on his side, but I don't know.

**Q Okay. Did this loan agreement put any responsibilities on you specifically?**

A On Rob Freeman?

**Q Yes.**

A No.

**Q Okay.**

A I hope not.

**Q Okay. Do you know why you were listed as**

**the person to receive notice?**

A I think as CEO I showed up on all kind of things to get notices, so, yeah, that would have been standard.

**Q Do you know if you received any notices, requests or demands related to the agreement?**

A Not that I remember.

**Q Okay. And you've mentioned Steve Willman a number of times. Was he counsel to more than just Tradewind regarding this loan agreement?**

A He would have just been -- he was counsel to Tradewind and its affiliates.

**Q And who would its affiliates have been?**

A All the projects of subsidiary companies.

**Q And what projects' subsidiaries companies are we talking about here?**

A Well, an example would be Osage Wind Project, LLC. And, again, as I described earlier, every time we started a project, we would set up a separate LLC to own the project. So they were single -- you know, what you call single purpose LLCs, that each owned projects. Yeah, so Steve -- Steve would have been the attorney for Tradewind and then all those companies. He never represented Enel, and couldn't. He would have been conflicted.

Page 114

1    **Q**   Okay.  Did he ever represent any
2    **affiliates of Enel?**
3        A   No -- well, not that I know of.
4    **Q**   Okay.
5        A   Certainly never came to me for permission
6    to represent Enel that I can ever recall.
7    **Q**   Did Steve Willman have any
8    **responsibilities pertaining to the loan agreement?**
9            MR. BALL:  Objection to form.
10       A   Not that I'm -- no, I mean, not that I'm
11   aware of.
12   **Q**   (By Ms. Baker)  Okay.  Did you speak with
13   **him?**
14       A   This is, I think, again, a pretty
15   straightforward -- we did quite a few of these where
16   Enel is loaning money to Tradewind on projects that
17   Tradewind needs money to fund, and they loan based
18   on their comfort with the risk profile of the
19   project, you know, the status of the project.
20   **Q**   Let's take a look now at page Bates
21   **stamped 40162.  It's Section 3.2.  It states that**
22   **Tradewind shall not on behalf of Osage or otherwise**
23   **allow Osage to undertake any of the following**
24   **actions relating to the Osage project without the**
25   **prior written approval of Enel Kansas, the lender --**

Page 115

1    **I'm sorry, the -- yes.  And then Paragraph P on the**
2    **next page says, "issuing any limited or full notices**
3    **to proceed under any construction contract."**
4        A   Okay.
5    **Q**   What's a limited notice to proceed?
6        A   The concept of limited notice to proceed
7    would be a subset of a larger contract to do
8    something, provide some kind of a service to a
9    project, et cetera, with a consulting firm.  So
10   there would be a grand scope, a full scope under a
11   consulting agreement, and sometimes you would do
12   something called, you know, a limited -- it would be
13   a limited scope notice to proceed on something that
14   would be a subset of a larger scope.
15   **Q**   Okay.  So what's the difference between
16   **that and a full notice to proceed?**
17       A   This is pure concept, but, again, the
18   concept is that full notice would be to fully engage
19   or to give the green light to the consultant or
20   whoever it is you are talking about, to give the
21   green light to fully proceed with whatever you've
22   engaged them to do, which would be -- it would be --
23   again, this is conceptual, but it would be the full
24   scope of the contract and presumably releasing the
25   full scope of the payment obligations, milestone

Page 116

1    payment schedule.
2    **Q**   Okay.  So were limited notices to proceed
3    **or a full notice to proceed used in regard to the**
4    **Osage Wind project?**
5        A   I don't know the answer to that.  These
6    are all very typical lender -- lender restrictions,
7    right?  Would show up in any loan agreement where
8    the lender is putting a bunch of money out the door
9    in the form of loans and doesn't -- doesn't -- they
10   want to know what's going on with the project as
11   money is going out the door.
12   **Q**   So why would Enel Kansas want to provide
13   **prior approval for notices to proceed?**
14           MR. BALL:  Objection to form.
15       A   Again, they -- it's -- it's the lender
16   wanting to be sure basically that they agree with or
17   are comfortable with how the project is proceeding
18   once they start pouring a lot of money into a
19   project.  This would be -- what's the amount of this
20   loan, is it 35 million?
21   **Q**   (By Ms. Baker)  I don't have that figure
22   **right in front of me.**
23       A   I think I saw that.  At this stage -- my
24   impression at this stage is this is a commitment to
25   a very large project.  Our normal projects like this

Page 117

1    would be 3 million -- $3 million for the whole -- to
2    fully complete development of a project, so by just
3    comparison, you can imagine that when you are ready
4    to dump $35 million into a project, you are getting
5    pretty pregnant, and so it's being -- it's being
6    watched very closely and sort of making sure that
7    the future buyer, i.e., Enel is comfortable with the
8    decisions that Tradewind is making with its money in
9    the form of a loan.
10   **Q**   So who at Enel Kansas would have approved
11   **notices to proceed on behalf of Enel Kansas?**
12           MR. BALL:  Objection, form.
13       A   Who at Enel Kansas -- I don't -- I don't
14   know what the approval matrix was on that side.
15   **Q**   (By Ms. Baker)  Okay.  Just to make sure I
16   **asked that question clearly, you don't know who**
17   **would have approved notices to proceed on behalf of**
18   **Enel Kansas?**
19       A   Does the contract say who gets notices for
20   this kind of stuff?  I think --
21   **Q**   Are you aware -- are you aware of who
22   **would have actually approved those notices?**
23           MR. BALL:  Objection to form.
24       A   For this list of things here I'm looking
25   at?

Page 118

1    Q    (By Ms. Baker)  Any notices to proceed.
2    A    Oh.
3    Q    So 3.2 --
4    A    Contractor -- I mean, no, I don't -- I
5    actually don't know the answer to that, because --
6    so Mike Storch was the counter-party on the
7    contract, but on something like a limited notice to
8    proceed, they would probably engage their
9    construction -- somebody from their construction
10   group or something like that.  So I don't -- I don't
11   have any names for you there.
12   Q    Do you know who would have reviewed
13   notices to proceed?
14       MR. BALL:  Objection to form.
15   A    Yeah, I just don't -- I don't -- I don't
16   have name -- no, I don't have names for you on --
17   Q    (By Ms. Baker)  Okay.
18   A    -- any back and forth like that on the
19   project.
20   Q    Okay.  Do you know whether construction
21   was ever halted at any point in time during that
22   construction process?
23   A    I don't know.  Tradewind was not involved
24   in construction, to be clear.
25   Q    Did Tradewind --

Page 119

1    A    So a limited notice to proceed is not --
2    don't assume that that's construction related.
3    Q    Okay.  So was Tradewind involved in any
4    way in the project after selling it to Enel Kansas?
5        MR. BALL:  Objection to the form.
6    A    Yeah, I don't -- I can't say it wasn't
7    involved in any way.  I don't recall any specifics
8    around that.  All I can tell you is that we --
9    Tradewind definitively did not have anything to do
10   with construction ever.  We were not -- we didn't --
11   we didn't have any people at Tradewind that knew
12   anything about construction, they never did
13   construction.
14       So I also mentioned this earlier, but when
15   we would have ongoing -- when we would have any
16   responsibilities beyond the date that we would sell
17   the project to Enel, it would be development later,
18   and I know you are -- you all are not in the
19   business, but it would not be construction.  It
20   would be -- it would be somebody left a gate open on
21   a piece of property and the cows got out and the
22   landowner is upset and we need somebody to go out
23   and smooth things over with the landowner.  That
24   would be something that Tradewind would do --
25   Q    (By Ms. Baker)  Okay.

Page 120

1    A    -- after selling a project.
2    Q    Let's take a look at Subsection J at the
3    top of the screen that we're looking at.  And this
4    subsection prohibits Tradewind from allowing Osage
5    Wind to finalize a material permit without prior
6    written approval from Enel Kansas.  The term,
7    material, is not defined.  Do you know what would
8    constitute a material permit?
9    A    No.
10   Q    Do you know why Enel Kansas would have
11   wanted to provide prior approval for material
12   permits?
13   A    The same -- same answer as for limited
14   notices to proceed.  They are -- when they make a
15   significant loan to a project, they want to know at
16   that point everything that's happening on the
17   project.
18   Q    Okay.  So do you know who would have
19   issued written approval to finalize material from it
20   on behalf of Enel Kansas?
21   A    I do not.
22   Q    Do you know how those material permits
23   were reviewed?
24       MR. BALL:  Objection to form.
25   A    Enel had a --

Page 121

1        (Simultaneous speakers.)
2    A    Sorry, are we okay?  Much like Tradewind
3    had Jennifer Dean -- Jennie Dean, Enel had their own
4    head of environmental and permitting, and -- I don't
5    even recall her name right now, but I never really
6    personally dealt with her, but I think it was a gal.
7    But so, yeah, they had -- they had an in-house
8    person or staff that dealt with environmental and
9    permitting on their side, but I don't have a name
10   for you.
11   Q    You said in-house, would that be in-house
12   to Enel Kansas or to EGPNA or --
13   A    Somewhere in the EGPNA world.  I don't --
14   I don't know.
15   Q    Enel or one of its affiliates or sub --
16   A    Right.
17   Q    -- entities?  Okay.
18   A    Right.  Right.
19   Q    For purposes of this provision, would a
20   lease from the OMC be considered material?
21   A    A lease from?
22   Q    The Osage Minerals Council.
23   A    If the project was going to lease
24   property from the Osage Minerals Council, is that
25   the question?

Page 122

1    Q   No, so no lease or permit -- if a lease or
2    permit was required from the Osage Minerals Council,
3    would that be considered material?
4    A   Material in the context of not going and
5    getting the permit without discussing it with Enel?
6    Q   Well, material in the context of this
7    Subsection J.  Again, we don't have the definition,
8    so for purposes of this agreement, as you understand
9    it and based on your experience.
10        MR. MAY:  What is it there's not a
11   definition of?  I'm sorry.
12        MS. BAKER:  Of material?
13   A   Material permit.  Well, I guess I'm
14   struggling a little bit with the question, because I
15   had already said we -- we didn't identify a permit
16   as being needed.
17   Q   (By Ms. Baker)  Okay.
18   A   So what -- I don't -- I guess in that
19   sense I don't understand why or -- I don't
20   understand the question.
21   Q   Okay.  If you had come out the other way
22   and decided a permit was needed, would that permit
23   be considered a material permit?
24   A   It depends on the nature of the permit,
25   right?  I can give you examples of permits that we

Page 123

1    would -- we would consider prudent or ministerial,
2    almost rubber stamped or automatic to get, and then
3    some can be really dicey and you don't know the
4    outcome, and they can kill a project.  So I can't --
5    I can't speak hypothetically about the permit that
6    we're not required to get, as to whether it would or
7    wouldn't be material.
8    Q   So you don't know whether this Osage
9    Minerals Council permit would be kind of a dicier
10   issue or more of a ministerial one?
11       MR. BALL:  Objection, form.
12   A   Well, no, because there was no permit
13   identified.
14   Q   (By Ms. Baker)  Okay.  Let's take a look
15   again on this same page, Subsection O.  So this is
16   prohibiting Tradewind from allowing Osage Wind to
17   submit comments with respect to a permit without
18   Enel Kansas's prior written approval.  Why did
19   Tradewind agree that Enel Kansas would have to give
20   prior approval for comments regarding a permit?
21   A   I would just say that all of this falls
22   into the category of not -- not doing things with
23   the project that are really anything other than just
24   day -- you know, day-to-day things that are already
25   understood, already in place, already being managed,

Page 124

1    so not changing the project, not initiating new
2    things with the project without Enel knowing about
3    it.  I don't think we can differentiate between
4    these things otherwise.  Again, I mean, I'm a guy
5    that, you know, I've read my share of financing
6    documents, and this is very standard stuff, where a
7    lender is putting pretty tight controls on things
8    once they start writing big checks.
9    Q   Do you know who was in charge of issuing
10   approval for comment submissions on behalf of Enel
11   Kansas?
12   A   I don't.
13   Q   Do you know who drafted this section of
14   the loan agreement?
15   A   It would have been, again, presumably
16   Steve Willman, with other reviewers, including
17   myself, and then whoever was involved on the Enel
18   side.
19       (Exhibit 199 marked for identification.)
20   Q   (By Ms. Baker)  Let's take a look now at a
21   different document, it's Bates stamped Osage Wind
22   040139, and I don't believe it's been marked yet, so
23   it should be Exhibit 199.
24       MS. BAKER:  Ridge, please, correct me if
25   I'm wrong, I believe it's 199.

Page 125

1        MR. HOWELL:  That is correct.
2        MR. MAY:  Excuse me, this is Kirk.  I need
3    to take a break.  I have a call I've got to make.
4    It's going to take about 15 minutes.
5        MS. BAKER:  Okay.
6        THE VIDEOGRAPHER:  We're off the record at
7    12:32 p.m.
8        (A recess was had.)
9        THE VIDEOGRAPHER:  We're back on the
10   record at 1:16 p.m.
11       MR. FIELDS:  So Stuart Ashworth for the
12   United States, since he didn't make any comments,
13   objections or otherwise in the first portion of the
14   deposition, I'm going to take over for him in this
15   second half.  I'm Nolan Fields, Assistant U.S.
16   Attorney.  I've been in the room the whole time.  I
17   just wanted to clarify for the record that once the
18   United States gets their turn, I'll be the one
19   asking questions.  Thank you.
20       (Exhibit 36 marked for identification.)
21   Q   (By Ms. Baker)  All right.  Mr. Freeman,
22   let's take a look at a document that has been
23   previously marked Exhibit 36.  That is Bates stamped
24   Osage Wind Priv 000414.  So this looks like a memo
25   from Sarah Stevenson to Bill Scott entitled Rights

Page 126

1  of Surface Owners to Use Soil, dated October 31,
2  2013.  Have you seen this memo before?
3      A   It does not ring a bell.  Modrall and
4  Sperling lawyers, is that -- is that -- that's Lynn
5  Slade's firm?  Is that correct?
6      Q   That's a question I would pose to you, if
7  you are familiar with this law firm?
8      A   Yeah, I don't -- I mean, sorry, I'm --
9      Q   That's okay.  So do you --
10     A   I don't recall the name of the firm.  I
11  just remember Lynn.
12     Q   Okay.  Do you recognize the name Bill --
13  I'm sorry, Sarah Stevenson?
14     A   I don't remember that name.
15     Q   Okay.  Do you know who Bill Scott is?
16     A   No, I don't remember Bill Scott either.
17     Q   Did you or any of the defendants receive
18  correspondence from the Osage Nation, or the OMC,
19  the Osage Minerals Council, prior to October 31 of
20  2013?
21         MR. BALL:  Objection to the form.
22         MR. MAY:  Who are the defendants, just for
23  clarification.
24         MS. BAKER:  The defendants would be -- I'm
25  sorry, the defendants in this litigation, so Osage

Page 127

1  Wind, LLC, EGPNA and Enel Kansas.
2      A   So rephrase the question.  Or ask the
3  question again, I should say.
4      Q   (By Ms. Baker)  Sure.  Well, have you --
5  do you recall whether -- do you recall whether
6  Tradewind received any correspondence from the Osage
7  Nation or the Osage Minerals Council prior to
8  October 31st, 2013?
9      A   I don't recall any specific -- written
10  correspondence from the Osage, yeah, so I -- the
11  date is sort of irrelevant.  I'm not sure I
12  understand why the date -- you are using the date,
13  but, yeah, I don't -- I don't recall specific
14  written correspondence.
15         MS. BAKER:  Ridge, we can go ahead and
16  take this exhibit down.
17     Q   (By Ms. Baker)  Do you recall when Osage
18  Wind's project excavation started?
19     A   I don't know anything about when
20  excavation started.
21     Q   Okay.  Do you know when crushing the rocks
22  started?
23     A   I don't know anything about that.
24     Q   Okay.  Are you aware of the Bureau of
25  Indian Affairs ever notifying Osage Wind or any

Page 128

1  company involved with the Osage Wind project that
2  they were illegally excavating the Osage Mineral
3  Estate without a lease?
4          MR. BALL:  Objection to form.
5      A   Am I aware of that kind of communication
6  being made by the Osage --
7      Q   (By Ms. Baker)  The -- by the Bureau of
8  Indian Affairs.  Do you know whether BIA, Bureau of
9  Indian Affairs notified Osage Wind, or any of the
10  companies involved, that they were illegally
11  excavating without the necessary lease?
12         MR. BALL:  Object to the form.
13     A   No.
14         (Exhibit 200 marked for identification.)
15     Q   (By Ms. Baker)  Okay.  Let's take a look
16  at a document that's been Bates stamped Osage Wind
17  Priv 000672.  We'll go ahead and mark this as
18  Exhibit Number 200.  This appears to be an email
19  exchange between you and Mr. Slade dated October 25,
20  2013.  Do you recognize this email?
21     A   Not right off.  No, not right off the top
22  of my head.
23     Q   In this email you wrote to Mr. Slade, "I'm
24  afraid to ask, given the long call yesterday, but
25  I've been quietly wondering if there is some

Page 129

1  specific activity affecting minerals that by
2  definition figures involvement of the BIA."  This
3  would be on page 673.  So it starts with, I'm afraid
4  to ask.  Yes.  Can you tell me why you were quietly
5  wondering this?
6      A   I guess it would just -- I don't remember
7  this email string, but I guess it would just fit
8  into the category of what I've already described,
9  which is we were diligencing the project and trying
10  to determine what the project needed, right, so it
11  appears as though I'm digging in with Lynn Slade, et
12  al.
13         I see George Knapp on there.  As I recall,
14  George Knapp was -- I think he was an attorney with
15  Wind Capital Group.  Right.  So, yeah, so I guess it
16  looks like I'm asking the question, trying to be
17  absolutely sure that that's not the case.
18     Q   Okay.  Was there anything that led you to
19  ask that question?
20     A   I don't remember anything in particular in
21  terms of the phraseology.  I just don't remember.
22     Q   Do you remember how long that had been a
23  concern of yours, how long you were wondering about
24  it?
25     A   No.

Page 130

1    Q   Do you recall talking with anyone else at
2  all about that concern that you had?
3    A   I don't remember.  I can't chapter and
4  verse, you know, specific conversations.  So all I
5  can do is just say that we -- I'm repeating what
6  I've already said.  We were aware there had been
7  litigation, right, so we knew that going into it,
8  and we were certainly digging in hard to make sure
9  that the litigation was resolved in favor of the
10  project, that there weren't lingering problems that
11  could be an issue for the project, and that's why we
12  hired Lynn Slade.
13    Q   Do you recall when you hired Lynn Slade?
14    A   No, I actually don't.  I mean, I said
15  earlier that -- I don't recall the specific date
16  that we hired him, but my -- my assumption would be
17  that we hired him leading up to the acquisition of
18  the project to the extent that we knew what we were
19  getting, but I don't recall the specific date.
20    Q   Who from Tradewind provided Mr. Slade with
21  the facts about the project that you based his legal
22  analysis on?
23    A   Well, I don't -- again, I don't know
24  specific names.  I don't recall who was involved at
25  that time.  It would have been the Tradewind team,

Page 131

1  so to speak, and, again, Matt Gilhousen was the CEO,
2  so he would have been involved, but Matt would have
3  to tell you who was on the -- who was on the due
4  diligence team.  Ultimately, Aaron Weigel was
5  responsible for that project, but I don't -- I don't
6  even recall the timing of when Aaron picked it up
7  and it was his -- his baby.
8    Q   Okay.  Did you personally provide any
9  facts about the project to Mr. Slade?
10    A   Any facts about the project?  Meaning the
11  development itself?
12    Q   What the project consisted of, what he
13  needed to formulate his opinion.
14    A   I would not have been the proper source of
15  details about the project for Lynn Slade, because
16  I'm not -- I wasn't in the details like that as the
17  CEO, and leading up to the acquisition of the
18  project, he would have essentially been sort of part
19  of the due diligence effort, right, so we're all
20  asking a lot of questions of David Boyce and George
21  Knapp and whoever the names are at Wind Capital
22  Group, most of which I don't recall.  So we had a
23  team of people that were asking questions, digging
24  in, turning over all the rocks to be sure that it
25  was a project that, again, could get completely

Page 132

1  derisked, and Lynn would have been part of that
2  effort.
3       So he would have been on calls with a lot
4  of people, both from Tradewind, but also on the Wind
5  Capital Group side, I think, as evidenced by this
6  email string right here, asking questions of the
7  Wind Capital Group people about the project, among
8  other things.
9    Q   Okay.  It looks like in this email
10  Mr. Slade is describing the project as simply moving
11  dirt.  Let's see if we can find that language in
12  here.  If you look at the bottom of -- okay.  Even
13  at the bottom of 672 you'll see it says, the Nation,
14  or BIA less likely, could contend any movement of
15  dirt as invading the mineral estate.  So it sounds
16  like Mr. Slade is saying, removal of dirt is what
17  the concern is, that's the activity that's being
18  undertaken in the construction process.  Would you
19  describe what was going on as simple removal of
20  dirt?
21    A   We're not involved in construction here.
22    Q   Okay.
23    A   So this is all -- this would be completely
24  prospective, and I would say -- I would say probably
25  loose in terms of terminology.  So, yeah -- so we're

Page 133

1  definitely not involved in construction at this
2  stage, and so, you know, that's -- that's nothing
3  that I can opine about.
4       (Exhibit 81 marked for identification.)
5    Q   (By Ms. Baker)  Okay.  Let's take a look
6  at another document that has been previously
7  marked -- that has been previously marked as Exhibit
8  81, and this is Docket 17-4 in the pending
9  litigation.  It's another version of this memo.
10  Were you aware -- were you aware that the advice
11  provided by Mr. Slade kind of evolved over the
12  course of his involvement with the project?
13       MR. BALL:  I'm going to object.
14    A   I don't know what that's referring to, no.
15    Q   (By Ms. Baker)  Okay.  Taking --
16    A   Hold -- I guess I want to keep just kind
17  of keep coming back to, our job was to find out if
18  we needed a permit, and we were told that we didn't
19  need a permit.  And there were no -- there was no
20  sort of caveats or qualifiers to that to Tradewind.
21  Well, if you do this, you don't need a permit; if
22  you do that, you need a permit.  Our advice was, you
23  don't need a permit.
24    Q   Okay.  I'm going to take a step back real
25  quick.  You've mentioned before that Tradewind was

Page 134

1 not involved in the actual construction. So who
2 determined what construction method would be used?
3     A   I don't know.
4     Q   You don't know if that was Enel or Enel
5 Kansas or which company might have made the decision
6 about how --
7     A   No, I don't -- you'll have to ask --
8 you'll have to ask the Enel folks that question.
9 All I can tell you is for damn sure it was not
10 Tradewind.
11        MS. BAKER:  I'd like to take a five-minute
12 break.  I know we just took a break, but it will be
13 five minutes.  If we can go off the record real
14 quickly.
15        THE VIDEOGRAPHER:  We're off the record at
16 1:32 p.m.
17        (A recess was had.)
18        THE VIDEOGRAPHER:  We are back on the
19 record at 1:42 p.m.
20     Q   (By Ms. Baker)  Mr. Freeman, I thank you
21 very much for your time.  I don't actually have any
22 further questions right now.  So I'll be turning
23 this over to the United States.  Thank you.
24     A   Appreciate it.
25        DIRECT EXAMINATION

Page 135

1 BY MR. FIELDS:
2     Q   Mr. Freeman, can you hear me?
3     A   Yes.
4     Q   Okay.  I just want to make sure I'm being
5 loud enough.  Thank you for your time this morning
6 and now into this afternoon.  I'll do my best to get
7 through my questions quickly, and we'll see how
8 quickly we can fire through the remaining sections
9 we have to ask about.
10     A   Okay.
11     Q   I think you mentioned that Tradewind --
12 you described them as the big dogs, and Oklahoma was
13 one of the key markets for you in developing wind
14 projects; is that correct?
15     A   Yes.
16     Q   And along those lines, you had specific
17 members of your team that would handle the
18 development of those projects, and then you would
19 hand off to a company like Enel Green Power North
20 America or one of their subsidiaries to kind of take
21 and run, I guess, once the construction began, or
22 something along those lines; is that correct?
23        MR. BALL:  Objection to form.
24     A   That was the general construct of the
25 relationship, yes.

Page 136

1     Q   (By Mr. Fields)  Okay.  So would you have
2 any knowledge about the setback distances that would
3 need to be spaced around wind turbines or other
4 varied infrastructure that's related to allowing the
5 turbines to generate energy, so as to not disrupt
6 their sub-adjacent support?
7     A   Setbacks, that's kind of -- when you use
8 the word, setback, I think of a set -- of a distance
9 of removal of a turbine from something, you know, a
10 structure, a house, whatever.  Those change from
11 county to county, so it would depend on what -- it
12 would depend on where you are.
13     Q   So I'm not asking about what other
14 structures would have to be set back from the
15 turbine.  I guess another way of describing it would
16 be, are you aware of the area immediately
17 surrounding the turbine that would have to be left
18 undisturbed by other construction or excavation, so
19 that the turbine wouldn't be compromised from an
20 engineering standpoint?
21     A   You're asking what -- what would --
22 Tradewind, as a developer, is going to ultimately
23 result in the construction of a wind project.  What
24 would you be concerned with in terms of things being
25 erected around turbines and the distance of those

Page 137

1 things?  Is that what you are asking?
2     Q   Yes.  What is the distance around a
3 turbine, if you are aware, that construction or
4 excavation could not occur once the turbine was
5 placed in the ground?
6     A   Okay.  Well, bottom line is I'm not -- I
7 don't know any specific setback requirements.
8     Q   I see.
9     A   I thought you were talking about more of a
10 regulatory concept of required setbacks, which is a
11 local -- kind of a local thing, but, no, I don't
12 personally have any -- any distances in mind that I
13 can share.
14     Q   Okay.  And you also mentioned, I think in
15 your earlier testimony, that y'all did have a lot of
16 experience with minerals in the context of oil and
17 gas development and that y'all had worked with
18 landowners to ensure that oil and gas development
19 wasn't disturbed or continued once the turbines went
20 in; is that correct?
21     A   Yes.  We were certainly looking at -- I
22 don't think that was a permit concept per se, but we
23 were certainly working -- working our way through
24 and around the -- the rights of mineral interest
25 owners in the context of oil and gas operations,

Page 138

1  yes.
2      Q   Okay.  So while your company might have
3  had some experience with minerals in the form of oil
4  and gas, did your company have experience working
5  with mineral rights in the form of mining?
6      A   Well, that seems like kind of a loaded
7  question, but, no, we're -- we -- we never -- we
8  never -- that I can recall, ever came across
9  something -- that term of, you know, mining in any
10  context in looking at what we needed as a wind
11  project developer.
12      Q   So you also mentioned earlier in your
13  testimony that the Osage Wind project and the
14  Mustang Run project, in whatever stage it got to,
15  both in Osage County, Oklahoma, would have been
16  Tradewind's only experience with Native American
17  tribal issues that you're aware of, correct?
18      A   Yeah, that's all I can think of, yeah.
19  Yeah.  I mean, we've done hundreds of projects, but
20  right off the top of my head, I can't think of any
21  other ones.
22      Q   So you've mentioned a lot about derisking
23  a project, and a lot of times it was the business
24  model to develop a project or occasionally acquire
25  it, like you did in this instance, from Wind Capital

Page 139

1  Group, and then after you derisked it, to then sell
2  it to Enel or another suitor, and that's kind of the
3  general business model that y'all were operating
4  under, correct?
5      A   Yes.
6      Q   So considering you were potentially
7  dealing with two issues that were not standard
8  issues for Tradewind, i.e., potential mining
9  operations and tribal relations with the Osage Wind
10  project, how did that influence your confidence in
11  derisking the project?
12      MR. BALL:  Objection to form.
13      A   That's why we hired Lynn Slade is my
14  answer, and we -- I mean, we dealt -- those two
15  issues may have been different on this project, but
16  we ran into things we had never seen before
17  routinely on projects as a developer, and you
18  would -- Tradewind would hire experts and get advice
19  and proceed based on all of the advice we were
20  getting from our experts, so that was Lynn Slade's
21  role.
22      Q   (By Mr. Fields)  You also mentioned that
23  Enel was rigid on their transaction structure, that
24  Enel preferred to allow Tradewind to perform the due
25  diligence.  So -- and you also mentioned that

Page 140

1  Tradewind was far better at this than Enel.  So in
2  the context of this project, did you feel as
3  confident, again considering there were unique
4  issues that Tradewind may have not had extensive
5  experience addressing in the past?
6      MR. BALL:  Objection to form.
7      A   I don't -- first of all, I guess I want to
8  be clear that -- so Tradewind was the -- we were
9  in -- we were leading the effort to do due diligence
10  on a project that we were acquiring and would be
11  providing information out of that process to Enel
12  and, ultimately, making recommendations and seeing
13  if we could get to an agreement between Tradewind
14  and Enel on whether we would or wouldn't buy a
15  project to go forward.
16      That's a different situation than
17  developing a project from scratch, where you have a
18  much, much longer life cycle than something --
19  typically, in something you are buying, that's
20  already in develop -- in development, has been in
21  development.
22      As far as confidence level goes, there's
23  no question, I mean, I think the record establishes
24  this, that we were -- we were working on getting our
25  arms around the situation with the Osage because of

Page 141

1  the history of litigation and their mineral estate,
2  if that's the proper term to use, but I can't say
3  that I was less or more comfortable than other
4  projects that we acquired, because -- I mean, that's
5  kind of a qualitative relative thing, but we -- I
6  had issues on all projects.  There were always
7  issues and things that you just had to kind of work
8  your way through, and I don't -- I don't know that I
9  would necessarily think of this one that
10  differently.
11      Q   Can you recall any other project that you
12  worked on with -- at Tradewind where a federal
13  agency issued a stop work order that y'all had to
14  deal with?
15      MR. BALL:  Object to the form.
16      A   Sorry, you broke up.  Issued a what?
17      Q   (By Mr. Fields)  Issued a stop work order
18  where the project had to be halted to comply with
19  the federal demand?
20      MR. BALL:  Objection to form, assumes
21  facts not in evidence.
22      A   Well, I'm not even -- I guess I'm not
23  aware --
24      Q   (By Mr. Fields)  You can answer.
25      A   Actually I'm not aware that that was done,

Page 142

1  so I don't --
2      Q   So you are not aware that -- you are not
3  aware that on October 9th, 2014, the BIA issued a
4  formal letter requesting or demanding that the Osage
5  Wind project cease and desist operations?
6      A   We had sold the project, right, in
7  September of 2014.
8      Q   Are you asking me or telling me?
9      A   Well, that's my memory of the date that we
10  all just looked at on the document, and, no, we were
11  not involved in construction, and we were not
12  consulting in any way with Enel in the construction
13  phase. And so at some point -- at some point I was
14  aware that there were -- there was a lawsuit filed,
15  but, no, I don't -- I don't recall necessary -- I
16  don't recall being informed or somebody telling me
17  that there was some kind of an order like that. I
18  don't know anything about that. I just know that I
19  became aware at some point that there was
20  litigation.
21      Q   Yes, sir. So earlier when the OMC was
22  showing you a set of emails, do you recall the email
23  in around October of 2013 where you asked Mr. Slade,
24  what would trigger BIA involvement?
25      A   I don't --

Page 143

1      Q   (Inaudible)
2      A   I don't remember that email string. That
3  was --
4      Q   Okay.
5      A   -- a long time ago other than what I just
6  read that you showed me.
7      Q   Yes, sir. Then fast forwarding a year
8  later, from October '13 to October of 2014, it seems
9  like your concerns came true, and the activities did
10  trigger a BIA response in the form of a cease and
11  desist letter. So it's your testimony that you
12  weren't aware of that letter coming in on
13  October 9th, 2014?
14      MR. BALL: Objection to form.
15      A   I don't -- I don't remember -- I don't
16  remember, no, I don't remember that. That's all I
17  can tell you.
18      Q   (By Mr. Fields) Okay.
19      MR. FIELDS: Michelle, could you pull up
20  what's previously been entered as Exhibit 60.
21      (Exhibit 60 marked for identification.)
22      Q   (By Mr. Fields) So, Mr. Freeman, you've
23  said a couple of times pretty emphatically that
24  Tradewind had nothing to do with the construction of
25  the Osage Wind project, correct?

Page 144

1      A   No, not to my knowledge.
2      Q   Okay.
3      A   We weren't a construction company, that's
4  right.
5      Q   Yes, sir. And the date of the membership
6  interest purchase agreement where Tradewind sold its
7  interest in the project to Enel Kansas was
8  September 17th, 2014, correct?
9      A   That's the date that I'm remembering,
10  yeah, that we all just looked at.
11      Q   So -- so based on Tradewind not having any
12  role in the construction of the Osage Wind project
13  and the fact that the assets weren't sold to Enel
14  Kansas until September 17th, 2014, who would have
15  been involved in monitoring, managing the
16  construction of the project before that transaction
17  sale date?
18      A   Before September 17th?
19      Q   Yes, sir.
20      A   Involving construction?
21      Q   Yes, sir.
22      A   I don't -- I'm not aware that there
23  were -- there were construction activities on site.
24  If there were, I'm not aware of it prior to that
25  date, and if there were, it would not have been

Page 145

1  Tradewind making the call or -- we wouldn't --
2  Tradewind -- there's no one at Tradewind, even if
3  they were -- even if there were something going on
4  site -- and by the way, we haven't, I guess, defined
5  construction, so I'm not sure what activity you
6  would be referencing, but there's -- for sure
7  there's nothing that Tradewind would have been
8  done -- doing on site that you might call
9  construction that would not be under the direction
10  of Enel.
11      Q   Okay. So what do you define construction
12  as then?
13      A   Well, the -- I mean, I guess it's just
14  when you start moving dirt, quote, unquote, would be
15  what most people would think. That's probably what
16  I would call it.
17      Q   Okay.
18      A   We, typically, would not -- we would,
19  typically, not move dirt or start, you know, those
20  kinds activities of on a project as Tradewind.
21      Q   Yes, sir. You mentioned that Enel would
22  have been the entity that would have been in charge
23  of construction activities before September 17th,
24  2014, on this project because Tradewind didn't have
25  that expertise, correct?

Page 146

1    A   Well, that's right. I'm struggling with
2 your question, because you're suggesting that I know
3 there was construction on the site before
4 September 17th, and I don't know that.
5    Q   That's correct, sir. I'm just trying --
6 you've mentioned a couple of times throughout your
7 testimony that -- things like the buck stops with
8 me, I'm the CEO, and I'm not trying to impugn your
9 memory going back, like you've said, some nine years
10 or what have you, but it's just critically
11 important, I think, to this case to understand what
12 you or Tradewind knew when you knew it and when --
13 and what the defendants were doing. So along those
14 lines, let me look at an exhibit that, hopefully,
15 will help continue what we're discussing.
16    A   Okay, fine. Not construction.
17    Q   Right.
18    A   So when you say that I said the buck stops
19 with me, I was speaking strictly about Tradewind
20 development activities. There was no construction
21 anything that ever came to me.
22    Q   Okay. So what you are looking at here is
23 a filing in this case.
24       MR. FIELDS: If you scroll to the top,
25 Michelle, to the very top.

Page 147

1    Q   (By Mr. Fields) This is document 17-1
2 that was filed on December 10th, 2014. This has
3 previously been entered as Exhibit 60. It's the
4 declaration of Bill Moskaluk.
5       MR. FIELDS: Can you scroll down,
6 Michelle, just so they can see that this is -- and
7 it was in the context of defense -- go back up.
8    Q   (By Mr. Fields) It was in the context of
9 a filing where defendants were responding to
10 plaintiff's motion for preliminary injunction in the
11 underlying litigation. So Mr. Moskaluk's
12 declaration was Exhibit 1.
13       MR. FIELDS: So scroll down, please, and
14 let them see the Bates stamp --
15    Q   (By Mr. Fields) Oh, I guess it's not
16 Bates stamped, because this was a filed document,
17 and this was Exhibit 60 that's previously been
18 entered in this testimony of other deponents. So
19 you'll see this is the declaration of Bill Moskaluk.
20       MR. FIELDS: Make it as big as you can.
21 Yeah, make it nice and big. Back to where you were
22 is good. Perfect. Scroll down to paragraph 12,
23 please.
24    Q   (By Mr. Fields) Mr. Freeman, if at any
25 point in time you can't read what's on the screen,

Page 148

1 please tell us. I want to make sure it's easy
2 enough to read and blown up to make it clear; okay?
3       MR. FIELDS: Perfect. A little bit more.
4 There you go. Okay.
5    Q   (By Mr. Fields) So this is Mr. Moskaluk,
6 and in paragraph 12, I'm just going to leave that
7 portion there. Can you see the beginning of it
8 where it says, "Construction of the project has been
9 proceeding on the schedule developed in 2013"?
10    A   Yes.
11    Q   Perfect. Do you mind reading through that
12 to yourself, and then once you've had a chance to
13 kind of surmise what it's about, we can ask some
14 questions.
15       MR. MAY: Can you please scroll up to the
16 top of that so the witness can get some context on
17 who this person is?
18    A   I don't know this name, Bill whoever. I
19 don't know that name.
20    Q   (By Mr. Fields) Okay. We can go back to
21 the very beginning, the first paragraph, so you can
22 see who Mr. Moskaluk is.
23       MR. FIELDS: Scroll back up, Michelle, if
24 you don't mind.
25    Q   (By Mr. Fields) I think the first couple

Page 149

1 of paragraphs will give you some context.
2    A   Okay.
3    Q   All right.
4       MR. FIELDS: Does counsel want to see any
5 additional context?
6       MR. MAY: Yes, just scroll down through
7 there, a little more scrolling just so I can see.
8       MR. FIELDS: I guess give them paragraphs
9 3 and 4.
10       MR. MAY: Keep going, please.
11       MR. FIELDS: Okay. Next page?
12       All right. Perfect. Thank you, Michelle.
13       MR. MAY: Yeah. Keep scrolling, please.
14 Okay. (Inaudible.)
15       MR. FIELDS: That's perfect, paragraph 11.
16    Q   (By Mr. Fields) All right. Would you
17 like to see any additional context before I get into
18 my questions, or are you okay, so far, Mr. Freeman?
19    A   Yeah, I think I'm okay.
20    Q   Okay. So do you see the first line on
21 paragraph 11 that says, "Construction of the Osage
22 Wind project commenced on October 25th, 2013"?
23    A   Yes.
24    Q   And so for context, that's approximately
25 two months after Tradewind purchased the project

Page 150

1  from Wind Capital Group, because that transaction
2  was executed August 22nd, 2013.  So if Tradewind
3  wasn't in charge of the construction for -- starting
4  October 25th, 2013, who was?
5      A   Well, it looks like -- first of all, I
6  didn't remember the roads had been -- initial road
7  construction had happened.  I'm having a hard time
8  -- let's see, I guess it looks like that's -- that's
9  about commensurate when we bought the project
10  from -- Tradewind bought the project from Wind
11  Capital Group.  So anyway, yeah, so I -- I didn't
12  remember that there was road -- road-related work
13  going on, and the answer to your question is who
14  would have -- who would have managed that or been
15  responsible, I don't know.  I would tell you to
16  ask -- ask the Enel guys and ask Matt Gilhousen.
17      Q   Okay.  So when you define construction as
18  moving dirt, wouldn't you say that this meets your
19  construction -- meets your definition of
20  construction if they were, in fact, moving dirt to
21  build roads and other site preparation work, as
22  noted in these two paragraphs that you can see here?
23      A   Generally, yeah, and we -- we typically
24  did not do this kind of stuff, so I just don't know
25  -- yeah, again, I don't know who was leading that

Page 151

1  and who was involved.  I would -- I mean, out of the
2  hundreds of projects that Tradewind developed, this
3  might be the only one that we -- there was actually
4  road construction going on on a project before we
5  sold it.  I had remembered that that happened on one
6  project, but I didn't remember that this was it.
7  So, apparently, this was it.  I was actually
8  thinking it might have been Mustang Run, but,
9  anyway, yeah.  So you'll have to -- you'll have to
10  ask them.
11      Q   Yes, sir.  So it looks like -- if you look
12  at the second sentence of paragraph 12, it says,
13  "That work continued through roughly the end of
14  January 2014.  From roughly late March through
15  June 2014 further road construction and site
16  preparation work was ongoing at the project."  Do
17  you -- in your opinion what is site preparation work
18  as it would be separate from road construction?
19      A   Yeah, I have no idea.
20      MR. FIELDS:  Scroll down, Michelle,
21  please.
22      Q   (By Mr. Fields)  I just want to show you
23  the rest of the paragraph.
24      MR. FIELDS:  Keep on going.
25      Q   (By Mr. Fields)  So I want to give you a

Page 152

1  chance to look through it.  Can you see to the end
2  of the paragraph which looks to end on Thanksgiving
3  weekend?  I just want to make sure that's available
4  for to you view on your screen, Mr. Freeman.
5      A   Yeah, I can see it.
6      Q   Okay.  Perfect.
7      MR. FIELDS:  So, Michelle, could you kind
8  of highlight the sentence that says, "Excavation
9  work for foundations began on September 10th, 2014,"
10  right in the middle?
11      A   I see that.
12      Q   (By Mr. Fields)  Okay.  So I just wanted
13  to be -- to be clear.  Based on this information
14  from a boots on the ground individual working for
15  Enel Green Power North America, Mr. Moskaluk, beyond
16  road work and site preparation, he's stating that
17  excavation work for the foundations began on
18  September 10th, 2014.  So would you say that that
19  also fits your definition of what construction would
20  entail?
21      A   Yeah, I would think so, yeah.  I don't
22  have any --
23      Q   And --
24      A   I don't have any specific knowledge of
25  that myself.

Page 153

1      Q   But in addition to -- I'm trying to put
2  this Osage Wind project in context to understand,
3  since you said you worked on so many projects, all
4  the different ways this project may have been unique
5  or stood out as being unusual compared to some of
6  the rest.  At this point we've identified the fact
7  that it involved a tribal nation, it had
8  construction work that was starting before y'all had
9  sold the assets, and it also involved a federal
10  cease and desist order from an agency that happened
11  about a month after the date of these foundations
12  excavation work beginning.
13      So can you think of any other unusual
14  aspects to this project that would have made it
15  separate and apart from the standard wind
16  development project that Tradewind was used to
17  doing?
18      MR. BALL:  Objection to form, assumes
19  facts not in evidence.
20      A   It was not terribly unusual for the
21  legal -- the legal process between Enel and
22  Tradewind, as partners to lag -- to lag things that
23  were going on with a project.  So that's not -- I
24  honestly can't say if it's -- if that's happened
25  other times where there was actually construction

Page 154

1  going on on site before the paper -- you know, the
2  papers were signed, but I do know for sure that
3  there were many, many times over the course of a
4  13-year partnership that the lawyers in a
5  transaction process would be lagging whatever it was
6  that we were working on.
7      So that actually doesn't -- that actually
8  doesn't shock me, and, in any event, regardless of
9  the date on the -- on the purchase and sale
10 agreement, I'm confident in saying that Enel would
11 have been -- Enel would have been managing any kind
12 of -- any kind of construction process, certainly
13 excavation work that's mentioned here.
14     And again, you mentioned the -- you
15 mentioned whatever the order was that came from the
16 U.S., that came after -- after the transaction had
17 closed, you know, all the above had occurred.  I'm
18 not going to sit here and tell you that there's no
19 one on my team that knew more specifically what had
20 happened in October.  I'm saying, I personally was
21 not -- I just don't remember.
22     Yeah, in fact, my -- my sense of how
23 things went after the acquisition by Enel was that
24 any information we were getting on the project was
25 just sort of dribbling in as almost hearsay.  So was

Page 155

1  this -- you are talking about whether this project
2  was unusual.  You know, we -- you need to appreciate
3  that we deal with -- in the development business, we
4  deal with lots of binary issues that if they go the
5  wrong way on you, you know, they can -- they can be
6  pretty challenging.  And so we're -- we're
7  accustomed to lots of curves on projects and dealing
8  with lots of binary issues on projects.
9      So I think you are asking me really if I
10 would characterize this project as unique, and I
11 guess I wouldn't say that.  I would not characterize
12 it as unique in that sense.
13     Q   Well, you testified earlier that you've
14 never sat for a deposition before, correct?
15     A   Correct.
16     Q   So would you characterize it as unusual
17 that you are sitting for a deposition now on a
18 project you developed that had these unusual
19 characteristics, but somehow the fact that we're in
20 litigation and you are here now, this doesn't kind
21 of confirm that this was an unusual situation for
22 Tradewind and you?
23     MR. BALL:  Objection to form, assumes
24 facts not in evidence.
25     A   Yeah, sorry.  I mean, all that says to me

Page 156

1  is that there's a plaintiff out there who decided to
2  file a lawsuit.  I mean, we wouldn't -- we were not
3  in the business of taking risks that would result in
4  litigation.
5      Q   (By Mr. Fields)  At this point, I mean,
6  are you aware that the Tenth Circuit has ruled that
7  the work that was done here was illegal mining that
8  required a federal permit, and so that's kind of the
9  juxta of why we're here taking these depositions in
10 discovery, is that we're trying to figure out how
11 the Osage Nation can be compensated for what
12 happened?  Are you aware that the Tenth Circuit had
13 issued that ruling and defined these activities as
14 mining?
15     MR. BALL:  Objection to form.
16     A   Yes, I -- obviously, I'm not involved in
17 litigation, and the only thing that I know is
18 basically what you just said, which came to me from
19 the attorneys that are involved.
20     Q   (By Mr. Fields)  So is it fair to say that
21 this is more than just a plaintiff filing a lawsuit,
22 now that the Tenth Circuit has made this ruling?  I
23 mean, considering you are also having to be deposed
24 for it, I would say that you are part of this
25 litigation, at least as a witness.  Isn't that fair

Page 157

1  to say?
2      MR. BALL:  Objection to form.
3      MR. MAY:  You are saying he (inaudible).
4  What kind of question is that?
5      THE REPORTER:  Mr. May, I cannot hear you
6  at all.
7      MR. MAY:  This is Kirk May, M-A-Y.  The
8  only reason he's "part of this litigation," which
9  he's not a party, is because you subpoenaed him.  So
10 what?
11     MR. FIELDS:  I'm not going to get into --
12     MR. MAY:  It's irrelevant.  I object.
13 Move on.  Move on.  It has -- it's irrelevant.
14     MR. FIELDS:  So are you instructing your
15 witness not to answer, or are you making a form
16 objection, which is the only type of objection
17 that's allowed?
18     MR. MAY:  I'm making a form objection.
19 The question is ridiculous, and it's not within the
20 scope of discovery.
21     MR. FIELDS:  Okay.
22     MR. MAY:  It assumes he had something to
23 do with being involved in the litigation, which he
24 didn't.
25     You can answer.

Page 158

1    MR. FIELDS:  Do you mind turning the
2 camera back to the deponent.
3    Q   (By Mr. Fields)  So Mr. Freeman --
4    A   Yeah, what's your question?
5    Q   My question is, is it your understanding
6 that your responsibilities regarding the Osage Wind
7 project ended on September 18th, 2014, when the sale
8 was completed?
9    MR. BALL:  Objection to form.
10    A   I don't -- no, I can't say that, because
11 again -- well, I've already said that it was not
12 unusual for Tradewind to have continuing
13 responsibility for specifically just development
14 related stuff.  I gave you an example of talking to
15 the landowner where the cows got out, and I think as
16 we were circling through the documents earlier, I
17 think I saw that there was a development agreement
18 that may have covered some of those kind of things.
19 So, no, I can't say that we had zero involvement.
20 What I'm saying is that we are -- we weren't
21 responsible for construction of the project.
22    And as far as how I would characterize
23 your question about my reaction to the litigation,
24 my reaction to the litigation is, I'm really
25 surprised that this happened and that this got this

Page 159

1 far, and I'm very surprised at the decision of a
2 court, because I've made it clear that we were
3 advised by counsel who we thought were some of the
4 foremost authorities in the country on these things,
5 looking at it, that we -- that there was nothing
6 needed.  So I'm surprised.
7    Q   (By Mr. Fields)  Based on your experience
8 being focused on derisking projects and being in the
9 business of many times handing them over to Enel or
10 one of their subsidiaries to purchase, what efforts
11 did you make or Tradewind make to push back on
12 Modrall Sperling's legal analysis to ensure that it
13 was accurate?
14    MR. BALL:  Objection to form.
15    A   What efforts did we make to push back on
16 Lynn Slade's analysis?  I don't remember the details
17 of the conversation.  I can tell you that we were a
18 very detail oriented shop.  We had a reputation
19 nationally as being one of the top development shops
20 in the country, and we had some extremely anal
21 retentive people, including Matt Gilhousen, on
22 development, making sure that all the boxes were
23 checked on projects.  That was the character of our
24 organization as relates to this dispute.
25    Q   (By Mr. Fields)  So are you aware of the

Page 160

1 efforts that Tradewind made to confirm whether or
2 not the legal analysis was thoroughly vetted by
3 outside counsel, Modrall Sperling?
4    MR. BALL:  Objection to form.
5    A   I would say that the Tradewind team felt
6 comfortable that it was fully vetted.
7    Q   (By Mr. Fields)  And what gave you that
8 level of comfort?
9    A   I had a lot of confidence in the team and
10 the process and the advisers.  That's the answer.
11    Q   You mentioned earlier that some
12 information about the project was dribbling in as
13 hearsay.  What did you mean by that?
14    A   I didn't have any -- I don't even know
15 what would constitute official, but I was not
16 contacted by any attorneys or board members or that
17 kind of thing, to have specific discussions with me
18 about what was going on with the project after we
19 sold it, but I became aware at one point --
20    Q   You mentioned --
21    A   -- that it was in litigation, that
22 somebody around Tradewind, probably -- probably Matt
23 Gilhousen, or it could have been in a conversation,
24 like I was having with Mike Storch, or -- so I don't
25 know, but at some point I became aware of it.

Page 161

1 don't know who told me, but we were -- we were
2 not -- we were not sort of brought in or, you know,
3 consulted with.  I use that term in a non-technical
4 sense, on whatever was going on at the time after we
5 sold it.
6    Q   Earlier in your testimony I got a little
7 confused when you were kind of giving some context
8 to Ms. Baker's questions about Tradewind's
9 partnership with Enel and then Tradewind's
10 acquisition by Enel and kind of the timeline of how
11 those events happened.  So approximately when did
12 you leave Tradewind, just to kind of refresh my
13 memory?
14    A   Me personally?
15    Q   Yeah, I think you said you went to Savion,
16 but when did that happen?
17    A   Yeah.  March of 2019.  There was -- there
18 was a sales transaction that involved multiple
19 parties, and Enel -- Enel bought Tradewind, but at
20 the same time, on the same day, about two-thirds of
21 the assets of the company were sold to other
22 companies, one of which was Savion.  So Savion
23 bought solar assets and Vinergy in Chicago bought
24 wind assets, and those things closed, and then,
25 essentially, commensurate with those deals closing

Page 162

1 and all those assets being sold off, Enel bought
2 what was left of Tradewind Energy, Inc.
3    Q   So since you didn't go with some of those
4 assets to Enel, are you aware of any other members
5 of your team that at the time went with the assets
6 to Enel?
7    A   Yes.  So at the closing, again, we had
8 about 145 employees, and roughly 53 or 55 moved with
9 Savion, and I was in that group.  Then all of the
10 remaining employees, so 145 give or take minus 53,
11 give or take, stayed with Tradewind.
12    Q   Okay.  And are you aware -- some of the
13 members of your team that were -- that you called
14 out earlier in the deposition, like Ms. Dean, are
15 you aware of where she went?
16    A   Yeah, she went with Tradewind.
17    Q   Okay.  Tradewind and then Enel?
18    A   Yeah, and Matt Gilhousen did as well.
19    Q   How about Mr. Coventry?
20    A   Geoff Coventry went with me over to Savion
21 and that group.  To be clear --
22    Q   So you mentioned --
23    A   -- on the closing of that transaction, all
24 the equity that Rob, Matt -- Rob Freeman, Matt
25 Gilhousen and Geoff Coventry owned was all sold,

Page 163

1 100 percent, so we had no remaining stake in the
2 company, and we owned -- at that time the three of
3 us owned about 81 percent of the business, and we
4 sold that 81 percent to Enel.
5    Q   You mentioned earlier in your testimony
6 that you personally provide close oversight of
7 outside counsel, and you were, I think, explaining
8 that in the context of not having an in-house
9 counsel at Tradewind in 2013 and '14 and that you
10 had used Mr. Willman, I think, as your general
11 counsel, but in an outside counsel relationship; is
12 that correct?
13    A   Yeah.
14    Q   And I know you mentioned that you are a
15 practicing attorney, I think you said in Missouri
16 and Arkansas, but, typically, when you were --
17    A   Licensed.  Licensed.
18    Q   Licensed.
19    A   Not practicing law.
20    Q   Okay.  That's what I meant, so I
21 appreciate that.  While you were a licensed
22 attorney, you weren't -- you were -- while you may
23 have been reviewing documents of a legal nature, you
24 were doing that in the context of your role as CEO,
25 correct?

Page 164

1    A   Correct.
2    Q   And so beyond Mr. Willman and Mr. Slade at
3 Modrall Sperling, can you recall any other outside
4 counsel that was involved on this project, Osage
5 Wind project, and how their analysis fit in with
6 this project's ability to go forward?
7    A   I can't name any other lawyers or firms
8 for sure.  Yeah, I just don't -- Enel frequently
9 used Stoel Rives.  I don't remember if they were
10 involved or not on the Enel side.
11    Q   So in your recollection of how outside
12 counsel was brought in on the Osage Wind project,
13 once the realization was made that there was a lack
14 of tribal relations -- or tribal experience related
15 to the Osage Wind project, whose idea was it to seek
16 additional outside counsel assistance?
17       MR. BALL:  Objection to form.
18    A   I don't remember exactly how that decision
19 was made or how we found Lynn.  Yeah, I just
20 don't -- I don't recall.
21    Q   (By Mr. Fields)  If you had to hazard a
22 guess, do you think it could have been Mr. Willman?
23       MR. BALL:  Objection to form.
24    A   Yes, if I was hazarding a guess, yes, that
25 would be my guess, yes.  Steve and I probably were

Page 165

1 talking, and, you know, Steve probably saying that
2 he -- you know, telling me that he didn't have any
3 particular experience in that kind of thing and that
4 we should bring in an expert.
5    Q   (By Mr. Fields)  And so after Tradewind
6 purchased the assets from Wind Capital Group in
7 August of 2013, fast forward about two or three
8 months to October of 2013 when both Wind Capital and
9 Tradewind, through each of their CEOs, yourself
10 being one of them, receive a letter from the Osage
11 Minerals Council warning about potential regulatory
12 violations that would require the need for a mining
13 permit.  Do you recall receiving that letter in
14 October of 2013 from the OMC?
15    A   I do not.
16    Q   So if at that point the decision had been
17 made to go to outside counsel with additional tribal
18 experience, would it have been possible that Enel
19 Green Power North America would have assisted
20 Mr. Willman in tracking down Modrall as the firm
21 that was going to kind of lead those efforts for
22 you?
23    A   Yeah, I just don't -- I just don't
24 remember how we -- how we found Lynn Slade.
25    Q   Okay.  But when you say "we," do you mean

Case 4:21-cv-00360-GKF-JFJ Document 342-14 Filed in USDC ND/OK on 11/16/21 Page 44 of 53

Page 166

1 we as in Tradewind, or do you mean we as in

2 Tradewind and some of the other interested parties

3 that had an interest in the Osage Wind project?

4    A   Well, Tradewind.  I'm speaking for

5 Tradewind.  At some point I'm sure that -- in fact,

6 I feel confident in saying that at some point there

7 were Enel people on the phone with our experts and

8 the Tradewind team, probably like I've mentioned

9 that they had -- you know, they had their own Jennie

10 Dean counterpart and that kind of thing, but

11 you're -- to be clear, I think you are asking me how

12 the decision was made to hire Lynn Slade, and I

13 don't -- I don't recall who was involved in that.

14    Q   But you are saying after the decision was

15 made to hire him that both employees of Tradewind

16 and employees of Enel Green Power North America were

17 involved with discussions, including Mr. Willman and

18 Mr. Slade, in the legal analysis to get Tradewind

19 and EGPNA comfortable with the fact that y'all did

20 not need a permit -- a mining permit for this job,

21 correct?

22    A   I believe so.

23    Q   In one of your comments earlier in your

24 deposition, you said that -- when asked some

25 questions about how the single project LLCs were

Page 167

1 used in different transactions, that was kind of

2 like a course and practice of the business or

3 industry, especially the transactions between

4 Tradewind and Enel, you mentioned that Mr. Willman

5 never represented Enel, and he wouldn't because it

6 would have been -- he would have been conflicted.

7 What did you mean by that?

8    A   Well, Steve represented Tradewind, and I

9 guess let me -- let me clarify that statement.  On

10 anything that Tradewind was -- that Steve was

11 representing Tradewind on, Steve would not have been

12 representing Enel.  I mean, just as a general

13 statement, he was not Enel's lawyer, he was

14 Tradewind's lawyer.  I can't say that there was

15 never a time over 13 years that he didn't have us

16 sign a conflict waiver to do something for Enel that

17 both sides would be comfortable with.  That may have

18 happened, but, yeah, generally, he was Tradewind's

19 lawyer, and if there was any real conflict; that is,

20 interests not aligned, something material, Steve

21 would not have been representing both sides at the

22 same time.

23    Q   So before the transaction was completed on

24 September 17th, 2014, where the Osage Wind assets

25 were sold from Tradewind to Enel Kansas, a wholly

Page 168

1 owned -- yeah, at that point would it have surprised

2 you if Mr. Willman would have been acting on Enel

3 Green Power North America's behest for aspects

4 related to the project?

5         MR. BALL:  Objection to form.

6    A   I would just say what I -- just repeat

7 what I just said, which is it would have required --

8 if he was giving legal advice to Enel, I mean, it

9 probably -- I would think he would have had a

10 conflict waiver, and it would have been something

11 that we considered to be -- everybody's interests

12 were aligned and not a big deal.  So would it shock

13 me, no.  I don't recall specifically that that

14 happened on that project.

15    Q   (By Mr. Fields)  But it's fair to say, as

16 you just mentioned, that as long as the interests of

17 Tradewind and Enel Kansas or Enel Green Power North

18 America were aligned, I mean, is it fair to say all

19 those entities would be kind of working together to

20 get a common goal accomplished, which is get this

21 project from development to completion?

22         MR. BALL:  Objection to form.

23    A   Yes, I mean, we were partners.  They

24 were -- they were lenders to the project, so once we

25 bought the project, we were getting -- we were

Page 169

1 getting very pregnant, so, yeah, certainly

2 everybody -- everybody would have been rowing in the

3 same direction to get the project done.  I mean,

4 that's kind of a no brainer, I think.

5    Q   (By Mr. Fields)  I don't mean to belabor

6 the point, but just to understand where you are

7 coming from, when you say "at that point in time we

8 were very pregnant," what do you mean by that?  I'm

9 just trying to figure out in what context you are

10 applying that.

11    A   There was a lot of money that was being

12 spent on the project, and, apparently, at some point

13 there roads and a laydown yard being set up.  So,

14 yeah -- I said this earlier, but you don't -- you

15 don't start spending a lot of money on a project

16 unless you are -- you've done your homework and

17 you're comfortable that everything is buttoned up,

18 and as the acquirer of the project and the lender to

19 the project, Enel would have exactly the same

20 interest, obviously, making sure that everything is

21 buttoned up.

22    Q   Are you aware there were upwards of, I

23 don't know, four to six different versions of the

24 detailed legal analysis that Modrall Sperling

25 provided in the one year from October of 2013 to

Page 170

1 October of 2014?
2    A   No.
3    Q   So you also wouldn't be aware of the
4 motivations for adjusting those various memoranda as
5 they changed throughout that year from October 2013
6 to October 2014?
7    A   I don't recall -- I don't recall specific
8 iterations. I'm confident that the bottom line that
9 we were focused on never changed.
10   Q   And that was?
11   A   That we didn't need a permit.
12       (Exhibit 183 marked for identification.)
13       MR. FIELDS:  Michelle, could you pull up
14 what's been previously marked as Exhibit 183.
15   Q   (By Mr. Fields)  This is Osage Wind
16 Priv-000697.  It's an email from August 19th, 2014.
17 Is that big enough where you can see, kind of read
18 what it says, or does Michelle need to blow it up a
19 little bit for you?
20   A   No, I can see it.
21   Q   Okay.  I'll give you a second to look at
22 that, and I'll ask you some follow-up questions.
23   A   I've read the opening sentence here, yeah.
24   Q   Okay.
25       MR. FIELDS:  Michelle, you can scroll down

Page 171

1 to show him that there's nothing else of context
2 other than disclaimers at the bottom.  Okay.  So
3 scroll back up for him.
4    Q   (By Mr. Fields)  I'm just trying to put
5 this email in context to what you have been telling
6 us over the last few minutes about Mr. Willman's
7 representation of Tradewind, and, potentially, I
8 guess, his arguable work for Enel Green Power North
9 America.  So this is dated, this email, August 19th,
10 2014, and it's from Mr. Willman to Mr. Slade.  This
11 is approximately a month before Tradewind has sold
12 its assets to Enel Kansas.
13   A   Okay.
14   Q   And so Mr. Willman is asking Mr. Slade to
15 get on a phone call the following day about the
16 Osage Mineral memo, as EGP has asked to have it
17 scaled back without conclusions.  So were you aware
18 that Enel Green Power had asked Mr. Willman to ask
19 Mr. Slade to scale back his legal memo to remove the
20 conclusions?
21       MR. BALL:  Objection to form.
22   A   Yeah, no, I mean, this doesn't -- it
23 doesn't ring any bells with me, no.
24   Q   (By Mr. Fields)  So because it looks like
25 Enel Green Power was specifically asking your

Page 172

1 outside general counsel to adjust a memo with your
2 outside counsel that you've hired specifically for
3 the Osage Wind project in Modrall Sperling, does it
4 surprise you that no one from Tradewind was copied
5 on this?
6    A   Not necessarily.  I mean, you would have
7 to ask Mr. Willman what his relationship was with
8 EGP.  I don't recall -- again, I don't recall
9 whether or not he was -- he was actually -- he was
10 actually advising them and representing them
11 pursuant to a conflict waiver or if somebody just
12 called up Steve and said, hey -- it was involved in
13 this whole due diligence process and said, hey, we
14 need some -- you know, we need some change or tweak
15 or whatever it was to a memo.  So I don't know.
16 You'll have to ask Steve.
17       MR. FIELDS:  You can take that down,
18 Michelle.
19   Q   (By Mr. Fields)  So you are not aware of
20 any reason the month before you are trying to
21 finally market and sell the assets of the Osage Wind
22 project to Enel Kansas why adjustments to that memo
23 would have been needed at that point in time?
24   A   No.  I don't recall anything about that.
25 I guess with this sort of tone of questioning, I

Page 173

1 feel -- I feel compelled to emphasize again that we
2 all felt comfortable that the project was on solid
3 legal standing or ground and proceeding the way we
4 were proceeding with the advice of Lynn Slade,
5 nothing nefarious going on.  Nobody was betting the
6 house on one single project in Oklahoma.  There was
7 no reason to do that:  I couldn't feed my family
8 very well that way, so --
9    Q   But this was not a small project.  I mean,
10 how much was Tradewind going to make off the sale of
11 this project to Enel Kansas?
12   A   I don't recall exactly, but this was no --
13 this project was no bigger than countless other
14 projects that we built.  I would say it was average
15 or --
16   Q   (Inaudible.)
17   A   You all tell me, how many megawatts was
18 this project?
19   Q   I'd rather ask you.  I mean, do you recall
20 how many megawatts this project generated?
21   A   No, I don't.  That's why I asked.
22   Q   So you would have deferred to someone at
23 Tradewind to provide that information to you,
24 correct?
25       MR. BALL:  Objection to form.

Page 174

1    A    Certainly -- again, eight years ago I no
2  doubt knew the size of the project.  I just don't
3  recall the size of the project sitting here right
4  now, but I do know that this project was not an
5  outlier for us.  It was -- this project was an
6  average sized project.  If -- in fact, if anything,
7  it may have been on the small side.  We've built --
8    Q    (By Mr. Fields)  I mean --
9    A    We've built 500 megawatt projects before,
10  and my guess is, this was a lot smaller than that.
11    Q    So my recollection, I believe it was 150
12  megawatts.
13    A    Okay.
14    Q    But that being said, while that might not
15  be 500, do you approximately recall the sales price
16  of what profits, I guess, Tradewind made to get this
17  sale completed on or around September 17th, 2014?
18    A    I don't recall the specific number.  All I
19  can tell you is that there's absolutely no reason
20  that we would have tried to force through a project
21  that would knowingly result in this kind of a
22  problem.
23    Q    Because you had an ongoing relationship
24  with Enel Green Power North America, and, clearly,
25  you would have wanted to make sure they were

Page 175

1  comfortable with whatever assets Enel Green Power
2  North America or one of its wholly owned
3  subsidiaries was buying, correct?
4    A    Well, that's your testimony, I guess, not
5  mine.  No, that's not --
6    Q    Would you agree with -- that's not right?
7  So it wasn't -- it wouldn't have been --
8    A    Our job.
9    Q    Tradewind's --
10    A    Our job -- our job was to sell projects to
11  Enel that all of us, Tradewind and Enel, felt like
12  were good projects that were going to get built and
13  operate and go smoothly.
14    Q    You didn't have to -- you didn't have to
15  encourage Enel to get comfortable with this project,
16  because they were kind of in lockstep with Tradewind
17  in the year leading up to the completion of
18  construction?
19    MR. BALL:  Objection to form.
20    A    Did we have to encourage Enel?  Enel
21  had -- Enel had concerns, like we did, the same --
22  it was all the same.  They had concerns over the
23  fact that this project had been in litigation, so
24  that's -- that's a red flag, right, so when you are
25  going to buy a project, it's a red flag if it's been

Page 176

1  in litigation.  So they had concern -- they had
2  concerns over that, and there was a lot of
3  discussion and kind of back and forth, no doubt
4  internally on their side, on our side and between
5  the two companies on what that meant for the
6  project.
7    And we did our homework and in the end we
8  had the Enel guys on their own, they reached their
9  own conclusions.  Ultimately, they are the ones that
10  would have to get comfortable, because they were the
11  ones writing the checks.  You know, they didn't --
12    Q    (By Mr. Fields)  Is it fair to say --
13    A    They didn't just take -- they didn't just
14  take Rob's word for whether a project should go
15  forward.  I mean, at 150 megawatts, that's a 3 --
16  that's a $300 million project that they are paying
17  for.  People don't -- people don't -- no one --
18  people lose their jobs over writing $300 million
19  checks and screwing it up.
20    Q    So is it fair to say that it would have
21  been your expectation that Enel Green Power North
22  America or its wholly owned subsidiaries would have
23  been doing their own due diligence well before when
24  they purchased the assets from you on
25  September 17th, 2014?

Page 177

1    A    Yes, they would do due diligence on all
2  projects they would buy from us, yes.
3    Q    And I guess you were talking about the
4  size of 150 megawatt project that could be worth
5  around $300 million, and you were saying that might
6  be on the smaller end maybe of some of the projects
7  that y'all have in your pipeline that you were
8  working on; is that fair to say?
9    A    Well, projects got bigger and bigger over
10  the years.  We were developing a 500 megawatt
11  project in Kansas at that time, I'm sure of that.
12  So I would call 150 -- at that point in time -- it
13  was -- it was averaged to -- leaning toward the
14  small side.  We -- I mean, our first project in 2008
15  that we built was 220 megawatts.
16    Q    So if you recall, based on your
17  recollection of the Osage Wind project, what efforts
18  did Tradewind or Enel Green Power North America make
19  towards negotiating some type of settlement to get
20  on the same page as the tribe, since there was other
21  forms of ongoing litigation and there was a dispute
22  around this particular permit?
23    MR. BALL:  Objection to form, assumes
24  facts not in evidence.
25    A    Well, I've already said, I just -- I'm

Page 178

1 just going to repeat myself again. I've already
2 said that I am personally aware that there were
3 discussions between our team and the Tradewind team
4 and the Osage. I cannot tell you whether there was
5 anybody from Enel at the table or what the history
6 was specifically with Wind Capital Group. So I was
7 aware that there were discussions. I can't really
8 quantify it in terms of how many meetings or that
9 kind of thing.
10     Q    (By Mr. Fields)  So because this was a
11 smaller project in the scope of the different
12 portfolio projects that Tradewind was working on,
13 are you aware if there was ever discussions around
14 what the cost benefit analysis would be to just
15 potentially seek the permit and compensate the Osage
16 Minerals Council for the mining they allege was
17 occurring?
18        MR. BALL:  Objection to form, assumes
19 facts not in evidence.
20     A    I don't -- I'm not quite sure how to think
21 through that question. When you say mining that
22 they alleged is occurring, are you talking about
23 after they filed -- or at the time they filed the
24 lawsuit, or are you talking about prior in time,
25 and, if so, when?

Page 179

1     Q    (By Mr. Fields)  I can break it up in
2 multiple parts. How about in 2013?
3        MR. BALL:  Objection, form.
4     A    Yes, well, so as far as -- as far as that
5 goes, I don't -- I think I've already said, I
6 don't -- I didn't recall any formal notices on
7 mining, you know, or what form that took. Certainly
8 there were -- there were conversations, I think,
9 about just trying to understand what is it that the
10 Osage want out of this, because my recollection is
11 that they were being very, sort of
12 non-communicative, not specific at all about their
13 own application of their own permits, the project,
14 how or why they would arise or anything like that.
15 I think -- I think my team, the Tradewind team felt
16 like we were -- we were basically trying to have
17 conversations with a brick wall.
18        So there was speculation internally on,
19 like, what is it these guys want, what are they
20 looking for out of this, because they weren't --
21 they weren't being clear about it.
22     Q    So what efforts are you aware of that
23 Tradewind made to directly try to figure out what
24 the OMC was raising, in that they believed that
25 federal regulations were requiring a mining permit?

Page 180

1        MR. BALL:  Objection to form, assumes
2 facts not in evidence, vague as to time.
3     A    Sorry, what -- well, I just don't -- I
4 mean, bottom line is I don't -- I was not involved
5 in those conversations, and I don't -- I don't have
6 anything I can tell you on that.
7     Q    (By Mr. Fields)  So you are not aware of
8 whether or not -- to alleviate any confusion, to use
9 your words, the OMC was directly engaged to request
10 how a permit could be obtained and what the
11 processes or procedures that would involve?
12        MR. BALL:  Objection to form.
13     A    Tell me again what OMC stands for.
14     Q    (By Mr. Fields)  Osage Minerals Council.
15     A    Yeah. All I can tell you all is, again,
16 I'm repeating, but I was aware that the Tradewind
17 team was having discussions with the Osage and
18 trying --
19     Q    But it was --
20     A    -- trying to get information from the
21 Osage on -- basically to try and make sure that we
22 didn't need a permit, right, that's kind of what it
23 comes down to, or something -- you know, something
24 with or from the Osage. That's -- that's the extent
25 of my -- my understanding and --

Page 181

1     Q    But with -- okay.
2     A    (Inaudible.)
3     Q    Wouldn't it have been more -- wouldn't it
4 have been more straightforward to just go directly
5 to the source and ask the OMC how to get this permit
6 and what information they had about the permit,
7 instead of speculating as to how it would be
8 applied?
9        MR. BALL:  Objection to form, assumes
10 facts not in evidence.
11     A    Well, I don't -- I guess I -- you're
12 suggesting that we never asked the Osage for their
13 view or their input on what was needed. I think
14 your question suggested that that never happened.
15     Q    (By Mr. Fields)  Well, if it was all so
16 vague and you didn't even know what the OMC was
17 asking about in regards to the permit, how did you
18 know what to ask Mr. Slade?
19        MR. BALL:  Objection to form, assumes
20 facts not in evidence.
21     A    What I'm telling you is, I don't -- there
22 was a lot -- there was a lot of things going on that
23 I was not involved in. I think we established that.
24 Right? So there were other people that were engaged
25 in conversations with the Osage, et cetera, that I

Page 182

1  was not involved with and Wind Capital Group, the
2  due diligence team, Matt Gilhousen, et cetera.
3       So right now you've just got me. I'm
4  telling you what I know or what I recall. The other
5  thing is it was a hell of a long time ago, but I sat
6  in on some calls, and I was on some email strings
7  apparently with Lynn Slade and crew on trying to
8  ultimately make sure that the team was comfortable
9  that we had -- and our advisers and our lawyers had
10  we had what we needed. And that was the conclusion
11  that we all came to, both Tradewind and Enel.
12     Q   (By Mr. Fields) But in your position as
13  the CEO, would it have given you pause to understand
14  that the tribe, the Osage Minerals Council was never
15  directly asked how to get a permit or why they
16  believed a permit was needed, and, instead, your
17  counsel effectively talked to other contractors in
18  the area as a way to seek the same information?
19     MR. BALL: Objection to form, assumes
20  facts not in evidence.
21     A   I don't -- I don't know that that -- that
22  those conversations never happened. So I'm not -- I
23  don't know -- I don't know how to answer your
24  question. I think you should ask Matt Gilhousen and
25  maybe some of that team as to whether that

Page 183

1  conversation ever occurred. I'm not going to sit
2  here and speculate around the -- that question,
3  never having asked, because I don't know that it
4  wasn't asked.
5     Q   (By Mr. Fields) But you at least admit
6  that you think it's an important question to ask?
7     MR. BALL: Objection to form.
8     A   I'm struggling, because I know that -- I
9  know that we had members of our team speaking
10  directly with the Osage, and I --
11     Q   (By Mr. Fields) At least that's what they
12  were telling you?
13     A   I'm having a hard time with your
14  suggesting that that conversation didn't happen,
15  never happened.
16     Q   I guess to be clear, I'm not saying --
17     A   (Inaudible.)
18     Q   Go ahead. I apologize.
19     A   No, after you.
20     Q   I'm not suggesting that your team never
21  had discussions with the Osage Minerals Council.
22  I'm specifically asking if you are aware that your
23  team did not ask the Osage Minerals Council directly
24  for a permit application or for any of the
25  procedures to obtain a permit, and instead they went

Page 184

1  through outside counsel and looked at other
2  contractors in the area who were working within the
3  confines of this mining permit?
4     A   My understanding was that we were not
5  getting any clear communication from the Osage at
6  that time.
7     Q   But if you don't ask --
8     A   (Inaudible.)
9     Q   If you don't ask the Osage directly --
10     A   The Osage --
11     Q   Then you understand --
12     A   The Osage knew exactly what we were doing.
13  They knew exactly what we were doing. They knew the
14  project, where it was going, they knew the whole
15  thing, and we were not getting any clear
16  communications from them on what their expectations
17  were. I can't -- I'm not going to speculate on --
18  on whether somebody used or didn't use the right
19  words to entice something. They were -- hell, they
20  had been in litigation on it, so it's not -- I'm not
21  going to go there on this some kind of an idea that
22  somebody didn't phrase a question or ask exactly a
23  right question in order to find out what they
24  needed. That's just not how it works in the
25  permitting game.

Page 185

1       And by the way, there's very much a legal
2  analysis involved in permits by definition. There
3  are legal things. They are either required. Or
4  they aren't. And that's -- it's very appropriate,
5  obviously, for us to have an attorney looking at a
6  legal analysis of whether a permit is required or
7  not.
8     Q   But were you aware what Tradewind was
9  missing from the OMC --
10     MR. BALL: Objection to form.
11     Q   (By Mr. Fields) -- that was requiring you
12  to hire Mr. Slade?
13     MR. BALL: Objection to form.
14     A   I don't know what else to say to you.
15  I've told you all I know. I mean, we -- my team,
16  Tradewind team, we felt like we did everything we
17  could do to find out what it was that the Osage felt
18  like was required in connection with our wind
19  project, and we did the legal analysis, both.
20     Q   (By Mr. Fields) So are you saying -- or
21  is it fair to say that at the time, in 2013 and '14,
22  did you perceive the OMC to be a brick wall of sorts
23  regarding this project?
24     A   Well, I'm not the best person to probably
25  answer that, but sitting in my seat, having

Page 186

1  conversations around Tradewind with the team, I
2  would say, yes, that was my -- that was my
3  impression, that they were not -- they were not --
4  they were not being helpful.
5       They were not communicating, very
6  different -- I can say very different experience
7  than -- we get permits all the time.  We get them at
8  the county level, we deal with planning and zoning,
9  we deal with counties, we deal with states all the
10  time.  We deal with environmental agencies, and the
11  Osage stood out as being unhelpful, no question
12  about it.
13  Q   When you are dealing --
14  A   No question about that.
15  Q   Okay.  When you are dealing with those
16  other governmental authorities that you've listed,
17  like the county or the state, don't you typically
18  engage with them directly to find out how you can
19  obtain the permit, what the permit looks like, what
20  is required of the permit?  Wouldn't you do that --
21  A   We do.
22  Q   -- as basic due diligence?
23  A   We do.  And I think that there were
24  probably conversations between Tradewind and the
25  Osage, but I will also point out that this was a

Page 187

1  different -- this was also a different situation,
2  right, where we bought the project from Wind Capital
3  Group, and Wind Capital Group and the Osage had it
4  litigated, to a final conclusion in litigation, and
5  there was nothing happening in that regard.
6       So you are asking me a lot of questions
7  about what I think is reasonable.  I think it was
8  very reasonable for us and Enel to conclude that the
9  dispute, whatever it was, the dispute between the
10  Osage and this project had been litigated and
11  concluded.  No one was sitting around thinking about
12  or talking about serial, multiple lawsuits that --
13  that was not -- that was not expected at all.
14  Q   Well, earlier in the very beginning of
15  your deposition Ms. Baker went into the specific
16  agreements that controlled the MIPA from Wind
17  Capital Group selling its assets to Tradewind Energy
18  on the Osage Wind project in August of 2013, and
19  then the MIPA in September of 2014 with Tradewind
20  selling its assets in the Osage Wind project to the
21  Enel Kansas.
22       In the context of each of those MIPAs,
23  governmental authority was specifically excluded as
24  to the Osage Minerals Council or the Osage Nation.
25  So isn't it fair to say that, unlike counties or

Page 188

1  states where you may have directly engaged with them
2  as to what a permanent would be required --
3       MR. BALL:  Object --
4  Q   (By Mr. Fields)  -- did that have some
5  bearing on why Tradewind didn't engage directly with
6  the government -- government authority that had no
7  authority under your own agreements?
8       MR. BALL:  Objection to form, misstates
9  the evidence.  It's incorrect what you've stated
10  about the agreements that you mentioned earlier.  So
11  objection, it misstates the evidence, misrepresents
12  it.
13  Q   (By Mr. Fields)  You can answer.
14  A   Well, now you are asking the wrong person.  I
15  don't -- you keep asking me about conversations with
16  other -- with the Osage or U.S. agencies or
17  whatever, and I just wasn't involved.  I wasn't
18  involved in that.
19  Q   But I'd like an answer to my question.  If
20  you expected the Osage Minerals Council to deal with
21  you directly, but you specifically in agreements
22  excluded that entity as a government authority that
23  had the ability to have binding permits on your
24  project, how are they supposed to inform you of
25  their permit that you are specifically saying they

Page 189

1  don't have the authority to levy on your project?
2       MR. BALL:  Objection to form,
3  misrepresents the --
4       (Reporter clarification.)
5       MR. BALL:  -- provisions in the agreement
6  you are referencing.  That's not at all what it
7  says.
8  A   I feel like you're conflating a couple of
9  points here.  So the fact that -- I guess what you
10  are looking back at is that the permit from the
11  Osage was excluded from the definition of
12  governmental authority.  That was in the reps,
13  right?
14  Q   (By Mr. Fields)  I believe so.
15  A   So the representations between buyer and
16  seller are -- well, first of all, I've already said
17  this, I don't recall -- I don't recall any specifics
18  around the drafting of the language in that
19  document, but the reps -- the form of the reps is a
20  risk allocation issue, among other things.  In any
21  event, that -- I don't see that that is dispositive
22  of conversations with -- of conversations with the
23  Osage and the determination that we -- there's not a
24  permit that we were listing there that was needed.
25       I feel like you are kind of conflating

Page 190

1 those things.  I don't see -- the terms used in the
2 legal agreement are not -- in the reps and
3 warranties are not dispositive of whatever was going
4 on with discussions with the Osage or the
5 government.
6     Q    And I appreciate that perspective, but I
7 guess you compared the Osage Minerals Council to a
8 state or local permitting authority that you would
9 deal with directly.  So what I'm trying to
10 understand is, is it your understanding that y'all
11 dealt with the OMC in the same way and literally
12 asked for the permit that they were telling you was
13 required?
14        MR. BALL:  Objection, misstates the
15 record, assumes facts not in evidence.
16     A    I don't -- you need to ask -- you need to
17 ask somebody else that question.  I wasn't
18 responsible for getting permits.
19     Q    (By Mr. Fields)  Okay.  So are you aware
20 of any financial valuation or quantification of what
21 compliance with the suggested mining permit would
22 have resulted in an impact to the project?
23        MR. BALL:  Objection to form.
24     A    We didn't identify it as a needed permit,
25 but, no, I'm not aware of a financial analysis.

Page 191

1     Q    (By Mr. Fields)  Okay.  But you also were
2 not aware that Mr. Slade and Modrall Sperling had
3 made anecdotes that it was possible that some of the
4 minerals rendered inaccessible by the turbines and
5 their related infrastructure could require
6 reimbursement to the mineral estate owner, correct?
7        MR. BALL:  Objection to form.
8     A    Ask the question again.
9     Q    (By Mr. Fields)  Were you aware that
10 Modrall Sperling noted that it's detailed legal
11 analysis included the potential that minerals
12 rendered inaccessible by the placement of the
13 turbines and the other infrastructure by the project
14 could require reimbursement to the mineral estate
15 owner?
16     A    Yeah, I don't remember that, no.
17     Q    So you took no efforts to investigate that
18 potential reimbursement requirement after it was
19 provided by Mr. Slade?
20        MR. BALL:  Objection to form.
21     A    I don't recall that.  I don't recall doing
22 that, no.
23     Q    (By Mr. Fields)  And, potentially, who
24 would be the best person or entity to follow up with
25 to find out if that type of valuation or

Page 192

1 reimbursement investigation was made?
2     A    Yeah, I don't know what to tell you.  I
3 don't know -- I don't even know if that would have
4 been done inside Tradewind or if that would have
5 been something that Enel did, if there is such a
6 thing.
7     Q    All right.
8        MR. FIELDS:  I'd like to take a couple of
9 minutes to just review my notes, but I definitely
10 don't expect many more questions whatsoever, but I'd
11 just like to confer here for about two minutes.
12        THE VIDEOGRAPHER:  We're off the record at
13 3:06 p.m.
14        (A recess was taken.)
15        THE VIDEOGRAPHER:  We're back on the
16 record at 3:14 p.m.
17     Q    (By Mr. Fields)  Thank you, Mr. Freeman,
18 for your patience.  I just have three discrete areas
19 to get into, and I think we'll be out of here in a
20 couple of minutes.
21        So to give you the context of maybe the
22 months leading up to the MIPA where Tradewind sold
23 its interest in Osage Wind to Enel Kansas, August
24 and September of 2014, are you aware that there was
25 potential pressure to get the tax credits for the

Page 193

1 project realized so that the construction timeline
2 needed to move forward quickly?
3     A    No.
4     Q    Were you aware that there was a timetable
5 with GE in which the turbines were going to be
6 delivered, that pressure was on that timeline as
7 well in September of 2014 and that construction
8 needed to kind of move quickly?
9        MR. BALL:  Objection.
10     A    No.
11     Q    (By Mr. Fields)  Were you aware that out
12 of the 84 turbines that there was additional
13 blasting requirements by the subcontractors that the
14 general contractor was requiring to more quickly be
15 able to process the turbine foundations in light of
16 staying in line with the timelines that the project
17 was on?
18        MR. BALL:  Objection, form.
19     A    No.
20     Q    (By Mr. Fields)  Are you aware of the
21 subject matter involving the 2011 litigation in
22 federal court regarding, I believe, Wind Capital
23 Group and the Osage Minerals Council regarding this
24 project?
25     A    I don't really have any current memory of

1  what that was about, no.

2      Q   The time in 2013 October to 2014 October,

3  were you aware then what the subject matter of that

4  litigation was?

5      A   I never read any of the -- any of the

6  documents related to the -- related to that

7  litigation, so what I would have known would have

8  just been -- well, I guess, yes, I probably -- I

9  probably was told somewhere along the way in the

10  form of a memo or discussions with David Boyce or

11  whoever what that was around, but I personally -- I

12  personally didn't go review the pleadings kind of

13  thing.  I guess it's possible that as part of our

14  due diligence on the project Steve Willman and/or

15  Lynn Slade may have reviewed the pleadings, but I

16  didn't.

17      Q   So you were not aware that that 2011

18  federal litigation was specific regarding potential

19  impairment of oil and gas development regarding the

20  area in which the Osage Wind project was going in?

21      MR. BALL:  Objection to form.

22      A   Rings a bell when you say that, but I

23  wouldn't be able to sit and explain today what that

24  suit entailed or involved.

25      Q   (By Mr. Fields)  But would it be fair to

1  say that a lawsuit regarding oil and gas impairment

2  being one specific type of minerals is separate and

3  apart from illegally mining hard rock minerals on

4  the same location?

5      MR. BALL:  Objection to form.

6      A   Yeah, I don't -- I mean, I don't have

7  any -- I don't have any -- that sounds like you are

8  asking me almost for a legal analysis, and I don't

9  have an opinion on that.

10      Q   (By Mr. Fields)  I'm just asking you about

11  your personal opinion.  Were you aware that the 2011

12  litigation concerned impairment of oil and gas and

13  that the current litigation that we're here for now

14  involves hard rock mining?

15      A   Your question is, are those two different

16  things?

17      Q   I'm asking you if you were aware that they

18  were two different subject matters involving at

19  least the same general area?

20      MR. BALL:  Objection to form.

21      A   Yeah, I mean, I guess.  I don't -- I mean,

22  it's -- you're -- I'm not sure how to answer the

23  question, because you are asking me about mining.

24  Again, we didn't identify mining as an issue, so I'm

25  struggling here with whether something that wasn't

1  identified as an issue is different than the prior

2  litigation.

3      Q   (By Mr. Fields)  But you are aware that

4  the entire purpose behind the request for outside

5  legal analysis from Modrall Sperling was

6  specifically regarding whether or not the activities

7  constituted mining?

8      MR. BALL:  Objection to the form, assumes

9  facts not in evidence.

10      A   Well, my recollection of our engagement of

11  Lynn Slade was to basically oil the ocean and tell

12  us what it was we needed or didn't need or anything

13  we're missing.

14      Q   (By Mr. Fields)  So you don't --

15      A   I can't -- I wouldn't even say that that

16  was wholly refined to a mining question per se.

17  Obviously, that came up in that form at some point.

18  Yeah, I mean, I guess the long and short of it is

19  the ultimate -- the ultimate theory that the Osage

20  land is on seems distinct from not interfering with

21  oil and gas in the way that we would typically

22  manage to.

23      Q   And you are aware of the distinction

24  between the Osage Minerals Council and the Bureau of

25  Indian Affairs, correct?

1      A   Very, very loosely, very high level.

2      Q   Were you --

3      A   I think the BIA is a -- is -- here would

4  be what I think the answer to that is.  The BIA is a

5  federal government agency and that the Osage

6  Minerals Council is a local level Osage County

7  group, and that may not even be right, but that's

8  my -- that's my guess or my understanding or

9  whatever.

10      Q   So if you didn't think that you were

11  asking Modrall Sperling and Lynn Slade for legal

12  advice on whether or not a mining permit was

13  required, or that mining regulations were required

14  of the Osage Wind project, what was your

15  understanding of what analysis you were requesting

16  from Modrall Sperling --

17      MR. BALL:  Objection to form.

18      Q   (By Mr. Fields)  -- beginning in October

19  of 2013?

20      A   Well, I didn't -- I did not say, I don't

21  think -- the record should reflect this, I did not

22  say that we weren't getting advice on mining.  I

23  said -- I think what I said was -- is that was --

24  that was -- I don't believe that we went to Lynn

25  Slade and said, we have a mining -- we have a mining

Page 198

1 question or a mining issue, research that for us. I
2 don't remember it being, you know, quite that
3 pointed early on. My recollection -- all I can
4 recall the engagement is, is that we hired Lynn
5 Slade to review what we were doing with the wind
6 project relative to the Osage interests in the
7 county and to identify anything that we needed to
8 know about and that certainly mining became part of
9 that.
10    Q    Were you aware that the Osage mineral
11 interests effectively are subsurface throughout the
12 entirety of Osage County, Oklahoma?
13    A    No, I don't recall the scope of their
14 mineral interests.
15    Q    When you described your personal view that
16 the Osage Minerals Council acted like a brick wall,
17 was that because they were simply opposing the
18 project, the Osage Wind project in multiple forms,
19 or was it based on something more specific?
20       MR. BALL:  Objection to form.
21    A    My -- my recollection was just simply that
22 the feedback from the team was that they were just
23 not helpful.  They were -- that we were not getting
24 feedback, we were -- they were just not helpful.  It
25 was not -- it was not "They are opposing the

Page 199

1 project" --
2    Q    (By Mr. Fields)  So --
3    A    -- because that implies -- that implies --
4 if someone is opposing a project, that sort of
5 implies that they have taken a position, and that's
6 not the way I remember it.
7    Q    So you -- how would you have wanted the
8 Osage Minerals Council to be more helpful at the
9 time in October 2013 to October 2014?
10    A    Well, I suppose it would have been very
11 specific direction or guidance on, here's what you
12 need, here's why, and here's the circumstances in
13 which you need it and when you need it.  I mean,
14 that would just be -- that would be a normal
15 permitting conversation.  And --
16    Q    But you don't --
17    A    Yeah, I don't -- personally, yeah, I guess
18 I don't -- I don't -- I don't -- I don't recall that
19 kind of specificity, and I just remember the team --
20 the team sort of complaining that they were not
21 being specific and not being helpful.  So if you
22 want more detail on that, you need to ask other
23 people.
24    Q    Okay.  Thank you for your time.  I don't
25 have any more questions at this point.  I appreciate

Page 200

1 your patience and for powering through a lot of this
2 day with very few breaks.  So thank you to your
3 determination to get through it.
4       THE WITNESS:  Okay.  Yeah.  No problem.
5       MR. BALL:  Give us a few minutes to
6 consider whether we have any questions, and we'll be
7 back.
8       THE VIDEOGRAPHER:  We're off the record at
9 3:25 p.m.
10       (A recess was had.)
11       THE VIDEOGRAPHER:  We are back on the
12 record at 3:34 p.m.
13       MR. BALL:  We reserve our questions for
14 trial.  Is there anything further?
15       MS. BAKER:  Nothing further from us.
16       MR. MAY:  This is Kirk May.  Would you
17 please be sure and send me the transcript?  The
18 witness wants to review it and sign it, please.
19       THE VIDEOGRAPHER:  This concludes the
20 videotaped deposition of Robert Freeman.  We're off
21 the record at 3:35 p.m.
22       (DEPOSITION CONCLUDED AT 3:35 P.M.)
23
24
25

Page 201

1       JURAT
2 UNITED STATES/OSAGE WIND MINERALS COUNCIL VS OSAGE
3             WIND
4       JOB FILE NO. 152612
5 STATE OF OKLAHOMA
6             SS
7 COUNTY OF TULSA
8       I, ROBERT FREEMAN, do hereby state under
9 oath that I have read the above and foregoing
10 deposition in its entirety and that the same is a
11 full, true and correct transcription of my testimony
12 so given at said time and place, except for the
13 corrections noted.
14
15       _____
16       Signature of Witness
17       Subscribed and sworn to before me, the
18 undersigned Notary Public in and for the State of
19 Oklahoma by said witness, ROBERT FREEMAN, on this
20 _____day of_____, 2021.
21
22
23       _____
24 NOTARY PUBLIC
25 MY COMMISSION EXPIRES:_____

Page 202

```
 1        ERRATA SHEET
 2  UNITED STATES/OSAGE WIND MINERALS COUNCIL VS OSAGE
 3        WIND
 4     DEPOSITION OF ROBERT FREEMAN
 5    REPORTED BY: MARY K. BECKHAM, CSR RPR
 6    DATE DEPOSITION TAKEN: SEPTEMBER 7, 2021
 7      JOB FILE NO. 152612
 8  PAGE  LINE  IS          SHOULD BE
 9  ____  ____  _____  _____
10  ____  ____  _____  _____
11  ____  ____  _____  _____
12  ____  ____  _____  _____
13  ____  ____  _____  _____
14  ____  ____  _____  _____
15  ____  ____  _____  _____
16  ____  ____  _____  _____
17  ____  ____  _____  _____
18  ____  ____  _____  _____
19  ____  ____  _____  _____
20  ____  ____  _____  _____
21  ____  ____  _____  _____
22  ____  ____  _____  _____
23  ____  ____  _____  _____
24  ____  ____  _____  _____
25  ____  ____  _____  _____
```

Page 203

```
 1        CERTIFICATE
 2  STATE OF OKLAHOMA
 3  SS
 4  COUNTY OF TULSA
 5      I, Mary K. Beckham, Certified Shorthand
 6  Reporter within and for the State of Oklahoma, do
 7  hereby certify that the above-named ROBERT FREEMAN
 8  was by me first duly sworn to testify the truth, the
 9  whole truth, and nothing but the truth, in the case
10  aforesaid; that the above and foregoing videotaped
11  deposition was by me taken in shorthand and
12  thereafter transcribed; that the same was taken,
13  pursuant to stipulations hereinbefore set out; and
14  that I am not an attorney for nor relative of any of
15  said parties or otherwise interested in the event of
16  said action.
17
18      IN WITNESS WHEREOF, I have hereunto set my
19  hand and official seal this 13th day of September,
20  2021.
21          Mary K. Beckham
22  _____
23      Mary K. Beckham, CSR, RPR
24      CSR No. 01053
25
```