# EXHIBIT 3

Case No. l4-CV-704-GKF-JFJ

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3   UNITED STATES OF AMERICA

 4        Plaintiff,

 5   and                        Case No.14-CV-704-GFK-JFJ

 6   OSAGE MINERALS COUNCIL,

 7        Intervenor-Plaintiff,

 8   Vs.

 9   OSAGE WIND, LLC;
     ENEL KANSAS, LLC; and
10   ENEL GREEN POWER NORTH AMERICA,
     INC.
11
          Defendants.
12

13     ZOOM/VIDEOTAPED DEPOSITION OF MATT GILHOUSEN

14     TAKEN ON BEHALF OF THE INTERVENOR-PLAINTIFF

15    ON SEPTEMBER 10, 2021, BEGINNING AT 9:13 A.M.

16          ALL PARTIES APPEARING VIA ZOOM

17   APPEARANCES:

18   On behalf of the PLAINTIFF:

19   Nolan Fields
     Cathryn McClanahan
20   UNITED STATES ATTORNEY'S OFFICE
     NORTHERN DISTRICT OF OKLAHOMA
21   110 West Seventh Street, Suite 300
     Tulsa, Oklahoma 74119
22   nolan.fields@usdoj.gov
     cathy.mcclanahan@usdoj.gov
23
     (Appearances continued on next page)
24

25        REPORTED BY:  MARCY A. KING, CSR, RPR
```

Page 2

1  APPEARANCES (Continued)

2  On behalf of the INTERVENOR-PLAINTIFF:

3  Shoney Blake
   Mary Kathryn Nagle
4  PIPESTEM & NAGLE, P.C.
   401 South Boston Avenue, Suite 2200
5  Tulsa, Oklahoma 74103
   mknagle@pipestemlaw.com
6  sblake@pipestemlaw.com

7
   On behalf of INTERVENOR-PLAINTIFF and DEFENDANT
8  OSAGE WIND, LLC, ENEL KANSAS, LLC and ENEL GREEN
   POWER NORTH AMERICA, INC.:
9
   Lynn H. Slade
10 MODRALL, SPERLING, ROEHL, SISKA, P.A.
   500 Fourth Street NW, Suite 1000
11 Albuquerque, New Mexico 87103-2168
   lynn.slade@modrall.com
12

13 On behalf of the DEFENDANTS:

14 Robin Ball
   NORTON ROSE FULBRIGHT US LLP
15 555 South Flower Street
   Forty-First Floor
16 Los Angeles, California 90071
   robin.ball@nortonrosefulbright.com
17

18 On behalf of the WITNESS:

19 Kirk T. May
   GM LAW
20 1201 Walnut, 20th Floor
   Kansas City, Missouri 74106
21 kirkm@gmlawpc.com

22
   Also present:  Sean Snell, virtual videographer
23              Michelle Hammock, Julie Combs,
                Christina Watson
24

25

Page 3

1        T A B L E   O F   C O N T E N T S

2                    PAGE

3  STIPULATIONS . . . . . . . . . . . .    4

4  DIRECT EXAMINATION BY MS. BLAKE. . .      6

5  CROSS EXAMINATION BY MR. FIELDS. . .    105

6

7                  EXHIBITS

8  For Plaintiff-Intervenor:          Page

9  36    Osage Wind Priv 000414-000420      95

10 38    Osage Wind Priv 243        100

11 46    Osage Wind 000381-000406        72

12 72    Osage Wind Priv 000239-000360      75

13 78    Osage Wind 021248-021320        33

14 79    Osage Wind 021119-021222        45

15 89    Osage Wind Priv 000299-000302      82

16 91    Osage Wind Priv 000357-000358      73

17 92    Osage Wind Priv 000359-000360      75

18 93    Osage Wind Priv 000361      76

19 94    Osage Wind Priv 000615-000616      85

20 102   Osage Wind 003768-003790      69

21 107   Osage Wind Priv 000577-000584      97

22 194   Osage Wind 040156-040170      49

23 195   Osage Wind 014867-014874      60

24 199   Osage Wind 040139-040155      64

25 200   Osage Wind Priv 000672-000673      91

Page 4

1  T A B L E   O F   C O N T E N T S (continued)

2  For Plaintiff:              Page

3
4  41    Osage Wind 1948        115

5  84    Osage Wind Priv 000114-000115      209

6  90    Osage Wind Priv 000427-000429      110

7  94    Osage Wind Priv 000615-000420      121

8  204   Osage Wind Priv 000294-000297      181

9  205   Osage Wind Priv 000290-000293      191

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1        S T I P U L A T I O N S

2

3      It is hereby stipulated and agreed by and

4  between the parties hereto, through their

5  respective attorneys, that the deposition of MATT

6  GILHOUSEN may be taken pursuant to agreement and

7  in accordance with the Federal Rules of Civil

8  Procedure on September 10, 2021, before Marcy A.

9  King, CSR, RPR.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 4:14-cv-00704-GKF-JFJ   Document 342-2 Filed in USDC ND/OK on 11/16/21   Page 4 of 59

Page 6

1          THE VIDEOGRAPHER:  This is the
2   videotaped deposition of Matt Gilhousen taken on
3   behalf of the Intervenor-Plaintiff in the matter
4   of the United States of America, Plaintiff; Osage
5   Mineral Council, Intervenor-Plaintiff, versus
6   Osage Wind, LLC, et al. filed in the United States
7   District Court for the Northern District of
8   Oklahoma, Case Number 14 CV-704-GFK-JFJ.
9          This deposition is being held via web
10  conference on Friday, September 10th, 2021.
11         We're on the record at 9:13 a.m.
12         Will counsel please state their
13  appearances for the record.
14         MS. BLAKE:  Shoney Blake for the
15  Osage Minerals Council along with Mary Kathryn
16  Nagle and Jenny Combs.
17         MR. FIELDS:  Nolan Fields for the
18  United States of America with Cathryn McClanahan,
19  and paralegals Michelle Hammock and Christina
20  Watson.
21         MR. BALL:  Robin Ball and
22  Christopher White for the defendants and also here
23  is Lynn Slade with the Modrall Sperling firm.
24         MR. MAY:  Kirk May for the
25  witness, Mr. Gilhousen.

Page 7

1          THE VIDEOGRAPHER:  Thank you.  The
2   court reporter will now swear the witness.
3          We're off the record at 9:14 a.m.
4      (A break was taken from 9:14 to 9:15 a.m.)
5          THE VIDEOGRAPHER:  Back on the
6   record at 9:15 a.m.
7               MATT GILHOUSEN,
8   of lawful age, being first duly sworn, testified
9   on his oath, as follows:
10            DIRECT EXAMINATION
11  BY MS. BLAKE:
12     Q  Hi, Mr. Gilhousen, I am Shoney Blake.
13  As I said before, I'm with Pipestem & Nagle
14  representing Osage Minerals Council.
15         Have you ever testified in a litigation
16  before today?
17     A  I have been in a deposition before,
18  probably 20 years ago.
19     Q  Okay.  Did that involve the Osage
20  Minerals Council or wind farm technology?
21     A  It did not involve the Osage Minerals
22  Council.  It did involve a wind project that was
23  -- I believe the land -- it's been years ago, but
24  I believe the landowners associated with the
25  project were filing suit against the county for a

Page 8

1   denial of a conditional use permit.
2      Q  And I'm assuming that was not done
3   virtually, correct?
4      A  Correct.  That was done in person.
5      Q  Okay.  So, just so you know today,
6   since we're on Zoom, all of the exhibits obviously
7   will be through share screen, and so Julie will be
8   doing that for me.  And so if you need -- if you
9   need us to scroll back or to make things bigger or
10  for, you know, better orientation within a
11  document itself, just let us know because it can
12  be different and a little difficult online.
13     A  Understood.
14     Q  What have you done to prepare for your
15  deposition today?
16     A  I've not been made privy to any
17  documents or done any research per se.  I just had
18  several conversations with Kirk about the process,
19  and that's it.
20      (An off the record discussion was had)
21         THE VIDEOGRAPHER:  Off the record
22  at 9:18 a.m.
23      (A break was taken from 9:18 to 9:26 a.m.)
24         THE VIDEOGRAPHER:  We are back on
25  the record at 9:26 a.m.

Page 9

1      Q  (By Ms. Blake)  Mr. Gilhousen, we were
2   just talking about, I was letting you know
3   that exhibits -- if you need us to slow down
4   scrolling or go to a different part of the exhibit
5   just let Julie know because it's a little
6   different through share screen than it would
7   normally be in person.
8         Also, if you need to take a break or
9   anything, please -- or want to take a break,
10  please also let me know that.  This doesn't have
11  to be a marathon today.
12         So did you speak with anyone other than
13  counsel about today's deposition?
14     A  I believe I spoke with Lynn Slade and I
15  spoke with my former partner, Rob Freeman.  And I
16  believe there was one other -- Robin with Norton
17  Rose was on the phone with Lynn Slade.  And other
18  than Kirk, that's it.
19     Q  Okay.  Great.  And then did you speak
20  with Mr. Freeman before or after his deposition?
21     A  Before.
22     Q  Okay.  Did you review any documents to
23  prepare for today?
24     A  I did not.
25     Q  All right.  Let's see.  And then is

Page 10

1  anyone in the room with you other than your
2  counsel?
3     A  No.
4     Q  All right.  So I'm going to get into
5  it.  Where did you work before Tradewind Energy?
6     A  I worked at Chapman & Associates.
7     Q  And what kind of firm was that?
8     A  An environmental engineering firm.
9     Q  And what was your position there?
10    A  I was a junior engineer, an engineer in
11 training.
12    Q  Environmental engineering or what kind
13 of engineering?
14    A  I have a degree in civil engineering.
15    Q  And then is that what you were doing --
16 is it Chapman?
17    A  Chapman & Associates.  I was -- my time
18 there, I was -- I was there for only a period of
19 three or four months and I was doing field work
20 associated with groundwater remediation in
21 Oklahoma City.  Taking water samples and those
22 sort of things.
23    Q  And so then you founded Tradewind right
24 after you were at Chapman?
25    A  Yes.

Page 11

1     Q  And can you tell me about groundwater
2  treatment.  That sounds like a big undertaking.
3     A  Yes.  I joined a couple of my
4  colleagues, Rob Freeman and Geoff Coventry over a
5  year or so period back in 2002.  After working at
6  Chapman & Associates for a brief stint, the --
7  kind of mentor and boss at Chapman & Associates
8  was an early investor in Tradewind and was
9  supportive of my move from Chapman & Associates to
10 the founding of Tradewind.
11    Yeah.  So it was -- I'm passionate
12 about climate matters and environmental matters,
13 and that was the origin of the start of business.
14    Q  And who are the other founders?
15    A  There was one other partner, Troy
16 Helming, but that's -- that would be the only
17 other founding partner.  He left the business
18 after a year or two to go on to other things.
19    Q  Sorry.  You and Troy Helming were the
20 founders?
21    A  I think technically Troy formed the
22 business entity.  I then joined very soon
23 thereafter.  And then Rob and Geoff both joined
24 within -- I can't remember exactly how many
25 months, or a year or so.  But Rob, Geoff and I

Page 12

1  were the primary partners in the business early
2  from the inception to when it was sold to Enel.
3     Q  That's Rob Freeman and Geoff Coventry,
4  correct?
5     A  Yes.
6     Q  How did you divide your
7  responsibilities within Tradewind?  You, Geoff
8  and Rob.
9        MR. BALL:  Objection to form.
10       THE WITNESS:  Rob was the Chief
11 Executive Officer.  Geoff was really -- he was the
12 -- I guess you would call him the Chief Operating
13 Officer and I was the Chief Development Officer.
14 My title didn't start out that way.  I was I think
15 a vice-president of development.  Our development
16 director initially, and then grew into the Chief
17 Development Officer role over time.  And was a --
18 I was a minority shareholder in the business the
19 entire period.
20    Q  (By Ms. Blake)  When exactly does the
21 chief development officer do?
22    A  Generally speaking, the chief
23 development officer in a renewable energy company
24 would be responsible for running various teams,
25 the staff basically that are responsible for, you

Page 13

1  know, real estate, the environmental studies,
2  meteorology, the energy production, estimates.
3  Any -- you know, any design work, as well as the
4  permitting process.
5     Q  And as far as design work, what does
6  that entail?
7     A  We -- we didn't do in-house
8  engineering.  We did really more the conceptional
9  layout of the facilities, kind of placement of the
10 turbines, you know, the access roads and
11 alignments to understand what the energy
12 production estimates were going to be.  How solid
13 -- a solid enough design that it could go through
14 the permitting process, whatever that might be.
15       And then typically the -- whoever was
16 going to own and operate, build, own and operate
17 the project would take it through the formal and
18 final design process with a third party engineer.
19    Q  You mentioned -- you mentioned that you
20 were in charge of permitting.  How did you -- was
21 there a formal process that you had at Tradewind
22 when you were going through your permitting
23 process?
24       MR. BALL:  Objection to form.
25       THE WITNESS:  I wouldn't say it's

Page 14

1  a formal process, but there was a structure to it.
2  We tried to rely on legal counsel to help us
3  populate what we call a permitting matrix for
4  whatever jurisdiction we're going into.  So we --
5  you know, it was mining for information to figure
6  out what permits were applicable in any given
7  state, county, based on where we were operating,
8  trying to develop a wind project, or a solar
9  project for that matter.
10     Q   (By Ms. Blake)  Did you use this same
11  council regardless of geographic location at the
12  project?
13     A   We had -- we worked closely with
14  out-of-house counsel.  We didn't have a general
15  counsel in-house.  We worked with Steve Willman
16  and his team the majority of the time I was at
17  Tradewind.  And then we brought in other experts
18  such as Lynn Slade and others depending on what we
19  felt was appropriate for each particular location.
20     Q   At the time you were developing the
21  Osage Wind Farm or Osage Wind wind farm, did you
22  have any other projects in Oklahoma?
23     A   I don't recall.  We have developed
24  other projects in Oklahoma, but I can't recall
25  whether this was our first project in Oklahoma or

Page 15

1  not.
2     Q   That's fine.  If you don't remember, I
3  don't want you to guess.
4        When did Tradewind start developing
5  projects with Enel?
6     A   Enel invested in Tradewind in 2006, I
7  believe.
8     Q   And how did that relationship come
9  about?
10     A   We were a relatively small -- small
11  company at the time trying to compete with much
12  larger utilities and much larger organizations.
13  And we needed an institutional investor that could
14  really fund the business appropriately relative to
15  what we were trying to accomplish in the business
16  we were in.  Wind projects are very capitally
17  intensive.
18     Q   What were some of the -- or which all
19  entities did you interface with primarily?
20        MR. BALL:  Objection to form.
21        THE WITNESS:  Excuse me.  He
22  objected.
23        MR. MAY:  Yeah, you can go ahead.
24        THE WITNESS:  Okay.  Enel Kansas I
25  think was one of the organizations, subsidiaries

Page 16

1  of Enel.  Enel, the North American arm of Enel
2  were the two primary organizations we dealt with
3  at Enel.
4     Q   (By Ms. Blake)  And who at Enel Kansas
5  did you talk to, did you communicate with?
6     A   There were -- Enel had -- they're a
7  massive corporation so they have a lot of
8  different people that we interacted with.  There's
9  a couple of names that come to mind, board
10  members.  Mike Storch, Toni Volpe, Francesco
11  Venturini.  Yeah, I mean, there were -- I mean, I
12  interfaced with most of the North American staff
13  from time to time.
14     Q   And was the North American -- by North
15  American staff do you mean Enel employees who
16  worked in North America or are you talking about
17  Enel Green Power North America?
18     A   I can't tell you what entity the
19  employees worked for.  They just represented Enel.
20  I can't tell you if they worked for an entity out
21  of -- Enel SPA out of Rome or they were based out
22  of Enel Green Power.  I can't tell you
23  specifically which entity.  They were just Enel
24  employees.
25     Q   So you mentioned Mr. Storch, Mr. Volpe

Page 17

1  and Mr. Venturini and you said they were board
2  members.  Did you mean they were board members of
3  Tradewind or Enel?
4     A   Of Tradewind from time to time.  I
5  can't tell you who was a board member at which
6  specific time, but they were all board members
7  over the years at Tradewind.
8     Q   Are they the only Enel employees that
9  you recall being board members of Tradewind?
10     A   Georgios Pergamalis and Georgios
11  Papadimitriou were both board members as well.
12     Q   Were they both based out of
13  North America, too?
14     A   Yes.
15     Q   And then, let's see, let me look at my
16  outline.
17        Do you remember -- I know you said you
18  don't remember the exact times that people were on
19  the board, but do you remember when Enel employees
20  first joined the Tradewind board of directors?
21     A   2006 would be my -- it was around 2006,
22  it could have been late 2005, early 2006.
23  Somewhere around 2006.
24     Q   Okay.  Mr. Freeman testified that in
25  2006 Tradewind agreed to grant Enel the right of

Page 18

1 first refusal to purchase the wind projects that
2 Tradewind was developing.  Was that your
3 recollection?
4     A  Correct.  Yes.
5     Q  And were you ever employed by Enel?
6     A  No.  Actually I need to think about
7 that for a second.  No.  I was employed by
8 Tradewind after Enel bought Tradewind.
9     Q  Okay.
10    A  But I was still an employee of
11 Tradewind.
12    Q  I appreciate the precision.  Thank you.
13       As far as the right of first refusal in
14 2006, were you one of the people that negotiated
15 that?
16    A  I was not -- I was not the primary
17 negotiator of that agreement.  Rob would have
18 taken point on that sort of negotiation.
19    Q  Okay.  Let's see.  So do you recall how
20 many other wind farm projects you had worked on
21 prior to Osage Wind?
22    A  Multiple.  But I can't give you a
23 specific number.
24    Q  That's fine.
25       Did any of those projects, to your

Page 19

1 recollection, involve Indian trust property?
2     A  Not to my knowledge.
3     Q  Okay.  And then were any of those
4 projects in partnership with Enel?
5        MR. BALL:  Objection to form.
6        THE WITNESS:  We -- Tradewind
7 developed -- am I supposed to answer here?
8        MR. MAY:  Yes.  Unless I tell you
9 not to.
10       THE WITNESS:  Yeah.  So Tradewind
11 developed projects on its -- we were a separate
12 company.
13    Q  (By Ms. Blake)  Uh-huh.
14    A  So we developed projects based on what
15 our board -- got general guidance from our board
16 in terms of which direction the company was to be
17 going with its investments and development
18 activity.
19       And I think the development, their --
20 at times we would acquire development assets from
21 others and sometimes we would do what's called
22 greenfield development, which is where we start
23 from scratch and we figure out where we want to
24 go.  There's been no future -- no prior
25 development there whatsoever.

Page 20

1        And other times, as is the case with
2 the Osage Wind project, we were purchasing a
3 matured development asset from a third party.  And
4 in this instance, I believe it was Wind Capital
5 Group.
6     Q  Did you do a lot of -- I'm sorry.
7        Had you coordinated with Wind Capital
8 Group before that Osage Wind project?
9     A  We had not done business with them.  We
10 had not bought a project with them or done
11 business with them prior to that.
12    Q  Were you working on any project
13 simultaneously with Osage Wind?
14    A  We -- yes.  Yes.
15    Q  Did any of those projects involve
16 Indian trust property?
17    A  Yes.
18    Q  Which one?  Or can you describe -- what
19 was the name of that project?
20    A  The Mustang Run project would be the
21 one that comes to mind.
22    Q  And can you describe that project a
23 little bit.
24    A  It was a -- it was a green -- I always
25 call it a greenfield development adjacent to or

Page 21

1 near the Osage Wind project.
2     Q  Was it also in Osage County?
3     A  Yes.
4     Q  Okay.  And was that project done in
5 conjunction with Wind Capital Group?
6     A  No.
7     Q  Was it done in conjunction
8 with Enel?
9        MR. BALL:  Objection.  Form.
10       THE WITNESS:  I'm not sure I
11 understand what conjunction means exactly.
12    Q  (By Ms. Blake)  Were you financed by
13 Enel for that project?
14    A  Enel was an investor/owner in Tradewind
15 and a lender to Tradewind.  So Tradewind was
16 funding the development of that project.
17    Q  Okay.  Was there an expectation that
18 Enel would become the owner of Mustang Run?
19    A  I would point you to the business
20 documents between Tradewind and Enel in that
21 respect.
22    Q  Okay.  So when did you work on the
23 Osage Wind project?
24    A  It would have been in the 2010 to '16
25 range.  And I don't mean to be coy.  It's been --

Page 22

1  I've been out of the business for several years
2  now and this project was -- and I've done many,
3  many projects since this project, so the timeline
4  is a little fuzzy to me.
5      Q  That's fine.
6      A  I think it was in the 2013, '14. The
7  diligence process of acquiring that, that project,
8  I can't tell you exactly how early that was, if it
9  was 2010 or '11 or '12. But somewhere in that
10 range.
11     Q  Okay, that's helpful. I can't remember
12 things I did last week. So I'm not trying to be a
13 stickler.
14     A  Yeah.
15     Q  And then you had mentioned that your
16 title changed a little bit. What was your title
17 at the time that you started the diligence work?
18     A  I don't -- I don't recall. I guess,
19 yeah, my title evolved over time, but I was -- you
20 know, I was in generally the same position. Just
21 my title changed over time.
22     Q  Okay. And then I know you already
23 described this a little bit generally, but in
24 particular with the Osage Wind project, what were
25 your responsibilities?

Page 23

1      A  To oversee my team as they dilligenced
2  the project from a development perspective, to
3  make a recommendation ultimately to the board as
4  to whether or not it should be acquired and then
5  subsequently sold.
6      Q  And who -- what were the names of your
7  team members?
8      A  Aaron Weigel, Jenny Dean, Andrew
9  Landal, Kevin Walter. Those would be names that
10 -- Vicki Schumaucher.
11     Q  Did they all direct -- or did they all
12 report directly to you?
13     A  Yes.
14     Q  And while you were -- while you were
15 developing the project, who had final authority
16 regarding major decisions over the project? Like
17 if you were -- you mentioned that you were in
18 charge of design, things like that. Who
19 ultimately made those decisions?
20     A  The board made the ultimate decisions.
21 At Tradewind, Rob, Geoff and I would be the next
22 layer down in terms of making decisions that
23 didn't require board approval.
24     Q  And I'm not trying to be dumb here, but
25 how were those decision made? I guess, as an

Page 24

1  example, did you and Rob and Geoff present to the
2  board or how did those things kind of come to
3  their attention?
4      MR. BALL: Objection to form.
5      THE WITNESS: We -- we would speak
6  with the board, present to the board, have
7  whatever conversations were needed based on the
8  decision that was being contemplated at the time.
9      Q  (By Ms. Blake) Did those happen at
10 regular board meetings usually?
11     A  We tended to call board meetings when
12 appropriate and needed. There were a lot -- I
13 mean, there were many, many board level decisions
14 being made, so it was a very active board.
15     Q  So it sounds like lots of special
16 meetings?
17     A  Yes. Yes.
18     Q  Who -- let's see -- and were most --
19 was this happening -- sorry, I'm trying to think
20 of a way to phrase this.
21     So Tradewind purchased -- Tradewind
22 purchased this project in August of 2013, correct?
23     MR. BALL: Objection to form.
24     THE WITNESS: I can't confirm that
25 date. It sounds reasonable but I can't confirm

Page 25

1  that date.
2      Q  (By Ms. Blake) So were the -- was this
3  sort of a decision process before Tradewind
4  purchased the project from Wind Capital or after
5  they purchased the project from Wind Capital?
6      MR. BALL: Objection. Form.
7      THE WITNESS: I don't quite
8  understand the question. Maybe you could try me
9  again.
10     Q  (By Ms. Blake) Yeah, for sure.
11     So you mentioned that there were major
12 decisions that were happening at the board level.
13 I'm just trying to understand if this was after
14 Tradewind entered the membership interest purchase
15 agreement or before?
16     A  The -- you're speaking of the MIPA
17 associated with the sale of the project to Enel or
18 the purchase of the project from Wind Capital?
19     Q  From Wind Capital.
20     A  From Wind Capital?
21     Q  Uh-huh.
22     A  The board would have been involved in
23 decisions leading up to the acquisition of the
24 project from Wind Capital and during the period of
25 ownership of Tradewind. While Tradewind owned the

Page 26

1 Osage Wind project, the board should have been
2 actively involved in all those decisions.
3      Once it sold to Enel or -- we sold
4 projects to many companies around -- around the
5 country, then our relationship -- our
6 responsibilities would be governed by the
7 specifics of that purchase and sale agreement.
8 Sometimes it was just no support at all.  You
9 know, it was just, here's the keys and they would
10 go on and do their business.  In other cases we
11 would play the ongoing role to continue some level
12 of active development on the project on behalf of
13 the new owner.
14      And I can't tell you -- you know, I
15 think -- I can't tell you specifically what the
16 arrangement was on Osage.  I just don't recall.
17      Q  That's fine.  Thank you for
18 understanding my poorly-asked question.
19      So let me see, I'm just looking through
20 my outline real quickly.
21      So were you involved at all in helping
22 structure or negotiate the financing for ownership
23 transactions related to the Osage Wind Farm
24 project?
25      MR. BALL:  Objection.  Form.

Page 27

1      THE WITNESS:  Yeah.  I don't
2 understand that question.  Yeah.
3      Q  (By Ms. Blake)  That's all right.  I
4 can rephrase it.
5      Did you help -- did you help with
6 negotiating the membership interest purchase
7 agreement?
8      MR. BALL:  Objection to form.
9      THE WITNESS:  Yes, I would have
10 been involved in the -- in that transaction.
11 Again, I wasn't typically point on negotiating --
12 at least on that project I don't recall being lead
13 negotiator.  I would have been more supporting
14 that transaction.  You're selling a development
15 asset, so the development team has to provide a
16 lot of content.  Leases, various documents and
17 data that are necessary -- they're really assets
18 of the entity you're selling, so we were actively
19 involved, yes.
20      Q  (By Ms. Blake)  And then what would
21 your role have been with regard to loan
22 agreements?
23      MR. BALL:  Objection.  Form.
24      THE WITNESS:  I don't recall being
25 involved in a loan agreement associated with the

Page 28

1 Osage Wind project.
2      Q  (By Ms. Blake)  And then you sort of
3 already touched on this, but I'm going to ask it
4 maybe a little bit differently.
5      Did your responsibilities personally
6 change at all after Tradewind Energy bought Osage
7 Wind from Wind Capital Group in August of 2013?
8      A  Did my responsibilities change after we
9 bought the project from Wind Capital before we
10 sold it to Enel?
11      Q  Yes.
12      A  I don't recall them changing, no.
13      Q  Do you recall it being changed after
14 Tradewind sold the project to Enel?
15      A  Are you asking about my
16 responsibilities at Tradewind or my responsibility
17 -- or Tradewind's responsibilities to Enel as
18 buyer of the project?
19      Q  I'm talking about your responsibilities
20 with respect to the project.  You, as in
21 Mr. Gilhousen.  Not you as in Tradewind.
22      A  Tradewind's responsibilities, therefore
23 mine, would change upon the sale of the project to
24 Enel.  Or -- when I say Enel, I'm meaning Enel
25 Kansas, or Enel -- whoever the entity was at Enel

Page 29

1 that bought the project.  I don't recall which
2 entity that was.  But, yes, those responsibilities
3 would have changed per contract when we sold the
4 project to Enel.
5      Q  And do you recall how your
6 responsibilities personally changed?
7      A  I don't specifically recall how those
8 would have changed.  Typically, once we sell the
9 project we are no longer responsible for it.  We
10 play a supporting role to a varying degree based
11 on what the owner, the new owner of the project
12 wants from us, which would be specified by
13 contract.
14      Q  Let's see.  I'm just looking down my
15 outline.
16      Did you ever communicate with Steve
17 Willman about the Osage Wind project?
18      A  I'm certain I did, yes.
19      Q  What kinds of things would you
20 communicate about?
21      A  Development-related matters.  He and
22 his team were actively involved in all legal
23 matters at -- virtually all legal matters at
24 Tradewind.
25      Q  And by "development matters," can you

1 give an example of -- some examples of what
2 development matters it would be?
3    A   Real estate leases and/or acquisitions.
4    Q   Is there anyone -- I'm sorry.  I
5 interrupted.
6    A   Go ahead.
7    Q   Would permitting be included in that?
8    A   Yes.
9    Q   Did you ever communicate with Steve
10 Champagne about the Osage Wind project?
11    A   Probably.  Steve was -- I believe he
12 was general counsel at Enel a good portion of the
13 time that I was at Tradewind.
14    Q   And do you have any recollection of how
15 frequently you might have communicated with him?
16    A   I can't say.  I don't recall.
17    Q   Okay.
18    A   There would have been a lot of contact
19 with Enel and their team, but as general counsel
20 he would have been involved.  Yeah, I wouldn't
21 have had contact with him on a regular basis, but
22 I'm sure I conversed with him numerous times
23 during that time period.  About what, I can't say
24 exactly.
25    Q   That's totally fine.

1       Do you happen to recall how frequently
2 you communicated with Mr. Willman?
3    A   Regularly.  I mean, multiple times a
4 week, I would suspect.
5    Q   Did you communicate with any other
6 outside counsel other than Mr. Willman about the
7 Osage Wind project?
8    A   Lynn Slade and his legal team.  There
9 may have been other law firms involved.  Probably
10 were, I can't give you a name, but there's often
11 multiple law firms and many lawyers involved in
12 any one of these projects.
13    Q   What sorts of things did you
14 communicate about with Mr. Slade?
15    A   My recollection is that it was
16 primarily around Native American law since we
17 hadn't developed in an area where there was any
18 Native American tribal activities.
19    Q   Do you recall who hired Mr. Slade and
20 his law firm?
21    A   I do not recall.  It would have been --
22 Tradewind retained him or the project entity,
23 Osage Wind, LLC, would have had him -- would have
24 retained him or hired him, or paid him.  I'm not
25 -- I can't recall if Wind Capital Group had

1 engaged them before we bought the project or not,
2 or the timeline when we engaged him, but I know he
3 was actively involved in the project.
4    Q   Do you -- do you remember who typically
5 would hire your outside counsel?
6       MR. BALL:  Objection to form.
7       THE WITNESS:  Rob was typically
8 involved in any engagements with any legal
9 counsel.  I may from time to time be involved as
10 well as Geoff and other staff, but Rob was
11 typically involved in that.
12    Q   (By Ms. Blake)  Okay.  So you -- you
13 mentioned before that for your projects you would
14 develop a permitting matrix.  Do I have that
15 correct?
16    A   That would be typical, yes.  I can't
17 tell you whether we did that from day one of the
18 company or that's something that evolved as a way
19 to manage the permitting process over time.  But
20 typically, at least in the sale documentation or
21 purchase documentation of an asset, there would be
22 a permitting matrix included.
23    Q   And was counsel involved in developing
24 that?
25    A   Yes.

1    Q   Was there any guidance for how that was
2 done project to project?
3       MR. BALL:  Object to the form.
4       THE WITNESS:  Yes.  There would
5 have been guidance by counsel.
6    Q   (By Ms. Blake)  So the guidance came
7 from counsel?  There wasn't anything Tradewind
8 developed on it's own?
9    A   It was a collaboration, typically.  I
10 guess I would describe it as what I would deem as
11 kind of an industry standard approach to trying to
12 navigate the permitting process.
13    Q   Was there -- how did you know which
14 permits to look into, I guess is my question?
15    A   We would primarily work with legal
16 counsel to develop those -- that list of permits.
17    Q   Okay.  And then who at Tradewind was
18 usually in charge of that?
19    A   It would have been the permitting
20 environmental team and the developer assigned to
21 the project.  Really, the project manager.  I use
22 the term developer.  It's a broader set of
23 responsibilities than that of a project manager.
24 But the permitting environmental team would have
25 been point on that process.

1    Q  Do you remember who that was for the
2  Osage Wind project?
3    A  I do not remember who specifically --
4  whether there was multiple staff members involved,
5  but I know -- Jenny Dean and Aaron Weigel would
6  have been two people actively involved in the
7  permitting process.
8    Q  Did Enel have any role in the
9  permitting process?
10         MR. BALL:  Objection.  Form.
11         THE WITNESS:  I can't recall.
12  They would certainly be -- they would do, you
13  know, due diligence on any asset they were going
14  to purchase from us.  So, yes, their team would be
15  aware of everything, you know, in advance of
16  purchasing the project.  As evidenced by the MIPA,
17  you can see what's in those documents.  They're
18  pretty detailed.
19    Q  (By Ms. Blake)  Right.  Let see.  I
20  think -- I'm actually going to go ahead and ask
21  you some questions about the methods.
22         [Julie, if you wouldn't mind pulling up
23  Exhibit Number 78.]  So this document has
24  previously been entered as Exhibit Number 78.
25  It's Bates stamped Osage Wind 8021248.  And this

1  is the membership interest purchase agreement
2  between Tradewind Energy and Wind Capital Group
3  from August 22nd, 2013.
4         Have you seen this agreement before?
5         THE WITNESS:  Can I look at that
6  document on your computer?  Because it's pretty
7  small.
8         MR. MAY:  You know what, you may
9  be able to show it on the other.
10         THE WITNESS:  I logged off.
11         MR. MAY:  Are you logged off?  So
12  let's see here.
13         THE WITNESS:  I don't mean to be
14  coy.  I can't -- I take legal documents pretty
15  seriously, so I think this is probably the MIPA
16  for that transaction.  I guess I would have to
17  take your word on it without having access to my
18  files and cross-checking that it is indeed the
19  execution copy of the MIPA for this transaction,
20  so I think it probably is the document.  But,
21  again, I can't confirm.  I don't mean to be coy;
22  I'm just trying to be thorough.
23    Q  (By Ms. Blake)  No worries.  I
24  appreciate it.
25         I'm just going to ask you a few

1  questions about this document really quick.  So
2  like I said before, let me know if there's
3  something more you want to read or you want us to
4  scroll to a part or need us to slow down.  I'm
5  going to.
6         So do you recall who from Tradewind was
7  involved in negotiating this transaction?
8    A  It typically would have been
9  Mr. Freeman, but Geoff Coventry and myself would
10  have supported him as needed.
11    Q  And then if you -- [Julie, can you go
12  to Page 11 of the document.  This should be Bates
13  stamped Osage Wind 021258.]
14         So if we look down at Paragraph 8, so
15  this is Section 2.4.  And Section 2.4 is --
16  [Actually, sorry.  Julie, if you could scroll up
17  so he could see the header of this section.] It
18  says Conditions Precedent To The Obligations Of
19  Purchaser At The Closing.
20         So if you go back down to section -- or
21  Paragraph H, it says, "The board of directors of
22  purchaser and EGP shall have approved this
23  transaction in all respects."  Can you see that?
24    A  I can.
25    Q  Okay.  Great.

1         So I'll represent to you that EGP is
2  defined on Page 3 of this agreement as Enel Green
3  Power North America.  And then, as you know, the
4  purchaser is Tradewind Energy.  Do you happen to
5  recall at all who was on the board of directors at
6  EGPNA during this -- to approve this transaction?
7         MR. BALL:  Objection to form.
8         THE WITNESS:  I can't tell you
9  with certainty tell you which combination of board
10  members were on the board at that time.  I gave
11  you the names of -- that I could recall were
12  Enel/EGP board members.
13    Q  (By Ms. Blake)  And if you can't
14  recall, that is totally fine.
15    A  Yeah.  Mike Storch was probably a board
16  member at the time and I know I shouldn't
17  speculate, but I think he was on the board and I
18  can't remember who the other board member was.
19  That should be easy to confirm.
20    Q  And you are -- just to be clear right
21  now, you're talking about the board of Tradewind,
22  correct?
23    A  Yes.
24    Q  Do you remember who any of the non Enel
25  people were on the board at that time for

Case 4:14-cv-00704-GKF-JFJ   Document 94-2   Filed in USDC ND/OK on 11/16/21   Page 12 of 59

1 Tradewind?

2    A  I can't give you the specific makeup.

3 We had various combinations of investors.  Enel

4 would nominate board members over time.

5    Q  Okay.  That is totally fine.  Let's

6 see.

7       Was Enel involved at all, if you know,

8 in drafting this agreement?

9    A  I don't recall.

10   Q  All right.

11      [Let's scroll down, Julie, to Page

12 21293.]  And this is, again, a form of a guaranty

13 by Enel Green Power North America on behalf of

14 Tradewind.  Do you recall why EGPNA in particular

15 was Tradewind's guarantor?

16   A  It would have been because they have

17 the larger balance sheet than Tradewind.

18   Q  And did EGPNA or Enel Kansas have any

19 previous involvement in the Osage Wind project

20 before this agreement?

21   A  They would have had involvement in the

22 project through the board and through their staff

23 dilligencing the project from before we even -- I

24 suspect before we bought it.  No.  Yeah, the board

25 would have been aware of the project before we

1 bought it, so they would have had involvement via

2 their ownership in Tradewind prior to even our

3 ownership.

4    Q  Okay.  Do you happen to know if an

5 executed version of this guaranty exists?

6    A  I do not.

7    Q  Okay.  All right.

8       [Julie, can we go back to Page 4?]

9       And I'm sorry, Mr. Gilhousen.  I did

10 not mean to make us all dizzy by going back and

11 forth through here.

12   A  You're good.

13   Q  This page will be Bates stamp 21251.

14 So on this page, it defines governmental authority

15 and I'll just read part of it for you.  It says,

16 "For the avoidance of doubt" -- oh, sorry.  Do you

17 see where that is, first?

18   A  The definition of governmental

19 authorities?

20   Q  Yeah.  It's right there in the middle

21 of the page.  Okay.

22      It says, "For the avoidance of doubt,

23 no Native American tribe, nation, entity, body,

24 organization, et cetera, shall be considered a

25 governmental authority for any purpose hereunder."

1       Do you have an understanding of why no

2 Native American tribe was considered a

3 governmental authority under this agreement?

4    A  I do not.

5    Q  Okay.  Did Tradewind ever make an

6 independent determination as to the rights of

7 Native American tribes in relation to the Osage

8 Wind project?

9       MR. BALL:  Objection to form.

10      THE WITNESS:  Can you ask that

11 question again, please?

12   Q  (By Ms. Blake)  Certainly I can.

13      Did Tradewind ever make an independent

14 inquiry into -- into the rights of a Native

15 American tribe in relation to the Osage Wind

16 project?

17   A  Independent meaning?

18   Q  Basically did you -- did Tradewind on

19 its own behalf ask anybody to make this

20 determination or make an inquiry into those

21 rights?

22   A  Yes.  We would have -- hold on one

23 second here.  Are you guys there?

24   Q  Uh-huh.  We're still here.

25   A  I had a phone call come in.

1    Q  No problem.

2    A  I won't take any unless it's my mom.

3       Let's see.  We would have relied on

4 counsel.  So I'm certain we engaged counsel with

5 respect to what permits and authorizations we need

6 -- we needed.  And I can't recall the status of

7 the county permitting on this project at the time,

8 whether it had been permitted when we acquired it

9 or not.

10   Q  And would that determination be

11 something that would have gone to the board of

12 directors?

13      MR. BALL:  Objection.  Form.

14      THE WITNESS:  The status of the

15 permitting of the project would have been part of

16 the due diligence that the buyer would have done

17 and the board would typically want to know whether

18 we have or don't have the permits needed for the

19 project.

20   Q  (By Ms. Blake)  Makes sense.

21      Do you have any knowledge as to what

22 entity would have included this term about

23 governmental authority in the agreement?

24   A  I do not.

25   Q  Do you know who was responsible for

1 drafting this definition?

2    A  I do not.

3    Q  And then I guess what about the

4 agreement in general, do you know who was

5 primarily responsible for drafting this agreement?

6       MR. BALL:  Objection.  Asked and

7 answered.

8       THE WITNESS:  When you say

9 "draft," are you speaking of the original drafter

10 of the form or the drafter during the negotiation?

11    Q  (By Ms. Blake)  Yeah, the form.  Do you

12 know where the form came from?

13    A  I don't know where the form came from.

14    Q  Okay.  Let's see here.  [Julie, can we

15 go to 21253.]  We're going to look at the

16 definition of permit.  It's right there in the

17 middle of the page.  Can you see that okay,

18 Mr. Gilhousen?

19    A  Yep.

20    Q  So it's defined as, "Any license,

21 permit, certificate, order, consent," et cetera,

22 "required under or issued pursuant to any

23 environmental law or by any governmental

24 authority."

25       Do you agree that this definition of

1 permit would exclude permits from the Osage

2 Minerals Council just because of the operation of

3 the definition of governmental authority?

4    A  Without studying the document more

5 thoroughly, I would be speculating, but it appears

6 that's the case.

7    Q  Do you know who made the decision to

8 exclude permits from the Osage Minerals Council

9 from the definition of permits in this agreement?

10    A  I do not.

11    Q  Let's see.  [Julie, can you put up Page

12 21268.]  So let's see.  21268, Osage Wind makes a

13 representation in Paragraph 3 that says, "The

14 company is in compliance and all materials are --

15 with all of the permits to the extent obtained and

16 has paid all amounts currently due under all

17 obtained permits."

18       Did anyone at Tradewind or on the board

19 of directors prior to the approval of this

20 agreement undertake any analysis to determine that

21 this statement was true?

22    A  I don't recall.

23    Q  Okay.  And that as of the signing of

24 this agreement which was in August 2013, is it

25 true that neither Tradewind nor Osage Wind nor

1 Wind Capital Group nor EGPNA had a permit from the

2 Osage Nation to mine the Osage Mineral estate?

3    A  To my knowledge, we didn't have a

4 permit or to my knowledge we weren't mining.  So,

5 no.

6    Q  Let's see.  Sorry.  I'm going to

7 just --

8    A  So your prior question, not the most

9 recent one, but the prior one about the document,

10 I'm not even sure if you were talking about the

11 representations or warranties.  What section of

12 the document you're referring to.

13    Q  Oh, yeah.

14    A  Obviously, before we would sign and

15 execute a document we would do our best to be in

16 compliance with the document we're signing.  So if

17 we had to make a REP, we would carefully read the

18 REP and decide whether we could make it or not.

19    Q  Oh, for sure.  Just the -- under this

20 agreement the company is Osage Wind, and I think

21 this is you buying it from Wind Capital Group.

22    A  Okay.  Right.  Thank you for

23 clarification.

24    Q  Yeah.  No problem.

25    A  Actually, I thought this was the sale

1 -- I was thinking this was the sale MIPA; not the

2 buying MIPA.  I think my answer applies still, but

3 I --

4    Q  Do you want me to reask the question?

5    A  No, I don't think so.

6    Q  Okay.  Let's see.  Yeah, all the

7 question was -- would be if -- so the company

8 representing that they're in compliance with all

9 of their permits to the extent obtained, would

10 Tradewind have looked into that?

11    A  Yes.

12    Q  And let's see, what would Tradewind

13 have done as part of that process to be

14 comfortable with that representation?

15    A  That the seller has all the permits?

16    Q  Exactly.  Uh-huh.

17    A  We would have spoken to the seller and

18 we would have reviewed the documents they have.

19 And depending on the documentation, we may or may

20 not engage directly with whoever that jurisdiction

21 is that might validate or not validate whether or

22 not we needed a permit or had the permit

23 necessary.  But it depended -- it depends upon the

24 documentation that we have from the seller.

25    Q  And would counsel have been involved in

Page 46

1  that process?
2      A  Yes.
3      Q  Okay.  All right.  So now we'll go to
4  Page 10.  [Julie, this is Section 2.3 of the
5  agreement.  Bates stamped 21257.  And it's the
6  Closing.]
7          And it says that "The closing..." --
8  let's see what we're looking at -- let's see.  The
9  third line.  "...will happen immediately following
10 the satisfaction or valid waiver of all of the
11 conditions set forth in Sections 2.4
12 and 2.5."
13         Do you recall when this transaction
14 closed?
15     A  I do not.
16     Q  Okay.  That is totally fine.
17         Let's see.  Okay.  So we're going to go
18 now to the MIPA from September 2014.
19         [Julie, if you could pull up Exhibit
20 Number 79.  This was previously marked as
21 Defendant's Exhibit Number 79 and it's Bates
22 stamped Osage Wind 21119.]
23         And Mr. Gilhousen, we've been going for
24 about an hour now, so if you need a break after
25 this, you know, let me know.

Page 47

1      A  Okay.
2      Q  So this is the agreement where
3  Tradewind sold the project.  Do you remember
4  seeing this agreement before?
5      A  The same answer as before.  I would
6  have to take your word that this is that
7  agreement, but there was a MIPA between Tradewind
8  and Enel selling them the Osage Wind project.
9      Q  Do you happen to know who the members
10 of Enel Kansas were at this time?
11     A  I do not know.
12     Q  Okay.  And did Osage Wind have any
13 employees?
14     A  I am not -- not to my knowledge.
15     Q  And do you happen to know -- and I'm
16 sorry if I asked you this before, but do you
17 happen to know who was on Tradewind's board during
18 this transaction?
19     A  No.
20     Q  [Julie, if you'll scroll down to
21 21123.]  So in the preamble, let me get to the
22 right spot for you, in the fourth "Whereas"
23 paragraph, it says that the -- the first MIPA was
24 amended on October 25th, 2013; November 2nd, 2013;
25 March 14th, 2014; and April 15th, 2014.  Do you

Page 48

1  know if those amendments were approved by Osage
2  Wind's board?
3          MR. BALL:  Objection to form.
4          THE WITNESS:  I don't know.
5      Q  (By Ms. Blake)  Do you know if
6  amendments of that type would typically be
7  approved by Tradewind's board?
8      A  I wouldn't use the word typical.  They
9  may or may not have been.  It depends on the
10 nature of the amendment.
11     Q  And then I guess speaking of the nature
12 of the amendment, do you have any recollection why
13 the MIPA was amended on October 25th, 2013?
14     A  I do not recall.
15     Q  What about the November 2nd, 2013
16 amendment?
17     A  The same answer.
18     Q  Okay.  And I'm going to go for the
19 other one.  What about March 14th, 2014?
20     A  Yeah, the same answer.  I don't recall.
21     Q  And I was going to ask you the last
22 one, April 15th, 2014.
23     A  Yeah.  I don't recall.
24     Q  Okay.  No problem.
25         Let's see.  [Julie, if you can go to

Page 49

1  Page 9.  So this should be Bates stamped 21127.]
2          So we're going to look at the
3  definition of governmental authority again.  And
4  then can you see that okay?
5      A  Yes.
6      Q  Okay.  It says that, "Governmental
7  authority is any national, tribal, state, or local
8  government, whether domestic or foreign, any
9  subdivision thereof," et cetera, et cetera.
10         Do you agree that this definition would
11 include the Osage Nation?
12     A  It appears that way if they're -- if
13 the reference to tribal would pick them up.  It
14 seems that's the case.
15     Q  Yeah.  So do you have an understanding
16 for why tribal governments and their
17 instrumentalities are included in this definition
18 of governmental authority?
19     A  I do not know.
20     Q  Okay.  And then do you have any
21 recollection of which entity included -- included
22 this provision?
23     A  Who -- the same answer as -- I guess my
24 comment about this document is as the prior one, I
25 don't know the origin of the form of this document

Page 50

1 and so I can't -- or the history of the
2 negotiations well enough to say if that language
3 was there initially or it was added or negotiated.
4     Q   No worries.  Let's see.  Just taking a
5 look down my outline really quickly.
6         Do you know if there was ever a
7 determination by Tradewind about including tribal
8 governments in this definition?
9     A   I do not.
10     Q   All right.  I am done actually with
11 this exhibit, so we can take a break now or we can
12 just continue on to the next one.  It's up to you,
13 Mr. Gilhousen.
14     A   Let's keep going.
15     Q   Okay.
16         All right.  [Julie, can you pull up
17 what's previously been entered as Exhibit 194.
18 And this one is Bates stamped Osage Wind 040156.]
19         This is the amended and restated Osage
20 Project Loan Agreement among Tradewind Energy and
21 Enel Kansas and EGPNA dated April 14th, 2014.
22         So the preamble mentions that - sorry?
23     A   Sorry.  That was just a thing on my
24 phone popping up.
25     Q   No problem.

Page 51

1         So the preamble mentions that Enel
2 Kansas and Tradewind are parties to an Osage
3 project loan agreement dated November 21st, 2013,
4 and then on this loan modification agreement dated
5 March 14th, 2014.  And that is in -- that's in the
6 second "Whereas" paragraph.  Do you see kind of
7 what I'm talking about?
8     A   Yeah, I see the section you're
9 referring to.
10     Q   Okay.  Do you know why the Osage
11 project loan agreement was modified on
12 March 14th, 2014?
13     A   I don't recall specifically.
14     Q   And do you recall why it was modified
15 again with this agreement on April 14th, 2014?
16     A   Unfortunately I don't recall.
17     Q   That's okay.  Let's see.
18         Do you recall if -- let's see.  Do you
19 know if Enel Kansas and EGPNA's responsibilities
20 and rights under the November 21st, 2013 and the
21 March 14th, 2014 agreements are the same as what
22 is in this one, as in this agreement?
23     A   I don't.
24         MR. BALL:  Objection.  Form.
25     Q   (By Ms. Blake)  That's fine.  And do

Page 52

1 you recall if Osage Wind had any employees at this
2 time?
3     A   I'm not -- I don't know the answer to
4 that.
5     Q   Do you know if Osage Wind ever had
6 employees?
7         MR. BALL:  Objection to form.
8         THE WITNESS:  I'm unaware of
9 whether they did or did not.
10     Q   (By Ms. Blake)  Okay.  Did Osage Wind
11 have employees when Tradewind owned Osage Wind?
12     A   I do not believe so.
13     Q   Did Osage Wind have any officers at the
14 time that this agreement was negotiated?
15     A   I don't recall.
16     Q   Okay.
17         [Julie, if you could go to Page 40162.]
18         So in Section 3.2 -- this is Lender
19 Approval Rights.  And it says that, "Tradewind
20 shall not on behalf of Osage Wind or otherwise
21 allow Osage Wind to undertake any of the following
22 actions relating to the Osage project without
23 prior written approval of Enel Kansas."
24         What would it mean for Tradewind to
25 allow Osage Wind to take an action?

Page 53

1     A   I'm not sure how to answer that
2 question.
3         MR. BALL:  Objection.  Form.
4         THE WITNESS:  Maybe you can ask
5 that differently.
6     Q   (By Ms. Blake)  So how -- I guess the
7 question would be why would -- what would be
8 required for Tradewind to allow Osage Wind to take
9 an action?
10         MR. BALL:  Objection.  Form.
11         THE WITNESS:  It appears, based on
12 what's in front of me here, that board consent
13 would be needed for certain actions.
14     Q   (By Ms. Blake)  Okay.  Thank you.  That
15 is helpful.
16         [Julie, can you scroll down to
17 Paragraph P.]
18         So one of the actions in paragraph --
19 this is Paragraph P, again.  It says, "Issuing any
20 limited or full notices to proceed under any
21 construction contract."
22         Do you know what a limited notice to
23 proceed is?
24     A   The industry standard would be as the
25 word implies, you're giving a contractor some

Page 54

1  limited notice to move forward with a particular
2  phase of a construction project or actions
3  associated with a construction project, which is a
4  partial -- a partial release for them to do some
5  level of work, or engineering.  I mean, it could
6  be purchasing a piece of equipment that's along
7  the item.  It could be starting more detailed
8  engineering.  It could be releasing them to start
9  moving some dirt.  It could be a whole host of
10  things that would fall under a limited notice to
11  proceed.  They're not uncommon in the construction
12  business to my -- that's been my experience.
13      Q  Okay.  And I'm asking because I'm not a
14  civil engineer, it's helpful to know exactly what
15  we're talking about here.  So how is that
16  different from a full notice to proceed?
17      A  A full notice to proceed would
18  typically -- again, I'm not speaking specific to
19  the Osage project, but it would be they're given a
20  full green light to execute under the construction
21  contract with no restrictions.  They can just
22  proceed according to the contract.
23      Q  Okay.  And so is the purpose of the
24  limited notice to proceed, are those financial or
25  what would be the purpose?

Page 55

1      MR. BALL:  Objection to form.
2      THE WITNESS:  Again, this is
3  industry -- based on my industry experience it
4  could be a whole host -- anything under the sun
5  could cause a limited notice to proceed.
6  Scheduled deadlines, financing, equipment lead
7  times, scarcity of resources.  A whole bunch of
8  different things could cause that.  It's very
9  common.
10      Q  (By Ms. Blake)  Yeah.  That's helpful.
11  Thank you.
12      So with respect to Osage Wind
13  specifically, who under this contract would have
14  requested written notice -- would have requested
15  written approval from Enel for notices to proceed?
16      MR. BALL:  Objection.  Form.
17      THE WITNESS:  It would have been
18  one of the -- either gone through the board or
19  through one of the senior staff and/or executives
20  at the business.  So it could have been Rob,
21  Geoff, me, one of the key department heads.  It
22  could have come from various people.
23      Q  (By Ms. Blake)  And who at Enel Kansas
24  would you have contacted for the written approval?
25      A  Typically it would go through -- it

Page 56

1  would have gone through the board.  But at various
2  times we had different points of contact at Enel,
3  whether it was their general counsel or their
4  project lead or one of our board members.  I can't
5  recall specifically at this point in time who
6  would have been the point person on their side for
7  the project.
8      Q  Okay.  And sorry, when you say, "go
9  through the board" what do you mean?
10      A  Say it again.
11      Q  When you say, "go through the board,"
12  are you talking about --
13      A  If there was a board level decision
14  necessary, we would have had to take it through
15  the board to get that approval, to make that
16  request of Enel.
17      Q  Okay.  I'm sorry.  I'm just trying to
18  make sure I understand.  So you would take it to
19  the board to -- to get -- to approve taking the
20  request to Enel?  Or to--
21      A  Well, Enel was on the board, so the
22  board could provide that authorization.  Or we
23  could have gone -- depending on the circumstances,
24  we could have gone directly to Enel, one of the
25  staff, and they could have -- to make that request

Page 57

1  and gotten the approval.  It could have gone
2  different channels to get that written
3  authorization.
4      Q  Okay.  And as far as the different
5  channels, was that based on the subject matter
6  usually?
7      A  It could have been the subject matter,
8  it could have been point in time.  I would just be
9  speculating on why we would go one channel or the
10  another.  But there were different people in Enel
11  that had lead -- kind of a lead point position on
12  a particular project.  So it really could have
13  gone through any different channel.
14      Q  What about permitting issues in
15  particular?
16      MR. BALL:  Objection to form.
17      THE WITNESS:  As I said earlier,
18  our permitting environmental department would have
19  taken lead along with support of counsel on
20  permitting-related matters.  I can't recall any
21  specifics with respect to this project or what
22  channel they worked through or if there were any
23  requests for consent.
24      Q  (By Ms. Blake)  Okay.  Let's see.  And
25  sorry I jumped ahead a little bit, but the reason

1  I asked about permitting -- [Julie, if you could
2  scroll up, please.  Oh, sorry.  Just to Paragraph
3  J.]
4       And so one of the things that requires
5  written approval under this contract in Paragraph
6  J is "Finalizing any material permit except where
7  not practicable."  As, for example, a fee has
8  already been submitted or (inaudible) are
9  automatic.
10      Do you know how written approval would
11  have been obtained for these material permits in
12  Paragraph J?
13      A  The same answer as before.  It could
14  have gone through multiple channels.
15      Q  Okay.  No problem.  And do you have --
16  so material isn't defined in this -- and it's not
17  a defined term.  Do you have any idea what a
18  material permit would have been under this
19  contract?
20          MR. BALL:  Objection to form.
21          THE WITNESS:  That's a judgment
22  call.  I can't -- it's -- the reader is going to
23  have to make their own definition since it's not a
24  defined term.  I guess it's self-evident.
25      Q  (By Ms. Blake)  As the chief

1  development officer, what kinds of things would
2  you consider to be material permits?
3      A  A conditional use permit or special use
4  permit is a good example of a material permit.
5      Q  Okay.  And was there any kind of
6  process at Tradewind for reviewing permits to
7  determine if they were material?
8      A  A permit matrix and that process of
9  discussing what all permits we thought we needed,
10  and discussions with counsel.  Yeah, if there was
11  anything that was on that list that was material
12  that we didn't have, then we would be focused on
13  those to make sure we get them.
14      Q  Okay.  Let's see.  Would a lease from
15  the Osage Minerals Council be considered a
16  material permit?
17          MR. BALL:  Objection to form.
18          THE WITNESS:  I can't say without
19  -- I've never seen a lease from the Mineral
20  Council, so I can't say.
21      Q  (By Ms. Blake)  No problem.
22      Let's see.  So based on this paragraph,
23  Paragraph J, is it true that if Osage Wind decided
24  to get a permit from the Osage Nation or the Osage
25  Minerals Council, Tradewind could not have done

1  that without prior or written approval from Enel
2  Kansas?
3      A  Again, I can't say whether that's a
4  material permit or not.  So it's hard to answer
5  the question because I believe this language
6  refers to material permits requiring consent from
7  Enel.  I just -- I can't speculate whether or not
8  they would have to provide consent.
9      Q  No problem.  So let's take a look at
10  Paragraph O.  It's on the same page, just a little
11  farther down.  Paragraph O prohibits Tradewind
12  from allowing Osage Wind to submit comments with
13  respect to any permit without prior written
14  approval of Enel Kansas.  Do you see Paragraph O?
15      A  Yeah.
16      Q  Do you know why a lender would want to
17  provide prior approval for comments submitted with
18  respect to permits?
19          MR. BALL:  Objection to form.
20          THE WITNESS:  Typically, it would
21  be their desire to make sure they understand
22  anything and everything that could affect the
23  security and to have -- the security to their
24  loan.  They're lending money.  The assets are
25  typically security.  So they -- this is -- this

1  would be -- I can't speak to the specifics of this
2  loan document, but my experience tells me that it
3  would be -- they're protecting their interest as
4  lender, and the assets that securitize the loan.
5      Q  (By Ms. Blake)  Let's see.  Sorry.  I'm
6  just seeing what other things we can get through
7  here.  I think we're done with this.
8      [Julie, if you could pull up Exhibit
9  Number 195.  So this one is Bates stamped Osage
10  Wind 014868.  Once we have it up.]
11      And it's a letter agreement to be
12  amended and restated of Osage Project loan
13  agreement among Tradewind Energy, Enel Kansas and
14  EPGNA.  And it's dated April 14th, 2014.  Were you
15  involved in the negotiation of this document at
16  all?
17      A  I don't recall.
18      A  Okay.  Let's see.  In Paragraph 1 --
19  [Julie, can you scroll down?  There are numbered
20  paragraphs at the bottom of this page.  There we
21  go.  Oops -- at the bottom of the page.  There we
22  go.]
23      So Paragraph Number 1 right there
24  defines acquisition as "TWE, Tradewind, will
25  acquire Osage with the proceeds from the Osage

1  loan."
2      Do you see that?
3      A  Yes.
4      Q  Okay.  And then -- [Julie, if you can
5  scroll up just a little bit.  Two paragraphs above
6  that.  In that paragraph starting with
7  "Contemporaneous."]
8      So the Osage loan is defined as the
9  document that we just looked at as Exhibit Number
10 194.  Do you see that one?
11     A  Yeah.
12     Q  So we're going to scroll -- sorry, I'm
13 giving you some definition so we can all know what
14 we're talking about before we start looking at
15 these defined terms.
16     [So if we scroll down to Paragraph 2,
17 Julie.  On the Number 2.  There we go.]
18     It says, "After the acquisition TWE
19 agrees to cause Osage to appoint EGPNA or its
20 affiliate as designated by EGPNA as project
21 representative with respect to finalizing the
22 project design and engineering and negotiating an
23 engineer procurement and construction contract."
24     Do you know if that appointment was
25 formalized in any document other than this letter

1  agreement?
2      A  I'm not aware.
3      Q  Okay.  Let's see.  Do you know what
4  Enel entity was appointed as project
5  representative?
6      A  I can't say.  I don't recall.
7      Q  Okay.  And then I think previously we
8  had talked about finalizing design and engineering
9  generally, but do you remember what that meant
10 with respect to this project, Osage Wind, at this
11 time?
12     A  Honestly, I can't recall the exact
13 status of the project when we bought and when we
14 sold it.  I can tell you that Enel engineered
15 their own projects and built their own projects.
16 So they -- it's highly -- I'm assuming that they
17 did appoint a representative and they did take
18 over the contract negotiations.  I don't recall
19 being involved in those negotiations or that
20 detailed engineering and construction process.
21     Q  Okay.  Let's see.  In Paragraph 3, it
22 says, "After the acquisition, TWE agrees to cause
23 Osage to appoint EGPNA, or its affiliate, as owner
24 representative under certain other contracts."
25     Do you know if those appointments were

1  formalized in a document?
2      A  I don't.
3      Q  Okay.  And then -- [Julie, if you can
4  go to Paragraph 9.]
5      Let's see.  This one says -- let me
6  find this for you.
7      After -- in the first line starting at
8  the end it says -- let's see.  "Osage will make
9  all final decisions on construction related
10 matters, but shall do so in good faith with due
11 regard to recommendations of EGPNA as the
12 anticipated construction manager for the project."
13     Do you know who at EGPNA was making
14 recommendations regarding construction in
15 April 2014?
16     A  I don't recall.
17     Q  And do you recall who at Osage Wind was
18 in charge of making these final decisions?
19     A  I don't recall and I may never have
20 known.
21     Q  Do you know who might have known that?
22     A  Enel.
23     Q  Enel would know?
24     A  I would think they might be able to
25 find out who was in that role.

1      Q  Okay.  Let's see.  And then do you know
2  what it means for Osage Wind to make their final
3  decision with due regard to EGPNA's
4  recommendation?
5      A  Sorry.  Say that again.
6      Q  Yeah.  Do you know what is meant here
7  by "due regard to recommendations of EGPNA"?
8          MR. BALL:  Object to form.
9          THE WITNESS:  I can't -- I can't
10 say.
11     Q  (By Ms. Blake)  Let's see.  Do you know
12 if in April of 2014 EGPNA recommended that the use
13 of dynamite or a rock crusher to construct the
14 Osage wind farm project?
15     A  I do not.
16     Q  (By Ms. Blake)  [Julie, if you could
17 pull up Exhibit Number 199.]
18     So this one doesn't -- it's not going
19 to have this stamp on it yet because I don't think
20 we've been given the officially stamped documents
21 yet.  But this was entered as Exhibit Number 199
22 in a prior deposition.  It's Osage Wind
23 040139.  So it's the project's development
24 agreement among Tradewind Energy, Enel Kansas and
25 Osage Wind, and it's dated April 14th, 2014.

Page 66

1    And then Tradewind on this page is
2 listed as the development manager. Do you see
3 that?
4    A  I do.
5    Q  Okay. And then, let's see, we'll
6 scroll down to Page 40144. And in Section 2.2.
7 Section 2.2 is called -- oh, you lost your video
8 again.
9    A  Sorry, I was just checking my battery.
10    Q  Oh, that's fine. Is it okay?
11    A  Yeah.
12       MR. MAY: We're going to try that
13 again.
14       THE WITNESS: I'm halfway --
15 halfway charged so we're good.
16    Q  (By Ms. Blake) Oh, okay. All right.
17    Okay. So the section we're looking at
18 right now, Section 2.2, is development manager
19 obligation. It says, "Tradewind agrees to perform
20 all reasonable and necessary activities relating
21 to the continued development of the project."
22    Do you happen to recall in April 2014
23 what those development activities were for this
24 project?
25    A  I don't recall specifically. I recall

Page 67

1 the project getting a mature asset, so my
2 recollection would be that it's just support work,
3 if Enel needs anything from us, but I can't say
4 specifically.
5    Q  And what kinds of things -- what kinds
6 of things are encompassed by support work?
7    A  It could be making sure that we have a
8 landowner relationship, that we could just help
9 facilitate Enel getting to know a landowner or
10 that kind of thing. Or providing any background.
11 Understanding of a particular development issue
12 that we were aware of. But oftentimes it was
13 landowner-related because those were relationships
14 that we often possess that Enel didn't when, at
15 least initially. They developed those
16 relationships over time.
17    But this project, we didn't do the
18 initial leasing, so those weren't -- those were
19 more Wind Capital relationships. I'm sure we got
20 to know those landowners while we owned it and
21 then Enel would have developed those relationships
22 after we sold it to them. That's an example.
23    Q  Perfect. So I'm going to -- let's see.
24 So a little further on it says -- it includes
25 items in Section 2.4 and Schedule 2.2. So

Page 68

1 Schedule 2.2 hasn't been produced. But I'm
2 guessing, do you recall -- do you happen to recall
3 what was on that schedule?
4    A  No, I don't recall what was
5 specifically on that schedule.
6    Q  Okay. That is totally fine.
7       Let's see. [Julie, can you pull up
8 Exhibit 52.] This one is Bates stamped Osage Wind
9 035610. As you can see, it's the amended and
10 restated balance of plant engineering procurement
11 and construction contract by and between Osage
12 Wind, LLC and IEA Renewable Energy formerly known
13 as RMT, Inc. And this is dated April 11th, 2013.
14 Have you seen this document before?
15    A  Not to my knowledge.
16    Q  Okay. Do you happen to know when
17 the decision was made to enter this agreement
18 with IEA?
19    A  I do not.
20    Q  Okay. Okay.
21       Let's go to -- [Julie, if you could go
22 to Page 11. It's Bates stamped 35620. Oh, wait,
23 actually let's go to 356 -- sorry, Julie. Page
24 63. Let's go there.]
25       So in Section 6.2. This is owner's

Page 69

1 manager. And it says, "The owner shall appoint a
2 representative to act as the manager and
3 coordinator of this contract on owner's behalf.
4 That's that first sentence there."
5       Do you know who the owner's manager was
6 in -- while Tradewind owned the project?
7    A  I do not.
8    Q  Okay. Let's see. [And then, Julie, if
9 you can go to Page 90.] So right here it says
10 that the contractor, which is IEA, acknowledges
11 the owner, which is Osage Wind and it's affiliates
12 "relied on the principles outlined in the Enel
13 Code of Ethics and Enel zero tolerance of
14 corruption in Enel 231 guidelines when conducting
15 business and management relations."
16       What is -- do you have an understanding
17 for why Wind Capital Group and then Tradewind
18 Energy would conduct business according to Enel's
19 code of ethics?
20       MR. BALL: Objection. Form.
21       THE WITNESS: I'm not aware that
22 we were. I assume this is boiler plate language
23 that Enel requires in their construction contracts
24 when someone is working on their behalf.
25    Q  (By Ms. Blake) Okay. So in April of

1  2013 did Enel have ownership in the Osage Wind
2  farm project?
3      A  I don't recall the timeline of --
4  honestly, when we bought it and we sold it to Enel
5  when they started construction and signed this
6  contract. I don't remember the specific sequences
7  or dates.
8      Q  Okay. No worries.
9      Let's see. [Then I think I'm done this
10 with one, Julie. We can go to Exhibit 102. And
11 that one is Bates stamped Osage Wind 003768.]
12     And this is a scope of work document.
13 And it's Exhibit B to that -- to the contract that
14 we were just talking about.
15     So based on an Enel technical report
16 that I was produced at Osage Wind 018685, this
17 appears to be a March 25th, 2013 version of the
18 scope of work.
19     [Julie, can you scroll down a little
20 bit? And then let's go to -- we're going to go to
21 Page 10 eventually.]
22     But Mr, Gilhousen, do you recall seeing
23 this document before?
24     A  Nope.
25     Q  Okay. So this will probably be quick

1  again, too. [Can we go to Page 10, Julie. So
2  we're going to go to Paragraph E. Let's see. It
3  might be page -- I think it's labeled Page 10 at
4  the bottom. There we go.]
5      So Paragraph E says, "Contractor will
6  not be restricted regarding movement or transport
7  of soil materials nor will contractor be
8  responsible for fees or delays associated with
9  mineral rights issues."
10     Do you see where Paragraph E is?
11     A  Oh, yeah. Subsection E?
12     Q  Exactly. Yeah.
13     So I know here, as opposed to the
14 earlier -- or, the other things we were looking
15 at, mineral rights is a defined term here. And it
16 looks like one, but it's not defined in the
17 contract we were looking at or in this exhibit.
18     Do you know what is meant by "mineral
19 rights issued" here?
20     A  I don't.
21     Q  Okay. Let's see. So Paragraph F says,
22 the -- it has quantities of excavated materials.
23 And then at the top, the paragraph at the top of
24 Page -- what would be Page 11, it says that, "The
25 contractor will be responsible to track excavation

1  volumes periodically throughout the project."
2      Do you see that sentence right there?
3      A  I do.
4      Q  Okay. Is this a typical requirement,
5  do you know, for a wind farm project?
6      A  I can't say. I was not responsible for
7  construction of -- final engineering or
8  construction of wind projects. So I can't say.
9      Q  And then I'm just going to ask one more
10 question, then, on this. [Julie, if you'll scroll
11 down a little bit.] Right there in Paragraph G it
12 says, "Rock blasting or removal has not been
13 included." Do you see that in Paragraph G?
14     A  Yes.
15     Q  So to your knowledge is it correct that
16 as of March 2013 Tradewind and Enel did not intend
17 to use blasting in the construction of the Osage
18 wind farm project?
19         MR. BALL: Objection to form.
20         THE WITNESS: Yeah, I can't say
21 whether -- whether or not that's the case. I
22 wasn't involved in those discussions.
23     Q  (By Ms. Blake) Okay. No worries.
24     A  This could mean a host of things. It
25 could mean that they didn't think they would see

1  rock or it could mean they weren't going to blast.
2  I don't know what the intent is because I've not
3  seen this document.
4      Q  Okay. No problem.
5      Let's see. [Let's go ahead and do
6  Exhibit Number 46, Julie. So this one is Bates
7  stamped Osage Wind 000381.]
8      And this is another scope of work. And
9  so counsel for defendants has represented that
10 this is an execution version of this scope of
11 work. And like the last one, based on the Enel
12 technical report that they produced, it appears to
13 be from August 2014. So have you seen this --
14 have you seen this document before?
15     A  Nope.
16     Q  Okay. Not surprising.
17     [Julie, can you go to Page 11.] Let's
18 see. Let's go -- let's look at paragraph --
19 Section F there at the very bottom. And it says,
20 "Rock blasting or removal has been included for 27
21 turbines." Do you, by any chance, know why that
22 change was made?
23     A  I do not know.
24     Q  Do you have -- do you know who would
25 have made that change?

1    A  I can't -- it wouldn't have been
2    Tradewind.  It must have been Enel or the
3    contractor.
4        Q  And is that the same for the -- so --
5    well, I guess first.  So the requirement to track
6    excavation lines has been removed.  Who would have
7    made that change?
8        A  The same answer.  It would have been
9    the parties to the contract.
10       Q  Okay.
11       [Julie, that's enough for that exhibit.
12   Can we pull up Exhibit Number 91?  This one is
13   Bates stamped Osage Wind Priv 000357.]
14       This is an email exchange as you can
15   see with the subject Attorney/Client Privileged.
16   [And then Julie, can you scroll all the way down
17   to the beginning of the thread.]
18       So here at the beginning of the thread
19   on February 17th, 2014, Justin Larson of -- it
20   looks like Tradewind based off of his email
21   address, asked John Blickensderfer at engineering
22   services if he has experience with an Osage mining
23   permit.  Do you see that email from Justin, or
24   from Mr. Larson?
25       A  Yes, I see the email address and see

1    the email.
2        Q  Okay, awesome.  Do you know who
3    Justin Larson is?
4        A  Yes, Justin reported to me.  He was
5    responsible for design -- design and engineering
6    for Tradewind.
7        Q  Okay.  Let's see.  Do you know why
8    Mr. Larson would ask Mr. Blickensderfer about an
9    Osage mining permit in February of 2014?
10       A  I can't say exactly what would have
11   triggered that task.
12       Q  So if we look at -- [Julie, can you
13   scroll up a little bit] -- look at
14   Mr. Blickensderfer's reply.  So he replies on
15   February 28th.  And he says, "This is the special
16   provision as associated with all projects in
17   Osage County."
18       Do you see where he says that?  It's
19   the first sentence of the email.
20       A  Right.
21       Q  Okay.  And then just above that on
22   April 25th Mr. Larson forwards this email to Aaron
23   Weigel.  Do you know why Mr. Larson forwarded the
24   email to Mr. Weigel on April 25th?
25       A  I can't say exactly.  Aaron was the

1    lead developer for the project, but I don't know
2    why he would have sent it exactly.
3        Q  No problem.
4        So we're going to look at a couple of
5    other exhibits really quick.
6        [So, Julie, if you can pull up Exhibit
7    Number 92.]
8        So this one is Bates stamped Osage Wind
9    Priv 000359.  And so based off of its placement in
10   defendants's production, it looks like one of the
11   attachments to that email exchange we just looked
12   at with Mr. Blickensderfer.  Have you seen this
13   document before?
14       A  I don't recall seeing it, no.
15       Q  Okay.
16       MS. BLAKE:  So I'll just note for
17   everyone else that another copy of this document
18   has been entered Exhibit Number 72 as well.
19       Q  (By Ms. Blake)  So this document is
20   titled Oklahoma Department of Transportation
21   Special Provision for Osage Nation Mineral
22   Reservations-Sandy Soil Mining Permit.  So, do you
23   agree that this document appears to be the
24   Oklahoma Department of Transportation
25   implementation of Osage specific mining

1    regulations?
2        MR. BALL:  Objection to form.
3    Calls for speculation.
4        THE WITNESS:  I can't say what
5    this is exactly.  If you're telling me that's what
6    it is, I guess I would have to assume it is what
7    you say it is.
8        Q  (By Ms. Blake)  Yep, no problem.
9        [Julie, if you could pull up Exhibit
10   Number 93.  This one is Bates stamped Osage Wind
11   Priv 000361.]  And it also appears to be -- it
12   appears to be the other attachment to
13   Mr. Blickensderfer's email just based off the
14   placement in the production.  Have you seen this
15   one before?
16       A  Not to my knowledge.
17       Q  So this one is titled Procedures for
18   Obtaining Sandy Soil and Rock Mining Permits-Osage
19   County, Oklahoma.  Do you see that?
20       A  Yes.
21       Q  And then just below that it says,
22   "Permits are processed through the branch of
23   minerals at the Osage Indian agency."  That's the
24   very first sentence.  Do you see that one?
25       A  Yep.

Page 78

1    Q  And then the second sentence says,
2  "Lessee will be subject to the code of federal
3  regulations under 25 CFR Part 214."  Do you see
4  that sentence, too?
5    A  Yes.
6    Q  And then the very last one I wanted to
7  draw your attention to is -- so the last sentence
8  of that first paragraph says, "The following steps
9  are described below."  And the first step says,
10  "Letter to the superintendent, Osage Indian
11  agency."  Do you see that?
12    A  Sorry, where is that?
13    Q  Sorry.  The last sentence of that very
14  first paragraph and then it gives the first step
15  as letter to the superintendent.  Do you see
16  those?
17    A  I see type of permit, legal
18  description, the mine site.
19    Q  Yeah.  You are more than welcome to go
20  ahead and read all of the --
21    A  Sorry.  Apologies.  I'm not seeing
22  exactly what you're pointing at.
23    Q  Oh, yeah.  So -- sorry.
24      So the first step of looking at a
25  permit is just letter to the superintendent and it

Page 79

1  includes all of the things that you just --
2    A  Okay.  Gotcha.
3    Q  Okay.  Yeah.
4      Did anyone follow up with -- to your
5  knowledge, did anyone follow up with
6  Mr. Blickensderfer for clarification about his
7  statement that the special provision was
8  associated with all projects in Osage County?
9    A  I'm not aware.  What was the timing of
10  that email relative to --
11    Q  Oh, yeah.  No problem --
12    A  -- the construction of the project and
13  this lawsuit?
14    Q  Yeah.  So, let's see.
15      [So, Julie, if you could pull up his
16  email again.  That's Exhibit Number 91.  And then
17  scroll down.  So -- another scroll.  Yeah, there
18  we go.]
19      So Mr. Blickensderfer's email was sent
20  on February 28th.  So, then, I believe the -- in
21  the second MIPA, so when Tradewind sold the
22  project to Enel, That was in September of 2014.
23  Does that help?
24    A  So this was after the acquisition prior
25  to the sale?

Page 80

1    Q  Exactly.  Yeah.  Right in the middle
2  there.
3    A  Okay, thank you.
4    Q  Yeah, no problem.
5      Let's see.  So do you know if anyone
6  followed up with Mr. Blickensderfer for
7  clarification?
8    A  Who was he again?
9    Q  He is -- well, just based off his
10  signature block he's the vice-president of
11  engineering at -- let's see.  Where is the title
12  of his -- of his company?
13      [Julie, if you can scroll up just a
14  little bit.  Sorry.  Scroll down.]
15      So he's the vice-president of
16  engineering at GUY Engineering Services, Inc.  And
17  this is the man that Justin Larson emailed for --
18  about experience with the Osage mining permit.
19      [Julie, can you scroll back up a just a
20  little bit.  Thank you.  Just right there.]
21      Do you know if anyone followed up on
22  his statement that this special provision was
23  associated with all projects in Osage County?
24    A  Yeah.  I don't know.  And I don't know
25  what he means by "all projects" either.

Page 81

1    Q  Yeah, I was not going to ask you.
2      Let's see.  Where -- let me see the
3  next one.  Do you know if anyone followed up with
4  him from (audio distortion) about anything else
5  related to this permit?
6    A  I'm not aware and I am not aware of who
7  he is or his involvement in the project.
8    Q  Yeah, no problem.
9      Let's see.  Do you know if anyone
10  followed up with the Osage Indian agency for more
11  information?
12      MR. BALL:  Objection to form.
13      THE WITNESS:  I'm not aware of --
14  in specific to this email string, no, not aware.
15    Q  (By Ms. Blake)  Oh.  So -- sorry.  I
16  was talking more about the attachments.  Do you
17  know if anyone followed up with the Osage Indian
18  agency regarding the attachments that we just
19  looked at, 92 and 93?
20      MR. BALL:  Objection to form.
21      THE WITNESS:  Yeah.  I don't know.
22    Q  (By Ms. Blake)  That's fine.  "I don't
23  know" is fine.
24      Do you know if anyone followed up with
25  the OMC or Osage Nation regarding those documents?

Page 82

1        MR. BALL:  Objection to form.

2        THE WITNESS:  I can't say with

3  respect to those attachments.  I've never -- to my

4  knowledge I've not seen them.  I know there were

5  numerous conversations from the project to the

6  Osage Nation throughout the life of the project.

7  But I can't say specific to this -- those

8  attachments or the email string.

9        Q   (By Ms. Blake)  Yeah, that's fine.

10  Okay, let me see --

11        MS. BLAKE:  Oh, sorry.  Do you see

12  something I'm missing?

13        MR. BALL:  I was just going to

14  say, it looks like the reporter may need a break.

15  Maybe we could take a break just because I see

16  her --

17        MS. BLAKE:  I'm sorry, Marcy.  I

18  had gallery first and then speaker view so I

19  didn't see your signals.  Sorry about that.

20        MR. BALL:  She wasn't signaling

21  that you could see but she was feeling the

22  effects.

23        THE VIDEOGRAPHER:  Off the record

24  at 11:28 a.m.

25        (A break was taken from 11:28 to 11:41

Page 83

1  a.m.)

2        THE VIDEOGRAPHER:  We're back on

3  the record at 11:41 a.m.

4        Q   (By Ms. Blake)  Mr. Gilhousen, I'm

5  going to start with another email exchange.

6        [Julie, if you could pull up Exhibit

7  Number 89.  Okay, great.  And this is Bates

8  stamped Osage Wind Priv 000299.]

9        And as you can see, it's got -- it an

10  email exchange with the subject EIA on there.

11        [Julie, could you scroll down to the

12  very bottom.]

13        Okay.  So it starts right here where

14  Ryan Ray forwards -- let's see.  [Let's scroll up

15  a little bit actually.]  So you see Ryan --

16  [Scroll down here.  Here we go.]  So, Steve

17  Willman says -- [Go up just a little bit.  Sorry,

18  Julie.]

19        So Steve Willman says -- he forwards to

20  you, Rob and -- Rob Freeman and Geoff Coventry a

21  letter that he says Ryan Ray provided from the

22  tribe website.  "Someone should probably pass this

23  along to EGP."  And this is on --

24        [Julie, if you'll scroll up a little

25  bit so we can try to catch the date.  This is

Page 84

1  October the 11th, 2014.  And then scroll up a

2  little more, Julie, to Mr. Gilhousen's response.]

3        And so there's -- you respond to

4  Mr. Willman -- or you forward it on to people

5  here.  [And then, Julie, if you could scroll up a

6  little bit more.  And a little bit more.  We're

7  going to go all the way past this.]

8        So this is -- Steve Willman has

9  forwarded this email on to Bill Scott.  [And then,

10  Julie, if you could go up just a little bit more.]

11        And then right here there's a reply

12  from you from October 11th.  And can you see where

13  that is?  It's kind of -- it's really bunched up

14  in there.

15        A   Yeah.  I'm sorry, what are we looking

16  at?  Where are we?

17        Q   Yeah, exactly.

18        Mr. Gilhousen, do you see your reply

19  on October 11th, 2014 at 2:01 p.m.?

20        A   So this is October 11th, 2014?  Yes.

21  My bearings as to where -- the context here and

22  where we're at in the process of the project are

23  unclear to me.

24        Q   Would it be helpful to read parts of

25  this email so you can get oriented?

Page 85

1        A   I'm not sure if it would or wouldn't

2  be.  What's the question?

3        Q   Well, so I was going to ask you some

4  questions about this -- about your response on

5  October 11th.  And I just want to make sure that

6  you can tell where that is because the way this is

7  produced, it's a little difficult to read.

8        A   Yeah.  I can see the email.

9        Q   Okay.  So in this reply right here, you

10  write that -- let's see, in the second sentence

11  you see, "I believe this was looked at some time

12  ago along with the overall mineral permit issue."

13        What did you mean here by "overall

14  mineral permit issue"?

15        A   I can't speculate exactly what I meant

16  about mineral permit issue, but I suspect we were

17  talking about whether we were mining or not.

18  Whether -- yeah, just the general topic.  But,

19  again, I can't recall exactly what I was talking

20  about here.

21        Q   Okay.  Do you -- do you remember what

22  -- when the research that you're referring to in

23  this paragraph was conducted?

24        A   Not specifically.  I believe we -- Wind

25  Capital Group and Tradewind and Enel engaged the

Page 86

1 county and the tribe numerous times throughout the
2 history of the project. So, yeah.
3    Q Okay. And then do you at all remember
4 exactly what the question that they researched
5 was?
6    A No, I don't remember exactly what that
7 question was.
8    Q Do you remember who asked them to do
9 the research?
10    A I do not.
11       MR. BALL: Objection to form.
12    Q (By Ms. Blake) Do you know who would?
13    A No. I mean, you would have to study
14 the email strings to figure out who requested the
15 question being asked. Yeah, what the context was.
16    Q Okay. Do you -- [Julie, if you can
17 scroll down to -- well, let's see. Actually,
18 let's do -- sorry, just looking through my
19 outline. Okay. Julie, actually, let's go to
20 Exhibit Number 94.] And this is Osage Wind Priv
21 000619. And as you can see, it's titled Minerals
22 Statutes.
23     [So, Julie, if you can scroll to the
24 very bottom of the email chain right there.]
25     This is an email from you to Lynn

Page 87

1 Slade, Bill Scott, Steve Willman, Rob Freeman and
2 Aaron Weigel. And you ask, "Can one of you send
3 out the specific language from the statutes that
4 describes what mineral-related activity does
5 require a permit from the BIA." Do you see that?
6    A Yeah.
7    Q And this says -- just so we can orient
8 ourselves, this is October 25th, 2013. Do you see
9 that up there at the top?
10    A Yes. So this was after the start of
11 construction? After the sale?
12    Q I believe --
13    A Or this was before?
14    Q This is before Tradewind's sale to Enel
15 but after Tradewind purchased from Wind Capital
16 Group.
17    A Gotcha.
18    Q [Let's scroll up a little bit, Julie,
19 to Mr. Slade's email.]
20    A Do we know that this is actually with
21 respect to an Osage project versus Mustang Run?
22    Q I would be interested -- what is your
23 recollection?
24    A I don't have a recollection other than
25 there were two projects in Osage County that we

Page 88

1 were involved in. I don't know which one I'm
2 speaking about here.
3    Q Was there -- were there any issues, do
4 you recall, going on with Mustang Run at this
5 time?
6    A It was a later -- it was an earlier
7 stage project, so it was going through -- we
8 didn't originate the Osage project. We bought it
9 pretty much completed from a developer perspective
10 is my recollection. Mustang Run was an expansion
11 project that was early-staged, so we would have
12 been going through the question and answer and
13 diligence process on Mustang Run potentially at
14 overlapping times on the Osage project.
15    Q Do you -- do you have any reason to
16 believe that the mining issues with respect to
17 Osage (sic) Run and Osage Wind would be different?
18    A I'm sorry. Did you say Osage Run?
19    Q Mustang Run and Osage Wind. Sorry, I
20 might have said that wrong.
21    A In different points in time, different
22 projects. But, yeah, they could potentially be
23 different.
24    Q Do you think -- sorry. So do you think
25 that there would be a difference in whether one

Page 89

1 was required to get a mining permit than the other
2 one?
3       MR. BALL: Objection. Form.
4       THE WITNESS: It's plausible.
5 Yeah. Again, there were different projects in the
6 same county next to each other. Different stages
7 of development so there could be different -- a
8 whole host of differences between the projects.
9 I'm not saying there are; I'm just saying that
10 it's plausible. I don't -- honestly, I don't
11 recall which project I was talking about at any
12 specific time unless I'm specifically saying this
13 is with respect to the Osage Wind project or this
14 is with respect to the Mustang Run project. I'm
15 not trying to be combative here. I don't know.
16    Q (By Ms. Blake) Oh, yeah, no worries.
17 If you had an inkling that it might be one or the
18 other, I wanted to understand that better.
19     I think regardless -- I think it's
20 still -- I think it's helpful to go through this a
21 little bit still.
22     So, let's see. So, as I said before,
23 if we look in Mr. Slade's email, he says that
24 there are specific regulations -- in that very
25 first sentence. Sorry. "There are specific

Page 90

1  regulations governing leasing of minerals other
2  than oil and gas on Osage lands." And cites 25
3  CFR Part 214.
4       And then -- sorry. Do you see that
5  right there in that first sentence?
6       A  Yes.
7       Q  Okay. And then -- [Julie, if you could
8  scroll down actually to the bottom.]
9       So there's a lot of discussion here
10 about the particulars of 25 CFR Part 211 which is
11 general (inaudible) subject to the regulations
12 under the Indian Mining Act.
13      And then at the very last -- the last
14 sentence of this he says that, "The Osage specific
15 regulations do not define mining or provide other
16 guidance as to what triggers the requirement of a
17 lease and they do not authorize a permit." Do you
18 see that?
19      A  I'm sorry, where specifically is that?
20      Q  Yeah, it's the second to the last
21 sentence in this email.
22      A  Okay. I see it.
23      Q  Awesome.
24      Do you remember what your understanding
25 of the requirements regarding obtaining a mining

Page 91

1  lease from the Osage -- for the Osage minerals in
2  the state was at this time?
3            MR. BALL: Objection. Form.
4            THE WITNESS: My recollection is
5  that -- and I can't say if this was with respect
6  to Osage or Mustang or both, but we spent a lot of
7  time talking with counsel, or times talking with
8  counsel, the various stakeholders, and didn't
9  believe that the wind project was mining.
10      We had legal counsel indicating --
11 telling us we didn't need a permit. And we had
12 never been told from the Mineral Council or the
13 tribe that we needed a permit prior to
14 commencement of the construction, to my knowledge.
15 So that's my recollection of the matter.
16      Q  (By Ms. Blake) Was there -- was there
17 any time that you thought you might need a permit?
18            MR. BALL: Objection to the form.
19            THE WITNESS: No.
20      Q  (By Ms. Blake) Let's see. So at the
21 time that Mr. Slade was giving you this
22 information about the regulations -- [Julie, if
23 you could scroll up.] This was October 25th,
24 2013. Do you know if the facts regarding the
25 project construction and excavation plans had been

Page 92

1  provided to Modrall?
2       A  I can't say whether they had or hadn't
3  been.
4       Q  Do you know who might know?
5       A  I can't say. I don't know.
6       Q  Let's see. [Julie, can you pull up
7  Osage Wind Priv 000672.]
8            MS. COMBS: Just to clarify. You
9  want to pull that by Bates stamp?
10           MS. BLAKE: If we have the stamped
11 exhibit, that would be great but I don't think we
12 have it yet. It's been previously entered as
13 Exhibit Number 200.
14      Q  (By Ms. Blake) Okay. Mr. Gilhousen,
15 this is another email exchange with Mr. Slade and
16 this one was started by Mr. Freeman, but you are
17 copied here on this email.
18      [Julie, if you could scroll down just
19 so we can kind of get oriented here.]
20      On October 25th, 2013, Mr. Freeman here
21 says that -- so, down here at this part of this
22 email exchange the subject is GMK revisions to
23 draft letter. I assume that LTR is letter. WCG
24 to OMC. And you're also copied on that part of
25 the email.

Page 93

1       Do you -- do you know, does WCG mean
2  Wind Capital Group?
3       A  I don't know. I would assume so, but I
4  don't know.
5       Q  And, then, so Mr. Freeman here says
6  "I'm afraid to ask given the long call yesterday
7  but I have been quietly wondering if there is some
8  specific activity affecting minerals that, by
9  definition, triggers involvement of the BIA."
10      [And then if we scroll up a little bit,
11 Julie, to Mr. Slade's reply.] You can see he
12 replies that same day.
13      And then in the last -- the second to
14 last sentence of that email he says, "We will
15 contend that simply moving dirt does not require a
16 mineral lease or permit."
17      What was your understanding of what
18 Mr. Slade meant by "simply moving dirt"?
19      A  I can't -- I can't speculate on that.
20      Q  Do you have your own understanding?
21      A  Like I said, I don't believe that there
22 was any point in time where we felt that building
23 the wind project constituted mining.
24      Q  Yeah, I understand that. But did you
25 have any kind of idea what it would mean to just

Page 94

1  simply move dirt?
2      A  Common vernacular would be you're
3  pushing dirt around, digging holes, building
4  roads, that kind of thing.
5      Q  Okay.  Then Mr. Freeman mentions -- had
6  mentioned in his email a long call.  Was that --
7  let's see.  Hold on.  Would information regarding
8  construction have been provided during that call?
9          MR. BALL:  Objection.  Form.
10         THE WITNESS:  I don't know.
11     Q  (By Ms. Blake)  Let's see.  Do you know
12  if Mr. Slade based his characterization on simply
13  moving dirt off of information that Tradewind had
14  provided to him?
15         MR. BALL:  Objection to form.
16         THE WITNESS:  I don't know the
17  answer to that question.
18     Q  (By Ms. Blake)  Do you know who might
19  know the answer to that question?
20     A  No.
21     Q  Okay.  Let's see.  Okay.  Let's go to
22  -- oh, I guess one more question would be.  Was
23  Wind Capital Group at all involved with Mustang
24  Run?
25     A  Sorry.  Say that again, please.

Page 95

1      Q  Was Wind Capital Group involved with
2  Mustang Run?
3      A  Not to my recollection, no.
4      Q  [And then, Julie, if you can scroll up
5  just a little bit.]
6          So in this last email to Mr. Freeman
7  you're copied up there as well.  Mr. Slade says
8  down here in his very last sentence that he's
9  interested in Connie's perspective on these
10  issues.  Do you know who Connie is?
11     A  I do not.
12     Q  Do you have any understanding why
13  Mr. Slade would be interested in her perspective?
14     A  I do not.
15     Q  Okay.
16         [Julie, can you scroll up just a little
17  bit.]  Is it possible that Connie is -- as you see
18  here in the 2 line there's Constance L. Rogers.
19  Is it possible that Connie is Constance L. Rogers?
20         MR. BALL:  Objection to form.
21         THE WITNESS:  I can't speculate on
22  that.  Sorry.
23     Q  (By Ms. Blake)  No, that's totally
24  fine.  Okay.  All right.
25         [Julie, if you could pull up Exhibit

Page 96

1  Number 36.]
2          So this is Bates stamped Osage Wind
3  Priv 000414.  Once we get it up.  And this is a
4  memorandum from Sarah Stevenson to Bill Scott and
5  it's dated October 31st, 2013.  So this is just a
6  week or two after the email exchange we just
7  looked at.
8          Have you seen this memorandum before?
9      A  I don't recall seeing it, but it's
10  possible.
11     Q  Okay.  Do you know who asked Modrall to
12  write this email?
13     A  I don't recall.
14     Q  Okay.  Do you know who might recall?
15     A  Nope.
16     Q  Do you know where Modrall might have
17  gotten the information -- or, sorry, gotten the
18  facts on which to base this memorandum?
19     A  I do not.
20     Q  I'm just checking my outline.
21         Do you know if Tradewind asked Modrall
22  to do this research?
23     A  I don't recall.
24     Q  Is there anybody at Tradewind that
25  would recall?

Page 97

1          MR. BALL:  Objection to form.
2          THE WITNESS:  I can't say if they
3  would or wouldn't.
4      Q  (By Ms. Blake)  Sorry, I'm just looking
5  through my outline.
6          Do you know if this analysis affected
7  the construction plans in October of 2013?
8      A  I do not.
9      Q  Do you know if the analysis in this
10  memorandum was acted upon for purposes of the
11  construction plan?
12     A  I can't say.  I don't know.
13     Q  [Julie, can you take that one down for
14  me.]  Let's see.  Who would know if the analysis
15  and the memorandum was implemented?
16         MR. BALL:  Object to the form.
17         THE WITNESS:  I don't know what
18  the emphasis of that memorandum is, so I can't
19  opine on those questions.
20     Q  (By Ms. Blake)  Do you know who would
21  have made a decision whether to follow advice of
22  counsel or not?
23     A  That was standard operating procedure,
24  was to act on advice of counsel.
25     Q  And how -- okay.  Let's see.  And who

Page 98

1 usually was involved in receiving the advice about
2 -- or who communicated with outside counsel
3 regarding advice typically?
4        MR. BALL: Objection. Form.
5        THE WITNESS: The same individuals
6 as I mentioned previously. My staff and my
7 colleagues, Rob and Geoff.
8    Q   (By Ms. Blake) So everyone -- was
9 everyone on the Tradewind/Osage team have been
10 involved with discussions with outside counsel?
11        MR. BALL: Objection to form.
12        THE WITNESS: I'm not saying that
13 everyone was. I'm saying that it's possible. It
14 wouldn't have been out of the ordinary course of
15 business for various department leads and project
16 managers as well as management of the company to
17 be engaged with outside counsel on various
18 matters.
19    Q   (By Ms. Blake) Okay. [Julie, can you
20 pull up Exhibit Number 107. This is stamped Osage
21 Wind Priv 000577.]
22        And this is another version of the memo
23 that's dated May 19th, 2014. And this is before
24 the September 2014 sale of the project to Enel.
25 So this is to Steve Willman, Tradewind Energy. Do

Page 99

1 you recall ever seeing this version of the memo?
2    A   I do not.
3    Q   Okay. And do you know why Steve
4 Willman would have needed an updated version of
5 the memo on May 19, 2014?
6    A   I do not.
7    Q   Do you know who might know?
8    A   I do not.
9    Q   Okay. Do you know if any of the
10 analysis here affected the construction plans at
11 all?
12        MR. BALL: Objection to form.
13        THE WITNESS: Again, I don't know
14 what the findings of the memo are, so I can't say.
15    Q   (By Ms. Blake) Okay. I'm just looking
16 at my outline to see. Let's see what's left.
17        [Julie, if we could go back to -- if we
18 could go back to Exhibit Number 89. Okay. So
19 let's go to -- let's go down to Mr. Gilhousen's reply
20 of October 11th. There we go. Right there.
21 That's perfect.]
22        Let's see. So do you know -- do you
23 recall how the research that you referred to in
24 here was implemented in either your development
25 plan or your construction plan?

Page 100

1        MR. BALL: Objection. Form.
2        THE WITNESS: I do not.
3    Q   (By Ms. Blake) And, sorry, I'm going
4 to ask again. Do you know who would know the
5 answer to that?
6    A   I don't.
7    Q   Let's see. So the last sentence -- or,
8 let's see, no, sorry, that's the third to the last
9 sentence. You say, "I wouldn't stop anything
10 until someone shows up with a TRO as we have done
11 nothing wrong."
12        Now that the Tenth Circuit has issued a
13 decision concluding that Enel and Tradewind were
14 required under law to obtain a permit from the
15 Osage Nation prior to mining the Osage Minerals
16 estate, is it still your opinion that you would
17 not have to obtain a permit unless there's a TRO?
18        MR. BALL: Objection to form.
19        THE WITNESS: I'm not aware of the
20 details of what has or hasn't been decided by the
21 court. If I was developing a project now, I would
22 definitely have to reeducate myself on what's
23 required.
24    Q   (By Ms. Blake) Okay. Let's see.
25        [Julie, can you pull up Exhibit Number

Page 101

1 38, please.]
2        This is the letter that was being
3 discussed in that email chain that we just went
4 back to. And it's Bates stamped Osage Wind Priv
5 000243.
6        Let's see. In the last paragraph,
7 [Julie if you could scroll up] you can see the
8 date on this is October 9t, 2014. And it's to
9 Mr. Francesco Venturini. [And If you could scroll
10 up a little bit, please, Julie. Yeah, just scroll
11 all the way up. We're going to go to the last
12 paragraph. There we go. Just so we can see the
13 whole body of the letter. Thank you.]
14        So the last paragraph says, "You are to
15 refrain from any further excavation of minerals
16 until such time that you have obtained a sandy
17 soil permit through the Osage agency. Do you see
18 that sentence?
19    A   I do.
20    Q   Do you know if excavation of the
21 project has ever halted like Superintendent
22 Phillips directed in her letter?
23        MR. BALL: Objection to form.
24        THE WITNESS: I'm not aware of
25 that.

Page 102

1  Q (By Ms. Blake) Okay. Let's see. Do
2  you know who might be?
3  A Whoever was responsible for
4  constructing the project.
5  Q Okay. Would that be someone at Enel or
6  at Tradewind?
7  MR. BALL: Objection to form.
8  THE WITNESS: Someone at Enel.
9  Q (By Ms. Blake) Okay. Let's see. Do
10 you know if the memorandum that I shared with you
11 in Exhibit 36 would have played any role to
12 continue in the decision to continue construction?
13 MR. BALL: Objection. Form.
14 THE WITNESS: I can't speculate on
15 that.
16 Q (By Ms. Blake) Let's see. Do you know
17 if Enel or Tradewind ever attempted to get a sandy
18 soil permit that Superintendent Phillips refers to
19 here?
20 A Not to my knowledge.
21 Q And do you know why that is?
22 A My recollection was that we didn't
23 believe the project needed a sandy soils permit.
24 And that's, again, based on not receiving the
25 indication that that was required by the tribe or

Page 103

1  by counsel. It was our general belief that we
2  weren't mining; we were building a wind project.
3  Q And just to be clear, so do you -- and
4  you don't have -- you said it was based on the
5  advice of counsel, but do you recollect who asked
6  counsel?
7  A Who asked counsel?
8  Q Uh-huh.
9  A Tradewind would have -- would have
10 asked counsel.
11 Q Okay.
12 A I assume Enel would have as well as
13 Wind Capital, but I can't say for sure.
14 Q And were you part of any of the
15 conversations with counsel?
16 MR. BALL: Objection to form.
17 THE WITNESS: I suspect I was. I
18 can't recall any specific conversations.
19 Q (By Ms. Blake) So do you have any
20 recollection for how much time you might have
21 spent discussing permitting issues regarding the
22 Osage minerals --
23 A I can't -- I can't recall specifically
24 how much time was spent on that, no.
25 Q Okay. Okay. Let's see. Do you know

Page 104

1  -- no. Let's see.
2  Do you know if the decision not to halt
3  construction in response to Superintendent
4  Phillips' letter was made based off of advice from
5  legal counsel?
6  MR. BALL: Objection. Form.
7  THE WITNESS: I don't know the
8  answer to that.
9  Q (By Ms. Blake) Sorry? You don't
10 remember or you don't know?
11 A I don't know. Yeah, I don't know. We
12 weren't building a project.
13 Q Okay. So do you know how that decision
14 was made?
15 A I do not.
16 Q Okay. I think -- let me -- let me
17 check my notes here. I think that might be -- oh,
18 I guess the last question I do have is who at
19 Tradewind would have asked Modrall to do the legal
20 research regarding the permitting?
21 MR. BALL: Form.
22 THE WITNESS: It could have been
23 my direct reports or myself or Rob or Geoff, or
24 counsel.
25 Q (By Ms. Blake) Okay. You just don't

Page 105

1  remember who exactly?
2  A Yeah, I don't remember who exactly had
3  asked.
4  MS. BLAKE: That is, I believe,
5  all. I'm sorry. I'm checking my notes again.
6  Okay. That is all I have.
7  I can pass the witness on to the United
8  States. We can take a lunch break. What do you
9  want to do, Nolan?
10 MR. FIELDS: I definitely want to
11 take a 30-minute lunch break at minimum. I don't
12 know about you, Mr. Gilhousen. Is that something
13 that you can work with?
14 THE WITNESS: Are you saying you
15 do or you don't? I'm sorry.
16 MR. FIELDS: I'm going to, yes.
17 I'm going to take a 30-minute lunch break. So I
18 hope that that works for the rest of you all.
19 Does that time sound decent so we can get started
20 back at, I don't know, like 1:00 Central time?
21 MR. BALL: Sure. Fine with me.
22 THE VIDEOGRAPHER: Off the record
23 at 12:21 p.m.
24 (A lunch break was had from 12:21 to
25 1:01 p.m.)

Page 106

1    THE VIDEOGRAPHER: We're back
2  record at 1:01 p.m.
3        CROSS EXAMINATION
4  BY MR. FIELDS:
5    Q  All right.  Mr. Gilhousen, thank you so
6  much for your time this morning.  You got
7  questions that were asked of you by the attorney
8  for the OMC and now representing the United States
9  I'm going to go ahead and ask you hopefully a
10  different set of questions at least initially.
11  And then I might cover some areas that you
12  previously had testimony regarding.  Can you hear
13  me clearly?  Are these mics picking everything up?
14    A  I can, yes.
15    Q  Okay.  Great.  So in the very beginning
16  of your testimony, Ms. Blake asked you how you
17  prepared for your deposition, and you said that
18  you conferred with Mr. Slade, Mr. Freeman and
19  Mr. Ball; is that correct?  In addition to
20  Mr. May?
21    A  Yeah.  Yeah I spoke to Rob, but we
22  didn't -- we didn't have any lengthy dialog about
23  the case.  It was more coordinating with Kirk and
24  that sort of thing.  So -- but, yes, those are the
25  people I spoke to.

Page 107

1    Q  So to your recollection, no other
2  attorneys for -- involved in this case other than
3  Mr. Slade, Mr. Ball, and so I guess Mr. May just
4  represents you, correct?
5    A  That's correct.
6    Q  When you talked about scheduling, do
7  you recall initially getting the subpoena for this
8  deposition?
9    A  Yes.  It wasn't all that long ago, but,
10  yes, I recall getting that subpoena.
11    Q  And I believe it was originally you
12  were subpoenaed for a date that was before August
13  30th to appear for your deposition testimony,
14  correct?
15    A  I can't remember the exact date, but I
16  believe we did ask for -- ask to push it out a
17  week or so.  A week or two.
18    Q  Okay.  And I'm just trying to figure
19  out why did you need to push it out?
20    A  I believe Kirk was on -- busy with
21  other clients and we received very little notice
22  or time between when I was served and when the
23  actual deposition was.  So it was just trying to
24  get schedules lined up.
25    Q  So it wasn't a schedule conflict on

Page 108

1  your end, but maybe one on Mr. May's?
2    A  Yeah.  It wasn't -- I had -- I think I
3  may have had some travel in there, but, yeah, we
4  were just trying to get a time that was a little
5  further out that would work for everybody.
6    Q  And at that time, did you confer with
7  any representatives from the defendants or their
8  counsel as to the scheduling of when you would sit
9  for your deposition or did you just coordinate
10  with Mr. May alone?
11    A  Just with Mr. May.  I don't recall any
12  conversations with anyone else about the
13  scheduling of that.
14    Q  Gotcha.  Well, thanks for making
15  yourself available.  We do appreciate your time.
16    A  Yeah.
17    Q  When you talked about relying on legal
18  counsel to work through the permitting matrix,
19  which legal counsel worked with you or others at
20  Tradewind Energy to create and maintain that
21  permitting matrix?
22        MR. BALL:  Objection to form.
23        THE WITNESS:  Well, I believe
24  Steve Willman and his team would have been
25  actively involved in looking at that matrix and

Page 109

1  helping populate it and review it.  Enel's
2  counsel, Giuseppe, would look at that as part --
3  part of the sale of the project.  Sometimes even
4  steering the ongoing development.
5        And I think Lynn Slade and those guys
6  probably looked at it as well.  I can't be -- I
7  can't say for sure who all commented on it, but
8  it's ordinary course for the attorneys to review
9  and add comments, et cetera.
10    Q  (By Mr. Fields)  And to give a time
11  frame to when this permitting matrix would have
12  been worked on by all those individuals you just
13  listed, attorneys and members of your team, would
14  that have occurred in a time frame from October
15  2013 to October 2014?
16        MR. BALL:  Objection to form.
17        THE WITNESS:  I don't have a good
18  recollection of exactly when a matrix would have
19  been created or if it was created.  I've not
20  looked at the MIPAs.  I suspect the purchase
21  agreement from Osage that are -- they already had
22  the permits and had a permit matrix.  I'm assuming
23  it was included in that MIPA.  Again, I have not
24  looked at it, so permitting of that project
25  occurred well before our involvement.  So it would

Page 110

1  have been an ongoing living document even -- yeah,
2  into the start of construction.
3      Q   (By Mr. Fields)  Okay.  So to kind of
4  put a finer point on it, you're saying that Wind
5  Capital Group may have already had one when they
6  sold the project to Tradewind based on the August
7  22, 2013 MIPA because -- isn't it fair to say that
8  Tradewind would have wanted to see some type of
9  permitting that was done before you all bought a
10 project that wasn't a greenfield?
11         MR. BALL:  Objection to form.
12         THE WITNESS:  Correct.  Yes.
13 There would have been some level of diligence on
14 the permitting status.  Again, I can't comment as
15 to whether there was or wasn't a permit matrix,
16 but I -- I'd would be shocked if permitting wasn't
17 addressed in the MIPA.
18     Q   (By Mr. Fields)  In considering
19 permitting was one of your areas of responsibility
20 at Tradewind when you all bought the project --
21 when you all bought the Osage Wind project around
22 August 22nd, 2013 from Wind Capital Group, surely
23 you would have been involved in vetting and
24 reviewing that at the time, correct?
25     A   Yeah, we relied heavily on my developer

Page 111

1  and my permitting environmental lead to do that.
2  But I would have been involved in communications
3  with them about the status of the permits.
4      Q   And that individual probably would have
5  been Jenny Dean as your permitting environmental
6  lead on your team?
7      A   Yeah.
8      Q   And so after that MIPA purchasing the
9  project from Wind Capital Group in August of 2013,
10 do you recall seeing a letter from the OMC
11 directed to both CEOs of Wind Capital Group and to
12 Tradewind Energy that was putting both entities on
13 notice of the need for federal mining permits for
14 the project?
15         MR. BALL:  Objection to form.
16         THE WITNESS:  I do not recall that
17 letter.
18     Q   (By Mr. Fields)  [Okay, Michelle, can
19 you pull up Exhibit 90.]  This has previously been
20 entered in the depositions in this case.  It's
21 Osage Wind Priv 427 through 29.  This is a series
22 of emails around October 11th, 2013.
23         [Can you scroll down so we can see
24 what's really entailed here?  Keep on going down.
25 Let's just start from the beginning.  Right

Page 112

1  there.]
2         This looks like the first email in this
3  chain.  It comes in from an attorney by the name
4  of Ian Shavitz with Akin Gump, and he sends it to
5  Mr. Freeman and Mr. Boyce and copies a number of
6  individuals with Bureau of Indian Affairs email
7  addresses and Osage tribe email addresses amongst
8  others.  And it's titled, "Information Request
9  Applicability of Federal Mineral Estate
10 Regulations to Construction of the Osage Wind
11 project."  [Okay, scroll down a little, Michelle,
12 so he can kind of see the content of that email.
13 Perfect.]  Can you see that, Mr. Gilhousen?
14     A   Yes.
15     Q   Okay.  I'll give you a second to look
16 at that short paragraph and then we'll scroll up
17 and go through the rest of the emails in this
18 chain.  Let me know after you've gotten through
19 it.
20     A   Okay.
21     Q   So, again, I'm just giving you a
22 context for additional questions.  [But scroll
23 up.]  So after counsel for the OMC sends across
24 this letter -- or this email with a letter,
25 [scroll up] and we'll see that it was forwarded --

Page 113

1  some emails from Mr. Boyce to Mr. Knapp -- [and
2  then keep going.  And then right here, stop for a
3  second.  I guess scroll up a little so we can
4  see.]  It looks like an email from Wind Capital
5  Group's general counsel, Mr. Knapp, to Mr. Freeman
6  asking him who at Tradewind Energy and which
7  external counsel should they be conferring with
8  regarding the letter.
9      A   Was this before -- was this email
10 string before or after we closed on the
11 acquisition of the projects?
12     Q   Well, the date of your MIPA purchasing
13 it from when Capital is executed, August 22nd,
14 2013.  So this is approximately two months later.
15 But my question to you would be, you tell me.
16 Just because a document was executed, had you all
17 completed the transaction at that point?  Two
18 months later?
19     A   Yeah, I was -- yeah, I don't know when
20 -- I don't when the closing of -- the closing of
21 that transaction was relative to the execution.
22     Q   So how does that work typically on your
23 projects?  When there's a close, I mean, what's
24 the usual lag, if any, between an execution and
25 completion of a close of a sale?

1   A It's entirely transaction specific. It
2   could be --
3       Q What's the --
4       A -- signed -- it could be signed and
5   closed and it could be a year later.
6       Q Well, on this project do you recall it
7   being a year later?
8       A I don't recall. No, I'm not saying
9   that. I don't recall.
10      Q Okay.
11      A I'm asking because I don't know when
12  close was relative to execution of the MIPA. I
13  don't know if it was the day of or some other
14  time.
15      Q No, I totally get it, and I'm with you.
16  And so I -- that's what we're just finding out.
17  Details. I appreciate it. [Okay, so we'll keep
18  scrolling up.] So then it looks like Mr. Knapp
19  emails Mr. Weigel and says, "See below." I guess
20  Rob was out of office. [Keep scrolling.] And
21  then Mr. Weigel loops you in, it looks to be maybe
22  first time on August 10th, 2013, saying, "I
23  shouldn't -- I suppose I shouldn't let things like
24  this surprise me. Darren and Steve, will you guys
25  start with this. Let's confer about whether or

1   not PS needs to support this."
2       Do you know what PS would be?
3           MR. BALL: Objection to form.
4           THE WITNESS: Whether -- what PS
5   means?
6       Q (By Mr. Fields) Yeah.
7       A I'm assuming that's Paul Sinaly, but I
8   can't say for sure.
9       Q Ah, that's probably right. Fair
10  enough. [Okay. Keep scrolling up. Thank you,
11  Michelle.] So then we get to the last email in
12  the chain where Darren Neil, I guess one of the
13  other attorneys working with Willman at
14  Polsinelli's. It says, "Lynn, we received the
15  attached letter from the Osage Minerals Council.
16  Would you be able to review and be available for a
17  call tomorrow?" And you see that there's an
18  attachment that's highlighted in blue. It's a pdf
19  and then another HCM attachment there. Do you see
20  that, Mr. Gilhousen?
21      A Yes.
22      Q And do you see that you're also copied
23  on this email up above?
24          MR. BALL: Objection to form.
25          THE WITNESS: Yes.

1       Q (By Mr. Fields) Okay. Perfect. [All
2   right. You can take that down, Michelle.]
3       And so now I'm going to show you
4   Exhibit 41, what's been previously been entered in
5   this case. It's Osage Wind 1948. It's the letter
6   that was attached to that email dated October
7   10th, 2013, from the Osage Minerals Council to the
8   CEOs of Wind Capital Group and Tradewind Energy.
9       So you can see on their letterhead it's
10  coming from the Osage Minerals Council, and then
11  you see the -- the two blocks of David Boyce for
12  Wind Capital. [And then scroll down a little.]
13  We've got Mr. Freeman with Tradewind. [And scroll
14  down a little bit.] I want you to kind of get a
15  feel -- this is a three-page letter but I'll --
16  I'll break it up in chunks so you can kind of get
17  context for it. [Could you scroll down a little
18  bit more and just give him the content of the --
19  perfect.] So here's the rest of the first page.
20  I'll give you a second to look it over and then
21  I'll ask you a couple of questions. Just let me
22  know when you've gotten through it.
23      A Okay.
24      Q And so I'll represent to you that
25  Mr. Shavitz had a drafting error and then while he

1   did reference at the bottom of the second
2   paragraph the CFR -- 25 CFR Sections 411 and 414,
3   I'd represent to you that he followed that up with
4   an email clarifying that he meant 211 and 214.
5   But anyway, nevertheless. [Can you scroll on to
6   the next page, Michelle, so he can see more?
7   Great. Perfect.]
8       A Okay.
9       Q Okay. So -- [Okay, keep on going,
10  Michelle. Fair enough. Keep scrolling down.]
11  So, I think you could see up to Paragraph 4, so
12  there's the rest.
13      A Okay.
14      Q Okay. [Keep on scroll --I think that's
15  pretty much the end of it.] Okay, so now that
16  you've kind of had a chance to see this, I gave
17  you some context with the emails and you've had a
18  chance to look this over. [Can you scroll back up
19  to the first page? The content?] Do you recall
20  receiving this letter about two months after the
21  MIPA was executed between Wind Capital Group and
22  Tradewind for the project?
23      A Yeah, I don't -- I don't recall the
24  letter, but, I mean, obviously, I was cc'd on it
25  so I must have seen it.

Page 118

1    Q   And so considering some of the
2  follow-up emails that you reviewed with Ms. Blake
3  earlier this morning, that's -- that kind of
4  seemed to spawn from this issue.  Do you think
5  it's fair to say that the Osage Minerals Counsel
6  was putting both Wind Capital Group and Tradewind
7  Energy on notice that it believed that these
8  federal regulations that implicated mining
9  activities applied to the project?
10       MR. BALL:  Objection to form.
11       THE WITNESS:  I -- yeah, I would
12  -- what I just read I would say that that -- I
13  think they're requesting information.  That's
14  really --
15    Q   (By Mr. Fields)  So from a permitting
16  -- okay.  From a permitting perspective --
17    A   I believe they had the information
18  already.  I think this project was -- went through
19  a lengthy local permitting process at the county
20  level, and I think there was a lawsuit that had
21  been undertaken and settled in favor of the
22  project prior to this.
23    Q   So do you have any knowledge what the
24  subject matter of an earlier lawsuit would have
25  been regarding this project?

Page 119

1    A   I do not recall.
2    Q   So if I represented to you that it
3  involved oil and gas mineral as opposed to mining
4  of hard rock minerals would you -- would you
5  understand that that's a separate issue and that
6  would not necessarily be related to the mining
7  that was implicated in this letter?
8    A   No.
9    Q   Okay.  So you're saying that because
10  county permitting and a previous lawsuit had
11  already happened at the time this letter was sent,
12  did you believe at the time that you all didn't
13  need to do any more due diligence regarding this
14  type of permitting as the project moved forward?
15       MR. BALL:  Objection to form.
16       THE WITNESS:  That's -- that's not
17  what I'm saying.  I'm just trying to recall
18  history leading up to this point in time.  And I'm
19  sure there's subsequent documentation of follow-up
20  inquiries and things we may have done.  Inquiries
21  with counsel, communications with -- with the
22  tribe, et cetera.
23    Q   (By Mr. Fields)  So -- and I appreciate
24  that from your -- you have --
25    A   Yes.

Page 120

1    Q   Absolutely.  But at the same time I'm
2  trying to figure out what you knew at the time,
3  and so you mentioned a lawsuit, a previous lawsuit
4  and you mentioned county permitting.  Do you
5  understand, and I'm sure you do, that there's
6  differences between state -- like local, county,
7  state, federal and tribal jurisdictions in
8  permitting?
9    A   I understand the concept of which
10  you're talking about, yes.
11    Q   But you only mentioned county
12  permitting.  So was there some reason that you
13  thought that the county permitting was somehow
14  more controlling than federal permitting, for
15  example, on this project?
16       MR. BALL:  Objection to form.
17       THE WITNESS:  No, I'm not saying
18  one's more important than the other, no.
19    Q   (By Mr. Fields)  I guess I'm trying to
20  get you to acknowledge that there was federal
21  permitting requirements.  An example of which
22  could have been, I don't know, an eagle take
23  permit from an environmental perspective, correct?
24    A   I'm just -- I'm -- yeah, we would have
25  looked at all -- all information in front of us

Page 121

1  and worked with our expert staff and our legal
2  counsel and made the best decisions we could make
3  based on that information and professional
4  judgment.
5    Q   And I appreciate that.  But I guess you
6  said that when this letter came through that you
7  believed that you already had the permitting that
8  you needed, and that you already had a previous
9  lawsuit that had addressed some type of issue, and
10  so I'm trying to understand, if this letter
11  influenced your decision-making on whether
12  additional permits needed to be required?
13       MR. BALL:  Objection to form.  It
14  mischaracterizes his testimony.
15       THE WITNESS:  That -- that wasn't
16  what I said.
17       MR. BALL:  Objection to form.
18       THE WITNESS:  I -- I was just
19  indicating that there were, I believe, prior
20  communications of information and that there had
21  been a prior lawsuit.  I'm not -- I'm not saying
22  anything about the outcome of that or what was
23  tried, what wasn't, et cetera.  I just -- just
24  facts.
25    Q   (By Mr. Fields)  No, I appreciate that.

Page 122

1 Earlier in your testimony when we were -- when Ms.
2 Blake showed you Exhibit 94, I think that you
3 might have had some pause, if you will, trying to
4 determine which of the two project certain emails
5 would have been applicable to.
6      So, like looking in the context of this
7 letter, did you have any concern that this is
8 applicable to the Osage Wind project, or do you
9 think it could also apply to the Mustang Run
10 project?
11      A  With the reference to the Wind Capital
12 folks, I would have to believe it's the Wind
13 Capital Osage Wind project communication.
14      Q  And were you aware at the time in
15 October of 2013 that the Osage Mineral estate
16 underlies all of Osage County and -- were you
17 aware of that?
18      A  I believe -- yeah.  I mean, I believe I
19 was aware of that at the time.
20      Q  And so, I mean, did you -- did you
21 learn that from discussions with counsel?  I guess
22 -- I imagine Modrall Sperling in that they were
23 the Native American like experts that you all
24 hired to assist in aspects of this project,
25 correct?

Page 123

1      MR. BALL:  Objection to form.
2      THE WITNESS:  I can't tell you
3 where I learned about the surface rights versus
4 the mineral estate in Osage County specifically,
5 but I was aware that the mineral estate was held
6 in trust by the BIA for the benefit of the -- the
7 Osage Nation or -- I'm not sure if it's the Osage
8 Nation or the Mineral Council.  But, yes, I was
9 kept aware of that some point along the way.
10      Q  (By Mr. Fields)  So, at the same time
11 it seemed like you were a little unsure when you
12 were speaking with -- with Ms. Blake about whether
13 or not these federal regulations that talked about
14 mining activities could potentially apply to both
15 the Mustang Run project, which is in Osage County,
16 and the Osage Wind project, which is in Osage
17 County.
18      MR. BALL:  Objection to form.
19      Q  (By Mr. Fields)  So, do you -- do you
20 still have any question that you think that
21 somehow these federal regulations for mining would
22 not apply to the Mustang Run project if,
23 hypothetically, excavation work would have
24 happened for the turbines and infrastructure like
25 it did on the Osage Wind project?

Page 124

1      MR. BALL:  Objection to form.
2      THE WITNESS:  My comments prior
3 were about different email communication or
4 various communications that I just couldn't tell
5 from that line of documents whether it was
6 specific to Osage or to Mustang or both.  I'm --
7 I'm not --
8      Q  (By Mr. Fields)  No, I appreciate that.
9 Okay, so at the same time, like, do you think that
10 you or Tradewind would have put more emphasis or
11 effort into a greenfield project like Mustang Run
12 that you all were developing as opposed to a more
13 fully developed project like Osage Wind that you
14 bought from Wind Capital Group?
15      MR. BALL:  Objection to form.
16      THE WITNESS:  We would not --
17 they're different -- it's a different project,
18 different job.  Different activities involved on
19 our end when we're buying a mature project versus
20 a greenfield.  So when you buy a greenfield --
21 when you start a greenfield you start from scratch
22 and go from there.  When you're buying an existing
23 asset you start from the diligence on what the
24 party you're buying it from has done.
25      Q  (By Ms. Fields)  But because both

Page 125

1 projects were in Osage County, both of them
2 potentially implicated the Osage Mineral estate
3 underneath the surface, wouldn't some of that
4 diligence for both projects overlap in that there
5 is the possibility that you may need a federal
6 mining permit pursuant to what Mr. Shavitz is
7 outlining in his letter here?
8      A  My recollection is is that we
9 collectively didn't believe we were mining, nor
10 did we need a mining permit for either project.
11      Q  Prior to the project?  So prior to the
12 purchase?  Oh, --
13      MR. BALL:  He said or/either.
14 E-I-T-H-E-R.
15      Q  (By Mr. Fields)  And what was the
16 earliest point that you acquired that knowledge
17 that a permit would not be required?
18      A  I can't -- I can't say when that
19 exactly occurred.
20      Q  Well, do you think it occurred before
21 this letter was sent on October 10th, 2013?
22      A  I can't -- I can't speculate as to what
23 -- when -- when I came to that -- we collectively
24 came to that conclusion.
25      Q  Okay.  So earlier in your testimony you

Page 126

1  mentioned in context of figuring out which of the
2  emails that we were reviewing were implicating
3  whether Osage Wind or Mustang Run, you said that
4  there were plausible difference -- that
5  differences between the projects would impact
6  whether or not a sandy soil mineral permit could
7  be required.  And then you also said that you
8  recalled spending a lot of time talking with
9  counsel, not believing that mining was happening.
10  That you all didn't need a permit and that you
11  weren't told from the OMC that you needed a
12  permit.
13      Now that you've seen this letter dated
14  October 10th, 2013, and seen the emails that were
15  sent to you, do you believe that you want to
16  update your testimony?
17      MR. BALL:  Objection to form.
18      THE WITNESS:  I don't think we
19  were told that we need a permit.  I believe we
20  were told that if we were mining, we would
21  potentially need a lease or a permit.
22      Q  (By Mr. Fields)  Okay.  Maybe so based
23  on the semantics of what you're saying.  But how
24  about the cease and desist letter you also saw
25  from Ms. Blake that was sent to Mr. Venturini from

Page 127

1  the Bureau of Indian Affairs that was saying, stop
2  the work on the project.  You need this permit.  I
3  mean, at that point you clearly have to admit that
4  you all were on notice that you needed the permit,
5  correct?
6      MR. BALL:  Objection to form.
7      THE WITNESS:  I -- I wasn't in --
8  I was no longer the owner of the -- our company
9  was not the owner and didn't own the project and I
10  wasn't -- yeah, that wasn't addressed to me, and I
11  wasn't responsible for the construction.
12      Q  (By Mr. Fields)  So you have ongoing
13  duties after the sale of the MIPA occurred on
14  September 17th, 2014, on a project that Tradewind
15  developed for one of its minor shareholders, Enel
16  Green Power North America, or Enel Kansas,
17  correct?
18      A  I believe there -- you showed me a
19  development agreement earlier.  I don't know what
20  the scope of it was.  But I -- it appears there
21  was a post closing development obligation, yes.
22      Q  And so it's true that certain employees
23  from Tradewind would have continued working on the
24  project after the date of the execution of the
25  MIPA of September 17th, 2014.  And I mean, that's

Page 128

1  pretty clear from the communications and from
2  previous testimony.  So would you admit --
3      MR. BALL:  Objection to form.
4      THE WITNESS:  I don't understand
5  the question.
6      Q  (By Mr. Fields)  Okay, I can rephrase.
7  A second ago I believe you just said that you
8  wouldn't have worked on this project after the
9  MIPA was over.  So September 17th, 2014 you
10  wouldn't have been responsible for the project.
11      A  I -- we no longer owned the project and
12  we were not responsible for the project.  We were
13  not responsible for construction.  There may have
14  been some assist -- we may have been there to
15  assist to do certain discrete things.  You'd have
16  to look at the development agreement to see what
17  those specific things could have been and then
18  look further to determine whether any of those
19  were actually requested or needed of us.
20      Q  And so this was not the only project,
21  the Osage Wind project, that you all sold to Enel
22  or Enel Green Power North America or Enel Kansas
23  from 20 -- from 2006 through, I don't know, 2016,
24  correct?
25      A  Correct.

Page 129

1      Q  And so on those other projects, I mean,
2  was it typical that even though you would have
3  sold the assets to an underlying project that you
4  developed that there may be some additional
5  responsibilities that may be ongoing after the
6  date based on the aspects of those individual
7  projects, correct?
8      A  Yes.
9      Q  And so turning to the Osage Wind
10  project, considering there were Enel Green Power
11  North America board members as minority
12  shareholders of the Tradewind, and Tradewind had
13  just completed the MIPA to sell assets of the
14  Osage Wind project to Enel Kansas, I mean, the
15  coordination that was ongoing from August 2013
16  through October 2014 are -- between the two MIPAs
17  would have continued even though Tradewind had
18  technically sold the asset to Enel Kansas,
19  correct?
20      MR. BALL:   Objection to form.
21      THE WITNESS:  No.  The -- our --
22  we would -- we sold the project to Enel.  They own
23  the project.  They're responsible for construction
24  of the project and operations.  We would have been
25  in a support role to the extent there was a

Page 130

1  development agreement in place that would have
2  outlined the extent of our responsibilities.
3      We -- our job was to develop projects,
4  not to engineer and construct and operate.  So we
5  -- our job was to go work on other projects that
6  needed our area of expertise, not to focus on
7  engineering, means, methods, construction,
8  construction management, operations.
9      **Q   (By Mr. Fields)  No, I appreciate that,**
10  **and frankly before the MIPA was even sold, or the**
11  **MIPA was executed on September 17th, 2014, before**
12  **that time period, for the year before that, you've**
13  **already testified that, you know, Enel was in**
14  **charge of the construction and they were the ones**
15  **that were like running the construction because**
16  **Tradewind didn't have that in it's -- in it's --**
17  **that's not what you all did, correct?**
18      MR. BALL:  Objection to form.
19  Misstates testimony.
20      THE WITNESS:  Correct.
21      **Q   (By Mr. Fields)  Right.  Okay.**
22  **Exactly.  So, I mean, the fact that Enel Green**
23  **Power North America was already running the**
24  **project's construction and engineering aspects**
25  **before the MIPA was completed on September 17th,**

Page 131

1  **2014, I mean, they would have continued that after**
2  **the MIPA was executed.  You're just saying that**
3  **Tradewind's development piece would have been**
4  **completed?**
5      A  Correct.
6      MR. BALL:  Objection to form.
7      **Q   (By Mr. Fields)  Okay.  So --**
8      A  With the exception of whatever post
9  closing obligations there might be outlined in the
10  contracts.
11      **Q   No.  And I -- and that's exactly right.**
12  **And so at the same time if I was to tell you, to**
13  **represent that Mr. Freeman testified a few days**
14  **ago that some of Tradewind's employees, in his**
15  **words, I might be misconstruing, were like loaned**
16  **out to Enel Green Power North America or Enel**
17  **Kansas to kind of like keep working on the project**
18  **to get certain aspects done.  It's possible that**
19  **would have been in line with the agreements and**
20  **ongoing responsibilities that you're saying could**
21  **have been included in the development agreement or**
22  **otherwise?**
23      MR. BALL:  Objection.
24  Mischaracterizes Mr. Freeman's testimony, and
25  objection to form.

Page 132

1      **Q   (By Mr. Fields)  You can answer.**
2      A  I would -- I don't know what to say
3  other than point you to the development agreement.
4  It says what our post closing development
5  responsibilities are.  The MIPA would state that
6  as well.  And we -- we wanted to do as little as
7  possible post closing so we could focus on what
8  our role was and our job was as business, which is
9  developing wind projects and solar projects.
10      So --
11      **Q   But, is he --**
12      A  And furthermore, just because it says
13  we had some obligation in that document doesn't
14  mean it actually was required or was done.  To
15  just -- I'm not trying to be controversial here.
16  I'm just trying to make the point that we only did
17  what we were asked to do contractually, nothing
18  more, nothing less.  And sometimes these documents
19  have a litany of things that we might be asked to
20  potentially do, but it wasn't applicable at the
21  end of the day for any given -- that given
22  project.
23      **Q   No, I appreciate that.  I mean, one of**
24  **those things that could fit that category is**
25  **Ms. Blake showed you some construction**

Page 133

1  **responsibilities regarding keeping detailed**
2  **records of the amount of certain excavations that**
3  **were occurring.  Do you think it's possible that**
4  **keeping those records of excavations might have**
5  **been one of the things that was listed in a**
6  **contract but actually didn't get done?**
7      MR. BALL:  Objection.
8  Mischaracterizes the evidence.
9      **Q   (By Mr. Fields)  You can answer.**
10      A  To -- the answer is no.  I mean, we --
11  to my knowledge we never that was an EPC contract
12  I believe I was shown earlier, and was not between
13  Tradewind.  It was between Enel or one of their
14  subs  and the contractor.  We don't -- that's not
15  our job.  That's not what we -- what were involved
16  in on this project.
17      **Q   Because Tradewind was more of the**
18  **developer, not the construction manager so much?**
19      A  Yeah.  We -- we didn't manage the
20  detailed engineering and we didn't manage
21  construction and we don't operate.
22      **Q   So considering -- I think you**
23  **previously testified that this might have been the**
24  **only project, the Osage Wind project, that**
25  **Tradewind bought from Wind Capital Group.  Did --**

Page 134

1  yeah, that's correct, right?  It's the only one
2  that you recall?
3      A  It's the only one I recall.
4      Q  So based on the experience that you all
5  had at Tradewind with Wind Capital Group, did the
6  -- the way this project unfolded lead to not
7  wanting to accept any more projects from the Wind
8  Capital Group going forward?
9          MR. BALL:  Objection to form.
10         THE WITNESS:  No.
11     Q  (By Mr. Fields)  Relative to the -- oh,
12 yeah.  One question I had was, earlier in your
13 testimony you said that, I think, when Ms. Blake
14 asked you approximately how many projects I could
15 guess you had worked in your tenure at -- wind
16 farm projects specifically in your tenure at
17 Tradewind, I'm not sure -- you kind of gave a
18 number of what you would estimate that to be.
19         So if you had to make an estimate,
20 approximately how many projects off the top of
21 your head that were wind farm projects did you
22 work on at Tradewind in the development role?
23     A  I guess I -- I could only answer that
24 if you give me more information as to what worked
25 on means.  I mean, I -- I -- again, I -- my team

Page 135

1  was responsible for siting wind projects all
2  around the country and solar power projects, so we
3  would look at many projects before we do a range
4  of different varying levels of work on projects.
5  Some -- some advance projects, you know, it was
6  tens of projects.  It could be 100 projects.  The
7  number of projects that we installed
8  meteorological towers on and did preliminary
9  investigative work on could be thousands.
10     Q  Okay.  Let me be more specific then.  I
11 think that the capacity of this project was 150
12 megawatts?  Does that seem like a fair industry
13 term, or am I totally misstating something?
14     A  No, you're -- you got it right.
15     Q  Okay.  So off the top of your head, if
16 you scaled -- or if you tied to think about how
17 many other similar to size wind projects, I don't
18 care about solar, I don't care about just
19 meteorological siting or whatever, approximately
20 how many similarly sized projects to the Osage
21 Wind project do you recall developing in your
22 tenure at Tradewind?
23         MR. BALL:  Objection to form.
24         THE WITNESS:  We -- you're talking
25 about successfully developed projects that we --

Page 136

1  that ended up getting built?
2      Q  (By Mr. Fields)  Yeah, that's --
3      A  By some other third party?  There's
4  probably -- shit -- sorry.  Pardon my French.
5  Five to 10,000 megawatts.  And that number would
6  have been much smaller at the time of this
7  project.  It may have been a thousand.
8      Q  So you -- okay.  So you said five to
9  10,000 megawatts.  Is that the scope of the
10 project or is that the number of projects you
11 think that fit that category?
12     A  That's the total number -- the projects
13 range from 100 megawatts, 50 megawatts to 500
14 megawatts.  So, yeah, it -- whatever five thousand
15 divided by 200 is might give you an approximate
16 number.
17     Q  Now you're making me do math.  Jeez.
18 Okay.  I can do the math off line.  I appreciate
19 that.
20         So maybe 25?
21     A  If --
22     Q  Roughly?  Maybe?
23     A  Yeah, it could be 25, it could be 50.
24 I just --
25     Q  Okay.  It's probably less than 100?

Page 137

1  Okay.
2          And so out of whatever that number is,
3  25 to 100 wind projects of somewhat similar
4  comparable size you only bought one from Wind
5  Capital Group?  And so --
6      A  Correct.
7      Q  Based on your experience with this
8  project, the Osage Wind project, were there any
9  aspects of purchasing a somewhat matured project
10 that was not a greenfield that would have made you
11 think twice after your experience on the Osage
12 Wind project?
13         MR. BALL:  Objection to form.
14         THE WITNESS:  You mean think twice
15 about buying a project from Wind Capital Group?
16     Q  (By Mr. Fields)  Or another party as
17 opposed to developing it on Tradewind's own as a
18 greenfield?
19     A  No.
20     Q  So you're saying -- is it fair to say
21 there was not additional complications of not
22 doing the development in-house like a greenfield,
23 and that by buying it in this example from Wind
24 Capital Group didn't add levels of difficulty that
25 you wouldn't have had if you were able to start it

Page 138

1 from scratch yourself?
2          MR. BALL: Objection to form.
3          THE WITNESS: Yeah. I would -- I
4 would answer no to that question.
5      Q  (By Mr. Fields) Why?
6      A  There's advantages and disadvantages of
7 buying a mature project versus an immature one.
8 This would not -- we wouldn't have bought it if we
9 didn't think it had advantages. I think that's
10 kind of obvious because we bought it.
11     Q  But as you sit here --
12     A  I'm not try be to go flippant. I just
13 -- there are advantages, right? So --
14     Q  No, I agree. But as you sit here seven
15 years later in a deposition, your second
16 deposition of your career, do you think it's
17 possible that things could have been handled
18 differently, at least from a permitting
19 standpoint, in the year of 2013 to 2014?
20         MR. BALL: Objection to form.
21         THE WITNESS: No. I mean, I --
22 this was a robust team of professionals.
23 Professional attorneys, power project developers,
24 finance people, turbine suppliers and everybody --
25 the project got built, which everybody felt like

Page 139

1 we were doing things on the up and up and we -- it
2 passed all -- all the scrutiny that any project
3 would go through. So I feel very good about --
4 about that project.
5      Q  (By Mr. Fields) So by -- the 25 to 100
6 other projects of similar size and scope, how many
7 of them resulted in federal litigation?
8         MR. BALL: Objection to form.
9         THE WITNESS: None that I'm aware
10 of.
11     Q  (By Mr. Fields) And, I guess, how many
12 of those 25 to 100 projects resulted in a Native
13 American tribe suing to try to get compensation
14 for minerals that were excavated without a permit?
15     A  Is that what -- is that what they're
16 being sued for?
17     Q  Amongst other things, yes.
18     A  I thought it was crushing rock, but --
19 sorry, what was the question?
20     Q  (By Ms. Blake) How many of the 25 to
21 other 100 similarly sized projects resulted in
22 lawsuits where Native American tribes were having
23 their minerals taken without a permit that you can
24 recall?
25         MR. BALL: Objection to form.

Page 140

1          THE WITNESS: I'm not going to
2 acquiesce to us doing anything wrong with respect
3 to mining, so I --
4      Q  (By Mr. Fields) I'm not asking you to
5 acquiesce anything. I'm asking you if you recall
6 any other projects where a Native American tribe
7 filed a lawsuit -- or believed that a lawsuit
8 should have been filed to vindicate their rights
9 where their minerals were being taken without a
10 permit.
11         MR. BALL: Objection to form.
12         THE WITNESS: Not to my knowledge.
13 I don't know any others.
14     Q  (By Mr. Fields) Okay. And, I mean,
15 because there were unique issues to the Osage Wind
16 project that required outside counsel to be
17 procured in the Modrall Sperling firm there were
18 aspects to this project that made it unique and
19 different from maybe the other 25 to 100 similarly
20 sized wind projects that you worked on, correct?
21         MR. BALL: Objection to form.
22         THE WITNESS: The Mustang Run
23 project was another.
24     Q  (By Mr. Fields) But that never got
25 developed, right?

Page 141

1      A  I think it was developed, yes. It was
2 never built, but it was developed. Then there
3 were -- there was another -- they were other
4 projects in the county that -- under development
5 with other reputable developers as well. But,
6 yeah, I mean, projects have unique challenges.
7 This -- this one had the unique attribute of
8 having a mineral estate owned by -- governed by
9 the BIA, or however you want to describe that,
10 held by the BIA for the tribe, and surface rights
11 that were, you know, traditional surface rights in
12 the state of Oklahoma, which have their own -- its
13 own rights of the -- of the surface -- of surface
14 owners via accommodation doctrine, et cetera. So,
15 yeah,  projects have unique attributes, so this --
16 I don't see it as anything beyond that.
17     Q  So if you -- if you're pretty steadfast
18 in your belief, if I'm hearing you correctly, that
19 you all didn't do anything wrong and that the
20 mining wasn't something that you all thought you
21 needed a permit for, why -- in your opinion, why
22 didn't the Mustang Run project go forward, or any
23 other projects in Osage County for that matter?
24         MR. BALL: Objection to form.
25         THE WITNESS: Just to correct --

Page 142

1 correct what you said, I don't believe we were
2 mining. So I don't believe any of us on our side
3 thought we were mining. But -- what was the rest
4 of the question?
5    Q    (By Mr. Fields)  Are you -- what's your
6 opinion on why the Mustang Run project didn't go
7 forward if this Osage Wind project was so
8 successful and became operational?
9        MR. BALL:  Objection to form.
10       THE WITNESS:  Well, because the --
11 the Osage Nation was an active adversary of wind
12 development in Osage County as evidenced by this
13 lawsuit and the prior lawsuits.  And so, yeah, we
14 -- we thought it should be developed -- the
15 Mustang Run project should be developed.  We
16 worked hard to get it permitted and got it
17 permitted and it was just -- at the end of the day
18 it -- it didn't get built and we chose to walk
19 away from it.
20       But it was -- it was -- I mean, I --
21 there's no secret there.  It was opposed by the
22 Osage Nation.
23    Q    (By Mr. Fields)  No, I totally agree
24 with you.  There's no secret about that and, I
25 guess, this project also by the federal

Page 143

1 government.
2        You mentioned earlier that yourself,
3 Mr. Freeman, Mr. Coventry, I guess had board seats
4 on Tradewind; is that correct?
5    A    At one point in time, yes.  I can't
6 remember if -- I don't think I had a board seat
7 initially in the early years.  I don't believe I
8 did.
9    Q    How about the years of 2013 to 2014?
10   A    I -- I can't recall.
11   Q    Well, when you -- when Tradewind was
12 sold to Enel and Green Power North America in
13 March of '19, didn't the shareholders get paid out
14 in that purchase?
15       MR. BALL:  Objection to form.
16       THE WITNESS:  You're asking
17 whether or not the owners of Tradewind got paid
18 when Tradewind was sold to Enel?
19   Q    (By Mr. Fields)  Yes.
20   A    Yes.
21   Q    And, I mean, you were one of those
22 owners at that point, correct?
23   A    Yes, I was a minority shareholder at
24 that point.
25   Q    And so, I mean, that would have been --

Page 144

1 I'm not asking you how much you made, but that
2 would have been some type of financial payday,
3 right?
4    A    We sold our company.  We didn't sell --
5 this project had already been sold, so we were not
6 selling --
7    Q    I'm not asking you about -- I'm not
8 asking you about Osage Wind.  I'm asking about you
9 personally.  Did you have a financial gain when
10 Tradewind sold in March of 2019 to Enel Green
11 Power North America?
12   A    Yes.
13   Q    Okay.  So going back in time, I mean,
14 because you made some type of financial gain, you
15 had an interest in, and a stake in making sure
16 that Tradewind was successful, correct?
17   A    Yes.
18   Q    And so you're telling me you don't
19 recall when you got a board seat on something that
20 had been a career for like over, I don't know,
21 almost two decades?  You don't remember when you
22 got a board seat?
23       MR. BALL:  Objection to form.
24       THE WITNESS:  I do not remember
25 when I got a board seat.

Page 145

1    Q    (By Mr. Fields)  Okay.
2    A    I mean, I -- yeah, I just don't
3 remember that date for the purpose --
4    Q    How many board members -- yeah.  When
5 -- when you were on the board, at least when it
6 sold in March of 2019, how many board seats were
7 there on Tradewind's board?
8        MR. BALL:  Objection to form.
9        THE WITNESS:  Five.
10   Q    (By Mr. Fields)  And so, were three of
11 those comprised of yourself, Mr. Coventry and
12 Mr. Freeman?
13   A    Correct.
14   Q    And so you all would have had a
15 majority stake in controlling board decisions if
16 you all voted as a block?
17   A    Incorrect.
18   Q    Please explain.
19   A    I -- I don't have the legal docs in
20 front of me, but we did not have -- we did not
21 have -- it wasn't a simple majority vote required
22 to make material decisions for the business.
23   Q    Did you all have different classes of
24 ownership shares of Tradewind?
25   A    Yes, at various points in time.

Page 146

```
1     Q   So it would have been a conflict --
2     A   I can't -- I can't speak to the nature
3  of those relative to Class A versus Class B, and I
4  can't tell you -- and too, I don't remember -- it
5  wasn't --  yeah, that was not my primary job.
6     Q   Okay.  So your prior testimony you said
7  that once Enel Green Power North America made an
8  investment as a minority shareholder in Tradewind,
9  they got one or a couple of board seats, correct?
10    A   They -- to my recollection they always
11  had two board seats.
12    Q   And while you listed a couple of the
13  people that might have been on the board,
14  including Mr. Storch -- Mr. Storch, Volpe,
15  Venturini and the two Gorgios, no one else comes
16  to mind?
17    A   David Post may have been on the board
18  as well.  I think I saw his name earlier in one of
19  these documents and that -- it jarred my memory
20  but I think he was on the board.  I can't say for
21  certain.
22    Q   Correct.  But he was another Enel Green
23  Power North America employee, correct?
24    A   Correct.
25    Q   Okay.  And so even though you don't
```

Page 147

```
1  know when you got your board seat and you're not
2  sure how -- it wasn't a simple majority vote, at
3  some point in time if Enel Green Power North
4  America had two of the five board seats they would
5  at least know what's going on with Tradewind, what
6  projects are in the pipeline, et cetera?
7     A   Yes.
8         MR. BALL:  Objection to form.
9  Assumes facts not in evidence.
10    Q   (By Mr. Fields)  All right.  So going
11  back to this letter that's in front of us still
12  from October 10th of 2013, it's your testimony
13  that this was not the OMC telling when Capital
14  Group and Tradewind that you all needed these
15  permits, it was them simply letting you all know
16  that these permits might be needed?
17    A   I believe it was a request for
18  information and, yes, letting us know if a permit
19  was required.
20    Q   Okay.  [Can you scroll down, Michelle,
21  to the second page.]  These bullet -- these
22  numbered points right here, they say, "Some
23  initial information from the Osage Minerals
24  Council requires to make the necessary regulatory
25  determinations includes the following.
```

Page 148

```
1         Number 1, Types of soil materials
2  located below the areas of excavation at the
3  project site.
4         Three, Dimensions of the foundations to
5  be excavated for; A, the construction of each
6  turbine; B, the construction of other project
7  features including but not limited to roads,
8  transmission line poles, towers, buildings,
9  meteorological towers collectively that ancillary
10  project features.
11        Four, Amount of cubic yards of the
12  solid materials that will be excavated by the
13  construction of; A, each turbine; and, B,
14  ancillary project features."
15        So those items one, three and four,
16  were those areas of information that Tradewind
17  would have been capable of answering and
18  responding to that were in Tradewind's area of
19  expertise?
20        MR. BALL:  Objection to the form.
21        THE WITNESS:  We could have --
22  could have and may have provided assumptions with
23  respect to those numbers.
24    Q   (By Mr. Fields)  To who?
25    A   To the Mineral Council or to the Osage
```

Page 149

```
1  Nation.
2     Q   You're saying hypothetically you could
3  you have, or you don't recall that Tradewind did?
4     A   I'm saying a couple of things.  We --
5  we don't do the final engineering so the means and
6  methods of excavating, the final dimension of the
7  foundation, the amount of cubic yards, the type of
8  turbine, final solid materials location, that's
9  all final engineering -- determined by final
10  engineering.
11        So I -- we could provide an industry
12  standard that we might use an excavator to dig a
13  hole and the hole might be roughly X wide by X
14  feet, and this is generally the type of turbine.
15  But we don't have the detailed engineering to do
16  -- to provide the specifics.
17    Q   And Tradewind -- Tradewind --
18    A   That may be a nuance to you, but --
19  and, then, my other point is that I believe -- my
20  recollection is that this information was provided
21  to a whole host of stakeholders, including the
22  Osage Nation.
23    Q   So we looked at some exhibits earlier
24  that talked about blasting on the project.  So if
25  there would have been differences in what was
```

Page 150

1  expected and then what actually happened, once the
2  ground started to be disturbed, was that
3  information that was supplied to all these
4  stakeholders supplemented because blasting would
5  have been a different method of excavating than
6  just typical digging with equipment?
7          MR. BALL:  Objection to form.
8          THE WITNESS:  I can't -- I don't
9  know how to answer that.  I --
10     Q  (By Mr. Fields)  So you don't know?
11     A  Yeah, I don't -- I don't build wind
12  farms.  I develop them.  So I don't know -- I've
13  never done that job, so I don't know how or what
14  Enel would do, or a wind farm builder would do in
15  that instance.  That's their job, is to be
16  compliant with their permits and regulatory
17  requirements while they're building it.  It's not
18  our job.
19     Q  So when you interfaced with the Enel
20  team from, I don't know, roughly August of 2013
21  through October of 2014, were you dealing with
22  individuals at Enel Green Power North America
23  directly or was like your outside counsel,
24  Mr. Willman, acting as a gatekeeper on this
25  specific issue regarding the need for a sandy soil

Page 151

1  mineral permit?
2          MR. BALL:  Objection to form.
3          THE WITNESS:  I don't see -- I'm
4  not sure what you're inferring there exactly.  I
5  -- I would have engaged with counsel and Enel
6  staff as needed, as appropriate.
7     Q  (By Mr. Fields)  What I'm getting at is
8  you didn't need to go through Willman to talk to
9  employees of Enel Green Power North America
10  regarding the Osage Wind project.  You would
11  interface with them directly.  You didn't have to
12  -- correct?
13     A  I -- yes.  Yes.  Yes.  Unless there was
14  an attorney/client privilege matter, yes, we would
15  go straight to staff.
16     Q  Got it.  And so on this particular
17  project when it turns into aspects of
18  investigations into if a sandy soil mineral permit
19  was needed and Mr. Willman didn't have that
20  particular legal knowledge, do you recall dealing
21  directly with attorneys at Modrall Sperling?
22     A  I do recall working directly with Lynn,
23  yes.
24     Q  And as Lynn and his team were creating
25  their detailed legal analysis in the form of the

Page 152

1  memo that Ms. Blake put in front of you, a couple
2  versions of it, you don't recall providing facts
3  about the project and the details about the
4  activities that could be considered mining,
5  providing that to Modrall Sperling, do you?
6          MR. BALL:  Objection to form.
7          THE WITNESS:  I would have
8  provided whatever they requested of me to support
9  their work.
10     Q  (By Mr. Fields)  But I think your
11  previous testimony to Ms. Blake was you -- when
12  she showed you the memos and looked at them, you
13  didn't really recall reviewing or getting through
14  the analysis, other than the fact that you relied
15  upon it, correct?
16          MR. BALL:  Objection to form.
17          THE WITNESS:  I just -- I did -- I
18  haven't read -- I haven't read those memos so
19  maybe I did.  I suspect I probably did years ago
20  but I just saw the header of the memo.  I don't
21  know what it says.  And I don't recall what I
22  provided or didn't provide that led to the
23  drafting of those.
24     Q  (By Mr. Fields)  But because you
25  testified --

Page 153

1     A  They're our -- they're are our legal
2  counsel, so I -- I'm just suggesting if Lynn
3  needed something, we would have got him what he
4  needed.
5     Q  Okay.  But considering you've testified
6  pretty -- pretty consistently that Tradewind
7  didn't do construction work, that if there were
8  construction related facts about the project, they
9  would have probably been provided to Modrall by
10  someone or another entity besides Tradewind or
11  you, correct?
12          MR. BALL:  Objection to form.
13          THE WITNESS:  It depends on
14  whether or not we own the project or they own the
15  project and what -- where we are at in the
16  process.
17     Q  (By Mr. Fields)  Well, but I --
18     A  I would have provided preliminary -- I
19  would have provided preliminary -- as I just
20  described earlier, we only had preliminary
21  information to provide, and whoever had the
22  detailed engineering, which would have been Enel,
23  they would have provided the specifics if they
24  were needed.
25     Q  Okay.  But, I mean, are you aware that

Page 154

1  before September 17th, 2014, that excavation work
2  and even potential blasting was taking place on
3  the project site while Tradewind owned the
4  project?
5      A  I don't know specifically what -- what
6  Enel was doing construction-wise.  They have from
7  time to time on various projects started some
8  limited construction work prior to the closing of
9  the sale of the project to Enel.  And that would
10 have been -- there would have been a document in
11 place that gives them the rights and gives them
12 the responsibility for compliance, et cetera,
13 associated with that.
14     Q  And what -- what kind of document would
15 that be called, or -- would that be the
16 development agreement or something else?
17     A  I don't know.  It may have been a
18 letter agreement.  I don't know.
19     Q  I mean, in past testimony we've heard
20 about a partnership agreement between Tradewind
21 and Enel for Tradewind to develop projects and
22 Enel to purchase them if they're interested.
23 That's not the type of agreement you're talking
24 about right here, correct?
25         MR. BALL:  Objection to form.

Page 155

1  Mischaracterizes his prior testimony.
2         THE WITNESS:  Yeah, I -- it is
3  generally consistent with that -- those
4  agreements, yes.
5      Q  (By Mr. Fields)  I guess I'm trying to
6  understand which agreement you could be referring
7  to that would talk about limited like construction
8  activities before a project was sold and that
9  would not be the MIPA, because the MIPA wouldn't
10 have closed yet, correct?
11     A  It may be in the MIPA.  It may have
12 been --
13     Q  Well, it wouldn't -- it wouldn't have
14 been in the September 17th, 2014 executed version
15 of the MIPA, because the work was already ongoing.
16 So it would have to be an agreement that was
17 entered in to before that date, correct?
18     A  Assuming your timeline's right, yeah, I
19 -- there -- there's -- there's some sort of
20 documentation.  If Enel wants to start
21 construction before they close on the purchase of
22 an asset, which happened a couple of times over
23 our long history, there would have been some sort
24 of a communication, a side letter or a
25 construction agreement or something that would

Page 156

1  have given them the rights to do that, et cetera.
2      I  don't -- I can't -- I'm not being
3  coy.  I just don't remember what was done in this
4  particular instance.  What the extent of the
5  pre-sale construction was.  But I know -- I know
6  we weren't responsible for building turbine
7  foundations on the Osage project.
8      Q  And so on this particular project if --
9  if the time lines were getting kind of crunched
10 for whatever reason and the work needed to keep
11 going at a good pace to meet certain deadlines, I
12 mean, it would be beneficial to Enel to be doing
13 some of that construction work before this MIPA
14 with Tradewind would have closed, correct?
15         MR. BALL:  Objection to form.
16         THE WITNESS:  Yeah, there -- it's
17 not uncommon at all for that to happen.
18     Q  (By Mr. Fields)  Okay.
19         [Okay, Michelle, can you pull up
20 Exhibit 94?  Number 2 in our group.]  This is a
21 previous exhibit I believe you've seen earlier
22 today with Ms. Blake.  It's an email from October
23 25th, 2013.  And I believe it's from you inquiring
24 about the regs.  [So scroll down, Michelle,
25 please.]

Page 157

1      So, I believe you saw this earlier in
2  the morning and it was initially initiated --
3  [keep going.]  An email from you on October 20 --
4  right there -- [just scroll up a little bit] --
5  October 25th, 2013, and you send this email
6  directly to Mr. Slade, Mr. Scott, also at Modrall,
7  Mr. Willman, Freeman and Weigel about mineral
8  stats or status.
9      "Can one of you send out the specific
10 language from the statutes that describe what
11 mineral" -- I can't read it because it's blocked.
12 "Something -- related to activity does require a
13 permit from the BIA."  And so, I'm just curious,
14 why do you think you were the person to have to
15 inquire about -- why were you inquiring about
16 these requiring a mineral permit from the BIA on
17 October 25th, 2013?
18     A  Are you -- are you suggesting -- are
19 you saying that the construction in order to be
20 done and why -- why at Enel's?
21     Q  I'm not asking anything other than --
22 my question is, like, why -- do you recall why you
23 were the one to send this email and ask this
24 question?
25     A  I do not have -- I don't know.  I mean,

Case 4:14-cv-00704-GKF-JFJ   Document 442-7 Filed in USDC ND/OK on 11/16/21   Page 42 of 59

Page 158

1  I -- my team is responsible for development of the
2  project, not construction.  So --
3     Q  Right.  And we're just talking about
4  mining.  So I guess my question is, this is two
5  weeks after you received email notice of a letter
6  that was sent to the CEOs of Wind Capital Group
7  and Tradewind Energy from the OMC saying you might
8  need federal mining permits under certain
9  regulations.  And then two weeks later you send
10 this email to a host of attorneys and one
11 subordinate, Mr. Weigel, and your CEO, Mr.
12 Freeman, asking for the specific language of the
13 statutes.  So my question is, why were you the one
14 to send this email two weeks later after receipt
15 of the OMC's letter?
16    A  I can't -- I'm not sure what -- I don't
17 know.  My -- it was part of my job, I guess, at
18 the time.
19    Q  Okay.  So in this instance it looks
20 like you didn't delegate it to Weigel or one of
21 your subordinates.  You, for whatever reason, you
22 sent the email asking for the regs language,
23 correct?
24    A  Correct.  It looks like it says that.
25    Q  [And then scroll up.]  Well, it

Page 159

1  definitely does.
2        And then it looks like Mr. Slade
3  lays it out for you guys.  And ironically, he
4  nails -- hits the nail on the end with two of the
5  statutes that are involved in this litigation.
6  And so after Mr. Slade laid out the language of
7  these regs, what did that -- how did that help you
8  since you had asked for them?
9        MR. BALL:  Objection to form.
10       THE WITNESS:  All I can tell you
11 is we -- we looked at this issue, worked with
12 counsel, and we came to the conclusion that we
13 were not mining and, therefore, we did not need a
14 mining permit or lease.
15    Q  (By Mr. Fields)  But is -- isn't it
16 fair to say that, I guess the letter from the OMC
17 on October 10th, 2013, it did at least serve the
18 purpose of forcing you all to investigate the
19 issue to determine whether or not you needed the
20 permit, correct?
21       MR. BALL:  Objection to form.
22       THE WITNESS:  I -- it appears --
23 yeah.  I mean, it appears we -- we stirred the pot
24 on this topic and came to the same conclusion we'd
25 come to before, that we weren't mining and didn't

Page 160

1  need a permit.
2     Q  (By Mr. Fields)  And, I mean, I guess
3  it's fair to say that before Tradewind brought --
4  bought the project in August of 2013, I would hope
5  at least that Wind Capital Group had some due
6  diligence where they looked into the issue.  But
7  then after that point here, roughly two months
8  later, it looks like Tradewind, the -- the
9  subsequent owner, is then looking into this same
10 issue again.  So I guess that's just doing
11 additional due diligence, correct?
12    A  I think that's an indication of prudent
13 -- prudent development.
14    Q  No, I agree with it -- with the fact
15 that prudent development would be investigating.
16 But I'm trying to figure out what happened next.
17       [Okay, so can you scroll -- or take
18 that down, Michelle?  Can you, then, pull up
19 Exhibit -- what we have numbered 2.1, which is
20 Exhibit 200], which you've already seen Mr. Weigel
21 -- or Mr. Gilhousen.
22       This is Osage Wind Priv 672 through 73.
23 It's an October 25, '13 email from Mr. Slade to
24 Tradewind.  So this is kind of as a follow-up to
25 the email chain that we just read through.  [Keep

Page 161

1  scrolling down, Michelle, so he can see that this
2  is the similar set emails.  Okay.]
3        So this has some of your outside
4  counsel that looks like -- talking about in the
5  subject line, Revisions to the draft of the letter
6  Wind Capital Group to OMC.  This email, the bottom
7  one in the chain, is dated October 25th, 2013,
8  again, two weeks after you all -- you all being
9  Wind Capital Group and Tradewind received the
10 letter from the OMC putting you on notice that
11 these federal mining regs might be applicable, and
12 then these emails I represent to you are draft
13 revisions of a response letter.
14       [So scroll back up.]  You'll see --
15 [right there for a second.  Would you go back down
16 a little bit.  I apologize.]
17       You'll see -- do you know who David
18 Boyce is?
19    A  He was one of the executives at Wind
20 Capital Group.
21    Q  Right.  And so his counterpart, I
22 believe, was Mr. Freeman at Tradewind.
23       I'd represent to you that, you know,
24 like a few days after this email chain, the
25 revisions got finalized and for whatever reason

Page 162

1  Mr. Boyce was the one from Wind Capital Group who
2  responded to the OMC's letter.
3      Do you have any idea why the
4  predecessor in interest of the project would have
5  responded to the letter as opposed to the current
6  owner at the time in October of 2013?
7      MR. BALL:  Objection to form.
8  Assumes facts not in evidence.  In fact, it's
9  contrary to the evidence.
10      THE WITNESS:  Can -- can you
11  confirm that we actually owned it at that time?
12      Q  (By Mr. Fields)  You tell me.  I mean,
13  you guys had signed the MIPA on August 22nd, 2013.
14  I mean, to me, I -- the executed version, I think
15  pretty clearly conveys the ownership interest.  So
16  it's August to September to October, two months
17  later, I mean, are you stating that you --
18      A  I -- the -- it either was or was not
19  owned by Tradewind.  It -- so the document says --
20      Q  Okay, but --
21      A  -- there's a formal closing date there
22  would be a closing -- there's a closing.  I don't
23  know when it was.  So maybe someone else can tell
24  me what -- when it was.  I just would like to know
25  because I can't answer this question or the

Page 163

1  answer's different depending on whether we do or
2  don't own it.
3      Q  (By Mr. Fields)  Okay.  Well, maybe
4  your counsel, or maybe the defendants counsel can
5  cross you on this after I'm done.  But I guess my
6  thing is, let's say that Wind Capital still was
7  the owner.  Would it have surprised you that at
8  that point two months after the MIPA had been
9  executed but maybe not closed, that Wind Capital
10  would have been the entity to send the response to
11  the OMC about why it didn't need this permit?
12      A  Not at all.  That would be standard
13  procedure.
14      Q  Okay.  Now the other hand.  Scenario 2.
15  If the MIPA had closed and been executed on August
16  22nd, 2013, two months later, while Tradewind's
17  the owner, can you think of why the former owner
18  then in that scenario would have been responding
19  about why a certain project that it used to own
20  didn't need a permit?
21      MR. BALL:  Objection to form.
22  Assumes facts not in evidence.
23      Q  (By Mr. Fields)  You can answer.
24      A  I can't speculate other than to say
25  that would not be unusual for the party you bought

Page 164

1  a project from to -- if they've got the
2  relationship and the history to make that
3  communication.
4      Q  Well, in this instance, you said that
5  this is the only time that you ever bought a
6  project from Wind Capital Group.  So if that was
7  the case and that Tradewind was the owner in
8  October 25th, 2013, you're saying it wouldn't have
9  been unusual if you had a history of working
10  together?
11      MR. BALL:  Objection.  Form.
12  Mischaracterizes his testimony.
13      MR. MAY:  I object.  That's not
14  what he answered.
15      Q  (By Mr. Fields)  Okay.  So can you
16  please explain to me why that's an industry
17  standard or something that would have happened if
18  you had a previous working relationship?
19      MR. BALL:  Objection to form.
20  Mischaracterizes the witness's testimony.
21      MR. FIELDS:  Court Reporter, can
22  you please restate what his answer was to my prior
23  question so I can attempt to not misstate whatever
24  he said?
25      THE REPORTER:  I have no idea

Page 165

1  which answer you're wanting me to read.
2      MR. FIELDS:  I want you to read the
3  answer to the second scenario question where I ask
4  him if Tradewind was the owner of the project but
5  Wind Capital Group sent the letter response in
6  October.
7      (The pending question was read back by the
8  reporter.)
9      Q  (By Mr. Fields)  My question to you now
10  is, Mr. Gilhousen, why would that be unusual?
11      A  Because they have -- the prior owner
12  has the history.  They've done all of the work.
13  They have the relationship with whoever the -- the
14  agency is or entity is that they're corresponding
15  with.  It's -- that's --
16      Q  Okay.
17      A  -- not uncommon.
18      Q  But from October 25th, 2013, do you
19  recall any additional direct interactions that
20  Tradewind had with the Osage Minerals Council
21  regarding this project?
22      MR. BALL:  Objection to form.
23      THE WITNESS:  I do not recall one
24  way or the other.
25      Q  (By Mr. Fields)  And so since you all

Page 166

1  -- Tradewind had bought the project and you wanted
2  to, I think, for it to be successful, wouldn't you
3  -- wouldn't it be prudent to attempt to interact
4  directly with members of the local community that
5  it's going to be impacting?
6        MR. BALL:  Objection to form.
7        THE WITNESS:  I know I met with
8  the Osage Nation, the Mineral Counsel and the then
9  chief of the tribe.  I can't tell you when the
10 date was.  I think it was with respect to the
11 Mustang Run project, but I can't tell you with --
12 if Osage was already under construction or not.
13 But that meeting did occur.
14    Q  (By Mr. Fields)  How did it go?
15    A  Very well.
16    Q  Why would you say that?
17    A  I seem to recall they were interested
18 in seeing the Mustang Run project proceed, and we
19 walked away from it with a positive sense of our
20 -- our ability to reengage with Osage Nation and
21 to kind of re, I guess, establish a fresh
22 relationship with them as Tradewind aside from the
23 Wind Capital Group's relationship with them that
24 appeared to be adversarial.
25    Q  So would that have been one of the

Page 167

1  reasons why you all -- Tradewind might have
2  preferred for Wind Capital Group to send the
3  response to the October 10th, 2013 letter that
4  basically said that a permit wasn't needed?  Would
5  that have been the motivation?
6     A  What -- no.
7        (At this time there was a brief
8  interruption by the reporter)
9     Q  (By Mr. Fields)  So if that meeting
10 that you had with the chief or the OMC was before
11 this letter on October 10th, 2013, wouldn't you
12 say that the October 10th, 2013 letter did not
13 comport with the good feelings that you said that
14 you felt walking away about the Mustang Run
15 project?
16       MR. BALL:  Objection to form.
17       THE WITNESS:  I made no -- I made
18 no statement about when that meeting with the
19 tribe occurred.  I don't recall.
20    Q  (By Mr. Fields)  Well, do you think it
21 occurred before you closed on the MIPA buying the
22 project from Wind Capital?
23    A  I -- I have no recollection.
24    Q  Who else was in the --
25    A  I think -- I think it was about -- I

Page 168

1  think it was about Mustang Run, not about the
2  Osage project.  But it's been ages since that
3  meeting occurred.
4     Q  No, I totally get it.  Do you recall
5  anyone else from Tradewind or Enel who was in that
6  meeting with you?
7     A  Steve Willman was in the meeting with
8  me.  I don't recall if there were other Tradewind
9  staff people in that meeting.  I think there was a
10 person from GRDA in that meeting and
11 representatives from the tribe and Mineral
12 Council.
13    Q  Do you think it could have happened
14 maybe in 2015 after this lawsuit was filed?
15    A  I can't -- I honestly do not know when
16 it happened.
17    Q  No, I'm with you.  And I appreciate you
18 trying to remember.
19       So I think you mentioned in your
20 previous testimony that Tradewind would have
21 relied some on Wind Capital Group as the initial
22 developer of the project.  And maybe having some
23 relationships built with the surface owners that
24 were leasing their land to Osage Wind to put the
25 project in on.  And so, do you recall having any

Page 169

1  meetings or direct communications with any of
2  those surface owners that leased the land to Osage
3  Wind for the project?
4     A  I don't remember any of those specific
5  relationships or names.  It's possible I did, but
6  I don't -- I don't recall.
7     Q  How about Mr. -- how about Mr. Cane?
8  Do you -- do you recall ever communicating with
9  Mr. Cane about the project?
10    A  That name sounds familiar, yes.
11    Q  And how about, do you -- do you recall
12 asking Mr. Kane to appear in front of the OMC?
13    A  I do not.
14    Q  Do you recall ever attending any OMC
15 meetings yourself?
16    A  No.  Nothing other than the meeting
17 with the chief and the OMC.
18    Q  So you don't recall -- you don't recall
19 ever -- did you -- were you aware that Mr. Kane
20 appeared before the OMC and --
21    A  I don't recall that.  No, I don't
22 recall that.
23    Q  And so, would it be fair to say --
24    A  I'm not saying it didn't happen.  I
25 just don't recall it.

1  Q  Okay.  Yes, sir.

2     Do you recall ever asking Mr. Kane

3  about the need to get a mineral or a leasing

4  permit for the project?

5  A  I do not, no.

6  Q  Did you know that Mr. Kane was a lawyer

7  and a judge in Osage County?

8  A  That sounds familiar, but I can't say

9  definitively.

10  Q  Fair enough.  I mean, it's all

11 relative, I guess, but Osage Wind -- Osage is not

12 a big county.  They don't have that many people in

13 there, but I believe -- I believe Mr. Kane might

14 have been the district court judge of the county

15 at the time.  Were you aware of that?

16  A  I -- I can't -- I don't know.  It

17 sounds familiar that he was involved in legal work

18 but that's about as much as I remember now that

19 you're saying that.  But I don't remember any

20 specifics.

21  Q  Would it have been a positive thing for

22 the development of the project to have someone

23 like a sitting judge to be an advocate for the

24 project in a local community like Pawhuska,

25 Oklahoma?

1     MR. BALL:  Objection to form.

2     THE WITNESS:  Judges are judges.

3  I mean, you'd have to ask him.  I -- I don't know

4  how to answer that.

5  Q  (By Mr. Fields)  Well, I guess he was

6  also a surface -- one of the surface owners, so I

7  -- I imagine he would have been in favor of the

8  project.  So what I'm getting at is, it would have

9  been helpful to have a surface owner who was

10 interested in the project who also happened to

11 have a position of prominence in the community

12 potentially that would help development, right?

13  A  I would say that's probably not a bad

14 thing.  He would obviously have to deal with

15 whatever conflicts he might have if what you're

16 saying is true.  But yeah, having advocates --

17 active advocates, advocates for a project is good,

18 yes.

19  Q  Going back to your meeting with the

20 GRDA about Mustang Run and the OMC and the chief,

21 I mean, if you walked away from that meeting with

22 a positive feel, do you recall any discussion in

23 that meeting at all going towards the Osage Wind

24 project and concerns that the OMC had?

25  A  No.

1  Q  Okay.  Do you -- I think you said in

2  your testimony, or you represented that it was

3  your belief at the time in October -- in 2013 and

4  2014 that mining was not occurring on the project

5  site, correct?

6  A  Correct.

7  Q  Are you aware that now in 2021 the 10th

8  Circuit Federal Court of Appeals has found that

9  the work that was done, the excavation, the

10 sorting, the crushing, the use the of that rock

11 was in fact mining and required a federal permit?

12     MR. BALL:  Objection to form.

13 Assumes facts not in evidence.

14     THE WITNESS:  I'm not aware of the

15 specifics of what was determined by the court.

16  Q  (By Mr. Fields)  Okay.  Were you aware

17 that at least what the court determined was mining

18 was the same federal regulations that you were

19 asking about in October of 2013 in your emails

20 that Mr. Slade responded to and provided upon your

21 request?

22  A  No.

23  Q  [Okay, Michelle can you take down this

24 exhibit and pull up the next one?  Exhibit 91.]

25     Mr. Gilhousen, I believe this is an

1  exhibit you've previously seen from Ms. Blake.

2  It's previously been entered as Exhibit 91.  It's

3  Osage Wind Priv 357 through 58.  It's an April

4  25th, 2014 set of emails that comprise two months

5  worth of -- I guess of activities.  They began in

6  February of 2014 with Mr. Larson emailing a guy's

7  name I'll butcher.  Blickensderfer, or something

8  else.  [Michelle will scroll down and show it to

9  you again.  Thank you, Michelle.]

10     Okay, so, I know we talked about this

11 earlier but I just had a few follow-up questions.

12 So you said that Justin Larson was an engineer who

13 did design and other work and he was one of your

14 -- you supervised him, right?

15  A  Correct.

16  Q  But you don't recall why Mr. Larson

17 reached out to Mr. Blickensderfer seeking this

18 information on this permit?

19  A  I do not.

20  Q  And so would Mr. Larson at the time in

21 April of 2014, have the autonomy to inquire on his

22 own without your oversight regarding a permit that

23 the OMC six months earlier had said that you guys

24 need, but you claim that you had legal advice that

25 made you think that you didn't need?

Page 174

1    MR. BALL: Objection to form.
2    Misstates the evidence.
3        THE WITNESS: He was -- it was
4    within his purview to ask about anything he
5    thought was prudent.
6    Q  (By Mr. Fields)  Okay.  But if you were
7    so confident that you all didn't need the permit
8    and you were getting memos from counsel as to
9    conclusions that said you didn't need the permit,
10   why six months later are you all still trying to
11   figure out details about this permit that you
12   don't need?
13       MR. BALL: Objection to form.
14       THE WITNESS: I don't know why.  I
15   guess you could maybe ask him.  Maybe there was --
16   there's probably some reason for it.  I don't know
17   what it is.  Maybe it's just being -- again,
18   double-checking and triple-checking and belts and
19   suspenders.
20   Q  (By Mr. Fields)  Well, you said that he
21   reported to you, and so you're ultimately
22   responsible for Tradewind's permitting, but you're
23   saying you don't recall why he was still seeking
24   out information on the permit?
25       MR. BALL: Objection to form.

Page 175

1        THE WITNESS: Yeah, I --
2    Q  (By Mr. Fields)  You can answer.
3        MR. BALL: It's the third time he
4    answered it.
5        THE WITNESS: I said I do not know
6    why he sent this email.
7    Q  (By Mr. Fields)  Do you think that
8    Mr. Larson was unsure if you all may need the
9    permit?
10       MR. BALL: Objection to form.
11   Calls for speculation.  Misstates the evidence.
12   Q  (By Mr. Fields)  You can answer.
13   A  He asked the question.  I don't know
14   why he was asking the question.  I don't know what
15   he thought or didn't think.  He was an engineer.
16   They ask questions.
17   Q  Well, you're an engineer, too.  I mean,
18   you might not have been performing that role in
19   this particular company, but you said you were a
20   civil engineer, correct?
21   A  By schooling.
22   Q  And so in April of 2014, are you aware
23   of any of your other subordinates on your team who
24   were unsure of whether or not Tradewind needed the
25   permit in question?

Page 176

1        MR. BALL: Objection to form.
2        THE WITNESS: I am unaware.
3    Q  (By Mr. Fields)  Did you ask any of the
4    members on your team if they thought that you all
5    might need the permit and maybe the legal analysis
6    from outside counsel was wrong?
7        MR. BALL: Objection to form.
8        THE WITNESS: I don't know.
9    Again, we -- we came to the conclusion through
10   proper diligence that we weren't mining and didn't
11   need a permit.  So I can't comment as to a one-off
12   email when I don't have -- I don't know why he
13   asked it, and --
14   Q  (By Mr. Fields)  Okay.
15       So when did you -- when did you
16   personally form the opinion that the permit wasn't
17   needed?
18       MR. BALL: Objection to form.
19       THE WITNESS: I believe that
20   question's already been asked.
21   Q  (By Mr. Fields)  So what's the answer?
22   A  I don't recall when I formulated that
23   decision.  That --
24   Q  [Okay, scroll up, Michelle.  No, not
25   that far.  Go back down again.]

Page 177

1        So, you'll note that the next email,
2    Mr. Weigel or -- is forwarding this to Mr. Neil,
3    Mr. Willman, your outside counsel at Rouse Frets
4    and to you again, and saying, "FYI."  [And then
5    scroll up.]  Then outside, or general counsel,
6    Mr. Willman, is forwarding this to your
7    specialized outside counsel to deal with Native
8    American issues and including Freeman, yourself,
9    Mr. Neil, Mr. Weigel letting them know that
10   Mr. Willman has received these reports about BIA
11   permitting from this engineering company and he --
12   he would appreciate their input.  Because you were
13   included in this email, do you recall Modrall
14   Sperling providing input on these attachments that
15   were forwarded to them on April 25th, 2014?
16   A  No.
17   Q  Okay.  All right, we'll keep that in
18   mind.  We're going to come back to more questions
19   about this later, specifically regarding
20   Mr. Scott.
21       One of those -- one of those
22   attachments, the first one, is labeled Osage Wind
23   Mineral Permit pdf.  Do you see that in blue?
24   A  Yes.
25   Q  Okay.  [Can you take this down,

Page 178

1  **Michelle.  And then can you pull up 3.2.  Exhibit**
2  **93.]  Previously entered in this deposition and**
3  **other depositions.  Osage Wind Priv 361.  This is**
4  **one of those two attachments -- this is what we**
5  **looked at earlier with Ms. Blake.  The procedures**
6  **for obtaining a sandy soil and rock mining permit,**
7  **Osage County, Oklahoma.  Do you see that at the**
8  **top of it it has the U.S. Department of Interior**
9  **title and like header, if you will?**
10  A  Yes.
11     **Q  Okay.  So before this Osage Wind**
12  **project were you familiar with the Department of**
13  **Interior or the BIA being a federal agency?**
14  A  Yes.
15     **Q  In what context?**
16  A  We worked with Fish and Wildlife
17  Service on multiple projects, and I was -- I
18  don't know how I was aware.  I just was, I guess,
19  casually aware that BIA was part of the federal
20  government.
21     **Q  But at the time you understood that the**
22  **Department of Interior and BIA were U.S. federal**
23  **government entities and separate and apart from**
24  **the Osage Minerals Council or the Osage Nation,**
25  **which is a sovereign government, correct?**

Page 179

1     MR. BALL:  Objection to form.
2     THE WITNESS:  I'm not sure -- I
3  mean, I'm aware that they're separate but I'm not
4  sure I'm aware of what -- of the nuances of the
5  government relationship with BIA and the tribe.
6  It is a black box to me as to what exactly how
7  that relationship works and what --
8     **Q  (By Mr. Fields)  No, I hear that.  But,**
9  **I mean, that's one of the reasons why -- probably**
10  **why you guys engaged Modrall Sperling, right?**
11  **Because that's some of their expertise they bring**
12  **to the table that interplay between the tribes and**
13  **the federal government?**
14  A  I think that's accurate, yes.
15     **Q  So when you looked at this earlier with**
16  **Ms. Blake, I mean, I know you've received probably**
17  **thousands of emails since then, seven years later,**
18  **but at the time considering Mr. Larson had gotten**
19  **it and thought it was important enough to forward**
20  **to you and then it got forwarded on to outside**
21  **counsel and your CEO and your other ownership**
22  **partners at Tradewind, at the time what did you**
23  **think the importance of this particular document**
24  **attachment was?**
25     MR. BALL:  Objection.

Page 180

1  Mischaracterizes the evidence.
2     THE WITNESS:  I believe we took
3  all communications seriously and engaged counsel
4  and revisited whatever questions were being asked
5  and what the communication said in the context of
6  all of the other communications and diligence we
7  had done.
8     **Q  (By Mr. Fields)  So not knowing or**
9  **recalling when you formed the opinion that the**
10  **permit wasn't needed, would you say that receipt**
11  **of this procedures for obtaining the permit in**
12  **question, did that help you further inform your**
13  **opinion whenever you made it?**
14     MR. BALL:  Objection to form.
15     THE WITNESS:  I'm not sure if it
16  did or it didn't.
17     **Q  (By Mr. Fields)  Or is that why you**
18  **were forwarding it on to counsel, so they could**
19  **factor it into their analysis?**
20     MR. BALL:  Objection to form.
21  Mischaracterizes the record.
22     **Q  (By Mr. Fields)  You can answer the**
23  **question.**
24  A  Can you ask the question again?
25     **Q  Were you forwarding it on to outside**

Page 181

1  **counsel so they could factor this into their legal**
2  **analysis?**
3     MR. BALL:  Same objection.
4     THE WITNESS:  Again, I think we
5  were just, I think, doing what we normally do,
6  which is take communications seriously and engage
7  counsel when appropriate and ask the relevant
8  questions in the context of what -- what we know
9  to date on a project and what our expectations --
10     **Q  (By Mr. Fields)  No, and I -- I totally**
11  **appreciate that, but one of your subordinates went**
12  **out and sought out this information specifically.**
13  **So I'm trying to understand if you under -- if you**
14  **know why that information that your subordinate**
15  **sought out was then important enough to forward on**
16  **to your outside counsel, who is specifically**
17  **giving you legal advice on the issue in question?**
18     MR. BALL:  Objection to form.
19     THE WITNESS:  I -- yeah, I guess I
20  don't understand how to answer the question.  I
21  don't even know --
22     **Q  (By Mr. Fields)  So --**
23  A  I don't know why -- why Justin made the
24  inquiry.  I don't have the background as to what
25  led up to that, what triggered it, what he was

1 thinking at the time.

2    Q Okay.

3    A I mean, he's a free thinker. He could

4 do -- I don't know if it was him just deciding one

5 day to ask that question or if there was some

6 prompt or some other communication that stirred

7 the pot on that conversation. I suspect it was

8 the former.

9    Q Gotcha. I appreciate it. [Okay,

10 Michelle, you can take that down. Can you pull up

11 Number 4 in our grouping?] I don't think this has

12 previously been listed as an exhibit, and so I'm

13 not sure exactly what number we're at now, but I

14 think we're at like -- [you said 204?] Okay.

15 This will be Exhibit 204. This is another email

16 chain. This one's from September 30th, 2014, five

17 -- roughly five months after the last email we

18 just looked at where you guys were forwarding on

19 the procedures for obtaining a sandy soil mining

20 permit to outside counsel. This is Osage Wind

21 Priv 294 through 97. [Scroll down to the bottom,

22 please. I guess that's the end. Okay,

23 scroll back up so we can give Mr. Gilhousen some

24 context.]

25    Mr. Gilhousen, are you familiar with

1 RNT or IEA and their role in the project?

2    A I believe they were construction

3 contractors that Enel engaged.

4    Q Yeah. I'd represent to you I think

5 they were the general contractor. But -- so it

6 looks like one of them --

7    A One of them may be an engineering firm.

8 I think -- I can't -- but I guess they may be both

9 construction firms. There may have been a merger

10 there or a partnership. I can't remember.

11    Q Yeah. I'll represent to you that RNT,

12 I believe, and IEA are the same company or they

13 have -- they're connected in some affiliated

14 subsidiaries, but they're one organization, I

15 believe.

16    But anyway, Mr. Welch is emailing Mr.

17 Hansen and Mr. Moskaluk at Enel to advise them on

18 a BIA employee who was -- came on site at the

19 project and was saying that a permit was needed on

20 September 25th, 2014, and that information was

21 being passed along. [So scroll up do the next

22 email above it, please.] And then it kicks off

23 another email chain, [perfect] where Mr. DiMarzio

24 at EGP North America sends to a group, including

25 Mr. Weigel, your subordinate, and another -- and a

1 whole host of people at Enel Green Power North

2 America with the subject of Bureau of Indian

3 Affairs on September 30th, 2014. And it says,

4 "EGP as owner will call back the BIA. And on the

5 agenda, one, do we need a rock crushing permit

6 with the minerals counsel for backfill of

7 foundations. Two, if so, can we get it? Three,

8 if not, should we prepare anyway for the strategy

9 for response? And four, who at EGP is going to

10 call the BIA." So, I'm not sure when it closed

11 but your MIPA was executed on September 17th,

12 2014, so this might be two weeks later. Do you

13 have any opinion on why Enel's project manager,

14 Mr. DiMarzio, would be wondering if a permit was

15 needed from the Minerals Council for the

16 activities that are the subject of this

17 litigation?

18    MR. BALL: Objection.

19 Mischaracterizes the evidence.

20    Q (By Mr. Fields) You can answer.

21    A He says -- he's saying, do we need a

22 rock crushing permit with the Minerals Counsel to

23 backfill of foundations. I -- you know, we don't

24 have anything to do with whether Enel or the

25 construction contractor crushes rock or how they

1 backfill or how they construct. So I don't know

2 why --

3    Q Right, because like you said, they --

4    MS. BLAKE: We lost his video.

5    Q (By Mr. Fields) Okay. Are you there?

6 Welcome back. Do you need to plug in your phone

7 or are you good?

8    A No, I'm good. When a phone call comes

9 in, it makes me decline it and goes black for a

10 second. Sorry.

11    Q No worries. And also, thanks for doing

12 that with your cell phone. I appreciate you. I

13 know you've been flexible with all the

14 technological stuff?

15    A We're good. We're good.

16    Q Okay. So as you've said, Tradewind

17 doesn't do construction, so at this point this is

18 an Enel project, or an Enel employee asking the

19 question of if a rock crushing permit was needed

20 on September 30th, 2014, correct?

21    A Yeah. And I -- he's not asking about a

22 mining permit. He's just asking whether he needs

23 a permit to crush rock.

24    Q Right. So are you aware who Joan

25 Heredia is?

Page 186

1    A  Yeah.  Joan was, I believe, the head of
2  permitting the environmental for Enel.
3    Q  So she sends a follow-up email the same
4  day and say it's "Important-High," so this group
5  of Enel employees, including Mr. Weigel, saying,
6  "We need to act with an abundance of caution.  We
7  should not be using materials at the site that
8  would be otherwise commercially available.  I
9  understood backfill would come from an off-site
10 quarry.  We need to discuss with Steve Champagne
11 before proceeding.  Please do not crush rock
12 further until we have a chance to discuss."
13    So do you have an opinion on the
14 distinction between crushing rock and mining on
15 the project site?
16         MR. BALL:  Objection to form.
17         THE WITNESS:  Do I have an
18 opinion?
19    Q  (By Mr. Fields)  Correct.
20    A  Yeah.  I don't think crushing rock is
21 mining, but --
22    Q  Okay.  So, second question.  Do you
23 have any idea why Mr. Weigel would be still copied
24 on these emails two weeks after the project's
25 over?  Do you think that that -- that could have

Page 187

1  to do with some of the -- the responsibilities
2  that were not -- we've previously discussed but
3  were not completely aware of that were in place
4  after the execution of the MIPA from Tradewind to
5  Enel Kansas occurred on September 17th, 2014?
6    A  Yeah.  It's just a -- it's -- he has a
7  background and history that Joan may not.  It's
8  part -- that would not be an uncommon request of
9  Enel is that we are available to answer questions,
10 support in whatever way they need after they take
11 ownership.
12    Q  [Roll up, Michelle.]  I mean, I
13 appreciate that.  [Keep going.  Keep on
14 scrolling.]  So then there's this letter -- [Okay,
15 keep scrolling.]  So you're copied on this email
16 from Mr. Weigel to the larger group, all of which
17 includes predominately -- I -- it's kind of a
18 split group between Enel Green Power North America
19 people and you and Ms. Dean.  "Have you heard from
20 Matt Sullivan -- have you heard from Dan Sullivan
21 on getting the meeting with the chief?  He
22 apparently signed the letter below which
23 instigated this."
24    Do you know who Dan Sullivan is?
25    A  Dan Sullivan, I believe, was the then

Page 188

1  president and/or CEO of Grand River Dam Authority.
2    Q  Perfect.  Okay.  [So can you scroll
3  down?  I guess we will look at the letter,
4  Michelle.]  I had hoped to not, but, hey, let's
5  see what's -- let's see what's in here.  So it's a
6  letter from the Osage Nation on their letterhead
7  sent to Robin Phillips, the superintendent of the
8  Osage Agency.  "This morning my office received a
9  report of possible misuse of the Osage mineral
10 estate.  Specifically, it's been alleged an
11 unauthorized taking of the minerals has occurred
12 south of the intersection of Highways 18 and 60
13 north of Fairfax, Oklahoma, as of September 25th,
14 2014.  Photographs were taken attributed to
15 Mr. Connor -- Dr. Connor.  Copies of the photos
16 note question enclosed therein.  Please provide my
17 office with your findings and actions on this
18 matter as soon as possible."
19    So that's a letter from Geoffrey
20 Standing Bear, the Chief of the Osage Nation.  I
21 know you said earlier that you met with the chief
22 and the GRDA and Mr. Willman on Mustang Run you
23 recalled, but you couldn't remember when that
24 meeting occurred.  Do you think it's possible that
25 that meeting occurred in response to this letter?

Page 189

1    A  No.  It was --
2    Q  Okay.
3    A  I believe my email indicates that I had
4  already requested that meeting.  We had a -- I
5  believe at some point we signed a power purchase
6  agreement, I think with GRDA, to sell the power
7  from Mustang Run.  And I believe I was -- I mean,
8  the origin of the meeting with the chief and the
9  Minerals Council was, as I said, to personally, as
10 Tradewind, engage the Osage Nation and the Mineral
11 Council.  I made that request through Dan so you
12 had -- or a call.  He had the connection to make
13 that happen.  And it was -- it was about Mustang
14 Run and our efforts to make that project a success
15 and going into that eyes wide open trying to
16 reestablish a positive working relationship going
17 forward.  And I think I would say --
18    Q  Now, someone --
19    A  I was surprise -- I was surprised maybe
20 by his signature on that letter.  I don't -- I
21 don't recall exactly.
22    Q  Okay.  Did you -- at the time in 20 --
23 in September of 2014, two weeks after you've --
24 the MIPA's been executed selling the assets to
25 Enel Kansas, are you surprised that the lead

Page 190

1  permitting person at Enel Green Power North
2  America is concerned and trying to be cautious
3  about rock crushing on the site and an issue that
4  could be related to permitting?
5       A  Am I -- am I surprised?
6       Q  At the time, was it a surprise to you
7  that she was concerned about rock crushing maybe
8  needing a permit?
9       A  I wasn't aware of any rock crushing
10  that was going to occur on the project, so I was
11  surprised by her email saying that there was rock
12  crushing.  But I'm not surprised that she was
13  concerned of the optics of that.  I still don't
14  believe it was mining, but I -- I understand the
15  optics of seeing a rock crusher, and that that
16  could look like mining.  But I -- so I don't
17  believe it is, but I think that's what she was
18  speaking towards.
19       Q  Gotcha.
20       A  We -- we were buying rock from -- I
21  believe from the quarry down the street for the
22  roads and all that stuff which is owned -- I think
23  that's a mineral -- I think that was a permitted
24  mine which is I think what's she's referencing as
25  an off-site mine where you could buy material.

Page 191

1       Q  Right.  Thank you, sir.  [Okay, we can
2  take this one down, Michelle.  Can you pull up
3  Number 5.]
4       This is another exhibit that I don't
5  believe that we previously entered.  This will be
6  Exhibit 205.  It's Osage Wind Priv 290 through 93.
7       MR. FIELDS:  And by all means,
8  Mary Kathryn, OMC, I mean, Ms. Blake, Mr. Ball, if
9  I'm getting these wrong and these are not new
10  exhibits feel free to chime in if you are so
11  inclined.  But I think this is a new one.  This is
12  an October 11th, 2014 email chain.
13       A  (By Mr. Fields)  Okay.  I think we've
14  looked at it maybe in different context, but there
15  has a different Bates stamp and I think its easier
16  to read.  Anyway -- [Can you scroll down to the
17  very beginning.  Yeah.  Okay.]  So I think at the
18  beginning of this e-mail chain Mr. Ray, one of the
19  other outside counsel and now trial counsel is
20  emailing a document.  [Okay.  Keep going, please.]
21  Then it goes to Mr. Willman and Mr. Willman passes
22  it on to Rod, Matt and Geoff.  [Hold on a second.
23  Let's see what he says.]  Here -- "below is a
24  letter that Ryan Ray provided from the tribe's
25  website.  Someone should probably pass this along

Page 192

1  to EGP.  Do you want me to do it or advise them?
2  I forwarded the letter to Lynn Slade and Bill
3  Scott."  That's on October 11th, 2014.
4       [So scroll up and let's see where it
5  goes.  Right there.]  And then you say, "This is a
6  letter Ryan found on the tribe's website."
7  [Scroll down.  The other way so I can just see it
8  over the screen because it's blocked by
9  Mr. Gilhousen's video.  Gotcha.  See -- keep
10  going.]
11       "See the attached letter to Ryan Ray
12  found on the tribe's website.  This is totally
13  inconsistent with the conversations with BIA of
14  late.  Let us know if we need to get on the phone
15  to discuss."
16       So, on October -- I'll represent to you
17  that the letter in question was the cease and
18  desist letter from Robin Phillips, the
19  superintendent of the Osage Agency of the BIA
20  telling Mr. Venturini, the CEO of Enel Green Power
21  North America to cease and desist all excavation,
22  rock crushing, mining activities on the Osage Wind
23  project site.  So in that context, what did you
24  mean at the time by saying, This is totally
25  inconsistent with the conversations with BIA as of

Page 193

1  late?"
2       MR. BALL:  Objection to form.
3  Misstates the evidence.
4       THE WITNESS:  I -- I don't recall
5  exactly which -- which conversations I was
6  referencing.  I think the spirit of what I was
7  saying was as written.  I must have thought it was
8  not consistent with what they were telling us.  So
9  I don't remember.
10       Q  (By Mr. Fields)  What were they telling
11  you?  I guess -- you know better than I did.  I
12  have no idea.
13       A  I don't -- I don't recall exactly.  I
14  -- again, I -- my recollection is we didn't feel
15  like we were mining and we were building a wind
16  farm.  And so when we get a cease and desist
17  letter that is inconsistent with our
18  understanding, and I -- I can't -- you'd have to
19  tell -- show me and tell me what the -- the BIA
20  conversations had been and if those -- I could
21  have been referencing EGP's conversations as well
22  when I say conversations.  It's probably a
23  collective group of conversations.
24       Q  No, and I appreciate that.  And I guess
25  to put it in context, this is on October 11th,

Page 194

1  2014, approximately two weeks after the previous
2  email we saw where the BIA field technician was
3  onsite at the project saying that the rock
4  crushing was not allowed and required a permit.
5  So I imagine from September 25th, or September
6  25th through October 11th, for those two weeks
7  roughly, there may have been discussions.  It's
8  just a matter of -- I wasn't a part of those
9  discussion.  So, I'm asking if you were, but if
10 you don't recall, that's -- I -- I understand.
11      So are you -- can you recall any
12 conversations you had with any BIA representatives
13 from September 25th, 2014, through October 10th,
14 2014?
15     A  I don't recall any specific
16 conversations that I had with the BIA.
17     Q  Okay.  Do you recall --
18     A  Or letters or communications, I don't
19 specifically remember those, if any.
20     Q  Do you think -- do you think it could
21 have been possible that maybe Ms. Heredia was
22 having some conversations with BIA representatives
23 in response to the letter from Chief Standing Bear
24 and the letter from Ms. Phillips at the BIA?
25     A  I would expect she would be.

Page 195

1      Q  But -- but for you to say that this
2  letter, cease and desist, the BIA requesting to
3  cease and desist of all excavation and rock
4  crushing, to be inconsistent would mean that there
5  was somehow a more positive working relationship,
6  I guess, with the BIA before receipt of this
7  letter.  Is that what you were trying to state in
8  your -- with your characterizing it as
9  inconsistent?
10         MR. BALL:  Objection to form.
11 Mischaracterizes the evidence.
12         THE WITNESS:  I think it's
13 consistent with me -- what I've been saying over
14 and over here, is that we didn't think we were
15 mining.  The whole collective diligence process
16 led us to that conclusion, including legal
17 counsel, and I can't recall whether -- what the
18 specific BIA communications were.
19     Q  (By Mr. Fields)  And I -- I totally
20 appreciate that and I get that it's been seven
21 years.  But, I guess, to me there's a distinction
22 between your -- your very rote response of, we
23 were not -- we were not mining.  We had advice of
24 counsel that says that the permit wasn't needed,
25 et cetera, compared with, it's totally

Page 196

1  inconsistent with the conversations with BIA as of
2  late.  So you're saying -- you in your -- your
3  opinion, you're saying that it was inconsistent
4  with BIA conversation as of late.  And so I'm just
5  trying to understand what were the conversations
6  coming out of BIA?  What were they engendering for
7  Tradewind and Enel Green Power North America at
8  this time?
9          MR. BALL:  Objection to form.
10         THE WITNESS:  I can't give you --
11 apparently, I don't have anything to offer that
12 you don't already have your hands on.  I don't
13 recall what exactly I was referencing.  And I may
14 have been expressing frustration as well that --
15 at the whole situation.  So, I don't know what I
16 meant exactly because I wrote it seven, eight
17 years ago.
18     Q  (By Mr. Fields)  No, I -- I appreciate
19 that.  Do you recall anyone at the BIA, before
20 this point, I guess of October 10th, 2014, telling
21 you or someone else that the permit was not
22 needed?  And not -- and when I say that, I mean
23 not coming from your legal counsel or Enel Green
24 Power North America.  I'm talking about a
25 representative of the BIA or the OMC telling you

Page 197

1  all that you do not need this permit.
2      A  I seem to recall we communicated to the
3  BIA that we did not -- this is what we had done
4  and the conclusion we had come to and that we did
5  not plan on, or require -- we're not going to be
6  mining.  We don't -- we don't believe we need a
7  lease or a mining permit because we're not mining.
8  Something to that effect.  And I don't believe we
9  received any -- anything to the contrary back
10 From BIA.
11     Q  So are you saying that a lack of a
12 response suggested to you that a permit was not
13 needed?
14     A  I guess.  We weren't mining so we
15 didn't need a permit, and I think we communicated
16 that to -- to the BIA and --
17     Q  I -- but -- I agree.  But that's a
18 communication from you, Tradewind or Enel Green
19 Power North America to the BIA.  I'm asking if the
20 BIA ever communicated back and explicitly said,
21 you do not need this permit?
22     A  I believe we received a letter
23 suggesting that they wanted more information and
24 that we might need a permit, and we responded
25 saying we've provided information, we've looked at

Page 198

1  this and we don't believe we need a permit because
2  we're not mining. So yeah, when you respond to
3  someone that engages you in writing -- in writing
4  and they don't respond that -- yes, I can't make
5  someone respond.
6      Q   Or is it more true that you can't make
7  them give you the answer you want?
8          MR. BALL: Objection to form.
9          THE WITNESS: I -- I can't
10 speculate on that.
11     Q   (By Mr. Fields)  [Okay, scroll up --
12 scroll up to the next question -- email.]
13     So the next email is from Mr. Champagne
14 to Ms. Heredia. "Do you know anything about this
15 permit? I'm copying Bill P. and asking him to
16 find out if the contractor got it, assuming we do
17 in fact need it. Until we can confirm one way or
18 the other we need to comply with the letter.
19 Steve."
20     And then, that gets forwarded -- look
21 up above, to Mr. William Scott at Modrall Sperling
22 and so -- [perfect Michelle. Scroll up a little
23 more.] It looks like Mr. Scott sends an email to
24 Mr. Willman and Mr. Slade the next day on October
25 11, 2014, saying, "Thanks for forwarding this.

Page 199

1  To my knowledge this -- curious that, to my
2  knowledge, this is the first time that BIA or
3  Osage have made any mention of a sandy soil mining
4  permit. I've tried to find a copy of the
5  application for a sandy soil mining permit, a copy
6  of such permit, or a regulation or pamphlet
7  describing the permit and the application process.
8  So far I have not been able to locate anything
9  specific about such permit on the BIA website,
10 through the BIA, or the Osage Agency site."
11     Okay. So keep that in mind, and we're
12 going to scroll up. And I just wanted to see if
13 you got looped back into the email. So it looks
14 like you did, because you're sending the next one
15 from Matt Gilhousen to Champagne. So at the time,
16 on October 11th 2014, did you appreciate that your
17 outside counsel, Mr. Scott at Modrall Sperling was
18 not aware that he had received six months earlier
19 from you and Mr. Weigel the sandy soil mining
20 permit procedures that outlined how to go about
21 getting this particular permit?
22     A   Sorry. Say -- say the question again.
23     Q   Yeah. So previously we looked at an
24 email from April 25th of 2014 where Justin
25 Morrison went out and got some information about

Page 200

1  the sandy soil mining permit. You don't know why
2  he got it but he went and got it and forwarded it
3  to Mr. Weigel, and you guys forwarded it to
4  Mr. Willman and Mr. Slade and Mr. Scott. So on --
5  in April of 2014, Mr. Scott at Modrall Sperling,
6  the law firm tasked with giving you your legal
7  advice on why you did not need this permit, had a
8  copy of the procedures about how to obtain the
9  permit. So that's in April of 2014.
10     Six months later, Mr. Scott, [scroll
11 down to the email below this,] Mr. Scott is
12 asking, "Hey, thanks for forwarding this. This is
13 the first time I've heard of these parties make
14 any mention of the sandy soil mining permit. I've
15 tried to find a copy of this and I haven't been
16 able to do it. I haven't been able to locate
17 anything specific about it."
18     So I guess what I'm saying is, did you
19 appreciate when he sent this email five and a
20 half, six months after he had already received
21 this information, did -- did that give you pause
22 or concern about your legal counsel's advice that
23 was supposed to be advising you on whether or not
24 this permit is needed?
25         MR. BALL: Objection to form.

Page 201

1  Mischaracterizes his testimony.
2          THE WITNESS: No, I -- it didn't
3  give me pause or any -- six months is a lot of
4  time. I assume he may not have had access to the
5  information he needed. I don't know. But it's
6  not -- did not give me pause for concern.
7      Q   (By Mr. Fields)  But you do admit that
8  Modrall Sperling was specifically hired to advise
9  on these tribal issues, and this is the permit in
10 question that there has been letters back from
11 October of 2013 explaining vehemently why Wind
12 Capital Group didn't need it, and you got multiple
13 versions of a memo that you looked at earlier with
14 Ms. Blake that explained why you didn't need this
15 permit. And so, it didn't give you any concerns
16 that your counsel seemed to not recall that they
17 previously had it for six months at that time?
18         MR. BALL: Objection to form.
19         MR. MAY: When you say you've got
20 the memo, what -- who's you? That you're saying
21 got memos? Mr. Gilhousen?
22         THE WITNESS: Tradewind.
23         MR. BALL: Objection to form.
24         MR. FIELDS: I appreciate what
25 you're asking, Mr. May. But I think it's pretty

1 clear that Mr. Gilhousen was copied on all the
2 emails in question, as was Mr. Scott.
3          MR. MAY: I thought you said
4 memos. I'm sorry.
5          MR. FIELDS: Yes, I was saying
6 memos.
7          MR. MAY: Okay.
8     **Q   (By Mr. Fields) Mr. Gilhousen was**
9 **copied -- yeah, on the -- on the legal memos that**
10 **Modrall Sperling created that were the -- that**
11 **defendants allege was the legal advice that they**
12 **relied upon as to why they did not need this sandy**
13 **soil mining permit.**
14          **So considering on one hand that Modrall**
15 **Sperling is kicking out a 10-page memo and**
16 **iterating it six times over the year in question,**
17 **right when everything's about to hit the fan and**
18 **you're about a month away from getting a federal**
19 **lawsuit, the fact that your outside counsel who's**
20 **been working on this legal analysis is only, then,**
21 **in the 11th hour realizing, I need this permit.**
22 **I'm just asking if that gives you pause right**
23 **when, I guess, Tradewind had sold this project and**
24 **developed it to Enel Kansas?**
25          MR. MAY: The narrative I

1 questioned was when you said, you received memos,
2 plural, and I'm asking are you suggesting you is
3 Mr. Gilhousen individually received these memos.
4          MR. BALL: Objection to the form.
5     **Q   (By Mr. Fields) Mr. Gilhousen, if you**
6 **-- if you have any questions about what I'm asking**
7 **you, feel free to ask away. But at the same time,**
8 **unless you're going to pose an objection, Mr. May,**
9 **I mean, I just -- I'm not going to answer**
10 **questions from you, even though it was helpful.**
11 **Helpful me rephrasing the question, it was helpful**
12 **to Mr. Gilhousen. So I'm still -- I guess, if you**
13 **can answer, Mr. Gilhousen, I would appreciate it,**
14 **but if -- if not, I understand.**
15          MR. BALL: Objection to form.
16 Misstates the evidence. Mischaracterizes the
17 documents and the evidence.
18     **Q   (By Mr. Fields) So you can answer if**
19 **you can.**
20     A   It -- it did -- it did not give me
21 pause if you're -- if you're suggesting that our
22 law firm didn't know what they were talking about.
23 I think it's six months later and it's a different
24 party engaging them and I have full confidence in
25 our legal counsel. I primarily remember working

1 with Lynn. I don't honestly remember working with
2 the other gentleman to the extent -- for whatever
3 reason, Lynn was my primarily contact there.
4     **Q   No, I appreciate that.**
5          MR. MAY: Let's take a break.
6          MR. FIELDS: Okay. How about five
7 minutes?
8          MR. BALL: How about 10?
9          MR. FIELDS: Okay, you drive a hard
10 bargain.
11          THE VIDEOGRAPHER: We're off the
12 record at 3:13 p.m.
13          (A break was taken from 3:13 to 3:21 p.m.)
14          THE VIDEOGRAPHER: We're back on
15 the record at 3:21 p.m.
16     **Q   (By Mr. Fields) Mr. Gilhousen, I**
17 **appreciate your patience. I think I only have one**
18 **last exhibit that you've already seen and then I**
19 **will be done. [So Michelle could you pull up**
20 **number -- Exhibit 89.] It's previously been**
21 **entered. It's Osage Wind Priv 299 through 302.**
22 **An email chain around October 11th, 2014.**
23          **[Okay. Can you scroll down just so we**
24 **can understand where this is coming from. Okay,**
25 **perfect. You can stop there. That's good enough.**

1 **There's not much there.]**
2          **So, again, I think, Mr. Gilhousen, this**
3 **is the same email chain you were just looking at,**
4 **or one that we recently looked at, but then it's**
5 **going to have a couple of new emails at the top**
6 **that we might not have talked about so much. So**
7 **the emails are starting around October 11th, 2014.**
8 **This one looks like it was directed at Rob, Matt,**
9 **and Geoff. A letter from Ryan Ray that he found**
10 **on the tribe's website. I'll represent to you**
11 **that I think it was the cease and desist letter**
12 **from Robin Phillips on October 9th, 2014. [Okay,**
13 **scroll up, please. Keep on scrolling. Okay, stop**
14 **right there.] So then Steve Champagne chimes in**
15 **and is asking Ms. Heredia if she knows anything**
16 **about this permit. "I'm copying Bill P. to ask**
17 **him to find out if the contractor got it, assuming**
18 **they need it. Will confirm." [Okay, scroll on**
19 **up.]**
20          **And then Mr. Price, or Mr. Scott, Bill**
21 **Scott, who works with Mr. Slade at Modrall**
22 **Sperling sends this detailed response to**
23 **Mr. Willman and Mr. Slade on October 11th. Again,**
24 **I'm not going to rehash it. We've already looked**
25 **at this very email where he's surprised that they**

Page 206

1 haven't mentioned the sandy soil mining permit in
2 the past.  Et cetera, et cetera.
3      [Okay, scroll up.  Okay, stop right
4 there.]  So then, later that day you respond,
5 "Seems like we're jumping the gun by stopping
6 work.  See the email below from Bill at Modrall
7 re: his research.  I believe this was looked at
8 some time ago along with the overall mineral
9 permit issue and determined to not be applicable
10 as it applies to the ODOT and pertains to using
11 minerals for state road projects."
12          MR. MAY:  "Material."
13      Q  (By Mr. Fields)  Not to mention --
14          MR. MAY:  It says material, not
15 minerals.
16      Q  (By Mr. Fields)  Okay.  "Not to mention
17 the fact that BIA never once brought this up in
18 the lengthy history we have with BIA on this
19 project.  I would not stop anything until someone
20 shows up with a TRO as we have done nothing wrong.
21 I suggest we reach out to the -- out to BIA ASAP
22 and figure out what the hell they are thinking.
23 It's Steve's call, but that's my opinion for what
24 it's worth."
25      And so, you're sending this email on

Page 207

1 October 11th, 2014, roughly two weeks -- oh,
2 shoot, maybe three weeks after the MIPA has been
3 executed selling the assets of Osage Wind from
4 Tradewind to Enel Kansas.  So now that you've seen
5 this email does it give you any additional context
6 as to what role you were playing despite the fact
7 that Tradewind had sold the asset?
8      A  My role was just providing my opinion
9 in that situation.  It's -- it was Enel -- Enel's
10 in the driver's side there.  That's why Steve
11 Champagne and Joan were driving this conversation.
12 I mean, I -- wasn't there a conversation with Joan
13 and the BIA after the BIA official was onsite and
14 called into question the rock crushing and that --
15 I seem to recall it was a positive conversation?
16      Q  Okay.  No, I mean, I appreciate what
17 you're saying.  I don't know.  Did -- did you talk
18 to counsel about that on the break or something,
19 or are you just trying to remember what happened.
20          MR. MAY:  Well, first off, he's
21 not going to talk to you and tell you about what
22 he talked to me about, and I object.  It's
23 privileged and I instruct him not to answer.
24          MR. FIELDS: Okay, so I'm not
25 asking for any privileged communications with

Page 208

1 counsel for the defendants or with counsel for
2 Tradewind Energy.  To my understanding, Mr. May,
3 you represent Mr. Gilhousen in his personal
4 capacity.  You don't represent him for Enel Green
5 Power North America, Enel Kansas or Osage Wind,
6 LLC; is that correct?
7          MR. MAY: I represent Mr. Gilhousen
8 personally.
9          MR. FIELDS:  Okay,so --
10          MR. MAY:  And I don't represent
11 any of the entities that you identified.  I
12 communicated with Mr. Gilhousen on the break and
13 my communications were as his attorney.  And our
14 communications are privileged, and to the extent
15 you asked him about them, I object and I'm
16 instructing him not to answer.  So go ahead.
17          MR. FIELDS:  I appreciate that.
18      Q  (By Mr. Fields)  Mr. Gilhousen, did you
19 review any documents on the break?
20      A  No.
21      Q  Okay.  So as it -- as it goes to this
22 email, even though you weren't working -- you were
23 not an employee of Enel Green Power North America,
24 Enel Kansas or Osage Wind, LLC, you characterize
25 you providing your opinion as to this issue

Page 209

1 because Enel was in the driver's seat, like you
2 said, correct?
3      A  Correct.
4      Q  Okay.  [You can scroll up Michelle,
5 please.  Okay, keep scrolling up.]  But then it
6 looks like Mr. Weigel responds at the end and
7 includes a larger distribution list, including
8 Ms. Heredia, yourself, Mr. Champagne, Mr. Willman,
9 et cetera.  And Mr. Weigel says, "This is hugely
10 frustrating giving -- given the timeline here.
11 All he had to do was call you back that day.  The
12 critical fact to me is whether or not he had a
13 site guide.  Our research shows this permit isn't
14 applicable, so I think we should require more than
15 just a letter stating we should get one before
16 altering course."
17      So, from your understanding,
18 Mr. Gilhousen, was Mr. Weigel, as your subordinate
19 at that time, doing something similar to what you
20 said you were doing in this email chain, just
21 providing his opinion considering Enel Green Power
22 North America or Enel Kansas was in the drivers
23 seat?
24      A  Yes.
25      Q  Okay.  Okay, perfect.  [Can you take

Page 210

1  that down Michelle?]  Because of your follow-up
2  questions about Ms. Heredia, I think that means I
3  have to have ask one more exhibit of you now,
4  which is Exhibit No. 84.  What we have as Number
5  8.  It's Osage Wind Priv 114 to 115.  It's an
6  October 16th, 2046 email recapping a conversation
7  between Ms. Heredia and Ms. Hale, the Deputy
8  Superintendent of the Osage Agency.  Okay.  [Let's
9  scroll down to the beginning.]  It's only two
10  pages,  and see what this is all about.  [I think
11  that's it.]
12        Okay.  So Mr. Heredia, is sending this
13  de -- is sending this detailed summary to a
14  distribution list that we'll look at up here, and
15  then we'll kind of break this letter down.  So
16  she's sending it to Mike, who I believe is in the
17  Enel legal department, Mr. Scott, who works with
18  Mr. Slade, Mr. Slade, along with yourself and
19  Mr. Weigel, Mr. Willman and some others.  It's
20  about Osage BIA discussion.  It's attorney/client
21  privileged information.  October 16th, 2014.
22        So I'm going to scroll through this and
23  let you see a couple of these paragraphs.  [So
24  stop right there.]  I'll give you a second,
25  Mr. Gilhousen, to see these first four paragraphs

Page 211

1  and once you're happy with what you've seen, let
2  me know and I'll ask you a couple of questions.
3     A  Do you want to scroll down?
4     Q  Whenever you're ready.
5     A  Perfect.
6     Q  We'll get you to the end of the page.
7     A  Okay.
8     Q  All right.  Okay.  [And then scroll
9  down to the next page.  I think there's just a
10  couple more paragraphs.]  Can you see that top
11  line?
12     A  Yes.
13     Q  Specified the letter -- perfect.
14     A  Yes.
15     Q  Okay, perfect.  [So then I think that
16  might be almost at the -- there, that's the end.]
17  So were you able to see those -- those five points
18  at the end?  And then I think that's it.
19     A  Yes.
20     Q  Perfect.  So Michelle is going to
21  scroll back to the top and we'll just go paragraph
22  by paragraph and then I think this is it.
23        And so your question to me was, you're
24  under the impression that some of the
25  conversations that were contemporaneous and timed

Page 212

1  here around October 15th-ish of 2014 between Ms.
2  Heredia and some people at the BIA were positive.
3  And so in response I want to go through this
4  letter.
5        So it looks like Ms. Heredia is giving
6  Mike Tierney, like assistant general counsel at
7  Enel Green Power North America and the attorneys
8  an update, and yet also including your contingency
9  from Enel -- Tradewind.  So she's giving a recap
10  of this discussion.
11        Second paragraph --
12        MR. BALL:  Sorry, Mr. Fields, you
13  glitched in my reception.
14        MR. FIELDS:  Okay.
15     Q  (By Mr. Fields)  In the second
16  paragraph, Ms. Heredia says that she returned the
17  call to the BIA Assistant Supervisor, Jeannine
18  Hale.  And she pulled in Robin Phillips, the
19  supervisor, and Tammy Canady from the real estate
20  department.  So it's my understanding that Ms.
21  Heredia was having a conversation with the three
22  of these BIA representatives.
23        "They indicated to me that a sandy soil
24  mining permit is required pursuant to 20 CFR 214.
25  I asked for a more specific citation and they

Page 213

1  indicated they would send the relevant portions of
2  the regulations that they think are applicable."
3        So, do you recall -- do you recall
4  asking Mr. Slade in October of 2013 in the emails
5  we already reviewed about the applicable statutes
6  that would be -- that would implicate whether or
7  not a mining permit was needed?
8     A  Do I recall those prior emails?
9     Q  That we reviewed maybe an hour ago from
10  October 25th, 2013.
11     A  Yes.
12     Q  And so, if you recall, you've asked
13  Mr. Slade for the particular statutes that
14  implicated the mining permit and he provided the
15  various statutes in an email to you, Mr. Weigel
16  and I believe Mr. Freeman.  And those statutes I
17  would represent to you -- or those regulations
18  were 25 CFR 211 and 25 CFR 214.  Do you recall
19  that?
20     A  Generally, yes.
21     Q  Okay.  And so now fast forward a year
22  later, those are the specific -- or that is the
23  specific CFR 214 that the Osage Agency BIA
24  representatives are -- are indicating to
25  Ms. Heredia that it required for the project,

Case 4:14-cv-00704-GKF-JFJ   Document 242-7 Filed in USDC ND/OK on 11/16/21   Page 56 of 59

1 correct?

2    A   That looks correct.

3        MR. BALL:  Objection.

4 Mischaracterizes the -- the email.

5    Q   (By Mr. Fields)  Okay.  Keep going.

6 Next paragraph.  [Can you just scroll down so I

7 can get his little video thumbnail out of it.

8 Perfect.]  "I indicated."

9        Okay.  the second paragraph says, "I

10 indicated we had not yet received the letter from

11 October 9th."  Okay.  The next paragraph.  The

12 third one.  "I stated I wanted to keep the lines

13 of communication --

14        MR. BALL:  (Audio distortion)

15        MR. FIELDS:  Mr. Ball, is my --

16        MR. BALL:  I'm having a difficult

17 time because -- Mr. Fields, you keep freezing on

18 me.

19        MR. FIELDS:  Okay.  Am I freezing

20 on anybody else?  Mary Kathryn, or Mr. Gilhousen?

21 Or is it all working?

22        MR. MAY:  I think you froze -- I

23 think you froze intermittently here on us.

24        Robin, did you drop off?

25        MR. FIELDS:  He's still on the

1 screen, but I don't know.

2        THE VIDEOGRAPHER:  Do we want to

3 go off the record?

4        MR. MAY:  He's breaking up on me.

5        MR. FIELDS:  Mr. Ball, are you

6 still there?  Maybe we should go off the record

7 until Mr. Ball can reconnect.

8        THE VIDEOGRAPHER:  We're off the

9 record at 3:39 p.m.

10        (A break was taken from 3:39 to 3:40 p.m.)

11        THE VIDEOGRAPHER:  We're back on

12 the record at 3:40 p.m.

13    Q   (By Mr. Fields)  Okay.  so let's just

14 -- let's just cut to it.  [So scroll down,

15 Michelle, where it says "I told her that when we

16 learned of the letter."  Let's go to that

17 paragraph.  Okay.  Can you put your little cursor

18 by it?  Okay.  Awesome.]

19        So, right there, Mr. Gilhousen, the

20 paragraph that begins -- the second one before the

21 bottom.  "I told her that when we learned of the

22 letter our legal counsel had done a quick search

23 of the web, and could only come up with the ODOT

24 information pertaining to the road base.  Although

25 we now have the CFR reference, our legal team

1 could look into this further."

2        Okay.  So, to your knowledge you had

3 asked Mr. Slade about the applicable CFRs back in

4 October of 2013, correct?

5    A   I believe that date is correct.  We

6 have legal memos, et cetera, associated with the

7 overall issue indicating we didn't need a permit.

8    Q   Yes, sir.  And based on all those memos

9 that came through and those email communications

10 that were being had with Modrall Sperling, with

11 Mr. Willman, with Enel Green Power North America

12 employees and representatives, and Mr. Champagne,

13 their general counsel, I mean, did it surprise you

14 at the time that Ms. Heredia was saying on October

15 16th, 2014 that only then was she receiving the

16 reference of what the applicable CFRs may be for

17 the sandy soil mining permit?

18        MR. BALL:  Give me a minute.

19 (Audio distortion)

20        THE WITNESS:  It was -- that's not

21 surprising to me based on the number of projects

22 and passage of time and a transition from one

23 owner to the next that the new owner may not have

24 the documents and research at their fingertips.

25    Q   (By Mr. Fields)  But Ms. Heredia --

1    A   Had she had all that information and

2 taken the time to look -- look back at the issue,

3 she would have realized there was a history here

4 that she -- maybe she had forgotten about or

5 wasn't fully aware of.

6    Q   So you -- do you -- is it your

7 testimony that you don't think Enel had the

8 information before the date of this email, October

9 6th, 2014, as Ms. Heredia is stating in the

10 paragraph we just reviewed?

11    A   No, they had --

12        MR. BALL:  Objection to form.

13        THE WITNESS:  They had all of the

14 information that we had.  That's -- we did due

15 diligence to the project and we sold them projects

16 based on that diligence.  And we've talked at --

17 about that throughout the day today.  So I can't

18 speak to why she didn't immediately agree -- you

19 know, remember that prior determination about this

20 permit but I can't speculate.  It wasn't

21 surprising to me, though.

22    Q   (By Mr. Fields)  So when she says, "Our

23 legal team will look into this further," what was

24 she talking about at the time?

25    A   The cease and desist letter.

Page 218

1    MR. BALL:  I apologize, but I am
2  having very -- I apologize, I'm still having
3  difficulty with the audio.  I'm going to ask
4  Mr. Slade if he can take over objecting or
5  responding to questions because I'm having
6  difficulty with it.  So unless you have objections
7  to that I'll ask that he do that.
8         MR. FIELDS:  No objection.  I'm
9  sorry about your audio.
10        Mr. Slade are you there?
11        MR. SLADE:  I am now unmuted.  Let
12  me see if I can get my video to start.
13        MR. FIELDS:  Okay.  You're going
14  to make an appearance here right at the end.
15        MR. SLADE:  It's time I came back
16  on stage.  Are you seeing me now?
17        MR. FIELDS:  Yes, sir.
18        MR. SLADE:  All right.
19    **Q   (By Mr. Fields)  Okay, so,**
20  **Mr. Gilhousen, you said it doesn't surprise you,**
21  **but you don't think that Ms. Heredia was being**
22  **untruthful with the BIA in her recap of the**
23  **conversation she had with those three**
24  **representatives on this date, do you?**
25    A   No.  I don't think she was being

Page 219

1  untruthful.  My -- my simple point is is that we
2  -- we went through a bunch of discovery, legal
3  memos, et cetera.  I can't say what Joan did or
4  did not, or the construction crew or company did
5  or didn't know about the work about the work that we he had done
6  when we had ownership of the asset and the
7  continuity of that understanding.
8    Q  Yes, sir --
9    A  It appears as if it's somewhat -- it
10  appears from reading the email that there -- it's
11  somewhat disjointed.
12    Q  In what way?
13    A  In her understanding that we had
14  addressed this issue previously.  We already
15  looked into this and determined that we didn't
16  need the permit.
17    **Q  Yes, sir.  So the last paragraph**
18  **begins, "She stated our use of the material would**
19  **require a permit and that she would send me the**
20  **form."**
21        **Okay.  Do you think that in her**
22  **multiple places in this letter, or, I mean, in**
23  **this email recapping your conversation with the**
24  **BIA that the BIA in any way was wavering in their**
25  **insistence of a permit at this point in time?**

Page 220

1    A   Whoever these individuals were that
2  were writing this letter, I didn't have personal
3  interactions with them that I -- that I recall.
4  They appear to be indicating that a permit needs
5  to be applied for and should be granted.  They
6  just need to provide the information.
7         I -- my perspective goes back to when
8  we acquired the project and dilligenced it with
9  the capital and the memos and the communication to
10  BIA based on their communication to us indicating
11  we didn't believe we needed one for certain
12  reasons, et cetera.  And I can't -- that's about
13  as far as I can take it in this communication.
14  Joan is -- yeah, I can't -- I can't speak to why
15  -- you know, what she did or didn't recall about
16  -- or did or didn't know about the history.
17    **Q  Correct.  I appreciate that.  All**
18  **right.  [All right, I think that's the end of it,**
19  **right?  What's on the next page?  Can you scroll**
20  **-- there -- just a little bit more.]**
21        **So the beginning of the next paragraph,**
22  **"She specified the letter stated BIA wanted us to**
23  **stop work until we got a permit."  I mean, that's**
24  **pretty unequivocal, right?  I mean, that -- the**
25  **BIA's position was clearly that Enel Green Power**

Page 221

1  **North America or Enel Kansas or Osage Wind, LLC,**
2  **whoever it was that was doing the work needed to**
3  **stop until they had the permit, correct?**
4    A   That appears to be this individual's
5  opinion.
6    **Q  Right.**
7         **All right.  I don't have any further**
8  **question about this exhibit.  [You can take that**
9  **down, Michelle.  Thank you so much.]**
10        **Mr. Gilhousen, are you aware of any**
11  **financial analysis or valuation of how much it**
12  **would cost to comply with the -- permit in**
13  **question, even though you stated that it was your**
14  **position that the permit wasn't needed?**
15    A  You're talking about the -- the cost to
16  build the project without crushing rock?
17    **Q  No.  I'm asking if there was -- you**
18  **ever saw a financial analysis or a cost benefit**
19  **analysis that quantified potentially how much it**
20  **would cost to comply with the permit and if the**
21  **project continued to go on but in compliance with**
22  **acquiring the permit?**
23    A  Not to my knowledge.  I don't -- I
24  don't think I even -- I don't think I even know
25  what -- I've never been involved in mining so I

Page 222

1  don't -- yeah, I don't -- don't know how to answer
2  that question, other than, I guess, no, would be
3  the right answer.
4      **Q  Okay.**
5      **So you never saw any analysis that took**
6  **volumes of minerals that were excavated or**
7  **rendered inaccessible and multiplied them by some**
8  **number to get to a cost in which a permit would be**
9  **-- that would go to the OMC to compensate them for**
10 **the minerals that were being mined on the Osage**
11 **Wind project.**
12      MR. SLADE:  Object to the form of
13 the question.
14      THE WITNESS:  I do not recall a
15 calculation of what -- that you just described.
16 I'm not sure I understand exactly what that
17 calculation is, but I don't recall anything along
18 those lines.
19      MR. FIELDS:  Okay.  With that I
20 pass the witness.  I appreciate your patience and
21 thank you so much for answering all my questions.
22      THE WITNESS:  Happy to do it.
23      MR. MAY:  Anyone else?
24      MR. SLADE:  Robin.  Do you want to
25 take over.  I'll yield back to you.

Page 223

1      MR. BALL:  I just wanted to say if
2  you can give us a few minutes to confer.  My guess
3  is we'll have no questions, but give us a couple
4  of minutes to confer.
5      THE VIDEOGRAPHER:  We're off the
6  record at 3:51 p.m.
7      (A break was taken from 3:51 to 3:55 p.m.)
8      THE VIDEOGRAPHER:  We're back on
9  the record at 3:55 p.m.
10     MR. BALL:  The defendants will
11 reserve their questions for trial.
12     MR. MAY:  This is Kirk May.  The
13 witness wants to read and sign, please, if you'll
14 send the transcript to me.
15     THE VIDEOGRAPHER:  This concludes
16 the videotaped deposition of Matt Gilhousen.
17     We're off the record at 3:56 p.m.
18     (The deposition concluded at 3:56 p.m.)
19
20
21
22
23
24
25

Page 224

1      J U R A T
2  USA -V- OSAGE MINERALS COUNCIL, et al.
3     JOB FILE NO. 152613
4      I, MATT GILHOUSEN, do hereby state under
5  oath that I have read the above and foregoing
6  deposition in its entirety and that the same is a
7  full, true and correct transcription of my
8  testimony so given at said time and place, except
9  for the corrections noted.
10
11     _____
12       Signature of witness
13
14     Subscribed and sworn to before me, the
15 undersigned Notary Public in and for the State of
16 Oklahoma, on this, the _____ day of
17 _____, 2021.
18
19
20     _____
21       Notary Public
22
23 My Commission Expires: _____
24 My Commission Number: _____
25

Page 225

1      E R R A T A  S H E E T
2  USA -V- OSAGE MINERALS COUNCIL, et al.
3     DEPOSITION OF MATT GILHOUSEN
4  REPORTER: MARCY A. KING, CSR, RPR
5     DATE TAKEN: SEPTEMBER 10, 2021
6        JOB FILE NO. 152613
7  PAGE  LINE  CORRECTION
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____
25 _____  _____  _____

1            C E R T I F I C A T E
2    STATE OF OKLAHOMA   )
3            ) SS:
4    COUNTY OF OKLAHOMA  )
5
6        I, Marcy A. King, a Certified Shorthand
7    Reporter for the State of Oklahoma, certify that
8    MATT GILHOUSEN was by me sworn to testify the
9    truth; that the deposition was taken by me in
10   stenotype and thereafter transcribed by computer
11   and is a true and correct transcript of the
12   testimony of the witness; that the deposition was
13   taken by me on September 10, 2021 via zoom, and
14   that I am not an attorney for or relative of
15   either party or otherwise interested in this
16   action.
17        Witness my hand and seal of office on
18   this 16th day of September, 2021.
19
20        _Marcy A. King_
21        _____
22        Marcy A. King, CSR, RPR
23        CSR # 0834
24
25