# EXHIBIT 9

Case No. l4-CV-704-GKF-JFJ

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OKLAHOMA
2
    UNITED STATES OF AMERICA,
3
                    Plaintiff,
4
    and
5
    OSAGE MINERALS COUNCIL,
6
                    Intervenor-Plaintiff,
7
    vs                            No. 14-CV-704-GKF-JFJ
8
    OSAGE WIND, LLC,
9   ENEL KANSAS, LLC;
    and ENEL GREEN POWER
10  NORTH AMERICA, INC.,
11                  Defendants.
12           VIDEOTAPED DEPOSITION OF STEVEN HAZEL
              Taken on Behalf of the Defendants
13          On April 29, 2021, beginning at 10:05 a.m.
             All Parties Appearing Via Webconference
14
                          APPEARANCES
15  Appearing on behalf of the PLAINTIFF:
    Stuart Ashworth
16  Cathryn McClanahan
    UNITED STATES ATTORNEY'S OFFICE
17  NORTHERN DISTRICT OF OKLAHOMA
    110 West Seventh Street, Suite 300
18  Tulsa, Oklahoma 74119
    918-382-2772
19  stuart.ashworth@sol.doi.gov
    and
20  Charles R. Babst, Jr.
    UNITED STATES DEPARTMENT OF THE INTERIOR
21  OFFICE OF THE SOLICITOR
    7906 East 33rd Street
22  Tulsa, Oklahoma 74145
    918-669-7730
23  charles.babst@sol.doi.gov

24          Appearances Continued on Next Page
    VIDEOTAPED BY:  STESHA SNOW
25  REPORTED BY:  MARY K. BECKHAM, CSR, RPR
```

```
 1                 APPEARANCES Continued

 2  Appearing on behalf of the INTERVENOR-PLAINTIFF,
    OSAGE MINERALS COUNCIL:
 3  Mary Kathryn Nagle
    Shoney Blake
 4  PIPESTEM & NAGLE
    1333 New Hampshire Avenue
 5  N.W. Washington, D.C. 20036
    202-407-0591
 6  mknagle@pipestemlaw.com

 7  Appearing on behalf of the INTERVENOR-PLAINTIFF and
    DEFENDANT, OSAGE WIND, LLC, ENEL KANSAS, LLC and
 8  ENEL GREEN POWER NORTH AMERICA, INC.:
    Ryan A. Ray
 9  NORMAN, WOHLGEMUTH, CHANDLER, JETER, BARNETT & RAY
    2900 Mid-Continent Tower
10  401 South Boston Avenue
    Tulsa, Oklahoma 74103
11  918-583-7571
    rar@nwcdlaw.com
12  and
    Lynn H. Slade
13  Sarah M. Stevenson
    Dominic Martinez
14  MODRALL, SPERLING, ROEHL, HARRIS & SISKA, P.A.
    Post Office Box 2168
15  Albuquerque, New Mexico 87103-2168
    505-848-1800
16

17
    Also present:  Christina Watson, Michelle Hammock,
18  John Pfahl, Kimberlee Centera

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2                                                    Page

 3  DIRECT EXAMINATION BY MR. RAY                        6

 4  CROSS EXAMINATION BY MR. ASHWORTH                  237

 5  REDIRECT EXAMINATION BY MR. RAY                    238

 6

 7                       EXHIBITS

 8  Exhibit                                           Page

 9    17         Appendix A                             12

10    18         Expert Report of Steven Hazel          35

11    19         Tenth Circuit Opinion                  85

12    20         25 CFR 214.1                           89

13    21         25 CFR 211.1                           86

14    22         25 CFR 211.27                         198

15    23         Limestone/Dolomite Lease              91

16    24         Email string with Estimated Project

17               Budget                                97

18    26         Materials PO for APAC, 9/16/14       138

19    27         PO for Burbank Materials, 11/19/13 140

20    28         Amended and Restated Lease and

21               Easement for a Wind Energy Project 150

22    32         Case of Ctr. City Periodontists, PC

23               v. Dentsply International, Inc.      226

24    33         Resume of Steven J. Hazel             16

25    34         Report of Kimberlee Centera          207
```

```
 1                        STIPULATIONS

 2    It is hereby stipulated and agreed by and between

 3    the parties hereto, through their respective

 4    attorneys, that the deposition of STEVEN HAZEL may

 5    be taken pursuant to notice and in accordance with

 6    the Federal Rules of Civil Procedure on April 29,

 7    2021, before Mary K. Beckham, CSR RPR.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    THE VIDEOGRAPHER:  This is the videotaped

2  deposition of Steven Hazel, taken in the matter of

3  the United States of America and Osage Minerals

4  Council versus Osage Wind, LLC, et al., filed in the

5  United States District Court for the Northern

6  District of Oklahoma, case number 14-CV-704-GKF-JFJ.

7  This deposition is being held on April 29th, 2021,

8  and we are on the record at 10:05 a.m.

9    Will counsel please state their

10  appearances for the record?

11    MR. RAY:  Ryan Ray, and with me is

12  co-counsel, Lynn Slade, Sarah Stevenson and Dominic

13  Martinez.  We all represent all defendants, and also

14  observing the proceedings are John Pfahl and

15  Kimberlee Centera that are testifying experts for

16  the defendants.  That's all for the defendant group.

17    MR. ASHWORTH:  Stuart Ashworth and Cathryn

18  McClanahan on behalf of the plaintiff, United

19  States.  We also have Charles Babst, who is attorney

20  for the Department of the Interior, Office of the

21  Solicitor, as well as Christina Watson and Michelle

22  Hammock, who are paralegals with the U.S. Attorney's

23  Office.

24    MS. NAGLE:  Mary Kathryn Nagle with

25  Pipestem & Nagle.  We represent the plaintiff --

1   intervenor plaintiff, the Osage Minerals Council,

2   and I also have with me here today a colleague from

3   my office, Shoney Blake.

4               THE VIDEOGRAPHER:  All right.

5               MR. RAY:  Will the court reporter please

6   swear the witness.

7   WHEREUPON,

8                      STEVEN HAZEL,

9   after having been first duly sworn, deposes and

10  says in reply to the questions propounded as

11  follows, to-wit:

12                  DIRECT EXAMINATION

13  BY MR. RAY:

14      Q    All right, Mr. Hazel.  You've been deposed

15  many, many times, correct?

16      A    Yes.

17      Q    And have you been deposed before by remote

18  means, like we are conducting this deposition today?

19      A    Yes.

20      Q    All right.  And do you have any -- do you

21  have a cellular telephone with you?

22      A    Somewhere.  I don't know exactly where it

23  is, but it is somewhere in my office, yes.

24      Q    Okay.  But can you commit to us that you

25  won't use it to communicate with anyone while we are

1    on the record?

2            A      Sounds good.

3            Q      All right.  And do you have any other

4    electronic devices there with you in the room, sir?

5            A      I mean, probably.  I have other computers,

6    I have a tablet, things like that, but none of them

7    are out or are on.

8            Q      Okay.  And will you likewise agree that

9    while we are on the record you won't use any of

10   those devices to communicate with any other person?

11           A      Yes.

12           Q      All right.  Is there anyone else with you

13   in the room, sir, right now?

14           A      No.

15           Q      Where are you physically located as we sit

16   here right now?

17           A      I'm in Centennial, Colorado.

18           Q      All right.  Is that -- are you in an

19   office, or are you at your home or somewhere else?

20           A      At my home.

21           Q      Okay.  Do you have any documents there

22   with you in the room related to this case?

23           A      I mean, there may be something on my

24   shelf, but because of the pandemic, most things

25   didn't get printed these days, so I don't believe

 1    there's anything, if anything at all.

 2         Q    Okay.  But if there is, you agree that you

 3    can't consult those materials unless we're

 4    specifically talking about it, and you let us know

 5    that; is that fair?

 6         A    That's fine.

 7         Q    All right.  Sir, now, as I understand it,

 8    you are a -- you're designated to give some opinion

 9    testimony on behalf of the United States of America

10    in this case; is that correct?

11         A    Sounds right.

12         Q    All right.  Now, tell us what -- what

13    matters you were retained to opine about, to your

14    understanding.

15         A    I don't know what you mean by what

16    matters.  I don't understand what you mean by that.

17         Q    Well, what is the subject matter of your

18    testimony?  Do you understand that?

19         A    Well, I think broadly it's damages.

20         Q    And damages on what claims?  Do you have

21    an understanding of that, or is it all claims?

22         A    That would be a legal conclusion.  I can't

23    make that conclusion.

24         Q    So you just don't have any understanding

25    of what claim or claims you may be offering damages

 1   testimony regarding, true?

 2        A    No, I wouldn't agree with that.

 3        Q    All right.  Well, tell us what claims you

 4   believe you are offering damages testimony

 5   regarding.

 6        A    Again, I'm not going to establish the

 7   damages, the remedies specific to the claims.  I

 8   could pull up the complaint and look at the various

 9   different claims that are being offered in this

10   case, if you would like.

11        Q    Have you done that prior to today?

12        A    Sure.

13        Q    And do you have any understanding, as we

14   sit here right now, of what those claims are?

15        A    Off the top of my head, no.

16        Q    No recollection whatsoever?

17        A    Again, I haven't looked at the complaint

18   for a couple of days, so I don't remember any

19   specific claims that are on there.

20        Q    All right, sir.  Tell us what you did to

21   prepare for this deposition today.

22        A    Well, broadly, I had a couple of calls

23   with the U.S. District Attorney's Office.  I had

24   reviewed all of my report, as well as other reports

25   offered in this case.  I looked at the various

 1   different documentation I have in my files to kind
 2   of recollect all the information I had previously.
 3       Q    All right.  When you said other reports,
 4   what other reports did you review?
 5       A    So you've already talked about Centera and
 6   Pfahl, that you'd said were on the call, so it would
 7   be their reports.  I think it's pronounced Freas,
 8   F-R-E-I-S (sic), I believe, I've looked at his
 9   report.  I can't think of any other reports off the
10   top of my head.
11       Q    All right.  So you reviewed the reports of
12   Ms. Centera, Mr. Pfahl and Mr. Freas; true?
13       A    Right.
14       Q    All right.  Had you reviewed any of those
15   reports prior to the last couple of days?
16       A    Have you -- of course.
17       Q    Which ones of them had you reviewed prior
18   to the last couple of days; all of them?
19       A    All of them.
20       Q    When did you first review those reports?
21   Let's start with --
22       A    I don't remember.
23       Q    -- Mr. Freas.  When did you first -- do
24   you recall when you first reviewed Mr. Freeze's
25   report?

1     A     I don't remember.  I would have to look at

2  my time records.

3     Q     Okay.  Would that be reflected in your

4  time records?

5     A     Should be.

6     Q     And did you review all these reports at

7  the same time for the first time or different times?

8     A     I mean, I have reviewed all three reports

9  at one time in one sitting, if that's what you're

10  asking, but if you're talking about originally, I

11  just don't remember.

12     Q     Was there a specific occasion that caused

13  you to review all three reports?

14     A     I'm sorry, you cut out on me a little bit

15  during the question.  Can you say that again?

16     Q     Was there a specific occasion that caused

17  you to review all those reports in one setting?

18     A     I don't know what you mean by that.

19  You'll have to rephrase that.  It doesn't make any

20  sense to me.

21     Q     Well, was there a specific reason that you

22  reviewed all the reports in one setting?

23     A     Well, I've already given you an example of

24  that.  I said, we did a depo preparation.  I looked

25  at all the different reports.

1       Q    Right.  And I said -- I think you said,

2   sir, that you looked at them prior to that in one

3   setting.  Is that true, or was the first time you

4   looked at them in one setting in preparation for the

5   deposition?

6       A    First of all, I don't think I said that,

7   but second of all, I don't remember whether I looked

8   at all the reports in one setting previously.

9       Q    Okay.  So the only time you can recall

10  looking at all of them in one setting is in the last

11  couple of days; is that correct?

12      A    Sure.

13           (Exhibit 17 marked for identification.)

14      Q    (By Mr. Ray)  All right.  Let's pull up,

15  if we could, Exhibit Number 17.  This should be

16  shared for you, sir, on the screen.  Hopefully you

17  can see it.  Let us know if you have any problems.

18      A    It's a little small, but I can see it.

19  I'm actually going to put my larger screen on, if

20  that's okay with you.

21      Q    Yes, that's fine.  Please do that, sir.

22      A    I'll be looking up, so that's what I'm

23  looking at when I'm looking up.  Okay.  Go ahead.

24      Q    All right.  Exhibit 17 is -- it's actually

25  an excerpt from your report.  Does -- other than the

1  three expert reports that you mentioned, does this

2  document list all the other documents you have

3  relied on in forming the opinions you have in this

4  case?

5      A    I would doubt it, because I'm pretty sure

6  we've gotten other information since the date of our

7  report, but I'm trying to think of an example.  I

8  can't think of one off the top of my head.

9      Q    But you do, in fact, believe that you have

10  received other materials since the date of your

11  report that you are relying on in the case; is that

12  true?

13      A    I can't think of what those documents are,

14  so it's hard for me to answer that question, so I

15  don't know.

16      Q    Do you know one way or another, whether

17  you've received other documents?

18      A    I don't know definitively one way or the

19  other.

20      Q    Is there any kind of objective source you

21  would have that you could consult and answer that

22  question, like a list?

23      A    Yes.  We have -- we keep an index of the

24  documents that we have.

25      Q    And do you update that every time you

Steven J. Hazel                           4/29/2021                                    14

1  receive a new document?

2       A    I don't update it, but it's updated by our

3  group, yes.

4       Q    And that's someone at FTI; is that

5  correct?

6       A    Correct.

7       Q    All right.  And tell us where -- how did

8  you receive the documents that are set forth on

9  Appendix A?  Where did you get them?

10      A    Well, broadly we received them from the

11 U.S. Attorney's Office counsel at various different

12 points in time.

13      Q    All of them?

14      A    No.  There's likely some research

15 materials and other articles that may have been

16 something that we sourced ourselves.

17      Q    Do you know which documents you would have

18 sourced yourselves, as you said?

19      A    I couldn't give you a full list of all the

20 laundry list of every single document we sourced

21 ourselves.  I would have to cross reference it to

22 what we received from counsel.

23      Q    Do you have an objective source that

24 segregates those two things?

25      A    I don't think so, but I'd have to again

1  look at the index to see how it's stratified.

2        Q    All right.  Now, you referenced some

3  research efforts that led to the location of some of

4  these materials; is that correct, sir?

5        A    True.

6        Q    And did you do that research yourself, or

7  did someone else do it?

8        A    I mean, it was at my direction, so I guess

9  it depends on how you look at that, but, I mean, did

10  I physically go and do a Google search, for example,

11  no.  Did I search for specific articles, no.  I

12  would direct my staff to do that.

13        Q    Did you search for any articles or source

14  materials yourself personally?

15        A    I did no -- not go out and look for them

16  in the standpoint of actually doing the searches

17  myself.

18        Q    Okay.  So all of the research was done by

19  another member of your staff, correct, the actual

20  looking for the documents; is that true?

21        A    Again, I don't agree with your premise.  I

22  mean, it's my report, it's my documents, they are my

23  information.  So if you're talking about the

24  physical aspect of doing the research or looking for

25  them, that is done at my direction by my staff.

Steven J. Hazel                         4/29/2021                                    16

1          Q    And none of it was actually done by you,

2    correct?

3          A    Again, I'm not -- I don't know what you

4    mean by that.  I mean, again, everything is done at

5    my direction, so it's done by me from that

6    standpoint.  I didn't push every button, I didn't

7    look for every article.  That's done by my staff.

8          Q    In fact, you didn't push any buttons or

9    look for any articles yourself, correct?

10              MR. ASHWORTH:  Object to the form.

11         A    Again, I'll just have to disagree with

12   you.  I mean, it's at my direction.  So it's -- I'm

13   the one doing it.  I'm not physically pushing the

14   button.

15         Q    (By Mr. Ray)  You didn't ever physically

16   push the button to look for these articles, correct?

17              MR. ASHWORTH:  Object to the form.

18         A    I didn't do the search, but after the

19   search was done and articles were identified, I

20   pushed the button to review them.

21         Q    (By Mr. Ray)  Did you review every

22   document on Appendix A yourself personally?

23         A    I believe so, but I'd have to go through

24   all of them to make sure.

25              (Exhibit 33 marked for identification.)

```
 1          Q     (By Mr. Ray)  Let's pull up, if we could,

 2    Exhibit 33.  All right, sir, this appears to be your

 3    biography on your website.  Is that what it appears

 4    to you to be?

 5          A     I don't know where you got this version.

 6    This looks to be my tax version.  I don't think this

 7    is the version on my report.

 8          Q     Right.  Is this -- but -- so if you look

 9    in the bottom left-hand corner, sir, we see, is

10    FTIConsulting.com your -- is that the website of

11    your business?

12          A     We have to be careful about my business.

13    FTI Consulting's a publicly traded company.  What

14    was your question?

15          Q     You work for FTI Consulting, correct?

16          A     Yes.

17          Q     And what is your affiliation with that

18    entity?

19          A     I am a senior managing director.

20          Q     All right.  How long have you been

21    associated with FTI Consulting?

22          A     Let's see, since October of 2015.

23          Q     All right.  And what is, as a -- you said

24    you're a senior managing director; is that correct?

25          A     Correct.
```

Steven J. Hazel                          4/29/2021                                    18

1      Q     All right.  And tell us what you do in

2  that role.

3      A     Well, broadly, I guess I'm responsible, is

4  the word I would use, for various different people

5  directly, work in broader teams on other different

6  matters, but, generally, I'm the person responsible

7  for the final product and, potentially, testifying.

8      Q     Is testifying as an expert witness your

9  primary work?

10      A     No.

11      Q     What is your primary work?

12      A     I mean, most people would consider me a

13  forensic accountant.  So I do, you know, various

14  different things in the capacity as a forensic

15  accountant.

16      Q     Testifying as an expert is one of them,

17  correct?

18      A     True.

19      Q     What percentage of your time would you

20  estimate you devote to testifying as an expert

21  witness?

22      A     Well, I mean, I guess it depends on how

23  you define that, but if you're talking about

24  specifically in a testifying capacity, it's

25  probably, I don't know, ten hours a month.

 1         Q     And what about preparing expert reports?

 2    By way of example, how often do you do that?

 3         A     Are you talking about expert reports in

 4    the capacity of litigation, or are you talking about

 5    expert reports generally?

 6         Q     We'll first start with litigation.

 7         A     I mean, it changes over time.  I would say

 8    it's probably 75 percent is in the form of

 9    litigation at this point.

10         Q     And do you also do work on occasion as a

11    non-testifying expert?

12         A     Yes.

13         Q     And tell us broadly what that usually

14    entails.

15         A     Well, first of all, there could be a

16    consulting role, which I was actually including kind

17    of within the litigation environment, but then

18    there's also roles where we're just doing either

19    valuation work, for example, or tax analysis,

20    something like that.  That would be outside of the

21    litigation environment, either prior to any

22    litigation commencing or some type of traditional

23    purpose, like financial reporting or a tax related

24    valuation, something like that.

25         Q     Have you ever prior to this case been

 1  involved in a litigation matter involving wind

 2  energy?

 3        A    I believe there was -- yes.

 4        Q    All right.  When was that, sir?

 5        A    It's been a while ago.  It's been -- I

 6  would guess it's probably around 15 years ago.

 7        Q    Do you recall the court in which that was

 8  pending?

 9        A    No.

10        Q    Do you recall the state it was in?

11        A    I don't remember where the court state

12  was, but the project was in Wyoming.

13        Q    And what was the litigation about, if you

14  recall?

15        A    It was about some construction cost

16  overruns.

17        Q    All right.  And do you recall any of the

18  parties to the case?

19        A    No.

20        Q    Do you recall any of the lawyers?

21        A    I can't think of who was involved with

22  that case.  It's been a long time ago.

23        Q    And what subject matter were you

24  testifying on in that case?

25        A    Related to the potential cost overruns of

 1    the project.  And I didn't testify, just so we're

 2    clear, but it was related to the overall

 3    construction costs of the project.

 4          Q    All right.  Were you retained as an expert

 5    witness for one of the parties?

 6          A    Yes.

 7          Q    All right.  Were you estimating the cost

 8    overruns for which party, if you recall?

 9          A    My remembrance is we were working for the

10    owner.

11          Q    The owner of the project?

12          A    Correct.  Sorry, my phone rang on my other

13    line.  I apologize.

14          Q    No, that's okay.  All right.  And it was a

15    dispute with whom?  Was it the contractor or --

16          A    Correct.

17          Q    Okay.  So were you attempting to value

18    the -- what these construction cost overruns would

19    cost?  Was that your role?

20          A    No, I wouldn't phrase it that way.  I

21    mean, I'm not an engineer, so I'm not going to be

22    doing that.

23          Q    Well, how would you phrase it?  What were

24    you doing in that case?

25          A    So I would be looking at the accumulation

1  of the costs related to the overall costs expended

2  by the general contractor, various different

3  approved or unapproved change orders, to look at the

4  potential cost overrun of the project.

5      Q    And what kinds of overruns were these, if

6  you recall?

7      A    I don't remember.  I don't remember what

8  they specifically were in that case.

9      Q    Do you remember generally what they were,

10 any sense at all?

11     A    I mean, I could speculate, based on what

12 generally these type of cases have, but I don't

13 remember anything specific to this case.

14     Q    Do you remember anything at all about the

15 nature of the overruns?

16     A    Well, there was some, but I don't remember

17 specifically how much or what the reasons were, the

18 purposes were.

19     Q    And did you give -- you said you did not

20 give any testimony in that case; is that right?

21     A    That's my remembrance.  I don't remember

22 giving any testimony.

23     Q    Did you draft a report in that case?

24     A    I don't even remember that for sure.  I'm

25 sure we were in the process of it, but I just don't

1   remember when it settled.

2        Q    You do recall that it did settle, though,

3   correct?

4        A    I mean, obviously, it settled in some way.

5   I don't remember exactly how, but I don't believe I

6   ever was deposed.  I don't believe I ever testified.

7        Q    Do you think you actually formed any

8   opinions in that case?

9        A    I mean, probably, but I don't remember

10  exactly how those would be memorialized.

11       Q    Did that case involve mineral interests in

12  any way?

13       A    I mean, I guess, yes, because there's

14  obviously something that has to be done when you

15  construct the site, but, again, I guess some people

16  would argue whether there's mineral interests or

17  not, but, it's -- you know, there's a subsurface

18  aspect to any type of wind farm.  Let's just put it

19  that way.

20       Q    But were you opining on anything related

21  to mineral interests in that case?

22       A    I mean, no, not the way you phrased it.

23  Obviously, there would be costs related to that

24  particular activity, but I wouldn't be opining on

25  the actual mining itself.

 1          Q     And were you aware of any payments being

 2     made to the mineral interest owner in that case?  Do

 3     you recall anything about that?

 4          A     I do not.

 5          Q     All right.  Have you had any other

 6     experience with litigation matters involving the

 7     wind energy industry?

 8          A     I can't think of one.

 9          Q     Do you have any experience in the wind

10     industry in non- -- in a non-litigation context?

11          A     It seems like there have been a couple of

12     cases that had wind farms on them, but nothing that

13     I can think of off the top of my head.

14          Q     It wasn't anything you were looking at

15     specifically as to your engagement; is that fair?

16          A     I mean, I would consider it was more of a

17     peripheral aspect.  It wasn't the main aspect of the

18     case.

19          Q     And it wasn't anything you were

20     specifically asked to form views on in those

21     matters; is that true?

22          A     Yeah, that I don't remember.  I don't

23     remember what the attorneys may have asked me to

24     look at in that way.  I don't remember.

25          Q     Do you recall in any of those matters

1   being asked to opine on payments that might be due

2   to mineral owners?

3         A    No, I don't remember that aspect coming

4   up.

5         Q    This is the first case in which you've

6   rendered that type of opinion; is that correct?

7         A    No.

8         Q    What other case have you rendered an

9   opinion about payments due to mineral owners in a

10  wind energy project?

11        A    Okay.  So if we're talking about specific

12  to wind projects, which was not your last question,

13  I can't think of one off the top of my head.

14        Q    All right, sir.  So we've looked at

15  Appendix A that listed the documents that you've

16  relied on after -- as of September 18th of 2020;

17  true?

18        A    It's not on the screen anymore, but, yes,

19  that's what that document represents.  There you go.

20  Thank you.  Yes.

21        Q    All right.  Now, you said you've looked at

22  the three expert reports after that, correct?

23        A    Yes.

24        Q    All right.  And you also said you believe

25  you've received some other information that you

1    would have on an index that FTI maintains, true?

2        A    I said that's likely, yes.

3        Q    All right.  And are there any other facts

4    that you have relied on that you've received orally

5    at any time?

6        A    I mean, you have the word facts there.  I

7    guess it's a little careful about determining what

8    the facts are, but has there been other information

9    that's been given to me verbally, probably.

10       Q    Did you rely on that information in

11   forming your opinions?

12       A    I mean, obviously, I took it at face value

13   to a certain extent.  As a forensic accountant, we

14   would be corroborating that with other information

15   to the extent possible.  You used the word, rely

16   upon.  I don't remember a specific statement that

17   somebody said that, okay, that's the only

18   information you have, so I'm going to rely on that

19   statement to make my conclusion.  I can't think of

20   anything like that.

21       Q    But was there any oral information that

22   you relied on, in part, in forming your opinions?

23       A    I mean, this has been a relatively long

24   case, and so, sure, I'm sure there's something that

25   somebody said that I considered and potentially

1   relied upon to basically form my opinion.

2        Q    All right.  And tell us all the oral

3   information that you recall that you relied on in

4   that sense that you just described.

5        A    Again, I've already said I can't think of

6   anything I relied upon in forming my ultimate

7   opinions and conclusions, but somebody may remind me

8   about something that was said that was helpful to my

9   opinion overall.

10       Q    You just can't identify anything

11  particular as we sit here right now; is that true?

12       A    I'm sorry, you cut out on me on the first

13  part of your question.  Could you say that again?

14       Q    Sorry.  You can't identify anything as we

15  sit here right now; is that true?

16       A    I can't think of anything that I relied

17  upon that formed my ultimate conclusion, correct.

18       Q    All right.  Sir, if we could go back to

19  Exhibit 33 for a moment.  All right.  Do you see

20  there, sir, where it indicates that you have a

21  Bachelor of Science Degree from the University of

22  Denver; do you see that, sir?

23       A    Yes.

24       Q    All right.  Is that the only degree from

25  an institution of higher learning that you have?

 1          A     Yes.

 2          Q     Did you attend any other institutes of

 3   higher learning?

 4          A     No.

 5          Q     All right.  From what years were you at

 6   the University of Denver?

 7          A     Let's see, I would have been there from

 8   1982 to approximately 1988.

 9          Q     What was your major field of study?

10          A     Accounting.

11          Q     Were you a full-time student all of those

12   years?

13          A     No.

14          Q     All right.  What periods of time were you

15   a full-time student, and what periods were you not?

16          A     So I graduate my undergraduate degree in

17   1986, so the four years, and then I was taking MBA

18   level classes for the time period after that until

19   my scholarship money ran out.

20          Q     So you received a bachelor's degree of

21   accounting in 1986, true?

22          A     Correct.

23          Q     And were you a continuous full-time

24   student from 1982 through 1986?

25          A     Whenever you look down, you cut out on me.

1    I can't hear what you say. So just letting you know

2    that, but can you say that again?

3         Q    Yeah.  From 1982 to 1986 were you a

4    full-time undergraduate student at the University of

5    Denver?

6         A    Yes.

7         Q    And did you graduate with any honors?

8         A    Yeah, I was like summa, magna cum laude or

9    something like that.

10        Q    Do you recall which one?

11        A    I thought it was all of those, but I would

12   have to look at my -- my diploma to look at it for

13   sure.

14        Q    All right.  And so were you a full-time

15   MBA student from 1986 through 1988?

16        A    No.  I mean, I was working since 1982, so

17   I was more transitioning to a full-time job and just

18   taking classes, as opposed to the opposite during

19   the other time frame.

20        Q    How many hours did you obtain toward an

21   MBA, if you recall?

22        A    I don't remember the number of hours, but

23   looking back, I probably should have finished.  I

24   think I was only six classes away from completing

25   it.

 1      Q      And was this coursework all taken at the
 2   University of Denver as well?
 3      A      Yes.
 4      Q      And why did you not complete that program?
 5      A      As I kind of mentioned before, my
 6   scholarship money ran out.  I was -- already been
 7   employed for four or five years at that point.  I
 8   just didn't ever finish it, because I didn't want to
 9   pay the full boat.
10      Q      All right.  So you said that you were
11   employed first in 1982, correct?
12      A      Correct.
13      Q      And is that -- if it's okay with you, I'll
14   just call it, is it the Pfleiger firm?  Is that a
15   fair way to refer to it, rather than every name, or
16   if it's -- if I'm mispronouncing it, please correct
17   me.
18      A      No, that's not the first firm I worked at.
19      Q      All right.  What is the first firm that
20   you worked at?
21      A      It's a company called Baller, B-A-L-L-E-R,
22   and Associates.
23      Q      Okay.  And you started there in '82?
24      A      Correct.
25      Q      And what job did you hold at the outset at

1    that firm?

2          A    Well, first I would call it kind of like a

3    gofer, basically go do whatever you are asked to do,

4    kind of an administrative role.

5          Q    All right.  How long were you in the gofer

6    role?

7          A    Relatively short period of time.  I proved

8    that I had computer skills that most people didn't

9    have at that time, as well as experience in the tax

10   world, so I got involved with some of the

11   computerized aspects in the tax world very quickly.

12         Q    Were you promoted to some position other

13   than the gofer role?

14         A    I don't remember there being a title or

15   anything, so, no, I don't think there was

16   necessarily a position, per se.

17         Q    All right.  So how long was it after you

18   started that your role changed?  I mean, was it two

19   months, six months, one year?

20         A    I think the computerized aspects changed

21   probably within the first two or three months.  The

22   tax season, as you probably are well aware of, of

23   January through April is the big time frame,

24   especially back then.  So it would have been, you

25   know, with that six, seven months after I started

1   before I really got involved with that particular

2   area.

3        Q    Were you preparing returns?  Is that what

4   you were doing?

5        A    I mean, I guess, technically, the answer

6   is yes, but, of course, I'm not signing the returns,

7   so I'm not technically the preparer, but I was

8   assisting with either accumulation of documents,

9   organizing of documents or filling out computerized

10  input forms.

11       Q    And was that for individuals, businesses

12  or both?

13       A    Both.

14       Q    Was it more one or the other?

15       A    At that specific time?

16       Q    Yes, sir.

17       A    I don't know.  I won't guess.  I don't

18  remember.  It's been a long time ago.

19       Q    But were you assisting another tax

20  preparer in inputting data?  Is that what you were

21  doing, or was it something else?

22       A    I mean, I was basically acting like a

23  staff accountant for the ultimate preparer of the

24  return, who, of course, would review all my work.

25       Q    And how long were you in that role?

1      A     At that firm you're talking about?

2      Q     Yes, sir.

3      A     So that would kind of stay for the whole

4   time while I was there, which I left in

5   approximately 1984.

6      Q     And where did you go in 1984?

7      A     To a firm called Halliburton, which is

8   H-A-L-L-I-B-U-R-T-O-N, Hunter & Associates.

9      Q     Okay.  So as the line item on your bio set

10  forth in Exhibit 33, relating to 1982 to 1990,

11  that's actually referring to three firms and not one

12  firm; is that true?

13     A     Well, first of all, this is not my bio.  I

14  would not consider what you have on the screen my

15  bio.  So I don't know where you got this from.  We

16  have a new website, so maybe they have the wrong bio

17  on the website for some reason.

18     Q     Did you approve what --

19     A     This is not --

20     Q     Did you approve what went --

21     A     -- information related to me.  It's a

22  tax-related bio, but it's not my bio for this case.

23  I want to make that very clear, but I don't have the

24  second page that you're looking at, so if you want

25  to go to the second page, then I can answer your

 1  question.

 2       Q    Do you see the line item at the top of the

 3  second page, sir?

 4       A    Yes.  So this is -- as your question you

 5  asked, this is basically the three firms during that

 6  time frame.

 7       Q    All right.  Did you have a chance to

 8  approve this before it was posted to the website?

 9       A    Apparently not.

10       Q    And did you --

11       A    It literally went live, I think,

12  yesterday, is literally what I think happened, so

13  I'll have to check in on that.

14       Q    And do you believe this is erroneous in

15  any way?

16       A    Go back to the first page.  I don't think

17  it's necessarily erroneous.  Hold on a second.  Can

18  you go to the second page a second?  I'm not

19  technically a member of the Colorado Society of CPAs

20  anymore, so that would be one thing, I guess, that's

21  technically erroneous.  I'm not sure it's a major

22  item, but, otherwise, it looks accurate from a tax

23  standpoint.

24       Q    Is it inaccurate from any other standpoint

25  in your opinion?

1        A    It's not really inaccurate.  I used to be

2    a member of the Colorado Society, I'm just not a

3    member anymore.  So I don't necessarily say it's

4    inaccurate, it's just dated.  So again, I don't know

5    where they got this from, to answer that question.

6        Q    Is there anything else that either should

7    or should not be on there, other than your

8    membership in the Colorado Society of Certified

9    Public Accountants?

10       A    Yeah, I'm not sure how to answer that

11   question.  I mean, again, there's a CV in my report.

12   That should be what you're using related to my bio

13   or CV.

14            (Exhibit 18 marked for identification.)

15       Q    (By Mr. Ray)  All right.  Well, let's go

16   ahead and pull up Exhibit 18, so we can have what

17   you want, sir.  That's your expert report, correct?

18       A    Looks that way, yes.

19       Q    The same document you looked at the past

20   couple of days, right?

21       A    At least once in the last couple of days,

22   yes.

23       Q    All right.  Let's go to page 62, if we

24   could.

25       A    I can see it now, if that's what you're

 1  waiting --

 2       Q    Is this then, sir, the accurate and

 3  correct bio that you ascribe to?

 4       A    Can you scroll to the next page?  Keep

 5  going.  I'm sorry, it's not there, so, obviously, it

 6  would be probably more information on this

 7  particular page, just because of the passage of

 8  time, but those first two pages are what I would

 9  consider my -- you know, the bio portion of my CV,

10  yes.

11       Q    All right.  So the page we're looking at,

12  it has the same line item on it about your work from

13  1982 to 1990, correct?

14       A    Correct.

15       Q    All right.  Now, so I think we were on

16  Halliburton Hunter.  What did you do at Halliburton

17  Hunter?

18       A    So, again, it's kind of the same thought

19  process of basically the computerized and the tax

20  side of the equation, but I was technically hired as

21  like director of write-up services or something like

22  that, where I was basically implementing a

23  computerized software to do monthly, quarterly and

24  annual financial statements for clients.

25       Q    Were those for businesses?

1      A      There was some personal financial

2    statements, but most of those would be businesses.

3      Q      Did that firm focus on any specific type

4    of business, or was it just the whole spectrum?

5      A      That's a good question.  I would say each

6    partner definitely focused, so if you want to look

7    at it that way, we would be talking about oil and

8    gas, chemicals, quite a bit of ranching, you know,

9    those type of industries.

10     Q      Did you work with any particular partner,

11   or did you work with many?

12     A      I worked with all of them, because, again,

13   I was kind of spearheading that particular area, so

14   all of their clients had those needs.

15     Q      You were working on kind of a data input

16   function and getting that up and going; is that

17   correct?

18     A      No.  I had two other direct reports that

19   would be doing the data input.  I was the -- again,

20   I think the word they used was director or manager,

21   some term like that, that basically I was

22   responsible for the functionality of it and make

23   sure that the data that came out of it was accurate

24   and complete.

25     Q      So what did you, yourself, sir, do on a

1    day-to-day basis?  I understand these other people

2    did data entry.  What did you do?

3         A    So in that area I would be responsible for

4    the formation.  So if we had a new client came in, I

5    would be responsible for getting that client up and

6    running, again, with other people's help that were

7    underneath me, to, basically, get the project

8    started.  At that point I would be reviewing the

9    monthly, quarterly, whatever, however often those

10   financials were done, to make sure that everything

11   was complete and accurate, as I mentioned before.

12   Despite the director of write-up services, I was

13   still doing more and more tax work, and so my days

14   were split doing those types of functions.

15        Q    And was that the only role that you had at

16   Halliburton Hunter?

17        A    I mean, there's other things that would

18   happen, like, you know, there was some business

19   valuation work that was being done at that point.

20   There would be special consulting projects related

21   to some type of modeling aspect, so there would be

22   other CPA traditional services that would be

23   involved, but that's generally what I did.

24        Q    How long were you at that firm?

25        A    Let's see, I was there from '84 to about

1   1989.

2        Q    Why did you leave?

3        A    My to-be partner, Harold Classick, which

4   is where the name comes from in the next firm, left

5   the firm in 1988.  Ever since he left, it just

6   wasn't the same, because we were very good friends,

7   very good business associates.  So I got a little

8   bit dis-enamored with the firm, so I left the firm

9   to go to Pfleiger, Alderman & Company which was a

10  higher end firm at the time.

11       Q    And I believe I forgot to ask you this,

12  sir. Why did you leave Baller & Associates?

13       A    Just the opportunity for something, you

14  know, bigger and better.

15       Q    All right.  So Pfleiger, Alderman, were

16  you there from '89 to '90?

17       A    Correct.

18       Q    All right.  And what did you do there?

19       A    So I think my title would have been

20  something like tax manager, something like that,

21  which is a very specific term in the industry, but I

22  would be doing audits, tax and other consulting type

23  services for the clients that they had.

24       Q    Was that the only position you held at

25  that firm?

1        A      Correct.

2        Q      What kind of clients were you doing tax

3   and audit work for?

4        A      One partner had a lot of agricultural type

5   things, including ranching, but they had a lot of

6   meat packing plants, things like that.  The other

7   partner had a lot of oil and gas and technology type

8   companies.  There was two partners there.

9        Q      Were you ever doing valuation of minerals

10  at that firm?

11       A      I don't remember doing valuation of

12  minerals at that firm, no.

13       Q      All right.  When did you leave Pfleiger,

14  Alderman?

15       A      It was October, I believe, of 1990.

16       Q      Why did you leave?

17       A      Because, like I said before, my, you know,

18  now partner, Harold Classick, which is where our

19  firm, Classick Hazel, name comes from, had started

20  his own firm in 1988.  There was an opportunity to

21  join him, so I took that opportunity.

22       Q      All right.  And was that first called

23  Classick Financial, or was it always called Classick

24  Hazel?

25       A      So Classick Hazel is the traditional CPA

1   firm, Classick Financial was our wealth management

2   firm.

3        Q    And I take it you were a part owner of

4   Classick Hazel, PC, correct?

5        A    Yes.

6        Q    Were you also an owner of Classick

7   Financial?

8        A    I don't remember how the ownership worked.

9   My partner was the CFP, so he really ran that part.

10  I don't remember how the ownership worked.

11       Q    Did you do -- did you render any services

12  for Classick Financial?

13       A    Yes.

14       Q    All right.  Tell us what those were.

15       A    They were more in support of my partner.

16  They might be financial statements, might be

17  personal financial statements, might be analysis of

18  investments.  It's just basically things that he

19  would need assistance with.

20       Q    Did you do any valuation of minerals in

21  your role with Classick Financial?

22       A    What's your definition of minerals, by the

23  way?  Are we talking about hard minerals?

24       Q    What's your definition of minerals?

25       A    It could be broad.  I mean, you could take

1    minerals as, basically, anything out of the ground,

2    or you can take it more in the traditional sense of

3    typically hard rock minerals.

4         Q    And how would you personally define it?

5         A    I typically define it broadly, but, again,

6    that's why I'm trying to answer your questions

7    concisely, to make sure that's what you meant by

8    minerals.

9         Q    All right.  Well, let's define it broadly

10   in your sense then, sir.  Did you do any valuation

11   of minerals, defined broadly?

12        A    Well, I mean, if we're talking about

13   broadly, which would include oil and gas activities,

14   that happened pretty early on in my career.  That

15   probably even started back in Halliburton days,

16   because one of the partners had a lot of oil and gas

17   work.  But, I mean, it would be a two or three

18   project type of thing a year.  It was a relatively

19   small portion before 1990.

20             When I started my own firm, I started

21   doing more and more valuation work, and so then it

22   might be slightly more, but it was still kind of a

23   secondary aspect to my practice.

24        Q    Well, let's step back to the first time

25   you can remember valuing minerals.  Tell us what you

1    were valuing.

2         A    Well, I mean, typically, in the oil and

3    gas context, you're looking at two things.  You're

4    looking at the valuation of either the property

5    itself or the business operating the property, or

6    you're looking at what we would call the valuation

7    of reserve study of the physical materials

8    themselves.

9         Q    And have you ever valued the physical

10   materials themselves, yourself?

11        A    Sure.  We've done reserve studies over

12   time.

13        Q    All right.  When is the first time you

14   recall doing that?

15        A    I remember being involved with a couple of

16   different projects back at the Halliburton Hunter

17   time frame, because, again, one of the partners was

18   focused on oil and gas.

19        Q    And were you personally the one that

20   placed a value on reserves, as you say?

21        A    Well, I mean, I wasn't the "expert"

22   actually preparing the report, so I guess,

23   technically, I wasn't putting the value on it, but

24   was I assisting with them to determine the value,

25   the answer would be yes.

1      Q     What did that assistance consist of?

2      A     I'm sorry, you cut out again.  Are you --

3      Q     What did the assistance -- what did the

4   assistance consist of?

5      A     So I was kind of like -- again, like the

6   manager role.  I wasn't a partner.  So I was

7   assisting the partner.  So I was, basically, in

8   charge of the project, typically working with lower

9   level from an organizational chart, staff, to

10  basically put all the information together to come

11  to an ultimate conclusion, which, of course, could

12  be updated, changed, whatever by the partner,

13  because it was his or her opinion that basically

14  would be rendered.

15     Q     And who there -- we'll focus on

16  Halliburton Hunter right now.  Who was the person

17  that actually said the reserves are worth X?  Was

18  that you or someone else?

19     A     I mean, again, I would be assisting with

20  coming up with that conclusion, but, ultimately, the

21  partner would be responsible for that, so that would

22  be their opinion at that point.

23     Q     And did you understand that the oil and

24  gas was, basically, a commodity that had a market

25  price?

1      A     You have to be careful about that thought

2 process, but -- I mean, that's true, but that's not

3 what valuation relates to.

4      Q     Well, what does valuation relate to from

5 your perspective at Halliburton Hunter?

6      A     Well, I don't think it would just be just

7 Halliburton Hunter; we're talking more broadly now.

8 So are we talking broadly, or are we talking

9 specific to Halliburton Hunter?

10      Q     I'm talking about specific to Halliburton

11 Hunter right now and what you were valuing there.

12      A     So again, as we talked about before, I was

13 valuing the property, valuing the business, or I was

14 valuing the reserves study, as we called it before.

15 So none of those would be what I would call the

16 commodity market, which is a different aspect of

17 the -- of the financial analysis.

18      Q     Well, so the oil or gas would only be

19 worth what you can sell it for, true?

20      A     That's true.

21      Q     And those prices are set on an open

22 market, are they not?

23      A     Yeah, but again, it's -- the value of the

24 mineral depends on where it's located, for example.

25 There's a freight cost to get it to where you want

1  it or a pipeline cost, whatever it might be, so

2  you're being way too generic and way to summarized

3  as the overall value of any type of asset.

4      Q    All right.  Is there anything else that

5  goes into it besides freight cost and pipeline cost?

6      A    Well, sure.  I mean, it depends on what

7  grade you have, it depends on what location that

8  particular mineral or oil and gas comes from.

9  There's all sorts of dynamics that change the

10  potential value from a commodity standpoint of that

11  particular item.

12      Q    Well, the market accounts for that, does

13  it not?  They have different price for different

14  grades, true?

15      A    True.

16      Q    And --

17      A    But it doesn't account for everything.  It

18  doesn't account for how far away you have to come

19  from.  So the market doesn't account for all of

20  those dynamics, if that's what you're getting at.

21      Q    But those would all be taken into account

22  by you in your model, true?

23      A    That's true.

24      Q    So you would look to the market for the

25  grade, correct?  The grade price --

 1        A      Yes.

 2        Q      -- would be set by the market, right?

 3        A      Yes.

 4        Q      And then you would have to take into

 5   account things like any type of transportation

 6   costs, correct?

 7        A      That's one item, yes.

 8        Q      What else would you take into account?

 9        A      Again, you have to look at the supply and

10   demand.  Yes, the market establishes that price,

11   but, again, there may be other dynamics related to

12   your specific situation, that you either don't sell

13   at that particular point in time or that you sell

14   later, just because of the dynamics of the supply

15   and demand at that particular point.

16        Q      Anything else you can identify?

17        A      No.  I tried to give you some examples of

18   it.

19        Q      You can't give us any other examples right

20   now?

21        A      Other examples of what?

22        Q      Of things you would take into account in

23   valuation.

24        A      Valuation broadly, or are we talking about

25   valuation of a commodity?

 1      Q    No, I'm talking about valuation of

 2 minerals, sir.  We've talked about that the grade

 3 would be established by the market, correct?

 4      A    Okay.  Again, you're jumping all over the

 5 place.  No.  The commodity is different than the

 6 minerals, so those are two different aspects of

 7 the -- of the aspect of the project.  There's a

 8 commodity price, and then there's the mining or the

 9 actual minerals themselves.  You're trying to make

10 it sound like those are the same thing, they're not.

11      Q    How are they different?

12      A    It depends on what mineral you're talking

13 about.  If you're talking about oil where there's a

14 very specific commodity price, it's different than

15 if you're talking about, you know, aggregates, like

16 we're talking about in this case, where it's a

17 totally different dynamic.  You're trying to be very

18 summarized to things that have drastically different

19 answers.

20      Q    Have you ever valued aggregate before,

21 sir?

22      A    Yes.

23      Q    When?

24      A    That comes up routinely.  I have several

25 current cases where we're valuing aggregates.

1        Q     Give me one example besides this case.

2        A     I have to be careful about

3    confidentiality.  Let me think if I can give you a

4    specific example.  We have a large matter right now

5    where I believe there's a total of 26 different

6    properties that have aggregates, you know, some form

7    of aggregates on them.  They haven't been disclosed

8    that I'm aware of at this point, but they would

9    generally be in the southeastern portion of the

10   United States.

11       Q     So what would be the process of valuing

12   aggregate generally?

13       A     I mean, generally, you're looking at some

14   type of business activity, whether it's a kind of

15   complete cycle, where you're actually the ultimate

16   seller to the end user or some type of other

17   developer where you're basically doing more of that

18   above the wholesale aspect of it, so it can be at

19   different -- different stages of the minerals being

20   used.

21       Q     So were you there valuing the overall

22   enterprise or the specific aggregate itself or maybe

23   both?

24       A     It depends.  As I already said, there's

25   different -- different locations are at different

1   stages of the life cycle.  So some are the

2   enterprise overall, and some would be at a lower

3   life cycle where they're selling off to some plant,

4   for example, that basically has used those

5   materials. It's not being done by them specifically.

6        Q    Is there any situation there where you

7   were actually valuing aggregate in place in the

8   ground?

9        A    I guess I'm trying to think of as opposed

10  to what?  I mean, you're -- you have to value the

11  aggregate in the ground to, basically, take it to

12  the next step.  So depending on where you are in

13  that life cycle, you have to know that answer before

14  you get to the ultimate conclusion.

15       Q    And is that based on the market price of

16  aggregate in that area?

17       A    That's definitely a key component, yes.

18       Q    All right.  I take it the transportation

19  costs would be another component, right?

20       A    True.

21       Q    Are there any other components from your

22  perspective?

23       A    Well, again, it depends on what type of

24  grade it is, it depends on what type of usage you

25  have in that particular area.  It depends on, you

 1   know, your own cost structure, for example.  It

 2   depends on what type of equipment you have.  It

 3   depends on a lot of different factors.

 4        Q    The market would certainly account for the

 5   grade, would it not?

 6        A    Well, to the ultimate conclusion of where

 7   you sell it, but, again, there's multiple different

 8   places you could sell it.

 9        Q    But there's a market price at any given

10   location; is that true?

11        A    I mean, there's generally a market price,

12   but it's not like it's a commodity from that

13   standpoint.  There is some supply and demand

14   aspects, but there's negotiation involved.

15        Q    But it would be true, in a given

16   geographic location, that there's pretty much a

17   going rate for something like aggregate; is that

18   true?

19        A    That's fair, I mean, at each point in

20   time.  It's not going to be static over a long

21   period of time, of course.

22        Q    But I mean, you're aware that aggregate is

23   pretty generally available in many locations, right?

24        A    Again, you cut out on me the first half of

25   your question there.

```
 1        Q    I mean, you're aware that aggregate is
 2   pretty generally available in many locations, true?
 3        A    That's fair.
 4             MR. ASHWORTH:  Hey, Ryan?
 5             MR. RAY:  Yes.
 6             MR. ASHWORTH:  Do you mind if we take a
 7   quick break?  I need to use the rest room.  We've
 8   been at it for about an hour now.
 9             MR. RAY:  No, let's take a few minutes.
10             THE WITNESS:  Okay.  Five minutes, is
11   that what we're saying?
12             MR. ASHWORTH:  That works.
13             MR. RAY:  Five, ten, something like that,
14   yeah.
15             THE WITNESS:  Okay.
16             THE VIDEOGRAPHER:  We're off the record at
17   11:02 a.m.
18             (A recess was had.)
19             THE VIDEOGRAPHER:  We're back on the
20   record at 11:12 a.m.
21        Q    (By Mr. Ashworth)  All right, sir.  Before
22   we left, we were talking about some of your work at
23   the -- I believe we were talking about Classick and
24   Music.  What did you do in the CPA side, what was
25   your role there?
```

1     A     Sorry, what did you call the firm?

2     Q     Classick and Hazel PC, is that the name of

3  it?

4     A     Oh, I thought you called it something

5  else.  I apologize.  You're cutting out on me from

6  time to time, so it's hard to hear you sometimes, so

7  I apologize.  Classick Hazel, PC, what was the

8  question related to it?

9     Q     What was your role in that business?

10     A     Well, obviously, I was a founding partner,

11  a named partner.  You know, both myself and Harold

12  Classick had extensive tax practices, as well as

13  write-up services.  As I mentioned before, he was a

14  CFP, a certified financial planner, so he ran the

15  wealth management side, and I focused more on the

16  valuations and some litigation support besides my

17  tax practice.

18     Q     All right.  If we could go back briefly to

19  Exhibit 18 and page -- I'm sorry, page 62 of it.

20  Does that, sir, list all of the certifications that

21  you hold?

22     A     Yes.

23     Q     All right.  Now, I take it -- when did you

24  become a certified public accountant?

25     A     In 1986.

 1        Q     All right.   And I take it was that in

 2   Colorado?

 3        A     Yes.

 4        Q     Have you been a CPA in any other state?

 5        A     I'm not sure what you mean by that.   I

 6   mean, you can be a CPA in other states, but am I

 7   licensed in other states, no.

 8        Q     Yeah.   Have you ever been licensed in any

 9   state other than Colorado?

10        A     No.

11        Q     Have you held that certification at all

12   times from 1986 through today?

13        A     You totally cut out on me there.   I have

14   no idea --

15        Q     I'm sorry.   Have you held that

16   certification from all times from 1986 through

17   today?

18        A     I sure hope so, yes.

19        Q     All right.   When did you become certified

20   in financial forensics?

21        A     That was later in time.   It's a relatively

22   new designation.   I would have to look back at my

23   records, but it would be approximately around 2010.

24        Q     How about -- we see there, sir, you're a

25   certified valuation analyst.   Is that true?

 1          A     Yes, a CVA.

 2          Q     What entity gives that designation?

 3          A     The National Association of CVAs.

 4          Q     How long have you held that analysis -- or

 5     designation?  Sorry.

 6          A     Yeah, I'm trying to remember exactly.

 7     That would have been through my Classick Hazel days,

 8     so I would say it was right around 1995.

 9          Q     And as a part of getting that

10     certification, did you have any training on the

11     valuation of minerals?

12          A     I mean, there's probably a small aspect of

13     that, because they talked about hard assets, but

14     it's generally more of a valuation for businesses.

15          Q     Do you recall anything they told you about

16     the valuation of minerals in the course of getting

17     that certification?

18          A     I mean, I don't remember any things.

19     We're talking about, again, 1995 and before, so I

20     don't remember exactly the course material.

21          Q     Do you remember anything generally about

22     the valuation of minerals?

23          A     Specific in that case?

24          Q     Yes, in that class.

25          A     No, I don't remember anything specific

1   about that class at all, much less related to the

2   minerals specifically.

3        Q    All right.  How about being an accredited

4   senior appraiser?  When did you receive that

5   certification?

6        A    Let's see, that would have been around --

7   let me think about that a second.  It would be

8   somewhere around 2005.

9        Q    And was there any training on the

10  valuation of minerals in that course of study that

11  you recall?

12       A    That one was much more likely, because the

13  valuation of ASAs is much broader, may cover

14  everything from jewelry to businesses and everything

15  in between, real estate, so there was likely classes

16  that would talk about hard assets and specifically

17  related to minerals.

18       Q    Do you recall anything about that training

19  that you received specific to minerals?

20       A    I mean, again, there's four classes that I

21  took during that time frame, starting back in the

22  year 2000, I believe, was the first class.  I don't

23  remember anything specifically about the class at

24  all, but, again, it was a pretty broad curriculum.

25       Q    Now, do you not remember anything specific

1    to the class at all over the entirety of the classes

2    you took or just the first one?

3        A    I mean, you know, because I'm a valuation

4    professional and I've been doing this for a long

5    time, I don't remember exactly what knowledge was

6    informed by that specific class or any of the four

7    classes from that time frame, related to the

8    valuation of businesses, much less the valuation of

9    mineral estates.  So I don't remember anything

10   related to specific dynamics I learned then as

11   opposed just to my ongoing practice.

12       Q    All right.  Sir, you used the word mineral

13   estate.  Do you have an understanding of that phrase

14   that you used?

15       A    I mean, I guess you can define it for me

16   if you would like, but I know how I used it.

17       Q    How did you use it?

18       A    Basically, someone that has an estate

19   that, basically, has a mineral right of some type.

20       Q    You also understand that there is what's

21   called a surface estate?

22       A    I've heard that term before, yes.

23       Q    And how would you define that term, sir?

24       A    Well, typically, when you talk about the

25   surface as opposed to the subsurface, you're talking

1   about just the ground above, you're talking about

2   the physical ground above the mineral estate.

3       Q    And do you understand that the mineral

4   estate and the surface estate have different rights?

5       A    Are you talking about specific to this

6   case, or are you talking about broadly?

7       Q    I'm just talking about generally right

8   now, sir.

9       A    If they're bifurcated, they would have

10   different rights, yes.

11       Q    And what would, in general, the rights of

12   the surface estate owner be?

13       A    Again, we're talking broadly, right?

14       Q    Yes, sir, just your understanding in

15   general.

16       A    I mean, they have the rights for anything

17   above the ground, basically.

18       Q    Do they ever have any right to break the

19   ground in any way?

20       A    They being the surface owners?

21       Q    Yes, sir.

22       A    And, obviously, they're not the mineral

23   owners as well, right?

24       Q    Correct.

25       A    So it's a situation where there's a

1    surface owner that does not have the mineral rights,

2    do they have the right to break the ground in any

3    way?

4          Q    Yes, sir.

5          A    You know, I'm not a lawyer.  That probably

6    would be a legal conclusion.  I'm not sure I should

7    opine on if they have the rights in any way.  They

8    probably do.

9          Q    Do you have -- you understand that there

10   certainly are some circumstances, which they

11   probably do, as you said, correct?

12         A    I can see that being the case, but, again,

13   I shouldn't be making legal conclusions about what

14   rights or rights they don't have.

15         Q    That's something that's beyond the scope

16   of your expertise, true?

17         A    I mean, it's definitely beyond the scope

18   of my expertise from a legal conclusion standpoint,

19   because, first of all, I'm not a lawyer, and, second

20   of all, I'm not going to make legal conclusions

21   anyway, but if you're talking about whether I

22   understand the differences we've been talking about.

23         Q    Yes, and so you understand that there are

24   situations in which the surface owner may be able to

25   break ground for some purpose, true?

Steven J. Hazel                       4/29/2021                              60

1          A     Again, I'm not aware of that happening.  I

2   wouldn't be surprised if they were able to do that

3   in certain circumstances.

4          Q     Like, for example, they might be able to

5   build a house, true?

6          A     Well, I mean, again, it depends on what

7   kind of house it is, whether you're, you know,

8   breaking the ground or not, I guess, so it depends

9   on what you're asking there.

10         Q     Do you think that the surface owner would

11  have the right to put a house in the subsurface at

12  all?

13               MR. ASHWORTH:  Object to the form.

14         A     I don't know.  I'm not going to make that

15  kind of legal conclusion.

16         Q     (By Mr. Ray)  Is that because it's beyond

17  the scope of your expertise as a non-lawyer?

18         A     Well, I'm not going to make a legal

19  conclusion, because I'm not a lawyer, so, again, do

20  I understand the aspects of what a piling is or what

21  a basement looks like or something like that that

22  would be subsurface?  Of course I understand that.

23         Q     And you understand that surface owners

24  have the ability to do that in general terms, true?

25         A     Again, I don't know that one way or the

 1    other.

 2        Q    All right.  Going back to Classick Hazel,

 3    sir, did you do any valuation of minerals at that

 4    firm?

 5        A    Well, again, if we're defining it broadly,

 6    I definitely did some oil and gas.  I'm trying to

 7    think if there's any hard rock minerals.  I can't

 8    think of any off the top of my head.

 9        Q    Have you ever valued hard rock minerals in

10    your career, sir?

11        A    Well, we've already talked about some, so

12    I'm not sure what you're asking there.

13        Q    All right.  Tell us all the times you have

14    valued hard rock minerals that you recall, that you

15    have not mentioned previously.

16        A    Wow, I mean, I couldn't give you a full

17    line list of all of those.  I've done multiple cases

18    within the last five years in the coal industry,

19    I've done multiple cases in the gold industry.  I've

20    already talked about the large case with the

21    aggregates.  Again, you get to decide if you

22    consider that hard rock or not.  I have a zinc

23    project that's just started up --

24        Q    Did you say zinc, sir?  I'm sorry.  You

25    cut off on us.  Did you use the work zinc?

1      A      Zinc, yeah, zinc mine.  Copper would be

2   another example.  I'm just trying to think of all

3   the minerals, as opposed to try to, you know,

4   stratify them.  Uranium would be another example.

5   There's probably others, but that's the ones I can

6   think of off the top of my head.  Did I say gold?  I

7   know --

8      Q      Yes, sir, you did say gold.

9      A      Gold would be another.

10     Q      All right.  And so did any of those

11  involve the mineral estate and the surface estate

12  being owned by different people?

13     A      I don't know.  I would think that maybe a

14  couple did, just because of the dynamics of the

15  mines, but I'd have to double-check all of those

16  cases.

17     Q      So you believe that there probably were a

18  couple of the coal mine cases that involved that; is

19  that true?

20     A      That's not the ones I was specifically

21  mentioning, but that would be a good example, yes.

22     Q      You think you've been involved in a coal

23  mine case before where there was different mineral

24  and surface ownership?

25     A      Correct.

1      Q     Did you have any understanding in that

2   case how the mineral owner and the surface owner

3   were paid for production of coal?

4      A     I don't -- I think in the coal mine

5   situation, they were the same owner, so that dynamic

6   wouldn't come into play.

7      Q     All right.  Was there any of these cases

8   where there was the other dynamic, where there was

9   different ownership?

10     A     So I remember a gold case, and then I also

11  remember a copper case where I believe the surface

12  was owned by a different party than the mineral

13  rights.

14     Q     Okay.  And so were both of these

15  substances being mined in those cases on kind of an

16  ongoing basis?

17     A     Yeah, obviously, at different points and

18  times, they had been shut down and reopened, and

19  shut down and so forth, but, yes, they were active

20  mining sites.

21     Q     So let's start in the gold case.  Did you

22  have any understanding of how the mineral owner was

23  paid in the gold case?

24     A     Yes.

25     Q     Was that based upon gold that was actually

 1  produced?

 2        A    I don't believe so.   I believe there was a

 3  lease in place where they got a set fee.

 4        Q    Was that a royalty off of production, or

 5  was it just kind of like a flat fee?

 6        A    Now that you mention it, I think it was

 7  both.   I think there was a flat fee, and then there

 8  was a royalty on top of that.

 9        Q    Did they get, like, a bonus at the outside

10  and then an ongoing royalty over time?

11        A    Again, I don't remember exactly, but,

12  vaguely, it seems like they were getting a set fee

13  on a monthly basis, and once they basically met

14  certain targets, they got a royalty on top of that,

15  but it wasn't one-time payments.   They were ongoing

16  payments for both.

17        Q    Okay.   But a component of their payment

18  certainly was a royalty on gold that was produced,

19  true?

20        A    That's my remembrance, yes.

21        Q    Now, in that case did the surface owner

22  get any payments from the company operating the gold

23  mine?

24        A    That, I don't remember.

25        Q    But you don't -- you weren't aware of any

1   distinct payments that you recall today, true?

2       A    I mean, I just don't remember.  I mean,

3   obviously, there's lots of different costs that were

4   basically being expended.  I don't remember exactly

5   how the payments were being made to the surface

6   owner.

7       Q    Do you even remember whether they were

8   receiving any payment?

9       A    No, I honestly don't remember one way or

10  the other.  I don't think people would allow it to

11  be done for free, so I mean, I would assume they are

12  getting something.

13      Q    Do you think it would have been less than

14  what the mineral owner was receiving?

15      A    In general, yes, because the mineral

16  rights usually are more valuable than surface

17  rights.

18      Q    Right, because the mineral owner owns the

19  gold, and the surface owner does not, correct?

20      A    I mean, that's one dynamic, sure.

21      Q    And you certainly don't disagree with that

22  statement, right?

23      A    No, I think that's a fair characterization

24  of it.

25      Q    All right.  Now, let's talk about copper.

1   In the copper case you were involved in, do you have

2   any understanding of how the mineral owner was paid

3   in the copper case?

4         A     You know, my remembrance is it was a

5   similar situation, where there was some type of a

6   set fee, but they got some other basis, whether it's

7   royalty or some other type of -- kind of an earn-out

8   payment.

9         Q     But you did have an understanding that

10  they got paid a royalty for the ongoing production

11  of copper?

12        A     There was definitely some type of add-on

13  based on the production, yes.

14        Q     Was that based upon actual sales of

15  copper?

16        A     I don't remember.

17        Q     Well, certainly, the copper company

18  wouldn't have the money to pay them for production

19  if they didn't actually sell the copper, true?

20        A     Well, I mean --

21              MR. ASHWORTH:  Object to the form.

22        A     -- that's not necessarily true.  I mean,

23  they could be holding onto it for speculation

24  purposes, but in general, they want to sell it at

25  some point so they get some kind of monetization of

 1   their asset, yes.

 2       Q    (By Mr. Ray)  And is that usually when the

 3   payment to the -- the royalty payment to the mineral

 4   owner is triggered?

 5       A    I don't remember there being a correlation

 6   like that, so I can't answer that one way or the

 7   other.

 8       Q    Do you remember the details of the royalty

 9   payments to the mineral owner at all?

10       A    No.

11       Q    So in the gold case, sir, what were you

12   actually valuing there?

13       A    Well, at that particular time it was after

14   the mine had been shut down, and we were looking at

15   the stock piles, is a term used in the industry, and

16   looking at what potential value the site would have

17   as is, as well as what potential value it would have

18   if they reopened the mine.

19       Q    So are the -- the stock piles, is that

20   gold that has actually been extracted from the

21   ground?

22       A    Typically it's not the gold, especially

23   when you talk about a gold mine, because gold has a

24   very specific value that's high.  So they typically

25   have the gold already out as best they can.

 1   There's, obviously, going to be traces still in the

 2   stock piles, but the stock piles typically are more

 3   valued for the other minerals that are there that

 4   have value in the marketplace.

 5        Q    And were you actually valuing those other

 6   minerals in the stock pile yourself?

 7        A    I mean, obviously, we have engineers, we

 8   have other people as part of the team, but, yes.

 9        Q    And did you value those based on the

10   marketplace price for the minerals in the stock

11   pile?

12        A    As the revenue source, sure.

13        Q    Is that sort of how you would value hard

14   minerals like that, based upon what they could be

15   sold for in the open market?

16             MR. ASHWORTH:  Object to the form.  Sorry,

17   go ahead.

18        Q    (By Mr. Ray)  You can answer, sir.

19             MR. ASHWORTH:  That was an objection,

20   sorry.

21        Q    (By Mr. Ray)  He objected to the form,

22   sir, but you can answer, subject to that.

23        A    Yeah.  So it's -- obviously, one dynamic

24   of it is the revenue side of the equation, yes.

25        Q    Were there other dynamics that you used in

1   valuing the hard minerals in the stock pile?

2          A     Well, we, obviously, have all the same

3   dynamics we talked about broadly with the mining

4   before, but in this particular case, it's more of a

5   concern about what the percentage of that stock pile

6   is what type of ore.

7          Q     Because different ores sell for different

8   prices on the open market, correct?

9          A     That's true.

10         Q     So were you the one that actually

11  performed the analysis of the different ores that

12  were there, or did someone else do that?

13         A     Well, we would do the financial

14  calculations related to it, but, again, I'm not a

15  geologist in that particular case or an engineer of

16  some type where you may be doing the pure technical

17  side of the equation.

18         Q     There was someone else involved that did

19  that, correct?

20         A     That assisted me with that, yes.

21         Q     And was this -- was the matter involving

22  gold in actual litigation?

23         A     I don't think the case had been filed yet,

24  but I think there was an anticipation of that.   I

25  don't even know what the status is at this point.

1    It's an old case, but it's still technically pending

2    is my understanding.  We were looking at kind of the

3    feasibility studies, is a term we would use in the

4    industry, so we were looking at that aspect, and so

5    I don't know if that was in litigation or not.

6         Q    How about the copper case; was that in

7    litigation?

8         A    I don't believe that was in litigation

9    either.  Again, there would have been a potential

10   for litigation going forward, but that -- I don't

11   know if they settled, but that case stopped

12   relatively quickly after we started.

13        Q    Did you actually prepare a written work

14   product in either of those cases?

15        A    Yes.

16        Q    Both?

17        A    I don't believe we ever did a final

18   product in the copper case, but in the gold case, we

19   definitely did a report.

20        Q    All right.  Are there any other cases,

21   besides the gold case and the copper case, that you

22   can think of where you were valuing hard minerals

23   yourself?

24        A    I mean, I gave you a list of all sorts of

25   different minerals where we were valuing the

 1    minerals themselves, so I don't know what your

 2    question is there.

 3         Q     All right.  Is there one case involving

 4    aggregate that you've already told us about?

 5         A     Okay.  So before we talked about the gold

 6    and the copper case specific to surface versus

 7    mineral rights, that's where the breakoff point

 8    went.  I talked about multiple different cases and

 9    various different ores, very different capacities

10    related to minerals broadly.  So all of those cases

11    would be in answer to your question.

12         Q     Okay.  And in the case of aggregate, did

13    you -- did you have any understanding of how those

14    were valued in the open market?

15         A     How those, what do you mean by those?

16         Q     The aggregate, the aggregate at issue in

17    that case.

18         A     I have an understanding of that, yes.

19         Q     And it's valued at what the market is

20    willing to pay for it, correct?

21         A     No.  I mean, the company is valued based

22    on its long-term performance.  If you're talking

23    about there's a value or a revenue to the specific

24    aggregate itself, the answer is yes.

25         Q     And that is what I'm referring to, sir.

1   You mentioned that case.  Are there other cases in

2   which you have valued the aggregate itself?

3        A    Again, I don't know how you would value a

4   mine without valuing the aggregate itself, so when

5   you're valuing the overall operation, you have to do

6   both of those dynamics.  Is there a situation where

7   we're valuing the minerals, absolutely.  I mean, I

8   do that every single mining case that we do.

9        Q    All right.  Have you done more than one

10  case where you have valued aggregate?

11       A    Yes.  I've already told you a case where

12  there's 26 different sites, so if that's -- I mean,

13  that's already 26 different ones right there alone.

14       Q    Right.  And did you value any of that

15  aggregate other than by looking to the market price?

16       A    Well, again, the valuation of that

17  particular operation is going to be different than

18  just looking at the revenue source of the price.  So

19  if you're asking me if the revenue source of the

20  price is one dynamic to the overall work, the answer

21  is absolutely.

22       Q    And I'm just focusing on the aggregate

23  itself.  I'm not talking about the business more

24  generally, sir.  I'm just talking about the

25  aggregate at any particular site.  Do you

 1    understand?

 2         A     Sure.

 3         Q     And did you value any of that aggregate at

 4    any of those 26 locations, other than by looking to

 5    the market price for that aggregate?

 6         A     If you're talking about the minerals

 7    themselves, you have to get a revenue and a value of

 8    that revenue stream.  That's only one dynamic to the

 9    overall work.

10         Q     But as it relates to the aggregate itself,

11    that's really the only dynamic for the aggregate

12    itself, true?

13         A     We'll just have to choose to disagree, so,

14    no, I don't agree with that.

15         Q     All right.  What are the other components

16    to valuing the aggregate itself?

17         A     We've already covered that multiple times

18    today.  There's all sorts of other dynamics.  You

19    like to talk about the transportation as the first

20    one, which, of course, is one of the dynamics that

21    would be different from one site to another site.

22    You have to look at the overall operations of that

23    particular location.

24         Q     All right.  So you'd consider the market

25    price and you'd consider transportation costs in

1    valuing the aggregate itself, true?

2          A     Sure.

3          Q     Is there anything else you would consider

4    in valuing the aggregate itself?

5          A     Okay.  You have to be in an operational

6    capacity to mine those minerals, so you have to look

7    at your overall cost structure.  We talked about the

8    cost of the mining itself, we talked about the

9    equipment necessary, we talked about the personnel

10   necessary, we talked about all of those dynamics in

11   detail previously.

12         Q     All right.  And so you have the production

13   costs, correct?

14         A     Yes.

15         Q     And then you have the transportation

16   costs, correct?

17         A     Yes.

18         Q     And then you have the market price, true?

19         A     As three options, yes.

20         Q     Is there anything else that you would take

21   into account when you're valuing specific aggregate

22   at a specific site?

23         A     Yeah.  I've already given you other

24   examples.

25               MR. ASHWORTH:  Object to the form.

1        A    Of course there's other aspects.

2        Q    (By Mr. Ray)  All right.  So let's just

3   focus --

4        A    You're asking the same question over and

5   over and over again and expecting a different

6   answer.  You're not going to get a different answer.

7        Q    No, sir.  My question is, let's take a

8   specific site in this project, all right?  You've

9   got 26.  Let's pick one.

10       A    Okay.

11       Q    Okay?

12       A    As I already told you, each one has a

13  different dynamic.  They're at different places of

14  the life cycle.

15       Q    I understand, but when you're valuing the

16  aggregate at that site, you would take into account

17  the market price, true?

18       A    Yes.

19       Q    And you would take into account the

20  production costs, true?

21       A    Yes.

22       Q    And you would take into account the

23  transportation costs, true?

24       A    Yes.

25       Q    Is there anything else for that specific

1  site that you would take into account in valuing the

2  aggregate at that site and the aggregate at that

3  site alone?

4       A     Well, you're making a lot of assumptions

5  there.  I guess you're saying that production costs

6  includes all the personnel, all the equipment, all

7  those different things.  So if that's what you're

8  saying, those dynamics are taken into account, but,

9  of course, the makeup of that specific aggregate

10  would be important.  So if you're saying the market

11  price takes into account all the different aspects

12  of the mineral itself, so you've already established

13  what that mineral composition is, then I'll agree

14  with you.  But, again, it's not as simple as just

15  those three factors.  There's lot of dynamics

16  related to those overall areas.

17       Q     All right.  So you identified the

18  composition of the mineral, right, that's one thing

19  that would have to be taken into account, true?

20       A     Yes.

21       Q     And the market sets different prices for

22  different minerals; does it not?

23       A     Again, as we talked about before, there's

24  a negotiation aspect of it, so it's not like there's

25  one price and only one price over a long period of

1  time.  So I want to make sure that's clear.  You're

2  making it sound like if I have a couple of rocks in

3  my pocket, I can take it to the site, and they're

4  going to pay me X dollars, no matter what.  That's

5  not how it works.  So you're trying to be very

6  summarized for something that's much more

7  complicated than that.

8      Q    Right.  But aggregate, you understand, in

9  a given location, aggregate has pretty much a going

10 rate, right?

11     A    For that specific type of aggregate, sure.

12     Q    Yes.

13     A    At that particular moment in time.

14     Q    And that's just whatever the market will

15 support, true?

16          MR. ASHWORTH:  Object to the form.

17     A    That's for any product or business or

18 service you have.  If you're a lawyer and the market

19 supports $500 an hour, that's what the market

20 supports.  So at that point in time, $500 an hour is

21 what it supports.

22     Q    (By Mr. Ray) All right.  How about zinc,

23 sir?  Is the zinc valued in a similar way, or is it

24 different?

25     A    I don't understand your question, if I

1    value --

2              (Simultaneous speakers.)

3         Q    (By Mr. Ray)  Right.  So you've done a

4    case where you've valued zinc, have you not?

5         A    I didn't say that.  I said there's a zinc

6    mine, yes.

7         Q    And as a part of that engagement, did you

8    actually value the zinc itself?

9         A    I mean, you have to understand the value

10   of the zinc to basically do the overall work of the

11   valuation of the solvency related to that particular

12   mine.  Am I an engineer or a geologist, I've already

13   said no.  We'd have assistance from that standpoint

14   to come up with the ultimate conclusion.

15        Q    Is that what, in fact, occurred in the

16   zinc case?

17        A    As it occurs in most mining cases, for

18   that matter.

19        Q    Do you usually rely on engineers to

20   actually conduct that valuation?

21        A    No.

22        Q    All right.  So what role did the engineers

23   play?

24        A    They're part of the team to basically

25   understand the quantity of the various different

1  mineral, whatever it might be.  They're actually

2  looking at the commodity prices, depending on if

3  it's a commodity.  We'll look at the market prices,

4  as you like to term it, related to other types of

5  minerals.  So they're looking at all of that

6  different information based on their knowledge.  We

7  will then take that information, we will look at the

8  overall equation to make sure it fits the facts and

9  circumstances of our case, make sure those reserves

10 are accurate to come up with the ultimate valuation

11 of that particular operation.

12      Q     But is it the engineers that actually give

13 you the information needed to value the actual zinc?

14      A     No.

15      Q     Who gives you that information?

16      A     Again, they're not giving me anything.

17 They're part of the team that's looking at the

18 overall equation, but, again, generally, you would

19 have a geologist that's looking at the mineral

20 itself.  So if we're talking about zinc, you're

21 looking at a geologist that's basically assisting

22 with that part of the project.

23      Q     Was there a geologist on your team in this

24 case, sir?

25      A     In this case, being Osage --

1      Q    Yes, sir.

2      A    -- the matter that we're talking about

3  here?

4      Q    Yes, sir.

5      A    I believe there was a geologist that was

6  involved with this case, yes.

7      Q    On your team?

8      A    I don't know what you mean by my team.  I

9  mean, my team is the FTI team.  If you're talking

10  about some other lawyer team, I'm not part of any

11  team.  I'm an objective, independent expert, so I'm

12  not sure what you're talking about there.

13      Q    Was there a geologist involved at FTI?

14      A    Not that I'm aware of, no.

15      Q    Did you rely on a geologist in forming any

16  of your opinions in this case?

17      A    No.

18      Q    Did you consider doing so?

19      A    Sorry, you cut out on me there.

20      Q    Did you consider doing so?

21      A    I don't know if I would say consider.  I

22  mean, I was already aware of people that had that

23  type of abilities or relied on others that had that

24  type of abilities.  As I've already mentioned, I've

25  seen the other reports that have those types of

1   dynamics, the type of rock.  That's not necessary

2   for my opinion.

3        Q    Are you rendering an opinion on the value

4   of the minerals in this case?

5            MR. ASHWORTH:  Object to the form.

6        A    I would say I am not valuing the minerals

7   themselves.  I'm a damage expert valuing the mineral

8   estate's rights and ownership and the damages

9   related to it.

10       Q    (By Mr. Ray)  But you're not valuing the

11  minerals themselves, correct?

12       A    No --

13           MR. ASHWORTH:  Object to the form.

14       A    -- it's my understanding there are others

15  that are doing that.

16       Q    (By Mr. Ray)  And I believe you've

17  actually reviewed those reports, true?

18       A    Yes.

19       Q    Do you intend to offer any testimony on

20  those, the subject matters of the reports of

21  Mr. Pfahl and Mr. Freas?

22       A    Well, I mean, it doesn't matter what my

23  intention would be.  I don't intend to do anything.

24  I don't know what questions I'll be asked, so I

25  can't answer that question.

Steven J. Hazel                          4/29/2021                                    82

1       Q      Have you formed any opinions, as you sit

2   here today, on the subject matters that those two

3   gentlemen have rendered reports regarding?

4       A      Well, I mean, obviously, I've read their

5   reports.  Some of them cross over into my report,

6   especially if you're looking at Pfahl's type of

7   information.  So, again, I don't know what I'm going

8   to be asked, so I would think there would be some

9   crossover.

10      Q      And what crossover do you think there

11  would be?

12      A      Again, you're asking me to speculate about

13  what's in somebody else's mind about what they think

14  the crossover is.  I can't answer that.

15      Q      Well, you said you thought there would be

16  crossover, did you not?

17      A      True, because my name specifically is

18  mentioned in the Pfahl report, for example, so, of

19  course, there's crossover.

20      Q      All right.  Do you have any criticisms or

21  responses to anything in Mr. Pfahl's report?

22      A      Sure.

23      Q      And tell us what those might be, sir.

24      A      You'd have to pull out the report.  We'd

25  have to go line by line if you want to go over all

1    the criticisms.

2        Q    Do you have any that generally come to

3    your mind, as we sit here right now?

4        A    I would rather have the report in front of

5    me to give you all of them.  I don't want to start

6    giving you a partial laundry list.

7        Q    Can you think of one example as you sit

8    here right now, without even looking at the report

9    in front of you?

10       A    Well, I think broadly he misses the point.

11   The point here in this particular situation is

12   negotiation of a lease.  It doesn't have anything to

13   do in my mind about what that particular mineral may

14   be worth right there at that particular moment in

15   time.  We're talking about damages related to this

16   case and what the mineral right owners should

17   receive as damages.  That's what we're talking about

18   in this case.  So he just totally misses the point.

19       Q    Damages for what?

20       A    For the failure to get a lease for the

21   mining activities that the Tenth Circuit determined

22   was going on.

23            MR. RAY:  All right.  Do we have up

24   Mr. Hazel's report, Exhibit 18?  Is that the exhibit

25   that we have here?

1          THE VIDEOGRAPHER:  It is, yes.

2      Q    (By Mr. Ray)  All right.  Let's go back to

3  the beginning of it.  All right, sir.  So you talked

4  about the mining activities defined by the Tenth

5  Circuit.  Is that correct?

6      A    I mean, I don't see it on that particular

7  page, but we have -- it was in the report, yes.

8      Q    All right.  Well, it says here on the --

9  if we see the third line of the second paragraph, do

10 you see you have a defined term, mineral

11 development; do you see that there, sir?

12     A    I'm sorry, are you on page 1?

13     Q    Yeah, I'm on page 1, yes, sir.

14     A    Are you talking about the first -- the

15 third or the first full paragraph?

16     Q    The second paragraph -- third line, second

17 paragraph.

18     A    Okay.  I apologize.  I thought you said

19 something else earlier.  I apologize.  I'm not sure

20 how that relates to the question you asked.  Can you

21 ask the question again?

22     Q    My question was simply, you have a defined

23 term, mineral development, on that line.  It

24 actually -- the term itself spills over to the

25 fourth line; do you see that?

```
 1        A    I see what you're saying.  Okay, yes,

 2   that's fine, yes.

 3        Q    All right.  And you've defined that to be

 4   "extraction, sorting, crushing and the use of

 5   minerals."  Correct?

 6        A    That's my defined term of mineral

 7   development, correct.

 8        Q    And is that the activity that required a

 9   lease?

10        A    I don't remember --

11             MR. ASHWORTH:  Object to the form.

12        A    I don't remember exactly what the Tenth

13   Circuit said.  We would have to look at their

14   language.  That would be more appropriate than what

15   my language is.

16             (Exhibit 19 marked for identification.)

17        Q    (By Mr. Ray)  All right.  Well, let's do

18   that.  Could we pull up -- it is Exhibit 19.  Let's

19   look -- let's go ahead and go to the third page.

20   And in the first full sentence there, sir, we see

21   very similar language, true?

22        A    True.

23        Q    And they say that that process, being

24   "extraction, sorting, crushing, and use of

25   minerals," that constituted mineral development,
```

 1    just like you define it, right?

 2        A    It's similar language, yes.

 3        Q    And it says, "thereby requiring a

 4    federally approved lease."  Do you see that?

 5        A    Yes.

 6        Q    Was there anything else that required a

 7    lease?

 8             MR. ASHWORTH:  Object to the form.

 9        A    I mean, I'm sure there's other things that

10    would require a lease, but if we're talking about

11    specific to this case --

12        Q    (By Mr. Ray)  Yes.

13        A    -- specific to the Tenth Circuit opinion,

14    I think you've summarized it well.

15        Q    All right.  Now -- all right, sir.  If

16    we -- now, you've looked at some of the Code of

17    Federal Regulations in this case, have you not?

18        A    I have seen those referenced as well as,

19    you know, in writing in various places, yes.

20             (Exhibit 21 marked for identification.)

21        Q    (By Mr. Ray)  All right.  Let's pull up

22    Exhibit 21, if we could.  And if we take a look at

23    part (a), you actually quote part of this Regulation

24    211.1(a) in your report, do you not, sir?

25        A    I think there might have been a footnote

Steven J. Hazel                           4/29/2021                              87

1   about that or maybe in the prose.  That's probably

2   true.

3       Q    All right.  And you reference this in

4   regard to the quote about "maximizing Indian mineral

5   owner's best economic interests"; do you recall

6   that?

7       A    I guess you'll have to show it to me or

8   let me look at the report to see exactly what you're

9   talking about.  I don't think I would phrase it that

10  way, no.

11      Q    All right.  Let's go back to Exhibit 18

12  then, if we could.  And if we could take a look at

13  -- we'll start on the bottom of page 6, and do you

14  see, sir, right there where it says, "The federal

15  regulations contemplated," and it's talking about

16  the Tenth Circuit opinion.  Do you see that

17  language, sir?

18      A    Yes.

19      Q    All right.  It says, to "protect Indian

20  mineral resources and maximize the Indians' best

21  economic interests."  Do you see that?

22      A    I do.

23      Q    And that same language was in 211.1(a),

24  was it not?

25               MR. ASHWORTH:  Object to the form.

1          (Simultaneous speakers)

2     A     -- 211.(a) (sic) but, again, we're not

3  footnoting this particular regulation in that

4  particular there; we're quoting the Tenth Circuit

5  order, so I'm not sure what you're getting at.

6     Q     (By Mr. Ray)  All right.  Let's pull back

7  up the Tenth Circuit's opinion.  I believe that's

8  Exhibit 19.  You're quoting -- before -- you're

9  quoting page 21 of the Tenth Circuit's opinion in

10 that portion of your report, are you not?

11    A     Again, I don't have the report with me, so

12 I can't answer that question, but I'll believe you.

13    Q     Okay.  Well, let's take a look on page 21.

14 All right, sir.  Do you see where it says -- the

15 Tenth Circuit's opinion here says, "The regulations

16 at issue here are designed to protect Indian mineral

17 resources and 'maximize Indians' best economic

18 interests.'"  Do you see that?

19    A     I do.

20    Q     And the Tenth Circuit Court of Appeals is,

21 in fact, quoting 25 CFR, Section 211.1.  Do you see

22 that?

23    A     I do.

24    Q     All right.  So can we go back to Exhibit

25 21?  And we see there, sir, in subsection (a), the

1   full sentence from which that's quoted.  It

2   starts -- do you see where it says, "These

3   regulations are intended to ensure that Indian

4   mineral owners desiring to have their resources

5   developed are assured that they will be developed in

6   a manner that," as they said, "maximizes their best

7   economic interests."  Do you see that?

8        A    Honestly, I can't see it because the

9   screen is cut off a little bit, but I think you read

10  it properly.

11       Q    All right.  Do you also have an

12  understanding that part 214 of these regulations

13  actually specifically applies in Osage County?  You

14  looked at some of those, did you not?

15       A    You'll have to refresh my memory, but that

16  sounds right.

17            (Exhibit 20 marked for identification.)

18       Q    (By Mr. Ray)  All right.  Well, let's take

19  a look at Exhibit Number 20, and if we could, let's

20  go to page 32.  And do you see there, sir, where

21  "Leases, among other things, must be on forms

22  prepared by the department, and the superintendent

23  of the Osage Indian School, Pawhuska, Oklahoma, will

24  furnish prospective lessees with such forms at the

25  cost of $1 per set."  Do you see that?

Steven J. Hazel                          4/29/2021                                90

1          MR. ASHWORTH:  Object to the form.  Ryan,

2    I can't see where you're -- what you're referring

3    to.  Could you enlarge it so I can see where you're

4    reading from?

5          MR. RAY:  Yeah, it's from the first

6    sentence there.

7      A    I mean, I think you read it properly, if

8    that's what you're asking, yes.

9      Q    (By Mr. Ray)  All right.  And one of the

10   things there is a form N, which would be a lease,

11   except for lead and zinc, right?

12     A    True.

13     Q    Are you aware of any forms prepared by the

14   Department of the Interior that would have terms

15   like those you are proposing?

16     A    I have no idea what you're talking about

17   there.

18     Q    Have you seen a form lease that would have

19   payment terms like what you've proposed in your

20   report?

21     A    Are you talking about our damage

22   calculation in our report?

23     Q    Yes, sir, that's basically based on the

24   terms of the surface leases that the surface owners

25   got in this case, right?

 1          A     True.

 2          Q     Have you seen forms prepared by the

 3   Department of the Interior that have terms like

 4   that?

 5                MR. ASHWORTH:  Object to the form.

 6          A     I don't know why they would prepare those,

 7   first of all, so I don't understand your question,

 8   but I guess, no, I haven't seen something specific

 9   like that.

10                (Exhibit 23 marked for identification.)

11          Q     (By Mr. Ray)  All right.  Let's take a

12   look at Exhibit 23.  Have you ever seen this

13   document, sir?

14          A     This one does look familiar.  I definitely

15   have some similar to this, but I can't remember if

16   it was Candy Creek or not.

17          Q     All right.  This would appear to be a

18   lease that was in effect in 2013 and 2014, true?

19          A     A negotiated lease between the two parties

20   at that time period, yes.

21          Q     Right.  It's on a form prepared by the

22   Department of the Interior, is it not?

23          A     That's what it appears.

24          Q     All right.  And it has -- in paragraph

25   2(a) it actually has a royalty rate, correct?

```
 1        A    It does.

 2        Q    And that's 51 cents per ton for all

 3   limestone and Dolomite received; is it not?

 4        A    It technically says removed, but, yes.

 5        Q    Removed -- "removed from the premises" is

 6   what it says, right?

 7        A    Yes.

 8        Q    That's what triggers payment of the

 9   royalty under this document?

10        A    We would have to look at the whole

11   document, but that's what this line says, yes.

12        Q    All right.  Well, please take a look, and

13   tell us if you -- I believe it's a two-page

14   document, sir.  If you need to look at the entire

15   thing to tell us if you see any other payment terms

16   that are set out, please take a look and let us know

17   what they are.  And I apologize.  It's actually four

18   pages, maybe it's five.

19        A    I'm not sure I really understand the

20   question.  Are you trying to say what is the trigger

21   event for a payment --

22        Q    Yes, sir.

23        A    Is that what your question is?

24        Q    I'm trying to ask you if there's anything

25   other than the removal of limestone or Dolomite?
```

1    A    That would cause a payment?

2    Q    Yes, sir.

3    A    Okay.  Can you go to the next page?  Okay.

4    Keep going.  Keep going.  So I think your question

5    is, is the removal of the limestone and Dolomite the

6    triggering for the royalty?  I agree with you.

7    Q    Nothing else that triggers a payment in

8    this form prepared by the Department of Interior?

9    A    I think that's fair.

10   Q    All right.  Let's go back to Exhibit 20,

11   and we'll take a look at page 12.  Now, do you see

12   subsection (d), sir?

13   A    You said B as in boy or D as in dog?  Oh,

14   D?  Okay.

15   Q    D as in, yeah, Delta.

16   A    Okay.

17   Q    All right.  Are you -- there was no gold,

18   silver, copper, lead, zinc, coal or asphaltum at

19   issue in this case, true?

20   A    Correct.

21   Q    All right.  So this provision actually

22   requires a royalty rate for those substances for

23   "10 percent of the value at the nearest shipping

24   point of all ores, metals or minerals marketed,"

25   correct?

 1          MR. ASHWORTH:   Object to the form.

 2     A     So it requires a royalty rate in a

 3  negotiated lease where both parties are active in

 4  negotiations; is that what you're asking?

 5     Q     (By Mr. Ray) Well, it specifies that

 6  royalties -- if you look at the first line, sir, the

 7  very first line of the regulation, it says,

 8  "Royalties will be required as follows"; do you see

 9  that?

10     A     That's what the standard says, yes.

11     Q     And then subsection (d) is specific to the

12  substances that are at issue in this case; is it

13  not?

14     A     I would say it's specific, but it

15  basically is part of those because it's not one of

16  the other things, yes.

17     Q     Okay.  It requires "a royalty of

18  10 percent of the value at the nearest shipping

19  point of all ores, metals or minerals marketed."

20  Correct?

21     A     If the Indian Nation wants to do a lease,

22  that's what they're required to do, correct.

23     Q     There isn't anything in this regulation --

24  and please review it if you need to, sir -- that

25  would contemplate any other royalty than what is

1    required in subsection (d) for these materials?

2         A    You'll have to do that one again.  Can you

3    say that one again?

4         Q    Is there anything else in this regulation

5    that would contemplate any different kind of royalty

6    for the substances at issue in this case, other than

7    that in subsection (d)?

8         A    Well, sure.  I mean, again, the Indian

9    Nation didn't want the development at all, so we're

10   talking about leases that the Nation wants.  Well,

11   they don't want this development, so if you're

12   trying to say that you have to charge us royalty in

13   every single possible situation, that doesn't make

14   sense to me.

15        Q    My question, sir, is specific to

16   subsection 210 of the Code of Federal Regulations,

17   and my question is whether anything in this

18   regulation contemplates a royalty for the substances

19   at issue here, other than that set forth in

20   subsection (d)?

21             MR. ASHWORTH:  Object to the form.

22        A    Well, first of all, this is 214.10(d), not

23   what you said, but second of all, if there's a

24   negotiated lease for these, is this royalty

25   required, the answer is yes.

Steven J. Hazel                          4/29/2021                          96

1        Q     (By Mr. Ray)   Is there anything -- any
2    language in 2 -- Section 214.10 that limits its
3    application to negotiated situations only?   Can you
4    point to any language in the regulation itself that
5    supports that, sir?
6              MR. ASHWORTH:   Object to the form.
7        A     You're asking -- it doesn't support the
8    opposite either.   You're basically saying under
9    every single possible scenario, no matter what the
10   scenario might be, they can only charge this amount.
11   That doesn't make sense to me.   If a judge decides
12   that, that's for the judge to decide.
13       Q     (By Mr. Ray)   But there's nothing in this
14   regulation that you could point to that would
15   contemplate a different royalty rate, true?
16             MR. ASHWORTH:   Object to the form.
17       A     If there's different facts and
18   circumstances that this royalty rate doesn't apply
19   to, of course, this doesn't apply to that.
20       Q     (By Mr. Ray)   Is there any language in
21   this regulation that limits its application in any
22   way?
23             MR. ASHWORTH:   Object to the form.
24       A     We'd have to look at the overall statute
25   to see if that answer would be apparent, but, again,

1  how could it ever contemplate all of the different

2  facts and circumstances that could come up?

3       Q    (By Mr. Ray)  Well, this is a regulation

4  that's adopted by the Department of the Interior; is

5  it not?

6       A    I don't have any problem with the

7  regulation.  It is what it is.

8       Q    Is there any regulation, sir, that you saw

9  in your review that contemplated different lease

10  terms, other than this one?

11      A    I didn't see any regulation that applied

12  to different lease terms one way or the other, so

13  you're asking me to prove a negative, which doesn't

14  exist.

15      Q    Well, this regulation certainly

16  contemplates lease terms for royalty, does it not?

17      A    If both parties want to negotiate a lease,

18  that is true.

19      Q    And there's nothing in here that limits

20  its application to only negotiated leases in --

21      A    Nothing that limits it to other types of

22  negotiations, either.

23           (Exhibit 24 marked for identification.)

24      Q    (By Mr. Ray)  Let's pull up Exhibit Number

25  24, if we could.  All right, sir.  This is a series

1   of documents that were produced to us regarding

2   compensation made to you and your firm and related

3   communications.  Have you seen these documents

4   before?

5        A    I mean, I don't remember seeing them

6   recently, but, of course, it's got my name on it, so

7   I definitely would have remembered it at the time.

8   This is back in February of 2020.

9        Q    All right.  Let's take a look at the

10  second page.  There's an email from you to a number

11  of people, a number of attorneys in this case.  Do

12  you see that, sir?

13       A    Yes.

14       Q    All right.  The second sentence of the

15  email says, "I stand ready to assist you and am

16  highly qualified in all of the various areas

17  needed."  Did you see that?

18       A    Yes.

19       Q    What did you understand the various areas

20  needed to be at this time?

21       A    Well, I think there was broadly the

22  renewable energy aspect, there was broadly the

23  mineral aspect, there was broadly the damages

24  expert.  It's all the different types of work that

25  needed to be done at that point.

 1       Q     And are you highly qualified in all of

 2  those areas?

 3       A     Yes.

 4       Q     All right.  As it relates to wind, I

 5  believe I understood you earlier that you've been

 6  involved in one case involving wind energy that

 7  involved construction overruns, correct?

 8       A     No, that's not what I said.

 9       Q     All right.  What other wind energy

10  projects have you been involved in?

11       A     Again, as we talked about previously,

12  there was the one case we talked about in detail.  I

13  believe there was other cases where there was wind

14  farms as part of the development, but was not the

15  focal aspect of that particular case.

16       Q     You certainly didn't analyze anything

17  about mineral leases in those cases specific to wind

18  farms, true?

19       A     I don't remember that being a dynamic in

20  those cases, correct.

21       Q     And you've never actually done that at all

22  before this case, true?

23       A     Sure.

24       Q     All right, sir.  Let's take a look at the

25  third page of Exhibit Number 24.  Is this a budget

 1  that you prepared?

 2      A    I mean, I didn't personally prepare it,

 3  but I'm responsible for it, yes.

 4      Q    Do you know who did personally prepare it?

 5      A    I probably did at the time, but I don't

 6  remember who specifically did the first version of

 7  this.

 8      Q    But you were ultimately responsible for

 9  all of this work; is that -- do I understand you

10  correctly there?

11      A    Yes.

12      Q    All right.  One of the line items that you

13  identify here, sir, is analysis, market and industry

14  research.  That's under paragraph B.  Do you see

15  that?

16      A    B as in boy?

17      Q    Yes, sir.

18      A    Yes, I see that.

19      Q    Did that work, in fact, occur?

20      A    I mean, broadly, yes.  Obviously, the

21  categories are pretty generic, and that's something

22  that we've done in every single case, but there was

23  definitely some industry research, definitely some

24  market research, definitely some analysis.

25      Q    All right.  How about the industry

1  research; can you describe for us what kind of

2  industry research was done?

3      A    Trying to think of an example, just bear

4  with me a second here.  I guess a good example would

5  be that we did some research related to the life

6  cycle of a wind turbine.

7      Q    Okay.  Any other examples that you can

8  think of?

9      A    Off the top of my head, I think we did

10 some analysis related to wind projects related to

11 their cost structure.  I think we did some research

12 related to the discount rates, to their rates of

13 return, to their revenue sources, to their

14 agreements with electrical providers, those types of

15 things.

16     Q    And did your research reveal any other

17 instance in which mineral owners were paid the same

18 as surface owners in a wind energy project?

19     A    I don't think the research spoke to that,

20 no.

21     Q    Are you aware of that occurring anywhere

22 else in the United States of America?

23     A    Again, that's not what we're doing here,

24 so I'm not sure why you're saying that, but I'm not

25 aware of that specific dynamic happening.

1    Q    And also, for example, your experience in

2    coal mines, certainly, the mineral owners and the

3    surface owners are not paid on the exact same terms

4    in a coal mine, are they?

5    A    They're generally not paid on the exact

6    same terms.  The mineral right owners usually get

7    paid more.

8    Q    All right, sir.  You're familiar with your

9    report and how it came to be, correct?

10   A    That's fair.

11   Q    All right.  Who drafted the report?  Did

12   you draft the report, or did someone else draft the

13   report?

14   A    Well, I'm ultimately responsible for it,

15   so at the end of the day I drafted it, because I'm

16   responsible for every word.  If you're talking

17   about, you know, the format originally or something

18   else, you'll have to ask those questions.

19   Q    So who actually put the words on the page,

20   and I'll limit that right now, sir, to the first 23

21   pages of the report.  I know it has appendices, but

22   the actual sort of narrative text, if you will, is

23   23 pages.  Who --

24        MR. ASHWORTH:  Object to the form.

25   Q    (By Mr. Ray)  Who wrote those words?

```
 1              MR. ASHWORTH:  Same.
 2        A     Again, I wrote them, I'm responsible for
 3   every single word.  Did I type every single word,
 4   probably not, because I probably didn't change every
 5   single word, when I would do my red lining and my
 6   work within a particular case, but I'm ultimately
 7   responsible for every single word in that report.
 8        Q     Did you dictate this to someone else?
 9        A     No.
10        Q     So someone else actually went through the
11   process of putting words on the page other than you,
12   correct?
13        A     Again, I'll disagree with that.  I mean,
14   again, I'm responsible for every word.  If somebody
15   else typed up the initial version of it, I agree
16   with you.
17        Q     How many different versions of this were
18   there?
19        A     I'm not sure of any other versions, but
20   there's a version that's on our server on our
21   subdirectory at any point in time.
22        Q     All right.  Sir, let's take a look, if we
23   can, at page 18 of Exhibit Number 24.  And this
24   appears to be a cover letter with an enclosed
25   invoice for the period from July 1 through
```

1   September 6th, do you see that, sir, of 2020?

2        A    I do.

3        Q    And was this the period of time in which

4   the majority of the work on your expert report was

5   done?

6        A    I mean, that would make sense just because

7   of the date of the actual report.  As you saw on

8   other things, we were doing things back in February

9   of 2020, even as early as January of 2020, so it

10  depends on what you mean by majority, but that was

11  definitely the big push during this time frame.

12       Q    Well, let's take a look at page 19, the

13  next page after this.  It appears your firm billed

14  $179,976 during this period of time, true?

15       A    That's what it appears, yes.

16       Q    That's certainly well more than 50 percent

17  of the total amount you've billed, correct?

18       A    I mean, you're using some qualifiers in

19  there.  Well more than 50 percent, I don't think

20  that's necessarily the case, no.

21       Q    How much have you billed in total; do you

22  know?

23       A    I don't know off the top of my head.

24       Q    Is it more or less than $300,000?

25       A    At this moment in time?

1    Q    Yes, sir.

2    A    I would think it's more.

3    Q    Do you know how much more?

4    A    No.

5    Q    Is it more or less than $400,000?

6    A    Again, I don't know one way or the other.

7  I haven't looked at the billings in, you know,

8  forever, honestly, but I haven't looked at it

9  recently.

10    Q    Do you know if there were any bills, other

11  than this bill prior, where you billed for actually

12  drafting the report?

13    A    I can't even see this bill where it says,

14  drafting the report, so we would have to look at all

15  the bills to determine that.

16    Q    All right.  Well, let's look at the -- the

17  first bill you submitted, starts on page 5.  Let's

18  go there, if we could.  Let's actually take a look

19  at page 7.

20    A    Okay.

21    Q    Would this be -- you were engaged in

22  January of 2020, correct?

23    A    Correct.

24    Q    So would this be the first bill?

25    A    I believe so, yes.

 1        Q    All right.  Do we see anything there other

 2   than discussions, either internally or with lawyers,

 3   or reviewing documents or case materials, anything

 4   else that happened there?

 5        A    No.  I think that's a good summary of it.

 6        Q    All right.  Then if we look at page 8,

 7   then we have the next bill.  That's for March 13th

 8   through April 24th, true?

 9        A    Yes.

10        Q    All right.  And then we look at -- page 11

11   has the detail.

12        A    Okay.

13        Q    And it appears you were reviewing

14   documents then, true?

15        A    Yes.

16        Q    And Mr. Campbell was reviewing case

17   materials, right?

18        A    Correct.

19        Q    The only other thing -- did you suspend

20   work in April of 2020?

21        A    Yes.

22        Q    And why did that happen?

23             MR. ASHWORTH:  Object to the form.

24        A    I mean, I don't know exactly, because,

25   again, I'm not a lawyer, but it's my understanding

1    that there was some type of ruling where we were

2    transitioning from the U.S. Attorney's Office to the

3    Pipestem Law Firm, but I don't -- again, I don't

4    know the specifics.  There was some transition that

5    was occurring there, that then subsequently was not

6    an issue, and so we basically went back with the

7    U.S. Attorney's Office.

8         Q    (By Mr. Ray)  Have you ever billed --

9              MR. ASHWORTH:  Ryan, we're almost --

10             MR. RAY:  Yeah.

11             MR. ASHWORTH:  No, you go ahead.  I was

12   going to say that we're almost at lunch time, if

13   this is a good stopping point.

14             MR. RAY:  You know, if you could give me

15   just a few more minutes, maybe we can conclude with

16   this exhibit.

17             Are you okay to go, sir, for just a few

18   more minutes?

19             THE WITNESS:  I mean, I'm fine, if you

20   want to go through the invoices.  It's whatever you

21   want to do, either way.

22        Q    (By Mr. Ray)  All right, sir.  And if we

23   look then, the next bill is for the period from

24   April 25th through June 30th.  That's on page 12.

25             MR. RAY:  If you could pull that up for

1    the witness, please?

2         Q    (By Mr. Ray)  Do you see that?

3         A    I do.

4         Q    All right.  And it would appear, if we

5    look on page 15, that, again, you're just reviewing

6    documents, and it looks like you may have had a

7    couple of different communications with some

8    attorneys, true?

9         A    That's fair.

10         Q    And it looks like the other people, that

11    were working under your supervision, were also doing

12    document review, correspondence and maybe one entry

13    with analysis; is that fair?

14         A    I mean, I think you're being too literal

15    there.  I mean, obviously, as you're reviewing case

16    documents, you're, you know, making a mental note or

17    some type of note to basically understand what the

18    aspects are there for the future use, just like

19    analysis would be, typically, some type of financial

20    manipulation.

21         Q    Right.  But there's not a billing entry

22    here that indicates anyone was actually drafting the

23    report; true?

24         A    I'm not sure why that matters, obviously.

25    I mean, you have to take all of your knowledge and

1    information as part of that drafting, so I don't

2    know why you're separating them.

3         Q    But is there a billing entry that

4    indicates someone was drafting the report during

5    this period of time?

6         A    There is no entry that says, drafting

7    report, if that's what you're asking.

8         Q    All right, sir.  Let's take a look at page

9    18, and this is the bill for the period of time from

10   July 1 through September 6th.  Is that true?

11        A    Yes.

12        Q    All right.  Now, let's take a look at

13   pages 21 and 22.  On page 21 we -- so the total

14   amount of time you billed during this period of time

15   was 11 and a half hours, correct?

16        A    Yes.

17        Q    And you billed three hours drafting the

18   report on September 5th of 2020, correct?

19        A    Yes.

20        Q    Any other of your entries that indicate

21   that you were drafting the report during that

22   period?

23        A    Again, I'm drafting the report the whole

24   time, because I'm giving direction to the staff of

25   what to do, so -- but there are other entries, like

Steven J. Hazel                    4/29/2021                              110

 1   report work on 9/6, obviously analysis is typically

 2   the review of the schedules themselves, so that's

 3   part of the report, but, again, reviewing case

 4   materials is informative so I can do the report.  So

 5   it's all part of the overall process.

 6        Q    And I believe you billed about an hour and

 7   a half reviewing case materials during this period

 8   of time, correct?

 9        A    True.

10        Q    Now, Mr. Campbell, he billed almost five

11   times as much as you during the period, correct?

12        A    He billed 49.9 hours, I billed 11.5, yes.

13             (Reporter clarification.)

14        Q    (By Mr. Ray)  You said 11 and a half that

15   you billed, correct, sir?

16        A    During this period, correct.

17        Q    Sorry.  The court reporter just didn't

18   hear your answer.  I apologize.

19        A    I understand.

20        Q    And is it Ms. Gagyor, am I pronouncing

21   that correctly?  You correct me if I'm wrong.

22        A    It's -- I mean, it's Hungarian, and if --

23   you don't pronounce the second G, so it's Gagyor.

24        Q    Gagyor.  Very well.  Ms. Gagyor, she

25   billed 129.6 hours, correct?

Steven J. Hazel                    4/29/2021                              111

```
 1        A     You'll have to go to the next page, if you
 2   wouldn't mind.   Yes, that is correct.
 3        Q     And she has a number of entries, some of
 4   them are on the prior page, if you need to see them,
 5   sir, about -- that indicate she spent time drafting
 6   the expert report, true?
 7        A     True.
 8        Q     Certainly far more than you, correct?
 9        A     Well, just choose to disagree with that
10   statement.   I mean, Melinda is one of my
11   lieutenants, and so she probably knows what I'm
12   thinking before I think it.
13        Q     But in terms of the bill, she certainly
14   has significantly more entries that objectively
15   indicate she was drafting the report than you do?
16              MR. ASHWORTH:   Object to the form.
17        A     I mean, okay, so what?   I mean, I don't
18   know what you're getting at there, but that's fine.
19   The hours are what they are.
20        Q     (By Mr. Ray)  Right.   That's a true
21   statement, is it not?
22        A     No.
23              MR. ASHWORTH:   Object to the form.
24        A     Because I told you what I considered
25   drafting the report, so the answer is no, I don't
```

1    agree with your statement.

2         Q    (By Mr. Ray)  Well, just numerically and

3    time-wise, she has more time billed drafting the

4    report than you do, correct?

5         A    Okay.  So what?

6         Q    That's --

7         A    I would expect that.

8         Q    Right.  Was she the principal author of

9    the report?

10        A    Of course not.  I've already explained

11   that to you.  It's my report.  I'm the one that

12   signed it.

13        Q    Even though you only billed 11 and a half

14   hours working on it in the period in which it was

15   prepared?

16        A    I mean, is that a question or --

17             MR. ASHWORTH:  Object to the form.

18        A    -- are you just arguing with me?

19        Q    (By Mr. Ray)  No, but that's a true

20   statement; is it not?

21        A    You totally cut out there.  You'll have to

22   say it again.

23        Q    That's a true statement.  You only billed

24   11 and a half hours during the period of time in

25   which the report was principally prepared, correct?

1           MR. ASHWORTH:  Object to the form.

2       A    Again, I don't agree it was -- I don't

3   agree with it's the time when it was principally

4   prepared.  I don't agree with that that's the time

5   that's all we're doing the drafting of the report,

6   so I disagree with your whole thought process.

7       Q    (By Mr. Ray)  All right.  Over what period

8   of time was the report drafted?

9       A    Again, you're trying to peg a time when

10  particular words are put on a page as being drafted.

11  That's not the draft of the report.  We're drafting

12  a report in the way we think about the overall

13  engagement since day one, so you can't -- if you

14  don't review case materials in previous time frames,

15  you can't draft a report at any point in time.  So I

16  don't know what you're trying to get at.  I'm

17  ultimately responsible for the report.

18      Q    Well, certainly, Mr. Campbell and Ms.

19  Gagyor reviewed substantially more case materials

20  than you did, did they not?

21      A    No.

22      Q    Did you review everything that they did?

23      A    Yes.  Did I review it in the same detail

24  they did, probably not.

25      Q    So did you personally read the entirety of

1  every document we looked at earlier on Appendix A?

2      A    Wow, I mean, read.  I definitely reviewed

3  all of the documents in my files.  Did I read every

4  single word when I went through it, probably not.

5      Q    Did Mr. Campbell or Ms. Gagyor?

6      A    Do what?

7      Q    Read the entirety of those documents?

8      A    Well, I would assume so, because that's

9  part of their particular part of the project, so I

10 would assume so.  I'm not them.  I can't answer for

11 them.

12     Q    But you're responsible for their work, are

13 you not?

14     A    Yes, as I've said many times.

15     Q    And did you ask them to review every

16 document that you have in your possession?

17     A    I don't need to ask them.  They know how

18 this works.  They know what they have to do, so they

19 have to look at all documents that we would have in

20 our files.

21     Q    And all of those documents came solely

22 from the U.S. Attorney's Office, correct?

23     A    Again, no, as we talked about previously,

24 there are other files and other documents that we

25 received ourselves.

 1        Q    Did you ask the defendants for any
 2   documents?
 3        A    Did I ask the defendants for any
 4   documents?
 5        Q    Yes.
 6        A    I asked for defendants documents through
 7   counsel, but, no, I did not have any direct line of
 8   communication with defendants.
 9        Q    Even though you claim to be an objective,
10   independent expert, right?
11             MR. ASHWORTH:  Object to the form.
12        A    Again, are you being argumentative
13   intentionally, or do you really mean that as a
14   question?
15        Q    (By Mr. Ray)  No, I really mean that as a
16   question.
17        A    So, again, I can request documents from
18   overall parties.  I don't have a direct link to the
19   defendants.  I wish I did, but, again, I am helping
20   the trier of fact in the determination of the case.
21   I'm not an advocate.  I have no skin in the game.
22   I'm objective and independent.
23        Q    Have you sought to open a line of
24   communication with the defendants to get documents
25   or the defendants' view of the case?

1      A     Indirectly, yes, because I asked for

2  documents that would be in the defendants'

3  possession and actually received some of those

4  documents that were in defendants' possession.  So I

5  didn't need to go to them directly, even if I wanted

6  to or could, because I was already doing that

7  indirectly.

8      Q     Is there anything that prevents you from

9  doing that, sir?

10     A     I've been doing this a long time, and I've

11 never had the opportunity, even when I've

12 specifically requested to have that opportunity.  So

13 if that's an open situation, I'm going to have to be

14 more adamant about it in the future.  I've never had

15 that opportunity in the past.

16     Q     And you've never asked for it in this

17 case, correct?

18     A     Well, again --

19           MR. ASHWORTH:  Object to the form.

20     A     -- we did, because we asked for the

21 information related to certain dynamics related to

22 defendants.  Do we need to get that directly from

23 them, or can we get that through you?  Typically,

24 counsel says, we'll get it for you, we'll get it

25 produced for you.  That's typically how the

1    discussion goes.

2         Q    (By Mr. Ray)  And that's counsel for the

3    party that's paying your fees, correct?

4         A    Again, I guess I don't know how that works

5    from the standpoint of the party that's paying my

6    fees.  I mean, again, we're working for the Osage

7    Nation.  It's my understanding the U.S. Attorney's

8    Office is paying our fee, so I don't know what you

9    mean by party in that question.

10        Q    Well, certainly, the defendants are not

11   paying any of your fees in this case, correct?

12             MR. ASHWORTH:  Object to the form.

13        A    I don't know one way or the other.  Maybe

14   at some point they will have to.

15        Q    (By Mr. Ray)  Right, but these invoices

16   that we have looked at in Exhibit Number 24, have

17   those all been paid?

18        A    I believe so, yes.

19        Q    And they've all been paid by the U.S.

20   Attorney's Office, correct?

21        A    I don't know that one way or the other.

22   I'm assuming that's the case, but I haven't looked

23   at the cash received.

24        Q    And you were engaged by the U.S.

25   Attorney's Office, right?

```
 1        A    I would have to look back at the

 2   engagement letter, but I believe that's correct.

 3        Q    You certainly weren't appointed by the

 4   court, correct?

 5        A    I don't -- sorry, what were you just

 6   saying?

 7        Q    I said, you weren't appointed by the

 8   court?

 9        A    Not that I'm aware of.

10        Q    And you weren't engaged by the defendants?

11        A    No.

12             MR. ASHWORTH:  Ryan, is this a good time

13   for the lunch break?

14             MR. RAY:  Sure.  We can go ahead and take

15   a lunch break.

16             THE WITNESS:  How long do you want to

17   take?

18             MR. RAY:  Is 30 minutes okay for you, sir,

19   or do you need more time?  You just let us know.

20             THE WITNESS:  It's really the court

21   reporter that really should answer that question.

22   She's doing -- I assume it's a she -- that's doing

23   the hard work, so maybe she should answer that.

24             THE REPORTER:  I'm good with whatever.

25             MR. RAY:  She said she's good with
```

Steven J. Hazel                    4/29/2021                           119

1   whatever.  Let's say 30, 40 minutes we'll be back;
2   fair?
3            THE WITNESS:  Well, you're talking to a
4   CPA here, so you've got to be precise.  Thirty or
5   40?
6            MR. ASHWORTH:  Either five past the hour
7   or ten past the hour?
8            MR. RAY:  Let's do ten past the hour; how
9   about that?  Is that fair?
10            MR. ASHWORTH:  That's fine.  Thank you.
11            THE VIDEOGRAPHER:  We're off the record at
12   12:34 p.m.
13            (A recess was had.)
14            THE VIDEOGRAPHER:  We're back on the
15   record at 1:14 p.m.
16            MR. ASHWORTH:  I want to note before we
17   went on the record -- sorry, went off the record,
18   there was questioning about Exhibit 24, which was
19   produced in February of this year.  What I'd say is,
20   this is something that kind of fell out of my note,
21   as well as Cathy's, that part of the exhibit that
22   was produced in February of this year was done
23   inadvertently without redactions, as it relates to
24   bills for staff of Mr. Hazel.  That information
25   would not be discoverable under Federal Rule

1   26(b)4(D).  Of course, you can continue your

2   questions, but following this deposition, we will

3   reproduce those with the appropriate redactions.

4           MR. RAY:  We will just note for the record

5   that we do not agree with that analysis, and we can

6   take it up in accordance with the rules at a later

7   time.

8           MR. ASHWORTH:  Sure.

9           MR. RAY:  Does that complete, sir, your

10  statement?

11          MR. ASHWORTH:  Yes.

12      Q    (By Mr. Ray)  All right.  Mr. Hazel, we

13  looked earlier at your definition of mineral

14  development from your report, which was based on the

15  Tenth Circuit opinion.  Do you recall that?

16      A    That's not how I phrased it before.  It's

17  a definition of mineral development based on our

18  expert report, which copies the Tenth Circuit's

19  opinion, yes.

20      Q    All right.  Now, if we could pull back up

21  your report, and we'll look first at page 2.  That's

22  Exhibit 18, I believe.

23          THE VIDEOGRAPHER:  I'm sorry, what page?

24          MR. RAY:  Page 2.

25          THE VIDEOGRAPHER:  Page 2?

1          MR. RAY:  Two, yes.

2          Q     (By Mr. Ray)  All right.  Sir, in the

3    third line at the bottom, do you see where you

4    state, "By September 2014 defendants began the

5    excavation work"?  Do you see that?

6          A     Yes.

7          Q     And do you understand that that is the

8    same work you referred to previously?

9          A     I have no idea what you're asking.

10         Q     I'm asking about the extraction, sorting,

11   crushing and use of minerals.

12         A     Are you asking if this sentence is exactly

13   the same as that?

14         Q     I'm asking if that is when that work

15   began?

16         A     I don't think I've tried to parse that

17   out, so I don't know what you're asking.

18         Q     Well, what did you mean here when you

19   said, "By September 2014 defendants began the

20   excavation work"?  What were you referring to?

21         A     It comes right out of the complaint.  It's

22   basically just background for the timing of certain

23   events.

24         Q     And so did the work you've described as

25   mineral development occur -- begin prior to

1    September of 2014?

2         A    I don't think I've looked into that, to be

3    able to answer that question.

4         Q    You certainly don't have any other

5    evidence to suggest that it did?

6         A    Again, I don't think I looked into that,

7    so I can't answer that question.

8         Q    Is this an assumption that underlies your

9    report, that the excavation work began in September

10   of 2014?

11        A    No.  First of all, it's not an assumption.

12   It's just background information from the complaint.

13        Q    Did you assume everything in the first

14   amended complaint was true?

15        A    Of course not.

16        Q    Did you conduct any independent research

17   to verify allegations in the first amended

18   complaint?

19        A    Well, we have various different documents

20   that talk about time frames when payments were made,

21   we have documents related to when permits were

22   required and received, so we have documents to kind

23   of understand the timeline, but, again, this is just

24   background information to understand the sequencing

25   of events.

 1          Q     You understand the term, mining, as set

 2     forth in the Tenth Circuit opinion, correct?

 3          A     Do I understand it?  Is that the question

 4     you asked?

 5          Q     Yes, sir.

 6          A     I mean, I think their definition is what

 7     it is.  I think it's a reasonable definition.

 8          Q     And so if you look on the next page, sir,

 9     in the second paragraph under summary of legal

10     actions between the parties, do you see that

11     paragraph?

12          A     I do.

13          Q     All right.  And it says there that the

14     defendants had completed the excavation work in late

15     November 2014; do you see that?

16          A     Yes.

17          Q     Do you have any evidence that indicates

18     that the mining activity found by the Tenth Circuit

19     occurred at any time after the end of November of

20     2014?

21          A     I don't think I looked into that one way

22     or the other, so I don't know.

23          Q     But you can't say that that activity is

24     occurring, correct?

25          A     Again, we have documents that talk about

1  the various different time frames where the surface

2  owners were being paid during the different phases

3  of the development.  We have other documents, like I

4  talked about, related to the sequencing and to the

5  permitting, but I haven't looked into that specific

6  dynamic to be able to answer your question.

7      Q    Well, we looked earlier, sir, at the Tenth

8  Circuit opinion, and we established that it was the

9  extraction, sorting, crushing and use of minerals

10  that required a lease, right?

11      A    I don't think it said exactly those words,

12  but something similar.

13      Q    And is that activity occurring today?

14      A    I mean, I don't know.  I don't believe so,

15  as part of the wind farm, because it's something

16  that was basically done as part of the construction

17  activities.

18      Q    And so you would expect when the

19  construction ended, that that activity ended, true?

20      A    I think that's fair, yes.

21      Q    Let's take a look, sir, at your report,

22  page 7, and I want to direct your attention to the

23  first full sentence of that paragraph.  It starts,

24  "Based on documents provided."  Do you see that?

25      A    On page 7?

1    Q    Yes, sir, page 7 of 23, the first full

2  sentence on the page after the words, "emphasis

3  added"?

4    A    Sorry.  I was looking at something else.

5  I apologize.  Yes, I see that now.

6    Q    Now, this sentence really is the core

7  premise of your damage model, is it not?

8    A    No, I don't know why it's a core premises.

9  It's how the calculation was done.

10   Q    Right.  Well, every other calculation that

11  comes after is dependent upon this statement, is it

12  not?

13        MR. ASHWORTH:  Object to the form.

14   A    I mean, I don't look at it that way, but

15  if you want to look at it that way, that's fine.

16   Q    (By Mr. Ray)  Well, how do you look at it?

17   A    It's a statement of basically looking at

18  the proxy of the surface owners and that the mineral

19  owners would have the same type of damages, same

20  types of rights, if not more.

21   Q    And that proxy underlies all of your

22  calculations, does it not?

23   A    No, because I think different dynamics

24  would come into play, where a judge could take

25  certain types of damages and not others, based on

1    the specific facts and circumstances of the case.

2          Q    All of the -- so you have six income

3    streams that you identify, correct?

4          A    That sounds right.

5          Q    And all of them come from surface leases,

6    true?

7          A    I mean, first of all, they're not

8    technically income streams, but they're -- we're

9    using the surface leases as a proxy for what a

10   reasonable negotiation would have been at a minimum

11   basis for the mineral state owners.

12         Q    Well, you're the one that refers to them

13   as income streams.  Take a look at the third

14   paragraph under summary of expert opinion.  Income

15   streams is your word, correct?

16         A    Sure.

17         Q    All right.

18         A    Used in a different context, so...

19         Q    Well, those are -- that is what makes up

20   your damage calculation, is it not, these six income

21   streams, and then you've reduced them to present

22   value and applied prejudgment interest?

23         A    No.

24         Q    All right.  What makes up your damage

25   calculation then other than that?

 1        A     Well, first of all, there's historical

 2   amounts that would not have a present value, so it's

 3   looking at the overall amounts that would be

 4   received by the six surface owners.

 5        Q     Over the entire life of the project?

 6        A     Well, not technically over the entire life

 7   of the project, over the initial period.  It does

 8   not include the renewal time frame.

 9        Q     Your calculations do not include the

10   renewal time frame?

11        A     Correct.

12        Q     Because it wouldn't be appropriate to

13   include those, because we don't know if the renewal

14   is going to happen or not, right?

15        A     I would disagree with that.  We were just

16   being conservative by just using the additional time

17   frame.  Technically, you would add the probability

18   of the lease being extended, which is pretty likely,

19   but we're talking about out in the future, so it

20   would be present valued back.

21        Q     And how do you know it is likely that the

22   lease will be extended?

23        A     Based on any renewable project, they want

24   the project as long as possible.  Now, obviously,

25   things can change in the industry at that time,

1   which is why you have to present value it back at a

2   risk adjusted rate.

3        Q    But as you sit here right now, you simply

4   don't know one way or another whether the renewal

5   option will or will not be exercised, correct?

6        A    Of course I don't know, because it's

7   something that's going to happen in the future, so I

8   can't say they're definitely going to do it or

9   they're definitely not going to do it.

10        Q    Let's take a look, sir, at page 10 of your

11   report, if we could.  And I want to direct your

12   attention to the first sentence of the final

13   paragraph.  It starts, "It is therefore evident"; do

14   you see that, sir?

15        A    Yes.

16        Q    All right.  So it says here, "It is

17   evident that during the construction period Osage

18   Wind engaged in mining of the mineral estate,

19   consistent with the Tenth Circuit Court of Appeals

20   order."  Is that right?

21        A    Yes.

22        Q    Was there mining at any other time?

23        A    I don't know what you mean by --

24             MR. ASHWORTH:  Object to the form.

25             (Simultaneous speakers.)

1    A    -- during the construction period; is that

2    what you are getting at?

3    Q    (By Mr. Ray)  I'm asking you if there was

4    mining at any other time other than the construction

5    period?

6           MR. ASHWORTH:  Object to the form.

7    A    I would have to look at the time periods

8    involved, to see what time periods they were

9    actually looking at for that period, double-check

10   that, but I'm not sure that's relevant in my

11   calculation.

12   Q    (By Mr. Ray)  My question is whether you

13   have any evidence that it occurred at any time other

14   than the construction periods you've defined?

15   A    I haven't looked into that, so I don't

16   know the answer to that.  I would say there probably

17   was some type of mining activities related to

18   sampling or whatever, but again, I don't -- I

19   haven't looked into that.

20   Q    Do you have any evidence that there was

21   mining type activities in relation to sampling?

22   A    I don't know -- do you mean by evidence,

23   do you mean a document, or what do you mean by

24   evidence?

25   Q    How do you define evidence?

 1        A     I'm asking you how you define it.  To me

 2   it means any type of information, verbal, nonverbal,

 3   depositions, it might be, you know, a document, it

 4   could be any type of thing that could basically be

 5   evidence, but, again, if you're using the term

 6   evidence from a legal context, I'm not a lawyer, so

 7   I'm not going to make a legal conclusion.

 8        Q     Let's use it from the definition you just

 9   gave.  Have you reviewed any type of information in

10   the categories you just identified that indicates

11   that mining is occurring anytime other than the

12   construction period?

13        A     Again, I've already answered that question

14   multiple times.  I haven't looked into that.  I

15   would have to look into that to see if that dynamic

16   matters.

17        Q     But you know enough to say that it is

18   evident that it occurred during the construction

19   period, correct?

20        A     True.

21        Q     And you just don't know anything to say

22   it's evident that it occurred any other time?

23        A     Yeah, I haven't looked into it.  It's not

24   whether I know or not.  I just haven't looked into

25   it one way or the other.

1    Q    Do you believe that the mining activity

2    ceased when the construction period ended?

3    A    I mean, if we're talking about

4    generically, that would make sense.  If we're

5    talking about specifics of this case as a defined

6    term of what they called the construction period in

7    the lease, I would have to look into that to see

8    exactly what time frame that was, to make sure there

9    was no other mining activities occurring.

10   Q    Well, let's look at -- you've defined --

11   if we look at the first period -- or the first

12   paragraph under number 4, do you see that, sir?

13   A    Yes.

14   Q    You've defined the -- construction period

15   is a defined term, in your report, is it not?

16   A    It is.

17   Q    And it's for the period commencing on the

18   lease effective dates, right?

19   A    I don't think that's technically true.

20   The leases were signed at different times, so there

21   may be slightly different time frames there.

22   Q    Well, you define it in footnote 50 as

23   being December 2011; do you not?

24   A    December of 2011?

25   Q    Yes, sir.

1        A     That would make sense.  Let me see what

2    you're looking at.  Okay.  That's fair.  I agree

3    with you.

4        Q     Okay.  And then you said that that period

5    -- the construction period ends on the commercial

6    operations date.  Do you see that back in the text?

7        A     That would also make sense, yes.

8        Q     All right.  And in paragraph -- in

9    footnote 51, you define that as being June 5, 2015,

10   correct?

11       A     That makes sense, yes.

12       Q     Has anything you've looked at, heard or

13   seen indicate to you that mining occurred after

14   June 5, 2015?

15       A     I can't think of anything where I saw

16   something, there was specifically mining occurring

17   after that date.

18       Q     All right.  Let's pull back up the Tenth

19   Circuit's opinion, if we can, Exhibit 19.  All

20   right.  Let's take a look at page 3, if we could.

21       A     Okay.

22       Q     Do you see in the last sentence, sir, of

23   the first paragraph under legal background, do you

24   see where it says, "The act also ensured that

25   property owners could use the land for farming,

 1    grazing or any other purpose not otherwise
 2    prohibited by the Osage Act"?  Do you see that?
 3        A    I see that.
 4        Q    And did you review this portion of the
 5    opinion in forming your opinions?
 6        A    I mean, I looked at the whole opinion, so,
 7    yes.
 8        Q    So did you understand that property owners
 9    had the right to use their land for anything not
10    otherwise prohibited?
11        A    I mean, I don't -- I didn't make a legal
12    conclusion like that, but that's what that sentence
13    says.
14        Q    And have you seen anything anywhere that
15    says that the property owners could not use their
16    property for a wind energy project, if they so
17    chose?
18        A    You're talking about the surface owners,
19    or you're talking about the mineral owners?
20        Q    The surface owners.
21        A    Have I seen anything that says the surface
22    owners couldn't do whatever they want?  I guess I
23    haven't really seen anything one way or the other,
24    but, obviously, they're the surface owners, so they
25    can't go into the subsurface, because that's not

1   something they own.

2        Q    You believe they can't go into the

3   subsurface at all?

4        A    I didn't say that.  Again, it's a legal

5   conclusion.  We covered that earlier.

6        Q    Let's take a look, sir, at page 23 of the

7   opinion.  Do you see the last paragraph there, it

8   starts, "We agree with Osage Wind"?

9        A    Yes.

10       Q    All right.  So you see it says, "We agree

11  with Osage Wind, however, that merely encountering

12  or incidentally disrupting minerals would not

13  trigger Section 211.3's definition," right?  Do you

14  see that?

15       A    Yes.

16       Q    So if you were merely encountering or

17  incidentally disrupting mineral materials, the

18  surface owner does not need the mineral owner's

19  consent for that according to this, true?

20       A    That seems pretty far --

21            MR. ASHWORTH:  Object to the form.

22       A    -- reaching, but, you know, again, it says

23  what it says.

24       Q    (By Mr. Ray)  Right.  It says, "There is

25  simply no sense in which the word mineral

1  development means only the removal of dirt without

2  some further manipulation, commercialization or

3  offsite relocation of it."  True?

4      A    That's what the order says, yeah.

5      Q    So there's nothing in this opinion that

6  you can point to that says that Osage Wind needed

7  the permission of the mineral holder to dig a hole,

8  right?

9          MR. ASHWORTH:  Object to the form.

10     Q    (By Mr. Ray)  You can answer.

11     A    You know, I haven't tried to parse out

12  whether the digging or the sorting or the crushing,

13  or whatever dynamic is specific there.  The opinion

14  is what it is, so I haven't tried to segregate it

15  out that way.

16     Q    Well, the opinion clearly says that the

17  simple removal of dirt does not constitute mining,

18  does it not?

19     A    I'm not sure I'd say clearly.  That's what

20  the words say, but, again, you have to look at the

21  overall context of the document.

22     Q    Well, and we looked earlier on page 3,

23  sir, and we looked that the Court defined mineral

24  development as extracting, sorting, crushing and use

25  of minerals as a part of excavation work, right?

 1       A     That's what it says.

 2       Q     And that's the same definition that you

 3    applied, right?

 4             MR. ASHWORTH:   Object to the form.

 5       A     Very similar, yes.

 6       Q     (By Mr. Ray)  And it was that activity

 7    that required a lease, according to this same

 8    sentence, right?

 9             MR. ASHWORTH:   Object to the form.

10       A     I think it's more than that just one

11    sentence, but this is a summary of why they required

12    a federally approved lease.

13       Q     (By Mr. Ray)  And did the mineral owner

14    have the right to say no to the project if that

15    operation didn't occur?

16             MR. ASHWORTH:   Ryan, I'm sorry, you cut

17    out there.  Could you re-ask that?

18       A     You did cut out.  I think I know what you

19    said, but just say it again, if you wouldn't mind.

20       Q     (By Mr. Ray)  Yeah.  Did the mineral owner

21    have the right to say no to the project if that

22    operation, that we just looked at the Tenth Circuit

23    described, did not occur?

24       A     So that operation being the --

25       Q     Extracting, sorting --

 1              (Simultaneous speakers.)

 2       A      -- extraction, sorting, crushing --

 3       Q      (By Mr. Ray)  -- sorting, crushing and

 4  use of --

 5       A      -- and use of materials prior to

 6  acquisition work costing mineral development; is

 7  that what you mean?

 8       Q      Yes, sir.

 9       A      Again, I'm not going to make a legal

10  conclusion like that.  I don't know.

11       Q      Well, we certainly know from the opinion

12  that if they only removed dirt, they would not have

13  needed -- Osage Wind would not have needed consent

14  of the mineral holder, correct?

15              MR. ASHWORTH:  Object to the form.

16       A      Again, I think you're, you know, applying

17  it liberally, but again, I'm not disagreeing with

18  you.  The opinion says what it says.  I'm not trying

19  to interpret or provide a legal conclusion of what

20  the order means.

21       Q      (By Mr. Ray)  Is there anything that you

22  saw when you reviewed this opinion, sir, that said,

23  more generally, that the consent of the mineral

24  holder was required to operate a wind energy

25  facility?

Steven J. Hazel                    4/29/2021                              138

1     A    I think that's pretty obvious.  I mean, it

2  says that Osage Wind failed to obtain the lease that

3  they needed, so if they have to obtain a lease, then

4  the mineral owners have those rights.

5     Q    And why did they need the lease?

6          MR. ASHWORTH:  Object to the form.

7     A    Again, I'm not a lawyer.  I'm not going to

8  make a legal conclusion like that.

9     Q    (By Mr. Ray)  Do you have any idea what

10  kind of activity required a lease?

11     A    Well --

12          MR. ASHWORTH:  Objection to form.

13     A    -- it's pretty obvious that the mining

14  that they did in this particular situation required

15  a lease, so, again, I'm just reading the opinion,

16  what the order says.

17     Q    (By Mr. Ray)  And do you know, sir,

18  whether the material that was extracted, sorted,

19  crushed and used was elsewhere available?

20     A    Do I know if it's available elsewhere?

21     Q    Right.

22     A    I would say it probably likely is.  It

23  probably won't be exactly the same composition, but

24  it would probably be very close.

25          (Exhibit 26 marked for identification.)

1      Q     (By Mr. Ray)  All right.  Let's take a

2   look at Exhibit 26, if we could.  Have you seen this

3   document before?

4      A     It does look familiar.  I don't remember

5   what context I saw this in, but it does look

6   familiar.

7      Q     And did you understand that IEA Renewable

8   Energy was the contractor that constructed this

9   project?

10      A     I actually thought it was a different name

11   that was spelled out, but I'm not trying to disagree

12   with you.  They could be the same entity.

13      Q     Well, whoever they are, it clearly appears

14   that they purchased some aggregate from Dewey,

15   Oklahoma, correct?

16      A     That's what it appears, yes.

17      Q     This was ordered on December 16th, 2014,

18   right?

19      A     Yes.

20      Q     That's during the construction period;

21   yes?

22      A     Sounds right, yes.

23      Q     All right.  And it says, if we look in the

24   bottom sort of left hand there, it says, "Delivered

25   to Osage Wind project," right?

1        A     It does.

2        Q     So it certainly appears that aggregate

3   was, in fact, purchased for this project from

4   another source; yes?

5        A     That's what it appears.

6              (Exhibit 27 marked for identification.)

7        Q     (By Mr. Ray)  Let's take a look at Exhibit

8   27, if we could.  Have you seen this document

9   before, sir?

10       A     This one does not look familiar, but,

11  again, it's a similar purchase order to the previous

12  one.

13       Q     And it certainly indicates a number of

14  hard mineral type materials were purchased for the

15  Osage Wind farm; do you see that?

16       A     Yeah.  I mean, I guess we should be

17  careful about using the word, hard, in that

18  particular context, but there are various different

19  materials purchased here, yes.

20       Q     Which one of them do you not define as

21  hard, if any?

22       A     Well, I mean, again, I'm not trying to be,

23  you know, argumentative, but most people would

24  consider clay and fill, they wouldn't necessarily

25  consider that a hard mineral.

1    Q    You wouldn't consider it a hard mineral,

2  right?

3    A    I wouldn't personally, but again, I'm not

4  trying to be argumentative.  If somebody wants to

5  consider it a hard mineral, that's fine.  I'm just

6  being precise.

7    Q    Just from your perspective, you personally

8  wouldn't, and you think a lot of other people

9  wouldn't either, right?

10   A    Sure.

11   Q    Are there any materials that were sorted,

12 crushed and used that aren't identified on either

13 Exhibits 26 or 27 that we just looked at?

14   A    I don't know.  I would have to

15 cross-reference the materials.  I don't know.

16   Q    Do you know what materials were subject to

17 being sorted, crushed and used?

18   A    Yeah, there's various different places

19 where it talks about that; I just didn't focus on

20 that.

21   Q    If we look at pages 23 and 24 of the Tenth

22 Circuit's opinion, that's Exhibit Number 19, the

23 court there in the last sentence that starts on page

24 23 and continues to 24 refers to that as rocks.  Do

25 you see that?  It says, "sorted the rocks, crushed

1    the rocks into smaller pieces and then exploited the

2    crushed rocks as structural support"; do you see

3    that?

4          A    That's what it says, yes.

5          Q    Do you think that would be a reference to

6    hard minerals?

7               MR. ASHWORTH:  Object to the form.

8          A    I mean, again, you don't generally have to

9    crush sand, for example; you don't generally have to

10   crush clay.  So, again, I don't know what they

11   meant.  You would have to ask the Court what they

12   meant by the sentence.

13         Q    (By Mr. Ray)  If we look, sir, at page 6.

14         A    Sorry, you cut out on me.  Page 6?

15         Q    I'm sorry.  Page 6, let's look at page 6

16   of the opinion.  And do you see there's a sentence

17   that starts, "This process," at the very bottom?

18   It's the last sentence on the page.  Do you see

19   that, sir?

20         A    Yes.

21         Q    All right.  Tell me when you've read all

22   of that sentence.

23         A    Looks like it continues on, but I've read

24   that.

25         Q    Yes.  Okay.  Let's continue on to page 7.

1    A    Okay.

2    Q    All right.  So the only rock we see

3  identified here is limestone and Dolomite, right?

4    A    It's not technically what it says.  It

5  says, including limestone and Dolomite.

6    Q    Are you aware of any other types of rock

7  that were used in this process?

8    A    Again, there's information for exactly

9  what the composition of the rocks are.  I was just

10  answering your question previously, because it says,

11  including, so there must be something else involved

12  there; otherwise, they wouldn't say it that way.

13    Q    And what information is there that

14  establishes exactly what the rock was?

15    A    I saw various different samples that were

16  taken that were basically the -- kind of like the

17  borings that -- is what I'm calling the borings,

18  that basically had the composition of rock at

19  different -- different levels.

20    Q    Where did you see that?

21    A    I've seen it a couple of different places.

22  I think the expert reports have it.

23    Q    Is that the reports of Mr. Pfahl and

24  Mr. Freas you're referring to?

25    A    That would make sense, just based on what

Steven J. Hazel                    4/29/2021                          144

1    they were talking about.

2         Q    Is there anywhere else that you think you

3    saw that information?

4         A    I thought I saw it related to a mapping of

5    the area and the various different rock structures

6    in the area that were relatively contiguous and

7    similar, but I would have to look back on that to

8    try to figure out where I saw that.

9         Q    Would the best source, from your

10   perspective, be to look at the reports of Mr. Pfahl

11   and Mr. Freas?

12        A    I don't know about best source.  I think

13   you should look at the best source of exactly what's

14   there.  So again, I'm not trying to parse out their

15   words from that dynamic.  I'm not a geologist.

16        Q    Would they be better qualified than you to

17   talk about exactly what rock is there?

18        A    Sure.

19        Q    All right.  Let's go back to your report,

20   sir, if we could, which is Exhibit Number 18.  There

21   is a paragraph a little more than halfway down.  It

22   starts, "Based on the above descriptions of the

23   defendants' excavation activities"; do you see that?

24        A    At the start of the paragraph?

25        Q    Yeah, it's on page 6.  I'm not sure that

 1   we're on the right page.

 2       A    Oh, yeah, you're on page 10 still, sorry.

 3   "Based on the above descriptions," that's the one

 4   you talked about?

 5       Q    Yes, sir.

 6       A    I see that.

 7       Q    How is it the case, sir, that the mineral

 8   estate is at least as integral as the surface estate

 9   to the construction of the wind farm?

10       A    Yes.

11       Q    Explain how that is so.

12       A    Well, I mean, we've already talked about

13   that many times today, that their damages are

14   probably at least what the surface estate -- I

15   believe you even agreed with me a couple of times

16   that the mineral estate is typically more valuable.

17   The bottom line here is, if you can't anchor down

18   that wind turbine, it's worthless.

19       Q    So is that -- so is it the anchoring of it

20   in the subsurface that is the basis of your

21   conclusion there?

22       A    No.  I'm just giving you an example of

23   something that has to have all the different aspects

24   of the equation.  You can't just set it on top of

25   the surface.

1      Q     Is there anything, sir, that you saw in

2   the Tenth Circuit's opinion that says a lease was

3   needed to place the foundations in the subsurface?

4      A     No, I don't think they got that specific

5   that I remember.

6      Q     In fact, the only time when they got

7   specific is when they talked about extraction,

8   sorting, crushing and use, true?

9           MR. ASHWORTH:  Object to the form.

10     A     No.  I mean, they got specific on various

11  different dynamics, but they got specific in that

12  particular situation, and again, that sentence, you

13  always take it out of there, but Osage Wind failed

14  to get the lease.

15     Q     (By Mr. Ray)  Right, but it was the

16  extraction, sorting, crushing and use that thereby

17  required a federally approved lease, right?

18          MR. ASHWORTH:  Object to the form.

19     Q     (By Mr. Ray)  That's what it says; yes?

20     A     Yeah, I'm not making a legal conclusion

21  there, but that's what the opinion says.

22     Q     There's nowhere in the opinion where it

23  says to operate a wind energy facility in Osage

24  County, a lease is required, there's nothing like

25  that that you saw, is there?

1              MR. ASHWORTH:  Object to the form.

2        A     Well, I mean, I don't quite understand the

3   question.  I mean, if they have to have a lease for

4   the mineral estate to be able to build the farm, of

5   course they have to have that lease to operate the

6   farm, because, otherwise, they can't build a farm.

7   So I don't quite understand your question.

8        Q    (By Mr. Ray)  Well, the lease -- or the

9   opinion says that the lease is required because of

10  extraction, sorting, crushing and use of minerals;

11  does it not?

12       A     I think that's a fair summary --

13             MR. ASHWORTH:  Object to form.

14       A     -- on it, yes.

15       Q    (By Mr. Ray)  Is there any other reason

16  anywhere in the opinion that the court says a lease

17  is required?

18       A     No.  I think you've summarized it, what

19  the lease is required to have that permit or that

20  lease to basically do that particular work.

21       Q     All right.  Let's go back to the Tenth

22  Circuit's opinion.  That's Exhibit 19, and if we can

23  look at page 5.  Now, we see there, sir, in the

24  first sentence under factual background, do you see

25  that?

 1        A    Yes.

 2        Q    All right.  "That Osage Wind lease surface

 3   rights for 8400 acres"; do you see that?

 4        A    Yes.

 5        Q    But we see a little further down, "The

 6   structures only occupied about 1.5 percent of the

 7   total acreage of leased surface land"; do you see

 8   that?

 9        A    Yes.

10        Q    So on the other 98.5 percent, the mineral

11   owners can still engage in mineral development,

12   true?

13             MR. ASHWORTH:  Object to the form.

14        A    There's been various different testimony

15   that that's not the exact case, based on what is

16   actually available and unavailable, but again, in

17   theory, could they do mining in other locations, the

18   answer is -- (inaudible)

19        Q    The answer is yes?  Sorry, you cut out on

20   us.

21        A    You have to take the whole answer

22   together.  You have to take the whole answer

23   together, not just parse it out that way.

24        Q    No.  We literally didn't hear you say the

25   last word, sir.

Steven J. Hazel                        4/29/2021                        149

```
 1         A     The answer is yes under those caveats
 2   related to that's not the exact percentage based on
 3   other people's discussions of this particular area.
 4         Q     What other testimony in this case have you
 5   reviewed, sir?
 6         A     Let's see, I have the report, first of
 7   all, but I think the deposition of Mr. Pfahl is the
 8   only deposition I've -- I have in my possession.
 9         Q     And did you read Mr. Pfahl's deposition in
10   its entirety?
11         A     I did.
12         Q     So even, sir, if in your opinion the view
13   -- the surface is a little bit more than
14   1.5 percent, you still would agree that there are a
15   lot of surface area within these 8400 acres that --
16   on which mineral development could occur?
17         A     I mean, it's honestly not relevant to me,
18   but I agree with your statement.
19         Q     But did you know that the surface owners
20   have given up the exclusive right for wind energy on
21   the entire 8400 acres?
22         A     I don't quite understand that question.
23   Would you say it one more time?
24         Q     Yes.  Have the surface owners leased all
25   of these acres to Osage Wind?
```

1          MR. ASHWORTH:  Object to the form.

2       A    I'd have to look at the language, but

3  again, that gets to be, you know, somewhat of a

4  legal conclusion, too, about what rights they have

5  given up, but I would have to look at the lease to

6  try to determine that.

7       Q    (By Mr. Ray)  Have you, in fact, looked at

8  the leases in this case?

9       A    I have.

10          (Exhibit 28 marked for identification.)

11       Q    (By Mr. Ray)  All right.  Let's pull one

12  of them up, Exhibit 28, if we could.  You used the

13  lease of Carolyn Cane Snively and James Snively as

14  your exemplar, right?

15       A    I mean, again, I wouldn't look at it that

16  way.  We found them to be very similar in all

17  capacities, so we just used one as a starting point.

18       Q    All right.  But they all were

19  substantively similar based on you and your staff's

20  review, correct?

21       A    Correct.

22       Q    All right.  So let's take a look then,

23  sir, if we could, at paragraph 2 on page 2.

24       A    So the development period rent; is that

25  where you're at?

```
1        Q    No, sir.  I'm on paragraph number 2 at the
2   bottom of page 2.
3        A    Oh, I see.  All right.
4        Q    It says, "purpose of lease."  Right?
5        A    Got it.
6        Q    It says, "Company shall have the exclusive
7   right to use the property solely for energy
8   purposes."  Do you see that?
9        A    I think that's different than what we
10  talked about before, but it's saying the company
11  shall have the exclusive right to use the property
12  solely, so they can only use it for wind energy
13  pro- -- purposes.
14       Q    Right, and someone else couldn't come in
15  and build another wind farm on this acreage?
16       A    You cut out again.  Did you say someone
17  else --
18       Q    I said, someone else couldn't come in and
19  build a wind farm on this acreage?
20            MR. ASHWORTH:  Object to the form.
21       A    Again, I think that's a legal conclusion
22  first of all, but I don't -- I don't know if that's
23  true or not.
24       Q    (By Mr. Ray)  All right.  Well, it says
25  here that they have -- the company has the exclusive
```

 1    right, right?  And you've seen that before, haven't

 2    you?

 3         A    I don't think I necessarily -- again, I

 4    shouldn't be making legal conclusions like this or

 5    interpretations.  I don't read that that way, but if

 6    a judge or another lawyer says that's the

 7    interpretation of that language, that's fine.  I'm

 8    not interpreting it one way or the other.

 9         Q    So it is your conclusion, sir, that the

10    mineral owners should receive a lease on these --

11    the terms, the same as Exhibit 28; is that correct?

12              MR. ASHWORTH:  Object to the form.

13         A    I mean, no, that's not what my report

14    says.  I mean, first of all, they may not want it at

15    all, so there should be no wind farm there.  So

16    that's the first option.  So, basically, now that

17    there is a wind farm there, do they have to tear it

18    up?  Let somebody else decide that.  But at this

19    point they have to have approval, being Osage Wind

20    has to have the approval of the mineral estate

21    owners, so why would they accept anything less than

22    what the surface owners got?  It doesn't make any

23    sense.  They would want at least that amount, if not

24    more, because, again, as you've agreed with me a

25    couple of different times, the mineral estate is

1   actually more valuable than the surface estate.

2        Q    (By Mr. Ray)  Well, that was in the

3   context of a coal mine, right?

4        A    I don't think it matters.  I mean, again,

5   there's a lot more area that goes down than goes up.

6        Q    Well, but there is not ongoing production

7   of minerals by Osage Wind at this time, is there?

8        A    So what?

9             MR. ASHWORTH:  Objection to form.

10       A    What does it matter?  I mean, again, they

11  had the opportunity to have to get a lease,

12  according to the opinion.  So the Osage Nation has

13  to have some say into whether or not there is a

14  lease at all, but at the point where there is some

15  type of a lease, again, why would they negotiate

16  something less than what the surface owners got?

17       Q    (By Mr. Ray)  My question, sir, though,

18  actually related to coal mines, right?  So coal --

19  in a coal mine, the mineral owner is paid more than

20  the surface owner, true?

21       A    Again, you're making -- we're making

22  generalities here.  In general, the mineral estate

23  is more valuable than the surface estate.

24       Q    In the context of a coal mine, right?

25  That's -- my question is specific to that.

Steven J. Hazel                         4/29/2021                              154

1        A    I'm trying to think of any mine that that

2    would not be the case, so there's probably some

3    exception to that general rule.  That's a general

4    rule.

5        Q    But Osage Wind isn't out there operating a

6    mine today, right?  You don't have any evidence of

7    that?

8        A    So what?  They were required to get a

9    lease, so they have to negotiate the lease with the

10   Osage Nation.

11       Q    My question, though, sir, is, do you have

12   any evidence that Osage Wind is operating a mine

13   today?

14       A    Again, in my thought process, they never

15   operated a mine, because they weren't in the mining

16   activity business, but they did mining on the

17   estate.  Because of the work that they did, they are

18   required to get a lease.

19       Q    And has that work occurred at any time

20   after the construction period ended?

21       A    Again, so -- I don't care.  So what?  It

22   doesn't matter.  They're required to get a lease for

23   the mining activities they did.  There's nothing in

24   the circuit case that says, okay, at some point in

25   time it stops.  The wind farm is there, so they're

 1  being damaged the whole time frame when the wind

 2  farm is there.  That's the damages component.

 3          MR. RAY:  Move to strike as nonresponsive.

 4      Q   (By Mr. Ray)  My question again, sir, is,

 5  do you have any evidence that mining occurred after

 6  the construction period ended?

 7      A   Again, you've asked me that question

 8  multiple times.  I've told you that I don't have any

 9  specific information, because I haven't looked into

10  that.  I already told you a bunch of times it's not

11  relevant to me.  That's not the calculation we made.

12      Q   Are you aware, sir, of any other instance

13  in which a mineral owner is paid other than for the

14  production of minerals from the mineral estate?

15          MR. ASHWORTH:  Object to the form.

16      A   I mean, there are situations, especially

17  in the oil and gas, where people are paid for other

18  than the extraction itself, because they need other

19  types of either pipelines or houses or whatever they

20  need to basically do the overall production of that

21  mineral, which is not specific to the mineral

22  itself.

23      Q   (By Mr. Ray)  So in the oil and gas

24  context, there often are payments to hold it for

25  future production, right?

1    A    No, that's not what I'm talking about, but

2    that would be an example of something else, sure.

3    Q    Right.  Can you name for us, sir, any

4    other example in which the mineral owner is paid due

5    to the subsurface presence of a structure?

6    A    I don't understand that question.  What

7    kind of structure are you talking about?

8    Q    Any kind of structure.

9    A    I'm trying to think of an example of a

10   structure that would be relevant.  Are we talking

11   about like a quarry that's below grade?

12   Q    Just a structure that's on the surface.

13   A    So how does a structure that's on the

14   surface relate to the mineral estate?

15   Q    Well, it's certainly present subsurface,

16   is it not?

17   A    Okay.  I guess I understand your question

18   now.  So, generally, the surface owner would have to

19   have the permission of the mineral estates below

20   them, or they would have to have access to their

21   mineral estate as well, so they can't just

22   unilaterally do whatever they want.

23   Q    So you believe that anytime that

24   subsurface construction takes place that the consent

25   of the mineral owner is required?

 1            MR. ASHWORTH:  Object to the form.

 2       A    Anytime that you go below the surface, is

 3  it required, I'm sure there's some exception to the

 4  rule.

 5       Q    (By Mr. Ray)  So, for example, if you

 6  build a large commercial building, do you have to

 7  have the consent of the mineral owner to do that?

 8            MR. ASHWORTH:  Object to the form.

 9       A    Again, I'm not going to make a legal

10  conclusion, but, again, if they can't access their

11  rights, why wouldn't you have to have their

12  approval?

13       Q    (By Mr. Ray)  But you've already agreed,

14  sir, that in this instance, there are significant

15  parts of the 8400 acres that the mineral estate

16  owners do have the right to access, true?

17            MR. ASHWORTH:  Object to the form.

18       A    Well, you're, first of all, assuming they

19  wanted access in that way, but, again, I've already

20  said that there could be mining activities on other

21  portions of the site, yes.

22       Q    (By Mr. Ray)  Do you have any evidence

23  that they do want to access any part of these

24  8400 acres?

25       A    Again, they don't want the wind farm there

1    at all, so I don't think they'd have an aspect that

2    they want to do mining in a different location, no.

3        Q    And are you aware of any hard mineral

4    mining taking place in Osage County other than the

5    two quarries we've already looked at?

6        A    I don't remember looking at the quarries

7    at all, so I'm not sure what you're referring to

8    there, so --

9        Q    APAC and Burbank.  We looked at their

10   invoices.  You're aware of those, right?

11       A    Well, I don't consider that the same thing

12   as looking at the quarries, but I don't know what

13   the full population of all the quarries are in that

14   county, so I can't answer that question.

15       Q    But you aren't aware of any intention to

16   mine in the 8400 acres that are subject to this

17   case, true?

18       A    Again, that wouldn't even make sense to

19   me.  They don't want the wind farm there.  There's

20   no indication that they want to mine it themselves

21   afterward.

22       Q    Now, the regulations, sir, require a lease

23   for mining, right?

24       A    I mean, I guess you have to be more

25   specific.  Which regulations are you getting at?

1          Q     The regulations you reviewed in this case,

2     that were at issue in the Tenth Circuit --

3          A     I guess I'm not following the question.

4     what do you mean?

5          Q     The regulations that were at issue in the

6     Tenth Circuit opinion; you understand that, right?

7          A     They mention certain particular statutes,

8     yes, but, again, they defined what they considered

9     mining in this particular context.

10         Q     And it was that activity that required a

11    lease, right?

12               MR. ASHWORTH:   Object to the form.

13         A     They're required to get a lease to do

14    those activities.   If they can't do those

15    activities, they can't have a wind farm.   That's

16    what they're basically saying.

17         Q     (By Mr. Ray)  And what do you base that

18    conclusion on, that they -- if they can't do those

19    activities they can't have a wind farm?

20         A     Well, because they constructed it that

21    way, so they must have felt it necessary to do it.

22         Q     Well, we've already seen, sir, in Exhibits

23    26 and 27 that these materials were available for

24    purchase from other locations, right?

25         A     Then they should have done that broadly.

1    Q    Right, but they could have done that; do
2  you agree?
3    A    Doesn't matter what they could or they
4  should have done, it's a matter of what they
5  actually did.
6    Q    Right.
7    A    They didn't get a lease when they were
8  supposed to get a lease for the activities they did.
9    Q    Right.  But, in fact, those materials were
10  commercially available in the county; we've seen
11  that, correct?
12    A    Again, so what?  That's not what they did.
13    Q    Right.
14    A    They did buy some, but they didn't buy
15  them all.
16    Q    Right.  But they all were available for
17  commercial purchase.  You don't have a basis to
18  dispute that, correct?
19    A    It was there, so if they wanted to do
20  that, they should have done that.
21    Q    And if they had done that, would they have
22  required a mineral lease under this opinion?
23    A    I don't know.  I don't know what the
24  specific facts and circumstances would be, in that
25  situation.  The Tenth Circuit would have to opine on

 1   that.  That's not my place.

 2        Q    But they certainly would have been --

 3   wouldn't have been extracting rock, sorting rock,

 4   crushing rock, and reusing rock from this area,

 5   true?

 6             MR. ASHWORTH:  Object to the form.

 7        A    Again, I don't know what they exactly

 8   would have done, because that didn't occur.

 9        Q    (By Mr. Ray)  But you know and understand

10   that aggregate is readily available for commercial

11   purpose -- purchase, do you not?

12        A    You had to have asked that question at

13   least 10 times now, so we're not disagreeing on

14   that.  They have access to it.  They just didn't do

15   it that way.

16             MR. RAY:  We've been going about an hour.

17   I'd like to take a rest room break, unless anyone

18   has an objection.

19             Is that okay with you, sir?

20             THE WITNESS:  Sure.  You're the boss.

21             THE VIDEOGRAPHER:  We're off the record at

22   2:11 p.m.

23             (A recess was had.)

24             THE VIDEOGRAPHER:  We're back on the

25   record at 2:27 p.m.

1        Q    (By Mr. Ray)  All right, sir.  Let's go

2   back to your report, if we could, which I believe is

3   Exhibit Number 18, and if we could take a look at

4   page 7.  All right, sir.  I want to take a look at

5   the first sentence of the first paragraph under --

6   or actually, I'm sorry, the second sentence of the

7   first paragraph under the heading of Roman numeral

8   3.

9        A    Okay.

10       Q    All right.  So this sentence says, "Based

11  on the documents in the record and independent

12  research, FTI has determined that the six surface

13  leases represent a reasonable determination of the

14  agreement the Osage Nation would have negotiated

15  with Osage Wind and the most directly comparable

16  proxy for amounts the Osage Nation itself was

17  willing and able to pay in order to lease the

18  property for the specific wind energy project."  Do

19  you see that, sir?

20       A    You didn't read it technically right, but

21  I'm not sure if you did that intentionally or not.

22       Q    All right.  Well, why don't you -- you can

23  read it into the record for us, sir.

24       A    Well, I mean, the main thing that you did

25  is, you said the Osage Nation itself was willing and

 1  able, that should have been Osage Wind.  That's the

 2  main critical change that would have to be made

 3  based on what you said.

 4       Q    Okay.  Anything else that you think was

 5  improper?

 6       A    Well, again, we could read the whole thing

 7  to make sure it's perfect, but, again, that's the

 8  main thing that would cause a big difference

 9  between -- Osage Wind and Osage Nation are

10  definitely two different entities.

11       Q    Well, why don't you just go ahead and read

12  it into the record yourself, sir, so that we're sure

13  it's perfect, as you would say.

14       A    And I'm not trying to be difficult, but I

15  can't see the whole thing, because when you blow it

16  up, with the way the screens are, it cuts off some

17  of it.  So if you just get rid of the little box, I

18  can read it.  Thank you.  "So based on the documents

19  in the record and independent research, FTI has

20  determined that the six surface leases represent a

21  reasonable determination of the agreement that the

22  Osage Nation would have negotiated with Osage Wind

23  and the most directly comparable proxy for amounts

24  that Osage Wind itself was willing and able to pay

25  in order to lease property for the specific wind

1    energy project."

2         Q    Thank you, sir.  All right.  So what

3    documents in the record are you referring to that

4    support this conclusion?

5         A    That's all the documents in their

6    totality.  It's based on everything we have.  We're

7    looking at the best and most appropriate proxy for

8    the damages.

9         Q    And you needed some kind of comparable

10   proxy, right?

11        A    Well, I don't think you necessarily needed

12   that.  I mean, you could obviously do a specific

13   performance type situation where they have to rip it

14   out, so you wouldn't need the documents in that type

15   of a remedy.

16        Q    Right, but to make a damages calculation

17   you needed some kind of a proxy, did you not?

18        A    I don't know why you're parsing the

19   damages.  Again, in a remedy for damages, you could

20   have it ripped out, so I don't know what you're

21   getting at there.

22        Q    Well, you either have one or the other,

23   right?  I mean, you either have it removed, or you

24   have to pay money damages; you understand that,

25   right?

Steven J. Hazel                4/29/2021                                    165

1          A     I think that's a fair --

2                MR. ASHWORTH:   Object to the form.

3          Q     (By Mr. Ray)  What did you say, sir?  I'm

4    sorry, we didn't hear you.

5          A     I think that's a fair summary.

6          Q     All right.  When you're doing a

7    calculation of damages, as you've done, right,

8    you're not opining on removal, you've said that

9    already, right?

10         A     I don't think I've said that, but I mean,

11   again, I wouldn't be opining on that the removal

12   required, because that's a legal conclusion.

13         Q     All right.  So you needed some kind of a

14   proxy to do a damages calculation like you did in

15   this case, right?

16         A     I mean, no, you don't have to have a

17   proxy.  You could do the damages a different way,

18   but we felt that the proxy in this particular

19   situation, related to surface owners, was the best

20   way of determining the damages.

21         Q     And are you aware of any other wind energy

22   project where the mineral owners and the surface

23   owners have been paid on the same terms?

24         A     Well, that dynamic could definitely play,

25   because, typically, they're the same people, so they

 1   would be, of course, on the same terms, but if
 2   you're asking whether they had been bifurcated or
 3   separated, which is relatively unique, I can't think
 4   of one specifically where they would have the exact
 5   same terms.
 6        Q    Is there any scholarly literature or
 7   anything like that that you reviewed that indicated
 8   that was an appropriate way of determining payments
 9   to mineral owners when a wind farm is constructed?
10        A    I mean, it's just standard damage theory,
11   so I would think any treatise or document related to
12   damages would look at it that way.
13        Q    Specific to wind energy?
14        A    Specific to wind energy.  No, they don't
15   get specifically, typically, to a specific industry.
16   I haven't seen any type of treatise that gets that
17   specific.
18        Q    And have you read any literature that
19   indicates that a mineral owner should be paid for
20   mining, other than based on the minerals mined?
21        A    Well, I mean, that's not the dynamic here.
22   Again, you have to get a lease to basically build
23   the wind farm.  It's not a matter of paying for the
24   minerals.  You're building a wind farm, so I don't
25   understand your question.

1     Q    Well, we looked, sir, already at the Tenth

2 Circuit opinion that clearly said it was the

3 extraction, sorting, crushing, use of minerals that

4 required a lease, right? We looked at that?

5         MR. ASHWORTH: Object to the form.

6     A    I agree.

7     Q    (By Mr. Ray) And there was nothing in the

8 opinion that just said generally to construct a wind

9 farm, you have to have a lease, true?

10         MR. ASHWORTH: Object to the form.

11     A    I don't understand that question. I mean,

12 we're talking about this specific case. They had

13 mining activities, so, therefore, they're required

14 to have a federally recognized lease, so, therefore,

15 they can't build it until they get the lease.

16     Q    (By Mr. Ray) Right, but there's no mining

17 going on out there right now?

18         MR. ASHWORTH: Object to the form.

19     A    Yeah, we've covered that ground at least

20 ten times, so I don't know why it matters. It

21 doesn't matter. They're still being damaged every

22 day the wind farm is there.

23     Q    (By Mr. Ray) And how is that?

24     A    How is what?

25     Q    How are they being damaged every day that

1   the wind farm is there?

2            MR. ASHWORTH:  Object to the form.

3        A    Because it's physically there.  They don't

4   want it there.  It's physically there.  So every day

5   it's there, it's impacting their particular property

6   rights.

7        Q    (By Mr. Ray)  Do you have an understanding

8   of property rights that surface and mineral owners

9   have in Osage County?

10           MR. ASHWORTH:  I'm sorry, Ryan, you broke

11   up there.  Can you re-ask that?

12           MR. RAY:  Yes, sir.

13       Q    (By Mr. Ray)  Do you have an understanding

14   of the property rights that surface and mineral

15   owners have in Osage County, Oklahoma?

16           MR. ASHWORTH:  Object to the form.

17       A    I have -- sorry.  I have a general

18   understanding of that.  I'm not making a legal

19   conclusion, just so we're clear.

20       Q    (By Mr. Ray)  And is there anything, sir,

21   in the Tenth Circuit's opinion that you can point to

22   that says that the mineral owner has the right to

23   say no to anything other than the mineral

24   development activities that the Tenth Circuit

25   described?

1       A    I don't think it's specific enough to that

2   particular dynamic in the Tenth Circuit, because

3   that wasn't the situation at the time that they're

4   willing, so you'll have to ask them that question.

5       Q    Well, let's pull up the Tenth Circuit's

6   opinion again, if we could, Exhibit 19.  Let's go to

7   page 3.  At the top, sir, we've looked at this

8   already, it says, "Osage Wind's extraction, sorting,

9   crushing and use of minerals as a part of its

10  excavation work constituted mineral development,"

11  right?

12      A    Yes.

13      Q    "And thereby requiring a federally

14  approved lease," true?

15      A    Which Osage Wind failed to obtain, yes.

16      Q    Right.  There's nowhere in here that they

17  say, to operate a wind farm on an ongoing basis you

18  need this kind of a lease; true?

19          MR. ASHWORTH:  Object to the form.

20      A    It doesn't say the opposite either, but,

21  obviously, you have -- you have to have a lease to

22  build a wind farm.  You have to negotiate with the

23  mineral estate owners to get that right.  So if

24  you're suggesting there's another set of facts where

25  they could have built this wind farm a different

1    way, that's fine.  You can argue that, but again,

2    that's not what specifically happened in this case.

3         Q    (By Mr. Ray)  But if it had, is there

4    anything you can point to in this opinion that would

5    say a lease was required, if this didn't happen?

6         A    Again, the Circuit is looking at the

7    specifics of this case.  They don't go into all of

8    the potential hypotheticals about other sets of

9    facts that could have or could not have occurred, so

10   of course, it doesn't have all of those different

11   options in here.

12        Q    Do you understand, sir, who has the right

13   to -- who has the rights for a wind project in a

14   given piece of property?  Do you have that

15   understanding?

16             MR. ASHWORTH:  Object to the form.

17        Q    (By Mr. Ray)  If there's bifurcated

18   mineral ownership, let's be clear on that.

19        A    I'm sorry, I don't even know what the

20   question is.

21        Q    The question is, do you have an

22   understanding of who has the right to approve or

23   disapprove a wind energy project?

24             MR. ASHWORTH:  Object to the form.

25        A    I have not looked into that.  It's a legal

1   conclusion, so I would not make that opinion.

2        Q    (By Mr. Ray)  So you're not rendering that

3   opinion in this case, true?

4        A    If you're asking about the legal opinion,

5   absolutely not.  I'm not a lawyer.  That's not my

6   place.

7        Q    Let's go back to your report, sir, page 7.

8   I believe that's Exhibit 18.  And you reference, as

9   we've seen, sir, that "the surface leases represent

10  a directly comparable proxy for amounts that Osage

11  Wind itself was willing and able to pay."  Do you

12  see that?

13       A    Yes.

14       Q    And what would they have been paying for?

15       A    The right to obtain that lease.

16       Q    And they needed the lease to do what?

17       A    To construct -- ultimately, to construct

18  the wind farm because, again, the way they did it,

19  they would need to have that lease to basically do

20  the complete project.

21       Q    Did any of the regulations you looked at,

22  sir, make reference to constructing a wind energy

23  project?

24            MR. ASHWORTH:  Objection to form.

25       A    I mean, I don't remember a specific one

1   talking about a wind energy project, but there may

2   be one there.  I don't know.

3        Q    (By Mr. Ray)  Let's go back, if we could,

4   to Exhibit 20, and if we could, let's look at page

5   9.

6        A    Where are you seeing page numbers on

7   these?

8        Q    Are you looking, sir, at the page that

9   says 25 CFR, Section 214.7?

10       A    Yes.

11       Q    Yes, we are on the correct page.

12       A    Great, perfect.  Thank you.

13       Q    All right.  Now, this regulation ties the

14   need for a lease to mining; yes?

15            MR. ASHWORTH:  Object to the form.

16       A    I mean, the first sentence says, "No

17   mining or work of any nature," so I guess if that's

18   what you're saying relates to mining, I have no

19   problem with that.

20       Q    (By Mr. Ray)  This certainly doesn't say

21   anything about operating a wind energy project in

22   this provision, true?

23            MR. ASHWORTH:  Object to the form.

24       A    There's work of any nature, so I don't

25   know what your definition of work of any nature

1    versus operations, if you're trying to parse that

2    out, I guess.

3         Q    (By Mr. Ray)  Well, let's take a look

4    again, sir, at the Tenth Circuit opinion, and if we

5    could go to page 5 of that.  And take a look, if you

6    would, sir, at footnote two, sir.  And we see there

7    that the Tenth Circuit says they are not addressing

8    the significance of the phrase, work of any nature;

9    do you see that?

10        A    I mean, it says more than that, but it

11   does say that, yes.

12        Q    But they did -- they did talk about mining

13   a number of times in the opinion, did they not?

14        A    Yeah.  I mean, I don't know what you're

15   getting at there.  I mean, this says that OMC does

16   not argue, so they're not even arguing about that

17   particular phrase.  They're arguing about the mining

18   aspect, so I don't know what you're getting at

19   there.

20        Q    Right.  So the only basis of the Tenth

21   Circuit's conclusion was that mining, as they

22   defined it, occurred.  That's what required a lease?

23        A    But, again, there may be other things that

24   require a lease as well.  Just because they dealt

25   with that one dynamic doesn't mean it's the only

1   dynamic.

2        Q     Is there any other language you can point

3   us to anywhere in this opinion, sir, that would say

4   they are basing their decision on other dynamics, as

5   you said, besides mining?

6        A     Again, you're asking for --

7              (Simultaneous speakers.)

8              MR. ASHWORTH:   Object to the form.

9        A     I mean, this particular order is about a

10  specific facts and circumstances.

11       Q     (By Mr. Ray)  Of this case, right --

12       A     It doesn't incorporate all other ten

13  potentially facts and circumstances; they are

14  dealing with this specific facts and circumstances.

15       Q     Which is --

16       A     So of course, there's not something about

17  all these other alternatives that we could make up

18  in that order.  It doesn't even make sense.

19       Q     Right, and the only specific alternative

20  that they're talking about is the conclusion that

21  mining occurred?

22       A     I mean, my opinion, it's the only thing

23  before the Court, so that's what they're talking

24  about, yes.

25       Q     And they didn't say that anything else

```
 1   required a lease, other than mining?
 2        A    Again --
 3             MR. ASHWORTH:  Object to the form.
 4        A    -- they're dealing with the facts and
 5   circumstances of this case, so they're dealing with
 6   this case.  They didn't investigate or determine
 7   other facts and circumstances.
 8        Q    (By Mr. Ray)  Right, and nothing else that
 9   occurred in this case, besides mining, did they say
10   required a lease in these specific circumstances,
11   correct?
12        A    They weren't asked to look --
13             MR. ASHWORTH:  Object to the form.
14        A    They weren't asked to look at all those
15   other potential options, so I don't know what they
16   would determine in that situation.
17        Q    (By Mr. Ray)  There's just nothing you can
18   point us to where they said they did conclude that
19   anything other than that required a lease?
20        A    Again, why would I have to point --
21             MR. ASHWORTH:  Object to the form.
22        A    -- to anything like that?  I mean, this
23   particular order is related to a specific dynamic.
24   They didn't cover other ten potential dynamics, so
25   of course, they wouldn't cover that in this
```

1    particular order.  It doesn't make sense.

2           Q     (By Mr. Ray)  Are there other --

3           A     It makes no sense, Counsel.

4           Q     Are there other dynamics that you believe

5    required a lease in this case?

6           A     I haven't looked into that, so I don't

7    know the answer to that.

8           Q     So the only dynamic that you're aware of

9    is that the Tenth Circuit said certain activities

10   constituted mining, thereby requiring a lease; yes?

11          A     That's what the order says, yes.

12          Q     And it doesn't say that anything else

13   about the specific facts and circumstance of this

14   case required a lease?

15          A     Again, you can ask me the same question 17

16   different times.  I'm not going to give you a

17   different answer.  They didn't identify other

18   dynamics, so of course, they didn't answer the

19   question of those dynamics.  They're only dealing

20   with the facts and circumstances of this case, based

21   on the allegations and arguments.

22          Q     Does any other allegation or argument that

23   you're aware of in the facts of this case require a

24   lease?

25          A     Again, I haven't looked into other

1    dynamics.  This particular case is very clear, based

2    on what the Tenth Circuit decided.

3        Q    Do you have anything, sir, that you're

4    aware of to suggest this wind energy project was

5    constructed in a way different from any other wind

6    energy project is normally constructed?  Are you

7    aware of any such facts?

8              MR. ASHWORTH:  Object to the form.

9              MR. BABST:  Same.

10       A    I mean, it seemed pretty standard to me.

11   I did not investigate whether it was done in a

12   different way, so I don't know the answer to your

13   question.

14       Q    (By Mr. Ray)  But it seemed pretty

15   standard to you, based on what you know, right?

16       A    Again, there's different types of wind

17   farms.

18             MR. ASHWORTH:  Object to the form.

19       A    So if you talk about a wind farm that's

20   out in the water, it's going to be done differently

21   than what's done on land, of course.  So it depends

22   on what you're getting at there, but do I think the

23   construction activities were reasonable, based on

24   what they had to do, yes.

25       Q    (By Mr. Ray)  Do you have anything to

1  suggest they were different from others that were

2  constructed on land?

3        A     I mean, again, if you have a construction

4  on a hilly side versus a mountain versus a flat

5  land, of course, it's going to be different.  The

6  construction aspects are going to be different.  So

7  it is what it is.  You do the construction based on

8  the specific topography of the land that you have.

9        Q     And did you, sir, see any sources of

10 material or have any knowledge, other than your

11 opinion in this case, of surface owners and mineral

12 owners being paid the same amounts for a wind

13 project?  Is there any other project you can

14 identify for us like that?

15       A     Again, that's not my opinion in this case.

16 We're talking about it's similar to that, and we're

17 being conservative, but I have not seen that

18 specific dynamic, because, again, generally the

19 mineral estate gets more than the surface estate.

20       Q     Are you aware of any wind energy project

21 where the mineral owner has received more than the

22 surface owner?

23       A     I'm not aware of that, because, typically,

24 they're the same people.

25       Q     Let me ask you this, sir, are you aware of

1    a coal mine where the surface owner gets paid more

2    than the mineral owner?

3         A    I'm not aware of that.  Is it possible

4    that occurs, it's possible.

5         Q    And, sir, what is the basis for your

6    conclusion that the amounts paid to the surface

7    owners are a directly comparable proxy to what

8    should have been paid to the Osage Nation here?

9              MR. ASHWORTH:  Object to the form.

10        A    This negotiated deal between the various

11   parties is exactly the same land in question.  One

12   is the subsurface, one is the surface, so they're

13   very close in proximity to each other.  It's all the

14   dynamics to make it the best approximation of the

15   minimum amount that the mineral estate owner should

16   receive.

17        Q    (By Mr. Ray)  You understand that in most

18   cases the mineral owner and the surface owner are

19   paid differing amounts based on what's occurring,

20   are you not?

21             MR. ASHWORTH:  Object to the form.

22        A    Well, that question makes no sense, so, I

23   mean, do you want me to try to answer that?

24        Q    (By Mr. Ray)  Well, let me start with an

25   example, sir.  So how about oil and gas, if we have

1    a different mineral owner and a different surface

2    owner?  The surface owner is usually paid relatively

3    nominal amounts for what's called surface damages;

4    you're aware of that, right?

5        A    That's a fair statement, but, again,

6    that's the exception to the general rule, that the

7    mineral owner and the surface owner are the same

8    party.

9        Q    Right.  But if we assume that's not the

10   case, okay?

11       A    Assume what's not the case?

12       Q    That the mineral owner and the surface

13   owner are not the same person.

14       A    In unique circumstances where they're not

15   the same?  That's what you're -- that's fine.

16       Q    Well, did you know that that's more often

17   the case in the state of Oklahoma than not?

18       A    That what's the dynamic?

19            MR. ASHWORTH:  Object to the form.

20       Q    (By Mr. Ray)  What's that?

21       A    That what's the dynamic is more common?

22       Q    That different mineral and surface

23   ownership.

24       A    Ultimately, or at the time of the original

25   lease?

1    Q    No, just generally in the state of

2    Oklahoma.

3    A    I have seen that.  I've talked to a couple

4    of attorneys that say in Oklahoma it does happen

5    from time to time, and, you know, I don't know if

6    it's more than 50 percent, but it definitely happens

7    more in Oklahoma than other places.

8    Q    So in that situation, if there's an oil

9    and gas well, certainly the mineral owner is -- and

10   let's assume it's successful.  The mineral owner is

11   going to be paid vastly more than the surface owner;

12   true?

13   A    Vastly is a --

14        MR. ASHWORTH:  Object to the form.

15   A    -- relative term, but, again, they

16   generally get paid more and sometimes substantially

17   more.

18   Q    (By Mr. Ray)  And that's because the

19   mineral owner has the right to exclusively take

20   those minerals.  You understand that, right?

21   A    That's reasonable.

22   Q    And I take it you just -- you have no

23   understanding of who has the right to grant wind

24   energy rights in the state of Oklahoma, right?

25   A    I haven't looked into the legal aspect of

1   who has the rights to grab those or not, no.

2        Q    Let's look, sir, at one specific category

3   of your report, and that will be on page 11 of your

4   report.

5        A    Okay.

6        Q    And that is pasture damages; do you see

7   that?

8        A    I do.

9        Q    And you state there that that is a payment

10  equal to $28 per acre related to pasture/forage

11  grass actually destroyed or damaged; do you see

12  that?

13       A    Yes.

14       Q    All right.  Now, did the mineral estate

15  owner have any rights in pasture or forage grass?

16       A    No.

17       Q    So how is it that they should receive a

18  payment that is for only forage grass actually -- or

19  pasture grass actually destroyed?

20       A    Because we're looking at the overall

21  equation, first of all, and there would be similar

22  dynamics to the subsurface of things that were

23  affected.  They would just use different semantics,

24  a different way of calling it, but it would have the

25  same type of category of damages.

1        Q     Do you know the circumstance under

2    which -- do you know the circumstances under which

3    pasture or forage grass was actually destroyed in

4    this situation?

5        A     Oh, I think there was some information

6    about that, but I don't remember the specifics.

7        Q     So do you know for a fact that that

8    implicated any right of the mineral owner?

9        A     Again, it's not -- I'm not trying to get

10   that precise.  The situation here is we have a

11   proxy.  So they would use different semantics, and

12   we fully agree with you, it's for -- basically,

13   that's more appropriate to subsurface, but they're

14   going to negotiate similar types of payments over

15   time for the dynamics that are specific to

16   subsurface.

17       Q     And what would you use as the similar

18   subsurface comparable, if you will, to the pasture?

19       A     I haven't thought about that.  I don't

20   know.  I would have to think about that.

21       Q     Yet, you, in fact, have concluded that

22   those payments are due as a part of your analysis,

23   true?

24       A     I've already explained to you why we did

25   that.

 1          Q     Is it just because it's in the surface

 2    lease?

 3          A     No.  I've already explained to you why we

 4    did that.  It's in the surface lease, which is a

 5    true statement, but I explained to you why we took

 6    it to the next step.

 7          Q     And why is that?

 8          A     Again, I've already explained that to you.

 9    Do you want me to explain it to you again?

10          Q     Yes, please.

11          A     So I've already told you that the

12    semantics of these names would likely be different

13    for the subsurface owners.  We appreciate that, but

14    we're trying to use these as a proxy on an overall

15    basis and not get definitive on what specific

16    dynamic, because of the semantics side of the

17    equation, because they would negotiate similar

18    payments, and, likely, if they were being our

19    negotiators, even more payments, because, generally,

20    the mineral estate is worth more.  So, again, we're

21    being conservative in using the surface lease as a

22    proxy for reasonable damages.

23          Q     And the mineral estate is only worth more

24    when it's tied to an actual mineral in place,

25    correct?

1    A    No.  I mean, I don't agree with that

2  statement, no.

3    Q    Well, you only get -- let's take your

4  example, sir, of gold.  I mean, you only get paid

5  for gold if you actually have gold under your

6  property, true?

7    A    That's true.

8    Q    The same is true of coal?

9    A    There's different dynamics with different

10  ores.  I totally agree with you.

11    Q    What about limestone?

12    A    What about it?

13    Q    Do you get paid for limestone if there

14  isn't actually limestone under your land?

15    A    Can you just do the whole thing again?

16  You cut out near the beginning.

17    Q    Yeah.  Do you get paid for limestone if

18  there isn't actually limestone under your land, as a

19  mineral owner only?

20    A    Well, again, the tribe doesn't want to get

21  paid for the limestone, the tribe doesn't want any

22  mining activities to occur.  You have to get a

23  lease, so I'm not sure what you're asking there.

24    Q    My question is more general, sir.  My

25  question is, are you paid for limestone as a mineral

Steven J. Hazel                    4/29/2021                          186

 1   owner if there is not limestone under your property?

 2        A    Okay.

 3             MR. ASHWORTH:  Object to the form.

 4        A    I don't understand that question.  It's

 5   like saying, okay, you get paid for the lumber if

 6   you don't have any trees.

 7        Q    (By Mr. Ray)  Right.

 8        A    Well, of course not.

 9        Q    Right.  The only value to that comes from

10   if you can sell timber in your example, right?

11        A    No, because if I have trees there --

12             MR. ASHWORTH:  Object to the form.

13        A    -- and I just happen to like those trees,

14   and I don't want you to tear them down, I don't want

15   you to touch the trees at all.

16        Q    (By Mr. Ray)  Well, but let's assume that

17   the trees were taken down somehow, intentionally,

18   negligently, whatever.  I mean, would you try to

19   assess the value, other than from the value of the

20   trees?

21             MR. ASHWORTH:  Object to the form.

22        A    Yes, because the negotiations to obtain

23   the right to cut those down would be different under

24   that dynamic when I don't want them taken down at

25   all.  If you unilaterally go in there, you know,

1    maliciously, or whatever word you just used there,

2    and you did it wrong, why should you get the benefit

3    of the doubt of that?  I would never have wanted you

4    to take those trees down in the first place.

5         Q    (By Mr. Ray)  But are you aware, sir, of

6    the principles that would be in play, if there were

7    a case like that, in calculating --

8              MR. ASHWORTH:  Object --

9         Q    -- damages?

10             MR. ASHWORTH:  Object to the form.  Ryan,

11   this kind of seems like a dead horse, but if you

12   want to keep beating the horse, go ahead.

13        Q    (By Mr. Ray)  You can answer, sir.

14        A    What's the principles you're talking

15   about?  I don't know what you mean by that term.

16        Q    We're talking about trees, right?  You

17   raised trees and timber; yes?

18        A    I used it as an example, yes.

19        Q    Right.  Okay.  So if there were litigation

20   over trees that were -- let's say they were your

21   trees, okay?  Are you with me?

22        A    Okay.  Yeah.

23        Q    All right.  Let's say that I've cut them

24   down somehow; okay?

25        A    Okay.

```
 1          Q    Then you sue me for that.  Okay?

 2          A    Yeah.

 3          Q    If you were a damages expert in that case,

 4    are the -- how would you calculate the damages?

 5          A    Well, the most --

 6               (Simultaneous speakers.)

 7               MR. ASHWORTH:  Object to the form.

 8          A    -- you would see in that situation is you

 9    have to put the trees back in the same shape, form,

10    size and so forth.  If there's for some reason,

11    which I have seen cases where that's not practical,

12    it depends on the circumstances.  Is there views

13    involved?  Is there water tables involved?  Is

14    there -- what are the other dynamics of why those

15    trees are important?  That will affect the facts and

16    circumstances of that case and what the damages

17    might be.

18          Q    (By Mr. Ray)  But what if they are just

19    trees and you've never used them for any particular

20    purpose?

21               MR. ASHWORTH:  Object to the form.

22          A    It doesn't matter.  I like those trees, so

23    what does it matter?

24          Q    (By Mr. Ray)  But do you think in that

25    situation that I would owe you for more than the
```

1  value of the trees?

2           MR. ASHWORTH:  Object to the form.

3      A    If you're asking me as a layperson, not

4  based on a legal conclusion, absolutely.  I love

5  those trees.  I don't want those trees gone.  So it

6  doesn't compensate me appropriately for you to give

7  me, quote, the value of that tree.  That doesn't do

8  it.

9      Q    What would be a comparable there?  How

10  would you determine that?

11          MR. ASHWORTH:  Object to the form.

12      A    I've already given you examples of that.

13  The first thing is to put the trees back in the

14  exact same trees that were there before.  That's one

15  comparable.  If that's not an appropriate remedy for

16  any reason, you have to look at all the other

17  dynamics of why those trees are important.

18      Q    (By Mr. Ray)  And my example, sir, is a

19  little bit further, though.  If there are no other

20  dynamics, if those trees are just there, you've

21  never -- you've never even been to the location they

22  are.

23          MR. ASHWORTH:  Object to the form.

24      A    So you're telling me I love these trees,

25  but I've never even seen them; is that what you're

1   trying to say?

2        Q    (By Mr. Ray)  I'm trying to say you own a

3   big piece of property, and there were trees, but

4   you've never really been to the tree site or had any

5   special use for the trees; do you understand?

6              MR. ASHWORTH:  Object to the form.

7        A    I don't care.

8              MR. ASHWORTH:  Object to the form.

9        A    They are my trees.  I can do what I want

10  with my trees.

11       Q    (By Mr. Ray)  Right, but we're trying to

12  understand how you would determine a value of those

13  trees, if you were asked to calculate damages in

14  that situation.

15             MR. ASHWORTH:  Object to the form.

16       A    And I've already said that at least three

17  times now.

18       Q    (By Mr. Ray)  How would you monetize that?

19       A    I've already answered that question three

20  times now.

21       Q    Well, answer it a fourth.

22       A    Okay.

23             MR. ASHWORTH:  Object to the form.

24       A    The first option is, you'd have to go to

25  all the cost and expense for the tree itself, for

1   all of the movement of those trees, you have to

2   obtain those trees, you have to find those trees,

3   and you have to put those trees back.  That's the

4   first option.

5          Q     (By Mr. Ray)  Okay.

6          A     Quantify that cost.

7          Q     Okay.

8          A     Okay.  Under the other dynamic, for

9   whatever reason they can't be replaced or they don't

10  want to replace them or for whatever reason this

11  judge says they don't have to replace them, there's

12  all sorts of different dynamics that I can take into

13  account, related to specific costs related to those

14  trees that we've already talked about, but other

15  pain and suffering, whatever the dynamics are of

16  that particular case of why I want those trees

17  there.

18         Q     Would the value of the trees play any

19  account in your second situation at all?

20         A     Sure.

21         MR. ASHWORTH:  Object to the form.  Ryan,

22  let me just -- let me interject real quick.  I just

23  felt that you may need me to explain.  This case

24  doesn't relate to trees.  Your line of questioning

25  is really becoming borderline harassing, if not way

1   over the line, so just keep that in cognizant here

2   for the witness here.

3          You can answer.

4          MR. RAY:  Well, just for the record, sir,

5   we can ask hypotheticals of an expert witness,

6   that's very clearly established, and we're entitled

7   to do that.

8          MR. ASHWORTH:  Well, I think this goes

9   beyond hypotheticals.  It goes more towards the line

10  of harassment.  It seems like we've been going --

11  talking about trees for over an hour now.

12         MR. RAY:  The record --

13         MR. ASHWORTH:  You can ask hypotheticals,

14  but, I mean, you also can't harass the witness.

15         MR. RAY:  Well, I disagree that the

16  witness is being harassed.

17         Can you read back the last question,

18  please?

19         (The requested portion was read back.)

20     A    I said, yes, that's one dynamic of the

21  equation, which I've already stated multiple times,

22  so I've already agreed with you that's part of the

23  equation; it's not the only equation.

24     Q    (By Mr. Ray)  I think the only other thing

25  you identified was potential pain and suffering?

1    A    No.  You're not listening.

2    Q    All right.  What else?  What else?  Okay.

3 So you've said potential pain and suffering?

4    A    I like that particular sight line with the

5 trees there.  If you take the trees out, it causes

6 erosion to that part of the property.  You can come

7 up with a variety of different facts and

8 circumstances why those trees are important besides

9 me just wanting to see them.  Based on those facts

10 and circumstances, you would calculate the damages,

11 based on the damages to that party from those trees

12 being removed improperly.

13    Q    Would that be based on something

14 objective, or would it just be any number you wanted

15 it to be?

16         MR. ASHWORTH:  Object to the form.

17    A    I would calculate those damages with

18 reasonable certainty, just like I did in this case.

19    Q    (By Mr. Ray)  Let me ask you this, sir.

20 How is it that you conclude that Osage Wind itself

21 was willing and able to pay these amounts to the

22 mineral owner?  Is that --

23    A    That they are willing --

24    Q    -- based on any objective evidence?

25    A    Besides the fact that they're willing and

1   able to pay the surface owners?

2       Q    Well, do you know whether that -- that

3   additional amount would make the project

4   economically viable or not?  Do you know that, for

5   example?

6       A    They would have to decide that and decide

7   if they want to produce the property at all and not

8   put a wind farm here at all, but they should have

9   determined that on the front end, not the back end.

10      Q    But is there anything, sir, other than the

11  fact that payments like that were made to the

12  surface owners that you base that conclusion on?

13      A    I think it's all the facts and

14  circumstances in this case.  It's based on the

15  financial performance, it's based on all of the

16  documentation in the record, that they should get a

17  similar amount to the surface owners and actually

18  probably get more.

19      Q    But you're not aware of any other wind

20  energy project in the United States where a separate

21  mineral owner has even been paid anything, are you?

22          MR. ASHWORTH:  Object to the form.

23      A    Again, this is a little bit different

24  dynamic in that case.  So Osage Wind, it's their

25  requirement to understand all the things they have

 1    to do to build this project.  They had to get a

 2    lease, based on the Tenth Circuit, so they should

 3    have got a lease.

 4        Q    (By Mr. Ray)  Well, the Tenth Circuit

 5    opinion didn't come down until after the fact,

 6    right?

 7        A    Okay.  So if you do something incorrectly

 8    because you decide not to do something, you should

 9    get the benefit of the doubt; is that what you're

10    suggesting?

11        Q    No, I'm asking you, sir, when the Tenth

12    Circuit's decision came down, before or after this

13    activity occurred?

14        A    So you're asking me if the litigation

15    occurred after they did something they weren't

16    supposed to.  Of course, it happened after, so of

17    course, the appeal happened after.  They had already

18    committed the problem.

19        Q    And you're also aware, sir, are you not,

20    that a federal judge concluded that the activity did

21    not constitute mining in the first instance, yes?

22            MR. ASHWORTH:  Object to the form.

23        A    The appeals gets to basically override

24    that, so sure, I agree with you.

25            MR. ASHWORTH:  Ryan, are we at a stopping

Steven J. Hazel                    4/29/2021                              196

```
 1   point for a break?
 2              MR. RAY:  Sure.
 3              MR. ASHWORTH:  Perfect.
 4              THE WITNESS:  Five minutes?
 5              MR. RAY:  Yep.
 6              MR. ASHWORTH:  Five minutes will work.
 7              THE VIDEOGRAPHER:  We're off the record at
 8   3:11 p.m.
 9              (A recess was had.)
10              THE VIDEOGRAPHER:  We're back on the
11   record at 3:20 p.m.
12       Q    (By Mr. Ray)  All right, sir.  You've
13   mentioned several times that the mineral owner is
14   usually paid more than the surface owner in your
15   view; do you recall that testimony?
16       A    I actually think you said it first, and I
17   agreed with you.
18       Q    But you've said it -- irrespective of who
19   said it, you've said it, right?
20       A    Yes.
21       Q    Are you aware of a situation in which that
22   is true, where it is not tied to a valuable mineral
23   deposit that's either being produced or expected to
24   be produced?
25              MR. ASHWORTH:  Object to the form.
```

 1        A     I can't think of a specific instance like

 2   that, but I wouldn't be surprised if that occurred.

 3        Q     (By Mr. Ray)  Can you name one instance

 4   that you're aware of where that has occurred?

 5        A     I literally just answered that question,

 6   literally.

 7        Q     So the answer is no, you cannot?

 8        A     I literally just answered the question.  I

 9   said, I'm not aware of one that specifically has

10   those dynamics, but I wouldn't be surprised if it --

11   if something did.

12        Q     And is there anything that you rely on to

13   support that belief, that you wouldn't be surprised

14   if it did?

15        A     Just because the dynamics of each mine are

16   different, and so it could be that direction, it

17   could be the other direction, it could be equal, it

18   could be all sorts of different things based on the

19   facts and circumstances of that particular case.

20        Q     But all the instances that you're

21   personally aware of where a mineral owner is paid

22   more, it's based on either the production of

23   minerals or anticipated production of minerals?

24        A     Well, that's generally what happens in a

25   mine, so I think that's true, but I would have to

1  look at all the cases to see if that dynamic was

2  always the case.

3       Q    But, certainly, that's how it generally

4  works with a mine, correct?

5       A    That's fair.

6            (Exhibit 22 marked for identification.)

7       Q    (By Mr. Ray)  Let's take a look, if we

8  could, at Exhibit Number 22.  And were you aware,

9  sir, that the regulation provides here in Section

10 211.127(a) (sic) that the primary term of a lease

11 cannot extend ten years?

12           MR. ASHWORTH:  Object to the form.  I'm

13 sorry, is this 214, you said?

14           MR. RAY:  211.27.

15      A    Are you asking am I aware of this

16 provision, or are you trying to extend it to

17 basically say that all leases have to be 10 years or

18 less?  Is that what you're suggesting?

19      Q    (By Mr. Ray)  I'm asking you, sir, if you

20 were aware of this provision?

21      A    I'm aware of this provision.

22           MR. ASHWORTH:  Object to the form.

23      Q    (By Mr. Ray)  All right.  And the lease

24 does -- or the regulation does, in fact, contemplate

25 that a lease could extend beyond ten years, does it

 1   not?

 2              MR. ASHWORTH:  Object to the form.

 3        A     That's true.

 4              MR. ASHWORTH:  I think you're

 5   mischaracterizing this reg.

 6        A     I was just going to say that, but sorry

 7   about that.  Go ahead.

 8        Q     (By Mr. Ray)  Right.  And that's as long

 9   as the minerals specified in the lease are produced

10   in paying quantities, right?  That's what we see

11   there in the first sentence.

12        A     You totally cut out of that.

13        Q     I'm sorry.  We see there that the

14   situation in which that can happen is so long as

15   thereafter as minerals specified in the lease are

16   produced in paying quantities, correct?

17        A     I don't interpret this that way, but,

18   again, if a judge or somebody else interprets it

19   that way, that's fine, but it says, "absent specific

20   lease provisions to the contrary," and you're

21   suggesting that that rest of it is defining that,

22   which I don't agree with you.  I think it's exactly

23   the situation here.  You have a 25-year lease.

24   There's no reason there can't be a 25-year lease

25   based on the specific provisions of the lease,

 1   because of the wind farm being there for 25 years

 2   plus.

 3       Q    But this clearly says, "All leases shall

 4   be for a term -- shall be for a term not to exceed a

 5   primary term of lease duration of ten years."  That

 6   language is, in fact, in the regulation, is it not?

 7            MR. ASHWORTH:  I'm going to interject here

 8   real quick and make an objection.  Ryan, I'm not

 9   accusing you of being unethical here, but you know

10   very well that the Tenth Circuit said that this

11   regulation doesn't apply to this -- to this lease.

12   Eleven -- sorry, 211 doesn't apply, but 214 does.

13   So simply apply it to the Osage matters.  Now, I'm

14   not saying you're unethical in trying to get him to

15   admit -- or trying to suggest to him that this would

16   apply and question him on this, but I just want to

17   throw that out there.  I mean, let's watch

18   ourselves.

19       A    What was the question?  I'm sorry, what

20   was the question?

21            MR. RAY:  Could you read back the last

22   question, please?

23            (The requested portion was read back.)

24       A    I mean, you use all sorts of words in

25   there I would disagree with.  You use the word

1    clearly.  I don't think it's clearly at all.  It has

2    ten years in there, so it clearly says 10 years, but

3    it talks about absent specific lease provisions.  In

4    the next sentence it talks absent specific lease

5    provisions to the contrary.  I mean, it has all

6    sorts of different caveats just in that first

7    paragraph alone.

8         Q    (By Mr. Ray)  Sir, does the absent

9    specific lease provisions to the contrary relate to

10   the term?

11             MR. ASHWORTH:  Object to the form.

12        A    You tell me.  You're the lawyer.  I don't

13   know.  I'm not making legal conclusions.

14        Q    (By Mr. Ray)  You just don't -- you don't

15   know how long that a term of a lease can be

16   permitted to be under these regulations?

17             MR. ASHWORTH:  Object to the form.

18        A    I honestly don't care, because I'm talking

19   about the damages, so you can interpret it any way

20   you want.  It's not going to change my conclusion.

21        Q    (By Mr. Ray)  I believe you said earlier,

22   sir, that you do not ascribe any damages to the

23   renewal term.  Did I understand you correctly there?

24        A    We didn't specifically calculate the

25   renewal term, correct.

1          MR. RAY:  All right.  Let's go back to

2  Mr. Hazel's report, if we could, and if we could go

3  to page 19.  That's Exhibit 18.

4          THE VIDEOGRAPHER:  You did say Mr. Hazel's

5  report?

6          MR. RAY:  I did.  Exhibit 18, please.

7          THE VIDEOGRAPHER:  One moment.  I've got a

8  technical issue here.  For some reason it is not

9  displaying.  Could we go off the record for a

10 moment, please?

11         MR. RAY:  Certainly.

12         THE VIDEOGRAPHER:  We're off the record at

13 3:30 p.m.

14         (A recess was had)

15         THE VIDEOGRAPHER:  We're back on the

16 record at 3:30 p.m.

17    Q    (By Mr. Ray)  All right, sir.  This is on

18 page 19 of your report.  It certainly appears to me

19 that you have calculated, about halfway through

20 table 7, future operating fees for the renewal term

21 period.  Do you see that?

22    A    Yeah, I stand corrected, you're right.  We

23 did include the 20 years at the discounted amount,

24 you're right.

25    Q    So should that be removed?

```
 1         A    No, I mean, it is what it is.  It's based
 2   on the time period of 2036 to 2056.  We've already
 3   risk adjusted, so it's still a fair calculation.
 4         Q    And how is it risk adjusted?  Explain that
 5   to me, sir.
 6         A    Okay.  Sorry, because we didn't just use a
 7   pure time value money, we used a risk adjusted rate.
 8         Q    And what was the -- what was the risk
 9   adjustment?
10         A    I don't know what you're asking there.
11         Q    You said you used a risk adjusted rate;
12   yes?
13         A    Yes.
14         Q    How did you determine the risk adjusted
15   rate?
16         A    The same way we considered the discount
17   rate in the other future operating fees, based on a
18   proxy of ocean, winds, cost of capital, plus an
19   add-on.
20         Q    And did you take into account if these
21   additional amounts were owed how that would affect
22   the calculation?
23         A    Sorry, you cut out on me again.
24         Q    I'm sorry.  Did you take into account if
25   these additional amounts were owed how that would
```

1  affect the calculation?

2       A     I'm sorry, I don't understand that

3  question.

4       Q     Well, so if an additional $25 million were

5  owed, did you take that into account in your

6  calculations?

7       A     Again, I don't understand your question.

8  What additional 25 million?  I don't understand your

9  question.

10      Q     Well, I'm talking, sir, about the roughly

11 25 million that you conclude in this chart.  That

12 would affect the cost of capital, would it not?

13      A     The 25 million in and of itself affects

14 the cost of capital?  No.

15      Q     For this project it certainly would, would

16 it not?

17      A     No.

18      Q     Why not?

19      A     That question doesn't even make any sense,

20 so how am I supposed to answer a question of why not

21 of something that makes no sense?

22      Q     How would you define the cost of capital

23 for the Osage Wind project?

24      A     Just like anybody would define the cost of

25 capital in any basic finance book.

1      Q     How --

2      A     It's basically the cost to that particular

3  person.

4      Q     And if your method were accepted, the cost

5  to Osage Wind of this project would go up by more

6  than $25 million, would it not?

7      A     No.

8      Q     Why not?

9      A     Again, you're asking me why not about

10 questions that make no sense.  So how am I supposed

11 to answer that?

12     Q     Well, certainly, Osage Wind incurred a

13 cost to construct this project; would you agree with

14 that?

15     A     Agreed.

16     Q     And if your calculations were accepted,

17 the cost of this project would go up by,

18 potentially, more than $25 million?

19     A     I see what you're getting at.  No, I would

20 agree with that from a pure accounting standpoint,

21 but the ongoing payments would go up by 25 million,

22 so the overall cost, if you want to look at it that

23 way, has increased.  I agree with that.

24     Q     And do you think that increase might

25 affect the decision of whether or not to renew?

 1              MR. ASHWORTH:  Object to the form.

 2       A     Well, no, because most of those costs are

 3   sunk, that means they have already been expended,

 4   and so, therefore, they wouldn't be relevant for

 5   that decision at the time of the renewal.  The

 6   renewal period on here is 5,763,000 based on the

 7   megawatt method being the highest method.  So divide

 8   by two for the surface owners and for the estate

 9   owners.  Is it possible they would renew for that

10   reason?  I think it's highly unlikely, based on the

11   portion of the proceeds that they're paying to the

12   two owners versus what they get to keep for

13   themselves, but it is possible.  They could make

14   that decision at that time.

15       Q     I believe, sir, that the court reporter

16   may not have heard one of the things that you said.

17              (Reporter clarification.)

18       Q     (By Mr. Ray)  I think you were referring

19   to the megawatt method, weren't you, sir?  When you

20   mentioned a method, I believe you said the megawatt

21   method; is that correct?

22       A     I did say that as part of my answer, yes.

23       Q     I believe that is what she did not catch.

24   Thank you.

25       A     I apologize.  I'll try to go a little

 1   slower.

 2        Q    All right, sir.  We talked earlier about

 3   the disagreements that you had with Mr. Pfahl.  Did

 4   you have any disagreements with Ms. Centera's report

 5   when you read her report?

 6        A    Again, you have to pull it up so I can

 7   remember what exactly the subject matter is.  I just

 8   found it to be, you know, I have a lot of experience

 9   in this industry, and I believe blank.  So it's

10   like, well, okay, you know, that's fine.  I mean, if

11   a judge thinks that's helpful to him or her or a

12   jury, that's fine, but I didn't really find any

13   value in it.

14             (Exhibit 34 marked for identification.)

15        Q    (By Mr. Ray)  Okay.  Let's pull up Exhibit

16   34 so that you can take a look at that, sir, and

17   we'll see if there's anything else that comes to

18   your mind.  Do you recall reviewing this document?

19   I think you said you reviewed it in the last couple

20   of days; yes?

21        A    I've reviewed it a couple of different

22   times, but, yes, most recently the last couple of

23   days.  I mean, I think, technically, it was probably

24   like a week ago when I looked at this document, but

25   within the last reasonable time frame.

1    Q    And is there anything you recall

2    disagreeing with about this report, based upon your

3    review in the last week?

4    A    I don't think that would be different than

5    the first time I read it, but can you go to the next

6    page?  I mean, in some ways you've covered some of

7    the semantic issues already today, so again, your

8    questions are what they are, and she's arguing a

9    different thing.  So again, to the extent the judge

10   or the jury decides this is appropriate, that's

11   fine.  I mean, again, she can have her opinion.  I

12   don't have any problem with that.  Can you go to the

13   next page?

14   Q    Was there anything you disagreed with on

15   either of the first two pages, sir?

16   A    Well, obviously, I disagree with it,

17   because we did something different than what she

18   did, but, again, she's entitled to her own opinion.

19   I just don't -- I just find it, you know, lacking in

20   basis and just, hey, I do a lot of this work, so I

21   know everything, and so here's what I think.  So,

22   again, to the extent that's helpful for somebody,

23   that's fine.

24   Q    And you, yourself, sir, have not ever done

25   any work in negotiating agreements in the wind

1    energy industry, true?

2         A     You know, I've negotiated a lot of

3    agreements.  Do I remember doing one in a --

4    specific to a wind energy project, no, I can't think

5    of one off the top of my head.  Again, that's not

6    what I did in this case either.  So she makes -- on

7    this next second page she makes statements like,

8    "The minerals are being extracted and modified over

9    a period of 25 to 45 years."  No, that's not what we

10   did.  So the length is not illogical; it's actually

11   what the specific lease that the surface owners

12   have.  So again, she has a different thought

13   process, I guess, which is fine, but again, she's

14   not paraphrasing my report properly.

15        Q     But you don't disagree that the minerals

16   are not being extracted by Osage Wind over 25 to 45

17   years, right?

18        A     Doesn't matter to me.  It's not what the

19   damages are in this case.

20        Q     Right, but you don't disagree with that

21   statement, do you?

22        A     Again, it doesn't matter one way or the

23   other whether they are being extracted or not.  It

24   doesn't matter.

25        Q     The question is not whether it matters,

1    sir.  The question is whether you disagree with that

2    statement.

3         A    I haven't formed an opinion on that one

4    way or another, because again, it doesn't matter to

5    me.  I mean, she talks about all these methods being

6    flawed, but again, these are specific methods that

7    Osage Wind used with the surface owner.  So okay, so

8    I don't understand what your opinion is, but if

9    somebody -- again, a judge or a jury decides that

10   that's not the appropriate way of doing it, I

11   respect that, but again, that's what they actually

12   did in this exact same wind farm with other owners.

13   So again, I agree with the semantics side of the

14   equation.  I don't disagree with it.

15        Q    And that was --

16        A    These are the exact methods that were

17   used.

18        Q    Right.  And those were other owners with

19   other rights, true?

20        A    I don't see how that matters.  Again,

21   we're talking about the negotiation of the mineral

22   estate owners to what they should receive based on,

23   you know, Osage Wind's failure to get the lease that

24   they needed.

25        Q    The question, sir, is not whether it

1  matters or not.  The question is whether the surface

2  owners have different rights than the mineral

3  owners?

4       A    We've already covered that subject many

5  times.  I agree with you they're different.  Could

6  we go to the next page?  So this particular area --

7  I mean, fails to address, we didn't fail to address.

8  In fact, we talked about a lot of the different use

9  agreements in our reports.  I don't know what she

10 means by failed to address.  We didn't consider

11 those as comparable as the actual leases that were

12 done on this particular property.  So again, she can

13 argue that those aren't the appropriate measure, and

14 she can argue something different.  That's fine.  I

15 respect that.  But it's not that we didn't look at

16 it, we're not aware of it.  We're definitely aware

17 of all those things so --

18      Q    Why are those not an appropriate --

19      A    -- again, if she has a different thought

20 process, that's fine.

21      Q    What methodology did you use, sir, to

22 conclude that those were not an appropriate

23 comparable?

24      A    Everything we've been talking about today.

25 I've already explained to you that the surface owner

1  leases are for this particular property, this

2  specific location, this particular project.  There's

3  so many more things that are similar than these

4  other -- like this person with the solar project, is

5  solar renewable energy?  Okay, fine.  Is it the same

6  thing as a wind farm, absolutely not, especially for

7  the surface owners.  So again, there's all sorts of

8  dynamics where you're looking at the best

9  comparables, which was what we did versus other

10  potential comparables that we're aware of that are

11  not as comparable as the one we used.

12     Q     Wouldn't a solar project, sir, actually

13  probably block more of the mineral estate than a

14  wind energy project would?

15     A     Yes.

16        MR. ASHWORTH:  Object to the form.

17     A     In general, that's true.  But again,

18  you're assuming that the mineral owners would allow

19  the solar project to be put there at all.  Can you

20  go to the next page -- I'm sorry, can you go back to

21  the first -- to that last page just for a quick

22  second?  I don't -- I don't think I'm the proper

23  person to speak to her two opinions at the bottom.

24  I mean, she seems to be pushing it back on the

25  Nation, that they are supposed to advise them or

1    tell them or something like that.  It's the

2    contractor that basically has that responsibility,

3    not the -- or the developer, I guess, is the word

4    she uses.  So I don't know who she's pushing this

5    off onto.  Again, they're the ones that have to look

6    into all the different aspects of the project to

7    know what the requirements are.  And they were on

8    notice that the Osage Nation didn't want this farm

9    here, so they should have investigated that further,

10   so these two particular areas to me are irrelevant.

11        Q    (By Mr. Ray)  But you don't have expertise

12   in these areas, correct?

13        A    I think I have enough expertise on lease

14   negotiation broadly, but even specific to wind

15   developers, I don't think there's any specific

16   dynamic there that changes that particular aspect.

17   Do I -- I mean, do I anticipate that a wind

18   developer should look into all the leases that are

19   necessary, absolutely.  Does that include a mining

20   lease?  Absolutely, if it's necessary.

21        Q    And do you know if it's ever been found

22   necessary other than in this case?

23        A    I haven't looked into that.  I don't know.

24   So you can go to the next page.  I think these are

25   just more details about those two opinions she was

1  asked to look into.  So, I mean, again, she says

2  what she says, and it is what it is.  I don't agree

3  it's an inaccurate valuation.  I don't agree it's an

4  inaccurate calculation of damages basis situation.

5  I don't agree that it's a disproportionate windfall.

6  How can it be a windfall?  It's exactly the same

7  thing as the surface owners got.  How could it be

8  possibly a windfall?  That makes no sense

9  whatsoever.  So all of those dynamics, I just

10  disagree, because I stand by my report.

11      Q    But you can't name for us, sir, any other

12  instance in which any other mineral owner has

13  received a penny for a mineral -- for a wind farm,

14  can you?

15      A    But again, in this case, they have to get

16  a lease, so that's irrelevant.  They have to get a

17  lease.  So they have to negotiate the lease with the

18  Osage Nation to basically get this wind farm in

19  place.  My understanding, the Osage Nation would

20  have said no.  Absolutely no is what they would have

21  said.  So now you're in a dynamic where you have to

22  negotiate a lease with somebody that doesn't even

23  want to do what you want them to do.  So again, it's

24  a very reasonable proxy to the damages in this

25  particular case.

1          Q     So why couldn't it be more?

2          A     I've already said it probably is more, but

3    I'm trying to get to the best, conservative proxy of

4    the damages for this particular case.

5          Q     But you're not aware of any other mineral

6    owner being paid in this way, correct?

7          A     Again, it doesn't matter.  This particular

8    case is somewhat unique.  They don't want a wind

9    farm there.  I don't know how I can get that through

10   to you.  They do not want a wind farm there.  So now

11   you're negotiating with a party that doesn't want to

12   do what you're doing.  How do you think that

13   negotiation is going to go?

14         Q     The question, sir, is not about relevance.

15   The question is whether you are aware of any other

16   mineral owner that has been paid in this way?

17         A     Again --

18               MR. ASHWORTH:  Object to the form.

19         A     -- I have not looked into that fully.  It

20   doesn't matter to me.  I'm looking at the facts and

21   circumstances of this case.

22         Q     (By Mr. Ray)  Are you aware of anyone

23   other than you in a published article, a court case,

24   anywhere else that advocates for paying a mineral

25   owner for a wind energy project in the way you do?

 1        A     Again, I don't think I published anywhere,

 2    so I don't know what you're asking there.  So do I

 3    have a specific case with exactly these same facts

 4    and circumstances, no.  Are there similar cases that

 5    speak to this, yes.  So again, the judge or jury is

 6    going to have to decide that.

 7        Q     What similar case speaks to this, in your

 8    opinion?

 9        A     I didn't say there's a similar case.  I

10    said there's other cases that speak to this.  I'm

11    not a lawyer.  I haven't investigated all the cases.

12        Q     Are you aware of even one?

13        A     There was a couple of cases that were

14    talked about, trying to remember the names.  I think

15    one was Millsap that was part of the -- because I

16    don't know if it's specific to this dynamic we're

17    talking about.  I think there's one called like

18    DeVilla is another case.  There was various

19    different cases that the counsel had referenced and

20    kind of told me how the cases came out to basically

21    inform that opinion where it's a reasonable

22    calculation of the damages.

23        Q     Did Millsap versus Andrews involve a wind

24    energy project?

25        A     Again, I don't remember the specific of

Steven J. Hazel                    4/29/2021                           217

1    the case, so I can't answer that.

2        Q    Did the DeVilla case involve a wind energy

3    project?

4        A    Again, I'm not sure how that's relevant,

5    but I don't remember one way or the other.

6        Q    It was a case you said informed your

7    conclusion in that regard; yes?

8        A    I didn't say that.

9        Q    All right.  Did you rely on Millsap versus

10   Andrews in any manner?

11       A    I'm just answering your questions.  I

12   don't think I would say I relied upon them, because,

13   again, I'm not a lawyer.  You asked if there's other

14   similar cases that might have formed your opinion

15   about damage calculations.  I gave you the best

16   answer I could.  I don't remember the specific of

17   those cases.

18       Q    Can you tell us anything about the

19   specifics of those cases?

20       A    You could pull them up, and we could read

21   them together.  I've read them before.

22       Q    No.  My question is your recollection as

23   we sit here right now?

24       A    I've tried to give you my best remembrance

25   of what I read.

```
 1        Q    Can you tell us anything at all about the
 2   DeVilla case?
 3        A    Again, you keep asking me the same
 4   question over and over and over again.  I've already
 5   tried to answer that.  I don't remember any
 6   specifics about the case.  I was trying to answer
 7   your other question.  I tried to give you examples.
 8        Q    Did you say, sir, awhile ago that you have
 9   not been published anywhere?
10        A    In this --
11             MR. ASHWORTH:  Object to the form.
12        A    -- particular case, I haven't been
13   published anywhere, because, of course, I haven't
14   testified in this matter.
15        Q    (By Mr. Ray)  And can you identify any
16   source, other than you, that would say the mineral
17   owners and the surface owners should be paid in the
18   same way if mining occurs contrary to these
19   regulations?
20        A    Again, any damage treatise or textbook or
21   whatever would talk about the comparable analysis we
22   did.  So all of those treatises and textbooks would
23   be similar to this dynamic.
24        Q    And they would say you would need some
25   kind of a comparable, correct?
```

1        A     Which we have here.  We have a comparable

2    for the same property, for the same time period, for

3    the same project.  All those different things are

4    the same.

5        Q     It's just a payment that's not based upon

6    mining production in any way?

7        A     Okay.  I understand your position there,

8    but again, that's not what I calculated.

9        Q     And what are you calculating?

10       A     If you don't have that figured out by now,

11   we're going to be here a while.  I've calculated the

12   damages to the mineral estate, based on the surface

13   owners as a proxy for the damages to the mineral

14   estate owner.  I've already said it's kind of a

15   conservative.  I've already said it probably should

16   be more, but I've tried to make a reasonable and

17   credible calculation based on the facts and

18   circumstances of this case.

19       Q     And by what methodology, sir, do you

20   conclude that that is an appropriate proxy in this

21   type of circumstance?

22       A     Based on all my years of training, based

23   on every single textbook and treatise I've looked

24   at, based on everything I've done in my whole

25   career.

1      Q     But you can't point out a single one of

2    those that says that mineral owners and surface

3    owners are paid the same in wind energy development;

4    true?

5      A     I don't believe any textbook would be that

6    specific to the industry.  Plus the other dynamic;

7    it's not done that way.  We're damage experts.

8    We're not -- there's not going to be a book that

9    says blank like that.  It's not going to happen.

10     Q     Is the only reason, sir, that you contend

11   that the surface leases are a better proxy than

12   actual mineral production in this county because you

13   believe the Osage Nation was opposed to the project?

14     A     Is that the only reason?

15     Q     Yes.

16     A     Is that what you asked?

17     Q     Yes, sir, that's what I'm asking.

18     A     I don't think it's the only reason.  I

19   think it's a big reason, but again, they went about

20   doing their construction regardless of what the

21   Osage Nation wanted or didn't want and, basically,

22   created it, so now they have to compensate them for

23   their damages.

24     Q     Are there any other reasons that you

25   believe the surface payments are an appropriate

1  proxy here?

2       A     Besides all the things we've talked about

3  today in this deposition today, as well as in my

4  report?  Is that what you're asking?

5       Q     Yes, anything else that you haven't

6  identified in your report or already today?

7       A     I mean, there's probably something else,

8  but I can't think of anything.  I think you've

9  covered the big areas.

10       Q     Let's take a look at Mr. Hazel's report

11  again.  If we could go to page 64.  All right.  This

12  is your listing of cases in the last four years at

13  the time this report was given, true?

14       A     True.

15       Q     All right.  Can you just look through

16  these to yourself and tell me if there are any of

17  them in which you gave a valuation of minerals?

18       A     Go to the next page, if you wouldn't mind.

19  I guess it depends on how you define it and what you

20  think is the same as a valuation of minerals, but

21  both the second and third line item there are what I

22  call sister cases, but they are two different

23  parties.  Those relate to an aggregate mine, for

24  lack of a better term.  So we had to value the

25  underlying material as well as the operation itself.

Steven J. Hazel                    4/29/2021                           222

1        Q      What --

2        A      Can you go to the next page?

3        Q      And what kind of a mine -- I'm sorry, sir.

4    I just want to be clear.  You're talking about

5    Hardesty and Schneider; is that correct?

6        A      Go back to the last page.  I apologize,

7    the second page.  So, yes, you used both names, the

8    second and third line items, Hardesty and then

9    Schneider, that's correct.

10       Q      All right.  And what kind of mines were at

11   issue in that case?

12       A      I mean, most people call it an aggregate

13   mine.  Some people might call it a sand and gravel

14   pit.  I mean, you could call it different things.

15   There's a quarry there.

16       Q      And how -- did you go about valuing the

17   aggregate that was in place or something else?

18       A      Both.  We did an aggregate in place from

19   the standpoint of the operations of the mine.

20       Q      How did you go about valuing that

21   aggregate?

22       A      The same way we do any of them.  We would

23   look at the value of the underlying mineral for the

24   revenue source, look at the overall costs we've been

25   talking about and look at the value of the operation

1    overall.

2           Q     Were you valuing the entire operation

3    there; is that what you were valuing?

4           A     Ultimately, yes.

5           Q     All right.  We can go to the next page

6    now.

7           A     Okay.  I mean, so now we're getting to the

8    coal matter at the very bottom there, the Licking

9    River matter.

10                (Reporter clarification.)

11          A     Licking River, just like it sounds.

12          Q     All right.

13          A     It's called the East Coast Mine, just to

14   make it easier words.

15          Q     And that was a bankruptcy; is that

16   correct?

17          A     True.

18          Q     Who retained you in that case?  Was it the

19   debtor or the trustee or a creditor or whom?

20          A     I don't remember.  We were actually

21   retained by the counsel with Jackson Kelly.  Let me

22   think about that a second.  I think that we were on

23   the trustee, but I would have to double-check the

24   actual kind of, quote, client side of the situation.

25          Q     Okay.  So what was your role in that

1    matter?  What were you looking at?

2         A    So I guess, broadly, we were looking at

3    the solvency and valuation of the operations, which

4    includes the coal itself, and then there was other

5    kind of fraudulent transfer preferential payment

6    types of issues as part of that bankruptcy matter.

7         Q    Okay.  So did you actually do a valuation

8    of actual coal there?

9         A    Yes.  The pricing of the coal, which is

10   what you're kind of talk -- calling it during your

11   questions today, was the pretty big dynamic of that.

12        Q    How did you go about determining that?

13        A    Well, this is a bankruptcy over a long

14   period of time, of course, so at different times

15   we're looking at the forward curves and the

16   commodity pricing for coal during various different

17   time frames.

18        Q    You were just looking at the pricing of

19   coal in the market that was applicable to this

20   particular mine; is that true?

21        A    You have to be a little bit careful there.

22   There was different types of coal, so it would be

23   different locations would be the appropriate spot

24   for the sale of that particular part of the coal.

25        Q    But for whatever particular part of coal

1  you were looking at, you would look at what it could

2  be sold for in the nearest location, true?

3       A    To determine what the revenue would be

4  from that particular operation, of course.

5       Q    All right.  Are you ready to go to the

6  next page, sir?

7       A    I'm ready.  I'm just trying to answer your

8  questions.

9       Q    Yes, sir.  Well, if you're ready, if

10  there's no other ones on that page that involve it,

11  involve the valuation of minerals, I'm ready.

12       A    Okay.  So you scrolled through that pretty

13  quick.  Can you go back to the last page to make

14  sure we didn't miss one?  Okay.  So go to the next

15  page.  Thank you very much.  It's interesting the

16  other -- let me think about that a second.  I was

17  expecting to see two other coal cases on here.  I

18  guess one settled relatively quickly, so we weren't

19  deposed.  The other one, they must have used the

20  same deposition.  Okay.  Sorry.  I'm just -- I'm

21  kind of thinking to myself.  I apologize.

22            Let's see.  You can go to the next page.

23  Go to the next page.  Next page.  I don't see any

24  other ones here that would relate to that dynamic.

25       Q    Sir, has a judge ever precluded your

1    testimony in any matter that you're aware of?

2              MR. ASHWORTH:   Object to the form.

3         A    I think there is one case that after the

4    fact it was precluded, which is different than

5    excluded, I guess.  I'm trying to remember the name

6    of that case.  It was like Dentsply, I think, was

7    the defendant.  After I testified, she -- it was a

8    she, the judge was a she -- determined that there

9    was nothing wrong with my background or the actual

10   calculations, but the remaining claims didn't

11   coincide with our damage calculations.

12             (Exhibit 32 marked for identification.)

13        Q    (By Mr. Ray)  Okay.  Let's pull up Exhibit

14   32 if we could.  I want to make sure we're talking

15   about the same thing here, sir.

16        A    That's fine.

17        Q    Is this the case style to which you're

18   referring?

19        A    Yeah, there's actually two cases.  One was

20   called Windstat and one was called Center City.  I'm

21   trying to find the jurisdiction here.

22        Q    It's in the Eastern District of

23   Pennsylvania, I believe.

24        A    Thank you.  I'm sorry, I'm not a lawyer.

25   I'm not used to looking at these things like you

1  are.  I see that now.  Pennsylvania, so yes, this is

2  the case I was referring to.

3       Q    It looks to me -- I'm looking at the fifth

4  page of this document.  It looks like the judge was

5  named C. Darnell Jones.  Is that -- I just want to

6  make sure we're referring to the same situation.

7  That's what it seems to indicate here.  You were in

8  the case, I wasn't.

9       A    That's fair.  I mean, I don't know what

10 the C. Darnell Jones is.  I guess we could look it

11 up, but, I mean, again, the judge that was on the

12 bench was a she.  She was the one that was presiding

13 over the matter.  So I assume that's the same judge

14 that's doing the opinion here.

15      Q    Okay.  If we look on page 10, if we could,

16 this is the section about -- the judge here says

17 your report is precluded; do you see that?

18      A    I do.

19      Q    And if we look on the next page, on page

20 11, we do see, I think, a paragraph there where I

21 believe, as you said, the judge found that you had

22 what he calls here "an undifferentiated methodology

23 that was now irrelevant for purposes of determining

24 the damages that are solely the result of the

25 wrong."  Is that the line of reasoning that you were

1    thinking of?

2            MR. ASHWORTH:  Object to the form.

3        A    It wasn't expressed to me exactly that

4    way, but I think that would be consistent with my

5    understanding of the claims that were remaining.

6        Q    (By Mr. Ray)  And, sir, have you ever in

7    your career testified adversely to the United

8    States?

9        A    I mean, I don't look at it that way, of

10   course, based on our previous discussion, but I

11   mean, there's been cases I've been on kind of the

12   taxpayer side, for example, or cases related to

13   different cases that we've had with the Department

14   of Justice or the Department of Interior or the

15   Department of Labor on, quote, the other side, but I

16   don't look at it being adverse to them.

17       Q    Okay.  How many such occasions do you

18   remember being retained by the party that was

19   adverse to the United States?

20       A    I would have to look back at the cases to

21   see if that's the dynamic, but -- I can't think of

22   one right off the top of my head, but I'm sure

23   there's one that had a caption where it was against

24   "the DOJ."

25       Q    You just can't recall that as you sit here

1  now?

2      A    Correct.  I can't think of one with that

3  specific dynamic.

4      Q    Would you have a document in your

5  possession that would show that?

6      A    Oh, part of the problem is "in my

7  possession" is the difficult word, because I

8  transitioned from RGL to FTI in October of 2015, so

9  I generally don't have anything available before

10  that time.  I have some of that, because there were

11  some cases that were ongoing.  I guess the only way

12  I could look at that is to look at every single case

13  I have in my possession to see if that's the dynamic

14  is probably the only way I could do that.

15      Q    You just don't recall one as you sit here

16  right now today, correct?

17      A    Yeah, I guess, I -- in full disclosure, I

18  remember one where that's the dynamic, but I didn't

19  necessarily get deposed or testify in those cases,

20  so I'm trying to think of ones where I've actually

21  testified or were deposed in those cases, and I

22  can't think of one.

23      Q    Tell me the one you recall, what you

24  recall about it.

25      A    Well, again, I can't give you specifics,

Steven J. Hazel                           4/29/2021                              230

1    of course, for privacy reasons, but there are cases

2    where I've been involved with the taxpayer against

3    the IRS or against the Department of Justice.  There

4    are cases in the ESOP realm that would have that

5    same dynamic.  It's more of a valuation project, but

6    there would be cases like that, would basically be,

7    you know, with the DOJ involved in some capacity.  I

8    shouldn't say it that way.  I should say the

9    government involved, because it, you know, might be

10   the Department of Labor, it might be the Department

11   of Interior.  I'm trying to kind of lump those into

12   one jurisdiction.

13        Q    Have you been involved, sir, in a case

14   prior to this one regarding the issue of whether a

15   lease should have been obtained from a Native

16   American Indian tribe?

17        A    I can -- you know, there may be more, but

18   I'm trying to think of the ones related to Indian

19   tribes.  I can think of one that's about -- trying

20   to think what time period that would be.  I would

21   guess maybe about six years ago was when that would

22   have been finalized, where that dynamic occurred.

23        Q    Okay.  Tell us what -- which side were you

24   on in that case?  Who retained you?

25        A    You've got to be careful --

1    Q    Let's just -- who retained you?

2    A    -- because of the privacy of the things,

3  but which -- again, I don't really look at which

4  side, but the attorneys were working for the party

5  trying to negotiate the lease, if that helps you.

6    Q    What was the subject matter of the lease?

7  What was -- what were they trying to lease the right

8  to do?

9    A    To operate a profitable operation on

10  Indian tribe land.

11   Q    Did it have anything to do with minerals?

12   A    I mean, I don't consider that the primary

13  aspect of that case, but, of course, minerals were

14  involved.

15   Q    Was the lease generally for a surface use?

16  Can you say that?

17   A    Both dynamics would come into play in this

18  particular example, so both the subsurface as well

19  as the surface.

20   Q    Did the issue of a mineral lease come up

21  in that matter in any way?

22   A    I don't remember it being separate and

23  apart from the overall dynamic.

24   Q    Do you ever remember it even being

25  mentioned at all by anyone?

1    A    Sure.  I mean, it's pretty common to

2  mention the surface and to mention the mineral,

3  because you're looking at -- you know, as any good

4  contractor, you're going to look at all the dynamics

5  of the particular site and make sure that you're

6  covering all bases so you don't come into a problem.

7    Q    But do you recall the minerals coming up

8  specifically during the course of that negotiation?

9    A    My remembrance is the minerals were a part

10  of that particular lease document.  Again, I don't

11  think it was primary in my mind, but you'd have to

12  ask the attorneys that are actually drafting that of

13  how important that particular aspect was of others.

14    Q    What was your role in this process?

15    A    I was a damage expert.

16    Q    Was it a matter in litigation?

17    A    Yes.

18    Q    In what court?

19    A    I can't tell you that, because it starts

20  getting to be -- gets to be obvious which project

21  we're talking about.  It was in the southwest.  I'll

22  tell you that.

23    Q    Was the entire case sealed?

24    A    I don't know.

25    Q    Was your involvement publicly disclosed to

1  your knowledge?

2       A    I don't know.

3       Q    Any other matters involved where you were

4  involved in negotiating a mineral lease with a

5  Native American tribe, other than that one?

6       A    I mean, again, the minerals come up when

7  you're talking about the tribes or any type of

8  commercial project, for that matter, but I mean, I

9  try -- I kind of remember that one from six years

10  ago.  Any other ones would be after that -- or prior

11  to that time frame.

12       Q    Do you have any specific recollection of

13  any others?

14       A    Not a specific matter, no, but again, you

15  know, mineral rights and surface rights are very

16  important for those types of dynamics.

17       Q    I take it for those matters you just

18  mentioned, you wouldn't have any documents in your

19  possession regarding those, because they predated

20  your time at FTI; is that correct?

21       A    I would have to check on that.  My

22  remembrance is the case I'm specifically talking

23  about, like I said, it was about six years ago, so

24  it's right on that cusp of that time frame.  It's

25  possible I would have some documents related to

1  that, because I think the case was still finishing

2  up right after I left RGL and when I started with

3  FTI.

4      Q    Can you tell us the name of the tribe that

5  was involved, sir, or do you believe you cannot do

6  so?

7      A    No, that would get to be pretty obvious

8  which case I'm talking about.

9      Q    And you believe -- is there a protective

10 order or something that prohibits you from

11 disclosing that?

12     A    Probably, but again, I'm a CPA.  I can't

13 disclose third party information without their

14 express written consent.

15     Q    Are there any other matters you can

16 recall, sir, where you offered any specific opinion

17 on the value of a mineral lease?

18     A    I mean, again, a lot of the oil and gas

19 matters would have a value of a mineral lease, if

20 you're including oil and gas.  In fact, we just did

21 one recently in a Texas operation, so I guess the

22 answer to that broadly is yes.

23     Q    And did you, in any of those instances,

24 look to payments to the surface owners to determine

25 the value of that lease?

Steven J. Hazel                          4/29/2021                          235

 1        A     I mean, in those cases they were mature

 2   oil and gas fields, so we were obviously aware of

 3   any differences between the mineral and the surface

 4   owners, if there were a difference, but then since

 5   they're mature, we're looking at the income streams

 6   that are actually being generated by the subsurface

 7   particles.

 8             MR. RAY:  All right.  Let's take a short

 9   break, if we could.  I think we may be reaching near

10   the end.

11             THE VIDEOGRAPHER:  We're off the record at

12   4:16 p.m.

13             (A recess was had.)

14             THE VIDEOGRAPHER:  Back on the record at

15   4:29 p.m.

16        Q     (By Mr. Ray)  The case, sir, involving a

17   Native American tribe in the southwest, did you

18   actually give testimony in that case?

19        A     I mean, it was testimony in an arbitration

20   that was unopposed but, yes, I guess I technically

21   provided testimony.

22        Q     So do you think you would have disclosed

23   that matter on expert reports that had -- if it was

24   within four years, or would you have been prohibited

25   from doing that?

1          MR. ASHWORTH:  Object to the form.

2          A     I mean, if I told you it was on my CV,

3    then yes, it would show up on all those reports in

4    that time frame.

5          Q     (By Mr. Ray)  Well, sir, we would like to

6    at least obtain the case number of that, so would

7    you look and see if you have a document that was

8    disclosed to others that reflects the case number of

9    that matter?

10         A     I'm not volunteering to do that, but if

11   I'm directed, then I can try to do that, but again,

12   I may not be able to give it to you just because of

13   privacy reasons.

14         Q     Okay.  Well, that would be our request.

15   We'll be willing to follow up with your counsel

16   about that, if that's okay -- or counsel for the

17   U.S.; how about that?

18         A     That's fine.  Again, I have my own ethics

19   and my own standards I have to abide by, so we'll

20   see what we have to do.

21         MR. RAY:  Very well.  I'll pass the

22   witness.

23         MR. ASHWORTH:  Sorry, do you want to go

24   first, Mary Kathryn?

25         MS. NAGLE:  Sorry, so the intervener

1   plaintiff does not have any follow-up questions at

2   this time.  So we're good.  Thank you.

3                     CROSS EXAMINATION

4   BY MR. ASHWORTH:

5        Q    Mr. Hazel, I just have two questions real

6   quick.  Earlier you, I believe -- I could be

7   mistaken, but I think you said something like you

8   were employed by the Osage Nation.  I don't know if

9   I misheard that, but I just wanted to clarify, that

10  you are employed by FTI.  FTI is your employer,

11  Osage Nation is not; is that right?  FTI is your

12  employer?

13       A    Yeah.

14       Q    The U.S. retained you?

15       A    Sorry.  If I misspoke somewhere around

16  there, no, I'm employed by FTI.

17       Q    Okay.  You've been retained by the U.S. as

18  an expert, but to be an independent expert, correct?

19       A    Correct.

20       Q    Okay.  The next thing is, earlier in your

21  deposition you talked about factors that you had

22  taken into consideration to value minerals, and you

23  talked about several.  You said market price you

24  would take into consideration as a factor,

25  transportation costs, production costs and other

1  factors.  And I just wanted to see if to evaluate

2  minerals another factor that you would take into

3  consideration would be if there was any local laws

4  or regulations that would apply to the minerals that

5  could affect the price, if that would be a factor --

6          MR. RAY:  Object to the form.

7      Q    (By Mr. Ashworth)  -- you'd take into

8  consideration, right?

9          MR. RAY:  Object to the form.

10     Q    (By Mr. Ashworth)  If it's applicable.

11     A    It has to be sellable is the word that

12 you're using or that you're referring, so I would

13 agree with that.

14         MR. ASHWORTH:  Okay.  I have no further

15 questions for you.  I will say one thing is if we

16 still have Ms. Centera and Mr. Pfahl still on the

17 line, that we would ask they not destroy any notes

18 they have taken today during the deposition, because

19 we plan on issuing a subpoena for that.

20         MR. RAY:  I just have one follow-up

21 question based on --

22         MR. ASHWORTH:  That's it.

23         MR. RAY:  I just have one follow-up

24 question if I could.

25                REDIRECT EXAMINATION

1   BY MR. RAY:

2       Q    Mr. Hazel, who actually has the contract

3   of engagement with the United States?  Is it FTI, or

4   is it you?

5       A    I guess I have to be careful answering

6   that question.  I think I'm the signatory on the

7   document, but it's on behalf of FTI.  Does that

8   answer your question?

9       Q    Right.  So you're signing on behalf of

10  FTI, and the United States has retained the --

11  whatever the full entity name of FTI is, correct?

12      A    Yeah.  I mean, again, are they retaining

13  me as the expert versus my firm, I mean, I don't

14  know the dynamics there, but again, it's an FTI

15  letterhead with my signature in the engagement

16  letter with the U.S. Attorney's Office.

17      Q    And have you ever been engaged by anyone

18  else in this case, including the Osage Minerals

19  Council?

20      A    Not that I'm aware of, no.

21      Q    You don't have any contract of engagement,

22  for example, with the Osage Minerals Council; is

23  that true?

24      A    Are you talking about me personally, or

25  are you talking about FTI?  I don't know for FTI,

```
 1   but I don't personally, no.

 2        Q    Have you signed a contract relating to

 3   your own services on behalf of FTI with the Osage

 4   Minerals Council?

 5        A    I don't believe so, no.

 6             MR. RAY:  All right.  I don't have

 7   anything further for today.  Thank you, sir, for

 8   your time.

 9             THE WITNESS:  Okay.  Are we done?

10             MR. ASHWORTH:  We are done.

11             MR. RAY:  The court reporter, sir, is

12   asking whether you wish to exercise your right to

13   read and sign the deposition transcript?

14             THE WITNESS:  I would prefer to do it that

15   way, but counsel can make the final decision on

16   that.

17             MR. ASHWORTH:  We'll have them send it to

18   you.

19             THE WITNESS:  Is there a standard 30 days,

20   or is there something else in this particular case?

21             MR. ASHWORTH:  Thirty days.

22             THE WITNESS:  Okay.  That's fine.

23             THE VIDEOGRAPHER:  We're off the record at

24   4:35 p.m.

25             (DEPOSITION CONCLUDED AT 4:35 P.M.)
```

```
 1                          JURAT

 2      UNITED STATES/OSAGE MINERALS COUNCIL VS OSAGE WIND

 3                     JOB FILE NO. 150476

 4   STATE OF OKLAHOMA

 5   SS

 6   COUNTY OF TULSA

 7             I, STEVEN HAZEL, do hereby state under

 8   oath that I have read the above and foregoing

 9   deposition in its entirety and that the same is a

10   full, true and correct transcription of my testimony

11   so given at said time and place, except for the

12   corrections noted.

13

14             _____

15             Signature of Witness

16

17             Subscribed and sworn to before me, the

18   undersigned Notary Public in and for the State of

19   Oklahoma by said witness, STEVEN HAZEL, on this

20   _____day of_____, 2021.

21

22

23             _____

24             NOTARY PUBLIC

25             MY COMMISSION EXPIRES:_____
```

1                          ERRATA SHEET

2        UNITED STATES/OSAGE MINERALS COUNCIL VS OSAGE WIND

3                    DEPOSITION OF STEVEN HAZEL

4              REPORTED BY: MARY K. BECKHAM, CSR RPR

5              DATE DEPOSITION TAKEN: APRIL 29, 2021

6                     JOB FILE NO. 150476

7    PAGE   LINE   IS                    SHOULD BE

8    _____  _____  _____  _____

9    _____  _____  _____  _____

10   _____  _____  _____  _____

11   _____  _____  _____  _____

12   _____  _____  _____  _____

13   _____  _____  _____  _____

14   _____  _____  _____  _____

15   _____  _____  _____  _____

16   _____  _____  _____  _____

17   _____  _____  _____  _____

18   _____  _____  _____  _____

19   _____  _____  _____  _____

20   _____  _____  _____  _____

21   _____  _____  _____  _____

22   _____  _____  _____  _____

23   _____  _____  _____  _____

24   _____  _____  _____  _____

25   _____  _____  _____  _____

```
 1                     CERTIFICATE
 2  STATE OF OKLAHOMA
 3  SS
 4  COUNTY OF TULSA
 5           I, Mary K. Beckham, Certified Shorthand
 6  Reporter within and for the State of Oklahoma, do
 7  hereby certify that the above-named STEVEN HAZEL was
 8  by me first duly sworn to testify the truth, the
 9  whole truth, and nothing but the truth, in the case
10  aforesaid; that the above and foregoing videotaped
11  deposition was by me taken in shorthand and
12  thereafter transcribed; that the same was taken,
13  pursuant to stipulations hereinbefore set out; and
14  that I am not an attorney for nor relative of any of
15  said parties or otherwise interested in the event of
16  said action.
17
18           IN WITNESS WHEREOF, I have hereunto set my
19  hand and official seal this 10th day of May, 2021.
20
21
22
23           _____
24           Mary K. Beckham, CSR, RPR
25           CSR No. 01053
```