# EXHIBIT 2

Case No. l4-CV-704-GKF-JFJ

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

   UNITED STATES OF AMERICA,
 4
        Plaintiff,
 5
   and
 6
   OSAGE MINERALS COUNCIL,
 7
        Intervenor-Plaintiff,
 8
   vs.                    Case No. 14-CV-704-GFK-JFG
 9
   OSAGE WIND, LLC;
10 ENEL KANSAS, LLC; and
   ENEL GREEN POWER
11 NORTH AMERICA, INC.,

12      Defendants.

13

14      VIDEO ZOOM DEPOSITION OF KIMBERLEE CENTERA
        TAKEN ON BEHALF OF THE INTERVENOR-PLAINTIFF
15       ON MAY 14, 2021, BEGINNING AT 10:49 A.M.
           REPORTER PRESENT IN YUKON, OKLAHOMA
16

17      APPEARANCES:

18 On behalf of the PLAINTIFF

19 Stuart Ashworth
   Cathryn D. McClanahan
20 UNITED STATES ATTORNEY'S OFFICE
   110 West 7th Street, Suite 300
21 Tulsa, Oklahoma 74119
   (918) 382-2700
22 stuart.ashworth@sol.doi.gov

23

24 THE VIDEOGRAPHER:  Jake Underwood

25 REPORTED BY:  Janna Pirtle, CSR, RPR
```

```
 1         APPEARANCES (Continued)

 2   On behalf of the INTERVENOR-PLAINTIFF

 3   Mary Kathryn Nagle
     Shoney Blake
 4   PIPESTEM & NAGLE, P.C.
     401 South Boston Avenue, Suite 2200
 5   Tulsa, Oklahoma 74103
     (918) 936-4705
 6   mknagle@pipestemlaw.com

 7
     On behalf of THE DEFENDANTS
 8
     Sarah M. Stevenson
 9   Dominic A. Martinez
     Lynn Slade
10   MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
     500 Fourth Street NW, Suite 1000
11   Albuquerque, New Mexico 87103
     (505) 848-1800
12   sarah.stevenson@modrall.com

13   Ryan A. Ray
     NORMAN, WOHLGEMUTH, CHANDLER, JETER, BARNETT &
14   RAY, P.C.
     401 South Boston Avenue, Suite 2900
15   Tulsa, Oklahoma 74103
     (918) 583-7571
16   rar@nwcjlaw.com

17

18   ALSO PRESENT:  Michelle Hammock
                    Christina Watson
19

20

21

22

23

24

25
```

1                          INDEX

2                                                        Page

3    DIRECT EXAMINATION BY MS. NAGLE              6

4    CROSS EXAMINATION BY MR. ASHWORTH          102

5

6

7                        EXHIBITS

8                                               Initial
                                               Reference
9    Exhibit                                      Page

10     35    10/30/20 Letter                       14

11     36    10/31/13 Memorandum                   56

12     37    OSAGE WIND-024749-024751              74

13     38    10/9/14 Letter                        85

14     39    The Project List                     110

15     40    Website Printout                     129

16     41    OSAGE WIND-001948-001950             184

17     42    OSAGE WIND-039298-039302             201

18

19

20

21

22

23

24

25

1                   STIPULATIONS

2           It is stipulated that the deposition of

3    KIMBERLEE CENTERA may be taken pursuant to

4    agreement and in accordance with Federal Rules

5    of Civil Procedure, on May 14, 2021, before

6    Janna Pirtle, Certified Shorthand Reporter.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE VIDEOGRAPHER:  This is the video

2   deposition of Kimberlee Centera taken on behalf

3   of the intervenor-plaintiff in the matter of

4   United States of America and Osage Minerals

5   Council versus Osage Wind.  Case is filed in the

6   United States District Court for the Northern

7   District of Oklahoma, Case Number

8   14-CV-704-GKF-JFJ [sic].  We are on the record

9   at 10:49 a.m.

10            Will counsel please state their

11   appearances for the record.

12            MS. NAGLE:  Yes, good morning.  My name

13   is Mary Kathryn Nagle.  I'm a partner at

14   Pipestem & Nagle, and I represent the

15   intervenor-plaintiff, the Osage Minerals

16   Council.  With me here today is my colleague,

17   Shoney Blake, also from Pipestem & Nagle.

18            MR. ASHWORTH:  Stuart Ashworth on behalf

19   of the U.S. Attorney's office.  I also have

20   Cathy McClanahan, an attorney with the U.S.

21   Attorney's office, Michelle Hammock, and

22   Chistina Watson, paralegals for the

23   U.S. Attorney's office.

24            MS. STEVENSON:  Sarah Stevenson with the

25   Modrall Sperling Law Firm on behalf of

1   defendants, Osage Wind, LLC; ML Kansas, LLC;

2   Enel Green Power North America, Inc.  Also

3   online today for defendants are Lynn Slade, Ryan

4   Ray, and Dominic Martinez.  I will state for the

5   record that I am here in the same room as the

6   witness, Ms. Kimberlee Centera.  We're sitting

7   about eight feet apart, and we will be using her

8   microphone.

9           THE VIDEOGRAPHER:  Okay.  The court

10  reporter will now swear in the witness.

11                KIMBERLEE CENTERA,

12  having been first duly sworn, deposes and says

13  in reply to the questions propounded as follows:

14                DIRECT EXAMINATION

15  BY MS. NAGLE:

16      **Q   Great.  Okay.  Good morning, Ms.**

17  **Centera.  My name is Mary Kathryn Nagle, and I**

18  **will be asking you a few questions today.  Just**

19  **just before we get started here, can you go**

20  **ahead and state your full name and spell it for**

21  **the court reporter, please?**

22      A   Kimberlee Centera, K-i-m-b-e-r-l-e-e,

23  C-e-n-t-e-r-a.

24      **Q   Thanks so much.  And where are you**

25  **located today?**



1      A    I am located in San Diego, California.

2      Q    Wonderful.  And just so you know, I will

3  be asking lots of questions and showing you some

4  exhibits on the screen.  Your counsel, who's

5  there in the room, may have some of these

6  documents, for instance, your report, in which

7  case, you know, if you want to look at it on the

8  screen or, you know, in print, I think either is

9  fine.

10          If I ask you a question that you don't

11  understand, please feel free to let me know.  If

12  you need me to repeat a question, you can let me

13  know.  Also, you know, any time you need to take

14  a break, we can take a break.  You know, it's

15  really -- I want you to be comfortable, and I

16  don't want you to feel like we have to keep

17  going if we need a bathroom break at any point

18  in time.

19          So jumping right in here, have you given

20  a deposition before?

21      A    I have.

22      Q    And have you ever testified in court

23  before?

24      A    No, I have not.

25      Q    Do you recall, how many times have you

1  given a deposition?  Do you know?

2      A   One other time.

3      Q   And do you recall the name of the case

4  or the litigation that was -- that you gave a

5  deposition in?

6      A   I don't recall the name of the case.  It

7  was with a prior employer several years ago, and

8  there was a case filed by one of the landowners

9  in connection with a project, and so they took

10  my deposition in connection with that.

11      Q   And so in that instance, you -- were you

12  deposed as an expert, or was it --

13      A   No.

14      Q   Okay.  Fact witness?

15      A   Correct.

16      Q   All right.  Today do you have a

17  smartphone with you?

18      A   I do, yes.

19      Q   And where is the phone located?

20      A   It's to the left of me.  It's turned

21  over facedown on the table.

22      Q   Okay.  And are there any other

23  electronic devices that you have with you during

24  this deposition, other than the laptop you're

25  using?

```
 1        A    No.

 2        Q    And do you agree to not text or use any

 3   other messaging system while we are recording

 4   this deposition?

 5        A    I do.

 6        Q    Okay.  And I understand that Sarah

 7   Stevenson is in the room with you.  Is there

 8   anyone else in the room with you at this time?

 9        A    No, there's not.

10        Q    And do you have any printed documents

11   with you this morning?

12        A    I do.

13        Q    And do you -- can you identify what

14   documents you do have with you?

15        A    Sure.  Is it -- is it okay if I just --

16   I tell you --

17        Q    Sure.  Absolutely.

18        A    I have a printed copy of my report, and

19   then I have the sandy soil permits.  I have the

20   John Pfahl reports, and I have a copy of the

21   interrogatories, a copy of the Tenth Circuit

22   opinion, and the -- not -- the FTI report.  Not

23   the complete report with all the appendices, but

24   just the report itself without the appendices,

25   and then the Roadrunner Solar Pharoah surface
```

```
 1   use agreement.
 2        Q    Okay.  All right.  And how many times
 3   have you been retained as an expert witness in a
 4   litigation?
 5        A    This is the first time.
 6        Q    Okay.  Prior to this litigation, have
 7   you ever been paid to form an opinion where
 8   minerals were extracted in violation of federal
 9   law?
10             MS. STEVENSON:  Object to form.
11             THE WITNESS:  Never.
12        Q    (By Ms. Nagle)  Have you, prior to this
13   litigation, ever been hired to form an opinion
14   where minerals were extracted from an Indian
15   trust property in violation of federal law?
16             MS. STEVENSON:  Object to form.
17             THE WITNESS:  Never.
18        Q    (By Ms. Nagle)  Have you ever been paid
19   to form an opinion related to 25 CFR Part 214?
20        A    No.
21        Q    Have you ever been paid to form an
22   opinion related to 25 CFR Part 211?
23        A    No.
24        Q    Have you ever been paid to form an
25   opinion related to the treaty rights of a
```

1    federally recognized tribal nation?

2        A    And I'm sorry, Mary Kathryn.  Could you

3    repeat that?  What kind of rights?

4        Q    Sure.  Have you ever been paid to form

5    an opinion related to the treaty rights of a

6    federally recognized tribal nation?

7        A    No.

8        Q    Have you ever been paid to form an

9    opinion related to the Osage Allotment Act of

10   1906 or its amendments?

11       A    No.

12       Q    Prior to this litigation, have you ever

13   been paid to form an opinion regarding whether

14   to obtain a lease to mine from a federally

15   recognized tribal nation?

16       A    No.

17       Q    Prior to this litigation, have you ever

18   been paid to form an opinion regarding the

19   reasonableness of a decision to obtain a mining

20   lease where the United States instructed the

21   decision-maker to obtain a mining lease?

22           MS. STEVENSON:  Object to form.

23           THE WITNESS:  No.

24       Q    (By Ms. Nagle)  And just overall, what

25   did you do to prepare for your deposition today?

```
 1        A   I reviewed some of the materials that I
 2   -- that I mentioned that I have here with me.   I
 3   -- to refresh my memory, I reviewed those
 4   materials.
 5        Q   And did you meet with counsel to prepare
 6   for today's deposition?
 7        A   I did.
 8        Q   And who did you meet with, specifically?
 9        A   Sarah Stevenson, Lynn Slade, and Ryan
10   Ray.
11        Q   And did you meet -- did you discuss
12   today's deposition with anyone else besides
13   those three individuals?
14        A   No, I did not.
15        Q   Did you look at any documents to prepare
16   for today's deposition that you didn't look at
17   to prepare for your report?
18        A   No.
19        Q   Okay.  And did you listen to the
20   deposition of Robert Freas in this litigation?
21        A   I did not.
22        Q   Okay.  Did you read his reports?
23        A   I did not.
24        Q   Do you have an opinion with regards to
25   his report?
```

1        A    I don't.

2        Q    Okay.  Did you listen to the deposition

3    of Steven J. Hazel in this litigation?

4        A    I did.

5        Q    And do you agree with his findings?

6        A    I don't.  No, I do not.

7        Q    And why do you not agree with his

8    findings?

9        A    I -- I don't agree with the basis on

10   which he does his valuation.  He uses the

11   surface leases as the basis for determining the

12   compensation, and in my years of experience of

13   working in renewables, which is almost 30 years,

14   I've never seen any kind of compensation even

15   contemplated, so I -- I have no -- there's no

16   basis in reality, in terms of my experience, to

17   calculate compensation on that basis.

18       Q    Just going over some of your general

19   experience in the field, I would love to hear a

20   little bit about this organization you work

21   with.  What is Women in Renewables and

22   Sustainability?

23       A    Women in Renewables and Sustainability

24   is an organization based in the Bay area that

25   promotes the advancement of women in -- you

1  know, generally in renewables, and just, you

2  know, sustainability at large, to try to

3  encourage women, you know, career paths,

4  education, that sort of thing.

5      Q   And what is your role in the

6  organization?

7      A   I am in an advisory role.  I also have

8  presented to them on materials.  I've spoken to

9  them on negotiations, so I've given them

10  presentations and on leadership and

11  negotiations.

12      Q   Now, I'd like to turn to your expert

13  report in this litigation, which I am going to

14  see if I can figure out how to share my screen

15  so that -- let's see here.  Okay.  So now we

16  should all be seeing this.  This is -- do you

17  recognize this as your expert report?

18      A   I -- I do, yes.

19      Q   Great.  So I will mark this as

20  deposition Exhibit Number 35.

21          MS. NAGLE:  I believe we're at Number

22  35, but someone correct me if I'm wrong.

23      Q   (By Ms. Nagle)  So this'll be marked as

24  Exhibit 35, and if we could turn to Appendix B

25  -- let me see if -- still -- here we go.

```
 1   Appendix B, great.  So I'm going to turn our

 2   attention to Appendix B and, specifically, your

 3   CV in here.

 4          And if you look at this, does Appendix B

 5   accurately reflect your background and

 6   qualifications?

 7      A    Can you scroll down a little bit more?

 8   It --

 9      Q    Sure.  Absolutely.

10      A    If it's the one that was in my report,

11   then it should, yes.  Yes.

12      Q    I can keep scrolling down.

13      A    Thank you.  That appears to be correct.

14      Q    Okay.  Great.  Are you currently a

15   California licensed real estate broker?

16      A    I am.

17      Q    And have you received any training

18   regarding Indian trust properties as a condition

19   of obtaining or maintaining your license?

20      A    No, I have not.

21      Q    And are you the president and founder of

22   TerraPro Solutions?

23      A    I am.

24      Q    How long have you been in your current

25   position?
```

1      A    Since about 2012.  Since 2012 I started

2   my consulting business.  The official company,

3   TerraPro Solutions, has been in existence for

4   about four years, three years, four years.  We

5   changed the name of the company a few years ago.

6      Q    And what was the name of the company

7   before the name change?

8      A    Before the name change, it was Centera

9   Land and Title and about, I want to say, three

10  years ago, we changed it to TerraPro Solutions.

11     Q    Okay.  Thank you.  And how long have you

12  been in your current position?

13     A    I basically founded the company in 2012.

14     Q    Okay.  And what are your job

15  responsibilities?

16     A    I manage the company.  I, you know, run

17  the company and work with, you know, different

18  people, and I have several people who work for

19  me.  And basically, I'm the -- you know, the

20  risk expert, if you will, so I work on a lot of

21  different projects and consult on different

22  projects for developers in the utility scale

23  space for energy.

24     Q    Uh-huh.  And when you state that you

25  work in risk, can you help explain a little bit

1  **more what risk entails?**

2       A   Well, we're -- our company is -- we're

3  finance experts, so we help our clients prepare

4  for financing on renewable energy projects, so

5  for debt financing in connection with

6  construction, or it could be tax equity

7  financing.  And so we will go in and take a look

8  at the documentation, so we'll look at leases,

9  we'll look at title reports.

10          We will -- we have a lot of reports that

11  we prepare for our clients to help them

12  understand the different risk profile for a

13  project.  So what that would mean is different

14  issues that might be raised by counsel in

15  connection with the financing.

16          And because we have a lot of financing

17  experience and that's what we specialize in, we

18  have a good understanding of the kinds of things

19  that attorneys are going to focus on for

20  purposes of due diligence.  So we help our

21  clients understand what those issues are, and

22  then we help them work out a strategy to solve

23  them.

24       **Q   And would some of the issues that**

25  **you-all would look at in doing this due**

1    diligence, would some of those issues relate to

2    potential leases that would need to be obtained

3    from the government?

4        A    It could, yes.

5        Q    In your experience, have you ever

6    advised a client on whether or not to obtain a

7    lease from a tribal nation?

8        A    Just generally?  Yes.

9        Q    And can you -- can you identify which

10   tribal nations you have advised in relation to?

11       A    I can't tell you a specific tribe, but,

12   I mean, you know, one of the things that we do

13   is get involved in early stage development.

14   Early stage development includes site control,

15   so if we are working with clients to identify

16   the ownership of a particular site, and that

17   would include a tribe, then we would absolutely

18   be working with them on that lease, potentially,

19   and negotiating that lease.  So we would get

20   involved, absolutely.

21       Q    Do you -- do you have any recollection

22   of an instance in which you advised on the

23   ownership of a particular site where a tribal

24   nation owned the mineral estate itself?

25       A    And I'm sorry.  With regard to a lease,

 1  are you saying?

 2      Q   Sure.  Or, you know, doesn't have to

 3  necessarily be a lease, but you mentioned

 4  advising on the ownership of a particular site,

 5  and I'm just wondering if you recollect whether

 6  you've ever worked or advised on an instance

 7  where a tribal nation did own the mineral estate

 8  at a particular site?

 9      A   Yes, yes.

10      Q   Can you name those specific examples?

11      A   Not without looking at material.  You

12  know, we work on so many different projects that

13  I can't tell you a specific project at this

14  moment.

15      Q   Okay.  Do you recall whether -- in those

16  instances where the tribal nation owned the

17  mineral estate, do you recall whether your

18  advice was to get a lease from the tribal nation

19  before mining or whether you advised to not get

20  a lease from the tribal nation before mining?

21  Do you recall?

22          MS. STEVENSON:  Form.

23          THE WITNESS:  Well, yeah, I think if

24  you're talking about mining, you're talking

25  about something different; right?  Because

```
 1   normally in our work, we're not entering into
 2   mining leases.  That doesn't come up.  Whether
 3   it's tribes or in any kind of a severance
 4   situation, we're not entering into leases.
 5          We might enter into accommodation
 6   agreements or surface use agreements, those
 7   types of things, but I've not ever seen a lease
 8   negotiated for purposes of mining, when it comes
 9   to tribal or otherwise.
10      Q    (By Ms. Nagle)  So in your personal work
11   and professional work experience, you do not
12   have experience negotiating a mining lease with
13   a tribal nation; is that correct?
14      A    That's correct.
15      Q    And before working and before founding
16   TerraPro Solutions, were you at AES Corporation?
17      A    Yes, I was.
18      Q    And how long were you there?
19      A    I was at AES Corporation from 2005 until
20   2012.
21      Q    And what were your job responsibilities
22   during your time there?
23      A    I was vice president of real estate, and
24   I ran the real estate division of the company
25   and managed a team of people.  And it was our
```

1    responsibility to acquire so -- establish site

2    control for all of our sites across the United

3    States and, in some cases, I did a little bit of

4    work in South America.  But I'm predominantly in

5    the U.S., and we were responsible for all of the

6    acquisition of all the sites and all --

7    responsible for all the financings and all the

8    management of all the real estate and title

9    rights associated with the projects.

10       **Q    And were most of those projects related**

11   **to wind power, or were there other forms of**

12   **renewables that you worked on as well?**

13       A    Other forms of renewables.

14       **Q    In addition to wind power, what else do**

15   **you have experience in?**

16       A    The solar.  We worked in solar as well,

17   solar development.

18       **Q    And before AES were you at SeaWest**

19   **WindPower Corporation?**

20       A    I was, yes.

21       **Q    And how long were you there?**

22       A    I started there in about 1993, and

23   SeaWest WindPower was acquired by AES

24   Corporation in 2005, so until 2005 when we were

25   acquired by AES.

1     Q    And what were your job responsibilities

2  at SeaWest WindPower?

3     A    At SeaWest WindPower, I had a similar

4  position.  I was responsible for all of the real

5  estate acquisitions and title.  We did all the

6  site control, site identification, and then all

7  of the financing work around the -- for the

8  projects, and predominantly all wind.  It was

9  all wind with SeaWest WindPower.

10    Q    And before that, you were at Jennings,

11 Engstrand & Henrikson; is that correct?

12    A    Yes.

13    Q    And how long were you there?

14    A    I want to say four or five years,

15 something like that.

16    Q    Okay.  And what were your job

17 responsibilities there?

18    A    I was a paralegal.  I worked for one of

19 the partners in the real estate trusts, estate

20 planning, wills, and probate.

21    Q    Okay.  And I'm going to turn to Page 2

22 of your CV and draw your attention to this line

23 here, where it states that you have specialized

24 expertise negotiating with public and private

25 entities and utilities including -- and you list

```
1    several.  And I see here that BIA is listed; is
2    that correct?
3         A    Right.
4         Q    Does BIA stand for Bureau of Indian
5    Affairs?
6         A    It does, yes.
7         Q    Could you please describe for us what
8    special expertise you have in negotiating with
9    BIA?
10        A    I worked on a project in -- it wasn't --
11   it was in the midwest.  I don't remember exactly
12   where it was, but we worked on negotiations of a
13   lease with the -- with the BIA.  It was very
14   early stage.  A lot of our work is early stage,
15   and so I was involved in those initial
16   negotiations with the BIA.
17             The client at the time ended up, for
18   different reasons, abandoning the project; there
19   were other things that -- that happened, so we
20   did not complete those negotiations, so the
21   leases weren't all entered into.  But I was
22   involved in the formulating of the lease and
23   some of the back-and-forth negotiations,
24   initially, with the BIA.
25        Q    Now, those leases that you were
```

1   negotiating, I realize they didn't come to

2   fruition, but were they mineral leases?

3        A   They were not.  No, they were for site

4   control, so they would have been for the

5   development of the -- of the wind project.

6        Q   And do you remember, roughly, what year

7   those negotiations would have been taking place?

8        A   I'm going to guess and say maybe 2013.

9        Q   Okay.  Do you remember the names of any

10  individuals that you worked with at BIA or spoke

11  with?

12       A   I don't.  You know, at any given time,

13  our -- we -- you know, we have one client where

14  we worked on 39 projects in one year, so it's

15  hard for me to recollect specific names and that

16  type of thing.

17       Q   Sure.  I can definitely understand that.

18  Let's see.  So let's -- I'm going to keep moving

19  on here, and let's see if I can find it on here.

20  Yeah, okay, so it looks like we have here,

21  listed in your Appendix B, a large number, a

22  very extensive list of different projects that

23  you've had involvement with.  And so I'm showing

24  you this here on the screen, but do you agree

25  that this is the correct listing of the projects

```
 1   you've been involved in?

 2        A   It looks to be correct, yes.

 3        Q   Okay.  And I apologize; I can't hand a

 4   hard copy to you, but I think you have one there

 5   in the room with you, so, hopefully, you can

 6   refer to that as much as you need as well.  Out

 7   of all of these projects, do you know how many

 8   were bifurcated where the mineral and surface

 9   estates were separate and actually the surface

10   estate was subservient to the mineral estate?

11        A   You know what?  I'd have to go back and

12   look at them.  I can't tell you a percentage.

13        Q   That's fine.  So you're not -- you're

14   not sure one way or the other without looking

15   further just how many of these had a bifurcated

16   -- okay.  Do you know how many of these

17   projects, if any of them, would have involved

18   the valuation of minerals?

19        A   The valuation of minerals with respect

20   -- like, what do you mean, the valuation of

21   minerals?

22        Q   Well, so I understand that your expert

23   report, and please correct me if I'm wrong, is

24   taking issue with Mr. Hazel's report in saying

25   that his valuation of the minerals of the lease
```

1   **in this litigation, that the Tenth Circuit**

2   **stated defendants are required to obtain, is**

3   **unreasonable.  And maybe we just -- maybe we**

4   **just take a step back and ask, in your expert**

5   **opinion, what would be a reasonable valuation**

6   **for the minerals that defendants have taken from**

7   **the Osage Minerals Council in this case?**

8            MS. STEVENSON:  Object to form.

9            THE WITNESS:  Yeah, I think what we're

10   -- what we're talking about is the compensation;

11   right?  So I'm not sure that we're talking about

12   the valuation of the minerals, per se, but I

13   think what we're talking about is a

14   compensation; right?  So that is what I have

15   more familiarity with, in terms of the

16   compensation that would be negotiated between

17   the parties.

18            So it's not really necessarily based

19   upon the valuation of the minerals, exactly.

20   You know, we're not going to go out and try to

21   evaluate, you know, how many minerals are out

22   there and what they're worth.  It really

23   pertains more to the -- to the use.

24            So, you know, I work on solar versus

25   wind, and so a lot of this is negotiated around

```
 1   what is the extent of the availability of the
 2   property.  But -- so I'm kind of confused by the
 3   question as to the valuation of the minerals,
 4   just because I don't try to value the minerals,
 5   per se.
 6        Q   (By Ms. Nagle)  Okay.  And so -- so in
 7   your expert opinion, compensation for minerals
 8   taken is not equivalent to the actual market
 9   value of the minerals themselves; is that
10   correct?
11            MS. STEVENSON:  Object to form.
12            THE WITNESS:  No, not necessarily.  In
13   other words, if you think about some of these
14   permits that's -- where you value the minerals
15   so much per ton that's extracted and all of
16   that, we really don't have those kinds of
17   conversations.  What we -- what we really talk
18   about is, you know, what is the use going to be,
19   what is the availability.
20            We will look at the -- you know,
21   sometimes at what the minerals are, if you have
22   oil and gas, for instance, and you can do slant
23   drilling.  And so it depends on the makeup of
24   the minerals, but I don't have someone go out
25   and try to look at the totality of the estate
```

1    and say, you know, the mineral estate is worth

2    this much, so, you know, we're going to make

3    payments on that basis.  It's more of a

4    negotiation that happens as a result of several

5    different factors.

6            And in a lot of cases, there's -- you

7    know, the compensation can be reciprocal rights.

8    For instance, we do a lot of work where, you

9    know, the wind farms have to build a lot of

10   roads.  And so if you're going to, you know,

11   come in and try to explore the minerals, there's

12   a benefit there of not having to build that

13   road, for instance.  I mean, some of these roads

14   are very expensive.

15           And so we might work out an arrangement

16   where, you know, there's no direct compensation

17   paid, but the parties will have a reciprocal

18   right for road use.  So a lot of times, it's the

19   function of a negotiation, and there's --

20   there's value around certain things that -- so

21   it's not really on the basis of the minerals,

22   per se, if that makes sense.

23       Q   (By Ms. Nagle)  I think that -- I think

24   that makes sense.  And so if I take out the word

25   "valuation" and replace it with "compensation,"

**Professional Reporters**

 1    **out of all these projects, did any of them**

 2    **involve you or your team undertaking to estimate**

 3    **how much the compensation from minerals would**

 4    **be?**

 5        A    So there -- we would -- we would work

 6    out a negotiation on the compensation to be paid

 7    between the parties, yes, yes, if that's what

 8    you're asking.

 9        Q    **And then in those instances where you**

10    **were involved in such a negotiation, would that**

11    **negotiation take place before the minerals were**

12    **mined or after the minerals are mined?**

13            MS. STEVENSON:  Object to form.

14            THE WITNESS:  Yeah, I -- you know, we

15    don't get involved in the mining of the

16    minerals, so, you know, that's going to be

17    something completely separate; right?

18        Q    **(By Ms. Nagle)  Uh-huh.**

19        A    You know, I think we're not negotiating

20    mining agreements; right?  That's renewables.

21    We're not in the business of mining; that's not

22    what we do, so we're not going to put that on

23    the table.  Like I said, the kinds of things

24    that would be involved in our negotiation would

25    be the kinds of things that -- actual things

1  that we can provide, like, you know, roads, you

2  know, the ability to be able to -- if there's

3  some reciprocity as far as uses and that kind of

4  thing.

5      I mean, we -- you know, I work a lot on

6  solar versus wind.  With solar and the spacing

7  of the turbines, you know, typically, I -- you

8  know, there's no restriction on other uses.

9  That's always been a big benefit of negotiating

10  wind power.  And I've been doing this a very

11  long time across all different kinds of

12  properties, so, you know, mining doesn't really

13  come up.  It's not what we do, it's not in our

14  area of expertise.

15      **Q   Did any of these projects in Appendix B**

16  **involve mining?**

17      A   No, no, none of them involved mining.

18      **Q   Did any of them involve a tribal nation?**

19      A   Some of them could.  I would have to go

20  back and look at that to be able to tell you

21  which ones exactly.  Again, I work on a lot of

22  projects, and I -- I don't keep them all in my

23  head.  There's no way I can do that.

24      **Q   Sure.  But you don't recall right now**

25  **any specific project listed here in Appendix B**

Kimberlee Centera    5/14/2021    32

```
 1    that involves a tribal nation; is that correct?

 2        A    Correct.

 3        Q    And do you recall any project listed

 4    here in Appendix B where the United States

 5    served as trustee?

 6        A    Served as trustee of the -- in what

 7    capacity?

 8        Q    Well, in capacity -- in the capacity as

 9    the trustee for Indian trust property.

10            THE REPORTER:  For what?  Indian?

11            MS. NAGLE:  Indian trust property.

12            THE WITNESS:  Where the United States --

13    you know, I can't really say that I have.  I

14    think in most cases, if we're working with

15    tribal land, we're either working with the tribe

16    directly or we're interfacing with the BIA.  So

17    I can't really say that we had a lot of

18    interface with, you know, the USA as a trustee,

19    no, I cannot say that.

20        Q    (By Ms. Nagle)  Did any of these

21    projects here listed in Appendix B involve a

22    trespass?

23        A    No.

24        Q    And in any of these projects listed here

25    in Appendix B, was the client that you worked on
```

1   behalf advised by the United States to halt

2   construction pending permit approval?

3           MS. STEVENSON:  Object to form.

4           THE WITNESS:  No.

5       Q   (By Ms. Nagle)  Were you in -- when you

6   prepared your report for this case, were you

7   informed that defendants had violated federal

8   law and committed a trespass on the Osage

9   mineral estate?

10          MS. STEVENSON:  Object to form.

11          THE WITNESS:  I don't know that I

12  understand that question.  I wasn't really

13  looking at the trespass.  You know, I was asked

14  to look at the FTI report, and really our focus

15  was the methodology that was used in connection

16  with that, you know, proposed compensation.  So

17  I can't say that we looked at that at all, no.

18      Q   (By Ms. Nagle)  Did you -- you said you

19  read or you reviewed the Tenth Circuit's

20  decision in this case; is that correct?

21      A   Certain portions of it, yes, that

22  pertained to my work, yes.

23      Q   Did you read the entire Tenth Circuit

24  decision?

25      A   I can't say that I did, no.  I think

1   there were certain pages that I really focused

2   on that spoke to the definition of mining and

3   that kind of thing, so that's really what I

4   focused on.

5       **Q   For the sections of the decision, you**

6   **focused on sections that the attorneys directed**

7   **you to focus on, or did you decide yourself**

8   **which sections to focus on?**

9       MS. STEVENSON:  Object to form, and

10   object to the extent it seeks privileged

11   information.

12       You can --

13       THE WITNESS:  What does -- the attorney

14   suggested there at the beginning, where there's

15   all the legalese -- you know, they suggested

16   that I don't necessarily have to read all of

17   that, so, you know, I didn't, because it didn't

18   really have bearing on my report.

19       **Q   (By Ms. Nagle)  What -- and in your**

20   **expert opinion, what part of the Tenth Circuit**

21   **opinion did have bearing on your report?**

22       A   Do you want me to tell you the pages?

23       **Q   Sure.**

24       A   I think I marked them so I could tell

25   you.  I apologize.  Just a moment here.

```
 1        Q    No, take your time.

 2        A    Let's see.  I want to say it was Page

 3   18.  Page 18 through Page -- I guess it's

 4   through the signatures so --

 5        Q    Okay.

 6        A    Well, pardon me.  Hang on just a second.

 7   Page 18 through, really, Page 27 is what I

 8   looked at.

 9        Q    So would that basically be 18 through

10   the end of the opinion?

11        A    Yes.  Well, let's see.  What's -- it

12   was, yeah, through Page 27, correct.

13        Q    And based on what you read of the Tenth

14   Circuit's decision, what is your understanding

15   of what the Tenth Circuit concluded or decided

16   in this case?

17        A    Well, I'm not an attorney, but they

18   decided that the fact that there was the

19   crushing of the -- of the limestone, that -- and

20   I guess there was, you know, really kind of an

21   ambiguity.  But they decided in favor of the

22   tribe with regard to the crushing of the

23   limestone, that that constituted mining, and

24   that there should have been a lease obtained for

25   that purpose.
```

1    Q   Okay.  And how -- how did your

2  understanding of what the Tenth Circuit decided

3  inform your expert opinion?

4    A   Besides the fact that I was shocked,

5  honestly?  Shocked and surprised, to be

6  perfectly honest, because, you know, I have

7  many, many years of doing this work, and I've

8  seen a lot of, you know, turbine foundations and

9  that kind of thing.  So I think I was just

10  surprised by the finding of the court that --

11  you know, so, you know, I -- that isn't

12  something that I would have anticipated, so I

13  was surprised by the finding.

14    Q   So your shock and surprise at the Tenth

15  Circuit's finding impacted your expert report in

16  this case; is that correct?

17    A   No.  I think what I'm saying is that I

18  was just surprised at their finding.  You know,

19  I -- you know, I've worked on a lot of

20  construction for a lot of projects, and I never

21  would have imagined that, you know, they would

22  have made the conclusion that they did, that,

23  you know, taking that limestone, you know,

24  crushing it and repurposing -- I guess in my

25  mind when I think about mining, I think about

```
 1   removing minerals from a site and taking them
 2   off the site and selling them for some purpose.
 3   And with my experience in renewables, I know
 4   that that's not happening, so I think that's
 5   what was, you know, different.  That was what
 6   was the surprise.
 7        Q    Uh-huh, uh-huh.  Okay.  Let's see here.
 8   Are all of the expert opinions that you have
 9   formed in this case represented in your expert
10   report?
11        A    Pertaining to this matter, yes, yes.
12        Q    Have you been asked to do any additional
13   work or form any additional opinion since
14   rendering your expert report in October?
15        A    With regard to this case, no, no.
16        Q    Okay.  Is there anything in your report
17   that you need to update, supplement, or correct?
18        A    Not that I'm aware of at this point, no.
19        Q    Excuse me.  And I can pull it back up on
20   the screen.  Let me just do that really quick
21   here.  We've got -- okay.  Let me share my
22   screen.  So we're looking here at your expert
23   report, and if I go up to Appendix A, which
24   lists the documents that you relied on in
25   rendering your expert report -- we've got here
```

```
 1   Appendix A, and this is Exhibit 35 that we're
 2   looking at right now.  Can you verify that
 3   Appendix A is a complete list of the documents
 4   you relied on in preparing your report?
 5            MS. STEVENSON:  Object to form.
 6            THE WITNESS:  Could you -- I'm sorry.
 7   Could you scroll down through the rest of the --
 8        Q   (By Ms. Nagle)  Sure.  Yeah, absolutely.
 9        A   That looks to be accurate, yes.  Thank
10   you.
11        Q   Okay.  Other than the documents listed
12   in Appendix A, were you provided with any other
13   facts that you considered in forming your
14   opinion?
15        A   No, I was not.
16        Q   Were there -- did counsel provide you
17   any facts or data that you considered in forming
18   your opinion?
19        A   Any facts or data, no, no, huh-uh.
20        Q   Were there any assumptions that counsel
21   provided to you that you considered in forming
22   your opinions in this report?
23        A   No.
24        Q   And are there any documents that you
25   asked for but did not receive?
```

```
 1        A    I don't believe so, no, huh-uh.

 2        Q    Okay.  Did you review any federal

 3   regulations in preparing your report?

 4        A    No, no, I did not, other than whatever

 5   is in this report, no.

 6        Q    Okay.  So did you review 25 CFR Part 214

 7   in preparing your report?

 8        A    Not really in preparing my report, no.

 9        Q    Okay.  Okay.  Let me just stop this one.

10             Did you review 25 CFR Part 211 in

11   preparing your report?

12        A    No, I didn't.

13        Q    Did you review the Osage Allotment Act

14   of 1906 and its amendments in preparing your

15   report?

16        A    I did not, no.

17        Q    Okay.  Actually, I'm going to go back to

18   your report again.  My apologies.  I just hate

19   leaving it on screen share when we're not there.

20   But it looks like, if we look at Page 4 of your

21   report, you discuss the Roadrunner solar project

22   here.  And so do you see that?  Is that -- does

23   that look like a correct rendition of your

24   report here on Page 4?

25        A    Yes, yes, it does.
```

```
 1        Q    And you received documents related to

 2   the Roadrunner solar project; is that correct?

 3        A    Yes.

 4        Q    Okay.  And did Roadrunner Solar involve

 5   the sovereignty of a tribal nation?

 6        A    I don't believe that it did, no.

 7        Q    Okay.  Did the documents you reviewed

 8   for Roadrunner solar involve a congressional

 9   statute mandating that the mineral estate be

10   administered in the best interests of the owner

11   of the mineral estate?

12        A    Not that I'm aware of, no.

13        Q    Did Roadrunner Solar, or any other

14   project for which you received documents,

15   involve the United States' duties or obligations

16   as trustee over an Indian trust asset?

17        A    Not that I'm aware of, no.

18        Q    And at the time that you conducted your

19   analysis for your expert report, were you aware

20   that in Osage County, the surface estates are

21   subservient to the Osage mineral estate?

22        A    You know, I'm not an attorney, but I

23   know from title review.  So if we looked at the

24   title, if there's a severance of the estate.  So

25   I'm not aware of, you know, the details around
```

1   Osage County, per se, but just in this

2   particular case, that there's a severance of the

3   estate.  I am aware of that.

4       **Q   And how did your understanding of the**

5   **severance of the estate factor into your**

6   **opinion?**

7       A   Well, I think it factors into all of our

8   work.  I mean, you know, we specialize in title

9   work, and we specialize in what we call curative

10  work.  So curative work is a resolution of any

11  issues that are going to come up in connection

12  with finance.  And so from the standpoint of a

13  severance, you know, that's one of the first

14  things that we look at whenever we do title

15  review.

16          Whether it's a wind project or a solar

17  project, we're always going to make sure that we

18  understand if there is a severance.  So, you

19  know, we're not so much focused on the

20  subservient or that type of thing; we're more

21  focused on the severance, what's constituted in

22  that, what -- you know, what could be out there

23  in terms of potential issues and that sort of

24  thing.  So if that makes sense, that's really

25  more of our perspective.

1      Q    Typically, in your work experience, when

2  there is that bifurcation and that severance of

3  the -- of the surface and the mineral estate,

4  what kind of issues could arise in your line of

5  work?

6      A    Well, there can be a -- you know, a

7  conflict of the parties -- right? -- in terms --

8  in terms of use.  And I think it's -- you know,

9  the other issue that arises for us is, our

10  clients want to make sure that they can get ALTA

11  35 coverage, which is mineral coverage.  And so

12  if we see a severance, initially, we know that

13  there's going to have to be some kind of

14  discussion with some of the parties to make sure

15  and find out what the parameters are going to be

16  in order to be able to get that coverage.

17         So it really depends on the particular

18  -- the particulars of the situation.  We're

19  going to look at a lot of different parameters,

20  you know, understand the parties, and understand

21  what -- you know, is there any, you know, our --

22  is there any minerals out there.  Sometimes, you

23  know, you have a severance, but there's -- you

24  know, there's not really a mineral estate that's

25  -- you know, has any real value, per se, in

```
 1    terms of exploration.
 2            So from our -- I guess from our
 3    standpoint, we're not really looking at it from
 4    a legal standpoint so much as a business risk
 5    standpoint and what factors might need to be
 6    addressed and negotiated.
 7        Q   Uh-huh.  And so from a business risk
 8    standpoint, what would be a red flag that
 9    perhaps something needs to be negotiated in a
10    situation where the surface estate is
11    subservient to the mineral estate?
12        A   I think any time you have a severance,
13    you know, you're going to want to look at that
14    really closely.  You're going to want to
15    understand who the parties are, you're going to
16    want to understand what the potential estate
17    could be, what the use is going to be.  Is it
18    going to be wind versus solar?  You want to look
19    at the adjoining land.
20            There's a lot of things that can be
21    taken into account in terms of a design, in
22    terms of location of improvements.  So I think
23    just from a -- from a high level, you're going
24    to want to understand all the different pieces.
25        Q   Uh-huh.
```

```
 1        A    Who the parties are, you know, that type

 2    of thing.

 3        Q    Okay.  So, now, I understand that your

 4    report discusses, quote, reasonable standards

 5    and customs within the renewable energy market;

 6    is that correct?

 7        A    Yes, that sounds correct.

 8        Q    And what is your definition of

 9    "reasonable standards and customs"?  How would

10    you define that?

11        A    I think it would be based upon a

12    precedent of my experience, having worked on

13    many financings, many projects across the United

14    States, and working with the attorneys, working

15    with the title companies, Alta surveyors, all

16    the different pieces and issues that they're

17    going to look at.

18        Q    And in your expert opinion, Mr. Hazel,

19    in his report, does not rely on reasonable

20    standards or customs; is that correct in your

21    opinion?

22        A    That's correct, yes.

23        Q    In your expert opinion, what would be a

24    reasonable standard here to rely on to determine

25    what amount defendants are owed to pay for the
```

1    lease the Tenth Circuit has stated they must

2    acquire?

3              THE REPORTER:  I'm sorry.  Can you

4    repeat the last part of that?

5              MS. NAGLE:  Sure.  Let's see.

6       Q    (By Ms. Nagle)  In your expert opinion,

7    what standards would you employ to decide what

8    amount of money defendants must pay to the Osage

9    Minerals Council for the -- for the lease that

10   the Tenth Circuit has stated they're required to

11   obtain?

12      A    I think what I would expect is that it

13   would be based on -- on the market conditions,

14   and I think, from what I can understand about

15   Osage County, there's a lot of information out

16   there on limestone being sold.  There's a --

17   there's a quarry that's very close to this

18   project site.

19             So I think that would be my expectation,

20   is that the compensation would be based upon

21   what's typically paid.  I think the problem or

22   part of the disconnect that I have that I still,

23   honestly, am struggling with here is, again, you

24   know, my idea of mining is -- in my experience,

25   if I'm working with a client on mining is that

1  there's an extraction that's taking place, it's

2  being taken off site, it's being sold.  And none

3  of that, you know, we know has happened here.

4          But irregardless of that, I think if you

5  were to agree that there needs to be a lease and

6  that there needs to be compensation, then I

7  think I would expect that it would be based on

8  those market conditions.

9          So, you know, I think we have some

10 permits and those kinds of things where there's

11 some kind of a, you know, payment that's made

12 upon execution of the agreement.  It looks like

13 there's a -- there's some kind of a payment

14 that's made during kind of the development or

15 assessment period, and then there's some kind of

16 percentage that's applied to that.

17     Q   **So in your opinion, did the Tenth**

18 **Circuit get it wrong here?  Do you disagree with**

19 **the Tenth Circuit that mining took place?**

20     A   Well, I'm not -- I'm not here to

21 disagree with the courts; right?  That's --

22 that's -- I mean, I think they've ruled what

23 they've ruled; right?  I'm just talking about my

24 experience, what you asked me about, you know,

25 what's reasonable and customary for me.  So I

```
 1   think with that in mind, that I -- if I'm
 2   looking at the compensation -- I don't think the
 3   courts really opined on the compensation; I
 4   think they really just said there's mining
 5   that's taken place.  So I -- that's really all I
 6   can say about that.
 7       Q   So in your expert opinion, did the Tenth
 8   Circuit get it right when it said that mining
 9   took place in this litigation?
10       A   I think they took a very liberal view.
11   I think they say in their opinion that where
12   there's an ambiguity, they need to rule in favor
13   of the tribe, and it seems to me like that's
14   what they've done here.  Certainly, you know,
15   there's a lot of history, there's obviously a
16   lot of legacy, you know, and working with the
17   tribes is very delicate.
18           And so I think, you know, there's a --
19   there's a lot of factors here, probably beyond
20   just the mining, but, yeah, you know, I'm not
21   really -- the courts ruled as they did, so I'm
22   not here to dispute that, per se, because I
23   think we are where we are.
24       Q   In your expert opinion, does the Tenth
25   Circuit's decision fit within the reasonable
```

```
 1    standards and customs framework that you use in

 2    your expert report?

 3       A   Well, all I can say is, you know, I have

 4    a lot of experience working on construction and

 5    construction of projects where foundations and

 6    materials are brought in, or what have you.  And

 7    I -- their -- their finding in this case, it

 8    just seems to me, you know, really outside the

 9    box.  I wouldn't have expected that.  If I was

10    sitting in the developer's seat, I would not

11    have anticipated that, no way.

12       Q   Do you have an understanding of why in

13    1906 Congress assigned the mineral rights to the

14    Osage Nation?

15           MS. STEVENSON:  Object to form.

16           THE WITNESS:  No, I don't know.

17       Q   (By Ms. Nagle)  Do you -- in your report

18    when you mention this reasonable standard --

19    this reasonableness standard -- excuse me --

20    does that reasonableness standard take into

21    account whether or not those parties, the seller

22    and the buyer, are willing to participate in the

23    negotiation?

24       A   I think so, yes.  You know, there is --

25    there's always going to be factors.  Renewable
```

```
 1   projects are very difficult to develop.  I work
 2   in all jurisdictions.  It's not easy anywhere.
 3   It's always a challenge, and there's always
 4   issues that come up, but there's a -- there's a
 5   conversation that, you know, has to take place.
 6   So...
 7       Q   Is the calculation of what is reasonable
 8   affected by the fact that there is an illegal
 9   trespass?
10           MS. STEVENSON:  Object to form.
11           THE WITNESS:  The trespass wasn't a
12   factor for me.  I'm not sure -- no, I didn't
13   consider that, no.
14       Q   (By Ms. Nagle)  Does the reasonableness
15   standard differ depending on the type of
16   renewable energy you're working on, you're
17   working with?
18       A   Well, as I mentioned, you know, every
19   project is different.  You know, every project
20   has its own set of parameters, but, generally
21   speaking, in my experience, there's -- there's
22   normally -- there's a common ground that can be
23   met.  You know, I've worked on a lot of
24   different cases.  I worked on a case where the
25   agreement was access rights.  We had a tribe
```

1    that, you know, they wanted to be able to hold

2    their vision quests.

3         And so one of the conditions of the

4    project was to -- for each of the landowners to

5    grant these rights across the access road so

6    that the tribe could be able to access this area

7    that was sacred for them, to be able to hold

8    their specific vision quests.  And so that was

9    done; those easements were negotiated.

10        So I think it depends on a lot of

11   different parameters, but I think certainly

12   there's -- you know, again, there's kind of a

13   reciprocal nature that, normally there's a

14   common ground that can be found on these

15   projects, that, I think, does help to repin

16   (phonetic) the reasonableness of the -- of the

17   compensation.

18   **Q   In your expert opinion, is there a**

19   **common ground here to be found between the Osage**

20   **Minerals Council and defendants?**

21   A   You know, I don't know, because I didn't

22   work on this case, so I don't -- I don't know.

23   I can't really speak to that.

24   **Q   Okay.  Does your reasonableness standard**

25   **account for a trust relationship between the**



 1   United States and a federally recognized tribal

 2   nation?

 3        A   No, I don't really take that into

 4   account, per se, no, huh-uh.

 5        Q   Does your reasonableness standard

 6   account for the sovereignty of a tribal nation?

 7        A   I think absolutely, because, as I say, I

 8   -- you know, there's a lot of different

 9   solutions that have been reached on other

10   projects.  So I would say yes.  You know,

11   there's not a one size fits all.  There's a lot

12   of different ways that things can be negotiated.

13        Q   Uh-huh.

14        A   By "things," I mean compensation, if you

15   want to classify it as compensation.  It's not

16   always, you know, a payment of money.  There may

17   be other things that are of value that can be

18   exchanged.

19        Q   Uh-huh.  Is it your understanding that

20   the Osage Minerals Council had the sovereign

21   right to say no to the mining that took place on

22   the Osage mineral estate in this case?

23        A   I believe I did hear that, yes.

24        Q   And did that factor -- that legal

25   reality factor into your expert opinion in any

1   shape or form?

2       A   In terms of the reasonableness, you

3   know, I -- you know, I think we're still talking

4   about what would be reasonable compensation.  I

5   think you're talking about something else;

6   right?  What their -- what their view might be

7   of the project or moving forward, I think that's

8   a different conversation; right?

9       Q   In your expert opinion, what would be a

10  reasonable compensation if the Osage Minerals

11  Council said, no, we're not -- we're not

12  granting a lease, you do not have permission to

13  mine on the Osage mineral estate?

14      A   I would have to sit down and think about

15  that.  I can't necessarily tell you that right

16  off the top of my head.  Again, I didn't work on

17  all the development of this project and didn't

18  have conversations with the parties, so it would

19  be hard for me to say.

20      Q   In rendering your expert opinion in this

21  case, did you review any documentation or

22  evidence that indicated to you that the Osage

23  Minerals Council would have been willing to

24  grant defendants a lease to mine the Osage

25  mineral estate?

```
 1        A    Well, I would only say, just speaking

 2   from the standpoint of a -- as a negotiator, I

 3   think there was an early letter about some

 4   collaboration and some exchange and, you know,

 5   making sure that they had all the information on

 6   the project.  So I'm an eternal optimist; I

 7   always feel that there's an opportunity for

 8   parties to work out something.

 9             There's -- in very rare cases, do --

10   maybe we have to walk away, but, typically, you

11   know, if people can sit down and really have a

12   conversation, there's some common ground that

13   can be reached.

14        Q    So would you say that your expert report

15   relies on the assumption that the parties would

16   have eventually worked it out and negotiated a

17   lease; is that correct?

18        A    Well, I would have to say that early on

19   -- you know, I don't think we knew in the

20   beginning that a lease was going to be required;

21   right?  I mean, I think this decision came very

22   much later.  I think it came even as the project

23   was in construction.  So I think if we're going

24   to back up and go to the very early part of this

25   project when the -- when the -- when the
```

1  negotiations took place, I don't know that it

2  would have been a lease -- right? -- because I

3  don't know that, you know, even the -- even the

4  Osage and the tribe didn't really put forward

5  the fact that there has to be a lease.

6       I don't think that -- I don't -- I

7  didn't see that in early -- any of that early

8  correspondence where it was specifically said,

9  you know, give us a lease.  So I can't say that

10  that negotiation would have taken place.  I

11  think, again, a lot of our work is in the early

12  stages, so I think if we back this up to, I

13  don't know, 2010 or 2011, maybe -- again, I

14  didn't work on this project, but in the very

15  early stages, I think that's where those, you

16  know, negotiations would have taken place.

17  **Q   So -- so just to be clear, your -- in**

18  **rendering your expert opinion in this case, you**

19  **assumed that the Osage Minerals Council did not**

20  **communicate to defendants that they needed to**

21  **get a lease in this case early on; is that**

22  **correct?**

23       A   In my -- in my expert opinion, I'm

24  commenting on the FTI report -- right? -- and

25  the calculation of the compensation.  So that's

1    -- that's what I am commenting on there, and the

2    basis for that, and whether or not that's, you

3    know, reasonable within the industry.

4          You know, as far as the lease and all

5    that, I think we're there now; right?  We

6    weren't there a long time ago, but I think

7    that's a -- that's a different -- that's a

8    different point than what we're talking about.

9    And I'm -- you know, at this point, I'm just

10   commenting on what I think is the reasonable --

11   based upon my industry experience of what I

12   would expect to see in terms of compensation

13   that would be paid, and it's not on the basis of

14   what's in the FTI report.

15   **Q   Yeah, I understand that.  I guess I'm**

16   **trying to understand what you mean when you**

17   **refer to the fact that, we didn't know that a**

18   **lease was required before construction.  And so**

19   **can you help me understand the time frames that**

20   **you're using when -- what is your understanding**

21   **of when construction commenced on the project?**

22   A   I believe, and I think I say in my

23   report, it would -- you know, construction of

24   the actual foundations maybe took three or four

25   months or something of that case in 2014.  So I

```
 1    -- my -- and, again, I didn't work on this

 2    project, but I think my understanding is that

 3    the construction took place in -- you know,

 4    thereabout in 2014.  So --

 5        Q    So -- I'm sorry.  Go ahead.

 6             And so when you say that you didn't --

 7    that the -- you know, there wasn't an

 8    understanding that a lease was required before

 9    construction commenced, are you referring to

10    2013 and before?

11        A    Correct, yes.

12        Q    And so in drafting your expert report in

13    this case, is it correct that one assumption --

14    or one fact that you relied on was that

15    defendants did not realize that a lease was

16    required from the OMC before 2014; is that

17    correct?

18             MS. STEVENSON:  Object to form.

19             THE WITNESS:  I don't know that it's

20    really correct to say that.  I mean, I think,

21    you know -- I think that there might have been a

22    different outcome in this if that was understood

23    earlier.  I think I would say that, but my

24    report was prepared to respond to the FTI report

25    in terms of the compensation that's been
```

1   calculated now.

2           So, you know -- you know, I think it's

3   unfortunate that we didn't know about that.  And

4   I'm putting myself in the developer's seat;

5   right?  You know, I'm putting myself like if

6   this was my -- my client, you know, and I would

7   certainly have wanted the benefit of that

8   information earlier.

9           Because, obviously, you know,

10  understanding -- you know, when we look at risk

11  and we look at due diligence and we're thinking

12  about the checklist and all the different

13  questions that are going to come up, you know,

14  the fact of, you know, do we have a mining lease

15  for doing work on a foundation is not going to

16  be something that has ever come up.  It's just

17  not going to come up so --

18      Q   (By Ms. Nagle)  Uh-huh, uh-huh.  Let's

19  see.  I am -- let's see -- I'm going to go ahead

20  and show you an exhibit.  I believe this will be

21  Exhibit 36.  Let me see if I can figure out how

22  to do this.

23          MS. STEVENSON:  Mary Kathryn, while

24  you're working on that -- this is Sarah -- we've

25  been going a little over an hour, so if you get

 1   to a stopping point in the next few questions, I

 2   could use a little break.

 3        MS. NAGLE:  Absolutely, yes.  Let me

 4   just introduce this exhibit.  I have just a

 5   couple of quick questions, and then we can take

 6   a break, absolutely.

 7        Here we go.  Okay.  This is the

 8   document.

 9   Q    (By Ms. Nagle)  Okay.  So I'm going to

10   share my screen, and so this document that we're

11   looking at here, just for everyone's benefit, is

12   Bates stamped Osage Wind PRIV-000414 through, it

13   looks like, 420.  And this is being entered as

14   Exhibit 36.  Give everyone just a little moment

15   to look at it and review it, and I'm just

16   labeling it 36.

17        And this is a memo from Sarah Stevenson

18   to Bill Scott on October 31st, 2013, and the

19   subject line states, "Rights of surface owners

20   to use soil."

21        Ms. Centera, have you seen this document

22   before?

23   A    I have not.

24   Q    So would it be correct to state that in

25   rendering your expert opinion in this case, you

1    did not rely on this document in any shape or

2    form?

3        A    I did not, no.

4        Q    Okay.  So I realize that you have not

5    seen it before, but turning to the second page

6    of the document, which is Bates stamped 415, I

7    just want to read to you this paragraph right

8    here -- well, I guess I can't highlight on this,

9    but here where it says, "analysis," it says,

10   "The Osage tribe has indicated that it will

11   assert Tradewinds Energy must receive a mining

12   permit from the Osage Minerals Council in order

13   to construct and operate the wind farm, on the

14   grounds that the excavation and construction and

15   permanent placement of the towers constitutes

16   mining of the Osage's mineral estate."

17           So just to read it, you were not aware

18   of this -- of this memo when you wrote your

19   expert report; is that correct?

20       A    No, I was not.

21       Q    And so you were not aware that in

22   October of 2013, defendants were relaying, at

23   least to one another, that the Osage tribe had

24   indicated that the construction -- the

25   excavation and construction on the Osage mineral

```
 1   estate would constitute mining; is that correct?

 2           MS. STEVENSON:  Object to form.

 3           THE WITNESS:  I -- I have not seen this,

 4   so I -- I -- I'm not aware of the contents of

 5   this information, so...

 6      Q   (By Ms. Nagle)  Would you agree that

 7   this memo is dated prior to the commencement of

 8   construction?

 9           MS. STEVENSON:  Object to form.

10           THE WITNESS:  It does appear to be, yes.

11   As far as I know, the construction started in

12   2014, yes.

13      Q   (By Ms. Nagle)  Okay.  In your expert

14   opinion, does this -- this sort of information

15   constitute the kind of apprisal that you mention

16   in your report when you state that entities need

17   to be apprised of the need to get a lease?  Does

18   this constitute that kind of form of apprisal?

19           MS. STEVENSON:  Object to form.

20           THE WITNESS:  You know what?  I have not

21   seen this before, so I've not had the chance to

22   read it or get familiar with it, so I can't

23   really comment on it.

24      Q   (By Ms. Nagle)  And so is it true that

25   when you rendered your expert opinion in this
```

1    case, you were not aware that defendants had

2    received this kind of communication from the

3    Osage tribe; is that correct?

4         MS. STEVENSON:  Object to form.

5         THE WITNESS:  No, I was not aware.

6    Q   (By Ms. Nagle)  Okay.  That's all the

7    questions I have on that document, and so why

8    don't we go ahead and take a break.  Would ten

9    minutes suffice?  Does that sound good?

10        MS. STEVENSON:  That should be fine.

11        MS. NAGLE:  Okay.  So we'll come back at

12   12:10 central.

13     (Short break at 12:00 p.m., resumed at 12:14

14                      p.m.)

15   Q   (By Ms. Nagle)  All right.  Great.

16   Thank you, everyone.  So I'm going to pick back

17   up -- let's turn to -- this is Exhibit 35, your

18   report, Ms. Centera.  Looking at Page 2 of your

19   report here -- wait, yes, Page 2.  My apologies.

20   I'm interested in the language here where you

21   write, "Specifically, the purported mining of

22   the minerals was a one-time event, confined to a

23   very specific time period and for a very

24   specific limited purpose, i.e., the sorting and

25   crushing of rock and excavation and reuse of the

```
 1   crushed rock for the wind turbine foundations."
 2           Oh, you know what?  My apologies.  I
 3   thought I was sharing my screen the whole time,
 4   and I was not.
 5       A   I'm sorry.  Can I interrupt for just a
 6   moment?
 7       Q   Yes.
 8       A   I want to go back to just to -- Mary
 9   Kathryn, to something I said earlier about the
10   documents.
11       Q   Sure.
12       A   I was provided with some additional
13   documents this week in connection with the
14   preparation for the deposition.  I did not
15   consider those in my report, and they didn't
16   change my opinion, and I understand those --
17   that information was sent to you.  So I just
18   want to make sure the record is corrected as to
19   that.
20       Q   Thank you so much for that
21   clarification, and I understand which documents
22   you're referring to.  Your counsel did send
23   those to us, and that makes sense, so thank you
24   for that clarification.
25           So I'll go back to Exhibit 35, and I'm
```

 1   going to actually hit Share Screen this time, so

 2   here's what I was showing myself before.  And so

 3   here we are on Page 2 of your report, and I'm

 4   interested in this language here in this -- in

 5   this top paragraph that we're looking at, and

 6   I'll read it again.

 7        You state, "Specifically, the purported

 8   mining of the minerals was a one-time event,

 9   confined to a very specific time period and for

10   a very specific limited purpose, i.e., the

11   sorting and crushing of rock in excavation and

12   reuse of the crushed rock for the wind turbine

13   foundations."

14        Do you see that language right here, Ms.

15   Centera?

16   A    I do, yes.

17   Q    And do you -- do you -- can you verify

18   that that is the actual language in your report?

19   A    Yes.

20   Q    Now, did you -- did you rely on the

21   Tenth Circuit's decision in drafting your report

22   and specifically your definition of mining?

23   A    Yes, we did -- I did.

24   Q    And I believe we spoke about this just a

25   little bit earlier, and you said you were

 1   **shocked and surprised by the Tenth Circuit's**

 2   **decision.  Can you help remind me, what exactly**

 3   **did you find to be different about the Tenth**

 4   **Circuit's definition of mining, different than**

 5   **the definition you would customarily use?**

 6        A    I just -- I think it was just the

 7   finding that the -- the crushing of the

 8   limestone, you know, constituted mining, that

 9   that -- that that use.  I think that was what

10   surprised me.  I -- you know, again, if I'm --

11   if I'm wearing my developer hat and, you know,

12   I'm aware of this, then I probably would have

13   taken steps to make other provisions.

14        If I had -- if it had been clear to me

15   and, again, I'm sitting in my developer seat and

16   we're talking about the project, you know, early

17   on and we have a clear understanding of what's

18   going to be required -- and, I mean, this is

19   just something that, you know, again, if I think

20   about construction -- you know, and I've seen,

21   you know, turbine foundations myself, and I

22   certainly know what -- you know, I've seen a lot

23   of different kinds, I know what goes into the

24   foundations.

25        And so from the standpoint of

1   construction, if you understand that there's

2   going to be certain requirements, whatever they

3   might be -- and, again, in our -- in the course

4   of our curative work, we work on all kinds of

5   different/different kinds of crossing

6   agreements.  There's a whole -- you know, many,

7   many different things that come up in the course

8   of construction that require compliance.

9            And so you're going to make sure that

10  you understand what all those are.  And so I

11  think from that standpoint, the fact that this

12  position was taken, again -- you know, ideally,

13  you know about it early, so that you can make an

14  informed decision, you know, as far as -- as how

15  you want to proceed.

16           So I think that was the view, and with

17  my developer hat on, I'm going to be surprised

18  that there's going to be this finding with

19  regard to the crushing of the rock.

20  **Q   And so in formulating your expert**

21  **opinion in this case, did you have an**

22  **understanding of whether or not defendants in**

23  **this case were aware that the crushing of the**

24  **limestone and use of that crushed limestone for**

25  **the foundations would trigger the need to obtain**



1   a lease?

2       A   My understanding of the information is

3   that it wasn't known until later, so I think

4   even in the early stages -- I mean, and, again,

5   my work is early -- right? -- because you're

6   setting it up for financing, so it's going to be

7   done well in advance of construction.  Crossing

8   agreements and subordinations and all the

9   different things that we work on are done, you

10  know, many, many months before construction

11  starts.

12          So I think in that case, again, if I

13  think about it from that standpoint and you

14  would consider this in that ordinary course,

15  then you would -- you would want to understand

16  that, so...

17      Q   And so just for purposes of your expert

18  report in this litigation, what was your

19  understanding or assumption of when the

20  developer, in this case defendants, had an

21  understanding that the rock crushing that they

22  were undertaking would require a lease?

23      A   My understanding is that it was later.

24  It was more near the period of time when they

25  were in construction.

```
 1      Q    So near the period of time of
 2   construction?
 3      A    Right.
 4      Q    Okay.  Now, also here on Page 2, I note
 5   that you state, "An ongoing mineral lease is not
 6   appropriate here."
 7           In your opinion, why is an ongoing
 8   mineral lease not appropriate?
 9      A    Because there's -- you know, there's not
10   ongoing mining.  You know, again, in my
11   understanding of mining in my work and what I
12   traditionally see, mining is -- and, you know,
13   again, if I think about my curative work, and we
14   looked at lots of oil and gas leases, for
15   instance, and different operations.  And in
16   those cases, it's an ongoing -- there's some
17   kind of an ongoing activity.
18           And if there's not an ongoing activity,
19   then a lot of cases, the rights will terminate.
20   And so that's the perspective that I'm looking
21   at here, if I'm thinking about some kind of an
22   ongoing activity.  And a lot of our work is we
23   use affidavits to get rid of leases where there
24   is no ongoing activity.  We're able to get those
25   removed from the record.  So that's the
```

```
 1    perspective that I'm using here.
 2        Q   In your expert opinion, when you state
 3    that an ongoing mineral lease is not
 4    appropriate, when -- what would you put as the
 5    date of termination for the mineral lease?  When
 6    did the mining stop?
 7        A   I think if you look at it from the --
 8    from the -- I'm not even sure that -- I guess
 9    the court did say that it was mining, so, you
10    know, if you look at it from the standpoint of
11    some of these permits, then maybe it would be
12    for the three months that the -- that the
13    construction of the foundations was going on.
14            You know, I'm not familiar enough with
15    all the different -- you know, the details
16    around this case, but -- in terms of the
17    construction, but that's what I would say, based
18    upon what I know.
19        Q   And so is that expert opinion that
20    you're drawing about whether or not an ongoing
21    mineral lease is necessary, is that based on the
22    Tenth Circuit's definition of mining?
23        A   Well, I think what I'm doing is I'm
24    comparing it back to the FTI report and the --
25    and I think the assertion in that report that
```

 1   part of the compensation for damages is the

 2   entirety of the operations, period, of the

 3   leases.  So if you look at it from that

 4   standpoint and then you take it back and you

 5   compare it to this kind of a mining operation

 6   that we're talking about here, I think that's

 7   where there's no -- there's no correlation.

 8          And so if you think about it from that

 9   standpoint and then you try to look at this case

10   and say, okay, there was some mining, when would

11   you say that that mining occurred, in my view,

12   that mining would have occurred just during that

13   period of time that you would have actually been

14   in the construction of the foundation.  So if

15   you were to go get this permit or something of

16   that sort, it would be for that period of time.

17   **Q   Would -- utilizing the Tenth Circuit**

18   **definition, are you saying that the permit would**

19   **have covered the time during which the rock was**

20   **crushed to be used for the foundations?**

21   A   I think that's what happened during the

22   construction of the foundation, so that would be

23   the period of time.

24   **Q   And what is your understanding of what**

25   **plans the defendants have made to return the**

1  crushed rock back to the Osage mineral estate

2  when they're done using that crushed rock?

3     A   I'm not aware of that.  I don't know.  I

4  haven't consulted on that, so I don't know.

5     Q   So you're not aware of any plans to

6  return the crushed rock to the mineral estate;

7  is that correct?

8          MS. STEVENSON:  Object to form.

9          THE WITNESS:  Yeah, I've had no

10 discussions with them as to what their plans are

11 later on, so I don't know.  This is not my

12 project, so I'm not working on that part of it.

13    Q   (By Ms. Nagle)  Do you have any

14 understanding of whether the Osage Wind project

15 could continue operating if the crushed rock was

16 taken out of the foundations of the wind

17 turbines and no longer there?

18          MS. STEVENSON:  Object to form.

19          THE WITNESS:  Well, I think it would be

20 difficult to do at this point; right?  I mean, I

21 think that's why early on in the process -- and,

22 again, I'm talking about what my role would have

23 been, which would have been much earlier, I

24 think you would look -- have looked at -- more

25 than likely you would have looked at

1    alternatives; right?  If you had understood that

2    you were going to end up in this situation with

3    the -- with this, you know, question around the

4    limestone, I think you would have looked at

5    alternatives.  That certainly would have been

6    what we would have done.

7            You know, what other options do we have?

8    I mean, that's kind of a standard -- one of the

9    standard first questions that I always ask is

10   what are our options, what other options.

11   There's other quarries, there's other things

12   that we could do, you know.  So I think that

13   would have been one of the questions.  So now at

14   this stage, yeah, I can't really comment on

15   that.

16       **Q   (By Ms. Nagle)  In this instance, what**

17   **is your understanding of what other options the**

18   **defendants considered?**

19       A   I'm not sure what those are.  I would

20   just say if it were -- if I had been involved at

21   that stage, I think we would have tried to have

22   looked at other options, as far as bringing in

23   -- you know, because if you think about the

24   construction, and we know -- as I say, in my

25   experience, I know materials are brought in for

1    roads routinely and for different things, then I

2    think as part of that, you would have looked at

3    the foundations as well.

4        Q   Uh-huh.  So I'm going to introduce an

5    exhibit that's been previously introduced.  This

6    is Exhibit 5, and it's Bates stamped -- sorry,

7    hold on just a second.  Let me get down here.

8    Osage Wind-012246, I believe this was first

9    introduced in Mr. Pfahl's deposition.  Are you

10   familiar with this document, or have you seen

11   this document before?

12       A   I don't recall seeing this, no.  I don't

13   recall seeing it.

14       Q   Well, I can represent to you that it is

15   a purchase order.  Are you familiar with Burbank

16   Materials, by any chance?

17       A   I am not, no.

18       Q   Okay.  Do you recognize the Osage wind

19   farm with the address here?

20       A   I recognize the name of the project,

21   yes.

22       Q   And are you familiar with some of these

23   materials here that are on the purchase order?

24       A   I'm familiar with shay and shale -- or

25   pardon me, I'm sorry -- clay and shale.  I'm

```
 1   familiar with that.  I'm not sure that I'm

 2   familiar with everything, but those things I am,

 3   generally.

 4        Q   And so are you aware that during the

 5   course of construction of the Osage wind farm,

 6   that defendants did purchase off site materials

 7   and minerals for the purposes of constructing

 8   the wind farm?

 9        A   I'm not specifically aware of it.  As I

10   say, I'm not surprised to hear of it, just

11   because I know -- I know it happened on these

12   projects, you know, routinely, especially for

13   the roads.  It's usually necessary to bring in

14   outside material, so I'm not surprised to hear

15   that.

16        Q   In your expert opinion, why didn't

17   defendants purchase all of their materials off

18   site, as opposed to taking some materials from

19   the Osage mineral estate itself?

20             MS. STEVENSON:  Object to form.

21             THE WITNESS:  I think it's because they

22   didn't know.  I mean, that's my understanding,

23   is that they weren't aware.  I -- you know,

24   again, it's -- to me in my experience, if you're

25   aware of these kinds of things through the
```

1    course of construction, you usually take steps

2    to make other provisions.

3        **Q    (By Ms. Nagle)  And in your expert**

4    **opinion, what would constitute knowledge that a**

5    **lease is required?**

6        A    I think being told specifically by the

7    party that you need to have a lease.  I mean,

8    normally, as you're going through the process,

9    whether it's permiting -- or I should really

10   talk about what I know, which is curative work.

11   You know, we submit, you know, a request for a

12   subordination or some particular document.  We

13   do a lot with federal agencies, and we get a

14   very specific request from them for documents,

15   and then we comply with all.

16            So normally we make a request, we say,

17   we have a project, we need a subordination, they

18   send us a form.  So I think that's what I'm

19   accustomed to seeing.  So, you know, just

20   thinking about the early correspondence that

21   went back and forth, at that point, you know,

22   normally, in my world, I would expect to see

23   some kind of specific request for whatever it

24   would be, documentation or what have you, a

25   lease.

1        Q   Uh-huh.  Okay.  Let's go to -- sorry,

2   hold on just one second.  Okay.  Give me just a

3   second here.  Looking through a couple of my

4   documents.  Okay.  I'm going to -- I believe I'm

5   at Exhibit 37, I think.  I'm going to introduce

6   a new exhibit, and let me open that up for --

7   okay.

8            So this is Exhibit 37 that I'm

9   introducing.  It is Bates stamped OSAGE WIND

10  024749, and it's an email chain, and it goes all

11  the way to OSAGE WIND-024751.  Ms. Centera, are

12  you familiar with this document, or have you

13  seen this communication before?

14       A   I don't believe that I have, no, no.

15       Q   Okay.  So -- go ahead.

16       A   No, I apologize for talking over you.

17  No, it doesn't look familiar, huh-uh.

18       Q   I see here that it looks like these

19  emails were being exchanged in May of 2014.  Do

20  you have an understanding of whether or not this

21  was before or after the commencement of

22  construction of the wind farm project?

23       A   I imagine it was before, but I can't say

24  for certain, because I'm not sure exactly when

25  the construction started.

1      Q    Okay.  And I see here there's an email

2   from Joan Heredia, it looks like May 22nd, 2014,

3   to several -- several people at the EGPNA.  Are

4   you familiar with who Joan Heredia is or what

5   her role is or was at that time at EGPNA?

6      A    Only on what's on the email there.

7      Q    Okay.  I will read -- she writes to

8   Aaron Weigel.  She states, "Aaron, I note in the

9   attached POD fees analysis being performed for

10  road aggregate.  In an abundance of caution that

11  we do not want to trigger a minerals permit,

12  will you please look into this and report back

13  to this group on what the plans are.  I note it

14  is common to try and use on site material when

15  possible, but as you know, Osage is special."

16          What is your -- do you have an

17  understanding of what Joan Heredia means when

18  she writes that, quote, unquote, Osage is

19  special?

20          MS. STEVENSON:  Object to form.

21          THE WITNESS:  You know what?  I don't

22  know.  I'm not sure, because I'm not sure what

23  she was thinking or -- I couldn't comment on

24  that.

25      Q    (By Ms. Nagle)  Okay.  If you move up,

 1   in response to her email, Aaron writes on May

 2   22nd, "Ron, Mike, Craig," and here is his email,

 3   and I'm going to skip right to this sentence

 4   right here that my cursor's over.  "It is very

 5   important that we not remove any soil from the

 6   project site or use site materials in lieu of

 7   materials we would typically buy off site in

 8   developing a wind project.  Osage Nation has

 9   mineral rights for the project lands, and

10   removal of soil, especially for commercial gain,

11   could constitute mining."

12           In your expert opinion, does this

13   demonstrate that defendants knew in May of 2014,

14   that if they use the on site minerals they were

15   taking from the Osage minerals estate to crush

16   and fill the wind turbine foundations, that they

17   would need to get a lease from the Osage Nation?

18           MS. STEVENSON:  Object to form.

19           THE WITNESS:  Not necessarily, no, no.

20   I mean, I think -- in my experience, again,

21   negotiating many, many site control documents,

22   projects have their own particular requirements.

23   I have worked on projects where landowners were

24   very specific about weeds and weed control, and

25   they were very particular about dirt, you know,

1    not being moved, even from turbine location,

2    maybe, to turbine location.  So I don't know

3    that you would necessarily jump to that

4    conclusion at all.

5           I mean, I think there's a lot of

6    correspondence, and usually that takes place

7    with regard to specific landowner concerns or

8    questions and, you know, making sure that

9    information gets to the -- to the construction

10   team or whoever it is.  It is also really

11   important, so you're not necessarily going to

12   jump to that conclusion, no.  It might just be

13   there's some particularities about this

14   particular landowner or this project.

15          I mean, there's all kinds of things,

16   from cattle guards or moving of cattle, or I

17   could go on and on and we could talk about it

18   all day, about all the different requirements

19   that come up.

20       **Q   (By Ms. Nagle)  So in your expert**

21   **opinion, this does not constitute knowing that a**

22   **mineral lease could be required; is that**

23   **correct?**

24       A   That's correct.

25       **Q   What would constitute knowing that a**

 1   mineral lease is required?

 2        A    Well, I think we certainly have clarity

 3   now -- right? -- because we have the Tenth

 4   Circuit opinion.  And I think I've already said

 5   that I feel like that's extraordinary in my

 6   experience; right?  I mean, you're just not used

 7   to seeing that.  So if I'm sitting on this

 8   development team, I'm not going to make the

 9   assumption that we need to go (inaudible).

10             THE REPORTER:  Need to what?

11             THE WITNESS:  I'm not -- I'm not

12   expecting that it's going to lead to a develop

13   -- or pardon me -- a mining lease.

14        Q    (By Ms. Nagle)  So in your expert

15   opinion, Aaron Weigel, in his e-mail on May

16   22nd, 2014, is incorrect?

17        A    Incorrect as to?

18        Q    Well, he states, quote, it is very

19   important that we not remove any soil from the

20   project site or use site materials in lieu of

21   materials we would typically buy off site in

22   developing a wind project.  Osage Nation has

23   mineral rights -- mineral rights for the project

24   lands, and removal of soil, especially for

25   commercial gain, could constitute mining, end

1    quote.

2          And you're saying that doesn't

3    constitute knowledge that a lease would be

4    required, and I'm just trying to understand from

5    your expert opinion where Aaron got it wrong.

6         A   Well, I think also he's saying removing

7    it from the property, which we're not going to

8    be removing anything from the property; right?

9    And I think that comes back to my statement

10   about the concerns of landowners and issues that

11   they might have.  I -- you know, I can't comment

12   on whether he got it right or whether he got it

13   wrong, but I would just say from this

14   correspondence, this very narrow review -- and,

15   again, I haven't seen this before, but from this

16   very narrow review, I'm not going to assume that

17   we're going to need a mining lease; right?

18   That's not going to occur to me, because we're

19   not planning to remove anything from the site.

20        Q   Uh-huh.  And in addition to removing, he

21   also refers to "or use site materials in lieu of

22   materials we would typically buy off site in

23   developing a wind project."

24          Do you have an understanding of whether

25   or not the developer in this instance,

1    **defendants, used site materials from the Osage**

2    **mineral estate in lieu of materials they could**

3    **have otherwise purchased off site?**

4         A    I need to read that.

5         **Q    Sure.  Take your time.**

6         A    Yeah, I still -- I'm not in Aaron's

7    head, so I don't know exactly what, you know, he

8    was trying to convey, but in my mind, this is

9    not going to lead me to believe that you need a

10   lease or for -- or that's going to constitute

11   mining.

12        **Q    Okay.  And so do you have an**

13   **understanding, in forming your expert opinion,**

14   **whether or not defendants used on site materials**

15   **from the Osage mineral estate that they could**

16   **have otherwise purchased off site?**

17        A    I think they did in the foundations.

18   They used the material that was there, correct.

19        **Q    And in your expert opinion, despite this**

20   **email, defendants did not know in May of 2014**

21   **that that could trigger the need for a lease; is**

22   **that correct?**

23        A    No, I -- because I think what they're

24   saying is, in lieu of materials we would

25   typically buy off site.  But, you know, I -- no.

1      Q    So -- okay.  So in your expert opinion

2    where you conclude that defendants did not know

3    that a lease was necessary for their use of

4    minerals from the Osage mineral estate, what

5    evidence or documentation, or what is -- what

6    have you relied on to formulate that expert

7    opinion that they did not know?

8      A    I'm sorry.  Could you -- could you

9    repeat the question?

10     Q    Sure.  So you stated earlier -- I

11   believe you stated that defendants did not know,

12   prior to commencing construction, that a lease

13   would be required.  I also understand that

14   you've looked at this email and you've said this

15   also doesn't constitute knowledge that a lease

16   was required.  I'm asking you, what evidence did

17   you look at that substantiates that they did not

18   know that a lease was required?

19          MS. STEVENSON:  Object to form.

20          THE WITNESS:  Well, I think if you

21   continue reading this, it says the Osage Nation

22   has minerals and that if they're removed for

23   commercial gain or if they're taken off and are

24   sold.  And I -- I'm not sure that I understand

25   what you're asking.

1     Q    (By Ms. Nagle)  Okay.  That's fine.  I
2   think we can be done with that document.  All
3   right.  So what is your definition of
4   "reasonable due diligence"?
5     A    Of reasonable due diligence, with
6   respect to a project as a whole or in regard to
7   -- what are you meaning in regard to?
8     Q    Well, in regards to this project, what
9   would constitute reasonable due diligence?
10     A    As it pertains to what?  Just the
11   entirety of the project or...
12     Q    Do you have any opinion -- does your
13   report opine on reasonable due diligence in any
14   shape or form?
15     A    Not that I'm aware of.
16     Q    Okay.  So you don't actually have an
17   opinion in this case of whether or not
18   defendants performed reasonable due diligence
19   regarding the need to get a lease before they
20   mined on the Osage mineral estate; is that
21   correct?
22     A    No, I think my report is in response to
23   the FTI report -- correct? -- on the -- on the
24   compensation.  I'm not sure that I'm -- that I'm
25   done commenting on the -- on the due diligence,

 1   because I think we're past that.  So I don't

 2   know.  What I think of due diligence, it's a --

 3   it's a very large -- you know, a box of

 4   material, so I'm not trying to be difficult; I

 5   just -- if you want me to give you some

 6   parameters or you want to give me some

 7   parameters, I'm happy to try to do that.

 8        Q   No, I think it's fine.  I mean, just to

 9   clarify, so your expert report does not opine on

10   whether or not defendants adequately performed

11   due diligence; is that correct?

12        A   I'm not trying to opine on that, no.

13        Q   Okay.  I am now going to go back to your

14   expert report, so let me share my screen.  And

15   so here we are, and I am looking at Page 4 of

16   your report and specifically down here under

17   Summary of Expert Opinion.  And I note here in

18   your second statement, "Second, if a wind energy

19   developer was clearly apprised, prior to

20   construction commencing, that a mining lease was

21   required to engage in ordinary turbine

22   foundation excavation for a wind energy project,

23   would the developer have practical and effective

24   alternatives to using minerals so mined from the

25   mineral estate in the construction of

1    foundations for the project?"

2           My question is -- to you is, what is

3    your definition of "clearly apprised" here in

4    your report?

5       A    As I mentioned, in my work, we will make

6    a request to an agency, could be to a bank, it

7    could be to a utility, it could be to some

8    entity, for when we'll say we're building the

9    project and we're going to be crossing your

10   easement or we need a subordination or what have

11   you.  And there's a specific exchange that

12   happens with regard to documentation.

13          So I think in my view my expectation

14   there is that there would be a clear request for

15   some kind of a document, whatever it might be.

16      Q    When you mentioned the clear request,

17   who would the request be coming from?

18      A    Normally, it's from the agency that you

19   -- that you consult with; right?  You contact

20   the agency, we're building this project, here's

21   all of our documentation.  And then, you know,

22   you -- then there's a -- then they will respond

23   in kind by letting you know what documentation

24   is required in order to be able to build the

25   project.

1        Q   So I am now going to introduce what I

2   believe is going to be Exhibit 38, and let me

3   just pull that up here really quick, so we are

4   going to look at this.  All right.  Okay.

5   Sorry, my apologies.

6            Okay.  So this is -- Exhibit 38 is Bates

7   stamped OSAGE WIND PRIV-000243.  It is a letter

8   dated October 9th, 2014, to Mr. Francesco

9   Venturini, president of EGPNA, and it looks like

10  it's from the superintendent of the United

11  States BIA, the Department of Interior, Bureau

12  of Indian affairs.

13           Ms. Centera, are you familiar with this

14  document?  Have you seen this document before?

15       A   I have, yes.

16       Q   I'll read here.  It states, "You are to

17  refrain from any further excavation of minerals

18  until such time that you have obtained a sandy

19  soil permit through the Osage agency."

20           In your expert opinion, would this

21  constitute a situation where defendants were,

22  quote, unquote, clearly apprised that a lease

23  would be necessary prior to or continuing to

24  excavate minerals?

25       A   Well, I think what I would say is you

1  certainly would want to take a look at the

2  information, you know.  I think it's October, so

3  that's conceivably in the middle of

4  construction.  So, you know, I think what I

5  mentioned is that normally, as I said, these

6  conversations take place early, and there's an

7  opportunity to review all the material, look at

8  all the material, understand the nature and

9  extent of the information.

10          So I think at this -- at this stage,

11  you're certainly going to want to ask for more

12  information and understand what the basis is for

13  -- for the request.

14      **Q   In your expert opinion, when defendants**

15  **were emailing each other memos in October of**

16  **2013 stating that the Osage tribe had told**

17  **defendants a lease was required, would that have**

18  **been a moment when they should have asked for**

19  **more information about obtaining a lease?**

20          MS. STEVENSON:  Object to form.

21          THE WITNESS:  I can't say because I

22  wasn't there at the time, and I'm not sure what

23  -- you kind of went out a little bit when you

24  said that, when -- when was the exchange, you

25  said?  I'm sorry.

1      Q    (By Ms. Nagle)  Sure.  That was Exhibit

2   36 that we looked at earlier.  If you'll give me

3   a second, I'll pull it back up.  Let's see here.

4   Let me just find it really quick.  Where did it

5   go?  Oh, here it is.  Okay.

6           So if -- so I'm just -- I'm trying to

7   understand when in -- when, in your expert

8   opinion, defendants were apprised, if they were

9   ever apprised, that there was a need for a

10  lease.  And, actually, let me just maybe stop

11  and ask that question.

12          In your expert opinion, in this case

13  where defendants -- have they ever been apprised

14  of the need to get a lease for the mining of the

15  Osage mineral estate?

16     A    Were they -- clear -- well, I think

17  certainly that the Tenth Circuit opinion --

18  right? -- is that they needed to go back.  So at

19  that point, we had clarity, so I think certainly

20  at that point.  But I think, you know, that

21  letter that you just showed -- I'm not familiar

22  with this memo, so I really can't comment on

23  that.  But I think certainly the letter that you

24  showed a moment ago is the first indication that

25  I saw where the agency came in or some

```
 1   representative, potentially, of the agency --
 2       Q    Uh-huh.
 3       A    -- and said that there needs to be
 4   something specifically provided; right?
 5       Q    Uh-huh.
 6       A    So, you know, that would be the first
 7   clear indication, perhaps, that there was a
 8   requirement.  But I think at that late stage,
 9   you know, you're in the middle of construction,
10   you're not necessarily going to stop
11   construction, but you are going to go ahead and
12   go back and then have a conversation; right?
13   But I think that -- at least in my understanding
14   of the documentation that I see, that was the
15   first case where there was something that was
16   put forth in terms of a requirement.
17            Now, I can tell you, too, in my
18   experience that sometimes you come back with a
19   lot of requests and some things don't apply;
20   right?  So you're certainly going to have a
21   conversation around the -- whatever
22   documentation is requested.
23            So -- and we find this even in our, you
24   know, negotiations of crossing agreements or
25   whatever kind of curative work might be done.
```

 1    So I think that, no, I can't, again, comment on

 2    this memorandum, but if we're looking at some

 3    kind of a clear requirement that -- in that

 4    prior letter that you said, that's the first

 5    time that there was at least something put forth

 6    for the project to consider.

 7        Q    So in your expert opinion and in terms

 8    of formulating your expert report where you

 9    state that -- you discuss being clearly

10    apprised, "Defendants were clearly apprised when

11    the United States notified them of the need to

12    get a lease in October of 2014, but they were

13    not clearly apprised when the OMC informed them

14    of this need in October of 2013"; is that

15    correct?

16             MS. STEVENSON:  Object to form.

17             THE WITNESS:  What -- I didn't see the

18    OMC -- the '13, when --

19        Q    (By Ms. Nagle)  Okay.  So what we're

20    looking at right here is what's been introduced

21    as Exhibit 36, and I'll note the date is October

22    31st, 2013.  It's an internal memo from Sarah

23    Stevenson to Bill Scott, the attorneys for

24    defendants.  And as we discussed earlier today

25    at page Bates stamped 415, there's this

1   paragraph here stating, "The Osage tribe has

2   indicated that it will assert Tradewinds Energy

3   must receive a mining permit from the Osage

4   Minerals Council in order to construct and

5   operate the wind farm, on the grounds that the

6   excavation and construction and permanent

7   placement of the towers constitutes mining of

8   the Osage mineral estate."

9       So my question to you is, just for

10  purposes of your expert report, this is not

11  being clearly apprised; correct?

12      MS. STEVENSON:  Object to form, and the

13  witness has already testified a number of times

14  she has not seen this document, in this

15  deposition.  So I don't know if we need to

16  continue asking her questions about her thoughts

17  about the documents she's seeing for the first

18  time today.

19      MS. NAGLE:  Okay.  Sure.  I'm just

20  trying to understand, she's used a terminology

21  in her report, "clearly apprised," if this would

22  constitute that.  But if she can't opine on that

23  today or ever, then we can also rest with the

24  understanding that her expert report doesn't --

25  doesn't extend to 2013 understandings, unless

1    she wants to answer whether or not this would

2    satisfy the "clearly apprised" standard.

3              THE WITNESS:  Yeah, I really can't

4    comment on this memorandum out of context so --

5        Q    (By Ms. Nagle)  Okay.  So in your expert

6    opinion, just so I understand, defendants became

7    clearly apprised in October of 2014?

8              MS. STEVENSON:  Object to form.

9              THE WITNESS:  I'm not -- that was the

10   first time that I'm aware of that a specific

11   indication of documentation was put forth in a

12   letter of that kind.  That -- that's what I'm

13   saying.  I'm saying that you're going to stop

14   and take a look at it and understand what's

15   going on at that time.

16       Q    (By Ms. Nagle)  Uh-huh.  So just so I

17   understand, you used the words "clearly

18   apprised" in your expert report, and -- and just

19   so in your expert report, the date in which

20   defendants did become clearly apprised was this

21   -- when this letter was sent in October of 2014;

22   is that correct?

23             MS. STEVENSON:  Object to form.

24             THE WITNESS:  It's when they had

25   information that there was a request put forward

```
 1    for information.  So I'm not sure that you would

 2    consider it clearly apprised, because you

 3    haven't had a chance to do your due diligence

 4    and understand all the different, you know,

 5    requirements.

 6        Q   (By Ms. Nagle)  So -- and I'm not trying

 7    to be difficult here; I'm just trying to

 8    understand.  So when you say, "clearly apprised"

 9    in your report, is it your expert opinion that

10    defendants did not become clearly apprised until

11    the Tenth Circuit issued its decision?

12        A   I think at that point, you were clearly

13    apprised of what the requirement was, yes.

14        Q   But for purposes of your expert report,

15    you aren't certain whether or not defendants

16    were clearly apprised before the Tenth Circuit's

17    decision; is that correct?

18        A   If I was sitting in their shoes, knowing

19    just the information that I have, I would not

20    have known that, no.

21        Q   Okay.

22            MR. ASHWORTH:  I'm sorry.  I didn't get

23    the last part.  What was the last part you said,

24    ma'am?  You were -- that you would not -- what

25    did -- what did you say?
```

```
 1              THE WITNESS:  I -- I would not have

 2     known, no.

 3              MR. ASHWORTH:  You would not have known?

 4              THE WITNESS:  I'm sorry.  Can some --

 5     can -- Janna, can you repeat that back?  Because

 6     I'm -- I don't want to misquote myself.

 7              THE REPORTER:  That's what I heard.

 8              "If I was sitting in their shoes,

 9     knowing just the information that I have, I

10     would not -- I would not have known that, no."

11              MR. ASHWORTH:  Sorry, I just didn't get

12     it.  It cut out.

13              THE WITNESS:  Sorry.

14       Q   (By Ms. Nagle)  Okay.  Let's see here.

15     Okay.  Going back to Page 5 of your report -- so

16     let me pull that up again.  So now I'm on Page

17     5, and I will share my screen so we can all see

18     it.

19              So, again, I know we're dealing with

20     this "clearly apprised" language.  Let's see if

21     I can find it.  Oh, here we go.  Okay.  Right.

22     So you write here, "I have assessed the

23     supporting documentation provided by Osage Wind,

24     and all such evidence would support a finding

25     that reasonable diligence would not have led a
```

```
 1    knowledgeable wind developer to anticipate the

 2    need for a mineral lease prior to construction

 3    on the Osage Wind project."

 4         What is your definition of "anticipate"

 5    here and how you're using it in your expert

 6    report?

 7    A    I think it's just based upon my

 8    experience, based upon my experience in having

 9    worked on many projects and just understanding

10    what typically constitutes mining, that it --

11    you would not have concluded that you would need

12    a mineral lease.

13    Q    So is "anticipate" knowing with

14    certainty that a lease is required?  Is that

15    anticipation?

16    A    I -- knowing with certainty?  I suppose.

17    You know, I -- I think, you know, just kind of

18    taking a step back from the project, if I'm

19    walking into a project, you're going to try to

20    anticipate as much as you can what's going to

21    come up, what's going to be the subject of the

22    due diligence.

23         And so based upon that experience and my

24    knowledge and working knowledge of projects, I

25    suppose that's what I mean, that I wouldn't have
```

1   expected that there would have been a need for a

2   mineral lease.  I mean, even taking into account

3   everything -- you know, there's a lot of

4   information that gets exchanged, there's a lot

5   of information that gets talked about in

6   preparation for projects.

7        **Q    Uh-huh.**

8        A    And these projects are difficult, and

9   the amount of documentation is enormous that

10  goes into putting all these projects together.

11  So I think that's why -- if I'm thinking about

12  this from my perspective, I think that's why

13  understanding with clarity what those

14  requirements are, you know, is really important.

15         So here I'd suppose I would equate

16  "anticipate" to "expect."

17        **Q    And would being informed by -- in your**

18  **experience in this field, would being -- if you**

19  **were informed by a governmental agency that a**

20  **lease is required, would that cause you to**

21  **anticipate or expect that a lease is required?**

22        A    It really depends on -- on -- on the

23  requirements.  It depends on the -- on the

24  standing, it depends on the jurisdiction.  You

25  know, there is a lot of things that come up

```
 1   through the course of projects, so if you're
 2   asking me if you just, at face value -- you
 3   know, every single thing that comes up, you do
 4   you take that at face value and are you trying
 5   to solve that or address that?  Not necessarily.
 6        I mean, everything has to be looked at,
 7   it has to be synthesized, it has to be
 8   understood within the context of the project.
 9   So through the course of the county permitting,
10   there is a series of documentation that are
11   required.  So I think in this the tribe had a
12   different relationship and relationship to the
13   project, so -- but -- but -- so just carte
14   blanche every single request that's made, are
15   you going to, you know, jump on it verbatim?  I
16   would say no.  There is due diligence that
17   happens, there's a -- there's a conversation
18   that happens, does it really apply.
19        In some cases, there's requests that are
20   made, but they may not necessarily apply.  It
21   depends.
22   Q   In your experience, how many projects
23   have you worked on where a governmental agency
24   had stated a lease or permit was required where
25   it was not actually required?
```

```
 1        A    I -- I can't give you a number on that.
 2   I don't know.
 3        Q    Are you -- do you recall any instances
 4   where that happened?
 5        A    Where a lease was required?  Not
 6   necessarily a lease, but there can be other
 7   provisions that, maybe, were required.  There
 8   can be wetlands requirements, there can be
 9   recording of certain maps, there can be
10   recording of survey maps, or there can be a
11   whole bevy of things that come up.
12             And so I think, you know, sometimes
13   there's requests that are made, and then, you
14   know, there's a discussion that has to happen.
15   I can't say every single case you're going to --
16   you're going to do a lease, huh-uh.
17        Q    Are you aware of any instances on
18   projects where you've worked where the United
19   States said a lease was required and actually
20   the United States just got it wrong?
21        A    I -- you know what?  I'm not aware of
22   the United States in that role, so no, no.
23        Q    And are you aware of any instances where
24   a tribal nation has stated that a lease was
25   required for a project that you worked on and
```

 1    that tribal nation just got it wrong?

 2        A    I'm not aware of leases being

 3    negotiated.  Well, let me -- let me backtrack on

 4    that, because that's not really correct, because

 5    we are going to negotiate leases for site

 6    control.  So I'm not aware of it right off, no,

 7    I'm not aware of it right off.  But I -- like I

 8    said, we work on multitudes of projects, so I

 9    can't speak to every single project.

10        Q    Uh-huh.  And so in this particular case

11    where we've now looked at documents today that

12    show that, internally, defendants were

13    discussing the need for a lease if on site

14    materials were used in lieu of things to be

15    purchased off site, the Osage tribe itself was

16    saying a lease was required and the United

17    States, what more in your expert opinion would

18    be necessary to get to that place where you

19    could say a reasonable wind developer would have

20    anticipated that a lease was required?

21            MS. STEVENSON:  Object to form.

22            THE WITNESS:  Well, I think what we have

23    said is that we had clarity around the lease at

24    the point that the opinion was issued.  And I

25    think even in the opinion, they say that there



 1  was some ambiguity around that.  But because

 2  there's a requirement for them to rule in favor

 3  of the tribe, that they're going to rule in

 4  favor of the tribe.

 5       So I think even in that case, you know,

 6  it's -- we're looking at a situation where it

 7  wasn't entirely clear.  I think if you look at,

 8  certainly, the letter that was sent, that there

 9  was a question raised, and they said, you know,

10  at some point -- but they don't really talk

11  about a lease, they talk about a permit, I

12  think, in that letter.

13       So then there seems to be some conflict

14  there -- correct? -- or -- are you getting a

15  lease, or are you getting a permit?  I think --

16  and, obviously, there's a lot of internal

17  conversations that take place.  That takes place

18  routinely on projects, but it seems to me that

19  even with respect to the request, it's a little

20  bit in conflict -- right? -- because I think the

21  Tenth Circuit opinion said a lease.

22       So I think what you'd have to do is go

23  back and do diligent -- do your due diligence

24  and try to understand.  But it seems to me that

25  there's a fair amount of, you know, ambiguity

1  all the way around, that I don't know that there

2  was clarity.

3        I mean, you know, if everything was

4  clear, why would we have a lawsuit; right?  I

5  mean, if you could point to something clearly

6  and say, here is what you need to do, why would

7  we have filed litigation?  I mean, this is --

8  you know; right?  You would just be able to

9  point to something and say, here it is.

10        But in this case, we had to rely upon

11  the court to come in and say, you need a lease

12  because of this particular.  So I think in my

13  view, if I take a step back, you know, I --

14  clearly, there's some -- you know, there's

15  ambiguity here -- correct? -- that we had to

16  rely upon some other third party to come in and

17  look at all the facts and say, you know -- so if

18  I'm -- again, if I'm in the developer seat,

19  certainly now we have hindsight, and we're much

20  smarter now for doing a debrief on this; right?

21  We're going to know what we're not going to do

22  the next time, or what have you; I don't know.

23        But, you know, we're all a lot smarter

24  now, but we have the benefit of that, you know,

25  looking back.  So I think if I'm sitting in this

```
 1    seat, what you're asking me to do, that --

 2    and/in trying to understand these facts, I

 3    think, you know, I'm not -- I'm not sure that

 4    it's clear.

 5        Q    (By Ms. Nagle)  Okay.  Thank you.  I

 6    think that really about wraps up my questioning

 7    for today.

 8            MS. NAGLE:  So I don't -- I know we've

 9    been going for quite a while, and I'm sure at

10    some point folks will want to eat lunch, but I

11    don't know, Sarah and Stuart, what your thoughts

12    are, and certainly want to take into account the

13    witness's need to eat and take a break so -- but

14    I think -- I think I'm ready to pass the

15    witness.

16            MR. ASHWORTH:  Ms. Centera, my name is

17    Stewart Ashworth, and I'm an attorney with the

18    U.S. Attorney's office.  I do have several

19    questions I would like to ask, and I anticipate

20    it being in excess of an hour.  We have been

21    going for a while, and I don't know what time it

22    is over there, if you've already had lunch, if

23    you would, you know, want to take a five-minute

24    break and keep on going, or if you want to take

25    a lunch break.  It's up to you.
```

```
 1            THE WITNESS:  For me here, it's just
 2    after 11:00, so we could probably go until what,
 3    for me, is 11:30, maybe, and then take a break
 4    at that time if that works.
 5            MS. STEVENSON:  And, Stuart, this is
 6    Sarah.  I think we have lunch coming at about
 7    11:30 or 11:45, so I think it may make sense if
 8    we want to get started, and then we can take a
 9    little longer break so the witness can eat when
10    it arrives.
11            MR. ASHWORTH:  Yeah, that works for me.
12    We'll just go ahead and get started.
13                  CROSS EXAMINATION
14    BY MR. ASHWORTH:
15       Q   Ma'am, if you could --
16            MR. ASHWORTH:  Michelle, can you pull up
17    the reports?
18            (Discussion off the record)
19       Q   (By Mr. Ashworth)  Ms. Centera, as we
20    are pulling up your report, I believe it was
21    previously marked -- or marked during your
22    deposition as Exhibit Number 35, I believe.
23            As that -- as that report's being pulled
24    up, who did Osage Wind retain, you or TerraPro
25    Solutions?
```

```
 1        A    Well, I -- I don't -- you know, I work

 2   under the umbrella of my company, so they would

 3   have retained TerraPro Solutions.  I would have

 4   been the one issuing the report, so -- but, you

 5   know, I don't necessarily work independently; I

 6   work under the umbrella of my company.

 7        Q    Okay.

 8             (Discussion off the record)

 9        Q    (By Mr. Ashworth)  So, Ms. Centera, I

10   say that just because right here in the first

11   sentence of your report, it says, "Kimberlee

12   Centera, TerraPro Solutions, has been retained

13   by Osage Wind, LLC."

14             It's your opinion that really they

15   retained you and TerraPro, it's one and the

16   same, pretty much, as the expert in this case;

17   is that correct?

18        A    Yes.

19        Q    Okay.  Is there anyone else at TerraPro

20   Solutions who have helped or assisted you in

21   forming your opinions?

22        A    In forming my opinions?

23        Q    Yes.

24        A    No, I -- no, I had help with the report,

25   but in terms of forming the opinions, these are
```

```
 1   my opinions.
 2       Q   Okay.  And when you say that you've had
 3   help with your report, are you saying that you
 4   had help with someone -- by someone drafting
 5   your reports -- drafting your report?
 6       A   Drafting the report, correct.
 7       Q   Okay.  Does that mean you had help with
 8   someone typing the report or someone actually,
 9   you know, putting opinions on the paper, doing
10   research?
11       A   Typing the report and assisting with
12   some of the research, yes.
13       Q   Okay.  Who would that have been?
14       A   That would have been Brittany Newsome.
15       Q   Britney Newson?
16       A   Newsome.
17       Q   Newsome?
18       A   Yes.
19       Q   When did Osage Wind retain TerraPro as
20   an expert in this case or, you know, as an
21   expert?
22       A   Gosh, the exact time, I want to say it
23   was shortly before the report -- maybe around
24   the middle or end of September of 2020.
25       Q   Okay.
```

```
 1        A    I would -- I would estimate.  I don't
 2   know the exact date.
 3        Q    In your report -- well, first off, in
 4   you report you refer to TerraPro Solutions as
 5   TPS.  I guess for purposes of your deposition,
 6   if I say, "TPS," you would understand that I'm
 7   referring to TerraPro Solutions.  Is that okay?
 8        A    Yes.
 9        Q    Okay.  In your report the -- the second
10   paragraph, second full sentence, it says,
11   "Centera is the president and CEO of TPS, a
12   leading risk management consulting firm
13   specializing in the development, financing,
14   construction, and operation of wind" -- I'm
15   sorry -- "renewable energy projects."
16             Did I read that correctly?
17        A    I'm sorry.  Where are you?  Yes,
18   president, yes, that looks correct.
19        Q    And that's, again, the second sentence
20   of the second paragraph of your report on the
21   first page?
22        A    Correct.
23        Q    Okay.  Is TPS a self-described leading
24   risk management consulting firm relative to
25   renewable energy products, or did someone else
```

1     classify TPS as that?

2        A   Well, you could ask our clients.   Well,

3   I suppose it's -- it's -- it's both, our

4   clients, but also self-described, you said?

5   Self-described?

6        Q   Yeah.

7        A   It's both.

8        Q   When you say, "leading," are you

9   referring to, like, how big the size is, the

10   market share of TPS?   What are you saying when

11   you're saying, "leading"?

12        A   Leading, I would say in terms of

13   experience.   There is very -- there is not a lot

14   of people that have, you know, almost 30 years

15   of experience in renewable projects like I do.

16        Q   Okay.   What would you say is the

17   percentage of market share that TPS holds

18   relative to consulting on renewable energy

19   projects?

20        A   You know what?   I don't know.   I -- you

21   know, I know we have some of the largest

22   renewable companies in the world that are our

23   clients, but I can't tell you what our market

24   share is.   I don't -- I don't know that offhand.

25        Q   Is TPS in the top 10% -- I'm sorry.

```
 1   Scratch that.

 2           Is TPS in the top ten largest consulting

 3   firms by size in the U.S., relative to renewable

 4   energy?

 5       A   No, no, not at all.

 6       Q   You know, I'm only saying this -- is

 7   because I Googled risk management consulting

 8   firms for renewable energy projects in the

 9   U.S., and I got numerous pages of search

10   results.  And I kind of stopped, after Page 12,

11   trying to search for TPS, and I didn't find it.

12   Is that at all -- does that seem about right;

13   there's that many firms in the industry?

14       A   You know what?  I -- I have no idea.  I

15   -- you know, without knowing who you were --

16   what kind of companies you were looking at, I --

17   I don't know, yeah.

18       Q   Okay.  How many employees does TPS

19   currently have?

20       A   We have 14.

21       Q   14?

22       A   Uh-huh.

23       Q   Let me rephrase that.  How many

24   employees does TPS have that is -- does not

25   include you or your family members?
```

```
 1       A    Oh, does not include me or family

 2  members?  I would say maybe four.

 3       Q    I'm sorry.  Does not include family

 4  members?

 5       A    Does not include family members, I would

 6  say maybe about four.

 7       Q    Okay.  You indicate in your report, I

 8  have seen --

 9            MR. ASHWORTH:  Scroll down a little bit

10  more.  I'm sorry, it's right there.  That's

11  fine.

12       Q    (By Mr. Ashworth)  It says, "Centera" --

13  kind of towards the top, that's fine.  It says,

14  "Centera, together with TPS, is overseeing

15  development over ten gigawatts of energy

16  projects, including the 2.5 gigawatt tax equity

17  financing transaction that closed in April of

18  2020."  First off, 10 GW, that does mean ten

19  gigawatts; is that correct?

20       A    That does, yes.

21       Q    Okay.  How much of the ten gigawatts

22  would you say relates to wind energy projects?

23       A    I would say well over half.  I would say

24  well over half.  I would also say, Stuart --

25  Stuart is your name?
```

```
 1        Q    Yes.

 2        A    Just for reference purposes, 13 -- about

 3   13% of renewables is women, and --

 4        Q    Okay.

 5        A    -- predominantly, those are technical

 6   jobs.  So the percentage of companies that have

 7   women ownership, women on the board, women

 8   ownership is even smaller than that.

 9             So if you're looking to compare us in

10   the industry, you're going to have a hard time

11   doing that, because women represent -- and

12   especially female-owned businesses like mine

13   that are private, a very -- are very limited in

14   the renewable business, which is why we're a

15   little bit of an anomaly in terms of who we are

16   and in our role, in that we represent so many of

17   the major renewable companies in the world, one

18   of which is NG.

19             And I'm sure if you did research, you

20   saw that they're a very formidable, you know,

21   company.  We worked on seven of the 11 projects

22   that comprised that financing, most of which

23   were wind.  I would say because wind has been

24   around longer in terms of a renewable resource,

25   that most of that ten gigawatts you'll find is
```

1    going to be wind -- will be wind.

2          Solar really has only been predominant

3    probably since maybe 2007, 2008, if that helps

4    you.

5      Q    Sure, no, I appreciate that.  Let me

6    pull up another exhibit.  One second.

7          MR. ASHWORTH:  Mary Kathryn, do you know

8    what exhibit number we left off with?  I forgot

9    to write it down.

10          MS. NAGLE:  I believe the last exhibit I

11    entered was 38.

12          MR. ASHWORTH:  Okay.  I didn't know if

13    it was 37 or 38.

14          MS. NAGLE:  Yeah, 38.

15      Q    (By Mr. Ashworth)  I'm going to show

16    what you I'm going to mark as Exhibit Number 39.

17    I'm sorry.  38.

18          THE REPORTER:  39.

19          MS. NAGLE:  39.

20          MR. ASHWORTH:  Exhibit 39?

21          MS. NAGLE:  Yes.

22      Q    (By Mr. Ashworth)  This is -- I pulled

23    from your website, and it's a project list.  On

24    the second page -- first off, this is a project

25    list.  You also carry a project list in your

 1   expert report.  Do you know if these project

 2   lists, the one that I pulled from your website

 3   yesterday is more current than what is in your

 4   report?

 5        A    I want to say the one in my report, in

 6   my expert report is going to be more current.

 7        Q    Okay.

 8        A    Than the one on the website.

 9        Q    Okay.

10             (Discussion off the record)

11        Q    (By Mr. Ashworth)  On this project list

12   that I pulled from your website, it shows that

13   your presence -- it lists 6,000 plus wind

14   megawatts developed that translates to six -- to

15   approximately six gigawatts; is that correct?

16        A    Right.

17        Q    And earlier I think you said that there

18   was more than -- more than half of your ten

19   gigawatts is -- represents wind?

20        A    Right.

21        Q    Okay.  Earlier you testified that TPS

22   is, you know, a risk management consulting firm

23   that specializes in financing of renewable

24   energy.  I wasn't quite clear any the earlier,

25   but I just want to make sure I understand what

1    **TPS does or at least what it specializes in.**

2    **Is it your testimony that TPS consults**

3    **with companies when it comes to financing of**

4    **renewable energy sources, financing them; is**

5    **that correct?**

6    A   Finance -- so -- so we specialize in

7    helping companies prepare their projects for

8    financing.  We do a lot more work than that.  We

9    do site acquisition work, and we basically do

10   full spectrum work across all real estate and

11   title.  So -- but our specialty is finance, if

12   that makes sense.

13   So if you have a project and you bring

14   me a lot of project assets, then we can help you

15   assemble all those assets and -- for a

16   particular project and get that prepared for

17   financing due diligence.  Does that kind help to

18   answer that?

19   **Q   That does.  So I guess in terms of that,**

20   **you would work with a client to prepare the**

21   **paperwork for them to get their financing stuff;**

22   **is that correct, as far as the process?**

23   A   Part of the process, correct.

24   **Q   When the project is financed and during**

25   **the construction phase, TPS doesn't oversee the**

 1  **project, does it, at that point?**

 2      A    We don't oversee the project.  We may be

 3  involved in certain phases of the project when

 4  it gets into construction.  It just depends on

 5  the nature of the financing and if there's --

 6  you know, so it depends on the nature of the

 7  financing to how much we get involved during

 8  construction.

 9      **Q    Okay.  TPS wouldn't act as a general**

10  **contractor during construction, would they?**

11      A    No, we would not, no.

12      **Q    Okay.  What aspects would TPS be**

13  **involved with during the construction phase?**

14      A    We would be coordinating between the

15  construction team and the ALTA survey team, and

16  a lot of times maybe the boots on the grounds in

17  terms of what's happening in the field.  A lot

18  of times when you're in construction, things can

19  change, and so we're going to be helping to

20  coordinate that and make sure if the arching

21  here that happened to the project, be it the

22  design or something in the field, that we're

23  apprised of that.  We make sure that -- you

24  know, if an easement gets moved, for instance,

25  that it's still within the boundaries of the

1    leasehold estate, make sure it's still subject
2    to all of the -- of the debt security documents.
3           If -- depending on the nature of the --
4    of the loans that secure the construction, if
5    there's different date down requirements for the
6    title, then we'll be involved in that.  So our
7    -- certainly our role is much more active
8    leading up to the start of construction, and we
9    -- but we're kind of -- we have a seat at the
10   table, in terms of just monitoring and making
11   sure that, at least from the standpoint of any
12   crossing agreements or any different agreements
13   that were agreed to, coordination with
14   landowners, that kind of thing, a lot of times
15   we're working on that during construction.
16       Q   Okay.  So TPS would be more busy in the
17   steps leading up to construction, and then they
18   have some involvement, depending on the project,
19   during construction; is that correct?
20       A   Correct.
21       Q   And if they were to be involved during
22   the construction -- I'm sorry.  Scratch that.
23           The instances when TPS would be involved
24   during the construction phase, that's a small
25   part relative to what TPS does; is that correct?

Kimberlee Centera

```
 1        A    Generally speaking, yes.

 2        Q    Okay.  Would you hold yourself out to be

 3   an expert in the industry when it -- in regards

 4   to overseeing the construction phase of

 5   renewable energy projects?

 6        A    Overseeing the construction phase?  As

 7   it relates to my particular niche of work for

 8   real estate and title, yes.  I'm not going to

 9   purport to be an expert on construction,

10   obviously, because I'm not an EPC, I'm not an

11   engineer.  But as to my particular piece of

12   work, yes.

13        Q    Would you hold yourself out to be an

14   expert in regards to whether permits or licenses

15   or leases are required to be obtained relative

16   to the construction phase of renewable energy

17   projects?

18        A    As it relates to the real estate and

19   title, generally, yes.

20        Q    Okay.  How would it relate to the title

21   issues?

22        A    Well, normally, we are -- part of the

23   work that we do is to obtain all the different

24   title reports for a particular project.  So if

25   it's a wind project, in this case, you've got
```

```
1    about 8,000 acres, I believe.  We work on some

2    wind projects that are 25,000 acres, for

3    instance, so we will look at all that title

4    work.  We prepare schedules, and then we make

5    sure that, you know, we interface with the title

6    company, with the lenders.  Basically all the

7    different exceptions have to be addressed in

8    some form for the financing.

9         So by saying some form, there's either

10   some kind of a document or some kind of coverage

11   that happens, so we maintain and monitor all

12   that --

13       Q   Okay.

14       A   -- respect, yes.

15       Q   Would you hold yourself out as being an

16   expert relative to determining whether or not a

17   lease or permit is required to be obtained

18   relative to a wind energy project?

19       A   For real estate and title, yes.

20       Q   Okay.  You believe that if a lease is

21   needed or a permit is needed relative to land

22   title, you would be an expert into -- in the

23   determination whether one's needed or not?

24       A   Yes.

25       Q   Okay.  Would you equate the need to
```

**obtain a mineral lease in this instance -- have**
**anything to do with title review that you would**
**be doing?**

A    Yeah, I mean, I think you're -- you're
certainly going to be looking at the fact that
there's a severance on -- of the mineral estate
and understanding what that is.  And then
there'll be some kind of an analysis done as to
what needs to happen.  I think, you know, as I
mentioned earlier, I'm not accustomed to seeing
leases.  Normally, there would be some kind of a
surface use agreement or some kind of an
accommodation agreement or some other kind of
agreement that would be negotiated.

        I've not seen leases negotiated, per se,
for mineral estates, just because I think also
from a financing standpoint, any time there's
any lease other than wind energy, then we have,
typically, a lender issue; right?  So if I have
some obscure -- if there's a lease for pasture
negotiations -- okay? -- I'm going to have to
explain that to my lender, and I'm going to have
to explain how that's not an issue.

        Lenders are not used to seeing leases,
because their go-to position is, it's going to

```
 1   interfere with the project; right?  So they're

 2   concerned about that.  So from my standpoint,

 3   I'm not going to negotiate a lease, because I

 4   know a lease is much more difficult to get title

 5   insurance over, to negotiate with my lender.

 6        So I am going to negotiate something

 7   that's more customary in terms of curative

 8   documents.  And I've talked a lot about, you

 9   know, subordinations, crossing agreements, or

10   crossing permits, and those kinds of things.  I

11   think when it comes to financing, party --

12   financing parties are accustomed to seeing

13   those, and so it's much easier to get everyone

14   comfortable with that.

15        So I wouldn't necessarily go to a lease,

16   because I know a lease is -- our lenders are

17   maybe not necessarily going to be in favor of

18   that, especially if it relates to minerals and

19   they're accustomed to seeing different

20   documentation.

21   Q   Okay.  I don't think that's particularly

22   responsive, but let me reask it this way.

23        Relative to this case, would you hold

24   yourself out to be an expert to opine as to

25   whether a lease was or was not needed under the
```

1    facts and circumstances in this case?

2          MS. STEVENSON:  Object to form.

3          THE WITNESS:  Yes, I would say yes.

4    Q    (By Mr. Ashworth)  You are an expert;

5    your opinions are authoritative in this case.

6    Is that your opinion as to whether or not a

7    lease should be -- a mineral lease should have

8    been obtained?

9    A    As to my title curative background, yes.

10   Q    Okay.  Have you ever done work for any

11   of the defendants, and that is Enel Green Power

12   North America, Enel Kansas, or Osage Wind?  Have

13   you ever done any work for them?

14   A    Other than the work here, no.

15   Q    Okay.  And, you know, just for the

16   purposes of your deposition, I may collectively

17   refer to the defendants as Enel Green and vice

18   versa.  Would that cause any confusion to you,

19   and would you understand if I say, "Enel Green,"

20   I'm really referring to really the defendants?

21   A    Okay.  Right.  No, that's not a problem.

22   Q    Okay.  What do you know about Enel

23   Green?

24         MS. STEVENSON:  Before -- I did want to

25   let you know that our lunch did arrive, so if

 1   you want to come to a stopping point, that would

 2   work (inaudible).

 3          THE REPORTER:  I'm sorry.  I didn't hear

 4   the last part.

 5          MR. ASHWORTH:  Let me finish this --

 6   sure.  Let me finish this last question, then we

 7   can go on a break.

 8          THE WITNESS:  Okay.

 9     Q   (By Mr. Ashworth)  Ms. Centera, what do

10   you -- what do you know about Enel Green?

11     A   I know that they develop renewable

12   projects across the U.S., similar to a lot of

13   the other parties that we work with or that we

14   talk to.

15     Q   Do you know anything about their market

16   share in the U.S.?

17     A   I do not, no.

18     Q   Do you know -- I'm sorry.  Were you

19   finished?

20     A   (Nods head)

21     Q   Do you know anything about how big they

22   are in terms of, you know, are they a big player

23   in the energy -- renewable energy sector?

24     A   Well, I'm not really sure what you mean

25   by "big," but no, I don't know.

```
 1      Q   Do you know if they're in the top ten

 2   renewable energy companies?

 3      A   I wouldn't be surprised, but I don't

 4   know that for a fact.

 5      Q   Okay.  Your -- TPS isn't a leading risk

 6   management company in the renewable energy

 7   sector, and it's your opinion you don't know --

 8   you wouldn't be able to estimate or give a basis

 9   of how big Enel Green is in terms of the

10   industry; is that correct?

11      A   I'm -- so which one are you asking me?

12   I'm sorry.  Are you asking me about my company,

13   or are you asking me about Enel?

14      Q   No, I just -- you know, expecting that

15   if you were to hold yourself out as a leading

16   risk management consulting firm in the renewable

17   energy field, I just would assume you-all would

18   kind of have a basis or knowledge of the players

19   in the industry, and I assume that you don't; is

20   that correct?

21           MS. STEVENSON:  Form.

22           THE WITNESS:  Well, I didn't say that I

23   don't know all the players in the industry.  I

24   certainly do.  I mean, I -- I know our client

25   base.  Do I know all the -- you know -- you
```

1    know, you're asking a difficult question, just

2    from the standpoint that, you know, renewable

3    companies have different presences in different

4    markets, you know.

5         Enel, I believe, focuses primarily on

6    wind power and -- at least that's my

7    understanding.  And many companies for

8    diversification have moved over to solar.  And

9    so as far as I know, I think Enel is still

10   primarily in the wind space.

11        So from that standpoint, I think they

12   have kind of an interesting business model, you

13   know.  But I don't have to know -- in order to

14   be a risk expert, you know, I'm not sure that I

15   need to know, you know, what their -- you know,

16   what their market share is.  I mean, the way

17   these projects are financed, all these projects

18   are -- you know, most all of them are financed

19   on a non-recourse basis.

20        So what that means is that there's

21   recourse only to the projects, and that's why

22   the financing is so important.  Because if

23   you're a lender and you're counsel representing

24   the lender, the only rights that you're going to

25   have to be able to enforce against are against

 1   the project.

 2           So, certainly, to the extent that a

 3   company might be large or small, is going to be

 4   a factor in some of these -- of these projects.

 5   But more importantly is going to be the -- the

 6   project itself and the basis of the project

 7   itself.  And that's why I mentioned earlier

 8   that, you know, the parameters of the project

 9   are important, understanding the specific

10   project parameters.

11           So, now, if you're a large player, can

12   you negotiate a better deal and -- there's a lot

13   of things that are going to happen there.

14   You're going to get pushed around a lot more if

15   you're smaller.

16           So I see a lot of different things.  We

17   work with some of the largest companies in the

18   world, many of which are disclosed on our

19   website, so -- but I think that's really, you

20   know, there's a lot of different factors that

21   impact companies, their business model, how they

22   finance projects, all that kind of thing.

23           I haven't worked with Enel, so I'm not

24   privy to all those different details.

25           MR. ASHWORTH:  I think we're at a great

```
 1   stopping point for a lunch.  Do we want to do 30

 2   minutes, Mary Kathryn?

 3        MS. NAGLE:  That works for me or, Sarah,

 4   did you want more time?

 5        MS. STEVENSON:  Can we do 45?

 6        MS. NAGLE:  That works for us.

 7        MR. ASHWORTH:  Okay.  45 minutes.

 8   (Lunch break at 1:39 p.m., resumed at 2:28 p.m.)

 9   Q    (By Mr. Ashworth)  Ma'am, we're back on

10   the record.  We took a 45-minute break, lunch

11   break, and I understand you already had lunch

12   delivered.

13        During the break, did you have a time to

14   consider your previous testimony today and want

15   to make any changes?

16   A    Yeah, I'm not sure what you mean.

17   Q    Sure, sure.

18   A    Yeah, I mean, not -- not -- not at this

19   stage, that I'm aware of.

20   Q    Sure.  During the break, did you speak

21   with counsel for the defendants about your

22   testimony?

23   A    Yes.

24   Q    What in particular about your testimony

25   was discussed?
```

```
 1           MS. STEVENSON:  I'm going to object to
 2      the extent it seeks attorney-client privileged
 3      information and direct the witness not to
 4      respond.
 5           Do you want to rephrase your question?
 6      Q    (By Mr. Ashworth)  You can go ahead and
 7      answer.
 8           MS. STEVENSON:  I directed her not to
 9      respond with attorney-client privileged
10      information.
11           MR. ASHWORTH:  I'm sorry.
12      Attorney-client privileged?
13           MS. STEVENSON:  That's right.
14           MR. ASHWORTH:  I'm sorry.  I didn't -- I
15      didn't hear.  I don't know if the court reporter
16      heard it either.  What privilege are you
17      asserting?
18           MS. STEVENSON:  The trial preparation
19      protection for communications between the
20      attorney's counsel and -- or between -- excuse
21      me -- between the parties' counsel and an expert
22      witness would be -- that are retained by party
23      for litigation.  So I'm directing her not to
24      discuss our specific communications about her
25      testimony.
```

Kimberlee Centera

5/14/2021

1       MR. ASHWORTH:  Sure.  During -- when the

2   deposition starts and until it ends, that, you

3   know, objection does not -- it doesn't exist.

4   It's waived.  When it -- communications --

5   unless the report -- involves her actual report

6   and the preparation of the report, you know --

7   but we will -- I guess we'll continue, and I

8   guess we can take this up with the court, and to

9   the extent we need to reopen this so I can reask

10  that question, that's fine.

11      And I'm sure the defendants wouldn't

12  mind paying that -- those fees.

13      **Q    (By Mr. Ashworth)  Ma'am, during the**

14  **break, the lunch break, our 45-minute break,**

15  **even though I'd asked for 30 minutes, is there**

16  **anything that was discussed that would cause you**

17  **to want to change your testimony that you**

18  **previously testified to today?**

19      A    No.

20      **Q    Okay.  Have you spoken with any of the**

21  **employees of Enel Green before?**

22      A    Have -- before ever?  Ever, you mean?

23      **Q    Yeah, before today.**

24      MS. STEVENSON:  And I'm going to object

25  to the form of this question, because Enel Green

1    is a defendant.  Are you -- which specific --

2          MR. ASHWORTH:  Okay.  We're only doing

3    -- okay.  Ms. Stevenson, we're only doing,

4    object to the form of the question.  If you

5    would like to add a narrative, I will call a

6    judge.  Okay.  That's clearly stated that it is

7    object to the form only, and that's it.  We'll

8    move on.

9          MS. STEVENSON:  I'll object to the form.

10      Q   (By Mr. Ashworth)  Okay.  Ms. Centera,

11   you can go ahead.

12      A   I'm sorry.  Could you reask the

13   question, please?

14      Q   Sure.  Have you ever spoken with an Enel

15   Green employee before your deposition today?

16   And that's Enel Green North -- Power North

17   America, Enel Kansas, Osage Wind, just Enel

18   Green, in general.

19      A   Not that I'm aware of, no.

20      Q   Okay.  Have you or TPS ever corroborated

21   on a project with Enel Green before?

22      A   No, we have not.

23      Q   Have you ever applied for or attempted

24   to solicit business from Enel Green before?

25      A   Gosh, myself in particular, I don't

1   believe so, no.

2        Q    What about TPS?

3        A    You know, it's possible.  I mean, we

4   send out emails to, you know, people all across

5   the industry, so it's possible, marketing

6   emails.  So it's possible someone on the

7   marketing team has sent out some email at some

8   point.  I can't point to anything in particular.

9        Q    Is there any possibility that TPS will

10  solicit business from Enel Green in the future?

11       A    I suppose it's possible, sure.

12       Q    Is there any desire that -- scratch

13  that.

14            Is it your belief that providing -- that

15  by -- scratch that.

16            Is it your belief that by providing

17  favorable testimony to Enel Green, that TPS may

18  get a contract with TPS -- I'm sorry -- with

19  Enel Green in the future?

20            MS. STEVENSON:  Object to form.

21            THE WITNESS:  No, no.  We have plenty of

22  clients and lots of business.  I haven't -- I've

23  built my business on integrity, and that's why I

24  have the business that I do.

25       Q    (By Mr. Ashworth)  Okay.  Jennifer

1    Purczynski -- I don't know if I'm saying that

2    correctly.  Jennifer Purczynski,

3    P-u-r-c-z-y-n-s-k-i, she is a senior director

4    for project transactions for TPS; is that

5    correct?

6       A   She is, and, congratulations, I think

7    you're probably one of the only people who's

8    ever been able to pronounce her name, the

9    first --

10      Q   I can tell you, if I did it correct,

11   it's by mistake.  It's definitely not based on

12   any knowledge I have.  Is she the second in

13   command of TPS?

14      A   Second in command?  I'm not sure what

15   you mean by that.

16      Q   Sure.  I'm going to pull up a document

17   that I will mark as Exhibit Number 40.  This is

18   something that I pulled off from your website.

19   It shows a list of employees and also a list of

20   experts on the -- going down under Experts, it

21   lists you first and then Jennifer Guthrie

22   Purczynski.  And I didn't know if that was just

23   in order of seniority of the company or who's

24   over it, but she's listed as second.

25      A   Yeah, you know, it's -- it doesn't have

1    any particular meaning in terms of -- and your

2    question was second in authority?

3         Q    Uh-huh.

4         A    So, no, I think she's -- she's one of

5    the experts that works for the company.  She

6    certainly has a long history in renewables.

7         Q    Sure.  Jennifer used to work for Enel

8    Green; is that correct?

9         A    She did, yes.

10        Q    Okay.  She started working for TPS in

11   2018?

12        A    2018?  I thought it was -- well, I

13   thought it was before that, but -- yeah, I

14   thought it was before that, actually, but it

15   could be 2018.

16        Q    Sure.  Let me pull up another exhibit.

17   I will look at that later.  Has Jennifer -- do

18   you know if Jennifer has spoken with anyone from

19   Enel Green about the Osage Wind project?

20        A    She has not.

21        Q    Okay.  I'm going to pull up your expert

22   report, and, in particular, I'm going to look at

23   the page starting with your CV, and that's going

24   to be page -- what is that number, page number?

25             (Discussion off the record)

1    Q   (By Mr. Ashworth)  As that's being

2    pulled up, when did you graduate from University

3    of Redlands?

4    A   2003 -- 2002, 2003, something like that.

5    Q   When did you obtain your paralegal

6    certificate from University of San Diego?

7    A   Oh, I want to say, hmm, like, 1990,

8    something like that.

9    Q   In your work history, you listed that

10   you worked for Jennings, Englestrand [sic]

11   Henrikson as a single -- I'm sorry -- senior

12   paralegal from 1989 to 1983 [sic]; is that

13   correct?

14   A   Yeah, 1993, I think you meant to say;

15   right?  Yeah.

16   Q   Sorry.  Did you work in real estate or

17   title before that?

18   A   I did.  Many years ago I worked for a

19   firm that did foreclosures, and I also worked

20   for a law firm in San Jose, California, prior to

21   1989 when I moved to San Diego.

22   Q   And you would consider that to be work

23   -- an experience in real estate and title?

24   A   Yes, I would.  Corporate with a

25   generalist attorney, so we did a lot of

1    different things in kind of the general business

2    area in real estate and title.

3        Q    Okay.  Going on the same page, a little

4    bit up, earlier you testified about your work

5    with -- or relative to a BIA lease negotiation,

6    I think you had talked about.  Do you recall

7    that?

8        A    Yes.

9        Q    And you had indicated that, ultimately,

10   the project fell through, but you didn't get

11   past the negotiation phase; is that correct?

12       A    Correct.  The project was stopped, yes,

13   so we didn't continue --

14       Q    I believe you indicated that it was

15   going to be in the northwest.

16       A    Yeah, somewhere in the midwest, I think,

17   is probably more likely, in the midwest, not

18   really --

19       Q    Do you know when that would have --

20   sorry.  Sorry to interrupt.  Go ahead.

21       A    Yeah, I'm sorry.  I was just saying more

22   in the midwest, not in the northwest.

23       Q    Okay.  Approximately what year would

24   that have been in?

25       A    I think I said it was in 2013, something

1    along those lines, 2013, maybe 2014.

2        Q    Okay.  And do you know what tribe was

3    involved?

4        A    I do not recall the tribe.  I do not.

5        Q    Okay.  Do you know what company was

6    involved, wind developer that was involved?

7        A    I do not.

8        Q    Were you retained by the wind developer

9    or the tribe?

10       A    We were actually retained as a

11   subcontractor to the person -- to the primary

12   company that was doing the project work, so they

13   retained us as an expert on the real estate and

14   title negotiations, because that's not something

15   that their firm does.  So they brought us in to

16   help them specifically in that area.

17       Q    Okay.  You were brought in -- you were

18   brought in to do the title and -- title

19   negotiations and the real estate -- I'm sorry --

20   negotiations?  Did I read that right -- did I

21   hear that right?

22       A    Well, in this particular case, we were

23   doing the lease negotiations --

24       Q    Okay.

25       A    -- in this case for the site control.

```
 1      Q    How do you nego- -- okay.  I take that
 2   back.
 3           Who would the lease have been from?
 4   Would that have been from the tribe or from BIA?
 5      A    Well, the lease was going to be with the
 6   tribe, but subject to the approval of BIA,
 7   because I understand that all the leases have to
 8   -- any -- any long-term leases that are entered
 9   into of this kind have to be approved or subject
10   to approval of the BIA.
11      Q    When you say, any leases of this kind,
12   what kind of leases are you referring to?
13      A    Site control leases, so -- which are
14   typically longer-term leases.  So they would be
15   subject to the approval of the BIA.
16      Q    Okay.  So site control leases, we're
17   talking about surface leases; is that right?
18      A    Correct, surface leases.
19      Q    Okay.  Do you know if -- were mineral
20   leases -- I'm sorry.  Was the mineral estate
21   severed in that instance?
22      A    No, no.  The tribe controlled the
23   mineral estate and the surface.
24      Q    Okay.  So the lease -- any negotiation
25   of the lease, had it actually gone through, it
```

 1    would have been for that section of the property

 2    for the tribe in its entirety?

 3        A    Correct, for the surface, yes.

 4        Q    You previously indicated earlier in the

 5    deposition that you're not an expert as to the

 6    valuation of mineral resources; is that correct?

 7        A    Correct.  I don't typically value

 8    mineral estates as part of my work, that's

 9    correct.

10        Q    Okay.  And even if you do, you don't

11    consider yourself to be an expert in that area?

12        A    I mean, I think if we're talking about

13    the value of a mineral estate, normally, I would

14    leave that to someone who is an expert in that

15    area, specifically of the value of the minerals,

16    per se.

17             So if I'm thinking about the value --

18    and I think I talked about the fact of different

19    parameters in a project, so understanding -- if

20    that's a question as part of the negotiations,

21    what is the -- what is the extent of the mineral

22    estate, you know, what is the makeup of the

23    mineral estate, what could be the potential

24    value of the mineral estate, then I'm not -- I'm

25    not an expert in trying to value a mineral

```
 1   estate or determine -- you know, taking a look
 2   at, you know, geology and making a determination
 3   on what is the compositive minerals and all
 4   that.  So I don't try to opine on that.  I'm not
 5   a min- -- I'm not an expert in that area.
 6        Q   Sure.  Do you hold yourself out to be an
 7   expert in regards to the calculation of damages
 8   in relations to when Indian minerals are taken
 9   without permission?
10            MS. STEVENSON:  Object to form.
11            THE WITNESS:  I don't, because it hasn't
12   really come up.  It hasn't come up.  I mean,
13   that's -- that's not something that comes up in
14   our business, so I wouldn't hold myself out as a
15   -- as an expert in that.
16        Q   (By Mr. Ashworth)  Sure.  Would you hold
17   yourself out as being an expert in regards to
18   calculation of damages in general that involves
19   the taking of mineral resources without
20   permission?
21            MS. STEVENSON:  Object to form.
22            THE WITNESS:  I think that's a very
23   unique aspect that is the subject of this case,
24   so it -- you know, damages doesn't come up, per
25   se.  It doesn't come up in the negotiations.  I
```

 1    think I mentioned the types of agreements that

 2    I'm accustomed to negotiating, surface use

 3    agreements and other accommodation agreements,

 4    but in terms of damages, that's not normally

 5    something that I'm going to try to opine on, per

 6    se.

 7             I think what I look at is -- and what I

 8    did here is to look at what's customary in terms

 9    of compensation.  And so I think that's -- and

10    maybe that's a real finer point, but that's

11    really what I looked at is, what is compensation

12    in the ordinary course of these negotiations.

13    And I think that's what we're looking at here,

14    what would have been a negotiation for a -- for

15    a mineral lease.

16             And that's what I'm accustomed to

17    negotiating is that kind of compensation, or

18    maybe it's a matter of semantics, but I don't

19    think of it in terms of damages.

20        Q   (By Mr. Ashworth)  Sure.  And I'll get

21    to compensation as a separate issue, because I

22    think compensation is before the taking, at

23    least in my opinion.  Damages is in regards to

24    the taking without permission.

25             So it's my understanding, just from your

1    long answer, was that you are not -- you don't

2    consider yourself to be an expert in regards to

3    the calculation of damages as to when minerals

4    are taken without permission?

5         MS. STEVENSON:  Object to form.

6     Q   (By Mr. Ashworth)  Is that -- is that

7    correct?

8         MS. STEVENSON:  Object to form.

9         THE WITNESS:  Correct.

10     Q   (By Mr. Ashworth)  Okay.  I'm trying to

11   understand, what is it that you were retained to

12   do as an expert in this case.  I'm going to

13   refer you to your expert report.  In particular,

14   I'd like to look at Page 5.  Actually, we'll

15   start with Page 4, the very bottom of your

16   expert report.  Right there.

17         Here at the bottom, at this bottom

18   paragraph, it says that you have been asked to

19   provide expert opinions in responses to two

20   questions.  The first one is whether a

21   knowledgeable and experienced wind developer

22   would have reasonably anticipated that a lease

23   from a mineral owner would be required prior to

24   construction of the project.  That's the first

25   part that you were required to give expert

```
 1    opinion on.

 2           The second is, if a wind energy

 3    developer was clearly apprised, prior to

 4    construction commencing, that a mineral lease

 5    was required to engage in ordinary turbine

 6    foundation excavation for a wind project, would

 7    the developer have practical and effective

 8    alternatives to using minerals so mined, end

 9    quote, from the mineral estate in the

10    construction of the foundation for the project.

11           Those are -- is this the two areas that

12    you were retained to give expert testimony on;

13    is that correct?

14           MS. STEVENSON:  Object to form.

15           THE WITNESS:  We were asked to answer

16    these two questions, together with looking at

17    the FTI report.

18       Q   (By Mr. Ashworth)  Okay.  Well, I'm just

19    trying to see.  It states in your report -- it

20    only says that these are the two areas that

21    you're giving expert opinions as to, and your --

22    it's your testimony that you're also giving

23    expert opinions as to the FTI report; is that

24    correct?

25       A   Say that again.  I'm sorry.
```

```
 1        Q   Sure.  I'm trying to understand what,
 2   exactly, you've been retained to give expert
 3   opinions as to.  Your report only indicates that
 4   there's two areas that you're giving expert
 5   opinions as to, but it seems to me that it's
 6   your testimony today that you're also giving an
 7   expert opinion as to the FTI report.
 8             MS. STEVENSON:  Object to form.
 9             THE WITNESS:  I think that's -- I think
10   we're -- we're responding to the FTI report, and
11   we're also answering these two questions.
12        Q   (By Mr. Ashworth)  Sure.  Are you
13   responding to the FTI report in a capacity as an
14   expert, or are you just making comments as to
15   it?
16             MS. STEVENSON:  Object to form.
17             THE WITNESS:  I'm responding to the
18   report as an expert.
19        Q   (By Mr. Ashworth)  Okay.
20             (Discussion off the record)
21        Q   (By Mr. Ashworth)  And I say that
22   because here in the last sentence --
23             (Discussion off the record)
24        Q   (By Mr. Ashworth)  The
25   second-to-last-sentence of this page, it says,
```

1    "I have been asked to comment specifically on

2    the contents of the FTI report with regard to

3    the reasonable standards and customs within the

4    wind industry -- wind development industry."

5         You know, I mention this because it says

6    you were asked to specifically comment versus to

7    give expert opinions.  And that's why I wanted

8    to, you know -- I guess there's some confusion

9    on me, because it seems like now you're going to

10   give expert opinions as to the FTI report.

11        MS. STEVENSON:  Object to form.

12   Q   (By Mr. Ashworth)  So my question is,

13   you're giving more than just comments --

14   correct? -- as to FTI's report?

15   A   Yes.

16   Q   Okay.  And it's my understanding that

17   your criticism of the FTI report is that the

18   calculation of damages by Mr. Hazel is

19   unreasonable; is that correct?

20   A   On the basis of using the payments in

21   the wind energy lease, yes.

22   Q   Okay.  And in fact -- scratch that.

23        And it's my understanding that you

24   aren't able to say what reasonable damages would

25   be in this case; is that correct?

Kimberlee Centera

5/14/2021

142

```
 1        A    I -- I'm not sure what you mean by that.
 2        Q    Sure.  It's your opinion, when we go to
 3   trial -- scratch that.
 4             When we go to trial, it's going to be
 5   your testimony to the court that based on your
 6   expert opinions and your expert background that
 7   the measure of damages or the calculation of
 8   damages by Mr. Hazel is unreasonable; correct?
 9        A    Correct.
10        Q    And that it's also going to be your
11   expert opinion to the court that, when asked,
12   what are the reasonable calculation of damages,
13   your response would be, I don't know; is that
14   correct?
15             MS. STEVENSON:  Object to form.
16             THE WITNESS:  Well, I think what I said
17   is that I am -- I'm -- maybe it's a matter of
18   disagreement over what "damages" means and
19   "compensation."  So I am disagreeing with the
20   formula that is used in the FTI report for
21   calculating the compensation.  When I -- when I
22   think of damages, I'm thinking of damages to the
23   surface.  Perhaps I'm thinking of it differently
24   than you are.  What I'm -- what I'm disagreeing
25   with is the calculation and the fact that the
```

1    entirety of the wind agreement, including all

2    the compensation, operating fees, and what have

3    you, are used in the basis of that calculation

4    for the compensation.

5           So I guess maybe we don't agree on what

6    constitutes damages, because, you know -- and,

7    again, I'm not an attorney, so maybe I'm --

8    maybe I'm misunderstanding.  But I'm -- that is

9    what I disagree with is the compensa- -- the way

10   that the compensation is being calculated.

11       Q    (By Mr. Ashworth)  Okay.  Well, let's --

12       A    You know.  Anyway...

13       Q    Well, how do you believe it should be

14   calculated?

15       A    I should -- I believe it should be

16   calculated on the basis of any other permit or

17   any other agreement that would customarily be

18   granted for this type of activity in Osage

19   County.  I think we looked at that and we said

20   there's a lot of other comparable documentation

21   out there to support that.  I don't believe that

22   there's documentation in Osage County that

23   supports using all the different payments under

24   the wind lease as the basis for the

25   compensation.  That's what I'm -- that's,

1    fundamentally, what I am disagreeing with in the

2    FTI report.

3       Q   Okay.  Earlier you testified that you

4    read part of the Tenth Circuit court opinion in

5    this case, so I assume you haven't read the part

6    where the defendants have been found liable in

7    this case, and the trial's really going to be on

8    damages.  And that's, you know, what the court's

9    going to order to compensate the defendants for

10   what was done.  Whether that is to have the

11   towers removed or what, my -- I'm trying to

12   understand, are you the expert for the

13   defendants to tell the court how much should be

14   paid or what should be done to, I guess, remedy

15   or compensate for the minerals that were taken?

16   Is that going to be you?

17            MS. STEVENSON:  Object to form.

18            THE WITNESS:  I -- I think you have

19   several other experts that are speaking

20   specifically to the value.  I think you have Mr.

21   Pfahl, who spoke specifically to the value and

22   the comparable nature of the damages in Osage

23   County.  I think my role is to talk about what's

24   customary and typical in the renewable energy

25   industry, and that's what I'm speaking to.  I'm

1  speaking on the basis of all my experience

2  negotiating many different kinds of crossing

3  agreements and permitting -- permits and that

4  type of thing for title in many other

5  jurisdictions and what happens.

6         And that's the basis for my -- so when

7  we -- when you go back and look at all those

8  different projects, is the compensation based on

9  the wind energy leases and all the different

10 payments that are set forth in the wind energy

11 lease.  And I'm here to testify that that's not

12 the case.

13        Now, there's other people that are, by

14 far, the experts on trying to, you know, opine

15 an all the specific damages.  But what I'm here

16 to talk about is the nature of that calculation

17 and what is customary on the basis of my many

18 years of experience.

19    **Q   (By Mr. Ashworth)  I have so many**

20 **questions, follow-up questions because of that**

21 **answer.  I'm trying to think of where to start.**

22        **My question to start would be, if you**

23 **believe that, you know, you're going to be the**

24 **expert at trial to say what is customary in the**

25 **industry to compensate a mineral rights --**

1    mineral estate owner for when a mineral lease

2    was not taken -- sorry, was not negotiated and

3    obtained and the minerals were taken -- it's

4    your testimony to the court -- so that was a

5    long, rambling question.  Let me start over

6    again.  Sorry about that.

7         Is it going to be your testimony to the

8    court that, as an expert with experience within

9    the industry, that you're going to opine as to

10   what compensation is reasonable for when

11   minerals are taken without permission relative

12   to a wind energy development project; is that

13   correct?

14        MS. STEVENSON:  Object to form.

15        THE WITNESS:  I think I'll be testifying

16   -- if there is a trial, then I will be

17   testifying on the basis of what's set forth in

18   that Tenth Circuit opinion that said that the

19   crushing of the minerals and that kind of thing

20   constituted mining.  So I will be testifying on

21   that -- on that basis, on the basis of my

22   industry experience working with mineral

23   negotiations.  So that will be the basis of my

24   testimony.

25        Q   (By Mr. Ashworth)  Sure.

```
1            MR. ASHWORTH:  And I would object to
2    that as nonresponsive and move to strike.
3         Q   (By Mr. Ashworth)  Let me reask that
4    question.
5            I'm trying to understand -- this is my
6    -- this probably will be my only time to speak
7    with you before trial, and I don't want to get
8    to trial and, all of a sudden, you tell the
9    court you've come up with a calculation that was
10   never previously disclosed to us.
11           But what I want to know is, is what
12   calculation -- based on your experience within
13   the industry, how, you know, you would
14   compensate minerals being taken from a mineral
15   estate owner without permission?  How would you
16   calculate that?
17           MS. STEVENSON:  Object to form.
18           THE WITNESS:  I think in this case, you
19   know, if you're going to establish that
20   compensation, then you're going to have to look
21   at the other documents, as I said, in the county
22   that have already been used, the other permits.
23   So you're going to pay some kind of a nominal
24   amount.  You're going to pay something -- I
25   think someone did some calculations, perhaps on
```

1    the amount of the limestone that was actually

2    manipulated for purposes of a foundation, so I

3    think they know that amount.

4          So I think you would be looking at that.

5    You would be looking at something based on what

6    a typical, you know, permit or a lease would

7    ordinarily be negotiated on for this three-month

8    period of time that the construction was

9    conducted.

10   **Q    (By Mr. Ashworth)  Okay.  And you base**

11   **that opinion based on your industry expert --**

12   **experience?**

13   A    Based upon my industry experience, yes.

14   If you go into a certain jurisdiction and you

15   are negotiating documents, permits, crossing

16   agreements, or whatever, then they are typically

17   negotiated based upon what's customary in that

18   state and county.

19   **Q    Okay.  Now we're -- you're talking about**

20   **negotiations.  I want to know about this**

21   **particular instance when minerals were taken**

22   **without permission, and it seems to me that**

23   **you're coming up with that opinion based on your**

24   **industry experience.**

25          **My question would be, it's my**

1    understanding that you have never been involved

2    in a wind development project where a minerals

3    lease was required and not obtained; is that

4    correct?

5         MS. STEVENSON:  Object to form.

6         THE WITNESS:  Where there was mining

7    involved?  If you're talking about mining, I've

8    worked on many, many lease negotiations.

9         Q   (By Mr. Ashworth)  Sure.

10        A   With tribes and other types.  But you're

11   talking about this particular case, where

12   there's an allegation around minerals being

13   mined.  I've not negotiated that kind of lease

14   before, no.

15        Q   Sure.  And I think we can decide whether

16   we agree, whether the word "mined" or "mineral

17   development" should be used.  But you've not had

18   any experience where a mineral lease was

19   required prior to beginning a wind development

20   project; correct?

21        A   Typically, no, no, because there's not

22   going to be -- there's no mining that takes

23   place.  So, normally, a mineral lease is not

24   going to come up, because you're not --

25        Q   Okay.

1        A    -- leasing the -- for -- you're not

2    going to be mining, so you're not going to

3    lease.

4        **Q    Sure.  And that just makes it a little**

5    **bit more confusing for me as to -- it's your**

6    **testimony that you have never been involved in a**

7    **situation where a mineral lease was required,**

8    **yet you believe that, based on your experience**

9    **in the industry, you're going to tell the court**

10   **how compensation should be paid when a mineral**

11   **lease was not obtained.**

12       A    Well, I think we know that, even in the

13   FTI report, there's no basis for the calculation

14   of using the wind lease as the basis for the

15   compensation.  I sat in on the deposition for

16   Mr. Hazel, and he's never worked on a single

17   project where that compensation was ever used or

18   ever at issue.

19           So this is a very unique case here

20   that's come up.  I've been involved in plenty of

21   negotiations, but not in a particular fact

22   scenario that we're talking about here, where

23   there's an allegation of mining as a result of

24   construction and rocks being crushed and all of

25   that.  That is a very unique case.

```
1        So I think, you know, there's not a
2   precedent for that, that I'm aware of.  And with
3   Mr. Hazel's experience, who I think he has close
4   to the amount of years of experience that I do
5   in his work, which is many years, and he has no
6   comp for that either.  So, you know, I think
7   across the board, as far as the experts, we both
8   agree that there's no precedent for the
9   calculation of these -- of this compensation.
10      Q   Sure.  Your -- but when it comes to
11   trial, you're going to be basing your testimony
12   based off of your industry experience, when
13   you've already said that there is no experience
14   relative to the facts of this case; correct?
15      A   I will be basing it on all the
16   experience that I have negotiating many, many,
17   many agreements.  But, you know, this is -- this
18   is definitely a different case with the facts
19   here, but people -- people ask me -- excuse me
20   for interrupting, but, you know, Stuart, people
21   ask me, have you worked in all 50 states?  Okay?
22   I haven't worked in all 50 states yet.  I've
23   worked in over 40 states, but I haven't worked
24   in all 50 states.
25          But I can tell you this.  There is best
```

1    practices.  There's ways that you work, and

2    there's best practices, and those apply across

3    the board.  So, you know -- you know, I haven't

4    worked in all 50 states, but it doesn't mean

5    that the information is not correct or accurate

6    as to the industry experience.

7         Q    Would you consider yourself to be an

8    expert as to the best practices that a renewable

9    energy developer should follow?

10        A    As it relates to real estate and title

11   and my particular area of expertise, yes.

12        Q    Would you -- in your experience as it

13   relates to real estate and title, would you

14   agree that one of the best practices to mitigate

15   risks by a renewable energy developer would be

16   to conduct comprehensive due diligence?  Would

17   you agree with that?

18        A    Yes, yes.

19        Q    Okay.  And part of the due diligence,

20   that would mean that a developer should try to

21   discover any potential risks and evaluate their

22   impacts to determine whether potential projects

23   would be a good investment for them; is that

24   correct?

25        A    Yes.

```
1        Q    Would you agree that part of due

2   diligence involves a review of permitting and

3   jurisdictional issues to determine site

4   feasibility?  Would you agree with that?

5        A    Yes.

6        Q    Okay.  Would you agree that, as part of

7   due diligence, involves compliance review to

8   ensure that a potential project adheres to

9   applicable regulations?

10       A    Well, on the regulations part, I'm not

11  too sure about that.  I'm not an attorney.  But

12  certainly within my area of expertise, yes, I

13  think you want to make sure that you do all the

14  -- all the due diligence that you can.  Comes to

15  the compliance part, that's up to the attorneys

16  to take a look at everything and ensure that

17  it's in compliance.

18       Q    Okay.  Would it -- would you agree that

19  due diligence would require compliance review?

20       A    I don't understand the question.  I'm

21  sorry.

22       Q    Sure.  We're talking about due

23  diligence.

24       A    Okay.

25       Q    Would you agree that one of the steps of
```

1    doing due diligence would be to have a

2    compliance review to ensure that there are any

3    -- to see if there are any potential regulations

4    or -- I'm sorry -- applicable regulations that

5    need to be adhered to?

6        A   It typically happens in the projects,

7    yes.

8        Q   Okay.  And that would be part of due

9    diligence; correct?

10       A   Yes, could be, yes.  Probably is part of

11   it, yes.

12       Q   So in doing due diligence, that could be

13   a step, or you don't know?

14       A   Yes, it's probably one of the steps that

15   happens.  Could be, yes.

16       Q   Okay.  And you would consider yourself

17   to be an expert in terms of best practices for

18   due diligence as it relates to real estate and

19   title; is that right?

20       A   Yes.

21       Q   Okay.  Do you know if Enel Green did any

22   type of due diligence work before starting

23   construction on the subject project?

24       A   You know, I -- no, I'm not sure what

25   took place.  I didn't work on this project, so I

1    don't know.

2        Q    But that's something that you would have

3    expected Enel Green to have done before

4    beginning construction?

5        A    Yes.

6        Q    Okay.  Does TPS perform due diligence on

7    behalf of its clients (inaudible)?

8            THE REPORTER:  What was the last part?

9        Q    (By Mr. Ashworth)  Does TPS do due

10   diligence for its clients if it's been retained

11   to do so?

12       A    We do, yes.

13       Q    Okay.

14       A    We do.

15       Q    And maybe to rephrase it this way, that

16   would -- doing due diligence for clients would

17   be one of the services offered by TPS?

18       A    Right, for real estate and title, for

19   our particular -- there's a lot of different

20   pieces associated with projects, so, you know,

21   we're very specific to real estate and title,

22   but yes.

23       Q    Okay.  And if TPS had been retained by

24   Enel Green to provide risk management consulting

25   services relative to the subject project, that's

1    something that due diligence -- I'm sorry --

2    would have been one of the things that TPS would

3    have -- let me restart that.  That was a

4    terrible question.  I was thinking I could save

5    it.

6            If TPS was retained by Enel Green to

7    provide risk management services to -- or

8    relative to the subject project, is it your

9    belief that TPS would have advised Enel Green to

10   follow the best practices in the industry to

11   mitigate any potential risks associated with

12   renewable energy projects?

13           MS. STEVENSON:  Object to form.

14           THE WITNESS:  Yes, I'm sure we would

15   have done that, right.  We have a protocol so...

16       Q   (By Mr. Ashworth)  Okay.  Based on what

17   we know now on the Tenth Circuit opinion, do you

18   believe that Enel Green performed adequate due

19   diligence before beginning construction on the

20   subject project?

21           MS. STEVENSON:  Object to form.

22           THE WITNESS:  I think they did, based

23   upon what they knew at the time, yes.

24       Q   (By Mr. Ashworth)  Okay.  And so based

25   on what they knew at the time, you believe that

```
 1    they performed due diligence adequately;
 2    correct?
 3        A    Yes.
 4        Q    What about -- is that a "yes"?
 5        A    Yes.
 6        Q    Okay.  What about based on what we know
 7    now?
 8             MS. STEVENSON:  Object --
 9        Q    (By Mr. Ashworth)  Do you believe that
10    Enel Green would have performed adequate -- or
11    did perform adequate due diligence before they
12    began construction on the subject project?
13             MS. STEVENSON:  Object to form.
14             THE WITNESS:  You know, I'm trying to
15    comment on something I really don't know
16    anything about.  I -- I can't really comment on
17    the totality of their due diligence.  You know,
18    we have information about a very specific area.
19    There are very specific questions around this --
20    the tribal rights so --
21        Q    (By Mr. Ashworth)  Okay.
22        A    -- you know, it wouldn't be correct of
23    me to try to comment on the totality of the due
24    diligence, because I really don't know.  I
25    wasn't there.  I don't know about that.
```

1    Q   Sure.  So you think it's inappropriate

2  for you to comment as to whether Enel Green did

3  proper due diligence, based on what we know now,

4  but you have no problems about opining that,

5  based on what was known at the time?

6         MS. STEVENSON:  Object to form.

7    Q   (By Mr. Ashworth)  Is that correct?

8         MS. STEVENSON:  Object to form.

9         THE WITNESS:  I'm sorry.  Could you

10  repeat the question?  It's kind of a little --

11    Q   (By Mr. Ashworth)  Sure, sure.  It seems

12  like you -- it's your opinion that Enel Green

13  did adequate due diligence based on the

14  information that they knew at the time; that was

15  your opinion.  And when I asked based on what we

16  know now, do you believe that Enel Green

17  performed adequate due diligence relative to the

18  subject project, and then you said, well,

19  actually, you don't -- you're not able to

20  comment?

21    A   Correct.

22    Q   All right.  What makes you able to

23  comment as to what you believe Enel Green knew

24  at the time versus what we actually know now?

25    A   I think it's a great question, and I

1  think that I should correct what I said

2  previously and say that all I can really speak

3  to is this particular question.  And, you know,

4  it's hard to -- I didn't look at any title work.

5  You know, I don't know about the totality and

6  all the history of this.  All I know is where we

7  are now and what we have in terms of the finding

8  and that we now know there should have been a

9  lease.

10      Q   Okay.

11      A   So, you know, I -- I mean, I work on a

12  lot of projects, and when you're done with a

13  project and debrief the project, you're a lot

14  smarter and -- you know, across the board.  You

15  probably go back, and perhaps you might do some

16  things differently.  So I should qualify my

17  comment by saying that.

18      Q   Okay.  Do you believe that Enel Green's

19  review of permitting and jurisdiction issues

20  prior to construction was sufficient enough for

21  purposes of due diligence?

22          MS. STEVENSON:  Object to form.

23          THE WITNESS:  Yeah, I'm not going to

24  comment on the totality of the permitting,

25  because I -- I wasn't -- you know, I wasn't

1    involved in that, so -- so I can't comment on

2    that.

3        Q   (By Mr. Ashworth)  I'm sorry.  You're

4    not able to comment as to the totality of

5    permitting?

6        A   Right, because -- could you ask --

7    because you asked about the permitting and all

8    that; right?  So you're asking about all the

9    different permits?

10       Q   Sure.  About the permits, yeah.  Even to

11   rephrase that, do you believe that Enel Green's

12   review of licensing, leasing, permitting, and

13   jurisdictional issues prior to the construction

14   of the project was sufficient enough for

15   purposes of due diligence?

16           MS. STEVENSON:  Object to form.

17           THE WITNESS:  Yeah, that -- that's way

18   too broad.  I have -- that's a huge -- you know,

19   it could be hundreds of documents.  I have no

20   idea.  You know, I --

21       Q   (By Mr. Ashworth)  Okay.  Well, let me

22   make the question a bit less broad, and maybe

23   you'll be able to answer it.  Do you believe

24   that Enel Green's review of regulations prior to

25   construction was sufficient enough for the

1   **purposes of due diligence?**

2          MS. STEVENSON:  Object to form.

3          THE WITNESS:  Yeah, I don't -- I think

4   -- I wasn't really asked to comment on that.  I

5   mean, I think as far as trying to understand all

6   the different -- all the different questions and

7   all of that when, you know, you're talking about

8   what happened back, I think -- what? -- in,

9   like, 2012, you know, I don't know.  I don't

10  know what Enel would have done back then.  I

11  don't know, or 2013.  I don't know.

12      Q   (By Mr. Ashworth)  **Okay.  Well, ma'am,**

13  **were you not retained to opine and give an**

14  **expert opinion as to whether a wind developer**

15  **would have reasonably anticipated whether a**

16  **lease from a mineral owner would have been**

17  **required prior to construction?**

18      A   I think that's what we're talking about,

19  right.  If you're talking about that, yes, yes.

20      Q   **Okay.  And if a regulation required that**

21  **a wind developer get a lease, would it be your**

22  **opinion that Enel Green did not undertake**

23  **sufficient due diligence to determine whether**

24  **that was a requirement?**

25          MS. STEVENSON:  Object to form.

```
 1          THE WITNESS:  I don't agree with that in
 2   this case, because there wasn't clarity around
 3   the -- around the requirements.  There wasn't a
 4   clear understanding of what those requirements
 5   even were.  There was discussion around permits,
 6   and there was discussion around leases.  I mean,
 7   it seems to me not even the agency itself, even
 8   when they sent the notification about the --
 9   that one letter that we looked at previously, it
10   talks about a permit.
11          So I don't -- I don't think that there
12   was clarity around even what needed to be asked
13   for.  So I can't say that the proper due
14   diligence wasn't done, because I -- it doesn't
15   appear that there was even clarity on the part
16   of the agencies and the particular groups that
17   were involved on what was needed.
18          So I'm not sure how you -- you know, do
19   due diligence around that.  I think you -- you
20   know -- you know, a case of specific due
21   diligence, if you're looking at a title report,
22   or I talked about some of the other documents
23   that we looked at, those are very specific.  You
24   can look at that and ascertain what their
25   requirements are.  I think you can due diligence
```

Kimberlee Centera   5/14/2021   163

```
 1   around that, but where you don't have clarity, I
 2   -- you know, I don't know what you can do around
 3   that.
 4       Q   (By Mr. Ashworth)  Okay.  Whose burden
 5   is it to -- you know, to set clarity?
 6           MS. STEVENSON:  Object to form.
 7           THE WITNESS:  I'm -- the court's, I
 8   think; right?  I mean, if there --
 9       Q   (By Mr. Ashworth)  Okay.
10       A   -- you know, I mean, yeah, I'm not sure
11   what you mean by that question.  That's a really
12   broad question, yeah.
13       Q   Sure.  You indicated that there was no
14   clarity at the time as to whether a lease was
15   required.  My question would be, whose burden
16   would it be to determine whether a lease, in
17   fact, would have been required?
18           MS. STEVENSON:  Object to form.
19           THE WITNESS:  Well, what I think I said
20   is that there's no part -- declaring on the part
21   of the agency; right?  I mean, you know, part --
22   part of what we do -- and I mentioned this as
23   part of our curative work, because, you know, we
24   reach out to a particular agency, we say, we are
25   proceeding with this project, here's all our
```

1    plans, here's all of our -- you know, here's

2    everything that's going to happen.  I understand

3    that that happened, you know, early on, I

4    believe; all that was presented.

5            So that's what I'm accustomed to.  You

6    would present all your material, you'd say

7    here's what -- here's what we're going to do,

8    here's what we need to do.  And then at that

9    point, you get a response back saying, okay,

10   you're going to need, you know, a subordination,

11   or in some cases we'll have a bank that will

12   say, we're not going to give you a

13   subordination, we're going to only give you a

14   nondisturbance agreement.  Okay.  If that's what

15   we're going to have to work with, that's what

16   we'll work with.

17           So in my experience, it's the agency or

18   the bank or whoever the entity is, they're the

19   ones that come back and say, this is what is

20   going to be required.  So I think that's where

21   my approach would be here, is you would be

22   reliant upon the particular agency or group to

23   come back to you and say, here's what we need.

24       Q   (By Mr. Ashworth)  Okay.  And if an

25   agency doesn't come back and say, you need a

1  **lease and you proceed anyways, is that -- is**

2  **that the agency's fault?**

3      A    Well, I think -- I think in one of the

4  earlier letters that I saw, the project is set,

5  you know.  We're not going to be doing any

6  mining, we don't believe any kind of

7  documentation is required, and I don't believe

8  that there was a response to that.

9          So is it incumbent -- you know, being --

10  you know, you can't guess; right?  I mean, I can

11  start trying to throw agreements at an agency.

12  You know, how do I know, what do I know.  What

13  -- you know, you don't know what they're -- what

14  they're going to want.

15          I mean, normally -- you know, I think

16  there's possibly other projects that have been

17  developed.  I mean, certainly, there's enough

18  mineral development.  I think there's other

19  limestone development that's happened in Osage

20  County, and we know that it happened adjacent to

21  the project.

22          So I would think that there would be a

23  familiarity with the documentation; right?  I

24  mean, I looked at the sandy soil permit, so --

25  and that -- there was one that was issued right

1    around this time frame, in 2014.  So, obviously,

2    there was familiarity with the kind of documents

3    that would ordinarily be issued.  There would be

4    a permit, was what I saw.

5          And so you would -- you know, you would

6    think that there would -- here's a -- you know,

7    here you go.  You know, you have to get a permit

8    or what have you.  But I think the other thing

9    that's at issue here is the fact that it's --

10   they didn't know that they were going to be

11   crushing material until they got into the

12   project, and then they started -- as they were

13   working, that's when this question came up so...

14        Q    Okay.  Well, would it be your testimony

15   **that a reasonably prudent wind developer would**

16   **proceed with a project when there's no clarity**

17   **as to whether a mineral lease is required?**

18        MS. STEVENSON:  Object to form.

19        THE WITNESS:  Because I think you're --

20   you're -- you know, if you make a request, if

21   you send all your documentation in and you don't

22   get a response, and you say, we're not mining,

23   and because I said you're -- you know, you're

24   not going to be mining, that's -- you know,

25   you're not going to be removing material, taking

Kimberlee Centera

167

```
1   it off site to sell it, then I don't think that
2   you're going to pursue that.  I don't think you
3   see any need for it.
4       Q   (By Mr. Ashworth)  Okay.  So -- so in
5   this instance, what we know is, is that the
6   defendants were placed on notice that a lease
7   was required, but it's your opinion that that
8   notice would not have been sufficient enough to
9   make them -- to apprise them that a lease was
10  indeed required; is that right?
11      MS. STEVENSON:  Object to form.
12      Q   (By Mr. Ashworth)  Is that your
13  testimony?
14      A   I'm not sure that we were put on notice
15  that a lease was required.  I'm not sure that we
16  -- because if you look at the contents of the
17  expectation of what the lease was going to be
18  for, which the lease is for the mining, they
19  didn't expect to be any mining.
20      Q   Is your testimony now that the
21  defendants were never notified that a lease was
22  required, that a mineral lease was required?
23      MS. STEVENSON:  Object to form.
24      THE WITNESS:  I think we saw the letter,
25  and, again, I don't remember the exact date of
```

```
 1    it, but I think we saw the letter that said that
 2    a -- some kind of a sandy soil permit may be
 3    required; right?  And at that point, you're
 4    going to do some due diligence; right?  You're
 5    going to be calling and saying, okay, what's
 6    going on, because, all of a sudden, we got this
 7    letter saying that you've been out inspecting or
 8    what have you, and you're saying that some kind
 9    of permit is required.
10            And I think you're going to be talking
11    to them at that point, but I think the request
12    at that point was some kind of permit.
13        Q   (By Mr. Ashworth)  Okay.  So I'll come
14    back to this issue.
15            Ma'am, do you know how many wind farms
16    there are on Indian land or within Indian
17    country?
18        A   I have no idea, no.
19        Q   I can let you know that that's a number
20    that's relatively small, and, I mean, I'm not
21    going to tell you that I know it off the top of
22    my head, because I don't, but I know that it's a
23    question that we can find.  What I do know is
24    that it's small, but you -- it's your testimony
25    that you've worked on at least some of those
```

```
 1   wind farm projects on Indian land or within

 2   Indian country?

 3        A    That's correct.

 4        Q    And how many of those would you have

 5   worked on?

 6        A    You know what?  I don't remember.  I

 7   can't tell you precisely.  I'd have to go back

 8   and look at my records.  A lot of what -- our

 9   work, too, is involved in early stages of

10   projects, so prior site control where there may

11   be some analysis and some review.  So it's

12   possible that we looked at sites, too, where --

13   for the -- you know, like you said, there's not

14   a lot of development.

15        There happens to be development out in

16   -- on tribal land in San Diego right outside my

17   back door, so I do know what's happened there.

18   But, you know, it's -- you know, it's -- it's

19   not something that happens a lot, per se.  But I

20   have no idea what the numbers are.

21        Q    Okay.  Can you give me an estimate of

22   how many wind development projects that you

23   worked on in relation to Indian land or Indian

24   country?  Is it maybe -- is it going to be more

25   than ten or less than ten?
```

```
1       A    You know, I don't know.  We look at

2    megawatts.  You know, I consult on projects in

3    all different jurisdictions, especially in -- on

4    -- in the west.  And so, you know, you're maybe

5    talking Arizona, Nevada, New Mexico, California,

6    as I said.  So some of those projects go

7    forward, some of them don't.  Also, you know,

8    Indian lands can be -- or tribal lands can also

9    be the subject of other rights.  You know, it

10   can be access, it can be transmission.

11           We just started working on a project

12   right now that's a solar project that involves

13   solely tribal lands.  So, you know, it -- I

14   don't -- I don't necessarily keep track of all

15   those numbers just because we -- you know, our

16   work is, a lot of times, early stage, so it just

17   depends.  Some of it goes forward, some of it

18   doesn't.

19       Q    Okay.  So it's your testimony that you

20   are unable to say whether you have worked on

21   wind development projects in relation to Indian

22   land or Indian country, whether it's in excess

23   of ten or less than ten; is that correct?

24           MS. STEVENSON:  Object to form.

25           THE WITNESS:  I would say it's probably
```

1    more than ten, but I can't give you the -- ten

2    projects.  I -- you know, I'd have to go back

3    and look at my records, because it would be over

4    the course of many years.

5         Q   (By Mr. Ashworth)  Okay.  And when would

6    be the last time you would have worked on a wind

7    development project in relation to Indian land

8    or Indian country?

9         A   A wind project.  I would say probably in

10   the last two or three years, we've worked on

11   one.  You're talking about wind; right?  You're

12   not talking --

13        Q   That's right.

14        A   -- solar?  I would say in the last two

15   or three years, possibly, yeah.

16            (Discussion off the record)

17        Q   (By Mr. Ashworth)  Ms. Centera, this is

18   a -- well, it's a summary of projects for

19   Kimberlee Centera.  I have not reviewed this

20   one, but I have reviewed the list of projects on

21   your website, and I've gone through all of them,

22   and I've not seen that any of them, based on

23   location, were done on Indian reservations or

24   Indian country.  So maybe I missed something.

25            So I'd like to go over these with you,

1    **and you let me know what I've missed, and let me**

2    **know which ones that you believe of your list of**

3     **projects -- and we're only looking at solar --**

4      **would have been done on Indian land or within**

5                    **Indian country.**

6              (Discussion off the record)

7         THE WITNESS:  Can you please go back up

8    for a second?

9         So some of these, I'm not necessarily --

10   first of all, I'm not necessarily going to talk

11   about all the tribal rights, if they exist,

12   because in a lot of cases, they're going to

13   exist as a matter of the severance of the

14   estate.

15        So in some of these cases, it was a

16   matter of what's evidenced on title, so it's not

17   necessarily going to be shown on here.  You

18   know, I don't know if you really want to take

19   the time to try to go through all these

20   projects.  I mean, I know there's projects, in

21   particular, in Wyoming and that kind of thing,

22   those wind projects.

23        Some of these projects in Kern County

24   involve a severance of an estate, but, you know,

25   some of the projects that are in Riverside

1    County involve tribal rights, but you get -- you

2    know, you're not necessarily going to see it

3    evidenced on here.  If you it's going to be

4    evidenced on the list, it's not necessarily

5    going to be there.

6         This is only a very high level summary

7    of the project, so it doesn't involve all of the

8    in-depth work around the title where the tribal

9    rights would be evidence.

10    Q    Sure.  And I'm not looking actually on

11   what's listed under these projects, whether it

12   says, "Indian reservation," "Indian country," or

13   "Indian land."  What I'm expressing to you is

14   that I have went through these projects and

15   Googled them to determine whether they were done

16   on -- within Indian country.

17        And I didn't see any, so that's why I'm

18   -- hopefully, this may refresh your memory by

19   reviewing these as to whether a particular

20   project was done on a reservation in Indian

21   country or in Indian land.

22        And I think that, perhaps, the easiest

23   way for you to do would be, since you do have a

24   copy of your report, this is -- in front of you,

25   if you can look at that yourself, if you can get

1   **someone else to scroll through or flip through**

2   **those pages.  And when you're done, let me know**

3   **and we can see what you've identified.  Okay?**

4       A   And I don't -- and, I'm sorry, you're

5   saying that you Googled every single one of

6   these projects in order to determine whether or

7   not there's -- there's tribal rights?

8       **Q   From what -- yes, yes, from what I've --**

9   **I've done and, you know, I don't get paid by the**

10  **hour, but I did it.  It's called due diligence.**

11      A   Right.  And, again, you know, a lot of

12  it is going to be on -- evidenced on title

13  report.  It may be reserved rights, it can even

14  be buried in documents, you know.  A lot of it

15  is not going to necessarily be on tribal lands,

16  per se.  They may have some kind of interest.

17          You know, I think we did work in

18  Riverside County on wind projects.  We're

19  working on a wind project right now, we're

20  finishing up the survey work where I believe

21  it's the Morongo tribe.  And if you Google that,

22  you'll see they do have an interest out in

23  Riverside County.  They have rights that

24  overlay.

25          So I think, you know, part of our job is

 1   to understand where those rights come from, and

 2   so you're not always going to be able to Google

 3   it and find the rights.  If it was that easy to

 4   do it, honestly, I probably wouldn't have a

 5   business, because everybody could just Google it

 6   and find out the information.

 7        But where it comes from, looking at the

 8   title documentation, it comes at looking at

 9   other evidence that's going to be of record.  If

10   you look at the records, you'll see out in

11   Riverside county, there is -- I believe it's a

12   tri-party agreement between the Indian tribe,

13   the tribal lands, the -- maybe the BLM and the

14   county of Riverside that have to do with the

15   development of certain land that overlays a lot

16   of the wind project.

17        And so these rights can be evidenced a

18   lot of different ways, so I -- you know, I'm not

19   sure about trying to take everyone's time and

20   try to go through all these projects and telling

21   you -- tell you all the ones that could have,

22   you know, different Indian rights.  But I can

23   tell you on the Mountain View -- the Mountain

24   View 1 and 2 project, which I'm not sure if it's

25   on here, because it's one that's in the very

1    early stages.  It's one that we're working on a
2    repower for right now.
3       Q   Okay.  In regards to time, I mean,
4    ma'am, this is going to be probably my only time
5    to speak with you before trial, so I am willing
6    to spend that time now.  In regards to tribal
7    rights, I'm not looking -- my question's not
8    about tribal rights.  It's about projects that's
9    done on a reservation or within Indian country
10   or has any -- you know, involves Indian property
11   as it involves in this case.
12            You have previously testified that you
13   had perhaps in excess of ten cases involving
14   Indian land or Indian country, wind farms within
15   Indian country.  And so my question is, you
16   know, let me know which ones they are.
17            So I will give you some time to look at
18   your report and your project list to -- kind of
19   to let me know if you can recognize any ones
20   that you've done on a reservation, within Indian
21   country, or on Indian land.
22            MS. STEVENSON:  Object to form.
23            THE WITNESS:  I would say we'd want to
24   look at the Mountain View 4 project.
25       Q   (By Mr. Ashworth)  Okay.

1    A    This one right -- and if you could keep

2    scrolling, please.  I'm going off my

3    recollection, too, so...

4        Q    Sure.

5        A    I think really in order to give you an

6    accurate and complete list, I would have to go

7    back through all my projects and take a look at

8    all my material and try --

9        Q    Well, I --

10       A    -- and come up with a list for you.

11       Q    Sure.  Well, at least specifically for

12   this list that you have on your CV that you

13   attached to your report -- I guess you attached

14   it to your report because you thought that was

15   relevant to this case, so that's why I wanted to

16   know, as to these cases, which ones.

17       A    All the Foote Creek projects that are

18   out in Wyoming also involved Indian rights.  I

19   mean, I think you said it yourself; there hasn't

20   been a lot of projects developed on tribal

21   lands.  Also I would say that a lot of our work

22   is very early stage, and some of it proceeds and

23   some of it doesn't.  I think there were also

24   some tribal rights on the Jupiter tax equity.

25   That's the NG, so --

```
 1        Q    When you say, "tribal rights," was it

 2   done on a reservation or Indian land or dealt

 3   with Indian property?

 4        A    There were some -- there were some

 5   tribal property that was involved.  I don't

 6   believe any of the landowners are -- is tribal.

 7   And I believe there were some tribal rights on

 8   some of the Kern County projects, but I can't

 9   tell you specifically which ones of those.  I'd

10   have to go back and look at my records to be

11   able to tell you exactly which ones.

12             Again, I would have to look at the

13   Mountain View projects that are in Riverside

14   County, because I believe that there was some

15   tribal lands involved in those.  It could have

16   been on the transmission line.  I don't remember

17   specifically.

18             And I think we mentioned the Foote Creek

19   projects so -- there may have been some Indian

20   or -- pardon me -- tribal rights on the Lost

21   Hills, but -- in Kern County, but I'd have to go

22   back and look at that.

23        Q    But that's solar, though; right?

24        A    That's solar, correct.

25        Q    And we're looking relative to wind
```

1    projects.

2         A    Can you go back up for a moment?   I

3    think on the Storm Lake, I'd need to go back and

4    look at that.  And could you scroll up, please?

5    Yeah, I think just on the Storm Lake.  Thank

6    you.  Yeah, some of -- some of the ALTA survey

7    projects, I can't speak off the top of my head

8    on those.  We'd have to go back and look at the

9    -- the title work on that.

10        Q    Okay.  So we finished scrolling through

11   all of those pages.  There were 22 pages there,

12   and based on our review, you had questions about

13   Storm Lake, Mountain View, and Fort [sic] Creek

14   as possibly being projects that you have worked

15   on that were wind development projects on Indian

16   land, within Indian country; is that correct?

17        A    I think I also mentioned the Foote Creek

18   projects in Wyoming.

19        Q    Yes, yes, I believe I mentioned that; is

20   that correct?

21        A    On -- on the basis of this review here

22   at the moment, it sounds correct.

23        Q    Yes.  And we would later be able to

24   consult with any reservation maps that defendant

25   may determine that those were indeed Indian

 1    country projects.  Would you -- yeah.

 2              Are there any other projects that you

 3    have done that are not on this list in relations

 4    to lease negotiations for wind projects?

 5        A    There could very well be.  I've been

 6    doing this work for a very long time, so there

 7    could very well be.

 8        Q    As you sit here today, are you able to

 9    point to any project, wind development project

10    where you were involved with the lease

11    negotiation?  Are you able to say -- or point to

12    any project that's not listed?

13        A    There -- actually, there's many projects

14    that are not on this list that never got

15    developed or could be under development right

16    now.  So they're not on this.

17        Q    Okay.

18        A    The primary ones that are on this list

19    are the ones that have gone through a financing,

20    so they're in the public domain.  If they're not

21    in the public domain, then I don't talk about my

22    clients' project.

23        Q    Sure.  Would any of those not listed

24    have involved tribal lands or Indian country?

25        A    There's a certain amount of projects

Kimberlee Centera

1    that are in Arizona and New Mexico and Nevada

2    that are -- are in various stages of

3    development, and actually in Utah that are in

4    various stages of development that may include

5    some parts of tribal land.  They may not

6    necessarily be the -- you know, for the primary

7    site, but they're for the transmission or that

8    type of thing.  So there may be some crossing

9    through some tribal land.

10        Q    I'm going to look at Page 5 of your

11   expert report.

12             (Discussion off the record)

13        Q    (By Mr. Ashworth)  Right there.  In the

14   second paragraph, this first sentence starts

15   with, "I have reviewed the six surface leases

16   and the project background.  Upon this review,

17   it is clear that while the mineral interest is

18   well established, there is no evidence to

19   conclude that the project site would need to

20   enter into a mineral lease."

21             Did I read that correctly?

22        A    Yes.

23        Q    The second sentence states, "Upon this

24   review."  When you say, "this review," I assume

25   you're referring to the review of the materials

1  you cited in the sentence that immediately

2  precedes; is that correct?

3       A    Correct.  The six surface leases and the

4  project background.

5       Q    What do you mean by "project background"

6  that you reviewed that caused you to believe

7  that there is no evidence to conclude in your

8  report that a mineral lease was needed?

9       A    I think the project background that we

10 were looking at was the initial background

11 that's set forth in the FTI report that talks

12 about just a timeline for the development and

13 what happened.  So if you're just looking at the

14 face of -- on the face of the surface leases and

15 the overarching project background, I think

16 that's what we're talking about.

17      Q    You say, "we're talking about."  That's

18 what you were -- is that you?

19      A    That's what I'm --

20      Q    Or is there someone else?

21      A    That's what I'm talking about.

22      Q    Okay.  When you wrote this, you had not

23 been provided with the document, I believe it's

24 -- Exhibit 36 is a letter from the BIA.

25           (Discussion off the record)

 1        Q    (By Mr. Ashworth)   Give me one second.

 2   My computer's...

 3             (Discussion off the record)

 4        Q    (By Mr. Ashworth)   Ma'am, have you seen

 5   this letter before?

 6        A    Can I see the top part of the letter?

 7   Okay.  Can you scroll down?  I think I have seen

 8   this before.

 9        Q    You believe you have?

10        A    I think I've seen this.  Trying to

11   think.  Could you keep scrolling, please?  Yes,

12   I have seen this letter, yes.

13        Q    Okay.  If we go back to the first page,

14   I'm going to look at the second paragraph right

15   there.  The last sentence, in particular, it

16   says -- this is a letter from Andrew Yates, at

17   the time, I believe, the chairman of OMC to

18   David Boyce.  That sentence says, "Activities

19   occurring within or affecting the Osage mineral

20   estate may be subject to a range of federal

21   regulations" -- I'm sorry -- "regulatory

22   requirements, including the need to secure a

23   federal permit or lease to undertake such

24   activities, pursuant to 25 CFR Sections 411 and

25   414."

```
 1            You have read that sentence before;

 2   correct?

 3       A   Yes.

 4       Q   Okay.  And before I get any further, I

 5   will mark this as Exhibit Number 41.  I believe

 6   that's the correct number.

 7            Ma'am, did you read that sentence before

 8   you wrote your expert report, wherein you state

 9   that there was no evidence to conclude that

10   project would have needed a minerals lease?

11       A   No, I did not.

12       Q   So you read this sentence after your

13   expert report; correct?

14       A   Right.  I --

15       Q   Okay.  And this letter to David Boyce,

16   who's -- my understanding is now or was the CEO

17   of Osage Wind, LLC.  And I'd also represent that

18   it appears that when it references 411, 414, if

19   you were to go to those sections, they don't

20   exist.  By looking at the titles, it would have

21   indicated 211 and 214.

22            Is it your understanding that this would

23   at least provide some evidence that -- for Osage

24   Wind to have concluded that a lease would have

25   been needed, pursuant to either the -- or
```

1   pursuant to the federal regulations?

2          MS. STEVENSON:   Object to form.

3          THE WITNESS:   I think you'd have to look

4   at it in its entirety, because it says, to the

5   extent that the project requires a lease or a

6   permit.  So I think this is -- it doesn't change

7   my opinion.  I think it's informational.

8      Q   (By Mr. Ashworth)  Okay.

9      A   It's -- to me it -- in my view, it's not

10  conclusive.  It's saying if a lease is required,

11  so I --

12     Q   Okay.

13     A   -- don't believe that it's conclusive.

14     Q   Sure.  You indicate in your report there

15  is no evidence to conclude that the project site

16  would have needed a mineral lease.  You say

17  there's no evidence.  Now, reviewing this, if

18  this is provided before the construction of the

19  project, you still believe that this does not

20  provide any evidence that the defendants should

21  have or should have at least looked into

22  obtaining a permit or lease?

23         MS. STEVENSON:   Object to form.

24     Q   (By Mr. Ashworth)  For the minerals?

25     A   Well, I think this letter is reciting

```
 1   what we already know; right?  I mean, I'm not --
 2   I'm not clear on the date of this letter, but I
 3   think it's -- the letter is saying that if a
 4   lease is required, that these are -- you know,
 5   you would -- I think what this is saying is
 6   you'd have to negotiate a lease on the ordinary
 7   terms and conditions.  So --
 8        Q    Sure.  And it would be -- you would like
 9   the court to believe that the defendants had no
10   notice -- the defendants had no notice, prior to
11   the construction of the project, the wind power,
12   that a lease was needed?
13           MS. STEVENSON:  Object to form.
14           THE WITNESS:  Yeah, I -- I'm not sure
15   that that's what we said.  I think that we were
16   not planning to mine, and I think the conclusion
17   of the court was that there was mining that took
18   place, and so then a lease is required.  But
19   that happened after the fact.  So I don't see
20   this as being conclusive to say that a lease or
21   a permit or what have you is going to be
22   required, because then even this is
23   contradictory to what they said later -- in
24   their later letter, when they went out there and
25   they said, well, you need a permit.
```

```
 1              So, you know, I'm not sure that -- I
 2    don't believe that this is conclusive to
 3    indicate that you -- that you needed a lease,
 4    because I think the project maintained from the
 5    very beginning that no mining was going to take
 6    place.
 7         Q    Okay.
 8         A    And so (inaudible).
 9              THE REPORTER:  I'm sorry.  Could you
10    repeat that?
11              THE WITNESS:  Oh, just that no mining --
12    the project had maintained that there was no
13    mining that was going to take place, and so
14    there was no lease that was needed.
15         Q    (By Mr. Ashworth)  Okay.  So if -- it's
16    your opinion that it has to be clear and certain
17    that a lease is required before a lease should
18    be obtained?  If it is not clear, you believe
19    it's completely fine for a reasonably prudent
20    wind developer to move forward with a project
21    without obtaining a lease?
22              MS. STEVENSON:  Object to form.
23              THE WITNESS:  I think that you know your
24    project is going to be the subject of due
25    diligence, and you want to make sure that you've
```

 1   taken all the proper steps.  But I don't see

 2   anything in here that says that, you know, you

 3   have to have a -- because you're not planning to

 4   mine.

 5          So I don't see this as saying -- it

 6   says, to the extent that the project requires a

 7   lease or even a permit.  So even in this letter,

 8   it's not really clear, you know, what it is that

 9   you're going to need to get.  But the letter is

10   simply saying that if you're going to -- you

11   know, I'm not sure what it says.  Okay.

12     Q   (By Mr. Ashworth)  Okay.  If a

13   **reasonably prudent wind developer had received a**

14   **letter indicating that they may or may not be**

15   **required to get a lease pursuant to a federal**

16   **regulation and that wind developer disagrees,**

17   **would it not be incumbent upon a reasonably**

18   **prudent wind developer to have gone through the**

19   **administrative process with that regulatory**

20   **authority to determine whether or not it was**

21   **indeed required?**

22          MS. STEVENSON:  Object to form.

23          THE WITNESS:  Well, I think, as I

24   understand it, the project did go through all

25   the permitting and all the permitting

1   requirements, so I think this is not part of the

2   permitting process, per se.  So I think this

3   falls out -- I -- you know, also, I'm looking at

4   this out of context in relation to all the other

5   material.  I think you have to take all the

6   other information together.

7         And it seems to me, if you look at all

8   the different correspondence, that if this was

9   the position of, you know, the tribe at the

10  time, then they should have provided the lease.

11  I don't believe that a lease was ever provided.

12  I mean, I said, you know, even in the course of

13  our, you know, curative negotiations, if an

14  entity says, you know, you've got to have a

15  non-disturbance agreement, then they send us the

16  non-disturbance agreement.  They say, here's our

17  form, and even this says, so I'm --

18       Q   (By Mr. Ashworth)  I'm sorry.  Is it

19  **your opinion that if the tribe took the position**

20  **that a lease was required, it's -- they're**

21  **required to give the lease to the wind**

22  **developer?  Is that what you're trying to say?**

23          MS. STEVENSON:  Object to form.

24          THE WITNESS:  I would think that's what

25  would happen, you know, I --

1    Q   (By Mr. Ashworth)  Okay.

2    A   I mean, I think it's -- I mean, again,

3    you know, if you look at a lot of what's already

4    been well established in the county, you know,

5    these documents are not hidden, these forms are

6    not hidden.  They're pretty customary, they're

7    pretty standard.

8         So it seems to me that, if there was

9    clarity around it's a permit, you know, you just

10   send a permit and say, here you go, and, you

11   know, get the permit filled out and get it back

12   to us.  But I don't see that happening here.  I

13   see this being kind of a discourse over, maybe

14   if it's required, and if it is, you're going to

15   have to follow this procedure.

16        So, I mean, it doesn't seem to me that

17   this is saying, a permit's required, here's your

18   permit.  You know, they clearly have the form.

19   I mean, there's plenty of them out there.  So

20   I'm not sure why in this case they wouldn't have

21   provided the form.

22   Q   Okay.  So it's your testimony that

23   because there was no clarity at the time as to

24   whether or not a lease was required, it's your

25   testimony, as an expert witness in the industry,

1    that it would have been completely reasonable

2    and fine for a reasonably prudent,

3    knowledgeable, and experienced wind developer to

4    just move on without trying to determine or get

5    clarity?

6            MS. STEVENSON:  Object to form.

7            THE WITNESS:  I'm saying that if, in

8    fact, a permit or a lease was required and it's

9    well established in the county that there is

10   many of them out there, that that would have

11   been part of this letter, here you go, here's a

12   permit, here you go.

13       Q   (By Mr. Ashworth)  Okay.  We're talking

14   about lease.

15       A   Okay.  Well, this says, "requires a

16   lease or a permit," so, you know, I mean, I

17   think later on they asked for a permit; right?

18   So this says, "lease or permit."  Later on they

19   asked for a permit.  I mean, this is kind of

20   what I'm talking about.  I guess as the project,

21   you're supposed to get what they want.  You

22   know, I don't know.

23           This is why I -- I'm a little bit kind

24   of confused about their requirements here.  It

25   seems to me that, yes, being the agency that

1  needs to issue whatever it is that needs to be

2  issued, if it is a lease or if it's a permit,

3  that that would be what they would send.  Here's

4  the document, and then it would be up to the

5  project to say, no, we don't think we need a

6  lease, we need a permit, or whatever.

7      Q   Okay.  We have been going on for about

8  an hour.  Let's take about a five-minute break.

9      A   Thank you.

10  (Short break at 4:05 p.m., resumed at 4:12 p.m.)

11      Q   (By Mr. Ashworth)  Ma'am, we're back on

12  the record.  We took a quick break.  And is

13  there anything that you would like to change

14  about your previous testimony, that you'd like

15  to do so now?

16      A   No.

17      Q   Okay.  I'm going to look at your expert

18  report and pull up Appendix A.  It's page -- I'm

19  going to look at Page 3 of Appendix A.  It

20  appears to me that Appendix A is a list of

21  documents that were provided to you.

22      A   Sounds right, yes.

23      Q   Do you know if any that you -- scratch

24  that.

25          Do you know if you reviewed all of the

1   **documents that were provided or that are listed**

2   **in Appendix A?**

3       A   You know what?  I'd have to go back and

4   refresh my memory.  I looked at a lot of them.

5   I would have to go back and refresh my memory to

6   say that I looked at every single one.

7       **Q   All right.  Is it possible that you may**

8   **have not looked at all of them?**

9       A   It's possible.  This is a list of all

10  the documents that were provided, so I focused

11  on the documents that were pertinent to my

12  report.  And so I would have focused on those

13  documents, so there may have been documents

14  provided to me that I did not look at because

15  they weren't pertinent.

16      **Q   Listed here kind of in the middle of the**

17  **screen is some documents that says -- starts**

18  **with JFWCO-Osage As-built.  I have not -- do you**

19  **know what these documents are?**

20      A   That is the as-built ALTA survey for the

21  project.

22      **Q   This is an as-built for the subject**

23  **project that was given to ALTA?  Or was it --**

24      A   It's customary in these projects to

25  prepare both a preconstruction and then post

1    construction survey that shows the location of

2    all the improvements.  So this particular survey

3    was prepared by John Watson, and so it just

4    depicts the location of all the improvements and

5    all the property that comprises their project.

6        Q    Okay.  And this would have been pre and

7    post project?

8        A    This particular is an as-built, so I --

9    I -- from my review, it looks to me like it's

10   just post construction, so it shows everything

11   post construction that -- from my high level

12   review.

13       Q    Did you rely upon any of the information

14   contained in these ALTA as-builts for your

15   opinion?

16       A    I did not.

17       Q    Okay.  There was nothing that you

18   noticed as being helpful for you to form your

19   opinion; is that correct?

20       A    I'm sorry.  Say that again.

21       Q    Sure.  There's nothing within these

22   as-builts, these ALTA as-builts that you believe

23   were important for you to form your opinion?

24       A    No, no, not necessarily.

25       Q    Okay.  Do you recall if anything within

1    these ALTA as-builts that quantified the amount
2    of minerals that were excavated?
3        A    In the ALTA survey, no.
4        Q    I'm sorry.  Is that a no, you don't know
5    if it --
6        A    No.
7        Q    -- included that information?
8        A    Not quantified in the ALTA survey, that
9    I saw.  Not that I -- that I saw.
10       Q    Okay.
11       A    If it is, I didn't see it.
12       Q    Ma'am, I'm going to -- well, scratch
13   that.
14            Well, I'll also look -- the place where
15   I was in my notes are not stapled.  Give me one
16   second.
17            Ma'am, do you know anything about
18   Chapter 25 CFR Part 165.500?  Have you ever
19   heard of that?
20       A    I'm not familiar with that, no.
21       Q    It's leasing requirements for tribal
22   lands as it relates to wind energy projects.  Do
23   you know anything about that now?
24       A    I can't -- I can't say that I could tell
25   you much about that, no.

1     Q    You have no recollections of ever being

2 involved in a project where that -- leases under

3 that section was undertaken; is that correct?

4     A    Well, I have -- I have no recollection

5 of that specific provision.  I'm -- I've not

6 looked at it.

7     Q    Ma'am, I'm going to -- earlier --

8 scratch that.

9          Earlier you had testified in your --

10 about your report.  You had indicated that if a

11 wind developer had been apprised of the

12 necessity of a mineral lease prior to

13 construction, it was your testimony that they

14 would have considered more practical options; is

15 that right?

16          MS. STEVENSON:  Object to form.

17          THE WITNESS:  I -- they would have

18 looked at options, if they knew that they would

19 have to get a mining lease, I think.

20     Q    (By Mr. Ashworth)  Okay.

21     A    I think I would look at other options.

22     Q    And I think your testimony was more

23 specific -- is that if they were aware that they

24 needed a mineral lease but that the tribe -- or

25 they were unable to get a mineral lease, you

1    believe that they would have considered other

2    options or alternative options?

3         MS. STEVENSON:  Objection to form.

4         THE WITNESS:  I'm not sure if I said

5    that, but I do know that if you -- if they would

6    have known that they were going to have to get a

7    mining lease, then I would think that they would

8    have looked at other alternatives as to bringing

9    the materials onto the site.

10        Q   (By Mr. Ashworth)  And it was your

11   testimony that you don't know if the defendants

12   actually looked at other alternative options at

13   the time; is that correct?

14        A   Well, I think -- was it Mary Kathryn put

15   up an invoice from the project that actually

16   showed that they did secure, you know, material

17   from off the site?  So I think we know that,

18   according to that invoice.  So I don't recall

19   seeing that prior to this, but I think we know

20   that, that they did actually acquire some

21   material from off the site.

22        Q   Sure.  That -- I'm sorry.  That purchase

23   order did not -- it was for minerals.  It's your

24   testimony that that was brought in as a

25   substitute for something?  Is that your

1    testimony?

2            MS. STEVENSON:  Object to form.

3            THE WITNESS:  No, I'm not in the

4    position to comment on that.  I am merely saying

5    that it appeared from that invoice that they did

6    bring onto the site some other matieral.  I

7    presume it probably took less for the roads, but

8    I don't know.  I wasn't involved in the

9    construction, so I don't know.  But based upon

10   my experience, I wouldn't be surprised, I think

11   is what I said, that they would bring materials

12   on the site.  It frequently happens for the

13   roads, that they --

14       Q   (By Mr. Ashworth)  Okay.

15       A   -- have other material.

16       Q   Would it be your -- scratch that.

17           What would have been an alternative

18   option in this case if a mineral lease was not

19   -- was required and wasn't taken?

20       A   As far as constructing foundations are

21   concerned relative to the limestone?  Is that

22   what you're asking?

23       Q   No.  My question is as it relates to the

24   minerals, the Osage minerals that were taken,

25   what would have been the alternatives that the

 1    **defendants could have considered instead of**

 2    **taking and using those minerals?**

 3         MS. STEVENSON:  Object to form.

 4         THE WITNESS:  Well, I think you would

 5    probably do something similar to what they did

 6    to the road -- for the roads, but they would

 7    look at acquiring a resource from off the site

 8    and bringing that in.  I mean, obviously, they

 9    knew in advance that they were going to need the

10    material for the roads, so they contracted for

11    that.

12         So it seems to me if you knew in advance

13    that you were going to need to replace the --

14    this limestone or what have you in the turbine

15    foundations, that you would have similarly

16    contracted in advance in order to bring in some

17    alternative minerals.  And I think we said that

18    there's other, you know, quarries and other

19    facilities in the county, and I think we saw

20    that evidenced by all the other permits; right?

21    There's many other permits, or other

22    developments for this kind of material that is

23    readily available.  So they would have been able

24    to bring it in from some other source.

25      Q   Okay.  So it would be your testimony

1    that one of the options would have been, instead

2    of excavating the minerals and using them -- and

3    using them, instead of using them, they could

4    have just set them aside and brought in

5    substitute fill?

6        A   Yes.

7        Q   As a way to negate the lease

8    requirement?

9        A   Right.  I mean, and I -- because I said

10   I've seen that happen in other cases where there

11   were possibly similar requirements, you know,

12   with not mixing, you know, topsoil, or for weed

13   control, whatever it might be.  And so you just

14   take out that, you make special allowances for

15   it, and then you bring in materials that, you

16   know, meet the requirements, from another

17   source.

18       Q   And if the defendants had a question as

19   to whether a lease was needed, why didn't they

20   -- why did they choose -- or do you know why

21   they chose to use Osage's minerals instead of

22   getting substitute minerals?

23            MS. STEVENSON:  Object to form.

24            THE WITNESS:  You know, I -- you know, I

25   don't know.  I can't put myself exactly in your

1   shoes, except that in my experience of

2   construction, you know, you don't always know

3   what you're going to get until you start with

4   construction.  So that may have been a factor

5   here is, when they started the construction,

6   then they encountered all this limestone so --

7        Q   (By Mr. Ashworth)  Okay.

8        A   The only thing I could think of.  I

9   don't know.  I wasn't there when they made the

10  decision.

11       Q   I'm going to introduce another exhibit

12  into the record.  I believe it possibly was

13  introduced in a previous deposition, but I'm not

14  sure.  I'm going to name it Exhibit Number 42.

15  It's a change order form.

16            (Discussion off the record)

17       Q   (By Mr. Ashworth)  This would have done

18  -- this change order -- first off, have you seen

19  this before?

20       A   No, I haven't.  I have not.

21       Q   Okay.  Well, I would represent to you

22  that this was a change order.  At least based on

23  the records, it appeared that it was done in

24  August of 2014, that during the project certain

25  specifications were called for, and then later

1    on it was determined that they needed to be

2    updated.  And this was what this change order

3    would have been -- taken place.  And I believe

4    it's -- the contractor is asking for more money.

5            And this is part of the justification

6    for the change.  In there, in this paragraph in

7    the middle of the page, I want to point at where

8    it starts with, "Given the issue."  I believe

9    that's the fourth point, bullet point.  "Given

10   the issue with Osage Nation, the disposal of

11   excavated rocks and import of backfill --

12   backfilling material from outside the county was

13   a more expensive solution."

14           Did I read that correctly?

15   A    Yes.

16   Q    So I guess my question before this was,

17   if not using the minerals that were excavated,

18   setting them aside and getting substitute

19   materials from outside the project area, why was

20   that not used?  And based on this change order,

21   it appears that that option or solution was not

22   used because it was more expensive.

23           Would you have any reasons to disagree?

24   A    You know what?  I have not seen this

25   change order before.  I don't know the basis for

```
 1    it, so it's hard for me to comment on the

 2    totality of it, just based upon that sentence.

 3         Q    Sure.  It just appears that the

 4    defendants made a calculated decision as to

 5    whether to obtain the lease or not, and -- or go

 6    with some type of alternative.  And they decided

 7    that the alternative would have been more

 8    expensive, and they went with using Osage's

 9    minerals.

10              MS. STEVENSON:   Object to form.

11         Q    (By Mr. Ashworth)   Is your understanding

12    of that different?

13         A    Yeah, I think that's a stretch, from

14    just reading that particular sentence.  I mean,

15    I think -- it seems to me that says from outside

16    of the county.  Well, it seems to me that -- I

17    mean, I think we said that there's a lot of

18    resources within the county.

19              So I'm not sure that I'm surprised by

20    the fact that if they have to -- I don't know.

21    This is a pretty big county, maybe.  I'm not

22    sure, but it seems to me that if you're going to

23    have to go way outside of the county to try to

24    find a replacement in any case, no matter what

25    kind of project you're constructing, there's
```

 1   going to be -- it's going to be more expensive;

 2   right?  So I don't see that -- and I'm not sure

 3   that I draw the conclusion just based on that.

 4   I don't think --

 5        Q    Sure.

 6        A    -- it says anything about leasing.  I

 7   think it just -- to me, I think, you know, it

 8   makes -- it makes sense.  If you're going to

 9   have to go further, you know, in order to find a

10   replacement, yeah, it's going to -- it's going

11   to cost more.  But, I mean, it -- so it kind of

12   is what it is.  But it's all --

13        Q    Uh-huh.

14        A    -- there.

15        Q    Sure.  Have you ever heard of the

16   saying, it's better to ask for forgiveness than

17   to ask for permission?

18        A    Sure, yeah, I've heard of that.

19        Q    Have you ever ran across, in your

20   experience in the industry, of a wind developer

21   or renewable energy developer to proceed without

22   permission with the expectation that it would be

23   easier for them to ask for forgiveness

24   afterwards?

25             MS. STEVENSON:  Object to form.

```
 1          THE WITNESS:  Yeah, I -- you know,
 2   really?  You know, how many wind developers are
 3   out there on how many projects?  I -- I don't
 4   know, you know.
 5      Q   (By Mr. Ashworth)  I'm asking about your
 6   experience.
 7      A   Oh, my experience.  You know, I'm not
 8   aware of -- you know, I'm not aware of very many
 9   developers that would do that.  You know, I
10   suppose, on a case-by-case basis, but...
11      Q   And I'd say outside of the defendants,
12   are you aware of any other developers who would
13   do that?
14          MS. STEVENSON:  Object to form.
15          THE WITNESS:  Yeah, I'm not even sure
16   how to answer that, to be honest with you.
17      Q   (By Mr. Ashworth)  How do you not know
18   how to answer that?  I mean, it's in your
19   experience.
20      A   Well, it's -- you know, how many
21   developers are going to take risks, and what
22   kinds, and, you know, I'm not really sure.  If
23   you -- if you want to give me a scenario,
24   perhaps.  But, I mean, these projects are -- you
25   know, most of the projects that we're working on
```

1   are very large scale projects.  There's, you

2   know, hundreds of millions of dollars to -- that

3   can be at stake.

4        So you're asking me do the people that I

5   work with and the clients that I cultivate, do

6   they take that philosophy on their projects?  I

7   would say the answer is no.  I don't -- I don't

8   prefer to work with those kinds of people,

9   because, you know, it flies in the face of doing

10  the right thing and having integrity on

11  projects.  And in my experience, that never

12  bodes well.  So I would say I make it a habit of

13  not working with those kinds of people.

14       **Q   Well, I think you answered my question**

15  **with that, and I have nothing further.**

16       MR. ASHWORTH:  I pass the witness.

17       MS. STEVENSON:  Thank you.  I'd like to

18  take a five-minute break just to confer with

19  co-counsel to determine if defendants have any

20  questions for this witness.

21       MR. ASHWORTH:  Sure.

22       MS. NAGLE:  Okay.  That sounds good.

23  Five-minute break.

24  (Short break at 4:32 p.m., resumed at 4:38 p.m.)

25       MS. STEVENSON:  Defendants reserve

1    questions for this witness, so if we just -- we

2    will read and sign the deposition.

3            THE REPORTER:  Reserve this witness

4    what?

5            MS. STEVENSON:  We reserve our questions

6    for this witness for future proceedings, and the

7    witness will read and sign.

8            MR. ASHWORTH:  Does the OMC have any

9    redirect?

10           MS. NAGLE:  We don't have any redirect

11   at this time.  Thank you.

12           (Deposition concluded at 4:39 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          JURAT

 2     STATE OF OKLAHOMA)

 3                      )

 4     COUNTY OF _____)

 5

 6          I, KIMBERLEE CENTERA, do hereby state

 7     under oath that I have read the above and

 8     foregoing deposition in its entirety and that

 9     the same is a full, true and correct

10     transcription of my testimony so given at said

11     time and place, except for the corrections

12     noted.

13

14                    _____

15                         KIMBERLEE CENTERA

16          Subscribed and sworn to before me, the

17     undersigned Notary Public, in and for the State

18     of Oklahoma, by said witness, on this, the _____

19     day of _____, 2021.

20

21                    _____

22                         NOTARY PUBLIC

23     My Commission Expires:  _____

24     Job No.  150594

25     UNITED STATES vs. OSAGE MINERAL COUNCIL, et al.
```

```
1                    ERRATA SHEET

2           DEPOSITION OF KIMBERLEE CENTERA

3        REPORTED BY:  JANNA PIRTLE, CSR, RPR

4       DATE OF DEPOSITION TAKEN:  MAY 14, 2021

5               JOB FILE NO.  150594

6   PAGE LINE IS SHOULD BE

7   _____    _____    _____

8   _____    _____    _____

9   _____    _____    _____

10  _____    _____    _____

11  _____    _____    _____

12  _____    _____    _____

13  _____    _____    _____

14  _____    _____    _____

15  _____    _____    _____

16  _____    _____    _____

17  _____    _____    _____

18  _____    _____    _____

19  _____    _____    _____

20  _____    _____    _____

21  _____    _____    _____

22  _____    _____    _____

23  _____    _____    _____

24  _____    _____    _____

25  _____    _____    _____
```

Kimberlee Centera   5/14/2021   210

```
 1                    CERTIFICATE

 2   STATE OF OKLAHOMA    )

 3                        )SS:

 4   COUNTY OF OKLAHOMA    )

 5           I, JANNA PIRTLE, Certified Shorthand

 6   Reporter within and for the State of Oklahoma,

 7   do hereby certify that the witness was by me

 8   first duly sworn to testify the truth, the whole

 9   truth, and nothing but the truth in the case

10   aforesaid, taken in shorthand to the best of my

11   ability and thereafter transcribed; that the

12   same was taken pursuant to stipulations

13   hereinbefore set out; and that I am not an

14   attorney for nor relative of any of said parties

15   or otherwise interested in the event of said

16   action.

17           IN WITNESS WHEREOF, I have hereunto set

18   my hand and seal this 24th day of May, 2021.

19

20                      Janna Pirtle

21                      _____

22                      Janna Pirtle, CSR, RPR

23                      CSR No:  1815

24

25
```

**WORD INDEX**

**< 0 >**
**024749** 74:*10*

**< 1 >**
**1** 175:*24*
**1:39** 124:*8*
**10** 106:*25* 108:*18*
**10/30/20** 3:*10*
**10/31/13** 3:*11*
**10/9/14** 3:*13*
**10:49** 1:*15* 5:*9*
**1000** 2:*10*
**102** 3:*4*
**11** 109:*21*
**11:00** 102:2
**11:30** 102:*3, 7*
**11:45** 102:*7*
**110** 1:*20* 3:*14*
**12** 107:*10*
**12:00** 60:*13*
**12:10** 60:*12*
**12:14** 60:*13*
**129** 3:*15*
**13** 89:*18* 109:*2, 3*
**14** 1:*15* 3:*10* 4:5
  107:*20, 21* 209:*4*
**14-CV-704-GFK-
  JFG** 1:2
**14-CV-704-GKF-
  JFJ** 5:*8*
**150594** 208:*24*
  209:*5*
**165.500** 195:*18*
**18** 34:*3, 7, 9*
**1815** 210:*23*
**184** 3:*16*
**1906** 11:*10* 38:*14*
  47:*13*
**1983** 131:*12*
**1989** 131:*12, 21*
**1990** 131:7
**1993** 21:*22*
  131:*14*

**< 2 >**
**2** 22:*21* 60:*18, 19*

62:*3* 66:*4* 175:*24*
  2.5 108:*16*
**2:28** 124:*8*
**2002** 131:*4*
**2003** 131:*4*
**2005** 20:*19* 21:*24*
**2007** 110:*3*
**2008** 110:*3*
**201** 3:*17*
**2010** 53:*13*
**2011** 53:*13*
**2012** 16:*1, 13*
  20:*20* 161:*9*
**2013** 24:*8* 55:*10*
  57:*18* 58:*22*
  86:*16* 89:*14, 22*
  90:*25* 132:*25*
  133:*1* 161:*11*
**2014** 54:*25* 55:*4,*
  *16* 59:*12* 74:*19*
  75:*2* 76:*13* 78:*16*
  80:*20* 85:*8* 89:*12*
  91:*7, 21* 133:*1*
  166:*1* 201:*24*
**2018** 130:*11, 12,*
  *15*
**2020** 104:*24*
  108:*18*
**2021** 1:*15* 4:*5*
  208:*19* 209:*4*
  210:*18*
**211** 10:*22* 38:*10*
  184:*21*
**214** 10:*19* 38:*6*
  184:*21*
**22** 179:*11*
**2200** 2:*4*
**22nd** 75:*2* 76:*2*
  78:*16*
**24th** 210:*18*
**25** 10:*19, 22* 38:*6,*
  *10* 183:*24* 195:*18*
**25,000** 116:*2*
**27** 34:*7, 12*
**2900** 2:*14*

**< 3 >**
**3** 192:*19*

**30** 13:*13* 106:*14*
  124:*1* 126:*15*
**300** 1:*20*
**31st** 57:*18* 89:*22*
**35** 3:*10* 14:*20, 22,*
  *24* 37:*1* 41:*11*
  60:*17* 61:*25*
  102:*22*
**36** 3:*11* 56:*21*
  57:*14, 16* 87:*2*
  89:*21* 182:*24*
**37** 3:*12* 74:*5, 8*
  110:*13*
**38** 3:*13* 85:*2, 6*
  110:*11, 13, 14, 17*
**382-2700** 1:*21*
**39** 3:*14* 24:*14*
  110:*16, 18, 19, 20*

**< 4 >**
**4** 38:*20, 24* 83:*15*
  138:*15* 176:*24*
**4:05** 192:*10*
**4:12** 192:*10*
**4:32** 206:*24*
**4:38** 206:*24*
**4:39** 207:*12*
**40** 3:*15* 129:*17*
  151:*23*
**401** 2:*4, 14*
**41** 3:*16* 184:*5*
**411** 183:*24*
  184:*18*
**414** 183:*25*
  184:*18*
**415** 58:*6* 89:*25*
**42** 3:*17* 201:*14*
**420** 57:*13*
**45** 124:*5, 7*
**45-minute** 124:*10*
  126:*14*

**< 5 >**
**5** 71:*6* 93:*15, 17*
  138:*14* 181:*10*
**50** 151:*21, 22, 24*
  152:*4*
**500** 2:*10*

**505** 2:*11*
**56** 3:*11*
**583-7571** 2:*15*

**< 6 >**
**6** 3:*3*
**6,000** 111:*13*

**< 7 >**
**74** 3:*12*
**74103** 2:*5, 15*
**74119** 1:*21*
**7th** 1:*20*

**< 8 >**
**8,000** 116:*1*
**848-1800** 2:*11*
**85** 3:*13*
**87103** 2:*11*

**< 9 >**
**918** 1:*21* 2:*5, 15*
**936-4705** 2:*5*
**9th** 85:*8*

**< A >**
**A.M** 1:*15* 5:*9*
**Aaron** 75:*8* 76:*1*
  78:*15* 79:*5*
**Aaron's** 80:*6*
**abandoning** 23:*18*
**ability** 30:2
  210:*11*
**able** 30:2, *20*
  41:*16* 49:*1, 6, 7*
  66:*24* 84:*24*
  100:*8* 121:*8*
  122:*25* 129:*8*
  141:*24* 158:*19, 22*
  160:*4, 23* 175:*2*
  178:*11* 179:*23*
  180:*8, 11* 199:*23*
**Absolutely** 9:*17*
  15:*9* 18:*17, 20*
  37:*8* 50:*7* 57:*3, 6*
**abundance** 75:*10*
**access** 48:*25* 49:*5,*
  *6* 170:*10*

**accommodation**
20:*5*  117:*13*
137:*3*
**account**  42:*21*
47:*21*  49:*25*  50:*4*,
*6*  95:*2*  101:*12*
**accurate**  37:*9*
152:*5*  177:*6*
**accurately**  15:*5*
**accustomed**  73:*19*
117:*10*  118:*12*, *19*
137:*2*, *16*  164:*5*
**acquire**  21:*1*
44:*2*  197:*20*
**acquired**  21:*23*, *25*
**acquiring**  199:*7*
**acquisition**  21:*6*
112:*9*
**acquisitions**  22:*5*
**acres**  116:*1*, *2*
**Act**  11:*9*  38:*13*
113:*9*
**action**  210:*16*
**active**  114:*7*
**Activities**  183:*18*,
*24*
**activity**  66:*17*, *18*,
*22*, *24*  143:*18*
**actual**  27:*8*
29:*25*  54:*24*
62:*18*  126:*5*
**add**  127:*5*
**addition**  21:*14*
79:*20*
**additional**  36:*12*,
*13*  61:*12*
**address**  71:*19*
96:*5*
**addressed**  42:*6*
116:*7*
**adequate**  156:*18*
157:*10*, *11*  158:*13*,
*17*
**adequately**  83:*10*
157:*1*
**adhered**  154:*5*
**adheres**  153:*8*
**adjacent**  165:*20*
**adjoining**  42:*19*

**administered**
39:*10*
**administrative**
188:*19*
**advance**  65:*7*
199:*9*, *12*, *16*
**advancement**
13:*25*
**advice**  19:*18*
**advised**  18:*6*, *10*,
*22*  19:*6*, *19*  32:*1*
156:*9*
**advising**  19:*4*
**advisory**  14:*7*
**AES**  20:*16*, *19*
21:*18*, *23*, *25*
**Affairs**  23:*5*
85:*12*
**affidavits**  66:*23*
**aforesaid**  210:*10*
**agencies**  73:*13*
162:*16*
**agency**  84:*6*, *18*,
*20*  85:*19*  87:*25*
88:*1*  95:*19*  96:*23*
162:*7*  163:*21*, *24*
164:*17*, *22*, *25*
165:*11*  191:*25*
**agency's**  165:*2*
**aggregate**  75:*10*
**ago**  8:*7*  16:*5*, *10*
54:*6*  87:*24*
131:*18*
**agree**  9:*2*  13:*5*, *7*,
*9*  24:*24*  45:*5*
59:*6*  143:*5*
149:*16*  151:*8*
152:*14*, *17*  153:*1*,
*4*, *6*, *18*, *25*  162:*1*
**agreed**  114:*13*
**agreement**  4:*4*
10:*1*  45:*12*  48:*25*
117:*12*, *13*, *14*
143:*1*, *17*  164:*14*
175:*12*  189:*15*, *16*
**agreements**  20:*6*
29:*20*  64:*6*  65:*8*
88:*24*  114:*12*
118:*9*  137:*1*, *3*

145:*3*  148:*16*
151:*17*  165:*11*
**ahead**  6:*20*  55:*5*
56:*19*  60:*8*  74:*15*
88:*11*  102:*12*
125:*6*  127:*11*
132:*20*
**al**  208:*25*
**Albuquerque**  2:*11*
**allegation**  149:*12*
150:*23*
**Allotment**  11:*9*
38:*13*
**allowances**  200:*14*
**ALTA**  41:*10*
43:*15*  113:*15*
179:*6*  193:*20*, *23*
194:*14*, *22*  195:*1*,
*3*, *8*
**alternative**  197:*2*,
*12*  198:*17*  199:*17*
203:*6*, *7*
**alternatives**  70:*1*,
*5*  83:*24*  139:*8*
197:*8*  198:*25*
**ambiguity**  34:*21*
46:*12*  99:*1*, *25*
100:*15*
**amendments**
11:*10*  38:*14*
**AMERICA**  1:*2*,
*11*  5:*4*  6:*2*  21:*4*
119:*12*  127:*17*
**amount**  43:*25*
44:*8*  95:*9*  99:*25*
147:*24*  148:*1*, *3*
151:*4*  180:*25*
195:*1*
**analysis**  39:*19*
58:*9*  75:*9*  117:*8*
169:*11*
**and/in**  101:*2*
**Andrew**  183:*16*
**anomaly**  109:*15*
**answer**  91:*1*
112:*18*  125:*7*
138:*1*  139:*15*
145:*21*  160:*23*

205:*16*, *18*  206:*7*
**answered**  206:*14*
**answering**  140:*11*
**anticipate**  94:*1*, *4*,
*13*, *20*  95:*16*, *21*
101:*19*
**anticipated**  35:*12*
47:*11*  98:*20*
138:*22*  161:*15*
**anticipation**  94:*15*
**Anyway**  143:*12*
**anyways**  165:*1*
**apart**  6:*7*
**apologies**  38:*18*
60:*19*  61:*2*  85:*5*
**apologize**  25:*3*
33:*25*  74:*16*
**appear**  59:*10*
162:*15*
**APPEARANCES**
1:*17*  2:*1*  5:*11*
**appeared**  198:*5*
201:*23*
**appears**  15:*13*
184:*18*  192:*20*
202:*21*  203:*3*
**appendices**  9:*23*,
*24*
**Appendix**  14:*24*
15:*1*, *2*, *4*  24:*21*
30:*15*, *25*  31:*4*, *21*,
*25*  36:*23*  37:*1*, *3*,
*12*  192:*18*, *19*, *20*
193:*2*
**applicable**  153:*9*
154:*4*
**applied**  45:*16*
127:*23*
**apply**  88:*19*
96:*18*, *20*  152:*2*
**appreciate**  110:*5*
**apprisal**  59:*15*, *18*
**apprise**  167:*9*
**apprised**  59:*17*
83:*19*  84:*3*  85:*22*
87:*8*, *9*, *13*  89:*10*,
*13*  90:*11*, *21*  91:*2*,
*7*, *18*, *20*  92:*2*, *8*,
*10*, *13*, *16*  93:*20*

113:*23*   139:*3*
196:*11*
**approach** 164:*21*
**appropriate** 66:*6,*
*8*   67:*4*
**approval** 32:*2*
134:*6, 10, 15*
**approved** 134:*9*
**approximately**
111:*15*   132:*23*
**April** 108:*17*
**arching** 113:*20*
**area** 13:*24*   30:*14*
49:*6*   132:*2*
133:*16*   135:*11, 15*
136:*5*   152:*11*
153:*12*   157:*18*
202:*19*
**areas** 139:*11, 20*
140:*4*
**arises** 41:*9*
**Arizona** 170:*5*
181:*1*
**arrangement**
28:*15*
**arrive** 119:*25*
**arrives** 102:*10*
**As-built** 193:*18,*
*20, 22*   194:*8*
**as-builts** 194:*14,*
*22*   195:*1*
**ascertain** 162:*24*
**Ashworth** 1:*19*
3:*4*   5:*18*   92:*22*
93:*3, 11*   101:*16,*
*17*   102:*11, 14, 16,*
*19*   103:*9*   108:*9,*
*12*   110:*7, 12, 15,*
*20, 22*   111:*11*
119:*4*   120:*5, 9*
123:*25*   124:*7, 9*
125:*6, 11, 14*
126:*1, 13*   127:*2,*
*10*   128:*25*   131:*1*
136:*16*   137:*20*
138:*6, 10*   139:*18*
140:*12, 19, 21, 24*
141:*12*   143:*11*
145:*19*   146:*25*

147:*1, 3*   148:*10*
149:*9*   155:*9*
156:*16, 24*   157:*9,*
*21*   158:*7, 11*
160:*3, 21*   161:*12*
163:*4, 9*   164:*24*
167:*4, 12*   168:*13*
171:*5, 17*   176:*25*
181:*13*   183:*1, 4*
185:*8, 24*   187:*15*
188:*12*   189:*18*
190:*1*   191:*13*
192:*11*   196:*20*
197:*10*   198:*14*
201:*7, 17*   203:*11*
205:*5, 17*   206:*16,*
*21*   207:*8*
**aside** 200:*4*
202:*18*
**asked** 32:*13*
36:*12*   37:*25*
45:*24*   86:*18*
126:*15*   138:*18*
139:*15*   141:*1, 6*
142:*11*   158:*15*
160:*7*   161:*4*
162:*12*   191:*17, 19*
**asking** 6:*18*   7:*3*
29:*8*   81:*16, 25*
90:*16*   96:*2*   101:*1*
121:*11, 12, 13*
122:*1*   160:*8*
198:*22*   202:*4*
205:*5*   206:*4*
**aspect** 136:*23*
**aspects** 113:*12*
**assemble** 112:*15*
**assert** 58:*11*   90:*2*
**asserting** 125:*17*
**assertion** 67:*25*
**assessed** 93:*22*
**assessment** 45:*15*
**asset** 39:*16*
**assets** 112:*14, 15*
**assigned** 47:*13*
**assisted** 103:*20*
**assisting** 104:*11*
**associated** 21:*9*
155:*20*   156:*11*

**assume** 79:*16*
121:*17, 19*   144:*5*
181:*24*
**assumed** 53:*19*
**assumption** 52:*15*
55:*13*   65:*19*   78:*9*
**assumptions** 37:*20*
**attached** 75:*9*
177:*13*
**attempted** 127:*23*
**attention** 15:*2*
22:*22*
**attorney** 5:*20*
33:*13*   34:*17*
39:*22*   101:*17*
131:*25*   143:*7*
153:*11*   210:*14*
**attorney-client**
125:*2, 9, 12*
**attorneys** 17:*19*
33:*6*   43:*14*   89:*23*
153:*15*
**ATTORNEY'S**
1:*20*   5:*19, 21, 23*
101:*18*   125:*20*
**August** 201:*24*
**authoritative**
119:*5*
**authority** 130:*2*
188:*20*
**availability** 27:*1,*
*19*
**available** 199:*23*
**Avenue** 2:*4, 14*
**aware** 36:*18*
39:*12, 17, 19, 25*
40:*3*   58:*17, 21*
59:*4*   60:*1, 5*
63:*12*   64:*23*   69:*3,*
*5*   72:*4, 9, 23, 25*
82:*15*   91:*10*
97:*17, 21, 23*   98:*2,*
*6, 7*   124:*19*
127:*19*   151:*2*
196:*23*   205:*8, 12*

**< B >**
**back** 25:*11*   26:*4*
30:*20*   36:*19*

38:*17*   52:*24*
53:*12*   60:*11, 16*
61:*8, 25*   67:*24*
68:*4*   69:*1*   73:*21*
75:*12*   79:*9*   83:*13*
87:*3, 18*   88:*12, 18*
93:*5, 15*   94:*18*
99:*23*   100:*13, 25*
124:*9*   134:*2*
145:*7*   159:*15*
161:*8, 10*   164:*9,*
*19, 23, 25*   168:*14*
169:*7, 17*   171:*2*
172:*7*   177:*7*
178:*10, 22*   179:*2,*
*3, 8*   183:*13*
190:*11*   192:*11*
193:*3, 5*
**back-and-forth**
23:*23*
**backfill** 202:*11*
**backfilling** 202:*12*
**background** 15:*5*
119:*9*   142:*6*
181:*16*   182:*4, 5, 9,*
*10, 15*
**backtrack** 98:*3*
**bank** 84:*6*
164:*11, 18*
**BARNETT** 2:*13*
**base** 121:*25*
148:*10*
**based** 13:*24*
26:*18*   34:*13*
43:*11*   44:*13, 20*
45:*7*   54:*11*   67:*17,*
*21*   94:*7, 8, 23*
129:*11*   142:*5*
145:*8*   147:*12*
148:*5, 11, 13, 17,*
*23*   150:*8*   151:*12*
156:*16, 22, 24*
157:*6*   158:*3, 5, 13,*
*15*   171:*22*   179:*12*
198:*9*   201:*22*
202:*20*   203:*2*
204:*3*

basically  16:*13*, *19*  34:*9*  112:*9*  116:*6*

basing  151:*11*, *15*

basis  13:*9*, *11*, *16*, *17*  28:*3*, *21*  54:*2*, *13*  86:*12*  121:*8*, *18*  122:*19*  123:*6*  141:*20*  143:*3*, *16*, *24*  145:*1*, *6*, *17*  146:*17*, *21*, *23*  150:*13*, *14*  179:*21*  202:*25*  205:*10*

Bates  57:*12*  58:*6*  71:*6*  74:*9*  85:*6*  89:*25*

bathroom  7:*17*

Bay  13:*24*

bearing  33:*18*, *21*

began  157:*12*

BEGINNING  1:*15*  33:*14*  52:*20*  149:*19*  155:*4*  156:*19*  187:*5*

BEHALF  1:*14*, *18*  2:*2*, *6*  5:*2*, *18*, *25*  32:*1*  155:*7*

belief  128:*14*, *16*  156:*9*

believe  14:*21*  38:*1*  39:*6*  50:*23*  54:*22*  56:*20*  62:*24*  71:*8*  74:*4*, *14*  80:*9*  81:*11*  85:*2*  102:*20*, *22*  110:*10*  116:*1*, *20*  122:*5*  128:*1*  132:*14*  143:*13*, *15*, *21*  145:*23*  150:*8*  156:*18*, *25*  157:*9*  158:*16*, *23*  159:*18*  160:*11*, *23*  164:*4*  165:*6*, *7*  172:*2*  174:*20*  175:*11*  178:*6*, *7*, *14*  179:*19*  182:*6*, *23*  183:*9*, *17*  184:*5*  185:*13*, *19*  186:*9*  187:*2*, *18*  189:*11*

194:*22*  197:*1*  201:*12*  202:*3*, *8*

benefit  28:*12*  30:*9*  56:*7*  57:*11*  100:*24*

best  39:*10*  151:*25*  152:*2*, *8*, *14*  154:*17*  156:*10*  210:*10*

better  123:*12*  204:*16*

bevy  97:*11*

beyond  46:*19*

BIA  23:*1*, *4*, *9*, *13*, *16*, *24*  24:*10*  31:*16*  85:*11*  132:*5*  134:*4*, *6*, *10*, *15*  182:*24*

bifurcated  25:*8*, *15*

bifurcation  41:*2*

big  30:*9*  106:*9*  120:*21*, *22*, *25*  121:*9*  203:*21*

Bill  57:*18*  89:*23*

bit  13:*20*  15:*7*  16:*25*  21:*3*  62:*25*  86:*23*  99:*20*  108:*9*  109:*15*  132:*4*  150:*5*  160:*22*  191:*23*

Blake  2:*3*  5:*17*

blanche  96:*14*

BLM  175:*13*

board  109:*7*  151:*7*  152:*3*  159:*14*

bodes  206:*12*

boots  113:*16*

Boston  2:*4*, *14*

bottom  138:*15*, *17*

boundaries  113:*25*

box  47:*9*  83:*3*

Boyce  183:*18*  184:*15*

break  7:*14*, *17*  57:*2*, *6*  60:*8*, *13*  101:*13*, *24*, *25*  102:*3*, *9*  120:*7*

124:*8*, *10*, *11*, *13*, *20*  126:*14*  192:*8*, *10*, *12*  206:*18*, *23*, *24*

bring  72:*13*  112:*13*  198:*6*, *11*  199:*16*, *24*  200:*15*

bringing  70:*22*  197:*8*  199:*8*

Britney  104:*15*

Brittany  104:*14*

broad  160:*18*, *22*  163:*12*

broker  15:*15*

brought  47:*6*  70:*25*  133:*15*, *17*, *18*  197:*24*  200:*4*

build  28:*9*, *12*  84:*24*

building  84:*8*, *20*

built  128:*23*

bullet  202:*9*

Burbank  71:*15*

burden  163:*4*, *15*

Bureau  23:*4*  85:*11*

buried  174:*14*

business  16:*2*  29:*21*  42:*4*, *7*  109:*14*  122:*12*  123:*21*  127:*24*  128:*10*, *22*, *23*, *24*  132:*1*  136:*14*  175:*5*

businesses  109:*12*

busy  114:*16*

buy  76:*7*  78:*21*  79:*22*  80:*25*

buyer  47:*22*

< C >

calculate  13:*17*  147:*16*

calculated  56:*1*  143:*10*, *14*, *16*  203:*4*

calculating  142:*21*

calculation  48:*7*  53:*25*  136:*7*, *18*

138:*3*  141:*18*  142:*7*, *12*, *25*  143:*3*  145:*16*  147:*9*, *12*  150:*13*  151:*9*

calculations  147:*25*

California  7:*1*  15:*15*  131:*20*  170:*5*

call  40:*9*  127:*5*

called  174:*10*  201:*25*

calling  168:*5*

capacity  31:*7*, *8*  140:*13*

career  14:*3*

carry  110:*25*

carte  96:*13*

Case  1:*2*  5:*5*, *7*  7:*7*  8:*3*, *6*, *8*  26:*7*  32:*6*, *20*  34:*16*  35:*16*  36:*9*, *15*  40:*2*  47:*7*  48:*24*  49:*22*  50:*22*  51:*21*  53:*18*, *21*  54:*25*  55:*13*  57:*25*  60:*1*  64:*21*, *23*  65:*12*, *20*  67:*16*  68:*9*  82:*17*  87:*12*  88:*15*  97:*15*  98:*10*  99:*5*  100:*10*  103:*16*  104:*20*  115:*25*  118:*23*  119:*1*, *5*  133:*22*, *25*  136:*23*  138:*12*  141:*25*  144:*5*, *7*  145:*12*  147:*18*  149:*11*  150:*19*, *25*  151:*14*, *18*  162:*2*, *20*  176:*11*  177:*15*  190:*20*  198:*18*  203:*24*  210:*9*

case-by-case  205:*10*

cases  21:*3*  28:*6*  31:*14*  48:*24*  52:*9*  66:*16*, *19*  96:*19*

164:*11*  172:*12, 15*
176:*13*  177:*16*
200:*10*
**Cathryn**  1:*19*
**Cathy**  5:*20*
**cattle**  77:*16*
**cause**  95:*20*
119:*18*  126:*16*
**caused**  182:*6*
**caution**  75:*10*
**CENTERA**  1:*14*
4:*3*  5:*2*  6:*6, 11,*
*17, 22*  16:*8*  57:*21*
60:*18*  62:*15*
74:*11*  85:*13*
101:*16*  102:*19*
103:*9, 12*  105:*11*
108:*12, 14*  120:*9*
127:*10*  171:*17, 19*
208:*6, 15*  209:*2*
**C-e-n-t-e-r-a**  6:*23*
**central**  60:*12*
**CEO**  105:*11*
184:*16*
**certain**  28:*20*
32:*21*  33:*1*  64:*2*
74:*24*  92:*15*  97:*9*
113:*3*  148:*14*
175:*15*  180:*25*
187:*16*  201:*24*
**Certainly**  46:*14*
49:*11*  56:*7*  63:*22*
70:*5*  78:*2*  86:*1,*
*11*  87:*17, 19, 23*
88:*20*  99:*8*
100:*19*  101:*12*
114:*7*  117:*5*
121:*24*  123:*2*
130:*6*  153:*12*
165:*17*
**certainty**  94:*14, 16*
**certificate**  131:*6*
210:*1*
**Certified**  4:*6*
210:*5*
**certify**  210:*7*
**CFR**  10:*19, 22*
38:*6, 10*  183:*24*

195:*18*
**chain**  74:*10*
**chairman**  183:*17*
**challenge**  48:*3*
**chance**  59:*21*
71:*16*  92:*3*
**CHANDLER**  2:*13*
**change**  16:*7, 8*
61:*16*  113:*19*
126:*17*  185:*6*
192:*13*  201:*15, 18,*
*22*  202:*2, 6, 20, 25*
**changed**  16:*5, 10*
**changes**  124:*15*
**Chapter**  195:*18*
**checklist**  56:*12*
**Chistina**  5:*22*
**choose**  200:*20*
**chose**  200:*21*
**Christina**  2:*18*
**Circuit**  9:*21*  26:*1*
32:*23*  33:*20*
34:*15*  35:*2*  44:*1,*
*10*  45:*18, 19*  46:*8*
68:*17*  78:*4*  87:*17*
92:*11*  99:*21*
144:*4*  146:*18*
156:*17*
**Circuit's**  32:*19*
34:*14*  35:*15*
46:*25*  62:*21*  63:*1,*
*4*  67:*22*  92:*16*
**circumstances**
119:*1*
**cited**  182:*1*
**Civil**  4:*5*
**clarification**
61:*21, 24*
**clarify**  83:*9*
**clarity**  78:*2*
87:*19*  95:*13*
98:*23*  100:*2*
162:*2, 12, 15*
163:*1, 5, 14*
166:*16*  190:*9, 23*
191:*5*
**classify**  50:*15*
106:*1*
**clay**  71:*25*

**clear**  53:*17*  63:*14,*
*17*  84:*14, 16*
87:*16*  88:*7*  89:*3*
99:*7*  100:*4*  101:*4*
111:*24*  162:*4*
181:*17*  186:*2*
187:*16, 18*  188:*8*
**clearly**  83:*19*
84:*3*  85:*22*  89:*9,*
*10, 13*  90:*11, 21*
91:*2, 7, 17, 20*
92:*2, 8, 10, 12, 16*
93:*20*  100:*5, 14*
127:*6*  139:*3*
190:*18*
**client**  18:*6*  23:*17*
24:*13*  31:*25*
44:*25*  56:*6*
112:*20*  121:*24*
**clients**  17:*3, 11,*
*21*  18:*15*  41:*10*
106:*2, 4, 23*
128:*22*  155:*7, 10,*
*16*  180:*22*  206:*5*
**close**  44:*17*  151:*3*
**closed**  108:*17*
**closely**  42:*14*
**co-counsel**  206:*19*
**collaboration**  52:*4*
**colleague**  5:*16*
**collectively**  119:*16*
**come**  20:*2*  24:*1*
28:*11*  30:*13*
40:*11*  48:*4*  56:*13,*
*16, 17*  60:*11*  64:*7*
77:*19*  88:*18*
94:*21*  95:*25*
97:*11*  100:*11, 16*
120:*1*  136:*12, 24,*
*25*  147:*9*  149:*24*
150:*20*  164:*19, 23,*
*25*  168:*13*  175:*1*
177:*10*
**comes**  20:*8*  79:*9*
96:*3*  112:*3*
118:*11*  136:*13*
151:*10*  153:*14*
175:*7, 8*

**comfortable**  7:*15*
118:*14*
**coming**  84:*17*
102:*6*  148:*23*
**command**  129:*13,*
*14*
**commenced**  54:*21*
55:*9*
**commencement**
59:*7*  74:*21*
**commencing**
81:*12*  83:*20*
139:*4*
**comment**  59:*23*
70:*14*  75:*23*
79:*11*  87:*22*  89:*1*
91:*4*  141:*1, 6*
157:*15, 16, 23*
158:*2, 20, 23*
159:*17, 24*  160:*1,*
*4*  161:*4*  198:*4*
203:*1*
**commenting**
53:*24*  54:*1, 10*
82:*25*
**comments**  140:*14*
141:*13*
**commercial**  76:*10*
78:*25*  81:*23*
**Commission**
208:*23*
**committed**  32:*8*
**common**  48:*22*
49:*14, 19*  52:*12*
75:*14*
**communicate**
53:*20*
**communication**
60:*2*  74:*13*
**communications**
125:*19, 24*  126:*4*
**comp**  151:*6*
**companies**  43:*15*
106:*22*  107:*16*
109:*6, 17*  112:*3, 7*
121:*2*  122:*3, 7*
123:*17, 21*
**company**  16:*2, 5,*
*6, 13, 16, 17*  17:*2*

**Professional Reporters**
800.376.1006
www.proreporters.com

20:*24*  103:2, *6*
109:*21*  116:*6*
121:*6, 12*  123:*3*
129:*23*  130:*5*
133:5, *12*
**comparable**
143:*20*  144:*22*
**compare**  68:*5*
109:*9*
**comparing**  67:*24*
**compensa**  143:*9*
**compensate**  144:*9,
15*  145:*25*  147:*14*
**compensation**
13:*12, 14, 17*
26:*10, 14, 16*  27:*7*
28:*7, 16, 25*  29:*3,
6*  32:*16*  44:*20*
45:*6*  46:*2, 3*
49:*17*  50:*14, 15*
51:*4, 10*  53:*25*
54:*12*  55:*25*  68:*1*
82:*24*  137:*9, 11,
17, 21, 22*  142:*19,
21*  143:*2, 4, 10, 25*
145:*8*  146:*10*
147:*20*  150:*10, 15,
17*  151:*9*
**complete**  9:*23*
23:*20*  37:*3*  177:*6*
**completely**  29:*17*
187:*19*  191:*1*
**compliance**  64:*8*
153:*7, 15, 17, 19*
154:*2*
**comply**  73:*15*
**compositive**  136:*3*
**comprehensive**
152:*16*
**comprised**  109:*22*
**comprises**  194:*5*
**computer's**  183:*2*
**conceivably**  86:*3*
**concerned**  118:*2*
198:*21*
**concerns**  77:*7*
79:*10*

**conclude**  81:*2*
181:*19*  182:*7*
184:*9*  185:*15*
**concluded**  34:*15*
94:*11*  184:*24*
207:*12*
**conclusion**  35:*22*
77:*4, 12*  186:*16*
204:*3*
**conclusive**  185:*10,
13*  186:*20*  187:*2*
**condition**  15:*18*
**conditions**  44:*13*
45:*8*  49:*3*  186:*7*
**conduct**  152:*16*
**conducted**  39:*18*
148:*9*
**confer**  206:*18*
**confined**  60:*22*
62:*9*
**conflict**  41:*7*
99:*13, 20*
**confused**  27:*2*
191:*24*
**confusing**  150:*5*
**confusion**  119:*18*
141:*8*
**congratulations**
129:*6*
**Congress**  47:*13*
**congressional**  39:*8*
**connection**  8:*9, 10*
17:*5, 15*  32:*15*
40:*11*  61:*13*
**consider**  48:*13*
61:*15*  65:*14*  89:*6*
92:*2*  124:*14*
131:*22*  135:*11*
138:*2*  152:*7*
154:*16*
**considered**  37:*13,
17, 21*  70:*18*
196:*14*  197:*1*
199:*1*
**constitute**  59:*1,
15, 18*  73:*4*  76:*11*
77:*21, 25*  78:*25*
79:*3*  80:*10*  81:*15*
82:*9*  85:*21*  90:*22*

**constituted**  34:*23*
40:*21*  63:*8*
146:*20*
**constitutes**  58:*15*
90:*7*  94:*10*  143:*6*
**construct**  58:*13*
90:*4*
**constructing**  72:*7*
198:*20*  203:*25*
**construction**  17:*6*
32:*2*  35:*20*  47:*4,
5*  52:*23*  54:*18, 21,
23*  55:*3, 9*  58:*14,
24, 25*  59:*8, 11*
63:*20*  64:*1, 8*
65:*7, 10, 25*  66:*2*
67:*13, 17*  68:*14,
22*  70:*24*  72:*5*
73:*1*  74:*22, 25*
77:*9*  81:*12*  83:*20,
25*  86:*4*  88:*9, 11*
90:*6*  94:*2*  105:*14*
112:*25*  113:*4, 8,
10, 13, 15, 18*
114:*4, 8, 15, 17, 19,
22, 24*  115:*4, 6, 9,
16*  138:*24*  139:*4,
10*  148:*8*  150:*24*
154:*23*  155:*4*
156:*19*  157:*12*
159:*20*  160:*13, 25*
161:*17*  185:*18*
186:*11*  194:*1, 10,
11*  196:*13*  198:*9*
201:*2, 4, 5*
**consult**  16:*21*
84:*19*  170:*2*
179:*24*
**consulted**  69:*4*
**consulting**  16:*2*
105:*12, 24*  106:*18*
107:*2, 7*  111:*22*
121:*16*  155:*24*
**consults**  112:*2*
**contact**  84:*19*
**contained**  194:*14*
**contemplated**
13:*15*

**contents**  59:*4*
141:*2*  167:*16*
**context**  91:*4*  96:*8*
189:*4*
**continue**  69:*15*
81:*21*  90:*16*
126:*7*  132:*13*
**Continued**  2:*1*
**continuing**  85:*23*
**contract**  128:*18*
**contracted**  199:*10,
16*
**contractor**  113:*10*
202:*4*
**contradictory**
186:*23*
**control**  18:*14*
21:*2*  22:*6*  24:*4*
76:*21, 24*  98:*6*
133:*25*  134:*13, 16*
169:*10*  200:*13*
**controlled**  134:*22*
**conversation**  48:*5*
51:*8*  52:*12*  88:*12,
21*  96:*17*
**conversations**
27:*17*  51:*18*  86:*6*
99:*17*
**convey**  80:*8*
**coordinate**  113:*20*
**coordinating**
113:*14*
**coordination**
114:*13*
**copy**  9:*18, 20, 21*
25:*4*  173:*24*
**Corporate**  131:*24*
**Corporation**
20:*16, 19*  21:*19,
24*
**Correct**  8:*15*
14:*22*  15:*13*
20:*13, 14*  22:*11*
23:*2*  24:*25*  25:*2,
23*  27:*10*  31:*1, 2*
32:*20*  34:*12*
35:*16*  36:*17*
38:*23*  39:*2*  43:*6,
7, 20, 22*  52:*17*

53:22  55:11, 13,
17, 20  57:24
58:19  59:1  60:3
69:7  77:23, 24
80:18, 22  82:21,
23  83:11  89:15
90:11  91:22
92:17  98:4  99:14
100:15  103:17
104:6  105:18, 22
108:19  111:15
112:5, 22, 23
114:19, 20, 25
121:10, 20  129:5,
10  130:8  131:13
132:11, 12  134:18
135:3, 6, 7, 9
138:7, 9  139:13,
24  141:14, 19, 25
142:8, 9, 14
146:13  149:4, 20
151:14  152:5, 24
154:9  157:2, 22
158:7, 21  159:1
169:3  170:23
178:24  179:16, 20,
22  182:2, 3  184:2,
6, 13  194:19
196:3  197:13
208:9
**corrected**  61:18
**corrections**  208:11
**correctly**  105:16
129:2  181:21
202:14
**correlation**  68:7
**correspondence**
53:8  73:20  77:6
79:14  189:8
**corroborated**
127:20
**cost**  204:11
**COUNCIL**  1:2
5:5, 16  26:7  44:9
49:20  50:20
51:11, 23  53:19
58:12  90:4
208:25

**counsel**  5:10  7:4
12:5  17:14  37:16,
20  61:22  122:23
124:21  125:20, 21
**country**  168:17
169:2, 24  170:22
171:8, 24  172:5
173:12, 16, 21
176:9, 14, 15, 21
179:16  180:1, 24
**County**  39:20
40:1  44:15  96:9
143:19, 22  144:23
147:21  148:18
165:20  172:23
173:1  174:18, 23
175:11, 14  178:8,
14, 21  190:4
191:9  199:19
202:12  203:16, 18,
21, 23  208:4
210:4
**couple**  57:5  74:3
**course**  64:3, 7
65:14  72:5  73:1
96:1, 9  137:12
171:4  189:12
**COURT**  1:1  5:6
6:9, 21  7:22
35:10  67:9
100:11  125:15
126:8  142:5, 11
144:4, 13  146:4, 8
147:9  150:9
186:9, 17
**courts**  45:21
46:3, 21
**court's**  144:8
163:7
**coverage**  41:11,
16  116:10
**covered**  68:19
**Craig**  76:2
**Creek**  177:17
178:18  179:13, 17
**criticism**  141:17
**CROSS**  3:4
102:13

**crossing**  64:5
65:7  84:9  88:24
114:12  118:9, 10
145:2  148:15
181:8
**crush**  76:15
**crushed**  61:1
62:12  64:24
68:20  69:1, 2, 6,
15  150:24
**crushing**  34:19,
22  35:24  60:25
62:11  63:7  64:19,
23  65:21  146:19
166:11
**CSR**  1:25  209:3
210:22, 23
**cultivate**  206:5
**curative**  40:9, 10
64:4  66:13  73:10
88:25  118:7
119:9  163:23
189:13
**current**  15:24
16:12  111:3, 6
**currently**  15:14
107:19
**cursor's**  76:4
**customarily**  63:5
143:17
**customary**  45:25
118:7  137:8
144:24  145:17, 24
148:17  190:6
193:24
**customs**  43:5, 9,
20  47:1  141:3
**cut**  93:12
**CV**  15:3  22:22
130:23  177:12

**< D >**
**damages**  68:1
136:7, 18, 24
137:4, 19, 23
138:3  141:18, 24
142:7, 8, 12, 18, 22
143:6  144:8, 22

145:15
**data**  37:17, 19
**date**  67:5  89:21
91:19  105:2
114:5  167:25
186:2  209:4
**dated**  59:7  85:8
**David**  183:18
184:15
**day**  77:18  208:19
210:18
**deal**  123:12
**dealing**  93:19
**dealt**  178:2
**debrief**  100:20
159:13
**debt**  17:5  114:2
**decide**  33:7  44:7
149:15
**decided**  34:15, 18,
21  35:2  203:6
**decision**  11:19
32:20, 24  33:5
34:14  46:25
52:21  62:21  63:2
64:14  92:11, 17
201:10  203:4
**decision-maker**
11:21
**declaring**  163:20
**defendant**  127:1
179:24
**Defendants**  1:12
2:6  6:1, 3  26:2, 6
32:7  43:25  44:8
49:20  51:24
53:20  55:15
58:22  60:1  64:22
65:20  68:25
70:18  72:6, 17
76:13  80:1, 14, 20
81:2, 11  82:18
83:10  85:21
86:14, 17  87:8, 13
89:10, 24  91:6, 20
92:10, 15  98:12
119:11, 17, 20
124:21  126:11
144:6, 9, 13  167:6,

21 185:20 186:9,
10 197:11 199:1
200:18 203:4
205:11 206:19, 25
**define** 43:10
**definitely** 24:17
129:11 151:18
**definition** 33:2
43:8 62:22 63:4,
5 67:22 68:18
82:3 84:3 94:4
**delicate** 46:17
**delivered** 124:12
**demonstrate** 76:13
**Department** 85:11
**depending** 48:15
114:3, 18
**depends** 27:23
41:17 49:10
95:22, 23, 24
96:21 113:4, 6
170:17
**depicts** 194:4
**deposed** 8:12
**deposes** 6:12
**DEPOSITION**
1:14 4:2 5:2
7:20 8:1, 5, 10, 24
9:4 11:25 12:6,
12, 16, 20 13:2
14:20 61:14 71:9
90:15 102:22
105:5 119:16
126:2 127:15
135:5 150:15
201:13 207:2, 12
208:8 209:2, 4
**describe** 23:7
**design** 42:21
113:22
**desire** 128:12
**despite** 80:19
**details** 39:25
67:15 123:24
**determination**
116:23 136:2
**determine** 43:24
136:1 152:22
153:3 161:23

163:16 173:15
174:6 179:25
188:20 191:4
206:19
**determined** 202:1
**determining**
13:11 116:16
**develop** 48:1
78:12 120:11
**developed** 111:14
165:17 177:20
180:15
**developer** 63:11,
15 64:17 65:20
79:25 83:19, 23
94:1 98:19
100:18 133:6, 8
138:21 139:3, 7
152:9, 15, 20
161:14, 21 166:15
187:20 188:13, 16,
18 189:22 191:3
196:11 204:20, 21
**developers** 16:22
205:2, 9, 12, 21
**developer's** 47:10
56:4
**developing** 76:8
78:22 79:23
**development**
18:13, 14 21:17
24:5 45:14 51:17
78:8 105:13
108:15 141:4
146:12 149:2, 17,
19 165:18, 19
169:14, 15, 22
170:21 171:7
175:15 179:15
180:9, 15 181:3, 4
182:12
**developments**
199:22
**devices** 8:23
**Diego** 7:1 131:6,
21 169:16
**differ** 48:15
**different** 16:17,
21 17:12, 13

19:12, 25 23:18
24:22 28:5 30:11
36:5 41:19 42:24
43:16 48:19, 24
49:11 50:8, 12
51:8 54:7, 8
55:22 56:12 63:3,
4, 23 64:7 65:9
66:15 67:15 71:1
77:18 92:4 96:12
114:5, 12 115:23
116:7 118:19
122:3 123:16, 20,
24 132:1 135:18
143:23 145:2, 8, 9
151:18 155:19
160:9 161:6
170:3 175:18, 22
189:8 203:12
**different/different**
64:5
**differently** 142:23
159:16
**difficult** 48:1
69:20 83:4 92:7
95:8 118:4 122:1
**diligence** 17:20
18:1 56:11 82:4,
5, 9, 13, 18, 25
83:2, 11 92:3
93:25 94:22
96:16 99:23
112:17 152:16, 19
153:2, 7, 14, 19, 23
154:1, 9, 12, 18, 22
155:6, 10, 16
156:1, 19 157:1,
11, 17, 24 158:3,
13, 17 159:21
160:15 161:1, 23
162:14, 19, 21, 25
168:4 174:10
187:25
**diligent** 99:23
**DIRECT** 3:3
6:14 28:16 125:3
**directed** 33:6
125:8

**directing** 125:23
**directly** 31:16
**director** 129:3
**dirt** 76:25
**disagree** 45:18, 21
143:9 202:23
**disagreeing**
142:19, 24 144:1
**disagreement**
142:18
**disagrees** 188:16
**disclosed** 123:18
147:10
**disconnect** 44:22
**discourse** 190:13
**discover** 152:21
**discuss** 12:11
38:21 89:9
125:24
**discussed** 89:24
124:25 126:16
**discusses** 43:4
**discussing** 98:13
**discussion** 41:14
97:14 102:18
103:8 111:10
130:25 140:20, 23
162:5, 6 171:16
172:6 181:12
182:25 183:3
201:16
**discussions** 69:10
**disposal** 202:10
**dispute** 46:22
**DISTRICT** 1:1, 2
5:6, 7
**diversification**
122:8
**division** 20:24
**document** 57:8,
10, 21 58:1, 6
60:7 71:10, 11
73:12 74:12 82:2
84:15 85:14
90:14 116:10
129:16 182:23
192:4
**documentation**
17:8 51:21 73:24

81:5  84:12, 21, 23
88:14, 22  91:11
93:23  95:9  96:10
118:20  143:20, 22
165:7, 23  166:21
175:8
**documents**  7:6
9:10, 14  12:15
36:24  37:3, 11, 24
39:1, 7, 14  61:10,
13, 21  73:14  74:4
76:21  90:17
98:11  114:2
118:8  147:21
148:15  160:19
162:22  166:2
174:14  190:5
192:21  193:1, 10,
11, 13, 17, 19
**doing**  17:25
30:10  35:7  56:15
67:23  100:20
104:9  109:11
117:3  127:2, 3
133:12, 23  154:1,
12  155:16  165:5
180:6  206:9
**dollars**  206:2
**domain**  180:20, 21
**Dominic**  2:9  6:4
**door**  169:17
**drafting**  55:12
62:21  104:4, 5, 6
**draw**  22:22  204:3
**drawing**  67:20
**drilling**  27:23
**due**  17:20, 25
56:11  82:4, 5, 9,
13, 18, 25  83:2, 11
92:3  94:22  96:16
99:23  112:17
152:16, 19  153:1,
7, 14, 19, 22  154:1,
8, 12, 18, 22  155:6,
9, 16  156:1, 18
157:1, 11, 17, 23
158:3, 13, 17
159:21  160:15
161:1, 23  162:13,

19, 20, 25  168:4
174:10  187:24
**duly**  6:12  210:8
**duties**  39:15

< E >
**earlier**  55:23
56:8  61:9  62:25
69:23  81:10  87:2
89:24  111:17, 21,
24  117:10  123:7
132:4  135:4
144:3  165:4
196:7, 9
**early**  18:13, 14
23:14  52:3, 18, 24
53:7, 11, 15, 21
63:16  64:13  65:4,
5  69:21  73:20
86:6  164:3  169:9
170:16  176:1
177:22
**easement**  84:10
113:24
**easements**  49:9
**easier**  118:13
204:23
**easiest**  173:22
**easy**  48:2  175:3
**eat**  101:10, 13
102:9
**education**  14:4
**effective**  83:23
139:7
**EGPNA**  75:3, 5
85:9
**eight**  6:7
**either**  7:8  31:15
116:9  125:16
151:6  184:25
**electronic**  8:23
**email**  74:10  75:1,
6  76:1, 2  80:20
81:14  128:7
**e-mail**  78:15
**emailing**  86:15
**emails**  74:19
128:4, 6

**employ**  44:7
**employee**  127:15
**employees**  107:18,
24  126:21  129:19
**employer**  8:7
**encountered**  201:6
**encourage**  14:3
**ended**  23:17
**ends**  126:2
**ENEL**  1:10  6:2
119:11, 12, 17, 19,
22  120:10  121:9,
13  122:5, 9
123:23  126:21, 25
127:14, 16, 17, 21,
24  128:10, 17, 19
130:7, 19  154:21
155:3, 24  156:6, 9,
18  157:10  158:2,
12, 16, 23  159:18
160:11, 24  161:10,
22
**energy**  16:23
17:4  43:5  48:16
58:11  83:18, 22
90:2  105:15, 25
106:18  107:4, 8
108:15, 22  111:24
112:4  115:5, 16
116:18  117:18
120:23  121:2, 6,
17  139:2  141:21
144:24  145:9, 10
146:12  152:9, 15
156:12  195:22
204:21
**enforce**  122:25
**engage**  83:21
139:5
**engineer**  115:11
**Englestrand**
131:10
**Engstrand**  22:11
**enormous**  95:9
**ensure**  153:8, 16
154:2
**entails**  17:1
**enter**  20:5  181:20

**entered**  23:21
57:13  110:11
134:8
**entering**  20:1, 4
**entire**  32:23
**entirely**  99:7
**entirety**  68:2
82:11  135:2
143:1  185:4
208:8
**entities**  22:25
59:16
**entity**  84:8
164:18  189:14
**EPC**  115:10
**equate**  95:15
116:25
**equity**  17:6
108:16  177:24
**equivalent**  27:8
**ERRATA**  209:1
**especially**  72:12
76:10  78:24
109:12  118:18
170:3
**establish**  21:1
147:19
**established**
181:18  190:4
191:9
**estate**  15:15
18:24  19:7, 17
20:23, 24  21:8
22:5, 19  25:10
27:25  28:1  32:9
39:9, 11, 21, 24
40:3, 5  41:3, 24
42:10, 11, 16
50:22  51:13, 25
58:16  59:1  69:1,
6  72:19  76:15
80:2, 15  81:4
82:20  83:25
87:15  90:8
112:10  114:1
115:8, 18  116:19
117:6  131:16, 23
132:2  133:13, 19
134:20, 23  135:13,

22, 23, 24  136:1
139:9  146:1
147:15  152:10, 13
154:18  155:18, 21
172:14, 24  183:20
estates  25:9
39:20  117:16
135:8
estimate  29:2
105:1  121:8
169:21
et  208:25
eternal  52:6
evaluate  26:21
152:21
event  60:22  62:8
210:15
eventually  52:16
everybody  175:5
everyone's  57:11
175:19
evidence  51:22
81:5, 16  93:24
173:9  175:9
181:18  182:7
184:9, 23  185:15,
17, 20
evidenced  172:16
173:3, 4  174:12
175:17  199:20
exact  104:22
105:2  167:25
exactly  23:11
26:19  30:21  63:2
74:24  80:7  140:2
178:11  200:25
EXAMINATION
3:3, 4  6:14
102:13
examples  19:10
excavate  85:24
excavated  195:2
202:11, 17
excavating  200:2
excavation  58:14,
25  60:25  62:11
83:22  85:17  90:6
139:6
exceptions  116:7

excess  101:20
170:22  176:13
exchange  52:4
84:11  86:24
exchanged  50:18
74:19  95:4
Excuse  36:19
47:19  125:20
151:19
execution  45:12
Exhibit  3:9
14:20, 24  37:1
56:20, 21  57:4, 14
60:17  61:25  71:5,
6  74:5, 6, 8  85:2,
6  87:1  89:21
102:22  110:6, 8,
10, 16, 20  129:17
130:16  182:24
184:5  201:11, 14
EXHIBITS  3:7
7:4
exist  126:3
172:11, 13  184:20
existence  16:3
expect  44:12
45:7  54:12  73:22
95:16, 21  167:19
expectation  44:19
84:13  167:17
204:22
expected  47:9
95:1  155:3
expecting  78:12
121:14
expensive  28:14
202:13, 22  203:8
204:1
experience  13:12,
16, 19  17:17  18:5
20:11, 12  21:15
36:3  41:1  43:12
44:24  45:24  47:4
48:21  54:11
70:25  72:24
76:20  78:6  88:18
94:8, 23  95:18
96:22  106:13, 15
131:23  145:1, 18

146:8, 22  147:12
148:12, 13, 24
149:18  150:8
151:3, 4, 12, 13, 16
152:6, 12  164:17
198:10  201:1
204:20  205:6, 7,
19  206:11
experienced
138:21  191:3
expert  8:12  10:3
14:12, 17  16:20
25:22  26:4  27:7
33:20  35:3, 15
36:8, 9, 14, 22, 25
39:19  43:18, 23
44:6  46:7, 24
47:2  49:18  50:25
51:9, 20  52:14
53:18, 23  55:12
57:25  58:19
59:13, 25  64:20
65:17  67:2, 19
72:16  73:3  76:12
77:20  78:14  79:5
80:13, 19  81:1, 6
83:9, 14, 17  85:20
86:14  87:7, 12
89:7, 8  90:10, 24
91:5, 18, 19  92:9,
14  94:5  98:17
103:16  104:20, 21
111:1, 6  115:3, 9,
14  116:16, 22
118:24  119:4
122:14  125:21
130:21  133:13
135:5, 11, 14, 25
136:5, 7, 15, 17
138:2, 12, 13, 16,
19, 25  139:12, 21,
23  140:2, 4, 7, 14,
18  141:7, 10
142:6, 11  144:12
145:24  146:8
148:11  152:8
154:17  161:14
181:11  184:8, 13
190:25  192:17

expertise  22:24
23:8  30:14
152:11  153:12
experts  17:3
129:20  130:5
144:19  145:14
151:7
Expires  208:23
explain  16:25
117:22, 23
exploration  42:1
explore  28:11
expressing  173:13
extend  90:25
extensive  24:22
extent  27:1  33:10
86:9  123:2  125:2
126:9  135:21
185:5  188:6
extracted  10:8, 14
27:15
extraction  45:1
extraordinary
78:5

< F >
face  96:2, 4
182:14  206:9
facedown  8:21
facilities  199:19
Fact  8:14  34:18
35:4  48:8  53:5
54:17  55:14
56:14  64:11
117:5  121:4
135:18  141:22
142:25  150:21
163:17  166:9
186:19  191:8
203:20
factor  40:5  48:12
50:24, 25  123:4
201:4
factors  28:5  40:7
42:5  46:19  47:25
123:20
facts  37:13, 17, 19
100:17  101:2

119:*1*  151:*14, 18*
**fair**  99:*25*
**falls**  189:*3*
**familiar**  59:*22*
  67:*14*  71:*10, 15,*
  *22, 24*  72:*1, 2*
  74:*12, 17*  75:*4*
  85:*13*  87:*21*
  195:*20*
**familiarity**  26:*15*
  165:*23*  166:*2*
**family**  107:*25*
  108:*1, 3, 5*
**far**  30:*3*  54:*4*
  59:*11*  64:*14*
  70:22  112:22
  122:9  145:*14*
  151:*7*  161:*5*
  198:*20*
**farm**  58:*13*  71:*19*
  72:*5, 8*  74:22
  90:*5*  169:*1*
**farms**  28:9
  168:*15*  176:*14*
**fault**  165:2
**favor**  34:*21*
  46:*12*  99:*2, 4*
  118:*17*
**favorable**  128:*17*
**feasibility**  153:*4*
**Federal**  4:*4*  10:*8,*
  *15*  32:*7*  38:*2*
  73:*13*  183:*20, 23*
  185:*1*  188:*15*
**federally**  11:*1, 6,*
  *14*  50:*1*
**feel**  7:*11, 16*  52:*7*
  78:*5*
**fees**  75:*9*  126:*12*
  143:*2*
**feet**  6:*7*
**fell**  132:*10*
**female-owned**
  109:*12*
**field**  13:*19*  95:*18*
  113:*17, 22*  121:*17*
**figure**  14:*14*
  56:*21*
**FILE**  209:*5*

**filed**  5:*5*  8:*8*
  100:*7*
**fill**  76:*16*  200:*5*
**filled**  190:*11*
**finance**  17:*3*
  40:*12*  112:*6, 11*
  123:22
**financed**  112:*24*
  122:*17, 18*
**financing**  17:*4, 5,*
  *7, 15, 16*  22:*7*
  65:*6*  105:*13*
  108:*17*  109:22
  111:*23*  112:*3, 4, 8,*
  *17, 21*  113:*5, 7*
  116:*8*  117:*17*
  118:*11, 12*  122:22
  180:*19*
**financings**  21:*7*
  43:*13*
**find**  24:*19*  41:*15*
  63:*3*  87:*4*  88:*23*
  93:*21*  107:*11*
  109:*25*  168:*23*
  175:*3, 6*  203:*24*
  204:*9*
**finding**  35:*10, 13,*
  *15, 18*  47:*7*  63:*7*
  64:*18*  93:*24*
  159:*7*
**findings**  13:*5, 8*
**fine**  7:*9*  25:*13*
  60:*10*  82:*1*  83:*8*
  108:*11, 13*  126:*10*
  187:*19*  191:*2*
**finer**  137:*10*
**finish**  120:*5, 6*
**finished**  120:*19*
  179:*10*
**finishing**  174:*20*
**Firm**  5:*25*
  105:*12, 24*  111:22
  121:*16*  131:*19, 20*
  133:*15*
**firms**  107:*3, 8, 13*
**first**  6:*12*  10:*5*
  40:*13*  70:*9*  71:*8*
  87:*24*  88:*6, 15*
  89:*4*  90:*17*  91:*10*

103:*10*  105:*3, 21*
  108:*18*  110:*24*
  129:*9, 21*  138:*20,*
  *24*  172:*10*  181:*14*
  183:*13*  201:*18*
  210:*8*
**fit**  46:*25*
**fits**  50:*11*
**five**  22:*14*
**five-minute**
  101:*23*  192:*8*
  206:*18, 23*
**flag**  42:*8*
**flies**  206:*9*
**flip**  174:*1*
**focus**  17:*19*
  32:*14*  33:*7, 8*
**focused**  33:*1, 4, 6*
  40:*19, 21*  193:*10,*
  *12*
**focuses**  122:*5*
**folks**  101:*10*
**follow**  152:*9*
  156:*10*  190:*15*
**follows**  6:*13*
**follow-up**  145:*20*
**Foote**  177:*17*
  178:*18*  179:*17*
**foreclosures**
  131:*19*
**foregoing**  208:*8*
**forgiveness**
  204:*16, 23*
**forgot**  110:*8*
**form**  10:*7, 10, 13,*
  *16, 19, 21, 24*  11:*4,*
  *8, 13, 18, 22*  19:22
  26:*8*  27:*11*  29:*13*
  32:*3, 10*  33:*9*
  36:*13*  37:*5*  47:*15*
  48:*10*  51:*1*  55:*18*
  58:*2*  59:*2, 9, 18,*
  *19*  60:*4*  69:*8, 18*
  72:*20*  73:*18*
  75:*20*  76:*18*
  81:*19*  82:*14*
  86:*20*  89:*16*
  90:*12*  91:*8, 23*
  98:*21*  116:*8, 9*

119:*2*  121:*21*
  126:*25*  127:*4, 7, 9*
  128:*20*  136:*10, 21*
  138:*5, 8*  139:*14*
  140:*8, 16*  141:*11*
  142:*15*  144:*17*
  146:*14*  147:*17*
  149:*5*  156:*13, 21*
  157:*13*  158:*6, 8*
  159:22  160:*16*
  161:*2, 25*  163:*6,*
  *18*  166:*18*  167:*11,*
  *23*  170:*24*  176:22
  185:*2, 23*  186:*13*
  187:22  188:22
  189:*17, 23*  190:*18,*
  *21*  191:*6*  194:*18,*
  *23*  196:*16*  197:*3*
  198:*2*  199:*3*
  200:*23*  201:*15*
  203:*10*  204:*25*
  205:*14*
**formed**  36:*9*
**formidable**  109:*20*
**forming**  37:*13, 17,*
  *21*  80:*13*  103:*21,*
  *22, 25*
**forms**  21:*11, 13*
  190:*5*
**formula**  142:*20*
**formulate**  81:*6*
**formulating**  23:22
  64:*20*  89:*8*
**Fort**  179:*13*
**forth**  73:*21*
  88:*16*  89:*5*  91:*11*
  145:*10*  146:*17*
  182:*11*
**forward**  51:*7*
  53:*4*  91:*25*  170:*7,*
  *17*  187:*20*
**found**  49:*14, 19*
  144:*6*
**foundation**  56:*15*
  68:*14, 22*  83:22
  139:*6, 10*  148:*2*
**foundations**  35:*8*
  47:*5*  54:*24*  61:*1*
  62:*13*  63:*21, 24*

64:25  67:13
68:20  69:16  71:3
76:16  80:17  84:1
198:20  199:15
founded  16:13
founder  15:21
founding  20:15
four  16:4  22:14
54:24  108:2, 6
Fourth  2:10
202:9
frame  166:1
frames  54:19
framework  47:1
Francesco  85:8
Freas  12:20
free  7:11
frequently  198:12
front  173:24
fruition  24:2
FTI  9:22  32:14
53:24  54:14
55:24  67:24
82:23  139:17, 23
140:7, 10, 13
141:2, 10, 17
142:20  144:2
150:13  182:11
FTI's  141:14
full  6:20  105:10
112:10  208:9
function  28:19
fundamentally
144:1
further  25:15
85:17  184:4
204:9  206:15
future  128:10, 19
207:6

< G >
gain  76:10  78:25
81:23
gas  27:22  66:14
general  13:18
113:9  127:18
132:1  136:18
generalist  131:25

generally  14:1
18:8  48:20  72:3
115:1, 19
geology  136:2
getting  99:14, 15
200:22  202:18
gigawatt  108:16
gigawatts  108:15,
19, 21  109:25
111:15, 19
give  53:9  57:14
74:2  83:5, 6  87:2
97:1  121:8
138:25  139:12
140:2  141:7, 10
161:13  164:12, 13
169:21  171:1
176:17  177:5
183:1  189:21
195:15  205:23
given  7:19  8:1
14:9  24:12
193:23  202:8, 9
208:10
giving  139:21, 22
140:4, 6  141:13
go  6:19  14:25
17:7  25:11  26:20
27:24  30:19
36:23  38:17
52:24  55:5  56:19
57:7  60:8  61:8,
25  68:15  74:1, 15
77:17  78:9  83:13
87:5, 18  88:11, 12
93:21  99:22
102:2, 12  118:15
120:7  125:6
127:11  132:20
142:2, 4  145:7
148:14  159:15
166:7  169:7
170:6  171:2, 25
172:7, 19  175:20
177:6  178:10, 21
179:2, 3, 8  183:13
184:19  188:24
190:10  191:11, 12

193:3, 5  203:5, 23
204:9
goes  63:23  74:10
95:10  170:17
going  7:17  13:18
14:13  15:1  17:19
22:21  24:8, 18
26:20  27:18  28:2,
10  29:16, 22
38:17  40:11, 17
41:13, 15, 19
42:13, 14, 15, 17,
18, 23  43:17
47:25  52:20, 23
56:13, 15, 17, 19,
25  57:9  60:16
62:1  63:18  64:2,
9, 17, 18  65:6
67:13  70:2  71:4
73:8  74:4, 5  76:3
77:11  78:8, 12
79:7, 16, 17, 18
80:9, 10  83:13
84:9  85:1, 2, 4
86:11  88:10, 11,
20  91:13, 15
93:15  94:19, 20,
21  96:15  97:15,
16  98:5  99:3
100:21  101:9, 21,
24  109:10  110:1,
15, 16  111:6
113:19  115:8
117:5, 21, 22, 25
118:3, 6, 17
122:24  123:3, 5,
13, 14  125:1
126:24  129:16, 20
130:21, 22, 23
132:3, 15  134:5
137:5  138:12
141:9  142:4, 10
144:7, 9, 16
145:23  146:7, 9
147:19, 20, 23, 24
149:22, 24  150:2,
9  151:11  159:23
164:2, 7, 10, 12, 13,
15, 20  165:5, 14

166:10, 24, 25
167:2, 17  168:4, 5,
6, 10, 21  169:24
172:10, 12, 17
173:2, 3, 5  174:12,
15  175:2, 9  176:4
177:2  181:10
183:14  186:21
187:5, 13, 24
188:9, 10  190:14
192:7, 17, 19
195:12  196:7
197:6  199:9, 13
201:3, 11, 14
203:22  204:1, 8,
10  205:21
good  5:12  6:16
17:18  60:9
152:23  206:22
Google  174:21
175:2, 5
Googled  107:7
173:15  174:5
Gosh  104:22
127:25
go-to  117:25
government  18:3
governmental
95:19  96:23
graduate  131:2
grant  49:5  51:24
granted  143:18
granting  51:12
Great  6:16  14:19
15:1, 14  60:15
123:25  158:25
GREEN  1:10  6:2
119:11, 17, 19, 23
120:10  121:9
126:21, 25  127:15,
16, 18, 21, 24
128:10, 17, 19
130:8, 19  154:21
155:3, 24  156:6, 9,
18  157:10  158:2,
12, 16, 23  161:22
Green's  159:18
160:11, 24

ground  48:22
49:14, 19  52:12
grounds  58:14
90:5  113:16
group  75:13
164:22
groups  162:16
guards  77:16
guess  24:8  34:3,
20  35:24  42:2
54:15  58:8  67:8
105:5  112:19
126:7, 8  141:8
143:5  144:14
165:10  177:13
191:20  202:16
Guthrie  129:21
GW  108:18

< H >
habit  206:12
half  108:23, 24
111:18
halt  32:1
Hammock  2:18
5:21
hand  25:3  210:18
Hang  34:6
happen  97:14
117:9  123:13
164:2  189:25
200:10
happened  23:19
45:3  68:21  72:11
97:4  113:21
161:8  164:3
165:19, 20  169:17
182:13  186:19
happening  36:4
113:17  190:12
happens  28:4
84:12  96:17, 18
116:11  145:5
154:6, 15  169:15,
19  198:12
happy  83:7
hard  24:15  25:4
51:19  109:10

159:4  203:1
HARRIS  2:10
hat  63:11  64:17
hate  38:18
Hazel  13:3  43:18
141:18  142:8
150:16
Hazel's  25:24
151:3
head  30:23  51:16
80:7  120:20
168:22  179:7
hear  13:19  50:23
72:10, 14  120:3
125:15  133:21
heard  93:7
125:16  195:19
204:15, 18
help  16:25  17:3,
11, 20, 22  49:15
54:19  63:2
103:24  104:3, 4, 7
112:14, 17  133:16
helped  103:20
helpful  194:18
helping  112:7
113:19
helps  110:3
Henrikson  22:11
131:11
Heredia  75:2, 4,
17
hereinbefore
210:13
hereunto  210:17
hidden  190:5, 6
high  42:23  173:6
194:11
highlight  58:8
Hills  178:21
hindsight  100:19
hired  10:13
history  46:15
130:6  131:9
159:6
hit  62:1
hmm  131:7
hold  49:1, 7  71:7
74:2  115:2, 13

116:15  118:23
121:15  136:6, 14,
16
holds  106:17
honest  35:6
205:16
honestly  35:5
44:23  175:4
hopefully  25:5
173:18
hour  56:25
101:20  174:10
192:8
huge  160:18
huh-uh  37:19
38:1  50:4  74:17
97:16
hundreds  160:19
206:2

< I >
i.e  60:24  62:10
idea  44:24
107:14  160:20
168:18  169:20
ideally  64:12
identification  22:6
identified  174:3
identify  9:13
18:9, 15
illegal  48:8
imagine  74:23
imagined  35:21
immediately  182:1
impact  123:21
impacted  35:15
impacts  152:22
import  202:11
important  76:5
77:11  78:19
95:14  122:22
123:9  194:23
importantly  123:5
improvements
42:22  194:2, 4
inappropriate
158:1

inaudible  78:9
120:2  155:7
187:8
include  18:17
107:25  108:1, 3, 5
181:4
included  195:7
includes  18:14
including  22:25
108:16  143:1
183:22
incorrect  78:16, 17
incumbent  165:9
188:17
independently
103:5
in-depth  173:8
INDEX  3:1
Indian  10:14
15:18  23:4  31:9,
10, 11  39:16
85:12  136:8
168:16  169:1, 2,
23  170:8, 21, 22
171:7, 8, 23, 24
172:4, 5  173:12,
13, 16, 20, 21
175:12, 22  176:9,
10, 14, 15, 20, 21
177:18  178:2, 3,
19  179:15, 16, 25
180:24
indicate  108:7
185:14  187:3
indicated  51:22
58:10, 24  90:2
132:9, 14  135:4
163:13  184:21
196:10
indicates  140:3
indicating  188:14
indication  87:24
88:7  91:11
individuals  12:13
24:10
industry  54:3, 11
107:13  109:10
115:3  121:10, 19,
23  128:5  141:4

144:*25*  145:*25*
146:*9, 22*  147:*13*
148:*11, 13, 24*
150:*9*  151:*12*
152:*6*  156:*10*
190:*25*  204:*20*
**inform**  35:*3*
**information**  33:*11*
44:*15*  52:*5*  56:*8*
59:*5, 14*  61:*17*
65:*2*  77:*9*  86:*2, 9,
12, 19*  91:*25*  92:*1,
19*  93:*9*  95:*4, 5*
125:*3, 10*  152:*5*
157:*18*  158:*14*
175:*6*  189:*6*
194:*13*  195:*7*
**informational**
185:*7*
**informed**  32:*7*
64:*14*  89:*13*
95:*17, 19*
**initial**  3:*8*  23:*15*
182:*10*
**initially**  23:*24*
41:*12*
**inspecting**  168:*7*
**instance**  7:*6*  8:*11*
18:*22*  19:*6*  27:*22*
28:*8, 13*  66:*15*
70:*16*  79:*25*
113:*24*  116:*3*
117:*1*  134:*21*
148:*21*  167:*5*
**instances**  19:*16*
29:*9*  97:*3, 17, 23*
114:*23*
**instructed**  11:*20*
**insurance**  118:*5*
**integrity**  128:*23*
206:*10*
**interest**  174:*16,
22*  181:*17*
**interested**  60:*20*
62:*4*  210:*15*
**interesting**  122:*12*
**interests**  39:*10*
**interface**  31:*18*

116:*5*
**interfacing**  31:*16*
**interfere**  118:*1*
**Interior**  85:*11*
**internal**  89:*22*
99:*16*
**internally**  98:*12*
**interrogatories**
9:*21*
**interrupt**  61:*5*
132:*20*
**interrupting**
151:*20*
**Intervenor-
Plaintiff**  1:*2, 14*
2:*2*  5:*3, 15*
**introduce**  57:*4*
71:*4*  74:*5*  85:*1*
201:*11*
**introduced**  71:*5,
9*  89:*20*  201:*13*
**introducing**  74:*9*
**investment**  152:*23*
**invoice**  197:*15, 18*
198:*5*
**involve**  29:*2*
30:*16, 18*  31:*21*
39:*4, 8, 15*  172:*24*
173:*1, 7*
**involved**  18:*13, 20*
23:*15, 22*  25:*1, 17*
29:*10, 15, 24*
30:*17*  70:*20*
113:*3, 7, 13*  114:*6,
21, 23*  133:*3, 6*
149:*1, 7*  150:*6, 20*
160:*1*  162:*17*
169:*9*  177:*18*
178:*5, 15*  180:*10,
24*  196:*2*  198:*8*
**involvement**
24:*23*  114:*18*
**involves**  31:*1*
126:*5*  136:*18*
153:*2, 7*  170:*12*
176:*10, 11*
**involving**  176:*13*
**irregardless**  45:*4*

**issue**  25:*24*  41:*9*
117:*19, 23*  137:*21*
150:*18*  166:*9*
168:*14*  192:*1*
202:*8, 10*
**issued**  92:*11*
98:*24*  165:*25*
166:*3*  192:*2*
**issues**  17:*14, 21,
24*  18:*1*  40:*11, 23*
41:*4*  43:*16*  48:*4*
79:*10*  115:*21*
153:*3*  159:*19*
160:*13*
**issuing**  103:*4*
**its**  11:*10*  38:*14*
48:*20*  92:*11*
135:*2*  155:*7, 10*
185:*4*  208:*8*

**< J >**
**Jake**  1:*24*
**Janna**  1:*25*  4:*6*
93:*5*  209:*3*  210:*5,
22*
**Jennifer**  128:*25*
129:*2, 21*  130:*7,
17, 18*
**Jennings**  22:*10*
131:*10*
**JETER**  2:*13*
**JFWCO-Osage**
193:*18*
**Joan**  75:*2, 4, 17*
**job**  16:*14*  20:*21*
22:*1, 16*  174:*25*
208:*24*  209:*5*
**jobs**  109:*6*
**John**  9:*20*  194:*3*
**Jose**  131:*20*
**judge**  127:*6*
**jump**  77:*3, 12*
96:*15*
**jumping**  7:*19*
**Jupiter**  177:*24*
**JURAT**  208:*1*
**jurisdiction**  95:*24*
148:*14*  159:*19*

**jurisdictional**
153:*3*  160:*13*
**jurisdictions**  48:*2*
145:*5*  170:*3*
**justification**  202:*5*

**< K >**
**KANSAS**  1:*10*
6:*1*  119:*12*
127:*17*
**Kathryn**  2:*3*
5:*13*  6:*17*  11:*2*
56:*23*  61:*9*  110:*7*
124:*2*  197:*14*
**keep**  7:*16*  15:*12*
24:*18*  30:*22*
101:*24*  170:*14*
177:*1*  183:*11*
**Kern**  172:*23*
178:*8, 21*
**KIMBERLEE**
1:*14*  4:*3*  5:*2*  6:*6,
11, 22*  103:*11*
171:*19*  208:*6, 15*
209:*2*
**K-i-m-b-e-r-l-e-e**
6:*22*
**kind**  11:*3*  13:*14*
20:*3*  27:*2*  30:*3*
33:*3*  34:*20*  35:*9*
41:*4, 13*  45:*11, 13,
14, 15*  49:*12*
59:*15, 18*  60:*2*
66:*17, 21*  68:*5*
70:*8*  73:*23*  84:*15,
23*  86:*23*  88:*25*
89:*3*  91:*12*  94:*17*
107:*10, 16*  108:*13*
112:*17*  114:*9, 14*
116:*10*  117:*8, 11,
12, 13*  121:*18*
122:*12*  123:*22*
132:*1*  134:*9, 11,
12*  137:*17*  146:*19*
147:*23*  149:*13*
158:*10*  165:*6*
166:*2*  168:*2, 8, 12*
172:*21*  174:*16*
176:*18*  190:*13*

191:*19, 23*   193:*16*
199:*22*   203:*25*
204:*11*
**kinds**   17:*18*
27:*16*   29:*23, 25*
30:*11*   45:*10*
63:*23*   64:*4, 5*
72:*25*   77:*15*
118:*10*   145:*2*
205:*22*   206:*8, 13*
**knew**   52:*19*
76:*13*   156:*23, 25*
158:*14, 23*   196:*18*
199:*9, 12*
**know**   7:*2, 7, 8, 11,*
*13, 14*   8:*1*   14:*1, 2,*
*3*   16:*16, 17, 19*
*18:12*   19:*2, 12*
24:*12, 13*   25:*7, 11,*
*16*   26:*20, 21, 24*
27:*18, 20*   28:*1, 2,*
*7, 9, 10, 16*   29:*14,*
*16, 19*   30:*1, 2, 5, 7,*
*8, 12*   31:*13, 18*
32:*11, 13, 16*
33:*15, 17*   34:*20*
35:*6, 8, 11, 18, 19,*
*21, 23*   36:*3, 5*
*39:22, 23, 25*   40:*8,*
*13, 19, 22*   41:*6, 8,*
*12, 20, 21, 23, 24,*
*25*   42:*13*   43:*1*
44:*24*   45:*3, 9, 11,*
*24*   46:*14, 16, 18,*
*20*   47:*3, 8, 16, 24*
48:*5, 18, 19, 23*
49:*1, 12, 21, 22*
50:*8, 10, 16*   51:*3*
52:*4, 11, 19*   53:*1,*
*3, 9, 13, 16*   54:*3, 4,*
*9, 17, 23*   55:*3, 7,*
*19, 21*   56:*2, 3, 5, 6,*
*9, 10, 13, 14*   59:*11,*
*20*   61:*2*   63:*8, 10,*
*11, 16, 19, 20, 21,*
*22, 23*   64:*6, 12, 13,*
*14*   65:*10*   66:*9, 10,*
*12*   67:*10, 14, 15,*
*18*   69:*3, 4, 11*

70:*3, 7, 12, 23, 24,*
*25*   72:*11, 12, 22,*
*23*   73:*10, 11, 19,*
*21*   75:*15, 21, 22*
76:*25*   77:*2, 8*
79:*11*   80:*7, 20, 25*
81:*2, 7, 11, 18*
83:*2, 3*   84:*21, 23*
86:*2, 4*   87:*20*
88:*6, 9, 24*   90:*15*
92:*4*   93:*19*   94:*17*
95:*3, 14, 25*   96:*3,*
*15*   97:*2, 12, 14, 21*
99:*5, 9, 25*   100:*1,*
*3, 8, 13, 14, 17, 21,*
*22, 23, 24*   101:*3, 8,*
*11, 21, 23*   103:*1, 5*
104:*9, 20*   105:*2*
106:*14, 20, 21, 24*
107:*6, 14, 15, 17*
109:*20*   110:*7, 12*
111:*1, 22*   113:*6,*
*24*   116:*5*   117:*9*
118:*4, 9, 16*
119:*15, 22, 25*
120:*10, 11, 15, 18,*
*21, 22, 25*   121:*1, 4,*
*7, 14, 23, 24, 25*
122:*1, 2, 4, 9, 13,*
*14, 15, 18*   123:*8,*
*20*   125:*15*   126:*3,*
*6*   128:*3, 4*   129:*1,*
*22, 25*   130:*18*
132:*19*   133:*2, 5*
134:*19*   135:*22*
136:*1, 2, 24*   141:*5,*
*8*   142:*13*   143:*6,*
*12*   144:*8*   145:*14,*
*23*   147:*11, 13, 19*
148:*3, 6, 20*
150:*12*   151:*1, 6,*
*17, 20*   152:*3*
154:*13, 21, 24*
155:*1, 20*   156:*17*
157:*6, 14, 15, 17,*
*22, 24, 25*   158:*3,*
*16, 24*   159:*3, 5, 6,*
*8, 11, 14, 25*
160:*18, 20*   161:*7,*

*9, 10, 11*   162:*18,*
*20*   163:*2, 5, 10, 21,*
*23*   164:*1, 3, 10*
165:*5, 9, 10, 12, 13,*
*15, 20*   166:*5, 6, 7,*
*10, 20, 23, 24*
167:*5*   168:*15, 19,*
*21, 22, 23*   169:*6,*
*13, 17, 18*   170:*1, 2,*
*4, 7, 9, 13, 15*
171:*2*   172:*1, 2, 18,*
*20, 24*   173:*2*
174:*2, 9, 11, 14, 17,*
*25*   175:*18, 22*
176:*10, 16, 19*
177:*16*   181:*6*
186:*1, 4*   187:*1, 23*
188:*2, 8, 11*   189:*3,*
*9, 12, 13, 14, 25*
190:*3, 4, 9, 11, 18*
191:*16, 22*   192:*23,*
*25*   193:*3, 19*
195:*4, 17, 23*
197:*5, 11, 16, 17,*
*19*   198:*8, 9*
199:*18*   200:*11, 12,*
*16, 20, 24, 25*
201:*2, 9*   202:*24,*
*25*   203:*20*   204:*7,*
*9*   205:*1, 2, 4, 7, 8,*
*9, 17, 20, 22, 25*
206:*2, 9*
**knowing**   77:*21,*
*25*   92:*18*   93:*9*
94:*13, 16*   107:*15*
**knowledge**   73:*4*
79:*3*   81:*15*   94:*24*
121:*18*   129:*12*
**knowledgeable**
94:*1*   138:*21*
191:*3*
**known**   65:*3*
92:*20*   93:*2, 3, 10*
158:*5*   197:*6*

**< L >**
**labeling**   57:*16*
**Lake**   179:*3, 5, 13*

**Land**   16:*9*   31:*15*
42:*19*   116:*21*
168:*16*   169:*1, 16,*
*23*   170:*22*   171:*7*
172:*4*   173:*13, 21*
175:*15*   176:*14, 21*
178:*2*   179:*16*
181:*5, 9*
**landowner**   77:*7,*
*14*
**landowners**   8:*8*
49:*4*   76:*23*   79:*10*
114:*14*   178:*6*
**lands**   76:*9*   78:*24*
170:*8, 13*   174:*15*
175:*13*   177:*21*
178:*15*   180:*24*
195:*22*
**language**   60:*20*
62:*4, 14, 18*   93:*20*
**laptop**   8:*24*
**large**   14:*2*   24:*21*
83:*3*   123:*3, 11*
206:*1*
**largest**   106:*21*
107:*2*   123:*17*
**late**   88:*8*
**Law**   5:*25*   10:*9,*
*15*   32:*8*   131:*20*
**lawsuit**   100:*4*
**lead**   78:*12*   80:*9*
**leadership**   14:*10*
**leading**   105:*12, 23*
106:*8, 11, 12*
114:*8, 17*   121:*5,*
*15*
**lease**   11:*14, 20, 21*
18:*7, 18, 19, 25*
19:*3, 18, 20*   20:*7,*
*12*   23:*13, 22*
25:*25*   34:*24*   44:*1,*
*9*   45:*5*   51:*12, 24*
52:*17, 20*   53:*2, 5,*
*9, 21*   54:*4, 18*
55:*8, 15*   56:*14*
59:*17*   65:*1, 22*
66:*5, 8*   67:*3, 5, 21*
73:*5, 7, 25*   76:*17*
77:*22*   78:*1, 13*

79:*3*, *17*   80:*10*, *21*
81:*3*, *12*, *15*, *18*
82:*19*   83:*20*
85:22   86:*17*, *19*
87:*10*, *14*   89:*12*
94:*2*, *12*, *14*   95:*2*,
*20*, *21*   96:*24*   97:*5*,
*6*, *16*, *19*, *24*   98:*13*,
*16*, *20*, *23*   99:*11*,
*15*, *21*   100:*11*
116:*17*, *20*   117:*1*,
*18*, *20*   118:*3*, *4*, *15*,
*16*, *25*   119:7
132:5   133:*23*
134:*3*, *5*, *24*, *25*
137:*15*   138:22
139:*4*   141:*21*
143:*24*   145:*11*
146:*1*   148:6
149:*3*, *8*, *13*, *18*, *23*
150:*3*, *7*, *11*, *14*
159:9   161:*16*, *21*
163:*14*, *16*   165:*1*
166:*17*   167:*6*, *9*,
*15*, *17*, *18*, *21*, *22*
180:*4*, *10*   181:*20*
182:*8*   183:*23*
184:*10*, *24*   185:*5*,
*10*, *16*, *22*   186:*4*, *6*,
*12*, *18*, *20*   187:*3*,
*14*, *17*, *21*   188:*7*,
*15*   189:*10*, *11*, *20*,
*21*   190:*24*   191:*8*,
*14*, *16*, *18*   192:*2*, *6*
196:*12*, *19*, *24*, *25*
197:*7*   198:*18*
200:*7*, *19*   203:*5*
**leasehold**  114:*1*
**leases**  13:*11*   17:*8*
18:*2*   20:*2*, *4*
23:*21*, *25*   24:*2*
66:*14*, *23*   68:*3*
98:*2*, *5*   115:*15*
117:*11*, *15*, *24*
134:*7*, *8*, *11*, *12*, *13*,
*14*, *16*, *17*, *18*, *20*
145:9   162:6
181:*15*   182:*3*, *14*
196:*2*

**leasing**  150:*1*
160:*12*   195:*21*
204:*6*
**leave**  135:*14*
**leaving**  38:*19*
**led**  93:25
**left**  8:*20*   110:*8*
**legacy**  46:*16*
**legal**  42:*4*   50:*24*
**legalese**  33:*15*
**lender**  117:*19*, *22*
118:*5*   122:*23*, *24*
**lenders**  116:*6*
117:*24*   118:*16*
**Letter**  3:*10*, *13*
52:*3*   85:*7*   87:*21*,
*23*   89:*4*   91:*12*, *21*
99:*8*, *12*   162:*9*
167:*24*   168:*1*, *7*
182:*24*   183:*5*, *6*,
*12*, *16*   184:*15*
185:*25*   186:*2*, *3*,
*24*   188:*7*, *9*, *14*
191:*11*
**letters**  165:*4*
**letting**  84:*23*
**level**  42:*23*   173:*6*
194:*11*
**liable**  144:*6*
**liberal**  46:*10*
**license**  15:*19*
**licensed**  15:*15*
**licenses**  115:*14*
**licensing**  160:*12*
**lieu**  76:*6*   78:*20*
79:*21*   80:*2*, *24*
98:*14*
**limestone**  34:*19*,
*23*   35:*23*   44:*16*
63:*8*   64:*24*   70:*4*
148:*1*   165:*19*
198:*21*   199:*14*
201:*6*
**limited**  60:*24*
62:*10*   109:*13*
**line**  22:*22*   41:*4*
57:*19*   178:*16*
209:*6*
**lines**  133:*1*

**List**  3:*14*   22:25
24:*22*   37:*3*
110:*23*, *25*   111:*11*
129:*19*   171:*20*
172:*2*   173:*4*
176:*18*   177:*6*, *10*,
*12*   180:*3*, *14*, *18*
192:*20*   193:9
**listed**  23:*1*   24:*21*
30:*25*   31:*3*, *21*, *24*
37:*11*   129:*24*
131:*9*   173:*11*
180:*12*, *23*   193:*1*,
*16*
**listen**  12:*19*   13:*2*
**listing**  24:25
**lists**  36:*24*   111:*2*,
*13*   129:*21*
**litigation**  8:*4*
10:*4*, *6*, *13*   11:*12*,
*17*   12:*20*   13:*3*
14:*13*   26:*1*   46:*9*
65:*18*   100:*7*
125:*23*
**little**  13:*20*   15:*7*
16:*25*   21:*3*   56:*25*
57:*2*, *14*   62:*25*
86:*23*   99:*19*
102:*9*   108:*9*
109:*15*   132:*3*
150:*4*   158:*10*
191:*23*
**LLC**  1:*2*, *10*   6:*1*
103:*13*   184:*17*
**loans**  114:*4*
**located**  6:*25*   7:*1*
8:*19*
**location**  42:*22*
77:*1*, *2*   171:*23*
194:*1*, *4*
**long**  15:*24*   16:*11*
20:*18*   21:*21*
22:*13*   30:*11*   54:*6*
130:*6*   138:*1*
146:*5*   180:*6*
**longer**  69:*17*
102:*9*   109:*24*
**longer-term**

134:*14*
**long-term**  134:*8*
**look**  7:*7*   12:*15*,
*16*   15:*4*   17:*7*, *8*, *9*,
*25*   25:*12*   27:*20*,
*25*   30:*20*   32:*14*
38:*20*, *23*   40:*14*
41:*19*   42:*13*, *18*
43:*17*   56:*10*, *11*
57:*15*   67:*7*, *10*
68:*3*, *9*   69:*24*
74:*17*   75:*12*
81:*17*   85:*4*   86:*1*,
*7*   91:*14*   99:*7*
100:*17*   116:*3*
130:*17*, *22*   136:*1*
137:*7*, *8*   138:*14*
145:*7*   147:*20*
153:*16*   159:*4*
162:*24*   167:*16*
169:*8*   170:*1*
171:*3*   173:*25*
175:*10*   176:*17*, *24*
177:*7*   178:*10*, *12*,
*22*   179:*4*, *8*
181:*10*   183:*14*
185:*3*   189:*7*
190:*3*   192:*17*, *19*
193:*14*   195:*14*
196:*21*   199:*7*
**looked**  32:*17*
34:*8*   39:*23*   66:*14*
69:*24*, *25*   70:*4*, *22*
71:*2*   81:*14*   87:*2*
96:*6*   98:*11*
137:*11*   143:*19*
162:*9*, *23*   165:*24*
169:*12*   185:*21*
193:*4*, *6*, *8*   196:*6*,
*18*   197:*8*, *12*
**looking**  19:*11*
25:*14*   32:*13*
36:*22*   37:*2*   42:*3*
46:*2*   57:*11*   60:*18*
62:*5*   66:*20*   74:*3*
83:*15*   89:*2*, *20*
99:*6*   100:*25*
107:*16*   109:*9*
117:*5*   137:*13*

Case 4:14-cv-00704-JRF-JFJ   Document 548-1 Filed in USDC ND/OK on 11/30/21   Page 228 of 245

139:*16* 148:*4, 5*
162:*21* 172:*3*
173:*10* 175:*7, 8*
176:*7* 178:*25*
182:*10, 13* 184:*20*
189:*3*
**looks** 24:*20* 25:2
37:9 38:*20* 45:*12*
57:*13* 74:*18* 75:2
85:9 105:*18*
194:*9*
**Lost** 178:*20*
**lot** 16:*20* 17:*10,
16* 23:*14* 26:25
28:*6, 8, 9, 18* 30:*5,
21* 31:*17* 35:*8, 19,
20* 41:*19* 42:*20*
44:*15* 46:*15, 16,
19* 47:*4* 48:*23*
49:*10* 50:*8, 11*
53:*11* 63:22
66:*19, 22* 73:*13*
77:*5* 88:*19* 95:*3,
4, 25* 99:*16*
100:*23* 106:*13*
112:*8, 14* 113:*16,
17* 114:*14* 118:*8*
120:*12* 123:*12, 14,
16, 20* 131:25
143:*20* 155:*19*
159:*12, 13* 169:*8,
14, 19* 170:*16*
172:*12* 174:*11, 14*
175:*15, 18* 177:*20,
21* 190:*3* 193:*4*
203:*17*
**lots** 7:*3* 66:*14*
128:22
**love** 13:*19*
**lunch** 101:*10, 22,
25* 102:*6* 119:25
124:*1, 8, 10, 11*
126:*14*
**Lynn** 2:*9* 6:*3*
12:*9*

**< M >**
**ma'am** 92:*24*
102:*15* 124:*9*

126:*13* 161:*12*
168:*15* 176:*4*
183:*4* 184:*7*
192:*11* 195:*12, 17*
196:*7*
**maintain** 116:*11*
**maintained** 187:*4,
12*
**maintaining** 15:*19*
**major** 109:*17*
**makeup** 27:*23*
135:22
**making** 52:*5*
77:*8* 114:*10*
136:2 140:*14*
**manage** 16:*16*
**managed** 20:25
**management** 21:*8*
105:*12, 24* 107:*7*
111:22 121:*6, 16*
155:*24* 156:*7*
**mandating** 39:*9*
**manipulated**
148:*2*
**maps** 97:*9, 10*
179:*24*
**mark** 14:*19*
110:*16* 129:*17*
184:*5*
**marked** 14:*23*
33:*24* 102:*21*
**market** 27:*8* 43:*5*
44:*13* 45:*8*
106:*10, 17, 23*
120:*15* 122:*16*
**marketing** 128:*5,
7*
**markets** 122:*4*
**Martinez** 2:*9* 6:*4*
**Mary** 2:*3* 5:*13*
6:*17* 11:*2* 56:*23*
61:*8* 110:*7* 124:*2*
197:*14*
**material** 19:*11*
72:*14* 75:*14*
80:*18* 83:*4* 86:*7,
8* 164:*6* 166:*11,
25* 177:*8* 189:*5*

197:*16, 21* 198:*15*
199:*10, 22* 202:*12*
**materials** 12:*1, 4*
14:*8* 47:*6* 70:25
71:*16, 23* 72:*6, 17,
18* 76:*6, 7* 78:*20,
21* 79:*21, 22* 80:*1,
2, 14, 24* 98:*14*
181:25 197:*9*
198:*11* 200:*15*
202:*19*
**matieral** 198:*6*
**matter** 5:*3* 36:*11*
137:*18* 142:*17*
172:*13, 16* 203:*24*
**McClanahan** 1:*19*
5:*20*
**mean** 17:*13*
18:*12* 25:*20*
28:*13* 30:*5* 40:*8*
45:22 50:*14*
52:*21* 54:*16*
55:*20* 63:*18* 65:*4*
69:*20* 70:*8* 72:22
73:*7* 76:*20* 77:*5,
15* 78:*6* 83:*8*
94:*25* 95:*2* 96:*6*
100:*3, 5, 7* 104:*7*
108:*18* 117:*4*
120:*24* 121:*24*
122:*16* 124:*16, 18*
126:*22* 128:*3*
129:*15* 135:*12*
136:*12* 142:*1*
152:*4, 20* 159:*11*
161:*5* 162:*6*
163:*8, 10, 11, 21*
165:*10, 15, 17, 24*
168:*20* 172:*20*
176:*3* 177:*19*
182:*5* 186:*1*
189:*12* 190:*2, 16,
19* 191:*16, 19*
199:*8* 200:*9*
203:*14, 17* 204:*11*
205:*18, 24*
**meaning** 82:*7*
130:*1*

**means** 75:*17*
122:*20* 142:*18*
**meant** 131:*14*
**measure** 142:*7*
**meet** 12:*5, 8, 11*
200:*16*
**megawatts** 111:*14*
170:*2*
**members** 107:25
108:*2, 4, 5*
**memo** 57:*17*
58:*18* 59:*7* 87:22
89:22
**Memorandum**
3:*11* 89:*2* 91:*4*
**memory** 12:*3*
173:*18* 193:*4, 5*
**memos** 86:*15*
**mention** 47:*18*
59:*15* 141:*5*
**mentioned** 12:*2*
19:*3* 48:*18* 84:*5,
16* 86:*5* 117:*10*
123:*7* 137:*1*
163:22 178:*18*
179:*17, 19*
**merely** 198:*4*
**messaging** 9:*3*
**met** 48:*23*
**methodology**
32:*15*
**Mexico** 2:*11*
170:*5* 181:*1*
**Michelle** 2:*18*
5:*21* 102:*16*
**microphone** 6:*8*
**middle** 86:*3* 88:*9*
104:*24* 193:*16*
202:*7*
**midwest** 23:*11*
132:*16, 17, 22*
**Mike** 76:*2*
**millions** 206:*2*
**min** 136:*5*
**mind** 35:25 46:*1*
80:*8* 126:*12*
**mine** 11:*14*
51:*13, 24* 109:*12*
186:*16* 188:*4*

**mined** 29:*12*
82:20 83:*24*
139:8 149:*13*, *16*
**mineral** 18:*24*
19:*7*, *17* 24:2
25:*8*, *10* 28:*1*
32:9 39:*9*, *11*, *21*
41:*3*, *11*, *24* 42:*11*
47:*13* 50:22
51:*13*, *25* 58:*16*,
*25* 66:*5*, *8* 67:*3*, *5*,
*21* 69:*1*, *6* 72:*19*
76:9 77:22 78:*1*,
*23* 80:2, *15* 81:*4*
82:20 83:*25*
87:*15* 90:*8* 94:2,
*12* 95:2 117:*1*, *6*,
*16* 119:*7* 134:*19*,
*20*, *23* 135:*6*, *8*, *13*,
*21*, *23*, *24*, *25*
136:*19* 137:*15*
138:*23* 139:*4*, *9*
145:*25* 146:*1*, *22*
147:*14* 149:*16*, *18*,
*23* 150:*7*, *10*
161:*16* 165:*18*
166:*17* 167:22
181:*17*, *20* 182:*8*
183:*19* 185:*16*
196:*12*, *24*, *25*
198:*18* 208:*25*
**MINERALS** 1:*2*
5:*4*, *15* 10:*8*, *14*
25:*18*, *19*, *21*, *25*
26:*6*, *7*, *12*, *19*, *21*
27:*3*, *4*, *7*, *9*, *14*, *21*,
*24* 28:*11*, *21* 29:*3*,
*11*, *12*, *16* 36:*1*
41:22 44:9 49:*20*
50:20 51:*10*, *23*
53:*19* 58:*12*
60:22 62:*8* 72:*7*
75:*11* 76:*14*, *15*
81:*4*, *22* 83:*24*
85:*17*, *24* 90:*4*
118:*18* 135:*15*
136:*3*, *8* 138:*3*
139:*8* 144:*15*
146:*3*, *11*, *19*

147:*14* 148:*21*
149:*2*, *12* 184:*10*
185:*24* 195:2
197:*23* 198:*24*
199:*2*, *17* 200:*2*,
*21*, *22* 202:*17*
203:*9*
**mining** 11:*19*, *21*
19:*19*, *20*, *24* 20:*2*,
*8*, *12* 29:*15*, *20*, *21*
30:*12*, *16*, *17* 33:2
34:*23* 35:*25*
44:*24*, *25* 45:*19*
46:*4*, *8*, *20* 50:*21*
56:*14* 58:*11*, *16*
59:*1* 60:*21* 62:*8*,
*22* 63:*4*, *8* 66:*10*,
*11*, *12* 67:*6*, *9*, *22*
68:*5*, *10*, *11*, *12*
76:*11* 78:*13*, *25*
79:*17* 80:*11*
83:*20* 87:*14* 90:*3*,
*7* 94:*10* 146:*20*
149:*6*, *7*, *22* 150:*2*,
*23* 165:*6* 166:*22*,
*24* 167:*18*, *19*
186:*17* 187:*5*, *11*,
*13* 196:*19* 197:*7*
**minutes** 60:*9*
124:*2*, *7* 126:*15*
**misquote** 93:*6*
**missed** 171:*24*
172:*1*
**mistake** 129:*11*
**misunderstanding**
143:*8*
**mitigate** 152:*14*
156:*11*
**mixing** 200:*12*
**mknagle@pipeste**
**mlaw.com** 2:*6*
**ML** 6:*1*
**model** 122:*12*
123:*21*
**MODRALL** 2:*10*
5:*25*
**moment** 19:*14*
33:*25* 57:*14* 61:*6*

86:*18* 87:*24*
179:*2*, *22*
**money** 44:*8*
50:*16* 202:*4*
**monitor** 116:*11*
**monitoring** 114:*10*
**months** 54:*25*
65:*10* 67:*12*
**morning** 5:*12*
6:*16* 9:*11*
**Morongo** 174:*21*
**Mountain** 175:*23*
176:*24* 178:*13*
179:*13*
**move** 75:*25*
127:*8* 147:*2*
187:*20* 191:*4*
**moved** 77:*1*
113:*24* 122:*8*
131:*21*
**moving** 24:*18*
51:7 77:*16*
**multitudes** 98:*8*

**< N >**
**Nagle** 2:*3*, *4* 3:*3*
5:*12*, *13*, *14*, *17*
6:*15*, *17* 10:*12*, *18*
11:24 14:2*1*, *23*
20:*10* 27:6 28:*23*
29:*18* 31:*11*, *20*
32:*5*, *18* 33:*19*
37:*8* 44:*5*, *6*
47:*17* 48:*14*
56:*18* 57:*3*, *9*
59:*6*, *13*, *24* 60:*6*,
*11*, *15* 69:*13*
70:*16* 73:*3* 75:*25*
77:*20* 78:*14* 82:*1*
87:*1* 89:*19* 90:*19*
91:*5*, *16* 92:*6*
93:*14* 101:*5*, *8*
110:*10*, *14*, *19*, *21*
124:*3*, *6* 206:22
207:*10*
**name** 5:*12* 6:*17*,
*20* 8:*3*, *6* 16:*5*, *6*,
*7*, *8* 19:*10* 71:*20*

101:*16* 108:*25*
129:*8* 201:*14*
**names** 24:*9*, *15*
**narrative** 127:*5*
**narrow** 79:*14*, *16*
**nation** 11:*1*, *6*, *15*
18:*7*, *24* 19:*7*, *16*,
*18*, *20* 20:*13*
30:*18* 31:*1* 39:*5*
47:*14* 50:*2*, *6*
76:*8*, *17* 78:*22*
81:*21* 97:*24* 98:*1*
202:*10*
**nations** 18:*10*
**nature** 49:*13*
86:*8* 113:*5*, *6*
114:*3* 144:*22*
145:*16*
**near** 65:*24* 66:*1*
**necessarily** 19:*3*
26:*18* 27:*12*
33:*16* 51:*15*
76:*19* 77:*3*, *11*
88:*10* 96:*5*, *20*
97:*6* 103:*5*
118:*15*, *17* 170:*14*
172:*9*, *10*, *17*
173:*2*, *4* 174:*15*
181:*6* 194:*24*
**necessary** 67:*21*
72:*13* 81:*3* 85:*23*
98:*18*
**necessity** 196:*12*
**need** 7:*12*, *13*, *17*
18:2 25:*6* 36:*17*
42:*5* 46:*12* 59:*16*,
*17* 64:*25* 73:*7*, *17*
76:*17* 78:*9*, *10*
79:*17* 80:*4*, *9*, *21*
82:*19* 84:*10* 87:*9*,
*14* 89:*11*, *14*
90:*15* 94:2, *11*
95:*1* 98:*13* 100:*6*,
*11* 101:*13* 116:*25*
122:*15* 126:*9*
154:*5* 164:*8*, *10*,
*23*, *25* 167:*3*
179:*3* 181:*19*
183:22 186:*25*

188:9  192:5, 6
199:9, 13
**needed**  53:20
87:18  116:21, 23
118:25  162:12, 17
182:8  184:10, 25
185:16  186:12
187:3, 14  196:24
200:19  202:1
**needs**  42:9  45:5,
6  88:3  117:9
192:1
**negate**  200:7
**nego**  134:1
**negotiate**  98:5
118:3, 5, 6  123:12
186:6
**negotiated**  20:8
26:16, 25  42:9, 9
49:9  50:12  52:16
98:3  117:14, 15
146:2  148:7, 17
149:13
**negotiating**  18:19
20:12  22:24  23:8
24:1  29:19  30:9
76:21  137:2, 17
145:2  148:15
151:16
**negotiation**  28:4,
19  29:6, 10, 11, 24
47:23  53:10
132:5, 11  134:24
137:14  180:11
**negotiations**  14:9,
11  23:12, 16, 20,
23  24:7  53:1, 16
88:24  117:21
133:14, 19, 20, 23
135:20  136:25
137:12  146:23
148:20  149:8
150:21  180:4
189:13
**negotiator**  52:2
**Nevada**  170:5
181:1
**Never**  10:11, 17
13:14  35:20

147:10  149:1
150:6, 16  167:21
180:14  206:11
**New**  2:11  74:6
170:5  181:1
**Newsome**  104:14,
16, 17
**Newson**  104:15
**NG**  109:18
177:25
**niche**  115:7
**Nods**  120:20
**nominal**  147:23
**nondisturbance**
164:14
**non-disturbance**
189:15, 16
**non-recourse**
122:19
**nonresponsive**
147:2
**normally**  20:1
48:22  49:13  73:8,
16, 22  84:18  86:5
115:22  117:11
135:13  137:4
149:23  165:15
**NORMAN**  2:13
**NORTH**  1:11
6:2  119:12
127:16
**NORTHERN**  1:2
5:6
**northwest**  132:15,
22
**Notary**  208:17, 22
**note**  66:4  75:8,
13  83:17  89:21
**noted**  208:12
**notes**  195:15
**notice**  167:6, 8, 14
186:10
**noticed**  194:18
**notification**  162:8
**notified**  89:11
167:21
**Number**  5:7
14:20, 21  24:21
90:13  97:1

102:22  110:8, 16
129:17  130:24
168:19  184:5, 6
201:14
**numbers**  169:20
170:15
**numerous**  107:9
**NW**  2:10

**< O >**
**oath**  208:7
**Object**  10:10, 16
11:22  26:8  27:11
29:13  32:3, 10
33:9, 10  37:5
47:15  48:10
55:18  59:2, 9, 19
60:4  69:8, 18
72:20  75:20
76:18  81:19
86:20  89:16
90:12  91:8, 23
98:21  119:2
125:1  126:24
127:4, 7, 9  128:20
136:10, 21  138:5,
8  139:14  140:8,
16  141:11  142:15
144:17  146:14
147:1, 17  149:5
156:13, 21  157:8,
13  158:6, 8
159:22  160:16
161:2, 25  163:6,
18  166:18  167:11,
23  170:24  176:22
185:2, 23  186:13
187:22  188:22
189:23  191:6
196:16  198:2
199:3  200:23
203:10  204:25
205:14
**objection**  126:3
197:3
**obligations**  39:15
**obscure**  117:20
**obtain**  11:14, 19,
21  18:6  26:2

44:11  64:25
115:23  117:1
131:5  203:5
**obtained**  18:2
34:24  85:18
115:15  116:17
119:8  146:3
149:3  150:11
187:18
**obtaining**  15:19
86:19  185:22
187:21
**obviously**  46:15
56:9  99:16
115:10  166:1
199:8
**occur**  79:18
**occurred**  68:11, 12
**occurring**  183:19
**October**  36:14
57:18  58:22  85:8
86:2, 15  89:12, 14,
21  91:7, 21
**offered**  155:17
**offhand**  106:24
**OFFICE**  1:20
5:19, 21, 23
101:18
**official**  16:2
**Oh**  61:2  87:5
93:21  108:1
131:7  187:11
205:7
**oil**  27:22  66:14
**Okay**  6:9, 16
8:14, 22  9:6, 15
10:2, 6  12:19, 22
13:2  14:15  15:14
16:11, 14  19:15
22:16, 21  24:9, 20
25:3, 16  27:6
34:5  35:1  36:7,
16, 21  37:11  38:2,
6, 9, 17  39:4, 7
43:3  49:24  57:7,
9  58:4  59:13
60:6, 11  66:4
68:10  71:18  74:1,
2, 4, 7, 15  75:1, 7,

25 80:*12* 81:*1*
82:*1, 16* 83:*13*
85:*4, 6* 87:*5*
89:*19* 90:*19* 91:*5*
92:*21* 93:*14, 15,*
*21* 101:*5* 103:*7,*
*19* 104:*2, 7, 13, 25*
105:*7, 9, 23*
106:*16* 107:*18*
108:*7, 21* 109:*4*
110:*12* 111:*7, 9,*
*21* 113:*9, 12*
114:*16* 115:*2, 20*
116:*13, 20, 25*
117:*21* 118:*21*
119:*10, 15, 21, 22*
120:*8* 121:*5*
124:*7* 126:*20*
127:*2, 3, 6, 10, 20*
128:*25* 130:*10, 21*
132:*3, 23* 133:*2, 5,*
*17, 24* 134:*1, 16,*
*19, 24* 135:*10*
138:*10* 139:*18*
140:*19* 141:*16, 22*
143:*11* 144:*3*
148:*10, 19* 149:*25*
151:*21* 152:*19*
153:*6, 18, 24*
154:*8, 16, 21*
155:*6, 13, 23*
156:*16, 24* 157:*6,*
*21* 159:*10, 18*
160:*21* 161:*12, 20*
163:*4, 9* 164:*9, 14,*
*24* 166:*14* 167:*4*
168:*5, 13* 169:*21*
170:*19* 171:*5*
174:*3* 176:*3, 25*
179:*10* 180:*17*
182:*22* 183:*7, 13*
184:*4, 15* 185:*8,*
*12* 187:*7, 15*
188:*11, 12* 190:*1,*
*22* 191:*13, 15*
192:*7, 17* 194:*6,*
*17, 25* 195:*10*
196:*20* 198:*14*

199:*25* 201:*7, 21*
206:*22*
**OKLAHOMA**
1:*2, 15, 21* 2:*5, 15*
5:*7* 208:*2, 18*
210:*2, 4, 6*
**OMC** 55:*16*
89:*13, 18* 183:*17*
207:*8*
**ones** 30:*21*
164:*19* 172:*2*
175:*21* 176:*16, 19*
177:*16* 178:*9, 11*
180:*18, 19*
**one's** 116:*23*
**one-time** 60:*22*
62:*8*
**ongoing** 66:*5, 7,*
*10, 16, 17, 18, 22,*
*24* 67:*3, 20*
**online** 6:*3*
**open** 74:*6*
**operate** 58:*13*
90:*5*
**operating** 69:*15*
143:*2*
**operation** 68:*5*
105:*14*
**operations** 66:*15*
68:*2*
**opine** 82:*13* 83:*9,*
*12* 90:*22* 118:*24*
136:*4* 137:*5*
145:*14* 146:*9*
161:*13*
**opined** 46:*3*
**opining** 158:*4*
**opinion** 9:*22*
10:*7, 13, 19, 22, 25*
11:*5, 9, 13, 18*
12:*24* 26:*5* 27:*7*
33:*20, 21* 34:*10*
35:*3* 36:*13* 37:*14,*
*18* 40:*6* 43:*18, 21,*
*23* 44:*6* 45:*17*
46:*7, 11, 24* 49:*18*
50:*25* 51:*9, 20*
53:*18, 23* 57:*25*
59:*14, 25* 61:*16*

64:*21* 66:*7* 67:*2,*
*19* 72:*16* 73:*4*
76:*12* 77:*21* 78:*4,*
*15* 79:*5* 80:*13, 19*
81:*1, 7* 82:*12, 17*
83:*17* 85:*20*
86:*14* 87:*8, 12, 17*
89:*7* 91:*6* 92:*9*
98:*17, 24, 25*
99:*21* 103:*14*
119:*6* 121:*7*
137:*23* 139:*1*
140:*7* 142:*2, 11*
144:*4* 146:*18*
148:*11, 23* 156:*17*
158:*12, 15* 161:*14,*
*22* 167:*7* 185:*7*
187:*16* 189:*19*
194:*15, 19, 23*
**opinions** 36:*8*
37:*22* 103:*21, 22,*
*25* 104:*1, 9* 119:*5*
138:*19* 139:*21, 23*
140:*3, 5* 141:*7, 10*
142:*6*
**opportunity** 52:*7*
86:*7*
**opposed** 72:*18*
**optimist** 52:*6*
**option** 198:*18*
202:*21*
**options** 70:*7, 10,*
*17, 22* 196:*14, 18,*
*21* 197:*2, 12*
200:*1*
**order** 41:*16*
58:*12* 71:*15, 23*
84:*24* 90:*4*
122:*13* 129:*23*
144:*9* 174:*6*
177:*5* 197:*23*
199:*16* 201:*15, 18,*
*22* 202:*2, 20, 25*
204:*9*
**ordinarily** 148:*7*
166:*3*
**ordinary** 65:*14*
83:*21* 137:*12*
139:*5* 186:*6*

**organization**
13:*20, 24* 14:*6*
**OSAGE** 1:*2* 3:*12,*
*16, 17* 5:*4, 5, 15*
6:*1* 11:*9* 26:*7*
32:*8* 38:*13* 39:*20,*
*21* 40:*1* 44:*8, 15*
47:*14* 49:*19*
50:*20, 22* 51:*10,*
*13, 22, 24* 53:*4, 19*
57:*12* 58:*10, 12,*
*23, 25* 60:*3* 69:*1,*
*14* 71:*8, 18* 72:*5,*
*19* 74:*9, 11* 75:*15,*
*18* 76:*8, 15, 17*
78:*22* 80:*1, 15*
81:*4, 21* 82:*20*
85:*7, 19* 86:*16*
87:*15* 90:*1, 3, 8*
93:*23* 94:*3* 98:*15*
102:*24* 103:*13*
104:*19* 119:*12*
127:*17* 130:*19*
143:*18, 22* 144:*22*
165:*19* 183:*19*
184:*17, 23* 198:*24*
202:*10* 208:*25*
**Osage's** 58:*16*
200:*21* 203:*8*
**outcome** 55:*22*
**outside** 47:*8*
72:*14* 169:*16*
202:*12, 19* 203:*15,*
*23* 205:*11*
**overall** 11:*24*
**overarching**
182:*15*
**overlay** 174:*24*
**overlays** 175:*15*
**oversee** 112:*25*
113:*2*
**overseeing** 108:*14*
115:*4, 6*
**owed** 43:*25*
**owned** 18:*24*
19:*16*
**owner** 39:*10*
138:*23* 146:*1*

147:15  161:16
owners  57:19
ownership  18:16,
23  19:4  109:7, 8

< P >
P.A  2:10
P.C  2:4, 14
p.m  60:13, 14
124:8  192:10
206:24  207:12
Page  3:2, 9  22:21
34:2, 3, 7, 12
38:20, 24  58:5
60:18, 19  62:3
66:4  83:15  89:25
93:15, 16  105:21
107:10  110:24
130:23, 24  132:3
138:14, 15  140:25
181:10  183:13
192:18, 19  202:7
209:6
pages  33:1, 22
107:9  174:2
179:11
paid  10:7, 18, 21,
24  11:4, 8, 13, 18
28:17  29:6  44:21
54:13  144:14
150:10  174:9
paper  104:9
paperwork  112:21
paragraph  58:7
62:5  90:1  105:10,
20  138:18  181:14
183:14  202:6
paralegal  22:18
131:5, 12
paralegals  5:22
parameters  41:15,
19  48:20  49:11
83:6, 7  123:8, 10
135:19
pardon  34:6
71:25  78:13
178:20
Part  10:19, 22
33:20  38:6, 10

44:4, 22  52:24
68:1  69:12  71:2
92:23  112:23
114:25  115:22
120:4  135:8, 20
138:25  144:4, 5
152:19  153:1, 6,
10, 15  154:8, 10
155:8  162:15
163:20, 21, 22, 23
174:25  183:6
189:1  191:11
195:18  202:5
participate  47:22
particular  18:16,
23  19:4, 8  40:2
41:17  73:12
76:22, 25  77:14
98:10  100:12
112:16  115:7, 11,
24  124:24  127:25
128:8  130:1, 22
133:22  138:13
148:21  149:11
150:21  152:11
155:19  159:3
162:16  163:24
164:22  172:21
173:19  183:15
194:2, 8  203:14
particularities
77:13
particularly
118:21
particulars  41:18
parties  26:17
28:17  29:7  41:7,
14, 20  42:15  43:1
47:21  51:18  52:8,
15  118:12  120:13
125:21  210:14
partner  5:13
partners  22:19
parts  181:5
party  73:7
100:16  118:11
125:22
pass  101:14

206:16
pasture  117:20
paths  14:3
pay  43:25  44:8
147:23, 24
paying  126:12
payment  45:11,
13  50:16
payments  28:3
141:20  143:23
145:10
pending  32:2
people  16:18
20:25  52:11  75:3
106:14  128:4
129:7  145:13
151:19, 20  206:4,
8, 13
percentage  25:12
45:16  106:17
109:6
perfectly  35:6
perform  155:6
157:11
performed  75:9
82:18  83:10
156:18  157:1, 10
158:17
period  45:15
60:23  62:9  65:24
66:1  68:2, 13, 16,
23  148:8
permanent  58:15
90:6
permission  51:12
136:9, 20  137:24
138:4  146:11
147:15  148:22
204:17, 22
permit  32:2
58:12  68:15, 18
75:11  85:19  90:3
96:24  99:11, 15
116:17, 21  143:16
148:6  162:10
165:24  166:4, 7
168:2, 9, 12
183:23  185:6, 22
186:21, 25  188:7

190:9, 10, 11, 18
191:8, 12, 16, 17,
18, 19  192:2, 6
permiting  73:9
permits  9:19
27:14  45:10
67:11  115:14
118:10  145:3
147:22  148:15
160:9, 10  162:5
199:20, 21
permit's  190:17
permitting  96:9
145:3  153:2
159:19, 24  160:5,
7, 12  188:25
189:2
person  133:11
personal  20:10
perspective  40:25
66:20  67:1  95:12
pertained  32:22
Pertaining  36:11
pertains  26:23
82:10
pertinent  193:11,
15
Pfahl  9:20  144:21
Pfahl's  71:9
Pharoah  9:25
phase  112:25
113:13  114:24
115:4, 6, 16
132:11
phases  113:3
philosophy  206:6
phone  8:19
phonetic  49:16
pick  60:16
piece  115:11
pieces  42:24
43:16  155:20
PIPESTEM  2:4
5:14, 17
Pirtle  1:25  4:6
209:3  210:5, 22
place  24:7  29:11
45:1, 19  46:5, 9
48:5  50:21  53:1,

10, 16  55:3  77:6
86:6  98:18  99:17
149:23  154:25
186:18  187:6, 13
195:14  202:3
208:11
**placed**  167:6
**placement**  58:15
90:7
**Plaintiff**  1:2, 18
**planning**  22:20
79:19  186:16
188:3
**plans**  68:25  69:5,
10  75:13  164:1
**player**  120:22
123:11
**players**  121:18, 23
**please**  5:10  6:21
7:11  23:7  25:23
75:12  127:13
172:7  177:2
179:4  183:11
**plenty**  128:21
150:20  190:19
**plus**  111:13
**POD**  75:9
**point**  7:17  36:18
54:8, 9  57:1
69:20  73:21
87:19, 20  92:12
98:24  99:10
100:5, 9  101:10
113:1  120:1
124:1  128:8
137:10  164:9
168:3, 11, 12
180:9, 11  202:7, 9
**portions**  32:21
**position**  15:25
16:12  22:4  64:12
117:25  189:9, 19
198:4
**possibility**  128:9
**possible**  75:15
128:3, 5, 6, 11
169:12  193:7, 9

**possibly**  165:16
171:15  179:14
200:11  201:12
**post**  193:25
194:7, 10, 11
**potential**  18:2
40:23  42:16
135:23  152:21, 22
153:8  154:3
156:11
**potentially**  18:18
88:1
**POWER**  1:10
6:2  21:11, 14
30:10  119:11
122:6  127:16
186:11
**practical**  83:23
139:7  196:14
**practices**  152:1, 2,
8, 14  154:17
156:10
**pre**  194:6
**precedent**  43:12
151:2, 8
**precedes**  182:2
**precisely**  169:7
**preconstruction**
193:25
**predominant**
110:2
**predominantly**
21:4  22:8  109:5
**prefer**  206:8
**preparation**  61:14
95:6  125:18
126:6
**prepare**  11:25
12:5, 15, 17  17:3,
11  112:7, 20
116:4  193:25
**prepared**  32:6
55:24  112:16
194:3
**preparing**  37:4
38:3, 7, 8, 11, 14
**presence**  111:13
**presences**  122:3

**PRESENT**  1:15
2:18  164:6
**presentations**
14:10
**presented**  14:8
164:4
**president**  15:21
20:23  85:9
105:11, 18
**presume**  198:7
**pretty**  103:16
190:6, 7  203:21
**previous**  124:14
192:14  201:13
**previously**  71:5
102:21  126:18
135:4  147:10
159:2  162:9
176:12
**primarily**  122:5,
10
**primary**  133:11
180:18  181:6
**print**  7:8
**printed**  9:10, 18
**Printout**  3:15
**prior**  8:7  10:6,
12  11:12, 17  59:7
81:12  83:19
85:23  89:4  94:2
131:20  138:23
139:3  149:19
159:20  160:13, 24
161:17  169:10
186:10  196:12
197:19
**PRIV-000243**  85:7
**PRIV-000414**
57:12
**private**  22:24
109:13
**privilege**  125:16
**privileged**  33:10
125:2, 9, 12
**privy**  123:24
**probably**  46:19
63:12  102:2
110:3  129:7
132:17  147:6

154:10, 14  159:15
170:25  171:9
175:4  176:4
198:7  199:5
**probate**  22:20
**problem**  44:21
119:21
**problems**  158:4
**Procedure**  4:5
190:15
**proceed**  64:15
165:1  166:16
204:21
**proceeding**  163:25
**proceedings**  207:6
**proceeds**  177:22
**process**  69:21
73:8  112:22, 23
188:19  189:2
**products**  105:25
**professional**  20:11
**profile**  17:12
**Project**  3:14  8:9
17:13  19:13
23:10, 18  24:5
30:25  31:3  38:21
39:2, 14  40:16, 17
44:18  48:19  49:4
51:7, 17  52:6, 22,
25  53:14  54:21
55:2  63:16  69:12,
14  71:20  73:17
74:22  76:6, 8, 9
77:14  78:20, 22,
23  79:23  82:6, 8,
11  83:22  84:1, 9,
20, 25  89:6  94:3,
18, 19  96:8, 13
97:25  98:9
110:23, 24, 25
111:1, 11  112:13,
14, 16, 24  113:1, 2,
3, 21  114:18
115:24, 25  116:18
118:1  123:1, 6, 8,
10  127:21  129:4
130:19  132:10, 12
133:12  135:19
138:24  139:6, 10

146:*12*  149:2, *20*
150:*17*  153:*8*
154:*23, 25*  155:*25*
156:8, *20*  157:*12*
158:*18*  159:*13*
160:*14*  163:*25*
165:4, *21*  166:*12,
16*  170:*11, 12*
171:7, 9  173:7, *20*
174:*19*  175:*16, 24*
176:*18, 24*  180:9,
*12, 22*  181:*16, 19*
182:4, 5, 9, *15*
184:*10*  185:5, *15,
19*  186:*11*  187:4,
*12, 20, 24*  188:6,
*24*  191:*20*  192:5
193:*21, 23*  194:5,
7  196:2  197:*15*
201:*24*  202:*19*
203:*25*
**projects**  16:*21, 22*
17:*4*  19:*12*  21:9,
*10*  22:8  24:*14, 22,
25*  25:7, *17*  29:*1*
30:*15, 22*  31:*21,
24*  35:20  43:*13*
47:5  48:*1*  49:*15*
50:*10*  72:*12*
76:22, 23  94:9, *24*
95:6, 8, 10  96:*1,
22*  97:*18*  98:8
99:*18*  105:*15*
106:*15, 19*  107:8
108:*16, 22*  109:*21*
112:7  115:5, *17*
116:2  120:*12*
122:*17, 21*  123:4,
22  145:8  152:22
154:6  155:*20*
156:*12*  159:*12*
165:*16*  169:*1, 10,
22*  170:2, 6, *21*
171:2, *18, 20*
172:*3, 20, 22, 23,
25*  173:*11, 14*
174:6, *18*  175:*20*
176:8  177:7, *17,
20*  178:8, *13, 19*

179:*1, 7, 14, 15, 18*
180:*1, 2, 4, 13, 25*
193:*24*  195:*22*
205:*3, 24, 25*
206:*1, 6, 11*
**promotes**  13:*25*
**pronounce**  129:*8*
**proper**  158:*3*
162:*13*  188:*1*
**properties**  15:*18*
30:*12*
**property**  10:*15*
27:2  31:9, *11*
79:7, 8  135:*1*
176:*10*  178:*3, 5*
194:*5*
**proposed**  32:*16*
**propounded**  6:*13*
**protection**  125:*19*
**protocol**  156:*15*
**provide**  30:*1*
37:*16*  138:*19*
155:*24*  156:7
184:*23*  185:*20*
**provided**  37:*12,
21*  61:*12*  88:*4*
93:*23*  182:*23*
185:*18*  189:*10, 11*
190:*21*  192:*21*
193:*1, 10, 14*
**providing**  128:*14,
16*
**provision**  196:*5*
**provisions**  63:*13*
73:2  97:7
**prudent**  166:*15*
187:*19*  188:*13, 18*
191:2
**public**  22:*24*
180:*20, 21*  208:*17,
22*
**pull**  36:*19*  85:*3*
87:*3*  93:*16*
102:*16*  110:6
129:*16*  130:*16, 21*
192:*18*
**pulled**  102:*23*
110:22  111:2, *12*

129:*18*  131:2
**pulling**  102:*20*
**purchase**  71:*15,
23*  72:6, *17*
197:*22*
**purchased**  80:*3,
16*  98:*15*
**Purczynski**  129:*1,
2, 22*
**P-u-r-c-z-y-n-s-k-i**
129:*3*
**purport**  115:*9*
**purported**  60:*21*
62:7
**purpose**  34:*25*
36:2  60:*24*  62:*10*
**purposes**  17:*20*
20:8  65:*17*  72:7
90:*10*  92:*14*
105:5  109:2
119:*16*  148:2
159:*21*  160:*15*
161:*1*
**pursuant**  4:*3*
183:*24*  184:*25*
185:*1*  188:*15*
210:*12*
**pursue**  167:2
**pushed**  123:*14*
**put**  29:22  53:*4*
67:*4*  88:*16*  89:5
91:*11, 25*  167:*14*
197:*14*  200:*25*
**putting**  56:*4, 5*
95:*10*  104:9

**< Q >**
**qualifications**  15:6
**qualify**  159:*16*
**quantified**  195:*1,
8*
**quarries**  70:*11*
199:*18*
**quarry**  44:*17*
**question**  7:*10, 12*
27:*3*  32:*12*  70:*3*
81:9  84:2  87:*11*
90:9  99:9  120:6
122:*1*  125:5

126:*10, 25*  127:*4,
13*  130:2  135:*20*
141:*12*  145:*22*
146:5  147:*4*
148:*25*  153:*20*
156:4  158:*10, 25*
159:3  160:*22*
163:*11, 12, 15*
166:*13*  168:*23*
176:*15*  198:*23*
200:*18*  202:*16*
206:*14*
**questioning**  101:6
**questions**  6:*13, 18*
7:3  56:*13*  57:*1, 5*
60:7  70:9, *13*
77:8  90:*16*
101:*19*  138:*20*
139:*16*  140:*11*
145:*20*  157:*19*
161:6  179:*12*
206:*20*  207:*1, 5*
**question's**  176:7
**quests**  49:2, *8*
**quick**  36:*20*  57:5
85:*3*  87:*4*  192:*12*
**quite**  101:9
111:*24*
**quote**  43:*4*  75:*18*
78:*18*  79:*1*  85:22
139:9

**< R >**
**raised**  17:*14*  99:9
**rambling**  146:5
**ran**  20:*24*  204:*19*
**range**  183:*20*
**rar@nwcjlaw.com**
2:*16*
**rare**  52:9
**Ray**  2:*13, 14*  6:*4*
12:*10*
**reach**  163:*24*
**reached**  50:9
52:*13*
**read**  12:22  32:*19,
23*  33:*16*  34:*13*
58:7, *17*  59:22
62:6  75:7  80:*4*

85:16  105:16
133:20  144:4, 5
181:21  184:1, 7,
12  202:14  207:2,
7  208:7
**readily** 199:23
**reading** 81:21
203:14
**ready** 101:14
**real** 15:15  20:23,
24  21:8  22:4, 19
41:25  112:10
115:8, 18  116:19
131:16, 23  132:2
133:13, 19  137:10
152:10, 13  154:18
155:18, 21
**reality** 13:16
50:25
**realize** 24:1
55:15  58:4
**really** 7:15  26:18,
22  27:16, 17
28:21  30:12
31:13, 17  32:12,
14  33:1, 3, 18
34:7, 20  36:20
38:8  40:24  41:17,
24  42:3, 14  46:3,
4, 5, 21  47:8
49:23  50:3  52:11
53:4  55:20  59:23
70:14  73:9  77:10
85:3  87:4, 22
91:3  95:14, 22
96:18  98:4  99:10
101:6  103:14
110:2  119:20
120:24  123:19
132:18  136:12
137:11  144:7
157:15, 16, 24
159:2  161:4
163:11  172:18
177:5  188:8
205:2, 22
**reask** 118:22
126:9  127:12
147:3

**reasonable** 26:5
43:4, 9, 19, 24
45:25  46:25
47:18  48:7  51:4,
10  54:3, 10  82:4,
5, 9, 13, 18  93:25
98:19  141:3, 24
142:12  146:10
191:1
**reasonableness**
11:19  47:19, 20
48:14  49:16, 24
50:5  51:2
**reasonably**
138:22  161:15
166:15  187:19
188:13, 17  191:2
**reasons** 23:18
202:23
**recall** 7:25  8:3, 6
19:15, 17, 21
30:24  31:3  71:12,
13  97:3  132:6
133:4  194:25
197:18
**receive** 37:25
58:11  90:3
**received** 15:17
39:1, 14  60:2
188:13
**reciprocal** 28:7,
17  49:13
**reciprocity** 30:3
**reciting** 185:25
**recognize** 14:17
71:18, 20  176:19
**recognized** 11:1, 6,
15  50:1
**recollect** 19:5
24:15
**recollection** 18:21
177:3  196:4
**recollections** 196:1
**record** 5:8, 11
6:5  61:18  66:25
102:18  103:8
111:10  124:10
130:25  140:20, 23
171:16  172:6

175:9  181:12
182:25  183:3
192:12  201:12, 16
**recording** 9:3
97:9, 10
**records** 169:8
171:3  175:10
178:10  201:23
**recourse** 122:21
**red** 42:8
**redirect** 207:9, 10
**Redlands** 131:3
**refer** 25:6  54:17
105:4  119:17
138:13
**Reference** 3:8
109:2
**references** 184:18
**referring** 55:9
61:22  105:7
106:9  119:20
134:12  181:25
**refers** 79:21
**reflect** 15:5
**refrain** 85:17
**refresh** 12:3
173:18  193:4, 5
**regard** 18:25
34:22  36:15
64:19  77:7  82:6,
7  84:12  141:2
**regarding** 11:13,
18  15:18  82:19
**regards** 12:24
82:8  115:3, 14
136:7, 17  137:23
138:2  176:3, 6
**regulation** 161:20
188:16
**regulations** 38:3
153:9, 10  154:3, 4
160:24  183:21
185:1
**regulatory** 183:21
188:19
**relate** 18:1
115:20

**related** 10:19, 22,
25  11:5, 9  21:10
39:1
**relates** 108:22
115:7, 18  118:18
152:10, 13  154:18
195:22  198:23
**relation** 18:10
169:23  170:21
171:7  189:4
**relations** 136:8
180:3
**relationship** 49:25
96:12
**relative** 105:24
106:18  107:3
114:25  115:15
116:16, 18, 21
118:23  132:5
146:11  151:14
155:25  156:8
158:17  178:25
198:21  210:14
**relatively** 168:20
**relaying** 58:22
**relevant** 177:15
**reliant** 164:22
**relied** 36:24  37:4
55:14  81:6
**relies** 52:15
**rely** 43:19, 24
58:1  62:20
100:10, 16  194:13
**remedy** 144:14
**remember** 23:11
24:6, 9  167:25
169:6  178:16
**remind** 63:2
**removal** 76:10
78:24
**remove** 76:5
78:19  79:19
**removed** 66:25
81:22  144:11
**removing** 36:1
79:6, 8, 20  166:25
**rendered** 59:25

**Professional Reporters**
800.376.1006
www.proreporters.com

rendering 36:*14,
25* 51:*20* 53:*18*
57:*25*
rendition 38:*23*
renewable 17:*4*
43:*5* 47:*25* 48:*16*
105:*15, 25* 106:*15,
18, 22* 107:*3, 8*
109:*14, 17, 24*
111:*23* 112:*4*
115:*5, 16* 120:*11,
23* 121:*2, 6, 16*
122:2 144:*24*
152:*8, 15* 156:*12*
204:*21*
renewables 13:*13,
21, 23* 14:*1* 21:*12,
13* 29:*20* 36:*3*
109:*3* 130:*6*
reopen 126:*9*
repeat 7:*12* 11:*3*
44:*4* 81:*9* 93:*5*
158:*10* 187:*10*
rephrase 107:*23*
125:*5* 155:*15*
160:*11*
repin 49:*15*
replace 28:*25*
199:*13*
replacement
203:*24* 204:*10*
reply 6:*13*
report 7:*6* 9:*18,
22, 23, 24* 12:*17,
25* 14:*13, 17*
15:*10* 25:*23, 24*
32:6, *14* 33:*18, 21*
35:*15* 36:*10, 14,
16, 23, 25* 37:*4, 22*
38:*3, 5, 7, 8, 11, 15,
18, 21, 24* 39:*19*
43:*4, 19* 47:*2, 17*
52:*14* 53:*24*
54:*14, 23* 55:*12,
24* 58:*19* 59:*16*
60:*18, 19* 61:*15*
62:*3, 18, 21* 65:*18*
67:*24, 25* 75:*12*
82:*13, 22, 23* 83:*9,*
*14, 16* 84:*4* 89:*8*
90:*10, 21, 24*
91:*18, 19* 92:*9, 14*
93:*15* 94:*6*
102:*20* 103:*4, 11,
24* 104:*3, 5, 6, 8,
11, 23* 105:*3, 4, 9,
20* 108:*7* 111:*1, 4,
5, 6* 126:*5, 6*
130:*22* 138:*13, 16*
139:*17, 19, 23*
140:*3, 7, 10, 13, 18*
141:*2, 10, 14, 17*
142:*20* 144:*2*
150:*13* 162:*21*
173:*24* 174:*13*
176:*18* 177:*13, 14*
181:*11* 182:*8, 11*
184:*8, 13* 185:*14*
192:*18* 193:*12*
196:*10*
REPORTED 1:*25*
209:*3*
REPORTER 1:*15*
4:*6* 6:*10, 21*
31:*10* 44:*3* 78:*10*
93:*7* 110:*18*
120:*3* 125:*15*
155:*8* 187:*9*
207:*3* 210:*6*
reports 9:*20*
12:*22* 17:*9, 10*
102:*17* 104:*5*
115:*24*
report's 102:*23*
repower 176:*2*
represent 5:*14*
71:*14* 109:*11, 16*
184:*17* 201:*21*
representative
88:*1*
represented 36:*9*
representing
122:*23*
represents 111:*19*
repurposing 35:*24*
request 73:*11, 14,
16, 23* 84:*6, 14, 16,
17* 86:*13* 91:*25*
96:*14* 99:*19*
166:*20* 168:*11*
requested 88:*22*
requests 88:*19*
96:*19* 97:*13*
require 64:*8*
65:*22* 153:*19*
required 26:*2*
44:*10* 52:*20*
54:*18* 55:*8, 16*
63:*18* 73:*5* 77:*22*
78:*1* 79:*4* 81:*13,
16, 18* 83:*21*
84:*24* 86:*17*
94:*14* 95:*20, 21*
96:*11, 24, 25* 97:*5,
7, 19, 25* 98:*16, 20*
115:*15* 116:*17*
138:*23, 25* 139:*5*
149:*3, 19* 150:*7*
161:*17, 20* 163:*15,
17* 164:*20* 165:*7*
166:*17* 167:*7, 10,
15, 22* 168:*3, 9*
185:*10* 186:*4, 18,
22* 187:*17* 188:*15,
21* 189:*20, 21*
190:*14, 17, 24*
191:*8* 198:*19*
requirement 88:*8,
16* 89:*3* 92:*13*
99:*2* 161:*24*
200:*8*
requirements
64:*2* 76:*22* 77:*18*
92:*5* 95:*14, 23*
97:*8* 114:*5* 162:*3,
4, 25* 183:*22*
189:*1* 191:*24*
195:*21* 200:*11, 16*
requires 185:*5*
188:*6* 191:*15*
research 104:*10,
12* 109:*19*
reservation
173:*12, 20* 176:*9,
20* 178:*2* 179:*24*
reservations
171:*23*
reserve 206:*25*
207:*3, 5*
reserved 174:*13*
resolution 40:*10*
resource 109:*24*
199:*7*
resources 135:*6*
136:*19* 203:*18*
respect 25:*19*
82:*6* 99:*19*
116:*14*
respond 55:*24*
84:*22* 125:*4, 9*
responding
140:*10, 13, 17*
response 76:*1*
82:*22* 142:*13*
164:*9* 165:*8*
166:*22*
responses 138:*19*
responsibilities
16:*15* 20:*21* 22:*1,
17*
responsibility 21:*1*
responsible 21:*5,
7* 22:*4*
responsive 118:*22*
rest 37:*7* 90:*23*
restart 156:*3*
restriction 30:*8*
result 28:*4*
150:*23*
results 107:*10*
resumed 60:*13*
124:*8* 192:*10*
206:*24*
retain 102:*24*
104:*19*
retained 10:*3*
103:*3, 12, 15*
125:*22* 133:*8, 10,
13* 138:*11* 139:*12*
140:*2* 155:*10, 23*
156:*6* 161:*13*
return 68:*25* 69:*6*
reuse 60:*25* 62:*12*
review 38:*2, 6, 10,
13* 39:*23* 40:*15*
51:*21* 57:*15*

79:14, 16   86:7
117:2   153:2, 7, 19
154:2   159:19
160:12, 24   169:11
179:12, 21   181:16,
24, 25   194:9, 12
**reviewed**   12:1, 3
32:19   39:7
171:19, 20   181:15
182:6   192:25
**reviewing**   173:19
185:17
**rid**   66:23
**right**   7:19   8:16
10:2   19:25   23:3
26:11, 14   28:18
29:17, 20   30:24
37:2   41:7   45:21,
23   46:8   50:21
51:6, 8, 15   52:21
53:2, 24   54:5
56:5   58:7   60:15
62:14   65:5   66:3
69:20   70:1   76:3,
4   78:3, 6   79:8, 12,
17   82:3   84:19
85:4   87:18   88:4,
12, 20   89:20
93:21   98:6, 7
99:20   100:4, 8, 20
103:10   107:12
108:10   111:16, 20
117:19   118:1
119:21   125:13
131:15   133:20, 21
134:17   138:16
154:19   155:18
156:15   158:22
160:6, 8   161:19
163:8, 21   165:10,
23, 25   167:10
168:3, 4   169:16
170:12   171:11, 13
174:11, 19   176:2
177:1   178:23
180:15   181:13
183:14   184:14
186:1   191:17
192:22   193:7

196:15   199:20
200:9   204:2
206:10
**rights**   10:25   11:3,
5   21:9   28:7
47:13   48:25   49:5
57:19   66:19   76:9
78:23   122:24
145:25   157:20
170:9   172:11
173:1, 9   174:7, 13,
23   175:1, 3, 17, 22
176:7, 8   177:18,
24   178:1, 7, 20
**risk**   16:20, 25
17:1, 12   42:4, 7
56:10   105:12, 24
107:7   111:22
121:5, 16   122:14
155:24   156:7
**risks**   152:15, 21
156:11   205:21
**Riverside**   172:25
174:18, 23   175:11,
14   178:13
**road**   28:13, 18
49:5   75:10   199:6
**Roadrunner**   9:25
38:21   39:2, 4, 8,
13
**roads**   28:10, 13
30:1   71:1   72:13
198:7, 13   199:6,
10
**Robert**   12:20
**rock**   60:25   61:1
62:11, 12   64:19
65:21   68:19   69:1,
2, 6, 15
**rocks**   150:24
202:11
**ROEHL**   2:10
**role**   14:5, 7
69:22   75:5   97:22
109:16   114:7
144:23
**Ron**   76:2
**room**   6:5   7:5

9:7, 8   25:5
**roughly**   24:6
**routinely**   71:1
72:12   99:18
**RPR**   1:25   209:3
210:22
**rule**   46:12   99:2, 3
**ruled**   45:22, 23
46:21
**Rules**   4:4
**run**   16:16
**Ryan**   2:13   6:3
12:9

**< S >**
**sacred**   49:7
**San**   7:1   131:6,
20, 21   169:16
**sandy**   9:19   85:18
165:24   168:2
**Sarah**   2:6   5:24
9:6   12:9   56:24
57:17   89:22
101:11   102:6
124:3
**sarah.stevenson@**
**modrall.com**   2:12
**sat**   150:15
**satisfy**   91:2
**save**   156:4
**saw**   87:25
109:20   165:4
166:4   167:24
168:1   195:9
199:19
**saying**   19:1
25:24   35:17
68:18   79:2, 6
80:24   91:13
98:16   104:3
106:10, 11   107:6
116:9   129:1
132:21   159:17
164:9   168:5, 7, 8
174:5   185:10
186:3, 5   188:5, 10
190:17   191:7
198:4   204:16

**says**   6:12   58:9
81:21   103:11
105:10   108:12, 13
138:18   139:20
140:25   141:5
173:12   183:16, 18
185:4   188:2, 6, 11
189:14, 17   191:15,
18   193:17   203:15
204:6
**scale**   16:22   206:1
**scenario**   150:22
205:23
**schedules**   116:4
**Scott**   57:18   89:23
**Scratch**   107:1
114:22   128:12, 15
141:22   142:3
192:23   195:12
196:8   198:16
**screen**   7:4, 8
14:14   24:24
36:20, 22   38:19
57:10   61:3   62:1
83:14   93:17
193:17
**scroll**   15:7   37:7
108:9   174:1
179:4   183:7
**scrolling**   15:12
177:2   179:10
183:11
**se**   26:12   27:5
28:22   40:1   41:25
46:22   50:4
117:15   135:16
136:25   137:6
169:19   174:16
189:2
**seal**   210:18
**search**   107:9, 11
**seat**   47:10   56:4
63:15   100:18
101:1   114:9
**SeaWest**   21:18,
23   22:2, 3, 9
**second**   34:6   58:5
71:7   74:2, 3
83:18   87:3   105:9,

10, 19, 20  110:6,
24  129:12, 14, 24
130:2  139:2
172:8  181:14, 23
183:1, 14  195:16
**second-to-last-**
**sentence** 140:25
**section** 135:1
196:3
**sections** 33:5, 6, 8
183:24  184:19
**sector** 120:23
121:7
**secure** 114:4
183:22  197:16
**security** 114:2
**see** 14:14, 15, 25
23:1  24:18, 19
34:2, 11  36:7
38:22  41:12  44:5
53:7  54:12  56:19,
21  62:14  66:12
73:22  74:18  75:1
87:3  88:14  89:17
93:14, 17, 20
123:16  139:19
154:3  167:3
173:2, 17  174:3,
22  175:10  183:6
186:19  188:1, 5
190:12, 13  195:11
204:2
**seeing** 14:16
71:12, 13  73:19
78:7  90:17
117:10, 24  118:12,
19  197:19
**seeks** 33:10  125:2
**seen** 13:14  20:7
35:8  57:21  58:5
59:3, 21  63:20, 22
71:10  74:13
79:15  85:14
90:14  108:8
117:15  171:22
183:4, 7, 10, 12
200:10  201:18
202:24

**self-described**
105:23  106:4, 5
**sell** 167:1
**seller** 47:21
**selling** 36:2
**semantics** 137:18
**send** 61:22  73:18
128:4  166:21
189:15  190:10
192:3
**senior** 129:3
131:11
**seniority** 129:23
**sense** 28:22, 24
40:24  61:23
102:7  112:12
204:8
**sent** 61:17  91:21
99:8  128:7  162:8
**sentence** 76:3
103:11  105:10, 19
140:22  181:14, 23
182:1  183:15, 18
184:1, 7, 12  203:2,
14
**separate** 25:9
29:17  137:21
**September** 104:24
**series** 96:10
**served** 31:5, 6
**services** 155:17,
25  156:7
**set** 48:20  145:10
146:17  163:5
165:4  182:11
200:4  210:13, 17
**setting** 65:6
202:18
**seven** 109:21
**severance** 20:3
39:24  40:2, 5, 13,
18, 21  41:2, 12, 23
42:12  117:6
172:13, 24
**severed** 134:21
**shale** 71:24, 25
**shape** 51:1  58:1
82:14

**share** 14:14
36:21  38:19
57:10  62:1  83:14
93:17  106:10, 17,
24  120:16  122:16
**sharing** 61:3
**shay** 71:24
**SHEET** 209:1
**shock** 35:14
**shocked** 35:4, 5
63:1
**shoes** 92:18  93:8
201:1
**Shoney** 2:3  5:17
**Short** 60:13
192:10  206:24
**Shorthand** 4:6
210:5, 10
**shortly** 104:23
**show** 56:20
98:12  110:15
**showed** 87:21, 24
197:16
**showing** 7:3
24:23  62:2
**shown** 172:17
**shows** 111:12
129:19  194:1, 10
**sic** 5:8  131:10,
12  179:13
**sign** 207:2, 7
**signatures** 34:4
**similar** 22:3
120:12  199:5
200:11
**similarly** 199:15
**simply** 188:10
**single** 96:3, 14
97:15  98:9
131:11  150:16
174:5  193:6
**SISK** 2:10
**sit** 51:14  52:11
180:8
**site** 18:14, 16, 23
19:4, 8  21:1  22:6
24:3  36:1, 2
44:18  45:2  72:6,
18  75:14  76:6, 7,

14, 21  78:20, 21
79:19, 21, 22  80:1,
3, 14, 16, 25  98:5,
13, 15  112:9
133:25  134:13, 16
153:3  167:1
169:10  181:7, 19
185:15  197:9, 17,
21  198:6, 12
199:7
**sites** 21:2, 6
169:12
**sitting** 6:6  47:10
63:15  78:7  92:18
93:8  100:25
**situation** 20:4
41:18  42:10  70:2
85:21  99:6  150:7
**six** 111:14, 15
181:15  182:3
**size** 50:11  106:9
107:3
**skip** 76:3
**Slade** 2:9  6:3
12:9
**slant** 27:22
**small** 114:24
123:3  168:20, 24
**smaller** 109:8
123:15
**smarter** 100:20,
23  159:14
**smartphone** 8:17
**soil** 9:19  57:20
76:5, 10  78:19, 24
85:19  165:24
168:2
**Solar** 9:25  21:16,
17  26:24  30:6
38:21  39:2, 4, 8,
13  40:16  42:18
110:2  122:8
170:12  171:14
172:3  178:23, 24
**sold** 44:16  45:2
81:24
**solely** 170:13
**solicit** 127:24
128:10

**solution** 202:*13, 21*

**Solutions** 15:*22* 16:*3, 10* 20:*16* 50:*9* 102:*25* 103:*3, 12, 20* 105:*4, 7*

**solve** 17:*22* 96:*5*

**sorry** 11:*2* 18:*25* 37:*6* 44:*3* 55:*5* 61:*5* 71:*6, 25* 74:*1* 81:*8* 85:*5* 86:*25* 92:*22* 93:*4, 11, 13* 105:*15, 17* 106:*25* 108:*3, 10* 110:*17* 114:*22* 120:*3, 18* 121:*12* 125:*11, 14* 127:*12* 128:*18* 131:*11, 16* 132:*20, 21* 133:*19* 134:*20* 139:*25* 146:*2, 6* 153:*21* 154:*4* 156:*1* 158:*9* 160:*3* 174:*4* 183:*21* 187:*9* 189:*18* 194:*20* 195:*4* 197:*22*

**sort** 14:*4* 40:*23* 59:*14* 68:*16*

**sorting** 60:*24* 62:*11*

**sound** 60:*9*

**sounds** 43:*7* 179:*22* 192:*22* 206:*22*

**source** 199:*24* 200:*17*

**sources** 112:*4*

**South** 2:*4, 14* 21:*4*

**sovereign** 50:*20*

**sovereignty** 39:*5* 50:*6*

**space** 16:*23* 122:*10*

**spacing** 30:*6*

**speak** 49:*23* 98:*9* 124:*20* 147:*6*

159:*2* 176:*5* 179:*7*

**speaking** 48:*21* 52:*1* 115:*1* 144:*19, 25* 145:*1*

**special** 23:*8* 75:*15, 19* 200:*14*

**specialize** 17:*17* 40:*8, 9* 112:*6*

**specialized** 22:*23*

**specializes** 111:*23* 112:*1*

**specializing** 105:*13*

**specialty** 112:*11*

**specific** 18:*11* 19:*10, 13* 24:*15* 30:*25* 49:*8* 60:*23, 24* 62:*9, 10* 73:*14, 23* 76:*24* 77:*7* 84:*11* 91:*10* 123:*9* 125:*24* 127:*1* 145:*15* 155:*21* 157:*18, 19* 162:*20, 23* 196:*5, 23*

**specifically** 12:*8* 15:*2* 53:*8* 60:*21* 62:*7, 22* 72:*9* 73:*6* 83:*16* 88:*4* 133:*16* 135:*15* 141:*1, 6* 144:*20, 21* 177:*11* 178:*9, 17*

**specifications** 201:*25*

**spectrum** 112:*10*

**spell** 6:*20*

**spend** 176:*6*

**SPERLING** 2:*10* 5:*25*

**spoke** 24:*10* 33:*2* 62:*24* 144:*21*

**spoken** 14:*8* 126:*20* 127:*14* 130:*18*

**SS** 210:*3*

**stage** 18:*13, 14* 23:*14* 70:*14, 21*

86:*10* 88:*8* 124:*19* 170:*16* 177:*22*

**stages** 53:*12, 15* 65:*4* 169:*9* 176:*1* 181:*2, 4*

**stake** 206:*3*

**stamped** 57:*12* 58:*6* 71:*6* 74:*9* 85:*7* 89:*25*

**stand** 23:*4*

**standard** 43:*24* 47:*18, 19, 20* 48:*15* 49:*24* 50:*5* 70:*8, 9* 91:*2* 190:*7*

**standards** 43:*4, 9, 20* 44:*7* 47:*1* 141:*3*

**standing** 95:*24*

**standpoint** 40:*12* 42:*3, 4, 5, 8* 52:*2* 63:*25* 64:*11* 65:*13* 67:*10* 68:*4, 9* 114:*11* 117:*17* 118:*2* 122:*2, 11*

**stapled** 195:*15*

**start** 114:*8* 138:*15* 145:*21, 22* 146:*5* 165:*11* 201:*3*

**started** 6:*19* 16:*1* 21:*22* 59:*11* 74:*25* 102:*8, 12* 130:*10* 166:*12* 170:*11* 201:*5*

**starting** 130:*23* 154:*22*

**starts** 65:*11* 126:*2* 181:*14* 193:*17* 202:*8*

**state** 5:*10* 6:*4, 20* 16:*24* 57:*24* 59:*16* 62:*7* 66:*5* 67:*2* 89:*9* 148:*18* 184:*8* 208:*2, 6, 17* 210:*2, 6*

**stated** 26:*2* 44:*1, 10* 81:*10, 11*

96:*24* 97:*24* 127:*6*

**statement** 79:*9* 83:*18*

**STATES** 1:*1, 2, 20* 5:*4, 6* 11:*20* 21:*3* 22:*23* 31:*4, 12* 32:*1* 39:*15* 43:*14* 50:*1* 57:*19* 75:*8* 78:*18* 85:*11, 16* 89:*11* 97:*19, 20, 22* 98:*17* 139:*19* 151:*21, 22, 23, 24* 152:*4* 181:*23* 208:*25*

**stating** 86:*16* 90:*1*

**statute** 39:*9*

**step** 26:*4* 94:*18* 100:*13* 154:*13*

**steps** 63:*13* 73:*1* 114:*17* 153:*25* 154:*14* 188:*1*

**Steven** 13:*3*

**Stevenson** 2:*6* 5:*24* 9:*7* 10:*10, 16* 11:*22* 12:*9* 19:*22* 26:*8* 27:*11* 29:*13* 32:*3, 10* 33:*9* 37:*5* 47:*15* 48:*10* 55:*18* 56:*23* 57:*17* 59:*2, 9, 19* 60:*4, 10* 69:*8, 18* 72:*20* 75:*20* 76:*18* 81:*19* 86:*20* 89:*16, 23* 90:*12* 91:*8, 23* 98:*21* 102:*5* 119:*2, 24* 121:*21* 124:*5* 125:*1, 8, 13, 18* 126:*24* 127:*3, 9* 128:*20* 136:*10, 21* 138:*5, 8* 139:*14* 140:*8, 16* 141:*11* 142:*15* 144:*17* 146:*14* 147:*17* 149:*5* 156:*13, 21* 157:*8, 13* 158:*6, 8*

159:22  160:*16*
161:*2, 25*  163:*6,*
*18*  166:*18*  167:*11,*
*23*  170:*24*  176:22
185:2, *23*  186:*13*
187:22  188:22
189:*23*  191:*6*
196:16  197:*3*
198:2  199:*3*
200:*23*  203:*10*
204:*25*  205:*14*
206:*17, 25*  207:5
**Stewart**  101:*17*
**stipulated**  4:2
**STIPULATIONS**
4:*1*  210:*12*
**stop**  38:*9*  67:*6*
87:*10*  88:*10*
91:*13*
**stopped**  107:*10*
132:*12*
**stopping**  57:*1*
120:*1*  124:*1*
**Storm**  179:*3, 5, 13*
**strategy**  17:22
**Street**  1:*20*  2:*10*
**stretch**  203:*13*
**strike**  147:2
**struggling**  44:*23*
**Stuart**  1:*19*  5:*18*
101:*11*  102:5
108:*24*, 25  151:*20*
**stuart.ashworth@s**
**ol.doi.gov**  1:22
**stuff**  112:*21*
**subcontractor**
133:*11*
**subject**  57:*19*
94:*21*  114:*1*
134:*6, 9, 15*
136:*23*  154:*23*
155:25  156:*8, 20*
157:*12*  158:*18*
170:*9*  183:*20*
187:*24*  193:22
**submit**  73:*11*
**subordination**
73:*12, 17*  84:*10*
164:*10, 13*

**subordinations**
65:*8*  118:*9*
**Subscribed**  208:*16*
**subservient**  25:*10*
39:*21*  40:*20*
42:*11*
**substantiates**
81:*17*
**substitute**  197:*25*
200:*5, 22*  202:*18*
**sudden**  147:*8*
168:*6*
**suffice**  60:*9*
**sufficient**  159:*20*
160:*14, 25*  161:*23*
167:*8*
**suggested**  33:*14,*
*15*
**Suite**  1:*20*  2:*4,*
*10, 14*
**Summary**  83:*17*
171:*18*  173:6
**superintendent**
85:*10*
**supplement**  36:*17*
**support**  93:*24*
143:*21*
**supporting**  93:*23*
**supports**  143:*23*
**suppose**  94:*16, 25*
95:*15*  106:*3*
128:*11*  205:*10*
**supposed**  191:*21*
**Sure**  9:*15, 17*
11:*4*  15:*9*  19:2
24:*17*  25:*14*
26:*11*  30:*24*
33:*23*  37:*8*  40:*17*
41:*10, 14*  44:*5*
48:*12*  52:*5*  61:*11,*
*18*  64:*9*  67:*8*
70:*19*  72:*1*  74:*24*
75:22  77:*8*  80:*5*
81:*10, 24*  82:*24*
86:22  87:*1*  90:*19*
92:*1*  101:*3, 9*
109:*19*  110:*5*
111:*25*  113:*20, 23*
114:*1, 11*  116:*5*

120:*6, 24*  122:*14*
124:*16, 17, 20*
126:*1, 11*  127:*14*
128:*11*  129:*14, 16*
130:*7, 16*  136:*6,*
*16*  137:*20*  140:*1,*
*12*  142:*1, 2*
146:*25*  149:*9, 15*
150:*4*  151:*10*
153:*11, 13, 22*
154:*24*  156:*14*
158:*1, 11*  160:*10*
162:*18*  163:*10, 13*
167:*14, 15*  173:*10*
175:*19, 24*  177:*4,*
*11*  180:*23*  185:*14*
186:*8, 14*  187:*1,*
*25*  188:*11*  190:*20*
194:*21*  197:*4, 22*
201:*14*  203:*3, 19,*
*22*  204:*2, 5, 15, 18*
205:*15, 22*  206:*21*
**surface**  9:*25*
13:*11*  20:*6*  25:*8,*
*9*  39:*20*  41:*3*
42:*10*  57:*19*
117:*12*  134:*17, 18,*
*23*  135:*3*  137:*2*
142:*23*  181:*15*
182:*3, 14*
**surprise**  35:*14*
36:*6*
**surprised**  35:*5, 10,*
*13, 18*  63:*1, 10*
64:*17*  72:*10, 14*
121:*3*  198:*10*
203:*19*
**survey**  97:*10*
113:*15*  174:*20*
179:*6*  193:*20*
194:*1, 2*  195:*3, 8*
**surveyors**  43:*15*
**Sustainability**
13:22, *23*  14:2
**swear**  6:*10*
**sworn**  6:*12*
208:*16*  210:*8*
**synthesized**  96:*7*

**system**  9:*3*

**< T >**
**table**  8:*21*  29:*23*
114:*10*
**take**  7:*13, 14*
17:*7*  26:*4*  28:*24*
29:*11*  34:*1*  47:*20*
48:*5*  50:*3*  57:*5*
60:*8*  68:*4*  73:*1*
80:*5*  86:*1, 6*
91:*14*  96:*4*  99:*17*
100:*13*  101:*12, 13,*
*23, 24*  102:*3, 8*
126:*8*  134:*1*
153:*16*  172:*18*
175:*19*  177:*7*
187:*5, 13*  189:*5*
192:*8*  200:*14*
205:*21*  206:*6, 18*
**TAKEN**  1:*14*  4:*3*
5:*2*  26:*6*  27:*8*
42:*21*  45:*2*  46:*5*
53:*10, 16*  63:*13*
64:*12*  69:*16*
81:*23*  136:*8*
138:*4*  144:*15*
146:*2, 3, 11*
147:*14*  148:*21*
188:*1*  198:*19, 24*
202:*3*  209:*4*
210:*10, 12*
**takes**  77:*6*  99:*17*
149:22
**talk**  27:*17*  73:*10*
77:*17*  99:*10, 11*
120:*14*  144:*23*
145:*16*  172:*10*
180:*21*
**talked**  95:*5*
118:*8*  132:*6*
135:*18*  162:22
**talking**  19:*24*
26:*10, 11, 13*
45:*23*  51:*3, 5*
54:*8*  63:*16*  68:*6*
69:22  74:*16*
134:*17*  135:*12*
148:*19*  149:*7, 11*

150:22  153:22
161:7, 18, 19
168:10  170:5
171:11, 12  182:16,
17, 21  191:13, 20
**talks**  162:10
182:11
**tax**  17:6  108:16
177:24
**team**  20:25  29:2
77:10  78:8
113:15  128:7
**technical**  109:5
**tell**  9:16  18:11
19:13  25:12
30:20  33:22, 24
51:15  88:17
106:23  129:10
144:13  147:8
150:9  151:25
168:21  169:7
175:21, 23  178:9,
11  195:24
**telling**  175:20
**ten**  60:8  107:2
108:15, 18, 21
109:25  111:18
121:1  169:25
170:23  171:1
176:13
**Tenth**  9:21  26:1
32:19, 23  33:20
34:13, 15  35:2, 14
44:1, 10  45:17, 19
46:7, 24  62:21
63:1, 3  67:22
68:17  78:3  87:17
92:11, 16  99:21
144:4  146:18
156:17
**terminate**  66:19
**termination**  67:5
**terminology**  90:20
**terms**  13:16
26:15  40:23  41:7,
8  42:1, 21, 22
51:2  54:12  55:25
67:16  88:16  89:7
103:25  106:12

109:15, 24  112:19
113:17  114:10
118:7  120:22
121:9  130:1
137:4, 8, 19
154:17  159:7
186:7
**TerraPro**  15:22
16:3, 10  20:16
102:24  103:3, 12,
15, 19  104:19
105:4, 7
**terrible**  156:4
**testified**  7:22
90:13  111:21
126:18  132:4
144:3  176:12
196:9
**testify**  145:11
210:8
**testifying**  146:15,
17, 20
**testimony**  112:2
124:14, 22, 24
125:25  126:17
128:17  139:12, 22
140:6  142:5
146:4, 7, 24  150:6
151:11  166:14
167:13, 20  168:24
170:19  190:22, 25
192:14  196:13, 22
197:11, 24  198:1
199:25  208:10
**text**  9:2
**Thank**  15:13
16:11  37:9  60:16
61:20, 23  101:5
179:5  192:9
206:17  207:11
**Thanks**  6:24
**thereabout**  55:4
**thing**  14:4  24:16
30:4  33:3  35:9
40:20, 24  43:2
96:3  114:14
123:22  145:4
146:19  166:8

172:21  181:8
201:8  206:10
**things**  17:18
18:12  20:7  23:19
28:20  29:23, 25
40:14  42:20
45:10  50:12, 14,
17  64:7  65:9
70:11  71:1  72:2,
25  77:15  88:19
95:25  97:11
98:14  113:18
118:10  123:13, 16
132:1  156:2
159:16
**think**  7:8  19:23
25:4  26:9, 13
27:13  28:23
29:19  31:14
32:25  33:24  35:9,
17, 25  36:4  40:7
41:8  42:12, 22
43:11  44:12, 14,
19, 21  45:4, 7, 9,
22  46:1, 2, 4, 10,
11, 18, 23  47:24
49:10, 11, 15  50:7
51:3, 5, 7, 14  52:3,
19, 21, 22, 23  53:6,
11, 12, 15  54:5, 6,
10, 22  55:2, 20, 21,
23  56:2  63:6, 9,
19  64:11, 16  65:3,
12, 13  66:13  67:7,
23, 25  68:6, 8, 21
69:19, 21, 24  70:4,
12, 21, 23  71:2
72:21  73:6, 18
74:5  76:20  77:5
78:2, 4  79:6, 9
80:17, 23  81:20
82:2, 22  83:1, 2, 8
84:13  85:25  86:2,
4, 10  87:16, 19, 20,
23  88:8, 13  89:1
92:12  94:7, 17
95:11, 12  96:11
97:12  98:22, 25
99:5, 7, 12, 15, 20,

22  100:12, 25
101:3, 6, 14  102:6,
7  111:17  117:4, 9,
16  118:11, 21
122:9, 11  123:19,
25  129:6  130:4
131:14  132:6, 16,
25  135:12, 18
136:22  137:1, 7, 9,
13, 19, 22  140:9
142:16, 22  143:19
144:18, 20, 23
145:21  146:15
147:18, 25  148:3,
4  149:15  150:12
151:1, 3, 6  153:13
156:22  158:1, 25
159:1  161:3, 5, 8,
18  162:11, 19, 25
163:8, 19  164:20
165:3, 15, 18, 22
166:6, 8, 19  167:1,
2, 24  168:1, 10, 11
173:22  174:17, 25
177:5, 19, 23
178:18  179:3, 5,
17  182:9, 15
183:7, 10, 11
185:3, 6, 7, 25
186:3, 5, 15, 16
187:4, 23  188:23
189:1, 2, 5, 24
190:2  191:17
192:5  196:19, 21,
22  197:7, 14, 17,
19  198:10  199:4,
17, 19  201:8
203:13, 15, 17
204:4, 7  206:14
**thinking**  56:11
66:21  73:20
75:23  95:11
135:17  142:22, 23
156:4
**third**  100:16
**this'll**  14:23
**thought**  61:3
130:12, 13, 14
177:14

thoughts 90:*16*
101:*11*
three 12:*13* 16:*4,*
*9* 54:24 67:*12*
171:*10, 15*
three-month 148:7
throw 165:*11*
time 7:*13, 18* 8:2
9:*8* 10:*5* 20:22
23:*17* 24:*12*
30:*11* 34:*1* 39:*18*
42:*12* 54:6, *19*
60:*23* 61:*3* 62:*1,*
*9* 65:24 66:*1*
68:*13, 16, 19, 23*
75:*5* 80:*5* 85:*18*
86:22 89:*5* 90:*18*
91:*10, 15* 100:22
101:*21* 102:*4*
104:22 109:*10*
117:*17* 124:*4, 13*
147:6 148:*8*
156:*23, 25* 158:*5,*
*14, 24* 163:*14*
166:*1* 171:6
172:*19* 175:*19*
176:*3, 4, 6, 17*
180:6 183:*17*
189:*10* 190:*23*
197:*13* 207:*11*
208:*11*
timeline 182:*12*
times 7:25 10:2
28:*18* 90:*13*
113:*16, 18* 114:*14*
170:*16*
Title 16:*9* 17:*9*
21:*8* 22:*5* 39:*23,*
*24* 40:8, *14* 43:*15*
112:*11* 114:6
115:*8, 19, 20, 24*
116:*3, 5, 19, 22*
117:2 118:*4*
119:*9* 131:*17, 23*
132:*2* 133:*14, 18*
145:*4* 152:*10, 13*
154:*19* 155:*18, 21*
159:*4* 162:*21*
172:*16* 173:*8*

174:*12* 175:*8*
179:*9*
titles 184:*20*
today 5:*16* 6:*3,*
*18, 25* 8:*16* 11:25
89:*24* 90:*18, 23*
98:*11* 101:*7*
124:*14* 126:*18, 23*
127:*15* 140:6
180:*8*
today's 12:*6, 12,*
*16*
told 73:6 86:*16*
ton 27:*15*
top 51:*16* 62:*5*
106:*25* 107:*2*
108:*13* 121:*1*
168:*21* 179:*7*
183:6
topsoil 200:*12*
totality 27:*25*
157:*17, 23* 159:*5,*
*24* 160:*4* 203:*2*
towers 58:*15*
90:*7* 144:*11*
TPS 105:*5, 6, 11,*
*23* 106:*1, 10, 17,*
*25* 107:*2, 11, 18,*
*24* 108:*14* 111:*21*
112:*1, 2, 25* 113:*9,*
*12* 114:*16, 23, 25*
121:*5* 127:*20*
128:*2, 9, 17, 18*
129:*4, 13* 130:*10*
155:*6, 9, 17, 23*
156:*2, 6, 9*
track 170:*14*
Tradewinds 58:*11*
90:*2*
traditionally 66:*12*
training 15:*17*
transaction 108:*17*
transactions 129:*4*
transcribed
210:*11*
transcription
208:*10*
translates 111:*14*

transmission
170:*10* 178:*16*
181:*7*
treaty 10:25 11:*5*
trespass 31:22
32:*8, 13* 48:*9, 11*
trial 125:*18*
142:*3, 4* 145:24
146:*16* 147:*7, 8*
151:*11* 176:*5*
trial's 144:*7*
tribal 11:*1, 6, 15*
18:*7, 10, 23* 19:*7,*
*16, 18, 20* 20:*9, 13*
30:*18* 31:*1, 15*
39:*5* 50:*1, 6*
97:*24* 98:*1*
157:*20* 169:*16*
170:*8, 13* 172:*11*
173:*1, 8* 174:*7, 15*
175:*13* 176:*6, 8*
177:*20, 24* 178:*1,*
*5, 6, 7, 15, 20*
180:*24* 181:*5, 9*
195:*21*
tribe 18:*11, 17*
31:*15* 34:22
46:*13* 48:25 49:6
53:*4* 58:*10, 23*
60:*3* 86:*16* 90:*1*
96:*11* 98:*15* 99:*3,*
*4* 133:*2, 4, 9*
134:*4, 6, 22* 135:*2*
174:*21* 175:*12*
189:*9, 19* 196:24
tribes 20:*3* 46:*17*
149:*10*
tried 70:*21*
trigger 64:*25*
75:*11* 80:*21*
tri-party 175:*12*
true 59:*24* 208:*9*
trust 10:*15* 15:*18*
31:*9, 11* 39:*16*
49:25
trustee 31:*5, 6, 9,*
*18* 39:*16*
trusts 22:*19*
truth 210:*8, 9*

try 14:2 26:*20*
27:*4, 25* 28:*11*
68:*9* 75:*14* 83:*7*
94:*19* 99:24
136:*4* 137:*5*
152:*20* 157:*23*
172:*19* 175:*20*
177:*8* 203:*23*
trying 54:*16*
79:*4* 80:*8* 83:*4,*
*12* 87:6 90:*20*
92:*6, 7* 96:*4*
101:*2* 107:*11*
135:*25* 138:*10*
139:*19* 140:*1*
144:*11* 145:*14, 21*
147:*5* 157:*14*
161:*5* 165:*11*
175:*19* 183:*10*
189:22 191:*4*
Tulsa 1:*21* 2:*5,*
*15*
turbine 35:*8*
61:*1* 62:*12* 63:*21*
76:*16* 77:*1, 2*
83:*21* 139:*5*
199:*14*
turbines 30:*7*
69:*17*
turn 14:*12, 24*
15:*1* 22:*21* 60:*17*
turned 8:*20*
turning 58:*5*
two 138:*19*
139:*11, 16, 20*
140:*4, 11* 171:*10,*
*14*
type 24:*16* 40:*20*
43:*1* 48:*15*
143:*18* 145:*4*
154:*22* 181:*8*
203:*6*
types 20:*7* 137:*1*
149:*10*
typical 144:*24*
148:*6*
typically 30:*7*
41:*1* 44:*21* 52:*10*
76:*7* 78:*21* 79:22

**Professional Reporters**
800.376.1006
www.proreporters.com

80:25  94:10
117:19  134:14
135:7  148:16
149:21  154:6
**typing**  104:8, 11

**< U >**
**U.S**  5:19, 20, 23
21:5  101:18
107:3, 9  120:12,
16
**Uh-huh**  16:24
29:18  36:7  42:7,
25  50:13, 19
56:18  71:4  74:1
79:20  88:2, 5
91:16  95:7  98:10
107:22  130:3
204:13
**ultimately**  132:9
**umbrella**  103:2, 6
**unable**  170:20
196:25
**undersigned**
208:17
**understand**  7:11
9:6  17:12, 21
24:17  25:22
32:12  40:18
41:20  42:15, 16,
24  43:3  44:14
54:15, 16, 19
61:16, 21  64:1, 10
65:15  79:4  81:13,
24  86:8, 12  87:7
90:20  91:6, 14, 17
92:4, 8  99:24
101:2  105:6
111:25  119:19
124:11  134:7
138:11  140:1
144:12  147:5
153:20  161:5
164:2  175:1
188:24
**understanding**
17:18  34:14  35:2
40:4  47:12  50:19
54:20  55:2, 8

56:10  63:17
64:22  65:2, 19, 21,
23  66:11  68:24
69:14  70:17
72:22  74:20
75:17  79:24
80:13  88:13
90:24  94:9  95:13
117:7  122:7
123:9  135:19
137:25  141:16, 23
149:1  162:4
184:16, 22  203:11
**understandings**
90:25
**understood**  55:22
70:1  96:8
**undertake**  161:22
183:23
**undertaken**  196:3
**undertaking**  29:2
65:22
**Underwood**  1:24
**unfortunate**  56:3
**unique**  136:23
150:19, 25
**UNITED**  1:1, 2,
20  5:4, 6  11:20
21:2  31:4, 12
32:1  39:15  43:13
50:1  85:10  89:11
97:18, 20, 22
98:16  208:25
**University**  131:2,
6
**unquote**  75:18
85:22
**unreasonable**
26:3  141:19
142:8
**update**  36:17
**updated**  202:2
**USA**  31:18
**use**  9:2  10:1
20:6  26:23  27:18
28:18  41:8  42:17
47:1  57:2, 20
63:5, 9  64:24
66:23  75:14  76:6,

14  78:20  79:21
81:3  117:12
137:2  200:21
**uses**  13:10  30:3, 8
**usually**  72:13
73:1  77:6
**Utah**  181:3
**utilities**  22:25
**utility**  16:22  84:7
**utilizing**  68:17

**< V >**
**valuation**  13:10
25:18, 19, 20, 25
26:5, 12, 19  27:3
28:25  135:6
**value**  27:4, 9, 14
28:20  41:25
50:17  96:2, 4
135:7, 13, 15, 17,
24, 25  144:20, 21
**various**  181:2, 4
**Venturini**  85:9
**verbatim**  96:15
**verify**  37:2  62:17
**versa**  119:18
**versus**  5:5  26:24
30:6  42:18  141:6
158:24
**vice**  20:23  119:17
**VIDEO**  1:14  5:1

**VIDEOGRAPHER**
1:24  5:1  6:9
**view**  46:10  51:6
64:16  68:11
84:13  100:13
175:23, 24  176:24
178:13  179:13
185:9
**violated**  32:7
**violation**  10:8, 15
**vision**  49:2, 8
**vs**  1:2  208:25

**< W >**
**wait**  60:19
**waived**  126:4

**walk**  52:10
**walking**  94:19
**want**  7:7, 15, 16
16:9  22:14  33:22
34:2  41:10  42:13,
14, 16, 18, 24
50:15  58:7  61:8,
18  64:15  65:15
75:11  83:5, 6
86:1, 11  93:6
101:10, 12, 23, 24
102:8  104:22
111:5, 25  119:24
120:1  124:1, 4, 14
125:5  126:17
131:7  147:7, 11
148:20  153:13
165:14  172:18
176:23  187:25
191:21  202:7
205:23
**wanted**  49:1
56:7  141:7
177:15
**wants**  91:1
**Watson**  2:18
5:22  194:3
**way**  25:14  30:23
47:11  74:11
100:1  118:22
122:16  143:9
155:15  160:17
173:23  200:7
203:23
**ways**  50:12
152:1  175:18
**wearing**  63:11
**Website**  3:15
110:23  111:2, 8,
12  123:19  129:18
171:21
**weed**  76:24
200:12
**weeds**  76:24
**week**  61:13
**Weigel**  75:8
78:15
**Well**  17:2  19:23
21:12, 16  25:6, 22

**Professional Reporters**
800.376.1006
www.proreporters.com

31:8  34:6, 11, 17
40:7  41:6  45:20
47:3  48:18  52:1,
18  58:8  65:7
67:23  69:19  71:3,
14  78:2, 18  79:6
81:20  82:8  85:25
87:16  98:3, 22
103:1  105:3
106:2  108:23, 24
115:22  120:24
121:22  130:12
133:22  134:5
139:18  142:16
143:11, 13  150:12
153:10  158:18
160:21  161:12
163:19  165:3
166:14  171:18
177:9, 11  180:5, 7
181:18  185:25
186:25  188:23
190:4  191:9, 15
195:12, 14  196:4
197:14  199:4
201:21  203:16
205:20  206:12, 14
**went**  73:21  86:23
173:14  186:24
203:8
**We're**  6:6  14:21
17:2  20:1, 4  26:9,
10, 11, 13, 20  28:2
29:19, 21, 22
31:14, 15, 16
36:22  37:1  38:19
40:17, 19, 20
41:18  42:3  51:3,
11  52:23  54:5, 8
56:11  57:10  62:5
63:16  66:24  68:6
79:7, 17, 18  83:1
84:8, 9, 20  89:2,
19  93:19  99:6
100:19, 21, 23
109:14  113:19, 22
114:9, 15  123:25
124:9  127:2, 3
134:16  135:12

137:13  140:10, 11
148:19  150:22
153:22  155:21
161:18  164:7, 12,
13, 15  165:5
166:22  172:3
174:18, 19  176:1
178:25  182:16, 17
191:13  192:11
205:25
**West**  1:20  170:4
**wetlands**  97:8
**We've**  36:21, 25
56:24  98:11
101:8  171:10
**WHEREOF**
210:17
**willing**  47:22
51:23  176:5
**wills**  22:20
**WIND**  1:2  5:5
6:1  21:11, 14
22:8, 9  24:5
26:25  28:9  30:6,
10  40:16  42:18
57:12  58:13  61:1
62:12  69:14, 16
71:18  72:5, 8
74:9, 22  76:8, 16
78:22  79:23
83:18, 22  85:7
90:5  93:23  94:1,
3  98:19  102:24
103:13  104:19
105:14  108:22
109:23  110:1
111:13, 19  115:25
116:2, 18  117:18
119:12  122:6, 10
127:17  130:19
133:6, 8  138:21
139:2, 6  141:4, 21
143:1, 24  145:9,
10  146:12  149:2,
19  150:14  161:14,
21  166:15  168:15
169:1, 22  170:21
171:6, 9, 11
172:22  174:18, 19

175:16  176:14
178:25  179:15
180:4, 9  184:17,
24  186:11  187:20
188:13, 16, 18
189:21  191:3
195:22  196:11
204:20  205:2
**WIND-001948-
001950**  3:16
**Wind-012246**  71:8
**WIND-024749-
024751**  3:12
**WIND-024751**
74:11
**WIND-039298-
039302**  3:17
**WindPower**  21:19,
23  22:2, 3, 9
**witness**  6:6, 10
8:14  10:3, 11, 17
11:23  19:23  26:9
27:12  29:14
31:12  32:4, 11
33:13  37:6  47:16
48:11  55:19  59:3,
10, 20  60:5  69:9,
19  72:21  75:21
76:19  78:11
81:20  86:21
89:17  90:13  91:3,
9, 24  93:1, 4, 13
98:22  101:15
102:1, 9  119:3
120:8  121:22
125:3, 22  128:21
136:11, 22  138:9
139:15  140:9, 17
142:16  144:18
146:15  147:18
149:6  156:14, 22
157:14  158:9
159:23  160:17
161:3  162:1
163:7, 19  166:19
167:24  170:25
172:7  176:23
185:3  186:14
187:11, 23  188:23

189:24  190:25
191:7  196:17
197:4  198:3
199:4  200:24
205:1, 15  206:16,
20  207:1, 3, 6, 7
208:18  210:7, 17
**witness's**  101:13
**WOHLGEMUTH**
2:13
**Women**  13:21, 23,
25  14:3  109:3, 7,
11
**Wonderful**  7:2
**wondering**  19:5
**word**  28:24
149:16
**words**  27:13
91:17
**work**  13:20
16:17, 18, 20, 25
17:22  19:12  20:1,
10, 11  21:4  22:7
23:14  26:24  28:8,
15  29:5  30:5, 21
32:22  35:7  36:13
40:8, 9, 10  41:1, 5
48:1  49:22  51:16
52:8  53:11, 14
55:1  56:15  64:4
65:5, 9  66:11, 13,
22  73:10  84:5
88:25  98:8  103:1,
5, 6  112:8, 9, 10,
20  115:7, 12, 23
116:1, 4  119:10,
13, 14  120:2, 11
123:17  130:7
131:9, 16, 22
132:4  133:12
135:8  151:5
152:1  154:22, 25
159:4, 11  163:23
164:15, 16  169:9
170:16  173:8
174:17, 20  177:21
179:9  180:6
206:5, 8

Case 4:14-cv-00961-CRF-JFJ   Document 548-1  Filed in USDC ND/OK on 11/30/21   Page 245 of 245

**worked** 19:6
21:*12, 16* 22:*18*
23:*10, 12* 24:*10,
14* 31:*25* 35:*19*
43:*12* 48:*23, 24*
52:*16* 76:*23* 94:*9*
96:*23* 97:*18, 25*
109:*21* 123:*23*
131:*10, 18, 19*
149:*8* 150:*16*
151:*21, 22, 23*
152:*4* 168:*25*
169:*5, 23* 170:*20*
171:*6, 10* 179:*14*
**working** 13:*13*
18:*15, 18* 20:*15*
31:*14, 15* 43:*14*
44:*25* 46:*16* 47:*4*
48:*16, 17* 56:*24*
69:*12* 94:*24*
114:*15* 130:*10*
146:*22* 166:*13*
170:*11* 174:*19*
176:*1* 205:*25*
206:*13*
**works** 102:*4, 11*
124:*3, 6* 130:*5*
**world** 73:*22*
106:*22* 109:*17*
123:*18*
**worth** 26:*22* 28:*1*
**wraps** 101:*6*
**write** 60:*21*
93:*22* 110:*9*
**writes** 75:*7, 18*
76:*1*
**wrong** 14:*22*
25:*23* 45:*18* 79:*5,
13* 97:*20* 98:*1*
**wrote** 58:*18*
182:*22* 184:*8*
**Wyoming** 172:*21*
177:*18* 179:*18*

**< Y >**
**Yates** 183:*16*
**yeah** 19:*23* 24:*20*
26:*9* 29:*14* 34:*12*
37:*8* 46:*20* 54:*15*

69:*9* 70:*14* 80:*6*
91:*3* 102:*11*
106:*6* 107:*17*
110:*14* 117:*4*
124:*16, 18* 126:*23*
129:*25* 130:*13*
131:*14, 15* 132:*16,
21* 159:*23* 160:*10,
17* 161:*3* 163:*10,
12* 171:*15* 179:*5,
6* 180:*1* 186:*14*
203:*13* 204:*10, 18*
205:*1, 15*
**year** 24:*6, 14*
132:*23*
**years** 8:*7* 13:*12,
13* 16:*4, 5, 10*
22:*14* 35:*7*
106:*14* 131:*18*
145:*18* 151:*4, 5*
171:*4, 10, 15*
**yesterday** 111:*3*
**you-all** 17:*25*
121:*17*
**YUKON** 1:*15*

**< Z >**
**ZOOM** 1:*14*