# EXHIBIT 3

Case No. l4-CV-704-GKF-JFJ

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
    UNITED STATES OF AMERICA,
 3

 4              Plaintiff,

 5    and

 6    OSAGE MINERALS COUNCIL,

 7              Intervenor-Plaintiff,
    vs.                          No. 14-CV-704-GFK-JFJ
 8
    OSAGE WIND, LLC; ENEL KANSAS,
 9    LLC; and ENEL GREEN POWER
    NORTH AMERICA,
10

11              Defendants.

12    VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF BILL MOSKALUK
              TAKEN ON BEHALF OF THE PLAINTIFF
13              ON JUNE 16, 2021 AT 10:00 A.M.

14                        APPEARANCES

15    On behalf of the PLAINTIFF:
    Stuart Ashworth
16    Cathryn D. McClanahan
    Nolan Fields
17    UNITED STATES ATTORNEY'S OFFICE
    Northern District of Oklahoma
18    110 West 7th Street, Suite 300
    Tulsa, Oklahoma  74119
19    918.382.2700
    stuart.ashworth@sol.doi.gov
20

21    (Appearances continued on the following page)

22    ALSO PRESENT:  Megan Beauregard, Michelle Hammock, &

23    Christina Watson

24    VIDEOTAPED BY:  Megan Smith

25    REPORTED BY:   Abby Rhodes, CSR, RPR
```

```
 1                    APPEARANCES CONTINUED

 2     On behalf of the INTERVENOR-PLAINTIFF:
       Mary Katherine Nagle
 3     Shoney Blake
       PIPESTEM & NAGLE
 4     401 South Boston Avenue, Suite 2200
       Tulsa, Oklahoma  74103
 5     918.936.4705
       mknagle@pipestemlaw.com
 6
       On behalf of the DEFENDANT:
 7     Ryan Ray
       NORMAN, WOHLGEMUTH, CHANDLER, JETERN, BARNETT & RAY
 8     401 South Boston Avenue
       2900 Mid-Continent Tower
 9     Tulsa, Oklahoma  74103
       918.583.7571
10
       Sarah M. Stevenson
11     Lynn Slade
       MODRALL, SPERLING, ROEHL, HARRIS & SISK
12     500 Fourth Street NW, Suite 1000
       Albuquerque, New Mexico  87103
13     505.848.1800
       sarah.stevenson@modrall.com
14

15

16

17

18

19

20

21

22

23

24

25
```

Bill Moskaluk                                6/16/2021                                        3

```
 1                       INDEX

 2                                              Page

 3   BILL MOSKALUK                               6

 4   Direct Examination by Mr. Ashworth          6

 5   Cross Examination by Ms. Nagle            127

 6   Redirect Examination by Mr. Ashworth      179

 7                     EXHIBITS

 8   Exhibit          Description

 9   8          5/15/14 E-mail                 144

10   37         5/22/14 E-mail Chain           140

11   38         10/9/14 Letter from the Bureau of  114

12              Indian Affairs

13   46         Exhibit B(i) Scope of Work      75

14   48         Organizational Procedure No. 80  98

15   52         Contract Between Osage Wind LLC & 177

16              IEA Renewable Energy Inc.

17   53         7/9/14 Email Chain             147

18   55         September 2014 E-mail Chain    156

19   56         September 2014 E-mail chain    159

20   59         Bill Moskaluk's LinkedIn Page   17

21   60         Defendants' Response to Plaintiff's  24

22              Motion for Preliminary Injunction

23   61         Osage Wind Project Alignment Meeting  37

24              Agenda 9/9/14

25                     EXHIBITS (Continued)
```

| | Exhibit | Description | Page |
|---|---|---|---|
| 2 | 62 | Project Option/Change Order | 89 |
| 3 | 63 | 5/22/15 E-mail Chain | 99 |
| 4 | 64 | October 2014 E-mail Chain | 106 |
| 5 | 65 | 10/14/14 E-mail Chain | 113 |
| 6 | 66 | 6/26/14 Meeting Notes | 150 |
| 7 | 67 | September 2014 E-mail Chain | 162 |
| 8 | 68 | September 2014 E-mail Chain | 164 |
| 9 | 69 | Defendants' Fifth Amended and | 171 |
| 10 | | Supplemental Privilege Log | |
| 11 | 70 | Project Short Views Update 10/17/14 | 174 |

12

13

14

15                          STIPULATIONS

16          It is stipulated that the deposition of BILL

17   MOSKALUK may be taken pursuant to agreement and

18   Federal Rules of Civil Procedure on June 16, 2021,

19   before Abby Rhodes, CSR, RPR.

20

21

22

23

24

25

1            VIDEOGRAPHER:  This is the videotape

2   deposition of Bill Moskaluk in the matter of the

3   United States of America and Osage Minerals Council

4   versus Osage Wind, et al., filed in the United States

5   District Court for the Northern District of Oklahoma,

6   Case No. 14-CV-704-GFK-JFJ.  We're on the record at

7   10:00 a.m. on June 16, 2021.  Will counsel please

8   state their names for the record.

9            THE WITNESS:  William Moskaluk.

10            MR. ASHWORTH:  Stuart Ashworth with the U.S.

11   Attorney's Office.  I also have Cathy McClanahan and

12   Nolan Fields, attorneys in the case, as well as

13   Michelle Hammock and Christina Watson who are

14   paralegals with the U.S. Attorney's Office.  And we

15   represent the U.S.

16            MS. NAGLE:  Mary Katherine Nagle with

17   Pipestem & Nagle.  I represent the

18   intervener-plaintiff, the Osage Minerals Council, and

19   with me today is my colleague Shoney Blake.

20            MR. RAY:  Ryan Ray for the defendants.  I

21   believe also on call for the defendants is Lynn Slade

22   and Sarah Stevenson.  Counsel Megan Beauregard is

23   observing.

24            VIDEOGRAPHER:  Okay.  Will the reporter now

25   swear in the witness.

```
 1              (Witness sworn)

 2                      BILL MOSKALUK,

 3    being first duly sworn, was examined and testified as

 4    follows, to wit:

 5                      DIRECT EXAMINATION

 6    BY MR. STUART ASHWORTH:

 7         Q    Sir, my name is Stuart Ashworth and I'm with

 8    the U.S. Attorneys Office and I represent the United

 9    States in this lawsuit.

10              Can I get your full name for the record.

11         A    William Moskaluk.

12         Q    What is your middle name?

13         A    Alexander.

14         Q    And do you -- and you go by Bill?  I think

15    he froze or he's thinking.  I'm sorry, we -- I think

16    there was technical difficulties there.

17              Before our screen froze, I had asked you go

18    by Bill; is that correct?

19         A    Correct.

20         Q    Okay.  Have you gone by any other names

21    other than Bill or William Alexander Moskaluk?

22         A    I had a nickname many years ago when I was

23    about three or four.  It was Buddy, but I don't go by

24    that now.

25         Q    Okay.  Have you ever given a deposition
```

1   **before?**

2        A    Yes.

3        **Q    How many depositions have you given?**

4        A    I believe it's been one, possibly two.

5        **Q    Okay.  How long ago were they, those?**

6        A    Gosh, I couldn't tell you in a matter of

7   years.  It was a while ago.

8        **Q    Within -- since 2000?**

9        A    I'm not sure.

10       **Q    Okay.  What did those depositions relate to?**

11       A    One was a lawsuit down in Orlando, Florida,

12  a person had tripped over a bumper block at the

13  parking garage at Orlando International Airport.

14       **Q    And were you a witness or was it related to**

15  **construction?**

16       A    It was related to construction.

17       **Q    What was the other deposition that you think**

18  **you may have been involved with?**

19       A    Oh, gosh.  I don't remember what it was for

20  right offhand, but that was several years ago as well.

21       **Q    Okay.  Have you ever testified at trial**

22  **before?**

23       A    No, sir.

24       **Q    Okay.  I'm going to go over some -- some**

25  **deposition ground rules just -- you know, since it**

1    seems like it's been a while.  You know, today, I'm

2    just going to be -- you know, it's just a

3    conversation.  I'm going to be asking you some

4    questions and you can -- I'll give you the opportunity

5    to respond.  The difference there is that we have a

6    court reporter, a stenographer who is writing

7    everything that you say and I say down so that we have

8    a clear record for the Court.

9           So because of that, I just kindly ask that

10   you let me answer my -- or ask my questions before you

11   respond and I'll do my best also to let you finish

12   your questions -- I'm sorry, finish your answer before

13   I ask my next question.  Okay?

14       A    Okay.

15       Q    Part of that to make a clear record, if I

16   ask you a yes-or-no question and you can answer it yes

17   or no, I ask that you do that.  And you can add

18   whatever you -- caveat you want to.  I just would ask

19   that you not say uh-huh or huh-uh just because those

20   words are written very similarly and I'd hate for you

21   to get one answer and it gets accidentally typed up as

22   a different answer by the court reporter.

23           Is that okay?

24       A    Yes.

25       Q    And if for any reason you -- you start

1    saying uh-huh or huh-uh during your deposition, if I

2    correct you, I hope that you understand that I'm not

3    trying to be mean; I'm just trying to make sure that

4    the record is clear.

5            Is that okay?

6    A    Yes.

7    Q    Your deposition is not -- not intended to be

8    a marathon.  I don't think that it's going to go super

9    long, but I do anticipate going on breaks every hour,

10   just a five-minute or however long break we'll --

11   we'll take.  At any point before those breaks, those

12   scheduled breaks you can ask for a break, just let me

13   know.  My only question or my only caveat is that I

14   ask -- if I ask you a question, that you finish

15   responding to the question before we take a break.

16           Is that fair?

17   A    Yes.

18   Q    Okay.  If for any reason I ask you a

19   question that you don't hear any part of that question

20   or you don't understand any part of that question, let

21   me know.  Just say, hey, Stuart, I didn't catch that,

22   I don't understand, can you rephrase or re-ask and

23   I'll be more than happy to do that.  Okay?

24   A    Okay.

25   Q    And the purpose of that is because I want to

```
 1   have a clear record and I would hate for you to

 2   respond to a question that you didn't hear or didn't

 3   understand before you answer.  So if I do ask you a

 4   question and you respond, would it be fair for me to

 5   assume that you heard the question and you understood

 6   it before you responded?

 7           MR. RAY:  Object to form.

 8           You can answer.

 9           THE WITNESS:  Yes.

10       Q    (By Mr. Ashworth) Okay.  And during your

11   deposition, your attorney or the attorneys here can

12   object, object to the form of the question.  That's

13   just their way of preserving an objection for the

14   Court.  Unless you're instructed not to answer, you

15   can go ahead and answer.  Okay?

16       A    Yes.

17       Q    Okay.  What did you do to prepare yourself

18   for today's deposition?  Did I cut out, Bill?

19       A    I didn't hear anything you said.  I'm sorry.

20       Q    Okay.  It just seems like we may be having

21   some -- some slight connection issues.

22           What did you do to prepare for your

23   deposition?

24       A    Would you repeat that, please?  I didn't

25   quite hear you.
```

```
 1        Q     No -- no problem.

 2              What did you do to prepare for your

 3   deposition?

 4        A     I met with Ryan Ray and Megan Beauregard

 5   yesterday and went over a couple of things.

 6        Q     So I'll just stop you there.  I don't want

 7   to know anything that you spoke with -- with your

 8   counsel because that's attorney-client privilege for

 9   your -- for you deposition prep, but any -- what --

10   other than speaking with counsel, what else did you

11   do?

12        A     Nothing.

13        Q     Did you review any documents?

14        A     I did.

15        Q     Okay.  What documents did you review?

16        A     It was some e-mails, past e-mails, a

17   declaration, things of that nature.

18        Q     Do you know about how many e-mails you

19   reviewed?

20        A     No, I don't.

21        Q     Okay.  With the e-mails that you reviewed,

22   were those your e-mails or e-mails from other people?

23        A     A little bit of both.  The majority of them

24   were e-mails by other people.

25        Q     Okay.
```

```
 1        A    And I did -- I did have some of my own that

 2   I responded to as well.

 3        Q    Were there anything contained in those

 4   e-mails that you disagreed with?

 5        A    No.

 6        Q    Okay.  Everything in those e-mails kind of

 7   go along with your recollection of the events at the

 8   time of the construction?

 9             MR. RAY:  Object to form.

10             THE WITNESS:  Basically, those -- those

11   other e-mails from other people, they were just

12   commenting on this and that.  I don't really know what

13   their background was with the information, but

14   ultimately, those people are responsible for saying

15   what they said so it would have to go back to them if

16   you wanted to contact them.

17        Q    (By Mr. Ashworth) Sure.

18             And I don't know what they wrote so I

19   wouldn't know how to contact them or who they were,

20   but my question would be is the information that is

21   contained in the e-mails that you reviewed, was there

22   anything inconsistent in those e-mails, inconsistent

23   with your memory of the construction project?

24             MR. RAY:  Object to form.

25             THE WITNESS:  Basically, that -- that
```

```
 1    project was seven years ago, going on eight, and for

 2    me to really remember everything that happened on that

 3    project site is kind of hard to do.  I was 62 at the

 4    time, I'm 70 years old now.  I've been through a

 5    cancerous situation.  I just don't remember all of it

 6    so I can't really, really comment on it.

 7              MR. ASHWORTH:  Sure.

 8              I'm going to ask the court reporter, Abby,

 9    if you could reread my question to Bill.

10              COURT REPORTER:  Sure.

11              (Court reporter read back requested portion

12    of transcript)

13              MR. RAY:  I renew the objection.

14        Q     (By Mr. Ashworth) Bill, I just wanted to get

15    a response to that -- that question.

16              MR. RAY:  Object to form.  Asked and

17    answered.

18        Q     (By Mr. Ashworth) Is there anything in those

19    e-mails that you -- that were inconsistent with your

20    memory?

21        A     No.

22        Q     Okay.  What about the declaration, do you --

23    did you review the declaration?

24        A     Yes.

25        Q     First off -- scratch that question.
```

Bill Moskaluk                                          6/16/2021                                          14

```
 1              The declaration you're referring to, that's

 2    the declaration that you submitted in response to a

 3    motion for injunction, I believe, as far as a lawsuit;

 4    is that correct?

 5         A    Yes.

 6         Q    And did you review that declaration in

 7    preparation for your deposition in its entirety?

 8         A    We briefly touched base on it, yes.

 9         Q    Okay.  Did you review your declaration --

10    did you read your declaration?  Let me ask that.

11         A    Yes.

12         Q    Okay.  Was there anything in the declaration

13    that you believe was incorrect?

14         A    No.

15         Q    Okay.  To the best of your memory,

16    everything contained in your declaration was accurate?

17    Bill, I may have cut out.  Did you -- did you respond

18    to that?

19         A    I didn't hear the whole question.  I'm

20    sorry.

21         Q    Sure.  Was there -- scratch that.

22              It's your testimony that the declaration

23    that you prepared, both the -- let me back up first.

24              There's two declarations that you submitted

25    relative to a lawsuit; is that correct?
```

```
 1         A     Yes.

 2         Q     And did you review both declarations?

 3         A     Yes.

 4         Q     Okay.  Is it -- would it be your testimony

 5    that both of the declarations that you reviewed were

 6    truthful?

 7         A     Yes.

 8         Q     Other than the e-mails and declarations,

 9    were there any other documents that you reviewed to

10    prepare for your deposition?

11         A     Like I said earlier, the -- the e-mails that

12    I -- I was looking at, other than that, there was no

13    other documents.

14         Q     Okay.  Did you speak with anyone other than

15    your counsel to prepare for your deposition?

16         A     No.

17         Q     Is anyone aware of your deposition other

18    than counsel?

19         A     My wife.

20         Q     Okay.  Other than your wife?

21         A     No.

22         Q     Did you do anything other than speak with

23    counsel and review documents that you already

24    discussed that could help -- that helped prepare you

25    or helped your memory of the case?
```

```
 1      A    No, they were the only ones.

 2      Q    Okay.  What is your current residential

 3  address?

 4      A    105 North 4th Street, Rio Vista, California

 5  94571.

 6      Q    How long have you lived there?

 7      A    Oh, gosh.  Twelve years.

 8      Q    Okay.  What is your highest level of

 9  education that you completed?

10      A    Thirteen, 14 years.

11      Q    When you say 13, 14 years, are we talking

12  about high school?

13      A    No, 12 years all together with elementary

14  school, junior high school, and -- and high school and

15  there was a couple years in there for college.

16      Q    Okay.  Your -- you graduated high school; is

17  that correct?

18      A    Yes.

19      Q    Okay.  Did you get any degrees in college?

20      A    There was a two-year AS degree in

21  architecture years ago.

22      Q    Where was that from?

23      A    Valencia Community College, Orlando,

24  Florida.

25      Q    Okay.  Who are you currently employed by?
```

```
 1      A     I'm not.  I'm retired.

 2      Q     When did you retire?

 3      A     September of '17.

 4      Q     I'm going to introduce an exhibit to your

 5   deposition that I'm going to mark as Exhibit No. 59.

 6   It's going to be a LinkedIn page.  We'll get that

 7   pulled up.  Scroll down a little bit.  This appears to

 8   be a LinkedIn page or at least your LinkedIn page,

 9   have to go to the next page -- does that -- does this

10   look like it could be yours?

11            (Exhibit 59 Marked for Identification)

12      A     I don't even remember that document.  I'm

13   sorry.

14      Q     Sure.  Do you know if you have a LinkedIn

15   page?

16      A     I don't know.  I think that account ran out

17   a long time ago.

18      Q     Okay.  But at one point you would have had a

19   LinkedIn page?

20      A     Yes.

21      Q     Okay.  Here it says that prior to

22   retirement, or at least it seems like you retired from

23   Enel Green Power North America.

24            Is that -- is that about accurate?  Bill,

25   did you -- did -- did I cut out?
```

```
 1       A    Yes, you did.

 2       Q    Okay.  It -- here it indicates that you

 3  retired from Enel Green Power North America; is that

 4  correct?

 5       A    Yes.

 6       Q    And it says that you worked there beginning

 7  in May 2014 to May 2017; is that -- is that correct?

 8       A    Yes.  Well, actually, it was -- actually, it

 9  was September of 2017.

10       Q    Okay.  And it says that you -- during your

11  time at Enel Green, that you were the site manager; is

12  that correct?

13       A    Yes.

14       Q    Okay.  When you -- were you the site manager

15  for Enel Green the entire time while working for Enel

16  Green?

17       A    Yes.

18       Q    Okay.  How long -- scratch that.

19            When you began work at Enel Green, you were

20  hired as a site manager; is that correct?

21       A    I was -- I was hired as a site

22  coordinator --

23       Q    Okay.

24       A    -- initially.

25       Q    When did you switch over?
```

```
 1        A     It was towards the end of my tenure with
 2   Enel Green Power.
 3        Q     Okay.  So during your tenure at Enel Green,
 4   you were not, in fact, site manager the entire time;
 5   correct?
 6        A     Correct.
 7        Q     Okay.  In your role as site coordinator,
 8   what would have been your job responsibilities?
 9        A     Basically to report site conditions and site
10   project to my superiors, to oversee the construction
11   activities.
12        Q     Okay.  Would you have been on site on a
13   project generally the entire time?
14        A     Yes.
15        Q     Okay.  Would your superior that you would
16   have reported to also have been on site?
17        A     They were on site occasionally and also once
18   a month at our construction meetings.
19        Q     Okay.  But in general, you would have been
20   the boots-on-the-ground person for Enel Green for a
21   particular project that you were assigned to; is that
22   correct?
23              MR. RAY:  Object to form.
24              You can answer.
25              THE WITNESS:  Yes.
```

1      Q     (By Mr. Ashworth) Okay.  What would a --

2   what's the difference between a site manager and a

3   site coordinator?

4      A     A site manager has responsibility to make

5   pertinent decisions for a site coordinator does not

6   have that ability, and he relies on his superiors in

7   order to direct him on his daily activities.

8      Q     What was -- when you -- scratch that.

9            When you started for Enel Green, what was

10   the first project that you were assigned to?

11      A     Osage Wind's prod -- project.

12      Q     Okay.  How long were you assigned to the

13   Osage Wind project?

14      A     Gosh, I can't really remember offhand the

15   exact time I was there.  Probably about six to eight

16   months.

17      Q     Were you there when the project finished?

18      A     Yes.

19      Q     Okay.  So you saw the project to completion?

20      A     Yes.

21      Q     After the Osage Wind project, what project

22   did you get assigned to for Enel?

23      A     I believe it was one in Weatherford,

24   Oklahoma.  I'm -- I can't remember the name of that

25   one.  Little Elk.

1      Q      Do you recall who was the site manager on

2   the Osage Wind project?

3      A      The project manager was Giuseppe DiMarzio.

4      Q      Okay.  And while you were on the Osage Wind

5   project, Giuseppe was always your superior; is that --

6   is that correct?

7      A      Yes, there was him and there was also a

8   fellow by the name of Bill Price.

9      Q      Okay.  And at all times while working on the

10  Osage Wind project, you were the site coordinator and

11  never the site manager; is that right?

12     A      That is correct.

13     Q      Okay.  Is there a chain of command that you

14  are aware of for issues or problems to be brought to

15  Enel Green management on site?

16            MR. RAY:  Object to form.

17            You can answer.

18            THE WITNESS:  There is a chain of command.

19  There's multiple people involved.  How many people,

20  I'm really not privy to that because half of them are

21  in Italy and half of them are in the United States

22  so...

23     Q      (By Mr. Ashworth) If -- if there was an

24  issue or a problem on any given project that you were

25  assigned to with Enel Green, as site coordinator, how

```
 1    would you bring that, you know, to someone's attention

 2    in the higher-ups of Enel Green?

 3         A     Sometimes it was a phone call, a simple

 4    phone call.  Sometimes it was an e-mail perhaps, just

 5    normal lines of communication.

 6         Q     Okay.  Would you have spoken with someone

 7    who is off site with Enel Green management?

 8         A     It would be with Enel management, yes.

 9         Q     And I assume if Enel Green management had an

10    issue or a problem relating to the project that you

11    were assigned to and they wanted to address it with

12    you, they would contact you or would they have to

13    contact someone else to get that information to you?

14         A     No, they'd contact myself.

15         Q     Okay.  Who is Joan Heredia?

16         A     She was our environmentalist and regulatory

17    affairs person.  I don't know if I've ever -- I don't

18    know if I have her title correct or not.

19         Q     Okay.  When you say "our," are you referring

20    to Enel Green?

21               MR. RAY:  Object to form.

22               You can answer.

23               THE WITNESS:  I'm sorry, I didn't hear the

24    question.

25         Q     (By Mr. Ashworth) Sure.
```

```
 1              Was Joan Heredia an Enel Green employee?
 2      A    Yes.
 3      Q    Okay.  What was Joan Heridia's role in
 4   relation to the Osage Wind project?
 5              MR. RAY:  Object to form.
 6              THE WITNESS:  She was basically my go-to
 7   person for any environmental concerns that I had on
 8   the project.
 9      Q    (By Mr. Ashworth) Do you know if you had any
10   environmental concerns relating to the Osage Wind
11   project?
12      A    No, I did not have any.  I -- I had concerns
13   myself about run-offs and facilitation leading to the
14   job site, but once we got it corrected, it was fine.
15      Q    Do you know if Joan Heredia had much
16   involvement with the Osage Wind project?
17      A    That, I don't know.
18      Q    I'm going to pull up your declaration that
19   I'm going to mark as an Exhibit No. 60.  This is going
20   to be the first declaration that you entered.  Maybe
21   make that just a little bit smaller.
22              Sir, I marked this declaration, it's
23   entitled Declaration of Bill Moskaluk as Exhibit
24   No. 60.
25              Is this the -- does this appear to be the
```

1    declaration, one of the declarations that you reviewed

2    to prepare for your deposition?

3                 (Exhibit 60 Marked for Identification)

4         A    What you need to do is enlarge that so I can

5    see it.  I -- I can't even read it.

6         Q    Sorry.  We can definitely do that.

7         A    All right.

8         Q    Sorry about that.

9         A    All right.

10        Q    And we can scroll through it if you want to

11   verify that this is the document you reviewed.

12        A    Yes, I believe so.

13        Q    When was the last time that you read this

14   document?

15        A    Yesterday.

16        Q    Okay.  We're going to go to the last page of

17   this declaration, which I believe is page No. 9 of the

18   declaration, ten on the PDF.

19             Right here, it says executed this ninth day

20   of December 2014 in Burbank, Oklahoma, and then it has

21   a signature there.

22             Is -- is -- is that your signature?

23        A    Yes.

24        Q    Okay.  And do you recall signing that,

25   signing this document?

```
 1       A    I must have because that's my signature so
 2   yes, I did.
 3       Q    Okay.  We'll scroll to the page above that
 4   just towards the bottom.  Right there.  It says
 5   "Pursuant to 28 USC, Section 1746, I declare under
 6   penalty of perjury that the foregoing is true and
 7   accurate to the best of my knowledge."
 8       A    To the best of my --
 9       Q    Did I read that correctly?  Did I read that
10   correctly?
11       A    I'm sorry, repeat that.
12       Q    Sure.
13            Did I read that sentence correctly?  I can
14   read -- reread it if you want me to.
15       A    No, I can -- I can read it just fine, and at
16   the time that this was happening, it was true and to
17   the best of my knowledge.
18       Q    Okay.  I believe you testified earlier that
19   you have reviewed this declaration and that there was
20   nothing in there that you believe was not true or
21   correct; is that right?
22       A    Yes, it was.  You've got to remember also
23   that this was a prepared document and basically we --
24   I reviewed it and put my signature on it as well.
25       Q    Sure.
```

1              Here in this sentence it says "Pursuant to

2     28 USC, Section 1746, I declare under penalty of

3     perjury that the foregoing is true and accurate to the

4     best of my knowledge," and then on the next page you

5     signed it.

6              Is it your testimony that you would have

7     signed this document even though you declared under

8     penalty of perjury not knowing that the -- what was in

9     the document, not true or -- or -- or accurate?

10             MR. RAY:  Object to form.  Misstates prior

11    testimony.

12             THE WITNESS:  First of all, I don't know

13    what that 28 USC 1746 is.  And everything at that time

14    I believe was true and correct.  I can't really

15    remember all the details, but I believe it was.

16       Q    (By Mr. Ashworth) Sure.

17             Would it be your testimony that after

18    reviewing this section, this citation to a statute,

19    that you would have signed this document not knowing

20    what the statute said?

21             MR. RAY:  Object to form.

22             THE WITNESS:  I knew what the document had

23    said after reviewing it at the time I signed it.  Like

24    I said, that was -- that was a long time ago as well.

25       Q    (By Mr. Ashworth) Sure.

```
 1                Would it be your testimony that in seeing a

 2      citation to a statute, that you would have signed this

 3      document not knowing what the requirements of the

 4      statute required?

 5                MR. RAY:  Object to form.

 6                THE WITNESS:  I -- I don't know what you're

 7      alluding to, but like I said, the document was signed

 8      back the -- on the date shown.  Other than that, I

 9      can't elaborate one way or another.  At the time I

10      signed it I, believe that it was true and correct.

11           Q    (By Mr. Ashworth) Okay.  Why was the purpose

12      for which you signed this declaration?

13           A    I think it had to do with our first case

14      against the Osage or they had up against Enel back

15      then.

16           Q    Okay.  And this was to -- this declaration

17      was to support Enel's case?

18           A    It was to support what?  I'm sorry?

19           Q    I'm sorry.

20                Was this declaration in support of Enel

21      Green's case?

22                MR. RAY:  Object to form.

23                THE WITNESS:  Yes.

24           Q    (By Mr. Ashworth) Okay.  And by submitting

25      this document, which was to be in support of Enel
```

1  Green's case, would it be your testimony that you

2  would have made sure that the information contained in

3  it was -- was accurate and truthful?

4      A    Yes.

5      Q    Okay.  We'll go to the top of this document,

6  which is the PDF pages two, it's the first page of the

7  declaration.

8           Sir, before I get into this, I know earlier

9  you testified that you did not prepare this document,

10 but when this document was presented to you, do you

11 recall if you made any changes?

12     A    I -- I can't remember that at all.

13     Q    Okay.

14     A    I'm not sure.

15     Q    If there was something in this document that

16 was incorrect, would you have made a change to it

17 before you would have signed it under penalty of

18 perjury?

19           MR. RAY:  Object to form.

20           THE WITNESS:  I probably would have changed

21 it, but I don't know if I had or not.

22     Q    (By Mr. Ashworth) We're going to have to go

23 to the paragraph five.  Actually, we're actually going

24 to stay right there on paragraph four.  I'll -- I'll

25 read this first part under paragraph four.  It says "I

1   am familiar with and in connection with the

2   preparation of this declaration, have reviewed the

3   business records of both Enel and Osage Wind, LLC

4   associated with the Osage," and then we'll scroll down

5   to the next page.

6          Then it goes on, it says "Wind project

7   concerning the development and construction of that

8   project.  Those records were contemporaneously made

9   by, or with information from, people with knowledge of

10  the information reported and kept in the course of

11  Enel's and Osage Wind, LLC's regularly conducted

12  business activities.  It is the regular practice of

13  both Enel and Osage Wind to prepare and maintain such

14  records."

15         It appears to me that -- well, first off,

16  did I read that correctly?

17    A    Yes.

18    Q    It seems that you made the statements in

19  this declaration based on your review of the documents

20  in the possession of Enel and Osage Wind.

21         Does that seem about right?

22    A    Yes.

23    Q    Okay.  Starting on page -- I'm sorry, on the

24  same page, paragraph five, it says "In 2010, Osage

25  Wind, LLC began to secure leases to approximately

```
 1   840 acres -- I'm sorry, 8,400 acres of privately-owned

 2   fee surface estate lands from the owners of those

 3   lands in an area northeast of the town of Burbank in

 4   Osage County, Oklahoma," and then it refers that to

 5   the Osage Wind project, I'm sorry, Osage -- scratch

 6   that.  I'm sorry, wind farm property.

 7       A    That's just history that was written into

 8   this declaration by others and for what -- what their

 9   reasoning was, I'm not really sure.

10       Q    Sure.

11            Just to be clear, you were hired by Enel

12   Green in May 2014; is that right?

13       A    Yes.

14       Q    Okay.  And you're making this declaration to

15   the Court under your name about the history of Osage

16   Wind beginning in 2010; is that right?

17       A    It -- it was prepared by others -- others

18   other than myself and it was just -- a little bit of

19   history about the project is the best I can -- I can

20   tell you.

21       Q    Sure.

22            This -- did you review this document before

23   your deposition?  Does anywhere in this -- this

24   declaration indicate to the Court that this was

25   prepared by someone other than you?
```

```
 1              MR. RAY:  Object to form.

 2              THE WITNESS:  Yes.

 3      Q    (By Mr. Ashworth) Somewhere in this

 4   declaration indicates that it was prepared and sent by

 5   someone other than you?

 6      A    Yes, it was.

 7      Q    Where do you recall seeing that?

 8      A    I'm sorry?

 9      Q    Where do you recall seeing that reference in

10   this declaration?

11      A    Are we talking about the 2010?

12      Q    No, I'm talking about your declaration.

13           Is there anywhere in this current

14   declaration that I marked as Exhibit No. 60 that

15   indicates to the Court that you did not prepare the

16   words on this declaration?

17              MR. RAY:  Object to form.

18              THE WITNESS:  No, I did not.

19      Q    (By Mr. Ashworth) Okay.  And there's nothing

20   in this declaration that indicates to the Court that

21   these are not your words; is that correct?

22              MR. RAY:  Object to form.

23              THE WITNESS:  Yes.

24      Q    (By Mr. Ashworth) Okay.  And, in fact, this

25   declaration tells the Court that this is being
```

```
 1   presented to the Court under your name?

 2       A    Yes.

 3       Q    Is that right?  Okay.

 4            Paragraph six says "No portion of the wind

 5   farm property is held in trust by the United States

 6   for the benefit of the Osage Nation."

 7            My question is, is what does "held in trust"

 8   mean?

 9       A    I don't know.

10       Q    Okay.  As a site coordinator on a wind

11   project, would -- would this have been something you

12   should have known about, whether the land was held in

13   trust or not?

14            MR. RAY:  Object to form.

15            THE WITNESS:  No.  No, that was, like I

16   said, above my pay grade.  It was in the upper

17   management hands and the legal departments as well.

18       Q    (By Mr. Ashworth) If you didn't know what

19   "held in trust" means, why did you indicate this in

20   your declaration under penalty of perjury to the

21   Court?

22            MR. RAY:  Object to form.

23            THE WITNESS:  I don't know.

24       Q    (By Mr. Ashworth) Okay.  Do you think it

25   would have been appropriate for you to tell the Court
```

1    something, to make a statement to the Court that you

2    didn't know what it meant?

3            MR. RAY:  Object to the form.

4            THE WITNESS:  I don't know.  I don't recall.

5        Q    (By Mr. Ashworth) I'm sorry, you don't

6    recall or you don't know?  Those are different --

7    those are different answers.

8        A    Yes, I do not know.

9        Q    Okay.  Paragraph eight, it says "No portion

10   of the surface estate" -- "no portion of surface

11   estate of the wind farm property is held subject to

12   restrictions by the United States against alienation."

13           My question is, is what is "held subject to

14   restrictions by the United States against alienation"

15   mean?

16       A    I don't know.

17       Q    As a site coordinator on a wind project, is

18   this something that you would have -- you should have

19   known about?

20           MR. RAY:  Object to form.

21           THE WITNESS:  No, because, like I said, all

22   the matters pertaining to the case were -- were within

23   our management, upper management people, and that

24   information was never held down on the site level.

25       Q    (By Mr. Ashworth) Okay.  And just to be

1    clear, when you made this statement to the Court, you

2    had no clue what it meant?

3           MR. RAY:  Object to form.

4           THE WITNESS:  No.

5       Q    (By Mr. Ashworth) Okay.  We'll do paragraph

6    11.  It says "Construction of the Osage Wind project

7    commenced on October 25, 2014."  Sorry, "2013."

8           You would have been the on-site -- you would

9    not have been on site when construction commenced; is

10   that correct?

11      A    Correct.

12      Q    Okay.  Do you know what kind of construction

13   started, what activity started in October 2013?

14      A    The construction that started, I'm assuming,

15   was the roadways for the project.

16      Q    Is that typical on a wind project based on

17   your experience in the industry?

18      A    That would be your first activity, yes.

19      Q    By the way, I skipped this part, how much

20   experience do you have or had working in the renewable

21   energy industry?

22          MR. RAY:  Object to form.

23          THE WITNESS:  Approximately 12 years.

24      Q    (By Mr. Ashworth) Okay.  Paragraph 12, it

25   says -- going to the second sentence of paragraph 12,

```
 1    in October '13, "Clearing and grubbing and initial

 2    road construction began on the wind farm property.

 3    That work continued through roughly the end of January

 4    2014.  From roughly late March through June 2014

 5    further road construction and site preparation work

 6    was ongoing at the wind farm property."

 7              Did I read that correctly?

 8        A    I believe you did, yes.

 9        Q    Okay.  It appears, based on this statement,

10    that work stopped sometime between late January and

11    early March 2014.

12              Do you know why construction activities

13    stopped during that period?

14        A    I really can't remember that.  I don't

15    recall.

16        Q    Based on your experience in the industry, is

17    it normal to see a project have a work stoppage during

18    the early stages of construction?

19        A    Not necessarily, no.

20        Q    Okay.  For there to be a work stoppage in

21    excess of a month, would that generally be caused

22    because there's some type of issue on the project,

23    based on your experience?

24              MR. RAY:  Object to form.

25              THE WITNESS:  Yes.
```

```
 1        Q     (By Mr. Ashworth) And again, you don't know

 2   what issue, if any, there was for the work stoppage

 3   here; is that correct?

 4        A     I just don't recall it.  I'm sorry.

 5        Q     Sure.

 6              In the middle of this paragraph, it begins

 7   with "excavation work."  It says "Excavation work for

 8   foundations then began on September 10, 2014."

 9              My question is:  Did excavation work begin

10   on schedule, if you recall?

11        A     Please -- please repeat that.

12        Q     Sure.

13              You would have been the site coordinator at

14   the time or at least during September 2014; that's

15   correct?

16        A     Yes.

17        Q     Do you recall if excavation work began on

18   schedule in September 2014?

19        A     I'm not really sure about the dates.  I'm --

20   I'm sorry.

21        Q     Sure.  I'm going to pull up another exhibit.

22   It's a meeting agenda exhibit that I'm going to mark

23   as Exhibit No. 61.  We'll scroll through this and let

24   you get a chance to -- to look at it.  Scroll back up.

25              Sir, do you know what this document is?
```

```
 1                  (Exhibit 61 Marked for Identification)

 2        A     It's an agenda for our monthly meeting.

 3        Q     Okay.  It says "Alignment Meeting Agenda."

 4              Is that the same as a monthly meeting?

 5        A     Yes.

 6        Q     Okay.  And it appears to be an all-day

 7   meeting that starts with breakfast at 7:00 I believe

 8   a.m. and then it goes down to -- if we scroll down a

 9   bit, it seems to me it ends at 5:30 p.m.

10              Are these monthly meetings generally a

11   full-day meeting?

12        A     Yes.

13        Q     Okay.  And it appears since this is dated

14   September 9, 2014, that this would have been the day

15   before excavation started?

16        A     I really don't recall.

17        Q     Okay.  Would you have been at this meeting?

18        A     Say that again.  I'm sorry.

19        Q     As site coordinator, do you know if you

20   would have been at this full-day meeting --

21        A     Yes.

22        Q     -- on the project?

23        A     Yes.

24        Q     Okay.  It says towards the top, it says at

25   6:30 a.m. to -- to 8:00 a.m. it says a welcome by Bill
```

 1    Price.

 2              Who is Bill Price?

 3       A    He, at that time, was the vice president for

 4    engineering and construction with Enel.

 5       Q    Okay.  And it appears that he was there in

 6    person based on this agenda.

 7       A    Yes.

 8       Q    Do you have any recollection of him showing

 9    up to the monthly meetings?

10       A    Yes, he normally was on every -- every

11    monthly meeting.  He -- he would come to site.

12       Q    Okay.  The entry at 11:30 a.m., it says --

13    it states "Issue escalation matrix."

14              Do you know what that means?

15       A    No.

16       Q    I can't tell if the word "issue" is being

17    used as a verb or a noun here, if this is an issue as

18    in a problem or are they issuing an escalation matrix.

19              Do you -- does that ring a bell?

20              MR. RAY:  Object to form.

21              THE WITNESS:  No.  No, sir.

22       Q    (By Mr. Ashworth) Okay.  Towards the bottom

23    of the day at 3:00, it says "Project issues."

24              Do you know what issues were discussed

25    during this meeting?

```
 1        A    At that time, probably so, yes.

 2        Q    Okay.  Do you -- do you know now, right now

 3   as we speak?

 4        A    I don't recall what the issues were but...

 5        Q    Okay.  And again, it seems like this is the

 6   day before excavation work would have started, and you

 7   don't know what the issues -- issues that would have

 8   been discussed here?

 9        A    No, I really don't recall.

10        Q    Okay.  We're going to go back to your

11   declaration and we're going to go to paragraph 15

12   under A, little I, I'm going to actually let you read

13   this to yourself and let me know when you're done.

14        A    Okay.

15        Q    You're making this, the declaration, the

16   statement in this section because you wanted the Court

17   to know about the excavation process in the case; is

18   that correct?

19        A    Yes.

20        Q    Okay.  In fact, you believe that by telling

21   the Court about the excavation process, you were

22   somehow trying to be helpful to defeat the U.S.'s

23   request for injunction in the case; is that right?

24             MR. RAY:  Object to form.

25             THE WITNESS:  Now, say that again.
```

Bill Moskaluk                              6/16/2021                              40

```
 1         Q    (By Mr. Ashworth) Sure.

 2              By -- by making your statement here, by

 3    informing the Court about the excavation process,

 4    you're trying to be helpful to -- you know, in

 5    opposition to the U.S.'s request for injunction; is

 6    that right?

 7              MR. RAY:  Same objection.

 8              THE WITNESS:  I'm not sure.  At that time, I

 9    think I was just basically explaining the excavation

10    process on foundations, nothing to do with anything

11    else.

12         Q    (By Mr. Ashworth) Sure.

13              Do you believe that everything within this

14    section is accurate, an accurate -- accurately

15    reflects the excavation for foundation in the case,

16    for the foundation in the case?

17         A    To the best of my knowledge, yes.

18         Q    Okay.  Nowhere in this section did you

19    inform about the significant amount of blasting that

20    was taking place at the time; is that correct?

21         A    This was prior to the blasting.

22         Q    I'm sorry, when did the blasting take place?

23         A    I'm not sure of the specific date, but

24    everybody that was involved with the blasting of these

25    excavations were relying on a document that was put
```

1    together by one of our engineering firms and they give

2    a soils analysis and they drill holes and we should

3    have just been able to dig those holes conventionally,

4    but when we first put the first bucket down to dig our

5    hole, we ran into rock and there was rock all the way

6    down, which basically we had to stop and regroup, and

7    that's when it was decided to go ahead and drill,

8    charge it, and then shoot the foundation.

9        Q    Okay.  Let me -- go ahead.  Sorry.

10       A    We couldn't -- we couldn't excavate it

11   normally.

12       Q    Okay.  Just -- just based on your testimony,

13   it seems to me that you're indicating that part of the

14   excavation process required blasting; is that correct?

15       A    Yes.

16       Q    Okay.  And in this section of your

17   declaration, you're saying the excavation for the

18   foundation began in September 2014.

19            My question to you would be:  There's

20   nowhere in this section did you tell the Court that

21   blasting was taking place as part of the excavation

22   work that you detailed; is that correct?

23       A    Yes.

24       Q    And, in fact, it was -- it was your intent

25   to mislead the Court about the excavation process; is

1    that correct?

2              MR. RAY:  Object to form.

3              THE WITNESS:  Repeat that again.  I'm sorry.

4        Q    (By Mr. Ashworth) Sure.

5              It was your intent to mislead the Court

6    about the excavation process to get the Court to deny

7    the U.S.'s request for injunction?

8              MR. RAY:  Object to form.

9              THE WITNESS:  No, that was not the intent,

10   sir.

11       Q    (By Mr. Ashworth) Okay.  And why did you

12   detail the excavation process you -- it seems like you

13   went into detail, but you fail to mention to the Court

14   about the blasting.

15       A    It -- I'm going to say it was an oversight

16   on my part.  I'm not really sure why I phrased it this

17   way.

18       Q    We're going to look at the next section

19   under, it's called two little I.  There's two parts to

20   this first page and when you're done with that, we'll

21   switch to the second page.

22       A    Mmm-hmm.  Okay.

23       Q    It's on the next page, just two lines.  When

24   you're done with that, let me know.

25       A    Yes.

Case 4:14-cv-00704-GKF-JFJ   Document 340-2 Filed in USDC ND/OK on 11/30/21   Page 44 of 214

```
 1      Q    Did you indicate to the Court anywhere in

 2   this section the purpose for the crushing -- the

 3   crushing of larger rocks into smaller rocks?

 4      A    No.

 5      Q    Okay.  Did crushing the larger rocks into

 6   smaller rocks fulfill any purpose?

 7      A    Say that again.

 8      Q    Sure.

 9           Did the crushing of the larger rocks into

10   smaller rocks, did that serve any purpose?

11      A    Yes, it was used for backfill material in

12   the foundation itself.  And we can't have anything 6

13   inches or greater in the foundation.

14      Q    Okay.  That was a requirement that you

15   couldn't have anything larger than 6 inches; is that

16   right, as backfill?

17      A    Yes.

18      Q    And do you know why that is so?

19      A    It's a requirement by Barr Engineering who

20   designed the foundation themselves.

21      Q    Do you know what purpose it served to have

22   rocks smaller than 6 inches as backfill?

23      A    Yes, it's compaction issues.  If you put the

24   larger rock in the hole, your smaller aggregates fall

25   through and create a void on top and you won't get
```

```
 1   100 percent compacted areas around -- around your

 2   foundation so you had to follow --

 3        Q    Why would -- I'm sorry, I cut you off there.

 4             You had to follow what?

 5        A    You had to follow the design engineer's

 6   recommendations.

 7        Q    Okay.  And why would it have been important

 8   that you would have voided those voids through

 9   compaction?

10        A    I'm not sure if I understand your question.

11   It has to deal with compaction efforts on their --

12        Q    Okay.

13        A    And you wouldn't want to use a large rock in

14   that because you can compact over it, but underneath

15   it, you wouldn't have any compaction at all.

16        Q    Okay.  Let me re-ask the question this way:

17   What was the purpose for compaction of backfill?

18        A    To stabilize your foundation and also the

19   turbine on top of your foundation.

20        Q    To stabilize the foundation.

21             We're talking about the wind tower

22   foundation; is that right?

23        A    That is correct.

24        Q    And to stabilize it, does that -- is that in

25   reference to providing structural support for the wind
```

1   tower?

2       A    Yes.

3       Q    Okay.  So then you would agree that by

4   crushing the rock into smaller pieces, the purpose of

5   that would be for structural support for use of

6   backfill for structural support for the wind towers?

7            MR. RAY:  Object to form.

8            THE WITNESS:  Yes.

9       Q    (By Mr. Ashworth) Is that correct?

10      A    Yes.

11      Q    You would agree that by crushing the rock

12  into smaller pieces, Enel Green derived some use out

13  of the rocks; is that correct?

14           MR. RAY:  Object to form.

15           THE WITNESS:  I think that we're restricted.

16  Once again, I don't really recall the whole situation

17  on why we did that.  I know we couldn't move the rock

18  from one site to another and that's why we elected

19  to -- to crush the rock, to leave it in place.

20           MR. ASHWORTH:  Okay.  I'm going to have

21  Abby, the court reporter, reread my question.

22           COURT REPORTER:  You bet.

23           (Court reporter read back requested portion

24  of transcript)

25           THE WITNESS:  Yes.

```
 1        Q    (By Mr. Ashworth) Okay.  In the middle of

 2   this section, it says "The contractor records the

 3   volume of rock crushed and rock is then stored at the

 4   site."

 5             Did I read that correctly?

 6        A    Yes.

 7        Q    Which contractor were you referring to here?

 8        A    The general contractor, which was IEA, had a

 9   subcontractor.  I can't remember what their

10   organization's name was, but he was responsible for

11   the volume of rock quantities.

12        Q    Was -- I'm sorry, was the contractor or the

13   subcontractor required?

14        A    The subcontractor was required under IEA to

15   track that.

16        Q    Okay.  Here you say contractor and not

17   subcontractor.

18             Is there a reason why you didn't tell the

19   Court that the responsibility referred to here was a

20   subcontractor?

21             MR. RAY:  Object to form.

22             THE WITNESS:  I don't have a contract --

23   Enel Green Power did not have a contract with the

24   subcontractor.  We only have a contract with the

25   general contractor themselves.  That's why I
```

1    referenced it the way I did.

2        Q    (By Mr. Ashworth) Okay.  So are you

3    telling -- did you tell the Court -- scratch that.

4             You're representing to the Court that IEA

5    had the responsibility to record the volume of crushed

6    rock --

7        A    Ultimately --

8        Q    -- is that what you're saying?

9        A    Ultimately, they do have the responsibility.

10       Q    Okay.  Here you say -- let me kind of re --

11   re -- redo this sentence.

12            It says the contractor records the volume of

13   rock, but it's your testimony today that the

14   contractor did not record the rock, it would have been

15   the subcontractor?

16            MR. RAY:  Object to form.

17            THE WITNESS:  Right.  It -- they had given

18   that responsibility themselves, and I can't really

19   speak to them why they did that, but that's the way I

20   understand that it went down.

21       Q    (By Mr. Ashworth) Sure.

22            And I -- and I understand you could not

23   represent why IEA delegated this duty to a

24   subcontractor, but I'd like for you to speak as to why

25   you told the Court that the contractor recorded the

1    volume of rocks when, in fact, you tell me today the

2    contractor did not do it.

3          MR. RAY:  Object to form.

4          THE WITNESS:  The -- the contractor is

5    ultimately responsible for their subcontractors' work

6    in its entirety.  They are the people, they are the

7    ones that answer to Enel Green Power and provide that

8    information.  If they fail to do so, I don't...

9          Q    (By Mr. Ashworth) Okay.  How -- go ahead,

10   I'm sorry if I interrupted you.

11         A    No, that's okay.

12         Q    How did you know that the contractor was

13   recording the volume of rock that was crushed?

14         A    I believe Mr. Price had made that agreement

15   with a Chris Hanson, which was a vice president of

16   construction for IEA.

17         Q    So it's your understanding that Chris Hanson

18   or someone else at Enel Green would have told Enel --

19   I'm sorry, would have told IEA that they were required

20   to record the volume of rock that was being crushed?

21         A    Yes.

22         Q    Okay.  Is it customary based on your

23   experience in the industry that whenever rock is

24   crushed during the excavation and backfill process,

25   that the volume of the rock that is being crushed is

1   recorded?

2       A   I don't think in most cases that it is.

3   This was just a special condition that we had gotten

4   into, and for some reason, they wanted them to keep

5   track of the -- the quantities.

6       **Q   So based on your experience in the industry,**

7   **your 12 years of experience in the industry, the**

8   **recording of the volume of crushed rock is not a**

9   **customary and standard construction process?**

10      A   A lot of times we don't have the rock

11  encountered on several projects; however, there --

12  there's different projects throughout the industry

13  that have dealt with rocky conditions elsewhere.

14      **Q   Okay.  My question is:  Based on your**

15  **experience in the industry, whenever rock is crushed,**

16  **is it customary in a standard construction practice to**

17  **record the volume of rock?**

18          MR. RAY:  Object to form.

19          THE WITNESS:  Yes.

20      **Q   (By Mr. Ashworth) Okay.  In preparing this**

21  **declaration under oath, would you have spoken with IEA**

22  **or its subcontractor to verify that the volume of**

23  **rocks were indeed being recorded?**

24          MR. RAY:  Object to form.

25          THE WITNESS:  I'm not -- I'm not sure if I

 1  did or not.  I just don't recall that.

 2      Q    (By Mr. Ashworth) Okay.  If Chris Hanson or

 3  someone else from Enel Green higher up would have

 4  instructed IEA to record the volume of rock that was

 5  being crushed, would it have been your responsibility

 6  to follow up with IEA or its subcontractor to verify

 7  that indeed they were doing that?

 8          MR. RAY:  Object to form.

 9          THE WITNESS:  That, I -- I don't recall me

10  doing that but...

11      Q    (By Mr. Ashworth) Okay.  Would it be

12  necessary to record the volume of rock that is crushed

13  for any other purpose other than there was an issue

14  that you alluded to earlier?

15          MR. RAY:  Object to form.

16          THE WITNESS:  No.

17      Q    (By Mr. Ashworth) Have you -- scratch that.

18          As site coordinator, would you have reviewed

19  the scope of work that would have been drafted by Enel

20  Green for IEA for this particular project?

21      A    No, I did not.

22      Q    Let me re-ask that question.

23          As a site coordinator, would it have been

24  your responsibility to have reviewed scope of work for

25  a -- for a contractor so that you knew exactly what

1    work the contractor was supposed to do on a project?

2              MR. RAY:  Object to form.

3              THE WITNESS:  Yes.

4         Q    (By Mr. Ashworth) Okay.  While you may not

5    have a recollection of what the scope of work stated,

6    you would at the time have known or been familiar with

7    the scope of work for IEA; correct?

8         A    Yes.

9         Q    Okay.  If there was a requirement for IEA to

10   record the volume of rocks that were being crushed, is

11   that something you would have anticipated that would

12   have been in the scope of work?

13             MR. RAY:  Object to form.

14             THE WITNESS:  No, I don't believe it was in

15   the scope of work.

16        Q    (By Mr. Ashworth) Are you aware that Craig

17   Mazurowski gave a deposition in this case?

18             MR. RAY:  Object to form.

19             THE WITNESS:  Am I aware of it?

20        Q    (By Mr. Ashworth) Yes.

21        A    Yes.

22        Q    Did you speak with him prior to your

23   deposition today?

24        A    No.

25        Q    Okay.  I'm terrible with his last name.  I

```
 1    don't, you know, want to get caught up, but I'll just

 2    call him -- refer to him as Craig in your deposition.

 3              Do you know who Craig is?

 4    A     Do I know who he is?

 5    Q     Yes.

 6    A     Yes.

 7    Q     Who is Craig?

 8    A     He was project manager for IEA.

 9    Q     Okay.  Would it surprise you if I were to

10    tell you that Craig testified that IEA did not record

11    the volume of rocks that were being crushed on site?

12              MR. RAY:  Object to form.

13              THE WITNESS:  No, it wouldn't surprise me.

14    Q     (By Mr. Ashworth) Would it surprise you if I

15    were to tell you that Craig testified that no one told

16    him that he needed to have the volume of rocks that

17    were crushed to be recorded?

18              MR. RAY:  Object to form.

19              THE WITNESS:  Like I said earlier, that --

20    that decision was made by two vice presidents, one for

21    Enel and one for IEA, and whatever the agreement was

22    or who would take care of the volume counts or

23    whatever was between them and their subcontractor so I

24    can't answer that truthfully.

25    Q     (By Mr. Ashworth) Okay.  My question would
```

1    be:  Again, would it surprise you that Craig testified

2    that no one told him that the rocks, the volume of

3    rocks needed to be recorded?

4             MR. RAY:  Object to form.

5             THE WITNESS:  No, it doesn't surprise me.

6        Q    (By Mr. Ashworth) But yet you made in your

7    declaration to the Court under oath, under penalty of

8    perjury, that the contractor recorded the volume of

9    rocks crushed.

10            MR. RAY:  Object to form.

11       Q    (By Mr. Ashworth) Is that not correct?

12       A    Yes, that was the agreement.

13       Q    Okay.  Sorry, that was the agreement?

14       A    Between those two parties I had mentioned

15   earlier, yes.

16       Q    Okay.  So then it would surprise you if

17   Craig testified that no one told him that the rocks

18   needed to be -- the volume needed to be recorded?

19            MR. RAY:  Object to form.

20            THE WITNESS:  I can't really recall, but it

21   would be surprising.

22       Q    (By Mr. Ashworth) Okay.  Why did you think

23   to include in your declaration to the Court anything

24   about the volume of rocks being recorded?

25            MR. RAY:  Object to form.

```
 1              THE WITNESS:  As I stated, the -- the

 2    declaration was not prepared by me.  It was prepared

 3    by others, and me being new with the company, I

 4    thought it was standard procedure to do so.  Give a

 5    little bit of history on the declaration and

 6    everything so that was my only response.

 7         Q    (By Mr. Ashworth) Sure.

 8              The -- what was the issue that was at

 9    dispute during construction?

10         A    What was the issue with what?  I'm sorry.

11         Q    Sure.

12              What was -- what was that issue in -- well,

13    let me kind of back this, make this question a little

14    bit more simpler.

15              The lawsuit that was filed by the United

16    States and Osage Minerals Council against Enel Green

17    and Osage Wind, do you know what the allegations were?

18         A    No.

19              MR. RAY:  Object to form.

20         Q    (By Mr. Ashworth) Okay.  Do you know that

21    there was a dispute during the excavation process with

22    Enel Green?  That's right; correct?

23         A    Yes.

24         Q    What was the dispute about?

25         A    The aggregates themselves.
```

```
1      Q    Okay.  The -- the aggregates, we're talking
2  about the rocks and the soil?

3      A    Yes.

4      Q    Okay.  And you had indicated just a few
5  minutes ago that you said that you believe with this
6  declaration that you were just providing background
7  information about the process; is that right?

8      A    Yes.

9      Q    But this -- this statement directly relates
10  to rocks that were at issue in the proceeding being
11  brought against Enel Green; is that right?

12          MR. RAY:  Object to form.

13          THE WITNESS:  That, I'm not sure of.  Like I
14  said, I wasn't involved in any of the disputes or
15  handlings of that at all.  It was -- it was -- I was
16  never involved.

17      Q    (By Mr. Ashworth) Okay.  As site coordinator
18  on the Osage Wind project, you were aware at the time
19  that there was an allegation made that Osage Wind and
20  Enel Green was using rocks without permission;
21  correct?

22          MR. RAY:  Object to form.

23          THE WITNESS:  I'm not sure if it was without
24  permission or not.  Like I said, I -- that would be up
25  to somebody other than myself, but the way it trickled
```

1   down, you know, I guess it -- it was a conflict

2   between the two parties.

3       Q   (By Mr. Ashworth) You were aware that

4   there -- that the rock and materials that were

5   excavated needed special handling?

6           MR. RAY:  Object to form.

7           THE WITNESS:  I don't know what you mean by

8   "special handling."

9       Q   (By Mr. Ashworth) Well, here you tell the

10  Court that the volume of rocks being crushed were

11  recorded, and so my question is, is why would you have

12  told the -- the Court this unless there was some type

13  of issue going on?

14          MR. RAY:  Object to form.

15      Q   (By Mr. Ashworth) Relating to the rock.

16          MR. RAY:  Same objection.

17          THE WITNESS:  If it was a requirement, which

18  I believe it was, I believe it was a directive that

19  came from Enel to the subcontractor to go ahead and

20  keep track of the volume.  Now, whether or not that

21  subcontractor or contractor had not done that, I think

22  would be -- I think that information would probably be

23  in the as-built drawings someplace.

24      Q   (By Mr. Ashworth) Okay.  We'll talk about

25  the as-builts later, but we're -- we're just past an

```
 1    hour.  I would like to take a quick break if you're

 2    okay with that.  Take about a ten-minute break.

 3              MR. RAY:  Sure.  That would be good.

 4              VIDEOGRAPHER:  We're off the record at

 5    11:14 a.m.

 6              (A recess was taken from 11:14-11:28 a.m.)

 7              VIDEOGRAPHER:  We're back on the record at

 8    11:28 a.m.

 9         Q    (By Mr. Ashworth) Sir, we're -- we're back

10    on the record, and before we get any further, I just

11    want to let you know that you are under oath, that you

12    swore to it during your deposition to give truthful

13    answers to the best of your ability.  That being said,

14    I just want to reiterate that at all points in your

15    deposition that oath will -- will, you know, still

16    apply.

17              Prior to -- now that we're back on the

18    record, is there anything about your prior test- --

19    I'm sorry, your previous testimony before the break

20    that you'd like to change?

21         A    No.

22         Q    Okay.  About this declaration, you don't

23    have to pull it up just yet, the declaration that we

24    discussed earlier which is marked as Exhibit No. 60,

25    did anyone from Enel Green management or any Enel
```

1    **Green employee tell you that you needed to sign the**

2    **declaration?**

3         A    It was presented to me for signature, yes.

4         **Q    Who presented it to you for signature?**

5         A    I -- I just don't recall.

6         **Q    Would it have been presented to you via**

7    **e-mail or in person?**

8         A    I'm -- I'm guessing here, but I'm thinking

9    that it was an e-mail that I received.

10        **Q    Okay.  Do you know who prepared it?**

11        A    I believe it was our legal department along

12   with outside attorneys as well.

13        **Q    Okay.  When it was given to you, do you know**

14   **if you were allowed to review it before you signed it?**

15        A    Yes, I was -- basically said if I had any

16   changes, go ahead and make the corrections and send it

17   back or whatever.

18        **Q    Were there any drafts of this declaration**

19   **that you are aware of that were made before you signed**

20   **it?**

21        A    I don't really recall that.

22        **Q    Did anyone from Enel Green speak with you to**

23   **go over the process before this declaration was**

24   **drafted?**

25        A    I don't recall, but I don't think so.

1    Q    Okay.  Would you -- this had been the very

2  first time that you would have seen the information or

3  knew about the information that was presented in the

4  declaration?

5           MR. RAY:  Object to form.

6           THE WITNESS:  Yes.

7    Q    (By Mr. Ashworth) Okay.  When the

8  declaration was given to you, were you able to ask any

9  questions, if you had them?

10    A    If I had them, yes.

11    Q    Do you know if you had any questions when

12  you -- before signing the declaration?

13    A    I -- I really can't recall.

14    Q    Okay.  Did you make any changes to the

15  declaration before you may -- before you signed it?

16    A    I -- I don't recall if I did or not.

17    Q    We'll go back to the declaration, the same

18  section on -- under paragraph or subparagraph two

19  little I in paragraph 15 on -- there we go.  Right

20  there.  A little bit down.  All the way down so we can

21  see subparagraph two little I.  Two little I.

22           It says "After the foundations are built and

23  cured, the crushed rock and soil is returned to the

24  hole from which it came."

25    A    True.

```
 1        Q    Is there anywhere -- okay.  Is there

 2   anywhere in -- in this section that indicates to the

 3   Court the reason why the crushed rock and soil is

 4   returned to the hole from which it came from?

 5             MR. RAY:  Object to form.

 6             THE WITNESS:  I really don't know the full

 7   history behind it, but I know that we weren't allowed

 8   to use the material anywhere else on site.  It had to

 9   remain on that specific turbine site.

10        Q    (By Mr. Ashworth) Okay.  The next sentence,

11   it says "The crusher is then moved to a new excavation

12   location.  This is a customary and standard

13   construction process including in wind projects and

14   has been employed around the" -- on the next page --

15   "country and at other projects in Oklahoma."

16             This language that you include, this is a

17   customary and standard construction process, are you

18   referring to the part that the crusher is moved to a

19   new excavation location or are you referring to this

20   entire section that you're telling the Court that this

21   entire process is customary and standard construction

22   practice?

23        A    The -- the crusher was moved to another

24   foundation location.  That -- we're just following the

25   sequence of turbines that --
```

```
1        Q     Okay.

2        A     -- we did.

3        Q     Well, let me -- sure.  Let me ask it this

4   way:

5              In -- after foundations are built and cured,

6   is it a customary and standard construction practice

7   within the industry that the crushed rock and soil is

8   returned to the hole from which it came from?

9        A     Yes.

10       Q     Okay.  So it would be your testimony that it

11  would not be a customary or standard construction

12  process to use the crushed rock and soil for any

13  purpose other than to return it to the hole from which

14  it came from?

15             MR. RAY:  Object to form.

16             THE WITNESS:  That's what we normally do,

17  yes, is replace that material that we excavated back

18  into the same hole and use it for compaction

19  requirements.  Any of the other soils that remain, we

20  build the site up to ensure proper drainage around the

21  turbines -- away from the turbines, I'm sorry.

22       Q     (By Mr. Ashworth) Sure.

23             So my question would be:  It would not be a

24  customary or standard construction process to use the

25  excavated material for anything other than backfill
```

```
 1    into the exact same hole from which it was -- it came
 2    from?
 3            MR. RAY:  Object to form.
 4            THE WITNESS:  On this site, we had to use
 5    all the material on that particular site.  We used it
 6    for backfill material and also the pad around the --
 7    the access pad around the turbines itself as well
 8    and...
 9        Q    (By Mr. Ashworth) Okay.  So I'm just kind of
10    using logic here, you -- you just testified that it is
11    a customary and standard construction process in the
12    industry to return excavated material back to the hole
13    from which it came from, that that is the standard and
14    customary practice within the industry, is when you
15    excavate material and it's been crushed, you return it
16    back to that same hole; is that right?
17        A    The majority -- yes.
18        Q    Okay.  Since that is the customary and
19    standard process, it would be -- logic to me would say
20    it's not -- would not be a customary process or
21    standard construction practice to use the excavated
22    soil for any other purpose?
23            MR. RAY:  Object to form.
24            THE WITNESS:  You would still use the
25    material on that specific site.  Anything remaining,
```

 1    you could probably use it elsewhere.  However, the

 2    restrictions on this project didn't allow us to do so.

 3        Q    (By Mr. Ashworth) Then why did you tell the

 4    Court that it is a customary and standard construction

 5    process that crushed rock and soil is returned to

 6    the -- that same hole from which it came from when

 7    you're telling me today that that's not the customary

 8    and standard construction process?

 9        A    It is -- it is the construction process

10    that -- that you do.  Anything that is left over and

11    excess on other projects, you know, you can use in the

12    shallow area and build it up or you try to use a

13    majority of it around the location itself.  This

14    particular project we had to leave everything within,

15    I can't remember the dimensions of the footprint, but

16    we had to leave everything on that particular site,

17    the backfill material, road, you know, the access road

18    leading up to it, et cetera.

19        Q    Okay.  Well, that's not what you're telling

20    the Court here in your declaration to the Court under

21    oath.  You're telling the Court here that the reason

22    why you crushed -- why the crushed rock and soil was

23    returned in the hole from which it came from is

24    because it's a customary and standard construction

25    process, but now you're telling me that the reason why

1    it was done that way was because this was a unique

2    situation.

3            MR. RAY:  Object to form.

4            THE WITNESS:  No, it -- it -- it's still

5    customary practice.  This job didn't allow us to do

6    the -- we were restricted in a sense.  I'm just

7    basically giving you a little bit of stuff, what we do

8    in construction.  It has nothing to do with anything

9    so...

10       Q    (By Mr. Ashworth) Sure.

11           Why did you mislead the Court here with your

12   statement under oath?

13           MR. RAY:  Object to form.

14           THE WITNESS:  I didn't intentionally do

15   that.  That -- at that time, when I -- when this was

16   written, it was to the best of my knowledge.

17       Q    (By Mr. Ashworth) Okay.  But you knew the

18   process at the time when it was written; correct?

19       A    I do know of a process -- of the process,

20   yes.

21       Q    Okay.  And, in fact, you signed this

22   declaration to the Court on behalf of your employer in

23   order to defeat the plaintiffs' request for

24   injunction; is that not correct?

25           MR. RAY:  Object to form.

```
 1              THE WITNESS:  That was not the intent.  That

 2    was not my intent, no, sir.

 3        Q    (By Mr. Ashworth) Okay.  It was not your

 4    intent that the request for injunction be defeated on

 5    behalf of your employer?

 6              MR. RAY:  Object to form.

 7              THE WITNESS:  I don't -- I don't get

 8    involved in any of the legal decisions that were there

 9    or any of the lawsuit.  I simply provided information

10    to the parties that put this document out.

11        Q    (By Mr. Ashworth) Okay.  You provided

12    information for this document; that information was

13    misleading.

14              MR. RAY:  Object to form.

15        Q    (By Mr. Ashworth) True?

16              MR. RAY:  Object to form.

17              THE WITNESS:  I don't know.

18        Q    (By Mr. Ashworth) Okay.  The information did

19    not accurately reflect the process that you oversaw

20    during the construction process.

21              MR. RAY:  Object to form.

22        Q    (By Mr. Ashworth) That's true; correct?

23              MR. RAY:  Object to form.

24              THE WITNESS:  Say that again, I'm sorry.

25        Q    (By Mr. Ashworth) Sure.
```

```
 1                    The information here -- I'll scratch that.

 2                    We'll go to -- we'll pull up a different

 3       exhibit.  We'll go to the scope of work and we're

 4       going to go to page 12.  We're going to look at -- on

 5       page 12 of the document, it's paragraph five, what is

 6       it, beginning here in the middle of the -- middle of

 7       the page it says "Excess excavated material from the

 8       foundation, if suitable, may be used to backfill --

 9       sorry, to balance backfill excavations, construct

10       roadways, construct crane pads, and may be spread

11       around the foundation pads."  Then it goes on to the

12       last sentence, it says "Contractor shall not haul

13       material outside of the project boundaries nor use

14       native material for any construction purpose other

15       than noted above."

16                    So under the scope of work that was drafted

17       by Enel or Osage Wind, it was indicated to IEA that

18       they could use the excavated material in addition to

19       using as backfill, they could use it for other

20       projects within the project area.

21                    MR. RAY:  Object to form.

22                    THE WITNESS:  I -- I think that --

23           Q    (By Mr. Ashworth) Is that correct?

24           A    I think this document -- I'm not sure if

25       it's -- of its date that it was written.  I really
```

```
 1   don't know.

 2             As I stated before, you can use this

 3   material if we didn't have the restrictions in place.

 4   This is just a -- like a boilerplate type requirement

 5   on the project.

 6        Q    Okay.  So when you say this is a boilerplate

 7   requirement for the project, are you indicating that

 8   it's kind of a loose requirement that doesn't have to

 9   be filled -- followed?

10             MR. RAY:  Object to form.

11             THE WITNESS:  I don't think it was intended

12   to be followed, actually, because of the restrictions

13   that we had.  Other than that, I -- I don't really

14   know.

15        Q    (By Mr. Ashworth) Okay.  But nowhere in your

16   declaration did you indicate that there was a scope of

17   work that would have allowed the crushed rock to be

18   used for something other than backfill?

19             MR. RAY:  Object to form.

20             THE WITNESS:  Yes.

21        Q    (By Mr. Ashworth) Okay.  We're going to go

22   to subparagraph, it's little numeral -- numeral

23   number -- or I'm sorry, numeral five which is on page

24   5.  Oh, I'm sorry, it's declaration.  Page 5, little

25   numeral five.  One page down.  In this section, I'm
```

1    going to look at the -- the second sentence, it says

2    "No sand, soil, or rock from any excavation is used

3    for any purpose other than to return to the hole from

4    which it came."

5              What does that sentence mean to you?

6       A    Exactly that, that it was to remain there.

7       Q    That the sand, soil, and rock that was

8    excavated, so the excavated material, the only purpose

9    for the excavated material was to be used as backfill

10   to the hole from which it came from; is that right?

11      A    Yes, that's my interpretation, yes.

12      Q    Okay.  So you're telling the Court that the

13   excavated material was only going to be used for

14   backfill or for no other purposes?

15      A    As long as the material stayed on that

16   designated site, yes.

17      Q    Okay.  But, in fact, this excavated material

18   was used for some -- for a purpose other than

19   backfill; is that correct?

20              MR. RAY:  Object to form.

21              THE WITNESS:  In some cases it was spread

22   around the turbine site itself, yes.

23      Q    (By Mr. Ashworth) When it was -- so when it

24   was used as backfill, it was also being used for

25   structural support for the wind tower; is that

1    correct?

2        A    The backfill material was for the structural

3    support.  The other area was for drainage that we

4    built up draining it away from the turbine itself, and

5    a portion of that in that little access road and apron

6    around the terminal -- around the turbine, but it

7    didn't leave that particular site, to my knowledge.

8        **Q    Did you tell the Court that the material is**

9    **being used for structural support in your declaration?**

10            MR. RAY:  Object to form.

11            THE WITNESS:  I don't think so, no.

12        **Q    (By Mr. Ashworth) Do you think it would have**

13    **been important for the Court to know that Enel Green**

14    **and Osage Wind was using the backfill material for**

15    **structural support?**

16            MR. RAY:  Object to form.

17            THE WITNESS:  I -- I don't know the answer

18    to that.

19        **Q    (By Mr. Ashworth) Okay.  Let me re-ask it**

20    **this way:  Do you know if it would have been important**

21    **for the Court to know that the materials that were**

22    **excavated on site was being used for structural**

23    **support for the wind tower?**

24            MR. RAY:  Object to form.

25            THE WITNESS:  I -- I don't -- I don't know

```
 1    that answer.

 2         Q    (By Mr. Ashworth) Okay.  Is the reason why

 3    you failed to tell the Court in your declaration that

 4    the purpose for the excavated material to be used was

 5    for structural support?  Is that reason -- scratch

 6    that.

 7              Is the reason why you said that -- did not

 8    say that was to help Enel Green defeat the request for

 9    injunction?

10         A    I don't --

11              MR. RAY:  Object to form.

12              THE WITNESS:  I don't think that was the

13    intent, no.

14         Q    (By Mr. Ashworth) Okay.  Under the --

15    paragraph underneath there, right under the page, it

16    says "No excavated rock or sand is sold or used for

17    commercial purposes."

18              Is that -- was that a correct statement?

19         A    Yes.

20         Q    Okay.  You separate sold and commercial

21    purposes.

22              When you're saying not used for commercial

23    purposes, are you meaning that the rock and sand were

24    not being used to advance any economic purpose of Enel

25    Green?
```

 1       A     No, not -- not to my knowledge anyway.  I

 2  know we didn't sell anything away from the job site.

 3       Q     Sure.

 4             You -- you didn't -- I know that you didn't

 5  sell any excavated rock and sand that was excavated.

 6  I -- you know, I get that.

 7       A     Okay.

 8       Q     And -- and but you're also saying none of

 9  the excavated rock or sand was used for commercial

10  purposes, and I just want to know what you're

11  referring to here.

12             Are you saying that Enel Green did not use

13  the rock or sand for any economic purposes?  Is that

14  what you're saying?

15             MR. RAY:  Object to form.

16             THE WITNESS:  Yes, that's exactly what I'm

17  saying.

18       Q     (By Mr. Ashworth) Let me just make sure I --

19  that question -- my question -- the setup to that

20  question was not phrased very well.

21             When you say here no excavated rock or sand

22  was used for commercial purposes, you're indicating to

23  the Court that Enel Green did not use any of the

24  excavated rock or sand to advance any economic

25  interests of Enel Green?

```
 1              MR. RAY:  Object to form.

 2              THE WITNESS:  That's my interpretation, yes.

 3    And you -- you keep mentioning commercial.  I'm unsure

 4    what that would do to benefit Enel.  I was not -- I'll

 5    state it again.  Whatever the issues were between Enel

 6    and also the Osage, I had nothing to do with that.  I

 7    had no knowledge of what they were doing on a

 8    day-to-day basis on -- on that case at all so this, to

 9    the best of my knowledge, is -- is what we basically

10    did.

11        Q    (By Mr. Ashworth) Well, I don't know what

12    you mean by commercial or not used for commercial

13    purposes here because these aren't my words, and

14    that's why I'm asking you what did you mean by -- by

15    this.  You said that you interpret that to mean that

16    you were saying to the Court that Enel Green was not

17    using any of the excavated rock or sand to advance any

18    economic interests.

19        A    No, they did not.

20        Q    Okay.  We're going to look at paragraph 12,

21    page 3, paragraph -- I'm sorry, of the document,

22    towards the bottom it says -- it begins with, it says

23    "Osage Wind has not engaged in a beat-the-clock

24    strategy and has not accelerated construction work on

25    the project.  Though it has taken reasonable steps to
```

1    stay on schedule."

2              Then it goes on and says, it says "In fact,

3    contrary to the usual practice for a project at this

4    stage of development, all construction work was shut

5    down for four days for the Thanksgiving weekend."

6              Did I read that correct?

7    A    Yes.

8    Q    It seems to me that you're telling the Court

9    here that you're not trying to increase work to get it

10   done as soon as possible -- well, scratch that.

11             It seems to me that you're trying to tell

12   the Court that you weren't in a hurry and as evidence

13   of that, you took four days -- you-all took four days

14   off during Thanksgiving weekend.

15             Is that -- am I reading that correctly?

16   A    Yes.

17   Q    And you're -- you're telling the Court that

18   taking off for Thanksgiving weekend is not a usual

19   practice in the industry?

20   A    Normally, we work through the holidays, yes.

21   Q    Okay.  And that's based on your experience

22   in the industry?

23   A    Yes.

24   Q    Okay.  I'm going to pull back up the

25   exhibit, the scope of work.

```
 1            Did I mark that as an exhibit?  I think it
 2      already is.
 3            MS. McCLANAHAN:  It's already been marked as
 4      an exhibit.
 5            MR. ASHWORTH:  Okay.  I will double check on
 6      the scope of work, the number of that.
 7      Q    (By Mr. Ashworth) As we pull that up, I'm
 8      going to look at page 8 at the top of the page.  Right
 9      here.  This is the scope of work between Osage Wind
10      and IEA.  It says "The intent of contract is for
11      Saturdays and Sundays to be utilized as make-up days,
12      contractor will notify owner if the work for schedule
13      varies significantly from this plan.  No work will be
14      performed on the following holidays without written
15      approval from owner."  It says Thanksgiving day, day
16      after Thanksgiving day, and based on the first
17      sentence, it seems that weekends as well would not be
18      anticipated to be worked on.
19            You've just testified earlier that it's
20      based on your experience and practice, and also as you
21      told the Court that you would work through
22      Thanksgiving, the day after Thanksgiving and the
23      weekend thereafter, but yet this scope of contract
24      seems to show that Enel had already decided that that
25      wasn't going to happen.
```

1      A     That, I don't --

2      Q     **Am I missing --**

3      A     That, I don't recollect, but it's normal

4   that -- I normally used to work through the holiday

5   seasons themselves.  This was a part of the contract

6   that was written, I'm not sure by who or who

7   interjected this.  That's maybe their regular holidays

8   that they get, but I do know that they -- they did

9   take off for Thanksgiving and I believe it was also

10  Christmas Eve and Christmas day.

11     Q     **Okay.  I also want to note for the record**

12  **that this scope of work that I'm referring to was**

13  **previously admitted in a previous deposition as**

14  **Exhibit No. 46.**

15          **So going back to that, in your declaration,**

16  **if we could go back, you told the Court under oath, in**

17  **fact, contrary to the usual practice for a project at**

18  **this stage of development, all construction was shut**

19  **down for four days for the Thanksgiving weekend.**

20          **While it may be your experience, you did not**

21  **tell the Court that that decision was already made**

22  **prior to this point by Enel Green.**

23          (Exhibit 46 Marked for Identification)

24          MR. RAY:  Object to form.

25          THE WITNESS:  I'm --

```
 1        Q     (By Mr. Ashworth) Is that not correct?

 2        A     I'm not sure who made the decision at -- at

 3   all.  I'm sorry, I just don't recall every little bit

 4   of it.

 5        Q     Sure.

 6              It -- if you say that the higher-ups in Enel

 7   Green, whether it's legal department or whatever, may

 8   have drafted or had a hand in drafting this, were they

 9   trying to set you up to tell mistruths to the Court?

10              MR. RAY:  Object to form.

11              THE WITNESS:  I -- I don't think so.

12        Q     (By Mr. Ashworth) Okay.  But the purpose of

13   this declaration was to get the Court to deny the

14   plaintiffs' request for injunction; correct?

15              MR. RAY:  Object to form.

16              THE WITNESS:  I -- I don't know the answer

17   to that question.  I'm sorry.

18        Q     (By Mr. Ashworth) Okay.  In paragraph 16 of

19   your declaration, you wrote that "Currently there are

20   approximately 200 people on site and involved in the

21   construction of the Osage Wind project.  This includes

22   employees of Osage Wind, Enel, IEA RE Inc., referring

23   to the general contractor, and several" -- I'm sorry,

24   "several contractors."

25              Was that a correct statement when you made
```

1  that?

2       A    Osage Wind... I really don't recall this,

3  but yes, I guess, yes.

4       Q    Okay.  How many Osage Wind employees were

5  there versus Enel Green employees on site?

6            MR. RAY:  Object to form.

7            THE WITNESS:  I believe there was one and

8  possibly another at our monthly meetings initially.

9       Q    (By Mr. Ashworth) When you say "one," are

10 you referring to Osage Wind employees?

11      A    Yes.

12      Q    Okay.  Do you know who that one Osage Wind

13 employee would have been?

14      A    No, sir, I just don't recall.

15      Q    What was Osage Wind's involvement in the

16 construction of the project, that you were aware of?

17           MR. RAY:  Object to form.

18           THE WITNESS:  The project was theirs and

19 Enel had bought the project from them.

20      Q    (By Mr. Ashworth) Okay.

21      A    Other than that, I -- I don't know.

22      Q    But the -- Enel Green was the company that

23 was directing the construction process; correct?

24           MR. RAY:  Object to form.

25           THE WITNESS:  Yes.

Bill Moskaluk   6/16/2021   78

```
1        Q    (By Mr. Ashworth) Okay.  Going back up to --
2    you don't have to go, scroll up.
3             Going back to the part where we talked about
4    Thanksgiving day weekend in your declaration where you
5    inform the Court under oath that that was a usual --
6    contrary to the usual and customary process where
7    construction would be stopped during that four-day
8    weekend --
9        A    Like I said --
10       Q    -- why did --
11       A    Go ahead.
12       Q    Yes.  Yeah.  The question is why, why did
13   you say that?
14       A    Repeat that again.  I'm getting a lot of hum
15   on this end.
16       Q    I'm sorry, that's on our end.  That's the
17   tornado siren in Tulsa.  It's every Wednesday.
18       A    Hmm.  Could you repeat your last question,
19   please.
20       Q    Sure.  Let me say the -- the statement that
21   you'd made in paragraph 12 said "In fact, contrary to
22   the usual practice for a project at this stage of
23   development, all construction work was shut down for
24   the four days of Thanksgiving weekend."
25            My question is:  Why do you think the
```

```
 1   purpose was for saying that statement to the Court?

 2            MR. RAY:  Object to form.

 3            THE WITNESS:  I -- I don't really know.

 4        Q    (By Mr. Ashworth) Okay.  We're going to go

 5   down to paragraph -- we're jumping around.  We're

 6   going to go to paragraph 20.

 7            Actually, this is a good stopping point for

 8   a break.  We can do -- we can break for lunch, or if

 9   we take a small break, sir, that's up to you and then

10   we -- you know, of course the other parties as well.

11            Do you have a preference, sir?

12        A    No, I don't.

13            MR. ASHWORTH:  Mary Katherine?

14            MS. NAGLE:  We're certainly fine to keep

15   going at this point.  I don't know.  Yeah, we're fine.

16   We're fine either way.

17            MR. ASHWORTH:  Ryan?

18            MR. RAY:  I think, I mean, we'd like a lunch

19   break at some point.  It doesn't necessarily have to

20   be now.

21            MR. ASHWORTH:  Let's continue then, sir,

22   unless you want to take a five-minute break.  Bill, do

23   you have a preference?

24            THE WITNESS:  No, I don't.

25            MR. ASHWORTH:  Great.  Let's continue.
```

```
 1        Q    (By Mr. Ashworth) Paragraph 20 of your

 2   declaration, it says "As of November 21, 2014, the

 3   total amount expended on the project including

 4   contracts that's been executed is 200" --

 5             VIDEOGRAPHER:  Excuse me, sorry to interrupt

 6   but we need to go off the record.  The reporter got

 7   kicked off of the call so --

 8             MR. ASHWORTH:  Okay.

 9             VIDEOGRAPHER:  -- we are off the record at

10   12:03 p.m.

11             (A recess was taken from 12:03-1:12 p.m.)

12             VIDEOGRAPHER:  It is 1:12 p.m. and we are

13   back on the record.

14        Q    (By Mr. Ashworth) Sir, we're back on -- on

15   the record.  I just want to remind you that you're

16   still under oath.  The rules of perjury still apply.

17             Coming back from the break, is there

18   anything that you would like to change about your

19   previous testimony?

20        A    No.

21        Q    Anything you want to add to your previous

22   testimony?

23        A    No, thank you.

24        Q    Who else is in the room with you other than

25   Ryan Ray and Megan Beauregard?  Is there anyone else?
```

 1        A    No.

 2        Q    Okay.  You understand that the minerals that

 3   were under the Osage Wind projects were owned by the

 4   Osage Nation; is that correct?

 5             MR. RAY:  Object to the form.

 6             THE WITNESS:  I was -- I was told that, yes.

 7        Q    (By Mr. Ashworth) Okay.  And -- and -- and

 8   based on that, you -- you understood that the rocks

 9   and soil underneath the project was owned by the

10   tribe; is that right?

11             MR. RAY:  Object to form.  And we -- we lost

12   you a little bit there, Stuart.  Can you re-ask that

13   question, please.

14             MR. ASHWORTH:  Sure.

15        Q    (By Mr. Ashworth) Sir, and based on -- based

16   on that, you understood at the time that the rocks and

17   soil underneath the wind project was owned by the

18   tribe?

19             MR. RAY:  Object to form.

20             THE WITNESS:  Yes.

21        Q    (By Mr. Ashworth) Okay.  We're going to go

22   to your declaration, page 20.  I'm sorry, paragraph

23   20.  I don't have a page number.

24             MS. McCLANAHAN:  That's okay.  I got it.

25        Q    (By Mr. Ashworth) This says "As of

1   **November 20 -- 21, 2014, the total amount expended on**

2   **the project including contracts that have been**

3   **executed is $287 million."**

4            **Is that correct?**

5       A    You know, I -- I can't -- I can't comment on

6   that because I don't -- that number was provided and I

7   don't know who provided it.  I just simply don't

8   remember that number.

9       **Q    You can't comment on the words that you told**

10  **the Court in opposition to a request for injunction;**

11  **is -- is that your testimony right now?**

12           MR. RAY:  Object to form.

13           THE WITNESS:  That was seven years ago, once

14  again, that I did that.  I don't remember all the

15  details with it at all at this present time.

16      **Q    (By Mr. Ashworth) Sure.**

17           **You know even though it's seven years ago**

18  **when you make a statement to the Court under oath, I**

19  **mean, I think we can all agree that we can do our best**

20  **to understand your statement.**

21           **You previously indicated that the**

22  **declaration that you made to the Court under oath was**

23  **based on your review of business records of Enel Green**

24  **and Osage Wind.**

25           **Was that a correct statement?**

1      A      Well, there were a lot of records that I did

2    review and stuff like that, but like I said, even

3    today, I -- I don't remember all of the things, if

4    any.  I mean, I haven't been affiliated with this for

5    seven years, eight years, whatever the number is, but

6    I can't -- I can't remember everything, and as a

7    matter of fact, I don't.

8      **Q      Okay.  Well, what -- if you indicated that**

9    **the declaration, the words that you told the Court**

10   **were based on your review of business records of Enel**

11   **Green and Osage Wind, I want to know is if you made**

12   **this statement regarding this number to the Court, you**

13   **would have made that statement based on something that**

14   **you saw in the business records of Enel Green or Osage**

15   **Wind; is that correct?**

16     A      Yes and no.  I mean, I don't know how to

17   answer that question.  The numbers were probably

18   provided by somebody else, maybe in our finance

19   department.  They weren't provided by myself.  The

20   numbers were just there due to the -- the records that

21   I -- or that I reviewed on this at that time.

22     **Q      Okay.  As you --**

23     A      I -- I really can't remember where the

24   $287 million came from.

25     **Q      So as you sit here today, you don't know if**

```
 1    this $287 million number is accurate or not?

 2              MR. RAY:  Object to form.

 3              THE WITNESS:  I'm -- I'm not sure.

 4         Q    (By Mr. Ashworth) Okay.  And, in fact, when

 5    you made this declaration to the Court, at that time,

 6    you didn't know if that number was correct?

 7              MR. RAY:  Object to form.

 8              THE WITNESS:  No, I think --

 9         Q    (By Mr. Ashworth) Is that true?

10         A    At -- at the time I reviewed the document,

11    the documents and everything else like that, the

12    number might have been -- you know, that number

13    probably is correct, but I -- like I said, it was

14    provided by someone else and I assumed it was a

15    correct number.  Other than that, I just don't

16    remember where the number came from.

17         Q    Okay.  Are you saying that you assumed at

18    the time that the number was correct before you told

19    that number to the Court?

20         A    Yes.

21         Q    Okay.  And, in fact, you did not do anything

22    to verify that that number was accurate?

23              MR. RAY:  Object to form.

24              THE WITNESS:  I'm not sure what -- what I

25    did.  I can't recall what my actions were at that
```

```
 1    time.

 2        Q    (By Mr. Ashworth) Okay.  Would it surprise

 3    you that you would have made this statement to the

 4    Court under oath without knowing or verifying that it

 5    was a true and accurate statement?

 6            MR. RAY:  Object to form.

 7            THE WITNESS:  At the time when I signed

 8    this, the number -- I probably verified the number,

 9    but I'm not sure if I had or not.  I can't give you

10    the particulars because I -- I have not remembered.

11    I've forgot or whatever.

12        Q    (By Mr. Ashworth) Okay.  If you did not --

13    scratch that.

14            Would you agree that if you made a statement

15    under oath to the Court, that you would not make that

16    statement unless you know it's true?

17        A    As I said, at the time when I -- when this

18    happened, I probably did verify that number, but

19    today, I just don't -- I don't even remember the

20    document today.

21        Q    Sure.

22            Sir, you're going to have to listen to my

23    question.  My question is:  If you make a statement to

24    the Court under oath, under penalty of perjury, that

25    statement that you make, you would have made sure that
```

1    that was an accurate statement; is that -- is that

2    true?

3              MR. RAY:  Object to form.

4              THE WITNESS:  I'll clarify, the -- the

5    287 million probably was a correct number.  I did not

6    at the present time have anything untruthful that I

7    reported back then on this document.  I -- I did not

8    lie or anything else of that nature.

9         Q    (By Mr. Ashworth) Okay.  You're saying that

10   you didn't lie, and I'm not saying -- you know, make

11   any representations, what I am saying is, is if you

12   make a statement to the Court, would you not agree

13   that you had a duty to verify that that statement is

14   true?

15             MR. RAY:  Object to form.

16             THE WITNESS:  Yes.

17        Q    (By Mr. Ashworth) Okay.  This number,

18   $287 million, that figure doesn't include any payments

19   to the Osage Nation, does it?

20             MR. RAY:  Object to form.

21             THE WITNESS:  Not -- not to my knowledge.

22        Q    (By Mr. Ashworth) Okay.  And -- and that's

23   because Enel Green never intended to pay for their

24   rocks and soil that they used to support their wind

25   towers; is that correct?

```
 1                    MR. RAY:  Object to form.

 2                    THE WITNESS:  I do not know that.

 3       Q    (By Mr. Ashworth) Okay.  Well, just to be

 4   clear, what I'm talking about, which -- which rock and

 5   soil I'm talking about, I'm talking about the rocks

 6   and soil that Enel Green took from the Osage Minerals

 7   without first obtaining permission or permit from the

 8   Osage Minerals Council.

 9                    MR. RAY:  Object to form.

10       Q    (By Mr. Ashworth) Do we have the same

11   understanding of what rocks and minerals I'm talking

12   about?

13                    MR. RAY:  Object to form.

14                    THE WITNESS:  No.

15       Q    (By Mr. Ashworth) I'm sorry, you don't know

16   what minerals I'm referring to?

17       A    I'm assuming that it is the limestone.

18       Q    Okay.  We'll just say the -- we'll call it

19   the excavated material.

20       A    Okay.

21       Q    The $287 million that was paid by Enel Green

22   for the project didn't include any type of payments

23   for the excavated materials; is that correct?

24                    MR. RAY:  Object to form.

25                    THE WITNESS:  Yes.
```

1        Q     (By Mr. Ashworth) I'm sorry, yes, it did

2    include payment to --

3        A     No.  No, it did not.  That -- that payment

4    was probably to the contractor themselves, IEA.

5        Q     Okay.  In this -- sorry, in this same

6    paragraph, I'm just going to reread it, it says "As of

7    November 21, 2014, the total amount expended on the

8    project including contracts that have been executed is

9    287 million.  These expenditures consist of the

10   following," and then if we go down, we can look at, it

11   says "D, cost of construction, the original contract

12   price between Osage Wind, LLC and IEA RE Inc. for the

13   project construction is approximately $54 million.  To

14   date, Osage Wind has incurred approximately round up

15   to 80 -- I'm sorry, 28 million in costs for work that

16   had been completed."

17            Why did you talk about the original contract

18   price between Osage Wind and IEA under the section

19   Cost of Construction?

20            MR. RAY:  Object to form.

21            THE WITNESS:  I'm not sure at this time.

22       Q     (By Mr. Ashworth) Okay.  Is it because you

23   think you believed it was important to the Court to

24   know what the contract price was?

25            MR. RAY:  Object to form.

```
 1              THE WITNESS:  No, like I said earlier, I
 2    didn't -- I provided some input to this declaration,
 3    but as far as the numbers and everything else are --
 4    that concern, everybody else added to it and the
 5    numbers seem to jibe on this declaration at that time.
 6        Q    (By Mr. Ashworth) Okay.  As -- as we sit
 7    here today, do you believe that it is relevant to
 8    know -- for the Court to know what the original
 9    contract price was in relations to the cost of
10    construction?
11              MR. RAY:  Object to form.
12              THE WITNESS:  I do not know what that number
13    was on that contract at all.  Even at this time, I
14    don't simply remember.
15        Q    (By Mr. Ashworth) I'm going to pull up an
16    exhibit that is a change order dated December 1, and
17    I'm going to mark it as Exhibit No. 62.
18              (Exhibit 62 Marked for Identification)
19              MR. RAY:  Is there a Bates number on that,
20    Stuart, that you can give us?
21              MR. ASHWORTH:  I don't know yet.  We'll have
22    to -- as it gets pulled up.
23              It's -- it's -- is it already made an
24    exhibit?
25              MS. McCLANAHAN:  No.
```

1          MR. ASHWORTH:  It's not Bates stamped.  This

2   was provided by IEA in response to a subpoena, it's

3   my -- if I can recall.  We'll go kind of towards the

4   beginning.

5          **Q    (By Mr. Ashworth) Sir, I -- first off, have**

6   **you seen any of the change orders that were entered**

7   **relative to the Osage Wind project?**

8          A    That was not part of my responsibilities.

9   Those were handled by upper folks within the company.

10  I never got to see the -- the total numbers of the

11  change order.  That was --

12         **Q    Okay.**

13         A    -- apparently none of -- none of my

14  business.

15         **Q    Oh, okay.  Okay.  None of your business.**

16         **Well, this -- this change order --**

17         A    I said apparently it was none of my

18  business.

19         **Q    I'm sorry, what?  I didn't catch that.**

20         A    I said apparently it was -- it was none of

21  my business or it didn't fall within my

22  responsibility.

23         **Q    Perhaps higher-ups at Enel Green did not**

24  **believe it was your pay grade?**

25         A    No, they let me know what it was about, but

1    they never showed me the numbers.  If I did get it, it

2    was always redacted.

3        Q    Okay.  Well, this change order is dated

4    December 1, 2014, around the same time as your

5    declaration.  If we scroll down a little bit, in the

6    middle of this page, keep going down, right here, it

7    indicates this is a change order with IEA.  It

8    indicates that the original contract price was

9    approximately $51 million.  With -- we're having a bit

10   of feedback over here.

11            With change orders, previous change orders,

12   it made the revised contract of IEA approximately

13   34 million.

14            Did I read -- am I summarizing that

15   correctly?

16            MR. RAY:  Object to form.

17            THE WITNESS:  I'm sure you are, but, you

18   know, once again, I had nothing to do with the

19   numbers.

20       Q    (By Mr. Ashworth) Sure.

21            Maybe -- and I understand that you had

22   nothing to do with the numbers, but in the

23   declaration, if we go back to the declaration, you

24   told the Court about the numbers even though you had

25   no involvement with the numbers.

```
 1       A    And that's -- that is correct, and I didn't

 2   know who entered -- entered these numbers in that

 3   agreement to begin with or that declaration to begin

 4   with.  I have no knowledge of that and, like I said, I

 5   basically don't remember the entirety of this

 6   declaration in -- in itself.

 7       Q    Do you think it would have been appropriate

 8   for the Court to have relied upon your declaration in

 9   ruling on the plaintiffs' requests for injunction, to

10   rely on the statements and numbers that you provided

11   even though the numbers were not, you know, within

12   your duties with IEA?

13            MR. RAY:  Object to form.

14            THE WITNESS:  That, I -- I don't know.

15       Q    (By Mr. Ashworth) You don't know if it would

16   be appropriate for the Court to rely on the numbers

17   that you presented?

18            MR. RAY:  Object to form.

19            THE WITNESS:  I think at the time that this

20   was written, I think that it -- they were true

21   numbers.  However, I can't verify that now.  I can't

22   really remember what -- what happened back then with

23   this declaration.  I have no idea.

24       Q    (By Mr. Ashworth) Okay.  Let me re-ask it

25   this way:
```

Case 4:14-cv-00704-GKF-JFJ   Document 476-2 Filed in USDC ND/OK on 11/30/21   Page 94 of 214

```
1              If you were not the numbers person at -- at

2    Enel Green, you would agree that the Court shouldn't

3    rely on the numbers that you gave to the Court because

4    you were not privy to the numbers?

5              MR. RAY:  Object to form.

6              THE WITNESS:  Oh, I'm sure that the numbers

7    that were provided were correct.  I just don't have

8    any way of verifying it now.  I -- I really don't.

9    That was a financial department decision to come up

10   with these numbers and that was not part of my job

11   description at that time.

12        Q    (By Mr. Ashworth) Is there anywhere here

13   that you indicate to the Court that you don't know

14   exactly what the numbers are but that you're relying

15   on someone else to -- for that?

16             MR. RAY:  Object to form.

17             THE WITNESS:  The numbers that were there, I

18   trusted the -- the people that provided the numbers,

19   that they were accurate.

20        Q    (By Mr. Ashworth) Well, under the Cost of

21   Construction section here in your declaration to the

22   Court, why did you tell the Court about the original

23   contract price even though at the time of this

24   declaration, that original contract price had already

25   been revised many times and at the time it was around
```

1    $34 million?  Why did you tell --

2              MR. RAY:  Object to form.

3              THE WITNESS:  I'm not sure why they did it.

4    You would have to ask the people that wrote the change

5    orders or put these numbers in here.  I don't have any

6    information on that.

7        Q    (By Mr. Ashworth) Sir, you know, I'm not

8    wanting to know why they gave those numbers.  I want

9    to know, is why did you tell the Court this?

10             MR. RAY:  Object to form.

11             THE WITNESS:  I seriously can't remember.

12       Q    (By Mr. Ashworth) Okay.  You don't know why

13   you misled the Court -- scratch that.

14             Do you think you did this, you made this

15   statement because you wanted to mislead the Court into

16   thinking that Enel Green's contract expenses were more

17   than what they actually were?

18             MR. RAY:  Object to form.

19             THE WITNESS:  No, I didn't intentionally do

20   anything of that nature at all, not to try to fool --

21       Q    (By Mr. Ashworth) Do you --

22       A    -- anybody.  I didn't realize that it was

23   going to have an effect on the tribe or, now, I had no

24   idea, you know, nothing.

25       Q    Do you think the person that provided you

1   this did so in an effort to mislead the Court into

2   thinking that Enel -- Enel Green's contract expenses

3   were more than what they actually were?

4           MR. RAY:  Object to form.  Calls for

5   speculation.

6           THE WITNESS:  I'm not sure.  I would have to

7   refer you to that person what the -- the thought

8   process was, but I don't --

9      Q   (By Mr. Ashworth) I'm not asking -- sure.

10  Sorry to interrupt you.  I'm not asking about their

11  thought process.  What I am asking is, is what your

12  current thought process is.

13          Do you think that the individuals who gave

14  you this number did so to mislead the Court?

15          MR. RAY:  Object to form.

16          THE WITNESS:  I don't think so.

17     Q   (By Mr. Ashworth) Do you think it was

18  truthful to tell the Court -- scratch that.

19          Do you think that you were being truthful to

20  the Court when you failed to tell the Court that the

21  contract price as of the time of your declaration was

22  $20 million less than the original contract --

23  contract price called for?

24          MR. RAY:  Object to form.  Lack of

25  foundation.

```
 1                THE WITNESS:  I'm not sure.

 2      Q     (By Mr. Ashworth) You're not sure if you're

 3  being truthful?

 4                MR. RAY:  Object to form.

 5                THE WITNESS:  No, I was truthful at the time

 6  that this was presented, you know.  Other than that, I

 7  really don't remember who provided all this

 8  information, who developed this report on the

 9  statements or anything else like that.  I really can't

10  remember the majority of the details.

11      Q     (By Mr. Ashworth) And do you know who I

12  could ask to find out who did this declaration for

13  you?

14      A     I'm not sure.  I don't know.  Like I said,

15  there was a -- we had a legal department and I believe

16  they had outside legal as well working on this.  Other

17  than that, I don't -- I don't know for sure.

18      Q     Have you ever signed a declaration before a

19  Court before?

20      A     I'm not sure if it was a declaration or not.

21  I really don't know.

22      Q     Have you ever signed an affidavit before?

23      A     I can't remember if I did but...

24      Q     Do you -- at the time that you signed this

25  declaration, did you know that by making the
```

1    statements, you were indicating that the statements

2    were true and accurate?  Did you at least know that?

3         A    Yes.

4         Q    Okay.  Is -- would it be fair for me to --

5    to believe that the reason why you did not tell the

6    Court in the declaration here that the contract price,

7    the revised contract price was 20,000 -- 20 million

8    less than what the original price was because you

9    didn't want the Court to -- to believe that Enel Green

10   was trying to cut costs on the project?

11             MR. RAY:  Object to form.

12             THE WITNESS:  No.

13        Q    (By Mr. Ashworth) Was Enel Green trying to

14   cut costs or save money on the project?

15        A    I think as an owner, they probably would

16   have liked to have saved some money, yes, but I'm not

17   even sure what the final numbers were on that project

18   so I don't think they -- everybody, every company

19   wants to save a little bit of money, but I don't know

20   what their actions were.

21        Q    In your position as site coordinator on the

22   Osage Wind project, was it your understanding that

23   Enel Green was trying to cut costs in relations to the

24   excavation process?

25        A    Not to my knowledge, no.

 1      Q    Okay.  I'm going to pull up an exhibit that

 2   was previously marked as Exhibit 48 and it's a change

 3   order for blasting and we're going to go to page 4.

 4   It's the middle of the page on page 4.  Right there.

 5   Second-to-last bullet point there, this is a change

 6   order, which is I guess somewhat -- I don't -- I'll

 7   say this, I do not see your name on it, but I just

 8   want to bring this to your attention, it's from Enel

 9   Green.

10          It says "In an attempt to limit the cost

11   impact of rock crushing, EP" -- sorry, "EGP E&C has

12   also inquired IEA/Barr to pursue" -- I assume that's

13   supposed to be "lighter crushing procedure.  The

14   response was that the material larger than 3 inches

15   would not have been suitable to meet compaction

16   requirements."

17          Were you aware at the time that Enel Green

18   tried to pursue other options for crushing the rock to

19   save money.

20          (Exhibit 48 Marked for Identification)

21          MR. RAY:  Object to form.

22          THE WITNESS:  No, all I know is we couldn't

23   use anything larger than that in order to achieve our

24   compaction results.

25      Q    (By Mr. Ashworth) Okay.  And just to be

```
 1   clear of what -- the number that you believe is the
 2   total on the project was $287 million.
 3           At least the number that you present to the
 4   Court; is that correct?
 5       A   Yes.
 6       Q   Okay.  I'm going to pull up another exhibit
 7   that I'm going to mark as Exhibit No. 63.  It is going
 8   to be e-mails regarding material costs.  Right there
 9   is perfect.
10           So this is an e-mail --
11           (Exhibit 63 Marked for Identification)
12           MR. RAY:  Is there a Bates range on this --
13   is there a Bates number on this document?
14           MR. ASHWORTH:  I don't believe there is, but
15   let's scroll down.  There's not.  I guess when IEA was
16   coordinating with counsel during the production, they
17   did not -- they failed to Bates stamp the production.
18       Q   (By Mr. Ashworth) Sir, this is an e-mail
19   from Craig Mazurowski and yourself, looks like May 22,
20   2015.
21           Do you recall seeing this e-mail?
22       A   No, I don't recall.
23       Q   Okay.  It indicates -- well, first off, do
24   you have any idea how much money Enel Green saved by
25   using the Osage minerals without permission?
```

```
 1              MR. RAY:  Object to form.

 2              THE WITNESS:  No, I don't.

 3         Q    (By Mr. Ashworth) Well, here, it says --

 4    these are calculations it seems like that Craig had

 5    provided to you.  It indicates 1200 cubic feet of

 6    excavation, but I'd represent to you just based on the

 7    numbers that perhaps it could be referred to cubic

 8    yards, but it says 12 -- 1200 cubic feet of

 9    excavation, please note the foundations were mixed

10    soil and not all limestone.  We did not import any

11    backfill material.  It was crushed on site.  It goes

12    on to say "Assumptions that 60 percent was limestone,

13    40 percent was soil, based on those assumptions here

14    is what I figured what it would have cost to backfill

15    with imports.  480 cubic yards of soil at a cost of

16    $7,488."  Then it says "720 cubic yards of limestone

17    at a cost of 15,660."

18              If you add 1566 -- I'm sorry, 660 to 7,488,

19    I'll, you know, I'm terrible at math, but I'll

20    represent that based on my numbers and -- and checking

21    and rechecking, that's $23,184 per foundation.

22              Sir, how many foundations were done on the

23    project?

24         A    There was a total of 84 foundations.

25         Q    Okay.  If you times $23,184 per foundation,
```

1   that's 84 foundations, that comes out to be a savings

2   that Enel Green realized of $1,944,432.

3          How much -- that's how much they saved by

4   using the Osage minerals without a permit.  Were you

5   aware of that at the time?

6          MR. RAY:  Object to form.

7          THE WITNESS:  No.

8      Q   (By Mr. Ashworth) You had no understanding

9   that Enel Green, had they chosen -- had they not used

10  the minerals, this is the amount of money they would

11  have had to have spent to use substitute backfill?

12         MR. RAY:  Object to form.

13         THE WITNESS:  I -- I don't know that.  This

14  e-mail that I got, I more than likely had forwarded on

15  either to Giuseppe or Bill Price.

16     Q   (By Mr. Ashworth) Okay.

17     A   I don't deal with it.

18     Q   You would understand just based on this --

19  well, scratch that.

20         It's your understanding that Enel Green did

21  not pay for any of the materials that were excavated;

22  correct?

23         MR. RAY:  Object to form.

24         THE WITNESS:  I did not -- I did not know

25  what they paid for, what they haven't paid for.  That

```
 1    was none of my -- it wasn't my business.  It just

 2    didn't fall in my realm of activities.

 3         Q    (By Mr. Ashworth) Okay.  It's -- it's -- as

 4    site coordinator -- scratch that.

 5         What is your realm of activities as site

 6    coordinator for the Osage Wind project?

 7         A    Oversee the construction that's happening

 8    around the job site.

 9         Q    Okay.  Well, we're going to go back to your

10    declaration, first page.  The bottom, I'm looking at

11    page -- paragraph three, the last thing it says "My

12    duty as site coordinator include, among other things,

13    the overall management and supervision of construction

14    of the project including timing and schedule of work

15    to ensure the project proceeds on schedule and on

16    budget."

17         And you're just telling me now that the

18    numbers were not within your bailiwick even though in

19    your declaration to the Court, it seems to me that

20    you're telling the Court that budgeting was within

21    your responsibility as site coordinator?

22         MR. RAY:  Object to form.

23         THE WITNESS:  The budget was handled by our

24    project manager Giuseppe DiMarzio.  He would let me

25    know where we were on budget and if I was going over
```

1  or whatever.  Other than that, I mean, I just don't

2  remember and I don't recall what the whole thing was.

3      Q    (By Mr. Ashworth) So you didn't write this

4  part about your responsibilities; is that what you're

5  telling me?

6      A    That's exactly what I'm telling you.

7      Q    Okay.  So when this was presented to you to

8  sign, knowing that this was not your job

9  responsibilities, you signed it anyways?

10          MR. RAY:  Object to form.

11          THE WITNESS:  At that time, I believe I was

12  signing in good faith that it was true and correct.

13      Q    (By Mr. Ashworth) So at the time in good

14  faith, you thought those were your job

15  responsibilities; is that what you're saying?

16      A    No, I'm not saying that.  My God, I can't

17  remember the entire document from seven years ago to

18  today.  I -- I really can't.  I don't know what answer

19  you want me to give you, but I can't give you a lot of

20  the answers because I simply don't remember.

21      Q    Sure, sir.  The answers that I want is the

22  truth.  I expect the truth from you just as I would

23  expect you to tell the Court the truth with your

24  declaration.

25      A    At the time that that declaration was

1  signed, it was the truth.  I -- I don't think that it

2  wasn't.

3      Q    So at the time of the declaration, you

4  believed your job responsibilities, as you told to the

5  Court, was the truth?

6      A    At the time --

7           MR. RAY:  Object to form.

8           THE WITNESS:  -- at the time of signing

9  this, yes.

10     Q    (By Mr. Ashworth) Okay.  We're going to go

11  back to -- we're actually going to go to a new

12  exhibit, change order for blasting.  It may already

13  be...

14          MS. McCLANAHAN:  It's already an exhibit.

15          MR. ASHWORTH:  It's going to be Exhibit 48,

16  page 4.  Middle of the page.  Down, right there.

17     Q    (By Mr. Ashworth) So this section it says at

18  the very top, it says "The decision process for rock

19  crushing was" -- I assume it's supposed to mean

20  derived -- "was derived by the following conditions,"

21  and then it goes on, which is the fourth bullet point

22  from the top, it says "Given the issues with the Osage

23  Nation, the disposal of excavated rock -- rocks and

24  imported backfill material from outside the county was

25  a more expensive solution."

1          Did I read that correctly?

2     A    Yes.

3     Q    It seems to me that Enel Green was making a

4  conscious decision that instead of not using the

5  excavated rocks, that they would save money by using

6  the rock -- scratch that.

7          It seems to me that Osage Nation -- sorry,

8  I'm getting a little flustered there.

9          Seems to me that Enel Green is making the

10 conscious decision here that it would be much cheaper

11 to use the excavated material versus using material

12 from off site.

13         Is that how you read this bullet point?

14         MR. RAY:  Object to the form.

15         THE WITNESS:  Yes.

16    Q    (By Mr. Ashworth) Okay.  And -- and based on

17 the e-mail, it seems that the savings would have been

18 about $1.9 million that Enel Green -- based on the

19 estimate provided by Craig Mazurowski?

20         MR. RAY:  Object to form.

21    Q    (By Mr. Ashworth) Is that correct?

22    A    Yes.

23    Q    We're going to pull up an exhibit that I'm

24 going to mark as Exhibit No. 64.  It's an e-mail dated

25 October 29.  So at the top it says -- where it says

1  thank you, it seems that this is coming from Barbara

2  Matula to Chris Hanson.

3         Do you know who Barbara Matula is?

4         (Exhibit 64 Marked for Identification)

5  A    No.

6  Q    Okay.  We're going to go down to the second

7  page at the very bottom.

8         MR. RAY:  Does this one also not have Bates

9  numbers?

10        MR. ASHWORTH:  That's correct.

11  Q    (By Mr. Ashworth) First off, who is Chris

12  Hanson -- I'm sorry, Chris Hanson, I think you -- you

13  told -- talked about him earlier.

14        What was his position and relations to the

15  Osage Wind project?

16  A    He was a general contractor with IEA.  He

17  represented them.  He was vice president of

18  construction for them, for IEA.

19  Q    Okay.  Here at the bottom, the second page,

20  this first bullet point it says "Osage Nation has

21  asserted mineral rights permit is required to break

22  the surface of the ground," and then it says "Enel

23  directed" -- or sorry, "Enel directs IEA to continue

24  without permit."

25        Did I read that correctly?

```
 1        A    Yes.

 2        Q    And just to confirm, it was indeed Enel

 3   Green who directed IEA to continue to work without

 4   first obtaining a minerals permit from the Osage

 5   tribe; is that correct?

 6             MR. RAY:  Object to form.

 7             THE WITNESS:  I'm sure they did, but I

 8   thought that the permit was in process, is the only

 9   reason why they would have made that statement I'm

10   sure.

11        Q    (By Mr. Ashworth) So you believed under this

12   statement where it says Enel directs IEA to continue

13   without permit, it's your understanding that Enel was

14   trying to get a permit even though they're directing

15   IEA not to get a permit or to continue without a

16   permit?

17             MR. RAY:  Object to form.

18             THE WITNESS:  I'm not really sure.

19        Q    (By Mr. Ashworth) You're not sure about

20   what?

21        A    I'm not sure of that, if they directed IEA

22   to continue without a permit.

23        Q    Okay.  It says it --

24        A    Go ahead.

25        Q    No, I'm sorry, I -- I interrupted you.
```

1        A    No, I don't even recall this, this e-mail

2    that you're showing me now.  I don't even know where

3    it came from or anything.  I just don't remember.

4        Q    We'll -- sure.  We'll scroll up to the

5    bottom of the first page.

6        A    Okay.

7        Q    Right here.  We'll stop here.  It's an

8    e-mail from Chris Hanson, and you said that Chris

9    Hanson was the vice president or one of the vice

10   presidents at IEA.

11       A    Correct.

12       Q    Is that right?

13       A    Yes.

14       Q    And if he's making this statement, Enel

15   directs IEA to continue without permit, in relations

16   to Osage Nation has asserted mineral rights permit is

17   required.

18       A    Okay.

19       Q    Is it your testimony that -- you know, that

20   IEA was trying to get a permit?

21            MR. RAY:  Object to form.

22            THE WITNESS:  I'm not sure.  I'm not sure at

23   all.

24       Q    (By Mr. Ashworth) Okay.  Is there anything

25   in here that would indicate to you that IEA was trying

1    to get a permit?

2        A    No.

3        Q    Okay.  If Enel Green had stopped work so

4    that it could obtain a minerals permit, that would

5    have delayed the project; is that correct?

6        A    That, I'm not sure of.

7        Q    Okay.  Well, it says Enel here or at least

8    in the e-mail that Chris is referencing it says "Enel

9    directs IEA to continue without permit."

10            You don't know if getting the permit would

11    have caused any delay?

12            MR. RAY:  Objection.  Asked and answered.

13            THE WITNESS:  I'm not -- I'm not sure if it

14    would or not.  I think that possibly they did proceed

15    without the permit until we got the permit.  I'm not

16    really sure.

17        Q    (By Mr. Ashworth) Okay.  By proceeding

18    without a permit, Enel Green stood to gain both time

19    and money on the project; would you not agree with

20    that?

21            MR. RAY:  Object to form.

22            THE WITNESS:  I'm not -- I'm not sure how

23    much money they saved on the project.  Like I said, I

24    was never involved in any of that.

25        Q    (By Mr. Ashworth) Sure.

```
 1                Do you know how much time they would have

 2      saved?

 3                MR. RAY:  Object to form.

 4                THE WITNESS:  No, I really don't.

 5           Q    (By Mr. Ashworth) During the project, did

 6      any government employee or government official show up

 7      to the project and direct that the project stop until

 8      a permit could be obtained?

 9           A    There was one fellow from the Osage tribe

10      that came to a site and he handed me a letter which I

11      in turn I forwarded it on to Giuseppe and Bill Price

12      that were handling the contract issues.

13           Q    Do you know who that individual was?

14           A    I know he was tall.  It was either, oh, oh,

15      Mr. Whitehead or a Frank Weir.  I'm not really sure

16      which, which one.

17           Q    Would an individual with the last name of

18      Whiteshield, does that sound familiar?

19           A    Yes.

20           Q    I'm sorry, who was the first person that

21      you -- the first name you said?

22           A    I'm not sure which one it was.  There were a

23      couple of gentlemen out there, plus I think several

24      more that they -- they drove on the site, but it was

25      either Frank Weir I believe is his last name or
```

1  Whiteshield guy or whatever.

2       Q     Would you have spoken with this Weir or --

3  or -- or Whiteshield individual outside of the letter

4  being handed to you?

5       A     I'm not sure.  I don't remember.  I know we

6  took them on a quick job site tour and showed them

7  exactly what was happening on site.  I do know that,

8  but other than that, I don't recall anything else.

9       Q     Did that occur at the same time that the

10  rock excavation and crushing was taking place?

11      A     Yes, I believe so.

12      Q     Okay.  Do you recall anyone showing up to

13  the project other than these two individuals that you

14  just mentioned, that were either from the government

15  or from the tribe?

16      A     I know there were other visitors that came

17  out there, but it was reported to me that they were

18  back kind of site -- who those individuals were, I

19  really don't know.  Normally, we have a protocol set

20  up, any visitors to the site must come to the main

21  office and check in with us and they would be escorted

22  out, but apparently that didn't happen on a few -- on

23  a few visits.

24      Q     And it's your understanding that when these

25  two individuals that you mentioned were on site, there

1   was a concern about the use of the excavated material;

2   is that -- is that right?

3            MR. RAY:  Object to form.

4            THE WITNESS:  That -- I can't answer that

5   because I don't know if there was a concern with that

6   or not.

7        Q    (By Mr. Ashworth) Okay.

8        A    They just wanted to see what the site was

9   all about so...

10       Q    And did any of these two individuals direct

11   you or anyone on site to stop construction?

12       A    The fellow that handed me the -- the letter,

13   it said that he wanted me to stop and I said I'll

14   forward it on to my superiors and they'll make that

15   decision.

16       Q    Okay.  I'm going to pull up another exhibit

17   that's an e-mail dated October 14, and I don't know if

18   it's Bates stamped.  We'll see.  I'm going to mark it

19   as Exhibit No. 65, I believe, yeah, 65.  It's not

20   Bates stamped.  At the bottom of the page, we're going

21   to go actually all the way to the bottom of the

22   document.

23            Sir, this is an e-mail from Louise Red Corn

24   and it's directed to it seems at EGPNA PR.

25            Do you know who that to line is, EGPNA PR?

```
 1    Is that the PR department of Enel Green?

 2              (Exhibit 65 Marked for Identification)

 3              MR. RAY:  Object to form.

 4              THE WITNESS:  Okay.

 5      Q    (By Mr. Ashworth) Oh, I'm asking you.

 6              Do you know what that is?

 7      A    Public relations, maybe.  I don't know.

 8      Q    Okay.  It says "To whom it may concern, I'm

 9  inquiring regarding a letter sent by the Bureau of

10  Indian Affairs, Osage agency, in Oklahoma regarding an

11  un-permitted quarry operation at Enel's Osage Wind

12  project."  It goes on "My question, what is Enel doing

13  to respond to this letter?  Has the company ceased

14  quarrying -- quarrying rock?  Why did it not obtain a

15  permit before commencing such operations?  The letter

16  sent by BI -- by the BIA to Enel NA to Francesco

17  Venturini is attached."

18              Do you recall reading this e-mail?

19      A    No.

20      Q    Do you know what letter is being referenced

21  here, the letter by the BIA to Francesco Venturini?

22      A    I believe it was the same letter that was

23  hand delivered to myself.

24      Q    Okay.

25              Can you pull up that letter?  The letter
```

1    from Robin Phillips.

2         Pull up a letter that was previously marked

3    as Exhibit No. 38.  It's my understanding, this is a

4    letter that was attached, I'll give you an opportunity

5    to look at this.

6         (Exhibit 38 Marked for Identification)

7    A    That was the letter that was submitted to me

8    by one of those two individuals.

9    Q    Okay.  And if we scroll at the top, it's

10   dated October 9, 2014.

11   A    Okay.

12   Q    And towards the bottom -- actually the

13   middle, if you go down a little bit, it says "You are

14   to refrain from any further excavation of minerals

15   until such time you have obtained a sandy soil permit

16   through the Osage agency."

17        Did I read that correctly?

18   A    Yes.

19   Q    Okay.  We're going to go back to the

20   previous exhibit, Exhibit 65, the e-mail.  We're going

21   to go to the bottom of the second page.  It seems that

22   it was forwarded to Steve Champagne.

23        Who -- first of all, who is Steve Champagne?

24   A    He was one of our legal counsel with Enel at

25   that time.

1      Q     Okay.  It says, he writes "My inclination

2   would be to say we have not received a letter and

3   would not respond to it until we do.  We are not

4   quarrying rock and we have all permits required for

5   the work we are doing."

6           Do you recall reading that, this e-mail?

7           MR. RAY:  Object to form.

8           THE WITNESS:  No.

9      Q     (By Mr. Ashworth) Okay.  Let's go to the

10  very top of this document, page one.  It's an e-mail

11  from Bill Price to Giuseppe DiMarzio and yourself, and

12  it says "Gents, please review the e-mail chain.  This

13  issue seems to be growing and we need to have a lock

14  down on all communications at the site.  At the site,

15  everything needs to be directed to Bill and then

16  deferred to internal communications, Michaela.  Bill,

17  I am trying to get you some talking points, but for

18  now, if asked, one, we have all permits required to

19  build the facility, and, two, please direct any

20  further communications to Michaela."

21          Do you recall reading this e-mail now?

22     A     No.

23     Q     Okay.  Would it be safe for me to assume

24  that none of the talking points that Bill Price is --

25  gave you would have indicated that Enel Green was

1    using Osage minerals without permission so that it

2    could have a substantial savings of money on the

3    project?  Is that -- is that correct?

4         MR. RAY:  Object to form.

5         THE WITNESS:  I'm not -- I'm not sure.  I

6    didn't understand all of that.  I'm sorry.

7         Q    (By Mr. Ashworth) Sure.  No problem.

8              Is it safe for me to assume that none of the

9    talking points that Bill Price gave you would have

10   been a talking point that said that Enel Green was

11   using the minerals in order to save money and time?

12        MR. RAY:  Object to form.

13        THE WITNESS:  That, I'm not sure of.  I

14   don't think that was referring to me.  I think that

15   was Michaela writing back to Bill Price.

16        Q    (By Mr. Ashworth) Okay.  Do you know what

17   any of the talking points eventually ended up being?

18        A    No.

19        Q    Okay.  Do you recall you being told talking

20   points to give relative to this project?

21        A    I -- I don't remember.

22        Q    Okay.  Sir, earlier you referenced

23   as-builts.

24             What -- first off, what are as-builts?

25        A    A record of the construction activities on

 1   site, what other kind of changes were made, like if we

 2   relocated a road, you know, we would have to show that

 3   on the as-built drawings.

 4        Q    It's my understanding that you have 12 years

 5   of experience in the wind industry; is that correct?

 6        A    Yes.

 7        Q    And you have more experience than that in

 8   the construction industry; is that correct?

 9        A    Yes.

10        Q    About how much experience do you have in the

11   construction industry in general?

12        A    Thirty-five plus or minus years.

13        Q    And you would be -- scratch that.

14             Would it be safe for me to assume that you

15   were very familiar with as-builts during your 35 years

16   of construction?

17        A    Yes.

18        Q    Okay.  And just so that I can understand the

19   as-builts a little bit better, based on your

20   explanation, is that an as-built, you have your

21   original kind of blueprints or plans and that if

22   anything deviates from that as they're built, you have

23   the redlined version and that's what we're looking at

24   as as-builts.

25             Is that -- is that my -- is my understanding

1    correct?

2              MR. RAY:  Object to form.

3              THE WITNESS:  Yes.

4         Q    (By Mr. Ashworth) Okay.  So if the project

5    said that a tower was supposed to be at X site but

6    then eventually ended up being at a different site,

7    that would be in the as-built?

8         A    Yes, it would be.

9         Q    Okay.  And did Enel Green or IEA keep

10   as-builts for the projects?

11        A    I believe they did, yes.

12        Q    Okay.  Is that based on your experience in

13   the wind industry, is it a customary practice to have

14   as-builts or to have as-builts for the construction

15   process?

16        A    Yes.

17        Q    Okay.  Would as-builts be kept for all

18   aspects of the construction process for a wind

19   project, based on your experience?

20        A    Yes.

21        Q    Okay.  Would that include as-builts for

22   transmission lines?

23        A    Yes.

24        Q    Would that include as-builts for any type of

25   buildings that were constructed?

```
 1      A    Yes, it would.

 2      Q    Would that include as-builts for excavation

 3   work?

 4      A    I believe there was already contract

 5   drawings in regards to the foundations on -- it was

 6   one from Barr Engineering, any changes in that would

 7   have had to have been reflected on the -- on the

 8   drawings itself but I don't believe any of them were.

 9      Q    Okay.  And that's for the foundation, is

10   that for the actual concrete foundation, or are we

11   talking about --

12      A    Yes, that was the -- I'm sorry.

13      Q    Were -- no, I'm sorry to interrupt there.

14           As -- sorry, there's a bit of delay so I'm

15   sorry for the interruption.  What were you going to

16   say?

17      A    That was for the foundations, yes.

18      Q    Okay.

19      A    Not -- not for the excavated material.

20      Q    Based on your experience, if -- if -- if

21   there was a drawing or plan that indicated that X

22   amount of material was to be excavated and a different

23   amount was excavated, based on your experience in the

24   wind industry, would that have been documented in an

25   as-built or documented, yeah, in general?
```

```
 1              MR. RAY:  Object to form.

 2              THE WITNESS:  Yes, it would have been

 3    reflected.

 4         Q    (By Mr. Ashworth) Okay.  And that's just --

 5    and that's based on your belief that's a customary and

 6    standard practice in the industry, to reflect changes

 7    from any deviation in excavation plans?

 8         A    Yeah, it would have been reflected on your

 9    quantity sheets that are part of the package, drawing

10    package.

11         Q    Who would have been responsible for that?

12         A    That was the contractor's responsibility.

13         Q    Do you know if anyone directed the

14    contractor to do as-builts for the entire project

15    except for excavation work?

16         A    No, I don't.

17         Q    Okay.  You never directed IEA to do

18    as-builts on the entire project except for the sole

19    aspect of excavation?

20         A    No, that was -- that was a contractual

21    requirement, that they provided as-builts once the

22    project was completed.

23         Q    Okay.

24         A    I don't believe that it -- it's -- had

25    anything to do with excavated materials in specific to
```

 1   that.

 2        Q    But if there was a deviation in the amount

 3   of what was actually excavated versus what the plans

 4   called for, you believe it should be documented?

 5        A    Yes.

 6        Q    By the contractor?

 7        A    Yes.

 8        Q    Okay.  And if Craig Mazurowski testified in

 9   his deposition that they were never told to keep or

10   document changes in excavation material, would that

11   surprise you?

12             MR. RAY:  Object to form.

13             THE WITNESS:  Yes.

14        Q    (By Mr. Ashworth) That would be against your

15   experience in the industry; correct?

16        A    I'm -- I'm not sure what the question was.

17        Q    You didn't hear the question or would you

18   like me to re -- rephrase the question?

19        A    Rephrase the question.

20        Q    Sure.

21             If Mr. -- I'm sorry, if Craig Mazurowski

22   testified during his deposition that they did not

23   document the deviations between the plans and what was

24   actually excavated, if he testified that that wasn't

25   documented, that would be contrary to your experience

```
 1    in the industry?

 2              MR. RAY:  Object to form.

 3              THE WITNESS:  I'm sorry, I still don't

 4    understand your last portion of that question.

 5         Q    (By Mr. Ashworth) Sure.  Let me just back it

 6    back up.

 7              In your experience in the industry, your 12

 8    years of experience, when drawings say that a certain

 9    amount of material is supposed to be excavated --

10         A    Mmm-hmm.

11         Q    -- if the amount -- if there was a deviation

12    of those plans, based on your experience, they should

13    be reported, that information should be reported?

14         A    Yes.

15         Q    And if that didn't happen here with the

16    Osage Wind project, that would be in contradictory --

17    in contradiction to your experience within the

18    industry?

19         A    Yes.

20         Q    Okay.  Have you ever lived in Oklahoma

21    outside of working on the Woodward project and the

22    Osage project?

23         A    Have I ever lived?

24         Q    Yes, like resided in Oklahoma.

25         A    I lived in Ponca City, I lived in
```

1   Weatherford, and I lived in Rush Springs.

2        Q    When did you live in Rush Springs?

3        A    What's that?

4        Q    Let me ask this:  Was Rush Springs part of a

5   wind project?

6        A    Yes.

7        Q    Okay.  Do you have any family members in

8   Oklahoma?

9        A    In Oklahoma?  I don't know --

10       Q    Yeah.

11       A    -- but my wife does.

12       Q    Do you know where they live?

13       A    Maysville.

14       Q    Okay.  Sir, you were the site coordinator on

15   the project and you previously indicated that the site

16   manager, which was your supervisor, was Giuseppe

17   DiMarzio.

18            Do you know why you were asked to provide

19   the declaration to the Court instead of the site

20   manager Giuseppe DiMarzio?

21            MR. RAY:  Object to form.

22            THE WITNESS:  I'm not sure.

23       Q    (By Mr. Ashworth) Okay.  When you were asked

24   to do this declaration, you had only worked with Enel

25   Green for less than a year; is that correct?

```
 1        A     That is correct.
 2        Q     Do you think that they gave or do you think
 3  Enel Green had you sign the declaration to the Court
 4  because you do not have as much experience or
 5  knowledge of Enel Green at that time?
 6              MR. RAY:  Object to form.
 7              THE WITNESS:  No, I don't think that was the
 8  case.
 9        Q     (By Mr. Ashworth) Okay.  Then why -- why do
10  you think Enel Green chose you to make the statements
11  that you did to the Court?
12              MR. RAY:  Object to form.
13              THE WITNESS:  I don't know.
14        Q     (By Mr. Ashworth) Okay.  Based on what you
15  know today, do you wish someone would have signed the
16  declaration at Enel Green instead of you?
17              MR. RAY:  Object to form.
18              THE WITNESS:  That would have been nice, I
19  guess.  Other than that, I did sign it.
20        Q     (By Mr. Ashworth) Okay.  Do you think there
21  was anyone -- scratch that.
22              Would there have been anyone at Enel Green
23  that would have been a better person to have signed a
24  declaration to the Court with the information that you
25  had -- had provided?
```

```
 1              MR. RAY:  Object to form.

 2              THE WITNESS:  I'm not sure.  A lot of things

 3    come into play, maybe it was a language barrier from

 4    Giuseppe.  He was Italian and maybe he didn't

 5    understand everything.  I'm really not sure how they

 6    came about that decision.

 7         Q    (By Mr. Ashworth) Okay.  My question -- let

 8    me re-ask the question this way:

 9              Do you think there would have been anyone at

10    Enel Green that would have been more qualified or

11    had -- be in a better position to sign the declaration

12    before in opposition to the plaintiffs' request for

13    injunction?

14              MR. RAY:  Object to form.

15              THE WITNESS:  Probably Bill Price.

16         Q    (By Mr. Ashworth) And do you believe that

17    Bill Price would have been a better person to sign the

18    declaration because he would have had more knowledge

19    of the statements that were in your declaration?

20              MR. RAY:  Object to form.

21              THE WITNESS:  Yes.

22         Q    (By Mr. Ashworth) Sir, why did you leave

23    Enel Green?

24         A    I was in North Dakota and the project was

25    finishing up and I was sick at the time so I went
```

```
 1   ahead and retired.  And then I was diagnosed with

 2   cancer at the time.

 3       Q    Sir, it's my understanding that at the

 4   beginning of the project, the project called for only

 5   27 of the foundation areas to be blasted but then

 6   later on that number had to change.

 7            Do you recall that part?

 8       A    Yes.

 9       Q    And I understand that IEA indicated to Enel

10   Green that the additional blasting was required

11   because of more rock that was encountered?

12       A    That's true.  They base their -- their

13   contractual amount off of the soils report that we had

14   gotten on the project and it didn't reflect actual

15   conditions.

16       Q    Okay.  Do you agree with IEA?

17       A    Yes.

18       Q    Okay.  Do you believe that additional

19   blasting was -- was necessary?

20       A    Yes.

21            MR. ASHWORTH:  Okay.  Let's take a

22   ten-minute break.  I am pretty sure I'm almost done.

23   Let me just take a quick break so I can gather

24   everything so I can end this quickly.  Okay, sir?

25            THE WITNESS:  Okay.
```

Bill Moskaluk                                                6/16/2021                                                127

```
 1              VIDEOGRAPHER:  We are off the record at
 2    2:22 p.m.
 3              (A recess was taken from 2:22-2:35 p.m.)
 4              VIDEOGRAPHER:  We are back on the record at
 5    2:35 p.m.
 6         Q    (By Mr. Ashworth) Sir, we're back on the
 7    record and I just want to remind you that you're still
 8    under oath.  The rules of perjury still apply.
 9              Is there anything that you wanted to change
10    about your previous testimony today?
11         A    No.
12         Q    Okay.  Is there anything that you would like
13    to add to your previous testimony today?
14         A    No.
15              MR. ASHWORTH:  Okay.  I have nothing,
16    nothing further, and I will pass the witness.
17              MS. NAGLE:  Great.
18              MR. ASHWORTH:  Thank you for your time.
19              THE WITNESS:  Okay.  Thank you.
20              CROSS EXAMINATION
21    BY MS. NAGLE:
22         Q    Good afternoon, Mr. Moskaluk.  My name is
23    Mary Katherine Nagle and I'm a partner here at
24    Pipestem & Nagle and I represent the Osage Minerals
25    Council.  And so I will be following up to Mr.
```

1    Ashworth's questions and asking a few -- a few of our

2    own, and I hope to not be repetitive and not repeat

3    questions he asked and hopefully not take too much

4    more of your time.

5        A    Okay.

6        Q    So thank you for indulging me and I know

7    you've -- I know you've already discussed things quite

8    at length so, you know, just -- just jumping right in,

9    and I can pull up the exhibits if we want to look at

10   them again, but earlier, you know, I know Mr. Ashworth

11   showed you Exhibit 48 which was a change order.

12            Just kind of stepping back more broadly,

13   what was your role in the change order process?

14       A    I would take the change orders that came in

15   and I would pass them on to Giuseppe which he in turn

16   would pass it on to Bill Price.  Both of them would

17   review it and then they would get back to me, telling

18   me, yes, this is -- this is good or whatever.  That

19   was the extent of it.  They were the ones that

20   approved the change orders.

21       Q    Okay.  So really you just passed it along

22   but you didn't personally have any decision-making

23   authority over whether they were approved or denied?

24       A    No decision making at all.

25       Q    Would that have been Bill Price or Giuseppe,

```
 1   do you know?

 2        A    It would have been them if not more people.

 3        Q    And did you receive -- when you would

 4   receive the change orders, were they coming from Craig

 5   Mazurowski?

 6        A    Most of them, I believe, they did.  He was

 7   responsible for writing the change orders and, like I

 8   said, they would come to me and then I would forward

 9   them on.

10        Q    Mmm-hmm.

11             And do you remember if you ever got any

12   change orders from anyone else other than Craig

13   Mazurowski?

14        A    I don't recall.

15        Q    Okay.  Do you remember EGPNA ever denying a

16   change order request?

17        A    I don't recall that either.  It's possible

18   they might have, but for sure, I don't know.

19        Q    And was it your understanding when you would

20   submit these change order requests to Giuseppe

21   DiMarzio, was he employed by Enel Green Power North

22   America?

23        A    Yes, he was.

24        Q    Okay.  I know earlier we were looking at the

25   dollar amounts.
```

```
 1              Was it your general impression that overall

 2    the change order requests were decreasing the cost of

 3    the contract to EGPNA?

 4       A    No, I didn't -- I didn't think that way.

 5       Q    Do you recall what most of the change orders

 6    related to?

 7       A    The only thing -- the only thing I can think

 8    of is -- is the -- the blasting --

 9       Q    Mmm-hmm.

10       A    -- and excavation.  I really don't know.

11       Q    Mmm-hmm.

12              And I know -- I know earlier we discussed

13    the fact that there was a little bit more blasting

14    than was -- was originally inspected simply because of

15    the amount of rock under the surface.

16              Do you recall when you joined the project

17    and -- and was hired -- when you were hired by EGPNA

18    in May of 2014, what was your understanding of what

19    the construction plan was for the foundations of the

20    turbines?

21       A    Only what was shown to me on -- on a

22    drawing, that that's what they had planned to build on

23    it.

24       Q    At that time in -- in May of 2014, was the

25    plan to use rock crushers?
```

```
 1        A    To use rock crushers?

 2        Q    Mmm-hmm.

 3        A    No.

 4        Q    Was it at that time to use imported backfill

 5   material purchased from off site?

 6        A    No, normally they use the material that they

 7   excavated from the foundation.  However, we could not

 8   break through that foundation with a conventional

 9   operation, and that's mainly -- excuse me, mainly the

10   geotech report that all parties were using was not

11   reflective of the actual materials that were on site.

12   So it caught us all by surprise --

13        Q    Mmm-hmm.

14        A    -- that we couldn't dig these foundations

15   without drilling and shooting.

16        Q    I see.

17             Do you recall when that realization

18   occurred?  I know it must have been after May 2014

19   but --

20        A    Yeah, I'm -- I'm not really sure.

21        Q    Okay.  Let's see.  Did you yourself while

22   you were working on the Osage Wind farm ever

23   communicate directly with anyone from the Tradewind

24   Energy company?

25        A    Excuse me?  Say that one more time.
```

```
 1        Q     While you worked on the Osage Wind farm, did
 2   you yourself ever have any communications with anyone
 3   from Tradewind?
 4        A     Yes.  Yes.
 5        Q     Okay.  And do you recall any names of anyone
 6   that you communicated with at Tradewind?
 7        A     Actually, no, because they were only on the
 8   project for short periods of time.  There was one
 9   fellow there and probably another guy from their
10   office every once in a while, like on the monthly
11   meetings, but once -- once Enel had solidified the
12   contracts with Tradewinds on the purchase of that
13   project, they -- they disappeared.
14        Q     Okay.  And you were employed by EGPNA; is
15   that correct?
16        A     Yes, ma'am.
17        Q     While working on the Osage Wind farm, did
18   you ever communicate with anyone from Enel Kansas?
19        A     Enel Kansas?
20        Q     Yes.
21        A     I don't -- I don't remember if I did.
22        Q     Okay.  Fair enough.
23              Are you -- are you familiar with the
24   corporate entity Enel Kansas?
25        A     No.
```

```
 1        Q    Okay.  Did you, while working on the Osage

 2   Wind farm project, ever communicate with anyone who

 3   was an employee of Osage Wind, LLC?

 4        A    That was the same people I just finished

 5   talking about.  There's one representative on site and

 6   I thought they were Tradewinds, not Osage Wind.

 7        Q    Okay.  So -- so you may have communicated

 8   with people from Osage Wind, LLC, but you thought they

 9   were folks from Tradewind; is that correct?

10        A    Correct.

11        Q    Okay.  And -- and during your work on the

12   Osage Wind farm, did you ever communicate with anyone

13   from General Electric?

14        A    Yes, their project manager with GE --

15        Q    Mmm-hmm.

16        A    -- was on the -- on the project site, along

17   with one of his helpers that he had.

18        Q    And do you recall his name, the project

19   manager's name?

20        A    We called him Gunny.

21        Q    Okay.

22        A    Because he was an ex-marine.

23        Q    Okay.  And do -- you don't remember Gunny's

24   last name by any chance, do you?

25        A    I actually don't.
```

```
 1        Q     Okay.  No worries.

 2              What about Gunny's -- you mentioned he had a

 3   helper or an assistant.

 4              Do you, by any chance, recall that person's

 5   name?

 6        A     Yeah, it was his right -- it was his

 7   right-hand man, Mark.

 8        Q     Mmm-hmm.

 9        A     I can't remember.  I -- I think he's an

10   employ -- employee with Enel at this time.

11        Q     Okay.  And -- okay.

12              Do you recall, you know, at that time, would

13   Gunny have been at the project site once a week or

14   more often than that or less often, do you recall?

15        A     He was there full time.

16        Q     Full time.  Okay.

17              Did he ever express any -- any stress or

18   anxiety over project construction delays that were

19   occurring?

20        A     I believe he might have mentioned that, but

21   when he did it, I'm not really sure.

22        Q     Did you have an understanding that if

23   construction on the wind turbines was delayed past a

24   certain amount of time, that there could be issues

25   with the contract between EGPNA and General Electric?
```

```
 1              MR. RAY:  Object to form.

 2              THE WITNESS:  Yes, there -- there were some

 3   penalty clauses in there.

 4        Q    (By Ms. Nagle) And do you recall discussions

 5   about those penalty clauses?

 6        A    No.

 7        Q    Okay.  How -- do you recall how were you

 8   aware that there were penalty clauses in the contract

 9   with GE?

10        A    I -- I had asked Giuseppe and Bill Price

11   about that and they -- they sent me some information,

12   that it -- it was so much per day, I believe it was,

13   but I -- I can't recall exactly what it was.

14        Q    Mmm-hmm.  Do you -- did you know or did you

15   have an understanding -- do you know today or did you

16   have an understanding at that time that -- that if

17   project construction on the wind farm wasn't finished

18   by a certain date, that Enel could lose entire --

19   entirely lose its contract with GE?

20        A    No, I did not know that.

21        Q    Okay.  Did you, while working on the Osage

22   Wind farm, ever communicate directly with anyone from

23   JP -- JPM Capital Corporation?

24        A    I'm not sure who they are.

25        Q    Okay.  And while working on the Osage Wind
```

```
 1    farm, did you ever communicate with anyone from

 2    Northwestern Mutual Life Insurance Company regarding

 3    the project?

 4         A    That, I'm unsure of as well.

 5         Q    Fair enough.

 6              And while working on the Osage Wind farm

 7    project, did you ever communicate with anyone from

 8    State Street Bank & Trust Company?

 9         A    Not that I -- I recall, no.

10         Q    Okay.  And I understand seven years ago is a

11    long time.

12         A    Yes.

13         Q    I'd have a hard time remembering myself so

14    I -- believe me, I understand.

15         A    I couldn't even -- I couldn't even tell you

16    what I had for dinner last night so how about that.

17         Q    I'm with you.

18              So now I just -- I have some questions I'd

19    like to ask you sort of about industry standards and

20    some definitions and words that have been thrown

21    around in the documents in this case.

22              What is your understanding of what is -- how

23    is it different to lay the foundation for a wind

24    turbine versus the foundation for just a building?

25         A    They're a lot different.  To support that
```

```
1   tower, it's almost in a conical shape, if you will,
2   like so, and it's -- in its circumference it's about
3   60 to 80 feet in width all the way around and it comes
4   up and it's got the pedestal that comes up with the
5   bolt hole sticking through the top of your foundation
6   which are in sync and in line with the flange plate
7   that fits over it and that's in the base of your
8   turbine, but it's nothing like a foundation for a
9   building or anything like that.
10       Q    And is it the case that, I think what we're
11  referring to or I guess how -- how would you describe
12  or define backfill?
13       A    It's material that we use to backfill the --
14  the foundation, to get the correct compaction around
15  it for the structural integrity of that foundation as
16  well, stops your movement this way and this way
17  (indicating).
18       Q    I see.
19            And so in terms of structural integrity, is
20  it true that without the backfill, the wind turbine
21  would not be able to remain standing upright?
22       A    Right.  Exactly.  I wouldn't want to try it.
23       Q    Yeah.
24            And -- and what is a borrow pit?
25       A    I'm sorry, I didn't catch all that.
```

```
 1        Q     No worries.

 2              I said how would you define a borrow pit?

 3        A     Material where I could take material out of

 4   and use for around the project.

 5        Q     And is it typical to have a borrow pit on

 6   site during the construction of a wind farm?

 7        A     It's always a nicety.  It --

 8        Q     Do you -- oh, go ahead.

 9        A     It will save you a lot of costs in trucking

10   if it -- if it was right there on site.

11        Q     Is that something that you would normally

12   expect the -- the subcontractor, for instance in this

13   case IEA, to create as a part of their work in -- in

14   constructing the wind farm?

15        A     No.  I think it has to be designated ahead

16   of time, the borrow areas on the project site.

17        Q     Do you know, were there borrow pits used or

18   created for -- for this construction, for the

19   construction of the Osage Wind farm?

20        A     No.

21        Q     Do you --

22        A     I --

23        Q     Go ahead.

24        A     -- I don't think we had one.

25        Q     Was that a decision -- was the decision to
```

Case 4:14-cv-00704-GKF-JFJ   Document 549-2 Filed in USDC ND/OK on 11/30/21   Page 140 of 214

```
 1    not have one a decision that you participated in or

 2    was that made by other folks?

 3        A    That was made by others in 2013 or 2010, I

 4    have no idea.

 5        Q    Do you know who at -- at EGPNA would have

 6    made that decision to not have a borrow pit?

 7        A    No, I don't.

 8        Q    Do you know whether (audio glitch-inaudible)

 9    a plan -- a construction plan is to have a borrow pit

10    on site?

11        A    I caught half of that.  The first half broke

12    up.

13        Q    Sorry.

14        A    That's okay.

15        Q    Yeah, it's telling me my internet is

16    unstable for some reason.

17             Do you -- do you know whether initially the

18    plan was for there to be a borrow pit on site at the

19    Osage Wind farm?

20        A    No, I don't.

21        Q    Okay.  And what does it mean to balance a

22    construction site?

23        A    It's your cut and fill areas.  You want to

24    make sure that you balance the site in that regard so

25    you have enough material to fill the voids to lower
```

1    depressed areas so you fill them up, so it's more or

2    less a -- a suitable roadway, et cetera, that you can

3    use in cut and filling your material.

4         Q    Okay.  So let's see.  I'm going to go ahead

5    and show you an exhibit.  Let's see if I can share my

6    screen.  And so this has already been entered into the

7    record as Exhibit 37.  I will note that it's Bates

8    stamped Osage Wind-024749, and this is an e-mail from

9    Joan Heredia on May 22, 2014, and I will note that it

10   looks like -- let's see here.  I'm actually not sure

11   if you were copied on this.

12              (Exhibit 37 Marked for Identification)

13        A    Doesn't look like it.

14        Q    Doesn't look like it.  Okay.

15              In any event, I'm going to read to you a

16   couple lines from this May -- this earlier e-mail from

17   May 22, 2014, from Aaron Weigel to Ron, Mike, and

18   Craig, which I -- I would assume is Craig Mazurowski

19   and Ron Ritter, but I'm -- I'm -- you know, I'm not

20   sure.

21        A    Mmm-hmm.

22        Q    He writes "It is my understanding that the

23   sieve analysis is on aggregate that's coming from the

24   quarry, but as Joan suggests below, please confirm

25   that's the case.  It is very important that we not

```
 1    remove ANY soil from the project site or use site

 2    materials in lieu of materials we would typically buy

 3    off site in developing a wind project.  Osage Nation

 4    has mineral rights for the project lands and removal

 5    of soil especially for commercial gain could

 6    constitute mining."

 7            Is that -- so I'm just reading there from

 8    Aaron's e-mail.  Is that -- does Aaron's statement

 9    here, is that in accordance or does that agree with

10    your understanding of what the restrictions were at

11    the time of construction of the Osage Wind farm?

12            MR. RAY:  Object to form.

13            THE WITNESS:  Yes.

14       Q    (By Ms. Nagle) And I know you're not copied

15    on this e-mail, but did -- did anyone ever communicate

16    that to you?

17       A    Communicated it, yes.  Yes, they have.

18       Q    Do you remember -- oh, sorry.  Go ahead.

19       A    Yeah, it -- it was Bill Price who -- who

20    told me that.  He wanted to make sure that I knew that

21    I was not to remove any materials from site in any

22    manner or form.  I knew that.

23       Q    And did Bill Price tell you that we -- that

24    you were also not to use site materials in lieu of

25    materials that could be bought or purchased off site?
```

1     A     No, he did not.

2     Q     He did not tell you that.  Okay.

3           Now, further on down in this e-mail from

4    Aaron Weigel, he writes "Please make sure this message

5    is widely communicated to any subcontractors working

6    on the project."

7           Do you recall anyone at EGPNA asking you to

8    communicate, make sure that the folks at IEA

9    understood the message that Aaron Weigel is sharing

10   here in this e-mail?

11    A     No.

12    Q     Okay.  Do you have any memory of anyone at

13   EGPNA, other than Bill Price, communicating to you

14   that it was important to not use the site materials in

15   lieu of materials that could be purchased off site?

16    A     No.

17    Q     Okay.  Now, I think earlier you did mention

18   that one of the restrictions you understood at the

19   time was that you were not allowed to take site

20   materials and -- and move them across the wind farm

21   and use them elsewhere.

22          Can you explain to me -- is that -- is that

23   a correct understanding of what you understood to be

24   the limitation at the time?

25    A     Yes, it -- all the material that we, say,

1    excavated from the turbine site or that particular

2    turbine site had to remain right there.  I couldn't

3    use that material any place on the job site other than

4    that hole.

5        Q    So your understanding was you -- you -- you

6    could take the minerals out of the ground, but you had

7    to put them right back where you got them; is that

8    correct?

9        A    Correct.

10       Q    Was your understanding that it was

11   permissible for EGPNA to -- to do that and crush the

12   materials before putting them back in the ground?

13       A    I caught a little bit of that but I didn't

14   really understand --

15       Q    Sure.

16       A    -- the last part.

17       Q    So I guess let me rephrase and ask a better

18   question.

19            Did anyone ever express to you, anyone from

20   EGPNA ever express to you any limitations on rock

21   crushing?

22       A    No.

23       Q    Okay.  Let's see here.  Okay.  So I'm now

24   going to show you a different document so if you'll

25   give me just a second to pull that up.  I'm going to

1    look at what has been previously marked as Exhibit 8

2    in this litigation, and this is Osage -- oh, I'm

3    sorry, yeah, no, this is -- it just doesn't -- for

4    some reason this version doesn't seem to have the

5    reporter's stamp on it, but I can represent to you

6    this is Exhibit 8 from the fall deposition and it's

7    Bates stamped Osage Wind Priv-000089, and this is a

8    May 15th e-mail from Joan Heredia.

9            Now, do you -- and I -- I see that it

10   doesn't look like you're copied on this e-mail either.

11           (Exhibit 8 Marked for Identification)

12       A    Mmm-hmm.

13       Q    Do you know who Daren Daters is,

14   D-A-T-E-R-S?

15       A    Yes, he's -- he's another environmentalist

16   that works along with Joe -- Joan Heredia.

17       Q    Okay.  And do you have an understanding of

18   what his job duties and responsibilities were in

19   relation to the Osage Wind farm?

20       A    He was -- he was there to ensure that we had

21   our silt control all in place throughout the job site

22   and that it was done properly.

23       Q    Okay.  And so I note for you here that --

24   that Joan also writes "...it is very important that we

25   not remove ANY soil from the project site or use site

```
 1   materials in lieu of materials we would typically buy

 2   off site in developing a wind project.  Osage Nation

 3   has mineral rights for the project lands and removal

 4   of soil especially for commercial gain could

 5   constitute mining."

 6          Does it -- does this sound familiar to you,

 7   this -- this statement and this understanding of what

 8   was permissible and what was not?

 9          MR. RAY:  Object to form.

10          THE WITNESS:  Partially, yes, but, like I

11   said, I'm not familiar with this one, with all... any

12   soils from the site and I never heard of using the

13   materials in lieu of materials from -- we had

14   typically bought off site.  I've -- I've never heard

15   that before.

16     Q    (By Ms. Nagle) Okay.  And did you -- did

17   Joan Heredia ever communicate directly with you about

18   any limitations in constructing the Osage Wind farm?

19     A    She visited the job site I believe once and

20   we had a conversation basically in regards to this.

21   She asked me if I was removing any of the material off

22   site and I said no.  She basically said, well, good.

23     Q    Mmm-hmm.

24          Do you -- do you recall when that visit was,

25   what month it would have been?
```

```
 1        A    No, ma'am, I don't.

 2        Q    Okay.  That's fine.

 3             Did Joan, Bill Price, or anyone else at

 4   EGPNA ever inform you that they had a legal memorandum

 5   from their attorneys telling them that it was fine

 6   to -- to -- to use these materials on site as backfill

 7   for the wind turbines --

 8             MR. RAY:  Object.

 9        Q    (By Ms. Nagle) -- without getting a permit

10   from Osage Nation?

11        A    I'm not -- I'm not sure.

12        Q    Okay.

13        A    I don't recall anything like that.

14        Q    So you don't recall ever hearing about a

15   legal memorandum that stated that EGPNA's construction

16   at the Osage Wind farm was perfectly legal and did not

17   trigger the need for a mining permit; is that correct?

18             MR. RAY:  Object to form.

19             THE WITNESS:  Yes, that's correct.

20        Q    (By Ms. Nagle) Did you ever have any

21   conversations with anyone at EGPNA about getting a --

22   a mining permit or lease from the Osage Nation?

23        A    Yes, I did, and that was with Steve

24   Champagne, and basically I was told that it was -- the

25   site didn't require one.
```

```
 1        Q      And what -- what explanation did Steve

 2   Champagne give you for that determination, that one

 3   was not needed?

 4        A      Yeah, he didn't -- he didn't elaborate on

 5   it.  He was just very short and to the point and that

 6   was that.

 7        Q      Okay.  Do you recall when he communicated

 8   that there would be no need for a permit to you?

 9        A      No, I really don't.

10        Q      Okay.  Do you recall if -- like, did -- did

11   anyone from EGPNA ever inform you that Osage Nation

12   had taken the position that a permit was required?

13        A      No.

14        Q      Okay.  So I am going to show you another

15   document, and let me just pull that up and this one

16   has also previously been entered as an exhibit in a

17   previous deposition, so this is Exhibit 53 and it is

18   Bates stamped IEA-00227119, and see here, it does look

19   like you -- you are a recipient of this e-mail.  The

20   e-mail is dated July 9, 2014, and it's from Ron

21   Ritter.

22               Do you recall who Ron Ritter was?

23               (Exhibit 53 Marked for Identification)

24        A      He -- he started out the project prior to

25   Craig Mazurowski coming on site.
```

Case 4:14-cv-00704-GKF-JFJ   Document 543-2 Filed in USDC ND/OK on 11/30/21   Page 149 of 214

```
 1        Q    And was he with IEA?

 2        A    Yes, he was.

 3        Q    Okay.  And it looks like below, we've got

 4    this -- at the very bottom we've got this e-mail here

 5    from Brian Jensen.

 6             Do you recall who Brian Jensen was?

 7        A    Yes, he worked for Tradewinds.  In what

 8    capacity, I'm -- I'm not really sure.

 9        Q    Okay.  Did you ever interact with him while

10    working on the Osage Wind farm?

11        A    I might have talked to him a couple of

12    times.  Nothing pertinent but...

13        Q    Sure.  He writes here in his July 9, 2014,

14    e-mail, that "And as we have discussed in the past, we

15    will not be able to transport fill from one part of

16    the project to another due to Osage Nation mining

17    laws."

18        A    Right.

19        Q    Does that conform with your understanding of

20    what some of the limitations were at the time of

21    construction?

22        A    Yes.

23        Q    Okay.  And let's see here.  Let me keep

24    going.  What was your understanding, though -- you

25    told me that Steve Champagne had -- had told you that
```

1    there would not be any need for a permit.

2            Was it your understanding that that was a

3    determination made by EGPNA as opposed to IEA?

4        A    Say that one more time.

5        Q    Sure.  So I guess let me ask a better

6    question.

7            Do you recall whether IEA had -- had the

8    authority to determine whether or not a mining permit

9    was necessary for this project, or was that a decision

10   made by EGPNA?

11           MR. RAY:  Object to form.

12           THE WITNESS:  I -- I think it was Steve

13   Champagne that -- Champagne that made that

14   determination.

15       Q    (By Ms. Nagle) Okay.  And so let's see.  So

16   let's see.  Still looking at this document, going back

17   down here, so if we're looking at this July 9, 2014,

18   e-mail again from Brian, he says "How much fill are

19   you anticipating hauling into the site?  Will this be

20   a change order as the construction plans initially had

21   a borrow on project site which is no longer a viable

22   method?"

23           I know I asked you earlier and you said you

24   did not recall whether or not the construction plans

25   initially entertained the idea or planned for having a

```
 1    borrow pit on site.

 2              Does this help jog your memory at all or do

 3    you still not recall?

 4         A    No, I don't recall that.

 5         Q    Okay.  And do you recall any conversations

 6    around the fact that a borrow pit was no longer a

 7    viable method?

 8         A    Not really, no.

 9         Q    Okay.  All right.  So let's see.  I'm going

10    to take a look at a different document now so give me

11    just a second to find this.  I'm trying to do this all

12    digitally is a -- is a new -- a new thing here.  Okay.

13    So I think I've pulled it up.  So I -- I believe that

14    we are on Exhibit 66 now, if I look at my notes real

15    quick.  Yeah, I think that Mr. Ashworth ended on 65 so

16    I'll introduce this document as Exhibit 66, and I will

17    note for the record it is Bates stamped IEA-00095047.

18    And it looks like this says here these are meeting

19    notes, excuse me, from June 26, 2014.

20              It states here that participants include

21    Bill Maluska.

22              Do you -- do you think that is supposed to

23    refer to you and that it might be a typo?

24              (Exhibit 66 Marked for Identification)

25         A    Yes.
```

Case 4:14-cv-00704-GKF-JFJ   Document 343-2 Filed in USDC ND/OK on 11/30/21   Page 152 of 214

1    Q    Okay.  That was my thought too.  And it

2    lists the other folks here.

3         Do you recall this meeting on or around

4    June 26, 2014?

5    A    No, ma'am.

6    Q    Okay.  Is this group here of folks that are

7    listed, Ron Ritter, Andrew Landoll, Justin Larson,

8    Craig Mazurowski, Mike Welch, Randy Gardner, Giovanni

9    Nicoletti, Giuseppe DiMarzio, Bill Moskaluk, and Brian

10   Jensen, is that a group -- would you all meet

11   routinely or was this more of just a spontaneous not

12   recurring meeting that took place?

13   A    Actually, I think this has to pertain to a

14   daily report and it was just informing everybody where

15   they were, "No safety issues and no rain today,"

16   just -- just an informative document.

17   Q    Okay.  Okay.  And if we look down a little

18   further, we see on this page it lists action items.

19   A    Mmm-hmm.

20   Q    And some things are crossed out, but I see

21   here it refers to earthwork balance confirmation for

22   mitigation of Osage mining permit risk, and then in

23   parenthesis it says Jacob.

24        Do you -- do you know whether Jacob refers

25   to Jacob Valentine?

```
 1        A     I have no idea who Jacob --

 2        Q     No idea.  Okay.

 3        A     No.

 4        Q     So you're not sure sitting -- and I realize

 5   this was seven years ago, so sitting here today,

 6   you're not sure who Jacob was?

 7        A     Correct.

 8        Q     Okay.  What was your understanding at the

 9   time in June of 2014 of what -- what -- what was meant

10   by Osage mining permit risk?

11        A     I'm not really sure.

12        Q     Okay.  Do you -- do you recall anyone ever

13   discussing the Osage mining permit risk?

14        A     No, just -- just what I was told, that the

15   permit was not necessary by Steve Champagne was the

16   only...

17        Q     Okay.

18        A     I think there were other conversations after

19   that.  I think I might have placed a call in to

20   Giuseppe and also Bill Price on that matter as well.

21        Q     Did -- after having that conversation with

22   Steve Champagne about how a permit would not be

23   necessary, did anyone ever give you instructions on

24   how to continue with the project and avoid the risk of

25   having to get a permit?
```

```
 1        A    I know I was told to continue on with what I
 2   was doing.
 3        Q    Okay.  And was -- were those instructions
 4   coming from your supervisors at Enel as opposed to
 5   IEA?
 6        A    No, that was coming from Steve Champagne.
 7        Q    Okay.  So -- so this is -- so let me
 8   actually go back just for a moment here to Exhibit 53,
 9   which we were looking at just a few moments ago, so
10   I've already shown you this document; I'm just going
11   back to it.
12             Here, if we look at Ron Ritter's e-mail,
13   kind of here to -- to Brian Jensen, Randy Gardner, and
14   to Jacob Valentine, Ron writes -- let's see if I can
15   find where I am.  Okay.  Now of course I've -- I'm
16   lost.  Oh, sorry.  I need to go all the way to the
17   top.  Here we go.  Okay.  My apologies.  I want to
18   look at this e-mail from Ron Ritter.  July 9, 2014,
19   and you are -- you are a recipient I see here.
20        A    Yes.
21        Q    Ron -- Ron writes "It would not be practical
22   for us to perform this work with imported fill at no
23   extra cost if the original scope was for us to be
24   allowed to mine onsite fill."
25             Does that statement from Ron, is that in
```

1    agreement with what your understanding was at the

2    time, in the summer of 2014?

3        A    Yes, I agree with it.

4        Q    Okay.  And -- okay.  Great.

5             Do you -- do you know whether the original

6    scope was for the IEA team to be allowed to mine on

7    site as -- as Ron states here?

8        A    No, I don't.

9        Q    Okay.  But it is your understanding that

10   originally the plan was for them to fill the -- the

11   back -- use backfill from the construction site on the

12   wind farm; is that correct?

13       A    Yes.

14       Q    Do you recall at any point in time, was

15   there a decision ever made to start importing the

16   backfill instead and purchasing those materials off

17   site?

18       A    I don't recall that.

19       Q    Okay.

20       A    No, wait a second.  I think there was the

21   opportunity for everybody to put together a cost

22   estimate, but to my knowledge, it didn't go any

23   further.

24       Q    Okay.  Do you recall reviewing the cost

25   estimate?

1      A     No, I don't.

2      Q     Okay.  Did anyone ask you to assist in

3   preparing the cost estimate?

4      A     Yes, Giuseppe had asked me.  Hold on now.

5   I'm not sure what it was, what estimate I did.  I

6   think it was on manhours or something of that nature,

7   not -- not materials.

8      Q     Okay.  And would that have been -- well, let

9   me -- let me actually ask this way:

10            If you -- if -- if EGPNA and IEA had had to

11   import backfill for the wind farm off site onto the

12   site, would that have increased the number of hours

13   of -- in terms of just manpower and labor to do that?

14      A     I'm not really sure.  If it was -- if it was

15   in the contract originally, there wouldn't be any

16   additional cost factors in it so...

17      Q     Mmm-hmm.

18      A     I'm unsure.

19      Q     Okay.  All right.  Let me move on to another

20   exhibit, and this was previously entered as Exhibit 55

21   in another deposition, and -- and so -- okay.  Here we

22   go.  So let's see here, this looks like it is dated --

23   well, first of all, I will say this is -- this is

24   Exhibit 55.  It's Bates stamped Osage Wind-019901 and

25   it looks like at the bottom here we've got an e-mail

1    from Craig Mazurowski to you, CCing Chris Hanson and

2    Ron Ritter, dated September 2, 2014, Craig writes

3    "Bill, in the past we have had a couple conversations

4    regarding crushing rock on site.  It is my

5    understanding that Enel/Tradewinds does not want any

6    crushing on site due to mineral right issues.  Please

7    confirm.  Thanks."

8            And you write back "Craig, let's discuss

9    this a.m.  Bill."

10           Do you recall this e-mail exchange in

11   September of 2014 with Craig Mazurowski?

12           (Exhibit 55 Marked for Identification)

13       A    Vaguely, but I do remember -- whatever the

14   outcome was, I -- I can't really remember, but I

15   vaguely remember this e-mail, yes.

16       Q    Okay.  Do you recall much -- well, do you

17   know first -- did you end up having this conversation

18   with Craig?

19       A    I'm not even certain about that either.

20       Q    Okay.  That's fine.  I -- I know it was a

21   long time ago.

22           When he writes "In the past we've had a

23   couple conversations regarding crushing rock on site,"

24   do you -- do you recall what those conversations were

25   about specifically?

```
 1        A    No.

 2        Q    Okay.  He also writes "It is my

 3   understanding that Enel/Tradewinds does not want any

 4   crushing on site due to mineral -- mineral right

 5   issues."

 6             Do you recall anyone from Enel or Tradewind

 7   saying something to you along those lines?

 8        A    They might have said something to Craig.

 9   That -- that, I don't know.

10        Q    Okay.  Do you recall anyone like Bill Price

11   or Steve Champagne ever mentioning to you that there

12   should not be crushing on site due to mineral right

13   issues?

14        A    No.

15        Q    Okay.  So you -- you really don't recall

16   ever kind of hearing any messaging around we need to

17   stop crushing due to mineral right issues?

18        A    No.

19        Q    And it is true that actually crushing

20   continued after September 3, 2014, on the Osage Wind

21   farm; is that correct?

22        A    Yes.

23        Q    Okay.  Do you recall whether the Bureau of

24   Indian Affairs ever communicated to EGPNA that

25   crushing minerals on the Osage Wind farm would require
```

1    a lease or permit?

2         A    In that letter that was presented to me, I

3    believe that's when they told Enel or whomever and

4    that was a sandy soil permit.

5         Q    Okay.  And do you recall reviewing that

6    letter when -- when it was received by EGPNA?

7         A    No, I -- I read it briefly and passed it on

8    to Giuseppe DiMarzio and also Bill Price.

9         Q    Okay.  And did they, after that, ask you to

10   tell IEA to cease construction while they reviewed the

11   letter or considered the legal issues, or were you

12   ever asked to even pause on construction?

13        A    No.

14        Q    Did they inform you at that time that there

15   would be no need to pause on construction because they

16   had a legal memorandum that -- that explained that the

17   BIA was wrong?

18        A    No.

19        Q    Okay.  So let's -- I'm going to -- we

20   don't -- I don't think we need to look at this

21   document anymore.  I'm actually going to show you

22   another document.  Here we go.  Okay.  And this one

23   was previously entered as Exhibit 56.  Here's its

24   stamp and it's -- it's Bates stamped Osage

25   Wind-018666.  And this looks like an e-mail to -- from

1    you to Giuseppe, dated September 16, 2014.

2             Do you happen to recall this e-mail?  I'll

3    give you a chance to look at it.

4             (Exhibit 56 Marked for Identification)

5        A    It's basically giving Giuseppe an update on

6    where we were at.  It was like a daily report.

7    Report.

8        Q    And was Giuseppe your direct supervisor or

9    would that be more Bill Price or was it a combo of

10   both?

11       A    More of a Bill Price.

12       Q    Okay.  So I note here that you write

13   "Running into rock conditions affecting the

14   operation."

15            What exactly did you mean by that?

16       A    Means I couldn't dig the hole.

17       Q    Okay.  And so I note that sort of in this --

18   this e-mail you mention having to -- let me see if

19   I -- you know, those areas will be charged and shot.

20            What -- what does it mean to -- and I may

21   not get the lingo right, to -- to charge those areas

22   or to shoot them, what is that referring to?

23       A    It's referring to the dyn -- dynamite charge

24   that you put in the drilled hole and then you

25   basically set it off.

1        Q       Mmm-hmm.

2        A       And you shoot your foundations so it's just

3    a construction term that we use.

4        Q       Mmm-hmm.   Mmm-hmm.   Mmm-hmm.

5                I note here that -- and -- and -- and so was

6    some of that not a part of the initial plan or design

7    or it wasn't fully anticipated when you commenced

8    construction?

9        A       Yeah, it was -- it was not -- it was not

10   part of the plan initially and, like I said, all of us

11   were under the impression that the geotech report was

12   true in its findings of the types of soil, but it

13   wasn't -- it didn't even reflect the correct soils

14   that were in there so somebody got mixed up.

15       Q       I see.

16               And you write here as of September 16

17   "Falling behind with excavations due to rock."

18       A       Yes.

19       Q       At current -- do you know how far behind you

20   would have been from the projected schedule at that

21   time?

22       A       One or two of the foundations, I believe,

23   were at -- at risk.  We had to complete them at a

24   certain time for GE to bring their turbines in, and

25   that's what we based -- that's what they based the

1    initial schedule on, was the delivery of turbines.  I

2    had to have some place to put them.

3         Q    Mmm-hmm.

4         A    Without any -- you know, without any

5    construction activity going around.

6         Q    Right.  Okay.

7              And you write here "At current rate, I don't

8    know if they can meet GE delivery time frames."

9              So is it correct to say that at that point

10   in time, in mid September, if there were any further

11   delays or pauses on construction, Enel would not be

12   able to meet GE's delivery time frame?  Is that

13   correct?

14        A    Yeah, they couldn't figure out what we were

15   going to do at the time, and that was just a little

16   nudge on my part to have them make a decision on which

17   way to go.

18        Q    Did they ever get back to you in response to

19   this with a decision?

20        A    I'm not really sure.

21        Q    Okay.  All right.  I think -- I think that

22   is enough with this document and so I am going to now

23   move on to another document.  Here we go.  And I

24   believe this one has not yet been introduced so this

25   is going to be Exhibit 67 and it is Bates stamped

Bill Moskaluk   6/16/2021   163

```
 1    Osage Wind Priv-000094.

 2              And I will note that this is an e-mail from

 3    Joan Heredia to -- to many folks, including yourself,

 4    dated September 30, 2014.

 5              I'll give you a chance to look at it.

 6              Do you recall this e-mail at all?

 7              (Exhibit 67 Marked for Identification)

 8        A    No.

 9        Q    Okay.  I see in this -- in the very top line

10    e-mail to Giuseppe, Joan writes on September 30,

11    "Giuseppe, we need to act with an abundance of

12    caution.  We should not be using materials at the site

13    that would be otherwise commercially available.  I

14    understood backfill would come from an offsite

15    quarry."

16              Was your understanding, while working on the

17    Osage Wind farm, the same as Joan's here in this

18    e-mail?

19        A    No, it was not.  I didn't know that

20    initially it was set up for backfill to come from an

21    offsite quarry.  I did not know that.  I -- I think

22    all that changed.  I'm not really sure.

23        Q    Okay.  So -- so -- okay.

24        A    Maybe Joan had some other information that I

25    didn't have but...
```

1      Q    Mmm-hmm.

2      A    I don't know.

3      Q    Okay.  So this -- so this e-mail from Joan

4  would be in conflict with -- with the instructions you

5  received in -- in doing your work on this site?

6      A    Yes.

7           MR. RAY:  Object to form.

8      Q    (By Ms. Nagle) Okay.  She also writes

9  "Please do not crush rock further until we have had a

10  chance to discuss."

11          Do you recall after this e-mail was sent on

12  September 30th whether you-all stopped crushing rock

13  on -- on the site for any period of time?

14     A    I don't believe we did, no.

15     Q    Okay.  Do you recall, were you a part of any

16  discussions in response to this e-mail from Joan,

17  discussions that may have taken place about whether or

18  not to stop crushing rock?

19     A    No.

20     Q    Okay.  Were you aware of any conversations

21  of that nature taking place?

22     A    Yeah, they were going back and forth on it

23  and basically it was -- that's -- that's a management

24  decision up there and I didn't have any input on it.

25     Q    Was that something that Steve Champagne

```
 1   would have been involved in?

 2        A    Yes.

 3        Q    And -- and did Steve Champagne ever explain

 4   to you Enel's reasoning or rationale behind his

 5   decision to not stop crushing rock?

 6        A    No.

 7        Q    Okay.  All right.  Let's -- I think we're

 8   finished with this document.  Moving right on, so this

 9   will be, I believe, Exhibit 68 and I note for the

10   record that Exhibit 68 is Bates stamped Osage Wind

11   Priv-000165.  It's an e-mail with the subject line

12   "Osage - Bureau of Indian Affairs."

13             And have you seen this e-mail exchange

14   before?  I will note it looks like you're copied here

15   at the top.

16             (Exhibit 68 Marked for Identification)

17        A    Vaguely I remember it, yes.

18        Q    Okay.  It looks like it's dated

19   September 30, 2014, and Bill Price writes -- I'm

20   sorry, Steve Champagne writes "Agree with Bill that

21   it's okay to continue excavating but hold off on the

22   crushing for now."

23             Does this refresh your memory, do you recall

24   ever being instructed to stop the crushing on site?

25        A    No.
```

```
 1        Q    Okay.  And I -- I think just a little bit
 2   further down on September 30th, Bill Price writes here
 3   "The large rocks removed from the excavation works is
 4   being crushed and reused for backfill.  This is normal
 5   as we do not want to dispose of the large excavated
 6   rocks (possibly would then be considered mining) and
 7   cannot use large rocks for backfill.  We are basically
 8   putting them back where we removed them - just in
 9   smaller pieces."
10        A    Yes.
11        Q    Does that -- is that -- does that sound like
12   what your -- your understanding of what the
13   construction process was at the time?
14        A    Yes.
15        Q    Okay.  Did you at the time or do you now
16   have an understanding of why disposal of large
17   excavated rocks would be considered mining?
18        A    No, I don't.
19        Q    Okay.  That's fine.
20             Bill also writes "We are expecting to be a
21   week delayed on GE WTG deliveries and any further
22   stoppages will...... you get the picture."
23             Do you know what WT -- I know what GE -- I
24   would assume GE means General Electric.
25             Do you know what WTG stands for?
```

1        A    Wind turbines themself.

2        **Q    Okay.  And does this align with your**

3   **understanding at the time that there could be**

4   **significant consequences to Enel if they were to delay**

5   **construction of the wind turbines any further?**

6        A    Yes.

7        **Q    Okay.  Let's see here.**

8        A    Could we take a break -- could we take a

9   break for about five minutes?

10           MS. NAGLE:  Absolutely.  Absolutely.  And

11   just so everyone knows, I'm getting a lot closer to

12   the end but not -- not -- I still have a little bit

13   more to go, but I know it's been a long day so let's

14   take five and then I'm hoping, like, 30 minutes more

15   and I'm done so...

16           VIDEOGRAPHER:  We are off the record at

17   3:29 p.m.

18           (A recess was taken from 3:29-3:34 p.m.)

19           VIDEOGRAPHER:  We are back on the record at

20   3:34 p.m.

21        **Q    (By Ms. Nagle) Okay.  So let's see.  We were**

22   **looking at Exhibit 68 and I think that -- I think that**

23   **I don't -- do not have any more questions for Exhibit**

24   **68 at this time so let me look through my notes here.**

25           **I think -- so I think earlier we -- we**

 1   did -- we -- we looked at some e-mails about possibly

 2   bringing in fill from off site to use as backfill for

 3   the wind turbines.

 4          Do you recall why that option was not

 5   pursued?

 6      A    No, I don't.

 7      Q    Okay.  Do you recall any discussions with

 8   anyone at EGPNA about the option of purchasing

 9   backfill off site?

10      A    I do, but I'm not sure what the final

11   outcome was.  I don't think we ever bought any

12   material off site to bring to site, and that's what I

13   know.

14      Q    Okay.  Okay.  And let's see here.  Do you --

15   all right.  I'm going to now show you what has

16   previously been marked as Exhibit 38 in this

17   litigation, and this is Bates stamped Osage Wind

18   Priv-000243, and it is a October 9, 2014, letter from

19   superintendent Robin Phillips to Francesco Venturini

20   and, Mr. Moskaluk, do you recall ever having reviewed

21   this letter or seen it in the past?

22      A    Yes, this is -- this is the letter that,

23   like -- like I said earlier, I can't remember the

24   gentleman's name that actually handed it to me.  It

25   was either Frank Weir or White himself.  I'm not --

```
 1    I'm not really sure, but I took this letter and passed
 2    it on to both Giuseppe and Bill Price at the time.
 3         Q    Okay.  So you were the person actually on
 4    site at the wind farm when the letter was hand
 5    delivered?
 6         A    Yes.
 7         Q    Was that the first time that you were on
 8    site at the wind farm when someone from the Bureau of
 9    Indian Affairs showed up?
10         A    No, they showed up once before as well.
11         Q    Do you remember when that time before was?
12         A    No, ma'am, I sure don't.
13         Q    Okay.  Did you speak with that person from
14    the BIA when they showed up the previous time?
15         A    Yes.
16         Q    And do you recall what -- what that
17    conversation was about or what you-all discussed?
18         A    I was basically taking them for a tour to
19    show them the job site and what we were doing, and if
20    he asked me any questions, I really don't remember,
21    but I'm sure -- I'm sure he did and I'm sure I gave
22    him some answers, but what those answers were, I -- I
23    really don't remember.
24         Q    Okay.  Fair enough.
25              And here it says that "You are to refrain
```

1   from any further excavation of minerals until such

2   time that you have obtained a Sandy Soil permit

3   through the Osage Agency."

4          Do you recall after this letter any steps

5   being taken by you or anyone else at EGPNA to obtain a

6   sandy soil permit?

7      A    I believe that they had, and I'm not sure

8   who was responsible for obtaining that permit, but

9   I -- I --

10     Q    Mmm-hmm.

11     A    -- I was led to believe that they were

12  trying to obtain it, yes.

13     Q    And what -- do you understand what steps

14  were being taken to obtain that permit?

15     A    No, I don't.

16     Q    Did anyone communicate to you that -- that

17  excavation would be stopped to comply with this demand

18  from the BIA?

19     A    No.

20     Q    Okay.  Do you know ultimately whether or not

21  EGPNA obtained the correct permit through the Osage

22  agency?

23          MR. RAY:  Object to form.

24          THE WITNESS:  I'm not sure if they -- they

25  had.

1      Q     (By Ms. Nagle) Okay.  So you just don't know

2   either way whether someone followed through on that or

3   not?

4      A     No.

5      Q     Did you have an understanding at the time of

6   whose job at EGPNA it would have been to get this

7   permit?

8      A     Not really.  Being new to the company, I

9   really didn't know all the players and what their

10   specific roles were.  I -- I could assume that it

11   would -- would have fallen underneath -- no, I -- I

12   don't know who -- who handled it for Enel.

13      Q     Okay.  And that's fine.

14            Okay.  I am going to move on to our next

15   exhibit.  And that is going to be, I believe, Exhibit

16   69, if that is where we are in the process, and this

17   Exhibit 69 is Defendants' Fifth Amended and

18   Supplemental Privilege Log, and so actually what I'm

19   going to be asking us to take a look at is on page 8,

20   one of the entries in defendants' privilege log in

21   this litigation specifically Osage Wind Priv-000111 is

22   an undated entry, but it lists you here as the author

23   and states that "Bill Moskaluk handwritten notes

24   regarding the costs associated with halting excavation

25   at Project site as requested by Bill Scott, Esquire."

```
1              Do you know who Bill Scott is?

2              (Exhibit 69 Marked for Identification)

3        A     No.

4        Q     Do you have any memory of -- of ever

5    communicating with him?

6        A     Not -- not really, I don't, no.

7        Q     Okay.  Do you -- oh, sorry, go ahead.

8        A     Was he an Enel person?

9        Q     I actually don't know.  So there we go.

10       A     Okay.

11       Q     But and -- and I of course don't want you to

12   share any kind of privileged information that may have

13   come from an attorney to you, but in terms of just a

14   business reason, do you -- do you recall what your

15   understanding was at the time of why you were being

16   asked to create notes, you know, about what the cost

17   would be for halting the excavation at the project

18   site?

19             MR. RAY:  Object to form.

20             THE WITNESS:  I -- I believe what this is

21   pertaining to, I think I was given the man-hours, the

22   rock crushers possibly, if we had halted the rental

23   and all that stuff from... I believe that's what it

24   was, but I'm not actually sure.

25       Q     (By Ms. Nagle) Okay.  And so you do at least
```

1   have some recollection of undertaking an analysis of

2   how much it would cost to stop construction; is that

3   correct?

4        A    Yeah, I gave them some -- I gave them some

5   preliminary numbers, and I'm sure they discussed it

6   and added some numbers as well.  I'm not really

7   100 percent sure.

8        Q    And you wouldn't happen to recall those

9   numbers sitting here today, would you?

10       A    No, ma'am, I don't.

11       Q    Is it your recollection that at -- at this

12   time when you were preparing these notes, that -- that

13   Enel was at least considering halting construction,

14   that was, like, an option on the table?

15       A    I was not aware of that.

16       Q    Okay.  Do you recall who else may have been

17   asked to prepare these kinds of numbers or financial

18   data on the costs of halting construction?

19       A    I believe Giuseppe was asked as well.

20       Q    Okay.  And were the numbers that you were

21   crunching, was that really just in relation to

22   man-hours or were you looking at other things like the

23   cost of losing the contract with GE or anything else

24   like that?

25       A    No, I just had to pertain to man-hours and

1   rental costs on the -- on the equipment being used.

2        Q    Okay.  And this looks like October 17, 2014,

3   I'm looking at Osage Wind Priv-108 to 110, it looks

4   like this is e-mail to counsel and others forwarding

5   Bill Moskaluk construction cost information.

6            Does that -- does that refresh your memory

7   that you were asked to prepare these numbers sometime

8   after October 9, 2014?

9        A    I'm not really sure of the dates, but it

10  was -- the requests came from Giuseppe to me.

11       Q    Mmm-hmm.

12       A    Right.

13       Q    And -- and was the request after EGPNA

14  received the cease and desist letter from

15  superintendent Phillips?

16       A    Oh, I couldn't -- I couldn't tell you that.

17       Q    You're not sure.  Okay.

18       A    I am not sure.

19       Q    Okay.

20            Did you have any understanding whether or

21  not EGPNA was asking for these numbers because they

22  had received this letter from superintendent Phillips?

23       A    No, not to my knowledge, no.

24       Q    Did you see them -- did you see this

25  number-crunching exercise at all -- as being at all

1    related to that letter from superintendent Phillips?

2         A     You broke up on that last one.

3         Q     Sure.

4              I was just wondering if you thought this

5    might at all be related -- at the time, did you have

6    an understanding that the number crunching you were

7    being asked to do was at all related to the

8    September 9 letter from superintendent Phillips?

9              MR. RAY:  Object to form.

10             THE WITNESS:  I'm not really sure at the

11   time.  I don't think I did think that it was in

12   relationship to that letter.  I'm not really sure.

13        Q     (By Ms. Nagle) Okay.  That's fine.

14             All right.  So I'm going to stop sharing

15   that, my screen on that document and move on to the

16   next document, and this document that I am introducing

17   will be Exhibit 70, and it's Bates stamped Osage

18   Wind-036433 and it's a document titled "Project Short

19   Views Update," looks like it's dated October 17, 2014.

20             Are you at all familiar with this document

21   or does this -- do you remember documents that looked

22   like this?

23             (Exhibit 70 Marked for Identification)

24        A     I'm not familiar with this document at all,

25   but I -- I think it was a monthly report that went to

```
 1   Italy management in Rome.

 2        Q    And at this point in October of 2014, you

 3   would have still been the site coordinator; is that

 4   correct?

 5        A    Yes.

 6        Q    If we look at page, let's go down to page,

 7   let's see, 58 here.  So -- so if we go to page ending

 8   in Bates stamp 36490 -- hold on.  It might not be --

 9   here we go.  I'm looking, actually, sorry, page 36491,

10   it looks like there's a list of different folks from

11   IEA who were involved in the project.

12             Did you have any direct communications with

13   any of these folks during the course of your work on

14   the Osage Wind farm?

15        A    Yes.

16        Q    What about Chris Hanson, were you in contact

17   with him?

18        A    Yes.

19        Q    And Craig Mazurowski?

20        A    Yes.

21        Q    Is there anyone else on this list that --

22   that you would have been routinely in contract[sic]

23   with that we haven't previously discussed?

24        A    I was in contact with Mike Welch, Kenny

25   Reck, Scott Beach, Robbie Lloyd, and Jerry Klemesten.
```

```
 1      Q    Okay.  And what was Mike Welch's role on the

 2  Osage Wind farm project?

 3      A    Mike Welch?

 4      Q    Yes.

 5      A    I believe he was like the erection

 6  superintendent.

 7      Q    And so what were his sort of

 8  responsibilities on the site?

 9      A    Putting the towers, stacking the towers up

10  with his --

11      Q    Okay.  Okay.  And was Mike Welch with IEA?

12      A    Yes.

13      Q    Okay.  What about Pat Ringler, do you know

14  who Pat Ringler was?

15      A    He's, like, the office manager.

16      Q    Okay.  And with IEA?

17      A    Yeah, I'm not really sure what his role was.

18      Q    Okay.  Fair enough.

19           Let's see here.  I'm just seeing if I

20  really -- okay.  I think that I have one last document

21  I would like to show you --

22      A    Okay.

23      Q    -- and then I will be finished with my

24  questioning.  So let me just pull up that document.

25  And this is a document that was previously entered as
```

1   an exhibit in Craig Mazurowski's deposition and it is

2   Exhibit 52, and for the record, I'll note it's Bates

3   stamped Osage Wind-035610.

4           Mr. Moskaluk, are you familiar with this,

5   what looks to be a contract between Osage Wind and

6   IEA, dated April 11, 2013?

7           (Exhibit 52 Marked for Identification)

8       A    No.

9       Q    Okay.  Do you recall ever receiving a copy

10   of this when you were working on the Osage Wind farm?

11      A    I know I had requested but it was several

12   months before I had received it.

13      Q    Okay.  So you -- do you recall if you ever

14   actually received a copy of this contract while you

15   were working on the wind farm?

16      A    I was -- the contract itself with the

17   numbers in it and everything else like that was

18   reda -- redacted so I didn't really get to see the

19   numbers of the contract, et cetera, but as far as

20   scopes of work were concerned, I believe I had those,

21   yes.

22      Q    Okay.  It looks like the -- this contract

23   was signed by David Bostwick for IEA and Rob Freeman

24   for Osage Wind.

25           Do you know who Rob Freeman is?

```
 1        A    No, ma'am.

 2        Q    Okay.  Do you have any understanding of who

 3   at Osage Wind or at EGPNA worked on negotiating the

 4   different provisions of this contract?

 5        A    No, ma'am.

 6             MS. NAGLE:  Okay.  Would you have -- okay.

 7   Well, actually, I think -- you know what?  I think

 8   those -- I think those are all the questions that I

 9   have and I thank you for your time and for -- and for

10   sitting through this with us today and I -- I am ready

11   to pass the witness so thank you, sir.

12             THE WITNESS:  Thank you, ma'am.

13             MR. RAY:  We're -- we're going to take a

14   short break.  We'll be back in ten minutes.

15             MS. NAGLE:  Okay.

16             VIDEOGRAPHER:  We are off the record at

17   3:50 p.m.

18             (A recess was taken from 3:50-4:01 p.m.)

19             VIDEOGRAPHER:  We are back on the record at

20   4:01 p.m.

21             MR. RAY:  The defendants will reserve

22   questioning for Mr. Moskaluk to the time of trial and

23   he will read and sign.

24             MR. ASHWORTH:  I will say I have one, two,

25   two follow-up questions to M.K.'s, though.  Sorry,
```

```
 1   Mary Katherine's questions.

 2              REDIRECT EXAMINATION

 3   BY MR. ASHWORTH:

 4        Q    Sir, I just have two quick questions.  The

 5   first question is:  Earlier you had indicated in

 6   reference to the use of backfill and -- and -- and why

 7   it was helpful for structural support, and you

 8   indicated that it prevents the tower from doing -- you

 9   said this and this.

10              Just for the record, you're refer -- just

11   for the record, to clarify, the backfill structural

12   support prevents the tower to go -- from going side to

13   side; is that right?

14        A    Yeah.  It --

15        Q    Or wobbling?

16        A    -- it's to prevent the -- the tipping of the

17   tower in either direction.

18        Q    Okay.  I just wanted to make sure because

19   when we read the transcript, I just want to make sure

20   it's clear.

21              And then also, you had indicated that Enel

22   Green provided to you with documents that were -- that

23   they redacted, that you reviewed, and perhaps, how I

24   define redacted and how you may define redaction or

25   redacted may be different so what do you mean by
```

1    **"redacted"?**

2          A     It was blacked out.

3          **Q     Blacked out?**

4          A     Yes.

5          **Q     So when Enel Green gave you certain**

6    **documents, they made the conscious decision to black**

7    **out something before they gave it to you, another Enel**

8    **Green employee?**

9                MR. RAY:  Object to form.

10               THE WITNESS:  Somebody did, yes.

11               MR. ASHWORTH:  Okay.  I have nothing

12   further.

13               MR. RAY:  We'll reserve our questions for

14   the time of trial.  Mr. Moskaluk will read and sign.

15               VIDEOGRAPHER:  Okay.  We are off the record

16   at 4:03 p.m.

17               (The deposition of BILL MOSKALUK was

18   concluded at 4:03 p.m.)

19

20

21

22

23

24

25

```
 1                            JURAT

 2       USA & Osage Minerals Council vs. Osage Wind LLC, et

 3                             al.

 4                       JOB No. 151136

 5             I, BILL MOSKALUK, do hereby state under oath

 6       that I have read the above and foregoing deposition in

 7       its entirety and that the same is a full, true and

 8       correct transcription of my testimony so given at said

 9       time and place.

10

11             _____

12             BILL MOSKALUK

13

14

15             Subscribed and sworn to before me, the

16       undersigned Notary Public in and for the State of

17       Oklahoma by said witness, BILL MOSKALUK, on this

18       _____ day of _____, 2021.

19

20

21

22             _____

23             NOTARY PUBLIC, STATE OF OKLAHOMA

24                   MY COMMISSION EXPIRES:_____

25                   (AER)
```

1                        ERRATA SHEET

2        USA & Osage Minerals Council vs. Osage Wind LLC, et

3                             al.

4                 DEPOSITION OF:  BILL MOSKALUK

5              REPORTER:  Abby Rhodes, CSR, RPR

6                  TAKEN ON: JUNE 16, 2021

7                    JOB NO.: 151136

8    PAGE      LINE      IS                 SHOULD BE

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Bill Moskaluk                                            6/16/2021                                            183

```
 1                    CERTIFICATE

 2   STATE OF OKLAHOMA        )

 3                           ) SS:

 4   COUNTY OF OKLAHOMA       )

 5

 6           I, Abby Rhodes, CSR, RPR, do hereby certify

 7   that on June 16  2021 at the offices, via Zoom, there

 8   came before me BILL MOSKALUK who was duly sworn to

 9   testify the truth, the whole truth, and nothing but

10   the truth; and that the foregoing pages constitute a

11   full, true, and correct transcript of the deposition

12   of said witness on the date as indicated.

13           I do further certify that I am not counsel,

14   attorney, or relative of either party, or otherwise

15   interested in the event of this suit.

16           IN WITNESS WHEREOF, I have hereunto set my

17   hand and affixed my seal at my office in Oklahoma City

18   Oklahoma County, Oklahoma, this 23rd day of June,

19   2021.

20

21   _____,

22        Abby Rhodes, CSR, RPR

23        CSR No. 1939.

24

25
```

**WORD INDEX**

**< $ >**
**$1,944,432** 101:2
**$1.9** 105:18
**$20** 95:22
**$23,184** 100:21, 25
**$287** 82:3 83:24
 84:1 86:18 87:21
 99:2
**$34** 94:1
**$51** 91:9
**$54** 88:13
**$7,488** 100:16

**< 1 >**
**1** 89:16 91:4
**1:12** 80:12
**10** 36:8
**10/14/14** 4:5
**10/17/14** 4:11
**10/9/14** 3:11
**10:00** 1:13 5:7
**100** 44:1 172:7
**1000** 2:12
**105** 16:4
**106** 4:4
**11** 34:6 177:6
**11:14** 57:5
**11:14-11:28** 57:6
**11:28** 57:8
**11:30** 38:12
**110** 1:18 173:3
**113** 4:5
**114** 3:11
**12** 16:13 34:23,
 24, 25 49:7 66:4,
 5 72:20 78:21
 100:8 117:4
 122:7
**12:03** 80:10
**12:03-1:12** 80:11
**1200** 100:5, 8
**127** 3:5
**13** 16:11 35:1
**14** 16:10, 11
 112:17
**140** 3:10

**144** 3:9
**147** 3:17
**14-CV-704-GFK-
JFJ** 1:7 5:6
**15** 39:11 59:19
**15,660** 100:17
**150** 4:6
**151136** 181:4
 182:7
**156** 3:18
**1566** 100:18
**159** 3:19
**15th** 144:8
**16** 1:13 4:18 5:7
 76:18 159:1
 160:16 182:6
 183:7
**162** 4:7
**164** 4:8
**17** 3:20 17:3
 173:2 174:19
**171** 4:9
**174** 4:11
**1746** 25:5 26:2,
 13
**177** 3:15
**179** 3:6
**1939** 183:23

**< 2 >**
**2** 156:2
**2:22** 127:2
**2:22-2:35** 127:3
**2:35** 127:5
**20** 79:6 80:1
 81:22, 23 82:1
 97:7
**20,000** 97:7
**200** 76:20 80:4
**2000** 7:8
**2010** 29:24 30:16
 31:11 139:3
**2013** 34:7, 13
 139:3 177:6
**2014** 3:18, 19 4:4,
 7, 8 18:7 24:20
 30:12 34:7 35:4,
 11 36:8, 14, 18
 37:14 41:18 80:2

**82:1** 88:7 91:4
 114:10 130:18, 24
 131:18 140:9, 17
 147:20 148:13
 149:17 150:19
 151:4 152:9
 153:18 154:2
 156:2, 11 157:20
 159:1 162:4
 164:19 167:18
 173:2, 8 174:19
 175:2
**2015** 99:20
**2017** 18:7, 9
**2021** 1:13 4:18
 5:7 181:18 182:6
 183:7, 19
**21** 80:2 82:1
 88:7
**22** 99:19 140:9,
 17
**2200** 2:4
**23rd** 183:18
**24** 3:21
**25** 34:7
**26** 150:19 151:4
**27** 126:5
**28** 25:5 26:2, 13
 88:15
**287** 86:5 88:9
**29** 105:25
**2900** 2:8

**< 3 >**
**3** 72:21 98:14
 157:20
**3:00** 38:23
**3:29** 166:17
**3:29-3:34** 166:18
**3:34** 166:20
**3:50** 178:17
**3:50-4:01** 178:18
**30** 162:4, 10
 164:19 166:14
**300** 1:18
**30th** 163:12
 165:2
**34** 91:13

**35** 117:15
**36490** 175:8
**36491** 175:9
**37** 3:10, 23 140:7,
 12
**38** 3:11 114:3, 6
 167:16

**< 4 >**
**4** 98:3, 4 104:16
**4:01** 178:20
**4:03** 180:16, 18
**40** 100:13
**401** 2:4, 8
**46** 3:13 75:14, 23
**48** 3:14 98:2, 20
 104:15 128:11
**480** 100:15
**4th** 16:4

**< 5 >**
**5** 67:24
**5/15/14** 3:9
**5/22/14** 3:10
**5/22/15** 4:3
**5:30** 37:9
**500** 2:12
**505.848.1800** 2:13
**52** 3:15 177:2, 7
**53** 3:17 147:17,
 23 153:8
**55** 3:18 155:20,
 24 156:12
**56** 3:19 158:23
 159:4
**58** 175:7
**59** 3:20 17:5, 11

**< 6 >**
**6** 3:3, 4 43:12, 15,
 22
**6/26/14** 4:6
**6:30** 37:25
**60** 3:21 23:19, 24
 24:3 31:14 57:24
 100:12 137:3
**61** 3:23 36:23
 37:1

**62** 4:2 13:*3*
89:*17, 18*
**63** 4:*3* 99:*7, 11*
**64** 4:4 105:*24*
106:*4*
**65** 4:*5* 112:*19*
113:2 114:*20*
150:*15*
**66** 4:6 150:*14, 16,
24*
**660** 100:*18*
**67** 4:7 161:*25*
162:*7*
**68** 4:*8* 164:9, *10,
16* 166:*22, 24*
**69** 4:9 170:*16, 17*
171:*2*

**< 7 >**
**7,488** 100:*18*
**7/9/14** 3:*17*
**7:00** 37:7
**70** 4:11 13:*4*
174:*17, 23*
**720** 100:*16*
**74103** 2:*4, 9*
**74119** 1:*18*
**75** 3:*13*
**7th** 1:*18*

**< 8 >**
**8** 3:*9* 74:8 144:*1,
6, 11* 170:*19*
**8,400** 30:*1*
**8:00** 37:25
**80** 3:*14* 88:*15*
137:*3*
**84** 100:*24* 101:*1*
**840** 30:*1*
**87103** 2:*12*
**89** 4:2

**< 9 >**
**9** 24:*17* 37:*14*
114:*10* 147:*20*
148:*13* 149:*17*
153:*18* 167:*18*
173:8 174:8

**9/9/14** 3:*24*
**918.382.2700** 1:*19*
**918.583.7571** 2:*9*
**918.936.4705** 2:*5*
**94571** 16:*5*
**98** 3:*14*
**99** 4:*3*

**< A >**
**A.M** 1:*13* 5:7
37:8, *25* 38:*12*
57:5, 6, 8 156:*9*
**Aaron** 140:*17*
142:*4, 9*
**Aaron's** 141:*8*
**Abby** 1:*25* 4:*19*
13:8 45:*21* 182:*5*
183:*6, 22*
**ability** 20:6 57:*13*
**able** 41:*3* 59:*8*
137:*21* 148:*15*
161:*12*
**Absolutely** 166:*10*
**abundance** 162:*11*
**accelerated** 72:*24*
**access** 62:7 63:*17*
69:*5*
**accidentally** 8:*21*
**account** 17:*16*
**accurate** 14:*16*
17:*24* 25:7 26:*3,
9* 28:*3* 40:*14*
84:*1, 22* 85:*5*
86:*1* 93:*19* 97:*2*
**accurately** 40:*14*
65:*19*
**achieve** 98:*23*
**acres** 30:*1*
**act** 162:*11*
**action** 151:*18*
**actions** 84:*25*
97:*20*
**activities** 19:*11*
20:7 29:*12* 35:*12*
102:*2, 5* 116:*25*
**activity** 34:*13, 18*
161:*5*
**actual** 119:*10*
126:*14* 131:*11*

**add** 8:*17* 80:*21*
100:*18* 127:*13*
**added** 89:*4* 172:6
**addition** 66:*18*
**additional** 126:*10,
18* 155:*16*
**address** 16:*3*
22:*11*
**admitted** 75:*13*
**advance** 70:*24*
71:*24* 72:*17*
**AER** 181:*25*
**Affairs** 3:*12*
22:*17* 113:*10*
157:*24* 164:*12*
168:*9*
**affidavit** 96:*22*
**affiliated** 83:*4*
**affixed** 183:*17*
**afternoon** 127:*22*
**agency** 113:*10*
114:*16* 169:*3, 22*
**Agenda** 3:*24*
36:*22* 37:*2, 3*
38:*6*
**aggregate** 140:*23*
**aggregates** 43:*24*
54:*25* 55:*1*
**ago** 6:*22* 7:5, *7,
20* 13:*1* 16:*21*
17:*17* 26:*24* 55:5
82:*13, 17* 103:*17*
136:*10* 152:*5*
153:9 156:*21*
**agree** 45:*3, 11*
82:*19* 85:*14*
86:*12* 93:2
109:*19* 126:*16*
141:9 154:*3*
164:*20*
**agreement** 4:*17*
48:*14* 52:*21*
53:*12, 13* 92:*3*
154:*1*
**ahead** 10:*15* 41:*7,
9* 48:*9* 56:*19*
58:*16* 78:*11*
107:*24* 126:*1*
138:8, *15, 23*

140:*4* 141:*18*
171:*7*
**Airport** 7:*13*
**al** 5:*4* 181:*3*
182:*3*
**Albuquerque** 2:*12*
**Alexander** 6:*13,
21*
**alienation** 33:*12,
14*
**align** 166:2
**Alignment** 3:*23*
37:*3*
**all-day** 37:6
**allegation** 55:*19*
**allegations** 54:*17*
**allow** 63:2 64:*5*
**allowed** 58:*14*
60:7 67:*17*
142:*19* 153:*24*
154:*6*
**alluded** 50:*14*
**alluding** 27:7
**Amended** 4:9
170:*17*
**AMERICA** 1:*1, 9*
5:*3* 17:*23* 18:*3*
129:22
**amount** 40:*19*
80:*3* 82:*1* 88:7
101:*10* 119:22, *23*
121:2 122:*9, 11*
126:*13* 130:*15*
134:24
**amounts** 129:*25*
**analysis** 41:2
140:*23* 172:*1*
**Andrew** 151:*7*
**answer** 8:*10, 12,
16, 21, 22* 10:*3, 8,
14, 15* 19:24
21:*17* 22:22 48:7
52:*24* 69:*17* 70:*1*
76:16 83:*17*
103:*18* 112:*4*
**answered** 13:*17*
109:*12*

**answers** 33:7
57:*13* 103:*20*, *21*
168:22
**anticipate** 9:9
**anticipated** 51:*11*
74:*18* 160:7
**anticipating**
149:*19*
**anxiety** 134:*18*
**anybody** 94:22
**anymore** 158:*21*
**anyway** 71:*1*
**anyways** 103:9
**apologies** 153:*17*
**apparently** 90:*13*,
*17*, *20* 111:22
**appear** 23:*25*
**APPEARANCES**
1:*14*, *21* 2:*1*
**appears** 17:7
29:*15* 35:9 37:6,
*13* 38:5
**apply** 57:*16*
80:*16* 127:8
**appropriate** 32:25
92:7, *16*
**approval** 74:*15*
**approved** 128:*20*,
*23*
**approximately**
29:25 34:*23*
76:20 88:*13*, *14*
91:*9*, *12*
**April** 177:6
**apron** 69:5
**architecture** 16:*21*
**area** 30:*3* 63:*12*
66:20 69:*3*
**areas** 44:*1* 126:5
138:*16* 139:*23*
140:*1* 159:*19*, *21*
**as-built** 56:*23*
117:*3*, *20* 118:7
119:25
**as-builts** 56:*25*
116:*23*, *24* 117:*15*,
*19*, *24* 118:*10*, *14*,
*17*, *21*, *24* 119:2
120:*14*, *18*, *21*

**Ashworth** 1:*15*
3:*4*, 6 5:*10* 6:6, 7
10:*10* 12:*17* 13:7,
*14*, *18* 20:*1* 21:*23*
22:25 23:9 26:*16*,
*25* 27:*11*, 24
28:22 31:*3*, *19*, 24
32:*18*, 24 33:5, 25
34:*5*, 24 36:*1*
38:22 40:*1*, *12*
42:*4*, *11* 45:9, 20
46:*1* 47:2, *21*
48:9 49:*20* 50:2,
*11*, *17* 51:*4*, *16*, 20
52:*14*, *25* 53:6, *11*,
22 54:7, 20 55:*17*
56:*3*, 9, *15*, *24*
57:9 59:7 60:*10*
61:22 62:9 63:*3*
64:*10*, *17* 65:*3*, *11*,
*15*, *18*, 22, 25
66:23 67:*15*, 21
68:*23* 69:*12*, *19*
70:2, *14* 71:*18*
72:*11* 74:5, 7
76:*1*, *12*, *18* 77:9,
20 78:*1* 79:4, *13*,
*17*, 21, 25 80:*1*, 8,
*14* 81:7, *14*, *15*, *21*,
*25* 82:*16* 84:*4*, 9
85:2, *12* 86:9, *17*,
22 87:*3*, *10*, 15
88:*1*, 22 89:6, *15*,
*21* 90:*1*, 5 91:*20*
92:*15*, 24 93:*12*,
20 94:7, *12*, 21
95:9, *17* 96:2, *11*
97:*13* 98:25
99:*14*, *18* 100:*3*
101:8, *16* 102:*3*
103:*3*, *13* 104:*10*,
*15*, *17* 105:*16*, *21*
106:*10*, *11* 107:*11*,
*19* 108:*24* 109:*17*,
*25* 110:5 112:7
113:5 115:9
116:7, *16* 118:*4*
120:*4* 121:*14*
122:5 123:*23*

124:9, *14*, 20
125:7, *16*, 22
126:*21* 127:6, *15*,
*18* 128:*10* 150:*15*
178:*24* 179:*3*
180:*11*
**Ashworth's** 128:*1*
**asked** 6:*17* 13:*16*
109:*12* 115:*18*
123:*18*, *23* 128:*3*
135:*10* 145:*21*
149:*23* 155:*4*
158:*12* 168:*20*
171:*16* 172:*17*, *19*
173:7 174:7
**asking** 8:*3* 72:*14*
95:9, *10*, *11* 113:5
128:*1* 142:7
170:*19* 173:*21*
**aspect** 120:*19*
**aspects** 118:*18*
**asserted** 106:*21*
108:*16*
**assigned** 19:*21*
20:*10*, *12*, 22
21:*25* 22:*11*
**assist** 155:2
**assistant** 134:*3*
**associated** 29:*4*
170:*24*
**assume** 10:5
22:9 98:*12*
104:*19* 115:*23*
116:8 117:*14*
140:*18* 165:*24*
170:*10*
**assumed** 84:*14*, *17*
**assuming** 34:*14*
87:*17*
**Assumptions**
100:*12*, *13*
**attached** 113:*17*
114:*4*
**attempt** 98:*10*
**attention** 22:*1*
98:8
**attorney** 10:*11*
171:*13* 183:*14*

**attorney-client**
11:*8*
**attorneys** 5:*12*
6:*8* 10:*11* 58:*12*
146:5
**ATTORNEY'S**
1:*17* 5:*11*, *14*
**audio** 139:*8*
**author** 170:22
**authority** 128:*23*
149:*8*
**available** 162:*13*
**Avenue** 2:*4*, *8*
**avoid** 152:*24*
**aware** 15:*17*
21:*14* 51:*16*, *19*
55:*18* 56:*3* 58:*19*
77:*16* 98:*17*
101:5 135:*8*
163:*20* 172:*15*

**< B >**
**B(i** 3:*13*
**back** 12:*15* 13:*11*
14:*23* 27:*8*, *14*
36:*24* 39:*10*
45:*23* 54:*13* 57:7,
*9*, *17* 58:*17* 59:*17*
61:*17* 62:*12*, *16*
73:*24* 75:*15*, *16*
78:*1*, *3* 80:*13*, *14*,
*17* 86:7 91:*23*
92:22 102:9
104:*11* 111:*18*
114:*19* 116:*15*
122:5, 6 127:*4*, 6
128:*12*, *17* 143:7,
*12* 149:*16* 153:8,
*11* 154:*11* 156:8
161:*18* 163:22
165:8 166:*19*
178:*14*, *19*
**backfill** 43:*11*, *16*,
22 44:*17* 45:6
48:*24* 61:25 62:6
63:*17* 66:8, *9*, *19*
67:*18* 68:*9*, *14*, *19*,
24 69:*2*, *14*
100:*11*, *14* 101:*11*

104:*24*  131:*4*
137:*12, 13, 20*
146:*6*  154:*11, 16*
155:*11*  162:*14, 20*
165:*4, 7*  167:*2, 9*
179:*6, 11*
**background**
12:*13*  55:*6*
**bailiwick**  102:*18*
**balance**  66:*9*
139:*21, 24*  151:*21*
**Bank**  136:*8*
**Barbara**  106:*1, 3*
**BARNETT**  2:*7*
**Barr**  43:*19*  119:*6*
**barrier**  125:*3*
**base**  14:*8*  126:*12*
137:*7*
**based**  29:*19*
34:*16*  35:*9, 16, 23*
38:*6*  41:*12*  48:*22*
49:*6, 14*  73:*21*
74:*16, 20*  81:*8, 15*
82:*23*  83:*10, 13*
100:*6, 13, 20*
101:*18*  105:*16, 18*
117:*19*  118:*12, 19*
119:*20, 23*  120:*5*
122:*12*  124:*14*
160:*25*
**Basically**  12:*10,*
*25*  19:*9*  23:*6*
25:*23*  40:*9*  41:*6*
58:*15*  64:*7*  72:*9*
92:*5*  145:*20, 22*
146:*24*  159:*5, 25*
163:*23*  165:*7*
168:*18*
**basis**  72:*8*
**Bates**  89:*19*  90:*1*
99:*12, 13, 17*
106:*8*  112:*18, 20*
140:*7*  144:*7*
147:*18*  150:*17*
155:*24*  158:*24*
161:*25*  164:*10*
167:*17*  174:*17*
175:*8*  177:*2*
**Beach**  175:*25*

**beat-the-clock**
72:*23*
**Beauregard**  1:*22*
5:*22*  11:*4*  80:*25*
**began**  18:*19*
29:*25*  35:*2*  36:*8,*
*17*  41:*18*
**beginning**  18:*6*
30:*16*  66:*6*  90:*4*
126:*4*
**begins**  36:*6*  72:*22*
**BEHALF**  1:*12, 15*
2:*2, 5*  64:*22*  65:*5*
**belief**  120:*5*
**believe**  5:*21*  7:*4*
14:*3, 13*  20:*23*
24:*12, 17*  25:*18,*
*20*  26:*14, 15*
27:*10*  35:*8*  37:*7*
39:*20*  40:*13*
48:*14*  51:*14*  55:*5*
56:*18*  58:*11*  75:*9*
77:*7*  89:*7*  90:*24*
96:*15*  97:*5, 9*
99:*1, 14*  103:*11*
110:*25*  111:*11*
112:*19*  113:*22*
118:*11*  119:*4, 8*
120:*24*  121:*4*
125:*16*  126:*18*
129:*6*  134:*20*
135:*12*  136:*14*
145:*19*  150:*13*
158:*3*  160:*22*
161:*24*  163:*14*
164:*9*  169:*7, 11*
170:*15*  171:*20, 23*
172:*19*  176:*5*
177:*20*
**believed**  88:*23*
104:*4*  107:*11*
**bell**  38:*19*
**benefit**  32:*6*  72:*4*
**best**  8:*11*  14:*15*
25:*7, 8, 17*  26:*4*
30:*19*  40:*17*
57:*13*  64:*16*  72:*9*
82:*19*
**bet**  45:*22*

**better**  117:*19*
124:*23*  125:*11, 17*
143:*17*  149:*5*
**BI**  113:*16*
**BIA**  113:*16, 21*
158:*17*  168:*14*
169:*18*
**BILL**  1:*12*  3:*3,*
*20*  4:*16*  5:*2*  6:*2,*
*14, 18, 21*  10:*18*
13:*9, 14*  14:*17*
17:*24*  21:*8*  23:*23*
37:*25*  38:*2*  79:*22*
101:*15*  110:*11*
115:*11, 15, 16, 24*
116:*9, 15*  125:*15,*
*17*  128:*16, 25*
135:*10*  141:*19, 23*
142:*13*  146:*3*
150:*21*  151:*9*
152:*20*  156:*3, 9*
157:*10*  158:*8*
159:*9, 11*  164:*19,*
*20*  165:*2, 20*
168:*2*  170:*23, 25*
171:*1*  173:*5*
180:*17*  181:*5, 12,*
*17*  182:*4*  183:*8*
**bit**  11:*23*  17:*7*
23:*21*  30:*18*  37:*9*
54:*5, 14*  59:*20*
64:*7*  76:*3*  81:*12*
91:*5, 9*  97:*19*
114:*13*  117:*19*
119:*14*  130:*13*
143:*13*  165:*1*
166:*12*
**black**  180:*6*
**blacked**  180:*2, 3*
**Blake**  2:*3*  5:*19*
**blasted**  126:*5*
**blasting**  40:*19, 21,*
*22, 24*  41:*14, 21*
42:*14*  98:*3*
104:*12*  126:*10, 19*
130:*8, 13*
**block**  7:*12*
**blueprints**  117:*21*

**boilerplate**  67:*4, 6*
**bolt**  137:*5*
**boots-on-the-
ground**  19:*20*
**borrow**  137:*24*
138:*2, 5, 16, 17*
139:*6, 9, 18*
149:*21*  150:*1, 6*
**Boston**  2:*4, 8*
**Bostwick**  177:*23*
**bottom**  25:*4*
38:*22*  72:*22*
102:*10*  106:*7, 19*
108:*5*  112:*20, 21*
114:*12, 21*  148:*4*
155:*25*
**bought**  77:*19*
141:*25*  145:*14*
167:*11*
**boundaries**  66:*13*
**break**  9:*10, 12, 15*
57:*1, 2, 19*  79:*8, 9,*
*19, 22*  80:*17*
106:*21*  126:*22, 23*
131:*8*  166:*8, 9*
178:*14*
**breakfast**  37:*7*
**breaks**  9:*9, 11, 12*
**Brian**  148:*5, 6*
149:*18*  151:*9*
153:*13*
**briefly**  14:*8*  158:*7*
**bring**  22:*1*  98:*8*
160:*24*  167:*12*
**bringing**  167:*2*
**broadly**  128:*12*
**broke**  139:*11*
174:*2*
**brought**  21:*14*
55:*11*
**bucket**  41:*4*
**Buddy**  6:*23*
**budget**  102:*16, 23,*
*25*
**budgeting**  102:*20*
**build**  61:*20*
63:*12*  115:*19*
130:*22*

**building** 136:*24*
137:*9*
**buildings** 118:*25*
**built** 59:22 61:*5*
69:*4* 117:22
**bullet** 98:*5*
104:*21* 105:*13*
106:20
**bumper** 7:*12*
**Burbank** 24:*20*
30:*3*
**Bureau** 3:*11*
113:9 157:*23*
164:*12* 168:*8*
**business** 29:*3, 12*
82:23 83:*10, 14*
90:*14, 15, 18, 21*
102:*1* 171:*14*
**buy** 141:2 145:*1*

**< C >**
**calculations** 100:*4*
**California** 16:*4*
**call** 5:*21* 22:*3, 4*
52:2 80:7 87:*18*
152:*19*
**called** 42:*19*
95:*23* 121:*4*
126:*4* 133:*20*
**Calls** 95:*4*
**cancer** 126:*2*
**cancerous** 13:*5*
**capacity** 148:*8*
**Capital** 135:*23*
**care** 52:22
**Case** 5:*6, 12*
15:*25* 27:*13, 17,*
*21* 28:*1* 33:22
39:*17, 23* 40:*15,*
*16* 51:*17* 72:*8*
124:*8* 136:*21*
137:*10* 138:*13*
140:*25*
**cases** 49:2 68:*21*
**catch** 9:*21* 90:*19*
137:*25*
**Cathryn** 1:*16*
**Cathy** 5:*11*

**caught** 52:*1*
131:*12* 139:*11*
143:*13*
**caused** 35:*21*
109:*11*
**caution** 162:*12*
**caveat** 8:*18* 9:*13*
**CCing** 156:*1*
**cease** 158:*10*
173:*14*
**ceased** 113:*13*
**certain** 122:*8*
134:*24* 135:*18*
156:*19* 160:*24*
180:*5*
**certainly** 79:*14*
**CERTIFICATE**
183:*1*
**certify** 183:*6, 13*
**cetera** 63:*18*
140:2 177:*19*
**Chain** 3:*10, 17, 18,*
*19* 4:*3, 4, 5, 7, 8*
21:*13, 18* 115:*12*
**Champagne**
114:*22, 23* 146:*24*
147:2 148:*25*
149:*13* 152:*15, 22*
153:6 157:*11*
163:*25* 164:*3, 20*
**chance** 36:*24*
133:*24* 134:*4*
159:*3* 162:*5*
163:*10*
**CHANDLER** 2:*7*
**change** 28:*16*
57:*20* 80:*18*
89:*16* 90:*6, 11, 16*
91:*3, 7, 11* 94:*4*
98:*2, 5* 104:*12*
126:6 127:*9*
128:*11, 13, 14, 20*
129:*4, 7, 12, 16, 20*
130:*2, 5* 149:*20*
**changed** 28:*20*
162:*22*
**changes** 28:*11*
58:*16* 59:*14*

117:*1* 119:*6*
120:*6* 121:*10*
**charge** 41:*8*
159:*21, 23*
**charged** 159:*19*
**cheaper** 105:*10*
**check** 74:*5*
111:*21*
**checking** 100:20
**chose** 124:*10*
**chosen** 101:*9*
**Chris** 48:*15, 17*
50:2 106:*2, 11, 12*
108:*8* 109:*8*
156:*1* 175:*16*
**Christina** 1:*23*
5:*13*
**Christmas** 75:*10*
**circumference**
137:*2*
**citation** 26:*18*
27:*2*
**City** 122:*25*
183:*17*
**Civil** 4:*18*
**clarify** 86:*4*
179:*11*
**clauses** 135:*3, 5, 8*
**clear** 8:*8, 15* 9:*4*
10:*1* 30:*11* 34:*1*
87:*4* 99:*1* 179:*20*
**Clearing** 35:*1*
**closer** 166:*11*
**clue** 34:*2*
**colleague** 5:*19*
**college** 16:*15, 19,*
*23*
**combo** 159:*9*
**come** 38:*11* 93:*9*
111:*20* 125:*3*
129:*8* 162:*14, 20*
171:*13*
**comes** 101:*1*
137:*3, 4*
**Coming** 80:*17*
106:*1* 129:*4*
140:*23* 147:*25*
153:*4, 6*

**command** 21:*13,*
*18*
**commenced** 34:*7,*
*9* 160:*7*
**commencing**
113:*15*
**comment** 13:*6*
82:5, *9*
**commenting** 12:*12*
**commercial** 70:*17,*
*20, 22* 71:*9, 22*
72:*3, 12* 141:*5*
145:*4*
**commercially**
162:*13*
**COMMISSION**
181:*24*
**communicate**
131:*23* 132:*18*
133:*2, 12* 135:22
136:*1, 7* 141:*15*
142:*8* 145:*17*
169:*16*
**communicated**
132:*6* 133:*7*
141:*17* 142:*5*
147:*7* 157:*24*
**communicating**
142:*13* 171:*5*
**communication**
22:*5*
**communications**
115:*14, 16, 20*
132:*2* 175:*12*
**Community** 16:*23*
**compact** 44:*14*
**compacted** 44:*1*
**compaction** 43:*23*
44:*9, 11, 15, 17*
61:*18* 98:*15, 24*
137:*14*
**company** 54:*3*
77:22 90:*9* 97:*18*
113:*13* 131:*24*
136:*2, 8* 170:*8*
**complete** 160:*23*
**completed** 16:*9*
88:*16* 120:22

completion 20:*19*
comply 169:*17*
concern 89:*4*
  112:*1*, *5*  113:*8*
concerned 177:*20*
concerning 29:*7*
concerns 23:*7, 10,*
*12*
concluded 180:*18*
concrete 119:*10*
condition 49:*3*
conditions 19:*9*
  49:*13*  104:*20*
  126:*15*  159:*13*
conducted 29:*11*
confirm 107:*2*
  140:*24*  156:*7*
confirmation
  151:*21*
conflict 56:*1*
  163:*4*
conform 148:*19*
conical 137:*1*
connection 10:*21*
  29:*1*
conscious 105:*4,*
*10*  180:*6*
consequences
  166:*4*
considered 158:*11*
  165:6, *17*
considering
  172:*13*
consist 88:*9*
constitute 141:*6*
  145:*5*  183:*10*
construct 66:*9, 10*
constructed
  118:*25*
constructing
  138:*14*  145:*18*
construction 7:*15,*
*16*  12:8, *23*  19:*10,*
*18*  29:*7*  34:6, *9,*
*12, 14*  35:*2, 5, 12,*
*18*  38:*4*  48:*16*
  49:*9, 16*  54:*9*
  60:*13, 17, 21*  61:*6,*
*11, 24*  62:*11, 21*

63:*4, 8, 9, 24*  64:*8*
  65:*20*  66:*14*
  72:*24*  73:*4*  75:*18*
  76:*21*  77:*16, 23*
  78:*7, 23*  88:*11, 13,*
*19*  89:*10*  93:*21*
  102:*7, 13*  106:*18*
  112:*11*  116:*25*
  117:8, *11, 16*
  118:*14, 18*  130:*19*
  134:*18, 23*  135:*17*
  138:6, *18, 19*
  139:*9, 22*  141:*11*
  146:*15*  148:*21*
  149:*20, 24*  154:*11*
  158:*10, 12, 15*
  160:*3, 8*  161:*5, 11*
  165:*13*  166:*5*
  172:*2, 13, 18*
  173:*5*
contact 12:*16, 19*
  22:*12, 13, 14*
  175:*16, 24*
contained 12:*3,*
*21*  14:*16*  28:*2*

contemporaneously
  29:*8*
continue 79:*21,*
*25*  106:*23*  107:*3,*
*12, 15, 22*  108:*15*
  109:*9*  152:*24*
  153:*1*  164:*21*
continued 1:*21*
  2:*1*  3:*25*  35:*3*
  157:*20*
Contract 3:*15*
  46:*22, 23, 24*
  74:*10, 23*  75:*5*
  88:*11, 17, 24*  89:*9,*
*13*  91:*8, 12*  93:*23,*
*24*  94:*16*  95:*2, 21,*
*22, 23*  97:*6, 7*
  110:*12*  119:*4*
  130:*3*  134:*25*
  135:*8, 19*  155:*15*
  172:*23*  177:*5, 14,*
*16, 19, 22*  178:*4*

contract[sic
  175:*22*
contractor 46:*2, 7,*
*8, 12, 16, 25*  47:*12,*
*14, 25*  48:*2, 4, 12*
  50:*25*  51:*1*  53:*8*
  56:*21*  66:*12*
  74:*12*  76:*23*  88:*4*
  106:*16*  120:*14*
  121:*6*
contractors 76:*24*
contractor's
  120:*12*
contracts 80:*4*
  82:*2*  88:*8*  132:*12*
contractual
  120:*20*  126:*13*
contradiction
  122:*17*
contradictory
  122:*16*
contrary 73:*3*
  75:*17*  78:*6, 21*
  121:*25*
control 144:*21*
conventional
  131:*8*
conventionally
  41:*3*
conversation 8:*3*
  145:*20*  152:*21*
  156:*17*  168:*17*
conversations
  146:*21*  150:*5*
  152:*18*  156:*3, 23,*
*24*  163:*20*
coordinating
  99:*16*
coordinator 18:*22*
  19:*7*  20:*3, 5*
  21:*10, 25*  32:*10*
  33:*17*  36:*13*
  37:*19*  50:*18, 23*
  55:*17*  97:*21*
  102:*4, 6, 12, 21*
  123:*14*  175:*3*
copied 140:*11*
  141:*14*  144:*10*

164:*14*
copy 177:*9, 14*
Corn 112:*23*
corporate 132:*24*
Corporation
  135:*23*
correct 6:*18, 19*
  9:*2*  14:*4, 25*
  16:*17*  18:*4, 7, 12,*
*20*  19:*5, 6, 22*
  21:*6, 12*  22:*18*
  25:*21*  26:*14*
  27:*10*  31:*21*
  34:*10, 11*  36:*3, 15*
  39:*18*  40:*20*
  41:*14, 22*  42:*1*
  44:*23*  45:*9, 13*
  51:*7*  53:*11*  54:*22*
  55:*21*  64:*18, 24*
  65:*22*  66:*23*
  68:*19*  69:*1*  70:*18*
  73:*6*  76:*1, 14, 25*
  77:*23*  81:*4*  82:*4,*
*25*  83:*15*  84:*6, 13,*
*15, 18*  86:*5, 25*
  87:*23*  92:*1*  93:*7*
  99:*4*  101:*22*
  103:*12*  105:*21*
  106:*10*  107:*5*
  108:*11*  109:*5*
  116:*3*  117:*5, 8*
  118:*1*  121:*15*
  123:*25*  124:*1*
  132:*15*  133:*9, 10*
  137:*14*  142:*23*
  143:*8, 9*  146:*17,*
*19*  152:*7*  154:*12*
  157:*21*  160:*13*
  161:*9, 13*  169:*21*
  172:*3*  175:*4*
  181:*8*  183:*11*
corrected 23:*14*
corrections 58:*16*
correctly 25:*9, 10,*
*13*  29:*16*  35:*7*
  46:*5*  73:*15*  91:*15*
  105:*1*  106:*25*
  114:*17*

**Professional Reporters**
800.376.1006
www.ProReporters.com

cost 88:*11*, *19*
89:*9* 93:*20* 98:*10*
100:*14*, *15*, *17*
130:2 153:*23*
154:*21*, *24* 155:*3*,
*16* 171:*16* 172:2,
*23* 173:5
costs 88:*15* 97:*10*,
*14*, *23* 99:8 138:*9*
170:*24* 172:*18*
173:*1*
COUNCIL 1:*6*
5:*3*, *18* 54:*16*
87:8 127:*25*
181:2 182:2
counsel 5:7, *22*
11:8, *10* 15:*15*, *18*,
*23* 99:*16* 114:*24*
173:*4* 183:*3*
country 60:*15*
counts 52:*22*
County 30:*4*
104:*24* 183:*4*, *18*
couple 11:*5*
16:*15* 110:*23*
140:*16* 148:*11*
156:*3*, *23*
course 29:*10*
79:*10* 153:*15*
171:*11* 175:*13*
COURT 1:*1* 5:*5*
8:*6*, *8*, *22* 10:*14*
13:*8*, *10*, *11* 30:*15*,
*24* 31:*15*, *20*, *25*
32:*1*, *21*, *25* 33:*1*
34:*1* 39:*16*, *21*
40:*3* 41:*20*, *25*
42:*5*, *6*, *13* 43:*1*
45:*21*, *22*, *23*
46:*19* 47:*3*, *4*, *25*
53:*7*, *23* 56:*10*, *12*
60:*3*, *20* 63:*4*, *20*,
*21* 64:*11*, *22*
68:*12* 69:*8*, *13*, *21*
70:*3* 71:*23* 72:*16*
73:*8*, *12*, *17* 74:*21*
75:*16*, *21* 76:*9*, *13*
78:*5* 79:*1* 82:*10*,
*18*, *22* 83:*9*, *12*

84:*5*, *19* 85:*4*, *15*,
*24* 86:*12* 88:*23*
89:*8* 91:*24* 92:*8*,
*16* 93:*2*, *3*, *13*, *22*
94:*9*, *13*, *15* 95:*1*,
*14*, *18*, *20* 96:*19*
97:*6*, *9* 99:*4*
102:*19*, *20* 103:*23*
104:*5* 123:*19*
124:*3*, *11*, *24*
Craig 51:*16* 52:2,
*3*, *7*, *10*, *15* 53:*1*,
*17* 99:*19* 100:*4*
105:*19* 121:8, *21*
129:*4*, *12* 140:*18*
147:*25* 151:*8*
156:*1*, *2*, *8*, *11*, *18*
157:*8* 175:*19*
177:*1*
crane 66:*10*
create 43:*25*
138:*13* 171:*16*
created 138:*18*
Cross 3:*5* 127:*20*
crossed 151:*20*
crunching 172:*21*
174:*6*
crush 45:*19*
143:*11* 163:*9*
crushed 46:*3*
47:*5* 48:*13*, *20*, *24*,
*25* 49:*8*, *15* 50:*5*,
*12* 51:*10* 52:*11*,
*17* 53:*9* 56:*10*
59:*23* 60:*3* 61:*7*,
*12* 62:*15* 63:*5*, *22*
67:*17* 100:*11*
165:*4*
crusher 60:*11*, *18*,
*23*
crushers 130:*25*
131:*1* 171:*22*
crushing 43:*2*, *3*,
*5*, *9* 45:*4*, *11*
98:*11*, *13*, *18*
104:*19* 111:*10*
143:*21* 156:*4*, *6*,
*23* 157:*4*, *12*, *17*,

*19*, *25* 163:*12*, *18*
164:*5*, *22*, *24*
CSR 1:*25* 4:*19*
182:*5* 183:*6*, *22*,
*23*
cubic 100:*5*, *7*, *8*,
*15*, *16*
cured 59:*23* 61:*5*
current 16:2
31:*13* 95:*12*
160:*19* 161:*7*
currently 16:*25*
76:*19*
customary 48:*22*
49:*9*, *16* 60:*12*, *17*,
*21* 61:*6*, *11*, *24*
62:*11*, *14*, *18*, *20*
63:*4*, *7*, *24* 64:*5*
78:6 118:*13*
120:*5*
cut 10:*18* 14:*17*
17:*25* 44:*3* 97:*10*,
*14*, *23* 139:*23*
140:*3*

< D >
daily 20:*7*
151:*14* 159:*6*
Dakota 125:*24*
Daren 144:*13*
data 172:*18*
date 27:8 40:*23*
66:*25* 88:*14*
135:*18* 183:*12*
dated 37:*13*
89:*16* 91:*3*
105:*24* 112:*17*
114:*10* 147:*20*
155:*22* 156:2
159:*1* 162:*4*
164:*18* 174:*19*
177:*6*
Daters 144:*13*
D-A-T-E-R-S
144:*14*
dates 36:*19* 173:*9*
David 177:*23*
day 24:*19* 37:*14*
38:*23* 39:*6* 74:*15*,

*16*, *22* 75:*10* 78:*4*
135:*12* 166:*13*
181:*18* 183:*18*
days 73:*5*, *13*
74:*11* 75:*19*
78:*24*
day-to-day 72:*8*
deal 44:*11* 101:*17*
dealt 49:*13*
December 24:*20*
89:*16* 91:*4*
decided 41:*7*
74:*24*
decision 52:*20*
75:*21* 76:2 93:*9*
104:*18* 105:*4*, *10*
112:*15* 125:*6*
128:*24* 138:*25*
139:*1*, *6* 149:*9*
154:*15* 161:*16*, *19*
163:*24* 164:*5*
180:*6*
decision-making
128:*22*
decisions 20:*5*
65:*8*
declaration 11:*17*
13:*22*, *23* 14:*1*, *2*,
*6*, *9*, *10*, *12*, *16*, *22*
23:*18*, *20*, *22*, *23*
24:*1*, *17*, *18* 25:*19*
27:*12*, *16*, *20* 28:*7*
29:*2*, *19* 30:*8*, *14*,
*24* 31:*4*, *10*, *12*, *14*,
*16*, *20*, *25* 32:*20*
39:*11*, *15* 41:*17*
49:*21* 53:*7*, *23*
54:*2*, *5* 55:*6*
57:*22*, *23* 58:*2*, *18*,
*23* 59:*4*, *8*, *12*, *15*,
*17* 63:*20* 64:*22*
67:*16*, *24* 69:*9*
70:*3* 75:*15* 76:*13*,
*19* 78:*4* 80:*2*
81:*22* 82:*22* 83:*9*
84:*5* 89:*2*, *5* 91:*5*,
*23* 92:*3*, *6*, *8*, *23*
93:*21*, *24* 95:*21*
96:*12*, *18*, *20*, *25*

97:6 102:*10*, *19*
103:*24*, *25* 104:*3*
123:*19*, *24* 124:*3*,
*16*, *24* 125:*11*, *18*,
*19*
**declarations**
14:*24* 15:2, *5*, *8*
24:*1*
**declare** 25:5 26:2
**declared** 26:7
**decreasing** 130:2
**defeat** 39:22
64:23 70:8
**defeated** 65:4
**DEFENDANT** 2:*5*
**Defendants** 1:*11*
3:*21* 4:*9* 5:20, *21*
170:*17*, *20* 178:*21*
**deferred** 115:*16*
**define** 137:*12*
138:2 179:*24*
**definitely** 24:6
**definitions** 136:*20*
**degree** 16:*20*
**degrees** 16:*19*
**delay** 109:*11*
119:*14* 166:4
**delayed** 109:*5*
134:*23* 165:*21*
**delays** 134:*18*
161:*11*
**delegated** 47:*23*
**delivered** 113:*23*
168:5
**deliveries** 165:*21*
**delivery** 161:*1*, *8*,
*12*
**demand** 169:*17*
**denied** 128:*23*
**deny** 42:6 76:*13*
**denying** 129:*15*
**department** 58:*11*
76:7 83:*19* 93:9
96:*15* 113:*1*
**departments** 32:*17*
**DEPOSITION**
1:*12* 4:*16* 5:2
6:*25* 7:*17*, *25* 9:*1*,
*7* 10:*11*, *18*, *23*

11:*3*, *9* 14:*7*
15:*10*, *15*, *17* 17:*5*
24:2 30:*23* 51:*17*,
*23* 52:2 57:*12*, *15*
75:*13* 121:9, 22
144:6 147:*17*
155:*21* 177:*1*
180:*17* 181:6
182:*4* 183:*11*
**depositions** 7:*3*, *10*
**depressed** 140:*1*
**derived** 45:*12*
104:*20*
**describe** 137:*11*
**Description** 3:8
4:*1* 93:*11*
**design** 44:5 160:6
**designated** 68:*16*
138:*15*
**designed** 43:20
**desist** 173:*14*
**detail** 42:*12*, *13*
**detailed** 41:22
**details** 26:*15*
82:*15* 96:*10*
**determination**
147:2 149:*3*, *14*
**determine** 149:*8*
**developed** 96:*8*
**developing** 141:*3*
145:2
**development** 29:7
73:*4* 75:*18* 78:*23*
**deviates** 117:22
**deviation** 120:7
121:2 122:*11*
**deviations** 121:*23*
**diagnosed** 126:*1*
**difference** 8:5
20:2
**different** 8:22
33:*6*, *7* 49:*12*
66:2 118:6
119:22 136:*23*, *25*
143:*24* 150:*10*
175:*10* 178:*4*
179:*25*
**difficulties** 6:*16*

**dig** 41:*3*, *4*
131:*14* 159:*16*
**digitally** 150:*12*
**DiMarzio** 21:*3*
102:*24* 115:*11*
123:*17*, *20* 129:*21*
151:9 158:*8*
**dimensions** 63:*15*
**dinner** 136:*16*
**Direct** 3:*4* 6:5
20:7 110:7
112:*10* 115:*19*
159:8 175:*12*
**directed** 106:*23*
107:*3*, *21* 112:*24*
115:*15* 120:*13*, *17*
**directing** 77:*23*
107:*14*
**direction** 179:*17*
**directive** 56:*18*
**directly** 55:9
131:*23* 135:22
145:*17*
**directs** 106:*23*
107:*12* 108:*15*
109:9
**disagreed** 12:*4*
**disappeared**
132:*13*
**discuss** 156:8
163:*10*
**discussed** 15:*24*
38:*24* 39:8 57:*24*
128:7 130:*12*
148:*14* 168:*17*
172:5 175:*23*
**discussing** 152:*13*
**discussions** 135:*4*
163:*16*, *17* 167:7
**disposal** 104:*23*
165:*16*
**dispose** 165:5
**dispute** 54:9, *21*,
*24*
**disputes** 55:*14*
**DISTRICT** 1:*1*,
*17* 5:5
**document** 17:*12*
24:*11*, *14*, *25*

25:23 26:7, *9*, *19*,
*22* 27:*3*, *7*, *25*
28:5, *9*, *10*, *15*
30:22 36:25
40:25 65:*10*, *12*
66:*5*, *24* 72:*21*
84:*10* 85:20 86:7
99:*13* 103:*17*
112:22 115:*10*
121:*10*, *23* 143:*24*
147:*15* 149:*16*
150:*10*, *16* 151:*16*
153:*10* 158:*21*, *22*
161:*22*, *23* 164:*8*
174:*15*, *16*, *18*, *20*,
*24* 176:*20*, *24*, *25*
**documented**
119:*24*, *25* 121:*4*,
*25*
**documents** 11:*13*,
*15* 15:*9*, *13*, *23*
29:*19* 84:*11*
136:*21* 174:*21*
179:22 180:6
**doing** 50:7, *10*
72:7 113:*12*
115:*5* 153:2
163:5 168:*19*
179:*8*
**dollar** 129:25
**double** 74:*5*
**drafted** 50:*19*
58:*24* 66:*16* 76:8
**drafting** 76:8
**drafts** 58:*18*
**drainage** 61:*20*
69:*3*
**draining** 69:*4*
**drawing** 119:*21*
120:9 130:22
**drawings** 56:*23*
117:*3* 119:*5*, *8*
122:8
**drill** 41:2, *7*
**drilled** 159:*24*
**drilling** 131:*15*
**drove** 110:*24*

due 83:20 148:16
156:6 157:4, 12,
17 160:17
duly 6:3 183:8
duties 92:12
144:18
duty 47:23 86:13
102:12
dyn 159:23
dynamite 159:23

< E >
E&C 98:11
earlier 15:11
25:18 28:8 50:14
52:19 53:15
57:24 74:19 89:1
106:13 116:22
128:10 129:24
130:12 140:16
142:17 149:23
166:25 167:23
179:5
early 35:11, 18
earthwork 151:21
economic 70:24
71:13, 24 72:18
education 16:9
effect 94:23
effort 95:1
efforts 44:11
EGP 98:11
EGPNA 112:24,
25 129:15 130:3,
17 132:14 134:25
139:5 142:7, 13
143:11, 20 146:4,
21 147:11 149:3,
10 155:10 157:24
158:6 167:8
169:5, 21 170:6
173:13, 21 178:3
EGPNA's 146:15
eight 13:1 20:15
33:9 83:5
either 79:16
101:15 110:14, 25
111:14 129:17
144:10 156:19

167:25 170:2
179:17 183:14
elaborate 27:9
147:4
elected 45:18
Electric 133:13
134:25 165:24
elementary 16:13
Elk 20:25
Email 3:17
E-mail 3:9, 10, 18,
19 4:3, 4, 5, 7, 8
22:4 58:7, 9
99:10, 18, 21
101:14 105:17, 24
108:1, 8 109:8
112:17, 23 113:18
114:20 115:6, 10,
12, 21 140:8, 16
141:8, 15 142:3,
10 144:8, 10
147:19, 20 148:4,
14 149:18 153:12,
18 155:25 156:10,
15 158:25 159:2,
18 162:2, 6, 10, 18
163:3, 11, 16
164:11, 13 173:4
e-mails 11:16, 18,
21, 22, 24 12:4, 6,
11, 21, 22 13:19
15:8, 11 99:8
167:1
employ 134:10
employed 16:25
60:14 129:21
132:14
employee 23:1
58:1 77:13 110:6
133:3 134:10
180:8
employees 76:22
77:4, 5, 10
employer 64:22
65:5
encountered
49:11 126:11
ended 116:17

118:6 150:15
ends 37:9
ENEL 1:7, 9
17:23 18:3, 11, 15,
19 19:2, 3, 20
20:9, 22 21:15, 25
22:2, 7, 8, 9, 20
23:1 27:14, 20, 25
29:3, 13, 20 30:11
38:4 45:12 46:23
48:7, 18 50:3, 19
52:21 54:16, 22
55:11, 20 56:19
57:25 58:22
66:17 69:13 70:8,
24 71:12, 23, 25
72:4, 5, 16 74:24
75:22 76:6, 22
77:5, 19, 22 82:23
83:10, 14 86:23
87:6, 21 90:23
93:2 94:16 95:2
97:9, 13, 23 98:8,
17 99:24 101:2, 9,
20 105:3, 9, 18
106:22, 23 107:2,
12, 13 108:14
109:3, 7, 8, 18
113:1, 12, 16
114:24 115:25
116:10 118:9
123:24 124:3, 5,
10, 16, 22 125:10,
23 126:9 129:21
132:11, 18, 19, 24
134:10 135:18
153:4 157:6
158:3 161:11
166:4 170:12
171:8 172:13
179:21 180:5, 7
Enel/Tradewinds
156:5 157:3
Enel's 27:17
29:11 113:11
164:4
Energy 3:16
34:21 131:24
engaged 72:23

engineering 38:4
41:1 43:19 119:6
engineer's 44:5
enlarge 24:4
ensure 61:20
102:15 144:20
entered 23:20
90:6 92:2 140:6
147:16 155:20
158:23 176:25
entertained 149:25
entire 18:15 19:4,
13 60:20, 21
103:17 120:14, 18
135:18
entirely 135:19
entirety 14:7
48:6 92:5 181:7
entitled 23:23
entity 132:24
entries 170:20
entry 38:12
170:22
environmental
23:7, 10
environmentalist
22:16 144:15
EP 98:11
equipment 173:1
erection 176:5
ERRATA 182:1
escalation 38:13,
18
escorted 111:21
especially 141:5
145:4
Esquire 170:25
estate 30:2 33:10,
11
estimate 105:19
154:22, 25 155:3,
5
et 5:4 63:18
140:2 177:19
181:2 182:2
Eve 75:10
event 140:15
183:15
events 12:7

**eventually** 116:*17*
118:*6*
**everybody** 40:*24*
89:*4* 97:*18*
151:*14* 154:*21*
**evidence** 73:*12*
**exact** 20:*15* 62:*1*
**exactly** 50:*25*
68:*6* 71:*16* 93:*14*
103:*6* 111:*7*
135:*13* 137:*22*
159:*15*
**Examination** 3:*4,
5, 6* 6:*5* 127:*20*
179:*2*
**examined** 6:*3*
**excavate** 41:*10*
62:*15*
**excavated** 56:*5*
61:*17, 25* 62:*12,
21* 66:*7, 18* 68:*8,
9, 13, 17* 69:*22*
70:*4, 16* 71:*5, 9,
21, 24* 72:*17*
87:*19, 23* 101:*21*
104:*23* 105:*5, 11*
112:*1* 119:*19, 22,
23* 120:*25* 121:*3,
24* 122:*9* 131:*7*
143:*1* 165:*5, 17*
**excavating** 164:*21*
**excavation** 36:*7, 9,
17* 37:*15* 39:*6, 17,
21* 40:*3, 9, 15*
41:*14, 17, 21, 25*
42:*6, 12* 48:*24*
54:*21* 60:*11, 19*
68:*2* 97:*24* 100:*6,
9* 111:*10* 114:*14*
119:*2* 120:*7, 15,
19* 121:*10* 130:*10*
165:*3* 169:*1, 17*
170:*24* 171:*17*
**excavations** 40:*25*
66:*9* 160:*17*
**excess** 35:*21*
63:*11* 66:*7*
**exchange** 156:*10*
164:*13*

**Excuse** 80:*5*
131:*9, 25* 150:*19*
**executed** 24:*19*
80:*4* 82:*3* 88:*8*
**exercise** 173:*25*
**Exhibit** 3:*8, 13*
4:*1* 17:*4, 5, 11*
23:*19, 23* 24:*3*
31:*14* 36:*21, 22,
23* 37:*1* 57:*24*
66:*3* 73:*25* 74:*1,
4* 75:*14, 23* 89:*16,
17, 18, 24* 98:*1, 2,
20* 99:*6, 7, 11*
104:*12, 14, 15*
105:*23, 24* 106:*4*
112:*16, 19* 113:*2*
114:*3, 6, 20*
128:*11* 140:*5, 7,
12* 144:*1, 6, 11*
147:*16, 17, 23*
150:*14, 16, 24*
153:*8* 155:*20, 24*
156:*12* 158:*23*
159:*4* 161:*25*
162:*7* 164:*9, 10,
16* 166:*22, 23*
167:*16* 170:*15, 17*
171:*2* 174:*17, 23*
177:*1, 2, 7*
**EXHIBITS** 3:*7,
25* 128:*9*
**ex-marine** 133:*22*
**expect** 103:*22, 23*
138:*12*
**expecting** 165:*20*
**expended** 80:*3*
82:*1* 88:*7*
**expenditures** 88:*9*
**expenses** 94:*16*
95:*2*
**expensive** 104:*25*
**experience** 34:*17,
20* 35:*16, 23*
48:*23* 49:*6, 7, 15*
73:*21* 74:*20*
75:*20* 117:*5, 7, 10*
118:*12, 19* 119:*20,
23* 121:*15, 25*

122:*7, 8, 12, 17*
124:*4*
**EXPIRES** 181:*24*
**explain** 142:*22*
164:*3*
**explained** 158:*16*
**explaining** 40:*9*
**explanation**
117:*20* 147:*1*
**express** 134:*17*
143:*19, 20*
**extent** 128:*19*
**extra** 153:*23*

**< F >**
**facilitation** 23:*13*
**facility** 115:*19*
**fact** 19:*4* 31:*24*
39:*20* 41:*24* 48:*1*
64:*21* 68:*17* 73:*2*
75:*17* 78:*21* 83:*7*
84:*4, 21* 130:*13*
150:*6*
**factors** 155:*16*
**fail** 42:*13* 48:*8*
**failed** 70:*3* 95:*20*
99:*17*
**fair** 9:*16* 10:*4*
97:*4* 132:*22*
136:*5* 168:*24*
176:*18*
**faith** 103:*12, 14*
**fall** 43:*24* 90:*21*
102:*2* 144:*6*
**fallen** 170:*11*
**Falling** 160:*17*
**familiar** 29:*1*
51:*6* 110:*18*
117:*15* 132:*23*
145:*6, 11* 174:*20,
24* 177:*4*
**family** 123:*7*
**far** 14:*3* 89:*3*
160:*19* 177:*19*
**farm** 30:*6* 32:*5*
33:*11* 35:*2, 6*
131:*22* 132:*1, 17*
133:*2, 12* 135:*17,
22* 136:*1, 6* 138:*6,

14, 19* 139:*19*
141:*11* 142:*20*
144:*19* 145:*18*
146:*16* 148:*10*
154:*12* 155:*11*
157:*21, 25* 162:*17*
168:*4, 8* 175:*14*
176:*2* 177:*10, 15*
**Federal** 4:*18*
**fee** 30:*2*
**feedback** 91:*10*
**feet** 100:*5, 8*
137:*3*
**fellow** 21:*8* 110:*9*
112:*12* 132:*9*
**Fields** 1:*16* 5:*12*
**Fifth** 4:*9* 170:*17*
**figure** 86:*18*
161:*14*
**figured** 100:*14*
**filed** 5:*4* 54:*15*
**fill** 139:*23, 25*
140:*1* 148:*15*
149:*18* 153:*22, 24*
154:*10* 167:*2*
**filled** 67:*9*
**filling** 140:*3*
**final** 97:*17*
167:*10*
**finance** 83:*18*
**financial** 93:*9*
172:*17*
**find** 96:*12*
150:*11* 153:*15*
**findings** 160:*12*
**fine** 23:*14* 25:*15*
79:*14, 15, 16*
146:*2, 5* 156:*20*
165:*19* 170:*13*
174:*13*
**finish** 8:*11, 12*
9:*14*
**finished** 20:*17*
133:*4* 135:*17*
164:*8* 176:*23*
**finishing** 125:*25*
**firms** 41:*1*
**first** 6:*3* 13:*25*
14:*23* 20:*10*

23:20  26:12
27:13  28:6, 25
29:15  34:18  41:4
42:20  59:2  74:16
87:7  90:5  99:23
102:10  106:11, 20
107:4  108:5
110:20, 21  114:23
116:24  139:11
155:23  156:17
168:7  179:5
**fits** 137:7
**five** 28:23  29:24
66:5  67:23, 25
166:9, 14
**five-minute** 9:10
79:22
**flange** 137:6
**Florida** 7:11
16:24
**flustered** 105:8
**folks** 90:9  133:9
139:2  142:8
151:2, 6  162:3
175:10, 13
**follow** 44:2, 4, 5
50:6
**followed** 67:9, 12
170:2
**following** 1:21
60:24  74:14
88:10  104:20
127:25
**follows** 6:4
**follow-up** 178:25
**fool** 94:20
**footprint** 63:15
**foregoing** 25:6
26:3  181:6
183:10
**forgot** 85:11
**form** 10:7, 12
12:9, 24  13:16
19:23  21:16
22:21  23:5  26:10,
21  27:5, 22  28:19
31:1, 17, 22  32:14,
22  33:3, 20  34:3,
22  35:24  38:20

39:24  42:2, 8
45:7, 14  46:21
47:16  48:3  49:18,
24  50:8, 15  51:2,
13, 18  52:12, 18
53:4, 10, 19, 25
54:19  55:12, 22
56:6, 14  59:5
60:5  61:15  62:3,
23  64:3, 13, 25
65:6, 14, 16, 21, 23
66:21  67:10, 19
68:20  69:10, 16,
24  70:11  71:15
72:1  75:24  76:10,
15  77:6, 17, 24
79:2  81:5, 11, 19
82:12  84:2, 7, 23
85:6  86:3, 15, 20
87:1, 9, 13, 24
88:20, 25  89:11
91:16  92:13, 18
93:5, 16  94:2, 10,
18  95:4, 15, 24
96:4  97:11  98:21
100:1  101:6, 12,
23  102:22  103:10
104:7  105:14, 20
107:6, 17  108:21
109:21  110:3
112:3  113:3
115:7  116:4, 12
118:2  120:1
121:12  122:2
123:21  124:6, 12,
17  125:1, 14, 20
135:1  141:12, 22
145:9  146:18
149:11  163:7
169:23  171:19
174:9  180:9
**forth** 163:22
**forward** 112:14
129:8
**forwarded** 101:14
110:11  114:22
**forwarding** 173:4
**foundation** 40:15,
16  41:8, 18  43:12,

13, 20  44:2, 18, 19,
20, 22  60:24  66:8,
11  95:25  100:21,
25  119:9, 10
126:5  131:7, 8
136:23, 24  137:5,
8, 14, 15
**foundations** 36:8
40:10  59:22  61:5
100:9, 22, 24
101:1  119:5, 17
130:19  131:14
160:2, 22
**four** 6:23  28:24,
25  73:5, 13  75:19
78:24
**four-day** 78:7
**Fourth** 2:12
104:21
**frame** 161:12
**frames** 161:8
**Francesco** 113:16,
21  167:19
**Frank** 110:15, 25
167:25
**Freeman** 177:23,
25
**froze** 6:15, 17
**fulfill** 43:6
**full** 6:10  60:6
134:15, 16  181:7
183:11
**full-day** 37:11, 20
**fully** 160:7
**further** 35:5
57:10  114:14
115:20  127:16
142:3  151:18
154:23  161:10
163:9  165:2, 21
166:5  169:1
180:12  183:13

< G >
**gain** 109:18
141:5  145:4
**garage** 7:13
**Gardner** 151:8

153:13
**gather** 126:23
**GE** 133:14  135:9,
19  160:24  161:8
165:21, 23, 24
172:23
**general** 19:19
46:8, 25  76:23
106:16  117:11
119:25  130:1
133:13  134:25
165:24
**generally** 19:13
35:21  37:10
**gentleman's**
167:24
**gentlemen** 110:23
**Gents** 115:12
**geotech** 131:10
160:11
**GE's** 161:12
**getting** 78:14
105:8  109:10
146:9, 21  166:11
**Giovanni** 151:8
**Giuseppe** 21:3, 5
101:15  102:24
110:11  115:11
123:16, 20  125:4
128:15, 25  129:20
135:10  151:9
152:20  155:4
158:8  159:1, 5, 8
162:10, 11  168:2
172:19  173:10
**give** 8:4  41:1
54:4  57:12  85:9
89:20  103:19
114:4  116:20
143:25  147:2
150:10  152:23
159:3  162:5
**given** 6:25  7:3
21:24  47:17
58:13  59:8
104:22  171:21
181:8
**giving** 64:7  159:5

glitch-inaudible
139:8
go 6:14, 17, 23
7:24 9:8 10:15
12:7, 15 17:9
24:16 28:5, 22
39:10, 11 41:7, 9
48:9 56:19 58:16,
23 59:17, 19 66:2,
3, 4 67:21 75:16
78:2, 11 79:4, 6
80:6 81:21 88:10
90:3 91:23 98:3
102:9 104:10, 11
106:6 107:24
112:21 114:13, 19,
21 115:9 138:8,
23 140:4 141:18
153:8, 16, 17
154:22 155:22
158:22 161:17, 23
166:13 171:7, 9
175:6, 7, 9 179:12
God 103:16
goes 29:6 37:8
66:11 73:2
100:11 104:21
113:12
going 7:24 8:2, 3
9:8, 9 13:1, 8
17:4, 5, 6 23:18,
19 24:19 28:22,
23 34:25 36:21,
22 39:10, 11, 12
42:15, 18 45:20
56:13 66:4 67:21
68:1, 13 72:20
73:24 74:8, 25
75:15 78:1, 3
79:4, 6, 15 81:21
85:22 88:6 89:15,
17 91:6 94:23
98:1, 3 99:6, 7
102:9, 25 104:10,
11, 15 105:23, 24
106:6 112:16, 18,
20 114:19, 20
119:15 140:4, 15
143:24, 25 147:14

148:24 149:16
150:9 153:10
158:19, 21 161:5,
15, 22, 25 163:22
167:15 170:14, 15,
19 174:14 178:13
179:12
good 57:3 79:7
103:12, 13 127:22
128:18 145:22
Gosh 7:6, 19
16:7 20:14
go-to 23:6
gotten 49:3
126:14
government 110:6
111:14
grade 32:16
90:24
graduated 16:16
Great 79:25
127:17 154:4
greater 43:13
GREEN 1:9
17:23 18:3, 11, 15,
16, 19 19:2, 3, 20
20:9 21:15, 25
22:2, 7, 9, 20 23:1
30:12 45:12
46:23 48:7, 18
50:3, 20 54:16, 22
55:11, 20 57:25
58:1, 22 69:13
70:8, 25 71:12, 23,
25 72:16 75:22
76:7 77:5, 22
82:23 83:11, 14
86:23 87:6, 21
90:23 93:2 97:9,
13, 23 98:9, 17
99:24 101:2, 9, 20
105:3, 9, 18 107:3
109:3, 18 113:1
115:25 116:10
118:9 123:25
124:3, 5, 10, 16, 22
125:10, 23 126:10
129:21 179:22
180:5, 8

Green's 27:21
28:1 94:16 95:2
ground 7:25
106:22 143:6, 12
group 151:6, 10
growing 115:13
grubbing 35:1
guess 56:1 77:3
98:6 99:15
124:19 137:11
143:17 149:5
guessing 58:8
Gunny 133:20
134:13
Gunny's 133:23
134:2
guy 111:1 132:9

< H >
half 21:20, 21
139:11
halted 171:22
halting 170:24
171:17 172:13, 18
Hammock 1:22
5:13
hand 76:8
113:23 168:4
183:17
handed 110:10
111:4 112:12
167:24
handled 90:9
102:23 170:12
handling 56:5, 8
110:12
handlings 55:15
hands 32:17
handwritten
170:23
Hanson 48:15, 17
50:2 106:2, 12
108:8, 9 156:1
175:16
happen 74:25
111:22 122:15
159:2 172:8
happened 13:2
85:18 92:22

happening 25:16
102:7 111:7
happy 9:23
hard 13:3 136:13
HARRIS 2:11
hate 8:20 10:1
haul 66:12
hauling 149:19
hear 9:19 10:2,
19, 25 14:19
22:23 121:17
heard 10:5
145:12, 14
hearing 146:14
157:16
held 32:5, 7, 12,
19 33:11, 13, 24
help 15:24 70:8
150:2
helped 15:24, 25
helper 134:3
helpers 133:17
helpful 39:22
40:4 179:7
Heredia 22:15
23:1, 15 140:9
144:8, 16 145:17
162:3
hereunto 183:16
Heridia's 23:3
hey 9:21
high 16:12, 14, 16
higher 50:3
higher-ups 22:2
76:6 90:23
highest 16:8
hired 18:20, 21
30:11 130:17
history 30:7, 15,
19 54:5 60:7
Hmm 78:18
Hold 155:4
164:21 175:8
hole 41:5 43:24
59:24 60:4 61:8,
13, 18 62:1, 12, 16
63:6, 23 68:3, 10
137:5 143:4

159:*16, 24*

**holes** 41:*2, 3*
**holiday** 75:*4*
**holidays** 73:*20*
74:*14* 75:*7*
**hope** 9:*2* 128:*2*
**hopefully** 128:*3*
**hoping** 166:*14*
**hour** 9:*9* 57:*1*
**hours** 155:*12*
**huh-uh** 8:*19* 9:*1*
**hum** 78:*14*
**hurry** 73:*12*

**< I >**
**idea** 92:*23* 94:*24*
99:*24* 139:*4*
149:*25* 152:*1, 2*
**Identification**
17:*11* 24:*3* 37:*1*
75:*23* 89:*18*
98:*20* 99:*11*
106:*4* 113:*2*
114:*6* 140:*12*
144:*11* 147:*23*
150:*24* 156:*12*
159:*4* 162:*7*
164:*16* 171:*2*
174:*23* 177:*7*
**IEA** 3:*16* 46:*8,*
*14* 47:*4, 23* 48:*16,*
*19* 49:*21* 50:*4, 6,*
*20* 51:*7, 9* 52:*8,*
*10, 21* 66:*17*
74:*10* 76:*22* 88:*4,*
*12, 18* 90:*2* 91:*7,*
*12* 92:*12* 99:*15*
106:*16, 18, 23*
107:*3, 12, 15, 21*
108:*10, 15, 20, 25*
109:*9* 118:*9*
120:*17* 126:*9, 16*
138:*13* 142:*8*
148:*1* 149:*3, 7*
153:*5* 154:*6*
155:*10* 158:*10*
175:*11* 176:*11, 16*
177:*6, 23*
**IEA/Barr** 98:*12*

**IEA-00095047**
150:*17*
**IEA-00227119**
147:*18*
**impact** 98:*11*
**import** 100:*10*
155:*11*
**important** 44:*7*
69:*13, 20* 88:*23*
140:*25* 142:*14*
144:*24*
**imported** 104:*24*
131:*4* 153:*22*
**importing** 154:*15*
**imports** 100:*15*
**impression** 130:*1*
160:*11*
**inches** 43:*13, 15,*
*22* 98:*14*
**inclination** 115:*1*
**include** 53:*23*
60:*16* 86:*18*
87:*22* 88:*2*
102:*12* 118:*21, 24*
119:*2* 150:*20*
**includes** 76:*21*
**including** 60:*13*
80:*3* 82:*2* 88:*8*
102:*14* 162:*3*
**inconsistent** 12:*22*
13:*19*
**incorrect** 14:*13*
28:*16*
**increase** 73:*9*
**increased** 155:*12*
**incurred** 88:*14*
**INDEX** 3:*1*
**Indian** 3:*12*
113:*10* 157:*24*
164:*12* 168:*9*
**indicate** 30:*24*
32:*19* 43:*1* 67:*16*
93:*13* 108:*25*
**indicated** 55:*4*
66:*17* 82:*21* 83:*8*
115:*25* 119:*21*
123:*15* 126:*9*
179:*5, 8, 21*
183:*12*

**indicates** 18:*2*
31:*4, 15, 20* 60:*2*
91:*7, 8* 99:*23*
100:*5*
**indicating** 41:*13*
67:*7* 71:*22* 97:*1*
137:*17*
**individual** 110:*13,*
*17* 111:*3*
**individuals** 95:*13*
111:*13, 18, 25*
112:*10* 114:*8*
**indulging** 128:*6*
**industry** 34:*17, 21*
35:*16* 48:*23* 49:*6,*
*7, 12, 15* 61:*7*
62:*12, 14* 73:*19,*
*22* 117:*5, 8, 11*
118:*13* 119:*24*
120:*6* 121:*15*
122:*1, 7, 18*
136:*19*
**inform** 40:*19*
78:*5* 146:*4*
147:*11* 158:*14*
**information** 12:*13,*
*20* 22:*13* 28:*2*
29:*9, 10* 33:*24*
48:*8* 55:*7* 56:*22*
59:*2, 3* 65:*9, 12,*
*18* 66:*1* 94:*6*
96:*8* 122:*13*
124:*24* 135:*11*
162:*24* 171:*12*
173:*5*
**informative**
151:*16*
**informing** 40:*3*
151:*14*
**initial** 35:*1* 160:*6*
161:*1*
**initially** 18:*24*
77:*8* 139:*17*
149:*20, 25* 160:*10*
162:*20*
**Injunction** 3:*22*
14:*3* 39:*23* 40:*5*
42:*7* 64:*24* 65:*4*

70:*9* 76:*14* 82:*10*
92:*9* 125:*13*
**input** 89:*2* 163:*24*
**inquired** 98:*12*
**inquiring** 113:*9*
**inspected** 130:*14*
**instance** 138:*12*
**instructed** 10:*14*
50:*4* 164:*24*
**instructions**
152:*23* 153:*3*
163:*4*
**Insurance** 136:*2*
**integrity** 137:*15,*
*19*
**intended** 9:*7*
67:*11* 86:*23*
**intent** 41:*24* 42:*5,*
*9* 65:*1, 2, 4* 70:*13*
74:*10*
**intentionally**
64:*14* 94:*19*
**interact** 148:*9*
**interested** 183:*15*
**interests** 71:*25*
72:*18*
**interjected** 75:*7*
**internal** 115:*16*
**International** 7:*13*
**internet** 139:*15*
**interpret** 72:*15*
**interpretation**
68:*11* 72:*2*
**interrupt** 80:*5*
95:*10* 119:*13*
**interrupted** 48:*10*
107:*25*
**interruption**
119:*15*
**intervener-
plaintiff** 5:*18*
**Intervenor-
Plaintiff** 1:*7* 2:*2*
**introduce** 17:*4*
150:*16*
**introduced** 161:*24*
**introducing**
174:*16*

**involved** 7:*18*
21:*19* 40:*24*
55:*14, 16* 65:*8*
76:*20* 109:*24*
164:*1* 175:*11*
**involvement**
23:*16* 77:*15*
91:*25*
**issue** 21:*24* 22:*10*
35:*22* 36:*2* 38:*13,*
*16, 17* 50:*13* 54:*8,*
*10, 12* 55:*10*
56:*13* 115:*13*
**issues** 10:*21*
21:*14* 38:*23, 24*
39:*4, 7* 43:*23*
72:*5* 104:*22*
110:*12* 134:*24*
151:*15* 156:*6*
157:*5, 13, 17*
158:*11*
**issuing** 38:*18*
**Italian** 125:*4*
**Italy** 21:*21* 175:*1*
**items** 151:*18*
**its** 14:*7* 48:*6*
49:*22* 50:*6* 66:*25*
135:*19* 137:*2*
158:*23* 160:*12*
181:*7*

**< J >**
**Jacob** 151:*23, 24,*
*25* 152:*1, 6*
153:*14*
**January** 35:*3, 10*
**Jensen** 148:*5, 6*
151:*10* 153:*13*
**Jerry** 175:*25*
**JETERN** 2:*7*
**jibe** 89:*5*
**Joan** 22:*15* 23:*1,*
*3, 15* 140:*9, 24*
144:*8, 16, 24*
145:*17* 146:*3*
162:*3, 10, 24*
163:*3, 16*
**Joan's** 162:*17*

**job** 19:*8* 23:*14*
64:*5* 71:*2* 93:*10*
102:*8* 103:*8, 14*
104:*4* 111:*6*
143:*3* 144:*18, 21*
145:*19* 168:*19*
170:*6* 181:*4*
182:*7*
**Joe** 144:*16*
**jog** 150:*2*
**joined** 130:*16*
**JP** 135:*23*
**JPM** 135:*23*
**July** 147:*20*
148:*13* 149:*17*
153:*18*
**jumping** 79:*5*
128:*8*
**JUNE** 1:*13* 4:*18*
5:*7* 35:*4* 150:*19*
151:*4* 152:*9*
182:*6* 183:*7, 18*
**junior** 16:*14*
**JURAT** 181:*1*
**Justin** 151:*7*

**< K >**
**KANSAS** 1:*7*
132:*18, 19, 24*
**Katherine** 2:*2*
5:*16* 79:*13*
127:*23*
**Katherine's** 179:*1*
**keep** 49:*4* 56:*20*
72:*3* 79:*14* 91:*6*
118:*9* 121:*9*
148:*23*
**Kenny** 175:*24*
**kept** 29:*10*
118:*17*
**kicked** 80:*7*
**kind** 12:*6* 13:*3*
34:*12* 47:*10*
54:*13* 62:*9* 67:*8*
90:*3* 111:*18*
117:*1, 21* 128:*12*
153:*13* 157:*16*
171:*12*

**kindly** 8:*9*
**kinds** 172:*17*
**Klemesten** 175:*25*
**knew** 26:*22*
50:*25* 59:*3* 64:*17*
141:*20, 22*
**know** 7:*25* 8:*1, 2*
9:*13, 21* 11:*7, 18*
12:*12, 18, 19*
17:*14, 16* 22:*1, 17,*
*18* 23:*9, 15, 17*
26:*12* 27:*6* 28:*8,*
*21* 32:*9, 18, 23*
33:*2, 4, 6, 8, 16*
34:*12* 35:*12* 36:*1,*
*25* 37:*19* 38:*14,*
*24* 39:*2, 7, 13, 17*
40:*4* 42:*24* 43:*18,*
*21* 45:*17* 48:*12*
52:*1, 3, 4* 54:*17,*
*20* 56:*1, 7* 57:*11,*
*15* 58:*10, 13*
59:*11* 60:*6, 7*
63:*11, 17* 64:*19*
65:*17* 67:*1, 14*
69:*13, 17, 20, 21,*
*25* 71:*2, 4, 6, 10*
72:*11* 75:*8* 76:*16*
77:*12, 21* 79:*3, 10,*
*15* 82:*5, 7, 17*
83:*11, 16, 25* 84:*6,*
*12* 85:*16* 86:*10*
87:*2, 15* 88:*24*
89:*8, 12, 21* 90:*25*
91:*18* 92:*2, 11, 14,*
*15* 93:*13* 94:*7, 8,*
*9, 12, 24* 96:*6, 11,*
*14, 17, 21, 25* 97:*2,*
*19* 98:*22* 100:*19*
101:*13, 24* 102:*25*
103:*18* 106:*3*
108:*2, 19* 109:*10*
110:*1, 13, 14*
111:*5, 7, 16, 19*
112:*5, 17, 25*
113:*6, 7, 20*
116:*16* 117:*2*
120:*13* 123:*9, 12,*
*18* 124:*13, 15*

128:*6, 7, 8, 10*
129:*1, 18, 24*
130:*10, 12* 131:*18*
134:*12* 135:*14, 15,*
*20* 138:*17* 139:*5,*
*8, 17* 140:*19*
141:*14* 144:*13*
149:*23* 151:*24*
153:*1* 154:*5*
156:*17, 20* 157:*9*
159:*19* 160:*19*
161:*4, 8* 162:*19,*
*21* 163:*2* 165:*23,*
*25* 166:*13* 167:*13*
169:*20* 170:*1, 9,*
*12* 171:*1, 9, 16*
176:*13* 177:*11, 25*
178:*7*
**knowing** 26:*8, 19*
27:*3* 85:*4* 103:*8*
**knowledge** 25:*7,*
*17* 26:*4* 29:*9*
40:*17* 64:*16* 69:*7*
71:*1* 72:*7, 9*
86:*21* 92:*4* 97:*25*
124:*5* 125:*18*
154:*22* 173:*23*
**known** 32:*12*
33:*19* 51:*6*
**knows** 166:*11*

**< L >**
**labor** 155:*13*
**Lack** 95:*24*
**land** 32:*12*
**Landoll** 151:*7*
**lands** 30:*2, 3*
141:*4* 145:*3*
**language** 60:*16*
125:*3*
**large** 44:*13*
165:*3, 5, 7, 16*
**larger** 43:*3, 5, 9,*
*15, 24* 98:*14, 23*
**Larson** 151:*7*
**late** 35:*4, 10*
**laws** 148:*17*

lawsuit  6:9  7:11
14:3, 25  54:15
65:9
lay  136:23
leading  23:13
63:18
lease  146:22
158:1
leases  29:25
leave  45:19
63:14, 16  69:7
125:22
led  169:11
left  63:10
legal  32:17  58:11
65:8  76:7  96:15,
16  114:24  146:4,
15, 16  158:11, 16
length  128:8
Letter  3:11
110:10  111:3
112:12  113:9, 13,
15, 20, 21, 22, 25
114:2, 4, 7  115:2
158:2, 6, 11
167:18, 21, 22
168:1, 4  169:4
173:14, 22  174:1,
8, 12
level  16:8  33:24
lie  86:8, 10
lieu  141:2, 24
142:15  145:1, 13
Life  136:2
lighter  98:13
liked  97:16
limestone  87:17
100:10, 12, 16
limit  98:10
limitation  142:24
limitations  143:20
145:18  148:20
line  112:25  137:6
162:9  164:11
182:8
lines  22:5  42:23
118:22  140:16
157:7
lingo  159:21

LinkedIn  3:20
17:6, 8, 14, 19
list  175:10, 21
listed  151:7
listen  85:22
lists  151:2, 18
170:22
litigation  144:2
167:17  170:21
little  11:23  17:7
20:25  23:21
30:18  39:12
42:19  54:5, 13
59:19, 20, 21  64:7
67:22, 24  69:5
76:3  81:12  91:5
97:19  105:8
114:13  117:19
130:13  143:13
151:17  161:15
165:1  166:12
live  123:2, 12
lived  16:6  122:20,
23, 25  123:1
LLC  1:7, 9  3:15
29:3, 25  88:12
133:3, 8  181:2
182:2
LLC's  29:11
Lloyd  175:25
location  60:12, 19,
24  63:13
lock  115:13
Log  4:10  170:18,
20
logic  62:10, 19
long  7:5  9:9, 10
16:6  17:17  18:18
20:12  26:24
68:15  136:11
156:21  166:13
longer  149:21
150:6
look  17:10  36:24
42:18  66:4  68:1
72:20  74:8  88:10
114:5  128:9
140:13, 14  144:1,
10  147:18  150:10,

14  151:17  153:12,
18  158:20  159:3
162:5  166:24
170:19  175:6
looked  167:1
174:21
looking  15:12
102:10  117:23
129:24  149:16, 17
153:9  166:22
172:22  173:3
175:9
looks  99:19
140:10  148:3
150:18  155:22, 25
158:25  164:14, 18
173:2, 3  174:19
175:10  177:5, 22
loose  67:8
lose  135:18, 19
losing  172:23
lost  81:11  153:16
lot  49:10  78:14
83:1  103:19
125:2  136:25
138:9  166:11
Louise  112:23
lower  139:25
lunch  79:8, 18
Lynn  2:11  5:21

< M >
M.K.'s  178:25
ma'am  132:16
146:1  151:5
168:12  172:10
178:1, 5, 12
main  111:20
maintain  29:13
majority  11:23
62:17  63:13
96:10
make-up  74:11
making  30:14
39:15  40:2  96:25
105:3, 9  108:14
128:24
Maluska  150:21
man  134:7

management
21:15  22:7, 8, 9
32:17  33:23
57:25  102:13
163:23  175:1
manager  18:11,
14, 20  19:4  20:2,
4  21:1, 3, 11  52:8
102:24  123:16, 20
133:14  176:15
manager's  133:19
manhours  155:6
man-hours
171:21  172:22, 25
manner  141:22
manpower  155:13
marathon  9:8
March  35:4, 11
mark  17:5  23:19
36:22  74:1  89:17
99:7  105:24
112:18  134:7
Marked  17:11
23:22  24:3  31:14
37:1  57:24  74:3
75:23  89:18  98:2,
20  99:11  106:4
113:2  114:2, 6
140:12  144:1, 11
147:23  150:24
156:12  159:4
162:7  164:16
167:16  171:2
174:23  177:7
Mary  2:2  5:16
79:13  127:23
179:1
material  43:11
60:8  61:17, 25
62:5, 6, 12, 15, 25
63:17  66:7, 13, 14,
18  67:3  68:8, 9,
13, 15, 17  69:2, 8,
14  70:4  87:19
98:14  99:8
100:11  104:24
105:11  112:1
119:19, 22  121:10
122:9  131:5, 6

137:*13*  138:*3*
139:25  140:*3*
142:25  143:*3*
145:*21*  167:*12*
**materials**  56:*4*
69:*21*  87:*23*
101:*21*  120:25
131:*11*  141:2, *21,*
*24, 25*  142:*14, 15,*
*20*  143:*12*  145:*1,*
*13*  146:6  154:*16*
155:7  162:*12*
**math**  100:*19*
**matrix**  38:*13, 18*
**matter**  5:2  7:6
83:7  152:2*0*
**matters**  33:22
**Matula**  106:2, *3*
**Maysville**  123:*13*
**Mazurowski**
51:*17*  99:*19*
105:*19*  121:8, *21*
129:5, *13*  140:*18*
147:25  151:8
156:*1, 11*  175:*19*
**Mazurowski's**
177:*1*
**McClanahan**  1:*16*
5:*11*  74:3  81:24
89:25  104:*14*
**mean**  9:*3*  32:8
33:*15*  56:7  68:5
72:*12, 14, 15*
79:*18*  82:*19*  83:*4,*
*16*  103:*1*  104:*19*
139:2*1*  159:*15, 20*
179:25
**meaning**  70:*23*
**means**  32:*19*
38:*14*  159:*16*
165:24
**meant**  33:2  34:2
152:9
**meet**  98:*15*
151:*10*  161:8, *12*
**Meeting**  3:*23*  4:6
36:22  37:2, *3, 4, 7,*
*11, 17, 20*  38:*11,*

*25*  150:*18*  151:*3,*
*12*
**meetings**  19:*18*
37:*10*  38:9  77:8
132:*11*
**Megan**  1:22, *24*
5:22  11:*4*  80:25
**members**  123:7
**memorandum**
146:*4, 15*  158:*16*
**memory**  12:*23*
13:*20*  14:*15*
15:25  142:*12*
150:2  164:*23*
171:*4*  173:6
**mention**  42:*13*
142:*17*  159:*18*
**mentioned**  53:*14*
111:*14, 25*  134:2,
*20*
**mentioning**  72:*3*
157:*11*
**message**  142:*4, 9*
**messaging**  157:*16*
**met**  11:*4*
**method**  149:22
150:7
**Mexico**  2:*12*
**Michaela**  115:*16,*
*20*  116:*15*
**Michelle**  1:22
5:*13*
**mid**  161:*10*
**Mid-Continent**
2:8
**middle**  6:*12*  36:6
46:*1*  66:6  91:6
98:*4*  104:*16*
114:*13*
**Mike**  140:*17*
151:8  175:24
176:*1, 3, 11*
**million**  82:*3*
83:24  84:*1*  86:5,
*18*  87:21  88:9, *13,*
*15*  91:9, *13*  94:*1*
95:22  97:7  99:2
105:*18*

**mine**  153:24
154:6
**mineral**  106:*21*
108:*16*  141:*4*
145:*3*  156:6
157:*4, 12, 17*
**MINERALS**  1:6
5:*3, 18*  54:*16*
81:2  87:6, *8, 11,*
*16*  99:25  101:*4,*
*10*  107:*4*  109:*4*
114:*14*  116:*1, 11*
127:24  143:6
157:25  169:*1*
181:2  182:2
**mining**  141:6
145:5  146:*17, 22*
148:*16*  149:8
151:22  152:*10, 13*
165:6, *17*
**minus**  117:*12*
**minutes**  55:5
166:9, *14*  178:*14*
**mislead**  41:2*5*
42:5  64:*11*  94:*15*
95:*1, 14*
**misleading**  65:*13*
**misled**  94:*13*
**missing**  75:2
**Misstates**  26:*10*
**mistruths**  76:9
**mitigation**  151:22
**mixed**  100:9
160:*14*
**mknagle@pipeste**
**mlaw.com**  2:5
**Mmm-hmm**
42:22  122:*10*
129:*10*  130:9, *11*
131:2, *13*  133:*15*
134:8  135:*14*
140:2*1*  144:*12*
145:23  151:*19*
155:*17*  160:*1, 4*
161:*3*  163:*1*
169:*10*  173:*11*
**MODRALL**  2:*11*
**moment**  153:8
**moments**  153:9

**money**  97:*14, 16,*
*19*  98:*19*  99:24
101:*10*  105:5
109:*19, 23*  116:2,
*11*
**month**  19:*18*
35:2*1*  145:25
**monthly**  37:2, *4,*
*10*  38:9, *11*  77:8
132:*10*  174:25
**months**  20:*16*
177:*12*
**MOSKALUK**
1:*12*  3:3  4:*17*
5:2, *9*  6:2, *11, 21*
23:23  127:22
151:9  167:2*0*
170:2*3*  173:5
177:*4*  178:22
180:*14, 17*  181:*5,*
*12, 17*  182:*4*
183:8
**Moskaluk's**  3:2*0*
**Motion**  3:22  14:*3*
**move**  45:*17*
142:2*0*  155:*19*
161:23  170:*14*
174:*15*
**moved**  60:*11, 18,*
*23*
**movement**  137:*16*
**Moving**  164:8
**multiple**  21:*19*
**Mutual**  136:2

**< N >**
**Nagle**  2:2, *3*  3:5
5:*16, 17*  79:*14*
127:*17, 21, 23, 24*
135:*4*  141:*14*
145:*16*  146:9, *20*
149:*15*  163:8
166:*10, 21*  170:*1*
171:25  174:*13*
178:6, *15*
**name**  6:7, *10, 12*
20:*24*  21:8  30:*15*
32:*1*  46:*10*  51:25
98:7  110:*17, 21,*

25 127:22 133:18, 19, 24 134:5 167:24

**names** 5:8 6:20 132:5

**Nation** 32:6 81:4 86:19 104:23 105:7 106:20 108:16 141:3 145:2 146:10, 22 147:11 148:16

**native** 66:14

**nature** 11:17 86:8 94:20 155:6 163:21

**necessarily** 35:19 79:19

**necessary** 50:12 126:19 149:9 152:15, 23

**need** 24:4 80:6 115:13 146:17 147:8 149:1 153:16 157:16 158:15, 20 162:11

**needed** 52:16 53:3, 18 56:5 58:1 147:3

**needs** 115:15

**negotiating** 178:3

**never** 21:11 33:24 55:16 86:23 90:10 91:1 109:24 120:17 121:9 145:12, 14

**New** 2:12 54:3 60:11, 19 104:11 150:12 170:8

**nice** 124:18

**nicety** 138:7

**nickname** 6:22

**Nicoletti** 151:9

**night** 136:16

**ninth** 24:19

**Nolan** 1:16 5:12

**normal** 22:5 35:17 75:3 165:4

**normally** 38:10 41:11 61:16

73:20 75:4 111:19 131:6 138:11

**NORMAN** 2:7

**NORTH** 1:9 16:4 17:23 18:3 125:24 129:21

**northeast** 30:3

**NORTHERN** 1:1, 17 5:5

**Northwestern** 136:2

**Notary** 181:16, 23

**note** 75:11 100:9 140:7, 9 144:23 150:17 159:12, 17 160:5 162:2 164:9, 14 177:2

**noted** 66:15

**Notes** 4:6 150:14, 19 166:24 170:23 171:16 172:12

**notify** 74:12

**noun** 38:17

**November** 80:2 82:1 88:7

**nudge** 161:16

**number** 67:23 74:6 81:23 82:6, 8 83:5, 12 84:1, 6, 12, 15, 16, 18, 19, 22 85:8, 18 86:5, 17 89:12, 19 95:14 99:1, 3, 13 126:6 155:12 174:6

**number-crunching** 173:25

**numbers** 83:17, 20 89:3, 5 90:10 91:1, 19, 22, 24, 25 92:2, 10, 11, 16, 21 93:1, 3, 4, 6, 10, 14, 17, 18 94:5, 8 97:17 100:7, 20 102:18 106:9 172:5, 6, 9, 17, 20 173:7, 21 177:17, 19

**numeral** 67:22, 23, 25

**NW** 2:12

**< O >**

**oath** 49:21 53:7 57:11, 15 63:21 64:12 75:16 78:5 80:16 82:18, 22 85:4, 15, 24 127:8 181:5

**Object** 10:7, 12 12:9, 24 13:16 19:23 21:16 22:21 23:5 26:10, 21 27:5, 22 28:19 31:1, 17, 22 32:14, 22 33:3, 20 34:3, 22 35:24 38:20 39:24 42:2, 8 45:7, 14 46:21 47:16 48:3 49:18, 24 50:8, 15 51:2, 13, 18 52:12, 18 53:4, 10, 19, 25 54:19 55:12, 22 56:6, 14 59:5 60:5 61:15 62:3, 23 64:3, 13, 25 65:6, 14, 16, 21, 23 66:21 67:10, 19 68:20 69:10, 16, 24 70:11 71:15 72:1 75:24 76:10, 15 77:6, 17, 24 79:2 81:5, 11, 19 82:12 84:2, 7, 23 85:6 86:3, 15, 20 87:1, 9, 13, 24 88:20, 25 89:11 91:16 92:13, 18 93:5, 16 94:2, 10, 18 95:4, 15, 24 96:4 97:11 98:21 100:1 101:6, 12, 23 102:22 103:10 104:7 105:14, 20 107:6, 17 108:21 109:21 110:3

112:3 113:3 115:7 116:4, 12 118:2 120:1 121:12 122:2 123:21 124:6, 12, 17 125:1, 14, 20 135:1 141:12 145:9 146:8, 18 149:11 163:7 169:23 171:19 174:9 180:9

**objection** 10:13 13:13 40:7 56:16 109:12

**observing** 5:23

**obtain** 109:4 113:14 169:5, 12, 14

**obtained** 110:8 114:15 169:2, 21

**obtaining** 87:7 107:4 169:8

**occasionally** 19:17

**occur** 111:9

**occurred** 131:18

**occurring** 134:19

**October** 4:4 34:7, 13 35:1 105:25 112:17 114:10 167:18 173:2, 8 174:19 175:2

**offhand** 7:20 20:14

**OFFICE** 1:17 5:11, 14 6:8 111:21 132:10 176:15 183:17

**offices** 183:7

**official** 110:6

**offsite** 162:14, 21

**Oh** 7:19 16:7 67:24 90:15 93:6 110:14 113:5 138:8 141:18 144:2 153:16 171:7 173:16

**Okay** 5:24 6:20, 25 7:5, 10, 21, 24 8:13, 14, 23 9:5,

18, 23, 24  10:10,
15, 17, 20  11:15,
21, 25  12:6  13:22
14:9, 12, 15  15:4,
14, 20  16:2, 8, 16,
19, 25  17:18, 21
18:2, 10, 14, 18, 23
19:3, 7, 12, 15, 19
20:1, 12, 19  21:4,
9, 13  22:6, 15, 19
23:3  24:16, 24
25:3, 18  27:11, 16,
24  28:5, 13  29:23
30:14  31:19, 24
32:3, 10, 24  33:9,
25  34:5, 12, 24
35:9, 20  37:3, 6,
13, 17, 24  38:5, 12,
22  39:2, 5, 10, 14,
20  40:18  41:9, 12,
16  42:11, 22  43:5,
14  44:7, 12, 16
45:3, 20  46:1, 16
47:2, 10  48:9, 11,
22  49:14, 20  50:2,
11  51:4, 9, 25
52:9, 25  53:13, 16,
22  54:20  55:1, 4,
17  56:24  57:2, 22
58:10, 13  59:1, 7,
14  60:1, 10  61:1,
10  62:9, 18  63:19
64:17, 21  65:3, 11,
18  67:6, 15, 21
68:12, 17  69:19
70:2, 14, 20  71:7
72:20  73:21, 24
74:5  75:11  76:12,
18  77:4, 12, 20
78:1  79:4  80:8
81:2, 7, 21, 24
83:8, 22  84:4, 17,
21  85:2, 12  86:9,
17, 22  87:3, 18, 20
88:5, 22  89:6
90:12, 15  91:3
92:24  94:12  97:4
98:1, 25  99:6, 23
100:25  101:16

102:3, 9  103:7
104:10  105:16
106:6, 19  107:23
108:6, 18, 24
109:3, 7, 17
111:12  112:7, 16
113:4, 8, 24  114:9,
11, 19  115:1, 9, 23
116:16, 19, 22
117:18  118:4, 9,
12, 17, 21  119:9,
18  120:4, 17, 23
121:8  122:20
123:7, 14, 23
124:9, 14, 20
125:7  126:16, 18,
21, 24, 25  127:12,
15, 19  128:5, 21
129:15, 24  131:21
132:5, 14, 22
133:1, 7, 11, 21, 23
134:1, 11, 16
135:7, 21, 25
136:10  139:14, 21
140:4, 14  142:2,
12, 17  143:23
144:17, 23  145:16
146:2, 12  147:7,
10, 14  148:3, 9, 23
149:15  150:5, 9,
12  151:1, 6, 17
152:2, 8, 12, 17
153:3, 7, 15, 17
154:4, 9, 19, 24
155:2, 8, 19, 21
156:16, 20  157:2,
10, 15, 23  158:5, 9,
19, 22  159:12, 17
161:6, 21  162:9,
23  163:3, 8, 15, 20
164:7, 18, 21
165:1, 15, 19
166:2, 7, 21  167:7,
14  168:3, 13, 24
169:20  170:1, 13,
14  171:7, 10, 25
172:16, 20  173:2,
17, 19  174:13
176:1, 11, 13, 16,

18, 20, 22  177:9,
13, 22  178:2, 6, 15
179:18  180:11, 15
**OKLAHOMA**
1:1, 17, 18  2:4, 9
5:5  20:24  24:20
30:4  60:15
113:10  122:20, 24
123:8, 9  181:17,
23  183:2, 4, 17, 18
**old**  13:4
**once**  19:17  23:14
45:16  82:13
91:18  120:21
132:10, 11  134:13
145:19  168:10
**ones**  16:1  48:7
128:19
**ongoing**  35:6
**onsite**  153:24
**on-site**  34:8
**operation**  113:11
131:9  159:14
**operations**  113:15
**opportunity**  8:4
114:4  154:21
**opposed**  149:3
153:4
**opposition**  40:5
82:10  125:12
**option**  167:4, 8
172:14
**Option/Change**
4:2
**options**  98:18
**Order**  4:2  20:7
64:23  89:16
90:11, 16  91:3, 7
98:3, 6, 23  104:12
116:11  128:11, 13
129:16, 20  130:2
149:20
**orders**  90:6
91:11  94:5
128:14, 20  129:4,
7, 12  130:5
**Organizational**
3:14

**organization's**
46:10
**original**  88:11, 17
89:8  91:8  93:22,
24  95:22  97:8
117:21  153:23
154:5
**originally**  130:14
154:10  155:15
**Orlando**  7:11, 13
16:23
**OSAGE**  1:6, 7
3:15, 23  5:3, 4, 18
20:11, 13, 21  21:2,
4, 10  23:4, 10, 16
27:14  29:3, 4, 11,
13, 20, 24  30:4, 5,
15  32:6  34:6
54:16, 17  55:18,
19  66:17  69:14
72:6, 23  74:9
76:21, 22  77:2, 4,
10, 12, 15  81:3, 4
82:24  83:11, 14
86:19  87:6, 8
88:12, 14, 18  90:7
97:22  99:25
101:4  102:6
104:22  105:7
106:15, 20  107:4
108:16  110:9
113:10, 11  114:16
116:1  122:16, 22
127:24  131:22
132:1, 17  133:1, 3,
6, 8, 12  135:21, 25
136:6  138:19
139:19  140:8
141:3, 11  144:2, 7,
19  145:2, 18
146:10, 16, 22
147:11  148:10, 16
151:22  152:10, 13
155:24  157:20, 25
158:24  162:1, 17
164:10, 12  167:17
169:3, 21  170:21
173:3  174:17
175:14  176:2

177:*3, 5, 10, 24*
178:*3* 181:*2*
182:2
**outcome** 156:*14*
167:*11*
**outside** 58:*12*
66:*13* 96:*16*
104:*24* 111:*3*
122:*21*
**overall** 102:*13*
130:*1*
**oversaw** 65:*19*
**oversee** 19:*10*
102:*7*
**oversight** 42:*15*
**owned** 81:*3, 9, 17*
**owner** 74:*12, 15*
97:*15*
**owners** 30:2

**< P >**
**p.m** 37:*9* 80:*10,
11, 12* 127:*2, 3, 5*
166:*17, 18, 20*
178:*17, 18, 20*
180:*16, 18*
**package** 120:*9, 10*
**pad** 62:*6, 7*
**pads** 66:*10, 11*
**page** 1:*21* 3:2, *20*
4:*1* 17:*6, 8, 9, 15,
19* 24:*16, 17* 25:*3*
26:*4* 28:*6* 29:*5,
23, 24* 42:*20, 21,
23* 60:*14* 66:*4, 5,
7* 67:*23, 24, 25*
70:*15* 72:*21* 74:*8*
81:*22, 23* 91:*6*
98:*3, 4* 102:*10, 11*
104:*16* 106:*7, 19*
108:*5* 112:*20*
114:*21* 115:*10*
151:*18* 170:*19*
175:*6, 7, 9* 182:*8*
**pages** 28:*6*
183:*10*
**paid** 87:*21*
101:*25*

**paragraph** 28:*23,
24, 25* 29:*24* 32:*4*
33:*9* 34:*5, 24, 25*
36:*6* 39:*11* 59:*18,
19* 66:*5* 70:*15*
72:*20, 21* 76:*18*
78:*21* 79:*5, 6*
80:*1* 81:*22* 88:*6*
102:*11*
**paralegals** 5:*14*
**parenthesis**
151:*23*
**parking** 7:*13*
**Part** 8:*15* 9:*19,
20* 28:*25* 34:*19*
41:*13, 21* 42:*16*
60:*18* 75:*5* 78:*3*
90:*8* 93:*10* 103:*4*
120:*9* 123:*4*
126:*7* 138:*13*
143:*16* 148:*15*
160:*6, 10* 161:*16*
163:*15*
**Partially** 145:*10*
**participants**
150:*20*
**participated** 139:*1*
**particular** 19:*21*
50:*20* 62:*5* 63:*14,
16* 69:*7* 143:*1*
**particulars** 85:*10*
**parties** 53:*14*
56:*2* 65:*10* 79:*10*
131:*10*
**partner** 127:*23*
**parts** 42:*19*
**party** 183:*14*
**pass** 127:*16*
128:*15, 16* 178:*11*
**passed** 128:*21*
158:*7* 168:*1*
**Pat** 176:*13, 14*
**pause** 158:*12, 15*
**pauses** 161:*11*
**pay** 32:*16* 86:*23*
90:*24* 101:*21*
**payment** 88:*2, 3*
**payments** 86:*18*

87:22
**PDF** 24:*18* 28:*6*
**pedestal** 137:*4*
**penalty** 25:*6*
26:*2, 8* 28:*17*
32:*20* 53:*7* 85:*24*
135:*3, 5, 8*
**people** 11:*22, 24*
12:*11, 14* 21:*19*
29:*9* 33:*23* 48:*6*
76:*20* 93:*18* 94:*4*
129:*2* 133:*4, 8*
**percent** 44:*1*
100:*12, 13* 172:*7*
**perfect** 99:*9*
**perfectly** 146:*16*
**perform** 153:*22*
**performed** 74:*14*
**period** 35:*13*
163:*13*
**periods** 132:*8*
**perjury** 25:*6*
26:*3, 8* 28:*18*
32:*20* 53:*8* 80:*16*
85:*24* 127:*8*
**permissible**
143:*11* 145:*8*
**permission** 55:*20,
24* 87:*7* 99:*25*
116:*1*
**permit** 87:*7*
101:*4* 106:*21, 24*
107:*4, 8, 13, 14, 15,
16, 22* 108:*15, 16,
20* 109:*1, 4, 9, 10,
15, 18* 110:*8*
113:*15* 114:*15*
146:*9, 17, 22*
147:*8, 12* 149:*1, 8*
151:*22* 152:*10, 13,
15, 22, 25* 158:*1, 4*
169:*2, 6, 8, 14, 21*
170:*7*
**permits** 115:*4, 18*
**person** 7:*12*
19:*20* 22:*17* 23:*7*
38:*6* 58:*7* 93:*1*
94:*25* 95:*7*
110:*20* 124:*23*

125:*17* 168:*3, 13*
171:*8*
**personally** 128:*22*
**person's** 134:*4*
**pertain** 151:*13*
172:*25*
**pertaining** 33:*22*
171:*21*
**pertinent** 20:*5*
148:*12*
**Phillips** 114:*1*
167:*19* 173:*15, 22*
174:*1, 8*
**phone** 22:*3, 4*
**phrased** 42:*16*
71:*20*
**picture** 165:*22*
**pieces** 45:*4, 12*
165:*9*
**PIPESTEM** 2:*3*
5:*17* 127:*24*
**pit** 137:*24* 138:*2,
5* 139:*6, 9, 18*
150:*1, 6*
**pits** 138:*17*
**place** 40:*20, 22*
41:*21* 45:*19* 67:*3*
111:*10* 143:*3*
144:*21* 151:*12*
161:*2* 163:*17, 21*
181:*9*
**placed** 152:*19*
**Plaintiff** 1:*4, 12,
15*
**plaintiffs** 64:*23*
76:*14* 92:*9*
125:*12*
**Plaintiff's** 3:*21*
**plan** 74:*13*
119:*21* 130:*19, 25*
139:*9, 18* 154:*10*
160:*6, 10*
**planned** 130:*22*
149:*25*
**plans** 117:*21*
120:*7* 121:*3, 23*
122:*12* 149:*20, 24*
**plate** 137:*6*

**play** 125:*3*

**players** 170:*9*

**please** 5:7 10:*24*
36:*11* 78:*19*
81:*13* 100:9
115:*12, 19* 140:24
142:4 156:*6*
163:9

**plus** 110:23
117:*12*

**point** 9:*11* 17:*18*
75:22 79:7, *15, 19*
98:5 104:*21*
105:*13* 106:*20*
116:*10* 147:5
154:*14* 161:9
175:2

**points** 57:*14*
115:*17, 24* 116:9,
*17, 20*

**Ponca** 122:*25*

**portion** 13:*11*
32:*4* 33:9, *10*
45:23 69:5 122:*4*

**position** 97:*21*
106:*14* 125:*11*
147:*12*

**possession** 29:*20*

**possible** 73:*10*
129:*17*

**possibly** 7:*4* 77:*8*
109:*14* 165:*6*
167:*1* 171:22

**POWER** 1:9
17:23 18:*3* 19:2
46:23 48:7
129:*21*

**PR** 112:*24, 25*
113:*1*

**practical** 153:*21*

**practice** 29:*12*
49:*16* 60:22 61:*6*
62:*14, 21* 64:5
73:3, *19* 74:20
75:*17* 78:22
118:*13* 120:*6*

**preference** 79:*11,*
*23*

**Preliminary** 3:22
172:5

**prep** 11:*9*

**preparation** 14:7
29:2 35:5

**prepare** 10:*17, 22*
11:2 15:*10, 15, 24*
24:2 28:9 29:*13*
31:*15* 172:*17*
173:7

**prepared** 14:*23*
25:23 30:*17, 25*
31:*4* 54:2 58:*10*

**preparing** 49:*20*
155:*3* 172:*12*

**PRESENT** 1:22
82:*15* 86:6 99:*3*

**presented** 28:*10*
32:*1* 58:*3, 4, 6*
59:*3* 92:*17* 96:6
103:7 158:2

**preserving** 10:*13*

**president** 38:*3*
48:*15* 106:*17*
108:9

**presidents** 52:*20*
108:*10*

**pretty** 126:22

**prevent** 179:*16*

**prevents** 179:*8, 12*

**previous** 57:*19*
75:*13* 80:*19, 21*
91:*11* 114:20
127:*10, 13* 147:*17*
168:*14*

**previously** 75:*13*
82:*21* 98:2 114:2
123:*15* 144:*1*
147:*16* 155:20
158:*23* 167:*16*
175:23 176:25

**Price** 21:*8* 38:*1,*
*2* 48:*14* 88:*12, 18,*
*24* 89:9 91:*8*
93:*23, 24* 95:*21,*
*23* 97:6, 7, *8*
101:*15* 110:*11*
115:*11, 24* 116:9,
*15* 125:*15, 17*

**Preliminary** 128:*16, 25* 135:*10*
141:*19, 23* 142:*13*
146:*3* 152:*20*
157:*10* 158:*8*
159:9, *11* 164:*19*
165:2 168:2

**prior** 17:*21*
26:*10* 40:*21*
51:22 57:*17, 18*
75:22 147:*24*

**Priv-000089** 144:7

**Priv-000094** 162:*1*

**Priv-000111**
170:*1*

**Priv-000165**
164:*11*

**Priv-000243**
167:*18*

**Priv-108** 173:*3*

**privately-owned**
30:*1*

**Privilege** 4:*10*
11:*8* 170:*18, 20*

**privileged** 171:*12*

**privy** 21:*20* 93:*4*

**Probably** 20:*15*
28:*20* 39:*1* 56:22
63:*1* 83:*17* 84:*13*
85:8, *18* 86:5
88:*4* 97:*15*
125:*15* 132:9

**problem** 11:*1*
21:*24* 22:*10*
38:*18* 116:7

**problems** 21:*14*

**Procedure** 3:*14*
4:*18* 54:4 98:*13*

**proceed** 109:*14*

**proceeding** 55:*10*
109:*17*

**proceeds** 102:*15*

**process** 39:*17, 21*
40:*3, 10* 41:*14, 25*
42:6, *12* 48:*24*
49:9 54:*21* 55:7
58:23 60:*13, 17,*
*21* 61:*12, 24*
62:*11, 19, 20* 63:5,
8, 9, 25 64:*18, 19*

65:*19, 20* 77:23
78:*6* 95:*8, 11, 12*
97:*24* 104:*18*
107:8 118:*15, 18*
128:*13* 165:*13*
170:*16*

**prod** 20:*11*

**production** 99:*16,*
*17*

**Project** 3:*23* 4:2,
*11* 12:23 13:*1, 3*
*19*:*10, 13, 21*
20:*10, 11, 13, 17,*
*19, 21* 21:2, *3, 5,*
*10, 24* 22:*10* 23:4,
*8, 11, 16* 29:6, *8*
30:*5, 19* 32:*11*
33:*17* 34:6, *15, 16*
35:*17, 22* 37:22
38:*23* 50:20 51:*1*
52:8 55:*18* 63:2,
*14* 66:*13, 20* 67:5,
*7* 72:25 73:*3*
75:*17* 76:*21*
77:*16, 18, 19*
78:22 80:*3* 81:9,
*17* 82:2 87:22
88:*8, 13* 90:7
97:*10, 14, 17, 22*
99:2 100:23
102:6, *14, 15, 24*
106:*15* 109:*5, 19,*
*23* 110:5, 7
111:*13* 113:*12*
116:*3, 20* 118:*4,*
*19* 120:*14, 18, 22*
122:*16, 21, 22*
123:5, *15* 125:24
126:4, *14* 130:*16*
132:8, *13* 133:2,
*14, 16, 18* 134:*13,*
*18* 135:*17* 136:*3,*
*7* 138:*4, 16* 141:*1,*
*3, 4* 142:6 144:25
145:2, *3* 147:*24*
148:*16* 149:9, *21*
152:24 170:25
171:*17* 174:*18*

175:11  176:2
**projected**  160:20
**projects**  49:11, 12
60:13, 15  63:11
66:20  81:3
118:10
**proper**  61:20
**properly**  144:22
**property**  30:6
32:5  33:11  35:2,
6
**protocol**  111:19
**provide**  48:7
123:18
**provided**  65:9, 11
82:6, 7  83:18, 19
84:14  89:2  90:2
92:10  93:7, 18
94:25  96:7  100:5
105:19  120:21
124:25  179:22
**providing**  44:25
55:6
**provisions**  178:4
**Public**  113:7
181:16, 23
**pull**  23:18  36:21
57:23  66:2  73:24
74:7  89:15  98:1
99:6  105:23
112:16  113:25
114:2  128:9
143:25  147:15
176:24
**pulled**  17:7
89:22  150:13
**purchase**  132:12
**purchased**  131:5
141:25  142:15
**purchasing**
154:16  167:8
**purpose**  9:25
27:11  43:2, 6, 10,
21  44:17  45:4
50:13  61:13
62:22  66:14  68:3,
8, 18  70:4, 24
76:12  79:1

**purposes**  68:14
70:17, 21, 23
71:10, 13, 22
72:13
**pursuant**  4:17
25:5  26:1
**pursue**  98:12, 18
**pursued**  167:5
**put**  25:24  40:25
41:4  43:23  65:10
94:5  143:7
154:21  159:24
161:2
**putting**  143:12
165:8  176:9

**< Q >**
**qualified**  125:10
**quantities**  46:11
49:5
**quantity**  120:9
**quarry**  113:11
140:24  162:15, 21
**quarrying**  113:14
115:4
**question**  8:13, 16
9:13, 14, 15, 19, 20
10:2, 4, 5, 12
12:20  13:9, 15, 25
14:19  22:24  32:7
33:13  36:9  41:19
44:10, 16  45:21
49:14  50:22
52:25  54:13
56:11  61:23
71:19, 20  76:17
78:12, 18, 25
81:13  83:17
85:23  113:12
121:16, 17, 18, 19
122:4  125:7, 8
143:18  149:6
179:5
**questioning**
176:24  178:22
**questions**  8:4, 10,
12  59:9, 11  128:1,
3  136:18  166:23

168:20  178:8, 25
179:1, 4  180:13
**quick**  57:1  111:6
126:23  150:15
179:4
**quickly**  126:24
**quite**  10:25  128:7

**< R >**
**rain**  151:15
**ran**  17:16  41:5
**Randy**  151:8
153:13
**range**  99:12
**rate**  161:7
**rationale**  164:4
**Ray**  2:7  5:20
10:7  11:4  12:9,
24  13:13, 16
19:23  21:16
22:21  23:5  26:10,
21  27:5, 22  28:19
31:1, 17, 22  32:14,
22  33:3, 20  34:3,
22  35:24  38:20
39:24  40:7  42:2,
8  45:7, 14  46:21
47:16  48:3  49:18,
24  50:8, 15  51:2,
13, 18  52:12, 18
53:4, 10, 19, 25
54:19  55:12, 22
56:6, 14, 16  57:3
59:5  60:5  61:15
62:3, 23  64:3, 13,
25  65:6, 14, 16, 21,
23  66:21  67:10,
19  68:20  69:10,
16, 24  70:11
71:15  72:1  75:24
76:10, 15  77:6, 17,
24  79:2, 18  80:25
81:5, 11, 19  82:12
84:2, 7, 23  85:6
86:3, 15, 20  87:1,
9, 13, 24  88:20, 25
89:11, 19  91:16
92:13, 18  93:5, 16
94:2, 10, 18  95:4,

15, 24  96:4  97:11
98:21  99:12
100:1  101:6, 12,
23  102:22  103:10
104:7  105:14, 20
106:8  107:6, 17
108:21  109:12, 21
110:3  112:3
113:3  115:7
116:4, 12  118:2
120:1  121:12
122:2  123:21
124:6, 12, 17
125:1, 14, 20
135:1  141:12
145:9  146:8, 18
149:11  163:7
169:23  171:19
174:9  178:13, 21
180:9, 13
**read**  13:11  14:10
24:5, 13  25:9, 13,
14, 15  28:25
29:16  35:7  39:12
45:23  46:5  73:6
91:14  105:1, 13
106:25  114:17
140:15  158:7
178:23  179:19
180:14  181:6
**reading**  73:15
113:18  115:6, 21
141:7
**ready**  178:10
**real**  150:14
**realization**  131:17
**realize**  94:22
152:4
**realized**  101:2
**really**  12:12  13:2,
6  20:14  21:20
26:14  30:9  35:14
36:19  37:16  39:9
42:16  45:16
47:18  53:20
58:21  59:13  60:6
66:25  67:13  77:2
79:3  83:23  92:22
93:8  96:7, 9, 21

103:*18*  107:*18*
109:*16*  110:*4, 15*
111:*19*  125:5
128:*21*  130:*10*
131:*20*  134:*21*
143:*14*  147:9
148:8  150:8
152:*11*  155:14
156:*14*  157:15
161:*20*  162:22
168:*1, 20, 23*
170:8, *9*  171:6
172:6, *21*  173:9
174:*10, 12*  176:*17,*
*20*  177:*18*
**realm**  102:*2, 5*
**re-ask**  9:*22*
44:*16*  50:22
69:*19*  81:*12*
92:*24*  125:8
**reason**  8:*25*  9:*18*
46:*18*  49:4  60:*3*
63:*21, 25*  70:2, *5,*
*7*  97:*5*  107:9
139:*16*  144:*4*
171:*14*
**reasonable**  72:*25*
**reasoning**  30:9
164:*4*
**recall**  21:*1*  24:*24*
28:*11*  31:7, *9*
33:*4, 6*  35:*15*
36:*4, 10, 17*  37:*16*
39:*4, 9*  45:*16*
50:*1, 9*  53:*20*
58:*5, 21, 25*  59:*13,*
*16*  76:*3*  77:2, *14*
84:*25*  90:*3*  99:*21,*
*22*  103:*2*  108:*1*
111:*8, 12*  113:*18*
115:*6, 21*  116:*19*
126:*7*  129:*14, 17*
130:*5, 16*  131:*17*
132:*5*  133:*18*
134:*4, 12, 14*
135:*4, 7, 13*  136:*9*
142:*7*  145:*24*
146:*13, 14*  147:*7,*
*10, 22*  148:6

149:*7, 24*  150:*3, 4,*
*5*  151:*3*  152:*12*
154:*14, 18, 24*
156:*10, 16, 24*
157:*6, 10, 15, 23*
158:*5*  159:*2*
162:*6*  163:*11, 15*
164:*23*  167:*4, 7,*
*20*  168:*16*  169:*4*
171:*14*  172:8, *16*
177:*9, 13*
**receive**  129:*3, 4*
**received**  58:9
115:2  158:*6*
163:*5*  173:*14, 22*
177:*12, 14*
**receiving**  177:9
**recess**  57:6  80:*11*
127:*3*  166:*18*
178:*18*
**rechecking**  100:*21*
**recipient**  147:*19*
153:*19*
**Reck**  175:*25*
**recollect**  75:*3*
**recollection**  12:*7*
38:*8*  51:*5*  172:*1,*
*11*
**recommendations**
44:*6*
**record**  5:6, *8*
6:*10*  8:8, *15*  9:*4*
10:*1*  47:*5, 14*
48:*20*  49:*17*  50:*4,*
*12*  51:*10*  52:*10*
57:*4, 7, 10, 18*
75:*11*  80:6, *9, 13,*
*15*  116:*25*  127:*1,*
*4, 7*  140:*7*  150:*17*
164:*10*  166:*16, 19*
177:*2*  178:*16, 19*
179:*10, 11*  180:*15*
**recorded**  47:*25*
49:*1, 23*  52:*17*
53:*3, 8, 18, 24*
56:*11*
**recording**  48:*13*
49:*8*

**records**  29:*3, 8,*
*14*  46:2  47:*12*
82:*23*  83:*1, 10, 14,*
*20*
**recurring**  151:*12*
**Red**  112:*23*
**reda**  177:*18*
**redacted**  91:2
177:*18*  179:*23, 24,*
*25*  180:*1*
**redaction**  179:*24*
**Redirect**  3:*6*
179:*2*
**redlined**  117:*23*
**redo**  47:*11*
**refer**  52:2  95:*7*
150:*23*  179:*10*
**reference**  31:9
44:*25*  179:*6*
**referenced**  47:*1*
113:*20*  116:22
**referencing**  109:*8*
**referred**  46:*19*
100:*7*
**referring**  14:*1*
22:*19*  46:*7*  60:*18,*
*19*  71:*11*  75:*12*
76:*22*  77:*10*
87:*16*  116:*14*
137:*11*  159:22, *23*
**refers**  30:*4*
151:*21, 24*
**reflect**  65:*19*
120:6  126:*14*
160:*13*
**reflected**  119:*7*
120:*3, 8*
**reflective**  131:*11*
**reflects**  40:*15*
**refrain**  114:*14*
168:*25*
**refresh**  164:*23*
173:*6*
**regard**  139:*24*
**regarding**  83:*12*
99:*8*  113:*9, 10*
136:2  156:*4, 23*
170:*24*

**regards**  119:*5*
145:*20*
**regroup**  41:*6*
**regular**  29:*12*
75:*7*
**regularly**  29:*11*
**regulatory**  22:*16*
**reiterate**  57:*14*
**relate**  7:*10*
**related**  7:*14, 16*
130:6  174:*1, 5, 7*
**relates**  55:*9*
**relating**  22:*10*
23:*10*  56:*15*
**relation**  23:*4*
144:*19*  172:*21*
**relations**  89:9
97:*23*  106:*14*
108:*15*  113:*7*
**relationship**
174:*12*
**relative**  14:*25*
90:*7*  116:*20*
183:*14*
**relevant**  89:*7*
**relied**  92:*8*
**relies**  20:*6*
**relocated**  117:*2*
**rely**  92:*10, 16*
93:*3*
**relying**  40:*25*
93:*14*
**remain**  60:9
61:*19*  68:6
137:*21*  143:*2*
**remaining**  62:*25*
**remember**  7:*19*
13:*2, 5*  17:*12*
20:*14, 24*  25:22
26:*15*  28:*12*
35:*14*  46:*9*  63:*15*
82:*8, 14*  83:*3, 6,*
*23*  84:*16*  85:*19*
89:*14*  92:5, *22*
94:*11*  96:*7, 10, 23*
103:*2, 17, 20*
108:*3*  111:*5*
116:*21*  129:*11, 15*
132:*21*  133:*23*

134:9  141:*18*
156:*13*, *14*, *15*
164:*17*  167:*23*
168:*11*, *20*, *23*
174:*21*

**remembered**
85:*10*

**remembering**
136:*13*

**remind**  80:*15*
127:*7*

**removal**  141:*4*
145:*3*

**remove**  141:*1*, *21*
144:*25*

**removed**  165:*3*, *8*

**removing**  145:*21*

**renew**  13:*13*

**Renewable**  3:*16*
34:*20*

**rental**  171:*22*
173:*1*

**repeat**  10:*24*
25:*11*  36:*11*  42:*3*
78:*14*, *18*  128:*2*

**repetitive**  128:*2*

**rephrase**  9:*22*
121:*18*, *19*  143:*17*

**replace**  61:*17*

**report**  19:*9*  96:*8*
126:*13*  131:*10*
151:*14*  159:*6*, *7*
160:*11*  174:*25*

**REPORTED**  1:*25*
19:*16*  29:*10*  86:*7*
111:*17*  122:*13*

**reporter**  5:*24*  8:*6*,
*22*  13:*8*, *10*, *11*
45:*21*, *22*, *23*  80:*6*
182:*5*

**reporter's**  144:*5*

**represent**  5:*15*, *17*
6:*8*  47:*23*  100:*6*,
*20*  127:*24*  144:*5*

**representations**
86:*11*

**representative**
133:*5*

**represented**
106:*17*

**representing**  47:*4*

**request**  39:*23*
40:*5*  42:*7*  64:*23*
65:*4*  70:*8*  76:*14*
82:*10*  125:*12*
129:*16*  173:*13*

**requested**  13:*11*
45:*23*  170:*25*
177:*11*

**requests**  92:*9*
129:*20*  130:*2*
173:*10*

**require**  146:*25*
157:*25*

**required**  27:*4*
41:*14*  46:*13*, *14*
48:*19*  106:*21*
108:*17*  115:*4*, *18*
126:*10*  147:*12*

**requirement**
43:*14*, *19*  51:*9*
56:*17*  67:*4*, *7*, *8*
120:*21*

**requirements**
27:*3*  61:*19*  98:*16*

**reread**  13:*9*
25:*14*  45:*21*  88:*6*

**reserve**  178:*21*
180:*13*

**resided**  122:*24*

**residential**  16:*2*

**respond**  8:*5*, *11*
10:*2*, *4*  14:*17*
113:*13*  115:*3*

**responded**  10:*6*
12:*2*

**responding**  9:*15*

**Response**  3:*21*
13:*15*  14:*2*  54:*6*
90:*2*  98:*14*
161:*18*  163:*16*

**responsibilities**
19:*8*  90:*8*  103:*4*,
*9*, *15*  104:*4*
144:*18*  176:*8*

**responsibility**
20:*4*  46:*19*  47:*5*,

9, *18*  50:*5*, *24*
90:*22*  102:*21*
120:*12*

**responsible**  12:*14*
46:*10*  48:*5*
120:*11*  129:*7*
169:*8*

**restricted**  45:*15*
64:*6*

**restrictions**  33:*12*,
*14*  63:*2*  67:*3*, *12*
141:*10*  142:*18*

**results**  98:*24*

**retire**  17:*2*

**retired**  17:*1*, *22*
18:*3*  126:*1*

**retirement**  17:*22*

**return**  61:*13*
62:*12*, *15*  68:*3*

**returned**  59:*23*
60:*4*  61:*8*  63:*5*,
*23*

**reused**  165:*4*

**review**  11:*13*, *15*
13:*23*  14:*6*, *9*
15:*2*, *23*  29:*19*
30:*22*  58:*14*
82:*23*  83:*2*, *10*
115:*12*  128:*17*

**reviewed**  11:*19*,
*21*  12:*21*  15:*5*, *9*
24:*1*, *11*  25:*19*, *24*
29:*2*  50:*18*, *24*
83:*21*  84:*10*
158:*10*  167:*20*
179:*23*

**reviewing**  26:*18*,
*23*  154:*24*  158:*5*

**revised**  91:*12*
93:*25*  97:*7*

**Rhodes**  1:*25*
4:*19*  182:*5*  183:*6*,
*22*

**right**  7:*20*  21:*11*
24:*7*, *9*, *19*  25:*4*,
*21*  28:*24*  29:*21*
30:*12*, *16*  32:*3*
39:*2*, *23*  40:*6*
43:*16*  44:*22*

47:*17*  54:*22*  55:*7*,
*11*  59:*19*  62:*16*
68:*10*  70:*15*  74:*8*
81:*10*  82:*11*  91:*6*
98:*4*  99:*8*  104:*16*
108:*7*, *12*  112:*2*
128:*8*  134:*6*
137:*22*  138:*10*
143:*2*, *7*  148:*18*
150:*9*  155:*19*
156:*6*  157:*4*, *12*,
*17*  159:*21*  161:*6*,
*21*  164:*7*, *8*
167:*15*  173:*12*
174:*14*  179:*13*

**right-hand**  134:*7*

**rights**  106:*21*
108:*16*  141:*4*
145:*3*

**ring**  38:*19*

**Ringler**  176:*13*, *14*

**Rio**  16:*4*

**risk**  151:*22*
152:*10*, *13*, *24*
160:*23*

**Ritter**  140:*19*
147:*21*, *22*  151:*7*
153:*18*  156:*2*

**Ritter's**  153:*12*

**road**  35:*2*, *5*
63:*17*  69:*5*  117:*2*

**roadway**  140:*2*

**roadways**  34:*15*
66:*10*

**Rob**  177:*23*, *25*

**Robbie**  175:*25*

**Robin**  114:*1*
167:*19*

**rock**  41:*5*  43:*24*
44:*13*  45:*4*, *11*, *17*,
*19*  46:*3*, *11*  47:*6*,
*13*, *14*  48:*13*, *20*,
*23*, *25*  49:*8*, *10*, *15*,
*17*  50:*4*, *12*  56:*4*,
*15*  59:*23*  60:*3*
61:*7*, *12*  63:*5*, *22*
67:*17*  68:*2*, *7*
70:*16*, *23*  71:*5*, *9*,
*13*, *21*, *24*  72:*17*

**Professional Reporters**
800.376.1006
www.ProReporters.com

87:4  98:11, 18
104:18, 23  105:6
111:10  113:14
115:4  126:11
130:15, 25  131:1
143:20  156:4, 23
159:13  160:17
163:9, 12, 18
164:5  171:22
**rocks**  43:3, 5, 6, 9,
10, 22  45:13  48:1
49:23  51:10
52:11, 16  53:2, 3,
9, 17, 24  55:2, 10,
20  56:10  81:8, 16
86:24  87:5, 11
104:23  105:5
165:3, 6, 7, 17
**rocky**  49:13
**ROEHL**  2:11
**role**  19:7  23:3
128:13  176:1, 17
**roles**  170:10
**Rome**  175:1
**Ron**  140:17, 19
147:20, 22  151:7
153:12, 14, 18, 21,
25  154:7  156:2
**room**  80:24
**roughly**  35:3, 4
**round**  88:14
**routinely**  151:11
175:22
**RPR**  1:25  4:19
182:5  183:6, 22
**Rules**  4:18  7:25
80:16  127:8
**ruling**  92:9
**Running**  159:13
**run-offs**  23:13
**Rush**  123:1, 2, 4
**Ryan**  2:7  5:20
11:4  79:17  80:25

< S >
**safe**  115:23
116:8  117:14
**safety**  151:15

**sand**  68:2, 7
70:16, 23  71:5, 9,
13, 21, 24  72:17
**sandy**  114:15
158:4  169:2, 6
**Sarah**  2:9  5:22
**sarah.stevenson@
modrall.com**  2:13
**Saturdays**  74:11
**save**  97:14, 19
98:19  105:5
116:11  138:9
**saved**  97:16
99:24  101:3
109:23  110:2
**savings**  101:1
105:17  116:2
**saw**  20:19  83:14
**saying**  9:1  12:14
41:17  47:8  70:22
71:8, 12, 14, 17
72:16  79:1  84:17
86:9, 10, 11
103:15, 16  157:7
**says**  17:21  18:6,
10  24:19  25:4
26:1  28:25  29:6,
24  32:4  33:9
34:6, 25  36:7
37:3, 24, 25  38:12,
23  46:2  47:12
59:22  60:11  66:7,
12  68:1  70:16
72:22  73:2  74:10,
15  80:2  81:25
88:6, 11  98:10
100:3, 8, 16
102:11  104:17, 18,
22  105:25  106:20,
22  107:12, 23
109:7, 8  113:8
114:13  115:1, 12
149:18  150:18
151:23  168:25
**schedule**  36:10,
18  73:1  74:12
102:14, 15  160:20
161:1
**scheduled**  9:12

**school**  16:12, 14,
16
**Scope**  3:13  50:19,
24  51:5, 7, 12, 15
66:3, 16  67:16
73:25  74:6, 9, 23
75:12  153:23
154:6
**scopes**  177:20
**Scott**  170:25
171:1  175:25
**scratch**  13:25
14:21  18:18  20:8
30:5  47:3  50:17
66:1  70:5  73:10
85:13  94:13
95:18  101:19
102:4  105:6
117:13  124:21
**screen**  6:17
140:6  174:15
**Scroll**  17:7  24:10
25:3  29:4  36:23,
24  37:8  78:2
91:5  99:15  108:4
114:9
**seal**  183:17
**seasons**  75:5
**second**  34:25
42:21  68:1  106:6,
19  114:21  143:25
150:11  154:20
**Second-to-last**
98:5
**Section**  25:5
26:2, 18  39:16
40:14, 18  41:16,
20  42:18  43:2
46:2  59:18  60:2,
20  67:25  88:18
93:21  104:17
**secure**  29:25
**see**  24:5  35:17
59:21  90:10  98:7
112:8, 18  131:16,
21  137:18  140:4,
5, 10  143:23
144:9  147:18
148:23  149:15, 16

150:9  151:18, 20
153:14, 19  155:22
159:18  160:15
162:9  166:7, 21
167:14  173:24
175:7  176:19
177:18
**seeing**  27:1  31:7,
9  99:21  176:19
**seen**  59:2  90:6
164:13  167:21
**sell**  71:2, 5
**send**  58:16
**sense**  64:6
**sent**  31:4  113:9,
16  135:11  163:11
**sentence**  25:13
26:1  34:25  47:11
60:10  66:12  68:1,
5  74:17
**separate**  70:20
**September**  3:18,
19  4:7, 8  17:3
18:9  36:8, 14, 18
37:14  41:18
156:2, 11  157:20
159:1  160:16
161:10  162:4, 10
163:12  164:19
165:2  174:8
**sequence**  60:25
**seriously**  94:11
**serve**  43:10
**served**  43:21
**set**  76:9  111:19
159:25  162:20
183:16
**setup**  71:19
**seven**  13:1  82:13,
17  83:5  103:17
136:10  152:5
**shallow**  63:12
**shape**  137:1
**share**  140:5
171:12
**sharing**  142:9
174:14
**SHEET**  182:1

**sheets** 120:*9*
**Shoney** 2:*3* 5:*19*
**shoot** 41:*8*
  159:22  160:2
**shooting** 131:*15*
**Short** 4:*11*  132:8
  147:5  174:*18*
  178:*14*
**shot** 159:*19*
**show** 74:24
  110:6  117:2
  140:5  143:24
  147:14  158:21
  167:15  168:*19*
  176:21
**showed** 91:*1*
  111:6  128:*11*
  168:9, *10*, 14
**showing** 38:8
  108:2  111:*12*
**shown** 27:8
  130:21  153:*10*
**shut** 73:4  75:18
  78:23
**sick** 125:25
**side** 179:12, *13*
**sieve** 140:23
**sign** 58:*1*  103:8
  124:3, *19*  125:*11*,
  17  178:23  180:*14*
**signature** 24:21,
  22  25:1, *24*  58:3,
  4
**signed** 26:5, 7, *19*,
  23  27:2, 7, *10*, 12
  28:17  58:14, *19*
  59:15  64:21  85:7
  96:18, 22, 24
  103:9  104:*1*
  124:15, 23  177:23
**significant** 40:*19*
  166:4
**significantly** 74:*13*
**signing** 24:24, 25
  59:12  103:*12*
  104:8
**silt** 144:21
**similarly** 8:*20*

**simple** 22:*3*
**simpler** 54:*14*
**simply** 65:9  82:7
  89:*14*  103:20
  130:*14*
**Sir** 6:7  7:23
  23:22  28:8  36:25
  38:21  42:*10*  57:9
  65:2  77:*14*  79:9,
  11, 21  80:*14*
  81:*15*  85:22  90:5
  94:7  99:*18*
  100:22  103:21
  112:23  116:22
  123:*14*  125:22
  126:3, *24*  127:6
  178:*11*  179:4
**siren** 78:*17*
**SISK** 2:*11*
**sit** 83:25  89:6
**site** 13:*3*  18:*11*,
  14, 20, 21  19:4, 7,
  9, 12, 16, 17  20:2,
  3, 4, 5  21:1, 10, 11,
  15, 25  22:7  23:*14*
  32:10  33:17, 24
  34:9  35:5  36:*13*
  37:*19*  38:*11*
  45:18  46:4  50:*18*,
  23  52:*11*  55:*17*
  60:8, 9  61:20
  62:4, 5, 25  63:*16*
  68:*16*, 22  69:7, 22
  71:2  76:20  77:5
  97:21  100:*11*
  102:4, 5, 8, 12, 21
  105:*12*  110:*10*, 24
  111:6, 7, 18, 20, 25
  112:8, *11*  115:*14*
  117:1  118:5, 6
  123:*14*, 15, *19*
  131:5, *11*  133:5,
  16  134:*13*  138:6,
  10, 16  139:*10*, 18,
  22, 24  141:*1*, 3, 21,
  24, 25  142:*14*, 15,
  19  143:*1*, 2, 3
  144:21, 25  145:2,
  12, 14, 19, 22

146:6, 25  147:25
149:*19*, 21  150:*1*
154:7, *11*, 17
155:*11*, 12  156:4,
6, 23  157:4, 12
162:*12*  163:5, *13*
164:24  167:2, 9,
12  168:4, 8, *19*
170:25  171:*18*
175:3  176:8
**sitting** 152:4, 5
  172:9  178:*10*
**situation** 13:5
  45:*16*  64:2
**six** 20:*15*  32:4
**skipped** 34:*19*
**Slade** 2:*11*  5:21
**slight** 10:21
**small** 79:9
**smaller** 23:21
  43:3, 6, 10, 22, 24
  45:4, 12  165:9
**Smith** 1:24
**soil** 55:2  59:23
  60:3  61:7, *12*
  62:22  63:5, 22
  68:2, 7  81:9, 17
  86:24  87:5, 6
  100:*10*, 13, 15
  114:15  141:1, 5
  144:25  145:4
  158:4  160:*12*
  169:2, 6
**soils** 41:2  61:*19*
  126:13  145:*12*
  160:*13*
**sold** 70:*16*, 20
**sole** 120:*18*
**solidified** 132:*11*
**solution** 104:25
**somebody** 55:25
  83:*18*  160:*14*
  180:*10*
**someone's** 22:*1*
**someplace** 56:23
**somewhat** 98:6
**soon** 73:*10*
**sorry** 6:*15*  8:*12*
  10:*19*  14:20

17:*13*  22:23  24:6,
8  25:11  27:*18*, 19
29:23  30:*1*, 5, 6
31:8  33:5  34:7
36:4, 20  37:*18*
40:22  41:9  42:*3*
44:3  46:*12*  48:*10*,
19  53:*13*  54:*10*
57:19  61:21
65:24  66:9  67:23,
24  72:21  76:3, 17,
23  78:*16*  80:5
81:22  87:*15*  88:*1*,
5, 15  90:*19*  95:*10*
98:*11*  100:*18*
105:7  106:*12*, 23
107:25  110:20
116:6  119:*12*, 13,
14, 15  121:21
122:3  137:25
139:*13*  141:*18*
144:3  153:*16*
164:20  171:7
175:9  178:25
**sort** 136:*19*
  159:*17*  176:7
**sound** 110:*18*
  145:6  165:*11*
**South** 2:4, 8
**speak** 15:*14*, 22
  39:3  47:*19*, 24
  51:22  58:22
  168:*13*
**speaking** 11:*10*
**special** 49:*3*  56:5,
8
**specific** 40:*23*
  60:9  62:25
  120:25  170:*10*
**specifically**
  156:25  170:21
**speculation** 95:5
**spent** 101:*11*
**SPERLING** 2:*11*
**spoke** 11:7
**spoken** 22:6
  49:21  111:2
**spontaneous**
  151:*11*

spread 66:*10*
68:*21*
**Springs** 123:*1, 2, 4*
**SS** 183:*3*
**stabilize** 44:*18, 20,*
*24*
**stacking** 176:9
**stage** 73:4 75:18
78:22
**stages** 35:*18*
**stamp** 99:*17*
144:5 158:*24*
175:8
**stamped** 90:*1*
112:*18, 20* 140:8
144:7 147:*18*
150:17 155:24
158:24 161:25
164:10 167:*17*
174:17 177:3
**standard** 49:9, *16*
54:4 60:*12, 17, 21*
61:6, *11, 24* 62:*11,*
*13, 19, 21* 63:4, 8,
24 120:6
**standards** 136:*19*
**standing** 137:*21*
**stands** 165:*25*
**start** 8:25 154:*15*
**started** 20:9
34:*13, 14* 37:15
39:6 147:*24*
**Starting** 29:*23*
**starts** 37:7
**state** 5:8 72:5
136:8 181:*5, 16,*
23 183:2
**stated** 51:5 54:*1*
67:2 146:15
**statement** 33:*1*
34:*1* 35:9 39:*16*
40:2 55:9 64:*12*
70:18 76:25
78:20 79:1 82:*18,*
*20, 25* 83:*12, 13*
85:*3, 5, 14, 16, 23,*
*25* 86:*1, 12, 13*
94:15 107:9, *12*

108:*14* 141:8
145:7 153:*25*
**statements** 29:*18*
92:*10* 96:9 97:*1*
124:*10* 125:*19*
**STATES** 1:*1, 17*
5:3, *4* 6:9 21:*21*
32:5 33:*12, 14*
38:*13* 54:*16*
150:*20* 154:7
170:*23*
**statute** 26:*18, 20*
27:2, *4*
**stay** 28:*24* 73:*1*
**stayed** 68:*15*
**stenographer** 8:6
**stepping** 128:*12*
**steps** 72:25
169:*4, 13*
**Steve** 114:22, *23*
146:*23* 147:*1*
148:25 149:*12*
152:*15, 22* 153:6
157:*11* 163:*25*
164:*3, 20*
**Stevenson** 2:9
5:22
**sticking** 137:*5*
**stipulated** 4:*16*
**STIPULATIONS**
4:*15*
**stood** 109:*18*
**stop** 11:6 41:6
108:7 110:7
112:*11, 13* 157:*17*
163:*18* 164:*5, 24*
172:2 174:*14*
**stoppage** 35:*17,*
*20* 36:2
**stoppages** 165:*22*
**stopped** 35:*10, 13*
78:7 109:*3*
163:*12* 169:*17*
**stopping** 79:7
**stops** 137:*16*
**stored** 46:*3*
**strategy** 72:*24*
**Street** 1:*18* 2:*12*

16:*4* 136:8
**stress** 134:*17*
**structural** 44:*25*
45:*5, 6* 68:*25*
69:2, *9, 15, 22*
70:5 137:*15, 19*
179:*7, 11*
**Stuart** 1:*15* 5:*10*
6:*6, 7* 9:*21* 81:*12*
89:*20*
**stuart.ashworth@s**
**ol.doi.gov** 1:*19*
**stuff** 64:7 83:2
171:*23*
**subcontractor**
46:*9, 13, 14, 17, 20,*
*24* 47:*15, 24*
49:*22* 50:6 52:*23*
56:*19, 21* 138:*12*
**subcontractors**
48:*5* 142:*5*
**subject** 33:*11, 13*
164:*11*
**submit** 129:*20*
**submitted** 14:2,
*24* 114:7
**submitting** 27:*24*
**subparagraph**
59:*18, 21* 67:22
**subpoena** 90:*2*
**Subscribed** 181:*15*
**substantial** 116:2
**substitute** 101:*11*
**suggests** 140:*24*
**suit** 183:*15*
**suitable** 66:*8*
98:*15* 140:*2*
**Suite** 1:*18* 2:*4, 12*
**summarizing**
91:*14*
**summer** 154:*2*
**Sundays** 74:*11*
**super** 9:*8*
**superintendent**
167:*19* 173:*15, 22*
174:*1, 8* 176:6
**superior** 19:*15*
21:*5*

**superiors** 19:*10*
20:6 112:*14*
**supervision**
102:*13*
**supervisor** 123:*16*
159:8
**supervisors** 153:*4*
**Supplemental**
4:*10* 170:*18*
**support** 27:*17, 18,*
*20, 25* 44:*25* 45:*5,*
*6* 68:*25* 69:*3, 9,*
*15, 23* 70:5 86:*24*
136:*25* 179:*7, 12*
**supposed** 51:*1*
98:*13* 104:*19*
118:5 122:*9*
150:22
**sure** 7:9 9:*3*
12:*17* 13:7, *10*
14:*21* 17:*14*
22:25 25:*12, 25*
26:*16, 25* 28:*2, 14*
30:*9, 10, 21* 36:*5,*
*12, 19, 21* 40:*1, 8,*
*12, 23* 42:*4, 16*
43:8 44:*10* 47:*21*
49:25 54:*7, 11*
55:*13, 23* 57:*3*
61:*3, 22* 64:*10*
65:25 66:*24* 71:*3,*
*18* 75:6 76:*2, 5*
78:20 81:*14*
82:*16* 84:*3, 24*
85:9, *21, 25* 88:*21*
91:*17, 20* 93:6
94:*3* 95:6, 9 96:*1,*
*2, 14, 17, 20* 97:*17*
103:*21* 107:7, *10,*
*18, 19, 21* 108:*4,*
*22* 109:*6, 13, 16,*
*22, 25* 110:*15, 22*
111:5 116:*5, 7, 13*
121:*16, 20* 122:*5*
123:22 125:*2, 5*
126:22 129:*18*
131:*20* 134:*21*
135:*24* 139:*24*
140:*10, 20* 141:*20*

**Professional Reporters**
800.376.1006
www.proreporters.com

142:*4*, *8*   143:*15*
146:*11*   148:*8*, *13*
149:*5*   152:*4*, *6*, *11*
155:*5*, *14*   161:*20*
162:22   167:*10*
168:*1*, *12*, *21*
169:*7*, *24*   171:24
172:*5*, *7*   173:*9*, *17*,
*18*   174:*3*, *10*, *12*
176:*17*   179:*18*, *19*
**surface**   30:2
33:*10*   106:22
130:*15*
**surprise**   52:*9*, *13*,
*14*   53:*1*, *5*, *16*
85:2   121:*11*
131:*12*
**surprising**   53:*21*
**swear**   5:25
**switch**   18:*25*
42:*21*
**swore**   57:*12*
**sworn**   6:*1*, *3*
181:*15*   183:8
**sync**   137:6

< T >
**table**   172:*14*
**take**   9:*11*, *15*
40:22   52:22   57:*1*,
*2*   75:9   79:*9*, 22
126:*21*, 23   128:*3*,
*14*   138:*3*   142:*19*
143:6   150:*10*
166:8, *14*   170:*19*
178:*13*
**TAKEN**   1:*12*
4:*17*   57:6   72:25
80:*11*   127:*3*
147:*12*   163:*17*
166:*18*   169:*5*, *14*
178:*18*   182:6
**talk**   56:*24*   88:*17*
**talked**   78:*3*
106:*13*   148:*11*
**talking**   16:*11*
31:*11*, *12*   44:*21*
55:*1*   87:*4*, *5*, *11*
115:*17*, *24*   116:*9*,
10, *17*, *19*   119:*11*
133:*5*
**tall**   110:*14*
**team**   154:6
**technical**   6:*16*
**tell**   7:6   30:20
32:*25*   38:*16*
41:20   46:*18*   47:*3*
48:*1*   52:*10*, *15*
56:9   58:*1*   63:*3*
69:*8*   70:*3*   73:*11*
75:*21*   76:9   93:22
94:*1*, *9*   95:*18*, *20*
97:*5*   103:*23*
136:*15*   141:*23*
142:2   158:*10*
173:*16*
**telling**   39:*20*
47:*3*   60:20   63:*7*,
*19*, *21*, *25*   68:*12*
73:*8*, *17*   102:*17*,
*20*   103:*5*, *6*
128:*17*   139:*15*
146:*5*
**tells**   31:*25*
**ten**   24:*18*   178:*14*
**ten-minute**   57:*2*
126:22
**tenure**   19:*1*, *3*
**term**   160:*3*
**terminal**   69:*6*
**terms**   137:*19*
155:*13*   171:*13*
**terrible**   51:*25*
100:*19*
**test**   57:*18*
**testified**   6:*3*   7:*21*
25:*18*   28:9   52:*10*,
*15*   53:*1*, *17*   62:*10*
74:*19*   121:*8*, 22,
24
**testify**   183:9
**testimony**   14:22
15:*4*   26:*6*, *11*, *17*
27:*1*   28:*1*   41:*12*
47:*13*   57:*19*
61:*10*   80:*19*, 22
82:*11*   108:*19*
127:*10*, *13*   181:*8*
**thank**   80:*23*
106:*1*   127:*18*, *19*
128:*6*   178:*9*, *11*,
*12*
**Thanks**   156:*7*
**Thanksgiving**
73:*5*, *14*, *18*   74:*15*,
*16*, 22   75:*9*, *19*
78:*4*, 24
**theirs**   77:*18*
**themself**   166:*1*
**thing**   102:*11*
103:2   130:*7*
150:*12*
**things**   11:*5*, *17*
83:*3*   102:*12*
125:2   128:*7*
151:*20*   172:22
**think**   6:*14*, *15*
7:*17*   9:*8*   17:*16*
27:*13*   32:24   40:9
45:*15*   49:2   53:22
56:*21*, 22   58:25
66:22, *24*   67:*11*
69:*11*, *12*   70:*12*
74:*1*   76:*11*   78:*25*
79:*18*   82:*19*   84:*8*
88:*23*   92:*7*, *19*, *20*
94:*14*, 25   95:*13*,
*16*, *17*, *19*   97:*15*,
*18*   104:*1*   106:*12*
109:*14*   110:*23*
116:*14*   124:2, *7*,
*10*, *20*   125:*9*
130:*4*, *7*   134:*9*
137:*10*   138:*15*, *24*
142:*17*   149:*12*
150:*13*, *15*, 22
151:*13*   152:*18*, *19*
154:*20*   155:6
158:*20*   161:*21*
162:*21*   164:*7*
165:*1*   166:22, 25
167:*11*   171:*21*
174:*11*, *25*   176:*20*
178:*7*, *8*
**thinking**   6:*15*
58:8   94:*16*   95:2
**Thirteen**   16:*10*
**Thirty-five**   117:*12*
**thought**   54:*4*
95:*7*, *11*, *12*
103:*14*   107:*8*
133:*6*, *8*   151:*1*
174:*4*
**three**   6:*23*   102:*11*
**thrown**   136:*20*
**time**   12:*8*   13:*4*
17:*17*   18:*11*, *15*
19:*4*, *13*   20:*15*
24:*13*   25:*16*
26:*13*, *23*, *24*   27:*9*
36:*14*   38:*3*   39:*1*
40:*8*, *20*   51:*6*
55:*18*   59:2   64:*15*,
*18*   81:*16*   82:*15*
83:*21*   84:*5*, *10*, *18*
85:*1*, *7*, *17*   86:*6*
88:*21*   89:*5*, *13*
91:*4*   92:*19*   93:*11*,
*23*, 25   95:*21*   96:*5*,
*24*   98:*17*   101:*5*
103:*11*, *13*, 25
104:*3*, *6*, *8*   109:*18*
110:*1*   111:*9*
114:*15*, 25   116:*11*
124:5   125:*25*
126:2   127:*18*
128:*4*   130:*24*
131:*4*, 25   132:*8*
134:*10*, *12*, *15*, *16*,
*24*   135:*16*   136:*11*,
*13*   138:*16*   141:*11*
142:*19*, *24*   148:*20*
149:*4*   152:*9*
154:2, *14*   156:*21*
158:*14*   160:*21*, *24*
161:*8*, *10*, *12*, *15*
163:*13*   165:*13*, *15*
166:*3*, *24*   168:2, *7*,
*11*, *14*   169:2
170:*5*   171:*15*
172:*12*   174:*5*, *11*
178:*9*, 22   180:*14*
181:*9*

**Professional Reporters**
800.376.1006
www.ProReporters.com

**times** 21:9 49:10 93:25 100:25 148:12
**timing** 102:14
**tipping** 179:16
**title** 22:18
**titled** 174:18
**today** 5:19 8:1 47:13 48:1 51:23 63:7 83:3, 25 85:19, 20 89:7 103:18 124:15 127:10, 13 135:15 151:15 152:5 172:9 178:10
**today's** 10:18
**told** 47:25 48:18, 19 52:15 53:2, 17 56:12 74:21 75:16 81:6 82:9 83:9 84:18 91:24 104:4 106:13 116:19 121:9 141:20 146:24 148:25 152:14 153:1 158:3
**top** 28:5 37:24 43:25 44:19 74:8 104:18, 22 105:25 114:9 115:10 137:5 153:17 162:9 164:15
**tornado** 78:17
**total** 80:3 82:1 88:7 90:10 99:2 100:24
**touched** 14:8
**tour** 111:6 168:18
**Tower** 2:8 44:21 45:1 68:25 69:23 118:5 137:1 179:8, 12, 17
**towers** 45:6 86:25 176:9
**town** 30:3
**track** 46:15 49:5 56:20

**Tradewind** 131:23 132:3, 6 133:9 157:6
**Tradewinds** 132:12 133:6 148:7
**transcript** 13:12 45:24 179:19 183:11
**transcription** 181:8
**transmission** 118:22
**transport** 148:15
**trial** 7:21 178:22 180:14
**tribe** 81:10, 18 94:23 107:5 110:9 111:15
**trickled** 55:25
**tried** 98:18
**trigger** 146:17
**tripped** 7:12
**trucking** 138:9
**true** 25:6, 16, 20 26:3, 9, 14 27:10 59:25 65:15, 22 84:9 85:5, 16 86:2, 14 92:20 97:2 103:12 126:12 137:20 157:19 160:12 181:7 183:11
**trust** 32:5, 7, 13, 19 136:8
**trusted** 93:18
**truth** 103:22, 23 104:1, 5 183:9, 10
**truthful** 15:6 28:3 57:12 95:18, 19 96:3, 5
**truthfully** 52:24
**try** 63:12 94:20 137:22
**trying** 9:3 39:22 40:4 73:9, 11 76:9 97:10, 13, 23 107:14 108:20, 25

115:17 150:11 169:12
**Tulsa** 1:18 2:4, 9 78:17
**turbine** 44:19 60:9 68:22 69:4, 6 136:24 137:8, 20 143:1, 2
**turbines** 60:25 61:21 62:7 130:20 134:23 146:7 160:24 161:1 166:1, 5 167:3
**turn** 110:11 128:15
**Twelve** 16:7
**two** 7:4 14:24 28:6 42:19, 23 52:20 53:14 56:2 59:18, 21 111:13, 25 112:10 114:8 115:19 160:22 178:24, 25 179:4
**two-year** 16:20
**type** 35:22 56:12 67:4 87:22 118:24
**typed** 8:21
**types** 160:12
**typical** 34:16 138:5
**typically** 141:2 145:1, 14
**typo** 150:23

< U >
**U.S** 5:10, 14, 15 6:8
**U.S.'s** 39:22 40:5 42:7
**uh-huh** 8:19 9:1
**ultimately** 12:14 47:7, 9 48:5 169:20
**undated** 170:22
**underneath** 44:14 70:15 81:9, 17 170:11

**undersigned** 181:16
**understand** 9:2, 20, 22 10:3 44:10 47:20, 22 81:2 82:20 91:21 101:18 116:6 117:18 122:4 125:5 126:9 136:10, 14 143:14 169:13
**understanding** 48:17 87:11 97:22 101:8, 20 107:13 111:24 114:3 117:4, 25 126:3 129:19 130:18 134:22 135:15, 16 136:22 140:22 141:10 142:23 143:5, 10 144:17 145:7 148:19, 24 149:2 152:8 154:1, 9 156:5 157:3 162:16 165:12, 16 166:3 170:5 171:15 173:20 174:6 178:2
**understood** 10:5 81:8, 16 142:9, 18, 23 162:14
**undertaking** 172:1
**unique** 64:1
**UNITED** 1:1, 17 5:3, 4 6:8 21:21 32:5 33:12, 14 54:15
**un-permitted** 113:11
**unstable** 139:16
**unsure** 72:3 136:4 155:18
**untruthful** 86:6
**Update** 4:11 159:5 174:19
**upper** 32:16 33:23 90:9

upright 137:*21*
USA 181:*2* 182:*2*
USC 25:*5* 26:*2, 13*
use 44:*13* 45:*5, 12* 60:*8* 61:*12, 18, 24* 62:*4, 21, 24* 63:*1, 11, 12* 66:*13, 18, 19* 67:*2* 71:*12, 23* 98:*23* 101:*11* 105:*11* 112:*1* 130:*25* 131:*1, 4, 6* 137:*13* 138:*4* 140:*3* 141:*1, 24* 142:*14, 21* 143:*3* 144:*25* 146:*6* 154:*11* 160:*3* 165:*7* 167:*2* 179:*6*
usual 73:*3, 18* 75:*17* 78:*5, 6, 22*
utilized 74:*11*

< V >
Vaguely 156:*13, 15* 164:*17*
Valencia 16:*23*
Valentine 151:*25* 153:*14*
varies 74:*13*
Venturini 113:*17, 21* 167:*19*
verb 38:*17*
verified 85:*8*
verify 24:*11* 49:*22* 50:*6* 84:*22* 85:*18* 86:*13* 92:*21*
verifying 85:*4* 93:*8*
version 117:*23* 144:*4*
versus 5:*4* 77:*5* 105:*11* 121:*3* 136:*24*
viable 149:*21* 150:*7*

vice 38:*3* 48:*15* 52:*20* 106:*17* 108:*9*
VIDEOCONFERENCE 1:*12*

VIDEOGRAPHER 5:*1, 24* 57:*4, 7* 80:*5, 9, 12* 127:*1, 4* 166:*16, 19* 178:*16, 19* 180:*15*
videotape 5:*1*
VIDEOTAPED 1:*12, 24*
Views 4:*11* 174:*19*
visit 145:*24*
visited 145:*19*
visitors 111:*16, 20*
visits 111:*23*
Vista 16:*4*
void 43:*25*
voided 44:*8*
voids 44:*8* 139:*25*
volume 46:*3, 11* 47:*5, 12* 48:*1, 13, 20, 25* 49:*8, 17, 22* 50:*4, 12* 51:*10* 52:*11, 16, 22* 53:*2, 8, 18, 24* 56:*10, 20*
vs 1:*7* 181:*2* 182:*2*

< W >
wait 154:*20*
want 8:*18* 9:*25* 11:*6* 24:*10* 25:*14* 44:*13* 52:*1* 57:*11, 14* 71:*10* 75:*11* 79:*22* 80:*15, 21* 83:*11* 94:*8* 97:*9* 98:*8* 103:*19, 21* 127:*7* 128:*9* 137:*22* 139:*23* 153:*17* 156:*5* 157:*3* 165:*5* 171:*11* 179:*19*
wanted 12:*16* 13:*14* 22:*11*

39:*16* 49:*4* 94:*15* 112:*8, 13* 127:*9* 141:*20* 179:*18*
wanting 94:*8*
wants 97:*19*
Watson 1:*23* 5:*13*
way 10:*13* 27:*9* 34:*19* 41:*5* 42:*17* 44:*16* 47:*1, 19* 55:*25* 59:*20* 61:*4* 64:*1* 69:*20* 79:*16* 92:*25* 93:*8* 112:*21* 125:*8* 130:*4* 137:*3, 16* 153:*16* 155:*9* 161:*17* 170:*2*
Weatherford 20:*23* 123:*1*
Wednesday 78:*17*
week 134:*13* 165:*21*
weekend 73:*5, 14, 18* 74:*23* 75:*19* 78:*4, 8, 24*
weekends 74:*17*
Weigel 140:*17* 142:*4, 9*
Weir 110:*15, 25* 111:*2* 167:*25*
Welch 151:*8* 175:*24* 176:*3, 11*
Welch's 176:*1*
welcome 37:*25*
well 5:*12* 7:*20* 12:*2* 18:*8* 25:*24* 26:*24* 29:*15* 32:*17* 54:*12* 56:*9* 58:*12* 61:*3* 62:*7* 63:*19* 71:*20* 72:*11* 73:*10* 74:*17* 79:*10* 83:*1, 8* 87:*3* 90:*16* 91:*3* 93:*20* 96:*16* 99:*23* 100:*3* 101:*19* 102:*9* 109:*7* 136:*4* 137:*16* 145:*22* 152:*20* 155:*8, 23*

156:*16* 168:*10* 172:*6, 19* 178:*7*
went 11:*5* 42:*13* 47:*20* 125:*25* 174:*25*
We're 5:*6* 24:*16* 28:*22, 23* 39:*10, 11* 42:*18* 44:*21* 45:*15* 55:*1* 56:*25* 57:*4, 7, 9, 17* 60:*24* 66:*3, 4* 67:*21* 72:*20* 79:*4, 5, 14, 15, 16* 80:*14* 81:*21* 91:*9* 98:*3* 102:*9* 104:*10, 11* 105:*23* 106:*6* 112:*20* 114:*19, 20* 117:*23* 127:*6* 137:*10* 149:*17* 164:*7* 178:*13*
West 1:*18*
we've 148:*3, 4* 155:*25* 156:*22*
WHEREOF 183:*16*
White 167:*25*
Whitehead 110:*15*
Whiteshield 110:*18* 111:*1, 3*
widely 142:*5*
width 137:*3*
wife 15:*19, 20* 123:*11*
William 5:*9* 6:*11, 21*
WIND 1:*7* 3:*15, 23* 5:*4* 20:*13, 21* 21:*2, 4, 10* 23:*4, 10, 16* 29:*3, 6, 11, 13, 20, 25* 30:*5, 6, 16* 32:*4, 10* 33:*11, 17* 34:*6, 16* 35:*2, 6* 44:*21, 25* 45:*6* 54:*17* 55:*18, 19* 60:*13* 66:*17* 68:*25* 69:*14, 23* 72:*23* 74:*9* 76:*21, 22* 77:*2, 4, 10, 12* 81:*3, 17* 82:*24*

Professional Reporters
800.376.1006
www.Proreporters.com

83:*11*, *15*  86:*24*
88:*12*, *14*, *18*  90:*7*
97:*22*  102:*6*
106:*15*  113:*11*
117:*5*  118:*13*, *18*
119:*24*  122:*16*
123:*5*  131:*22*
132:*1*, *17*  133:*2*, *3*,
*6*, *8*, *12*  134:*23*
135:*17*, *22*, *25*
136:*6*, *23*  137:*20*
138:*6*, *14*, *19*
139:*19*  141:*3*, *11*
142:*20*  144:*7*, *19*
145:*2*, *18*  146:*7*,
*16*  148:*10*  154:*12*
155:*11*  157:*20*, *25*
162:*1*, *17*  164:*10*
166:*1*, *5*  167:*3*, *17*
168:*4*, *8*  170:*21*
173:*3*  175:*14*
176:*2*  177:*5*, *10*,
*15*, *24*  178:*3*
181:*2*  182:*2*
**Wind-018666**
158:*25*
**Wind-019901**
155:*24*
**Wind-024749**
140:*8*
**Wind-035610**
177:*3*
**Wind-036433**
174:*18*
**Wind's**  20:*11*
77:*15*
**wish**  124:*15*
**wit**  6:*4*
**WITNESS**  5:*9*, *25*
6:*1*  7:*14*  10:*9*
12:*10*, *25*  19:*25*
21:*18*  22:*23*  23:*6*
26:*12*, *22*  27:*6*, *23*
28:*20*  31:*2*, *18*, *23*
32:*15*, *23*  33:*4*, *21*
34:*4*, *23*  35:*25*
38:*21*  39:*25*  40:*8*
42:*3*, *9*  45:*8*, *15*,
*25*  46:*22*  47:*17*

48:*4*  49:*19*, *25*
50:*9*, *16*  51:*3*, *14*,
*19*  52:*13*, *19*  53:*5*,
*20*  54:*1*  55:*13*, *23*
56:*7*, *17*  59:*6*
60:*6*  61:*16*  62:*4*,
*24*  64:*4*, *14*  65:*1*,
*7*, *17*, *24*  66:*22*
67:*11*, *20*  68:*21*
69:*11*, *17*, *25*
70:*12*  71:*16*  72:*2*
75:*25*  76:*11*, *16*
77:*7*, *18*, *25*  79:*3*,
*24*  81:*6*, *20*  82:*13*
84:*3*, *8*, *24*  85:*7*
86:*4*, *16*, *21*  87:*2*,
*14*, *25*  88:*21*  89:*1*,
*12*  91:*17*  92:*14*,
*19*  93:*6*, *17*  94:*3*,
*11*, *19*  95:*6*, *16*
96:*1*, *5*  97:*12*
98:*22*  100:*2*
101:*7*, *13*, *24*
102:*23*  103:*11*
104:*8*  105:*15*
107:*7*, *18*  108:*22*
109:*13*, *22*  110:*4*
112:*4*  113:*4*
115:*8*  116:*5*, *13*
118:*3*  120:*2*
121:*13*  122:*3*
123:*22*  124:*7*, *13*,
*18*  125:*2*, *15*, *21*
126:*25*  127:*16*, *19*
135:*2*  141:*13*
145:*10*  146:*19*
149:*12*  169:*24*
171:*20*  174:*10*
178:*11*, *12*  180:*10*
181:*17*  183:*12*, *16*
**wobbling**  179:*15*
**WOHLGEMUTH**
2:*7*
**wondering**  174:*4*
**Woodward**  122:*21*
**word**  38:*16*
**words**  8:*20*
31:*16*, *21*  72:*13*
82:*9*  83:*9*  136:*20*

**Work**  3:*13*  18:*19*
35:*3*, *5*, *10*, *17*, *20*
36:*2*, *7*, *9*, *17*  39:*6*
41:*22*  48:*5*  50:*19*,
*24*  51:*1*, *5*, *7*, *12*,
*15*  66:*3*, *16*  67:*17*
72:*24*  73:*4*, *9*, *20*,
*25*  74:*6*, *9*, *12*, *13*,
*21*  75:*4*, *12*  78:*23*
88:*15*  102:*14*
107:*3*  109:*3*
115:*5*  119:*3*
120:*15*  133:*11*
138:*13*  153:*22*
163:*5*  175:*13*
177:*20*
**worked**  18:*6*
74:*18*  123:*24*
132:*1*  148:*7*
178:*3*
**working**  18:*15*
21:*9*  34:*20*  96:*16*
122:*21*  131:*22*
132:*17*  133:*1*
135:*21*, *25*  136:*6*
142:*5*  148:*10*
162:*16*  177:*10*, *15*
**works**  144:*16*
165:*3*
**worries**  134:*1*
138:*1*
**write**  103:*3*
156:*8*  159:*12*
160:*16*  161:*7*
**writes**  115:*1*
140:*22*  142:*4*
144:*24*  148:*13*
153:*14*, *21*  156:*2*,
*22*  157:*2*  162:*10*
163:*8*  164:*19*, *20*
165:*2*, *20*
**writing**  8:*6*
116:*15*  129:*7*
**written**  8:*20*  30:*7*
64:*16*, *18*  66:*25*
74:*14*  75:*6*  92:*20*
**wrong**  158:*17*
**wrote**  12:*18*

76:*19*  94:*4*
**WT**  165:*23*
**WTG**  165:*21*, *25*

**< Y >**
**yards**  100:*8*, *15*,
*16*
**Yeah**  78:*12*
79:*15*  112:*19*
119:*25*  120:*8*
123:*10*  131:*20*
134:*6*  137:*23*
139:*15*  141:*19*
144:*3*  147:*4*
150:*15*  160:*9*
161:*14*  163:*22*
172:*4*  176:*17*
179:*14*
**year**  123:*25*
**years**  6:*22*  7:*7*,
*20*  13:*1*, *4*  16:*7*,
*10*, *11*, *13*, *15*, *21*
34:*23*  49:*7*  82:*13*,
*17*  83:*5*  103:*17*
117:*4*, *12*, *15*
122:*8*  136:*10*
152:*5*
**yes-or-no**  8:*16*
**yesterday**  11:*5*
24:*15*
**you-all**  73:*13*
163:*12*  168:*17*

**< Z >**
**Zoom**  183:*7*