## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

      Plaintiff,

      And

OSAGE MINERALS COUNCIL,

      Intervenor-Plaintiff,

v.

OSAGE WIND, LLC;
ENEL KANSAS, LLC; and
ENEL GREEN POWER NORTH
AMERICA, INC.,

      Defendants.

Case No. 14-CV-704-GKF-JFJ

**The United States' Response Opposing Defendants' Motion to Exclude the Testimony of Plaintiff the United States' Expert Witness Steven J. Hazel and Opening Brief in Support (Dkt. 337)**

# Contents

**Introduction**…………………………………………….......................1

**Mischaracterizations in Defendants' Summary of Mr. Hazel's Opinions**....6

**Argument**………………….....……………………………………..10

**I.    Mr. Hazel's relevant opinions and testimony will help the Court understand evidence and determine a fact in issue – the valuation of damages owed the OMC** ……..…………………………………...........10

**II.   Mr. Hazel's testimony and opinions are reliable**……………………………12

   1.    Mr. Hazel's opinions are based on sufficient facts and data…...........12

   2.    Mr. Hazel's testimony is the product of reliable principles and methods……………………………………………………………13

   3.    Mr. Hazel reasonably applied the principles and methods to the facts of this case……………………………………………………......14

         i.    Defendants' argument citing Northern District cases using the term ipse dixit regarding an expert's opinions misses the mark…………………………………………………………14

         ii.   Mr. Hazel's comparable analysis is fully supported in his report, providing the Court with fully adequate means to test his assumptions or evaluate the basis of his opinions......17

   4.    Mr. Hazel's opinions satisfy the additional factors justifying reliability…..............................................................................20

**III.  Mr. Hazel is more than qualified to opine on the damages valuation that should be calculated to compensate the OMC for the necessary mining lease that Defendants avoided**……………………………………………22

**Conclusion**…………………………………………………………..24

## Table of Authorities

<u>Cases</u>

*Bitler v. A.O. Smith Corp.*
    400 F.3d 1227 (10th Cir. 2004) …………………………........................................4

*Bright v. Ohio Nat'l Life Assur. Corp.*
    2012 WL 12888316 (N.D. Okla. Nov. 29, 2012)…………………………….15-16

*Center City Periodontists, P.C. v. Dentsply Int'l, Inc.*
    321 F.R.D. 193 (E.D. Pa. 2017)…………………………………………….11-12

*Cohlmia v. Ardent Health Servs., LLC*
    254 F.R.D. 426 (N.D. Okla. 2008)………………………………………….16-17

*Cook v. Rockwell Int'l Corp.*
    580 F.Supp.2d 1071 (D. Colo. 2006)…………………………………….11, 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
    509 U.S. 579 (1993)…………………………………………….10-11, 14, 16

*Dean v. Thermwood Corp.*
    2012 WL 90422 (N.D. Okla. Jan. 11, 2012)……………………………….17-18

*Gen. Elec. Co. v. Joiner*
    522 U.S. 136 (1997)……………………………………………………………..14

*Graves v. Mazda Motor Corp.*
    405 F. App'x 296 (10th Cir. 2010)…………………………………………...19

*Hellard v. Mid Century Ins. Co.*
    2021 WL 429917 (N.D. Okla. Feb. 8, 2021)………………………………….16

*Mitchell v. Gencorp Inc.*
    165 F.3d 778 (10th Cir. 1999)…………………………………………........4, 23

*Orth v. Emerson Elec. Co.*
    980 F.2d 632 (10th Cir. 1992)……………………………………….…….10

*Palmer v. Asarco Inc.*
    510 F.Supp.2d 519 (N.D. Okla. 2007)………………………………………….15

*Reed v. Smith & Nephew, Inc.*.
    527 F.Supp.2d 1336 (W.D. Okla. 2007)……………………………….....11, 14

*Schulze v. United States*
    2019 WL 1440306 (N.D. Okla. Apr. 1, 2019)…………………………….....19

*Smithwick v. BNSF Ry. Co.*,
    447 F.Supp.3d 1239 (W.D. Okla. 2020) …………………….............10-11, 14

*Travelers Prop. Cas. Co. of Amer. v. Hallam Eng. & Constr. Corp.*
    2012 WL 13029519 (D.N.J. Aug. 16, 2012)…………………………….....21

*Turpin v. Merrell Dow Pharmaceuticals, Inc.*
    959 F.2d 1349 (6th Cir. 1992)……………………………………………..14

*United States v. Osage Wind*
    871 F.3d 1078 (10th Cir. 2017)………………………………….………1, 3

## Federal Regulations

25 C.F.R. § 214.7……………………………………………………………12, 22

## Court Rules

Fed.R.Evid. 702………………………………………………..……...11, 23

## Other Authorities

Black's Law Dictionary (11th ed. 2019)……………………………………..1

Hold-up problem, *Wikipedia* <https://en.wikipedia.org/wiki/Hold-up_problem>
    (Nov. 24, 2021)……………………………………………………………2

Rogerson, W.P. (1992). Contractual Solutions to the Hold-Up Problem.
    *The Review of Economic Studies*, 4(59), 777-793. JSTOR 2297997………………..2

The United States objects to Defendants' Motion to Exclude the Testimony of Plaintiff the United States' Expert Witness Steven J. Hazel and Opening Brief in Support (Dkt. 337) and requests that the Court deny it.

## Introduction

Defendants characterize the sovereign right of the Osage Minerals Council (OMC) to negotiate, as established in federal regulations, as its "hold up"[1] value. *See* Dkt. 337 at 4, 10, 12, 15, 17. However, here, *Defendants* were the bad actors, robbing the OMC of their sovereign, Congressionally-authorized right to negotiate a mining lease. A mining lease, in fact, that the Tenth Circuit found *was required* for the acts Defendants admit liability for: trespass and conversion. *See United States v. Osage Wind, LLC,* 871 F.3d 1078, 1081-82, 1093 (10th Cir. 2017); Dkt. 321 at 6 ("Insofar as the Tenth Circuit held crushing rock for backfill required a mining lease, Osage Wind and EGPNA do not oppose summary judgment as to liability (only) on Plaintiff's trespass and conversion claims.").

The most apt explanation of a "hold-up problem" is found in economics:

> The hold-up problem is a situation where two parties may be able to work most efficiently by cooperating but refrain from doing so because of concerns that they may give the other party increased bargaining power and thus reduce their own profits. When party A has made a prior commitment to a relationship with party B, the latter can 'hold up' the former for the value of that commitment. The hold-up problem leads to severe economic cost and might also lead to underinvestment.

---

[1] "Hold up" (including its variations) could have various meanings - including stickup, robbery, or roadblock – all carrying the connotation of illegally taking another's property. Black's Law Dictionary (11th ed. 2019) (emphases added).

1

Hold-up problem, *Wikipedia* <https://en.wikipedia.org/wiki/Hold-up_problem>
(Nov. 24, 2021) (citing Rogerson, W.P. (1992). Contractual Solutions to the Hold-
Up Problem. *The Review of Economic Studies*, 4(59), 777-793. JSTOR 2297997). In the
instant case, Defendants, having initially invested in the Project, avoided
cooperating, acknowledging the mining lease requirement or entering into lease
negotiations with the OMC for fear of engaging the superior bargaining power the
OMC held. Defendants repeated use of "hold up value" in their motion attempts to
revise the facts of the case, flip the parties' roles, and slander the OMC by implying it
was the aggressor, holding the helpless Defendants hostage.

Throughout the post-remand pleadings and in the instant Motion, Defendants
repeatedly note they had alternatives in lieu of excavating and mining the Osage
Mineral Estate (OME), which was vital to the development and ongoing operation
of the Osage Wind farm (Project). In this second phase of the litigation, where the
parties are seeking to establish damages and remedies for Defendants' actions, the
focus remains on what Defendants *actually did*, not on what they *could* have done.
Defendants chose expediency over negotiation, opting to illicitly excavate and mine
the OME rather than to import offsite minerals for backfill, insulation and erosion
control. Defendants were motivated by the prospect of saving money and preventing
further construction delays, under fig leaf cover of an 'advice of counsel' defense (as
evidenced by the ever-evolving Modrall memos).

First, Mr. Hazel's opinions and testimony are relevant. Defendants attempt to
discredit Mr. Hazel for not indulging in hypothetical scenarios in which they could

have substituted minerals purchased offsite.[2] However, Mr. Hazel was not asked to value actions Defendants *did not take* – his job as Plaintiff's expert witness was to create a damages valuation based on the facts of the case and the law of the case as defined by the Tenth Circuit. *See United States v. Osage Wind, LLC,* 871 F.3d 1078 (10th Cir. 2017). Defendants may lament their business decision to illegally mine the OME and avoid negotiating with the OMC, but these decisions are what inform Mr. Hazel's opinions on the appropriate damages valuation for Defendants' actions. Accordingly, Mr. Hazel's opinions cannot be rendered inadmissible because Defendants believe he did not sufficiently speculate as to alternatives they failed to pursue compared with their chosen course of regulatory violations.

Despite Defendants' incessant focus on "crushing," it does not remake the Tenth Circuit's Opinion, and Mr. Hazel's damages valuation is not required to be cabined to it. *See* Dkt. 345 at 2 (n.1), 7 (subsections III (A-B)). Defendants ineffectively argue Mr. Hazel's opinions should be excluded as a mere thought exercise. However, this characterization in no way makes Mr. Hazel's opinions less likely to assist the trier of fact. Mr. Hazel's opinions are the only expert analysis here designed to assist the

---

[2] This is a red herring. *See* Dkt. 337 at 4 (citing Dkt. 300 at Undisputed Fact no. 7). Notably, Defendants leave out how, in support of Undisputed Fact no. 7, the United States provided important context to this road not taken: "Defendants made the conscious decision to use the excavated minerals in order to save money." *Id.* citing Dkt. 300-2 at 105:9-15 (Moskaluk confirms Defendants decided it was cheaper to use excavated material versus using material from offsite); Dkt. 300-4 at 4 ("[T]he disposal of excavated rocks and import of back filling material from outside the County **was a more expensive solution**. Importing material was also not advised by EGP NA Legal Dep. **because it would have given credit to Osage Nation's theory on the commercial use of soil and therefore abandoned**." (emphases added)).

Court in valuing damages owed to the OMC for Defendants' illegal mining.

Second, Mr. Hazel's opinions are reliable. Because the facts of this case are unusual or only capable of occurring in only one particular Native American reservation does not render Mr. Hazel's opinions unreliable. Presented with various methodologies on how to value the damages owed the OMC, Mr. Hazel chose a comparable proxy that Defendants find unacceptable.[3] It may be ironic that Defendants' own negotiated terms with the surface owners of the land in question are now being used to determine the damages they may be ordered to remit to the OMC, but Defendants' *disagreement* with Mr. Hazel's chosen methodology is not sufficient grounds to have his testimony stricken. *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1233 (10th Cir. 2004) (requirement that testimony must be reliable does not mean that the party offering such testimony must prove "that the expert is indisputably correct") (quoting *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 781 (10th Cir. 1999)).

Third, Mr. Hazel is qualified. Mr. Hazel's expert opinions and testimony are directed at providing a damages valuation for Defendants' failure to secure a mining lease with the OMC. Mr. Hazel is not only a forensic accountant; he has provided testimony regarding damage valuation nearly 50 times in the last four years. *See* Exhibit 1 to Dkt. 337, filed under seal at Dkt. 338, at 63-71 (Hazel Report).

---

[3] Defendants label Mr. Hazel's opinions as arbitrary, but it is inherently reasonable the OMC would have looked to the very terms Defendants negotiated with the surface owners of the land in question had Defendants abided by the federal mining regulations requiring a lease.

Clearly, Defendants would prefer to pen in Mr. Hazel's opinions around the issue of wind energy development. However, interestingly, Defendants conspicuously fail to mention their own purported expert in this area, Ms. Centera. This omission is likely due to Ms. Centera's endorsement of Mr. Hazel's damages or lease compensation methodology and Defendants rendering her willfully blind to their awareness of the need for the mining lease a year in advance of excavation. *See* Dkt. 336 at 3-5, 9. Despite Defendants' claims, Mr. Hazel did cite experience with projects involving the wind energy industry, including a project that included construction cost overruns.[4] Dkt. 337-1, Hazel Depo. Tr. Excerpts at 19:25-22:4, 24:9-18. Even as a referendum on Mr. Hazel's wind energy industry experience, Defendants' motion fails.

Mr. Hazel's expert opinions are relevant and helpful to the Court as they provide a reasonable and appropriate valuation of damages owed to the OMC, not what Defendants would have paid had they acted like a reasonable wind energy developer in otherwise typical circumstances. Here, despite a year of advance notice of the lease requirement, *no lease was negotiated with the OMC or acquired* by Defendants. The facts and law of this case matter: proceeding at their own risk, Defendants made a

---

[4] Interestingly, here Defendants also encountered various construction cost overruns on their Project, specifically regarding the primary method of excavation they authorized – blasting – which took place at 82 of the 84 turbine foundation sites (a stark increase from the 27 sites they initially planned for). *See* Dkt. 300-4 at 3-4. The other activity addressed in Defendants' Internal Change Order was crushing. *Id*. All told, these activities, blasting and crushing the OME, resulted in a cost overrun of $1,958,327. *Id*. at 5.

business decision to omit a mining lease, and Mr. Hazel has provided a damages valuation accounting for the applicable facts and law.

### Mischaracterizations in Defendants' Summary of Mr. Hazel's Opinions

Defendants misstate Mr. Hazel's opinions at various points in their "Summary". *See* Motion at 6-8. Some of the most concerning examples, albeit nuanced, are outlined below.

First, Defendants continually attempt to frame Mr. Hazel's opinions to be "the amount Osage Wind would have agreed to pay the OMC for a mining lease ...." Motion at 8. In actuality, Mr. Hazel explained under questioning that he was not opining on Osage Wind's intent in a hypothetical lease negotiation (that Defendants prevented from happening in reality), but that Osage Wind's negotiated terms with the surface owners *coupled with* the OMC's reluctance to accept a wind farm project that exploited their OME establish a "very reasonable proxy to the damages in this particular case." Hazel's complete Tr., Dkt. 342-3 at 214:24-25. For full context, note Mr. Hazel's entire explanation about the OMC's negotiating posture:

> But you can't name for us, sir, any other instance in which any other mineral owner has received a penny for a mineral -- for a wind farm, can you?
>
> But again, in this case, they have to get a lease, so that's irrelevant. They have to get a lease. So they have to negotiate the lease with the Osage Nation to basically get this wind farm in place. My understanding, the Osage Nation would have said no. Absolutely no is what they would have said. So now you're in a dynamic where you have to negotiate a lease with somebody that doesn't even want to do what you want them to do. So again, it's a very reasonable proxy to the damages in this particular case.

6

> So why couldn't it be more?
>
> I've already said it probably is more, but I'm trying to get to the best, conservative proxy of the damages for this particular case.
>
> But you're not aware of any other mineral owner being paid in this way, correct?
>
> Again, it doesn't matter. This particular case is somewhat unique. They don't want a wind farm there. I don't know how I can get that through to you. They do not want a wind farm there. So now you're negotiating with a party that doesn't want to do what you're doing. How do you think that negotiation is going to go?

Hazel's complete Tr., Dkt. 342-3 at 214:11-215:13; *see also Id.* at 167:1-168:6.

Second, Defendants are patently incorrect when they state that

> Mr. Hazel's damages opinions do not consider the value of the rock crushed for backfill by Osage Wind at the turbine sites, or the fact that such activity ended years ago.

Motion at 8 (citing Dkt. 337-1, Hazel Depo. Tr. Excerpts at 83:12-15). That selection of testimony *flat out* does not address crushing for backfill as an activity that ended years ago:

> It doesn't have anything to do in my mind about what that particular mineral may be worth right there at that particular moment in time.

Dkt. 337-1, Hazel Depo. Tr. Excerpts at 83:12-15. Defendants conveniently take the entire selection out of context. Had Defendants provided the page *before* the sentence they cherry-picked, or better yet Mr. Hazel's complete response, the Court could then see that this line of questioning addressed what *criticisms* Mr. Hazel had of the report of Defendants' geologist, Mr. Pfahl:

> Do you have any criticisms or responses to anything in Mr. Pfahl's report?

Sure.

And tell us what those might be, sir.

You'd have to pull out the report. We'd have to go line by line if you want to go over all the criticisms.

Do you have any that generally come to your mind, as we sit here right now?

I would rather have the report in front of me to give you all of them. I don't want to start giving you a partial laundry list.

Can you think of one example as you sit here right now, without even looking at the report in front of you?

**Well, I think broadly he misses the point. The point here in this particular situation is negotiation of a lease. It doesn't have anything to do in my mind about what that particular mineral may be worth right there at that particular moment in time. We're talking about damages related to this case and what the mineral right owners should receive as damages. That's what we're talking about in this case. So he [Mr. Pfahl] just totally misses the point.**

**Damages for what?**

**For the failure to get a lease for the mining activities that the Tenth Circuit determined was going on.**

Hazel's complete Tr., Dkt. 342-3 at 82:20-83:22 (emphasis added).

Third, Defendants again misconstrue Mr. Hazel's testimony, augmenting his statement – made obvious and by their use of brackets – to establish "the fact mining ended during the construction period". Defendants' added language directly contradicts Mr. Hazel actual response:

[D]o you have any evidence that Osage Wind is operating a mine today?

Again, in my thought process, they never operated a mine, because they weren't in the mining activity business, but they did mining on the

estate. Because of the work that they did, they are required to get a lease.

And has that work occurred at any time after the construction period ended?

Again, so -- I don't care. So what? It doesn't matter. They're required to get a lease for the mining activities they did. There's nothing in the circuit case that says, okay, at some point in time it stops. The wind farm is there, so they're being damaged the whole time frame when the wind farm is there. That's the damages component.

* * *

My question again, sir, is, **do you have any evidence that mining occurred after the construction period ended?**

**Again, you've asked me that question multiple times. I've told you that I don't have any specific information, because I haven't looked into that. I already told you a bunch of times it's not relevant to me. That's not the calculation we made.**

Are you aware, sir, of any other instance in which a mineral owner is paid other than for the production of minerals from the mineral estate?

* * *

I mean, there are situations, especially in the oil and gas, where people are paid for other than the extraction itself, because they need other types of either pipelines or houses or whatever they need to basically do the overall production of that mineral, which is not specific to the mineral itself.

Hazel's complete Tr., Dkt. 342-3 at 154:11-155:22 (emphasis added).

Fourth, and finally, Defendants' selective use of quotes from Mr. Hazel's report conveniently omits his reasoning (applying principles and methods to the facts of the case) for not selecting either Surface Use Agreements or Mineral Leases and Permits that were close in time, involving excavations for commercial purposes based on royalty rates applied to quantity/weight taken. *See* Motion at 8. Mr. Hazel's detailed

rationale for his decision-making is provided on pages 20-22 of his report. While only four areas of Defendants' summary of Mr. Hazel's opinions are addressed above, the United States refers the Court to Mr. Hazel's actual report, should it have any question about Mr. Hazel's opinions. *See* n.7 below (starting with the 23-page textual report).

## Argument

**I.    Mr. Hazel's relevant opinions and testimony will help the Court understand evidence and determine a fact in issue – the valuation of damages owed the OMC.**

Defendants argue Mr. Hazel's refusal to acknowledge they had an alternative to mining the OME – i.e. using substitute minerals purchased offsite – renders his opinions irrelevant. Regarding the court's gatekeeping functions:

> The Court is required to examine the admissibility of opinions [the expert] will actually render, not those opinions Plaintiff would like to see. *Cf. Orth v. Emerson Elec. Co.*, 980 F.2d 632, 637 (10th Cir. 1992) (noting Tenth Circuit authority for the proposition [] that 'otherwise relevant, factually related expert opinion' can support a claim 'despite the fact that the expert did not conduct independent tests' (internal quotation marks omitted) (pre-*Daubert*)). Plaintiff's speculative argument fails to adequately show that Mr. Peterson's omission of such a calculation undermines his issued expert opinions or reflects a defect in the underlying methodology.

*Smithwick v. BNSF Ry. Co.*, 447 F.Supp.3d 1239, 1244–45 (W.D. Okla. 2020).

Defendants object to Mr. Hazel's opinions arguing they are contradicted by testimony offered by the geology experts: Mr. Pfahl for Defendants and Mr. Freas for the United States. However, Defendants ignore the fact that the geologists are

valuing conversion of the OME while Mr. Hazel is valuing the illegal trespass.

Further, even with, *arguendo*, potentially inconsistent expert reports:

> A lack of consistency with a second expert's opinion is not, in and of itself, a basis for exclusion under Rule 702 and *Daubert*. *Cf. Cook v. Rockwell Int'l Corp.*, 580 F.Supp.2d 1071, 1128 (D. Colo. 2006) ("The dispute between these experts . . . goes to the weight of the survey evidence and does not warrant exclusion."); *Reed v. Smith & Nephew, Inc.*, 527 F.Supp.2d 1336, 1344 (W.D. Okla. 2007) (noting that a party's "disagreement with the expert's conclusion is not grounds for exclusion" (internal quotation marks omitted)).

*Smithwick v. BNSF Ry. Co.*, 447 F.Supp.3d 1239, 1244 (W.D. Okla. 2020).

Defendants, without acknowledging the scores of times Mr. Hazel has given relevant testimony, focus on Mr. Hazel previously having had testimony excluded as irrelevant in *Center City Periodontists, P.C. v. Dentsply Int'l, Inc.*, 321 F.R.D. 193 (E.D. Pa. 2017). *Center City Periodontists* concerned a breach of warranty action where the plaintiffs sought a class action certification. Mr. Hazel proposed damages calculations based on reimbursement, retrofit, and replacement of an allegedly faulty dental device. *Id.* at 203. Therein, Mr. Hazel conceded any revenue generated by the successful use of the device at issue, including value gained from unintended uses, should be discounted from any damages award for the individual class members. *Id.* at 204. As that case concerned a putative class action, individual inquiries were necessary to identify individualized damages for each class member, rendering Mr. Hazel's approach unhelpful for calculating damages on a class-wide basis. *Id.*

An additional hindrance unique to *Center City Periodontists* was a particular line of case law requiring "a model purporting to serve as evidence of damages in [a] class

action must measure only those damages attributable to that theory." *Id.* (citation omitted). The plaintiffs in *Center City Periodontists* sued under multiple theories of liability including consumer fraud claims. Because Mr. Hazel's expert opinions on damages were based on breach of express warranties and conduct under consumer fraud laws, when the court there "dismissed the consumer fraud claims, Hazel's undifferentiated methodology [became] irrelevant for purposes of determining damages that are solely the result of the wrong." *Id*. at 204 (citation omitted).

Unlike *Center City Periodontists*, the instant case is not a class action and none of Plaintiffs' claims have been dismissed, rendering Defendants' cherry-picking of language from that prior case unhelpful to their efforts to exclude Mr. Hazel's expert opinions on damages here. It is undisputed Defendants were required to secure a 25 C.F.R. § 214.7 lease for their mining activities, and they admit liability for their related trespass and conversion activities.[5] Thus, Mr. Hazel's expert opinions as to his valuation of damages relative to the lease requirement are valid, relevant, and helpful to the Court in awarding damages owed to the OMC.

## II.   Mr. Hazel's testimony and opinions are reliable.

### 1.  Mr. Hazel's opinions are based on sufficient facts and data.

Just because this is the only Native American reservation upon which this issue could arise under the applicable regulations, that rarity does not render Mr. Hazel's

---

[5] Dkt. 321 at 6 ("Insofar as the Tenth Circuit held crushing rock for backfill required a mining lease, Osage Wind and EGPNA do not oppose summary judgment as to liability (only) on Plaintiff's trespass and conversion claims.").

opinions unreliable. Defendants should not be rewarded because they are the first tortfeasors to invade and convert the OME on this massive scale. Further, Defendants should not be allowed to weaponize the uniqueness of the facts and circumstances underpinning the case to strike an expert who has sufficiently relevant experience. Most cases require the expert to address unique facts and circumstances, and the damages phase of this case is especially suited for a forensic accountant to provide damages valuations to assist the Court. *See* Section II(4) below at pp. 20-21 (regarding forensic accounting).

### 2. Hazel's testimony is the product of reliable principles and methods.

Defendants vigorously object to Mr. Hazel's chosen comparable proxy – the very terms they negotiated with the surface owners of the Project land. Defendants argue the valuations of geologists Pfahl and Freas for the minerals themselves are more appropriate, rendering Mr. Hazel's lease valuation damages duplicative and inappropriate. However, unlike the more traditional analyses the geologists rendered, which are more appropriate as remedies to Defendants' conversion of OME, Mr. Hazel's opinion finds the long-term leases secured to the surface owners are more apt for crafting the value of the long-term damages that are still being sustained by the continued use and exploitation of the OME. Defendants dislike their own negotiated terms coming back on them and claim such a mining lease is outside the bounds of wind industry development norms, but this is the only reservation where such a lease is required.

After considering the market factors and different approaches to a possible valuation, Mr. Hazel modeled his damages valuation on the surface leases for the same land, as already negotiated by and acceptable to Defendants. As noted, Defendants' argument that the geologists' different approaches to valuations are more appropriate is dispelled by the rule finding that disputes between experts goes to the weight of the evidence and does not warrant exclusion. *See Smithwick,* 447 F.Supp.3d at 1244 (quoting *Cook,* 580 F.Supp.2d at 1128). Nor is Defendants' mere disagreement with Mr. Hazel's conclusion grounds for exclusion. *See Smithwick,* 447 F.Supp.3d at 1244 (quoting *Reed*, 527 F.Supp.2d at 1344). Neither the geologists' different approaches to valuing the minerals *taken* from the OME (separate from the minerals *used or exploited*), nor Defendants' disagreement in having their own, arms-length negotiated terms used against them call for the exclusion of Mr. Hazel's opinions. This is a complex case. With many torts having been committed, many remedies and avenues of recovery are now available.

### 3. Mr. Hazel reasonably applied the principles and methods to the facts of this case.

#### i. Defendants' argument citing Northern District cases using the term *ipse dixit* regarding an expert's opinions misses the mark.

Defendants label Mr. Hazel's opinions as unreliable by stringing together Northern District cases wherein the term *ipse dixit* was used.[6] However, Defendants'

---

[6] The seminal case for labeling experts opinions with this term stems from this passage: "[N]othing in either *Daubert* or the Federal Rules of Evidence **requires** a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) (emphasis added). "A court **may** conclude

own 'say so' does not make their summary conclusions about Mr. Hazel's opinions correct. Each of the cited *ipse dixit* cases is distinguishable.

First, Defendants disagree with Mr. Hazel's opinion that "the Mineral Estate is at least as integral as the Surface Estate," making the OMC's damages "at least equal" to the present value of all payments under the six surfaces leases, which he deems "the most directly comparable proxy." Dkt. 337 at 12. Defendants then summarily conclude these opinions are "classic *ipse dixit*" and should be excluded. *Id.*, citing *Palmer v. Asarco Inc.,* 510 F.Supp.2d 519, 531 (N.D. Okla. 2007). The problem with labeling Mr. Hazel's opinions as classic *ipse dixit* is that, <u>unlike</u> the doctor in *Palmer*, Mr. Hazel is not making *medical causation* opinions (linking lead exposure to ADHD). *Id.* Further, <u>unlike</u> the doctor in *Palmer,* Mr. Hazel did not publish a book espousing the same medical causation opinion he was offering in the case – bolstering his own publication with his own subsequent opinion. *Id.* When Mr. Hazel explained his methodology in selecting the most reasonable and comparable proxy, he considered options and applied his expert training and experience. For these reasons, *Palmer* is inapposite.

Five years after *Palmer*, this Court excluded an expert's testimony by reasoning it "may be excluded where it is based on subjective beliefs or unsupported speculation which is no more than *ipse dixit* guesswork." *Bright v. Ohio Nat'l Life Assur. Corp.,* 2012

---

that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (citing *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1360 (6th Cir. 1992) (emphasis added).

WL 12888316, at *2 (N.D. Okla. Nov. 29, 2012). In *Bright*, Dr. Hudgins' report was found to merely bolster another doctor's independent medical examination (IME) conclusions without addressing how the IME was adequate or reasonable. *Id.* Because Dr. Hudgins focused on his own evaluation rather than the other doctor's IME methodology, this Court ruled such "bolstering would be unhelpful to the jury" and excluded Dr. Hudgins testimony. *Id.* at 2-3. In contrast to *Bright*, Mr. Hazel's opinions here do not evaluate or bolster another expert's opinions. Mr. Hazel painstakingly walks through his rationale, methodically explaining what other types of agreements he considered and how they failed when compared to the surface leases, which in his opinion "represent the *most reasonable and comparable proxy* for the mineral lease that Osage Wind was federally obligated to obtain in order to construct its Wind Farm." Hazel Report at 23 (emphasis added).

Finally, eight years after *Bright*, this Court again excluded opinions of an expert, but that case and its facts differ widely from the instant matter. In this recent case, the Court found certain opinions of an insurance industry expert to be "based only on the *ipse dixit* of Mr. Cary and are therefore inadmissible under the *Daubert* standard." *Hellard v. Mid Century Ins. Co.*, 2021 WL 429917, at *5 (N.D. Okla. Feb. 8, 2021). The Court went on to reason that Mr. Cary failed to "explain how his experience is reliably applied to the facts[,]" . . . has no discussion of the relevant facts, leaving the Court "without the means to evaluate the basis of [his] opinions." *Id.* In a corresponding footnote, the Court continued, explaining that:

16

> an expert report must contain "a complete statement of all opinions the witness will express *and the basis and reasons for them.*" Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). Thus, "[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not just his conclusory opinion.

*Id.* at *5 n.4 (emphasis in original) (quoting *Cohlmia v. Ardent Health Servs., LLC,* 254 F.R.D. 426, 430 (N.D. Okla. 2008)). Here, Mr. Hazel thoughtfully addresses the other types of agreements he considered, and, ultimately, why he reasoned the surface leases to be the "most reasonable and comparable proxy for the [required] mineral lease" Defendants failed to secure. Hazel Report at 23. Importantly, Mr. Hazel not only addresses the alternatives he investigated, he spends the bulk of his report (17 pages, 7 tables, and more than 17 attached schedules) detailing the methodologies underlying his damages calculations, which collectively arrive at a comprehensive valuation for what the OMC is owed. *Id.* at 3-19. In sum, despite Defendants' labeling Mr. Hazel's opinions as *ipse dixit* and intentionally mining the Court's previous decisions employing the phrase, Defendants' suggestion that this Court exclude Mr. Hazel's opinions is all hat, no cattle, and should be disregarded.

### ii. Mr. Hazel's comparable analysis is fully supported in his report, providing the Court with fully adequate means to test his assumptions and evaluate the basis of his opinions.

Defendants' surface-level attempts to argue Mr. Hazel's opinions were solely predicated on his experience is intellectually dishonest and disregards his report. Defendants summarily conclude "[n]either Mr. Hazel's report nor his deposition testimony adequately 'explain how his experience informed his analysis and produced the conclusions he seeks to sponsor.'" Dkt. 337 at 13 (quoting *Dean v.*

*Thermwood Corp.,* 2012 WL 90422, at *7 (N.D. Okla. Jan. 11, 2012) (Noting,

"[e]xperience may provide the basis for qualification as an expert, but experience is

not a methodology."). The expert at issue in *Dean*, Mr. Briscoe, admitted the only

methodology he used was his years of experience. *Id.* at *6. Unlike Mr. Briscoe, Mr.

Hazel offered particular reasons for not employing the possible alternatives to the

illegal acts – the business decisions – Defendants made.

   Another key distinction is that in *Dean*, Mr. Briscoe made no efforts to test the

plaintiff's version of events leading up the accident, blindly accepting them. *Id.* at *7-

9. Here, Defendants' *own* negotiated lease terms are now being used by Mr. Hazel in

his damages calculation as a reasonable comparable for his lost rental value

methodology. Rather than attack the terms they previously negotiated in the surface

leases, or their obvious proximity to the illegal mining, Defendants argue Mr.

Hazel's opinions are solely supported by his experience. Mr. Hazel's painstakingly

explained rationale for reviewing and ultimately *not* selecting alternative methods for

his damages valuations flatly refutes this argument. Hazel Report at 20-22. Beyond

addressing the alternative methods of valuation he investigated, Mr. Hazel's report

primarily explains the methodologies he selected and their application to his

damages calculations, which collectively arrive at a comprehensive valuation for

what the OMC is owed. *Id.* at 3-19. Contrast Mr. Hazel's detailed inspections and

investigations of the alternatives to mining the OME with the expert scrutinized in

*Dean*, Mr. Briscoe, who (i) failed to inspect the machine at issue, (ii) made no effort

to duplicate the sequence of events the plaintiff described, and (iii) was unable to

describe any principled methodology underlying his opinions. *Dean*, 2012 WL 90422, at *8. The respective explanations of Mr. Hazel and Mr. Briscoe regarding their expert opinions could not be more dissimilar.

Defendants continue their unjustified assignation of Mr. Hazel and his opinions by arguing that he "fails to explain how his experience led to his conclusions", leaving the Court "without the means to test [his] assumptions or evaluate the basis of [his] opinions[.]" Dkt. 337 at 13, quoting *Schulze v. United States*, 2019 WL 1440306, at *3 (N.D. Okla. Apr. 1, 2019). Naturally, the United States is familiar with its successful effort to exclude the testimony of the purported expert offered in *Schulze*, wherein Dr. Rouse, a clinical psychologist, tendered opinions on whether the evaluation and treatment of the plaintiff at a Veterans Affairs facility satisfied the appropriate standard of care. *Id.* at *1. In contrast to Mr. Hazel, Dr. Rouse only submitted a two-page report and subsequently testified that (i) he was not aware if there was a majority or minority view regarding the ultimate opinion he was rendering, (ii) "his opinion was not based on any study or research and that he was unaware of any evidence supporting his opinions", and (iii) an important assessment related to his opinion was not an "exact science" and that risk factors vary among individuals (alluding to a likely error rate). *Id.* at *3. Conversely, Mr. Hazel's testimony and report provide ample evidence for his opinions, rendering them admissible and any suggestion of *ipse dixit* unfitting. *See Graves v. Mazda Motor Corp.*, 405 F. App'x 296, 300 (10th Cir. 2010). In greater contrast to Dr. Rouse's two-page

19

report, Mr. Hazel's 75-page report[7] identified how (i) his valuation of a mining lease for the unique set of circumstances at issue is based on and informed by the Tenth Circuit's opinion, (ii) he evaluated multiple alternative theories when creating his damages valuation and provided granular details on the ultimate method he selected, and (iii) he made various conservative assumptions and provided the detail behind his calculations to "represent the most reasonable and comparable proxy for the mineral lease," e.g., noting that the temporal term of the Project may be extended by a renewal option period, which he identifies as a separate valuation component, giving the Court flexibility and clarity in the damages it ultimately awards to the OMC. For all these reasons, demonstrated in his testimony and report, Mr. Hazel successfully explains how his experience as a forensic accountant resulted in his conclusions, affording this Court more than adequate means to test his assumptions and evaluate his opinions.

### 4. Mr. Hazel's opinions satisfy the additional factors justifying reliability.

The expert opinion at issue can be and has been tested. Indeed, Defendants already agreed to similar terms with the surface owners for the same land in question. Simply because Defendants are reluctant to admit they mined the OME and remain vehemently opposed to paying out similar figures to the OMC as they

---

[7] *See* Hazel Report (consisting of a 23-page textual report; 7 tables; a 33-page cache of more than 17 schedules; a 3-page Appendix A outlining the documents received; a 9-page Appendix B including his CV, publications, and recent testimony; and a 4-page Appendix C detailing the Project's turbines).

have to the surface owners, fails to render the *same terms* Defendants have already

agreed to any less reasonable now.

The technique employed by Mr. Hazel has general acceptance in the relevant

discipline - forensic accounting – and the rationale of his preferred comparative

valuation in determining damages owed to the OMC for Defendants' failure to

secure a mining lease is clearly articulated. Mr. Hazel's resulting damages

calculation is followed by a present value of past and future revenue streams, which

he has ample experience analyzing and calculating as a forensic accountant.

Elsewhere, the court explained its rationale for finding a pair of forensic accountants

qualified, despite not having specific industry experience or nuance (in that case, for

fire loss investigations or fire spread analysis):

> [Amodio and Kreuter] are relying upon their expertise in the area of
> accounting to evaluate and **put a dollar amount to the damages** that
> resulted from the fire. **This is an appropriate task for forensic
> accountants**. Amodio and Kreuter, as reflected by their respective
> curriculum vitaes and extensive experience in the field of forensic
> accounting, see App. B & C of Report, are clearly qualified as forensic
> accountants who may be retained to evaluate the merit of the alleged
> damages.

*Travelers Prop. Cas. Co. of Amer. v. Hallam Eng. & Constr. Corp.,* 2012 WL 13029519, at

*3 (D.N.J. Aug. 16, 2012) (emphasis added). Applying this same analysis to the

instant case, Mr. Hazel may not have the extensive experience of wind turbine

trespass on a reserved mineral estate that *Defendants* artificially require, but that is not

the standard for his reliability and qualification. Mr. Hazel's experience in

performing damages valuations across various industries renders his opinions here

21

reliable and his qualifications sufficient for him to opine on the valuation of the damages owed to the OMC.

Finally, as discussed, Mr. Hazel has adequately considered various alternative valuation methods including Defendants' Surface Use Agreements and other OMC Mineral Leases and Permits that exhibited mineral excavation for commercial purposes based on a royalty rate for the minerals' quantity/weight and fair market value. Hazel Report at 20-22. The second alternative addressed may be perceived as the more typical approach to the value of minerals mined, which is the corresponding remedy for Defendants' conversion of the OME, as calculated by the pair of competing geologists. However, Mr. Hazel does much to explain why he determined this approach to be lacking, based on the scale of the Project and the OMC's unwillingness to readily accept the Project. *Id.*

### III.    Mr. Hazel is more than qualified to opine on the damages valuation that should be calculated to compensate the OMC for the necessary mining lease that Defendants avoided.

Mr. Hazel's damages valuation for what amount a lease would reasonably have garnered, is not cabined by what amount *Defendants* would hypothetically have agreed to pay the OMC for a mining lease. Defendants forfeited that right when they proceeded to mine the OME despite (i) warnings by the OMC a year in advance of excavation (October 2013) and (ii) orders from the BIA's Osage Agency to cease and desist contemporaneous to excavation (October 2014). The Tenth Circuit ruled a lease pursuant to Part 214.7 was required, and Mr. Hazel's expert opinion is that it is

22

*reasonable* the OMC be compensated on a comparable basis to what the surface owners are being paid.

Defendants mistake the focus of Mr. Hazel's damages valuation. It is not premised solely on wind development, but on comparable methodology (what Defendants were willing to pay in the marketplace, and a floor for what the OMC may have been willing to accept) to arrive at a reasonable amount that would fairly compensate the OMC for the damages incurred. The facts of this case, which involve various income streams related to a wind development project that were arrived at and remain possible due to Defendants' continuing trespass of the OME, informed Mr. Hazel as he fashioned his damages valuation. As noted, Defendants skip straight to Mr. Hazel's "hold up" value number to argue he should be disqualified. But, at this stage of litigation, that is not the point. The Court is simply charged with ensuring that the expert bases his opinion on facts (as Mr. Hazel did and Ms. Centera did not) and that he has a method that is sound (Mr. Hazel integrated the Tenth Circuit's lease requirement with comparable leases while Ms. Centera proposed some other "curative document" and wanted to "think about" damages in the case of litigation. Dkt. 290 at 10, 12. The United States "need not prove that the expert is undisputedly correct or that the expert's theory is 'generally accepted' in the scientific community"; rather the proponent of the expert "must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirement." *Mitchell,* 165 F.3d at 781 (citations omitted).

Mr. Hazel is a forensic accountant trying to follow the letter of the "law of the case" – i.e. the Tenth Circuit's finding that a lease was required – and looking for a contemporaneous, comparable reasonable proxy, which he determined to be the surface leases. Mr. Hazel is qualitatively different from, and in stark contrast to, Ms. Centera, who was presented in part as a rebuttal witness to Mr. Hazel and notably offered no quantitative analysis. While Mr. Hazel offered a detailed damages valuation, appropriate for this phase of the litigation, Ms. Centera seems employed by Defendants to justify or minimize their actions by attempting to inform the Court about what a reasonable wind energy developer would have done. However, that ship has long since sailed, and the parties (or at least the plaintiffs) are now focused on damages. Accordingly, Mr. Hazel's opinions will assist the Court in assigning the damages owed to the OMC for Defendants trespass of the OME.

## Conclusion

Plaintiff, the United States, prays this Court deny Defendants' Motion seeking to exclude the testimony of Mr. Steven J. Hazel as an expert for the United States and grant any additional relief the Court deems just and proper.

Respectfully submitted,

United States of America

Clinton J. Johnson
Acting United States Attorney

s/Nolan M. Fields IV
Cathryn D. McClanahan, OBA No. 14853
Nolan M. Fields IV, OBA No. 31550
Assistant United States Attorneys
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119
T: 918-382-2700
cathy.mcclanahan@usdoj.gov
nolan.fields@usdoj.gov

Stuart P. Ashworth, OBA #31468
Special Assistant United States Attorney
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor's Office
7906 East 33rd Street, Suite 100
Tulsa, Oklahoma 74145
T: 918-669-7905
stuart.ashworth@sol.doi.gov

Of Counsel:
Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor's Office
7906 East 33rd Street
Tulsa, Oklahoma 74145
T: 918-669-7902
charles.babst@sol.doi.gov

25