**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,

      Plaintiff,

and

OSAGE MINERALS COUNCIL,

      Intervenor-Plaintiff,

v.

OSAGE WIND, LLC;
ENEL KANSAS, LLC; and
ENEL GREEN POWER NORTH AMERICA,
INC.,

      Defendants.

Case No. 14-CV-00704-JCG-JFJ

**OSAGE MINERALS COUNCIL PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## CONTENTS

A.   Background on OMC Leasing of its Mineral Estate ........................................................... 2

B.   Defendants surface lease and failure to obtain a lease of the mineral estate. ..................... 3

C.   Value of the Minerals ......................................................................................................... 4

D.   Value of the Lease .............................................................................................................. 10

E.   Forcibly ejecting or excluding a person from the possession of real property. ................ 15

Discussion of law ..................................................................................................................... 20

II.   Treble damages ..................................................................................................................... 21

III.   Defendants asserted an advice of counsel defense. ............................................................ 23

IV.   Defendants argument that the United States had to tell Enel that Enel needed a permit .. 24

The Osage Minerals Council submits the following proposed findings of fact and conclusions of law.

### A.    BACKGROUND ON OMC LEASING OF ITS MINERAL ESTATE

1.  The law governing the Osage Mineral Estate is unique and is based upon the unique history of the Osage Tribe and the relatively early discovery of oil on the Osage Mineral Estate.

2.  The Osage Tribe's Reservation in Oklahoma was established in 1872 and comprised all of the land now in Osage County, Oklahoma.  Act of June 5, 1872, ch. 310, 17 Stat. 228 ("An Act to Confirm the Great and Little Osage Indians").   Unlike all or nearly all large Reservations, the Osage Tribe bought the land for its Reservation.

3.  In 1906, Congress decided it would create a new set of laws and practices specific to the Osage Reservation.  The result was the 1906 Act, 34 Stat. 539, § 3.  In the 1906 Act, Congress severed the surface estate from the mineral estate and decreed the end of Osage collective ownership of the surface estate.  It reserved all of the mineral estate, referred to as the Osage Mineral Estate or OME, in trust by the United States for the benefit of the Osage Tribe.  To execute the 1906 Act, the United States conducted a census of the Osage Tribe, resulting in the 1906 Osage membership roll.

4.  Congress directed the Secretary of Interior to collect and distribute royalty income from minerals pro rata to those who were on the 1906 Osage membership roll.  This right to receive quarterly trust distributions is referred to as a "headright."  *Taylor v. Tayrien*, 51 F.2d 884, 886 (10th Cir. 1931).  The 1906 Act created the sui generis concept of headrights and rights of inheritance regarding those headrights.  The Osage Tribe's Council was "vested with the authority to lease or take other actions" regarding the mineral estate on behalf of the headright holders.

5.  In 2004, Congress passed "An Act to reaffirm the inherent sovereign rights of the Osage Tribe to determine its membership and form of government," P.L. 108-431, 118 Stat. 2609 (2004); After passage of that Act, the name of the federally recognized Tribe became the "The Osage Nation," *e.g.*, 8 Fed. Reg. 944, 946 (Jan. 8, 2024) (annual published list of federally recognized tribes), and the entity which had been the Osage Tribal Council, and which exercised the leasing and other the ownership interest for the headright holders became the Osage Mineral Council (OMC).

   **B.   DEFENDANTS SURFACE LEASE AND FAILURE TO OBTAIN A LEASE OF THE MINERAL ESTATE.**

6.  In 2010, Tradewind, Defendants' predecessors in interest obtained surface leases for approximately 8200 acres of land in Osage County, Oklahoma T. 179: 6-9 (discussing acres for each of 6 surface leases), but they never submitted an application for a lease to the OMC or the Osage Nation.

7.  By no later than October 2013, Tradewind was aware that the Osage Nation or OMC asserted that Defendants were required to obtain a lease

8.  In United States v. Osage Wind, 871 F.3d 1078, 1092 (10th Cir. 2017), *cert. denied* 139 S.Ct 784 (Jan. 7, 2019), the Tenth Circuit held: "Osage Wind's excavation work here constituted 'mining' under § 211.3, thereby requiring Osage Wind to secure a federally approved lease from OMC under § 214.7."

9.  Although Defendants' petition for a writ of certiorari was denied over five years ago and Defendants have not sought a stay from this Court after certiorari was denied, Defendants have still never applied for a permit. Defendants' legal analysis

### C.   VALUE OF THE MINERALS

1. Defendants concede they are required to pay for the minerals, and the parties disagree on the value of the minerals.

2. Plaintiffs presented Robert Freas as its expert on the value of the minerals.  Defendant presented John Phahl as its expert on that topic.  Both experts were qualified to valuate hard minerals, and the experts agreed on many points, but the disagreed on the follow:

   a. The diameter of the base of the excavation for each turbine, with the primary disagreement stemming from different figures for the amount of "work area" around the turbine foundation;

   b. Whether compensation is owed for minerals other than limestone;

   c. Whether compensation is owed for minerals used in trenching;

   d. The slope from the base to the surface for 11 of the turbines;

   e. the number of turbines for which compensation is owed;

   f. The royalty rate.

3. Regarding the diameter of the base of the excavation, the experts agree that Defendants created a work area greater than the diameter of the concrete foundations, to allow for workers and equipment to access the location during construction.  The experts disagree on the size of that work area.  The Court finds the Plaintiffs' expert's analysis to be more persuasive on this factual issue.

4. The experts did not locate or rely upon any construction planning documents which described or specified how large the work area should be, nor did they locate or rely upon any writings created during the construction which included measurements of the work area.

5.   Plaintiffs' expert calculated the work area based upon pictures taken during construction which showed the work areas with workers present.  He used those pictures because the workers helped to provide scale.  He also used his own experience in similar projects.  From this he calculated the average work area to be eight feet. i.e. that the radius of the excavation was 8 feet beyond the intended concrete.  At trial, he was shown Plaintiffs' exhibit 35, and noted that the wood forms in that picture, which extend from the edge of the concrete to the start of the sideslope are typically 8-10 feet long and appeared to be that length in the picture.

6.   In contrast, Defendants' expert calculated the area blasted based upon two methods which he then claimed were approximately equal.  But both of his calculations were based upon plain mathematical errors.  In his first method, he added only 5 feet to the radius of the concrete base, instead of adding 8 feet as shown in pictures.  Notably he did this without looking at the pictures.  T.1367-8 (admitting that his list of documents relied upon for his opinion did not include the pictures of the blasted holes, and that he did not see the pictures until after he completed his report).  He also misstated or misinterpreted the "Foundation Blasting Drill-Hole Layout" which is figure 5-4 in his report.[1]  Based upon his plain misstatement of figure 5.4, he asserted that the "largest referenced value" for the diameter is 60 feet.  Figure 5.4 shows that the dynamiting was intended to produce an area with a 72-foot diameter, and the pictures as opposed to the plans show an area beyond that.

---

[1] Defendants' expert asserts that figure 5-4 shows a "trapezoidal shape that is 63 feet wide with a wedge shaped ramp … extending an additional 27 feet to the side." Def. Ex. 103 at¶50.  Putting aside that the shape is an irregular hexagon, not trapezoidal, Defendants' expert makes a basic math error.  The vertical distance between the dynamite is 63 feet, but, as Defendants' own expert discusses, the blast is expected to create a hole which extends out an additional 4.5 feet on each side from the dynamite.  That is a hole of 72 feet vertically, not 63 feet, and with total horizontal distance of 99 feet.

7. In his report, Defendants' expert did not mention the need for sideslope, and he calculated the volume based upon a cylinder with a 70 foot diameter.  At trial, he attempted to make up for his failure to include a sideslope by claiming that he had calculated a cylinder because the math was easier, so that he was, he claims, using a diameter of 65 feet and a tapered truncated cone of ten feet for sideslope.  His attempt at face-saving is contrary to his written report that he was using a 70 foot diameter, and in any case a diameter of 65 feet is contrary to the other evidence.

8. Based upon his use of a 70-foot diameter without any sideslope, Defendant calculated 1,425 cubic yards per foundation.

9. He then claimed to have corroborated his faulty estimate of 1425 cubic yards by calculating volume in a second manner, where his math is even worse.  He came up with this calculation based upon a diagram of the dynamiting plan for a hole.  Def. Ex. 103, fig. 5.4. Based upon plainly incorrect math, he *incorrectly* calculated volume under that diagram to be 1,390 cubic yards.  He did so even though the figure itself contained the blasting expert's estimate of 1,640 cubic yards for a nine-foot deep hole.  The blasting expert estimated that the dynamiting to 10 feet expelled 1800 cubic yards, T: 1296:11-12, and both experts concluded that using an average depth of ten feet was appropriate. Defendant's expert concluded that because 1,390 is close to 1,425, his estimate of 1,425 was sufficient, and that it slightly benefited Plaintiffs, and he use 1,425 cubic yards as his figure for his calculation of volume and then value.

10. For this second method of calculating, he assumed that each of the 60 dynamite charges created its own separate c*ircular hole* with a *radius of 4.5 feet.*  For 58 holes he assumed a depth of ten feet and for the remaining two holes (the ramp) he assumed a depth of five

feet. Def. Ex. 103 at 27 (expressly stating he assumed " a complete blast *radius* to 4.5 feet).

He then used the formula number of holes x depth x pi x radius[2], with d (depth) of 10 feet

for 58 holes and 5 feet for two holes on the ramp, and with r (radius) of 4.5 feet, coming to

1,390 cubic yards.[2]  If the blasts had created individual circular holes, his calculation would

have been correct, but those circular holes would be tangent to each other, with 10 foot

high areas of remaining material—about 21% of the volume that needed to be removed

and that was removed.  Contrary to Defendants' expert's miscalculation, the blasts did not

produce separate cylinders—the 60 charges worked together to remove the whole volume.

For each of the individual blasts, all of materials in a 9 foot by 9-foot rectangular cube was

removed, with a depth of 10 feet for 58 of those cubes and 5 feet for the remaining two (the

ramp).  The correct formula is number of holes x length x width x height.  This comes to

1770 cubic yards.[3]

11. Defendants' expert only reviewed the pictures after he had completed his report and after

    he realized that the competing expert had relied upon pictures to estimate the work area

    and had included excavation for sideslope.  After reviewing the pictures, Defendants'

    expert did not modify his prior estimate for the work area or correct his failure to include

    sideslope (though in his rebuttal he admits that the plans called for sideslope as required

    by law.) T: 1368: 7-15

12. The Court also finds Plaintiffs' expert more credible that a sideslope of 2/1 was used for

    11 of the foundation locations.  On this issue, Defendants' expert initially failed to include

---

[2]  $(58)(10)(3.14159)(4.5)^2 + 2(5)(3.14159)(4.5)^2 = 37,534$ cubic feet, which (dividing by 27) is 1,390 cubit yards.

[3]  $58(9)(9)(10) + 2(9)(9)(5) = 47,790$ cubic feet $= 1,770$ cubic yards.  The OMC notes this is close to the blast reports, which stated that for blasting to a depth of 10 feet, the total volume was 1800 cubic yards.

sideslope, but reworked his numbers after the fact to include sideslope without any increase in his calculation of the excavated volume.  Plaintiffs' expert testified that from his review of the geotechnical report, U.S. ex. 65, soil conditions, it was reasonable to conclude that Defendants would have used a 2/1 ratio on 11 of the turbine locations. The Court finds that testimony to be credible.

13. The Court further notes that the burden shifting in 25 U.S.C. § 194 applies to the current trial.  That section provides in whole:

> In all trials about the right of property in which an Indian may be a party on one side, and a white person[4] on the other, the burden of proof shall rest upon the white person, whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership.

14. The statute shifts both the burden of proof and the burden of persuasion to the non-Indian. *Wilson v. Omaha Indian Tribe*, 422 U.S. 653, 669 (1979).[5]

15. Although the OMC does not need to rely upon that burden shifting because it prevails even if it has the burden, the Court concludes that the Defendant had the burden of both proof and persuasion regarding the amount of OME used.

16. The experts disagree on whether Defendants must pay for minerals other than limestone. Defendants' non-attorney mining expert initially contended the Tenth Circuit required that Enel had to: 1) crush, 2) sort, and 3) use for structural support, 4) "rocks." Def. Ex. 103 at 22. He subsequently modified that to state that Enel was liable for rocks it crushed and used for structural support. T:1385.  This Court has previously rejected the assertion that

---

[4] The statute was initially adopted in 1822, and the language is dated.  "White person" includes any non-Indian and includes corporations.  "Indian" includes an Indian tribe. *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 664-666 (1979).

[5] Because the burden is shifted by statute, the Court need not determine whether the burden would have also shifted because Defendants failed to record the amount of OME which they excavated or crushed.  *See* U.S. Proposed Findings

Defendant's expert was making, Dkt. 386 at 33, and that argument is also contrary to the Tenth Circuit's decision in in *Millsap v. Andrus*, 717 F.2d 1326 (10th Cir. 1983).

17. In Milsap, the Tenth Circuit held that shale, clay, and other non-organic matters in Osage County are "minerals" under the 1906 Act and are therefore OME.  The parties agree that minerals other than limestone have economic value and they further agree that Defendants used those other minerals for backfill and other purposes.  Plaintiffs' expert discussed the market value for those minerals, and Defendants' expert did not contest that testimony. *E.g.*, Def. Ex. 103 at 32 n. 33.

18. Defendants put minerals other than limestone to beneficial use, including to fill the areas around the concrete turbine foundations, to protect the foundations from weather damage, and to provide additional weight to hold the foundations, and therefore the turbines, in place.  T: 87, T 1398:21-1999:17. Defendants also put minerals, including limestone and other minerals, to beneficial use for the approximately 33 miles of trenching.  T:42:24-43:5; Mazurowski Dep at 24:11-15; 35:14-36:14.  Defendants' expert excluded those minerals from his calculation based upon his assertion that Enel does not have to pay for OMC minerals unless it crushes and sorts those minerals.  Because they are OMC minerals, that Enel put to beneficial use, which Enel otherwise would have had to buy from an outside quarry, Enel is required to pay for them.

19. The experts also disagree on the number of turbines foundations which should be included in the calculation of value of the minerals owned.  Defendants' expert excluded two foundations based upon his assertion that even though Enel used OME at those two locations, it did not dynamite or crush rock at those two foundations.  This legal issue will be discussed below.

20. Finally, the experts disagreed on the royalty rate. The Court agrees with Plaintiffs that the Court is required to use the minimum royalty rate set by law.[6]  5 C.F.R. § 214.10(d).  T. 61:14-62:8.  As undisputed, that royalty rate was .89 per ton for limestone and .60 for other minerals  Pl. Ex. 39.  The Court therefore need not resolve and does not resolve the parties many disputes regarding Defendants' experts' assertion that the per ton royalty rate on two other OMC leases are comparable.[7]  The Court concludes that the royalty rate for the minerals was .89 per ton for limestone and .60 per ton for other minerals .

21. After excluding most of the minerals that Enel has been using for the past ten years from his calculation, Mr. Phahl opined that the royalty that was due was about $70,000.  But see T. 285:22-286 7 (In cross examining Mr. Hazel, Enel's attorney quotes from a BIA procedure for "sandy soil and rock permits" which states that the annual *minimum* advance royalty payment for the permit is $100,000, and attempts to chastise Mr. Hazel for not discussing that minimum annual royalty amount.)

### D.    VALUE OF THE LEASE

22. Steven Hazel provided an expert report regarding the value of the lease.  Defendants designated Kimberlee Centera as its rebuttal expert to Mr. Hazel in the final pretrial order in this matter, Dkt. 408 at 26 (On March 15, 2024, Defendants stated, "Ms. Centera will

---

[6] Defendants' expert appears to have been unaware of the statutory minimum royalty rate when he wrote his opinion.  As with other issues, after Defendants' expert became aware of his failure to consider materials which were considered by Plaintiffs' expert, Defendants' expert declined to modify his opinion.  In this and in other regards, Defendants expert appears to have been more of an advocate than an expert, and appeared unwilling to admit errors in his reports. .

[7] The Court notes that the per ton royalty rate in the leases that Defendants expert uses as "comparables" is lower than the statutory minimum, but the Court also notes those leases included payments to the OMC in addition to the per ton royalty rate.  The Court cannot determine from the available evidence whether the total compensation under those other leases was below the statutory minimum, and the Court cannot determine whether those other leases provided other benefits to the OMC which would not have been provided through a lease for the windfarm.

provide expert witness testimony as to the development of wind energy projects and rebut the testimony of Steven J. Hazel."). At trial, Defendants did not call Ms. Centara and instead called Mr. Phahl to attempt to rebut Mr. Hazel's testimony. Over Plaintiffs' objections, the Court permitted Defendants to change its expert from the expert they designated in the final pretrial order. But that does not mean that Defendants' last-minute decision not to call their designated expert is without consequences.

23. Under the specific facts here, the Court is permitted to apply the "missing witness inference." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 81 (2d Cir.2000) ("It is well-settled that a party's failure to call a witness may permissibly support an inference that that witness's testimony would have been adverse."). The adverse witness rule applies to both expert and non-expert witnesses. *E.g.*, *Chevron Corp. v. Donziger*, 974 F.Supp.2d 362 (2014); *Schaffner v. Chicago & N. W. Transp. Co.*, 129 Ill. 2d 1, 23, 541 N.E.2d 643, 652 (1989); 75A Am. Jur. 2d Trial § 497. The inference that the missing expert witness would be adverse to the Defendants is applies because that expert who did not testify is within the control of the Defendants, and Defendants did not offer any explanation for their late decision not to call her as planned.

24. Whether to apply that rule is based upon specific facts of a case, and is appropriate here for multiple reasons specific to the current facts: 1) Mr. Phahl's testimony did not rebut Mr. Hazel's discussion of the value of the lease. Instead, Mr. Phahl provided a legal argument, contrary to the applicable regulations and the law of this case that a lease was not required. 2) Defendants designated Ms. Centera as the rebuttal expert for regarding Mr. Hazel's opinion in their final pretrial order, not in some document from long ago; and they never altered their written designation of Ms. Centera as their rebuttal expert.

25. In any case, Mr. Phahl's testimony was not on point, and Defendants therefore failed to meet their burden to provide expert testimony on the value of the *lease*.  Mr. Phahl's testimony was based upon his erroneous legal assertion that no lease was required, and that therefore Enel only needed to pay for the value of the limestone that it crushed and began has been using for structural support for nearly ten years.  His legal assertion is contrary to both the prior Tenth Circuit decision and the applicable regulations.  25 C.F.R. § 214.9 (For OMC hard minerals, the user must have a lease and must pay a royalty rate, and that the prices for those two components must be negotiated and approved by the OMC.)  It is also contrary to the testimony that even when federal law does not require a lease and royalty payments, this is the standard structure of a mineral lease.

26. Mr. Phahl provided his opinion on royalty (and as discussed above, his opinion is unpersuasive on that issue), but did not provide an opinion on the value for the other component—the lease of the estate.  Instead, he argued that Enel should only have to pay a royalty on the limestone it used, not the separate lease payment required by law.

27. Mr. Phahl's testimony was also not credible.  Through Mr. Phahl, Defendants presented their legal assertion that the windfarm has powers which are similar to, but greater than, the federal power of eminent domain.  Phahl acknowledges that the OMC would not have leased a quarry to Enel or sold limestone to Enel for $70,000.  But he asserts, contrary to law, that Enel can defy the federal cease and desist letter, and can crush and use the OMC's property without permission for ten years, and that after the OMC prevails on claim that Enel has been violating OMC's rights for ten years, all Enel has to do is pay the amount which Phahl claims an "objective reasonable seller" of limestone would have asked for ten years ago.  That testimony is contrary to basic property law--no one except a sovereign

government can take someone else's real property and then force a sale at "fair market value." Defendants' legal argument, which they were presenting through Phahl, is also directly contrary to this Court's ruling that the trespass in this case is a continuing trespass. Phahl does not account for the nearly ten years of trespassing and does not account for the requirement of a lease in addition to the royalty payments.

28. The only witness who provided testimony on the trespass for the past ten years and the only witness who provided testimony on the value of the lease that was required for those ten years is Mr. Hazel.

29. Mr. Hazel discussed that for mineral leases there is generally a payment for leasing the land and a separate royalty payment, but unlike Mr. Phahl, Mr. Hazel then provided an opinion on the best comparable for a lease. T.349:9-10.

30. The Court is required to accept Mr. Hazel's unrebutted testimony, and the Court further concludes that Mr. Hazel's testimony was credible and thoughtful. He provided a clear explanation for his conclusion that the best available comparable for the current unique factual scenario is the surface leases for the same land. He further discussed that the applicable regulations set the minimum amount that the OMC can receive in lease payments and in the separate royalty payments, but that the regulations require a lease and do not cap the amount of the lease. T: 286-87.

31. Also unlike Mr. Phahl, Mr. Hazel acknowledge that the comparable that he used was not perfect, but he explained in detail why it was the best available comparable under the unique facts here—a defendant who is required by law to obtain a lease from a land owner who does not want to lease the land. E.g. T: 348:10-12

32. Defendants' attorneys asserted that Mr. Hazel's analysis was extreme and punitive, but their assertion was dependent upon, inter alia, their contention that Enel's trespass is not ongoing.  Defendants' expert contended that the "willing buyer" and "willing seller" were to be determined in about September 2014, before Enel had wrongfully crushed OME and before Enel had decided to pour concrete foundations over the OME after Enel received the United States' cease and desist letter.

33. Phahl also implicitly argued that Enel can wrongfully take property from the OMC and be disrespectful to the OMC and the Tribe, E.g. T. 545 ((discussing an email where Mr. Storch wrote that the Tribe's principal chief is not honorable because the Tribe was continuing to oppose the windfarm, T: 545:21-546 (testifying that Enel did not want to meet with the Tribe or the OMC, that instead it wanted to meet with "responsible government officials"); T: 568 ("I understand the Nation is a sovereign… but I –I don't think of them as government officials, rightly or wrongly."); Enel's expert asserts that even after all of that, the OMC cannot obtain more than what a seller who had not been so disrespected would obtain.

34. Mr. Hazel's analysis is also not based upon the current negotiating position of the parties. It is, in fact, much more favorable to the Defendants than the current negotiating position of the parties would allow.  Enel has previously asserted in this Court that it will lose hundreds of million dollars if it is required to remove the windfarm. Pl. Ex 58, ¶15.  If Enel's figure is accurate, that would set the maximum that an objective buyer in Enel's shoes would currently be willing to pay to obtain the lease.  Unlike Mr. Phahl, who is seeking to minimize the amount Enel must pay in any way he can think of, Mr. Hazel is not making the argument for the maximum possible lease value.  Instead, as he explained,

he was seeking to find the best available comparable under a factually difficult and unique scenario.

35. As Mr. Hazel testified, and as Defendants did not rebut, a mineral estate owner generally obtains more in lease payments than a surface owner.  Accepting that unrebutted testimony, Mr. Hazel's use of the surface estate leases as the best comparable is amply supported.

36. The Court therefore accepts as unrebutted the testimony of Mr. Hazel regarding the value of the lease.

    **E.**    **FORCIBLY EJECTING OR EXCLUDING A PERSON FROM THE POSSESSION OF REAL PROPERTY.**

37. As discussed below, the parties disagree about the standard for trebling of damages.[8]  But here, trebling of damages is appropriate regardless of which standard the court would apply.

38. The testimony regarding Defendants' liability for treble damages and the testimony which at long last explains how Enel made its very costly error came to a head in the testimony of Mr. Price.  The table for that had been set by Mr. Slade, who testified regarding the memos his firm drafted and the facts that were told to him and the facts that were kept from him when he drafted that memo.

39. Mr. Storch made conclusory statements supporting Enel's claim that prior to October 2014, Enel believed that any potential disputes with the Tribe or OMC had been resolved.  But after making those conclusory statements, Mr. Storch admitted that he did not believe disputes with the Tribe or OMC had been resolved, and that instead he believed that the

---

[8] In its proposed findings, the United States discusses the competing arguments for treble damages. For the reasons discussed herein, the OMC does not believe the Court needs to resolve those argument under the current facts because the Plaintiffs prevail even if the Court adopted Defendants erroneous legal assertion.  The OMC agrees with and adopts the United States legal argument regarding the legal standard.

Tribe and the OMC would continue to seek to stop construction of the windfarm.  E.g. T: 568: 11-12

40. Consistent with Enel's theme that Enel had thought the issues had been resolved, Mr. Storch claimed that when Enel received the cease and desist letter, it had never even heard of a "sandy soil permit."  T. 645:13-647:8 (repeatedly testifying that prior to October 2014 Enel had never heard of a "sandy soil permit" and had no idea what it was, and that it immediately began scrambling to learn what a sandy soil permit is.  His testimony was not credible.

41. In October 2013, Tradewind, Defendants' predecessor-in-interest knew that the OMC contended that Defendants required a lease from the OMC before it could begin constructing the windfarm.  The October 2013 memo refers to sandy soil leases. Defendants predecessors were provided that analysis in October 2013 and Defendants were provided with memos containing that content in April and May 2014.

42. Tradewind went to Lynn Slade.  Mr. Slade acknowledged in testimony that in his lengthy career, he never litigates on behalf of tribes, and that he has frequently litigated against tribes, including against the Osage Nation.  This includes that he was the lead attorney on a case in which he argued that the Osage Reservation had been disestablished.  He has expertise in the law applicable to the Osage Nation, but he is not neutral or dispassionate.

43. Tradewind r asked Mr. Slade to analyze whether it needed a lease to move soil at the windfarm location.  Mr. Slade and others in his law firm prepared a memo for internal use, in which they stated that although there was no case directly on point, the law firm's view was that Tradewind (which was a developer, not the entity which would ultimately engage

in construction, T. 520:2-6) could move soil without a permit or lease from the United States or OMC as long as Tradewind's contacts were merely "incidental" to the OME..

44. At trial, Enel asserted that Mr. Slade's memo that Tradewind could have "incidental" contact with minerals when it was moving soil allowed Enel to blow up thousands of tons of OME with dynamite. T.521:2-6, and that Enel was acting in reliance on advice of counsel when it blew apart the OME, then crushed and used the rocks for structural support.

45. Most problematic for Defendants, at the time the memo was written, Tradewind had not told Mr. Slade that there were plans to use explosives to blow up OME, nor did it disclose that it was going to sort and crush rocks. T: 800-801. As Defendants now acknowledge, those facts were material to the legal question of whether Defendants required a lease and were material to the Tenth Circuit's decision that Defendants now accept.

46. In April 2014, Defendants received a copy of the October 2013 memo, and a slightly modified version of that memo was provided in May 2014.

47. Mr. Storch testified at length about Mr. Slade's October 2013 and May 2014 memos. He asserted that the memo was clear and unequivocal, that it expressed no uncertainty. That testimony is contrary to the plain language of the memos, and is also unpersuasive because, as noted, Mr. Slade was not provided with the most important material facts relevant to whether a permit or lease was required. Even for moving soil, the October 2013 memo contained caveats and qualifiers, including Mr. Slade had not located any case on point.

48. By the time Enel belatedly disclosed to Mr. Slade (in September and October 2014) that it was crushing, sorting and using OMC minerals and that it was using dynamite to blast those minerals apart, Enel was already in the middle of its construction cycle, which required detailed scheduling and coordination.

49. As Enel repeatedly discussed, even a small delay in construction resulted in large damages to Enel.  U.S. Ex. 29 (Mr. Slade states that his understanding a the time is that Enel is not pouring concrete as of October 22, 2014, but that it is "continuing operations notwithstanding the superintendent's letter due to extreme economic costs."); Storch testimony T. 533:8-28 (discussing that Enel had "on the order of 200 construction workers" when it received the cease and desist instruction, and that "it would likely be at least a daily cost of six figure" to stop construction.

50. In October 2014, the United States sent Enel a cease-and-desist letter.  Enel's officers consistently referred to that letter as a request or recommendation that Enel step, but each of those witnesses ultimately admitted that the letter was a cease-and-desist letter and that Enel understood that the letter was a cease-and-desist letter.

51. In response to the cease-and-desist letter, Enel developed a two-stage response plan.  Plan A was to attempt to convince the United States to withdraw the cease-and-desist letter.  If the United States did not withdraw the letter, Enel would go to Plan B—it would stop crushing and using the OME.

52. Neither "Plan A" nor "Plan B" would have complied with the United States cease and desist letter, and no documents or testimony showed that Enel considered complying with the cease and desist order

53. As part of Plan A, Mr. Slade took his prior memo that Enel could move soil and turned it into an advocacy memo to the United States, seeking to convince the United States to withdraw the cease-and-desist letter.

54. The advocacy memo did not cite any legal authority other than those which had been cited in the October 2013 memo which opined that Enel could move soil without a permit, but

the conclusions in the memo were altered, consistent with the intended purpose to use the memo to advocate that the United States change its position.

55. Enel's effort to get the United States to withdraw the cease-and-desist letter did not work. Notably, Enel did not go on to plan B. Instead, after it obtained prices for importing limestone, and it decided not to not to stop crushing and using OME.

56. In his testimony, Mr. Price admitted that when Enel received the cease and desist letter, it had already crushed some of the OMC but it had **not** poured any of the concrete foundations. It could have set thee OME aside, instead of irretrievably committing to use the OME for the life of the windfarm.[9]

57. Mr. Storch and Mr. Price both testified to the very high costs that Enel would have incurred if it had complied with the cease-and-desist letter. Both acknowledged that they would have had to comply with NEPA before the United States could issue a permit, and they both acknowledged that process would take some unknown and unpredictable amount of

---

[9] As part of the argument on summary judgement, this Court asked Enel whether it could now remove the OME which Enel is unlawfully using as foundation for the turbines. Enel declined to take that possible lifeline.

time, but that it would be months.[10]   Construction could not have been completed before

winter.

58. There are multiple emails discussing Enel's Plan A and Plan B, but tellingly Enel did not

put in writing why it subsequently abandoned Plan B and decides to simply defy the cease-

and-desist letter.

59. But by the time it received the cease and desist letter, Enel was already in "recovery mode,"

i.e. it was already behind schedule and was trying to catch up before winter came.  It chose

to \defy the federal directive and to also not even stop crushing OME.

60. At the time it made those decisions, Mr. Storch and Mr. Price understood that the United

States had directed Enel to stop, and that Enel was choosing not to comply with that

directive.

## DISCUSSION OF LAW

1. As Defendants now concede, they were required to obtain a lease before then engaged in

any mining on the Osage Mineral Estate.  Defendants previously argued that their trespass

---

[10] Defendants' witnesses have substantial experience with NEPA.  Their attempt to understate the time it would take for NEPA compliance is consistent with their general refusal to admit facts which they know, but which they also know were harmful to Enel's position.  E.g., though they testified about money Enel had given to non-Indian communities, Mr. Storch refused to answer whether Enel gave any money to the Tribe or any tribal entity.  He claimed that the only way he could answer that simple and direct question was to say that Enel gave money to the primarily non-Indian town of Pahuska, Oklahoma.  Approximately 2/3 of the people in Pahuska are non-Indian.https://data.census.gov/profile/Pawhuska_CCD,_Osage_County,_Oklahoma?g=060XX00 US4011392496.  Similarly Mr. Price was asked whether Enel generally refuses to comply with a directive from a federal agency.  Using the same script as Mr. Storch, Mr. Price refused to answer 6the question, and used the same script that when he was refusing to answer the question he was "answering the only way he knew how.  In all of these instances, Enel's' witnesses unwisely harmed their own credibility by refusing to answer questions for which the answers were obvious. Answering the questions would have been slightly harmful to Enel, but the harm to the witness's credibility because they refused to answer was more significant.  Where a witness seeks to avoid providing facts that it thinks will be harmful, that permeates the whole of their testimony.

is not an ongoing trespass, but this Court held that the trespass is ongoing.  Nevertheless, Defendants present their case as if this is not a continuing trespass.

2. Defendants have been engaged in an ongoing trespass to the OME for almost a decade, in open defiance of a cease-and-desist letter issued to them by the United States.  Through their trespass, Defendants saved unknown millions of dollars by not having to purchase minerals from a quarry, and then by not delaying construction when the United States provided them with a cease-and-desist letter.

3. More troubling, the Supreme Court denied Defendants' petition for a writ of certiorari more than five years ago now, and although Defendants now concede that they were required by law to obtain a lease, they still have not applied for a lease.

4. The issues before this Court are now very narrow:  what is the value of the lease that Enel has had the duty to obtain nearly ten years ago, what is the royalty on the minerals that Enel has been wrongly using for the past ten years, and what are the other damages.[11]

## II.  TREBLE DAMAGES

5. The Court concludes that damages should be trebled.  As discussed above, the facts of this case are unique, but Defendants' decision-making was not unique, and that decision-making amply supports trebling of damages.

6. When Defendants receive the United States cease and desist letter, they understood that the United States was directing them to stop any activity until they obtained the required permit.  Here, unlike most cases, the United States is both the government and the owner of the land.

---

[11] In its proposed findings of fact and conclusions, the United States provides a thorough discussion of the legal issues regarding recovery of attorney fees and other costs as an element of damages, and an exact calculation of the damages.  The OMC incorporates the United States discussion by reference.

7. Defendants now argue that if they stopped at that point, removed the OME from the foundations, and imported rocks (or if they had entered into a valid lease with the OMC), they would not be in trespass.  It is therefore notable that at the time Enel received the cease-and-desist letter, they had not poured any of the concrete foundations.  Defendants therefore cannot assert that when they received the cease-and-desist letter, it was already too late, that they had already taken the step that irretrievably committed them to their current predicament.

8. Instead, Defendants understood the cease-and-desist letter and an objective person in their shoes would know that defying that letter carries risk.  The risk were enormous, because the windfarm is large and was expensive to build, but the legal rule is the same regardless of the consequences.  Enel is a large and sophisticated company, and it knew the risk it was taking.  It also knew the large cost that it would have faced if it complied with the cease-and-desist letter.  It weighted those risks and initially decided it would try to convince the United States to withdraw the cease-and-desist letter and if that failed it would stop crushing and using OME.  It did not convince the United States to withdraw the cease-and-desist letter, and it then decided not to stop crushing and using OME.  It went ahead and poured the concrete foundations which irretrievably committed it to the consequences of its risky decision to defy a federal cease and desist letter.

9. The evidence shows that Enel made its risky decision based upon a cost/risk analysis.  *Cf. Grimshaw v. Ford Motor Company (The Pinto Case)*, 174 Cal. Rptr 348 (1981) (even when the cost/risk analysis is unrelated to a federal directive to stop violating the United States rights of ownership of land, punitive damages are supported).

10. Moreover, Defendants have no argument at all against treble damages once the Supreme Court denied their petition for a writ of certiorari in January 2019. From that point forward, Plaintiffs cannot claim that they were uncertain whether they needed to obtain a lease, nor could they claim that Mr. Slade's prior 2013 memo that Tradewind could move soil without a permit excused Enel from obtaining a lease. Instead, since 2009, Defendants have simply not complied with the Tenth Circuit's decision. They have still not even applied for a lease. They must now bear the consequences of that decision as well.

## III. DEFENDANTS ASSERTED AN ADVICE OF COUNSEL DEFENSE.

11. To establish an advice of counsel defense, Defendants must show that they made a full disclosure of all material facts to their attorney and that they relied in good faith on the specific course of conduct recommended by the attorney. *United States v. Bush*, 626 F.3d 527, 539 (9th Cir. 2010) (citing *United States v. Ibarra–Alcarez*, 830 F.2d 968, 973 (9th Cir. 1987)). *Sec. & Exch. Comm'n v. Strategic Glob. Invs., Inc.*, 262 F. Supp. 3d 1007, 1024 (S.D. Cal. 2017). See also *United States v. Gray-Burriss*, 251 F. Supp. 3d 13, 20 (D.D.C. 2017), *aff'd,* 920 F.3d 61 (D.C. Cir. 2019) (holding that a defendant is not even entitled to a jury instruction on an advice of counsel defense unless the defendant "introduces evidence that (1) he made full disclosure of all material facts to his attorney before receiving the advice at issue; and (2) he relied in good faith on the counsel's advice that his course of conduct was legal.") (citing *United States v. DeFries*, 129 F.3d 1293, 1308 (D.C. Cir. 1997)) (internal punctuation omitted); *Doe v. Schuylkill County Courthouse*, 343 F.R.D. 289 (M.D. Penn. 2023); *United States v. Hagen*, 542 F.Supp.3d 515 (N.D. Tex. 2021).

12. As discussed above, the facts in this case show that Defendants did not disclose all material facts to their attorney. The "advice" that they relied upon was a memo that Tradewind

could move soil, but Defendants had not disclosed to the attorney that they would be using explosives to permanently break apart the OME, or that they would then crush rock and use it for foundational supports.  The fact that Defendants were crushing, sorting, and using rock were material to the Tenth Circuit decision.[12]

## IV. DEFENDANTS ARGUMENT THAT THE UNITED STATES HAD TO TELL ENEL THAT ENEL NEEDED A PERMIT

13. Defendants also seek to deflect blame by asserting that the OMC and the United States did not tell them early enough that Enel was required to obtain a permit.  That argument is rejected on both the facts and the law.  On the law, Defendants cannot blame a government for not telling them that Defendants needed to obtain a permit.  *E.g., United States v. Penn. Indus. Chem. Corp.*, 561 F.2d 468 (3rd Cir. 1972)(discussing the "traditionally rejected defense that ignorance of the law is an excuse," but that under the facts of that case, where the United States had affirmatively misled defendants through decades of prior written statements, the defendant might have a viable defense); *United States v. Atl. States Cast Iron Pipe Co.* 2007 WL 2282514 (D.N.J. 2007) (quoting with approval that "'a seller need not know a license is required to sell a security as long as the seller knows he does not have a permit.'  *Liparato v. United States*, 471 U.S. 419, 436 (1985) (White, J., dissenting))."

14. Defendants' argument also fails on the facts.  Defendants were aware of the OMC's position by no later than October 2013.  That was the reason they requested that Mr. Slade determine whether they needed a lease or permit based upon the law applicable to the Osage Nation and OMC.  Further, Defendants' witnesses acknowledged that they are

---

[12] The Tenth Circuit was apparently not aware that Enel used explosives to crush OMC even before it got to the rock crushers.  Plaintiffs have suggested that if the Tenth Circuit had been aware of that fact, it would have found that use of explosives to by mining.  This Court need not resolve that issue for current purposes.

responsible for determining the permits that are required, and that this is in fact a significant part of their due diligence.

Dated this 28th day of Junw, 2024

PATTERSON   EARNHART   REAL   BIRD   & WILSON LLP

*/s/ Jeffrey S. Rasmussen*
Jeffrey S. Rasmussen, *Pro Hac Vice*
Patterson Earnhart Real Bird & Wilson LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 926-5292 / Fax: (303) 926-5293
Email: Jrasmussen@nativelawgroup.com

*/s/ Rollie E. Wilson*
Rollie E. Wilson, D.C. Bar No. 1008022
Patterson Earnhart Real Bird & Wilson, LLP
601 Pennsylvania Ave., NW, South Bldg., Suite 900
Washington, D.C. 20004
Phone: 202-340-8232 / Fax: 202-639-8238
Email: RWilson@nativelawgroup.com
*Counsel for Osage Minerals Council*