# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, and THE
OSAGE MINERALS COUNCIL,

        Plaintiffs,

    v.

OSAGE WIND, LLC; ENEL KANSAS, LLC;
and ENEL GREEN POWER NORTH
AMERICA, INC.,

        Defendants.

Case No. 14-CV-704-JCG-JFJ

## DEFENDANTS' DEMONSTRATIVE PRESENTATION USED DURING JULY 9, 2024 HEARING

GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, TX 77002
(346) 718-6600

NORMAN WOHLGEMUTH, LLP
3200 Mid-Continent Tower
401 South Boston Avenue
Tulsa, OK 74103
(918) 583-7571

MODRALL, SPERLING, ROEHL,
HARRIS & SISK, P.A.
P.O. Box 2168
Albuquerque, NM 87103
(505) 848-1800

Dated: July 9, 2024

*Attorneys for Defendants Osage Wind, LLC,
Enel Kansas, LLC, and Enel Green Power
North America, Inc.*

In accordance with the Court's request at the July 9, 2024 hearing, Defendants hereby submit an electronic copy of their demonstrative presentation used during that hearing.

Dated: July 9, 2024

Respectfully submitted,

/s/ Ryan A. Ray
Ryan A. Ray, OBA # 22281
NORMAN WOHLGEMUTH, LLP
3200 Mid-Continent Tower
401 South Boston Avenue
Tulsa, OK 74103
(918) 583-7571

Gregg J. Costa, *pro hac vice*
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, TX 77002
(346) 718-6600

Betty X. Yang, *pro hac vice*
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100

Lynn H. Slade, *pro hac vice*
Sarah M. Stevenson, *pro hac vice*
MODRALL, SPERLING, ROEHL,
HARRIS & SISK, P.A.
P.O. Box 2168
Albuquerque, NM 87103
(505) 848-1800

Miguel A. Estrada, *pro hac vice*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8257

Matthew A. Hoffman, *pro hac vice*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

Rahim Moloo, *pro hac vice*
Peter Wade, *pro hac vice*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166
(212) 351-4000

*Attorneys for Defendants Osage Wind, LLC,*
*Enel Kansas, LLC, and Enel Green Power North America, Inc.*

1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 9, 2024, I electronically transmitted the attached Document to the Clerk of the Court using the ECF System for filing. Based on the electronic records currently on file, the Clerk of the Court will transmit a notice of Electronic Filing to the following ECF registrants:

Cathryn D. McClanahan
Nolan Fields IV
Stuart P. Ashworth
David McCullough
Jeffrey S. Rasmussen
Rollie Wilson

The following non-ECF registrants have been served by email:

Charles R. Babst, Jr.
Attorney-Advisor
United States Department of the Interior
Office of the Solicitor
Tulsa Field Solicitor Office
7906 East 33rd Street, Suite 1000
Tulsa, OK 74145-1308
(918) 669-7730
charles.babst@sol.doi.gov
*Attorney for the United States of America*

*/s/ Ryan A. Ray*
Ryan A. Ray

*United States of America, et. al.*
v.
*Osage Wind, LLC, et. al.*



1. What would Enel have paid OMC for the rocks if Enel had secured a permit?

2. When the trespass occurred in 2014, was Enel acting with the violence and bad faith needed to justify an unusual award of treble damages?

# Plaintiffs Bear the Burden

- Plaintiffs "bear[] the burden of proving [their] damages by a preponderance of the evidence." *Brown v. USA Truck Inc.*, 2013 WL 4848837, at *20 (W.D. Okla. Sept. 11, 2013), *aff'd*, 568 F. App'x 610 (10th Cir. 2014).

- Plaintiffs have burden to prove both compensatory damages and exemplary damages. *E.g.*, *Maxwell v. Samson Res. Co.*, 848 P.2d 1166, 1173 (Okla. 1993); *Nelson v. Am. Hometown Publ'g, Inc.*, 333 P.3d 962, 974 (Okla. Civ. App. 2014).

3

# Oklahoma Law Governs Damages

Plaintiffs' statement of the monetary award they will seek at trial (which Defendants oppose) is as follows:

a.   Conversion (value of the Osage Mineral Estate ("OME") plus fees and costs): Pursuant to 23 Okla. Stat. § 64:

The detriment caused by the wrongful conversion of personal property is presumed to be:

1.  The value of the property at the time of the conversion with the interest from that time; or,
2.  Where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party; and,
3.  A fair compensation for the time and money properly expended in pursuit of the property.

23 Okla. Stat. § 64.

**Pre-Trial Order, pages 3-4**

b.   Trespass (value of a lease/trebled):

Generally, "[f]or the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate for all detriment proximately caused thereby, whether it could have been anticipated or not." 23 Okla. Stat. § 61.  See Finnell v. Seismic, 67 P.3d 339, 345 n.29 (Okla. 2003).  The United States has retained (and . . . .

"For forcibly ejecting or excluding a person from the possession of real property, the measure of damages is *three times* such a sum as would compensate for the detriment caused to him by the act complained of." 23 Okla. Stat. § 71 (emphasis added).  Using the trespass damages itemized above, the trebling of such damages would result in the following awards:

# No Thumb on the Scale for Tribe

- Plaintiffs' damages are governed by generally applicable Oklahoma tort law. *See, e.g.*, *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 969 (10th Cir. 2019) (applying Oklahoma trespass law).

- Plaintiffs fail to identify *any* portion of that law that "would frustrate specific objectives of…federal programs," *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991), or that singles out federal interests for uniquely hostile treatment, *United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 594–97 (1973).

5

# Continuing Trespass Remedied by Injunction

| | |
|---|---|
| I. Declaration: Applicability & Violation of 25 C.F.R. § 211. | <u>Entered.</u> Doc. 386 at 17-18. |
| II. Declaration: Applicability & Violations of 25 C.F.R. § 214. | <u>Entered</u>. *Id.* |
| **III. Trespass.** | <u>**Liability found**</u>**; damages to be determined at trial. Doc. 386.** |
| IV. Continuing Trespass. | <u>Liability found</u>; injunctive relief to be entered. *Id.* |
| **V. Conversion.** | <u>**Liability found**</u>**; damages to be determined at trial.** ***Id.*** |

Plaintiffs' Pre-Trial Brief, page 1

6

# Single Recovery for Single Harm

- "[N]o double recovery is allowed for the same injury." *Houck v. Hold Oil Corp.*, 867 P.2d 451, 460–61 (Okla. 1993).

- Where "a single injury gives rise to more than one claim for relief, a plaintiff may recover his damages under any claim, but he may recover them only once." *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1236, 1261–62 (10th Cir. 1988), *rev'd on other grounds, Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).

7

# Compensatory Damages

- "the amount which will compensate for all detriment proximately caused thereby." *Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank of Tulsa*, 705 F.2d 396, 403 (10th Cir. 1983) (quoting 23 Okla. Stat. § 61).

- Goal is to place the injured party "as nearly as may be in the situation which he would have occupied had not the wrong been done." Id. (quoting *Midland Valley R.R. v. Barton*, 129 P.2d 1007, 1010 (Okla. 1942)).

- "[A plaintiff] is to be made whole, but [is] not entitled to be put in a better condition than he would be in had the wrong not been committed." *Stringer v. Dilger*, 313 F.2d 536, 541 (10th Cir. 1963).

8

# Compensatory Damages

- What would Enel have paid OMC for the rocks if Enel had secured a permit?

9

# Damages Experts

|  | **Enel** | **Plaintiffs** |
|---|---|---|
|  | ~ $69,000 | > $30,000,000 |
| **Real-World Economics** |  | **X** |
| **Facts of the Case** |  | **X** |
| **Governing Law** |  | **X** |

10

# John Pfahl

# Steven Hazel





# Credentials & Experience





- Over 20 years' experience in the mining industry
- Extensive experience valuing and negotiating mineral leases

- Accountant with background in tax
- No experience negotiating mineral leases

12

# Methodology





- Applied "market approach" to analyze the value owed for use of the Osage Mineral Estate

- Considered available comparable transactions between OMC and other parties

- Assumed an "unwilling seller"

- Assumed OMC could and would demand massive hold-up value, divorced from the value of the minerals

- Considered *surface* leases to be the right "comparables" for *mineral* leases

13

# Hazel's Method Contradicts Settled Market Valuation Principles



**International Valuation Standards (IVS)**

Effec

IVSC International Valuation Standards Council

Defendants' Exhibit
DTX95

DTX95, page 1 of 152

---

**30.   IVS-Defined Basis of Value – Market Value**

30.1.   *Market value* is the estimated amount for which an *asset* or liability *should* exchange on the valuation date between a willing buyer and a willing seller in an arm's length transaction, after proper marketing and where the parties had each acted knowledgeably, prudently and without compulsion.

30.2.   The definition of *market value must* be applied in accordance with the following conceptual framework:

. . . .

(d) "Between a willing buyer" refers to one who is motivated, but not compelled to buy. This buyer is neither over-eager nor determined to ~~buy at any price~~ with the realities of the current market and with current market expectations, rather than in relation to an imaginary or hypothetical market that cannot be demonstrated or anticipated to exist. The assumed buyer would not pay a higher *price* than the market requires.

(e) "And a willing seller" is neither an over-eager nor a forced seller prepared to sell at any *price*, nor one prepared to hold out for a *price* not considered reasonable in the current market. The willing seller is motivated to sell the *asset* at market terms for the best *price* attainable in the open market after proper marketing, whatever that *price may* be. The factual circumstances of the actual owner are not a part of this consideration because the willing seller is a hypothetical owner.

14

# Hazel's Method Contradicts Settled Market Valuation Principles

- "[Mine] is not a willing buyer / willing seller analysis." Tr. 350:11-351:5.

- "Q. And you think it's appropriate in making a market valuation to consider the subjective resistance of the seller to negotiating a price? A. Absolutely." Tr. 269:20-23.

- "Q. So you couldn't assume that I say 'Oh, I wouldn't have sold that…unless I got a million dollars,' right? That wouldn't factor into the valuation? A. If that's the facts and circumstances that [you] say[] that, then maybe it's worth a million dollars." Tr. 271:23-272:3.

15

# Hazel's Method Contradicts Settled Market Valuation Principles



**20.     Market Approach**

20.1.   The market approach provides an indication of *value* by comparing the *asset* with identical or comparable (that is similar) *assets* for which price information is available.

16

# Hazel's Method Contradicts Settled Market Valuation Principles

- In choosing "comparables," Hazel disregarded the OMC *mineral* leases, in favor of non-OMC *surface* leases.  Tr. 281:25–282:10.

- But Hazel could not identify a *single* mining lease that provided for the sorts of payments provided in the surface leases. Tr. 342:7–345:17.

- Nor could Hazel identify a *single* instance in which he had opined "that a mineral estate should be valued the exact same as the surface estate that's adjacent to it."  Tr. 244:11–245:13.

- Plaintiffs' other expert, Robert Freas, also testified that he had never used a surface lease as a comparable to value minerals. Tr. 102:4–7, 103:7–13, 106:8–15.

17

# Facts of the Case





- Considered all relevant facts, including OMC's other transactions and the availability of offsite backfill

- Ignored OMC's mineral leases with other parties

- Ignored the availability of alternative backfill

18

# Hazel Ignores Key Relevant Facts

- Beyond dispute that Enel could have sourced alternative backfill. *E.g.*, Tr. 1404:16–23, 1411:17–1415:4 (Price); PX 31, PX 37.

- Hazel ignores this fact, which undermines the entire premise of his conclusions—that OMC "would have negotiated" massive hold-up value because Enel had no other choice. *E.g.*, Tr. 189:23–190:9, 216:8–217:7 (Hazel).

19

# Governing Law





- Based his calculations on the amount of minerals "mined" under the Tenth Circuit's interpretation of 25 C.F.R. Part 214

- Assumed that, as surface owner, Enel had *no rights whatsoever* to enter the subsurface

- Assumed that OMC therefore could have prevented construction of the Project

- Ignores methodology reflected in 25 C.F.R. Part 214

20

# Hazel's Opinion Is Divorced from the Governing Law

- Hazel wrongly assumed that Enel needed a mineral lease  to "go into the subsurface" at all. Tr. 313:13–22

- "[I]t's the same land, it's just one above the ground and one below the ground basically. So if you have to have the ability to build the turbines and you have to go in the subsurface, you have to basically work with the mineral owners because they're just as integral as the surface owners. **They have to have both people sign off, if you want to call it that, to basically build this particular property**."  Tr. 186:2–17 (emphasis added).

 

- **Recognized Methodology**
- **Tethered to the Facts**
- **Tethered to the Law**
- **Reasonable Results**

- **Invalid Methodology**
- **Untethered from the Facts**
- **Untethered from the Law**
- **Absurd Results**

22

# Hazel's Opinion Leads to Absurd Results



# Top 10 Reasons Hazel's Opinion Is Unreliable

10. Ignores Methodology Reflected in 25 C.F.R. Part 214

9. Ties Damages to the Value of Surface Leases, Even Though Mining Occurred Beneath Less than **1%** of the Leased Land

8. Divorced from Court Rulings on What Constitutes "Mining"

25

7.    Instead of "Willing Seller," Assumes Recalcitrant Seller

6.    Instead of "Willing Buyer," Assumes Forced Buyer

5.    Ignores that Enel Could Have Bought Backfill from Nearby Quarry

26

4.      Values the Lease at More than **100x** the Value of the Minerals Mined

3.      Values the Lease at More than **All** Mining Royalties Annually Paid in Osage County

2.      Disregards Nearly Identical, Real-World Mining Leases

1.   **Not a Single Real-World Example that Uses Surface Leases as a Proxy for Mining Leases**

# **Pfahl's Damages Calculation Is Reliable**

# Pfahl's Damages Calculation



# Freas' Similar Calculation Is Inflated

- Wrongly assumed that "any material that was excavated from the ground," whether or not "subjected to any kind of treatment," had been "mined."  Tr. 117:12–118:10, 120:12–121:5.

- Ignored royalty rates from contemporaneous OMC leases. Tr. 133:19–134:25, 136:7–137:4.

- Applied incorrect slope ratio. Tr. 128:20–129:7, 130:4–24.

# **Plaintiffs' Compensatory Damages Are $68,993**

# Treble Damages

# No Basis for Treble Damages

**Plaintiffs must prove that Enel:**

1. acted with "malice" or bad faith; **and**

2. dispossessed Plaintiffs from "real property" with "violence" or "active force."

# No Basis for Treble Damages

**Plaintiffs must prove that Enel:**

**1** acted with "malice" or bad faith; **and**

**2** dispossessed Plaintiffs from "real property" with "violence" or "active force."

35

# No Evidence of "Evil Intent"

"The act which constitutes the cause of action must be actuated by or accompanied with some ***evil intent***, or must be the result of ***such gross negligence*** – such as disregard to another's rights – as it is ***deemed equivalent to such intent***."

*Dilworth v. Fortier*, 405 P.2d 38, 45 (Okla. 1964); *Edwards v. Lachman*, 534 P.2d 670, 673 (Okla. 1974).

# What Plaintiffs Failed to Show

**1**    Any evidence Enel acted with malice

**2**    Any evidence of reckless or wanton oppression by Enel

**3**    Any belief of Enel during construction of the wind farm (or anytime prior to the Tenth Circuit ruling) that a mining lease was required

# What The Evidence Actually Showed

**1** Enel's consistent effort to comply with the law

**2** Enel's reliance on a reasoned legal opinion

**3** Enel's controlled, routine, and typical construction process

**4** Enel's repeated efforts to address BIA's and OMC's concerns



# Modrall Understands Project Would Use Customary Excavation and Construction Processes and No Excavated Material Would Be Removed and/or Sold

Cc: Lynn H. Slade[lynn.slade@modrall.com]
From: Bill C. Scott
Sent: Tue 10/15/2013 8:46:34 PM

10 feet." Findings of Fact and Conclusions of Law, ¶ 8. Backhoes and other customary construction equipment will be used for the excavation and backfilling work.

site and will be used on site as backfill which will be compacted. No excavated material will be removed from the Project site and no excavated material will be processed (on site or off site) for commercial sale.

DX 96 at 2

40

# Modrall Concludes Osage Wind Project Did Not Require Mining Permit



**From:** Sarah Stevenson

**Date:** October 31, 2013

**Re:** Rights of surface owners to use soil

Trade Winds does not dispute that the Lease does not provide it with a right to conduct mining or other mineral extraction. Trade Winds, however, is not conducting mining. To the extent any soil or other subsurface material is (touched) by Trade Winds, it is merely incidental to Trade Winds' construction of its approved wind farm. No soil is removed from the site, or processed on site for a commercial use.

DX 48 at 4–5

41

# Enel Incorporates Modrall's Advice Into Its Construction Plan

To:     Andrew Landoll[alandoll@tradewindenergy.com]; Aaron Weigel[aweigel@tradewindenergy.com]
Cc:     Lincon, Nick (EGP North America)[Nick.Lincon@enel.com]; Hickey, Christopher (EGP North
America)[Christopher.Hickey@enel.com]; Ritter, Ron[rritter@iea.net]; Welch, Mike[Mike.Welch@rmtinc.com];
Mazurowski, Craig[Craig.Mazurowski@rmtinc.com]; Champagne, Steve (EGP North
America)[Steve.Champagne@enel.com]; Jennifer Dean[jdean@tradewindenergy.com]; DiMarzio, Giuseppe
(EGP North America)[Giuseppe.DiMarzio@enel.com]; Daters, Daren (EGP North
America)[Daren.Daters@enel.com]; Hameed, Khawar (EGP North America)[Khawar.Hameed@enel.com]
From:   Heredia, Joan (EGP North America)
Sent:   Thur 5/22/2014 7:32:26 PM
Subject: RE: Osage Wind

Perfect Thanks!  Just being cautious.

From: Andrew Landoll [mailto:alandoll@tradewindenergy.com]
Sent: Thursday, May 22, 2014 12:30 PM
To: Aaron Weigel
Cc: Heredia, Joan (EGP North America); Lincon, Nick (EGP North America); Hickey, Christopher (EGP North
America); rritter@iea.net; Welch, Mike (Mike.Welch@rmtinc.com); Mazurowski, Craig
(Craig.Mazurowski@rmtinc.com); Champagne, Steve (EGP North America); Jennifer Dean; DiMarzio, Giuseppe
(EGP North America); Daters, Daren (EGP North America)
Subject: Re: Osage Wind

This is for aggregate provided by the quarry.

Andrew Landoll
On May 22, 2014, at 14:23, "Aaron Weigel" <aweigel@tradewindenergy.com> wrote:

Ron/Mike/Craig,
   It is my understanding that the sieve analysis is on aggregate that's coming from the quarry,
but as Joan suggests below, please confirm that's the case. It is very important that we not
remove ANY soil from the project site or use site materials in lieu of materials we would typically
buy off site in developing a wind project. Osage Nation has mineral rights for the project lands
and removal of soil especially for commercial gain could constitute mining.  I know that
sometimes subcontractors make side deals with landowners and we need to be very careful
about not removing or selling soil.  For foundations, roads, etc. it is ok to backfill or reposition
soils on the site.  But, for example, we should not mix site materials into concrete, if the material
is something we would typically buy from a vendor.

Please make sure this message is widely communicated to any subcontractors working on the
project.

Aaron

From: Heredia, Joan (EGP North America) [mailto:Joan.Heredia@enel.com]
Sent: Thursday, May 22, 2014 2:17 PM
To: Aaron Weigel; Lincon, Nick (EGP North America); Hickey, Christopher (EGP North America); Champagne, Steve (EGP North America); Jennifer Dean; DiMarzio, Giuseppe (EGP North America);
Daters, Daren (EGP North America)
Subject: FW: Osage Wind

Aaron,



**Defendants' Exhibits**
**DX17**
14-cv-704-JCG-JFJ

OSAGE WIND-024749

DX17, page 1 of 3

---

On May 22, 2014, at 14:23, "Aaron Weigel" <aweigel@tradewindenergy.com> wrote:

Ron/Mike/Craig,
   It is my understanding that the sieve analysis is on aggregate that's coming from the quarry,
but as Joan suggests below, please confirm that's the case. It is very important that we not
remove ANY soil from the project site or use site materials in lieu of materials we would typically
buy off site in developing a wind project. Osage Nation has mineral rights for the project lands
and removal of soil especially for commercial gain could constitute mining. I know that
sometimes subcontractors make side deals with landowners and we need to be very careful
about not removing or selling soil.  For foundations, roads, etc. it is ok to backfill or reposition
soils on the site.  But, for example, we should not mix site materials into concrete, if the material
is something we would typically buy from a vendor.

Please make sure this message is widely communicated to any subcontractors working on the
project.

Aaron

DX 17

42



43

# September 2014 Site Visit by BIA Inspector Whiteshield

**To:** Aaron Weigel(aweigel@tradewindenergy.com); Lincon, Nick (EGP North America)[Nick.Lincon@enel.com]; Champagne, Steve (EGP North America)[Steve.Champagne@enel.com]; Steve Willman (swillman@dfrglaw.com) (swillman@dfrglaw.com); Bill C. Scott (bscott@modrall.com)[bscott@modrall.com]; Hickey, Christopher (EGP North America)[Christopher.Hickey@enel.com]; Matt Gilhousen[matt@tradewindenergy.com]; Jennifer Dean[jdean@tradewindenergy.com]
**Cc:**     Price, Bill (EGP North America)[Bill.Price@enel.com]; Moskaluk, Bill (EGP North America)[Bill.Moskaluk@enel.com]; Dators, Daren (EGP North America)[Daren.Dators@enel.com]; DiMarzio, Giuseppe (EGP North America)[Giuseppe.DiMarzio@enel.com]
**From:**   Heredia, Joan (EGP North America)
**Sent:**   Wed 10/1/2014 12:40:37 AM
**Subject:** RE: Osage - Mineral Rights

Osage Team,

I spoke with Ray Whiteshield at the BIA today, very nice ...
told to inquire as one of the Osage council members sa...
rock for sale. I explained to him that it is rock out of a f...
material we have to crush it to put it back in the hole. ...
need to not infringe on Osage Nation Mineral Rights. ...
their oil and gas operations, but that wind and oil and g...
explained we have reached out to the BIA and Osage N...
the site, but he declined as he felt comfortable with m...
Acting Regional Director and that we should send a fol...
the material, merely crushing and returning to the fou...

I asked Chris Hickey to set up a brief call with Modrall t...
letter.

My suggestion is the site can carry on. But we should t...

Take care,

**Joan Heredia**
Director, Environmental Compliance and Regu...
Enel Green Power North America, Inc.



3636 Nobel Drive #475
San Diego CA 92122

T   +1 619 507 4130

Joan.Heredia@enel.com



Defendants' Exhibits
DX35
14-cv-SR-JCG-JFJ

OSAGE WIND PRIV-000090

DX35, page 1 of 2

---

**From:** Heredia, Joan (EGP North America)
**Sent:** Wed 10/1/2014 12:40:37 AM
**Subject:** RE: Osage - Mineral Rights

I spoke with Ray Whiteshield at the BIA today, very nice man, he has been on the job for 5 months. He was told to inquire as one of the Osage council members saw the rock crusher and ==assumed we may be crushing rock for sale. I explained to him that it is rock out of a foundation hole, but due to the rocky nature of the material we have to crush it to put it back in the hole. No sale to external sources, as we are aware of the need to not infringe on Osage Nation Mineral Rights.== I did explain briefly that the Osage is very protective of their oil and gas operations, but that wind and oil and gas can coexist as we do at many of our sites. I explained we have reached out to the BIA and Osage Nation many times in the past. ==I invited him to come to the site, but he declined as he felt comfortable with my explanation.   He noted that Robin Phillips is the new Acting Regional Director and that we should send a follow up letter simply clarifying that we are not selling the material, merely crushing and returning to the foundation hole.==

DX 35



# Enel's Outreach to BIA Regarding Project Site Activities

**From:** Lynn H. Slade <lynn.slade@modrall.com>
**Sent:** Friday, October 17, 2014 3:58 PM

Joan, et al., this forwards my email to Alan Woodcock after our call today. I explained what Osage Wind is doing, and not doing, related the course of communications on this subject, as described in the email below, and outlined the law we believe applies to enable the surface owner to authorize our activities, and that no permit or lease is required. He said he is happy to receive this information, as he is scheduled to be in a meeting on Tuesday on this subject, which I understand will include BIA officials and possibly Osage officials. He said he does want the facts pertaining to the issue.

I offered to send him a memo outlining the facts and law, and he stated that would be helpful, and that it would be helpful to receive it Monday morning. I committed to do so, as stated in the email below.

I have spoken with Bill, and he will prepare a draft memo and forward it for review in time for us to deliver to Woodcock Monday morning.

Please raise any questions you may have (and please forward to others on this distribution who should receive it.

Regards,

Lynn

DX 59

# Modrall Solicits Input From Enel's Construction Team To Ensure Accuracy of Facts Communicated to BIA

From: Bill C. Scott [mailto:bscott@modrall.com]
Sent: Friday, October 17, 2014 1:47 PM
To: Tierney, Mike (EGP North America)
Cc: Lynn H. Slade
Subject: Draft Statement of Facts re: Construction Activity

Mike,

We are adding a statement of facts to the memo that will go to Alan Woodcock. A draft of that statement is set forth below which is based on our understanding from our telephone calls on this matter. Can you please review the statement and perhaps have your construction folks take a quick look to make sure that our description is accurate. We want to fold this in the memo as soon as possible so that we can have the memo to Woodcock by first thing Monday morning. I look forward to your comments.

50 and 60 feet in diameter. Rock from these excavations comes out in pieces of varying size and shapes. To return the rock to the excavation as backfill, Enel's contractor has a rock crusher on site which crushes the rock to a roughly ½ inch size. The rock is crushed and placed immediately next to the site from which it was excavated. This is a customary and standard construction practice. Once the foundations are poured and have cured, the crushed rock, sand and soil from the excavation are pushed back into the excavated site as backfill.

DX 57

47



# Enel Attempts to Meet with Tribe to Address Its Concerns



DX25, page 1 of 2

OSAGE WIND-021117

DX25, page 2 of 2

OSAGE WIND-021118

November 19, 2014

THE HONORABLE GEOFFREY STANDING BEAR
PRINCIPAL CHIEF OF THE OSAGE NATION
627 GRANDVIEW AVENUE
PAWHUSKA, OK 74056

It is with respect that I am writing to follow up on a series of meeting requests over the last several months on behalf of Enel Green Power North America, Inc. (EGP-NA) and its ownership interests in Osage Wind, LLC (Osage Wind).

Please be assured we are aware of Osage Nation concerns about the project, including mineral rights and wildlife protection. We would appreciate the opportunity to talk with you and explain how we are taking the concerns of the Osage Nation and broader community into consideration as we build and operate the project.

We believe that this kind of communication is helpful in ensuring that we avoid misunderstandings and, more importantly, that we better understand each other's concerns and objectives in ways that can help us find common ground. This kind of communication will help ensure that projects like Osage Wind are constructed in harmony with local interests and the environment.

Sincerely,

Stephen Pike
Vice President, Operations & Maintenance
Enel Green Power North America, Inc.

DX 25

49



Wind Capital secures host of local, state, and federal permits
OMC raises permit issue
Wind Capital responds to OMC
Oct. '13
Enel finds BIA letter
Enel considers BIA letter and talks to BIA
Oct. '14
Enel sends Modrall Memo to BIA & repeatedly invites discussion
District Court: Enel was **right**
2011 – 2013
Silence from OMC
2014
2015
2017
Aug. '13
TradeWind gets involved
Sept. '14
BIA visits site & talks with Enel about project scope
BIA seems satisfied with explanation
Nov. '14
Enel reaches out to BIA
11/19
Enel reaches out to Tribe
11/21
U.S. files lawsuit

# Enel Reasonably Believed No Mining Lease Required

**Modrall 2014 Memo (DX49):**

- "Trade Wind, however, does not intend to conduct mining.  To the extent any soil or other subsurface material would be moved by Trade Wind, it would be **merely incidental to Trade Wind's construction of its approved wind farm**.

**Judge Payne in 2015:**

- "[I]t is clear to the Court that 'mineral development' covers the activities of an entity engaged in the science, technique, and business of *developing minerals*, not those of an entity that **incidentally encounters minerals in connection with surface construction activities**."

# Enel Reasonably Believed No Mining Lease Required

- The Tenth Circuit rejected any claim that a "Sandy Soil" permit was required.

- The Tenth Circuit held that the applicable regulation was at best "ambiguous," and that Enel's interpretation was "reasonable."



**2011 – 2013**
Wind Capital secures host of local, state, and federal permits

**Aug. '13**
TradeWind gets involved

**Oct. '13**
OMC raises permit issue
Wind Capital responds to OMC

**Silence from OMC**

**Sept. '14**
BIA visits site & talks with Enel about project scope
BIA seems satisfied with explanation

**2014**

**Oct. '14**
Enel finds BIA letter
Enel considers BIA letter and talks to BIA

**Nov. '14**
Enel reaches out to BIA
Enel sends Modrall Memo to BIA & repeatedly invites discussion

**11/19**
Enel reaches out to Tribe

**11/21**
U.S. files lawsuit

**2015**
District Court: Enel was **right**

**2017**
Tenth Circuit: Enel was **reasonable**

# Plaintiffs' Red Herrings

- **Lacking evidence of malice or bad faith, Plaintiffs claim Enel:**

    - × **Withheld facts from its attorneys**

    - × **Continued construction solely to save money**

    - × **Disregarded BIA's claim about a "Sandy Soil" permit**

    - × **Didn't record volume of rock excavated**

54

# Enel Did Not Withhold Facts From Its Attorneys



> 9   Q   (By Mr. Ashworth) Sir, did your clients tell you what the
> 10  methods of excavation would have been for solid material?
> 11  A   What we heard was that they would use customary
> 12  excavation and construction processes.
> 13  Q   What was your understanding of that?
> 14  A   My understanding was that they would excavate using
> 15  whatever material or equipment is appropriate for this kind of
> 16  construction and then would return that same material to the
> 17  site from which it'd been -- it had been removed.

Tr. 739:9–17 (Slade)

# Enel Did Not Withhold Facts From Its Attorneys



From: Sarah Stevenson

Date: October 31, 2013

Re: Rights of surface owners to use soil

Trade Winds does not dispute that the Lease does not provide it with a right to conduct mining or other mineral extraction. Trade Winds, however, is not conducting mining. To the extent any soil or other subsurface material is (touched) by Trade Winds, it is merely incidental to Trade Winds' construction of its approved wind farm. No soil is removed from the site, or processed on site for a commercial use.

DX 48 at 5

# Enel Did Not Withhold Facts From Its Attorneys

```
                                             831
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF OKLAHOMA
 3
 4  UNITED STATES OF AMERICA,          )
 5           Plaintiff,                )
 6  and OSAGE MINERALS COUNCIL,        )
 7           Plaintiffs - Intervenor,  )
 8  vs                                 )No. 14-CV-704-JCG-JFJ
 9  OSAGE WIND, LLC; ENEL KANSAS,      )
    LLC; and ENEL GREEN POWER          )
10  NORTH AMERICA, INC.,               )
11           DEFENDANTS.               )
12
13
14            TRANSCRIPT OF PROCEEDINGS
15               MAY 23, 2024
16     BEFORE THE HONORABLE JENNIFER CHOE-GROVES
17        UNITED STATES DISTRICT JUDGE
18       BENCH TRIAL - VOLUME VIII, P.M. SESSION
19
20
21
22
23
24  REPORTED BY:  Laura Griffin, RPR, CRR, RMR, United States Court Reporter
25       laura_griffin@oknd.uscourts.gov, 918-699-4879

              United States District Court
```

| | |
|---|---|
| 17 | Q.   Now, in this memorandum, what was your understanding and |
| 18 | intent in the use of the word soil? |
| 19 | A.   My understanding of the use of soil was sort of a term to |
| 20 | encompass everything that would come out of the excavated |
| 21 | holes.   I notice in the sentence before it says soil or other |
| 22 | subsurface material.   I think those are essentially |
| 23 | synonymous. |
| 24 | Q.   So any time the word soil is used in this memorandum, |
| 25 | would it be consistent with that understanding? |

| | |
|---|---|
| 1 | A.   Yes, whatever comes out of the hole. |

Tr. 895:12–896:1 (Slade)

57

# Enel Did Not Withhold Facts From Its Attorneys



| 12 | Q.  And knowing everything that you know now, would knowledge |
| 13 | of blasting affect the core conclusion that you reached here? |
| 14 | A.  No, it would not have.  It would have been, in my |
| 15 | understanding, it's simply another form of excavation when one |
| 16 | reaches a harder rock underlying the surface estate. |

Tr. 929:12–16 (Slade)

58

# Plaintiffs' Red Herrings

- **Lacking evidence of malice or bad faith, Plaintiffs claim Enel:**

  × ~~**Withheld facts from its attorneys**~~

  × **Continued construction solely to save money**

59

# Cost/Delay Was Not the Driving Factor In Decision To Continue Construction



**From:** Price, Bill (EGP North America)
**Sent:** Mon 10/20/2014 5:45:35 PM
**Subject:** Osage letter from the BIA

Vittorio/Luigi,

So you are aware of the situation at Osage, last week we just received a letter from the Bureau of Indian Affairs (BIA) addressed to Francisco Venturini that basically asked us to stop construction activities until we have a "Sandy Soil Permit".

From our investigation this permit is required only if mining material is done on the Project in which we are not doing. Mining means the removal of rock/material for the sale or use outside of the Project. What we are doing is excavation of the WTG foundations and some of the foundations require blasting. The large rocks are then crushed and used for backfill. The BIA doesn't state the basis for their claim on why the project needs the Sandy Soil Permit, but the letter mentions our rock crushing activities in connection with the foundation excavation work.

- **Engineering and Construction**: We have been assessing how stopping construction affects the project and what activities we can do to comply with the order. It seems the primary concern is associated with the rock crushing. If our efforts to educate and clear up the issue are not immediately affective, we can stop crushing temporarily. We can then either crush the rock later. If this is a long term stoppage, we can then bring in other material for backfill. This will add cost to the Project but we think it can be managed.

DX 12

60

# Enel's Use of OME as Backfill Cost More than Using Replacement Backfill

**Cost of Rock Crushing:**

- $25,863 per site
- 82 sites  crushed
- $25,863 X 82 = **$2,120,766**



**Cost of Replacement Backfill:**

- $23,148 per turbine
- 84 turbines sites
- 23,148 X 84 sites = **$1,944,432**

PX 31 at 4; PX 37

61

# Enel Witnesses Confirmed The Decision to Continue Construction Was Based on Legal Advice That No Permit Was Needed

- Enel's decision to continue construction was "first based on [Modrall's] legal conclusion that a permit was not required."  Tr. 841:6–842:21 (Slade).

- "[B]ased on our discussions with the team and our legal staff, we determined [a "Sandy Soil Permit"] wasn't necessary."  Tr. 1448:6–18 (Price).

- "[W]e had the benefit of the Modrall work and believed that we were not doing anything that would trigger the need for…the permit or the lease."  Tr. 654:4–16 (Storch).

62

# Plaintiffs' Red Herrings

- **Lacking evidence of malice or bad faith, Plaintiffs claim Enel:**

  - ~~Withheld facts from its attorneys~~

  - ~~Continued construction solely to save money~~

  - Disregarded BIA's claim about a "Sandy Soil" permit

# "Sandy Soil Permit" Did Not Apply

OMC points to no agency interpretation, informal guidance document, adjudicatory decision, or anything else that explains or even mentions the Sandy Soil Lease other than negotiation letters involving ODOT's contractor, and the lease document itself. Thus, we cannot say that DOI's Sandy Soil Lease requirement for mere surface construction has the power to persuade.

*United States v. Osage Wind*, 871 F.3d 1078, 1088 (10th Cir. 2017)

# Plaintiffs' Red Herrings

- **Lacking evidence of malice or bad faith, Plaintiffs claim Enel:**

    × ~~Withheld facts from its attorneys~~

    × ~~Continued construction solely to save money~~

    × ~~Disregarded BIA's claim about a "Sandy Soil" permit~~

    × Didn't record volume of rock excavated

65

# Recording of Volume of Rock Excavated

- Enel's intent at the time of the trespass—not in subsequent litigation—is what matters.

- Not keeping such records was consistent both with the construction contract and Enel's standard practice.

# Plaintiffs' Red Herrings

- **Lacking evidence of malice or bad faith, Plaintiffs claim Enel:**

  - ~~Withheld facts from its attorneys~~

  - ~~Continued construction solely to save money~~

  - ~~Disregarded BIA's claim about a "Sandy Soil" permit~~

  - ~~Didn't record volume of rock excavated~~

67

# No Basis for Treble Damages

**Plaintiffs must prove that Enel:**

1. acted with "malice" or bad faith; **and**

2. dispossessed Plaintiffs from "real property" with "violence" or "active force."

# 23 Okla. Stat. § 71.
# Forcible Exclusion From Real Property

"For ***forcibly ejecting or excluding a <u>person from the possession of real property</u>***, the measure of damages is three times such a sum as would compensate for the detriment caused to him by the act complained of."

# Plaintiffs Trying To Rewrite Section 71

"For forcibly ejecting or excluding ~~*a person from the possession of*~~ real property, the measure of damages is three times such a sum as would compensate for the detriment caused to him by the act complained of."

# *Crow v. Davidson*, 96 P.2d 70 (Okla. 1939)

"The term forcibly ejected or excluded has been construed in similar statutes to mean ***force of an unusual kind*** which ***tends to bring about a breach of the peace***, such as an ***injury with a strong arm***, or a ***multitude of people***, or in a ***riotous manner***, or with ***personal violence***, or with ***threat or menace to life or limb***, or under ***circumstances which would naturally inspire fear***."

*Id.* at 72 (emphasis added)

# No Dispossession with "Violence" or "Active Force"

There is **no evidence** that:

- Enel attempted by force to remove OMC from the premises, **or**

- Enel's organized, scheduled construction process involved "violent," "riotous," "unusual," or "threatening" force that would "naturally inspire fear."

72

# No Dispossession with "Violence" or "Active Force"

Enel's use of blasting was:

- Controlled, routine, and conducted in a manner typical of similar projects.

- Not itself a trespass and did not remove Plaintiffs from the premises or eject Plaintiffs from anything.

- Consistent with Enel's rights to the surface estate.

# No Dispossession with "Violence" or "Active Force"

Undisputed that rock blasting is **<u>customary</u>** and **<u>typical</u>**:

- "It's very common to use blasting."  Tr. 1398:12 – 18 (Price).

- "[B]lasting is very common."  Tr. 460:16–25 (Storch).

- "[B]lasting" is "simply another form of excavation when one reaches a harder rock underlying the surface estate."  Tr. 929:12–16 (Slade).

74

Did Plaintiffs prove that—when the trespass occurred in 2014—Enel acted with the violence and bad faith needed to justify an unusual award of treble damages?

YES \_\_\_        NO ✓\_\_\_