## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**and**

**OSAGE MINERALS COUNCIL,**

    **Plaintiff-Intervenor,**

**v.**

**OSAGE WIND, LLC, ENEL KANSAS, LLC, AND ENEL GREEN POWER NORTH AMERICA, INC.,**

    **Defendants.**

**Court No. 4:14-cv-00704-JCG-JFJ**

## OPINION AND ORDER

In this opinion, the Court addresses the final damages phase in a litigation filed over 10 years ago by the United States and the Osage Nation against the private developers of a wind turbine farm in Osage County, Oklahoma.

After years of litigation, including appeals to the U.S. Court of Appeals for the Tenth Circuit and the U.S. Supreme Court, this Court found Defendants Osage Wind, LLC ("Osage Wind"), Enel Kansas, LLC, and Enel Green Power North America, Inc. (collectively, "Defendants") liable on Plaintiff's and Plaintiff-

Intervenor Osage Minerals Council's claims of conversion, trespass, and continuing trespass, and ordered declaratory relief, equitable relief, and monetary damages.  United States v. Osage Wind, LLC ("Osage Wind II"), 710 F. Supp. 3d 1018, 1042–43 (N.D. Okla. 2023); see also United States v. Osage Wind, LLC ("Osage Wind I"), 871 F.3d 1078 (10th Cir. 2017).  This Court held a damages bench trial.  Subsequently, the Parties spent several months attempting to reach a settlement, which was unsuccessful.

For the reasons discussed below, the Court grants injunctive relief in the form of ejectment of the wind towers by December 1, 2025 on the claim of continuing trespass, with Defendants estimating that it will cost approximately $259 million to remove the wind towers.  The Court awards damages on the claim of conversion in the amount of $242,652.28, and damages on the claim of trespass in the amount of $66,780.00.  The Court also awards to Plaintiff $1,943,666.17 for attorneys' fees and $32,554.08 for costs, and awards to Plaintiff-Intervenor $1,822,575.85 for attorneys' fees and $88,891.78 for costs.  The Court denies Plaintiff's and Plaintiff-Intervenor's requests for pre-judgment interest and treble damages.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's damages analysis. Osage Wind II, 710 F. Supp. 3d at 1025–29; Osage Wind I, 871 F.3d at 1082–84.

Osage County, Oklahoma incorporates the area designated by Congress as the Indian reservation for the Osage Nation. Okla. Const. art. XVII, § 8; Act of June 5, 1872, ch. 310, 17 Stat. 228 (1872). Congress severed the surface estate from the mineral estate in Osage County ("Osage Mineral Estate") in 1906. Act of June 28, 1906 ("Osage Act") §§ 2–3, ch. 3572, 34 Stat. 539, 540–44 (1906). Under the Osage Act, the surface estate was allotted to members of the Osage Nation. Id. § 2, 34 Stat. at 540–43. The Osage Mineral Estate was not allotted to individuals but was reserved for the benefit of the Osage Nation. Id. § 3, 34 Stat. at 543–44. The Osage Act authorized the Osage Nation, with the approval of the Secretary of the Interior, to issue "leases for all oil, gas, and other minerals" in the mineral estate. Id. Those wishing to engage in mining activities in the Osage Mineral Estate must obtain a lease from the Secretary of the Interior. 25 C.F.R. § 214.

Beginning in 2010, Defendants leased approximately 8,400 acres of surface rights in Osage County, Oklahoma on which to construct a commercial wind farm. Osage Wind I, 871 F.3d at 1083. The wind farm involved the construction of 84

wind turbines, underground electrical lines, an overhead transmission line, meteorological towers, and access roads.  Id.  The wind towers were secured into the ground with reinforced concrete foundations.  Id.  In 2011, Plaintiff and Plaintiff-Intervenor expressed concern that the project would block access to the mineral estate and interfere with oil and gas production.  Id.

The Osage Nation filed a lawsuit in October 2011 to halt the construction of the proposed wind farm, alleging that the project unlawfully deprived the Osage Nation of access to and the right to develop the mineral estate.  Compl. [Doc. 2], Osage Nation v. Wind Capital Grp., LLC, Case No. 4:11-cv-00643.  The Osage Nation's claims were denied, and the case was dismissed on its merits.  Osage Nation v. Wind Capital Grp., LLC, 2011 U.S. Dist. LEXIS 146407 (N.D. Okla. Dec. 20, 2011).

Defendants' construction on the wind towers began in October 2013 with site preparation, and excavation work began in September 2014.  Osage Wind I, 871 F.3d at 1083.  Defendants excavated holes to accommodate cement foundations measuring ten feet by 60 feet for each tower.  Id.  Smaller excavated rocks were crushed and used as backfill for the cement foundations.  Id.  Larger rocks were positioned near the holes from which they were removed.  Id.

Plaintiff commenced this action on November 21, 2014, seeking a declaratory judgment that Defendants engaged in unauthorized mining and

excavation in the Osage Mineral Estate without first obtaining a lease, permanent injunctive relief requiring the cessation of Defendants' activities, and monetary damages.  Compl.; Summons [Doc. 3].  Plaintiff later amended its Complaint to add claims of trespass, continuing trespass, and conversion based on Defendants' extraction of minerals during the construction of the wind tower project.  Am. Compl. [Doc. 20].  Plaintiff moved for partial summary judgment on its claims for declaratory relief, asking the Court to rule that Defendants' excavation of minerals during the construction of the wind towers required a lease for mining activities under 25 C.F.R. §§ 211 and 214.  Pl.'s Mot. Part. Summ. J. Counts I & II Am. Compl. & Request Expedited Consideration [Doc. 24].  Defendants also moved for summary judgment on Plaintiff's claims.  Defs.' Mot. Dismiss Summ. J. Opening Br. Supp. [Doc. 26].  The Court granted Defendants' summary judgment motion, holding that Defendants' activities did not constitute mining under 25 C.F.R. § 214 and that a lease was not required.  United States v. Osage Wind, LLC, 2015 U.S. Dist. LEXIS 132480 (N.D. Okla. Sept. 30, 2015), rev'd, 871 F.3d 1078 (10th Cir. 2017).

Plaintiff-Intervenor appealed the district court's opinion dismissing Plaintiff's claims.  Pl.-Interv.'s Notice Appeal [Doc. 49].  The U.S. Court of Appeals for the Tenth Circuit ("Tenth Circuit Court of Appeals") reversed the district court's order, finding that Defendants' activities constituted mining and

that a lease was required under 25 C.F.R. § 214.7.  Osage Wind I, 871 F.3d at

1093.  The U.S. Supreme Court denied Defendants' petition for a writ of certiorari.

Osage Wind, LLC v. Osage Minerals Council, 586 U.S. 1096 (2017).

On remand, Plaintiff-Intervenor filed Plaintiff-Intervenor's Motion for

Summary Judgment.  Pl.-Interv.'s Mot. Summ. J [Doc. 294].  Defendants filed

Defendants' Motion for Partial Summary Judgment and Opening Brief in Support.

Defs.' Mot. Part. Summ. J. Opening Br. Supp. [Doc. 297].  Plaintiff filed

Plaintiff's Motion for Summary Judgment.  Pl.'s Mot. Summ. J. [Doc. 300].  This

Court granted summary judgment as to liability on Plaintiff's claims of conversion,

trespass, and continuing trespass and held that Plaintiff and Plaintiff-Intervenor are

entitled to monetary damages on their conversion and trespass claims and equitable

relief in the form of ejectment on their continuing trespass claim.  Osage Wind II,

710 F. Supp. 3d at 1042.

A damages bench trial began on May 21, 2024.  Min. Orders [Docs. 456–

64].  Closing arguments took place on July 9, 2024.  Min. Order [Doc. 491].  The

Parties submitted post-trial briefs.  Pl.'s Resp. Defs.' Br. Resp. July 10, 2024 Order

Concerning Trespass Damages [Doc. 501]; Pl.-Interv.'s Resp. Defs.' Br. Resp. July

10, 2024 Order [Doc. 503]; Defs.' Reply Supp. Br. Resp. July 10, 2024 Order

[Doc. 505]; see also Order (July 31, 2024) [Doc. 500].

   The Court directed the Parties to provide briefing on attorneys' fees and

costs. Order (July 10, 2024) [Doc. 492]. The Parties filed briefs addressing the

availability of awarding fees and costs. Pl.'s Br. Entitlement Att'ys' Fees Cost

("Pl.'s Att'ys' Fee Br.") [Doc. 495]; Defs.' Br. Resp. July 10, 2024 Order [Doc.

496]; Pl.-Intervs.' Br. Supp. Att'y Fees Costs ("Pl.-Interv.'s Fees and Costs Br.")

[Doc. 498]; Defs.' Resp. Pl.'s Br. Entitlement Att'ys' Fees Costs ("Defs.' Att'ys'

Fee Br.") [Doc. 502]; Pl.'s Reply Br. Entitlement Att'ys' Fees Costs ("Pl.'s Att'ys'

Fee Reply Br.") [Doc. 504]; Pl.-Interv.'s Reply Entitlement Att'y Fees Costs [Doc.

506]. At the request of the Court, the Parties filed additional briefing on the

quantum of fees and costs that Plaintiff and Plaintiff-Intervenor seek to recover.

Letter (Dec. 4, 2024) [Doc. 511]; Pl.'s Quantum Att'ys' Fees, Costs, & Expenses

("Pl.'s Fees and Costs Br.") [Doc. 513]; Defs.' Resp. Pls.' Br. Quantum Att'ys'

Fees & Costs ("Defs.' Fees and Costs Resp.") [Doc. 514].

   At the conclusion of the damages trial, the Parties expressed a desire to

attempt to reach an amicable resolution of this case through mediation. Trial Tr.

vol. XV, 1719:17–1740:5 [Doc. 472]. The Court ordered the Parties to provide

regular updates on the status of their settlement efforts. Order (July 10, 2024).

The Parties advised the Court on September 27, 2024 that settlement efforts

reached an impasse.  Pl.'s Final Status Report Settlement Efforts [Doc. 509];

Defs.' Resp. Pl.'s Status Report [Doc. 510].

## FINDINGS OF FACT

The Court makes the following findings of fact based on a review of the

documents admitted into evidence and the credible testimony of the witnesses

during the bench trial:

### I.    Osage Wind Farm

Defendants operate the Osage Wind Farm in Osage County, Oklahoma, a

150-megawatt wind project that includes 84 wind towers, a collector system, a

substation, and transmission poles and lines.  Trial Tr. vol. I, 42:15–23 [Doc. 474];

Trial Tr. vol. XII, 1392:7–10 [Doc. 480].  The project was initially developed by

Osage Wind under the ownership of Wind Capital Group.  See Defs.' Ex. 22.  In

August 2013, Tradewind Energy ("Tradewind"), which is partially owned by

Defendants, purchased the wind farm project from Osage Wind.  Trial Tr. vol. I,

18:24–19:2; Trial Tr. vol. IV, 379:7–13, 409:3–7 [Doc. 467]; Defs.' Sealed Elec.

Filing Supp. Tr. Submission Pursuant LCvR30-1(c) Ex. F at 56:10–13 [Doc. 448].

Defendants purchased the wind farm project from Tradewind in September 2014.

Defs.' Ex. 20; Trial Tr. vol. VI, 613:25–614:14 [Doc. 468].

In 2010, Osage Wind entered into lease agreements with six surface rights

holders for the use of approximately 8,400 acres of land in Osage County.  Trial

Tr. vol. I, 42:12–23; Trial Tr. vol. II, 176:24–177:13 [Doc. 466]; Trial Tr. vol. X,
1154:5–16 [Doc. 479]; Pl.'s Ex. 60 ("Freas Report") at 3; Pl.'s Ex. 61 ("Hazel
Report") at 2; Defs.' Ex. 103 ("Pfahl Report") at 10; Defs.' Ex. 64 ("Surface
Lease").  Excavation work on the wind farm began in September 2014.  See Trial
Tr. vol. VII, 790:14–16 [Doc. 477].  During construction, mineral material was
excavated from the Osage Mineral Estate, crushed, and used as backfill on the
surface.  See Trial Tr. vol. I, 87:17–20.  Blasting was used in the excavation of 82
of the 84 wind tower excavation sites.  Pl.'s Ex. 31; Trial Tr. vol. II, 130:10–12;
Trial Tr. vol. V, 524:6–525:17 [Doc. 476]; Trial Tr. vol. IV, 461:5–19.  In 2014,
Bill Moskaluk, the Site Coordinator for the wind farm, represented to the Court
that Defendants' "contractor records the volume of rock crushed and the rock is
then stored at the site."  Defs.' Resp. Pl.'s Mot. Prelim. Inj. [Doc. 17] at Ex. 1
[Doc. 17-1] ¶ 15(a)(ii).  Defendants' contractors and subcontractors failed to
maintain, however, a record of the volume of mineral material extracted from the
Osage Mineral Estate during the construction of the wind farm.  See Trial Tr. vol.
IX, 988:25–990:2 [Doc. 478].

　　　Prior to the start of construction, Barr Engineering prepared design drawings
("Barr Drawings") and RMT, Inc. prepared a Geothermal Investigation Report
("RMT Report").  Freas Report at 5–7; Pfahl Report at 11, 24, 28; Pl.'s Ex. 65

("RMT Report"), Defs.' Ex. 16 (2014 Barr Drawings S-01 and S-02).[1]  The

diameter of the wind towers' base foundations measured 52 feet.  Defs.' Ex. 16;

Trial Tr. vol. I, 45:24–46:2, 49:3–7.  The depth of the excavation sites measured

nine feet, nine inches at the wind tower foundation and nine feet, three inches at

the edge of the excavation base.  Defs.' Ex. 16.  The top of the foundation

extended two feet, six inches above ground level.  See Pfahl Report at 29.

Each of the wind tower excavation sites utilized a side slope for access into

the foundation construction area and a work area around the spread footing for

rebar placement, concrete pours, and backfill and compaction requirements.  Freas

Report at 7–8; see Pfahl Report at 29.  The width of the work area measured

approximately eight feet.  Trial Tr. vol. I, 49:17–50:5, 52:6–13.  The side slopes of

the excavation areas needed to adhere to specific Occupational Safety and Health

Administration ("OSHA") requirements.  Trial Tr. vol. I, 52:14–22.  The grade of

the side slope was dependent on the minerals in the ground, a shallower slope

being required with softer materials.  Trial Tr. vol. I, 52:25–53:11; Trial Tr. vol. II,

129:8–130:24 [Doc. 466].  The soil at the excavation sites was generally

---

[1] Plaintiff referenced post-construction Barr Drawings S-01 and S-03 in its cross-examination of Pfahl.  Trial Tr. vol. XII, 1360:6–1365:15.  These drawings were not admitted into evidence during trial.  Barr Drawing S-03, which was produced post-construction, is reproduced as Figure 5-2 in Pfahl's Report.  See Pfahl Report at 25; Trial Tr. vol. XII, 1361:24–1362:18.

classifiable as Type B, which allowed for a one horizontal foot to one vertical foot incline to a depth of 20 feet.  RMT Report at 10; Trial Tr. vol. IX, 1059:22–1060:12; 29 C.F.R. § 1926.652(b)(2), app. A.  The Barr Drawings indicated that the excavations would require a minimum of a one-to-one side slope incline.  See Pfahl Report at 29.  Eleven of the wind tower excavation sites allowed for side slopes with inclines of two horizontal feet for every one vertical foot, and the remaining 73 sites allowed for side slopes with inclines of one horizontal foot for every one vertical foot.  Trial Tr. vol. I, 53:23–54:4; Trial Tr. vol. II, 128:15–130:2.

The 11 wind tower excavation sites with side slopes of a two-to-one incline had a depth of approximately ten feet.  Trial Tr. vol. I, 54:9–11.  The radius of the base of the excavation area, including the wind tower and the eight-foot surrounding work area, measured approximately 34 feet.  See Trial Tr. vol. I, 56:6–16.  The radius of the excavation area at ground level was 54 feet.  Trial Tr. vol. I, 57:7–8.  The volume of mineral material excavated from each wind tower foundation with a two-to-one side slope amounted to 61,868.43 cubic feet.

The remaining 73 wind tower excavation sites with side slopes of a one-to-one incline had a depth of ten feet.  Trial Tr. vol. I, 54:9–11.  The base of each excavation area, including the wind tower and the eight-foot surrounding work area, had a radius of approximately 34 feet.  See Trial Tr. vol. I, 56:6–16.  The

radius of the excavation area at ground level stretched 44 feet. Trial Tr. vol. I, 57:5–7.

Trenches of at least 177,277 linear feet in length were excavated in the construction of the collector system. Freas Report at 9; Trial Tr. vol. I, 59:5–18. The typical conduit trench was three feet deep and six inches wide, yielding a cross-sectional area of 1.5 square feet. Freas Report at 9; Trial Tr. vol. I, 59:23–25. Defendants excavated approximately 265,915.5 cubic feet of mineral material during the construction of the collector system. Freas Report at 9; Trial Tr. vol. I, 61:1–7.

The mineral material excavated during construction of the wind farm contained limestone, shale, and clay. Freas Report at 3, 7, 9–11; Pfahl Report at 8, 17, 18–19; Trial Tr. vol. IX, 1034:24–1035:19. Each of these minerals had commercial value and was sold at Burbank Materials, a quarry located adjacent to the wind farm. See Pl.'s Ex. 39. The mineral material excavated for the wind towers was 54.18 percent limestone, 25.56 percent shale, and 20.26 percent clay. Freas Report at 7; Trial Tr. vol. I, 73:23–74:3. The mineral material excavated for the collector system trenches was 28.5 percent limestone, 1.3 percent shale, and 70.2 percent clay. Freas Report at 9; Trial Tr. vol. I, 79:3–12. The excavated limestone had an approximate density of 155 pounds per cubic foot ("pcf"), the

shale had an approximate density of 130 pcf, and the clay had an approximate

density of 115 pcf.  RMT Report at 8.

Burbank Materials was the "nearest shipping point" to the wind farm.  Trial

Tr. vol. I, 63:19–22; Trial Tr. vol. XI, 1309:25–1311:4 [Doc. 470]; 25 C.F.R.

§ 214.10.  During the construction period, Burbank Materials sold limestone for

$8.90 per ton and shale and clay for $6.00 per ton.  Freas Report at 11; Pl.'s Ex.

39; Defs.' Ex. 63.

In October 2013, the Osage Minerals Council solicited information from

Wind Capital Group and Tradewind "to determine the federal permitting, leasing

and other regulatory requirements that could apply to the Osage Wind Project."

Defs.' Ex. 18 at 4.  This letter referenced that "[i]n addition to oil and gas, the

Osage Mineral Estate consists of solid materials, including limestone, dolomite,

sandstone, sand, gravel, clay, and shale" and that activities within the mineral

estate "may be subject to a range of federal regulatory requirements, including the

need to secure a federal permit or lease to undertake such activities, pursuant to 25

C.F.R. §§ 411 and 414." Id.  The Bureau of Indian Affairs contacted Defendants

on October 9, 2014, advising that an inspector had observed a large pit with piles

of crushed limestone around a wind turbine foundation.  Defs.' Ex. 23.  The letter

directed Defendants to cease further excavation until the necessary permits were

obtained and threatened legal action for non-compliance.  Id.  Acting Principal

Chief Raymond Red Corn of the Osage Nation asked Defendants in November 2014 to suspend construction of the wind energy facilities, noting that Defendants "have taken Osage minerals for use in construction of wind turbines without permits or approval of the Osage Minerals Council."  Defs.' Ex. 26.  Defendants did not cease work in response to these mandates.  See Trial Tr. vol. V, 533:24–534:6, 536:20–537:14; Trial Tr. vol. XIII, 1569:12–18, 1572:25–1573:11 [Doc. 471]; Pl.'s Ex. 29.

Wind Capital Group and Tradewind retained the law firm Modrall, Sperling, Roehl, Harris & Sisk, P.A. ("Modrall Sperling") in October 2013, after receiving the Osage Minerals Council's letter soliciting information needed to determine if a lease was required for the wind farm project.  Trial Tr. vol. VI, 601:25–602:4, 603:7–11; Defs.' Ex. 18 at 4.  Modrall Sperling produced a memorandum on October 31, 2013 with the subject line "[r]ights of surface owners to use soil," discussing "[w]hether a surface owner who excavates land for the purpose of construction consistent with its surface rights—and does not remove the land excavated from the property—is engaged in 'mining' of the mineral estate and requires a mining permit."  Defs.' Ex. 48 ("October 2013 Modrall Sperling Memo") at 1; see also Trial Tr. vol. VI, 603:9–11.  The October 2013 Modrall Sperling Memo described the wind farm construction as "[t]o the extent any soil or other subsurface material is (touched) by [Tradewind], it is merely incidental to

[Tradewinds'] construction of its approved wind farm.  No soil is removed from the site, or processed on site for a commercial use."  October 2013 Modrall Sperling Memo at 2.  The memorandum reasoned that no mining permit was required for the project and concluded that "[Tradewind was] not engaged in mining or other use of the mineral estate, but [was] taking actions consistent *only* with its [Surface Leases]."  Id. (emphasis in original).

Modrall Sperling produced a second memorandum on May 19, 2014 in response to their clients' request that the memorandum be directed to them.  Defs.' Ex. 49 ("May 2014 Modrall Sperling Memo"); Trial Tr. vol. VII, 806:3–9.  The May 2014 Modrall Sperling Memo largely reiterated the prior findings and analysis from the October 2013 Modrall Sperling Memo.  Compare October 2013 Modrall Sperling Memo at 2 with May 2014 Modrall Sperling Memo at 2.  A paragraph in the October 2013 Modrall Sperling Memo acknowledging that 25 C.F.R. § 214 "contains the regulations for the 'Leasing of Osage Reservations Lands, Oklahoma, for mining except oil and gas,'" was removed from the May 2014 Modrall Sperling Memo.  Compare October 2013 Modrall Sperling Memo at 2 with May 2014 Modrall Sperling Memo at 2.  The May 2014 Modrall Sperling Memo also added to its analysis the qualifying language "as we understand its plans" when discussing Tradewind's construction of the wind farm.  Compare October 2013 Modrall Sperling Memo at 2 ("[Tradewind's] construction of the

wind farm does not require a permit from the [Bureau of Indian Affairs] or the Osage Nation") with May 2014 Modrall Sperling Memo at 2 ("[Tradewind's] construction of the wind farm, *as we understand its plans*, will not require a permit from the [Bureau of Indian Affairs] or the Osage Nation." (emphasis added)).  In describing Tradewind's interaction with the mineral estate during construction, the May 2014 Modrall Sperling Memo replaced the word "touched" with "moved." Compare October 2013 Modrall Sperling Memo at 2 ("To the extent any soil or other subsurface material is *(touched)* by [Tradewinds], it is merely incidental to [Tradewind's] construction of its approved wind farm." (emphasis added)) with May 2014 Modrall Sperling Memo at 2 ("To the extent any soil or other subsurface material would be *moved* by [Tradewind], it would be merely incidental to [Tradewind's] construction of its approved wind farm." (emphasis added)).

In August 2014, Defendants requested that Modrall Sperling prepare a scaled-back memorandum without legal conclusions to provide to General Electric. Defs.' Ex. 47 ("August 2014 Modrall Sperling Memo"); Pl.'s Ex. 7; Trial Tr. vol. VII, 816:5–817:3.  The August 2014 Modrall Sperling Memo included multiple changes from the prior versions.  Compare August 2014 Modrall Sperling Memo with October 2013 Modrall Sperling Memo and May 2014 Modrall Sperling Memo.  The subject line of the August 2014 Modrall Sperling Memo was changed to expressly reference excavation.  Compare August 2014 Modrall Sperling Memo

at 1 ("Rights of surface owners or their lessees in Osage County, Oklahoma to excavate or utilize soil") with October 2013 Modrall Sperling Memo at 1 ("Rights of surface owners to use soil") and May 2014 Modrall Sperling Memo at 1 (same). The "Question Presented" was revised to change "excavates land" to "excavates soil and related materials" and to change "does not remove the land excavated from the property" to "does not remove the materials excavated from the property subject to a mineral reservation." Compare August 2014 Modrall Sperling Memo at 1 with October 2013 Modrall Sperling Memo at 1 and May 2014 Modrall Sperling Memo at 1. The August 2014 Modrall Sperling Memo removed references to the Osage Minerals Council's contention that a lease or permit was necessary, which had been included in prior versions of the memorandum. Compare August 2014 Modrall Sperling Memo with October 2013 Modrall Sperling Memo at 2 and May 2014 Modrall Sperling Memo at 2; see also Trial Tr. vol. VII, 819:16–820:10. A finalized version of the May 2014 Modrall Sperling Memo was prepared in September 2014. Defs.' Ex. 50 ("September 2014 Modrall Sperling Memo"); Defs.' Ex. 46.

## II.    Party Experts

The Parties offered three expert witnesses during trial: Robert C. Freas, John Pfahl, and Stephen Hazel. Trial Tr. vol. I, 33:22–Trial Tr. vol. II, 151:7; Trial Tr.

vol. II, 162:24–Trial Tr. vol. III, 355:24; Trial Tr. vol. IX, 992:23–Trial Tr. vol

XII, 1386:13.

    "The district courts have broad discretion to determine the admission of

expert testimony."  <u>Taylor v. Cooper Tire & Rubber Co.</u>, 130 F.3d 1395, 1397

(10th Cir. 1997).  The court's review of a proposed expert's testimony is governed

by Federal Rule of Evidence 702 and the U.S. Supreme Court's opinions in

<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and <u>Kumho</u>

<u>Tire Co., Ltd. v. Carmichael</u> ("<u>Kumho Tire</u>"), 526 U.S. 137 (1999).  Federal Rule

of Evidence 702 provides that:

> [a] witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an opinion
> or otherwise if the proponent demonstrates to the court that it is more
> likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine a
> fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles
> and methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, the trial judge is tasked with "ensuring that an

expert's testimony both rests on a reliable foundation and is relevant to the task at

hand."  <u>Daubert</u>, 509 U.S. at 597.  The objective of this "gatekeeping

requirement . . . is to make certain that an expert, whether basing testimony upon

professional studies or personal experience, employs in the courtroom the same

level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.  Rule 702 applies to all experts, including those offered in non-scientific fields.  See United States v. Kamahele, 748 F.3d 984, 998 (10th Cir. 2014).

Admissibility of an expert's opinion is determined through a two-step analysis.  Mathis v. Huff & Puff Trucking, Inc., 787 F.3d 1297, 1307 (10th Cir. 2015) (citing United States v. Nacchio, 555 F.3d 1234, 1241 (10th Cir. 2009)). The Court must first "determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion."  Id. (internal quotation omitted).  If the expert is deemed qualified, "the [C]ourt must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in Daubert."  Id. (citation omitted).  In Daubert, the U.S. Supreme Court identified four non-exclusive factors that may be considered in judging the reliability of an expert's opinion: (1) whether a "theory or scientific technique . . . can be (and has been) tested;" (2) whether the "theory or technique has been subjected to peer review and publication;" (3) whether there exists a "known or potential rate of error and the existence and maintenance of standards controlling the technique's operation;" and (4) the degree of acceptance of a technique within a relevant community.  Daubert, 509 U.S. at 593–94.  The U.S. Supreme Court has explained that these factors "may or may not be pertinent in

assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." <u>Kumho Tire</u>, 526 U.S. at 150.

### A.    Robert C. Freas

Plaintiff offered Robert C. Freas as an expert witness on the value of the extracted minerals.  Freas is the President of Industrial Minerals Resource Consultants Inc.  Freas Report at 1.  He holds a Bachelor of Science degree in Geology and Biology and Masters level degrees in Geology and Business and is a registered professional geologist with the American Institute of Professional Geologists and the states of Tennessee and Indiana.  <u>Id.</u> at 2; Trial Tr. vol. I, 34:8–20.  He has more than "45 years' experience in the mining and industrial minerals industry with specific experience in the areas of developing and mining crushed stone and other construction raw materials including limestone, dolomite, sand, and gravel, as well as a host of other materials."  Freas Report at 1–2; Trial Tr. vol. I, 34:21–38:12.  Freas has authored more than 40 publications and has served as the President of the Society for Mining, Metallurgy, and Exploration, the American Institute of Mining, Metallurgical, and Petroleum Engineers, and the United Engineering Foundation.  Freas Report at 2.  Freas was admitted as an expert in the field of industrial mineral geology, industrial mineral valuation, industrial mineral development, and industrial mineral mining operations.  Trial Tr. vol. I, 42:4–11.

The Court finds that Freas is qualified by knowledge, skill, experience, training, or education to render an opinion.

In calculating the quantity of mineral material extracted in the construction of the wind towers, Freas relied on the Barr Drawings, RMT Report, construction notes, and photographs. Freas Report at 5–7; see also Defs.' Ex. 16; Pfahl Report at 29. Based on these sources, Freas determined that each of the wind tower excavation sites required an access ramp into the foundation construction area and a work area around the spread footing for rebar placement, concrete pours, and backfill and compaction requirements. Freas Report at 7–8. Freas determined the approximate width of the work area using people in photographs for scale. Trial Tr. vol. I, 49:17–50:5, 52:6–13; see Pl.'s Ex. 35. Freas considered drill logs, cores, and photographs in the geologic report in determining the necessary incline of side slopes for each of the 84 wind tower sites. Trial Tr. vol. I, 53:23–54:4; Trial Tr. vol. II, 128:15–130:2.

In his calculation, Freas used a standard depth of ten feet for each of the wind tower excavation sites. Trial Tr. vol. I, 54:9–11. He also used a radius of 34 feet for the base of the work sites, based on the foundation and surrounding work area. Trial Tr. vol. I, 56:6–16. Using these values, Freas calculated the area in common to all the wind tower sites—a cylinder extending from the circumference of the base to the ground level, not including the side slope—to have a volume of

36,316.9 cubic feet.[2]  Trial Tr. vol. I, 56:18–22.  Freas next calculated the volume

of the mineral material excavated from the space above the side slopes.  Trial Tr.

vol. I, 56:24–57:8.  In doing so, he treated the space as a truncated hollow cone and

calculated its volume with the formula $\pi\frac{h}{2}(R^2 - r^2)$, where "h" is height, "R" is

the radius of the larger base, and "r" is the radius of the smaller base.  Trial Tr. vol.

I, 56:24–57:8.  For the wind tower sites with a one-to-one side slope, Freas

calculated the volume of the mineral material removed from the side slope areas to

be 12,252.2 cubic feet.[3]  Trial Tr. vol. I, 57:10–16.  For the wind tower sites with a

two-to-one side slope, Freas calculated the volume of the mineral material

removed from the side slope areas to be 27,646.1 cubic feet.[4]  Trial Tr. vol. I,

57:17–21.  These volumes were added together to derive the total volume of

mineral material extracted from each wind tower excavation site.  Trial Tr. vol. I,

57:23–58:7.  Freas calculated that the total volume of mineral material excavated

from each wind tower excavation site with a one-to-one side slope was 48,569.1

cubic feet.[5]  Trial Tr. vol. I, 57:23–58:3.  He calculated that the total volume of

---

[2] To calculate the volume of a cylinder, Freas used the formula V=$\pi r^2$h, where "V"
is volume, "r" is the radius of the base, and "h" is the height of the cylinder.  Trial
Tr. vol. I 56:14–16.  $\pi \times 34^2 \times 10 = 36,316.9$.
[3] $\pi\frac{10}{2}(44^2 - 34^2) = 12,252.2$.
[4] $\pi\frac{10}{2}(54^2 - 34^2) = 27,646.1$.
[5] $36,316.9 + 12,252.2 = 48,569.1$.

mineral material excavated from each wind tower excavation site with a two-to-one side slope was 63,963 cubic feet.[6]  Trial Tr. vol. I, 58:3–7.  Using these figures, Freas determined that the total volume of mineral material excavated from the 84 wind tower excavation sites was 4,249,137 cubic feet.[7]  Trial Tr. vol. I, 58:9–15.

Freas relied on the RMT Report in determining that the mineral material excavated during construction of the wind farm contained limestone, shale, and clay.  Freas Report at 3, 7, 9–11.  Freas reviewed individual drill logs to determine that the upper ten feet of the mineral estate for the wind tower excavation sites was composed of 54.18 percent limestone, 25.56 percent shale, and 20.26 percent clay.  Freas Report at 7; Trial Tr. vol. I, 73:23–74:3.  He applied the calculated mineral concentrations to the bulk densities for each mineral provided in the RMT Report and the calculated volumes of extracted mineral material to determine the tonnage of each specific mineral extracted during construction of the wind towers.  Freas Report at 7.  For limestone, Freas calculated a total tonnage of 178,419 tons.[8]  Trial Tr. vol. I, 74:7–16; 77:18–78:8.  For shale, Freas calculated a total tonnage of

---

[6] $36,316.9 + 27,646.1 = 63,963$.

[7] $(73 \times 48,569.1) + (11 \times 63,963) = 4,249,137.3$.

[8] $4,249,137 \text{ ft}^3 \times 0.5418 = 2,302,182.43 \text{ ft}^3$

$2,302,182.43 \text{ ft}^3 \times 155 \text{ pcf} = 356,838,276.12 \text{ lbs}$

$356,838,276.12 \text{ lbs} \div 2000 \, {}^{\text{lbs}}/_{\text{ton}} = 178,419.14 \text{ tons}$

70,595.16 tons.[9]  Trial Tr. vol. I, 74:16–19; 78:9–12.  For clay, Freas calculated a

total tonnage of 49,500 tons.[10]  Trial Tr. vol. I, 74:19–21; 78:12–16.

Values for the extracted limestone, shale, and clay were determined by

applying the rates available at the closest quarry to the wind farm project, Burbank

Materials, and by calculating the applicable royalty rate based on 25 C.F.R.

§ 214.10(d), as referenced in Osage Wind I.  Freas Report at 11; see also 25 C.F.R.

§ 214.10(d); Osage Wind I, 871 F.3d at 1089.  Based on a purchase order issued

less than one year before construction began, Freas determined the value of the

minerals at Burbank Materials to be $8.90 per ton for limestone and $6.00 per ton

for both shale and clay.[11]  Trial Tr. vol. I, 65:19–70:14, 73:1–14; Freas Report at

11; see Defs.' Ex. 63.  Freas determined the royalty rate to be ten percent of the

value of the minerals at Burbank Materials.  Trial Tr. vol. I, 61:25–62:22, 76:6–11.

---

[9] $4,249,137 \text{ ft}^3 \times 0.2556 = 1,086,079.42 \text{ ft}^3$
$1,086,079.42 \text{ ft}^3 \times 130 \text{ pcf} = 141,190,324.6 \text{ lbs}$
$141,190,324.6 \text{ lbs} \div 2000 \text{ }^{\text{lbs}}/_{\text{ton}} = 70,595.16 \text{ tons}$

[10] $4,249,137 \text{ ft}^3 \times 0.2026 = 860,875.16 \text{ ft}^3$
$860,875.16 \text{ ft}^3 \times 115 \text{ pcf} = 99,000,643.4 \text{ lbs}$
$99,000,643.4 \text{ lbs} \div 2000 \text{ }^{\text{lbs}}/_{\text{ton}} = 49,500.32 \text{ tons}$

[11] A purchase order from September 2014 reflecting the same rates was admitted
into evidence at trial.  Pl.'s Ex. 39.

For the minerals extracted from the wind tower sites, Freas calculated the royalty value of the limestone to be $158,792.91.[12]  Trial Tr. vol. I, 76:14–15.  He calculated the royalty value of the shale to be $42,357.[13]  Trial Tr. vol. I, 76:16–18.  He calculated the royalty value of the clay to be $29,700.[14]  Trial Tr. vol. I, 76:19–22.  Freas calculated the total royalty value of the minerals extracted in construction of the wind towers to be $230,849.91.  Trial Tr. vol. I, 76:23–77:1; 77:16–78:23.

In determining the volume of materials extracted in the construction of trenches for the electrical collector system, Freas reviewed a "layout of the collector system, the cross-section drawings of the collector system, . . . [and] the RMT [R]eport."  Trial Tr. vol. I, 58:25–59:5; Freas Report at 9.  Freas calculated that 177,277 linear feet were excavated for the collector system trenches.  Trial Tr. vol. I, 59:2–18; Freas Report at 9.  Freas acknowledged that this amount was less than the 194,400 linear feet of collector system path recorded in Defendants' weekly report, but opted to use the lesser amount, which he deemed more accurate based on a review of the drawings and changes made during construction.  Freas

---

[12] $178,419 \times 8.90 \times 0.1 = \$158,792.91$
The Court observes that Freas testified that the value of the limestone was $158,792.81.  Trial Tr. vol. I, 76:14–15.  His calculations appear to use the correct value of $158,792.91.
[13] $70,595 \times 6.00 \times 0.1 = \$42,357$
[14] $49,500 \times 6.00 \times 0.1 = \$29,700$

Report at 9; Trial Tr. vol. I, 59:5–18.  Based on engineering drawings, Freas

determined the typical conduit trench to be three feet deep and six inches wide,

yielding a cross-sectional area of 1.5 square feet.  Freas Report at 9; Trial Tr. vol. I,

59:23–25.  The cross-sectional area was multiplied by the total length of the

trenches to determine the quantity of mineral material excavated during the

construction of the collector system.  Freas Report at 9; Trial Tr. vol. I, 61:1–7.

Freas calculated that a total of 265,915.5 cubic feet of mineral material was

excavated during construction of the collector system trenches.[15]  Trial Tr. vol. I,

61:1–12.

Freas reviewed the upper three feet of the nearest drill holes to the collector

system and determined that the mineral estate in that area was composed of 28.5

percent limestone, 1.3 percent shale, and 70.2 percent clay.  Freas Report at 9;

Trial Tr. vol. I, 79:3–12.  Using these percentages, Freas calculated that 5,873 tons

of limestone were excavated during construction of the collector system.[16]  Trial

Tr. vol. I, 79:18–23, 81:15–82:3.  He calculated the tonnage of shale excavated to

---

[15] $1.5 \times 177{,}277 = 265{,}915.5$

[16] $265{,}915.5 \text{ ft}^3 \times 0.285 = 75{,}785.92 \text{ ft}^3$

$75{,}785.92 \text{ ft}^3 \times 155 \text{ pcf} = 11{,}746{,}817.6 \text{ lbs}$

$11{,}746{,}817.6 \text{ lbs} \div 2000 \text{ }^{\text{lbs}}/_{\text{ton}} = 5{,}873.41 \text{ tons}$

be 225 tons.[17]  Trial Tr. vol. I, 79:18–23, 81:15–82:3.  He calculated the tonnage of

excavated clay to be 10,734 tons.[18]  Trial Tr. vol. I, 79:18–23, 81:15–82:3.

Applying the same method as was used with the wind towers, Freas determined the

royalty value of the excavated limestone to be $5,226.97.[19]  Trial Tr. vol. I, 80:10–

15,82:3–10.  He calculated the royalty value of the shale to be $135.[20]  Trial Tr.

vol. I, 80:16–18, 82:3–10.  He calculated the royalty value of the clay to be

$6,440.40.[21]  Trial Tr. vol. I, 80:19–21, 82:3–10.  Freas calculated the total value of

the mineral material excavated in the construction of the collector system to be

$11,802.37.[22]  Trial Tr. vol. I, 80:22–25, 82:8–10.  Freas calculated the total

royalty value of the minerals excavated during construction of the wind towers and

collector system to be $242,652.28.[23]  Trial Tr. vol. I, 82:16–19.

 The Court finds that Freas' testimony is relevant to the issue of determining

the quantity and value of the mineral material extracted by Defendants.  In arriving

---

[17] $265{,}915.5 \text{ ft}^3 \times 0.013 = 3{,}456.90 \text{ ft}^3$
$3{,}456.90 \text{ ft}^3 \times 130 \text{ pcf} = 449{,}397.2 \text{ lbs}$
$449{,}397.2 \text{ lbs} \div 2000 \; {}^{\text{lbs}}/_{\text{ton}} = 224.7 \text{ tons}$
[18] $265{,}915.5 \text{ ft}^3 \times 0.702 = 186{,}672.68 \text{ ft}^3$
$186{,}672.68 \text{ ft}^3 \times 115 \text{ pcf} = 21{,}467{,}358.2 \text{ lbs}$
$21{,}467{,}358.2 \text{ lbs} \div 2000 \; {}^{\text{lbs}}/_{\text{ton}} = 10{,}733.68 \text{ tons}$
[19] $5{,}873 \times 8.90 \times 0.1 = \$5{,}226.97$
[20] $225 \times 6.00 \times 0.1 = \$135.00$
[21] $10{,}733.68 \times 6.00 \times 0.1 = \$6{,}440.40$
[22] $\$5{,}226.97 + \$135.00 + 6{,}440.40 = \$11{,}802.37$
[23] $\$230{,}849.91 + \$11{,}802.37 = \$242{,}652.28$

at his opinion, Freas relied on sufficient facts and data derived from the Barr

Drawings, RMT Report, and other contemporaneous recordings.  The Court finds

Freas' method of calculating the approximate volume of minerals extracted to be

based on reliable principles and methods.  The Court further finds that Freas'

methods of determining the quantity and value of limestone, shale, and clay

included in the extracted mineral material are based on reliable principles and

methods.  Therefore, the Court finds that Freas' expert testimony is sufficiently

reliable and is admissible.

### B.    John Pfahl

Defendants offered John Pfahl as an expert on the valuation of the excavated

minerals.  Pfahl is currently employed as Practice Lead, Portfolio Strategy and

Development with BHP, a diversified mining company.  Trial Tr. vol. IX, 993:5–

10.  At the time of preparing his report, Pfahl was employed by SRK Consulting, a

consulting firm in the mining industry.  Trial Tr. vol. IX, 994:5–20; Pfahl Report at

6.  Pfahl holds a Master of Engineering, Engineer of Mines, and a Bachelor of

Science in Engineering.  Pfahl Report at 6; Trial Tr. vol. IX, 999:24–1000:4.  He

has worked in the mining and mineral industry for more than 20 years.  Pfahl

Report at 6.  The primary component of his current position is "evaluat[ing]

mining projects for investment and acquisition."  Trial Tr. vol. IX, 993:11–16.

Pfahl is a registered member of the Society of Miners.  Trial Tr. vol. IX, 998:13–

25.  Through the Society of Miners, Pfahl is a "Qualified Person under the disciplines of Valuation, Market and Financial Analysis and Engineering, Mine Design, Infrastructure, Metallurgy and Processing under the guidelines of the Canadian National Instrument 43-101, as well as a Competent Person in accordance with the Australasian JORC Code."  Pfahl Report at 6; see Trial Tr. vol. IX, 999:1–14.  Pfahl was admitted as an expert at trial.  Trial Tr. vol. IX, 1017:14–17.  The Court finds that Pfahl is qualified by knowledge, skill, experience, training, or education to render an opinion.

In calculating the quantity of mineral material extracted in the construction of the wind towers, Pfahl calculated the average diameter of a wind tower excavation site by averaging the diameter at the base of a wind tower and the diameter of the excavation site at ground level, resulting in an average diameter of 59.5 feet.  Pfahl Report at 26; Trial Tr. vol. IX, 1053:24–1055:5.  He then calculated the depth of the excavation site by subtracting two feet, six inches, the portion of the foundation extending above the surface, from nine feet, three inches, the total height of the foundation, resulting in an average depth of six feet, nine inches.  Pfahl Report at 30.  Though Pfahl considered this calculation to be consistent with Moskaluk's declaration, he acknowledged that it likely did not account for the total volume blasted.  Id. at 30–31.  Pfahl also acknowledged that the Barr Drawings did not account for the possibility of over-excavation or

allowances for a working space or side slope.  Id. at 31–32.  Pfahl assumed a working space of five feet, though he noted that some photos suggested little or no working space for certain towers.  Trial Tr. vol. IX, 1057:17–1058:20.  He also testified that he assumed a one foot to one foot side slope for all of the sites because it was referenced in the Barr drawings.  Trial Tr. vol. IX, 1059:4–20. Pfahl explained that the soil type identified in the RMT Report for all of the sites allowed for a one-to-one slope up to a depth of 20 feet.  Trial Tr. vol. IX, 1059:4– 16.  To account for these additional factors, Pfahl calculated his volume estimate based on an average diameter of 70 feet and an average depth of ten feet.  Pfahl Report at 32; Trial Tr. vol. IX, 1054:1–1055:5.  This allowed for the average volume to be approximated by a cylinder with a volume of 1,425 cubic yards. Pfahl Report at 32.  Pfahl limited his calculations to only 82 wind tower sites, concluding that mining did not occur at the other two sites.  Id. at 34.  Pfahl concluded that approximately 117,000 cubic yards of mineral material was excavated.  Id. at 34–35.

Pfahl did not include the mineral material excavated from two of the wind tower sites or the collector system because he determined that they did not require the crushing of extracted minerals.  Id. at 64.  Significantly, Pfahl did not include shale and clay in determining the quantities and values of specific minerals because he considered shale and clay unlikely to have been crushed for backfill.

Id. at 26.  Pfahl reasoned that under the Tenth Circuit Court of Appeals' decision in Osage Wind I, crushing of the extracted mineral material was a required element to constitute mining.  Id. at 28, 60; Trial Tr. vol. IX, 1037:17–1039:1.  The Court has previously rejected such a narrow interpretation and held that the mining of the Osage Mineral Estate involved multiple actions, including excavation, sorting, crushing, and the "use of crushed rocks as backfill for support."  Osage Wind II, 710 F. Supp. 3d at 1036–38.  Despite considering only the value of the extracted limestone, Pfahl relied on the geotechnical drill borings in the RMT Report to determine that the top ten feet of the mineral estate for the average excavation site was composed of 54 percent limestone, 34 percent clay, and 10 percent shale.  Pfahl Report at 28.

In his assessment of the value of the extracted mineral material, Pfahl considered a mineral lease between the Osage Minerals Council and Candy Creek Crusher, LLC, a quarry in Osage County, and a resolution passed by the Osage Minerals Council concerning another lease with APAC Central to mine at a quarry in Osage County.  Id. at 35–36; Trial Tr. vol. IX, 1068:12–1069:14, 1073:29–1074:2; see Defs.' Exs. 21, 85.  Based on these documents, Pfahl determined that the royalty rate for limestone, as determined by the market, was $0.52 per ton in 2014.  Pfahl Report at 35–36.

Pfahl's calculation is inconsistent with 25 C.F.R. § 214.10(d), which provides that "[f]or substances other than gold, silver, copper, lead, zinc, coal, and asphaltum the lessee shall pay quarterly a royalty of [ten] percent of the value at the nearest shipping point of all ores, metals, or minerals marketed."  25 C.F.R. § 214.10(d).  Neither of the quarries considered by Pfahl qualify as the "nearest shipping point" for the minerals extracted and both apply a rate different than that mandated by regulation 25 C.F.R. § 214.10(d).

Because Pfahl's opinion is heavily reliant on averaging, inconsistent with the holdings of Osage Wind I and Osage Wind II, and fails to apply the requirements of 25 C.F.R. § 214.10, the Court finds Pfahl's expert testimony to be unreliable and inadmissible.

### C.    Stephen Hazel

Plaintiff offered Stephen Hazel as an expert witness on the value of mineral leases.  Hazel is a certified public account with FTI Consulting.  Trial Tr. vol. II, 163:3–12, 164:19–22; see also Trial Tr. vol. II, 176:3–5.  Hazel holds a degree in accounting from the University of Denver and has various credentials in valuation and financial forensics.  Trial Tr. vol. II, 164:19–165:15.  Between 1982 and 1999, Hazel was employed in "traditional accounting."  Trial Tr. vol. II, 165:16–166:4. Since 1999, he has focused on forensic accounting.  Trial Tr. vol. II, 166:5–167:20. Hazel has experience working on valuations involving Indian tribal interests and

mining operations.  Trial Tr. vol. II, 172:13–173:6, 174:4–175:21.  Hazel was

designated as an expert at trial.  Trial Tr. vol. III, 240:15–242:3 [Doc. 475].  The

Court finds that Hazel is qualified by knowledge, skill, experience, training, or

education to render an opinion.

In attempting to assign a value to the lease that Defendants failed to obtain

before extracting mineral material from the Osage Mineral Estate, Hazel

determined that the surface rights leases between surface rights holders and

Defendants were the "most reasonable and comparable proxy for the mineral lease

that Osage Wind was federally obligated to obtain in order to construct its [w]ind

[f]arm."  Hazel Report at 7, 20–22.  Hazel considered six Surface Leases between

Defendants and surface rights owners, with six identifiable income streams:

(1) signing bonuses; (2) development period rents; (3) exercise of option payments;

(4) fees during the construction period; (5) construction payments; and

(6) compensation for pasture damages.  Id. at 4–5, 7–12.  Based on these income

streams, Hazel calculated the amount paid by Defendants to surface rights owners

during the period in which the wind farm was under construction.  Id. at 4–5, 7–12;

Trial Tr. vol. II, 180:13–183:1, 195:17–198:10; Surface Lease ¶¶ 3.1, 3.2, 5.1, 5.2,

5.6, 14.7.  Hazel also calculated the damages based on the cash flows that would be

paid to the surface rights owners during the commercial operation of the towers.

Hazel Report at 12–22.  The Surface Leases have an initial term of 25 years and an

option to renew for an additional 20 years.  Hazel's Report at 14; Trial Tr. vol. II, 183:6–13; Surface Lease ¶¶ 3–4.  During the period of commercial operation, Defendants pay the surface rights owners an annual "Turbine Operating Fee" determined by the greater of the (1) turbine capacity in megawatts; (2) applicable royalty amount; and (3) total number of acres included in the project.  Hazel Report at 5–7; Trial Tr. vol. II, 200:2–15; Surface Lease ¶ 5.3.  Hazel applied a discounted cash flow method to calculate the anticipated present value of the payments that would be made over both the initial 25 years of the surface leases and the additional 20-year renewal period.  Hazel Report at 13–14; Trial Tr. vol. II, 200:16–202:20.

At trial, Hazel was unable to identify another similar situation in which the value of a mineral estate was based on the lease of an accompanying surface estate.  Trial Tr. vol. III, 244:6–246:25.  Hazel acknowledged that the "most important thing" to his analysis was the "understanding that the Osage [N]ation, the [Osage Minerals Council] didn't want the turbines there at all."  Trial Tr. vol. II, 185:3–16, 216:17–217:7; see also Trial Tr. vol. III, 269:15–22.  This perspective is reflected in Hazel's Report, which assumes "that the [Osage] Mineral Estate is *at least as integral* as the [s]urface [e]state to the construction of the [w]ind [f]arm by [Defendants]" and concludes that "the damages suffered by the Osage Nation due to Defendants' failure to enter into the appropriate leases are *at least equal* to the

present value of the amount paid by, or willing to be paid by the Defendants to the owners of the [s]urface [e]state." Hazel's Report at 6 (emphasis in original); Trial Tr. vol. II, 185:21–187:2, 189:23–190:9.

Hazel's reasoning that Defendants would have been forced to accept a mineral rights lease with terms at least equal to the terms of the surface rights leases is at odds with both accepted valuation standards and common sense. At trial, Hazel conceded that "a market valuation looks at what a willing buyer and a willing seller would pay in an arm's length transaction." Trial Tr. vol. III, 269:25–270:5. In order to define "willing seller" and "willing buyer," Defendants offered the International Valuation Standards published by the International Valuation Standards Council as representative of best practices for valuing assets. Defs.' Ex. 95 (International Valuation Standards); see also Defs.' Ex. 1 (IVS 105: Valuation Approaches and Methods: Exposure Draft). At trial, Hazel acknowledged the International Valuation Standards Council to be reputable and its standards credible. Trial Tr. vol. III, 273:4–14. The International Valuation Standards defines a "willing seller" as:

> neither an over-eager nor a forced seller prepared to sell at any price, nor one prepared to hold out for a price not considered reasonable in the current market. The willing seller is motivated to sell the asset at market terms for the best price attainable in the open market after proper marketing, whatever that price may be. The factual circumstances of the actual owner are not a part of this consideration because the willing seller is a hypothetical owner.

Defs.' Ex. 95 § 30.2(e).  A "willing buyer" is defined as:

> one who is motivated, but not compelled to buy.  This buyer is neither over-eager nor determined to buy at any price.  This buyer is also one who purchases in accordance with the realities of the current market and with current market expectations, rather than in relation to an imaginary or hypothetical market that cannot be demonstrated or anticipated to exist.  The assumed buyer would not pay a higher price than the market requires.  The present owner is included among those who constitute "the market."

Id. § 30.2(d).  Hazel testified that he did not disagree with these definitions.  Trial Tr. vol. III, 273:15–275:25.

Hazel's valuation is premised on the Osage Minerals Council not acting as a willing seller in an arm's length transaction and, instead, imposing an exorbitant price on an unwanted transaction.  The valuation also presumes Defendants to be compelled purchasers, required to accept the terms offered to secure necessary permissions to complete the wind farm project.  This assumption ignores that Defendants could have secured minerals for backfill from local quarries, potentially avoiding the need for the mineral lease in its entirety.  It would have been unreasonable for Defendants to have accepted a lease imposing tens of millions of dollars in obligations when a significantly cheaper alternative was available.  Because there is no evidence that Hazel's valuation methodology is based on industry practice, the Court strikes Hazel's testimony with respect to his

valuation of the leases.  The Court finds that Hazel's valuation is not a reasonable or reliable fair rental rate and Hazel's testimony is inadmissible.

## CONCLUSIONS OF LAW

### I.    Conversion

The Court granted summary judgment on Plaintiff's claims of conversion. Osage Wind II, 710 F. Supp. 3d at 1030–32.  Conversion is an "act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein."  Welty v. Martinaire of Okla., Inc., 867 P.2d 1273, 1275 (Okla. 1994).  Defendants' extraction of minerals from the mineral estate and subsequent use of the minerals as backfill during construction of the wind farm constituted an act of conversion.  Osage Wind II, 710 F. Supp. 3d at 1031–32. Plaintiff is entitled to recovery of the market value, or replacement cost, of the converted property.  See United States v. Hatahley, 257 F.2d 920, 923 (10th Cir. 1958) (recognizing that plaintiffs were entitled to the market value, or replacement cost, of horses and burros unlawfully taken by the United States).

In order to determine the appropriate royalty amount for the minerals extracted, the Court must determine: (1) the volume of the extracted mineral material; (2) the specific minerals composing the excavated materials; and (3) the applicable royalty rate and market value for those specific minerals.

## A.    Volume

The volume of the extracted minerals is in question because Defendants' contractors and subcontractors did not maintain records of such information during construction of the wind farm.  See Trial Tr. vol. IX, 988:25–990:2.  As an initial matter, Plaintiff urges the Court to draw adverse inferences against Defendants, alleging that "[a]ny uncertainty that exists is due to Enel's flagrant misrepresentation to the Court while blasting was ongoing."  Pl.'s Post-Trial Br. at 5.  In a 2014 declaration in support of Defendants' response to a motion for preliminary injunction, Moskaluk represented to the Court that Defendants' "contractor records the volume of rock crushed and the rock is then stored at the site," Defs.' Resp. Pl.'s Mot. Prelim. Inj. at Ex. 1  ¶ 15(a)(ii), which was later revealed to be untrue.  Judge Frizzell previously considered Plaintiff's request for sanctions against Defendants for Moskaluk's inaccurate representation, ruling that Defendants were not required by statute or regulation to create records of extracted mineral volumes and that sanctions were not warranted.  Order (Oct. 18, 2022) at 10 [Doc. 364]; see also Pl.'s Mot. Determine Sanctions Spoilation Evid. [Doc. 293].  This Court is not inclined to relitigate the same issue at this stage of the litigation and will not order sanctions in the form of adverse inferences based on Defendants' failure to maintain records of extracted mineral volumes or Moskaluk's misrepresentation.

At trial, Plaintiff confirmed that it is no longer seeking damages related to mineral material excavated in the construction of the collector substation foundation and transmission towers, leaving only the wind tower excavation sites and the trenches dug for the collector system.  Trial Tr. vol. II, 122:12–123:6.  In calculating the volume of minerals extracted from each wind tower site, Freas and Pfahl both relied on the Barr Drawings and the RMT Report.  Freas Report at 5–7; Pl.'s Ex. 65; Defs.' Ex. 16; Pfahl Report at 29; see also Defs.' Ex. 14 (email directing that foundations be built to the Barr Drawings).  In relevant part, the Barr Drawings reflect that each wind tower had a 52-foot diameter foundation ring. Defs.' Ex. 16; Pfahl Report at 29; Trial Tr. vol. I, 45:24–46:2, 49:3–7.  The depth of the excavation sites was nine feet, nine inches at the wind tower foundation and nine feet, three inches at the edge of the excavation base.  Pfahl Report at 29.  The top of the foundation extended two feet, six inches above ground level.  Id.

Freas observed that two of the three design drawings, S-01 and S-02, referenced the need for a three-inch mud mat of lean concrete below the spread footing of the towers.  Freas Report at 6.  He also noted that construction notes and photographs identified the need for an access ramp into the foundation construction area and a work area around the spread footing for rebar placement, concrete pours, and backfill and compaction requirements.  Id. at 7–8.  Freas estimated the width of the work area to be approximately eight feet.  Trial Tr. vol. I, 49:17–50:5,

52:6–13.  He also explained that the slopes on the sides of the excavation area were required to adhere to specific OSHA requirements.  Trial Tr. vol. I, 52:14–22. Freas explained that the grade of the side slope is dependent on the minerals in the ground, a shallower slope being required with softer materials.  Trial Tr. vol. I, 52:25–53:11; Trial Tr. vol. II, 129:8–130:24.  Based on a review of the available drill logs, cores, and photographs in the primary geologic report, Freas determined that 11 sites would have required side slopes with a two-to-one incline and the remaining 73 sites would have allowed for side slopes with a one-to-one incline. Trial Tr. vol. I, 53:23–54:4; Trial Tr. vol. II, 128:15–130:2.

The Court finds Freas' conclusion that 11 of the wind tower excavation sites had side slopes with a two-to-one incline to be reasonable.  The Barr Drawings reference the need for a side slope and show a "min[imum] compaction limit" of one-to-one and note that "excavation [is] to meet all OSHA requirements."  See Pfahl Report at 29.  The RMT Report states that "the overburden soil at the site may generally be inferred to be a Type B soil."  RMT Report at 10.  Soil Type B allows for a one-to-one side slope to a depth of 20 feet.  See 29 C.F.R. § 1926.652(b)(2), app. A, Table B-1.  This is the maximum permissible incline, however, and can be reduced based on the conditions present.  See 29 C.F.R. § 1926.652(b)(2), app. A.  Freas reviewed the available drill logs, photographs, cores, and materials logs in determining that some of the sites required a shallower

incline.  Trial Tr. vol. I, 53:23–54:4.  The Court finds this to be reasonable and accepts that 73 wind tower sites had side slopes with a one-to-one incline and the remaining 11 wind tower sites had side slopes with a two-to-one incline.

The Court also adopts Freas' method of calculating volume for the wind towers and collector system.  Freas calculated the area in common to all the wind tower sites, a cylinder extending from the circumference of the base to the ground level, to have a volume of 36,316.9 cubic feet.  Trial Tr. vol. I, 56:18–22.  For the wind tower sites with a one-to-one side slope, Freas calculated the volume of the mineral material removed from the side slope areas to be 12,252.2 cubic feet.  Trial Tr. vol. I, 57:10–16.  He calculated the total volume of mineral material excavated from each wind tower excavation site with a one-to-one side slope as 48,569.1 cubic feet.  Trial Tr. vol. I, 57:23–58:3.  For the wind tower sites with a two-to-one side slope, Freas calculated the volume of the mineral material removed from the side slope areas to be 27,646.1 cubic feet.  Trial Tr. vol. I, 57:17–21.  He calculated the total volume of mineral material excavated from each wind tower excavation site with a two-to-one side slope as 63,963 cubic feet.  Trial Tr. vol. I, 58:3–7.  Using these figures, Freas determined that the total volume of mineral material excavated from the 84 wind tower excavation sites was 4,249,137 cubic feet.  Trial Tr. vol. I, 58:9–15.

Freas calculated that 177,277 linear feet were excavated for the collector system trenches.  Trial Tr. vol. I, 59:2–18; Freas Report at 9.  Based on engineering drawings, Freas determined the typical conduit trench to be three feet deep and six inches wide, yielding a cross-sectional area of 1.5 square feet.  Freas Report at 9; Trial Tr. vol. I, 59:23–25.  The cross-sectional area was multiplied by the total length of the trenches to determine the quantity of mineral material excavated during the construction of the collector system.  Freas Report at 9; Trial Tr. vol. I, 61:1–7.  Freas calculated that a total of 265,915.5 cubic feet of mineral material was excavated during construction of the collector system trenches.  Trial Tr. vol. I, 61:1–12.

### B.    Composition

The Osage Act provides that "the oil, gas, coal, or *other minerals*" of the Osage Mineral Estate are to be reserved to the Osage Nation.  Osage Act § 2–3, 34 Stat. at 543 (emphasis added).  The act further provides for "leases for all oil, gas, and *other minerals*" to be issued.  Id.  In Millsap v. Andrus, 717 F.2d 1326 (10th Cir. 1983), the Tenth Circuit Court of Appeals held that the phrase "other minerals" should be interpreted broadly.  Millsap v. Andrus, 717 F.2d 1326, 1328–29 (10th Cir. 1983).  The mineral material extracted during the construction of the wind farm was composed, in relevant part, of limestone, shale, and clay.  Freas Report at 3, 7, 9–11.

In determining the composition of the mineral material excavated during construction of the wind towers, Freas reviewed individual drill logs to determine that the upper ten feet of the mineral estate for the wind tower excavation sites was composed of 54.18 percent limestone, 25.56 percent shale, and 20.26 percent clay. Freas Report at 7; Trial Tr. vol. I, 73:23–74:3.  The RMT Report provides the average density determined for the minerals composing the Osage Mineral Estate. RMT Report at 8.  The approximate density of limestone was determined to be 155 pcf, the approximate density of shale was determined to be 130 pcf, and the approximate density of clay was determined to be 115 pcf.  Id.  Applying these values to the 4,249,137 cubic feet of mineral material excavated during construction of the wind towers results in 178,419 tons of limestone, 70,595.16 tons of shale, and 49,500 tons of clay.  Trial Tr. vol. I, 74:7–21; 78:8–16.

In calculating the composition of the mineral material excavated during construction of the collector system trenches, Freas reviewed the upper three feet of the nearest drill holes to the collector system and determined that the mineral estate in that area was composed of 28.5 percent limestone, 1.3 percent shale, and 70.2 percent clay.  Freas Report at 9; Trial Tr. vol. I, 79:3–12.  Applying these proportions to the 265,915.5 cubic feet of mineral material excavated for the collector system trenches results in 5,873 tons of limestone, 225 tons of shale, and 10,734 tons of clay.  Trial Tr. vol. I, 79:3–23, 81:15–82:3.

Case No. 4:14-cv-00704-JCG-JFJ                                              44

### C.    Value

Under the applicable regulation, "[f]or substances other than gold, silver, copper, lead, zinc, coal, and asphaltum the lessee shall pay quarterly a royalty of [ten] percent of the value at the nearest shipping point of all ores, metals, or minerals marketed." 25 C.F.R. § 214.10. Freas adopted this method of valuation in his report and identified Burbank Materials, located adjacent to the wind farm, as the nearest shipping point. Freas Report at 11. Based on a purchase order issued less than one year before construction began, Freas determined the value of the minerals to be $8.90 per ton for limestone and $6.00 per ton for both shale and clay.[24] Id.; see Defs.' Ex. 63. For each of these, the royalty rate would be $0.89 per ton for limestone and $0.60 per ton for shale and clay. Applying these rates to the quantities calculated for the respective minerals results in values of $164,019.88 for limestone, $42,492.00 for shale, and $36,140.40 for clay. This equates to a royalty of $242,652.28.

Therefore, Plaintiff is entitled to a damages award of $242,652.28 in royalties for the mineral material excavated during construction of the wind farm on the claim of conversion.

---

[24] A purchase order from September 2014 reflecting the same rates was admitted into evidence at trial. Pl.'s Ex. 39.

###    D.    Pre-Judgment Interest

Plaintiff asks the Court to award pre-judgment interest on its conversion damages to address the unfair benefit experienced by Defendants during the prolonged life of this dispute and to dissuade others that might be tempted to unlawfully invade the Osage Mineral Estate.  Pl.'s Pre-Trial Br. at 6–7; Pl.'s Post-Trial Br. at 9–10.  Oklahoma law permits "[a]ny person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day."  23 Okla. St. Ann. § 6.  Pre-judgment interest may only be awarded for "damages that are 'liquidated or capable of ascertainment before judgment.'"  MCC Mgmt. of Naples, Inc. v. Int'l Bancshares Corp., 468 Fed. App'x 816, 829 (10th Cir. 2012) (quoting Taylor v. State Farm Fire & Cas. Co., 981 P.2d 1253, 1261 (Okla. 1999)).  "[I]f the fact-finder must weigh conflicting evidence in order to determine the precise amount of damages due to the plaintiff, then a court cannot grant prejudgment interest."  Strickland Tower Maint., Inc. v. AT&T Comms., Inc., 128 F.3d 1422, 1429 (10th Cir. 1997) (citing Withrow v. Red Eagle Oil Co., 755 P.2d 622, 625 (Okla. 1988); Liberty Nat'l Bank & Trust Co. v. Acme Tool Div., 540 F.2d 1375, 1383 (10th Cir. 1976)).  In this case, multiple factual elements of the damages calculation were unresolved

before trial, including the nature and quantity of the mineral material extracted.

Therefore, the Court cannot award pre-judgment interest.

## II.    Trespass

Plaintiff contends that the proper valuation of damages for trespass is the

reasonable rental value of the property.  Pl.'s Pre-Trial Br. at 9–11; Pl.'s Post-Trial

Br. at 12–13.  Conversely, Defendants contend that the proper value of Plaintiff's

damages for trespass is the royalty value of the minerals excavated, because both

Plaintiff's conversion and trespass claims derived from the same conduct of

"entering the mineral estate, extracting minerals, and using the extracted minerals

without first obtaining the necessary lease."  Defs.' Post-Trial Br. at 20–21

(quoting Osage Wind II, 710 F. Supp. 3d at 1031).  Because these damages are the

same as those recoverable for conversion, Defendants argue that double recovery

should not be permitted.  Id. at 33–34.

At the outset, the Court disagrees with Defendants' position that because

Plaintiff's trespass and conversion claims arose from common facts, the two claims

resulted in the same injury.  Conversion is an "act of dominion wrongfully exerted

over another's personal property in denial of or inconsistent with his rights

therein."  Welty, 867 P.2d at 1275.  "The State of Oklahoma recognizes a right of

action in trespass where one person 'actual[ly] physical[ly] inva[des] . . . the real

estate of another without the permission of the person lawfully entitled to

possession.'" Davilla v. Enable Midstream Partners L.P., 913 F.3d 959, 966 (10th Cir. 2019) (quoting Williamson v. Fowler Toyota, Inc., 956 P.2d 858, 862 (Okla. 1998)). In this case, conversion occurred through limited discrete acts of removing and acting upon extracted minerals. Trespass was a prolonged occupation of the mineral estate, preventing its use by other parties. These were distinct offenses that resulted in distinct injuries.

Though the specific facts of this case are unique, the Court finds persuasive prior cases involving trespass against Indian surface property. In Oneida County v. Oneida Indian Nation of New York State ("Oneida"), 470 U.S. 226 (1985), the U.S. Supreme Court affirmed the decision of the lower courts awarding damages for trespass against Indian land based on the "fair rental value of the land in question." Oneida Cnty. v. Oneida Indian Nation of New York State, 470 U.S. 226, 229–33 (1985); see also Cayuga Indian Nation of New York v. Pataki, 413 F.3d 266, 273–74 (2d Cir. 2005) (recognizing that Oneida "allowed Indian Tribes to seek fair rental value damages for violation of their possessory rights following an ancient dispossession"); Hammond v. Cnty. of Madera, 859 F.2d 797, 804 (9th Cir. 1988), rev'd on other grounds, Woods v. Ostrander, 851 F.2d 1212 (9th Cir. 1988); Watson v. United States, 263 F. 700, 702 (8th Cir. 1920) ("We think they show wrongful entry and unlawful holding of [Osage] possession, which are the

elements of an action of trespass for mesne profits, in which reasonable rental value may measure the damages to be recovered.").

The Court concludes that the fair rental value of the mineral estate occupied by Defendants is a reasonable and appropriate method for valuing the damages caused by Defendants' trespass. However, determining a reasonable fair market rental value for the mineral estate is challenging.

Plaintiff and the Osage Minerals Council urge the Court to calculate a reasonable rental rate, based on the expert testimony of Stephen Hazel. Pl.-Interv.'s Br. Supp. Pl.-Interv.'s Mot. Summ. J. at 21–22 [Dkt. 294-1]; Pl.'s Mot. Summ. J. at 11–13 [Dkt. 300]. As discussed above, the Court does not find Hazel's testimony to be reliable or consistent with industry practice and strikes Hazel's testimony. In contrast to Hazel's proposed methodology, the regulations applicable to the management of the Osage Mineral Estate provide a more reasonable method of calculating a fair rental value. Pursuant to 25 C.F.R. § 214.9, lessees are required to pay as advance rental "15 cents per acre for the first year; 30 cents per acre for the second year; 50 cents per acre for the third year; and $1 per acre per annum for the fourth and each succeeding year during the life of any lease." 25 C.F.R. § 214.9  The rate represents the value of the mineral estate prior to development and mineral extraction. See id.  In the instant case, the trespass claim concerns the unlawful occupancy of the mineral estate and the

Case No. 4:14-cv-00704-JCG-JFJ                                              49

conversion claim concerns the unlawful development. For this reason, the Court adopts the rental rates described in 25 C.F.R. § 214.9 for purposes of calculating trespass damages.

Defendants began excavation and first entered the mineral estate in September 2014. <u>See</u> Trial Tr. vol. VII, 790:14–16. For the first year, September 2014 through September 2015, Defendants incurred $1,260.00 in advance rental fees. The following year, September 2015 through September 2016, that amount increased to $2,520.00. In the third year, September 2016 through September 2017, Defendants incurred $4,200.00. Defendants incurred an additional $8,400.00 in each of the seven years between September 2017 and this opinion. The total value of advance rentals between September 2014 and September 2024 is $66,780.00.

Therefore, the Court awards $66,780.00 in damages for trespass, with an additional $8,400 to accrue on the first day of September of each subsequent year until the wind towers are removed and the mineral estate is returned to Plaintiff.

## III.    Treble Damages

Plaintiff contends that Defendants' conduct warrants the trebling of damages. Pl.'s Pre-Trial Br. at 12–25; Pl.'s Post-Trial Br. at 20–22. Defendants counter that the facts of the case do not justify treble damages. Defs.' Pre-Trial Br. at 20–25; Defs.' Post-Trial Br. at 34–40.

Oklahoma law recognizes that "[f]or forcibly ejecting or excluding a person from the possession of real property, the measure of damages is three times such a sum as would compensate for the detriment caused to him by the act complained of." 23 Okla. Stat. Ann. § 71. This statute is penal in nature and must be construed strictly. Ansay v. Boecking-Berry Equip. Co., 450 F.2d 433, 436 (10th Cir. 1971); Autumn Wood Farms, LLC v. Bynum, 361 P.3d 540, 542–43 (Ct. Civ. App. Okla. 2015). To establish an entitlement to treble damages, a Plaintiff must demonstrate ejectment through an active force by the trespasser. Ansay, 450 F.2d at 436. This Court has previously held that Section 71 also requires some degree of wrongful intent. Order (Apr. 23, 2024) at 5–6 [Doc. 408] (citing Main v. Levine, 118 P.2d 252, 255 (Okla. 1941); Maxwell v. Samson Res. Co., 848 P.2d 1166, 1173 (Okla. 1993); Crow v. Davidson, 96 P.2d 70, 72–73 (Okla. 1939)).

Plaintiff argues that the use of blasting in the construction of the wind towers and the scale of the wind farm's construction demonstrate the use of active force and oppressive intent. Pl.'s Pre-Trial Br. at 13; Pl.'s Post-Trial Br. at 20. Defendants counter that they did not attempt to remove Plaintiff from the Osage Mineral Estate by force, as required for treble damages under the statute. Defs.' Pre-Trial Br. at 22–24. A review of case law applying the Oklahoma statute supports Defendants' position.

In Crow v. Davidson, 96 P.2d 70 (Okla. 1939), the Oklahoma Supreme Court explained that not every ejection from property is forcible. Crow, 96 P.2d at 72. In considering the statute, the court noted that:

> [t]he term forcibly ejected or excluded has been construed in similar statutes to mean force of an unusual kind which tends to bring about a breach of the peace, such as an injury with a strong arm, or a multitude of people, or in a riotous manner, or with personal violence, or with threat or menace to life or limb, or under circumstances which would naturally inspire fear.

Id. In the view of the Crow court, the purpose of allowing treble damages in the case of forcible ejection is to dissuade competing uses of force that would breach the public peace at the cost of a public disturbance or injuries to the parties. Id.

The Oklahoma Supreme Court provided further clarification of the type of force required for an award of treble damages in Main v. Levine, 118 P.2d 252 (Okla. 1941), two years after the Crow decision. Main concerned plaintiffs who rented a dwelling from the defendants. Main, 118 P.2d at 254. The defendants terminated the plaintiffs' rental agreement and notified the plaintiffs that they must vacate the property. Id. When the plaintiffs refused to vacate, the defendants sent a moving crew to the property that jacked up the house and disconnected utilities in preparation to move the house to another location. Id. In affirming the award of treble damages, the Oklahoma Supreme Court found that the "[d]efendants ignored the legal methods provided for securing possession of the premises, and in

disregard of the rights of plaintiffs and their claim of rightful possession, attempted by force to remove them from the premises, and were about to do so when plaintiffs, to avoid further conflict, removed therefrom." Id. at 255.  The court further held that "[w]hile the force was not applied to the persons of plaintiffs, it was nevertheless a forcible and unlawful ejection from the premises, in disregard of their right of occupancy." Id. (citing Crow, 96 P.2d 70; Sanders v. Cline, 101 P. 267 (Okla. 1908)).

The Tenth Circuit Court of Appeals later considered the meaning of "forcibly ejecting or excluding" in Ansay v. Boecking-Berry Equipment Co., 450 F.2d 433 (10th Cir. 1971).  In Ansay, a trespasser erected a chain link fence topped with barbed wire around a disputed property.  Ansay, 450 F.2d at 435.  The trial court believed that the erection of the fence constituted forcible exclusion within the meaning of Section 71, but denied treble damages because the court found that the defendant honestly believed that it was legally within its rights to occupy the property.  Id. at 436.  On appeal, the Tenth Circuit Court of Appeals affirmed the denial of treble damages, but deviated from the findings of the trial court by holding that "[t]he building of the fence was a clear symbol of an assertion of a right and of exclusion, but it was not an active force as contemplated by [Section 71]." Id.

In considering these cases, it is clear to the Court that forcible ejection or exclusion requires more than a simple act of impairing access to property.  See Ansay, 450 F.2d at 436; see also Wiley v. Safeway Stores, Inc., 400 F. Supp. 653, 655 (N.D. Okla. 1975) (holding that a notice to remove an amusement ride from property did not constitute force as required under Section 71).  To warrant an award of treble damages, a trespasser must exert an unusual degree of force or violence such that the owner or possessor of a property feels threatened and compelled to abandon the property.  See Main, 118 P.2d at 254.

Defendants' use of blasting to disturb the Osage Mineral Estate while excavating for the wind tower foundations, though an inherently violent act, was not the type of force contemplated by Section 71.  The blasting was conducted as a normal part of the construction process based on the composition of the ground.  It was not done for the purpose of excluding Plaintiff or the Osage Minerals Council from accessing the mineral estate.  It was also not the type of force that risked disturbing the peace, invoking retaliatory force, or causing injury or harm to another party.  See Crow, 96 P.2d at 72.  Therefore, the Court holds that Plaintiff is not entitled to treble damages.

Plaintiff urges the Court to interpret the force element of Section 71 differently in light of federal policies protecting the rights of Indians to peacefully occupy land.  Pre-Trial Br. at 23–25; Pl.'s Post-Trial Br. at 20–21.  The Court is

not convinced that its reading of Section 71 frustrates any specific objectives of a federal policy. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98 (1991) ("[F]ederal courts should 'incorporat[e] [state law] as the federal rule of decision,' unless 'application of [the particular] state law [in question] would frustrate specific objectives of the federal programs.'" (quoting United States v. Kimbell Foods, Inc., 440 U.S. 715, 728 (1979))). Section 71 does not set a bar so high that it would foreclose exemplary damages in all cases but those involving heinous or violent acts. It does set, however, a threshold high enough to exclude acts of a symbolic nature or that are not intended to induce concern or apprehension in the property holder. This is necessary to limit treble damages to only those cases in which they are warranted by a defendant's actions. Ultimately, in this case, federal Indian policies cannot alter the fact that the type of force applied by Defendants in blasting the ground during construction is not the type of force contemplated by Section 71.

Though Plaintiff has not demonstrated the requisite forcible ejection or exclusion under Section 71, the Court finds it appropriate to address the remaining element of Defendants' alleged wrongful intent. Defendants maintain the position that they "'honestly believed' that construction of the Osage Wind project did not require a mining lease or permit" in reliance on the advice of counsel. Defs.' Pre-Trial Br. at 21; Defs.' Post-Trial Br. at 35–36. Plaintiff argues that Defendants'

reliance on the advice of outside counsel is disingenuous because Defendants did not provide their counsel with all the pertinent information and made decisions for a financial benefit.  Pl.'s Pre-Trial Br. at 16–23.

Defendants and their predecessors in the wind farm project were told by officials of the United States and Osage Nation governments on multiple occasions of the need to secure permits and leases, and the governments issued cease-and-desist requests until such authorization was obtained.  As early as October 2013, the Osage Minerals Council solicited information from Wind Capital Group and Tradewind "to determine the federal permitting, leasing and other regulatory requirement that could apply to the Osage Wind Project."  Defs.' Ex. 18 at 4.  The October 2013 letter referenced that "[i]n addition to oil and gas, the Osage Mineral Estate consists of solid materials, including limestone, dolomite, sandstone, sand, gravel, clay, and shale," and that activities within the mineral estate "may be subject to a range of federal regulatory requirements, including the need to secure a federal permit or lease to undertake such activities, pursuant to 25 C.F.R. §§ 411 and 414."  Id.

The Bureau of Indian Affairs contacted Defendants on October 9, 2014, advising that an inspector had observed a large pit with piles of crushed limestone around a wind turbine foundation.  Defs.' Ex. 23.  The letter directed Defendants to cease further excavation until the necessary permits were obtained, and legal action

was threatened for non-compliance.  Id.  The following month, in response to a request by Defendants to arrange a meeting, Acting Principal Chief Raymond Red Corn of the Osage Nation asked Defendants to suspend construction of the wind energy facilities, noting that Defendants "have taken Osage minerals for use in construction of wind turbines without permits or approval of the Osage Minerals Council."  Defs.' Ex. 26.

Defendants disregarded these governmental mandates and continued with construction.  It is apparent that this decision was the product of a desire to maximize financial gains by Defendants' representatives, while recklessly disregarding the risks of infringing upon the mineral rights of the Osage Nation. When asked to explain the decision to disregard the Bureau of Indian Affairs' cease-and-desist instruction, multiple representatives for Defendants indicated that they simply believed that the Bureau of Indian Affairs and Osage Minerals Council, the organizations responsible for administering the Osage Mineral Estate, were wrong to require a permit and needed to be better educated on the topic. Michael Storch, a former Enel Green Power executive, testified that:

> [w]e had several factors, you know, involved.  The question of authority to stop the project was one.  The fact that we didn't believe we needed a permit and that it was more about, as you've seen in other e-mails and so forth, communication with the Bureau of Indian Affairs to help have them understand the basis for our conclusion that no permit was required and so forth.

Trial Tr. vol. V, 536:20–537:10.  William Price, Head of Engineering Construction for Enel North America, testified that Defendants' plan to address the Bureau of Indian Affairs' cease-and-desist letter was to "execute the project as originally planned" and to educate the Bureau of Indian Affairs on the matter.  Trial Tr. vol. XIII, 1562:15–24.  He testified further that "the request to cease activity was not valid" because Defendants determined that they did not need a permit.  Trial Tr. vol. XIII, 1569:12–18, 1572:25–1573:11.

It is also clear that financial considerations, in large part, drove the decision to ignore the cease-and-desist instructions.  In October 2014, Defendants' counsel, Lynn Slade, informed a representative of the Department of the Interior's Regional Solicitor's Office that Defendants were "continuing operations notwithstanding the [Bureau of Indian Affairs'] letter due to extreme costs."  Pl.'s Ex. 29; see also Trial Tr. vol. V, 533:24–534:6.  This sentiment was reflected in the witness testimony at trial.  Stephen Pike, President and CEO of Enel Green Power North America, testified that the decision to not cease construction was the result of "the high cost to stop a construction project of that magnitude with hundreds of workers."  Trial Tr. vol. XIV, 1610:14–16 [Doc. 481].  Storch also noted the "extreme cost" among his reasons for continuing work.  Trial Tr. vol. V, 537:10–14.

Defendants attempt to justify their decision to ignore the Bureau of Indian Affairs and Osage Minerals Council by claiming that they relied on the advice of

outside counsel.  Good faith reliance on the advice of counsel is not a complete

defense, but may be considered when determining if a defendant acted willfully.

United States v. Wenger, 427 F.3d 840, 853 (10th Cir. 2005) (citing United States

v. Custer Channel Wing Corp., 376 F.2d 675, 683 (4th Cir. 1967)).  A defendant

must demonstrate "(1) a request for advice of counsel on the legality of a proposed

action, (2) full disclosure of the relevant facts to counsel, (3) receipt of advice from

counsel that the action to be taken will be legal, and (4) reliance in good faith on

counsel's advice."  Id. (quoting C.E. Carlson, Inc. v. S.E.C., 859 F.2d 1429, 1436

(10th Cir. 1988)).

Defendants point to the series of memoranda produced by Modrall Sperling

in 2013 and 2014.  See August 2014 Modrall Sperling Memo; October 2013

Modrall Sperling Memo; May 2014 Modrall Sperling Memo; September 2014

Modrall Sperling Memo.  Wind Capital Group and Tradewind retained Modrall

Sperling in October 2013, after receiving the Osage Minerals Council's letter

soliciting information needed to determine if a lease was required for the wind

farm project.  Trial Tr. vol. VI, 601:25–602:4, 603:7–11; Defs.' Ex. 18 at 4.

Modrall Sperling produced its first memorandum on October 31, 2013.

October 2013 Modrall Sperling Memo.  The subject line of the memorandum reads

"[r]ights of surface owners to use soil" and the content of the memorandum

addresses the question of "[w]hether a surface owner who excavates land for the

purpose of construction consistent with its surface rights—and does not remove the land excavated from the property—is engaged in 'mining' of the mineral estate and requires a mining permit." Id. at 1; see also Trial Tr. vol. VI, 603:9–11.  In reaching the ultimate conclusion that a mining permit was not required for the project, the October 2013 Modrall Sperling Memo described the construction as "[t]o the extent any soil or other subsurface material is (touched) by [Tradewind], it is merely incidental to [Tradewind's] construction of its approved wind farm. No soil is removed from the site, or processed on site for a commercial use." October 2013 Modrall Sperling Memo at 2.  It concluded that "[Tradewind was] not engaged in mining or other use of the mineral estate, but [was] taking actions consistent *only* with its lease." Id. (emphasis in original).

Modrall Sperling produced a second memorandum on May 19, 2014 in response to their clients' request that the memorandum be directed to them.  Trial Tr. vol. VII, 806:3–9.  The May 2014 Modrall Sperling Memo largely reiterated its prior findings and analysis, with a few notable differences.  May 2014 Modrall Sperling Memo.  A paragraph acknowledging that 25 C.F.R. § 214 "contains the regulations for the 'Leasing of Osage Reservations Lands, Oklahoma, for mining except oil and gas,'" was removed from the May 2014 Modrall Sperling Memo. Compare October 2013 Modrall Sperling Memo at 2 with May 2014 Modrall Sperling Memo at 2.  The May 2014 Modrall Sperling Memo also added to its

analysis the qualifying language "as we understand its plans" when discussing Tradewind's construction of the wind farm.  <u>Compare</u> October 2013 Modrall Sperling Memo at 2 ("[Tradewind's] construction of the wind farm does not require a permit from the [Bureau of Indian Affairs] or the Osage Nation") <u>with</u> May 2014 Modrall Sperling Memo at 2 ("[Tradewind's] construction of the wind farm, *as we understand its plans*, will not require a permit from the [Bureau of Indian Affairs] or the Osage Nation." (emphasis added)).  In describing Tradewind's interaction with the mineral estate during construction, the May 2014 Modrall Sperling Memo replaced the word "touched" with "moved."  <u>Compare</u> October 2013 Modrall Sperling Memo at 2 <u>with</u> May 2014 Modrall Sperling Memo at 2.  At trial, Slade testified that he did not recall any additional material information on the construction plans being provided between the October 2013 Modrall Sperling Memo and the May 2014 Modrall Sperling Memo.  Trial Tr. vol. VII, 807:21–808:23.

In August 2014, Defendants requested that Modrall Sperling prepare a scaled-back memorandum that did not include legal conclusions.  Pl.'s Ex. 7. Slade testified that Defendants requested the change because the memorandum would be shared with an investor, identified as General Electric.  Trial Tr. vol. VII, 816:5–817:3.  The August 2014 Modrall Sperling Memo included multiple changes from the prior versions.  For example, the subject line of the memorandum

was changed to expressly reference excavation.  <u>Compare</u> August 2014 Modrall

Sperling Memo at 1 ("Rights of surface owners or their lessees in Osage County,

Oklahoma to excavate or utilize soil") <u>with</u> October 2013 Modrall Sperling Memo

at 1 ("Rights of surface owners to use soil") <u>and</u> May 2014 Modrall Sperling

Memo at 1 (same).  The "Question Presented" was also changed from "excavates

land" to "excavates soil and related materials" and from "does not remove the land

excavated from the property" to "does not remove the materials excavated from the

property subject to a mineral reservation."  <u>Compare</u> August 2014 Modrall

Sperling Memo at 1 <u>with</u> October 2013 Modrall Sperling Memo at 1 <u>and</u> May

2014 Modrall Sperling Memo at 1.  The August 2014 Modrall Sperling Memo also

removed references to the Osage Minerals Council's contention that a lease or

permit was necessary, which had been included in prior versions of the

memorandum.  <u>Compare</u> August 2014 Modrall Sperling Memo <u>with</u> October 2013

Modrall Sperling Memo at 2 <u>and</u> May 2014 Modrall Sperling Memo at 2; <u>see also</u>

Trial Tr. vol. VII, 819:16–820:10.  A finalized version of the May 2014 Modrall

Sperling Memo was prepared in September 2014.  September 2014 Modrall

Sperling Memo; Defs.' Ex. 46.

As an initial matter, Defendants' reliance on the Modrall Sperling

memoranda to justify their decision to ignore the directions of the Bureau of Indian

Affairs and the Osage Minerals Council is severely weakened by the fact that none

of the memoranda expressly recommended that Defendants disregard the cease-and-desist instructions and continue with construction of the wind farm. The content of the memoranda was limited to whether a permit or lease was required for certain activities related to construction. Counsel did not suggest that Defendants were legally authorized to disregard directives from governmental authorities. It is unreasonable to conclude that counsel were authorizing Defendants to disregard the clear instructions of the Bureau of Indian Affairs and Osage Minerals Council.

In addition to this serious flaw, it is clear to the Court that Defendants failed to fully disclose all of the relevant facts to counsel when requesting Modrall Sperling's opinion. Changes between the October 2013 Modrall Sperling Memo and the May 2014 Modrall Sperling Memo suggest that at the time of the May 2014 Modrall Sperling Memo, Defendants' outside counsel had a different understanding of the situation than it had a few months prior. The Court also notes that the Modrall Sperling memoranda do not expressly describe the nature of the construction project, such as the use of blasting, or the intended use of excavated materials as backfill. This ambiguity demonstrates that Defendants failed to provide all the specific details of the construction project to Modrall Sperling.

Defendants have also failed to convincingly demonstrate that they relied on Modrall Sperling's legal advice. At trial, Storch described the October 2013

Modrall Sperling memorandum as "quite strong," "conclusive," "no room for doubt," and lacking "any kind of qualifiers of concern in describing the work that had been done to reach the conclusion that they had reached."  Trial Tr. vol. IV, 390:4–18 [Doc. 461]; Trial Tr. vol. V, 604:3–8.  The Court finds this characterization to be inconsistent with the express language of the October 2013 Modrall Sperling Memo, which conceded that "there is no controlling authority on" whether a mining lease was required and that only "some weak authority was found on" whether excavation incident to construction on the surface qualified as mining.  October 2013 Modrall Sperling Memo at 1, 7.  The memorandum also noted that "no federal cases interpreting [the] regulatory definition of 'mining' were located, or the rights of mineral estate owners in Osage County."  Id. at 1–2.  Additionally, the Court finds troubling Defendants' request for an altered memorandum excluding legal conclusions that was provided to a potential investor.  This conduct strongly suggests that the memoranda were drafted in the interest of Defendants' business goals, rather than to provide accurate legal information.

Defendants cannot now assert that they relied on the advice of counsel in good faith to negate their willful decision to disregard the cease-and-desist instructions.  See Mumby v. Pure Energy Servs. (USA), Inc., 636 F.3d 1266, 1270 (10th Cir. 2011) (holding that, in the context of employment, "[a]lthough

consultation with an attorney may help prove that an employer lacked willfulness, such a consultation is, by itself, insufficient to require a finding in favor of the employer"); Wenger, 427 F.3d at 853 (holding that, in the context of securities fraud, "[g]ood faith reliance on counsel . . . is merely one factor a jury may consider when determining whether a defendant acted willfully"); Takecare Corp. v. Takecare of Okla., Inc., 889 F.2d 955, 957 (10th Cir. 1989) (holding that, in the context of trademark infringement, "[a]bsent [a showing of other factors], counsel's advice alone will not shield the actor from the consequences of his act" (internal quotation omitted)).  Modrall Sperling advised Defendants that it believed that a lease was not required for the construction of the wind farm.  It did not instruct Defendants to disregard the cease-and-desist instructions.  Based on the testimony of Defendants' representative and the evidence presented at trial, it is clear that Defendants' decision to move forward with construction of the wind farm was motivated by financial interests and not a legitimate belief in the legality of their actions.  Defendants viewed the Modrall Sperling memoranda not as statements of law, but as tools to entice investors and as a potential shield against the consequences of Defendants' actions.  Defendants' bad-faith reliance on the advice of counsel cannot excuse its willful and wrongful intent; however, because Plaintiff has not demonstrated the requisite forcible ejection, the Court cannot award treble damages based on the facts of this case.

## IV.    Continuing Trespass

The Court held Defendants liable for continuing trespass and ordered ejectment of the wind towers.  Osage Wind II, 710 F. Supp. 3d at 1038, 1039–42. The Parties were directed to file briefs proposing a plan and schedule for removal of the wind turbines and rehabilitation of the impacted mineral estate.  Order (Feb. 8, 2024) [Doc. 393].

As an initial matter, Defendants argued for the first time that the Court should alter its prior ruling and require only the removal and replacement of the backfill used for support of the wind towers.  Defs.' Br. Resp. Feb. 8, 2024 Order at 2–3, 7–10 [Doc. 396].  Defendants argue that removal of the backfill and replacement with substitute materials would be a more narrowly-tailored remedy than total removal of the wind towers.  Id. at 2–3 (citing Garrison v. Baker Hughes Oilfield Operations, Inc., 287 F.3d 955, 962 (10th Cir. 2002)).  The Court disagrees.  As explained in Osage Wind II, the harm resulting from Defendants' continuing trespass is not only the continued use of the wrongfully obtained backfill, but also the interference with the Osage Nation's sovereignty.  Osage Wind II, 710 F. Supp. at 1041–42.  Defendants reiterate many of the same arguments previously weighed by the Court regarding the claimed benefits of the wind farm continuing to operate.  These arguments are not more impactful now than they were at the summary judgment stage of this litigation.  The Court is not

persuaded by Defendants' backdoor attempt to seek reconsideration of the prior grant of injunctive relief and the Court does not alter its award of "injunctive relief in the form of ejectment of the wind towers." Id.

In addressing the Court's request for a removal plan, Defendants represented that "the removal of all 84 wind turbines—via either controlled demolition, more targeted decommissioning and dismantling, or a combination of both—is expected to take 18 months." Defs.' Br. Resp. Feb. 8, 2024 Order at 2. Defendants propose that the first six months of this period would be spent obtaining necessary permits and engaging external specialists. Id. at 4–5. During this time, Defendants would also "develop and distribute a detailed plan for the project such that the qualified specialists needed to do the work could evaluate and bid on it." Id. at 5. Defendants anticipate that the physical removal of the wind turbines and restoration of the surrounding land will take 12 months. Id. at 6. Defendants have estimated that removal of the wind towers would result in Osage Wind suffering a negative economic impact of $258,729,611.70. Defs.' Resp. Pl.'s Mot. Summ. J. at 5–6 [Doc. 321].

The Osage Minerals Council argues that removal should be limited to 12 months. Pl.-Interv.'s Resp. Defs.' Br. Regarding Feb. 8, 2024 Order at 7–8 [Doc. 404]. In support of this argument, the Osage Minerals Council relies on a provision of the Surface Leases that requires Defendants to "remove all

[w]indpower [f]acilities" within 12 months of the expiration or termination of the Surface Lease.  Id.; Surface Lease ¶ 14.6.

The Court is convinced that 12 months is an adequate period of time for the removal of the wind farm.  At the time of negotiating the Surface Leases, Defendants clearly believed that the wind farm could be removed from the surface estate within 12 months.  There has been nothing presented to the Court suggesting that conditions have changed to require a longer period.  Furthermore, Defendants have had nearly one year (while the damages phase of this trial continued) since the Court ordered ejectment of the wind farm to obtain necessary permits, contact specialists, and make other initial arrangements.  Therefore, the Court holds that Defendants shall remove the wind farm from the Osage Mineral Estate and return the Osage Mineral Estate to its pre-trespass condition on or before December 1, 2025.

Defendants contend that the Court should not award both injunctive and monetary damages for continuing trespass.  Defs.' Br. Resp. July 10, 2024 Order. The Court agrees.  Injunctive relief is appropriate only to prevent irreparable harm that cannot be satisfied through a monetary award.  See Schrier v. Univ. of Colo., 427 F.3d 1253, 1267 (10th Cir. 2005).  In this case, the injury caused by Defendants' continuing trespass was the interference to the Osage Nation's sovereignty, which a monetary award cannot cure.  Osage Wind II, 710 F. Supp.

3d. at 1041.  The Court hereby incorporates by reference its prior analysis on ejectment and sovereignty in Osage Wind II.  Id. at 1039–42.  The injury suffered as a result of Defendants' continuing trespass should not be conflated with the injury suffered as a result Defendants' trespass against the mineral estate, which can be cured through a monetary award and will continue to accrue until the ejectment of the wind towers is complete.  The Court's grant of injunctive relief for continuing trespass does not bar or limit Plaintiff's ability to recover damages in trespass.

## V.    Attorneys' Fees and Costs

Plaintiff and the Osage Minerals Council seek recovery of attorneys' fees and costs related to this litigation.  Pl.'s Att'ys' Fee Br.; Pl-Interv.'s Att'ys' Fee Br.  Their theories of recovery are based on 23 Okla. St. Ann. § 64(3), which allows for recovery of "fair compensation for the time and money properly expended in pursuit" of recovering property; 12 Okla. St. Ann. § 940(A), which allows for recovery of fees for negligent or willful injury to property, principles of equity and federal Indian policy; and the Declaratory Judgment Act, 28 U.S.C. § 2202.  Pl.'s Att'ys' Fee Br.; Pl-Interv.'s Att'ys' Fee Br.  Defendants contend that the Court has already ruled on Plaintiff's and Plaintiff-Intervenor's Sections 64(3) and 940(A) theories and that no misconduct during the life of this case warrants an award of costs and fees in equity.  Defs.' Att'ys' Fee Br.

### A.    Availability of Fees and Costs

Section 64(3) of Title 23 provides that "[t]he detriment caused by the wrongful conversion of personal property is presumed to be [a] fair compensation for the time and money properly expended in pursuit of the property."  23 Okla. St. Ann. § 64(3).  In advance of trial, Defendants moved to exclude evidence related to the recovery of litigation fees and costs.  Defs.' Mot. Exclude Certain Evid. Trial at 4–6 [Doc. 413].  In ruling on Defendants' pre-trial motion, the Court relied on U.S. Supply Co. v. Gillespie, 166 P. 139 (1917), in which the Oklahoma Supreme Court held that attorneys' fees "paid in connection with the prosecution of [an] action for damages [. . .] are not recoverable as compensation for money properly expended in pursuit of the property."  Order (Apr. 23, 2024) at 9 [Doc. 423]; Gillespie, 166 P. at 140.  This Court held that Section 64(3) does not allow for the recovery of attorneys' fees incurred in pursuit of litigation.  Order (Apr. 23, 2024) at 9.

Plaintiff contends that it is entitled to recover the costs of its experts and specialists retained for purposes of this litigation.  Pl.'s Att'ys' Fee Br. at 5–6; Pl.'s Att'ys' Fee Reply Br. at 5.  In support of this argument, Plaintiff cites to two cases from the Oklahoma appellate courts: W.P. Bistro Tulsa v. Henry Real Estate, 514 P.3d 1091 (Okla. Ct. App. 2022) and First National Bank & Trust Co. v. Exchange National Bank & Trust Co., 517 P.2d 805 (Okla. Ct. App. 1973).  Pl.'s Att'ys' Fee Br. at 5–6.  These cases are distinguishable from the facts of the instant case

because they each involve recovery of fees related to experts tasked with pursuing

property, not with litigation.  W.P. Bistro Tulsa, LLC, 514 P.3d at 1098 (fee for an

asset recovery specialist retained to determine if appellee's assets could be

gathered and collateral sold); First Nat'l Bank & Trust, 517 P.2d at 807

("accountants' fees necessary in pursuit of the property").  In contrast, the experts

retained by Plaintiff and Plaintiff-Intervenor in this case provided valuations and

other functions specifically within the scope of the litigation.  These are not the

type of fees recoverable under Section 64(3).

 Section 940(A) of Title 12 provides that:

> [i]n any civil action to recover damages for the negligent or willful
> injury to property and any other incidental costs related to such action,
> the prevailing party shall be allowed reasonable attorney's fees, court
> costs and interest to be set by the court and to be taxed and collected as
> other costs of the action.

12 Okla. St. Ann. § 940(A).  In ruling on Defendant's pre-trial motion to exclude,

the Court held that Section 940(A) "does not provide an avenue for recovery of

attorneys' fees in this case because Plaintiff and Plaintiff-Intervenor have not

claimed damages based on physical injury to the mineral estate."  Order (Apr. 23,

2024) at 9 (citing Weyerhaeuser Co. v. Brantley, 510 F.3d 1256, 1268 (10th Cir.

2007)).

 Plaintiff now contends that it raised the issue of physical injury to the Osage

Mineral Estate in the Amended Complaint.  Pl.'s Att'ys' Fee Reply Br. at 2; Am.

Compl.  In the Amended Complaint, Plaintiff makes general reference to damages

resulting from Defendants' trespass and conversion:

> 50.    By conducting unauthorized and unapproved mining or work related to minerals, as contemplated by 25 C.F.R. § 211 or 25 C.F.R. § 214, Defendants trespassed on the Osage [M]ineral [E]state, in violation of law and, in doing so, caused damages.

> 51.    Defendants are co-trespassers and are jointly and severally liable for all damages that resulted from the trespass.

> * * *

> 64.    By conducting unauthorized and unapproved mining or work related to minerals, as contemplated by 25 C.F.R. § 211 or 25 C.F.R. § 214, Defendants converted property belonging to the Osage mineral estate and, in doing so, caused damages.

> 65.    Defendants are jointly and severally liable for all damages that resulted from the conversion.

> * * *

> Prayer for Relief

> * * *

> 3.    Enter a judgment assessing damages, as determined, to the Osage [M]ineral [E]state for unlawful or unauthorized mining, excavation or other work, as set out in the federal regulations.

> 4.    Enter a judgment finding Defendants jointly and severally liable for damages, in an amount to be proven, resulting from the trespass and conversion.

Am. Compl. ¶¶ 50–51, 64–65, 3–4.  In light of the evidence presented at trial, the

Court views these general references to damages related to trespass as allegations

of injury to the Osage Mineral Estate and considers the Section 940(A) arguments presented by Plaintiff and Plaintiff-Intervenor.

In considering Section 940(A), the Tenth Circuit Court of Appeals has held that "[t]he use of the word 'shall' renders the award of attorney's fees mandatory when an action falls under the purview of § 940(A)." Sundance Energy Okla., LLC v. Dan D. Drilling Corp., 836 F.3d 1271, 1280 (10th Cir. 2016) (citing Schaeffer v. Shaeffer, 743 P.2d 1038, 1040 (Okla. 1987)). The statute only applies when a prevailing party recovers actual damages for physical injury to property. Weyerhaeuser, 510 F.3d at 1268. With regard to Plaintiff's trespass claims, Plaintiff has only recovered damages related to Defendants' occupancy of the Osage Mineral Estate equivalent to fair rental value. Supra § II. Alternatively, the Court has awarded damages on Plaintiff's conversion claims based on the value of minerals removed from the mineral estate through blasting and excavation. Supra § I. The Court concludes that the damages award for Plaintiff's conversion claim is sufficient under Section 940(A). Because the statute makes the awarding of attorneys' fees mandatory, the Court grants Plaintiff's and Plaintiff-Intervenor's requests for attorneys' fees and costs incurred in litigating this case.

Plaintiff also seeks recovery of fees and costs in equity, alleging that Defendants' actions impeded Plaintiff's ability to enforce its rights. Pl.'s Att'ys' Fee Br. at 7–8; Pl.'s Att'ys' Fee Reply Br. at 6–9. Defendants contend that

Plaintiff has not identified any specific litigation misconduct warranting a shifting of fees.  Defs.' Att'ys' Fee Br. at 7–10.

As the U.S. Supreme Court has recognized, "it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  Hall v. Cole, 412 U.S. 1, 5 (1973) (internal quotation omitted).  In the Tenth Circuit, "the bad faith exception is drawn very narrowly, and may be resorted to 'only in exceptional cases and for dominating reasons of justice.'"  Sterling Energy, Ltd. v. Friendly Nat'l Bank, 744 F.2d 1433, 1437 (10th Cir. 1984) (quoting Cornwell v. Robinson, 654 F.2d 685, 687 (10th Cir. 1981)).  As the U.S. Supreme Court has explained:

> if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.

Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991).

Plaintiff points to multiple examples in which it contends that Defendants "at least acted in a manner oppressive to the rights of Plaintiffs."  Pl.'s Att'ys' Fee Br. at 8.  For example, Plaintiff raises Defendants' failure to obtain a lease following Osage Wind I, despite the Tenth Circuit Court of Appeals finding that the lease was required for Defendants' mining activities.  Pl.'s Att'ys' Fee Br. at 8; Pl.'s Att'ys' Fee Reply Br. at 6–7.  Though it would have been advisable following

the Tenth Circuit Court of Appeals' decision for Defendants to make efforts to obtain the needed lease, their failure to do so has not amounted to a fraud upon the Court nor hampered this litigation. If anything, Defendants' failure to obtain a lease has contributed to increased damages owed to Plaintiffs.

Plaintiff also argues that Moskaluk's misrepresentation that a "record [of] the volume of crushed" materials was maintained during construction warrants fee shifting. Pl.'s Att'ys' Fee Br. at 8; Pl.'s Att'ys' Fee Reply Br. at 7. This representation was made in the context of a motion for injunctive relief and the accompanying filing was signed by counsel. Pl.'s Ex. 57 at 22–23, 25–26; Pl.'s Ex. 58 ¶ 15(a)(ii). Though it has been established that Moskaluk's statement was inaccurate, it has not been demonstrated that it was made in bad faith, rather than innocent error. See Autorama Corp. v. Stewart, 802 F.2d 1284, 1288 (10th Cir. 1986) ("[I]t is not surprising that attorneys' fees are awarded only when there is 'clear evidence' that challenged actions are taken entirely without color and are pursued for reasons of harassment or delay."). In fact, as discussed above, Judge Frizzell previously considered and denied a request for sanctions based on Moskaluk's misstatement. Order (Oct. 18, 2022) at 10. The fact that Defendants' counsel signed the accompanying submission might reflect on the quality of representation, but it does not amount to a fraud on the Court.

Plaintiff alleges that Defendants made other misrepresentations during the litigation. Pl.'s Att'ys' Fee Br. at 8 n.6. Plaintiff points to inconsistencies between some witnesses who claimed that roughly 25% of the material excavated was not returned to the ground and others who testified that all the material was returned. Id.; see also Pl.'s Ex. 58 ¶ 15(a)(i); Trial Tr. vol. I, 20:10–13; Trial Tr. vol. XII, 1406:1–7, 1418:22–25, 1423:5–18, 1426:2–4; Trial Tr. vol. XIII, 1537:15–1540:23, 1541:3–1545:23, 1546:7–25. Plaintiff argues that these inconsistencies are significant because the location of the minerals was considered relevant to Pfahl's valuation calculation. Pl.'s Att'ys' Fee Reply Br. at 7–8. As with Moskaluk's statement discussed above, there is no indication that these inconsistencies between witnesses were acts of bad faith, rather than misremembrances of events that occurred a decade prior to the trial.

Plaintiff next argues that Defendants' continuation of construction after the filing of this action was an oppressive act. Pl.'s Att'ys' Fee Br. at 8. Again, this behavior does not warrant fee shifting because it did not impact the litigation. Defendants' decision to continue an action that was later held to be unlawful might impact damages, but it did not hamper Plaintiff's ability to prosecute this case.

Finally, Plaintiff takes issue with Defendants' reliance on statements of a Bureau of Indian Affairs inspector, Ray Whiteshield, who did not testify at the trial. Pl.'s Att'ys' Fee Br. at 8 n.6; Pl.'s Att'ys' Fee Reply Br. at 8–9.

Whiteshield's visit to the wind farm is described in an internal email.  Defs.' Ex 35.  At trial, Defendants' counsel asked Storch to give his impressions of Whiteshield's site visit, which Storch did not attend, based on the email.  Trial Tr. vol. VI, 635:14–21.  The Court sustained an objection to the testimony as hearsay, and Defendants' counsel represented to the Court that the evidence was not being offered for the truth of the matter.  Trial Tr. vol. VI, 635:22–636:14.  In their Proposed Findings of Fact and Conclusions of Law, Defendants state that "[t]he inspector expressed concern that Enel was 'crushing rock for sale.'"  Defs.' Post-Trial Br. at 10.  This statement directly quotes language from the internal email and cites the email as support.  Id.; Defs.' Ex. 35.  The Court notes that the email was admitted into evidence without objection.  Trial Tr. vol. XII, 1425:16–22.  The Court does not consider one sentence improperly based on inadmissible evidence to amount to fraud or an attempt to hinder the proceedings.

Even viewed in their totality, Plaintiff's complaints do not amount to the type of bad faith or vexatious conduct needed to warrant equitable fee shifting.  It is without question that Plaintiff has identified examples of imperfect lawyering and imperfect witnesses, but Plaintiff's allegations do not reach the level of fraud or disruption to the proceedings required to reallocate fees and costs based on equity.

Plaintiff's final theory for recovery of attorneys' fees and costs is through the Declaratory Judgments Act.  Pl.'s Att'ys' Fee Br. at 9–10; Pl.'s Att'ys' Fee Reply Br. at 9–10.  28 U.S.C. § 2202 provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."  28 U.S.C. § 2202.  "Further necessary or proper relief" can include an award of attorneys' fees and costs.  See Sec. Ins. Co. v. White, 236 F.2d 215, 220 (10th Cir. 1956).  The statute is not an independent basis for such an award and does not authorize the Court to grant attorney's fees and costs that are "not otherwise authorized by statute, contract, or state law."  Schell v. OXY USA Inc., 814 F.3d 1107, 1127 (10th Cir. 2016).

It is uncontroverted that Plaintiff prevailed on its claim for declaratory relief. Osage Wind II, 710 F. Supp. 3d at 1030.  In this case, an independent statutory ground exists under 12 Okla. St. Ann. § 940(A) for an award of attorneys' fees and costs related to Defendants' failure to obtain the necessary lease for their mining activities.  Therefore, an award of attorneys' fees and costs for Plaintiff's declaratory claims is appropriate.

Plaintiff and Plaintiff-Intervenor are not required to succeed on each of their theories for recovery.  Typically, the Court is required to apportion attorneys' fees and costs between claims for which there is a statutory authorization to shift fees

and claims for which there is not an independent authorization.  See Travelers Indem. Co. v. Hans Lingl Anlagenbau und Verfahrenstechnik GMBH & Co KG, 189 Fed. App'x 782, 788 (10th Cir. 2006).  "[W]here non-authorized claims contain common components of a claim for which attorney fees are authorized, it may be proper to award fees without apportionment."  Id. (citing Green Bay Packaging, Inc. v. Preferred Packaging, Inc., 932 P.2d 1091, 1098 (Okla. 1996)). Plaintiff and Plaintiff-Intervenor are entitled to recover attorneys' fees and cost related to their successful trespass, conversion, and declaratory judgment claims. Because those claims are intrinsically connected to the remaining claims in this case based on their common facts and allegations, the Court finds it appropriate to award Plaintiff and Plaintiff-Intervenor attorneys' fees and costs related to all claims in this case.

## B.    Attorneys' Fees

In determining a reasonable attorneys' fee amount, the Court begins with "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).  This is commonly referred to as the "lodestar" figure and there is a "strong presumption" of its reasonableness.  Perdue v. Kenny A. ex rel. Winn., 559 U.S. 542, 553–54 (2010).  "[T]hat presumption may be overcome in those rare circumstances in

which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." Id.

In order to determine a reasonable hourly rate, the Court looks to "what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time." Case v. Unified School Dist. No. 233, 157 F.3d 1243, 1256 (10th Cir. 1998). The burden is on the requesting party to "provide evidence of the prevailing market rate for similar services by lawyers of reasonably comparable skill, experience, and reputation in the relevant community." Lippoldt v. Cole, 468 F.3d 1204, 1224–25 (10th Cir. 2006) (internal quotation omitted). This evidence may include "affidavits submitted by the parties and other reliable evidence of local market rates for [similar] litigation at the time fees are awarded." Case, 157 F.3d at 1256. A judge may also rely on her own "knowledge of prevailing market rates as well as other indicia of a reasonable market rate." Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1493 (10th Cir. 1994).

### 1.    Plaintiff United States

Plaintiff claims that it incurred legal fees totaling $1,943,666.17 in litigating this case. Pl.'s Fees and Costs Br. at 2–9. Plaintiff seeks to recover fees for two attorneys, Cathy McClanahan and Nolan Fields. Id. at 3. McClanahan recorded 4,989.70 hours at a rate of $204.51 per hour, totaling $1,001,842.22. Id. Fields

recorded 4,498.31 hours at a rate of $158.43 per hour, totaling $712,658.93.  Id.

Plaintiff also submitted that two paralegals assisted with this case, Michelle

Hammock and Sarah Coffey.  Id.  Hammock recorded 1,119.16 hours at a rate of

$127.36 per hour, totaling $142,536.86.  Id.  Coffey recorded 591.70 hours at a rate

of $146.41 per hour, totaling $86,628.16.  Id.  Plaintiff is not seeking to recover

fees for the work performed by four other federal employees who contributed work

on this matter.  Id. at 7–9.

Plaintiff's fees request is supported by the written declaration of Emma

Werlein, the Resource Management Officer for the U.S. Attorney's Office for the

Northern District of Oklahoma.  Id. at Ex. 1 ("Werlein Decl.") [Doc. 513-1].  In

preparing Plaintiff's submission, Werlein reviewed employee time records that

were submitted weekly into an internal record keeping and tracking computer

application.  Id. ¶¶ 3–4.  She also reviewed employee compensation information.

Id. ¶ 6.  For each of the four relevant attorneys and paralegals, an hourly salary was

calculated by dividing the employee's annual salary by 2,080 hours.  Id. ¶ 11.  An

hourly benefit rate was calculated by multiplying the hourly salary rate by 30%.

Id.  Using these amounts, an hourly fee rate was calculated as the sum of the

hourly salary rate, the hourly benefit rate, and a standard overhead rate of $93.64.

Id.  The Court finds this method of calculating hourly fee rates to be reasonable.

The Court observes that the rates billed by McClanahan, Fields, Hammock, and Coffey are comparable, and generally less than, those charged by private counsel for Plaintiff-Intervenors.  Compare Pl.'s Fees and Costs Br. at 3 with Pl.-Interv.'s Fees and Costs Br. at Exs. A ("Fredericks Peebles & Morgan Invoices") [Doc. 498-1], B ("Pipestem Law Invoices") [Doc. 498-2], C ("Patterson Earnhart Invoices") [Doc. 498-3].  Plaintiff has also not sought to enhance a fee award or recovery for some members of its legal team.  Pl.'s Fees and Costs Br. at 7–9.  The Court finds the hourly rates claimed of $204.51 for McClanahan, $158.43 for Fields, $127.36 for Hammock, and $146.41 for Coffey to be reasonable.

The tracking system used by the Department of Justice allows for hours to be recorded in quarter-hour increments.  Id. ¶ 14.  It does not maintain detailed descriptions of work performed on an hourly basis.  Pl.'s Fees and Costs Br. at 4.  Recognizing that this case was filed more than a decade ago and has included multiple motions, an appeal, and a trial, and upon review of Plaintiff's submissions, the Court finds reasonable the 4,898.70 hours claimed for McClanahan, 4,498.31 hours claimed for Fields, 1,119.16 hours claimed for Hammock, and 591.70 hours claimed for Coffey.

Defendants raise multiple objections to Plaintiff's fee request and the supporting documentation.  Defendants argue that Plaintiff has not met its burden to provide the Court information necessary to distinguish between fee-bearing and

non-fee bearing claims.  Pl.-Interv.'s Fees and Costs Resp. at 3–5.  As discussed

above, because all of the claims in this case are interrelated, all claims are fee-

bearing.  There is no need for Plaintiff or the Court to distinguish between fee-

bearing and non-fee-bearing claims in apportioning fees and costs.

Defendants also argue that Plaintiff's recovery should be denied or reduced

because it is not supported by contemporaneous, meticulous documentation.  Id. at

5–7.  The party requesting that fees be awarded "has the burden of proving hours

to the district court by submitting meticulous, contemporaneous time records that

reveal, for each lawyer for whom fees are sought, all hours for which

compensation is requested and how those hours were allotted to specific tasks."

Case, 157 F.3d at 1250.  A court may deny a claim for fees when contemporaneous

records were not maintained.  See Anderson v. Sec'y Health and Hum. Servs., 80

F.3d 1500, 1506 (10th Cir. 1996).  In this case, Plaintiff is represented by the

Department of Justice, which does not operate in the same manner as a private law

firm with the need to track billable hours.  Plaintiff has explained that in the

normal course of business, "[the Department of Justice] does not maintain records

containing detailed descriptions of task performed on an hourly or sub-hourly

basis."  Pl.'s Fees and Costs Br. at 4; Werlein Decl. ¶ 4.  Because Plaintiff's

submission is based on data collected in the normal practice of the Department of

Justice, the Court does not find it necessary to deny or reduce recovery. Therefore, Plaintiff is awarded $1,943,666.17 as reasonable attorneys' fees.

### 2.    Plaintiff-Intervenor Osage Minerals Council

Plaintiff-Intervenor claims that it incurred legal fees totaling $2,297,044 in litigating this case. Pl.-Interv.'s Fees and Costs Br. at 4–7. Plaintiff-Intervenor was initially represented in this case by the law firm Fredericks Peebles & Morgan during the appeal to the Tenth Circuit Court of Appeals and in the response to the petition for a writ of certiorari before the U.S. Supreme Court. Id. at 4. During discovery, Plaintiff-Intervenor was represented by Pipestem Law, P.C. Id. Patterson Earnhart Real Bird & Wilson LLP ("Patterson Earnhart") represented Plaintiff-Intervenor for summary judgment, trial, and post-trial work. Id. For Fredericks Peebles & Morgan and Pipestem Law, Plaintiff-Intervenor provides figures based on records maintained by Plaintiff-Intervenor in the normal course of business. Id. at 4–5. For Patterson Earnhart, Plaintiff-Intervenor provides records obtained from invoices sent to Plaintiff-Intervenor and Patterson Earnhart's billing software. Id. at 5.

The records submitted to the Court reflect that seven professionals worked on this case on behalf of Fredericks Peebles & Morgan, LLP between September 2016 and December 2019: Chloe Bourne, Peter J. Breuer, Katie D. Frayer, Jeffrey Rasmussen, Rebecca Sher, Kamran Zafar, and TWF. Fredericks Peebles &

Morgan Invoices.  Rasmussen and TWF billed at a rate of $300 per hour and the
other individuals billed at a rate of $200 per hour.  Id.  Rasmussen recorded 121.5
hours, Bourne recorded 36.1 hours, Breuer recorded 24.3 hours, Frayer recorded
13.4 hours, Sher recorded 39.7 hours, Zafar recorded 3.7 hours, and TWF recorded
2 hours.  Id.  The Court finds these hourly rates and the amount of work performed
reasonable.  Plaintiff-Intervenor is awarded $60,490 as reasonable attorneys' fees
for work performed by Fredericks Peebles & Morgan.

The invoices submitted by Plaintiff-Intervenor covering work performed by
Pipestem Law reflect that at least 11 individuals performed work on this case.
Pipestem Law Invoices.  Each of those individuals billed at a rate of either $100
per hour or $300 per hour.  Id.  The Court finds these rates to be reasonable.

Plaintiff-Intervenor has not provided the number of hours worked by each
individual or the total number of hours worked by Pipestem Law.  It is not the
Court's job to sort through 359 pages of invoices, covering a period of more than
three years, to determine how many hours were recorded and at what rate those
hours were billed.  It is possible for the Court to make a reasonable estimate of the
billed hours using the information provided by Plaintiff-Intervenor.  Of the 11
individuals reflected on the provided invoices, six billed at a rate of $300 per hour
(AF, JH, MN, RH, SB, and ST) and five billed at a rate of $100 per hour (Ashleigh

Fixico, AS, JC, WW, and ZL).  See id.  The average rate for this group of individuals is $209.09 per hour.

Plaintiff-Intervenor contends that Pipestem Law's billing totaled $2,049,799. Pl.-Interv.'s Fees and Costs Br. at 5–6.  In reviewing the invoices provided in support of Plaintiff-Intervenor's request, the Court observes three discrepancies. First, in its billing summary, Plaintiff-Intervenor represents that Pipestem Law billed $17,420 for the month of April 2020.  Id. at 5.  Multiple pages of the corresponding invoice were not provided to the Court for review.  Pipestem Law Invoices at 11–13.  The invoice lines included on the pages provided to the Court total $8,030.  Id.  Because only $8,030 is supported by the evidence before the Court, the total amount recoverable is reduced by $9,390.  Second, for the month of May 2020, Plaintiff-Intervenor represents that $81,010 was billed.  Pl.-Interv.'s Fees and Costs Br. at 5.  The items invoiced in support of this billing total only $79,680.  Pipestem Law Invoices at 15–22.  The total amount recoverable is reduced by the difference of $1,330.  Third, the amount invoiced for March 2021 is $127,250.  Pl.-Interv.'s Fees and Costs Br. at 6.  The items invoiced in support of this billing total only $119,150.  Pipestem Law Invoices at 120–37.  The total amount recoverable is reduced by the difference of $8,100.  With these adjustments, the total recoverable amount for work performed by Pipestem Law is $2,030,979.  This total divided by the average hourly rate of $209.09 per hour

results in 9,713.4 hours.  The Court finds this to be a reasonable approximation of the hours worked by Pipestem Law.  The Court finds that Plaintiff-Intervenor is entitled to recover $2,030,974.81 as reasonable attorneys' fees for the work performed by Pipestem Law.

The records submitted to the Court reflect that six professionals worked on this case on behalf of Patterson Earnhart since September 2022: Jeffrey Rasmussen, Rollie Wilson, Michelle Long, Celene Olguin, Logan Big Eagle, and RTL.  Patterson Earnhart Invoices.  Jeffrey Rasmussen and Rollie Wilson billed at a rate of $300 per hour.  Id.  Long, Big Eagle, and RTL billed at a rate of $250 per hour.  Id.  Olguin billed at a rate of $100 per hour.  Id.  The Court finds these rates to be reasonable.

As with the records provided for Pipestem Law, Plaintiff-Intervenor has not provided a statement of the total hours worked by each attorney and paralegal or the total hours worked by Patterson Earnhart.  The provided invoices reflect that Patterson Earnhart billed 173.6 hours for the period of September 2022 through February 2024.  Patterson Earnhart Invoices at 1–22.  They also reflect 416.8 hours for the period of March 1, 2024 through July 12, 2024.[25]  Patterson Earnhart

---

[25] The invoice indicates 456.7 total billable hours.  Patterson Earnhart Invoices at 60.  This includes 39.9 hours marked as "unbilled."  Id. at 59–60.  The Court considers only the billed hours.

Invoices at 36–60.  The Court finds this to be a reasonable number of hours for the four-month period prior to and including trial.  The Court finds 590.4 hours to be a reasonable amount of time billed for the period of September 2022 through trial.  The Court finds further that Plaintiff-Intervenor is entitled to recovery of $186,755 as reasonable attorneys' fees for the work performed by Patterson Earnhart.

The adjusted total amount billed by the three law firms is $2,278,219.81.  Defendants contend that this amount should be reduced because the supporting invoices group multiple actions together as block bills, making it difficult to determine if specific billing lines are reasonable or duplicative.  Defs.' Fees and Costs Resp. at 8–9.  In determining reasonableness, a court considers "whether the attorney's hours were 'necessary' under the circumstances."  Robinson v. City of Edmond, 160 F.3d 1275, 1281 (10th Cir. 1998).  This task is frustrated when an invoice groups multiple discrete actions into a single billed item without delineating the amount of time spent on each specific task.  Okla. Nat. Gas. Co. v. Apache Corp., 355 F. Supp. 2d 1246, 1264 (N.D. Okla. 2004) ("[W]here block billing makes it difficult, if not impossible, for the Court to determine the amount of time spent on specific tasks, a general reduction in attorney fees may be warranted.")  Each of Plaintiff-Intervenor's law firms used block billing to a degree.  For example:

> Research panel of judges assigned to the Tenth Circuit [Court of Appeals] oral arguments hearing next week and review Indian law cases they have authored opinion[s] in. Draft summary of finding[s] for J. Rasmussen. Research and read several Interion Board of Indian Appeals cases related to the prosecution of trespassers of mineral and forest resources on Indian lands. Review Osage Wind case file . . . .

Fredericks Peebles & Morgan Invoices at 3.

> Conference call with Osage Minerals Council to prepare for upcoming settlement conference in Osage Wind litigation. Review newly released discovery documents from Defendants. Phone call with [a]ssociate regarding discovery and Osage Minerals Council's Fourt [sic] Privilege Log. Review correspondence from U.S. Attorney's Office to Settlement Judge in Osage Wind Litigation. Review documents sought by Defendants in January 20 letter regarding Osage Wind litigation. Begin drafting letter responding to Defendants' January 20 letter. Review privileged documents sought by Defendants and letter from Defendants requesting discovery supplementation. Draft response letter to Defendants' counsel.

Pipestem Law Invoices at 100.

> Exchange numerous emails regarding Enel's further edits to draft pretrial order. Through emails and call, coordinate responses to same with the United States. Prepare and review emails regarding exchange of exhibits listed by parties in the pretrial order. Review and redact attorney billings and compute amount for firm billing. Prepare follow-up emails with Chief of staff regarding obtaining attorney billings for other firms from the Osage Minerals Council.

Patterson Earnhart Invoices at 21. The Court does not agree with Defendants that it is necessary to exclude all items from the invoices that might qualify as block billing. Defs.' Fees and Costs Resp. at 8–9. The Court does find that a reduction is appropriate to address any potentially unnecessary or redundant work grouped

with otherwise permissible billing.  Case, 157 F.3d at 1250 ("[A] general reduction of hours claimed in order to achieve what the court determines to be a reasonable number is not an erroneous method, so long as there is sufficient reason for its use.").  Therefore, the Court applies a 20% reduction to Plaintiff-Intervenor's recoverable fees.  Upon consideration of the documents submitted, the Court awards Plaintiff-Intervenor $1,822,575.85 in attorneys' fee.

### C.    Costs and Expenses

#### 1.    Plaintiff United States

Plaintiff seeks to recover $32,554.08 in costs incurred in litigating this case and $591,595.78 in expenses related to experts.  Pl.'s Fees and Costs Br. at 9–10.  Plaintiff's costs are associated with the preparation of transcripts and the preparation of video evidence.  Id. at 9.  Plaintiff is not seeking to recover costs associated with document production.  Id. at 10.  The Court has reviewed the summary and invoices provided by Plaintiff and finds $32,554.08 to be a reasonable amount for costs incurred in this prolonged litigation.

Plaintiff seeks to recover expert expenses in the amount of $591,595.78.  Id. at 10.  Defendants contend that Plaintiff is not entitled to the recovery of expert fees under any identified authority.  Defs.' Fees and Costs Resp. at 9–10.  As discussed above, the Court concludes that recovery of expert expenses is not permitted in this case because the experts were retained for the purpose of trial, not

for the recovery of the converted property.  The Court awards Plaintiff $32,554.08 in costs and expenses related to this litigation.

### 2.    Plaintiff-Intervenor Osage Minerals Council

Plaintiff-Intervenor seeks to recover $90,263.30 for costs incurred in this litigation.  Pl.-Interv.'s Fees and Costs Resp. at 4–7.  Upon review of the supporting invoices, the Court observes discrepancies in Plaintiff-Intervenor's summary.  Plaintiff-Intervenor identifies $1,171.52 in expenses for April 2020.  Id. at 5.  No expense invoice for this amount or this date is included among the documents submitted to the Court.  Plaintiff-Intervenor claims $828.00 in expenses for the month of October 2020.  Id.  The accompanying invoice includes only $628.00 in expenses.  Pipestem Law Invoices at 66.  To account for these discrepancies, the Court will decrease the amount of available expenses by $1,371.52.  The Court also observes that an invoice dated July 9, 2020 in the amount of $333.50 and an invoice dated July 12, 2021 in the amount of $5,553.30 were included in Plaintiff-Intervenor's supporting documents but were not included in the summary of expenses Plaintiff-Intervenor seeks to recover.  Pl.-Interv.'s Fees and Costs Br. at 5–6; Pipestem Law Invoices at 14, 139.  Because Plaintiff-Intervenor did not include the expenses in its summary, the Court will exclude them from consideration.  Upon consideration of the invoices provided by

Plaintiff-Intervenor, the Court awards Plaintiff-Intervenor $88,891.78 in costs and expenses related to this litigation.

## CONCLUSION

For the reasons discussed above, the Court holds that Plaintiff and Plaintiff-Intervenor are entitled to damages on their conversion claim in the amount of $242,652.28 and on their trespass claim in the amount of $66,780.00. The Court also grants injunctive relief in the form of ejectment of the wind towers on the claim of continuing trespass. Plaintiff is awarded attorneys' fees in the amount of $1,943,666.17 and costs in the amount on $32,554.08. Plaintiff-Intervenor is awarded attorneys' fees in the amount of $1,822,575.85 and costs in the amount on $88,891.78. Plaintiff's and Plaintiff-Intervenor's requests for pre-judgment interest and the trebling of damages are denied.

## ORDER

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

(1)     Defendants shall pay to Plaintiff and Plaintiff-Intervenor damages in the amount of $242,652.28 on the claim of conversion.

(2)     Defendants shall pay to Plaintiff and Plaintiff-Intervenor damages in the amount of $66,780.00 on the claim of trespass.

(3)     The Osage Wind Farm Defendants shall remove the wind farm from the Osage Mineral Estate and return the Osage Mineral Estate to its pre-trespass condition on or before December 1, 2025.

(4)     Defendants shall reimburse Plaintiff $1,943,666.17 for attorneys' fees and $32,554.08 for costs incurred in this litigation.

(5)     Defendants shall reimburse Plaintiff-Intervenor $1,822,575.85 for attorneys' fees and $88,891.78 for cost incurred with this litigation.

IT IS SO ORDERED this 18th day of December, 2024.

_/s/ Jennifer Choe-Groves_____
Jennifer Choe-Groves
U.S. District Court Judge[*]

---

[*] Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.